Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   Tele/Video Proceedings

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   August 16, 2021

17                   10:09 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN WALKER

Page 2

1    HEARING re Continuance of Confirmation Hearing From August

2    13, 2021 After Omnibus Motions

3

4    HEARING re Notice of Agenda / Agenda for August 16, 2021

5    Hearing Notice of Hearing / Notice of Fifth Interim Fee

6    Hearing with hearing to be held on

7    8/16/2021 at 10:00 AM at Courtroom TBA, White Plains

8    Courthouse (RDD) (ECF #3247)

9

10   HEARING re Application for Interim Professional Compensation

11   / Fifth Interim Fee Application of Dechert LLP, as 327(e)

12   Special Counsel, for Compensation for Professional Services

13   Rendered and Reimbursement of Actual and Necessary Expenses

14   Incurred During the Period February 1, 2021 Through May 31,

15   2021 for Dechert LLP, Debtor's Attorney, period: 2/1/2021 to

16   5/31/2021, fee:$2,600,931.71, expenses: $22,492.97. filed by

17   Dechert LLP. (ECF #3208)

18

19   HEARING re Fifth Application for Interim Professional

20   Compensation for Arnold & Porter Kaye Scholer LLP, Debtor's

21   Attorney, period: 2/1/2021 to 5/31/2021, fee:$409,966.70,

22   expenses: $70.00. filed by Arnold & Porter Kaye Scholer LLP.

23   (ECF #3195)

24

25   HEARING re Fifth Application for Interim Professional

Page 3

1  Compensation / Summary Sheet for Fifth Interim Fee

2  Application of King & Spalding LLP for Compensation for

3  Services Rendered and Reimbursement of Expenses Incurred As

4  Special Counsel to the Debtors and Debtors in Possession for

5  the Period from February 1, 2021 Through May 31, 2021

6  for KING & SPALDING LLP, Special Counsel, period: 2/1/2021

7  to 5/31/2021, fee:$800,088.36, expenses: $70.00.(related

8  document(s)543) filed by Scott I. Davidson. (ECF #3205)

9

10  HEARING re Application for Interim Professional Compensation

11  / Fifth Interim Application of Davis Polk & Wardwell LLP for

12  Compensation for Services Rendered and Reimbursement of

13  Expenses Incurred as Counsel to the Debtors and Debtors in

14  Possession for the Period from February 1, 2021 through May

15  31, 2021 for Davis Polk & Wardwell, Debtor's Attorney,

16  period: 2/1/2021 to 5/31/2021, fee:$34,450,050, expenses:

17  $167,729.08. filed by Davis Polk & Wardwell. (Attachments: #

18  1 Exhibit A - Certification of Compliance with Fee

19  Guidelines # 2 Exhibit B - Retention Order # 3 Exhibit C -

20  Professional and Paraprofessional Fees for Fee Period # 4

21  Exhibit D - Fees by Project Category for Fee Period # 5

22  Exhibit E - Budget and Staffing Plan for Fee Period # 6

23  Exhibit F - Expense Summary # 7 Exhibit G - Customary and

24  Comparable Compensation Disclosures for

25  the Fee period) (Huebner, Marshall) (ECF #3202)

Page 4

1    HEARING re Fifth Application for Interim Professional

2    Compensation /Jones Day's Fifth Interim Application For

3    Allowance of Compensation For Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred

5    During Retention Period From February 1, 2021 Through May

6    31, 2021 for Jones Day, Special Counsel, period:

7    2/1/2021 to 5/31/2021, fee:$882,115.82, expenses:

8    $21,909.83. filed by Jones Day. (Buck, Chane) (ECF #3207)

9

10   HEARING re Application for Interim Professional Compensation

11   / Fifth Joint Interim Fee Application Of KPMG LLP as Tax

12   Consultant to the Debtors and the Official Committee of

13   Unsecured Creditors for Allowance of Compensation for

14   Services Rendered and Reimbursement of Expenses for the

15   Period from February 1, 2021 through May 31, 2021 for KPMG

16   LLP, Consultant, period: 2/1/2021 to 5/31/2021, fee:

17   $298,267.40, expenses: $0.00. filed by KPMG LLP. (ECF# 3165)

18

19   HEARING re Application for Interim Professional Compensation

20   / Fifth Interim Fee Application of Ernst & Young LLP for

21   Compensation and Reimbursement of Expenses Incurred as

22   Auditors and Providers of Other Professional Services for

23   the Debtors for the Period from February 1, 2021 through May

24   31, 2021 for Ernst & Young LLP, Auditor, period:

25   2/1/2021 to 5/31/2021, fee:$325,460.00, expenses: $1,475.67.

1    filed by Ernst & Young LLP. (Vonnegut, Eli) (ECF # 3206)

2

3    HEARING re Application for Interim Professional Compensation

4    / Fifth Interim Fee Application of AlixPartners, LLP

5    Financial Advisor for the Chapter 11 Debtors, for Allowance

6    of Compensation for Professional Services Rendered and

7    Reimbursement of Expenses for the Period February 1, 2021

8    through May 31, 2021 for AlixPartners, LLP, Other

9    Professional, period: 2/1/2021 to 5/31/2021,

10   fee:$3,441,447.00, expenses: $116,367.10.

11   filed by AlixPartners, LLP. (ECF #3238)

12

13   HEARING re Second Application for Interim Professional

14   Compensation of Prime Clerk LLC, as Administrative Advisor

15   to the Debtors, for Services Rendered and Reimbursement of

16   Expenses for the Period from February 1, 2021 through May

17   31, 2021 for Prime Clerk, LLC, Other Professional, period:

18   2/1/2021 to 5/31/2021, fee:$173227.97, expenses:

19   $70. filed by Prime Clerk, LLC. (ECF #3196)

20

21   HEARING re Fifth Application for Interim Professional

22   Compensation Fifth Interim Fee Application Of Skadden, Arps,

23   Slate, Meagher & Flom LLP For Compensation For Services

24   Rendered And Reimbursement Of Expenses As Special Counsel To

25   The Debtors For The Period From February 1, 2021 Through And

Page 6

1    Including May 31, 2021 for Skadden, Arps, Slate, Meagher &

2    Flom LLP, Debtor's Attorney, period: 2/1/2021 to 5/31/2021,

3    fee:$3,794,615.52, expenses: $76,225.81. filed by Skadden,

4    Arps, Slate, Meagher & Flom LLP. (ECF #3230)

5

6    HEARING re Application for Interim Professional Compensation

7    / Fourth Interim Application of Cornerstone Research for

8    Compensation for Services Rendered and Reimbursement of

9    Expenses Incurred as Consultant to the Debtors for the

10   Period from February 1, 2021 through May 31, 2021 for

11   Cornerstone Research, Consultant, period: 2/1/2021 to

12   5/31/2021, fee:$352,927.00, expenses: $475.66. filed by

13   Cornerstone Research. (Vonnegut, Eli) (ECF #3194)

14

15   HEARING re Application for Interim Professional Compensation

16   /Fifth Interim Application of Jefferies LLC for Allowance of

17   Compensation Earned and Reimbursement of Expenses

18   Incurred as Investment Banker for the Official Committee of

19   Unsecured Creditors for the Period from February 1, 2021

20   Through and Including May 31, 2021 for Jefferies

21   LLC, Other Professional, period: 2/1/2021 to 5/31/2021,

22   fee:$900,000.00, expenses: $13,898.00. filed by Jefferies

23   LLC. (ECF #3215)

24

25   HEARING re Application for Interim Professional Compensation

Page 7

1    /Fourth Interim Fee Application of Cole Schotz P.C. As Co-

2    Counsel to the Official Committee of Unsecured Creditors of

3    Purdue Pharma L.P., et al., for Allowance of Compensation

4    for Services Rendered and Reimbursement of Expenses for the

5    Period of February 1, 2021 Through and Including

6    May 31, 2021 for Cole Schotz P.C., Special Counsel, period:

7    2/1/2021 to 5/31/2021, fee:$620,905.00, expenses: $443.85.

8    filed by Cole Schotz P.C. (ECF #3213)

9

10   HEARING re Application for Interim Professional Compensation

11   /Fifth Interim Application of Province, LLC, Financial

12   Advisor to the Official Committee of Unsecured Creditors of

13   Purdue Pharma L.P., et al., for Compensation and

14   Reimbursement of Expenses for the Interim Period of February

15   1, 2021 Through May 31, 2021 for Province, Inc., Other

16   Professional, period: 2/1/2021 to 5/31/2021,

17   fee:$3,476,404.50, expenses: $318.33. filed by Province,

18   Inc.. (Dizengoff, Ira) (ECF #3220)

19

20   HEARING re Application for Interim Professional Compensation

21   /Fifth Interim Fee Application of Akin Gump Strauss Hauer &

22   Feld LLP as Counsel to the Official Committee of Unsecured

23   Creditors of Purdue Pharma L.P., et al., for Allowance of

24   Compensation for Services Rendered and Reimbursement of

25   Expenses Incurred for the Period of February

Page 8

1    1, 2021 Through and including May 31, 2021 for Akin Gump

2    Strauss Hauer & Feld LLP, Creditor Comm. Aty, period:

3    2/1/2021 to 5/31/2021, fee:$8,389,582.50, expenses:

4    $478,594.23. filed by Akin Gump Strauss Hauer & Feld LLP.

5    (Dizengoff, Ira) (ECF #3212)

6

7    HEARING re Application for Interim Professional Compensation

8    /Fifth Interim Fee Application of Kurtzman Carson

9    Consultants LLC as Information Agent to the Official

10   Committee of Unsecured Creditors for Allowance of

11   Compensation for Professional Services Rendered and for

12   Reimbursement of Actual and Necessary Expenses Incurred From

13   February 1, 2021 Through and Including May 31, 2021 for

14   Kurtzman Carson Consultants LLC, Other Professional, period:

15   2/1/2021 to 5/31/2021, fee:$101,004.83, expenses:

16   $49,906.45. filed by Kurtzman Carson Consultants LLC.

17   (Dizengoff, Ira) (ECF #3216)

18

19   HEARING re Application for Interim Professional Compensation

20   /Fourth Interim Fee Application of Bedell Cristin Jersey

21   Partnership as Special Foreign Counsel to the Official

22   Committee of Unsecured Creditors of Purdue Pharma L.P., et

23   al., for Allowance of Compensation for Services Rendered and

24   Reimbursement of Expenses for the Period of February 1,

25   2021 Through May 31, 2021 for Bedell Cristin Jersey

1    Partnership, Special Counsel, period: 2/1/2021 to 5/31/2021,

2    fee:$206,490.00, expenses: $17,745.39. filed by Bedell

3    Cristin Jersey Partnership. (Dizengoff, Ira) (ECF #3214)

4

5    HEARING re Fifth Application for Interim Professional

6    Compensation /Fifth Interim Fee Application of Brown Rudnick

7    LLP as Co-Counsel to the Ad Hoc Committee of Governmental

8    and Other Contingent Litigation Claimants for Services and

9    Reimbursement of Expenses Incurred for the Period of

10   February 1, 2021 through May 31, 2021 for Brown Rudnick

11   LLP, Other Professional, period: 2/1/2021 to 5/31/2021,

12   fee:$3,179,282.5, expenses: $10,207.55. filed by Brown

13   Rudnick LLP. (ECF #3204)

14

15   HEARING re Fifth Interim Fee Application of Brown Rudnick

16   LLP as Co-Counsel to the Ad Hoc Committee of Governmental

17   and Other Contingent Litigation Claimants for Services and

18   Reimbursement of Expenses Incurred for the Period of

19   February 1, 2021 through May 31, 2021 for Brown Rudnick LLP,

20   Other Professional, period: 2/1/2021 to 5/31/2021,

21   fee:$3,179,282.5, expenses: $10,207.55.(ECF #3204)

22

23   HEARING re Application for Interim Professional Compensation

24   / Fifth Interim Fee Application of FTI Consulting, Inc. for

25   Compensation Earned and Expenses Incurred for the Period

Page 10

1   from February 1, 2021 through May 31, 2021 for FTI

2   Consulting, Inc., Other Professional, period: 2/1/2021 to

3   5/31/2021, fee:$1,674,459.00, expenses: $49.99. filed

4   by FTI Consulting, Inc. (ECF #3228)

5

6   HEARING re Application for Interim Professional Compensation

7   / Application of Otterbourg P.C. as Co-Counsel to the Ad Hoc

8   Committee of Governmental and Other Contingent Claimants for

9   Fifth Interim Allowance of Compensation for Services

10   Rendered and Reimbursement of Expenses Incurred from January

11   1, 2021 Through and Including May 31, 2021 for Otterbourg

12   P.C., Other Professional, period: 1/1/2021 to 5/31/2021,

13   fee:$683,168.00, expenses: $887.21. filed by Otterbourg P.C.

14   (ECF #3221)

15

16   HEARING re Application for Interim Professional Compensation

17   / Fifth Interim Application for Allowance of Compensation

18   for Services Rendered and Reimbursement of Expenses

19   Incurred by Gilbert LLP as Co-Counsel to the Ad Hoc

20   Committee of Governmental and Other Contingent Litigation

21   Claimants for the Period February 1, 2021 through May

22   31, 2021 for Gilbert LLP, Other Professional, period:

23   2/1/2021 to 5/31/2021, fee:$3,010,527.00, expenses:

24   $12,859.32. filed by Gilbert LLP. (ECF #3224)

25

Page 11

1    HEARING re Application for Interim Professional Compensation

2    / Fifth Interim Application of Kramer Levin Naftalis &

3    Frankel LLP, as Co-Counsel to the Ad Hoc Committee of

4    Governmental and Other Contingent Litigation Claimants, for

5    Allowance of Compensation for Professional Services Rendered

6    and for Reimbursement of Actual and Necessary Expenses

7    Incurred for the Period from February 1, 2021 through May

8    31, 2021 for Kramer Levin Naftalis & Frankel LLP, Other

9    Professional, period: 2/1/2021 to 5/31/2021,

10   fee:$3,922,853.00, expenses: $14,335.04. filed by Kramer

11   Levin Naftalis & Frankel LLP. (ECF #3234)

12

13   HEARING re Application for Interim Professional Compensation

14   / Fourth Interim Fee Application of Houlihan Lokey Capital,

15   Inc., Investment Banker and Co-Financial Advisor to the Ad

16   Hoc Committee, for Compensation and Reimbursement of

17   Expenses for the Period from February 1, 2021 through May

18   31, 2021 for Houlihan Lokey Capital, Inc., Other

19   Professional, period: 2/1/2021 to 5/31/2021,

20   fee:$800,000.00, expenses: $1,390.57.

21   filed by Houlihan Lokey Capital, Inc. (ECF #3229)

22

23   HEARING re Interim Application for Interim Professional

24   Compensation / First Interim Application of Caplin &

25   Drysdale, Chartered, for Allowance of Compensation and

Page 12

1   Reimbursement of Expenses With Respect to Services Rendered

2   as Counsel to the Multi-State Governmental Entities Group

3   for the Period Commencing September 15, 2019, through

4   May 31, 2021 for Multi-State Governmental Entities Group,

5   Other Professional, period: 9/15/2019 to 5/31/2021,

6   fee:$2,407,696.25, expenses: $57,542.78. filed by Multi-

7   State Governmental Entities Group. (ECF #3233)

8

9   HEARING re Fourth Interim Application of Bielli & Klauder,

10  LLC for Compensation for Services Rendered and Reimbursement

11  of Expenses Incurred as Counsel to the Fee Examiner,

12  David M. Klauder, Esquire for the Period from February 1,

13  2021 through May 31, 2021 -- for Bielli & Klauder, LLC,

14  Other Professional, period: 2/1/2021 to 5/31/2021,

15  fee:$220,000, expenses: $. (ECF #3184)

16

17  HEARING re Motion to File Proof of Claim After Claims Bar

18  Date (ECF #3058)

19

20  Related Documents:

21  HEARING re Notice of Hearing re: Motion to File Proof of

22  Claim After Claims Bar Date filed by Benjamin Payne Ellis

23  (ECF #3059)

24

25  HEARING re Motion to File Proof of Claim After Claims Bar

Page 13

1    Date (Memorandum in Support of Motion of Benjamin Payne

2    Ellis) filed by James Franklin Ozment / on behalf of

3    Charles Fitch, Creighton Bloyd (ECF #3132)

4

5    HEARING re Statement / Notice of Filing of Proposed Order

6    Granting Late Claim Motion (related document(s)2982, 3058)

7    filed by James I. McClammy on behalf of Purdue Pharma L.P.

8    (ECF #3138)

9

10   HEARING re Motion to File Proof of Claim After Claims Bar

11   Date (Related Doc. 3058 & 3132) filed by Benjamin Payne

12   Ellis (ECF #3190)

13

14   HEARING re Motion to File a Late Claim filed by Lawrence

15   Higgins. (ECF #3342)

16

17   Related Documents:

18   HEARING re Notice of Hearing Re: Motion to File Proof of

19   Claim After Claims Bar Date filed by Lawrence Higgins

20   (ECF #3343)

21

22   HEARING re Statement / Notice of Filing of Proposed Order

23   Granting Late Claim Motion (related document(s)3342) filed

24   by James I. McClammy on behalf of Purdue Pharma L.P.

25   (ECF#3503)

1   HEARING re Motion to Allow for Rule 3018 Motion filed by

2   Augustus Hebrew Evans Jr. (ECF #3131)

3

4   Related Documents:

5   HEARING re Notice of Hearing Regarding Motion Requesting

6   Recruitment of Counsel and Rule 3018 Motion (related

7   document(s)3131) filed by James I. McClammy on behalf of

8   Purdue Pharma L.P. (ECF# 3134)

9

10  HEARING re Notice of Hearing / Corrected Notice of Hearing

11  Requesting Recruitment of Counsel and Rule 3018 Motion

12  (related document(s)3130, 3131) filed by James I. McClammy

13  on behalf of Purdue Pharma L.P. (ECF #3164)

14

15  HEARING re Motion to Allow/Motion Seeking Permission for

16  Creditor Tyiavory Jackson to Vote for the Rule 3018(a);

17  Motion Filing Deadline for The Purdue Pharma Bankruptcy Case

18  (ECF #3162)

19

20  Related Documents:

21  HEARING re Statement / Debtors Statement in Response to Rule

22  3018 Motions Filed by Augustus Hebrew Evans Jr. and Tyiavory

23  Jackson (related document(s)3162, 3131) filed by

24  James I. McClammy on behalf of Purdue Pharma L.P.

25  (ECF #3502)

Page 15

1    HEARING re Notice of Hearing Regarding Motion Requesting

2    Recruitment of Counsel and Rule 3018 Motion (related

3    document(s)3131) filed by James I. McClammy on behalf of

4    Purdue Pharma L.P. (ECF #3134)

5

6    HEARING re Notice of Hearing / Corrected Notice of Hearing

7    Requesting Recruitment of Counsel and Rule 3018 Motion

8    (related document(s)3130, 3131) filed by James I. McClammy

9    on behalf of Purdue Pharma L.P. (ECF #3164)

10

11   HEARING re Motion to Allow for Appointment of Counsel filed

12   by Augustus Hebrew Evans Jr. (ECF #3130)

13

14   Related Documents:

15   HEARING re Statement / Debtors Statement in Response to

16   Motion Requesting Recruitment of Counsel (related

17   document(s)3130) filed by James I. McClammy on behalf of

18   Purdue Pharma L.P. (ECF #3504)

19

20   HEARING re Notice of Hearing Regarding Motion Requesting

21   Recruitment of Counsel and Rule 3018 Motion (related

22   document(s)3131) filed by James I. McClammy on behalf of

23   Purdue Pharma L.P. (ECF #3134)

24

25   HEARING re Notice of Hearing / Corrected Notice of Hearing

1   Requesting Recruitment of Counsel and Rule 3018 Motion

2   (related document(s)3130, 3131) filed by James I. McClammy

3   on behalf of Purdue Pharma L.P. (ECF #3164)

4

5   HEARING re Motion for Summary Judgment filed by Amanda

6   Morales. (ECF #3191)

7

8   Responses:

9   HEARING re Objection / Debtors Objection to Amanda Morales

10   Motion for Summary Judgment (related document(s)3191) filed

11   by James I. McClammy on behalf of Purdue Pharma

12   L.P. (ECF #3505)

13

14   HEARING re Response to defense (Purdue Pharma) objection to

15   Claimant's motion (related document(s)3505) filed by Amanda

16   Morales. (ECF #3558)

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WITNESSES:

4    JAYNE CONROY

5    MICHAEL ATKINSON

6    JENNIFER BLOUIN

7    PHILIP GREEN

8    MATTHEW CAIN

9    JONATHAN WHITE

10    ALEXA SAUNDER

11

12    DAVIS POLK WARDWELL LLP

13        Attorney for Debtors

14        450 Lexington Avenue

15        New York, NY 10017

16

17    BY:   MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

18        JAMES I. MCCLAMMY (TELEPHONICALLY)

19        BENJAMIN KAMINETZKY (TELEPHONICALLY)

20

21

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

7

8    PULLMAN COMLEY, LLC

9         Attorney on behalf of State of Connecticut

10        850 Main Street

11        Bridgeport, CT 06604

12

13   BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

14

15   AKIN GUMP STRAUSS HAUER & FELD LLP

16        Attorneys for Official Committee of Unsecured Creditors

17        One Bryant Park

18        New York, New York 10036

19

20   BY:  MITCHELL HURLEY (TELEPHONICALLY)

21        ARIK PREIS (TELEPHONICALLY)

22

23

24

25

Page 19

1   PILLSBURY WINTHROP SHAW PITTMAN LLP

2        Attorneys for Ad Hoc Group of Non-Consenting States

3        31 West 52nd Street

4        New York, NY 10019

5

6   BY:  ANDREW M. TROOP (TELEPHONICALLY)

7

8   KRAMER LEVIN NAFTALIS FRANKEL LLP

9        Attorneys for the Ad Hoc Committee

10       1177 Avenue of the Americas

11       New York, NY 10036

12

13  BY:  KENNETH H. ECKSTEIN (TELEPHONICALLY)

14       SAMUEL ISSACHAROFF (TELEPHONICALLY)

15

16  FRANK OZMENT ATTORNEY AT LAW, LLC

17       Attorneys for Bridges Bloyd Fitch

18       217 Country Club Park, Box 501

19       Birmingham, AL 35213

20

21  BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

22

23

24

25

Page 20

1    JOSEPH HAGE AARONSON LLC

2         Raymond Sackler Family

3         485 Lexington Ave, 30th Floor

4         New York, NY 10017

5

6    BY:   GREGORY JOSEPH (TELEPHONICALLY)

7

8    OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

9         Attorney for State of Maryland

10         200 Saint Paul Place

11         Baltimore, MD 20852

12

13    BY:   BRIAN EDMUNDS (TELEPHONICALLY)

14

15    DEBEVOISE & PLIMPTON

16         Attorneys for Side A of the Sackler Family

17         919 Third Avenue

18         New York, NY 10022

19

20    BY:   MAURA K. MONAGHAN (TELEPHONICALLY)

21

22

23

24

25

1    LITE DEPALMA GREENBERG & AFANADOR

2         Attorneys for Certain Canadian Municipality Creditors

3         and Canadian First Nation Creditors

4         570 Broad Street, Suite 1201

5         Newark, NJ 07102

6

7    BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

8

9    PAUL S. ROTHSTEIN, P.A.

10        Attorneys for Dr. Michael Masiowski

11        626 NE 1st Street

12        Gainesville, FL 32601

13

14   BY:  PAUL S. ROTHSTEIN

15

16   AUGUSTUS HEBREW EVANS, JR., Pro Se

17   AMANDA MORALES, Pro Se

18

19   ALSO PRESENT TELEPHONICALLY:

20   JILL S. ABRAMS

21   BENJAMIN ALBERT

22   ROXANA ALEALI

23   PHILIP D. ANKER

24   ROMAN ASUDALAYEV

25   MITCHELL JAY AUSLANDER

Page 22

1     JASMINE BALL

2     BROOKS BARKER

3     THOMAS MOULTRIE BESHERE

4     THOMAS D. BIELLI

5     DAVID E. BLABEY

6     HUNTER BLAN

7     LOUIS BOGRAD

8     SARA BRAUNER

9     PAUL. E. BREENE

10    DAVID BROWN

11    GABE BRUNSWICK

12    CHANE BUCK

13    AARON R. CAHN

14    MATTHEW CAIN

15    CHRISTOPHER CARTER

16    MAUREEN CHAKRABORTY

17    MARK CHALOS

18    DAVID CHRISTIAN

19    GEARD CICERO

20    MARK A. COLANTONIO

21    HAYDEN COLEMAN

22    DANIEL CONNOLLY

23    DYLAN DONSLA

24    CHARLES D. COWAN

25    ABBY G. CUNNINGHAM

```
 1    MELANIE L. CYGANOWSKI

 2    MARIO D'ANGELO

 3    PETER C. D'APICE

 4    STACY DASARO

 5    SCOTT I. DAVIDSON

 6    JOSEPH G. DAIVS

 7    KEVIN DAVIS

 8    MARK DEARMAN

 9    JESSE DELACONTE

10    SHANNON DEVON

11    CLINT DOCKEN

12    JOHN C. DOUGHERTY

13    JOHN DUBEL

14    STEPHANIE EBERHARDT

15    MARIA ECKE

16    KENNETH H. ECKSTEIN

17    BRIAN EDMUNDS

18    BERNARD ARDAVAN ESKANDARI

19    BARBARA FARASH

20    MATHEW FARRELL

21    JENNIFER S. FEENEY

22    JULIANNA FELIZ-KIDD

23    LAURA FEMINO

24    ROBERTO FINZI

25    MATTHEW FITZSIMMONS
```

1    LAWRENCE FOGELMAN

2    SAM FRAIDIN

3    HEATHER FRAZIER

4    BRYCE L. FRIEDMAN

5    GAYLE GALAN

6    CAROLINE GANGE

7    GILL GELDREICH

8    MELISSA GIBSON

9    JARED GIDDENS

10   SCOTT GILBERT

11   JEFFREY R. GLEIT

12   MATTHEW J. GOLD

13   MICHAEL GOLDSTEIN

14   GEOFFREY S. GOODMAN

15   ISLEY MARKMAN GOSTIN

16   GARY GOTTO

17   JARED T. GREEN

18   JAMES S. GREEN, JR.

19   DEBORAH GREENSPAN

20   EMILY GRIM

21   JOHN GUARD

22   STEPHANIE GULKIN SATZ

23   RAHUL GUPTA

24   ADAM P. HABERKORN

25   LAWRENCE HAMERMESH

Page 25

```
 1   RYAN HAMPTON

 2   SARAH HARBUCK

 3   BEN HARRINGTON

 4   DAVID A. HART

 5   CATHERINE BEIDEMAN HEITZENRATER

 6   ANGELA K. HERRING

 7   JACOB R. HERZ

 8   MICHELE HIRSHMAN

 9   JENNA A. HUDSON

10   MITCHELL HURLEY

11   ELISA HYDER

12   MARK S. INDELICATO

13   HAROLD D. ISRAEL

14   STEPHEN IVES

15   EVAN M. JONES

16   ETHAN KAMINSKY

17   JEFFREY KAPLAN

18   KOCKOLAS KARAVOLAS

19   LAUREN KELLEHER

20   NEIL FX KELLY

21   KAREN KENNEDY

22   MARC KESSELMAN

23   MUHAMMAD UMAIR KHAN

24   DAVID KLAUDER

25   DARREN S. KLEIN
```

1   JEREMY C. KLEINMAN

2   LAWRENCE KOTLER

3   ANN KRAMER

4   KYUNG LEE

5   ALEXANDER LEES

6   WILLIAM LEGIER

7   DANIEL LENNARD

8   MARA LEVENTHAL

9   RUTH LICHTENFELD

10  JEFFREY LIESEMER

11  EDAN LISOVICZ

12  JOHN LONGMIRE

13  GARRETT LYNAM

14  KEVIN MACLAY

15  TIMOTHY J. MARTIN

16  BRIAN S. MASUMOTO

17  PATRICK C. MAXCY

18  LAURA MCCLOUD

19  HUGH M. MCDONALD

20  SHANNON M. MCNULTY

21  MICHELE MEISES

22  NATHANIEL MILLER

23  JONATHAN E. MITNICK

24  DAVID MOLTON

25  PATRICK MORRISEY

Page 27

1    ANDREW J. MUHA

2    GEOFFREY M. MULVIHILL

3    AISLING MURRAY

4    SARA NADIM

5    ALISSA M. NANN

6    EDWARD E. NEIGER

7    CASEY NUNEZ

8    GEORGE O'CONNOR

9    ANGELA O'DONNELL

10   SHERYL R. O'DONNELL

11   MICHAEL PATRICK O'NEIL

12   RACHAEL R. OBALDO

13   LENARD PARKINS

14   JENNIE PEACOCK

15   MARK PLEVIN

16   STEVEN POHL

17   KATHERINE PORTER

18   DOUGLESS PRESS

19   MICHELE PUIGGARI

20   KAMI QUINN

21   MARION QUIRK

22   GILLIAN RENDEL

23   CHRISTINA RICARTE

24   JOSEPH RICE

25   RACHAEL RINGER

Page 28

1    ALMA ROBLES

2    JEFFREY J. ROSEN

3    JORDAN ROSENBAUM

4    JASON RUBINSTEIN

5    CHARLES RUBIO

6    WILLIAM T. RUSSELL

7    JEREMY W. RYAN

8    JAMES E. SMITH

9    DAVID SACKER

10   JAMES SALWEN

11   DANIEL JOSEPH SAVAL

12   HEATHER SAYDAH

13   SETH SCHINFELD

14   FREDERICK E. SCHMIDT

15   PAUL KENAN SCHWARTZBERG

16   R. J. SHANNON

17   MICHAEL SHEPHERD

18   J. CHRISTOPHER SHORE

19   RICHARD SHORE

20   RICHARD SILBERT

21   LIANNA SIMMONDS

22   PAUL M. SINGER

23   MARC F. SKAPOF

24   ARTEM SKOROSTENSKY

25   D. RYAN SLAUGH

Page 29

 1    ERIC J. SNYDER

 2    JOSEPH SORKIN

 3    CLAUDIA Z. SPRINGR

 4    CATHERINE STEEGE

 5    HOWARD STEEL

 6    ERIC STODOLA

 7    JEROME TAPLEY

 8    PAMELA THURMOND

 9    MARC JOSEPH TABACK

10    SARA E. TONNESEN

11    KARA TRAINOR

12    CARL TROMPETTA

13    KELLY TSAI

14    ALICE TSIER

15    JOSEPH TURNER

16    GERARD UZZI

17    MELISSA L. VAN ECK

18    SHMUEL VASSER

19    ANDREW D. VELEZ-RIVERA

20    MICHAEL J. VENDITTO

21    ELI J. VONNEGUT

22    RYAN A. WAGNER

23    JORDAN WEBER

24    SHIRA WEINER

25    WILLIAM P. WEINTRAUB

1   MARTIN WEISS

2   ALLISON H. WEISS

3   THEODORE WELLS JR.

4   STEVEN WILAMOWSKY

5   LAUREN S. ZABEL

6   DAVID ZYLBERBERG

7   DAVID A. HART

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2              THE COURT:  Okay.  Good morning.  This is Judge

3     Drain.  As we discussed on Friday, before we resume with the

4     hearing on the Debtors' request of confirmation in the In re

5     Purdue Pharma, LP, cases of their Chapter 11 plan, we're

6     taking the matters scheduled for the regular monthly Purdue

7     omnibus cases -- I'm sorry, the omnibus agenda for those

8     cases.

9              I have the agenda for that hearing, and I'm happy

10    to go down it in order.  I will note that the first few

11    matters on the agenda are uncontested.  I just want to have

12    confirmation from the Debtor's counsel that it still remains

13    the case with regard to the interim fee applications, the

14    late claim motion by Mr. Ellis, the late claim motion by Mr.

15    Higgins, the late claim aspect of the motion by Mr. Evans,

16    and the late claim motion by Mr. Jackson.

17             MR. HUEBNER:  Yes, Your Honor; good morning.  For

18    the record, Marshall Huebner of DavisPolk for the Debtors.

19    Your Honor, can I be heard and seen clearly?

20             THE COURT:  Yes.

21             MR. HUEBNER:  Okay.  Yeah.  And just a small

22    procedural note on the side, I know that the audio has not

23    been perfect at all times.  And so we've been asking people

24    and sending emails and texts asking people to please get

25    closer to the mic.  I'm actually using headphones today,

1   which hopefully will be helpful, so that the public is

2   aware, you know, the Debtors and the Court, frankly, have

3   gone to all the lengths that were made possible to them to

4   have access be as broad as possible.

5          With respect to this morning, before pro-se

6   motions that are uncontested reflect that philosophy, you

7   know, wherever we can frankly just agree when people are

8   facing very difficult life situations where it's

9   appropriate, we have accommodated.  We also ask the Court

10  despite the great number of people listening not to move the

11  remaining two pro-se motions that are contested because we

12  are well aware how incredibly difficult it is for many pro-

13  se movants, especially those who are incarcerated, to have

14  hearing dates changed on them.

15         So we appreciate everybody's patience and,

16  obviously, the Court's obviously cooperate as well in

17  letting those proceed.  So the short answer is, yes, there

18  are agreed reductions with the fee examiner reflected in an

19  omnibus form of agreed order.  Everything remains

20  uncontested except for the two, which Mr. McClammy is

21  handling.

22         And before the Court came on, I think one of our

23  two pro-se claimants is already on the sort-of CCTB I think

24  waiting to join.  So unless the Court has further questions

25  from me, I think those five orders can simply be entered

Page 33

1    without taking up any further cost or time of the general

2    public, and we can actually turn the podium over to Mr.

3    McClammy to handle the two and then get directly back into

4    the confirmation hearing.

5              THE COURT:  Okay.  All right.  Well, I have

6    revised the motions which are all filed by people who are

7    incarcerated for authority to file a late proof of claim.

8    The Debtors have agreed to that relief after consultation

9    with key parties in interest, including the Unsecured

10   Creditors' Committee.  And I will grant each of those

11   motions requests for leave to file a late proof of claim.

12             I have also reviewed the interim fee applications

13   and the proposed order which reflects agreed reductions

14   after consultation with the fee examiner.  And I will grant

15   each of those applications on an interim basis.

16   So those orders will be entered, as well.

17             That leaves two contested matters that are on the

18   agenda, and the first one involves a different request by

19   Mr. Evans, who I see on the screen, for the appointment of

20   counsel for him in this bankruptcy case.  I've reviewed that

21   request as well as the Debtors' objection to it.

22             So, Mr. Evans, I see you there.  Do you have

23   anything further to say in support of your request to be

24   appointed a pro bono counsel?

25             Oh, I think you're on mute, sir.  If you can

Page 34

1    unmute yourself.

2              Can we unmute him?

3              CLERK:  (Indiscernible).

4              THE COURT:  Okay.  We can't unmute him from here?

5    Okay.

6              MR. EVANS:  Sound check one two.

7              THE COURT:  Yes, I can hear you now.

8              MR. EVANS:  Okay.  Thank you.  Good morning, Your

9    Honor.

10             THE COURT:  Good morning.

11             MR. EVANS:  My issues are I'm not understanding as

12   much.  Are my claims being considered timely for the voting

13   purposes or from this minute forth my claim is considered to

14   be timely?

15             THE COURT:  Right.  Okay.  Why don't I ask the

16   Debtors' counsel to confirm the answer to that.

17             MR. McCLAMMY:  Yes, Your Honor.  We believe

18   they'll be treated and with the order will be treated timely

19   for both the purposes of voting and we've made efforts to

20   also send the voting package out to Mr. Evans and will be

21   considered timely for purposes of the trust distribution

22   procedures should the plan be approved.

23             All rights have been reserved with respect to the

24   merits of the claim, but the timeliness issue has been taken

25   off the table.

Page 35

1           THE COURT:  Okay.  So that was Mr. McClammy who

2    represents the Debtors in this case.  So the answer to your

3    question, Mr. Evans, is that your claim will be treated as

4    timely for both --

5           MR. EVANS:  Okay.

6           THE COURT:  -- voting and claim purposes.

7           MR. EVANS:  Okay.  Because I was communicating

8    with an attorney and she said there was an issue that needed

9    to be resolved.  So I have been putting forth an effort

10   myself to try to communicate with lawyers, but it's hard for

11   me to get on the phone and communicate with these people and

12   write them and get a timely response.

13          So this is why I'm asking the Court to recruit

14   counsel for me because this bankruptcy stuff, this stuff is

15   like very, very complicated.  I mean I got stacks of papers

16   that I'm still trying to understand things.  And being

17   incarcerated, the obstacles that are put before me are just

18   like -- they're overbearing.

19          THE COURT:  Okay.

20          MR. EVANS:  So --

21          THE COURT:  Well, you now do have the answer to

22   that question, which is that your claim will be treated as

23   timely.

24          MR. EVANS:  Right.

25          THE COURT:  And then let me address the other

1      aspect of your request which is to have a pro-bono lawyer

2      appointed for you.  You stated just now that you've been

3      talking to an attorney.  Has that person agreed to represent

4      you?

5                    MR. EVANS:  No.  It came from the Creditors'

6      Committee.

7                    THE COURT:  Okay.

8                    MR. EVANS:  Mr., I think it's, Arik Preis.

9                    THE COURT:  Right.

10                   MR. EVANS:  And Arik Preis gave me a reference to

11     a lawyer in Texas and -- but this is also confusing because

12     she said the case would have to be filed under Texas law.

13     And I know at this point for me to -- for them to file the

14     case under Texas law, she must have just came into the law

15     firm or something because it doesn't make sense --

16                   THE COURT:  Right.

17                   MR. EVANS:  -- because it went this far, why would

18     we go -- so I have issues --

19                   THE COURT:  I understand.  Because it really isn't

20     a case.  It's a claim in a bankruptcy case --

21                   MR. EVANS:  Right.

22                   THE COURT:  -- as opposed to a separate

23     litigation.

24                   MR. EVANS:  Right.

25                   THE COURT:  There are attorneys who have

Page 37

1    represented people in this case, like yourself, who are

2    incarcerated.  In fact, I see one on the screen, Mr. Ozment.

3              But let me explain sort of the context here which

4    is important.  And I appreciate you're not a lawyer.  There

5    are well over 100,000 people, individuals who have filed

6    claims in these cases.  Many of them are represented by

7    lawyers but many are not.  At this point, their claims

8    themselves are not being determined.  They're not being

9    fixed.

10             MR. EVANS:  Right.

11             THE COURT:  The plan that's before the Court, the

12   Chapter 11 plan, proposes setting up a trust with a

13   dedicated amount of money, between $700 million and $750

14   million, which would go along with the expenses of the trust

15   to pay allowed personal injury claims like yourself that you

16   filed.

17             MR. EVANS:  Right.

18             THE COURT:  But part of the plan and the trust

19   structure contemplates a procedure to determine whether

20   those claims would be allowed.

21             MR. EVANS:  Right.

22             THE COURT:   And that procedure has not yet gone

23   into effect because the Debtors' request for approval of the

24   plan is still pending before me.

25             MR. EVANS:  Right.

Page 38

1                THE COURT:  So when that procedure -- if the plan

2      is confirmed, when that procedure goes into place, you will

3      receive forms as to whether you elect to have what's called

4      the fast claims procedure or, instead, elect to go through a

5      trial to establish your claim.

6                MR. EVANS:   Understood.

7                THE COURT:  It may at that point you would want to

8      have a lawyer.  At this point, the interests of all of the

9      personal injury claimants as well as all the other unsecured

10     creditors are represented by the Official Committee of

11     Unsecured Creditors --

12               MR. EVANS:  Understood.

13               THE COURT:  -- which is a broad group of people

14     represented by Mr. Preis who contacted you who are looking

15     out for all the unsecured creditors.

16               MR. EVANS:  Understood.

17               THE COURT:  And in addition, there are, again, a

18     lot of the people who filed claims represented by counsel

19     who have also been looking out for not only, in effect,

20     everyone because their clients at this stage of the case are

21     personal-injury claimants like all the other personal-injury

22     claimants so they were negotiating with other types of

23     creditors like the state and local governments as to the

24     allocation of value.

25               MR. EVANS:  Right.

1          THE COURT:  So I will give you my ruling in a

2     second, but I want you to understand that at this point in

3     the case, and this is going to be consistent with my ruling,

4     you would not fall into the very limited set of

5     circumstances where someone would really need a lawyer to be

6     appointed for them --

7          MR. EVANS:  Understood.

8          THE COURT:  -- in this type of case.  It may be

9     that lawyers now that they see you might reach out to you to

10    have you be represented, but the law that deals with the

11    appointment of counsel for someone really doesn't call for

12    the appointment of counsel for you at this point given the

13    status of the case.

14         MR. EVANS:  That's understood, sir.  And most of

15    what you have said to me I fully understand.

16         THE COURT:  Okay.

17         MR. EVANS:  So it's not a lose-lose situation.

18    But it would help me out a lot if I did have an attorney.

19    But I guess if it's denied, I can get to that stage where if

20    no one has taken my case by then, I just refile a motion for

21    appointment of counsel if I'm denied.

22         THE COURT:  That's right.  You could do that then.

23    And there are -- if I confirm the plan, there will be an

24    administrator of the trust and you can reach out to them.

25    And that's described to a fairly large extent in the plan,

Page 40

1    but you can get an explanation of how that works from the

2    lawyer for the Creditors' Committee.

3              MR. EVANS:  Right.

4              THE COURT:  Okay.

5              MR. JOSEPH:  Your Honor, permit me for one second

6    just it may be helpful for Mr. Evans and frankly others who

7    are similarly situated.

8              Mr. Evans, just so you know -- and, Judge,

9    obviously, please stop me if you don't like it, it won't

10   take very long -- the voting on the plan has concluded.  But

11   because over 120,000 people have voted, your vote frankly,

12   it does not affect your distribution.  In other words,

13   whether you vote yes or whether you vote no or whether you

14   choose not to vote or whether you don't get a ballot in time

15   has no effect on whether you are able to recover under the

16   plan and get sort of money out of the trust being set up.

17             So I just don't want you to think that because,

18   you know, you may have missed the voting deadline that that

19   will affect your economic recovery.  That's a different

20   issue, and I just wanted to make sure that you and others

21   who may be in the same situation of just not having gotten

22   their ballots understand that that's not likely to change

23   your economic recovery.

24             MR. EVANS:  Actually, if I may, actually I got my

25   ballots and all of that.  All of that's good.  I sent that

Page 41

1    in whether it's challenged or not.  I kind of, you know, in

2    my opinion, it's (indiscernible) a good plan.  But, however,

3    I still think I have to continue to reach out to lawyers

4    because this bankruptcy stuff is like, wow, it's confusing

5    to me.  It's confusing.

6              THE COURT:  Okay.  No, I understand that.

7              MR. JOSEPH:  Me, too.

8              THE COURT:  And, again, I earlier granted this

9    morning your request to have your claim be treated as a

10   timely-filed claim for purposes of allowance.  You know, you

11   still have to prove the merits of it, and that's where you

12   might want to get a lawyer.

13             MR. EVANS:  That's going to be easy.

14             THE COURT:  Okay.  So I'm just going to cover this

15   very briefly, sir, because I think we've gone through it.

16   But the other request that you made in your motion beyond

17   the request which I've already granted which is to deem your

18   claim timely --

19             MR. EVANS:  Right.

20             THE COURT:  -- is that you have a lawyer appointed

21   for you.  And the judicial code permits the appointment of a

22   lawyer for someone that can't afford a lawyer in 28 U.S.C.

23   Section 1915(e)(1).  But the circumstances where someone is

24   entitled to the appointment of a lawyer where they are in a

25   civil case that is a claim for money as opposed to a claim

1    that affects their potential criminal liability or potential

2    liability for a fine, quasi-criminal liability, is extremely

3    rare.

4              MR. EVANS:  Understood.

5              THE COURT:  The courts have really limited that.

6    In fact, there's even some question whether bankruptcy

7    courts have the power to appoint counsel in a civil case,

8    and all bankruptcy cases are really civil cases.

9              MR. EVANS:  (Indiscernible).

10             THE COURT:  So that's laid out in a pretty

11   thorough opinion from one of the courts in my circuit, In re

12   Parker, 2012 WL 4021144, 2-3 (Bankr.D.Vt. September 11,

13   2012).  It's also discussed at the district-court level by

14   one of the judges in this courthouse, Judge Karas, in an

15   unpublished opinion, In re McDermott, Civil Number 17-CV-

16   520(KMK).  And in that case, Judge Karas goes through the

17   basis for appointing someone -- giving someone a civil pro-

18   bono attorney.

19             And it's really a two-step analysis according to

20   Judge Karas.  First, the person has to make a threshold

21   showing that their underlying claim that they want to be

22   represented on has some likelihood of winning.  And that's a

23   fairly easy showing to make.

24             And then there's the second requirement which is a

25   balancing of a lot of factors.  But they include: the

Page 43

1    ability to investigate crucial facts -- usually, that's when

2    someone's being sued as opposed to in your case having a

3    claim; whether conflicting evidence implicating the need for

4    cross-examination will be the major proof presented at any

5    trial; and the complexity of the legal issues and any

6    special reason why appointment of counsel would be more

7    likely to lead to a just determination.

8            Now here, again, none of those claims is

9    implicated at this point.  There's no trial involving your

10   claim that's scheduled.  There are no witnesses that you're

11   going to have to examine.  No one's going after you as

12   opposed to you presenting a claim.  Once you -- once we

13   decide how claims like yours are going to be liquidated and

14   determined, you know, on their merits, then you may or may

15   not need a lawyer.

16           I mean one of the aspects of the claim procedures

17   under the trust setup for personal-injury claimants under

18   the plan that's proposed and before me for consideration is

19   pretty simple streamlined procedures to submit a claim.

20           MR. EVANS:  Right.

21           THE COURT:  So you may not need a lawyer for that.

22   Even though overall, bankruptcy is completed and you've got

23   this lengthy document, the disclosure statement which lays

24   out a lot of issues in this overall bankruptcy case,

25   determination of the merits of your claim may be pretty

Page 44

1    simple.  So --

2             MR. EVANS:  But the evidence --

3             THE COURT:  So at that point but not before then,

4    I don't see any need for you to have a lawyer, frankly.  And

5    I don't know whether at that point I would require a lawyer

6    to be appointed for you.  Hopefully, at that point things

7    will become clearer to you as far as what you need to do to

8    present your claim.  And I think we should take it at that

9    point as opposed to now.

10            MR. EVANS:  Can I say just one more thing, please?

11            THE COURT:  Sure.

12            MR. EVANS:  I'm trying to get -- for almost a

13   year, I'm trying to get copies of my business license and

14   the hospital reports, and it seems like I just can't get

15   that stuff.  Every time I try to get it, they don't respond

16   to my letters or nothing like that.  So maybe if I get a

17   lawyer to take my case, I'll be able to get that stuff.

18            THE COURT:  Okay.  Well, again, the Creditors'

19   Committee has been very active in this case looking out for

20   the interests of all unsecured creditors.

21            MR. EVANS:  Right.

22            THE COURT:  They may know of lawyers who may be

23   willing to take on your claim at some point in the case.

24   You can reach out to them about that.  But at this point, it

25   really is under the law that I've just gone through, it's

1    not warranted that I require a lawyer be appointed for you

2    at this point.

3              MR. EVANS:  Okay, thank you.

4              THE COURT:  Okay.

5              MR. OZMENT:  Your Honor, this is Frank Ozment.  If

6    I reach out to him, it will be on a pro-bono basis, if at

7    all, and also just to talk to him about some of the

8    logistics that he may anticipate in getting even a

9    streamline claim filed.  So --

10             THE COURT:  Okay.

11             MR. OZMENT:  Thank you, Your Honor.

12             THE COURT:  Mr. Ozment is one of the lawyers who

13   represents personal-injury claimants like yourself,

14   including people who are incarcerated.  So I'm not putting

15   him on the spot here.  It's up to him whether he would take

16   on your, you know, representation.  But, you know, there are

17   lawyers out there that, I think as lawyers often do, are

18   willing to represent people pro bono.  So we'll leave it at

19   that.

20             MR. EVANS:  Right.  Thank you.

21             MR. PREIS:  Your Honor, this is Arik Preis.  May I

22   just be heard for one moment?

23             THE COURT:  Yes.

24             MR. PREIS:  Can you hear me clearly?

25             THE COURT:  Yes, I can.

Page 46

1          MR. PREIS:  Okay.  I appreciate what you said

2    earlier about the UCC seeking to put claimants in touch with

3    counsel.  We have indeed, as Mr. Evans pointed out, put him

4    in touch with counsel who had said that they would be

5    willing to take on clients such as Mr. Evans.  I know there

6    are 165 people on this Zoom.  Obviously, in addition to Mr.

7    Ozment, if anybody wants -- if anybody is willing to

8    represent Mr. Evans, we would ask that they contact us and

9    we will put you in touch with Mr. Evans because we have his

10   information.  So I do appreciate you saying that.

11          THE COURT:  Okay.

12          MR. PREIS:  Thank you.

13          THE COURT:  Very well.

14          MR. OZMENT:  And just to be clear, Mr. Evans, I

15   generally don't represent personal-injury claimants.  Most

16   of my practice involves representing prisoners.  So they may

17   have a much better lawyer for you than me.

18          MR. EVANS:  Thank you.

19          THE COURT:  Okay.  All right.  Very well.  So why

20   don't we move then -- and I'll ask the Debtors to submit an

21   order on that aspect of Mr. Evans' motion.  I have the

22   orders on the other aspect of it and the other three

23   claimants to have their claims be deemed timely.

24          MR. McCLAMMY:  We can do that, Your Honor.

25          THE COURT:  Okay.  Then the next matter on the

1    agenda is a motion by Amanda Morales for -- it's couched.

2    Again, Ms. Morales is pro se.  It's couched as a motion for

3    summary judgment on her claim in these cases.  As I said,

4    Ms. Morales is representing herself and is not a lawyer.

5    And I am treating this motion as a request for determination

6    and, if determined to be an allowed claim, the payment of

7    her claim in this case.

8            I've read it.  I read the Debtors' objection to it

9    and Ms. Morales' reply which is in the form of an affidavit

10   with certain attachments.  That reply was filed Friday.  It

11   was emailed to chambers and I believe the clerk's office

12   filed it.  So I believe the Debtors have received it.

13           MR. McCLAMMY:  We have, Your Honor.

14           THE COURT:  So, Ms. Morales, I see you there on

15   the screen.

16           MS. MORALES:  Yes, hello.

17           THE COURT:  Good morning.

18           MS. MORALES:  Good morning.

19           THE COURT:  And, again, I've read your pleadings

20   and the Debtors' response.  But I'm happy to hear you, as

21   well.

22           MS. MORALES:  Okay.  So my father passed away on

23   January 2, 2010.  He was -- he had back problems, and he was

24   on disability so he was prescribed OxyContin for his pain --

25   for pain.  And he was also prescribed antidepressants that

Page 48

1    at the time he wasn't warned that they could interact with

2    OxyContin and cause a rare thing called serotonin syndrome.

3            And when he died, the autopsy report said that he

4    died of an OxyContin, Citalopram, and Amitriptyline and

5    Tramadol intoxication.  I'm sorry, this is -- it's hard for

6    me.  Six years after he passed away, the FDA issued a safety

7    announcement announcing that Citalopram, and Amitriptyline

8    and Tramadol are all associated with serotonin syndrome, and

9    they changed the warning on the  label to include those

10   specific medications as interacting with OxyContin.

11           He wasn't warned and he didn't know that there was

12   going to be an interaction.  There was no warning at the

13   time.  It took six years before like -- before there was an

14   FDA safety announcement issued.  Failure to warn has a

15   variety of factors including but not limited to: one, the

16   likelihood of a potential interaction; two, the potential

17   severity of a potential interaction; three, the interaction

18   is well known by the general population or scientific

19   community; or whether the drug product labeling already

20   warns against ingestion of the prescription.

21           In this regard, he wasn't warned that there was

22   going to be any potential interaction.  And it's not well

23   known by the general population or scientific community.  I

24   believe only 15 percent of doctors are trained to diagnose

25   and detect serotonin syndrome.  So it wasn't something that

Page 49

1      was very well known.

2                I think -- oh, yeah, consumer rights.  So as a

3      consumer, we have the right to safety, the right to choose,

4      the right to be informed, the right to consumer education,

5      the right to be heard, and the right to seek redress.  So

6      considering all those, I feel that, you know, he wasn't

7      warned, he didn't have the right to choose or else I believe

8      he would have chosen a safer pain management treatment.  The

9      right to be informed was after the fact.

10               The right to consumer education, actually Purdue

11     Pharma has spent a lot of time and resources into educating

12     -- well, they say they educate and train doctors, you know,

13     with different seminars.  They train them.  They also funded

14     a nonprofit such as the American Academy of Pain Management

15     and American Pain Society.  So they put a lot of time and

16     resources into educating about pain management, but this

17     interaction wasn't one of them.  But they really trained

18     physicians and clinicians to really be aware of.  And it

19     wasn't really on the warning label.

20               I feel like either they knew about the

21     interactions and it's a failure to warn or they should have

22     known about the interactions or some time after the fact,

23     some more trials and research and data was collected and

24     then they found out about the serotonin syndrome.  And why

25     those trials and data wasn't done before, I don't know.  But

1    those are pretty much the issues that I have.  I think

2    that's it.  I'm sorry.

3              THE COURT:  Okay.  Well, there's no reason to be

4    sorry.  And, frankly, your supporting materials were very

5    eloquent.

6              Go ahead.

7              MS. MORALES:  Okay.  I would like to add there was

8    a similar case with Acorn and Pope.  So it was a

9    pharmaceutical company that failed to warn on a prescription

10   label that it would harmfully interact with another drug she

11   was taking, and it also caused serotonin syndrome.  Ms. Pope

12   latched into a coma and suffered permanent cognitive damage

13   from when she was given the drug methyl blue during a 2013

14   surgery.  Two years after her surgery, Acorn had also issued

15   a safety announcement which changed the warning label.  And

16   in that case, the plaintiff was awarded her summary judgment

17   in 2017 -- in 2017, sorry.

18             THE COURT:  Okay.

19             MS. MORALES:  I think that's it.

20             THE COURT:  And you would describe that case in

21   your papers, too.  So do the Debtors have more to say on

22   this, or they content to rely on their objection that was

23   filed?

24             MR. McCLAMMY:  Thank you, Your Honor.  Jim

25   McClammy of DavisPolk for the Debtors.  All we will say,

Page 51

1    similar to Your Honor's reaction, is we're clearly very

2    sympathetic to Ms. Morales' situation and, indeed, all that

3    have suffered loss in the opioids crisis.

4          And then, you know, obviously faced with the many

5    unique individual claims here, and understanding that the

6    Bankruptcy Code is meant to provide a collective process for

7    addressing those claims and the Debtors having put forth a

8    plan that they believe is in, you know, the best interest of

9    all creditors and the American public more generally, to

10   help abate the opioid crisis, we will rely on our papers,

11   Your Honor.

12         THE COURT:  Okay.  So, Ms. Morales, I want to be

13   clear in distinguishing between your claim in the case and

14   the context in which it's raised at this point in the case.

15   Those are really two different things.

16         There are about 140,000 people who have filed

17   claims on behalf of themselves or a family member against

18   the Debtors.  That's a lot of claims, obviously.  The merits

19   of those claims have not yet been determined on a claim-by-

20   claim basis.  And generally, there's a very strong principle

21   of bankruptcy law that you don't decide the merits of one

22   claim and provide for its payment before you have a plan

23   that provides how all of those claims will be dealt with.

24   Otherwise, someone would get a leg up on the rest because

25   they --

Page 52

1          MS. MORALES:  Right.

2          THE COURT:  -- would have their claim determined

3    first.  So what the Debtors have proposed here with the

4    support of a lot of different parties in the case, including

5    the Unsecured Creditors' Committee, which represents the

6    interests of all creditors including yourself, and lawyers

7    who represent lots of those 140,000 people, states,

8    governmental entities and other types of claimants, is a

9    plan that allocates in the aggregate basis money to pay

10   claims.

11         So under the plan that's before me, I haven't

12   confirmed it.  It's on -- the hearings are on for

13   confirmation.  700 to 750 million dollars are allocated to

14   cover personal-injury claims like the one you have filed.

15   But it would be premature to decide your claim now and to

16   have a payment now as opposed to under a plan that deals

17   with all of those claims in an organized way so that people

18   get treated the same who have similar claims.

19         The plan that is up for approval at this point, as

20   I've discussed in the matter that came up just before you,

21   sets up a trust where claims like yours will have the right

22   to seek redress, seek payment.  And --

23         MS. MORALES:  I guess --

24         THE COURT:  Let me just finish because I'm just

25   going to another point that I think is important to you --

1          MS. MORALES:  Okay.

2          THE COURT:  -- at least based on what I've read.

3     There are two ways to seek recovery from that trust if I

4     approve the plan.  One is called the so-called streamline

5     procedures or, you know, more simple procedures where you

6     submit certain information as a claimant that's specified in

7     a notice.  And the trust administrators will determine based

8     on, you know, categories that apply across the board to

9     people whether you would be entitled to a payment based on

10    the information provided.

11         The other way to submit -- to proceed to have

12    redress for your claim would be to ask for a trial and in a

13    regular, you know, in a court, a court of law.  And I take

14    away from your pleadings that you actually want to know as

15    determined perhaps by a court of law what actually caused

16    your father's death and whether Purdue is responsible in

17    some way for that.  So there is that option to you to have a

18    court determine that issue as opposed to a trust

19    administrator.

20         But under either scenario, those things happen

21    under a plan where all of the creditors like yourself, all

22    the roughly 140,000 people, have the right to proceed with

23    those two approaches and get paid their pro-rata share.  And

24    it's really against a major principle of bankruptcy law that

25    that happen early for just one person like yourself as

Page 54

1    opposed to under procedures like that.

2               MS. MORALES:  Okay.

3               THE COURT:  So my determination is to deny your

4    motion to seek payment and a determination now but not on

5    the merits of your claim.  The merits of your claim survive.

6               MS. MORALES:  Okay.

7               THE COURT:  And you would be able to seek that

8    relief assuming that this plan is confirmed under the plan,

9    under the two alternative mechanisms that I explained, or if

10   the plan's not confirmed, in some other way but again in a

11   way that has comparable treatment for you and the other

12   140,000 or so people who have filed claims like you.

13              So this is just a procedural ruling.  It doesn't

14   go to the merits of your claim.  The merits of your claim

15   will be addressed, but it's too early to address it at this

16   point.

17              MS. MORALES:  Okay.  And I guess that's just where

18   I didn't see in the plan.  It's just -- there's just for

19   overdose and it wasn't just an overdose.  It was an overdose

20   of four medications that should not have been like ever

21   interact -- like they interacted.  They should have never

22   been taken together.  And I guess it's just because that was

23   so broad, I just didn't think that it would cover

24   specifically like a situation like mine where it wasn't --

25              THE COURT:  I think --

Page 55

1              MS. MORALES:  Yeah, I guess that's where it was

2    confused or -- yeah.

3              THE COURT:  If he had a prescription for OxyContin

4    and that contributed to his death, then I believe it would

5    be covered by --

6              MS. MORALES:  Well, there's no -- would there be a

7    separate one for failure to warn because when he took --

8              THE COURT:  Let me clear.  Those claims are

9    subsumed within --

10             MS. MORALES:  Okay.

11             THE COURT:  -- within the basic fact pattern that

12   I just went through that someone had a prescription --

13             MS. MORALES:  Okay.

14             THE COURT:  -- for OxyContin and it contributed to

15   their death or personal injury.

16             MS. MORALES:  So it doesn't matter that it's a

17   little bit different because serotonin syndrome's pretty

18   rare.  It's I guess --

19             THE COURT:  I don't think so.  I don't believe so.

20             MS. MORALES:  No?

21             THE COURT:  I don't believe so.

22             MS. MORALES:  Okay.  Okay.

23             THE COURT:  So I mean one would still have to show

24   that that prescription led to your father's death.  But --

25             MS. MORALES:  It's -- okay.

1          THE COURT:  -- under the facts as you've alleged,

2     you might well be able to show that.  On the other hand --

3          MS. MORALES:  Okay.

4          THE COURT:  -- the Court may determine that it

5     didn't.

6          MS. MORALES:  Okay.

7          THE COURT:  But those are the issues that will be

8     decided --

9          MS. MORALES:  Okay.

10          THE COURT:  -- either under the plan or if I don't

11     confirm the plan in some other mechanism as well as all the

12     other claims by the personal-injury claimants like yourself.

13          MS. MORALES:  Okay.

14          THE COURT:  Okay.  So I hate to say --

15          MS. MORALES:  So I just had one question.

16          THE COURT:  I hate to say this, but -- and this is

17     not particularly fair, but I think you need to be -- you

18     need to wait a bit until there's a mechanism to determine --

19          MS. MORALES:  Oh, okay.  I'm not trying to be fair

20     -- I'm not trying to be unfair to any other claimants.

21          THE COURT:  I understand.

22          MS. MORALES:  If they voted and gave up their

23     rights, they have the right to do so.  If they voted and

24     didn't, if they objected, they have their rights to do so.

25     So I was just -- you know, my thing is rare.  Serotonin

Page 57

1    syndrome is rare.  There was no warning at the time about

2    taking antidepressants with Oxycontin until six years later.

3              THE COURT:  Right.

4              MS. MORALES:  I mean so I just thought mine was --

5    I didn't think because I don't think that there's going to

6    be like too many claimants similar to mine.  So I just

7    wasn't sure if there was a category for mine because it's a

8    little bit -- I don't know how you guys like -- I don't know

9    how it's going to be -- because I mean overdose is kind of

10   broad, and I didn't know if it was going to go deeper into

11   different like issues and like -- of how it's classified, I

12   guess.

13             THE COURT:  The plan -- the current plan, the plan

14   before me, contemplates tiers of potential liability but

15   also gives people like yourself the opportunity to have a

16   determination by a court.  So I believe that it does take

17   into account the individual facts.

18             MS. MORALES:  Yeah, the facts.  And so the merits,

19   like as long as like -- I guess I'm still -- it's not going

20   to affect my claim either -- it's not going to -- by you

21   denying this or approving, it's not going to --

22             THE COURT:  No.  It doesn't affect --

23             MS. MORALES:  Okay.

24             THE COURT:  -- the merits of your claim at all.

25             MS. MORALES:  So in summary judgment, so usually

1    that works like it's usually granted when you could prove

2    the undisputed facts of --

3              THE COURT:  Let me be clear, Ms. Morales.

4              MS. MORALES:  Okay.

5              THE COURT:  I'm denying your motion not on the

6    merits.

7              MS. MORALES:  Oh, okay.

8              THE COURT:  So you won't be bound by this order as

9    far as your underlying claim is concerned.  I'm denying it

10   because it's premature in seeking the relief.

11             MS. MORALES:  Oh, okay.

12             THE COURT:  Okay?

13             MS. MORALES:  Okay.  I see that, okay.  I

14   understand.

15             THE COURT:  And that will be put in the order.

16   That will be clearly stated in the order.  So someone from

17   Purdue or a trust can't waive the order at you without that

18   Paragraph being there which protects you on that point.

19             MS. MORALES:  Oh, okay.  Okay.

20             THE COURT:  Okay?

21             MS. MORALES:  Thank you.  All right.

22             THE COURT:  So I'm going to ask the Debtors to

23   submit that order.  Like the person who was on before you,

24   when this case gets to the point of liquidating, that is

25   deciding the merits of the underlying claims, you may want

1    to reach out to a lawyer.

2              MS. MORALES:  Okay.

3              THE COURT:  That's up to you.  But at this point,

4    it's just premature to decide the underlying merits of your

5    claim.

6              MS. MORALES:  Is there still discovery going on?

7    Is there still discovery because --

8              THE COURT:  Well, the trust makes it easier to

9    take discovery because there's a document -- I'm trying to

10   use a non-lawyer word.  There's a place where there's a lot

11   of documents that are available.  But --

12             MS. MORALES:  Okay.

13             THE COURT:  -- there is -- particularly if you

14   follow the court route, you have, you know, time to take

15   discovery.

16             MS. MORALES:  So is discovery -- is it over or is

17   it still ongoing because I don't --

18             THE COURT:  No, for individual claimants, you can

19   take discovery.

20             MS. MORALES:  Oh, okay.  Okay.

21             THE COURT:  Yeah.

22             MS. MORALES:  All right.

23             THE COURT:  But, again, it's premature to do that

24   until you're in the claim liquidation process.

25             MS. MORALES:  Oh, okay.  And I was just -- to my

Page 60

1    understanding, it was just after discovery that like -- that

2    a moving party can file for that.  So now it's understood

3    that I can't do that yet.

4                THE COURT:  Not yet; that's right.

5                MS. MORALES:  Not yet, okay.

6                THE COURT:  And, again, if I confirm the plan, the

7    trust has two different paths that you can take.  One is one

8    where there's not a lot of time spent with lawyers and

9    discovery and the like.  It's a faster path.  But you can

10   choose to take the other path which is a trial path.  And

11   it's really there to give people two different options.

12               MS. MORALES:  Okay.

13               THE COURT:  Thank you.

14               MS. MORALES:  Thank you.

15               THE COURT:  Okay.  So I'll look for that order,

16   Mr. McClammy.

17               MR. McCLAMMY:  Yes, Your Honor.  We'll take care

18   of that.

19               THE COURT:  All right.  And I think that then

20   concludes the omnibus hearing.  And we will get back to the

21   hearing on the Debtors' request for confirmation of their

22   amended Chapter 11 plan.

23               Mr. Evans, you're not a party to that hearing so

24   you could sign off.

25               MR. EVANS:  You have a great day, Your Honor.

Page 61

1              THE COURT:  Okay.  Thank you.

2              MR. EVANS:  And thank you.

3              MR. McCLAMMY:  And, Your Honor, just one

4    housekeeping matter before we start with witnesses.

5              THE COURT:  Sure.

6              MR. McCLAMMY:  We were informed by counsel for

7    West Virginia that Dr. Cohen who's on the witness schedule

8    at number ten for today.  Due to unforeseen circumstances,

9    he will not be available today.  We understand he will be

10   available starting tomorrow, and if he were to go tomorrow,

11   we would propose after having discussions with counsel, just

12   let him in after Mr. Bickford testifies tomorrow.

13             THE COURT:  Okay.

14             MR. McCLAMMY:  We've informed other counsel on the

15   case this morning and have not heard anything to the

16   contrary.

17             THE COURT:  All right.  Very well.

18             MAN 1:  Your Honor?

19             THE COURT:  Let me just confirm on this point, I

20   think I have this right, Mr. Cohen I believe was the one who

21   was not originally on the witness list and then West

22   Virginia asked to have him added or was that someone else?

23             MR. McCLAMMY:  I believe he's been on the list,

24   Your Honor.

25             THE COURT:  Mr. Cahn, you had made a request to

Page 62

1    add some one to the list?  Was it Mr. Cohen?

2              MR. CAHN:  Mr. Cohen -- can you hear me, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. CAHN:  All right.  Dr. Cohen was always on the

6    witness list.  We didn't have his declaration filed by the

7    deadline, so we filed it out of time.

8              THE COURT:  Fine.

9              MR. CAHN:  But he's always been on the list.

10             THE COURT:  So no one is objecting to him

11   testifying, right, given that -- the statement that he's

12   been on my list for a while now, correct?  We'll just

13   take --

14             MR. McCLAMMY:  That's correct.

15             THE COURT:  We'll just take --

16             MR. McCLAMMY:  That's correct.

17             THE COURT:  Okay.  Very well.  Thank you, Mr.

18   Cahn.

19             MR. CAHN:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MR. EDMUNDS:  Your Honor, Brian Edmunds for the

22   State of Maryland.  There's one other housekeeping matter

23   that we would bring to the Court's attention now so that we

24   can understand how to proceed.

25             THE COURT:  Okay.

Page 63

1          MR. EDMUNDS:  As the Court knows, David Sackler is

2    scheduled to provide his direct testimony as a witness for

3    the Side B Family.  I think he's the third witness today.

4    We had been discussing with the Side B Family and the

5    Debtors whether we would also call him as our witness as

6    he's on our witness list today for his convenience to make

7    it easier for him to testify at once.

8          We've had a little bit of an issue arise with the

9    exhibits.  Your Honor entered the procedures order that

10   governs this case on August 10.  On August 11, in a manner

11   not inconsistent with the procedures order, we received

12   instructions from Debtors as to how to use -- how we could

13   use the screenshare to show exhibits to witnesses.  And it

14   turns out that we had discussed with them and prepared with

15   them over the weekend to use that system today, and it turns

16   out that it's not available.

17         So as Mr. Sackler is a witness that we would put

18   on our case and as this has come up I think through nobody's

19   fault, I just wanted to make clear and inform the Court and

20   ask the Court that we would be able to recall him tomorrow

21   or whenever the Debtors allow rather than have to shift

22   gears and sort of go through the other process with the

23   exhibits today, which I think would be quite -- we're trying

24   to do that as I'm speaking to the Court.  I think it would

25   be quite a difficult shuffle to get in of somebody who may

Page 64

1    testify in an hour from now.

2            THE COURT:  Okay.  All right.  Let me ask you are

3    these exhibits -- Mr. Edmunds, are these exhibits already in

4    the joint exhibit book or are --

5            MR. EDMUNDS:  I think -- I believe that they are.

6    Yeah.

7            THE COURT:  Okay.  And have you given my clerks a

8    list of them so I have them at hand, I will have them

9    readily available?

10           MR. EDMUNDS:  I do not believe that we have done

11   that yet.  If not --

12           THE COURT:  All right.  I would ask you to do that

13   because, you know, there are boxes of exhibits all over the

14   courtroom.  And it really would be helpful to do that.  But

15   that's neither here nor there to your point which is that

16   you would like to be able to recall David Sackler as part of

17   your case.

18           So is there any problem with that, Mr. Joseph?

19           MR. JOSEPH:  Your Honor, there's no reason why Mr.

20   Sackler should be testifying twice.  The virtual procedures

21   order is clear.  They had emailed us exhibits that they want

22   to use with him.  We've sent them and told him not to open

23   them.  But I will say that if Your Honor is not going to

24   have him testify all at once today, then we would prefer to

25   do it just one time.  You know, we can pick a time later in

1    the week.

2            THE COURT:  That's fine.  I think that makes

3    sense.  I mean I have read his declaration.  It's a very

4    limited declaration.  It just goes to -- the declaration

5    itself just goes to the importance of the releases.  So that

6    aspect of his testimony I believe would be fairly short.

7    I'm happy to do it on a different day.

8            MR. JOSEPH:  All right.  The other thing I would

9    say, Your Honor, is over the weekend we understood from Mr.

10   Edmunds that he'd be cross-examining two to three hours

11   today.  I think there's going to be a large hole in the

12   schedule today if that doesn't happen.

13           THE COURT:  Well, I don't know if they're going to

14   have --

15           MR. JOSEPH:  But whatever the Court wants.

16           THE COURT:  -- two to three hours or that

17   declaration.  I think it's more likely that that would be

18   part of the testimony that he would have as a witness being

19   called by the objecting states.

20           MR. JOSEPH:  Correct.  There's no question about

21   that, Your Honor.  And we'll just plan to have him come back

22   later in the week.  We'll schedule a time.

23           THE COURT:  All right.  Okay.

24           MR. EDMUNDS:  Thank you, Your Honor.

25           THE COURT:  Okay.

1             MR. JOSEPH:  Thank you, Your Honor.

2             THE COURT:  All right.  Very well.  So unless

3     there are any -- we just lost --

4             CLERK:  He is still on.

5             THE COURT:  Okay.  So unless there are any other

6     housekeeping matters, I think the first witness on for today

7     is Ms. Conroy, and I see her there.

8             Would you raise your right hand, please?

9             Do you swear or affirm to tell the truth, the

10    whole truth, and nothing but the truth, so help you God?

11            MS. CONROY:  I do.

12            THE COURT:  Okay.  And it's J-A-Y-N-E, new word C-

13    O-N-R-O-Y?

14            THE WITNESS:  That's correct.

15            THE COURT:  Okay.  Ms. Conroy, you submitted a

16    declaration in support of the Ad Hoc Committee's reply to

17    plan objections and in support of plan confirmation.  It's

18    dated August 3, 2021.  Under my order establishing

19    procedures for this hearing in this matter, it's intended to

20    be your direct testimony in the hearing.

21            Knowing that and sitting here today on August 16,

22    is there anything in it that you would wish to change?

23            THE WITNESS:  No, there is not, Your Honor.

24            THE COURT:  Okay.  All right.  Are there any

25    objections to the admission of Ms. Conroy's declaration as

Page 67

1    her direct testimony?

2                (No audible response)

3                THE COURT:  All right.  I will admit the

4    declaration.

5                (Declaration of Jayne Conroy Entered Into

6    Evidence)

7                THE COURT:  Does anyone want to cross-examine Ms.

8    Conroy?

9                MR. GOLDMAN:  Good morning, Your Honor.  Irve

10   Goldman, Pullman Comley, representing the State of

11   Connecticut.  Yes, I do.

12               THE COURT:  Okay.  You can go ahead.

13                    CROSS-EXAMINATION OF JAYNE CONROY

14   BY MR. GOLDMAN:

15   Q    Good morning, Ms. Conroy.  I'm just going to go through

16   a few statements in your declaration as kind of a lead-in to

17   some more substantive questions.  So just bear with me for a

18   minute or two.

19        According to Paragraph 4 of your declaration, in

20   investigating the role of Purdue Pharma and members of the

21   Sackler Family and the fraudulent marketing and misbranding

22   of Oxycontin since 2002, is that correct?

23   A    That's correct.

24   Q    And initially, your investigation was in connection

25   with your representation of individual plaintiffs that had

Page 68

1    sued Purdue Pharma over what you say was the fraudulent

2    marketing and misbranding of OxyContin?

3    A    Yes.

4    Q    And that investigation led to the filing of 1,000

5    complaints in New York Supreme Court Suffolk County?  Is

6    that right?

7    A    Not -- no, not Suffolk County.  A thousand complaints

8    were filed in Staten Island.

9         THE COURT:  Richmond.

10   Q    Richmond County?

11   A    Richmond County.

12   Q    Yeah, my mistake.  Thank you.

13        Did you obtain discovery and take depositions of Purdue

14   Pharma executives in those lawsuits?

15   A    Yes, we did.

16   Q    And was that over the period of 2003 to 2006?

17   A    Yes.

18   Q    And would you characterize the volume of information

19   you obtained in those suits as substantial?

20   A    Absolutely, yes.

21   Q    And was what you obtained in discovery turned over to

22   the United States Department of Justice?

23   A    I couldn't tell you that 100 percent of it was turned

24   over but, yes, a substantial portion was turned over.

25   Q    And would you say that what was provided to DOJ led to

Page 69

1    the guilty plea that they got from Purdue Pharma in 2007

2    along with the $600 million in fines that were assessed?

3    A    That's certainly my understanding.

4    Q    And after you settled your litigation with Purdue

5    Pharma in 2007, in 2016, you became re-engaged in suits that

6    your firm filed against Purdue Pharma here in Suffolk

7    County, New York and other government entities across the

8    country, correct?

9    A    Yes.

10   Q    Did that include the filing of suits in federal court

11   that later got transferred to the multi-district litigation

12   in the Northern District of Ohio?

13   A    Yes, it did.

14   Q    Is that what's known as the MDL?

15   A    Yes.

16   Q    Okay.  Was that --

17   A    The opioid MDL.  There are lots of MDLs but, yes, the

18   opioid one.

19   Q    Okay.  Thank you for that clarification.

20        Was that initiated in early 2018, the MDL, what we'll

21   call MDL in your colloquy we're having here?

22   A    I -- I think I probably would have put slightly earlier

23   toward the end of 2017.  But -- but, yes, you know, the

24   winter is when it really kicked in.

25   Q    And in the MDL, were the Purdue defendants ordered to

Page 70

1    produce to the plaintiffs all documents they had produced to

2    the attorney general of -- attorneys general, rather, of

3    various states?

4    A    Yes.

5    Q    Did you as counsel for the plaintiff governmental

6    entities receive those documents?

7    A    Yes, we did.  Yes.

8    Q    You state in Paragraph 12 of your declaration that you

9    and the other firms serving as co-leads on the Plaintiffs'

10   executive committee, you say worked tirelessly over the next

11   three years to bring the wrongdoers who had caused the

12   opioid epidemic to justice.  Did that include -- did that

13   work include obtaining and reviewing documents and taking

14   depositions?

15   A    Yes, it did.

16   Q    What role, if any, did the documents and other

17   discovery you received in the MDL play in adding as

18   Defendants to your Suffolk County litigation the members of

19   the Sackler Family that are named in your amended complaints

20   in those actions?

21   A    A very significant role.  A substantial role.

22   Q    And that led to the filing of amended complaints that

23   named certain of the Sackler Family members as Defendants?

24   A    It certainly did, with respect to my firm.  Yes.  And

25   others.

Page 71

1   Q    Okay.  And the Factor Family members that were added

2   were Richard Sackler, Jonathan Sackler, Mortimer D.A.

3   Sackler, Kathy Sackler, Ilene Sackler Lefcourt, Beverly

4   Sackler, Theresa Sackler, and David Sackler, right?

5   A    Yes.

6   Q    And when did that occur, in 2018?

7   A    Yes.  With respect to my firm, we added them first, I

8   believe, in the Suffolk County case in October of 2018.

9   Q    And then a similar amendment was made in the

10  Pennsylvania litigation?

11  A    That's right.

12  Q    Okay.  A little bit later?

13  A    You probably have the dates more in mind, but yes, it

14  would have been a little bit later.

15  Q    Right.  It's in your declaration.  And of course, you

16  wouldn't have named those Sackler Defendants as defendants

17  unless you thought there was merit to the claims against

18  them, correct?

19  A    You are absolutely -- Yes.  Yes.

20          MR. ISSACHAROFF:  Your Honor, can I be heard for a

21  second?  I don't mind any question about public documents.

22  I'm worried that Ms. Conroy not be asked about work product

23  and (indiscernible) impressions of counsel.  I certainly

24  don't want to open the door to those kinds of questions.

25          THE COURT:  Okay.  Well, Ms. Conroy's an

1    accomplished lawyer.  I think should be careful in her

2    answers.  I don't think the last question really cross that

3    line.  But your concern is noted, and Ms. Conroy, you should

4    keep in mind in responding to Mr. Goldman's questions.

5              THE WITNESS:  Thank you.  I will be mindful.

6    BY MR. GOLDMAN:

7    Q    And your decision to name the Sacklers as Defendants

8    was given some affirmation, was it not, when the New York

9    Court denied a motion by the Sackler Defendants to extricate

10   themselves from the lawsuit, correct?

11   A    I would not see it as an affirmation of our decision.

12   I see it as the Court's determination.

13   Q    Were you in attendance at any meetings in New York City

14   where attorneys for the Sackler Family members made defense

15   presentations to those that were there?

16   A    Yes, I was.

17   Q    And did that change your view of the merits of the

18   direct claims that you had asserted against them?

19   A    Not at all.

20   Q    Going back to Paragraph 12 of your declaration, where

21   you state that the Plaintiffs' firm has "worked tirelessly

22   to bring the wrongdoers who caused the opioid epidemic to

23   justice," in Paragraph 12.  By wrongdoers, do you mean

24   Purdue Pharma and the Sacklers that you named in your

25   amended complaint in the Suffolk County litigation?

Page 73

1   A    Yes, I do.

2   Q    Are you aware if any of the Purdue documents that were

3   produced to you in the MDL litigation served as a basis for

4   the Massachusetts Attorney General's complaint against

5   Purdue Pharma and the Sacklers?

6   A    Was I aware that they were used?  Is that your

7   question?

8   Q    Yes, that is.  Yes.

9   A    Yes.  Yes, I am aware that.

10  Q    And are you aware that the Massachusetts Attorney

11  General did amend her complaint in the Massachusetts

12  litigation to name as defendants, Richard, Beverly, Ilene,

13  Jonathan, Kathy, Mortimer, Theresa and David Sackler?

14  A    Yes.

15  Q    Are you also aware that the Sacklers moved to dismiss

16  that Massachusetts complaint against them in Massachusetts

17  Superior Court, which denied the motion?

18  A    I believe I'm aware of that.  Yes.

19  Q    Would you consider yourself to be among those having

20  the most knowledge about the merits of potential direct

21  claims against the Sacklers?

22  A    Yes.

23  Q    Were you ever invited by the Special Committee of

24  Purdue Pharma Inc. to provide a presentation on your views

25  of such third-party claims?

Page 74

1    A    No.  I don't believe so.

2    Q    To your knowledge, was anyone on the Plaintiffs'

3    Executive Committee so invited?

4    A    That could be.  I'm not certain.  But as you know, Paul

5    Henley served on the Executive Committee, so I'm not certain

6    if he was.

7    Q    You state in Paragraph 2 of your declaration that it is

8    submitted, "in support of confirmation of the Chapter 11

9    Plan."  But you would acknowledge, would you not, that

10   reasonable minds could differ about the amount the Sacklers

11   should be contributing to the plan in order to obtain third-

12   party releases, would you not?

13   A    Of course.  After 30 years of litigation, there's a lot

14   that reasonable minds differ about.

15   Q    In Paragraph 15 of your declaration, you state in part,

16   "That the threat of liability for at least some members of

17   the family was real, and that without the protections of

18   bankruptcy, individual family members were at risk of

19   substantial judgments against them."  But no individual

20   Sackler Family member has filed for personal bankruptcy,

21   have they?

22   A    Not that I am aware.

23   Q    So was it contemplated by you or the Plaintiffs'

24   Executive Committee that the Sacklers would receive "the

25   protections of bankruptcy", just by virtue of the Chapter 11

Page 75

1    filings of Purdue Pharma and its affiliates?

2    A    I can't speak for the Committee.  I know for myself it

3    would have been my understanding that they would have

4    received such protection.  But that would not be unusual.

5    Q    And did you contemplate that would include a stay of

6    all proceedings against them during the pendency of the

7    Chapter 11 cases and then a third-party release?

8    A    Yes, I did.

9    Q    So, in fact, if the plan is confirmed, that is per site

10   three what will have occurred in these cases, that is that

11   the Sacklers will have received the benefit of a stay of all

12   the actions against them for the entire duration of these

13   cases, and will effectively receive a discharge of all

14   opioid-related claims against them via a third-party

15   release, correct?

16   A    Correct.

17   Q    And that is without having to undergo personal

18   bankruptcies themselves, correct?

19   A    That's my understanding, yes.

20            MR. GOLDMAN:  No further questions, Your Honor.

21            THE COURT:  Okay.  Does anyone else want to cross-

22   examine Ms. Conroy?

23            MR. HUEBNER:  Yes, Your Honor.  Marshall Huebner,

24   of Davis Polk, for the Debtors.

25            THE COURT:  Okay.

Page 76

1    BY MR. HUEBNER:

2    Q    Good morning, Ms. Conroy.  Can you hear and see me

3    clearly?

4    A    I can.  Yes.  Thank you.

5    Q    Excellent.  I have just a few questions for you, and I

6    apologize.  In order to get them right I'm going to look

7    away a little bit, because my vision's not good enough to

8    multitask anymore.

9              Ms. Conroy, in negotiating the settlements reached

10   and incorporated into the plan during these Chapter 11

11   cases, did the AHC anticipate that objecting states or other

12   material public creditors would be able to opt out and

13   pursue their own direct claims against the Sacklers outside

14   the settlement?

15   A    Was that contemplated?  Is that what you're asking?

16   Q    Yes.  In other words, did you anticipate while you were

17   negotiating that the plan would allow for an opt out of

18   states?  I'll make it easier.  In negotiating the

19   settlement, did you anticipate that objecting states would

20   be allowed to opt out and pursue separate claims against the

21   Sacklers as they saw fit?

22   A    No, that would not have been my understanding.

23   Q    Okay.  And is it fair to say that the expectation of

24   the AHC is that this would be a global settlement with

25   virtually all stakeholders bound to it?

1    A    Yes.  Yes.

2    Q    Okay.  And is this an important attribute of the

3    settlement to you, that it was reviewed is a material

4    change?  If for example, I announced right now in open court

5    that we had decided and the Sacklers had agreed that we were

6    going to just let all the objecting states opt out and not

7    be bound by the release, would you say that would be a

8    material change to the settlement from your perspective?

9    A    It would certainly be a material change, I think from

10   everyone's perspective.

11   Q    Yes.  Well, we'll be talking about those "everyones"

12   later in the hearing.  But for now, if you don't mind, I'm

13   just actually asking about you.  If that happened, if for

14   example -- and obviously, this is clearly a hypothetical and

15   I think that there's no doubt in anybody's mind -- and

16   again, it's not for me to have a colloquy with you about

17   what I think every creditor group would use, so I'm just

18   going to ask you a specific question, which is what is

19   appropriate.

20        If in this hypothetical, as unlikely as it may be,

21   that the Debtors and the Sacklers were willing to do a deal

22   in which the objecting states could simply opt out, not be

23   bound, and recommence suing the Sacklers, would the AHC

24   continue to support a reorganization plan in which they were

25   bound to receive their allocations under this plan, but the

Page 78

1    objecting states were not bound?

2              MR. GOLDMAN:  Objection, Your Honor.  Hypothetical

3    questions aren't an appropriate way to address this fact

4    witness, not expert witness.

5              MR. HUEBNER:  Yeah.  Mr. Goldman, I'm asking based

6    on her experience in the negotiations in which she

7    participated, where various plans were discussed.  I know

8    that you were not here yet and this question is actually

9    much less hypothetical than any number of the ones that you

10   asked our director, including asking him to speculate what

11   attorneys general would do in fact patterns.

12             THE COURT:  Well --

13             MR. HUEBNER:  (indiscernible)

14             MR. GOLDMAN:  Which he refused --

15             THE COURT:  Let --

16             MR. GOLDMAN:  Which he refused to answer.

17             THE COURT:  Let me ask the question this way,

18   which is, Ms. Conroy, based on your experience in connection

19   with the negotiation of this plan, has the AHC, of which you

20   are one of the counsel, expressed its view as to whether it

21   would continue to be bound by its agreement to support the

22   plan if the plan were amended to permit other states to opt

23   out of the plan settlement release?

24             THE WITNESS:  I'm not entirely sure how to answer.

25   Our view in any negotiation is, you know, maximum recovery

Page 79

1    in return for a release.  I don't know what would've

2    happened --

3              MR. HUEBNER:  Your Honor, I'll --

4              THE WITNESS:  -- if (indiscernible) option.

5              MR. HUEBNER:  I'll withdraw it and rephrase it.  I

6    t's actually, I think, a lot easier for me to just ask

7    (indiscernible) about the (indiscernible) targeted.

8    BY MR. HUEBNER:

9    Q    Ms. Conroy, are you aware that the settlement provides

10   for payments over nine years?

11   A    Yes.

12   Q    Are you aware that the private side Plaintiffs actually

13   get paid basically what's in the first four years, whereas

14   the governmental claimants are largely back-ended?

15   A    I'm probably somewhat aware of that.  I'm not sure I

16   could have -- unless you asked me the question, I'm not sure

17   I could have articulated.

18   Q    Okay.  Sure.  I'm happy to move on, because I don't

19   want to get (indiscernible).  It doesn't really matter, and

20   they'll be plenty to talk about later in the week.  I'm

21   going to switch gears and ask you just a couple of final

22   questions based on Mr. Goldman's, and then I will be done.

23              Do you remember Mr. Goldman asked you, I think,

24   two question about the Special Committee of the Debtors'

25   Board of Directors?

Page 80

1    A    Yes.

2    Q    Okay.  Ms. Conroy, to your knowledge, did the Debtors

3    or the Special Committee ever refuse to meet with the AHC

4    itself?

5    A    I'm not aware of that.  But I, you know, again would

6    say Mr. Henley went to -- you know, was quite involved.  So

7    it could be some things that I am not aware of.

8    Q    That's fine.

9    A    I'm not -

10   Q    But we're only asking for your knowledge.  We know that

11   you don't know what you don't know, and that's true for --

12   and obviously, you know, many people mourned the passing of

13   Mr. Henley, and I did want to express a personal thought on

14   that, since I obviously worked with him a fair amount at the

15   beginning of the case, and I am sorry I had heard that news.

16   A    Thank you.

17   Q    But again, back to your knowledge alone -- because Mr.

18   Goldman obviously was trying to get at something, and I

19   think it's important that the record be clear.  To your

20   knowledge, did the PEC -- did Special Committee ever refuse

21   to meet with the PEC, if the PEC ever requested such a

22   meeting?

23   A    I'm not aware of that happening.

24   Q    Okay.  And was your firm ever declined an opportunity

25   to meet with the Special Committee?

Page 81

1   A    Not that I personally am aware.

2   Q    Okay.  And as I think you probably know, there are four

3   law firms that are representing the AHC in this case, that

4   we've actually been reimbursing for many months now.  I'm

5   not going to name them, but they've been quite active.  To

6   your knowledge, have any of those law firms ever been

7   rebuffed in their opportunity to make their views known to

8   the Special Committee?

9   A    I'm not aware that happening.

10  Q    Or even the Debtors?  Have you ever heard in any of

11  your meetings -- obviously, meeting privilege aside -- they

12  won't agree to hear our views?

13  A    I have never heard such a thing.

14  Q    Okay.  And if I told you -- and this will be my last

15  question -- it's not really a hypothetical, although it's

16  not really precise -- if I told you that I probably had

17  either thousands or tens of thousands of emails and

18  conversations with the lawyers for the AHC during this case,

19  with that surprise you?

20          MR. GOLDMAN:  Objection, Your Honor.  Lack of

21  foundation.  If I told you I had thousands...

22          THE COURT:  No, you --

23          MR. GOLDMAN:  (indiscernible)

24          THE COURT:  I'll overrule that objection.

25  BY MR. HUEBNER:

Page 82

```
 1    A     Leaving aside foundation, I know how many emails I have

 2    received, so I don't actually dispute how many you probably

 3    have received.

 4    Q     Okay.

 5            MR. HUEBNER:  Your Honor, I have nothing further.

 6    Thank you.

 7            THE COURT:  Okay.  All right.  Does anyone else

 8    want to cross-examine Ms. Conroy?  Okay.  Any redirect?

 9            MAN 1:  Very briefly, Your Honor.

10            REDIRECT EXAMINATION OF JAYNE CONROY

11    BY MR. ISSACHAROFF:

12    Q     Ms. Conroy, you were asked about documents you received

13    in connection with the 2007 litigation against Purdue.  Were

14    you able to make those documents public?

15    A     Yes, we were.  They were significant documents that we

16    had collected through discovery, rather unusual discovery,

17    back in the time when a lot of things were written down and

18    after the MDO was formed and discovery was pursued in the

19    MDO, we were able to turn over the documents that we had

20    collected during our significant document review and

21    productions from the earlier litigation.

22    Q     Let me be precise.  Between 2007 and 2018, were you

23    able to (indiscernible)?

24    A     Yes, we were.  Some -- well, some were made public

25    through motions and such, and complaints.  There were others
```

Page 83

1    that are not public.

2    Q    And were MDO documents generally publicly available

3    before being publicized or put in the public domain by the

4    State of Massachusetts?

5    A    Not at all.  Not at all.  They were part of the

6    litigation and, therefore, protected under confidentiality

7    orders.

8    Q    And is it fair to say that the bulk of the 2007

9    documents did not become public until they were incorporated

10   into the MDO and then made public through the State of

11   Massachusetts filing and the State Court order in

12   Massachusetts?

13   A    Yes, that's true.

14   Q    You're familiar with one feature of this plan, which is

15   to create a repository of documents that will be publicly

16   available?

17   A    I am.  And I'm very supportive of it.

18   Q    Could you tell the Court briefly why you are -- whether

19   you think this is important, and if so, why?

20   A    Yes.  In addition to any monetary settlement, it could

21   be that the document repository is actually the most

22   valuable piece of this settlement.  I know from what my firm

23   uncovered back starting in 2002, all the way until 2018 --

24   not just about the things that we hear so much about -- the

25   marketing of OxyContin and call notes and sales

Page 84

1    representatives -- but in the documents, as we have

2    progressed in this litigation -- the MDO now I'm talking

3    about -- it had become clear what the industry has been able

4    to do with controlled substances.  And I'm talking about

5    manufacturers, distributors, and chain pharmacies.  And the

6    documents are truly a goldmine.

7              And I would even say myself with everything I know

8    about this litigation and potential liability, I can look

9    back at those documents and understand more and more about

10   the way this industry worked and about the way the fraud was

11   perpetrated on the Americans.

12             So I am very supportive of a repository because

13   there needs to be intense scrutiny on those documents so

14   that academics and scholars and families of victims and

15   everyone can look at those documents and understand what can

16   happen when there is a fraud, and how intense and how long

17   that fraud can go on.  Here, we're talking about over 20

18   years.

19             And so, much work needs to be done.  We're doing

20   it on the litigation side.  But there is just nothing like

21   sunshine on these sorts of documents that will hopefully try

22   to prevent another tragedy like this, and maybe even point

23   toward some way to resolve it.

24   Q    Switching gears, Ms. Conroy, we've been talking about

25   suits against the Sacklers, and we tend to use the term "the

1    Sacklers" quite broadly to cover everyone in the family.

2    Your lawsuit in Massachusetts name the people specified in

3    your claim -- or in your declaration.  Sorry.  You did not

4    name all the Sacklers, did you?

5    A    No, we did not.

6    Q    And did you name any of the Sacklers who are citizens

7    of Europe, for example?

8    A    No --

9    Q    European countries?

10   A    No.  We were very selective in who we named,

11   individuals we believed had operational responsibilities at

12   Purdue or in one of the trusts, and also individuals that we

13   could have service on, and we would be able to have some

14   impact with respect to their assets.

15   Q    Did you name the younger generation, the children,

16   grandchildren, who did not have operational roles at Purdue

17   Pharma?

18   A    No, we did not.

19   Q    Did you name any of the offshore trusts in which

20   Sackler monies are held?

21   A    No, we did not.

22   Q    To your knowledge, were any of these foreign citizens

23   or offshore trusts named in any of the complaints by anybody

24   you had sued beyond just Purdue corporate entities?

25   A    I don't know the answer to that.

Page 86

1    Q    Okay.  In your response to the motions to dismiss in

2    Suffolk County, on the question of whether the individual

3    Sackler Family members could be held accountable in that

4    litigation, what were the arguments put forward as to why

5    these named Sackler individuals could be sued in your New

6    York State lawsuit?

7    A    Well, in part, because, obviously, our briefing was

8    more expansive, but each and every one of them had, we

9    believed, direct involvement in the operation of Purdue.

10   They were individuals who walked through the front door in

11   Stanford.  And to a certain extent, certainly Richard and --

12   well, most of them were day-to-day involved, making

13   decisions.  Sometimes very involved in email responses,

14   involved in day-to-day business decisions, ride-alongs with

15   sales representatives.  Even down to the mundane of choosing

16   what sort of menu to have at the Christmas party.  So it was

17   -- we named people who were involved.

18   Q    Did these individuals have assets in the United States

19   that you thought were potential sources of recovery?

20   A    Yes.  Yes, they did.

21   Q    Okay.  Final set of questions -- just a couple

22   questions.  Ms. Conroy, you've been involved in mass tort

23   cases for decades at this point, correct?

24   A    Yes.

25   Q    I won't ask how many, but it's a number of --

Page 87

1    A    Many.

2    Q    -- (indiscernible).  I know that we've known each other

3    for several decades, so probably that's a fair

4    (indiscernible).  Are you familiar with the term "a peace

5    premium"?

6    A    I certainly am.  Yes.

7    Q    Could you just briefly tell the court what a peace

8    premium is and how it relates to this litigation?

9    A    Well, generally, what it talks about, and in particular

10   we see in large mass torts, asbestos litigation, things like

11   that, a piece premium is when you can reach a resolution

12   with a defendant that also brings closure or peace to that

13   defendant so that they know that the next day they will not

14   be sued in another jurisdiction for the same issues.

15          In this case in particular, that is very

16   important.  There's no premium that we can achieve in a

17   settlement with a defendant if there's another group waiting

18   to settle with that defendant a week later.  And so for a

19   maximum recovery and to receive things, even like the

20   document repository that we are seeking here, that would not

21   be achievable if litigation was to continue and there wasn't

22   that peace premium available.

23          MR. ISSACHAROFF:  That's all I have, Your Honor.

24          THE COURT:  Okay.  Very well.

25          MR. GOLDMAN:  Your Honor, may I --

Page 88

```
 1              THE COURT:  Sure.
 2              MR. GOLDMAN:  -- have a few --
 3              THE COURT:  Right, you can have re-cross on the
 4     redirect.
 5              MR. GOLDMAN:  Thank you, Your Honor.
 6                  RECROSS EXAMINATION OF JAYNE CONROY
 7     BY MR. GOLDMAN:
 8     Q    The lawyer that was just questioning you asked about
 9     having a document repository as a factor to your belief that
10     the settlement was a good settlement.  Now, initially you
11     mentioned that the documents in the Massachusetts litigation
12     were under seal, some of them?
13     A    I don't think I had mentioned about anything being
14     under seal, but certainly there are protective orders with
15     respect to Purdue documents.
16     Q    And of course, at the end of the litigation where a
17     judgment might be rendered, any documents that were subject
18     to confidentiality could always be rendered publicly
19     available by the Court.  Isn't that correct?
20     A    I suppose it's possible.  Yes.
21     Q    Similar to how Judge Drain just issued a decision prior
22     to the hearing unsealing certain documents that were under
23     seal.  Are you aware that?
24     A    Yes.  And I think it's a question of what gets unsealed
25     and the breadth of the documents --
```

Page 89

1    Q    Well, correct, but --

2    A    -- to be unprotected.  But certainly --

3    Q    (indiscernible)

4    A    -- that is available, certainly.

5    Q    Okay.  There was some questioning by prior counsel

6    about when you named the trusts as recipients of fraudulent

7    transfers, which I believe you said you did not name the

8    trusts.  Are you aware of any other suits that had

9    fraudulent transfer claims based on the $11 million dollars

10   or so in assets that were transferred out of Purdue to these

11   various trusts?

12   A    As I sit here, there well could be, but I'm not aware

13   of them.

14   Q    Are you aware that the state of Connecticut has

15   included such claims in this complaint?

16          MR. HUEBNER:  Your Honor, can I just, I guess,

17   sort of object for a second?  Mr. Goldman is including

18   factual statements in his questions that are just completely

19   false.  The thousand Pages of reports that the Debtors

20   published about where the money went are critical and

21   important.  Everyone in this case is relying on them.  It's

22   not the case that $11 million went to the trust.  It's just

23   not true.  So you have to get your facts right to ask

24   questions.

25          THE COURT:  So you're saying the question assumes

Page 90

1    facts not in evidence?  Is that the basis for the objection?

2              MR. HUEBNER:  I apologize.  This is not really my

3    forte, but I think that is right.

4              THE COURT:  Okay.  Well, I think Ms. Conroy

5    actually answered the question and Mr. Goldman moved on to

6    another one, which was whether Ms. Conroy was aware of any,

7    I guess, prepetition lawsuits that asserted a fraudulent

8    transfer claim against the trust?

9              MR. GOLDMAN:  Correct.

10             THE COURT:  You can answer the question.

11             MS. CONROY:  Regardless of the amounts involved, I

12   just don't know.

13   BY MR. GOLDMAN:

14   Q    You did not mean in your amended complaint in Suffolk

15   County Raymond Sackler.

16   A    That's --

17   Q    Is that correct?

18   A    That's correct.

19   Q    And to your knowledge, did Raymond Sackler have the

20   intent of involvement that you had described in your answers

21   to prior counsel's questioning in Purdue's affairs?

22   A    I believe he did involvement, but it was a wider

23   analysis than that.

24   Q    The wider analysis you're talking about is -- includes

25   issues regarding service of process?

Page 91

1   A      True.

2   Q      And the fact that you might not have been able to get

3   service or personal jurisdiction over Raymond Sackler being

4   sued, correct?

5              MR. ISSACHAROFF:  Your Honor, I'm going to --

6              MR. GOLDMAN:  Pardon me, Your Honor?

7              THE COURT:  There's an objection to that question.

8   I was just making sure Ms. Conroy saw --

9              MR. GOLDMAN:  (indiscernible)

10             THE COURT:  -- counsel.  It's -- is this a --

11             MR. ISSACHAROFF:  He's getting into the attorney

12  work product and the decision of counsel.  This is where I

13  hope the Court could draw a line.  If he must ask what she

14  -- what was in the complaints and so forth, that's fine, but

15  I -- I'm very nervous about this line of questioning.

16             MR. GOLDMAN:  Your Honor, this subject matter was

17  elicited by counsel during his questioning where --

18             THE COURT:  It was elicited in a very general

19  sense.  A number of factors apply to a lot of different

20  people, so I can understand why there would be an objection

21  here where there wouldn't be otherwise where you're

22  pinpointing it as to a specific legal conclusion and the

23  specific person.  So I'm going to sustain the objection.

24  BY MR. GOLDMAN:

25  Q      So Ms. Conroy, it's fair to say that the

Page 92

1    (indiscernible) Raymond Sackler was not based on what he

2    believed to be the merits of claims against his, correct?

3               MR. ISSACHAROFF:  Again, Your Honor, I'm going to

4    object to that.

5               THE COURT:  I'll sustain that objection.

6    BY MR. GOLDMAN:

7    Q    The piece premium that you described in your testimony

8    in response to questions from prior counsel still leaves the

9    Sackler family members with billions of dollars of wealth;

10   does it not?

11   A    I don't know that I -- I don't know that I can even

12   answer that.  It's so broad.

13   Q    Well, the -- you implied that they were paying a piece

14   premium under the current plan; is that correct?

15   A    Think I was describing generally what piece premium is

16   and why it maximizes a settlement recovery, but I don't -- I

17   would not be able to itemize what it leaves for something as

18   general as the Sackler family.

19   Q    Well, you were aware that they are going to be left, if

20   this plan is confirmed, with billions of dollars.

21               THE COURT:  I think Ms. Conroy's point is when you

22   say "they", you're referring to whom?

23               MR. GOLDMAN:  The Sackler family.

24               THE COURT:  All right.  The entire family

25   including the --

1          MR. GOLDMAN:  Yes.

2          THE COURT:  -- grandchildren and in the trust and

3    --

4          MR. GOLDMAN:  Well, the trust, yes.

5          THE COURT:  Well, I think you need to specify it.

6          MR. GOLDMAN:  The Side A and Side B families.

7    BY MR. GOLDMAN:

8    A    I don't know.  I don't know the answer to that.

9          MR. GOLDMAN:  I have no further questions, Your

10   Honor.

11         MR. HIGGINS:  Your Honor, this is Ben Higgins for

12   the U.S. Trustee.  I apologize.  I wasn't able to get my

13   video feed up earlier.  If you would permit it, we did have

14   one question for Ms. Conroy.

15         THE COURT:  Before we get to that, I -- because of

16   all the back and forth, Ms. Conroy, I'm not quite sure which

17   -- what you didn't know the answer to.  Was it --

18         MS. CONROY:  I don't know the answer to what

19   amounts of money are still potentially held if this plan was

20   to be confirmed by, and with quotes around it, "the Sackler

21   family" even if someone says Side A and Side B.  I don't

22   know what they still have.

23         THE COURT:  All right.  Thank you.  Okay.

24         You can go ahead, Mr. Higgins.

25         MR. HIGGINS:  Thank you, Your Honor.

1                    CROSS-EXAMINATION OF JAYNE CONROY

2    BY MR. HIGGINS:

3    Q    Good morning, Ms. Conroy.  My name is Ben Higgins.  I

4    represent the United States Trustee.  Can you hear me

5    clearly?

6    A    I can.  Good morning.

7    Q    Did any of your litigation against the Sacklers involve

8    claims related to Perdue's non-opioid products?

9    A    Let me think about that for a minute.  No.  I don't

10   recall that at all.

11   Q    Thank you.

12              MR. HIGGINS:  No further questions, Your Honor.

13              THE COURT:  Okay.

14              MAN:  Your Honor, I have about three questions

15   based on Mr. Goldman's recross.

16              THE COURT:  Okay.  Mr. O'Neill, are you like Mr.

17   Higgins, you didn't -- you weren't able to get on for cross

18   and do you want to do cross now?  Or...

19              MR. ROBINSON O'NEILL:  You know, Your Honor, I

20   have a few questions related to the redirection examination

21   that didn't come up in Ms. Conroy's initial testimony.

22              THE COURT:  Okay.

23              MAN:  Please.  I'm happy to go last.  Go ahead,

24   sir.

25                    CROSS-EXAMINATION OF JAYNE CONROY

Page 95

```
1    BY MR. ROBINSON O'NEILL:

2    Q    Good morning, Ms. Conroy.  Can you hear me?

3    A    I can.

4    Q    This is Tad Robinson O'Neill on behalf of the State of

5    Washington for the record.  You testified in -- on redirect

6    about the value of the document repository that will be

7    created out of this confirmation plan; is that correct?

8    A    That's right.

9    Q    You're aware that the document repository was

10   negotiated in what's been called Phase 3 of the

11   negotiations?  Is that right?

12   A    I --

13             MAN:  Objection.  Assumes facts not in evidence.

14   That is a false statement.  It was negotiated all through

15   the case from the very second hearing starting in October.

16   She's just not correct.

17             MR. ROBINSON O'NEILL:  I'll withdraw the question

18   and ask a different one then, Your Honor.

19             THE COURT:  Very well.  Go ahead, Mr. O'Neill.

20   BY MR. ROBINSON O'NEILL:

21   Q    Do you know when the document repository was agreed to

22   by the Debtor and by the Sacklers?

23   A    No, I do not.

24   Q    Thank you.  You were asked about the -- what was called

25   the piece premium.
```

1    A    Right.

2    Q    You were also asked by Mr. Huebner whether during the

3    negotiations parties contemplated a plan without an opt-out

4    provision.  Do you recall that testimony?

5    A    I do.

6    Q    Would you agree with me that the piece premium

7    calculation would be different under a scenario where an

8    opt-out was contemplated?

9    A    Doesn't sound like a piece premium to me, so I don't

10   know.

11   Q    Well, you don't know --

12   A    I (indiscernible) --

13   Q    You don't know whether the Sacklers -- if you don't

14   know, you don't know, whether the Sacklers would've paid

15   additional piece premium to purchase off the opt-out stake.

16   We just don't know because that was never part of the

17   negotiations; isn't that right?

18   A    Well, I certainly don't know one way or the other.

19   Q    Thank you.

20          MR. ROBINSON O'NEILL:  I have no more questions,

21   Your Honor.

22          THE COURT:  Okay.

23          MAN:  Your Honor, just very briefly.

24             CROSS-EXAMINATION BY JAYNE CONROY

25   BY UNIDENTIFIED MALE SPEAKER:

Page 97

1    Q    Ms. Conroy, just because I think the numbers actually

2    matter a great deal to the Debtors and I don't want there to

3    be any confusion.  Are you aware that the special committee

4    of the board of directions did an extraordinarily detailed

5    forensic investigation and filed an approximately 500-Page

6    report on the docket listing the $10.4 billion of cash

7    transfers that went out to or for the benefit of the

8    shareholders between 2008 and 2019?  Are you aware that

9    there was such a report?

10   A    Yes, I am.

11   Q    Okay.  Are you aware of the (indiscernible) of the

12   board of directions did a second report that detailed every

13   single non-cash transfer that went out to or for the benefit

14   of the shareholders, and that that was filed also as a

15   multi-hundred Page forensic analysis report on the docket?

16   A    I don't think I'm -- I don't think I would've

17   remembered that unless you asked me, so --

18   Q    Which is fair.  Again, as always, you know, we're all

19   --

20   A    Yeah, I just -- it's just not --

21   Q    Okay.  Right.  It's fair.  And so I guess I probably

22   know the answer, but I'm going to ask it anyway.  Are you

23   aware that the debtors later quantified that in their view

24   the potential fraudulent transfer exposure for the non-cash

25   transactions is approximately another $1.4 billion dollars

Page 98

1    on top of the 10.4 of cash transfers that were previously

2    discussed?  You know, if you're not aware, just say --

3    A    No.

4    Q    -- I don't really know the --

5    A    I'm not aware.  Not something I would've focused on.

6    Q    Okay.  But you're generally aware that all the "money"

7    that the Sacklers took out was, in fact, cataloged in

8    hundreds and hundreds of Pages of report done by the special

9    committee that are on the dockets of these cases for

10   everyone in the world to see?

11   A    Yes.

12   Q    Okay.  I have two questions just based on Mr. O'Neill,

13   and then I very much hope that I'm done.  You're aware,

14   obviously because I think we discussed it before, that the

15   settlement reached with the HD contemplates payments over a

16   period potentially as long as nine years?

17   A    Yes.

18   Q    If Mr. O'Neill's client, the State of Washington, and

19   Mr. Goldman's client, the State of Connecticut, were each

20   free to sue the Sacklers directly, and let's assume

21   hypothetically that they each won $1 billion judgment in

22   2022 or 2023, would you still agree to take nine years of

23   payment risk for your recoveries?

24   A    I can't answer that here.  I don't know.

25   Q    Okay.  Fair enough.

1          MAN:  Thank you very much, Your Honor.  I have

2     nothing further.

3          MS. MONAGHAN:  Your Honor, this is Maura Monaghan.

4     I represent Side A of the Sackler family.  I just have a

5     quick two questions for Ms. Conroy if I may.

6          THE COURT:  Okay.

7               CROSS-EXAMINATION OF JAYNE CONROY

8     BY MS. MONAGHAN:

9     Q    Ms. Conroy, you referenced, in response to Mr. Higgins'

10    question, that you were not aware of complaints related to

11    non-opioid products.  Are you aware of allegations and

12    complaints you're familiar with about something called

13    Project Tango?

14    A    I am.  I would've considered -- you're talking about

15    epinephrin or something like that?

16    Q    Right, that's an opioid antagonist, correct?

17    A    It is.  I think I would've put that in with opioids.  I

18    thought, you know, I wouldn't have put the Senokot and those

19    other kind -- I would -- that's where I was drawing my

20    distinction.

21    Q    Understood, but you're aware that there have been

22    allegations about buprenorphine and Project Tango in some of

23    the complaints, correct?

24    A    Yes, but as I was saying, I would've --

25    Q    I understand.  In your mind -- I'm not impugning your

Page 100

1    testimony at all.  I understand in your mind you thought of

2    it as opioid adjacent perhaps or something like that, but it

3    actually is a different type of product.  My second question

4    is you're aware that Purdue has an affiliate called Avrio

5    Health, correct?

6    A    I have heard of that, yes.

7    Q    And Avrio Health is an over-the-counter producer,

8    correct?  It doesn't produce prescription opioids.  Isn't

9    that correct?

10   A    I wouldn't have known that.

11   Q    Okay.  Are you aware that Avrio Health has been named

12   in complaints, including the complaint by the State of

13   Maryland?

14   A    Not aware.  Not anything I ever focused on.

15   Q    Okay.  Thank you very much.  In any event, the

16   complaints speak for themselves.  Would that be fair to say?

17   A    I suppose.  I have no idea.

18   Q    Okay.  Thank you, Ms. Conroy.

19              THE COURT:  Okay.  Anyone else?

20              MR. OZMENT:  Your Honor, this is Frank Ozment.  I

21   have one follow-up question for Ms. Conroy.

22              THE COURT:  Okay.

23              MR. OZMENT:  Maybe two.

24   CROSS-EXAMINATION OF JAYNE CONROY

25   BY MR. OZMENT:

Page 101

```
 1    Q    Ms. Conroy, my name is Frank Ozment, and I represent

 2   some individual claimants who were opioid use disorder

 3   victims.  You were asked about your understanding regarding

 4   what was included within the definition of opioid product,

 5   and there was some colloquy regarding buprenorphine.  In

 6   your understanding of what is an opioid product for purposes

 7   of these releases, is buprenorphine an opioid product or an

 8   opioid?

 9    A    Well, it's not an -- it's -- I don't know the answer

10   with respect -- as I sit here right now, I don't know the

11   answer with respect to the releases.  It's certainly -- it's

12   not an opioid.  In my mind, it's an opioid product.  It's an

13   antagonist, but it also can be abused, and I'm aware of

14   Project Tango, but I don't know the answer to your question

15   with respect to the release.

16    Q    Okay.  And would you -- just so that we're clear on the

17   record, and I don't mean to quibble, but would it be

18   consistent with your recollection that buprenorphine is

19   actually an opioid agonist?

20    A    Yes.

21    Q    Okay.  So bottom line is, as you're sitting here today,

22   you can't tell us whether these releases would preclude

23   litigation arising from allegations around buprenorphine,

24   right?

25    A    Well, it -- I can't -- I mean, I'm not looking at a
```

Page 102

1    release.  I don't have an opinion on that, and I -- so I

2    don't have an answer for you sitting here.

3    Q    And as you sit here today, you can't tell us whether

4    buprenorphine is an opioid in the sense that that has been

5    used in the litigation that you pressed; is that right?

6    A    Well, it has been used in the litigation as an opioid

7    in litigation that we have pressed, and it's been part of

8    when we have sought ARCOS data and other data.  It has been

9    included as a drug that we have been interested in, in

10   wanting to understand in the broader picture, you know, who

11   has distributed that drug and who has dispensed it.  But I

12   am not -- I just -- as I sit here today, I'm not familiar

13   with where it sits with respect to the Purdue release.

14   Q    Okay.  And to be more specific, I mean, you didn't

15   press any claims for improper marketing or other misconduct

16   or alleged misconduct on the part of Purdue that involved

17   buprenorphine; is that right?

18   A    Not exactly true.  I know there were several emails

19   that we looked at with respect to the marketing of

20   buprenorphine and how it was -- and how it would fit into

21   the general marketing scheme by Purdue, so we did look at

22   that.

23   Q    And I guess what I'm interested in is not whether you

24   looked at it, but whether you actually filed a lawsuit

25   seeking recovery based on misconduct involving

1    buprenorphine.

2    A    Our lawsuit was filed based on misrepresentation made

3    by Perdue Pharm with respect to their controlled substances.

4    So yes, we -- that would've been included in our lawsuit.

5    In my lawsuit certainly.

6    Q    Thank you.

7           THE COURT:  All right.  Anyone else?

8           MR. UNDERWOOD:  Good morning.  This is Allen

9    Underwood on behalf of (indiscernible) Creditors and

10   Canadian First Nation Creditors.  I have maybe four

11   questions for the witness Ms. Conroy.

12          THE COURT:  Okay.

13          MR. UNDERWOOD:  Thank you.

14             CROSS-EXAMINATION OF JAYNE CONROY

15   BY MR. UNDERWOOD:

16   Q    Ms. Conroy, I believe Mr. Issacharoff introduced this

17   notion of a piece premium, and I just want to confirm in the

18   first instance it's your contention that there is a premium

19   baked into the settlement plan and trust with

20   (indiscernible) today.

21   A    It was hard to hear you.  Did -- could you just repeat

22   whether there was a piece premium?

23   Q    That's -- the question was whether the settlement with

24   the Sackers under the plan includes in your view some form

25   of piece premium.

Page 104

```
1    A    I believe in negotiating anything of this size, there

2    is -- for a maximum recovery, there is an expectation of

3    closure, yes.

4    Q    As a follow-up question, Ms. Conroy, we did

5    negotiations that involved a settlement.  Apparently it

6    contained some form of piece premium, account for the cost

7    and risk of non-USA litigation to the Sacklers that may

8    follow the resolution before this Court.

9    A    Let me just make sure I understand your question.

10   Would the negotiation of this settlement include risk

11   outside of the United States or the failure to receive

12   closure outside of the United States?

13   Q    That's a fair rephrasing of the question, yes.

14   A    I'm not sure that's -- I'm not sure that I ever looked

15   at anything, any risk for litigants outside the United

16   States.  I've been focused on U.S. litigants and the

17   possibilities with U.S. litigants.

18   Q    Isn't it true, Ms. Conroy, that, aside from historical

19   value of the document repository, the primary value may be

20   in pursuit of litigation and other jurisdictions, and would

21   that not potentially adversely affect the Sacklers' ability

22   to satisfy the intent as required, their portion of this

23   long-term settlement?

24   A    I don't know the answer to that.  I don't know.

25   Q    In terms of this piece premium, and this is my last
```

Page 105

1     question, to the extent that it was considered, was the

2     piece premium a function of what was offered or an in-depth

3     analysis of what could actually be recovered globally from

4     the Sacklers?

5     A    I'm not sure I actually understand your question when

6     you say part of what was offered.  I mean, it's -- as I said

7     before, it's a part of any -- generally any major settlement

8     negotiation.  You know, what (indiscernible), so I'm not --

9     but I'm not sure I understand what you mean by what was

10    offered.

11    Q    I think the intent was to understand that the Ad Hoc

12    Committee had a full understanding of potential global

13    litigation and global assets, and whether that was a factor

14    within this (indiscernible) settlement.

15    A    Well, certainly global assets were a factor in the

16    analysis.

17    Q    Potential global education in places like Canada,

18    Australia, South Africa, any of the European countries was

19    -- is not considered (indiscernible)?

20    A    I -- I'm -- do you mean risk analysis of the -- of

21    those litigations on assets?  I -- I'm just not really

22    following your question.

23    Q    I think that's correct.  That's a fair summarization.

24    If we believe that the Sacklers have disclosed all of their

25    assets, then presumably their ability to pay under this plan

1    and settlement would be affected by the strength or weakness

2    of otherwise global litigation.

3    A    Well, I suppose that's true.  I don't know to what

4    extent it's possible to -- look, we analyze the risk of the

5    U.S. litigation and the ability to recover and get assets

6    and resources to communities in the United States.  You

7    know, I suppose offshore litigation is a risk, but I don't

8    know how to -- I personally don't know how to analyze that,

9    but it's -- there are lots of things that could be a risk to

10   assets that are outside the United States.  In particular,

11   you know, litigation in the United States.

12   Q    So it does appear that that issue is not necessarily

13   addressed by Ad Hoc Committee or in the Unsecured Creditors

14   Committee.  Are you aware of whether the Sacklers exactly

15   looked at that issue in terms of the negotiation process and

16   the settlement ultimately brokered?

17   A    I'm sorry.  I really didn't --

18              THE COURT:  Mr. Underwood, you've got to --

19   BY MR. UNDERWOOD:

20   A    -- understand that question.

21              THE COURT:  -- ask a question -- I'm sorry.  These

22   -- Ms. Conroy is actually trying to figure out what you're

23   asking.  I'm having an equally hard time understanding what

24   you're asking.

25              MR. UNDERWOOD:  I think what I wanted to know was

Page 107

1    it does not appear that the risk of long-term global

2    litigation with regard to the settlement proposed was

3    necessarily a factor that was refuted by any of the, let's

4    call them, Plaintiff's side parties.  My question was

5    whether there --

6              MR. ISSACHAROFF:  Your Honor, sorry.  I have two

7    objections.  First of all, he's not asking her about what

8    all Plaintiff parties considered, which is obviously

9    unknowable and calls for speculation.  He's also misstating

10   her testimony of about five minutes ago.  This is just not a

11   proper question in any way, shape, or form.  I don't even

12   know what he means by "all Plaintiff constituencies".  There

13   are 2,700 lawsuits pending even as of the filing date.  Is

14   she supposed to know what's in the mind of 2,700 separate

15   Plaintiffs' lawyers?  It just is non-sensical.

16             MR. UNDERWOOD:  Well, okay.

17   BY MR. UNDERWOOD:

18   Q    So the Ad Hoc Committee perhaps did not consider global

19   wide ability and its impact upon settlement proposed under

20   the plan.

21             MR. ISSACHAROFF:  I'll object to that too.  I

22   think that also misstates her prior testimony.  I think he

23   should just ask her a question instead of saying what does

24   she think.

25   BY MR. UNDERWOOD:

Page 108

1   Q    Okay.  Ms. Conroy, are you aware of whether the

2   Sacklers, in terms of their ability to pay over time,

3   considered the risk of litigation outside of this Board,

4   maybe outside of this jurisdiction.

5              MR. ISSACHAROFF:  Your Honor, this is outside the

6   bounds of the declaration, outside the bounds of anything

7   we've put forward through this witness.  And also, it's sort

8   of silly to ask her what the Sacklers considered.  I doubt

9   she is the position witness.

10             THE COURT:  Well, let me -- do you understand what

11  the Sacklers considered in entering into this settlement

12  agreement by way of the risks that they face?

13             MS. CONROY:  Not at all.  I mean --

14             THE COURT:  Okay.

15             MS. CONROY:  -- I assume they analyzed them, but I

16  don't know what they analyzed.  I'd like to know.

17             MR. UNDERWOOD:  Your Honor, I only advanced this

18  line of questioning because I'm concerned about any

19  resolution here being pure.  I have no further questions.

20  Thank you.

21             THE COURT:  All right.  Mr. Issacharoff, do you

22  have any redirect on any of those questions?

23             MR. ISSACHAROFF:  No, I don't, Your Honor.  And my

24  apologies.  I forgot to state my name for the record.

25  Again, it's Samuel Issacharoff.  We tendered what

Page 109

1    (indiscernible).  I have nothing further.

2              THE COURT:  Okay.  All right.  So hearing no one

3    else, Ms. Conroy, you can sign off at this point.  Your

4    testimony is complete.

5              MS. CONROY:  Thank you, Your Honor.

6              THE COURT:  Thank you.  All right.

7              So I think that the next witness Jennifer Blouin

8    if I'm pronouncing that correct.  B-L-O-U-I-N.

9              MS. BLOUIN:  Yes, Your Honor.

10             THE COURT:  And I see Ms. Blouin there.  Would you

11   raise your right hand, please?  Do you swear or affirm to

12   tell the truth, the whole truth, and nothing but the truth,

13   so help you God?

14             MS. BLOUIN:  I do.

15             THE COURT:  And it's Jennifer, J-E-N-N-I-F-E-R,

16   new word, B-L-O-U-I-N, correct?

17             MS. BLOUIN:  Yes, Your Honor.

18             THE COURT:  Okay.  So Ms. Blouin, you submitted a

19   supplemental declaration dated August 4, 2021 in connection

20   with this matter under my order establishing procedures for

21   the hearing.  It's intended to be your direct testimony.  It

22   attaches an expert report dated June 15, 2021 and

23   supplements that are -- corrects or amends it.  Sitting here

24   today and knowing that it would be your direct testimony, is

25   there anything in it that you would wish to change or

Page 110

1    correct?

2            MS. BLOUIN:  No.

3            THE COURT:  Does anyone object to the admission of

4    Ms. Blouin's August 4, 2021 supplemental declaration and

5    except to the extent it's corrected by the supplemental

6    declaration, her June 15, 2021 expert report?  Okay.

7    Hearing no one then, I will admit the declaration and

8    appended expert report, which I have reviewed.

9            (Declaration of Jennifer Blouin Admitted Into

10   Evidence)

11           THE COURT:  Does anyone want to cross-examine Ms.

12   Blouin on these documents?  No?  All right.  Very well.  I

13   don't have any questions.  I believe that, frankly, it's --

14   the report is summed up in paragraph 7 of that report.  And

15   hearing no one, I will excuse you, Ms. Blouin.

16           MS. BLOUIN:  Thank you very much.

17           THE COURT:  All right. Next on the list was David

18   Sackler.  But as discussed, this morning, his testimony will

19   be taking place later in the week so that it can be

20   coordinated with the testimony that the objecting states

21   wish to elicit.

22           And I then the next person slated to testify is

23   Michael Atkinson?

24           MR. HURLEY:  Good afternoon, Your Honor, Mitch

25   Hurley with Akin Gump on behalf of the UCC.  Mr. Atkinson is

Page 111

```
 1    next.  I'm just emailing him to join.

 2              THE COURT:  Okay.

 3              UNKNOWN FEMALE:  Hey.  Can you call me on my --

 4    let me --

 5              THE COURT:  Okay.  I see Mr. Atkinson.  Would you

 6    raise your right hand, please?  Do you swear or affirm tell

 7    the truth, the whole truth, and nothing but the truth, so

 8    help you God.

 9              THE WITNESS:  I do.

10              THE COURT:  Okay.  And it's -- and it's Michael,

11    M-I-C-H-A-E-L, Atkinson, A-T-K-I-N-S-O-N?

12              THE WITNESS:  Correct.

13              THE COURT:  Okay.  Good morning, Mr. Atkinson.

14              You submitted a declaration in support of the

15    statement of the Official Committee of Unsecured Creditors

16    in support of confirmation of the Debtor's Amended Plan.

17    It's dated August 5, 2021.  It attaches as Exhibit A the

18    letter from the Committee, so called Plan Support Letter,

19    that went out with the Debtor's disclosure statement for the

20    Plan.

21              Under my order establishing procedures for this

22    hearing, your declaration is intended to be your direct

23    testimony.  Knowing that and sitting here today on August

24    16th, is there anything in it that you would wish to change?

25              THE WITNESS:  No, there's not, Your Honor.
```

1              THE COURT:  Okay.  Does anyone object to the

2       admission of Mr. Atkinson's testimony?

3              MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson,

4       here on behalf of the State of Washington.

5              I don't judge the declaration and I don't believe

6       I have an objection to the letter, I'm just -- I'd like to

7       clarify it's being offered for the purpose of showing what

8       was sent in the solicitation package rather than for the

9       statements or the truth therein in that letter.

10             THE COURT:  Well, it's -- I think that's probably

11      a little broad.  I don't think it's being asserted for the

12      truth of the assertions in the letter, but it's more than

13      just attached as a mailing.  Right?  I understand it, but

14      Mr. Hurley can correct me, being offered as evidence of the

15      Committee's process, both as a process and its thought

16      process in reaching the -- the determination that it reach

17      to support confirmation of the Plan.

18             Is that right, Mr. Hurley?

19             MR. HURLEY:  That is correct, Your Honor.  The

20      document is being offered as evidence of Committee's views,

21      effectively, rather than the truth of the contents of the

22      letter.

23             THE COURT:  Okay.  Does that -- does that answer

24      your question, Mr. O'Neill or --

25             MR. ROBINSON O'NEILL:  It does, Your Honor.

Page 113

```
 1              THE COURT:  Okay.  All right.  So, then there's no

 2    objection to the admission of the declaration or the

 3    exhibit, the exhibit for that purpose?

 4              All right.  I will admit the declaration and the

 5    attached exhibit, and then ask does anyone wish to cross-

 6    examine Mr. Atkinson?

 7              MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson on

 8    behalf of the State of Washington.

 9              THE COURT:  Okay.  You can go ahead.

10              CROSS-EXAMINATION OF MICHAEL ATKINSON:

11    BY MR. ROBINSON O'NEILL:

12    Q    Good morning, Mr. Atkinson.  Can you hear me okay?

13    A    I can, thank you.

14    Q    I'd like you to turn -- you have a copy of your

15    declaration there with you?

16    A    I do, yes.

17    Q    Could you turn to Page -- paragraph 3, which is on Page

18    2?  Are you there?

19    A    I am.

20    Q    In that paragraph, you indicate that the declaration is

21    based on your personal knowledge, and then you say, "the

22    review of documents and information that I have considered

23    in my capacity as an advisor to the Official Committee"; did

24    I read that correctly?

25    A    Yes, you did.
```

Page 114

```
1    Q    What document -- is there a list somewhere of the
2    documents or information that you considered in preparing
3    this declaration, or are you referring to some, like,
4    general review of all the time you've booked on the case?
5    A    I think it's the general review time where I've worked
6    on this case.
7    Q    And you work on the UCC -- you were -- well, for the A
8    -- UCC, you were a financial advisor; is that correct?
9    That's -- you're a financial advisor, not a legal scholar or
10   legal analyst?
11   A    That is correct.
12   Q    But you did personally participate in, I think, what
13   could be characterized safely as extensive meetings and
14   participation all throughout this case and the mediation
15   that's been involved; is that correct?
16   A    That's correct.
17   Q    If you go to Page 3 of your declaration, paragraph 9?
18   And this indicates you have extensive experience working on
19   creditor committee cases and debtor cases, having worked on
20   more than 50 of those; is that correct?
21   A    Yes.
22   Q    One of the cases that you worked on was, Mallincrodt,
23   which is another opioid company that's in bankruptcy; is
24   that correct?
25   A    Yes, that is correct.
```

1    Q    Okay.  One of the unique characteristics of this

2    particular Plan is its focus on public abatement and public

3    health.  Would you agree with me that that's unique in your

4    experience?

5    A    And very much so, yes.

6    Q    Can you think of any other case in which 48 states,

7    several thousand cities, a group of insurance companies,

8    groups of hospitals have agreed to voluntarily restrict

9    money or receive (indiscernible) through a bankruptcy to

10   abatement purposes for the public good?

11   A    I think -- I think just Insys, maybe as well as Purdue

12   and Mallincrodt potentially.

13   Q    Right.  But the other two -- those are two other opioid

14   bankruptcy cases; is that correct?

15   A    That's correct, yes.

16   Q    Would you agree with the me that the -- those

17   restrictions on money and the service of the public good is

18   central to this Plan?

19   A    Yeah, that's my read of the Plan.  I think it's a

20   central tenet to this Plan, yes.

21   Q    And without those restrictions and focus on public

22   health, you would agree with me that this negotiated

23   resolution wouldn't be here in front of the Court for

24   approval of a confirmation hearing?

25   A    I understand that that was a central component of, I

Page 116

1    guess, phase one of the mediations, and it's become a

2    central component of the Plan statements.

3    Q    Thank you.  Now, just to clarify, the UCC represents

4    all creditors in its view -- and that would include the

5    creditors that are represented by the states -- the states

6    in this case, right?

7    A    We represent -- we're the voice for all unsecured

8    creditors, correct.

9    Q    Okay.  But the UCC does contain any states on it in its

10   commitments?  The states were not included on the UCC

11   Committee; is that correct?

12   A    I know we opened it up to states.  I know there was one

13   state that had asked (indiscernible) to be on our Committee;

14   and ultimately, decided not to be on our Committee.  But

15   yes, that is fair that there are none on the Committee

16   currently.  There are -- there are municipalities.  I think

17   there's municipalities represented, but no states.

18   Q    All right.  Now, I'd like to shift your attention to

19   the mediation process.  You were a participant in the

20   mediation process after the UCC was formed, after the filing

21   of the Purdue Bankruptcy; is that correct?

22   A    I was a participant in phase one and phase two of

23   mediation process, yes.

24   Q    Okay.  The UCC was not a party to what has been called

25   in this case the settlement framework, which was an

1    agreement between the Sacklers the Debtor and 23 states that

2    preceded the bankruptcy.  Are you aware of that settlement

3    framework?

4    A    I -- I am aware.

5              MR. HURLEY:  I'm sorry, Your Honor.  Objection.

6    Assumes facts not in evidence.  There are actually various

7    other parties.  That framework included the MPLPC.  Mr.

8    O'Neill is actually just misdescribing the parties to the

9    settlement (indiscernible), which I apologize.

10             THE COURT:  That's fine.  But I think it's

11   summarized in the declaration and the -- in the letter.  So,

12   he's really just -- so that Mr. Atkinson can know --

13             MR. ROBINSON O'NEILL:  Yeah, and I do mean to --

14             THE COURT:  So --

15             MR. ROBINSON O'NEILL:  -- shorten it.  I

16   apologize.  I didn't mean to -- I was trying to shorten it.

17   There's a lot of detail that I'm kind of skipping a little

18   bit.

19             THE COURT:  Right.

20   Q    I wanted to ask you, Mr. Atkinson, when the UCC was

21   formed, there was already agreement in place which included

22   substantial contribution from the Sacklers; is that correct?

23   A    That is correct, yes.

24   Q    Would you agree with me that the negotiations that then

25   followed in mediation one and two always included the notion

Page 118

1    of or contribution of billions of dollars by the Sacklers?

2            MR. HURLEY:  Your Honor, I'm just going to object

3    and ask for a caution that the witness not testify as to

4    anything that's subject to mediation confidentiality.

5            THE COURT:  Okay.  Keeping that in mind, Mr.

6    Atkinson, you can -- you can answer the question.

7    A    Are you asking me if the amounts discussed ever went

8    below $3 billion?

9    Q    No.  And let me -- let me, first of all, agree with Mr.

10   Hurley, I don't want you to disclose anything that occurred

11   in the mediation that was subject to privilege.  So, if I

12   get into anywhere near that, please don't answer that

13   question and stop.  I'm just -- and I'm not really concerned

14   about the amount, I'm just -- when the UCC was formed, there

15   was already a plan for the Sacklers to contribute billions

16   of dollars in support of this -- in -- during this

17   bankruptcy?  That's all I'm asking.

18   A    Yes, there was.

19   Q    And during those phase one, phase two negotiations,

20   there -- those negotiations never involved a scenario in

21   which the Sacklers weren't making a significant contribution

22   to this estate?

23   A    I guess if they failed, potentially, yes.  But no, I

24   don't think that came up.

25           MR. HURLEY:  Your Honor, with apologies again,

Page 119

1   phase one mediation was exclusively intercreditor, so

2   objection.  Facts not in evidence.  Mr. Robinson is just

3   simply misdescribing what has happened in this case; and

4   therefore; just --

5              THE COURT:  The focus on phase two.

6              MR. ROBINSON O'NEILL:  Well, Your Honor, I

7   disagree with that.  Phase one, although they were

8   intercreditor negotiations, took place under -- with the

9   understanding that there would be billions of dollars

10  contributed.

11             The amounts that were agreed in that phase one

12  negotiation between the creditors couldn't have taken place

13  if they -- if the creditor -- or if the parties didn't

14  believe that there were billions available from the

15  Sacklers.

16             THE COURT:  Okay.

17             MR. HURLEY:  Your Honor, I cannot (indiscernible)

18  --

19             THE COURT:  I think -- you know, honestly, this is

20  just a question and if -- I'll overrule the objection.  I

21  don't think the question is trying to put words in Mr.

22  Atkinson's mouth.  I, you know --

23             MR. HURLEY:  Understood, Your Honor.

24             THE COURT:  Okay.  So, do you want to ask -- I

25  apologize, Mr. O'Neill.  Could you ask the question again

Page 120

1    because I think he may have lost track of it during that

2    discussion?

3              MR. ROBINSON O'NEILL:  I actually think, you know,

4    I'm just looking at back at the real-time transcript, and I

5    think his answer was, "I guess if they fail potentially,

6    yes.  But no, I don't think that came up."  I think that

7    answer stands.

8              THE COURT:  Okay.

9              MR. ROBINSON O'NEILL:  I don't know that we --

10             THE COURT:  That's fine.

11   BY MR. ROBINSON O'NEILL:

12   Q    It's -- it's true -- apologize.  Having some technical

13   difficulties on my computer.

14        All right.  The use -- I'm sorry, the Purdue Pharma has

15   substantial assets of its own in cash reserved and the like.

16   I think at the time, approaching a billion dollars; was that

17   correct?

18   A    It has substantial assets, yes.  When you mention cash

19   withdraw, are you asking me how much cash they had or are

20   you asking a different question?

21   Q    No.  I'm just asking whether -- well, I guess the bulk

22   of the question I want to ask you is whether it would have

23   been possible to negotiate a deal just disposing of Purdue's

24   own assets in this bankruptcy?

25   A    I personally don't believe so, no.

Page 121

1    Q    Have you not been involved -- in the case of

2    Mallincrodt, for example, and the -- and bankruptcies, where

3    the assets of the debtor are the only assets that are being

4    distributed?

5    A    I have been in cases where yes, it's the debtor the

6    one's being distributed, yes.

7    Q    And in case -- a specific example of Insys, in that

8    case, there was a resolution in the bankruptcy where only

9    assets of Insys were distributed?

10   A    That's correct.  I mean, I don't know if you're trying

11   to say that the -- and I -- I think of the assets of Purdue,

12   including cause of action against the Sacklers.  So, if

13   you're suggesting that we don't include them, I don't

14   believe we have the same situation in -- or had the same

15   situation in Insys, with the same magnitude of dollars, so

16   that was why it wasn't considered there.  And I think we're

17   reserving our rights in Mallincrodt, currently.

18   Q    And that's fair enough.  The -- one of the assets that

19   Purdue has is its direct claim -- or its claims, the estate

20   claim, we'll call them, against the Sacklers.  So, thank you

21   for that correction.

22        Now, when you receive -- when you began in the -- on

23   the mediation, did you understand that part of this deal was

24   to not allow states to opt out?

25              MR. HURLEY:  Objection.  Vague.  I'm not sure

Page 122

1    which part of the mediation the question is referring to.

2    Q    Any of the mediations.  In any of the mediations that

3    you participated in, were you aware of whether or not there

4    was the contemplation that objecting states could opt out of

5    the releases?

6    A    I was not aware of it in any way.  I don't think I

7    heard that as an -- as a possibility one way or the other.

8    Q    All right.  Can you turn to paragraph 31 of your

9    report?

10            MR. HURLEY:  And just so we're covered, this is

11   not a report.  This is our letter that we sent to the

12   creditors.

13            THE COURT:  Well, it's the declaration, I think,

14   that you --

15            MR. HURLEY:  I mean, the declaration.  I'm sorry.

16   I misspoke.  When I said report, I meant declaration.

17            MR. HURLEY:  Fair enough.  (Indiscernible.)

18   Q    This is the part that purports to describe how much

19   money the objecting states would receive under the Plan; is

20   that correct?

21   A    I'm sorry.  You said, Page 31?

22            THE COURT:  No.  Paragraph 31.

23            THE WITNESS:  Say it, again?  Sorry.  Thank you.

24            THE COURT:  It starts at Page 10, and the chart is

25   on Page 11.

Page 123

1          THE WITNESS:  Got it.  Good.  Thank you.  Okay.

2    I'm there.

3    Q    Okay.  Did you personally prepare this chart?

4    A    I did.

5    Q    Okay.  And I -- I just want to confirm that the

6    methodology used to do it, you took the projected sum of $4

7    billion and then you calculated it by the percentage that's

8    in the NOAT distribution trust for each of the states that's

9    an objecting state; is that right?

10   A    That's correct.  The disclosure statement had the $4

11   billion as a potential value and the NOAT agreement had --

12   and I think this footer statement had the percentages by

13   state that I utilized.  .

14   Q    That's correct.  So, for example, the number, $93

15   million for Washington is taking $4 billion and multiplying

16   it by 0.231 percent, which is the allocation that Washing

17   state would receive?

18   A    That's correct.

19   Q    Okay.  Are -- are you -- and at the end, you are aware

20   that the settlement value or the settlement payouts occur

21   over nine years; is that right?

22   A    I mean, I'm aware of that, yes.

23   Q    So, your number you're presenting here doesn't take

24   into account a discount rate for the time value of money;

25   does it?

Page 124

1    A    It -- it's not -- it's an illustrative value because it

2    doesn't include other assets as well.  But yes, it's fair to

3    say that this is a nominal dollar amount.  We just want --

4    which is the way I have come to see the states and other

5    public constituencies look at the recoveries in these cases

6    is on nominal dollars.  But yes, it's a fair statement.

7    It's nominal, not net present value.

8    Q    Has Washington state ever communicated to you that it

9    views settlement in nominal values only?

10   A    I've seen those settlements that have my numbers listed

11   in related to other settlements.  I don't know that

12   Washington state has ever communicated that to me

13   specifically.  But it's been my experience in dealing with

14   the states because it's definitely different.  As you

15   pointed out, there's a big health -- public health crisis at

16   hand.  So, this is case is different.  And in that way, it's

17   also different in the sense of nominal versus present value.

18   It's different than dealing with hedge funds.

19   Q    You -- and you would agree with me, over this nine

20   years, their money that would be distributed to the NOAT is

21   not distributed randomly?  It -- we're not getting the same

22   amount of money every year; is that right?

23   A    That is fair, yes.

24   Q    And, if anything, the payments under the NOAT

25   distribution are back-weighted, meaning that they occurred

Page 125

1   later in the Plan?

2   A      Payments to the NOAT are back-weighted?  Yes, the --

3   that's correct.

4   Q     And in part, that's so that the Confirmation Plan can

5   fund the private creditors like plaintiffs, the personal

6   injury plaintiffs, for example, early in the Plan?

7   A      I think it's to fund the settlement that the states and

8   the -- or the public side and the private side waged that

9   related to the private side settlements.  So, yes, there

10  were agreements that were struck, and they were struck with

11  earlier payments by both the public and the private.

12  Q     So, in the case of the NOAT distributions, the time and

13  value of money can be fairly significant; would you agree

14  with me -- because of the back-weighting?

15  A      I think -- I think it's fair that there will be

16  payments later, more payments later to the NOAT than

17  earlier.

18  Q     Did you, when you made this chart, did you make any

19  considerations for how the NOAT distributions function?

20  A      I don't understand the question.

21  Q     Well, let me -- let me be specific.  So, out of the

22  mythical $4 billion that would be paid in the distribution

23  in nominal value, are you aware that the Tribal allocation

24  comes off the top before the state -- that allocation is

25  calculated?

Page 126

1    A     Yes, I'm aware of that.

2    Q    You're aware as well that there's an attorney fee fund

3    that's funded out across -- again, off the top before the

4    percentages are allocated?

5    A     Yes.  My understanding is the $4 billion is a

6    separation allocation in the disclosure statement.  So, I

7    don't think it includes things like -- it's not -- it's not

8    meant to represent to represent the travel amount.  And I

9    mentioned earlier, it doesn't things like released excess

10   cash or insurance proceeds, which could be material in this

11   case.

12   Q    Well, and I -- I recognize that.  I guess -- let me ask

13   the next question.

14        You're also aware that there are administrative

15   expenses to be taken out of the top both from the estate --

16   the Bankruptcy Estate, as well as at the NOAT level, and

17   then again, at the state level for administrating this

18   Trust?

19   A     Yeah, I think --

20            MR. HURLEY:  Objection.  Your Honor, I think we're

21   starting to get beyond the scope of the direct examination

22   at this point, into details that were not referenced by Mr.

23   Atkinson in the declaration at all.  And, so, yeah, that's

24   the objection.

25            THE COURT:  No, I think at this -- you can ask --

Page 127

1    I'll overrule that objection.

2              MR. ROBINSON O'NEILL:  Thank you, Your Honor.

3    Q    And I guess my point is that the chart that you

4    prepared as an illustrative one, doesn't taken in a number

5    factors such that the (indiscernible) to the objecting

6    states may be significantly lower than your chart would

7    indicate?

8    A    I think it goes -- could go both way, yes.  So, it is -

9    - it is an illustrative chart in the sense that it's based

10   on the proposed distributions, hypothetical distributions in

11   the Plan, and the allocation as presented in the NOAT.  But

12   it does not NPV, I should point it out -- and it does not

13   include certain other assets that we know exist, such as the

14   insurance purses.

15   Q    And do you have any personal knowledge of what the

16   State of Washington's expert report revealed about the

17   amount of money that would be necessary to abate the opioid

18   crisis in the state of Washington?

19   A    I do not have personal knowledge, but as with pretty

20   much everybody in this case, there's just not enough money

21   to make anyone whole.

22   Q    Fair enough.  Now, can you look in your declaration at

23   Page 4, paragraph 11?  Are you there?

24   A    I am.

25   Q    And you agree with me that the UCC as part of its work

Page 128

```
 1    on this case conducted an evaluation of the likelihood of

 2    success of claims against the Sacklers and related entities,

 3    like the --

 4              MR. HURLEY:  Objection.

 5    Q    -- damages associated with such claims and the

 6    likelihood of collecting on judgment?

 7              MR. HURLEY:  Objection to the extent that, Your

 8    Honor, I think the phrase in that paragraph is "estate

 9    claims".

10              THE COURT:  Right.

11              MR. ROBINSON O'NEILL:  Yeah.  I didn't mean to

12    speak -- I -- yes, the estate claims.

13    A    So, the question is -- just to make sure I understand

14    the question.  The question -- can you just repeat it?  I'm

15    sorry.

16    Q    Sure.  The UCC investigated the likelihood of success

17    of estate claims against the Sacklers and related entities,

18    the likely damages associated with such claims, and the

19    likelihood of collecting on judgment?

20    A    That is -- that is correct, we looked into all that.

21    Q    Okay.  One of the things that UCC evaluated is what you

22    call -- and it's paragraph B of -- I mean, it's subparagraph

23    B of paragraph 14, if you want to turn to that.

24         "The UCC evaluated the degree to which the Sacklers and

25    others fiduciaries exposed the Debtors to a liability
```

Page 129

1    through aggressive marketing tactics"; do you see that?

2    A    I do.

3    Q    And then you say, "and other misconduct"; do you see

4    that?

5    A    I do.

6    Q    Now, did that other misconduct include Purdue's

7    participation with a company called Practice Fusion?

8    A    That is definitely something that we considered and

9    looked into, but, yes.

10   Q    And in fact, the criminal plea agreement between Purdue

11   and the Department of Justice included a specific conviction

12   related to the interaction with Practice Fusion; is that

13   correct?

14          MR. HURLEY:  Objection.  Foundation.

15          MR. ROBINSON O'NEILL:  If he knows.

16          THE COURT:  Well, when you say, "they," you mean

17   Purdue?

18          MR. ROBINSON O'NEILL:  Right.

19   Q    This is a -- I'm sorry.  The criminal conviction of

20   Purdue, the criminal plea agreement of Purdue,

21   (indiscernible), the allegations specific to Practice

22   Fusion; is that correct?

23   A    I don't know the answer to that question.

24   Q    Fair enough.  Do you know -- and but you do think that

25   other misconduct here included Purdue's relationship with

Page 130

1    Practice Fusion?

2    A    Yes, that's something that we considered, for sure.

3    Q    Did the other misconduct that you mentioned here also

4    include Purdue's participation with a company called

5    McKinsey?

6    A    Yes, that's something else we considered.

7    Q    And you were aware that McKinsey entered into a

8    separate settlement with near -- forty-five other states,

9    related to its misconduct in which McKinsey admitted that it

10   had violated what are called unfair and deceptive act --

11   practice -- or Unfair and Deceptive Practices Acts or UDAP?

12   A    I'm loosely aware of that, yes.

13   Q    And are you aware that the Sacklers, or at least

14   there's evidence to suggest that the Sacker Board members,

15   personally participated in discussions about the McKinsey

16   campaigns that led to those civil settlements?

17        MR. HURLEY:  Can I just object and again ask for

18   caution that the witness not testify as to any attorney-

19   client communications or attorney work product in answering

20   this question.

21   A    Yeah, I don't know what we've publicly disclosed.  I

22   know that we've filed some motions that may be related to

23   the crime fraud that we had, what -- last year, that we --

24   to give more insight into what's public.  So, I don't know

25   that I should say anything, not remembering what was in

Page 131

1      those documents.

2      Q    Okay.  But in any case, you believe that the misconduct

3      in this paragraph includes the McKinsey allegations?

4      A    I know that we think that there's allegations against

5      McKinsey.  I think McKinsey's an excluded party.

6      Q    Okay.  Now, do you also, as part of your evaluation,

7      you've had an opportunity to review the Sackler defense

8      presentations?

9      A    Yes, I have.

10     Q    Have you had an opportunity to review the evidence that

11     was submitted in this case in advance, the declarations and

12     expert reports?

13     A    I have primarily.  I don't know if I've read all of

14     them, but I've seen most of them.

15     Q    And if you could turn to the letter that's attached to

16     your declaration, Page 16 of that letter?

17     A    Okay.

18     Q    There's a Subsection F on that Page; did you see it?

19     A    I do.

20     Q    And there's one complete paragraph in that -- in that

21     section, and if you, I think it's the third sentence, it

22     starts, in connection with these privileged motions.

23     A    Yes.

24     Q    And I think the privileged motions that you referenced

25     earlier in your testimony, are these the same privileged

1  motions?

2  A    I do believe so.

3  Q    And I think you used the word, the crime prognotions?

4  A    Yeah, I think if you look in my declaration footnote 2,

5  I think that's where generally the documents that I'm

6  referring to.

7  Q    All right.  In this sentence, you indicate that after

8  the review of hundreds of pages of evidence, gathered

9  through those discovery efforts that the UCC concludes the

10 claims against the debtors were colorable, and that there

11 was probable cause to conclude that the Sacklers and the

12 debtors engaged in intentional fraud, and breaches of

13 fiduciary duty in connection with transferring billions of

14 dollars to the Sackler's between 2007 and 2017; do you

15 remember that correctly?

16            MR. HURLEY:  Judge, objection.  I believe the

17 question was said you said X, and the letter is a letter

18 from the UCC, not from the witness.

19 BY MR. ROBINSON O'NEILL:

20 Q    With that qualification, did I read it correctly?

21 A    With that qualification, yes, that's correct.

22 Q    Does the UCC's position, or has the UCC's position on

23 the fact that there's probably cause to believe the

24 Sackler's engaged in intentional fraud changed because of

25 the defense presentation that you've had an opportunity to

Page 133

```
 1    review?

 2              MR. HURLEY:  We're going to object.  It calls for

 3    the witness to disclose attorney client communications and

 4    work product.

 5              THE COURT:  Well, let me, I mean, let me ask this.

 6    This letter was written at -- was this letter written before

 7    or after the Sackler's defense presentations?

 8              MR. HURLEY:  After.

 9              THE COURT:  Okay.  So, I don't think -- I mean, I

10    think that's the answer.

11              MR. ROBINSON O'NEILL:  Was it -- and was this

12    written -- the letter was not written after the -- it was

13    not -- it was written before, excuse me, Your Honor.  It was

14    written before the declarations and (inaudible) reports in

15    this matter, (inaudible).

16              THE COURT:  Oh, you're talking now about the --

17    the --

18              MR. ROBINSON O'NEILL:  That's my next question.

19    My next questions is whether anything that they've read or

20    that UCC (inaudible) has changed their opinion.

21              THE COURT:  Wait.  Okay.  So, you mean in

22    connection --

23              MR. ROBINSON O'NEILL:  I'm sorry --

24              THE COURT:  -- with this trial?

25              MR. ROBINSON O'NEILL:  That's right, Your Honor.
```

Page 134

1    Any of the trial evidence, does that change the UCC's

2    position about --

3              THE COURT:  Well, again, if you know about the UCC

4    generally, as opposed to yourself, is the earlier point Mr.

5    Hurley made.

6              MR. ROBINSON O'NEILL:  And it's -- it's hard

7    because I have not been in --

8              MR. HURLEY:  Wait Mike -- Mike --

9              MR. ROBINSON O'NEILL:  Yes?

10             MR. HURLEY:  I think, Your Honor, was in the

11   middle of saying something.

12             THE COURT:  It's all right, Mr. Hurley.

13             MR. HURLEY:  Oh, I'm sorry.  I didn't -- I didn't

14   understand, Your Honor.  My apologies.

15             THE COURT:  Well --

16             MR. HURLEY:  My objection is then the same, which

17   is that it calls for the witness to describe attorney client

18   communications.  It's asking whether or not the UCC's

19   position was affect the (inaudible) questions has changed

20   based on your information.

21             THE COURT:  Okay.  I'll sustain that.

22   BY MR. ROBINSON O'NEILL:

23   Q    All right.  Can we turn to page 17 of your -- of the

24   letter -- of the UCC letter?

25   A    I'm there.

Page 135

1    Q    The first full paragraph above subsection 7, starts

2    with the words, to be clear.

3    A    Yes.

4    Q    When the UCC wrote this letter, they were -- they had

5    had an opportunity to meet with the defense presentations

6    from the Sackler's; is that correct?

7    A    Yes.

8    Q    And in spite of those defense presentations, the UCC

9    indicated it does not believe that the Sackler settlement

10   reflects the full value of claims against the Sacklers and

11   related parties; is that correct?

12   A    I think it in a -- in a vacuum, yes, that is correct.

13                     WOMAN 1:  (Inaudible).

14            MR. ROBINSON O'NEILL:  What --

15            MR. HURLEY: (Inaudible).

16            MR. ROBINSON O'NEILL:  I'm sorry.

17            MR. HURLEY:  Onto the sentence it says before

18   taking other factors into account and I think that's a very

19   important part that I believe the witness is referring to.

20            THE COURT:  Okay.

21   BY: MR. ROBINSON O'NEILL:

22   Q    My next question is to ask what factors those are.

23   A    So things that we consider would be significant

24   litigation risk, time to litigate.  There was collection

25   risks that we think is significant.  I think that there's --

Page 136

1    there's other things that we think about, I think at the end

2    of the day, all of the, stage one of the mediation was tied

3    to -- to getting to a resolution that with the plan, what

4    the contribution and the loss of the phase one of mediation

5    we viewed as a massive risk to -- to any outcome that didn't

6    include a contribution from the Sacklers.

7            We also have factored in, you know, with out a

8    successful plan, the DOJ Snapback provision.  So, there were

9    a lot of things I think went into play.  But I think in a

10   vacuum, we, you know, we believe we have a good case, but

11   there's a lot of risks to that case.

12   Q    But in -- the question that I want to ask you then, is

13   in way does the UCC support from this plan, condone the

14   actions of the Sacklers in their role as the Board of

15   Directors overseeing Purdue Pharma, from 2007 through 2018?

16   A    I -- I think -- I think that's a fair statement.  I

17   don't think we'll be doing anything (inaudible).

18   Q    So if I were to try to put the UCC's position in direct

19   terms, this is the best deal you can negotiate, but it -- is

20   that fair?

21           MR. HURLEY:  Object to characterization of the

22   UCC's position.  It was contained in full in the letter that

23   is an exhibit in the declaration.

24           THE COURT:  Well, I mean, if you can answer that

25   question, you can answer it, Mr. Atkinson.

Page 137

1    BY MR. ROBINSON O'NEILL:

2    A    I think with all deals there's negotiation on both

3    sides.  I think it's reached -- we've got significant

4    consensus among the creditor groups, and it was heavily --

5    heavily discussed and bantered back and forth on our

6    committed, amongst our committee members.  Because at the

7    end of the day, our committee members are as much focused on

8    the economics and a successful outcome, getting money to

9    victims as they are on punishing the parties involved.  And

10   I think this -- I think from the committee's view this

11   struck a balance.  It would get money to the victims

12   quickly.

13   Q    Thank you.  If you could now turn to page 22 of your --

14   of the letter, of the UCC letter.  Not you personally, but

15   the UCC letter.

16   A    I'm sorry, what page did you tell me to go to?

17   Q    Page 22 of the UCC letter.

18   A    Okay.

19   Q    At the bottom of that page there's a discussion of the

20   direct claims against the Sacklers and there are enumerated

21   paragraphs that lists a number of -- each of the claims.  Do

22   you see that?

23   A    Yes.  Yes.

24   Q    Do you have any personal knowledge about the analysis

25   that was done for each of these claims?

1    A    I know -- I know that this is something that Nathan

2    spent a lot of time with researching and reviewing.  That's

3    -- that's my personal knowledge.

4    Q    So for example, if you look at that first point, where

5    it said public nuisance and there's a subpoint A where it

6    says they pray this would need to prove that Purdue and the

7    Sackler's acted with intent to create a public nuisance; do

8    you see that language?

9    A    Yes.

10   Q    You're not going to be able to provide an answer for

11   whether or not they considered what law in public nuisance,

12   are you?

13            MR. HURLEY:  Let me just object, Your Honor.  I

14   think we are getting outside the scope of the direct.  The

15   only think in this witness's declaration about the letter,

16   the only statement was that he understands it to be -- to

17   represent the views of the committee.  He very deliberately

18   did not testify about the contents of the letter.  And

19   questioning concerning the contents of the letter, we would

20   submit, is beyond the direct.

21            MR. ROBINSON O'NEILL:  Your Honor, I -- I -- my --

22   my goal here is just to have the UCC stipulate that this

23   letter doesn't provide any of the underlying analysis.  It

24   doesn't purport to analyze Washington's claims under

25   Washington law, or for that matter, claims of any of the

1    objective states.  It is a summary statement without any

2    evidentiary support or analysis.

3              THE COURT:  Well, 1A goes --

4              MR. ROBINSON O'NEILL:  The letter speaks for it's

5    self, Your Honor.

6              THE COURT:  -- with -- with common law public

7    nuisance claims, which is not a state claim, as I gather.

8    But the witness has already testified, I think, that as far

9    as this analysis of legal claims is concerned, he relied on

10   committee counsel.

11             MR. ROBINSON O'NEILL:  And this letter doesn't

12   purport to put any of that analysis, so none of that

13   analysis is in the record.  That's all active.

14             THE COURT:  Well -- I -- it says what it says.

15   It's not a legal brief.  I -- it says what they considered.

16             MR. ROBINSON O'NEILL:  All right. Thank you, Your

17   Honor.  I don't have any further questions.

18             THE COURT:  Okay.  All right.

19             MR. HUEBNER:  Your Honor, I have eight questions

20   for Mr. Atkinson, if now is a good time, I'm happy to do it.

21             THE COURT:  Okay.

22               CROSS EXAMINATION OF MICHAEL ATKINSON

23   BY MR. HUEBNER:

24   Q    Mr. Atkinson, you were asked before about paragraph 9

25   of your declaration, when you talked about having been --

Page 140

1    led the engagements in over 50 creditors committee and

2    debtor side cases.  Do you remember that testimony?

3    A    I do.

4    Q    Okay.  I -- I assume it's fair to say that you would

5    generally agree with me that your job is to insure the best

6    available outcome for all unsecured creditors, when you are

7    representing an official committee of unsecured creditors?

8    A    Yes.

9    Q    And is it fair to say, and this may be a little bit

10   numbery, but that in a case like this where, sort of, you

11   know, almost unfathomable loss is involved, that duty feels

12   even more sacred that the fiduciary duties normally feel

13   when only money is involved.  Is that a fair statement of

14   how you've approached this case?

15   A    A hundred percent.  I've never had a case like this

16   before.

17   Q    Looking at page 1 of the UCC letter, which lists the

18   UCC members.  Is it fair to say that several of the members

19   of the UCC have suffered unthinkable, unfathomable loss?

20   A    Yes, unfortunately, that's the case.

21   Q    And is it fair to say that those UCC members view

22   themselves as extremely adverse, hostile, passionately so,

23   to Purdue and to the Sackler family?

24        MR. HURLEY:  Objection, Your Honor, that calls for

25   speculation about how they view themselves.

1              MR. HUEBNER:  I'm not asking for speculation.  I'm

2     asking him for what he experienced in interacting with them.

3     There's no speculation at all here.

4              THE COURT:  Just based on what you witnessed, Mr.

5     Atkinson.

6              MR. HUEBNER:  Correct.  That's all I asked.

7     BY MR. HUEBNER:

8     A    I -- I think I would answer this way.  I would say that

9     there is no dollar amount that would make them okay.  But

10    that being said, I think that they have taken their

11    responsibilities very seriously as committee members.

12    Q    Okay.  Thank you, Mr. Atkinson.  Is it correct that

13    when we filed the case in September 2015, after the UCC was

14    appointed, the UCC was, for many months of this case, in

15    fact, I think well over a year, not in support of the

16    framework or the settlement then on the table that was

17    represented by the settlement framer agreed to with AHC and

18    the MDLPC prior to the bankruptcy?  In other words, you were

19    not on board for a very long part of this case?

20             MR. HURLEY:  I just want to objection, and again,

21    caution the witness not to reveal any attorney client

22    communications.  If he is asking Mr. Gibner for information

23    that would be publicly known.  I don't object to him

24    providing that kind of answer --

25             MR. HUEBNER:  Yeah that -- that -- that's all

Page 142

1    glema, I'm not asking the jury.  Answer the question,

2    please.

3    BY MR. HUEBNER:

4    Q    Is it correct that the UCC was not on board at the

5    publicly expressed for much of these cases with the

6    settlement framework and the specific settlement with the

7    Sacklers?  The one that was on the table publicly?

8    A    That is correct.  We had not done any of our work yet.

9    Q    Okay.  And there came a time, in -- during after phase

10   two of the mediation, where the mediators put out a number,

11   and UCC ultimately came on board with the developing

12   settlement; is that correct?

13   A    Yes, at some point in time, the UCC came on board.

14   Q    Okay.  I want to put dates to things, just for a second

15   and I'm -- I'm moving towards being done.  The UCC letter,

16   just accept that I'm being accurate, was basically finalized

17   on or about June 3rd and was included in the solicitation

18   package on June 15 of 2021, and your declaration is dated

19   August 5 of 2021.  Do you have any reason to believe that my

20   dates are not precise and accurate?

21   A    They sound reasonable to me.

22   Q    Okay.  I'd like to ask you to turn to page 24 of your

23   letter -- sorry, forgive me, of the UCC letter, which is not

24   your letter, that was attached -- which was attached to your

25   declaration, to which is not an expert report.  I do ask you

1    to look at the last couple of sentences, you know, the final

2    sentence says, accordingly the UCC urges every unsecured

3    creditor to vote in favor of the plan.  I assume you see

4    that concluding sentence in, I believe bold and italics?

5    A    That is correct.

6    Q    Based on what you know, now, as opposed to on, let's

7    use the earliest date, June 3rd, do you have any reason to

8    believe that that recommendation no longer stands?

9    A    I have not reason to believe it no longer stands.

10   Q    Okay.  And then going above that, I'm going to read you

11   a clause, which actually was serve the subject of the

12   colloquy with Mr. O'Neill, but I just think we weren't on

13   the right paragraph.

14          The UCC believes, with conviction, that the terms

15   of the plan represent the only viable conclusion for the

16   Chapter 11 cases, indeed confirmation the plan will ensure

17   that funds are distributed promptly to begin to compensate

18   victims and update the abate the opiate crisis that

19   continues to grip this country.  And just to be fair, right

20   before I read that part, there's language that says, not

21   withstanding lots of criticism of the plan, in light of the

22   requirements imposed of an (inaudible) process, and a myriad

23   competing interests.

24          So, in other words, you should read the whole

25   sentence.  I don't want to be accused of reading only part

Page 144

1    of it.  The last two sentences of the letter, right before

2    the italicised sentence, if you'd just read those to

3    yourself for a minute, I think that's probably better.  And

4    let me ask you a very simple question, which is, knowing

5    what you know now, including reading the objections and the

6    pleadings that were filed, since the June 3rd letter, and

7    since also your August 5th declaration, do you still believe

8    this concluding paragraph to represent the views of the

9    committee?

10   A    I -- I believe the committee views have not changed.

11   Q    Okay.  One last topic, which is a little bit different,

12   because Mr. O'Neill and I were actually agreeing about

13   something before, but it wasn't obvious, I can't help myself

14   as a document-based lawyer to -- to be a little fussy about

15   precision, which I apologize to Mr. O'Neill, I did  not mean

16   to be sort of, you know, micromanaging before, but I do want

17   to ask it my way, because it's important.  Were you working

18   on this case and involved during phase one of mediation,

19   which was intra-creditor phase, or essentially what we can

20   coequally call the public private splits, and then the

21   intra-public and intra-private deals were more or less

22   agreed to; I assume you were working on the case at that

23   time?

24   A    Yes, I was.

25   Q    Okay.  And you were involved in those negotiations and

Page 145

1    those respisions?

2    A    I was, yes.

3    Q    Okay.  And you're aware that many of those turn sheets

4    reached among creditors without the debtors or the Sacklers

5    being part of them, a fact required as a condition precedent

6    that the Sacklers be part of the deal and is also being

7    imbodied in the plan.

8            MR. HURLEY:  Your Honor, I'm going to object

9    because this calls for disclosure of communications during

10   the mediation.  I understand the greater point, but this

11   does seem to be specifically (inaudible) --

12           MR. HUEBNER:  Mr. Hurley, let -- let -- let me

13   rephrase, because I think it has been made public, so I'll

14   ask it a different way and to the extent that I errored in

15   being too specific.  Let me apologize and withdraw, and then

16   I can ask it a lot like the way you did.  Maybe my quest for

17   precision is (inaudible) I'll try it once, and then I'm

18   actually happy to live with your questions and answers.  I

19   just want it to be right because it matters to me.

20   BY MR. HUEBNER:

21   Q    Is it generally correct that the intra-creditor

22   agreements reached in phase one of mediation were

23   conditioned on the Sackler's participating and contributing

24   in a primary of the organization?

25           MR. PREIS:  Your Honor, this is Arik, I just --

Page 146

1    Mr. Huebner is trying, in the spirit of trying to get it

2    exactly right.  It is actually addressed in the mediator's

3    report, and it deals -- it's specifically is public

4    knowledge what -- what occurred, but Mr. Huebner asked

5    questions about intra-creditor allocations, and included in

6    his question are the allocation among public entities and I

7    don't look at (inaudible) that there's public knowledge

8    about what conditions there were to those allocations.  So,

9    I know Mr. Huebner understands what I'm asking, so if he

10   could just clarify.

11            MR. HUEBNER:  Yeah, so this is actually great

12   because I'm trying to be a little bit more technical than

13   Mr. O'Neill, and Mr. Preis is telling me that I'm not being

14   technical and precise enough, so here's what I'm going to

15   do.  I'm going to withdraw the question and be finished, and

16   merely note that I'm sure Mr. Preis is technically correct,

17   as he virtually always is.  That the mediator's report

18   contains exactly what is needed here and what is relevant,

19   and we can all look to that when it's time to discuss it at

20   oral argument, and I have no further question.

21            THE COURT:  Okay.  Very well.  Does anyone else

22   want to cross-examine Mr. Atkinson?

23            MR. OZMENT:  Your Honor, this is Frank Ozment, I

24   have a few questions, but if I'm the only one, I'll wait

25   until the end.

Page 147

1          THE COURT:  Okay.  Is there anyone else that wants

2     to cross-examine Mr. Atkinson?

3          MR. UNDERWOOD:  Your Honor, this is Allen

4     Underwood, on behalf of the Canadian Municipal and First

5     Nations Creditors.  I have just a few quick questions of Mr.

6     Atkinson.

7               CROSS-EXAMINATION OF MR. ATKINSON

8     BY MR. UNDERWOOD:

9     Q    Mr. Atkinson, I call your attention to the plan support

10    letter at page 20.  There's a numbered paragraph 3, and that

11    plan support letter states that UCC believes that the

12    debtors, creditors, may well hold direct claims against the

13    Sackler's foreign access in excess of their total assets.

14    Are there any examples other than punitive provisions of

15    security that has been taken in Sackler or IAC assets for

16    the benefit of the creditors in this -- in this case in the

17    event of a default?

18         MR. HURLEY:  Objection, vague.  I guess the

19    witness can answer that much or I do.

20         THE COURT:  Mr. Underwood, are you asking -- are

21    their any liens securing the --

22         MR. UNDERWOOD:  Liens to prevent --

23         THE COURT:  -- I don't understand what you're

24    saying.  I'm sorry, you have to rephrase the question.

25         MR. UNDERWOOD:  Certainly.  Well, we're in a

Page 148

1    circumstance where it appears that the UCC believes that

2    there, and I would too, that there are claims --

3              THE COURT:  But please just ask the question.

4              MR UNDERWOOD:  Right.  Sorry, Your Honor.

5              THE COURT:  Okay.

6    BY MR. UNDERWOOD:

7    Q    Is there -- is there any security, by way of liens,

8    mortgages, rights to -- you know, to require boards of IAC's

9    to take certain actions with respect to the liquidation of

10   assets in the event of a default by the Sacklers' as to

11   their obligations under the plan?

12             MR. HURLEY:  I would object, Your Honor. This is

13   beyond the scope of the direct.  I think it also would

14   require the witness to testify as to communications with

15   counsel.  But mostly it's beyond the scope of the direct.

16             THE COURT:  Well, I mean --

17             MR. UNDERWOOD:  Well, Your -- Your --

18             THE COURT:  -- settlement agreement itself lays

19   out, in detail, remedies and the like.  So, if -- if you're

20   trying to lay a foundation, you can refer to that.

21   BY MR. UNDERWOOD:

22   Q    Was any consideration given to the sale or liquidation

23   value of the IAC's over time, i.e., they may loose value the

24   day after a (inaudible) a plan is confirmed here?

25   A    Was any consideration given from the UCC's perspective?

Page 149

1   Q    Correct.

2            MR. HURLEY:  Let me just object again.  The UCC's

3   view is included in the letter.  Mr. Atkinson isn't here to

4   testify as a proxy on their behalf.  He testified only that

5   he understands that the statements in a letter correctly

6   summarized their view.  This has gone beyond that.

7        MR. HUEBNER:  And Your Honor, I would also note, again,

8   just in the interest of helping the public, the plan

9   supplements that have been filed and updated and updated,

10  actually contain very substantial detail about this, all of

11  which is outside the scope of this declaration.  If people

12  want to see what the covenants are, that the debtors, the

13  UCC, the AHC, and MSG and others illustrated --

14           THE COURT:  All right --

15           MR. HUEBNER:  -- it's all on the public docket.

16           THE COURT:  -- I think we moved off of that

17  question and we're going to another question, which is did

18  the unsecured creditors committed look at the, on a forward

19  going basis, the value of the I think that's a fair question

20  to answer.

21  BY MR. UNDERWOOD:

22  A    I can answer it if now's the time.

23           THE COURT:  Yes.

24  BY MR. UNDERWOOD:

25  A    Okay.  Thank you.  So yes, the UCC, as an investment

Page 150

1   banker, Jeffreys, and Jeffreys has spent a lot of time

2   focusing in on the value of the IAC's, and so it's something

3   that UCC considered in their analysis.

4           MR. UNDERWOOD:  Okay. I have no further questions,

5   Your Honor, thank you.

6           THE COURT:  Okay.  Anyone else before Mr. Ozmet?

7           MR. OZMET:  No one?

8              CROSS-EXAMINATION OF MICHAEL ATKINSON

9   BY MR. OZMET:

10  Q    Mr. Atkinson, my name is Frank Ozmet and I represent

11  some significant claimants in this case and I'd like to ask

12  you a few questions.  You're a financial professional, not a

13  lawyer, right?

14  A    That is correct.

15  Q    At page 5 of the letter that -- the UCC letter, there's

16  some mention of free and at ostranzan value that those drugs

17  contributed or the provision those drugs would contribute to

18  the settlement.  Do you recall that?

19  A    I don't.  Can you tell me specifically where it is?

20  What paragraph?

21  Q    I don't recall where that's printed.  I think on the

22  Bates numbering its page 18, for the docket number.

23          THE COURT:  It's the first --

24          MR. ATKINSON:  What page?

25          THE COURT:  -- I think it's the fist full

Page 151

1    paragraph on page 5 of the letter.

2              MR. OZMET:  Yes, sir.

3    BY MR. OZMET:

4    A    Okay.  Go ahead, I'm sorry.  Ask the question again.

5    Q    Let me ask the question again.  Do you recall the UCC

6    considering the value of those drugs as they were forming

7    their opinion regarding the value of the potential

8    settlement?

9    A    It's definitely something that we looked at, yes.

10   Q    Okay.  And is the idea that if they're going to provide

11   these free and below cost drugs, or at cost drugs, then that

12   would be something that would benefit -- that portion of the

13   general public that needs to drugs to address opioid use

14   disorder?

15             MR. HURLEY:  Objection, is this a question about

16   what the members of the UCC think about his specific

17   question?  Because if it is, I would say, lack of

18   foundation.

19             MR. OZMET:  I'm not sure I understand the

20   objection, but I'll recast the question.

21             THE COURT:  Okay.

22   BY MR. OZMET:

23   Q    Mr. Atkinson, when you talk about a value that those

24   free and at cost drugs provide to the settlement, is that

25   basically anticipating that beneficiaries of the settlement,

Page 152

1    and perhaps the general public, to some extent, would get

2    drugs at a lower cost than they would otherwise receive

3    them?

4            MR. HURLEY:  Objection, it's the UCC's letter, for

5    the record.

6            THE COURT:  Okay.  But I think the question,

7    though, is does -- did the UCC contemplate that under the

8    plan, there would be a provision, at least for some period,

9    abatement medicines or drugs produced by the debtors at cost

10   or free?

11   BY MR. OZMENT:

12   A    I think, you know, from our perspective, as I

13   understand it, we were focused on getting money to --

14   specifically money to victims, and or public, you know,

15   public claimants, so that they could use the money as they

16   saw fit, which would include getting money to abate the

17   prices.  I don't know if we had a strong view as it relates

18   to Purdue's public health initiatives, specifically.

19   Q    And as convoluted as my question might be, I'm not

20   trying to be tricky with it.  You'd testified that you were

21   focused on getting money to those -- I mean, this would be a

22   way of getting value to those parties; is that fair?

23   A    The reason I'm hesitating is there's some dispute about

24   the different programs, so we were looking at distributable

25   value to claimants.  And I'm not -- I'm not passing

Page 153

1    judgement on any of the programs, because I think, you know,

2    the committee is certainly all for abating the crises as

3    quickly as possible, and whatever the most efficient way to

4    do that is.

5    Q    Okay.  So, you're -- I'll move on.  I understand your

6    answer, I think

7              THE COURT:  But so -- so Mr. Atkinson, is it fair

8    to say that in evaluating the plan and in support of the

9    plan, the committee, which supportive of all forms of

10   abatement, views any public health initiative of the post --

11   post confirmation of the entity that will be formed, to be

12   in addition to whatever value the committed puts on the

13   settlement as opposed to, you know, something that's you've

14   already factored into the settlement?

15             MR. ATKINSON:  That's fair.  We did not factor it

16   into the settlement.

17             THE COURT:  It would be on top of that to the

18   extent that the people running the company, as

19   reconstituted, would pursue it?

20             THE WITNESS:  That's exactly right.

21             THE COURT:  Okay.

22   BY MR. OZMENT:

23   Q    And I think I understand your answer to Judge Drain's

24   question, but just to make sure, the Committee in deciding

25   whether this settlement would be approved really did not

Page 154

1    give weight to the value of these below or at cost drugs.

2    Is that fair?

3    A     I don't know if I want to say that.  I think that the

4    Committee was comfortable that the claimants that were

5    getting the operating entity going forward would be able to

6    make the decision as to whether they thought it was in the

7    best interest of the public to go forward with those drugs

8    or not.

9    Q     And you haven't been sitting in on these hearings, so

10   let me explain, I'm not really focused as much on the public

11   interest right now as a particular segment of the public.

12   Do you know whether the individuals who are incarcerated in

13   prisons, as opposed to jails, generally get those drugs?

14   A     I don't know the answer to that.

15   Q     I submit to you they can get in a trouble with that in

16   any instance.  So, and again, I know you're a financial

17   professional, not a lawyer, so I don't want to get into the

18   technicalities of intercreditor agreement or security

19   performance, et cetera, but I do want to use a concept, a

20   pretty simple one, which is a lien.  You understand what a

21   lien is, don't you?

22   A     I do.

23   Q     Okay.  The Unsecured Creditors Committee included only

24   people with claims that were not secured by liens.  Is that

25   correct?

Page 155

1   A    I think by definition, that's correct.

2   Q    Okay.  Did the Unsecured Creditors Committee have any

3   discussions with the United States Department of Justice

4   regarding whether opioid use disorder victims or others

5   would receive a lien as part of the criminal plea agreement

6   between Purdue and the U.S.?

7              MR. HURLEY:  Objection, beyond the scope of the

8   declaration.

9              THE COURT:  I agree with that.  I don't think

10  that's part of Mr. Atkinson's testimony on direct.

11  BY MR. OZMENT:

12  Q    Okay.  Maybe it's subject to a similar objection, but

13  just to make sure, was there anybody on the Committee, as

14  opposed to the Committee itself, who was having those kinds

15  of discussions with the United States regarding whether

16  opioid use disorder victims could have a lien under the

17  mandatory Victim Restitution Act?

18             MR. HURLEY:  Same objection.

19             THE COURT:  I'll sustain that for the same reason.

20             MR OZMENT:  Your Honor, that's all.  Thank you.

21             THE COURT:  Okay.  Thank you.  All right.  Does

22  anyone have any further cross for Mr. Atkinson?

23             Okay.  Any redirect?

24             MR. HURLEY:  Yeah, just one or two questions on

25  redirect, Your Honor.

Page 156

1          THE COURT:  Okay.

2          REDIRECT EXAMINATION OF MICHAEL ATKINSON

3    BY MR. HURLEY:

4    Q    You were asked some questions, Mr. Atkinson about the

5    composition of the membership of the UCC.  Do you remember

6    that?

7    A    Yes, I do.

8    Q    Okay.  And you mentioned that there were some -- let me

9    withdraw that.  Are you aware that there were some members

10   who were ex-officio members of the UCC?

11   A    Yes.

12   Q    And your understanding is that those members are ones

13   which you did not note to participate in much of the

14   Committee's proceedings?

15   A    That's correct.

16   Q    And I think you referred to a couple of public entities

17   that were on the Committee in that capacity.  Is that right?

18   A    Yes.

19   Q    Okay.  And there were no public entities that were

20   actually official members of the official Committee, right?

21   A    That is correct.

22   Q    And do you know who determines what the membership

23   composition of the official Committee will be in bankruptcy?

24   A    Yes.

25   Q    And who determines that?

Page 157

1    A    It's the U.S. Trustee, so the Department of the DOJ.

2    Q    There were some questions put to you about nominal

3    value versus net present value and the significance ascribed

4    to nominal versus net present value of certain parties.  Do

5    you remember that questioning?

6    A    I do.

7    Q    Has the -- are you familiar with the term NCSG, or

8    Nonconsenting State Group?

9    A    I am.

10   Q    Okay.  And has the NCSG or its counsel ever

11   communicated to you that the NCSG looks at nominal value

12   more than net present value or at least as important as net

13   present value?

14             MR. TROOP:  Objection, foundation.

15   BY MR. HURLEY:

16   Q    Have you had --

17             THE COURT:  I was just going to say I think you

18   should lay some foundation for that question.

19   BY MR. HURLEY:

20   Q    Okay.  Mr. Atkinson, have you had communications

21   directly with the NCSG and its representatives in these

22   cases?

23   A    I have.

24   Q    And in any of those communications did NCSG or its

25   counsel ever make clear to you that the NCSG looks at

Page 158

1      nominal value more than net present value in considering

2      issues related to these cases?

3                  MR. TROOP:  Objection, hearsay.

4                  THE COURT:  Well, just based upon what you heard.

5      Obviously, you don't know whether it's true or not, but just

6      based on what you heard, Mr. Atkinson.  Let me put one more

7      -- I'm assuming, Mr. Hurley, the communications you're

8      referring to have to deal with the characterization of the

9      value that would be received by the estates from the

10     Sacklers as well as the characterization of value that would

11     be received by the private side versus the public side?  Is

12     that what we're talking about?  The characterization of the

13     value that the parties were negotiating over?

14                 MR. HURLEY:  That's correct, Your Honor.

15                 THE COURT:  And how that was described.

16                 MR. HURLEY:  Yes.

17                 THE COURT:  Whether it was described usually in

18     nominal value terms instead of net present value terms?

19                 MR. HURLEY:  Much better put than my question.

20     That's exactly right.

21                 THE COURT:  Okay.  All right.  So, again, just

22     based on your knowledge of how people characterized the

23     value that they were discussing, not whether they believed

24     it or not, you can answer that question.

25                 MR. TROOP:  Your Honor, I still would like to

Page 159

1    raise a foundation objection.  I'd like some context in

2    which these communications took place, whether they might

3    otherwise have been privileged or not subject to or subject

4    to some evidentiary exclusion.  I just don't know.  I

5    should, but I just don't know.

6              THE COURT:  Well.  Mr. Atkinson, you've been

7    involved in, as you know, scores of Chapter 11 cases and I

8    think you have a pretty good idea of attorney-client

9    privilege and shared privilege.  So I don't want you to

10   disclose anything that would fall into either of those

11   categories when you answer those questions.

12             MR. TROOP:  And, Your Honor, I would raise two

13   others, mediation privilege in the context of the estate.

14             THE COURT:  Yes.

15             MR. TROOP:  And 408, generally.

16             MR. HURLEY:  Your Honor --

17             THE COURT:  Well, the 408 doesn't really apply

18   because that just goes to the truth in a contested matter.

19   So that's not what we're focusing on, but yes, the mediation

20   privilege as well.

21             MR. HURLEY:  Thank you, Your Honor.  After all

22   this, I'll withdraw the question.

23             THE COURT:  Okay.

24             MR. TROOP:  Sorry, Mitch.

25             MR. HURLEY:  Well done, Andrew.

Page 160

```
1              MR. TROOP:  Just being careful.

2    BY MR. HURLEY:

3    Q    It was referenced in cross, Mr. Atkinson, to the UCC

4    having attended presentations by the Sacklers concerning

5    their defenses.  Do you remember that?

6    A    Yes.

7    Q    Okay.  Did the UCC or its representatives, to your

8    knowledge, invite counsel for the Ad Hoc Committee or the

9    PEC to present their views on the merits of the claims

10   against either Purdue or the Sacklers or both to UCC in the

11   course of these cases?

12             MR. ROBINSON O'NEILL:  Your Honor, I believe

13   that's beyond the scope of the cross.

14             MR. HURLEY:  Your Honor, reference was made to the

15   fact that the UCC attended a presentation by the Sacklers

16   and there was earlier testimony on these topics as well.  I

17   think it made sense to complete the record with respect to

18   how we went about this part of taking information from

19   various parties that didn't only include the Sacklers.

20             MR. ROBINSON O'NEILL:  There was testimony on

21   other witnesses, but not this witness.  He didn't -- we

22   haven't' -- the only question was whether he reviewed that

23   and considered it in forming his -- the UCC's position.

24   There was no discussion about invitations to other groups

25   with this witness.  I just think it's beyond the scope for
```

Page 161

1      this witness.  That testimony has come in under other

2      witness.  And it's Tad Robinson O'Neill for the record.  I

3      didn't say that when I announced myself.  I apologize.

4              THE COURT:  I'm just looking back at my notes.

5      There was a discuss about the Sackler defense presentations.

6              MR. HURLEY:  I can tell you, Your Honor, it will

7      be very brief, if you permit it.

8              THE COURT:  Did the UCC -- I think you can ask if

9      the UCC take into account other presentations besides the

10     Sacklers.  I think that's fair to ask.

11             MR. HURLEY:  It's getting a something a little

12     different than that, Your Honor, and it will be a very short

13     run of questions if it's permitted.

14             THE COURT:  Well, you can ask it.  Go ahead.

15             MR. HURLEY:  Okay.

16     BY MR. HURLEY:

17     Q    So did the UCC invite counsel for the Ad Hoc Committee

18     or the PEC to present their views to the Committee

19     concerning the merits of the claims against Purdue and

20     Sacklers?  Sort of like the Sacklers made a presentation?

21     Did the UCC give that opportunity to the AHC and PEC?

22     A    I believe we did, yes.  We requested that.

23     Q    Yeah.  And did the AHC or PEC accept that invitation

24     and actually make a presentation to the UCC?

25     A    I don't, I don't think we ever got that.

Page 162

1   Q    Same question for the NCSG that we talked about before.

2   Was the NCSG invited by the UCC to make a presentation

3   concerning the merits of the claims against Purdue or the

4   Sacklers to the UCC?

5   A    I think we made that request as well.

6   Q    And did the NCSG make a presentation to the UCC?

7   A    I don't believe so, no.

8            MR. HURLEY:  Give me one moment, Your Honor.  I

9   have no further redirect, Your Honor.

10           THE COURT:  Okay.

11           MR. HUEBNER:  Your Honor, I have literally one

12   question and it will be very quick.

13           THE COURT:  Okay.

14            RECROSS-EXAMINATION OF MICHAEL ATKINSON

15   BY MR. HUEBNER:

16   Q    Mr. Atkinson, let's assume I'm reading Docket Entry

17   1716, which is the Phase 1 Mediator Report correctly to you,

18   Paragraph 12, which many people sent me after Mr. Preis

19   tried to help me help Mr. O'Neill because it turns out the

20   term sheets were public and I actually was, in fact, saying

21   if it wasn't public -- I'm going to read a paragraph to you

22   and I'm just going to ask you whether you believe the

23   mediator's summary is correct or not.

24           MR. HURLEY:  Your Honor, I'm going to just object.

25   If it's in the record, it's in the record.  I don't know why

Page 163

1    we need to ask the witness what's in a docket number that's

2    already in front of the Court.  I appreciate Mr. Huebner's

3    point, I don't' think the Court needs it.

4            THE COURT:  No one is really challenging the

5    mediator's statement, are they?

6            MR. HUEBNER:  Your Honor, again, my point is that

7    there be a clear record because it's actually quite

8    important that as the mediator set forth, the term sheets

9    were conditioned on the Sacklers being part of the deal and

10   as long as --

11           THE COURT:  There is a clear record of what the

12   mediator said.

13           MR. HUEBNER:  Okay.  That's fine.  I thought Mr.

14   O'Neill was suggesting to the contrary.  If he's not then, I

15   have no further questions.  Thank you.

16           THE COURT:  Okay.  All right.

17           MR. ECKSTEIN:  I have just two redirect questions

18   please.

19           THE COURT:  Sure.

20           MR. ECKSTEIN:  Thank you.

21             RECROSS-EXAMINATION OF MICHAEL ATKINSON

22   BY MR. ECKSTEIN:

23   Q    Mr. Atkinson, this is Ken Eckstein from Kramer Levin on

24   behalf of the Ad Hoc Committee.  In regard to a question you

25   were asked by Mr. Hurley a moment ago, do you recall

Page 164

1   attending a meeting at the offices of Millbank on or around

2   January of 2020, attended by representatives of the Ad Hoc

3   Committee and the Nonconsenting States where presentations

4   were made about the merits of the cases?

5           MR. ROBINSON O'NEILL:  Your Honor, this is Tad

6   Robinson from Washington State.  Can I -- I appreciate

7   everyone's interest in this.  I just -- we're straying into

8   communications that happened during the mediation and it's -

9   -

10          MR. ECKSTEIN:  These were not mediations.

11          THE COURT:  Look.  I'm going to give, I think I'm

12  going to give Mr. Eckstein a chance to see if -- not to get

13  into the details of this, but just whether there was such a

14  discussion.

15          MR. ECKSTEIN:  And, Mr. O'Neill, those

16  presentations likely were all brought before the

17  commencement of mediation.  I could be wrong.  I don't think

18  they were during presentation.  I think they actually

19  predated them.  In any event, it happened in all event.

20          MR. ROBINSON O'NEILL:  Your Honor --

21          MR. ECKSTEIN:  They predated the mediation.  I

22  just want to know whether the witness recalled attending

23  those meetings?

24          MR. O'NEILL:  Your Honor, can Mr. Eckstein repeat

25  the question?  I think it's a little bit not correctly

1    phrased.

2              MR. ECKSTEIN:  My question was --

3              THE COURT:  Well, even if it was correctly

4    phrased, I think, I think given the discussion that happened

5    afterwards, you should, you should ask it again, Mr.

6    Eckstein.

7              MR. ECKSTEIN:  Sure, Your Honor.

8    BY MR. ECKSTEIN:

9    Q    Mr. Atkinson, do you recall attending a meeting on or

10   around January of 2020 attended by representatives of the Ad

11   Hoc Committee and the Nonconsenting States where

12   presentations were made about the merits of the claim?

13             MR. ROBINSON O'NEILL:  Objection, presentations by

14   whom?

15             MR. ECKSTEIN:  I'm asking him whether he recalls

16   attending the meeting.

17             MR. ROBINSON O'NEILL:  Meeting or meetings?

18   Presentation by whom?

19   BY MR. ECKSTEIN:

20   Q    Do you recall a presentation made by Mr. Nachman on

21   behalf of the New York Attorney General's Office and Ms.

22   Conroy on behalf of the Plaintiff Steering Committee?

23   A    I recall being -- I think if I recall, I recall being a

24   meeting.  I thought it was a meeting where the Sackler

25   parties presented.  I know Mr. Nachman and Ms. Conroy were

Page 166

1    there.  And I know they spoke, but I don't recall the

2    specifics of what they discussed.

3              MR. ECKSTEIN:  Thank you.  No further questions.

4              THE COURT:  Okay.  All right.  Mr. Ozment, I think

5    you were interrupted but you were about to ask a question on

6    redirect -- on recross?

7              MR. OZMENT:  Yes.

8                RECROSS-EXAMINATION OF MICHAEL ATKINSON

9    BY MR. OZMENT:

10   Q    Mr. Atkinson, you talk about the role of the Department

11   of Justice in designating who served on the UCC.  Do you

12   recall that testimony?

13   A    I do.

14   Q    Are the people at US DOJ who made those appointments

15   the same people who decided that the US DOJ should not try

16   to get a lien position for the opioid abuse disorder victims

17   as part of the criminal plea agreement with Purdue?

18   A    I don't know specifically who made the decisions at the

19   DOJ.

20             MR. OZMENT:  Thank you.

21             THE COURT:  Okay.  Any other questions for Mr.

22   Atkinson?  All right.  You can sign off, sir.

23             THE WITNESS:  Thank you.

24             THE COURT:  All right.  It's 1:30.  The next

25   witness here is Phillip Green by my count.  I don't know how

Page 167

1    long people expect him to go, but this may be a good point

2    to stop for lunch, unless no one is planning to cross-

3    examine Mr. Green.  Well, I don't hear anyone speaking up

4    either way.

5              Why don't we break for lunch and we'll be back at

6    2:30 with Mr. Green.

7              WOMAN 1:  Thank you, Your Honor.  We will make

8    sure that he's ready at 2:30.

9              THE COURT:  Okay.  Very well.  Thank you.

10             (Recess)

11             THE COURT:  Okay.  Good afternoon.  This is Judge

12   Drain.  We are back on the record in In re Purdue Pharma, et

13   al.  And I believe the next witness up is Philip Green.

14             MS. MONAGHAN:  That's correct, Your Honor.  And I

15   believe that Mr. Green has signed in already.  Yeah, I see

16   him on the screen.

17             THE COURT:  There he is.  I see you now, Mr.

18   Green.  Would you raise your right hand, please?

19             Do you swear or affirm to tell the truth, the

20   whole truth, and nothing but the truth, so help you God?

21             MR. GREEN:  Yes, I do, sir.

22             THE COURT:  Okay.  And it's P-H-I-L-I-P, new word,

23   G-R-E-E-N?

24             MR. GREEN:  That is correct, sir.

25             THE COURT:  Okay.  Mr. Green, you submitted an

1    expert report dated July 6th, 2021.  And I understand that,

2    consistent with my order setting forth the procedures for

3    this confirmation hearing, it's intended to be your expert

4    testimony on direct.  So sitting here today on August 16th,

5    is there anything in your expert report that you wish to

6    change?

7              MR. GREEN:  No, sir.  Not that I'm aware of.

8              THE COURT:  Okay.  And you understand that it

9    would be your direct testimony?

10             MR. GREEN:  Yes, I do.

11             THE COURT:  All right.  Does anyone object to the

12   admission of Mr. Green's expert report of July 6th?  Okay.

13             I have reviewed the report and I will admit it as

14   Mr. Green's expert testimony with respect to the matters set

15   forth in the report, which primarily go to a response to a

16   rebuttal of Mr. DeRamus' report on non-cash transfers by the

17   Debtors to the Sacklers indirectly through the IACs largely

18   with respect to royalty rates.

19             Does anyone want to cross-examine Mr. Green?  No?

20   Okay.

21             I don't have any questions of him either, based on

22   my review of the report.  So hearing no one who wishes to

23   cross-examine Mr. Green, you can be excused.

24             MR. GREEN:  Thank you, Your Honor.  I appreciate

25   it.

Page 169

```
 1                THE COURT:  Okay.

 2                MS. MONAGHAN:  Your Honor, next on our witness

 3      list is Timothy Martin, who you will recall appeared on

 4      Friday.  He was only subject to recall today if Your Honor

 5      had any questions for him on the work that he did for the

 6      Side A report.

 7                THE COURT:  Right.  I have -- well, I have

 8      reviewed that report and I actually do not have any

 9      questions of him focusing as I have done primarily on the

10      summary of assets and liabilities at Page 48 on the report

11      generally.  So I think we do not need to have further

12      testimony by him.

13                MS. MONAGHAN:  Okay, Your Honor.  Mr. Martin, I

14      think you are free to sign off now.

15                MR. MARTIN:  Thank you.

16                THE COURT:  Okay.

17                MS. MONAGHAN:  So then our next witness, Your

18      Honor, is Mr. Cain.  And just a quick housekeeping note with

19      respect to Mr. Cain.  He is a rebuttal expert to Mr. Hrycay.

20      But because of the way the scheduling worked out, all

21      counsel agreed that Mr. Cain could be called today and Mr.

22      Hrycay in accordance with his availability I believe

23      tomorrow now.  So it's a little out of order, but everyone

24      was amenable to that.

25                THE COURT:  Okay.  And just for the court
```

Page 170

1    reporter's benefit, Mr. Hrycay's last name is spelled H-R-Y-

2    C-A-Y.  And then for my benefit, I have only a redacted

3    version of Mr. Hrycay's report.  Do you have it now?  Okay.

4    All right, very well.  Okay.

5              So I see Mr. Cain there.  Would you raise your

6    right hand, please?  Do you swear or affirm to tell the

7    truth, the whole truth, and nothing but the truth, so help

8    you God?

9              MR. CAIN:  I do.

10              THE COURT:  And it's Matthew, M-A-T-T-H-E-W, new

11    word, C-A-I-N?

12              MR. CAIN:  Yes, that's correct.

13              THE COURT:  Okay.  Mr. Cain, you submitted an

14    expert report dated July 6th, 2021.  Under my orders

15    submitting the procedures for this hearing, I understand and

16    I understand you understand that it's intended to be your

17    direct testimony for the hearing.  Sitting here today and

18    knowing that, is there anything in your expert report that

19    you'd like to update or change from it?

20              MR. CAIN:  No, there is not.

21              THE COURT:  Okay.  All right.  Is there any

22    objection to the admission of Mr. Cain's July 6th expert

23    report as his direct testimony?  No.  Okay.

24              I reviewed that report prior to the start of this

25    hearing today, and I don't have any questions on it.  So let

Page 171

1    me ask, does anyone wish to cross-examine Mr. Cain, his

2    report having now been admitted as an expert report and

3    expert testimony on direct for the purposes set out in his

4    report, which as noted, is a rebuttal report as to a couple

5    of issues raised in Mr. Hrycay's expert report?  So does

6    anyone want to cross-examine Mr. Cain?  No.  All right.

7              Again, I don't have any questions of you, sir.  So

8    you can sign off at this point.

9              MR. CAIN:  Okay, thank you.

10             MS. MONAGHAN:  Thank you, Mr. Cain.

11             THE COURT:  Okay.  I think that leaves the next

12   witness, Mr. White.

13             MS. MONAGHAN:  Correct, Your Honor.  We have let

14   him know and he should be signing in momentarily.

15             THE COURT:  Okay.

16             Okay, I can see Mr. White now on the screen.

17   Would you raise your right hand, please?  Do you swear or

18   affirm to tell the truth, the whole truth, and nothing but

19   the truth, so help you God?

20             Oh, you have to unmute yourself.

21             MS. MONAGHAN:  Jonathan, you are on mute.

22             MR. WHITE:  I beg your pardon.  I do.

23             THE COURT:  Very well.  Thank you.  And it's

24   Jonathan, J-O-N-A-T-H-A-N, next word White, W-H-I-T-E?

25             MR. WHITE:  It is, Your Honor.

1          THE COURT:  Okay.  Mr. White, you submitted a

2     declaration dated August 4, 2021 as your direct testimony in

3     this matter under my order setting forth the procedures for

4     the hearing on confirmation of the Debtor's amended Chapter

5     11 plan.  Knowing that and sitting here today on August 16th

6     is there anything in your declaration that you would wish to

7     change as your direct testimony?

8          MR. WHITE:  No, there is not, Your Honor.

9          THE COURT:  Okay.  Does anyone object to the

10    admission of Mr. White's declaration as his direct

11    testimony?

12         All right.  I will admit it then as Mr. White's

13    direct testimony.  Does anyone want to cross-examine Mr.

14    White?

15         MR. GOLD:  Your Honor, Matthew Gold, Kleinberg,

16    Kaplan, Wolff & Cohen for Washington, Oregon, and the

17    District of Columbia.  We do, but I do not insist on primacy

18    versus anyone else who wishes to cross.  Also willing to go

19    first if that's preferable.

20         THE COURT:  Well, I think you're it, Mr. Gold.  So

21    you can go ahead.

22              CROSS-EXAMINATION OF JONATHAN WHITE

23    BY MR. GOLD:

24    Q    Mr. White, can you hear me clearly?

25    A    Yes, I can.  Thank you.

Page 173

1    Q    Okay, thank you.  Mr. White, first just to get the

2    general clarification, you are basically testifying in the

3    role of a trustee.  Is that correct?

4    A    No, that is not correct.  I am testifying in my

5    capacity as a director of various trustee companies.

6    Q    Okay.  But those trustee companies serve as trustees to

7    the trusts at issue.  Is that correct?

8    A    That is correct in the majority of cases.

9    Q    Okay.  And is the -- is it integral to the role of a

10   trustee to be able to act independently of the beneficiaries

11   of the trust?

12   A    Yes, it is.  Although as a trustee, one has to act in

13   the interest of the beneficiaries.

14   Q    Thank you.  Is it correct that you have retained

15   investment professionals to advise the trustees for some or

16   all of these trusts?

17   A    That is correct.

18   Q    Is a trustee authorized to retain outside counsel?

19   A    A trustee is typically authorized to retain outside

20   counsel, yes.

21   Q    And the relevant trustees here are authorized to retain

22   outside counsel?

23   A    One would -- it's likely more precise because the

24   decision would depend upon who you are wishing to retain and

25   for what purpose.

Page 174

1   Q    Okay.  Well actually, let me just go to my next

2   question, which is have you retained outside counsel in

3   connection with the Purdue bankruptcy case?

4   A    Yes, we have.

5   Q    And if so, who is that?

6   A    That's Debevoise & Plimpton.

7   Q    Okay.  And Debevoise & Plimpton also represents many of

8   the or if not all of the Sackler Side A parties in the

9   bankruptcy case as well?

10  A    That's correct.

11  Q    Now, you are an attorney, are you not?

12  A    I am a qualified lawyer both in the United Kingdom and

13  in Jersey.

14  Q    Okay.  Are you licensed to practice in the United

15  States?

16  A    I am not.

17  Q    Okay, thank you.  You say that since 2018, certain

18  governmental and private plaintiffs have named as

19  defendants, among others, the Side A former directors.  Is

20  that correct?

21  A    You're referring --

22  Q    I'm not trying to trap you.  If it's easier, I can

23  point you to --

24  A    You're referring to my declaration.

25  Q    That is correct.

Page 175

1    A    Yes, that is correct.

2            MS. MONAGHAN:  I think it would be helpful, Mr.

3    Gold, to point him to the particular paragraph when you're

4    referring to his declaration.

5            MR. GOLD:  Certainly.  That's no problem.

6    BY MR. GOLD:

7    Q    I am referring to Paragraph 18 on Page 10.

8    A    Thank you very much.

9    Q    How did you become aware of this?

10           MS. MONAGHAN:  Object to the form.  Aware of what?

11   BY MR. GOLD:

12   Q    Okay.  How did you become aware that since 1918,

13   certain governmental and private plaintiffs have been named

14   as defendants, including, among others, the Side A former

15   directors?

16           MS. MONAGHAN:  And just for the record, I assume

17   you meant 2018, not 1918.

18           MR. GOLD:  I certainly did mean 2018.  Thank you

19   for correcting the record.

20   BY MR. GOLD:

21   A    The detail would have been provided by our lawyers.

22   Q    And by your lawyers you mean the lawyers who are also

23   the lawyers for the Side A Sackler defendants?

24   A    That's correct.

25   Q    Okay.  In that same paragraph, you see a statement that

Page 176

1    there are currently approximately 2,600 suits against Purdue

2    regarding its prescription opioid marketing practices.  How

3    did you become aware of that particular fact?

4    A    Again, the detail was provided by Debevoise & Plimpton.

5    Q    And one more statement from there that there are

6    currently approximately 750 lawsuits against the Side A

7    former directors.  How did you become aware of that?

8    A    The same source.

9    Q    Did you make any independent investigations to

10   determine these facts outside of information provided to you

11   by Debevoise & Plimpton?

12   A    No, I did not.

13   Q    Just to be clear, did you review any of the complaints

14   in those lawsuits?

15   A    I have seen various complaints over the years, yes.

16   Q    Okay.  But just to be clear, you were saying that

17   you've seen some of the complaints that we've just been

18   describing?

19   A    A limited number,  yes.

20   Q    A limited number.  And do you have any way of knowing

21   from your personal knowledge whether that limited number is

22   in any way representative of the large number of complaints

23   you referenced?

24   A    No, I don't.

25   Q    Okay.  Your declaration states -- and now I'm referring

Page 177

1     to Paragraph 23 on Page 12 -- that I understand, for

2     example, that one state alleged that the entire Sackler

3     family, together with entities for their benefit, engaged in

4     unlawful conduct through an entity the state termed the

5     "Sackler Pharmaceutical Enterprise".  Do you see that?

6     A     Yes.

7     Q     Which state made this allegation?

8     A     I'm afraid I can't recall.

9     Q     Did you know at one time?

10    A     Yes, I did know at one time.

11    Q     Further, your declaration states that, quote, in the

12    same place, that one complaint named the daughter of a Side

13    B former director even though she never sat on Purdue's

14    board and she worked in Purdue's R&D group for a few months

15    more than a decade ago.  Which state made this allegation?

16    A     I'm afraid I can't tell you which state made that

17    allegation.

18    Q     Are there any outstanding opioid-related suits against

19    the beneficiaries of what I will term for this purposes your

20    trusts other than suits against the Side A former directors?

21            MS. MONAGHAN:  Object to the form.  By your trust,

22    you mean the trusts of which the trust companies of which he

23    is a director or service trustee?

24            MR. GOLD:  I am -- thank you for the

25    clarification.  I am referring to the trusts listed in the

1    declaration.

2             MS. MONAGHAN:  Okay.  And by -- I am also going to

3    object that the term outstanding is vague and confusing.

4    What do you mean by cases outstanding?

5    BY MR. GOLD:

6    Q    Are you aware -- let me try to rephrase.  Are you aware

7    of any complaints raising opioid-related issues against any

8    of the beneficiaries of the trusts listed in your

9    declaration other than suits against the Side A former

10   directors?  What I'm trying to get at is whether there are

11   any suits against any of the other ones.

12   A    I don't believe that there are.

13            MS. MONAGHAN:  Okay.  And I'm just going to

14   register a belated objection just to clarify the record.

15   Against any Sackler Side A family members other than the

16   former directors?  Is that --

17            MR. GOLD:  That would be my generic way of

18   phrasing it, but I was really trying to -- that's why I

19   phrased it in terms of beneficiaries of the trust listed on

20   the -- in the declaration, if there is a difference between

21   those beneficiaries and what you referred to as Sackler

22   persons I don't know.  But I think the witness answered the

23   question.

24   BY MR. GOLD:

25   A    Could you -- would you be kind enough just to explain

Page 179

```
1    what you mean by complaint?  Do you mean some form of formal

2    legal process?

3    Q    Yes, that is what I meant.

4    A    Thank you.  Then my answer stands.

5    Q    Thank you.  The -- do you consider it to be prudent to

6    be concerned about exposure of beneficiaries of the trusts

7    listed in your declaration other than the Side A former

8    directors even though they have not currently been named in

9    any complaints to your knowledge?

10   A    Yes, I do.

11   Q    Okay, thank you.  Have you read the plan of

12   reorganization in this case?

13   A    I have read most of it, yes.  It is a very long and

14   detailed and complicated document, but I have done my best

15   to work my way through it.

16   Q    There is certainly no argument about your

17   characterization from me, sir.  Did you review the fifth

18   amended plan?

19   A    Could I check to see which plan I've been working on?

20   Q    I have no objection.

21        MS. MONAGHAN:  And Mr. Gold, I'll just interject

22   here to say a different party provided us with notice of

23   their intent to use documents for cross-examination, I don't

24   think we got any notice from you, as that the seventh plan,

25   the seventh amended plan be the one that Mr. White had
```

Page 180

```
 1   before him.

 2             THE WITNESS:  And that is the one that I have in

 3   front of me.

 4             MR. GOLD:  Okay.  My question was just which ones

 5   he has reviewed.  I'm not asking about what he happens to

 6   have in front of him now except as it may help him to answer

 7   my question.

 8   BY MR. GOLD:

 9   Q    Just so the record is clear, I'm not sure I got an

10   answer.  Did you review the fifth amended plan?

11   A    I'm afraid I can't remember whether the earlier plans

12   that I reviewed were the first, second, third, fourth,

13   fifth, or sixth.

14   Q    Okay, thank you.  Did you read the disclosure

15   statement?

16   A    Yes.

17   Q    Okay.  Did you read the shareholder settlement

18   agreement?

19   A    Yes.

20   Q    Did you read the proposed confirmation order?

21   A    I believe so, yes.

22   Q    Okay.  Well, that would have been just in the past few

23   days.  Can you clarify whether you -- and it would have been

24   another long document.  So just to confirm, your answer to

25   that is yes?
```

Page 181

1   A    No, I can't be absolutely sure whether I've seen that.

2   Q    Okay.  Are you satisfied that the releases in the plan

3   are sufficient for your beneficiaries?

4           MS. MONAGHAN:  Object to the --

5           MR. GOLD:  -- excuse me -- for the beneficiaries

6   of the entities listed in your declaration?

7           MS. MONAGHAN:  I see it's becoming training, Mr.

8   Gold.  But I was actually objecting to the term sufficient,

9   because I don't know what you mean by sufficient.  But if

10  Mr. White can understand it, he can answer.

11  BY MR. GOLD:

12  A    I don't understand it.

13  Q    Okay.  Well, then by sufficient, I mean are they

14  sufficient for you to approve the undertaking by the trusts

15  to make the payments called for under the plan.

16  A    I believe that they are, but that is subject to

17  independent verification and approval by the Jersey court.

18  Q    Okay.  Well, the -- all right.  Did you consult with

19  counsel in making that determination?

20  A    That determination being the adequacy of the releases?

21  Q    That is correct.

22  A    Yes, that would be --

23          MS. MONAGHAN:  I'm going to just intervene to say,

24  Mr. White, you can testify that you consulted with counsel,

25  but the substance of attorney-client communications are

Page 182

1   privileged and shouldn't be disclosed.

2   BY MR. GOLD:

3   Q    Was that counsel Debevoise & Plimpton?

4   A    That counsel was Debevoise & Plimpton.

5   Q    Okay.  Thank you.  Okay.  Now I want to turn to your

6   statement in Paragraph 21 on Page 11.  I'm sorry?  The --

7   and I am referring to the statement that, "The best

8   interests of beneficiaries is satisfied only if there is

9   global finality."

10  A    Yes.

11  Q    Okay.  Is it -- do you understand that by global

12  finality, that that means that the risks of litigation for

13  the Sacklers relating to Purdue is eliminated once and for

14  all?

15  A    Relating to Purdue, yes.  My understanding is that it

16  should be eliminated once and for all.

17  Q    Okay.  Your statement refers to the subject matter of

18  the releases.  Do you see where you used that term?

19  A    Yes.

20  Q    Could you please explain what you mean by the subject

21  matter of the shareholder releases?

22  A    Yes.  I think that what I am referring to when I talk

23  about the subject matter of the releases is the

24  comprehensive nature of the releases that are being granted,

25  taking into account the nature and extent of the allegations

Page 183

1    that have been made.  I have to say mass tort is a new

2    experience to me, as is the inventiveness of many of the

3    lawyers who practice in that area.  And given the wide and

4    extensive nature of the claims, it seems to me important to

5    have wide and extensive releases.

6    Q    Is mass tort your characterization of the applicable

7    law that is being addressed in this area?

8    A    I am not qualified in the United States, so I can't

9    give you an answer to that question, I'm afraid.  My

10   understanding is that that is a generic description of the

11   type of claims that have been made.

12   Q    Okay.  The -- is it correct that if a party that

13   objected to the plan were carved out from the releases being

14   given, that you would not consent or you would not -- to the

15   confirmation of the transactions from the trusts called for

16   under the settlement?

17   A    I think that's almost certainly the case, yes.  Because

18   global finality is very important for everybody.

19   Q    Well, how is it possible that you have taken that

20   position inasmuch as the current plan has been modified to

21   provide for a carveout?

22            MS. MONAGHAN:  Object to the form.

23            THE COURT:  Maybe you can show him what you're

24   referring to and lay a foundation for that question.

25   BY MR. GOLD:

Page 184

1   Q    Okay, well, let me -- are you aware that the plan has

2   been modified to provide for a carveout for certain Canadian

3   creditors?

4          MS. MONAGHAN:  Object to the form.  I don't know

5   what you mean by a carveout.

6   BY MR. GOLD:

7   Q    Let me rephrase.  Are you aware that the plan has been

8   modified to provide for a preservation of the ability of

9   certain Canadian creditors to bring actions against Sackler

10  defendants that would not be blocked by the injunctions

11  contained in the plan or the releases contained in the plan?

12         MS. MONAGHAN:  Object to the form inasmuch as it

13  omits the fact that the exception is for claims related to

14  Purdue Canada.  Mr. White testified earlier that his

15  understanding of the releases were related to Purdue meaning

16  the Debtors.

17         MR. GOLD:  I will -- I am simply asking whether he

18  is aware of that -- of the plan modification that relates to

19  Canadian creditors.

20         THE COURT:  Do you have the settlement agreement,

21  Mr. Gold, that you could either read to him from or show

22  him?

23         MR. GOLD:  Well, Your Honor, I have not -- I have

24  not provided it to counsel as an exhibit for this

25  discussion.  And simply right now I'm asking whether he is

1    aware of it or not without me having shown it to him.  I can

2    read from it if that is helpful and I can reference it

3    because it is a plan exhibit that (indiscernible) record if

4    that is helpful.  But right now I'm just asking whether he

5    received notice of whether that has occurred at all.

6    BY MR. GOLD:

7    A    I am aware that there is an ability for Canadian

8    nationals to bring claims against Purdue Canada in the same

9    way that I am aware that it is possible for Australian

10   citizens to bring claims against the Australian business.

11   Q    Thank you.  So is it fair to say that when you refer to

12   global finality, you are not referring to 100 percent global

13   finality, but some subset thereof?

14   A    The global finality I am referring to is finality in

15   respect of the Debtor, Purdue.  And it's very strange that

16   the opioid crisis seems to be very much of a U.S.

17   (indiscernible) and there have been no claims brought

18   against anybody, with the exception of Canada, in any other

19   country in the world.  So that is why I refer to global

20   finality.  And it seems to me that the situation that we are

21   facing in the United States is very different.

22   Q    Okay.  So what you're -- I don't want to put words in

23   your mouth, so please feel free to rephrase.  But what

24   you're saying is that because so much of the liability and

25   exposure for the Sacklers is centered in the U.S., that you

Page 186

1    are prepared to proceed even understanding that there may be

2    some additional exposure relating to Canadians, Australians,

3    and possibly others?

4            MS. MONAGHAN:  Object to the form.  I don't think

5    Mr. White testified that he has evaluated that there is

6    exposure with respect to Australians or Canadians.

7            MR. GOLD:  Well, I didn't say there was.  I said

8    potential exposure.

9    BY MR. GOLD:

10   A    I am not aware of any potential exposure.

11   Q    You're not aware of any potential exposure to

12   Canadians?

13   A    I am aware of the Canadian action, yes.  I'm sorry, I

14   misspoke.

15   Q    Okay.  So then let me return to my question, and I'll

16   leave out the Australians.  Is it your position that because

17   so much of the liability exposure for the Sacklers is

18   centered in the U.S., that you were prepared to proceed with

19   the settlement even if there might be some additional

20   exposure relating to Canadians?

21   A    I think it is, yes.

22   Q    Okay, thank you.

23           MR. HUEBNER:  Your Honor, just one quick thing.

24   It's more of an objection.  We need to either say Purdue

25   Canada or Canadian creditors of Purdue.  We can't say the

Page 187

1   Canadians, because those are two completely different I

2   think witnesses.  And the Court and all parties, and Mr.

3   Gold, frankly, deserve to know what questions he's asking

4   and what answers he's getting.

5           MR. GOLD:  Your Honor, as much as I appreciate Mr.

6   Huebner's contention to try to assist my questioning, I

7   think that in this particular instance that he is missing

8   the mark.  The testimony as I understood it is that we are

9   trying to -- or that the witness is trying to deal with this

10  from the perspective of the potential defendants and that

11  the -- from the perspective of the potential defendants,

12  their primary concern is that they not be faced with

13  liability from one direction, from another direction under

14  Theory A, Theory B, or Theory C, which is why they've

15  thought to try to get such broad releases, in which case the

16  niceties of exactly how the claims are being concerted and

17  brought by whom and in exactly what capacity are not their

18  concern.  So that is why I don't think it is necessary for

19  the purposes of my questions to make distinctions exactly

20  there.

21          On the other hand, if the witness -- if the

22  position of the parties is that a business judgement was

23  made that the Canadian exposure is sufficiently limited

24  because of who can bring it and in what capacity you can

25  bring it, then I think that's useful for the record to

Page 188

1    reflect.

2              THE COURT:  Again, the plan and the settlement

3    agreement spell out the terms of what is covered in the

4    release.  So I'm assuming that that's not being modified by

5    this testimony.  So I think that perhaps was Mr. Huebner's

6    concern, but that's not what Mr. Gold is seeking here.

7              THE WITNESS:  If I may, Your Honor.  I'm not sure

8    that Mr. Gold completely understands the position I was

9    taking.  Because I think that what the trustees for the A

10   family want to see is an end to all Purdue-related claims.

11   And those Purdue-related claims flow from the United States

12   but can affect many individuals and many businesses outside.

13   So it's the -- to the extent there is an extraterritorial

14   impact of this, it flows from Purdue and everything that has

15   happened in Purdue.  But I'm aware that there is that

16   extraterritorial side to the releases.

17             THE COURT:  Okay.

18   BY MR. GOLD:

19   Q    Okay, thank you.  Okay.  I am now going to, excuse me,

20   refer to -- take you to Page 13, Paragraph 25.  And in

21   particular, to the quote there -- let me know when you're

22   with me -- that says, "The trustees believe that the Side A

23   former directors acted lawfully and ethically at all times."

24   A    I am there.

25   Q    Okay, thank you.  In reaching that conclusion, did the

Page 189

1    trustees take into account that Purdue has pled guilty to

2    three federal crimes as specified in -- on the docket,

3    Docket Number 1828, Joint Exhibit 2953?

4    A    I think it's very important to distinguish between the

5    company and what happened to the company, the directors of

6    the company, and the shareholders.  And as far as I am

7    aware, none of the Side A former directors have ever been

8    accused or found guilty of anything.

9    Q    Mr. White, I appreciate your explanation, but I would

10   appreciate it if it would be preceded with a yes or no to my

11   question first.  So -- and that the yes or no in response of

12   my question starts so the record is clear.  So do you need

13   me to repeat my question again?

14   A    Yes, please.

15   Q    In reaching the conclusion -- and by that conclusion I

16   mean that the trustees believe that the Side A former

17   directors acted lawfully and ethically at all times, did the

18   trustees take into account that Purdue has pled guilty to

19   three federal crimes?

20   A    Yes, they did.

21   Q    Okay, thank you.  The -- and do you know what those

22   three federal crimes were, or would it be helpful for me to

23   state them?

24   A    It would be helpful for you to state them, please.

25   Q    A dual object conspiracy to defraud the United States

Page 190

1    and to violate the Food, Drug, and Cosmetic Act over the

2    time period from May 2007 through March 2017.  Two,

3    conspiracy to violate the federal antikickback statute

4    related to Purdue's payments to healthcare providers over

5    the time period of June 2009 through March 2017.  And three,

6    conspiracy to violate the federal antikickback statute

7    related to Purdue's (indiscernible) Practice Fusion, a

8    cloud-based EHR platform, over the time period from the fall

9    of 2015 through June 2017.  Those were all specifically

10   taken into account by the trustees?

11   A    They were aware of those issues, yes.

12   Q    Okay.  Furthermore -- and by that conclusion, I'm going

13   to be referring back to the conclusion that the Side A

14   former directors acted lawfully and ethically at all times.

15   In reaching that conclusion, did the trustees take into

16   account that the United States government has concluded that

17   Mortimer D.A. Sackler and Kathe Sackler knowingly caused the

18   submission of false and fraudulent claims to federal

19   healthcare benefit programs for Purdue's opioid drugs that

20   were prescribed for uses that were unsafe, ineffective, and

21   medically unnecessary and that were often diverted for uses

22   that lacked a legitimate medical purpose?

23             MS. MONAGHAN:  Object to the form.  The settlement

24   agreement speaks for itself, but it contains an express

25   denial of all liability.  It's a civil settlement and

Page 191

1    compromise of claims.  The government didn't make findings,

2    it made assertions, which --

3              MR. GOLD:  My question is whether he knew about

4    the -- whether that had been done --

5              MS. MONAGHAN:  Your question is was he aware of

6    the settlement agreement.

7              MR. GOLD:  No, my question is --

8              MS. MONAGHAN:  (indiscernible).

9              MR. GOLD:  My question was whether the trustees

10   took into account that the United States government had

11   taken that position.

12   BY MR. GOLD:

13   A    I was aware that certain allegations were being made.

14   I wasn't aware of the precise nature of them, and I was

15   always -- but I was also aware that those involved believed

16   that they had proper defenses and had been advised

17   accordingly.

18   Q    Okay.  Well, I will return to that.  Thank you.  But I

19   would like to just check a few more specifics here.  Did the

20   trustees take into account that the U.S. Government has

21   stated that from 2013 to 2018, Mortimer D.A. Sackler and

22   Kathe Sackler approved an initiative that intensified

23   marketing to high-volume prescribers and resulted in

24   prescriptions of OxyContin that were unsafe, ineffective,

25   and medically unnecessary and were diverted for uses that

Page 192

1     lacked a legitimate medical purpose?

2              MS. MONAGHAN:  Objection, asked and answered.  Mr.

3     White testified that he is aware of the settlement

4     agreement, but not the precise nature of the allegations.

5              THE COURT:  This is a different allegation.

6              MR. GOLD:  That's correct.  Thank you.

7              MS. MONAGHAN:  Okay.

8              THE WITNESS:  Your Honor, I am not aware of the

9     details of each and every allegation that's been made in

10    many of these cases.  And I am aware that allegations are

11    being made in many (indiscernible), and I am also aware that

12    the advice that we as trustees have received is that there

13    are full and proper defenses to all of those allegations.

14    And this is I think addressed in the court document filed by

15    the lawyers representing the trustees and the A family

16    members.

17             THE COURT:  Okay.

18    BY MR. GOLD:

19    Q    But just so the record is clear -- and if I have to,

20    I'll read it again -- are you aware of the specific

21    allegation that I had last read?

22    A    I do not recall that specific allegation.

23    Q    Okay.  I'm going to read just a few more.  I am not

24    planning to read all 20 pages of allegations into the record

25    and ask the witness as to all of them.

Page 193

1              My next one is whether they were aware that

2      Mortimer D.A. Sackler and Kathe Sackler knew or should have

3      known that after the release of reformulated OxyContin, the

4      product continued to be abused, but the primary method of

5      abuse -- I'm sorry -- that the primary method of abuse

6      continued -- shifted to abuse through oral ingestion, that

7      abuse and diversion appeared concentrated among a cohort of

8      high-volume prescribers, and nevertheless endorsed a

9      marketing effort beginning in 2013 focused on high-volume

10     prescribers?

11             MS. MONAGHAN:  Object to the form.  You can ask

12     him if he is aware DOJ asserted that.  But what you asked

13     him is a different question.

14             MR. GOLD:  Okay.  For ease of reference, each of

15     my questions with regard to these specific allegations are

16     to see whether he -- whether the witness had knowledge that

17     the U.S. government has asserted these things.

18     BY MR. GOLD:

19     A    As I've told you already, I have a general

20     understanding of a wide number of allegations.  I'm afraid I

21     cannot answer precisely as you go through each of these

22     whether I had specific knowledge of each and every one.

23     Q    I'm just trying to focus on whether the ones that you

24     have some knowledge of include the ones that I am listing

25     for you.  So do you have knowledge of those specific

Page 194

1  allegations?

2  A    At a very high level, yes.

3  Q    Okay.  Could you -- okay.  I'll try a few more with the

4  same preface as I previously discussed.  The next allegation

5  is that Mortimer D.A. Sackler and Kathe Sackler pressed the

6  company to recapture lost sales and implement strategies,

7  including the so-called E2E program, to improve profits

8  without regard to whether those sales were tethered to or

9  could be achieved based solely on medically-necessary

10  prescriptions.  Are you familiar with that allegation?

11  A    No, I was not.

12  Q    And are you familiar with the allegation that Mortimer

13  D.A. Sackler suggested that Purdue find an alternative

14  distribution strategy to fill prescriptions that were

15  rejected because of safeguards against medically unnecessary

16  prescribing, and in doing so, he knew or should have known

17  that the alternative distribution model could cause a

18  submission of false claims for Purdue opioids?

19  A    And what was the alternative distribution model?

20  Q    I'll read it again.  The Mortimer --

21  A    My question to you was what was the --

22  Q    The start of my question --

23          THE COURT:  It doesn't say.  It doesn't say what

24  that model was.

25          MR. GOLD:  Oh, okay, that's --

Page 195

1    BY MR. GOLD:

2    A    I'm sorry, I don't recall that.

3    Q    Okay, thank you.  Okay.  So what -- you have referred

4    in your answer to several of these questions to your high-

5    level understanding.  Could you please explain what your

6    high-level understanding was?

7    A    Yes.  My high-level understanding was that a great many

8    allegations have been made, and the consistent advice that

9    the trustees and I believe family members (indiscernible) is

10   that there were full and proper defenses to each of those

11   allegations.

12   Q    Okay.  So could you please explain your understanding

13   of what those full and proper defenses are, even at a high

14   level?

15   A    I would need to refer to the document filed on behalf

16   of the A Side by Debevoise, which, if I remember correctly,

17   sets out the defenses in considerable detail.

18   Q    Okay.  But without referring to that, you don't have a

19   current knowledge of that those would be.  Is that correct?

20   A    I can't recall, and I wouldn't wish to be less than

21   fully accurate.

22   Q    I appreciate --

23   A    I have reviewed those, and they seemed extremely

24   compelling to me and were consistent with the advice that

25   had been given throughout.

1    Q    Okay.  Well, the advice -- by the advice that was

2    given, are you referring to the advice that you received

3    from Debevoise?

4            MS. MONAGHAN:  Objection.  Mr. White can testify

5    to what counsel has been engaged, but not to the substance

6    of the advice provided by counsel or the exchange of

7    attorney-client communications.

8            MR. GOLD:  I'm simply --

9            THE COURT:  All right.  So you can answer that

10   question, Mr. White.  But just be careful if there is a

11   follow-up question that actually gets into the substance of

12   the advice.

13   BY MR. GOLD:

14   A    Thank you.  Could you repeat the question, please?

15   Q    You stated, I have reviewed those and they seemed

16   extremely to me and were consistent with the advice that I

17   was being given throughout.  That was your statement a

18   moment ago.  I'm asking whether by the advice that you

19   referred to in that statement, you were referring to advice

20   that you had received from Debevoise.

21   A    That is correct.

22   Q    Was there any -- strike that.  Did you undertake any

23   investigation into these allegations outside of information

24   provided to you by Debevoise --

25            MS. MONAGHAN:  And by these allegations, you mean

Page 197

1    the allegations by the Department of Justice?

2              MR. GOLD:  Yes.

3    BY MR. GOLD:

4    A    No, we did not.

5    Q    Okay.  And now thanks to Ms. Monaghan's question, let

6    me expand my last question so that I'm referring to these

7    allegations not just to the Department of Justice

8    allegations, but to the broader universe of allegations made

9    in various complaints against those parties.  Do you

10   understand my question?

11   A    Yes, I do.  And I think it's right to say that over the

12   years, I made a practice of meeting with the independent

13   directors on the board of Purdue, who I held in very high

14   regard.  And I would meet with them once or twice a year and

15   talk to them about matters and about the challenges that the

16   business was facing.  And at all times, those individuals

17   said to me that in their opinion, all the board, including

18   the Sackler family members, had behaved entirely

19   appropriately.  And I placed a high level of credence and

20   credibility on what I was being told.

21   Q    Can you tell me over what time period you are

22   referring?

23   A    I think it would have been probably from about 2009

24   through to the -- it's difficult to tell how long before the

25   Chapter 11 filing, but up to a period of perhaps a year

Page 198

1   before the full filing.  I'm sorry I can't be more precise.

2   Q    Okay.  So the -- and with whom did you have these

3   discussions?

4   A    Well, there were a number of independents.  But the

5   people I remember having most discussions with were Judy

6   Lewent and Cecil Pickett.

7   Q    And apart from those discussions that you just

8   identified, did you make any other efforts to assess the

9   veracity of the claims being made that we have been

10  discussing here?

11        MR. GOLD:  Do I need to clarify that, Ms.

12  Monaghan?

13        MS. MONAGHAN:  Well, I just object to the form

14  because of the sort of mix and match of the time periods.

15  He describes the period of time he was discussing with the

16  independent directors starting all the way back in 2009.

17  The first allegations or the first complaints against any of

18  the shareholders were not until 2018, as Ms. Conroy

19  testified.

20        MR. GOLD:  That's a good point and I appreciate

21  you making it, Ms. Monaghan.  So I do understand that some

22  of his consultations would not have concerned the specific

23  allegations that we are discussing here.  But I'm just

24  asking more generally whether there is anyone with whom he

25  consulted outside of the -- with respect to any of these.

Page 199

1   And if we have to narrow the time period, I'll do that after

2   he answers the question.

3           MS. MONAGHAN:  Okay.  And so your question is

4   other than the independent directors or counsel, anybody

5   else, is that the question?

6           MR. GOLD:  Yes.  That is correct.

7           MS. MONAGHAN:  Okay.

8           MR. GOLD:  Well, by counsel, we mean counsel for

9   the defendants.

10          MS. MONAGHAN:  Okay.  Do you understand the

11  question, Mr. White?

12  BY MR. GOLD:

13  A    Yes, I do.  And there is one other person I should

14  mention.  That was Stuart Baker, who was a trustee director

15  for much of the relevant period.  And he had a closer

16  involvement in the business than the rest of the trustee

17  directors and he guided the directors on some of these

18  issues and was consistent in his opinion that all matters

19  had been dealt with by, as I say, the Side A former

20  directors in an entirely lawful and ethical manner.

21  Q    Okay.  Now, let me refer to Paragraph 24 on Page 12 of

22  your declaration, which refers to something putting quotes -

23  - and I hope I'm pronouncing this right -- as a Beddoe

24  proceeding.

25  A    That's correct.

Page 200

1    Q    Okay.  That is commenced before the Royal Court of

2    Jersey.  Is that correct?

3    A    That's correct.

4    Q    Does that relate to -- I'm not showing you right now,

5    but it is a decision of the Royal Court of Jersey dated

6    August 5th, 2021 that is Joint Exhibit 2908.

7    A    I have in front of me the order dated the 5th day of

8    August, yes.

9    Q    Okay.  I just -- could you please --

10             MR. GOLD:  Ms. Monaghan, is there a way to verify

11   that what he is looking at is indeed the same document that

12   is the joint exhibit?

13             MS. MONAGHAN:  So, Mr. White, could you just read

14   into the record kind of the top portion of the document

15   you're looking at so that we can confirm it's the same one

16   Mr. Gold has in mind?

17             THE WITNESS:  Yes.  I have the document that has a

18   court seal and it's Royal Court of Jersey (indiscernible),

19   2020 and 152 on the right-hand side, in the year 2021, the

20   fifth day of August before James Walker McNeill,

21   commissioner.  And then it goes on.  Do you want me to read

22   the whole of the page?

23             MS. MONAGHAN:  I think that's enough probably to

24   confirm.  Is it not, Mr. Gold?

25             MR. GOLD:  Probably.  But I would just say rather

Page 201

1   than look at what I consider the caption, if you look at the

2   second page, does it have whereas clauses that start with A,

3   B, and C on Page 2 and --

4   BY MR. GOLD:

5   A    It does.  A starts, "The Royal Court", B starts, "The

6   representor trustees", C starts, "Itself facing such

7   litigation".

8   Q    Very good, thank you.  I think we are dealing with the

9   same document here.  The -- now, first I will just note that

10   this is dated August 5th, 2021.  That's correct?

11   A    That's correct.

12   Q    And is that the same date that your declaration was

13   dated?

14   A    Yes, it is.

15   Q    Okay.  When was the proceeding, the underlying

16   proceeding before -- well, I guess what you call the Beddoe

17   proceeding, when was that commenced?

18   A    As you will appreciate, I am not at liberty to disclose

19   anything related to these proceedings other than that which

20   appears in the order.  They are private proceedings between

21   the Court and the trustees in Jersey.

22   Q    So you are forbidden to reveal when the relief was

23   requested of the Court.  Is that correct?

24          MS. MONAGHAN:  I'm going to object and say I think

25   other than to the extent the information is presented in the

Page 202

1    order that the Court authorized.  So if that information is

2    in there, Mr. White is allowed to disclose it.  I'm not sure

3    if it is, but...

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18             MS. MONAGHAN:  So if that information is in there,

19    Mr. White is allowed to disclose it.  I'm not sure if it is,

20    but --

21    BY MR. GOLD:

22    A    And I don't think it is.

23    Q    Okay, so then the record reflects, is that you --

24    you're advising us that you were forbidden to identify when

25    the proceeding was commenced?

Page 204

1    A    That's correct.

2    Q    Okay.  Can you tell me whether the -- whether there was

3    a hearing in the matter or -- as -- and what I'm asking here

4    is, as opposed to the court simply taking documents that

5    were presented to it, and issuing a ruling?

6    A    I do think I'm limited to talk about the way in which

7    this application has been conducted, I'm afraid.

8    Q    Okay, so that -- can you state who were the parties to

9    the (indiscernible) proceeding?

10   A    Yes, I can, because it's in the heading and you will

11   see that it relates to the Beacon Trust and 89 others, and

12   that is all of the trusts that have a Jersey connection;

13   that is to say, either Jersey (indiscernible) trusts or

14   trusts that have Jersey trustees, or in the case of certain

15   Wyoming trusts, which are governed by Jersey law, those are

16   also subject to the application.

17   Q    Can you tell me who were the counsel of record in this

18   proceeding?

19   A    Yes, I can.  You'll see it on the final page of the

20   order, and then you have Advocate Kissler is for the

21   trustees.  Advocate Sanders and Advocate (indiscernible) for

22   the beneficiaries.

23   Q    So those are all parties for the trustees or the

24   beneficiaries; is that correct?

25   A    The beneficiaries.  Yes, that's correct.

Page 205

1    Q    Okay.  The -- and can you state whether the submissions

2    to the Royal Court consisted of anything other than the

3    material submitted by those counsel?

4    A    It's not appropriate for me to go into the conduct of

5    those -- the representation.

6    Q    Was notice of this proceeding provided to any of the

7    plaintiffs in any actions against the Side A directors?

8    A    I don't believe that it was.

9    Q    Okay.  Was notice of the proceeding provided to any of

10   the objecting states?

11   A    I don't --

12   Q    -- don't understand what I mean by objecting states, I

13   can clarify.

14   A    Yes, I do, thank you.

15   Q    There are nine states who have objected to the

16   confirmation of the plan.  Are you (indiscernible) with that

17   or is it helpful for me to --

18   A    I'm aware of that; thank you.

19   Q    Okay.  So, was notice of that proceeding provided to

20   any of those states?

21   A    No.

22   Q    Was notice of the proceeding provided to the Debtors?

23   A    No.

24   Q    Was notice of the proceeding provided to the, I'm going

25   to say UCC.  If you don't understand that acronym, please

Page 206

1      let me know.

2              MS. MONAGHAN:  -- going to just belatedly object

3      to the form.  I assume by notice, counsel, you're asking

4      whether formal court notice, not whether in negotiations or

5      otherwise, Debtors and other parties were made aware of this

6      proceeding.  Because I believe that's how Mr. White is

7      framing his answer.

8              THE WITNESS:  That's correct.

9              MR. GOLD:  Well, then let the record be clear,

10     because really, now, I have to -- I should now ask two

11     questions.

12     BY MR. GOLD:

13     Q    My first question will be whether formal legal notice

14     was provided to the Debtors or to the UCC.

15     A    No, it was not.

16     Q    Okay.

17     A    Just to be clear, the only parties to the

18     representation are the parties listed on the front page of

19     the order.

20     Q    Okay, I appreciate that.  Thank you.  I wanted the --

21     that to be clear.  The -- so speaking more broadly, apart

22     from formal legal notice, was -- were the Debtors made aware

23     that this proceeding was going to be commenced, before it

24     was?

25     A    No.

Page 207

1   Q    Was the UCC made aware that this proceeding was going

2   to be commenced, before it was commenced?

3   A    No, and they would never be in applications of this

4   kind.

5   Q    Were they aware that the proceeding was ongoing prior

6   to the issuance of the order?

7   A    Which proceedings?

8   Q    The (indiscernible) proceedings.

9   A    No, they would not.  It's just not normal practice.

10  Q    Okay.  Was the Royal Court advised that Purdue has pled

11  guilty to the three federal crimes that we discussed

12  earlier?

13  A    It's not appropriate for me to go into what the Royal

14  Court was and was not advised.  You're -- the order is quite

15  clear that the hearing was in private and we're not at

16  liberty to talk about what went on, other than what appears

17  in the order.

18  Q    Okay, fair enough.

19         MR. GOLD:  I have no further questions on cross,

20  Your Honor.

21         THE COURT:  Okay.  Does anyone else want to cross

22  examine Mr. White?

23         MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

24  the U.S. Trustee.  May I proceed?

25         THE COURT:  Sure.

Page 208

1                  CROSS EXAMINATION OF JONATHAN WHITE

2    BY MR. HIGGINS:

3    Q    Good afternoon, Mr. White.

4    A    Good afternoon.

5    Q    My name --

6    A    Good evening.

7    Q    Good evening to you.  My name is Benjamin Higgins.  I

8    represent the United States Trustee.  Can you hear me

9    clearly?

10   A    Yes, thank you.

11   Q    You testified in Paragraph 24 of your declaration that

12   the Trustees of the Sackler family trusts have been

13   authorized by an order of the Royal Court of Jersey of

14   commit to paying trust assets only if they obtain releases

15   for the trusts, the trustees, the trust protectors, the

16   special trustees, and the Sackler family Side A individuals;

17   is that correct?

18   A    That's correct.

19   Q    I'll try not to cover ground you've already covered

20   with Mr. Gold.  Are you aware that several parties have

21   objected to the Debtors' plan, based on the scope of the

22   proposed releases?

23   A    Yes, I am.

24   Q    If the releases, as currently proposed, are not

25   approved, can the trustees of the Sackler family trusts go

1    back to the Royal Court of Jersey and ask for the order to

2    be amended?

3    A    They could.

4    Q    I'm sorry, did you say they could or they ---

5    A    Yes, they could.  They could.

6    Q    And so if the bankruptcy court were to refuse to

7    approve the releases and the trustees determine that would

8    be -- it would be in the best interest of the trust

9    beneficiaries to agree to releases with a narrower scope,

10   the trustees could go back to the Royal Court of Jersey and

11   ask for new instructions; is that correct?

12   A    It -- the nature of the (indiscernible) application is

13   not one of instructions.  It is an endorsement of the

14   decisions made by the trustees, by the court, taking into

15   account all relevant factors and discounting all irrelevant

16   factors.  So, there is a duty to provide full information to

17   the court and once that happens, the court will express a

18   view as to whether the trustee's position in the

19   circumstances is fair and reasoned.

20        So -- I'm sorry to be slightly longwinded, but to

21   answer your question, the trustees would need to decide

22   whether they are willing to proceed on the basis of a

23   settlement -- a different agreement or a different order

24   made by the bankruptcy court and thus far, I think it would

25   be very difficult for them to do so, because they have taken

Page 210

1    the view that the interests of the beneficiaries are only

2    served if full and proper releases can be granted, and this

3    matter can be brought to an end.

4    Q    Thank you for that explanation, and pardon my ignorance

5    with respect to the proceeding.  And maybe I'll focus it --

6    my question based on what you just described.  If the

7    trustees were to determine that it would be in the best

8    interest of the trust beneficiaries to agree to releases

9    with a narrower scope, they could ask for an amendment from

10   the Royal Court of Jersey; is that correct?

11   A    They could go back and say to the court that either

12   they felt what was currently being proposed was right for

13   the beneficiaries or wrong for the beneficiaries and they

14   would be required to put both the positive and the negative

15   arguments before the court in order to get guidance.

16   Q    You testify in your declaration at Paragraph 5 that

17   there are also trusts governed by Wyoming law and the trust

18   governed by New York law; is that correct?

19   A    That's correct.

20   Q    Are these trusts subject to the order from the Royal

21   Court of Jersey?

22   A    There are some Wyoming trusts that are, because those

23   are governed by Jersey law.  There are some that are not.

24   And similarly, there are a number of trusts that have as

25   their trustees, individuals and not the Jersey private trust

Page 211

1    companies, or for that matter (indiscernible) Wyoming

2    private trust companies, as well.

3    Q    So just so I understand, are there some trusts that you

4    refer to in your declaration that are not governed by the

5    order from the Royal Court of Jersey?

6    A    I am -- I don't refer to them in my declaration, but by

7    definition, there are certain -- my declaration refers to 89

8    trusts, and there are, in fact, all of them there, so I

9    can't, I'm afraid, tell you completely how many there are,

10   but the trusts that are covered by this are listed in

11   Schedule B of my declaration, and there is also a full list

12   of all the trusts that has been disclosed, and if you

13   compare the two, you will see a difference and I'm afraid I

14   can't tell you how many -- how big the difference is.

15   Q    Okay.  I want to make sure I understand the

16   confidential nature of the proceeding that was discussed

17   with Mr. Gold, and I'll try not to retread ground that he

18   already covered, but so I understand it correctly, there's a

19   confidential proceeding in the Royal Court of Jersey

20   involving the Sackler family trusts, the parties to which

21   are the trustees and the trust beneficiaries; is that

22   correct?

23   A    That's correct.

24   Q    And you can testify about the existence of the

25   proceeding and the limitations that are imposed upon you by

Page 212

1    the proceeding.  Is that correct?

2    A    That is correct.

3    Q    And you can do that, because the Debevoise law firm

4    needed authority to refer to that matter in their papers and

5    they requested that you request that authority from the

6    court; is that correct?

7    A    That is correct.  I've -- the request was made through

8    the trustee's counsel, but the thrust of your question is

9    correct.

10   Q    And you can't tell us anything that's beyond what's in

11   the order that Mr. Gold referred to, correct?

12   A    I can't.  I cannot tell you in detail about anything

13   that has taken place in those proceedings, no.

14   Q    And is that because you haven't requested permission to

15   do so?

16   A    The scope of the consent requested is contained in the

17   order.  These proceedings are typically conducted in private

18   because parties -- in order to meet the tests required of

19   the court, parties are required to put very extensive

20   information before the court and that is treated as private

21   by the court, and it's only by proceeding in that way, can

22   the court be satisfied that the trustee will not be

23   inhibited by having to disclose information in other

24   proceedings.

25   Q    But if you or Debevoise or another party wish to put

Page 213

1    more information about the proceeding into the bankruptcy

2    court record, that information could be requested by the

3    trustees; is that correct?

4    A    It could be requested.  Whether it would be requested,

5    I don't know, or whether the court would grant it, I don't

6    know.  The court is fiercely protective of its jurisdiction

7    and the desirability of keeping matters such as this

8    private.

9    Q    Thank you.  Shifting gears, you testified in Paragraph

10   18 of your declaration that at least four of the trust

11   beneficiaries served on Purdue's board, have been named in

12   lawsuits; is that correct?

13   A    That's correct.

14   Q    And you've also testified, also in Paragraph 18, that

15   the bankruptcy estate has asserted fraudulent conveyance

16   claims to recover at least $10 billion in distributions from

17   Purdue to entities for the benefit of the Sackler families;

18   is that correct?

19   A    I think sometimes it's 10 billion; sometimes, it's

20   hundreds of billions.  It even gets into the trillions in

21   some of these cases, I think.

22   Q    So it's some large number that has been asserted.  Is

23   that correct?

24   A    That's correct.

25   Q    You also testify in Paragraphs 26, 27, and 30 regarding

Page 214

1    what may happen in the event there were no settlement

2    agreement.  Do you recall testifying about that scenario?

3    A    Yes, I do.

4    Q    If there were not third-party release and the

5    bankruptcy estate pursued its fraudulent transfer claims

6    against the Sacklers, is it your understanding that the

7    bankruptcy estate could pursue the trust assets that (sound

8    drops) in your declaration?

9         MS. MONAGHAN:  Object to the form.

10        MR. HIGGINS:  Your Honor, he testifies about his

11   in his declaration, and I think it's --

12        THE COURT:  No, I --

13        THE WITNESS:  (indiscernible).

14        THE COURT:  I'm sorry.  I wasn't sure what was the

15   problem with that question, Ms. Monahan.

16        MS. MONAHAN:  The question was whether they could,

17   which implies to different things, whether they possibly

18   could and whether it would succeed.  I don't think Mr. White

19   is --

20        THE COURT:  Okay --

21        MS. MONAHAN:  -- qualified to testify --

22        THE COURT:  Why don't we break it down, then, into

23   two categories.  Would there be a procedural vehicle for the

24   bankruptcy estate to pursue the fraudulent transfer claims

25   against the trust -- the Jersey trusts?

Page 215

1              THE WITNESS:  I think the word, Your Honor, I

2     think there is -- the trustees have always tried to

3     cooperate with this process, but have never submitted to the

4     jurisdiction, so if proceeding were to be brought, I suspect

5     -- and now, I'm not expressing a formal legal opinion here,

6     but I suspect that they would need to be brought maybe on a

7     parallel basis in the United States and in Jersey or in

8     Jersey alone.

9     BY MR. HIGGINS:

10    Q    But Mr. White, there -- to narrow it down specifically

11    to the judge's question, there is a procedural vehicle

12    through which these trust assets could be pursued; is that

13    correct?

14    A    If there is a legitimate claim, there is a procedural

15    vehicle.

16              MR. HIGGINS:  No further questions, Your Honor.

17              THE COURT:  Okay.  Mr. Edmunds --

18              MR. EDMUNDS:  Your Honor --

19              THE COURT:  Did you have cross?

20              MR. EDMUNDS:  I do.  Your Honor, just a few

21    questions.

22              CROSS EXAMINATION OF JONATHAN WHITE

23    BY MR. EDMUNDS:

24    Q    Mr. White, is it correct that over -- that in relation

25    to these trusts, the family members and beneficiaries from

Page 216

1    the families have established a family council?

2              MS. MONAHAN:  Object to the form.

3              MR. EDMUNDS:  I can --

4    BY MR. EDMUNDS:

5    A    If you could restate the question, please.

6    Q    Mr. White, is it correct that with respect to these

7    trusts, there is a family council, the beneficiary family

8    members participate in?

9              MS. MONAHAN:  Object to the form.  I'm not sure I

10   understand with respect to these trusts.

11             THE WITNESS:  Well, I -- if I can answer this,

12   because --

13             MS. MONAHAN:  If you can, please do, Mr. White.

14   BY MR. EDMUNDS:

15   A    I think that it's a mistake to pose the question in

16   that way, but if I can deal with it in two parts.  Some

17   years ago, the family took advice from aw leading family

18   governance consultant who helped them on structuring their

19   family affairs and organizing those affairs, and he advised

20   them to create a family council, and that family council

21   was, I think -- and I can't be sure about the dates.  It was

22   created about 20 years ago, and the function of the family

23   council was multiple.

24        It had (indiscernible) sides, it had family

25   (indiscernible), and it was anticipated that the family

Page 217

1    council would create a vehicle for liaising with the

2    trustees.  In practice, that never worked.  It was envisaged

3    that a trust committee would be established, but that was

4    never formally activated, and the relationship between the

5    trustees and the beneficiaries continued as it had

6    previously, and has never focused on the family council,

7    save to the extent that there have been meetings between the

8    trustees and the family council, typically twice a year.

9    Q    So there is a family council that meets with the

10    trustees twice a year?

11    A    There is.

12    Q    Okay.  And that council has actually been recognized

13    for its role in anonymized, but released, decisions

14    judgments of the Royal Court of Jersey; is that right?

15    A    (indiscernible).

16            MS. MONAHAN:  Object to the form.  No.

17    BY MR. EDMUNDS:

18    A    No, it has not.

19    Q    Are you aware of a 2017 Royal Court of Jersey judgment

20    published on the Royal Court of Jersey's law page that

21    refers to the Mortimer Trust and to the family council?

22            MS. MONAHAN:  Object to the form.

23            THE WITNESS:  I am --

24            THE COURT:  I think -- again, I'm not quite sure

25    why that question is objectionable.  Does it assume a

Page 218

1    document that doesn't exist or some other reason?

2          MS. MONAHAN:  So, Mr. Edmunds referred to it, so

3    he talked about, as Mr. White has testified, there is quite

4    stringent rules, enforceable as breach of professional

5    responsibility, around the confidentiality of the Jersey

6    proceedings --

7          THE COURT:  That's fine.  I didn't need a long

8    explanation.  I'm just trying to figure out what the basis

9    for the objection is, beyond objection to form.

10          MS. MONAHAN:  It was referencing (indiscernible)

11    captioned as being for the Mortimer Sackler trusts.  It's an

12    anonymized judgment.  It doesn't have those names on it.

13    Mr. White has the documents if Mr. Edmunds wants to ask him

14    about the particular judgment.

15          THE COURT:  All right.  So, if you could refer him

16    to the -- I guess the issue is that the way you're

17    describing, Mr. Edmunds, is inaccurate.  If you could refer

18    him to the actual exhibit.

19          MR. EDMUNDS:  But --

20          THE COURT:  I think that would be helpful.

21          MR. EDMUNDS:  Okay, I -- you know, I'm going to

22    have to -- (indiscernible) if I have the joint exhibit

23    number in front of me.  It's the --

24    BY MR. EDMUNDS:

25    Q    Mr. White, do you have a June 30th, 2017 judgment of

Page 219

1    the Royal Court of Jersey in front of you?

2    A    I do not, I'm afraid.  I was not sent that judgment.

3              MR. EDMUNDS:  I think that we will -- to Ms.

4    Monaghan's objection, Your Honor, I think that we will be

5    able to link this up tomorrow through Mr. Cushing --

6              THE COURT:  Okay.

7              MR. EDMUNDS:  -- when he testifies, because he was

8    counsel (sound drops), but so I don't know where that leaves

9    us.  I can -- I think --

10             MS. MONAHAN:  You can ask Mr. White if there was a

11   proceeding involving the trustees in 2017.

12   BY MR. EDMUNDS:

13   Q    Mr. White, was there a proceeding involving the

14   trustees in 2017?

15   A    Yes, there was.

16   Q    And are you aware of an anonymized but published

17   judgment of the Royal Court on June 30th, 2017 in that

18   proceeding?

19   A    Yes, I am.

20   Q    Okay, and in that judgment, does the Royal Court talk

21   about the role of the family council in administering the

22   trust?

23   A    No, it does not.

24   Q    It does not mention the royal -- the family council?

25   A    No, I don't think so.  I think -- and I can't remember

Page 220

1    the precise wording, but you might be thinking of a

2    beneficiary committee that -- the beneficiary committee was

3    referred to, but in a very limited capacity, and that

4    related only to determining issue.  It had nothing to do

5    with the administration of the trust itself, and neither the

6    family council nor the beneficiary committee has every

7    directed the trustees as to how they should exercise their

8    discretions.

9    Q    That's not exactly what I asked, but I will move on

10    from this point and just ask if you have ever seen the

11    charter of the family council.

12    A    Yes, I have.

13    Q    And you're familiar with the subcommittees of the

14    family council that interact with the trust?

15    A    Some years since I've seen it, but -- and as I said,

16    there are no committees that interact with the trustees.

17    Q    That's not my question.  I'm just asking if you are

18    aware of the (sound drops).

19    A    Your question, I think, was am I aware of committees

20    who interact with the trusts.  I think that was precisely

21    what you said and there no committees that interact with the

22    trust, is my answer.

23    Q    So you -- are there committees that interact with the

24    trustees?

25    A    No, there are not.

Page 221

1   Q    You have never had any interaction with a member of the

2   Sackler family as a -- acting as a representative of one of

3   those committees?

4   A    I don't think I have.  I don't think the committees

5   have been formally constituted or have met.  There was a

6   philanthropy committee and that has been superseded because

7   the family foundations deal with that and the trustees have

8   interactions with the family foundations.  As I've already

9   testified, it was envisaged there would be a trust committee

10  and one family member was appointed to head that, but that

11  never happened.

12       So, the liaison and the interface between the trustees

13  and the family takes place between the trustees and

14  individual family members, save for the meetings that I've

15  referred to that take place twice a year where the family

16  council comes together and the trustees discuss matters

17  affecting the trust generally at that time.

18  Q    So is it fair to say that you -- the trustees meet with

19  the members of the family, but that you don't understand

20  that to be in their capacity as representatives of the

21  subcommittees of the family council?

22  A    That's correct.

23            MR. EDMUNDS:  No further questions, Your Honor.

24            THE COURT:  Okay.  Does anyone else want to cross

25  examine Mr. White?

1          MR. UNDERWOOD:  Yes, Your Honor.  This is Allen

2    Underwood on behalf of certain Canadian Municipal Creditors

3    and Canadian First Nations.  I have a number of questions

4    for Mr. White.

5          THE COURT:  Okay.

6          MR. UNDERWOOD:  Good -- sorry, Your Honor.

7               CROSS EXAMINATION OF JONATHAN WHITE

8    BY MR. UNDERWOOD:

9    Q    Good evening, Mr. White.

10   A    Good evening.

11   Q    Do you have before you a copy of Joint Exhibit 2908,

12   this being the order entered August 5th, 2021, by the Royal

13   Court of Jersey?

14   A    Yes.  Sorry, I think -- yes, I do.

15   Q    Okay.  Thank you.  If you look at the terms of that

16   order, if I were to tell you that a stipulation was entered

17   into and approved by the bankruptcy court on August 10th

18   that related to (sound drops) with regard to provinces in

19   particular, do you feel you would be required to go back --

20          THE COURT:  I'm sorry, Mr. Underwood.  You just

21   referred to the stipulation in the provinces, but you didn't

22   say what the stipulation provided.

23          MR. UNDERWOOD:  Right, Your Honor.

24   BY MR. UNDERWOOD:

25   Q    There is a stipulation -- I apologize.  There's a

Page 223

1    stipulation, Mr. White, that was entered by this Court on

2    August 5th that provided for a modification of the otherwise

3    global releases as to U.S. Purdue entities, but in effect,

4    only as to Canadian claims, Canadian assets, and any

5    particular Canadian claims against the Sacklers' assets, I

6    guess, in Canada.

7               MR. HUEBNER:  Your Honor, Marshall Huebner.  I'll

8    object, but we'll describe in oral argument how that's --

9               THE COURT:  It's not actually an accurate

10   description of that stipulation, Mr. Underwood.

11              MR. UNDERWOOD:  Okay.  I might not have it in my

12   capacity to describe that stipulation.

13              MR. UNDERWOOD:  I guess my question, though, is

14   that if there is a modification to what otherwise you would

15   believe to be global releases, whether Mr. White believes

16   that he has go back before the court in Jersey to seek a

17   modification of the August 5th order that he has from there

18   in order that we may know that the trust will abide by the

19   terms of any confirmed (sound drops) before this court.

20              MS. MONAHAN:  Objection.

21              MR. UNDERWOOD:  I think it's a very fair question.

22              MS. MONAHAN:  I don't -- I'm sorry, I don't -- I'm

23   not sure I understood the question.

24              THE COURT:  I think the question is as follows.

25   Mr. White, if the release that's currently in the plan is

Page 224

1    modified to make it more narrow, will the trustees have to

2    go to the Jersey Royal Court, no matter how that release is

3    changed, in order to get an amendment of the August 5 order

4    and approval of the release?

5            THE WITNESS:  Yes, Your Honor, and the -- this

6    order is quite clear and it is -- I think in the settlement

7    agreement or the plan -- forgive me, I can't remember which

8    -- that makes it clear that the final sanction of the Royal

9    Court is required to perfect this, so if and when this Court

10   confirms the plan, the trustees would go back to the Royal

11   Court in Jersey and would present the revised plan.

12           And to answer the particular question, it would be

13   incumbent on the trustees to explain developments and

14   explain any changes.

15           THE COURT:  Okay.  Mr. Underwood, if you have more

16   questions, you can go ahead.

17           MR. UNDERWOOD:  Thank you, Your Honor.

18   BY MR. UNDERWOOD:

19   Q    Mr. White, in terms of presuming that the Jersey court

20   ultimately approves whatever proposed plan is before this

21   Court, who has the authority to act on behalf of the trusts

22   as to the sale of the IACs?  And the question, really, is do

23   the trusts or the trustees really have the authority to

24   direct a sale of those assets under the terms of the plan?

25   A    Yes, they do.

Page 225

1    Q    Would you feel that as of today, you would be required

2    to modify you declaration at Paragraph 22, insofar as, as of

3    right now, the release is not complete?

4            MS. MONAHAN:  Object to the form.

5    BY MR. UNDERWOOD:

6    A    Paragraph 22.

7            THE COURT:  I'm sorry, what was the question, Mr.

8    Underwood?

9            MR. UNDERWOOD:  the question -- I'm sorry.  The

10   question is that with regard to Paragraph 22 -- this is on

11   Page 11 -- of Mr. White's declaration, he says, "To be

12   clear, if one or more of the parties have objected to the

13   plan, or carved out or otherwise excluded from the

14   shareholder releases, the trust could not commit the assets

15   of the trust to the applications described above because the

16   benefits of finality would be lost."

17   BY MR. UNDERWOOD:

18   Q    And I -- my question simply is, Mr. White, as of this

19   moment, do you need to modify that paragraph or is this

20   still fully enforceable?

21           WOMAN 1:  (indiscernible) anyone.

22           THE COURT:  I'm sorry, someone is on -- not on

23   mute and they need to put themselves on mute so --

24           WOMAN 1:  Sure.

25           MS. MONAHAN:  Can I ask, Mr. Underwood, are you

Page 226

1   simply trying to say, does anything about the Canadian

2   stipulation --

3           MR. UNDERWOOD:  No --

4           THE COURT:  Is the -- Mr. Underwood, are you

5   asking whether, based on the facts that he's aware of today,

6   Mr. White needs to go back to seek relief from the August 5

7   Royal Court of Jersey order, based on what he knows today?

8           MR. UNDERWOOD:  Well, I think -- I think we, Your

9   Honor, respectfully, that was the question that he just

10  answered previous.  The question now is whether he needs to

11  change his declaration at Paragraph 22.

12          MS. MONAHAN:  I'm having trouble framing an

13  objection because I don't understand the question.

14  BY MR. UNDERWOOD:

15  Q    Well, presuming that there is no longer -- or there is

16  a modification within the proposed plan and an order that

17  carves out certain claims as to IAC assets, does Mr. White

18  believe he needs to modify chapter -- Paragraph 22 on Page

19  11 of his declaration today.

20  A    I think I would need to -- everything in the round at

21  the end of the day, make a determination at that time.  I

22  think it's -- with respect -- inappropriate to be asked

23  whether specific events would influence my thinking.

24  Q    Thank you.  And I think that in terms of your testimony

25  with Mr. Gold, what I'm wondering is, you used the term

Page 227

1    global in your declaration, and I think that you ably narrow

2    that to be a description of global claims as arising from

3    the U.S. Debtors.  Is that a correct understanding of your

4    testimony here today?

5    A    Yes, (indiscernible) related -- (indiscernible) U.S.-

6    related claims, and those can be incredibly extensive, but

7    they all flow from the Debtor and the Debtor's business.

8    Yes.

9    Q    Are you aware that international claims parties that

10   may not have been provided notice or participated in this

11   bankruptcy as to non-U.S. debtors in particular, but also

12   possibly as to U.S. debtors, may not be the -- ultimately

13   the subject of the order before this Court?

14            MS. MONAHAN:  Object to the form.

15   BY MR. UNDERWOOD:

16   A    I'm not sure I --

17            THE COURT:  You need to rephrase the question, Mr.

18   Underwood.

19            MR. UNDERWOOD:  Thank you, Your Honor.

20   BY MR. UNDERWOOD:

21   Q    Let's --

22            THE COURT:  Mr. Kaminetzky, you're on mute.  If

23   you're making an objection, we can't hear you.

24            MR. KAMINETZKY:  Sorry.  I also object to the use

25   of non-U.S. debtors.  I'm not sure who Mr. Underwood is or

Page 228

1   what Mr. Underwood is referring to.

2           THE COURT:  Well, that's why I think he needs to

3   restate the question -- one of the reasons.

4           MR. UNDERWOOD:  I apologize.

5   BY MR. UNDERWOOD:

6   Q   Mr. White, let's presume that parties filing claims

7   before this Court, having participated in the bankruptcy, be

8   they U.S. or foreign creditors, are subject to the

9   jurisdiction of this bankruptcy court and the confirmed plan

10  hereunder.  And my question is whether or not consideration

11  has been given by the trust to claims that may arise in

12  other countries, ultimately against the Jersey trusts.

13          MR. KAMINETZKY:  Objection, form.  I just don't

14  understand at all.  Against the Jersey trusts?

15          THE COURT:  Types of claims --

16          MR. UNDERWOOD:  You know what, I'll withdraw the

17  question.  That's fine.

18          THE COURT:  All right.  Okay.

19          MR. UNDERWOOD:  Thank you.

20          THE COURT:  Okay.

21          MR. UNDERWOOD:  That's all, Your Honor.  Thank

22  you.

23          THE COURT:  Okay.  Does anyone else want to cross

24  examine Mr. White?  Hearing no one.  I had one question, Mr.

25  White.  If you look at Paragraph 25 of your declaration, and

Page 229

1    you spent some time on this with Mr. Gold, in that paragraph

2    you state, "In addition, the trustees believe that the Side

3    A former directors acted lawfully and ethically at all

4    times."

5            When you say that, are you referring to their

6    acting lawfully and ethically at all times with respect to

7    the Purdue Debtors?  Is that -- or is it with respect to the

8    trusts?  I'm just trying to figure out what that refers to.

9            THE WITNESS:  I -- Your Honor, I'm intending to

10   state there and refer to the way the conducted themselves as

11   directors of Purdue.

12           THE COURT:  Okay.  And my next question and

13   perhaps my last one is, besides reflecting your belief, is

14   that belief relevant to the permission you need to get from

15   the Jersey Royal Court with regard to the settlement?  Is

16   that a relevant issue, as far as your conduct of -- or as a

17   director or as -- of the trust's conduct?

18           THE WITNESS:  I think, without getting into the

19   detail of that procedure, Your Honor, I think what the court

20   is interested in way of, is the scale of the settlement

21   against the possible defenses that the parties have.  Now,

22   that is doubly complicated here because not only do you look

23   at the defense of each case on a case-by-case basis, but you

24   have this multitude of (sound drops) and the extraordinary

25   pressures that the trustees are under in trying to conduct

Page 230

1    matters in the interests of the beneficiaries.

2            So, to answer your question, it is a relevant

3    factor, but one of many relevant factors, because the court

4    is interested in assessing the possible likelihood of claims

5    exceeding, if they were to be litigated through to a logical

6    conclusion.

7            THE COURT:  Am I right in believing, though, that

8    the Jersey court's perspective is with respect to the best

9    interests of the beneficiaries?

10           THE WITNESS:  Yes, that is correct.

11           THE COURT:  Okay.  All right.  Okay, thank you.

12   Does anyone want to cross examine Mr. White on that

13   colloquy?

14           MR. ROTHSTEIN:  Your Honor, Paul Rothstein for Dr.

15   Masiowski.  I'm having technical difficulties, so my picture

16   is not on.

17           THE COURT:  well --

18           MR. ROTHSTEIN:  I just wanted to --

19           THE COURT:  We can see you -- we can see you fine.

20           MR. ROTHSTEIN:  Oh, okay.  I can't see anybody, so

21   --

22           THE COURT:  Oh, all right.  Okay.

23               CROSS EXAMINATION OF JONATHAN WHITE

24   BY MR. ROTHSTEIN:

25   Q    My only question is, can you give us some timeline in

Page 231

1    regard to the Jersey court, how long it would take to render

2    a decision based on the issues that have been discussed

3    here?

4    A    It will not take long.

5    Q    Okay, thank you.

6            THE COURT:  Okay.  Does anyone else have any

7    further questions before any redirect?

8            MR. INDELICATO:  -- an opportunity to speak about

9    his practice and I'll hand it off.

10           THE COURT:  I'm sorry, I don't know who that was.

11           MR. INDELICATO:  (indiscernible).  I guess he was

12   drinking (indiscernible).

13           THE COURT:  Mr. Indelicato --

14           MR. INDELICATO:  (indiscernible) because --

15           THE COURT:  Mr. Indelicato, you're not -- Mr.

16   Indelicato, you're not on mute.

17           MR. INDELICATO:  (indiscernible).

18           THE COURT:  So whatever private conversation --

19           MR. INDELICATO:  (indiscernible).

20           THE COURT:  -- is being --

21           MR. INDELICATO:  Thanks, Judge.

22           THE COURT:  -- by 148 people.  Okay.  All right,

23   before we get to redirect, does anyone have any further

24   questions for Mr. White?

25           MR. HIGGINS:  Your Honor, this is Ben Higgins for

1    the U.S. Trustee.  I don't, but I think Mr. Gold, his

2    screen, it looked like he was trying to come on and --

3            THE COURT:  No, he's on the screen.

4            MR. HIGGINS:  Okay.

5            MR. GOLD:  Your Honor, I do have some questions.

6    I don't know whether it's best that I go before redirect or

7    after, but I'm happy to --

8            THE COURT:  Well --

9            MR. GOLD:  -- proceed now, if that makes sense.

10           THE COURT:  Well, are they on -- are they relating

11   to questions that others asked?

12           MR. GOLD:  Well, they are relating to, most

13   particularly, the questions that Your Honor asked.

14           THE COURT:  Okay.

15           MR. GOLD:  But again, I don't know the proper --

16   I'm prepared to go in either order --

17           THE COURT:  All right.

18           MR. GOLD:  -- at Your Honor's discretion.

19           THE COURT:  No, that's fine.  So, Mr. Ozment, do

20   you have cross?  I see you on the screen.

21           MS. MONAHAN:  You're on mute, Mr. Ozment.

22           THE COURT:  You're on mute, Mr. Ozment.

23           MR. OZMENT:  I also had a follow-up question based

24   on his answer to one of your questions, but I'll defer to

25   Mr. Gold.

Page 233

1          THE COURT:  Okay.  Well, why don't you go ahead,

2    Mr. Gold, and then we'll hear from Mr. Ozment?

3          MR. GOLD:  Thank you, Your Honor.

4              CROSS EXAMINATION OF JONATHAN WHITE

5    BY MR. GOLD:

6    Q    So Mr. White, just to summarize, you're saying that the

7    scope of what the various Side A directors and others

8    actually did would be relevant to the Jersey court, but that

9    you are not in the position to provide to this Court or to

10   any of us here any information regarding what information

11   was provided to the Jersey shore -- Jersey court, excuse me,

12   how complete it was or what it covered.  Is that correct?

13   A    That's correct.

14          MR. GOLD:  Thank you.  I just wanted to make that

15   clear, Your Honor.  No further questions.

16          THE COURT:  Okay.  Mr. Ozment, do you still have

17   your questions?

18          MR. OZMENT:  No, sir.  That's covered (sound

19   drops).  Thank you.

20          THE COURT:  Okay.  So, Ms. Monaghan, any redirect?

21          MS. MONAHAN:  Yeah, briefly, Your Honor.

22              REDIRECT EXAMINATION OF JONATHAN WHITE

23   BY MS. MONAHAN:

24   Q    Mr. White -- and I realize we are somewhat -- our hands

25   are somewhat tied by the confidentiality proceedings, but

Page 234

1   can you confirm what was not presented to the Jersey court?

2   Is that something you're free to do?

3   A     Well, I'm not --

4            THE COURT:  I think you have to --

5            MS. MONAHAN:  Let me try again.

6            THE COURT:  I think you have to give him something

7   --

8            MS. MONAHAN:  I believe there's some --

9            THE COURT:  -- give him some examples --

10           MS. MONAHAN:  -- confusing arising and I'm trying

11  to figure out --

12           THE COURT:  -- what was not presented.

13           MS. MONAHAN:  -- a way to dispel it.

14  BY MS. MONAHAN:

15  Q    Does the Jersey court have any role in weighing the

16  merits or culpability of any underlying defendant's

17  behavior, or is their role limited to concluding whether the

18  trustees have exercised their fiduciary duties towards the

19  beneficiaries in concluding that the benefits of the

20  settlement outweigh its risks?

21  A     Thank you.  Now, I understand the question.  The Jersey

22  proceedings related only to the trustees and the trusts.

23  They have no bearing at all on any claim that might be made

24  against beneficiaries, so in assessing the (indiscernible)

25  application, it is for the trustee to put before the court

Page 235

1    matters that are relevant to the trusts and not matters that

2    are -- may impact upon individual beneficiaries, unless and

3    only unless the beneficiary -- the claims made against a

4    beneficiary could track through to the trustees.  That is

5    the only way that would be relevant and -- you know, that's

6    it.

7    Q    Okay, thank you, Mr. White.  Just a couple of other

8    questions.  You were asked a few questions about potential

9    variations of the release terms and what the implications of

10   that would be.  In your declaration, in Paragraph 21, you

11   testified that the trustees considered that their entry into

12   the settlement agreement is in the best interests of the

13   beneficiaries, if and only if it provides releases that

14   provide for global finality for the trust beneficiaries and

15   related parties.

16        Is that still your testimony that that is the guiding

17   principle that the trustees have to follow?

18   A    That is absolutely my testimony.

19   Q    And then Mr. Higgins asked you whether there is an

20   ability for the trustees to go back to the Jersey court if

21   there is an ability for the trustees to go back to the

22   Jersey court if there is a variation in the terms of the

23   settlement, and my question to you is, based on your

24   experience and what you know of the Jersey court, without

25   getting into any confidential proceedings, in your view,

Page 236

```
 1    would the Jersey court be likely to approve a release that

 2    was narrower in any material respect than the one contained

 3    in the current plan of reorganization?

 4    A    I don't think it would, and I don't think the trustees

 5    would be willing to do that, either.

 6    Q    And then the last thing I'll ask you is, you were asked

 7    a number of questions by Mr. Gold about the Department of

 8    Justice's allegations, and you testified that you were not

 9    aware of the specifics of the allegations.  You are aware of

10    the settlement agreement between the Department of Justice

11    and certain beneficiaries of the trust of which you are a

12    trustee; isn't that correct?

13    A    I'm absolutely aware of that.

14    Q    And you took the DOJ proceedings very seriously; isn't

15    that correct?

16    A    We took them extremely seriously.  I mean -- I'm sorry,

17    I understood I was being cross examined on my declaration.

18    Had I known I was going to be asked questions around that, I

19    would have spent more time refreshing my memory.

20    Q    And my last question, Mr. White.  I think you testified

21    that you and seen the filing, meaning the confirmation brief

22    that the Side A family members had filed in this Court.  Do

23    you recall that?

24    A    I think so.  I'm getting slightly confused by the

25    number of different documents, I'm afraid.
```

Page 237

1    Q    And is it fair to say that in your view, the purpose of

2    the settlement here is not to determine the merits of the

3    underlying claim, but to bring them to an orderly conclusion

4    that best serves the interests of the beneficiaries, who are

5    your object of protection?

6            MAN 1:  Objection.  Leading, Your Honor.

7            THE COURT:  Sustained.

8    BY MS. MONAHAN:

9    Q    Mr. White, what is your view of the objective of the

10   settlement that the trustees have given their consent to

11   here?

12   A    It is to bring finality.  I mean, we're operating in a

13   (indiscernible) environment that I am not used to.  The

14   costs of -- the costs in these actions is absolutely

15   enormous.  I'm used to operating in a system where

16   successful parties can recover their costs from unsuccessful

17   parties.  There's no prospect of that in the United States.

18   The idea of litigating for years to come is intolerable from

19   a trustee's perspective and from the perspective of the

20   beneficiaries, and the opportunity to draw a line under this

21   and make a really worthwhile contribution, which is what the

22   family are doing and what the trustees are doing, is, I

23   think, the right way to go.

24   Q    Thank you, Mr. White.

25            MS. MONAHAN:  I don't have anything further, Your

Page 238

1   Honor.

2           THE COURT:  Okay.  Any recross on the redirect?

3           MR. UNDERWOOD:  Yes, Your Honor.  This is Allen

4   Underwood on behalf of the Canadian Municipal Creditors and

5   Canadian First Nations.

6               RECROSS EXAMINATION OF JONATHAN WHITE

7   BY MR. UNDERWOOD:

8   Q    Mr. White, to put it in, perhaps, simpler terms, I

9   guess my understanding is that when you go before the Jersey

10  court in a matter similar to that which resulted in the

11  August 5th, 2021 order, you are, in effect, seeking the

12  court's blessing with regard to your determination as to how

13  to dispose of or address the assets of the trust, and that

14  is, in essence, your protection as a fiduciary.  Is that

15  correct?

16  A    That's correct.  The (indiscernible) principle enables

17  trustees to go before the court and for the court to

18  exercise in a jurisdiction where trustees are facing

19  momentous decisions, and this is certainly a momentous

20  decision.

21  Q    I just have two other questions.  The first question is

22  -- and you may not know the answer, but if you've reviewed

23  the most recent plan or its prior derivations.  Do you

24  believe that you are a released party under the terms of the

25  confirmed plan in this case?

Page 239

1    A    Are you asking me personally?

2    Q    In your capacities as a -- yes.  Yes, I am asking you

3    personally.

4    A    I believe I am.

5    Q    And do you believe that the determination of

6    confirmation of a plan herein and the release of you would

7    necessarily apply to the claims of trust beneficiaries in a

8    court of Jersey who believed otherwise?

9              MS. MONAHAN:  Object to the form.

10             THE COURT:  I don't understand that question, Mr.

11   Underwood.

12             MR. UNDERWOOD:  I apologize.

13   BY MR. UNDERWOOD:

14   Q    I think that the nexus of the question, Mr. White and

15   Your Honor, is simply that although in a confirmed plan, as

16   may be contemplated before this Court, you may be a releases

17   party, is the Jersey court obliged to follow that release?

18   For instance, the beneficiaries (indiscernible)?

19   A    The personal release that I may or may not receive is

20   not a matter for the Jersey court.  The Jersey court is only

21   concerned with the trusts, the trustees, the beneficiaries,

22   and sadly, they're not concerned about me, personally.  And

23   so, I am (indiscernible) with that order and in terms of

24   (indiscernible) applications generally, beneficiaries will

25   always be convened before the court so that they have an

Page 240

1    opportunity of expressing their views to the court, because

2    they will be directly impacted by any decision that the

3    trustee makes.

4    Q    Thank you.  And I -- last question that I have for you,

5    Mr. White -- and I appreciate your time and I'm sure it's

6    late there -- is, if I were to tell you that there's

7    potentially somewhere between $60 billion and maybe as high

8    as $100 billion worth of claims that may be brought against

9    Purdue Canada assets and against the Sacklers, to the extent

10   of their -- I guess the extent that they can be reached in

11   Canada, is that something that you would feel the need to

12   report to the Jersey court in the context of this plan?

13              MS. MONAHAN:  Object to the form.  Lack of

14   foundation.

15              THE COURT:  No, I'll -- you can ask that as a

16   hypothetical question.

17   BY MR. UNDERWOOD:

18   A    I think, if I'm understanding the question correctly,

19   the trustees would need to take advice.  They would take

20   advice from Canadian counsel and other counsel as to the

21   respective merits of the claim and that is a factor that I

22   think should and would be disclosed to the Jersey court.

23   Q    Thank you, Mr. White.

24              MR. UNDERWOOD:  I have no further questions.

25              THE COURT:  Okay.

1         MS. MONAHAN:  I just have one, Your Honor, based

2    on that.

3         THE COURT:  Well, I don't know --

4         MS. MONAHAN:  Unless Mr. Gold wants to go.

5         THE COURT:  -- Mr. Gold, did you have any

6    questions on the redirect or related to the redirect?

7         MR. GOLD:  Yes, Your Honor, and I will -- I know

8    others have said this.  I'll try to be very brief.

9             RECROSS EXAMINATION OF JONATHAN WHITE

10   BY MR. GOLD:

11   Q    Mr. White, do I understand you correctly that the

12   beneficiaries of the trusts, who you have -- you have listed

13   in your declaration whose interests you take (indiscernible)

14   consider the prospect of years and years of litigation on

15   these matters with the costs that you described to be a

16   prospect to be voided?

17   A    Was your question the beneficiaries or the trustees?

18   Q    Beneficiaries.

19   A    I believe so.

20   Q    And that they are -- highly prefer a negotiated

21   settlement to the years of litigation that would be a

22   prospect.  Is that correct?

23   A    Yes, and they believe that their very substantial

24   contribution that they're willing to make would be put to

25   better use by a settlement and the creation of the MDT than

Page 242

1    paying very expensive lawyers over a period of perhaps 10 or

2    20 years.

3    Q    Are you saying that it's important to the beneficiaries

4    that their funds be put to the uses set forth in the

5    settlement and the plan?

6    A    If you're suggesting that it is the beneficiaries that

7    are driving this decision, they are not.  The trustees have

8    to make independent decisions which they are very carefully

9    doing.  They're exercising their discretion and they have

10   concluded that this is the right thing to do.  They have

11   certainly discussed matters with the beneficiaries.  They're

12   aware of the beneficiaries' position, but they have an

13   independent fiduciary duty, which they are very careful to

14   discharge.

15   Q    Mr. White, once again, I must ask you to begin your

16   answers with a yes or no and then to add any clarification

17   afterwards.  The -- can you answer my question with a yes or

18   no, prior to your clarification?

19   A    If you could repeat your question.

20   Q    Are you saying it is important to the beneficiaries

21   that their funds be put to the uses set forth in the

22   settlement and the plan?

23   A    What do you mean by their funds?  I'm sorry, I don't

24   understand the question.

25   Q    The funds of the trust.  Excuse me.

Page 243

```
 1   A    The funds of the trust are not their funds and I repeat

 2   my answer.  That is a matter for the discretion of the

 3   trustees.

 4   Q    Excuse me, sir.  I'm asking you to start with a yes or

 5   no, not the clarification to my question.  Appreciate it.

 6   A    Well, I don't understand the question.

 7   Q    Let me try --

 8              THE COURT:  Let me try to ask it this way because

 9   I do think there were a couple of mines in both of those

10   questions, which Mr. White felt he needed to diffuse.

11              I think, Mr. Gold, what you are asking is where

12   you have sought the beneficiaries' views regarding the

13   proposed settlement under the plan, is it your belief, based

14   on that consultation, that the beneficiaries you -- the uses

15   to which the funds are being put as being important?

16              THE WITNESS:  Yes, Your Honor.

17              THE COURT:  Okay.

18              MR. GOLD:  Thank you, Your Honor.

19   BY MR. GOLD:

20   Q    But is it also fair to say that the beneficiaries'

21   belief in the importance of the use of those funds is

22   subordinate to them obtaining the releases, and that if they

23   do not obtain the releases, they are comfortable with the

24   funds not being released and the beneficiaries of those

25   funds not receiving the benefit of them?
```

Page 244

```
 1    A    I'm afraid I'm just not in a position to express that

 2    sort of view as to the way they're thinking.

 3    Q    Okay.  That's -- I appreciate that.  That is fair.

 4         So my other question for you is, hypothetically, were

 5    this Court to agree with the position advanced by the

 6    objecting states and to rule that the plan could not be

 7    confirmed that contains involuntary releases imposed upon

 8    the objecting states, opening the prospect of the long-term

 9    litigation that you have described, would you expect that

10    the parties for the -- for the trusts, trustees, and the

11    beneficiaries of the trust, and their counsel would return

12    to negotiations in order to avoid the long-term litigation

13    that you describe as so horrible, and to conform it around

14    the legal landscape resulting from any such court decision?

15              MS. MONAGHAN:  I'm going to object to the form.  I

16    got lost partway through there.

17              THE COURT:  Did you follow the question, Mr.

18    White?

19              THE WITNESS:  No.  It's not easy as to questions,

20    but I think my view on this is that we have -- we have been

21    through several mediations.  We have had negotiations going

22    on ad nauseum indefinitely, and we have at long last -- or

23    we appear at long last to be at a point where most, but not

24    all, parties agree that the plan which contains the releases

25    is the right way forward.  I personally find it very
```

Page 245

1    difficult to see how any negotiations could start again if

2    we fail at this juncture.

3    BY MR. GOLD:

4    Q    Okay.  so what you're saying is that should the Court

5    enter that ruling, there would be no further negotiations.

6    There would be just long-term litigation because so many

7    negotiations have been tried before and that the parties

8    would then subject themselves to what they've described to

9    be so terrible?

10             MS. MONAGHAN:  Objection.  I think that

11    mischaracterizes his testimony.

12             THE COURT:  Well, I think it's been asked and

13    answered.

14             MR. GOLD:  Okay.  Then I -- then I withdraw the

15    question, Your Honor.

16             THE COURT:  Okay.

17             MR. GOLD:  I have no further questions.

18             THE COURT:  Okay.  All right.

19             MS. MONAGHAN:  I have just one, Your Honor, if

20    everybody else is finished.

21             THE COURT:  Okay.

22              REDIRECT EXAMINATION OF JONATHAN WHITE

23    BY MS. MONAGHAN:

24    Q    Mr. White, has any living member of the A side Sackler

25    family ever served on the Board of Directors of Purdue

Page 246

1   Canada?

2   A     I don't believe so.

3              MS. MONAGHAN:  Thank you.

4              THE COURT:  All right.  I think that concludes Mr.

5   White's testimony, so you can sign off and I think probably

6   go to bed.  What time is it there, sir?

7              THE WITNESS:  It is -- it is 20 to 10.

8              THE COURT:  Okay.  It's not that late.  I'm not

9   telling you to go to bed.

10             MS. MONAGHAN:  You still have time for a nightcap,

11  Mr. White.

12             THE WITNESS:  Thank you very much.

13             THE COURT:  All right.

14             MS. MORALES:  Excuse me, Your Honor.

15             THE COURT:  Yes?

16             MS. MORALES:  Your Honor?

17             THE COURT:  We're having connection issues Ms.

18  Morales with --

19             MS. MORALES:  May I speak?  Yeah.  (Indiscernible)

20  Morales with (indiscernible).

21             I just want to say that my father didn't

22  (indiscernible) --

23             THE COURT:  Ms. Morales, we -- I'm sorry.  You're

24  not -- you're just not coming through.  We can't hear you.

25             MS. MORALES:  Okay.  Okay.  I'm sorry.  I just

Page 247

1   want to say that my father's death was not self-inflicted

2   like a lot of the other claimants with addiction and misuse

3   of OxyContin.  He didn't know that the antidepressants were

4   going to react the way they did.  And I just (indiscernible)

5   on (indiscernible) system which I got a little bit more

6   information how it's going to proceed, so in that aspect, I

7   guess (indiscernible) on how it's like --

8             THE COURT:  I'm sorry again.  You're cutting out.

9   But let me say this, Ms. Morales.  The issue I think you're

10   discussing is not up for me to decide, and I'm going through

11   evidence on something else, not on the -- not on your claim.

12   So I --

13             MS. MORALES:  I was --

14             THE COURT:  I think for two reasons -- one is that

15   we really can't hear you, and second in that you have not

16   objected to the plan -- I have to hear you some other time,

17   but not at this point.

18             MS. MORALES:  Okay.

19             THE COURT:  We need to move on to the next

20   scheduled witness in the confirmation hearing.  And I think

21   that next scheduled witness is now on the screen, Ms.

22   Saunders.

23             MS. SAUNDERS:  That's correct.  Yes.

24             THE COURT:  Okay.  Let me swear you in.  Would you

25   raise your right hand, please?  Do you swear or affirm to

Page 248

1    tell the truth, the whole truth, and nothing but the truth

2    so help you God?

3              THE WITNESS:  I do.

4              THE COURT:  Okay.  And it's Alexa, A-L-E-X-A,

5    Saunders, S-A-U-N-D-E-R-S?

6              THE WITNESS:  Yes.  That's correct, Your Honor.

7              THE COURT:  Ms. Saunders, you submitted a

8    declaration in connection with this hearing on confirmation

9    of the Debtor's amended Chapter 11 plan.  It's dated August

10   5, 2021.  And under my order establishing the procedures for

11   this hearing, it's intended to be your direct testimony.

12             Sitting here on August 16 and knowing that, is

13   there anything in your declaration that you wish to change?

14             THE WITNESS:  No, Your Honor.

15             THE COURT:  Okay.  Does anyone wish to cross

16   examine -- well, first -- excuse me.  Does anyone object to

17   the admissibility of Ms. Saunders' declaration as her direct

18   testimony?  Okay.  It's admitted.

19             Now, does anyone want to cross examine Ms.

20   Saunders on her declaration?

21             MR. GOLD:  Yes, Your Honor, if I may proceed.

22   Matthew Gold on behalf of Wolff & Cohen for (indiscernible)

23   states --

24             THE COURT:  Yes.

25             MR. GOLD:  -- Washington, Oregon, and District

Page 249

1    Columbia.

2             THE COURT:  Yes.  You can go ahead.

3             MR. GOLD:  Thank you, Your Honor.

4                CROSS EXAMINATION OF ALEXA SAUNDERS

5    BY MR. GOLD:

6    Q    Ms. Saunders, are you -- you are an attorney, are you

7    not?

8    A    I am, yes.

9    Q    Where do you practice?

10   A    I practice in Jersey in the Channel Islands.

11   Q    Are you licensed to practice in the United States?

12   A    No, I'm not.

13   Q    Okay.  Thank you.

14        The -- I'd like to get a little bit of an understanding

15   of the role of a protector, that which is what you are?

16   A    That's correct.  Yes.

17   Q    Do I correctly understand that the purpose is that the

18   protector has to exercise independent judgement with respect

19   to the beneficiaries of the trust?

20   A    That is correct, yes.

21   Q    Okay.  Thank you.  Is a protector authorized to retain

22   outside counsel?

23   A    Yes, it is.

24   Q    Have you retained outside counsel in connection with

25   the Purdue bankruptcy case?

Page 250

1    A    The protectors are represented by Debevoise alongside

2    the trustees and certain family members.

3    Q    Okay.  Thank you.  Have the protectors retained any

4    counsel that is independent of the beneficiaries?

5    A    No, they have not.

6    Q    Okay.  Thank you.

7         I'm going to refer now to your declaration to Page 5,

8    Paragraph 7.  Can you look there?

9    A    Yes.  Thank you.

10   Q    Okay.  You say you are aware that since 2018, certain

11   governmental and private plaintiffs have named as defendants

12   among others the Side A former directors; is that correct?

13   A    That correct.  Yes.

14   Q    How did you become aware of this?

15   A    I became aware of that through Counsel.

16   Q    And by Counsel, are you referring to Debevoise?

17   A    Yes.  That's correct.

18   Q    You also say that there were -- there are approximately

19   2,600 suits against Purdue regarding its prescription opioid

20   marketing practices?

21   A    That's correct.  Yes.

22   Q    How did you become aware of this?

23   A    I also became aware of that through Debevoise.

24   Q    Thank you.  You say that there are approximately 750

25   suits against the Side A former directors.

Page 251

1    A    I do.  Yes.

2    Q    And how'd you become aware of that?

3    A    Also through Debevoise.

4    Q    Are you aware of any out -- any opioid-related suits

5    against the beneficiaries of the trusts that you have listed

6    in your dilation other than against the Side A former

7    directors?

8    A    I'm not.  No.

9    Q    Do you consider it to be prudent to be concerned about

10   the exposure of non-Side-A former director beneficiaries

11   even though they have not been formally sued?

12   A    Could you repeat the question?  Sorry.

13   Q    Certainly.  Do you consider it prudent to be concerned

14   about the exposure of non-Side-A former director

15   beneficiaries even though they have not been formally sued?

16   A    Yes, I do.

17   Q    Okay.  Thank you.  Have you read the plan of

18   reorganization for this case?

19   A    I have read parts of it.  I've not read it in its

20   entirety.

21   Q    Okay.  Do you know which version of the plan you read?

22   A    I've been provided with the most recent one.  I think

23   it might be the seventh.

24   Q    Okay.  But, so if -- you've read portions of the

25   seventh plan.

Page 252

1    A     That's correct.  Yes.

2    Q     But do you know, based on your own knowledge, whether

3    there are any provisions in the plan other than what you

4    reviewed that could affect the meaning or interpretation of

5    the provisions you did review?

6    A     I don't have that level of detailed knowledge of the

7    plan.

8    Q     Okay.  Thank you.  Are you satisfied that the releases

9    in the plan are sufficient to provide you with the basis to

10   authorize the payments that are contemplated in connection

11   with the plan?

12          MS. MONAGHAN:  Objection.  I think Ms. Saunders'

13   declaration lays out a different -- a different route by

14   which the protector's approval is required.  It's not to the

15   payment.  It's to the sale of certain assets.

16   BY MR. GOLD:

17   Q     Then let me restate.  Are you satisfied that the

18   releases in the plan are sufficient to authorize you to --

19   sufficient to provide the basis for you to authorize the

20   sales contemplating the plan?

21   A     I would say the releases coupled with the protection

22   that will, we anticipate, be offered by an order of the

23   royal court approving the entry into the plan by the

24   trustees -- sorry -- the entry into the settlement

25   agreement.

Page 253

1   Q    And this royal court entry is something that is

2   prospective, that would have to be obtained subsequently or

3   has been obtained?

4   A    It is prospective, so it is anticipated that an

5   application will be made shortly.

6   Q    Did you consult with Counsel in making the

7   determination regarding the adequacy and effectiveness of

8   the releases in the plan?

9         MS. MONAGHAN:  I'm going to just interpose a

10  caution here, Ms. Saunders.  You can testify to the fact

11  that you may have consulted Counsel or not, and things like

12  time and place of that consultation, but not to the

13  substance of communications between counsel and client.  If

14  you can answer the question, though, you can go ahead and

15  answer.  Thank you.

16        THE WITNESS:  So could you repeat the question,

17  please, Mr. Gold?

18  BY MR. GOLD:

19  Q    Did you consult with Counsel in making the

20  determination regarding the adequacy of the releases

21  contained in the plan?

22  A    Yes, I did.

23  Q    And by Counsel, that refers to Debevoise?

24  A    That's correct.  Yes.

25  Q    Okay.  The -- your -- now refer to Paragraph 9 on Page

Page 254

```
1    6 of the declaration where you refer to global finality.

2    A    Yes.

3    Q    And you state that the entry is in the best interest of

4    beneficiaries if and only if it provides for global

5    finality.

6    A    That's correct.  Yes.

7    Q    The -- are you aware that there is an exception in the

8    plan preserving certain actions that can be brought by

9    certain Canadian creditors with respect to Purdue Canada?

10   A    I'm aware of that.  Yes.

11   Q    And is it your view that the -- that the plan, even

12   while permitting those actions to proceed, still constitutes

13   global finality?

14   A    My use of the term global is not intended to be used in

15   its geographical sense.  It's meant to be used in the sense

16   that it provides complete resolution of any litigation or

17   potential claims arising out or Purdue U.S. and its

18   activities.

19        So to the extent that there is litigation in Canada

20   against Purdue Canada, that is not resolved as part of this

21   plan.  That's what my understanding is.

22   Q    Okay.  Thank you.  The -- in making -- how can you --

23   let me phrase it this way.  How can you describe your view

24   of these releases as independent if your only input was from

25   Counsel for the beneficiaries?
```

Page 255

1    A    I'm not sure I said my review of the releasees had to

2    be independent from the beneficiaries.  What we have to do

3    is exercise independent judgment, so we can't simply -- we

4    have to apply our own minds, our own judgment when making a

5    decision.  That doesn't require us to instruct separate

6    counsel.

7    Q    Does it require you to make any legal judgments

8    regarding the issues at play?

9    A    Legal judgments, no.  That's what we would instruct

10   counsel to do that.

11   Q    All right.  Okay.  But counsel there are Counsel for

12   the beneficiaries; is that correct?

13   A    And for the trustees, yes.

14   Q    Yes.  Okay.  Which are the same counsel in this case;

15   is that right?

16   A    That's correct.  Yes.

17   Q    Okay.  The -- in connection with evaluating whether to

18   -- how to exercise your independent judgment in this case,

19   did you review the settlement that was reached between the

20   Side A Sacklers -- or all Sackler's, actually -- and the

21   United States wonderment?

22   A    Again, in part.  I didn't read the settlement in its

23   entirety, but I'm aware in general terms of -- of what it

24   was designed to achieve.

25   Q    Okay.  Well, are you aware of the allegations that were

Page 256

1    made by the United States in that settlement with respect to

2    actions by the Side A Sacklers?

3              MS. MONAGHAN:  Object to the form.

4              THE COURT:  On the basis that it's an inaccurate -

5    - it assumes facts not in evidence?

6              MS. MONAGHAN:  On the basis that she just

7    testified that she was not aware of the specifics.  She was

8    generally aware of the existence of the document.

9              THE COURT:  Well, I'll overrule that objection.

10   Are -- because, Mr. Gold --

11             MS. MONAGHAN:  I was just trying to avoid the

12   (indiscernible).

13             THE COURT:  He's trying to get to the specifics

14   again, so are you aware of specific allegations made in that

15   settlement by the Department of Justice regarding certain

16   Sackler family members?

17             THE WITNESS:  Yes, but again, I'm not aware of the

18   -- with any specificity of what -- what those allegations

19   were.  It was some 10 months ago now, I believe.

20   BY MR. GOLD:

21   Q    Okay.  But so you didn't consider it necessary to

22   review the specifics of those allegations in order to reach

23   your independent judgment; is that correct?

24   A    I think what we -- what as protectors we did was assess

25   with input from Counsel whether reaching that settlement was

Page 257

1      a sound decision.

2          Now again, that settlement itself did not require

3      protector consent.  We were aware of it.  We were involved

4      in discussions about it, but no formal consent by us was

5      required in order for that settlement to be reached.

6      Q    I understand, but that's -- my question was whether it

7      was necessary for you to understand the specifics of those

8      allegations in order to reach the judgments that you did

9      reach with respect to the plan and the settlements under

10     that?

11     A    But our consent wasn't required, so we -- we were aware

12     of it.  We thought that it was a sound and proper decision

13     for the trustees to make, but as our consent wasn't formally

14     required, there was no formal decision needed from us.

15              MR. GOLD:  Okay.  Thank you.  I have no further

16     questions, Your Honor.

17              THE COURT:  Okay.  All right.  Does anyone else

18     wish to cross examine Ms. Saunders?

19              MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

20     the United States Trustee.  May I proceed?

21              THE COURT:  Yes.

22              CROSS EXAMINATION OF ALEXA SAUNDERS

23     BY MR. HIGGINS:

24     Q    Hello, Ms. Saunders.  My name is Benjamin Higgins, and

25     I represent the United States Trustee.  Can you hear me

Page 258

1    okay?

2    A    Yes, thank you.

3    Q    Thank you.  You testified that you're the director of

4    Beacon Company Limited, which acts as a protector for

5    certain trusts for the benefit of the Side A family members;

6    is that correct?

7    A    That's correct.  Yes.

8    Q    And you yourself are also the protector of certain

9    trusts for the benefit of Side A family members; is that

10   right?

11   A    That's correct.  Yes.

12   Q    And these trusts, they hold certain pharmaceutical

13   companies or cash and other investments for the benefit of

14   the Side A family; is that right?

15   A    That's right.  Yes.

16   Q    And under the plan, which incorporates an agreement

17   with the Sackler family, certain of these assets currently

18   held in trust will be sold, and the proceeds will be

19   escrowed and used to fund the payment obligations of the

20   Sackler families; is that right?

21   A    That's my understanding.  Yes.

22   Q    And I want to -- I want to make sure I understand the

23   extent of your testimony where Mr. Gold was getting at the

24   end there.  And please correct if I misstate it, but is it

25   true that your consent is not required to enter the

Page 259

```
 1    settlement agreement; is that right?

 2    A    That's right.  Yes.

 3    Q    But is it your testimony that your consent is required

 4    to sell the assets that are held in trust?

 5    A    The protectors' consent is required to sell any asset

 6    that has been designated as a retained asset.

 7    Q    Okay.  So that would include your consent and the

 8    consent of the other protectors to sell those assets?

 9    A    That's correct.  Yes.

10    Q    And you're aware that several parties have objected to

11    the Debtor's plan based on the scope of the proposed

12    releasees?

13    A    I'm aware.  Yes.

14    Q    If the releases as currently proposed are not approved,

15    is it within the protectors' discretion to consent to the

16    sale on the basis of narrower releases if they believed it

17    was in the best interest of the trust beneficiaries?

18    A    Only if they believed it was in the best interests of

19    the beneficiaries but not otherwise.

20    Q    You've testified that at least four of the trust

21    beneficiaries serve on Purdue's Board and have been named as

22    defendants in hundreds of lawsuits; is that correct?

23    A    Yes.  That's correct.

24    Q    And you've also testified that the bankruptcy estate

25    has asserted that it could bring fraudulent conveyance
```

Page 260

1   claims to recover at least $10 billion in distributions from

2   Purdue to entities for the benefit of the Sackler families;

3   is that right?

4   A    That's correct.  Yes.

5   Q    If there were no shareholder release, do you have an

6   understanding as to whether there's a procedural mechanism

7   for the bankruptcy estate to pursue assets of the trust?

8           MS. MONAGHAN:  Object to the form.  This is far

9   outside the scope of her declaration.

10          THE COURT:  That's fair.  I think you've already

11  gotten this answer already, Mr. Higgins, from another

12  witness, so --

13          MR. HIGGINS:  Sure.  Sure.  I'll withdraw the

14  question, Your Honor.

15  BY MR. HIGGINS:

16  Q    Ms. Saunders, are you -- or do you -- are you aware of

17  whether or not you would qualify as a released party under

18  the plan?

19  A    I believe I would, yes.

20          MR. HIGGINS:  Thank you, Ms. Saunders.  No further

21  questions, Your Honor.

22          THE COURT:  Okay.  Does anyone else want to cross

23  examine Ms. Saunders?

24          MR. UNDERWOOD:  Yes, Your Honor.  This is Allen

25  Underwood on behalf of the Canadian Municipal and Canadian

Page 261

1      First Nations Creditors.

2                  THE COURT:  Go ahead.

3                      CROSS EXAMINATION OF ALEXA SAUNDERS

4      BY MR. UNDERWOOD:

5      Q    Ms. Saunders, I believe that you just testified that

6      your consent was not required in order to enter this

7      settlement; is that correct?

8      A    That is correct.  Yes.

9      Q    And I believe the you also testified that your consent,

10     and in fact unanimous consent of the protectors, would be

11     required to sell the IACs, and that consent would be based

12     upon protectors' analysis of the best interest of the trust

13     and, I guess, beneficiaries; is that correct?

14     A    That is correct.  Yes.

15     Q    Is there a circumstance that one could conceive of over

16     the next nine years where even though a plan embodying this

17     settlement is (indiscernible) before this Court, the

18     protectors might not find it in the best interest of the

19     trust to liquidate the IAC assets?

20     A    I --

21                  MS. MONAGHAN:  Objection.  Are you asking whether

22     having committed the settlement they could then renege?  Is

23     that the question?

24                  MR. UNDERWOOD:  Yes.

25                  MS. MONAGHAN:  Okay.  Ms. Saunders, if you can

Page 262

1    answer the question, you can -- you can answer it.

2         THE WITNESS:  So I don't think being entered into

3    the settlement that the proctors could probably withhold

4    their consent of the sale of any IACs because to withhold

5    that consent would be clearly not in the interest of the

6    beneficiaries of the relevant trusts.

7    BY MR. UNDERWOOD:

8    Q   Isn't it -- isn't it true, Ms. Saunders, that there are

9    a variety of beneficiaries to these trusts that may face

10   different liability with regard to claims under the plan?

11        MS. MONAGHAN:  I'm sorry, Mr. Underwood, I

12   couldn't hear you.  You cut out there for a minute.

13   BY MR. UNDERWOOD:

14   Q   I apologize.  Ms. Saunders, isn't it true that there's

15   a variety of beneficiaries on a variety of trusts that are

16   administered hereunder?

17   A   Yes.  That's correct.

18   Q   Isn't it possible that, particularly -- and I'll give

19   you the example -- if there is litigation internationally

20   subsequent to the entry of a confirmed plan here, could the

21   results of that litigation impact your best interest

22   determination in any way as to whether or not to sell the

23   IACs under this plan on a best interest analysis?

24   A   I think we have to make that determination at the time

25   the settlement agreement is entered into as to whether --

Page 263

1    where the interests of the beneficiaries lie.

2        I repeat what I said earlier.  I don't -- I think the

3    consequences of reneging on what was agreed under the

4    settlement agreement by withholding my consent to the sale

5    of an IAC would be serious and extremely detrimental to the

6    beneficiaries as a whole of the -- of the trusts.

7    Q    I only have one further question, Ms. Saunders.  So you

8    feel that you have sufficient information at this time with

9    regards to global legality of the trusts and beneficiaries

10   to commit to the ultimate sale of these IACs that are under

11   a confirmed plan as of today?

12   A    As of today, the only litigation that I'm aware of is

13   in the U.S. and in Canada.  I'm not aware of any other

14   litigation claimed or threatened in any other jurisdiction,

15   so we can only deal with the facts as we understand them as

16   they are today and address the risks that are present today.

17   Q    I guess my final question is are you aware that there

18   are attorneys or solicitors seeking plaintiffs to bring

19   action in Australia against a Purdue entity there and, I

20   guess presumably, the trusts and beneficiaries?

21   A    I'm -- I was not aware of any such litigation or

22   threats of litigation.

23            MR. UNDERWOOD:  I have no further questions, Your

24   Honor.  Thank you.

25            THE COURT:  Okay.  Thank you.

Page 264

1          All right.  Does anyone else wish to cross examine

2    Ms. Saunders?  All right.  Oh, I'm sorry.  Was that you, Mr.

3    Ozment?  Yes.  Do you have --

4          MR. OZMENT:  Yes.  Just one or two very briefly.

5    CROSS EXAMINATION OF ALEXA SAUNDERS

6    BY MR. OZMENT:

7    Q    Ms. Saunders, my name is Frank Ozment, and I represent

8    some individual claimants.  You testified about side A

9    family members serving as directors.  Did any of them serve

10   as directors when the Board picked up whether to approve the

11   criminal plea agreement between the Debtors in the United

12   States?

13          THE COURT:  Which -- there are two of those, Mr.

14   Osmond.

15          MS. MONAGHAN:  20 --

16          THE COURT:  Which date are -- which one are you

17   referring to and the date of it?

18          MR. OZMENT:  The -- I believe it's November.

19          MS. MONAGHAN:  Are you talking about the --

20          MR. OZMENT:  From --

21          MS. MONAGHAN:  I'm sorry, Mr. Ozment --

22          MR. OZMENT:  (Indiscernible).

23          MS. MONAGHAN:  The 2020 plea agreement; that's

24   what you're referring to?

25          MR. OZMENT:  Correct.

Page 265

1            THE WITNESS:  My recollection of timelines is that

2    there were no A-side family members remaining on the Board

3    at that time.

4            MR. OZMENT:  Okay.  That's -- I thank you.

5            THE COURT:  Okay.  Ms. Monaghan, do you have any

6    redirect?

7            MS. MONAGHAN:  Very briefly.

8             REDIRECT EXAMINATION OF ALEXA SAUNDERS

9    BY MS. MONAGHAN:

10   Q    Very briefly.  Ms. Saunders, are you aware of whether

11   in the (indiscernible) proceeding in Jersey there are

12   separate counsel for the beneficiaries?

13   A    There are.  Yes.

14           MS. MONAGHAN:  Thank you.  That's all I have, Your

15   Honor.

16           THE COURT:  Okay.  All right, Ms. Saunders, your

17   testimony is concluded, and you can sign off.  Thank you.

18           THE WITNESS:  Thank you very much.

19           THE COURT:  Okay.  Okay.  I think that concludes

20   the witnesses for today, correct?  You're on mute again, Mr.

21   Kaminetzky.

22           MS. MONAGHAN:  I'm looking to Mr. Kaminetzky.  On

23   the A side --

24           MR. KAMINETZKY:  Yes.

25           MS. MONAGHAN:  -- that's certainly correct --

1            MR. KAMINETZKY:  Yeah, that's --

2            MS. MONAGHAN:  -- Mr. Drain -- I mean, Judge

3        Drain.

4            MR. KAMINETZKY:  Sorry.  That's correct, Your

5    Honor.  We've concluded the witnesses available for today.

6            THE COURT:  Okay.

7            MR. KAMINETZKY:  We could -- we'll immediately --

8    I think there's one issue we're working out with respect to

9    order for tomorrow, but we'll immediately e-mail Chambers

10   and the parties with the order for tomorrow.

11           THE COURT:  Okay.  Very well.  And again, if you

12   can either point us when you do that or the witnesses --

13   presenters can point us, or those who would tend to cross

14   examine with exhibits, to the exhibits that they intend to

15   use, that would be helpful so that we don't have to -- my

16   clerks don't have to run around the courtroom and locate the

17   exhibits separately.  I know some of you have been doing

18   that with witness notebooks and the like, and that is useful

19   and saves time.

20           Okay.  We'll resume tomorrow at 10.

21           MR. JOSEPH:  Your Honor, Gregory Joseph for Side

22   B.  May I ask the Court, tomorrow (indiscernible) will be

23   testifying.  He is an economic expert, and there will be

24   reference to having him compare multiple financial documents

25   at the same time.

Page 267

```
 1              I'm wondering -- I believe it would be efficient

 2     and save time if the Court were to permit us to actually use

 3     the screen.  We have a professional person who to show

 4     exhibits.  I think it would expedite matters, but it's -- I

 5     know the Court has been reluctant to have any shared screens

 6     of exhibits and will abide by whatever the Court wants to

 7     do.

 8              THE COURT:  Okay.  If you just give me a moment.

 9     Okay.

10              MR. JOSEPH:  Okay.

11              THE COURT:  Unless this can be worked out

12     overnight, it -- the reason for the screen sharing not being

13     acceptable, I gather, is because our tech people believe

14     that they have to become a cohost, which the administrative

15     office isn't prepared to do at this point.

16              MR. JOSEPH:  Then, Your Honor, that's fine.  We'll

17     simply proceed --

18              THE COURT:  You can raise it with Mr. Andino.

19     Maybe there have been discussions about this since then, but

20     that -- I think that's the reason why it doesn't work.  I

21     know there've been a couple of courts that have done that

22     sort of thing, but basically the administrative office isn't

23     comfortable with it.  And --

24              MR. JOSEPH:  That's --

25              THE COURT:  -- it also has to do with the number
```

Page 268

1     of people who are signed on.  So --

2              MR. JOSEPH:  That's fine, Your Honor.

3              THE COURT:  I think we'll have to go with witness

4     binders instead.

5              MR. JOSEPH:  That's fine, Your Honor.  Thank you.

6              THE COURT:  Okay.  And while we're at it, I'll

7     just say this for the record too.  I'd hoped that we could

8     have the public have more access than just going down to the

9     courthouse at the (indiscernible) if they wanted to see the

10    hearing as opposed to listen to it.

11             But again, the administrative office of the

12    courts, although it has been very -- they have been very

13    proactive during the COVID epidemic in being flexible to

14    address remote hearings, are still reluctant with regard to

15    the technology for the public generally to view hearings as

16    opposed to listening to them, except to the extent where

17    permitting it is part of this hearing.  So that's why not

18    everyone who wants to is able to watch the hearing

19    (indiscernible) listen to it.

20             Those who are actually participating in the

21    hearing can watch it, but they're not -- just not

22    comfortable enough with the technology to expand it beyond

23    that.

24             So we'll resume again, as I said, at 10 tomorrow

25    morning.  Thank you.

Page 269

1          (Whereupon these proceedings were concluded at

2    5:12 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2

3                        RULINGS

4                                            Page        Line

5     Late Proof of Claim Motions Granted    33          10

6

7     Interim Fee Applications Granted        33          14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 271

1                       C E R T I F I C A T I O N

2

3            I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5

6      Sonya Ledanski                Digitally signed by Sonya Ledanski Hyde
                                     DN: cn=Sonya Ledanski Hyde, o, ou,
                                     email=digital@veritext.com, c=US
7      Hyde                          Date: 2021.08.17 11:59:38 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  August 17, 2021

[& - 2021]                                                                                                    Page 1

**&**

**&**   2:20,22 3:2,6
3:11,15,17 4:20
4:24 5:1,23 6:1,4
7:21 8:2,4 11:2,8
11:11,24 12:9,13
13:11 18:15 20:15
21:1 172:16 174:6
174:7 176:4,11
182:3,4 248:22

**0**

**0.00.**   4:17
**0.231**   123:16
**06604**   18:11
**07102**   21:5

**1**

**1**   2:14 3:5,14,18
4:5,15,23 5:7,16
5:25 6:10,19 7:5
7:15 8:1,13,24
9:10,19 10:1,11
10:21 11:7,17
12:12 41:23 61:18
82:9 98:21 135:13
140:17 162:17
167:7 225:21,24
237:6
**1,000**   68:4
**1,390.57.**   11:20
**1,475.67.**   4:25
**1,674,459.00**   10:3
**1.4**   97:25
**1/1/2021**   10:12
**10**   63:10 122:24
175:7 213:16,19
242:1 246:7
256:19 260:1
266:20 268:24
270:5
**10,207.55.**   9:12,21
**10.4**   97:6 98:1

**100**   68:23 185:12
240:8
**100,000**   37:5
**10014**   18:4
**10017**   17:15 20:4
**10019**   19:4
**10022**   20:18
**10036**   18:18 19:11
**1006**   18:3
**101,004.83**   8:15
**10601**   1:14
**10:00**   2:7
**10:09**   1:17
**10th**   222:17
**11**   5:5 31:5 37:12
42:12 60:22 63:10
74:8,25 75:7
76:10 89:9,22
122:25 127:23
143:16 159:7
172:5 182:6
197:25 225:11
226:19 248:9
**11501**   271:23
**116,367.10.**   5:10
**1177**   19:10
**12**   70:8 72:20,23
162:18 177:1
199:21
**12,859.32.**   10:24
**120,000**   40:11
**1201**   21:4
**13**   2:2 188:20
**13,898.00.**   6:22
**14**   128:23 270:7
**14,335.04.**   11:10
**140,000**   51:16
52:7 53:22 54:12
**148**   231:22
**15**   12:3 48:24
74:15 109:22
110:6 142:18

**152**   200:19
**16**   1:16 2:4 66:21
131:16 248:12
**165**   46:6
**167,729.08.**   3:17
**16th**   111:24 168:4
172:5
**17**   42:15 134:23
271:25
**17,745.39.**   9:2
**1716**   162:17
**173227.97**   5:18
**18**   150:22 175:7
213:10,14
**1828**   189:3
**19-23649**   1:3
**1915**   41:23
**1918**   175:12,17
**1:30**   166:24
**1a**   139:3
**1st**   21:11

**2**

**2**   3:19 47:23 74:7
113:18 132:4
201:3
**2,407,696.25**   12:6
**2,600**   176:1
250:19
**2,600,931.71**   2:16
**2,700**   107:13,14
**2-3**   42:12
**2/1/2021**   2:15,21
3:6,16 4:7,16,25
5:9,18 6:2,11,21
7:7,16 8:3,15 9:1
9:11,20 10:2,23
11:9,19 12:14
**20**   84:17 147:10
192:24 216:22
242:2 246:7
264:15
**200**   20:10

**2002**   67:22 83:23
**2003**   68:16
**2006**   68:16
**2007**   69:1,5 82:13
82:22 83:8 132:14
136:15 190:2
**2008**   97:8
**2009**   190:5 197:23
198:16
**201**   18:3
**2010**   47:23
**2012**   42:12,13
**2013**   50:13 191:21
193:9
**2015**   141:13 190:9
**2016**   69:5
**2017**   50:17,17
69:23 132:14
190:2,5,9 217:19
218:25 219:11,14
219:17
**2018**   69:20 71:6,8
82:22 83:23
136:15 174:17
175:17,18 191:21
198:18 250:10
**2019**   12:3 97:8
**2020**   164:2 165:10
200:19 264:23
**2021**   1:16 2:2,4,14
2:15 3:5,5,14,15
4:5,6,15,15,23,24
5:7,8,16,17,25 6:1
6:10,19,20 7:5
7:6,15,15 8:1,1,13
8:13,25,25 9:10
9:10,19,19 10:1,1
10:11,11,21,22
11:7,8,17,18 12:4
12:13,13 66:18
109:19,22 110:4,6
111:17 142:18,19
168:1 170:14

172:2 200:6,19
201:10 222:12
238:11 248:10
271:25
**2022**   98:22
**2023**   98:22
**206,490.00**   9:2
**20852**   20:11
**21**   182:6 235:10
**21,909.83.**   4:8
**217**   19:18
**22**   137:13,17
225:2,6,10 226:11
226:18
**22,492.97.**   2:16
**220,000**   12:15
**23**   117:1 177:1
**24**   142:22 199:21
208:11
**248**   1:13
**25**   188:20 228:25
**26**   213:25
**27**   213:25
**28**   41:22
**2908**   200:6 222:11
**2953**   189:3
**298,267.40**   4:17
**2982**   13:6
**2:30**   167:6,8

**3**

**3**   3:19 66:18 95:10
113:17 114:17
118:8 147:10
**3,010,527.00**
10:23
**3,179,282.5**   9:12
9:21
**3,441,447.00**   5:10
**3,476,404.50**   7:17
**3,794,615.52**   6:3
**3,922,853.00**
11:10

**30**   74:13 213:25
**300**   1:13 271:22
**3018**   14:1,6,11,16
14:22 15:2,7,21
16:1
**3058**   12:18 13:6
13:11
**3059**   12:23
**30th**   20:3 218:25
219:17
**31**   2:14 3:5,15 4:6
4:15,24 5:8,17 6:1
6:10,20 7:6,15 8:1
8:13,25 9:10,19
10:1,11,22 11:8
11:18 12:4,13
19:3 122:8,21,22
**3130**   14:12 15:8
15:12,17 16:2
**3131**   14:2,7,12,23
15:3,8,22 16:2
**3132**   13:3,11
**3134**   14:8 15:4,23
**3138**   13:8
**3162**   14:18,23
**3164**   14:13 15:9
16:3
**3165**   4:17
**318.33.**   7:17
**3184**   12:15
**3190**   13:12
**3191**   16:6,10
**3194**   6:13
**3195**   2:23
**3196**   5:19
**3202**   3:25
**3204**   9:13,21
**3205**   3:8
**3206**   5:1
**3207**   4:8
**3208**   2:17
**3212**   8:5

**3213**   7:8
**3214**   9:3
**3215**   6:23
**3216**   8:17
**3220**   7:18
**3221**   10:14
**3224**   10:24
**3228**   10:4
**3229**   11:21
**3230**   6:4
**3233**   12:7
**3234**   11:11
**3238**   5:11
**3247**   2:8
**325,460.00**   4:25
**32601**   21:12
**327**   2:11
**33**   270:5,7
**330**   271:21
**3342**   13:15,23
**3343**   13:20
**34,450,050**   3:16
**3502**   14:25
**3503**   13:25
**3504**   15:18
**3505**   16:12,15
**352,927.00**   6:12
**35213**   19:19
**3558**   16:16
**3rd**   142:17 143:7
144:6

**4**

**4**   3:20 67:19
109:19 110:4
123:6,10,15
125:22 126:5
127:23 172:2
**4021144**   42:12
**408**   159:15,17
**409,966.70**   2:21
**443.85.**   7:7
**450**   17:14

**475.66.**   6:12
**478,594.23.**   8:4
**48**   115:6 169:10
**485**   20:3
**49,906.45.**   8:16
**49.99.**   10:3

**5**

**5**   3:21 111:17
142:19 150:15
151:1 210:16
224:3 226:6
248:10 250:7
**5/31/2021**   2:16,21
3:7,16 4:7,16,25
5:9,18 6:2,12,21
7:7,16 8:3,15 9:1
9:11,20 10:3,12
10:23 11:9,19
12:5,14
**50**   114:20 140:1
**500**   97:5
**501**   19:18
**520**   42:16
**52nd**   19:3
**543**   3:8
**57,542.78.**   12:6
**570**   21:4
**5:12**   269:2
**5th**   144:7 200:6,7
201:10 222:12
223:2,17 238:11

**6**

**6**   3:22 254:1
**60**   240:7
**600**   69:2
**620,905.00**   7:7
**626**   21:11
**683,168.00**   10:13
**6th**   168:1,12
170:14,22

[7 - admitted]                                                                                           Page 3

**7**

**7**  3:23 110:14
  135:1 250:8
**70**  5:19
**70.00.**  2:22 3:7
**700**  37:13 52:13
**750**  37:13 52:13
  176:6 250:24
**76,225.81.**  6:3

**8**

**8,389,582.50**  8:3
**8/16/2021**  2:7
**800,000.00**  11:20
**800,088.36**  3:7
**850**  18:10
**882,115.82**  4:7
**887.21.**  10:13
**89**  204:11 211:7

**9**

**9**  114:17 139:24
  253:25
**9/15/2019**  12:5
**900,000.00**  6:22
**919**  20:17
**93**  123:14

**a**

**aaron**  22:13
**aaronson**  20:1
**abate**  51:10
  127:17 143:18
  152:16
**abatement**  115:2
  115:10 152:9
  153:10
**abating**  153:2
**abby**  22:25
**abide**  223:18
  267:6
**ability**  43:1
  104:21 105:25
  106:5 107:19
  108:2 184:8 185:7

235:20,21
**able**  40:15 44:17
  54:7 56:2 63:20
  64:16 76:12 82:14
  82:19,23 84:3
  85:13 91:2 92:17
  93:12 94:17
  138:10 154:5
  173:10 219:5
  268:18
**ably**  227:1
**abrams**  21:20
**absolutely**  68:20
  71:19 181:1
  235:18 236:13
  237:14
**abuse**  166:16
  193:5,5,6,7
**abused**  101:13
  193:4
**academics**  84:14
**academy**  49:14
**accept**  142:16
  161:23
**acceptable**  267:13
**access**  32:4
  147:13 268:8
**accommodated**
  32:9
**accomplished**
  72:1
**account**  57:17
  104:6 123:24
  135:18 161:9
  182:25 189:1,18
  190:10,16 191:10
  191:20 209:15
**accountable**  86:3
**accurate**  142:16
  142:20 195:21
  223:9 271:4
**accused**  143:25
  189:8

**achievable**  87:21
**achieve**  87:16
  255:24
**achieved**  194:9
**acknowledge**  74:9
**acorn**  50:8,14
**acronym**  205:25
**act**  130:10 155:17
  173:10,12 190:1
  224:21
**acted**  138:7
  188:23 189:17
  190:14 229:3
**acting**  221:2
  229:6
**action**  121:12
  186:13 263:19
**actions**  70:20
  75:12 136:14
  148:9 184:9 205:7
  237:14 254:8,12
  256:2
**activated**  217:4
**active**  44:19 81:5
  139:13
**activities**  254:18
**acts**  130:11 258:4
**actual**  2:13 4:4
  8:12 11:6 218:18
**ad**  9:7,16 10:7,19
  11:3,15 19:2,9
  66:16 105:11
  106:13 107:18
  160:8 161:17
  163:24 164:2
  165:10 244:22
**adam**  24:24
**add**  50:7 62:1
  242:16
**added**  61:22 71:1
  71:7
**addiction**  247:2

**adding**  70:17
**addition**  38:17
  46:6 83:20 153:12
  229:2
**additional**  96:15
  186:2,19
**address**  35:25
  54:15 78:3 151:13
  238:13 263:16
  268:14
**addressed**  54:15
  106:13 146:2
  183:7 192:14
**addressing**  51:7
**adequacy**  181:20
  253:7,20
**adjacent**  100:2
**administered**
  262:16
**administering**
  219:21
**administrating**
  126:17
**administration**
  220:5
**administrative**
  5:14 126:14
  267:14,22 268:11
**administrator**
  39:24 53:19
**administrators**
  53:7
**admissibility**
  248:17
**admission**  66:25
  110:3 112:2 113:2
  168:12 170:22
  172:10
**admit**  67:3 110:7
  113:4 168:13
  172:12
**admitted**  110:9
  130:9 171:2

248:18
**advance** 131:11
**advanced** 108:17
  244:5
**adverse** 140:22
**adversely** 104:21
**advice** 192:12
  195:8,24 196:1,1
  196:2,6,12,16,18
  196:19 216:17
  240:19,20
**advise** 173:15
**advised** 191:16
  207:10,14 216:19
**advising** 203:24
**advisor** 5:5,14
  7:12 11:15 113:23
  114:8,9
**advocate** 204:20
  204:21,21
**afanador** 21:1
**affairs** 90:21
  216:19,19
**affect** 40:12,19
  57:20,22 104:21
  134:19 188:12
  252:4
**affidavit** 47:9
**affiliate** 100:4
**affiliates** 75:1
**affirm** 66:9
  109:11 111:6
  167:19 170:6
  171:18 247:25
**affirmation** 72:8
  72:11
**afford** 41:22
**afraid** 177:8,16
  180:11 183:9
  193:20 204:7
  211:9,13 219:2
  236:25 244:1

**africa** 105:18
**afternoon** 110:24
  167:11 208:3,4
**agenda** 2:4,4 31:7
  31:9,11 33:18
  47:1
**agent** 8:9
**aggregate** 52:9
**aggressive** 129:1
**ago** 107:10 163:25
  177:15 196:18
  216:17,22 256:19
**agonist** 101:19
**agree** 32:7 81:12
  96:6 98:22 115:3
  115:16,22 117:24
  118:9 124:19
  125:13 127:25
  140:5 155:9 209:9
  210:8 244:5,24
**agreed** 32:18,19
  33:8,13 36:3 77:5
  95:21 115:8
  119:11 141:17
  144:22 169:21
  263:3
**agreeing** 144:12
**agreement** 78:21
  108:12 117:1,21
  123:11 129:10,20
  148:18 154:18
  155:5 166:17
  180:18 184:20
  188:3 190:24
  191:6 192:4
  209:23 214:2
  224:7 235:12
  236:10 252:25
  258:16 259:1
  262:25 263:4
  264:11,23
**agreements**
  125:10 145:22

**ahc** 76:11,24
  77:23 78:19 80:3
  81:3,18 141:17
  149:13 161:21,23
**ahead** 50:6 67:12
  93:24 94:23 95:19
  113:9 151:4
  161:14 172:21
  224:16 233:1
  249:2 253:14
  261:2
**aisling** 27:3
**akin** 7:21 8:1,4
  18:15 110:25
**al** 7:3,13,23 8:23
  19:19 167:13
**albert** 21:21
**aleali** 21:22
**alexa** 17:10 248:4
  249:4 257:22
  261:3 264:5 265:8
**alexander** 26:5
**alice** 29:14
**alissa** 27:5
**alixpartners** 5:4,8
  5:11
**allegation** 177:7
  177:15,17 192:5,9
  192:21,22 194:4
  194:10,12
**allegations** 99:11
  99:22 101:23
  129:21 131:3,4
  182:25 191:13
  192:4,10,13,24
  193:15,20 194:1
  195:8,11 196:23
  196:25 197:1,7,8
  197:8 198:17,23
  236:8,9 255:25
  256:14,18,22
  257:8

**alleged** 56:1
  102:16 177:2
**allen** 21:7 103:8
  147:3 222:1 238:3
  260:24
**allison** 30:2
**allocated** 52:13
  126:4
**allocates** 52:9
**allocation** 38:24
  123:16 125:23,24
  126:6 127:11
  146:6
**allocations** 77:25
  146:5,8
**allow** 14:1,15
  15:11 63:21 76:17
  121:24
**allowance** 4:3,13
  5:5 6:16 7:3,23
  8:10,23 10:9,17
  11:5,25 41:10
**allowed** 37:15,20
  47:6 76:20 202:2
  203:19
**alma** 28:1
**alongs** 86:14
**alongside** 250:1
**alternative** 54:9
  194:13,17,19
**amanda** 16:5,9,15
  21:17 47:1
**amenable** 169:24
**amend** 73:11
**amended** 60:22
  70:19,22 72:25
  78:22 90:14
  111:16 172:4
  179:18,25 180:10
  209:2 248:9
**amendment** 71:9
  210:9 224:3

amends 109:23
american 49:14
  49:15 51:9
americans 84:11
americas 19:10
amitriptyline
  48:4,7
amount 37:13
  74:10 80:14
  118:14 124:3,22
  126:8 127:17
  141:9
amounts 90:11
  93:19 118:7
  119:11
analysis 42:19
  90:23,24 97:15
  105:3,16,20
  137:24 138:23
  139:2,9,12,13
  150:3 261:12
  262:23
analyst 114:10
analyze 106:4,8
  138:24
analyzed 108:15
  108:16
andino 267:18
andrew 19:6 27:1
  29:19 159:25
angela 25:6 27:9
anker 21:23
ann 26:3
announced 77:4
  161:3
announcement
  48:7,14 50:15
announcing 48:7
anonymized
  217:13 218:12
  219:16
answer 32:17
  34:16 35:2,21

78:16,24 85:25
90:10 92:12 93:8
93:17,18 97:22
98:24 101:9,11,14
102:2 104:24
112:23 118:6,12
120:5,7 129:23
133:10 136:24,25
138:10 141:8,24
142:1 147:19
149:20,22 153:6
153:23 154:14
158:24 159:11
179:4 180:6,10,24
181:10 183:9
193:21 195:4
196:9 206:7
209:21 216:11
220:22 224:12
230:2 232:24
238:22 242:17
243:2 253:14,15
260:11 262:1,1
answered 90:5
  178:22 192:2
  226:10 245:13
answering 130:19
answers 72:2
  90:20 145:18
  187:4 199:2
  242:16
antagonist 99:16
  101:13
anticipate 45:8
  76:11,16,19
  252:22
anticipated
  216:25 253:4
anticipating
  151:25
antidepressants
  47:25 57:2 247:3

antikickback
  190:3,6
anybody 46:7,7
  85:23 155:13
  185:18 199:4
  230:20
anybody's 77:15
anymore 76:8
anyway 97:22
apart 198:7
  206:21
apologies 108:24
  118:25 134:14
apologize 76:6
  90:2 93:12 117:9
  117:16 119:25
  120:12 144:15
  145:15 161:3
  222:25 228:4
  239:12 262:14
apparently 104:5
appear 106:12
  107:1 244:23
appeared 169:3
  193:7
appears 148:1
  201:20 207:16
appended 110:8
applicable 183:6
application 2:10
  2:11,19,25 3:2,10
  3:11 4:1,2,10,11
  4:19,20 5:3,4,13
  5:21,22 6:6,7,15
  6:16,25 7:1,10,11
  7:20,21 8:7,8,19
  8:20 9:5,6,15,23
  9:24 10:6,7,16,17
  11:1,2,13,14,23
  11:24 12:9 204:7
  204:16 209:12
  234:25 253:5

applications
  31:13 33:12,15
  207:3 225:15
  239:24 270:7
apply 53:8 91:19
  159:17 239:7
  255:4
appoint 42:7
appointed 33:24
  36:2 39:6 41:20
  44:6 45:1 141:14
  221:10
appointing 42:17
appointment
  15:11 33:19 39:11
  39:12,21 41:21,24
  43:6
appointments
  166:14
appreciate 32:15
  37:4 46:1,10
  163:2 164:6
  168:24 187:5
  189:9,10 195:22
  198:20 201:18
  206:20 240:5
  243:5 244:3
approached
  140:14
approaches 53:23
approaching
  120:16
appropriate 32:9
  77:19 78:3 205:4
  207:13
appropriately
  197:19
approval 37:23
  52:19 115:24
  181:17 224:4
  252:14
approve 53:4
  181:14 209:7

236:1 264:10
**approved** 34:22
  153:25 191:22
  208:25 222:17
  259:14
**approves** 224:20
**approving** 57:21
  252:23
**approximately**
  97:5,25 176:1,6
  250:18,24
**arcos** 102:8
**ardavan** 23:18
**area** 183:3,7
**argument** 146:20
  179:16 223:8
**arguments** 86:4
  210:15
**arik** 18:21 36:8,10
  45:21 145:25
**arising** 101:23
  227:2 234:10
  254:17
**arnold** 2:20,22
**arps** 5:22 6:1,4
**artem** 28:24
**articulated** 79:17
**asbestos** 87:10
**ascribed** 157:3
**aside** 81:11 82:1
  104:18
**asked** 61:22 71:22
  78:10 79:16,23
  82:12 88:8 95:24
  96:2 97:17 101:3
  116:13 139:24
  141:6 146:4 156:4
  163:25 192:2
  193:12 220:9
  226:22 232:11,13
  235:8,19 236:6,18
  245:12

**asking** 31:23,24
  35:13 76:15 77:13
  78:5,10 80:10
  106:23,24 107:7
  118:7,17 120:19
  120:20,21 134:18
  141:1,2,22 142:1
  146:9 147:20
  165:15 180:5
  184:17,25 185:4
  187:3 196:18
  198:24 204:3
  206:3 220:17
  226:5 239:1,2
  243:4,11 261:21
**aspect** 31:15 36:1
  46:21,22 65:6
  247:6
**aspects** 43:16
**asserted** 72:18
  90:7 112:11
  193:12,17 213:15
  213:22 259:25
**assertions** 112:12
  191:2
**assess** 198:8
  256:24
**assessed** 69:2
**assessing** 230:4
  234:24
**asset** 259:5,6
**assets** 85:14 86:18
  89:10 105:13,15
  105:21,25 106:5
  106:10 120:15,18
  120:24 121:3,3,9
  121:11,18 124:2
  127:13 147:13,15
  148:10 169:10
  208:14 214:7
  215:12 223:4,5
  224:24 225:14
  226:17 238:13

240:9 252:15
  258:17 259:4,8
  260:7 261:19
**assist** 187:6
**associated** 48:8
  128:5,18
**assume** 98:20
  108:15 140:4
  143:3 144:22
  162:16 175:16
  206:3 217:25
**assumes** 89:25
  95:13 117:6 256:5
**assuming** 54:8
  158:7 188:4
**asudalayev** 21:24
**atkinson** 17:5
  110:23,25 111:5
  111:11,13 113:6
  113:10,12 117:12
  117:20 118:6
  126:23 136:25
  139:20,22,24
  141:5,12 146:22
  147:2,6,7,9 149:3
  150:8,10,24
  151:23 153:7,15
  155:22 156:2,4
  157:20 158:6
  159:6 160:3
  162:14,16 163:21
  163:23 165:9
  166:8,10,22
**atkinson's** 112:2
  119:22 155:10
**attached** 112:13
  113:5 131:15
  142:24,24
**attaches** 109:22
  111:17
**attachments** 3:17
  47:10

**attendance** 72:13
**attended** 160:4,15
  164:2 165:10
**attending** 164:1
  164:22 165:9,16
**attention** 62:23
  116:18 147:9
**attorney** 2:15,21
  3:15 6:2 17:13
  18:9 19:16 20:8,9
  35:8 36:3 39:18
  42:18 70:2 73:4
  73:10 91:11 126:2
  130:18,19 133:3
  134:17 141:21
  159:8 165:21
  174:11 181:25
  196:7 249:6
**attorneys** 18:2,16
  19:2,9,17 20:16
  21:2,10 36:25
  70:2 72:14 78:11
  263:18
**attribute** 77:2
**aty** 8:2
**audible** 67:2
**audio** 31:22
**auditor** 4:24
**auditors** 4:22
**august** 1:16 2:1,4
  63:10,10 66:18,21
  109:19 110:4
  111:17,23 142:19
  144:7 168:4 172:2
  172:5 200:6,8,20
  201:10 222:12,17
  223:2,17 224:3
  226:6 238:11
  248:9,12 271:25
**augustus** 14:2,22
  15:12 21:16
**auslander** 21:25

**australia** 105:18 263:19
**australian** 185:9 185:10
**australians** 186:2 186:6,16
**authority** 33:7 212:4,5 224:21,23
**authorize** 252:10 252:18,19
**authorized** 173:18,19,21 202:1 208:13 249:21
**autopsy** 48:3
**availability** 169:22
**available** 59:11 61:9,10 63:16 64:9 83:2,16 87:22 88:19 89:4 119:14 140:6 266:5
**ave** 20:3
**avenue** 17:14 19:10 20:17
**avoid** 244:12 256:11
**avrio** 100:4,7,11
**aw** 216:17
**awarded** 50:16
**aware** 32:2,12 49:18 73:2,6,9,10 73:15,18 74:22 79:9,12,15 80:5,7 80:23 81:1,9 88:23 89:8,12,14 90:6 92:19 95:9 97:3,8,11,23 98:2 98:5,6,13 99:10 99:11,21 100:4,11 100:14 101:13 106:14 108:1

117:2,4 122:3,6 123:19,22 125:23 126:1,2,14 130:7 130:12,13 145:3 156:9 168:7 175:9 175:10,12 176:3,7 178:6,6 184:1,7 184:18 185:1,7,9 186:10,11,13 188:15 189:7 190:11 191:5,13 191:14,15 192:3,8 192:10,11,20 193:1,12 205:18 206:5,22 207:1,5 208:20 217:19 219:16 220:18,19 226:5 227:9 236:9 236:9,13 242:12 250:10,14,15,22 250:23 251:2,4 254:7,10 255:23 255:25 256:7,8,14 256:17 257:3,11 259:10,13 260:16 263:12,13,17,21 265:10

**b**

**b** 1:21 3:19 63:3,4 93:6,21 109:8,16 128:22,23 177:13 187:14 201:3,5 211:11 266:22
**back** 33:3 47:23 60:20 65:21 72:20 79:14 80:17 82:17 83:23 84:9 93:16 120:4 124:25 125:2,14 137:5 161:4 167:5,12 190:13 198:16 209:1,10 210:11 222:19 223:16

224:10 226:6 235:20,21
**baked** 103:19
**baker** 199:14
**balance** 137:11
**balancing** 42:25
**ball** 22:1
**ballot** 40:14
**ballots** 40:22,25
**baltimore** 20:11
**banker** 6:18 11:15 150:1
**bankr.d.vt.** 42:12
**bankruptcies** 75:18 121:2
**bankruptcy** 1:1 1:11,23 14:17 33:20 35:14 36:20 41:4 42:6,8 43:22 43:24 51:6,21 53:24 74:18,20,25 114:23 115:9,14 116:21 117:2 118:17 120:24 121:8 126:16 141:18 156:23 174:3,9 209:6,24 213:1,15 214:5,7 214:24 222:17 227:11 228:7,9 249:25 259:24 260:7
**bantered** 137:5
**bar** 12:17,22,25 13:10,19
**barbara** 23:19
**barker** 22:2
**based** 53:2,7,9 78:5,18 79:22 89:9 92:1 94:15 98:12 102:25 103:2 113:21 127:9 134:20

141:4 143:6 144:14 158:4,6,22 168:21 190:8 194:9 208:21 210:6 226:5,7 231:2 232:23 235:23 241:1 243:13 252:2 259:11 261:11
**basic** 55:11
**basically** 79:13 142:16 151:25 173:2 267:22
**basis** 33:15 42:17 45:6 51:20 52:2 73:3 90:1 149:11 209:22 215:7 218:8 229:23 252:9,19 256:4,6 259:16
**bates** 150:22
**beacon** 204:11 258:4
**bear** 67:17
**bearing** 234:23
**becoming** 181:7
**bed** 246:6,9
**beddoe** 199:23 201:16
**bedell** 8:20,25 9:2
**beg** 171:22
**began** 121:22
**beginning** 80:15 193:9
**behalf** 13:2,7,24 14:7,13,24 15:3,9 15:17,22 16:3,11 18:9 51:17 95:4 103:9 110:25 112:4 113:8 147:4 149:4 163:24 165:21,22 195:15 222:2 224:21

238:4 248:22
260:25
**behaved** 197:18
**behavior** 234:17
**beideman** 25:5
**belated** 178:14
**belatedly** 206:2
**belief** 88:9 229:13
229:14 243:13,21
**believe** 34:17
47:11,12 48:24
49:7 51:8 55:4,19
55:21 57:16 61:20
61:23 64:5,10
65:6 71:8 73:18
74:1 89:7 90:22
103:16 104:1
105:24 110:13
112:5 119:14
120:25 121:14
131:2 132:2,16,23
135:9,19 136:10
142:19 143:4,8,9
144:7,10 160:12
161:22 162:7,22
167:13,15 169:22
178:12 180:21
181:16 188:22
189:16 195:9
205:8 206:6
223:15 226:18
229:2 234:8
238:24 239:4,5
241:19,23 246:2
256:19 260:19
261:5,9 264:18
267:1,13
**believed** 85:11
86:9 92:2 158:23
191:15 239:8
259:16,18
**believes** 143:14
147:11 148:1

223:15
**believing** 230:7
**ben** 25:3 93:11
94:3 207:23
231:25 257:19
**beneficiaries**
151:25 173:10,13
177:19 178:8,19
178:21 179:6
181:3,5 182:8
204:22,24,25
209:9 210:1,8,13
210:13 211:21
213:11 215:25
217:5 230:1,9
234:19,24 235:2
235:13,14 236:11
237:4,20 239:7,18
239:21,24 241:12
241:17,18 242:3,6
242:11,12,20
243:12,14,20,24
244:11 249:19
250:4 251:5,10,15
254:4,25 255:2,12
259:17,19,21
261:13 262:6,9,15
263:1,6,9,20
265:12
**beneficiary** 216:7
220:2,2,6 235:3,4
**benefit** 75:11 97:7
97:13 147:16
151:12 170:1,2
177:3 190:19
213:17 243:25
258:5,9,13 260:2
**benefits** 225:16
234:19
**benjamin** 12:22
13:1,11 17:19
18:6 21:21 208:7
257:24

**bernard** 23:18
**beshere** 22:3
**best** 51:8 136:19
140:5 154:7
179:14 182:7
209:8 210:7 230:8
232:6 235:12
237:4 254:3
259:17,18 261:12
261:18 262:21,23
**better** 46:17 144:3
158:19 241:25
**beverly** 71:3
73:12
**beyond** 41:16
85:24 126:21
138:20 148:13,15
149:6 155:7
160:13,25 212:10
218:9 268:22
**bickford** 61:12
**bielli** 12:9,13 22:4
**big** 124:15 211:14
**billion** 97:6,25
98:21 118:8
120:16 123:7,11
123:15 125:22
126:5 213:16,19
240:7,8 260:1
**billions** 92:9,20
118:1,15 119:9,14
132:13 213:20
**binders** 268:4
**birmingham**
19:19
**bit** 55:17 56:18
57:8 63:8 71:12
71:14 76:7 117:18
140:9 144:11
146:12 164:25
247:5 249:14
**blabey** 22:5

**blan** 22:6
**blessing** 238:12
**blocked** 184:10
**blouin** 17:6 109:7
109:9,10,14,17,18
110:2,9,12,15,16
**blouin's** 110:4
**bloyd** 13:3 19:17
**blue** 50:13
**board** 53:8 79:25
97:4,12 108:3
130:14 136:14
141:19 142:4,11
142:13 177:14
197:13,17 213:11
245:25 259:21
264:10 265:2
**boards** 148:8
**bograd** 22:7
**bold** 143:4
**bono** 33:24 36:1
42:18 45:6,18
**book** 64:4
**booked** 114:4
**bottom** 101:21
137:19
**bound** 58:8 76:25
77:7,23,25 78:1
78:21
**bounds** 108:6,6
**box** 19:18
**boxes** 64:13
**brauner** 22:8
**breach** 218:4
**breaches** 132:12
**breadth** 88:25
**break** 167:5
214:22
**breene** 22:9
**brian** 20:13 23:17
26:16 62:21
**bridgeport** 18:11

**bridges** 19:17
**brief** 139:15 161:7
236:21 241:8
**briefing** 86:7
**briefly** 41:15 82:9
83:18 87:7 96:23
233:21 264:4
265:7,10
**bring** 62:23 70:11
72:22 184:9 185:8
185:10 187:24,25
237:3,12 259:25
263:18
**brings** 87:12
**broad** 21:4 32:4
38:13 54:23 57:10
92:12 112:11
187:15
**broader** 102:10
197:8
**broadly** 85:1
206:21
**brokered** 106:16
**brooks** 22:2
**brought** 164:16
185:17 187:17
210:3 215:4,6
240:8 254:8
**brown** 9:6,10,12
9:15,19 22:10
**brunswick** 22:11
**bryant** 18:17
**bryce** 24:4
**buck** 4:8 22:12
**budget** 3:22
**bulk** 83:8 120:21
**buprenorphine**
99:22 101:5,7,18
101:23 102:4,17
102:20 103:1
**business** 44:13
86:14 185:10
187:22 197:16

199:16 227:7
**businesses** 188:12

**c**

**c** 3:19 17:1 23:3
23:12 26:1,17
31:1 66:12 111:11
170:2,11 187:14
201:3,6 271:1,1
**cahn** 22:13 61:25
62:2,5,9,18,19
**cain** 17:8 22:14
169:18,19,21
170:5,9,12,13,20
171:1,6,9,10
**cain's** 170:22
**calculated** 123:7
125:25
**calculation** 96:7
**call** 39:11 63:5
69:21 83:25 107:4
111:3 121:20
128:22 144:20
147:9 201:16
**called** 38:3 48:2
53:4,4 65:19
95:10,24 99:12
100:4 111:18
116:24 129:7
130:4,10 169:21
181:15 183:15
194:7
**calls** 107:9 133:2
134:17 140:24
145:9
**campaigns** 130:16
**canada** 105:17
184:14 185:8,18
186:25 223:6
240:9,11 246:1
254:9,19,20
263:13
**canadian** 21:2,3
103:10 147:4

184:2,9,19 185:7
186:13,25 187:23
222:2,3 223:4,4,5
226:1 238:4,5
240:20 254:9
260:25,25
**canadians** 186:2,6
186:12,20 187:1
**can't** 177:8,16
180:11 181:1
183:8 186:25
195:20 198:1
**capacities** 239:2
**capacity** 113:23
156:17 173:5
187:17,24 220:3
221:20 223:12
**capital** 11:14,18
11:21
**caplin** 11:24
**caption** 201:1
**captioned** 218:11
**care** 60:17
**careful** 72:1 160:1
196:10 242:13
**carefully** 242:8
**carl** 29:12
**caroline** 24:6
**carson** 8:8,14,16
**carter** 22:15
**carved** 183:13
225:13
**carveout** 183:21
184:2,5
**carves** 226:17
**case** 1:3 14:17
31:13 33:20 35:2
36:12,14,20,20
37:1 38:20 39:3,8
39:13,20 41:25
42:7,16 43:2,24
44:17,19,23 47:7
50:8,16,20 51:13

51:14 52:4 58:24
61:15 63:10,18
64:17 71:8 80:15
81:3,18 87:15
89:21,22 95:15
114:4,6,14 115:6
116:6,25 119:3
121:1,7,8 124:16
125:12 126:11
127:20 128:1
131:2,11 136:10
136:11 140:10,14
140:15,20 141:13
141:14,19 144:18
144:22 147:16
150:11 174:3,9
179:12 183:17
187:15 204:14
229:23,23,23
238:25 249:25
251:18 255:14,18
**cases** 31:5,7,8
37:6 42:8,8 47:3
75:7,10,13 76:11
86:23 98:9 114:19
114:19,22 115:14
121:5 124:5 140:2
142:5 143:16
157:22 158:2
159:7 160:11
164:4 173:8 178:4
192:10 213:21
**casey** 27:7
**cash** 97:6,13,24
98:1 120:15,18,19
126:10 168:16
258:13
**cataloged** 98:7
**categories** 53:8
159:11 214:23
**category** 3:21
57:7

**catherine** 25:5
29:4
**cause** 48:2 121:12
132:11,23 194:17
**caused** 50:11
53:15 70:11 72:22
190:17
**caution** 118:3
130:18 141:21
253:10
**cctb** 32:23
**cecil** 198:6
**centered** 185:25
186:18
**central** 115:18,20
115:25 116:2
**certain** 21:2 47:10
53:6 70:23 74:4,5
86:11 88:22
127:13 148:9
157:4 174:17
175:13 184:2,9
191:13 204:14
211:7 222:2
226:17 236:11
250:2,10 252:15
254:8,9 256:15
258:5,8,12,17
**certainly** 69:3
70:24 71:23 77:9
86:11 87:6 88:14
89:2,4 96:18
101:11 103:5
105:15 147:25
153:2 175:5,18
179:16 183:17
238:19 242:11
251:13 265:25
**certification** 3:18
**certified** 271:3
**cetera** 154:19
**chain** 84:5

**chakraborty**
22:16
**challenged** 41:1
**challenges** 197:15
**challenging** 163:4
**chalos** 22:17
**chambers** 47:11
266:9
**chance** 164:12
**chane** 4:8 22:12
**change** 40:22
66:22 72:17 77:4
77:8,9 109:25
111:24 134:1
168:6 170:19
172:7 226:11
248:13
**changed** 32:14
48:9 50:15 132:24
133:20 134:19
144:10 224:3
**changes** 224:14
**channel** 249:10
**chapter** 5:5 31:5
37:12 60:22 74:8
74:25 75:7 76:10
143:16 159:7
172:4 197:25
226:18 248:9
**characteristics**
115:1
**characterization**
136:21 158:8,10
158:12 179:17
183:6
**characterize**
68:18
**characterized**
114:13 158:22
**charles** 13:3 22:24
28:5
**chart** 122:24
123:3 125:18

127:3,6,9
**charter** 220:11
**chartered** 11:25
**check** 34:6 179:19
191:19
**children** 85:15
**choose** 40:14 49:3
49:7 60:10
**choosing** 86:15
**chosen** 49:8
**christian** 22:18
**christina** 27:23
**christmas** 86:16
**christopher** 22:15
28:18
**cicero** 22:19
**circuit** 42:11
**circumstance**
148:1 261:15
**circumstances**
39:5 41:23 61:8
209:19
**citalopram** 48:4,7
**cities** 115:7
**citizens** 85:6,22
185:10
**city** 72:13
**civil** 41:25 42:7,8
42:15,17 130:16
190:25
**claim** 12:17,22,25
13:6,10,14,19,23
31:14,14,15,16
33:7,11 34:13,24
35:3,6,22 36:20
38:5 41:9,10,18
41:25,25 42:21
43:3,10,12,16,19
43:25 44:8,23
45:9 47:3,6,7
51:13,19,20,22
52:2,15 53:12
54:5,5,14,14

57:20,24 58:9
59:5,24 85:3 90:8
121:19,20 139:7
165:12 215:14
234:23 237:3
240:21 247:11
270:5
**claimant** 53:6
**claimant's** 16:15
**claimants** 9:8,17
10:8,21 11:4
32:23 38:9,21,22
43:17 45:13 46:2
46:15,23 52:8
56:12,20 57:6
59:18 79:14 101:2
150:11 152:15,25
154:4 247:2 264:8
**claimed** 263:14
**claims** 12:17,22
12:25 13:10,19
34:12 37:6,7,15
37:20 38:4,18
43:8,13 46:23
51:5,7,17,18,19
51:23 52:10,14,17
52:18,21 54:12
55:8 56:12 58:25
71:17 72:18 73:21
73:25 75:14 76:13
76:20 89:9,15
92:2 94:8 102:15
121:19 128:2,5,9
128:12,17,18
132:10 135:10
137:20,21,25
138:24,25 139:7,9
147:12 148:2
154:24 160:9
161:19 162:3
183:4,11 184:13
185:8,10,17
187:16 188:10,11

190:18 191:1
194:18 198:9
213:16 214:5,24
223:4,5 226:17
227:2,6,9 228:6
228:11,15 230:4
235:3 239:7 240:8
254:17 260:1
262:10
**clarification**
69:19 173:2
177:25 242:16,18
243:5
**clarify** 112:7
116:3 146:10
178:14 180:23
198:11 205:13
**classified** 57:11
**claudia** 29:3
**clause** 143:11
**clauses** 201:2
**clear** 46:14 51:13
55:8 58:3 63:19
64:21 80:19 84:3
101:16 135:2
157:25 163:7,11
176:13,16 180:9
189:12 192:19
206:9,17,21
207:15 224:6,8
225:12 233:15
**clearer** 44:7
**clearly** 31:19
45:24 51:1 58:16
76:3 77:14 94:5
172:24 208:9
262:5
**clerk** 5:14,17,19
34:3 66:4
**clerk's** 47:11
**clerks** 64:7 266:16
**client** 98:18,19
130:19 133:3

134:17 141:21
159:8 181:25
196:7 253:13
**clients** 38:20 46:5
**clinicians** 49:18
**clint** 23:11
**closer** 31:25
199:15
**closure** 87:12
104:3,12
**cloud** 190:8
**club** 19:18
**code** 41:21 51:6
**coequally** 144:20
**cognitive** 50:12
**cohen** 61:7,20
62:1,2,5 172:16
248:22
**cohort** 193:7
**cohost** 267:14
**colantonio** 22:20
**cole** 7:1,6,8
**coleman** 22:21
**collected** 49:23
82:16,20
**collecting** 128:6
128:19
**collection** 135:24
**collective** 51:6
**colloquy** 69:21
77:16 101:5
143:12 230:13
**colorable** 132:10
**columbia** 172:17
249:1
**coma** 50:12
**come** 63:18 65:21
94:21 124:4 161:1
232:2 237:18
**comes** 125:24
221:16
**comfortable**
154:4 243:23

267:23 268:22
**coming** 246:24
**comley** 18:8 67:10
**comm** 8:2
**commenced** 200:1
201:17 203:25
206:23 207:2,2
**commencement**
164:17
**commencing** 12:3
**commissioner**
200:21
**commit** 208:14
225:14 263:10
**commitments**
116:10
**committed** 137:6
149:18 153:12
261:22
**committee** 4:12
6:18 7:2,12,22
8:10,22 9:7,16
10:8,20 11:3,16
18:16 19:9 33:10
36:6 38:10 40:2
44:19 52:5 70:10
73:23 74:3,5,24
75:2 79:24 80:3
80:20,25 81:8
97:3 98:9 105:12
106:13,14 107:18
111:15,18 113:23
114:19 116:11,13
116:14,15 137:6,7
138:17 139:10
140:1,7 141:11
144:9,10 153:2,9
153:24 154:4,23
155:2,13,14
156:17,20,23
160:8 161:17,18
163:24 164:3
165:11,22 217:3

220:2,2,6 221:6,9
**committee's** 66:16
112:15,20 137:10
156:14
**committees**
220:16,19,21,23
221:3,4
**common** 139:6
**communicate**
35:10,11
**communicated**
124:8,12 157:11
**communicating**
35:7
**communications**
130:19 133:3
134:18 141:22
145:9 148:14
157:20,24 158:7
159:2 164:8
181:25 196:7
253:13
**communities**
106:6
**community** 48:19
48:23
**companies** 115:7
173:5,6 177:22
211:1,2 258:13
**company** 50:9
114:23 129:7
130:4 153:18
189:5,5,6 194:6
258:4
**comparable** 3:24
54:11
**compare** 211:13
266:24
**compelling**
195:24
**compensate**
143:17

compensation
  2:10,12,20 3:1,2
  3:10,12,24 4:2,3
  4:10,13,19,21 5:3
  5:6,14,22,23 6:6,8
  6:15,17,25 7:3,10
  7:13,20,24 8:7,11
  8:19,23 9:6,23,25
  10:6,9,16,17 11:1
  11:5,13,16,24,25
  12:10
competing  143:23
complaint  72:25
  73:4,11,16 89:15
  90:14 100:12
  177:12 179:1
complaints  68:5,7
  70:19,22 82:25
  85:23 91:14 99:10
  99:12,23 100:12
  100:16 176:13,15
  176:17,22 178:7
  179:9 197:9
  198:17
complete  109:4
  131:20 160:17
  225:3 233:12
  254:16
completed  43:22
completely  89:18
  187:1 188:8 211:9
complexity  43:5
compliance  3:18
complicated
  35:15 179:14
  229:22
component
  115:25 116:2
composition
  156:5,23
comprehensive
  182:24

compromise
  191:1
computer  120:13
conceive  261:15
concentrated
  193:7
concept  154:19
concern  72:3
  187:12,18 188:6
concerned  58:9
  108:18 118:13
  139:9 179:6
  198:22 239:21,22
  251:9,13
concerning
  138:19 160:4
  161:19 162:3
concerted  187:16
conclude  132:11
concluded  40:10
  190:16 242:10
  265:17 266:5
  269:1
concludes  60:20
  132:9 246:4
  265:19
concluding  143:4
  144:8 234:17,19
conclusion  91:22
  143:15 188:25
  189:15,15 190:12
  190:13,15 230:6
  237:3
condition  145:5
conditioned
  145:23 163:9
conditions  146:8
condone  136:13
conduct  177:4
  205:4 229:16,17
  229:25
conducted  128:1
  204:7 212:17

229:10
confidential
  211:16,19 235:25
confidentiality
  83:6 88:18 118:4
  218:5 233:25
confirm  34:16
  39:23 56:11 60:6
  61:19 103:17
  123:5 180:24
  200:15,24 234:1
confirmation  2:1
  31:4,12 33:4
  52:13 60:21 66:17
  74:8 95:7 111:16
  112:17 115:24
  125:4 143:16
  153:11 168:3
  172:4 180:20
  183:15 205:16
  236:21 239:6
  247:20 248:8
confirmed  38:2
  52:12 54:8,10
  75:9 92:20 93:20
  148:24 223:19
  228:9 238:25
  239:15 244:7
  262:20 263:11
confirms  224:10
conflicting  43:3
conform  244:13
confused  55:2
  236:24
confusing  36:11
  41:4,5 178:3
  234:10
confusion  97:3
connecticut  18:9
  67:11 89:14 98:19
connection  67:24
  78:18 82:13
  109:19 131:22

132:13 133:22
  174:3 204:12
  246:17 248:8
  249:24 252:10
  255:17
connolly  22:22
conroy  17:4 66:7
  66:11,15 67:5,8
  67:13,15 71:22
  72:3 75:22 76:2,9
  78:18 79:9 80:2
  82:8,10,12 84:24
  86:22 88:6 90:4,6
  90:11 91:8,25
  93:14,16,18 94:1
  94:3,25 95:2
  96:24 97:1 99:5,7
  99:9 100:18,21,24
  101:1 103:11,14
  103:16 104:4,18
  106:22 108:1,13
  108:15 109:3,5
  165:22,25 198:18
conroy's  66:25
  71:25 92:21 94:21
consensus  137:4
consent  183:14
  212:16 237:10
  257:3,4,11,13
  258:25 259:3,5,7
  259:8,15 261:6,9
  261:10,11 262:4,5
  263:4
consenting  19:2
consequences
  263:3
consider  73:19
  107:18 135:23
  179:5 201:1
  241:14 251:9,13
  256:21
considerable
  195:17

**consideration**
43:18 148:22,25
228:10
**considerations**
125:19
**considered** 34:12
34:13,21 99:14
105:1,19 107:8
108:3,8,11 113:22
114:2 121:16
129:8 130:2,6
138:11 139:15
150:3 160:23
235:11
**considering** 49:6
151:6 158:1
**consisted** 205:2
**consistent** 39:3
101:18 168:2
195:8,24 196:16
199:18
**conspiracy**
189:25 190:3,6
**constituencies**
107:12 124:5
**constituted** 221:5
**constitutes** 254:12
**consult** 181:18
253:6,19
**consultant** 4:12
4:16 6:9,11
216:18
**consultants** 8:9,14
8:16
**consultation** 33:8
33:14 243:14
253:12
**consultations**
198:22
**consulted** 181:24
198:25 253:11
**consulting** 9:24
10:2,4

**consumer** 49:2,3
49:4,10
**contact** 46:8
**contacted** 38:14
**contain** 116:9
149:10
**contained** 104:6
136:22 184:11,11
212:16 236:2
253:21
**contains** 146:18
190:24 244:7,24
**contemplate** 75:5
152:7
**contemplated**
74:23 76:15 96:3
96:8 239:16
252:10
**contemplates**
37:19 57:14 98:15
**contemplating**
252:20
**contemplation**
122:4
**content** 50:22
**contention** 103:18
187:6
**contents** 112:21
138:18,19
**contested** 32:11
33:17 159:18
**context** 37:3
51:14 159:1,13
240:12
**contingent** 9:8,17
10:8,20 11:4
**continuance** 2:1
**continue** 41:3
77:24 78:21 87:21
**continued** 193:4,6
217:5
**continues** 143:19

**contrary** 61:16
163:14
**contribute** 118:15
150:17
**contributed** 55:4
55:14 119:10
150:17
**contributing**
74:11 145:23
**contribution**
117:22 118:1,21
136:4,6 237:21
241:24
**controlled** 84:4
103:3
**convened** 239:25
**convenience** 63:6
**conversation**
231:18
**conversations**
81:18
**conveyance**
213:15 259:25
**conviction** 129:11
129:19 143:14
**convoluted**
152:19
**cooperate** 32:16
215:3
**coordinated**
110:20
**copies** 44:13
**copy** 113:14
222:11
**cornerstone** 6:7
6:11,13
**corporate** 85:24
**correct** 62:12,14
62:16 65:20 66:14
67:22,23 69:8
71:18 72:10 75:15
75:16,18 86:23
88:19 89:1 90:9

90:17,18 91:4
92:2,14 95:7,16
99:16,23 100:5,8
100:9 105:23
109:8,16 110:1
111:12 112:14,19
114:8,11,15,16,20
114:24,25 115:14
115:15 116:8,11
116:21 117:22,23
120:17 121:10
122:20 123:10,14
123:18 125:3
128:20 129:13,22
132:21 135:6,11
135:12 141:6,12
142:4,8,12 143:5
145:21 146:16
149:1 150:14
154:25 155:1
156:15,21 158:14
162:23 167:14,24
170:12 171:13
173:3,4,7,8,14,17
174:10,20,25
175:1,24 181:21
183:12 192:6
195:19 196:21
199:6,25 200:2,3
201:10,11,23
204:1,24,25 206:8
208:17,18 209:11
210:10,18,19
211:22,23 212:1,2
212:6,7,9,11
213:3,12,13,18,23
213:24 215:13,24
216:6 221:22
227:3 230:10
233:12,13 236:12
236:15 238:15,16
241:22 247:23
248:6 249:16,20

250:12,13,17,21
252:1 253:24
254:6 255:12,16
256:23 258:6,7,11
258:24 259:9,22
259:23 260:4
261:7,8,13,14
262:17 264:25
265:20,25 266:4
**corrected** 14:10
15:6,25 110:5
**correcting** 175:19
**correction** 121:21
**correctly** 113:24
132:15,20 149:5
162:17 164:25
165:3 195:16
211:18 240:18
241:11 249:17
**corrects** 109:23
**cosmetic** 190:1
**cost** 33:1 104:6
151:11,11,24
152:2,9 154:1
**costs** 237:14,14,16
241:15
**couched** 47:1,2
**council** 216:1,7,20
216:20,23 217:1,6
217:8,9,12,21
219:21,24 220:6
220:11,14 221:16
221:21
**counsel** 2:12 3:4,6
3:13 4:6 5:24 7:2
7:6,22 8:21 9:1,7
9:16 10:7,19 11:3
12:2,11 14:6,11
15:2,7,11,16,21
16:1 31:12 33:20
33:24 34:16 35:14
38:18 39:11,12,21
42:7 43:6 46:3,4

61:6,11,14 70:5
71:23 78:20 89:5
91:10,12,17 92:8
139:10 148:15
157:10,25 160:8
161:17 169:21
173:18,20,22
174:2 181:19,24
182:3,4 184:24
196:5,6 199:4,8,8
204:17 205:3
206:3 212:8 219:8
240:20,20 244:11
249:22,24 250:4
250:15,16 253:6
253:11,13,19,23
254:25 255:6,10
255:11,11,14
256:25 265:12
**counsel's** 90:21
**count** 166:25
**counter** 100:7
**countries** 85:9
105:18 228:12
**country** 19:18
69:8 143:19
185:19 271:21
**county** 68:5,7,10
68:11 69:7 70:18
71:8 72:25 86:2
90:15
**couple** 79:21
86:21 143:1
156:16 171:4
235:7 243:9
267:21
**coupled** 252:21
**course** 71:15
74:13 88:16
160:11
**court** 1:1,11 31:2
31:20 32:2,9,22
32:24 33:5 34:4,7

34:10,15 35:1,6
35:13,19,21,25
36:7,9,16,19,22
36:25 37:11,11,18
37:22 38:1,7,13
38:17 39:1,8,16
39:22 40:4 41:6,8
41:14,20 42:5,10
42:13 43:21 44:3
44:11,18,22 45:4
45:10,12,23,25
46:11,13,19,25
47:14,17,19 50:3
50:18,20 51:12
52:2,24 53:2,13
53:13,15,18 54:3
54:7,25 55:3,8,11
55:14,19,21,23
56:1,4,4,7,10,14
56:16,21 57:3,13
57:16,22,24 58:3
58:5,8,12,15,20
58:22 59:3,8,13
59:14,18,21,23
60:4,6,13,15,19
61:1,5,13,17,19
61:25 62:4,8,10
62:15,17,20,25
63:1,19,20,24
64:2,7,12 65:2,13
65:15,16,23,25
66:2,5,12,15,24
67:3,7,12 68:5,9
69:10 71:25 72:9
73:17 75:21,25
77:4 78:12,15,17
81:22,24 82:7
83:11,18 87:7,24
88:1,3,19 89:25
90:4,10 91:7,10
91:13,18 92:5,21
92:24 93:2,5,15
93:23 94:13,16,22

95:19 96:22 99:6
100:19,22 103:7
103:12 104:8
106:18,21 108:10
108:14,21 109:2,6
109:10,15,18
110:3,11,17 111:2
111:5,10,13 112:1
112:10,23 113:1,9
115:23 117:10,14
117:19 118:5
119:5,16,19,24
120:8,10 122:13
122:22,24 126:25
128:10 129:16
133:5,9,16,21,24
134:3,12,15,21
135:20 136:24
139:3,6,14,18,21
141:4 146:21
147:1,20,23 148:3
148:5,16,18
149:14,16,23
150:6,23,25
151:21 152:6
153:7,17,21 155:9
155:19,21 156:1
157:17 158:4,15
158:17,21 159:6
159:14,17,23
161:4,8,14 162:10
162:13 163:2,3,4
163:11,16,19
164:11 165:3
166:4,21,24 167:9
167:11,17,22,25
168:8,11 169:1,7
169:16,25,25
170:10,13,21
171:11,15,23
172:1,9,20 181:17
183:23 184:20
187:2 188:2,17

192:5,14,17
194:23 196:9
200:1,5,18,18
201:5,21,23 202:1
204:4 205:2 206:4
207:10,14,21,25
208:13 209:1,6,10
209:14,17,17,24
210:10,11,15,21
211:5,19 212:6,19
212:20,21,22
213:2,5,6 214:12
214:14,20,22
215:17,19 217:14
217:19,20,24
218:7,15,20 219:1
219:6,17,20
221:24 222:5,13
222:17,20 223:1,9
223:16,19,24
224:2,9,9,11,15
224:19,21 225:7
225:22 226:4,7
227:13,17,22
228:2,7,9,15,18
228:20,23 229:12
229:15,19 230:3,7
230:11,17,19,22
231:1,6,10,13,15
231:18,20,22
232:3,8,10,14,17
232:19,22 233:1,8
233:9,11,16,20
234:1,4,6,9,12,15
234:25 235:20,22
235:24 236:1,22
237:7 238:2,10,17
238:17 239:8,10
239:16,17,20,20
239:25 240:1,12
240:15,22,25
241:3,5 243:8,17
244:5,14,17 245:4

245:12,16,18,21
246:4,8,13,15,17
246:23 247:8,14
247:19,24 248:4,7
248:15,24 249:2
252:23 253:1
256:4,9,13 257:17
257:21 260:10,22
261:2,17 263:25
264:13,16 265:5
265:16,19 266:6
266:11,22 267:2,5
267:6,8,11,18,25
268:3,6
**court's** 32:16
62:23 72:12 230:8
238:12
**courthouse** 2:8
42:14 268:9
**courtroom** 2:7
64:14 266:16
**courts** 42:5,7,11
267:21 268:12
**covenants** 149:12
**cover** 41:14 52:14
54:23 85:1 208:19
**covered** 55:5
122:10 188:3
208:19 211:10,18
233:12,18
**covid** 268:13
**cowan** 22:24
**create** 83:15
138:7 216:20
217:1
**created** 95:7
216:22
**creation** 241:25
**credence** 197:19
**credibility** 197:20
**creditor** 8:2 14:16
77:17 114:19
119:13 137:4

143:3 144:19
145:21 146:5
**creditors** 4:13
6:19 7:2,12,23
8:10,22 18:16
21:2,3 33:10 36:5
38:10,11,15,23
40:2 44:18,20
51:9 52:5,6 53:21
76:12 103:9,10
106:13 111:15
116:4,5,8 119:12
122:12 125:5
140:1,6,7 145:4
147:5,12,16
149:18 154:23
155:2 184:3,9,19
186:25 222:2
228:8 238:4 254:9
261:1
**creighton** 13:3
**crime** 130:23
132:3
**crimes** 189:2,19
189:22 207:11
**criminal** 42:1,2
129:10,19,20
155:5 166:17
264:11
**crises** 153:2
**crisis** 51:3,10
124:15 127:18
143:18 185:16
**cristin** 8:20,25 9:3
**critical** 89:20
**criticism** 143:21
**cross** 43:4 65:10
67:7,13 72:2
75:21 82:8 88:3
94:1,17,18,25
96:24 99:7 100:24
103:14 110:11
113:5,10 139:22

146:22 147:2,7
150:8 155:22
160:3,13 167:2
168:19,23 171:1,6
172:13,18,22
179:23 207:19,21
208:1 215:19,22
221:24 222:7
228:23 230:12,23
232:20 233:4
236:17 248:15,19
249:4 257:18,22
260:22 261:3
264:1,5 266:13
**crucial** 43:1
**ct** 18:11
**culpability** 234:16
**cunningham**
22:25
**current** 57:13
92:14 183:20
195:19 236:3
**currently** 116:16
121:17 176:1,6
179:8 208:24
210:12 223:25
258:17 259:14
**cushing** 219:5
**customary** 3:23
**cut** 262:12
**cutting** 247:8
**cv** 42:15
**cyganowski** 23:1

|     d     |
|-----------|

**d** 1:22 3:21 21:23
22:4,24 25:13
28:25 29:19 31:1
248:5 270:1
**d.a.** 71:2 190:17
191:21 193:2
194:5,13
**daivs** 23:6

damage  50:12
damages  128:5,18
daniel  22:22 26:7
  28:11
darren  25:25
dasaro  23:4
data  49:23,25
  102:8,8
date  12:18,22
  13:1,11,19 107:13
  143:7 201:12
  264:16,17 271:25
dated  66:18
  109:19,22 111:17
  142:18 168:1
  170:14 172:2
  200:5,7 201:10,13
  248:9
dates  32:14 71:13
  142:14,20 216:21
daughter  177:12
david  12:12 22:5
  22:10,18 25:4,24
  26:24 28:9 30:6,7
  63:1 64:16 71:4
  73:13 110:17
davidson  3:8 23:5
davis  3:11,15,17
  17:12 23:7 75:24
davispolk  31:18
  50:25
day  4:6,8 60:25
  65:7 86:12,12,14
  86:14 87:13 136:2
  137:7 148:24
  200:7,20 226:21
day's  4:2
days  180:23
deadline  14:17
  40:18 62:7
deal  77:21 97:2
  120:23 121:23
  136:19 145:6

158:8 163:9 187:9
  216:16 221:7
  263:15
dealing  124:13,18
  201:8
deals  39:10 52:16
  137:2 144:21
  146:3
dealt  51:23
  199:19
dearman  23:8
death  53:16 55:4
  55:15,24 247:1
debevoise  20:15
  174:6,7 176:4,11
  182:3,4 195:16
  196:3,20,24 212:3
  212:25 250:1,16
  250:23 251:3
  253:23
deborah  24:19
debtor  1:9 95:22
  114:19 117:1
  121:3,5 140:2
  185:15 227:7
debtor's  2:15,20
  3:15 6:2 31:12
  111:16,19 227:7
  248:9 259:11
debtors  3:4,4,13
  3:13 4:12,23 5:5
  5:15,25 6:9 14:21
  15:15 16:9 17:13
  31:4,18 32:2 33:8
  33:21 34:16 35:2
  37:23 46:20 47:8
  47:12,20 50:21,25
  51:7,18 52:3
  58:22 60:21 63:5
  63:12,21 75:24
  77:21 79:24 80:2
  81:10 89:19 97:2
  97:23 128:25

132:10,12 145:4
  147:12 149:12
  152:9 168:17
  184:16 205:22
  206:5,14,22
  208:21 227:3,11
  227:12,25 229:7
  264:11
debtor's  172:4
decade  177:15
decades  86:23
  87:3
deceptive  130:10
  130:11
dechert  2:11,15
  2:17
decide  43:13
  51:21 52:15 59:4
  209:21 247:10
decided  56:8 77:5
  116:14 166:15
deciding  58:25
  153:24
decision  72:7,11
  88:21 91:12 154:6
  173:24 200:5
  231:2 238:20
  240:2 242:7
  244:14 255:5
  257:1,12,14
decisions  86:13,14
  166:18 209:14
  217:13 238:19
  242:8
declaration  62:6
  65:3,4,4,17 66:16
  66:25 67:4,5,16
  67:19 70:8 71:15
  72:20 74:7,15
  85:3 108:6 109:19
  110:4,6,7,9
  111:14,22 112:5
  113:2,4,15,20

114:3,17 117:11
  122:13,15,16
  126:23 127:22
  131:16 132:4
  136:23 138:15
  139:25 142:18,25
  144:7 149:11
  155:8 172:2,6,10
  174:24 175:4
  176:25 177:11
  178:1,9,20 179:7
  181:6 199:22
  201:12 208:11
  210:16 211:4,6,7
  211:11 213:10
  214:8,11 225:2,11
  226:11,19 227:1
  228:25 235:10
  236:17 241:13
  248:8,13,17,20
  250:7 252:13
  254:1 260:9
declarations
  131:11 133:14
declined  80:24
dedicated  37:13
deem  41:17
deemed  46:23
deeper  57:10
default  147:17
  148:10
defendant  87:12
  87:13,17,18
defendant's
  234:16
defendants  69:25
  70:18,23 71:16,16
  72:7,9 73:12
  174:19 175:14,23
  184:10 187:10,11
  199:9 250:11
  259:22

defense 16:14
72:14 131:7
132:25 133:7
135:5,8 161:5
229:23
defenses 160:5
191:16 192:13
195:10,13,17
229:21
defer 232:24
definitely 124:14
129:8 151:9
definition 101:4
155:1 211:7
defraud 189:25
degree 128:24
delaconte 23:9
deliberately
138:17
denial 190:25
denied 39:19,21
72:9 73:17
deny 54:3
denying 57:21
58:5,9
depalma 21:1
department 18:1
68:22 129:11
155:3 157:1
166:10 197:1,7
236:7,10 256:15
depend 173:24
depositions 68:13
70:14
depth 105:2
deramus' 168:16
derivations
238:23
describe 50:20
122:18 134:17
223:8,12 244:13
254:23

described 39:25
90:20 92:7 158:15
158:17 210:6
225:15 241:15
244:9 245:8
describes 198:15
describing 92:15
176:18 218:17
description
183:10 223:10
227:2
deserve 187:3
designated 259:6
designating
166:11
designed 255:24
desirability 213:7
despite 32:10
detail 117:17
148:19 149:10
175:21 176:4
195:17 212:12
229:19
detailed 97:4,12
179:14 252:6
details 126:22
164:13 192:9
detect 48:25
determination
43:7,25 47:5 54:3
54:4 57:16 72:12
112:16 181:19,20
226:21 238:12
239:5 253:7,20
262:22,24
determine 37:19
53:7,18 56:4,18
176:10 209:7
210:7 237:2
determined 37:8
43:14 47:6 51:19
52:2 53:15

determines
156:22,25
determining
220:4
detrimental 263:5
developing
142:11
developments
224:13
devon 23:10
diagnose 48:24
didn't 186:7
191:1
died 48:3,4
differ 74:10,14
difference 178:20
211:13,14
different 33:18
40:19 49:13 51:15
52:4 55:17 57:11
60:7,11 65:7
91:19 95:18 96:7
100:3 120:20
124:14,16,17,18
144:11 145:14
152:24 161:12
179:22 185:21
187:1 192:5
193:13 209:23,23
214:17 236:25
252:13,13 262:10
difficult 32:8,12
63:25 197:24
209:25 245:1
difficulties 120:13
230:15
diffuse 243:10
dilation 251:6
direct 63:2 66:20
67:1 72:18 73:20
76:13 86:9 109:21
109:24 111:22
121:19 126:21

136:18 137:20
138:14,20 147:12
148:13,15 155:10
168:4,9 170:17,23
171:3 172:2,7,10
172:13 224:24
248:11,17
directed 220:7
direction 187:13
187:13
directions 97:4,12
directly 33:3
98:20 157:21
240:2
director 78:10
173:5 177:13,23
199:14 229:17
251:10,14 258:3
directors 79:25
136:15 174:19
175:15 176:7
177:20 178:10,16
179:8 188:23
189:5,7,17 190:14
197:13 198:16
199:4,17,17,20
205:7 229:3,11
233:7 245:25
250:12,25 251:7
264:9,10
disability 47:24
disagree 119:7
discharge 75:13
242:14
disclose 118:10
133:3 159:10
201:18 202:2
203:19 212:23
disclosed 105:24
130:21 182:1
211:12 240:22
disclosure 43:23
111:19 123:10

126:6 145:9
180:14
**disclosures** 3:24
**discount** 123:24
**discounting**
209:15
**discovery** 59:6,7,9
59:15,16,19 60:1
60:9 68:13,21
70:17 82:16,16,18
132:9
**discretion** 232:18
242:9 243:2
259:15
**discretions** 220:8
**discuss** 146:19
161:5 221:16
**discussed** 31:3
42:13 52:20 63:14
78:7 98:2,14
110:18 118:7
137:5 166:2 194:4
207:11 211:16
231:2 242:11
**discussing** 63:4
158:23 198:10,15
198:23 247:10
**discussion** 120:2
137:19 160:24
164:14 165:4
184:25
**discussions** 61:11
130:15 155:3,15
198:3,5,7 257:4
267:19
**dismiss** 73:15
86:1
**disorder** 101:2
151:14 155:4,16
166:16
**dispel** 234:13
**dispensed** 102:11

**dispose** 238:13
**disposing** 120:23
**dispute** 82:2
152:23
**distinction** 99:20
**distinctions**
187:19
**distinguish** 189:4
**distinguishing**
51:13
**distributable**
152:24
**distributed**
102:11 121:4,6,9
124:20,21 143:17
**distribution** 34:21
40:12 123:8
124:25 125:22
194:14,17,19
**distributions**
125:12,19 127:10
127:10 213:16
260:1
**distributors** 84:5
**district** 1:2 42:13
69:11,12 172:17
248:25
**diversion** 193:7
**diverted** 190:21
191:25
**dizengoff** 7:18 8:5
8:17 9:3
**doc** 13:11
**docken** 23:11
**docket** 97:6,15
149:15 150:22
162:16 163:1
189:2,3
**dockets** 98:9
**doctors** 48:24
49:12
**document** 3:8
13:6,23 14:7,12

14:23 15:3,8,17
15:22 16:2,10,15
43:23 59:9 82:20
83:21 87:20 88:9
95:6,9,21 104:19
112:20 114:1
144:14 179:14
180:24 192:14
195:15 200:11,14
200:17 201:9
218:1 256:8
**documents** 12:20
13:17 14:4,20
15:14 59:11 70:1
70:6,13,16 71:21
73:2 82:12,14,15
82:19 83:2,9,15
84:1,6,9,13,15,21
88:11,15,17,22,25
110:12 113:22
114:2 131:1 132:5
179:23 204:4
218:13 236:25
266:24
**doesn't** 194:23,23
**doing** 84:19
136:17 194:16
237:22,22 242:9
266:17
**doj** 68:25 136:8
157:1 166:14,15
166:19 193:12
236:14
**dollar** 124:3 141:9
**dollars** 52:13 89:9
92:9,20 97:25
118:1,16 119:9
120:16 121:15
124:6 132:14
**domain** 83:3
**donsla** 22:23
**don't** 79:18
168:21 170:25

171:7 176:24
178:12,22 179:23
181:9,12 184:4
185:22 186:4
187:18 195:2,18
**door** 71:24 86:10
**doubly** 229:22
**doubt** 77:15 108:8
**dougherty** 23:12
**dougless** 27:18
**dr** 21:10 61:7 62:5
230:14
**drain** 1:22 31:3
88:21 167:12
266:2,3
**drain's** 153:23
**draw** 91:13
237:20
**drawing** 99:19
**drinking** 231:12
**driving** 242:7
**drops** 214:8 219:8
220:18 222:18
223:19 229:24
233:19
**drug** 48:19 50:10
50:13 102:9,11
190:1
**drugs** 150:16,17
151:6,11,11,13,24
152:2,9 154:1,7
154:13 190:19
**drysdale** 11:25
**dual** 189:25
**dubel** 23:13
**due** 61:8
**duration** 75:12
**duties** 140:12
234:18
**duty** 132:13
140:11 209:16
242:13

dylan 22:23
d'angelo 23:2
d'apice 23:3

**e**

e 1:21,21 2:11
3:22 17:1,1 22:5,9
26:23 27:6 28:8
28:14 29:10 31:1
31:1 41:23 66:12
109:15,15 111:11
167:23,23 170:10
171:24 248:4,5
266:9 270:1 271:1
e2e 194:7
earlier 41:8 46:2
69:22 82:21 93:13
125:11,17 126:9
131:25 134:4
160:16 180:11
184:14 207:12
263:2
earliest 143:7
early 53:25 54:15
69:20 125:6
earned 6:17 9:25
ease 193:14
easier 59:8 63:7
76:18 79:6 174:22
easy 41:13 42:23
244:19
eberhardt 23:14
ecf 2:8,17,23 3:8
3:25 4:8,17 5:1,11
5:19 6:4,13,23 7:8
7:18 8:5,17 9:3,13
9:21 10:4,14,24
11:11,21 12:7,15
12:18,23 13:3,8
13:12,15,20,25
14:2,8,13,18,25
15:4,9,12,18,23
16:3,6,12,16

eck 29:17
ecke 23:15
eckstein 19:13
23:16 163:17,20
163:22,23 164:10
164:12,15,21,24
165:2,6,7,8,15,19
166:3
economic 40:19
40:23 266:23
economics 137:8
ecro 1:25
edan 26:11
edmunds 20:13
23:17 62:21,21
63:1 64:3,5,10
65:10,24 215:17
215:18,20,23
216:3,4,14 217:17
218:2,13,17,19,21
218:24 219:3,7,12
221:23
educate 49:12
educating 49:11
49:16
education 49:4,10
105:17
edward 27:6
effect 37:23 38:19
40:15 223:3
238:11
effectively 75:13
112:21
effectiveness
253:7
efficient 153:3
267:1
effort 35:9 193:9
efforts 34:19
132:9 198:8
ehr 190:8
eight 139:19

either 49:20 53:20
56:10 57:20 81:17
159:10 160:10
167:4 168:21
184:21 186:24
204:13 210:11
232:16 236:5
266:12
elect 38:3,4
eli 5:1 6:13 29:21
elicit 110:21
elicited 91:17,18
eliminated 182:13
182:16
elisa 25:11
ellis 12:22 13:2,12
31:14
eloquent 50:5
email 86:13
emailed 47:11
64:21
emailing 111:1
emails 31:24
81:17 82:1 102:18
embodying
261:16
emily 24:20
enables 238:16
ended 79:14
endorsed 193:8
endorsement
209:13
enforceable 218:4
225:20
engaged 69:5
132:12,24 177:3
196:5
engagements
140:1
enormous 237:15
ensure 143:16
enter 245:5
258:25 261:6

entered 32:25
33:16 63:9 67:5
130:7 222:12,16
223:1 262:2,25
entering 108:11
enterprise 177:5
entire 75:12 92:24
177:2
entirely 78:24
197:18 199:20
entirety 251:20
255:23
entities 12:2,4,7
52:8 69:7 70:6
85:24 128:2,17
146:6 156:16,19
177:3 181:6
213:17 223:3
260:2
entitled 41:24
53:9
entity 153:11
154:5 177:4
263:19
entry 162:16
235:11 252:23,24
253:1 254:3
262:20
enumerated
137:20
environment
237:13
envisaged 217:2
221:9
epidemic 70:12
72:22 268:13
epinephrin 99:15
equally 106:23
eric 29:1,6
ernst 4:20,24 5:1
errored 145:14
escrowed 258:19

eskandari 23:18
especially 32:13
esquire 12:12
essence 238:14
essentially 144:19
establish 38:5
established 216:1
  217:3
establishing 66:18
  109:20 111:21
  248:10
estate 118:22
  121:19 126:15,16
  128:8,12,17
  159:13 213:15
  214:5,7,24 259:24
  260:7
estates 158:9
et 7:3,13,23 8:22
  154:19 167:12
ethan 25:16
ethical 199:20
ethically 188:23
  189:17 190:14
  229:3,6
europe 85:7
european 85:9
  105:18
evaluated 128:21
  128:24 186:5
evaluating 153:8
  255:17
evaluation 128:1
  131:6
evan 25:15
evans 14:2,22
  15:12 21:16 31:15
  33:19,22 34:6,8
  34:11,20 35:3,5,7
  35:20,24 36:5,8
  36:10,17,21,24
  37:10,17,21,25
  38:6,12,16,25

39:7,14,17 40:3,6
40:8,24 41:13,19
42:4,9 43:20 44:2
44:10,12,21 45:3
45:20 46:3,5,8,9
46:14,18,21 60:23
60:25 61:2
evening 208:6,7
  222:9,10
event 100:15
  147:17 148:10
  164:19,19 214:1
events 226:23
everybody 127:20
  183:18 245:20
everybody's
  32:15
everyone's 77:10
  164:7
everyones 77:11
evidence 43:3
  44:2 67:6 90:1
  95:13 110:10
  112:14,20 117:6
  119:2 130:14
  131:10 132:8
  134:1 247:11
  256:5
evidentiary 139:2
  159:4
ex 156:10
exactly 102:18
  106:14 146:2,18
  153:20 158:20
  187:16,17,19
  220:9
examination 43:4
  67:13 82:10 88:6
  94:1,20,25 96:24
  99:7 100:24
  103:14 113:10
  126:21 139:22
  147:7 150:8 156:2

162:14 163:21
166:8 172:22
179:23 208:1
215:22 222:7
230:23 233:4,22
238:6 241:9
245:22 249:4
257:22 261:3
264:5 265:8
examine 43:11
  67:7 75:22 82:8
  110:11 113:6
  146:22 147:2
  167:3 168:19,23
  171:1,6 172:13
  207:22 221:25
  228:24 230:12
  248:16,19 257:18
  260:23 264:1
  266:14
examined 236:17
examiner 12:11
  32:18 33:14
examining 65:10
example 77:4,14
  85:7 121:2,7
  123:14 125:6
  138:4 177:2
  262:19
examples 147:14
  234:9
exceeding 230:5
excellent 76:5
exception 184:13
  185:18 254:7
excess 126:9
  147:13
exchange 196:6
excluded 131:5
  225:13
exclusion 159:4
exclusively 119:1

excuse 110:15
  133:13 181:5
  188:19 233:11
  242:25 243:4
  246:14 248:16
excused 168:23
executive 70:10
  74:3,5,24
executives 68:14
exercise 220:7
  238:18 249:18
  255:3,18
exercised 234:18
exercising 242:9
exhibit 3:18,19,19
  3:21,22,23,23
  64:4 111:17 113:3
  113:3,5 136:23
  184:24 185:3
  189:3 200:6,12
  218:18,22 222:11
exhibits 63:9,13
  63:23 64:3,3,13
  64:21 266:14,14
  266:17 267:4,6
exist 127:13 218:1
existence 211:24
  256:8
expand 197:6
  268:22
expansive 86:8
expect 167:1
  244:9
expectation 76:23
  104:2
expedite 267:4
expense 3:23
expenses 2:13,16
  2:22 3:3,7,13,16
  4:4,7,14,17,21,25
  5:7,10,16,18,24
  6:3,9,12,17,22 7:4
  7:7,14,17,25 8:3

8:12,15,24 9:2,9
9:12,18,21,25
10:3,10,13,18,23
11:6,10,17,20
12:1,6,11,15
37:14 126:15
**expensive** 242:1
**experience** 78:6
78:18 114:18
115:4 124:13
183:2 235:24
**experienced**
141:2
**expert** 78:4
109:22 110:6,8
127:16 131:12
142:25 168:1,3,5
168:12,14 169:19
170:14,18,22
171:2,3,5 266:23
**explain** 37:3
154:10 178:25
182:20 195:5,12
224:13,14
**explained** 54:9
**explanation** 40:1
189:9 210:4 218:8
**exposed** 128:25
**exposure** 97:24
179:6 185:25
186:2,6,8,10,11
186:17,20 187:23
251:10,14
**express** 80:13
190:24 209:17
244:1
**expressed** 78:20
142:5
**expressing** 215:5
240:1
**extensive** 114:13
114:18 183:4,5
212:19 227:6

**extent** 39:25
86:11 105:1 106:4
110:5 128:7
145:14 152:1
153:18 182:25
188:13 201:25
217:7 240:9,10
254:19 258:23
268:16
**extraordinarily**
97:4
**extraordinary**
229:24
**extraterritorial**
188:13,16
**extremely** 42:2
140:22 195:23
196:16 236:16
263:5
**extricate** 72:9

**f**

**f** 1:21 3:23 28:23
109:15 131:18
271:1
**face** 108:12 262:9
**faced** 51:4 187:12
**facing** 32:8
185:21 197:16
201:6 238:18
**fact** 37:2 42:6
49:9,22 55:11
75:9 78:3,11 91:2
98:7 129:10
132:23 141:15
145:5 160:15
162:20 176:3
184:13 211:8
253:10 261:10
**factor** 71:1 88:9
105:13,15 107:3
153:15 230:3
240:21

**factored** 136:7
153:14
**factors** 42:25
48:15 91:19 127:5
135:18,22 209:15
209:16 230:3
**facts** 43:1 56:1
57:17,18 58:2
89:23 90:1 95:13
117:6 119:2
176:10 226:5
256:5 263:15
**factual** 89:18
**fail** 120:5 245:2
**failed** 50:9 118:23
**failure** 48:14
49:21 55:7 104:11
**fair** 56:17,19
76:23 80:14 83:8
87:3 91:25 97:18
97:21 98:25
100:16 104:13
105:23 116:15
121:18 122:17
124:2,6,23 125:15
127:22 129:24
136:16,20 140:4,9
140:13,18,21
143:19 149:19
152:22 153:7,15
154:2 161:10
185:11 207:18
209:19 221:18
223:21 237:1
243:20 244:3
260:10
**fairly** 39:25 42:23
65:6 125:13
**fall** 39:4 159:10
190:8
**false** 89:19 95:14
190:18 194:18

**familiar** 83:14
87:4 99:12 102:12
157:7 194:10,12
220:13
**families** 84:14
93:6 213:17 216:1
258:20 260:2
**family** 20:2,16
51:17 63:3,4
67:21 70:19,23
71:1 72:14 74:17
74:18,20 85:1
86:3 92:9,18,23
92:24 93:21 99:4
140:23 177:3
178:15 188:10
192:15 195:9
197:18 208:12,16
208:25 211:20
215:25 216:1,7,7
216:17,19,20
216:20,22,24,25
217:6,8,9,21
219:21,24 220:6
220:11,14 221:2,7
221:8,10,13,14,15
221:19,21 236:22
237:22 245:25
250:2 256:16
258:5,9,14,17
264:9 265:2
**far** 36:17 44:7
58:9 139:8 189:6
209:24 229:16
260:8
**farash** 23:19
**farrell** 23:20
**fast** 38:4
**faster** 60:9
**father** 47:22
246:21
**father's** 53:16
55:24 247:1

fault  63:19
favor  143:3
fda  48:6,14
feature  83:14
february  2:14 3:5
  3:14 4:5,15,23 5:7
  5:16,25 6:10,19
  7:5,14,25 8:13,24
  9:10,19 10:1,21
  11:7,17 12:12
federal  69:10
  189:2,19,22 190:3
  190:6,18 207:11
fee  2:5,11,16,21
  3:1,7,16,18,20,21
  3:22,25 4:7,11,16
  4:20,25 5:4,10,18
  5:22 6:3,12,22 7:1
  7:7,17,21 8:3,8,15
  8:20 9:2,6,12,15
  9:21,24 10:3,13
  10:23 11:10,14,20
  12:6,11,15 31:13
  32:18 33:12,14
  126:2 270:7
feed  93:13
feel  49:6,20
  140:12 185:23
  222:19 225:1
  240:11 263:8
feels  140:11
feeney  23:21
fees  3:20,21
feld  7:22 8:2,4
  18:15
feliz  23:22
felt  210:12 243:10
female  111:3
femino  23:23
fiduciaries  128:25
fiduciary  132:13
  140:12 234:18
  238:14 242:13

fiercely  213:6
fifth  2:5,11,19,25
  3:1,11 4:1,2,11,20
  5:4,21,22 6:16
  7:11,21 8:8 9:5,6
  9:15,24 10:9,17
  11:2 179:17
  180:10,13 200:20
figure  106:22
  218:8 229:8
  234:11
file  12:17,21,25
  13:10,14,18 33:7
  33:11 36:13 60:2
filed  2:16,22 3:8
  3:17 4:8,17 5:1,11
  5:19 6:3,12,22 7:8
  7:17 8:4,16 9:2,12
  10:3,13,24 11:10
  11:21 12:6,22
  13:2,7,11,14,19
  13:23 14:1,7,12
  14:22,23 15:3,8
  15:11,17,22 16:2
  16:5,10,15 33:6
  36:12 37:5,16
  38:18 41:10 45:9
  47:10,12 50:23
  51:16 52:14 54:12
  62:6,7 68:8 69:6
  74:20 97:5,14
  102:24 103:2
  130:22 141:13
  144:6 149:9
  192:14 195:15
  236:22
filing  13:5,22
  14:17 68:4 69:10
  70:22 83:11
  107:13 116:20
  197:25 198:1
  228:6 236:21

filings  75:1
fill  194:14
final  79:21 86:21
  143:1 204:19
  224:8 263:17
finality  182:9,12
  183:18 185:12,13
  185:14,14,20
  225:16 235:14
  237:12 254:1,5,13
finalized  142:16
financial  5:5 7:11
  11:15 114:8,9
  150:12 154:16
  266:24
find  194:13
  244:25 261:18
findings  191:1
fine  42:2 62:8
  65:2 80:8 91:14
  117:10 120:10
  163:13 218:7
  228:17 230:19
  232:19 267:16
  268:2,5
fines  69:2
finish  52:24
finished  146:15
  245:20
finzi  23:24
firm  36:15 69:6
  70:24 71:7 72:21
  80:24 83:22 212:3
firms  70:9 81:3,6
first  11:24 21:3
  31:10 33:18 42:20
  52:3 66:6 71:7
  79:13 103:10,18
  107:7 118:9 135:1
  138:4 147:4
  150:23 172:19
  173:1 180:12
  189:11 198:17,17

201:9 206:13
  222:3 238:5,21
  248:16 261:1
fist  150:25
fit  76:21 102:20
  152:16
fitch  13:3 19:17
fitzsimmons
  23:25
five  32:25 107:10
  130:8
fixed  37:9
fl  21:12
flexible  268:13
flom  5:23 6:2,4
floor  20:3
flow  188:11 227:7
flows  188:14
focus  115:2,21
  119:5 193:23
  210:5
focused  98:5
  100:14 104:16
  137:7 152:13,21
  154:10 193:9
  217:6
focusing  150:2
  159:19 169:9
fogelman  24:1
follow  59:14
  100:21 104:4,8
  196:11 232:23
  235:17 239:17
  244:17
followed  117:25
following  105:22
follows  223:24
food  190:1
footer  123:12
footnote  132:4
forbidden  201:22
  203:24

foregoing  271:3
foreign  8:21 85:22
   147:13 228:8
forensic  97:5,15
forgive  142:23
   224:7
forgot  108:24
form  32:19 47:9
   103:24 104:6
   107:11 175:10
   177:21 179:1
   183:22 184:4,12
   186:4 190:23
   193:11 198:13
   206:3 214:9 216:2
   216:9 217:16,22
   218:9 225:4
   227:14 228:13
   239:9 240:13
   244:15 256:3
   260:8
formal  179:1
   206:4,13,22 215:5
   257:4,14
formally  217:4
   221:5 251:11,15
   257:13
formed  82:18
   116:20 117:21
   118:14 153:11
former  174:19
   175:14 176:7
   177:13,20 178:9
   178:16 179:7
   188:23 189:7,16
   190:14 199:19
   229:3 250:12,25
   251:6,10,14
forming  151:6
   160:23
forms  38:3 153:9
forte  90:3

forth  34:13 35:9
   51:7 91:14 93:16
   137:5 163:8 168:2
   168:15 172:3
   242:4,21
forty  130:8
forward  86:4
   108:7 149:18
   154:5,7 244:25
found  49:24 189:8
foundation  81:21
   82:1 129:14
   148:20 151:18
   157:14,18 159:1
   183:24 240:14
foundations  221:7
   221:8
four  54:20 79:13
   81:2 103:10
   213:10 259:20
fourth  6:7 7:1
   8:20 11:14 12:9
   180:12
fraidin  24:2
framer  141:17
framework
   116:25 117:3,7
   141:16 142:6
framing  206:7
   226:12
frank  19:16 45:5
   100:20 101:1
   146:23 150:10
   264:7
frankel  11:3,8,11
   19:8
franklin  13:2
   19:21
frankly  32:2,7
   40:6,11 44:4 50:4
   110:13 187:3
fraud  84:10,16,17
   130:23 132:12,24

fraudulent  67:21
   68:1 89:6,9 90:7
   97:24 190:18
   213:15 214:5,24
   259:25
frazier  24:3
frederick  28:14
free  98:20 150:16
   151:11,24 152:10
   169:14 185:23
   234:2
friday  31:3 47:10
   169:4
friedman  24:4
front  86:10
   115:23 163:2
   180:3,6 200:7
   206:18 218:23
   219:1
fti  9:24 10:1,4
full  105:12 135:1
   135:10 136:22
   150:25 192:13
   195:10,13 198:1
   209:16 210:2
   211:11
fully  39:15 195:21
   225:20
function  105:2
   125:19 216:22
fund  125:5,7
   126:2 258:19
funded  49:13
   126:3
funds  124:18
   143:17 242:4,21
   242:23,25 243:1,1
   243:15,21,24,25
further  32:24
   33:1,23 75:20
   82:5 93:9 94:12
   99:2 108:19 109:1
   139:17 146:20

150:4 155:22
162:9 163:15
166:3 169:11
177:11 207:19
215:16 221:23
231:7,23 233:15
237:25 240:24
245:5,17 257:15
260:20 263:7,23
furthermore
   190:12
fusion  129:7,12
   129:22 130:1
   190:7
fussy  144:14
fx  25:20

g

g  3:23 22:25 23:6
   31:1 167:23
gabe  22:11
gainesville  21:12
galan  24:5
gange  24:6
garrett  26:13
gary  24:16
gather  139:7
   267:13
gathered  132:8
gayle  24:5
geard  22:19
gears  63:22 79:21
   84:24 213:9
geldreich  24:7
general  20:8 33:1
   48:18,23 70:2,2
   73:11 78:11 91:18
   92:18 102:21
   114:4,5 151:13
   152:1 173:2
   193:19 255:23
general's  73:4
   165:21

**generally** 46:15
51:9,20 83:2 87:9
92:15 98:6 105:7
132:5 134:4 140:5
145:21 154:13
159:15 169:11
198:24 221:17
239:24 256:8
268:15
**generation** 85:15
**generic** 178:17
183:10
**geoffrey** 24:14
27:2
**geographical**
254:15
**george** 27:8
**gerard** 29:16
**getting** 45:8 91:11
124:21 136:3
137:8 138:14
152:13,16,21,22
154:5 161:11
187:4 229:18
235:25 236:24
258:23
**gibner** 141:22
**gibson** 24:8
**giddens** 24:9
**gilbert** 10:19,22
10:24 24:10
**gill** 24:7
**gillian** 27:22
**give** 39:1 60:11
130:24 154:1
161:21 162:8
164:11,12 183:9
230:25 234:6,9
262:18 267:8
**given** 39:12 50:13
62:11 64:7 72:8
148:22,25 165:4
183:3,14 195:25

196:2,17 228:11
237:10
**gives** 57:15
**giving** 42:17
**gleit** 24:11
**glema** 142:1
**global** 76:24
105:12,13,15,17
106:2 107:1,18
182:9,11 183:18
185:12,12,14,19
223:3,15 227:1,2
235:14 254:1,4,13
254:14 263:9
**globally** 105:3
**go** 31:10 36:18
37:14 38:4 50:6
54:14 57:10 61:10
63:22 67:12,15
84:17 93:24 94:23
94:23 95:19 113:9
114:17 127:8
137:16 151:4
154:7 161:14
167:1 168:15
172:18,21 174:1
193:21 205:4
207:13 208:25
209:10 210:11
222:19 223:16
224:2,10,16 226:6
232:6,16 233:1
235:20,21 237:23
238:9,17 241:4
246:6,9 249:2
253:14 261:2
268:3
**goal** 138:22
**god** 66:10 109:13
111:8 167:20
170:8 171:19
248:2

**goes** 38:2 42:16
65:4,5 127:8
139:3 159:18
200:21
**going** 39:3 41:13
41:14 43:11,11,13
48:12,22 52:25
57:5,9,10,19,20
57:21 58:22 59:6
64:23 65:11,13
67:15 72:20 76:6
77:6,18 79:21
81:5 91:5,23 92:3
92:19 97:22 118:2
133:2 138:10
143:10,10 145:8
146:14,15 149:17
149:19 151:10
154:5 157:17
162:21,22,24
164:11,12 178:2
178:13 181:23
188:19 190:12
192:23 201:24
205:24 206:2,23
207:1 218:21
236:18 244:15,21
247:4,6,10 250:7
253:9 268:8
**gold** 24:12 172:15
172:15,20,23
175:3,5,6,11,18
175:20 177:24
178:5,17,24
179:21 180:4,8
181:5,8,11 182:2
183:25 184:6,17
184:21,23 185:6
186:7,9 187:3,5
188:6,8,18 191:3
191:7,9,12 192:6
192:18 193:14,18
194:25 195:1

196:8,13 197:2,3
198:11,20 199:6,8
199:12 200:10,16
200:24,25 201:4
203:21 206:9,12
207:19 208:20
211:17 212:11
226:25 229:1
232:1,5,9,12,15
232:18,25 233:2,3
233:5,14 236:7
241:4,5,7,10
243:11,18,19
245:3,14,17
248:21,22,25
249:3,5 252:16
253:17,18 256:10
256:20 257:15
258:23
**goldman** 18:13
67:9,10,14 72:6
75:20 78:2,5,14
78:16 79:23 80:18
81:20,23 87:25
88:2,5,7 89:17
90:5,9,13 91:6,9
91:16,24 92:6,23
93:1,4,6,7,9
**goldman's** 72:4
79:22 94:15 98:19
**goldmine** 84:6
**goldstein** 24:13
**good** 31:2,17 34:8
34:10 40:25 41:2
47:17,18 67:9,15
76:2,7 88:10 94:3
94:6 95:2 103:8
110:24 111:13
113:12 115:10,17
123:1 136:10
139:20 159:8
167:1,11 198:20
201:8 208:3,4,6,7

222:6,9,10
**goodman** 24:14
**gostin** 24:15
**gotten** 40:21
    260:11
**gotto** 24:16
**governance**
    216:18
**governed** 204:15
    210:17,18,23
    211:4
**government** 69:7
    190:16 191:1,10
    191:20 193:17
**governmental** 9:7
    9:16 10:8,20 11:4
    12:2,4,7 52:8 70:5
    79:14 174:18
    175:13 250:11
**governments**
    38:23
**governs** 63:10
**grandchildren**
    85:16 93:2
**grant** 33:10,14
    213:5
**granted** 41:8,17
    58:1 182:24 210:2
    270:5,7
**granting** 13:6,23
**great** 32:10 60:25
    97:2 146:11 195:7
**greater** 145:10
**green** 17:7 24:17
    24:18 166:25
    167:3,6,13,15,18
    167:21,24,25
    168:7,10,19,23,24
**greenberg** 21:1
**greenspan** 24:19
**green's** 168:12,14
**gregory** 20:6
    266:21

**grim** 24:20
**grip** 143:19
**ground** 208:19
    211:17
**group** 12:2,4,7
    19:2 38:13 77:17
    87:17 115:7 157:8
    177:14
**groups** 115:8
    137:4 160:24
**guard** 24:21
**guess** 39:19 52:23
    54:17,22 55:1,18
    57:12,19 89:16
    90:7 97:21 102:23
    116:1 118:23
    120:5,21 126:12
    127:3 147:18
    201:16 218:16
    223:6,13 231:11
    238:9 240:10
    247:7 261:13
    263:17,20
**guidance** 210:15
**guided** 199:17
**guidelines** 3:19
**guiding** 235:16
**guilty** 69:1 189:1
    189:8,18 207:11
**gulkin** 24:22
**gump** 7:21 8:1,4
    18:15 110:25
**gupta** 24:23
**guys** 57:8

**h**

**h** 19:13 23:16
    30:2 111:11
    167:22 170:1,10
    171:24,24
**haberkorn** 24:24
**hage** 20:1
**hamermesh** 24:25

**hampton** 25:1
**hand** 56:2 64:8
    66:8 109:11 111:6
    124:16 167:18
    170:6 171:17
    187:21 200:19
    231:9 247:25
**handle** 33:3
**handling** 32:21
**hands** 233:24
**happen** 53:20,25
    65:12 84:16 214:1
**happened** 77:13
    79:2 119:3 164:8
    164:19 165:4
    188:15 189:5
    221:11
**happening** 80:23
    81:9
**happens** 180:5
    209:17
**happy** 31:9 47:20
    65:7 79:18 94:23
    139:20 145:18
    232:7
**harbuck** 25:2
**hard** 35:10 48:5
    103:21 106:23
    134:6
**harmfully** 50:10
**harold** 25:13
**harrington** 25:3
**hart** 25:4 30:7
**hate** 56:14,16
**hauer** 7:21 8:2,4
    18:15
**hayden** 22:21
**hd** 98:15
**head** 221:10
**heading** 204:10
**headphones** 31:25
**health** 100:5,7,11
    115:3,22 124:15

124:15 152:18
    153:10
**healthcare** 190:4
    190:19
**hear** 34:7 45:24
    47:20 62:2 76:2
    81:12 83:24 94:4
    95:2 103:21
    113:12 167:3
    172:24 208:8
    227:23 233:2
    246:24 247:15,16
    257:25 262:12
**heard** 31:19 45:22
    49:5 61:15 71:20
    80:15 81:10,13
    100:6 122:7 158:4
    158:6
**hearing** 2:1,1,4,5
    2:5,6,6,10,19,25
    3:10 4:1,10,19 5:3
    5:13,21 6:6,15,25
    7:10,20 8:7,19 9:5
    9:15,23 10:6,16
    11:1,13,23 12:9
    12:17,21,21,25
    13:5,10,14,18,18
    13:22 14:1,5,5,10
    14:10,10,15,21
    15:1,1,6,6,6,11,15
    15:20,20,25,25,25
    16:5,9,14 31:4,9
    32:14 33:4 60:20
    60:21,23 66:19,20
    77:12 88:22 95:15
    109:2,21 110:7,15
    111:22 115:24
    168:3,22 170:15
    170:17,25 172:4
    204:3 207:15
    228:24 247:20
    248:8,11 268:10
    268:17,18,21

**hearings** 52:12
154:9 268:14,15
**hearsay** 158:3
**heather** 24:3
28:12
**heavily** 137:4,5
**hebrew** 14:2,22
15:12 21:16
**hedge** 124:18
**heitzenrater** 25:5
**held** 2:6 85:20
86:3 93:19 197:13
258:18 259:4
**hello** 47:16 257:24
**help** 39:18 51:10
66:10 109:13
111:8 144:13
162:19,19 167:20
170:7 171:19
180:6 248:2
**helped** 216:18
**helpful** 32:1 40:6
64:14 175:2 185:2
185:4 189:22,24
205:17 218:20
266:15
**helping** 149:8
**henley** 74:5 80:6
80:13
**hereunder** 228:10
262:16
**herring** 25:6
**herz** 25:7
**hesitating** 152:23
**hey** 111:3
**he's** 187:3,4
**higgins** 13:15,19
18:6 31:15 93:11
93:11,24,25 94:2
94:3,12,17 99:9
207:23,23 208:2,7
214:10 215:9,16
231:25,25 232:4

235:19 257:19,19
257:23,24 260:11
260:13,15,20
**high** 191:23 193:8
193:9 194:2 195:4
195:6,7,13 197:13
197:19 240:7
**highly** 241:20
**hirshman** 25:8
**historical** 104:18
**hoc** 9:7,16 10:7,19
11:3,16 19:2,9
66:16 105:11
106:13 107:18
160:8 161:17
163:24 164:2
165:11
**hold** 147:12
258:12
**hole** 65:11
**hon** 1:22
**honestly** 119:19
**honor** 31:17,19
34:9,17 40:5 45:5
45:11,21 46:24
47:13 50:24 51:11
60:17,25 61:3,18
61:24 62:3,19,21
63:9 64:19,23
65:9,21,24 66:1
66:23 67:9 71:20
75:20,23 78:2
79:3 81:20 82:5,9
87:23,25 88:5
89:16 91:5,6,16
92:3 93:10,11,25
94:12,14,19 95:18
96:21,23 99:1,3
100:20 107:6
108:5,17,23 109:5
109:9,17 110:24
111:25 112:3,19
112:25 113:7

117:5 118:2,25
119:6,17,23
126:20 127:2
128:8 133:13,25
134:10,14 138:13
138:21 139:5,17
139:19 140:24
145:8,25 146:23
147:3 148:4,12
149:7 150:5
155:20,25 158:14
158:25 159:12,16
159:21 160:12,14
161:6,12 162:8,9
162:11,24 163:6
164:5,20,24 165:7
167:7,14 168:24
169:2,4,13,18
171:13,25 172:8
172:15 184:23
186:23 187:5
188:7 192:8
207:20,23 214:10
215:1,16,18,20
219:4 221:23
222:1,6,23 223:7
224:5,17 226:9
227:19 228:21
229:9,19 230:14
231:25 232:5,13
233:3,15,21 237:6
238:1,3 239:15
241:1,7 243:16,18
245:15,19 246:14
246:16 248:6,14
257:16,19 260:14
260:21,24 263:24
265:15 266:5,21
267:16 268:2,5
**honor's** 51:1
232:18

**hope** 91:13 98:13
199:23
**hoped** 268:7
**hopefully** 32:1
44:6 84:21
**horrible** 244:13
**hospital** 44:14
**hospitals** 115:8
**hostile** 140:22
**houlihan** 11:14,18
11:21
**hour** 64:1
**hours** 65:10,16
**housekeeping**
61:4 62:22 66:6
169:18
**how'd** 251:2
**howard** 29:5
**hrycay** 169:19,22
**hrycay's** 170:1,3
171:5
**hudson** 25:9
**huebner** 3:25
17:17 31:17,18,21
75:23,23 76:1
78:5,13 79:3,5,8
81:25 82:5 89:16
90:2 96:2 139:19
139:23 141:1,6,7
141:25 142:3
145:12,20 146:1,4
146:9,11 149:7,15
162:11,15 163:6
163:13 186:23
223:7,7
**huebner's** 163:2
**huebner's** 187:6
188:5
**hugh** 26:19
**hundred** 97:15
140:15
**hundreds** 98:8,8
132:8 213:20

259:22
**hunter** 22:6
**hurley** 18:20
25:10 110:24,25
112:14,18,19
117:5 118:2,10,25
119:17,23 121:25
122:10,15,17
126:20 128:4,7
129:14 130:17
132:16 133:2,8
134:5,8,10,12,13
134:16 135:15,17
136:21 138:13
140:24 141:20
145:8,12 147:18
148:12 149:2
151:15 152:4
155:7,18,24 156:3
157:15,19 158:7
158:14,16,19
159:16,21,25
160:2,14 161:6,11
161:15,16 162:8
162:24 163:25
**hyde** 16:25 271:3
271:8
**hyder** 25:11
**hypothetical**
77:14,20 78:2,9
81:15 127:10
240:16
**hypothetically**
98:21 244:4

**i**

**i.e.** 148:23
**iac** 147:15 226:17
261:19 263:5
**iac's** 148:8,23
150:2
**iacs** 168:17
224:22 261:11
262:4,23 263:10

**idea** 100:17
151:10 159:8
237:18
**identified** 198:8
**identify** 203:24
**ignorance** 210:4
**ilene** 71:3 73:12
**illustrated** 149:13
**illustrative** 124:1
127:4,9
**imbodied** 145:7
**immediately**
266:7,9
**impact** 85:14
107:19 188:14
235:2 262:21
**impacted** 240:2
**implement** 194:6
**implicated** 43:9
**implicating** 43:3
**implications**
235:9
**implied** 92:13
**implies** 214:17
**importance** 65:5
243:21
**important** 37:4
52:25 77:2 80:19
83:19 87:16 89:21
135:19 144:17
157:12 163:8
183:4,18 189:4
242:3,20 243:15
**imposed** 143:22
211:25 244:7
**impressions** 71:23
**improper** 102:15
**improve** 194:7
**impugning** 99:25
**inaccurate** 218:17
256:4
**inappropriate**
226:22

**inasmuch** 183:20
184:12
**inaudible** 133:14
133:15,20 134:19
135:13,15 136:17
143:22 145:11,17
146:7 148:24
**incarcerated**
32:13 33:7 35:17
37:2 45:14 154:12
**include** 42:25
48:9 69:10 70:12
70:13 75:5 104:10
116:4 121:13
124:2 127:13
129:6 130:4 136:6
152:16 160:19
193:24 259:7
**included** 89:15
101:4 102:9 103:4
116:10 117:7,21
117:25 129:11,25
142:17 146:5
149:3 154:23
**includes** 90:24
103:24 126:7
131:3
**including** 6:1,20
7:5 8:1,13 10:11
33:9 45:14 48:15
52:4,6 78:10
89:17 92:25
100:12 121:12
144:5 175:14
194:7 197:17
**inconsistent** 63:11
**incorporated**
76:10 83:9
**incorporates**
258:16
**incredibly** 32:12
227:6

**incumbent** 224:13
**incurred** 2:14 3:3
3:13 4:4,21 6:9,18
7:25 8:12 9:9,18
9:25 10:10,19
11:7 12:11
**indefinitely**
244:22
**indelicato** 25:12
231:8,11,13,14,15
231:16,17,19,21
**independent**
176:9 181:17
197:12 198:16
199:4 242:8,13
249:18 250:4
254:24 255:2,3,18
256:23
**independently**
173:10
**independents**
198:4
**indicate** 113:20
127:7 132:7
**indicated** 135:9
**indicates** 114:18
**indirectly** 168:17
**indiscernible** 34:3
41:2 42:9 71:23
78:13 79:4,7,7,19
81:23 82:23 87:2
87:4 89:3 91:9
92:1 96:12 97:11
103:9,20 105:8,14
105:19 109:1
115:9 116:13
117:9 119:17
122:17 127:5
129:21 185:3,17
190:7 191:8
192:11 195:9
200:18 204:9,13
204:21 205:16

207:8 209:12
211:1 214:13
216:24,25 217:15
218:10,22 225:21
227:5,5 231:11,12
231:14,17,19
234:24 237:13
238:16 239:18,23
239:24 241:13
246:19,20,22
247:4,5,7 248:22
256:12 261:17
264:22 265:11
266:22 268:9,19
**individual** 51:5
57:17 59:18 67:25
74:18,19 86:2
101:2 221:14
235:2 264:8
**individuals** 37:5
85:11,12 86:5,10
86:18 154:12
188:12 197:16
208:16 210:25
**industry** 84:3,10
**ineffective** 190:20
191:24
**inflicted** 247:1
**influence** 226:23
**inform** 63:19
**information** 8:9
46:10 53:6,10
68:18 113:22
114:2 134:20
141:22 160:18
176:10 196:23
201:25 202:1
203:18 209:16
212:20,23 213:1,2
233:10,10 247:6
263:8
**informed** 49:4,9
61:6,14

**ingestion** 48:20
193:6
**inhibited** 212:23
**initial** 94:21
**initially** 67:24
88:10
**initiated** 69:20
**initiative** 153:10
191:22
**initiatives** 152:18
**injunctions**
184:10
**injury** 37:15 38:9
38:21,21 43:17
45:13 46:15 52:14
55:15 56:12 125:6
**input** 254:24
256:25
**insight** 130:24
**insist** 172:17
**insofar** 225:2
**instance** 103:18
154:16 187:7
239:18
**instruct** 255:5,9
**instructions** 63:12
209:11,13
**insurance** 115:7
126:10 127:14
**insure** 140:5
**insys** 115:11
121:7,9,15
**integral** 173:9
**intend** 266:14
**intended** 66:19
109:21 111:22
168:3 170:16
248:11 254:14
**intending** 229:9
**intense** 84:13,16
**intensified** 191:22
**intent** 90:20
104:22 105:11

138:7 179:23
**intentional**
132:12,24
**interact** 48:1
50:10 54:21
220:14,16,20,21
220:23
**interacted** 54:21
**interacting** 48:10
141:2
**interaction** 48:12
48:16,17,17,22
49:17 129:12
221:1
**interactions** 49:21
49:22 221:8
**intercreditor**
119:1,8 154:18
**interest** 33:9 51:8
149:8 154:7,11
164:7 173:13
209:8 210:8 254:3
259:17 261:12,18
262:5,21,23
**interested** 102:9
102:23 229:20
230:4
**interests** 38:8
44:20 52:6 143:23
182:8 210:1 230:1
230:9 235:12
237:4 241:13
259:18 263:1
**interface** 221:12
**interim** 2:5,10,11
2:19,25 3:1,10,11
4:1,2,10,11,19,20
5:3,4,13,21,22 6:6
6:7,15,16,25 7:1
7:10,11,14,20,21
8:7,8,19,20 9:5,6
9:15,23,24 10:6,9
10:16,17 11:1,2

11:13,14,23,23,24
12:9 31:13 33:12
33:15 270:7
**interject** 179:21
**international**
227:9
**internationally**
262:19
**interpose** 253:9
**interpretation**
252:4
**interrupted** 166:5
**intervene** 181:23
**intolerable**
237:18
**intoxication** 48:5
**intra** 144:19,21
144:21 145:21
146:5
**introduced**
103:16
**inventiveness**
183:2
**investigate** 43:1
**investigated**
128:16
**investigating**
67:20
**investigation**
67:24 68:4 97:5
196:23
**investigations**
176:9
**investment** 6:18
11:15 149:25
173:15
**investments**
258:13
**invitation** 161:23
**invitations** 160:24
**invite** 160:8
161:17

**invited** 73:23 74:3
162:2
**involuntary** 244:7
**involve** 94:7
**involved** 80:6
86:12,13,14,17,22
90:11 102:16
104:5 114:15
118:20 121:1
137:9 140:11,13
144:18,25 159:7
191:15 257:3
**involvement** 86:9
90:20,22 199:16
**involves** 33:18
46:16
**involving** 43:9
102:25 211:20
219:11,13
**ira** 7:18 8:5,17 9:3
**irrelevant** 209:15
**irve** 18:13 67:9
**island** 68:8
**islands** 249:10
**isley** 24:15
**israel** 25:13
**issacharoff** 19:14
71:20 82:11 87:23
91:5,11 92:3
103:16 107:6,21
108:5,21,23,25
**issuance** 207:6
**issue** 34:24 35:8
40:20 53:18 63:8
106:12,15 173:7
218:16 220:4
229:16 247:9
266:8
**issued** 48:6,14
50:14 88:21
**issues** 34:11 36:18
43:5,24 50:1 56:7
57:11 87:14 90:25

158:2 171:5 178:7
190:11 199:18
231:2 246:17
255:8
**issuing** 204:5
**italicised** 144:2
**italics** 143:4
**itemize** 92:17
**it's** 167:22 168:3
169:23 170:10,16
171:23 173:23
174:22 181:7
185:15 186:24
188:13 189:4
190:25 197:11,24
200:15,18
**ives** 25:14
**i'll** 179:21 186:15
192:20 194:3,20
199:1
**i'm** 168:7 174:22
176:25 177:8,16
178:10,13 180:5,9
180:11 181:23
182:6 183:9
184:25 185:4
186:13 188:4,7,15
190:12 192:23
193:5,20,23 195:2
196:8,18 197:6
198:1,23 199:23
200:4 201:24
202:2
**i've** 179:19 181:1
193:19

## j

**j** 18:6,13 21:7
24:12 26:15 27:1
28:2,16,18 29:1
29:20,21 66:12
109:15 171:24
**jackson** 14:16,23
31:16

**jacob** 25:7
**jails** 154:13
**james** 13:2,7,24
14:7,12,24 15:3,8
15:17,22 16:2,11
17:18 19:21 24:18
28:8,10 200:20
**january** 10:10
47:23 164:2
165:10
**jared** 24:9,17
**jasmine** 22:1
**jason** 28:4
**jay** 21:25
**jayne** 17:4 67:5
67:13 82:10 88:6
94:1,25 96:24
99:7 100:24
103:14
**jefferies** 6:16,20
6:22
**jeffrey** 24:11
25:17 26:10 28:2
**jeffreys** 150:1,1
**jenna** 25:9
**jennie** 27:14
**jennifer** 17:6
23:21 109:7,15
110:9
**jeremy** 26:1 28:7
**jerome** 29:7
**jersey** 8:20,25 9:3
174:13 181:17
200:2,5,18 201:21
204:12,13,14,15
208:13 209:1,10
210:10,21,23,25
211:5,19 214:25
215:7,8 217:14,19
218:5 219:1
222:13 223:16
224:2,11,19 226:7
228:12,14 229:15

230:8 231:1 233:8
233:11,11 234:1
234:15,21 235:20
235:22,24 236:1
238:9 239:8,17,20
239:20 240:12,22
249:10 265:11
**jersey's** 217:20
**jesse** 23:9
**jill** 21:20
**jim** 50:24
**job** 140:5
**john** 23:12,13
24:21 26:12
**join** 32:24 111:1
**joint** 4:11 64:4
189:3 200:6,12
218:22 222:11
**jonathan** 17:9
26:23 71:2 73:13
171:21,24 172:22
208:1 215:22
222:7 230:23
233:4,22 238:6
241:9 245:22
**jones** 4:2,6,8
25:15
**jordan** 28:3 29:23
**joseph** 20:1,6 23:6
27:24 28:11 29:2
29:9,15 40:5 41:7
64:18,19 65:8,15
65:20 66:1 266:21
266:21 267:10,16
267:24 268:2,5
**jr** 14:2,22 15:12
21:16 24:18 30:3
**judge** 1:23 31:2
40:8 42:14,16,20
88:21 112:5
132:16 153:23
167:11 231:21
266:2

**judge's** 215:11
**judgement** 153:1
187:22 249:18
**judges** 42:14
**judgment** 16:5,10
47:3 50:16 57:25
88:17 98:21 128:6
128:19 217:19
218:12,14,25
219:2,17,20 255:3
255:4,18 256:23
**judgments** 74:19
217:14 255:7,9
257:8
**judicial** 41:21
**judy** 198:5
**julianna** 23:22
**july** 168:1,12
170:14,22
**juncture** 245:2
**june** 109:22 110:6
142:17,18 143:7
144:6 190:5,9
218:25 219:17
**jurisdiction** 87:14
91:3 108:4 213:6
215:4 228:9
238:18 263:14
**jurisdictions**
104:20
**jury** 142:1
**justice** 18:1 68:22
70:12 72:23
129:11 155:3
166:11 197:1,7
236:10 256:15
**justice's** 236:8
**justin** 1:25

**k**

**k** 20:20 25:6
111:11
**kami** 27:20

**kaminetzky** 17:19
227:22,24 228:13
265:21,22,24
266:1,4,7
**kaminsky** 25:16
**kaplan** 25:17
172:16
**kara** 29:11
**karas** 42:14,16,20
**karavolas** 25:18
**karen** 25:21
**kathe** 190:17
191:22 193:2
194:5
**katherine** 27:17
**kathy** 71:3 73:13
**kaye** 2:20,22
**keep** 72:4
**keeping** 118:5
213:7
**kelleher** 25:19
**kelly** 25:20 29:13
**ken** 163:23
**kenan** 28:15
**kennedy** 25:21
**kenneth** 19:13
23:16
**kesselman** 25:22
**kevin** 23:7 26:14
**key** 33:9
**khan** 25:23
**kicked** 69:24
**kidd** 23:22
**kind** 41:1 57:9
67:16 99:19
117:17 141:24
178:25 200:14
207:4
**kinds** 71:24
155:14
**king** 3:2,6
**kingdom** 174:12

**kissler** 204:20
**klauder** 12:9,12
12:13 25:24
**klein** 25:25
**kleinberg** 172:15
**kleinman** 26:1
**kmk** 42:16
**knew** 49:20 191:3
193:2 194:16
**know** 31:22 32:2
32:7 36:13 40:8
40:18 41:1,10
43:14 44:5,22
45:16,16 46:5
48:11 49:6,12,25
51:4,8 53:5,8,13
53:14 56:25 57:8
57:8,10 59:14
64:13,25 65:13
69:23 74:4 75:2
78:7,25 79:1 80:5
80:6,10,11,11,12
81:2 82:1 83:22
84:7 85:25 87:2
87:13 90:12 92:11
92:11 93:8,8,17
93:18,22 94:19
95:21 96:10,11,13
96:14,14,16,18
97:18,22 98:2,4
98:24 99:18 101:9
101:10,14 102:10
102:18 104:24,24
105:8 106:3,7,8,8
106:11,25 107:12
107:14 108:16,16
116:12,12 117:12
119:19,22 120:3,9
121:10 124:11
127:13 129:23,24
130:21,22,24
131:4,13 134:3
136:7,10 138:1,1

140:11 143:1,6
144:5,16 146:9
148:8 152:12,14
152:17 153:1,13
154:3,12,14,16
156:22 158:5
159:4,5,7 162:25
164:22 165:25
166:1,18,25
171:14 177:9,10
178:22 181:9
184:4 187:3
188:21 189:21
206:1 213:5,6
218:21 219:8
223:18 228:16
231:10 232:6,15
235:5,24 238:22
241:3,7 247:3
251:21 252:2
266:17 267:5,21
**knowing** 66:21
109:24 111:23
144:4 170:18
172:5 176:20
248:12
**knowingly** 190:17
**knowledge** 73:20
74:2 80:2,10,17
80:20 81:6 85:22
90:19 113:21
127:15,19 137:24
138:3 146:4,7
158:22 160:8
176:21 179:9
193:16,22,24,25
195:19 252:2,6
**known** 48:18,23
49:1,22 69:14
81:7 87:2 100:10
141:23 193:3
194:16 236:18

**knows** 63:1
129:15 226:7
**kockolas** 25:18
**kotler** 26:2
**kpmg** 4:11,15,17
**kramer** 11:2,8,10
19:8 26:3 163:23
**kurtzman** 8:8,14
8:16
**kyung** 26:4

**l**

**l** 23:1 24:4 29:17
109:8,16 111:11
167:22 248:4
**l.p.** 1:7 7:3,13,23
8:22 13:7,24 14:8
14:13,24 15:4,9
15:18,23 16:3,12
**label** 48:9 49:19
50:10,15
**labeling** 48:19
**lack** 81:20 151:17
240:13
**lacked** 190:22
192:1
**laid** 42:10
**landscape** 244:14
**language** 138:8
143:20
**large** 39:25 65:11
87:10 176:22
213:22
**largely** 79:14
168:17
**latched** 50:12
**late** 13:6,14,23
31:14,14,15,16
33:7,11 240:6
246:8 270:5
**laura** 23:23 26:18
**lauren** 25:19 30:5
**law** 19:16 36:12
36:14,14 39:10

44:25 51:21 53:13
53:15,24 81:3,6
138:11,25 139:6
183:7 204:15
210:17,18,23
212:3 217:20
**lawful** 199:20
**lawfully** 188:23
189:17 190:14
229:3,6
**lawrence** 13:14,19
24:1,25 26:2
**lawsuit** 72:10 85:2
86:6 102:24 103:2
103:4,5
**lawsuits** 68:14
90:7 107:13 176:6
176:14 213:12
259:22
**lawyer** 36:1,11
37:4 38:8 39:5
40:2 41:12,20,22
41:22,24 43:15,21
44:4,5,17 45:1
46:17 47:4 59:1
59:10 72:1 88:8
144:14 150:13
154:17 174:12
**lawyers** 35:10
37:7 39:9 41:3
44:22 45:12,17,17
52:6 60:8 81:18
107:15 175:21,22
175:22,23 183:3
192:15 242:1
**lay** 148:20 157:18
183:24
**lays** 43:23 148:18
252:13
**lead** 43:7 67:16
**leading** 216:17
237:6

**leads** 70:9
**leave** 33:11 45:18
186:16
**leaves** 33:17 92:8
92:17 171:11
219:8
**leaving** 82:1
**led** 55:24 68:4,25
70:22 130:16
140:1
**ledanski** 16:25
271:3,8
**lee** 26:4
**lees** 26:5
**lefcourt** 71:3
**left** 92:19
**leg** 51:24
**legal** 43:5 91:22
114:9,10 139:9,15
179:2 206:13,22
215:5 244:14
255:7,9 271:20
**legality** 263:9
**legier** 26:6
**legitimate** 190:22
192:1 215:14
**lenard** 27:13
**lengths** 32:3
**lengthy** 43:23
**lennard** 26:7
**letter** 111:18,18
112:6,9,12,22
117:11 122:11
131:15,16 132:17
132:17 133:6,6,12
134:24,24 135:4
136:22 137:14,14
137:15,17 138:15
138:18,19,23
139:4,11 140:17
142:15,23,23,24
144:1,6 147:10,11
149:3,5 150:15,15

151:1 152:4
**letters** 44:16
**letting** 32:17
**level** 42:13 126:16
126:17 194:2
195:5,6,7,14
197:19 252:6
**leventhal** 26:8
**levin** 11:2,8,11
19:8 163:23
**lewent** 198:6
**lexington** 17:14
20:3
**liabilities** 169:10
**liability** 42:1,2,2
57:14 74:16 84:8
128:25 185:24
186:17 187:13
190:25 262:10
**liaising** 217:1
**liaison** 221:12
**lianna** 28:21
**liberty** 201:18
207:16
**license** 44:13
**licensed** 174:14
249:11
**lichtenfeld** 26:9
**lie** 263:1
**lien** 154:20,21
155:5,16 166:16
**liens** 147:21,22
148:7 154:24
**liesemer** 26:10
**life** 32:8
**light** 143:21
**likelihood** 42:22
48:16 128:1,6,16
128:19 230:4
**limitations** 211:25
**limited** 39:4 42:5
48:15 65:4 176:19
176:20,21 187:23

204:6 220:3
234:17 258:4
**line** 72:3 91:13,15
101:21 108:18
237:20 270:4
**link** 219:5
**liquidate** 261:19
**liquidated** 43:13
**liquidating** 58:24
**liquidation** 59:24
148:9,22
**lisovicz** 26:11
**list** 61:21,23 62:1
62:6,9,12 63:6
64:8 110:17 114:1
169:3 211:11
**listed** 124:10
177:25 178:8,19
179:7 181:6
206:18 211:10
241:12 251:5
**listen** 268:10,19
**listening** 32:10
268:16
**listing** 97:6
193:24
**lists** 137:21
140:17
**lite** 21:1
**literally** 162:11
**litigants** 104:15
104:16,17
**litigate** 135:24
**litigated** 230:5
**litigating** 237:18
**litigation** 9:8,17
10:20 11:4 36:23
69:4,11 70:18
71:10 72:25 73:3
73:12 74:13 82:13
82:21 83:6 84:2,8
84:20 86:4 87:8
87:10,21 88:11,16

94:7 101:23 102:5
102:6,7 104:7,20
105:13 106:2,5,7
106:11 107:2
108:3 135:24
182:12 201:7
241:14,21 244:9
244:12 245:6
254:16,19 262:19
262:21 263:12,14
263:21,22
**litigations** 105:21
**little** 55:17 57:8
63:8 71:12,14
76:7 112:11
117:17 140:9
144:11,14 146:12
161:11 164:25
169:23 247:5
249:14
**live** 145:18
**living** 245:24
**llc** 5:14,17,19 6:16
6:21,23 7:11 8:9
8:14,16 12:10,13
18:8 19:16 20:1
**llp** 2:11,15,17,20
2:22 3:2,6,11 4:11
4:16,17,20,24 5:1
5:4,8,11,23 6:2,4
7:22 8:2,4 9:7,11
9:13,16,19 10:19
10:22,24 11:3,8
11:11 17:12 18:15
19:1,8
**local** 38:23
**locate** 266:16
**logical** 230:5
**logistics** 45:8
**lokey** 11:14,18,21
**long** 40:10 57:19
84:16 98:16
104:23 107:1

141:19 163:10
167:1 179:13
180:24 197:24
218:7 231:1,4
244:8,12,22,23
245:6
**longer** 143:8,9
226:15
**longmire** 26:12
**longwinded**
209:20
**look** 60:15 76:6
84:8,15 102:21
106:4 124:5
127:22 132:4
138:4 143:1 146:7
146:19 149:18
164:11 201:1,1
222:15 228:25
229:22 250:8
**looked** 102:19,24
104:14 106:15
128:20 129:9
151:9 232:2
**looking** 38:14,19
44:19 101:25
120:4 140:17
152:24 161:4
200:11,15 265:22
**looks** 157:11,25
**loose** 148:23
**loosely** 130:12
**lose** 39:17,17
**loss** 51:3 136:4
140:11,19
**lost** 66:3 120:1
194:6 225:16
244:16
**lot** 38:18 39:18
42:25 43:24 49:11
49:15 51:18 52:4
59:10 60:8 74:13
79:6 82:17 91:19

117:17 136:9,11
138:2 145:16
150:1 247:2
**lots** 52:7 69:17
106:9 143:21
**louis** 22:7
**lower** 127:6 152:2
**lp** 31:5
**lunch** 167:2,5
**lynam** 26:13

## m

**m** 12:12 19:6
25:15 26:19,20
27:2,5 28:22
111:11 170:10
**maclay** 26:14
**magnitude** 121:15
**mail** 266:9
**mailing** 112:13
**main** 18:10
**major** 43:4 53:24
105:7
**majority** 173:8
**making** 86:12
91:8 118:21
181:19 198:21
227:23 253:6,19
254:22 255:4
**male** 96:25
**mallincrodt**
114:22 115:12
121:2,17
**man** 61:18 82:9
94:14,23 95:13
96:23 99:1 237:6
**management** 49:8
49:14,16
**mandatory**
155:17
**manner** 63:10
199:20
**manufacturers**
84:5

mara  26:8
marc  25:22 28:23
  29:9
march  190:2,5
maria  23:15
mario  23:2
marion  27:21
mark  22:17,20
  23:8 25:12 27:15
  187:8
marketing  67:21
  68:2 83:25 102:15
  102:19,21 129:1
  176:2 191:23
  193:9 250:20
markman  24:15
marshall  3:25
  17:17 31:18 75:23
  223:7
martin  26:15 30:1
  169:3,13,15
maryland  20:8,9
  62:22 100:13
masiowski  21:10
  230:15
mass  86:22 87:10
  183:1,6
massachusetts
  73:4,10,11,16,16
  83:4,11,12 85:2
  88:11
massive  136:5
masumoto  26:16
match  198:14
material  76:12
  77:3,8,9 126:10
  205:3 236:2
materials  50:4
mathew  23:20
matter  1:5 46:25
  52:20 55:16 61:4
  62:22 66:19 79:19
  91:16 97:2 109:20

133:15 138:25
  159:18 172:3
  182:17,21,23
  204:3 210:3 211:1
  212:4 224:2
  238:10 239:20
  243:2
matters  31:6,11
  33:17 66:6 145:19
  168:14 197:15
  199:18 213:7
  221:16 230:1
  235:1,1 241:15
  242:11 267:4
matthew  17:8
  22:14 23:25 24:12
  170:10 172:15
  248:22
maura  20:20 99:3
maureen  22:16
maxcy  26:17
maximizes  92:16
maximum  78:25
  87:19 104:2
mcclammy  13:7
  13:24 14:7,12,24
  15:3,8,17,22 16:2
  16:11 17:18 32:20
  33:3 34:17 35:1
  46:24 47:13 50:24
  50:25 60:16,17
  61:3,6,14,23
  62:14,16
mccloud  26:18
mcdermott  42:15
mcdonald  26:19
mckinsey  130:5,7
  130:9,15 131:3,5
mckinsey's  131:5
mcneill  200:20
mcnulty  26:20
md  20:11

mdl  69:14,17,20
  69:21,25 70:17
  73:3
mdlpc  141:18
mdls  69:17
mdo  82:18,19
  83:2,10 84:2
mdt  241:25
meagher  5:23 6:1
  6:4
mean  35:15 43:16
  55:23 57:4,9 65:3
  72:23 90:14
  101:17,25 102:14
  105:6,9,20 108:13
  117:13,16 121:10
  122:15 123:22
  128:11,22 129:16
  133:5,9,21 136:24
  144:15 148:16
  152:21 175:18,22
  177:22 178:4
  179:1,1 181:9,13
  182:20 184:5
  189:16 196:25
  199:8 205:12
  236:16 237:12
  242:23 266:2
meaning  124:25
  184:15 236:21
  252:4
means  107:12
  182:12
meant  51:6
  122:16 126:8
  175:17 179:3
  254:15
mechanism  56:11
  56:18 260:6
mechanisms  54:9
mediation  114:14
  116:19,20,23
  117:25 118:4,11

119:1 121:23
  122:1 136:2,4
  142:10 144:18
  145:10,22 159:13
  159:19 164:8,17
  164:21
mediations  116:1
  122:2,2 164:10
  244:21
mediator  162:17
  163:8,12
mediator's  146:2
  146:17 162:23
  163:5
mediators  142:10
medical  190:22
  192:1
medically  190:21
  191:25 194:9,15
medications  48:10
  54:20
medicines  152:9
meet  80:3,21,25
  135:5 197:14
  212:18 221:18
meeting  80:22
  81:11 164:1 165:9
  165:16,17,24,24
  197:12
meetings  72:13
  81:11 114:13
  164:23 165:17
  217:7 221:14
meets  217:9
meises  26:21
melanie  23:1
melissa  24:8
  29:17
member  51:17
  74:20 221:1,10
  245:24
members  67:20
  70:18,23 71:1

72:14 74:16,18
86:3 92:9 130:14
137:6,7 140:18,18
140:21 141:11
151:16 156:9,10
156:12,20 178:15
192:16 195:9
197:18 215:25
216:8 221:14,19
236:22 250:2
256:16 258:5,9
264:9 265:2
**membership**
156:5,22
**memorandum**
13:1
**memory** 236:19
**mention** 120:18
150:16 199:14
219:24
**mentioned** 88:11
88:13 126:9 130:3
156:8
**menu** 86:16
**merely** 146:16
**merit** 71:17
**merits** 34:24
41:11 43:14,25
51:18,21 54:5,5
54:14,14 57:18,24
58:6,25 59:4
72:17 73:20 92:2
160:9 161:19
162:3 164:4
165:12 234:16
237:2 240:21
**met** 221:5
**method** 193:4,5
**methodology**
123:6
**methyl** 50:13
**mic** 31:25

**michael** 17:5
21:10 24:13 27:11
28:17 29:20
110:23 111:10
113:10 139:22
150:8 156:2
162:14 163:21
166:8
**michele** 25:8
26:21 27:19
**micromanaging**
144:16
**middle** 134:11
**mike** 134:8,8
**millbank** 164:1
**miller** 26:22
**million** 37:13,14
52:13 69:2 89:9
89:22 123:15
**mind** 71:13,21
72:4 77:12,15
99:25 100:1
101:12 107:14
118:5 200:16
**mindful** 72:5
**minds** 74:10,14
255:4
**mine** 54:24 57:4,6
57:7
**mineola** 271:23
**mines** 243:9
**minute** 34:13
67:18 94:9 144:3
262:12
**minutes** 107:10
**misbranding**
67:21 68:2
**mischaracterizes**
245:11
**misconduct**
102:15,16,25
129:3,6,25 130:3
130:9 131:2

**misdescribing**
117:8 119:3
**misrepresentation**
103:2
**missed** 40:18
**missing** 187:7
**misspoke** 122:16
186:14
**misstate** 258:24
**misstates** 107:22
**misstating** 107:9
**mistake** 68:12
216:15
**misuse** 247:2
**mitch** 110:24
159:24
**mitchell** 18:20
21:25 25:10
**mitnick** 26:23
**mix** 198:14
**model** 194:17,19
194:24
**modification**
184:18 223:2,14
223:17 226:16
**modified** 183:20
184:2,8 188:4
224:1
**modify** 225:2,19
226:18
**molton** 26:24
**moment** 45:22
162:8 163:25
196:18 225:19
267:8
**momentarily**
171:14
**momentous**
238:19,19
**monaghan** 20:20
99:3,3,8 167:14
169:2,13,17
171:10,13,21

175:2,10,16
177:21 178:2,13
179:21 181:4,7,23
183:22 184:4,12
186:4 190:23
191:5,8 192:2,7
193:11 196:4,25
198:12,13,21
199:3,7,10 200:10
200:13,23 201:24
203:18 206:2
214:9 233:20
244:15 245:10,19
245:23 246:3,10
252:12 253:9
256:3,6,11 260:8
261:21,25 262:11
264:15,19,21,23
265:5,7,9,14,22
265:25 266:2
**monaghan's**
219:4
**monaghan's**
197:5
**monahan** 214:15
214:16,21 216:2,9
216:13 217:16,22
218:2,10 219:10
223:20,22 225:4
225:22 226:12
227:14 232:21
233:21,23 234:5,8
234:10,13,14
237:8,25 239:9
240:13 241:1,4
**monetary** 83:20
**money** 37:13
40:16 41:25 52:9
89:20 93:19 98:6
115:9,17 122:19
123:24 124:20,22
125:13 127:17,20
137:8,11 140:13

152:13,14,15,16
152:21
**monies** 85:20
**monthly** 31:6
**months** 81:4
141:14 177:14
256:19
**morales** 16:6,9,16
21:17 47:1,2,4,9
47:14,16,18,22
50:7,19 51:2,12
52:1,23 53:1 54:2
54:6,17 55:1,6,10
55:13,16,20,22,25
56:3,6,9,13,15,19
56:22 57:4,18,23
57:25 58:3,4,7,11
58:13,19,21 59:2
59:6,12,16,20,22
59:25 60:5,12,14
246:14,16,18,19
246:20,23,25
247:9,13,18
**morning** 31:2,17
32:5 34:8,10 41:9
47:17,18 61:15
67:9,15 76:2 94:3
94:6 95:2 103:8
110:18 111:13
113:12 268:25
**morrisey** 26:25
**mortgages** 148:8
**mortimer** 71:2
73:13 190:17
191:21 193:2
194:5,12,20
217:21 218:11
**motion** 12:17,21
12:25 13:1,6,10
13:14,18,23 14:1
14:1,5,6,11,15,15
14:17 15:1,2,7,11
15:16,20,21 16:1

16:5,10,15 31:14
31:14,15,16 39:20
41:16 46:21 47:1
47:2,5 54:4 58:5
72:9 73:17
**motions** 2:2 14:22
32:6,11 33:6,11
82:25 86:1 130:22
131:22,24 132:1
270:5
**moultrie** 22:3
**mourned** 80:12
**mouth** 119:22
185:23
**movants** 32:13
**move** 32:10 46:20
79:18 153:5 220:9
247:19
**moved** 73:15 90:5
149:16
**moving** 60:2
142:15
**mplpc** 117:7
**msg** 149:13
**muha** 27:1
**muhammad**
25:23
**multi** 12:2,4,6
69:11 97:15
**multiple** 216:23
266:24
**multiplying**
123:15
**multitask** 76:8
**multitude** 229:24
**mulvihill** 27:2
**mundane** 86:15
**municipal** 147:4
222:2 238:4
260:25
**municipalities**
116:16,17

**municipality** 21:2
**murray** 27:3
**mute** 33:25
171:21 225:23,23
227:22 231:16
232:21,22 265:20
**myriad** 143:22
**mythical** 125:22

**n**

**n** 17:1 31:1 66:12
66:13 109:8,15,15
109:16 111:11,11
167:23 170:11
171:24,24 248:5
270:1 271:1
**nachman** 165:20
165:25
**nadim** 27:4
**naftalis** 11:2,8,11
19:8
**name** 72:7 73:12
81:5 85:2,4,6,15
85:19 89:7 94:3
101:1 108:24
150:10 170:1
208:5,7 257:24
264:7
**named** 70:19,23
71:16 72:24 85:10
85:23 86:5,17
89:6 100:11
174:18 175:13
177:12 179:8
213:11 250:11
259:21
**names** 218:12
**nann** 27:5
**narrow** 199:1
215:10 224:1
227:1
**narrower** 209:9
210:9 236:2
259:16

**nathan** 138:1
**nathaniel** 26:22
**nation** 21:3
103:10
**nationals** 185:8
**nations** 147:5
222:3 238:5 261:1
**nature** 182:24,25
183:4 191:14
192:4 209:12
211:16
**nauseum** 244:22
**ncsg** 157:7,10,11
157:21,24,25
162:1,2,6
**ne** 21:11
**near** 118:12 130:8
**necessarily**
106:12 107:3
239:7
**necessary** 2:13
4:4 8:12 11:6
127:17 187:18
194:9 256:21
257:7
**need** 39:5 43:3,15
43:21 44:4,7
56:17,18 93:5
138:6 163:1
169:11 186:24
189:12 195:15
198:11 209:21
215:6 218:7
225:19,23 226:20
227:17 229:14
240:11,19 247:19
**needed** 35:8
146:18 212:4
243:10 257:14
**needs** 84:13,19
151:13 163:3
226:6,10,18 228:2

[negative - objected]    Page 36

**negative** 210:14
**negotiate** 120:23
  136:19
**negotiated** 95:10
  95:14 115:22
  241:20
**negotiating** 38:22
  76:9,17,18 104:1
  158:13
**negotiation** 78:19
  78:25 104:10
  105:8 106:15
  119:12 137:2
**negotiations** 78:6
  95:11 96:3,17
  104:5 117:24
  118:19,20 119:8
  144:25 206:4
  244:12,21 245:1,5
  245:7
**neiger** 27:6
**neil** 25:20
**neither** 64:15
  220:5
**nervous** 91:15
**net** 124:7 157:3,4
  157:12,12 158:1
  158:18
**never** 54:21 81:13
  96:16 118:20
  140:15 177:13
  207:3 215:3 217:2
  217:4,6 221:1,11
**nevertheless**
  193:8
**new** 1:2 17:15
  18:4,18,18 19:4
  19:11 20:4,18
  66:12 68:5 69:7
  72:8,13 86:5
  109:16 165:21
  167:22 170:10
  183:1 209:11

  210:18
**newark** 21:5
**news** 80:15
**nexus** 239:14
**niceties** 187:16
**nightcap** 246:10
**nine** 79:10 98:16
  98:22 123:21
  124:19 205:15
  261:16
**nj** 21:5
**noat** 123:8,11
  124:20,24 125:2
  125:12,16,19
  126:16 127:11
**nobody's** 63:18
**nominal** 124:3,6,7
  124:9,17 125:23
  157:2,4,11 158:1
  158:18
**non** 19:2 59:10
  94:8 97:13,24
  99:11 104:7
  107:15 168:16
  227:11,25 251:10
  251:14
**nonconsenting**
  157:8 164:3
  165:11
**nonprofit** 49:14
**normal** 207:9
**normally** 140:12
**northern** 69:12
**note** 31:10,22
  146:16 149:7
  156:13 169:18
  201:9
**notebooks** 266:18
**noted** 72:3 171:4
**notes** 83:25 161:4
**notice** 2:4,5,5
  12:21 13:5,18,22
  14:5,10,10 15:1,6

  15:6,20,25,25
  53:7 179:22,24
  185:5 205:6,9,19
  205:22,24 206:3,4
  206:13,22 227:10
**notion** 103:17
  117:25
**november** 264:18
**now's** 149:22
**npv** 127:12
**nuisance** 138:5,7
  138:11 139:7
**number** 32:10
  42:15 61:8 78:9
  86:25 91:19
  123:14,23 127:4
  137:21 142:10
  150:22 163:1
  176:19,20,21,22
  189:3 193:20
  198:4 210:24
  213:22 218:23
  222:3 236:7,25
  267:25
**numbered** 147:10
**numbering**
  150:22
**numbers** 97:1
  124:10
**numbery** 140:10
**nunez** 27:7
**ny** 1:14 17:15
  18:4 19:4,11 20:4
  20:18 271:23

      **o**

**o** 1:21 31:1 66:13
  66:13 109:8,16
  111:11 171:24
  271:1
**o'neill** 94:16,19
  95:1,4,17,19,20
  96:20 98:12 112:3
  112:24,25 113:7

  113:11 117:8,13
  117:15 119:6,25
  120:3,9,11 127:2
  128:11 129:15,18
  132:19 133:11,18
  133:23,25 134:6,9
  134:22 135:14,16
  135:21 137:1
  138:21 139:4,11
  139:16 143:12
  144:12,15 146:13
  160:12,20 161:2
  162:19 163:14
  164:5,15,20,24
  165:13,17
**o'neill's** 98:18
**obaldo** 27:12
**object** 89:17 92:4
  107:21 110:3
  112:1 118:2
  130:17 133:2
  136:21 138:13
  141:23 145:8
  148:12 149:2
  162:24 168:11
  172:9 175:10
  177:21 178:3
  181:4 183:22
  184:4,12 186:4
  189:25 190:23
  193:11 198:13
  201:24 206:2
  214:9 216:2,9
  217:16,22 223:8
  225:4 227:14,24
  237:5 239:9
  240:13 244:15
  248:16 256:3
  260:8
**objected** 56:24
  183:13 205:15
  208:21 225:12
  247:16 259:10

**objecting** 62:10
65:19 76:11,19
77:6,22 78:1
110:20 122:4,19
123:9 127:5 181:8
205:10,12 244:6,8
**objection** 16:9,9
16:14 33:21 47:8
50:22 78:2 81:20
81:24 90:1 91:7
91:20,23 92:5
95:13 112:6 113:2
117:5 119:2,20
121:25 126:20,24
127:1 128:4,7
129:14 132:16
134:16 140:24
141:20 147:18
151:15,20 152:4
155:7,12,18
157:14 158:3
159:1 165:13
170:22 178:14
179:20 186:24
192:2 196:4 218:9
218:9 219:4
223:20 226:13
227:23 228:13
237:6 245:10
252:12 256:9
261:21
**objectionable**
217:25
**objections** 66:17
66:25 107:7 144:5
**objective** 139:1
237:9
**obligations**
148:11 258:19
**obliged** 239:17
**obstacles** 35:17
**obtain** 68:13
74:11 208:14

243:23
**obtained** 68:19,21
253:2,3
**obtaining** 70:13
243:22
**obvious** 144:13
**obviously** 32:16
32:16 40:9 46:6
51:4,18 77:14
80:12,14,18 81:11
86:7 98:14 107:8
158:5
**occur** 71:6 123:20
**occurred** 75:10
118:10 124:25
146:4 185:5
**october** 71:8
95:15
**offered** 105:2,6,10
112:7,14,20
252:22
**office** 20:8 47:11
165:21 267:15,22
268:11
**offices** 164:1
**official** 4:12 6:18
7:2,12,22 8:9,21
18:16 38:10
111:15 113:23
140:7 156:20,20
156:23
**officio** 156:10
**offshore** 85:19,23
106:7
**oh** 33:25 49:2
56:19 58:7,11,19
59:20,25 133:16
134:13 171:20
194:25 230:20,22
264:2
**ohio** 69:12
**okay** 31:2,21 33:5
34:4,5,8,15 35:1,5

35:7,19 36:7
39:16 40:4 41:6
41:14 44:18 45:3
45:4,10 46:1,11
46:19,25 47:22
50:3,7,18 51:12
53:1 54:2,6,17
55:10,13,22,22,25
56:3,6,9,13,14,19
57:23 58:4,7,11
58:12,13,13,19,19
58:20 59:2,12,20
59:20,25 60:5,12
60:15 61:1,13
62:17,20,25 64:2
64:7 65:23,25
66:5,12,15,24
67:12 69:16,19
71:1,12,25 75:21
75:25 76:23 77:2
79:18 80:2,24
81:2,14 82:4,7,8
86:1,21 87:24
89:5 90:4 93:23
94:13,16,22 96:22
97:11,21 98:6,12
98:25 99:6 100:11
100:15,18,19,22
101:16,21 102:14
103:12 107:16
108:1,14 109:2,18
110:6 111:2,5,10
111:13 112:1,23
113:1,9,12 115:1
116:9,24 118:5
119:16,24 120:8
123:1,3,5,19
128:21 131:2,6,17
133:9,21 134:21
135:20 137:18
139:18,21 140:4
141:9,12 142:9,14
142:22 143:10

144:11,25 145:3
146:21 147:1
148:5 149:25
150:4,6 151:4,10
151:21 152:6
153:5,21 154:23
155:2,12,21,23
156:1,8,19 157:10
157:20 158:21
159:23 160:7
161:15 162:10,13
163:13,16 166:4
166:21 167:9,11
167:22,25 168:8
168:12,20 169:1
169:13,16,25
170:3,4,13,21,23
171:9,11,15,16
172:1,9 173:1,6,9
174:1,7,14,17
175:12,25 176:16
176:25 178:2,13
179:11 180:4,14
180:17,22 181:2
181:13,18 182:5,5
182:11,17 183:12
184:1 185:22
186:15,22 188:17
188:19,19,25
189:21 190:12
191:18 192:7,17
192:23 193:14
194:3,3,25 195:3
195:3,12,18 196:1
197:5 198:2 199:3
199:7,10,21 200:1
200:9 201:15
203:23 204:2,8
205:1,9,19 206:16
206:20 207:10,18
207:21 211:15
214:20 215:17
217:12 218:21

219:6,20 221:24
222:5,15 223:11
224:15 228:18,20
228:23 229:12
230:11,11,20,22
231:5,6,22 232:4
232:14 233:1,16
233:20 235:7
238:2 240:25
243:17 244:3
245:4,14,16,18,21
246:8,25,25
247:18,24 248:4
248:15,18 249:13
249:21 250:3,6,10
251:17,21,24
252:8 253:25
254:22 255:11,14
255:17,25 256:21
257:15,17 258:1
259:7 260:22
261:25 263:25
265:4,5,16,19,19
266:6,11,20 267:8
267:9,10 268:6
**old** 271:21
**omits** 184:13
**omnibus** 2:2 31:7
31:7 32:19 60:20
**once** 43:12,12
63:7 64:24 145:17
182:13,16 197:14
209:17 242:15
**one's** 43:11 121:6
**ones** 78:9 156:12
178:11 180:4
193:23,24
**ongoing** 59:17
207:5
**open** 64:22 71:24
77:4
**opened** 116:12

**opening** 244:8
**operating** 154:5
237:12,15
**operation** 86:9
**operational** 85:11
85:16
**opiate** 143:18
**opinion** 41:2
42:11,15 102:1
133:20 151:7
197:17 199:18
215:5
**opioid** 51:10
69:17,18 70:12
72:22 75:14 94:8
99:11,16 100:2
101:2,4,6,7,8,12
101:12,19 102:4,6
114:23 115:13
127:17 151:13
155:4,16 166:16
176:2 177:18
178:7 185:16
190:19 250:19
251:4
**opioids** 51:3 99:17
100:8 194:18
**opportunity**
57:15 80:24 81:7
131:7,10 132:25
135:5 161:21
231:8 237:20
240:1
**opposed** 36:22
41:25 43:2,12
44:9 52:16 53:18
54:1 134:4 143:6
153:13 154:13
155:14 204:4
268:10,16
**opt** 76:12,17,20
77:6,22 78:22
96:3,8,15 121:24

122:4
**option** 53:17 79:4
**options** 60:11
**oral** 146:20 193:6
223:8
**order** 3:19 13:5
13:22 31:10 32:19
33:13 34:18 46:21
58:8,15,16,17,23
60:15 63:9,11
64:21 66:18 74:11
76:6 83:11 109:20
111:21 168:2
169:23 172:3
180:20 200:7
201:20 202:1
204:20 206:19
207:6,14,17
208:13 209:1,23
210:15,20 211:5
212:11,17,18
222:12,16 223:17
223:18 224:3,3,6
226:7,16 227:13
232:16 238:11
239:23 244:12
248:10 252:22
256:22 257:5,8
261:6 266:9,10
**ordered** 69:25
**orderly** 237:3
**orders** 32:25
33:16 46:22 83:7
88:14 170:14
**oregon** 172:16
248:25
**organization**
145:24
**organized** 52:17
**organizing** 216:19
**originally** 61:21
**osmond** 264:14

**ostranzan** 150:16
**otterbourg** 10:7
10:11,13
**outcome** 136:5
137:8 140:6
**outside** 76:13
104:11,12,15
106:10 108:3,4,5
108:6 138:14
149:11 173:18,19
173:22 174:2
176:10 188:12
196:23 198:25
249:22,24 260:9
**outstanding**
177:18 178:3,4
**outweigh** 234:20
**overall** 43:22,24
**overbearing**
35:18
**overdose** 54:19,19
54:19 57:9
**overnight** 267:12
**overrule** 81:24
119:20 127:1
256:9
**overseeing** 136:15
**oxycontin** 47:24
48:2,4,10 55:3,14
57:2 67:22 68:2
83:25 191:24
193:3 247:3
**ozment** 13:2
19:16,21 37:2
45:5,5,11,12 46:7
46:14 100:20,20
100:23,25 101:1
146:23,23 152:11
153:22 155:11,20
166:4,7,9,20
232:19,21,22,23
233:2,16,18 264:3
264:4,6,7,18,20

264:21,22,25
265:4
**ozmet** 150:6,7,9
150:10 151:2,3,19
151:22
**o'connor** 27:8
**o'donnell** 27:9,10
**o'neil** 27:11

**p**

**p** 17:1,1 24:24
29:25 31:1 167:22
167:22
**p.a.** 21:9
**p.c.** 7:1,6,8 10:7
10:12,13
**package** 34:20
112:8 142:18
**page** 97:5,15
113:17,17 114:17
122:21,24,25
127:23 131:16,18
134:23 137:13,16
137:17,19 140:17
142:22 147:10
150:15,22,24
151:1 169:10
175:7 177:1 182:6
188:20 199:21
200:22 201:2,3
204:19 206:18
217:20 225:11
226:18 250:7
253:25 270:4
**pages** 89:19 98:8
132:8 192:24
**paid** 53:23 79:13
96:14 125:22
**pain** 47:24,25
49:8,14,15,16
**pamela** 29:8
**papers** 35:15
50:21 51:10 212:4

**paragraph** 58:18
67:19 70:8 72:20
72:23 74:7,15
110:14 113:17,20
114:17 122:8,22
127:23 128:8,22
128:23 131:3,20
135:1 139:24
143:13 144:8
147:10 150:20
151:1 162:18,21
175:3,7,25 177:1
182:6 188:20
199:21 208:11
210:16 213:9,14
225:2,6,10,19
226:11,18 228:25
229:1 235:10
250:8 253:25
**paragraphs**
137:21 213:25
**parallel** 215:7
**paraprofessional**
3:20
**pardon** 91:6
171:22 210:4
**park** 18:17 19:18
**parker** 42:12
**parkins** 27:13
**part** 37:18 64:16
65:18 74:15 83:5
86:7 96:16 102:7
102:16 105:6,7
121:23 122:1,18
125:4 127:25
131:6 135:19
141:19 143:20,25
145:5,6 155:5,10
160:18 163:9
166:17 254:20
255:22 268:17
**participant**
116:19,22

**participate**
114:12 156:13
216:8
**participated** 78:7
122:3 130:15
227:10 228:7
**participating**
145:23 268:20
**participation**
114:14 129:7
130:4
**particular** 87:9,15
106:10 115:2
154:11 175:3
176:3 187:7
188:21 218:14
222:19 223:5
224:12 227:11
**particularly**
56:17 59:13
232:13 262:18
**parties** 33:9 52:4
96:3 107:4,8
117:7,8 119:13
135:11 137:9
152:22 157:4
158:13 160:19
165:25 174:8
187:2,22 197:9
204:8,23 206:5,17
206:18 208:20
211:20 212:18,19
225:12 227:9
228:6 229:21
235:15 237:16,17
244:10,24 245:7
259:10 266:10
**partnership** 8:21
9:1,3
**parts** 216:16
251:19
**partway** 244:16

**party** 60:2,23
73:25 74:12 75:7
75:14 86:16
116:24 131:5
179:22 183:12
212:25 214:4
238:24 239:17
260:17
**passed** 47:22 48:6
**passing** 80:12
152:25
**passionately**
140:22
**path** 60:9,10,10
**paths** 60:7
**patience** 32:15
**patrick** 26:17,25
27:11
**pattern** 55:11
**patterns** 78:11
**paul** 20:10 21:9
21:14 22:9 28:15
28:22 74:4 230:14
**pay** 37:15 52:9
105:25 108:2
**paying** 92:13
208:14 242:1
**payment** 47:6
51:22 52:16,22
53:9 54:4 98:23
252:15 258:19
**payments** 79:10
98:15 124:24
125:2,11,16,16
181:15 190:4
252:10
**payne** 12:22 13:1
13:11
**payouts** 123:20
**peace** 87:4,7,12
87:22
**peacock** 27:14

**pec** 80:20,21,21
160:9 161:18,21
161:23
**pendency** 75:6
**pending** 37:24
107:13
**pennsylvania**
71:10
**people** 31:23,24
32:7,10 33:6
35:11 37:1,5
38:13,18 40:11
45:14,18 46:6
51:16 52:7,17
53:9,22 54:12
57:15 60:11 80:12
85:2 86:17 91:20
149:11 153:18
154:24 158:22
162:18 166:14,15
167:1 198:5
231:22 267:13
268:1
**percent** 48:24
68:23 123:16
140:15 185:12
**percentage** 123:7
**percentages**
123:12 126:4
**perdue** 103:3
**perdue's** 94:8
**perfect** 31:23
224:9
**performance**
154:19
**period** 2:14,15,21
3:5,6,14,16,20,21
3:22,25 4:5,6,15
4:16,23,24 5:7,9
5:16,17,25 6:2,10
6:11,19,21 7:5,6
7:14,16,25 8:2,14
8:24 9:1,9,11,18

9:20,25 10:2,12
10:21,22 11:7,9
11:17,19 12:3,5
12:12,14 68:16
98:16 152:8 190:2
190:5,8 197:21,25
198:15 199:1,15
242:1
**periods** 198:14
**permanent** 50:12
**permission** 14:15
212:14 229:14
**permit** 40:5 78:22
93:13 161:7 267:2
**permits** 41:21
**permitted** 161:13
**permitting** 254:12
268:17
**perpetrated** 84:11
**person** 36:3 42:20
53:25 58:23 91:23
110:22 199:13
267:3
**personal** 37:15
38:9,21,21 43:17
45:13 46:15 52:14
55:15 56:12 74:20
75:17 80:13 91:3
113:21 125:5
127:15,19 137:24
138:3 176:21
239:19
**personally** 81:1
106:8 114:12
120:25 123:3
130:15 137:14
239:1,3,22 244:25
**persons** 178:22
**perspective** 77:8
77:10 148:25
152:12 187:10,11
230:8 237:19,19

**peter** 23:3
**pharm** 103:3
**pharma** 1:7 7:3
7:13,23 8:22 13:7
13:24 14:8,13,17
14:24 15:4,9,18
15:23 16:3,11,14
31:5 49:11 67:20
68:1,14 69:1,5,6
72:24 73:5,24
75:1 85:17 120:14
136:15 167:12
**pharmaceutical**
50:9 177:5 258:12
**pharmacies** 84:5
**phase** 95:10 116:1
116:22,22 118:19
118:19 119:1,5,7
119:11 136:4
142:9 144:18,19
145:22 162:17
**philanthropy**
221:6
**philip** 17:7 21:23
167:13
**phillip** 166:25
**philosophy** 32:6
**phone** 35:11
**phrase** 128:8
254:23
**phrased** 165:1,4
178:19
**phrasing** 178:18
**physicians** 49:18
**pick** 64:25
**picked** 264:10
**pickett** 198:6
**picture** 102:10
230:15
**piece** 83:22 87:11
92:7,13,15 95:25
96:6,9,15 103:17
103:22,25 104:6

104:25 105:2
**pillsbury** 19:1
**pinpointing** 91:22
**pittman** 19:1
**place** 20:10 38:2
59:10 110:19
117:21 119:8,12
159:2 177:12
212:13 221:13,15
253:12
**placed** 197:19
**places** 105:17
**plains** 1:14 2:7
**plaintiff** 50:16
70:5 107:8,12
165:22
**plaintiff's** 107:4
**plaintiffs** 67:25
70:1,9 72:21 74:2
74:23 79:12
107:15 125:5,6
174:18 175:13
205:7 250:11
263:18
**plan** 3:22 31:5
34:22 37:11,12,18
37:24 38:1 39:23
39:25 40:10,16
41:2 43:18 51:8
51:22 52:9,11,16
52:19 53:4,21
54:8,8,18 56:10
56:11 57:13,13,13
60:6,22 65:21
66:17,17 74:9,11
75:9 76:10,17
77:24,25 78:19,22
78:22,23 83:14
92:14,20 93:19
95:7 96:3 103:19
103:24 105:25
107:20 111:16,18
111:20 112:17

115:2,18,19,20
116:2 118:15
122:19 125:1,4,6
127:11 136:3,8,13
143:3,15,16,21
145:7 147:9,11
148:11,24 149:8
152:8 153:8,9
172:5 179:11,18
179:19,24,25
180:10 181:2,15
183:13,20 184:1,7
184:11,11,18
185:3 188:2
205:16 208:21
223:25 224:7,10
224:11,20,24
225:13 226:16
228:9 236:3
238:23,25 239:6
239:15 240:12
242:5,22 243:13
244:6,24 247:16
248:9 251:17,21
251:25 252:3,7,9
252:11,18,20,23
253:8,21 254:8,11
254:21 257:9
258:16 259:11
260:18 261:16
262:10,20,23
263:11
**plan's** 54:10
**planning** 167:2
192:24
**plans** 78:7 180:11
**platform** 190:8
**play** 70:17 136:9
255:8
**plea** 69:1 129:10
129:20 155:5
166:17 264:11,23

**pleadings** 47:19
53:14 144:6
**please** 31:24 40:9
44:10 66:8 94:23
109:11 111:6
118:12 142:2
148:3 163:18
167:18 170:6
171:17 182:20
185:23 189:14,24
195:5,12 196:14
200:9 205:25
216:5,13 247:25
253:17 258:24
**pled** 189:1,18
207:10
**plenty** 79:20
**plevin** 27:15
**plimpton** 20:15
174:6,7 176:4,11
182:3,4
**pm** 269:2
**podium** 33:2
**pohl** 27:16
**point** 36:13 37:7
38:7,8 39:2,12
43:9 44:3,5,6,9,23
44:24 45:2 51:14
52:19,25 54:16
58:18,24 59:3
61:19 64:15 84:22
86:23 92:21 109:3
126:22 127:3,12
134:4 138:4
142:13 145:10
163:3,6 167:1
171:8 174:23
175:3 198:20
220:10 244:23
247:17 266:12,13
267:15
**pointed** 46:3
124:15

**polk** 3:11,15,17
17:12 75:24
**pope** 50:8,11
**population** 48:18
48:23
**porter** 2:20,22
27:17
**portion** 68:24
104:22 151:12
200:14
**portions** 251:24
**pose** 216:15
**position** 108:9
132:22,22 134:2
134:19 136:18,22
160:23 166:16
183:20 186:16
187:22 188:8
191:11 209:18
233:9 242:12
244:1,5
**positive** 210:14
**possession** 3:4,14
**possibilities**
104:17
**possibility** 122:7
**possible** 32:3,4
88:20 106:4
120:23 153:3
183:19 185:9
229:21 230:4
262:18
**possibly** 186:3
214:17 227:12
**post** 153:10,11
**potential** 42:1,1
48:16,16,17,22
57:14 73:20 84:8
86:19 97:24
105:12,17 123:11
151:7 186:8,10,11
187:10,11 235:8
254:17

**potentially** 93:19
98:16 104:21
115:12 118:23
120:5 240:7
**power** 42:7
**practice** 46:16
129:7,12,21 130:1
130:11 174:14
183:3 190:7
197:12 207:9
217:2 231:9 249:9
249:10,11
**practices** 130:11
176:2 250:20
**pray** 138:6
**preceded** 117:2
189:10
**precedent** 145:5
**precise** 81:16
82:22 142:20
146:14 173:23
191:14 192:4
198:1 220:1
**precisely** 193:21
220:20
**precision** 144:15
145:17
**preclude** 101:22
**predated** 164:19
164:21
**preface** 194:4
**prefer** 64:24
241:20
**preferable** 172:19
**preis** 18:21 36:8
36:10 38:14 45:21
45:21,24 46:1,12
145:25 146:13,16
162:18
**premature** 52:15
58:10 59:4,23
**premium** 87:5,8
87:11,16,22 92:7

92:14,15 95:25
96:6,9,15 103:17
103:18,22,25
104:6,25 105:2
**prepare** 123:3
**prepared** 63:14
127:4 186:1,18
232:16 267:15
**preparing** 114:2
**prepetition** 90:7
**prescribed** 47:24
47:25 190:20
**prescribers**
191:23 193:8,10
**prescribing**
194:16
**prescription**
48:20 50:9 55:3
55:12,24 100:8
176:2 250:19
**prescriptions**
191:24 194:10,14
**present** 21:19
44:8 124:7,17
157:3,4,12,13
158:1,18 160:9
161:18 224:11
263:16
**presentation**
73:24 132:25
160:15 161:20,24
162:2,6 164:18
165:18,20
**presentations**
72:15 131:8 133:7
135:5,8 160:4
161:5,9 164:3,16
165:12,13
**presented** 43:4
127:11 165:25
201:25 204:5
234:1,12

**presenters** 266:13
**presenting** 43:12
123:23
**preservation**
184:8
**preserving** 254:8
**press** 27:18
102:15
**pressed** 102:5,7
194:5
**pressures** 229:25
**presumably**
105:25 263:20
**presume** 228:6
**presuming** 224:19
226:15
**pretty** 42:10
43:19,25 50:1
55:17 127:19
154:20 159:8
**prevent** 84:22
147:22
**previous** 226:10
**previously** 98:1
194:4 217:6
**prices** 152:17
**primacy** 172:17
**primarily** 131:13
168:15 169:9
**primary** 104:19
145:24 187:12
193:4,5
**prime** 5:14,17,19
**principle** 51:20
53:24 235:17
238:16
**printed** 150:21
**prior** 88:21 89:5
90:21 92:8 107:22
141:18 170:24
207:5 238:23
242:18

**prisoners** 46:16
**prisons** 154:13
**private** 79:12
125:5,8,9,11
144:20,21 158:11
174:18 175:13
201:20 207:15
210:25 211:2
212:17,20 213:8
231:18 250:11
**privilege** 81:11
118:11 159:9,9,13
159:20
**privileged** 131:22
131:24,25 159:3
182:1
**pro** 21:16,17 32:5
32:11,12,23 33:24
36:1 42:17 45:6
45:18 47:2 53:23
**proactive** 268:13
**probable** 132:11
**probably** 69:22
71:13 79:15 81:2
81:16 82:2 87:3
97:21 112:10
132:23 144:3
197:23 200:23,25
246:5 262:3
**problem** 64:18
175:5 214:15
**problems** 47:23
**procedural** 31:22
54:13 214:23
215:11,14 260:6
**procedure** 37:19
37:22 38:1,2,4
229:19
**procedures** 34:22
43:16,19 53:5,5
54:1 63:9,11
64:20 66:19
109:20 111:21

168:2 170:15
172:3 248:10
**proceed** 32:17
53:11,22 62:24
186:1,18 207:24
209:22 232:9
247:6 248:21
254:12 257:20
267:17
**proceeding**
199:24 201:15,16
201:17 203:25
204:9,18 205:6,9
205:19,22,24
206:6,23 207:1,5
210:5 211:16,19
211:25 212:1,21
213:1 215:4
219:11,13,18
265:11
**proceedings** 1:12
75:6 156:14
201:19,20 207:7,8
212:13,17,24
218:6 233:25
234:22 235:25
236:14 269:1
271:4
**proceeds** 126:10
258:18
**process** 51:6
59:24 63:22 90:25
106:15 112:15,15
112:16 116:19,20
116:23 143:22
179:2 215:3
**proctors** 262:3
**produce** 70:1
100:8
**produced** 70:1
73:3 152:9
**producer** 100:7

**product** 48:19
71:22 91:12 100:3
101:4,6,7,12
130:19 133:4
193:4
**productions**
82:21
**products** 94:8
99:11
**professional** 2:10
2:12,19,25 3:10
3:20 4:1,10,19,22
5:3,6,9,13,17,21
6:6,15,21,25 7:10
7:16,20 8:7,11,14
8:19 9:5,11,20,23
10:2,6,12,16,22
11:1,5,9,13,19,23
12:5,14 150:12
154:17 218:4
267:3
**professionals**
173:15
**profits** 194:7
**prognotions**
132:3
**program** 194:7
**programs** 152:24
153:1 190:19
**progressed** 84:2
**project** 3:21 99:13
99:22 101:14
**projected** 123:6
**promptly** 143:17
**pronouncing**
109:8 199:23
**proof** 12:17,21,25
13:10,18 33:7,11
43:4 270:5
**proper** 107:11
191:16 192:13
195:10,13 210:2
232:15 257:12

**propose** 61:11
**proposed** 13:5,22
33:13 43:18 52:3
107:2,19 127:10
180:20 208:22,24
210:12 224:20
226:16 243:13
259:11,14
**proposes** 37:12
**prospect** 237:17
241:14,16,22
244:8
**prospective** 253:2
253:4
**protected** 83:6
**protection** 75:4
237:5 238:14
252:21
**protections** 74:17
74:25
**protective** 88:14
213:6
**protector** 249:15
249:18,21 257:3
258:4,8
**protector's**
252:14
**protectors** 208:15
250:1,3 256:24
259:5,8,15 261:10
261:12,18
**protects** 58:18
**prove** 41:11 58:1
138:6
**provide** 51:6,22
63:2 73:24 138:10
138:23 151:10,24
183:21 184:2,8
209:16 233:9
235:14 252:9,19
**provided** 53:10
68:25 175:21
176:4,10 179:22

**184**:24 196:6,24
205:6,9,19,22,24
206:14 222:22
223:2 227:10
233:11 251:22
**providers** 4:22
190:4
**provides** 51:23
79:9 235:13 254:4
254:16
**providing** 141:24
**province** 7:11,15
7:17
**provinces** 222:18
222:21
**provision** 96:4
136:8 150:17
152:8
**provisions** 147:14
252:3,5
**proxy** 149:4
**prudent** 179:5
251:9,13
**public** 32:1 33:2
51:9 71:21 76:12
82:14,24 83:1,3,9
83:10 115:2,2,10
115:17,21 124:5
124:15 125:8,11
130:24 138:5,7,11
139:6 144:20,21
145:13 146:3,6,7
149:8,15 151:13
152:1,14,15,18
153:10 154:7,10
154:11 156:16,19
158:11 162:20,21
268:8,15
**publicized** 83:3
**publicly** 83:2,15
88:18 130:21
141:23 142:5,7

**published** 89:20
217:20 219:16
**puiggari** 27:19
**pullman** 18:8
67:10
**punishing** 137:9
**punitive** 147:14
**purchase** 96:15
**purdue** 1:7 7:3,13
7:23 8:22 13:7,24
14:8,13,17,24
15:4,9,18,23 16:3
16:11,14 31:5,6
49:10 53:16 58:17
67:20 68:1,13
69:1,4,6,25 72:24
73:2,5,24 75:1
82:13 85:12,16,24
86:9 88:15 89:10
100:4 102:13,16
102:21 115:11
116:21 120:14
121:11,19 129:10
129:17,20,20
136:15 138:6
140:23 155:6
160:10 161:19
162:3 166:17
167:12 174:3
176:1 182:13,15
184:14,15 185:8
185:15 186:24,25
188:10,11,14,15
189:1,18 194:13
194:18 197:13
207:10 213:17
223:3 229:7,11
240:9 245:25
249:25 250:19
254:9,17,20 260:2
263:19
**purdue's** 90:21
120:23 129:6,25

130:4 152:18
213:11 259:21
**purdue's** 177:13
177:14 190:4,7,19
**pure** 108:19
**purport** 138:24
139:12
**purports** 122:18
**purpose** 112:7
113:3 173:25
190:22 192:1
237:1 249:17
**purposes** 34:13,19
34:21 35:6 41:10
101:6 115:10
171:3 177:19
187:19
**purses** 127:14
**pursue** 76:13,20
153:19 214:7,24
260:7
**pursued** 82:18
214:5 215:12
**pursuit** 104:20
**put** 35:17 46:2,3,9
49:15 51:7 58:15
63:17 69:22 83:3
86:4 99:17,18
108:7 119:21
136:18 139:12
142:10,14 157:2
158:6,19 185:22
210:14 212:19,25
225:23 234:25
238:8 241:24
242:4,21 243:15
**puts** 153:12
**putting** 35:9
45:14 199:22

**q**

**qualification**
132:20,21

**qualified** 174:12
183:8 214:21
**qualify** 260:17
**quantified** 97:23
**quarropas** 1:13
**quasi** 42:2
**quest** 145:16
**question** 35:3,22
42:6 56:15 65:20
71:21 72:2 73:7
77:18 78:8,17
79:16,24 81:15
86:2 88:24 89:25
90:5,10 91:7
93:14 95:17 99:10
100:3,21 101:14
103:23 104:4,9,13
105:1,5,22 106:20
106:21 107:4,11
107:23 112:24
118:6,13 119:20
119:21,25 120:20
120:22 122:1
125:20 126:13
128:13,14,14
129:23 130:20
132:17 133:18
135:22 136:12,25
142:1 144:4 146:6
146:15,20 147:24
148:3 149:17,17
149:19 151:4,5,15
151:17,20 152:6
152:19 153:24
157:18 158:19,24
159:22 160:22
162:1,12 163:24
164:25 165:2
166:5 174:2
178:23 180:4,7
183:9,24 186:15
189:11,12,13
191:3,5,7,9

193:13 194:21,22
196:10,11,14
197:5,6,10 199:2
199:3,5,11 206:13
209:21 210:6
212:8 214:15,16
215:11 216:5,15
217:25 220:17,19
223:13,21,23,24
224:12,22 225:7,9
225:10,18 226:9
226:10,13 227:17
228:3,10,17,24
229:12 230:2,25
232:23 234:21
235:23 236:20
238:21 239:10,14
240:4,16,18
241:17 242:17,19
242:24 243:5,6
244:4,17 245:15
251:12 253:14,16
257:6 260:14
261:23 262:1
263:7,17
**questioning** 88:8
89:5 90:21 91:15
91:17 108:18
138:19 157:5
187:6
**questions** 32:24
67:17 71:24 72:4
75:20 76:5 78:3
79:22 86:21,22
89:18,24 92:8
93:9 94:12,14,20
96:20 98:12 99:5
103:11 108:19,22
110:13 133:19
134:19 139:17,19
145:18 146:5,24
147:5 150:4,12
155:24 156:4

157:2 159:11
161:13 163:15,17
166:3,21 168:21
169:5,9 170:25
171:7 187:3,19
193:15 195:4
206:11 207:19
215:16,21 221:23
222:3 224:16
231:7,24 232:5,11
232:13,24 233:15
233:17 235:8,8
236:7,18 238:21
240:24 241:6
243:10 244:19
245:17 257:16
260:21 263:23
**quibble** 101:17
**quick** 99:5 147:5
162:12 169:18
186:23
**quickly** 137:12
153:3
**quinn** 27:20
**quirk** 27:21
**quite** 63:23,25
80:6 81:5 85:1
93:16 163:7
207:14 217:24
218:3 224:6
**quote** 177:11
188:21
**quotes** 93:20
199:22

**r**

**r** 1:21 17:1 22:13
24:11 25:7 27:10
27:12 28:16 31:1
66:13 109:15
167:23 170:1
248:5 271:1
**r&d** 177:14

**rachael** 27:12,25
**rahul** 24:23
**raise** 66:8 109:11
  111:6 159:1,12
  167:18 170:5
  171:17 247:25
  267:18
**raised** 51:14
  171:5
**raising** 178:7
**randomly** 124:21
**rare** 42:3 48:2
  55:18 56:25 57:1
**rata** 53:23
**rate** 123:24
**rates** 168:18
**raymond** 20:2
  90:15,19 91:3
  92:1
**rdd** 1:3 2:8
**reach** 39:9,24
  41:3 44:24 45:6
  59:1 87:11 112:16
  256:22 257:8,9
**reached** 76:9
  98:15 137:3 145:4
  145:22 240:10
  255:19 257:5
**reaching** 112:16
  188:25 189:15
  190:15 256:25
**react** 247:4
**reaction** 51:1
**read** 47:8,8,19
  53:2 65:3 113:24
  115:19 131:13
  132:20 133:19
  143:10,20,24
  144:2 162:21
  179:11,13 180:14
  180:17,20 184:21
  185:2 192:20,21
  192:23,24 194:20

200:13,21 251:17
  251:19,19,21,24
  255:22
**readily** 64:9
**reading** 143:25
  144:5 162:16
**ready** 167:8
**real** 74:17 120:4
**realize** 233:24
**really** 36:19 39:5
  39:11 42:5,8,19
  44:25 49:17,18,19
  51:15 53:24 60:11
  64:14 69:24 72:2
  79:19 81:15,16
  90:2 98:4 105:21
  106:17 117:12
  118:13 153:25
  154:10 159:17
  163:4 178:18
  206:10 224:22,23
  237:21 247:15
**reason** 43:6 50:3
  64:19 142:19
  143:7,9 152:23
  155:19 218:1
  267:12,20
**reasonable** 74:10
  74:14 142:21
**reasoned** 209:19
**reasons** 228:3
  247:14
**rebuffed** 81:7
**rebuttal** 168:16
  169:19 171:4
**recall** 63:20 64:16
  94:10 96:4 150:18
  150:21 151:5
  163:25 165:9,20
  165:23,23,23
  166:1,12 169:3,4
  177:8 192:22
  195:2,20 214:2

236:23
**recalled** 164:22
**recalls** 165:15
**recapture** 194:6
**recast** 151:20
**receive** 38:3 70:6
  74:24 75:13 77:25
  87:19 104:11
  115:9 121:22
  122:19 123:17
  152:2 155:5
  239:19
**received** 47:12
  63:11 70:17 75:4
  75:11 82:2,3,12
  158:9,11 185:5
  192:12 196:2,20
**receiving** 243:25
**recess** 167:10
**recipients** 89:6
**recognize** 126:12
**recognized**
  217:12
**recollection**
  101:18 265:1
**recommence**
  77:23
**recommendation**
  143:8
**reconstituted**
  153:19
**record** 31:18
  80:19 95:5 101:17
  108:24 139:13
  152:5 160:17
  161:2 162:25,25
  163:7,11 167:12
  175:16,19 178:14
  180:9 185:3
  187:25 189:12
  192:19,24 200:14
  203:23 204:17
  206:9 213:2 268:7

271:4
**recover** 40:15
  106:5 213:16
  237:16 260:1
**recovered** 105:3
**recoveries** 98:23
  124:5
**recovery** 40:19,23
  53:3 78:25 86:19
  87:19 92:16
  102:25 104:2
**recross** 88:6 94:15
  162:14 163:21
  166:6,8 238:2,6
  241:9
**recruit** 35:13
**recruitment** 14:6
  14:11 15:2,7,16
  15:21 16:1
**redacted** 170:2
**redirect** 82:8,10
  88:4 95:5 108:22
  155:23,25 156:2
  162:9 163:17
  166:6 231:7,23
  232:6 233:20,22
  238:2 241:6,6
  245:22 265:6,8
**redirection** 94:20
**redress** 49:5
  52:22 53:12
**reductions** 32:18
  33:13
**refer** 148:20
  185:11,19 188:20
  195:15 199:21
  211:4,6 212:4
  218:15,17 229:10
  250:7 253:25
  254:1
**reference** 36:10
  160:14 185:2
  193:14 266:24

**referenced** 99:9
126:22 131:24
160:3 176:23
**referencing**
218:10
**referred** 156:16
178:21 195:3
196:19 212:11
218:2 220:3
221:15 222:21
**referring** 92:22
114:3 122:1 132:6
135:19 158:8
174:21,24 175:4,7
176:25 177:25
182:7,22 183:24
185:12,14 190:13
195:18 196:2,19
197:6,22 228:1
229:5 250:16
264:17,24
**refers** 182:17
199:22 211:7
217:21 229:8
253:23
**refile** 39:20
**reflect** 32:6 188:1
**reflected** 32:18
**reflecting** 229:13
**reflects** 33:13
135:10 203:23
**reformulated**
193:3
**refreshing** 236:19
**refuse** 80:3,20
209:6
**refused** 78:14,16
**refuted** 107:3
**regard** 31:13
48:21 107:2
163:24 193:15
194:8 197:14
222:18 225:10

229:15 231:1
238:12 262:10
268:14
**regarding** 14:5
15:1,20 90:25
101:3,5 151:7
155:4,15 176:2
213:25 233:10
243:12 250:19
253:7,20 255:8
256:15
**regardless** 90:11
**regards** 263:9
**register** 178:14
**regular** 31:6
53:13
**reimbursement**
2:13 3:3,12 4:4,14
4:21 5:7,15,24 6:8
6:17 7:4,14,24
8:12,24 9:9,18
10:10,18 11:6,16
12:1,10
**reimbursing** 81:4
**rejected** 194:15
**relate** 200:4
**related** 3:7 12:20
13:6,11,17,23
14:4,6,12,20,23
15:2,8,14,16,21
16:2,10,15 75:14
94:8,20 99:10
124:11 125:9
128:2,17 129:12
130:9,22 135:11
158:2 177:18
178:7 184:13,15
188:10,11 190:4,7
201:19 220:4
222:18 227:5,6
234:22 235:15
241:6 251:4

**relates** 87:8
152:17 184:18
204:11
**relating** 182:13,15
186:2,20 232:10
232:12
**relation** 215:24
**relationship**
129:25 217:4
**release** 75:7,15
77:7 78:23 79:1
101:15 102:1,13
188:4 193:3 214:4
223:25 224:2,4
225:3 235:9 236:1
239:6,17,19 260:5
**released** 126:9
217:13 238:24
243:24 260:17
**releasees** 255:1
259:12
**releases** 65:5
74:12 101:7,11,22
122:5 181:2,20
182:18,21,23,24
183:5,13 184:11
184:15 187:15
188:16 208:14,22
208:24 209:7,9
210:2,8 223:3,15
225:14 235:13
239:16 243:22,23
244:7,24 252:8,18
252:21 253:8,20
254:24 259:14,16
**relevant** 146:18
173:21 199:15
209:15 229:14,16
230:2,3 233:8
235:1,5 262:6
**relied** 139:9
**relief** 33:8 54:8
58:10 201:22

226:6
**reluctant** 267:5
268:14
**rely** 50:22 51:10
**relying** 89:21
**remaining** 32:11
265:2
**remains** 31:12
32:19
**remedies** 148:19
**remember** 79:23
132:15 140:2
156:5 157:5 160:5
180:11 195:16
198:5 219:25
224:7
**remembered**
97:17
**remembering**
130:25
**remote** 268:14
**rendel** 27:22
**render** 231:1
**rendered** 2:13 3:3
3:12 4:3,14 5:6,15
5:24 6:8 7:4,24
8:11,23 10:10,18
11:5 12:1,10
88:17,18
**renege** 261:22
**reneging** 263:3
**reorganization**
77:24 179:12
236:3 251:18
**repeat** 103:21
128:14 164:24
189:13 196:14
242:19 243:1
251:12 253:16
263:2
**rephrase** 79:5
145:13 147:24
178:6 184:7

185:23 227:17
**rephrasing**
104:13
**reply** 47:9,10
66:16
**report** 48:3 97:6,9
97:12,15 98:8
109:22 110:6,8,14
110:14 122:9,11
122:16 127:16
142:25 146:3,17
162:17 168:1,5,12
168:13,15,16,22
169:6,8,10 170:3
170:14,18,23,24
171:2,2,4,4,5
240:12
**reporter's** 170:1
**reports** 44:14
89:19 131:12
133:14
**repository** 83:15
83:21 84:12 87:20
88:9 95:6,9,21
104:19
**represent** 36:3
45:18 46:8,15
52:7 94:4 99:4
101:1 116:7 126:8
126:8 138:17
143:15 144:8
150:10 208:8
257:25 264:7
**representation**
45:16 67:25 205:5
206:18
**representative**
176:22 221:2
**representatives**
84:1 86:15 157:21
160:7 164:2
165:10 221:20

**represented** 37:1
37:6 38:10,14,18
39:10 42:22 116:5
116:17 141:17
250:1
**representing**
46:16 47:4 67:10
81:3 140:7 192:15
**representor** 201:6
**represents** 35:2
45:13 52:5 116:3
174:7
**request** 31:4
33:18,21,23 36:1
37:23 41:9,16,17
47:5 60:21 61:25
162:5 212:5,7
**requested** 80:21
161:22 201:23
212:5,14,16 213:2
213:4,4
**requesting** 14:5
14:11 15:1,7,16
15:20 16:1
**requests** 33:11
**require** 44:5 45:1
148:8,14 255:5,7
257:2
**required** 104:22
145:5 210:14
212:18,19 222:19
224:9 225:1
252:14 257:5,11
257:14 258:25
259:3,5 261:6,11
**requirement**
42:24
**requirements**
143:22
**research** 6:7,11
6:13 49:23
**researching** 138:2

**reserved** 34:23
120:15
**reserving** 121:17
**resolution** 87:11
104:8 108:19
115:23 121:8
136:3 254:16
**resolve** 84:23
**resolved** 35:9
254:20
**resources** 49:11
49:16 106:6
**respect** 12:1 32:5
34:23 70:24 71:7
85:14 88:15
101:10,11,15
102:13,19 103:3
148:9 160:17
168:14,18 169:19
185:15 186:6
198:25 210:5
216:6,10 226:22
229:6,7 230:8
236:2 249:18
254:9 256:1 257:9
266:8
**respectfully** 226:9
**respective** 240:21
**respisions** 145:1
**respond** 44:15
**responding** 72:4
**response** 14:21
15:15 16:14 35:12
47:20 67:2 86:1
92:8 99:9 168:15
189:11
**responses** 16:8
86:13
**responsibilities**
85:11 141:11
**responsibility**
218:5

**responsible** 53:16
**rest** 51:24 199:16
**restate** 216:5
228:3 252:17
**restitution** 155:17
**restrict** 115:8
**restrictions**
115:17,21
**resulted** 191:23
238:10
**resulting** 244:14
**results** 262:21
**resume** 31:3
266:20 268:24
**retain** 173:18,19
173:21,24 249:21
**retained** 173:14
174:2 249:24
250:3 259:6
**retention** 3:19 4:5
**retread** 211:17
**return** 79:1
186:15 191:18
244:11
**reveal** 141:21
201:22
**revealed** 127:16
**review** 82:20
113:22 114:4,5
131:7,10 132:8
133:1 168:22
176:13 179:17
180:10 252:5
255:1,19 256:22
**reviewed** 33:12,20
77:3 110:8 160:22
168:13 169:8
170:24 180:5,12
195:23 196:15
238:22 252:4
**reviewing** 70:13
138:2

**revised** 33:6
224:11
**ricarte** 27:23
**rice** 27:24
**richard** 28:19,20
71:2 73:12 86:11
**richmond** 68:9,10
68:11
**ride** 86:14
**right** 33:5 34:15
35:24 36:9,16,21
36:24 37:10,17,21
37:25 38:25 39:22
40:3 41:19 43:20
44:21 45:20 46:19
49:3,3,4,4,5,5,7,9
49:10 52:1,21
53:22 56:23 57:3
58:21 59:22 60:4
60:19 61:17,20
62:5,11 64:2,12
65:8,23 66:2,8,24
67:3 68:6 71:4,11
71:15 76:6 77:4
82:7 88:3 89:23
90:3 92:24 93:23
95:8,11 96:1,17
97:21 99:16
101:10,24 102:5
102:17 103:7
108:21 109:2,6,11
110:12,17 111:6
112:13,18 113:1,4
115:13 116:6,18
117:19 120:14
122:8 123:9,21
124:22 128:10
129:18 132:7
133:25 134:12,23
139:16,18 143:13
143:19 144:1
145:19 146:2
148:4 149:14

150:13 153:20
154:11 155:21
156:17,20 158:20
158:21 163:16
166:4,22,24
167:18 168:11
169:7 170:4,6,21
171:6,17 172:12
181:18 184:25
185:4 196:9
197:11 199:23
200:4,19 210:12
217:14 218:15
222:23 225:3
228:18 230:7,11
230:22 231:22
232:17 237:23
242:10 244:25
245:18 246:4,13
247:25 255:11,15
257:17 258:10,14
258:15,20 259:1,2
260:3 264:1,2
265:16
**rights** 34:23 49:2
56:23,24 121:17
148:8
**ringer** 27:25
**risk** 74:18 98:23
104:7,10,15
105:20 106:4,7,9
107:1 108:3
135:24 136:5
**risks** 108:12
135:25 136:11
182:12 234:20
263:16
**rivera** 29:19
**road** 271:21
**robert** 1:22
**roberto** 23:24
**robinson** 94:19
95:1,4,17,20

96:20 112:3,3,25
113:7,7,11 117:13
117:15 119:2,6
120:3,9,11 127:2
128:11 129:15,18
132:19 133:11,18
133:23,25 134:6,9
134:22 135:14,16
135:21 137:1
138:21 139:4,11
139:16 160:12,20
161:2 164:5,6,20
165:13,17
**robles** 28:1
**role** 67:20 70:16
70:21,21 136:14
166:10 173:3,9
217:13 219:21
234:15,17 249:15
**roles** 85:16
**roman** 21:24
**room** 1:13
**rosen** 28:2
**rosenbaum** 28:3
**rothstein** 21:9,14
230:14,14,18,20
230:24
**roughly** 53:22
**round** 226:20
**route** 59:14
252:13
**roxana** 21:22
**royal** 200:1,5,18
201:5 205:2
207:10,13 208:13
209:1,10 210:10
210:20 211:5,19
217:14,19,20
219:1,17,20,24
222:12 224:2,8,10
226:7 229:15
252:23 253:1

**royalty** 168:18
**rubinstein** 28:4
**rubio** 28:5
**rudnick** 9:6,10,13
9:15,19
**rule** 14:1,6,11,16
14:21 15:2,7,21
16:1 244:6
**rules** 218:4
**ruling** 39:1,3
54:13 204:5 245:5
**rulings** 270:3
**run** 161:13 266:16
**running** 153:18
**russell** 28:6
**ruth** 26:9
**ryan** 25:1 28:7,25
29:22

| s |
|---|

**s** 3:8 13:6,23 14:7
14:12,23 15:3,8
15:17,22 16:2,10
16:15 17:1 21:9
21:14,20 23:21
24:14,18 25:12,25
26:16 30:5 31:1
111:11 248:5,5
**sacker** 28:9
130:14
**sackers** 103:24
**sackler** 20:2,16
63:1,17 64:16,20
67:21 70:19,23
71:2,2,3,3,3,4,4,4
71:16 72:9,14
73:13 74:20 85:20
86:3,5 90:15,19
91:3 92:1,9,18,23
93:20 99:4 110:18
131:7 135:9
140:23 147:15
161:5 165:24
174:8 175:23

177:2,5 178:15,21
184:9 190:17,17
191:21,22 193:2,2
194:5,5,13 197:18
208:12,16,25
211:20 213:17
218:11 221:2
245:24 256:16
258:17,20 260:2
**sackler's** 132:14
132:24 133:7
135:6 138:7
145:23 147:13
255:20
**sacklers** 72:7,24
73:5,15,21 74:10
74:24 75:11 76:13
76:21 77:5,21,23
84:25 85:1,4,6
94:7 95:22 96:13
96:14 98:7,20
104:7,21 105:4,24
106:14 108:2,8,11
117:1,22 118:1,15
118:21 119:15
121:12,20 128:2
128:17,24 130:13
132:11 135:10
136:6,14 137:20
142:7 145:4,6
148:10 158:10
160:4,10,15,19
161:10,20,20
162:4 163:9
168:17 182:13
185:25 186:17
214:6 223:5 240:9
255:20 256:2
**sacred** 140:12
**sadly** 239:22
**safeguards**
194:15

**safely** 114:13
**safer** 49:8
**safety** 48:6,14
49:3 50:15
**saint** 20:10
**sale** 148:22
224:22,24 252:15
259:16 262:4
263:4,10
**sales** 83:25 86:15
194:6,8 252:20
**salwen** 28:10
**sam** 24:2
**samuel** 19:14
108:25
**sanction** 224:8
**sanders** 204:21
**sara** 22:8 27:4
29:10
**sarah** 25:2
**sat** 177:13
**satisfied** 181:2
182:8 212:22
252:8,17
**satisfy** 104:22
**satz** 24:22
**saunder** 17:10
**saunders** 247:22
247:23 248:5,7,17
248:20 249:4,6
252:12 253:10
257:18,22,24
260:16,20,23
261:3,5,25 262:8
262:14 263:7
264:2,5,7 265:8
265:10,16
**saval** 28:11
**save** 217:7 221:14
267:2
**saves** 266:19
**saw** 76:21 91:8
152:16

**saydah** 28:12
**saying** 46:10
89:25 99:24
107:23 134:11
147:24 162:20
176:16 185:24
233:6 242:3,20
245:4
**says** 93:21 135:17
138:6 139:14,14
139:15 143:2,20
188:22 225:11
**scale** 229:20
**scenario** 53:20
96:7 118:20 214:2
**schedule** 61:7
65:12,22 211:11
**scheduled** 31:6
43:10 63:2 247:20
247:21
**scheduling** 169:20
**scheme** 102:21
**schinfeld** 28:13
**schmidt** 28:14
**scholar** 114:9
**scholars** 84:14
**scholer** 2:20,22
**schotz** 7:1,6,8
**schwartzberg**
28:15
**scientific** 48:18,23
**scope** 126:21
138:14 148:13,15
149:11 155:7
160:13,25 208:21
209:9 210:9
212:16 233:7
259:11 260:9
**scores** 159:7
**scott** 3:8 17:17
23:5 24:10
**screen** 33:19 37:2
47:15 167:16

171:16 232:2,3,20
247:21 267:3,12
**screens** 267:5
**screenshare** 63:13
**scrutiny** 84:13
**se** 21:16,17 32:5
32:11,13,23 47:2
**seal** 88:12,14,23
200:18
**second** 5:13 39:2
40:5 42:24 71:21
89:17 95:15 97:12
100:3 142:14
180:12 201:2
247:15
**section** 41:23
131:21
**secured** 154:24
**securing** 147:21
**security** 147:15
148:7 154:18
**see** 33:19,22 37:2
39:9 44:4 47:14
54:18 58:13 66:7
72:11,12 76:2
87:10 98:10
109:10 111:5
124:4 129:1,3
131:18 137:22
138:8 143:3
149:12 164:12
167:15,17 170:5
171:16 175:25
177:5 179:19
181:7 182:18
188:10 193:16
204:11,19 211:13
230:19,19,20
232:20 245:1
268:9
**seek** 49:5 52:22
52:22 53:3 54:4,7
223:16 226:6

seeking  14:15
  46:2 58:10 87:20
  102:25 188:6
  238:11 263:18
seen  31:19 124:10
  131:14 176:15,17
  181:1 220:10,15
  236:21
segment  154:11
selective  85:10
self  139:5 247:1
sell  259:4,5,8
  261:11 262:22
seminars  49:13
send  34:20
sending  31:24
senokot  99:18
sense  36:15 65:3
  91:19 102:4
  124:17 127:9
  160:17 232:9
  254:15,15
sensical  107:15
sent  40:25 64:22
  112:8 122:11
  162:18 219:2
sentence  131:21
  132:7 135:17
  143:2,4,25 144:2
sentences  143:1
  144:1
separate  36:22
  55:7 76:20 107:14
  130:8 255:5
  265:12
separately  266:17
separation  126:6
september  12:3
  42:12 141:13
serious  263:5
seriously  141:11
  236:14,16

serotonin  48:2,8
  48:25 49:24 50:11
  55:17 56:25
serve  143:11
  173:6 259:21
  264:9
served  73:3 74:5
  166:11 210:2
  213:11 245:25
serves  237:4
service  85:13
  90:25 91:3 115:17
  177:23
services  2:12 3:3
  3:12 4:3,14,22 5:6
  5:15,23 6:8 7:4,24
  8:11,23 9:8,17
  10:9,18 11:5 12:1
  12:10
serving  70:9
  264:9
set  39:4 40:16
  86:21 163:8
  168:14 171:3
  242:4,21
seth  28:13
sets  52:21 195:17
setting  37:12
  168:2 172:3
settle  87:18
settled  69:4
settlement  76:14
  76:19,24 77:3,8
  78:23 79:9 83:20
  83:22 87:17 88:10
  88:10 92:16 98:15
  103:19,23 104:5
  104:10,23 105:7
  105:14 106:1,16
  107:2,19 108:11
  116:25 117:2,9
  123:20,20 124:9
  125:7 130:8 135:9

141:16,17 142:6,6
  142:12 148:18
  150:18 151:8,24
  151:25 153:13,14
  153:16,25 180:17
  183:16 184:20
  186:19 188:2
  190:23,25 191:6
  192:3 209:23
  214:1 224:6
  229:15,20 234:20
  235:12,23 236:10
  237:2,10 241:21
  241:25 242:5,22
  243:13 252:24
  255:19,22 256:1
  256:15,25 257:2,5
  259:1 261:7,17,22
  262:3,25 263:4
settlements  76:9
  124:10,11 125:9
  130:16 257:9
setup  43:17
seventh  179:24,25
  251:23,25
severity  48:17
shannon  23:10
  26:20 28:16
shape  107:11
share  53:23
shared  159:9
  267:5
shareholder
  180:17 182:21
  225:14 260:5
shareholders  97:8
  97:14 189:6
  198:18
sharing  267:12
shaw  19:1
sheet  3:1
sheets  145:3
  162:20 163:8

shepherd  28:17
sheryl  27:10
shift  63:21 116:18
shifted  193:6
shifting  213:9
shira  29:24
shmuel  29:18
shore  28:18,19
  233:11
short  32:17 65:6
  161:12
shorten  117:15,16
shortly  253:5
shouldn't  182:1
show  55:23 56:2
  63:13 183:23
  184:21 267:3
showing  42:21,23
  112:7 200:4
shown  185:1
shuffle  63:25
side  20:16 31:22
  63:3,4 79:12
  84:20 93:6,6,21
  93:21 99:4 107:4
  125:8,8,9 140:2
  158:11,11 169:6
  174:8,19 175:14
  175:23 176:6
  177:12,20 178:9
  178:15 179:7
  188:16,22 189:7
  189:16 190:13
  195:16 199:19
  200:19 205:7
  208:16 229:2
  233:7 236:22
  245:24 250:12,25
  251:6,10,14
  255:20 256:2
  258:5,9,14 264:8
  265:2,23 266:21

**sides** 137:3 216:24
**sign** 60:24 109:3
 166:22 169:14
 171:8 246:5
 265:17
**signed** 167:15
 268:1
**significance** 157:3
**significant** 70:21
 82:15,20 118:21
 125:13 135:23,25
 137:3 150:11
**significantly**
 127:6
**signing** 171:14
**silbert** 28:20
**silly** 108:8
**similar** 50:8 51:1
 52:18 57:6 71:9
 88:21 155:12
 238:10
**similarly** 40:7
 210:24
**simmonds** 28:21
**simple** 43:19 44:1
 53:5 144:4 154:20
**simpler** 238:8
**simply** 32:25
 77:22 119:3
 184:17,25 196:8
 204:4 225:18
 226:1 239:15
 255:3 267:17
**singer** 28:22
**single** 97:13
**sir** 33:25 39:14
 41:15 94:24 151:2
 166:22 167:21,24
 168:7 171:7
 179:17 233:18
 243:4 246:6
**sit** 89:12 101:10
 102:3,12

**site** 75:9
**sits** 102:13
**sitting** 66:21
 101:21 102:2
 109:23 111:23
 154:9 168:4
 170:17 172:5
 248:12
**situated** 40:7
**situation** 39:17
 40:21 51:2 54:24
 121:14,15 185:20
**situations** 32:8
**six** 48:6,13 57:2
**sixth** 180:13
**size** 104:1
**skadden** 5:22 6:1
 6:3
**skapof** 28:23
**skipping** 117:17
**skorostensky**
 28:24
**slate** 5:23 6:1,4
**slated** 110:22
**slaugh** 28:25
**slightly** 69:22
 209:20 236:24
**small** 31:21
**smith** 28:8
**snapback** 136:8
**snyder** 29:1
**society** 49:15
**sold** 258:18
**solely** 194:9
**solicitation** 112:8
 142:17
**solicitors** 263:18
**solutions** 271:20
**somebody** 63:25
**someone's** 43:2
**somewhat** 79:15
 233:24,25

**sonya** 16:25 271:3
 271:8
**sorkin** 29:2
**sorry** 31:7 48:5
 50:2,4,17 80:15
 85:3 106:17,21
 107:6 117:5
 120:14 122:15,21
 122:23 128:15
 129:19 133:23
 134:13 135:16
 137:16 142:23
 147:24 148:4
 151:4 159:24
 182:6 186:13
 193:5 195:2 198:1
 209:4,20 214:14
 222:6,14,20
 223:22 225:7,9,22
 227:24 231:10
 236:16 242:23
 246:23,25 247:8
 251:12 252:24
 262:11 264:2,21
 266:4
**sort** 32:23 37:3
 40:16 63:22 86:16
 89:17 108:7
 140:10 144:16
 161:20 198:14
 244:2 267:22
**sorts** 84:21
**sought** 102:8
 243:12
**sound** 34:6 96:9
 142:21 214:7
 219:8 220:18
 222:18 223:19
 229:24 233:18
 257:1,12
**source** 176:8
**sources** 86:19

**south** 105:18
**southern** 1:2
**spalding** 3:2,6
**speak** 75:2 100:16
 128:12 231:8
 246:19
**speaker** 96:25
**speaking** 63:24
 167:3 206:21
**speaks** 139:4
 190:24
**special** 2:12 3:4,6
 4:6 5:24 7:6 8:21
 9:1 43:6 73:23
 79:24 80:3,20,25
 81:8 97:3 98:8
 208:16
**specific** 48:10
 77:18 91:22,23
 102:14 121:7
 125:21 129:11,21
 142:6 145:15
 151:16 192:20,22
 193:15,22,25
 198:22 226:23
 256:14
**specifically** 54:24
 124:13 145:11
 146:3 150:19
 152:14,18 166:18
 190:9 215:10
**specificity** 256:18
**specifics** 166:2
 191:19 236:9
 256:7,13,22 257:7
**specified** 53:6
 85:2 189:2
**specify** 93:5
**speculate** 78:10
**speculation** 107:9
 140:25 141:1,3
**spell** 188:3

**spelled** 170:1
**spent** 49:11 60:8
  138:2 150:1 229:1
  236:19
**spirit** 146:1
**spite** 135:8
**splits** 144:20
**spoke** 166:1
**spot** 45:15
**springr** 29:3
**stacks** 35:15
**stacy** 23:4
**staffing** 3:22
**stage** 38:20 39:19
  136:2
**stake** 96:15
**stakeholders**
  76:25
**stands** 120:7
  143:8,9 179:4
**stanford** 86:11
**start** 61:4 170:24
  194:22 201:2
  243:4 245:1
**starting** 61:10
  83:23 95:15
  126:21 198:16
**starts** 122:24
  131:22 135:1
  189:12 201:5,5,6
**state** 12:2,4,7 18:9
  20:8,9 38:23
  62:22 67:10 70:8
  72:21 74:7,15
  83:4,10,11 86:6
  89:14 95:4 98:18
  98:19 100:12
  108:24 112:4
  113:8 116:13
  123:9,13,17 124:8
  124:12 125:24
  126:17 127:16,18
  139:7 157:8 164:6

177:2,4,7,15,16
  189:23,24 204:8
  205:1 229:2,10
  254:3
**stated** 36:2 58:16
  191:21 196:15
**statement** 13:5,22
  14:21,21 15:15,15
  43:23 62:11 95:14
  111:15,19 123:10
  123:12 124:6
  126:6 136:16
  138:16 139:1
  140:13 163:5
  175:25 176:5
  180:15 182:6,7,17
  196:17,19
**statements** 67:16
  89:18 112:9 116:2
  149:5
**staten** 68:8
**states** 1:1,11 18:1
  19:2 52:7 65:19
  68:22 70:3 76:11
  76:18,19 77:6,22
  78:1,22 86:18
  94:4 104:11,12,16
  106:6,10,11
  110:20 115:6
  116:5,5,9,10,12
  116:17 117:1
  121:24 122:4,19
  123:8 124:4,14
  125:7 127:6 130:8
  139:1 147:11
  155:3,15 164:3
  165:11 174:15
  176:25 177:11
  183:8 185:21
  188:11 189:25
  190:16 191:10
  205:10,12,15,20
  208:8 215:7

237:17 244:6,8
  248:23 249:11
  255:21 256:1
  257:20,25 264:12
**status** 39:13
**statute** 190:3,6
**stay** 75:5,11
**steege** 29:4
**steel** 29:5
**steering** 165:22
**step** 42:19
**stephanie** 23:14
  24:22
**stephen** 25:14
**steven** 27:16 30:4
**stipulate** 138:22
**stipulation** 222:16
  222:21,22,25
  223:1,10,12 226:2
**stodola** 29:6
**stop** 40:9 118:13
  167:2
**strange** 185:15
**strategies** 194:6
**strategy** 194:14
**strauss** 7:21 8:2,4
  18:15
**straying** 164:7
**streamline** 45:9
  53:4
**streamlined** 43:19
**street** 1:13 18:3
  18:10 19:3 21:4
  21:11
**strength** 106:1
**strike** 196:22
**stringent** 218:4
**strong** 51:20
  152:17
**struck** 125:10,10
  137:11
**structure** 37:19

**structuring**
  216:18
**stuart** 199:14
**stuff** 35:14,14
  41:4 44:15,17
**subcommittees**
  220:13 221:21
**subject** 88:17
  91:16 118:4,11
  143:11 155:12
  159:3,3 169:4
  181:16 182:17,20
  182:23 204:16
  210:20 227:13
  228:8 245:8
**submission**
  190:18 194:18
**submissions** 205:1
**submit** 43:19
  46:20 53:6,11
  58:23 138:20
  154:15
**submitted** 66:15
  74:8 109:18
  111:14 131:11
  167:25 170:13
  172:1 205:3 215:3
  248:7
**submitting** 170:15
**subordinate**
  243:22
**subparagraph**
  128:22
**subpoint** 138:5
**subsection** 131:18
  135:1
**subsequent**
  262:20
**subsequently**
  253:2
**subset** 185:13
**substance** 181:25
  196:5,11 253:13

[substances - telephonically]                                                      Page 53

substances  84:4
  103:3
substantial  68:19
  68:24 70:21 74:19
  117:22 120:15,18
  149:10 241:23
substantive  67:17
subsumed  55:9
succeed  214:18
success  128:2,16
successful  136:8
  137:8 237:16
sue  98:20
sued  43:2 68:1
  85:24 86:5 87:14
  91:4 251:11,15
suffered  50:12
  51:3 140:19
sufficient  181:3,8
  181:9,13,14 252:9
  252:18,19 263:8
sufficiently
  187:23
suffolk  68:5,7
  69:6 70:18 71:8
  72:25 86:2 90:14
suggest  130:14
suggested  194:13
suggesting  121:13
  163:14 242:6
suing  77:23
suite  18:3 21:4
  271:22
suits  68:19 69:5
  69:10 84:25 89:8
  176:1 177:18,20
  178:9,11 250:19
  250:25 251:4
sum  123:6
summarization
  105:23
summarize  233:6

summarized
  117:11 149:6
summary  3:1,23
  16:5,10 47:3
  50:16 57:25 139:1
  162:23 169:10
summed  110:14
sunshine  84:21
superior  73:17
superseded  221:6
supplemental
  109:19 110:4,5
supplements
  109:23 149:9
support  13:1
  33:23 52:4 66:16
  66:17 74:8 77:24
  78:21 111:14,16
  111:18 112:17
  118:16 136:13
  139:2 141:15
  147:9,11 153:8
supporting  50:4
supportive  83:17
  84:12 153:9
suppose  88:20
  100:17 106:3,7
supposed  107:14
supreme  68:5
sure  40:20 44:11
  57:7 61:5 78:24
  79:15,16,18 88:1
  91:8 93:16 104:9
  104:14,14 105:5,9
  121:25 128:13,16
  130:2 146:16
  151:19 153:24
  155:13 163:19
  165:7 167:8 180:9
  181:1 188:7 202:2
  203:19 207:25
  211:15 214:14
  216:9,21 217:24

223:23 225:24
  227:16,25 240:5
  255:1 258:22
  260:13,13
surgery  50:14,14
surprise  81:19
survive  54:5
suspect  215:4,6
sustain  91:23 92:5
  134:21 155:19
sustained  237:7
swear  66:9 109:11
  111:6 167:19
  170:6 171:17
  247:24,25
switch  79:21
switching  84:24
sympathetic  51:2
syndrome  48:2,8
  48:25 49:24 50:11
  57:1
syndrome's  55:17
system  63:15
  237:15 247:5

          t

t  24:17 28:6
  111:11 170:10,10
  171:24,24 271:1,1
t's  79:6
taback  29:9
table  34:25
  141:16 142:7
tactics  129:1
tad  95:4 112:3
  113:7 161:2 164:5
take  40:10 44:8
  44:17,23 45:15
  46:5 53:13 57:16
  59:9,14,19 60:7
  60:10,17 62:13,15
  68:13 98:22
  123:23 148:9
  161:9 188:20

189:1,18 190:15
  191:20 221:15
  231:1,4 240:19,19
  241:13
taken  34:24 39:20
  54:22 119:12
  126:15 127:4
  141:10 147:15
  183:19 190:10
  191:11 209:25
  212:13
takes  221:13
talk  45:7 79:20
  151:23 166:10
  182:22 197:15
  204:6 207:16
  219:20
talked  139:25
  162:1 218:3
talking  36:3 77:11
  84:2,4,17,24
  90:24 99:14
  133:16 158:12
  264:19
talks  87:9
tango  99:13,22
  101:14
tapley  29:7
targeted  79:7
tax  4:11
tba  2:7
tech  267:13
technical  120:12
  146:12,14 230:15
technicalities
  154:18
technically
  146:16
technology
  268:15,22
tele  1:12
telephonically
  17:17,18,19 18:6

18:13,20,21 19:6
19:13,14,21 20:6
20:13,20 21:7,19
**tell**  66:9 68:23
83:18 87:7 101:22
102:3 109:12
111:6 137:16
150:19 161:6
167:19 170:6
171:18 177:16
197:21,24 204:2
204:17 211:9,14
212:10,12 222:16
240:6 248:1
**telling**  146:13
246:9
**ten**  61:8
**tend**  84:25 266:13
**tendered**  108:25
**tenet**  115:20
**tens**  81:17
**term**  84:25 87:4
104:23 107:1
157:7 162:20
163:8 177:19
178:3 181:8
182:18 226:25
244:8,12 245:6
254:14
**termed**  177:4
**terms**  104:25
106:15 108:2
136:19 143:14
158:18,18 178:19
188:3 222:15
223:19 224:19,24
226:24 235:9,22
238:8,24 239:23
255:23
**terrible**  245:9
**testified**  95:5
139:8 149:4
152:20 184:14

186:5 192:3
198:19 208:11
213:9,14 218:3
221:9 235:11
236:8,20 256:7
258:3 259:20,24
261:5,9 264:8
**testifies**  61:12
214:10 219:7
**testify**  63:7 64:1
64:24 110:22
118:3 130:18
138:18 148:14
149:4 181:24
196:4 210:16
211:24 213:25
214:21 253:10
**testifying**  62:11
64:20 173:2,4
214:2 266:23
**testimony**  63:2
65:6,18 66:20
67:1 92:7 94:21
96:4 100:1 107:10
107:22 109:4,21
109:24 110:18,20
111:23 112:2
131:25 140:2
155:10 160:16,20
161:1 166:12
168:4,9,14 169:12
170:17,23 171:3
172:2,7,11,13
187:8 188:5
226:24 227:4
235:16,18 245:11
246:5 248:11,18
258:23 259:3
265:17
**tests**  212:18
**tethered**  194:8
**texas**  36:11,12,14

**texts**  31:24
**thank**  34:8 45:3
45:11,20 46:12,18
50:24 58:21 60:13
60:14 61:1,2
62:17,19 65:24
66:1 68:12 69:19
72:5 76:4 80:16
82:6 88:5 93:23
93:25 94:11 95:24
96:19 99:1 100:15
100:18 103:6,13
108:20 109:5,6
110:16 113:13
116:3 121:20
122:23 123:1
127:2 137:13
139:16 141:12
149:25 150:5
155:20,21 159:21
163:15,20 166:3
166:20,23 167:7,9
168:24 169:15
171:9,10,23
172:25 173:1,14
174:17 175:8,18
177:24 179:4,5,11
180:14 182:5
185:11 186:22
188:19,25 189:21
191:18 192:6
195:3 196:14
201:8 205:14,18
206:20 208:10
210:4 213:9
222:15 224:17
226:24 227:19
228:19,21 230:11
231:5 233:3,14,19
234:21 235:7
237:24 240:4,23
243:18 246:3,12
249:3,13,21 250:3

250:6,9,24 251:17
252:8 253:15
254:22 257:15
258:2,3 260:20
263:24,25 265:4
265:14,17,18
268:5,25
**thanks**  197:5
231:21
**that's**  167:14
170:12 172:19
174:6,10 175:5,24
178:18 183:17
187:25 188:4,6
192:6,9 194:25
198:20 199:25
200:3,23 201:10
201:11
**theodore**  30:3
**theory**  187:14,14
187:14
**thereof**  185:13
**theresa**  71:4
73:13
**they've**  187:14
**thing**  44:10 48:2
56:25 65:8 81:13
186:23 236:6
242:10 267:22
**things**  35:16 44:6
51:15 53:20 80:7
82:17 83:24 87:10
87:19 106:9 126:7
126:9 128:21
135:23 136:1,9
142:14 193:17
214:17 253:11
**think**  32:22,23,25
33:25 36:8 40:17
41:3,15 44:8
45:17 49:2 50:1
50:19 52:25 54:23
54:25 55:19 56:17

57:5,5 60:19
61:20 63:3,18,23
63:24 64:5 65:2
65:11,17 66:6
69:22 72:1,2 77:9
77:15,17 79:6,23
80:19 81:2 83:19
88:13,24 90:3,4
92:15,21 93:5
94:9 97:1,16,16
98:14 99:17
105:11,23 106:25
107:22,22,24
109:7 112:10,11
114:5,12 115:6,11
115:11,19 116:16
117:10 118:24
119:19,21 120:1,3
120:5,6,6,16
121:11,16 122:6
122:13 123:12
125:7,15,15 126:7
126:19,20,25
127:8 128:8
129:24 131:4,5,21
131:24 132:3,4,5
133:9,10 134:10
135:12,18,25,25
136:1,1,9,9,16,16
136:17 137:2,3,10
137:10 138:14,15
139:8 141:8,10,15
143:12 144:3
145:13 148:13
149:16,19 150:21
150:25 151:16
152:6,12 153:1,6
153:23 154:3
155:1,9 156:16
157:17 159:8
160:17,25 161:8
161:10,25 162:5
163:3 164:11,17

164:18,25 165:4,4
165:23 166:4
169:11,14 171:11
172:20 175:2
178:22 179:24
182:22 183:17
186:4,21 187:2,7
187:18,25 188:5,9
189:4 192:14
197:11,23 200:23
201:8,24 203:22
204:6 209:24
213:19,21 214:11
214:18 215:1,2
216:15,21 217:24
218:20 219:3,4,9
219:25,25 220:19
220:20 221:4,4
222:14 223:21,24
224:6 226:8,8,20
226:22,24 227:1
228:2 229:18,19
232:1 234:4,6
236:4,4,20,24
237:23 239:14
240:18,22 243:9
243:11 244:20
245:10,12 246:4,5
247:9,14,20
251:22 252:12
256:24 260:10
262:2,24 263:2
265:19 266:8
267:4,20 268:3
**thinking**  220:1
226:23 244:2
**third**  20:17 63:3
73:25 74:11 75:7
75:14 131:21
180:12 214:4
**thomas**  22:3,4
**thorough**  42:11

**thought**  57:4
71:17 80:13 86:19
99:18 100:1
112:15 154:6
163:13 165:24
187:15 257:12
**thousand**  68:7
89:19 115:7
**thousands**  81:17
81:17,21
**threat**  74:16
**threatened**
263:14
**threats**  263:22
**three**  46:22 48:17
65:10,16 70:11
75:10 94:14 189:2
189:19,22 190:5
207:11
**threshold**  42:20
**thrust**  212:8
**thurmond**  29:8
**tied**  136:2 233:25
**tiers**  57:14
**time**  33:1 40:14
44:15 48:1,13
49:11,15,22 57:1
59:14 60:8 62:7
64:25,25 65:22
82:17 106:23
108:2 114:4,5
120:4,16 123:24
125:12 135:24
138:2 139:20
142:9,13 144:23
146:19 148:23
149:22 150:1
177:9,10 190:2,5
190:8 197:21
198:14,15 199:1
221:17 226:21
229:1 236:19
240:5 246:6,10

247:16 253:12
262:24 263:8
265:3 266:19,25
267:2
**timeline**  230:25
**timelines**  265:1
**timeliness**  34:24
**timely**  34:12,14
34:18,21 35:4,12
35:23 41:10,18
46:23
**times**  31:23
188:23 189:17
190:14 197:16
229:4,6
**timothy**  26:15
169:3
**tirelessly**  70:10
72:21
**today**  31:25 61:8
61:9 63:3,6,15,23
64:24 65:11,12
66:6,21 101:21
102:3,12 103:20
109:24 111:23
168:4 169:4,21
170:17,25 172:5
225:1 226:5,7,19
227:4 263:11,12
263:16,16 265:20
266:5
**told**  64:22 81:14
81:16,21 193:19
197:20
**tomorrow**  61:10
61:10,12 63:20
169:23 219:5
266:9,10,20,22
268:24
**tonnesen**  29:10
**top**  98:1 125:24
126:3,15 153:17
200:14

topic  144:11
topics  160:16
tort  86:22 183:1,6
torts  87:10
total  147:13
touch  46:2,4,9
track  120:1 235:4
tragedy  84:22
train  49:12,13
trained  48:24
  49:17
training  181:7
trainor  29:11
tramadol  48:5,8
transactions
  97:25 183:15
transcribed  16:25
transcript  120:4
  271:4
transfer  89:9 90:8
  97:13,24 214:5,24
transferred  69:11
  89:10
transferring
  132:13
transfers  89:7
  97:7 98:1 168:16
trap  174:22
travel  126:8
treated  34:18,18
  35:3,22 41:9
  52:18 212:20
treating  47:5
treatment  49:8
  54:11
trial  38:5 43:5,9
  53:12 60:10
  133:24 134:1
trials  49:23,25
tribal  125:23
tricky  152:20
tried  162:19 215:2
  245:7

trillions  213:20
trompetta  29:12
troop  19:6 157:14
  158:3,25 159:12
  159:15,24 160:1
trouble  154:15
  226:12
true  80:11 83:13
  89:23 91:1 102:18
  104:18 106:3
  120:12 158:5
  258:25 262:8,14
  271:4
truly  84:6
trust  34:21 37:12
  37:14,18 39:24
  40:16 43:17 52:21
  53:3,7,18 58:17
  59:8 60:7 89:22
  90:8 93:2,4
  103:19 123:8
  126:18 173:11
  177:21,22 178:19
  204:11 208:14,15
  209:8 210:8,17,25
  211:2,21 213:10
  214:7,25 215:12
  217:3,21 219:22
  220:5,14,22 221:9
  221:17 223:18
  225:14,15 228:11
  235:14 236:11
  238:13 239:7
  242:25 243:1
  244:11 249:19
  258:18 259:4,17
  259:20 260:7
  261:12,19
trust's  229:17
trustee  18:2 93:12
  94:4 157:1 173:3
  173:5,6,10,12,18
  173:19 177:23

199:14,16 207:24
  208:8 212:22
  232:1 234:25
  236:12 240:3
  257:20,25
trustee's  209:18
  212:8 237:19
trustees  173:6,15
  173:21 188:9,22
  189:1,16,18
  190:10,15 191:9
  191:20 192:12,15
  195:9 201:6,21
  204:14,21,23
  208:12,15,16,25
  209:7,10,14,21
  210:7,25 211:21
  213:3 215:2 217:2
  217:5,8,10 219:11
  219:14 220:7,16
  220:24 221:7,12
  221:13,16,18
  224:1,10,13,23
  229:2,25 234:18
  234:22 235:4,11
  235:17,20,21
  236:4 237:10,22
  238:17,18 239:21
  240:19 241:17
  242:7 243:3
  244:10 250:2
  252:24 255:13
  257:13
trusts  85:12,19,23
  89:6,8,11 173:7
  173:16 177:20,22
  177:25 178:8
  179:6 181:14
  183:15 204:12,13
  204:14,15 208:12
  208:15,25 210:17
  210:20,22,24
  211:3,8,10,12,20

214:25 215:25
  216:7,10 218:11
  220:20 224:21,23
  228:12,14 229:8
  234:22 235:1
  239:21 241:12
  244:10 251:5
  258:5,9,12 262:6
  262:9,15 263:6,9
  263:20
truth  66:9,10,10
  109:12,12,12
  111:7,7,7 112:9
  112:12,21 159:18
  167:19,20,20
  170:7,7,7 171:18
  171:18,19 248:1,1
  248:1
try  35:10 44:15
  84:21 136:18
  145:17 166:15
  178:6 187:6,15
  194:3 208:19
  211:17 234:5
  241:8 243:7,8
trying  35:16
  44:12,13 56:19,20
  59:9 63:23 80:18
  106:22 117:16
  119:21 121:10
  146:1,1,12 148:20
  152:20 174:22
  178:10,18 187:9,9
  193:23 218:8
  226:1 229:8,25
  232:2 234:10
  256:11,13
tsai  29:13
tsier  29:14
turn  33:2 82:19
  113:14,17 122:8
  128:23 131:15
  134:23 137:13

142:22 145:3
182:5
**turned**   68:21,23
68:24
**turner**   29:15
**turns**   63:14,15
162:19
**twice**   64:20
197:14 217:8,10
221:15
**two**   32:11,20,23
33:3,17 34:6
42:19 48:16 50:14
51:15 53:3,23
54:9 60:7,11
65:10,16 67:18
79:24 98:12 99:5
100:23 107:6
115:13,13 116:22
117:25 118:19
119:5 142:10
144:1 155:24
159:12 163:17
187:1 190:2
206:10 211:13
214:23 216:16
238:21 247:14
264:4,13
**tyiavory**   14:16,22
**type**   39:8 100:3
183:11
**types**   38:22 52:8
228:15
**typically**   173:19
212:17 217:8

**u**

**u**   109:8,16 248:5
**u.s.**   1:23 18:2
93:12 104:16,17
106:5 155:6 157:1
185:16,25 186:18
191:20 193:17
207:24 223:3

227:3,5,11,12,25
228:8 232:1
254:17 263:13
**u.s.c.**   41:22
**ucc**   46:2 110:25
114:7,8 116:3,9
116:10,20,24
117:20 118:14
127:25 128:16,21
128:24 132:9,18
133:20 134:3,24
135:4,8 136:13
137:14,15,17
138:22 140:17,18
140:19,21 141:13
141:14 142:4,11
142:13,15,23
143:2,14 147:11
148:1 149:13,25
150:3,15 151:5,16
152:7 156:5,10
160:3,7,10,15
161:8,9,17,21,24
162:2,4,6 166:11
205:25 206:14
207:1
**ucc's**   132:22,22
134:1,18 136:18
136:22 148:25
149:2 152:4
160:23
**udap**   130:11
**ultimate**   263:10
**ultimately**   106:16
116:14 142:11
224:20 227:12
228:12
**umair**   25:23
**unanimous**
261:10
**uncontested**
31:11 32:6,20

**uncovered**   83:23
**undergo**   75:17
**underlying**   42:21
58:9,25 59:4
138:23 201:15
234:16 237:3
**understand**   35:16
36:19 39:2,15
40:22 41:6 56:21
58:14 61:9 62:24
84:9,15 91:20
99:25 100:1
102:10 104:9
105:5,9,11 106:20
108:10 112:13
115:25 121:23
125:20 128:13
134:14 145:10
147:23 151:19
152:13 153:5,23
154:20 168:1,8
170:15,16,16
177:1 181:10,12
182:11 197:10
198:21 199:10
205:12,25 211:3
211:15,18 216:10
221:19 226:13
228:14 234:21
239:10 241:11
242:24 243:6
249:17 257:6,7
258:22 263:15
**understanding**
34:11 51:5 60:1
69:3 75:3,19
76:22 101:3,6
105:12 106:23
119:9 126:5
156:12 182:15
183:10 184:15
186:1 193:20
195:5,6,7,12

214:6 227:3 238:9
240:18 249:14
254:21 258:21
260:6
**understands**
138:16 146:9
149:5 188:8
**understood**   38:6
38:12,16 39:7,14
42:4 60:2 65:9
99:21 119:23
187:8 223:23
236:17
**undertake**   196:22
**undertaking**
181:14
**underwood**   21:7
103:8,9,13,15
106:18,19,25
107:16,17,25
108:17 147:3,4,8
147:20,22,25
148:4,6,17,21
149:21,24 150:4
222:1,2,6,8,20,23
222:24 223:10,11
223:13,21 224:15
224:17,18 225:5,8
225:9,17,25 226:3
226:4,8,14 227:15
227:18,19,20,25
228:1,4,5,16,19
228:21 238:3,4,7
239:11,12,13
240:17,24 260:24
260:25 261:4,24
262:7,11,13
263:23
**undisputed**   58:2
**unfair**   56:20
130:10,11
**unfathomable**
140:11,19

unforeseen 61:8
unfortunately
  140:20
unidentified
  96:25
unique 51:5 115:1
  115:3
united 1:1,11 18:1
  68:22 86:18 94:4
  104:11,12,15
  106:6,10,11 155:3
  155:15 174:12,14
  183:8 185:21
  188:11 189:25
  190:16 191:10
  208:8 215:7
  237:17 249:11
  255:21 256:1
  257:20,25 264:11
universe 197:8
unknowable
  107:9
unknown 111:3
unlawful 177:4
unmute 34:1,2,4
  171:20
unnecessary
  190:21 191:25
  194:15
unprotected 89:2
unpublished
  42:15
unsafe 190:20
  191:24
unsealed 88:24
unsealing 88:22
unsecured 4:13
  6:19 7:2,12,22
  8:10,22 18:16
  33:9 38:9,11,15
  44:20 52:5 106:13
  111:15 116:7
  140:6,7 143:2

149:18 154:23
  155:2
unsuccessful
  237:16
unthinkable
  140:19
unusual 75:4
  82:16
update 143:18
  170:19
updated 149:9,9
urges 143:2
usa 104:7
use 59:10 63:12
  63:13,15 64:22
  77:17 84:25 101:2
  120:14 143:7
  151:13 152:15
  154:19 155:4,16
  179:23 227:24
  241:25 243:21
  254:14 266:15
  267:2
useful 187:25
  266:18
uses 190:20,21
  191:25 242:4,21
  243:14
usually 43:1 57:25
  58:1 158:17
utilized 123:13
uzzi 29:16

v

vacuum 135:12
  136:10
vague 121:25
  147:18 178:3
valuable 83:22
value 38:24 95:6
  104:19,19 123:11
  123:20,24 124:1,7
  124:17 125:13,23
  135:10 148:23,23

149:19 150:2,16
  151:6,7,23 152:22
  152:25 153:12
  154:1 157:3,3,4
  157:11,12,13
  158:1,1,9,10,13
  158:18,18,23
values 124:9
van 29:17
variation 235:22
variations 235:9
varick 18:3
variety 48:15
  262:9,15,15
various 70:3 78:7
  89:11 117:6
  160:19 173:5
  176:15 197:9
  233:7
vasser 29:18
vehicle 214:23
  215:11,15 217:1
velez 29:19
venditto 29:20
veracity 198:9
verification
  181:17
verify 200:10
veritext 271:20
version 170:3
  251:21
versus 124:17
  157:3,4 158:11
  172:18
viable 143:15
victim 155:17
victims 84:14
  101:3 137:9,11
  143:18 152:14
  155:4,16 166:16
video 1:12 93:13
view 72:17 78:20
  78:25 97:23

103:24 116:4
  137:10 140:21,25
  149:3,6 152:17
  209:18 210:1
  235:25 237:1,9
  244:2,20 254:11
  254:23 268:15
viewed 136:5
views 73:24 81:7
  81:12 112:20
  124:9 138:17
  144:8,10 153:10
  160:9 161:18
  240:1 243:12
violate 190:1,3,6
violated 130:10
virginia 61:7,22
virtual 64:20
virtually 76:25
  146:17
virtue 74:25
vision's 76:7
voice 116:7
voided 241:16
volume 68:18
  191:23 193:8,9
voluntarily 115:8
vonnegut 5:1 6:13
  29:21
vote 14:16 40:11
  40:13,13,14 143:3
voted 40:11 56:22
  56:23
voting 34:12,19
  34:20 35:6 40:10
  40:18

w

w 28:7 170:10
  171:24
waged 125:8
wagner 29:22
wait 56:18 133:21
  134:8 146:24

waiting   32:24
  87:17
waive   58:17
walked   86:10
walker   1:25
  200:20
want   31:11 38:7
  39:2 40:17 41:12
  42:21 51:12 53:14
  58:25 64:21 67:7
  71:24 75:21 79:19
  80:13 82:8 94:18
  97:2 103:17
  110:11 118:10
  119:24 120:22
  123:5 124:3
  128:23 136:12
  141:20 142:14
  143:25 144:16
  145:19 146:22
  149:12 154:3,17
  154:19 159:9
  164:22 168:19
  171:6 172:13
  182:5 185:22
  188:10 200:21
  207:21 211:15
  221:24 228:23
  230:12 246:21
  247:1 248:19
  258:22,22 260:22
wanted   40:20
  63:19 106:25
  117:20 206:20
  230:18 233:14
  268:9
wanting   102:10
wants   46:7 65:15
  147:1 218:13
  241:4 267:6
  268:18
wardwell   3:11,15
  3:17 17:12

warn   48:14 49:21
  50:9 55:7
warned   48:1,11
  48:21 49:7
warning   48:9,12
  49:19 50:15 57:1
warns   48:20
warranted   45:1
washing   123:16
washington   95:5
  98:18 112:4 113:8
  123:15 124:8,12
  127:18 138:25
  164:6 172:16
  248:25
washington's
  127:16 138:24
wasn't   191:14
watch   268:18,21
way   52:17 53:11
  53:17 54:10,11
  78:3,17 83:23
  84:10,10,23 96:18
  107:11 108:12
  122:6,7 124:4,16
  127:8 136:13
  141:8 144:17
  145:14,16 148:7
  152:22 153:3
  167:4 169:20
  176:20,22 178:17
  179:15 185:9
  198:16 200:10
  204:6 212:21
  216:16 218:16
  229:10,20 234:13
  235:5 237:23
  243:8 244:2,25
  247:4 254:23
  262:22
ways   53:3
we've   31:23 34:19
  41:15 61:14 63:8

64:22 81:4 84:24
  87:2 108:7 130:21
  130:22 137:3
  266:5
weakness   106:1
wealth   92:9
weber   29:23
week   65:1,22
  79:20 87:18
  110:19
weekend   63:15
  65:9
weighing   234:15
weight   154:1
weighted   124:25
  125:2
weighting   125:14
weiner   29:24
weintraub   29:25
weiss   30:1,2
wells   30:3
went   36:17 55:12
  80:6 89:20,22
  97:7,13 111:19
  118:7 136:9
  160:18 207:16
west   19:3 61:7,21
we've   176:17
white   1:14 2:7
  17:9 171:12,16,22
  171:24,25 172:1,8
  172:14,22,24
  173:1 179:25
  181:10,24 184:14
  186:5 189:9 192:3
  196:4,10 199:11
  200:13 202:2
  203:19 206:6
  207:22 208:1,3
  214:18 215:10,22
  215:24 216:6,13
  218:3,13,25
  219:10,13 221:25

222:4,7,9 223:1
  223:15,25 224:19
  225:18 226:6,17
  228:6,24,25
  230:12,23 231:24
  233:4,6,22,24
  235:7 236:20
  237:9,24 238:6,8
  239:14 240:5,23
  241:9,11 242:15
  243:10 244:18
  245:22,24 246:11
white's   225:11
  246:5
white's   172:10,12
wide   107:19 183:3
  183:5 193:20
wider   90:22,24
wilamowsky   30:4
william   26:6 28:6
  29:25
willing   44:23
  45:18 46:5,7
  77:21 172:18
  209:22 236:5
  241:24
winning   42:22
winter   69:24
winthrop   19:1
wish   66:22 109:25
  110:21 111:24
  113:5 168:5 171:1
  172:6 195:20
  212:25 248:13,15
  257:18 264:1
wishes   168:22
  172:18
wishing   173:24
withdraw   79:5
  95:17 120:19
  145:15 146:15
  156:9 159:22
  228:16 245:14

260:13
**withhold** 262:3,4
**withholding**
  263:4
**withstanding**
  143:21
**witness** 61:7,21
  62:6 63:2,3,5,6,17
  65:18 66:6,14,23
  72:5 78:4,4,24
  79:4 103:11 108:7
  108:9 109:7 111:9
  111:12,25 118:3
  122:23 123:1
  130:18 132:18
  133:3 134:17
  135:19 139:8
  141:21 147:19
  148:14 153:20
  160:21,25 161:1,2
  163:1 164:22
  166:23,25 167:13
  169:2,17 171:12
  178:22 180:2
  187:9,21 188:7
  192:8,25 193:16
  200:17 206:8
  214:13 215:1
  216:11 217:23
  224:5 229:9,18
  230:10 243:16
  244:19 246:7,12
  247:20,21 248:3,6
  248:14 253:16
  256:17 260:12
  262:2 265:1,18
  266:18 268:3
**witness's** 138:15
**witnessed** 141:4
**witnesses** 17:3
  43:10 61:4 63:13
  160:21 187:2
  265:20 266:5,12

**wl** 42:12
**wolff** 172:16
  248:22
**woman** 135:13
  167:7 225:21,24
**won** 98:21
**wondering** 226:25
  267:1
**wonderment**
  255:21
**word** 59:10 66:12
  109:16 132:3
  167:22 170:11
  171:24 215:1
**wording** 220:1
**words** 40:12
  76:16 119:21
  135:2 141:18
  143:24 185:22
**work** 70:13 71:22
  84:19 91:12 114:7
  127:25 130:19
  133:4 142:8 169:5
  179:15 267:20
**worked** 70:10
  72:21 80:14 84:10
  114:5,19,22
  169:20 177:14
  217:2 267:11
**working** 114:18
  144:17,22 179:19
  266:8
**works** 40:1 58:1
**world** 98:10
  185:19
**worried** 71:22
**worth** 240:8
**worthwhile**
  237:21
**would've** 79:1
  96:14 97:16 98:5
  99:14,17,24 103:4

**wouldn't** 195:20
**wow** 41:4
**write** 35:12
**written** 82:17
  133:6,6,12,12,13
  133:14
**wrong** 164:17
  210:13
**wrongdoers** 70:11
  72:22,23
**wrote** 135:4
**wyoming** 204:15
  210:17,22 211:1

|   |
|---|
| **x** |

**x** 1:4,10 132:17
  248:4 270:1

|   |
|---|
| **y** |

**y** 66:12,13 170:1,2
**yeah** 31:21 49:2
  55:1,2 57:18
  59:21 64:6 68:12
  78:5 97:20 115:19
  117:13 126:19,23
  128:11 130:21
  132:4 141:25
  146:11 155:24
  161:23 167:15
  233:21 246:19
  266:1
**year** 44:13 124:22
  130:23 141:15
  197:14,25 200:19
  217:8,10 221:15
**years** 48:6,13
  50:14 57:2 70:11
  74:13 79:10,13
  84:18 98:16,22
  123:21 124:20
  176:15 197:12
  216:17,22 220:15
  237:18 241:14,14
  241:21 242:2
  261:16

**york** 1:2 17:15
  18:4,18,18 19:4
  19:11 20:4,18
  68:5 69:7 72:8,13
  86:6 165:21
  210:18
**young** 4:20,24 5:1
**younger** 85:15
**you'd** 170:19
**you're** 172:20
  174:21,24 175:3
  183:23 185:22,24
  186:11 188:21
  200:15
**you've** 176:17

|   |
|---|
| **z** |

**z** 29:3
**zabel** 30:5
**zoom** 46:6
**zylberberg** 30:6