**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**SUPPLEMENTAL AFFIDAVIT OF SERVICE OF SOLICITATION MATERIALS**

I, Alex Orchowski, depose and say that:

1.        I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims, noticing, and solicitation agent for the Debtors in the above-captioned Chapter 11 cases. At my direction and under my supervision, employees of Prime Clerk caused the following materials to be served:

      a.    a book containing the: *(1) Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [substantially in the form of Docket No. 2983] with all exhibits attached thereto, including, among others, the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [substantially in the form of Docket No. 2982]; (2) *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 2988] (collectively, the "***Disclosure Statement Book***");

      b.    the Notice of Hearing to Consider Confirmation of the Fifth Amended Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines, a copy of which is attached hereto as **Exhibit A** (the "***Confirmation Hearing Notice***");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

c.  the Letter from Purdue Pharma L.P. on its own behalf and for each of the other Debtors to All Holders of Claims Entitled to Vote on the Plan, dated June 3, 2021, a copy of which is attached hereto as **Exhibit B** (the "***Debtors' Cover Letter***");

d.  the Plan Support Letter, a copy of which is attached hereto as **Exhibit C** (the "***Committee Letter*** ");

e.  the Class 10(b) Non-NAS PI Claims Ballot for Voting to Accept or Reject the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, a form of which is attached hereto as **Exhibit D** (the "***Class 10(b) Ballot***"); and

f.  a pre-addressed, postage paid return envelope (the "***Return Envelope***"), a sample of which is not attached hereto.

2.      Unless otherwise stated, on August 6, 2021, at my direction and under my supervision, employees of Prime Clerk caused true and correct copies of the above materials to be served as follows:

a.  the Disclosure Statement Book, Confirmation Hearing Notice, Debtors' Cover Letter, Committee Letter, Class 10(b) Ballot, and Return Envelope were served via First Class Mail on the party identified on the service list attached hereto as **Exhibit E**.

[*Remainder of Page Intentionally Left Blank*]

Dated: August 13, 2021

_/s/ Alex Orchowski_
Alex Orchowski

State of New York
County of New York

Subscribed and sworn (or affirmed) to me on August 13, 2021, by Alex Orchowski, proved to me on the basis of satisfactory evidence to be the person who executed this affidavit.


_/s/ Liz Santodomingo_
Notary Public, State of New York
No. 01SA6301250
Qualified in New York County
Commission Expires April 14, 2022

SRF 55727

## Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## NOTICE OF HEARING TO CONSIDER
## CONFIRMATION OF THE FIFTH AMENDED CHAPTER 11 PLAN FILED BY THE
## DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On June 3, 2021, the United States Bankruptcy Court for the Southern District of New York (the "**Court**") entered an order (the "**Disclosure Statement Order**"), (a) authorizing Purdue Pharma L.P. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), to solicit acceptances for the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "**Plan**"); (b) approving the *Disclosure Statement for Fifth Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Disclosure Statement**")[2] as containing "**adequate information**" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

(d) approving procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan.

2.      The hearing at which the Court will consider Confirmation of the Plan (the "**Confirmation Hearing**") will commence on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; *provided* that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Confirmation Hearing shall be conducted via **Zoom videoconference** for those who will be participating in the Confirmation Hearing[3] so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[4] The Confirmation Hearing may be continued from time to time by the Court or the Debtors **without further notice** other than by such adjournment being announced in open court, by Agenda filed with the Court, and/or by a Notice of Adjournment filed with the Court and served on all parties entitled to notice.

3.      The Plan contemplates a Shareholder Settlement by and among the Debtors, the Master Disbursement Trust, and certain of the Shareholder Released Parties (including **members of the Sackler families** and certain other individuals and related entities). The Plan provides for the release of any actual or potential claims or causes of action against the Shareholder Released Parties relating to the Debtors (including claims in connection with Opioid-Related Activities) and

---

[3]      Parties or members of the public who wish to participate in the Confirmation Hearing should consult the Court's calendar with respect to the day of the Confirmation Hearing at https://www.nysb.uscourts.gov/calendars/rdd.html for information regarding how to be added as a participant. Members of the public who wish to listen to, but not participate in, the Hearing free of charge may do so telephonically at a number to be provided on the Debtors' case website at: https://restructuring.primeclerk.com/purduepharma.

[4]      A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operationsunder-exigent-circumstances-created-covid-19.

the channeling injunction described below, in exchange for the payment by certain of the Shareholder Released Parties of $4.275 billion and the relinquishment of their equity interests in the Debtors.

4.      The deadline for filing objections to the Plan is **July 19, 2021, at 4:00 p.m., prevailing Eastern Time** (the "**Plan Objection Deadline**"). All objections to the relief sought at the Confirmation Hearing **must** (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, (c) be filed with the Court (i) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at http://www.nysb.uscourts.gov), and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and (d) be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [D.I. 498], on (i) counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attention: Marshall S. Huebner, Benjamin S. Kaminetzky, Eli J. Vonnegut and Christopher S. Robertson), (ii) counsel to the Creditors Committee, (A) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attention: Arik Preis, Mitchell P. Hurley, Sara L. Brauner and Edan Lisovicz) and (B) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attention: Justin R. Alberto), and (iii) the Office of the U.S. Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014 (Attention: Paul K. Schwartzberg), so as to be actually received on or before the Plan Objection Deadline.

5.      Pursuant to the Order, the Court approved the use of certain materials in the solicitation of votes to accept or reject the Plan and certain procedures for the tabulation of votes to accept or reject the Plan.  Subject to the Master Ballot Solicitation Procedures (pursuant to which (among other things) your Law Firm may be casting a vote on your behalf), if you are a holder of a Claim against the Debtors as of **March 10, 2021,** and entitled to vote, you have received with this Notice, a ballot form (a "**Ballot**") and instructions for completing the Ballot.

6.      The deadline for voting on the Plan is on **July 14, 2021, at 4:00 p.m., prevailing Eastern Time** (the "**Voting Deadline**"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must** (a) follow the Ballot instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it (or the Master Ballot submitted on your behalf, as applicable) is **actually received** by the Debtors' Solicitation Agent, Prime Clerk LLC (the "**Solicitation Agent**") on or before the Voting Deadline.  **A failure to follow such instructions may disqualify your vote.**

7.      Please note that if you hold a Claim in Classes 4, 5, 6, 7, 8, 9, 10(a) and/or 10(b) as of the Voting Record Date that is otherwise allowed for voting purposes and you are represented by an attorney, it is possible that your attorney has elected, through exercising the option in the Solicitation Directive, to cast a vote on your behalf through a Master Ballot.  If your attorney elects to vote your claim by Master Ballot, it is possible that you may not receive a copy of the Plan, Disclosure Statement, Disclosure Statement Order and/or a Ballot.  Therefore, if you hold a Claim in Classes 4, 5, 6, 7, 8, 9, 10(a) and/or 10(b) as of the Voting Record Date that is otherwise allowed for voting purposes and you did not receive a Plan, Disclosure Statement, Disclosure Statement

Order and/or a Ballot and wish to receive any of the aforementioned materials, you are encouraged to contact your attorney.

8.      If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan. Notwithstanding the fact that your Claim would otherwise satisfy the definition of another type of Claim, or your receipt of a ballot or notice, which identifies your Claim as belonging to a specific Class for voting and distribution purposes, any Claim that satisfies the definition of Co-Defendant Claim under Sections 1.1 and 4.16 of the Plan shall be a Co-Defendant Claim and any Claim that satisfies the definition of an Other Subordinated Claim under Sections 1.1 and 4.17 of the Plan shall be an Other Subordinated Claim.

9.      If any claimant wishes to challenge the disallowance of its Claim for voting purposes, such claimant must file a motion with the Court for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes (a "**Rule 3018 Motion**"). Any Rule 3018 Motion must be filed on or before 4:00 p.m. (prevailing Eastern Time) on July 19, 2021 (the "**Rule 3018(a) Motion Filing Deadline**") and served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [D.I. 498].

10.     The Debtors will file the Plan Supplement (as defined in the Plan) on or before **July 7, 2021**, and will serve notice on all holders of Claims entitled to vote on the Plan and all known

holders of other Released Claims, Shareholder Released Claims, or Channeled Claims, which will (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

11.      If confirmed, the Plan shall bind all holders of Claims and Interests to the maximum extent permitted by applicable law, whether or not such holder will receive or retain any property or interest in property under the Plan, has filed a Proof of Claim in these Chapter 11 Cases, or failed to vote to accept or reject the Plan or voted to reject the Plan.

12.      **Sections 10.6, 10.7, 10.8, 10.9, 10.10, 10.11, 10.12, and 10.13 of the Plan contain release, shareholder release, exculpation, injunction, channeling injunction, MDT insurer injunction, Settling MDT insurer injunction and shareholder channeling injunction provisions.** **For your convenience, such provisions are set forth on Exhibit 1 hereto.  Pursuant to the Plan, certain parties are releasing the Released Parties, which include certain third parties, and the Shareholder Released Parties (subject to and in accordance with the terms of the Shareholder Settlement) from certain Claims and Causes of Action.  The Releasing Parties include all holders of Claims and Interest under the Plan.  The Released Parties include, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties and (iii) solely for purposes of the Releases by the Debtors in** <u>**Section 10.6(a)**</u> **of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such;** *provided*, *however*, **that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (ii) of this definition of Released Parties include Persons referenced in clause (ii) of the definition**

of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.

13.     If confirmed, the Plan will conclusively, absolutely, unconditionally, irrevocably, and forever release the Shareholder Released Parties from actual or potential claims or causes of action relating to the Debtors (including Purdue prescription opioids, like OxyContin, or other prescription opioids manufactured, marketed or sold by Purdue, or any other claims in connection with Opioid-Related Activities) subject to the conditions set forth in the Plan, including Sections 10.7(a) and (b) thereof.  Holders of such actual or potential claims or causes of action will be bound by the releases and Channeling Injunctions in the Plan, whether or not such holders will receive or retain any property or interest in property under the Plan, have filed a Proof of Claim in these Chapter 11 Cases or failed to vote to accept or reject the Plan or voted to reject the Plan.

14.     If you should have any questions or if you would like to obtain additional solicitation materials at no charge, please contact the Debtors' Solicitation Agent, by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165; and/or (d) emailing purduepharmainfo@primeclerk.com.  You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: http://www.nysb.uscourts.gov.  Please be advised that the Solicitation Agent is authorized to

answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

Dated:    June 3, 2021
          New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Christopher S. Robertson
*Counsel to the Debtors and Debtors in Possession*

---

**If you have questions about this notice, please contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC, at 844-217-0912 (toll-free), +1 347-859-8093 (international), or by email at purduepharmainfo@primeclerk.com. You may also find out more information at https://restructuring.primeclerk.com/purduepharma.**

---

## EXHIBIT 1

**Section 10.6(a) Releases by Debtors**

    As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether in rem, quasi in rem, in personam or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the

Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(a)</u>.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(a) shall (A) release any Cause of Action against any Shareholder Release Snapback Party, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

**Section 10.6(b)        Releases by Releasing Parties**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business

10

or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party to the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this **Section 10.6(b)** shall (A) release any Cause of Action against (I) any Shareholder Release Snapback Party or (II) any Holder of Co-Defendant Claims, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

Notwithstanding anything herein to the contrary, the Debtors shall not be released from liability for any Claim that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

**Section 10.6(c)**          **Releases by Debtors of Holders of Claims**

        **As of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(c)</u>.**

        **As of the Effective Date, all Holders of PI Channeled Claims and Holders of NAS Monitoring Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the Restructuring Transactions, (iii) the Pending Opioid Actions, (iv) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (v) any past use or misuse of any opioid, whether sold by the Debtors or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (vi) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (vii) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, or (viii) any other act, conduct, occurrence or continuing condition in any way relating to any of the foregoing.**

        **Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(c)</u> shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and unrelated to the subject matter of the Pending Opioid Actions, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.**

**Section 10.7(a)**             **Shareholder Releases - Releases by Debtors**

      **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this <u>Section 10.7(a)</u>, by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with**

respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in this **Section 10.7(a)**.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this **Section 10.7(a)** shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this **Section 10.7(a)** shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of this **Section 10.7(a)** had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A),the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

**Section 10.7(b)**          **Shareholder Releases - Releases by Non-Debtors**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this **Section 10.7(b)**, by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness,

14

reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(b) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Section 10.7(b) shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall

continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

**Section 10.7(c)**          **Shareholder Releases - Releases by Shareholder Released Parties**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this Section 10.7(c), by the Shareholder Released Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring

16

of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(c) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements, and including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in this Section 10.7(c) of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in this Section 10.7(c) shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

**Section 10.8          Channeling Injunction**

              In order to supplement the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases set forth in Sections 10.5, 10.6 and 10.7 of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

              (a)          **Terms.          In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in Sections 10.5, 10.6 and 10.7 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:**

                            (i)          commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any

property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Reservations. Notwithstanding anything to the contrary in this **Section 10.8** or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;

(v)    **the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;**

(vi)    **the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents;**

(vii)    **the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or**

(viii)    **NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.**

(c)    **Notice of Shareholder Release Snapback.** Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this Section 10.8(c), the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(d)    **Modifications**. Except as expressly set forth in paragraph (c) of this Section 10.8, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)    **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of this Section 10.8, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**Section 10.9    Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction**

(a)    **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group;

and (iii) with respect to the applicable Shareholder Family Group, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreement.

(b)     **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreement to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

**Section 10.10          MDT Insurer Injunction**

(a)     **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

(i)      **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(ii)     **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the**

property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and**

(v)    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.**

(b)    **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against a MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and agents of the Debtors that are not Sackler Family Members that are preserved under the Plan or (iii) the terms of the Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights.

(c)    **Modifications**. To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that (i) any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply equally to all Classes of Claims, and (B) shall comply with any procedures set forth in the MDT Agreement and (ii) the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(d)    **Non-Limitation of MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.10, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

**Section 10.11        Settling MDT Insurer Injunction**

(a)    **Terms.  In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert**

21

or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)     commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)    enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)   creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)     **Reduction of Insurance Judgments.** Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

22

(c)     **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)     N**on-Limitation of Settling MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.11, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

**Section 10.12          Exculpation**

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this Section 10.12 shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Claims or Causes of Action that may be asserted against any Excluded Party.

**Section 10.13          Injunction Related to Releases and Exculpation**

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in this Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in Section 5.3(b), 5.4(c) or 5.6(b) of the Plan.

**<u>Exhibit B</u>**

**June 3, 2021**

RE:    *In re Purdue Pharma L.P., et al., Chapter 11 Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.)*

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on September 15, 2019.

You have received this letter and the enclosed materials because you are entitled to vote on the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (as modified, amended, or supplemented from time to time, the "**Plan**"). On June 3, 2021 the Court entered an order (the "**Disclosure Statement Order**") (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* (the "**Disclosure Statement**")[1] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "**Solicitation Package**"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

As explained in the enclosed Disclosure Statement, under the Plan, billions of dollars will flow into trusts established for the benefit of states and localities, Native American Tribes, hospitals, third-party payors and insurance carriers, children with a history of Neonatal Abstinence Syndrome and their guardians, and personal injury claimants.  With the exception of the personal injury trust, which will make unrestricted distributions to individual holders, each trust will require that all value be dedicated exclusively to opioid abatement efforts (subject to payment of attorneys' fees and administrative costs), and there will be transparency to ensure that funds are not spent for any other purpose.

Purdue Pharma's existing shareholders will be required to pay $4.5 billion in the aggregate, consisting of $4.275 billion that will be paid to the Debtors' estates and distributed to creditors through the trusts described above, and $225 million that has been paid by the Sackler Families to satisfy their civil settlement with the United States Department of Justice.  This represents a significant improvement to the initial settlement framework that was in place at the commencement of these Chapter 11 Cases, most notably by increasing the amount that Purdue Pharma's existing shareholders will be required to pay in the aggregate from $3.0 billion to $4.5 billion.  This material

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

improvement in the recovery from the shareholders directly increases by $1.275 billion the amount of guaranteed funds payable to the stakeholders.

As for Purdue Pharma, it will cease to exist.  On the Effective Date, the Debtors' businesses will be transferred to a newly created company, which will be indirectly owned by two of the opioid abatement trusts, with the value of the business benefiting those trusts.

In short, the Plan fulfils the goal of directing as much of the value of the Debtors' assets as possible to combatting the opioid crisis in this country.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

    a.  the notice of the hearing to consider confirmation of the Plan;

    b.  a copy of the Solicitation and Voting Procedures;

    c.  a Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope;

    d.  this letter;

    e.  a letter from the Official Committee of Unsecured Creditors; and

    f.  a flash drive containing each of the following materials:

        (1) the Disclosure Statement Order, as entered by the Court;

        (2) the Disclosure Statement, as approved by the Court (with the Plan annexed thereto).

The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions, however, please feel free to contact Prime Clerk LLC, the Solicitation Agent retained by the Debtors in the chapter 11 cases (the "**Solicitation Agent**"), by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in the chapter 11 cases at no charge by contacting the Solicitation Agent by any of the means listed above.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of solicitation materials, but may **__not__** advise you as to whether you should vote to accept or reject the Plan.

54014-03

> **You are receiving this letter because you are entitled to vote on the Plan.  Therefore, you should read this letter carefully and discuss it with your attorney.  If you do not have an attorney, you may wish to consult one.**

The Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Multi-State Governmental Entity Group, the Native American Tribes Group, the Ad Hoc Group Of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, and the Ad Hoc Group of NAS Children all support confirmation of the Plan.  This level of consensus is extraordinary, given the nature of the litigation against certain Debtors and the differing views on fundamental settlement and allocation issues held over time by the various supporting stakeholders.  **The Debtors and many other stakeholder groups, including the Official Committee of Unsecured Creditors, urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

Sincerely,

**Purdue Pharma L.P.**
on its own behalf and for each of the other Debtors

**<u>Exhibit C</u>**

*In re Purdue Pharma L.P.*, Case No. 19-23469 (RDD)

## Plan Support Letter

To all unsecured creditors of Purdue Pharma L.P. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Purdue"):

We write this letter as lead counsel to, and on behalf of, the Official Committee of Unsecured Creditors (the "UCC") appointed in Purdue's bankruptcy cases (the "Chapter 11 Cases"). The UCC consists of the following nine members:

1. a personal injury victim who suffered from opioid use disorder;

2. a third party payor and trade association for 35 independent health insurance companies collectively insuring 110 million members;

3. a trade creditor and co-defendant in opioid litigation that has asserted indemnification claims;

4. the mother of a child who died of an opioid overdose;

5. the mother of a child diagnosed upon birth with Neonatal Abstinence Syndrome ("NAS") due to fetal opioid exposure;

6. a trade creditor;

7. the federal entity responsible for insuring defined benefit pension plans;

8. the grandfather of a child diagnosed upon birth with NAS due to fetal opioid exposure; and

9. a hospital.

The purpose of this letter is to explain to all creditors the UCC's position with respect to the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982] (as amended, the "Plan").[1]

The UCC is an independent fiduciary for and represents the interests of **all creditors** in the Chapter 11 Cases. In their capacities as **unpaid** and **volunteer** members of the UCC, the above individuals and representatives of the above institutions have met, on average, twice weekly during these cases (approximately 160 times) and have reviewed and considered daily emails from counsel regarding the events that have occurred over the more than 600 days since the UCC's appointment. The UCC members have reviewed thousands of documents, listened to numerous hearings, attended presentations and reviewed analyses from their own advisors, as well as the advisors and principals of numerous other parties.

At the outset of their appointment, the UCC members agreed not to speak to the press or otherwise make public statements regarding Purdue's bankruptcy or the Sacklers, and instead determined to make their views known through the positions advanced by the UCC in Court. This self-imposed "gag order" has been, and continues to be, a hardship for many of the members of the UCC. This is particularly true for the victim advocates, who prior to their appointment to the UCC, had made it their lives' work to combat the opioid crisis and speak publicly on opioid issues. This situation was exacerbated by the decision made by certain other parties to speak through various forms of media in order to make their positions known. Indeed, it is in part because of the public silence of its members to date that the UCC is compelled to make the important and somewhat lengthy statements contained in this letter.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

Below is a brief overview of the items covered in this letter.

**Section I**       A summary of the UCC's conclusions and position regarding the Plan

**Section II**      An overview of certain background information regarding the Chapter 11 Cases

**Section III**     The UCC's approach to the Chapter 11 Cases

**Section IV**      Phase I Mediation: determining allocation of value among creditor constituencies

**Section V**       The work the UCC and its advisors have done to understand, evaluate and prepare to prosecute the various potential causes of action against the Sacklers

**Section VI**      Phase II Mediation: the attempt to negotiate a settlement among the Sacklers, the Public Claimants,[2] the UCC and the Debtors

**Section VII**     The Emergency Relief Fund and Document Repository

**Section VIII**    The future of Purdue

**Section IX**      Concluding remarks about the Plan

*For the reasons explained in this letter, the UCC (i) has determined that it will not object to the Plan and (ii) encourages all creditors to vote to accept the Plan*.[3]

**I.    SUMMARY OF THE UCC'S CONCLUSIONS**

Since its formation, the UCC has advocated for an outcome that (i) maximizes value for those harmed by the conduct of the Debtors and the members of the Sackler family and (ii) allocates such value fairly among numerous creditor constituencies, including personal injury victims (including children diagnosed upon birth with NAS), hospitals, insurance ratepayers, third-party payors (including employer and government-sponsored health insurance plans administered by these companies), States, municipalities, Native American Tribes, public schools and the Federal Government.

In an effort to maximize value available for creditors, the UCC and its advisors have thoroughly investigated and analyzed whether the approximately $3 billion originally offered by the Sacklers, coupled with other contingent consideration and the value of Purdue itself, was sufficient to compensate creditors for (i) the harm caused by the Debtors' sale and marketing of opioid products and (ii) value and assets that Purdue caused to be distributed to the Sacklers or to entities under the Sacklers' control. As a result of this investigation (the "Investigation"), the UCC developed a detailed understanding of the value that could be recovered from the Sacklers in litigation. Armed with the results of this work, the UCC, along with the Debtors and the Consenting Committee (as defined below), participated in mediation ("Phase II Mediation") to reach resolution with the Sacklers over an increased contribution, which resulted in an additional $1.275 billion in guaranteed value beyond the approximately $3 billion initially offered.

With respect to ensuring that value is allocated fairly among various creditor constituencies, the UCC and its advisors worked closely with the Debtors, the Public Claimants and the various groups representing the Private

---

[2] The term "Public Claimants" refers collectively to the States, both in the Consenting Committee and the NCSG, their political subdivisions, Native American Tribes and other entities defined in the Plan as the holders of "Non-Federal Domestic Governmental Claims."

[3] Although the UCC has determined to support the Plan, final documentation of the Sackler Settlement (as defined below), as well as certain other supplemental documents related to the Plan, remains subject to continued negotiation. As such, and for the avoidance of doubt, nothing contained in this letter is or should be construed as the UCC's agreement to any terms of the Sackler Settlement or the Plan that have not been filed publicly as of the date of this letter. To the extent these ongoing negotiations fail to result in consensus regarding open issues, the UCC will no longer be in a position to support the Plan and will disclose its views in a supplemental filing on the Court's docket.

Claimants,[4] in particular during mediation ("Phase I Mediation" and together with Phase II Mediation, "Mediation"). Ultimately, Phase I Mediation resulted in settlements in principle among certain of the Public Claimants and Private Claimants.

As a result of all of its work and the knowledge it has gained to date, the UCC has determined that the best path forward is confirmation of the Plan. Indeed, this is the only path that will ensure value can begin to make its way to creditors, who desperately need it as soon as practicable. To be clear, the UCC believes that the claims against the Sacklers and related parties could well be worth more than the $4.275 billion (the "Settlement Amount") contemplated by the settlement with members of the Sackler family (the "Sackler Settlement"). Nevertheless, two factors strongly favor acceptance of the Plan: (i) the significant risk, cost and delay (potentially years) that would result from pursuing the Sacklers and related parties through litigation; and (ii) the importance of preserving the agreements reached between Public Claimants and Private Claimants regarding allocation of value, absent which creditors would be forced to engage in time-consuming, messy and costly litigation.

The UCC therefore views the Plan as an imperfect solution that remains the ***only*** way to ensure that individuals, institutions and States and their political subdivisions start to receive the funds necessary to compensate them for their injuries (for individuals) and abate the opioid crisis (for every other party), which continues to take a staggering toll and has only been exacerbated by the COVID-19 pandemic.

***Therefore, with appropriate deference to M. de Voltaire, the UCC urges creditors not to let the perfect be the enemy of the good.***

## II.    OVERVIEW AND BACKGROUND OF THE CHAPTER 11 CASES

Purdue's bankruptcy has occurred against the backdrop of the opioid crisis, which is the single worst man-made epidemic—and other than the COVID-19 pandemic, the defining public health crisis—of this generation. It has resulted in half a million deaths and ruined countless other lives, in addition to leaving thousands of children suffering from fetal opioid exposure. Indeed, a few sentences could hardly do justice to the horrors of the opioid crisis and the human toll wrought by the Debtors' past actions. Therefore, the UCC will not attempt to explain in this letter the widespread harm and devastation to individuals and families alike with which many readers of this letter are all too familiar. Suffice it to say that this tragic backdrop, coupled with the many complex legal issues to which it has given rise, have made these Chapter 11 Cases among the most complex, difficult, important, emotional and painful imaginable.

### A.    *The Opioid Crisis Resulted in Extensive Litigation Against Purdue and Others*

In addition to the tragic human toll, the opioid epidemic has resulted in extensive litigation. More than a dozen opioid manufacturers, distributors and retail pharmacies have been named as defendants in thousands of lawsuits brought by numerous and varied plaintiff groups. These lawsuits seek to hold defendants responsible for creating or perpetuating the opioid crisis. In 2017, much of this litigation was centralized in the United States District Court for the Northern District of Ohio, in a single multi-district litigation entitled *In re National Prescription Opiate Litigation*, Case No. 17-2804 (the "MDL"). Even within this landscape of litigation, two things set Purdue apart from the other defendants.

*First*, Purdue manufactured OxyContin—a blockbuster "branded" opioid drug, which was sold to consumers by name and marketed aggressively to doctors and patients alike. Purdue's role in creating the opioid crisis through its marketing tactics placed it front and center in many of the complaints filed against multiple opioid defendants. *Second*, unlike any of the other defendants, Purdue was owned and operated for many years by members of a single family: the Sacklers. For their role in owning and operating Purdue, many members of the Sackler family were named individually as defendants in various litigations. Moreover, because Purdue was owned

---

[4] The term "Private Claimants" refers collectively to the holders of Hospital Claims, Third-Party Payor Claims, Ratepayer Claims, NAS Monitoring Claims and PI Claims, each as defined in the Plan.

exclusively by the Sacklers, the Sacklers were able to cause Purdue to transfer assets out of the reach of Purdue's creditors, to themselves and other entities they owned. Indeed, between 2008 and 2017, the Sacklers—as the owners and operators of Purdue—transferred ***more than $10 billion*** from the company to their own personal accounts and trusts. These amounts were generated largely from the sales of OxyContin.

A wide variety of plaintiff groups have brought claims and causes of action against the Debtors and the Sacklers, including the following:

1.  the United States Department of Justice (the "DOJ");

2.  the States (through their attorneys general);

3.  political subdivisions of the States (including cities and counties);

4.  Native American Tribes;

5.  a putative class of independent public school districts ("Public Schools");

6.  personal injury victims;

7.  mothers/guardians of children diagnosed at birth with NAS;

8.  hospitals;

9.  third party payors (including employer and government-sponsored health insurance plans administered by these companies);

10. a putative class of guardians for children diagnosed with NAS (the "NAS Monitoring Class") seeking establishment of a medical monitoring program to monitor the effect of *in utero* exposure to opioids;

11. a putative class of purchasers of private health insurance (the "Ratepayers") who allege that they were forced to pay increased premiums to account for the impact of the opioid crisis; and

12. a putative class of independent emergency room physicians.

Collectively, the damages asserted by these plaintiff groups amount to ***trillions*** of dollars. The various defendants do not have the means to pay these amounts in full. As a result, the media has reported that some of these defendants are in the process of negotiating settlements. Other defendants continue to litigate. And still others—Insys Therapeutics, Inc. ("Insys"), Purdue and Mallinckrodt plc ("Mallinckrodt")—have filed for bankruptcy protection.

**B.    *Purdue and the Sacklers Attempted To Settle with a Subset of Plaintiffs and Filed for Chapter 11 To Implement Their Settlement Framework***

Before filing for chapter 11, Purdue attempted to settle with certain governmental plaintiffs. Specifically, in August 2019, Purdue and the Sacklers reached an agreement with 23 States and what is referred to as the "Plaintiffs' Executive Committee" or "PEC."[5] Most notably, this settlement contemplated that the Sacklers would pay $3 billion in fixed payments over seven years to settle all claims against them—not only those brought by the settling States and the PEC. In addition, the settlement provided that the Sacklers would give up their ownership interests in Purdue, including control of the Debtors' cash, assets and insurance rights, to their creditors.

On September 15, 2019, Purdue filed for bankruptcy protection with this compromise—the so-called "Settlement Framework"—agreed to in principle by the settling States, the PEC, the Debtors and the Sacklers. At

---

[5] The PEC was appointed in the MDL to coordinate the efforts of the various plaintiffs, but largely consists of attorneys for municipalities and political subdivisions. A separate group of approximately 1,300 entities (mostly political subdivisions) referred to as the "Multi-State Governmental Entities Group" or "MSGEG," was formed to represent the interests of its members, which sought an independent voice in the Chapter 11 Cases.

the outset of the Chapter 11 Cases, certain settling States and the PEC formed the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "Consenting Committee").

The Settlement Framework was publicized at the outset of the cases as being worth between $10 and $12 billion. A portion of the perceived value of the Settlement Framework was rooted in the notion that Purdue would emerge from bankruptcy as a "public benefit company," in which the Sacklers would have no role,[6] which would manufacture and distribute addiction treatment and opioid overdose reversal drugs to the public for free or at cost. This program was called Purdue's "Public Health Initiative"; and between $4 and $5 billion of the $10 to $12 billion in settlement value was attributed to the value of these free or at-cost drugs. In other words, Purdue would use roughly $600 million of cash (which otherwise would be distributed to creditors) to manufacture these drugs, and then give away such drugs for free (or sell them at or below cost). Once this and other facts were considered, the UCC determined that the *Settlement Framework actually was worth somewhere between $5 and $6 billion in direct value to the litigants that had been harmed by the Sacklers and Purdue*. Moreover, while there can be no dispute that the Public Health Initiative was (and remains) a noble goal, the UCC is steadfast in the belief that the funds from Purdue's estates should be distributed to the claimants that had been harmed by the Sacklers and Purdue.

The UCC was not the only constituency to express concerns regarding the Settlement Framework. 24 State attorneys general (and the attorney general for the District of Columbia) formed a group, known as the "Non-Consenting States" or "NCSG," to advance their position that the Settlement Framework was not sufficient. Indeed, the NCSG has fought against the Settlement Framework throughout the Chapter 11 Cases, and continues to oppose the enhanced Sackler Settlement.

### C. *Appointment of the UCC*

In all chapter 11 cases, the Office of the United States Trustee (the "U.S. Trustee"), an arm of the DOJ, is tasked with determining whether to appoint a fiduciary committee to represent the interests of all unsecured creditors.[7] Here, the U.S. Trustee appointed the UCC on September 26, 2019, 11 days after Purdue commenced the Chapter 11 Cases.

The UCC's nine members (described on the first page of this letter) represent diverse interests. Importantly, the UCC does not include any governmental entities because the U.S. Trustee has taken the position that governmental entities cannot sit on official creditors' committees. Nevertheless, the UCC owes fiduciary duties to *all* unsecured creditors, regardless whether such creditors are Public or Private Claimants.

During the first few months of the Chapter 11 Cases, four different parties requested to join the UCC in an *ex officio* (non-voting) capacity: (i) Cameron County, Texas (on behalf of the MSGEG); (ii) the Cheyenne and Arapaho Tribes (on behalf of an ad hoc group of Native American Tribes); (iii) Thornton Township High School District 205, a public school district in Illinois (on behalf of a putative class of independent public school districts); and (iv) the State of Maryland. The UCC voted to accept all four, but the State of Maryland subsequently withdrew its request. The other three joined the UCC and remain *ex officio* members.

### D. *Intercreditor Dynamics*

Since the beginning of the Chapter 11 Cases, the interactions between the UCC and the two major Public Claimant groups (the Consenting Committee and the NCSG) has been complicated, as has the relationship between the Public Claimants and the Private Claimants generally. While all claimants are united in their desire to obtain the most value from the Sacklers and from Purdue's assets to fund creditor recoveries, the Public Claimants and Private Claimants have been at odds regarding where that value should go once it is received.

---

[6] At least since the agreement on the Settlement Framework, the Sacklers have had no board or management role in Purdue.

[7] An "unsecured" creditor is any creditor that does not have a lien, mortgage or similar security interest in a debtor's assets. Purdue does not have any debt to banks or similar institutions in the form of loans, bonds or notes. As a result, the vast majority of the Debtors' creditors are unsecured.

Specifically, the Public Claimants have expressed to the UCC and others their view that, as sovereigns, they are entitled to most of the value received through the Chapter 11 Cases to abate the opioid crisis and, further, they should be in control of how such value is allocated to other creditor groups and ultimately used. To be sure, it is commendable that the Public Claimants have been consistent in their desire to ensure that as much money as possible goes to abate the opioid crisis. Indeed one of the fundamental principles of the Plan is that the Public Claimants will use substantially all of the value they receive for abatement (and the Public Claimants have required that all Private Claimants other than personal injury claimants use substantially all of the money they receive for abatement) and the mishaps stemming from the oft-criticized use of the tobacco settlement money almost two decades ago will not be repeated.[8] Consistent with this overall approach, the Public Claimants also viewed, and continue to view, themselves as the arbiter of the strength of all creditors' claims, including their own.

Many of the Private Claimants have taken the position that the Chapter 11 Cases should function as a vehicle to achieve an allocation of value among *all* of the various claimants, based on the strength and weakness of their respective claims (although, admittedly, each Private Claimant group tends to think its claims are the strongest) and the amount of harm each such constituency has suffered. Many Private Claimants have also expressed the view that there is no basis to require claimants to use the value they receive for specified opioid abatement purposes, or in any other particular way. Finally, certain of the Private Claimants have argued that many of the States and their subdivisions were aware of the magnitude of the opioid crisis for years before bringing litigation, but nevertheless continued to receive value from the opioid business through tax revenues—notwithstanding their ability to take action, in their sovereign capacity, to abate the opioid crisis and stop various opioid defendants from causing harm. Accordingly, these Private Claimants have taken the position that Public Claimant allocations should be reduced (and such value reallocated to other creditors), at least by the amount of the tax revenues they have received, and possibly more.

Because of its composition, the UCC often was viewed as the voice of the Private Claimants alone, rather than of all unsecured creditors. Aside from being incorrect as a matter of bankruptcy law, this perception has resulted in unfortunate tensions throughout the Chapter 11 Cases. Indeed, it is impossible to understand how the Plan was constructed—and why the UCC does not object to the Plan—without understanding these dynamics.

## III.   THE UCC'S GENERAL APPROACH TO THE CHAPTER 11 CASES

From the outset, the UCC has made clear that it believes there are three pillars to a successful outcome in these cases.

1. ***Determining a Fair Allocation***: Negotiating or otherwise determining a fair and appropriate allocation among all Private and Public Claimants, based on legal principles.

2. ***Maximizing Value***: Increasing the total value available to ***all*** claimants, primarily by investigating the Settlement Framework and increasing the contribution from the Sacklers.

3. ***Furthering Public Health Objectives***: Ensuring that the results of these cases are consistent with the urgent need to combat the opioid crisis and help those most in need.

Each of these goals is addressed in further detail below.

---

[8] Recently, certain States have been criticized for the manner in which they have used (or not used) settlement money from the recent multi-State opioid settlement with McKinsey & Co., and, therefore, the Plan represents a landmark achievement on behalf of the Public Claimants. *See, e.g.,* Mary Murphy, *Parents who lost children to opioids demand NYS settlement money for treatment*, PIX11News, (updated June 2, 2021 at 6:39 PM EDT) https://pix11.com/ news/local-news/parents-who-lost-children-to-opioids-demand-nys-settlement-money-for-treatment/.

## IV.   DETERMINING A FAIR ALLOCATION AMONG OPIOID CLAIMANTS

The Debtors, the UCC and numerous other parties organized a six-month Mediation process to promote agreement between the Public and Private Claimants regarding the allocation of whatever value would eventually be received from the Sacklers and related parties, along with any value from the Debtors' estates. Without such an agreed resolution, creditors would compete against one another for value in costly and time-consuming litigation of all against all.

Perhaps even more significant than the uncertainty of any claimant's recovery was the uncertainty of timing that would have resulted from a failure to reach an allocation settlement. Without an agreement on allocation, the Debtors would be required to hold onto the value of their businesses and any value obtained from the Sacklers unless and until litigation regarding entitlement to such value among claimants was fully and finally resolved, a costly process that could take years. By contrast, a largely consensual mediated resolution of allocation issues would enable the Debtors to confirm a plan of reorganization and put their (and the Sacklers') value to work more quickly to compensate victims and abate the opioid crisis.

### A.   *The Scope and Participants for Phase I Mediation*

Following discussions regarding the appropriate scope of the mediation, the number of mediators and the participants in such mediation, the parties agreed that the Honorable Layn Phillips (Ret.) and Kenneth Feinberg would be appointed co-mediators (collectively, the "Mediators")[9] of Phase I Mediation. The parties then turned to negotiating and drafting a form of order that would govern the process. As reflected in the *Order Appointing Mediators* [ECF No. 895] (the "Mediation Order"), the parties agreed that the purpose of Phase I Mediation was solely to determine the relative allocation of the value of the Debtors' estates as between Public Claimants, on the one hand, and Private Claimants, on the other hand, and *not* allocation among the claimants on each side. In addition, the Mediation Order contained provisions identifying the Phase I Mediation Parties,[10] the role of the DOJ in the mediation and heavily-negotiated provisions regarding confidentiality and what could and could not be disclosed publicly regarding the mediation.

### B.   *Keeping Phase I Mediation on the Right Track*

The UCC's objective for Phase I Mediation was to work with the other parties to help facilitate an outcome that was (i) fair and appropriate and (ii) the product of a fair and reasoned process.

Due to factors both within and outside the parties' control, Phase I Mediation progressed slowly at the outset. The start of the mediation in March 2020 coincided with the onset of the COVID-19 pandemic, which prevented in-person meetings with the Mediators and among the Phase I Mediation Parties. In addition, the Public Claimants chose to focus first on reaching agreement among themselves regarding how the value to be distributed to the Public Claimants would be allocated—a commendable goal. Only after the Public Claimants reached general agreement on this issue did negotiations regarding allocation of estate value *as between* Public Claimants and Private Claimants begin in earnest.

In July 2020, and with the parties still in negotiations, the Court imposed a deadline of August 31, 2020 for Phase I Mediation to conclude. As this deadline approached, it became clear that several issues appeared to be

---

[9] Mr. Feinberg is a world-renowned mediator with whom almost all of the advisors to the Phase I Mediation Parties have had prior experience in other complex mass tort cases. Judge Phillips is another world-renowned mediator and former federal district court judge, who had mediated the Debtors' $275 million settlement with the State of Oklahoma prior to the Debtors filing for bankruptcy.

[10] Phase I Mediation involved representatives of nearly all significant creditor constituencies, including: (i) the Debtors; (ii) the UCC (including *ex officio* members); (iii) the Consenting Committee; (iv) the Ad Hoc Committee of NAS Babies; (v) the Ad Hoc Group of Hospitals; (vi) the Non-Consenting States; (vii) the MSGEG; (viii) the Ad Hoc Group of Individual Victims; (ix) counsel for the Blue Cross and Blue Shield Association, various third party payors and employer and government-sponsored health insurance plans administered by these companies; and (x) the Ratepayers (collectively, the "Phase I Mediation Parties"). In addition, certain other parties, including the DOJ, the Public Schools and the NAACP had varying levels of involvement in Phase I Mediation, but were not official Phase I Mediation Parties.

hindering progress, and the mediation likely would fail or result in an inappropriate outcome. Accordingly, on August 19, 2020, the UCC expressed to the Mediators and the Phase I Mediation Parties the UCC's views, including with respect to a viable path forward. Because of the confidentiality provisions of the Mediation Order, this letter cannot provide significant detail regarding the specifics of what occurred during Phase I Mediation or the nature of the UCC's specific views. Indeed, although certain developments during the mediation were leaked to media outlets, the only "official" information regarding Phase I Mediation to be disclosed publicly was included in the *Mediators' Report* [ECF No. 1716] filed with the Court on September 23, 2020 (the "1st Mediators' Report") and in the subsequent *Mediator's Report* [ECF No. 2548] filed with the Court on March 23, 2021 following the conclusion of Phase II Mediation (the "2nd Mediators' Report" and, together with the 1st Mediators' Report, the "Mediators' Reports").

### C. *Phase I Mediation Results*

As described in the Mediators' Reports, Phase I Mediation resulted in: (i) the Public Claimants' agreement that all value they receive in the Chapter 11 Cases would be used to fund programs intended to abate the opioid crisis; (ii) an allocation of estate value, pursuant to fixed payment schedules, among four Private Claimant constituencies—Personal Injury Claimants, [11] Hospital Claimants, [12] Third-Party Payor Claimants and NAS Monitoring Claimants (with regard to abatement), as reflected in four separate term sheets agreed to by the Public Claimants and the specific Private Claimant group party to such term sheet (collectively, the "Phase I Mediation Settlements"); and (iii) the agreement of the Hospital Claimants, Third-Party Payor Claimants and NAS Monitoring Claimants to use substantially all of the value they receive to fund programs to abate the opioid crisis.[13] Each of the Phase I Mediation Settlements was conditioned on confirmation of a plan of reorganization that included a contribution from the Sacklers. In other words, if no settlement ultimately was reached with the Sacklers, then there was no requirement that the Phase I Mediation Settlements be honored by the Public Claimants. Furthermore—and critically for the dynamics of Phase II Mediation—because each of the Phase I Mediation Settlements contemplated that the Private Claimants would receive a fixed recovery over a defined period of time, the Public Claimants would receive all of the upside that could result from litigating against or settling with the Sacklers, beyond the value required to pay the settling Private Claimants.

Phase I Mediation resulted in an approximate split of Purdue's "nominal" or headline value of 79% to Public Claimants and 21% to Private Claimants (in the aggregate), which, after taking into account timing of payments, equals a 76% / 24% split on a "net present value" basis. These amounts were negotiated and agreed to by the Phase I Mediation Parties, and were not dictated, mandated or even proposed by the UCC. Certain creditors may believe that this outcome is unfair because it provides too much value to the Private Claimants; others may believe that Public Claimants received too much value. The UCC offers the following observations:

1. The Public Claimants—in particular, the States and their political subdivisions, including the PEC—brought most of the pre-bankruptcy litigation against Purdue and the Sacklers. As a result, certain parties believe that the Public Claimants are most responsible for increasing the pot of value available to creditors, and as such, are entitled to receive most of Purdue's available value.

2. The Debtors' most significant assets are the causes of action against the Sacklers. The extent to which the Sacklers' agreement to contribute $4.275 billion to the estates as part of the Sackler Settlement was motivated by the strength of these causes of action (as opposed to a fear of defending against the direct causes of action of the States, their political subdivisions and the other Public and Private Claimants),

---

[11] Eight months after Phase I of Mediation had been substantially completed, the Personal Injury Claimants agreed to further subdivide their allocation as between NAS Personal Injury Claimants and Non-NAS Personal Injury Claimants.

[12] The Hospital Claimants are defined in the Plan to include claims held by "a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity."

[13] In addition, the Debtors and the ratepayers reached agreement on a sum to be paid over two years for dedicated abatement purposes.

however, is unclear.  Analysis of both the estate causes of action and the direct causes of action is set forth later in this letter.

3.  At its core, the opioid crisis involves harm to people.  Indeed, there would be no crisis were it not for the individuals who have suffered immeasurable harm.  Therefore, some believe that the more than 140,000 personal injury victims[14] who filed claims against the Debtors should have received a larger allocation.

4.  With the exception of personal injury victims, each litigation creditor's claim can be divided into three parts: (i) a "damages" claim to compensate for past harm; (ii) a "future damages" claim to compensate for future harm; and (iii) an "abatement" claim to pay for programs to combat the opioid crisis in the future.  As noted above, the Public Claimants have stated that they believe all estate value (other than payments to address past damages suffered by personal injury victims) should be used exclusively for abatement.  Moreover, the Public Claimants required in connection with the Phase I Mediation Settlements that Private Claimants, other than personal injury victims, forego compensation for past and future damages claims and use any recoveries solely for abatement purposes.

5.  The UCC has observed that creditor constituencies—both public and private—believe that the claims of other creditor constituencies are not as strong as their own.  In addition, certain constituencies believe that other constituencies were culpable, at least in part, for the opioid crisis.

6.  As of the date of this letter, the treatment of the Public Schools' claims remains unresolved.  The UCC hopes that there will be further negotiation regarding such claims that will result in a resolution.

Despite an imperfect process and the foregoing observations, the UCC supports the resolutions reached in Phase I Mediation because: (i) funds are needed to address the opioid crisis ***now***; (ii) the alternative to a mediated resolution—*i.e.*, litigation regarding the merits of creditor constituency's claims—would be costly and time-consuming and would further delay the use of funds to combat the opioid crisis; and (iii) the outcome has been agreed to by almost all of the Phase I Mediation Parties.

## V.   THE UCC CONDUCTED A THOROUGH INVESTIGATION OF THE SACKLERS, INDEPENDENT FROM THE DEBTORS IN ORDER TO FULFILL ITS FIDUCIARY DUTIES AND MAXIMIZE VALUE[15]

The UCC made clear immediately upon its appointment that it needed to conduct a thorough investigation into the proposed settlement before the UCC could consider supporting the Settlement Framework.  Moreover, "prepetition" or pre-bankruptcy litigation presented serious allegations concerning the Debtors' and the Sacklers' role in the opioid epidemic.  As such, numerous unsecured creditors informed the UCC that they believed a thorough investigation into the Debtors' role in the opioid epidemic and massive transfers of wealth to or for the benefit of the Sackler family was itself a primary objective in the Chapter 11 Cases.

The UCC therefore set out to fulfill its fiduciary duties by investigating these issues.  Among other things, the UCC's Investigation:

1.  was designed to determine the ***magnitude of the value recoverable from the Sacklers***, through litigation or otherwise;

---

[14] Counsel to the UCC has responded to more than 200 personal injury victims who reached out directly and has communicated with a number of the approximately 100 additional individuals who filed letters on the Court's docket.

[15] This section contains references to various Court orders and filings submitted by the UCC and other parties in interest.  For the sake of brevity, this letter does not include citations to every such filing.  To the extent any claimant would like to review any of the cited materials, such claimant may find them on the public docket (*available at* https://restructuring.primeclerk.com/purduepharma/Home-DocketInfo) or should feel free to reach out to counsel to the UCC to obtain copies of such documents.

2. involved an ***evaluation of claims*** (i) against the Sacklers and (ii) relating to the Debtors' prepetition marketing practices, transfers of value to the Sacklers and other potential misconduct; and

3. involved an ***assessment of the Sacklers' ability to satisfy any judgment*** rendered against them, and the ***likelihood of successfully collecting upon*** any such judgment.

All together, the Investigation encompassed document discovery of the Debtors, the Sacklers, more than 100 Sackler-owned entities in the United States and abroad (including the foreign independent associated companies ultimately owned by the Sackler families (the "IACs")) and the other entities owned and controlled by the Sackler families  (the "Other II Way Entities" and together with the IACs, the "Sackler Entities"), the Debtors' insurance brokers, non-Sackler directors, certain financial institutions and the Debtors', the Sacklers' and Sackler Entities' long-time advisors at Norton Rose Fulbright US LLP ("NRF").  The UCC conducted 16 depositions of Sacklers, directors and executives of the Debtors, advisors to the Debtors or Sacklers and other key personnel.  The UCC analyzed the Settlement Framework in light of the findings from this Investigation, and worked to maximize the estates' value by ensuring that the claims against the Sacklers would be prosecuted if the Settlement Framework was not sufficiently improved.

### A.   *The UCC's Initial Discovery Efforts*

The UCC initially sought to conduct its Investigation through voluntary disclosures from the Debtors and the Sacklers.  During the first days of the Chapter 11 Cases, the Debtors filed a motion with the Court seeking a preliminary injunction (the "Preliminary Injunction") to enjoin cases relating to the Debtors' opioid business from proceeding against the Debtors or the Sacklers.  Due to, among other things, the Debtors' and the Sacklers' agreement to provide discovery to the UCC on a voluntary basis, the UCC supported the Preliminary Injunction.  These commitments and obligations were memorialized in a stipulation (the "Case Stipulation").

Beginning in October 2019, the UCC issued diligence requests to the Debtors and the Sacklers.  The UCC sought categories of information that were relevant to potential estate causes of action against the Sacklers, including causes of action pertaining to the Sacklers' ownership and control of the Debtors, misconduct of the Debtors while under the Sacklers' control and the transfer of billions of dollars in value from the Debtors to the Sacklers and the Sackler Entities.

The UCC understood that the Debtors had formed a special committee (the "Special Committee"), which had been delegated full authority respecting all matters concerning the Sacklers and was overseeing investigations concerning the Sacklers.  Starting in early November 2019, the UCC met with the Debtors in an effort to learn about the Special Committee's investigatory process and seek to collaborate and coordinate the two investigations.  The Debtors made available to the UCC and other parties certain documents, including the Transfer Reports (as defined below) detailing cash and non-cash transfers made by the Debtors to and for the benefit of the Sacklers.  The Debtors also made clear, however, that they did not intend to share much of the work product and analysis of the Special Committee with the UCC.  Therefore, the UCC concluded that a thorough and vigorous investigation (independent of the Special Committee's investigation) would be necessary to fulfil the UCC's fiduciary duties.

The UCC was also committed to sharing the findings from its Investigation with its constituents to the greatest extent possible.  Thus, the UCC entered into a comprehensive protective order that allowed the production of confidential material to a broad range of professionals for such groups.  The UCC also negotiated a protocol that permitted sharing confidential information between and among certain groups of creditors.

### B.   *The UCC Investigation Was Rigorous and Exhaustive*

**The Sacklers:**  Pursuant to the Case Stipulation, the UCC was not permitted to seek formal discovery from the Sacklers until first attempting to obtain disclosures voluntarily.  Prior to the UCC's discovery efforts in these Chapter 11 Cases, minimal discovery had been taken from the Sacklers in any context, including the prepetition

10

litigation.[16]  The UCC issued its first diligence requests to the Sacklers in November 2019 and issued additional comprehensive requests in January 2020.  Counsel for the UCC and the Sacklers met and conferred on many occasions in a good faith effort to agree on the appropriate scope of discovery in response to the UCC's diligence requests.  For example, between January and March 2020, the UCC's advisors conferred with representatives of the Sackler family concerning discovery by telephone on at least four occasions, and exchanged many more meet and confer letters and emails.  The UCC also began the process of negotiating custodians and search terms with the Sacklers for purposes of obtaining Sackler family emails and other relevant electronically stored information, such as e-mails.  Unfortunately, the Sacklers were not willing to provide (voluntarily) sufficient discovery from the perspective of the UCC.

On March 25, 2020, the UCC filed a motion with the Court under Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking authorization to conduct an examination of the Sacklers, including by serving formal subpoenas for documents and testimony.  The Court granted the request, and the UCC served formal discovery demands on the Sacklers on March 31.  The UCC continued to engage in multiple meet and confers with the Sacklers regarding the scope of its subpoenas, and the Sacklers continued to object to discovery requested by the UCC.  On two more occasions, the UCC determined that it had reached an impasse with the Sacklers regarding the scope of discovery and thus sought assistance from the Court.  Pursuant to the Court's instruction on June 8, the parties resumed their meet and confer efforts and finally reached agreements concerning the scope of the Sacklers' disclosures, which were set forth in publicly filed stipulations.  In total, the Sacklers have produced more than 450,000 documents in response to the UCC's discovery demands.

**The IACs and Other II Way Entities:**  The UCC also sought discovery from the IACs and Other II Way Entities, which received over a billion dollars in additional value from the Debtors in the form of cash and non-cash transfers over the past decade.  The UCC at first sought to obtain diligence in the possession of these entities on a voluntary basis from the Sacklers.  Early in these Chapter 11 Cases, the Sacklers' longtime advisors coordinated some initial responses to the UCC's requests concerning the IACs, but those advisors later stopped responding. Accordingly, the UCC sought assistance from the Court to require the Sacklers to order the IACs to cooperate.  As a result, the IACs engaged new counsel, and the UCC met and conferred in good faith with the IACs' new counsel. The Other II Way Entities also engaged their own counsel to respond to diligence requests, with whom the UCC likewise met and conferred concerning voluntary disclosures.

The UCC ultimately determined that it would not be possible to reach agreement with either the IACs or the Other II Way Entities concerning voluntary disclosures, and sought and received authorization from the Court to serve formal subpoenas on the IACs and the Other II Way Entities.  The UCC then sent a formal subpoena to the IACs on July 6 and served a subpoena on the Other II Way Entities on July 11.  The UCC met and conferred with counsel to the IACs and the Other II Way Entities numerous times regarding the scope of their respective disclosures. The UCC also negotiated two stipulation (each of which was filed publicly) with the IACs concerning the scope of the IACs' disclosures.  Ultimately, the IACs produced almost 800,000 documents and the Other II Way Entities produced approximately 40,000 documents in response to the UCC's discovery demands.

**The Debtors:**  The UCC issued its first voluntary diligence requests to the Debtors in October 2019, and later supplemented those requests with additional comprehensive requests in January 2020.  The UCC sought corporate governance and formation documents, board materials, contracts, insurance documents, copies of prepetition productions and other materials necessary for the evaluation of claims.  The UCC also requested that the Debtors obtain and review emails and documents of key custodians that were never produced in prepetition litigation, including the files of Sacklers and other directors and executives on company servers.  The UCC met and conferred numerous times with the Debtors over the scope of its Investigation, and ultimately negotiated a stipulation (which was filed publicly) to govern the disclosures.  To date, the Debtors have produced approximately

---

[16] For instance, the only Sackler documents produced by any Sacklers in the MDL were fewer than 200 documents produced by Richard Sackler.

700,000 documents in response to the UCC's requests, and have also provided copies of approximately 12 million documents that had been produced in prepetition litigation or produced to the DOJ or Congress.

**NRF:**  The law firm Norton Rose Fulbright served as long-time counsel to the Debtors, the Sacklers, the IACs and the Other II Way Entities.  Moreover, Stuart Baker, a former partner at NRF, held numerous non-legal roles with the Debtors, the Sacklers and their trusts, the IACs and the Other II Way Entities, including roles as an executive, a director and a trustee.  Accordingly, the UCC moved the Court for authorization to serve a formal subpoena on Mr. Baker, which the Court granted.  The UCC also moved the Court for authorization to serve a formal subpoena on NRF, which the Court also granted.  The UCC met and conferred with the Debtors, the Sacklers, the IACs, the Other II Way Entities and Mr. Baker to ensure that the NRF's files were searched and reviewed for non-privileged documents responsive to the UCC's requests.  NRF ultimately produced, directly or jointly with the Debtors, close to 200,000 documents in response to the UCC's requests.

**Other Related Parties:**  The UCC also sought and was granted authority, through formal motion practice before the Court, to seek document productions from other parties, including non-Sackler directors of the Debtors and certain of the Debtors' insurers regarding policies and potential coverages.  The insurance brokers produced more than 4,000 documents in response to the UCC's discovery requests.

**Financial Institutions:**  Finally, the UCC joined in a motion by the NCSG for authorization to conduct an examination of financial institutions to obtain information in relation to the location and amount of the Sacklers' assets and transfers of those assets over time.

**Privileged Materials:**  The Debtors, the Sacklers, the IACs and NRF withheld or redacted tens of thousands of documents from their productions, including as a result of claims of privilege asserted by the various parties. The UCC spent significant time and effort obtaining and analyzing privilege and redaction logs, and concluded that the grounds offered for withholding and/or redacting many of these documents were subject to challenge. Accordingly, the OCC engaged in extensive meet and confer meetings with the producing parties, and later moved the Court to compel the production of such documents from the Debtors and the Sacklers.[17]  Ultimately, the Debtors and the Sacklers voluntarily agreed to produce in full or to limit the redactions on more than 16,700 documents that were previously withheld and/or redacted.

**Agreement with the Debtors on Privileged Materials:**  In addition, the UCC reached consensual resolution of its motions directed to the Debtors, with the Debtors agreeing to produce to the UCC nearly 13,000 Debtor-privileged documents in exchange for the UCC withdrawing its motions.  The privileged documents so-produced included every communication by and among the Sacklers and other directors or executives of the Debtors responsive to the UCC's document requests.[18]  ***The UCC is aware of no other creditors' committee that has obtained comparable access to such a volume of privileged documents from a debtor in bankruptcy, and appreciates the Debtors' willingness to provide—and constructive cooperation in providing—these documents to the UCC in connection with its Investigation.***

The following chart summarizes the number of documents the UCC obtained that were produced either prior to or following the commencement of the Chapter 11 Cases.

---

[17] *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752].

[18] *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908].  The motions remain adjourned with respect to the Sacklers, and the UCC will proceed with its motions to compel privileged documents from the Sacklers in the event that a settlement with the Sacklers is not approved.

| Producing Party | Document Category | Approximate Document Count | Approximate Page Count |
|---|---|---|---|
| **Sacklers** | Documents produced in response to UCC's discovery requests | 465,008 | 2,604,556 |
| | Documents produced in prepetition litigation | 152 | 634 |
| **IACs** | Documents produced in response to UCC's discovery requests | 782,252 | 7,896,339 |
| **Other II Way Entities** | Documents produced in response to UCC's discovery requests | 38,323 | 326,828 |
| **Debtors** | Documents produced in prepetition litigation | 9,865,317 | 71,120,741 |
| | Documents produced to the DOJ | 2,230,764 | 12,354,380 |
| | Documents produced to Congress | 7,951 | 92,617 |
| | Documents produced in response to the UCC's requests | 711,494 | 4,815,418 |
| **NRF** | Documents produced in response to the UCC's requests | 197,476 | 1,478,280 |
| **Insurance Broker** | Documents produced in response to the UCC's requests | 4,157 | 41,884 |
| **Non-Sackler Directors** | Documents produced in prepetition litigation | 2,157 | 17,230 |
| **Sacklers' Financial Institutions** | Documents produced in response to NCSG's requests | 3,540 | 94,429 |
| **TOTAL** | | 14,305,051 | 99,365,056 |

**C.  *The UCC Obtained Critical Information Regarding Both the Claims Against the Sacklers and the Sacklers' Ability To Pay***

The documents that the UCC obtained from the Debtors, the Sacklers and others related to the merits of the claims against the Sacklers, including the Sacklers' ownership and control of the Debtors, knowledge of and involvement in misconduct and intent concerning prepetition transactions dating back to the 1990s, as well as documents relating to claims against the Sacklers and the Debtors arising out of Purdue's opioid businesses.  The UCC also sought and obtained documents related to the Sacklers' ability to pay an eventual judgment, including documents concerning their wealth and investments, and documents concerning the intricate array of trusts through which the Sacklers own the Debtors and other assets.

The UCC obtained more than 14 million documents (comprising close to 100 million pages), including approximately 2 million documents that had not been produced previously in any litigation or in connection with a government investigation.  The UCC utilized analytics and targeted searches to review the 12 million documents that had been produced prepetition efficiently and cost effectively.  The UCC also relied on a dedicated team of contract attorneys and efficiency counsel to review the documents newly produced in the Chapter 11 Cases.  Through this review, the UCC identified thousands of documents of great relevance to claims against Purdue and the Sacklers and other key issues.

The Case Stipulation also required the Sacklers to make presentations regarding the trusts through which they held their wealth, their assets and their asserted defenses.  The UCC carefully analyzed these presentations and assessed them in the context of the extensive diligence it obtained in the Chapter 11 Cases.

The UCC also carefully reviewed the reports prepared by the Special Committee that detailed the cash and non-cash transfers made by the Debtors to the Sacklers and their entities (the "Transfer Reports").  The UCC relied on the accuracy of the Transfer Reports and generally did not seek to recreate that work beyond verifying the

reasonableness of the information contained therein through a variety of means.  The UCC did obtain discovery from the Sacklers, however, in order to conduct additional analysis that was not addressed in the Transfer Reports.

In connection with the Investigation, the UCC conducted 16 depositions of key personnel (identified in coordination with the NCSG), including seven members of the Sackler family,[19] long-serving members of the Debtors' board,[20] the Debtors' current and past CEOs,[21] a former Vice President and Associate General Counsel at Purdue,[22] Stuart Baker and other Sackler family advisors.[23]  When the UCC encountered difficulties in scheduling these depositions, the UCC moved the Court for authority to serve compulsory discovery demands to obtain the depositions, which the Court granted.

### D.  *The UCC Obtained Information Necessary To Evaluate the Strength of Estate Claims*

As a result of these discovery efforts, the UCC obtained and analyzed the information necessary to evaluate the strength and potential value of the Debtors' estates' claims against the Sacklers, held for the benefit of the Debtors' creditors.[24]

***First, the UCC obtained the information necessary to evaluate potential fraudulent transfer claims to claw back more than $4.1 billion in non-tax U.S. partner cash distributions from the Debtors to the Sacklers through their trusts.***  The UCC obtained documents, and conducted legal research, in order to investigate whether the transfers would be avoidable and recoverable as intentional or constructive fraudulent transfers.  Among other things, this analysis required consideration of the Debtors' intent in approving the transfers and the Debtors' insolvency at the time of each transfer, taking into account the Debtors' contingent liabilities from opioid litigation.  The UCC did not have access to the Special Committee's insolvency analysis described in the Disclosure Statement, and thus the UCC conducted an independent insolvency analysis, spanning 2008 through 2017.  Such analysis tested whether the Debtors (i) had total liabilities that exceeded the total fair value of their assets, (ii) incurred debts beyond their ability to pay as they matured, or (iii) had unreasonably small capital to operate their business in the ordinary course and (iv) received reasonably equivalent value in exchange for cash and non-cash transfers.  This analysis required the UCC to assess the Debtors': (a) research and development, strategic and business plans and budgets; (b) actual and projected financial position; and (c) operating results and cash flows.  The UCC also performed extensive research and analysis of probable and reasonable estimable opioid liabilities at all relevant points in time, based on industry, scientific and economic studies and literature on opioid use and abuse (some of which included Purdue's own funded studies), findings from litigation filings, internal communications and other facts identified in support of allegations of misconduct as well as the Sacklers and Purdue's awareness of the forthcoming opioid litigation and resulting liability.  Furthermore, the UCC assessed the applicable statutes of limitations, including the statutes of limitations available to any so-called "golden creditor," and the impact of prejudgment interest on the value of claims.

***Second, the UCC obtained information necessary to evaluate potential fraudulent transfer claims to claw back approximately $4.7 billion in tax distributions made by the Debtors on behalf of the Sacklers and their trusts.***  The UCC sought extensive discovery concerning the purpose and context of these tax distributions, in order to investigate the intent behind those transfers and the Debtors' insolvency at the time of those transfers.  The UCC also investigated the extent to which the Sacklers might argue that such tax distributions conferred any form of value on the Debtors.

---

[19] Richard Sackler, Mortimer D.A. Sackler, Kathe Sackler, Theresa Sackler, Ilene Sackler-Lefcourt, David Sackler and Marianna Sackler.

[20] Cecil Pickett and F. Peter Boer.

[21] Mark Timney, John Stewart and Craig Landau.

[22] Robin Abrams.

[23] Stephen Ives and Jonathan White.

[24] The UCC investigated, researched, and considered numerous potential claims.  This letter does not purport to identify all of the claims considered, or all of the issues considered in connection with those claims.

*Third, the UCC obtained information necessary to identify and evaluate potential fraudulent transfer claims to claw back transfers to the Sackler Entities for the benefit of the Sacklers.* These transfers included, among others: (i) cash of approximately $1.5 billion; (ii) additional non-cash value, based on below-market royalty payments charged by the Debtors (when the Debtors were owned and controlled by the Sacklers) to the IACs for the international licensing and sale of OxyContin to an Other II-Way Entity; and (iii) stock and equity interests and other valuable intellectual property assets transferred to or for the benefit of the Sacklers and the Sackler Entities for no consideration. Among other things, the UCC investigated the intent of the Debtors and the particular circumstances of each of transfer of value to the Sackler Entities by reviewing, among other things, the Debtors' related party agreements, board materials, presentations, transfer documents and financial information. The UCC also prepared analyses to assess the value of the non-cash property that was transferred to determine whether the Debtors had received reasonably equivalent value in exchange, and if not, an estimate of potential damages. The UCC examined the tax implications of all non-cash transactions, particularly those involving intellectual property rights, between the Debtors and the Sackler Entities and the effect that unwinding those transactions would have on any settlement. As part of this effort, the UCC prepared an analysis of the royalty rates that governed the Debtors' licensing agreements with the IACs.

*Fourth, the UCC obtained the diligence necessary to investigate potential breach of fiduciary duty claims.* The UCC investigated the manner in which the Sacklers and other fiduciaries carried out, or breached, their fiduciary duties to the Debtors. This analysis required consideration of the Debtors' financial condition, taking into account their contingent liability from opioid marketing practices. This investigation also required consideration of the degree to which the Sacklers and others exposed the Debtors to liability through aggressive marketing tactics and/or enriched the Sacklers at the expense of the Debtors and the Debtors' creditors. Specifically, the UCC investigated the degree to which the Sacklers failed to exercise reasonable care as directors, failed to implement reasonable steps to monitor or address red flags related to the opioid businesses and otherwise breached their fiduciary duties. The UCC also investigated the extent to which the Sacklers overstepped the bounds of ordinary director behavior and actively managed or micromanaged the Debtors' opioid marketing and other activities. The UCC also investigated the Sacklers' domination and control of the non-family directors who served on the Debtors' board. Finally, among other things, the UCC conducted extensive analysis regarding questions of standing, the strength of breach of fiduciary duty claims and the collectability of any judgment on such claims against the assets held in the Sacklers' trusts.

*Fifth, the UCC obtained the diligence necessary to evaluate claims to pierce the Debtors' corporate veil, or to argue that the Sacklers and the Sacklers' numerous trusts and other entities constituted alter egos of the Debtors.* The UCC obtained discovery to investigate the extent to which the Debtors disregarded corporate formalities, shared resources, intermingled assets or otherwise were not separate from the Sacklers' trusts or other entities.

*Sixth, the UCC obtained the discovery necessary to investigate numerous other claims, including claims for unlawful dividends and unjust enrichment.*

*Finally, the UCC obtained the information necessary to evaluate the Sacklers' ability to satisfy potential judgments on claims.* The UCC pursued extensive discovery to investigate the location, nature and ownership of the Sacklers' wealth. This included an investigation into a complex array of domestic and foreign trusts through which each side of the Sackler family holds its ownership of the Debtors and other assets. The UCC obtained and analyzed extensive information concerning the assets held in trust, the location of proceeds of potentially fraudulent transfers within the trust structures and the recoverability of trust assets in the event a judgment was rendered. The Sacklers provided an analysis of flow of funds summarizing cash transfers received from Purdue and the proximate recipients of those funds. The UCC analyzed these presentations and performed related diligence, including meeting periodically with the Sacklers' financial advisors to request additional support related to certain holdings and transfers. The UCC also obtained discovery from the Sacklers to conduct its own tracing analysis on a sampling of cash distributions made by the Debtors. The UCC's analysis comprised detailed sample tracing of funds from the Debtors to and through the entities and holding companies above them, to the recipient Sackler trusts, individuals and Sackler Entities, as well as subsequent intra-trust/individual distributions and recoverability against each

recipient. Additionally, the UCC sought to develop a holistic view of the primary historical funding sources of each trust's assets to estimate the proportion of value attributable to proceeds from Purdue distributions to determine the theoretical value of recoverable assets. The UCC also investigated whether the trusts were insufficiently independent from the Sacklers in their individual capacities, used for improper purposes or failed to follow formalities such that the assets held in one or more of the trusts would be available to satisfy a judgment against the Sacklers. Finally, the UCC analyzed international law concerning foreign trust structures as asset protection vehicles.

### E.    *The UCC Also Evaluated Third-Party Direct Claims Against the Sacklers To Assess the Impact of Third-Party Releases*

In addition to investigating potential estate causes of action, the UCC obtained discovery pertaining to the Debtors' role in the opioid epidemic and the Sacklers' involvement in any misconduct. The UCC worked with creditor constituencies to ensure that search criteria utilized to obtain documents from the Debtors, the Sacklers, the IACs, the Other II Way Entities and NRF incorporated terms designed to capture evidence of potential misconduct and any Sackler involvement in the same.

### F.    *The UCC's View of the Debtors' and the Sacklers' Liability and Related Motion Practice*

As noted above, the UCC moved to compel both the Debtors and the Sacklers to produce communications with their respective counsel and other documents that were withheld on privilege grounds. To that end, the UCC argued that the fiduciary, crime fraud and "at issue" exceptions to the privilege applied, and required the Sacklers and the Debtors to produce such withheld materials. In connection with these privilege motions, the UCC marshalled hundreds of pages of evidence gathered through its discovery efforts demonstrating that claims against the Debtors were "colorable," and that there was "probable cause" to conclude that the Sacklers and the Debtors had engaged in intentional fraud and breaches of fiduciary duty in connection with transferring billions of dollars to the Sacklers between 2007 and 2017. To the extent Sackler transfers could be shown to be the product of actual fraud based on the extensive evidence unearthed, the UCC argued that the primary obstacles to Sackler liability (statutes of limitation arguments) and creditor recovery (transfers to spendthrift trusts) would fall away. The Debtors settled the motion as to them by supplying the UCC with unprecedented access to Debtor-privileged documents, as discussed above. The motion as against the Sacklers is still pending, but will be withdrawn in the event the Plan is approved.

## VI.    REACHING AGREEMENT OVER ADDITIONAL VALUE FROM THE SACKLERS THROUGH PHASE II MEDIATION

Around the time Phase I Mediation concluded, the Debtors proposed that the Mediators continue to serve in an expanded capacity to mediate claims and causes of action that may be asserted by the Debtors' estates or creditors against members of the Sackler family and related parties. While the UCC did not object to mediating such disputes, it believed that commencing this second phase of mediation was premature in light of the significant work that still needed to be done in connection with its Investigation. Nonetheless, the key parties agreed to engage in Phase II Mediation, beginning in September 2020.

As noted, each of the Phase I Mediation Settlements was conditioned on confirmation of a chapter 11 plan that included a contribution from the Sacklers. Moreover, pursuant to the Phase I Mediation Settlements, Private Claimants would not receive the benefit of any increase in the value of a Sackler contribution. Further, because the Consenting Committee had already agreed to the Settlement Framework with the Sacklers, the views of the Non-Consenting States would, in many ways, drive negotiations with the Sacklers during Phase II Mediation. The UCC's efforts during Phase II Mediation focused on increasing the value of the Sackler contribution to ensure that the Phase I Mediation Settlements would be preserved and that other creditors—specifically the NCSG—ultimately would support a plan of reorganization. Specifically, the UCC focused on attempting to bridge the gap between the Sacklers and the NCSG. In addition, the UCC (i) continued to conduct, in close coordination with the NCSG, its

16

Investigation and (ii) presented its preliminary analysis of the value of estate claims—based on the incomplete discovery it had received at the time—to the Mediators and the Phase II Mediation Parties other than the Sacklers.

As the Court-imposed deadline for Phase II Mediation of January 31, 2021 neared, it became clear that the gap between the Sacklers and the Non-Consenting States would prove too great to be bridged. Given the importance of achieving a resolution with the Sacklers in order to preserve the Phase I Mediation Settlements, the UCC began working closely with the Debtors, the Consenting Committee and the MSGEG on the terms of a proposal to the Sacklers that each of the four parties would support.[25] After exchanging numerous proposals and counterproposals, the UCC, the Debtors, the Consenting Committee, the MSGEG and the Sacklers reached an agreement in principle on the broad economic terms of a settlement. Although the Private Claimants would not receive any of the upside of the increased Settlement Amount, the UCC understood (based on its discussions with the advisors to the various Private Claimant groups) that the Private Claimants also supported the Sackler Settlement.

To be clear, the UCC does not believe that the Sackler Settlement reflects the full value of the claims against the Sacklers and related parties before taking other factors into account. Moreover, the UCC acknowledges that many creditors—including those who have suffered the most harm as a result of the Sacklers' role in the opioid crisis—may view the proposed Sackler Settlement unfavorably. Indeed, the UCC understands why certain creditors believe the Sacklers should be forced to give up more, if not all, of their wealth in exchange for the releases proposed under the Plan. Notwithstanding the foregoing, the UCC views the Sackler Settlement as an imperfect solution that nevertheless is superior to any other available alternatives for the majority of Purdue's creditors.

## VII.    THE PUBLIC HEALTH LANDSCAPE OF THE CHAPTER 11 CASES

Since the beginning of the Chapter 11 Cases, the UCC has been guided by an understanding of the ways in which the opioid crisis makes these cases different from all others. The public health and safety catastrophe caused in part by Purdue's past conduct required—and continues to require—immediate action. Thus, the costs of delay are far more severe than in most chapter 11 cases. The issues described in this section are part and parcel of the UCC's decision to not object to the Plan.

### A.    *The UCC's Attempt To Establish an Emergency Relief Fund*

The first time counsel to the UCC spoke on the record in the Chapter 11 Cases, it articulated the UCC's vision for a $200 million emergency relief fund (the "ERF"). The idea was as follows: because of the urgent need for front-line relief, the Debtors should use some of their value to provide ***immediate*** funding for organizations dedicated to fighting the opioid crisis. Various parties appeared receptive to this idea, and the Court explicitly disclaimed the notion that agreement on the terms of an ERF would be "utopian." The UCC therefore began work to establish an ERF to start to put the Debtors' value to work in order to combat the opioid crisis.

The UCC, at the request of the Consenting Committee, drafted a term sheet. The term sheet proposed funding, through a grant process, primarily for underfunded entities, such as recovery community organizations, harm reduction centers, syringe exchange programs and family support services. The selection of these targets was based on two factors. *First*, such organizations were not the recipients of funding appropriated by the federal government for State programs. *Second*, such organizations were not already creditors in the Chapter 11 Cases, and, therefore, providing funding to such organizations would not function as a prepayment of any claims that should otherwise be treated in the Chapter 11 Cases. The cornerstone of the term sheet was an independent board for the ERF, which would have autonomous discretion to accept grant proposals. In addition, the term sheet was premised on the UCC's view—in turn based on research and government statistics—that certain States had yet to use millions of dollars in federal opioid grants, due to various reasons.

The Consenting Committee (supported here by the DOJ) opposed three key foundations of the UCC's ERF proposal. *First*, the Consenting Committee objected to the proposed quantum of the ERF. *Second*, the Consenting

---

[25] At the same time, all parties continued their efforts to encourage the NCSG to participate in the ongoing negotiations with the Sacklers.

Committee would not agree in advance to any terms governing the types of organizations that would be the recipients of ERF funds. *Finally*, the Consenting Committee made clear that it would not support any ERF unless the money went directly to States, to be channeled through existing State infrastructure, rather than being controlled by a neutral oversight board.

After several months of negotiations, the Debtors attempted to broker a compromise. Unfortunately, the States and the UCC were unable to reach agreement (largely due to the issues of scope and control). The UCC's proposal of two smaller ERFs—one along the lines supported by each group—was also rebuffed. In March 2020, in connection with the commencement of Phase I Mediation, the parties agreed to put discussions of an ERF off until such process was complete. The issue was never revisited.

The UCC believes that the failure to establish an ERF remains one of the greatest disappointments of the Chapter 11 Cases, but also provides essential color for why the UCC is not objecting to the Plan.

### B.  *The Importance of a Document Repository*

One of the key public health objectives for the Debtors, the UCC and numerous other parties in the Chapter 11 Cases has been transparency. Indeed, ameliorating the opioid crisis and all of the harm the Debtors and the Sacklers have caused will require public access to a large volume of documents detailing the history of Purdue's actions. Only through this sort of unprecedented disclosure, can we shine a light on Purdue's tragic past and ensure that we are not condemned to repeat the conduct that gave rise to the worst man-made public health crisis of our generation.

Accordingly, the creation of a public document repository has been a central tenet for all parties, including, importantly, both Purdue itself and the Court, since the outset of the Chapter 11 Cases. In October 2019, the Court explained, "[T]here's a legitimate public interest in knowing what happened with Purdue."[26] The UCC recognizes and appreciates that since the first day of the Chapter 11 Cases, Purdue has made this one of its most significant goals.

As set forth in the Disclosure Statement, the concept of a public document repository took a step forward when the Debtors included it as a binding obligation in connection with the DOJ Resolution, and the Debtors have committed that any order approving the Plan will contain a ***requirement*** that such a repository be established and that the parameters are acceptable to the Debtors and various creditor groups, including the UCC. The details and mechanics of the document repository have been the subject of numerous discussions among various parties, including, among others, State attorneys general, members of the UCC and the Debtors. As of the date of this letter, all parties continue to work on ironing out the repository's parameters, terms and conditions, and the UCC is heartened by the efforts of all parties.

The UCC is hopeful that once established, the document repository will provide critical information to scholars, doctors and the general public alike and serve as a resource for generations to come.

### C.  *The Future of Purdue and the Failed Attempt To Secure a Purchaser for Purdue's Assets*

During the Chapter 11 Cases, a debate emerged regarding what should happen to Purdue's business following emergence from bankruptcy. A wide range of views was expressed to the UCC by various parties in interest, including the following.

1.  OxyContin sales should cease entirely, and the non-OxyContin portions of the Purdue business should be liquidated, with the value distributed to creditors.

---

[26] Transcript of October 11, 2019 Hearing at 65:2–3.

2. Creditors—primarily the States—should "own" reorganized Purdue (including the OxyContin business) and run it in a morally, ethically and socially responsible manner.

3. Purdue should become a "public benefit company" that can conduct its business to provide a broad range of monetary and non-monetary benefits to the American public, the profits of which would flow to the States.

4. Purdue should be sold to a third party that will agree to abide by the Voluntary Business Injunction[27] that has been in place during the Chapter 11 Cases to restrict the Debtors' conduct surrounding the sale and marketing of opioid products.

This debate regarding the future of Purdue became a central focus during Mediation. To the UCC's knowledge, both the Consenting Committee and the NCSG favored selling Purdue (rather than owning it themselves), but the NCSG wanted to sell it to a third party during the Chapter 11 Cases, while the Consenting Committee appeared willing to hold onto the business after Purdue emerged from chapter 11, with certain divisions being sold promptly thereafter and others sold later. The Debtors preferred a longer-term ownership plan (perhaps through 2029) of the various business lines, with a significant portion of Purdue's future revenue being used for the Public Health Initiative—*i.e.*, bringing to market opioid addiction reversal drugs for free or at cost for the benefit of the American public. And, finally, the DOJ appeared to be focused on ensuring a vast majority of future revenue was used for opioid crisis abatement purposes, and ultimately would require pursuant to the terms of their settlement the new owners of Purdue to transform Purdue into a "public benefit company or entity with a similar mission."

In the summer of 2020—approximately one year after the commencement of the Chapter 11 Cases—an interested party (the "Potential Purchaser") contacted the Debtors to explore purchasing the Debtors' assets. The Potential Purchaser had experience working with opioid companies and was not a defendant (or affiliated with any defendant) in any opioid litigation. The parties agreed that it would be worthwhile to provide diligence to the Potential Purchaser to determine whether its interest would result in an actionable bid.

For almost four months, the Debtors provided the Potential Purchaser with a significant amount of diligence. As a result of that diligence, as well as feedback from various parties—including the NCSG, the Consenting Committee, the UCC and the Debtors—the Potential Purchaser worked to reformulate its proposal a number of times. In the UCC's view, these various reformulations were indicative of the Potential Purchaser's interest as well as its willingness to modify the proposed transaction structure based on the feedback it received from various parties. Unfortunately, however, the Potential Purchaser was not able to increase materially the value of its proposal.

In connection with Phase II Mediation (in late January 2021), the parties in interest resumed discussions regarding the future of Purdue. It is fair to say that the parties had varying perspectives on this issue, including the proposals made by the Potential Purchaser. These discussions centered on whether Public Claimants should have either a direct or indirect ownership interest in reorganized Purdue, the value being offered by the Potential Purchaser, and whether the Potential Purchaser's proposal would still result in the Public Claimants as the economic beneficiaries of an opioid company. Ultimately, the Consenting Committee (and the Debtors) determined not to engage further with the Potential Purchaser absent dramatic (and infeasible) changes to the proposal.

The UCC understood and accepted that any decision regarding the future of Purdue ultimately rested with the Public Claimants, given the results of Phase I Mediation. Moreover, the UCC fully recognizes the complex and varied perspectives regarding the future of Purdue, and as such, does not object to the fact that the Plan does not contemplate the sale of Purdue. Under the Plan, not only will the Sacklers have no ownership or management role with Purdue, but also Purdue will continue to (i) be bound by the Voluntary Business Injunction and (ii) have an

---

[27] *See Order Pursuant to 11 U.S.C. § 105(a) Granting, in part, Motion for a Preliminary Injunction, Purdue Pharma L.P. v. Commonwealth. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 82] (as amended from time to time, the "Voluntary Business Injunction").

independent monitor whose role is to ensure that Purdue/NewCo follows public health and safety. It is hoped that Purdue/NewCo's competitors will be held to the same standards.

## VIII.   THE UCC'S ASSESSMENT OF THE PLAN

Having experienced first-hand the events set forth in this letter, the UCC views the Plan as an imperfect solution that is, nonetheless, a better outcome for the majority of Purdue's creditors than any other available alternative. This view, and the decision not to object to the Plan, rest on three fundamental premises: (i) claimants need recoveries *now*, not at some uncertain time in the future; (ii) the ability to obtain such value for creditors would be uncertain without the various settlements contemplated by the Plan; and (iii) without the Plan, there is no clear mechanism to provide value to the creditors who need it.

### A.   *Victims and Other Creditors Need Recoveries Now*

Creditors cannot wait for years of litigation to play out before they get value from the Debtors' estates. Indeed, the Debtors' creditors cannot wait any longer for relief. Individual victims require financial compensation *now*, and all other claimants require funds to abate the opioid crisis in the absence of federal funding. The situation could not be any more dire. After 20 months in bankruptcy, it is time for the Debtors to put their money to work compensating victims and abating the opioid crisis.

### B.   *Litigating Claims Against the Sacklers Will Not Result in Immediate Payment*

The UCC has conducted an unprecedented Investigation of the claims against the Sacklers. The following critical points bear repeating in connection with the UCC's rationale for not objecting to the Plan:

1. The Sacklers likely are liable to the Debtors (and thus to their creditors) in amounts far in excess of the Settlement Amount, *but* obtaining judgments to establish that liability could take years; and there can be no guarantee of success.

2. The Sacklers have assets far in excess of the $4.275 billion Settlement Amount, *but* obtaining a judgment against the Sacklers does not guarantee that either the Debtors or their creditors will be able to access those assets, many of which are in overseas trusts.

3. In addition to the Debtors' claims against the Sacklers, the UCC believes that the Debtors' creditors may well also hold direct claims against the Sacklers far in excess of their total assets. ***Without the Preliminary Injunction and settlement in place to restrain litigation against the Sacklers, however, the Sacklers are likely to exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court***.

Against this backdrop, the benefits of a settlement are clear. Indeed, a settlement is the only way to bring value into the Debtors' estates now for the benefit of *all* creditors. Certainly, there is a chance—and not a small one—that litigating against the Sacklers could eventually lead to a judgment or multiple judgments greater than $4.275 billion. But such judgment could be years in the future, and there is no guarantee that the proceeds of those judgments, if they can even be monetized, would be distributed to all creditors in an equal or fair manner.

### C.   *The Plan Is the Only Way To Preserve the Phase I Mediation Settlements*

Many State attorneys general in the NCSG have stated publicly that the $4.275 billion Settlement Amount is insufficient to pay for the damage and destruction wrought by the opioid crisis. ***This undoubtedly is true.*** As discussed above, the claims in these cases total in the trillions of dollars; and no amount of recovery could truly compensate victims for these immeasurable damages. But absent an agreement with the Sacklers, all of the work done in Phase I Mediation and the agreements reached could fall apart.

Once it became clear that the Sacklers would not pay the amount the NCSG desired, the creditors in these cases had a choice to either (i) not reach a settlement with the Sacklers and seek to lift the Preliminary Injunction that protected the Sacklers to permit the 3,000+ lawsuits to spring back to life or (ii) reach a settlement with the Sacklers that did not include the NCSG.  If creditors could have agreed that pursuing (i) would have kept intact the Phase I Mediation Settlements (for example, by agreement among all parties to pay the first dollars obtained from the Sacklers in satisfaction of those settlements), then an entirely different plan could be before us—one that allowed the Public Claimants to continue pursuing their and the Debtors' claims against the Sacklers, while preserving the Phase I Mediation Settlements.  But such a consensus could not be reached.  Therefore, the only available path forward to preserve the Phase I Mediation Settlements (including the settlement among the Public Claimants regarding the division of assets amongst them) was to reach a reasonable settlement with the Sacklers.

In sum, although the UCC believes the claims against the Sacklers likely are worth more than $4.275 billion, the Phase I Mediation Settlements would not hold without the Sackler Settlement.  Moreover, under the current construct, ***any increase in the Settlement Amount would not benefit any Private Claimant***, in any event.  Because there is no other path to intercreditor peace, the UCC supports the imperfect, but entirely necessary Sackler Settlement embodied in the Plan as it stands.

### D.   *The Plan Represents a Reasonable Resolution of Claims Against the Sacklers and Related Parties*

As part of its Investigation, the UCC evaluated, among others, the following categories of claims and causes of action.

| Claim | Issue |
|---|---|
| *Intentional Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) intentionally transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017, with an intent to "hinder, delay or defraud" Purdue's creditors from being able to collect on their claims? |
| *Constructive Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017 at a time when Purdue was insolvent (or rendered insolvent as a result of such transfers) without Purdue receiving "reasonably equivalent value" in return? |
| *Breach of Fiduciary Duty* | In connection with the decisions contemplated above (or otherwise), did the Sacklers, as members of the Purdue Board of Directors, breach their fiduciary duties to Opioid Claimants? |
| *Unjust Enrichment* | Were the Sacklers and related parties unjustly enriched as a result of any of the transfers Purdue made to the Sacklers (including to their related trusts and the Sackler Entities)? |

In considering the likelihood of success of each of the above categories of claims, the UCC thoroughly evaluated the following questions, among others:

1.   What evidence, if any, exists to demonstrate that Purdue and the Sacklers engaged in intentional fraud?

2.   To the extent there is evidence of intentional fraud, is that evidence stronger in respect of certain members or "sides" of the Sackler family (*i.e.*, Side A or Side B)?

3.   Can all members of the Sackler family be held "jointly and severally liable" for any such claims?

4.   Was Purdue insolvent (or rendered insolvent by relevant transfers) at any point from 2008 to 2017?

5. How is insolvency demonstrated based on actual and potential litigation claims?

6. Was Purdue more or less likely to be insolvent at different points in time from 2008 to 2017?

7. Given that Federal and State governments received $4-5 billion in taxes throughout the applicable period, should those entities, as the ultimate recipient of the proceeds of a fraudulent transfer, be required to return such value to the Purdue estates?

8. To what extent can the proceeds of each transfer be traced, which may or may not be necessary to recover value from fraudulent transfers?

9. Which party has the burden of proof on tracing the proceeds of fraudulent transfers?

10. At what point in time did the Sacklers (and the Purdue Board) begin to owe fiduciary duties to Opioid Claimants?

11. What knowledge did the Sacklers have of the impending onslaught of litigation liability they would face and when did they have that knowledge?

12. What knowledge did the Sacklers have that Purdue had engaged in conduct that would lead to the onslaught of litigation liability they ultimately would face? When did they have that knowledge? Were they the architects of that conduct, or did they just receive reports from management?

13. Did the Sacklers micromanage the affairs of Purdue, such that they had full knowledge of all of Purdue's conduct?

14. If the allegations underlying these causes of action could be proved, would prejudgment interest apply to the judgments obtained? If so, what would the appropriate rate of such interest be?

Beyond these questions regarding the "estate" claims, the UCC conducted a thorough and balanced review of the strengths and weaknesses of the various "direct" legal claims made (or that could be made) against the Sacklers by the Public and Private Claimants outside of the bankruptcy, in order to determine whether the Settlement Amount was fair consideration for the releases that the Sacklers were seeking. The UCC considered several factors in assessing the viability of these claims, including: (i) statutes of limitations (whether the alleged wrongful acts took place too long ago); (ii) causation (whether the alleged wrongful acts caused the alleged harm); (iii) federal preemption (whether government involvement in approving the drugs and the drug labels was significant enough for Purdue and the Sacklers to avoid liability); and (iv) the municipal cost recovery rule (whether government efforts to deal with the opioid crisis fall within the government's normal duty of providing public services).

In addition, the UCC considered the potential damages available to the Public and Private Claimants for each of these types of claims, including but not limited to the potential recovery of: (i) remedial costs associated with addressing the opioid crisis; (ii) costs associated with abating the opioid crisis; (iii) disgorgement of profits or benefits that Purdue and the Sacklers received; (iv) fines for state law violations; and (v) injunctive relief. The UCC also considered whether and how much the Public and Private Claimants might be able to obtain in court absent the bankruptcy setting. In considering the specific claims brought against the Sacklers, the UCC focused on the following claims, among others:

1. ***Public Nuisance*** – The UCC assessed both common law public nuisance and statutory public nuisance claims, which both the Public and Private Claimants included in various prepetition actions. In assessing these claims, the UCC considered numerous factors, including but not limited to the following:

   a. to prove common law public nuisance claims, plaintiffs would need to demonstrate that Purdue and the Sacklers acted with intent to create the public nuisance;

b. whether it is possible to prove that the Sacklers acted together with the other defendants or that each individual defendant intended to create the public health and safety crisis (rather than intended to engage in general profit-seeking activities);

c. claimants may need to convince a trier of fact that it should ignore government approval of the product and its labeling, doctor prescriptions of the products and patient abuse of the product as potential intervening causes of the crisis; and

d. the only trial on this issue (against Johnson & Johnson) resulted in a ruling on behalf of the plaintiffs, giving claimants precedent for their claims against Purdue and the Sacklers.

2. *RICO* – The UCC assessed Public and Private Claimant claims under the RICO Act. In considering these claims, the UCC balanced the following factors:

a. the Ohio MDL court specifically upheld such claims on both a motion to dismiss and a subsequent summary judgment motion; and

b. RICO claims require a finding of intentional illegal acts conducted via mail or wires.

3. *Consumer Protection* – The UCC contemplated Public and Private Claimant consumer protection claims focusing on, among other things, the evidentiary standard in many States for consumer protection claims (including the fact that many consumer protection statutes do not require that consumers were actually misled), as well as potential recoveries associated with such claims.

4. *Deceptive Practices* – In evaluating these claims asserted by both Public and Private Claimants, focusing on arguments that the relevant statutes are generally broadly construed (such that neither intent nor actual deception are required), and also considering (i) to whom the allegedly deceptive practices claims were aimed and (ii) the proof of related damages/injury.

5. *Unfair Trade Practices* – In evaluating these claims by both Public and Private Claimants, the UCC considered (i) plaintiffs' allegations that Purdue and the Sacklers implemented marketing schemes that purportedly led to higher rates of opioid prescriptions and addiction (and ignored large volumes of product flooding the market and being diverted to the black market) as well as (ii) the difficulty of proving that the alleged actions caused opioid abuse and the opioid crisis.

6. *Unjust Enrichment* – Public Claimants have asserted numerous types of unjust enrichment claims. Some allege Purdue and the Sacklers were unjustly enriched when the States paid Purdue for opioids through Medicaid and workers' compensation programs. Others assert that Purdue was enriched by its failure to exercise due diligence in preventing diversion and by its deceptive marketing practices. The UCC considered the allegations and supporting evidence as well as whether the States/municipalities actually conferred a compensable benefit on Purdue/the Sacklers by remedying and mitigating the alleged harms and whether these claims would be difficult to prove.

7. *Negligence* – In assessing these claims brought by both Public and Private Claimants, the UCC balanced the fact that the Ohio MDL court determined that the plaintiffs plausibly alleged that defendants had a duty not to act negligently in their marketing against the standard for negligence and the difficulty of proof on certain issues.

This letter is not the appropriate forum to address each of these issues regarding estate and third-party claims. This is particularly true in light of the structure of the Sackler Settlement, which provides that in the event the Sacklers breach their payment obligations, the Master Distribution Trust (the "MDT")—which is responsible for making all payments to other creditor trusts for subsequent distribution—would take ownership of (and have the ability to pursue for creditors' benefit) all estate claims and causes of action against the Sacklers and related

23

parties; and further, that upon such "snapback," all Public and Private Claimants would be free to re-commence (or commence) their direct causes of action.  As such, it would be inappropriate for this letter to provide the UCC's views on these issues.

The UCC can confirm, however, that (as discussed herein) the number and scope of issues considered by the UCC in connection with its Investigation was vast, its analysis thorough and the time spent immense.  And the results of the Investigation—along with all of the other work the UCC and its advisors performed and the numerous other diverse factors at play—were the various settlements contained in the Plan, including the Sackler Settlement, the Phase I Mediation Settlements and numerous others.  If the Sackler Settlement could be evaluated in a vacuum, the UCC almost certainly would have come to a different conclusion.  But it cannot be.

The UCC is also aware that the Plan, and the Sackler Settlement in particular, have received significant criticism.  Notwithstanding this criticism, and considering the requirements imposed by the bankruptcy process and the myriad competing interests at play, the UCC believes with conviction that the terms of the Plan represent the only viable conclusion to the Chapter 11 Cases.  Indeed, confirmation of the Plan will ensure that funds are distributed promptly to begin to compensate victims and abate the opioid crisis that continues to grip this Country.

***Accordingly, the UCC urges every unsecured creditor to vote in favor of the Plan.***

**<u>Exhibit D</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**CLASS 10(B): NON-NAS PI CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY**
**<u>BEFORE</u> COMPLETING THIS BALLOT.**

**THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO**
**BE <u>ACTUALLY RECEIVED</u> BY PRIME CLERK LLC ("<u>PRIME CLERK</u>" OR THE**
**"<u>SOLICITATION AGENT</u>") BY 4:00 P.M. (PREVAILING EASTERN TIME) ON**
**July 14, 2021 (THE "<u>VOTING DEADLINE</u>").**

---

The Solicitation Agent, on behalf of Purdue Pharma L.P. ("**Purdue Pharma**"), its general partner Purdue Pharma Inc. ("**PPI**"), and Purdue Pharma's wholly owned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**"), is soliciting votes to accept or reject the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated June 3, 2021 [D.I. 2982] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "**Plan**"[2]) from the holders of certain Impaired Claims against the Debtors.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement and Solicitation Procedures Order (as defined herein), as applicable.

You are receiving this ballot (the "**Ballot**") because you hold a Claim against the Debtors as of **March 10, 2021** (the "**Voting Record Date**"). Your Claim is classified under the Plan in Class 10(b) (Non-NAS PI Claims). Except as otherwise set forth in the Bar Date Order, all timely filed Claims have been deemed filed against the Debtors, and, therefore, you are entitled to vote to accept or reject the Plan in Class 10(b).

The rights of holders of Claims in Class 10(b) are described in the Disclosure Statement for the Plan, filed on June 3, 2021 [D.I. 2983] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and the Order approving the Disclosure Statement and related solicitation procedures [D.I. 2988] (the "**Disclosure Statement and Solicitation Procedures Order**"). The Solicitation Package you are receiving with this Ballot provides instructions detailing how to access electronic versions, request hard copies or request flash-drive format versions of each of the Disclosure Statement Order as entered by the Bankruptcy Court (without any exhibits) and the Disclosure Statement as approved by the Court (with the Plan annexed thereto). If you need to obtain additional solicitation materials, you may contact the Solicitation Agent by (i) visiting the Debtors' case website at https://restructuring.primeclerk.com/purduepharma; (ii) writing Purdue Pharma Ballot Processing, c/o Prime Clerk, LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165; (iii) emailing purduepharmaballots@primeclerk.com; or (iv) calling the Solicitation Agent at (844) 217-0912 (domestic toll-free) or (347) 859-8093 (if calling from outside the U.S. or Canada). You may also access these materials for a fee via PACER at https://www.nysb.uscourts.gov/.

Pursuant to the Disclosure Statement and Solicitation Procedures Order, the Bankruptcy Court has approved the Disclosure Statement as containing adequate information under section 1125 of the Bankruptcy Code. Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. This Ballot may not be used for any purpose other than to vote to accept or reject the Plan. If you believe that you have received this Ballot in error, please contact the Solicitation Agent at the address or telephone numbers set forth above.

**For your vote to be counted, this Ballot must be properly completed, signed, and returned to the Solicitation Agent so that it is actually received no later than 4:00 p.m. (prevailing Eastern Time) on July 14, 2021.**

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan. Notwithstanding the fact that your Claim would otherwise satisfy the definition of another type of Claim, or your receipt of a ballot or notice, which identifies your Claim as belonging to a specific Class for voting and distribution purposes, any Claim that satisfies the definition of Co-Defendant Claims under Sections 1.1 and 4.16 of the Plan shall be a Co-Defendant Claim and any Claim that satisfies the definition of an Other

Subordinated Claim under Sections 1.1 and 4.17 of the Plan shall be an Other Subordinated Claim.

If you have any questions on how to properly complete this Ballot, please call the Solicitation Agent at (844) 217-0912 (domestic toll-free) or (347) 859-8093 (international). **THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

---

**IMPORTANT NOTICE REGARDING CERTAIN RELEASE, EXCULPATION, INJUNCTION, AND CHANNELING INJUNCTION PROVISIONS IN THE PLAN**

**Sections 10.6, 10.7, 10.8, 10.9, 10.10, 10.11, 10.12, and 10.13 of the Plan contain release, shareholder release, exculpation, injunction, channeling injunction, MDT insurer injunction, Settling MDT insurer injunction and shareholder channeling injunction provisions. Thus, you are advised to review and consider the Plan carefully. For your convenience, such provisions are set forth on Exhibit 1 hereto.  Below is a summary of the release provisions. For the avoidance of doubt, to the extent any provision of this notice conflicts with the terms of the plan, the terms of the plan will control.  Capitalized terms used below and in Exhibit 1 have the meanings ascribed to such terms in the Plan.**

**INFORMATION ABOUT RELEASE PROVISIONS, INCLUDING THIRD-PARTY RELEASES:**

**Pursuant to the Plan, certain parties are releasing the Released Parties, which include certain third parties, and the Shareholder Released Parties (subject to and in accordance with the terms of the Shareholder Settlement) from certain Claims and Causes of Action.**

**The Releasing Parties include all holders of Claims and Interest under the Plan.**

**The Released Parties include, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties and (iii) solely for purposes of the Releases by the Debtors in Section 10.6(a) of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Release Snapback Party shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (ii) of this definition of Released Parties include Persons referenced in clause (ii) of the definition of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.  The Shareholder Released Parties are the beneficiaries of the separate shareholder release provisions in the Plan.  The Plan Supplement will include the Shareholder Settlement, which will provide for, among other things, the settlement of claims against the Shareholder Released Parties.**

---

3

**IMPORTANT NOTICE TO HOLDERS OF PERSONAL INJURY CLAIMS IN CLASSES 10(a) and 10(b) REGARDING REQUIREMENT TO FILE ADDITIONAL CLAIM FORM AND OPTION TO ELECT TO LIQUIDATE CLAIMS IN THE TORT SYSTEM:**

Pursuant to the Plan, PI Claims against the Debtors will be channeled to the PI Trust, which will be the only source of recovery for holders of qualified personal injury claims in Classes 10(a) (NAS PI Claims) and 10(b) (Non-NAS PI Claims).

In order to be eligible to recover money on your PI Channeled Claim under the PI TDP, you must have *already* filed a Proof of Claim in the Chapter 11 Cases[3] asserting such PI Channeled Claim against one or more Debtors no later than April 23, 2021.[4] Further, you must complete, sign and submit an *additional* signed claim form **no later than (i) 90 days[5] after the dissemination of the Non-NAS PI Claim Form or (ii) 150 days[6] after the dissemination of the NAS PI Claim Form** describing your injury and electing your payment option, as well as a HIPAA consent form. These forms are attached to the PI TDP in the Plan Supplement, and will also be available on a website to be set up by the PI Trust.

As set forth in Article III.T of the Plan and the Plan Supplement, you may elect to liquidate your PI Claim pursuant to the streamlined liquidation procedures set forth in the in the personal injury trust distribution procedures ("**PI TDP**"). Alternatively, you may "opt out" of the streamlined liquidation procedures and liquidate your PI Claim through a lawsuit in the tort system that you commence against the PI Trust (and only the PI Trust), and not against the Debtors or any members of the Sackler Families.

The special procedures set forth in Exhibit G to the PI TDP shall apply to PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in their capacity as an heir must execute and submit the Heirship Declaration attached to the PI TDP as Exhibit F.

**In order to "opt out" and liquidate your PI Claim in the tort system, you must make such an election by checking the "opt out" box on the additional signed claim form that must be submitted no later than (i) 90 days after the dissemination of the Non–NAS PI Claim Form or (ii) 150 days after the dissemination of the NAS PI Claim Form. Failure to respond does not constitute "opting out." If you fail to submit your claim form by this deadline,[7] you will be deemed not to have "opted out", and will therefore be subject to the non-"opt out" provisions of the applicable trust distribution procedures, which provide that if you fail to complete and return the claim form by the deadline,[8] your personal injury claims will be Disallowed, you will not recover any money on it from the PI Trust, and you will be forever barred from pursuing your claims in any forum. If you choose to opt-out, you do not need to fill out the sections of the claim form regarding supporting evidence of your claim, but you will need to provide**

---

[3] For PI Channeled Claims that are liquidated pursuant to the liquidation procedures of the PI TDP, the PI Trust claims administrator will consider exceptions for good cause on a case-by case basis.

[4] Subject to exceptions set forth in the PI TDP.

[5] Subject to extension which the PI Trust claims administrator may give in his discretion.

[6] Subject to extension which the PI Trust claims administrator may give in his discretion.

[7] Subject to extensions which the PI Trust claims administrator may give in his discretion.

[8] Subject to extensions which the PI Trust claims administrator may give in his discretion.

**evidence to the court when you pursue your claim in the tort system.**

**An election to liquidate your PI Claim in the tort system instead of under the PI TDP cannot be reversed.  If you choose to opt out, you will be forever barred from accessing the streamlined and expedited liquidation processes under the PI TDP as well as the expedited appeal process set forth in the PI TDP.**

Each of these options has a distinct proof threshold.  The liquidation process under the PI TDP requires you to submit minimal evidence to prove your claim, such as prescription records or an affidavit swearing that you took certain Purdue opioid products.  By contrast, the tort system will require you to prove every legal "element" of your PI Claim.

The Plan fixes a set amount of money available to compensate all PI Claimants for their opioid-related personal injuries.  On average, it costs more money to resolve claims in the tort system than it does to resolve them under the streamlined liquidation procedures of the PI TDP.  Therefore, the more PI Claimants who "opt out," the less money will be available for the individual victims as a group.  The responsibility, costs and expenses of defending against your PI Claim will fall solely on the PI Trust, and will reduce the already-limited amount of money available to compensate other individual victims of Purdue opioid products.

If you elect to opt out of the streamlined procedures set forth in the PI TDP, and succeed in proving your PI Claim in court, your judgment may still be subject to appeal, which may add additional time and expense to the litigation process, further reducing the amount of money you can ultimately receive.  Payments on account of a successful final judgment will also be subject to certain limitations and caps that ensure no personal injury claimant receives more than its pro rata recovery on account of opioid-related personal injury claims against the Debtors.  Any multiple, exemplary, statutory-enhanced and/or punitive damages, attorneys' fees and costs, and interest, awarded by a court as part of a final judgment will be excluded for purposes of calculating any payments to be made by the PI Trust in respect of such final judgment.

**You are advised to carefully review Article III.T of the Plan and the Plan Supplement, which set forth the eligibility requirements and process by which the PI Trust will make distributions to holder of qualified PI Claims in Classes 10(a) and 10(b).  For the avoidance of doubt, to the extent any provision of this notice conflicts with the terms of the Plan, the terms of the Plan will control.  Capitalized terms used herein have the meanings ascribed to such terms in the Plan.**

## INSTRUCTIONS FOR COMPLETING THE BALLOT

This Ballot is submitted to you to solicit your vote to accept or reject the Plan. The terms of the Plan are described in the Disclosure Statement. **PLEASE READ THE PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

The Plan will be accepted by Class 10(b) if the Plan is accepted by the holders of at least two-thirds (2/3) in amount and at least one-half (1/2) in number of Claims in Class 10(b) that vote on the Plan in each such Class. In the event that Class 10(b) votes to reject the Plan, the Bankruptcy Court may nevertheless confirm the Plan and, thereby, make the Plan binding on the holders of Claims in Class 10(b) if the Bankruptcy Court finds that the Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in Class 10(b) and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, all holders of Claims against, and Interests in, the Debtors (including those holders who abstain from voting on or vote to reject the confirmed Plan, and those holders who are not entitled to vote on the confirmed Plan) will be bound by the confirmed Plan and the transactions contemplated thereunder.

**To have your vote counted, you must complete, sign, and return this Ballot so that it is <u>actually received</u> by the Solicitation Agent no later than the Voting Deadline of <u>July 14, 2021 at 4:00 p.m. (prevailing Eastern Time)</u>.** Ballots must be delivered to the Solicitation Agent at the appropriate address listed below:

| If by E-Ballot: | If by standard or overnight: | If by hand delivery: |
| --- | --- | --- |
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit E-Ballot" link | Purdue Pharma Ballot Processing c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165 | Purdue Pharma Ballot Processing c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165 |
| For your E-Ballot login credentials and further detail, please see page 7 below. | | If you plan to hand-deliver your Ballot to Prime Clerk's office, please email purduepharmaballots@primeclerk.com at least twenty-four (24) hours in advance to arrange delivery. |

**Class 10(b) Ballots will not be accepted by telecopy, facsimile, email, or other electronic means of transmission (other than by E-Ballot).**

You must properly complete the Ballot as follows:

a.    <u>Item 1 (Amount of Claim)</u>. Make sure that the information contained in Item 1 below regarding the amount of your Claim is correct. **Please note that, except as otherwise set forth in the Disclosure Statement and Solicitation Procedures Order, each Claim in Class 10(b) has been allowed in the amount of $1.00 for voting purposes only, and not for distribution, allowance, or any other purpose.**

b.      <u>Item 2 (Vote on the Plan)</u>.  Cast one vote to accept or reject the Plan by checking the appropriate box in Item 2 below. You must vote the entire amount of your Claim either to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan and you may not split your vote. Accordingly, any vote within a single Class that attempts partially to accept and partially reject the Plan will not be counted.

c.      If you hold Claims in a Class other than Class 10(b), you may receive more than one Ballot or Solicitation Package, labeled for a different Class of Claims. Your vote will be counted in determining acceptance or rejection of the Plan by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for such Class of Claims in accordance with the instructions on that Ballot.

d.      If more than one timely, properly completed Ballot is received, unless the holder of the Class 10(b) Claim receives Bankruptcy Court approval otherwise, then the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.

e.      If you fail to designate either an acceptance or rejection of the Plan or designate both an acceptance and rejection of the Plan, the Solicitation Agent may, in its discretion, either contact you to attempt to cure the defect or not count your vote as either an acceptance or rejection of the Plan.

f.      <u>Item 3 (Acknowledgments and Certifications)</u>.  Item 3 contains certain required certifications, which you are making by signing and returning the Ballot.  Please ensure that you have read and understood the certifications prior to signing the Ballot and the certifications are correct for your Ballot.  Provide your name, mailing address, and any remaining information requested in Item 3 below.

g.      If you are completing this Ballot on behalf of another claimant, indicate your relationship with such claimant and the capacity in which you are signing on the appropriate line in Item 3 below. By submitting the Ballot you are certifying that you have authority to so act and agree to provide documents evidencing such authority upon request (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act).

h.      Sign and date the Ballot.

i.      If additional space is required to respond to any item on the Ballot, please use additional sheets of paper clearly marked to indicate the applicable item of the Ballot to which you are responding. Do not include medical records with this Ballot. Medical records cannot be returned by the Solicitation Agent.

j.      Deliver the completed, executed Ballot so as to be **<u>actually received</u>** by the Solicitation Agent before the Voting Deadline.

**PLEASE NOTE:**

No Ballot shall constitute or be deemed a Proof of Claim or an assertion of a Claim. No fees, commissions, or other remuneration will be payable for soliciting votes on the Plan.

**NOTHING CONTAINED HEREIN OR IN THE SOLICITATION PACKAGES SHALL RENDER YOU OR ANY OTHER PERSON THE AGENT OF THE DEBTORS OR THE SOLICITATION AGENT, OR AUTHORIZE YOU OR ANY OTHER PERSON TO USE ANY DOCUMENT OR MAKE ANY STATEMENTS ON BEHALF OF THE DEBTORS OR THE SOLICITATION AGENT WITH RESPECT TO THE PLAN, EXCEPT FOR THE STATEMENTS CONTAINED IN THE SOLICITATION PACKAGES.**

**IF YOU (A) HAVE ANY QUESTIONS REGARDING THE BALLOT, (B) DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, OR (C) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE SOLICITATION AGENT AT 844-217-0912 (DOMESTIC TOLL-FREE) OR 347-859-8093 (INTERNATIONAL), OR BY EMAILING PURDUEPHARMABALLOTS@PRIMECLERK.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

8

**SUBMITTING BY E-BALLOT**

**PLEASE COMPLETE THE FOLLOWING:**

**To submit your Ballot via the "E-Ballot" platform, please visit https://restructuring.primeclerk.com/purduepharma. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#:_____**

**The Solicitation Agent's "E-Ballot" platform is the sole manner in which your Ballot will be accepted via electronic or online transmission. Ballots submitted by telecopy, facsimile, email, or other electronic means of transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your E-Ballot. Please complete and submit an E-Ballot for each E-Ballot ID# you receive, as applicable.**

Holders who cast a Ballot using the Solicitation Agent's "E-Ballot" platform should <u>NOT</u> also submit a paper Ballot.

## NON-NAS PI CLAIMS BALLOT

**PLEASE COMPLETE THE FOLLOWING:**

**Item 1.  Amount of Non-NAS PI Claims.**  For purposes of voting to accept or reject the Plan, the undersigned certifies that as of March 10, 2021, the undersigned holds Class 10(b) Claims in the amount set forth below. **Please note that, except as otherwise set forth in the Disclosure Statement and Solicitation Procedures Order, each Claim in Class 10(b) has been allowed in the amount of $1.00 for voting purposes only, and not for distribution, allowance, or any other purpose.**

| |
|---|
| **Claims Amount:** $1.00 |

**Item 2.  Vote on the Plan.**  The undersigned holder of Class 10(b) Claims in the amount set forth in Item 1 above hereby votes to:

**Check one box**:          ☐      **ACCEPT (I.E., VOTE IN FAVOR OF)** the Plan

                           ☐      **REJECT (I.E., VOTE AGAINST)** the Plan

*[Remainder of Page Intentionally Left Blank / Certification Page to Follow]*

**Item 3.  Acknowledgments and Certification.**  By signing this Ballot, the undersigned certifies that the undersigned has been provided with a copy of the Disclosure Statement, including the Plan and all other exhibits thereto, the Disclosure Statement and Solicitation Procedures Order without exhibits and a Confirmation Hearing Notice.  The undersigned further acknowledges that the solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and Solicitation Procedures Order, and the procedures for the solicitation of votes to accept or reject the Plan contained therein.

Name of Claimant:                        _____

Signature:                               _____

Name of Signatory (if different than Claimant):  _____

If authorized by Agent, Title of Agent   _____

Street Address:                          _____

Street Address:                          _____
(continued)

City, State, Zip Code:                   _____

Telephone Number:                        _____

Email Address:                           _____

Date Completed:                          _____

## **EXHIBIT 1**

**Section 10.6(a) Releases by Debtors**

         **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether in rem, quasi in rem, in personam or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim**

or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this **Section 10.6(a)**.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(a) shall (A) release any Cause of Action against any Shareholder Release Snapback Party, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

**Section 10.6(b)**          **Releases by Releasing Parties**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11

Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this Section 10.6(b) shall (A) release any Cause of Action against (I) any Shareholder Release Snapback Party or (II) any Holder of Co-Defendant Claims, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

Notwithstanding anything herein to the contrary, the Debtors shall not be released from liability for any Claim that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim,

and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

Section 10.6(c)          Releases by Debtors of Holders of Claims

As of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(c)</u>.

As of the Effective Date, all Holders of PI Channeled Claims and Holders of NAS Monitoring Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party, Co-Defendant or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses and liabilities for any Claim in connection with, or arising out of, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the Restructuring Transactions, (iii) the Pending Opioid Actions, (iv) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (v) any past use or misuse of any opioid, whether sold by the Debtors or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (vi) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (vii) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, or (viii) any other act, conduct, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in this <u>Section 10.6(c)</u> shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and unrelated to the subject matter of the Pending Opioid Actions, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in

any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

**Section 10.7(a)**          **Shareholder Releases - Releases by Debtors**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this **Section 10.7(a)**, by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing

condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in this <u>Section 10.7(a)</u>.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this <u>Section 10.7(a)</u> shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this <u>Section 10.7(a)</u> shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of this <u>Section 10.7(a)</u> had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A),the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

**Section 10.7(b)        Shareholder Releases - Releases by Non-Debtors**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this <u>Section 10.7(b)</u>, by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this **Section 10.7(b)** shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this

**Section 10.7(b)** shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

**Section 10.7(c)          Shareholder Releases - Releases by Shareholder Released Parties**

          As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of this **Section 10.7(c)**, by the Shareholder Released Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production,

manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in this Section 10.7(c) shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements, and including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in this Section 10.7(c) of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in this Section 10.7(c) shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

Section 10.8            Channeling Injunction

In order to supplement the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases set forth in Sections 10.5, 10.6 and 10.7 of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

(a)        Terms.    In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in Sections 10.5, 10.6 and 10.7 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or

**judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:**

(i)    **commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;**

(ii)    **enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;**

(iii)    **creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and**

(v)    **taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.**

(b)    **Reservations. Notwithstanding anything to the contrary in this Section 10.8 or the Confirmation Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:**

(i)    **the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;**

(ii)    **the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;**

     (iii)    **the rights of Persons to assert any claim, debt or litigation against any Excluded Party;**

     (iv)    **the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;**

     (v)    **the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;**

     (vi)    **the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents;**

     (vii)    **the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or**

     (viii)    **NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.**

(c)    **Notice of Shareholder Release Snapback.** Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by <u>Section 10.9(a)</u> of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this <u>Section 10.8(c)</u>, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(d)    **Modifications**. Except as expressly set forth in paragraph <u>(c)</u> of this <u>Section 10.8</u>, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)    **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of this <u>Section 10.8</u>, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**Section 10.9**    **Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction**

(a)    **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; and (iii) with respect to the applicable Shareholder Family Group, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreement.

(b)    **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreement to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

**Section 10.10**        **MDT Insurer Injunction**

(a)    **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

(i)        **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an**

(ii)      **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iii)      **creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iv)      **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and**

(v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.**

(b)      **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against a MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and agents of the Debtors that are not Sackler Family Members that are preserved under the Plan or (iii) the terms of the Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights.

(c)      **Modifications**. To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that (i) any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply equally to all Classes of Claims, and (B) shall comply with any procedures set forth in the MDT Agreement and (ii) the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall

13

be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(d)    **Non-Limitation of MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.10, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

**Section 10.11          Settling MDT Insurer Injunction**

(a)    **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:**

(i)    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(ii)    **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and**

(v)    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the**

14

Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)      **Reduction of Insurance Judgments.** Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)      **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)      N**on-Limitation of Settling MDT Insurer Injunction**. Except as set forth in paragraphs (b) and (c) of this Section 10.11, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

**Section 10.12            Exculpation**

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this Section 10.12 shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Claims or Causes of Action that may be asserted against any Excluded Party.

**Section 10.13            Injunction Related to Releases and Exculpation**

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively

54014-15

or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in this Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in Section 5.3(b), 5.4(c) or 5.6(b) of the Plan.

**<u>Exhibit E</u>**

Exhibit E

Class 10(b) Service List

Served via First Class Mail

| MMLID | NAME | ADDRESS 1 | CITY | STATE | POSTAL CODE |
|---|---|---|---|---|---|
| 11290066 | Name on File [1] | Address on File | | | |

[1] Name suppressed pursuant to confidentiality provisions of the *Order Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto* **[Docket No. 800]**