Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11                  United States Bankruptcy Court

12                  Tele/Video Proceedings

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 17, 2021

17                  10:08 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN WALKER

1    HEARING re Continuance of Confirmation Hearing From August

2    16, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   WITNESSES:

4   GAYLE GALAN

5   RAHUL GUPTA

6   WILLIAM LEGIER

7   DAVID SACKLER

8   MICHAEL CUSHING

9   SCOTT BICKFORD

10   WILLIAM HRYCAY

11   CHARLES COWAN

12

13   DAVIS POLK WARDWELL LLP

14        Attorney for Debtors

15        450 Lexington Avenue

16        New York, NY 10017

17

18   BY:   MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

19        BENJAMIN KAMINETZKY (TELEPHONICALLY)

20        JAMES I. MCCLAMMY (TELEPHONICALLY)

21

22

23

24

25

1   PAUL, WEISS, RIFKIND, WHARTON GARRISON LLP

2       Attorneys for the Raymond Sackler Family

3       1285 Avenue of the Americas

4       New York, NY 10019-6064

5

6   BY:  DAVID BROWN (TELEPHONICALLY)

7

8   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

9       Attorney for State of Maryland

10      200 Saint Paul Place

11      Baltimore, MD 20852

12

13  BY:  BRIAN EDMUNDS (TELEPHONICALLY)

14

15  PAUL S. ROTHSTEIN, P.A.

16      Attorneys for Dr. Michael Masiowski

17      626 NE 1st Street

18      Gainesville, FL 32601

19

20  BY:  PAUL S. ROTHSTEIN

21

22

23

24

25

1   CARTER LEDYARD MILBURN LLP

2        Attorneys for the State of West Virginia

3        2 Wall Street

4        New York, NY 11598

5

6   BY:  AARON R. CAHN (TELEPHONICALLY)

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorneys for the U.S. Trustee

10        201 Varick Street, Suite 1006

11        New York, NY 10014

12

13   BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

14

15   KRAMER LEVIN NAFTALIS FRANKEL LLP

16        Attorneys for the Ad Hoc Committee

17        1177 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  JONATHAN M. WAGNER (TELEPHONICALLY)

21

22

23

24

25

Page 6

1    KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

2         Attorneys for State of Washington

3         500 Fifth Avenue

4         New York, NY 10110

5

6    BY:  MATTHEW J. GOLD (TELEPHONICALLY)

7         STEVEN R. POPOFSKY  (TELEPHONICALLY)

8

9    LITE DEPALMA GREENBERG & AFANADOR

10        Attorneys for Certain Canadian Municipality Creditors

11        and Canadian First Nation Creditors

12        570 Broad Street, Suite 1201

13        Newark, NJ 07102

14

15   BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

16

17   JOSEPH HAGE AARONSON LLC

18        Raymond Sackler Family

19        485 Lexington Ave, 30th Floor

20        New York, NY 10017

21

22   BY:  GREGORY JOSEPH (TELEPHONICALLY)

23        BENJAMIN ALBERT (TELEPHONICALLY)

24

25   MICHELLE QUIGLEY, Attorney for Dr. Michael Masiowski

Page 7

1    ALSO PRESENT TELEPHONICALLY:

2    JILL S. ABRAMS

3    ROXANA ALEALI

4    PHILIP D. ANKER

5    MICHAEL ATINSON

6    MITCHELL JAY AUSLANDER

7    JASMINE BALL

8    BROOKS BARKER

9    THOMAS MOULTRIE BESHERE

10   THOMAS BIELLI

11   DAVID E. BLABEY JR.

12   HUNTER BLAIN

13   JENNIFER BLOUIN

14   LOUIS BOGRAD

15   SARA BRAUNER

16   PAUL E. BREENE

17   GAGE BRUNSWICK

18   CHRISTOPHER CARTER

19   MAUREEN CHAKRABORTY

20   JOHN CHRISTOPHER

21   GERARD CICERO

22   HAYDEN COLEMAN

23   DANIEL CONNOLLY

24   DYLAN CONSLA

25   CHARLES D. COWAN

Page 8

1   MELANIE L. CYGANOWSKI

2   MARIO D'ANGELO

3   PETER C. D'APICE

4   STACY DASARO

5   JOSEPH G. DAVIS

6   KEVIN DAVIS

7   MARK DEARMAN

8   JESSE DELACONTE

9   SHANNON DEVON

10   CLINT DOCKEN

11   JOHN C. DOUGHERTY

12   JOHN DUBEL

13   STEPHANIE EBERHARDT

14   MARIA ECKE

15   KENNETH H. ECKSTEIN

16   BERNARD ARDAVAN ESKANDARI

17   BARBARA FARASH

18   MATHEW FARRELL

19   JENNIFER S. FEENEY

20   JULIANNE FELIZ-KIDD

21   ROBERT FINZI

22   MATTHEW FITZSIMMONS

23   LAWRENCE FOGELMAN

24   SAM FRAIDIN

25   HEATHER FRAZIER

Page 9

1   BRYCE L. FRIEDMAN

2   GAYLE GALAN

3   KATHERINE GALLE

4   CAROLINE GANGE

5   GILL GELDREICH

6   MELISSA GIBSON

7   JARED GIDDENS

8   MAGALI GIDDENS

9   SCOTT GILBERT

10  JEFFREY R. GLEIT

11  IRVE J. GOLDMAN

12  MICHAEL GOLDSTEIN

13  LESLIE A. GOLLER

14  GEOFFREY S. GOODMAN

15  ISLEY MARKMAN GOSTIN

16  GARY GOTTO

17  JARED T. GREEN

18  JAMES S. GREEN, JR.

19  DEBORAH GREENSPAN

20  EMILY GRIM

21  JOHN GUARD

22  STEPHANIE GULKIN SATZ

23  ADAM P. HABERKORN

24  LAWRENCE HAMERMESH

25  RYAN HAMPTON

Page 10

```
 1    BEN HARRINGTON

 2    CATHERINE BEIDERMAN HEITZENRATER

 3    ANGELA K. HERRING

 4    MICHELE HIRSHMAN

 5    JENNA A. HUDSON

 6    MITCHELL HURLEY

 7    ELISA HYDER

 8    SAMUEL ISSACHAROFF

 9    HAROLD D. ISRAEL

10    STEVEN IVES

11    EVAN M. JONES

12    CHERYL JUAIRE

13    ETHAN KAMINETZKY

14    JEFFREY KAPLAN

15    NICKOLAS KARAVOLAS

16    LAUREN KELLEHER

17    NEIL F.X. KELLY

18    KAREN KENNEDY

19    MARC KESSELMAN

20    DAVID KLAUDER

21    DARREN S. KLEIN

22    JEREMY C. KLEINMAN

23    LAWRENCE KOTLER

24    ANN KRAMER

25    KYUNG LEE
```

1   ALEXANDER LEES

2   DANIEL LENNARD

3   MARA LEVENTHAL

4   DANIELLE J. LEVINE

5   RUTH LICHTENFELD

6   JEFFREY LIESENMER

7   EDAN LISOVICZ

8   JOHN LONGMIRE

9   GARRETT LYNAM

10   KEVIN MACLAY

11   TIMOTHY MARTIN

12   BRIAN S. MASUMOTO

13   PATRICK C. MAXCY

14   LAURA MCCLOUD

15   HUGH M. MCDONALD

16   CARRIE MCGAHA

17   SHANNON M. MCNULTY

18   NATHANIEL MILLER

19   JONATHAN E. MITNICK

20   GAYANE MKRTTCHIAN

21   DAVID MOLTON

22   MAURA KATHLEEN MONAGHAN

23   PATRICK MORRISEY

24   ANDREW J. MUHA

25   GEOFFREY M. MULVIHILL

Page 12

1    AISLING MURRAY

2    SARA NADIM

3    ALISSA M. NANN

4    EDWARD E. NEIGER

5    LEE M. NICHOLSON

6    GEORGE O'CONNOR

7    ANGELA O'DONNELL

8    MICHAEL PATRICK O'NEIL

9    RACHEL R. OBALDO

10   LENARD PARKINS

11   JENNIFER PEANCOCK

12   STEPHEN POHL

13   KATHERINE PORTER

14   ARIK PREIS

15   DOUGLASS PRESS

16   MICHELE PULGGARI

17   KAMI QUINN

18   MARION QUIRK

19   GILLIAN RENDEL

20   CHRISTINA RICARTE

21   JOSEPH RICE

22   RACHAEL RINGER

23   ALMA ROBLES

24   JEFFREY J. ROSEN

25   JORDAN ROSENBAUM

```
 1    JASON RUBINSTEIN

 2    CHARLES RUBIO

 3    WILLIAM T. RUSSELL

 4    JEREMEY W. RYAN

 5    RICHARD SACKLER

 6    JAMES SALWEN

 7    DANIEL JOSEPH SAVAL

 8    SETH SCHINFELD

 9    FREDERICK E. SCHMIDT

10    PAUL KENAN SCHWARTZBERG

11    R.J. SHANNON

12    MICHAEL SHEPHERD

13    J. CHRISTOPHER SHORE

14    RICHARD SHORE

15    RICHARD SILBERT

16    LIANNA SIMMONDS

17    PAUL M. SINGER

18    MARC F. SKAPOF

19    ARTEM SKOROSTENSKY

20    ERIC J. SNYDER

21    JOSEPH L. SOROKIN

22    CLAUDIA Z. SPRINGER

23    CATHERINE STEEGE

24    HOWARD STEEL

25    ERIC STODOLA
```

Page 14

1    JEROME TAPLEY

2    PAMELA THURMOND

3    ANDREW M. TROOP

4    MARC J. TOBACK

5    KARA TRAINOR

6    CARL TROMPETTA

7    KELLY TSAI

8    JOSEPH TURNER

9    GERARD UZZI

10    ANDREW D. VELEZ-RIVERA

11    MICHAEL J. VENDITTO

12    ELI J. VONNEGUT

13    JONATHAN WAGNER

14    RYAN A. WAGNER

15    JORDAN WEBER

16    SHIRA WEINER

17    WILLIAM P. WEINTRAUB

18    MARTIN WEIS

19    ALLISON H. WEISS

20    THEODORE WELLS, JR.

21    DANIEL WOLF

22    LAUREN S. ZABEL

23    DAVID ZYLBERBERG

24

25

1                        P R O C E E D I N G S

2              THE COURT:  Okay.  Good morning.  This is Judge

3      Drain.  We're here in In re Purdue Pharma, LP, et al, on the

4      fourth day of the hearing on the Debtors' request for

5      confirmation of their amended Chapter 11 plan.

6              I have the list of the testifying witnesses for

7      today, and I'm happy  to go down that unless any parties

8      have any preliminary matters to raise that are relevant to

9      the agenda for today.

10             MR. KAMINETZKY:  Good morning.  Judge Drain, this

11     is Ben Kaminetzky of DavisPolk for the Debtors.  No, Your

12     Honor, we sent that revised list of experts just to give the

13     Court a preview.  I don't believe the first three witnesses

14     that are the hospital witnesses there will be any

15     substantive or much substantive cross-examination.  And then

16     we'll move on to Mr. Sackler.

17             The only note I make is that Mr. Cushing, who is

18     scheduled to go after Mr. Sackler, we've been advised is in

19     Switzerland and he's six hours ahead.  So we'll see where we

20     are.  But that should hopefully work considering his

21     schedule.

22             THE COURT:  Okay.  No thought was given to having

23     him go before Mr. Sackler so that we don't have that time

24     problem?

25             MR. KAMINETZKY:  I'd defer to my colleagues on the

Page 16

1    Sackler side.  This was the order that they suggested,

2    but -- well, there you are.  Ms. Monaghan, do you want to

3    respond to that?

4            MS. MONAGHAN:  Sure.  Thanks, Mr. Kaminetzky.  So,

5    Mr. Cushing's at your disposal.  We just wanted to let

6    everyone know that he has to be finished by 4:30, so it will

7    depend on how long parties anticipate cross-examining Mr.

8    Sackler.

9            THE COURT:  All right.

10           MS. MONAGHAN:  He can go earlier if need be.

11           THE COURT:  Okay.  Well, we'll see where we are

12   after the first three witnesses.

13           So why don't we proceed then.  As I understand it,

14   the first witness to be called this morning is William

15   Legier.  I hope I'm pronouncing that right.

16           MR. O'NEIL:  Judge, this is Michael O'Neil on

17   behalf of the Hospital Group.  I think we --

18           THE COURT:  I'm sorry.  You're going to have to be

19   closer to the microphone.

20           MR. O'NEIL:  I thought we had either Dr. Galan or

21   Dr. Gupta up first, but we're happy to take them in whatever

22   --

23           THE COURT:  Oh, I thought you had changed the

24   order so that Legier, Gupta, and Galan, we're going in that

25   order.  But if it's as per the original order of Galan,

Page 17

1    Gupta, and Legier, that's fine, too.

2              MR. O'NEIL:  Thank you, Judge.  we'll get Dr.

3    Galan on the line right now.

4              THE COURT:  Okay.  All right.  So let's take Gayle

5    Galan first.

6              (Pause)

7              THE COURT:  Okay.  I see Dr. Galan there.

8              Would you raise your right hand, please?

9              Do you swear or affirm to tell the truth, the

10   whole truth, and nothing but the truth so help you God?

11             MS. GALAN:  Yes.

12             THE COURT:  Okay.  And it's G-A-Y-L-E, new word G-

13   A-L-A-N?

14             THE WITNESS:  Yes.

15             THE COURT:  Okay.  Dr. Galan, you submitted an

16   amended declaration which under my order establishing the

17   procedures for this hearing is intended to be your direct

18   expert testimony.  It's dated August 16th.  Knowing that it

19   would be your direct testimony and sitting here today on

20   August 17th, is there anything in it that you wish to

21   change?

22             THE WITNESS:  No.

23             THE COURT:  Okay.  And it attaches in redacted

24   form, as I understand has been agreed with counsel for Dr.

25   Malanowski -- Masiowski, excuse me, Dr. Masiowski, an expert

1   report dated July 13, 2021.  Knowing that that would be part

2   of your direct testimony, is there anything in it that you

3   wish to change?

4              THE WITNESS:  No.

5              THE COURT:  Okay.  All right.

6              Is there any objection to the admission of Dr.

7   Galan's amended declaration and the attached revised that is

8   blacklined July 13, 2021 expert report?

9              MR. ROTHSTEIN:  No objection from Dr. Masiowski.

10             THE COURT:  Okay.  Very well.  And I gather from

11  no one else either.  And I appreciate, Mr. Rothstein, how

12  you and counsel for the hospitals, I guess led by Mr.

13  O'Neil, worked out your issue on this and the other two

14  declarations.

15             So I will admit Dr. Galan's admitted declaration

16  and her July 13, 2021 expert report that's attached to it as

17  her direct expert testimony.

18             (Declaration of Gayle Galan Received Into

19  Evidence)

20             THE COURT:  Does anyone want to cross-examine Dr.

21  Galan?

22             (No audible response)

23             THE COURT:  Okay.

24             MS. QUIGLEY:  Your Honor?

25             THE COURT:  Oh, I'm sorry.

1          MS. QUIGLEY:  I'm sorry, this is Michelle Quigley.

2    I have a question.

3          THE COURT:  Yes, go ahead.

4          MS. QUIGLEY:  The July 13th expert report, is that

5    the redacted report that was agreed to --

6          THE COURT:  Correct.

7          MS. QUIGLEY:  -- with counsel?

8          THE COURT:  That's right.  It's the one that's

9    attached to the amended declaration.

10          MS. QUIGLEY:  Okay.  I just wanted to clarify

11    that.  Thank you.

12          THE COURT:  And just to be clear, the redactions

13    were agreed with counsel for Dr. Masiowski since --

14          MS. QUIGLEY:  Yes.  I'm sorry, Your Honor.  You

15    haven't met me.

16          THE COURT:  -- Dr. Masiowski didn't submit an

17    expert --

18          MS. QUIGLEY:  I'm actually one of the counsel for

19    Dr. Masiowski.

20          THE COURT:  Okay.  All right.  So you understand

21    the reasons for the redactions.  All right.

22          MS. QUIGLEY:  Yes.

23          THE COURT:  So hearing no one who wants to cross-

24    examine Dr. Galan and based on my review of the report, I'm

25    not having any questions for her.  The report's clear and

Page 20

1    sets forth reviews so I don't have any questions.  You can

2    be excused, Dr. Galan.

3              THE WITNESS:  Thank you.

4              THE COURT:  Okay, thank you.

5              MR. O'NEIL:  Thank you, Judge.  May we add Dr.

6    Gupta next?

7              THE COURT:  Yes.  If you can put Dr. Gupta or make

8    sure Dr. Gupta signs on to the --

9              MR. O'NEIL:  He should be out momentarily, Judge.

10             (Pause)

11             THE COURT:  Okay.  I see Dr. Gupta there on the

12   screen.

13             Would you raise your right hand, please?

14             Do you swear or affirm to tell the truth, the

15   whole truth, and nothing but the truth so help you God?

16             MR. GUPTA:  I do.

17             THE COURT:  Okay.  And you can put your hand down.

18   And it's Rahul, R-A-H-U-L; next word G-U-P-T-A?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  Okay.  Dr. Gupta, you submitted an

21   amended declaration dated August 16th, 2021.  It attaches an

22   expert report and opinions in redacted form.  Under my order

23   establishing the procedures for this hearing, the

24   declaration and the attached report are intended to be your

25   direct testimony.  Knowing that, and I appreciate it's only

Page 21

1    one day later, but sitting here on August 17th, is there

2    anything in your declaration or the attached report and

3    opinions that you wish to change?

4                THE WITNESS:  No, Your Honor.

5                THE COURT:  Okay.  Does anyone object to the

6    admission of Dr. Gupta's amended declaration and the

7    attached report and opinions, again, in the blackline form

8    as agreed to with counsel for Dr. Masiowski?

9                (No audible response)

10               THE COURT:  Okay.  And, again, I have reviewed

11   that report.  I don't have any questions on it.  Does anyone

12   wish to cross-examine Dr. Gupta?

13               (No audible response)

14               THE COURT:  All right.  Again, I have reviewed the

15   report.  And given its clarity, I don't have any questions

16   of Dr. Gupta and no one else does either.  So, Dr. Gupta,

17   you can be excused.

18               THE WITNESS:  Thank you.

19               THE COURT:  Okay.  Then I think the last witness

20   now is Dr. -- I'm sorry, is William Legier.

21               MR. O'NEIL:  It's actually pronounced Legier,

22   Judge, but yes, he'll be out in just a second.

23               THE COURT:  If you can get him on the phone.

24               (Pause)

25               (Court and Clerk confer)

1           THE COURT:  All right.  I see Mr. Legier there.  I

2    may have inadvertently turned you into a doctor, Mr. Legier,

3    having heard from the prior two witnesses.  But you're not a

4    doctor, you're a CPA and forensic accountant, correct?

5           MR. LEGIER:  Yes, sir.

6           THE COURT:  All right.  Would you raise your right

7    hand, please?

8           Do you swear or affirm to tell the truth, the

9    whole truth, and nothing but the truth so help you God?

10          MR. LEGIER:  I do.

11          THE COURT:  Okay.  And it's William and then L-E-

12   G-I-E-R?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Okay.  Mr. Legier, you submitted an

15   amended declaration dated August 16, 2021.  It attaches an

16   expert report in redacted form as agreed to with respect to

17   the redactions with counsel for Dr. Masiowski.  Under my

18   order establishing procedures for this hearing, the amended

19   declaration and attached expert report are intended to be

20   your direct testimony.

21          By sitting here today on August 17th, is there

22   anything in them that you wish to change?

23          THE WITNESS:  No, Your Honor.

24          THE COURT:  Okay.  Does anyone object to the

25   admission of Mr. Legier's amended declaration and the

```
 1    attached report?

 2              (No audible response)

 3              THE COURT:  Okay.  Does anyone wish to cross-

 4    examine Mr. Legier?

 5              (No audible response)

 6              THE COURT:  All right.  Again, I have reviewed Mr.

 7    Legier's report, and I have no questions on it based on that

 8    review.  So hearing no one who wishes to cross-examine the

 9    witness, Mr. Legier, you can be excused.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  Thank you.

12              MR. ROTHSTEIN:  Your Honor, this is Paul Rothstein

13    on behalf of Dr. Masiowski.  I just have one minor issue

14    that I want to announce to the Court that I'm deferring

15    argument -- deferring it to the argument phase.  We don't

16    need to get into the details unless the Court requires it.

17    But it's a minor matter, and I'm just going to raise it at

18    our argument if we're not able to resolve it by then.

19              THE COURT:  Okay.  That's fine.

20              All right.  But, again, this is -- I'm not

21    recalling Drs. --

22              MR. ROTHSTEIN:  Correct.

23              THE COURT:  -- Galan or Gupta or Mr. Legier.

24              MR. ROTHSTEIN:  Absolutely not.

25              THE COURT:  Okay.  Very well.  Thank you.
```

1         All right.  Well, it's only 10:20 or so here in

2    New York.  I don't know how long the intended cross of Dr.

3    Sackler and more -- I think more likely the agreed

4    examination of him as a witness called by the objecting

5    state of Maryland is intended to be.  If his testimony is to

6    go longer than roughly 4:30, I think it may make sense to

7    call Mr. Cushing instead and then go with David Sackler.  I

8    don't know if you could give me any estimate of that, Mr.

9    Edmunds, Mr. Joseph, and others.

10         MR. EDMUNDS:  Your Honor, Brian Edmunds, State of

11    Maryland.  I don't think it will possibly go to 4:30.

12         THE COURT:  Okay.

13         MR. EDMUNDS:  I mean we've done as Your Honor has

14    said --

15         THE COURT:  All right.

16         MR. EDMUNDS:  -- and condensed significantly the

17    examination.  So I would think that we'll be done by

18    lunchtime.

19         THE COURT:  All right.  That's fine.  So why don't

20    we then ask Mr. Sackler, that is David Sackler, to log on to

21    the Zoom link.

22         MR. EDMUNDS:  We're calling him now, Your Honor.

23         THE COURT:  Okay.

24         Okay.  I see Mr. Sackler on the screen.

25         Would you raise your right hand, please?

1          Do you swear or affirm to tell the truth, the

2     whole truth, and nothing but the truth so help you God?

3          MR. D. SACKLER:  Yes, Your Honor.

4          THE COURT:  Okay.  And it's David S-A-C-K-L-E-R?

5          THE WITNESS:  Correct.

6          THE COURT:  Okay.  Mr. Sackler, I understand that

7     you're going to testify first with respect to the

8     declaration that you submitted as your direct testimony in

9     this hearing and then testify as a witness called by the

10    State of Maryland.

11         Let me turn first to your declaration.  Under my

12    order establishing procedures for this hearing, this

13    declaration is intended to be your direct testimony.  It's

14    dated August 4, 2021.  Knowing that it's intended to be your

15    direct testimony and sitting here today on August 17th, is

16    there anything in it that you wish to change?

17         THE WITNESS:  No, Your Honor.

18         THE COURT:  Okay.  Does anyone object to the

19    admission of the declaration as Mr. Sackler's direct

20    testimony?

21         (No audible response)

22         THE COURT:  Okay.  I will admit it for that

23    purpose.

24         (Declaration of David Sackler Received Into

25    Evidence)

1          THE COURT:  Does anyone want to cross-examine Mr.

2     Sackler on his declaration?

3          MR. EDMUNDS:  Your Honor, obviously, Brian Edmunds

4     for the State of Maryland.  We will combine cross with

5     direct I think in this instance.

6          THE COURT:  All right.  And I think that's fine.

7          MR. EDMUNDS:  But I don't know how others are

8     going to cross or not.

9          THE COURT:  That's fine.  You're not waiving cross

10    by including your questions as part of your direct

11    examination of him as your direct witness.

12         Does anyone else wish to cross-examine Mr.

13    Sackler?

14         MR. RUSSELL:  Your Honor, William Russell of

15    Simpson Thatcher on behalf of Gulf Underwriters Insurance

16    Company.  We have a few questions, but it may be appropriate

17    to ask those questions after the State of Maryland's

18    examination.  It might actually obviate the need for us to

19    ask questions.

20         THE COURT:  All right.  That's fine.

21         MR. RUSSELL:  Thank you, Your Honor.

22         MR. HIGGINS:  Your Honor, Ben Higgins for the

23    United States Trustee.  We did have some limited cross.  I'm

24    happy to wait until after Maryland or proceed now, whatever

25    Your Honor prefers we do.

Page 27

1              THE COURT:  Why don't you go ahead now, Mr.

2      Higgins.  I think that's fine.

3              MR. HIGGINS:  Okay.

4              CROSS-EXAMINATION OF DAVID SACKLER

5      BY MR. HIGGINS:

6      Q    Good morning, Mr. Sackler.  My name is Benjamin

7      Higgins, and I represent the United States Trustee.  Can you

8      hear me okay?

9      A    I can.  Good morning.

10     Q    Good morning.  You've testified that you and your

11     family are only willing to support a resolution in which you

12     receive broad releases under the plan.  Is that correct?

13     A    That is correct.

14     Q    Are you familiar with the plan's definition of

15     "shareholder-released parties?"

16     A    I am.

17     Q    Are you familiar with Appendix H to the disclosure

18     statement that lists more than 1,000 line entries of parties

19     receiving releases?

20     A    I'm generally familiar with it, yes.

21     Q    Are you aware that the Debtors filed a seventh amended

22     plan last week?

23     A    I am aware of that, yes.

24     Q    Are you aware that the Debtors amended the definition

25     of "shareholder-released parties" in that seventh amended

1    plan?

2    A    I'm not sure I -- I'm aware of that.

3    Q    Do you have a copy of the seventh amended plan?

4    A    Yeah, I believe I do.  Should I take it out?

5    Q    Please.

6    A    Give me one second, please.

7         Okay.  I have it here.

8    Q    Okay.  Can you please turn to page 36?

9    A    Okay.

10   Q    Do you see the definition of "shareholder-released

11   parties?"

12   A    Yes, I see it.

13   Q    Do you see (ii)?

14   A    Yes.

15   Q    Do you see that it lists the designated shareholder-

16   released parties?

17   A    I see that.

18   Q    And this was in addition.  That was not in the sixth

19   amended plan.  Are you aware of that?

20   A    No, I'm not aware.

21   Q    Okay.  I'll save you the trouble of flipping to the

22   definition of designated shareholder-released parties.  I'll

23   just tell you that it's defined as having the meaning set

24   forth in the shareholder settlement agreement.  Are you

25   familiar with the shareholder settlement agreement?

1    A    I have not memorized these documents, so I don't know

2    precisely what you're getting at.  I'm generally familiar

3    with it.

4    Q    Sure.  Are you aware that the Debtors filed a plan

5    supplement last week that included an unexecuted version of

6    the shareholder settlement agreement?

7    A    No, I'm not sure.

8    Q    Are you generally familiar with the shareholder

9    settlement agreement?

10   A    I think generally, yes.

11   Q    Have you signed a final version of the shareholder

12   settlement agreement?

13   A    Well, it's not been executed.  I don't believe I've

14   signed it, no.

15   Q    And when do you expect it will be executed?

16   A    I don't know.  I'd have to defer to my lawyers on that.

17   Q    Okay.  Is it your understanding that the settlement

18   agreement that is being approved as part of the plan has not

19   been finalized yet?

20   A    Well, I believe the plan has not been finalized yet,

21   therefore, I don't know about the agreement.  Again, I'd

22   have to defer to my lawyers.  This is getting into some

23   technical legal stuff.

24   Q    Are you aware that the shareholder settlement agreement

25   defines the term "designated shareholder-released parties"

Page 30

1    by referring to an exhibit that has been left blank on the

2    most recently filed version?

3    A    Again, I'd have to defer to my attorneys on this one.

4    Q    Do you have an understanding as to whether or not

5    parties could be added to the designated shareholder-

6    released parties list that are not currently disclosed?

7    A    I don't know.

8    Q    You testified in paragraph 2 of your declaration that

9    you and your family are only willing to support the plan if

10   all civil claims against you for Purdue's opioid-related

11   activities are fully, finally, and permanently released.  Is

12   that correct?

13   A    Yes.  And then I expanded upon that in paragraph 4 --

14   Q    Right.

15   A    -- to include all of Purdue's conduct.

16   Q    And you're asking -- you're actually asking for a

17   release of claims that also relates to non-opioid products.

18   Is that correct?

19   A    Yes; as paragraph 4 indicates.

20   Q    And you're also seeking a release that goes beyond the

21   claims that have actually been filed against you by states

22   and other third parties.  Is that correct?

23   A    That is correct.

24   Q    And if I could just direct you, no need to turn to it,

25   I'm just going to read you some of the language from the

Page 31

1    release provision in the plan, if that's okay.

2    A    Okay.

3    Q    You're seeking a release for claims related to the

4    Debtor's "development, production, manufacture, licensing,

5    labeling, marketing, advertising, promotion, distribution,

6    or sale of non-opioid products or the use or receipt of any

7    proceeds therefrom in each case including the Debtor's

8    interaction with regulators regardless of where in the world

9    any such activities for any result, loss, injury, or damage

10   resulting therefrom occur."

11           Are you generally familiar with that portion of

12   the release provision?

13   A    I wouldn't say I'm familiar with it, but as you read

14   it, I'm re-familiarized, I guess.

15   Q    With respect to the portion of the release that relates

16   to non-opioid provisions, isn't it true that you're seeking

17   a release that would extinguish claims related to the

18   Debtors' products that treat things like high cholesterol or

19   constipation and that have nothing to do with opioids?

20   A    Correct.

21   Q    To your knowledge, are any of the lawsuits against you

22   or your family completely unrelated to opioids or opioid-

23   related activities?

24   A    I don't know.

25   Q    Do you have any knowledge of any lawsuits against you

1    or your family that involve completely non-opioid-related

2    activity?

3    A    I don't know of any, no.

4    Q    Would you agree that you shouldn't receive a release

5    for anything to do with tax liability?

6    A    This is intended to be a global release or a full

7    separation with the Debtor.  I would defer to my attorneys

8    on the individual pieces that are needed to effectuate such

9    an outcome.

10   Q    You're seeking a release related to the future use or

11   misuse of opioid products.  Isn't that correct?

12   A    Correct.

13   Q    And, again, I'm going to read you a little bit of the

14   language from the plan.  You're seeking a release for claims

15   related to "any past, present, or future use or misuse of

16   any opioid whether sold by the Debtors or by Newco or any of

17   its subsidiaries or otherwise."

18            So you're seeking a release for claims based on

19   conduct that may have not even occurred yet.  Is that

20   correct?

21   A    Absolutely, yes.

22   Q    And you're also seeking a release that would extinguish

23   any claims related to fraud.  Is that right?

24   A    Yes.

25   Q    To your knowledge, has any Sackler family member filed

Page 33

1   for personal bankruptcy?

2   A    Not to my knowledge, no.

3   Q    Are you aware that liability related to fraud is not

4   dischargeable for an individual debtor in personal

5   bankruptcy?

6   A    I'd have to defer to my lawyers.

7   Q    In paragraph 4 of your declaration, you testified that

8   your family has offered billions of dollars as part of the

9   proposed shareholder settlement.  Is that correct?

10  A    That is correct, yes.

11  Q    And under the plan, that money would be paid out over

12  nine years or ten years if certain payments are made ahead

13  of schedule.  Is that correct?

14  A    That's correct.

15  Q    Do you have any understanding as to whether the amount

16  of money your family will contribute under the plan will be

17  more or less than your family's expected investment returns

18  over the nine-year period?

19  A    I don't think anybody can say that with any certainty.

20  Q    Have any financial advisors informed you of whether --

21  of what your family's expected investment return would be

22  over that nine-year period?

23  A    No, they have not.  But their advice would be

24  worthless.  As you know, markets go up and down, and

25  investment -- you know, past performance is no guarantee of

Page 34

1    future performance.

2    Q    In paragraph 4 of your declaration, you say that you

3    look forward to the time that the billions of dollars your

4    family has offered from the settlement can be put to work to

5    abate the opioid crisis but also that your family won't

6    agree to make the payments in the plan without the broad

7    releases.  Is that correct?

8    A    That is correct, yes.

9    Q    You're aware that several parties, including my office,

10   nine states, and the United States Attorneys Office, argue

11   that the proposed releases are impermissible?

12   A    I am aware of that.

13   Q    If the bankruptcy court decides that it won't or that

14   it can't approve the releases as currently proposed because

15   they're too broad, would you have to reevaluate your

16   position?

17   A    I'm not sure I understand your question.

18   Q    Sure.  Well, you've stated that you're only willing to

19   pay the billions of dollars offered under the settlement

20   agreement if you receive the releases currently proposed

21   under the plan.  Is that correct?

22   A    That's correct.

23   Q    So if the bankruptcy court decided that it wouldn't

24   approve those releases, would you still be willing to

25   fund -- would you still be willing to contribute money

1   toward the abatement of the opioid crisis?

2   A    No.  Not in this fashion, no.  And it would result in a

3   litigation posture is my understanding.  I'd have to refer

4   to my attorneys but, you know, I don't know of another forum

5   that would allow this kind of global solution, this kind of

6   equitable solution for all parties.  And so, no, I believe

7   we would litigate the claims to their final outcome.  That's

8   my guess, but I don't know exactly.

9   Q    Have you considered whether there's an amount of money

10  your family would be willing to pay to help abate the opioid

11  crisis in exchange for a narrower release?

12  A    No, I've not considered it.  It's this release or --

13  you know, I -- first of all, I'd have to defer to my

14  attorneys.  We need a release that is sufficient to get our

15  goals accomplished.  And if the release fails to do that,

16  then we will not support it.  How broad or how narrow that

17  release has to be is a question for the lawyers.  But as I

18  understand it, this release is fairly -- is essential for

19  the funding of that -- of the settlement.

20  Q    In your declaration, you state at Paragraph 3 that you

21  are deeply saddened by the opioid crisis and the fact that

22  OxyContin, a product made by Purdue, played a part in it.

23  You also state in Paragraph 5 that you believe your family

24  has good legal defenses against the claims against it; is

25  that correct?

Page 36

```
 1   A     It's my testimony, and yes, I believe it.

 2   Q     Do you believe that the Sackler family or any of its

 3   members have any responsibility for the opioid crisis?

 4   A     Well, I think we bear -- because a product that we

 5   produced that has helped millions of people has also been

 6   associated with the opioid epidemic, I think we bear moral

 7   responsibility to try and help, and that's -- that's what

 8   this settlement is designed to do.

 9               MR. HIGGINS:  Thank you, Mr. Sackler.  No further

10   questions, Your Honor.

11               THE COURT:  Okay.  Thank you.

12               All right.  I think -- well, let me ask.  Does

13   anyone else want to cross examine Mr. Sackler on his

14   declaration before we go into Mr. Edmunds' examination?

15               All right, Mr. Edmunds.  You can go ahead.

16               MR. EDMUNDS:  Okay.  Thank you, Your Honor.

17                 CROSS EXAMINATION OF DAVID SACKLER

18   BY MR. EDMUNDS:

19   Q     Good morning, Mr. Sackler.  This is Brian Edmunds for

20   the State of Maryland.

21   A     Good morning.

22   Q     Good morning.  Before we go into some things, let me

23   just do a few housekeeping matters.  We have --

24   A     Mr. Edmunds, it's a little bit hard to hear you.

25   Q     Okay.
```

1    A    Can you get a little closer?

2    Q    Yeah.

3    A    I'll turn up my speaker, but --

4    Q    Let me see.  Can you hear me now?

5    A    Yes.  Yes.

6    Q    Okay.

7    A    Thank you.

8    Q    I'll try to lean forward like this.  Let's -- before we

9    get into the substance, let's go through a few housekeeping

10   matters.  I just want to make sure you received a packet of

11   documents for purposes of this examination today.  Did you

12   receive about -- there are 50 or so documents sent

13   electronically.

14   A    I received 21 files through a -- something called

15   Hightail.  And then most recently, one PDF file was sent,

16   but the number is not 50.

17   Q    Okay.  (Indiscernible).  I'm sorry, Mr. Sackler.  I

18   (indiscernible) here.

19   A    The number is not 50.  I received 21 files on something

20   called Hightail and then another lone PDF was sent to me a

21   few minutes before the hearing began.

22   Q    All right.

23   A    So it's 22 files in all.

24   Q    Okay.  Well, we may have to -- I think there were more

25   than that, but perhaps some were combined, and we may have

1    to reconcile --

2              M:   I think that we got them in two different

3    sets.

4              THE WITNESS:  Oh.

5              M:   Oh, so the 21 plus one was the ones that

6    actually had exhibit numbers on them, but there was another

7    set of files that had no numbers, and that may be the 50

8    number, Mr. Edmunds, you're referring to.

9    BY MR. EDMUNDS:

10   Q    That may be, but does he have them is the question?

11   A    Well, I can -- I can -- let me try and find them.

12   Q    They were sent last night.  About 11:00 last night you

13   have an e-mail from Benjamin Taylor with those files.

14   A    Let's see.  This is -- I have something at midnight.

15   Is -- do you think that'll be it?

16   Q    That (indiscernible).

17   A    This only has one file in it.  Oh, it's a zip drive.

18   Hang on just a second.  I'm sorry.

19   Q    Okay.  (Indiscernible).

20   A    I apologize, Mr. Edmunds.  This is coming in quite

21   (indiscernible).

22   Q    (Indiscernible).  It's going.  Just --

23   A    I have -- this -- so there's a lot of files here,

24   deposition exhibits.  There's 11.  I think I probably have

25   everything.

1   Q    That sounds about right, but you've got them.  You've

2   got access to it now.

3   A    Yeah.  I mean, because they came in batches, we may

4   have to work to pull them up, but I will try and keep up

5   with you.

6   Q    I think that latter one probably includes everything

7   that I'm going to ask about.  I think it's probably

8   cumulative.  I think your testimony got moved, and so maybe

9   there were two batches because of that.  But I think that

10  we're probably in good shape.

11       So let me also ask you -- it's my understanding that

12  you've been listening to the confirmation hearing on the

13  line throughout the course of proceedings; is that correct?

14  A    I've listened to some, yes.

15  Q    Okay.  And when -- I suppose what times did you not

16  listen?  What times were you unavailable to listen?

17  A    On Friday, I had some medical testing, so I was unable

18  to listen for portions of that.

19  Q    Did you listen all day Thursday?

20  A    I believe so, yes.

21  Q    And did you listen all day Monday?

22  A    I may have missed a little bit, but substantively all

23  of it.

24  Q    All right.  And you -- and you were previously deposed

25  in this proceeding, is that right, in this bankruptcy?

1    A    Yes.

2    Q    And you should have a copy of that in the exhibit

3    (indiscernible)?

4    A    Yeah.  I have -- I also have a hard copy that was

5    requested.

6    Q    Okay.

7    A    Whichever you prefer.

8    Q    Right.  And have you had an occasion to review your

9    deposition transcript before today?

10   A    I'm sorry.  There's a lot of paper shuffling, so I

11   can't really hear you.

12   Q    Okay.

13   A    Did I have a chance, and then I lost you.

14   Q    Had you had a chance to review your deposition

15   transcript between the time it was taken and today?

16   A    Yes.  It was sent to me for verification and signature

17   after -- after the fact.  So yeah, I have reviewed it and

18   signed it.

19   Q    Okay.  Did -- for the -- for the record, that is -- it

20   was definitely the KXT987, but I think that the file in the

21   document repository was (indiscernible) separate copy to the

22   Court and (indiscernible).

23          MAN 1:  Mr. Edmunds -- Mr. Edmunds,

24   (indiscernible) one second.

25          Your Honor, with tremendous apologies, just so you

1    know, your mic is fully picking up.

2              THE COURT:  Right.  We're trying to find the

3    deposition transcript.  We have the exhibits but not the

4    transcript.

5              MAN 1:  Okay.  Understood.  I just wanted to make

6    sure the Court knew the (indiscernible) papers and

7    communications were audible to people.

8              Mr. Edmunds, apologies for interrupting.  Just

9    trying to help everybody be able to hear.

10             MR. EDMUNDS:  Certainly.

11   BY MR. EDMUNDS:

12   Q    Mr. Sackler, I had asked you that -- whether you'd had

13   occasion to review the transcript before today, and I think

14   you said yes.  And I'm just going to ask are there any

15   statements in the transcript that you made that are untrue?

16   A    I'm sorry.  I lost it again.  Now there's some other

17   noise on the line.  Are there any statements --

18   Q    That are inaccurate or -- inaccurate?

19   A    I don't believe so.

20   Q    Thank you.  And you were --

21   A    I just -- I just want to be clear.  I mean, I don't

22   believe so.  At the time that deposition was taken was much

23   earlier in the case, so events have transpired subsequently,

24   but -- that may have obviated some of the testimony.  But at

25   the time it was given, I believe it was -- it was accurate.

Page 42

1    Yes.

2    Q    Okay.  Thank you for that clarification, Mr. Sackler.

3         You served as a director of Purdue Pharma from 2012 to

4    August 2018; is that right?

5    A    I'm sorry, Mr. Edmunds.  Again --

6              THE COURT:  August -- then you faded out.  August

7    something.

8    BY MR. EDMUNDS:

9    Q    Oh, August 2018.  From 2012 to August 2018.

10   A    Yes.

11   Q    Before that time, had you been in contact with other

12   directors, such as your father, regarding the operations of

13   the company?

14   A    I'm sorry.  I'm still having very great difficulty

15   hearing you.

16   Q    I wonder if --

17             MAN 1:  Yeah.  Your Honor --

18             MR. EDMUNDS:  (Indiscernible) not muted.

19             MAN 1:  Your Honor, I'll take it on the chin here

20   with apologies.  With tremendous apologies and no disrespect

21   intended, every time the door open and closes in the court

22   or people bring you things, it actually cuts Mr. Edmunds'

23   microphone out, and the witness can't hear anything.  So

24   please forgive me for mentioning it.

25             THE COURT:  That's fine.

```
 1              MAN 1:  I think that actually --

 2              THE COURT:  I think we have all --

 3              MAN 1:  I think that is the source.

 4              THE COURT:  I think we have all the documents that

 5    -- now that were referred to at the beginning of this

 6    testimony, so I don't think we're going to be searching

 7    around anymore.

 8              So apologies, Mr. Edmunds.  If you can ask that

 9    question again.

10              MR. EDMUNDS:  Thank you, Your Honor.

11    BY MR. EDMUNDS:

12    Q    Mr. Sackler, you were -- I'll back up.  You served as

13    director for Purdue from 2012 to August 2018; is that right?

14    A    That's correct.

15    Q    And prior to the 2012, you were informed and -- you

16    were informed about the operations of the company to some

17    extent, weren't you?

18    A    Not the operations so much.  It was -- I was -- I

19    remember discussing things like strategic alternatives and

20    things like that, but not so much the operations.  Like I

21    had, for example, no idea how sales were doing or anything

22    like that.

23    Q    But you had conversions with -- such as -- with Board

24    members such as your father, particularly regarding --

25    A    I --
```

1   Q     -- the operations of the company?

2   A     You keep saying operations.  I think that that's a term

3   I don't agree with.  I had conversations with him about the

4   company, but it was certainly not about the day-to-day

5   operations.

6   Q     Fair enough.  You have also served as a director of

7   MNP; is that correct?

8   A     That's correct.

9   Q     Are you currently a director of MNP?

10  A     The entity was renamed MNC, and yes, I'm a director.

11  Q     The entity MNC has the same functions as the former

12  entity, MNP; is that correct?

13  A     Largely, yes.

14  Q     And in that capacity, I believe you've testified, and

15  you testified in your deposition that MNP makes

16  recommendations to the family-owned IACs; is that correct?

17  A     Yes.  Recommendations to the Boards of those IACs, yes.

18  Q     Recommendations to the Boards.  You also serve as a

19  director on some of the Boards; is that right?

20  A     I'm not sure.  I don't think that's the case, but it

21  may have been in the past.  It would've been very few in

22  number.

23  Q     Do you recall testifying in your deposition

24  (indiscernible) affiliates in Germany, Australia, and in

25  Britain (indiscernible) company?

```
 1              MR. JOSEPH:  Do we have a reference that we can --
 2              THE WITNESS:  Yeah.  I -- can you refresh my
 3    memory?  I don't remember that.
 4    BY MR. EDMUNDS:
 5    Q    (Indiscernible) page.  Your Honor, I'll withdraw and
 6    come back to that.  I don't have the page right in front of
 7    me.  I don't know if it's --
 8    A    Yeah.  I -- if -- if --
 9    Q    (Indiscernible) need to do that (indiscernible).  But
10    let me ask, as a Board member of Purdue Pharma, as a
11    director of Purdue Pharma, you attended Board meetings; is
12    that right?
13    A    Yes.
14    Q    And you attended them regularly; is that correct?
15    A    Yes.
16    Q    And you also received what are called the Board books;
17    is that correct?
18    A    That's correct.
19    Q    And what are the Board books that -- well, just
20    describe them.
21    A    It's an agenda really of what's going to be discussed
22    along with presentations that management intends to give, so
23    the slides in advance for people to study so that, you know,
24    they can think about the issues.
25    Q    Right.  So you will receive typically an agenda
```

Page 46

1   followed by tabs containing presentations; is that correct?

2   A    That's correct.

3   Q    And you read those; do you not?

4   A    Yes.

5   Q    And you also -- and how often would the Board meet?

6   A    It varied.  You know, generally about once every two

7   months.

8   Q    Okay.  Was it ever more frequent than that?

9   A    Well, there were -- there were times when it was a

10  little bit more frequent than that just for scheduling where

11  there'd be a budgeting meeting.  There'd be a midyear

12  meeting, and then those would throw off the calendar, so it

13  would be a little bit more frequent for a period, and then -

14  - my recollection is the cadence was roughly every six weeks

15  to every two months, the six weeks being in those time

16  periods that were sort of compressed by those special

17  meetings.  They're not special but those calendared

18  meetings.

19  Q    Okay.  And those are the formal meet -- formal meetings

20  of the Board of Directors.  Were there also meetings among

21  the directors that took place sort of within the formal

22  meeting schedule?

23  A    I'm not sure I understand your question.

24  Q    Did you meet with individual directors or groups of

25  directors outside of the formal meetings of the Board of

Page 47

1    Directors that were called?

2    A    Very infrequently.  I mean, Directors are always free

3    to talk with one another.  But there weren't very many

4    formal meetings of Directors outside of the presence of

5    management, except for normal Board meeting functions, like

6    executive sessions and things like that.

7    Q    Would you say that on a regular basis, you engaged in

8    informal communications with other Purdue Directors?

9    A    I don't know what you'd define as regular basis.  I

10   don't recall it being overly burdensome.

11   Q    On a day-to-day basis, would you have communications

12   with other Directors?

13   A    I don't think so, no.

14   Q    Would you communicate by email with other Directors?

15   A    At times, yes.

16   Q    I want to ask you, at the time you became a member of

17   the Purdue Board, you were aware that opioids were

18   addictive, were you not?

19   A    Yes.  It's a facet of all opiates.  Yes, I was aware.

20   Q    And you were aware that opioids had killed at that time

21   tens of thousands of people, right?

22   A    I'm sorry.  I'm having trouble hearing you, Mr.

23   Higgins.

24   Q    Yeah.  I'm having trouble hearing you.  I'll just --

25   I'll keep going.  You were aware at the time you became a

Page 48

1   Director of Purdue Pharma that opioids were killing tens of

2   thousands of people, were you not?

3   A    Yes.  I was aware that there was an ongoing problem of

4   opioid overdose.

5   Q    And that opioid overdoses would kill thousands more in

6   the years on which you served on the Board.  Is that right?

7   A    Well, I didn't know that at the time I joined.  But,

8   you know, so I don't know how to answer that question

9   exactly.

10  Q    Did you have an expectation as to whether that trend

11  that had happened in the past would keep going?

12  A    Well, I didn't think that it was likely to stop, though

13  I was hopeful that, you know, efforts by the federal

14  government and by companies like Purdue, at least on the

15  prescription side, could help.  And then, you know, the

16  illicit market isn't something that really industry could

17  help.  But that's -- you know, hopefully the federal

18  government could help abate that, along side maybe some

19  states.  But you know, obviously, we were all hoping for the

20  best.

21  Q    You were hoping for the best, but did you expect that

22  increasing Purdue Pharma sales would help with the problem

23  of people dying of opioid overdoses?

24  A    Sorry.  I'm having -- it's just very, very hard to hear

25  you.

Page 49

1    Q    Yeah, very --

2    A    Can you try that one again?

3    Q    -- (indiscernible) and I don't know --

4            MR. HUEBNER:  Yeah.  Hey, Your Honor, I'm sorry.

5    Just for the record, there are now three unmuted boxing

6    coming from the courtroom.  One is chambers RDD, where

7    there's no video feed.  One is Your Honor himself.  And then

8    the third is the 0020120.  I don't remember seeing the

9    chambers RDD box before as unmuted.  It may be that there is

10   double feedback coming from within the courtroom.  My fear

11   also is based on prior transcripts.  We may get a very

12   incomplete transcript because the audio is actually quite

13   challenging for I think those who are listening.  So again,

14   I'm just trying to be sort of a friend of the people here

15   and help (indiscernible) to the listening public.  If the

16   other one -- I see someone has now muted the 0020120.  That

17   then leaves a second one, which is chambers RDD.  Clearly,

18   that needs to be unmuted.  Obviously, you're the Court and

19   we're just (indiscernible).  But I did want to point it out,

20   just in case technologically that's the source of the

21   distortion of the audio, because I think Mr. Edmunds and Mr.

22   Sackler --

23           THE COURT:  The person running it says it's not,

24   but --

25           MR. HUEBNER:  Okay.

```
 1              THE COURT:   -- you should unmute -- you should

 2    mute everything except my mic.

 3              MAN:  (indiscernible)

 4              THE COURT:  Everything is muted, I'm told, except

 5    --

 6              MR. HUEBNER:  Okay.

 7              THE COURT:  -- except Mr. Edmunds and the witness

 8    and my mic.

 9              MAN:  (indiscernible)

10              MR. HUEBNER:  Thanks, Your Honor.  Please don't

11    blame the messenger.  I'm just trying to help.

12              THE COURT:  Okay.

13              MR. EDMUNDS:  Thank you, Mr. Huebner.  Thank you,

14    Your Honor.  It does seem to be better at this point, I

15    think.

16    BY MR. EDMUNDS:

17    Q    Mr. Sackler, my question was, did you expect the

18    increase in Purdue Pharma sales of opioids would help in

19    preventing the future deaths of (indiscernible) of Americans

20    from opioid overdoses?

21    A    You know, I believe actually the answer, in my

22    expectation, was yes.  And the reason I believe that is

23    prior to my joining the Board, Purdue had reformulated

24    OxyContin to make it abuse-deterrent.  And that

25    reformulation, while the data that I was able to review when
```

Page 51

1    I joined the Board had been successful at reducing the

2    product's incidence of nasal and injectable use.

3            Furthermore, the company was spending hundreds of

4    millions of dollars developing other abuse-deterrent

5    opioids, which we hoped we could bring to market.  So the

6    idea in increasing the sales was to take market share from

7    non-abuse-deterrent products, thereby reducing abuse and

8    diversion of the category as a whole, and hopefully thereby

9    having a positive effect on opioid overdoses.

10   Q    And in fact, opioid overdoses went up during the time

11   since you became a Director of Purdue Pharma, did they not?

12   A    They have gone up, and Purdue's market share has

13   declined.  So, obviously, you know, the hopes I had for

14   increasing Purdue's sales were not realized.

15   Q    Is there a document that you have that lays out these

16   hopes that you had for increasing Purdue's market share and

17   thereby reducing the contribution of Purdue to the opioid

18   prices?

19   A    Sure.  I'm certain it's dotted throughout the Board

20   presentations over my years on the Board.  It was a huge

21   emphasis of management.  The driving strategy of the company

22   when I joined the Board was abuse-deterrent opioids and how

23   important they were for public health in the United States,

24   and how important it was to try and convert as much of the

25   market as possible.

Page 52

1          So while I don't have them at hand, I am certain

2    that throughout the record they exist in great number.

3    Q    Well, I understand that Purdue has marketed opioids,

4    and OxyContin in particular, as abuse-deterrent.  But is

5    there a document that lays out your theory that that is why

6    you, as a Board Member, were promoting those drugs?

7    A    I'm not sure if there is --

8          MR. JOSEPH:  I'm going to object to the form, that

9    he as a Board Member was promoting drugs.

10         THE COURT:  Okay.  I think it's understood that

11   what you were talking about was the -- as Mr. Sackler

12   testified, the Board and the company's primary strategy.

13         THE WITNESS:  Yeah.  And I -- Your Honor, should I

14   answer the question?

15         THE COURT:  Yes.

16         THE WITNESS:  Okay.

17   BY MR. EDMUNDS:

18   A    I believe there should be quite a few documents

19   throughout the -- throughout the record, though I don't have

20   any at hand.

21   Q    Can you identify specifically, even describe a single

22   document that makes the claim -- in which you make the claim

23   that you're making now, that that was your reason for

24   joining -- or that that was your policy -- and that was your

25   policy in joining the Board of Directors?

1   A    Well, I don't have an exhaustive record of the

2   documents in my head.  I know what I believed when I joined

3   the Board of Directors.  And what management presented to

4   the Board orally, as well as in presentations, was focused

5   on abuse-deterrent opioids.  And I know the hundreds of

6   millions of dollars that were spent in that effort.

7           So while I don't have a specific document to cite

8   for you, I'm just giving you my understanding of where the

9   company was when I joined the Board.

10  Q    But that's the answer to my question.  There isn't a

11  document in which you have laid out the theory that you have

12  described just now in writing?

13  A    I believe that there are documents that should help

14  support it, though I don't know.  I do not have an

15  exhaustive record of the tens and tens of millions of

16  documents that have been observed in this case.  So while I

17  can't give it to you (indiscernible) I'm just giving you my

18  impressions as a Director joining the Board.

19  Q    All right.  You heard Mr. Lowne's testimony, did you

20  not?

21  A    I believe so, yes.

22  Q    And did you hear Mr. Lowne confirm that Purdue, after

23  February 2018, continued to market both opioids and an

24  opioid induced constipation drug through the (indiscernible)

25  sales force to opioid prescribers?

1    A    Yes.

2             MR. JOSEPH:  Objection.  If there's a reference to

3    testimony, that's not my recollection of it.  I think we

4    ought to be directed to the exact testimony.

5             THE COURT:  Well, he just answered yes, so...

6             MR. JOSEPH:  Oh, well, I remember vaguely Mr.

7    Lowne being questioned about some (indiscernible) marketing,

8    so I was going to say -- I was going to say I didn't

9    remember the exact testimony, but --

10   BY MR. EDMUND:

11   Q    Do you contend that Purdue did not promote opioids and

12   opioid induced constipation drugs at the same time through

13   its sale force after February 2018?

14   A    I'm sorry.  I'm not sure I understand your question.

15   Q    After February --

16            THE COURT:  I think -- maybe if you could make it

17   not compound.  There are two different points.  Two

18   different types of products.

19            MR. EDMUNDS:  All right, Your Honor.

20   BY MR. EDMUNDS:

21   Q    You understand that Purdue marketed the drug Symproic

22   through a sales force following February 2018?

23   A    I believe that's the case, though, you know, management

24   was making the marketing decisions at, you know, all times,

25   but at that time as well.  The Board supported management in

Page 55

1    its desire to end opioid marketing.  And I believe there was

2    a Q-month period when Symproic was still promoted.  But, you

3    know, these are really questions that should be directed to

4    management (indiscernible).

5    Q    Well, I don't know.  We'll see.  But do you -- you

6    understand that in February 2018, the Board issued a press

7    release for -- I'm sorry -- Purdue issued a press release in

8    which it told the American public that it would -- it had

9    stopped or would stop marketing opioids (indiscernible).  Do

10   you recall that?

11   A    Well, I recall -- no, I don't recall the press release,

12   but I'll take your --

13   Q    What we take a look at it.  And I will direct you to

14   the document you've been sent.

15   A    I'm sorry.  I can't hear you, sir.

16   Q    Yeah, we still have -- why don't I -- I'll direct you

17   to this press release, and if you could take a look in the

18   documents that you have been sent, it is in the folder as JX

19   (indiscernible) -- a file name beginning with JX-2458.

20   A    I don't see a 2458.  There's so many --

21   Q    I believe it may be on the second set --

22   A    Oh, no, I've got it.

23   Q    -- the second set.

24   A    I got it.  Okay.

25   Q    Could you take a look at this document, Mr. Sackler?

1    A    I see this document.

2    Q    And you see that it says -- it is a press release from

3    Purdue Pharma and that it says that Purdue will no longer --

4    we have (indiscernible) -- we have restructured and

5    significantly reduced their commercial operations and our

6    sales representatives will no longer promote opioids to

7    prescribers.  Is that right?

8    A    What do you mean, is it right?  That's what the

9    document says.

10   Q    Well, that's the question.  That's what it says?

11   A    Yes.

12   Q    And you understand that Purdue issued that press

13   release and that statement on February 9, 2018, did it not?

14   A    No, I don't recall it offhand.  But that's what it says

15   here, and I have no reason to dispute it.

16   Q    That was not a decision that would have been made by

17   the Board?

18   A    The decision to -- as I recall it, it was a management

19   proposal to cease prescribe -- cease promoting products to

20   doctors -- or to cease promoting opioid products to doctors.

21   And the Board was supportive of it.  I think management had

22   a vision, as I recall at the time, of winding down the whole

23   salesforce.  But because of some issues with some Symproic,

24   wanted to continue it for a few months.  But that's what I

25   recall.  This was a management-led initiative, and the Board

Page 57

```
 1    was supportive of it.

 2    Q    The Board was supportive of it.  So the Board approved

 3    of it?

 4    A    As I said, yeah, the Board was supportive of it, of

 5    CC-ing the promotion to doctors.  Yes, the Boards in --

 6    Q    Was this a decision -- I guess we're -- we still have

 7    (indiscernible) here, but I'm not sure.  Was this a decision

 8    that had to be made by the Board of Directors of Purdue

 9    Pharma?

10    A    I -- you know, I don't know because management proposed

11    it and the Board supported it.  So I don't know what was

12    required.  Could management have done this on their own?  I

13    would assume so.  So, I -- but I don't know.  I'd have to

14    refer to counsel to know exactly what the bylaws state.  You

15    know, I -- but I assume management could've done this on

16    their own had they wanted to.

17    Q    Well, is it your position that Purdue stopped marketing

18    opioids through its salesforce in February of 2018?

19    A    As far as I know.  I have no reason to dispute that.

20    As I said, the Board was not involved with day-to-day

21    marketing operations.  So, if that's what this represents

22    and that's what we were told by management, I don't have a

23    reason to dispute it.

24    Q    So that's your testimony, the Board was not involved in

25    this decision.
```

1    A    No, as I -- look, I think my testimony's been clear.

2    Management came to the Board with this proposal.  The Board

3    was supportive of it.  Management then went away and

4    executed the proposal.

5    Q    I'm sorry.  (Indiscernible).

6    A    I'm sorry.  Am I --

7            THE COURT:  I think he finished his answer.

8    BY MR. EDMUNDS:

9    Q    All right.  I think we're -- and let me turn you to

10   another exhibit that you have there.  This one is JX1688,

11   Mr. Sackler, and it -- the file name begins with JX1688.

12   Can you pull that up?

13   A    I see it, yes.

14   Q    Okay.  And I am going to ask you to, first of all, take

15   a look at this document and see if you can identify what it

16   is.

17   A    I'm sorry.  See if I can what?  Something.

18   Q    Can you identify what it is, this document?

19   A    Yes, it's a -- what you refer to as a Board book, but

20   it's the agenda for a meeting of the U.S. Boards of

21   Directors.

22   Q    Okay.  And the U.S. Boards of Directors of Purdue

23   Pharma then met -- and debtors met on January 30, 2018 and

24   continued to meet through February 1, 2018; is that right?

25   A    I just -- I'm sorry.  Is there -- there's so much

Page 59

1    interference I can't tell if there's --

2    Q    I understand.

3    A    -- an objection or what and I don't want to speak over.

4    I apologize.  I don't know if all of those hours were

5    filled.  Quite often the time is illustrative, and we would

6    get through items much faster than what was here.

7    Q    Sure, but there was a board meeting on those dates,

8    right?

9    A    Well, it was scheduled.  I don't know.  For example, we

10   might've finished and canceled Thursday, but this is what

11   was scheduled --

12   Q    Right.

13   A    -- so I don't --

14   Q    It was scheduled for --

15   A    -- recall offhand.

16   Q    A board meeting took place in approximately that time;

17   isn't that right?

18   A    Yes.  I'm not sure I mean to quibble with you.  I'm

19   just --

20   Q    Well --

21   A    -- with the three days' matter, I can't tell you with

22   certainty if we met a full three days.

23   Q    I'm not sure it matters, but this procedure

24   (indiscernible) about eight days; is that right?

25   A    Sorry, I can't -- it's very hard to hear you.  This

Page 60

1    press release and then I lose you.

2    Q    Given when the meeting actually took place, or whenever

3    the meeting took place over this period, this predates the

4    press release I just showed you previously by about eight

5    days; is that right?

6    A    I assume that's right based on the dates, yeah.  That's

7    what it appears.

8    Q    Right.  And this is not only an agenda on pages U.S. 1

9    and U.S. 2, but it also contains the tabs we discussed

10   earlier that are -- that appear along with the Board agenda

11   in the -- in what's called the Board books, right?

12   A    I think that's --

13   Q    (Indiscernible)?

14   A    I think that's correct.  There was a lot there.  I --

15   can you just break it down for me so that I'm precise here?

16   Q    This is the Board book; is that right?

17   A    Well, you're calling it the Board book.  I have no

18   reason to dispute it, so --

19   Q    I mean, I don't think it's my --

20   A    -- this is --

21   Q    I'm sorry.  Go ahead.

22   A    Well, I don't know what I would call it.  I would call

23   it the agenda for the meeting, and it absolutely has slides

24   attached to it that outline the management items that were

25   on the agenda for this meeting.

Page 61

1   Q    Okay.  Take a look if you would at page U.S. 7.  I

2   think it's the seventh --

3   A    U.S. 7.

4   Q    -- the seventh page in the PDF with the...

5   A    Page 7, the one that's titled Our Operating

6   Assumptions?  There are so many page numbers here it's hard

7   to --

8   Q    Well, I --

9   A    Or Summary of Actions?  Which maybe you can give me the

10  title of the page and I'll find it.

11  Q    I will.  Just give me a second.  I've lost the --

12  (indiscernible) myself here.  Yeah, I think it's the seventh

13  page of the PDF.

14  A    Okay.  I'm there.  It's titled Summary of Actions.

15  Q    Yeah, I think it had something -- in the Summary of

16  Actions, you know, this is a presentation of the Board,

17  correct?

18  A    Yes.  This is a presentation to the Board by management

19  of the summary of the actions taken to-date since the

20  management change, yes.

21  Q    And these are some of the steps that the Board is being

22  told that management is taking at this time, right?

23  A    Yeah, it's a list of what management was doing at the

24  time since the CEO management change.

25  Q    Okay.  And if you'll scroll down to the next page,

Page 62

1   you'll see that one of those -- one of the operating

2   assumptions is that -- they need -- that Purdue needs to be

3   based off a probability in the face of a challenging

4   environment, right?

5   A    Yes.

6   Q    And that bold and immediate action is required.

7   A    Yes, I see where it says that.

8   Q    Okay.  And that you will have a going concern in the

9   pharmaceutical space; is that right?

10  A    That's what it says here, yes.

11  Q    Do you understand what that means that you have a going

12  concern in the pharmaceutical space?

13  A    I believe that it relates to management's belief that

14  it could settle the lawsuits that had materialized at this

15  page -- at this point for a manageable amount of money.

16  Q    Okay.  And that --

17  A    -- (indiscernible).

18  Q    Okay.  It reflects in some way the concern with the

19  losses and litigation the company is facing, right?

20  A    Well, it's -- of course, you know, given the volume of

21  lawsuits, there was concern, and this indicates management's

22  belief that they could be settled for a manageable amount of

23  money by the debtor.

24  Q    Okay.  Let me ask you to scroll, I believe it's the

25  next tab, but let's look at the (indiscernible).  Hey, could

Page 63

1    you scroll to page U.S. 17, Mr. Sackler?

2    A    Okay.  I could do that.  Maybe it'd be easier to just

3    stick with either the U.S. page numbers, or the PDF page

4    numbers.  They seem to be identical.

5    Q    I think they're the same.

6    A    Okay.

7    Q    They're --

8    A    That's fine with me.

9    Q    Yeah, that's -- I know there's a Bates number on it.

10   We'll just worry about --

11   A    Okay.  Go ahead, please.

12   Q    -- the numbers.  And you could see these two actions be

13   considered to optimize the business, right?

14   A    I think I got your question, but I'm going to ask you

15   to repeat it because --

16   Q    The title is these two actions have been considered to

17   optimize the business, right?

18   A    That's correct.

19   Q    And one of the items under sales and marketing being

20   presented to the Board is the need to optimize the

21   (indiscernible) plan; is that right?

22   A    That's what it says here.

23   Q    And I would have you go now to U.S. 27 or page 27 of

24   the PDF.

25            MAN:  Mr. Edmunds, quick question.  I'm working in

Page 64

1    the background to try to solve the technical problems we're

2    all experiencing.  And given the public import of this

3    trial, obviously, I think having a transcript that is

4    complete is important to many people.  Is there a chance you

5    could use headphones because the consensus appears to be

6    that it might actually be the source of your audio.

7              So I really don't mean to impose or disrupt you,

8    but I just respectfully suggest if it's possible for you to

9    pop in air pods or something, it might actually solve the

10   problem.  But again, please forgive the intrusion.  I'm

11   just, as always, trying to field emails and texts from many

12   people trying to make the trial as public and efficient as

13   possible.

14             MR. EDMUNDS:  Again, I may have just -- maybe I

15   don't need -- can you hear me?

16             THE COURT:  I can, yes.

17             MR. EDMUNDS:  Okay.  And does that improve the --

18             THE COURT:  Yes.

19             MAN:  A lot.  A lot.

20             MR. EDMUNDS:  Okay.  Okay.

21             MAN:  It is a radical improvement.  Thank you so

22   much, Mr. Edmund.

23             MR. EDMUNDS:  So I'm not sure -- I mean, it is the

24   same setup I had yesterday, so I apologize if it is my

25   fault.  I'm not sure what's happened to the system here.

1    BY MR. EDMUNDS:

2    Q    Okay.  So I believe I've asked you, Mr. Sackler, to

3    turn to page U.S. 27.

4    A    I'm there.

5    Q    Okay.  And on page U.S. 27, the company or the sale --

6    the executives are presenting to the Board a plan to

7    optimize Symproic for the rapidly changing market, right?

8    Do you see that?  It's several lines down.

9    A    That's what it says here, yeah.

10   Q    All right.  So that's being presented to the Board.

11   And another immediately above that, the Board is being told

12   that it is going to -- or that Purdue is going to reduce the

13   traditional investment in opioids and approach that market

14   differently, did it not?

15   A    That's what it --

16   Q    Do you see that?

17   A    -- says here.

18   Q    Okay.  All right.  Why don't we turn to another

19   document?  And the next one we will put up is JX1689, which

20   you should have in front of you or in your folder.

21   A    I have it.

22   Q    Okay.  And JX1689 is another what I -- agenda followed

23   by tabs of presentations to the Board, right?

24   A    Yes.

25   Q    And this is a meeting that was actually held of the

1    Board, right?

2    A    I believe so, yes.

3    Q    Okay.  And this follows the announcement, the press

4    release, that we've looked at, right?

5    A    Yes, in time it does.

6    Q    Okay.  And you would've read this document as a

7    director?

8    A    Yes, I believe I would've.

9    Q    Okay.  Now, I would like you to turn -- so this follows

10   the announcement that Purdue has discontinued marketing

11   through a -- opioids through a salesforce, right?

12   A    In time it follows the press release, yes.  We -- I

13   said yes to that.

14   Q    Okay.  I apologize if you did.  Would you scroll down,

15   please, to U.S. 16 of this document?  And I believe it's the

16   same as before.  The PDF page numbers will follow the...

17   A    I don't see anything on page 16 other than a title

18   slide for opioid analgesics.  Is that what you're looking

19   for?

20   Q    Give me a moment to scroll.  U.S. 17, rather.  But yes,

21   there's a title slide for opioid analgesics.  And under that

22   title slide there is a statement to the Board.

23   A    Correct.

24   Q    And it says we remain committed to patients and

25   healthcare professionals and will always remain steadfast to

Page 67

1    supporting responsible opioid utilization, right?

2    A    That is what it says here, yes.

3    Q    And an acronym for that that is used with the company

4    is SROU; is that right?

5    A    It's the first time I've heard it, but --

6    Q    Okay.

7    A    -- there is no --

8    Q    Or it may not be, but continue.  If you would scroll

9    down, in this presentation on opioid analgesics on the next

10   page, which is U.S. 18, it says our engagement model has

11   changed, right?  You see that?

12   A    Yes.

13   Q    And this was presented to you as a member of the Board,

14   right?

15   A    Correct.

16   Q    And it says --

17   A    From management to the Board, yes.

18   Q    From management to the Board at a meeting.  And it

19   indicates that Perdue Pharma will continue through the

20   Symproic sales force to call on 29,000 -- 25,000, rather,

21   330 call plan HCPs for Symproic; is that right?

22   A    That's what it says, yes.

23   Q    So this information about what Perdue was doing with

24   respect to Symproic was, in fact, presented to the Board.

25   A    Okay.  Yes.

1    Q    So --

2    A    I don't follow.  I don't think I was disputing with you

3    that management would present something like this, so I

4    won't --

5    Q    And did you -- did the Board instruct management to

6    stop --

7    A    No.

8    Q    -- to selling to those healthcare providers with the

9    salesforce?

10   A    Well, as I recall at the time, what was happening was

11   the debtor Perdue was negotiating an exit from Symproic with

12   the company we had licensed it from.  So the idea was we

13   contractually had a certain number of calls that we had to

14   make with our salesforce to honor that contract.  And while

15   they were negotiating the exit from that contract, which

16   would fully eliminate the field force, they were going to

17   continue to call on physicians for Symproic to honor the

18   contract so we wouldn't breach.  That process, until we got

19   out of that license, I think took about another two months.

20   So that was the plan at the time.  It won't be presented

21   here because, you know, the discussions were ongoing and

22   more highly confidential with, I believe it was Takeda that

23   Perdue or the debtor had wanted to exit.

24   Q    It was Shionogi, in fact.

25   A    I'm sorry.

Page 69

1  Q    Is that right?

2  A    Shionogi, yeah.

3  Q    And at the time, contrary to what you're saying, you

4  were in negotiations trying to get Shionogi to reduce the

5  price to Perdue Pharma of marketing Symproic of its co-

6  marketing arrangement in marketing Symproic; is that right?

7  A    I -- you know, I wasn't -- management was handling the

8  negotiations with Shionogi.  I was not.  As I understood it

9  at the time that the desire was to just exit from the

10 product totally, and I think that that's what happened.

11 Q    Do you deny that the Board received presentations about

12 the ongoing negotiations with Shionogi over the price of the

13 -- the price that Perdue paid in order to co-market

14 Symproic?

15 A    I have no reason to dispute that.  I'm sure management

16 presented to the Board a sensitive negotiation that they

17 were engaged in.

18 Q    And do you understand that negotiation to have been

19 over price, not what you said earlier about negotiating an

20 exit?

21 A    That's not my recollection at all, but, you know, the

22 management may have gone through a number of phases of

23 trying to make Symproic a viable, profitable business for

24 Perdue.  So they may have negotiated on price first and then

25 decided to exit later.  You know, this is a management

Page 70

1    negotiation, and so what I was told when I was told, you

2    know, I just -- I can't recall.  The ultimate decision was

3    to exit Symproic.  It was all by Shionogi.

4    Q    Okay, but at least at this time, right, based on these

5    presentations and Mr. Lowne's testimony, it appears that

6    Perdue continued to market both Symproic and opioids to

7    healthcare providers who prescribed opioids; isn't that

8    right?

9              MR. JOSEPH:  Objection.

10             MR. SACKLER:  I'm sorry.  Go ahead.

11             THE COURT:  What's the basis for the objection?

12             MR. JOSEPH:  Your Honor, if we're going to refer

13   to the testimony, we ought to see the testimony.  That's not

14   my recollection that Lowne said opioids were continuing to

15   be marketed, just Symproic, which is not an opioid.

16             MR. EDMUNDS:  I mean, I --

17             THE COURT:  Again, Mr. Edmunds, I think --

18             MR. EDMUNDS:  -- don't believe --

19             THE COURT:  I sense it's a compound question

20   because you're asking about two different products.  So

21   maybe you should ask it --

22             MR. EDMUNDS:  Well --

23             THE COURT:  -- with respect to both products

24   separately.  Or if you want to, you could refer to Mr.

25   Lowne's testimony.

Page 71

1            MR. EDMUNDS:  I can, but I can't exactly.  I have

2    his -- I have the -- I guess the text readout from --

3            THE COURT:  Well --

4            MR. EDMUNDS:  -- Live Note --

5            THE COURT:  -- we have the testimony, but --

6            MR. EDMUNDS:  -- but I don't have the --

7            THE COURT:  -- again, if you -- you can ask the

8    witness two questions, one about each product.

9            MAN 2:  (indiscernible).

10           MR. EDMUNDS:  Okay.

11           THE COURT:  Or each type of product.

12   BY MR. EDMUNDS:

13   Q    I suppose my question would be that if Mr. Lowne

14   testified that Perdue continued to market opioids alongside

15   Symproic, so the question's about opioids, you wouldn't have

16   any reason to dispute that, would you?

17   A    Yes, I would.  That's not my recollection at all,

18   though, you know, your definition of marketing, I think, is

19   broader than what this presentation's going to, which is

20   talking about sales representatives.  I believe from what I

21   recall of the Lowne testimony, you also include medical

22   science liaisons in that.  And I don't know anything about

23   that program, but as far as sales reps go, as you can see,

24   the Board was told that promotion of opioids by sales reps

25   to doctors was to cease.

Page 72

1   Q    I see that the Board was -- well, and I think the

2   document says something different, but --

3   A    Okay.  Well, Mr. -- please direct me to where it says

4   that because right here I say no field-based opioid

5   promotion.  That's what the Board was told.  So if this

6   document says something different than that, because it's

7   very plain to me, please point it out to me and I'd love to

8   respond to it.

9   Q    Well, this is a presentation about opioid analgesics,

10  isn't it?

11  A    Which says --

12  Q    And you've seen the lines that say "approach the market

13  in a different way".

14           MR. JOSEPH:  May he answer the question?

15           MR. EDMUNDS:  Sure.

16  BY MR. EDMUNDS:

17  A    It is a presentation that's dealing with a range of

18  topics, in this case engagement model, and it says very

19  clearly no field-based opioid promotion.  I don't understand

20  the dispute.

21  Q    So you would interpret this document as saying that --

22  and Mr. Lowne's testimony as suggesting that Perdue did stop

23  marketing opioids.

24           MR. JOSEPH:  Object --

25  BY MR. EDMUNDS:

1   Q    That's your interpretation, your --

2           MR. JOSEPH:  Objection.  May we do them one at a

3   time?

4           MR. EDMUNDS:  Sure.  I'm going to have to -- I

5   think that I am going to have to replace the headphones,

6   which are unfortunately running low, I guess.  So I guess

7   I'm back on regular.  Let me see if I can...

8   BY MR. EDMUNDS:

9   Q    Mr. Sackler, these documents could be read...

10  A    I'm sorry.  Was that a question?

11  Q    No, it's not.  Your interpretation of this document is

12  what you have said, right?

13  A    I'm simply reading the line on it, which I don't think

14  leaves a lot of room for interpretation, but I guess that's

15  fair.  I'm interpreting a simple sentence to mean what it

16  says.  That's correct.

17  Q    Well, I don't know if it's a simple sentence.  Based on

18  everything that you have seen, your interpretation is all of

19  these statements that we've just reviewed say what you claim

20  they are, what you claim they mean, right?

21          MR. JOSEPH:  Objection.  Vague.  "All of these

22  things that we've reviewed"?

23  BY MR. EDMUNDS:

24  Q    We've reviewed several statements across a few

25  documents, Mr. Sackler; is that right?

1    A    Mostly you just have me confirm that they say certain

2    things, but yes.

3    Q    Right.  So those statements.  I'm asking about those

4    statements.  You are offering an interpretation of those

5    statements; is that right?

6         MR. JOSEPH:  Objection.  He's responding to

7    questions.

8    BY MR. EDMUNDS:

9    Q    And in your answers, you offer an interpretation -- you

10   have just offered an interpretation of what you think those

11   statements mean, have you not?

12   A    I --

13        THE COURT:  You can answer that question.

14   BY MR. EDMUNDS:

15   A    I'm -- well, I don't want to take us backwards from the

16   last hour.  I don't recall giving you interpretations for

17   all of it.  I've given you certainly my belief that

18   management was correct in what they told us, that there

19   would be no field-based opioid promotion.  That was my

20   belief.  That's my interpretation of a sentence that says

21   "no field-based opioid promotion", yes.

22   Q    But at any rate, these documents and this issue came

23   before the Board; is that right?

24   A    Yes, as we've established.

25   Q    So if it turns out that Perdue was continuing to market

1    opioids and Mr. Lowne -- if Mr. Lowne testified as to that,

2    the Board was informed of what it was doing; is that right?

3              MR. KAMINETZKY:  Your Honor, I do object to the

4    reference to Mr. Lowne's testimony.  I mean, I'm not sure --

5    we have the testimony.  We have the transcript.  I think

6    it's misinterpreting -- or sorry, misrepresenting the

7    record.  And I, you know, caution counsel to be very careful

8    here.  Because, you know, to represent to the witness that

9    something happened when the exact opposite did I think is

10   inappropriate.

11             MR. EDMUNDS:  No, I'm --

12             MR. KAMINETZKY:  I don't --

13             MR. EDMUNDS:  -- not doing that at all.

14             THE COURT:  Well, I have to say, Mr. Edmunds, I

15   don't -- I do not recollect Mr. Lowne's testimony covering

16   the marketing of opioids after the date of this press

17   release.  He did testify as to the sales force with regard

18   to the constipation product.  And he testified, I believe,

19   as to some tie-in to a contractual obligation they had.  But

20   I'm not -- I think you may be mischaracterizing his

21   testimony.

22             MR. EDMUNDS:  I think we'll have to --

23   unfortunately, I only have the Live Notes --

24             THE COURT:  Well, that's fine.

25             MR. EDMUNDS:  -- (indiscernible) --

1          THE COURT:  Well, I don't think -- so I think in

2     asking the question, you shouldn't -- you know, I think you

3     need to be very careful on how you characterize his

4     testimony.

5          MR. EDMUNDS:  I think we'll have to see what it,

6     you know, turns out to be, Your Honor, and I will --

7          THE COURT:  That's fair.  That's fine.  That's

8     fine.

9          MR. KAMINETZKY:  Your Honor, I'm looking at --

10    this is Ben Kaminetzky for the debtors.  Page 118 of the

11    official transcript, I refer Mr. Edmunds to that starting

12    with the question on line 6, and then there's another

13    question on line 16, and Mr. Lowne makes it absolutely clear

14    that -- well, let me ask you about -- well, I'm not going to

15    start reading testimony, but he talked about continuing to

16    market non-opioid --

17         MR. EDMUNDS:  Yeah, I'm --

18         MR. KAMINETZKY:  -- products.

19         MR. EDMUNDS:  I'm actually not sure -- I've

20    withdrawn the question.  I'm --

21         THE COURT:  Okay.

22         MR. EDMUNDS:  -- moving on.

23         THE COURT:  That's fine.

24         MR. EDMUNDS:  We'll let the record speak for

25    itself.

1                    THE COURT:  Okay.

2                    MR. EDMUNDS:  Good.  Great.

3        BY MR. EDMUNDS:

4        Q    Mr. Sackler, you are aware, are you not, that Perdue

5        pleaded guilty in 2007 to a criminal charge in connection

6        with its marketing of Oxycontin?

7        A    Yes.

8        Q    And entered into assurances of discontinuation and

9        consent judgments with a number of states related solely to

10       Oxycontin; is that right?

11       A    That's my understanding.

12       Q    Okay.  And in those judgments, the Sacklers -- your --

13       members of your family, including you, were released for

14       conduct that related to Oxycontin before those years; is

15       that right?

16       A    I would have to refer to my lawyers.  This was quite a

17       number of years ago.

18       Q    That's fine, but the -- at any rate, there is a guilty

19       plea to criminal conduct in the marketing and sale of

20       opioids in that year; is that right?

21       A    I believe that's accurate, yes.

22       Q    And then in 2015, there is also a settlement with the

23       State of New York; is that right?

24       A    Yes, for $75,000 if memory serves.

25       Q    Well, the amount -- in any event, the settlement

1    involves allegations of misconduct in the marketing of

2    opioids; does it not?

3    A    I'm not familiar with the details of that settlement

4    beyond the monetary compensation that New York State

5    requested.

6    Q    All right.  Well, how about the guilty plea in 2020?

7    A    I am familiar with it.

8    Q    You are familiar with it.  And that is a guilty plea by

9    Perdue to three federal charges or there are three counts,

10   federal charges, related to the marketing of Oxycontin and

11   other opioids; is that right?

12           MR. JOSEPH:  Objection.

13           THE COURT:  What is the basis?

14           MR. JOSEPH:  It mischaracterizes what the plea is

15   for.  Count 1 has nothing to do with marketing.  Count 2 has

16   to do with payments to doctors.  Count 3 has to do with

17   practice fusion.  That's not three counts of marketing.

18           MR. EDMUNDS:  Well, I think that we can just open

19   it up and have the counts read for what they, in fact, are.

20   BY MR. EDMUNDS:

21   Q    So, Mr. Sackler, I believe you have it.  It is JX2094.

22   And I'll ask you to pull it up, and I will also.

23   A    JX2094.  Let me see.  Where would I find this?

24   Q    I think it is in the second packet of documents,

25   because I'm not sure what the first one is that you

1    received.

2    A    I -- I --

3              MR. JOSEPH:  The number, I'm not seeing it in the

4    second packet, but I could be missing.

5              MR. EDMUNDS:  Where is it -- it is titled, I guess

6    the number is not there.  The title is Purdue 2020 Plea

7    Agreement.

8              MR. SACKLER:  Sorry, it's -- I've gone through

9    both packets.  Is that something that might have been sent

10   separately?

11             MR. EDMUNDS:  No.  I believe it was in packet --

12   it's a -- you may have to back out of the folder, if you're

13   in it, it's in the main --

14             MR. SACKLER:  What's the number again?

15             MR. EDMUNDS:  The title of the file it's going to

16   be Purdue 2020 Plea Agreement.

17             MR. SACKLER:  That doesn't help me.  I'm sorry.

18   What was the JX number?

19             MR. EDMUNDS:  The JX number is JX209 --

20             MR. JOSEPH:  The first set.  This is in the first

21   set.

22             MR. SACKLER:  I'm sorry -- in fact I just missed

23   it.

24             MR. JOSEPH:  (Indiscernible).

25             MR. SACKLER:  220 what?

1          MR. EDMUNDS:  2094.

2          MR. SACKLER:  I have 96 --

3          MR. EDMUNDS:  I don't think that that's in the

4     file name though.  Mr. Joseph is sending you to the first

5     set, which I guarantee to start --

6          MR. SACKLER:  I see a 2000 -- there's a 2007 plea.

7     Is that what you want?

8          MR. EDMUNDS:  No, the 2020 plea.

9          MR. JOSEPH:  This is 2007 (indiscernible).

10         MR. SACKLER:  All I have is 2007.

11         MR. EDMUNDS:  I don't know if Mr. Joseph --

12         MR. SACKLER:  Oh, 2020 -- okay.  You didn't label

13    it with the JX number.  Now I have it.  Please go ahead.

14    BY MR. EDMUNDS:

15    Q    Okay.  I'm going to ask you to turn to what is Page --

16    oh, okay.  Well, Page 48 of the PDF.

17         MR. JOSEPH:  Can I get the page number at the

18    bottom?  I don't know if we had a hard copy.

19         MR. EDMUNDS:  It's -- it's at the top.  Mr. Joseph

20     and I think it's Page 15.

21         THE COURT:  So is the heading Schedule A, is that

22     what?

23         MR. EDMUNDS:  That is right.  The Schedule A is

24     the heading.

25         MR. SACKLER:  Okay.  I'm there.

Page 81

1    BY MR. EDMUNDS:

2    Q    And Mr. Sackler, did -- do you want to -- I suppose I

3    could refer you to Schedule A Count 1B.  And Count 1B reads,

4    and I'll read it.  From at least 2007 through February 2018,

5    Purdue employed sales representatives to establish and

6    maintain relationships with healthcare providers, who

7    prescribed opioids.  Purdue's sales representatives called

8    on, or detailed HCP Offices with the goal of promoting its'

9    opioid products to those HCP's.  Purdue instructed it's

10   sales representatives to prescribe -- provide HCP's with

11   prescription savings cards to defray the cost to patients to

12   fill prescriptions for Purdue opioid products.  From as

13   early as August 2010, Purdue implemented speaker programs,

14   in which Purdue recruited and paid HCP's to educate other

15   educate other HCP's about Purdue opioid products.  Do you

16   see that?

17   A    I see that, yes.

18   Q    And have I read that correctly?

19   A    I -- I think so.  I just have a question, because I

20   haven't been able to go through the whole document.  Is

21   Schedule A the agreed Statement of Fact?  Yeah, oh, I see it

22   is.  Okay.

23   Q    Yeah.

24   A    Go ahead.

25   Q    These are the -- this includes, and it is obviously

1    more broad than the section I just read, but this includes

2    the conduct to which Purdue pleaded guilty.  Do you

3    understand that?

4    A    I see that --

5              MR. JOSEPH:  Objection.

6              MR. EDMUNDS:  Sorry, Your Honor.

7              THE COURT:  And what's the basis for that Mr.

8    Joseph?

9              MR. JOSEPH:  It -- it's conduct which Purdue

10   admitted but it doesn't reflect that doing those acts were

11   as -- what it was pleading to -- the plea is later in this

12   language.

13             THE COURT:  Okay.

14             MR. EDMUNDS:  I believe that forms the basis of

15   the count, part of the basis of the count to which Purdue

16   pleaded guilty.

17   BY MR. EDMUNDS:

18   Q    Is that your understanding, Mr. Sackler?

19   A    I'm sorry.  I am not sure I can answer that.  I'm not -

20   - I'm not a lawyer, so I -- I just -- I don't know exactly

21   what that means.

22   Q    Do you understand Purdue to have pleaded guilty to

23   Federal Charges?

24   A    Yes.

25   Q    And if this is a description of the Federal -- of the

Page 83

1    conduct that underlies the guilty plea to those Federal

2    charges, you wouldn't have any basis for disputing it, would

3    you?

4    A    Well -- I -- I just -- you know, I just don't know is

5    the answer.  I -- we've ventured into a place where you're -

6    - oh I feel like you're asking me for legal opinions, and I

7    can't really give it.

8    Q    No, I'm just asking you if you, reading misconduct do

9    you have any basis for denying what it in fact occurred as

10   was said in the plea?

11   A    That paragraph?  I don't have any basis for -- for

12   disputing, no.

13   Q    Okay.  And that conduct occurred from -- during the

14   time that you were a member of the Board of Directors at

15   Purdue Pharma; is that right?

16   A    That's correct.

17   Q    And the rest of the conduct in count, and you can take

18   some time to look at it, if you would like.  But in Count 2

19   and in Count 3, and in the rest of Count 1, that conduct

20   occurred while you were a Director of Purdue Pharma, right?

21   A    I think generally speaking, all the counts here fall

22   into that category.  That's correct.

23   Q    So Purdue pleaded guilty to the conduct -- to this

24   conduct -- conduct that occurred while you were a Director

25   of Purdue Pharma; is that right?

1    A    I think I just answered that and said yes.

2    Q    Okay.  Thank you.  Let me turn you to Addendum A to

3    this document.  I will -- and I will before the Court

4    (indiscernible) and you, Mr. Sackler, Addendum A appears on

5    Page 79 of the PDF, and it is not, I don't think, a numbered

6    page, but at the top it reads it has the court's docket

7    number and says Page 47 of 97 of this paper that was

8    submitted on the docket of the Court.  Are -- are you there,

9    Mr. Sackler?

10   A    Yeah, Addendum A of the Settlement Agreement, is how it

11   begins?

12   Q    That's right.

13   A    Yes, I'm there.

14   Q    And so this is the addendum to Purdue's Civil

15   Settlement Agreement; is that right?

16   A    I believe so, yes.

17   Q    Okay.  And there is a similar Addendum A to a

18   Settlement Agreement that you and other members of your

19   family entered into with the U.S. Department of Justice.  Is

20   that correct?

21   A    Yes.

22   Q    Okay.  I'm going to ask -- I'm just going to ask you to

23   flip to the first page of Addendum -- and the first page

24   with typing on it that starts with an introduction with the

25   settlement agreement -- of the Addendum A to the Settlement

Page 85

1    Agreement.

2    A     I'm there.

3    Q     Okay.  And it talks about in Paragraph 4 --

4              MR. JOSEPH:  Your Honor, all of the allegations in

5    the Civil Settlement Agreement, except those that are

6    coincident with what's on Pages 15 to 18 of the Plea

7    Agreement, are denied.  It's inadmissible under Rule 408.

8              THE COURT:  Well, it depends on how this is being

9    asked.  How the question -- what the question's is.  We

10   haven't gotten to the question yet.

11             MR. JOSEPH:  Good.

12   BY MR. EDMUNDS:

13   Q     And if you turn to Paragraph 4, Mr. Sackler, and look

14   at it.  As it -- Paragraph 4 reads, as a result from 2010

15   through approximately February 2018, Purdue developed and

16   implemented several strategies to insure that the revenues

17   generated from its opioid prescriptions, including those

18   that Purdue knew, or should have known, were not medically

19   necessary and would continue to flow to Purdue.  Do you see

20   that?

21   A     I see that.

22   Q     And do you -- do you have any reason to deny that

23   Purdue engaged in strategies to promote its' revenues?

24             MR. JOSEPH:  I -- I object, Your Honor.  Rule 408

25   says you can't use a denied Settlement Agreement to prove a

Page 86

1    claim.

2            MR. EDMUNDS:  I'm not -- I'm asking him about the

3    --

4            THE COURT:  I think he's just setting the context

5    for the question.  Not -- not -- let me just make it -- let

6    me ask you, Mr. EDMUNDS.  Are you asking the witness to

7    accept the truth of that first clause that Purdue developed

8    and implemented several strategies to insure that the

9    revenues generated from its opioid prescriptions; are you

10   asking to accept as true that?  Or are you just asking him

11   whether Purdue developed and implemented several strategies

12   to insure that the revenues generated from its' opioid

13   prescription is -- whether that's true?  Whether that

14   happened?

15           MR. EDMUNDS:  I'm asking -- I am asking him if he

16   denies the fact stated in the paragraph --

17           THE COURT:  Well, that -- that you can't ask --

18           MR. EDMUNDS:  -- whether it's the binding legal

19   document.

20           THE COURT:  -- because it's not -- because it's

21   not admissible as a fact, but you could ask him the

22   question, did Purdue develop and implement several

23   strategies from 2010 through approximately February 2018, to

24   insure that the revenues generated from its' opioid

25   prescriptions would continue to flow to Purdue.  You could

Page 87

1    ask that question.

2              MR. EDMUNDS:  Right, and I think that is -- I'm

3    using this as a basis for questions about facts.  Not for

4    anything having to do with whether the document, in fact, is

5    an admission to those facts.  I'm asking him now.

6              THE COURT:  But you -- but --

7              MR. EDMUNDS:  So that is my question.

8              THE COURT:  Just ask him the question.  Don't --

9    don't state it --

10             MR. EDMUNDS:  Sure.

11             THE COURT:  -- as a fact, and then say do you deny

12   it.  Ask him the question.  And then he can answer it yes or

13   no.

14             MR. EDMUNDS:  All right.

15   BY MR. EDMUNDS:

16   Q    From 2010 through approximately 2018, Mr. Sackler, did

17   Purdue develop and implement strategies -- several

18   strategies to insure that the revenues generated from its'

19   opioid prescriptions, including those that Purdue knew or

20   should have known were not medically necessary, would

21   continue to flow to Purdue?

22   A    I know that that conduct is disputed by both the debtor

23   and the family, so --

24   Q    Did Purdue develop and implement several strategies to

25   insure that its' revenues would continue to flow?

1    A    I'm not sure I follow your question.  As in any

2    business, the -- the one desires to have revenue, so I -- I

3    don't follow the question.

4    Q    Did Purdue (indiscernible) strategies to promote it's

5    revenue, is the question.

6    A    A strategies?  Sure.  The Board -- the Board was

7    apprised of Management's strategies on occasion for

8    maintaining market share and for growing market share.

9    Q    Okay.

10   A    I don't -- I don't agree with the paragraph, nor do I

11   think that those were illegal or unethical.  The Board was

12   advised conduct that (indiscernible)

13   Q    Well --

14   A    -- the opposite would be true.

15   Q    -- my -- my question was just did it do it.  And I

16   think you've answered that.

17          MR. JOSEPH:  May I just ask clarifying question?

18   Assuming for all of these, Mr. EDMUNDS, you're only asking

19   for the time he was on the Board?

20          MR. EDMUNDS:  Right.  Yeah, that's correct and I -

21   - I think -- well, we can count into each these following

22   questions to 2012 to August 2018.

23   BY MR. EDMUNDS:

24   Q    If you would turn to Page 10, it's Paragraph 50 of this

25   Addendum A, Mr. Sackler, I'd like you to look at Paragraph

1    50 -- it's on -- it's on numbered page 10, which is 89 of

2    the PDF.

3    A    Okay.  I'm at Paragraph 50.

4    Q    Okay.  Did -- on January 25th, 2010, did your father,

5    Richard Sackler email members of the Purdue Board, by way of

6    background, the most important driver of our sales growth is

7    the decline in performance of OxiCon -- Oxycodone Extended

8    Release forms in the market called LER.  This is comprised

9    of Oxycontin tablets, plus all of the generics in this

10   phase.  Did -- did your father send that email to members of

11   the Board?

12   A    Mr. Edmund, as I'm sure you know, I joined the Board in

13   2012.  This is 2010, so I -- I wouldn't be able to answer

14   your question.

15   Q    Do you know any -- are you familiar with any of the

16   conduct that occurred in 2010 of -- by Purdue designed to

17   increase sales?

18   A    Am I aware -- I'm sorry, I -- I've read these

19   complaints.  I've read these allegations.  I -- I don't know

20   quite how to answer your question.

21   Q    Let's go to Paragraph 62, Mr. Sackler.  You see

22   Paragraph 62?

23   A    I see that.

24   Q    There is a discussion of another email, April 15th,

25   2012.  Let's strike that.  On Paragraph 63, do you see there

Page 90

```
 1    is a discussion of a July 17th, 2012, email from Mortimer D.

 2    A. Sackler to fellow Purdue Board Members?  Discussing the

 3    search for a new CEO and potential replacement of the head

 4    of sales and marketing?

 5    A    I see what it says here.

 6    Q    Was there such an email?

 7    A    I couldn't possibly recall.

 8    Q    If it's stated here, do you have any reason to believe

 9    there wasn't such an email?

10    A    No.

11    Q    And do you see in Paragraph 65, there is a description

12    of Mortimer Sackler's activity, and it discusses him

13    inquiring with executives to show the breakdown of Oxycontin

14    market share by it's strength against competitors, because

15    he would like to understand the more recent dynamics of the

16    market and where patients are shifting to what we are

17    losing.  Do you agree with me that Board Members from time

18    to time, in communications that you were copied on,

19    consulted with Purdue's Sales and Marketing executives

20    regarding the sale and marketing of Purdue's opioids?

21    A    I'm trying to follow your question here.  Can you

22    simplify it at all?

23    Q    Sure.

24    A    I mean, I don't think that was on this email. I don't

25    think that -- but I don't know.
```

1   Q     Okay.  Fair enough.

2   A     I don't remember it.  So I -- I -- maybe you can

3   simplify your question, so I understand it a little better?

4   Q     Well, the question is just did the Board -- did members

5   of the Board, in communications that you were copied on,

6   regularly consult with Sales and Marketing executives at

7   Purdue about Purdue sales and marketing strategies?

8   A     I wouldn't say it was regular, no.  I would say

9   occasionally.

10  Q     Would you turn, please to Paragraph 100.  I guess to

11  Paragraph 99.  There is a discussion in Paragraph 99 of the

12  Purdue Board's discussion in August -- on August 15th, 2013,

13  of -- it says consulting company here, but a discussion with

14  the consulting company on evaluating growth opportunities

15  for Oxycontin.  Do you see that?

16  A     I see that.

17  Q     And would you have participated in an August 15th,

18  2013, meeting of the Board and a consulting company?

19  A     Well, as I was on the Board, I would have participated

20  in that team -- you know, the Board meeting, if that's what

21  this was.  So yes, I assume so.

22  Q     Okay.  And do you see in Paragraph -- and -- and do you

23  understand the marketing company in this paragraph?  Do you

24  recall Purdue's engagement of McKinsey and Company as a

25  marketing consultant for Purdue (indiscernible)?

Page 92

1   A    I -- I do.  Management hired McKinsey to conduct a

2   review of the business.

3   Q    Okay.  And in Paragraph 101, if I could just ask you

4   about that -- whether you recall your father, Richard

5   Sackler, engaging a face-to-face meeting with the Board with

6   McKinsey, outside the presence of Purdue executives?

7   A    I don't recall that, not.

8   Q    Had there been such a meeting, would you have attended

9   it?

10  A    Possibly.

11  Q    And did you support the marketing program that McKinsey

12  and Company ultimately recommended to the Board be

13  implemented for Purdue Pharma?

14  A    You know, I don't -- it's hard to distinguish what

15  you're saying from Management's proposal, because what

16  happened is, Management took -- listened to McKinsey, took a

17  variety of their ides, I assume -- from what I've seen,

18  lacked a number of others that weren't discussed with the

19  Board on sort of on the cutting room floor, and presented to

20  the Board, this is their kind of shared vision of what they

21  would like to do, and got Board support for that.  So

22  it's -- it's not a clean answer of yes or now.  It's a

23  little bit more of a Hodge podge than a, you know, yes or

24  now.

25  Q    The Board was informed, you would agree with me, of

Page 93

1    what McKinsey was -- was doing with respect to Purdue's

2    sales and marketing strategies?  Was it not?

3    A     Certainly not all of it.  You know, there have been

4    subsequent media reports about a number of things the Board

5    was just totally unaware of that McKinsey had proposed, so,

6    certainly not all of it, no.

7    Q     In Paragraph 106, did you receive a -- a presentation

8    on McKinsey's proposal that evolved to excellence implement

9    strategy at a September 2013 Board meeting?

10   A     Well, I don't remember --

11             MR. JOSEPH:  Objection.

12             MR. SACKLER:  Oh, sorry.

13             MR. JOSEPH:  There's no reference to McKinsey in

14   Paragraph 106.

15             MR. EDMUNDS:  Continue the presentation on Evolve

16   to Excellence in September -- at the September 2013 Board

17   Meeting.

18             THE COURT:  Well, I don't remember it,

19   specifically, but you know, I go within the dispute that it

20   happened.

21   BY MR. EDMUNDS:

22   Q     It -- it was your testimony in your deposition that the

23   Board controlled the company's sales and marketing budget,

24   was it not?

25   A     I -- I don't -- maybe you can point me to that?

1    Q     Well let me just -- I'll ask it more simply.  Did the

2    Board control the sales and marketing budget of Purdue

3    Pharma?

4    A     Well, in a way, yes.  So when management had to set up

5    a budget and make the proposal, for what they thought they

6    needed and wanted.  And then the Board would vote on it at

7    budget time, along side things like R&D and Uncle Fairs, and

8    -- and all the way down the line items of costs.

9    Q     When -- just a second (indiscernible)

10            MR. EDMUNDS:  Your Honor, could I request, two,

11   three minutes.  I seem to have lost power here.

12            THE COURT:  Okay.  That's fine.  We can see you

13   fine.  Are you on another screen too?

14            MR. EDMUNDS:  I have another screen that I'm

15   reading from and that seems to be out.

16            THE COURT:  Yeah.

17            MR. EDMUNDS:  So --

18            THE COURT:  That's fine.  Let's take --

19            MR. SACKLER:  Your Honor would it --

20            THE COURT:  Let's take a five-minute break and --

21   that includes you, Mr. Sackler, but you shouldn't discuss

22   your testimony with anyone during that break.

23            MR. SACKLER:  Understood.

24            THE COURT:  So we'll be back --

25            MR. EDMUNDS:  Thank you, Your Honor.

1              THE COURT:  We'll be back at five after 12.

2              MR. SACKLER:  Okay.  Thank you.

3              MR. JOSEPH:  Thank you, Your Honor.

4                   (Off The Record)

5              THE COURT:  Okay.  We're back on the record in Re:

6    Purdue Pharma et. all.  Mr. Sackler, you understand that

7    you're still under oath, correct?

8              MR. SACKLER:  Yes, sir.

9              THE COURT:  Okay.  So Mr. Edmunds, you can

10   continue.

11             MR. EDMUNDS:  Thank you, Your Honor.

12   BY MR. EDMUNDS:

13   Q    And so, Mr. Sackler, I won't ask you to answer any more

14   from that document, but let me -- this is the set -- to go

15   back, this is the guilty plea, and it accompanies also a

16   settlement by you and other members of your family, right?

17   A    No.  Your -- your characterization of this is

18   incorrect.  There were two separate settlements, and yes,

19   what you've brought up is Purdue's guilty plea.  So

20   you're --

21   Q    I'm not -- I'm not talking about the document, Mr.

22   Sackler, but your family also, in connection with this,

23   though it is a separate settlement, your family entered a

24   civil settlement agreement with the Department of Justice,

25   right?

Page 96

1    A    That's correct, yes.

2    Q    And the Department of Justice alleged, substantially,

3    in another Addendum A, to that civil settlement agreement

4    with you and members of your family, the same allegations

5    that are in the Addendum we just reviewed; is that right?

6              MR. JOSEPH:  Objection, referring to matters not

7    in evidence.  Very general.  It's not even correct.

8              MR. EDMUNDS:  Well, let's just put it in.

9    BY MR. EDMUNDS:

10   Q    I'm going to ask you to open, I believe that this is

11   the separate document that you were sent later, it's JX2096.

12   That was emailed to you this morning.  It was a separate

13   document.  It didn't come with the set less.

14   A    Got it.

15   Q    Can you see that the title of the document is

16   Settlement Agreement?

17   A    Correct.

18   Q    And this document is, in fact, the settlement agreement

19   you and other members of your family, including your father,

20   Richard Sackler, your cousins, Mortimer Sackler, Cathy

21   Sackler, and your late uncle, I think, Jonathan Sackler,

22   entered with the United States Department of Justice.  Is

23   that correct?

24   A    That's correct.

25   Q    Okay.  And this settlement also contains an Addendum A;

Page 97

1   does it not?

2   A     It does, yes.

3   Q     Okay.  And I'm not going to ask you to go through the

4   Addendum A because I know, in fact, you did not agree with

5   Addendum A.  But wait, I'm right in that you denied it as

6   part of the earlier language of the agreement, right?

7   A     We strenuously, yes, we deny it.

8   Q     But what I will ask you is, rather than litigate with

9   the Department of Justice, you entered a pedelment

10  agreement; is that right?

11          MR. JOSEPH:  Objection, Your Honor.  That clearly

12  is to suggest liability based on a settlement agreement,

13  which is completely precluded by Rule 408.

14          MR. EDMUNDS:  I -- I am not trying to establish

15  liability.  I am trying test what he indicated in his prior

16  testimony with, I believe, Mr. Higgins, that he would

17  continue to litigate these issues against other parties.

18  And I am just pointing out the fact that they did not

19  continue to litigate these issues when these issues were

20  raised by the United States Department of Justice.  And

21  that's the basis for the question.

22          MR. JOSEPH:  Objection.  That is totally

23  irrelevant.  The document speaks for itself.

24          MR. EDMUNDS:  I don't think that's -- that's not a

25  relevance objection.

1              THE COURT:  Well, I -- I think it's a tautology

2       though, Mr. Edmunds.  The -- the Sackler parties to this DOJ

3       settlement agreement, settled the claims that are settled in

4       the settlement agreement.  Right?  Is that what you're

5       asking?

6              MR. EDMUNDS:  Well, that's sure, as to the claims.

7       The question is whether the family defended itself against

8       the Department of Justice on -- on these allegations?

9              THE COURT:  Well, there's a settlement agreement

10      that speaks for itself on that point.

11             MR. EDMUNDS:  All right.  Fair enough.

12      BY MR. EDMUNDS:

13      Q    Mr. Sackler, are you aware of allegations that --

14      strike that.  Mr. Sackler, you sit on -- you already

15      testified that you sit on the Board of MMP, that makes

16      recommendations to International Affiliated Companies,

17      right?

18      A    (Indiscernible).

19      Q    I think, Mr. Sackler, I didn't hear your --

20      A    Oh, my, my voice is fading a bit.  Correct.

21      Q    Okay.  And in fact, are you aware that allegations have

22      been made against Mundipharma International entities when

23      countries such as Europe, or it's countries such as Italy?

24      A    You know, everything I would know about that would come

25      from Counsel.

1    Q    Does that come from Counsel?

2    A    Correct.  I would have learned of it through Counsel

3    and I -- I, so I don't know what I can answer here or not.

4    Because there'd be privilege issues associated with it.

5              THE COURT:  Well, but this question just want are

6    you aware of allegations (indiscernible) Mundipharma from --

7              MR. SACKLER:  I --

8              THE COURT:  -- Italy.

9              MR. SACKLER:  I apologize, Your Honor.

10   BY MR. EDMUNDS:

11   A    Yes, I am aware that those were -- that that was

12   resolved.

13   Q    That was my next question, Mr. Sackler.  There was a

14   resolution also of those allegations against Mundipharma

15   Italy, right?

16   A    Yeah, I do not recall --

17             MR. JOSEPH:  Objection, irrelevant.  Mundipharma

18   has nothing to do with the debtors.  It has nothing to do

19   with the reason we're here today.

20             THE COURT:  Well, I -- I don't know that.  Why

21   don't we just move on?

22             MR. EDMUNDS:  Yes, Your Honor. Okay.  Well, I

23   would just ask, I mean, the -- do you wan me to move on,

24   Your Honor?  I -- I will move on to --

25             THE COURT:  I -- I that question was answered, I

Page 100

1    believe.

2            MR. EDMUNDS:  Okay.

3            THE COURT:  There was objection to it, but I'm

4    overruling the objection.

5            MR. EDMUNDS:  All right.  Thank you, Your Honor.

6            THE COURT:  I'll let you answer some more

7    questions to see whether in fact you are going down a

8    relevant path or not.  So far, you are.

9    BY MR. EDMUNDS:

10   Q    And do you -- do you -- are you aware that those

11   allegations that were settled were related to kickbacks in

12   the marketing of Oxycontin, it may be called something else,

13   but Oxycodone Extended Release, in Italy?..

14   0

15   A    I don't know that and all the details that this would

16   be privileged.  Of my knowledge would be privileged.

17            Q    No, I don't think your knowledge is

18   privileged, Mr. Sackler, but are you aware that the Italian

19   Mundipharma entity settled allegations of kickbacks related

20   to opioids?

21   A    I don't recall the details of the settlement, no.

22   Q    Okay.

23   A    It was a number of years ago.

24   Q    You have no reason to -- do you have any reason to

25   believe -- do you have any reason to deny that the

Page 101

```
1    Mundipharma Italian entity did not enter a resolution of its

2    payment of kickbacks to the Italian doctors in Italy?

3    A    I just don't know the situation well enough anymore to

4    give you crisp answers.  I believe that's correct.

5    Q    Okay.  And are you aware of any other allegations

6    against any other Sackler owned entities operating

7    throughout the world?

8    A    Yes.

9    Q    In which ones?

10   A    Canada, which has been pretty extensively discussed

11   during this hearing.

12   Q    I understand Canada.  Any others besides Canada.

13   A    No, I'm not aware of any others.  I mean, like all

14   businesses, there are regulatory actions that -- oh, I

15   should also mention the -- well, there are regulatory

16   actions in the businesses that pop off and are settled or

17   resolved.  And I'm not aware of any that are ongoing now,

18   but that's part of -- part of the business over time.

19   Q    But -- so, are you aware of any regulatory actions that

20   have popped up that are now resolved involving any of the

21   Sackler owned entities and their promotion or marketing or

22   sale of opioids?

23   A    No.

24        MR. ALBERT:  Objection.  We're talking about non-

25   U.S., non-Debtor entities.  It is not relevant.
```

Page 102

1              THE COURT:  But what -- Mr. Edmunds, what is the -

2  - I'm not quite sure, I thought I understood the basis for

3  this questioning, but I'm not at this point, I'm not sure I

4  do.  So, what is --

5              MR. EDMUNDS:  I think --

6              THE COURT:  -- the purpose for -- of these

7  questions?

8              MR. EDMUNDS:  There are a couple, Your Honor.  One

9  purpose, obviously, is that they are seeking releases for

10  these entities and, you know, related to their own conduct

11  involving in any way opioids, and both --

12              THE COURT:  Actually, I don't --

13              MR. EDMUNDS:  -- some non-opioids.

14              THE COURT:  Can we -- can we stop on that point.

15              MR. EDMUNDS:  Sure.

16              THE COURT:  As I understood it from the statements

17  earlier in the trial, the releases they're seeking are in

18  respect of claims based on the U.S. companies' activities

19  that may be asserted by foreign people, but U.S. based.  So,

20  I think if you're asking about claims that are being made

21  based on the activities of the foreign entities, that isn't

22  correct.  The Plan doesn't seek that type of release.

23              MR. EDMUNDS:  Your Honor, it was my understanding

24  that the Plan releases the foreign entities for any

25  involvement in Purdue's conduct, which --

Page 103

1            THE COURT:  Right, Purdue's conduct.  And if

2     you're asking questions about Purdue's conduct, vis-à-vis

3     these foreign entities, I understand; that's relevant.  It's

4     not relevant if you're asking questions about these

5     entities' own conduct because that's not covered by the

6     release?

7            MR. EDMUNDS:  My -- my second -- the second reason

8     in which I think it is relevant is that they're asking for

9     releases of themselves, you know, related to the marketing

10    of opioids or non-opioids, and I think that those release,

11    as Mr. Higgins pointed out, involve conduct even in the

12    future.  And so, I think --

13            THE COURT:  No, but again, as I understood it,

14    that is for U.S. based conduct.

15            MR. EDMUNDS:  And I think, Your Honor, that what

16    occurs in the entities that Mr. Sackler and other members of

17    the family run is relevant to the appropriateness of such a

18    release of future behavior.

19            If the Court is going to consider releasing them

20    from conduct in the future, it ought to know that even, you

21    know, as recently as the settlement in Italy, a few years

22    ago, and in the other regulatory activities I was about to

23    ask Mr. Sackler of now, I think that is relevant to whatever

24    releases of future conduct or releases are appropriate.  And

25    so, it would relate to issues that the objecting states have

Page 104

1    raised in their three objections in which, you know, there

2    is a sovereign decision to be made about whether a release -

3    -

4              THE COURT:  The states don't have any sovereignty

5    over what happens in Italy by an Italian company.

6              MR. EDMUNDS:  Absolutely not, Your Honor.  And we

7    do not --

8              THE COURT:  So, I think we're going over old

9    ground here.  If you're talking about future claims based on

10   U.S. activity, I think you're getting --

11             MR. EDMUNDS:  I think --

12             THE COURT:  -- pretty far away from the fact given

13   the condition in the settlement that the Sacklers don't

14   engage in any U.S. opioid related activity.

15             So, I think given the time constraints here, this

16   really is getting to be irrelevant at this point.  '

17             MR. EDMUNDS:  All right.  Your Honor, I will -- I

18   will move on.

19             MR. ROBINSON O'NEILL:  Your Honor, this is Tad

20   Washing -- or Tad Robinson O'Neill from Washington state.

21   May I be heard on this particular issue?

22             THE COURT:  Okay.

23             MR. ROBINSON O'NEILL:  As I understand it, Your

24   Honor, the funding for the Sackler payments will be paid in

25   large part based on the sale of the independent affiliated

Page 105

1    companies, including companies abroad.  Regulatory actions

2    and potential regulatory actions against those companies may

3    very well adversely impact the value of those -- that sale

4    and the Sackler ability to pay the obligations under this

5    contract.

6              I would request that it is relevant, Your Honor,

7    or some inquiry into the IACs.

8              MR. ALBERT:  The IA -- the sale of the IACs is not

9    a condition of the payment.  It's just some security.  The

10   family is obliged to make the payments --

11             THE COURT:  No, I -- that, there is some relevance

12   to that line of inquiry.  It wasn't the relevance that Mr.

13   Edmunds was getting at.

14             So, I guess a question can be asked as to the

15   magnitude of such allegations and, you know, whether the

16   witness has any concerns as to the ability to pay the

17   settlement.  That's a fair question to ask.

18             MR. EDMUNDS:  Your Honor, I could asked (sic) -- I

19   would just ask to be able to ask what the -- he mentioned

20   regulatory activities of which he is aware, and I think that

21   the underlying nature of those activities will -- you know,

22   determining what he means by that may impact whether there

23   is cause to be concerned about the future value with the

24   IACs.

25             THE COURT:  I --

1          MR. EDMUNDS:  So, that's what I would ask.

2          THE COURT:  Well, that's not where you were --

3          MR. EDMUNDS:  It's --

4          THE COURT:  -- going, but you can ask questions

5     about the future viability of the IACs and the ability to

6     pay the settlement.  That's fair.

7     BY MR. EDMUNDS:

8     Q    Well, so -- Mr. Sackler, you had mentioned regulatory

9     activities, regulatory, I guess, actions that have been

10    brought -- commenced against Sackler companies worldwide and

11    my question was at the beginning of all of this, whether

12    those regulatory activities involve allegations about the

13    marketing or sale of Mundipharma opioids?

14    A    Well, there's only one that I can think of, and I don't

15    believe that I know of any others that are ongoing.  The one

16    I was thinking of has closed out now.  We can discuss that,

17    but I don't know of any other ongoing regulatory activities,

18    maybe a tax regulatory activity to -- for a nominal sum in

19    Europe, but I'm not 100 percent certain on that.

20    So, if you'd like to discuss the Australia action, which is

21    public now, I can do that.  But that was settled for a

22    nominal -- I think about $400,000 Australian, with the

23    government.

24    Q    And what were Australia's allegations?

25    A    That one line in a -- I think an off-branded marketing

1   material that referred to opioids as being part of a multi-

2   modal treatment -- potential treatment option for pain after

3   other alternatives have been considered was, under the

4   Australian guidelines, not appropriate.  So, that line was

5   removed and the settlement was enacted, and that was -- that

6   was it.

7   Q    Okay.  And I believe your testimony was something to

8   the effect of that these things -- you know, that regulatory

9   actions such as that have occurred and happened in the

10  business; is that right?

11  A    No, I was thinking more along the lines of tax.  You

12  know, the tax audits pop up and we deal with those on a --

13  you know, not regular basis, but they do occur.

14  Q    Okay.  But you've got United States, Canada, Italy, and

15  Australia, at least, taking action for entities that the

16  Sackler family owns and controls, activities in the sale and

17  marketing of opioids into its countries; is that right?

18  A    No.

19  Q    What is not right about that.

20  A    Your verb, taking, is wrong.  They're -- Australia and

21  -- Australia and Italy are closed out.  So, they are no

22  longer taking any, actions are completed.

23  Q    So, if I said, have taken, you would be in agreement --

24  A    Have taken and Italy and Australia have been closed out

25  for very small amounts of money (indiscernible) to the value

Page 108

```
 1    of the IACs, yes.

 2    Q    Let me turn -- the shares of Purdue and the other

 3    Sackler family companies are owned by family trusts; is that

 4    right?

 5    A    Yes, I believe so.

 6    Q    And --

 7    A    But I want to be -- I want to be clear though, I can't

 8    speak for the A Side.  I don't know their structures.  So,

 9    I'm only talking about the B Side when you --

10    Q    The B Side of the family holds shares in trust, or the

11    shares are held by trusts for the benefit of you and other

12    members of the B family; is that right?

13    A    That's correct, yes.

14    Q    And those trusts -- as the Director of Purdue, you have

15    cause over time, distributions to be made ultimately that go

16    to those family trusts; is that right?

17    A    Yes, distributions remanded in part ended up in those

18    trusts, yes.

19    Q    And since the time that you became a Director of Purdue

20    Pharma, the distributions to family trusts were upward of

21    $10 billion; is that correct?

22    A    No.  Well, it depends on how you characterize the tax

23    payments.  So, that -- so, half of that, roughly speaking,

24    went to taxes, and another portion was reinvested in the

25    IACs and never really went to family trusts.  So --
```

1           MR. ALBERT:  Your Honor, I believe it's undisputed

2     that, for at least four years of those preceded his time on

3     the Board.

4           MR. EDMUNDS:  Okay --

5           THE COURT:  I don't know what -- I mean, I don't

6     think -- you can go ahead, Mr. Edmunds, but I don't want --

7           MR. EDMUNDS:  It's okay.

8           THE COURT:  -- to repeat the Debtor's own

9     testimony as to the --

10          MR. EDMUNDS:  All right.  But we --

11          THE COURT:  -- distributions that have been made.

12          MR. EDMUNDS:  We won't -- we won't do that.

13          MR. HUEBNER:  Hey, Edmunds, with apologies, if

14    you're headphones are charged, you may want to try them

15    again because you're sound --

16          MR. EDMUNDS:  (Indiscernible) --

17          MR. HUEBNER:  -- has actually degraded again a lot

18    in the last few minutes.  I just want to make sure that

19    everybody, including you, frankly, has the transcript that

20    they need for whatever purposes they would like to use them.

21          MR. EDMUNDS:  Well, I understand.  I will lean in

22    and I don't think that the headphones have charged.

23          MR. HUEBNER:  Okay.  All good.

24          MR. EDMUNDS:  So -- but thank you, Mr. Huebner.

25    BY MR. EDMUNDS:

1   Q    And you run an entity called Summer Road, right, that,

2   in fact invests money that is held in the family trust; is

3   that right?

4   A    I'm the President of Summer Road, yes.

5   Q    And Summer Road directly invests the money that is held

6   in those trusts; is that correct?

7   A    What do you mean by directly?

8   Q    You have authority to invest the money that's in the

9   family trust that is granted to you by the trustee?

10  A    Yes.

11  Q    All right.  And you also receive an income from the

12  trusts, right?

13  A    No.  I receive an income through Summer Road.

14  Q    Through Summer Road, but ultimately is paid for by the

15  trusts; is that right?

16  A    Summer Road is billed to the -- the expenses of Summer

17  Road, including my compensation, is billed to the various

18  trusts.  That is accurate.

19  Q    Okay.  You're also seeking releases -- just turning to

20  releases.  You were seeking releases for your non-opioid

21  U.S. liability; is that right?

22  A    Yes.

23  Q    And that would involve drugs like Adhansia, right?

24  A    I believe so, yes.

25  Q    And Adhansia is a -- is a central nervous system

1    stimulant; is it not?

2    A    I believe so, yeah.

3    Q    And under Rhodes Pharmaceuticals, another one of the

4    Debtors, you also manufactured central nervous system

5    stimulants; did you not?  Or, the company did?

6    A    Yes, Rhodes did.  Yes.

7    Q    And Rhodes also manufactured generic benzodiazepines;

8    did it not?

9    A    I don't know.

10    Q    How about cannabinoids; did it -- did it manufacture

11    cannabinoids?

12    A    I don't recall.

13    Q    All right.  But if it did, you're -- you -- at any

14    rate, a release for all conducts that Rhodes may have

15    engaged in related to non-opioid controlled substances; is

16    that right?

17    A    That's correct.

18    Q    And you -- Purdue has -- Purdue is the owner of the

19    intellectual property rights that international Sackler

20    companies use in marketing prescription drugs abroad; is

21    that right?

22    A    I believe that they -- there are cross-licenses between

23    -- you know, I think it goes both ways.  So, I think that is

24    correct and I believe that other entities own IP that Purdue

25    uses as well, as far as I recall.  But I -- I'm not entirely

Page 112

1    certain of all the IP crossovers.

2    Q    All right.  Do you know whether the opioids licenses

3    received from Purdue from the U.S. ultimately to the

4    international IACs.

5    A    I'm sorry, I just don't know.  I'd have to refer to

6    counsel.

7    Q    Mr. Sackler, does your family through its international

8    entities intend to continue marketing opioids?

9    A    Well, I think the agreement is quite clear, that we

10   intend to accent the IACs and then within the opioid

11   business, over the course of the next seven years, once the

12   Plan is confirmed.

13   Q    And through that time, you will continue to market

14   opioids?

15   A    Yes, we will continue to market opioids in the markets

16   where that occurs.  Yes.

17   Q    And that is despite the fact that people are dying from

18   opioids; is that right?

19   A    Sir, these are approved products around the world.  The

20   W.H.O. considers access to them a human right, basic human

21   right, and the balance between risk and societal benefit I

22   think is unquestioned.  So, I wrestle with the notion that

23   people are dying as the only barometer of these medications'

24   worth.

25   Q    But --

1    A    That's not true.

2    Q    -- thousands, tens of thousands of people are dying

3    from these drugs; is that right?  You don't deny that --

4    A    Actually --

5              MR. ALBERT:  Objection.  Foundation.

6              THE COURT:  What -- which -- Mr. Edmunds are you -

7    - are you now focusing on the foreign entities in the

8    foreign countries?

9              MR. EDMUNDS:  I think I'm just focusing on opioids

10   generally.

11             THE COURT:  Well --

12             MR. EDMUNDS:  But yes, the foreign entities that -

13   - where he continue -- you know, where I think marketing

14   continues, right, where the -- so.

15             THE COURT:  Right.  So, I think that's his -- I

16   guess that's a sufficient foundation.

17             Are you aware of deaths --

18             MR. EDMUNDS:  Sir --

19             THE COURT:  -- from opioids in the countries where

20   the IACs will be operating over the next several years

21   before they're sold?

22             THE WITNESS:  Yes, there are deaths from opioids

23   in many jurisdictions around the world, but illicit --

24   primarily driven by illicit opioids.  But, you know, that is

25   one of the risks associated with opioid therapy, yes.

Page 114

1          MR. EDMUNDS:  All right.  No further questions,

2     Your Honor.

3          THE COURT:  Okay.

4          MR. EDMUNDS:  Thank you, Mr. Sackler.

5          THE COURT:  Okay.  All right.  Does anyone else

6     want to cross-examine the witness?

7          MR. RUSSELL:  Yes, Your Honor.

8          THE COURT:  Okay.

9               CROSS-EXAMINATION OF MR. SACKLER

10    BY MR. RUSSELL:

11    Q    Mr. Sackler, my name is William Russell and I represent

12    the Gulf Underwriters Insurance Company, and I'd like to ask

13    you this afternoon just a handful of questions about three

14    entities that were listed as Side B shareholder lease

15    parties on page 498 of the Debtors' Disclosure Statement.

16    A    Will you allow me to pull it up?

17    Q    Oh, of course.

18    A    Oh, okay.  You said 498?

19    Q    Yeah.  I believe it's the second-to-last page of the

20    disclosure statement.

21    A    Okay.  I'm there.  Go ahead.

22    Q    And this list, these are entities that are owned

23    directly or indirectly by members of what you call Side B of

24    the Sackler family; is that right?

25    A    I can't characterize all of them like this.  I'd have

1    to defer to my counsel as there are quite a many.

2    Q    Okay.  But they are listed on as Side B shareholder

3    release parties; do you see that?

4    A    I see that.

5    Q    The first one I want to ask you about is the Purdue

6    Frederick Company, Incorporated; are you familiar with that

7    company?

8    A    No.  I mean, I don't know exactly what it is or what it

9    holds, so no.

10   Q    Can you tell me who owns it?

11   A    I don't know.

12   Q    Can you tell me what its business is?

13   A    No, I don't know.

14   Q    Okay.  The next company I want to ask you about is the

15   PF Laboratories Inc.; are you familiar with that company?

16   A    No.  I mean, these are all entities related to Purdue.

17   Though I don't know off hand and I'd have to refer to

18   counsel to under -- to better refresh my recollection of the

19   structure to know what everything holds.  I just don't know

20   it off the top of my head.

21   Q    Sure.  And so, you're unable to tell us what the

22   business of the PF Laboratories Inc. is; is that correct?

23   A    Not off the top of my head, no.

24   Q    And the third company I want to ask you about is PRA

25   Holdings Inc.  Are you familiar with PRA Holdings Inc.?

Page 116

1   A    Not in the questions I believe you're going to ask, not

2   in that level of detail.  I do know the name.

3   Q    So, you can't tell us who owns PRA Holdings Inc. or

4   what its business is?

5   A    Again, I believe in the context of all three of things

6   that you've asked about that has been disclosed through our

7   attorneys, and I just don't have the structure memorized.

8   So, I can't answer it for you.

9   Q    When you say it's been disclosed by your attorneys, do

10  you know where your attorneys have disclosed who owns and

11  what's the business of the Purdue Frederick Company, Inc.,

12  the PF Laboratories, Inc. and PRA Holdings, Inc.?

13  A    It may not have been disclosed.  I don't know.  I would

14  assume in the ownership chain of Purdue that the Debtor

15  would have made those disclosures, but I don't know that to

16  a certainty.

17  Q    And these three entities are not what are being

18  referred to as IACs or independent affiliate companies, are

19  they?

20  A    I don't know what their characterization is here.

21  Q    As you sit here today, do you have any basis to

22  disagree with the fact that these three entities were not

23  identified on Exhibit E to the Shareholder's Settlement

24  Agreement as IACs?

25  A    I don't have any reason to dispute that, no.

1    Q    And if they're not IACs, they're not among the

2    companies that are being sold and then having their proceeds

3    distributed to the Debtor's estate.  Is that right?

4    A    Well, I don't know exactly what they are, so I just, I

5    can't answer your question.  They maybe pass-through

6    entities.  They, you know, I just, I don't know.  They may

7    have no assets.  They may have no business.  So

8    unfortunately, I can't answer those questions.

9    Q    Sure, but it's the IACs that are the companies that are

10   being sold and having the proceeds distributed to the

11   estate; is that right?  Is that your understanding?

12   A    That is my understanding.

13   Q    And if these are not IACs, they're not among the

14   companies who are going to be sold and have the proceeds of

15   the sale distributed to the estate, correct?

16   A    I don't think you can make that assumption as clearly

17   as you are.  They may have -- as pass-through entities, they

18   may be in the value chain of the IACs and maybe either

19   collapse or may have to go along with the IACs and sale.  So

20   I just -- unfortunately, I just don't know the answer to

21   this, but I don't think one can just assume the way you are

22   that these things -- simply because they're not operating

23   IACs are not part and parcel to those transactions.

24   Q    But Exhibit E to the Shareholder Settlement Agreement,

25   identifies all the IACs, not just operating IACs.  Is that

Page 118

1    right?

2    A    I don't know.

3    Q    You don't know one way or another?

4    A    No, I don't.

5    Q    And can you tell me any assets or value that any of

6    these three companies: the Purdue Frederick Company, Inc.,

7    the PF Laboratories, Inc., and PRA Holdings, Inc. is

8    contributing to the Debtor's estate or to the

9    reorganization?

10    A    I don't know the answer to that.

11    Q    As you sit here today, you can't identify any assets or

12    value that they are contributing?

13    A    As I don't know what these entities are, I can't

14    possibly answer.

15    Q    Mr. Sackler, that's all I have for you.  Thank you very

16    much.

17    A    Thank you.

18         THE COURT:  Okay.  Does anyone else want to cross-

19    examine Mr. Sackler?

20         MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson

21    O'Neill on behalf of the State of Washington.

22         THE COURT:  Okay.  You can go ahead, Mr. O'Neill.

23              CROSS-EXAMINATION OF DAVID SACKLER

24    BY MR. ROBINSON O'NEILL:

25    Q    Good afternoon, Mr. Sackler.  Can you hear me okay?

Page 119

1    A    I can.

2    Q    Do you recall that you testified -- probably the last

3    question Mr. Higgins asked you, you answered that you felt

4    your family had a moral responsibility to help those harmed

5    by the opioid crisis.  Do you recall that testimony?

6    A    Yes.

7    Q    Are you admitting here today that you have a legal

8    responsibility to pay for those people who have been harmed

9    by the opioid crisis in the United States?

10   A    No and I don't believe so and I don't believe the

11   allegations against our family are legally meritus.  That's

12   my belief and my position.  That said, our family cares

13   deeply that OxyContin was a part of the opioid crisis

14   although it was unintentional.  And though we don't believe

15   our conduct was illegal in any way, we want to help.

16   Q    And I believe it's the position that both yourself and

17   your family that you complied with all legal requirements

18   during your time as a Director of Purdue Pharma, LLP.  Is

19   that right?

20   A    Yes.

21   Q    Are you paying for any of the proposed Sackler payments

22   under this confirmation plan and proposed settlement out of

23   your own funds or personal assets?

24   A    Trusts of which I'm a beneficiary are paying the

25   settlement amounts.

1   Q    Right.  And I guess that's the question I had.  Do you

2   intend to pay for the Sackler payments out of the trusts of

3   which you are a beneficiary but not directly out of your own

4   personal assets?

5   A    My, yeah, I believe that is the current plan but I'd

6   have to refer to my counsel to be absolutely certain.

7   Q    Well, for now we'll just take your understanding.  Now

8   those future payments, would you agree with me that the

9   money for that is planned to be funded out of the sale of

10  what are called IACs?

11  A    No.  I think the Debtor has done an extensive and the

12  UCC as well, some extensive exercise to underwrite the

13  families' ability to pay here.  And while it's planned that

14  the IAC sales will contribute to the settlement, and that is

15  the hope, I think that, you know, we've underwritten --

16  there's a variety of scenarios here basically where that is

17  probably the case but it may not be the case.  I want to

18  just be clear.  I think some portion of the settlement will

19  be paid from the IAC sales.  I think that's highly likely.

20  Q    Fair enough.  We should perhaps incorporate your

21  attorney, Mr. Joseph's observation that they are security

22  for the payments.  The IACs are security for the payments,

23  but not necessarily the payment themselves.

24  A    Correct.

25  Q    Do you feel better with that characterization, Mr.

Page 121

```
 1    Sackler?

 2    A     Yes.  As I said, the Debtor and the UCC and their

 3    advisors have done an extensive amount of work on our

 4    creditworthiness to make these payments.

 5    Q     During the questioning by Mr. Edmunds, you testified

 6    that Purdue Pharma, as with any business, sought to increase

 7    its market share and revenue.  Do you recall that testimony?

 8    I'm not asking -- do you remember that testimony?

 9    A     Yes.

10    Q     And I think the phrase you used was "as with any

11    business."  Do you recall using that phrase?

12    A     I do, yes.

13    Q     But Purdue Pharma is not just any business, is it, Mr.

14    Sackler?  Doesn't it sell a highly-addictive substance?

15    A     I'm sorry.  I don't follow.  OxyContin -- well, Purdue

16    swells a wide variety of products.

17    Q     One of those products is OxyContin?

18    A     One of those products is OxyContin.

19    Q     One of those products is Butrans?

20    A     One of those products is Butrans, yes.

21    Q     One of those products is Hysingla?

22    A     One is Hysingla.

23    Q     One of those products is MS Contin?

24    A     I believe Rhodes sells MS Contin.  I'm not entirely

25    sure Purdue sells MS Contin.
```

Page 122

```
 1   Q    But that qualification that it might be one of Rhodes,

 2   I'm not sure if it's an IAC or subsidiary, but in any case,

 3   the Purdue Pharma umbrella company sells MS Contin?

 4   A    Yes.  Well, a generic form.  I think the proper way to

 5   characterize it at this point is probably control-released

 6   morphine.

 7   Q    These are all what are called opioids, sometimes also

 8   called narcotics.  Is that right?

 9   A    Yes.

10   Q    And those drugs all carry the possibility of addiction?

11   A    Yes, they do.

12   Q    And they all carry the possibility of death?

13   A    That is a possibility, yes.  It's listed on the label.

14   Q    Fair point.  Those are all listed on the label.  And,

15   in fact, your label -- the label for those drugs indicates

16   that even when taken as prescribed, those drugs can cause

17   addiction and death.  Is that right?

18   A    Yes.  You're referring to an iatrogenic addiction,

19   which I believe the FDA states is rare.

20   Q    And in the United States, it is true that Purdue Drugs

21   have caused deaths in the United States.  Is that right?

22   A    I believe that that is true, yes.

23   Q    And opioid drugs have caused -- the Purdue drugs have

24   caused addiction in the United States.  Is that correct?

25   A    I believe -- so I'm saying I believe that's true
```

Page 123

1    because I think statistically, it must be.  Though, you

2    know, so, yes, I believe that is true.  I'm sorry.  Your

3    screen's gone blank, sir.  I don't know if --

4              THE COURT:  Is he off?  You froze for a moment,

5    Mr. O'Neill.  I don't know if you were asking a question.

6              MR. ROBINSON O'NEILL:  I apologize, Your Honor.

7    Am I back?

8              THE COURT:  Yes.

9    BY MR. ROBINSON O'NEILL:

10   Q    Mr. Sackler, can you hear me?  I apologize.

11             THE COURT:  He can hear you.

12   BY MR. ROBINSON O'NEILL:

13   Q    All right.  And to be fair to your position and the

14   position of your family, it's also true that you maintain

15   that those drugs also provide value in the form of pain

16   relief for people who suffer from chronic pain.  Is that

17   right?

18   A    I think that's undeniable, yes.

19   Q    And for that value, the pain relief value, your family,

20   the Sackler Trusts, have received 10.4 billion dollars in

21   disbursements since 2007.  Is that right?

22   A    I think all those disbursements have been listed.  As

23   we said before, half went to taxes, some was reinvested in

24   other businesses, but yes, that is the gross number.

25   Q    And you've also received 1.4 billion dollars in

Page 124

1   nonmonetary transfers from the business that sells OxyContin

2   and these other opioids?

3   A    I believe that was the number of the AlixPartners

4   report, but I don't know it off the top of my head.

5   Whatever has been disclosed, I do not dispute.

6   Q    And that massive amount of compensation was

7   compensation for the value you provided in pain relief, is

8   it?

9   A    I believe so, yes.

10  Q    Would you agree that in the case of opioids, the real

11  question or the heart of the matter is that you have to

12  value the benefits of opioid use against the possible

13  adverse outcomes?

14  A    I don't have to do that.  That's the job of the U.S.

15  Food and Drug Administration.

16  Q    But your company makes this drug and sells it?

17  A    Under a marketing authorization from the U.S. Food and

18  Drug Administration, an incredibly, highly-regulated

19  industry.  So, yes, while we manufacture and make it, there

20  is a tremendous amount of government oversight over the use

21  of these medications.

22  Q    There's also physicians that would be responsible for

23  each individual prescribing decision and we would all hope

24  that they make that balance themselves.

25  A    That's correct, yes.

```
 1    Q    You received reports at the Board that Purdue's

 2    marketing altered that balance and ordered more opioid

 3    prescribing, did you not?

 4              MR. JOSEPH:  Objection.  Referring to undisclosed,

 5    unidentified matters.  It's not fair to ask him.  He

 6    received reports over six years.  If he wants to identify a

 7    report, that would be fine.

 8              MR. ROBINSON O'NEILL:  Your Honor, I'm just asking

 9    for his memory.  Maybe he doesn't remember and we can rely

10    on all the --

11              THE COURT:  Can you ask the question again?  I'm

12    not sure I --

13              MR. ROBINSON O'NEILL:  Sure.  You received reports

14    at the Board that Purdue's marketing caused physicians to

15    write more opioid prescriptions.

16              THE COURT:  Is the question do you recall

17    receiving such reports?

18              MR. ROBINSON O'NEILL:  Yes.

19    BY MR. ROBINSON O'NEILL:

20    A    No.

21    Q    All right.

22    A    If one looks back at my time on the Board, OxyContin

23    prescriptions were falling.  Purdue was losing market share.

24    So marketing was not causing, you know, net more opioid

25    prescribing at Purdue.  I don't know how on my time on the
```

Page 126

1   Board anybody could argue that marketing was leading to more

2   opioid prescribing.

3   Q    I suspect, Mr. Sackler, the documents will speak for

4   themselves, but since you volunteered that information that

5   Purdue's -- the overall numbers of Purdue's were dropping,

6   isn't it true that your received reports from McKensey that

7   your E2E Program -- not yours, but Purdue's E2E Program and

8   aggressive marketing slowed that and caused certain

9   prescribers to write more opioids?

10         MR. JOSEPH:  Objection.  Characterization as

11   aggressive marketing.  It's not a factual question.

12         THE COURT:  I think that's a fair question.  You

13   can answer that question.

14   BY MR. ROBINSON O'NEILL:

15   A    No.  Everything that we did on the Board, sales were

16   always couched as a part of market share.  So E2E or

17   anything else you want to talk about with marketing is

18   always geared towards market share, which means you're

19   taking an opioid prescription from your competitor, not

20   creating a brand new opioid prescription.  So, no, I think

21   that's been badly mischaracterized.  Market share is not the

22   same thing as market expansion.

23   Q    All right.  Thank you, Mr. Sackler.  We'll let the

24   documents speak for themselves.  Let's turn now to -- it's

25   true that in February of 2018, you were on the Board and

Page 127

1    approved a plan by Purdue management to cease all opioid

2    marketing in the United States.  Is that correct?

3    A    Yes.  As Mr. Edmunds asked in great detail.  Yes, that

4    is correct.

5    Q    He did ask quite a lot of questions about that.  Were

6    you in support of that decision to cease marketing in the

7    United States?

8    A    As I recall, management made a very good presentation

9    about this being the right direction for the business to go

10    in and I was in favor on that one, yes.

11    Q    Was your decision to cease marketing based on a legal

12    responsibility to cease marketing?

13    A    No.

14    Q    Do you believe you could have continued to legally

15    market opioids in the United States consistent with the FDA

16    guidance?

17    A    I believe so.  I never heard otherwise.

18    Q    Was your decision to cease marketing opioids then based

19    on your moral responsibility to make sure that you didn't do

20    any more harm?

21    A    I don't believe that the marketing in 2018, as you are

22    trying to say, was doing harm.  The reps, as it was

23    described to the Board, were spending a huge amount of time

24    with doctors on the CDC guidelines and helping them move

25    toward those and things like that.  I think it was based on

Page 128

1    management's best estimate of what was correct for the

2    business.  I can't tell you all the factors that went into

3    their thinking.

4    Q    What was the reason you voted in favor of ceasing all

5    marketing in the United States?

6    A    We had a very esteemed management team that we hired

7    with great expense, that had some of the best minds that we

8    could recruit, who were advocating for it.  So I thought it

9    was wise to support their decision for the business.

10   Q    I understand that you deferred to the management

11   recommendation.  I'm asking what were the factors that you

12   considered important in supporting the decision to cease all

13   marketing in the United States?

14   A    Sorry.  I thought I answered that.  I mean the most

15   important factor, the overriding factor was management and

16   their belief that it was the best thing to do for the

17   business at the time.

18   Q    When you say "best," best how?  Best legally?  Best

19   morally?  Best for maximizing your revenues?  Please

20   explain.

21   A    As I said, I don't recall the management's rationale

22   for doing it.  But I think, I think it was -- unfortunately,

23   I just don't recall at this point all of management's

24   reasons for doing it.

25   Q    It wasn't because you were being sued -- Purdue Pharma

Page 129

1   was being sued by many states, municipalities, and other

2   entities?

3   A    No.  I think that it was an independent decision by

4   management, but again, I can't put myself into management's

5   head and tell you why they made that recommendation.  So if

6   that played into it, it didn't -- I don't recall.

7   Q    All right.  You are still on this company called MNP

8   Consulting; is that correct you're on the Board?

9   A    I believe MNP has now changed its name to MNC, but,

10  yes.

11  Q    MNC, excuse me.

12  A    Yeah.

13  Q    That's the entity that makes recommendations to the

14  IACs internationally?

15  A    To the Boards of the IACs, yes.

16  Q    Those IACs continue to sell opioids.  Is that correct?

17  A    Some do, yes.

18  Q    They also continue to market opioids; is that correct?

19  A    Some do, yes.

20  Q    And that means that the marketing of opioids will pay

21  for your obligations in this matter, correct?

22  A    Not necessarily, no.

23  Q    To the extend marketing influences prescribing, it will

24  help pay for this settlement in the United States?

25  A    Let me try to unpack this.  You know, I don't know how

Page 130

```
 1    to answer that to the level of specificity that you want.

 2    The value of the IACs is a complicated thing with a myriad

 3    of factors that need to be considered.  So sales trajectory

 4    is only one of them.

 5    Q    Does the moral responsibility that you discussed with

 6    Mr. Higgins end at the United States' borders?

 7    A    Certainly not.

 8            MR. ROBINSON O'NEILL:  All right.  I have no more

 9    questions.  Thank you.

10            THE COURT:  Okay.  Does anyone else want to

11    question Mr. Sackler?

12            MR. UNDERWOOD:  Your Honor, this is Allen

13    Underwood on behalf of certain Canadian Municipal Creditors

14    and Canadian First Nations.  I'd like to ask a few precise

15    questions.

16            THE COURT:  All right.

17            MR. UNDERWOOD:  Thank you.

18              CROSS-EXAMINATION OF DAVID SACKLER

19    BY MR. UNDERWOOD:

20    Q    Mr. Sackler, your asserted goal is a global release,

21    and a quote from today, "final separation from the Debtor."

22    Is that not correct?

23    A    I think those things are redundant in the way you

24    phrased them.  I think one if the other, but, yes, that is

25    the goal.
```

Page 131

1   Q    Okay.  And by final separation from the Debtor, don't

2   you really mean a final separation from the worldwide opioid

3   business?

4   A    No.  I think we just covered the families' continuing

5   business that's out of the U.S., so, no, that's not what it

6   means.  But ultimately it means that.  The settlement for

7   the family to sell the IACs over the remaining, over seven

8   years and through that process, exit the opioid business.

9   Q    Thank you and that was an answer to the question if I

10  had phrased it better.  Mr. Sackler, isn't it correct that

11  one of the fundamental principles of the plan before this

12  Court is that the Sacklers withdraw from the management of

13  all U.S. and foreign Purdue opioid-related entities?

14  A    I'm not sure I understand.  In the U.S., the family has

15  withdrawn a few years ago.  So I don't understand your

16  question.

17  Q    It is ultimately -- is it not ultimately the goal of

18  the Sackler family to withdraw from the opioid-related

19  business worldwide, and granted that may take seven years,

20  but isn't that the ultimate goal?

21  A    Well, that's part of the agreement.

22  Q    Thank you.  Finality and fairness are a goal this Court

23  and a goal of the Creditors before this Court.  Are finality

24  and fairness your goals in participating this process?

25  A    I think absolutely and I think the voting in this case

Page 132

1    and then the acceptance of the deal by the Creditors,

2    overwhelming so, speaks to that.

3    Q    Mr. Sackler, under the existing plan, the U.S. Purdue

4    entities will be, in effect, given over as public trusts for

5    the benefit of a variety of interests; is that not correct?

6    A    I believe so, yes.

7    Q    And as I think you've addressed, is it not correct that

8    the IACs, which are termed properly independent associated

9    companies, the equity of same being held of family trusts or

10   estates in which Sackler family members are beneficiaries,

11   are to be sold over a period of years to help fund the

12   settlement agreement obligations of the Sackler family to

13   the opioid trust under the plans?

14   A    Sorry.  You went over a lot of ground there.  Is there

15   any way you can cut that question up because I want to

16   answer it for you, but I'm not sure I understand it totally?

17   Q    Thank you, I will.  The IACs, family trusts are

18   agreeing the IACs will be sold over a period of years to

19   fund the settlement agreement and the opioid trusts under

20   the plan; is that correct?

21   A    Sort of.  It's sort of correct.  As Mr. Joseph has

22   pointed out and I pointed out, throughout my testimony the

23   IACs are security interest and their sales, the proceeds

24   from those will go to fund the settlement agreement, that is

25   true.  There is a condition whereby the family has to sell

Page 133

1    them over a certain number of years.  That is also true.

2    But you know it is possible that the family needs to finance

3    the settlement in a different fashion, although I think

4    unlikely, or I hope unlikely.  I'm sorry.  I hope that

5    answered your question.  I'm finding it a little bit

6    difficult to follow.

7    Q    I think you answered the question and thank you.  Mr.

8    Sackler, do you know here the proceeds of the operation of

9    those entities prior to sale under the plan will go?

10   A    Well, I mean all those entities have with them the net

11   proceeds.  I think you need to talk in terms of net proceeds

12   rather than proceeds because for example, in the business

13   you have the most interest in in Canada, that business, the

14   proceeds from that, well eventually the net proceeds, the

15   net of liabilities will flow to family trust for the benefit

16   of the settlement.

17        And then it will be transferred -- well, actually, let

18   me back up.  I'm not entirely sure on the plumbing.  I'd

19   have to defer to my lawyers for that but the liabilities

20   need to be looked at as well as the asset value.  So in the

21   case of Canada, the financial advisors for the UCC and for

22   the Debtors have spent extensive time thinking about those

23   liabilities, I believe from my understanding.  And once

24   those are settled, the net proceeds can then move.

25   Q    Mr. Sackler, isn't it true that not all international

Page 134

1    creditors of the IACs would either be bound by or released

2    by an order confirming a plan before this Court?

3            MR. JOSEPH:  Objection, legal conclusion.

4            THE WITNESS:  I was going to say I'd have to

5    consult my attorney.  I don't know if that makes your life

6    easier.  I just don't know.

7            MR. UNDERWOOD:  I think the purpose for asking the

8    question, Your Honor, is to have a better understanding of

9    what the Sackler's family expectation of the results of this

10   process is and I'm not sure there's a privilege aspect to

11   that.

12           THE COURT:  All right.  Let me ask the question

13   differently then because I think you are asking what the

14   effect of the release might be.  The terms of the release we

15   all know.  The effect of it is a legal question as it

16   pertains to wholly foreign entities.  But your question

17   really is one I think one that the witness probably already

18   has addressed.  Tell me if this is where you want to go with

19   this, Mr. Underwood.

20           Is it your belief, Mr. Sackler, that

21   notwithstanding the claims by Creditors against the IACs

22   that are not subject to the release under the plan, the net

23   proceeds, whether in terms of cash flow or sale proceeds,

24   along with the settling parties' other assets, will be

25   sufficient to fund the settlement?

Page 135

1              THE WITNESS:  Oh, boy, Your Honor.  I'm having

2    difficulty following that.

3              THE COURT:  The question is -- let me ask it

4    differently.  Your answer assumes that the net proceeds from

5    the IACs would go to fund the settlement in all likelihood

6    and under certain circumstances, they would have to be sold.

7    But you referred to net proceeds, net of liabilities.

8              THE WITNESS:  Yes.

9              THE COURT: So the question is from your side of

10   things, not the Debtor's side or the Creditor's side, but

11   from your side of things, do you believe that the net

12   proceeds, which assumes, of course, it's net of all claims

13   against those entities, including claims that aren't

14   released, would be sufficient, along with your families'

15   other assets, to pay the settlement?

16             THE WITNESS:  Certainly, yes.  I believe that's

17   the case, though, again, I would defer back to the Creditors

18   Committee here, the Unsecured Creditors Committee and the

19   Debtor who have done extensive diligence on this more than I

20   could ever present.

21             THE COURT:  But as far as you're concerned, you're

22   not agreeing to something that you believe your family is

23   going to default on?

24             THE WITNESS:  Certainly not, no.

25   BY MR. UNDERWOOD:

Page 136

1    Q    Thank you.  Isn't it also true though, Mr. Sackler,

2    that once those IACs are sold or liquidated and the net

3    proceeds are paid over the U.S. Opioid Trust, the only

4    remaining recovery by foreign creditors who have not

5    participated in the plan or did not receive distributions

6    hereunder would potentially be against management,

7    executives, and Sackler family members with regard to those

8    very IACs?

9             MR. JOSEPH:  Objection.  Legal conclusion.  It

10   makes assumptions whether there's going to be actions in

11   advance of sale and it makes multiple assumptions and he's

12   not qualified to answer.

13            THE COURT:  Okay.  I think that's right, Mr.

14   Underwood.  It's too broad a hypothetical.

15            MR. UNDERWOOD:  Okay.  Maybe I'll try to rephrase

16   it.

17   BY MR. UNDERWOOD:

18   Q    Mr. Sackler, once the IACs are sold or liquidated and

19   the net proceeds contributed to the U.S. Opioid Trust, are

20   there any other avenues of recovery that you are aware of

21   with regard to foreign claimants or creditors that are not a

22   part of this U.S. bankruptcy process?

23   A    I would have to consult with my attorneys to be able to

24   answer your question.  I'm sorry.  I just -- this is sort of

25   assuming future liability that doesn't exist today and a

1    bunch of other things that I don't feel qualified to answer

2    this question for you.  I'm sorry.

3    Q    Fine.  And thank you for trying.  If the liquidation

4    and sale of the IACs with the contribution of net assets to

5    the U.S. Opioid Trust does not eliminate the potential

6    released claims, claims that are released in the U.S.,

7    doesn't that defeat the intention of a global release and

8    final separation under this plan?

9              MR. JOSEPH:  Objection, form.  I honestly do not

10   understand that and I'm reading it.

11             THE COURT:  That's sustained, Mr. Underwood.  I

12   didn't follow the question either.

13   BY MR. UNDERWOOD:

14   Q    So the question I think ultimately is to one of

15   finality, Mr. Sackler.  And I think the question is it

16   appears that there are potentialities for the Sacklers to be

17   required a) to contribute more than they have considered if

18   the IACs lose value.  Are you aware of that possibility?

19   A    As I previously testified, the IAC value is hard to

20   estimate and there are a myriad of factors that make it go

21   up and down.  So, of course, I'm aware, yes.

22   Q    And ultimately, is it not true that there is

23   potentially significant international liability that is not

24   addressed by the plan before this Court, but that could

25   impact the Trust's ultimate ability to satisfy the

1   obligations to the Trust -- to the Purdue Opioid Trusts?

2   A    I know of no such activity besides the Canadian

3   actions.

4   Q    Are you aware that Purdue Frederick, Inc., is a

5   Canadian corporation?

6   A    No, as I testified.  I'm sorry.  I just don't know the

7   structure.

8           MR. UNDERWOOD:  I thank you for your time, Mr.

9   Sackler.  And I have no further questions.  Thank you, Your

10  Honor.

11          THE COURT:  Okay.  All right.  Does anyone else

12  want to cross-examine Mr. Sackler?

13          MR. OZMENT:  Your Honor, this is Frank Ozment.  I

14  have a few questions to follow up on what Mr. Edmunds was

15  pursuing.

16          THE COURT:  Okay.

17          MR. OZMENT:  Thank you.

18              CROSS-EXAMINATION OF DAVID SACKLER

19  BY MR. OZMENT:

20  Q    Mr. Sackler, my name is Frank Ozment.  And I represent

21  some individual claimants, Stacy Bridges, Creighton Boyd,

22  and Charles Fitch.  In part of your answers to Mr. Edmunds'

23  questions, I had some difficulty following what you were

24  saying, probably because some of the audio, but I want to go

25  back and touch on some of those answers as opposed to

1    anything you said in your declaration.  I think you

2    testified, of course, that people use opioids for legal and

3    illicit -- legal and licit reasons.  And if I understood you

4    correctly, you're talking about medically indicated reasons,

5    right?

6    A    Yes.  Correct.

7    Q    Okay.  And if people are using opioids for medically

8    indicated reasons, they can become dependent on them.  Is

9    that right?

10   A    Yes, that's correct.

11   Q    Okay.  And in fact, your company, or Purdue, actually

12   made some medicine to help people manage or reduce the

13   dependence.  Is that right?

14   A    I'm sorry.  I don't know what you're referring to.  Can

15   you give me a product name?

16   Q    Sure.  What I'm -- I was going to ask you for product

17   names.  I know one of them is buprenorphine.  I mean, Purdue

18   manufactures Suboxone, right?

19   A    I don't -- at least at the time I was a director, I

20   think that was a potential development opportunity.  But I

21   don't know if they now have entered the Suboxone market.  I

22   don't recall.

23   Q    Okay.  So that wasn't --

24   A    Buprenorphine, just for the sake of completeness,

25   Butrans is a buprenorphine patch that is not for curbing --

Page 140

1    or whatever indication you brought up.  But Purdue does

2    market that, or manufacture.

3    Q    Okay.  And do you know what that Butrans is used for?

4    A    Yeah.  Pain.

5    Q    Okay.

6    A    Treatment of pain.

7    Q    And so, as you sit here today, you don't really recall

8    anything that they made to reduce that dependence, correct?

9    While you were (indiscernible)?

10   A    I remember Rhodes was interested in developing generic

11   Suboxone.  I know the NDT has confirmed it is very

12   interested in supplying Suboxone at or below cost.  So my

13   assumption is that project was or can be completed.  You

14   know, Purdue was developing Nalmaphene during my time on the

15   Board, I believe, and is very supportive of that.  That

16   doesn't reduce dependence, but it reverses overdose.

17   Q    Right.

18   A    I don't know where that project stands today.

19   Q    One of the things that you testified to is that in many

20   instances, death from opioid use is really something that's

21   more likely to involve illicit use.  Did I understand you

22   correctly when you were talking about that?

23   A    Oh, I think that that's indisputable, from the current

24   statistics.  Yes.

25   Q    And I'm not disputing you now.  I just want to follow-

1    up on what you meant by that.  Okay?  And when you're

2    referring to illicit use, are you really -- is that

3    referring largely to heroin?

4    A    Well, it depends on what you're talking about.  It's --

5    illicit use is a variety of things.  I think today, the most

6    dangerous illicit narcot -- well, opioid is fentanyl,

7    clearly, where the majority of overdoses come from.  Heroin

8    is another illicit opioid, yes.

9    Q    Okay.  And as a practical matter, when somebody is

10   dependent on an opioid, either because of their medically

11   indicated use, or for other reasons, it's dangerous for them

12   abruptly to discontinue that without medical supervision,

13   isn't it?

14   A    I believe that's correct.  I think the FDA has issued a

15   letter of guidance on this front.  So I would defer to that

16   as -- you know, them, as the sort of leading authority.

17   Q    Sure.  But as an executive who's been in that business,

18   I mean, that's fairly common knowledge, isn't it?

19   A    Yes.  It's on the label of most of the medications that

20   shouldn't abruptly stop.  And frankly, dependence is a

21   feature of many medications outside of (indiscernible)

22   products.  Anti --

23   Q    Right.  And the difference being with this medication

24   is we actually have available other medications to assist

25   with that dependence reduction, right?

1   A    Well, I think there's some confusion here in your

2   answer between, you know, dependence and addiction.  I think

3   you may be muddling the to a little bit.  Normally,

4   hopefully, dependent -- patients who are dependent on an

5   opioid can simply be titrated down and stepped off the

6   opioid, right, without going to something like

7   buprenorphine, which is reserved for, you know, medication-

8   assisted therapy for addiction -- you know, opioid use

9   disorder and addiction.  So they're kind of two different

10  things, a little bit.  It's not --

11  Q    And I think that's a point well taken, and I want to

12  follow up on what you said about medicine-assisted therapy.

13  Okay?  So with medicine-assisted therapy, that's something

14  that is used to reduce addiction, correct, or to manage

15  addiction?

16  A    To manage it and, hopefully, help patients, you know,

17  be cured of addiction.  Yes.

18  Q    And sometimes that can be a long-term undertaking.  Is

19  that right?

20  A    From the data I've seen, yes, that's accurate.

21  Q    And does MAT basically reduce that risk of overdose

22  from -- I'm sorry -- does MAT basically reduce the risk of

23  death associated with overdose from illicit usage?  Is that

24  fair?

25  A    You're pushing me beyond my limits of my knowledge of

Page 143

1    the studies.  So I would want to consult the literature to

2    see if that's been studied and confirmed.

3    Q    Okay.  And I may be pushing your limits on this for one

4    last question, but I think it's within your (indiscernible)

5    well.  And that is, when people are using MAT, it's

6    important for them to have therapy and counseling to support

7    that, isn't it?

8    A    You know, I'm not an expert on the state of the art

9    today and what is medical best practice.  So you could be

10   right.  I just -- I don't know enough on MAT usage and sort

11   of what's used in conjunction with it.

12           MR. OZMENT:  That's all I have, Your Honor.  Thank

13   you.

14           THE COURT:  Okay.  All right.

15           MR. ROTHSTEIN:  Your Honor, this is Paul

16   Rothstein.

17           THE COURT:  Go ahead, Mr. Rothstein.

18           CROSS-EXAMINATION OF DAVID SACKLER

19   BY MR. ROTHSTEIN:

20   Q    Mr. Sackler, my screen is not working so well, so I'm

21   not seeing your picture.  But I do have some follow-up

22   questions.  I represent Dr. Masiowski in these proceedings.

23   He's been a Board Certified Emergency Room Physician for

24   over 25 years.  And what I want to know is, has your

25   position in the Sackler group, has there ever been any

Page 144

1    discussions at the Board to implement non-medicated policies

2    to deal with the opioid abuse problem?  And if so, are you

3    able to identify what those policies have been?

4            And I ask this because Dr. Masiowski has been a

5    strong proponent of the implementation of non-medicated

6    strategies to combat the opioid crisis.

7    A    Well, I'm not sure what you mean by non-medicated.

8    Could you just give me an example, and then I think I'll be

9    able to answer your question?

10   Q    Well, there are many strategies out there, whether to

11   minimize the opioid use, whether it be strategies such as

12   meditation, such as strategies up here, group therapy, these

13   types of strategies that Dr. Masiowski has been advocating

14   in order to minimize medications as the forefront for the

15   opioid abuse crisis.  And I want to know what your views

16   have been on that, and what the Sackler Family and the

17   Sackler entities' views about funding those types of

18   efforts.

19   A    Okay.  All right.  So there's a lot there to unpack, so

20   I'll try and do it bit by bit.  So as -- at Pursue, as a

21   pharmaceutical company, we spent a great deal of time and

22   money trying to develop non-opioid treatments for pain, both

23   chronic and acute.

24           We're not a company that -- you know, it was not a

25   business that was ever sort of looking at non-medication

Page 145

1   modalities like meditation.  You know, the data on those,

2   I'm just uncertain about, whether or not, you know, there is

3   large, controlled trials to demonstrate the utility there.

4   If there are, great.  Or even if it works anecdotally, you

5   know, I applaud his efforts.

6           As far as Purdue, you know, we concentrated our

7   efforts on trying to develop one, safer opioids, our R&D

8   efforts, which is, I think, what you're getting at.  So one,

9   safer opioids on a variety of fronts, both abuse deterrent

10  and with properties like less respiratory depression.  And

11  two, on non-opioid modalities for treating pain.  And I can

12  name a few of those projects.  Unfortunately, they didn't

13  succeed in the clinic, but they were extremely costly.

14          And then, you know, then outside of that, doing a

15  lot of work -- there are over 60 programs at Purdue embarked

16  upon over the course of time that have nothing to do with

17  medication or anything else designed to combat opioid abuse

18  and diversion.  So I can tell you about some of those.

19  Sponsorship at the National Sheriff's Association.  Heavy

20  emphasis on prescription drug monitoring programs.  Purdue

21  funded many of those in states, brought together experts to

22  help the states develop those programs and best practices,

23  consulted on many of them.

24          So there's over 60 programs.  I think this is a

25  side of Purdue and a story that may never be told, but there

Page 146

1    were a vast number of things Purdue was trying to do, from

2    the very start, from 2001 all the way to, you know, the

3    present.  The Debtor is still working on those efforts, as I

4    understand it.

5             MR. ROTHSTEIN:  I have no further questions

6             THE COURT:  Okay.  Thank you.

7             MR. HUEBNER:  Your Honor, Marshall Huebner, of

8    Davis Polk, for the Debtors.  I have seven questions for Mr.

9    Sackler.

10            THE COURT:  Okay.

11                 CROSS-EXAMINATION OF DAVID SACKLER

12   BY MARSHALL HUEBNER:

13   Q    Mr. Sackler, can you see and hear me clearly?

14   A    Yes.  That's one of your seven, Mr. Huebner.

15   Q    7.7.  Mr. Sackler, are you generally aware of the

16   structure of the 2019 settlement framework, with which

17   Purdue entered Chapter 11?

18   A    Yeah, I'm generally aware.  Yes.

19   Q    And would you consider it a fair summary if I said that

20   the Sacklers, among other covenants -- but I'll focus only

21   on the financial parts -- were obligated to pay $3 billion

22   of guaranteed consideration, and then there were splits of

23   the net proceeds of IAC proceeds above that.  In rough

24   terms, it was 90 percent to the estate of the next $1.5

25   billion above $3 billion, and then 50 percent of things

Page 147

1   above approximately $4.6 billion.  Is this more or less an

2   accurate summary?

3   A     Yes.  I remember it well.

4   Q     Okay.  And so, is it correct in your recollection that

5   under the original settlement framework, the estates

6   actually had a very -- potentially variable amount of

7   recovery.  It could be $3 billion; it could be $3.5, it

8   could be $3.8, it could be $4.-something or more, based on

9   the net proceeds of the IACs.

10  A     Yes.  That is correct.

11  Q     Okay.  So the estate essentially were taking risks, but

12  had a contingency with respect to IAC net proceeds amounts?

13  A     Yes.

14  Q     Okay.  Are you generally familiar with the current

15  settlement framework that we expect you to be on the brink

16  of being ready to sign as the documents fulfill their final

17  rounds of wordsmiths?

18  A     Yes.  And thank you for reminding me I had not yet

19  signed it.  I was asked that before and --

20  Q     Is it a fair summary, to your knowledge, that the

21  Sacklers collectively -- and I'm using the Sacklers in the

22  same colloquial sense that people have been using it

23  throughout this trial -- are now obligated to pay a fixed

24  amount of $4.325 billion?

25  A     Yes.

Page 148

```
 1    Q    Do you agree with that?

 2    A    Yes.

 3    Q    And are you aware that, therefore, irrespective of

 4    whether the IACs sell for 2 billion, 3 billion, 1 billion, 4

 5    billion, or some other number, your obligation in the

 6    current deal is to pay $4.325, irrespective of IAC net sale

 7    proceeds?

 8    A    That's correct.

 9    Q    Okay.  And do you understand that if you fail to pay

10    that, whether because the IAC sale proceeds are less than

11    you hoped them to be, or for any other reason, that the

12    virtual certain consequence of that is that the estate and

13    many, many other parties, likely numbering in the hundreds

14    or thousands, will go back to suing you, or the Debtors'

15    estate, obviously created recently, will commence suing you

16    for probably tens of billions or more of dollars?

17    A    Yes, I am aware of that.

18    Q    Okay.  And just so there's no confusion -- because

19    people asked you about your goals and aspirations, which

20    frankly are not really of great interest to me -- I care

21    about your obligations -- do you understand that the current

22    settlement agreement obligates the Sackler Family to exit

23    the worldwide pharmaceutical industry in a fixed period of

24    time?

25    A    Yes.  We understand that well.
```

Page 149

1   Q    And I assume that you intend to comply with that

2   obligation as well?

3   A    Absolutely.

4   Q    Thank you.

5           MR. HUEBNER:  I have no further questions, Your

6   Honor.

7           THE COURT:  Okay.  All right.  I think we're at

8   redirect, but it's 1:30.  I don't know if it makes sense to

9   break, with Mr. Sackler not talking to anyone about his

10  testimony during that break.  I don't know how much time you

11  have, Mr. Joseph, for redirect.

12          MR. JOSEPH:  No questions, Your Honor.

13          THE COURT:  Okay.  All right.  So hearing no one

14  else with questions, Mr. Sackler, you can sign off from your

15  testimony.  Okay.  I think this actually is a good time to

16  break for lunch now.  Mr. Cushing's availability ends at

17  4:30?  Is that right?

18          MS. TONNESEN:  Yes, Your Honor.

19          THE COURT:  All right.  So --

20          MS. TONNESEN:  That's about 10:30 his time.

21          THE COURT:  All right.  So we'll have -- I'm

22  assuming you won't be longer than a couple of hours, so --

23          MS. TONNESEN:  No.

24          THE COURT:   -- I think if we return in an hour,

25  that should be -- and he's ready to testify then, we'll be

Page 150

1      able to cover him.

2                  MS. TONNESEN:  Yes.  Will have him ready to sign

3      on in an hour.

4                  THE COURT:  All right.  So we'll be back at 2:30

5      New York time.

6                  MS. TONNESEN:  Thank you.

7                  THE COURT:  Thank you.

8                  (Recess)

9                  THE COURT:  All right.  Good afternoon.  This is

10     Judge Drain, and we're here in In re Purdue Pharma LP et al.

11                 And I believe the next witness to be heard from is

12     Michael Cushing, although before Mr. Cushing testifies, I

13     believe there may be an objection to the admission of his

14     expert report, which was the subject of some e-mail

15     correspondence last week or the week before between the Side

16     A counsel and counsel for the State of Maryland.  I don't

17     know if that objection is still being pursued.

18                 MS. TONNESEN:  Your Honor, this is Sara Tonnesen

19     for the State of Maryland.  Although -- you saw our letter.

20     We have concerns that Mr. Cushing's expert opinion is the

21     same, trying to --

22                 THE COURT:  I'm sorry.  You're coming through very

23     faintly, Ms. Tonnesen.

24                 MS. TONNESEN:  I apologize.  I'll try to get

25     closer.  Is that --

Page 151

1           THE COURT:  Thank you.

2           MS. TONNESEN:  Can you hear me better?  Great.

3           You know, we believe Mr. Cushing's expert opinion

4    provides the same kind of hypothetical scenario that is

5    neither relevant nor particularly helpful to the Court.  But

6    because this is a bench trial, we're comfortable eliciting

7    that information on cross examination.  We don't have an

8    objection at this point.

9           THE COURT:  Okay.  Very well.  Thank you for that

10   update.

11          All right.  So Mr. Cushing, would you raise your

12   right hand, please?  Do you swear or affirm to the truth,

13   the whole truth, and nothing but the truth so help you God?

14          THE WITNESS:  I do.

15          THE COURT:  And it's Michael, M-I-C-H-A-E-L,

16   Cushing, C-U-S-H-I-N-G?

17          THE WITNESS:  That's correct, Your Honor.

18          THE COURT:  Okay.  Mr. Cushing, you submitted an

19   expert report dated June 15, 2021, with a lengthy set of

20   exhibits to it.  Under my order establishing procedures for

21   this hearing, it is intended to be your direct testimony in

22   this hearing.  Knowing that and sitting here today, August

23   17th, is there anything in your expert report that you would

24   wish to change?

25          THE WITNESS:  No, sir.

1          THE COURT:  Okay.  All right.  And I gather that

2     the State of Maryland no longer has an objection to the

3     admission of the report.  Does anyone else object to its

4     admission as Mr. Cushing's direct testimony?

5          MR. HUEBNER:  Your Honor, this is Marshall Huebner

6     for the Debtor.  Just one procedural point for five seconds.

7     We certainly don't object to its admission.

8          I do want to be clear and remind everybody --

9     because there's a lot of cross examination going on that may

10    or may not really be needed -- there is a stipulation that

11    we've read into the record.  And the Debtors, for example,

12    are not bound nor in any way deemed to agree to anything in

13    this or any other witness's testimony, which for that reason

14    that we're not engaging in quite extensive cross examination

15    of every witness.

16         And so again, I know that's nothing everyone

17    doesn't know, but since there are people dancing in and out

18    of the hearing, frankly, and some people quite new to the

19    case, not everybody I think understood the stipulation the

20    first time.

21         I do want to be clear for the record with respect

22    to this and following witnesses that the Debtor's lack of

23    (indiscernible) cross examination and silence does not bind

24    the estate to any form of agreement with the content of any

25    witness's declaration or testimony.

Page 153

1              THE COURT:  Right.  And as I stated repeatedly

2       when this point has come up, I find it very hard to believe

3       that there would be any collateral estoppel effect from the

4       failure -- or not even the failure -- from the fact that

5       there is not cross exam of Mr. Cushing in any subsequent

6       litigation.  And that applies not only for the Debtors but

7       for any party in interest in the case.

8              I am considering Mr. Cushing's expert testimony

9       only insofar as it reflects on the issues pertaining to my

10      consideration of the proposed settlement -- that is a

11      central element of the Debtor's Chapter 11 plan -- and not

12      with respect to the merits of any underlying litigation that

13      might ensue if the settlement is not approved or if the

14      settlement is breached and there is subsequent litigation.

15             So does anyone want to cross examine Mr. Cushing

16      on his declaration, which again is an expert declaration

17      with respect to the law of the Bailiwick of Jersey as it

18      applies as discussed in the declaration itself?

19             MS. TONNESEN:  Your Honor, Sara Tonnesen on behalf

20      of the State of Maryland.

21             THE COURT:  You can go ahead, Ms. Tonnesen.

22             MS. TONNESEN:  Thank you.

23               CROSS EXAMINATION OF MICHAEL CUSHING

24      BY MS. TONNESEN:

25      Q    Good afternoon, Mr. Cushing.

Page 154

1    A    Good afternoon.

2    Q    Is it your testimony in this case that Jersey's Royal

3    Court has the inherent jurisdiction deriving from its

4    customary law to recognize and enforce foreign judgments?

5              MS. MONAGHAN:  Objection to the form.

6              MS. TONNESEN:  Your Honor, I can ask again.  I'd

7    be happy to show Mr. Cushing an exhibit that might get us

8    (indiscernible).

9              THE COURT:  Okay.

10   BY MS. TONNESEN:

11   Q    Mr. Cushing, I believe you would've gotten a series of

12   documents from your counsel ahead of your testimony today.

13   Can you open up KX-1588?

14   A    I'm on -- I'm working from an iPad, unfortunately, with

15   (indiscernible) PDF attachments.  So I have looked at the

16   attachments.  If you could tell me what that attachment is

17   rather than by reference.

18   Q    Of course.  And that's actually the June 15th expert

19   report, so you probably have it pretty handy.

20             THE COURT:  It's your expert report.

21             THE WITNESS:  Oh, I do have that.

22   BY MS. TONNESEN:

23   Q    So if you want to turn to the bottom of Page 5 at

24   Paragraph 10.2.

25   A    Yes.

Page 155

1    Q    You opine here Jersey's Royal Court does however have

2    an inherent jurisdiction to recognize and enforce foreign

3    judgments (indiscernible) investment agency (indiscernible)

4    fidelis nominees unlimited 2008 (indiscernible) 337 Royal

5    Court, clear and correct copy.  Booklet.  This derives from

6    Jersey customary law.  Your opinion hasn't changed --

7    A    Yes.

8    Q    -- since June 15th, has it?

9    A    No, it hasn't.

10   Q    Great.  In preparing to provide your June 15th expert

11   report, you performed legal research as to whether there was

12   any direct authority from the Royal Court on the enforcement

13   of a U.S. judgment, right?

14   A    I'm sorry.  I missed the question.  There was some

15   rustling, I'm afraid.

16   Q    Yeah.  Of course.  When you were preparing your expert

17   report that you submitted on June 15th, you performed legal

18   research in preparation for writing that report?

19   A    That's correct.

20   Q    Yes.  And did you look into whether there was any

21   direct authority from the Royal Court as to an enforcement

22   of a U.S. judgment?

23   A    Yes, I did.  I did a search in the reported and

24   unreported judgments which are available on the Jersey Legal

25   Information Board website to see if I could identify any

1    U.S. judgments which had been enforced.  I wasn't able to

2    identify any in that search.  But that said, the search only

3    went back 10 years in looking at the records.

4    Q    Okay.  And when you did that search at the time you

5    were deposed, you weren't aware of any cases in which the

6    Royal Court of Jersey failed to enforce a U.S. judgment

7    either -- let me ask that again.  I apologize.

8         At the time you were writing your expert report, you

9    weren't aware of any cases in which the Royal Court of

10   Jersey failed to enforce a judgment of any United States

11   state court, right?

12   A    I'm -- I didn't identify any in my research, no.

13   Q    Nor did you find any cases in which the Royal Court

14   failed to enforce a judgment of any United States federal

15   court, right?

16   A    That's correct.

17   Q    Okay.  Thank you.  And for purposes of forming your

18   expert opinions in this case, did you review the underlying

19   Side A trust documents?

20   A    The only documents that I reviewed for the purposeless

21   of preparing the expert report was the instruction letter

22   that I received from Debevoise & Plimpton, and that's

23   appended to my expert report.  I saw nothing else.

24   Q    All right.  And you based your opinion on hypothetical

25   scenario, right?

Page 157

1    A    Indeed.  That was what I was instructed to do.  Yes.

2    Q    And you've been practicing law in Jersey since 2005,

3    correct?

4    A    That's correct.

5    Q    And in your practice, if you were asked to handle a

6    case that involved the interpretation of a trust instrument,

7    you would review the trust documents at issue, wouldn't you?

8    A    If I was asked to advise on the interpretation of a

9    trust document, yes.  In order to interpret a trust

10   document, I would want to see the document itself.  Yes.

11   Q    Okay.  And in fact, as a matter of Jersey law, the

12   Court would also begin its interpretation of any trust

13   instrument by looking at the words of the trust document and

14   construing the trust instrument; isn't that right?

15   A    If there was a question of interpretation or

16   construction of the document, then yes.  It seems to me the

17   Court would need to review the document in order to

18   interpret and construe the document.  Yes.

19   Q    I just have one more thing for you this afternoon, Mr.

20   Cushing.  If you could turn to JX-1589.  I know you asked me

21   to tell you what that is.  There's an opinion appended to

22   your deposition transcript.  I believe it's Exhibit 2.  The

23   citation is 2017 JRC 100 for Royal Court of New -- of

24   Jersey.

25   A    Yes.  It's an -- it's the 2017 judgment, I believe,

1   isn't it?

2   Q    And on Page 2 of -

3   A    It's (indiscernible).

4   Q    I'm sorry.  I didn't mean to cut you off.

5   A    Sorry.  I'm with you, Page 2.

6   Q    Okay.  I'm sorry.  I think there must've been some

7   feedback.

8        On Page 2 of that document, it says at the top Advocate

9   M.P. Cushing for third, fourth, and fifth respondents.

10  That's you, right?

11  A    Yes.  That's correct.

12  Q    And the family referred to in this judgment is the

13  Mortimer Sackler family, right?

14  A    I believe it's the Mortimer Sackler family, yes.

15  Certainly members of the Sackler family.

16  Q    Could you tell me specifically if you recall which

17  members of the Sackler family?

18  A    Sadly, I don't.  I'm afraid this was four or five years

19  -- four years ago, wasn't it?  I don't recall the names.

20       MS. TONNESEN:  I understand.  No further

21  questions, Your Honor.

22       THE COURT:  Okay.  Does anyone else want to cross

23  examine Mr. Cushing?  No.

24       I had one question, sir, if you have your expert

25  report there handy?

Page 159

1                    THE WITNESS:  Yes, sir.

2                    THE COURT:  If you take a look at Paragraph 10.19

3       on Page 11.

4                    THE WITNESS:  Yes, sir.

5                    THE COURT:  And in that paragraph, you state your

6       belief that even if therefore and in persona before a

7       judgment against the trustees would be enforceable as a

8       matter of Jersey customary.  The judgment would be

9       unenforceable under the statutory prohibition contained in

10      Article 9 of the trusts (Jersey) law 1984 to the extent that

11      the judgment itself is inconsistent with the provision of

12      Article 9.  Do you see that opinion?

13                   THE WITNESS:  I do, sir.  Yes.

14                   THE COURT:  So the question I have then is I take

15      it from that that you reached the conclusion that if there

16      is an inconsistency, the plaintiff that obtained the foreign

17      judgment would have to start over again in Jersey; is that a

18      fair --

19                   THE WITNESS:  It is, sir, because the -- the

20      provisions of the trust law, Article 9 particularly of the

21      trust law, are designed to ensure that Jersey trusts are

22      only construed, interpreted and the validity of those trusts

23      is determined applying only matters of Jersey law rather

24      than (indiscernible) foreign law.

25                        And if there is a judgement which is obtained

Page 160

1    where issues of foreign law are taken into account -- so for

2    example, in relation to the interpretation of the trust

3    instrument, that trust instrument is interpreted using

4    principles which are different to those which a Jersey court

5    would apply.  Then the judgment would be unenforceable as a

6    matter of statute in Jersey.

7            THE COURT:  Right.  But my -- so let me -- I'll

8    ask you my next question, which is if the judgment creditor

9    started over again in the Royal Court in Jersey, would that

10   court then apply principles of choice of law to decide

11   whether the issue should be decided under Jersey law or

12   under the foreign law?  So it would apply Jersey choice-of-

13   law principles to decide what law should apply on the

14   underlying merits.  Is that a concept that applies in --

15   under Jersey law?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  So it's conceivable it would apply,

18   for example, U.S. law if Jersey choice of law principles

19   would direct the court to U.S. law?

20           THE WITNESS:  That's correct, sir.

21           THE COURT:  Okay.  All right.  Thank you.  All

22   right.

23           MS. TONNESEN:  Your Honor, I apologize.  I

24   apologize, but can I please move JX-1589 into evidence?

25   (Indiscernible).

Page 161

1          THE COURT:  That's the legal decision by the Royal

2     Court?

3          MS. TONNESEN:  Yes, please.

4          THE COURT:  Okay.  Is there any objection to that,

5     Ms. Monaghan?

6          MS. MONAGHAN:  No, Your Honor.

7          THE COURT:  Okay.  It's admitted as JX-1589.

8          MS. TONNESEN:  Thank you.

9          THE COURT:  Okay.  All right.  Is there any

10    redirect?

11              REDIRECT EXAMINATION OF MICHAEL CUSHING

12    BY MS. MONAGHAN:

13    Q    Just one quick question, Mr. Cushing.  Would the Jersey

14    law -- would the Jersey Royal Court apply non-Jersey law if

15    it was inconsistent with the law of Jersey under its choice-

16    of-law principles?

17    A    Not in relation to the (indiscernible) interpretation

18    of a trust, no.  The Royal Court would have to, under

19    Article 9, apply Jersey law to those points.  But if one was

20    dealing with, for example, a contractual (indiscernible)

21    where the law governing the contract is law (indiscernible),

22    then that law will clearly be applied by the Jersey court in

23    relation to the dispute.

24    Q    So if --

25              THE COURT:  Can I interrupt here.  Some strong

Page 162

1    background noise.  It just stopped.

2              MAN 1:  Yeah, it's -- Your Honor.

3              THE COURT:  I'm sorry to interrupt.  I think it

4    did just stop so --

5              MAN 1:  Your Honor, (indiscernible) mute.  There

6    we go.  Thank you, sir.

7              THE COURT:  Okay.  Sorry to interrupt you all, but

8    I think we did get that answer out, and I think everyone

9    heard it.

10             You can go on, Ms. Monaghan.

11   BY MS. MONAGHAN:

12   Q    If there were a claim for fraudulent transfer, would

13   the Jersey court apply Jersey law as to the question of

14   whether the transfer was fraudulent, or would it apply

15   foreign law to that question?

16   A    Sorry.  A fraudulent transfer into a trust?

17   Q    Yes.  I'm sorry.  I should have specified.  A

18   fraudulent transfer into a trust with either a Jersey

19   trustee or governed by Jersey law.

20   A    Well, the -- again, under Article 9 -- and the

21   provision is clear -- it says that any question concerning

22   the validity or effect of any transfer or other disposition

23   property to a trust shall be determined according to the law

24   of Jersey.

25   Q    And then if there were a foreign judgment against the

1    beneficiary of a Jersey trust, and the foreign judgment

2    creditor was attempting to enforce that judgment against the

3    Jersey trust, would the Jersey Royal Court apply Jersey law

4    or foreign law to that question?

5    A    The question of the enforcement of a judgment against a

6    beneficiary will be determined according to Jersey law

7    principles in relation to enforcement.  That's the question?

8    Q    That is the question, whether the trust assets would be

9    available to respond to a judgment against the beneficiary.

10   A    The -- whether the trust assets would be available

11   would be determined in accordance with Jersey law.  That's

12   correct.

13           MS. MONAGHAN:  Thank you.  No further questions,

14   Mr. Cushing.

15           THE COURT:  Okay.  Is there any -- are there any

16   further questions on recross?

17           All right.  Mr. Cushing, you can sign off.  Your

18   testimony is complete.  Thank you.

19           THE WITNESS:  I'm very grateful, sir.  Thank you.

20           THE COURT:  All right.  The next witness is, as I

21   understand it, Scott Bickford, being presented by the NAS

22   Committee.  And I see Mr. Bickford there.

23           Would you raise your right hand, please?  Do you

24   swear or affirm to tell the truth, the whole truth, and

25   nothing but the truth so help you God?

Page 164

1              THE WITNESS:  I do, Your Honor.

2              THE COURT:  Okay.  And it's Scott, S-C-O-T-T B-I-

3      C-K-F-O-R-D?

4              THE WITNESS:  That's correct, Your Honor.

5              THE COURT:  Mr. Bickford, you submitted a

6      declaration in support of the Ad Hoc committee of NAS

7      Children's reply to the United States Trustee's objection.

8      It's dated August 5, 2021.  Under my order establishing

9      procedures for this hearing, it's intended to be your direct

10     testimony in the hearing.  Knowing that and sitting there

11     today, August 17th, is there anything in your declaration

12     that you would wish to change?

13             THE WITNESS:  No, Your Honor.

14             THE COURT:  Okay.  All right.  Does anyone object

15     to the admission of Mr. Bickford's declaration as his direct

16     testimony?

17             All right.  Does anyone want to cross examine Mr.

18     Bickford on his declaration?

19             All right.  I'm pausing because at times, Mr.

20     Higgins has taken a little while to sign on.  I just want to

21     make sure.

22             MR.  HIGGINS:  Your Honor, Ben Higgins for the

23     U.S. Trustee.  We don't intend any cross examination.  Thank

24     you for checking.

25             THE COURT:  All right.  Very well.  All right.

1    And no one else wants to cross examine Mr. Bickford either.

2              I have reviewed the declaration, and I don't have

3    any questions on it.  It seems clear to me, so you can sign

4    off, sir.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  Okay.  All right.  The next witness is

7    being called by the State of West Virginia, Dr. Charles

8    Cowan.  As I understand it, he's a PhD doctor, which is no

9    slight to PhDs.  So Mr. Cahn, is he signing on?  Are you

10   getting him on the line?

11             MR. CAHN:  We asked him to sign on, Your Honor.

12   He should be on momentarily.

13             THE COURT:  Okay.  Thank you.

14             MAN 2:  Hi, how are you?  Good to see you.  I just

15   wanted to say --

16             THE COURT:  No.  Whoever is talking, you need to

17   put yourself on mute.

18             Is he signing on?

19             MAN 1:  Your Honor, we're just waiting for Mr.

20   Cowan to sign on.

21             THE COURT:  Okay.  Mr. Cahn, if he's having

22   difficulties, he should contact Mr. Andino, who's been able

23   to walk people through the process.

24             MR. CAHN:  Yes, Your Honor.  I'm not sure what the

25   problem is, but we've been in contact -- we're contacting

Page 166

1   him to see if there's a problem.

2           THE COURT:  If he indicates there is, he should --

3   you should ask him to e-mail Mr. Andino to walk him through.

4           MR. WAGNER:  Your Honor -- Your Honor, while we're

5   waiting, I just want to make sure Your Honor has the

6   exhibits as well as the deposition transcript.

7           THE COURT:  I have the exhibits.  I don't know --

8   yes.  I have the deposition transcript too.

9           MR. WAGNER:  Okay.  And I think the only exhibits

10  I'm going to be using are 388, 389, and 392, as well as the

11  transcript.

12          THE COURT:  All right.

13          MR. WAGNER:  Aaron, maybe you should e-mail him

14  and text him.

15          MR. CAHN:  I have.  He's (indiscernible) tried to

16  call.  I don't know what the problem is.  I know that he

17  tested the link earlier this morning and had no problem.

18  He's been in contact with me throughout the day.  I know

19  that he is physically located on the Florida Gulf Coast,

20  which is having some weather issues.  I don't know if that's

21  a factor or not.

22          MR. WAGNER:  Why don't we wait a few minutes?

23          THE COURT:  Okay.  I know our clerk's office has

24  tried to reach him, but it just goes to voicemail, so --

25          MR. WAGNER:  Does he have a landline?

Page 167

1        MR. CAHN:  I don't know if he does or not.  He

2   literally just (indiscernible) over this past weekend.

3        THE COURT:  Well, maybe it makes sense --

4        MR. CAHN:  So I don't know.

5        THE COURT:  -- to go to the next witness and then

6   come back to Mr. Cowan if -- I know that it's a different

7   party that's presenting the next witness, which is Mr. -- I

8   think it's Hrycay.

9        MR. WAGNER:  Yeah.  Maybe wait another couple

10   minutes, and then --

11        THE COURT:  All right.

12        MR. GOLD:  Your Honor, Matthew Gold here from

13   Kleinberg Kaplan simply to advise the Court that Mr. Hrycay

14   is here and ready to go at any point --

15        THE COURT:  Okay.

16        MR. GOLD:  -- without technological problem if

17   we're ready, if that's where we go.

18        THE COURT:  That's fine.  Thanks for that, and I'm

19   sorry I mispronounced his name.

20        MR. GOLD:  You're hardly alone, Your Honor.

21        THE COURT:  Okay.

22        MR. CAHN:  Your Honor, if you want to proceed with

23   the next witness (indiscernible) intended to be.

24        THE COURT:  Well, I think we should do that.  I

25   think we will get to Mr. Cowan, unless he's, you know, in a

Page 168

1    blackout or something, but why don't we proceed with Mr.

2    Hrycay, and that's spelled H-R-Y-C-A-Y.

3              MR. CAHN:  Very well, Your Honor.  I apologize.  I

4    really don't know what happened.

5              THE COURT:  That's fine.

6              MR. CAHN:  As I say, we've been --

7              THE COURT:  That's fine.

8              So Mr. Gold, can you set up for Mr. Hrycay?

9              MR. POPOFSKY:  Yes, Your Honor.  This is Steven

10   Potoski.  I'll be handling this witness --

11             THE COURT:  Okay.

12             MR. POPOFSKY:  -- in lieu of Mr. Gold.  Good

13   afternoon.

14             THE COURT:  Good afternoon.  Now, as with the last

15   witness, I'm aware that there is a -- or at least there was

16   a motion to exclude Mr. Hrycay's testimony.  I don't know if

17   that's still being pursued.

18             MS. MONAGHAN:  No, Your Honor.  This is Maura

19   Monaghan.  We have withdrawn the motion pursuant to

20   stipulations.

21             THE COURT:  Okay.  And does that -- I'm not aware

22   of the specific stipulation.  Does it need to be laid out on

23   the record so I know what to consider and what not to

24   consider?

25             MS. MONAGHAN:  I'm happy to put it in the record.

Page 169

1    I believe it had been submitted to the Court as part of the

2    agreement with respect to the relative exhibits that came as

3    a result of the disposition of the dispute over Mr. Joseph's

4    declaration.

5              THE COURT:  Okay.  So it's that stipulation.

6              MS. MONAGHAN:  Yeah.  It's contained in that

7    stipulation.

8              THE COURT:  Very well.  All right.  Okay.  So Mr.

9    Hrycay -- and I am pronouncing it correctly now?

10             MR. HRYCAY:  Hrycay, yes.

11             THE COURT:  Hrycay.  Okay.  So Mr. Hrycay, would

12   you raise your right hand, please?  Do you swear or affirm

13   to tell the truth, the whole truth, and nothing but the

14   truth so help you God?

15             THE WITNESS:  I do.

16             THE COURT:  Okay.  Mr. Hrycay, you submitted an

17   expert report dated June 15, 2021.  Under my order

18   establishing procedures for this hearing, it's intended to

19   be your direct expert testimony.  Sitting here today on

20   August 17th, 2021, is there anything in it that you wish to

21   change?

22             THE WITNESS:  No, sir.  A little bit of time has

23   passed.  A few facts have changed, but my report stands.

24             THE COURT:  Okay.  And again, just for the court

25   reporter, it's H-R-Y-C-A-Y.  That's correct?

Page 170

```
 1                    THE WITNESS:  Yes, sir.

 2                    THE COURT:  Okay.  All right.  Does any -- well, I

 3       gather that there -- that the objection by the Side A

 4       Sackler family to the admission of Mr. Hrycay's report is

 5       withdrawn as per the stipulation.  Does anyone else object

 6       to the admission of his expert report as his direct

 7       testimony?

 8                    Okay.  I -- it's admitted then.  Does anyone want

 9       to cross examine Mr. Hrycay?

10                    MR. JOSEPH:  Yes, Your Honor.  Gregory Joseph for

11       the Raymond Sackler family.

12                    THE COURT:  Okay.  All right.  You can go ahead.

13                    MR. JOSEPH:  Thank you.

14                    CROSS EXAMINATION OF WILLIAM HRYCAY

15       BY MR. JOSEPH:

16       Q    Mr. Hrycay -- and it is Mr. Hrycay, correct?  You don't

17       have a doctorate in economics or any other discipline,

18       correct?

19       A    That's correct, sir.

20       Q    You have a BA in economics?

21       A    I have a BA in economics.  I have --

22       Q    And you have an MBA as well, correct?

23       A    That is correct.

24       Q    So is it -- is it your position that any one of the

25       tens or hundreds of thousands of people that have an MBA are
```

Page 171

1    qualified to give the opinion that you gave in this case?

2    A    My opinion is based upon --

3    Q    That's a yes or no.  Is it your position that an MBA in

4    itself is sufficient qualification to give the opinion

5    you've given in this case?

6    A    Not necessarily, no.

7    Q    So there's something about your background which

8    qualifies you to give this opinion, correct?

9    A    I believe so.

10   Q    And it's not that you've ever worked as a professional

11   wealth manager, correct?

12   A    I have not worked as a professional wealth manager.

13   No, sir.

14   Q    And it's not that you have any experience in managing

15   investment portfolios, correct?

16   A    That's correct.

17   Q    You have your report in front of you?

18   A    I will.  One moment.  I do, sir.  Thank you.

19   Q    Sure.  If you would turn to your CV, which is Exhibit

20   2.

21   A    Yes, sir.

22   Q    The first sentence under your name says Mr. Hrycay is

23   an associate director in NERA's Securities and Finance

24   Practice.  So you're an associate director.  You're not a

25   director, correct?

Page 172

1    A    Correct.

2    Q    You're not a managing director either.

3    A    No, sir.

4    Q    And then the next sentence says, "He specializes in

5    expert analysis relevant to securities litigation."  Do you

6    see that?

7    A    Yes, sir.

8    Q    Judge Furman doesn't consider you an expert in

9    securities litigation analysis, does he?

10   A    Judge Furman admitted my testimony as expert testimony.

11   Q    And then he rejected it.

12   A    He had criticism of it, sir.  Yes.

13   Q    He rejected it; did he not?

14   A    He rejected the conclusions I had.  Correct.

15   Q    In fact, the only other case in which you've testified

16   as an expert is the Atlantica Securities case in front of

17   Judge Furman last year, correct?

18   A    It was two years ago, but otherwise correct.  Yes.

19   Q    And you testified for the plaintiff on loss causation,

20   right?

21   A    Loss causation and damages, sir.

22   Q    But he rejected your opinion on loss causation because

23   you did not disaggregate losses caused by non-fraud factors,

24   right?

25   A    That was his opinion.  Yes, sir.

Page 173

1   Q    And he also held that you didn't even try to identify

2   or calculate losses from other factors, correct?

3   A    That was his opinion.  Yes, sir.

4   Q    So basically, he said you failed to account for

5   multiple variables that could've caused the loss, right?

6   A    I -- yes.  I believe that's what that means.

7   Q    All right.  So I'm -- now, in this case, I'm going to

8   focus on your work here concerning the Raymond Sackler

9   family.  I believe Ms. Monaghan may have some questions

10   relating to the Mortimer Sackler family.  So do you have

11   that in mind?

12   A    I will try to bear that in mind.  Thank you.

13   Q    All right.  Please turn to page 16 -- excuse me -- Page

14   9, Paragraph 16 of your report.

15   A    Yes, sir.

16   Q    And one thing you did as part of your assignment in

17   this case was to take the net asset statement of the Raymond

18   Sackler family as of September 30, 2020 and estimate what

19   those assets would be six months later, as of March 31,

20   2021, correct?

21   A    That's correct.

22   Q    And if we look at Page 13 and Exhibit 6 of your report,

23   you estimated -- and I'm looking at the third column from

24   the right, which says "value as of 9-30-2020" at the bottom.

25   It says the value, and this was a Huron reported value,

Page 174

1    correct, the $5,871,500,000?

2    A    That's correct.

3    Q    All right.  You estimated that that 5.871 billion would

4    in six months, if we look over on the far right-hand side,

5    grow to 6.544 billion, correct?

6    A    Yes, sir.

7    Q    So that's about a $600 million increase in six months

8    that you projected.

9    A    Approximately, yes.

10   Q    And after you submitted your report, Huron prepared a

11   net asset report showing the value of Side B's assets, the

12   Raymond Sackler family, as of March 31, 2021, correct?

13   A    Yes, it did.

14           MR. JOSEPH:  And Mr. Popofsky, could you please

15   put Exhibit 1922 in front of the witness?  That is one of

16   the reports that we identified for you.

17           THE COURT:  Do you have a tab number, Mr. Joseph,

18   in your booklet?

19           MR. JOSEPH:  That, I don't.  I just have an

20   exhibit.

21           THE WITNESS:  I got it.

22           THE COURT:  I think it's Tab 4.  At least, it's

23   Tab 4 in my book.

24           THE WITNESS:  Tab 6.  1922?

25           THE COURT:  All right, well, you're under

Page 175

1    different tabs; 1922 is my Tab 4, but I guess you found it.

2              THE WITNESS:  Okay, yes --

3              MR. JOSEPH:  Your Honor, the reason for the

4    difference is the Side A had already submitted some of the

5    reports to you and we were asked by your clerk not to

6    duplicate.

7              THE COURT:  Okay, that's fine.

8              MR. JOSEPH:  Okay.

9    BY MR. JOSEPH:

10   Q    So do you have Exhibit 1922?

11   A    This is the Raymond side asset report as of March 31st,

12   2021.

13   Q    Right.  Now this is the same date as of which you

14   projected that Raymond side assets would be $6.544 billion

15   in your report, correct?

16   A    That's correct.

17   Q    And if you turn to Slide 8 of Exhibit 1922.

18   A    Slide 8, yes, sir.

19   Q    All right.  That report shows how much the net assets

20   of the Raymond Sackler family grew in that six-month period,

21   correct?

22   A    It includes an estimate that -- with the assumption

23   that the IACs are constant, but yes, it says it grew by

24   $93.5 million.

25   Q    $93.5 million, not $600 billion, correct?

Page 176

```
 1   A    Correct.  This, again, is --

 2   Q    (sound drops) very much.  You've answered my question.

 3            MR. POPOFSKY:  Your Honor --

 4            MR. JOSEPH:  That's --

 5            MR. POPOFSKY:  Your Honor, I'd ask that Mr. Joseph

 6   not cut off the witness.  The witness is not keeping his

 7   voice as much as, perhaps, he could, but he is being cut

 8   off.

 9            MR. JOSEPH:  I only (sound drops) answers to my

10   questions, Your Honor.  That's all I'm trying to do and not

11   have extraneous testimony.

12            THE COURT:  Okay, well, Mr. Joseph, just wait

13   until the answer is all the way out, though.

14            MR. JOSEPH:  All right, thank you, (sound drops).

15   BY MR. JOSEPH:

16   Q    So in that six-month period of the abou8t $600 million,

17   you were off by about $250 million in marketable securities

18   and hedge funds, right?

19   A    And of that amount, I would note that approximately --

20   Q    Answer yes or now.

21   A    I --

22            MR. POPOFSKY:  Your Honor, I would ask again that

23   witness not be cut off.

24            THE COURT:  Well, no, it was a yes or no question.

25   BY MR. JOSEPH:
```

Page 177

1   A    The aggregate balance difference is approximately off

2   by the amount you stated, yes, sir.

3   Q    A quarter billion dollars.

4   A    Yes, sir.

5   Q    Okay.  And it was a quarter billion lower than you

6   projected for that six-month period?

7   A    That's correct.

8   Q    So you would agree with me, would you not, that in

9   trying to project investment returns, the longer into the

10   future that you forecast, the more difficult it is to

11   predict the outcome, correct?

12   A    I would say that the longer -- over the longer the time

13   period is, the more variability there will be around any

14   sort of mean estimate.  That's correct.

15   Q    Okay.  So, once you took the assets to 2021 at this

16   $600 million higher number, you then projected it out for

17   another nine years, correct?

18   A    That's correct, sir.

19   Q    And you did that by applying growth rates to various

20   asset categories and accounting for settlement payments,

21   correct?

22   A    Yes, sir.

23   Q    And you pulled the growth rates from BlackRock's

24   publicly available website, correct?

25   A    Yes, sir.

Page 178

1    Q    And you tried to match the categories on the publicly

2    available website to the categories in the Huron net asset

3    report, correct?

4    A    Yes, sir.

5    Q    And that's really a function of multiplication, right,

6    of the asset categories by the growth rates over that

7    period.  Is that fair?

8    A    Once you understand the growth rate or have an estimate

9    for the growth rate, obtaining the net asset value every

10   year is multiplication.  Yes, sir.

11   Q    And you didn't actually have information or even access

12   to information showing what the portfolio holdings were on

13   an asset-by-asset basis, right?

14   A    No, I did not have the individual asset holdings.

15   Q    And you had general categories, correct?

16   A    Sorry, I -- the audio failed a little bit.

17   Q    I'm sorry -- did you hear my question?

18          MR. POPOFSKY:  NO, he did not hear -- we did not

19   hear the question.

20          MR. JOSEPH:  Okay.

21   BY MR. JOSEPH:

22   Q    All you had were general asset categories.  You didn't

23   have an asset-by-asset breakdown, correct?

24   A    That's correct.  Huron report reported in these general

25   asset categories.

Page 179

1    Q    So now, to estimate the return on marketable securities

2    and hedge funds, you assumed a 60/40 weighting, an average

3    return on the largest, on U.S. large cap equities, correct,

4    and aggregate U.S. bonds?  It's -- if you want to look at

5    your report, it's Exhibit 8 on Page 16.

6    A    Thank you.

7    Q    The third item down under assets, it says, "Marketable

8    securities and hedge funds, 60/40 U.S. large cap equities

9    and U.S. aggregate bonds."

10   A    Yes, sir.

11   Q    And you have no idea whether the marketable securities

12   and hedge funds were actually at a 60/40 weighting, correct?

13   A    No, I don't know whether there was a 60/40 weighting

14   between equities and bonds in this asset class.

15   Q    Weighting could be significantly different than you

16   assume, right?

17   A    It could be.

18   Q    And if the weighting were debt heavy, that would lower

19   the expected returns, would it not?

20   A    If there were more than 40 percent debt, that would

21   reduce the expected return.  Yes, sir.

22   Q    And you did no sensitivity analysis to determine how

23   rates of returns would change based on different assumptions

24   of asset composition, did you?

25   A    No, sir.  I reported a midpoint asset.

Page 180

1    Q    I'm sorry?

2    A    I reported a midpoint asset of expected returns.

3             MR. POPOFSKY:  Yeah, if you could keep your voice

4    up a little bit.

5             THE WITNESS:  I will try.

6             MR. JOSEPH:  That's fine.  We're all dealing with

7    technical issues.  At least Mr. Hrycay was able to sign on,

8    so we're doing well.

9    BY MR. JOSEPH:

10   Q    In projecting the Raymond Sackler family's assets,

11   you've assumed that the asset allocation would remain static

12   over nine years, correct?

13   A    Yes, sir.

14   Q    And you know, from the six-month report from Huron,

15   that that's not what's happening, correct?

16   A    I know that there were some changes to asset categories

17   from September 30th to March 31st, yes.

18   Q    Let's take a look at Page 9 of your report, Exhibit 4.

19   That sets out Side B's assets as of September 30, 2020,

20   correct?  Under assets, it says cash and cash equivalents,

21   $444 million.

22   A    Yes, sir.

23   Q    Now, if you look at Exhibit 1922, which is the updated

24   report that I think you also have in front of you now, and

25   turn to Slide 10 of that.

Page 181

1    A      Slide 10.  Yes, sir.

2    Q      All right.  If you take a look at Bullet 3, it says the

3    estimated value of cash and cash equivalents as of March 31,

4    2021 total $682 million or $237.3 million more than the

5    value presented in the updated net asset report.  You see

6    that?

7    A      Yes, sir.

8    Q      So instead of remaining static, it increased by about a

9    third, right?

10   A      Yes, sir.

11   Q      And the reason it went up by that amount was because of

12   redemption from private equity funds, right?

13   A      That's what it says.  Yes, sir.

14   Q      Okay.  So, the same bullet point, so you know that, and

15   that was perfectly predictable that private equity funds or

16   hedge funds are going to be redeeming over time, correct?

17   A      I don't know whether that's predictable or not, sir.

18   Q      Is it your understanding with private equity funds, the

19   money stays in there forever?

20   A      No.  My understanding is that private equity funds will

21   redeem at some point.  It's not predictable when or whether

22   they will be reinvested.

23   Q      But you took the assumption that everything would

24   remain the same for nine years, correct?

25   A      Yes, sir.

Page 182

```
 1    Q    And you did no sensitivity analysis to determine

 2    changes in asset allocation because redemptions or anything

 3    else would affect asset growth through 2030, correct?

 4    A    No, sir.

 5    Q    It -- no, you didn't, and that is correct?

 6    A    I did not make any sensitivity analysis around asset

 7    allocation.

 8    Q    And that's because you had no idea how the Sacklers

 9    would change their assets over nine years, correct?

10    A    Essentially, yes, but it was -- the simplest assumption

11    was to assume that the asset allocation would remain

12    basically the same as it was as of the two points for which

13    I had their information on their portfolio.

14    Q    Now, to calculate the future value of the IACs for the

15    Raymond Sackler family, you assumed they were worth $4.5

16    billion as of September 30, 2020, correct?

17    A    No, that's not quite correct, sir.

18    Q    All right.  Would you take a look -- do you have your

19    deposition in front of you?

20    A    (indiscernible).

21    Q    You remember when your deposition was taken by Mr. Lees

22    of Milbank?

23    A    Yes, I do.  I remember the deposition.

24    Q    That was July 29th.  You were sworn to tell the truth,

25    correct?
```

Page 183

```
 1    A    That's correct, sir.

 2    Q    And you did tell the truth, correct?

 3    A    As best I could.  Yes, sir.

 4    Q    Okay.  If you turn to Page 98, Line 5.  Do you have

 5    that in front of you?

 6    A    Page 98, you said?

 7    Q    Yes, Page 98, Line 5.  Are you there?

 8    A    Yes, sir.

 9    Q    And the question was, "Just to clarify, your report

10    assumed that the IACs were worth four-and-a-half billion

11    dollars as of June 15, 2020 -- sorry, '21."  Answer:  "No,

12    it assumed they were worth $4.5 billion as of the dates of

13    the statements."  Those are the Huron statements, correct?

14    A    I don't -- yes, if you look right above that, I stated

15    that there was further discussion.  We assumed that the

16    point in the future that the IACs would achieve $4.5

17    billion.

18    Q    What --

19    A    (indiscernible).

20    Q    -- future value --

21    A    (indiscernible), sir.

22    Q    Okay.  Well, let's go, then, Page 172, Line 25 of your

23    transcript.

24    A    Page 27?

25    Q    Page 172.
```

Page 184

1    A    One, seven, two.  Thank you.

2    Q    Sure.  And see Line 25 there?

3    A    Yes, sir.

4    Q    And you said, "I assumed the IACs were worth $4.5

5    billion as of September 30, 2020."  You testified to that,

6    correct?

7    A    Yes, sir.  I've also stated in other parts of the

8    transcript that I assumed that the estimate was performed as

9    of September 2019 and that I'm growing it based on the

10   change in information between those two dates.

11   Q    Well, that value didn't --

12   A    And I apologize if I misspoke in this particular

13   segment.

14   Q    I see.  In fact, you grew the $4.5 billion from

15   September 2020 through 2027, correct?

16   A    Correct, sir.

17   Q    And to calculate the growth, you applied a 7.4 percent

18   annual growth rate, correct --

19            THE COURT:  Can you mute, Mr. Rothstein, please?

20   Is he muted?  Okay.  Sorry, Mr. Joseph.  Go ahead.

21            MR. JOSEPH:  No, Your Honor.

22   BY MR. JOSEPH:

23   Q    To calculate the growth, you took $4.5 billion as of

24   September 2020 and you applied a 7.4 percent annual return

25   rate, correct?

Page 185

1    A    Correct.  Right -- sorry, I need to qualify that.  I

2    grew it at different rate from 20 -- from the original date

3    of the Huron report to March 2021, and then grew it at, I

4    think, the 7.4 percent growth rate, commensurate with

5    (indiscernible) U.S. equities.

6    Q    Okay, from -- thank you.  So, from September -- from

7    2021 to 2030, you grew it by 7.4 percent per year?

8    A    March 31st, 2021.  I think you said September.

9            MR. POPOFSKY:  Objection.  Not to 2030.

10           MR. JOSEPH:  Thank you for the correct.

11   BY MR. JOSEPH:

12   Q    Your assumption that the IACs were worth $4.5 billion

13   as of September 2020 was not based on any independent

14   valuation of the IACs, correct?

15   A    My assumption of the value, that there was an estimate

16   that the -- as of 2019, there was an estimate that the IACs

17   would be sold for $4.5 billion at that time.  It was not

18   based on my independent assessment.  No, sir.

19   Q    At that time or in the future?

20   A    The estimate existed as of 2019 and it estimated that

21   the sales would occur in the future.

22   Q    All right, so you took a value as of 2019 or 2020 which

23   was stated to be a future sale value, and you grew it from

24   2019 and 2020, correct?

25   A    Yes, and I did --

Page 186

1  Q    And --

2  A    (indiscernible).

3  Q    Sorry?

4  A    Yes, because of the change in market conditions.

5  Q    The Raymond side net asset report, take a look at

6  Exhibit 479.  Now, that's the net asset report date March

7  (indiscernible) 2021.

8          MR. POPOFSKY:  If you gave us tab numbers based on

9  what you sent, it would move it quicker.  We can find

10  anything otherwise, but --

11          MR. JOSEPH:  Sure.

12          MR. POPOFSKY:  (indiscernible) slow down.

13          MR. JOSEPH:  All right.  For you, it's Tab 2.

14  Your Honor, I don't have the shorter version --

15          THE COURT:  That's fine.  I have it.

16          MR. JOSEPH:  Okay.

17          MR. POPOFSKY:  To take this book (indiscernible).

18  See of you can do better with the numbers.

19  BY MR. JOSEPH:

20  Q    Do you have it in front of you, sir?

21  A    And what page?

22  Q    Go to Slide 21, please.

23  A    I'm there.

24  Q    All right, the top bullet says, "The IACs have retained

25  an investment banker to market the businesses for sale.  The

Page 187

1    value of the IACs is currently carried on the balance sheets

2    at their book values.  No fair market valuation for the IACs

3    currently exists.  An independent fair market value of the

4    IACs is outside the scope of this updated net asset report."

5    So, you knew that Huron was saying there was no fair market

6    value for the IACs, as of the date of the report, which was

7    the 2020 value that you grew at 7.4 percent per year,

8    correct?

9    A    I understand that the Huron report said there's no fair

10   market valuation for the IACs currently.

11   Q    And if you look at the next bullet, it says, "For

12   purpose of this updated net asset report and to illustrate

13   how the proceeds from the sale of the IACs might potentially

14   flow to the individual initial covered Sackler persons, a

15   hypothetical growth sale value for all of the IACs of $4.5

16   billion," and it defines that as the hypothetic IAC value

17   was chosen and the value was allocated among the IACs,

18   correct?

19   A    You read that correctly.  Yes, sir.

20   Q    And the hypothetical value for the future sale is the

21   one that you grew at 7.4 percent per year, correct?

22   A    That's correct, sir, yes.

23   Q    And it also said in the next bullet that the

24   hypothetical IAC value as of September 20 -- or September

25   30, 2020, and the allocation of value is unchanged from the

Page 188

```
1    January 15, 2020 net asset report.  So, you knew that Huron

2    wasn't growing that value, the future sale value, correct?

3    A     That's what it says, yes.

4    Q     You have no reason to dispute that.

5    A     I have no reason to dispute that's what they said.

6    Q     Well, in fact, if you look at their prior -- I'm sorry,

7    did I cut you off?

8    A     If that's what you mean by "that," that they said that,

9    yes.

10   Q     In fact, if you go back to -- pull up Exhibit 1916,

11   which in your (indiscernible) is Tab 5 --

12   A     Yes, sir.

13   Q     And you go to Slide 13.

14   A     Yes, sir.

15   Q     The top bullets say pretty much the same as they said

16   in 2020, which is, there is no fair market valuation and

17   this is a hypothetical IAC value, correct?  (indiscernible)

18   into the record, if you like --

19   A     Yes.

20   Q     It's no --

21   A     That's says -- it says the same thing.

22   Q     Okay.  And you understood that this value, this

23   hypothetical value was a future value based on a future sale

24   at some point of the IACs?

25   A     I understood that.  Yes, sir.
```

Page 189

1   Q    So knowing that the $4.5 billion hypothetical value was

2   a future value, you grew it as if it were a present fair

3   market value throughout the period, correct?

4   A    I grew -- yes, as if people would respond to the change

5   in market information by changing prices.  Yes, sir.

6   Q    You never asked the parties that retained you what due

7   diligence was being done on the IACs, did you?

8   A    Not specifically, no, sir.

9   Q    Did you ask them generally?

10  A    I asked them for best information available on the

11  IACs.

12  Q    You don't know whether, based on the due diligence

13  that's been done on the IACs, they believe the IACs would be

14  worth $4.5 billion when they're sold in the future, correct?

15  A    I have not seen any specific other valuations of the

16  IACs.  No, sir.

17  Q    And you haven't asked the states that retained you?

18  There were 25 states that originally retained you, correct?

19  A    I asked for valuation information.

20  Q    I see.  And you weren't provided it, but you didn't ask

21  for due diligence information?

22          MR. POPOFSKY:  Objection.  Compound question.

23          THE COURT:  Sustained.

24          MR. JOSEPH:  I'll ask it -- that's fair.

25  BY MR. JOSEPH:

Page 190

```
 1   Q     You didn't ask for due diligence information on the

 2   IACs to assist you in your valuation, correct?

 3   A     I did not ask for due diligence information.  No, sir.

 4   Q     The IACs are the largest asset category in your

 5   estimate for the Raymond Sackler family's assets as of 2030,

 6   correct?

 7   A     I believe that's correct.  Yes, sir.

 8   Q     And of all the growth rates that you applied to any

 9   asset category, you used the largest growth rate for that

10   asset category, correct?

11   A     That is correct.

12   Q     And you did no sensitivity analysis to determine how

13   the Sacklers' net worth in 2030 would change based on

14   different possible outcomes on the sale of the IACs,

15   correct?

16   A     I did not do a sensitivity analysis on that.  no, sir.

17   Q     Now, you know that -- I'm going to call them Side A and

18   Side B.  Are you familiar with that terminology?

19   A     Yes, sir.

20   Q     Even though the Side A and Side B each own 50 percent

21   of the IACs, correct?

22   A     That's my understanding.  Yes, sir.

23   Q     But your valuation of the IACs for Side A is higher

24   than your valuation of the IACs for Side B in 2030, correct?

25   A     Yes, sir.
```

Page 191

```
 1   Q    And one reason for that, one reason for that is that
 2   you apply your growth rate to the hypothetical $4.5 billion
 3   starting in 2019 for Side A but only in 2020 did you start
 4   it for Side B, correct?
 5   A    That is correct.  Yes, sir.
 6   Q    But in fact, you had a 2019 $4.5 billion valuation for
 7   Side B also, didn't you?  You saw it hadn't changed by 2021
 8   -- or by 2019.
 9   A    I saw it had not changed.  That's correct.  Yes, sir.
10   Q    Okay, so you grew it on Side A and you didn't grow it
11   on Side B, right?
12   A    Yes, sir.
13   Q    For that year.  Okay.  Now, there's another reason why
14   these values are different.  Isn't it true you omitted about
15   $300 million in IAC value owned by Side B?
16   A    I don't believe I did.
17   Q    You didn't.  Okay, well, let's take a look at the --
18   excuse me -- Exhibits 3 and 4 of your report.  Turn to
19   Exhibit 3 first, please, on Page 8, the last row under
20   assets.
21   A    Yes, sir.
22   Q    So that shows the starting value of the IACs on the
23   Mortimer side is $2.248 billion, correct?
24   A    Correct, sir.
25   Q    Now, then, look at the next page, Exhibit 4, the fourth
```

Page 192

1    row under assets.  It shows the starting value of the IACs

2    on the Raymond side is $1.9 billion, correct?

3    A    Yes, sir.

4    Q    Even though you know they both own 50 percent, correct?

5    A    I believe these are the numbers from the Huron reports.

6    Q    But did you capture all of the numbers in the Huron

7    report?  You're missing about $313 million, correct?

8    A    There's a $300 million difference between these

9    numbers.

10   Q    All right.  Do you have Exhibit 1916 in front of you?

11   That's Tab 5.  We were just talking about it.

12   A    Yes, sir.

13   Q    Go to 15 -- slide 15.

14   A    Yes, sir.

15   Q    The third bullet point, the one that says, "Because the

16   Raymond and Mortimer sides of the Sackler family each

17   directly or indirectly own 50 percent."  Are you with me

18   there?

19   A    Yes, sir.

20   Q    Then the first bullet says, "The $4.5 million

21   hypothetical value," -- (indiscernible) million of the total

22   value are owned equally by the Raymond and the Mortimer

23   sides of the family, correct?

24   A    Yes, sir.

25   Q    And the number you have for the Mortimer side is half

Page 193

1    of that, correct, the $2.248 million?

2    A    Yes, sir.

3    Q    But the $1.934 billion you have for the Raymond side is

4    not half of that, right?

5    A    Yes, sir.

6    Q    And if you look at the next sub-bullet point on Exhibit

7    1916, it says, "$1.934 million of the Raymond side's

8    interest is held by initial covered (sound drops) persons

9    and the remaining $313 million is held by non-initial

10   covered Sackler persons."  That is the difference that you

11   missed, correct?

12   A    That appears correct.

13   Q    Okay.  Let's go to the BlackRock data that you used to

14   grow these various asset categories.  You pulled that off a

15   public website, right?

16   A    Yes, sir.

17   Q    You haven't worked at BlackRock, right?

18   A    No, sir.

19   Q    You weren't involved in devising the methodology that

20   underlies that website growth rate set that they've got up

21   there, correct?

22   A    No, sir.

23   Q    And you don't have access to that methodology to check,

24   right?

25   A    They describe the methodology they use, but not the

Page 194

1    exact calculations.

2    Q    You don't have access to the model or its algorithms

3    that go into forming the return figures, right?

4    A    No, I don't have BlackRock's proprietary models.

5    Q    So if you were asked to recreate the asset returns that

6    BlackRock did, you couldn't do them?

7    A    No, sir.

8    Q    And you have no way to test the model that BlackRock

9    used to see if its assumptions and calculations were proper,

10   right?

11   A    I can evaluate the discussion they have on their

12   website about how they -- their methodology and some of the

13   assumptions they used and evaluate it relative to general

14   principles of corporate (indiscernible), yields in the

15   market.  So, there are ways to test the (indiscernible) of

16   it.

17   Q    What's the yield in the market in the year 2027?

18   A    Well --

19   Q    You don't know that, because it hasn't happened yet,

20   right?

21   A    Correct.  I --

22   Q    There's no way to know whether the plan --

23         MR. POPOFSKY:  Objection (indiscernible).

24   BY MR. JOSEPH:

25   Q    Please, continue.

Page 195

1    A    I can compare it to what yields (indiscernible) yields

2    are now, and so if someone is invested in a ten-year bond,

3    that's the -- effectively, they're very similar to the yield

4    they're going to receive over the next ten years.

5    Q    I see.  So, if you'd done this in 2006 and projected up

6    for nine years, how would your -- and you relied on

7    something like the BlackRock growth rates, how would that

8    projection have come out?

9    A    In 2006?

10   Q    Yeah, two years before the meltdown.  How would that

11   have worked?  You have no idea what's happening in the

12   future, right?

13   A    No, I don't know what's happening in the future.  The

14   markets went down during that time, then they rebounded

15   during that time.  So, in ten years, I don't know if they

16   would've been a net up or down from the 2006 projection.

17   Q    You said you read what BlackRock said about its growth

18   rates.  You actually misused the BlackRock data based on

19   what BlackRock said, right?

20   A    No.

21   Q    I'm going to ask you to look at Exhibit 2548, which is

22   Tab 9 in your binder.  It is Exhibit 9 at your deposition.

23   A    Yes.

24   Q    Do you remember -- right now, do you recognize this --

25   A    Yes

1    Q    -- as BlackRock website data that you reviewed when you

2    took those values?

3    A    Yes, sir.

4    Q    Okay.  I want to direct your attention to the bolded

5    text at the bottom of the first page.  Are you with me?

6    A    I see what you're -- I see the bolded text.  Yes, sir.

7    Q    And it says, "This information is not intended as a

8    recommendation to invest in any particular asset class or a

9    strategy or as a promise or even estimate of future

10   performance."  You saw that, correct?

11   A    I did see that, yes.

12   Q    And then you used the BlackRock data to estimate future

13   performance, correct?

14   A    Yes, and I've also seen things like the table right

15   above it, which says, "Asset return expectations," and the

16   bottom of the X axis of that same graph which says,

17   "Expected annualized return."  And then, I saw things two

18   pages later, Page 5 of 8, which says that what they're

19   providing is return expectations, geometric, arithmetic.  I

20   also downloaded the data.  When you download the data in

21   cell form, it labels the column headers as expected returns.

22   So yes, I did see --

23   Q    (indiscernible).

24   A    -- where they expressed concern that they don't want

25   people to take these as recommendations, but I've also seen

Page 197

1    that BlackRock published that these were fair estimates of

2    market expectations and provided that information to the

3    investing public.

4    Q    So you disregarded, based on your review of the

5    website, the warning on the website that the information was

6    not an estimate of future performance and not to be used for

7    that.  Is that right?

8    A    It doesn't say that it's not to be used as an estimate

9    of future performance.  It just says that in the context of

10   stating that they're not making recommendation or a promise

11   about future asset performance, that it's not an estimate,

12   but I've also seen numerous other places where the exact

13   same number is described as estimated.

14   Q    Since you've never worked at BlackRock, you don't know

15   that BlackRock would even use these growth rates, if it had

16   the same assignment that you had, correct?

17   A    I don't know what they would do with the same

18   assignment.  I know that they provide these estimates to the

19   investing public and investment managers.

20   Q    So I just want to understand.  After Judge Furman

21   rejected your opinion in the only case you've testified in,

22   for failing to account for multiple variables, what you did

23   here was to take general categories of assets at a point in

24   time and project them out for a decade, right?

25   A    I used a ten-year expected asset projection and used

1    that to apply expected performance over the -- a nine-year

2    period.

3    Q    And assumed the assets would remain allocated the same

4    throughout that nine-year period, even though you knew they

5    -- strike that.  You just assumed that they would remain

6    allocated the same throughout that nine-year period,

7    correct?

8    A    I assumed that the asset allocation would remain the

9    same, yes.

10   Q    And you used a set of growth rates you can't validate

11   the methodology of?

12   A    I used a set of growth rates which -- for which the

13   assumptions are explained in, you know, a reasonable level

14   of detail by one of the leading asset managers in the world.

15   Q    I see.  So, you're just relying on BlackRock's

16   reputation?

17   A    I'm relying on their reputation in the market.  I'm

18   relying upon their description of the process that they went

19   through in order to derive these estimates.  I'm relying on

20   the fact that they said that they are publishing this

21   information to help investors and portfolio managers

22   navigate capital markets.  Yes, sir.

23   Q    And you can't validate -- you have no access to the

24   algorithms that go into forming those return figures

25   (indiscernible).

1    A    No, I don't have the algorithms that calculate the

2    returns figures.  No, sir.

3              MR. JOSEPH:  Okay.  All right, I don't have any

4    more questions of this witness, Your Honor.

5              THE COURT:  Okay.  Any other cross?

6              MS. MONAGHAN:   Very briefly, Your Honor.

7                CROSS EXAMINATION OF WILLIAM HRYCAY

8    BY MS. MONAGHAN:

9    Q    Mr. Hrycay, is it correct that your calculations assume

10   that none of the IACs were sold before 2027?

11   A    Yes.  I assumed that the IACs would be sold in 2027.

12   Q    And so if any of the IACs were sold before 2027, your

13   calculations would not reflect that.  Is that correct?

14   A    No, the calculations wouldn't reflect that.

15   Q    Did you review the settlement agreement terms with

16   respect to the IAC sales and what the obligations are of the

17   Sackler families and the trusts that own the IACs?

18   A    As represented in the June 3rd statement?  Is that what

19   you have in mind?

20   Q    At all.

21   A    In the -- I reviewed the June 3rd statement, yes, sir -

22   - yes, ma'am.

23   Q    So under the settlement agreement, are the Sackler

24   families entitled to sell the IACs, retain the proceeds,

25   reinvest them, keep the returns, and only then pay those

Page 200

1    proceeds over to the settlement process?

2    A    My understanding is the IACs were expected to be sold

3    over time and deposited into a account.  I forgot the title

4    of the account.

5    Q    So the answer is no, correct?  They are not permitted

6    to earn returns after the IACs are sold, whenever they are

7    sold, between now and 2027, correct?

8    A    That may be correct.

9    Q    And your model takes no account of that, correct?

10   A    The model assumes that they'd be sold in 2027.

11   Q    Mr. Hrycay, Mr. Joseph asked you some questions about

12   the fact that there's been a diligence process undertaken by

13   groups of creditors with respect to the value of the IACs.

14   Do you recall that?

15   A    He did.

16   Q    And those creditor groups include the creditors who

17   retained you, correct?

18   A    I don't know that for sure.  That may very well be the

19   case.

20   Q    So if the outcome of that diligence is different than

21   the values reflected in your report, would you encourage

22   those parties to disregard the diligence and rely on your

23   numbers instead?

24   A    I relied on the Huron estimates of projected sale value

25   that were -- the information that was available to me.  The

Page 201

1    settling parties or the other parties can make their own

2    decision.

3    Q    In performing your calculations, Mr. Hrycay, you

4    neglected to take account of the fees associated with the

5    investments.  Isn't that correct?  You reported gross

6    returns without taking account of fees?

7    A    I did not adjust the returns for fees, no.

8    Q    And that's true even though BlackRock cautioned that

9    those growth rates are gross of fees and that fees should be

10   taken into account; isn't that correct?

11   A    It does state that.  It also states that for these

12   sorts of asset categories which are broad based equity

13   returns, such as the S&P 500 or the MSCI World indices, that

14   these would be low or 0.15 percent, for example.

15   Q    But there are categories of assets, including those

16   within these report for which the fees would be anticipated

17   to be higher; isn't that correct?

18   A    Well, for example, if you need a specific example, we

19   can discuss it.  If we're talking about private equity, for

20   example, I didn't apply the private equity rate of return,

21   which BlackRock had at 18 percent.  I applied, again, the

22   sort of broader market rate of return, including a mix of

23   debt and equity, the 60/40 debt (indiscernible) equity.

24   Q    So even though you used the BlackRock rates, you

25   disregarded the BlackRock rates for one category of assets,

1    correct?  That's what your testimony is?

2    A    I used a more conservative assumption than the

3    BlackRock asset category would have implied.

4    Q    Mr. Hrycay, I think this is implicit in your testimony,

5    but just to confirm, you have no basis for your starting

6    number of $4.5 billion for the value, the gross value of the

7    IACs other than the Huron data; is that correct?

8    A    That's correct.

9    Q    And so if Huron disagrees that that was the current

10   market value, you have no basis independently to say that

11   was the current market value; isn't that correct?

12          MR. POPOFSKY:  Objection to current market value.

13   BY MS. MONAGHAN:

14   A    That I believe Huron was trying to estimate was -- or

15   reported that they were estimating was the value of what the

16   IACs would be sold for over time.  They maintained the same

17   number from 2019, 2020, now in to 2021, despite the fact

18   that market conditions have changed.  U.S. equity markets,

19   for example, have gone up, I think, more than 38 percent

20   during those time periods in my report, and I think it's --

21   33 percent, beg your pardon.  I think it's a more reasonable

22   assumption to say that as market conditions change, that

23   values of securities change.

24   Q    But when Huron reported the $4.5 billion, in 2019, that

25   was accurate enough for you to feel you could rely on it.

Page 203

1    And then when Huron reported the same number in 2020, on the

2    Raymond Sackler side, that was accurate enough that you felt

3    you could rely on it, and then all of a sudden in 2021, it's

4    not accurate anymore?

5    A    I have tried to reflect the fact that when you have a

6    estimate that's created in one market environment here in

7    2019, that one should update that.  It's now been more --

8    almost two years since September 2019 and I think that

9    estimates of market values of securities should reflect

10   market conditions.

11              MS. MONAGHAN:  I have no further questions, Your

12   Honor.

13              THE COURT:  Okay.  Are the IACs publicly traded?

14              THE WITNESS:  No, sir.

15              THE COURT:  So, when you're referring to market

16   conditions, are you referring to market conditions for the

17   IACs?

18              THE WITNESS:  Yeah, the market conditions in

19   general.  You know, you can think about it this way, Your

20   Honor.  Imagine someone had come up with an estimate in the

21   year 1928 for how much they expect to sell some business

22   over the course of the next five to ten years, and then 1929

23   happens and you keep seeing reports that keep coming out

24   with the same sale value year after year.  At some point,

25   you start to think it's unreasonable, because the Great

Page 204

1    Depression happened and the market crashed out right in the

2    middle of all that.

3            And we've had a little bit of that, just kind of

4    in reverse, where the market hasn't gone down by 50 percent,

5    but it has gone up by 33 percent, and to say that the amount

6    that you're going to sell these, you know, very valuable

7    assets for, is not going to change over the course of two

8    years, when market conditions are changing, doesn't seem

9    that reason able to me.  And so, I've assumed that --

10           THE COURT:  But you're looking at the general

11    world -- what market are you looking at, the general

12    worldwide market?  The U.S. public securities market?

13           THE WITNESS:  No, sir.  For the IACs, my change in

14    value is based on -- sorry, I want to get -- I want to be

15    exact for you -- MSCI World ex U.S. Index.

16           THE COURT:  I'm sorry --

17           THE WITNESS:  MSCI --

18           THE COURT:  Say that again?

19           THE WITNESS:  MSCI -- that's the Morgan -- it's

20    published by Morgan Stanley, and it's kind of like the S&P

21    500, in that it's a broad-based equity market index, except

22    it's not for the United States.  It's for the world outside

23    the United States.

24           THE COURT:  So publicly traded securities that are

25    international companies?

1                THE WITNESS:  That's correct, sir.  Yes.

2                THE COURT:  All right.  Okay.  But you don't know

3      the basis for Huron's valuation?

4                THE WITNESS:  Other than what they said, no, sir.

5                THE COURT:  Well -- and what do you think they

6      said the basis was.

7                THE WITNESS:  They --

8                MR. POPOFSKY:  I'm sorry, Your Honor, I don't

9      think he heard --

10                THE COURT:  What do you think they said the basis

11      for their valuation was?

12                THE WITNESS:  They said that it was the estimated

13      sale value based on what they think they could get in an

14      arm's length transaction as conducted over, you know, a

15      reasonable sales process.  But they didn't specify, you

16      know, is it discounted -- was it based on discounted

17      cashflow, was it based on marketable -- some sort of market

18      multiple.  They didn't say specifically in any of their

19      reports that I've seen.

20                MR. POPOFSKY:  (indiscernible).

21                THE COURT:  And that valuation assumed a sale in

22      the future, right?

23                THE WITNESS:  Yes.

24                THE COURT:  Which assumed, potentially, the

25      increase in market rates or the decrease in market rates?

1          MR. POPOFSKY:  If you're not hearing me, Judge --

2          THE COURT:  (indiscernible) say it again --

3          MR. POPOFSKY:  (indiscernible).

4          THE COURT:  So --

5          THE WITNESS:  (indiscernible) say it?

6          THE COURT:  That assumption of Huron's, i.e., they

7    were assuming a sale, it was a sale in the future, right?

8          THE WITNESS:  They were assuming a sale in the

9    future.  Yes, Your Honor.

10         THE COURT:  Okay.

11         THE WITNESS:  But the same (indiscernible) --

12         THE COURT:  So, in assuming a sale in the future,

13   do you take into account assumptions as to growth on the one

14   hand and decline on the other?

15         THE WITNESS:  It's not clear that they did that.

16   It's -- all I know is it was an estimate that existed as of

17   September 2019.

18         THE COURT:  Okay.

19         THE WITNESS:  And that market conditions changed

20   after --

21         THE COURT:  Well, but if you don't know the basis

22   upon which they projected the sale value in the future, how

23   do you know whether they took in account market changes or

24   not?

25         THE WITNESS:  It's possible that they did.  It's

1    possible that they anticipated that, you know, markets were

2    going to do very well over the next two years, but given

3    that the fact that these are sale expectations that were

4    formed in 2019, it seems more reasonable to me that one

5    should assume that when market conditions changes, the

6    amount you expect to sell an asset for changes.

7              THE COURT:  But as your example showed, that could

8    change overnight, as happened in October of 1929, right?

9              THE WITNESS:  It certainly could.  Yes, sir.

10             THE COURT:  Okay.  All right.

11             THE WITNESS:  And that's what I was trying to

12   account for, the fact that it had changed to the up side.

13             THE COURT:  Well, but that's as of today, you're

14   assuming.  In fact, you assumed it during a period when, I

15   guess -- I guess, you didn't assume it during a period where

16   it was growing, right -- the market was growing?  There was

17   a period where you didn't assume change while the market was

18   growing.

19             THE WITNESS:  So, for the -- yes, for the Raymond

20   side asset, because their statement was September 2020, I

21   started it at September 2020, but that would -- perhaps it

22   would've been more consistent to start both of them in

23   September 2019 and account for the market changes between

24   those two dates.  I didn't do that.  That would result in a

25   higher value than I have, but I did keep the Raymond side

Page 208

```
 1   value at the 2020 value.

 2            THE COURT:  Okay, thank you.  I don't --

 3            THE WITNESS:  Thank you.

 4            THE COURT:  -- questions on that line of

 5   questioning that I had?  No?  Any redirect?

 6            MR. POPOFSKY:  Yes.  Few minutes of redirect, Your

 7   Honor.

 8            THE COURT:  Okay.

 9            REDIRECT EXAMINATION OF WILLIAM HRYCAY

10   BY MR. POPOFSKY:

11   Q    I'd ask you to turn to the same Joint Exhibit 1914,

12   which was Tab 4 of Side B's binder, and look at Paragraph 29

13   of Mr. Martin's report, please.

14   A    Yes, sir.

15   Q    Could you read the first three sentences of Paragraph

16   29 from Mr. Martin please?

17   A    "Although I express no opinion with respect to the

18   value of any specific asset, I believe that with the

19   adjustments made, the net assets report, updated net assets

20   report, and March 31st, 2021 net assets report represent a

21   reasonable approach to approximate the net asset values of

22   the Raymond side ICSPs.  I further believe that it is

23   reasonable to use $4.5 billion as an illustrative value for

24   the estimated value of the IACs in lieu of the balance sheet

25   value because that was the value assigned to the IACs in
```

Page 209

1     connection with the proposed settlement framework.  My

2     understanding of the 4.5 illustrative value was arrived at

3     assuming an orderly sale of the 100 percent of the interests

4     of the IACs."

5     Q    This particular version of Mr. Martin's report was

6     submitted in July of 2021, but when you were preparing your

7     report in June, had you read language like this in prior

8     reports from Mr. Martin?

9     A    Yes.  The previous reports from Mr. Martin contained

10    the same or very similar language.

11    Q    You saw previously language that said it is reasonable

12    to use $4.5 billion?

13    A    Yes.

14    Q    On cross examination, counsel discussed with you

15    certain change to additional assumptions.  One was taken

16    into account fees.  It was pointed out that you didn't take

17    into account fees in your report.  Can you quantify,

18    roughly, for the Court the effect of that factor on your

19    $14.5 billion estimate?

20    A    I -- sure.  The four-point -- if you (indiscernible)

21    fees from the same source material, from BlackRock,

22    BlackRock estimates that fees for these kinds of assets, the

23    kinds of rates of return I was applying, which were the

24    fraud market indices that you can get from an index fund,

25    for example, or an ETF, would cost 0.15 to, believe it was

Page 210

1    0.4 percent.  That wouldn't apply to all the asset

2    categories.  It doesn't apply to residential real estate,

3    for example.  It just applies to some of these broader

4    market measures.  If you apply this discount -- if you

5    subtract a 1.5 -- I'm sorry, 0.15 to 0.45 fee, annual fee,

6    you would get to at least some of the asset categories, you

7    might get a reduction of up to 1 percent on the total asset

8    value for 2030.

9    Q    And what is that -- what does that do to $14.5 billion?

10   A    That would roughly reduce it by about $140 million, at

11   1 percent.  If you were to say 2 percent, that would be $280

12   million or $290 million.

13   Q    Down to $14.1 or $14.2 billion?

14   A    That sounds right.

15   Q    And same question with regards to IAC sales.  You were

16   asked on cross examination about potentially different

17   timing on the sales of the IACs from the time you had

18   assumed in your report.  Can you quantify roughly the effect

19   on the $14.5 million estimate if the IACs are sold at

20   earlier times?

21   A    It would depend a lot on the type of -- the timing of

22   the assumptions, when they're sold, how much they're sold

23   for, but roughly speaking, it would have some impact.  It

24   might have a -- let's say a 5 percent impact.  You have to

25   bear in mind that if there's money -- if the IACs are being

Page 211

1    sold and those proceeds are being used to fund settlement

2    payments at earlier dates, then what you would see -- a

3    couple things.  One, you'd see a reduction in the tax

4    obligation that goes with that, that I billed up as a

5    liability in these estimates as well.  And then the other

6    thing you would see is that other funds that I'm currently

7    using to make some of the other payments, would be free to

8    be invested.  So, they could keep money in things like a --

9    their marketable securities fund, for example, and continue

10   to earn, you know, 5 percent on that.  So, the difference

11   would not be maybe as big as maybe you would expect.

12   Q    When I asked you to quantify and you said maybe 5

13   percent, can you put a dollar figure on that?  How does that

14   affect $14.5 billion estimate?

15   A    The 5 percent would be approximately -- I believe

16   that's about $750 million.

17   Q    That would take your -- the midpoint of your estimate

18   down into the high $13 billions; is that right?

19   A    Somewhere in there.  Yes, sir.

20   Q    In your report, Paragraph 3 of your report says that

21   you were asked to estimate the expected net value of the

22   Sacklers' assets over the next ten years, and Paragraph 10-A

23   says, "As of 2030, after the propose payments, the expected

24   net value of the Sackler assets would be $14.574 billion."

25   Mr. Hrycay, why did you not include bands of uncertainty or

Page 212

1    sensitivity analyses in that conclusion?

2    A    A couple of reasons.  One, this is what I was asked to

3    do.  It was my assignment from the attorney who hired me.

4    They asked me to estimate an expected value.  Second is

5    that, you know, I understand that this is a sophisticated

6    forum, that what I provided the Court is a midpoint

7    estimate.  I think that sophisticated users of that

8    information will understand that it's not an exact

9    prediction, that it could be lower, it could be higher.  But

10   what we have and what I've given the Court is a midpoint

11   estimate.

12   Q    Is it common to do sensitivity analyses in connection

13   with financial projections?

14   A    Sure.  sometimes, you see sensitivity analyses to the

15   upside and to the down side.  Also, common not to do

16   financial -- it's also common not to do sensitivity analyses

17   to the up side or down side.  For example, the -- there's a

18   financial forecast for Purdue, the company, and it's part of

19   the reorganization plan, how much revenue, costs you might

20   see.  This is in one of the appendices for the June 3rd

21   settlement agreement.  And -- settlement proposal.  And

22   there's no -- there's not an upper bound or lower bound.

23   It's a forecast.  It's a single-point forecast.

24   Q    And is it common to use a single-point forecast also in

25   financial projections?

Page 213

1    A    Yes, it is.

2    Q    Would the assumptions you employed in your report, were

3    they aggressive?  Were they neutral?  Were they

4    conservative?

5    A    In several places, I think I employed conservative

6    assumptions.  We discussed before the private equity

7    assumptions with the Raymond side of the family has one of

8    their assets listed as private equity.  The most natural

9    matching category in -- among the BlackRock categories was

10   called private equity and they had 18 percent annual growth

11   rate for that, more than 18 percent.  They had some

12   qualifications around that.

13        They said it was based on limited information, mostly

14   that they know from the BlackRock universe of investing, and

15   therefore, I thought it was more reasonable, more

16   conservative to employ a rate of return that reflected a

17   broader asset mix, and that being the 60/40 equity/debt

18   split that we discussed earlier and so I ended up using a 5

19   percent growth rate rather than 18 percent growth rate for

20   that category of assets which I think was about $1.6 billion

21   as of -- in the Huron report.  Yes, $1.66 billion.  So that

22   was one of the conservative assumptions.

23        Using the 60/40 asset split overall in many of these

24   categories, is conservative for a high net worth individual;

25   60/40 is -- it's kind of a rule of thumb that you've seen in

1    investment management. Keep 60 percent of your assets in

2    debt and 40 percent -- I'm sorry, 60 percent in equity, 40

3    percent debt, and, you know, it's a rule of thumb that's

4    used for people who are -- need that money to pay the

5    mortgage and if the market goes down 20 percent, they can't

6    -- you know, it's going to impact them, but they don't want

7    to be in equity funds if it goes down 20 percent.

8         So, you know, but as you get -- a general principle in

9    finance, is that if you get -- for the most part, when you

10   have -- if you're dealing with higher levels of wealth, that

11   there's (indiscernible) less sensitivity to those kinds of

12   (indiscernible), and so you see -- tend to see a little bit

13   more of an equity split.  That was another conservative

14   assumption, but was also a category in BlackRock asset

15   projections that was for, I believe it's called private

16   lending, which had a rate of return over 9 percent.

17        I didn't apply that to any of the group.  So overall,

18   as the Kane report actually pointed out, the rate of return

19   I end up applying is about 5.4 percent across the total mix

20   and I think that's pretty consistent with a number of ways

21   to get there, including some reasonable mix of debt and

22   equity.

23   Q    Anything else (indiscernible) on assumptions?

24   A    Well, I mean, one of the assumptions is that the --

25   when the payments are made, there's no countervailing tax

1   benefit associated with that.  I hadn't seen anything at the

2   time I wrote my report -- subsequent report.  I think it was

3   the 12th supplement, Section 4 discusses the potential for

4   these assets -- I'm sorry, for these payments, to receive

5   certain tax treatment that would reduce the impact from $4.2

6   billion or thereabouts.  For example, if you would say that

7   there's -- apply the 33 percent tax rate that is used in the

8   Martin report to the full amount, just for illustration,

9   then that's about a $1.4 billion benefit that nets out.  I

10  didn't apply anything like that in the projections.

11  Q    On cross examination a short while ago, Mr. Joseph went

12  through with you the two-step process that you employed in

13  your report, where first you had to bring certain value to

14  current, to the end of 2020 (indiscernible) 2021 and then

15  project them forward.  And he pointed out that you did

16  subsequently become aware of actual financial reports that

17  brought the assets current to the end of 2020 or the start

18  of 2021.

19  A    Correct.

20  Q    Do you recall that?

21  A    Yes, I do.

22  Q    Mr. Joseph also indicated that you were way off on your

23  estimates.  Do you agree with that?

24  A    I don't agree with that, and the reason I don't is that

25  the majority of the difference is the assumptions about the

Page 216

1    IAC value, and we've discussed that, but one of the biggest

2    drivers of the difference between the net asset value that I

3    have as of March 31st and the net asset value that was

4    reported in Huron, is the difference in the IAC value, and

5    so that's -- it's a methodological difference; it's not a

6    calculation difference, so --

7    Q    And if you put aside what you just called a

8    methodological difference, how did your estimate compare to

9    what actually came out?

10   A    The -- on the -- if you do the analysis without --

11   after subtracting out the value of the IACs, putting those

12   aside, the value of the Sackler family net assets as of the

13   two earlier Raymond reports is about 10.7.  If you subtract

14   out the net of $3 billion, give or take, for the IACs, you

15   have a value of about $7.7 billion.  That grows over the

16   course in my report to, I think, about $8.6 billion, and I

17   think in another report, it's about $8.5 billion.  So, the

18   difference is about $100,000 on net between the two sides --

19   Q    (indiscernible).

20   A    Hundred million, thank you.  If you exclude the

21   different assumptions we made about how much the IACs might

22   be sold for.

23   Q    Testified on cross examination that you did not ask

24   particularly for due diligence material when you were

25   preparing your report.  What did you ask for?

1   A    I asked for information about -- I asked for

2   information about the IACs and I asked for, specifically,

3   the best indications of value as to what the IACs are worth,

4   and I read the -- what we had in the Martin report and I

5   asked if there was any other valuation reports or anything

6   along those lines on the IACs, and it was indicated to me

7   that the Martin report and the Huron attachments were the

8   best indications of value.

9   Q    Did the rebuttal expert report by Mr. Kane offer any

10  counter estimate to yours on the expected value of the

11  Sackler assets in 2030, something different from your $14.5

12  billion midpoint estimate?

13  A    No, it did not.

14  Q    Did the rebuttal expert report from Mr. Kane assert

15  that BlackRock is not a reliable source from which to

16  construct financial projections?

17  A    No, it did not.

18          MR. POPOFSKY:  No further redirect, Your Honor.

19          THE COURT:  Okay.  Any re-cross on redirect?

20          MR. HUEBNER:  Yes, Your Honor.  Based on your

21  questions, and on the re-cross, I have -- I was about to say

22  five questions, but then I'll get several smart-aleck emails

23  from people afterwards that I asked six or seven, so I have

24  a very small number of questions.

25          MR. POPOFSKY:  Having a little trouble hearing.

Page 218

1          MR. HUEBNER:  Let me just bring it closer, with

2     apologies.  Can you hear me now?

3          THE WITNESS:  Somewhat better, thank you.

4          MR. POPOFSKY:  You're breaking up a little bit,

5     but let's try it.

6          MR. HUEBNER:  Good.

7          RE-CROSS EXAMINATION OF WILLIAM HRYCAY

8     BY MR. HUEBNER:

9     Q    Sir, did you -- for the record, I'm Marshall Huebner,

10    sir.  I represent the Debtors in this case.  Can you hear me

11    clearly now?

12    A    Fairly clearly.  We'll try it.

13    Q    Okay.  Did you listen to David Sackler's testimony

14    earlier today?

15    A    No, I did not.

16    Q    Okay.  So, let's just make the assumption that Mr.

17    Sackler testified that the family was interested in selling

18    the IACs and that they would not breach that covenant

19    because that is, in fact, how they hope to pay all of the

20    settlement.  We just take that as an assumption, since I

21    believe he so testified?

22    A    Okay.

23    Q    Okay.  If, hypothetically, the Sacklers sold all of the

24    IACs in the first year or two after these proceedings, what

25    would that do to your calculations, since I believe you

1    testified that your math assumed that they held, invested,

2    and grew $4.5 billion in value for the entire period?  Would

3    that largely materially drop your terminal estimate of their

4    wealth if in year one or two, $4.5 billion disappeared?

5    A    Are we assuming the sale price would be $4.5 billion?

6    What are you assuming the sale price is?

7    Q    So that's a great question, and you're right, because

8    the lower the sale price, the more they have to dip into

9    other assets to pay us, so let's go with that assumption for

10   the beginning, which is they sell them for $4.5 billion net.

11   A    If they sell for $4.5 billion net, at the beginning of

12   the period, let's say 2022, then that would reduce some of

13   the -- that would -- yes, it would reduce the estimated

14   value I have on the IAC, which assumes that the two-year-old

15   estimate on what the sale price is likely to be, would be --

16   would turn out different than that.  It would mean that the

17   family would be able to keep the rest of its assets, so that

18   would be something of an offset.  There would be also

19   something of an offset between the tax liability that

20   assumed also grew at the same 7 percent plus rate, so there

21   would be a couple of offsets, but certainly, if they only

22   sold for 4.5, then that would reduce the net asset value I

23   projected.

24   Q    But sir, are you aware that under the settlement

25   agreement they're obligated to pay us the net proceeds,

Page 220

1    potentially, as soon as they are realized?  Are you aware of

2    that?

3    A    Yeah, that's my read of the agreement.  Yes, sir.

4    Q    Right.  So, in other words, an accelerated sale of the

5    IACs would move material assets from the Sacklers'

6    investible asset base on an accelerated basis; is that

7    correct?

8    A    Yeah, if they sell the IACs next year, for example,

9    then that removes the asset from their asset base.

10   Q    Right.  And if they sold them for much less than $4.5

11   billion, on an accelerated basis, then they would actually

12   suffer a radically greater decline in wealth, because they

13   both wouldn't have that spread, and they would have to dip

14   into personal assets to pay along the schedule provided for

15   in the settlement.  Is that correct?

16   A    Yes.  Hypothetically, if they sold for less than $4.5

17   billion, then they would need to use proceeds from

18   (indiscernible) assets, and that would --

19   Q    But again, I was asking you a different question.

20   A    I beg your pardon.

21   Q    Which is, doesn't that -- which everything you said so

22   far is right, just you didn't get to the last part, which

23   is, that means that their terminal wealth would be very much

24   lower, right, because they would both have a lower IAC sale

25   recovery and they would have to dip into other assets, so

1    their investible base would be much, much lower several

2    years in than you budgeted for.  Is that correct?

3    A    It would be -- it would be lower.  I mean, I don't know

4    what you mean by much, much lower.  I haven't run the

5    numbers --

6    Q    (indiscernible).

7    A    -- but I do take your point.

8    Q    Apologies.  I don't have a finance degree.  We'll go

9    with much lower, and I withdraw the second "much" which is

10   not particularly useful.  And so the reason I'm asking,

11   because I represent the estate, right, one of the many

12   parties who negotiated this deal opposite the Sacklers, and

13   so if it turns out that your -- withdrawn.  Let me ask one

14   other question first.  Do you understand that as compared to

15   the deal with (indiscernible) bankruptcy in 2019, the estate

16   now no longer has a contingent recovery based on the value

17   of the IACs, but instead of having a fixed recovery of only

18   $3 billion, we now have a guaranteed recovery of $4.325

19   billion?

20   A    Yes.

21   Q    You understand --

22   A    I've read that in the June 30 -- June 3rd statement.

23   Yes, sir.

24   Q    Okay.  And so, if that $4.325 billion ends up being a

25   much bigger percentage of a lower terminal value than the

Page 222

1    one that you testified you thought was right, that means we

2    cut a better deal than your report would lead one to

3    believe, doesn't it?

4            MR. POPOFSKY:  Objection.

5            THE COURT:  What --

6            MR. HUEBNER:  On what grounds?

7            THE COURT:  On what basis?

8            MR. POPOFSKY:  Mr. Hrycay is here as an expert on

9    the -- on what he opined on, which is the ultimate value of

10   the Sacklers' assets, not on whether it's a good deal or bad

11   deal.  That's for the lawyers to argue and Your Honor to

12   decide.  That's not for Mr. Hrycay to opine on.  And he did

13   not, in fact, opine on that.

14           MR. HUEBNER:  Your Honor, that's great.  That was

15   actually going to be my next question, which I'm now not

16   going to ask.  So, I'm actually going to ask the question I

17   did ask.

18   BY MR. HUEBNER:

19   Q    Which is, isn't it mathematically correct that if their

20   terminal wealth is much lower than your report suggested,

21   that the estate and its stakeholders are receiving a

22   concomitantly higher percentage or a correspondingly higher

23   percentage of their wealth?

24   A    If the projected wealth is lower than as estimated in

25   my report, then $4.25 billion as a percent of a smaller

Page 223

1    number is a higher percentage.  Yes, sir.

2    Q    Okay.  One last question.  Are you aware that the IACs

3    are -- I believe from the judge's colloquy I now know the

4    answer, so it'll really be the follow-up that I'm asking --

5    just to confirm, you told the judge that you understand that

6    the IACs are privately held pharmaceutical companies; is

7    that correct?

8    A    They are privately held distribution companies, my

9    understanding, that distribute Purdue Pharma product.  I'm

10   not sure if that's a distinction in your mind, but --

11   Q    Okay, I'm happy to leave it at that level of generality

12   for now.  I'm not (indiscernible) correct, but we'll go with

13   it.  And are you aware that there are -- do you know how

14   many countries the IACs are in?

15   A    They're in many countries.  I forget the exact number.

16   I think I saw around a hundred.  That may not be right.

17   Q    Okay.  And do you purport to have expertise in the

18   markets and market conditions in, let's say, 50 of those

19   hundred countries?

20   A    No, I'm not opining on the specific market conditions

21   in any of those countries.  No, sir.

22   Q    Okay.  And would you agree that, for example, a set of

23   privately held pharmaceutical companies in 100 countries may

24   not be perfectly correlated to the MSCI 2 World Index,

25   especially when compared, for example, to an investment

Page 224

1    portfolio of publicly held stocks and bonds?

2    A    No, it's probably not perfectly correlated.  It's an

3    indicator of where international markets are going and

4    that's the way I used it, but you're certainly right, it's

5    not (indiscernible) have perfect correlation.

6    Q    Right.  And is it fair to say that it's probably much

7    harder to value 100 privately held pharmaceutical companies,

8    100 separate companies, let alone over time, than it is to

9    value a portfolio of publicly traded stocks and bonds?

10   A    Yes, I think that's a fair statement.

11   Q    Thank you, sir.  I have nothing further.  Thank you

12   very much for your time.

13   A    Thank you.

14          MR. POPOFSKY:  I have two questions, Your Honor,

15   hopefully.

16          THE COURT:  Is that -- I'm sorry, who -- I can't

17   say who asked

18          MR. POPOFSKY:  I'm sorry, this is Mr. Popofsky.  I

19   have two redirect questions.

20          THE COURT:  Well, before we get to that, I just

21   want to know if there's any other -- further re-cross, based

22   on your direct -- your redirect, from either Mr. Joseph or

23   Ms. Monaghan.

24          MR. JOSEPH:  I have nothing.

25          MS. MONAGHAN:  I have just a couple questions.

Page 225

1                  CROSS-EXAMINATION OF WILLIAM HRYCAY

2    BY MS. MONAGHAN:

3    Q    Mr. Hrycay, you described what you characterized as a

4    methodological difference as to the valuation of the IACs as

5    accounting for the majority of the difference between your

6    calculation of the Side B assts in six months versus the

7    (indiscernible) Report.  Is that correct?

8    A    Yes.

9    Q    Did you do a discounted cashflow analysis of the IAC

10   value?

11   A    No, I did not.

12   Q    You didn't do a recent comparable sale analysis of the

13   IAC value.  Isn't that correct?

14   A    No, I did not.

15   Q    You did not do a precedent transaction analysis of the

16   IAC value.  Isn't that correct?

17   A    No, I did not.

18   Q    Thank you.  No further questions.

19            THE COURT:  Okay.  Now you can ask that, Mr. --

20   you can ask the redirect on that recross.

21               REDIRECT EXAMINATION OF WILLIAM HRYCAY

22   BY MR. POPOFSKY:

23   Q    On the question from a couple of minutes ago about it

24   being harder to value 100 international companies, does that

25   lead to a conclusion in either direction, one direction of

Page 226

1    the other, that these characteristics lead to a conclusion

2    that the value might be higher or lower than your estimates?

3    A    It doesn't lead to a particular conclusion in either

4    direction.  The question was whether there's perfect

5    correlation between the MSCI World Index and any particular

6    of these -- let's call it a hundred international markets.

7    And no, there's not.  Some markets could be better, some

8    markets could be worse.  But it doesn't necessarily indicate

9    a directional bias.

10   Q    And when you were asked about the IAC's possibly being

11   sold earlier, one of the things you said was the Sacklers

12   would be able to keep the rest of their assets.  Can you

13   just elaborate on what you meant by that?

14   A    Yes.  In my model, because the IAC sales don't occur

15   until 2027, I am assuming that in order to me the prior

16   payments, the payments in 2021 through 2026, that other

17   certain assets are sold off over time or liquidated over

18   time.  And that means they're not available for any return.

19   So if the IACs are sold sooner, that means that the family

20   can maintain its other assets and a return on its stock

21   market portfolio, for example.

22           MR. POPOFSKY:  No further redirect, Your Honor.

23           THE COURT:  Okay.  Any other questions?  No?

24           You can sign off, Mr. Hrycay.

25           THE WITNESS:  Thank you, Your Honor.

Page 227

1                THE COURT:  Or Hrycay, excuse me.

2                Okay.  That takes us back to Mr. Cowen if I'm not

3       mistaken.

4                MR. POPOFSKY:  Well, you're demoting him.  It's

5       Dr. Cowen.

6                THE COURT:  Excuse me.  Well, PhD doctor.

7                MR. POPOFSKY:  Well, we'll see how the testimony

8       goes.

9                THE COURT:  So -- and I see him there on the

10      screen.  Let me just get his declaration and cross-

11      examination exhibits.  Okay.

12               Mr. Cowan, would you raise your right hand,

13      please?  Do you swear or affirm to tell the truth, the whole

14      truth, and nothing but the truth, so help you God?

15               MR. COWEN:  I do.

16               THE COURT:  Okay.  And it's Charles C-O-W-A-N?

17               MR. COWEN:  Yes, sir.

18               THE COURT:  Okay.  Mr. Cowan, you submitted a

19      declaration dated August 5, 2021 which attaches an amended

20      expert report authored by you and Sean Malone.

21               MR. COWEN:  Yes, Your Honor.

22               THE COURT:  Under my order establishing procedures

23      for this hearing, the declaration and the attached report

24      are intended to be your direct expert testimony for the

25      purposes of the hearing.  Sitting here today on August 17,

Page 228

1    is there anything that you would wish to change in your

2    declaration or the amended expert report?

3            MR. COWEN:  No, Your Honor.

4            THE COURT:  Okay.  All right.  Does anyone object

5    to the admission of Mr. Cowen's declaration or the amended

6    expert report?

7            MR. WAGNER:  No objection.

8            THE COURT:  Okay.  All right.  Does anyone want to

9    cross-examine Mr. Cowan on the expert report?

10           MR. WAGNER:  Yes, Your Honor.  Jonathan Wagner for

11   Kramer Levin Naftalis & Frankel on behalf of the Ad Hoc

12   Committee of Governmental and Other Contingent Litigation

13   Claimants.

14           THE COURT:  Okay.

15           MR. WAGNER:  May I proceed?

16           THE COURT:  Yes.

17               CROSS-EXAMINATION OF CHARLES COWAN

18   BY MR. WAGNER:

19   Q    Good afternoon, Dr. Cowan.  It's nice finally to see

20   you again.

21   A    Same here, Mr. Wagner.  Good to see you.

22   Q    And I have some questions about your report and the

23   issue of allocation and the objections by West Virginia.  Do

24   you have your deposition transcript there?

25   A    I do.

1   Q     Okay.  And I'm going to be asking questions probably

2   about three exhibits, 388, 389, and 392.  So let me start

3   with your qualifications and then we'll get into the

4   substance.

5        Am I right, sir, that you've never designed an opioid

6   allocation program that's actually been implemented?

7   A     That's correct.

8   Q     And am I right that aside from this case, you've never

9   worked on any litigation involving allocation or abatement

10  in the context of opioid use?

11  A     That's correct.

12  Q     And aside from this case, you've never worked on any

13  litigation involving opioids?

14  A     That's correct.

15  Q     You listed some cases on your CV.  Am I right that

16  there are cases in which your opinion has at least been

17  partially excluded?

18  A     That is correct.

19  Q     And am I right there have been instances when your

20  opinion was allowed, but the Court did not follow your

21  opinion?

22  A     Yes.

23  Q     Now, sir, let's get into the substance.  Would you

24  agree with me that the opioid crisis is one of the most

25  complex and difficult to measure public health crises in the

1  United States' history?

2  A    Yes.

3  Q    And would you agree with me, sir, that the issues we're

4  dealing with in the context of this bankruptcy, vis-à-vis

5  allocation and abatement, are extremely complicated?

6  A    Yes.

7  Q    And would you agree with me, sir, that reasonable

8  people in this case may differ as to what is a reasonable

9  allocation plan?

10  A    I have a problem with the term reasonable in the sense

11  that it's not a statistical term.  It's not a term that's

12  common in economics.  So from a technical perspective, it's

13  difficult for me to answer that question.  From an English

14  perspective, yes, reasonable people might differ.  But I'm

15  saying that without a basis other than my own opinion as a

16  person as opposed to being a technical expert.

17  Q    And I think you put in your report that you believe

18  your plan better addresses the issues having to do with the

19  problem of opioid treatment and abatement.  Do you recall

20  that?

21  A    Yes.

22  Q    Okay.  But reasonable minds could differ on the issue

23  of what is a better methodology.  Isn't that true?

24  A    I believe what I said in -- the short answer is yes.  I

25  believe what I said was that it depends on the type -- the

Page 231

1   objective function, what it is that you're trying to sell

2   for, and the assumptions that you make to pursue that

3   objective.

4   Q    Okay.  Now, sir, you've made presentations concerning

5   allocation in the context of the opioid crisis, correct?

6   A    Yes.

7   Q    And abatement as well, right?

8   A    Yes.

9   Q    And would you agree with me, sir, that your own

10  writings, reports, presentations, and white papers are

11  authoritative and reliable?

12  A    Yes.

13  Q    You made no mistakes in those papers and presentations,

14  correct?

15  A    Not that I am aware of.

16  Q    And you stand by those presentations.  Am I right?

17  A    I do.

18  Q    And you have not issued any updates to those white

19  papers.

20  A    I have not.

21  Q    Can you look at Exhibit 388, which is your allocation -

22  - I believe it's Allocation White Paper.  Let me know when

23  you have it there.

24  A    I have it in front of me.

25  Q    Okay.  And can you turn -- this is one of your white

1    papers, right?

2    A    Yes, sir.

3    Q    Can you turn to Page 12?  And tell me when you're

4    there.

5    A    I am there.

6    Q    Sir, can you read the top paragraph on that page for

7    the record?

8    A    There are two top paragraphs.  I'm assuming you want

9    the one that's on the upper-left.

10   Q    That's correct.

11   A    "Previous sections were offered to posit that even with

12   a limited number of recipients where the nature of the

13   recipients is well known, there is no simple answer to the

14   question about how to allocate and award from a series of

15   trials or one large settlement.  Too many questions remain.

16   Too many issues need to be resolved.  Not enough research is

17   available currently to perform a fair allocation."

18   Q    And in that paragraph, you bolded a word, did you not?

19   A    Yes, the word no.

20   Q    And that's, "There's no simple answer", right?

21   A    That is correct.

22   Q    If you look at your Fair White Paper, that's Exhibit

23   392.  And let me know when you have it.

24   A    Mr. Wagner, did you say 392?

25   Q    Yeah.  That's the Fair White Paper.

1    A    Okay.  I am there.

2    Q    You have it?

3    A    Yes.

4    Q    Okay.  Can you turn to Page 2 of that document that you

5    authored?  Let me know when you're there.  The one that says

6    defining fair.

7    A    Thank you.  I am there.

8    Q    Okay.  And can you read the second paragraph of that

9    page on the left side?

10   A    "Fair stirs strong sentiment.  We don't ask for fair,

11   we demand it.  When only two parties search for fair, fair

12   is relative to both parties.  When more than two people are

13   involved, fair is relative to each member of a group, making

14   it supremely hard to recognize or adjudge.

15   Q    And would you agree with me, Dr. Cowan, that that's

16   true with respect to this context, which is considering --

17   which is the consideration of competing allocation plans?

18   A    Yes.

19   Q    And the abatement plans in this case are future-looking

20   plans, right?

21   A    That's my understanding, yes.

22   Q    And the answer to what is fair in the context of an

23   abatement plan to address future damages is complicated, is

24   it not?

25   A    Yes.

Page 234

1    Q    And when trying to deal with projections to the future

2    in the context of these allocations and abatement plans, a

3    solution becomes even more complicated, correct?

4    A    Yes.

5    Q    Okay.  Now let's turn to the subject of good faith.  In

6    your white papers, you've written about the difficulty of

7    putting in place a global settlement in the context of

8    opioid abuse.  Right?

9    A    Yes.

10   Q    And you understand that the attorneys general who

11   negotiated these settlements, this settlement, are competent

12   counsel, right?

13   A    Yes.

14   Q    And they are the chief legal officers of their various

15   states, are they not?

16   A    Yes.

17   Q    And it's your understanding that the attorneys general

18   were advocating as best they could on behalf of their

19   particular states, correct?

20   A    I actually don't have personal knowledge of that.

21   That's my understanding based on the claims that I've heard.

22   But again, I don't have personal knowledge of that.

23   Q    Okay.  But you do know, sir, that the plan that emerged

24   in the bankruptcy and that's now before Judge Drain is the

25   result of compromise among the attorneys general, right?

1    A    Yes.

2    Q    And you understand that it is in the nature of

3    bankruptcy settlements that there is compromise amongst the

4    parties, right?

5    A    Yes.

6    Q    And you have a plan in your own -- you set out a plan

7    in your report, did you not?

8    A    I did.

9    Q    And your own plan is a compromise between what we'll

10   call the Denver Plan and a federal plan called SAMHSA,

11   correct?

12   A    I think your use of the word compromise has taken on a

13   new meaning.  The estimate and allocation plan that we

14   developed is a compromise mathematically in the sense that

15   it falls between two other points.  But it's not as if it's

16   a compromise between two groups of people or the result of

17   discussion, it's simply a mathematical formulation.

18   Q    That's fine.  And would you agree with me that

19   mathematically all plans would be some kind of compromise?

20   A    No.

21   Q    Did you get deposed in this case, sir?

22   A    I was, but -- sure, go ahead.

23   Q    And that was last month, was it not?

24   A    Yes.

25   Q    Can you turn to your deposition, Page 127, Line 21?

Page 236

1    Let me know when you're there.

2    A    Okay, I'm sorry.  I'm at my deposition.  And tell me

3    where I should go again, please.

4    Q    Just tell me when you're at Page 127, Line 21.

5    A    127.

6    Q    Line 21.  Just tell me when you're there.

7    A    Yes.

8    Q    And were you asked the following question and did you

9    give the following answer?

10        Question, "So your plan is in some sense a compromise,

11   right?"

12        Answer, "Well, mathematically all plans would be some

13   type of compromise."

14        Were you asked that question and did you give that

15   answer?

16   A    I did.

17   Q    And, sir, you're not aware of a single other states

18   besides West Virginia that's objecting to the bankruptcy

19   plan allocation, are you?

20   A    Not to the allocation, no.

21   Q    Okay.  Now let's talk about some of the models in your

22   white papers.  Your white papers contained allocation

23   models, did they not?

24   A    We gave hypotheticals.  And on a small scale, not on a

25   national scale, but yes.

1   Q    That's fine.  And you prepared those models pre-

2   litigation, right?

3   A    I did.

4   Q    Okay.  And nothing in your white papers, which were

5   prepared before litigation, are remotely close to the model

6   that you came up in this litigation, isn't that true?

7   A    I think I would object to the use of the words remotely

8   close because some of the models involve intensity, some

9   involve severity.  They are a different type of mix.  They

10  are what you just called a compromise.

11  Q    Sir, you were deposed -- I think it was five weeks ago.

12  Right?

13  A    Right.

14  Q    Can you turn to Page 31, Line 5?  And let me know when

15  you're there.

16  A    I'm there.

17  Q    And were you asked the following question last month

18  and did you give the following answer?

19      Question, "And we didn't see in this white paper

20  anything remotely close to the model that you came up with

21  in this litigation, correct?"

22      Answer, "I believe that's true."

23      Were you asked that question and did you give that

24  answer?

25  A    I did.

1    Q    Now, the model -- and the model that you used in this

2    report is nowhere described in your pre-litigation

3    allocation white paper, right?

4    A    That's correct.

5    Q    This is something you came up with for litigation,

6    right?

7    A    This was something I came up with for litigation, yes.

8    Q    And in your white paper, the allocation factors you

9    used were two health expenses -- two health expense series,

10   three law enforcement and judicial, the number of opioids

11   prescribed, and the number of deaths resulting from

12   overdose.  Is that right?

13   A    That's one of several, yes.

14   Q    Okay.  And again, that's different from the allocation

15   model that you have now presented today, right?

16   A    That's correct.

17   Q    And you have fair hypotheticals in your Fair White

18   Paper, do you not?

19   A    I do.

20   Q    And you didn't use any of the intensity or severity

21   measures in those models that you are offering in your

22   report, right?

23   A    Correct.

24   Q    And just to complete this subject, the model that

25   you've proposed has not been proposed by anyone else, has

Page 239

```
 1    it?

 2    A    Not that I'm aware.

 3    Q    Okay.  And in developing this model, you didn't call up

 4    any experts and ask for any input, did you?

 5    A    No.

 6    Q    Okay.  Let's talk now about the issue of the importance

 7    of putting in place a plan now.  You understand the

 8    importance of consensual resolution in bankruptcy matters,

 9    right?

10    A    Yes.

11    Q    And you understand the importance of an abatement

12    program in the context of this case, do you not?

13    A    I do.

14    Q    And would you agree that hundreds of thousands of

15    people have died since 1996 on account of opioid addiction

16    and abuse?

17    A    I do.

18    Q    And the more time that this problem festers without

19    additional spending on opioid abatement, the worse the

20    problem will become, right?

21    A    Relative to no resolution, yes, I agree.

22    Q    And settlement provides certainty, at least this

23    settlement provides certainty and immediate commencement of

24    spending on abatement, does it not?

25    A    I don't actually know that.  And it's a -- I think
```

Page 240

1   you're asking me to describe something that I would call a

2   legal conclusion.  I don't know how rapidly it comes into

3   play.

4   Q    That's fine.  You also issued a PowerPoint or published

5   a PowerPoint in June 2019, correct?

6   A    No.  We discussed this before.  I didn't issue the

7   PowerPoint.

8   Q    Well, you're saying you didn't issue it because there

9   are three authors, right?

10  A    Well, no.  Actually, it's because the parent company

11  that hosted the conference issued it by taking three papers

12  and combining them.

13  Q    Okay.  Well, let's just go to -- can you pull out that

14  document, which is Exhibit 389?  And let me know when you

15  have the document.

16  A    I am there.  Thank you.

17  Q    Okay.  And can you turn to Slide 12?  Let me know when

18  you're there.

19  A    I am there, thank you.

20  Q    And by the way, you prepared this slide, did you not?

21  A    I did.

22  Q    Can you read the first bullet for the court?

23  A    "Spending more NOW in the effective way will reduce

24  future damages."

25  Q    And you capitalized one of the words in that bullet,

1    did you not?

2    A    Yes.

3    Q    What word is that?

4    A    Now.

5    Q    And you stand by this statement in this slide, right?

6    A    Yes.

7    Q    Now, your white paper has a series of allocation

8    examples, right?

9    A    I'm sorry, which -- there's four white papers.  Are you

10   talking about the (indiscernible) white paper or the others?

11   Q    Well, your allocation white paper.

12   A    Yes.

13   Q    Okay.  And the bankruptcy plan has another allocation

14   plan, does it not?

15   A    Yes.

16   Q    And then you've got your allocation plan, correct?

17   A    Yes.

18   Q    And would you agree with me, sir, that none of these

19   plans are ineffective with the sole exception of the fact

20   that California is not contributing to the Oner Percent

21   Intensity Fund?

22   A    Mr. Wagner, I'm sorry, you kind of cut out there a

23   little bit.  So could you just repeat your question?

24   Q    I'm sorry.  And I don't know whether there are people

25   who aren't muted.  But would you agree with me that none of

Page 242

1    these plans are ineffective in your view with the sole

2    exception of the fact that California is not contributing to

3    the One Percent Intensity Fund?

4    A    I would agree with that.

5    Q    Okay.  And we'll get to California a bit later.  We're

6    making good progress.  But although you would prefer your

7    plan, you would prefer to see the bankruptcy plan put in

8    place than no plan put in place, right?

9           MR. POPOFSKY:  Your Honor, I object to that

10   question.  It's way beyond the scope of the direct

11   testimony.  And it's irrelevant to this examination.

12          MR. WAGNER:  I don't think it's irrelevant at all,

13   Your Honor.

14          THE COURT:  I don't think it's irrelevant.  And

15   the expert report compares the bankruptcy plan allocation to

16   the proposed allocation by Mr. Cowan.  So I don't think it's

17   beyond the direct, either.

18   BY MR. WAGNER:

19   Q    You can answer.

20   A    Thank you,  Your Honor.  I would -- I would agree with

21   the statement that it would be better to have a plan than no

22   plan.

23   Q    And when you say a plan, we're talking about -- just so

24   that it's clear, we're talking about the bankruptcy plan,

25   right?

Page 243

1    A    Yes.

2    Q    Okay.  Now let's turn to a slightly different topic.

3    Would you agree with me that as set out in your white

4    papers, that damages, abatement, and allocation are a

5    package consideration?

6    A    Yes.

7    Q    And in fact one of your white papers was on the topic

8    of abatement, was it not?

9    A    Yes, it was.

10   Q    Okay.  And you have no quarrel with the abatement plan

11   in the bankruptcy, correct?

12   A    As I understand it, yes.

13   Q    And you have no quarrel with the amount of the

14   settlement?

15   A    I do not.

16   Q    You have no quarrel with any of the payment terms,

17   right?

18   A    I do not.

19   Q    You are not opining on the Sackler's contribution, are

20   you?

21   A    No, I am not.

22   Q    Your only criticism is with respect to allocation, is

23   it not?

24   A    That's correct.

25   Q    Okay.  Now let's focus on your criticism with respect

1    to the use of population.  Am I right that you have written

2    in your white papers that, quote, "Large communities likely

3    should receive more than small communities"?  Did you write

4    that in one of your white papers?

5    A    I did.  I said likely.

6    Q    Okay.  And you've been retained on behalf of West

7    Virginia, correct?

8    A    Yes.

9    Q    And do you understand that West Virginia itself has

10   programs in place to allocate funds to communities and

11   locales based on population?

12   A    Actually, I believe I said I wasn't aware of that in my

13   deposition.

14   Q    Well, that's your understanding, is it not?

15   A    I don't think I've discussed this with West Virginia.

16   So I just don't have an opinion on this.

17   Q    Okay.  Can you turn to your deposition, Page 84, Line 2

18   to 7?  Just let me know when you're there.

19   A    Okay.  I'm sorry, Page 84?

20   Q    Page 84, Line 2.  Tell me when you're there.

21   A    I am there.

22   Q    Okay.  And were you asked the following question and

23   did you give the following answer?

24        Question, "Did you look at whether West Virginia has

25   programs in place that allocate funds to communities and

Page 245

1    locales based on population?"

2        Answer, "I didn't look at that, but that is my

3    understanding."

4        Were you asked that question and did you give that

5    answer?

6    A    I did.

7    Q    All right.  Let's turn now to the bankruptcy plan and

8    the issue of intensity and severity measures.  You state in

9    Paragraph 19 of your report that there are three vital

10   statistics to model the need for opioid abatement resources;

11   drug-related deaths, substance abuse disorders, and the

12   amount of prescription opioid drugs.  Is that a fair

13   characterization of Paragraph --

14   A    Yes.

15   Q    Yes?

16   A    I'm sorry, I didn't mean to interrupt you.  Yes.

17   Q    Okay.  And am I right, sir, that level of pain reliever

18   use disorder is a measure of intensity?

19   A    The level of pain use?

20   Q    Yeah.  Level of pain reliever use disorder is a measure

21   of intensity.

22   A    I'm sorry, I believe you're combining two terms.  I

23   think of level as a total -- there is a ratio of pain use

24   disorder to measure the intensity.

25   Q    That's fair.  That's fair.  And thank you for

Page 246

1    correcting me.  And would you agree with me that the ratio

2    of overdoes deaths is also a measure of intensity?

3    A    If it's the ratio of overdose deaths to the population

4    in the same state, yes, it is.

5    Q    Okay.  And now I'm going to ask you a hypothetical, the

6    same one I asked you at your deposition.  And hopefully

7    we'll get the same answer.  And, sir, this will be the only

8    hypothetical I ask you, so just bear with me.

9         Assuming that West Virginia has one percent of the

10   nation's population and California has ten percent of the

11   nation's population, and if overdose deaths in West Virginia

12   are twice the level per capita as compared to California, am

13   I right that if you use the ratio of overdose deaths as a

14   factor, then West Virginia would obtain more funding than it

15   otherwise would if population alone were used as a factor?

16   A    In that hypothetical, yes.

17   Q    All right.  Now, in the -- I'm right in the bankruptcy

18   plan, there is an 85 percent piece and there is a 15 percent

19   piece, right?

20   A    Yes.

21   Q    Okay.  So let's talk about the 85 percent piece first.

22   Am I right that drug-related deaths are 22 percent of that

23   first 85 percent?

24   A    Yes.

25   Q    And am I right that the number of persons suffering

Page 247

1   from opioid use disorder, that's another 22 percent of the

2   85 percent?

3   A    Yes.

4   Q    And for the remaining 15 percent under the plan, that

5   piece is based on opioid use disorder, overdose deaths, and

6   opioid morphine milligram equivalents, right?

7   A    Yes.

8   Q    Okay.  And while you -- those are all intensity

9   measures, right?

10  A    Not the way you describe them.  Those were all totals.

11  Q    Okay.  Well, let's assume that they are rates.

12  A    I'm sorry, is this a hypothetical again?

13  Q    No.  This is I think the way they are treated.  Well,

14  let me ask you this question.  Am I right that while you may

15  have a quarrel that these factors, these three are only used

16  in 15 percent, you have no quarrel with the use of these

17  three factors?

18  A    As intensity measures, I don't.  As totals as in the

19  Denver Plan, I do.

20  Q    Okay.  Well, we'll get to the Denver Plan in a little

21  bit.  I want to focus now on how West Virginia is treated

22  here.

23       Now, you say in Paragraph 4 of your report that the

24  model takes a more reasonable approach and is more equitable

25  than the bankruptcy plan, right?

Page 248

1    A    I do.

2    Q    Okay.  But if the allocation in the bankruptcy plan

3    were based solely on pro-rata population, then West Virginia

4    would be receiving less than it would under the bankruptcy

5    plan, right?

6    A    Yes.

7    Q    And West Virginia's share of the population in the 2020

8    census is -- and I know you'll take my word for it -- it's a

9    shade over a half a percent, right?

10   A    Yes.

11   Q    Okay.  But under the plan, West Virginia -- the

12   bankruptcy plan, West Virginia is receiving -- would receive

13   1.16 percent, right?

14   A    That's correct.

15   Q    Okay.  So that's more than twice the share of its

16   population, right?

17   A    Yes.

18   Q    And would you agree with me that the bankruptcy plan

19   model which gives West Virginia 1.16 percent is more fair to

20   West Virginia than merely allocating based on population?

21   A    Yes.

22   Q    And you are familiar with the National Tobacco

23   Settlement?

24   A    I am.

25   Q    Okay.  And you are aware that population was a factor

Page 249

1    in allocating settlement funds under that settlement?

2    A    I am.

3    Q    And will you take my word for it, and we saw it at your

4    deposition, that in that settlement, West Virginia got 0.886

5    percent?

6    A    Yes, I would agree.

7    Q    Okay.  And that's less than the percentage that West

8    Virginia is getting in the current bankruptcy plan, right?

9    A    That's correct.

10   Q    Okay.  And that was a settlement in the late 1990s or

11   early 2000.  I think it was the late 1990s, right?

12   A    Yes.

13   Q    And West Virginia, for better or for worse, has

14   certainly lost population since then, right?

15   A    They have.

16   Q    Okay.  Now I want to go back to your 2019 presentation.

17   That's Exhibit 389.

18   A    Thank you.

19   Q    And let me know when you're there.  I'd like you to

20   turn to Slide 11.

21   A    I am there.  Thank you.

22   Q    Okay.  And you state there -- can you read the first

23   bullet?

24   A    "There are dilution returns to expenditures."

25   Q    And you can skip the second bullet, but can you read

Page 250

1   the third and fourth bullets?

2   A    "Modest increases in expenditures will have limited

3   value."  We don't know where this -- that was one below

4   that, I'm sorry.  The other bullet you'd like me to read is,

5   "We don't know where this downturn occurs without some

6   research."

7   Q    And you have not done any research on the impact of

8   additional spending in connection with the report that you

9   issued, correct?

10   A    That is correct.

11   Q    Okay.  And can you turn now back to your Fair White

12   Paper?  Let me know when you have it.  That's Exhibit 392.

13   A    I am there, thank you.

14   Q    Okay.  And can you turn to Page 11?  Let me know when

15   you're there.

16   A    I'm there.

17   Q    Okay.  And you see on the right side of the page you

18   have a heading, How Much Fairness.

19   A    Yes.

20   Q    And can you read the second paragraph for the record

21   under that heading?

22   A    "However, it is likely that there are diminishing

23   returns to more expenditures.  Equal treatment in terms of

24   offerings may not translate into increased efficacy.  In

25   short, just spending more to achieve equality may not be the

Page 251

1  best outcome."

2  Q    Okay.  Now I want to turn to another subject, one that

3  you are an expert on.  And that's data collection issues.

4  You have written papers on data collection issues, right?

5  A    I have.

6  Q    Okay.  For example, you wrote a 1998 paper on what you

7  call rare and elusive populations, right?

8  A    Yes.

9  Q    Okay.  And can you explain for the Court what an

10  elusive population is?

11  A    An elusive population would be a population like the

12  homeless, who sometimes don't want to be found.  And

13  certainly they're not in a location necessarily where they

14  are readily counted.  Even those who are in shelters move

15  from shelter to shelter and from city to city over time.  So

16  the homeless would be an elusive population.

17  Q    Okay.  And would you agree with me, Dr. Cowan, that the

18  population of opioid users is hard to count?

19  A    Yes.

20  Q    And in some respects, the population of opioid users is

21  elusive?

22  A    I would agree.

23  Q    Okay.  And you would agree with me also that the

24  difficulty in counting opioid deaths should have a bearing

25  on the issues here?

Page 252

1    A     I'm sorry, you jumped from opioid users to opioid

2    deaths.

3    Q     Yes.

4    A     I do agree that there is some difficulty in counting

5    the opioid deaths because of poor recording.  But, yes, it

6    should have some bearing.

7    Q     Okay.  Now I want to turn to -- and we are I think

8    almost done.  But I want to talk about your plan and factors

9    that are or are not taken into account in your plan.  Are

10   you with me?

11   A     I am.

12   Q     Am I right that your plan assumes that payments would

13   be made over ten years just like in the bankruptcy plan?

14   A     I'm sorry, somebody else was speaking and I missed part

15   of what you said, Mr. Wagner.

16   Q     I'm sorry.  Your plan, like the bankruptcy plan,

17   assumes that payments will be made over a ten-year period.

18   A     Yes, I do.

19   Q     And am I right that your plan doesn't take into account

20   the prospect that opioid users may move from state to state?

21   A     Actually, when you asked me that, I corrected my

22   response and said the assumption is made that they move from

23   state to state at the same rate as non-opioid users.

24   Q     Well, can you turn to your deposition, Page 84, Line

25   19?  Just let me know when you're there.

Page 253

1   A    I am at Line 19.

2   Q    Okay.  And were you asked the following question and

3   did you give the following answer?

4        Question, "Did your plan take into account or factor in

5   the prospect that opioid users can move from state to

6   state?"

7        Answer, "No."

8        Were you asked that question and did you give that

9   answer?

10  A    I did.  And on the very next page in Line 3, I said,

11  "May I amend my previous response?"

12       You said sure.  And I said, "What I actually assume is

13  that opioid users and non-opioid users were moving at the

14  same rate between states.  So I apologize."

15  Q    That's fine.  And I'm sorry, I didn't mean to -- I

16  didn't mean to constrain your testimony.  But again, would

17  you agree with me that you're aware that no state has been

18  losing population as severely as West Virginia?

19  A    It's because they're dying.

20  Q    Can you just answer my question?

21  A    Sure.  They have the highest death rate of any state.

22  Q    Not my question.

23  A    Well, that's the answer to your question, though.

24  You've asked me am I aware that they have the greatest loss

25  of population.  And the answer is yes.  They're dying.

Page 254

1    Q    Okay.  You didn't put anything in your report about the

2    statistics of the number of West Virginians who passed away,

3    did you?

4    A    No.  That's as a result of you asking me that question

5    during the deposition.

6    Q    Okay.  But anyway, in all -- and I think you testified

7    to this.  All other things being equal, he would expect that

8    opioid users would move out of West Virginia at the same

9    rate as non-opioid users.

10   A    Indeed.

11   Q    Okay.  And your plan doesn't take into account the

12   prospect of migration of opioid users out of West Virginia,

13   does it?

14   A    It doesn't take account of migration of any population.

15   Q    Okay.  And your plan doesn't take into account relative

16   law enforcement costs occasioned by the crisis?

17   A    Not directly, no.

18   Q    Okay.  And that was actually a factor you used in your

19   allocation hypothetical and your white paper, right?

20   A    Yes.

21   Q    And your plan doesn't take into account different costs

22   and cost structures within each state, does it?

23   A    No, it does not.

24   Q    And it doesn't take into account different levels of

25   infrastructure already in place in each state, does it?

Page 255

1    A    It does not.

2    Q    It does not take into account spending that's already

3    been undertaken by each state, does it?

4    A    It does not.

5    Q    It doesn't take into account the level of federal

6    spending on abatement already in place in each state?

7    A    It does not.

8    Q    And it doesn't take into account potential changes in

9    rates of severity and intensity over time, does it?

10   A    It does not.

11   Q    And whatever -- by the way, states also spend

12   internally on opioid abatement, do they not?

13   A    Yes.

14   Q    And whatever spending is going to come from this

15   bankruptcy plan, assuming it gets approved, is on top of the

16   state and federal spending, is it not?

17   A    Yes.

18   Q    Okay.  Now, I'm right, sir, there has been no empirical

19   research done on your proposed allocation, has there been?

20   A    There is no research on any allocation.

21   Q    Okay, fair statement.  And would you also agree that

22   there is an element of guesswork with respect to the

23   effectiveness of all of these plans?

24   A    I agree.

25   Q    All right.  Now, just a little bit more.  I want to go

1    back to the statement in your white paper that, quote,

2    "Large communities likely should receive more than small

3    communities."  Do you remember that statement that you made?

4    A    I do.

5    Q    Okay.  Your plan has some pretty odd numbers, doesn't

6    it?

7    A    It depends on your definition of odd.

8    Q    Okay.  Well, let's look at a few of these.  Under your

9    plan --

10         MR. WAGNER:  And this is -- Your Honor, I'm not

11    going to have any quarrel with Dr. Cowan because we went

12    over this before.  But it's the last couple of pages of his

13    report.  And I'll do the same with all of these numbers.

14    And I also have an exhibit, Your Honor, it's Exhibit 396,

15    which lists population for various states.  But Dr. Cowan is

16    not going to quarrel with any of that.  So let me just go

17    through these briefly.

18    BY MR. WAGNER:

19    Q    Am I right that under your plan, Texas gets 3.25

20    percent?

21    A    I believe that's correct.

22    Q    Okay.  And the state's population, you'll take my word

23    for it, is 29 million and has grown dramatically between

24    2010 and 2020, right?

25    A    Yes.

Page 257

1   Q    Okay.  The State of Washington, with a population of 7

2   million, or about one-fourth the size of Texas under your

3   plan gets more money than Texas, does it not?

4   A    Yes.

5   Q    Okay.  And you've seen articles about the difficulty of

6   measuring opioid abuse and opioid deaths in Texas, have you

7   not?

8   A    Well, not just Texas.  I've seen articles on the

9   difficulty in many states.

10  Q    And one of those states is Texas, right?

11  A    Yes.

12  Q    Okay.  And New York has a population of 20 million.

13  Kentucky has a population of four-and-a-half million, or

14  about a quarter of New York.  And under your plan, New York

15  gets 2.98 percent, but Kentucky, with one-fourth the

16  population of New York, gets 3.56 percent.  Is that right?

17  A    Yes.

18  Q    And under your plan, California, with a population of

19  40 million, gets 6.75 percent, right?

20  A    Yes.

21  Q    And Ohio, with a population of about a fourth of

22  California, gets more money than California, right?

23  A    Yes.

24  Q    Okay.  And your client, West Virginia, has a population

25  in the 2020 census of 1.79 million, right?

Page 258

1    A    Yes.

2    Q    And for better or for worse -- and you've identified

3    the high death rate there.  But for better or for worse,

4    West Virginia's population has been materially declining

5    over time, is it not?

6    A    As with other states, yes.

7    Q    Okay.  Well, one of the states that hasn't declined in

8    population is the neighboring state of Virginia, right?

9    A    Yes.

10   Q    And Virginia actually has a population that's four

11   times the size of West Virginia, right?

12   A    Yes.

13   Q    And it's a state that's growing rapidly in population,

14   right?

15   A    I agree.

16   Q    Okay.  And under your plan, Virginia, with four times

17   the population, gets less than your client, West Virginia.

18   Does it not?

19   A    Yes.

20   Q    And again, West Virginia is a neighboring -- Virginia

21   is a neighboring state to West Virginia, right?

22   A    Yes, it is.

23   Q    And you would expect over time that some West Virginia

24   opioid users might move to Virginia over the next ten years?

25   A    I expect opioid users to move from every state to every

1   other state.

2   Q    One of the -- well, we're going to move off of this

3   topic now.  Just a few more.  Just a little bit more, sir.

4   One of the criticisms you have of the bankruptcy plan is

5   that it's complicated, right?

6   A    I'm sorry, I heard everything up until the last four

7   words.

8   Q    Okay, I'm sorry.  One of your criticisms of the

9   bankruptcy plan is that it is complicated, right?

10  A    Yes.

11  Q    Okay.  Your plan contains six separate steps, correct?

12  A    Yes.

13  Q    Okay.  I want to now focus on what you call the Denver

14  Plan, which you reference on occasion in your report.  Can

15  you turn to your report?  It's Figure 2 on Page 30.  Let me

16  know when you have it.

17  A    Thank you.  I am there.

18  Q    Okay.  And you see in Paragraph 82 based on the graph,

19  quote, "The Denver Plan is extremely close to a plan based

20  only on population."  Do you see that?

21  A    Yes.

22  Q    But would you agree with me, sir, that the Denver Plan

23  is not the entirety of the NOAT plan or the bankruptcy plan

24  that's before the Court?

25  A    You characterized it during the deposition as being

1    only 85 percent of the total (indiscernible) plan.

2    Q    But there's another 15 percent that's allocated based

3    on intensity measures, is there not?

4    A    They're not intensity measures as I understood it in

5    the description that's given elsewhere in my report.  They

6    are also levels and they are correlated with population.

7    Q    Okay.  But whatever it is, when you did the graph on

8    Page 81 -- I'm sorry, in Paragraph 81 or whatever, between

9    81 and 82, you didn't graph a NOAT plan against population,

10   you graphed the Denver Plan, correct?

11   A    Yes, because it's 85 percent of the overall plan.

12   Q    So you left out the 15 percent?

13   A    Well, the 15 percent we just agreed was also based on

14   similar measures that are totals that are related to

15   population.  So I don't think the chart would change much.

16   Q    Well, that's not true, is it?

17   A    Well, I would have to search in my report to see what

18   that is.  But it's clearly documented in my report.

19   Q    Okay.  Well, let's turn to Table 3 then.  That's on

20   Page 32.

21   A    I'm sorry, Table 3 in my report?

22   Q    Yeah, Table 3, Page 32.

23   A    Yes, I'm there.  Thank you.

24   Q    Okay.  And do you see you did a chart comparing the

25   Denver Plan allocation to the Federal Plan and you listed

Page 261

1    West Virginia as 0.97 percent.  Do you see that?

2    A    Yes.

3    Q    That's not the amount West Virginia is getting under

4    the bankruptcy plan, is it?

5    A    No, that's the proportion that came out of the Denver

6    Plan.

7    Q    Okay.  But under the bankruptcy plan, West Virginia is

8    getting a number that's 20 percent higher of what you listed

9    in this chart.

10   A    I understand that.  But I was clear in the way I

11   labeled this and in my description in the previous paragraph

12   that I was describing what was going on in the Denver plan

13   and the reason that I thought the Denver Plan was not a

14   reasonable contribution.

15   Q    Okay.  But whatever it is, the inclusion of that

16   additional 15 percent pulled up the West Virginia number in

17   the bankruptcy plan from .097 to 1.16 percent, did it not?

18   A    I agree.

19   Q    Okay.  And that's an increase of about 20 percent, is

20   it not?

21   A    Well, now you're taking a ratio of a percent of

22   percent, which isn't actually a percent.  So, sorry.

23   Q    Okay.  Now I want to talk about California and your

24   statement that the failure to contribute is ineffective.

25   Under the bankruptcy plan, California is getting 9.9 percent

Page 262

1    of the distribution, of the funds.  Right?

2    A    Yes.

3    Q    And will you take my word for it, as you did at the

4    deposition, that California has the highest percentage share

5    of expenditures on criminal justice with respect to the

6    opioid crisis?

7    A    Yes.  I believe it was 18 percent.

8    Q    Okay.  And spending on criminal justice could be --

9    could be -- it's not in the bankruptcy plan, but it could be

10   an element of a future-looking abatement plan, right?

11   A    It could be.

12   Q    Okay.  And again, you just referenced it, but in your

13   allocation white paper, you reported that California's

14   expenditures on opioid-related law enforcement were 18

15   percent of the total in the nation, right?

16   A    Yes.

17   Q    But under this plan, California is getting a little bit

18   more than half of that 18 percent, right?

19   A    Well, you're reporting the overall plan plus all of the

20   components of the plan (indiscernible) component.  So I

21   don't think that's a fair comparison.

22   Q    Okay.  But whatever it is, California is not getting

23   eight percent under the plan, it's getting 9.9 percent,

24   right?

25   A    I believe -- I may have misheard you.  California is

Page 263

1   not getting 18 percent.  You are correct.

2   Q    Okay.

3   A    They're getting nine percent.  But the criminal justice

4   expenditures are a small portion of the overall expenditures

5   made by any state.

6   Q    Got it.  That's fair. I just have one more series of

7   questions.

8        In your pre-litigation allocation models, you have an

9   entry for West Virginia, do you not?

10  A    I'm sorry, would you ask me that again?

11  Q    Yeah.  Let me -- I don't want there to be any

12  uncertainty.  And again, these will be my last questions.

13  If you look at Exhibit 388, that's the allocation white

14  paper.  And just let me know when you have it.  And I'd like

15  to turn you to Page 9.

16  A    Thank you.  I am there.

17  Q    And by the way, Dr. Cowan, thank you for your patience

18  today.  I know you had some trouble signing on.  And the

19  technology is frustrating, but I appreciate your patience.

20  And Mr. Cahn, I appreciate yours as well.

21  A    Mr. Wagner, thank you.  I have to say that the tropical

22  storm Fred that came through here yesterday didn't help

23  anything.

24  Q    And I understand you've recently moved.

25  A    I have.

Page 264

1   Q    So I hope it all works out for you.

2   A    Thank you very much.

3   Q    Okay.  If you turn to Page 9, you have -- there you

4   have an allocation hypothetical, right?  Allocation of

5   hypothetical damages awarded to the 50 states and D.C.  Do

6   you see that?

7   A    Yes.

8   Q    and there you have an entry for West Virginia.  It's a

9   little bit to see, on the bottom left.  But I think we

10  established at your deposition that the range of allocation

11  in this model in your allocation white paper is between one

12  and one-and-a-half percent, right?

13  A    Yes.

14  Q    Okay.  And under the bankruptcy plan, West Virginia is

15  actually getting a number between one and one-and-a-half

16  percent, correct?

17  A    That is correct.

18  Q    Okay.  And then after you wrote this white paper, you

19  were retained by West Virginia, were you not?

20  A    I was.

21  Q    Okay.  And now you've issued a report in which West

22  Virginia is supposed to get 1.86 percent, correct?

23  A    Yes.

24  Q    Okay.

25        MR. WAGNER:  No further questions, Your Honor.

Page 265

1          THE COURT:  Okay.  Does anyone else want to cross-

2     examine Mr. Cowan?

3          MR. OZMENT:  Your Honor, this is Frank Ozment, and

4     I do have a few questions.  I know it's late, and I'll try

5     to be quick.

6          THE COURT:  Okay.

7          MR. OZMENT:  Thank you.

8              CROSS-EXAMINATION OF CHARLES COWAN

9     BY MR. OZMENT:

10    Q    Dr. Cowan, you mentioned that you had some early

11    publications regarding techniques for measuring furtive

12    populations.  Do you remember that testimony?

13    A    I'm sorry, did you say furtive?

14    Q    Furtive or elusive.

15         THE COURT:  Elusive.

16    BY MR. OZMENT:

17    A    Yeah, elusive.

18    Q    Yeah.

19    A    I did.

20    Q    Did any of that work have to do with, you know,

21    locating people who perhaps had been homeless but wound up

22    in prison?

23    A    A long time ago, yes.

24    Q    And is it fair to say that once they wind up in prison,

25    you can fairly easily locate them, correct?

Page 266

```
 1   A     Actually, I'm doing some work on prisons right now, and

 2   I would still argue that they're not quite as easy to find

 3   as some of the general population.  Especially if they were

 4   homeless in the first place, you may not have a good

 5   identifier for them.  Once you know that they're in prison,

 6   then yes.  But you'd have to actually know that they're in

 7   prison.

 8   Q     Okay.  And once you know they're in prison, do you have

 9   some judgement about how frequent or how likely they are to

10   be opioid use disorder victims?

11   A     This would be my opinion not based on any research of

12   my own.

13   Q     Go ahead.

14   A     Okay.  They're more likely to be opioid users.

15   Q     Okay.  That's a fairly dense concentration of opioid

16   use disorder victims, right?

17   A     Well, I'm sorry, that's a relative term.  When you say

18   it's a dense...

19   Q     Right.  In other words, as a percentage of the

20   population (indiscernible) more likely to be opioid

21   (indiscernible), aren't they?

22   A     I believe that's correct, yes.

23   Q     Are you familiar with any statistics regarding exactly

24   how frequent opioid use disorder (indiscernible) in the

25   prison population?
```

Page 267

1    A    While they're incarcerated?

2    Q    Right.

3    A    No.

4    Q    Okay.  There was also some discussion regarding

5    migration from state to state and place to place.  That

6    population is unlikely to migrate, isn't it?

7    A    I'm sorry, which population?  The prison population?

8    Q    Right.  When in prison, isn't it?

9    A    Well, I don't know what the rate of transfer is from

10   prison to prison.  And I know it's non-zero, but it would be

11   way less than the general population.

12   Q    Right.  There has been some discussion regarding

13   abatement.  And we don't always define that term as we're

14   having conversation about it.  But would your definition of

15   abatement include stopping people who are -- let me recast

16   that question.  Would your definition of abatement include

17   helping people who are opioid use disorder victims to

18   discontinue or to manage their opioid use?

19   A    Yes.

20   Q    And is it fair to say that's a fairly expensive

21   proposition?

22   A    Yes.

23   Q    Do you know any offhand figures for how much that costs

24   for a typical patient on an outpatient basis?

25   A    In --

Page 268

1              MR. HUEBNER:  Your Honor, Your Honor, sorry.  Sir,

2    Mr. Cowan.  Your Honor, this -- I'm going to object.  This

3    is so far beyond the scope of the testimony and direct.  You

4    know, the cost to the estate and to abatement of these

5    proceedings is tens of thousands of dollars an hour --

6              THE COURT:  Right.  No, I --

7              MR. HUEBNER:  -- given how many law firms we're

8    paying for.

9              THE COURT:  I understood --

10             MR. HUEBNER:  And these objectors are taking

11   depositions.

12             THE COURT:  It is beyond the direct and the cross

13   I think, Mr. Ozment.  This is really in essence free

14   discovery, which --

15             MR. HUEBNER:  Thank you, Your Honor.

16             THE COURT:  Which isn't really appropriate at this

17   stage of the case.

18   BY MR. OZMENT:

19   Q    You were mentioning as a measurement for frequency --

20   I'm sorry, a measurement of severity deaths attributable to

21   overdose.  Is that death attributable to overdose

22   exclusively opioids, or is it (indiscernible).

23   A    Is deaths attributable to opioids as a severity

24   measure, that would be (indiscernible) deaths.

25   Q    Okay.  I guess what I'm trying to get from you is are

1   you looking at that severity measure as one that is

2   reflecting only deaths from opioid use, or does it reflect

3   deaths from other drugs?  I think I understand where you are

4   on that, but I just want to clarify.

5   A    For severity, the denominator is all deaths, my

6   understanding, and the numerator is deaths from opioids or

7   anything that the county coroner or medical examiner or

8   whatever is appropriate for the jurisdiction rules as a

9   death that's related to opioids, fentanyl, or anything else

10  that falls into that category.

11  Q    Right.  It's not including alcohol poisoning and things

12  of that nature.

13  A    It is not.

14  Q    Thank you.  So when you're looking at that as a measure

15  of severity for distributing assets for abatement, is it

16  fair to say that by the time somebody dies, the cost of

17  abatement ends?

18  A    I don't know that in part because I don't know what

19  states have in place for dealing with families who are still

20  suffering from the after effects.  I know in Texas, for

21  example, that that expense continues.  And in particular, it

22  increases the cost for the foster child system.

23  Q    But in terms of stopping or managing opioid use, it

24  ends with death, right?

25  A    Stopping opioid use.  But that was a different question

1    than the one you asked me.  The expenses (indiscernible) use

2    continue on.

3    Q    So does your model reflect those expenses?

4    A    No.  And it wouldn't be -- no, it does not.

5    Q    Pretty much impossible to capture that, isn't it?

6    A    I don't think so.  It just requires more than four

7    white papers.

8    Q    Okay.

9            MR. OZMENT:  That's it.  Thank you, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           THE WITNESS:  Thank you, Mr. Ozment.

12           THE COURT:  All right.  I think that's all the

13   cross.  Mr. Cahn, do you have any redirect?

14           MR. CAHN:  Yes, Your Honor.  Thank you.

15              REDIRECT EXAMINATION OF CHARLES COWAN

16   BY MR. CAHN:

17   Q    First of all, can you hear me okay?

18   A    You're really light relative to Mr. Wagner.  If you

19   could speak up a little bit or...

20   Q    Okay.  Let me -- is that any better?

21   A    Moderately so, yes.

22   Q    Okay.  I'll try to shout a little bit more.  Mr. Wagner

23   and Mr. (indiscernible) explains in (indiscernible) opioid

24   issues.  Do you have any (indiscernible) experience in

25   developing opioid plans?

Page 271

1    A    I'm working with another state and some other entities

2    like hospitals to develop both abatement plans and also

3    allocation within a state.

4    Q    So these issues are not unfamiliar to you.  Is that

5    correct?

6    A    That's correct.

7    Q    And Mr. Wagner asked you a series of questions

8    (indiscernible).  He first asked you if you engaged in a

9    dialogue about whether or not (indiscernible).  Do you

10   recall that discussion?

11   A    I'm having a lot of trouble hearing you, Mr. Cahn.

12   Sorry.

13   Q    Sorry.

14            THE COURT:  Do you -- let me ask you, Mr. Cahn, do

15   you have earphones that you can use?  Because I think that

16   may be the issue.

17            MR. CAHN:  Not within reach.  I apologize.  Let me

18   just try (indiscernible).

19            THE WITNESS:  It's not so much you, Mr. Cahn,

20   there's just some background noise I keep hearing.  But go

21   ahead.

22            MR. CAHN:  Well, it is (indiscernible).  It's not

23   coming from my end.  (indiscernible).

24            THE COURT:  Is everyone else on mute?  Okay.  Go

25   ahead, Mr. Cahn.

Page 272

1          MR. CAHN:  Thank you (indiscernible).

2    BY MR. CAHN:

3    Q    Sir, do you recall the discussions you had with Mr.

4    Wagner about the use of the word reasonable?

5    A    I heard everything except for the word you want me to

6    respond to.

7          THE COURT:  Use of the word reasonable.  The use

8    of the word reasonable.

9          THE WITNESS:  Oh, yes.  Thank you, Your Honor.

10   BY MR. CAHN:

11   Q    Is reasonable the same thing as appropriate?

12   A    I'm going to have to shift into English major mode to

13   be able to answer these questions.  I'm not sure.  I

14   actually don't see that reasonable is exactly the same as

15   appropriate.  Appropriate would be sort of a larger set than

16   reasonable.

17   Q    So in the context of this discussion, a position

18   concerning, for example, allocation could be reasonable

19   without necessarily being appropriate.  Is that correct?

20   A    I could see that, yes.

21   Q    And now Mr. Wagner also asked you about the word fair.

22   A    Yes.

23   Q    Fair is -- withdrawn.  I'll move on to something else.

24   He also asked you about the attorneys general and their

25   various representatives (indiscernible) over the course of

Page 273

1    (indiscernible) participated in the formulation of the

2    allocation, and specifically the Denver Plan.  And he asked

3    you if you thought that they were advocating as best they

4    could on behalf of their respective states.  Do you recall

5    that discussion?

6    A    I do.

7    Q    Now, in your mind does advocating on behalf of their

8    respective states necessarily mean that they're advocating

9    for the greater good or simply to their respective state?

10            MR. WAGNER:  Objection to form.

11            THE COURT:  You can answer that question, although

12   -- well, go ahead.  You an answer that question, Mr. Cowan.

13            THE WITNESS:  Okay.  Thank you, Your Honor.

14   BY MR. CAHN:

15   A    In economics, there are a couple of different concepts.

16   One would be where everybody is looking after themselves, or

17   in this case advocating for their individual states, versus

18   considering an underlying common greater good.  And I see

19   those as being different because they wind up being

20   completely different objective functions in terms of how one

21   solves for a particular allocation or treatment of a group

22   of people versus the individual pieces.

23   Q    Now, Mr. Wagner also asked you a series of questions

24   about various white papers that you had written prior to

25   being engaged for this bankruptcy case.  Do you recall that

Page 274

1    discussion?

2    A    Yes.

3    Q    Do those white papers (indiscernible) a specific issue,

4    or were they general discussions of the topic of allocation?

5                MR. WAGNER:  Objection.  Leading.

6                THE WITNESS:  In general based on --

7                THE COURT:  Just in the future, Mr. Cahn, don't

8    lead.  Okay?

9                MR. CAHN:  Very well, Your Honor.

10               THE COURT:  Okay.  You can answer this question,

11   Mr. Cowan.

12               THE WITNESS:  Thank you, Your Honor.  I'm sorry

13   that I jumped in there.

14   BY MR. CAHN:

15   A    So I would always (indiscernible) as a result of being

16   invited to speak at a conference on the calculation of

17   damages.  And then when I was at the conference, people

18   started to talk about allocation issues, then we talked

19   about abatement issues.  And then the word fair was

20   (indiscernible) quite a bit.  So my motivation in writing

21   these was to respond to things I was hearing at different

22   conferences and among different groups to whom I was

23   speaking.  So they all came as general pieces of information

24   not intended for any one audience, but for a broad audience.

25   Q    And when you were retained by West Virginia, you were -

Page 275

1      - I'm sorry.  I don't know where the noise is coming from,

2      but -- okay, I'm trying to (indiscernible).  I'm sorry.

3           When you were retained by the State of West Virginia,

4      did you understand whether or not there was a specific focus

5      that was being requested in your study?

6      A    Only in the sense that in our initial conversations we

7      had discussions about intensity, severity, the high death

8      rate in West Virginia, and high expenditures.

9      Q    Very well.  Now, Mr. Wagner asked you a series, a

10     lengthy series of questions of various types about the

11     (indiscernible) population versus intensity or severity.  Do

12     you recall those discussions?

13     A    Yes.

14     Q    And he asked you whether or not -- he asked you to --

15     sorry, withdrawn.  He asked you whether or not West Virginia

16     under the bankruptcy plan is receiving more (indiscernible)

17     percentage of distributions from NOAT trust than its

18     population bears to the total population of the United

19     States.  Do you recall that?

20     A    Yes.

21     Q    And do you understand -- I'm sorry, withdrawn.  What is

22     the (indiscernible) your report, what is the relation to the

23     population to the (indiscernible) and severity measures that

24     you've identified?

25     A    Well, population is the denominator in the intensity

Page 276

1   measures, which causes it to be somewhat uncorrelated with

2   population.  And so in the way that we had constructed the

3   allocation, a component of that is still population to

4   account for the fact that some states have greater

5   expenditures or greater losses than others.  But then

6   there's an adjustment for intensity that is uncorrelated

7   with population.  And it accounts for the fact that either a

8   much higher proportion and a much lower proportion of people

9   are impacted or are affected by opioid use disorder or have

10  a higher or lower death rate due to opioid.

11  Q    So the fact that population -- I'm sorry, did you

12  finish your answer?

13  A    Yes, I did.  Thank you.

14  Q    Okay.  So does the fact that a state has

15  (indiscernible) population than any other state necessarily

16  mean that it shouldn't receive more money than that other

17  state?

18  A    I don't see it that way.  In the examples that Mr.

19  Wagner gave, for example, Texas and California had low

20  intensity.  So they have much larger populations.  I don't

21  deny that.  However, the intensity of the -- of opioid use

22  is much greater in West Virginia and in other states like

23  Ohio.  The comparison was made between California and Ohio

24  and the fact that Ohio was getting more than California.

25  Well, Ohio had a much greater intensity than did California,

Page 277

1    which explains why there's a greater allocation to Ohio than

2    there is to California.

3    Q    Thank you.  You were also asked a series of questions

4    about West Virginia's loss of population.  Do you recall

5    those questions?

6    A    I do.

7            MR. HUEBNER:  Sorry.  Mr. Cahn, may I interrupt

8    one second?  With apologies.  It is really barely audible.

9    And this actually only started when you came off mute.  If

10   you do have headphones nearby, it might be worth a 30-second

11   break to go get them.  My concern only for all of us -- in

12   fact, with you in particular, since presumably you want this

13   testimony, is that there may not be a transcript that works.

14   There may be a lot of inaudibles.  And if you have a while

15   to go and it's not difficult, it might make sense.

16   Otherwise, I leave it to you.  But you should know that it

17   is very, very hard for people to hear, which means the

18   transcription might be imperfect.

19           MR. CAHN:  Mr. Huebner, thank you for that.  I

20   actually don't have very long to go.  And forgive me, I

21   would rather just continue and finish up.

22           MR. HUEBNER:  Of course.  I'm just a guy.  No --

23           MR. CAHN:  No, no, no.  I -- believe me, I

24   appreciate very much your input.  So, thank you for that.

25   Let me just continue and see if I can help alleviate the

```
 1    problem.

 2    BY MR. CAHN:

 3    Q     Mr. Ozment (indiscernible) about West Virginia's loss

 4    of population.  And I believe you answered that

 5    (indiscernible) of lost population, too.

 6    A     Yes.

 7    Q     And regarding (indiscernible) accounts for any loss of

 8    population by West Virginia or any other state?

 9    A     It does -- my plan does not account for loss of

10    population in different states (indiscernible) population

11    for different reasons.

12    Q     (indiscernible).

13              THE COURT:  You're really fading out now, Mr.

14    Cahn.  We can't hear you.

15              MR. CAHN:  Okay.

16              THE COURT:  Now we can.

17              MR. CAHN:  That's better.  Is that better?

18              THE COURT:  Yes.

19              MR. CAHN:  Okay.  We have such a (indiscernible),

20    Your Honor.  I'm so sorry.

21              THE COURT:  That's all right.

22              MR. CAHN:  I do want (indiscernible).  The Zoom

23    experience (indiscernible) for me, particularly when it

24    comes to court hearings.  So I apologize to Your Honor.

25              THE COURT:  That's fine.
```

Page 279

 1            MR. CAHN:  And to everybody else, for that matter.

 2            THE COURT:  That's fine.

 3   BY MR. CAHN:

 4   Q    I'm sorry, I was asking you, Dr. Cowan, does the Denver

 5   Plan also account for -- the Denver Plan account for various

 6   states' loss of population to your knowledge?

 7   A    Well, you asked me about the Denver Plan, but none of

 8   the plans accounted for population change.

 9   Q    Okay.  And again, you were also asked -- withdrawn.

10   You were asked about your statement that the Denver Plan

11   was, and I quote, complicated.  And Mr. Wagner didn't ask

12   you what you meant by that.  So I am asking you, what did

13   you mean by the fact that it was complicated?

14   A    The Denver Plan -- you're asking me about the Denver

15   Plan, but I'm going to expand this to the (indiscernible)

16   plan, too.  The Denver Plan incorporates many more steps

17   than the plan that I put forward and some adjustments that

18   are specific to particular states as opposed to being just a

19   continuous application of the same methodology with all

20   states.  So it's complicated both in the number of steps and

21   also complicated in terms of the specific application to --

22   for example, the 12 most intense states.

23   Q    Very well.  And last question, Dr. Cowan

24   (indiscernible).  Mr. Wagner asked you if you would prefer a

25   plan to no plan.  And you answered I believe that you would

Page 280

1    prefer a plan to no plan.  Is that correct?

2    A    Yes.

3    Q    So (indiscernible) ask you if you would prefer a plan

4    which doesn't employ the factors that you've identified as

5    the most critical to a proper allocation of funds

6    (indiscernible).

7    A    Well, I think to simplify that, I would just say that I

8    would prefer a plan that relies on intensity measures and

9    severity measures rather than a plan that is heavily

10   dependent on levels, like the size of the population.

11   Whether it's part of the plan or overall, levels aren't

12   measuring something specific to the cost of abatement or the

13   population of people who are affected, it measures a class

14   that's relative to the entire population, which include many

15   people who are not affected by opioids.

16        So I would prefer any plan that focused more on

17   intensity and severity because that's what drives the costs.

18   And it is the population over the next ten years that would

19   be subject to treatment as opposed to the full population

20   within a state.

21   Q    Thankyou, Dr. Cowan.

22            MR. CAHN:  I have nothing further.  And I

23   apologize to the Court for all of the problems today.

24            THE COURT:  That's fine.  Thank you.

25            Any redirect on that?

1         MR. WAGNER:  You mean recross?

2         THE COURT:  I'm sorry.  Any recross?

3         MR. WAGNER:  I know it's late.  No, I have no

4    further questions.  And again, Dr. Cowan, I thank you.

5         THE WITNESS:  Thank you.  It was good to see you

6    again, Mr. Wagner.

7         MR. WAGNER:  Thank you.

8         MR. OZMENT:  Your Honor, with all apologies to Mr.

9    Huebner, he did testify to one point that I think I'd like

10   to follow up on very briefly.

11        THE COURT:  Okay.  Go ahead.

12           RECROSS EXAMINATION OF CHARLES COWAN

13   BY MR. OZMENT:

14   Q    Dr. Cowan, did I hear you correct me that you said you

15   have been engaged to work on allocation plans separate and

16   apart from this one?

17   A    Yes.

18        MR. OZMENT:  Your Honor, I think if he is

19   testifying that he has worked on allocation plans other than

20   this one and if he's testifying about reasonableness, I

21   would very humbly ask may I revisit whether he actually

22   knows how much money it costs to rehabilitate somebody with

23   opioid use disorder.  I'm not gathering this for some sort

24   of lawsuit.  I think it's important to note for purposes of

25   determining whether his testimony is reasonable.

Page 282

1           THE COURT:  Okay.  If you know the answer to that,

2    you can answer it, Mr. Cowan.

3           THE WITNESS:  Thank you, Your Honor.

4    BY MR. OZMENT:

5    A    I apologize, Mr. Ozment.  I don't mean to make this

6    more complicated than necessary.  But let me point out that

7    the cost is going to differ from person to person because

8    there is quite a bit of literature that talks about the

9    amount of time it takes people to get off of opioids and the

10   fact that there is a recurrence relationship that's -- I'm

11   using recurrence in the statistical jargon -- where people

12   become addicted again and then they have to get off again.

13   And in some cases, they need training to go find a new job.

14   Or in other cases, they have a good job, they are well-

15   trained, they just need to get off of drugs, so they don't

16   get that kind of training.

17         So it varies quite a bit, but I have heard numbers

18   anywhere between, you know, for any individual per year, and

19   this is an annual cost, of $60,000 to $100,000.  But if you

20   think about the fact that the average time to get off of

21   opioids is on average eight years, that adds up to nearly a

22   million dollars per person.

23   Q    Is part of that work that you isolate how much it costs

24   just for the medicine and the therapy?  And by therapy I'm

25   not talking about job counseling, I'm just talking about the

1    therapy associated with the medicine administration.

2    A    I did not.

3    Q    Okay.  Going to that figure, going to your testimony

4    about your work in actually putting together an allocation

5    plan, is that something that you anticipate your client or

6    customer will actually implement?

7    A    Yes.

8    Q    And in that case, do we have something or do you have

9    something that is analogous to the list of people who filed

10   proofs of claim in this bankruptcy?  That is to say a fixed

11   list of people who might be contacted to determine whether

12   they need to be or are actually in active recovery?

13   A    That's not part of the scope of my assignment.

14   Q    Okay.  So you don't have that data in that case.

15   A    I do not.

16   Q    Okay.

17          MR. OZMENT:  Thank you, Judge.  That's all I've

18   got.

19          THE COURT:  Okay.  All right.  So I'm not sure I

20   got the answer to my question, Mr. Wagner.  Do you have any

21   recross on the redirect?

22          MR. WAGNER:  I have nothing else.

23          THE COURT:  Okay.  All right.  Thank you, Mr.

24   Cowan.  You can step down.  I mean you can sign off

25          THE WITNESS:  Thank you, Your Honor.  I appreciate

1      it.

2                  MR. WAGNER:  Dr. Cowan.

3                  THE COURT:  All right.  I think that is a good

4      stopping point for today.  The other two witnesses who we

5      thought we might get to today are Richard Sackler and

6      Theresa Sackler.  Let me ask before we close for the day, do

7      the parties have a pretty good idea of the order of

8      testimony for tomorrow?

9                  MR. POPOFSKY:  Yes, Your Honor.  We'll send that

10     to you within the next few minutes.  We've been emailing

11     back and forth all day with the various parties.  So you we

12     should have something to you very quickly.

13                 THE COURT:  Is it contemplated that we'll go

14     another day beyond tomorrow with testimony?

15                 MR. POPOFSKY:  Unfortunately, yes, Your Honor.

16                 THE COURT:  Okay.  All right.

17                 MR. POPOFSKY:  I mean, this isn't debtor-driven,

18     but the answer is that based on the schedule that's been

19     submitted, mostly by Mr. Edmunds that has just joined, yes

20     is the answer.

21                 THE COURT:  And these are fact witnesses as

22     opposed to experts?

23                 MR. POPOFSKY:  Correct, Your Honor.  But again,

24     these aren't our witnesses, so I appreciate you asking the

25     questions, and I encourage you to do so.  But I don't know

Page 285

1    anything more than what I'm told.

2          THE COURT:  Okay.  Well, why don't we see where we

3    go tomorrow.  And then we'll talk about Thursday.

4          MR. EDMUNDS:  Your Honor, just if I may, I think

5    that there is a question of availability.  I am not sure

6    that we will go the whole day tomorrow, but I believe that

7    additional Sackler witnesses are not available until

8    Thursday.  So that's where we are.  But --

9          THE COURT:  Well, what about --

10         MR. EDMUNDS:  (indiscernible) would be the last

11   witnesses.  We do have one additional witness we might call

12   after the Sackler family testifies, but I think he is a

13   short witness and I think it would be largely in response to

14   what happens there.

15         THE COURT:  To what happens with regard to the

16   other witnesses that are to testify, the other Sackler

17   witnesses?

18         MR. EDMUNDS  That's right, Your Honor.  That's

19   right.

20         THE COURT:  So is it fair to say that there are a

21   few Sackler witnesses and then one other witness after that

22   perhaps?

23         MR. EDMUNDS:  That's correct, for the State of

24   Maryland, Your Honor.  I will leave it to Mr. Kaminetzky to

25   account for anyone else who may be coming in, because I

Page 286

1    don't know.

2            THE COURT:  Okay.

3            MR. POPOFSKY:  It's only the State of Maryland,

4    Your Honor.

5            THE COURT:  And it sounds like that witness may or

6    may not be testifying, so we can't -- it doesn't really make

7    sense to have that person testify if one of the Sackler

8    witnesses isn't available tomorrow.  Is that fair?

9            MR. EDMUNDS:  Correct, Your Honor.  Correct.

10           THE COURT:  Okay.  All right, very well.  So we'll

11   pick up at 10:00 tomorrow.  And I will just ask you to do

12   what you did before, which is submit your -- the exhibits

13   that you intend to use, and try to do it with the one that

14   you're actually going to use.  We ran off about 500 pages

15   that weren't used this time and had to change the toner and

16   almost burn up the copy machine.  So if you could try to

17   make sure that there's a good chance you will use these

18   exhibits.

19           MR. POPOFSKY:  Apologize for that.  But, yes, we

20   will make every effort to do that.

21           THE COURT:  Very well.  Thank you.  We'll see you

22   all tomorrow then at 10:00.

23           MR. POPOFSKY:  Thank you, Your Honor.

24           (Whereupon these proceedings were concluded at

25   5:57 PM)

Page 287

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.08.18 13:40:13 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 17, 2021

[& - 2018]                                                                    Page 1

## &

**&**   6:1,9 156:22
228:11

## 0

**0**   100:14
**0.15**   201:14
209:25 210:5
**0.4**   210:1
**0.45**   210:5
**0.886**   249:4
**0.97**   261:1
**0020120**   49:8,16
**07102**   6:13
**097**   261:17

## 1

**1**   40:23 41:5 42:17
42:19 43:1,3
58:24 60:8 78:15
83:19 148:4 162:2
162:5 165:19
210:7,11
**1,000**   27:18
**1.16**   248:13,19
261:17
**1.4**   123:25 215:9
**1.5**   146:24 210:5
**1.6**   213:20
**1.66**   213:21
**1.79**   257:25
**1.86**   264:22
**1.9**   192:2
**1.934**   193:3,7
**10**   88:24 89:1
108:21 156:3
180:25 181:1
211:22
**10.19**   159:2
**10.2.**   154:24
**10.4**   123:20
**10.7.**   216:13
**100**   91:10 106:19
157:23 209:3

223:23 224:7,8
225:24
**100,000**   216:18
282:19
**10014**   5:11
**10017**   3:16 6:20
**10019-6064**   4:4
**10036**   5:18
**1006**   5:10
**101**   92:3
**10110**   6:4
**106**   93:7,14
**10601**   1:14
**10:00**   286:11,22
**10:08**   1:17
**10:20**   24:1
**10:30**   149:20
**11**   15:5 38:24
146:17 153:11
159:3 249:20
250:14
**11501**   287:23
**11598**   5:4
**1177**   5:17
**118**   76:10
**11:00**   38:12
**12**   95:1 232:3
240:17 279:22
**1201**   6:12
**127**   235:25 236:4
236:5
**1285**   4:3
**12th**   215:3
**13**   18:1,8,16
173:22 188:13
211:18
**13th**   19:4
**14.1**   210:13
**14.2**   210:13
**14.5**   209:19 210:9
210:19 211:14
217:11

**14.574**   211:24
**140**   210:10
**15**   80:20 85:6
151:19 169:17
183:11 188:1
192:13,13 246:18
247:4,16 260:2,12
260:13 261:16
**1588**   154:13
**1589**   157:20
160:24 161:7
**15th**   89:24 91:12
91:17 154:18
155:8,10,17
**16**   2:2 22:15 66:15
66:17 76:13
173:13,14 179:5
**16th**   17:18 20:21
**17**   1:16 63:1 66:20
227:25 287:25
**172**   183:22,25
**17th**   17:20 21:1
22:21 25:15 90:1
151:23 164:11
169:20
**18**   67:10 85:6
201:21 213:10,11
213:19 262:7,14
262:18 263:1
**19**   245:9 252:25
253:1
**19-23649**   1:3
**1914**   208:11
**1916**   188:10
192:10 193:7
**1922**   174:15,24
175:1,10,17
180:23
**1928**   203:21
**1929**   203:22 207:8
**1984**   159:10
**1990s**   249:10,11

**1996**   239:15
**1998**   251:6
**1:30**   149:8
**1b**   81:3,3
**1st**   4:17

## 2

**2**   5:3 30:8 60:9
71:9 78:15 83:18
148:4 157:22
158:2,5,8 165:14
171:20 186:13
210:11 223:24
233:4 244:17,20
259:15
**2.248**   191:23
193:1
**2.98**   257:15
**20**   185:2 187:24
214:5,7 257:12
261:8,19
**200**   4:10
**2000**   80:6 249:11
**2001**   146:2
**2005**   157:2
**2006**   195:5,9,16
**2007**   77:5 80:6,9
80:10 81:4 123:21
**2008**   155:4
**201**   5:10
**2010**   81:13 85:14
86:23 87:16 89:4
89:13,16 256:24
**2012**   42:3,9 43:13
43:15 88:22 89:13
89:25 90:1
**2013**   91:12,18
93:9,16
**2015**   77:22
**2017**   157:23,25
**2018**   42:4,9,9
43:13 53:23 54:13
54:22 55:6 56:13
57:18 58:23,24

**[2018 - 6]**                                                          Page 2

81:4 85:15 86:23
87:16 88:22
126:25 127:21
**2019**   146:16 184:9
185:16,20,22,24
191:3,6,8 202:17
202:24 203:7,8
206:17 207:4,23
221:15 240:5
249:16
**2020**   78:6 79:6,16
80:8,12 173:18
180:19 182:16
183:11 184:5,15
184:24 185:13,22
185:24 187:7,25
188:1,16 191:3
202:17 203:1
207:20,21 208:1
215:14,17 248:7
256:24 257:25
**2021**   1:16 2:2 18:1
18:8,16 20:21
22:15 25:14
151:19 164:8
169:17,20 173:20
174:12 175:12
177:15 181:4
185:3,7,8 186:7
191:7 202:17
203:3 208:20
209:6 215:14,18
226:16 227:19
287:25
**2022**   219:12
**2026**   226:16
**2027**   184:15
194:17 199:10,11
199:12 200:7,10
226:15
**2030**   182:3 185:7
185:9 190:5,13,24
210:8 211:23

217:11
**20852**   4:11
**2094**   80:1
**21**   37:14,19 38:5
183:11 186:22
235:25 236:4,6
**22**   37:23 246:22
247:1
**220**   79:25
**237.3**   181:4
**2458**   55:19,20
**248**   1:13
**25**   143:24 183:22
184:2 189:18
**25,000**   67:20
**250**   176:17
**2548**   195:21
**25th**   89:4
**27**   63:23,23 65:3,5
183:24
**280**   210:11
**29**   208:12,16
256:23
**29,000**   67:20
**290**   210:12
**29th**   182:24

**3**

**3**   35:20 78:16
83:19 146:21,25
147:7 148:4 181:2
191:18,19 211:20
216:14 221:18
253:10 260:19,21
260:22
**3.25**   256:19
**3.5**   147:7
**3.56**   257:16
**3.8**   147:8
**30**   58:23 173:18
180:19 182:16
184:5 187:25
221:22 259:15
277:10

**300**   1:13 191:15
192:8 287:22
**30th**   6:19 180:17
**31**   173:19 174:12
181:3 237:14
**313**   192:7 193:9
**31st**   175:11
180:17 185:8
208:20 216:3
**32**   260:20,22
**32601**   4:18
**33**   202:21 204:5
215:7
**330**   67:21 287:21
**337**   155:4
**36**   28:8
**38**   202:19
**388**   166:10 229:2
231:21 263:13
**389**   166:10 229:2
240:14 249:17
**392**   166:10 229:2
232:23,24 250:12
**396**   256:14
**3rd**   199:18,21
212:20 221:22

**4**

**4**   25:14 30:13,19
33:7 34:2 85:3,13
85:14 147:8 148:4
174:22,23 175:1
180:18 191:18,25
208:12 215:3
247:23
**4.2**   215:5
**4.25**   222:25
**4.325**   147:24
148:6 221:18,24
**4.5**   182:15 183:12
183:16 184:4,14
184:23 185:12,17
187:15 189:1,14
191:2,6 192:20

202:6,24 208:23
209:2,12 219:2,4
219:5,10,11,22
220:10,16
**4.6**   147:1
**40**   179:20 214:2,2
257:19
**400,000**   106:22
**408**   85:7,24 97:13
**444**   180:21
**450**   3:15
**47**   84:7
**479**   186:6
**48**   80:16
**485**   6:19
**498**   114:15,18
**4:30**   16:6 24:6,11
149:17

**5**

**5**   35:23 154:23
164:8 183:4,7
188:11 192:11
196:18 210:24
211:10,12,15
213:18 227:19
237:14
**5,871,500,000**
174:1
**5.4**   214:19
**5.871**   174:3
**50**   37:12,16,19
38:7 88:24 89:1,3
146:25 190:20
192:4,17 204:4
223:18 264:5
**500**   6:3 201:13
204:21 286:14
**570**   6:12
**5:57**   286:25

**6**

**6**   76:12 173:22
174:24

**[6.544 - addition]**                                                    Page 3

**6.544** 174:5
175:14
**6.75** 257:19
**60** 145:15,24
214:1,2
**60,000** 282:19
**60/40** 179:2,8,12
179:13 201:23
213:17,23,25
**600** 174:7 175:25
176:16 177:16
**62** 89:21,22
**626** 4:17
**63** 89:25
**65** 90:11
**682** 181:4

**7**

**7** 61:1,3,5 219:20
244:18 257:1
**7.4** 184:17,24
185:4,7 187:7,21
**7.7** 216:15
**7.7.** 146:15
**75,000** 77:24
**750** 211:16
**79** 84:5

**8**

**8** 175:17,18 179:5
191:19 196:18
**8.5** 216:17
**8.6** 216:16
**81** 260:8,8,9
**82** 259:18 260:9
**84** 244:17,19,20
252:24
**85** 246:18,21,23
247:2 260:1,11
**89** 89:1

**9**

**9** 56:13 159:10,12
159:20 161:19
162:20 173:14

180:18 195:22,22
214:16 263:15
264:3
**9-30-2020** 173:24
**9.9** 261:25 262:23
**90** 146:24
**93.5** 175:24,25
**96** 80:2
**97** 84:7
**98** 183:4,6,7
**99** 91:11,11

**a**

**aaron** 5:6 166:13
**aaronson** 6:17
**abate** 34:5 35:10
48:18
**abatement** 35:1
229:9 230:5,19
231:7 233:19,23
234:2 239:11,19
239:24 243:4,8,10
245:10 255:6,12
262:10 267:13,15
267:16 268:4
269:15,17 271:2
274:19 280:12
**ability** 105:4,16
106:5 120:13
137:25
**able** 23:18 41:9
50:25 81:20 89:13
105:19 136:23
144:3,9 150:1
156:1 165:22
180:7 204:9
219:17 226:12
272:13
**abou8t** 176:16
**abrams** 7:2
**abroad** 105:1
111:20
**abruptly** 141:12
141:20

**absolutely** 23:24
32:21 60:23 76:13
104:6 120:6
131:25 149:3
**abuse** 50:24 51:4
51:7,7,22 52:4
53:5 144:2,15
145:9,17 234:8
239:16 245:11
257:6
**accelerated** 220:4
220:6,11
**accent** 112:10
**accept** 86:7,10
**acceptance** 132:1
**access** 39:2
112:20 178:11
193:23 194:2
198:23
**accompanies**
95:15
**accomplished**
35:15
**account** 160:1
173:4 197:22
200:3,4,9 201:4,6
201:10 206:13,23
207:12,23 209:16
209:17 239:15
252:9,19 253:4
254:11,14,15,21
254:24 255:2,5,8
276:4 278:9 279:5
279:5 285:25
**accountant** 22:4
**accounted** 279:8
**accounting**
177:20 225:5
**accounts** 276:7
278:7
**accurate** 41:25
77:21 110:18
142:20 147:2

202:25 203:2,4
287:4
**achieve** 183:16
250:25
**acronym** 67:3
**action** 62:6
106:20 107:15
**actions** 61:9,14,16
61:19 63:12,16
101:14,16,19
105:1,2 106:9
107:9,22 136:10
138:3
**active** 283:12
**activities** 30:11
31:9,23 102:18,21
103:22 105:20,21
106:9,12,17
107:16
**activity** 32:2
90:12 104:10,14
106:18 138:2
**acts** 82:10
**actual** 215:16
**acute** 144:23
**ad** 5:16 164:6
228:11
**adam** 9:23
**add** 20:5
**added** 30:5
**addendum** 84:2,4
84:10,14,17,23,25
88:25 96:3,5,25
97:4,5
**addicted** 282:12
**addiction** 122:10
122:17,18,24
142:2,8,9,14,15
142:17 239:15
**addictive** 47:18
121:14
**addition** 28:18

**additional** 209:15 239:19 250:8 261:16 285:7,11
**address** 233:23
**addressed** 132:7 134:18 137:24
**addresses** 230:18
**adds** 282:21
**adhansia** 110:23 110:25
**adjudge** 233:14
**adjust** 201:7
**adjustment** 276:6
**adjustments** 208:19 279:17
**administration** 124:15,18 283:1
**admissible** 86:21
**admission** 18:6 21:6 22:25 25:19 87:5 150:13 152:3 152:4,7 164:15 170:4,6 228:5
**admit** 18:15 25:22
**admitted** 18:15 82:10 161:7 170:8 172:10
**admitting** 119:7
**advance** 45:23 136:11
**adverse** 124:13
**adversely** 105:3
**advertising** 31:5
**advice** 33:23
**advise** 157:8 167:13
**advised** 15:18 88:12
**advisors** 33:20 121:3 133:21
**advocate** 158:8
**advocating** 128:8 144:13 234:18

273:3,7,8,17
**afanador** 6:9
**affect** 182:3 211:14
**affiliate** 116:18
**affiliated** 98:16 104:25
**affiliates** 44:24
**affirm** 17:9 20:14 22:8 25:1 151:12 163:24 169:12 227:13
**afraid** 155:15 158:18
**afternoon** 114:13 118:25 150:9 153:25 154:1 157:19 168:13,14 228:19
**agency** 155:3
**agenda** 15:9 45:21 45:25 58:20 60:8 60:10,23,25 65:22
**aggregate** 177:1 179:4,9
**aggressive** 126:8 126:11 213:3
**ago** 77:17 100:23 103:22 131:15 158:19 172:18 215:11 225:23 237:11 265:23
**agree** 32:4 34:6 44:3 88:10 90:17 92:25 97:4 120:8 124:10 148:1 152:12 177:8 215:23,24 223:22 229:24 230:3,7 231:9 233:15 235:18 239:14,21 241:18,25 242:4 242:20 243:3

246:1 248:18 249:6 251:17,22 251:23 252:4 253:17 255:21,24 258:15 259:22 261:18
**agreed** 17:24 19:5 19:13 21:8 22:16 24:3 81:21 260:13
**agreeing** 132:18 135:22
**agreement** 28:24 28:25 29:6,9,12 29:18,21,24 34:20 79:7,16 84:10,15 84:18,25 85:1,5,7 85:25 95:24 96:3 96:16,18 97:6,10 97:12 98:3,4,9 107:23 112:9 116:24 117:24 131:21 132:12,19 132:24 148:22 152:24 169:2 199:15,23 212:21 219:25 220:3
**ahead** 15:19 19:3 27:1 33:12 36:15 60:21 63:11 70:10 80:13 81:24 109:6 114:21 118:22 143:17 153:21 154:12 170:12 184:20 235:22 266:13 271:21,25 273:12 281:11
**air** 64:9
**aisling** 12:1
**al** 15:3 150:10
**albert** 6:23 101:24 105:8 109:1 113:5
**alcohol** 269:11

**aleali** 7:3
**aleck** 217:22
**alexander** 11:1
**algorithms** 194:2 198:24 199:1
**alissa** 12:3
**alixpartners** 124:3
**allegations** 78:1 85:4 89:19 96:4 98:8,13,21 99:6 99:14 100:11,19 101:5 105:15 106:12,24 119:11
**alleged** 96:2
**allen** 6:15 130:12
**alleviate** 277:25
**allison** 14:19
**allocate** 232:14 244:10,25
**allocated** 187:17 198:3,6 260:2
**allocating** 248:20 249:1
**allocation** 180:11 182:2,7,11 187:25 198:8 228:23 229:6,9 230:5,9 231:5,21,22 232:17 233:17 235:13 236:19,20 236:22 238:3,8,14 241:7,11,13,16 242:15,16 243:4 243:22 248:2 254:19 255:19,20 260:25 262:13 263:8,13 264:4,4 264:10,11 271:3 272:18 273:2,21 274:4,18 276:3 277:1 280:5 281:15,19 283:4

**allocations** 234:2
**allow** 35:5 114:16
**allowed** 229:20
**alma** 12:23
**alongside** 71:14
**altered** 125:2
**alternatives** 43:19
  107:3
**amend** 253:11
**amended** 15:5
  17:16 18:7 19:9
  20:21 21:6 22:15
  22:18,25 27:21,24
  27:25 28:3,19
  227:19 228:2,5
**american** 55:8
**americans** 50:19
**americas** 4:3 5:17
**amount** 33:15
  35:9 62:15,22
  77:25 121:3 124:6
  124:20 127:23
  147:6,24 176:19
  177:2 181:11
  204:5 207:6 215:8
  243:13 245:12
  261:3 282:9
**amounts** 107:25
  119:25 147:12
**analgesics** 66:18
  66:21 67:9 72:9
**analogous** 283:9
**analyses** 212:1,12
  212:14,16
**analysis** 172:5,9
  179:22 182:1,6
  190:12,16 216:10
  225:9,12,15
**andino** 165:22
  166:3
**andrew** 11:24
  14:3,10

**anecdotally** 145:4
**angela** 10:3 12:7
**anker** 7:4
**ann** 10:24
**announce** 23:14
**announcement**
  66:3,10
**annual** 184:18,24
  210:5 213:10
  282:19
**annualized**
  196:17
**answer** 48:8 50:21
  52:14 53:10 58:7
  72:14 74:13 82:19
  83:5 87:12 89:13
  89:20 92:22 95:13
  99:3 100:6 116:8
  117:5,8,20 118:10
  118:14 126:13
  130:1 131:9
  132:16 135:4
  136:12,24 137:1
  142:2 144:9 162:8
  176:13,20 183:11
  200:5 223:4
  230:13,24 232:13
  232:20 233:22
  236:9,12,15
  237:18,22,24
  242:19 244:23
  245:2,5 246:7
  253:3,7,9,20,23
  253:25 272:13
  273:11,12 274:10
  276:12 282:1,2
  283:20 284:18,20
**answered** 54:5
  84:1 88:16 99:25
  119:3 128:14
  133:5,7 176:2
  278:4 279:25

**answers** 74:9
  101:4 138:22,25
  176:9
**anti** 141:22
**anticipate** 16:7
  283:5
**anticipated**
  201:16 207:1
**anybody** 33:19
  126:1
**anymore** 43:7
  101:3 203:4
**anyway** 254:6
**apart** 281:16
**apologies** 40:25
  41:8 42:20,20
  43:8 109:13 218:2
  221:8 277:8 281:8
**apologize** 38:20
  59:4 64:24 66:14
  99:9 123:6,10
  150:24 156:7
  160:23,24 168:3
  184:12 253:14
  271:17 278:24
  280:23 282:5
  286:19
**appear** 60:10
**appears** 60:7 64:5
  70:5 84:4 137:16
  193:12
**appended** 156:23
  157:21
**appendices**
  212:20
**appendix** 27:17
**applaud** 145:5
**application**
  279:19,21
**applied** 161:22
  184:17,24 190:8
  201:21

**applies** 153:6,18
  160:14 210:3
**apply** 160:5,10,12
  160:13,17 161:14
  161:19 162:13,14
  163:3 191:2 198:1
  201:20 210:1,2,4
  214:17 215:7,10
**applying** 159:23
  177:19 209:23
  214:19
**appreciate** 18:11
  20:25 263:19,20
  277:24 283:25
  284:24
**apprised** 88:7
**approach** 65:13
  72:12 208:21
  247:24
**appropriate**
  26:16 103:24
  107:4 268:16
  269:8 272:11,15
  272:15,19
**appropriateness**
  103:17
**approve** 34:14,24
**approved** 29:18
  57:2 112:19 127:1
  153:13 255:15
**approximate**
  208:21
**approximately**
  59:16 85:15 86:23
  87:16 147:1 174:9
  176:19 177:1
  211:15
**april** 89:24
**ardavan** 8:16
**aren't** 241:25
  266:21 280:11
  284:24

argue  34:10 126:1
  222:11 266:2
argument  23:15
  23:15,18
arik  12:14
arithmetic  196:19
arm's  205:14
arrangement  69:6
arrived  209:2
art  143:8
artem  13:19
article  159:10,12
  159:20 161:19
  162:20
articles  257:5,8
aside  216:7,12
  229:8,12
asked  41:12 65:2
  85:9 105:14,18
  116:6 119:3 127:3
  147:19 148:19
  157:5,8,20 165:11
  175:5 189:6,10,17
  189:19 194:5
  200:11 210:16
  211:12,21 212:2,4
  217:1,1,2,5,23
  224:17 226:10
  236:8,14 237:17
  237:23 244:22
  245:4 246:6
  252:21 253:2,8,24
  270:1 271:7,8
  272:21,24 273:2
  273:23 275:9,14
  275:14,15 277:3
  279:7,9,10,24
asking  30:16,16
  70:20 74:3 76:2
  83:6,8 86:2,6,10
  86:10,15,15 87:5
  88:18 98:5 102:20
  103:2,4,8 121:8

123:5 125:8
128:11 134:7,13
220:19 221:10
223:4 229:1 240:1
254:4 279:4,12,14
284:24
aspect  134:10
aspirations
  148:19
assert  217:14
asserted  102:19
  130:20
assessment
  185:18
asset  133:20
  173:17 174:11
  175:11 177:20
  178:2,6,9,13,13
  178:14,22,23,23
  178:25 179:14,24
  179:25 180:2,11
  180:16 181:5
  182:2,3,6,11
  186:5,6 187:4,12
  188:1 190:4,9,10
  193:14 194:5
  196:8,15 197:11
  197:25 198:8,14
  201:12 202:3
  207:6,20 208:18
  208:21 210:1,6,7
  213:17,23 214:14
  216:2,3 219:22
  220:6,9,9
assets  117:7 118:5
  118:11 119:23
  120:4 134:24
  135:15 137:4
  163:8,10 173:19
  174:11 175:14,19
  177:15 179:7
  180:10,19,20
  182:9 190:5

191:20 192:1
197:23 198:3
201:15,25 204:7
208:19,19,20
209:22 211:22,24
213:8,20 214:1
215:4,17 216:12
217:11 219:9,17
220:5,14,18,25
222:10 226:12,17
226:20 269:15
assigned  208:25
assignment
  173:16 197:16,18
  212:3 283:13
assist  141:24
  190:2
assisted  142:8,12
  142:13
associate  171:23
  171:24
associated  36:6
  99:4 113:25 132:8
  142:23 201:4
  215:1 283:1
association
  145:19
assts  225:6
assume  57:13,15
  60:6 91:21 92:17
  116:14 117:21
  149:1 179:16
  182:11 199:9
  207:5,15,17
  247:11 253:12
assumed  179:2
  180:11 182:15
  183:10,12,15
  184:4,8 198:3,5,8
  199:11 204:9
  205:21,24 207:14
  210:18 219:1,20

assumes  135:4,12
  200:10 219:14
  252:12,17
assuming  88:18
  136:25 149:22
  206:7,8,12 207:14
  209:3 219:5,6
  226:15 232:8
  246:9 255:15
assumption
  117:16 140:13
  175:22 181:23
  182:10 185:12,15
  202:2,22 206:6
  214:14 218:16,20
  219:9 252:22
assumptions  61:6
  62:2 136:10,11
  179:23 194:9,13
  198:13 206:13
  209:15 210:22
  213:2,6,7,22
  214:23,24 215:25
  216:21 231:2
assurances  77:8
atinson  7:5
atlantica  172:16
attached  18:7,16
  19:9 20:24 21:2,7
  22:19 23:1 60:24
  227:23
attaches  17:23
  20:21 22:15
  227:19
attachment
  154:16
attachments
  154:15,16 217:7
attempting  163:2
attended  45:11,14
  92:8
attention  196:4

**attorney** 3:14 4:8 4:9 6:25 120:21 134:5 212:3
**attorneys** 4:2,16 5:2,9,16 6:2,10 30:3 32:7 34:10 35:4,14 116:7,9 116:10 136:23 234:10,17,25 272:24
**attributable** 268:20,21,23
**audible** 18:22 21:9,13 23:2,5 25:21 41:7 277:8
**audience** 274:24 274:24
**audio** 49:12,21 64:6 138:24 178:16
**audits** 107:12
**august** 1:16 2:1 17:18,20 20:21 21:1 22:15,21 25:14,15 42:4,6,6 42:9,9 43:13 81:13 88:22 91:12 91:12,17 151:22 164:8,11 169:20 227:19,25 287:25
**auslander** 7:6
**australia** 44:24 106:20 107:15,20 107:21,24
**australia's** 106:24
**australian** 106:22 107:4
**authored** 227:20 233:5
**authoritative** 231:11
**authority** 110:8 141:16 155:12,21

**authorization** 124:17
**authors** 240:9
**availability** 149:16 285:5
**available** 141:24 155:24 163:9,10 177:24 178:2 189:10 200:25 226:18 232:17 285:7 286:8
**ave** 6:19
**avenue** 3:15 4:3 5:17 6:3
**avenues** 136:20
**average** 179:2 282:20,21
**award** 232:14
**awarded** 264:5
**aware** 27:21,23 27:24 28:2,19,20 29:4,24 33:3 34:9 34:12 47:17,19,20 47:25 48:3 77:4 89:18 98:13,21 99:6,11 100:10,18 101:5,13,17,19 105:20 113:17 136:20 137:18,21 138:4 146:15,18 148:3,17 156:5,9 168:15,21 215:16 219:24 220:1 223:2,13 231:15 236:17 239:2 244:12 248:25 253:17,24
**axis** 196:16

**b**

**b** 1:21 108:9,10,12 114:14,23 115:2 164:2 190:18,20 190:24 191:4,7,11

191:15 225:6
**b's** 174:11 180:19 208:12
**ba** 170:20,21
**back** 43:12 45:6 73:7 79:12 94:24 95:1,5,15 123:7 125:22 133:18 135:17 138:25 148:14 150:4 156:3 167:6 188:10 227:2 249:16 250:11 256:1 284:11
**background** 64:1 89:6 162:1 171:7 271:20
**backwards** 74:15
**bad** 222:10
**badly** 126:21
**bailiwick** 153:17
**balance** 112:21 124:24 125:2 177:1 187:1 208:24
**ball** 7:7
**baltimore** 4:11
**bands** 211:25
**banker** 186:25
**bankruptcy** 1:1 1:11,23 33:1,5 34:13,23 39:25 136:22 221:15 230:4 234:24 235:3 236:18 239:8 241:13 242:7,15,24 243:11 245:7 246:17 247:25 248:2,4,12,18 249:8 252:13,16 255:15 259:4,9,23 261:4,7,17,25

262:9 264:14 273:25 275:16 283:10
**barbara** 8:17
**barely** 277:8
**barker** 7:8
**barometer** 112:23
**base** 220:6,9 221:1
**based** 19:24 23:7 32:18 49:11 60:6 62:3 70:4 72:4,19 73:17 74:19,21 97:12 102:18,19 102:21 103:14 104:9,25 127:11 127:18,25 147:8 156:24 171:2 179:23 184:9 185:13,18 186:8 188:23 189:12 190:13 195:18 197:4 201:12 204:14,21 205:13 205:16,17 213:13 217:20 221:16 224:21 234:21 244:11 245:1 247:5 248:3,20 259:18,19 260:2 260:13 266:11 274:6 284:18
**basic** 112:20
**basically** 120:16 142:21,22 173:4 182:12
**basis** 47:7,9,11 70:11 78:13 82:7 82:14,15 83:2,9 83:11 87:3 97:21 102:2 107:13 116:21 178:13 202:5,10 205:3,6

205:10 206:21
220:6,11 222:7
230:15 267:24
**batches** 39:3,9
**bates** 63:9
**bear** 36:4,6
173:12 210:25
246:8
**bearing** 251:24
252:6
**bears** 275:18
**beg** 202:21 220:20
**began** 37:21
**beginning** 43:5
55:19 106:11
219:10,11
**begins** 58:11
84:11
**behalf** 16:17
23:13 26:15
118:21 130:13
153:19 228:11
234:18 244:6
273:4,7
**behavior** 103:18
**beiderman** 10:2
**belief** 62:13,22
74:17,20 119:12
128:16 134:20
159:6
**believe** 15:13 28:4
29:13,20 35:6,23
36:1,2 39:20
41:19,22,25 44:14
50:21,22 52:18
53:13,21 54:23
55:1,21 62:13,24
65:2 66:2,8,15
68:22 70:18 71:20
75:18 77:21 78:21
79:11 82:14 84:16
90:8 96:10 97:16
100:1,25 101:4

106:15 107:7
108:5 109:1
110:24 111:2,22
111:24 114:19
116:1,5 119:10,10
119:14,16 120:5
121:24 122:19,22
122:25,25 123:2
124:3,9 127:14,17
127:21 129:9
132:6 133:23
135:11,16,22
140:15 141:14
150:11,13 151:3
153:2 154:11
157:22,25 158:14
169:1 171:9 173:6
173:9 189:13
190:7 191:16
192:5 202:14
208:18,22 209:25
211:15 214:15
218:21,25 222:3
223:3 230:17,24
230:25 231:22
237:22 244:12
245:22 256:21
262:7,25 266:22
277:23 278:4
279:25 285:6
**believed** 53:2
**ben** 10:1 15:11
26:22 76:10
164:22
**bench** 151:6
**beneficiaries**
132:10
**beneficiary**
119:24 120:3
163:1,6,9
**benefit** 108:11
112:21 132:5
133:15 215:1,9

**benefits** 124:12
**benjamin** 3:19
5:13 6:23 27:6
38:13
**benzodiazepines**
111:7
**bernard** 8:16
**beshere** 7:9
**best** 48:20,21
128:1,7,16,18,18
128:18,18,19
143:9 145:22
183:3 189:10
217:3,8 234:18
251:1 273:3
**better** 50:14 91:3
115:18 120:25
131:10 134:8
151:2 186:18
218:3 222:2 226:7
230:18,23 242:21
249:13 258:2,3
270:20 278:17,17
**beyond** 30:20
78:4 142:25
242:10,17 268:3
268:12 284:14
**bias** 226:9
**bickford** 3:9
163:21,22 164:5
164:18 165:1
**bickford's** 164:15
**bielli** 7:10
**big** 211:11
**bigger** 221:25
**biggest** 216:1
**billed** 110:16,17
211:4
**billion** 108:21
123:20,25 146:21
146:25,25 147:1,7
147:24 148:4,4,4
148:5 174:3,5

175:14,25 177:3,5
182:16 183:10,12
183:17 184:5,14
184:23 185:12,17
187:16 189:1,14
191:2,6,23 192:2
193:3 202:6,24
208:23 209:12,19
210:9,13 211:14
211:24 213:20,21
215:6,9 216:14,15
216:16,17 217:12
219:2,4,5,10,11
220:11,17 221:18
221:19,24 222:25
**billions** 33:8 34:3
34:19 148:16
211:18
**bind** 152:23
**binder** 195:22
208:12
**binding** 86:18
**bit** 32:13 36:24
39:22 46:10,13
92:23 98:20 133:5
142:3,10 144:20
144:20 169:22
178:16 180:4
204:3 214:12
218:4 241:23
242:5 247:21
255:25 259:3
262:17 264:9
270:19,22 274:20
282:8,17
**blabey** 7:11
**blackline** 21:7
**blacklined** 18:8
**blackout** 168:1
**blackrock** 193:13
193:17 194:6,8
195:7,17,18,19
196:1,12 197:1,14

[blackrock - calendar]                                                    Page 9

197:15 201:8,21
201:24,25 202:3
209:21,22 213:9
213:14 214:14
217:15
**blackrock's**
177:23 194:4
198:15
**blain**   7:12
**blame**   50:11
**blank**   30:1 123:3
**blouin**   7:13
**board**   43:23 45:10
45:11,16,19 46:5
46:20,25 47:5,17
48:6 50:23 51:1
51:19,20,22 52:6
52:9,12,25 53:3,4
53:9,18 54:25
55:6 56:17,21,25
57:2,2,4,8,11,20
57:24 58:2,2,19
59:7,16 60:10,11
60:16,17 61:16,18
61:21 63:20 65:6
65:10,11,23 66:1
66:22 67:13,17,18
67:24 68:5 69:11
69:16 71:24 72:1
72:5 74:23 75:2
83:14 88:6,6,11
88:19 89:5,11,12
90:2,17 91:4,5,18
91:19,20 92:5,12
92:19,20,21,25
93:4,9,16,23 94:2
94:6 98:15 109:3
125:1,14,22 126:1
126:15,25 127:23
129:8 140:15
143:23 144:1
155:25

**board's**   91:12
**boards**   44:17,18
44:19 57:5 58:20
58:22 129:15
**bograd**   7:14
**bold**   62:6
**bolded**   196:4,6
232:18
**bond**   195:2
**bonds**   179:4,9,14
224:1,9
**book**   58:19 60:16
60:17 174:23
186:17 187:2
**booklet**   155:5
174:18
**books**   45:16,19
60:11
**borders**   130:6
**bottom**   80:18
154:23 173:24
196:5,16 264:9
**bound**   134:1
152:12 212:22,22
**box**   49:9
**boxing**   49:5
**boy**   135:1
**boyd**   138:21
**brand**   126:20
**branded**   106:25
**brauner**   7:15
**breach**   68:18
218:18
**breached**   153:14
**break**   60:15 94:20
94:22 149:9,10,16
277:11
**breakdown**   90:13
178:23
**breaking**   218:4
**breene**   7:16
**brian**   4:13 11:12
24:10 26:3 36:19

**bridges**   138:21
**briefly**   199:6
256:17 281:10
**bring**   42:22 51:5
215:13 218:1
**brink**   147:15
**britain**   44:25
**broad**   6:12 27:12
34:6,15 35:16
82:1 136:14
201:12 204:21
274:24
**broader**   71:19
201:22 210:3
213:17
**brooks**   7:8
**brought**   95:19
106:10 140:1
145:21 215:17
**brown**   4:6
**brunswick**   7:17
**bryce**   9:1
**budget**   93:23 94:2
94:5,7
**budgeted**   221:2
**budgeting**   46:11
**bullet**   181:2,14
186:24 187:11,23
192:15,20 193:6
240:22,25 249:23
249:25 250:4
**bullets**   188:15
250:1
**bunch**   137:1
**buprenorphine**
139:17,24,25
142:7
**burdensome**
47:10
**burn**   286:16
**business**   63:13,17
69:23 88:2 92:2
101:18 107:10

112:11 115:12,22
116:4,11 117:7
121:6,11,13 124:1
127:9 128:2,9,17
131:3,5,8,19
133:12,13 141:17
144:25 203:21
**businesses**   101:14
101:16 123:24
186:25
**butrans**   121:19,20
139:25 140:3
**bylaws**   57:14

─────── c ───────

**c**   3:1 8:3,11 10:2
11:13 15:1 25:4
151:15,16 164:2,3
168:2 169:25
227:16 287:1,1
**cadence**   46:14
**cahn**   5:6 165:9,11
165:21,24 166:15
167:1,4,22 168:3
168:6 263:20
270:13,14,16
271:11,14,17,19
271:22,25 272:1,2
272:10 273:14
274:7,9,14 277:7
277:19,23 278:2
278:14,15,17,19
278:22 279:1,3
280:22
**calculate**   173:2
182:14 184:17,23
199:1
**calculation**   216:6
225:6 274:16
**calculations**   194:1
194:9 199:9,13,14
201:3 218:25
**calendar**   46:12

**calendared** 46:17
**california** 241:20
  242:2,5 246:10,12
  257:18,22,22
  261:23,25 262:4
  262:17,22,25
  276:19,23,24,25
  277:2
**california's**
  262:13
**call** 24:7 60:22,22
  67:20,21 68:17
  114:23 166:16
  190:17 226:6
  235:10 239:3
  240:1 251:7
  259:13 285:11
**called** 16:14 24:4
  25:9 37:14,20
  45:16 47:1 60:11
  81:7 89:8 100:12
  110:1 120:10
  122:7,8 129:7
  165:7 213:10
  214:15 216:7
  235:10 237:10
**calling** 24:22
  60:17
**calls** 68:13
**canada** 101:10,12
  101:12 107:14
  133:13,21
**canadian** 6:10,11
  130:13,14 138:2,5
**canceled** 59:10
**cannabinoids**
  111:10,11
**can't** 278:14
  286:6
**cap** 179:3,8
**capacity** 44:14
**capita** 246:12

**capital** 198:22
**capitalized**
  240:25
**capture** 192:6
  270:5
**cards** 81:11
**care** 148:20
**careful** 75:7 76:3
**cares** 119:12
**carl** 14:6
**caroline** 9:4
**carrie** 11:16
**carried** 187:1
**carry** 122:10,12
**carter** 5:1 7:18
**case** 1:3 31:7
  41:23 44:20 49:20
  53:16 54:23 72:18
  120:17,17 122:2
  124:10 131:25
  133:21 135:17
  152:19 153:7
  154:2 156:18
  157:6 171:1,5
  172:15,16 173:7
  173:17 197:21
  200:19 218:10
  229:8,12 230:8
  233:19 235:21
  239:12 268:17
  273:17,25 283:8
  283:14
**cases** 156:5,9,13
  229:15,16 282:13
  282:14
**cash** 134:23
  180:20,20 181:3,3
**cashflow** 205:17
  225:9
**categories** 177:20
  178:1,2,6,15,22
  178:25 180:16
  193:14 197:23

  201:12,15 210:2,6
  213:9,24
**category** 51:8
  83:22 190:4,9,10
  201:25 202:3
  213:9,20 214:14
  269:10
**catherine** 10:2
  13:23
**cathy** 96:20
**causation** 172:19
  172:21,22
**cause** 105:23
  108:15 122:16
**caused** 122:21,23
  122:24 125:14
  126:8 172:23
  173:5
**causes** 276:1
**causing** 125:24
**caution** 75:7
**cautioned** 201:8
**cc** 57:5
**cdc** 127:24
**cease** 56:19,19,20
  71:25 127:1,6,11
  127:12,18 128:12
**ceasing** 128:4
**cell** 196:21
**census** 248:8
  257:25
**central** 110:25
  111:4 153:11
**ceo** 61:24 90:3
**certain** 6:10 33:12
  51:19 52:1 68:13
  74:1 106:19 112:1
  120:6 126:8
  130:13 133:1
  135:6 148:12
  209:15 215:5,13
  226:17

**certainly** 41:10
  44:4 74:17 93:3,6
  130:7 135:16,24
  152:7 158:15
  207:9 219:21
  224:4 249:14
  251:13
**certainty** 33:19
  59:22 116:16
  239:22,23
**certified** 143:23
  287:3
**chain** 116:14
  117:18
**chakraborty** 7:19
**challenging** 49:13
  62:3
**chambers** 49:6,9
  49:17
**chance** 40:13,14
  64:4 286:17
**change** 17:21 18:3
  21:3 22:22 25:16
  61:20,24 151:24
  164:12 169:21
  179:23 182:9
  184:10 186:4
  189:4 190:13
  202:22,23 204:7
  204:13 207:8,17
  209:15 228:1
  260:15 279:8
  286:15
**changed** 16:23
  67:11 129:9 155:6
  169:23 191:7,9
  202:18 206:19
  207:12
**changes** 180:16
  182:2 206:23
  207:5,6,23 255:8
**changing** 65:7
  189:5 204:8

chapter 15:5 146:17 153:11
characteristics 226:1
characterization 95:17 116:20 120:25 126:10 245:13
characterize 76:3 108:22 114:25 122:5
characterized 225:3 259:25
charge 77:5
charged 109:14 109:22
charges 78:9,10 82:23 83:2
charles 3:11 7:25 13:2 138:22 165:7 227:16 228:17 265:8 270:15 281:12
chart 260:15,24 261:9
check 193:23
checking 164:24
cheryl 10:12
chief 234:14
child 269:22
children's 164:7
chin 42:19
choice 160:10,12 160:18 161:15
cholesterol 31:18
chosen 187:17
christina 12:20
christopher 7:18 7:20 13:13
chronic 123:16 144:23
cicero 7:21

circumstances 135:6
citation 157:23
cite 53:7
city 251:15,15
civil 30:10 84:14 85:5 95:24 96:3
claim 52:22,22 73:19,20 86:1 162:12 283:10
claimants 136:21 138:21 228:13
claims 30:10,17 30:21 31:3,17 32:14,18,23 35:7 35:24 98:3,6 102:18,20 104:9 134:21 135:12,13 137:6,6 234:21
clarification 42:2
clarify 19:10 183:9 269:4
clarifying 88:17
clarity 21:15
class 179:14 196:8 280:13
claudia 13:22
clause 86:7
clean 92:22
clear 19:12,25 41:21 58:1 76:13 108:7 112:9 120:18 152:8,21 155:5 162:21 165:3 206:15 242:24 261:10
clearly 49:17 72:19 97:11 117:16 141:7 146:13 161:22 218:11,12 260:18
clerk 21:25 175:5

clerk's 166:23
client 257:24 258:17 283:5
clinic 145:13
clint 8:10
close 237:5,8,20 259:19 284:6
closed 106:16 107:21,24
closer 16:19 37:1 150:25 218:1
closes 42:21
coast 166:19
cohen 6:1
coincident 85:6
coleman 7:22
collapse 117:19
collateral 153:3
colleagues 15:25
collection 251:3,4
collectively 147:21
colloquial 147:22
colloquy 223:3
column 173:23 196:21
combat 144:6 145:17
combine 26:4
combined 37:25
combining 240:12 245:22
come 45:6 96:13 98:24 99:1 141:7 153:2 167:6 195:8 203:20 255:14
comes 240:2 278:24
comfortable 151:6
coming 38:20 49:6,10 150:22 203:23 271:23

275:1 285:25
commence 148:15
commenced 106:10
commencement 239:23
commensurate 185:4
commercial 56:5
committed 66:24
committee 5:16 135:18,18 163:22 164:6 228:12
common 141:18 212:12,15,16,24 230:12 273:18
communicate 47:14
communications 41:7 47:8,11 90:18 91:5
communities 244:2,3,10,25 256:2,3
companies 48:14 98:16 102:18 105:1,1,2 106:10 108:3 111:20 116:18 117:2,9,14 118:6 132:9 204:25 223:6,8,23 224:7,8 225:24
company 26:16 42:13 43:16 44:1 44:4,25 51:3,21 53:9 62:19 65:5 67:3 68:12 91:13 91:14,18,23,24 92:12 104:5 111:5 114:12 115:6,7,14 115:15,24 116:11 118:6 122:3 124:16 129:7

139:11 144:21,24
212:18 240:10
**company's**  52:12
93:23
**comparable**
225:12
**compare**  195:1
216:8
**compared**  221:14
223:25 246:12
**compares**  242:15
**comparing**  260:24
**comparison**
262:21 276:23
**compensation**
78:4 110:17 124:6
124:7
**competent**  234:11
**competing**  233:17
**competitor**
126:19
**competitors**  90:14
**complaints**  89:19
**complete**  64:4
163:18 238:24
**completed**  107:22
140:13
**completely**  31:22
32:1 97:13 273:20
**completeness**
139:24
**complex**  229:25
**complicated**
130:2 230:5
233:23 234:3
259:5,9 279:11,13
279:20,21 282:6
**complied**  119:17
**comply**  149:1
**component**
262:20 276:3
**components**
262:20

**composition**
179:24
**compound**  54:17
70:19 189:22
**compressed**  46:16
**comprised**  89:8
**compromise**
234:25 235:3,9,12
235:14,16,19
236:10,13 237:10
**conceivable**
160:17
**concentrated**
145:6
**concentration**
266:15
**concept**  160:14
**concepts**  273:15
**concern**  62:8,12
62:18,21 196:24
277:11
**concerned**  105:23
135:21
**concerning**
162:21 173:8
231:4 272:18
**concerns**  105:16
150:20
**concluded**  286:24
**conclusion**  134:3
136:9 159:15
212:1 225:25
226:1,3 240:2
**conclusions**
172:14
**concomitantly**
222:22
**condensed**  24:16
**condition**  104:13
105:9 132:25
**conditions**  186:4
202:18,22 203:10
203:16,16,18

204:8 206:19
207:5 223:18,20
**conduct**  30:15
32:19 77:14,19
82:2,9 83:1,13,17
83:19,23,24,24
87:22 88:12 89:16
92:1 102:10,25
103:1,2,5,11,14
103:20,24 119:15
**conducted**  205:14
**conducts**  111:14
**confer**  21:25
**conference**
240:11 274:16,17
**conferences**
274:22
**confidential**  68:22
**confirm**  53:22
74:1 202:5 223:5
**confirmation**  2:1
15:5 39:12 119:22
**confirmed**  112:12
140:11 143:2
**confirming**  134:2
**confusion**  142:1
148:18
**conjunction**
143:11
**connection**  77:5
95:22 209:1
212:12 250:8
**connolly**  7:23
**consensual**  239:8
**consensus**  64:5
**consent**  77:9
**consequence**
148:12
**conservative**
202:2 213:4,5,16
213:22,24 214:13
**consider**  103:19
146:19 168:23,24

172:8
**consideration**
146:22 153:10
233:17 243:5
**considered**  35:9
35:12 63:13,16
107:3 128:12
130:3 137:17
**considering**  15:20
153:8 233:16
273:18
**considers**  112:20
**consistent**  127:15
207:22 214:20
**consla**  7:24
**constant**  175:23
**constipation**
31:19 53:24 54:12
75:18
**constrain**  253:16
**constraints**
104:15
**construct**  217:16
**constructed**  276:2
**construction**
157:16
**construe**  157:18
**construed**  159:22
**construing**  157:14
**consult**  91:6 134:5
136:23 143:1
**consultant**  91:25
**consulted**  90:19
145:23
**consulting**  91:13
91:14,18 129:8
**contact**  42:11
165:22,25 166:18
**contacted**  283:11
**contacting**  165:25
**contained**  159:9
169:6 209:9
236:22

containing 46:1
contains 60:9
  96:25 259:11
contemplated
  284:13
contend 54:11
content 152:24
context 86:4
  116:5 197:9
  229:10 230:4
  231:5 233:16,22
  234:2,7 239:12
  272:17
contin 121:23,24
  121:25 122:3
contingency
  147:12
contingent 221:16
  228:12
continuance 2:1
continue 56:24
  67:8,19 68:17
  85:19 86:25 87:21
  87:25 93:15 95:10
  97:17,19 112:8,13
  112:15 113:13
  129:16,18 194:25
  211:9 270:2
  277:21,25
continued 53:23
  58:24 70:6 71:14
  127:14
continues 113:14
  269:21
continuing 70:14
  74:25 76:15 131:4
continuous
  279:19
contract 68:14,15
  68:18 105:5
  161:21
contractual 75:19
  161:20

contractually
  68:13
contrary 69:3
contribute 33:16
  34:25 120:14
  137:17 261:24
contributed
  136:19
contributing
  118:8,12 241:20
  242:2
contribution
  51:17 137:4
  243:19 261:14
control 94:2 122:5
controlled 93:23
  111:15 145:3
controls 107:16
conversation
  267:14
conversations
  44:3 275:6
conversions 43:23
convert 51:24
copied 90:18 91:5
copy 28:3 40:2,4
  40:21 80:18 155:5
  286:16
coroner 269:7
corporate 194:14
corporation 138:5
correct 19:6 22:4
  23:22 25:5 27:12
  27:13 30:12,18,22
  30:23 31:20 32:11
  32:12,20 33:9,10
  33:13,14 34:7,8
  34:21,22 35:25
  39:13 43:14 44:7
  44:8,12,16 45:14
  45:17,18 46:1,2
  60:14 61:17 63:18
  66:23 67:15 73:16

74:18 83:16,22
  84:20 88:20 95:7
  96:1,7,17,23,24
  98:20 99:2 101:4
  102:22 108:13,21
  110:6 111:17,24
  115:22 117:15
  120:24 122:24
  124:25 127:2,4
  128:1 129:8,16,18
  129:21 130:22
  131:10 132:5,7,20
  132:21 139:6,10
  140:8 141:14
  142:14 147:4,10
  148:8 151:17
  155:5,19 156:16
  157:3,4 158:11
  160:20 163:12
  164:4 169:25
  170:16,18,19,22
  170:23 171:8,11
  171:15,16,25
  172:1,14,17,18
  173:2,20,21 174:1
  174:2,5,12 175:15
  175:16,21,25
  176:1 177:7,11,14
  177:17,18,21,24
  178:3,15,23,24
  179:3,12 180:12
  180:15,20 181:16
  181:24 182:3,5,9
  182:16,17,25
  183:1,2,13 184:6
  184:15,16,18,25
  185:1,10,14,24
  187:8,18,21,22
  188:2,17 189:3,14
  189:18 190:2,6,7
  190:10,11,15,21
  190:24 191:4,5,9
  191:23,24 192:2,4

192:7,23 193:1,11
  193:12,21 194:21
  196:10,13 197:16
  198:7 199:9,13
  200:5,7,8,9,17
  201:5,10,17 202:1
  202:7,8,11 205:1
  215:19 220:7,15
  221:2 222:19
  223:7,12 225:7,13
  225:16 229:7,11
  229:14,18 231:5
  231:14 232:10,21
  234:3,19 235:11
  237:21 238:4,16
  238:23 240:5
  241:16 243:11,24
  244:7 248:14
  249:9 250:9,10
  256:21 259:11
  260:10 263:1
  264:16,17,22
  265:25 266:22
  271:5,6 272:19
  280:1 281:14
  284:23 285:23
  286:9,9
corrected 252:21
correcting 246:1
correctly 81:18
  139:4 140:22
  169:9 187:19
correlated 223:24
  224:2 260:6
correlation 224:5
  226:5
correspondence
  150:15
correspondingly
  222:22
cost 81:11 140:12
  209:25 254:22
  268:4 269:16,22

280:12 282:7,19
**costly** 145:13
**costs** 94:8 212:19
254:16,21 267:23
280:17 281:22
282:23
**couched** 126:16
**could've** 57:15
173:5
**counsel** 17:24
18:12 19:7,13,18
21:8 22:17 57:14
75:7 98:25 99:1,2
112:6 115:1,18
120:6 150:16,16
154:12 209:14
234:12
**counseling** 143:6
282:25
**count** 78:15,15,16
81:3,3 82:15,15
83:17,18,19,19
88:21 251:18
**counted** 251:14
**counter** 217:10
**countervailing**
214:25
**counting** 251:24
252:4
**countries** 98:23
98:23 107:17
113:8,19 223:14
223:15,19,21,23
**country** 287:21
**counts** 78:9,17,19
83:21
**county** 269:7
**couple** 102:8
149:22 167:9
211:3 212:2
219:21 224:25
225:23 256:12
273:15

**course** 39:13
62:20 112:11
114:17 135:12
137:21 139:2
145:16 154:18
155:16 203:22
204:7 216:16
272:25 277:22
**court** 1:1,11 15:2
15:13,22 16:9,11
16:18,23 17:4,7
17:12,15,23 18:5
18:10,20,23,25
19:3,6,8,12,16,20
19:23 20:4,7,11
20:17,20 21:5,10
21:14,19,23,25
22:1,6,11,14,24
23:3,6,11,14,16
23:19,23,25 24:12
24:15,19,23 25:4
25:6,18,22 26:1,6
26:9,20 27:1
34:13,23 36:11
40:22 41:2,6 42:6
42:21,25 43:2,4
49:18,23 50:1,4,7
50:12 52:10,15
54:5,16 58:7
64:16,18 70:11,17
70:19,23 71:3,5,7
71:11 74:13 75:14
75:24 76:1,7,21
76:23 77:1 78:13
80:21 82:7,13
84:3,8 85:8 86:4
86:17,20 87:6,8
87:11 93:18 94:12
94:16,18,20,24
95:1,5,9 98:1,9
99:5,8,20,25
100:3,6 102:1,6
102:12,14,16

103:1,13,19 104:4
104:8,12,22
105:11,25 106:2,4
109:5,8,11 113:6
113:11,15,19
114:3,5,8 118:18
118:22 123:4,8,11
125:11,16 126:12
130:10,16 131:12
131:22,23 134:2
134:12 135:3,9,21
136:13 137:11,24
138:11,16 143:14
143:17 146:6,10
149:7,13,19,21,24
150:4,7,9,22
151:1,5,9,15,18
152:1 153:1,21
154:3,9,20 155:1
155:5,12,21 156:6
156:9,11,13,15
157:12,17,23
158:22 159:2,5,14
160:4,7,9,10,17
160:19,21 161:1,2
161:4,7,9,14,18
161:22,25 162:3,7
162:13 163:3,15
163:20 164:2,5,14
164:25 165:6,13
165:16,21 166:2,7
166:12,23 167:3,5
167:11,13,15,18
167:21,24 168:5,7
168:11,14,21
169:1,5,8,11,16
169:24,24 170:2
170:12 174:17,22
174:25 175:7
176:12,24 184:19
186:15 189:23
199:5 203:13,15
204:10,16,18,24

205:2,5,10,21,24
206:2,4,6,10,12
206:18,21 207:7
207:10,13 208:2,4
208:8 209:18
212:6,10 217:19
222:5,7 224:16,20
225:19 226:23
227:1,6,9,16,18
227:22 228:4,8,14
228:16 229:20
240:22 242:14
251:9 259:24
265:1,6,15 268:6
268:9,12,16
270:10,12 271:14
271:24 272:7
273:11 274:7,10
278:13,16,18,21
278:24,25 279:2
280:23,24 281:2
281:1 282:1
283:19,23 284:3
284:13,16,21
285:2,9,15,20
286:2,5,10,21
**court's** 84:6
**courtroom** 49:6
49:10
**cousins** 96:20
**covenant** 218:18
**covenants** 146:20
**cover** 150:1
**covered** 103:5
131:4 187:14
193:8,10
**covering** 75:15
**cowan** 3:11 7:25
165:8,20 167:6,25
227:12,18 228:9
228:17,19 233:15
242:16 251:17
256:11,15 263:17

265:2,8,10 268:2
270:15 273:12
274:11 279:4,23
280:21 281:4,12
281:14 282:2
283:24 284:2
**cowen** 227:2,5,15
227:17,21 228:3
**cowen's** 228:5
**cpa** 22:4
**crashed** 204:1
**created** 148:15
203:6
**creating** 126:20
**creditor** 160:8
163:2 200:16
**creditor's** 135:10
**creditors** 6:10,11
130:13 131:23
132:1 134:1,21
135:17,18 136:4
136:21 200:13,16
**creditworthiness**
121:4
**creighton** 138:21
**criminal** 77:5,19
262:5,8 263:3
**crises** 229:25
**crisis** 34:5 35:1,11
35:21 36:3 119:5
119:9,13 144:6,15
229:24 231:5
254:16 262:6
**crisp** 101:4
**critical** 280:5
**criticism** 172:12
243:22,25
**criticisms** 259:4,8
**cross** 15:15 16:7
18:20 19:23 21:12
23:3,8 24:2 26:1,4
26:8,9,12,23 27:4
36:13,17 111:22

114:6,9 118:18,23
130:18 138:12,18
143:18 146:11
151:7 152:9,14,23
153:5,15,23
158:22 164:17,23
165:1 170:9,14
199:5,7 209:14
210:16 215:11
216:23 217:19,21
218:7 224:21
225:1 227:10
228:9,17 265:1,8
268:12 270:13
**crossovers** 112:1
**cumulative** 39:8
**curbing** 139:25
**cured** 142:17
**current** 120:5
140:23 147:14
148:6,21 202:9,11
202:12 215:14,17
249:8
**currently** 30:6
34:14,20 44:9
187:1,3,10 211:6
232:17
**cushing** 3:8 15:17
24:7 150:12,12
151:11,16,18
153:5,15,23,25
154:7,11 157:20
158:9,23 161:11
161:13 163:14,17
**cushing's** 16:5
149:16 150:20
151:3 152:4 153:8
**customary** 154:4
155:6 159:8
**customer** 283:6
**cut** 132:15 158:4
176:6,7,23 188:7
222:2 241:22

**cuts** 42:22
**cutting** 92:19
**cv** 171:19 229:15
**cyganowski** 8:1

**d**

**d** 1:22 7:4,25 10:9
14:10 15:1 25:3
90:1 164:3
**d.c.** 264:5
**damage** 31:9
**damages** 172:21
233:23 240:24
243:4 264:5
274:17
**dancing** 152:17
**dangerous** 141:6
141:11
**daniel** 7:23 11:2
13:7 14:21
**danielle** 11:4
**darren** 10:21
**dasaro** 8:4
**data** 50:25 142:20
145:1 193:13
195:18 196:1,12
196:20,20 202:7
251:3,4 283:14
**date** 61:19 75:16
175:13 185:2
186:6 187:6
287:25
**dated** 17:18 18:1
20:21 22:15 25:14
151:19 164:8
169:17 227:19
**dates** 59:7 60:6
183:12 184:10
207:24 211:2
**david** 3:7 4:6 7:11
10:20 11:21 14:23
24:7,20 25:4,24
27:4 36:17 118:23
130:18 138:18

143:18 146:11
218:13
**davis** 3:13 8:5,6
146:8
**davispolk** 15:11
**day** 15:4 21:1
39:19,21 44:4,4
47:11,11 57:20,20
166:18 284:6,11
284:14 285:6
**days** 59:21,22,24
60:5
**deal** 107:12 132:1
144:2,21 148:6
221:12,15 222:2
222:10,11 234:1
**dealing** 72:17
161:20 180:6
214:10 230:4
269:19
**dearman** 8:7
**death** 122:12,17
140:20 142:23
253:21 258:3
268:21 269:9,24
275:7 276:10
**deaths** 50:19
113:17,22 122:21
238:11 245:11
246:2,3,11,13,22
247:5 251:24
252:2,5 257:6
268:20,23,24
269:2,3,5,6
**debevoise** 156:22
**deborah** 9:19
**debt** 179:18,20
201:23,23 213:17
214:2,3,21
**debtor** 1:9 32:7
33:4 62:23 68:11
68:23 87:22
101:25 116:14

120:11 121:2
130:21 131:1
135:19 146:3
152:6 284:17
**debtor's** 31:4,7
109:8 117:3 118:8
135:10 152:22
153:11
**debtors** 3:14 15:4
15:11 27:21,24
29:4 31:18 32:16
58:23 76:10 99:18
111:4 114:15
133:22 146:8
148:14 152:11
153:6 218:10
**decade** 197:24
**decide** 160:10,13
222:12
**decided** 34:23
69:25 160:11
**decides** 34:13
**decision** 56:16,18
57:6,7,25 70:2
104:2 124:23
127:6,11,18 128:9
128:12 129:3
161:1 201:2
**decisions** 54:24
**declaration** 17:16
18:7,15,18 19:9
20:21,24 21:2,6
22:15,19,25 25:8
25:11,13,19,24
26:2 30:8 33:7
34:2 35:20 36:14
139:1 152:25
153:16,16,18
164:6,11,15,18
165:2 169:4
227:10,19,23
228:2,5

**declarations**
18:14
**decline** 89:7
206:14 220:12
**declined** 51:13
258:7
**declining** 258:4
**decrease** 205:25
**deemed** 152:12
**deeply** 35:21
119:13
**default** 135:23
**defeat** 137:7
**defended** 98:7
**defenses** 35:24
**defer** 15:25 29:16
29:22 30:3 32:7
33:6 35:13 115:1
133:19 135:17
141:15
**deferred** 128:10
**deferring** 23:14
23:15
**define** 47:9
267:13
**defined** 28:23
**defines** 29:25
187:16
**defining** 233:6
**definitely** 40:20
**definition** 27:14
27:24 28:10,22
71:18 256:7
267:14,16
**defray** 81:11
**degraded** 109:17
**degree** 221:8
**delaconte** 8:8
**demand** 233:11
**demonstrate**
145:3
**demoting** 227:4

**denied** 85:7,25
97:5
**denies** 86:16
**denominator**
269:5 275:25
**dense** 266:15,18
**denver** 235:10
247:19,20 259:13
259:19,22 260:10
260:25 261:5,12
261:13 273:2
279:4,5,7,10,14
279:14,16
**deny** 69:11 85:22
87:11 97:7 100:25
113:3 276:21
**denying** 83:9
**depalma** 6:9
**department** 5:8
84:19 95:24 96:2
96:22 97:9,20
98:8
**depend** 16:7
210:21
**dependence**
139:13 140:8,16
141:20,25 142:2
**dependent** 139:8
141:10 142:4,4
280:10
**depends** 85:8
108:22 141:4
230:25 256:7
**deposed** 39:24
156:5 235:21
237:11
**deposited** 200:3
**deposition** 38:24
40:9,14 41:3,22
44:15,23 93:22
157:22 166:6,8
182:19,21,23
195:22 228:24

235:25 236:2
244:13,17 246:6
249:4 252:24
254:5 259:25
262:4 264:10
**depositions**
268:11
**depression** 145:10
204:1
**derive** 198:19
**derives** 155:5
**deriving** 154:3
**describe** 45:20
52:21 193:25
240:1 247:10
**described** 53:12
127:23 197:13
225:3 238:2
**describing** 261:12
**description** 82:25
90:11 198:18
260:5 261:11
**designated** 28:15
28:22 29:25 30:5
**designed** 36:8
89:16 145:17
159:21 229:5
**desire** 55:1 69:9
**desires** 88:2
**despite** 112:17
202:17
**detail** 116:2 127:3
198:14
**detailed** 81:8
**details** 23:16 78:3
100:15,21
**determine** 179:22
182:1 190:12
283:11
**determined**
159:23 162:23
163:6,11

**determining**
105:22 281:25
**deterrent** 50:24
51:4,7,22 52:4
53:5 145:9
**develop** 86:22
87:17,24 144:22
145:7,22 271:2
**developed** 85:15
86:7,11 235:14
**developing** 51:4
140:10,14 239:3
270:25
**development** 31:4
139:20
**devising** 193:19
**devon** 8:9
**dialogue** 271:9
**didn't** 225:12
237:19 238:20
239:3 240:6,8
245:2,16 253:15
253:16 254:1
260:9 263:22
279:11
**died** 239:15
**dies** 269:16
**differ** 230:8,14,22
282:7
**difference** 141:23
175:4 177:1 192:8
193:10 211:10
215:25 216:2,4,5
216:6,8,18 225:4
225:5
**different** 38:2
54:17,18 70:20
72:2,6,13 133:3
142:9 160:4 167:6
175:1 179:15,23
185:2 190:14
191:14 200:20
210:16 216:21

217:11 219:16
220:19 237:9
238:14 243:2
254:21,24 269:25
273:15,19,20
274:21,22 278:10
278:11
**differently** 65:14
134:13 135:4
**difficult** 133:6
177:10 229:25
230:13 277:15
**difficulties** 165:22
**difficulty** 42:14
135:2 138:23
234:6 251:24
252:4 257:5,9
**diligence** 135:19
189:7,12,21 190:1
190:3 200:12,20
200:22 216:24
**dilution** 249:24
**diminishing**
250:22
**dip** 219:8 220:13
220:25
**direct** 17:17,19
18:2,17 20:25
22:20 25:8,13,15
25:19 26:5,10,11
30:24 55:13,16
72:3 151:21 152:4
155:12,21 160:19
164:9,15 169:19
170:6 196:4
224:22 227:24
242:10,17 268:3
268:12
**directed** 54:4 55:3
**direction** 127:9
225:25,25 226:4
**directional** 226:9

**directly** 110:5,7
114:23 120:3
192:17 254:17
**director** 42:3
43:13 44:6,9,10
44:19 45:11 48:1
51:11 53:18 66:7
83:20,24 108:14
108:19 119:18
139:19 171:23,24
171:25 172:2
**directors** 42:12
46:20,21,24,25
47:1,2,4,8,12,14
52:25 53:3 57:8
58:21,22 83:14
**disaggregate**
172:23
**disagree** 116:22
**disagrees** 202:9
**disappeared**
219:4
**disbursements**
123:21,22
**dischargeable**
33:4
**discipline** 170:17
**disclosed** 30:6
116:6,9,10,13
124:5
**disclosure** 27:17
114:15,20
**disclosures**
116:15
**discontinuation**
77:8
**discontinue**
141:12 267:18
**discontinued**
66:10
**discount** 210:4
**discounted**
205:16,16 225:9

**discovery** 268:14
**discuss** 94:21
106:16,20 201:19
**discussed** 45:21
60:9 92:18 101:10
130:5 153:18
209:14 213:6,18
216:1 240:6
244:15
**discusses** 90:12
215:3
**discussing** 43:19
90:2
**discussion** 89:24
90:1 91:11,12,13
183:15 194:11
235:17 267:4,12
271:10 272:17
273:5 274:1
**discussions** 68:21
144:1 272:3 274:4
275:7,12
**disorder** 142:9
245:18,20,24
247:1,5 266:10,16
266:24 267:17
276:9 281:23
**disorders** 245:11
**disposal** 16:5
**disposition**
162:22 169:3
**dispute** 56:15
57:19,23 60:18
69:15 71:16 72:20
93:19 116:25
124:5 161:23
169:3 188:4,5
**disputed** 87:22
**disputing** 68:2
83:2,12 140:25
**disregard** 200:22
**disregarded**
197:4 201:25

**disrespect** 42:20
**disrupt** 64:7
**distinction** 223:10
**distinguish** 92:14
**distortion** 49:21
**distribute** 223:9
**distributed** 117:3
  117:10,15
**distributing**
  269:15
**distribution** 31:5
  223:8 262:1
**distributions**
  108:15,17,20
  109:11 136:5
  275:17
**district** 1:2
**diversion** 51:8
  145:18
**docken** 8:10
**docket** 84:6,8
**doctor** 22:2,4
  165:8 227:6
**doctorate** 170:17
**doctors** 56:20,20
  57:5 71:25 78:16
  101:2 127:24
**document** 40:21
  51:15 52:5,22
  53:7,11 55:14,25
  56:1,9 58:15,18
  65:19 66:6,15
  72:2,6,21 73:11
  81:20 84:3 86:19
  87:4 95:14,21
  96:11,13,15,18
  97:23 157:9,10,10
  157:13,16,17,18
  158:8 233:4
  240:14,15
**documented**
  260:18

**documents** 29:1
  37:11,12 43:4
  52:18 53:2,13,16
  55:18 73:9,25
  74:22 78:24 126:3
  126:24 147:16
  154:12 156:19,20
  157:7
**doesn't** 226:3,8
  252:19 254:11,14
  254:15,21,24
  255:5,8 256:5
  280:4 286:6
**doing** 43:21 61:23
  67:23 75:2,13
  82:10 93:1 127:22
  128:22,24 145:14
  180:8 266:1
**doj** 98:2
**dollar** 211:13
**dollars** 33:8 34:3
  34:19 51:4 53:6
  123:20,25 148:16
  177:3 183:11
  268:5 282:22
**don't** 52:1 226:14
  233:10 234:20,22
  239:25 240:2
  241:24 242:12,14
  242:16 244:15,16
  247:18 250:3,5
  251:12 260:15
  262:21 263:11
  267:9,13 269:18
  269:18 270:6
  272:14 274:7
  275:1 276:18,20
  277:20 282:5,15
  283:14 284:25
  285:2 286:1
**door** 42:21
**dotted** 51:19

**double** 49:10
**dougherty** 8:11
**douglass** 12:15
**download** 196:20
**downloaded**
  196:20
**downturn** 250:5
**dr** 4:16 6:25 16:20
  16:21 17:2,7,15
  17:24,25 18:6,9
  18:15,20 19:13,16
  19:19,24 20:2,5,7
  20:8,11,20 21:6,8
  21:12,16,16,20
  22:17 23:13 24:2
  143:22 144:4,13
  165:7 227:5
  228:19 233:15
  251:17 256:11,15
  263:17 265:10
  279:4,23 280:21
  281:4,14 284:2
**drain** 1:22 15:3
  15:10 150:10
  234:24
**dramatically**
  256:23
**drive** 38:17
**driven** 113:24
  284:17
**driver** 89:6
**drivers** 216:2
**drives** 280:17
**driving** 51:21
**drop** 219:3
**dropping** 126:5
**drops** 176:2,9,14
  193:8
**drs** 23:21
**drug** 53:24 54:21
  124:15,16,18
  145:20 245:11
  246:22

**drugs** 52:6,9
  54:12 110:23
  111:20 113:3
  122:10,15,16,20
  122:23,23 123:15
  245:12 269:3
  282:15
**dubel** 8:12
**due** 189:6,12,21
  190:1,3 216:24
  276:10
**duplicate** 175:6
**dying** 48:23
  112:17,23 113:2
  253:19,25
**dylan** 7:24
**dynamics** 90:15
**d'angelo** 8:2
**d'apice** 8:3

---

e

**e** 1:21,21 3:1,1
  7:11,16 11:19
  12:4 13:9 15:1,1
  17:12 22:11,12
  25:4 38:13 116:23
  117:24 150:14
  151:15 166:3,13
  287:1
**e2e** 126:7,7,16
**earlier** 16:10
  41:23 60:10 69:19
  97:6 102:17
  166:17 210:20
  211:2 213:18
  216:13 218:14
  226:11
**early** 81:13
  249:11 265:10
**earn** 200:6 211:10
**earphones** 271:15
**easier** 63:2 134:6
**easily** 265:25

easy 266:2
eberhardt 8:13
ecke 8:14
eckstein 8:15
economics 170:17
170:20,21 230:12
273:15
ecro 1:25
edan 11:7
edmund 54:10
64:22 89:12
edmunds 4:13
24:9,10,10,13,16
24:22 26:3,3,7
36:14,15,16,18,19
36:24 38:8,9,20
40:23,23 41:8,10
41:11 42:5,8,18
42:22 43:8,10,11
45:4 49:21 50:7
50:13,16 52:17
54:19,20 58:8
63:25 64:14,17,20
64:23 65:1 70:16
70:17,18,22 71:1
71:4,6,10,12
72:15,16,25 73:4
73:8,23 74:8,14
75:11,13,14,22,25
76:5,11,17,19,22
76:24 77:2,3
78:18,20 79:5,11
79:15,19 80:1,3,8
80:11,14,19,23
81:1 82:6,14,17
85:12 86:2,6,15
86:18 87:2,7,10
87:14,15 88:18,20
88:23 93:15,21
94:10,14,17,25
95:9,11,12 96:8,9
97:14,24 98:2,6
98:11,12 99:10,22

100:2,5,9 102:1,5
102:8,13,15,23
103:7,15 104:6,11
104:17 105:13,18
106:1,3,7 109:4,6
109:7,10,12,13,16
109:21,24,25
113:6,9,12,18
114:1,4 121:5
127:3 138:14,22
284:19 285:4,10
285:18,23 286:9
educate 81:14,15
edward 12:4
effect 51:9 107:8
132:4 134:14,15
153:3 162:22
209:18 210:18
effective 240:23
effectively 195:3
effectiveness
255:23
effects 269:20
effectuate 32:8
efficacy 250:24
efficient 64:12
effort 53:6 286:20
efforts 48:13
144:18 145:5,7,8
146:3
eight 59:24 60:4
262:23 282:21
either 16:20 18:11
21:16 63:3 117:18
134:1 137:12
141:10 156:7
162:18 165:1
172:2 224:22
225:25 226:3
242:17 276:7
elaborate 226:13
electronically
37:13

element 153:11
255:22 262:10
eli 14:12
eliciting 151:6
eliminate 68:16
137:5
elisa 10:7
elusive 251:7,10
251:11,16,21
265:14,15,17
email 47:14 89:5
89:10,24 90:1,6,9
90:24
emailed 96:12
emailing 284:10
emails 64:11
217:22
embarked 145:15
emerged 234:23
emergency
143:23
emily 9:20
emphasis 51:21
145:20
empirical 255:18
employ 213:16
280:4
employed 81:5
213:2,5 215:12
enacted 107:5
encourage 200:21
284:25
ended 108:17
213:18
ends 149:16
221:24 269:17,24
enforce 154:4
155:2 156:6,10,14
163:2
enforceable 159:7
enforced 156:1
enforcement
155:12,21 163:5,7

238:10 254:16
262:14
engage 104:14
engaged 47:7
69:17 85:23
111:15 271:8
273:25 281:15
engagement 67:10
72:18 91:24
engaging 92:5
152:14
english 230:13
272:12
ensue 153:13
ensure 159:21
enter 101:1
entered 77:8
84:19 95:23 96:22
97:9 139:21
146:17
entire 219:2
280:14
entirely 111:25
121:24 133:18
entirety 259:23
entities 98:22
101:6,21,25
102:10,21,24
103:3,5,16 107:15
111:24 112:8
113:7,12 114:14
114:22 115:16
116:17,22 117:6
117:17 118:13
129:2 131:13
132:4 133:9,10
134:16 135:13
144:17 271:1
entitled 199:24
entity 44:10,11,12
100:19 101:1
110:1 129:13

[entries - exhibit]                                                        Page 20

entries  27:18
entry  263:9 264:8
environment  62:4
  203:6
epidemic  36:6
equal  250:23
  254:7
equality  250:25
equally  192:22
equitable  35:6
  247:24
equities  179:3,8
  179:14 185:5
equity  132:9
  181:12,15,18,20
  201:12,19,20,23
  201:23 202:18
  204:21 213:6,8,10
  213:17 214:2,7,13
  214:22
equivalents
  180:20 181:3
  247:6
eric  13:20,25
eskandari  8:16
especially  223:25
  266:3
essence  268:13
essential  35:18
essentially  147:11
  182:10
establish  81:5
  97:14
established  74:24
  264:10
establishing  17:16
  20:23 22:18 25:12
  151:20 164:8
  169:18 227:22
estate  117:3,11,15
  118:8 146:24
  147:11 148:12,15
  152:24 210:2

221:11,15 222:21
  268:4
estates  132:10
  147:5
esteemed  128:6
estimate  24:8
  128:1 137:20
  173:18 175:22
  177:14 178:8
  179:1 184:8
  185:15,16,20
  190:5 196:9,12
  197:6,8,11 202:14
  203:6,20 206:16
  209:19 210:19
  211:14,17,21
  212:4,7,11 216:8
  217:10,12 219:3
  219:15 235:13
estimated  173:23
  174:3 181:3
  185:20 197:13
  205:12 208:24
  219:13 222:24
estimates  197:1
  197:18 198:19
  200:24 203:9
  209:22 211:5
  215:23 226:2
estimating  202:15
estoppel  153:3
et  15:3 95:6
  150:10
etf  209:25
ethan  10:13
europe  98:23
  106:19
evaluate  194:11
  194:13
evaluating  91:14
evan  10:11
event  77:25

events  41:23
eventually  133:14
everybody  41:9
  109:19 152:8,19
  273:16 279:1
evidence  18:19
  25:25 96:7 160:24
evolve  93:15
evolved  93:8
ex  204:15
exact  54:4,9 75:9
  194:1 197:12
  204:15 212:8
  223:15
exactly  35:8 48:9
  57:14 71:1 82:20
  115:8 117:4
  266:23 272:14
exam  153:5
examination
  15:15 24:4,17
  26:11,18 27:4
  36:14,17 37:11
  114:9 118:23
  130:18 138:18
  143:18 146:11
  151:7 152:9,14,23
  153:23 161:11
  164:23 170:14
  199:7 208:9
  209:14 210:16
  215:11 216:23
  218:7 225:1,21
  227:11 228:17
  242:11 265:8
  270:15 281:12
examine  18:20
  19:24 21:12 23:4
  23:8 26:1,12
  36:13 114:6
  118:19 138:12
  153:15 158:23
  164:17 165:1

170:9 228:9 265:2
examiner  269:7
examining  16:7
example  43:21
  59:9 133:12 144:8
  152:11 160:2,18
  161:20 201:14,18
  201:18,20 202:19
  207:7 209:25
  210:3 211:9
  212:17 215:6
  220:8 223:22,25
  226:21 251:6
  269:21 272:18
  276:19 279:22
examples  241:8
  276:18
excellence  93:8,16
exception  241:19
  242:2
exchange  35:11
exclude  168:16
  216:20
excluded  229:17
exclusively
  268:22
excuse  17:25
  129:11 173:13
  191:18 227:1,6
excused  20:2
  21:17 23:9
executed  29:13,15
  58:4
executive  47:6
  141:17
executives  65:6
  90:13,19 91:6
  92:6 136:7
exercise  120:12
exhaustive  53:1
  53:15
exhibit  30:1 38:6
  40:2 58:10 116:23

117:24 154:7
157:22 171:19
173:22 174:15,20
175:10,17 179:5
180:18,23 186:6
188:10 191:19,25
192:10 193:6
195:21,22 208:11
231:21 232:22
240:14 249:17
250:12 256:14,14
263:13
**exhibits** 38:24
41:3 151:20 166:6
166:7,9 169:2
191:18 227:11
229:2 286:12,18
**exist** 52:2 136:25
**existed** 185:20
206:16
**existing** 132:3
**exists** 187:3
**exit** 68:11,15,23
69:9,20,25 70:3
131:8 148:22
**expand** 279:15
**expanded** 30:13
**expansion** 126:22
**expect** 29:15
48:21 50:17
147:15 203:21
207:6 211:11
254:7 258:23,25
**expectation** 48:10
50:22 134:9
**expectations**
196:15,19 197:2
207:3
**expected** 33:17,21
179:19,21 180:2
196:17,21 197:25
198:1 200:2
211:21,23 212:4

217:10
**expenditures**
249:24 250:2,23
262:5,14 263:4,4
275:8 276:5
**expense** 128:7
238:9 269:21
**expenses** 110:16
238:9 270:1,3
**expensive** 267:20
**experience** 171:14
270:24 278:23
**experiencing** 64:2
**expert** 17:18,25
18:8,16,17 19:4
19:17 20:22 22:16
22:19 143:8
150:14,20 151:3
151:19,23 153:8
153:16 154:18,20
155:10,16 156:8
156:18,21,23
158:24 169:17,19
170:6 172:5,8,10
172:16 217:9,14
222:8 227:20,24
228:2,6,9 230:16
242:15 251:3
**expertise** 223:17
**experts** 15:12
145:21 239:4
284:22
**explain** 128:20
251:9
**explained** 198:13
**explains** 270:23
277:1
**express** 208:17
**expressed** 196:24
**extend** 129:23
**extended** 89:7
100:13

**extensive** 120:11
120:12 121:3
133:22 135:19
152:14
**extensively**
101:10
**extent** 43:17
159:10
**extinguish** 31:17
32:22
**extraneous**
176:11
**extremely** 145:13
230:5 259:19

**f**

**f** 1:21 13:18 164:3
287:1
**f.x.** 10:17
**face** 62:3 92:5,5
**facet** 47:19
**facing** 62:19
**fact** 35:21 40:17
51:10 67:24 68:24
78:19 79:22 81:21
83:9 86:16,21
87:4,11 96:18
97:4,18 98:21
100:7 104:12
110:2 112:17
116:22 122:15
139:11 153:4
157:11 172:15
184:14 188:6,10
191:6 198:20
200:12 202:17
203:5 207:3,12,14
218:19 222:13
241:19 242:2
243:7 276:4,7,11
276:14,24 277:12
279:13 282:10,20
284:21

**factor** 128:15,15
166:21 209:18
246:14,15 248:25
253:4 254:18
**factors** 128:2,11
130:3 137:20
172:23 173:2
238:8 247:15,17
252:8 280:4
**facts** 87:3,5
169:23
**factual** 126:11
**faded** 42:6
**fading** 98:20
278:13
**fail** 148:9
**failed** 156:6,10,14
173:4 178:16
**failing** 197:22
**fails** 35:15
**failure** 153:4,4
261:24
**faintly** 150:23
**fair** 44:6 73:15
76:7 91:1 98:11
105:17 106:6
120:20 122:14
123:13 125:5
126:12 142:24
146:19 147:20
159:18 178:7
187:2,3,5,9
188:16 189:2,24
197:1 224:6,10
232:17,22,25
233:6,10,10,11,11
233:13,22 238:17
238:17 245:12,25
245:25 248:19
250:11 255:21
262:21 263:6
265:24 267:20
269:16 272:21,23

274:19 285:20
286:8
**fairly** 35:18
141:18 218:12
265:25 266:15
267:20
**fairness** 131:22,24
250:18
**fairs** 94:7
**faith** 234:5
**fall** 83:21
**falling** 125:23
**falls** 235:15
269:10
**familiar** 27:14,17
27:20 28:25 29:2
29:8 31:11,13
78:3,7,8 89:15
115:6,15,25
147:14 190:18
248:22 266:23
**familiarized**
31:14
**families** 120:13
131:4 135:14
199:17,24 269:19
**family** 4:2 6:18
27:11 30:9 31:22
32:1,25 33:8,16
34:4,5 35:10,23
36:2 44:16 77:13
84:19 87:23 95:16
95:22,23 96:4,19
98:7 103:17
105:10 107:16
108:3,3,10,12,16
108:20,25 110:2,9
112:7 114:24
119:4,11,12,17
123:14,19 131:7
131:14,18 132:9
132:10,12,17,25
133:2,15 134:9

135:22 136:7
144:16 148:22
158:12,13,14,15
158:17 170:4,11
173:9,10,18
174:12 175:20
182:15 192:16,23
213:7 216:12
218:17 219:17
226:19 285:12
**family's** 33:17,21
180:10 190:5
**far** 57:19 71:23
100:8 104:12
111:25 135:21
145:6 174:4
220:22 268:3
**farash** 8:17
**farrell** 8:18
**fashion** 35:2
133:3
**faster** 59:6
**father** 42:12
43:24 89:4,10
92:4 96:19
**fault** 64:25
**favor** 127:10
128:4
**fda** 122:19 127:15
141:14
**fear** 49:10
**feature** 141:21
**february** 53:23
54:13,15,22 55:6
56:13 57:18 58:24
81:4 85:15 86:23
126:25
**federal** 48:13,17
78:9,10 82:23,25
83:1 156:14
235:10 255:5,16
260:25

**fee** 210:5,5
**feed** 49:7
**feedback** 49:10
158:7
**feel** 83:6 120:25
137:1 202:25
**feeney** 8:19
**fees** 201:4,6,7,9,9
201:16 209:16,17
209:21,22
**feliz** 8:20
**fellow** 90:2
**felt** 119:3 203:2
**fentanyl** 141:6
269:9
**festers** 239:18
**fidelis** 155:4
**field** 64:11 68:16
72:4,19 74:19,21
**fifth** 6:3 158:9
**figure** 211:13
259:15 283:3
**figures** 194:3
198:24 199:2
267:23
**file** 37:15 38:17
40:20 55:19 58:11
79:15 80:4
**filed** 27:21 29:4
30:2,21 32:25
283:9
**files** 37:14,19,23
38:7,13,23
**fill** 81:12
**filled** 59:5
**final** 29:11 35:7
130:21 131:1,2
137:8 147:16
**finality** 131:22,23
137:15
**finalized** 29:19,20
**finally** 30:11
228:19

**finance** 133:2
171:23 214:9
221:8
**financial** 33:20
133:21 146:21
212:13,16,18,25
215:16 217:16
**find** 38:11 41:2
61:10 78:23 153:2
156:13 186:9
266:2 282:13
**finding** 133:5
**fine** 17:1 23:19
24:19 26:6,9,20
27:2 42:25 63:8
75:24 76:7,8,23
77:18 94:12,13,18
125:7 137:3
167:18 168:5,7
175:7 180:6
186:15 235:18
237:1 240:4
253:15 278:25
279:2 280:24
**finish** 276:12
277:21
**finished** 16:6 58:7
59:10
**finzi** 8:21
**firms** 268:7
**first** 6:11 15:13
16:12,14,21 17:5
25:7,11 35:13
58:14 67:5 69:24
78:25 79:20,20
80:4 84:23,23
86:7 115:5 130:14
152:20 171:22
191:19 192:20
196:5 208:15
215:13 218:24
221:14 240:22
246:21,23 249:22

266:4 270:17
271:8
**fitch** 138:22
**fitzsimmons** 8:22
**five** 94:20 95:1
152:6 158:18
203:22 217:22
237:11
**fixed** 147:23
148:23 221:17
283:10
**fl** 4:18
**flip** 84:23
**flipping** 28:21
**floor** 6:19 92:19
**florida** 166:19
**flow** 85:19 86:25
87:21,25 133:15
134:23 187:14
**focus** 146:20
173:8 243:25
247:21 259:13
275:4
**focused** 53:4
280:16
**focusing** 113:7,9
**fogelman** 8:23
**folder** 55:18 65:20
79:12
**follow** 66:16 68:2
88:1,3 90:21
121:15 133:6
137:12 138:14
140:25 142:12
143:21 223:4
229:20 281:10
**followed** 46:1
65:22
**following** 54:22
88:21 135:2
138:23 152:22
236:8,9 237:17,18
244:22,23 253:2,3

**follows** 66:3,9,12
**food** 124:15,17
**force** 53:25 54:13
54:22 67:20 68:16
75:17
**forecast** 177:10
212:18,23,23,24
**forefront** 144:14
**foregoing** 287:3
**foreign** 102:19,21
102:24 103:3
113:7,8,12 131:13
134:16 136:4,21
154:4 155:2
159:16,24 160:1
160:12 162:15,25
163:1,4
**forensic** 22:4
**forever** 181:19
**forget** 223:15
**forgive** 42:24
64:10 277:20
**forgot** 200:3
**form** 17:24 20:22
21:7 22:16 52:8
122:4 123:15
137:9 152:24
154:5 196:21
273:10
**formal** 46:19,19
46:21,25 47:4
**formed** 207:4
**former** 44:11
**forming** 156:17
194:3 198:24
**forms** 82:14 89:8
**formulation**
235:17 273:1
**forth** 20:1 28:24
284:11
**forum** 35:4 212:6
**forward** 34:3 37:8
215:15 279:17

**foster** 269:22
**found** 175:1
251:12
**foundation** 113:5
113:16
**four** 109:2 158:18
158:19 183:10
209:20 241:9
257:13 258:10,16
259:6 270:6
**fourth** 15:4 158:9
191:25 250:1
257:2,15,21
**fraidin** 8:24
**framework**
146:16 147:5,15
209:1
**frank** 138:13,20
265:3
**frankel** 5:15
228:11
**frankly** 109:19
141:20 148:20
152:18
**fraud** 32:23 33:3
172:23 209:24
**fraudulent** 162:12
162:14,16,18
**frazier** 8:25
**fred** 263:22
**frederick** 13:9
115:6 116:11
118:6 138:4
**free** 47:2 211:7
268:13
**frequency** 268:19
**frequent** 46:8,10
46:13 266:9,24
**friday** 39:17
**friedman** 9:1
**friend** 49:14
**front** 45:6 65:20
141:15 171:17

172:16 174:15
180:24 182:19
183:5 186:20
192:10 231:24
**fronts** 145:9
**froze** 123:4
**frustrating**
263:19
**fulfill** 147:16
**full** 32:6 59:22
215:8 280:19
**fully** 30:11 41:1
68:16
**function** 178:5
231:1
**functions** 44:11
47:5 273:20
**fund** 34:25 132:11
132:19,24 134:25
135:5 209:24
211:1,9 241:21
242:3
**fundamental**
131:11
**funded** 120:9
145:21
**funding** 35:19
104:24 144:17
246:14
**funds** 119:23
176:18 179:2,8,12
181:12,15,16,18
181:20 211:6
214:7 244:10,25
249:1 262:1 280:5
**furman** 172:8,10
172:17 197:20
**further** 36:9
114:1 138:9 146:5
149:5 158:20
163:13,16 183:15
203:11 208:22
217:18 224:11,21

225:18 226:22
264:25 280:22
281:4
**furthermore** 51:3
**furtive** 265:11,13
265:14
**fusion** 78:17
**future** 32:10,15
34:1 50:19 103:12
103:18,20,24
104:9 105:23
106:5 120:8
136:25 177:10
182:14 183:16,20
185:19,21,23
187:20 188:2,23
188:23 189:2,14
195:12,13 196:9
196:12 197:6,9,11
205:22 206:7,9,12
206:22 233:19,23
234:1 240:24
262:10 274:7

**g**

**g** 8:5 15:1 17:12
17:12 20:18 22:12
151:16
**gage** 7:17
**gainesville** 4:18
**galan** 3:4 9:2
16:20,24,25 17:3
17:5,7,11,15
18:18,21 19:24
20:2 23:23
**galan's** 18:7,15
**galle** 9:3
**gange** 9:4
**garrett** 11:9
**garrison** 4:1
**gary** 9:16
**gather** 18:10
152:1 170:3

**gathering** 281:23
**gayane** 11:20
**gayle** 3:4 9:2 17:4
18:18
**geared** 126:18
**geldreich** 9:5
**general** 4:8 96:7
178:15,22,24
194:13 197:23
203:19 204:10,11
214:8 234:10,17
234:25 266:3
267:11 272:24
274:4,6,23
**generality** 223:11
**generally** 27:20
29:2,8,10 31:11
46:6 83:21 113:10
146:15,18 147:14
189:9
**generated** 85:17
86:9,12,24 87:18
**generic** 111:7
122:4 140:10
**generics** 89:9
**geoffrey** 9:14
11:25
**geometric** 196:19
**george** 12:6
**gerard** 7:21 14:9
**germany** 44:24
**getting** 29:2,22
104:10,16 105:13
145:8 165:10
249:8 261:3,8,25
262:17,22,23
263:1,3 264:15
276:24
**gibson** 9:6
**giddens** 9:7,8
**gilbert** 9:9
**gill** 9:5

**gillian** 12:19
**give** 15:12 24:8
28:6 45:22 53:17
61:9,11 66:20
83:7 101:4 139:15
144:8 171:1,4,8
216:14 236:9,14
237:18,23 244:23
245:4 253:3,8
**given** 15:22 21:15
41:25 60:2 62:20
64:2 74:17 104:12
104:15 132:4
171:5 207:2
212:10 260:5
268:7
**gives** 248:19
**giving** 53:8,17
74:16
**gleit** 9:10
**global** 32:6 35:5
130:20 137:7
234:7
**go** 15:7,18,23
16:10 19:3 24:6,7
24:11 27:1 33:24
36:14,15,22 37:9
60:21 63:11,23
70:10 71:23 80:13
81:20,24 89:21
93:19 95:14 97:3
108:15 109:6
114:21 117:19
118:22 127:9
132:24 133:9
134:18 135:5
137:20 138:24
143:17 148:14
153:21 162:6,10
167:5,14,17
170:12 183:22
184:20 186:22
188:10,13 192:13

193:13 194:3
198:24 219:9
221:8 223:12
235:22 236:3
240:13 249:16
255:25 256:16
266:13 271:20,24
273:12 277:11,15
277:20 281:11
282:13 284:13
285:3,6
**goal** 81:8 130:20
130:25 131:17,20
131:22,23
**goals** 35:15
131:24 148:19
**god** 17:10 20:15
22:9 25:2 151:13
163:25 169:14
227:14
**goes** 30:20 111:23
166:24 211:4
214:5,7 227:8
**going** 16:18,24
23:17 25:7 26:8
30:25 32:13 38:22
39:7 41:14 43:6
45:21 47:25 48:11
52:8 54:8,8 58:14
62:8,11 63:14
65:12,12 68:16
70:12 71:19 73:4
73:5 76:14 79:15
80:15 84:22,22
96:10 97:3 100:7
103:19 104:8
106:4 116:1
117:14 134:4
135:23 136:10
139:16 142:6
152:9 166:10
173:7 181:16
190:17 195:4,21

204:6,7 207:2
214:6 222:15,16
222:16 224:3
229:1 246:5
255:14 256:11,16
259:2 261:12
268:2 272:12
279:15 282:7
283:3,3 286:14
**gold** 6:6 167:12
167:12,16,20
168:8,12
**goldman** 9:11
**goldstein** 9:12
**goller** 9:13
**good** 15:2,10 27:6
27:9,10 35:24
36:19,21,22 39:10
77:2 85:11 109:23
118:25 127:8
149:15 150:9
153:25 154:1
165:14 168:12,14
218:6 222:10
228:19,21 234:5
242:6 266:4 273:9
273:18 281:5
282:14 284:3,7
286:17
**goodman** 9:14
**gostin** 9:15
**gotten** 85:10
154:11
**gotto** 9:16
**governed** 162:19
**governing** 161:21
**government** 48:14
48:18 106:23
124:20
**governmental**
228:12
**granted** 110:9
131:19

**graph** 196:16
259:18 260:7,9
**graphed** 260:10
**grateful** 163:19
**great** 42:14 52:2
77:2 127:3 128:7
144:21 145:4
148:20 151:2
155:10 203:25
219:7 222:14
**greater** 220:12
273:9,18 276:4,5
276:22,25 277:1
**greatest** 253:24
**green** 9:17,18
**greenberg** 6:9
**greenspan** 9:19
**gregory** 6:22
170:10
**grew** 175:20,23
184:14 185:2,3,7
185:23 187:7,21
189:2,4 191:10
219:2,20
**grim** 9:20
**gross** 123:24
201:5,9 202:6
**ground** 104:9
132:14
**grounds** 222:6
**group** 16:17
143:25 144:12
214:17 233:13
273:21
**groups** 46:24
200:13,16 235:16
274:22
**grow** 174:5
191:10 193:14
**growing** 88:8
184:9 188:2
207:16,16,18
258:13

**grown** 256:23
**grows** 216:15
**growth** 89:6 91:14
177:19,23 178:6,8
178:9 182:3
184:17,18,23
185:4 187:15
190:8,9 191:2
193:20 195:7,17
197:15 198:10,12
201:9 206:13
213:10,19,19
**guarantee** 33:25
80:5
**guaranteed**
146:22 221:18
**guard** 9:21
**guess** 18:12 31:14
35:8 57:6 71:2
73:6,6,14 79:5
91:10 105:14
106:9 113:16
120:1 175:1
207:15,15 268:25
**guesswork** 255:22
**guidance** 127:16
141:15
**guidelines** 107:4
127:24
**guilty** 77:5,18
78:6,8 82:2,16,22
83:1,23 95:15,19
**gulf** 26:15 114:12
166:19
**gulkin** 9:22
**gupta** 3:5 16:21
16:24 17:1 20:6,7
20:8,11,16,20
21:12,16,16 23:23
**gupta's** 21:6
**guy** 277:22

| **h** |
| --- |

**h** 8:15 14:19
20:18 27:17
151:15,16 168:2
169:25
**haberkorn** 9:23
**hage** 6:17
**half** 108:23
123:23 183:10
192:25 193:4
248:9 257:13
262:18 264:12,15
**hamermesh** 9:24
**hampton** 9:25
**hand** 17:8 20:13
20:17 22:7 24:25
52:1,20 115:17
151:12 163:23
169:12 174:4
206:14 227:12
**handful** 114:13
**handle** 157:5
**handling** 69:7
168:10
**handy** 154:19
158:25
**hang** 38:18
**happened** 48:11
64:25 69:10 75:9
86:14 92:16 93:20
107:9 168:4
194:19 204:1
207:8
**happening** 68:10
180:15 195:11,13
**happens** 104:5
203:23 285:14,15
**happy** 15:7 16:21
26:24 154:7
168:25 223:11
**hard** 36:24 40:4
48:24 59:25 61:6
80:18 92:14

137:19 153:2
233:14 251:18
277:17
**harder**  224:7
225:24
**harm**  127:20,22
**harmed**  119:4,8
**harold**  10:9
**harrington**  10:1
**hasn't**  258:7
**hayden**  7:22
**hcp**  81:8
**hcp's**  81:9,10,14
81:15
**hcps**  67:21
**he'll**  21:22
**head**  53:2 90:3
115:20,23 124:4
129:5
**headers**  196:21
**heading**  80:21,24
250:18,21
**headphones**  64:5
73:5 109:14,22
277:10
**health**  51:23
229:25 238:9,9
**healthcare**  66:25
68:8 70:7 81:6
**hear**  27:8 36:24
37:4 40:11 41:9
42:23 48:24 53:22
55:15 59:25 64:15
98:19 118:25
123:10,11 146:13
151:2 178:17,18
178:19 218:2,10
270:17 277:17
278:14 281:14
**heard**  22:3 53:19
67:5 104:21
127:17 150:11
162:9 205:9

234:21 259:6
272:5 282:17
**hearing**  2:1,1 15:4
17:17 19:23 20:23
22:18 23:8 25:9
25:12 37:21 39:12
42:15 47:22,24
101:11 149:13
151:21,22 152:18
164:9,10 169:18
206:1 217:25
227:23,25 271:11
271:20 274:21
**hearings**  278:24
**heart**  124:11
**heather**  8:25
**heavily**  280:9
**heavy**  145:19
179:18
**hedge**  176:18
179:2,8,12 181:16
**heitzenrater**  10:2
**held**  65:25 108:11
110:2,5 132:9
173:1 193:8,9
219:1 223:6,8,23
224:1,7
**help**  17:10 20:15
22:9 25:2 35:10
36:7 41:9 48:15
48:17,18,22 49:15
50:11,18 53:13
79:17 119:4,15
129:24 132:11
139:12 142:16
145:22 151:13
163:25 169:14
198:21 227:14
263:22 277:25
**helped**  36:5
**helpful**  151:5
**helping**  127:24
267:17

**hereunder**  136:6
**heroin**  141:3,7
**herring**  10:3
**hey**  49:4 62:25
109:13
**he's**  281:20
**hi**  165:14
**higgins**  5:13 26:22
26:22 27:2,3,5,7
36:9 47:23 97:16
103:11 119:3
130:6 164:20,22
164:22
**high**  31:18 211:18
213:24 258:3
275:7,8
**higher**  177:16
190:23 201:17
207:25 212:9
214:10 222:22,22
223:1 226:2 261:8
276:8,10
**highest**  253:21
262:4
**highly**  68:22
120:19 121:14
124:18
**hightail**  37:15,20
**hired**  92:1 128:6
212:3
**hirshman**  10:4
**history**  230:1
**hoc**  5:16 164:6
228:11
**hodge**  92:23
**holdings**  115:25
115:25 116:3,12
118:7 178:12,14
**holds**  108:10
115:9,19
**homeless**  251:12
251:16 265:21
266:4

**hon**  1:22
**honestly**  137:9
**honor**  15:12 18:24
19:14 20:19 21:4
22:13,23 23:10,12
24:10,13,22 25:3
25:17 26:3,14,21
26:22,25 36:10,16
40:25 42:17,19
43:10 45:5 49:4,7
50:10,14 52:13
54:19 68:14,17
70:12 75:3 76:6,9
82:6 85:4,24
94:10,19,25 95:3
95:11 97:11 99:9
99:22,24 100:5
102:8,23 103:15
104:6,17,19,24
105:6,18 109:1
114:2,7 118:20
123:6 125:8
130:12 134:8
135:1 138:10,13
143:12,15 146:7
149:6,12,18
150:18 151:17
152:5 153:19
154:6 158:21
160:23 161:6
162:2,5 164:1,4
164:13,22 165:5
165:11,19,24
166:4,4,5 167:12
167:20,22 168:3,9
168:18 170:10
175:3 176:3,5,10
176:22 184:21
186:14 199:4,6
203:12,20 205:8
206:9 208:7
217:18,20 222:11
222:14 224:14

226:22,25 227:21
228:3,10 242:9,13
242:20 256:10,14
264:25 265:3
268:1,1,2,15
270:9,14 272:9
273:13 274:9,12
278:20,24 281:8
281:18 282:3
283:25 284:9,15
284:23 285:4,18
285:24 286:4,9,23
**hope** 16:15 120:15
124:23 133:4,4
218:19 264:1
**hoped** 51:5
148:11
**hopeful** 48:13
**hopefully** 15:20
48:17 51:8 142:4
142:16 224:15
246:6
**hopes** 51:13,16
**hoping** 48:19,21
**hospital** 15:14
16:17
**hospitals** 18:12
271:2
**hosted** 240:11
**hour** 74:16 149:24
150:3 268:5
**hours** 15:19 59:4
149:22
**housekeeping**
36:23 37:9
**howard** 13:24
**hrycay** 3:10 167:8
167:13 168:2,8
169:9,10,10,11,11
169:16 170:9,14
170:16,16 171:22
180:7 199:7,9
200:11 201:3

202:4 208:9
211:25 218:7
222:8,12 225:1,3
225:21 226:24
227:1
**hrycay's** 168:16
170:4
**hudson** 10:5
**huebner** 3:18 49:4
49:25 50:6,10,13
109:13,17,23,24
146:7,7,12,14
149:5 152:5,5
217:20 218:1,6,8
218:9 222:6,14,18
268:1,7,10,15
277:7,19,22 281:9
**huge** 51:20 127:23
**hugh** 11:15
**human** 112:20,20
**humbly** 281:21
**hundred** 216:20
223:16,19 226:6
**hundreds** 51:3
53:5 148:13
170:25 239:14
**hunter** 7:12
**hurley** 10:6
**huron** 173:25
174:10 178:2,24
180:14 183:13
185:3 187:5,9
188:1 192:5,6
200:24 202:7,9,14
202:24 203:1
213:21 216:4
217:7
**huron's** 205:3
206:6
**hyde** 2:25 287:3,8
**hyder** 10:7
**hypothetic** 187:16

**hypothetical**
136:14 151:4
156:24 187:15,20
187:24 188:17,23
189:1 191:2
192:21 246:5,8,16
247:12 254:19
264:4,5
**hypothetically**
218:23 220:16
**hypotheticals**
236:24 238:17
**hysingla** 121:21
121:22

**i**

**i.e.** 206:6
**ia** 105:8
**iac** 120:14,19
122:2 137:19
146:23 147:12
148:6,10 187:16
187:24 188:17
191:15 199:16
210:15 216:1,4
219:14 220:24
225:9,13,16
226:14
**iacs** 44:16,17
105:7,8,24 106:5
108:1,25 112:4,10
113:20 116:18,24
117:1,9,13,18,19
117:23,25,25
120:10,22 129:14
129:15,16 130:2
131:7 132:8,17,18
132:23 134:1,21
135:5 136:2,8,18
137:4,18 147:9
148:4 175:23
182:14 183:10,16
184:4 185:12,14
185:16 186:24

187:1,2,4,6,10,13
187:15,17 188:24
189:7,11,13,13,16
190:2,4,14,21,23
190:24 191:22
192:1 199:10,11
199:12,17,24
200:2,6,13 202:7
202:16 203:13,17
204:13 208:24,25
209:4 210:17,19
210:25 216:11,14
216:21 217:2,3,6
218:18,24 220:5,8
221:17 223:2,6,14
225:4 226:19
**iac's** 226:10
**iatrogenic** 122:18
**icsps** 208:22
**idea** 43:21 51:6
68:12 179:11
182:8 195:11
284:7
**identical** 63:4
**identified** 116:23
174:16 258:2
275:24 280:4
**identifier** 266:5
**identifies** 17:25
**identify** 52:21
58:15,18 118:11
125:6 144:3
155:25 156:2,12
173:1
**ides** 92:17
**ii** 28:13
**illegal** 88:11
119:15
**illicit** 48:16
113:23,24 139:3
140:21 141:2,5,6
141:8 142:23

illustrate 187:12
illustration 215:8
illustrative 59:5
  208:23 209:2
imagine 203:20
immediate 62:6
  239:23
immediately
  65:11
impact 105:3,22
  137:25 210:23,24
  214:6 215:5 250:7
impacted 276:9
imperfect 277:18
impermissible
  34:11
implement 86:22
  87:17,24 93:8
  144:1 283:6
implementation
  144:5
implemented
  81:13 85:16 86:8
  86:11 92:13 229:6
implicit 202:4
implied 202:3
import 64:2
importance 239:6
  239:8,11
important 51:23
  51:24 64:4 89:6
  128:12,15 143:6
  281:24
impose 64:7
impossible 270:5
impressions 53:18
improve 64:17
improvement
  64:21
inaccurate 41:18
  41:18
inadmissible 85:7

inadvertently
  22:2
inappropriate
  75:10
inaudibles 277:14
incarcerated
  267:1
incidence 51:2
include 30:15
  71:21 200:16
  211:25 267:15,16
  280:14
included 29:5
includes 39:6
  81:25 82:1 94:21
  175:22
including 26:10
  31:7 34:9 77:13
  85:17 87:19 96:19
  105:1 109:19
  110:17 135:13
  201:15,22 214:21
  269:11
inclusion 261:15
income 110:11,13
incomplete 49:12
inconsistency
  159:16
inconsistent
  159:11 161:15
incorporate
  120:20
incorporated
  115:6
incorporates
  279:16
incorrect 95:18
increase 50:18
  89:17 121:6 174:7
  205:25 261:19
increased 181:8
  250:24

increases 250:2
  269:22
increasing 48:22
  51:6,14,16
incredibly 124:18
independent
  104:25 116:18
  129:3 132:8
  185:13,18 187:3
independently
  202:10
index 204:15,21
  209:24 223:24
  226:5
indicate 226:8
indicated 97:15
  139:4,8 141:11
  215:22 217:6
indicates 30:19
  62:21 67:19
  122:15 166:2
indication 140:1
indications 217:3
  217:8
indicator 224:3
indices 201:13
  209:24
indirectly 114:23
  192:17
indiscernible
  37:17,18 38:16,19
  38:21,22 40:3,21
  40:22,24 41:6
  42:18 44:24,25
  45:5,9,9 49:3,15
  49:19 50:3,9,19
  53:17,24 54:7
  55:4,9,19 56:4
  57:7 58:5 59:24
  60:13 61:12 62:17
  62:25 63:21 71:9
  75:25 79:24 80:9
  84:4 88:4,12

91:25 94:9 98:18
  99:6 107:25
  109:16 140:9
  141:21 143:4
  152:23 154:8,15
  155:3,3,4 158:3
  159:24 160:25
  161:17,20,21
  162:5 166:15
  167:2,23 182:20
  183:19,21 185:5
  186:2,7,12,17
  188:11,17 192:21
  194:14,15,23
  195:1 196:23
  198:25 201:23
  205:20 206:2,3,5
  206:11 209:20
  214:11,12,23
  215:14 216:19
  220:18 221:6,15
  223:12 224:5
  225:7 241:10
  260:1 262:20
  266:20,21,24
  268:22,24 270:1
  270:23,23,24
  271:8,9,18,22,23
  272:1,25 273:1
  274:3,15,20 275:2
  275:11,16,22,23
  276:15 278:3,5,7
  278:10,12,19,22
  278:23 279:15,24
  280:3,6 285:10
indisputable
  140:23
individual 32:8
  33:4 46:24 124:23
  138:21 178:14
  187:14 213:24
  273:17,22 282:18

induced 53:24
  54:12
industry 48:16
  124:19 148:23
ineffective 241:19
  242:1 261:24
influences 129:23
informal 47:8
information 67:23
  126:4 151:7
  155:25 178:11,12
  182:13 184:10
  189:5,10,19,21
  190:1,3 196:7
  197:2,5 198:21
  200:25 212:8
  213:13 217:1,2
  274:23
informed 33:20
  43:15,16 75:2
  92:25
infrastructure
  254:25
infrequently 47:2
ing 57:5
inherent 154:3
  155:2
initial 187:14
  193:8,9 275:6
initiative 56:25
injectable 51:2
injury 31:9
input 239:4
  277:24
inquiring 90:13
inquiry 105:7,12
insofar 153:9
instance 26:5
instances 140:20
  229:19
instruct 68:5
instructed 81:9
  157:1

instruction
  156:21
instrument 157:6
  157:13,14 160:3,3
insurance 26:15
  114:12
insure 85:16 86:8
  86:12,24 87:18,25
intellectual
  111:19
intend 112:8,10
  120:2 149:1
  164:23 286:13
intended 17:17
  20:24 22:19 24:2
  24:5 25:13,14
  32:6 42:21 151:21
  164:9 167:23
  169:18 196:7
  227:24 274:24
intends 45:22
intense 279:22
intensity 237:8
  238:20 241:21
  242:3 245:8,18,21
  245:24 246:2
  247:8,18 255:9
  260:3,4 275:7,11
  275:25 276:6,20
  276:21,25 280:8
  280:17
intention 137:7
interaction 31:8
interest 132:23
  133:13 148:20
  153:7 193:8
interested 140:10
  140:12 218:17
interests 132:5
  209:3
interference 59:1
internally 255:12

international
  98:16,22 111:19
  112:4,7 133:25
  137:23 204:25
  224:3 225:24
  226:6
internationally
  129:14
interpret 72:21
  157:9,18
interpretation
  73:1,11,14,18
  74:4,9,10,20
  157:6,8,12,15
  160:2 161:17
interpretations
  74:16
interpreted
  159:22 160:3
interpreting
  73:15
interrupt 161:25
  162:3,7 245:16
  277:7
interrupting 41:8
introduction
  84:24
intrusion 64:10
invest 110:8 196:8
invested 195:2
  211:8 219:1
investible 220:6
  221:1
investing 197:3,19
  213:14
investment 33:17
  33:21,25 65:13
  155:3 171:15
  177:9 186:25
  197:19 214:1
  223:25
investments 201:5

investors 198:21
invests 110:2,5
invited 274:16
involve 32:1
  103:11 106:12
  110:23 140:21
  237:8,9
involved 57:20,24
  157:6 193:19
  233:13
involvement
  102:25
involves 78:1
involving 101:20
  102:11 229:9,13
ip 111:24 112:1
ipad 154:14
irrelevant 97:23
  99:17 104:16
  242:11,12,14
irrespective 148:3
  148:6
irve 9:11
isley 9:15
isn't 225:13,16
  230:23 237:6
  261:22 267:6,8
  268:16 270:5
  284:17 286:8
isolate 282:23
israel 10:9
issacharoff 10:8
issue 18:13 23:13
  74:22 104:21
  157:7 160:11
  228:23 230:22
  239:6 240:6,8
  245:8 271:16
  274:3
issued 55:6,7
  56:12 141:14
  231:18 240:4,11
  250:9 264:21

**issues** 45:24 56:23
97:17,19,19 99:4
103:25 153:9
160:1 166:20
180:7 230:3,18
232:16 251:3,4,25
270:24 271:4
274:18,19
**it'd** 63:2
**it'll** 223:4
**italian** 100:18
101:1,2 104:5
**italy** 98:23 99:8
99:15 100:13
101:2 103:21
104:5 107:14,21
107:24
**item** 179:7
**items** 59:6 60:24
63:19 94:8
**it's** 204:22 227:4
227:16 228:19
230:11,11,12
231:22 234:17
235:15,15,17
239:25 240:10
242:10,11,12,14
242:16,24 246:3
248:8 253:19
256:12,14 258:13
259:5,15 260:11
260:18 262:9,23
264:8 265:4
266:18 267:10
269:11 271:19,22
277:15 279:20
280:11 281:3,24
286:3
**ives** 10:10
**i'd** 249:19 263:14
281:9
**i'll** 256:13 265:4
270:22 272:23

**i'm** 227:2 229:1
230:14 232:8
236:2,2 237:16
239:2 241:9,22,24
244:19 245:16,22
246:5,17 247:12
250:4,16 252:1,14
252:16 253:15
255:18 256:10
259:6,8 260:8,21
260:23 263:10
265:13 266:1,17
267:7 268:2,20,25
271:1,11 272:12
272:13 274:12
275:1,2,2,21
276:11 277:22
278:20 279:4,15
281:2,23 282:10
282:24,25 283:19
285:1
**i've** 234:21 244:15
257:8 283:17

**j**

**j** 5:13 6:6,15 9:11
11:4,24 12:24
13:13,20 14:4,11
14:12
**james** 3:20 9:18
13:6
**january** 58:23
89:4 188:1
**jared** 9:7,17
**jargon** 282:11
**jasmine** 7:7
**jason** 13:1
**jay** 7:6
**jeffrey** 9:10 10:14
11:6 12:24
**jenna** 10:5
**jennifer** 7:13 8:19
12:11

**jeremey** 13:4
**jeremy** 10:22
**jerome** 14:1
**jersey** 153:17
155:6,24 156:6,10
157:2,11,24 159:8
159:10,17,21,23
160:4,6,9,11,12
160:15,18 161:13
161:14,14,15,19
161:22 162:13,13
162:18,19,24
163:1,3,3,3,6,11
**jersey's** 154:2
155:1
**jesse** 8:8
**jill** 7:2
**job** 124:14 282:13
282:14,25
**john** 7:20 8:11,12
9:21 11:8
**joined** 48:7 51:1
51:22 53:2,9
89:12 284:19
**joining** 50:23
52:24,25 53:18
**joint** 208:11
**jonathan** 5:20
11:19 14:13 96:21
228:10
**jones** 10:11
**jordan** 12:25
14:15
**joseph** 6:17,22 8:5
12:21 13:7,21
14:8 24:9 45:1
52:8 54:2,6 70:9
70:12 72:14,24
73:2,21 74:6
78:12,14 79:3,20
79:24 80:4,9,11
80:17,19 82:5,8,9
85:4,11,24 88:17

93:11,13 95:3
96:6 97:11,22
99:17 125:4
126:10 132:21
134:3 136:9 137:9
149:11,12 170:10
170:10,13,15
174:14,17,19
175:3,8,9 176:4,5
176:9,12,14,15,25
178:20,21 180:6,9
184:20,21,22
185:10,11 186:11
186:13,16,19
189:24,25 194:24
199:3 200:11
215:11,22 224:22
224:24
**joseph's** 120:21
169:3
**jr** 7:11 9:18 14:20
**jrc** 157:23
**juaire** 10:12
**judge** 1:23 15:2
15:10 16:16 17:2
20:5,9 21:22
150:10 172:8,10
172:17 197:20
206:1 223:5
234:24 283:17
**judge's** 223:3
**judgement** 159:25
266:9
**judgment** 155:13
155:22 156:6,10
156:14 157:25
158:12 159:7,8,11
159:17 160:5,8
162:25 163:1,2,5
163:9
**judgments** 77:9
77:12 154:4 155:3
155:24 156:1

**judicial** 238:10
**julianne** 8:20
**july** 18:1,8,16
19:4 90:1 182:24
209:6
**jumped** 252:1
274:13
**june** 151:19
154:18 155:8,10
155:17 169:17
183:11 199:18,21
209:7 212:20
221:22,22 240:5
**jurisdiction** 154:3
155:2 269:8
**jurisdictions**
113:23
**justice** 5:8 84:19
95:24 96:2,22
97:9,20 98:8
262:5,8 263:3
**justin** 1:25
**jx** 55:18,19 79:18
79:19 80:13
157:20 160:24
161:7
**jx1688** 58:10,11
**jx1689** 65:19,22
**jx209** 79:19
**jx2094** 78:21,23
**jx2096** 96:11

**k**

**k** 10:3 25:4 164:3
**kami** 12:17
**kaminetzky** 3:19
10:13 15:10,11,25
16:4 75:3,12 76:9
76:10,18 285:24
**kane** 214:18 217:9
217:14
**kaplan** 6:1 10:14
167:13

**kara** 14:5
**karavolas** 10:15
**karen** 10:18
**katherine** 9:3
12:13
**kathleen** 11:22
**keep** 39:4 44:2
47:25 48:11 180:3
199:25 203:23,23
207:25 211:8
214:1 219:17
226:12 271:20
**keeping** 176:6
**kelleher** 10:16
**kelly** 10:17 14:7
**kenan** 13:10
**kennedy** 10:18
**kenneth** 8:15
**kentucky** 257:13
257:15
**kesselman** 10:19
**kevin** 8:6 11:10
**kickbacks** 100:11
100:19 101:2
**kidd** 8:20
**kill** 48:5
**killed** 47:20
**killing** 48:1
**kind** 35:5,5 92:20
142:9 151:4 204:3
204:20 213:25
235:19 241:22
282:16
**kinds** 209:22,23
214:11
**klauder** 10:20
**klein** 10:21
**kleinberg** 6:1
167:13
**kleinman** 10:22
**knew** 41:6 85:18
87:19 187:5 188:1
198:4

**know** 16:6 24:2,8
26:7 29:1,16,21
30:7 31:24 32:3
33:24,25 35:4,4,8
35:13 41:1 45:7
45:23 46:6 47:9
48:7,8,8,13,15,17
48:19 49:3 50:21
51:13 53:2,5,14
54:23,24 55:3,5
57:10,10,11,13,14
57:15,19 59:4,9
60:22 61:16 62:20
63:9 68:21 69:7
69:21,25 70:2
71:18,22 73:17
75:7,8 76:2,6
80:11,18 82:20
83:4,4 87:22
89:12,15,19 90:25
91:20 92:14,23
93:3,19 97:4
98:24,24 99:3,20
100:15 101:3
102:10 103:9,20
103:21 104:1
105:15,21 106:15
106:17 107:8,12
107:13 108:8
109:5 111:9,23
112:2,5 113:13,24
115:8,11,13,17,19
115:19 116:2,10
116:13,15,20
117:4,6,6,20
118:2,3,10,13
120:15 123:2,3,5
124:4 125:24,25
129:25,25 133:2,8
134:5,6,15 138:2
138:6 139:14,17
139:21 140:3,11
140:14,18 141:16

142:2,7,8,16
143:8,10,24
144:15,24 145:1,2
145:5,6,14 146:2
149:8,10 150:17
151:3 152:16,17
157:20 166:7,16
166:16,18,20,23
167:1,4,6,25
168:4,16,23
179:13 180:14,16
181:14,17 189:12
190:17 192:4
194:19,22 195:13
195:15 197:14,17
197:18 198:13
200:18 203:19
204:6 205:2,14,16
206:16,21,23
207:1 211:10
212:5 213:14
214:3,6,8 221:3
223:3,13 224:21
231:22 232:23
233:5 234:23
236:1 237:14
239:25 240:2,14
240:17 241:24
244:18 248:8
249:19 250:3,5,12
250:14 252:25
259:16 263:14,18
265:4,20 266:5,6
266:8 267:9,10,23
268:4 269:18,18
269:20 275:1
277:16 281:3
282:1,18 284:25
286:1
**knowing** 17:18
18:1 20:25 25:14
151:22 164:10
189:1

**knowledge** 31:21
31:25 32:25 33:2
100:16,17 141:18
142:25 147:20
234:20,22 279:6
**known** 85:18
87:20 232:13
**knows** 281:22
**kotler** 10:23
**kramer** 5:15
10:24 228:11
**kx** 154:13
**kxt987** 40:20
**kyung** 10:25

**l**

**l** 8:1 9:1 13:21
17:12,13 20:18
22:11 25:4 151:15
**l.p.** 1:7
**label** 80:12 122:13
122:14,15,15
141:19
**labeled** 261:11
**labeling** 31:5
**labels** 196:21
**laboratories**
115:15,22 116:12
118:7
**lack** 152:22
**lacked** 92:18
**laid** 53:11 168:22
**landline** 166:25
**language** 30:25
32:14 82:12 97:6
209:7,10,11
**large** 104:25
145:3 179:3,8
232:15 244:2
256:2
**largely** 44:13
141:3 219:3
285:13

**larger** 272:15
276:20
**largest** 179:3
190:4,9
**late** 96:21 249:10
249:11 265:4
281:3
**laura** 11:14
**lauren** 10:16
14:22
**law** 153:17 154:4
155:6 157:2,11
159:10,20,21,23
159:24 160:1,10
160:11,12,13,13
160:15,18,18,19
161:14,14,15,16
161:19,21,21,22
162:13,15,19,23
163:3,4,6,11
238:10 254:16
262:14 268:7
**lawrence** 8:23
9:24 10:23
**lawsuit** 281:24
**lawsuits** 31:21,25
62:14,21
**lawyer** 82:20
**lawyers** 29:16,22
33:6 35:17 77:16
133:19 222:11
**lays** 51:15 52:5
**lead** 222:2 225:25
226:1,3 274:8
**leading** 126:1
141:16 198:14
274:5
**lean** 37:8 109:21
**learned** 99:2
**lease** 114:14
**leave** 223:11
277:16 285:24

**leaves** 49:17 73:14
**led** 18:12 56:25
**ledanski** 2:25
287:3,8
**ledyard** 5:1
**lee** 10:25 12:5
**lees** 11:1 182:21
**left** 30:1 232:9
233:9 260:12
264:9
**legal** 29:23 35:24
83:6 86:18 119:7
119:17 127:11
134:3,15 136:9
139:2,3 155:11,17
155:24 161:1
234:14 240:2
287:20
**legally** 119:11
127:14 128:18
**legier** 3:6 16:15
16:24 17:1 21:20
21:21 22:1,2,5,10
22:14 23:4,9,23
**legier's** 22:25 23:7
**lenard** 12:10
**lending** 214:16
**length** 205:14
**lengthy** 151:19
275:10
**lennard** 11:2
**ler** 89:8
**leslie** 9:13
**letter** 141:15
150:19 156:21
**let's** 226:6 229:23
234:5 236:21
239:6 240:13
243:2,25 245:7
246:21 247:11
256:8 260:19
**level** 116:2 130:1
198:13 223:11

245:17,19,20,23
246:12 255:5
**levels** 214:10
254:24 260:6
280:10,11
**leventhal** 11:3
**levin** 5:15 228:11
**levine** 11:4
**lexington** 3:15
6:19
**liabilities** 133:15
133:19,23 135:7
**liability** 32:5 33:3
97:12,15 110:21
136:25 137:23
211:5 219:19
**liaisons** 71:22
**lianna** 13:16
**license** 68:19
**licensed** 68:12
**licenses** 111:22
112:2
**licensing** 31:4
**lichtenfeld** 11:5
**licit** 139:3
**liesenmer** 11:6
**lieu** 168:12 208:24
**life** 134:5
**light** 270:18
**likelihood** 135:5
**limited** 26:23
213:13 232:12
250:2
**limits** 142:25
143:3
**line** 17:3 27:18
39:13 41:17 73:13
76:12,13 94:8
105:12 106:25
107:4 165:10
183:4,7,22 184:2
208:4 235:25
236:4,6 237:14

244:17,20 252:24
253:1,10
**lines**   65:8 72:12
107:11 217:6
**link**   24:21 166:17
**liquidated**   136:2
136:18 226:17
**liquidation**   137:3
**lisovicz**   11:7
**list**   15:6,12 30:6
61:23 114:22
283:9,11
**listed**   114:14
115:2 122:13,14
123:22 213:8
229:15 260:25
261:8
**listen**   39:16,16,18
39:19,21 218:13
**listened**   39:14
92:16
**listening**   39:12
49:13,15
**lists**   27:18 28:15
256:15
**lite**   6:9
**literally**   167:2
**literature**   143:1
282:8
**litigate**   35:7 97:8
97:17,19
**litigation**   35:3
62:19 153:6,12,14
172:5,9 228:12
229:9,13 237:2,5
237:6,21 238:2,5
238:7 263:8
**little**   32:13 36:24
37:1 39:22 46:10
46:13 91:3 92:23
133:5 142:3,10
164:20 169:22
178:16 180:4

204:3 214:12
217:25 218:4
241:23 247:20
255:25 259:3
262:17 264:9
270:19,22
**live**   71:4 75:23
**llc**   6:17
**llp**   3:13 4:1 5:1,15
119:18
**locales**   244:11
245:1
**locate**   265:25
**located**   166:19
**locating**   265:21
**location**   251:13
**log**   24:20
**lone**   37:20
**long**   16:7 24:2
142:18 265:23
277:20
**longer**   24:6 56:3,6
107:22 149:22
152:2 177:9,12,12
221:16
**longmire**   11:8
**look**   34:3 55:13
55:17,25 58:1,15
61:1 62:25 83:18
85:13 88:25
155:20 159:2
173:22 174:4
179:4 180:18,23
181:2 182:18
183:14 186:5
187:11 188:6
191:17,25 193:6
195:21 208:12
231:21 232:22
244:24 245:2
256:8 263:13
**looked**   66:4
133:20 154:15

**looking**   66:18
76:9 144:25 156:3
157:13 173:23
204:10,11 233:19
262:10 269:1,14
273:16
**looks**   125:22
**lose**   60:1 137:18
**losing**   90:17
125:23 253:18
**loss**   31:9 172:19
172:21,22 173:5
253:24 277:4
278:3,7,9 279:6
**losses**   62:19
172:23 173:2
276:5
**lost**   40:13 41:16
61:11 94:11
249:14 278:5
**lot**   38:23 40:10
60:14 64:19,19
73:14 109:17
127:5 132:14
144:19 145:15
152:9 210:21
271:11 277:14
**louis**   7:14
**love**   72:7
**low**   73:6 201:14
276:19
**lower**   177:5
179:18 212:9,22
219:8 220:24,24
221:1,3,4,9,25
222:20,24 226:2
276:8,10
**lowne**   53:22 54:7
70:14 71:13,21
75:1,1 76:13
**lowne's**   53:19
70:5,25 72:22
75:4,15

**lp**   15:3 150:10
**lunch**   149:16
**lunchtime**   24:18
**lynam**   11:9

**m**

**m**   5:20 10:11
11:15,17,25 12:3
12:5 13:17 14:3
38:2,5 151:15
**m.p.**   158:9
**ma'am**   199:22
**machine**   286:16
**maclay**   11:10
**magali**   9:8
**magnitude**   105:15
**mail**   38:13 150:14
166:3,13
**main**   79:13
**maintain**   81:6
123:14 226:20
**maintained**
202:16
**maintaining**   88:8
**major**   272:12
**majority**   141:7
215:25 225:5
**making**   52:23
54:24 197:10
233:13 242:6
**malanowski**
17:25
**malone**   227:20
**man**   40:23 41:5
42:17,19 43:1,3
50:3,9 63:25
64:19,21 71:9
162:2,5 165:14,19
**manage**   139:12
142:14,16 267:18
**manageable**   62:15
62:22
**management**
45:22 47:5 51:21

53:3 54:23,25
55:4 56:18,21,25
57:10,12,15,22
58:2,3 60:24
61:18,20,22,23,24
67:17,18 68:3,5
69:7,15,22,25
74:18 92:1,16
94:4 127:1,8
128:6,10,15 129:4
131:12 136:6
214:1

**management's**
62:13,21 88:7
92:15 128:1,21,23
129:4

**manager**   171:11
171:12

**managers**   197:19
198:14,21

**managing**   171:14
172:2 269:23

**manufacture**   31:4
111:10 124:19
140:2

**manufactured**
111:4,7

**manufactures**
139:18

**mara**   11:3

**marc**   10:19 13:18
14:4

**march**   173:19
174:12 175:11
180:17 181:3
185:3,8 186:6
208:20 216:3

**maria**   8:14

**mario**   8:2

**marion**   12:18

**mark**   8:7

**market**   48:16
51:5,6,12,16,25

53:23 65:7,13
69:13 70:6 71:14
72:12 74:25 76:16
88:8,8 89:8 90:14
90:16 112:13,15
121:7 125:23
126:16,18,21,22
127:15 129:18
139:21 140:2
186:4,25 187:2,3
187:5,10 188:16
189:3,5 194:15,17
197:2 198:17
201:22 202:10,11
202:12,18,22
203:6,9,10,15,16
203:18 204:1,4,8
204:11,12,12,21
205:17,25,25
206:19,23 207:5
207:16,17,23
209:24 210:4
214:5 223:18,20
226:21

**marketable**
176:17 179:1,7,11
205:17 211:9

**marketed**   52:3
54:21 70:15

**marketing**   31:5
54:7,24 55:1,9
57:17,21 63:19
66:10 69:5,6,6
71:18 72:23 75:16
77:6,19 78:1,10
78:15,17 90:4,19
90:20 91:6,7,23
91:25 92:11 93:2
93:23 94:2 100:12
101:21 103:9
106:13,25 107:17
111:20 112:8
113:13 124:17

125:2,14,24 126:1
126:8,11,17 127:2
127:6,11,12,18,21
128:5,13 129:20
129:23

**markets**   33:24
112:15 195:14
198:22 202:18
207:1 223:18
224:3 226:6,7,8

**markman**   9:15

**marshall**   3:18
146:7,12 152:5
218:9

**martin**   11:11
14:18 208:16
209:8,9 215:8
217:4,7

**martin's**   208:13
209:5

**maryland**   4:8,9
24:5,11 25:10
26:4,24 36:20
150:16,19 152:2
153:20 285:24
286:3

**maryland's**   26:17

**masiowski**   4:16
6:25 17:25,25
18:9 19:13,16,19
21:8 22:17 23:13
143:22 144:4,13

**massive**   124:6

**masumoto**   11:12

**mat**   142:21,22
143:5,10

**match**   178:1

**matching**   213:9

**material**   107:1
209:21 216:24
220:5

**materialized**
62:14

**materially**   219:3
258:4

**math**   219:1

**mathematical**
235:17

**mathematically**
222:19 235:14,19
236:12

**mathew**   8:18

**matter**   1:5 23:17
59:21 124:11
129:21 141:9
157:11 159:8
160:6 279:1

**matters**   15:8
36:23 37:10 59:23
96:6 125:5 159:23
239:8

**matthew**   6:6 8:22
167:12

**maura**   11:22
168:18

**maureen**   7:19

**maxcy**   11:13

**maximizing**
128:19

**mba**   170:22,25
171:3

**mcclammy**   3:20

**mccloud**   11:14

**mcdonald**   11:15

**mcgaha**   11:16

**mckensey**   126:6

**mckinsey**   91:24
92:1,6,11,16 93:1
93:5,13

**mckinsey's**   93:8

**mcnulty**   11:17

**md**   4:11

**mean**   24:13 39:3
41:21 47:2 56:8
59:18 60:19 64:7
64:23 70:16 73:15

73:20 74:11 75:4
90:24 99:23
101:13 109:5
110:7 115:8,16
128:14 131:2
133:10 139:17
141:18 144:7
158:4 177:14
188:8 214:24
219:16 221:3,4
245:16 253:15,16
273:8 276:16
279:13 281:1
282:5 283:24
284:17
**meaning** 28:23
235:13
**means** 62:11
82:21 105:22
126:18 129:20
131:6,6 173:6
220:23 222:1
226:18,19 277:17
**meant** 141:1
226:13 279:12
**measure** 229:25
245:18,20,24
246:2 268:24
269:1,14
**measurement**
268:19,20
**measures** 210:4
238:21 245:8
247:9,18 260:3,4
260:14 275:23
276:1 280:8,9,13
**measuring** 257:6
265:11 280:12
**media** 93:4
**medical** 39:17
71:21 141:12
143:9 269:7

**medically** 85:18
87:20 139:4,7
141:10
**medicated** 144:1
144:5,7
**medication**
141:23 142:7
144:25 145:17
**medications**
112:23 124:21
141:19,21,24
144:14
**medicine** 139:12
142:12,13 282:24
283:1
**meditation** 144:12
145:1
**meet** 46:5,19,24
58:24
**meeting** 46:11,12
46:22 47:5 58:20
59:7,16 60:2,3,23
60:25 65:25 67:18
91:18,20 92:5,8
93:9,17
**meetings** 45:11
46:17,18,19,20,25
47:4
**melanie** 8:1
**melissa** 9:6
**meltdown** 195:10
**member** 32:25
45:10 47:16 52:6
52:9 67:13 83:14
233:13
**members** 36:3
43:24 77:13 84:18
89:5,10 90:2,17
91:4 95:16 96:4
96:19 103:16
108:12 114:23
132:10 136:7
158:15,17

**memorized** 29:1
116:7
**memory** 45:3
77:24 125:9
**mention** 101:15
**mentioned** 105:19
106:8 265:10
**mentioning** 42:24
268:19
**merely** 248:20
**merits** 153:12
160:14
**meritus** 119:11
**messenger** 50:11
**met** 19:15 58:23
58:23 59:22
**methodological**
216:5,8 225:4
**methodology**
193:19,23,25
194:12 198:11
230:23 279:19
**mic** 41:1 50:2,8
**michael** 3:8 4:16
6:25 7:5 9:12 12:8
13:12 14:11 16:16
150:12 151:15
153:23 161:11
**michele** 10:4
12:16
**michelle** 6:25 19:1
**microphone** 16:19
42:23
**middle** 204:2
**midnight** 38:14
**midpoint** 179:25
180:2 211:17
212:6,10 217:12
**midyear** 46:11
**might've** 59:10
**migrate** 267:6
**migration** 254:12
254:14 267:5

**milbank** 182:22
**milburn** 5:1
**miller** 11:18
**milligram** 247:6
**million** 174:7
175:24,25 176:16
176:17 177:16
180:21 181:4,4
191:15 192:7,8,20
192:21 193:1,7,9
210:10,12,12,19
211:16 216:20
256:23 257:2,12
257:13,19,25
282:22
**millions** 36:5 51:4
53:6,15
**mind** 173:11,12
199:19 210:25
223:10 273:7
**minds** 128:7
230:22
**mineola** 287:23
**minimize** 144:11
144:14
**minor** 23:13,17
**minute** 94:20
**minutes** 37:21
94:11 109:18
166:22 167:10
208:6 225:23
284:10
**mischaracterized**
126:21
**mischaracterizes**
78:14
**mischaracterizing**
75:20
**misconduct** 78:1
83:8
**misheard** 262:25
**misinterpreting**
75:6

**mispronounced**
167:19
**misrepresenting**
75:6
**missed** 39:22
79:22 155:14
193:11 252:14
**missing** 79:4
192:7
**misspoke** 184:12
**mistaken** 227:3
**mistakes** 231:13
**misuse** 32:11,15
**misused** 195:18
**mitchell** 7:6 10:6
**mitnick** 11:19
**mix** 201:22
213:17 214:19,21
237:9
**mkrttchian** 11:20
**mmp** 98:15
**mnc** 44:10,11
129:9,11
**mnp** 44:7,9,12,15
129:7,9
**modal** 107:2
**modalities** 145:1
145:11
**mode** 272:12
**model** 67:10
72:18 194:2,8
200:9,10 226:14
237:5,20 238:1,1
238:15,24 239:3
245:10 247:24
248:19 264:11
270:3
**models** 194:4
236:21,23 237:1,8
238:21 263:8
**moderately**
270:21

**modest** 250:2
**molton** 11:21
**moment** 66:20
123:4 171:18
**momentarily** 20:9
165:12
**monaghan** 11:22
16:2,4,10 154:5
161:5,6,12 162:10
162:11 163:13
168:18,19,25
169:6 173:9 199:6
199:8 202:13
203:11 224:23,25
225:2
**monday** 39:21
**monetary** 78:4
**money** 33:11,16
34:25 35:9 62:15
62:23 107:25
110:2,5,8 120:9
144:22 181:19
210:25 211:8
214:4 257:3,22
276:16 281:22
**monitoring**
145:20
**month** 55:2
175:20 176:16
177:6 180:14
235:23 237:17
**months** 46:7,15
56:24 68:19
173:19 174:4,7
225:6
**moral** 36:6 119:4
127:19 130:5
**morally** 128:19
**morgan** 204:19,20
**morning** 15:2,10
16:14 27:6,9,10
36:19,21,22 96:12
166:17

**morphine** 122:6
247:6
**morrisey** 11:23
**mortgage** 214:5
**mortimer** 90:1,12
96:20 158:13,14
173:10 191:23
192:16,22,25
**motion** 168:16,19
**motivation** 274:20
**moultrie** 7:9
**move** 15:16 99:21
99:23,24 104:18
127:24 133:24
160:24 186:9
220:5 251:14
252:20,22 253:5
254:8 258:24,25
259:2 272:23
**moved** 39:8
263:24
**moving** 76:22
253:13
**msci** 201:13
204:15,17,19
223:24 226:5
**muddling** 142:3
**muha** 11:24
**multi** 107:1
**multiple** 136:11
173:5 197:22
205:18
**multiplication**
178:5,10
**mulvihill** 11:25
**mundipharma**
98:22 99:6,14,17
100:19 101:1
106:13
**municipal** 130:13
**municipalities**
129:1

**municipality** 6:10
**murray** 12:1
**must've** 158:6
**mute** 50:2 162:5
165:17 184:19
271:24 277:9
**muted** 42:18
49:16 50:4 184:20
241:25
**myriad** 130:2
137:20

**n**

**n** 3:1 15:1 17:13
151:16 227:16
287:1
**nadim** 12:2
**naftalis** 5:15
228:11
**nalmaphene**
140:14
**name** 27:6 55:19
58:11 80:4 114:11
116:2 129:9
138:20 139:15
145:12 167:19
171:22
**names** 139:17
158:19
**nann** 12:3
**narcot** 141:6
**narcotics** 122:8
**narrow** 35:16
**narrower** 35:11
**nas** 163:21 164:6
**nasal** 51:2
**nathaniel** 11:18
**nation** 6:11
262:15
**national** 145:19
236:25 248:22
**nations** 130:14
**nation's** 246:10
246:11

natural 213:8
nature 105:21
  232:12 235:2
  269:12
navigate 198:22
ndt 140:11
ne 4:17
nearby 277:10
nearly 282:21
necessarily
  120:23 129:22
  171:6 226:8
  251:13 272:19
  273:8 276:15
necessary 85:19
  87:20 282:6
need 16:10 23:16
  26:18 30:24 35:14
  45:9 62:2 63:20
  64:15 76:3 109:20
  130:3 133:11,20
  157:17 165:16
  168:22 185:1
  201:18 214:4
  220:17 232:16
  245:10 282:13,15
  283:12
needed 32:8 94:6
  152:10
needs 49:18 62:2
  133:2
neglected 201:4
negotiated 69:24
  221:12 234:11
negotiating 68:11
  68:15 69:19
negotiation 69:16
  69:18 70:1
negotiations 69:4
  69:8,12
neiger 12:4
neighboring
  258:8,20,21

neil 10:17
neither 151:5
nera's 171:23
nervous 110:25
  111:4
net 125:24 133:10
  133:11,14,15,24
  134:22 135:4,7,7
  135:11,12 136:2
  136:19 137:4
  146:23 147:9,12
  148:6 173:17
  174:11 175:19
  178:2,9 181:5
  186:5,6 187:4,12
  188:1 190:13
  195:16 208:19,19
  208:20,21 211:21
  211:24 213:24
  216:2,3,12,14,18
  219:10,11,22,25
nets 215:9
neutral 213:3
never 108:25
  127:17 145:25
  189:6 197:14
  229:5,8,12
new 1:2 3:16 4:4
  5:4,11,18 6:4,20
  17:12 24:2 77:23
  78:4 90:3 126:20
  150:5 152:18
  157:23 235:13
  257:12,14,14,16
  282:13
newark 6:13
newco 32:16
nice 228:19
nicholson 12:5
nickolas 10:15
night 38:12,12
nine 33:12,18,22
  34:10 177:17

180:12 181:24
  182:9 195:6 198:1
  198:4,6 263:3
nj 6:13
noat 259:23 260:9
  275:17
noise 41:17 162:1
  271:20 275:1
nominal 106:18
  106:22
nominees 155:4
non 30:17 31:6,16
  32:1 51:7 76:16
  101:24,25 102:13
  103:10 110:20
  111:15 144:1,5,7
  144:22,25 145:11
  161:14 172:23
  193:9 252:23
  253:13 254:9
  267:10
nonmonetary
  124:1
normal 47:5
normally 142:3
note 15:17 71:4
  176:19 281:24
notes 75:23
notion 112:22
notwithstanding
  134:21
number 37:16,19
  38:8 44:22 52:2
  63:9 68:13 69:22
  77:9,17 79:3,6,14
  79:18,19 80:13,17
  84:7 92:18 93:4
  100:23 123:24
  124:3 133:1 146:1
  148:5 174:17
  177:16 192:25
  197:13 202:6,17
  203:1 214:20

217:24 223:1,15
  232:12 238:10,11
  246:25 254:2
  261:8,16 264:15
  279:20
numbered 84:5
  89:1
numbering
  148:13
numbers 38:6,7
  61:6 63:3,4,12
  66:16 126:5 186:8
  186:18 192:5,6,9
  200:23 221:5
  256:5,13 282:17
numerator 269:6
numerous 197:12
ny 1:14 3:16 4:4
  5:4,11,18 6:4,20
  287:23

**o**

o 1:21 15:1 164:2
  164:3 227:16
  287:1
o'neil 16:16,16,20
  17:2 18:13 20:5,9
  21:21
o'neill 104:19,20
  104:23 118:20,21
  118:22,24 123:5,6
  123:9,12 125:8,13
  125:18,19 126:14
  130:8
oath 95:7
obaldo 12:9
object 21:5 22:24
  25:18 52:8 72:24
  75:3 85:24 152:3
  152:7 164:14
  170:5 228:4 237:7
  242:9 268:2
objecting 24:4
  103:25 236:18

**objection** 18:6,9
54:2 59:3 70:9,11
73:2,21 74:6
78:12 82:5 93:11
96:6 97:11,22,25
99:17 100:3,4
101:24 113:5
125:4 126:10
134:3 136:9 137:9
150:13,17 151:8
152:2 154:5 161:4
164:7 170:3 185:9
189:22 194:23
202:12 222:4
228:7 273:10
274:5
**objections** 104:1
228:23
**objective** 231:1,3
273:20
**objectors** 268:10
**obligated** 146:21
147:23 219:25
**obligates** 148:22
**obligation** 75:19
148:5 149:2 211:4
**obligations** 105:4
129:21 132:12
138:1 148:21
199:16
**obliged** 105:10
**observation**
120:21
**observed** 53:16
**obtain** 246:14
**obtained** 159:16
159:25
**obtaining** 178:9
**obviate** 26:18
**obviated** 41:24
**obviously** 26:3
48:19 49:18 51:13
64:3 81:25 102:9

148:15
**occasion** 40:8
41:13 88:7 259:14
**occasionally** 91:9
**occasioned**
254:16
**occur** 31:10
107:13 185:21
226:14
**occurred** 32:19
83:9,13,20,24
89:16 107:9
**occurs** 103:16
112:16 250:5
**october** 207:8
**odd** 256:5,7
**offer** 74:9 217:9
**offered** 33:8 34:4
34:19 74:10
232:11
**offering** 74:4
238:21
**offerings** 250:24
**offhand** 56:14
59:15 267:23
**office** 4:8 34:9,10
166:23
**officers** 234:14
**offices** 81:8
**official** 76:11
**offset** 219:18,19
**offsets** 219:21
**oh** 16:23 18:25
38:4,5,17 42:9
54:6 55:22 80:12
80:16 81:21 83:6
93:12 98:20
101:14 114:17,18
135:1 140:23
154:21 272:9
**ohio** 257:21
276:23,23,24,25
277:1

**okay** 15:2,22
16:11 17:4,7,12
17:15,23 18:5,10
18:23 19:10,20
20:4,11,17,20
21:5,10,19 22:11
22:14,24 23:3,19
23:25 24:12,23,24
25:4,6,18,22 27:3
27:8 28:7,8,9,21
29:17 31:1,2
36:11,16,25 37:6
37:17,24 38:19
39:15 40:6,12,19
41:5 42:2 46:8,19
49:25 50:6,12
52:10,16 55:24
58:14,22 61:1,14
61:25 62:8,16,18
62:24 63:2,6,11
64:17,20,20 65:2
65:5,18,22 66:3,6
66:9,14 67:6,25
70:4 71:10 72:3
76:21 77:1,12
80:12,15,16,25
81:22 82:13 83:13
84:2,17,22 85:3
88:9 89:3,4 91:1
91:22 92:3 94:12
95:2,5,9 96:25
97:3 98:21 99:22
100:2,22 101:5
104:22 107:7,14
109:4,7,23 110:19
114:3,5,8,18,21
115:2,14 118:18
118:22,25 130:10
131:1 136:13,15
138:11,16 139:7
139:11,23 140:3,5
141:1,9 142:13
143:3,14 144:19

146:6,10 147:4,11
147:14 148:9,18
149:7,13,15 151:9
151:18 152:1
154:9 156:4,17
157:11 158:6,22
160:21 161:4,7,9
162:7 163:15
164:2,14 165:6,13
165:21 166:9,23
167:15,21 168:11
168:21 169:5,8,11
169:16,24 170:2,8
170:12 175:2,7,8
176:12 177:5,15
178:20 181:14
183:4,22 184:20
185:6 186:16
188:22 191:10,13
191:17 193:13
196:4 199:3,5
203:13 205:2
206:10,18 207:10
208:2,8 217:19
218:13,16,22,23
221:24 223:2,11
223:17,22 225:19
226:23 227:2,11
227:16,18 228:4,8
228:14 229:1
230:22 231:4,25
233:1,4,8 234:5
234:23 236:2,21
237:4 238:14
239:3,6 240:13,17
241:13 242:5
243:2,10,25 244:6
244:17,19,22
245:17 246:5,21
247:8,11,20 248:2
248:11,15,25
249:7,10,16,22
250:11,14,17

251:2,6,9,17,23
252:7 253:2 254:1
254:6,11,15,18
255:18,21 256:5,8
256:22 257:1,5,12
257:24 258:7,16
259:8,11,13,18
260:7,19,24 261:7
261:15,19,23
262:8,12,22 263:2
264:3,14,18,21,24
265:1,6 266:8,14
266:15 267:4
268:25 270:8,10
270:17,20,22
271:24 273:13
274:8,10 275:2
276:14 278:15,19
279:9 281:11
282:1 283:3,14,16
283:19,23 284:16
285:2 286:2,10
**old** 104:8 219:14
287:21
**omitted** 191:14
**once** 46:6 112:11
133:23 136:2,18
177:15 178:8
265:24 266:5,8
**oner** 241:20
**ones** 38:5 101:9
**ongoing** 48:3
68:21 69:12
101:17 106:15,17
**open** 42:21 78:18
96:10 154:13
**operating** 61:5
62:1 101:6 113:20
117:22,25
**operation** 133:8
**operations** 42:12
43:16,18,20 44:1
44:2,5 56:5 57:21

**opiates** 47:19
**opine** 155:1
222:12,13
**opined** 222:9
**opining** 223:20
243:19
**opinion** 150:20
151:3 155:6
156:24 157:21
159:12 171:1,2,4
171:8 172:22,25
173:3 197:21
208:17 229:16,20
229:21 230:15
244:16 266:11
**opinions** 20:22
21:3,7 83:6
156:18
**opioid** 30:10,17
31:6,16,22 32:1
32:11,16 34:5
35:1,10,21 36:3,6
48:4,5,23 50:20
51:9,10,17 53:24
53:25 54:12 55:1
56:20 66:18,21
67:1,9 70:15 72:4
72:9,19 74:19,21
76:16 81:9,12,15
85:17 86:9,12,24
87:19 104:14
110:20 111:15
112:10 113:25
119:5,9,13 122:23
124:12 125:2,15
125:24 126:2,19
126:20 127:1
131:2,8,13,18
132:13,19 136:3
136:19 137:5
138:1 140:20
141:6,8,10 142:5
142:6,8 144:2,6

144:11,15,22
145:11,17 229:5
229:10,24 230:19
231:5 234:8
239:15,19 245:10
245:12 247:1,5,6
251:18,20,24
252:1,1,5,20,23
253:5,13,13 254:8
254:9,12 255:12
257:6,6 258:24,25
262:6,14 266:10
266:14,15,20,24
267:17,18 269:2
269:23,25 270:23
270:25 276:9,10
276:21 281:23
**opioids** 31:19,22
47:17,20 48:1
50:18 51:5,22
52:3 53:5,23
54:11 55:9 56:6
57:18 65:13 66:11
70:6,7,14 71:14
71:15,24 72:23
75:1,16 77:20
78:2,11 81:7
90:20 100:20
101:22 102:11,13
103:10,10 106:13
107:1,17 112:2,8
112:14,15,18
113:9,19,22,24
122:7 124:2,10
126:9 127:15,18
129:16,18,20
139:2,7 145:7,9
229:13 238:10
268:22,23 269:6,9
280:15 282:9,21
**opportunities**
91:14

**opportunity**
139:20
**opposed** 138:25
230:16 279:18
280:19 284:22
**opposite** 75:9
88:14 221:12
**optimize** 63:13,17
63:20 65:7
**option** 107:2
**orally** 53:4
**order** 16:1,24,25
16:25 17:16 20:22
22:18 25:12 69:13
134:2 144:14
151:20 157:9,17
164:8 169:17
198:19 226:15
227:22 284:7
**ordered** 125:2
**orderly** 209:3
**original** 16:25
147:5 185:2
**originally** 189:18
**ought** 54:4 70:13
103:20
**outcome** 32:9
35:7 177:11
200:20 251:1
**outcomes** 124:13
190:14
**outline** 60:24
**outpatient** 267:24
**outside** 46:25 47:4
92:6 141:21
145:14 187:4
204:22
**overall** 126:5
213:23 214:17
260:11 262:19
263:4 280:11
**overdoes** 246:2

**overdose** 48:4
140:16 142:21,23
238:12 246:3,11
246:13 247:5
268:21,21
**overdoses** 48:5,23
50:20 51:9,10
141:7
**overly** 47:10
**overnight** 207:8
**overriding** 128:15
**overruling** 100:4
**oversight** 124:20
**overwhelming**
132:2
**owned** 44:16
101:6,21 108:3
114:22 191:15
192:22
**owner** 111:18
**ownership** 116:14
**owns** 107:16
115:10 116:3,10
**oxicon** 89:7
**oxycodone** 89:7
100:13
**oxycontin** 35:22
50:24 52:4 77:6
77:10,14 78:10
89:9 90:13 91:15
100:12 119:13
121:15,17,18
124:1 125:22
**ozment** 138:13,13
138:17,19,20
143:12 265:3,3,7
265:9,16 268:13
268:18 270:9,11
278:3 281:8,13,18
282:4,5 283:17
**o'connor** 12:6
**o'donnell** 12:7

**o'neil** 12:8

**p**

**p** 3:1,1 9:23 14:17
15:1 20:18
**p.a.** 4:15
**p.c.** 6:1
**package** 243:5
**packet** 37:10
78:24 79:4,11
**packets** 79:9
**page** 28:8 45:5,6
61:1,4,5,6,10,13
61:25 62:15 63:1
63:3,3,23 65:3,5
66:16,17 67:10
76:10 80:15,16,17
80:20 84:5,6,7,23
84:23 88:24 89:1
114:15,19 154:23
158:2,5,8 159:3
173:13,13,22
179:5 180:18
183:4,6,7,22,24
183:25 186:21
191:19,25 196:5
196:18 232:3,6
233:4,9 235:25
236:4 237:14
244:17,19,20
250:14,17 252:24
253:10 259:15
260:8,20,22
263:15 264:3
**pages** 60:8 85:6
196:18 256:12
286:14
**paid** 33:11 69:13
81:14 104:24
110:14 120:19
136:3
**pain** 107:2 123:15
123:16,19 124:7
140:4,6 144:22

145:11 245:17,19
245:20,23
**pamela** 14:2
**paper** 40:10 84:7
231:22 232:22,25
237:19 238:3,8,18
241:7,10,11
250:12 251:6
254:19 256:1
262:13 263:14
264:11,18
**papers** 41:6
231:10,13,19
232:1 234:6
236:22,22 237:4
240:11 241:9
243:4,7 244:2,4
251:4 270:7
273:24 274:3
**paragraph** 30:8
30:13,19 33:7
34:2 35:20,23
83:11 85:3,13,14
86:16 88:10,24,25
89:3,21,22,25
90:11 91:10,11,11
91:22,23 92:3
93:7,14 154:24
159:2,5 173:14
208:12,15 211:20
211:22 232:6,18
233:8 245:9,13
247:23 250:20
259:18 260:8
261:11
**paragraphs** 232:8
**parcel** 117:23
**pardon** 202:21
220:20
**parent** 240:10
**parkins** 12:10
**part** 18:1 26:10
29:18 33:8 35:22

82:15 97:6 101:18
101:18 104:25
107:1 108:17
117:23 119:13
126:16 131:21
136:22 138:22
169:1 173:16
212:18 214:9
220:22 252:14
269:18 280:11
282:23 283:13
**partially** 229:17
**participated**
91:17,19 136:5
273:1
**participating**
131:24
**particular** 52:4
104:21 184:12
196:8 209:5 226:3
226:5 234:19
269:21 273:21
277:12 279:18
**particularly**
43:24 151:5
159:20 216:24
221:10 278:23
**parties** 15:7 16:7
27:15,18,25 28:11
28:16,22 29:25
30:5,6,22 34:9
35:6 97:17 98:2
114:15 115:3
134:24 148:13
189:6 200:22
201:1,1 221:12
233:11,12 235:4
284:7,11
**parts** 146:21
184:7
**party** 153:7 167:7
**pass** 117:5,17

passed  169:23
  254:2
patch  139:25
path  100:8
patience  263:17
  263:19
patient  267:24
patients  66:24
  81:11 90:16 142:4
  142:16
patrick  11:13,23
  12:8
paul  4:1,10,15,20
  7:16 13:10,17
  23:12 143:15
pause  17:6 20:10
  21:24
pausing  164:19
pay  34:19 35:10
  105:4,16 106:6
  119:8 120:2,13
  129:20,24 135:15
  146:21 147:23
  148:6,9 199:25
  214:4 218:19
  219:9,25 220:14
paying  119:21,24
  268:8
payment  101:2
  105:9 120:23
  243:16
payments  33:12
  34:6 78:16 104:24
  105:10 108:23
  119:21 120:2,8,22
  120:22 121:4
  177:20 211:2,7,23
  214:25 215:4
  226:16,16 252:12
  252:17
pdf  37:15,20 61:4
  61:13 63:3,24
  66:16 80:16 84:5

89:2 154:15
peancock  12:11
pedelment  97:9
people  36:5 41:7
  42:22 45:23 47:21
  48:2,23 49:14
  64:4,12 102:19
  112:17,23 113:2
  119:8 123:16
  139:2,7,12 143:5
  147:22 148:19
  152:17,18 165:23
  170:25 189:4
  196:25 214:4
  217:23 230:8,14
  233:12 235:16
  239:15 241:24
  265:21 267:15,17
  273:22 274:17
  276:8 277:17
  280:13,15 282:9
  282:11 283:9,11
percent  106:19
  146:24,25 179:20
  184:17,24 185:4,7
  187:7,21 190:20
  192:4,17 201:14
  201:21 202:19,21
  204:4,5 209:3
  210:1,7,11,11,24
  211:10,13,15
  213:10,11,19,19
  214:1,2,2,3,5,7,16
  214:19 215:7
  219:20 222:25
  241:20 242:3
  246:9,10,18,18,21
  246:22,23 247:1,2
  247:4,16 248:9,13
  248:19 249:5
  256:20 257:15,16
  257:19 260:1,2,11
  260:12,13 261:1,8

261:16,17,19,21
  261:22,22,25
  262:7,15,18,23,23
  263:1,3 264:12,16
  264:22
percentage
  221:25 222:22,23
  223:1 249:7 262:4
  266:19 275:17
perdue  67:19,23
  68:11,23 69:5,13
  69:24 70:6 71:14
  72:22 74:25 77:4
  78:9
perfect  224:5
  226:4
perfectly  181:15
  223:24 224:2
perform  232:17
performance
  33:25 34:1 89:7
  196:10,13 197:6,9
  197:11 198:1
performed  155:11
  155:17 184:8
performing  201:3
period  33:18,22
  46:13 55:2 60:3
  132:11,18 148:23
  175:20 176:16
  177:6,13 178:7
  189:3 198:2,4,6
  207:14,15,17
  219:2,12 252:17
periods  46:16
  202:20
permanently
  30:11
permitted  200:5
person  49:23
  230:16 282:7,7,22
  286:7

persona  159:6
personal  33:1,4
  119:23 120:4
  220:14 234:20,22
persons  187:14
  193:8,10 246:25
perspective
  230:12,14
pertaining  153:9
pertains  134:16
peter  8:3
pf  115:15,22
  116:12 118:7
pharma  1:7 15:3
  42:3 45:10,11
  48:1,22 50:18
  51:11 56:3 57:9
  58:23 67:19 69:5
  83:15,20,25 92:13
  94:3 95:6 108:20
  119:18 121:6,13
  122:3 128:25
  150:10 223:9
pharmaceutical
  62:9,12 144:21
  148:23 223:6,23
  224:7
pharmaceuticals
  111:3
phase  23:15 89:10
phases  69:22
phd  165:8 227:6
phds  165:9
philip  7:4
phone  21:23
phrase  121:10,11
phrased  130:24
  131:10
physically  166:19
physician  143:23
physicians  68:17
  124:22 125:14

**pick** 286:11
**picking** 41:1
**picture** 143:21
**piece** 246:18,19
  246:21 247:5
**pieces** 32:8 273:22
  274:23
**place** 4:10 46:21
  59:16 60:2,3 83:5
  234:7 239:7 242:8
  242:8 244:10,25
  254:25 255:6
  266:4 267:5,5
  269:19
**places** 197:12
  213:5
**plain** 72:7
**plains** 1:14
**plaintiff** 159:16
  172:19
**plan** 15:5 27:12
  27:22 28:1,3,19
  29:4,18,20 30:9
  31:1 32:14 33:11
  33:16 34:6,21
  63:21 65:6 67:21
  68:20 102:22,24
  112:12 119:22
  120:5 127:1
  131:11 132:3,20
  133:9 134:2,22
  136:5 137:8,24
  153:11 194:22
  212:19 230:9,18
  233:23 234:23
  235:6,6,9,10,10
  235:13 236:10,19
  239:7 241:13,14
  241:16 242:7,7,8
  242:15,21,22,23
  242:24 243:10
  245:7 246:18
  247:4,19,20,25

248:2,5,11,12,18
249:8 252:8,9,12
252:13,16,16,19
253:4 254:11,15
254:21 255:15
256:5,9,19 257:3
257:14,18 258:16
259:4,9,11,14,19
259:19,22,23,23
260:1,9,10,11,25
260:25 261:4,6,7
261:12,13,17,25
262:9,10,17,19,20
262:23 264:14
273:2 275:16
278:9 279:5,5,7
279:10,14,15,16
279:16,17,25,25
280:1,1,3,8,9,11
280:16 283:5
**plan's** 27:14
**planned** 120:9,13
**plans** 132:13
  233:17,19,20
  234:2 235:19
  236:12 241:19
  242:1 255:23
  270:25 271:2
  279:8 281:15,19
**play** 240:3
**played** 35:22
  129:6
**plea** 77:19 78:6,8
  78:14 79:6,16
  80:6,8 82:11 83:1
  83:10 85:6 95:15
  95:19
**pleaded** 77:5 82:2
  82:16,22 83:23
**pleading** 82:11
**please** 17:8 20:13
  22:7 24:25 28:5,6
  28:8 42:24 50:10

63:11 64:10 66:15
72:3,7 80:13
91:10 128:19
151:12 160:24
161:3 163:23
169:12 173:13
174:14 184:19
186:22 191:19
194:25 208:13,16
227:13 236:3
**plimpton** 156:22
**plumbing** 133:18
**plus** 38:5 89:9
  219:20 262:19
**pm** 286:25
**podge** 92:23
**pods** 64:9
**pohl** 12:12
**point** 49:19 50:14
  62:15 72:7 93:25
  98:10 102:3,14
  104:16 122:5,14
  128:23 142:11
  151:8 152:6 153:2
  167:14 181:14,21
  183:16 188:24
  192:15 193:6
  197:23 203:24
  209:20 212:23,24
  221:7 281:9 282:6
  284:4
**pointed** 103:11
  132:22,22 209:16
  214:18 215:15
**pointing** 97:18
**points** 54:17
  161:19 182:12
  235:15
**poisoning** 269:11
**policies** 144:1,3
**policy** 52:24,25
**polk** 3:13 146:8

**poor** 252:5
**pop** 64:9 101:16
  107:12
**popofsky** 6:7
  168:9,12 174:14
  176:3,5,22 178:18
  180:3 185:9 186:8
  186:12,17 189:22
  194:23 202:12
  205:8,20 206:1,3
  208:6,10 217:18
  217:25 218:4
  222:4,8 224:14,18
  224:18 225:22
  226:22 227:4,7
  242:9 284:9,15,17
  284:23 286:3,19
  286:23
**popped** 101:20
**population** 244:1
  244:11 245:1
  246:3,10,11,15
  248:3,7,16,20,25
  249:14 251:10,11
  251:11,16,18,20
  253:18,25 254:14
  256:15,22 257:1
  257:12,13,16,18
  257:21,24 258:4,8
  258:10,13,17
  259:20 260:6,9,15
  266:3,20,25 267:6
  267:7,7,11 275:11
  275:18,18,23,25
  276:2,3,7,11,15
  277:4 278:4,5,8
  278:10,10 279:6,8
  280:10,13,14,18
  280:19
**populations** 251:7
  265:12 276:20
**porter** 12:13

**portfolio** 178:12
182:13 198:21
224:1,9 226:21
**portfolios** 171:15
**portion** 31:11,15
108:24 120:18
263:4
**portions** 39:18
**posit** 232:11
**position** 34:16
57:17 119:12,16
123:13,14 143:25
170:24 171:3
272:17
**positive** 51:9
**possibility** 122:10
122:12,13 137:18
**possible** 51:25
64:8,13 124:12
133:2 190:14
206:25 207:1
**possibly** 24:11
90:7 92:10 118:14
226:10
**posture** 35:3
**potential** 90:3
105:2 107:2 137:5
139:20 215:3
255:8
**potentialities**
137:16
**potentially** 136:6
137:23 147:6
187:13 205:24
210:16 220:1
**potoski** 168:10
**power** 94:11
**powerpoint** 240:4
240:5,7
**pra** 115:24,25
116:3,12 118:7
**practical** 141:9

**practice** 78:17
143:9 157:5
171:24
**practices** 145:22
**practicing** 157:2
**pre** 237:1 238:2
263:8
**preceded** 109:2
**precedent** 225:15
**precise** 60:15
130:14
**precisely** 29:2
**precluded** 97:13
**predates** 60:3
**predict** 177:11
**predictable**
181:15,17,21
**prediction** 212:9
**prefer** 40:7 242:6
242:7 279:24
280:1,3,8,16
**prefers** 26:25
**preis** 12:14
**preliminary** 15:8
**preparation**
155:18
**prepared** 174:10
237:1,5 240:20
**preparing** 155:10
155:16 156:21
209:6 216:25
**prescribe** 56:19
81:10
**prescribed** 70:7
81:7 122:16
238:11
**prescribers** 53:25
56:7 126:9
**prescribing**
124:23 125:3,25
126:2 129:23
**prescription**
48:15 81:11 86:13

111:20 126:19,20
145:20 245:12
**prescriptions**
81:12 85:17 86:9
86:25 87:19
125:15,23
**presence** 47:4
92:6
**present** 7:1 32:15
68:3 135:20 146:3
189:2
**presentation**
61:16,18 67:9
72:9,17 93:7,15
127:8 249:16
**presentation's**
71:19
**presentations**
45:22 46:1 51:20
53:4 65:23 69:11
70:5 231:4,10,13
231:16
**presented** 53:3
63:20 65:10 67:13
67:24 68:20 69:16
92:19 163:21
181:5 238:15
**presenting** 65:6
167:7
**president** 110:4
**press** 12:15 55:6,7
55:11,17 56:2,12
60:1,4 66:3,12
75:16
**presumably**
277:12
**pretty** 101:10
104:12 154:19
188:15 214:20
256:5 270:5 284:7
**preventing** 50:19
**preview** 15:13

**previous** 209:9
232:11 253:11
261:11
**previously** 39:24
60:4 137:19
209:11
**price** 69:5,12,13
69:19,24 219:5,6
219:8,15
**prices** 51:18 189:5
**primarily** 113:24
**primary** 52:12
**principle** 214:8
**principles** 131:11
160:4,10,13,18
161:16 163:7
194:14
**prior** 22:3 43:15
49:11 50:23 97:15
133:9 188:6 209:7
226:15 273:24
**prison** 265:22,24
266:5,7,8,25
267:7,8,10,10
**prisons** 266:1
**private** 181:12,15
181:18,20 201:19
201:20 213:6,8,10
214:15
**privately** 223:6,8
223:23 224:7
**privilege** 99:4
134:10
**privileged** 100:16
100:16,18
**pro** 248:3
**probability** 62:3
**probably** 38:24
39:6,7,10 119:2
120:17 122:5
134:17 138:24
148:16 154:19
224:2,6 229:1

**problem** 15:24
48:3,22 64:10
144:2 165:25
166:1,16,17
167:16 230:10,19
239:18,20 278:1
**problems** 64:1
280:23
**procedural** 152:6
**procedure** 59:23
**procedures** 17:17
20:23 22:18 25:12
151:20 164:9
169:18 227:22
**proceed** 16:13
26:24 167:22
168:1 228:15
**proceeding** 39:25
**proceedings** 1:12
39:13 143:22
218:24 268:5
286:24 287:4
**proceeds** 31:7
117:2,10,14
132:23 133:8,11
133:11,12,14,14
133:24 134:23,23
135:4,7,12 136:3
136:19 146:23,23
147:9,12 148:7,10
187:13 199:24
200:1 211:1
219:25 220:17
**process** 68:18
131:8,24 134:10
136:22 165:23
198:18 200:1,12
205:15 215:12
**produced** 36:5
**product** 35:22
36:4 69:10 71:8
71:11 75:18
139:15,16 223:9

**product's** 51:2
**production** 31:4
**products** 30:17
31:6,18 32:11
51:7 54:18 56:19
56:20 70:20,23
76:18 81:9,12,15
112:19 121:16,17
121:18,19,20,21
121:23 141:22
**professional**
171:10,12
**professionals**
66:25
**profitable** 69:23
**program** 71:23
92:11 126:7,7
229:6 239:12
**programs** 81:13
145:15,20,22,24
244:10,25
**progress** 242:6
**prohibition** 159:9
**project** 140:13,18
177:9 197:24
215:15
**projected** 174:8
175:14 177:6,16
195:5 200:24
206:22 219:23
222:24
**projecting** 180:10
**projection** 195:8
195:16 197:25
**projections**
212:13,25 214:15
215:10 217:16
234:1
**projects** 145:12
**promise** 196:9
197:10
**promote** 54:11
56:6 85:23 88:4

**promoted** 55:2
**promoting** 52:6,9
56:19,20 81:8
**promotion** 31:5
57:5 71:24 72:5
72:19 74:19,21
101:21
**pronounced**
21:21
**pronouncing**
16:15 169:9
**proofs** 283:10
**proper** 122:4
194:9 280:5
**properly** 132:8
**properties** 145:10
**property** 111:19
162:23
**proponent** 144:5
**proportion** 261:5
276:8,8
**proposal** 56:19
58:2,4 92:15 93:8
94:5 212:21
**propose** 211:23
**proposed** 33:9
34:11,14,20 57:10
93:5 119:21,22
153:10 209:1
238:25,25 242:16
255:19
**proposition**
267:21
**proprietary** 194:4
**prospect** 252:20
253:5 254:12
**prove** 85:25
**provide** 81:10
123:15 155:10
197:18
**provided** 124:7
189:20 197:2
212:6 220:14

**providers** 68:8
70:7 81:6
**provides** 151:4
239:22,23
**providing** 196:19
**provision** 31:1,12
159:11 162:21
**provisions** 31:16
159:20
**public** 49:15
51:23 55:8 64:2
64:12 106:21
132:4 193:15
197:3,19 204:12
229:25
**publications**
265:11
**publicly** 177:24
178:1 203:13
204:24 224:1,9
**published** 197:1
204:20 240:4
**publishing** 198:20
**pulggari** 12:16
**pull** 39:4 58:12
78:22 114:16
188:10 240:13
**pulled** 177:23
193:14 261:16
**purdue** 1:7 15:3
35:22 42:3 43:13
45:10,11 47:8,17
48:1,14,22 50:18
50:23 51:11,17
52:3 53:22 54:11
54:21 55:7 56:3,3
56:12 57:8,17
58:22 62:2 65:12
66:10 79:6,16
81:5,9,12,13,14
81:15 82:2,9,15
82:22 83:15,20,23
83:25 85:15,18,19

85:23 86:7,11,22
86:25 87:17,19,21
87:24 88:4 89:5
89:16 90:2 91:7,7
91:12,25 92:6,13
94:2 95:6 108:2
108:14,19 111:18
111:18,24 112:3
115:5,16 116:11
116:14 118:6
119:18 121:6,13
121:15,25 122:3
122:20,23 125:23
125:25 127:1
128:25 131:13
132:3 138:1,4
139:11,17 140:1
140:14 145:6,15
145:20,25 146:1
146:17 150:10
212:18 223:9
**purdue's** 30:10,15
51:12,14,16 81:7
84:14 90:19,20
91:24 93:1 95:19
102:25 103:1,2
125:1,14 126:5,5
126:7
**purport** 223:17
**purpose** 25:23
102:6,9 134:7
187:12
**purposeless**
156:20
**purposes** 37:11
109:20 156:17
227:25 281:24
**pursuant** 168:19
**pursue** 144:20
231:2
**pursued** 150:17
168:17

**pursuing** 138:15
**pushing** 142:25
143:3
**put** 20:7,17 34:4
65:19 96:8 129:4
165:17 168:25
174:15 211:13
216:7 230:17
242:7,8 254:1
279:17
**putting** 216:11
234:7 239:7 283:4

**q**

**qualification**
122:1 171:4
**qualifications**
213:12 229:3
**qualified** 136:12
137:1 171:1
**qualifies** 171:8
**qualify** 185:1
**quantify** 209:17
210:18 211:12
**quarrel** 243:10,13
243:16 247:15,16
256:11,16
**quarropas** 1:13
**quarter** 177:3,5
257:14
**question** 19:2
34:17 35:17 38:10
43:9 46:23 48:8
50:17 52:14 53:10
54:14 56:10 63:14
63:25 70:19 71:13
72:14 73:10 74:13
76:2,12,13,20
81:19 85:9,10
86:5,22 87:1,7,8
87:12 88:1,3,5,15
88:17 89:14,20
90:21 91:3,4
97:21 98:7 99:5

99:13,25 105:14
105:17 106:11
117:5 119:3 120:1
123:5 124:11
125:11,16 126:11
126:12,13 130:11
131:9,16 132:15
133:5,7 134:8,12
134:15,16 135:3,9
136:24 137:2,12
137:14,15 143:4
144:9 155:14
157:15 158:24
159:14 160:8
161:13 162:13,15
162:21 163:4,5,7
163:8 176:2,24
178:17,19 183:9
189:22 210:15
219:7 220:19
221:14 222:15,16
223:2 225:23
226:4 230:13
232:14 236:8,10
236:14 237:17,19
237:23 241:23
242:10 244:22,24
245:4 247:14
253:2,4,8,20,22
253:23 254:4
267:16 269:25
273:11,12 274:10
279:23 283:20
285:5
**question's** 71:15
85:9
**questioned** 54:7
**questioning** 102:3
121:5 208:5
**questions** 19:25
20:1 21:11,15
23:7 26:10,16,17
26:19 36:10 55:3

71:8 74:7 87:3
88:22 100:7 102:7
103:2,4 106:4
114:1,13 116:1
117:8 127:5 130:9
130:15 138:9,14
138:23 143:22
146:5,8 149:5,12
149:14 158:21
163:13,16 165:3
173:9 176:10
199:4 200:11
203:11 208:4
217:21,22,24
224:14,19,25
225:18 226:23
228:22 229:1
232:15 263:7,12
264:25 265:4
271:7 272:13
273:23 275:10
277:3,5 281:4
284:25
**quibble** 59:18
**quick** 63:25
161:13 265:5
**quicker** 186:9
**quickly** 284:12
**quigley** 6:25
18:24 19:1,1,4,7
19:10,14,18,22
**quinn** 12:17
**quirk** 12:18
**quite** 38:20 49:12
52:18 59:5 77:16
89:20 102:2 112:9
115:1 127:5
152:14,18 182:17
266:2 274:20
282:8,17
**quote** 130:21
244:2 256:1
259:19 279:11

**[r - recollection]**                                                                  Page 46

| r | | | |
|---|---|---|---|
| **r**  1:21 3:1 5:6 6:7 | 205:25,25 209:23 | **really**  40:11 45:21 | **recall**  44:23 47:10 |

**r**  1:21 3:1 5:6 6:7
  9:10 12:9 15:1
  20:18 22:12 25:4
  164:3 168:2
  169:25 287:1
**r&d**  94:7 145:7
**r.j.**  13:11
**rachael**  12:22
**rachel**  12:9
**radical**  64:21
**radically**  220:12
**rahul**  3:5 20:18
**raise**  15:8 17:8
  20:13 22:6 23:17
  24:25 151:11
  163:23 169:12
  227:12
**raised**  97:20
  104:1
**ran**  286:14
**range**  72:17
  264:10
**rapidly**  65:7
  240:2 258:13
**rare**  122:19 251:7
**rata**  248:3
**rate**  74:22 77:18
  111:14 178:8,9
  184:18,25 185:2,4
  190:9 191:2
  193:20 201:20,22
  213:11,16,19,19
  214:16,18 215:7
  219:20 252:23
  253:14,21 254:9
  258:3 267:9 275:8
  276:10
**rates**  177:19,23
  178:6 179:23
  190:8 195:7,18
  197:15 198:10,12
  201:9,24,25

205:25,25 209:23
  247:11 255:9
**ratio**  245:23 246:1
  246:3,13 261:21
**rationale**  128:21
**raymond**  4:2 6:18
  170:11 173:8,17
  174:12 175:11,14
  175:20 180:10
  182:15 186:5
  190:5 192:2,16,22
  193:3,7 203:2
  207:19,25 208:22
  213:7 216:13
**rdd**  1:3 49:6,9,17
**reach**  166:24
  271:17
**reached**  159:15
**read**  30:25 31:13
  32:13 46:3 66:6
  73:9 78:19 81:4
  81:18 82:1 89:18
  89:19 152:11
  187:19 195:17
  208:15 209:7
  217:4 220:3
  221:22 232:6
  233:8 240:22
  249:22,25 250:4
  250:20
**readily**  251:14
**reading**  73:13
  76:15 83:8 94:15
  137:10
**readout**  71:2
**reads**  81:3 84:6
  85:14
**ready**  147:16
  149:25 150:2
  167:14,17
**real**  124:10 210:2
**realized**  51:14
  220:1

**really**  40:11 45:21
  48:16 55:3 64:7
  83:7 104:16
  108:25 131:2
  134:17 140:7,20
  141:2 148:20
  152:10 168:4
  178:5 223:4
  268:13,16 270:18
  277:8 278:13
  286:6
**reason**  50:22
  52:23 56:15 57:19
  57:23 60:18 69:15
  71:16 85:22 90:8
  99:19 100:24,24
  100:25 103:7
  116:25 128:4
  148:11 152:13
  175:3 181:11
  188:4,5 191:1,1
  191:13 204:9
  215:24 221:10
  261:13
**reasonable**
  198:13 202:21
  205:15 207:4
  208:21,23 209:11
  213:15 214:21
  230:7,8,10,14,22
  247:24 261:14
  272:4,7,8,11,14
  272:16,18 281:25
**reasonableness**
  281:20
**reasons**  19:21
  128:24 139:3,4,8
  141:11 212:2
  278:11
**rebounded**
  195:14
**rebuttal**  217:9,14

**recall**  44:23 47:10
  55:10,11,11 56:14
  56:18,22,25 59:15
  68:10 70:2 71:21
  74:16 90:7 91:24
  92:4,7 99:16
  100:21 111:12,25
  119:2,5 121:7,11
  125:16 127:8
  128:21,23 129:6
  139:22 140:7
  158:16,19 200:14
  215:20 230:19
  271:10 272:3
  273:4,25 275:12
  275:19 277:4
**recalling**  23:21
**recast**  267:15
**receipt**  31:6
**receive**  27:12 32:4
  34:20 37:12 45:25
  93:7 110:11,13
  136:5 195:4 215:4
  244:3 248:12
  256:2 276:16
**received**  18:18
  25:24 37:10,14,19
  45:16 69:11 79:1
  112:3 123:20,25
  125:1,6,13 126:6
  156:22
**receiving**  27:19
  125:17 222:21
  248:4,12 275:16
**recess**  150:8
**recipients**  232:12
  232:13
**recognize**  154:4
  155:2 195:24
  233:14
**recollect**  75:15
**recollection**  46:14
  54:3 69:21 70:14

71:17 115:18
147:4
**recommendation**
128:11 129:5
196:8 197:10
**recommendations**
44:16,17,18 98:16
129:13 196:25
**recommended**
92:12
**reconcile** 38:1
**record** 40:19 49:5
52:2,19 53:1,15
75:7 76:24 95:4,5
152:11,21 168:23
168:25 188:18
218:9 232:7
250:20 287:4
**recording** 252:5
**records** 156:3
**recovery** 136:4,20
147:7 220:25
221:16,17,18
283:12
**recreate** 194:5
**recross** 163:16
225:20 281:1,2,12
283:21
**recruit** 128:8
**recruited** 81:14
**recurrence**
282:10,11
**redacted** 17:23
19:5 20:22 22:16
**redactions** 19:12
19:21 22:17
**redeem** 181:21
**redeeming** 181:16
**redemption**
181:12
**redemptions**
182:2

**redirect** 149:8,11
161:10,11 208:5,6
208:9 217:18,19
224:19,22 225:20
225:21 226:22
270:13,15 280:25
283:21
**reduce** 65:12 69:4
139:12 140:8,16
142:14,21,22
179:21 210:10
215:5 219:12,13
219:22 240:23
**reduced** 56:5
**reducing** 51:1,7
51:17
**reduction** 141:25
210:7 211:3
**redundant** 130:23
**reevaluate** 34:15
**refer** 35:3 57:14
58:19 70:12,24
76:11 77:16 81:3
112:5 115:17
120:6
**reference** 45:1
54:2 75:4 93:13
154:17 259:14
**referenced** 262:12
**referred** 43:5
107:1 116:18
135:7 158:12
**referring** 30:1
38:8 96:6 122:18
125:4 139:14
141:2,3 203:15,16
**reflect** 82:10
199:13,14 203:5,9
269:2 270:3
**reflected** 200:21
213:16
**reflecting** 269:2

**reflects** 62:18
153:9
**reformulated**
50:23
**reformulation**
50:25
**refresh** 45:2
115:18
**regard** 75:17
136:7,21 285:15
**regarding** 42:12
43:24 90:20
265:11 266:23
267:4,12 278:7
**regardless** 31:8
**regards** 210:15
**regular** 47:7,9
73:7 91:8 107:13
**regularly** 45:14
91:6
**regulated** 124:18
**regulators** 31:8
**regulatory** 101:14
101:15,19 103:22
105:1,2,20 106:8
106:9,12,17,18
107:8
**rehabilitate**
281:22
**reinvest** 199:25
**reinvested** 108:24
123:23 181:22
**rejected** 172:11
172:13,14,22
197:21
**relate** 103:25
**related** 30:10 31:3
31:17,23 32:1,10
32:15,23 33:3
77:9,14 78:10
100:11,19 102:10
103:9 104:14
111:15 115:16

131:13,18 245:11
246:22 260:14
262:14 269:9
**relates** 30:17
31:15 62:13
**relating** 173:10
**relation** 160:2
161:17,23 163:7
275:22
**relationship**
282:10
**relationships** 81:6
**relative** 169:2
194:13 233:12,13
239:21 254:15
266:17 270:18
280:14
**release** 30:17,20
31:1,3,12,15,17
32:4,6,10,14,18
32:22 35:11,12,14
35:15,17,18 55:7
55:7,11,17 56:2
56:13 60:1,4 66:4
66:12 75:17 89:8
100:13 102:22
103:6,10,18 104:2
111:14 115:3
130:20 134:14,14
134:22 137:7
**released** 27:15,25
28:10,16,22 29:25
30:6,11 77:13
122:5 134:1
135:14 137:6,6
**releases** 27:12,19
34:7,11,14,20,24
102:9,17,24 103:9
103:24,24 110:19
110:20,20
**releasing** 103:19
**relevance** 97:25
105:11,12

**relevant** 15:8
100:8 101:25
103:3,4,8,17,23
105:6 151:5 172:5
**reliable** 217:15
231:11
**relied** 195:6
200:24
**relief** 123:16,19
124:7
**relies** 280:8
**reliever** 245:17,20
**rely** 125:9 200:22
202:25 203:3
**relying** 198:15,17
198:18,19
**remain** 66:24,25
180:11 181:24
182:11 198:3,5,8
232:15
**remaining** 131:7
136:4 181:8 193:9
247:4
**remanded** 108:17
**remember** 43:19
45:3 49:8 54:6,9
91:2 93:10,18
121:8 125:9
140:10 147:3
182:21,23 195:24
256:3 265:12
**remind** 152:8
**reminding** 147:18
**remotely** 237:5,7
237:20
**removed** 107:5
**removes** 220:9
**renamed** 44:10
**rendel** 12:19
**reorganization**
118:9 212:19
**repeat** 63:15
109:8 241:23

**repeatedly** 153:1
**rephrase** 136:15
**replace** 73:5
**replacement** 90:3
**reply** 164:7
**report** 18:1,8,16
19:4,5,24 20:22
20:24 21:2,7,11
21:15 22:16,19
23:1,7 124:4
125:7 150:14
151:19,23 152:3
154:19,20 155:11
155:17,18 156:8
156:21,23 158:25
169:17,23 170:4,6
171:17 173:14,22
174:10,11 175:11
175:15,19 178:3
178:24 179:5
180:14,18,24
181:5 183:9 185:3
186:5,6 187:4,6,9
187:12 188:1
191:18 192:7
200:21 201:16
202:20 208:13,19
208:20,20 209:5,7
209:17 210:18
211:20,20 213:2
213:21 214:18
215:2,2,8,13
216:16,17,25
217:4,7,9,14
222:2,20,25 225:7
227:20,23 228:2,6
228:9,22 230:17
235:7 238:2,22
242:15 245:9
247:23 250:8
254:1 256:13
259:14,15 260:5
260:17,18,21

264:21 275:22
**report's** 19:25
**reported** 155:23
173:25 178:24
179:25 180:2
201:5 202:15,24
203:1 216:4
262:13
**reporter** 169:25
**reporting** 262:19
**reports** 93:4
125:1,6,13,17
126:6 174:16
175:5 192:5
203:23 205:19
209:8,9 215:16
216:13 217:5
231:10
**repository** 40:21
**represent** 27:7
75:8 114:11
138:20 143:22
208:20 218:10
221:11
**representatives**
56:6 71:20 81:5,7
81:10 272:25
**represented**
199:18
**represents** 57:21
**reps** 71:23,24
127:22
**reputation** 198:16
198:17
**request** 15:4
94:10 105:6
**requested** 40:5
78:5 275:5
**required** 57:12
62:6 137:17
**requirements**
119:17

**requires** 23:16
270:6
**research** 155:11
155:18 156:12
232:16 250:6,7
255:19,20 266:11
**reserved** 142:7
**residential** 210:2
**resolution** 27:11
99:14 101:1 239:8
239:21
**resolve** 23:18
**resolved** 99:12
101:17,20 232:16
**resources** 245:10
**respect** 22:16 25:7
31:15 67:24 70:23
93:1 102:18
147:12 152:21
153:12,17 169:2
199:16 200:13
208:17 233:16
243:22,25 255:22
262:5
**respectfully** 64:8
**respective** 273:4,8
273:9
**respects** 251:20
**respiratory**
145:10
**respond** 16:3 72:8
163:9 189:4 272:6
274:21
**respondents**
158:9
**responding** 74:6
**response** 18:22
21:9,13 23:2,5
25:21 252:22
253:11 285:13
**responsibility**
36:3,7 119:4,8
127:12,19 130:5

**responsible** 67:1
 124:22
**rest** 83:17,19
 219:17 226:12
**restructured** 56:4
**result** 31:9 35:2
 85:14 169:3
 207:24 234:25
 235:16 254:4
 274:15
**resulting** 31:10
 238:11
**results** 134:9
**retain** 199:24
**retained** 186:24
 189:6,17,18
 200:17 244:6
 264:19 274:25
 275:3
**return** 33:21
 149:24 179:1,3,21
 184:24 194:3
 196:15,17,19
 198:24 201:20,22
 209:23 213:16
 214:16,18 226:18
 226:20
**returns** 33:17
 177:9 179:19,23
 180:2 194:5
 196:21 199:2,25
 200:6 201:6,7,13
 249:24 250:23
**revenue** 88:2,5
 121:7 212:19
**revenues** 85:16,23
 86:9,12,24 87:18
 87:25 128:19
**reverse** 204:4
**reverses** 140:16
**review** 19:24 23:8
 40:8,14 41:13
 50:25 92:2 156:18

157:7,17 197:4
 199:15
**reviewed** 21:10,14
 23:6 40:17 73:19
 73:22,24 96:5
 156:20 165:2
 196:1 199:21
**reviews** 20:1
**revised** 15:12 18:7
**revisit** 281:21
**rhodes** 111:3,6,7
 111:14 121:24
 122:1 140:10
**ricarte** 12:20
**rice** 12:21
**richard** 13:5,14
 13:15 89:5 92:4
 96:20 284:5
**rifkind** 4:1
**right** 16:9,15 17:3
 17:4,8 18:5 19:8
 19:20,21 20:13
 21:14 22:1,6,6
 23:6,20 24:1,15
 24:19,25 26:6,20
 30:14 32:23 36:12
 36:15 37:22 39:1
 39:24,25 40:8
 41:2 42:4 43:13
 44:19 45:6,12,25
 47:21 48:6 53:19
 54:19 56:7,8 58:9
 58:24 59:8,12,17
 59:24 60:5,6,8,11
 60:16 61:22 62:4
 62:9,19 63:13,17
 63:21 65:7,10,18
 65:23 66:1,4,11
 67:1,4,11,14,21
 69:1,6 70:4,8 72:4
 73:12,20,25 74:3
 74:5,23 75:2
 77:10,15,20,23

78:6,11 80:23
 83:15,20,25 84:12
 84:15 87:2,14
 88:20 95:16,25
 96:5 97:5,6,10
 98:4,11,17 99:15
 100:5 103:1
 104:17 107:10,17
 107:19 108:4,12
 108:16 109:10
 110:1,3,11,12,15
 110:21,23 111:13
 111:16,21 112:2
 112:18,20,21
 113:3,14,15 114:1
 114:5,24 117:3,11
 118:1 119:19
 120:1 122:8,17,21
 123:13,17,21
 125:21 126:23
 127:9 129:7 130:8
 130:16 134:12
 136:13 138:11
 139:5,9,13,18
 140:17 141:23,25
 142:6,19 143:10
 143:14 144:19
 149:7,13,17,19,21
 150:4,9 151:11,12
 152:1 153:1
 155:13 156:11,15
 156:24,25 157:14
 158:10,13 160:7
 160:21,22 161:9
 163:17,20,23
 164:14,17,19,25
 164:25 165:6
 166:12 167:11
 169:8,12 170:2,12
 172:20,24 173:5,7
 173:13,24 174:3,4
 174:25 175:13,19
 176:14,18 178:5

178:13 179:16
 181:2,9,12 182:18
 183:14 185:1,22
 186:13,24 191:11
 192:10 193:4,15
 193:17,24 194:3
 194:10,20 195:12
 195:19,24 196:14
 197:7,24 199:3
 204:1 205:2,22
 206:7 207:8,10,16
 210:14 211:18
 219:7 220:4,10,22
 220:24 221:11
 222:1 223:16
 224:4,6 227:12
 228:4,8 229:5,8
 229:15,19 231:7
 231:16 232:1,20
 233:20 234:8,12
 234:25 235:4
 236:11 237:2,12
 237:13 238:3,6,12
 238:15,22 239:9
 239:20 240:9
 241:5,8 242:8,25
 243:17 244:1
 245:7,17 246:13
 246:17,17,19,22
 246:25 247:6,9,14
 247:25 248:5,9,13
 248:16 249:8,11
 249:14 250:17
 251:4,7 252:12,19
 254:19 255:18,25
 256:19,24 257:10
 257:16,19,22,25
 258:8,11,14,21
 259:5,9 262:1,10
 262:15,18,24
 264:4,12 266:1,16
 266:19 267:2,8,12
 268:6 269:11,24

270:12 278:21
283:19,23 284:3
284:16 285:18,19
286:10

**rights** 111:19

**ringer** 12:22

**risk** 112:21
142:21,22

**risks** 113:25
147:11

**rivera** 14:10

**road** 110:1,4,5,13
110:14,16,17
287:21

**robert** 1:22 8:21

**robinson** 104:19
104:20,23 118:20
118:20,24 123:6,9
123:12 125:8,13
125:18,19 126:14
130:8

**robles** 12:23

**room** 1:13 73:14
92:19 143:23

**rosen** 12:24

**rosenbaum** 12:25

**rothstein** 4:15,20
18:9,11 23:12,12
23:22,24 143:15
143:16,17,19
146:5 184:19

**rough** 146:23

**roughly** 24:6
46:14 108:23
209:18 210:10,18
210:23

**rounds** 147:17

**row** 191:19 192:1

**roxana** 7:3

**royal** 154:2 155:1
155:4,12,21 156:6
156:9,13 157:23
160:9 161:1,14,18

163:3

**rubinstein** 13:1

**rubio** 13:2

**rule** 85:7,24 97:13
213:25 214:3

**rules** 269:8

**run** 103:17 110:1
221:4

**running** 49:23
73:6

**russell** 13:3 26:14
26:14,21 114:7,10
114:11

**rustling** 155:15

**ruth** 11:5

**ryan** 9:25 13:4
14:14

**s**

**s** 3:1 4:15,20 7:2
8:19 9:14,18
10:21 11:12 14:22
15:1 25:4 151:16
164:2

**s&p** 201:13
204:20

**sackler** 3:7 4:2
6:18 13:5 15:16
15:18,23 16:1,8
24:3,7,20,20,24
25:3,6,24 26:2,13
27:4,6 32:25 36:2
36:9,13,17,19
37:17 41:12 42:2
43:12 49:22 50:17
52:11 55:25 58:11
63:1 65:2 70:10
73:9,25 77:4
78:21 79:8,14,17
79:22,25 80:2,6
80:10,12,25 81:2
82:18 84:4,9
85:13 87:16 88:25
89:5,21 90:2 92:5

93:12 94:19,21,23
95:2,6,8,13,22
96:20,20,21,21
98:2,13,14,19
99:7,9,13 100:18
101:6,21 103:16
103:23 104:24
105:4 106:8,10
107:16 108:3
111:19 112:7
114:4,9,11,24
118:15,19,23,25
119:21 120:2
121:1,14 123:10
123:20 126:3,23
130:11,18,20
131:10,18 132:3
132:10,12 133:8
133:25 134:20
136:1,7,18 137:15
138:9,12,18,20
143:18,20,25
144:16,17 146:9
146:11,13,15
148:22 149:9,14
158:13,14,15,17
170:4,11 173:8,10
173:18 174:12
175:20 180:10
182:15 187:14
190:5 192:16
193:10 199:17,23
203:2 211:24
216:12 217:11
218:17 284:5,6
285:7,12,16,21
286:7

**sackler's** 25:19
90:12 134:9
218:13

**sacklers** 77:12
104:13 131:12
137:16 146:20

147:21,21 182:8
190:13 211:22
218:23 220:5
221:12 222:10
226:11

**sackler's** 243:19

**saddened** 35:21

**sadly** 158:18

**safer** 145:7,9

**saint** 4:10

**sake** 139:24

**sale** 31:6 54:13
65:5 77:19 90:20
101:22 104:25
105:3,8 106:13
107:16 117:15,19
120:9 133:9
134:23 136:11
137:4 148:6,10
185:23 186:25
187:13,15,20
188:2,23 190:14
200:24 203:24
205:13,21 206:7,7
206:8,12,22 207:3
209:3 219:5,6,8
219:15 220:4,24
225:12

**sales** 43:21 48:22
50:18 51:6,14
53:25 54:22 56:6
63:19 67:20 71:20
71:23,24 75:17
81:5,7,10 89:6,17
90:4,19 91:6,7
93:2,23 94:2
120:14,19 126:15
130:3 132:23
185:21 199:16
205:15 210:15,17
226:14

**salesforce** 56:23
57:18 66:11 68:9

68:14
salwen 13:6
sam 8:24
samhsa 235:10
samuel 10:8
sara 7:15 12:2
  150:18 153:19
satisfy 137:25
satz 9:22
saval 13:7
save 28:21
savings 81:11
saw 150:19
  156:23 191:7,9
  196:10,17 209:11
  223:16 249:3
saying 44:2 69:3
  72:21 92:15
  122:25 138:24
  187:5 230:15
  240:8
says 49:23 56:2,3
  56:9,10,14 62:7
  62:10 63:22 65:9
  65:17 66:24 67:2
  67:10,16,22 72:2
  72:3,6,11,18
  73:16 74:20 84:7
  85:25 90:5 91:13
  158:8 162:21
  171:22 172:4
  173:24,25 175:23
  179:7 180:20
  181:2,13 186:24
  187:11 188:3,21
  188:21 192:15,20
  193:7 196:7,15,16
  196:18 197:9
  211:20,23 233:5
scale 236:24,25
scenario 151:4
  156:25

scenarios 120:16
schedule 15:21
  33:13 46:22 80:21
  80:23 81:3,21
  220:14 284:18
scheduled 15:18
  59:9,11,14
scheduling 46:10
schinfeld 13:8
schmidt 13:9
schwartzberg
  13:10
science 71:22
scope 187:4
  242:10 268:3
  283:13
scott 3:9,18 9:9
  163:21 164:2
screen 20:12
  24:24 94:13,14
  143:20 227:10
screen's 123:3
scroll 61:25 62:24
  63:1 66:14,20
  67:8
sean 227:20
search 90:3
  155:23 156:2,2,4
  233:11 260:17
searching 43:6
second 21:22 28:6
  38:18 40:24 49:17
  55:21,23 61:11
  78:24 79:4 94:9
  103:7,7 114:19
  212:4 221:9 233:8
  249:5 250:20
  277:8,10
seconds 152:6
section 82:1 215:3
sections 232:11
securities 171:23
  172:5,9,16 176:17

179:1,8,11 202:23
  203:9 204:12,24
  211:9
security 105:9
  120:21,22 132:23
see 15:19 16:11
  17:7 20:11 22:1
  24:24 28:10,12,13
  28:15,17 37:4
  38:14 49:16 55:5
  55:20 56:1,2
  58:13,15,17 62:1
  62:7 63:12 65:8
  65:16 66:17 67:11
  70:13 71:23 72:1
  73:7 76:5 78:23
  80:6 81:16,17,21
  82:4 85:19,21
  89:21,23,25 90:5
  90:11 91:15,16,22
  94:12 96:15 100:7
  115:3,4 143:2
  146:13 155:25
  157:10 159:12
  163:22 165:14
  166:1 172:6 181:5
  184:2,14 186:18
  189:20 194:9
  195:5 196:6,6,11
  196:22 198:15
  211:2,3,6 212:14
  212:20 214:12,12
  227:7,9 228:19,21
  237:19 242:7
  250:17 259:18,20
  260:17,24 261:1
  264:6,9 272:14,20
  273:18 276:18
  277:25 281:5
  285:2 286:21
seeing 49:8 79:3
  143:21 203:23

seek 102:22
seeking 30:20
  31:3,16 32:10,14
  32:18,22 102:9,17
  110:19,20
seen 72:12 73:18
  92:17 142:20
  189:15 196:14,25
  197:12 205:19
  213:25 215:1
  257:5,8
segment 184:13
sell 121:14 129:16
  131:7 132:25
  148:4 199:24
  203:21 204:6
  207:6 219:10,11
  220:8 231:1
selling 68:8
  218:17
sells 121:24,25
  122:3 124:1,16
send 89:10 284:9
sending 80:4
sense 24:6 70:19
  147:22 149:8
  167:3 230:10
  235:14 236:10
  275:6 277:15
  286:7
sensitive 69:16
sensitivity 179:22
  182:1,6 190:12,16
  212:1,12,14,16
  214:11
sent 15:12 37:12
  37:15,20 38:12
  40:16 55:14,18
  79:9 96:11 186:9
sentence 73:15,17
  74:20 171:22
  172:4

sentences 208:15
sentiment 233:10
separate 40:21
95:18,23 96:11,12
224:8 259:11
281:15
separately 70:24
79:10
separation 32:7
130:21 131:1,2
137:8
september 93:9
93:16,16 173:18
180:17,19 182:16
184:5,9,15,24
185:6,8,13 187:24
187:24 203:8
206:17 207:20,21
207:23
series 154:11
232:14 238:9
241:7 263:6 271:7
273:23 275:9,10
277:3
serve 44:18
served 42:3 43:12
44:6 48:6
serves 77:24
sessions 47:6
set 28:23 38:7
55:21,23 79:20,21
80:5 94:4 95:14
96:13 151:19
168:8 193:20
198:10,12 223:22
235:6 243:3
272:15
seth 13:8
sets 20:1 38:3
180:19
setting 86:4
settle 62:14

settled 62:22 98:3
98:3 100:11,19
101:16 106:21
133:24
settlement 28:24
28:25 29:6,9,12
29:17,24 33:9
34:4,19 35:19
36:8 77:22,25
78:3 84:10,15,18
84:25,25 85:5,25
95:16,23,24 96:3
96:16,18,25 97:12
98:3,4,9 100:21
103:21 104:13
105:17 106:6
107:5 116:23
117:24 119:22,25
120:14,18 129:24
131:6 132:12,19
132:24 133:3,16
134:25 135:5,15
146:16 147:5,15
148:22 153:10,13
153:14 177:20
199:15,23 200:1
209:1 211:1
212:21,21 218:20
219:24 220:15
232:15 234:7,11
239:22,23 243:14
248:23 249:1,1,4
249:10
settlements 95:18
234:11 235:3
settling 134:24
201:1
setup 64:24
seven 112:11
131:7,19 146:8,14
184:1 217:23
seventh 27:21,25
28:3 61:2,4,12

severely 253:18
severity 237:9
238:20 245:8
255:9 268:20,23
269:1,5,15 275:7
275:11,23 280:9
280:17
shade 248:9
shannon 8:9
11:17 13:11
shape 39:10
share 51:6,12,16
88:8,8 90:14
121:7 125:23
126:16,18,21
248:7,15 262:4
shared 92:20
shareholder
27:15,25 28:10,15
28:22,24,25 29:6
29:8,11,24,25
30:5 33:9 114:14
115:2 117:24
shareholder's
116:23
shares 108:2,10
108:11
sheet 208:24
sheets 187:1
shelter 251:15,15
shelters 251:14
shepherd 13:12
sheriff's 145:19
shift 272:12
shifting 90:16
shionogi 68:24
69:2,4,8,12 70:3
shira 14:16
shore 13:13,14
short 215:11
230:24 250:25
285:13

shorter 186:14
shouldn't 276:16
shout 270:22
show 90:13 154:7
showed 60:4
207:7
showing 174:11
178:12
shows 175:19
191:22 192:1
shuffling 40:10
sic 105:18
side 16:1 48:15,18
94:7 108:8,9,10
114:14,23 115:2
135:9,10,10,11
145:25 150:15
156:19 170:3
174:4,11 175:4,11
175:14 180:19
186:5 190:17,18
190:20,20,23,24
191:3,4,7,10,11
191:15,23 192:2
192:25 193:3
203:2 207:12,20
207:25 208:12,22
212:15,17,17
213:7 225:6 233:9
250:17
side's 193:7
sides 192:16,23
216:18
sign 147:16
149:14 150:2
163:17 164:20
165:3,11,20 180:7
226:24 283:24
signature 40:16
signed 29:11,14
40:18 147:19
significant 137:23

**significantly**
24:16 56:5 179:15
**signing**  165:9,18
263:18
**signs**  20:8
**silbert**  13:15
**silence**  152:23
**similar**  84:17
195:3 209:10
260:14
**simmonds**  13:16
**simple**  73:15,17
232:13,20
**simplest**  182:10
**simplify**  90:22
91:3 280:7
**simply**  73:13 94:1
117:22 142:5
167:13 235:17
273:9
**simpson**  26:15
**singer**  13:17
**single**  52:21
212:23,24 236:17
**sir**  22:5 55:15
95:8 112:19
113:18 123:3
151:25 158:24
159:1,4,13,19
160:16,20 162:6
163:19 165:4
169:22 170:1,19
171:13,18,21
172:3,7,12,21,25
173:3,15 174:6
175:18 177:2,4,18
177:22,25 178:4
178:10 179:10,21
179:25 180:13,22
181:1,7,10,13,17
181:25 182:4,17
183:1,3,8,21
184:3,7,16 185:18

186:20 187:19,22
188:12,14,25
189:5,8,16 190:3
190:7,16,19,22,25
191:5,9,12,21,24
192:3,12,14,19,24
193:2,5,16,18,22
194:7 196:3,6
198:22 199:2,21
203:14 204:13
205:1,4 207:9
208:14 211:19
218:9,10 219:24
220:3 221:23
223:1,21 224:11
227:17 229:5,23
230:3,7 231:4,9
232:2,6 234:23
235:21 236:17
237:11 241:18
245:17 246:7
255:18 259:3,22
268:1 272:3
**sit**  98:14,15
116:21 118:11
140:7
**sitting**  17:19 21:1
22:21 25:15
151:22 164:10
169:19 227:25
**situation**  101:3
**six**  15:19 46:14,15
125:6 173:19
174:4,7 175:20
176:16 177:6
180:14 217:23
225:6 259:11
**sixth**  28:18
**size**  257:2 258:11
280:10
**skapof**  13:18
**skip**  249:25

**skorostensky**
13:19
**slide**  66:18,21,22
175:17,18 180:25
181:1 186:22
188:13 192:13
240:17,20 241:5
249:20
**slides**  45:23 60:23
**slight**  165:9
**slightly**  243:2
**slow**  186:12
**slowed**  126:8
**small**  107:25
217:24 236:24
244:3 256:2 263:4
**smaller**  222:25
**smart**  217:22
**snyder**  13:20
**societal**  112:21
**sold**  32:16 113:21
117:2,10,14
132:11,18 135:6
136:2,18 185:17
189:14 199:10,11
199:12 200:2,6,7
200:10 202:16
210:19,22,22
211:1 216:22
218:23 219:22
220:10,16 226:11
226:17,19
**sole**  241:19 242:1
**solely**  77:9 248:3
**solution**  35:5,6
234:3
**solutions**  287:20
**solve**  64:1,9
**solves**  273:21
**somebody**  141:9
252:14 269:16
281:22

**somewhat**  218:3
276:1
**sonya**  2:25 287:3
287:8
**soon**  220:1
**sooner**  226:19
**sophisticated**
212:5,7
**sorokin**  13:21
**sorry**  16:18 18:25
19:1,14 21:20
37:17 38:18 40:10
41:16 42:5,14
47:22 48:24 49:4
54:14 55:7,15
58:5,6,17,25
59:25 60:21 68:25
70:10 73:10 75:6
79:8,17,22 82:6
82:19 89:18 93:12
112:5 121:15
123:2 128:14
132:14 133:4
136:24 137:2
138:6 139:14
142:22 150:22
155:14 158:4,5,6
162:3,7,16,17
167:19 178:16,17
180:1 183:11
184:20 185:1
186:3 188:6
204:14,16 205:8
210:5 214:2 215:4
224:16,18 236:2
241:9,22,24
244:19 245:16,22
247:12 250:4
252:1,14,16
253:15 259:6,8
260:8,21 261:22
263:10 265:13
266:17 267:7

268:1,20 271:12
271:13 274:12
275:1,2,15,21
276:11 277:7
278:20 279:4
281:2
sort 46:16,21
49:14 92:19
132:21,21 136:24
141:16 143:10
144:25 177:14
201:22 205:17
272:15 281:23
sorts 201:12
sought 121:6
sound 109:15
176:2,9,14 193:8
sounds 39:1
210:14 286:5
source 43:3 49:20
64:6 209:21
217:15
southern 1:2
sovereign 104:2
sovereignty 104:4
space 62:9,12
speak 59:3 76:24
108:8 126:3,24
270:19 274:16
speaker 37:3
81:13
speaking 83:21
108:23 210:23
252:14 274:23
speaks 97:23
98:10 132:2
special 46:16,17
specializes 172:4
specific 53:7
168:22 189:15
201:18 208:18
223:20 274:3
275:4 279:18,21

280:12
specifically 52:21
93:19 158:16
189:8 205:18
217:2 273:2
specificity 130:1
specified 162:17
specify 205:15
spelled 168:2
spend 255:11
spending 51:3
127:23 239:19,24
240:23 250:8,25
255:2,6,14,16
262:8
spent 53:6 133:22
144:21
split 213:18,23
214:13
splits 146:22
sponsorship
145:19
spread 220:13
springer 13:22
srou 67:4
stacy 8:4 138:21
stage 268:17
stakeholders
222:21
stand 231:16
241:5
stands 140:18
169:23
stanley 204:20
start 76:15 80:5
146:2 159:17
191:3 203:25
207:22 215:17
229:2
started 160:9
207:21 274:18
277:9

starting 76:11
191:3,22 192:1
202:5
starts 84:24
state 4:8,9 5:2 6:2
24:5,10 25:10
26:4,17 35:20,23
36:20 57:14 77:23
78:4 87:9 104:20
118:21 143:8
150:16,19 152:2
153:20 156:11
159:5 165:7
201:11 245:8
246:4 249:22
252:20,20,23,23
253:5,6,17,21
254:22,25 255:3,6
255:16 257:1
258:8,13,21,25
259:1 263:5 267:5
267:5 271:1,3
273:9 275:3
276:14,15,17
278:8 280:20
285:23 286:3
stated 34:18 86:16
90:8 153:1 177:2
183:14 184:7
185:23
statement 27:18
56:13 66:22 81:21
114:15,20 173:17
199:18,21 207:20
221:22 224:10
241:5 242:21
255:21 256:1,3
261:24 279:10
statements 41:15
41:17 73:19,24
74:3,4,5,11
102:16 183:13,13

states 1:1,11 5:8
26:23 27:7 30:21
34:10,10 48:19
51:23 77:9 96:22
97:20 103:25
104:4 107:14
119:9 122:19,20
122:21,24 127:2,7
127:15 128:5,13
129:1,24 130:6
145:21,22 156:10
156:14 164:7
189:17,18 201:11
204:22,23 234:15
234:19 236:17
253:14 255:11
256:15 257:9,10
258:6,7 264:5
269:19 273:4,8,17
275:19 276:4,22
278:10 279:18,20
279:22
states' 230:1
279:6
state's 256:22
static 180:11
181:8
stating 197:10
statistical 230:11
282:11
statistically 123:1
statistics 140:24
245:10 254:2
266:23
statute 160:6
statutory 159:9
stays 181:19
steadfast 66:25
steege 13:23
steel 13:24
step 215:12
283:24

stephanie 8:13
9:22
stephen 12:12
stepped 142:5
steps 61:21
259:11 279:16,20
steven 6:7 10:10
168:9
stick 63:3
stimulant 111:1
stimulants 111:5
stipulation 152:10
152:19 168:22
169:5,7 170:5
stipulations
168:20
stirs 233:10
stock 226:20
stocks 224:1,9
stodola 13:25
stop 48:12 55:9
68:6 72:22 102:14
141:20 162:4
stopped 55:9
57:17 162:1
stopping 267:15
269:23,25 284:4
storm 263:22
story 145:25
strategic 43:19
strategies 85:16
85:23 86:8,11,23
87:17,18,24 88:4
88:6,7 91:7 93:2
144:6,10,11,12,13
strategy 51:21
52:12 93:9 196:9
street 1:13 4:17
5:3,10 6:12
strength 90:14
strenuously 97:7
strike 89:25 98:14
198:5

strong 144:5
161:25 233:10
structure 115:19
116:7 138:7
146:16
structures 108:8
254:22
studied 143:2
studies 143:1
study 45:23 275:5
stuff 29:23
sub 193:6
subject 134:22
150:14 234:5
238:24 251:2
280:19
submit 19:16
286:12
submitted 17:15
20:20 22:14 25:8
84:8 151:18
155:17 164:5
169:1,16 174:10
175:4 209:6
227:18 284:19
suboxone 139:18
139:21 140:11,12
subsequent 93:4
153:5,14 215:2
subsequently
41:23 215:16
subsidiaries 32:17
subsidiary 122:2
substance 37:9
121:14 229:4,23
245:11
substances 111:15
substantially 96:2
substantive 15:15
15:15
substantively
39:22

subtract 210:5
216:13
subtracting
216:11
succeed 145:13
successful 51:1
sudden 203:3
sued 128:25 129:1
suffer 123:16
220:12
suffering 246:25
269:20
sufficient 35:14
113:16 134:25
135:14 171:4
suggest 64:8
97:12
suggested 16:1
222:20
suggesting 72:22
suing 148:14,15
suite 5:10 6:12
287:22
sum 106:18
summary 61:9,14
61:15,19 146:19
147:2,20
summer 110:1,4,5
110:13,14,16,16
supervision
141:12
supplement 29:5
215:3
supplying 140:12
support 27:11
30:9 35:16 53:14
92:11,21 127:6
128:9 143:6 164:6
supported 54:25
57:11
supporting 67:1
128:12

supportive 56:21
57:1,2,4 58:3
140:15
suppose 39:15
71:13 81:2
supposed 264:22
supremely 233:14
sure 16:4 20:8
28:2 29:4,7 34:17
34:18 37:10 41:6
44:20 46:23 51:19
52:7 54:14 57:7
59:7,18,23 64:23
64:25 69:15 72:15
73:4 75:4 76:19
78:25 82:19 87:10
88:1,6 89:12
90:23 98:6 102:2
102:3,15 109:18
115:21 117:9
121:25 122:2
125:12,13 127:19
131:14 132:16
133:18 134:10
139:16 141:17
144:7 164:21
165:24 166:5
171:19 184:2
186:11 200:18
209:20 212:14
223:10 235:22
253:12,21 272:13
283:19 285:5
286:17
suspect 126:3
sustained 137:11
189:23
swear 17:9 20:14
22:8 25:1 151:12
163:24 169:12
227:13
swells 121:16

switzerland  15:19
sworn  182:24
symproic  54:21
  55:2 56:23 65:7
  67:20,21,24 68:11
  68:17 69:5,6,14
  69:23 70:3,6,15
  71:15
system  64:25
  110:25 111:4
  269:22

**t**

t  9:17 13:3 20:18
  164:2,2 287:1,1
tab  62:25 174:17
  174:22,23,24
  175:1 186:8,13
  188:11 192:11
  195:22 208:12
table  196:14
  260:19,21,22
tablets  89:9
tabs  46:1 60:9
  65:23 175:1
tad  104:19,20
  118:20
take  16:21 17:4
  28:4 42:19 51:6
  55:12,13,17,25
  58:14 61:1 74:15
  83:17 94:18,20
  120:7 131:19
  159:2,14 173:17
  180:18 181:2
  182:18 186:5,17
  191:17 196:25
  197:23 201:4
  206:13 209:16
  211:17 216:14
  218:20 221:7
  248:8 249:3
  252:19 253:4
  254:11,14,15,21

254:24 255:2,5,8
  256:22 262:3
takeda  68:22
taken  40:15 41:22
  61:19 107:23,24
  122:16 142:11
  160:1 164:20
  182:21 201:10
  209:15 235:12
  252:9
takes  200:9 227:2
  247:24 282:9
talk  47:3 126:17
  133:11 236:21
  239:6 246:21
  252:8 261:23
  274:18 285:3
talked  76:15
  274:18
talking  52:11
  71:20 95:21
  101:24 104:9
  108:9 139:4
  140:22 141:4
  149:9 165:16
  192:11 201:19
  241:10 242:23,24
  282:25,25
talks  85:3 282:8
tapley  14:1
tautology  98:1
tax  32:5 106:18
  107:11,12 108:22
  211:3 214:25
  215:5,7 219:19
taxes  108:24
  123:23
taylor  38:13
team  91:20 128:6
technical  29:23
  64:1 180:7 230:12
  230:16

techniques  265:11
technological
  167:16
technologically
  49:20
technology
  263:19
tele  1:12
telephonically
  3:18,19,20 4:6,13
  5:6,13,20 6:6,7,15
  6:22,23 7:1
tell  17:9 20:14
  22:8 25:1 28:23
  59:1,21 115:10,12
  115:21 116:3
  118:5 128:2 129:5
  134:18 145:18
  154:16 157:21
  158:16 163:24
  169:13 182:24
  183:2 227:13
  232:3 236:2,4,6
  244:20
ten  33:12 195:2,4
  195:15 197:25
  203:22 211:22
  246:10 252:13,17
  258:24 280:18
tend  214:12
tens  47:21 48:1
  53:15,15 113:2
  148:16 170:25
  268:5
term  29:25 44:2
  142:18 230:10,11
  230:11 266:17
  267:13
termed  132:8
terminal  219:3
  220:23 221:25
  222:20

terminology
  190:18
terms  133:11
  134:14,23 146:24
  199:15 243:16
  245:22 250:23
  269:23 273:20
  279:21
test  97:15 194:8
  194:15
tested  166:17
testified  27:10
  30:8 33:7 44:14
  44:15 52:12 71:14
  75:1,18 98:15
  119:2 121:5
  137:19 138:6
  139:2 140:19
  172:15,19 184:5
  197:21 216:23
  218:17,21 219:1
  222:1 254:6
testifies  150:12
  285:12
testify  25:7,9
  75:17 149:25
  281:9 285:16
  286:7
testifying  15:6
  44:23 281:19,20
  286:6
testimony  17:18
  17:19 18:2,17
  20:25 22:20 24:5
  25:8,13,15,20
  36:1 39:8 41:24
  43:6 53:19 54:3,4
  54:9 57:24 70:2
  70:13,13,25 71:5
  71:21 72:22 75:4
  75:5,15,21 76:4
  76:15 93:22 94:22
  97:16 107:7 109:9

119:5 121:7,8
132:22 149:10,15
151:21 152:4,13
152:25 153:8
154:2,12 163:18
164:10,16 168:16
169:19 170:7
172:10,10 176:11
202:1,4 218:13
227:7,24 242:11
253:16 265:12
268:3 277:13
281:25 283:3
284:8,14
**testimony's**  58:1
**testing**  39:17
**texas**  256:19
257:2,3,6,8,10
269:20 276:19
**text**  71:2 166:14
196:5,6
**texts**  64:11
**thank**  17:2 19:11
20:3,4,5 21:18
23:10,11,25 26:21
36:9,11,16 37:7
41:20 42:2 43:10
50:13,13 64:21
84:2 94:25 95:2,3
95:11 100:5
109:24 114:4
118:15,17 126:23
130:9,17 131:9,22
132:17 133:7
136:1 137:3 138:8
138:9,17 143:12
146:6 147:18
149:4 150:6,7
151:1,9 153:22
156:17 160:21
161:8 162:6
163:13,18,19
164:23 165:5,13

170:13 171:18
173:12 176:14
179:6 184:1 185:6
185:10 208:2,3
216:20 218:3
224:11,11,13
225:18 226:25
233:7 240:16,19
242:20 245:25
249:18,21 250:13
259:17 260:23
263:16,17,21
264:2 265:7
268:15 269:14
270:9,10,11,14
272:1,9 273:13
274:12 276:13
277:3,19,24
280:24 281:4,5,7
282:3 283:17,23
283:25 286:21,23
**thanks**  16:4 50:10
167:18
**thankyou**  280:21
**thatcher**  26:15
**that's**  229:6,7,11
229:14 230:11
232:9,10,20,22,25
233:15,21 234:21
234:24 235:18
236:18 237:1,22
238:4,13,14,16
240:4 243:24
244:14 245:25,25
247:1 248:14,15
249:7,9,17 250:12
251:3 253:15,23
254:4 255:2
256:21 258:10,13
259:24 260:2,5,16
260:19 261:3,5,8
261:19 262:21
263:6,13 266:15

266:17,22 267:20
269:9 270:9,12
271:6 278:17,21
278:25 279:2
280:14,17,24
282:10 283:13,17
284:18 285:8,18
285:18,23
**theodore**  14:20
**theory**  52:5 53:11
**therapy**  113:25
142:8,12,13 143:6
144:12 282:24,24
283:1
**thereabouts**  215:6
**therefrom**  31:7,10
**theresa**  284:6
**there's**  226:4,7
232:20 241:9
260:2 271:20
276:6 277:1
286:17
**they're**  226:18
251:13 253:19,25
260:4 263:3 266:2
266:5,6,8,14
267:1 273:8
**thing**  126:22
128:16 130:2
157:19 173:16
188:21 211:6
272:11
**things**  31:18
36:22 42:22 43:19
43:20 47:6 73:22
74:2 93:4 94:7
107:8 116:5
117:22 127:25
130:23 135:10,11
137:1 140:19
141:5 142:10
146:1,25 196:14
196:17 211:3,8

226:11 254:7
269:11 274:21
**think**  16:17 21:19
24:3,6,11,17 26:5
26:6 27:2 29:10
33:19 36:4,6,12
37:24 38:2,15,24
39:6,7,8,9 40:20
41:13 43:1,2,3,4,6
44:2,20 45:24
47:13 48:12 49:13
49:21 50:15 52:10
54:3,16 56:21
58:1,7,9 60:12,14
60:19 61:2,12,15
63:5,14 64:3 68:2
68:19 69:10 70:17
71:18 72:1 73:5
73:13 74:10 75:5
75:9,20,22 76:1,1
76:2,5 78:18,24
80:3,20 81:19
83:21 84:1,5 86:4
87:2 88:11,16,21
90:24,25 96:21
97:24 98:1,19
100:17 102:5,20
103:8,10,12,15,23
104:8,10,11,15
105:20 106:14,22
106:25 109:6,22
111:23,23 112:9
112:22 113:9,13
113:15 117:16,21
120:11,15,18,19
121:10 122:4
123:1,18,22
126:12,20 127:25
128:22,22 129:3
130:23,24 131:4
131:25,25 132:7
133:3,7,11 134:7
134:13,17 136:13

137:14,15 139:1
139:20 140:23
141:5,14 142:1,2
142:11 143:4
144:8 145:8,24
149:7,15,24
152:19 158:6
162:3,8,8 166:9
167:8,24,25
174:22 180:24
185:4,8 202:4,19
202:20,21 203:8
203:19,25 205:5,9
205:10,13 212:7
213:5,20 214:20
215:2 216:16,17
223:16 224:10
230:17 235:12
237:7,11 239:25
242:12,14,16
244:15 245:23
247:13 249:11
252:7 254:6
260:15 262:21
264:9 268:13
269:3 270:6,12
271:15 280:7
281:9,18,24
282:20 284:3
285:4,12,13
**thinking** 106:16
107:11 128:3
133:22
**third** 30:22 49:8
115:24 158:9
173:23 179:7
181:9 192:15
250:1
**thomas** 7:9,10
**thought** 15:22
16:20,23 94:5
102:2 128:8,14
213:15 222:1

261:13 273:3
284:5
**thousands** 47:21
48:2,5 113:2,2
148:14 170:25
239:14 268:5
**three** 15:13 16:12
49:5 59:21,22
78:9,9,17 94:11
104:1 114:13
116:5,17,22 118:6
208:15 229:2
238:10 240:9,11
245:9 247:15,17
**throw** 46:12
**thumb** 213:25
214:3
**thurmond** 14:2
**thursday** 39:19
59:10 285:3,8
**tie** 75:19
**time** 15:23 34:3
40:15 41:22,25
42:11,21 46:15
47:16,20,25 48:7
51:10 54:12,25
56:22 59:5,16
61:22,24 66:5,12
67:5 68:10,20
69:3,9 70:4 73:3
83:14,18 88:19
90:17,18 94:7
101:18 104:15
108:15,19 109:2
112:13 119:18
125:22,25 127:23
128:17 133:22
138:8 139:19
140:14 144:21
145:16 148:24
149:10,15,20
150:5 152:20
156:4,8 169:22

177:12 181:16
185:17,19 195:14
195:15 197:24
200:3 202:16,20
210:17 215:2
224:8,12 226:17
226:18 239:18
251:15 255:9
258:5,23 265:23
269:16 282:9,20
286:15
**times** 39:15,16
46:9 47:15 54:24
164:19 210:20
258:11,16
**timing** 210:17,21
**timothy** 11:11
**title** 61:10 63:16
66:17,21,22 79:6
79:15 96:15 200:3
**titled** 61:5,14 79:5
**titrated** 142:5
**tobacco** 248:22
**toback** 14:4
**today** 15:7,9
17:19 22:21 25:15
37:11 40:9,15
41:13 99:19
116:21 118:11
119:7 130:21
136:25 140:7,18
141:5 143:9
151:22 154:12
164:11 169:19
207:13 218:14
227:25 238:15
263:18 280:23
284:4,5
**told** 50:4 55:8
57:22 61:22 65:11
70:1,1 71:24 72:5
74:18 145:25
223:5 285:1

**tomorrow** 284:8
284:14 285:3,6
286:8,11,22
**toner** 286:15
**tonnesen** 149:18
149:20,23 150:2,6
150:18,18,23,24
151:2 153:19,19
153:21,22,24
154:6,10,22
158:20 160:23
161:3,8
**top** 80:19 84:6
115:20,23 124:4
158:8 186:24
188:15 232:6,8
255:15
**topic** 243:2,7
259:3 274:4
**topics** 72:18
**total** 181:4 192:21
210:7 214:19
245:23 260:1
262:15 275:18
**totally** 69:10 93:5
97:22 132:16
**totals** 247:10,18
260:14
**touch** 138:25
**traded** 203:13
204:24 224:9
**traditional** 65:13
**trained** 282:15
**training** 282:13
282:16
**trainor** 14:5
**trajectory** 130:3
**transaction**
205:14 225:15
**transactions**
117:23
**transcribed** 2:25

[transcript - u.s.]                                                      Page 59

transcript 40:9,15
41:3,4,13,15
49:12 64:3 75:5
76:11 109:19
157:22 166:6,8,11
183:23 184:8
228:24 277:13
287:4
transcription
277:18
transcripts 49:11
transfer 162:12
162:14,16,18,22
267:9
transferred
133:17
transfers 124:1
translate 250:24
transpired 41:23
treat 31:18
treated 247:13,21
treating 145:11
treatment 107:2,2
140:6 215:5
230:19 250:23
273:21 280:19
treatments 144:22
tremendous 40:25
42:20 124:20
trend 48:10
trial 64:3,12
102:17 147:23
151:6
trials 145:3
232:15
tried 166:15,24
178:1 203:5
trompetta 14:6
troop 14:3
tropical 263:21
trouble 28:21
47:22,24 217:25
263:18 271:11

true 31:16 86:10
86:13 88:14 113:1
122:20,22,25
123:2,14 126:6,25
132:25 133:1,25
136:1 137:22
191:14 201:8
230:23 233:16
237:6,22 260:16
287:4
trust 108:10 110:2
110:9 132:13
133:15 136:3,19
137:5 138:1
156:19 157:6,7,9
157:9,12,13,14
159:20,21 160:2,3
161:18 162:16,18
162:23 163:1,3,8
163:10 275:17
trust's 137:25
trustee 5:9 26:23
27:7 110:9 162:19
164:23
trustee's 164:7
trustees 159:7
trusts 108:3,11,14
108:16,18,20,25
110:6,12,15,18
119:24 120:2
123:20 132:4,9,17
132:19 138:1
159:10,21,22
199:17
truth 17:9,10,10
20:14,15,15 22:8
22:9,9 25:1,2,2
86:7 151:12,13,13
163:24,24,25
169:13,13,14
182:24 183:2
227:13,14,14

try 36:7 37:8
38:11 39:4 49:2
51:24 64:1 109:14
129:25 136:15
144:20 150:24
173:1,12 180:5
218:5,12 265:4
270:22 271:18
286:13,16
trying 41:2,9
49:14 50:11 64:11
64:12 69:4,23
90:21 97:14,15
127:22 137:3
144:22 145:7
146:1 150:21
176:10 177:9
202:14 207:11
231:1 234:1
268:25 275:2
tsai 14:7
turn 25:11 28:8
30:24 37:3 58:9
65:3,18 66:9
80:15 84:2 85:13
88:24 91:10 108:2
126:24 154:23
157:20 171:19
173:13 175:17
180:25 183:4
191:18 208:11
219:16 231:25
232:3 233:4 234:5
235:25 237:14
240:17 243:2
244:17 245:7
249:20 250:11,14
251:2 252:7,24
259:15 260:19
263:15 264:3
turned 22:2
turner 14:8

turning 110:19
turns 74:25 76:6
221:13
twice 246:12
248:15
two 18:13 22:3
38:2 39:9 46:6,15
54:17,17 63:12,16
68:19 70:20 71:8
94:10 95:18 142:9
145:11 172:18
182:12 184:1,10
195:10 196:17
203:8 204:7 207:2
207:24 215:12
216:13,18 218:24
219:4,14 224:14
224:19 232:8
233:11,12 235:15
235:16 238:9,9
245:22 284:4
type 71:11 102:22
210:21 230:25
236:13 237:9
types 54:18
144:13,17 275:10
typical 267:24
typically 45:25
typing 84:24

u

u 20:18,18 151:16
u.s. 1:23 5:9 58:20
58:22 60:8,9 61:1
61:3 63:1,3,23
65:3,5 66:15,20
67:10 84:19
101:25 102:18,19
103:14 104:10,14
110:21 112:3
124:14,17 131:5
131:13,14 132:3
136:3,19,22 137:5
137:6 155:13,22

156:1,6 160:18,19
164:23 179:3,4,8
179:9 185:5
202:18 204:12,15
**ucc** 120:12 121:2
133:21
**ultimate** 70:2
131:20 137:25
222:9
**ultimately** 92:12
108:15 110:14
112:3 131:6,17,17
137:14,22
**umbrella** 122:3
**unable** 39:17
115:21
**unavailable** 39:16
**unaware** 93:5
**uncertain** 145:2
**uncertainty**
211:25 263:12
**unchanged**
187:25
**uncle** 94:7 96:21
**uncorrelated**
276:1,6
**undeniable**
123:18
**underlies** 83:1
193:20
**underlying**
105:21 153:12
156:18 160:14
273:18
**understand** 16:13
17:24 19:20 25:6
34:17 35:18 46:23
52:3 54:14,21
55:6 56:12 59:2
62:11 69:18 72:19
82:3,22 90:15
91:3,23 95:6
101:12 103:3

104:23 109:21
128:10 131:14,15
132:16 137:10
140:21 146:4
148:9,21,25
158:20 163:21
165:8 178:8 187:9
197:20 212:5,8
221:14,21 223:5
234:10 235:2
239:7,11 243:12
244:9 261:10
263:24 269:3
275:4,21
**understanding**
29:17 30:4 33:15
35:3 39:11 53:8
77:11 82:18
102:23 117:11,12
120:7 133:23
134:8 181:18,20
190:22 200:2
209:2 223:9
233:21 234:17,21
244:14 245:3
269:6
**understood** 41:5
52:10 69:8 94:23
102:2,16 103:13
139:3 152:19
188:22,25 260:4
268:9
**undertaken**
200:12 255:3
**undertaking**
142:18
**underwood** 6:15
130:12,13,17,19
134:7,19 135:25
136:14,15,17
137:11,13 138:8
**underwrite**
120:12

**underwriters**
26:15 114:12
**underwritten**
120:15
**undisclosed** 125:4
**undisputed** 109:1
**unenforceable**
159:9 160:5
**unethical** 88:11
**unexecuted** 29:5
**unfamiliar** 271:4
**unfortunately**
73:6 75:23 117:8
117:20 128:22
145:12 154:14
284:15
**unidentified**
125:5
**unintentional**
119:14
**united** 1:1,11 5:8
26:23 27:7 34:10
51:23 96:22 97:20
107:14 119:9
122:20,21,24
127:2,7,15 128:5
128:13 129:24
130:6 156:10,14
164:7 204:22,23
230:1 275:18
**universe** 213:14
**unlimited** 155:4
**unmute** 50:1
**unmuted** 49:5,9
49:18
**unpack** 129:25
144:19
**unquestioned**
112:22
**unreasonable**
203:25
**unrelated** 31:22

**unreported**
155:24
**unsecured** 135:18
**untrue** 41:15
**update** 151:10
203:7
**updated** 180:23
181:5 187:4,12
208:19
**updates** 231:18
**upper** 212:22
232:9
**upside** 212:15
**upward** 108:20
**usage** 142:23
143:10
**use** 31:6 32:10,15
51:2 64:5 85:25
109:20 111:20
124:12,20 139:2
140:20,21 141:2,5
141:11 142:8
144:11 193:25
197:15 208:23
209:12 212:24
220:17 229:10
235:12 237:7
238:20 244:1
245:18,19,20,23
246:13 247:1,5,16
266:10,16,24
267:17,18 269:2
269:23,25 270:1
271:15 272:4,7,7
276:9,21 281:23
286:13,14,17
**useful** 221:10
**users** 212:7
251:18,20 252:1
252:20,23 253:5
253:13,13 254:8,9
254:12 258:24,25
266:14

**uses**  111:25
**utility**  145:3
**utilization**  67:1
**uzzi**  14:9

**v**

**vague**  73:21
**vaguely**  54:6
**validate**  198:10
   198:23
**validity**  159:22
   162:22
**valuable**  204:6
**valuation**  185:14
   187:2,10 188:16
   189:19 190:2,23
   190:24 191:6
   205:3,11,21 217:5
   225:4
**valuations**  189:15
**value**  105:3,23
   107:25 117:18
   118:5,12 123:15
   123:19,19 124:7
   124:12 130:2
   133:20 137:18,19
   173:24,25,25
   174:11 178:9
   181:3,5 182:14
   183:20 184:11
   185:15,22,23
   187:1,3,6,7,15,16
   187:17,20,24,25
   188:2,2,17,22,23
   188:23 189:1,2,3
   191:15,22 192:1
   192:21,22 200:13
   200:24 202:6,6,10
   202:11,12,15
   203:24 204:14
   205:13 206:22
   207:25 208:1,1,18
   208:23,24,25,25
   209:2 210:8

211:21,24 212:4
215:13 216:1,2,3
216:4,11,12,15
217:3,8,10 219:2
219:14,22 221:16
221:25 222:9
224:7,9 225:10,13
225:16,24 226:2
250:3
**values**  187:2
   191:14 196:2
   200:21 202:23
   203:9 208:21
**variability**  177:13
**variable**  147:6
**variables**  173:5
   197:22
**varick**  5:10
**varied**  46:6
**varies**  282:17
**variety**  92:17
   120:16 121:16
   132:5 141:5 145:9
**various**  110:17
   177:19 193:14
   234:14 256:15
   272:25 273:24
   275:10 279:5
   284:11
**vast**  146:1
**velez**  14:10
**venditto**  14:11
**ventured**  83:5
**verb**  107:20
**verification**  40:16
**veritext**  287:20
**version**  29:5,11
   30:2 186:14 209:5
**versus**  225:6
   273:17,22 275:11
**viability**  106:5
**viable**  69:23

**victims**  266:10,16
   267:17
**video**  1:12 49:7
**view**  242:1
**views**  144:15,17
**virginia**  5:2 165:7
   228:23 236:18
   244:7,9,15,24
   246:9,11,14
   247:21 248:3,11
   248:12,19,20
   249:4,8,13 253:18
   254:8,12 257:24
   258:8,10,11,16,17
   258:20,20,21,23
   258:24 261:1,3,7
   261:16 263:9
   264:8,14,19,22
   274:25 275:3,8,15
   276:22 278:8
**virginians**  254:2
**virginia's**  248:7
   258:4 277:4 278:3
**virtual**  148:12
**vis**  103:2,2 230:4
   230:4
**vision**  56:22 92:20
**vital**  245:9
**voice**  98:20 176:7
   180:3
**voicemail**  166:24
**volume**  62:20
**volunteered**  126:4
**vonnegut**  14:12
**vote**  94:6
**voted**  128:4
**voting**  131:25

**w**

**w**  13:4 227:16
**w.h.o.**  112:20
**wagner**  5:20
   14:13,14 166:4,9
   166:13,22,25

167:9 228:7,10,10
228:15,18,21
232:24 241:22
242:12,18 252:15
256:10,18 263:21
264:25 270:18,22
271:7 272:4,21
273:10,23 274:5
275:9 276:19
279:11,24 281:1,3
281:6,7 283:20,22
284:2
**wait**  26:24 97:5
   166:22 167:9
   176:12
**waiting**  165:19
   166:5
**waiving**  26:9
**walk**  165:23 166:3
**walker**  1:25
**wall**  5:3
**wan**  99:23
**want**  16:2 18:20
   23:14 26:1 36:13
   37:10 41:21 47:16
   49:19 59:3 70:24
   74:15 80:7 81:2
   99:5 108:7,7
   109:6,14,18 114:6
   115:5,14,24
   118:18 119:15
   120:17 126:17
   130:1,10 132:15
   134:18 138:12,24
   140:25 142:11
   143:1,24 144:15
   152:8,21 153:15
   154:23 157:10
   158:22 164:17,20
   166:5 167:22
   170:8 179:4 196:4
   196:24 197:20
   204:14,14 214:6

224:21 228:8
232:8 247:21
249:16 251:2,12
252:7,8 255:25
259:13 261:23
263:11 265:1
269:4 272:5
277:12 278:22
**wanted**  16:5
    19:10 41:5 56:24
    57:16 68:23 94:6
    165:15
**wants**  19:23 125:6
    165:1
**wardwell**  3:13
**warning**  197:5
**washing**  104:20
**washington**  6:2
    104:20 118:21
    257:1
**wasn't**  244:12
**way**  62:18 72:13
    89:5 94:4,8
    102:11 117:21
    118:3 119:15
    122:4 130:23
    132:15 146:2
    152:12 176:13
    194:8,22 203:19
    215:22 224:4
    240:20,23 242:10
    247:10,13 255:11
    261:10 263:17
    267:11 276:2,18
**ways**  111:23
    194:15 214:20
**we've**  15:18 24:13
    66:4 73:19,22,24
    74:24 83:5 120:15
    152:11 165:25
    168:6 204:3 216:1
**wealth**  171:11,12
    214:10 219:4

220:12,23 222:20
    222:23,24
**weather**  166:20
**weber**  14:15
**website**  155:25
    177:24 178:2
    193:15,20 194:12
    196:1 197:5,5
**week**  27:22 29:5
    150:15,15
**weekend**  167:2
**weeks**  46:14,15
    237:11
**weighting**  179:2
    179:12,13,15,18
**weiner**  14:16
**weintraub**  14:17
**weis**  14:18
**weiss**  4:1 14:19
**wells**  14:20
**went**  51:10 58:3
    108:24,25 123:23
    128:2 132:14
    156:3 181:11
    195:14 198:18
    215:11 256:11
**weren't**  286:15
**west**  5:2 165:7
    228:23 236:18
    244:6,9,15,24
    246:9,11,14
    247:21 248:3,7,11
    248:12,19,20
    249:4,7,13 253:18
    254:2,8,12 257:24
    258:4,11,17,20,21
    258:23 261:1,3,7
    261:16 263:9
    264:8,14,19,21
    274:25 275:3,8,15
    276:22 277:4
    278:3,8

**we'll**  227:7 229:3
    235:9 242:5 246:7
    247:20 284:9,13
    285:3 286:10,21
**we're**  230:3 242:5
    242:23,24 259:2
    267:13 268:7
**we've**  284:10
**wharton**  4:1
**whichever**  40:7
**white**  1:14 231:10
    231:18,22,25
    232:22,25 234:6
    236:22,22 237:4
    237:19 238:3,8,17
    241:7,9,10,11
    243:3,7 244:2,4
    250:11 254:19
    256:1 262:13
    263:13 264:11,18
    270:7 273:24
    274:3
**wholly**  134:16
**wide**  121:16
**william**  3:6,10
    13:3 14:17 16:14
    21:20 22:11 26:14
    114:11 170:14
    199:7 208:9 218:7
    225:1,21
**willing**  27:11 30:9
    34:18,24,25 35:10
**wind**  265:24
    273:19
**winding**  56:22
**wise**  128:9
**wish**  17:20 18:3
    21:3,12 22:22
    23:3 25:16 26:12
    151:24 164:12
    169:20 228:1
**wishes**  23:8

**withdraw**  45:5
    131:12,18 221:9
**withdrawn**  76:20
    131:15 168:19
    170:5 221:13
    272:23 275:15,21
    279:9
**witness**  16:14
    17:14,22 18:4
    20:3,19 21:4,18
    21:19 22:13,23
    23:9,10 24:4 25:5
    25:9,17 26:11
    38:4 42:23 45:2
    50:7 52:13,16
    71:8 75:8 86:6
    105:16 113:22
    114:6 134:4,17
    135:1,8,16,24
    150:11 151:14,17
    151:25 152:15
    154:21 159:1,4,13
    159:19 160:16,20
    163:19,20 164:1,4
    164:13 165:5,6
    167:5,7,23 168:10
    168:15 169:15,22
    170:1 174:15,21
    174:24 175:2
    176:6,6,23 180:5
    199:4 203:14,18
    204:13,17,19
    205:1,4,7,12,23
    206:5,8,11,15,19
    206:25 207:9,11
    207:19 208:3
    218:3 226:25
    270:11 271:19
    272:9 273:13
    274:6,12 281:5
    282:3 283:25
    285:11,13,21
    286:5

[witness's - à]                                                                                    Page 63

**witness's**   152:13
  152:25
**witnesses**   3:3 15:6
  15:13,14 16:12
  22:3 152:22 284:4
  284:21,24 285:7
  285:11,16,17,21
  286:8
**wolf**   14:21
**wolff**   6:1
**wonder**   42:16
**word**   17:12 20:18
  232:18,19 235:12
  241:3 248:8 249:3
  256:22 262:3
  272:4,5,7,8,21
  274:19
**words**   157:13
  220:4 237:7
  240:25 259:7
  266:19
**wordsmiths**
  147:17
**work**   15:20 34:4
  39:4 121:3 145:15
  173:8 265:20
  266:1 281:15
  282:23 283:4
**worked**   18:13
  171:10,12 193:17
  195:11 197:14
  229:9,12 281:19
**working**   63:25
  143:20 146:3
  154:14 271:1
**works**   145:4
  264:1 277:13
**world**   31:8 101:7
  112:19 113:23
  198:14 201:13
  204:11,15,22
  223:24 226:5

**worldwide**   106:10
  131:2,19 148:23
  204:12
**worry**   63:10
**worse**   226:8
  239:19 249:13
  258:2,3
**worth**   112:24
  182:15 183:10,12
  184:4 185:12
  189:14 190:13
  213:24 217:3
  277:10
**worthless**   33:24
**would've**   44:21
  66:6,8 154:11
  195:16 207:22
**wouldn't**   270:4
**wound**   265:21
**wrestle**   112:22
**write**   125:15
  126:9 244:3
**writing**   53:12
  155:18 156:8
  274:20
**writings**   231:10
**written**   234:6
  244:1 251:4
  273:24
**wrong**   107:20
**wrote**   215:2 251:6
  264:18

**x**

**x**   1:4,10 196:16

**y**

**y**   17:12 168:2,2
  169:25,25
**yeah**   28:4 37:2
  39:3 40:4,17
  42:17 45:2,8
  47:24 49:1,4
  52:13 55:16 57:4
  60:6 61:12,15,23

63:9 65:9 69:2
  76:17 81:21,23
  84:10 88:20 94:16
  99:16 111:2
  114:19 120:5
  129:12 140:4
  146:18 155:16
  162:2 167:9 169:6
  180:3 195:10
  203:18 220:3,8
  232:25 245:20
  260:22 263:11
  265:17,18
**year**   33:18,22
  77:20 172:17
  178:10 185:7
  187:7,21 191:13
  194:17 195:2
  197:25 198:1,4,6
  203:21,24,24
  218:24 219:4,14
  220:8 252:17
  282:18
**years**   33:12,12
  48:6 51:20 77:14
  77:17 100:23
  103:21 109:2
  112:11 113:20
  125:6 131:8,15,19
  132:11,18 133:1
  143:24 156:3
  158:18,19 172:18
  177:17 180:12
  181:24 182:9
  195:4,6,10,15
  203:8,22 204:8
  207:2 211:22
  221:2 252:13
  258:24 280:18
  282:21
**yesterday**   64:24
  263:22

**yield**   194:17 195:3
**yields**   194:14
  195:1,1
**york**   1:2 3:16 4:4
  5:4,11,18 6:4,20
  24:2 77:23 78:4
  150:5 257:12,14
  257:14,16
**you'd**   250:4 266:6
**you'll**   248:8
  256:22
**you're**   227:4
  231:1 232:3 233:5
  236:1,4,6,17
  237:15 240:1,8,18
  244:18,20 245:22
  249:19 250:15
  252:25 253:17
  261:21 262:19
  269:14 270:18
  278:13 279:14
  286:14
**you've**   229:5,8,12
  231:4 234:6
  238:25 241:16
  244:6 253:24
  257:5 258:2
  263:24 264:21
  275:24 280:4

**z**

**z**   13:22
**zabel**   14:22
**zero**   267:10
**zip**   38:17
**zoom**   24:21
  278:22
**zylberberg**   14:23

**à**

**à**   103:2 230:4