1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  Tele/Video Proceedings

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 13, 2021

17                  10:07 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: JUSTIN WALKER

1    HEARING re Continuance of Confirmation Hearing From August

2    12, 2021

3

4    HEARING re Notice of Agenda I Amended Agenda for August 12,

5    2021 Confirmation Hearing (ECF #3549)

6

7    HEARING re Amended Plan / Seventh Amended Joint Chapter 11

8    Plan of Reorganization of Purdue Pharma LP. and its

9    Affiliated Debtors filed by Eli J. Vonnegut on behalf of

10    Purdue Pharma L.P. (ECF #3545)

11

12    HEARING re Responses:

13    Objection to the Bankruptcy plan re: Claim 88041 filed by

14    Carrie L. McGaha. (ECF #2921)

15

16    HEARING re Letter to Judge Drain re: 82739 received 6-1-21

17    Filed by Michael W. Normile III. (ECF #2966)

18

19    HEARING re Letter to Judge Drain re: Claim 6177, Disclosure

20    Statement Filed by Les Burris.(ECF #3028)

21

22    HEARING re Letter to Judge Drain, re: 6750 Filed by Daniel

23    West, on behalf of Brian West.(ECF #3057)

24

25    HEARING re Letter Re: Legal Mail from Prime Clerk Marked

1   Contraband Filed by Thomas Hickey.(ECF #3099)

2

3   HEARING re Letter received 6/30/21 Filed by Theresa Willis.

4   (ECF #3100)

5

6   HEARING re Letter /Concerns regarding Disclosure

7   Statement/Plan (related document(s)2988) Filed by Teresa

8   VomSaal. (ECF #3110)

9

10  HEARING re Letter received 6/28/21 Filed by James E Crawley.

11  (ECF #3111)

12

13  HEARING re Statement Nictim Statement (Claim 619028) filed

14  by Tamara Graham. (ECF #3122)

15

16  HEARING re Letter re: Disclosure Statement (Settlement)

17  (related document(s)2988) Filed by Ruby Romas. (ECF #3123)

18

19  HEARING re Objection to Debtors' Plan of Reorganization

20  (related document(s)2988) filed by Kelvin X Singleton.

21  (ECF #3125)

22

23  HEARING re Letter re: Voting Disclosure Statement (related

24  document(s)2988) Filed by Shirley Belk.(ECF #3188)

25

1    HEARING re Objection to the Plan/Claimants Objection

2    (related document(s)2988) filed by Donald Ernest Allee. (ECF

3    #3199)

4    HEARING re Objection to Plan (related document(s)2988) filed

5    by Mary Butler-Fink, aka Parker's Mom. (ECF #3235)

6

7    HEARING re Objection of the United States Trustee to Sixth

8    Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and its

9    Affiliated Debtors (related document(s)2982, 2983, 3185)

10   filed by Paul Kenan Schwartzberg on behalf of United

11   States Trustee. (ECF #3256)

12

13   HEARING re Objection to Sixth Amended Joint Plan, filed by

14   Peter D'Apice on behalf of Certain Native American Tribes

15   and Others.(ECF #3257)

16

17   HEARING re Objection to Confirmation of Amended Plan by

18   Independent Emergency Room Physician Michael Masiowski

19   (related document(s)3185) filed by Paul S Rothstein on

20   behalf of Paul S Rothstein. (ECF #3262)

21

22   HEARING re Objection I Certain Insurers' Limited Objection

23   to Plan Confirmation and Reservation of Rights (related

24   document(s)3185) filed by Philip D. Anker on behalf of XL

25   Insurance America, Inc., Liberty Mutual Insurance

Page 5

1    Company, Liberty Mutual Fire Insurance Company, Liberty

2    Insurance Corporation, American Guarantee and

3    Liability Insurance Company, Aspen American Insurance

4    Company, Navigators Specialty Insurance Company,

5    North American Elite Insurance Company, Steadfast Insurance

6    Company. (ECF #3263)

7

8    HEARING re Objection to Confirmation of Amended Plan City of

9    Seattle's Objection to the Debtors' Plan of Reorganization

10   filed by Ben Harrington on behalf of City of Seattle.

11   (ECF #3264)

12

13   HEARING re Objection by The State of West Virginia, ex. rel

14   Patrick Morrisey, Attorney General to Confirmation of the

15   Debtors' Sixth Amended Joint Plan of Reorganization (related

16   document(s)2982, 2983, 3185) filed by Aaron R. Cahn on

17   behalf of The State of West Virginia, ex el. Patrick

18   Morrisey, Attorney General. (ECF #3265)

19

20   HEARING re Statement of the United States Regarding the

21   Shareholder Release filed by Lawrence Fogelman on behalf of

22   United States of America.(ECF #3268)

23

24   HEARING re Joint Objection to Confirmation of Plan of the

25   State of Connecticut, State of Maryland and District of

Page 6

1   Columbia filed by Irve J. Goldman on behalf of State of

2   Connecticut. (ECF #3270)

3

4   HEARING re Objection to Plan and Plan Confirmation filed by

5   James Franklin Ozment I on behalf of Stacey Bridges.

6   (ECF #3271)

7

8   HEARING re Joinder and Objection of Gulf Underwriters

9   Insurance Company and St. Paul Fire and Marine Insurance

10   Company to the Sixth Amended Joint Chapter 11 Plan of

11   Reorganization of Purdue Pharma L.P. and its Affiliated

12   Debtors (related document(s)3185) filed by Bryce L. Friedman

13   on behalf of Gulf Underwriters Insurance Company, St. Paul

14   Fire and Marine Insurance Company. (ECF #3272)

15

16   HEARING re Objection to Confirmation of Plan (related

17   document(s)3185) filed by John A. Boyle on behalf of John H.

18   Stewart. (ECF #3273)

19

20   HEARING re Objection to Confirmation of Amended Plan filed

21   by Bernard Arda van Eskandari on behalf of People of the

22   State of California. (ECF #3274)

23

24   HEARING re Objection to Confirmation of Plan by Certain

25   Canadian Municipality Creditors and Canadian First Nation

Page 7

1    Creditors to Confirmation of the Sixth Amended Joint Chapter

2    11 Plan of Reorganization of Purdue Pharma L.P.

3    and Its Affiliated Debtors (related document(s)3185) filed

4    by Allen J. Underwood on behalf of Guardian Law

5    Group LLP (ECF #3275)

6

7    HEARING re Objection to Confirmation of Plan of the State of

8    Washington, the State of Oregon, and the Objecting States

9    filed by Matthew J. Gold on behalf of State of Washington.

10   (ECF #3276)

11

12   HEARING re Objection to Plan Confirmation filed by James

13   Franklin Ozment I on behalf of Creighton Bloyd. (ECF #3277)

14

15   HEARING re Objection to Motion Objection to Sixth Amended

16   Joint Plan of Reorganization filed by Brian Edmunds on

17   behalf of State Of Maryland. (ECF #3278)

18

19   HEARING re Joinder filed by Jill Abrams on behalf of State

20   of Vermont. (ECF #3279)

21

22   HEARING re Joinder of the State of Delaware to Objection of

23   the State of Washington, the State of Oregon, and the

24   Objecting States to Confirmation of the Debtors' Plan of

25   Reorganization filed by Jillian Lazar on behalf of State of

Page 8

1   Delaware. (ECF #3280)

2

3   HEARING re Objection to Motion filed by Morgan R Bentley on

4   behalf of Sarasota County Public Hospital District.

5   (ECF #3288)

6

7   HEARING re Objection to Consider Confirmation of the Fifth

8   Amended Chapter 11 Plan (related document(s)2988) filed by

9   Joyce Villnave. (ECF #3292)

10

11   HEARING re Objection to Fifth Amended Chapter 11 Plan of

12   Reorganization (Motion for Allowance) (related

13   document(s)2988) filed by Jerome J. Ferrier. (ECF #3293)

14

15   HEARING re Objection to the Plan & Motion to file late

16   balots (related document(s)2988) filed by Earl Cobb.

17   (ECF #3298)

18

19   HEARING re Objection to the Plan & Motion to file late

20   ballots (related document(s)2988) filed by Tim Wright.

21   (ECF #3299)

22

23   HEARING re Objection to Confirmation of Plan Chubb Insurance

24   USAs Objection To The Sixth Amended Joint Chapter 11

25   Plan Of Reorganization Of Purdue Pharma L.P. And Its

Page 9

1   Affiliated Debtors (related document(s)3185) filed by

2   Lawrence J. Kotler on behalf of Chubb Insurance USA.

3   (ECF #3301)

4   HEARING re Opposition/ Joinder of National Union to Certain

5   Insurers' Limited Objection to Plan Confirmation (related

6   document(s)3263) filed by Joseph G. Davis on behalf of

7   National Union Fire Insurance Company of Pittsburgh, PA.

8   (ECF #3304)

9

10  HEARING re Objection /Joint Objection of Certain

11  Distributors, Manufacturers, and Pharmacies (ECF #3306)

12

13  HEARING re Amended Objection to Confirmation of Amended Plan

14  by Independent ER Room Physician, Dr. Michael Masiowski

15  (ECF #3323)

16

17  HEARING re Statement Reservation of Rights of Her Majesty

18  the Queen in Right of the Province of British Columbia and

19  other Canadian Governments with respect to confirmation of

20  the Sixth Amended Joint Chapter 11 Plan of Reorganization of

21  Purdue Pharma L.P. and Its Affiliated Debtors filed by

22  Nickolas Karavolas on behalf of Her Majesty in Right of the

23  Province of British Columbia. (ECF #3335)

24

25  HEARING re Objection to Restructuring of Purdue Pharma L.P.,

1    ET ALL Case No. 19-23649(RDD) (related document(s)2988)

2    filed by Maria Ecke. (ECF #3357)

3

4    HEARING re Objection Anderson Brecon, Inc D/B/A PCI Pharma

5    Services (ECF #3359)

6

7    HEARING re Objection to the plan (related document(s)2988)

8    filed by D. Thomas Page. (ECF #3368)

9

10   HEARING re Objection to Confirmation of Plan filed by On

11   behalf of the Farash Family Barbara Farash.(ECF #3404)

12

13   HEARING re The Multi-State Governmental Entities Group's

14   Statement in Support of and Response to Certain Objections

15   to the Sixth Amended Joint Chapter 11 Plan of Reorganization

16   of Purdue Pharma L.P. and Its Affiliated Debtors

17   filed by Kevin C. Maclay on behalf of Multi-State

18   Governmental Entities Group. (ECF #3430)

19

20   HEARING re Statement of The Raymond Sackler Family in

21   Support of Confirmation of Debtors' Sixth Amended Plan of

22   Reorganization and in Reply to Plan Objections filed by

23   Gerard Uzzi on behalf of The Raymond Sackler Family.

24   (ECF#3438)

25

Page 11

1   HEARING re Objection to Proposed Amendment of Contracts

2   Pursuant to Section 8.4 of Sixth Amended Joint Chapter 11

3   Plan of Purdue Pharma L.P. and Its Affiliated Debtors

4   (related document(s)3185) filed by Daniel Joseph Saval on

5   behalf of CuraScript, Inc., Express Scripts Holding Company,

6   Express Scripts Pharmacy, Inc., Express Scripts,

7   Inc. (ECF #3439)

8

9   HEARING re Response to Motion The Mortimer D. Sackler

10  Family's Response to Plan Objections and Statement in

11  Support of Confirmation of The Sixth Amended Joint Chapter

12  11 Plan of Reorganization of Purdue Pharma L.P. and its

13  Affiliated Debtors (related document(s)3435) filed by

14  Jasmine Ball on behalf of Beacon Company. (ECF #3442)

15

16  HEARING re Response to Objection of the United States

17  Trustee (related document(s)3256) filed by Michael Patrick

18  O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #3453)

19

20  HEARING re Response TO INSURER CONFIRMATION OBJECTIONS

21  (related document(s)3301, 3304, 3272, 3263) filed by Paul M.

22  Singer on behalf of Purdue Pharma L.P. (ECF #3455)

23

24  HEARING re Statement / Redacted Statement of the Official

25  Committee of Unsecured Creditors in Support of Confirmation

1    of the Sixth Amended Joint Chapter 11 Plan of Reorganization

2    of Purdue Phrama L.P. and Its Affiliated Debtors

3    filed by Ira S. Dizengoff on behalf of The Official

4    Committee of Unsecured Creditors of Purdue Pharma L.P., et

5    al. (ECF #3459)

6

7    HEARING re Reply: Reply to Objection and Improperly

8    Submitted Amended Supplemental Objection of Dr. Michael

9    Masiowski (related document(s)3323, 3262) filed by Michael

10   Patrick O'Neil on behalf of Ad Hoc Group of Hospitals.

11   (ECF #3413)

12

13   HEARING re Response / The Ad Hoc Group of Individual

14   Victims' Limited Reply in Support of Confirmation of the

15   Debtors' Joint Chapter 11 Plan of Reorganization (related

16   document(s)3271, 3256, 3185) filed by J. Christopher Shore

17   on behalf of Ad Hoc Group of Individual Victims of Purdue

18   Pharma L.P. (ECF #3427)

19

20   HEARING re Ad Hoc Committee Of NAS Children's Motion For

21   Leave To Exceed The Page Limit In Filing The Reply To

22   The United States Trustee's Objection To The Fee Settlements

23   Included In Sixth Amended Joint Chapter 11 Plan

24   Of Reorganization Of Purdue Pharma L.P. And Its Affiliated

25   Debtors filed by Scott S. Markowitz on behalf of Ad

Page 13

1   Hoc Committee of NAS Babies. (ECF #3396)

2

3   HEARING re Debtors' Memorandum of Law in Support of

4   Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan

5   of Reorganization of Purdue Pharma L.P. and its Debtor

6   Affiliates and Omnibus Reply to Objections Thereto

7   (related document(s)3185) filed by Marshall Scott Huebner on

8   behalf of Purdue Pharma L.P. (ECF #3461)

9

10   HEARING re Ad Hoc Committee's Reply to Plan Objections

11   (related document(s)3268, 3270, 3256, 3272, 3276, 3265,

12   3301, 3304, 3185, 3263, 3306) filed by Kenneth H. Eckstein

13   on behalf of Ad Hoc Committee of Governmental and

14   Other Contingent Litigation Claimants. (ECF #3465)

15

16   HEARING re Related Documents:

17   Statement/ Notice of Filing of Special Education Initiative

18   Term Sheet (related document(s)2982) filed by Eli J.

19   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3120)

20

21   HEARING re Statement / Notice of Filing of Eighth Plan

22   Supplement Pursuant to the Fifth Amended Joint Chapter 11

23   Plan of Reorganization of Purdue Pharma L.P. and its

24   Affiliated Debtors (related document(s)2982) filed by Eli J.

25   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3121)

Page 14

1

2    HEARING re Letter request for video access to Confirmation

3    Hearing Filed by Katie Lynn B Townsend on behalf of Dow

4    Jones & Company, Inc., Boston Globe Media Partners, LLC, and

5    Reuters News & Media, Inc. (ECF #3129)

6

7    HEARING re Statement /Notice of Filing of Blackline of Sixth

8    Amended Plan (related document(s)3185) filed by Eli J.

9    Vonnegut on behalf of Purdue Pharma L.P. (ECF #3186)

10

11   HEARING re Statement/ Notice of Filing of Ninth Plan

12   Supplement Pursuant to the Sixth Amended Joint Chapter 11

13   Plan of Reorganization of Purdue Pharma L.P. and its

14   Affiliated Debtors (related document(s)3185) filed by Eli J.

15   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3187)

16

17   HEARING re Statement/ Notice of Extension of Voting Deadline

18   (related document(s)3166, 2982) filed by Eli J. Vonnegut on

19   behalf of Purdue Pharma L.P. (ECF #3231)

20

21   HEARING re Statement/ Notice of Filing of Tenth Plan

22   Supplement Pursuant to the Sixth Amended Joint Chapter 11

23   Plan of Reorganization of Purdue Pharma L.P. and its

24   Affiliated Debtors (related document(s)3 l 85) filed by Eli

25   J. Vonnegut on behalf of Purdue Pharma L.P. (ECF#3232)

Page 15

1

2    HEARING re Statement/ Notice of Filing of Eleventh Plan

3    Supplement Pursuant to the Sixth Amended Joint Chapter 11

4    Plan of Reorganization of Purdue Pharma L.P. and its

5    Affiliated Debtors (related document(s)3185) filed by Eli J.

6    Vonnegut on behalf of Purdue Pharma L.P. (ECF #3246)

7

8    HEARING re Letter (Letter in Support of Request for Video

9    Access to Confirmation Hearing) (related document(s)3129)

10   Filed by Andrew M. Troop on behalf of Ad Hoc Group of Non-

11   Consenting States. (ECF #3248)

12

13   HEARING re Motion to Allow Filing of Amici Curiae Brief

14   filed by Ira Bumim on behalf of Kennedy Forum and other

15   national organizations. (ECF #3251)

16

17   HEARING re Statement/ Notice of Filing of Twelfth Plan

18   Supplement Pursuant to the Sixth Amended Joint Chapter 11

19   Plan of Reorganization of Purdue Pharma L.P. and its

20   Affiliated Debtors (related document(s)3185) filed by Eli J.

21   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3283)

22

23   HEARING re Certain Distributors, Manufacturers, and

24   Pharmacies' Motion to Authorize Leave to Exceed Page Limit

25   in Filing the Joint Objection to the Sixth Amended Joint

Page 16

1  Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated

2  Debtors filed by Christopher A. Lynch (ECF #3305)

3

4  HEARING re Order signed on 7/23/2021 Granting Leave to

5  Exceed Page Limit in Filing the Joint Objection to the Sixth

6  Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its

7  Affiliated Debtors (Related Doc# 3305) (ECF #3309)

8

9  HEARING re Declaration/ Preliminary Declaration of Christina

10  Pullo of Prime Clerk LLC Regarding the Solicitation of Votes

11  and Tabulation of Ballots Cast on the Fifth Amended Joint

12  Chapter 11 Plan of Reorganization of Purdue Pharma

13  L.P. and its Affiliated Debtors (related document(s)2982)

14  filed by Eli J. Vonnegut on behalf of Purdue Pharma

15  L.P. (ECF #3327)

16

17  HEARING re Letter re Consents to Filing Amici Curiae Brief

18  Filed by Ira Bumim on behalf of Kennedy Forum and other

19  national organizations. (ECF #3355)

20

21  HEARING re Declaration / Final Declaration of Christina

22  Pullo of Prime Clerk LLC Regarding the Solicitation of Votes

23  and Tabulation of Ballots Cast on the Fifth Amended Joint

24  Chapter 11 Plan of Reorganization of Purdue Pharma L.P.

25  and its Affiliated Debtors (related document(s)3327, 2982)

1    filed by Eli J. Vonnegut on behalf of Purdue Pharma

2    L.P. (ECF #3372)

3

4    HEARING re Motion to Allow- Ad Hoc Committee Of NAS

5    Children's Motion For Leave To Exceed The Page Limit In

6    Filing The Reply To The United States Trustee's Objection To

7    The Fee Settlements Included In Sixth Amended Joint

8    Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And

9    Its Affiliated Debtors filed by Scott S. Markowitz on behalf

10   of Ad Hoc Committee of NAS Babies. (ECF #3396)

11

12   HEARING re Declaration of Scott R. Bickford, Esq. In Support

13   of The Ad Hoc Committee of NAS Children's Reply To The

14   United States Trustee's Objection To The Fee Settlements

15   Included In The Sixth Amended Joint Chapter 11 Plan

16   of Reorganization of Purdue Pharma L.P. And Its Affiliated

17   Debtors (related document(s)3397, 3256, 3185) filed

18   by Scott S. Markowitz on behalf of Ad Hoc Committee of NAS

19   Babies. (ECF #3398)

20

21   HEARING re Declaration/ Third Supplemental Declaration of

22   Jeanne C. Finegan (related document(s)717, 719) filed by

23   James I. McClammy on behalf of Purdue Pharma L.P.

24   (ECF #3403)

25

1   HEARING re Affidavit Declaration of Rahul Gupta, MD, MPH,

2   MBA, FACP Filed by Michael Patrick O'Neil on behalf of Ad

3   Hoc Group of Hospitals. (ECF #3405)

4   HEARING re Affidavit Declaration of Rebecca M.S. Busch, MBA

5   Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group

6   of Hospitals.(ECF #3407)

7

8   HEARING re Affidavit Declaration of Gayle A. Galan, M.D.

9   FACEP Filed by Michael Patrick O'Neil on behalf of Ad Hoc

10  Group of Hospitals. (ECF #3408)

11

12  HEARING re Affidavit Declaration of William Legier Filed by

13  Michael Patrick O'Neil on behalf of Ad Hoc Group of

14  Hospitals. (ECF#3409)

15

16  HEARING re Declaration of Richard A. Collura filed by

17  Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

18  (ECF #3410)

19

20  HEARING re Declaration of Jesse DelConte filed by Benjamin

21  S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3411)

22

23  HEARING re Declaration of Deborah E. Greenspan filed by

24  Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

25  (ECF#3412)

1   HEARING re Declaration of Gautam Gowrisankaran filed by

2   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

3   (ECF #3414)

4

5   HEARING re Declaration of Carl J. Trompetta filed by Gerard

6   Uzzi on behalf of The Raymond Sackler Family. (ECF #3415)

7

8   HEARING re Declaration of Garrett Lynam filed by Gerard Uzzi

9   on behalf of The Raymond Sackler Family. (ECF #3416)

10

11  HEARING re Declaration of Stephen A. Ives filed by Gerard

12  Uzzi on behalf of The Raymond Sackler Family. (ECF#3417)

13

14  HEARING re Declaration of David Sackler filed by Gerard Uzzi

15  on behalf of The Raymond Sac kl er Family. (ECF #3418)

16

17  HEARING re Declaration Supplemental Declaration of Jennifer

18  L. Blouin filed by Gerard Uzzi on behalf of The Raymond

19  Sackler Family. (ECF #3419)

20

21  HEARING re Declaration Maureen M. Chakraborty filed by

22  Gerard Uzzi on behalf of The Raymond Sackler Family.

23  (ECF #3420)

24

25  HEARING re Declaration of Lawrence A. Hamermesh filed by

1    Gerard Uzzi on behalf of The Raymond Sackler Family.

2    (ECF #3421)

3

4    HEARING re Declaration of Timothy J. Martin filed by Gerard

5    Uzzi on behalf of The Raymond Sackler Family. (ECF #3422)

6    Declaration of Mark F. Rule, CPA filed by Benjamin S.

7    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3424)

8

9    HEARING re Motion to Authorize Raymond Sackler Family's

10   Motion for Leave to Exceed Page Limit in Statement in

11   Support of Confirmation of Debtors' Sixth Amended Plan of

12   Reorganization and in Reply to Plan Objections filed by

13   Gerard Uzzi on behalf of The Raymond Sackler Family.

14   (ECF #3425)

15

16   HEARING re Order signed on 8/5/2021 Granting Leave to Exceed

17   the Page Limit in Filing the Reply to the United States

18   Trustee's Objection to the Fee Settlements Included in Sixth

19   Amended Joint Chapter 11 Plan of Reorganization of

20   Purdue Pharma L.P. And its Affiliated Debtors,{Related Doc#

21   3396) (ECF #3426)

22

23   HEARING re Declaration of David W. DeRamus, Ph.D. filed by

24   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

25   (ECF#3428)

1    HEARING re Order signed on 8/5/2021 RE: Establishing

2    Procedures for Remote Hearing on Confirmation of the Joint

3    Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and

4    It's Affiliated Debtors. (ECF #3429)

5

6    HEARING re Declaration of Joseph L. Turner filed by Benjamin

7    S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3431)

8

9    HEARING re Declaration of Lianna E. Simmonds filed by

10   Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P.

11   (ECF #3432)

12

13   HEARING re Declaration of John S. Dubel filed by Benjamin S.

14   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3433)

15

16   HEARING re Motion to Allow The Mortimer D. Sackler Family's

17   Motion for Leave to Exceed Page Limit in Filing their

18   Response to Plan Objections and Statement in Support of

19   Confirmation of the Sixth Amended Joint Chapter 11

20

21   HEARING re Plan of Reorganization of Purdue Pharma L.P. and

22   its Affiliated Debtors filed by Jasmine Ball on behalf of

23   Beacon Company. (ECF #3435)

24

25   HEARING re Motion to Authorize Leave to Exceed the Page

1    Limit in Filing the Reply to the U.S. Trustee's Objection

2    filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of

3    Hospitals. (ECF #3437)

4

5    HEARING re Declaration of Jon Lowne filed by Benjamin S.

6    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3440)

7

8    HEARING re Declaration of Gregory P. Joseph filed by Gerard

9    Uzzi on behalf of The Raymond Sackler Family. (ECF #3441)

10

11   HEARING re Declaration/ Declaration of Gary A. Gotto in

12   Support of Ad Hoc Committee's Reply to Plan Objections and

13   in Support of Plan Confirmation filed by Kenneth H. Eckstein

14   on behalf of Ad Hoc Committee of Governmental and

15   Other Contingent Litigation Claimants. (ECF #3443)

16

17   HEARING re Declaration/ Declaration of John M. Guard in

18   Support of Ad Hoc Committee's Reply to Plan Objections and

19   in Support of Plan Confirmation filed by Kenneth H. Eckstein

20   on behalf of Ad Hoc Committee of Governmental and

21   Other Contingent Litigation Claimants. (ECF #3446)

22

23   Declaration/ Declaration of Jayne Conroy in Support of Ad

24   Hoc Committee's Reply to Plan Objections and in

25   Support of Plan Confirmation filed by Kenneth H. Eckstein on

Page 23

1    behalf of Ad Hoc Committee of Governmental and

2    Other Contingent Litigation Claimants. (ECF #3447)

3    HEARING re Declaration of Timothy J. Martin (related

4    document(s)3442, 3185) filed by Jasmine Ball on behalf of

5    Beacon Company. (ECF #3448)

6

7    HEARING re Declaration of Peter H. Weinberger in Support of

8    Ad Hoc Committee's Reply to Plan Objections and in Support

9    of Plan Confirmation filed by Kenneth H. Eckstein on behalf

10   of Ad Hoc Committee of Governmental and Other Contingent

11   Litigation Claimants. (ECF #3449)

12

13   HEARING re Declaration of Jessica B. Horewitz, PhD. in

14   Support of the Ad Hoc Committee's Reply to Plan

15   Objections and in Support of Plan Confirmation filed by

16   Kenneth H. Eckstein on behalf of Ad Hoc Committee of

17   Governmental and Other Contingent Litigation Claimants.

18   (ECF #3450)

19

20   HEARING re Declaration of Jonathan Greville White (related

21   document(s)3442, 3185) filed by Jasmine Ball on

22   behalf of Beacon Company. (ECF #3451)

23

24   HEARING re Declaration of Alexa M. Saunders (related

25   document(s)3442, 3185) filed by Jasmine Ball on behalf of

Page 24

1    Beacon Company. (ECF #3452)

2

3    HEARING re Declaration of Jesse DelConte filed by Benjamin

4    S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF #3456)

5

6    HEARING re Motion to Allow/ Motion of the Official Committee

7    of Unsecured Creditors for Leave to Exceed Page Limit in

8    Statement in Support of Confirmation of the Sixth Amended

9    Joint Chapter 11 Plan of Reorganization of Purdue Pharma

10   L.P. and Its Affiliated Debtors filed by Ira S. Dizengoff on

11   behalf of The Official Committee of Unsecured Creditors of

12   Purdue Pharma L.P., et al. (ECF #3457)

13

14   HEARING re Declaration / Redacted Declaration of Michael

15   Atkinson in Support of the Statement of the Official

16   Committee of Unsecured Creditors in Support of Confirmation

17   of the Sixth Amended Joint Chapter 11 Plan of Reorganization

18   of Purdue Pharma L.P. and Its Affiliated Debtors filed by

19   Ira S. Dizengoff on behalf of The Official Committee of

20   Unsecured Creditors of Purdue Pharma L.P., et al.(ECF #3460)

21

22   HEARING re Motion to Allow/ Debtors' Motion for Leave to

23   Exceed the Page Limit in Filing Memorandum of Law in Support

24   of Confirmation of Debtors' Sixth Amended Joint Chapter 11

25   Plan of Reorganization of Purdue Pharma L.P. and

1    its Debtor Affiliates and Omnibus Reply to Objections

2    Thereto filed by Marc Joseph Tobak on behalf of Purdue

3    Pharma L.P. (ECF #3462)

4

5    HEARING re Motion to Approve Motion to Exclude the Expert

6    Testimony of William P. Hrycay, CPA filed by Jasmine Ball on

7    behalf of Beacon Company (ECF #3490)

8

9    HEARING re Notice of Motion to Exclude the Expert Testimony

10   of William P. Hrycay, CPA (related document(s)3490) filed

11   by Jasmine Ball on behalf of Beacon Company. (ECF #3491)

12

13   HEARING re Order signed on 8/9/2021 Granting Leave to Exceed

14   the Page Limit in the Mortimer D. Sackler Family's

15   Response to Plan Objections and Statement in Support of

16   Confirmation of the Sixth Amended Joint Chapter 11

17   Plan of Reorganization of Purdue Pharma L.P. and its

18   Affiliated Debtors (related document(s)3480) (ECF #3515)

19

20   HEARING re Amended Order signed on 8/9/2021 Establishing

21   Procedures for Remote Hearing on Confirmation of the Sixth

22   Amended Joint Chapter Plan of Reorganization of Purdue

23   Pharma L.P. and Its Affiliated Debtors (ECF #3521)

24

25   HEARING re Notice of Withdrawal of Limited Objection to Plan

1   (related document(s)3257) filed by Peter D'Apice on behalf

2   of Certain Native American Tribes and Others. (ECF #3522)

3   HEARING re Statement/ Notice of Filing of Thirteenth Plan

4   Supplement Pursuant to the Sixth Amended Joint Chapter 11

5   Plan of Reorganization of Purdue Pharma L.P. and its

6   Affiliated Debtors (related document(s)3185) filed by Eli J.

7   Vonnegut on behalf of Purdue Pharma L.P. (ECF #3528)

8

9   HEARING re Motion to Strike Amended Motion to Exclude the

10   Expert Testimony of William P. Hrycay, CPA (related

11   document(s)3490, 3491) filed by Jasmine Ball on behalf of

12   Beacon Company (ECF #3530)

13

14   HEARING Re Motion to Strike Declaration of Lawrence

15   Hamermesh and Exclude Expert Testimony filed by Sara

16   Tonnesen on behalf of State Of Maryland. (ECF #3542)

17

18   HEARING re Stipulation in Connection with the Debtors'

19   Chapter 11 Plan of Reorganization (related document(s)2982,

20   3185) Filed by Marshall Scott Huebner on behalf of Purdue

21   Pharma L.P. (ECF #3543)

22

23   HEARING re Statement / Notice of Filing of Blackline of

24   Seventh Amended Plan (related document(s)3545) filed by Eli

25   J. Vonnegut on behalf of Purdue Pharma L.P. (ECF#3546)

1    HEARING re Statement I Notice of Filing of Fourteenth Plan

2    Supplement Pursuant to the Seventh Amended Joint Chapter 11

3    Plan of Reorganization of Purdue Pharma L.P. and its

4    Affiliated Debtors (related document(s)3545) filed by Eli J.

5    Vonnegut on behalf of Purdue Pharma L.P. (ECF #3547)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 28

1    A P P E A R A N C E S :

2

3    WITNESSES:

4    DEBORAH GREENSPAN

5    JESSE DELCONTE

6    JOHN GUARD

7    JESSICA HOREWITZ

8    GARY GOTTO

9    PETER H. WEINBERGER

10   GARRETT LYNAM

11   STEPHEN IVES

12

13   DAVIS POLK WARDWELL LLP

14        Attorney for Debtors

15        450 Lexington Avenue

16        New York, NY 10017

17

18   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

19        BENJAMIN KAMINETZKY (TELEPHONICALLY)

20        MARC J. TOBACK (TELEPHONICALLY)

21        JAMES I. MCCLAMMY (TELEPHONICALLY)

22

23

24

25

```
 1   PAUL S. ROTHSTEIN, P.A.

 2        Attorneys for Dr. Michael Masiowski

 3        626 NE 1st Street

 4        Gainesville, FL 32601

 5

 6   BY:  PAUL S. ROTHSTEIN

 7

 8   UNITED STATES DEPARTMENT OF JUSTICE

 9        Attorneys for the U.S. Trustee

10        201 Varick Street, Suite 1006

11        New York, NY 10014

12

13   BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

14

15   PULLMAN COMLEY, LLC

16        Attorney on behalf of State of Connecticut

17        850 Main Street

18        Bridgeport, CT 06604

19

20   BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

21

22

23

24

25
```

1    OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

2        Attorney for State of Maryland

3        200 Saint Paul Place

4        Baltimore, MD 20852

5

6    BY:  BRIAN EDMUNDS (TELEPHONICALLY)

7

8    CARTER LEDYARD MILBURN LLP

9        Attorneys for the State of West Virginia

10       2 Wall Street

11       New York, NY 11598

12

13   BY:  AARON R. CAHN (TELEPHONICALLY)

14

15   KRAMER LEVIN NAFTALIS FRANKEL LLP

16       Attorneys for the Ad Hoc Committee

17       1177 Avenue of the Americas

18       New York, NY 10036

19

20   BY:  KENNETH H. ECKSTEIN (TELEPHONICALLY)

21       DAVID E. BLABEY JR. (TELEPHONICALLY)

22       JONATHAN M. WAGNER (TELEPHONICALLY)

23       SAMUEL ISSACHAROFF (TELEPHONICALLY)

24       ARTHUR AUFSES (TELEPHONICALLY)

25

```
 1   GILBERT LLP

 2        Attorneys for Ad Hoc Comm. of Gov't and Litig.

 3        Claimants

 4        700 Pennsylvania Avenue SE, Suite 400

 5        Washington, DC 20003

 6

 7   BY:  JENNA A. HUDSON (TELEPHONICALLY)

 8

 9   ATTORNEY GENERAL FOR THE CONSUMER PROTECTION DIVISION AT THE

10   WASHINGTON STATE ATTORNEY GENERAL'S OFFICE

11        800 Fifth Avenue, Suite 2000

12        Seattle, WA 98104

13

14   BY:  THOMAS ROBINSON O'NEILL (TELEPHONICALLY)

15

16   PILLSBURY WINTHROP SHAW PITTMAN LLP

17        Attorneys for Ad Hoc Group of Non-Consenting States

18        31 West 52nd Street

19        New York, NY 10019

20

21   BY:  ANDREW M. TROOP (TELEPHONICALLY)

22

23

24

25
```

 1   WILMER CUTLER PICKERING HALE AND DORR LLP

 2        Attorneys for Navigators Specialty Insurance Company

 3        1875 Pennsylvania Avenue NW

 4        Washington, DC 20006

 5

 6   BY:  ISLEY MARKMAN GOSTIN (TELEPHONICALLY)

 7

 8   US ATTORNEY'S OFFICE

 9        86 Chambers Street, 3rd Floor

10        New York, NY 10007

11

12   BY:  LAWRENCE FOGELMAN (TELEPHONICALLY)

13

14   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

15        Attorneys for State of Washington

16        500 Fifth Avenue

17        New York, NY 10110

18

19   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

20

21

22

23

24

25

1   LITE DEPALMA GREENBERG & AFANADOR

2        Attorneys for Certain Canadian Municipality Creditors

3        and Canadian First Nation Creditors

4        570 Broad Street, Suite 1201

5        Newark, NJ 07102

6

7   BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

8

9   JOSEPH HAGE AARONSON LLC

10        Raymond Sackler Family

11        485 Lexington Ave, 30th Floor

12        New York, NY 10017

13

14   BY:  GREGORY JOSEPH (TELEPHONICALLY)

15

16   MARYLAND ATTORNEY GENERAL OFFICE

17        Attorneys for the State of Maryland

18        200 Saint Paul Street

19        Baltimore, MD 21217

20

21   BY:  SARA E. TONNESEN (TELEPHONICALLY)

22

23   ALSO PRESENT TELEPHONICALLY:

24   JILL S. ABRAMS

25   BENJAMIN ALBERT

Page 34

1    ROXANA ALEALI

2    PHILIP D. ANKER

3    ROMAN ASUDULAYEV

4    MICHAEL ATINSON

5    MITCHELL JAY AUSLANDER

6    ROSEN J. BALL

7    JASMINE BALL

8    BROOKS BARKER

9    THOMAS MOULTRIE BESHERE

10   HUNTER BLAIN

11   SARA BRAUNER

12   PAUL E. BREENE

13   DAVID BROWN

14   CHRISTOPHER CARTER

15   MAUREEN CHAKRABORTY

16   JOHN CHRISTOPHER

17   GERARD CICERO

18   HAYDEN COLEMAN

19   DANIEL CONNOLLY

20   MELANIE L. CYGANOWSKI

21   MARIO D'ANGELO

22   PETER C. D'APICE

23   STACY DASARO

24   JOSEPH G. DAVIS

25   KEVIN DAVIS

Page 35

1    CLINT DOCKEN

2    JOHN C. DOUGHERTY

3    JOHN DUBEL

4    STEPHANIE EBERHARDT

5    MARIA ECKE

6    BERNARD ARDAVAN ESKANDARI

7    MATHEW FARRELL

8    JENNIFER S. FEENEY

9    JULIANNE FELIZ-KIDD

10   LAURA FEMINO

11   JEANNE FINEGAN

12   ROBERT FINZI

13   MARK FISHER

14   SAM FRAIDIN

15   BRYCE L. FRIEDMAN

16   MARCO GALINDEZ

17   KATHERINE GALLE

18   MELISSA GIBSON

19   JARED GIDDENS

20   MAGALI GIDDENS

21   JEFFREY R. GLEIT

22   MICHAEL GOLDSTEIN

23   GEOFFREY S. GOODMAN

24   ISLEY MARKMAN GOSTIN

25   GUATAM GOWRISANKARAN

Page 36

```
 1   JARED T. GREEN

 2   JAMES S. GREEN, JR.

 3   EMILY GRIM

 4   STEPHANIE GULKIN SATZ

 5   ADAM P. HABERKORN

 6   LAWRENCE HAMERMESH

 7   BEN HARRINGTON

 8   CATHERINE BEIDERMAN HEITZENRATER

 9   ANGELA K. HERRING

10   SEAN HIGGINS

11   MICHELE HIRSHMAN

12   MITCHELL HURLEY

13   ELISA HYDER

14   HAROLD D. ISRAEL

15   STEVEN IVES

16   EVAN M. JONES

17   CHERYL JUAIRE

18   NICKOLAS KARAVOLAS

19   LAUREN KELLEHER

20   NEIL F.X. KELLY

21   MARC KESSELMAN

22   MUHAMMAD UMAIR KHAN

23   DARREN S. KLEIN

24   JEREMY C. KLEINMAN

25   LAWRENCE KOTLER
```

Page 37

1    ANN KRAMER

2    KYUNG LEE

3    ALEXANDER LEES

4    DANIEL LENNARD

5    MARA LEVENTHAL

6    JEFFREY LIESENMER

7    EDAN LISOVICZ

8    JOHN LONGMIRE

9    GARRETT LYNAM

10   LAUREN M. MACKSOUD

11   TIMOTHY MARTIN

12   BRIAN S. MASUMOTO

13   PATRICK C. MAXCY

14   HUGH M. MCDONALD

15   CARRIE MCGAHA

16   SHANNON M. MCNULTY

17   PATRICK FRANCIS MCTERNAN

18   MICHELE MEISES

19   NATHANIEL MILLER

20   JONATHAN E. MITNICK

21   GAYANE MKRTTCHIAN

22   DAVID MOTON

23   MAURA KATHLEEN MONAGHAN

24   PATRICK MORRISEY

25   ANDREW J. MUHA

Page 38

1    GEOFFREY M. MULVIHILL

2    AISLING MURRAY

3    SARA NADIM

4    ALISSA M. NANN

5    EDWARD E. NEIGER

6    GEORGE O'CONNOR

7    MICHAEL PATRICK O'NEIL

8    JAMES FRANKLIN OZMENT

9    STEPHEN POHL

10   KATHERINE PORTER

11   ARIK PREIS

12   MICHELE PULGGARI

13   MARION QUIRK

14   GILLIAN RENDEL

15   CHRISTINA RICARTE

16   ALMA ROBLES

17   JEFFREY J. ROSEN

18   WILLIAM T. RUSSELL

19   JEREMEY W. RYAN

20   JAMES SALWEN

21   DANIEL JOSEPH SAVAL

22   ELIZABETH SCHLECKER

23   PAUL KENAN SCHWARTZBERG

24   MICHAEL SHEPHERD

25   J. CHRISTOPHER SHORE

Page 39

```
 1   ROB SIKO

 2   RICHARD SILBERT

 3   LIANNA SIMMONDS

 4   PAUL M. SINGER

 5   MARC F. SKAPOF

 6   ARTEM SKOROSTENSKY

 7   ERIC J. SNYDER

 8   JOSEPH L. SOROKIN

 9   CLAUDIA Z. SPRINGER

10   CATHERINE STEEGE

11   ERIC STODOLA

12   JEROME TAPEY

13   SARA E. TONNESEN

14   KARA TRAINOR

15   CARL TROMPETTA

16   KELLY TSAI

17   ALICE TSIER

18   JOSEPH TURNER

19   ALLEN J. UNDERWOOD

20   GERARD UZZI

21   MELISSA L. VAN ECK

22   ANDREW D. VELEZ-RIVERA

23   MICHAEL J. VENDITTO

24   ELI J. VONNEGUT

25   RYAN A. WAGNER
```

1    JORDAN WEBER

2    WENDY WEINBERG

3    WILLIAM P. WEINTRAUB

4    ALLISON H. WEISS

5    THEODORE WELLS, JR.

6    LAUREN S. ZABEL

7    DAVID ZYLBERBERG

8                    P R O C E E D I N G S

9            THE COURT:  Okay, good morning.  This is Judge

10   Drain.  We are here in In re Purdue Pharma LP et al.  This

11   is the second day of the hearing on the Debtor's request for

12   confirmation of their amended Chapter 11 plan.  And I have

13   the order of witnesses that was submitted for today and I'm

14   happy to go down that order unless there are any initial

15   housekeeping or other statements.

16           MR. HUEBNER:  Good morning, Your Honor.  For the

17   record, Marshall Huebner of Davis Polk & Wardwell on behalf

18   of the Debtors.  Can I be heard and seen clearly?

19           THE COURT:  Yes.

20           MR. HUEBNER:  Terrific.  Your Honor, three quick

21   matters for me before I turn the virtual podium over to Mr.

22   Kaminetzky.  Number one, with respect to the glitches that

23   happened yesterday (indiscernible) is aware the governmental

24   Zoom system proved complicated for many people who could not

25   get in.  Many people stayed up very late into the night,

Page 41

1    including from the Clerk's office and of course chambers and

2    obviously the private side we have now put in I hope double

3    and triple redundancies to ensure that we're ready to go.

4    Our witnesses already have empty rooms dialed in and are

5    ready to step in as they are allowed to.  So hopefully those

6    complexities will not (indiscernible).  It was no one's

7    fault.  You know, it's governmental Zoom's fault as it were.

8    But it does appear that it's now addressed, and we have

9    backup plans ready to go to repeat any of the complexities

10   of yesterday.

11           THE COURT:  Okay, great.

12           MR. HUEBNER:  Number two, Your Honor, I did want

13   to take the opportunity -- I did not want to cut in

14   yesterday, but you asked Mr. Kaminetzky a question yesterday

15   at the very end, which I actually had about six calls last

16   night to confirm.  I actually knew the answer but I didn't

17   want to jump in until I confirmed it.  So I do want to give

18   the Court the answer for what it is worth.  Obviously I'm

19   just a lawyer, but there is each TDP was actually done by

20   its own group and was done by experts in the field of that

21   category of TDP.  So, for example --

22           THE COURT:  All right.  And since I have Ms.

23   Greenspan, I'll ask her that question, which is fine.

24           MR. HUEBNER:  Okay, yeah.  Again, I'm not sure she

25   was involved in drafting of each TDPs.  I think she looked

Page 42

1   at them afterwards.  But let's see how the day goes.  But we

2   will be ready to discuss that.  And in confirmed with

3   multiple parties last night how their TDPs were done.  And

4   it was definitely absolutely not done by anybody's

5   bankruptcy lawyers.

6           THE COURT:  Okay.

7           MR. HUEBNER:  The last item, Your Honor, is Mr.

8   Troop asked me to announce on the record this morning, which

9   we are certainly happy to do, a few days ago as part of an

10  agreement on several other matters, including removing

11  things in the plan that were proving just unworkable, that

12  were really, you know, arguably for the benefit only of the

13  states that they were willing to live without as well as the

14  Stewart and Timney stipulation which was negotiated by

15  various parties and then presented to the Debtors.  We

16  didn't' negotiate it, the AHC and the UCC and the NCSG

17  negotiated it and then brought it to us, and we were fine

18  with it.

19          The Debtors were asked to pay all of the fees of

20  the NCSG through the date of the end of the third round of

21  mediation before Judge Chapman, where that group obviously

22  split with now approximately two-thirds of that group

23  constituting the 38 states out of 48 who support the plan.

24  Candidly, not an entirely simple proposition for us since

25  obviously most of the plan objectors are actually the

Page 43

1    remaining stub of that group that continues to object.  And

2    it's not typical to say the least to pay the fees for most

3    of the case for people who are very much not on board.

4            Nonetheless, we decided it was just the right

5    thing to do.  And so we will be filing papers in due course

6    that will look a lot like the motions that the Court has

7    seen before with the MSGE and the AHC.  So we will now

8    essentially be paying the fees in the face of the NCSG

9    through the end of round three of mediation for all of the

10   three organized governmental --

11           WOMAN:  How do we -- the speaker.

12           MR. HUEBNER:  Yeah, sorry.  Could the witness in

13   Washington please stay on mute until we're ready?  Thank you

14   so much.

15           So I just wanted to -- Mr. Troop just asked that

16   we let the Court know that.  Again, there will be a full

17   formal motion on notice.  Anyone can say their piece.  But

18   the AHC and the UCC and the MSGE all support the request,

19   and the Debtors ultimately came around to it.  Obviously

20   we're not paying for the fees of the objectors to object to

21   confirmation.  This is through round three of mediation.

22   And, again, it just seems like the right thing to do, and so

23   we did it.  So, Your Honor, that --

24           THE COURT:  Okay.  Just to be clear, those fees

25   aren't being paid until there is a determination on that

Page 44

1    motion.

2          MR. HUEBNER:  Absolutely, Your Honor.  That

3    probably wasn't clear.  We are filing a full motion on

4    notice to be a separate hearing with a proposed order

5    exactly as we do for everything in this case.  But Mr. Troop

6    asked that it be announced this morning just to let the

7    world I guess know that the Debtors have agreed to do this.

8    And we didn't have a reason to not exceed to his request.

9          THE COURT:  Okay, fine.  Thank you.

10          MR. HUEBNER:  So with that, Your Honor, I will go

11    off-camera and on mute and turn the podium over to

12    Kaminetzky and our witnesses for today.

13          THE COURT:  Okay, very well.

14          MR. ROTHSTEIN:  Your Honor, this is Paul Rothstein

15    for Dr. Masiowski.  I just have one really minor

16    housekeeping matter.  I don't know whether you want me to

17    bring it up now or at the end of the day in regards to

18    Christina Pullo of Prime Clerk.

19          THE COURT:  Why don't you go ahead?

20          MR. ROTHSTEIN:  Okay.  So I just would like to be

21    able to know what the Court said they were going to defer

22    ruling as to whether the information we requested yesterday

23    regarding the people in the hospital trust that voted no as

24    to whether we can get the granular data on that --

25          THE COURT:  No, that should come up when I hear

1    your argument on this issue.  I'm not even sure how it ties

2    into any issue before me.  So it is premature to raise it at

3    this point.

4            MR. ROTHSTEIN:  All right, thank you.

5            THE COURT:  Okay.

6            MR. KAMINETZKY:  Good morning, Your Honor.

7    Benjamin Kaminetzky of Davis Polk for the Debtors.

8            Before we turn to the first witness who is teed

9    up, Ms. Deborah Greenspan, I want to just provide an update

10   with respect to two other witnesses, Jesse DelConte and

11   Lianna Simmonds.

12           As Your Honor is aware, the insurer group filed a

13   motion in limine at Docket 3514 with respect to certain

14   testimony, very limited, offered by Jesse DelConte and Ms.

15   Lianna Simmonds.  The Debtors, the Ad Hoc Committee, and the

16   Insurers Group, including Travelers, are engaged in good

17   faith negotiations with respect to that motion in limine.

18   So according, the insurer group agreed not to be crossing

19   Mr. DelConte or Ms. Simmonds today on the issues covered by

20   that motion in limine.

21           The Debtors will call Mr. DelConte and Ms.

22   Simmonds back to the extent that motion in limine is not

23   worked out.  Obviously we have -- you know, we believe it

24   could and should and will be worked out.

25           So Mr. DelConte's declaration will be offered into

1    evidence and hopefully received into evidence today, will be

2    subject to the issues raised in the insurer's motion in

3    limine, at least until the parties' efforts conclude.

4              THE COURT:  Okay.

5              MR. KAMINETZKY:  The debtors won't be calling,

6    therefore, Ms. Simmonds today as Your Honor may have seen.

7    The only issue relates to the insurance, so she likely --

8    you know, we'll just wait until the motion in limine is

9    worked out and --

10             THE COURT:  And she was not a witness other than

11   to introduce documents.  She didn't offer up any testimony.

12             MR. KAMINETZKY:  Exactly.

13             THE COURT:  So that's fine.

14             MR. KAMINETZKY:  Okay, that's fine.  Also, we have

15   confirmed again with the DMPs with whom we are still working

16   away at a resolution.  So we have the same agreement.

17   They'll forego cross-examination on Mr. DelConte and Mr.

18   Turner.  And if things fall apart, we'll agree to bring them

19   back.  I think that's the most efficient way to proceed,

20   rather than, you know, make them do their spiel when

21   hopefully it won't be necessary.

22             THE COURT:  Okay.

23             MR. KAMINETZKY:  So we've confirmed with

24   (indiscernible) and she is on board with that.

25             Finally, Your Honor, as you mentioned, we had to

Page 47

1    shift around the order of witnesses.  Not the Debtor's

2    witnesses.  We'll proceed in the order that we provided to

3    the Court.  And then, you know, we'll proceed with the

4    witnesses per my email to the Court and to the parties

5    yesterday evening.  Do you want me to read that order so

6    that folks know what's to come, or we could just proceed?

7              THE COURT:  Well, was this order -- the order of

8    witnesses filed?

9              MR. KAMINETZKY:  It's the order of witnesses that

10   we circulated last night.

11             THE COURT:  Was it filed on the docket?

12             MR. KAMINETZKY:  It was not filed -- its original

13   order was not filed on the docket.

14             THE COURT:  All right.  So I'll just read it.  As

15   I have it, it's Ms. Greenspan and Mr. DelConte, who are the

16   Debtor's witnesses.  Mr. Turner, who is also a Debtor

17   witness.  You are not going to actually go ahead with Ms.

18   Simmonds, I guess.

19             MR. KAMINETZKY:  Right.

20             THE COURT:  And then John -- I hope I'm

21   pronouncing this right -- Guard, Jessica Horewitz, Gary

22   Gotto, and Peter Weinberger, each of whom are being offered

23   by the Ad Hoc Committee.  And then witnesses offered up by

24   one or other of the Sackler family members, Timothy Martin,

25   Carl Trompetta, Lawrence Hamermesh, with respect to which

Page 48

1    there is a motion in limine by the State of Maryland,

2    Maureen Chakraborty, Garrett Lynam, which is -- and then

3    Stephen Ives, if we get to those two.

4            MR. HIGGINS:  Your Honor, this is Ben Higgins for

5    the U.S. Trustee.  I had a question on the DelConte matter

6    if that's okay.

7            THE COURT:  Okay.

8            MR. HIGGINS:  As Your Honor is probably aware, the

9    Debtors rely on Mr. DelConte's testimony related to the

10   insurance in support of their arguments on subject matter

11   jurisdiction.  And we had some very limited cross on the

12   insurance piece.  I'm just wondering if they're offering the

13   insurance part today and if it's appropriate for us to cross

14   on those issues today or if we should wait until the motion

15   in limine is resolved, Your Honor.

16           THE COURT:  Okay.

17           MR. KAMINETZKY:  I'm fine either way.  But I think

18   the U.S. Trustee can certainly ask those questions today,

19   because that's not going to be -- his issue won't be

20   resolved by the motion in limine.

21           THE COURT:  All right.  And frankly, I don't think

22   the motion in limine really addresses those issues if I

23   understand them correctly, Mr. Higgins.  So you should plan

24   on asking those today.

25           MR. HIGGINS:  Thank you, Your Honor.

Page 49

1            THE COURT:  Okay.  All right.

2            MR. KAMINETZKY:  And just one final thing, Your

3    Honor, is that Mr. (indiscernible) from your office just

4    asked me to announce that one of the issues yesterday is

5    that folks shouldn't click on the Zoom link, but instead

6    joined with browser and manually enter the password, and

7    that should overcome some of the problems that we had

8    yesterday.  So I thought I would do that (indiscernible).

9            THE COURT:  Okay.  And could I just say if someone

10   does have a problem linking in, they might shortcut being

11   able to link in by reaching out to Mr. (indiscernible) in

12   the clerk's office and he can walk them through it.  But

13   hopefully that's been done with people, as you said, last

14   night and this morning.  Okay.

15           So are we ready to call Ms. Greenspan then?

16           MR. KAMINETZKY:  Yes, we are.  Thank you, Your

17   Honor.

18           THE COURT:  Okay.

19           MR. KAMINETZKY: (indiscernible) Davis Polk &

20   Wardwell LP for the Debtors.  And the Debtor's next witness

21   is Ms. Greenspan.

22           THE COURT:  Okay.  So, Ms. Greenspan, would you

23   raise your right hand, please?

24           Do you swear or affirm to tell the truth, the

25   whole truth, and nothing but the truth, so help you God?

1            MS. GREENSPAN:  I do.

2            THE COURT:  Okay.  And it's Deborah, D-e-b-o-r-a-

3    h, and then next word G-r-e-e-n-s-p-a-n?

4            MS. GREENSPAN:  That's correct.

5            THE COURT:  Okay.  Ms. Greenspan, you submitted a

6    declaration dated August 5, 2021, which attaches an expert

7    report as your direct testimony in this proceeding under my

8    order establishing procedures for this hearing.  The expert

9    report is dated June 15, 2021.  Sitting here today on August

10   13, is there anything in either your declaration or your

11   expert report that you would wish to change?

12           MS. GREENSPAN:  No, Your Honor, I do not wish to

13   change anything.

14           THE COURT:  Okay, very well.  Thank you.

15           So does anyone object to the admission of Ms.

16   Greenspan's declaration or expert report?

17           All right.  I will admit the declaration and

18   expert report as Ms. Greenspan's direct testimony.  And

19   subsumed in that ruling is my determination that she is

20   qualified as an expert on the resolution and implementation

21   of mass claims or mass claims against entities or people and

22   the opinions in her expert report.

23           Does anyone wish to cross-examine Ms. Greenspan?

24   Okay, no one.

25           Let me ask you, Ms. Greenspan, although I did ask

1    counsel this yesterday, did you have any role in negotiating

2    or drafting the actual trust distribution procedures that

3    are in the plan or plan supplement here that you opine on?

4            MS. GREENSPAN:  No.  I did not have any role in

5    drafting or negotiating those documents.

6            THE COURT:  Okay.  And I just want to -- you don't

7    opine as to the propriety of the allocation, do you, between

8    the amount dedicated to the personal injury trusts and the

9    amount dedicated to other claimant recoveries and other

10   trusts under the plan?  That's not a subject of your

11   testimony, right?

12           MS. GREENSPAN:  No.

13           THE COURT:  Okay.

14           MS. GREENSPAN:  I do not opine on those matters.

15           THE COURT:  Right.  All right, very well.  So

16   hearing no one who wishes to cross-examine you on your

17   declaration or your report, you can sign off.

18           MS. GREENSPAN:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           MR. KAMINETZKY:  Mr. DelConte offered two

21   different declarations, one fact and one expert.  I hope

22   Your Honor has that --

23           THE COURT:  I have them both.  So you're calling

24   Mr. DelConte at this point.

25           MR. HUEBNER:  Mr. Kaminetzky, while we're waiting,

1    when you lean back from the mic, your voice really fades out

2    and it's hard for everyone to hear.  So if you don't

3    (indiscernible) really short.  So you have to lean in a

4    little bit.

5           MR. KAMINETZKY:  Lean into that.

6           THE COURT:  Okay.  Would you raise your right

7    hand, please?  Do you swear or affirm to tell the truth, the

8    whole truth, and nothing but the truth, so help you God?

9           MR. DELCONTE:  I do.

10          THE COURT:  Okay.  And it's J-e-s-s-e, new word,

11   D-e-l-C-o-n-t-e?

12          MR. DELCONTE:  That's correct.

13          THE COURT:  Okay.  Mr. DelConte, you submitted two

14   declarations in connection with this hearing under my order

15   establishing procedures for the hearing.  They are intended

16   to be your direct testimony.  The first one is dated August

17   5, 2021 and it is a facts declaration.  Sitting here today

18   and knowing that it would be your direct testimony, is there

19   anything in it that you would wish to change?

20          MR. DELCONTE:  No, there is not.

21          THE COURT:  Okay.  And then in addition to that,

22   you submitted an August 5, 2021 declaration attaching an

23   amended expert report dated August 3, 2021, again intended

24   to be your direct testimony in this case as an expert on

25   liquidation analyses and related issues.  Under my order

Page 53

```
 1    establishing procedures for this hearing, this is intended
 2    to be your direct testimony in the hearing.  Sitting here
 3    today on August 13th, is there anything that you wish to
 4    change in either the declaration or the expert report that's
 5    attached to and incorporated in it?
 6              MR. DELCONTE:  No, there is not.
 7              THE COURT:  Okay.  All right.  Does anyone object
 8    to the admission of either of these declarations?  And I'm
 9    saying that with the caveat that we previously recognized
10    that two parties in the case, their rights are reserved if
11    the Debtors and they do not work out a resolution of
12    potential objections to the declarations to call and cross
13    Mr. DelConte later and/or object as per the motion in limine
14    that was filed.  But does anyone else object to the
15    admission of either of these declarations?
16              All right.  I will admit each of them.  Subsumed
17    in that is the qualification of Mr. DelConte as an expert
18    with respect to the matters covered by his expert
19    declaration, which is primarily -- or is couched in terms of
20    his liquidation analysis for purposes of the plan and the
21    information -- his assessment of the information in it.
22              So does anyone wish to cross-examine Mr. DelConte?
23              MR. GOLDMAN:  Good morning, Your Honor.  Irve
24    Goldman for the State of Connecticut.  Yes, I wish to cross-
25    examine.
```

1          THE COURT:  Okay.  You can go ahead.

2          MR. GOLDMAN:  Thank you.

3               CROSS-EXAMINATION OF JESSE DELCONTE

4    BY MR. GOLDMAN:

5    Q    Good morning, Mr. DelConte.  My name is Irve Goldman.

6    I represent the State of Connecticut in this case.

7    According to Paragraph 11 of your declaration, your

8    assignment in this case was to evaluate whether the Debtor's

9    plan satisfies the best interests of creditors test under

10   Section --

11          THE COURT:  Can I interrupt you, Mr. Goldman?

12          MR. GOLDMAN:  Yes.

13          THE COURT:  Just to be clear, when you are

14   referring to the declaration -- and I think this should go

15   for everyone who wishes to cross-examine Mr. DelConte --

16   let's assume unless you say otherwise that the declaration

17   you're referring to is the expert declaration, not the --

18          MR. GOLDMAN:  Yes, Your Honor.

19          THE COURT:  Not the summary of the plan.  That's

20   the fact declaration.

21          MR. GOLDMAN:  Yes, Your Honor.

22          THE COURT:  Okay.  So I'm sorry to interrupt you.

23   I just wanted to make it clear which declaration we were

24   referring to.  But go ahead.

25          MR. GOLDMAN:  Thank you.  I'll begin over again

Page 55

1    for clarity.

2    BY MR. GOLDMAN:

3    Q    Mr. DelConte, your assignment in this case according to

4    Paragraph 11 of your declaration was to evaluate whether the

5    Debtor's plan satisfies the best interests of creditors test

6    under Section 1129 of the Bankruptcy Code.  Is that correct?

7    A    That is correct.

8    Q    And just so we have a mutual understanding, you would

9    agree with me that that test requires the plan proponent to

10   establish that for those creditors that have not accepted

11   the plan, the recovery they will receive under the plan will

12   not be less than what they would receive in a Chapter 7 case

13   of the Debtors, correct?

14   A    That's correct.

15   Q    Okay.  And in a Chapter 7 case of Purdue and its Debtor

16   affiliates, there would be no third party releases, correct?

17   A    That's correct.

18   Q    Okay.  Could you turn to Appendix A of your report,

19   which is your liquidation analysis?  And specifically Page

20   5, Note 3.

21   A    Okay.

22   Q    Now, you say there that to the extent relevant for

23   purposes of the best interest of creditors test, the

24   liquidation analysis assumes direct claims against the

25   shareholder release parties would be retained.  Is there

1    some question in your mind as to whether the retention of

2    direct claims in a Chapter 7 case is relevant to the best

3    interest of creditors test?

4    A    I'm sorry, there was a little bit of noise.  Could you

5    repeat the question?

6    Q    Is there some question in your mind as to whether the

7    retention of these direct claims in a Chapter 7 case would

8    be relevant to the best interest of creditors test?

9    A    I believe that to the extent that there is value to

10   those claims, they could be relevant to the best interest of

11   creditors test.

12   Q    In Note 3 which we've been looking at, you refer the

13   reader to a section of the disclosure statement for a

14   discussion of the value of such claims in a Chapter 7

15   scenario.  So my question is in Exhibit 1 or in your

16   liquidation analysis that is attached to the report, you

17   don't account for any value for the direct claims of

18   creditors against the shareholder release parties, correct?

19   A    That's correct.

20   Q    So to the extent these claims are relevant to a best

21   interest of creditors test, you are just deferring to the

22   discussion of the value in the disclosure statement?

23   A    That's correct.  We did not feel that we were able to

24   adequately value those claims and that they were estimable

25   for purposes --

1   Q    All right.  It just calls for a yes or no answer.  Now,

2   the disclosure statement at the section you cited also

3   refers creditors to statements that were filed by the

4   Sacklers in support of the Debtor's disclosure statement.

5   So are you also deferring to those statements to the extent

6   the retention of these direct claims is relevant to the best

7   interest of creditors test?

8   A    I understand that the Sacklers have provided various

9   defenses against those claims, and that's what's referenced

10  in that section.

11  Q    And that's what you deferred to in your liquidation

12  analysis, correct?

13  A    One of the facts surrounding the direct claims would be

14  both the claims that certain parties have as well as the

15  potential defense against --

16  Q    Well, could I just interrupt you here?  I'd like an

17  answer to my question.

18  A    Yes.

19  Q    That is what you also deferred to in your liquidation

20  analysis.  Yes or no?

21  A    Yes.

22  Q    To assess the value of direct claims against the

23  Sacklers in a Chapter 7 case, do you think it's a wise

24  choice to rely on statements of the targets of those direct

25  claims for claiming innocence?

Page 58

1    A    I think that is one of the facts surrounding the direct

2    claims.  I don't rely upon what they have laid out as far as

3    their defenses.  You know, I would evaluate that given that

4    they are coming from the Sackler parties.

5    Q    You would take it with a grain of salt is what you're

6    saying in effect?

7    A    Yeah, I think that's a good way to frame it.

8    Q    Okay.  And so far as you were aware, was any attempt

9    made by you or anyone else to ascertain the universe of

10   creditors in these estates that are asserting claims against

11   the Sackler?

12   A    I know that there have been various lawsuits filed that

13   have included the shareholder parties and there has been

14   615,000 claims filed in the he case.  So I would say that,

15   you know, they could all potentially have claims against the

16   shareholder parties.  But outside of that, we haven't done

17   an analysis to try to evaluate which of those specific

18   parties would potentially have claims.

19   Q    And for the liquidation analysis that you did, did

20   anyone -- you or anyone from the Debtors undertake to come

21   up with an estimate of the value of the direct claims of

22   Purdue creditors against any of the Sacklers?

23   A    Based on the facts that there's, as I said before, a

24   number of different claims that third parties could

25   potentially have against the shareholders as well as the

1   number of potential defenses that the shareholders could

2   have against those claims and the fact that there has not

3   been to date any trial taken to judgement that has laid out

4   what potential damages could be allocated based on those

5   claims, we didn't feel that it was possible to adequately or

6   accurately estimate those claims.

7   Q    Is that a long way of saying no?

8   A    We --

9         MR. KAMINETZKY:  Your Honor, I'm going to

10  (indiscernible) colloquy.

11        THE COURT:  I'm sorry?

12        MR. KAMINETZKY:  He answered the question and Mr.

13  Goldman's giving him a hard time --

14        THE COURT:  He can answer it -- this is another

15  question.

16  BY MR. GOLDMAN:

17  A    We considered the claims.  We just did not feel

18  comfortable that we could accurately estimate a value for

19  those claims.

20        THE COURT:  So you didn't, right?

21        THE WITNESS:  So we did not include a value for

22  those claims in the deliberation analysis.

23        THE COURT:  Okay.

24  BY MR. GOLDMAN:

25  Q    And so the disclosure statement narrative is expected

Page 60

1    to address all the direct claims generically, is that

2    correct?

3    A    That's correct.

4    Q    Now, you would agree with me that damage experts are

5    routinely retained to give expert testimony in litigation

6    cases, are they not?

7    A    They are.

8    Q    Yet one was not retained here for evaluating potential

9    damages to the dissenting states' claims or other direct

10   claims against the Sacklers, correct?

11   A    I know that there has been a number of professionals

12   hired by the Debtors that have investigated a number of the

13   various potential claims in conjunction with the evaluation

14   of the shareholder settlement.  I'm not aware of whether or

15   not they evaluated the direct -- how they evaluated the

16   direct claims.

17   Q    Are you aware if any expert was retained to evaluate

18   the value of those direct claims?

19   A    I am not aware.

20   Q    Would it surprise you to know that between the Debtors

21   and the Sacklers, they retained a total of 12 experts for

22   this confirmation hearing?

23   A    I know that there have been a significant number of

24   expert reports filed in conjunction with the confirmation

25   hearing.

Page 61

1    Q    Now, it's been established at the outset of the hearing

2    that the dissenting states here are Connecticut, Washington,

3    Oregon, Maryland, Rhode Island, Delaware, Vermont,

4    California, New Hampshire, and the District of Columbia.  As

5    part of your best interest test assignment, did you

6    determine the amounts those particular states would receive

7    under the plan?

8    A    Under the plan, they would receive a recovery from the

9    National Opioid Abatement Trust, which in the plan has an

10   estimated recovery of approximately $4 billion.  I am not

11   aware of allocations that have been made with the National

12   Opioid Abatement Trust and how those will go to the specific

13   states, but that is generally the pot of money that they

14   will be paid out.

15   Q    So it would be a simple multiplication exercise of

16   whatever allocation percentage of the particular state

17   multiplied by the gross amount.  Is that what you're saying?

18   A    Depending on how that -- as I said, depending on how

19   the allocation is set up in the NOAT, that would determine

20   how the ultimate dollars are distributed to the various

21   states.  To the extent it's simply just a percentage by

22   state, then yes, it would just be the amount of total

23   dollars that go to the National Opioid Abatement Trust times

24   that percentage.

25   Q    Okay.  And you may have answered this, but I just want

Page 62

1  to make sure.  You're not aware of any attempt having been

2  made to estimate or project what the dissenting states would

3  recover if they were permitted to continue their actions or

4  initiate new actions against the Sacklers, correct?

5              MR. KAMINETZKY:  Object.  He (indiscernible) twice

6  already.

7              THE COURT:  I'm sorry, what did you say, Mr.

8  Kaminetzky?  I didn't hear that.

9              MR. KAMINETZKY:  He asked that twice already, the

10  same question.  So I object as asked and answered.

11              MR. GOLDMAN:  I just want to make clear.  I think

12  I asked for all the states for the initial question.  Now

13  I'm focusing in on --

14              THE COURT:  You can answer as to whether there was

15  a state-by-state for the dissenting states' analysis under

16  1129(a)(7) of what they would get on account of their

17  claims.

18  BY MR. GOLDMAN:

19  A    We did not -- in conjunction with the Chapter 7

20  liquidation as shown in the exhibit, the expectation in a

21  liquidation would be that they would receive zero dollars on

22  their claims.  And with respect to the direct claims that we

23  were unable to estimate given the (indiscernible), you know,

24  those -- we obviously did not assign a value to what those

25  potential claims could be.  But to the extent that those

1   states wanted to -- those states were allowed to go after

2   those values, that would obviously put the rest of the plan

3   at risk and would cause the shareholder settlement to fall

4   apart and would potentially cost the estate billions and

5   billions of dollars.

6   Q    Mr. DelConte, in a Chapter 7 scenario where states like

7   Connecticut would be free to pursue their direct claims

8   against the Sacklers, it's conceivable, is it not, that more

9   and more of the Sacklers themselves could become insolvent?

10  A    That would be a possibility.

11  Q    Right.  There would just have to be a judgment or a

12  collection of judgements in an aggregate amount that

13  exceeded the net worth of any individual family member,

14  correct?

15  A    Correct.

16  Q    Are you aware that in documents made available in this

17  case by the Sackler Side A and Side B families, their net

18  worth was reported to be about $10.6 billion?

19  A    Yes.

20  Q    Okay.  So you would just need a judgement or judgments

21  that were greater than that amount if you were looking it in

22  the aggregate.  But if you looked at it individually, it

23  would be a different calculus.  You'd have to look at that

24  individual family member's net worth and then compare that

25  to the amount of the judgment or judgments, correct?

1    A    Correct.

2    Q    Wouldn't that expose them to potential personal

3    liabilities or personal bankruptcies?

4    A    Under the --

5            MR. KAMINETZKY:  Objection.  Beyond the scope of

6    his testimony and calls for a legal conclusion.  I'm not

7    sure --

8            THE COURT:  Well, I just -- I mean, it's -- I

9    guess isn't this the same question as it's conceivable that

10   one or more of the Sacklers themselves would become

11   insolvent?  I mean, you were just putting math to that.

12   Right, Mr. Goldman?

13           MR. GOLDMAN:  Correct.

14           THE COURT:  If there is a judgement you're

15   speaking of that exceeds their assets, they would become

16   insolvent.

17           MR. GOLDMAN:  Yes.

18           THE COURT:  So I think it's -- you've covered this

19   already.

20           MR. GOLDMAN:  Your Honor, if I may, I'm getting at

21   a different angle here.  And I think he's certainly able to

22   answer as an expert in this field and experienced in

23   bankruptcy cases that if one becomes insolvent -- I would

24   think that question could be answered.  And then I have a

25   follow-up.

1           THE COURT:  Well, I think the answer is obvious.

2    If a judgement against an individual is high enough, it goes

3    -- he or she goes bankrupt, or could file bankruptcy.

4           MR. GOLDMAN:  Okay.  I will move on to my next

5    question with that, Your Honor.  Thank you.

6           THE COURT:  Okay.

7    BY MR. GOLDMAN:

8    Q    Mr. DelConte, do you know if any analysis was done as

9    to whether the trust assets of any of the Sackler members

10   would become property of their individual bankruptcy estate

11   if they ended up having to file bankruptcy?

12   A    I'm not aware.

13          MR. GOLDMAN:  I have no further questions,  Your

14   Honor.

15          THE COURT:  Okay.  All right.  Does anyone else

16   want to cross-examine Mr. DelConte?

17          MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

18   the United States Trustee.  May I proceed?

19          THE COURT:  Yes.

20          MR. HIGGINS:  Thank you, Your Honor.

21   BY MR. HIGGINS:

22   Q    Good morning, Mr. DelConte.  My name is Benjamin

23   Higgins and I represent the United States Trustee.  Can you

24   hear me okay?

25   A    Yes.

Page 66

1    Q    Good morning, Mr. Higgins.  Thank you.  In your

2    declaration -- and I should specify your facts declaration,

3    the one that was filed at Docket 3456, you testify regarding

4    the Debtor's insurance policies that would be transferred to

5    the Master Disbursement Trust.  Is that correct?

6    A    That's correct.

7    Q    And you testified that these insurance policies can be

8    lumped into two categories, general liability insurance

9    policies and directors and officers liability insurance

10   policies.  Is that right?

11   A    That's correct.

12   Q    Thank you.  And in your declaration, you testify about

13   the general categories of parties that may qualify as named

14   insureds or additional insureds under the Debtor's insurance

15   policies.  Is that right?

16   A    That's correct.

17   Q    Are you familiar with the plan's definition of

18   shareholder released parties and the list of certain

19   shareholder released parties attached to the disclosure

20   statement at Exhibit H?

21   A    I am generally aware.

22   Q    Are you aware that it contains hundreds of individuals

23   and entities, including unnamed children, grandchildren,

24   unnamed entities and individuals to which assets were

25   transferred, and unnamed businesses and entities owned by

1    some of the identified released parties?

2    A    I am generally aware of that.

3    Q    Isn't it true that in your declaration, you did not

4    identify by name any of the shareholder released parties as

5    being covered by the Debtor's insurance policies?

6    A    I did not name any -- I did not include any of the

7    names of the various people that would be covered under the

8    Debtor parties.  However, I am aware that from some of the

9    work I've done related to the Debtor's D&O policies that

10   there are a number of shareholder parties listed on those

11   policies.

12   Q    And are you aware of how many of the shareholder

13   released parties are covered by the Debtor's insurance

14   policies?

15   A    I am aware that there was a pretty significant number

16   of parties on the Debtor's prepetition insurance policies

17   just given the way that they were structured on the

18   prepetition basis.  I can't give you a number of how many of

19   them are covered.

20   Q    So sitting here today, you don't know how many.

21   A    I would say that the -- from the declarations and in

22   the plan and disclosure statement, you know, I can tell you

23   that there were approximately I want to say a dozen

24   shareholders who at one time or another were directors or

25   officers of the business.  But I can tell you that at least

Page 68

1    those 12 would have been listed on the Debtor's D&O

2    policies.

3    Q    So about 12 out of the hundreds of parties listed on

4    the shareholder released parties list?

5    A    There are more people on the shareholder release

6    parties list than there would have been on the Debtor's D&O

7    policies.  The other -- and again, I do not know every name

8    that's -- everything that's listed on the shareholder

9    release parties list.  But to the extent that there is other

10   companies listed that are formerly owned by the

11   shareholders, the debtor's general liability policies I know

12   have a large number of companies listed on those policies.

13   Not necessarily the D&O ones, but those policies have a

14   number of other named insureds.

15   Q    But sitting here today, you can't specify how many

16   would be covered by the general liability insurance

17   policies?

18   A    That's correct.  I can't give you an exact number.

19   Q    Thank you.  Isn't it true that the insurers that issued

20   the Debtor's insurance policies have either denied coverage

21   for opioid claims subject to the Chapter 11 or reserved

22   their rights to do so?

23   A    I am aware, correct.

24   Q    Thank you, Mr. DelConte.

25        MR. HIGGINS:  No further questions, Your Honor.

1            THE COURT:  Okay, very well.  Does anyone else

2     want to cross-examine Mr. DelConte?

3            MR. UNDERWOOD:  Very briefly, Your Honor.  Allen

4     Underwood, counsel for the Canadian Municipal Creditors and

5     the Canadian First Nations claimants.

6     BY MR. UNDERWOOD:

7     Q    Mr. DelConte, isn't it correct that there is no

8     reference to a review or estimate of the Chapter 7 value of

9     prepetition transfers under Section 548 of the Bankruptcy

10    Code or under applicable state law?  And with that I'm

11    referencing fraudulent transfers.

12            THE COURT:  I'm sorry, where?  I didn't -- that

13    just seemed to be a hanging -- no reference where?

14            MR. UNDERWOOD:  Oh no, by reference to Section 548

15    of the Code, I'm making reference to fraudulent conveyances.

16            THE COURT:  No, but you're saying -- but what are

17    you pointing Mr. DelConte to when you refer to fraudulent

18    transfers?

19            MR. UNDERWOOD:  I apologize.  His expert report,

20    Your Honor.

21            THE COURT:  Okay, the liquidation analysis?

22            MR. UNDERWOOD:  Correct.  Exhibit -- yes.

23            THE COURT:  Okay.  And so just so -- tell me if

24    I'm getting this wrong.  Are you asking Mr. DelConte whether

25    there is any reference to causes of action or recoveries or

Page 70

1    hypothetical recoveries under causes of action for

2    fraudulent transfers under the Bankruptcy Code 548 or 544 in

3    his liquidation analysis?

4            MR. UNDERWOOD:  That's correct, Your Honor.  I

5    apologize.  I didn't phrase it --

6            THE COURT:  Okay.  You can answer that question,

7    Mr. DelConte.

8    BY MR. UNDERWOOD:

9    A    The causes of action that the estate would have against

10   the shareholders on behalf of the fraudulent conveyance on

11   litigation, those are referenced in the he litigation

12   analysis.  And the recoveries are what is assumed under the

13   Sackler settlement in the shareholder settlement on the --

14   in the liquidation analysis.

15   Q    And did you perform that analysis with regard to any

16   creditors other than what I would call insiders or the

17   Sacklers?

18           THE COURT:  You mean transferees?

19           MR. UNDERWOOD:  Correct.

20   BY MR. UNDERWOOD:

21   Q    So, Mr. DelConte, was your universe just the Sacklers

22   or was it all potential recipients of fraudulent transfers?

23   A    We looked at the potential value for causes of action

24   against the shareholders on behalf -- that would be one of

25   the potential causes of action against the shareholders.

Page 71

1    And the valuation of those is included in the liquidation

2    analysis under the Sackler settlement.

3              THE COURT:  And let me just -- when you say the --

4    when you say the shareholder, do you mean just the people,

5    or do you mean the companies that they own?  People have

6    used the term shareholders or Sacklers to include those.

7    Sometimes they don't include them.  What do you mean when

8    you say the Sacklers or the shareholders?

9              THE WITNESS:  I mean the transfers to the

10   shareholders themselves, the Sacklers.

11             THE COURT:  Okay.

12   BY MR. UNDERWOOD:

13   Q    So did you look at transfers to any parties other than

14   the Sacklers during the applicable fraudulent conveyance

15   period?

16   A    I should say that one of the other things -- to Your

17   Honor's question, one of the other things that we obviously

18   looked at that I believe (indiscernible) put a declaration

19   in was other transfers of value that went to the IAC

20   companies, which indirectly benefitted the shareholders.  So

21   we were looking at the transfers of value that went to the

22   IACs as well.

23             MR. UNDERWOOD:  And I have only one other

24   question, Your Honor.

25   BY MR. UNDERWOOD:

Page 72

```
 1   Q    Did you perform an analysis in the context of a Chapter

 2   7 liquidation of applicable potential Section 547 claims,

 3   preference claims that would be available to a liquidating

 4   trustee?

 5   A    We have not included any value for those types of

 6   claims in this analysis.

 7   Q    What was the basis for you not viewing that as a

 8   liquidation asset?

 9   A    We didn't believe that there would be material value to

10   come into the estate on behalf of those actions and that

11   those would likely be eaten up by potential fees going after

12   the -- in prosecuting those potential causes of action.  And

13   because of that, we didn't think it had a material effect on

14   what the ultimate conclusions were drawn from the

15   liquidation analysis.

16   Q    Did you go so far as to actually estimate the potential

17   preference recovery and the potential cost of that

18   litigation?

19   A    We did not.

20   Q    No further questions.  Thank you.

21           THE COURT:  Okay.  Does anyone else want to cross-

22   examine Mr. DelConte?  Okay.  Is there any redirect?

23           MR. KAMINETZKY:  Very brief, Your Honor.  Again,

24   Ben Kaminetzky, Davis Polk, for the Debtors.

25               REDIRECT EXAMINATION OF JESSE DELCONTE
```

Page 73

1    BY MR. KAMINETZKY:

2    Q    Mr. DelConte, Mr. Goldman's first question was have you

3    confirmed that your liquidation analysis does not account

4    for value of the third party claims that, for example, the

5    State of Connecticut or the other dissenting states or

6    objecting states would have or potentially have against the

7    shareholders.  Do you recall that testimony?

8    A    I do.

9    Q    And could you tell the Court why it is that you didn't

10   account or put a value on those causes of action?

11   A    We did not.  We determined that we couldn't adequately

12   estimate the value of those potential claims, you know,

13   based on the fact that, as I testified to before and as laid

14   out in the disclosure statement, the fact that there's a

15   number of different causes of action that various third

16   parties could have against the shareholders, as well as a

17   number of defenses that the shareholders could have against

18   those particular causes of action and the fact that none of

19   those causes of action have been taken to judgement to date.

20   We didn't think that we were accurately able to estimate

21   what that total value could be, so we determined that we

22   should not include that in the liquidation analysis.

23   Q    Now just so the record is clear, is the reason you

24   didn't assign value because of the Sackler's statements of

25   their defenses to those potential causes of action?

Page 74

1    A    No.

2              MR. KAMINETZKY:  That's all I have, Your Honor.

3              THE COURT:  Okay.  Any recross on that?

4              MR. UNDERWOOD:  I would just ask the witness, Your

5    Honor...

6                   RECROSS-EXAMINATION OF JESSE DELCONTE

7    BY MR. UNDERWOOD:

8    Q    Mr. DelConte, it's certainly possible to have retained

9    another expert who could have done some sort of evaluation

10   of the claims or the damages that follow from the claims,

11   correct?

12   A    I think that it would have been very difficult for any

13   expert to come in and attempt to, you know, accurately put a

14   value on it, but the Debtors could have hired somebody.

15   Q    And you don't do any damage analysis, do you?

16   A    I did not.

17             MR. UNDERWOOD:  No further questions, Your Honor.

18             THE COURT:  Okay.  All right.  You can sign off,

19   Mr. DelConte.

20             THE WITNESS:  Thank you.

21             MR. KAMINETZKY:  Your Honor, since the next

22   witness is Mr. Joe Turner, I will turn it over to Mr.

23   McClammy to present this (indiscernible).

24             MR. MCCLAMMY:  Good morning, Your Honor.  Jim

25   McClammy on behalf of the Debtors.  As Mr. Kaminetzky noted,

1    our next witness is Joseph L. Turner, managing director at

2    PJT Partners LP.  I believe he is joining.

3              THE COURT:  Okay, I see him there.  Good morning,

4    Mr. Turner.  Would you raise your right hand, please?  Can

5    you hear me, Mr. Turner?

6              MR. TURNER:  I can, Your Honor.  Can you hear me

7    okay?

8              THE COURT:  Yes.  Would you raise your right hand,

9    please?  Do you swear or affirm to tell the truth, the whole

10   truth, and nothing but the truth, so help you God?

11             MR. TURNER:  I do.

12             THE COURT:  Okay.  And it's Joseph, p-h, next word

13   T-u-r-n-e-r?

14             MR. TURNER:  That's right.

15             THE COURT:  You can take your hand down.  That's

16   fine.

17             MR. TURNER:  Thanks, Your Honor.

18             THE COURT:  And, Mr. Turner, you submitted a

19   declaration in this matter consisting of your expert

20   testimony.  It's dated August 5th, 2021.  Under my order

21   establishing procedures for this hearing, it's intended to

22   be your direct testimony.  Sitting here today on August 13,

23   is there anything in it that you would with to change?

24             MR. TURNER:  No, there's not, Your Honor.

25             THE COURT:  Okay.

1            MR. MCCLAMMY:  And, Your Honor, I would note that

2    you may have mentioned that it was submitted as expert

3    testimony, but we have Mr. Turner here as a fact witness.

4            THE COURT:  Oh, I'm sorry.  Let me just -- okay,

5    fine.  Even as to his valuation analysis?

6            MR. MCCLAMMY:  It's being presented as evidence of

7    what was done and presented for the special committee's

8    consideration and for inclusion in the disclosure statements

9    and not presented as an expert valuation.

10           THE COURT:  Okay.  Thank you for that correction.

11   All right, does anyone object to Mr. Turner's declaration

12   being admitted as his direct testimony?

13           All right, then it's admitted.

14           Does anyone wish to question Mr. Turner?

15           MR. EDMUNDS:  Just briefly, Your Honor.  Brian

16   Edmunds for Maryland.

17           THE COURT:  Okay.

18               CROSS-EXAMINATION OF JOSEPH TURNER

19   BY MR. EDMUNDS:

20   Q    Mr. Turner, in your declaration, you said that PJT

21   Partners considered four scenarios.  Is that right?

22   A    That's right.

23   Q    And are there other alternative scenarios that PJT

24   Partners considered?

25   A    So at the direction of the Special Committee, we did

1    look at further variations of Scenario 3.  But as you think

2    of them as kind of these broad scenarios, no, there were no

3    additional scenarios beyond the four and the variations

4    thereof.

5    Q    No additional ones that you considered.  Is that right?

6    A    Not as part of this analysis.  That's correct.

7    Q    It's possible there could be other variations that

8    could be considered.  Is that right?

9    A    That's correct, yeah.

10   Q    The valuation that you express in Paragraph 22 of your

11   declaration that I understand is not being submitted as an

12   expert valuation, but could you tell me if that included any

13   assessment of the value of the approved claims against its

14   shareholders?

15   A    No, it does not.  That's a valuation of the operating

16   assets of the business.

17   Q    Okay.  Thank you very much.

18          MR. EDMUNDS:  No further questions, Your Honor.

19          THE COURT:  Let me just make sure I heard you

20   correctly, Mr. Edmunds.  Did you say with regard to

21   Paragraph 22, you asked whether that assessment of value did

22   or did not include the estate's claims against the

23   shareholders?

24          MR. EDMUNDS:  A value for the estate's claims

25   against --

Page 78

1            THE COURT:  The estate's claims --

2            MR. EDMUNDS:  -- the shareholders.  Yes.  Yes,

3    Your Honor.

4            THE COURT:  Okay.  Okay.  Does anyone else want to

5    cross-examine Mr. Turner?

6            All right.  Any redirect?

7            MR. MCCLAMMY:  No, Your Honor.

8            THE COURT:  Okay, very well.  So, Mr. Turner, you

9    can sign off.

10           MR. TURNER:  Thank you, Your Honor.

11           THE COURT:  Could I just -- I know we are moving

12   on to the next witness, but I want to make something clear

13   for those people who are not that familiar with the trial

14   procedures for this hearing and their implication as far as

15   the record for this hearing.  If you've been listening,

16   you'll note that the direct testimony by the witnesses has

17   been submitted by declaration or affidavit under penalty of

18   perjury.  And I've sworn in each witness and they've

19   attested to that fact.

20           That obviously saves an enormous amount of time in

21   that the party offering the witness does not need to go

22   through the direct.  It's already a matter of record on the

23   docket.  To some extent, it also helps those who are going

24   to do cross-examination prepare for that cross-examination.

25   However, those who only listen to the trial don't have the

Page 79

1      benefit of those declarations.  They do, however, have the

2      ability to go to the docket of the case and read them at

3      their leisure to see what the declarations state.  Obviously

4      the Court reads the declarations, the parties read the

5      declarations.  And I'm assuming those who have a stake in

6      the case read the declarations since that's the evidence

7      that the Debtor and its allies in this case, such as the

8      party offering the next set of witnesses, are offering in

9      support of confirmation of the plan.

10             But if you want to know more about that testimony,

11     what you need to do is go to the docket, which you can do

12     easily, and pull up the declaration and read it.

13             Okay, so are we ready to proceed to the next

14     witness?

15             MR. KAMINETZKY:  Yes.  As we just mentioned,

16     subject to being -- having to recall Ms. Simmonds once we've

17     worked it out with the motion in limine, the Debtors are

18     finished with their witnesses and I'll turn it over to Mr.

19     Eckstein.

20             THE COURT:  Okay, very well.

21             MR. ECKSTEIN:  Your Honor, good morning.  This is

22     Kenneth Eckstein with Kramer Levin on behalf of the Ad Hoc

23     Committee of consenting states and governmental entities.

24             As Your Honor is aware, the Ad Hoc Committee --

25             THE COURT:  Sorry.  There is a hospital near the

1   courthouse and this happens a couple of times every day with

2   the --

3            MR. ECKSTEIN:  I understand.  That's fine, Your

4   Honor.

5            THE COURT:  The ambulance going by.

6            MR. ECKSTEIN:  I don't know if you can hear me

7   now, Your Honor.

8            THE COURT:  I can hear you fine.

9            MR. ECKSTEIN:  Your Honor, the Ad Hoc Committee

10  has submitted five declarations in support of confirmation

11  addressing various issues that have been joined in

12  connection with confirmation of the plan.  And we've also

13  submitted a memorandum of law that addresses several of

14  those issues.  And we'll deal with those in connection with

15  closing arguments.

16            At this point, I want to just introduce to Your

17  Honor two of my colleagues, Jonathan Wagner and David

18  Blabey, as well as Jenna Hudson of the Gilbert firm.  And

19  they will be handling the next few witnesses that will be

20  giving testimony.  One of our witnesses is not available

21  today, Ms. Jayne Conroy.  And I believe she is scheduled to

22  testify on Monday.

23            So unless Your Honor has any questions for me, I

24  am pleased to turn it over to Jonathan Wagner.

25            THE COURT:  Well, I guess one question only, Mr.

1   Eckstein, which is there are a lot of ad hoc committees in

2   this case.  Again, the people that have been living with

3   this case know I think the members of your ad hoc committee.

4   But could you just describe it so that the record is clear

5   as to who your client is?

6           MR. ECKSTEIN:  Sure, Your Honor.  The committee

7   that I am representing is the Ad Hoc Committee of Consenting

8   States and Governmental Entities.  And as parties who are

9   involved in the case are aware, the Ad Hoc Committee

10  consists of 16 members including (indiscernible) states and

11  the PEC as well as six local governmental entities, cities,

12  and counties.  And we were described as the Ad Hoc Committee

13  of Consenting States since at the outset of the case we were

14  the party that had negotiated the framework for what has now

15  evolved into the Plan of Reorganization, including the

16  initial terms of an agreement that had been reached with the

17  Sacklers subject to the work that had been done by both the

18  Ad Hoc Committee as well as the UCC and the Ad Hoc Committee

19  of Non-Consenting States.  And we have continued to be

20  consenting to (indiscernible) throughout the case and have

21  worked with the company as well as with the other parties in

22  the case closely not only on the development of the Sackler

23  settlement, but also on issues that will be the subject of

24  testimony today, including the abatement plan, the

25  allocation among states, as well as a wide variety of other

Page 82

1   issues pertaining to the creation of Newco and other items

2   that are essential to the plan of reorganization.

3              So Your Honor will hear testimony from several Ad

4   Hoc Committee witnesses that will address allocation, the

5   abatement, the attorney fee structure, as well as a variety

6   of other issues that were principally focused on by the

7   members of the Ad Hoc Committee over the entire duration of

8   the case.

9              THE COURT:  Okay.  And just one other question.

10  The PEC that you referred to, that's -- correct me if I'm

11  wrong, that's the Plaintiff's Executive Committee in the

12  multidistrict litigation that was pending in the Ohio

13  District Court before the filing of this Chapter 11 case?

14             MR. ECKSTEIN:  That is correct, Your Honor.  They

15  were actively involved, as Your Honor knows, in the

16  litigation from its inception and were integral members of

17  the negotiations that took place leading up to the

18  bankruptcy, including the negotiations that took place in

19  Cleveland during the spring and summer of 2019.

20             THE COURT:  Okay.

21             MR. ECKSTEIN:  And they've remained active members

22  of the Ad Hoc Committee throughout the Chapter 11.

23             THE COURT:  Okay, very well.  So I'm not sure

24  whether Mr. Blabey or Mr. Wagner is going to do this, but

25  I'm happy to proceed now with your witness, who is Mr.

```
1    Guard?

2              MR. ECKSTEIN:  Mr. John Guard from the State of

3    Florida.  He is Chief Deputy for the State of Florida.  And

4    my partner, Jonathan Wagner, is going to be handling that

5    direct.

6              THE COURT:  Okay.  So, Mr. Guard, would you raise

7    your right hand, please?  Do you swear or affirm to tell the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10             MR. GUARD:  I do.

11             THE COURT:  Okay.  And it's John, J-o-h-n, new

12   word, G-u-a-r-d?

13             MR. GUARD:  Yes, sir.

14             THE COURT:  Okay.  Mr. Guard, you submitted a

15   declaration in this matter.  It's dated August 5, 2021.

16   Under my order establishing procedures for the hearing, it's

17   intended to be your direct testimony in the hearing.

18   Knowing that and sitting here on August 13, is there

19   anything in your declaration that you would wish to change?

20             MR. GUARD:  No, Your Honor.

21             THE COURT:  Okay.  So does anyone object to the

22   admission of Mr. Guard's declaration as his direct

23   testimony?  All right.  I will admit it.

24             Does anyone want to cross-examine Mr. Guard?

25             MR. WAGNER:  Your Honor, before we start this,
```

Page 84

1    it's Mr. Wagner.  Before Mr. Cahn begins his cross-

2    examination, we got a few minutes ago, really, after the

3    hearing this morning began, a document that Mr. Cahn wishes

4    to use during the cross-examination of Mr. Guard.

5            The document is a memorandum from Mr. Guard to

6    other state attorneys general.  I don't know why we're just

7    receiving it now for use as cross-examination.  The document

8    implicates the common interest privilege issues that we've

9    flagged for Your Honor.  And if West Virginia wanted to --

10   if Mr. Cahn and West Virginia wanted to use this document,

11   they really had a responsibility to let us know sometime

12   before this hearing began.

13           We heard from the State of Washington last night.

14   They want to use the document.  That was fine.  The document

15   is probably helpful to the Ad Hoc Committee, but that's not

16   the point.  The point is that the document is protected by

17   the common interest privilege.  Two agreements signed by

18   west Virginia.  The document says on it internal,

19   deliberative, do not produce.  And the attorneys general,

20   some of whom are on this call, they jealously guard their

21   common interest.

22           In the few minutes we've had between the time we

23   got the document and now, we've checked with members of our

24   committee and they object to the use of the document.  I

25   would ask either -- it's a document communication amongst

```
 1    lawyers protected by common interest.  I would ask that

 2    either Your Honor exclude the document or that the

 3    examination with respect to the document be upheld in

 4    abeyance pending Your Honor's ruling with respect to the

 5    document.

 6              THE COURT:  Okay.  Mr. Troop, I know you were

 7    interested not in this document, but in other documents that

 8    implicated the common interest agreement and privilege.  Do

 9    you have anything to say on this one?

10              MR. TROOP:  Yes, Your Honor.  First of all, I want

11    to thank Mr. Wagner and his colleagues for sending me the

12    document.  It was not produced to us by West Virginia or its

13    counsel, notwithstanding the fact that we've engaged on

14    common interest privilege issues.

15              I've only had a chance to read it because I just

16    saw the email literally as Mr. Guard's picture illuminated

17    on the screen.  But I do agree, Your Honor, this is the

18    exact kind of document and communication that is subject to

19    the common interest agreements between the states.  And

20    whether it's helpful or hurtful to the AHC's position or

21    West Virginia's position.  Those agreements have a very

22    significant purpose to permit the kind of discussions among

23    states that can lead to resolution.  And as a result, I

24    would join the request that it be excluded completely.  Or

25    if not, we can continue these conversations more either in-
```

Page 86

1    camera, or in your chambers, or nay way that you think most

2    appropriate.

3            THE COURT:  Okay.  Mr. Cahn, is there any dispute

4    that this is covered by the common interest agreement?

5            MR. CAHN:  No, Your Honor.  But -- and I didn't

6    necessarily intend to argue the merits of whether or not the

7    confidentiality provisions of these pre-bankruptcy common

8    interest agreements should continue to hold under the

9    current circumstances.  I didn't intend to argue the merits

10   of that now.  And actually, I only have one or two questions

11   that I intended to ask Mr. Guard based on this document

12   (indiscernible).

13           Your Honor, I would observe that Mr. Guard's

14   declaration clearly puts front and center all of the

15   negotiations that took place between various states over the

16   four-plus years that these issues have been considered.  And

17   I think at this point in time to exclude any document or any

18   evidence that (indiscernible) this process would be giving

19   parties other than the Ad Hoc Committee and the Debtors an

20   unfair advantage here.

21           Nevertheless, having said that, I am happy to hold

22   this issue in abeyance for further discussion.  Because as I

23   said, I don't think the Court necessarily wants to engage on

24   the merits of this issue at this time.

25           THE COURT:  I mean, look, I think the parties to

Page 87

1    that agreement have their rights under the agreement.  If

2    they can waive them, then I think they have to do it

3    collectively.  And I'm just hearing that that's not been

4    done with regard to this.  So I'm not sure what it means to

5    hold it in abeyance.  Mr. Guard is scheduled to testify

6    today.  I'm sure he is a busy person.  This hearing is on a

7    timetable to be finished.  It just seems to me that under

8    those circumstances that the document should be excluded.

9           MR. CAHN:  Well, of course I don't agree with

10   that.  But what I will do is let me proceed with my cross-

11   examination.  And, you know, perhaps we'll see at the end of

12   the cross that we won't need to refer to this document.

13          THE COURT:  Well, that's fine.  And perhaps during

14   that period the parties to the agreement may decide to waive

15   it.  I don't know.  But if they don't, then I don't see

16   where we go beyond what I've already ruled.

17          So why don't you go ahead, Mr. Cahn, with cross.

18          MR. CAHN:  Very well, Your Honor.

19          THE COURT:  Okay.

20             CROSS-EXAMINATION OF JOHN GUARD

21   BY MR. CAHN:

22   Q    Good morning, Mr. Guard.  Can you hear me clearly?

23   A    I can.

24   Q    Thank you.  You say in your declaration that you first

25   engaged with the allocation issues in late 2018.  And in

1   Paragraph 12, you described the elements that relate to the

2   proposal as you first encountered it.  And I note that one

3   of the factors that you identify is state population.  The

4   other three factors, were the other three factors also

5   dependent to a considerable extent on population?

6   A    No in the sense that -- I mean, I guess I don't

7   necessarily understand your question.  I mean, the other

8   three factors deal with raw numbers.  And I guess to the

9   extent that somehow those raw numbers increased because

10  there are mor people in certain states and less people in

11  other states, if that's what your question is getting at,

12  then I guess that answers your question.  But no, they are

13  raw numbers of the number of occurrences that occur in each

14  state.

15       So the first factor was the morphine milligram

16  equivalents.  So that would be the number of morphine

17  milligram equivalents, the number of pills for lack of a

18  better term, shipped into a state.  So there may be some

19  impact that having more people, there might be more pills

20  prescribed.  But that would be the extent of it.

21  Q    Right.  Okay.  And I'm sorry if my question wasn't

22  clear.  But, for example, in Paragraph 27, you referred to

23  an example by comparing the populations of California and

24  West Virginia and noting the substantial difference in per

25  capita opioid death rate in those two states.  And

1    nevertheless, applying those figures as you've done in your

2    -- I'm sorry, Footnote 1 on Page 9 of your declaration, you

3    note that California would have roughly three times the

4    number of deaths that West Virginia had even though West

5    Virginia, according to your figures, West Virginians have

6    eight times the likelihood of dying from opioid abuse.

7         So isn't that an example of how -- of necessity raw

8    population numbers affect each one of the other two

9    categories that are identified in Paragraph 12 of your

10   declaration.

11            MR. KAMINETZKY:  Objection to form.

12            THE COURT:  Let me see if I can ask the question.

13   Just turning to the paragraph that Mr. Cahn referred to,

14   Paragraph 22 --

15            MR. CAHN:  Twenty-seven, Your Honor.

16            THE COURT:  I'm sorry, 27.  Do you agree that

17   there is a -- that the footnote, Footnote 1 in Paragraph 27

18   can be read as an example of how there may be more deaths in

19   a highly-populous state like California, which would be a

20   potential tie-in to the second metric in Paragraph 12, i.e.

21   an adjusted metric reflecting the approximate deaths related

22   to opioids?

23            THE WITNESS:  There is a relationship between

24   population and the metric.  It is not a perfect or direct

25   relationship, but there is a relationship.  And so

1    increasing population or -- well, I guess I could do it this

2    way, Your Honor.  If two states had the exact same rate and

3    one of them was -- what we were trying to solve for is if

4    two states have the same opioid overdose death rates and one

5    state had a population ten times smaller than the other,

6    under the approach advanced by some states, they would have

7    been treated the same even though the state that had ten

8    times more, you know, people would have had ten times the

9    number of deaths.  So the increase in population does have

10   some relationship, but it's not just driven by population I

11   guess is my point and my quandary with the questions that I

12   was being asked.

13            THE COURT:  Okay.  Mr. Cahn, you can go on.

14            MR. CAHN:  Thank you, Your Honor.

15   BY MR. CAHN:

16   Q    Mr. Guard, the formula as you first encountered it in

17   November of 2018, can you identify or recollect the

18   respective weights that were given to each of the form

19   factors that are outlined in that paragraph?

20   A    The first one that I encountered the formula, I believe

21   it was even for each of the four categories in November of -

22   - I guess it was November 2018.  And then in between

23   November and sometime later, there was a change and it said

24   other metrics were increased.

25   Q    So 2018 it was 25 percent for each of the four

Page 91

1   categories.  Is that correct?

2   A     That is correct.

3   Q     Thank you.  In Paragraph 17, you identify the -- your

4   proposal as it was in April of 2019, or roughly five months

5   later if I'm counting correctly.  And each of the factors

6   was the same, but were the weights the same at that point?

7   A     No.  At that point in time, I believe the morphine

8   milligram equivalence units was -- that rate was increased

9   at the expense of the other metrics.

10  Q     And do you recall how much it was increased?

11  A     I do not.  I believe it was around 28 or 31, but I

12  cannot remember clearly which one of those it was.

13  Q     And do you know the reason for that change in the

14  weights?

15  A     I believe they were internal discussions and a decision

16  was made by the Remedies Committee to weight it differently.

17  Q     Do you -- Mr. Guard, do you know why either in November

18  of 2018 or April 2019, do you know why population was added

19  as a standalone factor in addition to the three other

20  categories?

21  A     Well, the problem with the three categories are that

22  each of those metrics -- I mean, none of them were intended

23  for allocation.  And each of those metrics has issues with

24  it.  For example, in some states, you do not have medical

25  doctors that serve as medical examiners.  And so you have --

Page 92

```
1    in some states you have elected people who get to determine

2    whether causes of death are listed and what cause of death

3    is listed.  And so I think in all states it's true that the

4    number of opioid deaths are underreported.  But in some

5    states, there is a difference in the level of

6    underreporting.  And so it's not -- so that's one example.

7    Morphine milligram equivalents as another example is while

8    the pills may be shipping to one state, during the opioid

9    crisis, we saw people traveling across the country to get

10   pills.  So the fact that pills were shipped and prescribed

11   in particular states and dispensed would not necessarily

12   mean that the pills ended up being consumed in that state.

13   And the third metric, the survey for pain reliever use

14   disorder order, is a self-report measure where you are

15   relying on people to say that they have a problem and

16   issue., and so, you have a huge level underreporting, and

17   that level varies by state depending on what kind of

18   substance abuse treatment and the help each state utilizes.

19   So population was added to try to -- in a way, to try to

20   deal with the issues that existed for the other metrics and

21   population was and is a typical metric that is utilized in

22   state attorney general's settlement.  It's not used in every

23   settlement, every work settlement, that it is one that is

24   routinely considered and routinely used.

25   Q    Well, okay, thank you for that answer.  But in
```

Page 93

1   Paragraph 19, you note that including population as a metric

2   would not help your state, Florida, to earn a greater share

3   of distributions.  Did you ever consider or did your office,

4   or your administration ever consider supporting a formula

5   that either eliminated or deemphasized population?

6   A    No, because General Moody's administration was trying

7   to reach consensus with the other states, and we also

8   recognized fairly early on the limitations of the other

9   metrics.  And so, given the limitations, given where other

10  states were and given the direction that the Attorney

11  General of the State of Florida, you know, gave me, which

12  was to try to develop consensus in a way so that we could

13  settle all these cases, not just the Purdue matter; that

14  wasn't contemplated or considered.

15  Q    In Paragraph 27, which we referred to earlier, we

16  talked about the discrepancy in the per capita death rates

17  between -- you specifically noted the difference between

18  Washington and California.  And as we talked about earlier,

19  under your figures, West Virginians were eight times as

20  likely to die from opioid abuse as were Californians.

21  Wouldn't this argument militate in favor of being more

22  solicitous of states such as West Virginia, which has such a

23  high relative death rate?

24  A    No.

25  Q    And why is that?

Page 94

1    A    Well, you know, the economic effects of the opioid

2    epidemic, our numbers are actually -- I mean, if you have --

3    and if California has more people that are addicted to

4    opioids, to get them treated.  Treatment is like a per-

5    person cost.  There is a cost that is associated with per

6    person.  So while I think -- and I don't want any of my

7    testimony to in any way suggest that the opioid epidemic has

8    not been devastating to West Virginia -- it has.  It's been

9    devastating of all the states.

10            But, I mean, you're talking about things like

11   paying for treatment and paying for treatment is going to be

12   a per kind of patient cost and it's going to, frankly, it

13   probably varies by state depending on what kind of

14   healthcare infrastructure there is, but there is a per-unit

15   cost.  And so, the same thing with people dying, that the

16   effects is you're losing, you know, tax revenues, you're

17   losing other amounts of money and as a kind of per-

18   individual cost.

19            So while I think that those rates do tell you

20   where you have a concentrated problem and may, you know, in

21   a perfect world, you know, it'd tell you where you need to

22   focus or where there needs to be something done.  When

23   you're looking at trying to develop an allocation or you're

24   looking at trying to figure out how money should flow, you

25   know, the fact that their rate is higher doesn't necessarily

1    -- on a per capita basis, doesn't necessarily tell you

2    anything.

3            Again, I go back to my example.  If, you know,

4    there's the state of Alabama and the state of Florida had

5    the exact same rates, Florida is, you know, many times

6    bigger than the state of Alabama and there would be more

7    people that would have opioid addiction in Florida than in

8    Alabama.

9            So, you know, I don't think that just because the

10   per capita rate is higher and even considerably higher --

11   again, I don't mean to diminish or demean what is going on

12   in West Virginia in the slightest -- I don't think that

13   really tells you much about how money should flow.

14   Q    Just to be clear, Mr. Guard, you've spoken about

15   economies of scales.  You are not an economist; is that

16   correct?

17   A    I am not.

18   Q    Thank you.  I understand everything that you said, but

19   is it not a fact that under the current allocation

20   methodology, the state of California will receive fully 10

21   times the amount of distribution that West Virginia will; is

22   that correct?

23   A    I think it's a little less than 10 times, but it's more

24   than 9 times, so it's -- I'm not -- I don't want to quibble

25   with you, but I do want to be accurate.  They're getting

Page 96

1    about 10 percent or a little bit over 10 percent, I think

2    it's 10.2, and West Virginia's getting 1.15 percent.

3    Q    Actually, I think it's 1.16, but again, let's not

4    quibble.  Thank you.  And is, in your view -- and again with

5    respect to everything you said by way of explanation, does

6    10 times or 9, the same amount times multiple seem like a

7    fair allocation to you?

8    A    Well, I don't know what you mean by fair.  I mean, this

9    was a negotiated solution here that we spent two years

10   negotiating over.  You know, fair involves some kind of

11   subjective view of things.  I think in the end, it is fair

12   in the sense that on multiple occasions, we were able to get

13   states to compromise and improve the situation for states

14   like West Virginia.  And we were -- and so, like any

15   negotiation, we ended up at a point where I'm sure if you

16   talked to California, they don't think the allocation is

17   fair.  And usually that's -- we have a good agreement or a

18   good kind of consensus position, all the parties, to some

19   degree, feel like it is "not fair" to them.

20   Q    In Paragraph 29, you indicate that California refused

21   to contribute to the 1 percent intensity claim that you've

22   established.  Do you have a reason for that refusal?

23   A    I think, without reviewing because I'm trying to be

24   very careful with the privilege here and I'm not trying to

25   waive California's privilege in the slightest, I think that

Page 97

1   thought they had given enough in the negotiation, and they

2   were unwilling to give more.

3   Q    Okay.  Did you have any -- I'm not asking you for the

4   content at this point.  Did you have any conversations with

5   any representatives of California about this issue?

6   A    I did.

7   Q    And can you tell me who those conversations were with?

8   A    Melanie -- what's Melanie's --

9   Q    Cyganowski?

10  A    No, Melanie -- my attorney.

11  Q    (indiscernible) or no?

12  A    Melanie, I think it's Fontes Rainer.  It was the head

13  of the group for California that was dealing with the opioid

14  litigation.

15  Q    And are you familiar with the rank in which California

16  stands on the intensity measures that have been developed?

17  A    I don't know specifically where they stand.  I know

18  generally that they have a lower intensity rate than -- you

19  know, they're definitely in the bottom half.  I don't know

20  exactly where they fit on "intensity" measures.  And I'm

21  assuming by intensity measures, you mean the workout in the

22  measures.

23  Q    It, for the fact -- well, let me (indiscernible).

24  Thank you.  You referred in Paragraph 33 to conversations

25  that you have with West Virginia's Attorney General Patrick

1    Morrissey.  Did you -- I'm pointing at that West Virginia,

2    and I quote, "wanted a larger allocation."  Did you explore

3    what Attorney General Morrissey, the reasons why West

4    Virginia wanted a larger allocation?

5    A    He had, at one point in time, did indicate why.

6    Q    I'm inviting you, as counsel for West Virginia, to

7    stand on that answer.

8            MAN:  Your Honor, just as long as that's perceived

9    as a waiver with respect to common interest for all the

10   other states.

11           THE COURT:  Okay.  All right, you can go ahead,

12   Mr. Guard.

13           THE WITNESS:  Well, I think that my understanding

14   was that General Morrissey was under clinical pressure from

15   members of the PEC, based on his prior settlements with the

16   distributors, and, you know -- and also because of the

17   intensity that West Virginia had experienced.  So I think he

18   was, you know, trying to do right by the folks that he

19   served and wanted to get more of an allocation and there was

20   a political reality also existing.

21   BY MR. CAHN:

22   Q    But I take from your answer that it wasn't just because

23   West Virginia wanted more money to build a statute or

24   somebody or whatever.

25   A    No, I don't think any Attorney General was intending to

1   build a statute of anybody.  I think every -- my take from

2   all of the dozens upon dozens of sessions and phone calls

3   and negotiations that I took part in, is that all the

4   Attorneys General are committed to trying to fix the

5   situation we find ourselves in with the opioid epidemic.

6   Q    In Paragraphs 36 spilling over into 37, you note that

7   West Virginia proposed a plan, including a ranking of the

8   consenting states in October 2019.  Have you familiarized

9   yourself with -- did you familiarize yourself with that

10  plan?

11  A    Not particularly.  I got it I think the evening before

12  at, like, 11:00 I believe, sometime late in the evening the

13  night before we were having that meeting.  I did look over

14  it.  I did at the time put it on -- I think especially the

15  next morning, but I haven't reviewed it since.

16  Q    I'm sorry.  I missed the last part of your answer.

17  A    I have not reviewed it in depth since.  You know, other

18  than I do believe that I did look at it to fill in the

19  information that is Paragraph 37.

20  Q    Did you speak to anybody from West Virginia or a

21  representative of West Virginia about the plan either at

22  that time or subsequently?

23  A    Well, I spent the entire day with General Morrissey, so

24  I definitely spent time with General Morrissey.  I believe

25  your expert was present or someone from your -- that General

Page 100

1    Morrissey had brought to that meeting.  And so, those are

2    the only two folks from West Virginia that I would have

3    spoken to.  I think they were the only two folks at that

4    meeting.

5    Q    By our expert, are you referring to Dr. Charles Cowan?

6    A    Yes.  I believe that was the gentleman that was there,

7    though, I just -- I remember him saying he was a doctor, and

8    I don't -- and I want to say that his last name was Cowan,

9    but I -- you know, again, it was a very limited interaction

10   with him.  I spent -- I had many more conversations or much

11   more conversations with General Morrissey himself.

12   Q    Recognizing that you haven't familiarized yourself with

13   that plan, are you -- are we generally in agreement that if

14   severely deemphasized population and focuses attention were

15   on intensity measures; is that fair to say?

16   A    What I remember from it being struck is how much West

17   Virginia benefited at the expense of basically half the

18   country.

19   Q    Well, are you familiar with the distributions made

20   under the SAMHSA program?

21   A    Not specifically, but generally, yes, I'm familiar with

22   the different distributions that occur under -- that has

23   evolved under SAMHSA, but it is not uniform.

24   Q    And for the record, let me just clarify we're talking

25   about the Substance Abuse and Mental Health Services

1    Administration?

2    A    That's correct.

3    Q    Okay.  And are you aware that West Virginia

4    consistently receives at least 3 percent of the funds

5    distributed under that program; are you aware of that?

6    A    I think I'm aware of at least one year where it did

7    after, I believe, there was intervention by the senators

8    from the state of West Virginia.

9    Q    Well, I'm not going to ask him about -- that's not in

10   evidence.  You say that in Paragraph 38, and I quote, "West

11   Virginia's proposal...," and I'm talking about at the

12   Atlanta meeting.  I think it's at the Atlanta meeting,

13   forgive me.  Yes, the Atlanta meeting of consenting states

14   in October 2019.  West Virginia made a proposal which -- and

15   again, I'm quoting -- "Did not garner significant support

16   amongst the consenting states."

17          Can you tell us how many states and your state

18   spoke either for or against West Virginia's proposal?

19   A    I don't believe any states spoke in favor of West

20   Virginia's proposal.  My memory is that Alabama and New

21   Mexico also spoke against, I guess the Denver plan

22   generally, but no one that I can recall spoke in favor of

23   the West Virginia proposal.

24   Q    And in Paragraph 42, you report the adoption of New

25   York proposing they allocate 15 percent of the total

Page 102

1    distributions to the states using the PEC metrics.  Isn't it

2    a fact that the PEC metrics do not include population as a

3    standalone metric?

4    A    They do not.

5    Q    The final adoption of a debated plan, which now

6    comprises 85 percent of the allocations to the states, do

7    you recall what the weight given to population is in that

8    proposal?

9    A    I believe it's 31 percent.

10   Q    Which is more than any other factor; is that correct?

11   A    I believe so, yes, but it's far less than what other

12   states wanted it to be.

13   Q    I understand.

14          MR. CAHN:  Thank you, Mr. Garner.  No further

15   questions.

16          THE COURT:  Okay.  Does anyone else want to

17   question Mr. Guard?

18          MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson

19   O'Neill on behalf of the State of Washington.

20          THE COURT:  Okay.

21   BY MR. O'NEILL:

22   Q    Good morning, Mr. Guard.

23   A    Good morning.

24   Q    As the colloquy at the beginning of the last

25   examination indicated, there are common interest issues

Page 103

1   here.  And to the extent my questions get anywhere near

2   that, I hope that you will help me (sound glitch) it and I'm

3   sure Mr. Wagner and Mr. Troop will jump in.  In your

4   declaration at Paragraph 47, if you could turn to that.

5   A    Yes.

6   Q    In this section -- it's not just Paragraph 47, but the

7   following ones as well -- you discuss the efforts by the

8   states, the local governments, and actually the private

9   trusts as well focusing on abatement as the priority for the

10   NOAT Trust; is that correct?

11   A    I'd almost -- well, it turned out to be the NOAT Trust.

12   At the time, I don't think we even had an idea about NOAT

13   from the start.  Obviously, the abatement strategies that

14   are listed here apply and I think across every settlement,

15   so I don't think it was specific as to Purdue or NOAT.  But

16   I guess the answer to your question is maybe

17   (indiscernible).

18   Q    That's actually a fair point.  My next question was the

19   discussion you had here about abatement strategy.  The place

20   in the plan where it's implemented is through the NOAT

21   document, which is Exhibit JX-1620; is that correct?

22   A    Yeah.  I think that exhibit -- I don't have the exhibit

23   number on it, but it's Docket No. 3232, and I think from the

24   email that I got from your office, that would be right.

25   Q    And it's my suspicion, Mr. Guard, that you are familiar

Page 104

```
1    enough with that document that you can probably cite to it

2    without even having to look at it.  Is it true that in the

3    NOAT agreement, it requires the local governments and states

4    that receive funds from it to expend those funds on approved

5    uses that you describe in your declaration?

6    A    Yes, except for 5 percent.

7    Q    Yeah.  In fact, it's virtually all, it's 95 percent of

8    it; is that correct?

9    A    That is correct.

10   Q    And you referenced just a minute ago that this set of

11   abatement strategies has been applied in other settlements

12   as well within the opioid industry; is that correct?

13   A    Yes.  It is featured in both the distributor settlement

14   and the Janssen settlement.

15   Q    And I believe it's also part of the Mallinckrodt

16   bankruptcy; is that correct?

17   A    Assuming that that plan gets confirmed, yes, it's part

18   -- I believe it's part of the plan.

19   Q    All right.  Now in the case of the states, there are 48

20   states that were involved in the bankruptcy.  There were two

21   states that had settled separately; is that correct?

22   A    In Purdue, yes.

23   Q    There are also several thousand local governments that

24   were involved in the negotiations over the abatement

25   strategy; is that correct?
```

Page 105

1    A    The PEC was actively involved.  I don't know what they

2    did with the document, but I assume they sent it out to

3    their clients.

4    Q    The federal government's also been consulted and has

5    had an opportunity to approve these list of abatement

6    services?

7    A    Yes.  We received an email from an assistant United

8    States attorney that we were negotiating with after we had

9    multiple calls with the Department of Health and Human

10   Services and the Department of Justice about these issues.

11   Q    Do you know if any of the -- any of the states, whether

12   objecting or supporting of this plan, have objected on the

13   basis of these abatement strategies?

14   A    I'm unaware of it.

15   Q    Would you agree with me that these abatement strategies

16   are fully consensual as to all of the states and the local

17   governments, at least to the extent they've entered into

18   this agreement, as well as the federal government?

19   A    I guess I want to -- and so I understand your question.

20   My understanding is that the lawyers representing all those

21   parties agreed to these being the abatement strategies.  If

22   that answers your question, then yes.  You know, again, I

23   don't know if the 3,000 individual local governments all

24   voted yes, and I don't -- you know, I assume that -- I don't

25   know how the United States voted as far as this plan.

Page 106

1        But, I mean, they sent us an email indicating they

2   were accepting of these being the abatement approved uses of

3   the money.

4   Q    And Mr. Guard, you spent, as you indicate in your

5   declaration, thousands of hours working on this plan; is

6   that correct?

7   A    Hundreds if not thousands, yes.  I mean, we're part of

8   the group that was doing the day-to-day, week-to-week,

9   involved in all the mediations.

10  Q    If -- you may know this, but if you need to refer to

11  the document, I can direct you to it.  But the plan or the

12  NOAT Trust also requires that each state that participates

13  in it set up what's called a government participation

14  mechanism; is that correct?

15  A    It does if they do the default mechanism.  If they

16  enter into a statewide agreement with their subdivisions,

17  there may be ways not to do it if their subdivisions agree

18  to it.

19  Q    The other alternative is to set up what you call the

20  statewide agreement, that is an agreement between the state

21  and its local governments on how to administer these funds.

22  A    That's correct.

23  Q    That is a significant part of this plan and represents

24  an extraordinary cooperation between local governments and

25  states on this abatement plan; is that correct?

1   A    It is, at least from my background and knowledge, I've

2   never seen a united or collaborative effort what is proposed

3   in this plan to be tried -- to be attempted to be

4   accomplished.

5   Q    Can you think of any other plan where you have the

6   support of 48 states, the federal government, and several

7   local governments in favor of a public health benefit like

8   this?

9   A    I cannot, no.  Cases like this do not exist on a

10  regular basis.

11  Q    And as you've indicated, this has spread beyond just

12  the Purdue matter, but to other opioid settlements that are

13  going on nationally now.

14  A    That is correct.

15  Q    As part of the government protecting -- government

16  participation mechanism and/or the statewide agreement, the

17  states and local governments agree to submit to the

18  jurisdiction either of this Court, if the Court retains

19  confirmation post-confirmation, or to a state court; is that

20  correct?

21  A    That is correct.

22  Q    In addition, in the last section of the NOAT, there is

23  a, I would say, a robust accountability requirement that the

24  states have voluntarily submitted to which requires us to

25  report publicly how the money is being spent; is that

Page 108

1    correct?

2    A    That is correct.

3    Q    And also submits the states and the local governments

4    to the jurisdiction either of this Court, if it has

5    jurisdiction post-confirmation, or to the Delaware -- I

6    mean, I think it's Delaware where the companies or the state

7    or otherwise incorporated or to a state court with

8    jurisdiction; is that correct?

9    A    That is also correct.

10   Q    All of these provisions that are in the NOAT are more

11   consistent with injunctive relief than they are with a

12   monetary settlement; would you agree with me?

13   A    I don't know about that.  I think, you know, money can

14   be conditioned on use.  And, you know, given how the money

15   is being split up here and we're not cutting it up into

16   tiny, tiny amounts, which is what would happen if we each

17   had our claims, you know, I don't -- you know, we do

18   settlements all the time that condition use of money on

19   specific purposes, and I don't ever think that is

20   injunctive.

21        I mean, the tobacco settlement itself, at least

22   the Florida version of it, had limitations on it.  I know

23   the MSA may have not.  And I'm thinking through some of the

24   other settlements -- National Mortgage settlement, BP

25   settlement -- they're all conditioned the money on

Page 109

1    particular uses.  So I don't think I agree with your -- that

2    it's injunctive relief.

3    Q    Right, and that's a fair point and a good distinction.

4    But in this case, the parties are asking this Court to enter

5    those terms and subject states and local governments to

6    court oversight on the terms.  That does make it different

7    than the voluntary settlements, and there is a court order

8    that is being contemplated (sound drops).

9    A    Well, I mean, it's a bankruptcy case, so there are -- I

10   mean, in other cases, their work in National -- I mean,

11   National Mortgage settlement, I believe there was a Federal

12   District Court consent order.  So, you know, I don't -- I

13   guess it's what I'm struggling with is there are -- in each

14   one of those kinds of cases, there is some kind of court

15   mechanism that reflects limitations, so I guess that's what

16   I'm struggling with.

17   Q    All right.  We'll move on then.  It is true that this

18   settlement could not have come together without the

19   abatement lists that you have described here.

20   A    I think that it would have been very difficult to get

21   the high level of voting at the levels that are -- of yes

22   votes that have happened in this case without having some

23   lists of what the money is going for.  Because I -- you

24   know, rightfully or wrongfully, you know, there was, at

25   least in one point in time, a lack of trust between states

Page 110

1    and their localities on how settlement monies were being

2    spent.

3              And so, what the list has done is kind of, it

4    prevented those suspicions and those concerns, so it's

5    allayed them in a way that allows the settlement to happen.

6    Q    All right, Mr. Guard.  I will conclude by just

7    remarking that it is incredible the efforts that you and

8    Jennie Peacock in Tennessee, Steve Mange in North Carolina,

9    and Gillian Feiner of Massachusetts have done to negotiate

10   this public abatement deal.  Thank you.

11   A    I appreciate it.

12             THE COURT:  All right.  Does anyone else wish to

13   cross-examine Mr. Guard?

14             MR. HUEBNER:  Your Honor, it's Marshall Huebner.

15   I have two questions for Mr. Guard.

16             THE COURT:  Okay.

17             MR. HUEBNER:  Good morning, Mr. Guard.  For the

18   record, I'm Marshall Huebner of Davis, Polk & Wardwell, on

19   behalf of the Debtors.  Can you hear and see me clearly?

20             THE WITNESS:  I can.

21             MR. HUEBNER:  Thank you.

22   BY MR. HUEBNER:

23   Q    Mr. Guard, I'd like to pose a hypothetical to you.

24   This will take about 60 seconds, then we're done.  Imagine

25   the case where every private creditor group and 49 of the 50

Page 111

```
1    states all supported a resolution and one state did not

2    because it had a different vision.  In your view as a senior

3    state official, would it be justice if one state were

4    allowed to block the will of 49 states and all the other

5    stakeholder groups in a situation?

6    A    No.

7            MR. FOGELMAN:  Your Honor, I don't see the

8    relevance.

9            MR. O'NEIL:  Yeah.  I object and move to strike

10   the answer, Your Honor.

11           THE COURT:  I'm sorry.  I just want to make --

12   who's objecting?  Was that Mr. O'Neill?

13           MR. FOGELMAN:  This is Larry Fogelman on behalf of

14   the United States objecting, Your Honor.

15           THE COURT:  Oh, Mr. Fogelman, okay.  All right.

16           MR. O'NEILL:  I am also objecting, Your Honor.

17           MR. HUEBNER:  Your Honor, I'm happy to address

18   those.  I note that yesterday, both of these lawyers sat

19   there as our witnesses were asked about their conception of

20   justice.  They were also asked what governmental officials

21   should have their views as their vision of justice.  And

22   neither Mr. O'Neil or Mr. Fogelman argued in any way that a

23   private witness does not have to answer the question putting

24   himself in the minds of a senior attorney general official.

25           Here, we have such an official and suddenly
```

Page 112

1    they're objecting?  This is rather --

2              THE COURT:  Well, let me -- I'm not sure what the

3    objection is and that's partly because people are talking

4    over each other, so let me hear from the two objectors.

5    What's the basis for the objection?

6              MR. FOGELMAN:  Your Honor, this is Larry Fogelman

7    from the United States Attorney's Office.  Mr. Guard's

8    opinion about whether a hypothetical of 49 out of 50 states,

9    whether that constitutes justice in Mr. Huebner's whatever

10   example he's giving, is simply irrelevant and calls for

11   speculation.  There's no foundation, and he should not be

12   allowed the answer the question.

13             THE COURT:  Okay.  Let me hear from the other

14   objectors too.

15             MR. O'NEILL:  Your Honor, my objection is also

16   that it's a hypothetical and also, frankly, goes to the

17   ultimate issue that's before this Court since the Court has

18   to make this determination in the real situation of this

19   case with 20 percent of the states objecting.

20             THE COURT:  I guess -- I'm not sure if it is a

21   hypothetical in the sense that the State of West Virginia

22   has its own unique objection.

23             MR. O'NEILL:  Fair enough.

24             MR. EDMUNDS:  Your Honor, if now would be a good

25   time for me to -- I've been trying to get in, but there's

1    been cross-talk.

2              THE COURT:  Yes, go ahead.  Go ahead, Mr. Edmunds.

3              MR. EDMUNDS:  Brian Edmunds for the State of

4    Maryland.  I join the objection as stated by Mr. Robinson-

5    O'Neill and Mr. Fogelman and would add additionally that, to

6    Mr. Huebner's point, that Mr. Guard may be authorized to

7    speak for the State of Florida, but his -- he is not

8    authorized to speak for the State of Maryland.

9              MR. HUEBNER:  So, Your Honor, may I address the

10   objection?

11             THE COURT:  Can I just -- let me -- I'm going to

12   try to cut this short.  In the questioning yesterday and

13   even Mr. O'Neill's or someone's question -- no, actually, it

14   was Mr. Cahn's questioning today, witnesses were asked,

15   including Mr. Guard today by Mr. Cahn, is something fair or

16   is something just.  Those are very broad concepts, as Mr.

17   Guard answered.  Fairness is often in the eye of the

18   beholder and can be thrown around as part of argument.

19             But ultimately, I have to decide under the

20   standards that congress and the courts have set out for me

21   to decide.  It is, I think, clear that someone whose child

22   has died has every right to think that that's not fair and

23   perhaps even that it's not just.  It's a lot to ask people

24   who are not lawyers to appreciate that those determinations

25   are not really what is before the Court, except as they are

Page 114

1    incorporated into the legal standards that I need to follow.

2            So I think, frankly, those questions are a

3    distraction, although they're certainly moral questions with

4    great weight, but they're a distraction in this case unless

5    they're tied to a particular standard that I need to rule

6    on.

7            I let the question be asked yesterday.  But I

8    think people should be quite careful as the same folks who

9    were asking it yesterday, I recognize today, in straying

10   from what is really at issue before the Court, which is the

11   legal standard I need to apply.

12           So I will overrule -- I'm sorry.  I will not

13   permit the question to be asked, unless it's tied to the

14   standard that I need to apply.

15           MR. HUEBNER:  Your Honor, I think, as was true

16   yesterday when the objectors asked this exact question, this

17   is really for oral argument, and I will reserve my views on

18   many of these topics for then.

19           THE COURT:  Okay.  All right.  So you didn't have

20   any other questions, Mr. Huebner?

21           MR. HUEBNER:  I don't, Your Honor.  Thank you very

22   much.

23           THE COURT:  Okay.

24           MR. HUEBNER:  And thank you, Mr. Guard.

25           THE COURT:  All right.  Does anyone else have any

1   questions for Mr. Guard?

2           I have a couple of questions for you, sir, and

3   maybe I just couldn't hear you clearly enough on this.  Your

4   testimony was quite clear that the quite complex and,

5   obviously at this point, very widely accepted opioid

6   abatement strategies that would be under this plan are

7   actually being proposed and even implemented in other

8   contexts involving opioid litigation, and you've named a

9   couple of cases of settlements and a pending bankruptcy case

10  where that's proposed.

11          I want to take you back to the allocations among

12  states that was the subject of the first cross-examination

13  of you today.  And I think I heard you state that these were

14  developed with no particular case in mind, although I think

15  I also took away from your declaration that the Purdue case

16  certainly led the attorneys' general to focus their

17  attention even more than it had been focused on, on coming

18  up with what they believe was an allocation mechanism that

19  they could agree to.

20          Has this mechanism of allocating just the money

21  among the states been implemented in other contexts yet?

22          THE WITNESS:  Yes, Your Honor.  It's been

23  implemented in the McKinsey settlement that occurred earlier

24  this year or, I guess it was earlier this year or the year

25  previous.  And then also while the numbers slightly changed

Page 116

1    because in each instance, there are different states that

2    have settled with a particular defendant.

3              And so, while the numbers for Florida have not

4    changed, numbers for the states like West Virginia and some

5    of the other smaller states changed by settlement because

6    they are the beneficiaries of the kind of the shifting of

7    monies for each one of these sums.

8              THE COURT:  Because not necessarily every state's

9    a party to it?

10             THE WITNESS:  That is correct.

11             THE COURT:  Okay.

12             THE WITNESS:  Or in -- they're like in -- for

13   example, in this case, Oklahoma settled before the

14   bankruptcy.

15             THE COURT:  Right.

16             THE WITNESS:  And the distributor case, West

17   Virginia settled with all three distributors prior to our

18   settlement being announced.

19             THE COURT:  Okay, thank you.

20             THE WITNESS:  And West Virginia and Oklahoma are

21   about equal as far as the allocations they had.

22             THE COURT:  Okay.  My other question is related to

23   the portion of your declaration that deals with the part of

24   the phase one mediation that addressed how to split monies

25   between private and public creditors, and you talk about

Page 117

1     that at Paragraph 66, 67, et cetera.

2              In the declaration and your testimony today, it

3     comes through that there was heavy negotiation among the

4     states as states and then among the states on the one side

5     and other governmental entities on the other.  How would you

6     characterize the negotiation among the states and

7     governmental entities on the one hand and the private

8     creditors on the other?

9              THE WITNESS:  Probably actually more intense than

10    the first two, which was surprising.  I thought it would be

11    -- when you deal with -- usually deal with parties that are

12    more like commercial creditors, you would think it'd be

13    easier, but it was not.

14             THE COURT:  And those private creditors, who were

15    they represented by?

16             THE WITNESS:  They each had a group of counsel,

17    which was a subset of, I guess, the nationwide counsel that

18    represented each group or set of individuals.  So they had a

19    negotiating committee like we had a negotiating committee.

20             THE COURT:  Okay.  And they included -- those

21    creditors or claimants included individuals who were injured

22    by opioids?

23             THE WITNESS:  At some of the meetings, some of the

24    PI or personal injury family members were present and made

25    presentations to us.  They were not necessarily in some of

Page 118

1    the negotiations, so it was just their lawyers, but their

2    lawyers did bring them to and have them make very impactful

3    presentations to the negotiating parties and the committee.

4              THE COURT:  So it was both the lawyers and, in

5    some cases, their individual clients.

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  All right.  Does anyone have

8    any questions on that?

9              MR. FOGELMAN:  Your Honor, I just have a couple of

10   questions on redirect, clarify a couple of points.  May I

11   proceed?

12             THE COURT:  Sure.

13                  REDIRECT EXAMINATION OF JOHN GUARD

14   BY MR. FOGELMAN:

15   Q    Mr. Guard, first of all, thank you for your patience.

16   Just so that it's clear, I'm right that the population 31

17   percent, that's 31 percent of the 85 percent under the plan,

18   correct?

19   A    That is correct.

20   Q    And the other 15 percent, is population a factor at

21   all?

22   A    No, it is not.

23   Q    You alluded to this during your -- during the cross.

24   But is Florida advantaged or disadvantaged by the inclusion

25   of population as a factor?

Page 119

1    A    It is disadvantaged.  It's the only factor that

2    actually disadvantages Florida.

3    Q    And can you explain why it's disadvantaged?

4    A    So all the other metrics are higher than 7 percent and

5    Florida's population, depending on which year is utilized,

6    is 6.3 to 6.4 percent.  I haven't looked to see what it is

7    under the latest census, but it's lower.  And so, while all

8    the other factors were higher, population, in effect,

9    dragged Florida's number down and there's no (sound drops).

10   Q    I'm sorry.  Can you tell us why nevertheless Florida is

11   advocating for this plan?

12   A    Well, you have to come to some kind of agreement and

13   consensus in order for this plan to occur.  And like again,

14   I've been a lawyer for 20 years.  I've never had a

15   settlement where I was 100 percent happy and 100 percent

16   satisfied with where things ended up.  And so, to develop

17   that consensus meant that my -- the attorney general's views

18   and, to the extent they were relevant, my views had to give

19   way, you know, so that we could have an agreement or so that

20   we could have an agreement where there's as many states as

21   have agreed to this allocation.

22   Q    And just one last question.  What resources did your

23   office have available in developing the factors that

24   ultimately went into the plan?

25   A    There is a lot of different data out there from a lot

Page 120

1    of different data sources.  But the data sources that I

2    tended to focus on were from the Centers for Disease Control

3    and from SAMHSA and from the National Institute of Health,

4    so that is the data that we were focused on and looking at

5    in looking for alternative potential measures.

6              MR. FOGELMAN:  Thank you.  Nothing further.

7              THE COURT:  Okay.  Any further questions?

8              MR. ROBINSON O'NEILL:  Your Honor, I have one

9    follow up on cross-examination question.

10             THE COURT:  Okay.  Go ahead, Mr. O'Neill.

11                  RECROSS-EXAMINATION OF JOHN GUARD

12   BY MR. ROBINSON-ONEILL:

13   Q    Mr. Guard, I neglected to ask this earlier, but you

14   mentioned it and the Judge in his question mentioned as

15   well.  Are you aware of any other bankruptcy proceeding in

16   which private, you know, groups of private creditors like

17   hospitals or insurance companies or the NAS babies I think

18   is the other one, agree voluntarily to restrict their money

19   to abatements related to spending?

20   A    I'm not aware of any other case like that.

21             MR. ROBINSON-ONEILL:  Thank you.

22             MR. CAHN:  Your Honor, may I recross briefly?

23             THE COURT:  Yes, just on the redirect though

24   and/or my question.

25             MR. CAHN:  I'm sorry, Your Honor, I didn't hear

Page 121

1    what you said.

2              THE COURT:  You can recross, but just on the

3    questions that were answered after your cross-examination.

4              MR. CAHN:  Yes, of course, Your Honor.

5              THE COURT:  Okay.

6              MR. CAHN:  And I also do -- I do have one question

7    with respect to an answer that he gave in response to your

8    question.

9              THE COURT:  No, that's included.  Go ahead.

10   BY MR. CAHN:

11   Q    Mr. Guard, where is it written that this point had to

12   be developed by the states in devising your own settlement?

13   I realize that before the bankruptcy case, there was one

14   dynamic.  And in the bankruptcy case, wouldn't the plan

15   proponent generally develop its settling parameters for its

16   plan?

17             MAN:  Objection to form.

18             THE COURT:  You have to ask a question, Mr. Cahn.

19             MR. CAHN:  I thought I did, Your Honor.

20             THE COURT:  Well, is the question why did the

21   states themselves develop the allocation among the states,

22   as opposed to the Debtor?

23             MR. CAHN:  Yes, Your Honor.

24             THE COURT:  Okay.  You can answer that, Mr. Guard.

25             THE WITNESS:  Well, one, I think because we

1    already had allocation that had been agreed to by the vast

2    majority of states, you know.  I can't answer for the

3    Debtor, but I mean, I think that they were aware that we

4    already had an allocation.  And, you know, I guess why

5    create a new -- why design a new wheel if the wheel already

6    exists.

7                And two, I think it's common in bankruptcy for,

8    you know, plan proponents or people that have come into the

9    bankruptcy as plan supporters to engage with the Debtor on

10   issues that are important to them.

11   BY MR. CAHN:

12   Q    All right.  So what you're saying, if I understand you

13   correctly.  I just want to clarify your answer.  What you're

14   saying is that the states already had a plan in place before

15   the bankruptcy.  And did the Debtor agree that it was

16   appropriate for the states to continue to devise this plan,

17   rather than the Debtor taking part?

18   A    Was there a specific written agreement to that fact?

19   No.  At some point in time, we talked with the Debtor and

20   addressed the allocation and gave them information on how it

21   was achieved and how it came about and things like that, and

22   it when was utilized.  So if that -- if action can be an

23   agreement, then I guess that is an agreement.

24   Q    Yes.  All right.  I also -- I have one question for you

25   in response to -- you answered in response to a question

1    that Judge Drain asked you and you discussed the McKinsey

2    settlement.  And I thought -- correct me if I'm wrong, I

3    wasn't sure if I heard your answer.  Did you say that West

4    Virginia was part of the McKinsey settlement?

5    A    I didn't mention West Virginia at all.  I didn't

6    mention any state in response to that question.

7    Q    Okay.  So your answer was with respect to the

8    distribute of the settlement.

9    A    No.  My answer was the McKinsey settlement used the

10   metrics from this allocation.

11   Q    Okay.  Are you aware of whether West Virginia was part

12   of the McKinsey settlement?

13   A    I don't believe it or Nevada were part of the McKinsey

14   settlement.

15           MR. CAHN:  Thank you, Mr. Guard.  No further

16   questions.

17           THE COURT:  Okay.  Your Honor, with apologies, I

18   have two questions based on the recross.

19           THE COURT:  Okay.

20             REDIRECTION EXAMINATION OF JOHN GUARD

21   BY MR. HUEBNER:

22   Q    Mr. Guard, did the Debtors at any time intend to impose

23   their vision or view of how the states should allocate among

24   themselves (sound glitch)?

25   A    No.

Page 124

1   Q    What do you think the reaction of the 48 states

2   participating in the case would have been if the Debtors had

3   attempted to say this is our view of what each of you will

4   be getting and we have designed an intra-state allocation?

5              MR. FOGELMAN:  Objection, Your Honor.  It calls

6   for speculation.

7              MR. ROBINSON-O'NEILL:  I join the objection.

8              THE COURT:  I actually don't think it does, given

9   that Mr. Guard is a lead negotiator, along with a number of

10   other attorney generals or their representatives.  He can

11   certainly say his view if that were the case.

12              MR. HUEBNER:  That's all I'm asking for, Your

13   Honor, just his view had the Debtors attempted, which he

14   already testified that the did not, to impose Purdue Pharma

15   L.P.'s view of intra-state allocation.

16              THE WITNESS:  So I think that would have not gone

17   very well.  I am sure that would have caused a negative

18   reaction probably from -- well, I can only speak for -- I

19   can speak for Florida and the states that I am close with.

20   It would have sparked a negative reaction and probably

21   (sound glitch) the plan.

22              MR. HUEBNER:  I have no further questions, Your

23   Honor.  Thank you.

24              MR. EDMUNDS:  Your Honor, if I may.  Brian Edmunds

25   for Maryland.  I'd just like to point out, I think there are

Page 125

1    a lot of attorneys who have submitted testimony in this case

2    who represent parties in the case, and I think maybe that

3    can work for some facts that aren't at issue.  But I think

4    to the extent attorneys are submitting testimony that offers

5    opinions or works to be broader than the scope of what --

6    you know, I think maybe -- maybe the attorney testimony is

7    exceeding, you know, what it should.

8            THE COURT:  I don't think it is here.  Mr. Guard

9    was speaking for himself.  And, frankly, there are times

10   when attorneys evaluate matters in negotiations where it's

11   perfectly appropriate to hear their view.  It helps inform

12   the Court's view, so it depends.

13           But as to this question and this answer, to the

14   extent there is an objection to it, I would overrule it.

15           MR. EDMUNDS.  Thank you, Your Honor.

16           THE COURT:  Okay.  All right.  Hearing no one

17   else, Mr. Guard, you can sign off.  Thank you.

18           MR. GUARD:  Thank you, Your Honor.

19           MR. BLABEY:  Your Honor, the next witness, Jessica

20   Horewitz, will be presented by Jenna Hudson of the Gilbert

21   Firm.

22           THE COURT:  Okay, very well.

23           MS. HUDSON:  Good afternoon, Your Honor.  Can you

24   see and hear us well?

25           THE COURT:  Yes, I can.

Page 126

1            MS. HUDSON:  I'm in a conference room together

2    with Ms. Horewitz.  I believe you should be able to see both

3    of us.

4            THE COURT:  No, I can see you both.  Thanks.  Miss

5    Horewitz, would you raise your right hand, please.  Do you

6    swear or affirm to tell the truth, the whole truth, and

7    nothing but the truth, so help you God?

8            MS. HOREWITZ:  I do.

9            THE COURT:  Okay.  You can take your hand down.

10   And it's J-E-S-S-I-C-A.

11           MS. HOREWITZ:  Yes.

12           THE COURT:  Next word, H-O-R-E-W-I-T-Z?

13           MS. HOREWITZ:  Correct.

14           THE COURT:  Okay.  And Miss Horewitz, you

15   submitted a declaration dated August 5th, 2021, in this

16   matter.  It attaches as an exhibit a Purdue Pharma liability

17   analysis dated June 24, 2021.  Under my order establishing

18   procedures for this hearing, those two documents are meant

19   to be your direct testimony.

20           Knowing that, let me ask you sitting here today on

21   August 13th, and except -- recognizing the update in your

22   declaration to your exhibit, is there anything else that you

23   would like to change in either the exhibit or the

24   declaration?

25           MS. HOREWITZ:  No.

Page 127

```
 1              THE COURT:  Okay.  All right.  Does anyone object

 2    to the admission of Ms. Horewitz's declaration and the

 3    attached exhibit?  All right.  I will admit them and treat

 4    Miss Horewitz as an expert with regard to the matters

 5    covered by her report as updated by her declaration

 6    regarding the liability assessment and percentage recovery

 7    opinions that she gives.

 8              Does anyone want to cross-examine Miss Horewitz?

 9              MS. GOSTIN:  Yes, Your Honor.  This is Isley

10    Gostin of Wilmer Hale on behalf of Specialty -- Navigators

11    Specialty Insurance Company.  I have some very brief cross

12    for Miss Horewitz.

13              THE COURT:  Okay.

14                CROSS-EXAMINATION OF JESSICA HOREWITZ

15    BY MS. GOSTIN:

16    Q    Miss Horewitz, if you have your declaration in front of

17    you, could you please --

18    A    I do.

19    Q    Great, thanks.  If you could please turn to Paragraph

20    11 of your declaration.

21    A    I have it.

22    Q    And if you see Paragraph 11 of your declaration quotes

23    a sentence from Section 5.2 of the plan; is that correct?

24    A    That's correct.

25    Q    And then Paragraph 12 of your declaration states, "The
```

Page 128

```
 1    ad hoc committee retained me to determine whether the

 2    position set forth in Section 5.2 of the plan is accurate."

 3    Do you see that?

 4    A    I do.

 5    Q    And when you say the position set forth in Section 5.2,

 6    am I right that you were referring to the position that is

 7    set forth in the sentence quoted above in Paragraph 11?

 8    A    Yes.

 9    Q    Okay.  So in other words, you're not offering an

10    opinion regarding any other portions of Section 5.2 of the

11    plan; is that right?

12    A    That's correct.

13    Q    And then turning to Paragraph 13 of your declaration,

14    it says, "To test the accuracy of Section 5.2 of the plan, I

15    analyzed the magnitude of the Debtors' liabilities arising

16    out of or in connection with opioid claims, i.e., minimum

17    opioid claim liability, as compared to the value of the

18    assets."  Is that right?

19    A    Yes.

20    Q    And when you refer in that sentence to the Debtors

21    liabilities arising out of or in connection with opioid

22    claims, am I right that you're referring to that in the

23    aggregate for all of the Debtors?

24    A    For all of the Debtors?

25    Q    Yeah.  So when you wrote -- my question -- apologies,
```

Page 129

```
 1    let me clarify.  When you referred to the Debtors'

 2    liabilities in that sentence, are you referring to the

 3    aggregate liabilities for all of the Debtors in the

 4    aggregate?

 5    A    My understanding is that there's one Debtor, but it's

 6    all of the liabilities associated with the Debtor.

 7              THE COURT:  So I think the answer is in the

 8    aggregate.  There are multiple Debtors and they're not being

 9    subsequently consolidated, but you looked at all of the

10    claims filed --

11              THE WITNESS:  Correct.

12              THE COURT:  -- against all of the Debtors' assets.

13              THE WITNESS:  Yes.

14              THE COURT:  Okay.

15              MS. GOSTIN:  Thank you, Your Honor.

16    BY MS. GOSTIN:

17    Q    And so to clarify, you're not offering an opinion as to

18    liabilities with respect to any singular particular debtor;

19    is that right?

20    A    That's correct.

21    Q    Okay.  If you could -- if you have handy JX-0534, which

22    is the disclosure statement for the fifth amended plan.

23    A    I don't have that in front of me just yet.

24              MS. HUDSON:  Your Honor, it would be helpful to

25    know for what purpose the document is referenced.  We may
```

Page 130

1    have (sound glitch) in another document.

2              THE COURT:  Do you have a particular section --

3              MS. GOSTIN:  I'm not sure I heard Miss Hudson's

4    question.

5              THE COURT:  Do you have a particular section of

6    the disclosure statement you want to reference or refer the

7    witness to?

8              MS. GOSTIN:  Yes.  It's Page 51 of the disclosure

9    statement.

10             THE COURT:  Okay.  And --

11             MS. GOSTIN:  And the JX number is JX-0534-60 --

12             THE COURT:  Okay.

13             MS. GOSTIN:  -- if you're looking at a labeled

14   version.

15             THE COURT:  And that's a section that discusses

16   Rhodes Technologies and Rhodes entities?

17             MS. GOSTIN:  Correct.

18             THE COURT:  Okay.  So I have to assume your

19   question is about Rhodes Technologies or some other Rhodes

20   entity?

21             MS. GOSTIN:  Correct.

22             THE COURT:  Okay.  Does that help you?

23             MS. HUDSON:  It does, but it does not, Your Honor.

24   I would, therefore, need to object to relevance.  I don't

25   believe this is something that Miss Horewitz has previously

1    reviewed.

2           MS. GOSTIN:  Your Honor, I believe Miss Horewitz

3    listed it in her expert report as one of the documents that

4    she reviewed in preparing her report.

5           THE COURT:  Okay.  But she's testified she looked

6    at all the Debtors' liabilities together in the aggregate,

7    so I'm not sure whether focusing on one really matters.

8           MS. GOSTIN:  Okay.  I'm happy to move on.

9           THE COURT:  Okay.

10          MS. GOSTIN:  I guess with that, Your Honor, I

11   think I have no other questions.

12          THE COURT:  Okay.  Does anyone else want to

13   question Miss Horewitz?  No, all right.  Miss Horewitz, I've

14   reviewed your report and your declaration, and I don't have

15   any questions.  Well, wait, someone apparently does have a

16   question.

17          MR. UNDERWOOD:  I apologize, Your Honor.  It took

18   me a moment to turn my screen on.

19          THE COURT:  Okay.

20          MR. UNDERWOOD:  I have really just perhaps two

21   questions for Miss Horewitz.  I apologize.

22          THE COURT:  And can you just -- again, it's Mr.

23   Underwood, correct?

24          MR. UNDERWOOD:  Correct.  Allen Underwood of the

25   firm of Lite DePalma on behalf of Canadian First Nations.

Page 132

1                    CROSS-EXAMINATION OF JESSICA HOREWITZ

2    BY MR. UNDERWOOD:

3    Q    Miss Horewitz, in terms of your calculation of the

4    total amount of claims outstanding with your report

5    submitted to this Court, did that calculation include the

6    (sound glitch) filed or made against the U.S. Debtor by

7    Canadian First Nations?

8    A    I've not made a specific calculation about any

9    particular claim.

10   Q    Okay.  But was it inclusive of Canadian First Nations

11   claim, opioid-related claims?

12   A    I can't answer that because there was nothing specific

13   about the claims.  I simply bounded the total liabilities.

14   Q    I see.  So your references to claims herein are derived

15   from information contained in the Debtors' plan and

16   disclosure statement; is that correct?

17   A    Correct.

18            MR. UNDERWOOD:  All right, thank you.  No further

19   questions.

20            THE COURT:  Okay.  All right.  As I was starting

21   to say, I don't have any further and I believe no one else

22   does at this point either.  Is there any redirect?

23            MS. HUDSON:  No, Your Honor.

24            THE COURT:  Okay.  So Miss Horewitz, you can sign

25   off.  Thank you.

Page 133

1           MS. HOREWITZ:  Thank you.

2           MS. HUDSON:  Your Honor, with that, I believe my

3      colleague, (indiscernible) will be (indiscernible).

4           THE COURT:  Okay.  So the next witness listed is

5      Mr. Gotto.

6           MR. BLABEY:  Yes, good afternoon, Your Honor.

7      David Blabey from Kramer Levin Naftalis & Frankel on behalf

8      of the Ad Hoc Committee.  Our next witness is Mr. Gary

9      Gotto.

10          THE COURT:  Okay.  All right, and I see Mr. Gotto

11     on the screen.  Would you raise your right hand, sir.  Do

12     you swear or affirm to tell the truth, the whole truth, and

13     nothing but the truth, so help you God.

14          MR. GOTTO:  I do.

15          THE COURT:  Okay.  And it's Gary, G-A-R-Y, and

16     Gotto, G-O-T-T-O?

17          MR. GOTTO:  That's correct, Your Honor.

18          THE COURT:  Okay.  So Mr. Gotto, you submitted a

19     declaration in connection with this proceeding or this

20     matter under my order establishing procedures for this

21     hearing.  It's intended to be your direct testimony.  It's

22     dated August 5th.  Knowing that it would be your direct

23     testimony, is there anything in it sitting here today,

24     August 13th, that you would wish to change?

25          MR. GOTTO:  No, Your Honor.

Page 134

1          THE COURT:  Okay.  Does anyone object to the

2      admission of Mr. Gotto's declaration as his direct

3      testimony?

4          MR. EDMUNDS:  Your Honor, Brian Edmunds for the

5      State of Maryland.  Again, I would just note that Mr. Gotto

6      is an attorney who represents parties in this matter.  And

7      to the extent that the declaration -- I'm looking at various

8      points where it expresses opinions that I think go beyond

9      the nuts and bolts of what happened.  I'm not sure he would

10     qualify or will be qualified as an expert to state those

11     things.

12         And I just make that generally to -- I think that

13     the -- I think that's across the board in some cases here.

14         THE COURT:  Well, it's hard to know without you're

15     focusing on a specific paragraph.  But again, I will note

16     that in evaluating a settlement -- and I believe in large

17     measure that's what Mr. Grotto's declaration goes to -- the

18     Supreme Court and the Circuit asked the Court to review

19     whether the settlement is beneficial and fair and equitable

20     in light of a number of factors, including the costs and

21     risks of litigation, but also the views of interested

22     parties in ultimately determining whether the settlement is

23     a proper exercise of judgment.

24         I think the courts asked for the views of

25     interested parties for a number of reasons, including to

Page 135

1    determine whether the parties who negotiated the settlement,

2    negotiated it at arms' length on a reasonably well-informed

3    basis, which includes their representation by counsel and

4    their understanding of the legal issues and the other issues

5    that affect the settlement.

6            So I don't view this as expert testimony.  I don't

7    view it as necessarily stating the truth of the underlying

8    issues or someone's view of the underlying issues, but I do

9    believe that it's perfectly appropriate to admit it as a

10   description of what a party playing an important role in the

11   negotiations perceived those negotiations and how they

12   unfolded.

13           So I guess unless you identify some particular

14   paragraph that crosses the line on those issues, my

15   inclination is, to the extent this is an objection, to

16   overrule it.

17           MR. ECKSTEIN:  Your Honor, this is Mr. Eckstein.

18   Can I just make one observation on this point?

19           THE COURT:  Okay.

20           MR. ECKSTEIN:  I would like to just make clear for

21   the record that Mr. Gotto, like Mr. Guard, served throughout

22   the case as a member of the ad hoc committee, not as counsel

23   to the ad hoc committee, and in that capacity, they

24   functioned essentially as principals in the case.  And this

25   is -- and he was also a member of the subcommittee that was

Page 136

1    responsible for negotiating the abatement plans.

2              And so, this declaration is provided as actual

3    testimony based upon Mr. Gotto's activities as a principal

4    of the ad hoc committee and a participant in the abatement

5    subcommittee.

6              THE COURT:  Right.  It's clear from his

7    declaration that he's a negotiating party.

8              MR. EDMUNDS:  Your Honor, I think my objection may

9    be satisfied by your statement that the matters that are

10   admitted may not be considered, you know, for the truth of

11   what's in them and they're just party opinions.  I think the

12   parties need to (sound glitch) in court.

13             THE COURT:  Well, it depends -- I mean, it depends

14   on how -- what matters you're referring to.  Yes, in terms

15   of analysis of litigation, absolutely.

16             MR. EDMUNDS:  Yeah.

17             THE COURT:  If it's reporting on the course of a

18   negotiation, that's fact testimony and it's what the witness

19   perceived, not anything more than that.

20             MR. EDMUNDS:  My objection is just with respect to

21   the former, not the latter.

22             THE COURT:  Okay.

23             MR. EDMUNDS:  So I think that that covers it.

24   Thank you, Your Honor.

25             THE COURT:  Very well.  So I will admit Mr.

1    Gotto's declaration.

2            MR. BLABEY:  Your Honor, I'm not sure if any party

3    wishes to cross, but I would just note that you had asked

4    Professor Gowrisankaran a question yesterday about the

5    creation of the note TDP.  I think that Mr. Gotto would

6    probably be able to answer that question.  I'd be happy to

7    ask him or --

8            THE COURT:  No.  I think I take that away from his

9    declaration.  They're really two different witnesses and two

10   different questions.  So I may have that question asked at

11   some point, but I don't think we need to get that out at

12   this point.

13           So does anyone want to cross-examine Mr. Gotto?

14           MR. ROBINSON O'NEILL:  Your Honor, Tad Robison

15   O'Neill on behalf of the State of Washington, just briefly.

16           THE COURT:  Okay.

17               CROSS-EXAMINATION OF GARY GOTTO

18   BY MR. ROBINSON O'NEILL:

19   Q    Good morning, Mr. Gotto.

20   A    Good morning, Mr. O'Neill.

21   Q    You actually represent King County in Washington State;

22   is that correct?

23   A    That's correct.

24   Q    It's nice to talk to you again.  We've had many

25   conversations.  I want to focus you on the NOAT abatement

Page 138

1    trust, which has been adopted in the plan.  I don't know if

2    you've got a copy of it with you, but my suspicion is you

3    know very well the terms of that.

4    A    I am very familiar with it.  I can access a copy of it

5    easily if need be.  I don't have it in front of me at the

6    moment.

7    Q    In Paragraph 8 of your declaration, you indicate -- and

8    I'll wait for you to get there.  I'm sorry, sir.

9    A    I'm there.

10   Q    And actually, I meant Paragraph 9.  I apologize.

11   A    Okay.

12   Q    At the -- in the representation or in the negotiation

13   of this trust, would you agree with me that abatement and

14   the public good that the money could be spent was at the

15   core of the negotiations?

16   A    Absolutely.

17   Q    And you understand the NOAT Trust to bind the state,

18   for example, the State of Washington, to follow either a

19   separate agreement or the default conditions that are in the

20   NOAT Trust on how to spend the money; is that correct?

21   A    Yes.  Distributions under the trust are made subject to

22   its terms, including the terms on how the money is going to

23   be expended.

24   Q    And that will be part of the court order in this case

25   if the confirmation is granted; is that correct?

Page 139

```
 1    A    That's my understanding.

 2    Q    And the agreement also includes enforcement provisions,

 3    which would allow King County or any other municipality in

 4    Washington State to resort to court to enforce the terms of

 5    the trust; is that correct?

 6    A    There are provisions to that effect depending on the

 7    Bankruptcy Court's retention of jurisdiction, yes.

 8    Q    And there -- you're not aware of any state involved in

 9    this Purdue bankruptcy or any other local government that

10    has objected on the basis of this NOAT Trust or the

11    requirement that the money be spent on abatement, are you?

12    A    I'm not aware of any.

13    Q    Thank you.  That's all the questions I've got for you.

14              THE COURT:  Okay.  Does anyone else want to cross-

15    examine Mr. Gotto?  Okay.  Mr. Gotto, I've reviewed your

16    declaration, and I just -- I want to make sure I'm looking

17    for one note.  No, I don't have any questions on it.  Is

18    there any redirect?

19              MR. BLABEY:  No, Your Honor.

20              THE COURT:  Okay, all right.  Well, I will ask the

21    question you wanted to get in.

22              Mr. Gotto, did you have a role in negotiating and

23    preparing the terms of the NOAT Trust, including for

24    distribution purposes?

25              THE WITNESS:  Yes, Your Honor, certainly in the
```

Page 140

1    context of the abatement term sheet that was agreed upon in

2    2020, which then is essentially becomes the NOAT Trust TDP.

3               THE COURT:  Okay, all right.  Thank you.  All

4    right, you can sign off, sir.

5               MR. GROTTO:  Thank you, Your Honor.

6               THE COURT:  Thank you.  All right.  The next

7    witness is Mr. Weinberger.  It's about quarter to 1:00.  I

8    don't know whether there's going to be -- whether there's

9    any estimate of how long he will take.

10              MR. BLABEY:  Your Honor, Mr. Weinberger, as I

11   believe Mr. Kaminetzky had indicated in his communication to

12   chambers, is not available until 2:00.

13              THE COURT:  All right.

14              MR. BLABEY:  So now could be a good time for a

15   lunch break if we wanted to.

16              THE COURT:  Okay, that's fine.  That's where I was

17   heading anyway.  So we'll break and return at 2:00.  If you

18   could just make sure Mr. Weinberger is ready to testify at

19   that point and we'll proceed then with him.  Thank you.

20              (Recess)

21              THE COURT:  Okay.  Good afternoon everyone.  This

22   is Judge Drain and we're back on the record in re: Purdue

23   Pharma, L.P., et al.  I think our next witness is Mr.

24   Weinberger, correct?

25              MR. BLABEY:  That is correct.

Page 141

1                THE COURT:  Okay.

2                MR. BLABEY:  Good afternoon, Your Honor.  David

3    Blabey from Kramer Levin on behalf of the Ad Hoc Committee.

4    Samuel Issacharoff will be presenting Mr. Weinberger.

5                THE COURT:  Okay.  And I see Mr. Weinberger there.

6    Would you raise your right hand, please?  Do you swear or

7    affirm to tell the truth, the whole truth and nothing but

8    the truth, so help you God?

9                MR. WEINBERGER:  I will.

10               THE COURT:  Okay.  Thank you.  Mr. Weinberger, you

11   submitted a Declaration in this matter dated August 5, 2021,

12   under my Order establishing procedures for this hearing.  It

13   was intended to be your direct testimony.  Understanding

14   that and sitting where you are today on August 13th, is

15   there anything in your Declaration that you would wish to

16   change?

17               MR. WEINBERGER:  No, Your Honor.

18               THE COURT:  Okay.  Does anyone object to the

19   admission of Mr. Weinberger's Declaration as his direct

20   testimony?  Okay.  I will admit it.  Does anyone want to

21   cross-examine Mr. Weinberger?  Okay.

22               Mr. Weinberger, I had a couple of questions for

23   you assuming that, again, there's no cross.  The first goes

24   to the discussion that you have on the attorneys' fees

25   provision in Section 5.8 of the Plan and that starts at

1   paragraph 55 of your Declaration.  You note that the Plan

2   and that Section establishes two separate funds for

3   attorneys' fees.  One is from 10 percent of the money

4   received by the National (indiscernible) Abatement Trust and

5   Tribal Abatement Trust Fund not to exceed $500 million.  And

6   then the second is described in paragraph 57, is 5 percent

7   of each of the settlements reached with the groups of

8   private creditors.  The -- as I understand it, the first

9   fund is to be allocated or awarded by a third-party panel of

10  arbitrators and then, ultimately, the Court retains

11  jurisdiction over both payment and appeals from that panel.

12  And that's with regard to $275 million to be allocated.  And

13  then it says, the remaining $225 million will be allocated

14  by the states according to their internal processes.  And I

15  just wanted you to elaborate on that last sentence.  To your

16  knowledge, how is that allocated among the states?  Are you

17  aware whether they have an agreement on that or is that

18  still to be resolved?  And if so, is there a default

19  mechanism if they are not able to reach an agreement?

20          MR. WEINBERGER:  Your Honor, I don't have personal

21  knowledge with which to answer that question because, as

22  liaison counsel for the MDL, I have only personal knowledge

23  as to what the Plan procedure is with respect to the monies

24  that go into the MDL, which is the $275 million.  The $225

25  million, which is to be allocated among the state, is

Page 143

1    something over which the arbitrators and the Arbitrator

2    Agreement and Order has nothing to do with.  And so, in that

3    regard, I cannot answer your question because I don't know -

4    - I don't have the information --

5                THE COURT:  Okay.

6                MR. WEINBERGER:  -- with respect to --

7                THE COURT:  That's fine.  It wasn't clear to me,

8    and I guess I'll have to ask counsel for one or more of the

9    states about that section.  The other question I had is, I

10   want to take you back to the first part of your Declaration

11   where you, in paragraph 6, discuss your experience in mass

12   tort situations and your role as court appointed Plaintiff's

13   Executive Committee counsel or co-counsel in a number of

14   different multi-district litigations.  And then you state

15   that you're currently serving as court appointed Plaintiff's

16   lead liaison counsel and counsel to the Plaintiff's

17   Executive Committee in the multi-state -- I'm sorry, the

18   multi-district litigation in Cleveland.  Which, until this

19   bankruptcy case, included in a very large measure, Purdue

20   Pharma, as well as involved the Sackler family members.  So,

21   I'm inferring, but I would like your answer to this

22   question, that in that role, you and the other Plaintiffs

23   that you're working with, have a goal to maximize recoveries

24   in respect of those claims.  Is that a fair inference to

25   make?

Page 144

1          MR. WEINBERGER:  That is correct, Your Honor.

2          THE COURT:  Okay.  In fact, that is your role, I

3     gather?

4          MR. WEINBERGER:  Very much so.  That is the

5     highest of our priorities.  Yes, Your Honor.

6          THE COURT:  Okay.  And you're familiar, I assume,

7     with the fact that under this Plan, the Bankruptcy Plan

8     that's before me, that is, not only would the debtor or the

9     debtors get a discharge, but there would be broad releases

10    of the released parties and shareholder released parties,

11    which would include the Sackler family and their companies.

12    We've heard testimony and exhibits as to the potential

13    liability of those third parties to creditors of these

14    debtors.  And I'm not asking to evaluate that liability, but

15    knowing your primary, really exclusive, role to maximize

16    recoveries, why would your clients -- why do your clients

17    support that aspect of the settlement in this Plan, the

18    settlement of the third-party claims?

19         MR. WEINBERGER:  Your Honor, any time one

20    evaluates a settlement, whether in a bankruptcy scenario

21    such as this one, or in any other case, in evaluating any

22    settlement, one takes into account what is the liability,

23    whether there is potential recovery and what is, in terms of

24    damages, and what is the defendant's ability to pay.  And in

25    this case, where, admittedly, the abatement costs associated

Page 145

1    with abating this opioid prescription pill epidemic is

2    enormous and far exceeds what has been proposed in this

3    bankruptcy, the plaintiff's lawyers in the MDL and the PEC,

4    specifically the 21 firms who lead this and who have

5    appointed me as liaison counsel with the court's consent,

6    have evaluated all those factors and waived continued

7    litigation against the Sackler family and Purdue versus what

8    has been offered and have determined that this is an

9    appropriate, fair, settlement in light of all those

10   circumstances.  And it is why we recommend that it be

11   accepted.

12            THE COURT:  Okay.

13            MR. WEINBERGER:  I might add, if you don't mind,

14   Your Honor, to that answer.

15            THE COURT:  Go ahead.

16            MR. WEINBERGER:  Since my Declaration and my

17   testimony is directed to Section 5.8, that the other factor

18   that is extremely important is that, as Judge Polster stated

19   from the very beginning, the importance of this litigation

20   is to maximize the recovery of costs associated with abating

21   the epidemic.  And so, the way in which 5.8 works in terms

22   of fees, that would go into this fund as well as associated

23   issues associated with contingent (indiscernible) contracts

24   which, the political subdivisions are being relieved of, is

25   further -- furthers our goal of putting as much money into

Page 146

1    the abatement remedy as possible under these circumstances

2    and this, Your Honor, takes into account the fact that -- I

3    can speak for myself and for my colleagues, I have devoted

4    nearly four years of my professional life, full-time, on

5    this project, as have hundreds of lawyers represented by the

6    21 Plaintiff's Executive Committee firms and firms outside

7    of the PEC.  And I can tell you that, to a person, to a

8    lawyer, the importance of creating an abatement fund to deal

9    with this national health crisis, is our number one

10   priority.

11             THE COURT:  Okay.  Thank you.  Does anyone wish to

12   cross-examine Mr. Weinberger on those questions, or his

13   answers to those questions?

14             MR. O'NEILL:  Your Honor, Tad Robinson O'Neill

15   from the State of Washington.

16             THE COURT:  Go ahead Mr. Robinson -- Mr. O'Neill,

17   excuse me.

18             CROSS-EXAMINATION OF PETER H. WEINBERGER

19   BY MR. O'NEILL:

20   Q    Mr. Weinberger, the PEC is involved in litigation other

21   than Purdue in relation to opioids.  Is that correct?

22   A    That is correct.

23   Q    And there have been multiple settlements, national

24   settlements announced in recent -- in over the last year.

25   Is that correct?

Page 147

1   A    Yes, that is true.  Specifically, the settlements

2   involving the three distributors and Johnson & Johnson,

3   which was announced about a year ago, but finalized in terms

4   of paperwork within the last three weeks, subject to

5   critical mass agreements by both the states and political

6   subdivisions.

7   Q    And the volume of those settlements in far in excess of

8   the amount of money that would be paid under this

9   Confirmation Plan into a NOAT or an abatement fund.  Is that

10  correct?

11  A    Well, to be clear, what these settlements provide is,

12  $26 billion, that's assuming that there's 100 percent

13  agreement among all the political subdivisions and all of

14  the states.  Yes, it provides for $26 billion paid out over

15  a period of 18 years, 18 years as to the distributors and

16  then a shorter period of time as to Johnson & Johnson.

17  Q    And there are other cases, like the McKinsey case or

18  the Mallinckrodt bankruptcy where abatement funds are also

19  being distributed.  Is that correct?

20  A    Well, the McKinsey case is a case that was resolved by

21  the State's Attorney General and the political subdivisions,

22  both in the MDL and outside the MDL, have not -- some of

23  whom are pursuing these cases, have not resolved those

24  cases.  So, that's the case with McKinsey.  And what was

25  your other -- what was the other --

Page 148

1   Q      Mallinckrodt was the other bankruptcy.

2   A      Well, Mallinckrodt is similarly in bankruptcy and so

3   there is a resolution associated with that bankruptcy, yes.

4   Q      In any of those other cases, is there a billionaire

5   family involved seeking releases to the scope here?

6   A      Not that I'm aware of.

7   Q      In any of those other cases, are states being

8   threatened with the extinguishment of their direct claims

9   without a consensual release?

10  A      Can you rephrase that question please?  I don't quite

11  understand it.

12  Q      Sure.  Well, in this Confirmation Plan, if it's

13  approved, the State of Washington's direct claims against

14  the Sacklers would be extinguished by a non-consensual

15  third-party release.  Do you understand that?

16  A      I understand it.

17  Q      In any of the other abatement work on opioids, are you

18  aware of the state being forced into a non-consensual

19  release of its claims against what the state considers to be

20  a wrong here?

21  A      I'm not aware of that, but I don't know if this answers

22  your question or not, but I know --

23  Q      And if you don't know, we'll just stop there.  I mean,

24  I don't want to -- I don't want to get too far off of what -

25  - where we are.

1   A    I wasn't getting too far off field, but I think for

2   clarification purposes, if you don't mind --

3   Q    All right.  Go ahead, clarify.

4   A    So, for example, with respect to the settlement

5   involving McKesson, Cardinal Health and AmerisourceBergen,

6   there are a myriad list, a large list, of affiliated

7   companies that are being released as a result of that

8   settlement.  I can't speak to any particular individuals,

9   but it wouldn't surprise me if it included officers and

10  board members of all those corporate entities.

11  Q    All right.  And this is just -- the last question I

12  would ask you is, in the context of this case, does your

13  support for the Confirmation Plan in any way condone the

14  activities of the Sacklers in management of Purdue Pharma

15  over the last two decades?

16  A    No, of course not.  It doesn't condone any of their

17  conduct and in fact, I think it is our efforts that

18  uncovered that the direct conduct and behavior of a number

19  of members of the Sackler family in the way in which the

20  company was directly operated by them, and our litigation

21  strategy to pursue the Sackler family, was, I believe, a

22  significant factor in bringing the Sackler family to the

23  table to tender with Purdue almost $5.5 billion, which --

24  I'm not trying to pat ourselves on the back.  It is what we

25  do, as litigators, and in representing more than 2,000

Page 150

1      political subdivisions in this litigation, I believe, our

2      efforts result in a substantial benefit to the Abatement

3      Plan that (indiscernible).

4      Q    (indiscernible), you didn't get sign on by all of the

5      states, did you?

6      A    You broke up again.  I'm sorry.

7      Q    You did not get sign on by all of the states, did you?

8      A    Well, the -- under the terms of the Agreement, the

9      states have 30 days from the date that it was executed to

10     consent.  Those 30 days have not run, so I --

11     Q    Is there a condition in that settlement that 100

12     percent of the states have to be called, that the company

13     receive global fees?

14     A    The way that the Agreement works, Mr. O'Neill, is that

15     within that 30-day period of time, and I think we're coming

16     up on the time within the next week or so, the states will

17     determine whether or not they consent and it is then the

18     decision of the three distributors looking at that deal

19     alone, to determine whether or not they have achieved, in

20     their discretion, a critical mass.  If they determine that

21     critical mass has been achieved, then the next phase of

22     consent process kicks in and the political subdivisions in

23     the states who have consented to the Agreement then have 120

24     days to determine whether or not to consent to the

25     settlement and again, the three distributors then have the

Page 151

1    ability to determine whether or not critical mass was

2    achieved at the political subdivision level.

3    Q    Is it clear to you -- if it's true, that critical mass

4    does not (indiscernible).  Is that right?

5    A    Since the decision on critical mass is now defined in

6    the Agreement and since the political subdivisions, who I

7    represent, have no say so as to what constitute critical

8    mass, I don't know that I can agree to that statement.

9    (indiscernible)

10   Q    Thank you, Mr. Weinberger.

11   A    Sure, Mr. O'Neill.

12          THE COURT:  Okay.  Does anyone else have questions

13   for Mr. Weinberger based on any of my questions or Mr.

14   O'Neill's.

15          MR. HUEBNER:  I do, Your Honor.  I have about five

16   questions, and it should be (indiscernible) brief.

17          THE COURT:  Okay.

18          CROSS-EXAMINATION OF PETER H. WEINBERGER

19   BY MR. HUEBNER:

20   Q    Mr. Weinberger, good afternoon.  I'm Marshall Huebner

21   representing Purdue.  A couple of quick questions for you.

22   Are you aware that there are aspects of the settlement with

23   the Sacklers that are not financial, but rather relate to

24   other types of covenants?

25   A    Yes, I am aware of that.

Page 152

1    Q    Was it important to your client that the Sacklers be

2    completely removed from any and all further involvement with

3    Purdue until the end of time?

4    A    Yes, that was certainly an important part of the

5    resolution.

6    Q    Are you aware that the settlement requires the Sacklers

7    to exit the pharmaceutical business (indiscernible) within a

8    specific period of time?

9    A    Yes.

10   Q    Was that important to your clients?

11   A    Yes.

12   Q    Have you or the Sacklers agreed to (indiscernible) with

13   respect to naming rights with respect to charitable

14   organizations and if I can ask if you view that as a

15   positive and was important to your clients?

16   A    Yes, it was.

17   Q    Are you aware that a document repository of tens of

18   millions of documents, including many categories of

19   (indiscernible) privileged documents is going to be created

20   by this case to be available to the public for years or

21   decades or possibly (indiscernible)?

22   A    Mr. Huebner, I think of all the aspects of what I would

23   call the injunctive relief part of this, that it may be the

24   most important because this document repository, which tells

25   the story of Purdue and the Sacklers, is extremely important

Page 153

1   from the standpoint of, not only what it is that we

2   developed in terms of evidence, perhaps that's the least

3   important part of it, as much as lessons to be learned from

4   the conduct that was uncovered and revealed.  And so, this

5   public document, which no doubt, if this case went to trial,

6   would come out at trial and now is in this document

7   repository, which is available to the public and can be

8   studied and written about, is extremely important.  Sorry

9   for that long-winded answer, but --

10  Q    Mr. Weinberger, I share that view, so I'm actually

11  asking a follow up question to you about that.  If you know,

12  does the document repository in the McKinsey settlement

13  repository include attorney/client privilege documents

14  (indiscernible) public domain?

15  A    I'm sorry.  I don't know the answer to that question.

16  Q    That's okay.  One last question, you said four years of

17  your life, full-time, have been on this case.  To make sure

18  I understand, is that four years full-time suing Purdue and

19  the Sacklers, for which you believe to be their

20  (indiscernible) in the opioid crisis?

21  A    It is my -- it constitutes my entire involvement in all

22  aspects of the multi-district litigation, which includes,

23  obviously, cases brought against a number of other

24  defendants.

25  Q    Mr. Huebner, my apologies, just one very last question

Page 154

1    based on something Mr. O'Neill (indiscernible).  You listed

2    the case settlements, I think, Mallinckrodt and the

3    distributors, in any of those cases, are the owners of the

4    company that made or committed the product at issue paying

5    anything (indiscernible) or did any of the companies

6    themselves, which would primarily (indiscernible)?

7    A    Yes, it's only the company themselves and I think it's

8    important to point out that, to my knowledge, with respect

9    to all of the defendants, all of the other defendants in

10   this case, that Purdue was the only closely held corporation

11   that was a defendant.

12   Q    Okay and is it fair to say -- and with this I will wrap

13   up, that you actually approach each situation differently

14   and you settle on terms that you believe appropriate to

15   further the goals that you testified about before, including

16   abatement and frankly, (indiscernible), you believe that

17   (indiscernible)?

18   A    That is correct.

19   Q    I have no further questions.  Thank you, Mr.

20   Weinberger.

21   A    You're welcome.

22            MR. O'NEILL:  Your Honor, Tad Robinson O'Neill

23   with just a follow up question, if I may.

24            THE COURT:  Well, I'll let you, but let me just

25   have other folks who want to cross go first --

 1              MR. O'NEILL:  I'll wait.

 2              THE COURT:  -- then you can come back.

 3              MR. GOLDMAN:  Your Honor, may I?  I'm sorry.  I'm

 4    glad to yield to the other gentleman.

 5              THE COURT:  To Mr. O'Neill?  That's fine.

 6              MR. GOLDMAN:  Oh no.  I mean, as long as I can

 7    reserve my --

 8              THE COURT:  Sure.  Yeah.

 9              MR. GOLDMAN:  Okay.  That's fine.

10              MR. JOHNSON:  Your Honor, this is Evan Johnson

11    (indiscernible).

12              THE COURT:  Okay.

13              MR. JOHNSON:  May I be heard?

14              THE COURT:  Sure.

15              MR. JOHNSON:  Thank you, Your Honor.  Again, Evan

16    Johnson, (indiscernible).  We represent Johnson & Johnson in

17    this case.  I just want to note for the record that there

18    was some discussion of a recent settlement involving Johnson

19    & Johnson and I think (indiscernible) that settlement is

20    actually correct, but I'm not involved in that settlement,

21    so I don't want there to be suggestion that by listening to

22    that testimony, not raising an issue, (indiscernible).  I've

23    seen situations where courts have ruled by (indiscernible).

24              THE COURT:  I understand your point, Mr. Jones and

25    I can't imagine there would be any estoppel here.  It's a --

Page 156

1    Mr. Weinberger was briefly summarizing a settlement that I'm

2    sure is quite lengthy and complex and not getting into the

3    merits, at all, of the underlying claims.  So, there's no

4    estoppel effect on your client.

5            MR. JOHNSON:  Thank you, Your Honor.

6            THE COURT:  Okay.  So, it's either Mr. Goldman or

7    Mr. O'Neill, whichever one of you wants to --

8            MR. GOLDMAN:  I'll take the turn, Your Honor.

9            THE COURT:  Okay.

10            MR. GOLDMAN:  I just have a few questions.

11            CROSS-EXAMINATION OF PETER H. WEINBERGER

12    BY MR. GOLDMAN:

13    Q    Mr. Weinberger, the document repository that you were -

14    - had a colloquy with Mr. Huebner on, is only going to be

15    created and publicly accessible after the Plan is confirmed,

16    correct?

17    A    That's correct.

18    Q    And that's after the Sacklers have walked off with

19    their third-party releases, correct?

20    A    I don't know that for sure.

21            THE COURT:  Assume that that's the case, Mr.

22    Weinberger.

23            MR. WEINBERGER:  Okay.

24            THE COURT:  Okay.

25    BY MR. GOLDMAN:

1   A    Assuming that to be the case, the answer is yes.

2   Q    Okay and once that's created, it's possible that we

3   could see even more inculpatory evidence of Sackler

4   culpability in this matter that exists now?

5               MR. HUEBNER:  Your Honor, I'm sorry.  Objection as

6   to form.  I don't know who "we" is.  There is a Protective

7   Order in this case and (indiscernible) have seen 100 million

8   pages plus of documents.  I'm not sure what Mr. Goldman is

9   getting at.  I know he's joined to the case relatively

10  recently and may not know that his clients have access to --

11              THE COURT:  Well, okay.  I understand your

12  objection.  When you say --

13              MR. GOLDMAN:  The public.

14              THE COURT:  Are you talking about the public?

15              MR. GOLDMAN:  Yes.

16              THE COURT:  The general public?

17              MR. GOLDMAN:  Yes.

18              THE COURT:  All right.

19              MR. HUEBNER:  Mr. Weinberger, that's certainly

20  fine.

21              THE COURT:  Okay, so, do you remember the

22  question, Mr. Weinberger?  Is it possible that after the

23  public release of the document repository, that the general

24  public might see more evidence than currently exists in the

25  public record showing the Sackler's potential liability or

Page 158

1    liability?

2    BY MR. GOLDMAN:

3    A    Yes.

4    Q    I was also going to ask you, was your group part of the

5    discussions that took place in the months leading up to the

6    Chapter 11 Plan?

7    A    Yes.

8    Q    And was it supportive of the settlement framework as

9    where the other states would sign on to it?

10   A    Yes, the Plaintiff's Executive Committee and the

11   negotiated -- the subcommittee, which was the negotiated

12   committee, was supportive -- well, I can't say that it was -

13   - that we had come to final terms, but the structure of the

14   settlement and the offer that was on the table -- and I

15   can't tell you chapter and verse what that was, was

16   something that the Plaintiff's Executive Committee was

17   optimistic about and on board with.  But it had not been

18   finalized, certainly, as of the time of the filing of the

19   Petition.

20   Q    And how about the (indiscernible)?

21   A    It's been proposed.  I don't know that we had arrived

22   at a final decision as to whether or not the dollars that

23   were on the table at the time were adequate.  I know that

24   they were subject to further discussion.  So, I would say,

25   we were having discussions that we thought would continue to

1    be fruitful towards resolution.

2    Q    So, you would acknowledge that this is really a matter

3    of line drawing as to their one constituent or set of

4    constituents might consider an acceptable amount for

5    allowing the Sacklers to walk off with releases?

6    A    I'm sorry.  I don't understand that question.

7    Q    Before a party, even your constituents, would actually

8    sign off on a settlement with the Sacklers which involves

9    third-party releases, you need to be satisfied with the

10   amount that was being contributed was sufficient to do that,

11   correct?  And what I'm asking is, you acknowledged that

12   different constituents would view that amount differently

13   and come to a different conclusion as to what should be

14   contributed in order to gain those third-party releases.

15   A    Well, let me answer it this way, Mr. Goldman.  Any time

16   you are involved in settlement discussions, you draw a line,

17   and you evaluate the entire situation, including the factors

18   that I testified previously about, and you ultimately make a

19   recommendation to the client and determine what your bottom

20   line is going to be.  So, could somebody else evaluate it

21   differently?  I suppose, but we -- knowing what we knew then

22   and what we had uncovered and how we analyzed the case, I

23   think we were heading in the direction of a potential

24   resolution that we certainly were prepared to recommend to

25   our constituents.

Page 160

1    Q    Understood.  And I'm sure you would be pleased if there

2    was an additional amount of money contributed, would you

3    not?

4    A    Well, since our goal is always to maximize the recovery

5    in any situation like this, I guess the answer is yes.

6           MR. GOLDMAN:  No further questions, Your Honor.

7           THE COURT:  Okay.  Mr. O'Neill?

8           MR. O'NEILL:  Tad Robinson O'Neill from the State

9    of Washington.

10          CROSS-EXAMINATION OF PETER H. WEINBERGER

11   BY MR. O'NEILL:

12   Q    Mr. Weinberger, I just want to clarify, Mr. Huebner

13   (indiscernible) suggest that the document repository --

14   well, I wasn't clear, but I wanted to clarify.  It doesn't

15   include Sacklers waiving attorney/client privilege, but just

16   Purdue itself.  Is that right?

17   A    I don't know those details.

18   Q    Fair enough.  It's in the documents anyway.  All right.

19   Thank you.

20          THE COURT:  Okay.  Any more questions for Mr.

21   Weinberger?

22          MR. GOLDMAN:  Your Honor, if I may, just a couple

23   of redirects.

24          THE COURT:  Does anyone have any more cross for

25   Mr. Weinberger before we go to redirect?  No?  Okay.  You

1     can go ahead, Mr. (indiscernible).

2             REDIRECT EXAMINATION OF PETER H. WEINBERGER

3     BY MR. (indiscernible):

4     Q    Mr. Weinberger, your Declaration is almost exclusively

5     on Section 5.8, but much of the questioning has been about

6     the (indiscernible) the bankruptcy proposal.  Could you just

7     say something about the basis of your opinion on the

8     bankruptcy proposal at large (indiscernible) supported.

9     A    Yes.  I think I expressed it earlier but let me be

10    clear.  It is my view, in part because of the work that we

11    contributed to pre-bankruptcy, that we created substantial

12    global through the creditors in this case by bringing both

13    Purdue and the Sacklers to the table with the tender of $5.5

14    billion to maximize -- and that the structure of this, which

15    maximizes the amounts for abatement, is a very important

16    part of the work that we did pre-Petition to facilitate this

17    resolution.  And I don't want to be repetitive, but it goes

18    without saying that, in addition, the injunctive relief,

19    which includes document repository, which tells a story,

20    which file would -- I mean, there's another way of doing it,

21    which would be a trial, but in this case, this allows the

22    public to understand the story and to learn from it and to

23    have people publish about it, as well as the other

24    injunctive relief, was an extremely important part of the

25    resolution, and light is that the PEC supports this

1    reorganization Plan.

2    Q    And one last question, Mr. Weinberger.  In your

3    Declaration, you describe the amount of hours that was spent

4    pre-Petition and also the millions and millions of pages of

5    documents that were reviewed by AI manually.  What's your

6    assessment about how central the inquiry into the review and

7    the Sacklers was in the work that you can see and

8    (indiscernible) bankruptcy filing.

9    A    Sure.  So, this case began with Purdue.  This case

10   began with Purdue in its development of OxyContin and its

11   marketing of OxyContin.  And then, flowing from that, were

12   the other manufacturers who was the opportunities -- the

13   same opportunities and proceeded along the same lines of

14   marketing.  And then the other parts of the distribution

15   chain, which includes the distributors and the pharmacies,

16   the retail, chain pharmacies, all of whom are defendants in

17   the litigation that we pursued, all followed from that.  But

18   to the way in which Purdue's story changed the paradigm of

19   the use of controlled substances to treat pain and the way

20   that it marketed that, was and remains a central part of the

21   story, and in any litigation involving any of the other

22   defendants, is a very important part of the story.

23          MAN 3:  That's all I have, Your Honor.

24          THE COURT:  So, just to make sure the record is

25   clear, Mr. Weinberger, when you say, "this case", you're

1    referring not to just this Purdue case, but basically to the

2    multi-district litigation as a whole, correct?

3              MR. WEINBERGER:  Yes, Your Honor.

4              THE COURT:  Okay.

5              MR. WEINBERGER:  Yes, Your Honor.

6              THE COURT:  All right.  Does anyone have any more

7    questions for Mr. Weinberger?  I normally ask --

8              MAN:  Your Honor --

9              THE COURT:  Oh, go ahead.  I'm sorry.

10             MAN:  I just wanted to make one observation in Mr.

11   Weinberger's finish before you move to the next witness.  I

12   just wanted to point out, Your Honor, for the record, in

13   response to an observation that you made at the outset of

14   the questioning.  That, in addition to Mr. Weinberger's

15   testimony, I wanted to bring Your Honor's attention to

16   portions of Mr. Guard's Declaration, particularly beginning

17   with paragraph 72, running through paragraph 79, which also

18   addresses the (indiscernible), but from the state's

19   perspective.  So, I want you to be aware --

20             THE COURT:  I'm very aware of that.  Thank you.

21             MAN:  Okay, I just --

22             THE COURT:  Yeah.  I just -- that one sentence in

23   his Declaration, I just wanted to know if he could amplify

24   on it, and I appreciate his answer.

25             MAN:  Very well, Your Honor.

Page 164

```
 1              THE COURT:  Okay.  I'd normally say you could step

 2    down Mr. Weinberger, but instead, you can sign off.

 3              MR. WEINBERGER:  Thank you, Your Honor.

 4              THE COURT:  Okay.  All right.  I think with the

 5    next set of witnesses, we're really dealing with different

 6    introducing parties and counsel.  And the first witness is

 7    Timothy Martin.

 8              MR. JOSEPH:  Yes, Your Honor.  Gregory Joseph for

 9    the Raymond Sackler Family and we're presenting Mr. Martin.

10    And I will observe he also gave a Declaration that relates

11    to the belt of the A side of the Mortimer Sackler Family,

12    and it may be, although nobody indicated an interest in

13    crossing him before today, it may be efficient to have any

14    questioning concerning him take place at one time, if that

15    suits the Court.

16              THE COURT:  Okay, well I have his -- I have before

17    me his Declaration on the Side B.  I haven't gone over the

18    other one yet.  So, we'll see if there are questions on Side

19    -- on his -- I take it there are two other -- there are two

20    Declarations, both August 4, 2021?

21              MR. JOSEPH:  I don't know the date of the A side.

22              THE COURT:  There are two separate ones.

23              MR. JOSEPH:  Correct, yes.  This -- the file that

24    you have is just the B side.

25              THE COURT:  Okay, well, you know what?  I will
```

Page 165

1    swear him in on both and we'll see if there's cross.  If

2    there is to be cross, we may have to take him at a different

3    time.  I'll review the other one separately, but I guess

4    enough said on that point.  And I think, with all of your

5    witnesses and the Side A witnesses, they are governed by the

6    stipulation that was read into the record yesterday between

7    the Sackler families and the states in Connecticut, Oregon,

8    Washington and the District of Columbia.

9            MR. JOSEPH:  Yes, Your Honor.

10           THE COURT:  Okay.  All right.  So, Mr. Martin,

11   would you raise your right hand, please?  Do you swear or

12   affirm to tell the truth, the whole truth and nothing but

13   the truth, so help you God?

14           MR. MARTIN:  Yes, Your Honor.

15           THE COURT:  Okay.  And it's Timothy and then, M-A-

16   R-T-I-N?

17           MR. MARTIN:  That's correct.

18           THE COURT:  Okay.  So, Mr. Martin, you submitted a

19   Declaration intended to be your direct testimony under my

20   Order governing the procedures in this matter dated August

21   4, 2021, to which you've attached an Amended Expert Report

22   of Timothy J. Martin on behalf of the Raymond Sackler

23   Family, sometimes referred to as the Side B Family.  Knowing

24   that this would be your direct testimony for this hearing,

25   sitting where you are today, August 13th, is there anything

Page 166

1    in the Declaration or the Expert Report that you wish to

2    change?

3              MR. MARTIN:  No, Your Honor.

4              THE COURT:  Okay.  I'm going to ask you the same

5    question with regard to your Declaration regarding the

6    Expert Report on the Side A or Mortimer Sackler Family.  Is

7    there anything, knowing that that would be your direct

8    testimony also for this hearing, in those documents that you

9    would wish to change?

10             MR. MARTIN:  Your Honor, let me just clarify

11   something with counsel.  The Family A Report was a Facts

12   Declaration --

13             THE COURT:  Okay.

14             MR. MARTIN:  and not a --

15             THE COURT:  Not an expert report, all right.

16             MS. MONAGHAN:  That's correct, Your Honor.

17             THE COURT:  Okay.  All right.  Well, you know, Mr.

18   Joseph, since I haven't reviewed it, I may need to have Mr.

19   Martin come back to testify on that.

20             MR. JOSEPH:  That's fine, Your Honor.  He was only

21   here on the B side originally.  This just came up today, an

22   inquiry from Maryland.

23             THE COURT:  All right.  And let me just ask, will

24   anyone want to cross-examine Mr. Martin on the Side A

25   Declaration?  All right.  So, I will let you know whether I

1    need to have any more questions of him based on my review of

2    it, in which case we'll have to put him on again.  But since

3    no-one else wants -- no-one wants to cross-examine him, it

4    may be that I'm satisfied after I read it that I don't have

5    any questions based on it.

6           MS. MONAGHAN:  Thank you, Your Honor.  This is

7    Maura Monaghan from Debevoise & Plimpton on behalf of the A

8    side, just for the record.  And we will do whatever is most

9    convenient for everyone.

10          THE COURT:  All right.  Very well.  All right, so

11   focusing then on the B side Declaration and Expert Report,

12   does anyone object to its admission?  All right.  I will

13   admit the Declaration and the Expert Report that's attached

14   to it as an Expert Report on the topics covered by that

15   report, mainly the financial condition of the B side Family

16   or the Raymond Sackler Family.

17          MR. JOSEPH:  Thank you, Your Honor.

18          THE COURT:  Does anyone want to cross-examine Mr.

19   Martin on his Declaration and Expert Report?

20          MR. UNDERWOOD:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. UNDERWOOD:  Allen Underwood with the firm of

23   Lite DePalma Greenberg Afanador on behalf of certain

24   Canadian Municipal Creditors and certain Canadian First

25   Nations.

Page 168

1              CROSS-EXAMINATION OF TIMOTHY MARTIN

2      BY MR. UNDERWOOD:

3      Q    Mr. Martin, by virtue of the fact that Purdue Canada is

4      an independent associated company, is it not true that its

5      value is being committed to fund the U.S. Plan?

6                  MAN 3:  Objection.  That's beyond the scope of his

7      report and beyond the scope of his expertise.

8                  THE COURT:  Okay.  I think the report was simply

9      to evaluate the -- to put a value on the assets of the

10     Raymond Sackler Family.  So, I think --

11                 MR. UNDERWOOD:  I understand.

12     BY MR. UNDERWOOD:

13     Q    So, Mr. Martin, isn't it true that you did not actually

14     perform a full valuation of Purdue Canada, but rather

15     attributed to it an illustrative value for the purposes of

16     your report?

17     A    That's correct.  No valuation was done on the IACs.  It

18     was -- the $4.5 million gross amount was (indiscernible).

19     Q    And that illustrative value, isn't it true that it

20     doesn't account for potential loss of value in IACs,

21     including Purdue Canada, following confirmation of this

22     Plan, depending upon what happens post-confirmation, but

23     pre-sale?

24     A    The value itself was not intended to be an enterprise

25     value.  The IAC is illustrative (indiscernible).

Page 169

1          THE COURT:  I'm sorry, Mr. Martin.  You're going

2     to have to come closer to your microphone because you're

3     breaking up.

4          MR. MARTIN:  I'm sorry, Your Honor.  Is this

5     better?

6          THE COURT:  Yes.

7     BY MR. UNDERWOOD:

8     A   Okay.  I'll just answer that again.  You are correct in

9     that the $4.5 billion amount is an illustrative value.  It

10    was not intended to represent the enterprise values.  It

11    does not factor in any specific action.

12    Q   Isn't it true that the Sacklers will benefit from any

13    post-confirmation pre-sale increase in the value of the

14    IACs?

15         MAN 3:  Objection.  That's neither relevant, Your

16    Honor, nor is it part of the Expert Report within the

17    expertise.  He assessed value as of a point in time,

18    including an illustrative value for the IACs.  He wasn't

19    engaged to speculate as to the future.

20         THE COURT:  Okay.  I think, Mr. Underwood, your

21    point is just a question really as to an interpretation of

22    the Plan as opposed to Mr. Martin's Expert Report, i.e., the

23    Plan provides for what is retained by the Sacklers, which

24    can go up or down in value, but it's not something that Mr.

25    Martin addressed.  So, I'll sustain the objection.

Page 170

1           MR. UNDERWOOD:  I'll ask one more question and

2    that's all.

3           THE COURT:  Okay.

4    BY MR. UNDERWOOD:

5    Q    Isn't it true, Mr. Martin, that your Declaration and

6    your Report does not account for worldwide liability claims

7    and causes of action as to the value of the IACs?

8    A    With respect to the IACs, it's strictly an illustrative

9    value.  It does not account for any specific liability

10   (indiscernible).

11   Q    No further questions.  Thank you.

12          THE COURT:  Okay.  Does anyone else wish to cross-

13   examine Mr. Martin?  All right.  Do you have any redirect

14   Mr. Joseph?

15          MR. JOSEPH:  I do not, Your Honor.

16          THE COURT:  Okay.

17          MR. JOSEPH:  Thank you.

18          THE COURT:  Mr. Martin, you can sign off then.

19   Thank you.

20          MR. MARTIN:  Thank you, Your Honor.

21          THE COURT:  All right.  I think the next witness

22   is Mr. Trompetta.  Mr. Joseph, I think you're on mute.

23          MR. JOSEPH:  Okay.  I guess I'm off mute.  I

24   apologize.

25          THE COURT:  Now you're off mute.

1          MR. JOSEPH:  Mr. Trompetta, is hearing impaired,

2     Your Honor.  And we would ask anybody who asks him a

3     question to look directly at the camera because that will

4     assist him in being able to hear and understand what's being

5     said.  And we've also arranged, this morning, with Mr.

6     Andino and the Court so that he'll have a real time

7     (indiscernible) to assist him also if there are questions

8     for him.

9          THE COURT:  Okay.  All right.  Well, I want to

10    thank Mr. Andino for that, as well as many other things he

11    and his staff have done for this hearing.  Mr. Trompetta, I

12    see you there.  Would you raise your right hand please?  Do

13    you swear or affirm to tell the truth, the whole truth and

14    nothing but the truth, so help you God?

15         MAN 2:  This is his lawyer, Your Honor.

16         THE COURT:  Oh, I'm sorry.  I was just assuming it

17    was the witness.  Is he signing on?

18         MAN 2:  Yes, we're told that he is signing on,

19    Your Honor.

20         THE COURT:  Okay.

21         MAN 2:  There is Mr. Trompetta.

22         THE COURT:  All right.  Good afternoon.  I see you

23    there, Mr. Trompetta.  Would you raise your right hand

24    please?  Do you swear or affirm to tell the truth, the whole

25    truth and nothing but the truth, so help you God?

1                MR. TROMPETTA:  I do.

2                THE COURT:  And -- you can take your hand down.

3        And it's Carl, C-A-R-L, Trompetta, T-R-O-M-P-E-T-T-A?

4                MR. TROMPETTA:  That's correct.

5                THE COURT:  Okay.  Mr. Trompetta, you submitted a

6        Declaration in connection with this proceeding, this

7        contested matter, dated July 26, 2021, which was intended,

8        under my Order governing procedures for this hearing, to be

9        your direct testimony.  Sitting here today on August 13th,

10       is there anything in this Declaration that you would wish to

11       change?

12               MR. TROMPETTA:  No.

13               THE COURT:  Okay.  Does anyone have any objection

14       to Mr. Trompetta's Declaration being admitted as his direct

15       testimony?  Okay.  I've reviewed it and hearing no-one, I'll

16       admit it as Mr. Trompetta's direct testimony.  Does anyone

17       wish to cross-examine Mr. Trompetta on his Declaration?

18       Okay.  I've reviewed the Declaration.  I don't have any

19       questions of Mr. Trompetta, so you have a very short

20       appearance here and can be excused.  You can sign off.

21               MR. TROMPETTA:  Okay.  Thank you.

22               THE COURT:  Thank you.  All right.  The next

23       witness is Mr. Hamermesh, but before we call him, there is a

24       pending Motion in Limine by the State of Maryland with

25       respect to this Declaration, which I think we should address

Page 173

1   first.

2          MS. TONNESEN:  Good morning, Your Honor.  Sara

3   Tonnesen on behalf of (indiscernible).  As you mentioned, we

4   have --

5          THE COURT:  Ms. Tonnesen, you're going to have to

6   come a little closer to your microphone, if you can.

7          MS. TONNESEN:  All right.  Let me see.  Can you

8   hear me okay now?

9          THE COURT:  It's better.  Thank you.

10          MS. TONNESEN:  Okay, good.  Thank you, Your Honor.

11   As our Motion in Limine to Strike the Declaration of

12   Professor Hamermesh and exclude his testimony

13   (indiscernible) --

14          THE COURT:  I'm sorry.  Can I interrupt you?  Is

15   there any way we can make it louder?

16          MS. TONNESEN:  I apologize I don't have a separate

17   microphone.  I'll try to keep speaking up.

18          THE COURT:  We'll try the sound here too.  Okay.

19   Good, thank you.  I'm sorry.  You have to start over if you

20   want, that's fine.

21          MS. TONNESEN:  As our Motion in Limine to Strike

22   the Declaration of Professor Hamermesh --

23          MAN 3:  Excuse me, Your Honor.  Professor

24   Hamermesh has come on.  Shall we have him sign off and so --

25          THE COURT:  Mr. Hamermesh, we're dealing with the

Page 174

1    Motion in Limine on your Declaration, so you can just sign

2    off for the moment.

3                 MR. HAMERMESH:  Certainly.  Thank you, Your Honor.

4                 THE COURT:  Okay.  All right.  Time #4, you can go

5    ahead Ms. Tonnesen.

6                 MS. TONNESEN:  Okay, thanks.  Professor

7    Hamermesh's opinions are inadmissible in this case for a

8    number of reasons.  First of all, we would argue that

9    Professor Hamermesh's opinions are inadmissible because

10   they're simply not relevant to any decision that's

11   (indiscernible).  Professor Hamermesh's Report lays out a

12   hypothetical future litigation and opines on how the Sackler

13   Family acted or didn't act based on a highly selective

14   (indiscernible) own admission is 639 documents in a year

15   versus a million documents.  (indiscernible) lengthy

16   statement of assumed facts -- that statement of assumed

17   facts was sort of a sister to the proposed findings of fact

18   and conclusions of law that Your Honor held is inadmissible

19   when you struck the Declaration of Mr. Gregory Joseph in

20   this case during your pre-trial hearing on August 9th, and

21   would argue that the opinions today are sort of akin to that

22   Declaration and that all it really does is put forth a

23   hypothetical case based on an assumed universal fact and a

24   very narrow view of the relevant evidence.  And even to that

25   extent, only a cursory review of the evidence and therefore,

Page 175

1    there's nothing relevant to the Court.  Because it's not

2    relevant to any (indiscernible) action you're being asked to

3    decide.  I apologize.  Let me turn my phone off.

4    (indiscernible) qualified to give (indiscernible) although

5    (indiscernible) interpreting corporate documents

6    (indiscernible).  He doesn't actually have the experience

7    that would (indiscernible) opinion as to the complex

8    (indiscernible) issues that are raised in his opinion.  I

9    mean, (indiscernible) the number of compliance reports, he

10   had sent us compliance reports and opines that the Sacklers

11   acted -- did not act inconsistently with generally accepted

12   corporate document principles.  But it's simply impossible

13   for Professor Hamermash to (indiscernible) that decision

14   based on his expertise.  He admits in his Declaration he

15   doesn't have any of the scientific or regulatory background

16   that one would (indiscernible) or any kind of

17   (indiscernible) finance report (indiscernible).  Third,

18   Professor Hamermesh's work is also unreliable because of

19   (indiscernible).  As I mentioned, he (indiscernible)

20   available in this case, but all selected by counsel for the

21   Sacklers.  He didn't (indiscernible) any documents

22   (indiscernible).  As far as we know based on his opinion, he

23   never asked for additional documents and even the 639

24   documents that he had, he admits that (indiscernible), he

25   didn't look at (indiscernible) that one would expect in

1   order for him to put on any kind of (indiscernible) the

2   underlying (indiscernible).  And additionally,

3   (indiscernible) today.  Professor Hamermesh's opinions

4   simply aren't very helpful to the Court and shouldn't be

5   admitted under 704.  His hypothetical case based on a

6   Sackler attorney (indiscernible) statement of facts is sort

7   of (indiscernible) opinion that the rules have said

8   (indiscernible).  And finally, Professor Hamermesh's

9   opinions are nothing more than an opinion on the legal issue

10  of reliability and even when he tries to disclaim this, his

11  opinion is (indiscernible).  It's very clear at the end of

12  the day, that's what he's doing here and he's making opinion

13  as to the ultimate merits of the pending (indiscernible)

14  litigation that simply has been before the Court and is

15  appropriate to be decided today.  And therefore, for those

16  reasons, would ask that you strike his Declaration

17  (indiscernible).

18          THE COURT:  Okay.  Let me address the last point

19  that you made.  As I understand it from the Agreement by the

20  Raymond Sackler Family and the other Sacklers, this

21  document, like all of the documents that are being offered

22  by them, are not being offered for the purpose of persuading

23  the Court to make a finding or conclusion at this hearing on

24  the ultimate merits of any underlying claim against the

25  Sackler families.  So, I would understand your last argument

Page 177

1   very well and probably agree with it, but for that

2   stipulation.  But I guess before I ask you a question, Ms.

3   Tonnesen, I'm asking Mr. Joseph.  If this Expert Report and

4   the witness's testimony is not being offered for my ultimate

5   determination of the merits of claims against the Sackler

6   Families, what is it being offered for?

7           MR. JOSEPH:  Your Honor, (indiscernible) it's

8   relevant to identify for the Court issues that the estate

9   would face in pursuing claims against the Sacklers.  He

10  offers three opinions, all dealing with customary norms of

11  corporate governance.  The first is --

12          THE COURT:  No, I understand the opinions he's

13  offering.  So, it's being -- just to go back to your first

14  sentence there.  It's being offered so that I can see the

15  types of arguments that would be raised by the Sacklers in

16  connection with any attempt to pursue third-party claims

17  against them as to the --

18          MR. JOSEPH:  Your Honor --

19          THE COURT:  -- testifying to as far as their roles

20  on the Board and management?

21          MR. JOSEPH:  Yes, Your Honor.  And more

22  specifically, under the Second Circuit's decision in

23  Bilzerian, ordinary practices are legitimate item of expert

24  testimony so that the defendant's conduct can be weighed

25  against standard accepted practices in the industry.  And

1    we're talking about, in the case, to take his first opinion,

2    standard accepted practices of corporate governance in terms

3    of director oversight of the compliance function.  And that

4    is relevant to a care mark claim.  It's relevant to a

5    question of whether or not there was negligence, whether or

6    not they would give rise to any inference of bad faith.  And

7    so, that -- it's relevant to get the industry standards

8    under Bilzerian, so that the Court can evaluate the

9    settlement, whether or not the settlement makes sense.  And

10   I'm saying -- first of all, if Your Honor has a question,

11   I'll stop, but I --

12            THE COURT:  No, go ahead.

13            MR. JOSEPH:  The entire premise of the Motion is

14   wrong.  There's nothing wrong with illiciting expert

15   testimony by hypothetical.  That's a perfectly proper way to

16   do so.  In the (indiscernible) case, specifically allowed an

17   expert in a complicated case to rely on a memorandum

18   prepared by counsel because the case was massively sprawling

19   and I'm sure that it was a tiny fraction of the size of this

20   case because the Court said, there would be no way for the

21   expert to be able to grasp all of the nuances.  And if

22   there's a challenge to the foundation, then that's a matter

23   for cross-examination, but it's not a matter for exclusion.

24   The Advisory Committee note General Rule 702 says

25   specifically that disputes of facts are not the basis for

Page 179

1   exclusion.  It's very common in a case to have disputes of

2   fact and those have to be determined by the prior fact

3   before a prior fact to make an assessment.  All this is

4   doing, Your Honor, is to provide Your Honor with industry

5   norms, which are relevant to determining whether or not

6   there was a (indiscernible) violation, whether or not the

7   behavior of the shareholders as owners of the company and

8   their conduct was in line with the conduct and demands of

9   other shareholders and whether or not as a result, there is

10  a complete domination or control.  And it's relevant to know

11  what the industry standards are on that.

12          THE COURT:  Well, let me then turn to another

13  point that Ms. Tonnesen made, which is that Mr. Hamermesh is

14  not really qualified as to the industry that the Debtors are

15  in, i.e, the pharmaceutical industry and therefore, the

16  property industry norm for a board or an officer in that

17  particular industry.

18          MR. JOSEPH:  Your Honor, he spent -- I'm sorry,

19  there's an echo.  He spent 40 years examining --

20          THE COURT:  Someone needs to put their phone on

21  mute so that there's no echo.

22          MR. JOSEPH:  He spent more than 40 years both as a

23  partner at Morris Nichols and as a professor, examining

24  industries and he specifically looked at the criteria for

25  pharma boards in connection with his engagement and it's

Page 180

1    perfectly appropriate for an expert with generalized

2    expertise to focus on a particular industry for a particular

3    engagement.  So, he's perfectly qualified.  They themselves

4    say (indiscernible) published with distinction.  That

5    requires that one focus on particular industries at

6    different points in time.

7              THE COURT:  All right.

8              MR. JOSEPH:  And to the extent they claim that

9    there is some legal opinions hidden here, it distorts

10   paragraph 10 of this opinion by taking a snippet, which

11   (indiscernible) very clear in that first sentence, is simply

12   a foundational assumption excluded the time period between

13   May 2007 because it wouldn't be pertinent to assessment of

14   liability, which means his opinion would not help the Court

15   because his assumption is, the Court's not going to be

16   looking at liability issues prior to 2007.  I'd also say,

17   Your Honor, I don't want to overlook the fact, this Motion

18   is extremely untimely.  They took -- they got this report on

19   June 15th, they got his supplemental report on July 12th,

20   they took his deposition on July 15th.  Their Motion on Your

21   Honor's rules was due five days before trial.  They made it

22   at 10 p.m. on the day before trial, which required

23   (indiscernible) done in advance.  We filed our brief at

24   12:30 a.m. today on this issue.  So, it should be denied

25   purely as untimely.  And I'd also say, Your Honor, at this

1    point, given that Your Honor has determined that you were

2    not interested in dealing with the merits or don't consider

3    it an appropriate (indiscernible) the merits of the

4    underlying opioid litigation, we're offering this opinion

5    specifically in connection with the state claims to help

6    inform the Court's view of the (indiscernible) of the

7    settlement.  Maryland hasn't objected to the settlement of

8    the estate claims.  Nobody has objected to the settlement of

9    the estate claims.  They don't even have a basis for

10   objecting to testimony not being offered on their claims to

11   their objection.

12          THE COURT:  Well, I guess that was the last

13   question I had, which is, as I read this report, it does not

14   deal with the aspects of the state -- not estate, the state

15   claims that the states contend are unique to them and that

16   create a different standard for liability than one would

17   have otherwise.  Am I right about that?  I guess I am

18   because you've just said, this is not offered as even to

19   show the arguments that would be made if one were to

20   consider the merits of claims against the Sacklers if those

21   claims were asserted by a state.

22          MR. JOSEPH:  Correct, Your Honor.  We heard you

23   loud and clear also, that you're not interested in

24   litigating that, to the extent it could be interpreted any

25   other way.  What he talks about are care mark, he talks

Page 182

1     about alter ego, he talks about facts that are relevant to

2     the unjust enrichment or fiduciary duty claims versus the

3     three opinions that he gives.  One can disagree with the

4     opinions, but they're not directed at Maryland or the

5     state's claims.

6               THE COURT:  Okay.  And by the way --

7               MAN 4:  Your Honor, that was my only reason for --

8               THE COURT:  It wasn't I that said I wasn't

9     interested in claims that the states would have against the

10    Sacklers.  It was that the Debtors had chosen not to

11    evaluate those as part of their showing and therefore, I

12    wasn't interested because of that choice that the Debtors

13    made.  So, Ms. Tonnesen, I think there are some legitimate

14    points that Mr. Joseph has made here.  I'm not going to

15    focus on the time at this point.  I really haven't had the

16    chance to focus on the 1:30 a.m. this morning response, but

17    based on my own review, it appears to me that given the

18    limitations that the Sacklers have placed on this document

19    and that it's really not offered as lawyer argument, but

20    focusing just on corporate norms, it's admissible.  And more

21    importantly, it's not being used with respect to the state's

22    claims against the Sacklers.  And it appeared that way to me

23    and if it was going to be used, I would have made it quite

24    clear that it doesn't really deal with the state's claims

25    but, in fact, I don't need to do that because the party

Page 183

1    offering the document has -- as made it crystal clear that

2    it's not going to be used against the states.  So, I just --

3    to me, it's marginally helpful and you could certainly

4    cross-examine him on it.  Although again, it would be in the

5    capacity as someone looking after the estate's claims, not

6    the states'.

7                MS. TONNESEN:  Thank you, Your Honor.  We would

8    ask then if counsel for Professor Hamermesh would stipulate

9    as to the authenticity of the deposition of Professor

10   Hamermesh that we took (indiscernible) exhibit at JX-0384 as

11   the deposition and then the (indiscernible) at 0385, 0386

12   and 0387.  We think it would save the Court resources and

13   time to simply get the deposition --

14               THE COURT:  Let me make sure because if it came

15   through family, what you're asking is that you would like to

16   have those deposition --

17               MS. TONNESEN:  (indiscernible)

18               THE COURT:  -- included in the record in lieu of

19   your cross-examination.

20               MS. TONNESEN:  Yes, it's already in the Joint

21   Exhibit book.  I believe we're the only party that objected

22   to the deposition and we would obviously withdraw that

23   objection if Mr. Joseph would just stipulate that that's an

24   authentic copy of the deposition to allow it to be entered

25   into the record.

Page 184

```
 1                THE COURT:  All right.

 2                MR. JOSEPH:  Of course, Your Honor.  As long as

 3      it's the entire deposition.  It's complete under 106 and

 4      it's authentic and we have no objection.

 5                THE COURT:  Okay.  All right.  Mr. Fogelman, I

 6      think you're on mute.

 7                MR. FOGELMAN:  I apologize, Your Honor.  This is

 8      Larry Fogelman from the (indiscernible).  May I be heard?

 9                THE COURT:  Sure.

10                MR. FOGELMAN:  Thank you, Your Honor.  Your Honor,

11      just briefly, we understand that Purdue is not -- in light

12      of the presentation of this case and chief, it's not taking

13      issue with questions regarding how the former directors

14      acted in running Purdue.  However, Your Honor, it is very

15      possible that this Plan may not be confirmed, and the

16      Declaration contains not just legal analysis, but

17      conclusions.  For example, paragraph 52, that the conduct of

18      the former directors during the relevant period did not

19      amount to personal direct participation in any wrongdoing by

20      Purdue.  And my understanding is that the Debtors do contest

21      that and should there be need for further proceedings if

22      this Plan is not confirmed, that may include estate claims

23      being brought against the Sacklers to bring more money into

24      the estate for its benefit.  And I know there was some

25      stipulation referenced this morning about how it wouldn't
```

Page 185

1    prejudice future cases or future -- if there's a need for

2    further proceedings in this case (indiscernible) specific

3    parties, but to the extent that the United States isn't part

4    of general unsecured creditor in the case, we just want to

5    make sure that any part, by not contesting or cross-

6    examining the witnesses on these points and also on

7    subsequent witness testimony by the Sacklers, isn't

8    conceding.  And again, this is not part of the Debtors' case

9    issues.

10             THE COURT:  Right.  That's my understanding, Mr.

11   Fogelman.  Again, this is not being offered for the Court to

12   make a determination on the merits of any claims that the

13   estate would have against anyone.  It's being offered as

14   expert testimony as to arguments, which I assume would be

15   made in such a litigation.  But I'm not going to rule on the

16   merits, so I can't imagine how it would estop anyone since

17   there wouldn't be a decision.  But I also understood that

18   the agreement that was referenced at the start of the

19   hearing applies not just to specific parties, but to

20   everyone on these points so that they don't have to worry

21   about such estoppel.

22             MS. TONNESEN:  Your Honor, could I clarify one

23   point.  I apologize for interrupting you.  Maryland isn't a

24   party to that stipulation, so to the extent that's relevant

25   to our --

```
 1            THE COURT:  No, but -- it's not -- I've clarified
 2    by Mr. Joseph.  It's not being offered to determine the
 3    liability of the Sacklers, right?  It's being offered to
 4    show what the Sacklers would argue on this point.  And
 5    you're free to let me know -- you haven't hesitated to let
 6    me know what your client would argue to the contrary.  In
 7    fact, I have that.  The one difference is that this is
 8    expert testimony as opposed to a legal brief.  But I think,
 9    given the nature of the testimony, which is a somewhat
10    esoteric deal, although not scientifically esoteric.  It's
11    worth having, for what it's worth.  I do rule on issues of
12    corporate governance and ultimately, I'm guided by what I
13    know, and parties are free to brief those issues to me, as
14    they have, and states, in fact, have basically said this is
15    largely irrelevant to their claims in any event.  So, again,
16    it's -- I appreciate that this is testimony rather than
17    legal argument, but it is not fact testimony.  I'm not
18    taking the facts, the hypotheticals, certainly as true.  I'm
19    not taking any of those assertions as true, it's a
20    hypothetical and it just helps me to guide what arguments
21    might be made in respect of estate claims like veil piercing
22    and breach of fiduciary duty.  And frankly, having just
23    dealt with two monster litigations that include breach of
24    fiduciary duty claims, I think I'm up on those already, but
25    it doesn't hurt to hear from Mr. Hamermesh on that, as well,
```

Page 187

1    as far as I'm concerned.

2            MS. TONNESEN:  May I just ask one clarifying

3    question?  Are the underlying documents coming in

4    (indiscernible) 639 exhibits -- I'm sorry, not exhibits,

5    documents --

6            THE COURT:  They're only in to the extent they're

7    in because the parties have agreed to their admissibility.

8    This doesn't back door their entrance into the case.

9            MS. TONNESEN:  Thank you.

10            THE COURT:  Okay.  So, Mr. Fogelman, I don't know,

11    did that satisfy you in responding to your point?

12            MR. FOGELMAN:  Yes, Your Honor.  You've made clear

13    no parties absolved by any facts (indiscernible) Declaration

14    and parties are free to argue this point if there's a

15    subsequent hearing in this proceeding.  Thank you, Your

16    Honor.

17            THE COURT:  Well, and you're free to argue them

18    anytime, including if there's a subsequent proceeding.

19    Okay.  All right, so I think we --

20            MR. FOGELMAN:  Thank you, Your Honor.

21            THE COURT:  -- with those clarifications, I'll

22    overrule the remainder of the Motion in Limine because I

23    think the clarifications resolved the grounds upon which I

24    might have granted them.  So, can we get Mr. Hamermesh back

25    on the call?

Page 188

1          MAN 3:  We have that in process, Your Honor.

2          THE COURT:  Okay.  Okay, yes.  I see Professor

3     Hamermesh.  Would you raise your right hand please?

4          MR. HAMERMESH:  Sure.

5          THE COURT:  Do you swear or affirm to tell the

6     truth, the whole truth and nothing but the truth, so help

7     you God?

8          MR. HAMERMESH:  I do.

9          THE COURT:  Okay.  Mr. Hamermesh, you submitted a

10    Declaration dated August 4, 2021, that's consistent with my

11    Order establishing the ground rules for this hearing.  It's

12    intended to be your direct testimony and it attaches an

13    Expert Report corrected as of July 12, 2021.  Knowing that

14    this would be your direct testimony today, on August 13th,

15    is there anything in it that you would wish to change?

16         MR. HAMERMESH:  No, Your Honor.

17         THE COURT:  Okay.  All right.  And I think we've

18    already addressed the objection to this, which I've

19    overruled with clarifications that I've set out on the

20    record, but I don't think are particularly relevant to your

21    testimony.  Just the parties understand in what way your

22    testimony is to be used and in what ways it will not be

23    used, including in the future.  So, let me just confirm.

24    Does anyone have any remaining objection to the admission of

25    Mr. Hamermesh's Expert Report attached to his Declaration?

Page 189

1    Okay.  It's admitted, again, on the basis of my ruling on

2    the record before I swore Mr. Hamermesh in.  Does anyone

3    want to cross-examine the witness?

4               MR. EDMUNDS:  Your Honor, Brian Edmunds.  Just to

5    confirm (indiscernible)

6               THE COURT:  Oh yes.  Yes, the deposition -- some

7    people may not have heard you.  I think I kind of read your

8    lips, that was how I could hear you.  You're asking whether

9    the agreement by Mr. Joseph that the accuracy of the

10   deposition transcript that Maryland would offer up in lieu

11   of its cross-examination of Professor Hamermesh is agreed

12   and that it could be used in connection, in lieu of cross?

13   And I think Mr. Joseph confirmed that, but that's right,

14   right Mr. Joseph?

15              MR. JOSEPH:  Absolutely, Your Honor.

16              THE COURT:  Okay.

17              MR. JOSEPH:  Thank you, Your Honor.

18              THE COURT:  All right.  So, does anyone want to

19   cross-examine Mr. Hamermesh?  Okay.  I have reviewed this

20   Declaration and I don't have any questions on it. I think

21   it's clear and self-explanatory, along with clarifications

22   or stipulations that were made in connection with the Motion

23   in Limine.  So, hearing no-one, Mr. Hamermesh, after all of

24   that, you can be excused.

25              MR. HAMERMESH:  Thank you very much, Your Honor.

Page 190

1              THE COURT:  Mr. Huebner, did you have a question?

2              MR. HUEBNER:  Yes.  Your Honor, just one very

3     small (indiscernible) before he steps down.  There are

4     actually certain emails flying around (indiscernible) Your

5     Honor's ruling could not have been more clear.  So, let me

6     just clarify.  No (indiscernible) is prejudiced by the types

7     of testimony being put on (indiscernible).  Many of us

8     disagree strongly (indiscernible), we don't have to disagree

9     now (indiscernible) statement of another party.  I think

10    Your Honor is being very clear (indiscernible) since this

11    hearing started, so it is clear, I just want there to be no

12    doubt that (indiscernible) examination (indiscernible) on

13    the stipulation that there is no confirmation for the

14    Sacklers' breach.  We will be sitting there for a year, for

15    decades (indiscernible) this hearing cannot be used against

16    us.

17             THE COURT:  Again, I thought I was clear on that.

18    As is often the case, in fact, almost always the case when a

19    debtor or other party moves for approval of the settlement

20    agreement, and of course, this is a multiple faceted

21    settlement agreement, in bankruptcy court, they will let the

22    Court know what the legal issues are and some sense of the

23    risks and reward of continued litigation instead of

24    resolving those legal issues.  But it's only to inform the

25    Court of those issues, not the ultimate merits, to be

1    decided by the Court.  That's the whole point of the

2    settlement.  If you don't decide the ultimate merits and it

3    is crystal clear that if I don't confirm the Plan or if

4    there is a breach under the Plan of the Sacklers'

5    obligations if I do confirm the Plan and litigation ensues,

6    that there's no estoppel and no prejudice in such ensuing

7    litigation based on anyone's not contesting or cross-

8    examining Mr. Hamermesh or any other witness offered by the

9    Sacklers.  Again, the sole purpose of which is to show some

10   side of the arguments that they would be making if there

11   were litigation, but not for that litigation.  And there's a

12   big difference for collateral estoppel purposes.

13           MR. HUEBNER:  Thank you, Your Honor.  I apologize.

14           CLERK:  The next witness has come on the screen.

15   Would you like to (indiscernible)?

16           THE COURT:  I think we're -- again, you can sign

17   off now Mr. Hamermesh.

18           MR. HAMERMESH:  Thanks very much, Your Honor.

19           MR. HUEBNER:  Your Honor, I'll go back.  I'm just

20   at a crossroads for many parties' concerns --

21           THE COURT:  No, that's fine.  I understand.

22           MR. HUEBNER:  (indiscernible)

23           THE COURT:  All right.  So yes, we should go to

24   the next witness, and I see her on the screen.  Ms.

25   Chakraborty.  I hope I'm pronouncing that correctly.

Page 192

1                    THE WITNESS:  Yes.

2                    THE COURT:  Okay.  So would you raise your right

3       hand, please?  Do you swear or affirm to tell the truth, the

4       whole truth, and nothing but the truth so helps you God?

5                    THE WITNESS:  I do.

6                    THE COURT:  Okay.  And it's Maureen, M-A-U-R-E-E-

7       N?

8                    THE WITNESS:  Correct.

9                    THE COURT:  Chakraborty?  C-H-A-K-R-A-B-O-R-T-Y?

10                   THE WITNESS:  Correct.

11                   THE COURT:  Okay.  Ms. Chakraborty, you submitted

12      a declaration in this matter dated August 4, 2021 under my

13      order establishing procedures for this hearing.  It -- and

14      the expert report dated June 15, 2021 that's attached to it,

15      corrected as of July 26, 2021, is intended to be your direct

16      testimony in this matter.

17                   Knowing that and sitting here now on August 13th,

18      is there anything in your corrected expert report of July

19      26, 2021 or your declaration that you wish to change?

20                   THE WITNESS:  No.

21                   THE COURT:  Okay.  Does anyone object to the

22      admission of Ms. Chakraborty's declaration and attached

23      expert report?

24                   Okay.

25                   MR. ROBINSON O'NEILL:  Your Honor, this is Tad

Page 193

```
 1    Robinson O'Neill, state of Washington.  I don't object.  I

 2    just -- I want to say ditto to the extended colloquy from

 3    the last witness to this witness.

 4                THE COURT:  Okay.  No.  I want to be clear.  What

 5    we said with regard to there being no estoppel or other

 6    adverse consequences in any future dispute, when I was

 7    addressing Mr. Hamermesh's testimony, the same goes for all

 8    of the witnesses called by the Sacklers, including Ms.

 9    Chakraborty.

10                MR. ROBINSON O'NEILL:  Yep.  And I think also that

11    Mr. Joseph is offering and not -- with the stipulation that

12    we had agreed.

13                THE COURT:  Correct.  That goes again for all of

14    the Sackler witnesses.

15                MR. JOSEPH:  Correct, Your Honor.

16                THE COURT:  Okay.  All right.  So hearing no one,

17    I will admit Ms. Chakraborty's expert report as her direct

18    testimony.

19                (Declaration of Maureen Chakraborty Entered Into

20    Evidence)

21                Does anyone -- and of course, subsumed within

22    that, excuse me, is her qualification as an expert with

23    respect to the matters covered by the report with regard to

24    a retroactive solvency -- and I'm using the term solvency

25    broadly here -- retroactively solvency analysis that she
```

1    conducts or sets forth in her expert report.

2              So does anyone want to cross-examine Ms.

3    Chakraborty?

4              Okay.  I've reviewed the report.  Again, I'm not

5    reviewing it other than in the context of reviewing

6    arguments that would be made in the underlying litigation if

7    that were to ensure, not as to the validity of those

8    arguments.  And given that, I don't have any questions

9    either.

10             So again, I'm going to give people one last

11   chance, but if they don't have any cross, and I don't hear

12   anyone, Ms. Chakraborty, you can be excused.

13             THE WITNESS:  Okay.  Thank you very much.

14             THE COURT:  Thank you.

15             MR. JOSEPH:  Thank you.

16             THE COURT:  I have down as the next witness then

17   Garrett Lynam.  Excuse me.

18             MR. JOSEPH:  Yes, Your Honor, and he's in the

19   process, I'm advised, of signing on.

20             THE COURT:  Okay.

21             MR. JOSEPH:  Here he is, Your Honor.

22             THE COURT:  All right.  Would you raise your right

23   hand, please?  Do you swear or affirm to tell the truth, the

24   whole truth, and nothing but the truth so help you God?

25             THE WITNESS:  Yes.

1                 THE COURT:  And it's G-A-R-R-E-T-T, new word, L-Y-

2     N-A-M?

3                 THE WITNESS:  Yes.  Correct.

4                 THE COURT:  Mr. Lynam, you submitted a declaration

5     in this matter.  It's dated August 2, 2021, under my order

6     governing the procedures for this hearing.  It's intended to

7     be your direct testimony on -- at the hearing.

8                 Knowing that and sitting here today, August 13, is

9     there anything in it that you wish to change?

10                THE WITNESS:  No.

11                THE COURT:  Okay.  Does anyone object to the

12    admission of Mr. Lyman's declaration as his direct

13    testimony?

14                Okay.  Does anyone want to cross examine Mr.

15    Lynam?

16                MR. GOLD:  Yes, Your Honor.  Matthew Gold from

17    Kleinberg, Kaplan, Wolff & Cohen for Washington, Oregon, and

18    the District of Columbia.  May I proceed?

19                THE COURT:  Yes.

20                MR. GOLD:  Your Honor, before I actually begin my

21    cross examination, I would -- I think it would be helpful to

22    be clear.  The court provided guidance earlier that parties

23    and their corporate representatives are being permitted to

24    listen to proceedings, and I would appreciate -- I think it

25    would be helpful to have clarity from counsel to the

Page 196

1    Sacklers regarding whether they are contending that that

2    exception applies to certain particular witnesses which I

3    will now name.

4           The first is Mr. Ives, who is scheduled to testify

5    next, and the second are two Side A witnesses, Saunders and

6    White, who I believe may be testifying on Monday.  But all

7    three -- all four of them are covering similar ground.

8           MR. JOSEPH:  It is not our position that either

9    Mr. Lynam or Mr. Ives is a corporate representative.

10   However, as we advised the Court yesterday -- because no

11   party had invoked Rule 615 -- Mr. Lynam did listen to

12   yesterday's testimony.  I believe Mr. Ives listed about half

13   an hour or so, maybe less, of yesterday's testimony.  But

14   they stopped immediately when the Rule 615 issue was raised

15   at about 5:20 last night.

16          MS. MONAGHAN:  And on -- this is Maura Monaghan

17   from Debevoise & Plimpton LLP on behalf of the Mortimer-

18   Sackler family.  No Mortimer Sackler witness has listened to

19   or will be listening to the testimony of other witnesses,

20   including Mr. White and Ms. Saunders.

21          THE COURT:  Okay.

22          MR. JOSEPH:  I would ask -- I would ask the Court

23   for clarification.  After a witness has testified --

24          THE COURT:  Oh, then there's no problem.

25          MR. JOSEPH:  -- it's customary --

1          THE COURT:  With one exception.  There've been a

2     couple witnesses who might have to come back, depending on

3     whether parties that might have testimony have resolved

4     their underlying issue, so they cannot listen after the --

5     after they've testified, until that's clarified that they

6     won't -- there's no chance that they'd be coming back to

7     testify.

8          But if someone's testimony is complete and they're

9     not going to testify anymore, then they can listen.  Sure.

10          MR. JOSEPH:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MR. GOLD:  Thank you, Your Honor.  Thank you,

13     Counsel.

14          THE COURT:  All right.  So do you want to go

15     ahead, Mr. Gold?

16          MR. GOLD:  Yes, please, Your Honor.

17              CROSS EXAMINATION OF GARRETT LYNAM

18     BY MR. GOLD:

19     Q    Mr. Lynam, can you hear me clearly?

20     A    Yes, I can.

21     Q    Okay.  Thank you.  Would you please turn to Page 3,

22     Paragraph 7 of your declaration?

23     A    Yes, I'm here.

24     Q    Thank you.  You refer there to certain releases.  Do

25     you see that?

Page 198

1    A    Mr. Gold, I'm sorry.  I didn't hear what you said.

2    Could you repeat what you said?

3    Q    Certainly.  You refer in that Paragraph 7 to certain

4    releases.  I just want to make sure that you're focused on

5    what I'm to ask you about, and --

6    A    Yes.

7    Q    -- you're referencing those releases.

8    A    Correct.

9    Q    Okay.  Did you make an assessment regarding the

10   strength of the claims that those releases would release?

11   A    So I've been advised by Counsel to the B side about --

12            MR. JOSEPH:  Objection.  Don't disclose privileged

13   information.

14            THE WITNESS:  Of course.

15            THE COURT:  Okay.  So the question was did you

16   make an assessment of the strength of the underlying claims

17   that are being released.  I think that was the question.

18   Right, Mr. Gold?

19            MR. GOLD:  That is correct, Your Honor.

20            THE COURT:  All right.  So you should respond only

21   to the extent that you're not disclosing privileged

22   information, either attorney work product or attorney-client

23   communications.

24            THE WITNESS:  So I think the answer would be yes,

25   I have made an assessment.

1    BY MR. GOLD:

2    Q    Thank you.  The -- did that reference evidence your

3    assessment that such claims are weak or meritless?

4    A    Could you repeat the question, Mr. Gold?

5    Q    Did that reference evidence your assessment that such

6    claims are weak or meritless?

7    A    I apologize.  I don't know want reference is referring

8    to.

9    Q    Sorry.  The reference to claims being released and to

10   Mr. Lynam's subsequent statement that he evaluated such

11   claims.

12            THE COURT:  Is there -- I think what Mr. Joseph is

13   saying is, is there a paragraph in his declaration where he

14   states that claims being released are weak or meritless?

15            MR. GOLD:  No, I'm asking him now whether he made

16   that determination.

17            THE COURT:  Oh.

18            MR. JOSEPH:  I'm going to object to going beyond

19   the scope of the direct examination.  He's not here to

20   provide expert testimony.  He is a lawyer, and he's not here

21   to provide expert testimony as a lawyer.

22            THE COURT:  I think -- I think that's correct.  I

23   think the declaration goes to only the statement that --

24   well, it's summarized in Paragraph 10 -- that the Side B

25   family and Side B shareholder payment parties, he would not

Page 200

1    recommend entering into the settlement under the plan unless

2    they received the releases of the related parties under the

3    plan.

4            Now, you can ask him why he reached that

5    conclusion, but I think you can't ask him out of the blue

6    how he evaluated the claims.

7            MR. GOLD:  Your Honor, if I may, I will withdraw -

8    - I think my question can be clarified with reference to

9    another statement in his declaration that I believe will

10   show that his statement -- his declaration goes a bit beyond

11   Your Honor's summary, so maybe I can proceed with that, and

12   then we'll return to the question.

13           THE COURT:  Okay.

14   BY MR. GOLD:

15   Q    Okay.  Mr. Lynam, will you refer to or look at Page 4,

16   Paragraph 8 of your declaration?

17   A    Yes.

18   Q    And I'm going to read a section, and I will ask that

19   anyone note if I am reading it incorrectly.  It says,

20   "History has shown that Plaintiffs will pursue individuals

21   in litigation related to the Debtors even if the individual

22   has title or no connection to the Debtors."  Do you see the

23   part I just read from?

24   A    Yes, I do.

25   Q    Okay.  Now, when you referred to an individual having

1    little or no connection to the Debtors, was that statement

2    meant to be a shorthand for indicating that the claims

3    against such individuals would be weak?

4    A    No.   It's intended -- it's intended to reflect the fact

5    that people who have little or no connection to the Debtors,

6    to Purdue Pharma U.S., are called in to this litigation, and

7    I give examples in the next few sentences.

8    Q    I understand, but what is the relevance of their

9    connection to the Debtors with respect to your declaration?

10   A    The relevance is that these are individuals who have

11   little or no connection with the Debtors, yet they were

12   still subjected to very extensive discovery.

13   Q    I understand, but are you -- if they had little or no

14   connection to the Debtors and yet there were strong claims

15   that could be asserted against them, would it not make sense

16   that they would be subjected to discovery or actions?

17            MR. JOSEPH:  Objection.  It's a hypothetical.

18   It's an inappropriate question.  His statements are very

19   factual as to why the releases need to be as they are.

20            MR. GOLD:  Your Honor, I disagree.  He could

21   recite that the parties had brown hair, and that might be

22   very factual, but we would be wondering why he thought it

23   was relevant to mention that they had brown hair.  I am

24   asking in this context --

25            THE COURT:  I take the statement to mean that Mr.

1    Lynam is justifying the grant of a release even to people

2    that have a remote connection to the Debtors to respond to

3    the argument why would someone who has a remote connection

4    to the Debtors need a release.

5            And I think normally, if someone's -- he's

6    equating remote connection to the Debtors as being a

7    bystander, like for example, a grandchild, you know, a

8    minor.  And his declaration goes to why even that person

9    would -- there would be an insistence that they get a

10   release.

11           But again, the declaration goes to the basic

12   question, which is why is the release so broad, not to the

13   merits of the claims that are being released.

14           MR. GOLD:  Understood, Your Honor.

15           THE COURT:  So again, you can ask him why, you

16   know, they -- why someone would be included in the release.

17           MR. GOLD:  Thank you, Your Honor.  I will move on.

18           THE COURT:  But I don't think -- put it

19   differently.  I don't think this is -- this declaration is

20   being offered to try to convince me that because it's

21   unlikely someone should get sued, it doesn't matter whether

22   they get a release or not.  I don't think that's why it's

23   being offered.

24           I think it's being offered to show why people that

25   one would normally think might not be entitled to a release,

1    the Sacklers still think that they should get a release.

2    It's not evaluating the claims.  It's trying to explain why

3    the release is as broad as it is.

4             And you can certainly ask questions about that

5    because I think that's what the declaration is all about.

6    Why is it so broad?

7             MR. GOLD:  I understand, Your Honor, and I am

8    trying -- and I think you will see, hopefully successfully -

9    - to tailor my questions to what's within the declaration.

10            THE COURT:  Okay.

11   BY MR. GOLD:

12   Q    Mr. Lynam, would you please turn to Page 3, Paragraph 6

13   of your declaration?

14   A    Yes.  I'm here.

15   Q    And I'm going to again read the portion here and ask

16   you just to indicate that you see what I'm reading and that

17   it is correct.  It says, "In my capacity as an executor,

18   officer, or advisor to the Side B shareholder payment

19   parties discussed above, I have authority over or meaningful

20   input into the material decisions of these entities and

21   trusts, including whether to enter the shareholder's

22   settlement agreement and contribute to payment of the

23   shareholder settlement (indiscernible)."

24   A    Yes.

25   Q    Thank you.  Of the entities that you referred to

Page 204

1    earlier in your declaration -- if anyone's confused, I will

2    specify them if that's necessary, but I'm trying to save

3    some time here.  Of those entities, could you please

4    indicate which are the ones you have authority over and

5    which are the ones that you instead have meaningful input

6    into decision making of?

7    A    Yes.  So I have authority over the estate of John

8    Sackler.  I am the sole executor.  I also have authority

9    over Temagami LLC.  I am the sole manager of Temagami.

10   Authority in my view means that I have the ability to make

11   the decision.  I don't need to consult with any else.  It's

12   my decision.

13        For the various trusts that are listed in Paragraph 3,

14   A through J -- excluding Temagami, which I just mentioned,

15   which is not a trust -- I'm a vice president of an entity

16   called Cornice Fiduciary Management LLC.  That is the

17   trustee of all of those trusts.  There are other individuals

18   who serve as vice president as well, and we collectively

19   make decisions to effectuate actions of the trustee, so I

20   have meaningful input into the decisions of that entity.

21        In addition, in Paragraph 5, I list entities which I am

22   not an officer of, but I do work with them on a regular

23   basis, and I advise them through my role as general counsel

24   of Kokino LLC.

25        I also advise the trust that's listed in Item H, for

Page 205

1   Henry, in Section 5.  I'm not a trustee of that entity.  I'm

2   not an officer of the trustee, but I serve on committees for

3   administering that trustee, and I also (indiscernible).

4   Q    Thank you.  So just so I understand, the only two that

5   you have authority over is the first two you mentioned, and

6   the rest fall in the category of meaningful input.

7   A    Correct.

8   Q    Is that correct?  Thank you.

9        The -- and again, I think you stated this.  I hope --

10  this is just a clarification -- that by meaningful

11  authority, you mean that someone other than solely you are

12  the decision maker; is that correct?

13  A    That would be correct.  Yes.

14  Q    Thank you.  Now, in the instances where you have

15  authority, does that mean that you are acting in a fiduciary

16  capacity in those instances?  Do I understand you correctly?

17  A    That is correct.  Yes.  I act as a fiduciary.

18  Q    Okay.  And for whom do you -- who are the beneficiaries

19  of that fiduciary capacity?

20  A    So it depends on the role.  As executor, I have a

21  fiduciary duty to maximize the size of the estate because

22  that estate is still pending.  It has not been wrapped up.

23  It has not been distributing assets.  I have a fiduciary to

24  preserve it, fiduciary duty to preserve it.

25       For Temagami, I have a fiduciary duty to its owner,

1   which is a trust, so I act as a fiduciary for its owner.

2   Q    Can you tell me who generally are the ultimate

3   beneficiaries in either case or both cases?

4   A    Yes.   In general, the ultimate beneficiaries are

5   members of Jonathan Sackler's family.

6   Q    Do the -- are you permitted to consult with the

7   beneficiaries in connection with making your determinations

8   in these regards?

9   A    Yes.

10  Q    Do the beneficiaries include the Side B former

11  directors, which is a defined term you've used?  If you need

12  clarification, I can point you to it, but I'm hoping not.

13  A    So it depends on the trust in question.  Jonathan

14  Sackler's family is the family of Jonathan Sackler with a

15  Side B former director, but Jonathan Sackler passed away in

16  2020.  None of his remaining family ever served -- was ever

17  a Board member of Purdue Pharma, his immediate family.  But

18  other trusts, such as the trust in Item 5, Number H, some of

19  the beneficiaries are members of Richard Sackler's family.

20  And some of those family members were also directors, and

21  they are still living.

22          MR. GOLD:  Okay.  Thank you.  I have no further

23  questions.

24          THE COURT:  Okay.  Does anyone else have any

25  questions for Mr. Lynam?  No.

Page 207

1                    I have a question or two for you, Mr. Lynam.  Do

2        you have handy the term related parties?

3                    THE WITNESS:  Yes.

4                    THE COURT:  And do you have handy the shareholder

5        release provision of the plan?  I think it's 1027.

6                    THE WITNESS:  Your Honor, I do not have that

7        handy.  I have related parties as defined in my declaration.

8                    THE COURT:  Okay.

9                    THE WITNESS:  Is that what you're referencing?

10                   THE COURT:  That's fine.  Let me make -- let me

11       turn to one other definition, which is the definition of the

12       shareholder released parties.  Do you have that handy?

13                   THE WITNESS:  I do not have it in front of me,

14       Your Honor.  (Indiscernible) have it handy.

15                   THE COURT:  Okay.  All right.  I guess my question

16       goes primarily to the aspect of related parties that

17       includes independent contractors, subcontractors, agents,

18       and consultants, and separately, affiliates.  So let me deal

19       with the first group first -- not the affiliates but the

20       other group.

21                   Are you aware that McKinsey did work for Purdue

22       for which it has entered into a settlement with certain

23       state attorney's general?

24                   THE WITNESS:  Yes.  I am aware of that.

25                   THE COURT:  Okay.  Would the shareholder release,

Page 208

1    using this language, cover McKinsey?

2            THE WITNESS:  Your Honor, to the extent that

3    McKinsey would have been an agent of the Debtor's and it's a

4    civil claim, my understanding is that it possibly could be

5    covered.

6            THE COURT:  As part of the shareholder release?

7    I'm just focusing on your declaration, which says that the

8    Side B shareholder parties and the shareholder payment

9    parties wouldn't enter into the Sackler settlement with a

10   plan release.  And I'm -- and in saying that, do you

11   consider a company like McKinsey that acted as an advisor or

12   constant?

13           THE WITNESS:  Your Honor, I consider the

14   definition to be very broad because it's reflecting the

15   purpose of what it's trying to get at, which is global

16   peace.  So through that prism, the way I analyze it, I do

17   think an advisor like McKinsey may be picked up.  I do not

18   have the language in front of me, though, so I'm just

19   telling you my interpretation of how I view the scope of

20   this language.

21           MR. JOSEPH:  Your Honor, McKinsey is an excluded

22   party, so --

23           THE COURT:  I understand McKinsey, but I'm saying

24   if there was someone -- some company like McKinsey that had

25   engaged in what McKinsey has now revealed to have -- I guess

1    for the reason why it's excluded.  Unless it's an excluded

2    party, would it be covered?

3            THE WITNESS:  Your Honor, are you directing the

4    question to me or --

5            THE COURT:  Yes.  Yes.  Yeah.  I'm sorry.

6            THE WITNESS:  Yes.  Okay.  Sorry.  Yes.  Yes.

7    Again, the breadth of this release is a function of its

8    purpose, which is to achieve global peace, so I would expect

9    McKinsey to be covered if it's not excluded explicitly.

10           THE COURT:  And why would -- and I appreciate

11   McKinsey itself is excluded, but let's assume for the moment

12   that a company that didn't -- that engaged in the assignment

13   that it did for Purdue that was not excluded, why would it

14   be necessary for global peace that it be covered by the

15   release?

16           THE WITNESS:  Your Honor, the nature of this

17   litigation is such that global peace, in my view as a

18   fiduciary for Jonathan Sackler's family, is the only way to

19   have people move on with their lives.  A pending lawsuit

20   against any party runs the risk of, in my view, pulling Jon

21   Sackler's family back into litigation, or if not the family

22   members themselves, possibly the trusts.

23           THE COURT:  Well, can I explore that?  The --

24   maybe I shouldn't be using the word McKinsey.  Maybe let's

25   just call it M Co. or X Co.

1           X Co. isn't contributing to the settlement, right?

2       No consultant or subcontractor is paying under the

3       settlement, correct?

4               THE WITNESS:  Correct.  Correct.

5               THE COURT:  And so is it the case that the only

6       way that those who are paying into the settlement would be

7       dragged into litigation against X Co., that they would have

8       to provide discovery or be deposed?

9               THE WITNESS:  Your Honor, could you rephrase the

10      last part of your question?

11              THE COURT:  Sure.

12              THE WITNESS:  I do not understand it.

13              THE COURT:  I took it from your answer --

14              THE WITNESS:  Yes.

15              THE COURT:  -- to my prior question that the

16      people who are putting up the money, either directly or

17      through their companies, their equity in this case.  Don't -

18      -

19              THE WITNESS:  But could you rephrase the question

20      -- I'm sorry.  Go ahead.

21              THE COURT:  Don't want to have a risk that a

22      consultant like X Co. be subject to a Purdue-related

23      litigation, and I took it from your answer that it's because

24      they don't want to be dragged into that litigation, that the

25      people who are paying don't want to be dragged into the

Page 211

1    litigation, but I'm asking you how would they be dragged in

2    other than as a witness or someone providing discovery?

3            THE WITNESS:  Your Honor, I'm not sure they would

4    be dragged in other than as a witness or providing

5    discovery.  But --

6            THE COURT:  Okay.

7            THE WITNESS:  Yeah.

8            THE COURT:  All right.

9            THE WITNESS:  I think that answers the question.

10           THE COURT:  Okay.  And let me turn then to the

11   other aspect that I focused on here, which is affiliates.

12   Do affiliates cover any company that the shareholder release

13   parties have more than a 20 percent interest in?

14           THE WITNESS:  So Your Honor, I don't have the

15   definition of affiliates as that term is used in the plan in

16   front of me.  It can be a simple term.

17           THE COURT:  It's not a defined term as far as I

18   can tell.  It's a lowercase affiliates.

19           THE WITNESS:  Okay.  So then I would interpret

20   affiliates to be defined by the concept of control, so any

21   entity that's under the control of the shareholder release

22   parties, such as the trust fund, the benefit of the Sackler

23   family.  We get the benefit of the release as well.

24           THE COURT:  Okay.  And does that apply not only to

25   affiliates that would be either directly or indirectly

Page 212

1    contributing to the settlement but to other affiliates as

2    well?

3                THE WITNESS:  Yes.  It would cover all affiliates.

4                THE COURT:  Okay.  And the rationale for that is

5    what?

6                THE WITNESS:  So from my experience working with

7    the Jonathan Sackler family, there are many, many entities

8    in the structure for the trusts and for the investments that

9    they own.

10                If we did not include affiliates, we only included

11    the owners within the scope of the release, I would be

12    concerned that there would be a loophole, so to speak, in

13    the release where underlying entities that are affiliates

14    that have value, sometimes significant value, would still be

15    subject to lawsuits.

16                THE COURT:  Related to Purdue?

17                THE WITNESS:  Yes because if they're excluded from

18    the release, I would expect that they could be subject to

19    lawsuits related to Purdue, even if they have little or no

20    connection to Purdue.

21                THE COURT:  What if they actually did have

22    connection to Purdue and were not contributing to the

23    settlement?

24                THE WITNESS:  Your Honor, I think the entities

25    that -- I'll give you an example of an entity that I

Page 213

1   immediately recognize needs the definition you're

2   describing.

3          It would be like some of the independent

4   associated companies, some of the non-U.S. businesses.

5   Those are affiliates of the Sackler family, so to speak,

6   generally speaking.  They are being sold in connection with

7   this settlement, and the proceeds are being paid to fund the

8   $4.325 billion cash (indiscernible).

9          THE COURT:  No, I -- my question when to

10  affiliates that were not contributing, whose assets were not

11  being contributed.

12         THE WITNESS:  Your Honor, again, I think that any

13  entity that's left out there that is an affiliate of the

14  Sackler family, even if it had no connection to Purdue, I

15  would be concerned as a fiduciary that that entity would be

16  sued.  And it's not necessarily the merit of the case.  It's

17  just the volume of the lawsuits.

18         THE COURT:  Okay.  Let me go on this point, and

19  I'm going to have to read this to you, I think, because I

20  don't think you have it in front of you.  There's no reason

21  you would because it's not referenced in your declaration.

22  But the section of the plan which starts at Page 122, it's

23  headed "releases by releasing parties."

24         So I guess I wanted to focus on a couple of

25  aspects of this.  One aspect of the release, it's Subheading

1       8 -- (indiscernible) 8 -- is release of any past, present,

2       or future use or misuse of any opioid.  And I -- if an

3       affiliated company sells an opioid in the future, is this

4       intended to cover that company where there's a claim against

5       it?

6               THE WITNESS:  Your Honor, I'm not sure.  But if

7       the settlement is consummated, there is actually a covenant

8       and settlement agreement saying that certain members of the

9       Sackler family and trust for their benefit cannot be --

10              THE COURT:  I understand.  I understand, but I'm

11      talking about affiliates, and I just want to make sure.  I'm

12      not sure the answer to this question, and maybe you're not

13      the right one to ask it because I think it may be more

14      appropriate to ask the people who drafted this.

15              But I think I can pose this question to you.  If

16      an affiliate run by someone else -- not run by the Sacklers

17      -- is selling opium -- opioids, the Sacklers are out of it,

18      so they don't have the ability to control it, so it would

19      have to be another definition of affiliate, like 20 percent

20      owner.  And it sells opioids and has a liability for that in

21      the future, of future sales, why would the Sacklers want to

22      be shielded -- have it be shielded from liability?

23              THE WITNESS:  Your Honor, again, I don't have the

24      language in front of me.  I'm not actually sure what it is

25      that you are referencing, but I would think that these

Page 215

1    claims stem from conduct of Purdue Pharma U.S.

2           THE COURT:  Okay.  Which is really tied to more

3    past liability or --

4           THE WITNESS:  Correct.

5           THE COURT:  -- sort of spillover liability.

6           THE WITNESS:  Correct.

7           THE COURT:  Okay.  It is not clear to me from your

8    declaration whether Purdue Canada is on Side A or Side B, or

9    is it both?

10          THE WITNESS:  It is on both.

11          THE COURT:  Okay.  So I approved a settlement

12   earlier this week where the Sacklers agreed in return for

13   the release of claims against the estate -- significant

14   claims -- to carve out from the release the Canadian

15   provinces.

16          THE WITNESS:  Correct.  Well, my understanding of

17   that stipulation, Your Honor, is that Canadian provinces

18   withdrew their proofs of claim.  And in exchange for that,

19   there was an acknowledgement that the release contemplated

20   by this Chapter 11 plan does not extend to claims brought by

21   non-U.S. persons in non-U.S. jurisdictions --

22          THE COURT:  Right.

23          THE WITNESS:  -- stemming from non-U.S. conduct.

24          THE COURT:  Right.  Foreign conduct.  Canadian

25   conduct.

Page 216

1                    THE WITNESS:  Right.

2                    THE COURT:  Right.

3                    THE WITNESS:  Correct.  Yes.

4                    THE COURT:  But it's limited to those provinces,

5      correct?

6                    THE WITNESS:  That is my understanding, Your

7      Honor.  Correct.

8                    THE COURT:  That agreement wouldn't extend, for

9      example, to Mr. Underwood's clients, the handful of non-

10     provincial government -- any of these in Indian -- First

11     Nation peoples that he represents.

12                   THE WITNESS:  Your Honor, I'm not sure.  I'm not

13     familiar how provinces bind municipalities in Canada.

14                   THE COURT:  Okay.  Well, no.  I'm not saying that.

15     It may perfectly be the case, not knowing Canadian law, that

16     they're bound by the province's agreement.

17                   But the -- leaving aside the carveout in the

18     release for those provinces, as you've described it and is

19     set forth in the settlement agreement, that is, and the

20     carveout for the United States, there are no carveouts for

21     other foreign creditors and similar limitations, if they

22     haven't asserted a claim against the Debtors, I gather.

23     Right?

24                   THE WITNESS:  That is my understanding.

25     Particularly, I believe what you're referencing for conduct

Page 217

1   that's unrelated to the United States.

2             THE COURT:  Correct.

3             THE WITNESS:  Correct.

4             THE COURT:  So if, for example, a foreign party

5   has a claim based upon conduct that occurred because of a

6   foreign entity, other than the settling provinces or the

7   provinces that are carved out of the release, they would be

8   bound by this release?

9             THE WITNESS:  Just to confirm I understand your

10  question, are you asking me if foreign governments, or

11  foreign entities, or foreign plaintiffs generally speaking?

12            THE COURT:  Well, I'll use one of Mr. Underwood's

13  clients as an example.  Let's say that its claim really is

14  based on conduct by Purdue Canada.

15            THE WITNESS:  Okay.

16            THE COURT:  Which in large measure I think is the

17  reason why the Debtors argue that it should be classified as

18  it is.  It's in a class, therefore, that's getting $15

19  million pro rata with the other general unsecured creditors.

20  It would be precluded by this release from pursuing a claim

21  against Purdue Canada?

22            THE WITNESS:  If the underlying conduct is related

23  to U.S. opioid-related activities --

24            THE COURT:  But what if the underlying conduct is

25  related only to Canadian activities?

1            THE WITNESS:  No.  I (indiscernible).

2            THE COURT:  Let's assume that if that is the case,

3    I just want to make sure why is it that the Sacklers need

4    that release if it's conduct that is just caused by the --

5    of the Canadian company?

6            MR. JOSEPH:  It has nothing to do with redirect,

7    but just go ahead and say it.

8            MR. UZZI:  Your Honor, it's Gerard Uzzi.  I

9    apologize that I'm interrupting, but it may -- if I could be

10   helpful in answering that question --

11           THE COURT:  Okay.

12           MR. UZZI:  -- I think there's some confusion.  I

13   think the releasees -- the releases as we've drafted them

14   and what we're looking for is all related to conduct of the

15   Debtor, and as related to conduct of the Debtor.

16           So what the Canadian stipulation did was to

17   clarify the limits of the release.  To answer your specific

18   question, to the extent that there is a claim against Purdue

19   Canada that is for Purdue Canada's own conduct, that claim

20   is not being released, Your Honor.

21           THE COURT:  Okay.

22           MR. UZZI:  The claims, to be clear --

23           THE COURT:  So let me just --

24           MR. ROBERTSON:  Your Honor --

25           THE COURT:  I'm sorry.  I appreciate that

Page 219

1    clarification, but I just want to make sure that would

2    include not just the provinces but also other creditors who

3    only have a claim against Purdue Canada?

4            MR. UZZI:  That is correct, Your Honor, but --

5            MR. GOLD:  Excuse me, Your Honor.  I am concerned

6    that this witness is getting educated by the argument --

7            THE COURT:  No, no.  I -- Mr. Gold, there are two

8    different things going on here.

9            Mr. Lynam's declaration is submitted for the

10   purpose of saying that the release is necessary for the

11   settlement that Side B has entered into.  And I'm trying to

12   probe why it is necessary.  Part of that requires me to ask

13   what is settled, and if he's not the one to know what is

14   settled, then I can certainly hear from the lawyers who

15   drafted it.  And then I can decide whether I want to ask

16   him, "All right, having that clarified, is it -- in your

17   mind, is it necessary to have that released?"  But if it's

18   not being released, I don't have to ask him that question.

19   So I think it's -- so I appreciate the (indiscernible).

20           MR. UZZI:  If I could just add on --

21           THE COURT:  It wasn't clear to me.  And I'm not

22   sure it was clear to Mr. Underwood, so I just wanted to --

23   so that's why --

24           MR. UZZI:  Well, if I can --

25           THE COURT:  -- I appreciate your telling me that.

1              MR. UZZI:  So if I can give you the distinctions,

2     Your Honor --

3              THE COURT:  OKAY.

4              MR. UZZI:  And then we will deal with this, of

5     course, at closing as to the specific language in the plan

6     and how it relates to many of your questions.

7              There's two types of claims I think we can talk

8     about.  One is the type of claim that you asked about and I

9     just mentioned.  That is Purdue Canada's own conduct.  That

10    is the conduct of Purdue Canada separate and apart from

11    these U.S. Debtors.

12             THE COURT:  Right.

13             MR. UZZI:  In Canada, those --

14             THE COURT:  That could be any foreign

15    (indiscernible).

16             MR. UZZI:  Yes.  Yes.  I'm just using Purdue

17    Canada as the example.

18             THE COURT:  Okay.

19             MR. UZZI:  That's not being released, Your Honor.

20    But to be clear, many of the claims, if not all the claims

21    against Purdue Canada, even being asserted in Canada, are

22    really being asserted as based upon claims of the conduct of

23    Purdue U.S.  And that's --

24             THE COURT:  Well, that depends on ultimately how a

25    Court -- where that comes out as far as the Court decides.

Page 221

1   But I understand.

2           MR. UZZI:  Well, yes.

3           THE COURT:  Yes.  That's fine.

4           MR. UZZI:  Yes.

5           THE COURT:  Okay.

6           MR. UZZI:  Yes.  And so if you read the -- for

7    your benefit, Your Honor, and maybe the benefit of some

8    others, if you understand that and you read the Canadian

9    stipulation against that backdrop, it kind of makes sense

10   why the definition of continuing claims and what the

11   Canadian provinces were looking for were clarification on

12   that point, Your Honor.

13          THE COURT:  All right.  But there's always a

14   concern that when one side -- one party clarifies something,

15   the folks who have not clarified it think, "Oh, well, maybe

16   I'm not in that same boat."

17          MR. UZZI:  I --

18          THE COURT:  I think the record's clear now.

19          MR. UZZI:  No, and I'll just add --

20          MR. ROBERTSON:  Your Honor --

21          MR. UZZI:  -- one thing, Your Honor.  The plan, I

22   believe, has been actually amended, and there's so much

23   paper flying around, Your Honor, so I don't know what's been

24   filed yet or not.  The plan is being amended to clarify that

25   as well.

Page 222

1              THE COURT:  Okay.

2              MR. ROBERTSON:  Yes.  Your Honor, on that point --

3     this is Christopher Robertson on behalf of the Debtors.  I

4     presented the Canadian stipulation, and so I just want to

5     clarify that one point.  If you look at the seventh amended

6     plan at the definition of exclude claim, that definition has

7     been amended to essentially incorporate the concept of

8     continuing claim to not only apply to the (indiscernible)

9     government but to all creditors.

10             THE COURT:  Okay.  All right.

11             MR. ROBERTSON:  Thank you.

12             MR. UZZI:  Thank you.

13             THE COURT:  I think those are all of my questions

14    for Mr. Lynam.  I appreciate that may, just as with Mr.

15    Weinberger, elicit other cross and perhaps redirect, so I'll

16    open to the floor to anyone else that wants to cross examine

17    Mr. Lynam on those questions.

18             MR. GOLD:  I have more questions, Your Honor, but

19    as before, I will defer to allow anyone else to go first.

20             THE COURT:  Okay.

21             MR. UNDERWOOD:  Your Honor, just before we get to

22    re-cross, the status of the matter as represented by Mr.

23    Robertson through the Debtor is, as I understand it, that

24    the --

25             THE COURT:  Okay.

Page 223

1          MR. UNDERWOOD:  -- essentially Canada claims are

2     applicable against Canadian corporation and assets of non-

3     Debtors.  They're not being released in Canada.

4          THE COURT:  Okay.

5          MR. UNDERWOOD:  I just want to make sure we're on

6     the same page, but I also want to make clear that in

7     conversations with counsel for the information officer up in

8     Canada in the CCAA proceeding, his understanding is

9     identical, i.e. that it is of concern to the information

10    officer that Canadian claims be preserved against Canadian

11    assets, and Canadians that are potentially liable will

12    release third parties.

13          THE COURT:  All right.  And apparently there's no

14    dispute over that --

15          MR. UNDERWOOD:  Good.

16          THE COURT:  -- as far as the seventh amended plan

17    is concerned.  Although, again, it's a CCAA only in the

18    sense that it's a recognition proceeding under the Canadian

19    law.

20          MR. UNDERWOOD:  Correct, Your Honor.  Thank you.

21          THE COURT:  All right.  Does anyone else want to

22    cross examine Mr. Lynam before we get back to Mr. Gold?

23          MR. HIGGINS:  Yes, Your Honor.  Ben Higgins for

24    the United States Trustee.  May I proceed?

25          THE COURT:  Yes.

1           MR. HIGGINS:  Thank you.

2           CROSS EXAMINATION OF GARRETT LYNAM

3    BY MR. HIGGINS:

4    Q    Good afternoon, Mr. Lynam.  My name is Benjamin

5    Higgins.  I represent the United States Trustee.  Can you

6    hear me okay?

7    A    Yes, I can.  Thank you.

8    Q    Thank you.  The Court was just asking you about the

9    definition of related parties.  Do you recall that

10   discussions?

11   A    Yes, I do.

12   Q    And you testified that it was important to the Sackler

13   families that the scope of their release be very broad for

14   the sake of global peace; is that correct?

15   A    Correct.

16   Q    And you testified that the release is broad enough it

17   includes parties not contributing to the settlement; is that

18   correct?

19   A    That is correct.

20   Q    And in fact, it includes parties such as consultants

21   because of a concern that litigation against them could drag

22   the Sackler family members in as witnesses; is that correct?

23   A    Yes, generally correct.  Yes.

24           THE COURT:  Unless they're an excluded party.

25           MR. HIGGINS:  Correct.

Page 225

1            THE COURT:  Okay.

2            MR. HIGGINS:  Thank you.  No further questions,

3    Your Honor.

4            THE COURT:  Okay.  All right.  Shall we go back to

5    Mr. Gold then?  Larry, I'm sorry.

6            MR. FOGELMAN:  Your Honor, this is Larry Fogelman

7    from the United States Attorney's Office.

8            THE COURT:  I know it takes a little while to get

9    back on, so you go ahead, Mr. Fogelman

10           MR. FOGELMAN:  Thank you, Your Honor.

11           CROSS EXAMINATION OF GARRETT LYNAM

12    BY MR. FOGELMAN:

13    Q    Referring you back to the language of the release, are

14    you aware that the release includes conduct relating to the

15    sale of non-opioid products?

16           THE COURT:  Can I interrupt for a second?  I just

17    -- I think this is an important point to clarify.  Does the

18    United States have any claims that are affected by the

19    third-party release given the carveout in the plan?

20           MR. FOGELMAN:  We are carved out, Your Honor, but

21    we do have concerns about the release from a policy and

22    regulatory standpoint.

23           THE COURT:  How does that -- but if you're carved

24    out, how does the U.S. have standing as opposed to the U.S.

25    Trustee?

Page 226

1          MR. FOGELMAN:  Your Honor, the United States has

2     the ability to file its position in any case in federal

3     court.  The United States has statutory ability to file what

4     are called statements of interest that allow the United

5     States to weigh in on issues that are of significance to the

6     government.

7          THE COURT:  Even if there's no remedy to give the

8     government?

9          MR. FOGELMAN:  Your Honor, it's quite common.  As

10    Your Honor observed in the (indiscernible) case, we filed a

11    brief addressing our concerns about third-party releases.

12    Even though we were not a party in that case, we did file a

13    Second Circuit brief regarding third-party release issues in

14    that case as well.  And it's quite common that the United

15    States files statements of interest in proceedings

16    throughout the country when the government wants its views

17    to be known.

18          THE COURT:  Well, okay.  Although, again, in this

19    particular case, the government's a party, and it's dealt

20    with as a party with the carveout as opposed to in that case

21    where one could argue that it was concerned about precedent

22    affecting it in the future.

23          MR. FOGELMAN:  Your Honor, certainly we're a

24    party, and certainly you're also correct that we do have a

25    carveout, but that -- we nevertheless have a substantial

1    interest in all of the issues being addressed concerning the

2    third-party release, and we would like an opportunity to be

3    heard on these issues and to question this witness about the

4    scope of the release.

5              THE COURT:  Okay.  All right.  Well, you can go

6    ahead.

7              MR. FOGELMAN:  Thank you, Your Honor.

8    BY MR. FOGELMAN:

9    Q    Are you aware that the release includes a release for

10   conduct relating to the sale of non-opioid products?

11   A    Yes.  My understanding is the release concerns conduct

12   of Purdue Pharma in the United Stets, which does sell non-

13   opioid products.

14   Q    The actions have that have been filed against the

15   Sacklers that were the subject of the negotiations and the

16   MDL, that didn't deal with non-opioid products, did it?

17   A    I'm not sure.  Not to my knowledge.

18   Q    And I'm just going to read you one excerpt from the

19   release.  It's Subparagraph 7.  It describes how the release

20   covers opioid-related activities or the Debtor's

21   development, production, manufacturing, licensing, labeling,

22   marketing, advertising, promotion, distribution, or sale of

23   non-opioid products, or the use or receipt of any proceeds

24   therefrom in each case, including the Debtor's interactions

25   with regulators, and regardless where in the world any such

Page 228

1    activities or any resultant loss, injury, or damage

2    resulting therefrom occurred.

3        And then I'll -- I'm just going to direct you to the

4    last clause of that same release paragraph in the plan that

5    also includes any other acts, conduct, omission, event,

6    transaction, occurrence, or continuing condition in any way

7    relating to any of the foregoing.

8        Did you hear me clearly on those, or are aware of the

9    excerpts I just read to you?

10   A    I heard you say, but in fairness, it's a very long

11   piece of text that you just read to me.

12   Q    Understood.  It's pretty vague, right?

13   A    I don't necessarily think it's vague.  It's just very

14   long.

15   Q    So sitting here today, can you tell me, for example,

16   that if the Sacklers were implicated in violations of state

17   tax laws relating to anything concerning manufacture or

18   production of opioids, is that tax claim now released?

19   A    My understanding is that tax claims are not part of the

20   release.  Perhaps one of the lawyers who drafted it can

21   confirm my understanding.

22        MR. JOSEPH:  Your Honor, I think this highlights

23   that this isn't the appropriate witness to be going --

24        THE COURT:  Well, I think it -- let me phrase the

25   question differently.

Page 229

1           As far as your testimony, Mr. Lynam, in evaluating

2    the importance, what went into your evaluation on behalf of

3    the Side B family, of the importance of obtaining a release

4    relating to the Debtor's sale of non-opioid products or

5    other activity related to that, such as tax payments or

6    underpayment of taxes?

7           THE WITNESS:  Your Honor, my assessment of the

8    necessity for a broad release was based on my observation,

9    my experience working for the Sackler family, and also the

10   advice from legal counsel that a broad release --

11          MR. JOSEPH:  Don't go into -- don't --

12          THE COURT:  Right.  That's fine.

13          THE WITNESS:  Yes, but -- I understand.  A broad

14   release is necessary, and as a fiduciary, that is the basis

15   of my recommendation.  And to the extent I have the

16   authority, my decisions actually execute the settlement

17   agreement in that capacity.

18          THE COURT:  But you're -- are you aware of claims

19   asserted against the Sacklers -- and I'm using that term

20   broadly -- including the companies that they own that are

21   contributing to the settlement for activities of Purdue

22   related to non-opioid products?

23          MR. FOGELMAN:  Your Honor, I'm not aware of any

24   claims that are solely related to non-opioid products.

25          THE COURT:   I'm talking about third-party claims

Page 230

1    now, of course, because that's what the release we're

2    talking about is.  And the discovery that's taken place in

3    this case and in other cases, none of that has really

4    pertained to the sale of non-opioid products, right?

5              MR. FOGELMAN:  That is my understanding.

6              THE COURT:  Okay.  Or claims for Purdue's

7    nonpayment of taxes or the like?

8              MR. FOGELMAN:  Yes, the litigation is opioid-

9    related litigation.

10             THE COURT:  Okay.  And the veil piercing claims

11   are being settled as part of the Debtor's release, right?

12             MR. FOGELMAN:  Just to clarify, Your Honor --

13             THE COURT:  Claims for piercing the corporate veil

14   and alter ego, those are being settled as part of the

15   Debtor's release?

16             MR. FOGELMAN:  Yes, correct, yes.

17             THE COURT:  Okay.  All right.  I'm sorry to

18   interrupt you, Mr. Fogelman, but I just wanted to tie it

19   into Mr. Lynam's declaration as opposed to interpreting the

20   release.

21             MR. FOGELMAN:  Thank you, Your Honor.

22   BY MR. FOGELMAN:

23   Q    Is it your understanding in counseling your clients to

24   accept the release or to require the release that it would

25   also release the Sackler family from potential environmental

Page 231

1    liabilities to the extent they are directly liable and not

2    liable derivatively?

3    A    So I testified that my understanding of the release is

4    that it covers activities or claims relating to the Debtors.

5    Q    And that includes if there was an environmental problem

6    created relating to the manufacture of opioids, the Sackler

7    family would now be globally released from any such

8    environmental claims to the extent that they have direct

9    liability on those claims; is that correct, from the States?

10   A    Mr. Fogelman, I don't think the Sackler family has been

11   involved with Purdue since 2019.  And I'm not aware of any

12   claim like that that's pending.  So I think this is purely

13   hypothetical.

14   Q    Are you saying --

15            THE COURT:  But in terms of balancing the risks,

16   the release covers it, right?

17            THE WITNESS:  Yes.

18            THE COURT:  All right.  So, again, maybe not risk

19   to either party, but the one taking the risk is the

20   hypothetical creditor as opposed to the hypothetical lawsuit

21   against the Sacklers.

22   BY MR. FOGELMAN:

23   Q    And to the extent that the Sacklers may be liable

24   directly for their advice or conduct concerning employees of

25   Purdue, if the Sacklers -- if there's any employment law

1    violations, not Purdue, but the Sacklers are directly liable

2    for, is this absolving them of that as well?

3    A    Mr. Fogelman, I have not analyzed release and the

4    accepted claims from the scope of the release with that fact

5    scenario in mind, so I'm just going to respond I don't know.

6    Q    But, your intent was to cover ---

7                THE COURT:  Again, I'm trying to tie this into

8    your affidavit.  You're saying that this is important to

9    them too -- if it is covered by the release, it's important

10   to them too?

11               THE WITNESS:  Your Honor, it's important to have a

12   very broad release to achieve global peace.  That

13   specifically is -- and I think what we're getting at is it's

14   really related to opioid-related litigation because that's

15   the litigation that was ongoing and resulted in Purdue

16   Pharma filing for bankruptcy.

17               THE COURT:  Okay.  That's helpful to hear for me

18   that's it's related to opioid-related litigation because

19   global peace can mean having a release from a hit-and-run

20   accident.  So, thank you.

21   BY MR. FOGELMAN:

22   Q    Right.  But environmental violations aren't related to

23   the current opioid-related litigation, but they are,

24   nevertheless, covered by this release you just said, right?

25               THE COURT:  Well, Mr. Fogelman, he doesn't know,

Page 233

1   but I think what he said is what's important is a broad

2   release related to opioid-related litigation.

3           MR. FOGELMAN:  And respectfully, Your Honor, it's

4   not worded as such.

5           THE COURT:  I understand.  I understand.

6           MR. FOGELMAN:  But I'll move on.

7           THE COURT: I understand, but again, the witness

8   has offered up as to why it's important to have a release.

9           MR. FOGELMAN:  Okay.  Understood, Your Honor.

10  Thank you.

11          THE COURT:  And he has testified to why it's

12  important.

13  BY MR. FOGELMAN:

14  Q    And, sir, have you reviewed Appendix H to your

15  disclosure statement listing more than a thousand

16  individuals and entities and other categories of individuals

17  and entities who are receiving a third-party release?

18  A    Yes, I have.

19  Q    Of those thousands, how many are actually making a

20  financial contribution to the estate?

21  A    So the cash contribution portion of the settlement is

22  being paid by the Sackler family, specifically out of the

23  sale and proceeds from the IACs.  So, in this case, it would

24  be the Trust that own the IACs that would be making that

25  payment or to the extent that there's a funding deadline

Page 234

1    that comes up and there has not been a sale that yields the

2    specific payments, it will be paid by -- for the Jonathan

3    Sackler's family, it will be paid by trusts that receive

4    money from Purdue Pharma.  That is our current intention.

5    Q    Okay.  But that's it as far as you know in terms of

6    who's providing the financial contribution to the estate?

7    A    Correct, yes.

8    Q    Okay.  So, for example, all of the -- the fact that the

9    release provision, and I believe it's discussed before, but

10   it references financial advisors, attorneys, accountants,

11   investment bankers, consultants, experts, and other

12   professionals, none of those are giving a financial

13   contribution to the estate, right?

14   A    Correct.

15   Q    Okay.

16         MR. FOGELMAN:  I have nothing further.  Thank you,

17   Your Honor.

18         THE COURT:  Okay.  All right.  I think we're back

19   to Mr. Gold.

20         MR. GOLD:  We are unless Mr. Underwood has

21   something more to contribute, Your Honor.  Not that I don't

22   particularly -- Matthew Gold, again, I'm prepared to go

23   ahead now.

24         THE COURT:  Why don't you go ahead?

25         MR. GOLD:  Okay.  Thank you, Your Honor.

1                    CROSS-EXAMINATION OF GARRETT LYNAM

2     BY MR. GOLD:

3     Q    Okay.  Thank you.  Mr. Lynam, I do want to focus for

4     the moment on global piece, which, to my awareness, was not

5     a phrase that was used in your declaration, but now that

6     you've mentioned it a few times in your testimony, I do wish

7     to explore it.  And I also want to question you about a

8     statement that you made earlier, which I'll just read so

9     that everyone is clear on what it says that "I think that

10    any entity that's left out that is an affiliate of the

11    Sackler family, even if it had no connection to Purdue, I

12    would be concerned as a fiduciary that that entity would be

13    sued and it's not necessarily the merit of the case, it's

14    just the volume of lawsuits."  So did you mean by that --

15              THE COURT:  I'm sorry, is this in his declaration

16    or somewhere else?

17              MR. GOLD:  This is his testimony about 20 minutes

18    or so ago, Your Honor.

19              THE COURT:  All right, well, go ahead.

20    BY MR. GOLD:

21    Q    When you said that it's not necessarily the merits of

22    the case, do I understand correctly that you're saying, the

23    party -- you want to make sure that the parties to the

24    release don't get sued even if the merits may be strong or

25    weak, that the merits of it really don't enter into it, they

Page 236

1    just want to be left out.  Is that a correct understanding

2    of what you meant by that?

3    A    What I meant by it was that it's extremely expensive

4    and stressful to defend oneself from many, many lawsuits in

5    different jurisdictions and courtrooms.

6    Q    Regardless of the underlying strength of the merits,

7    that statement is correct?

8    A    Yes.

9    Q    Thank you.  Now, turning to global piece, I'm going to

10   -- well, if -- I'm sorry.  Let me put it this way.  Are you

11   aware that there are ten states that have objected to the

12   confirmation or the plan?

13   A    Yes, I am aware that there are nonconsenting states.

14   Q    Okay.  Thank you.  If those states were permitted to

15   opt out of the release and to preserve their actions, would

16   that, in your view, be antithetical to the concept of global

17   peace?

18   A    Yes.  I would view that as a material change to the

19   release.

20   Q    Thank you.  Such that were that to happen, you would no

21   longer be recommending that the settlement be approved or

22   that the payments be made.  Is that correct?

23   A    Correct.

24   Q    Now, and you make that statement regardless of the

25   particular merits of the claims of any particular state,

1    whether that state or strong or weak claims -- I'm stating

2    myself -- that's true regardless of your particular

3    investigation into the strength of the claim of those

4    states.  Is that correct?

5    A    Yes.

6    Q    Thank you.  Now, if it was only one state that was

7    permitted to opt out, would your opinion be the same?

8    A    Yes.

9    Q    Thank you.  Now I want to return to the Canadian

10   stipulation which was discussed earlier.  It seems that you

11   -- correct me if I'm wrong -- but it seems that you're aware

12   of that so that it's not necessary to review it in

13   particular and we've had some discussion regarding the

14   extent of it.  Is that correct?

15   A    If you are going to ask me specific questions about it,

16   I would like to refresh my memory by looking at it, but it

17   depends on what your question is.

18   Q    That's fair and if that is necessary, please let me

19   know.  The -- what I would like to say is that is it not

20   true that that stipulation and the carve out there is also

21   antithetical to your notion of global peace because it

22   expressly provides that the parties you are concerned with

23   remain open to ongoing litigation?

24   A    No.  And I disagree.  So this is talking about non-U.S.

25   litigation involving non-U.S. conduct.  My interpretation of

Page 238

1    the release which is being part of a Chapter 11 plan in U.S.

2    Bankruptcy Court, is American courts may not have

3    jurisdiction to stop claims relating to non-U.S. conduct

4    arising in non-U.S. courts.  So, in my view, it doesn't

5    change the release.

6    Q    I'm not asking whether it changes the release.  My

7    question goes to whether it changes what is essentially the

8    business position of your clients in terms of what is

9    necessary for them to be receiving in order for you to be in

10   agreement that you would recommend the deal.

11        So, again, you're saying that with these claims carved

12   out and being permitted to go forward, you still believe

13   that the overall settlement is one that you're approving and

14   authorizing the payments thereunder.  Is that correct?

15   A    Yes.  Sorry, Greg, did you want to say something?

16             MR. JOSEPH:  Just objected to form.  It was very

17   long, but if you understand it and the Judge determines

18   whether you answered.

19             THE COURT:  You were referring to the Canadian

20   settlement, right?  That's what you understood, Mr. Lynam,

21   when Mr. Gold was talking about it?

22             THE WITNESS:  I think so, but to be frank, I am

23   confused about the question and I was going to ask Mr. Gold

24   to rephrase it.

25             THE COURT:  I think you've already answered the

Page 239

1      question, frankly.

2                  THE WITNESS:  Okay.

3                  THE COURT:  You've analyzed the merits of having a

4      release of non-U.S. litigation over non-U.S. conduct as

5      compared to what you believe is released and made that

6      assessment based on that.  I don't think you need to ask the

7      question again, Mr. Gold.

8                  MR. GOLD:  No, no.  I appreciate that.  I will

9      move onto my next question.

10     BY MR. GOLD:

11     Q    Which is again, to properly understand your answer to a

12     different question that I gave before, if I understood you

13     correctly, you observed that the Canadian release was in a

14     different category because as a legal matter, there were

15     limitations on whether that release could be compelled by a

16     U.S. Court.  Is that correct?

17     A    Mr. Gold, can you try to -- can you rephrase the

18     question again?  I just want to -- it's a highly technical

19     question and I just want to make sure that I understand it.

20     Q    Certainly.  Did you -- wasn't your observation that one

21     relevant factor in assessment the meaningfulness of the

22     Canadian release was that it was -- that there was a

23     question about whether a United States court would have

24     jurisdiction to compel the releases of these Canadian causes

25     of action.

Page 240

1    A    Mr. Gold, I'm not sure what you're referring to by

2    "Canadian release."

3    Q    The releases that were -- excuse me, you're absolutely

4    right.  It's not a release.  It's the carve out from

5    releases that are encompassed within the stipulation and are

6    now apparently being incorporated into the plan.  The -- is

7    it your -- so, when I said Canadian release, I'm sorry.  I

8    was referring to the Canadian carve out, if you will.

9    A    Okay.  What I'd like to do is try to restate your

10   question, but I still don't understand what you're asking me

11   to answer.

12             THE COURT:  I think -- are you trying to set up

13   another question, Mr. Gold?

14             MR. GOLD:  Well, I was trying to break up my prior

15   question that was objected to into two parts so that it

16   would be less long and objectionable to Mr. Joseph and

17   perhaps others, but so I guess that means my answer to Your

18   Honor's question is yes.

19             THE COURT:  So you're trying to lay a foundation

20   for another question by re-asking the same question you

21   asked before as far as the reason for being willing to carve

22   out releases of non-U.S. -- pertaining to non-U.S. conduct?

23             MR. GOLD:  Well, Your Honor, I'm trying to

24   understand his response to it.

25             THE COURT:  Well, he said it.  He said it just as

1    you've assumed it, I think, which is that because of

2    concerns as to whether a U.S. Court in position of an

3    injunction to pursue claims in a foreign court based on

4    foreign conduct would be enforceable, to carve out -- that's

5    one factor in agreeing to a carve out and making such a

6    release not critical, unlike the release by the ten states

7    or any one of them.

8            MR. GOLD:  Thank you, Your Honor.  Once again,

9    you've stated it more succinctly and better than I could.  I

10   would only ask that the witness state that he agrees with

11   what Your Honor just said so that the record is clear.

12           THE COURT:  Or generally, Mr. Lynam on that point.

13   BY MR. FOGELMAN:

14   A    So I'd like to respond that I generally agree with what

15   Judge Drain just said.  I did not hear anything that I

16   disagreed with.  But, again, this is a highly technical

17   point and some of the terminology that people are using may

18   not be accurate.  So I'll just leave it at that.

19           MR GOLD:  Thank you, Your Honor and Mr. Lynam, I

20   have no further questions.

21           THE COURT:  Okay.  All right.  Anyone else before

22   Mr. Joseph and redirect?

23           ALLEN UNDERWOOD:  Your Honor, I have a few

24   questions for the witness if that's all right.

25           THE COURT:  All right.

Page 242

1          CROSS-EXAMINATION OF GARRETT LYNAM

2    BY MR. UNDERWOOD:

3    Q    Allen Underwood from the firm of Lite, DePalma,

4    Greenberg, Afanador on behalf of certain Canadian Municipal

5    Creditors and certain Canadian First Nation Creditors.  My

6    first question, Mr. Lynam, is it not true that as the

7    executor of an estate you have a duty to the creditors of

8    that estate?

9    A    Mr. Underwood, I think you skipped a little bit in your

10   audio, but I think what you were asking was as an executor

11   of an estate, do I have a duty to the creditors of that

12   estate.  Is that correct?

13   Q    That is correct.

14   A    Okay.  So I view my duty as an executor to maximize the

15   value of the estate.

16   Q    And isn't it true though in terms of maximizing value

17   of the estate, the value of the estate should first go to

18   the creditors of that estate in advance of any distribution

19   to beneficiaries?  Is that not correct?

20           MR. JOSEPH:  Objection.  This goes way beyond

21   anything in his declaration.  It has nothing to do with the

22   release.  He's now asking for legal opinions as to an order

23   of priority of an estate under unknown state law.

24           MR. UNDERWOOD:  Isn't it true he's the executor of

25   an estate?  I mean this is his duty.  This is his job.  This

1    is primary 101.  I'm getting somewhere, Your Honor, if

2    you'll let me.

3              THE COURT:  Okay.

4              MR. JOSEPH:  Your Honor, he's also a general

5    counsel and he has duties in that capacity.  It's unrelated

6    to what he's testifying to.

7              MR. UNDERWOOD:  Well, Your Honor --

8              THE COURT:  Why don't you ask the next question,

9    Mr. Underwood, because I'm not quite sure where you're going

10   with this.

11             MR. UNDERWOOD:  Certainly.

12   BY MR. UNDERWOOD:

13   Q    So, Mr. Lynam, you just stated before that cash will be

14   paid by the sale of the IAC, from the trust that owns the

15   IAC to the Debtor.  Isn't it correct that you stated that?

16   A    It's not being paid to the Debtor.  It will be paid to

17   the NVT, but generally, everything else I agree with, yes.

18   Q    Okay.  And Purdue Canada is an IAC?

19   A    Correct.

20   Q    What is the time frame of the sale for Purdue Canada,

21   if you know?

22             MR. JOSEPH:  Objection, it's way beyond the scope

23   of direct.

24             THE COURT:  Sustained.  Again, Mr. Underwood, this

25   witness is testifying as to whether and to what extent the

Page 244

1    release under the plan are critical to the releasing

2    parties.

3              MR. UNDERWOOD:  Right.  And I think what my line

4    of questioning is intended to drive at is the fact that the

5    asset for which we have a carve out from this release is

6    going to be contributed in toto to the U.S. Trust without

7    any benefit to my clients who are not within that trust

8    class.

9              MR. JOSEPH:  Your Honor, that may be an argument

10   that counsel wants to make.  It has nothing to do with this

11   witness.

12             THE COURT:  He's not evaluating -- he's not

13   discussing when things are getting sold or anything like

14   that.

15             MR. UNDERWOOD:  But he would be the person or a

16   person involved in the liquidation of that asset on behalf

17   of the estate or the trust that are before the Court.

18   That's what he's talking about.

19             THE COURT:  Well, we did have witnesses already

20   that talked about the plan and the schedule for including

21   the liquidation analysis and comparison for the sale of the

22   assets.  He's not really the witness that is here to testify

23   on the sale of the assets under the settlement.

24   BY MR. UNDERWOOD:

25   Q    Let me ask Mr. Lynam a hypothetical question.  If he

Page 245

1   received and was provided and served with an order of a

2   Canadian court that required him to take steps with regard

3   to trusts or the estate in question -- and I'm asking this

4   because you already brough into question the scope of the

5   jurisdiction in this Court -- what would his initial --

6   would he ignore that order?  Is that correct?

7            MR. JOSEPH:  Objection, Your Honor.  That's a

8   totally inappropriate question, totally inappropriate

9   hypothetical.  We have no idea if there's jurisdiction.  It

10  has nothing to do with what he's testifying about.  We don't

11  know what the order says.  We don't know whether it was

12  served.

13           THE COURT:  Mr. Underwood, again, this might be

14  the type of question, you know if someone called me up

15  during a deposition, I decide whether you can answer the

16  question, but we're not at that -- that's not what's going

17  on here.

18           MR. UNDERWOOD:  I understand.

19           THE COURT:  So I'll sustain the objection.

20  BY MR. UNDERWOOD:

21  Q   Mr. Lynam, isn't it true that even in light of the

22  carve out that is proposed under the seventh amended plan,

23  there are circumstances where Canadian assets would continue

24  to be protected by the non-Debtor releases granted under

25  this proposed plan?

Page 246

1    A    Mr. Underwood, I don't understand the question.

2              THE COURT:  I think that's a question for the

3    lawyers and from reading the document, I think the answer is

4    yes if it's on account of U.S. claims, but I don't think

5    it's a question for Mr. Lynam.  Make a note and you can ask

6    it during oral argument, Mr. Underwood.

7              MR. UNDERWOOD:  A couple of major issues to cover

8    under oral argument, Judge, thank you.

9              THE COURT:  Okay.  All right.  Okay, any redirect?

10             MR. JOSEPH:  A little bit, Your Honor.

11                  REDIRECT EXAMINATION OF GARRETT LYNAM

12   BY MR. JOSEPH:

13   Q    Mr. Lynam, you were asked questions related to

14   independent contractors, affiliates, consultants, and others

15   covered by the release.  Would you tell the Court whether or

16   not there is any concern apart from discovery costs that the

17   family may bear, potential claims of contribution against

18   the family?

19   A    Yes.  I would be concerned that people just wouldn't

20   want to work for the Sackler family.

21   Q    Is there any concern that anyone --

22             THE COURT:  I'm sorry.  All right.  I'll ask the

23   question after you're done, but are you talking about work

24   in the future?

25             THE WITNESS:  No, continued working, or maybe work

Page 247

1    in the future, but just in general.

2    BY MR. JOSEPH:

3    Q    Would you tell the Court whether or not there was a

4    concern that any such entity might assert a financial claim

5    against the family or contribution or indemnification?

6            MR. FOGELMAN:  Objection, leading, Your Honor.

7            THE COURT:  That's true.

8            MR. JOSEPH:  That's why I asked whether or not

9    there was a concern.

10           THE COURT:  Well, it's still leading.  If you

11   could rephrase it.

12           MR. JOSEPH:  Certainly.

13   BY MR. JOSEPH:

14   Q    Has the issue of contribution or indemnification

15   affected or not affected your view as to the need to extend

16   the release beyond family members?

17   A    Yes, it has.

18   Q    In what way?

19   A    So when the entities and trusts that I work with engage

20   service providers, they may be indemnified and we typically

21   agree to customary indemnification clauses.  And if a third-

22   party incurs a cost just solely because of its engagement,

23   that may be indemnified.

24   Q    You mentioned earlier in your testimony that release

25   claims have to be related to the conduct of the Debtor in

Page 248

1    connection with the Canadian claims and otherwise.  Would

2    you tell the Court whether or not there has been any concern

3    that the same sort of massive litigation that was brought

4    for opioid products might be brought for non-opioid products

5    if those are not released?

6            MR. FOGELMAN:  Objection, Your Honor.  His

7    questions are still continuing to suggest the answers in

8    them whether they're phrased whether or not or otherwise.

9            MR. JOSEPH:  I'll try again, Your Honor.

10            THE COURT:  Well, let me ask it.  What is the

11    basis -- I think we already -- I've already asked this

12    question.  What is the basis for insisting on a release that

13    covers non-opioid product activities related to Purdue?

14            THE WITNESS:  Your Honor, the release is drafted

15    broadly because lawyers can be clever and they can style a

16    lawsuit whether -- if something is not opioid related,

17    perhaps they can style it as opioid related.  I'm not really

18    sure though.  It's just something as a fiduciary, I need to

19    recommend a deal that has global peace.

20            MR. JOSEPH:  I don't have any additional questions

21    for the witness.

22            THE COURT:  I have a question related to that, Mr.

23    Lynam.  Sometimes the case when a settling party wants

24    peace, but is afraid of strike suits, clever lawyers -- I

25    think that was the phrase you used -- that such suits in the

1    first instance so that the party making the injunction can

2    make the decision be brought in the court that issued the

3    injunction to see whether it was covered or not, whether it

4    was clever lawyering or independence, would that resolve

5    your concern if there was a such as a provision?

6            THE WITNESS:  Your Honor, what would resolve my

7    concern is the claims being released in the first instance

8    and not being ---

9            THE COURT:  Obviously, that is the easiest way to

10   resolve your concern.  If there was a potential problem with

11   that because it was overbroad, wouldn't requiring a suit

12   that raised an issue as to whether the junction applied or

13   not being brought in the court that issued the injunction

14   resolve the issue of strike suits or clever lawyering around

15   the injunction?

16           THE WITNESS:  Your Honor, if the release that I've

17   been contemplating is not available, then yes, I do think

18   having a test forum, which I understand your question to be

19   asking about, to test whether a claim is covered or not by

20   the release, would be -- it wouldn't be helpful necessarily,

21   but it would be the reality if that's what you order.

22           THE COURT:  Okay.  All right.  I think, Mr.

23   Fogelman, you were just objecting to a couple of the

24   questions, right?  You didn't have any -- do you have any

25   recross?

1              MR. FOGELMAN:  No, Your Honor, thank you.

2              THE COURT:  Okay.  All right.  Mr. Joseph, do you

3    have any redirect on my question?

4              MR. JOSEPH:  No, Your Honor.

5              THE COURT:  Okay.  All right.  Thank you, Mr.

6    Lynam, you can sign off at this point.

7              THE WITNESS:  Thank you.

8              THE COURT:  Okay.  All right, let me --

9              MAN 1:  Your Honor.

10             THE COURT:  Yes.

11             MAN 1: I wanted to wait until the witness was off

12   the stand to not run any risk of someone saying I was trying

13   to help answer some of your questions, anybody was helping

14   (indiscernible).  There's no risk to comment since obviously

15   as the ultimate Debtor fiduciary.  I do want to clarify one

16   thing based on my understanding which I sure hope was right.

17   Just for example, if Purdue Canada has liability to

18   Plaintiffs for its own conduct, it has to deal with that and

19   there's nothing in our releases in any way, shape, or form

20   that releases --.

21             THE COURT:  I understand.  I think Mr. Robertson

22   was clear on that point.  In any event, we'll look at the

23   amendment to the plan.

24             MAN 1:  But just to be clear, that was always

25   true.  That's not releasing the Canadian element.  We have

1    never proposed to give IACs release.

2              THE COURT: I think counsel for the U.S. Trustee

3    asked a question about that, that type of thing in one of

4    the earlier witnesses and I wanted to explain.

5              MAN 1:  Yes.  I just wanted to make sure our view

6    was clear.  Thank you, Your Honor.

7              THE COURT:  Okay.  We have one other witness for

8    today, Mr. Ives.  I don't know how long he will be, but I

9    think we probably should go ahead with him.  It's on the

10   same type of subject that we just discussed with Mr. Lynam.

11   So, if he's available, can we get him on the screen?

12             MAN 2:  We are reaching out to him and having him

13   dial in.

14             THE COURT:  Okay.

15             MR. GOLD:  Your Honor, Matthew Gold.  May I speak?

16             THE COURT:  Sure.

17             MR. GOLD:  I will simply candidly advise the Court

18   and all parties that this ---

19             THE COURT:  I'm sorry.  You're fading in and out,

20   Mr. Gold.

21             MR. JOSEPH:  Your Honor, we can't hear him at all.

22   His screen is totally frozen.

23             THE COURT:  Yeah.  It' frozen.  I think what he

24   was going to tell me is that he expected he had fairly

25   lengthy cross for Mr. Ives as he did for Mr. Lynam, but

Page 252

1    maybe I'm wrong.

2                MR. GOLD:  Can you hear me know, Your Honor?

3                THE COURT:  Yes, you're back.

4                MR. GOLD:  That's a relief, Your Honor.

5                THE COURT:  Must have been a sun spot or

6    something, but go ahead.

7                MR. GOLD:  Yes.  I'm simply saying that since the

8    parties are proffering two witnesses with the similar

9    positions that's unavoidably where we're going to be.  So

10   that's all I --

11               THE COURT:  Okay.  We'll, let's go ahead with Mr.

12   Ives.  I think I see him now on the screen.

13               Would you raise your right hand please?  Do you

14   swear or affirm to tell the truth, the whole truth, and

15   nothing but the truth so help you God?

16               MR. IVES:  I do.

17               THE COURT:  And it's Stephen with a P-H and then

18   I-V-E-S?

19               MR. IVES:  Yes.

20               THE COURT:  Okay.  And Mr. Ives, you submitted a

21   declaration dated August 2, 2021, which under my order of

22   setting the procedures for this hearing on this matter is

23   intended to be your direct testimony.  Knowing that and

24   sitting here today on August 13th, is there anything in your

25   declaration that you would wish to change?

1           MR. IVES:  No, sir.

2           THE COURT:  Okay.  And let me ask then, does

3    anyone object to the admission of Mr. Ives' declaration?

4    Okay.  I will admit it as his direct testimony.

5        (Declaration of Stephen Ives Admitted Into Evidence)

6           THE COURT:  Does anyone want to cross-examine Mr.

7    Ives?

8           MR. GOLD:  Yes, Your Honor, Matthew Gold,

9    representing (sound drops).

10          THE COURT:  You froze again, Mr. Gold.

11          MR. GOLD: Your Honor, this is -- can you hear me

12   now?

13          THE COURT:  Yes, but I perceive problems because

14   your image is stuck.

15          MR. GOLD:  That is unfortunate, Your Honor.  It

16   seems to be as you said of sun spots.  I will try to proceed

17   as quickly as possible if you can hear me now.

18          THE COURT:  I can hear you clearly.  It's just

19   your image is being frozen, but it's more to be able to see

20   the witness than the lawyer.  So why don't you go ahead?

21          MR. GOLD:  My image may be a favor to people not

22   to be able to see.

23               CROSS-EXAMINATION OF STEPHEN IVES

24   BY MR. GOLD:

25   Q    Mr. Ives, could you please turn to Page 9, Paragraph 24

1    of your declaration?

2    A    Okay.  I have it.

3    Q    You refer there to certain releases.  Do you see that?

4    A    Yes.

5    Q    Did you make an assessment -- without referring to any

6    privileged communication that you received, did you make an

7    assessment of the strength of the claims that would be

8    released?

9    A    Without -- I'm sorry, without -- would you say it

10   again?  Without representation, was that your question?

11   Q    I'm asking whether you personally made an assessment of

12   the strength of claims that would be released?

13   A    No.

14   Q    I am anticipating counsel's objection that your answer

15   should not include the substance of any communication that

16   came from Side B counsel.

17   A    My answer is no.

18   Q    Thank you.  The -- is it your position that even though

19   one might argue that the claims are weak or meritless, that

20   it is still necessary that those claims be removed?

21        MR. JOSEPH:  Objection, Your Honor.  This is

22   exactly what was sustained, his questioning against Mr.

23   Lynam.  He's not here to attest to his views which he hasn't

24   independently assessed, which he has received legal counsel

25   on as to the strength and merits and whether or not there

Page 255

1  should be a release regardless of merits as to which he has

2  been advised.

3          THE COURT:  All right.  Let me ask the question,

4  if I may.  As far as the released claims are concerned, does

5  it matter to you whether the claims that are being released

6  are strong or weak?

7          THE WITNESS:  No, sir.

8          THE COURT:  Okay.

9          MR. GOLD:  Thank you, Your Honor, I'll proceed.

10 BY MR. GOLD:

11 Q    Mr. Ives, would you please turn to Page 8, Paragraph 21

12 of your declaration?

13 A    Okay.

14 Q    I'm going to read (indiscernible) that you see what I'm

15 reading and have got it correct?  "As a trustee or officer

16 of the Side B Shareholder Payment Parties discussed in

17 Paragraphs 4 and 5 above, I have authority over or

18 meaningful input into the material decisions of those

19 entities -- these entities, excuse me -- including whether

20 to enter into the shareholder settlement agreement and

21 contribute the payment of the shareholder settlement

22 amount."  Do you see that?

23 A    Yes, sir.

24 Q    Of the entities that you listed in your declaration,

25 can you please identify which are the ones you have

Page 256

```
 1    authority over and which are the ones you have meaningful

 2    input into?

 3    A    The ones that are listed in Paragraphs 4 and 5, I have

 4    authority in all of them.  I'm an officer or trustee of all

 5    those entities.

 6    Q    That covers all of them?  Are there any entities that

 7    you are referring to that are outside of 4 and 5?

 8    A    I don't believe so.  I'm sorry.  I would need to, if

 9    you'd like me, I can go through this list again for myself

10    in just a minute.  I will say, yes, I'm sorry.  Let me make

11    sure very quickly.  I am an officer of Cheyenne Petroleum

12    Company which is not -- I don't believe it's listed here

13    because it shouldn't have been.  These are -- Paragraphs 4

14    and 5 are Side B Shareholder Payment Parties.  And that's

15    what I understood that I needed to make clear for this

16    declaration.

17    Q    I'm not looking for -- thank you for that

18    clarification.  I'm not looking to go outside that listing

19    of all entities that you may serve that are unrelated to the

20    purposes that we are discussing today.  I'm just confining

21    my questions to the entities that you listed in your

22    declaration.

23    A    Okay.

24    Q    Now, when you said "meaningful authority," did you mean

25    someone other than solely you is the decision maker?
```

Page 257

1    A    In any of these entities that are listed, I am an

2    officer, but not the sole officer.  So there are other

3    officers at different levels with other authorities, but I

4    was to make clear that to make sure that you knew I was an

5    officer and had authority on those listed entities.

6    Q    I'm sorry.  I'm confused.  When you said you had

7    meaningful -- I'm trying to understand your use of the term

8    "meaningful authority."

9    A    Okay.

10   Q    When you said you have meaningful authority, does that

11   mean you do not have sole authority or that -- let me put it

12   a different way -- does that mean that your decision could

13   be overruled by other decision makers?

14   A    Not necessarily.  If I am authorized as an officer to

15   act on behalf of an entity, then I can act under my

16   authority and that's what I consider meaningful.

17   Q    So you mean authority and meaningful authority are the

18   same, essentially, in this context.  Is that correct?

19   A    I would say yes, the way you're asking the question,

20   yes.  I have authority.  I consider if I have authority,

21   it's meaningful.

22   Q    Okay.  In exercising that authority, are you acting in

23   a fiduciary capacity?

24   A    Yes, I consider it a fiduciary capacity.

25   Q    Okay.  For whom?

1    A    For the entity for which I'm an officer.

2    Q    Okay.  Well, I'm trying to understand who are the

3    beneficiaries, if you will, of the fiduciary capacity that

4    you are serving in?

5    A    They are all Side B, the Side B family members, the

6    Raymond Sackler family members.

7    Q    Are you permitted to consult with the beneficiaries in

8    connection with making your determinations?

9    A    You mean beneficiaries of trusts or?

10   Q    With the various parties who we just identified as

11   being -- as benefitting from the capacities in which you

12   serve as a fiduciary.

13   A    Okay.  Am I permitted to visit with them?  Was that

14   your question?

15   Q    Yes.

16   A    Yes, yes, I'm permitted to visit with them.

17   Q    And to take their views into account in making your

18   determinations?

19   A    I can, yes.

20   Q    Okay.  Do the beneficiaries include the Side B former

21   directors?  That's a term you used as a defined term, if you

22   need to refer to your declaration.

23   A    Yes.  Yes, it does.

24   Q    Okay.  Thank you.  Now, would you please turn to Page

25   9, Paragraph 24 of your declaration?

Page 259

```
 1    A    Okay, I have it.

 2    Q    Would you please focus on the -- read the last sentence

 3    in Paragraph 24?

 4    A    Staring with "It is my opinion"?

 5    Q    Yes, please.

 6    A    "It is my opinion as a fiduciary for the Side B family

 7    that the contribution of billions of dollars by Side B would

 8    not be wise or prudent without global peace for all Side B

 9    related parties."  That sentence?

10    Q    Yes, thank you.

11    A    Okay.

12    Q    I would like to focus on the term "global peace."

13    A    Okay.

14    Q    Now, if -- are you aware that ten states have objected

15    to the confirmation of the plan?

16    A    I wasn't aware of the number of states.  I was aware

17    that there were one or more states that objected.

18    Q    Okay.  Thank you.  If those one or more states were

19    permitted to opt out of the plan injunction, but all the

20    other states remain bound, would that be consistent with

21    your view of global peace for the Side B related parties or

22    antithetical to it?

23    A    No, sir.  I think my answer would be no.

24    Q    No that would not be global peace?  I asked the

25    question poorly, I'm afraid.  Is that correct?
```

1    A    It would not be my understanding of global peace.

2    Q    Okay.  Very good.  Thank you.  if a single one of the

3    objecting states were permitted to opt out of the plan

4    injunction but all the other states remain bound, would that

5    be global peace?

6    A    No, sir.

7    Q    Thank you.  Okay.  Now, counsel, I would like to refer

8    Mr. Ives to the Canada stipulation, which I have provided to

9    everyone as well as to the Court.  I know we discussed it

10   previously and I don't know, Mr. Ives, whether you are

11   familiar with it or not, but counsel, can you provide that?

12           THE COURT:  I guess we need to provide him with

13   the code so that he can open it now.

14           (Court and clerk confer)

15           THE COURT:  Okay.  So you have it, Mr. Ives, but

16   you have not opened it.  Is that what the situation is with

17   that document?

18           THE WITNESS:  Correct.  I received it in an email

19   and was told not to open it.

20   BY MR. GOLD:

21   Q    So you can open it now.

22   A    Okay.  Can I get my iPad to open it?  I've only got a

23   single screen.

24   Q    Yeah, go ahead.  That's fine.

25   A    Okay.  Bear with me.  I'm trying to find it.  Okay.

Page 261

```
 1    Let' see.  Okay -- let's make sure I've got the right --

 2    stipulation and agreed order by and among the Debtors to the

 3    Canadian Government.  Is that what you're referring to, Mr.

 4    Gold?

 5    Q    Yes.  That is correct.

 6    A    Thank you.  I've got it open.

 7    Q    Thank you.  And so the record is clear, this is also

 8    Docket No. 3520 filed in this case entered on August 10th,

 9    2021.  Would you please -- are you familiar with this

10    document?  Have you seen it before?

11    A    No, sir.

12    Q    Would you please turn to Page 4 of the document?

13    A    Okay.

14    Q    Okay.  I am going to read the first sentence of the

15    paragraph there to make sure -- I'll spare you the reading

16    and I'll read it myself -- but to make sure that you are

17    following what I'm referring to and if I've read it

18    correctly.

19    A    Okay.

20    Q    "There's nothing in a) any plan of reorganization

21    confirmed in the Chapter"

22    A    Excuse me, just a second, I --

23    Q    This is Paragraph 2, I'm sorry.

24    A    Oh, Paragraph 2.  Okay.  Thank you.  I was looking at

25    Paragraph 1.  I'm sorry.  I apologize.
```

1    Q    I'm certainly not reading from that.  "Nothing in a)

2    any plan of reorganization confirmed in the Chapter 11

3    cases, b) the shareholder settlement agreement, or c) any

4    order of the bankruptcy court confirming, amending, or

5    modifying the plan in the Chapter 11 cases, any such order

6    or confirmation order shall release or enjoin any continuing

7    claims -- there's a footnote there -- and any and all such

8    claims and cause of actions are expressly reserved."  Do you

9    see that?

10   A    Yes.

11   Q    Are you familiar with the, with the concept expressed

12   in that that such as settlement and stipulation had been

13   reached?

14   A    Just a second.  I'm not sure.

15   Q    I withdraw the question.

16   A    I was afraid.  I wasn't sure I could answer or even

17   understand the question.  I'm sorry.  Like I said, it's the

18   first time I've seen this so I'm trying to soak it in.

19   Q    The fault is more mine than yours, sir.  Let me

20   proceed.

21   A    Okay.

22   Q    Is this not an instance of governmental claims that

23   will continue to be asserted against the Side B related

24   parties notwithstanding the settlement in the plan?

25           MR. JOSEPH:  Objection.  He's disqualified himself

Page 263

1    from answering.  He said he understand this.  He's not

2    familiar with it.

3              THE COURT:  Let me ask this.  Other than just

4    reading this now, are you aware of a carve out from the

5    release that would carve out what's defined here as the

6    "continuing claims"?  The release of the Sackler families in

7    the plan?

8              THE WITNESS:  When you say carve out, sir, Your

9    Honor, I --

10             THE COURT:  It wouldn't be covered by -- the

11   continuing claims as defined here in Footnote 3, would not

12   be covered by the release.  They would not be released under

13   the plan.

14             THE WITNESS:  Okay.

15             THE COURT:  Other than just reading this now, are

16   you aware of that?

17             THE WITNESS:  No, sir.

18             THE COURT:  Okay.  All right.  I'm not sure the

19   witness can testify anymore about it then.

20             MR. GOLD:  That may be the case if you would give

21   me just a moment, Your Honor, to see if there's any other

22   questions I have to ask in this regard.  I don't think I do,

23   Your Honor.  Thank you.

24             THE COURT:  Okay.  All right.  Anything else?  I

25   just want to make sure you're done all your cross?

Page 264

1              MR. GOLD:  I am done with my cross, Your Honor.

2      We'll have to see what other questions come.

3              THE COURT:  All right.  Does anyone else want to

4      cross-examine Mr. Ives?

5              MR. HIGGINS:  Yes, Your Honor.  I'm sorry it took

6      me a second to get on the screen.

7              THE COURT:  That's all right.

8              MR. HIGGINS:  Ben Higgins for the U.S. Trustee.

9              THE COURT:  Right.

10                CROSS-EXAMINATION OF STEPHEN IVES

11     BY MR. HIGGINS:

12     Q    Good evening, Mr. Ives.  Can you hear me okay?

13     A    Yes, I can, thank you.

14     Q    Thanks.  My name is Benjamin Higgins.  I represent the

15     United States Trustee.  You testified in your declaration

16     regarding global peace and the need for the release and the

17     need to include all the parties listed in Appendix H, the

18     disclosure statement.  Is that correct?

19     A    Yes, sir.

20     Q    And Appendix H lists among hundreds of named parties,

21     it also includes unnamed parties such as assets and

22     businesses own by the named parties and entities and

23     individuals to which assets have been transferred.  Is that

24     correct?

25     A    I can't say.  I don't have that exhibit.  I saw it in

Page 265

```
 1   one draft some time ago, but I don't have it and I certainly

 2   didn't memorize it.  So, I'm sorry, my answer is I don't

 3   know.

 4   Q    When you specifically referenced Appendix H in your

 5   declaration, is your -- well, I'll proceed to a different

 6   question.  Is it your understanding that the release parties

 7   include parties who are not contributing to the settlement?

 8   A    You mean contributing monetarily to the settlement?

 9   Q    Correct, sir.

10   A    Yes.

11   Q    And is it your understanding that the -- are you

12   familiar with the release provision itself as contained in

13   the plan?

14   A    I've read it and I think I have a general

15   understanding, yes.

16   Q    Are you aware that it includes releases for claims

17   based on future use or misuse of opioids?

18   A    I don't recall that language.  I'm sorry.

19   Q    Are you aware that it contains language regarding

20   release of claims related to the sale and distribution of

21   non-opioid products?

22   A    Again, I don't recall.  If it might help, my

23   recollection was that the language of full and unconditional

24   and broad release, anything related to this bankruptcy

25   proceeding, so that's really the extent of my understanding.
```

Page 266

```
1    There may be some more details, but these that you're asking

2    me, I'm going to have to say I don't know.

3    Q    So when you say you don't know about these specific

4    provisions, are you, you know, strike that.  I'll move on.

5    Are you aware that the released parties definition also

6    includes various related parties such as consultants,

7    agents, advisors?

8    A    I may not have heard the end of your question.  I think

9    your screen wobbled, but my answer is yes.  I'm aware that

10   it includes related parties, consultant, and I think others

11   that you said.

12   Q    And can you just -- you've testified regarding the

13   importance of the releases to the Sackler families.  Can you

14   just explain why it's important for consultants or agents or

15   advisors to have releases?

16   A    Yes.  It's my understanding that without those releases

17   in the future, any of those unreleased parties may be

18   subject to some claims or litigation related to this

19   bankruptcy which could then pour back to the family in some

20   way and therefore, involve them in future litigation.

21   That's what I understand.

22   Q    You mean involve them as a witness, say, in future

23   litigation?

24   A    I don't know in what capacity that it involved.  And I

25   understand that the full release would prevent that.
```

1   Q    From your understanding is the release broad enough to

2   include something such as state law tax claims related to

3   the manufacture of opioids?

4   A    I don't know.

5   Q    From your understanding is the release broad enough to

6   cover something as broad as environmental problems related

7   to the manufacture of opioids?

8   A    I'm sorry.  I take those as legal questions.  I'm just

9   not -- I just don't -- if it was stated, I don't remember

10  it.

11  Q    Sure.  But would it be -- okay.

12          MR. HIGGINS:  Thank you, Mr. Ives.  No further

13  questions at this time, Your Honor.

14          THE COURT:  Okay.  Does anyone else wish to cross-

15  examine Mr. Ives?

16          MR. FOGELMAN:  I have a few questions, Your Honor.

17  This is Larry Fogelman on behalf of the United States.

18          THE COURT:  Okay.

19              CROSS-EXAMINATION OF STEPHEN IVES

20  BY MR. FOGELMAN:

21  Q    Mr. Ives, you testified moments ago about the release

22  for individuals or entities like financial advisors,

23  attorney, accountants, investment bankers, consultants,

24  experts, and professionals.  Is that right?

25  A    Yes, sir.

Page 268

1    Q    Okay.  So that was important?

2    A    Yes.

3    Q    So let's say a financial advisor committed fraud and

4    lied during the course of this proceedings, do you think

5    they should be given a release?

6    A    Again, I'm sorry.  That seems like a hypothetical, more

7    of a lawyer's question, but, again, I'm trying to help

8    answer.  I want to make clear my understanding is that full

9    and unconditional -- it's very clear.  When I did read it,

10   it was very lengthy that it was a full release for any

11   claims related to this bankruptcy.  I realize that's very

12   broad.  And I understood, and I understand it needs to be

13   very broad.  I'm not sure I'm qualified to answer specific

14   hypotheticals.  I'll try.

15   Q    I'm not asking you a hypothetical.  I'm asking you

16   about the release that you said was so important for your

17   client.  Isn't it true that that release that's so important

18   for your client would immunize investment bankers,

19   attorneys, consultants, and the experts if they directly

20   rely in these bankruptcy court proceedings?  Isn't that

21   true?

22            MR. JOSEPH:  Objection.  He's not a lawyer.  He

23   said he doesn't know.  This is asked and answered.

24            THE COURT:  Well, I think --

25            MR. FOGELMAN:  I don't believe he's answered the

Page 269

1     question, Your Honor.

2              THE COURT:  I think we should confine it to the

3     actual language of the release.  And I think there is a

4     separate provision that deals with the proceedings

5     themselves which covers this point.  So I think you should

6     move on, Mr. Fogelman.

7              MR. FOGELMAN:  That's all I have, Your Honor.

8     Thank you.

9              THE COURT:  Okay.

10             Okay.  Anyone else have any cross for Mr. Ives?

11             MR. EDMUNDS:  Your Honor, Brian Edmunds from

12    Maryland.  Lightening struck, and I am in the dark on my

13    phone.

14             THE COURT:  Okay.

15             MR. EDMUNDS:  But I do have a few questions.  And

16    I have missed part of this, obviously, so I, you know, will

17    make all appropriate apologies.

18                  CROSS-EXAMINATION OF STEPHEN IVES

19    BY MR. EDMUNDS:

20    Q    But I do have a question, Mr. Ives, about one of your

21    answers when you were answering Mr. Gold's questions.  You

22    had said that you are, I believe, not the sole authority

23    over the trust.  With whom do you share authority?

24    A    If -- if there are other trustees or officers of the

25    trust company that's the trustee, then those would also be

Page 270

1    involved in any trust decisions.  That's what I meant.

2    Q    If there are others; are there others --

3    A    Yes.

4    Q    -- who have that authority?

5    A    Yes.  I -- I am not --

6    Q    Are there --

7    A    Excuse me; the answer's yes.

8    Q    Are there others besides the trustee if you have

9    authority over the trust?

10   A    I believe as a trustee we are bound by the trust

11   document and had that authority and are supposed to -- you

12   know, to enact our authority based on that trust document.

13   So that's -- that's the way I understand my role as a

14   trustee.

15   Q    Well, I'm not sure that that answers my question.  Are

16   there others who have authority over the trust?

17   A    If there are other trustees, any trustee -- like I

18   said, any trustee would have authority.  And so I'm not --

19   I'm not a sole trustee, then there would be another trustee

20   that -- that would also have authority under the -- under

21   the trust documents.

22   Q    And who is the other trustee that has authority over

23   these trusts?

24   A    Well, there are other trustees in various trusts.

25   There are other trustees.

Page 271

1    Q     Okay.   In these trusts, who are the trustees?

2              MR. JOSEPH:   Your Honor, may we have

3    some clarification as to which trust?  We have a two-page or

4    three-page list.  So --

5              THE COURT:   Well, are you looking for any

6    particular type of person?  For example, are you referring

7    to any of the Sacklers?

8              MR. EDMUNDS:   Well, not exclusively, Your Honor.

9    I'd just like to know who.   I --

10             THE COURT:   Well, why --

11             MR. EDMUNDS:   -- (indiscernible).

12             THE COURT:   I could understand, although it's not

13   really relevant to this testimony why you might want to know

14   whether the Sacklers are a trustee.  But I'm not sure why

15   you need to know which other person is besides Mr. Ives.

16             MR. EDMUNDS:   Well, Your Honor, we would take the

17   position that it's important to know everyone who is a

18   trustee over the trust given I think arguments that are made

19   later in the case.  Obviously, there would be an issue if a

20   Sackler family member were a trustee and I would certainly

21   ask that question that there might --

22             THE COURT:   All right.  Why don't you ask that

23   question?  Why don't you ask that --

24             MR. JOSEPH:   Your Honor, that's in evidence in Mr.

25   Martin's report and nobody asked Mr. Martin about it, but

Page 272

1    the trustees are identified.

2              THE COURT:  So you're saying it's identified

3    somewhere else?

4              MR. JOSEPH:  Yes, Your Honor.  Another witness.

5              THE COURT:  All right.  In which report is it; Mr.

6    Martin?

7              MR. JOSEPH:  Correct.

8              THE COURT:  All right.  So --

9              MR. JOSEPH:  He has attached several, but there's

10   an organizational structure.

11             THE COURT:  Okay.  So, Mr. Edmunds, it's in that

12   report.

13             MR. EDMUNDS:  Okay.  I hear that, Your Honor.  I

14   do have a bit more.

15             THE COURT:  Okay.

16   Q   Mr. Ives, aside from the trustees, are there others who

17   have authority over the trust?

18   A   If I understand your question correctly, my opinion is

19   that the trustees have the authority over the trust as

20   stated in the trust document.

21             THE COURT:  And no one else?

22   Q   Are there other --

23   A   I'm sorry.

24             THE COURT:  And no one else; just the trustees?

25   A   Yes.  Decisions for trusts, my understanding the way I

Page 273

```
 1    operate, decisions for trusts are set with the trustees.

 2              THE COURT:  Okay.

 3    Q    Mr. Ives, are there others who influence the decisions

 4    of the trustees of the trust?

 5              THE COURT:  Mr. Edmunds, this was covered by Mr.

 6    Gold's testimony.

 7              MR. EDMUNDS:  Okay.  Your Honor, I do apologize.

 8    I don't know -- I'm not sure.  Under the circumstances, I

 9    don't have access to documents now.  I don't have --

10              THE COURT:  Right.

11              MR. EDMUNDS:  -- you know, much.  If the Court

12    would not mind, I will try not to do this, but I guess I

13    would maybe reserve the right to recall.  I don't know what

14    else to do.

15              MR. JOSEPH:  I object to that.

16              THE COURT:  Mr. Edmunds, this is just -- look,

17    first of all, this declaration is really -- the questions

18    you're asking and they're the same questions that Mr. Gold

19    asked on cross are pretty tangential to the declaration in

20    the first place.  I don't want to go through it twice.

21              MR. EDMUNDS:  Okay, Your Honor.  Yeah, I guess I'm

22    stuck with it.

23              THE COURT:  There was a witness on earlier who

24    went to the organization and could have been asked these

25    questions.  This is just not -- it's not what his
```

Page 274

```
 1    declaration's about.

 2              MR. EDMUNDS:  Okay.  Thank you, Your Honor.

 3              THE COURT:  Okay.

 4         Okay.  Mr. Underwood, did you have any questions?

 5              MR. UNDERWOOD:  Very briefly, Your Honor.

 6                CROSS-EXAMINATION OF STEPHEN IVES

 7    BY MR. UNDERWOOD:

 8    Q    Mr. Ives, is it not true that the trust over which you

 9    exercised authority hold or held global -- and when I say

10    global, I mean around the earth -- opioid-related assets?

11    A    Just a moment.  Let me think about -- I'm thinking of

12    the trust for which I'm a trustee, so if you'll bear with me

13    for just a second.

14              MR. JOSEPH:  I'm going to object.

15              THE COURT:  Well, he answered.

16              MR. UNDERWOOD:  He's answered.

17              THE COURT:  I think he answered no, right?

18              MR. UNDERWOOD:  He did.

19    A    Yes, sir.

20              THE COURT:  Okay.

21    Q    So notwithstanding the fact that you answered that

22    question no, is there any evidence to suggest that generally

23    in this case global relief will be afforded by an order

24    confirming the plan?

25              MR. JOSEPH:  Objection.  I do not understand the
```

Page 275

```
 1    question.  He's not a lawyer.  I don't know how he could

 2    possibly answer.

 3              THE COURT:  I'm not sure I understand the question

 4    either, Mr. Underwood.

 5    Q    Well, isn't it true that you advise your -- well, you

 6    advise the beneficiaries that accepting the terms of the

 7    plan, would produce global peace?

 8              MR. JOSEPH:  Objection.  I really don't understand

 9    the question.

10              MR. UNDERWOOD:  I mean I think the witness states

11    that in his certification.

12              MR. JOSEPH:  Why are we asking -- can I object

13    that it's redundant?

14              THE COURT:  Mr. Underwood, if you're asking

15    whether the release covers claims against foreign entities

16    for those entity's own activities, I think that's already

17    been answered on the record by the plan proponent.  So if

18    you're asking questions about that of Mr. Ives, it's

19    covering ground that the Debtors have stipulated to.

20              MR. UNDERWOOD:  All right.  I have no questions,

21    Your Honor.  Thank you.

22              THE COURT:  Okay.  All right.  I mean I don't want

23    to cut you off, but I thought that was where you were going,

24    and I think it's already been made clear on the record.

25              MR. UNDERWOOD:  No, I appreciate that you
```

1   clarified it, Your Honor.

2           THE COURT:  Okay.  Mr. Joseph, do you have any

3   redirect?

4           MR. JOSEPH:  No, Your Honor.

5           THE COURT:  Okay.

6           Okay.  Mr. Huebner, were you going to ask any?

7   I'm sorry.  I didn't mean -- sometimes it takes a little

8   while for someone to appear on the screen.  Did you have any

9   cross?

10          MR. HUEBNER:  No, most definitely not, Your Honor.

11          THE COURT:  Okay.

12          MR. HUEBNER:  I just, you know, in my sort of

13  other role, you know, overall, I wanted to just assist in

14  closing down the day.

15          THE COURT:  No.  Let me then let Mr. Ives sign

16  off.  Your testimony is concluded, sir, so you can sign off

17  at this point.

18          MR. IVES:  Thank you, Your Honor.

19          THE COURT:  All right.  So that does end all the

20  witnesses for today, and we caught up on yesterday's two

21  witnesses.  So I guess we resume on Monday.

22          MR. HUEBNER:  Yeah.  So, Your Honor, let me just

23  help for a second, if I may.  So we will consult with the

24  remaining witnesses over the weekend.  There were a few

25  things that we need to figure out with counsel for the

Page 277

1    parties over the weekend both to ensure a smooth operation,

2    an agreed order with respect to witnesses.  You know, people

3    have various blackout periods and they can only do, you

4    know, 1:00 to 4:30.  And so we'll make sure that's all teed

5    up as efficiently as possible.

6           As the Court surely remembers at the last pretrial

7    conference, we also had some conversations that are not

8    quite resolved yet about where we're going with oral

9    argument and timing for each issue and the like.  We will be

10   in written communication with the parties to try to lock

11   that down.  And I very much hope that based on the Court's

12   guidance, we will reach a schedule that makes sense because

13   obviously people need to know when they are arguing issues,

14   when they're up, for how long, and the like.  And so we will

15   be (indiscernible).  We will figure that out.

16          There is one other issue, Your Honor, that's

17   (indiscernible) lawyer so I'm probably a little bit out of

18   my (indiscernible) here, but the issue about the witnesses

19   that some of the dissenting states, originally I believe on

20   the Maryland end if my memory is right, they may have been

21   joined since then.  And so that issue needs to be figured

22   out also because I think the Court and everybody needs to

23   know, you know, do we have, you know, 12 witnesses left or

24   20 witnesses left.

25          And so I don't know, these are the Debtors'

1    witnesses, that goes without saying, you know, whether

2    there's anything that either the states or the Sacklers feel

3    they should say about that now or whether we should just

4    caucus over the weekend and see if we can figure things out

5    and narrow things and hopefully come with a much narrower

6    set of (indiscernible) for the Court to resolve.

7            So, you know, in order to get everything organized

8    for next week, I just wanted to put on the table some of the

9    things that I think that we will be doing over the weekend

10   to try to ensure a complete but also efficient trial because

11   many parties' weeks depend upon what's happening next week.

12           THE COURT:  So --

13           MR. JOSEPH:  Your Honor?

14           THE COURT:  Go ahead, Mr. Joseph; that's fine.

15           MR. JOSEPH:  I was just going to say we have only

16   two witnesses left, and they'll both be there Monday morning

17   and available for cross.

18           THE COURT:  Okay.  So I'm all for the parties

19   talking over the weekend to clarify who they're calling and

20   what exhibits relate to that testimony.  But since we're

21   picking up again Monday morning, my clerks and I will need

22   to know who is testifying and the exhibits that people

23   intend to address during their testimony so that I can read

24   the witness declarations and we could be ready with the

25   exhibits.

1          So I think, in other words, it doesn't really help

2    us much to know this at, you know, 11:00 Sunday night.  I

3    think really we ought to know before then, at least as to

4    the Monday agenda, you know, I would say end of the day

5    Saturday.

6          MR. HUEBNER:  Yep.  Understood, Your Honor.  And I

7    think that the early part of next week, sort of the next

8    witnesses are probably not where the complexity comes.

9          THE COURT:  That's fine.

10         MR. HUEBNER:  I think it probably starts after

11   that.

12         THE COURT:  And that's fine.  Wherever you are,

13   you need to give us lead time so that I have reviewed the

14   declarations and know whether I have any questions and able

15   to deal with objections and cross and the like so that, you

16   know, in a way that I can do it.  And that means letting us

17   know who's going to be testifying sufficiently in advance

18   and those declarations are teed up so that we can review

19   them.

20         MR. HUEBNER:  Absolutely, Your Honor.  I

21   understand that whatever side one is on, everyone

22   understands that you're being asked to read literally

23   thousands of pages of paper.  And giving you 36 hours to do

24   so is the least any party to this case can do.

25         THE COURT:  Okay.

1           MR. HUEBNER:  So we will be in touch.  Obviously,

2    if I've said something that someone disagrees with about

3    what's open to next week, I trust they'll speak now.

4    Otherwise, we will jump right back into trying to continue

5    to have this be as orderly and agreed as we can all

6    collectively figure out.

7           THE COURT:  Okay.  All right.

8           There are times when I ask questions of people

9    just to see how they will answer them.  I think the parties

10   should take away today, though, that I do have some concerns

11   about the breadth of these releases as articulated not only

12   by me but by Mr. Fogelman and others.  And some focus on

13   that might be a good idea.

14          MR. HUEBNER:  Your Honor, we -- as I hope we

15   always do, we listen very clearly, you know, just to be

16   candid.  It was an awkward spot because there was a witness

17   on the stand and people were musing about things that in

18   fact are not in fact correct with respect to how the

19   releases were in some cases.  In others, for example, the

20   Debtors are not taxpayers.

21          THE COURT:  I'm just -- look, there are points

22   that I think need to be addressed as far as --

23          MR. HUEBNER:   Yeah, and that's what I was going

24   to --

25          THE COURT:  -- the extent of the releases.

Page 281

1           MR. HUEBNER:  I think we understand that there are

2   clearly some reflections from the bench that need to be

3   thought about very carefully and that Your Honor can be

4   quite confident that everybody was listening.  And we will

5   be doing a lot of thinking over the weekend.

6           THE COURT:  Okay.  Now one of my clerks quite

7   cleverly pointed out that as I understand it, although we're

8   picking up 10, the trial actually will follow the

9   uncontested omnibus hearing on Monday morning.

10          MR. HUEBNER:  Yeah, there are two -- as a reminder

11  for the Court, there are a total a six pro-se matters, four

12  of which are uncontested, two are contested but I think will

13  be very brief, if my prognostication is correct.

14          THE COURT:  Okay.

15          MR. HUEBNER:  And then there are only the

16  uncontested sort of the examiner-related things that will

17  only take five minutes.  So for efficiency's sake, what

18  might make sense to do only, of course, if it's the Court's

19  pleasure is to just book the commencement of the

20  confirmation hearing for 11:00 and we can let people go --

21          THE COURT:  Well, I'm not sure that's -- look, I

22  think -- check with Mr. Andino on that.  I think it may be

23  better for people to sign on and just be signed on as

24  opposed to having a whole sign-on process at 11:00

25  because --

Page 282

1          MR. HUEBNER:  Sure.

2          THE COURT:  -- that may mean that we're actually

3    starting at 11:30.  I just don't know how long it's been

4    taking people to sign on.  I'd like you to check with him

5    and then send an email around to the parties who are

6    participating in the trial.  I think it may be more

7    efficient for everyone to sign on at 10:00 and just realize

8    that the trial actually isn't starting until we get through

9    those relatively simple omnibus matters.

10          MR. HUEBNER:  And, Your Honor, to be candid about

11   it, one of our issues is that, as the Court well knows, the

12   Debtors are paying the fees of a great many parties in this

13   case.  And an extra hour --

14          THE COURT:  That's true.

15          MR. HUEBNER:  -- of an entire confirmation

16   (indiscernible) listening is in fact possibly in the six

17   figures.  So --

18          THE COURT:  All right.

19          MR. HUEBNER:  -- we would ask --

20          THE COURT:  As long as --

21          MR. HUEBNER:  -- (indiscernible) but please don't

22   sit here for an hour if these are not (indiscernible).

23          THE COURT:  However we save time is the best.  So

24   if we save time by having people sign on at 11:00, that's

25   fine.  If we save --

Page 283

1              MR. HUEBNER:  Okay.  We'll work it out, Your

2      Honor.

3              THE COURT:  Okay.  So just check with him because

4      he knows basically how efficiently people can sign on and I

5      don't.

6              MR. HUEBNER:  Yep.

7              THE COURT:  Just for those of you on the line,

8      check your emails as to whether we're starting on the

9      confirmation hearing at 11:00 or at 10:00.

10             MR. HUEBNER:  Thank you, Your Honor.  Nothing

11     further from the Debtors.

12             THE COURT:  Okay.  Very well.  Thank you all.

13             (Whereupon these proceedings were concluded at

14     5:52 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 284

**C E R T I F I C A T I O N**

1

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

Sonya
6
Ledanski Hyde
7

Digitally signed by Sonya
Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital@veritext.com,
c=US
Date: 2021.08.18 16:36:45 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 15, 2021

[& - 30th]                                                                                    Page 1

| **&** |
| --- |
| **&**  8:15,19 14:4,5 |
| 32:14 33:1 40:17 |
| 49:19 110:18 |
| 133:7 147:2,16 |
| 155:16,19 167:7 |
| 195:17 196:17 |

| **0** |
| --- |
| **0384**  183:10 |
| **0385**  183:11 |
| **0386**  183:11 |
| **0387**  183:12 |
| **0534**  129:21 |
| **0534-60**  130:11 |
| **06604**  29:18 |
| **07102**  33:5 |

| **1** |
| --- |
| **1**  56:15 89:2,17 |
| 96:21 250:9,11,24 |
| 251:5 261:25 |
| **1.15**  96:2 |
| **1.16**  96:3 |
| **10**  95:20,23 96:1,1 |
| 96:6 142:3 180:10 |
| 180:22 199:24 |
| 281:8 |
| **10.2**  96:2 |
| **10.6**  63:18 |
| **100**  119:15,15 |
| 147:12 150:11 |
| 157:7 |
| **10007**  32:10 |
| **10014**  29:11 |
| **10017**  28:16 33:12 |
| **10019**  31:19 |
| **10036**  30:18 |
| **1006**  29:10 |
| **101**  243:1 |
| **10110**  32:17 |
| **1027**  207:5 |
| **106**  184:3 |

**10601**  1:14
**10:00**  282:7 283:9
**10:07**  1:17
**10th**  261:8
**11**  2:7 4:8 6:10 7:2
  8:8,11,24 9:20
  10:15 11:2,12
  12:1,15,23 13:4
  13:22 14:12,22
  15:3,18 16:1,6,12
  16:24 17:8,15
  20:19 21:3,19
  24:9,17,24 25:16
  26:4,19 27:2
  40:12 54:7 55:4
  68:21 82:13,22
  127:20,22 128:7
  158:6 215:20
  238:1 262:2,5
**1129**  55:6 62:16
**11501**  284:23
**11598**  30:11
**1177**  30:17
**11:30**  282:3
**12**  2:2,4 60:21
  68:1,3 88:1 89:9
  89:20 127:25
  188:13 277:23
**120**  150:23
**1201**  33:4
**122**  213:22
**12:30**  180:24
**12th**  180:19
**13**  1:16 50:10
  75:22 83:18
  128:13 195:8
**13th**  53:3 126:21
  133:24 141:14
  165:25 172:9
  188:14 192:17
  252:24
**15**  50:9 101:25
  118:20 192:14

  217:18 284:25
**15th**  180:19,20
**16**  81:10
**1620**  103:21
**17**  91:3
**18**  147:15,15
**1875**  32:3
**19**  93:1
**19-23649**  1:3 10:1
**1:00**  140:7 277:4
**1:30**  182:16
**1st**  29:3

| **2** |
| --- |
| **2**  30:10 171:15,18 |
| 171:21 195:5 |
| 251:12 252:21 |
| 261:23,24 |
| **2,000**  149:25 |
| **20**  112:19 119:14 |
| 211:13 214:19 |
| 235:17 277:24 |
| **200**  30:3 33:18 |
| **2000**  31:11 |
| **20003**  31:5 |
| **20006**  32:4 |
| **2007**  180:13,16 |
| **201**  29:10 |
| **2018**  87:25 90:17 |
| 90:22,25 91:18 |
| **2019**  82:19 91:4 |
| 91:18 99:8 101:14 |
| 231:11 |
| **2020**  140:2 206:16 |
| **2021**  1:16 2:2,5 |
| 50:6,9 52:17,22 |
| 52:23 75:20 83:15 |
| 126:15,17 141:11 |
| 164:20 165:21 |
| 172:7 188:10,13 |
| 192:12,14,15,19 |
| 195:5 252:21 |
| 261:9 284:25 |

**20852**  30:4
**21**  145:4 146:6
  255:11
**21217**  33:19
**22**  77:10,21 89:14
**225**  142:13,24
**24**  126:17 253:25
  258:25 259:3
**248**  1:13
**25**  90:25
**26**  147:12,14
  172:7 192:15,19
**27**  88:22 89:16,17
  93:15
**275**  142:12,24
**28**  91:11
**29**  96:20
**2921**  2:14
**2966**  2:17
**2982**  4:9 5:16
  13:18,24 14:18
  16:13,25 26:19
**2983**  4:9 5:16
**2988**  3:7,17,20,24
  4:2,4 8:8,13,16,20
  10:1,7
**2:00**  140:12,17

| **3** |
| --- |
| **3**  14:24 52:23 |
| 55:20 56:12 77:1 |
| 101:4 162:23 |
| 168:6 169:15 |
| 173:23 188:1 |
| 197:21 203:12 |
| 204:13 263:11 |
| **3,000**  105:23 |
| **30**  150:9,10,15 |
| **300**  1:13 284:22 |
| **3028**  2:20 |
| **3057**  2:23 |
| **3099**  3:1 |
| **30th**  33:11 |

| | | | |
|---|---|---|---|
| **31** 31:18 91:11 102:9 118:16,17 | **3273** 6:18 | **3411** 18:21 | **3459** 12:5 |
| **3100** 3:4 | **3274** 6:22 | **3412** 18:25 | **3460** 24:20 |
| **3110** 3:8 | **3275** 7:5 | **3413** 12:11 | **3461** 13:8 |
| **3111** 3:11 | **3276** 7:10 13:11 | **3414** 19:3 | **3462** 25:3 |
| **3120** 13:19 | **3277** 7:13 | **3415** 19:6 | **3465** 13:14 |
| **3121** 13:25 | **3278** 7:17 | **3416** 19:9 | **3480** 25:18 |
| **3122** 3:14 | **3279** 7:20 | **3417** 19:12 | **3490** 25:7,10 26:11 |
| **3123** 3:17 | **3280** 8:1 | **3418** 19:15 | **3491** 25:11 26:11 |
| **3125** 3:21 | **3283** 15:21 | **3419** 19:19 | **3514** 45:13 |
| **3129** 14:5 15:9 | **3288** 8:5 | **3420** 19:23 | **3515** 25:18 |
| **3166** 14:18 | **3292** 8:9 | **3421** 20:2 | **3520** 261:8 |
| **3185** 4:9,19,24 5:16 6:12,17 7:3 9:1 11:4 12:16 13:7,12 14:8,14 15:5,20 17:17 23:4,21,25 26:6 26:20 | **3293** 8:13 | **3422** 20:5 | **3521** 25:23 |
| | **3298** 8:17 | **3424** 20:7 | **3522** 26:2 |
| | **3299** 8:21 | **3425** 20:14 | **3528** 26:7 |
| | **33** 97:24 | **3426** 20:21 | **3530** 26:12 |
| | **330** 284:21 | **3427** 12:18 | **3542** 26:16 |
| | **3301** 9:3 11:21 13:12 | **3428** 20:25 | **3543** 26:21 |
| | **3304** 9:8 11:21 13:12 | **3429** 21:4 | **3545** 2:10 26:24 27:4 |
| **3186** 14:9 | | **3430** 10:18 | |
| **3187** 14:15 | **3305** 16:2,7 | **3431** 21:7 | **3546** 26:25 |
| **3188** 3:24 | **3306** 9:11 13:12 | **3432** 21:11 | **3547** 27:5 |
| **3199** 4:3 | **3309** 16:7 | **3433** 21:14 | **3549** 2:5 |
| **3231** 14:19 | **3323** 9:15 12:9 | **3435** 11:13 21:23 | **36** 99:6 279:23 |
| **3232** 14:25 103:23 | **3327** 16:15,25 | **3437** 22:3 | **37** 99:6,19 |
| **3235** 4:5 | **3335** 9:23 | **3438** 10:24 | **38** 42:23 101:10 |
| **3246** 15:6 | **3355** 16:19 | **3439** 11:7 | **3rd** 32:9 |
| **3248** 15:11 | **3357** 10:2 | **3440** 22:6 | **4** |
| **3251** 15:15 | **3359** 10:5 | **3441** 22:9 | **4** 61:10 164:20 165:21 174:4 182:7 188:10 192:12 200:15 255:17 256:3,7,13 261:12 |
| **3256** 4:11 11:17 12:16 13:11 17:17 | **3368** 10:8 | **3442** 11:14 23:4 23:21,25 | |
| **3257** 4:15 26:1 | **3372** 17:2 | **3443** 22:15 | |
| **32601** 29:4 | **3396** 13:1 17:10 20:21 | **3446** 22:21 | |
| **3262** 4:20 12:9 | **3397** 17:17 | **3447** 23:2 | **4.325** 213:8 |
| **3263** 5:6 9:6 11:21 13:12 | **3398** 17:19 | **3448** 23:5 | **4.5** 168:18 169:9 |
| | **3403** 17:24 | **3449** 23:11 | **40** 179:19,22 |
| **3264** 5:11 | **3404** 10:11 | **3450** 23:18 | **400** 31:4 |
| **3265** 5:18 13:11 | **3405** 18:3 | **3451** 23:22 | **42** 101:24 |
| **3268** 5:22 13:11 | **3407** 18:6 | **3452** 24:1 | **450** 28:15 |
| **3270** 6:2 13:11 | **3408** 18:10 | **3453** 11:18 | **47** 103:4,6 |
| **3271** 6:6 12:16 | **3409** 18:14 | **3455** 11:22 | **48** 42:23 104:19 107:6 124:1 |
| **3272** 6:14 11:21 13:11 | **3410** 18:18 | **3456** 24:4 66:3 | |
| | | **3457** 24:12 | |

**485**  33:11
**49**  110:25 111:4
112:8
**4:30**  277:4

**5**

**5**  50:6 52:17,22
55:20 83:15 104:6
141:11 142:6
204:21 205:1
206:18 255:17
256:3,7,14
**5.2**  127:23 128:2,5
128:10,14
**5.5**  149:23 161:13
**5.8**  141:25 145:17
145:21 161:5
**50**  110:25 112:8
**500**  32:16 142:5
**51**  130:8
**52**  184:17
**52nd**  31:18
**544**  70:2
**547**  72:2
**548**  69:9,14 70:2
**55**  142:1
**57**  142:6
**570**  33:4
**5:20**  196:15
**5:52**  283:14
**5th**  75:20 126:15
133:22

**6**

**6**  143:11 203:12
**6-1-21**  2:16
**6.3**  119:6
**6.4**  119:6
**6/28/21**  3:10
**6/30/21**  3:3
**60**  110:24
**615**  196:11,14
**615,000**  58:14
**6177**  2:19

**619028**  3:13
**626**  29:3
**639**  174:14 175:23
187:4
**66**  117:1
**67**  117:1
**6750**  2:22

**7**

**7**  55:12,15 56:2,7
56:14 57:23 62:16
62:19 63:6 69:8
72:2 119:4 197:22
198:3 227:19
**7/23/2021**  16:4
**700**  31:4
**702**  178:24
**704**  176:5
**717**  17:22
**719**  17:22
**72**  163:17
**79**  163:17

**8**

**8**  138:7 200:16
214:1,1 255:11
**8.4**  11:2
**8/5/2021**  20:16
21:1
**8/9/2021**  25:13,20
**800**  31:11
**82739**  2:16
**85**  14:24 102:6
118:17
**850**  29:17
**86**  32:9
**88041**  2:13

**9**

**9**  89:2 95:24 96:6
138:10 253:25
258:25
**95**  104:7
**98104**  31:12

**9th**  174:20

**a**

**a.m.**  180:24
182:16
**aaron**  5:16 30:13
**aaronson**  33:9
**abatement**  61:9
61:12,23 81:24
82:5 103:9,13,19
104:11,24 105:5
105:13,15,21
106:2,25 109:19
110:10 115:6
136:1,4 137:25
138:13 139:11
140:1 142:4,5
144:25 146:1,8
147:9,18 148:17
150:2 154:16
161:15
**abatements**
120:19
**abating**  145:1,20
**abeyance**  85:4
86:22 87:5
**ability**  79:2
144:24 151:1
204:10 214:18
226:2,3
**able**  44:21 49:11
56:23 64:21 73:20
96:12 126:2 137:6
142:19 171:4
178:21 253:19,22
279:14
**abrams**  7:19
33:24
**absolutely**  42:4
44:2 136:15
138:16 189:15
240:3 279:20
**absolved**  187:13

**absolving**  232:2
**abuse**  89:6 92:18
93:20 100:25
**accept**  230:24
**acceptable**  159:4
**accepted**  55:10
115:5 145:11
175:11 177:25
178:2 232:4
**accepting**  106:2
275:6
**access**  14:2 15:9
138:4 157:10
273:9
**accessible**  156:15
**accident**  232:20
**accomplished**
107:4
**account**  56:17
62:16 73:3,10
144:22 146:2
168:20 170:6,9
246:4 258:17
**accountability**
107:23
**accountants**
234:10 267:23
**accuracy**  128:14
189:9
**accurate**  95:25
128:2 241:18
284:4
**accurately**  59:6
59:18 73:20 74:13
**achieve**  209:8
232:12
**achieved**  122:21
150:19,21 151:2
**acknowledge**
159:2
**acknowledged**
159:11

acknowledgement
215:19
act   174:13 175:11
205:17 206:1
257:15,15
acted   174:13
175:11 184:14
208:11
acting   205:15
257:22
action   69:25 70:1
70:9,23,25 72:12
73:10,15,18,19,25
122:22 169:11
170:7 175:2
239:25
actions   62:3,4
72:10 201:16
204:19 227:14
236:15 262:8
active   82:21
actively   82:15
105:1
activities   136:3
149:14 217:23,25
227:20 228:1
229:21 231:4
248:13 275:16
activity   229:5
acts   228:5
actual   51:2 136:2
269:3
ad   11:18 12:10,13
12:17,20,25 13:10
13:13 15:10 17:4
17:10,13,18 18:2
18:5,9,13 22:2,12
22:14,18,20,23
23:1,8,10,14,16
30:16 31:2,17
45:15 47:23 79:22
79:24 80:9 81:1,3
81:7,9,12,18,18

82:3,7,22 84:15
86:19 128:1 133:8
135:22,23 136:4
141:3
adam   36:5
add   113:5 145:13
219:20 221:19
added   91:18
92:19
addicted   94:3
addiction   95:7
addition   52:21
91:19 107:22
161:18 163:14
204:21
additional   66:14
77:3,5 160:2
175:23 248:20
additionally
113:5 176:2
address   60:1 82:4
111:17 113:9
172:25 176:18
278:23
addressed   41:8
116:24 122:20
169:25 188:18
227:1 280:22
addresses   48:22
80:13 163:18
addressing   80:11
193:7 226:11
adequate   158:23
adequately   56:24
59:5 73:11
adjusted   89:21
administer   106:21
administering
205:3
administration
93:4,6 101:1
admissibility
187:7

admissible   182:20
admission   50:15
53:8,15 83:22
127:2 134:2
141:19 167:12
174:14 188:24
192:22 195:12
253:3
admit   50:17 53:16
83:23 127:3 135:9
136:25 141:20
167:13 172:16
193:17 253:4
admits   175:14,24
admitted   76:12,13
136:10 172:14
176:5 189:1 253:5
admittedly
144:25
adopted   138:1
adoption   101:24
102:5
advance   180:23
242:18 279:17
advanced   90:6
advantage   86:20
advantaged
118:24
adverse   193:6
advertising
227:22
advice   229:10
231:24
advise   204:23,25
251:17 275:5,6
advised   194:19
196:10 198:11
255:2
advisor   203:18
208:11,17 268:3
advisors   234:10
266:7,15 267:22

advisory   178:24
advocating
119:11
afanador   33:1
167:23 242:4
affect   89:8 135:5
affidavit   18:1,4,8
18:12 78:17 232:8
affiliate   213:13
214:16,19 235:10
affiliated   2:9 4:9
6:11 7:3 9:1,21
10:16 11:3,13
12:2,24 13:24
14:14,24 15:5,20
16:1,7,13,25 17:9
17:16 20:20 21:4
21:22 24:10,18
25:18,23 26:6
27:4 149:6 214:3
affiliates   13:6
25:1 55:16 207:18
207:19 211:11,12
211:15,18,20,25
212:1,3,10,13
213:5,10 214:11
246:14
affirm   49:24 52:7
75:9 83:7 126:6
133:12 141:7
165:12 171:13,24
188:5 192:3
194:23 252:14
afforded   274:23
afraid   248:24
259:25 262:16
afternoon   125:23
133:6 140:21
141:2 151:20
171:22 224:4
agenda   2:4,4
279:4

agent  208:3
agents  207:17
  266:7,14
aggregate  63:12
  63:22 128:23
  129:3,4,8 131:6
ago  42:9 84:2
  104:10 147:3
  235:18 265:1
  267:21
agree  46:18 55:9
  60:4 85:17 87:9
  89:16 105:15
  106:17 107:17
  108:12 109:1
  115:19 120:18
  122:15 138:13
  151:8 177:1
  241:14 243:17
  247:21
agreed  44:7 45:18
  105:21 119:21
  122:1 140:1
  152:12 187:7
  189:11 193:12
  215:12 261:2
  277:2 280:5
agreeing  241:5
agreement  42:10
  46:16 81:16 85:8
  86:4 87:1,1,14
  96:17 100:13
  104:3 105:18
  106:16,20,20
  107:16 119:12,19
  119:20 122:18,23
  122:23 138:19
  139:2 142:17,19
  143:2 147:13
  150:8,14,23 151:6
  176:19 185:18
  189:9 190:20,21
  203:22 214:8

216:8,16,19
  229:17 238:10
  255:20 262:3
agreements  84:17
  85:19,21 86:8
  147:5
agrees  241:10
ahc  42:16 43:7,18
ahc's  85:20
ahead  44:19 47:17
  54:1,24 87:17
  98:11 113:2,2
  120:10 121:9
  145:15 146:16
  149:3 161:1 163:9
  174:5 178:12
  197:15 210:20
  218:7 225:9 227:6
  234:23,24 235:19
  251:9 252:6,11
  253:20 260:24
  278:14
ai  162:5
aisling  38:2
aka  4:5
akin  174:21
al  12:5 24:12,20
  40:10 140:23
alabama  95:4,6,8
  101:20
albert  33:25
aleali  34:1
alexa  23:24
alexander  37:3
alice  39:17
alissa  38:4
allayed  110:5
allee  4:2
allen  7:4 33:7
  39:19 69:3 131:24
  167:22 241:23
  242:3

allies  79:7
allison  40:4
allocate  101:25
  123:23
allocated  59:4
  142:9,12,13,16,25
allocating  115:20
allocation  51:7
  61:16,19 81:25
  82:4 87:25 91:23
  94:23 95:19 96:7
  96:16 98:2,4,19
  115:18 119:21
  121:21 122:1,4,20
  123:10 124:4,15
allocations  61:11
  102:6 115:11
  116:21
allow  15:13 17:4
  21:16 24:6,22
  139:3 183:24
  222:19 226:4
allowance  8:12
allowed  41:5 63:1
  111:4 112:12
  178:16
allowing  159:5
allows  110:5
  161:21
alluded  118:23
alma  38:16
alter  182:1 230:14
alternative  76:23
  106:19 120:5
ambulance  80:5
amended  2:4,7,7
  4:8,13,17 5:8,15
  6:10,20 7:1,15 8:8
  8:11,24 9:13,13
  9:20 10:15,21
  11:2,11 12:1,8,23
  13:4,22 14:8,12
  14:22 15:3,18,25

16:6,11,23 17:7
  17:15 20:11,19
  21:19 24:8,17,24
  25:16,20,22 26:4
  26:9,24 27:2
  40:12 52:23
  129:22 165:21
  221:22,24 222:5,7
  223:16 245:22
amending  262:4
amendment  11:1
  250:23
america  4:25 5:22
american  4:14 5:2
  5:3,5 26:2 238:2
americas  30:17
amerisourceber...
  149:5
amici  15:13 16:17
amount  51:8,9
  61:17,22 63:12,21
  63:25 78:20 95:21
  96:6 132:4 147:8
  159:4,10,12 160:2
  162:3 168:18
  169:9 184:19
  255:22
amounts  61:6
  94:17 108:16
  161:15
amplify  163:23
analyses  52:25
analysis  53:20
  55:19,24 56:16
  57:12,20 58:17,19
  59:22 62:15 65:8
  69:21 70:3,12,14
  70:15 71:2 72:1,6
  72:15 73:3,22
  74:15 76:5 77:6
  126:17 136:15
  184:16 193:25
  244:21

analyze 208:16
analyzed 128:15
 159:22 232:3
 239:3
anderson 10:4
andino 171:6,10
 281:22
andrew 15:10
 31:21 37:25 39:22
angela 36:9
angle 64:21
anker 4:24 34:2
ann 37:1
announce 42:8
 49:4
announced 44:6
 116:18 146:24
 147:3
answer 41:16,18
 57:1,17 59:14
 62:14 64:22 65:1
 70:6 92:25 98:7
 98:22 99:16
 103:16 111:10,23
 112:12 121:7,24
 122:2,13 123:3,7
 123:9 125:13
 129:7 132:12
 137:6 142:21
 143:3,21 145:14
 153:9,15 157:1
 159:15 160:5
 163:24 169:8
 198:24 210:13,23
 214:12 218:17
 239:11 240:11,17
 245:15 246:3
 250:13 254:14,17
 259:23 262:16
 265:2 266:9 268:8
 268:13 275:2
 280:9

answer's 270:7
answered 59:12
 61:25 62:10 64:24
 113:17 121:3
 122:25 238:18,25
 268:23,25 274:15
 274:16,17,21
 275:17
answering 218:10
 263:1 269:21
answers 88:12
 105:22 146:13
 148:21 211:9
 248:7 269:21
 270:15
anticipating
 254:14
antithetical
 236:16 237:21
 259:22
anybody 99:1,20
 171:2 250:13
anybody's 42:4
anymore 197:9
 263:19
anyone's 191:7
 204:1
anytime 187:18
anyway 140:17
 160:18
apart 46:18 63:4
 220:10 246:16
apologies 123:17
 128:25 153:25
 269:17
apologize 69:19
 70:5 131:17,21
 138:10 170:24
 173:16 175:3
 184:7 185:23
 191:13 199:7
 218:9 261:25
 273:7

apparently
 131:15 223:13
 240:6
appeals 142:11
appear 41:8 276:8
appearance
 172:20
appeared 182:22
appears 182:17
appendix 55:18
 233:14 264:17,20
 265:4
applicable 69:10
 71:14 72:2 223:2
applied 104:11
 249:12
applies 185:19
 196:2
apply 103:14
 114:11,14 211:24
 222:8
applying 89:1
appointed 143:12
 143:15 145:5
appreciate 110:11
 113:24 163:24
 186:16 195:24
 209:10 218:25
 219:19,25 222:14
 239:8 275:25
approach 90:6
 154:13
appropriate
 48:13 86:2 122:16
 125:11 135:9
 145:9 154:14
 176:15 180:1
 181:3 214:14
 228:23 269:17
approval 190:19
approve 25:5
 105:5

approved 77:13
 104:4 106:2
 148:13 215:11
 236:21
approving 238:13
approximate
 89:21
approximately
 42:22 61:10 67:23
april 91:4,18
arbitrator 143:1
arbitrators
 142:10 143:1
arda 6:21
ardavan 35:6
aren't 43:25
arguably 42:12
argue 86:6,9
 174:8,21 186:4,6
 187:14,17 217:17
 226:21 254:19
argued 111:22
arguing 277:13
argument 45:1
 93:21 113:18
 114:17 176:25
 182:19 186:17
 202:3 219:6 244:9
 246:6,8 277:9
arguments 48:10
 80:15 177:15
 181:19 185:14
 186:20 191:10
 194:6,8 271:18
arik 38:11
arising 128:15,21
 238:4
arms 135:2
arranged 171:5
arrived 158:21
artem 39:6
arthur 30:24

**articulated**
  280:11
**ascertain**  58:9
**aside**  216:17
  272:16
**asked**  41:14 42:8
  42:19 43:15 44:6
  49:4 62:9,10,12
  77:21 90:12
  111:19,20 113:14
  114:7,13,16 123:1
  134:18,24 137:3
  137:10 175:2,23
  220:8 240:21
  246:13 247:8
  248:11 251:3
  259:24 268:23
  271:25 273:19,24
  279:22
**asking**  48:24
  69:24 97:3 109:4
  114:9 124:12
  144:14 153:11
  159:11 177:3
  183:15 189:8
  199:15 201:24
  211:1 217:10
  224:8 238:6
  240:10,20 242:10
  242:22 245:3
  249:19 254:11
  257:19 266:1
  268:15,15 273:18
  275:12,14,18
**asks**  171:2
**aspect**  144:17
  207:16 211:11
  213:25
**aspects**  151:22
  152:22 153:22
  181:14 213:25
**aspen**  5:3

**assert**  247:4
**asserted**  181:21
  201:15 216:22
  220:21,22 229:19
  262:23
**asserting**  58:10
**assertions**  186:19
**assess**  57:22
**assessed**  169:17
  254:24
**assessment**  53:21
  77:13,21 127:6
  162:6 179:3
  180:13 198:9,16
  198:25 199:3,5
  229:7 239:6,21
  254:5,7,11
**asset**  72:8 244:5
  244:16
**assets**  64:15 65:9
  66:24 77:16
  128:18 129:12
  168:9 205:23
  213:10 223:2,11
  244:22,23 245:23
  264:21,23 274:10
**assign**  62:24
  73:24
**assignment**  54:8
  55:3 61:5 209:12
**assist**  171:4,7
  276:13
**assistant**  105:7
**associated**  94:5
  129:6 144:25
  145:20,22,23
  148:3 168:4 213:4
**assume**  54:16
  105:2,24 130:18
  144:6 156:21
  185:14 209:11
  218:2

**assumed**  70:12
  174:16,16,23
  241:1
**assumes**  55:24
**assuming**  79:5
  97:21 104:17
  141:23 147:12
  157:1 171:16
**assumption**
  180:12,15
**asudulayev**  34:3
**atinson**  34:4
**atkinson**  24:15
**atlanta**  101:12,12
  101:13
**attached**  53:5
  56:16 66:19 127:3
  165:21 167:13
  188:25 192:14,22
  272:9
**attaches**  50:6
  126:16 188:12
**attaching**  52:22
**attempt**  58:8 62:1
  74:13 177:16
**attempted**  107:3
  124:3,13
**attention**  100:14
  115:17 163:15
**attest**  254:23
**attested**  78:19
**attorney**  5:14,18
  28:14 29:16 30:1
  30:2 31:9,10
  33:16 82:5 92:22
  93:10 97:10,25
  98:3,25 105:8
  111:24 119:17
  124:10 125:6
  134:6 147:21
  153:13 160:15
  176:6 198:22,22
  267:23

**attorney's**  32:8
  112:7 207:23
  225:7
**attorneys**  29:2,9
  30:9,16 31:2,17
  32:2,15 33:2,17
  84:6,19 99:4
  115:16 125:1,4,10
  141:24 142:3
  234:10 268:19
**attributed**  168:15
**audio**  242:10
**aufses**  30:24
**august**  1:16 2:1,4
  50:6,9 52:16,22
  52:23 53:3 75:20
  75:22 83:15,18
  126:15,21 133:22
  133:24 141:11,14
  164:20 165:20,25
  172:9 174:20
  188:10,14 192:12
  192:17 195:5,8
  252:21,24 261:8
  284:25
**auslander**  34:5
**authentic**  183:24
  184:4
**authenticity**
  183:9
**authorities**  257:3
**authority**  203:19
  204:4,7,8,10
  205:5,11,15
  229:16 255:17
  256:1,4,24 257:5
  257:8,10,11,16,17
  257:17,20,20,22
  269:22,23 270:4,9
  270:11,12,16,18
  270:20,22 272:17
  272:19 274:9

**authorize** 15:24
20:9 21:25
**authorized** 113:6
113:8 257:14
**authorizing**
238:14
**available** 63:16
72:3 80:20 119:23
140:12 152:20
153:7 175:20
249:17 251:11
278:17
**ave** 33:11
**avenue** 28:15
30:17 31:4,11
32:3,16
**awarded** 142:9
**aware** 40:23
45:12 48:8 58:8
60:14,17,19 61:11
62:1 63:16 65:12
66:21,22 67:2,8
67:12,15 68:23
79:24 81:9 101:3
101:5,6 120:15,20
122:3 123:11
139:8,12 142:17
148:6,18,21
151:22,25 152:6
152:17 163:19,20
207:21,24 225:14
227:9 228:8
229:18,23 231:11
236:11,13 237:11
259:14,16,16
263:4,16 265:16
265:19 266:5,9
**awareness** 235:4
**awkward** 280:16

**b**

**b** 1:21 10:4 14:3
23:13 50:2 63:17
164:17,24 165:23

166:21 167:11,15
192:9 198:11
199:24,25 203:18
206:10,15 208:8
215:8 219:11
229:3 254:16
255:16 256:14
258:5,5,20 259:6
259:7,8,21 262:3
262:23
**babies** 13:1 17:10
17:19 120:17
**back** 45:22 46:19
52:1 95:3 115:11
140:22 143:10
149:24 155:2
166:19 177:13
187:8,24 191:19
197:2,6 209:21
223:22 225:4,9,13
234:18 252:3
266:19 280:4
**backdrop** 221:9
**background**
107:1 175:15
**backup** 41:9
**bad** 178:6
**balancing** 231:15
**ball** 11:14 21:22
23:4,21,25 25:6
25:11 26:11 34:6
34:7
**ballots** 8:20 16:11
16:23
**balots** 8:16
**baltimore** 30:4
33:19
**bankers** 234:11
267:23 268:18
**bankrupt** 65:3
**bankruptcies**
64:3

**bankruptcy** 1:1
1:11,23 2:13 42:5
55:6 64:23 65:3
65:10,11 69:9
70:2 82:18 86:7
104:16,20 109:9
115:9 116:14
120:15 121:13,14
122:7,9,15 139:7
139:9 143:19
144:7,20 145:3
147:18 148:1,2,3
161:6,8,11 162:8
190:21 232:16
238:2 262:4
265:24 266:19
268:11,20
**barbara** 10:11
**barker** 34:8
**based** 58:23 59:4
73:13 86:11 98:15
123:18 136:3
151:13 154:1
167:1,5 174:13,23
175:14,22 176:5
182:17 191:7
217:5,14 220:22
229:8 239:6 241:3
250:16 265:17
270:12 277:11
**basic** 202:11
**basically** 100:17
163:1 186:14
283:4
**basis** 67:18 72:7
95:1 105:13
107:10 112:5
135:3 139:10
161:7 178:25
181:9 189:1
204:23 229:14
248:11,12

**beacon** 11:14
21:23 23:5,22
24:1 25:7,11
26:12
**bear** 246:17
260:25 274:12
**began** 84:3,12
162:9,10
**beginning** 102:24
145:19 163:16
**begins** 84:1
**behalf** 2:9,23 4:10
4:14,20,24 5:10
5:17,21 6:1,5,13
6:17,21 7:4,9,13
7:17,19,25 8:4 9:2
9:6,22 10:11,17
10:23 11:5,14,18
11:22 12:3,10,17
12:25 13:8,13,19
13:25 14:3,9,15
14:19,25 15:6,10
15:14,21 16:14,18
17:1,9,18,23 18:2
18:5,9,13,17,21
18:24 19:2,6,9,12
19:15,18,22 20:1
20:5,7,13,24 21:7
21:10,14,22 22:2
22:6,9,14,20 23:1
23:4,9,16,22,25
24:4,11,19 25:2,7
25:11 26:1,7,11
26:16,20,25 27:5
29:16 40:17 70:10
70:24 72:10 74:25
79:22 102:19
110:19 111:13
127:10 131:25
133:7 137:15
141:3 165:22
167:7,23 173:3
196:17 222:3

[behalf - brought]                                                    Page 9

229:2 242:4
244:16 257:15
267:17
**behavior** 149:18
179:7
**beholder** 113:18
**beiderman** 36:8
**believe** 45:23 56:9
71:18 72:9 75:2
80:21 90:20 91:7
91:11,15 99:12,18
99:24 100:6 101:7
101:19 102:9,11
104:15,18 109:11
115:18 123:13
126:2 130:25
131:2 132:21
133:2 134:16
135:9 140:11
149:21 150:1
153:19 154:14,16
183:21 196:6,12
200:9 216:25
221:22 234:9
238:12 239:5
256:8,12 268:25
269:22 270:10
277:19
**belk** 3:24
**belt** 164:11
**ben** 5:10 36:7
48:4 65:17 72:24
223:23 264:8
**bench** 281:2
**beneficial** 134:19
**beneficiaries**
116:6 205:18
206:3,4,7,10,19
242:19 258:3,7,9
258:20 275:6
**benefit** 42:12 79:1
107:7 150:2
169:12 184:24

211:22,23 214:9
221:7,7 244:7
**benefited** 100:17
**benefitted** 71:20
**benefitting**
258:11
**benjamin** 18:17
18:20,24 19:2
20:6,24 21:6,10
21:13 22:5 24:3
28:19 29:13 33:25
45:7 65:22 224:4
264:14
**bentley** 8:3
**bernard** 6:21 35:6
**beshere** 34:9
**best** 54:9 55:5,23
56:2,8,10,20 57:6
61:5 282:23
**better** 88:18 169:5
173:9 241:9
281:23
**beyond** 64:5 77:3
87:16 107:11
134:8 168:6,7
199:18 200:10
242:20 243:22
247:16
**bickford** 17:12
**big** 191:12
**bigger** 95:6
**billion** 61:10
63:18 147:12,14
149:23 161:14
169:9 213:8
**billionaire** 148:4
**billions** 63:4,5
259:7
**bilzerian** 177:23
178:8
**bind** 138:17
216:13

**bit** 52:4 56:4 96:1
200:10 242:9
246:10 272:14
277:17
**blabey** 30:21
80:18 82:24
125:19 133:6,7
137:2 139:19
140:10,14,25
141:2,3
**blackline** 14:7
26:23
**blackout** 277:3
**blain** 34:10
**block** 111:4
**blouin** 19:18
**bloyd** 7:13
**blue** 200:5
**board** 43:3 46:24
134:13 149:10
158:17 177:20
179:16 206:17
**boards** 179:25
**boat** 221:16
**bolts** 134:9
**book** 183:21
281:19
**boston** 14:4
**bottom** 97:19
159:19
**bound** 216:16
217:8 259:20
260:4 270:10
**bounded** 132:13
**boyle** 6:17
**bp** 108:24
**brauner** 34:11
**breach** 186:22,23
190:14 191:4
**breadth** 209:7
280:11
**break** 140:15,17
240:14

**breaking** 169:3
**brecon** 10:4
**breene** 34:12
**brian** 2:23 7:16
30:6 37:12 76:15
113:3 124:24
134:4 189:4
269:11
**bridgeport** 29:18
**bridges** 6:5
**brief** 15:13 16:17
72:23 127:11
151:16 180:23
186:8,13 226:11
226:3 281:13
**briefly** 69:3 76:15
120:22 137:15
156:1 184:11
274:5
**bring** 44:17 46:18
118:2 163:15
184:23
**bringing** 149:22
161:12
**british** 9:18,23
**broad** 33:4 77:2
113:16 144:9
202:12 203:3,6
208:14 224:13,16
229:8,10,13
232:12 233:1
265:24 267:1,5,6
268:12,13
**broader** 125:5
**broadly** 193:25
229:20 248:15
**broke** 150:6
**brooks** 34:8
**brough** 245:4
**brought** 42:17
100:1 153:23
184:23 215:20
248:3,4 249:2,13

**brown**  34:13 201:21,23
**browser**  49:6
**bryce**  6:12 35:15
**build**  98:23 99:1
**bumim**  15:14 16:18
**burris**  2:20
**busch**  18:4
**business**  67:25 77:16 152:7 238:8
**businesses**  66:25 213:4 264:22
**busy**  87:6
**butler**  4:5
**bystander**  202:7

**c**

**c**  10:17 17:22 28:1 34:22 35:2 36:24 37:13 40:8 52:11 126:10 172:3 192:9 262:3 284:1 284:1
**cahn**  5:16 30:13 84:1,3,10 86:3,5 87:9,17,18,21 89:13,15 90:13,14 90:15 98:21 102:14 113:15 120:22,25 121:4,6 121:10,18,19,23 122:11 123:15
**cahn's**  113:14
**calculation**  132:3 132:5,8
**calculus**  63:23
**california**  6:22 61:4 88:23 89:3 89:19 93:18 94:3 95:20 96:16,20 97:5,13,15
**california's**  96:25

**californians**  93:20
**call**  45:21 49:15 53:12 70:16 84:20 106:19 152:23 172:23 187:25 209:25
**called**  106:13 150:12 193:8 201:6 204:16 226:4 245:14
**calling**  46:5 51:23 278:19
**calls**  41:15 57:1 64:9 99:2 105:9 112:10 124:5
**camera**  44:11 86:1 171:3
**canada**  168:3,14 168:21 215:8 216:13 217:14,21 218:19 219:3 220:10,13,17,21 220:21 223:1,3,8 243:18,20 250:17 260:8
**canada's**  218:19 220:9
**canadian**  6:25,25 9:19 33:2,3 69:4,5 131:25 132:7,10 167:24,24 215:14 215:17,24 216:15 217:25 218:5,16 221:8,11 222:4 223:2,10,10,18 237:9 238:19 239:13,22,24 240:2,7,8 242:4,5 245:2,23 248:1 250:25 261:3
**canadians**  223:11
**candid**  280:16 282:10

**candidly**  42:24 251:17
**can't**  67:18 68:15 68:18
**capacities**  258:11
**capacity**  135:23 183:5 203:17 205:16,19 229:17 243:5 257:23,24 258:3 266:24
**capita**  88:25 93:16 95:1,10
**cardinal**  149:5
**care**  178:4 181:25
**careful**  96:24 114:8
**carefully**  281:3
**carl**  19:5 39:15 47:25 172:3
**carolina**  110:8
**carrie**  2:14 37:15
**carter**  30:8 34:14
**carve**  215:14 237:20 240:4,8,21 241:4,5 244:5 245:22 263:4,5,8
**carved**  217:7 225:20,23 238:11
**carveout**  216:17 216:20 225:19 226:20,25
**carveouts**  216:20
**case**  1:3 10:1 43:3 44:5 52:24 53:10 54:6,8 55:3,12,15 56:2,7 57:23 58:14 63:17 79:2 79:6,7 81:2,3,9,13 81:20,22 82:8,13 104:19 109:4,9,22 110:25 112:19 114:4 115:9,14,15 116:13,16 120:20

121:13,14 124:2 124:11 125:1,2 135:22,24 138:24 143:19 144:21,25 147:17,20,20,24 149:12 152:20 153:5,17 154:2,10 155:17 156:21 157:1,7,9 159:22 161:12,21 162:9,9 162:25 163:1 167:2 174:7,20,23 175:20 176:5 178:1,16,17,18,20 179:1 184:12 185:2,4,8 187:8 190:18,18 206:3 210:5,17 213:16 216:15 218:2 226:2,10,12,14,19 226:20 227:24 230:3 233:23 235:13,22 248:23 261:8 263:20 271:19 274:23 279:24 282:13
**cases**  60:6 64:23 93:13 107:9 109:10,14 115:9 118:5 134:13 147:17,23,24 148:4,7 153:23 154:3 185:1 206:3 230:3 262:3,5 280:19
**cash**  213:8 233:21 243:13
**cast**  16:11,23
**categories**  66:8,13 89:9 90:21 91:1 91:20,21 152:18 233:16

**category** 41:21
205:6 239:14
**catherine** 36:8
39:10
**caucus** 278:4
**caught** 276:20
**cause** 63:3 92:2
262:8
**caused** 124:17
218:4
**causes** 69:25 70:1
70:9,23,25 72:12
73:10,15,18,19,25
92:2 170:7 239:24
**caveat** 53:9
**ccaa** 223:8,17
**census** 119:7
**center** 86:14
**centers** 120:2
**central** 162:6,20
**certain** 4:14,22
6:24 9:4,10 10:14
15:23 26:2 33:2
45:13 57:14 66:18
88:10 167:23,24
190:4 196:2
197:24 198:3
207:22 214:8
242:4,5 254:3
**certainly** 42:9
48:18 64:21 74:8
114:3 115:16
124:11 139:25
152:4 157:19
158:18 159:24
174:3 183:3
186:18 198:3
203:4 219:14
226:23,24 239:20
243:11 247:12
262:1 265:1
271:20

**certification**
275:11
**certified** 284:3
**cetera** 117:1
**chain** 162:15,16
**chakraborty**
19:21 34:15 48:2
191:25 192:9,11
193:9,19 194:3,12
**chakraborty's**
192:22 193:17
**challenge** 178:22
**chambers** 32:9
41:1 86:1 140:12
**chance** 85:15
182:16 194:11
197:6
**change** 50:11,13
52:19 53:4 75:23
83:19 90:23 91:13
126:23 133:24
141:16 166:2,9
172:11 188:15
192:19 195:9
236:18 238:5
252:25
**changed** 115:25
116:4,5 162:18
**changes** 238:6,7
**chapman** 42:21
**chapter** 2:7 4:8
6:10 7:1 8:8,11,24
9:20 10:15 11:2
11:11 12:1,15,23
13:4,22 14:12,22
15:3,18 16:1,6,12
16:24 17:8,15
20:19 21:3,19
24:9,17,24 25:16
25:22 26:4,19
27:2 40:12 55:12
55:15 56:2,7,14
57:23 62:19 63:6

68:21 69:8 72:1
82:13,22 158:6,15
215:20 238:1
261:21 262:2,5
**characterize**
117:6
**charitable** 152:13
**charles** 100:5
**check** 281:22
282:4 283:3,8
**checked** 84:23
**cheryl** 36:17
**cheyenne** 256:11
**chief** 83:3 184:12
**child** 113:21
**children** 66:23
**children's** 12:20
17:5,13
**choice** 57:24
182:12
**chosen** 182:10
**christina** 16:9,21
38:15 44:18
**christopher** 12:16
16:2 34:14,16
38:25 222:3
**chubb** 8:23 9:2
**cicero** 34:17
**circuit** 134:18
226:13
**circuit's** 177:22
**circulated** 47:10
**circumstances**
86:9 87:8 145:10
146:1 245:23
273:8
**cite** 104:1
**cited** 57:2
**cities** 81:11
**city** 5:8,10
**civil** 208:4
**claim** 2:13,19 3:13
96:21 128:17

132:9,11 176:24
178:4 180:8 208:4
214:4 215:18
216:22 217:5,13
217:20 218:18,19
219:3 220:8 222:6
222:8 228:18
231:12 237:3
247:4 249:19
**claimant** 51:9
**claimants** 4:1
13:14 22:15,21
23:2,11,17 31:3
69:5 117:21
**claiming** 57:25
**claims** 50:21,21
55:24 56:2,7,10
56:14,17,20,24
57:6,9,13,14,22
57:25 58:2,10,14
58:15,18,21,24
59:2,5,6,17,19,22
60:1,9,10,13,16
60:18 62:17,22,22
62:25 63:7 68:21
72:2,3,6 73:4,12
74:10,10 77:13,22
77:24 78:1 108:17
128:16,22 129:10
132:4,11,13,14
143:24 144:18
148:8,13,19 156:3
170:6 177:5,9,16
181:5,8,9,10,15
181:20,21 182:2,5
182:9,22,24 183:5
184:22 185:12
186:15,21,24
198:10,16 199:3,6
199:9,11,14 200:6
201:2,14 202:13
203:2 215:1,13,14
215:20 218:22

220:7,20,20,22
221:10 223:1,10
225:18 228:19
229:18,24,25
230:6,10,13 231:4
231:8,9 232:4
236:25 237:1
238:3,11 241:3
246:4,17 247:25
248:1 249:7 254:7
254:12,19,20
255:4,5 262:7,8
262:22 263:6,11
265:16,20 266:18
267:2 268:11
275:15
**clarification**
149:2 196:23
205:10 206:12
219:1 221:11
256:18 271:3
**clarifications**
187:21,23 188:19
189:21
**clarified** 186:1
197:5 200:8
219:16 221:15
276:1
**clarifies** 221:14
**clarify** 100:24
118:10 122:13
129:1,17 149:3
160:12,14 166:10
185:22 190:6
218:17 221:24
222:5 225:17
230:12 250:15
278:19
**clarifying** 187:2
**clarity** 55:1
195:25
**class** 217:18 244:8

**classified** 217:17
**claudia** 39:9
**clause** 228:4
**clauses** 247:21
**clear** 43:24 44:3
54:13,23 62:11
73:23 78:12 81:4
88:22 95:14
113:21 115:4
118:16 135:20
136:6 143:7
147:11 151:3
160:14 161:10
162:25 176:11
180:11 181:23
182:24 183:1
187:12 189:21
190:5,10,11,17
191:3 193:4
195:22 215:7
218:22 219:21,22
220:20 221:18
223:6 235:9
241:11 250:22,24
251:6 256:15
257:4 261:7 268:8
268:9 275:24
**clearly** 40:18
86:14 87:22 91:12
110:19 115:3
197:19 228:8
253:18 280:15
281:2
**clerk** 2:25 16:10
16:22 44:18
191:14 260:14
**clerks** 278:21
281:6
**clerk's** 41:1 49:12
**cleveland** 82:19
143:18
**clever** 248:15,24
249:4,14

**cleverly** 281:7
**click** 49:5
**client** 81:5 152:1
153:13 156:4
159:19 160:15
186:6 198:22
268:17,18
**clients** 105:3
118:5 144:16,16
152:10,15 157:10
216:9 217:13
230:23 238:8
244:7
**clinical** 98:14
**clint** 35:1
**close** 124:19
**closely** 81:22
154:10
**closer** 169:2 173:6
**closing** 80:15
220:5 276:14
**cobb** 8:16
**code** 55:6 69:10
69:15 70:2 260:13
**cohen** 32:14
195:17
**coleman** 34:18
**collaborative**
107:2
**collateral** 191:12
**colleague** 133:3
**colleagues** 80:17
85:11 146:3
**collection** 63:12
**collectively** 87:3
204:18 280:6
**colloquy** 59:10
102:24 156:14
193:2
**collura** 18:16
**columbia** 6:1 9:18
9:23 61:4 165:8
195:18

**come** 44:25 47:6
58:20 72:10 74:13
109:18 119:12
122:8 153:6 155:2
158:13 159:13
166:19 169:2
173:6,24 191:14
197:2 264:2 278:5
**comes** 117:3
220:25 234:1
279:8
**comfortable**
59:18
**coming** 58:4
115:17 150:15
187:3 197:6
**comley** 29:15
**comm** 31:2
**commencement**
281:19
**comment** 250:14
**commercial**
117:12
**committed** 99:4
154:4 168:5 268:3
**committee** 11:25
12:4,20 13:1,13
17:4,10,13,18
22:14,20 23:1,10
23:16 24:6,11,16
24:19 30:16 45:15
47:23 76:25 79:23
79:24 80:9 81:3,6
81:7,9,12,18,18
82:4,7,11,22
84:15,24 86:19
91:16 117:19,19
118:3 128:1 133:8
135:22,23 136:4
141:3 143:13,17
146:6 158:10,12
158:16 178:24

**committee's** 13:10
22:12,18,24 23:8
23:14
**committees** 81:1
205:2
**committee's** 76:7
**common** 84:8,17
84:21 85:1,8,14
85:19 86:4,7 98:9
102:25 122:7
179:1 226:9,14
**communication**
84:25 85:18
140:11 254:6,15
277:10
**communications**
198:23
**companies** 68:10
68:12 71:5,20
108:6 120:17
144:11 149:7
154:5 210:17
213:4 229:20
**company** 5:1,1,3
5:4,4,5,6 6:9,10
6:13,14 9:7 11:5
11:14 14:4 21:23
23:5,22 24:1 25:7
25:11 26:12 32:2
81:21 127:11
149:20 150:12
154:4,7 168:4
179:7 208:11,24
209:12 211:12
214:3,4 218:5
256:12 269:25
**compare** 63:24
**compared** 128:17
239:5
**comparing** 88:23
**comparison**
244:21

**compel** 239:24
**compelled** 239:15
**complete** 179:10
184:3 197:8
278:10
**completely** 85:24
152:2
**complex** 115:4
156:2 175:7
**complexities** 41:6
41:9
**complexity** 279:8
**compliance** 175:9
175:10 178:3
**complicated**
40:24 178:17
**comprises** 102:6
**compromise**
96:13
**conceding** 185:8
**conceivable** 63:8
64:9
**concentrated**
94:20
**concept** 211:20
222:7 236:16
262:11
**conception**
111:19
**concepts** 113:16
**concern** 221:14
223:9 224:21
246:16,21 247:4,9
248:2 249:5,7,10
**concerned** 187:1
212:12 213:15
219:5 223:17
226:21 235:12
237:22 246:19
255:4
**concerning**
164:14 227:1
228:17 231:24

**concerns** 3:6
110:4 191:20
225:21 226:11
227:11 241:2
280:10
**conclude** 46:3
110:6
**concluded** 276:16
283:13
**conclusion** 64:6
159:13 176:23
200:5
**conclusions** 72:14
174:18 184:17
**condition** 108:18
150:11 167:15
228:6
**conditioned**
108:14,25
**conditions** 138:19
**condone** 149:13
149:16
**conduct** 149:17
149:18 153:4
177:24 179:8,8
184:17 215:1,23
215:24,25 216:25
217:5,14,22,24
218:4,14,15,19
220:9,10,22
225:14 227:10,11
228:5 231:24
237:25 238:3
239:4 240:22
241:4 247:25
250:18
**conducts** 194:1
**confer** 260:14
**conference** 126:1
277:7
**confident** 281:4
**confidentiality**
86:7

**confine** 269:2
**confining** 256:20
**confirm** 41:16
188:23 189:5
191:3,5 217:9
228:21
**confirmation** 2:1
2:5 4:17,23 5:8,14
5:24 6:4,16,20,24
7:1,7,12,24 8:7,23
9:5,13,19 10:10
10:21 11:11,20,25
12:14 13:4 14:2
15:9 20:11 21:2
21:19 22:13,19,25
23:9,15 24:8,16
24:24 25:16,21
40:12 43:21 60:22
60:24 79:9 80:10
80:12 107:19,19
108:5 138:25
147:9 148:12
149:13 168:21,22
169:13 190:13
236:12 259:15
262:6 281:20
282:15 283:9
**confirmed** 41:17
42:2 46:15,23
73:3 104:17
156:15 184:15,22
189:13 261:21
262:2
**confirming** 262:4
274:24
**confused** 204:1
238:23 257:6
**confusion** 218:12
**congress** 113:20
**conjunction** 60:13
60:24 62:19
**connecticut** 5:25
6:2 29:16 53:24

54:6 61:2 63:7
73:5 165:7
**connection** 26:18
52:14 80:12,14
128:16,21 133:19
172:6 177:16
179:25 181:5
189:12,22 200:22
201:1,5,9,11,14
202:2,3,6 206:7
212:20,22 213:6
213:14 235:11
248:1 258:8
**connolly** 34:19
**conroy** 22:23
80:21
**consensual**
105:16 148:9,14
148:18
**consensus** 93:7,12
96:18 119:13,17
**consent** 109:12
145:5 150:10,17
150:22,24
**consented** 150:23
**consenting** 15:11
31:17 79:23 81:7
81:13,19,20 99:8
101:13,16
**consents** 16:17
**consequences**
193:6
**consider** 8:7 93:3
93:4 159:4 181:2
181:20 208:11,13
257:16,20,24
**considerable** 88:5
**considerably**
95:10
**consideration**
76:8
**considered** 59:17
76:21,24 77:5,8

86:16 92:24 93:14
136:10
**considers** 148:19
**consistent** 108:11
188:10 259:20
**consistently** 101:4
**consisting** 75:19
**consists** 81:10
**consolidated**
129:9
**constant** 208:12
**constituent** 159:3
**constituents**
159:4,7,12,25
**constitute** 151:7
**constitutes** 112:9
153:21
**constituting** 42:23
**consult** 204:11
206:6 258:7
276:23
**consultant** 210:2
210:22 266:10
**consultants**
207:18 224:20
234:11 246:14
266:6,14 267:23
268:19
**consulted** 105:4
**consumed** 92:12
**consumer** 31:9
**consummated**
214:7
**contained** 132:15
265:12
**contains** 66:22
184:16 265:19
**contemplated**
93:14 109:8
215:19
**contemplating**
249:17

**contend** 181:15
**contending** 196:1
**content** 97:4
**contest** 184:20
**contested** 172:7
281:12
**contesting** 185:5
191:7
**context** 72:1
140:1 149:12
194:5 201:24
257:18
**contexts** 115:8,21
**contingent** 13:14
22:15,21 23:2,10
23:17 145:23
**continuance** 2:1
**continue** 62:3
85:25 86:8 122:16
158:25 245:23
262:23 280:4
**continued** 81:19
145:6 190:23
246:25
**continues** 43:1
**continuing** 221:10
222:8 228:6 248:7
262:6 263:6,11
**contraband** 3:1
**contractors**
207:17 246:14
**contracts** 11:1
145:23
**contrary** 186:6
**contribute** 96:21
203:22 234:21
255:21
**contributed**
159:10,14 160:2
161:11 213:11
244:6
**contributing**
210:1 212:1,22

213:10 224:17
229:21 265:7,8
**contribution**
233:20,21 234:6
234:13 246:17
247:5,14 259:7
**control** 120:2
179:10 211:20,21
214:18
**controlled** 162:19
**convenient** 167:9
**conversations**
85:25 97:4,7,24
100:10,11 137:25
223:7 277:7
**conveyance** 70:10
71:14
**conveyances**
69:15
**convince** 202:20
**cooperation**
106:24
**copy** 138:2,4
183:24
**core** 138:15
**cornice** 204:16
**corporate** 149:10
175:5,12 177:11
178:2 182:20
186:12 195:23
196:9 230:13
**corporation** 5:2
154:10 223:2
**correct** 50:4 52:12
55:6,7,13,14,16
55:17 56:18,19,23
57:12 60:2,3,10
62:4 63:14,15,25
64:1,13 66:5,6,11
66:16 68:18,23
69:7,22 70:4,19
74:11 77:6,9
82:10,14 91:1,2

95:16,22 101:2
102:10 103:10,21
104:8,9,12,16,21
104:25 106:6,14
106:22,25 107:14
107:20,21 108:1,2
108:8,9 116:10
118:18,19 123:2
126:13 127:23,24
128:12 129:11,20
130:17,21 131:23
131:24 132:16,17
133:17 137:22,23
138:20,25 139:5
140:24,25 144:1
146:21,22,25
147:10,19 154:18
155:20 156:16,17
156:19 159:11
163:2 164:23
165:17 166:16
168:17 169:8
172:4 181:22
192:8,10 193:13
193:15 195:3
198:8,19 199:22
203:17 205:7,8,12
205:13,17 210:3,4
210:4 215:4,6,16
216:3,5,7 217:2,3
219:4 223:20
224:14,15,18,19
224:22,23,25
226:24 230:16
231:9 234:7,14
236:1,7,22,23
237:4,11,14
238:14 239:16
242:12,13,19
243:15,19 245:6
255:15 257:18
259:25 260:18
261:5 264:18,24

265:9 272:7
280:18 281:13
**corrected** 188:13
192:15,18
**correction** 76:10
**correctly** 48:23
77:20 91:5 122:13
191:25 205:16
235:22 239:13
261:18 272:18
**cost** 63:4 72:17
94:5,5,12,15,18
247:22
**costs** 134:20
144:25 145:20
246:16
**couched** 53:19
**couldn't** 73:11
**counsel** 51:1 69:4
85:13 98:6 117:16
117:17 135:3,22
142:22 143:8,13
143:13,16,16
145:5 164:6
166:11 175:20
178:18 183:8
195:25 197:13
198:11 204:23
223:7 229:10
243:5 244:10
251:2 254:16,24
260:7,11 276:25
**counsel's** 254:14
**counseling** 230:23
**counties** 81:12
**counting** 91:5
**country** 92:9
100:18 226:16
284:21
**county** 8:4 137:21
139:3
**couple** 80:1 115:2
115:9 118:9,10

141:22 151:21
160:22 197:2
213:24 246:7
249:23
**course** 41:1 43:5
87:9 121:4 136:17
149:16 184:2
190:20 193:21
198:14 220:5
230:1 268:4
281:18
**court** 1:1,11 40:9
40:19 41:11,18,22
42:6 43:6,16,24
44:9,13,19,21,25
45:5 46:4,10,13
46:22 47:3,4,7,11
47:14,20 48:7,16
48:21 49:1,9,18
49:22 50:2,5,14
51:6,13,15,19,23
52:6,10,13,21
53:7 54:1,11,13
54:19,22 59:11,14
59:20,23 62:7,14
64:8,14,18 65:1,6
65:15,19 69:1,12
69:16,21,23 70:6
70:18 71:3,11
72:21 73:9 74:3
74:18 75:3,8,12
75:15,18,25 76:4
76:10,17 77:19
78:1,4,8,11 79:4
79:20,25 80:5,8
80:25 82:9,13,20
82:23 83:6,11,14
83:21 85:6 86:3
86:23,25 87:13,19
89:12,16 90:13
98:11 102:16,20
107:18,18,19
108:4,7 109:4,6,7

109:12,14 110:12
110:16 111:11,15
112:2,13,17,17,20
113:2,11,25
114:10,19,23,25
116:8,11,15,19,22
117:14,20 118:4,7
118:12 120:7,10
120:23 121:2,5,9
121:18,20,24
123:17,19 124:8
125:8,16,22,25
126:4,9,12,14
127:1,13 129:7,12
129:14 130:2,5,10
130:12,15,18,22
131:5,9,12,19,22
132:5,20,24 133:4
133:10,15,18
134:1,14,18,18
135:19 136:6,12
136:13,17,22,25
137:8,16 138:24
139:4,14,20 140:3
140:6,13,16,21
141:1,5,10,18
142:10 143:5,7,12
143:15 144:2,6
145:12,15 146:11
146:16 151:12,17
154:24 155:2,5,8
155:12,14,24
156:6,9,21,24
157:11,14,16,18
157:21 160:7,20
160:24 162:24
163:4,6,9,20,22
164:1,4,15,16,22
164:25 165:10,15
165:18 166:4,13
166:15,17,23
167:10,18,21
168:8 169:1,6,20

| | | | |
|---|---|---|---|
| 170:3,12,16,18,21 | 220:25,25 221:3,5 | 278:14,18 279:9 | **created**   152:19 |
| 170:25 171:6,9,16 | 221:13,18 222:1 | 279:12,25 280:7 | 156:15 157:2 |
| 171:20,22 172:2,5 | 222:10,13,20,25 | 280:21,25 281:6 | 161:11 231:6 |
| 172:13,22 173:5,9 | 223:4,13,16,21,25 | 281:11,14,21 | **creating**   146:8 |
| 173:14,18,25 | 224:8,24 225:1,4 | 282:2,11,14,18,20 | **creation**   82:1 |
| 174:4 175:1 176:4 | 225:8,16,23 226:3 | 282:23 283:3,7,12 | 137:5 |
| 176:14,18,23 | 226:7,18 227:5 | **court's**   125:12 | **creditor**   110:25 |
| 177:8,12,19 178:8 | 228:24 229:12,18 | 139:7 145:5 | 185:4 231:20 |
| 178:12,20 179:12 | 229:25 230:6,10 | 180:15 181:6 | **creditors**   6:25 7:1 |
| 179:20 180:7,14 | 230:13,17 231:15 | 277:11 281:18 | 11:25 12:4 24:7 |
| 181:12 182:6,8 | 231:18 232:7,17 | **courthouse**   80:1 | 24:11,16,20 33:2 |
| 183:12,14,18 | 232:25 233:5,7,11 | **courtrooms**   236:5 | 33:3 54:9 55:5,10 |
| 184:1,5,9 185:10 | 234:18,24 235:15 | **courts**   113:20 | 55:23 56:3,8,11 |
| 185:11 186:1 | 235:19 238:2,19 | 134:24 155:23 | 56:18,21 57:3,7 |
| 187:6,10,17,21 | 238:25 239:3,16 | 238:2,4 | 58:10,22 69:4 |
| 188:2,5,9,17 | 239:23 240:12,19 | **covenant**   214:7 | 70:16 116:25 |
| 189:6,16,18 190:1 | 240:25 241:2,3,12 | **covenants**   151:24 | 117:8,12,14,21 |
| 190:17,21,22,25 | 241:21,25 243:3,8 | **cover**   208:1 | 120:16 142:8 |
| 191:1,16,21,23 | 243:24 244:12,17 | 211:12 212:3 | 144:13 161:12 |
| 192:2,6,9,11,21 | 244:19 245:2,5,13 | 214:4 232:6 246:7 | 167:24 216:21 |
| 193:4,13,16 | 245:19 246:2,9,15 | 267:6 | 217:19 219:2 |
| 194:14,16,20,22 | 246:22 247:3,7,10 | **coverage**   68:20 | 222:9 242:5,5,7 |
| 195:1,4,11,19,22 | 248:2,10,22 249:2 | **covered**   45:19 | 242:11,18 |
| 196:10,21,22,24 | 249:9,13,22 250:2 | 53:18 64:18 67:5 | **creighton**   7:13 |
| 197:1,11,14 | 250:5,8,10,21 | 67:7,13,19 68:16 | **crisis**   92:9 146:9 |
| 198:15,20 199:12 | 251:2,7,14,16,17 | 86:4 127:5 167:14 | 153:20 |
| 199:17,22 200:13 | 251:19,23 252:3,5 | 193:23 208:5 | **criteria**   179:24 |
| 201:25 202:15,18 | 252:11,17,20 | 209:2,9,14 232:9 | **critical**   147:5 |
| 203:10 206:24 | 253:2,6,10,13,18 | 232:24 246:15 | 150:20,21 151:1,3 |
| 207:4,8,10,15,25 | 255:3,8 260:9,12 | 249:3,19 263:10 | 151:5,7 241:6 |
| 208:6,23 209:5,10 | 260:14,15 262:4 | 263:12 273:5 | 244:1 |
| 209:23 210:5,11 | 263:3,10,15,18,24 | **covering**   196:7 | **cross**   46:17 48:11 |
| 210:13,15,21 | 264:3,7,9 267:14 | 275:19 | 48:13 50:23 51:16 |
| 211:6,8,10,17,24 | 267:18 268:20,24 | **covers**   136:23 | 53:12,22,24 54:3 |
| 212:4,16,21 213:9 | 269:2,9,14 271:5 | 227:20 231:4,16 | 54:15 65:16 69:2 |
| 213:18 214:10 | 271:10,12,22 | 248:13 256:6 | 72:21 76:18 78:5 |
| 215:2,5,7,11,22 | 272:2,5,8,11,15 | 269:5 275:15 | 78:24,24 83:24 |
| 215:24 216:2,4,8 | 272:21,24 273:2,5 | **cowan**   100:5,8 | 84:1,4,7 87:10,12 |
| 216:14 217:2,4,12 | 273:10,11,16,23 | **cpa**   20:6 25:6,10 | 87:17,20 110:13 |
| 217:16,24 218:2 | 274:3,15,17,20 | 26:10 | 113:1 115:12 |
| 218:11,21,23,25 | 275:3,14,22 276:2 | **crawley**   3:10 | 118:23 120:9 |
| 219:7,21,25 220:3 | 276:5,11,15,19 | **create**   122:5 | 121:3 127:8,11,14 |
| 220:12,14,18,24 | 277:6,22 278:6,12 | 181:16 | 132:1 137:3,13,17 |

139:14 141:21,23
146:12,18 151:18
154:25 156:11
160:10,24 165:1,2
166:24 167:3,18
168:1 170:12
172:17 178:23
183:4,19 185:5
189:3,11,12,19
191:7 194:2,11
195:14,21 197:17
222:15,16,22
223:22 224:2
225:11 235:1
242:1 251:25
253:6,23 263:25
264:1,4,10 267:14
267:19 269:10,18
273:19 274:6
276:9 278:17
279:15
**crosses** 135:14
**crossing** 45:18
164:13
**crossroads** 191:20
**crystal** 183:1
191:3
**ct** 29:18
**culpability** 157:4
**curascript** 11:5
**curiae** 15:13
16:17
**current** 86:9
95:19 232:23
234:4
**currently** 143:15
157:24
**cursory** 174:25
**customary** 177:10
196:25 247:21
**cut** 41:13 113:12
275:23

**cutler** 32:1
**cutting** 108:15
**cyganowski** 34:20
97:9

**d**

**d** 1:22 4:24 10:4,8
11:9 21:16 25:14
34:2 36:14 39:22
40:8 50:2 52:11
83:12
**d&o** 67:9 68:1,6
68:13
**d'apice** 4:14 26:1
**damage** 60:4
74:15 228:1
**damages** 59:4
60:9 74:10 144:24
**daniel** 2:22 11:4
34:19 37:4 38:21
**dark** 269:12
**darren** 36:23
**dasaro** 34:23
**data** 44:24 119:25
120:1,1,4
**date** 42:20 59:3
73:19 150:9
164:21 284:25
**dated** 50:6,9
52:16,23 75:20
83:15 126:15,17
133:22 141:11
165:20 172:7
188:10 192:12,14
195:5 252:21
**david** 19:14 20:23
30:21 34:13 37:22
40:7 80:17 133:7
141:2
**davis** 9:6 28:13
34:24,25 40:17
45:7 49:19 72:24
110:18

**day** 40:11 42:1
44:17 80:1 99:23
106:8,8 150:15
176:12 180:22
276:14 279:4
**days** 42:9 150:9
150:10,24 180:21
**dc** 31:5 32:4
**deadline** 14:17
233:25
**deal** 80:14 88:8
92:20 110:10
117:11,11 146:8
150:18 181:14
182:24 186:10
207:18 220:4
227:16 238:10
248:19 250:18
279:15
**dealing** 97:13
164:5 173:25
177:10 181:2
**deals** 116:23
269:4
**dealt** 186:23
226:19
**death** 88:25 90:4
92:2,2 93:16,23
**deaths** 89:4,18,21
90:9 92:4
**debated** 102:5
**debevoise** 167:7
196:17
**deborah** 18:23
28:4 45:9 50:2
**debtor** 1:9 13:5
25:1 47:16 55:15
67:8 79:7 121:22
122:3,9,15,17,19
129:5,6,18 132:6
144:8 190:19
218:15,15 222:23
243:15,16 245:24

247:25 250:15
**debtor's** 208:3
227:20,24 229:4
230:11,15
**debtors** 2:9 3:19
4:9 5:9,15 6:12
7:3,24 9:1,21
10:16,21 11:3,13
12:2,15,25 13:3,4
13:24 14:14,24
15:5,20 16:2,7,13
16:25 17:9,17
20:11,20 21:4,22
24:10,18,22,24
25:18,23 26:6,18
27:4 28:14 40:18
42:15,19 43:19
44:7 45:7,15,21
46:5 48:9 49:20
53:11 55:13 58:20
60:12,20 72:24
74:14,25 79:17
86:19 110:19
123:22 124:2,13
128:15,20,23,24
129:1,3,8,12
131:6 132:15
144:9,14 179:14
182:10,12 184:20
185:8 200:21,22
201:1,5,9,11,14
202:2,4,6 216:22
217:17 220:11
222:3 223:3 231:4
261:2 275:19
277:25 280:20
282:12 283:11
**debtor's** 40:11
47:1,16 49:20
54:8 55:5 57:4
66:4,14 67:5,9,13
67:16 68:1,6,11
68:20

**decades** 149:15
152:21 190:15
**decide** 87:14
113:19,21 175:3
191:2 219:15
245:15
**decided** 43:4
176:15 191:1
**decides** 220:25
**decision** 91:15
150:18 151:5
158:22 174:10
175:13 177:22
185:17 204:6,11
204:12 205:12
249:2 256:25
257:12,13
**decisions** 203:20
204:19,20 229:16
255:18 270:1
272:25 273:1,3
**declaration** 16:9,9
16:21,21 17:12,21
17:21 18:1,4,8,12
18:16,20,23 19:1
19:5,8,11,14,17
19:17,21,25 20:4
20:6,23 21:6,9,13
22:5,8,11,11,17
22:17,23,23 23:3
23:7,13,20,24
24:3,14,14 26:14
45:25 50:6,10,16
50:17 51:17 52:17
52:22 53:4,19
54:7,14,16,17,20
54:23 55:4 66:2,2
66:12 67:3 71:18
75:19 76:11,20
77:11 78:17 79:12
83:15,19,22 86:14
87:24 89:2,10
103:4 104:5 106:5

115:15 116:23
117:2 126:15,22
126:24 127:2,5,16
127:20,22,25
128:13 131:14
133:19 134:2,7,17
136:2,7 137:1,9
138:7 139:16
141:11,15,19
142:1 143:10
145:16 161:4
162:3 163:16,23
164:10,17 165:19
166:1,5,12,25
167:11,13,19
170:5 172:6,10,14
172:17,18,25
173:11,22 174:1
174:19,22 175:14
176:16 184:16
187:13 188:10,25
189:20 192:12,19
192:22 193:19
195:4,12 197:22
199:13,23 200:9
200:10,16 201:9
202:8,11,19 203:5
203:9,13 204:1
207:7 208:7
213:21 215:8
219:9 230:19
235:5,15 242:21
252:21,25 253:3,5
254:1 255:12,24
256:16,22 258:22
258:25 264:15
265:5 273:17,19
**declaration's**
274:1
**declarations**
51:21 52:14 53:8
53:12,15 67:21
79:1,3,4,5,6 80:10

164:20 278:24
279:14,18
**dedicated** 51:8,9
**deemphasized**
93:5 100:14
**default** 106:15
138:19 142:18
**defend** 236:4
**defendant** 116:2
154:11
**defendant's**
144:24 177:24
**defendants**
153:24 154:9,9
162:16,22
**defense** 57:15
**defenses** 57:9 58:3
59:1 73:17,25
**defer** 44:21
222:19
**deferred** 57:11,19
**deferring** 56:21
57:5
**defined** 151:5
206:11 207:7
211:17,20 258:21
263:5,11
**definitely** 42:4
97:19 99:24
276:10
**definition** 66:17
207:11,11 208:14
211:15 213:1
214:19 221:10
222:6,6 224:9
266:5
**degree** 96:19
**delaware** 7:22 8:1
61:3 108:5,6
**delconte** 18:20
24:3 28:5 45:10
45:14,19,21 46:17
47:15 48:5 51:20

51:24 52:9,12,13
52:20 53:6,13,17
53:22 54:3,5,15
55:3 63:6 65:8,16
65:22 68:24 69:2
69:7,17,24 70:7
70:21 72:22,25
73:2 74:6,8,19
**delconte's** 45:25
48:9
**deliberation**
59:22
**deliberative** 84:19
**demands** 179:8
**demean** 95:11
**denied** 68:20
180:24
**denver** 101:21
**depalma** 33:1
131:25 167:23
242:3
**department** 29:8
105:9,10
**depend** 278:11
**dependent** 88:5
**depending** 61:18
61:18 92:17 94:13
119:5 139:6
168:22 197:2
**depends** 125:12
136:13,13 205:20
206:13 220:24
237:17
**deposed** 210:8
**deposition** 180:20
183:9,11,13,16,22
183:24 184:3
189:6,10 245:15
**depth** 99:17
**deputy** 83:3
**deramus** 20:23
**derivatively** 231:2

derived 132:14
describe 81:4
104:5 162:3
described 81:12
88:1 109:19 142:6
216:18
describes 227:19
describing 213:2
description
135:10
design 122:5
designed 124:4
details 160:17
266:1
determination
43:25 50:19
112:18 177:5
185:12 199:16
determinations
113:24 206:7
258:8,18
determine 61:6,19
92:1 128:1 135:1
150:17,19,20,24
151:1 159:19
186:2
determined 73:11
73:21 145:8 179:2
181:1
determines
238:17
determining
134:22 179:5
devastating 94:8
94:9
develop 93:12
94:23 119:16
121:15,21
developed 97:16
115:14 121:12
153:2
developing
119:23

development
81:22 162:10
227:21
devise 122:16
devising 121:12
devoted 146:3
dial 251:13
dialed 41:4
didn't 41:16 44:8
46:11 59:5,20
62:8 69:12 70:5
72:9,13 73:9,20
73:24 86:5,9
didn't' 42:16
die 93:20
died 113:22
difference 88:24
92:5 93:17 186:7
191:12
different 51:21
58:24 63:23 64:21
73:15 100:22
109:6 111:2 116:1
119:25 120:1
137:9,10 143:14
159:12,13 164:5
165:2 180:6
181:16 219:8
236:5 239:12,14
257:3,12 265:5
differently 91:16
154:13 159:12,21
202:19 228:25
difficult 74:12
109:20
diminish 95:11
direct 50:7,18
52:16,18,24 53:2
55:24 56:2,7,17
57:6,13,22,24
58:1,21 60:1,9,15
60:16,18 62:22
63:7 75:22 76:12

78:16,22 83:5,17
83:22 89:24
106:11 126:19
133:21,22 134:2
141:13,19 148:8
148:13 149:18
165:19,24 166:7
172:9,14,16
184:19 188:12,14
192:15 193:17
195:7,12 199:19
228:3 231:8
243:23 252:23
253:4
directed 145:17
182:4
directing 209:3
direction 76:25
93:10 159:23
directly 149:20
171:3 210:16
211:25 231:1,24
232:1 268:19
director 75:1
178:3 206:15
directors 66:9
67:24 184:13,18
206:11,20 258:21
disadvantaged
118:24 119:1,3
disadvantages
119:2
disagree 182:3
190:8,8 201:20
237:24
disagreed 241:16
disagrees 280:2
disbursement
66:5
discharge 144:9
disclaim 176:10
disclose 198:12

disclosing 198:21
disclosure 2:19
3:6,16,23 56:13
56:22 57:2,4
59:25 66:19 67:22
73:14 76:8 129:22
130:6,8 132:16
233:15 264:18
discovery 201:12
201:16 210:8
211:2,5 230:2
246:16
discrepancy
93:16
discretion 150:20
discuss 42:2 103:7
143:11
discussed 123:1
203:19 234:9
237:10 251:10
255:16 260:9
discusses 130:15
discussing 244:13
256:20
discussion 56:14
56:22 86:22
103:19 141:24
155:18 158:24
237:13
discussions 85:22
91:15 158:5,25
159:16 224:10
disease 120:2
disorder 92:14
dispensed 92:11
dispute 86:3
193:6 223:14
disputes 178:25
179:1
disqualified
262:25
dissenting 60:9
61:2 62:2,15 73:5

277:19
**distinction** 109:3
180:4
**distinctions** 220:1
**distorts** 180:9
**distraction** 114:3
114:4
**distribute** 123:8
**distributed** 61:20
101:5 147:19
**distributing**
205:23
**distribution** 51:2
95:21 139:24
162:14 227:22
242:18 265:20
**distributions** 93:3
100:19,22 102:1
138:21
**distributor**
104:13 116:16
**distributors** 9:11
15:23 98:16
116:17 147:2,15
150:18,25 154:3
162:15
**district** 1:2 5:25
8:4 61:4 82:13
109:12 143:14,18
153:22 163:2
165:8 195:18
**ditto** 193:2
**division** 31:9
**dizengoff** 12:3
24:10,19
**dmps** 46:15
**doc** 16:7 20:20
**docken** 35:1
**docket** 45:13
47:11,13 66:3
78:23 79:2,11
103:23 261:8

**doctor** 100:7
**doctors** 91:25
**document** 3:7,17
3:20,24 4:2,4,9,19
4:24 5:16 6:12,17
7:3 8:8,13,16,20
9:1,6 10:1,7 11:4
11:13,17,21 12:9
12:16 13:7,11,18
13:24 14:8,14,18
14:24 15:5,9,20
16:13,25 17:17,22
23:4,21,25 25:10
25:18 26:1,6,11
26:19,24 27:4
84:3,5,7,10,14,14
84:16,18,23,24,25
85:2,3,5,7,12,18
86:11,17 87:8,12
103:21 104:1
105:2 106:11
129:25 130:1
152:17,24 153:5,6
153:12 156:13
157:23 160:13
161:19 175:12
176:21 182:18
183:1 246:3
260:17 261:10,12
270:11,12 272:20
**documents** 13:16
46:11 51:5 63:16
85:7 126:18 131:3
152:18,19 153:13
157:8 160:18
162:5 166:8
174:14,15 175:5
175:21,23,24
176:21 187:3,5
270:21 273:9
**doing** 106:8
161:20 176:12
179:4 278:9 281:5

**dollars** 61:20,23
62:21 63:5 158:22
259:7
**domain** 153:14
**domination**
179:10
**donald** 4:2
**don't** 44:16,19
48:21 51:6 52:2
56:17 58:2 67:20
71:7 74:15 78:25
80:6 84:6 86:23
87:9,15,15,15,17
88:6
**door** 187:8
**dorr** 32:1
**double** 41:2
**doubt** 153:5
190:12
**dougherty** 35:2
**dow** 14:3
**dozen** 67:23
**dozens** 99:2,2
**dr** 9:14 12:8 29:2
44:15 100:5
**draft** 265:1
**drafted** 214:14
218:13 219:15
228:20 248:14
**drafting** 41:25
51:2,5
**drag** 224:21
**dragged** 119:9
210:7,24,25 211:1
211:4
**drain** 1:22 2:16
2:19,22 40:10
123:1 140:22
241:15
**draw** 159:16
**drawing** 159:3
**drawn** 72:14

**drive** 244:4
**driven** 90:10
**drops** 109:8 119:9
253:9
**dubel** 21:13 35:3
**due** 43:5 180:21
**duration** 82:7
**duties** 243:5
**duty** 182:2 186:22
186:24 205:21,24
205:25 242:7,11
242:14,25
**dying** 89:6 94:15
**dynamic** 121:14
**d'angelo** 34:21
**d'apice** 34:22

**e**

**e** 1:21,21 3:10
18:23 21:9 28:1,1
30:21 33:21 34:12
37:20 38:5 39:13
40:8,8 50:2,3,3
52:10,10,11,11
75:13 126:10,12
172:3 192:6,6
195:1 252:18
284:1
**earl** 8:16
**earlier** 93:15,18
115:23,24 120:13
161:9 195:22
204:1 215:12
235:8 237:10
247:24 251:4
273:23
**early** 93:8 279:7
**earn** 93:2
**earth** 274:10
**easier** 117:13
**easiest** 249:9
**easily** 79:12 138:5
**eaten** 72:11

**eberhardt** 35:4
**ecf** 2:5,10,14,17
  2:20,23 3:1,4,8,11
  3:14,17,21,24 4:2
  4:5,11,15,20 5:6
  5:11,18,22 6:2,6
  6:14,18,22 7:5,10
  7:13,17,20 8:1,5,9
  8:13,17,21 9:3,8
  9:11,15,23 10:2,5
  10:8,11,18,24
  11:7,14,18,22
  12:5,11,18 13:1,8
  13:14,19,25 14:5
  14:9,15,19,25
  15:6,11,15,21
  16:2,7,15,19 17:2
  17:10,19,24 18:3
  18:6,10,14,18,21
  18:25 19:3,6,9,12
  19:15,19,23 20:2
  20:5,7,14,21,25
  21:4,7,11,14,23
  22:3,6,9,15,21
  23:2,5,11,18,22
  24:1,4,12,20 25:3
  25:7,11,18,23
  26:2,7,12,16,21
  26:25 27:5
**echo** 179:19,21
**eck** 39:21
**ecke** 10:2 35:5
**eckstein** 13:12
  22:13,19,25 23:9
  23:16 30:20 79:19
  79:21,22 80:3,6,9
  81:1,6 82:14,21
  83:2 135:17,17,20
**economic** 94:1
**economies** 95:15
**economist** 95:15
**ecro** 1:25

**edan** 37:7
**edmunds** 7:16
  30:6 76:15,16,19
  77:18,20,24 78:2
  112:24 113:2,3,3
  124:24,24 125:15
  134:4,4 136:8,16
  136:20,23 189:4,4
  269:11,11,15,19
  271:8,11,16
  272:11,13 273:5,7
  273:11,16,21
  274:2
**educated** 219:6
**education** 13:17
**edward** 38:5
**effect** 58:6 72:13
  119:8 139:6 156:4
**effects** 94:1,16
**effectuate** 204:19
**efficiency's**
  281:17
**efficient** 46:19
  164:13 278:10
  282:7
**efficiently** 277:5
  283:4
**effort** 107:2
**efforts** 46:3 103:7
  110:7 149:17
  150:2
**ego** 182:1 230:14
**eight** 89:6 93:19
**eighth** 13:21
**either** 48:17 50:10
  53:4,8,15 68:20
  84:25 85:2,25
  91:17 93:5 99:21
  101:18 107:18
  108:4 126:23
  132:22 138:18
  156:6 194:9 196:8
  198:22 206:3

  210:16 211:25
  231:19 275:4
  278:2
**el** 5:17
**elaborate** 142:15
**elected** 92:1
**element** 250:25
**elements** 88:1
**eleventh** 15:2
**eli** 2:9 13:18,24
  14:8,14,18,24
  15:5,20 16:14
  17:1 26:6,24 27:4
  39:24
**elicit** 222:15
**eliminated** 93:5
**elisa** 36:13
**elite** 5:5
**elizabeth** 38:22
**email** 47:4 85:16
  103:24 105:7
  106:1 260:18
  282:5
**emails** 190:4
  283:8
**emergency** 4:18
**emily** 36:3
**employees** 231:24
**employment**
  231:25
**empty** 41:4
**enact** 270:12
**encompassed**
  240:5
**encountered** 88:2
  90:16,20
**ended** 65:11 92:12
  96:15 119:16
**enforce** 139:4
**enforceable** 241:4
**enforcement**
  139:2

**engage** 86:23
  122:9 247:19
**engaged** 45:16
  85:13 87:25
  169:19 208:25
  209:12
**engagement**
  179:25 180:3
  247:22
**enjoin** 262:6
**enormous** 78:20
  145:2
**enrichment** 182:2
**ensues** 191:5
**ensuing** 191:6
**ensure** 41:3 194:7
  277:1 278:10
**enter** 49:6 106:16
  109:4 203:21
  208:9 235:25
  255:20
**entered** 105:17
  183:24 193:19
  207:22 219:11
  261:8
**entering** 200:1
**enterprise** 168:24
  169:10
**entire** 82:7 99:23
  153:21 159:17
  178:13 184:3
  282:15
**entirely** 42:24
**entities** 10:13,18
  50:21 66:23,24,25
  79:23 81:8,11
  117:5,7 130:16
  149:10 203:20,25
  204:3,21 212:7,13
  212:24 217:11
  233:16,17 247:19
  255:19,19,24
  256:5,6,19,21

257:1,5 264:22
267:22 275:15
**entitled**  202:25
**entity**  130:20
204:15,20 205:1
211:21 212:25
213:13,15 217:6
235:10,12 247:4
257:15 258:1
**entity's**  275:16
**entrance**  187:8
**environmental**
230:25 231:5,8
232:22 267:6
**epidemic**  94:2,7
99:5 145:1,21
**equal**  116:21
**equating**  202:6
**equitable**  134:19
**equity**  210:17
**equivalence**  91:8
**equivalents**  88:16
88:17 92:7
**er**  9:14 19:15
**eric**  39:7,11
**ernest**  4:2
**eskandari**  6:21
35:6
**esoteric**  186:10,10
**especially**  99:14
**esq**  17:12
**essential**  82:2
**essentially**  43:8
135:24 140:2
222:7 223:1 238:7
257:18
**establish**  55:10
**established**  61:1
96:22
**establishes**  142:2
**establishing**  21:1
25:20 50:8 52:15
53:1 75:21 83:16

126:17 133:20
141:12 188:11
192:13
**estate**  63:4 65:10
70:9 72:10 177:8
181:8,9,14 184:22
184:24 185:13
186:21 204:7
205:21,22 215:13
233:20 234:6,13
242:7,8,11,12,15
242:17,17,18,23
242:25 244:17
245:3
**estate's**  183:5
**estates**  58:10
**estate's**  77:22,24
78:1
**estimable**  56:24
**estimate**  58:21
59:6,18 62:2,23
69:8 72:16 73:12
73:20 140:9
**estimated**  61:10
**estop**  185:16
**estoppel**  155:25
156:4 185:21
191:6,12 193:5
**et**  10:1 12:4 24:12
24:20 40:10 117:1
140:23
**evaluate**  54:8 55:4
58:3,17 60:17
125:10 144:14
159:17,20 168:9
178:8 182:11
**evaluated**  60:15
60:15 145:6
199:10 200:6
**evaluates**  144:20
**evaluating**  60:8
134:16 144:21
203:2 229:1

244:12
**evaluation**  60:13
74:9 229:2
**evan**  36:16 155:10
155:15
**evening**  47:5
99:11,12 264:12
**event**  186:15
228:5 250:22
**everybody**  277:22
281:4
**evidence**  46:1,1
76:6 79:6 86:18
101:10 153:2
157:3,24 174:24
174:25 193:20
199:2,5 253:5
271:24 274:22
**evolved**  81:15
100:23
**ex**  5:13,17
**exact**  68:18 85:18
90:2 95:5 114:16
**exactly**  44:5 46:12
97:20 254:22
**examination**
46:17 54:3 72:25
74:6 76:18 78:24
78:24 84:2,4,7
85:3 87:11,20
102:25 115:12
118:13 120:9,11
121:3 123:20
127:14 132:1
137:17 146:18
151:18 156:11
160:10 161:2
168:1 178:23
183:19 189:11
190:12 195:21
197:17 199:19
224:2 225:11
235:1 242:1

246:11 253:23
264:10 267:19
269:18 274:6
**examine**  50:23
51:16 53:22,25
54:15 65:16 69:2
72:22 78:5 83:24
110:13 127:8
137:13 139:15
141:21 146:12
166:24 167:3,18
170:13 172:17
183:4 189:3,19
194:2 195:14
222:16 223:22
253:6 264:4
267:15
**examiner**  281:16
**examiners**  91:25
**examining**  179:19
179:23 185:6
191:8
**example**  41:21
73:4 88:22,23
89:7,18 91:24
92:6,7 95:3
112:10 116:13
138:18 149:4
184:17 202:7
212:25 216:9
217:4,13 220:17
228:15 234:8
250:17 271:6
280:19
**examples**  201:7
**exceed**  12:21
15:24 16:5 17:5
20:10,16 21:17,25
24:7,23 25:13
44:8 142:5
**exceeded**  63:13
**exceeding**  125:7

exceeds  64:15
  145:2
exception  196:2
  197:1
excerpt  227:18
excerpts  228:9
excess  147:7
exchange  215:18
exclude  25:5,9
  26:9,15 85:2
  86:17 173:12
  222:6
excluded  85:24
  87:8 180:12
  208:21 209:1,1,9
  209:11,13 212:17
  224:24
excluding  204:14
exclusion  178:23
  179:1
exclusive  144:15
exclusively  161:4
  271:8
excuse  146:17
  173:23 193:22
  194:17 219:5
  240:3 255:19
  261:22 270:7
excused  172:20
  189:24 194:12
execute  229:16
executed  150:9
executive  82:11
  143:13,17 146:6
  158:10,16
executor  203:17
  204:8 205:20
  242:7,10,14,24
exercise  61:15
  134:23
exercised  274:9
exercising  257:22

exhibit  56:15
  62:20 66:20 69:22
  103:21,22,22
  126:16,22,23
  127:3 183:10,21
  264:25
exhibits  144:12
  187:4,4 278:20,22
  278:25
exist  107:9
existed  92:20
existing  98:20
exists  122:6 157:4
  157:24
exit  152:7
expect  175:25
  209:8 212:18
expectation  62:20
expected  59:25
  251:24
expend  104:4
expended  138:23
expense  91:9
  100:17
expensive  236:3
experience  143:11
  175:6 212:6 229:9
experienced
  64:22 98:17
expert  25:5,9
  26:10,15 50:6,8
  50:11,16,18,20,22
  51:21 52:23,24
  53:4,17,18 54:17
  60:5,17,24 64:22
  69:19 74:9,13
  75:19 76:2,9
  77:12 99:25 100:5
  127:4 131:3
  134:10 135:6
  165:21 166:1,6,15
  167:11,13,14,19
  169:16,22 177:3

177:23 178:14,17
  178:21 180:1
  185:14 186:8
  188:13,25 192:14
  192:18,23 193:17
  193:22 194:1
  199:20,21
expertise  168:7
  169:17 175:14
  180:2
experts  41:20
  60:4,21 234:11
  267:24 268:19
explain  119:3
  203:2 251:4
  266:14
explanation  96:5
explanatory
  189:21
explicitly  209:9
explore  98:2
  209:23 235:7
expose  64:2
express  11:5,6,6
  77:10
expressed  161:9
  262:11
expresses  134:8
expressly  237:22
  262:8
extend  215:20
  216:8 247:15
extended  193:2
extension  14:17
extensive  201:12
extent  45:22
  55:22 56:9,20
  57:5 61:21 62:25
  68:9 78:23 88:5,9
  88:20 103:1
  105:17 119:18
  125:4,14 134:7
  135:15 174:25

180:8 181:24
  185:3,24 187:6
  198:21 208:2
  218:18 229:15
  231:1,8,23 233:25
  237:14 243:25
  265:25 280:25
extinguished
  148:14
extinguishment
  148:8
extra  282:13
extraordinary
  106:24
extremely  145:18
  152:25 153:8
  161:24 180:18
  236:3
eye  113:17

**f**

f  1:21 20:6 39:5
  284:1
f.x.  36:20
face  43:8 177:9
facep  18:9
faceted  190:20
facilitate  161:16
facp  18:2
fact  51:21 54:20
  59:2 73:13,14,18
  76:3 78:19 85:13
  92:10 94:25 95:19
  97:23 102:2 104:7
  122:18 136:18
  144:2,7 146:2
  149:17 168:3
  174:17,23 179:2,2
  179:3 180:17
  182:25 186:7,14
  186:17 190:18
  201:4 224:20
  232:4 234:8 244:4
  274:21 280:18,18

282:16
**factor** 88:15 91:19
  102:10 118:20,25
  119:1 145:17
  149:22 169:11
  239:21 241:5
**factors** 88:3,4,4,8
  90:19 91:5 119:8
  119:23 134:20
  145:6 159:17
**facts** 52:17 57:13
  58:1,23 66:2
  125:3 166:11
  174:16,17 176:6
  178:25 182:1
  186:18 187:13
**factual** 201:19,22
**fades** 52:1
**fading** 251:19
**fair** 96:7,8,10,11
  96:17,19 100:15
  103:18 109:3
  112:23 113:15,22
  134:19 143:24
  145:9 154:12
  160:18 237:18
**fairly** 93:8 251:24
**fairness** 113:17
  228:10
**faith** 45:17 178:6
**fall** 46:18 63:3
  205:6
**familiar** 66:17
  78:13 97:15
  100:19,21 103:25
  138:4 144:6
  216:13 260:11
  261:9 262:11
  263:2 265:12
**familiarize** 99:9
**familiarized** 99:8
  100:12

**families** 63:17
  165:7 176:25
  177:6 224:13
  263:6 266:13
**family** 10:11,20
  10:23 19:6,9,12
  19:15,19,22 20:1
  20:5,13 22:9
  33:10 47:24 63:13
  63:24 117:24
  143:20 144:11
  145:7 148:5
  149:19,21,22
  164:9,11 165:23
  165:23 166:6,11
  167:15,16 168:10
  174:13 176:20
  183:15 196:18
  199:25 206:5,14
  206:14,16,17,19
  206:20 209:18,21
  209:21 211:23
  212:7 213:5,14
  214:9 224:22
  229:3,9 230:25
  231:7,10 233:22
  234:3 235:11
  246:17,18,20
  247:5,16 258:5,6
  259:6 266:19
  271:20
**family's** 20:9
  25:14
**family's** 11:10
  21:16
**far** 58:2,8 72:16
  78:14 102:11
  105:25 116:21
  145:2 147:7
  148:24 149:1
  175:22 177:19
  187:1 211:17
  220:25 223:16

229:1 234:5
  240:21 255:4
  280:22
**farash** 10:11,11
**farrell** 35:7
**fault** 41:7,7
  262:19
**favor** 93:21
  101:19,22 107:7
  253:21
**featured** 104:13
**federal** 105:4,18
  107:6 109:11
  226:2
**fee** 12:22 17:7,14
  20:18 82:5
**feel** 56:23 59:5,17
  96:19 278:2
**feeney** 35:8
**fees** 42:19 43:2,8
  43:20,24 72:11
  141:24 142:3
  145:22 150:13
  282:12
**feiner** 110:9
**feliz** 35:9
**femino** 35:10
**ferrier** 8:13
**fiduciary** 182:2
  186:22,24 204:16
  205:15,17,19,21
  205:23,24,25
  206:1 209:18
  213:15 229:14
  235:12 248:18
  250:15 257:23,24
  258:3,12 259:6
**field** 41:20 64:22
  149:1
**fifth** 8:7,11 13:22
  16:11,23 31:11
  32:16 129:22

**figure** 94:24
  276:25 277:15
  278:4 280:6
**figured** 277:21
**figures** 89:1,5
  93:19 282:17
**file** 8:15,19 65:3
  65:11 161:20
  164:23 226:2,3,12
**filed** 2:9,13,17,20
  2:22 3:1,3,7,10,13
  3:17,20,24 4:2,4
  4:10,13,19,24
  5:10,16,21 6:1,4
  6:12,17,20 7:3,9
  7:12,16,19,25 8:3
  8:8,13,16,20 9:1,6
  9:21 10:2,8,10,17
  10:22 11:4,13,17
  11:21 12:3,9,16
  12:25 13:7,12,18
  13:24 14:3,8,14
  14:18,24 15:5,10
  15:14,20 16:2,14
  16:18 17:1,9,17
  17:22 18:2,5,9,12
  18:16,20,23 19:1
  19:5,8,11,14,18
  19:21,25 20:4,6
  20:12,23 21:6,9
  21:13,22 22:2,5,8
  22:13,19,25 23:4
  23:9,15,21,25
  24:3,10,18 25:2,6
  25:10 26:1,6,11
  26:15,20,24 27:4
  45:12 47:8,11,12
  47:13 53:14 57:3
  58:12,14 60:24
  66:3 129:10 132:6
  180:23 221:24
  226:10 227:14
  261:8

files  226:15
filing  12:21 13:17
  13:21 14:7,11,21
  15:2,13,17,25
  16:5,17 17:6
  20:17 21:17 22:1
  24:23 26:3,23
  27:1 43:5 44:3
  82:13 158:18
  162:8 232:16
fill  99:18
final  16:21 49:2
  102:5 158:13,22
finalized  147:3
  158:18
finally  46:25
  176:8
finance  175:17
financial  151:23
  167:15 233:20
  234:6,10,12 247:4
  267:22 268:3
find  99:5 260:25
finding  176:23
findings  174:17
fine  41:23 42:17
  44:9 46:13,14
  48:17 75:16 76:5
  80:3,8 84:14
  87:13 140:16
  143:7 155:5,9
  157:20 166:20
  173:20 191:21
  207:10 221:3
  229:12 260:24
  278:14 279:9,12
  282:25
finegan  17:22
  35:11
finish  163:11
finished  79:18
  87:7

fink  4:5
finzi  35:12
fire  5:1 6:9,14 9:7
firm  80:18 125:21
  131:25 167:22
  242:3
firms  145:4 146:6
  146:6
first  6:25 33:3
  45:8 52:16 69:5
  73:2 85:10 87:24
  88:2,15 90:16,20
  115:12 117:10
  118:15 131:25
  132:7,10 141:23
  142:8 143:10
  154:25 164:6
  167:24 173:1
  174:8 177:11,13
  178:1,10 180:11
  196:4 205:5
  207:19,19 216:10
  222:19 242:5,6,17
  249:1,7 261:14
  262:18 273:17,20
fisher  35:13
fit  97:20
five  80:10 91:4
  151:15 180:21
  281:17
fix  99:4
fl  29:4
flagged  84:9
floor  32:9 33:11
  222:16
florida  83:3,3
  93:2,11 95:4,5,7
  108:22 113:7
  116:3 118:24
  119:2,10 124:19
florida's  119:5,9
flow  94:24 95:13

flowing  162:11
flying  190:4
  221:23
focus  94:22
  115:16 120:2
  137:25 180:2,5
  182:15,16 213:24
  235:3 259:2,12
  280:12
focused  82:6
  115:17 120:4
  198:4 211:11
focuses  100:14
focusing  62:13
  103:9 131:7
  134:15 167:11
  182:20 208:7
fogelman  5:21
  32:12 111:7,13,13
  111:15,22 112:6,6
  113:5 118:9,14
  120:6 124:5 184:5
  184:7,8,10 185:11
  187:10,12,20
  225:6,6,9,10,12
  225:20 226:1,9,23
  227:7,8 229:23
  230:5,8,12,16,18
  230:21,22 231:10
  231:22 232:3,21
  232:25 233:3,6,9
  233:13 234:16
  241:13 247:6
  248:6 249:23
  250:1 267:16,17
  267:20 268:25
  269:6,7 280:12
folks  47:6 49:5
  98:18 100:2,3
  114:8 154:25
  221:15
follow  64:25
  74:10 114:1 120:9

138:18 153:11
  154:23 281:8
followed  162:17
following  103:7
  168:21 261:17
fontes  97:12
footnote  89:2,17
  89:17 262:7
  263:11
forced  148:18
forego  46:17
foregoing  228:7
  284:3
foreign  215:24
  216:21 217:4,6,10
  217:11,11 220:14
  241:3,4 275:15
forgive  101:13
form  89:11 90:18
  121:17 157:6
  238:16 250:19
formal  43:17
former  136:21
  184:13,18 206:10
  206:15 258:20
formerly  68:10
formula  90:16,20
  93:4
forth  128:2,5,7
  174:22 194:1
  216:19
forum  15:14
  16:18 249:18
forward  238:12
foundation
  112:11 178:22
  240:19
foundational
  180:12
four  76:21 77:3
  86:16 90:21,25
  146:4 153:16,18
  196:7 281:11

fourteenth 27:1
fraction 178:19
fraidin 35:14
frame 58:7 243:20
framework 81:14
  158:8
francis 37:17
frank 238:22
frankel 30:15
  133:7
franklin 6:5 7:13
  38:8
frankly 48:21
  94:12 112:16
  114:2 125:9
  154:16 186:22
  239:1
fraud 268:3
fraudulent 69:11
  69:15,17 70:2,10
  70:22 71:14
free 63:7 186:5,13
  187:14,17
friedman 6:12
  35:15
front 86:14
  127:16 129:23
  138:5 207:13
  208:18 211:16
  213:20 214:24
froze 253:10
frozen 251:22,23
  253:19
fruitful 159:1
full 43:16 44:3
  146:4 153:17,18
  168:14 265:23
  266:25 268:8,10
fully 95:20 105:16
function 178:3
  209:7
functioned 135:24

fund 142:5,9
  145:22 146:8
  147:9 168:5
  211:22 213:7
funding 233:25
funds 101:4 104:4
  104:4 106:21
  142:2 147:18
further 65:13
  68:25 72:20 74:17
  77:1,18 86:22
  102:14 120:6,7
  123:15 124:22
  132:18,21 145:25
  152:2 154:15,19
  158:24 160:6
  170:11 184:21
  185:2 206:22
  225:2 234:16
  241:20 267:12
  283:11
furthers 145:25
future 169:19
  174:12 185:1,1
  188:23 193:6
  214:2,3,21,21
  226:22 246:24
  247:1 265:17
  266:17,20,22

**g**

g 9:6 34:24 40:8
  50:3 83:12 133:15
  133:16 195:1
gain 159:14
gainesville 29:4
galan 18:8
galindez 35:16
galle 35:17
garner 101:15
  102:14
garrett 19:8 28:10
  37:9 48:2 194:17
  197:17 224:2

225:11 235:1
  242:1 246:11
gary 22:11 28:8
  47:21 133:8,15
  137:17
gather 144:3
  216:22
gautam 19:1
gayane 37:21
gayle 18:8
general 5:14,18
  30:1 31:9 33:16
  66:8,13 68:11,16
  84:6,19 93:6,11
  97:25 98:3,14,25
  99:4,23,24,25
  100:11 111:24
  115:16 147:21
  157:16,23 178:24
  185:4 204:23
  206:4 207:23
  217:19 243:4
  247:1 265:14
general's 92:22
  119:17
generalized 180:1
generally 61:13
  66:21 67:2 97:18
  100:13,21 101:22
  121:15 134:12
  175:11 206:2
  213:6 217:11
  224:23 241:12,14
  243:17 274:22
generals 124:10
general's 31:10
generically 60:1
gentleman 100:6
  155:4
geoffrey 35:23
  38:1
george 38:6

gerard 10:23 19:5
  19:8,11,14,18,22
  20:1,4,13 22:8
  34:17 39:20 218:8
getting 64:20
  69:24 88:11 95:25
  96:2 124:4 149:1
  156:2 157:9
  217:18 219:6
  232:13 243:1
  244:13
gibson 35:18
giddens 35:19,20
gilbert 31:1 80:18
  125:20
gillian 38:14
  110:9
give 41:17 60:5
  67:18 68:18 97:2
  119:18 175:4
  178:6 194:10
  201:7 212:25
  220:1 226:7 251:1
  263:20 279:13
given 58:3 62:23
  67:17 90:18 93:9
  93:9,10 97:1
  102:7 108:14
  124:8 181:1
  182:17 186:9
  194:8 225:19
  268:5 271:18
gives 127:7 182:3
giving 59:13
  80:20 86:18
  112:10 234:12
  279:23
glad 155:4
gleit 35:21
glitch 103:2
  123:24 124:21
  130:1 132:6
  136:12

glitches 40:22
global 150:13
  161:12 208:15
  209:8,14,17
  224:14 232:12,19
  235:4 236:9,16
  237:21 248:19
  259:8,12,21,24
  260:1,5 264:16
  274:9,10,23 275:7
globally 231:7
globe 14:4
go 40:14 41:3,9
  44:10,19 47:17
  54:1,14,24 61:12
  61:23 63:1 72:16
  78:21 79:2,11
  87:16,17 90:13
  95:3 98:11 113:2
  113:2 120:10
  121:9 134:8
  142:24 145:15,22
  146:16 149:3
  154:25 160:25
  161:1 163:9
  169:24 174:4
  177:13 178:12
  191:19,23 197:14
  210:20 213:18
  218:7 222:19
  225:4,9 227:5
  229:11 234:22,24
  235:19 238:12
  242:17 251:9
  252:6,11 253:20
  256:9,18 260:24
  273:20 278:14
  281:20
goal 143:23
  145:25 160:4
goals 154:15
god 49:25 52:8
  75:10 83:9 126:7

133:13 141:8
165:13 171:14,25
188:7 192:4
194:24 252:15
goes 42:1 65:2,3
  112:16 134:17
  141:23 161:17
  193:7,13 199:23
  200:10 202:8,11
  207:16 238:7
  242:20 278:1
going 44:21 47:17
  48:19 59:9 72:11
  78:23 80:5 82:24
  83:4 94:11,12
  95:11 101:9
  107:13 109:23
  113:11 138:22
  140:8 152:19
  156:14 158:4
  159:20 166:4
  169:1 173:5
  180:15 182:14,23
  183:2 185:15
  194:10 197:9
  199:18,18 200:18
  203:15 213:19
  219:8 227:18
  228:3,23 232:5
  236:9 237:15
  238:23 243:9
  244:6 245:16
  251:24 252:9
  255:14 261:14
  266:2 274:14
  275:23 276:6
  277:8 278:15
  279:17 280:23
gold 7:9 32:19
  195:16,16,20
  197:12,15,16,18
  198:1,18,19 199:1
  199:4,15 200:7,14

201:20 202:14,17
203:7,11 206:22
219:5,7 222:18
223:22 225:5
234:19,20,22,25
235:2,17,20
238:21,23 239:7,8
239:10,17 240:1
240:13,14,23
241:8,19 251:15
251:15,17,20
252:2,4,7 253:8,8
253:10,11,15,21
253:24 255:9,10
260:20 261:4
263:20 264:1
273:18
gold's 269:21
  273:6
goldman 6:1
  29:20 53:23,24
  54:2,4,5,11,12,18
  54:21,25 55:2
  59:16,24 62:11,18
  64:12,13,17,20
  65:4,7,13 155:3,6
  155:9 156:6,8,10
  156:12,25 157:8
  157:13,15,17
  158:2 159:15
  160:6,22
goldman's 59:13
  73:2
goldstein 35:22
good 40:9,16 45:6
  45:16 53:23 54:5
  58:7 65:22 66:1
  74:24 75:3 79:21
  87:22 96:17,18
  102:22,23 109:3
  110:17 112:24
  125:23 133:6
  137:19,20 138:14

140:14,21 141:2
151:20 171:22
173:2,10,19
223:15 224:4
260:2 264:12
280:13
goodman 35:23
gostin 32:6 35:24
  127:9,10,15
  129:15,16 130:3,8
  130:11,13,17,21
  131:2,8,10
gotto 22:11 28:8
  47:22 133:5,9,10
  133:14,16,17,18
  133:25 134:5
  135:21 137:5,13
  137:17,19 139:15
  139:15,22
gotto's 134:2
  136:3 137:1
gov't 31:2
governance
  177:11 178:2
  186:12
governed 165:5
governing 165:20
  172:8 195:6
government
  105:18 106:13
  107:6,15,15 139:9
  216:10 222:9
  226:6,8,16 261:3
government's
  105:4 226:19
governmental
  10:13,18 13:13
  22:14,20 23:1,10
  23:17 40:23 41:7
  43:10 79:23 81:8
  81:11 111:20
  117:5,7 262:22

governments 9:19 103:8 104:3,23 105:17,23 106:21 106:24 107:7,17 108:3 109:5 217:10

gowrisankaran 19:1 35:25 137:4

graham 3:14

grain 58:5

grandchild 202:7

grandchildren 66:23

grant 202:1

granted 138:25 187:24 245:24

granting 16:4 20:16 25:13

granular 44:24

grasp 178:21

great 41:11 114:4 127:19 282:12

greater 63:21 93:2

green 36:1,2

greenberg 33:1 167:23 242:4

greenspan 18:23 28:4 41:23 45:9 47:15 49:15,21,22 50:1,4,5,12,23,25 51:4,12,14,18

greenspan's 50:16,18

greg 238:15

gregory 22:8 33:14 164:8 174:19

greville 23:20

grim 36:3

gross 61:17 168:18

grotto 140:5

grotto's 134:17

ground 188:11 196:7 275:19

grounds 187:23

group 7:5 10:18 11:18 12:10,13,17 15:10 18:3,5,10 18:13 22:2 31:17 41:20 42:21,22 43:1 45:12,16,18 97:13 106:8 110:25 117:16,18 158:4 207:19,20

group's 10:13

groups 111:5 120:16 142:7

guarantee 5:2

guard 22:17 28:6 47:21 83:1,2,6,10 83:13,14,20,24 84:4,5,20 86:11 87:5,20,22 90:16 91:17 95:14 98:12 102:17,22 103:25 106:4 110:6,13,15 110:17,23 113:6 113:15,17 114:24 115:1 118:13,15 120:11,13 121:11 121:24 123:15,20 123:22 124:9 125:8,17,18 135:21

guard's 112:7 163:16

guardian 7:4

guard's 83:22 85:16 86:13

guatam 35:25

guess 44:7 47:18 64:9 80:25 88:6,8 88:12 90:1,11,22

101:21 103:16 105:19 109:13,15 112:20 115:24 117:17 122:4,23 131:10 135:13 143:8 160:5 165:3 170:23 177:2 181:12,17 207:15 208:25 213:24 240:17 260:12 273:12,21 276:21

guidance 195:22 277:12

guide 186:20

guided 186:12

gulf 6:8,13

gulkin 36:4

gupta 18:1

**h**

h 6:17 13:12 22:13,19,25 23:7 23:9,16 28:9 30:20 40:4 50:3 66:20 75:12 83:11 126:12 146:18 151:18 156:11 160:10 161:2 192:9 204:25 206:18 233:14 252:17 264:17,20 265:4

haberkorn 36:5

hage 33:9

hair 201:21,23

hale 32:1 127:10

half 97:19 100:17 196:12

hamermash 175:13

hamermesh 19:25 26:15 36:6 47:25 172:23 173:12,22 173:24,25 174:3

179:13 183:8,10 186:25 187:24 188:3,4,8,9,16 189:2,11,19,23,25 191:8,17,18

hamermesh's 174:7,9,11 175:18 176:3,8 188:25 193:7

hampshire 61:4

hand 49:23 52:7 75:4,8,15 83:7 117:7 126:5,9 133:11 141:6 165:11 171:12,23 172:2 188:3 192:3 194:23 252:13

handful 216:9

handling 80:19 83:4

handy 129:21 207:2,4,7,12,14

hanging 69:13

happen 108:16 110:5 236:20

happened 40:23 109:22 134:9

happening 278:11

happens 80:1 168:22

happy 40:14 42:9 82:25 86:21 111:17 119:15 131:8 137:6

hard 52:2 59:13 134:14

harold 36:14

harrington 5:10 36:7

haven't 58:16

hayden 34:18

he'll 171:6

**head** 97:12
**headed** 213:23
**heading** 140:17
  159:23
**health** 100:25
  105:9 107:7 120:3
  146:9 149:5
**healthcare** 94:14
**hear** 44:25 52:2
  62:8 65:24 75:5,6
  80:6,8 82:3 87:22
  110:19 112:4,13
  115:3 120:25
  125:11,24 171:4
  173:8 186:25
  189:8 194:11
  197:19 198:1
  219:14 224:6
  228:8 232:17
  252:2 253:11,17
  253:18 264:12
  272:13
**heard** 40:18 77:19
  84:13 115:13
  123:3 130:3
  144:12 155:13
  181:22 184:8
  189:7 227:3
  228:10 266:8
**hearing** 2:1,1,4,5
  2:7,12,16,19,22
  2:25 3:3,6,10,13
  3:16,19,23 4:1,4,7
  4:13,17,22 5:8,13
  5:20,24 6:4,8,16
  6:20,24 7:7,12,15
  7:19,22 8:3,7,11
  8:15,19,23 9:4,10
  9:13,17,25 10:4,7
  10:10,13,20 11:1
  11:9,16,20,24
  12:7,13,20 13:3

13:10,16,21 14:2
14:3,7,11,17,21
15:2,8,9,13,17,23
16:4,9,17,21 17:4
17:12,21 18:1,4,8
18:12,16,20,23
19:1,5,8,11,14,17
19:21,25 20:4,9
20:16,23 21:1,2,6
21:9,13,16,21,25
22:5,8,11,17 23:3
23:7,13,20,24
24:3,6,14,22 25:5
25:9,13,20,21,25
26:3,9,14,18,23
27:1 40:11 44:4
50:8 51:16 52:14
52:15 53:1,2
60:22,25 61:1
75:21 78:14,15
83:16,17 84:3,12
87:3,6 125:16
126:18 133:21
141:12 165:24
166:8 171:1,11
172:8,15 174:20
176:23 185:19
187:15 188:11
189:23 190:11,15
192:13 193:16
195:6,7 252:22
281:9,20 283:9
**heavy** 117:3
**heitzenrater** 36:8
**held** 154:10
  174:18 274:9
**help** 49:25 52:8
  75:10 83:8 92:18
  93:2 103:2 126:7
  130:22 133:13
  141:8 165:13
  171:14,25 180:14
  181:5 188:6

194:24 250:13
252:15 265:22
268:7 276:23
279:1
**helpful** 84:15
  85:20 129:24
  176:4 183:3
  195:21,25 218:10
  232:17 249:20
**helping** 250:13
**helps** 78:23
  125:11 186:20
  192:4
**henry** 205:1
**herring** 36:9
**hesitated** 186:5
**he's** 64:21
**hickey** 3:1
**hidden** 180:9
**higgins** 29:13
  36:10 48:4,4,8,23
  48:25 65:17,17,20
  65:21,23 66:1
  68:25 223:23,23
  224:1,3,5,25
  225:2 264:5,8,8
  264:11,14 267:12
**high** 65:2 93:23
  109:21
**higher** 94:25
  95:10,10 119:4,8
**highest** 144:5
**highlights** 228:22
**highly** 89:19
  174:13 239:18
  241:16
**hired** 60:12 74:14
**hirshman** 36:11
**history** 200:20
**hit** 232:19
**hoc** 11:18 12:10
  12:13,17,20 13:1
  13:10,13 15:10

17:4,10,13,18
18:3,5,9,13 22:2
22:12,14,18,20,24
23:1,8,10,14,16
30:16 31:2,17
45:15 47:23 79:22
79:24 80:9 81:1,3
81:7,9,12,18,18
82:4,7,22 84:15
86:19 128:1 133:8
135:22,23 136:4
141:3
**hold** 86:8,21 87:5
  274:9
**holding** 11:5
**hon** 1:22
**honor** 40:16,20
  41:12 42:7 43:23
  44:2,10,14 45:6
  45:12 46:6,25
  48:4,8,15,25 49:3
  49:17 50:12 51:18
  51:22 53:23 54:18
  54:21 59:9 64:20
  65:5,14,17,20
  68:25 69:3,20
  70:4 71:24 72:23
  74:2,5,17,21,24
  75:6,17,24 76:1
  76:15 77:18 78:3
  78:7,10 79:21,24
  80:4,7,9,17,23
  81:6 82:3,14,15
  83:20,25 84:9
  85:2,10,17 86:5
  86:13 87:18 89:15
  90:2,14 98:8
  102:18 110:14
  111:7,10,14,16,17
  112:6,15,24 113:9
  114:15,21 115:22
  118:9 120:8,22,25
  121:4,19,23

123:17 124:5,13
124:23,24 125:15
125:18,19,23
127:9 129:15,24
130:23 131:2,10
131:17 132:23
133:2,6,17,25
134:4 135:17
136:8,24 137:2,14
139:19,25 140:5
140:10 141:2,17
142:20 144:1,5,19
145:14 146:2,14
151:15 154:22
155:3,10,15 156:5
156:8 157:5 160:6
160:22 162:23
163:3,5,8,12,25
164:3,8 165:9,14
166:3,10,16,20
167:6,17,20 169:4
169:16 170:15,20
171:2,15,19 173:2
173:10,23 174:3
174:18 177:7,18
177:21 178:10
179:4,4,18 180:17
180:25 181:1,22
182:7 183:7 184:2
184:7,10,10,14
185:22 187:12,16
187:20 188:1,16
189:4,15,17,25
190:2,10 191:13
191:18,19 192:25
193:15 194:18,21
195:16,20 197:10
197:12,16 198:19
200:7 201:20
202:14,17 203:7
207:6,14 208:2,13
208:21 209:3,16
210:9 211:3,14

212:24 213:12
214:6,23 215:17
216:7,12 218:8,20
218:24 219:4,5
220:2,19 221:7,12
221:20,21,23
222:2,18,21
223:20,23 225:3,6
225:10,20 226:1,9
226:10,23 227:7
228:22 229:7,23
230:12,21 232:11
233:3,9 234:17,21
234:25 235:18
240:23 241:8,11
241:19,23 243:1,4
243:7 244:9 245:7
246:10 247:6
248:6,9,14 249:6
249:16 250:1,4,9
251:6,15,21 252:2
252:4 253:8,11,15
254:21 255:9
263:9,21,23 264:1
264:5 267:13,16
269:1,7,11 271:2
271:8,16,24 272:4
272:13 273:7,21
274:2,5 275:21
276:1,4,10,18,22
277:16 278:13
279:6,20 280:14
281:3 282:10
283:2,10

**honor's**   163:15
180:21 190:5
200:11 240:18

**honor's**   71:17
85:4

**hope**   41:2 47:20
51:21 103:2
191:25 205:9
250:16 277:11

280:14
**hopefully**   41:5
46:1,21 49:13
203:8 278:5
**hoping**   206:12
**horewitz**   23:13
28:7 47:21 125:20
126:2,5,8,11,13
126:14,25 127:4,8
127:12,14,16
130:25 131:2,13
131:13,21 132:1,3
132:24 133:1
**horewitz's**   127:2
**hospital**   8:4 44:23
79:25
**hospitals**   11:18
12:10 18:3,6,10
18:14 22:3 120:17
**hour**   196:13
282:13,22
**hours**   106:5 162:3
279:23
**housekeeping**
40:15 44:16
**hrycay**   25:6,10
26:10
**hudson**   31:7
80:18 125:20,23
126:1 129:24
130:23 132:23
133:2
**hudson's**   130:3
**huebner**   13:7
26:20 28:18 40:16
40:17,20 41:12,24
42:7 43:12 44:2
44:10 51:25
110:14,14,17,18
110:21,22 111:17
113:9 114:15,20
114:21,24 123:21
124:12,22 151:15

151:19,20 152:22
153:25 156:14
157:5,19 160:12
190:1,2 191:13,19
191:22 276:6,10
276:12,22 279:6
279:10,20 280:1
280:14,23 281:1
281:10,15 282:1
282:10,15,19,21
283:1,6,10
**huebner's**   112:9
113:6
**huge**   92:16
**hugh**   37:14
**human**   105:9
**hundreds**   66:22
68:3 106:7 146:5
264:20
**hunter**   34:10
**hurley**   36:12
**hurt**   186:25
**hurtful**   85:20
**hyde**   27:25 284:3
284:8
**hyder**   36:13
**hypothetical**   70:1
110:23 112:8,16
112:21 174:12,23
176:5 178:15
186:20 201:17
231:13,20,20
244:25 245:9
268:6,15
**hypotheticals**
186:18 268:14

| i |
| --- |

**i.e**   179:15
**i.e.**   89:20 128:16
169:22 223:9
**iac**   71:19 168:25
243:14,15,18

**iacs** 71:22 168:17 168:20 169:14,18 170:7,8 233:23,24 251:1

**idea** 103:12 245:9 280:13

**identical** 223:9

**identified** 67:1 89:9 258:10 272:1 272:2

**identify** 67:4 88:3 90:17 91:3 135:13 177:8 255:25

**ignore** 245:6

**iii** 2:17

**illiciting** 178:14

**illuminated** 85:16

**illustrative** 168:15,19,25 169:9,18 170:8

**image** 253:14,19 253:21

**imagine** 110:24 155:25 185:16

**immediate** 206:17

**immediately** 196:14 213:1

**immunize** 268:18

**impact** 88:19

**impactful** 118:2

**impaired** 171:1

**implementation** 50:20

**implemented** 103:20 115:7,21 115:23

**implicated** 85:8 228:16

**implicates** 84:8

**implication** 78:14

**importance** 145:19 146:8 229:2,3 266:13

**important** 122:10 135:10 145:18 152:1,4,10,15,24 152:25 153:3,8 154:8 161:15,24 162:22 224:12 225:17 232:8,9,11 233:1,8,12 266:14 268:1,16,17 271:17

**importantly** 182:21

**impose** 123:22 124:14

**impossible** 175:12

**improperly** 12:7

**improve** 96:13

**inadmissible** 174:7,9,18

**inappropriate** 201:18 245:8,8

**inception** 82:16

**inclination** 135:15

**include** 59:21 67:6 71:6,7 73:22 77:22 102:2 132:5 144:11 153:13 160:15 184:22 186:23 206:10 212:10 219:2 254:15 258:20 264:17 265:7 267:2

**included** 12:23 17:7,15 20:18 58:13 71:1 72:5 77:12 117:20,21 121:9 143:19 149:9 183:18 202:16 212:10

**includes** 135:3 139:2 153:22 161:19 162:15

207:17 224:17,20 225:14 227:9 228:5 231:5 264:21 265:16 266:6,10

**including** 41:1 42:10 45:16 66:23 81:10,15,24 82:18 93:1 99:7 113:15 134:20,25 138:22 139:23 152:18 154:15 159:17 168:21 169:18 187:18 188:23 193:8 196:20 203:21 227:24 229:20 244:20 255:19

**inclusion** 76:8 118:24

**inclusive** 132:10

**inconsistently** 175:11

**incorporate** 222:7

**incorporated** 53:5 108:7 114:1 240:6

**incorrectly** 200:19

**increase** 90:9 169:13

**increased** 88:9 90:24 91:8,10

**increasing** 90:1

**incredible** 110:7

**inculpatory** 157:3

**incurs** 247:22

**indemnification** 247:5,14,21

**indemnified** 247:20,23

**independence** 249:4

**independent** 4:18 9:14 168:4 207:17 213:3 246:14

**independently** 254:24

**indian** 216:10

**indicate** 96:20 98:5 106:4 138:7 203:16 204:4

**indicated** 102:25 107:11 140:11 164:12

**indicating** 106:1 201:2

**indirectly** 71:20 211:25

**indiscernible** 40:23 41:6 46:24 49:3,8,11,19 52:3 59:10 62:5,23 71:18 74:23 81:10 81:20 86:12,18 97:11,23 103:17 133:3,3 142:4 145:23 150:3,4 151:4,9,16 152:7 152:12,19,21 153:14,20 154:1,5 154:6,16,17 155:11,16,19,22 155:23 157:7 158:20 160:13 161:1,3,6,8 162:8 163:18 168:18,25 170:10 171:7 173:3,13 174:11 174:14,15 175:2,4 175:4,5,6,7,8,9,13 175:16,17,17,19 175:19,21,22,24 175:25 176:1,2,3 176:6,7,8,11,13 176:17 177:7

178:16 179:6
180:4,11,23 181:3
181:6 183:10,11
183:17 184:8
185:2 187:4,13
189:5 190:3,4,6,7
190:8,9,10,12,12
190:15 191:15,22
203:23 205:3
207:14 213:8
214:1 218:1
219:19 220:15
222:8 226:10
250:14 255:14
271:11 277:15,17
277:18 278:6
282:16,21,22
**individual**  12:13
12:17 63:13,24
65:2,10 94:18
105:23 118:5
200:21,25
**individually**
63:22
**individuals**  66:22
66:24 117:18,21
149:8 200:20
201:3,10 204:17
233:16,16 264:23
267:22
**industries**  179:24
180:5
**industry**  104:12
177:25 178:7
179:4,11,14,15,16
179:17 180:2
**inference**  143:24
178:6
**inferring**  143:21
**influence**  273:3
**inform**  125:11
181:6 190:24

**information**  44:22
53:21,21 99:19
122:20 132:15
143:4 198:13,22
223:7,9
**informed**  135:2
**infrastructure**
94:14
**initial**  40:14 62:12
81:16 245:5
**initiate**  62:4
**initiative**  13:17
**injunction**  241:3
249:1,3,13,15
259:19 260:4
**injunctive**  108:11
108:20 109:2
152:23 161:18,24
**injured**  117:21
**injury**  51:8
117:24 228:1
**innocence**  57:25
**input**  203:20
204:5,20 205:6
255:18 256:2
**inquiry**  162:6
166:22
**insiders**  70:16
**insistence**  202:9
**insisting**  248:12
**insolvent**  63:9
64:11,16,23
**instance**  116:1
249:1,7 262:22
**instances**  205:14
205:16
**institute**  120:3
**insurance**  4:25,25
5:1,2,3,3,4,5,5 6:9
6:9,13,14 8:23 9:2
9:7 32:2 46:7
48:10,12,13 66:4
66:7,8,9,14 67:5

67:13,16 68:16,20
120:17 127:11
**insureds**  66:14,14
68:14
**insurer**  11:20
45:12,18
**insurers**  4:22 9:5
45:16 68:19
**insurer's**  46:2
**integral**  82:16
**intend**  86:6,9
123:22 278:23
**intended**  52:15,23
53:1 75:21 83:17
86:11 91:22
133:21 141:13
165:19 168:24
169:10 172:7
188:12 192:15
195:6 201:4,4
214:4 244:4
252:23
**intending**  98:25
**intense**  117:9
**intensity**  96:21
97:16,18,20,21
98:17 100:15
**intent**  232:6
**intention**  234:4
**interaction**  100:9
**interactions**
227:24
**interest**  55:23
56:3,8,10,21 57:7
61:5 84:8,17,21
85:1,8,14,19 86:4
86:8 98:9 102:25
164:12 211:13
226:4,15 227:1
**interested**  85:7
134:21,25 181:2
181:23 182:9,12

**interests**  54:9
55:5
**internal**  84:18
91:15 142:14
**interpret**  211:19
**interpretation**
169:21 208:19
237:25
**interpreted**
181:24
**interpreting**
175:5 230:19
**interrupt**  54:11
54:22 57:16
173:14 225:16
230:18
**interrupting**
185:23 218:9
**intervention**
101:7
**intra**  124:4,15
**introduce**  46:11
80:16
**introducing**  164:6
**investigated**
60:12
**investigation**
237:3
**investment**
234:11 267:23
268:18
**investments**  212:8
**inviting**  98:6
**invoked**  196:11
**involve**  266:20,22
**involved**  41:25
81:9 82:15 104:20
104:24 105:1
106:9 139:8
143:20 146:20
148:5 155:20
159:16 231:11
244:16 266:24

270:1
**involvement**
152:2 153:21
**involves** 96:10
159:8
**involving** 115:8
147:2 149:5
155:18 162:21
237:25
**ipad** 260:22
**ira** 12:3 15:14
16:18 24:10,19
**irrelevant** 112:10
186:15
**irve** 6:1 29:20
53:23 54:5
**island** 61:3
**isley** 32:6 35:24
127:9
**isn't** 64:9 67:3
68:19 69:7 89:7
**israel** 36:14
**issacharoff** 30:23
141:4
**issue** 45:1,2 46:7
48:19 86:22,24
92:16 97:5 112:17
114:10 125:3
154:4 155:22
176:9 180:24
184:13 196:14
197:4 247:14
249:12,14 271:19
277:9,16,18,21
**issued** 68:19
249:2,13
**issues** 45:19 46:2
48:14,22 49:4
52:25 80:11,14
81:23 82:1,6 84:8
85:14 86:16 87:25
91:23 92:20
102:25 105:10

122:10 135:4,4,8
135:8,14 145:23
175:8 177:8
180:16 185:9
186:11,13 190:22
190:24,25 226:5
226:13 227:1,3
246:7 277:13
282:11
**it'd** 94:21 117:12
**item** 42:7 177:23
204:25 206:18
**items** 82:1
**it's** 41:7,8 47:9,15
48:13 50:2 52:2
52:10 57:23 61:1
61:21 63:8 64:8,9
64:18 74:8 75:12
75:20,21 76:6,13
77:7 78:22 83:11
83:15,16 84:1,25
90:10 92:3,6
**ives** 19:11 28:11
36:15 48:3 196:4
196:9,12 251:8,25
252:12,16,19,20
253:1,3,5,7,23,25
255:11 260:8,10
260:15 264:4,10
264:12 267:12,15
267:19,21 269:10
269:18,20 271:15
272:16 273:3
274:6,8 275:18
276:15,18
**i'd** 57:16
**i'll** 41:23 47:14
54:25 79:18
**i'm** 40:13 41:18
41:24 45:1 47:20
48:12,17 53:8
54:22 56:4 59:9
59:11 60:14 62:7

62:13 64:6,20
65:12 69:10,12,15
69:24 76:4 79:5
82:10,23,25 87:3
87:4,6 88:21 89:2
89:16 91:5 160:1
166:4 178:19
186:12,24 187:4
**i've** 67:9 78:18
85:15 87:16

**j**

**j** 2:9 6:1 7:4,9
8:13 9:2 12:16
13:18,24 14:8,14
14:18,25 15:5,20
16:14 17:1 19:5
20:4 23:3 26:6,25
27:4 28:20 29:13
29:20 32:19 33:7
34:6 37:25 38:17
38:25 39:7,19,23
39:24 52:10 83:11
126:10 165:22
204:14
**james** 3:10 6:5
7:12 17:23 28:21
36:2 38:8,20
**janssen** 104:14
**jared** 35:19 36:1
**jasmine** 11:14
21:22 23:4,21,25
25:6,11 26:11
34:7
**jay** 34:5
**jayne** 22:23 80:21
**jealously** 84:20
**jeanne** 17:22
35:11
**jeffrey** 35:21 37:6
38:17
**jenna** 31:7 80:18
125:20

**jennie** 110:8
**jennifer** 19:17
35:8
**jeremey** 38:19
**jeremy** 36:24
**jerome** 8:13 39:12
**jesse** 18:20 24:3
28:5 45:10,14
54:3 72:25 74:6
**jessica** 23:13 28:7
47:21 125:19
127:14 132:1
**jill** 7:19 33:24
**jillian** 7:25
**jim** 74:24
**job** 242:25
**joe** 74:22
**john** 6:17,17
21:13 22:17 28:6
34:16 35:2,3 37:8
47:20 83:2,11
87:20 118:13
120:11 123:20
204:7
**johnson** 147:2,2
147:16,16 155:10
155:10,13,15,16
155:16,16,18,19
156:5
**join** 85:24 113:4
124:7
**joinder** 6:8 7:19
7:22 9:4
**joined** 49:6 80:11
157:9 277:21
**joining** 75:2
**joint** 2:7 4:8,13
5:15,24 6:10 7:1
7:16 8:24 9:10,20
10:15 11:2,11
12:1,15,23 13:4
13:22 14:12,22
15:3,18,25,25

16:5,6,11,23 17:7
17:15 20:19 21:2
21:19 24:9,17,24
25:16,22 26:4
27:2 183:20
**jon** 22:5 209:20
**jonathan** 23:20
30:22 37:20 80:17
80:24 83:4 206:5
206:13,14,15
209:18 212:7
234:2
**jones** 14:4 36:16
155:24
**jordan** 40:1
**joseph** 9:6 11:4
21:6 22:8 25:2
33:9,14 34:24
38:21 39:8,18
75:1,12 76:18
164:8,8,21,23
165:9 166:18,20
167:17 170:14,15
170:17,22,23
171:1 174:19
177:3,7,18,21
178:13 179:18,22
180:8 181:22
182:14 183:23
184:2 186:2 189:9
189:13,14,15,17
193:11,15 194:15
194:18,21 196:8
196:22,25 197:10
198:12 199:12,18
201:17 208:21
218:6 228:22
229:11 238:16
240:16 241:22
242:20 243:4,22
244:9 245:7
246:10,12 247:2,8
247:12,13 248:9

248:20 250:2,4
251:21 254:21
262:25 268:22
271:2,24 272:4,7
272:9 273:15
274:14,25 275:8
275:12 276:2,4
278:13,14,15
**joyce** 8:9
**jr** 30:21 36:2 40:5
**juaire** 36:17
**judge** 1:23 2:16
2:19,22 40:9
42:21 120:14
123:1 140:22
145:18 238:17
241:15 246:8
**judgement** 59:3
63:20 64:14 65:2
73:19
**judgements** 63:12
**judgment** 63:11
63:25 134:23
**judgments** 63:20
63:25
**julianne** 35:9
**july** 172:7 180:19
180:20 188:13
192:15,18
**jump** 41:17 103:3
280:4
**junction** 249:12
**june** 50:9 126:17
180:19 192:14
**jurisdiction** 48:11
107:18 108:4,5,8
139:7 142:11
238:3 239:24
245:5,9
**jurisdictions**
215:21 236:5
**justice** 29:8
105:10 111:3,20

111:21 112:9
**justifying** 202:1
**justin** 1:25
**jx** 103:21 129:21
130:11,11 183:10

### k

**k** 36:9 192:9
**kaminetzky** 18:17
18:21,24 19:2
20:7,24 21:7,10
21:14 22:6 24:4
28:19 40:22 41:14
44:12 45:6,7 46:5
46:12,14,23 47:9
47:12,19 48:17
49:2,16,19 51:20
51:25 52:5 59:9
59:12 62:5,8,9
64:5 72:23,24
73:1 74:2,21,25
79:15 89:11
140:11
**kaplan** 32:14
195:17
**kara** 39:14
**karavolas** 9:22
36:18
**katherine** 35:17
38:10
**kathleen** 37:23
**katie** 14:3
**keep** 173:17
**kelleher** 36:19
**kelly** 36:20 39:16
**kelvin** 3:20
**kenan** 4:10 38:23
**kennedy** 15:14
16:18
**kenneth** 13:12
22:13,19,25 23:9
23:16 30:20 79:22
**kesselman** 36:21

**kevin** 10:17 34:25
**khan** 36:22
**kicks** 150:22
**kidd** 35:9
**kind** 77:2 85:18
85:22 92:17 94:12
94:13,17 96:10,18
109:14 110:3
116:6 119:12
175:16 176:1
189:7 221:9
**kinds** 109:14
**king** 137:21 139:3
**kl** 19:15
**klein** 36:23
**kleinberg** 32:14
195:17
**kleinman** 36:24
**knew** 41:16
159:21 257:4
**know** 41:7 42:12
43:16 44:7,16,21
45:23 46:8,20
47:3,6 58:3,12,15
60:11,20,23 62:23
65:8 67:20,22
68:7,11 73:12
74:13 78:11 79:10
80:6 81:3 84:6,11
85:6 87:11,15
90:8 91:13,17,18
93:11 94:1,16,20
94:21,25 95:3,5,9
96:8,10 97:17,17
97:19,19 98:16,18
99:17 100:9 105:1
105:11,22,23,24
105:25 106:10
108:13,13,14,17
108:17,22 109:12
109:24,24 119:19
120:16 122:2,4,8
125:6,7 129:25

| | | | |
|---|---|---|---|
| 134:14 136:10 | **kokino** 204:24 | 217:16 | **lays** 174:11 |
| 138:1,3 140:8 | **kotler** 9:2 36:25 | **largely** 186:15 | **lazar** 7:25 |
| 143:3 148:21,22 | **kramer** 30:15 | **larger** 98:2,4 | **lead** 85:23 124:9 |
| 148:23 151:8 | 37:1 79:22 133:7 | **larry** 111:13 | 143:16 145:4 |
| 153:11,15 156:20 | 141:3 | 112:6 184:8 225:5 | 279:13 |
| 157:6,9,10 158:21 | **kyung** 37:2 | 225:6 267:17 | **leading** 82:17 |
| 158:23 160:17 | **l** | **late** 8:15,19 40:25 | 158:5 247:6,10 |
| 163:23 164:21,25 | **l** 2:14 6:12 14:24 | 87:25 99:12 | **lean** 52:1,3,5 |
| 166:17,25 175:22 | 19:18 21:6 34:20 | **latest** 119:7 | **learn** 161:22 |
| 179:10 184:24 | 35:15 39:8,21 | **laura** 35:10 | **learned** 153:3 |
| 186:5,6,13 187:10 | 52:11 75:1 172:3 | **lauren** 36:19 | **leave** 12:21 15:24 |
| 190:22 199:7 | 195:1 | 37:10 40:6 | 16:4 17:5 20:10 |
| 202:7,16 219:13 | **l.p.** 1:7 2:10 4:8 | **law** 7:4 13:3 24:23 | 20:16 21:17,25 |
| 221:23 225:8 | 6:11 7:2 8:25 9:21 | 69:10 80:13 | 24:7,22 25:13 |
| 232:5,25 234:5 | 9:25 10:16 11:3 | 174:18 216:15 | 241:18 |
| 237:19 243:21 | 11:12,22 12:2,4 | 223:19 231:25 | **leaving** 216:17 |
| 245:11,11,14 | 12:18,24 13:5,8 | 242:23 267:2 | **led** 115:16 |
| 251:8 252:2 260:9 | 13:19,23,25 14:9 | **lawrence** 5:21 9:2 | **ledanski** 27:25 |
| 260:10 265:3 | 14:13,15,19,23,25 | 19:25 26:14 32:12 | 284:3,8 |
| 266:2,3,4,24 | 15:4,6,19,21 16:1 | 36:6,25 47:25 | **ledyard** 30:8 |
| 267:4 268:23 | 16:6,13,15,24 | **laws** 228:17 | **lee** 37:2 |
| 269:16 270:12 | 17:2,8,16,23 | **lawsuit** 209:19 | **lees** 37:3 |
| 271:9,13,15,17 | 18:17,21,24 19:2 | 231:20 248:16 | **left** 213:13 235:10 |
| 273:8,11,13 275:1 | 20:7,20,24 21:3,7 | **lawsuits** 58:12 | 236:1 277:23,24 |
| 276:12,13 277:2,4 | 21:10,14,21 22:6 | 212:15,19 213:17 | 278:16 |
| 277:13,23,23,23 | 24:4,10,12,18,20 | 235:14 236:4 | **legal** 2:25 64:6 |
| 277:25 278:1,7,22 | 24:25 25:3,17,23 | **lawyer** 41:19 | 114:1,11 135:4 |
| 279:2,2,3,4,14,16 | 26:5,7,21,25 27:3 | 119:14 146:8 | 176:9 180:9 |
| 279:17 280:15 | 27:5 140:23 | 171:15 182:19 | 184:16 186:8,17 |
| 282:3 | **l.p.'s** 124:15 | 199:20,21 253:20 | 190:22,24 229:10 |
| **knowing** 52:18 | **labeled** 130:13 | 268:22 275:1 | 239:14 242:22 |
| 83:18 126:20 | **labeling** 227:21 | 277:17 | 254:24 267:8 |
| 133:22 144:15 | **lack** 88:17 109:25 | **lawyer's** 268:7 | 284:20 |
| 159:21 165:23 | **laid** 58:2 59:3 | **lawyering** 249:4 | **legier** 18:12 |
| 166:7 188:13 | 73:13 | 249:14 | **legitimate** 177:23 |
| 192:17 195:8 | **language** 208:1,18 | **lawyers** 42:5 85:1 | 182:13 |
| 216:15 252:23 | 208:20 214:24 | 105:20 111:18 | **leisure** 79:3 |
| **knowledge** 107:1 | 220:5 225:13 | 113:24 118:1,2,4 | **length** 135:2 |
| 142:16,21,22 | 265:18,19,23 | 145:3 146:5 | **lengthy** 156:2 |
| 154:8 227:17 | 269:3 | 219:14 228:20 | 174:15 251:25 |
| **known** 226:17 | **large** 68:12 | 246:3 248:15,24 | 268:10 |
| **knows** 82:15 | 134:16 143:19 | **lay** 240:19 | **lennard** 37:4 |
| 282:11 283:4 | 149:6 161:8 | | |

les 2:20
lessons 153:3
letter 2:16,19,22
  2:25 3:3,6,10,16
  3:23 14:2 15:8,8
  16:17
letting 279:16
let's 42:1 54:16
level 92:5,16,17
  109:21 151:2
levels 109:21
  257:3
leventhal 37:5
levin 30:15 79:22
  133:7 141:3
lexington 28:15
  33:11
liabilities 64:3
  128:15,21 129:2,3
  129:6,18 131:6
  132:13 231:1
liability 5:3 66:8,9
  68:11,16 126:16
  127:6 128:17
  144:13,14,22
  157:25 158:1
  170:6,9 180:14,16
  181:16 186:3
  214:20,22 215:3,5
  231:9 250:17
liable 223:11
  231:1,2,23 232:1
liaison 142:22
  143:16 145:5
lianna 21:9 39:3
  45:11,15
liberty 4:25 5:1,1
licensing 227:21
lied 268:4
liesenmer 37:6
lieu 183:18 189:10
  189:12

life 146:4 153:17
light 134:20 145:9
  161:25 184:11
  245:21
lightening 269:12
likelihood 89:6
limine 45:13,17
  45:20,22 46:3,8
  48:1,15,20,22
  53:13 79:17
  172:24 173:11,21
  174:1 187:22
  189:23
limit 12:21 15:24
  16:5 17:5 20:10
  20:17 21:17 22:1
  24:7,23 25:14
limitations 93:8,9
  108:22 109:15
  182:18 216:21
  239:15
limited 4:22 9:5
  12:14 25:25 45:14
  48:11 100:9 216:4
limits 218:17
line 135:14 159:3
  159:16,20 179:8
  244:3 283:7
lines 162:13
link 49:5,11
linking 49:10
lips 189:8
liquidating 72:3
liquidation 52:25
  53:20 55:19,24
  56:16 57:11,19
  58:19 62:20,21
  69:21 70:3,14
  71:1 72:2,8,15
  73:3,22 244:16,21
lisovicz 37:7
list 66:18 68:4,6,9
  105:5 110:3 149:6

149:6 204:21
  256:9 271:4
listed 67:10 68:1,3
  68:8,10,12 92:2,3
  103:14 131:3
  133:4 154:1
  196:12 204:13,25
  255:24 256:3,12
  256:21 257:1,5
  264:17
listen 78:25
  195:24 196:11
  197:4,9 280:15
listened 196:18
listening 78:15
  155:21 196:19
  281:4 282:16
listing 233:15
  256:18
lists 109:19,23
  264:20
lite 33:1 131:25
  167:23 242:3
literally 85:16
  279:22
litig 31:2
litigating 181:24
litigation 13:14
  22:15,21 23:2,11
  23:17 60:5 70:11
  70:11 72:18 82:12
  82:16 97:14 115:8
  134:21 136:15
  143:18 145:7,19
  146:20 149:20
  150:1 153:22
  162:17,21 163:2
  174:12 176:14
  181:4 185:15
  190:23 191:5,7,11
  191:11 194:6
  200:21 201:6
  209:17,21 210:7

210:23,24 211:1
  224:21 230:8,9
  232:14,15,18,23
  233:2 237:23,25
  239:4 248:3
  266:18,20,23
litigations 143:14
  186:23
litigators 149:25
little 52:4 56:4
  95:23 96:1 173:6
  201:1,5,11,13
  212:19 225:8
  242:9 246:10
  276:7 277:17
live 42:13
lives 209:19
living 81:2 206:21
llc 14:4 16:10,22
  29:15 33:9 204:9
  204:16,24
llp 7:5 28:13 30:8
  30:15 31:1,16
  32:1 196:17
local 81:11 103:8
  104:3,23 105:16
  105:23 106:21,24
  107:7,17 108:3
  109:5 139:9
localities 110:1
lock 277:10
long 59:7 98:8
  140:9 153:9 155:6
  184:2 228:10,14
  238:17 240:16
  251:8 277:14
  282:3,20
longer 236:21
longmire 37:8
look 43:6 63:23
  71:13 77:1 86:25
  99:13,18 104:2
  171:3 175:25

200:15 222:5
250:22 273:16
280:21 281:21
**looked**  41:25
63:22 70:23 71:18
119:6 129:9 131:5
179:24
**looking**  56:12
63:21 71:21 94:23
94:24 120:4,5
130:13 134:7
139:16 150:18
180:16 183:5
218:14 221:11
237:16 256:17,18
261:24 271:5
**loophole**  212:12
**losing**  94:16,17
**loss**  168:20 228:1
**lot**  43:6 81:1
113:23 119:25,25
125:1 281:5
**loud**  181:23
**louder**  173:15
**lower**  97:18 119:7
**lowercase**  211:18
**lowne**  22:5
**lp**  2:8 40:10 49:20
75:2
**lumped**  66:8
**lunch**  140:15
**lyman's**  195:12
**lynam**  19:8 28:10
37:9 48:2 194:17
195:4,15 196:9,11
197:17,19 200:15
202:1 203:12
206:25 207:1
222:14,17 223:22
224:2,4 225:11
229:1 235:1,3
238:20 241:12,19
242:1,6 243:13

244:25 245:21
246:5,11,13
248:23 250:6
251:10,25 254:23
**lynam's**  199:10
219:9 230:19
**lynch**  16:2
**lynn**  14:3

**m**

**m**  11:21 15:10
19:21 22:17 23:24
30:22 31:21 36:16
37:10,14,16 38:1
38:4 39:4 165:15
172:3 192:6 195:2
209:25
**m.d.**  18:8
**m.s.**  18:4
**macksoud**  37:10
**maclay**  10:17
**magali**  35:20
**magnitude**  128:15
**mail**  2:25
**main**  29:17
**majesty**  9:17,22
**major**  246:7
**majority**  122:2
**maker**  205:12
256:25
**makers**  257:13
**making**  69:15
176:12 191:10
204:6 206:7
233:19,24 241:5
249:1 258:8,17
**mallinckrodt**
104:15 147:18
148:1,2 154:2
**man**  98:8 121:17
162:23 163:8,10
163:21,25 168:6
169:15 171:15,18
171:21 173:23

182:7 188:1 250:9
250:11,24 251:5
251:12
**management**
149:14 177:20
204:16
**manager**  204:9
**managing**  75:1
**mange**  110:8
**manually**  49:6
162:5
**manufacture**
228:17 231:6
267:3,7
**manufacturers**
9:11 15:23 162:12
**manufacturing**
227:21
**mara**  37:5
**marc**  25:2 28:20
36:21 39:5
**marco**  35:16
**marginally**  183:3
**maria**  10:2 35:5
**marine**  6:9,14
**mario**  34:21
**marion**  38:13
**mark**  20:6 35:13
178:4 181:25
**marked**  2:25
**marketed**  162:20
**marketing**  162:11
162:14 227:22
**markman**  32:6
35:24
**markowitz**  12:25
17:9,18
**marshall**  13:7
26:20 28:18 40:17
110:14,18 151:20
**martin**  20:4 23:3
37:11 47:24 164:7
164:9 165:10,14

165:17,18,22
166:3,10,14,19,24
167:19 168:1,3,13
169:1,4,25 170:5
170:13,18,20
271:25 272:6
**martin's**  169:22
271:25
**mary**  4:5
**maryland**  5:25
7:17 26:16 30:1,2
33:16,17 48:1
61:3 76:16 113:4
113:8 124:25
134:5 166:22
172:24 181:7
182:4 185:23
189:10 269:12
277:20
**masiowski**  4:18
9:14 12:9 29:2
44:15
**mass**  50:21,21
143:11 147:5
150:20,21 151:1,3
151:5,8
**massachusetts**
110:9
**massive**  248:3
**massively**  178:18
**master**  66:5
**masumoto**  37:12
**material**  72:9,13
203:20 236:18
255:18
**math**  64:11
**mathew**  35:7
**matter**  1:5 44:16
48:5,10 75:19
78:22 83:15 93:13
107:12 126:16
133:20 134:6
141:11 157:4

159:2 165:20
172:7 178:22,23
192:12,16 195:5
202:21 222:22
239:14 252:22
255:5
**matters** 40:21
42:10 51:14 53:18
125:10 127:4
131:7 136:9,14
193:23 281:11
282:9
**matthew** 7:9
32:19 195:16
234:22 251:15
253:8
**maura** 37:23
167:7 196:16
**maureen** 19:21
34:15 48:2 192:6
193:19
**maxcy** 37:13
**maximize** 143:23
144:15 145:20
160:4 161:14
205:21 242:14
**maximizes** 161:15
**maximizing**
242:16
**mba** 18:2,4
**mcclammy** 17:23
28:21 74:23,24,25
76:1,6 78:7
**mcdonald** 37:14
**mcgaha** 2:14
37:16
**mckesson** 149:5
**mckinsey** 115:23
123:1,4,9,12,13
147:17,20,24
153:12 207:21
208:1,3,11,17,21
208:23,24,25

209:9,11,24
**mcnulty** 37:16
**mcternan** 37:17
**md** 18:1 30:4
33:19
**mdl** 142:22,24
145:3 147:22,22
227:16
**mean** 64:8,11
70:18 71:4,5,7,9
86:25 88:6,7
91:22 92:12 94:2
94:10 95:11 96:8
96:8 97:21 106:1
106:7 108:6,21
109:9,10,10 122:3
136:13 148:23
155:6 161:20
175:9 201:25
205:11,15 232:19
235:14 242:25
256:24 257:11,12
257:17 258:9
265:8 266:22
274:10 275:10,22
276:7 282:2
**meaningful**
203:19 204:5,20
205:6,10 255:18
256:1,24 257:7,8
257:10,16,17,21
**meaningfulness**
239:21
**means** 87:4
180:14 204:10
240:17 279:16
**meant** 119:17
126:18 138:10
201:2 236:2,3
270:1
**measure** 92:14
134:17 143:19
217:16

**measures** 97:16
97:20,21,22
100:15 120:5
**mechanism**
106:14,15 107:16
109:15 115:18,20
142:19
**media** 14:4,5
**mediation** 42:21
43:9,21 116:24
**mediations** 106:9
**medical** 91:24,25
**meeting** 99:13
100:1,4 101:12,12
101:13
**meetings** 117:23
**meises** 37:18
**melanie** 34:20
97:8,10,12
**melanie's** 97:8
**melissa** 35:18
39:21
**member** 63:13
135:22,25 206:17
271:20
**members** 47:24
65:9 81:3,10 82:7
82:16,21 84:23
98:15 117:24
143:20 149:10,19
206:5,19,20
209:22 214:8
224:22 247:16
258:5,6
**member's** 63:24
**memorandum**
13:3 24:23 80:13
84:5 178:17
**memorize** 265:2
**memory** 101:20
237:16 277:20
**mental** 100:25

**mention** 123:5,6
201:23
**mentioned** 46:25
76:2 79:15 120:14
120:14 173:3
175:19 204:14
205:5 220:9 235:6
247:24
**merit** 213:16
235:13
**meritless** 199:3,6
199:14 254:19
**merits** 86:6,9,24
156:3 176:13,24
177:5 181:2,3,20
185:12,16 190:25
191:2 202:13
235:21,24,25
236:6,25 239:3
254:25 255:1
**methodology**
95:20
**metric** 89:20,21
89:24 92:13,21
93:1 102:3
**metrics** 90:24
91:9,22,23 92:20
93:9 102:1,2
119:4 123:10
**mexico** 101:21
**mic** 52:1
**michael** 2:17 4:18
9:14 11:17 12:8,9
18:2,5,9,13 22:2
24:14 29:2 34:4
35:22 38:7,24
39:23
**michele** 36:11
37:18 38:12
**microphone** 169:2
173:6,17
**milburn** 30:8

militate 93:21
miller 37:19
milligram 88:15
88:17 91:8 92:7
million 142:5,12
142:13,24,25
157:7 168:18
174:15 217:19
millions 152:18
162:4,4
mind 56:1,6
115:14 145:13
149:2 219:17
232:5 273:12
minds 111:24
mine 262:19
mineola 284:23
minimum 128:16
minor 44:15
202:8
minute 104:10
256:10
minutes 84:2,22
235:17 281:17
missed 99:16
269:16
misuse 214:2
265:17
mitchell 34:5
36:12
mitnick 37:20
mkrttchian 37:21
modifying 262:5
mom 4:5
moment 131:18
138:6 174:2
209:11 235:4
263:21 274:11
moments 267:21
monaghan 37:23
166:16 167:6,7
196:16,16

monday 80:22
196:6 276:21
278:16,21 279:4
281:9
monetarily 265:8
monetary 108:12
money 61:13
94:17,24 95:13
98:23 106:3
107:25 108:13,14
108:18,25 109:23
115:20 120:18
138:14,20,22
139:11 142:3
145:25 147:8
160:2 184:23
210:16 234:4
monies 110:1
116:7,24 142:23
monster 186:23
months 91:4
158:5
moody's 93:6
mor 88:10
moral 114:3
morgan 8:3
morning 40:9,16
42:8 44:6 45:6
49:14 53:23 54:5
65:22 66:1 74:24
75:3 79:21 84:3
87:22 99:15
102:22,23 110:17
137:19,20 171:5
173:2 182:16
184:25 278:16,21
281:9
morphine 88:15
88:16 91:7 92:7
morris 179:23
morrisey 5:14,18
37:24

morrissey 98:1,3
98:14 99:23,24
100:1,11
mortgage 108:24
109:11
mortimer 11:9
21:16 25:14
164:11 166:6
196:17,18
motion 7:15 8:3
8:12,15,19 11:9
12:20 15:13,24
17:4,5 20:9,10
21:16,17,25 24:6
24:6,22,22 25:5,5
25:9 26:9,9,14
43:17 44:1,3
45:13,17,20,22
46:2,8 48:1,14,20
48:22 53:13 79:17
172:24 173:11,21
174:1 178:13
180:17,20 187:22
189:22
motions 43:6
moton 37:22
moultrie 34:9
move 65:4 109:17
111:9 131:8
163:11 202:17
209:19 233:6
239:9 266:4 269:6
moves 190:19
moving 78:11
mph 18:1
msa 108:23
msge 43:7,18
muha 37:25
muhammad
36:22
multi 10:13,17
143:14,17,18
153:22 163:2

multidistrict
82:12
multiple 42:3 96:6
96:12 105:9 129:8
146:23 190:20
multiplication
61:15
multiplied 61:17
mulvihill 38:1
municipal 69:4
167:24 242:4
municipalities
216:13
municipality 6:25
33:2 139:3
murray 38:2
musing 280:17
mute 43:13 44:11
170:22,23,25
179:21 184:6
mutual 4:25 5:1
55:8
myriad 149:6

**n**

n 28:1 40:8 50:3,3
52:11 75:13 83:11
165:16 192:7
195:2 284:1
nadim 38:3
naftalis 30:15
133:7
name 54:5 65:22
67:4,6 68:7 100:8
196:3 224:4
264:14
named 66:13
68:14 115:8
264:20,22
names 67:7
naming 152:13
nann 38:4
narrative 59:25

**narrow** 174:24
278:5
**narrower** 278:5
**nas** 12:20 13:1
17:4,10,13,18
120:17
**nathaniel** 37:19
**nation** 6:25 33:3
216:11 242:5
**national** 9:4,7
15:15 16:19 61:9
61:11,23 108:24
109:10,11 120:3
142:4 146:9,23
**nationally** 107:13
**nations** 69:5
131:25 132:7,10
167:25
**nationwide**
117:17
**native** 4:14 26:2
**nature** 186:9
209:16
**navigators** 5:4
32:2 127:10
**nay** 86:1
**ncsg** 42:16,20
43:8
**ne** 29:3
**near** 79:25 103:1
**nearly** 146:4
**necessarily** 68:13
86:6,23 88:7
92:11 94:25 95:1
116:8 117:25
135:7 213:16
228:13 235:13,21
249:20 257:14
**necessary** 46:21
204:2 209:14
219:10,12,17
229:14 237:12,18
238:9 254:20

**necessity** 89:7
229:8
**need** 63:20 78:21
79:11 87:12 94:21
106:10 114:1,5,11
114:14 130:24
136:12 137:11
138:5 159:9
166:18 167:1
182:25 184:21
185:1 201:19
202:4 204:11
206:11 218:3
239:6 247:15
248:18 256:8
258:22 260:12
264:16,17 271:15
276:25 277:13
278:21 279:13
280:22 281:2
**needed** 256:15
**needs** 94:22
179:20 213:1
268:12 277:21,22
**negative** 124:17
124:20
**neglected** 120:13
**negligence** 178:5
**negotiate** 42:16
110:9
**negotiated** 42:14
42:17 81:14 96:9
135:1,2 158:11,11
**negotiating** 51:1,5
96:10 105:8
117:19,19 118:3
136:1,7 139:22
**negotiation** 96:15
97:1 117:3,6
136:18 138:12
**negotiations**
45:17 82:17,18
86:15 99:3 104:24

118:1 125:10
135:11,11 138:15
227:15
**negotiator** 124:9
**neiger** 38:5
**neil** 36:20
**neither** 111:22
169:15
**net** 63:13,17,24
**nevada** 123:13
**never** 107:2
119:14 175:23
251:1
**nevertheless**
86:21 89:1 119:10
226:25 232:24
**new** 1:2 28:16
29:11 30:11,18
31:19 32:10,17
33:12 52:10 61:4
62:4 83:11 101:20
101:24 122:5,5
195:1
**newark** 33:5
**newco** 82:1
**news** 14:5
**nice** 137:24
**nichols** 179:23
**nickolas** 9:22
36:18
**nictim** 3:13
**night** 40:25 41:16
42:3 47:10 49:14
84:13 99:13
196:15 279:2
**ninth** 14:11
**nj** 33:5
**noat** 61:19 103:10
103:11,12,15,20
104:3 106:12
107:22 108:10
137:25 138:17,20
139:10,23 140:2

147:9
**noise** 56:4
**non** 15:10 31:17
81:19 148:14,18
213:4 215:21,21
215:23 216:9
223:2 225:15
227:10,12,16,23
229:4,22,24 230:4
237:24,25 238:3,4
239:4,4 240:22,22
245:24 248:4,13
265:21
**nonconsenting**
236:13
**nonpayment**
230:7
**norm** 179:16
**normally** 163:7
164:1 202:5,25
**normile** 2:17
**norms** 177:10
179:5 182:20
**north** 5:5 110:8
**note** 55:20 56:12
76:1 78:16 88:2
89:3 93:1 99:6
111:18 134:5,15
137:3,5 139:17
142:1 155:17
178:24 200:19
246:5
**noted** 74:25 93:17
**notice** 2:4 13:17
13:21 14:7,11,17
14:21 15:2,17
25:9,25 26:3,23
27:1 43:17 44:4
**noting** 88:24
**notion** 237:21
**notwithstanding**
85:13 262:24
274:21

**november**   90:17
  90:21,22,23 91:17
**nuances**   178:21
**number**   40:22
  41:12 58:24 59:1
  60:11,12,23 67:10
  67:15,18 68:12,14
  68:18 73:15,17
  88:13,16,17 89:4
  90:9 92:4 103:23
  119:9 124:9
  130:11 134:20,25
  143:13 146:9
  149:18 153:23
  174:8 175:9
  206:18 259:16
**numbers**   88:8,9
  88:13 89:8 94:2
  115:25 116:3,4
**nuts**   134:9
**nvt**   243:17
**nw**   32:3
**ny**   1:14 28:16
  29:11 30:11,18
  31:19 32:10,17
  33:12 284:23

**o**

**o**   1:21 40:8 50:2
  52:11 83:11
  126:12 133:16,16
  172:3 192:9 284:1
**o'neil**   11:18 12:10
  18:2,5,9,13 22:2
  111:9
**o'neill**   102:18,19
  102:21 111:12,16
  111:22 112:15,23
  113:5 120:8,10
  124:7 137:14,15
  137:18,20 146:14
  146:14,16,19
  150:14 151:11
  154:1,22,22 155:1

155:5 156:7 160:7
  160:8,8,11 192:25
  193:1,10
**o'neill's**   113:13
  151:14
**object**   43:1,20
  50:15 53:7,13,14
  62:5,10 76:11
  83:21 84:24 111:9
  127:1 130:24
  134:1 141:18
  167:12 192:21
  193:1 195:11
  199:18 253:3
  273:15 274:14
  275:12
**objected**   105:12
  139:10 181:7,8
  183:21 236:11
  238:16 240:15
  259:14,17
**objecting**   7:8,24
  73:6 105:12
  111:12,14,16
  112:1,19 181:10
  249:23 260:3
**objection**   2:13
  3:19 4:1,1,4,7,13
  4:17,22,22 5:8,9
  5:13,24 6:4,8,16
  6:20,24 7:7,12,15
  7:15,22 8:3,7,11
  8:15,19,23,24 9:5
  9:10,10,13,25
  10:4,7,10 11:1,16
  12:7,8,22 15:25
  16:5 17:6,14
  20:18 22:1 25:25
  64:5 89:11 112:3
  112:5,15,22 113:4
  113:10 121:17
  124:5,7 125:14
  135:15 136:8,20

157:5,12 168:6
  169:15,25 172:13
  181:11 183:23
  184:4 188:18,24
  198:12 201:17
  242:20 243:22
  245:7,19 247:6
  248:6 254:14,21
  262:25 268:22
  274:25 275:8
**objectionable**
  240:16
**objections**   10:14
  10:22 11:10,20
  13:6,10 20:12
  21:18 22:12,18,24
  23:8,15 25:1,15
  53:12 279:15
**objectors**   42:25
  43:20 112:4,14
  114:16
**obligations**   191:5
**observation**
  135:18 163:10,13
  229:8 239:20
**observe**   86:13
  164:10
**observed**   226:10
  239:13
**obtaining**   229:3
**obvious**   65:1
**obviously**   41:2,18
  42:21,25 43:19
  45:23 62:24 63:2
  71:17 78:20 79:3
  103:13 115:5
  153:23 183:22
  249:9 250:14
  269:16 271:19
  277:13 280:1
**occasions**   96:12
**occur**   88:13
  100:22 119:13

**occurred**   115:23
  217:5 228:2
**occurrence**   228:6
**occurrences**
  88:13
**october**   99:8
  101:14
**offer**   46:11 158:14
  189:10
**offered**   45:14,25
  47:22,23 51:20
  145:8 176:21,22
  177:4,6,14 181:10
  181:18 182:19
  185:11,13 186:2,3
  191:8 202:20,23
  202:24 233:8
**offering**   48:12
  78:21 79:8,8
  128:9 129:17
  177:13 181:4
  183:1 193:11
**offers**   125:4
  177:10
**office**   30:1 31:10
  32:8 33:16 41:11
  49:3,12 93:3
  103:24 112:7
  119:23 225:7
**officer**   179:16
  203:18 204:22
  205:2 223:7,10
  255:15 256:4,11
  257:2,2,5,14
  258:1
**officers**   66:9
  67:25 149:9 257:3
  269:24
**official**   11:24 12:3
  24:6,11,15,19
  111:3,24,25
**officials**   111:20

[oh - opioid]                                                                    Page 42

**oh**  69:14 76:4
  111:15 155:6
  163:9 171:16
  189:6 196:24
  199:17 221:15
  261:24
**ohio**  82:12
**okay**  40:9 41:11
  41:24 42:6 43:24
  44:9,13,20 45:5
  46:4,14,22 48:6,7
  48:16 49:1,9,14
  49:18,22 50:2,5
  50:14,24 51:6,13
  52:6,10,13,21
  53:7 54:1,22
  55:15,18,21 58:8
  59:23 61:25 63:20
  65:4,6,15,24 69:1
  69:21,23 70:6
  71:11 72:21,22
  74:3,18 75:3,7,12
  75:25 76:4,10,17
  77:17 78:4,4,8
  79:13,20 82:9,20
  82:23 83:6,11,14
  83:21 85:6 86:3
  87:19 88:21 90:13
  92:25 97:3 98:11
  101:3 102:16,20
  110:16 111:15
  112:13 114:19,23
  116:11,19,22
  117:20 118:7
  120:7,10 121:5,24
  123:7,11,17,19
  125:16,22 126:9
  126:14 127:1,13
  128:9 129:14,21
  130:10,12,18,22
  131:5,8,9,12,19
  132:10,20,24
  133:4,10,15,18

  134:1 135:19
  136:22 137:16
  138:11 139:14,15
  139:20 140:3,16
  140:21 141:1,5,10
  141:18,20,21
  143:5 144:2,6
  145:12 146:11
  151:12,17 153:16
  154:12 155:9,12
  156:6,9,23,24
  157:2,11,21 160:7
  160:20,25 163:4
  163:21 164:1,4,16
  164:25 165:10,15
  165:18 166:4,13
  166:17 167:21
  168:8 169:8,20
  170:3,12,16,23
  171:9,20 172:5,13
  172:15,18,21
  173:8,10,18 174:4
  174:6 176:18
  182:6 184:5
  187:10,19 188:2,2
  188:9,17 189:1,16
  189:19 192:2,6,11
  192:21,24 193:4
  193:16 194:4,13
  194:20 195:11,14
  196:21 197:11,21
  198:9,15 200:13
  200:15,25 203:10
  205:18 206:22,24
  207:8,15,25 209:6
  211:6,10,19,24
  212:4 213:18
  215:2,7,11 216:14
  217:15 218:11,21
  220:3,18 221:5
  222:1,10,20,25
  223:4 224:6 225:1
  225:4 226:18

  227:5 230:6,10,17
  232:17 233:9
  234:5,8,15,18,25
  235:3 236:14
  239:2 240:9
  241:21 242:14
  243:3,18 246:9,9
  249:22 250:2,5,8
  251:7,14 252:11
  252:20 253:2,4
  254:2 255:8,13
  256:23 257:9,22
  257:25 258:2,13
  258:20,24 259:1
  259:11,13,18
  260:2,7,15,22,25
  260:25 261:1,13
  261:14,19,24
  262:21 263:14,18
  263:24 264:12
  267:11,14,18
  268:1 269:9,10,14
  271:1 272:11,13
  272:15 273:2,7,21
  274:2,3,4,20
  275:22 276:2,5,6
  276:11 278:18
  279:25 280:7
  281:6,14 283:1,3
  283:12
**oklahoma**  116:13
  116:20
**old**  284:21
**omission**  228:5
**omnibus**  13:6
  25:1 281:9 282:9
**once**  79:16 157:2
  241:8
**oneill**  120:12,21
**ones**  68:13 77:5
  103:7 164:22
  204:4,5 255:25
  256:1,3

**oneself**  236:4
**one's**  41:6
**ongoing**  232:15
  237:23
**open**  222:16
  237:23 260:13,19
  260:21,22 261:6
  280:3
**opened**  260:16
**operate**  273:1
**operated**  149:20
**operating**  77:15
**operation**  277:1
**opine**  51:3,7,14
**opines**  174:12
  175:10
**opinion**  112:8
  128:10 129:17
  161:7 175:7,8,22
  176:7,9,11,12
  178:1 180:10,14
  181:4 237:7 259:4
  259:6 272:18
**opinions**  50:22
  125:5 127:7 134:8
  136:11 174:7,9,21
  176:3,9 177:10,12
  180:9 182:3,4
  242:22
**opioid**  61:9,12,23
  68:21 88:25 89:6
  90:4 92:4,8 93:20
  94:1,7 95:7 97:13
  99:5 104:12
  107:12 115:5,8
  128:16,17,21
  132:11 145:1
  153:20 181:4
  214:2,3 217:23
  225:15 227:10,13
  227:16,20,23
  229:4,22,24 230:4
  230:8 232:14,18

232:23 233:2
248:4,4,13,16,17
265:21 274:10
**opioids** 89:22 94:4
117:22 146:21
148:17 214:17,20
228:18 231:6
265:17 267:3,7
**opium** 214:17
**opportunities**
162:12,13
**opportunity**
41:13 105:5 227:2
**opposed** 121:22
169:22 186:8
225:24 226:20
230:19 231:20
281:24
**opposition** 9:4
**opt** 236:15 237:7
259:19 260:3
**optimistic** 158:17
**oral** 114:17 246:6
246:8 277:8
**order** 16:4 20:16
21:1 25:13,20
40:13,14 44:4
47:1,2,5,7,7,9,13
50:8 52:14,25
75:20 83:16 92:14
109:7,12 119:13
126:17 133:20
138:24 141:12
143:2 157:7
159:14 165:20
172:8 176:1
188:11 192:13
195:5 238:9
242:22 245:1,6,11
249:21 252:21
261:2 262:4,5,6
274:23 277:2
278:7

**orderly** 280:5
**ordinary** 177:23
**oregon** 7:8,23
61:3 165:7 195:17
**organization**
273:24
**organizational**
272:10
**organizations**
15:15 16:19
152:14
**organized** 43:10
278:7
**original** 47:12
**originally** 166:21
277:19
**ought** 279:3
**outlined** 90:19
**outset** 61:1 81:13
163:13
**outside** 58:16
146:6 147:22
256:7,18
**outstanding** 132:4
**overall** 238:13
276:13
**overbroad** 249:11
**overcome** 49:7
**overdose** 90:4
**overlook** 180:17
**overrule** 114:12
125:14 135:16
187:22
**overruled** 188:19
257:13
**oversight** 109:6
178:3
**owned** 66:25
68:10
**owner** 205:25
206:1 214:20
**owners** 154:3
179:7 212:11

**owns** 243:14
**oxycontin** 162:10
162:11
**ozment** 6:5 7:13
38:8
**o'connor** 38:6
**o'neil** 38:7
**o'neill** 31:14

**p**

**p** 22:8 25:6,10
26:10 28:1,1 36:5
40:3,8 50:3 75:12
172:3 252:17
**p.a.** 29:1
**p.c.** 32:14
**p.m.** 180:22
**pa** 9:7
**page** 10:8 12:21
15:24 16:5 17:5
20:10,17 21:17,25
24:7,23 25:14
55:19 89:2 130:8
197:21 200:15
203:12 213:22
223:6 253:25
255:11 258:24
261:12 271:3,4
**pages** 157:8 162:4
279:23
**paid** 43:25 61:14
147:8,14 213:7
233:22 234:2,3
243:14,16,16
**pain** 92:13 162:19
**panel** 142:9,11
**paper** 221:23
279:23
**papers** 43:5
**paperwork** 147:4
**paradigm** 162:18
**paragraph** 54:7
55:4 77:10,21
88:1,22 89:9,13

89:14,17,20 90:19
91:3 93:1,15
96:20 97:24 99:19
101:10,24 103:4,6
117:1 127:19,22
127:25 128:7,13
134:15 135:14
138:7,10 142:1,6
143:11 163:17,17
180:10 184:17
197:22 198:3
199:13,24 200:16
203:12 204:13,21
228:4 253:25
255:11 258:25
259:3 261:15,23
261:24,25
**paragraphs** 99:6
255:17 256:3,13
**parameters**
121:15
**parker's** 4:5
**part** 42:9 48:13
61:5 77:6 99:3,16
104:15,17,18
106:7,23 107:15
113:18 116:23
122:17 123:4,11
123:13 138:24
143:10 152:4,23
153:3 158:4
161:10,16,24
162:20,22 169:16
182:11 185:3,5,8
200:23 208:6
210:10 219:12
228:19 230:11,14
238:1 269:16
279:7
**participant** 136:4
**participates**
106:12

**participating**
124:2 282:6
**participation**
106:13 107:16
184:19
**particular** 61:6,16
73:18 92:11 109:1
114:5 115:14
116:2 129:18
130:2,5 132:9
135:13 149:8
179:17 180:2,2,5
196:2 226:19
236:25,25 237:2
237:13 271:6
**particularly**
99:11 163:16
188:20 216:25
234:22
**parties** 42:3,15
47:4 53:10 55:25
56:18 57:14 58:4
58:13,16,18,24
66:13,18,19 67:1
67:4,8,10,13,16
68:3,4,6,9 71:13
73:16 79:4 81:8
81:21 86:19,25
87:14 96:18
105:21 109:4
117:11 118:3
125:2 134:6,22,25
135:1 136:12
144:10,10,13
164:6 185:3,19
186:13 187:7,13
187:14 188:21
191:20 195:22
197:3 199:25
200:2 201:21
203:19 207:2,7,12
207:16 208:8,9
211:13,22 213:23

223:12 224:9,17
224:20 235:23
237:22 244:2
251:18 252:8
255:16 256:14
258:10 259:9,21
262:24 264:17,20
264:21,22 265:6,7
266:5,6,10,17
277:1,10 278:11
278:18 280:9
282:5,12
**parties'** 46:3
**partly** 112:3
**partner** 83:4
179:23
**partners** 14:4
75:2 76:21,24
**parts** 162:14
240:15
**party** 55:16 73:4
78:21 79:8 81:14
116:9 135:10
136:7,11 137:2
142:9 144:18
148:15 156:19
159:7,9,14 177:16
182:25 183:21
185:24 190:9,19
196:11 208:22
209:2,20 217:4
221:14 224:24
225:19 226:11,12
226:13,19,20,24
227:2 229:25
231:19 233:17
235:23 247:22
248:23 249:1
279:24
**passed** 206:15
**password** 49:6
**pat** 149:24

**patience** 118:15
**patient** 94:12
**patrick** 5:14,17
11:17 12:10 18:2
18:5,9,13 22:2
37:13,17,24 38:7
97:25
**paul** 4:10,19,20
6:9,13 11:21 29:1
29:6 30:3 33:18
34:12 38:23 39:4
44:14
**pay** 42:19 43:2
144:24
**paying** 43:8,20
94:11,11 154:4
210:2,6,25 282:12
**payment** 142:11
199:25 203:18,22
208:8 233:25
255:16,21 256:14
**payments** 229:5
234:2 236:22
238:14
**pci** 10:4
**peace** 208:16
209:8,14,17
224:14 232:12,19
236:17 237:21
248:19,24 259:8
259:12,21,24
260:1,5 264:16
275:7
**peacock** 110:8
**pec** 81:11 82:10
98:15 102:1,2
105:1 145:3 146:7
146:20 161:25
**penalty** 78:17
**pending** 82:12
85:4 115:9 172:24
176:13 205:22
209:19 231:12

**pennsylvania**
31:4 32:3
**people** 6:21 40:24
40:25 43:3 44:23
49:13 50:21 67:7
68:5 71:4,5 78:13
81:2 88:10,10,19
90:8 92:1,9,15
94:3,15 95:7
112:3 113:23
114:8 122:8
161:23 189:7
194:10 201:5
202:1,24 209:19
210:16,25 214:14
241:17 246:19
253:21 277:2,13
278:22 280:8,17
281:20,23 282:4
282:24 283:4
**peoples** 216:11
**perceive** 253:13
**perceived** 98:8
135:11 136:19
**percent** 90:25
96:1,1,2,21 101:4
101:25 102:6,9
104:6,7 112:19
118:17,17,17,20
119:4,6,15,15
142:3,6 147:12
150:12 211:13
214:19
**percentage** 61:16
61:21,24 127:6
**perfect** 89:24
94:21
**perfectly** 125:11
135:9 178:15
180:1,3 216:15
**perform** 70:15
72:1 168:14

[period - plan]                                                                    Page 45

period  71:15
  87:14 147:15,16
  150:15 152:8
  180:12 184:18
periods  277:3
perjury  78:18
permit  85:22
  114:13
permitted  62:3
  195:23 206:6
  236:14 237:7
  238:12 258:7,13
  258:16 259:19
  260:3
person  87:6 94:5
  94:6 146:7 202:8
  244:15,16 271:6
  271:15
personal  51:8
  64:2,3 117:24
  142:20,22 184:19
personally  254:11
persons  215:21
perspective
  163:19
persuading
  176:22
pertained  230:4
pertaining  82:1
  240:22
pertinent  180:13
peter  4:14 23:7
  26:1 28:9 34:22
  47:22 146:18
  151:18 156:11
  160:10 161:2
petition  158:19
  161:16 162:4
petroleum  256:11
ph.d.  20:23
pharma  1:7 2:8
  2:10 4:8 6:11 7:2
  8:25 9:21,25 10:4

10:16 11:3,12,22
  12:4,18,24 13:5,8
  13:19,23,25 14:9
  14:13,15,19,23,25
  15:4,6,19,21 16:1
  16:6,12,14,24
  17:1,8,16,23
  18:17,21,24 19:2
  20:7,20,24 21:3,7
  21:10,14,21 22:6
  24:4,9,12,18,20
  24:25 25:3,17,23
  26:5,7,21,25 27:3
  27:5 40:10 124:14
  126:16 140:23
  143:20 149:14
  179:25 201:6
  206:17 215:1
  227:12 232:16
  234:4
pharmaceutical
  152:7 179:15
pharmacies  9:11
  15:24 162:15,16
pharmacy  11:6
phase  116:24
  150:21
phd  23:13
philip  4:24 34:2
phone  99:2 175:3
  179:20 269:13
phrama  12:2
phrase  70:5
  228:24 235:5
  248:25
phrased  248:8
physician  4:18
  9:14
pi  117:24
picked  208:17
pickering  32:1
picking  278:21
  281:8

picture  85:16
piece  43:17 48:12
  228:11 235:4
  236:9
piercing  186:21
  230:10,13
pill  145:1
pills  88:17,19 92:8
  92:10,10,12
pillsbury  31:16
pittman  31:16
pittsburgh  9:7
pjt  75:2 76:20,23
place  30:3 82:17
  82:18 86:15
  103:19 122:14
  158:5 164:14
  230:2 273:20
placed  182:18
plains  1:14
plaintiff's  143:12
  143:15,16 145:3
  146:6 158:10,16
plaintiffs  143:22
  200:20 217:11
  250:18
plaintiff's  82:11
plan  2:7,8,13 3:7
  3:19 4:1,4,8,13,17
  4:23 5:8,9,15,24
  6:4,4,10,16,20,24
  7:2,7,12,16,24 8:8
  8:11,15,19,23,25
  9:5,13,20 10:7,10
  10:15,21,22 11:3
  11:10,12 12:1,15
  12:23 13:4,10,21
  13:23 14:8,11,13
  14:21,23 15:2,4
  15:17,19 16:1,6
  16:12,24 17:8,15
  20:11,12,19 21:3
  21:18,21 22:12,13

22:18,19,24,25
  23:8,9,14,15 24:9
  24:17,25 25:15,17
  25:22,25 26:3,5
  26:19,24 27:1,3
  40:12 42:11,23,25
  48:23 51:3,3,10
  53:20 54:9,19
  55:5,9,11,11 61:7
  61:8,9 63:2 67:22
  79:9 80:12 81:15
  81:24 82:2 99:7
  99:10,21 100:13
  101:21 102:5
  103:20 104:17,18
  105:12,25 106:5
  106:11,23,25
  107:3,5 115:6
  118:17 119:11,13
  119:24 121:14,16
  122:8,9,14,16
  124:21 127:23
  128:2,11,14
  129:22 132:15
  138:1 141:25
  142:1,23 144:7,7
  144:17 147:9
  148:12 149:13
  150:3 156:15
  158:6 162:1 168:5
  168:22 169:22,23
  184:15,22 191:3,4
  191:5 200:1,3
  207:5 208:10
  211:15 213:22
  215:20 220:5
  221:21,24 222:6
  223:16 225:19
  228:4 236:12
  238:1 240:6 244:1
  244:20 245:22,25
  250:23 259:15,19
  260:3 261:20

262:2,5,24 263:7
263:13 265:13
274:24 275:7,17
**plans** 41:9 136:1
**plan's** 66:17
**playing** 135:10
**please** 43:13
49:23 52:7 75:4,9
83:7 126:5 127:17
127:19 141:6
148:10 165:11
171:12,24 188:3
192:3 194:23
197:16,21 203:12
204:3 237:18
252:13 253:25
255:11,25 258:24
259:2,5 261:9,12
282:21
**pleased** 80:24
160:1
**pleasure** 281:19
**plimpton** 167:7
196:17
**plus** 86:16 157:8
**pm** 283:14
**podium** 40:21
44:11
**pohl** 38:9
**point** 45:3 51:24
80:16 84:16,16
86:17 90:11 91:6
91:7 96:15 97:4
98:5 103:18 109:3
109:25 113:6
115:5 121:11
122:19 124:25
132:22 135:18
137:11,12 140:19
154:8 155:24
163:12 165:4
169:17,21 176:18
179:13 181:1

182:15 185:23
186:4 187:11,14
191:1 206:12
213:18 221:12
222:2,5 225:17
241:12,17 250:6
250:22 269:5
276:17
**pointed** 281:7
**pointing** 69:17
98:1
**points** 118:10
134:8 180:6
182:14 185:6,20
280:21
**policies** 66:4,7,9
66:10,15 67:5,9
67:11,14,16 68:2
68:7,11,12,13,17
68:20
**policy** 225:21
**political** 98:20
145:24 147:5,13
147:21 150:1,22
151:2,6
**polk** 28:13 40:17
45:7 49:19 72:24
110:18
**polster** 145:18
**poorly** 259:25
**population** 88:3,5
89:8,24 90:1,5,9
90:10 91:18 92:19
92:21 93:1,5
100:14 102:2,7
118:16,20,25
119:5,8
**populations** 88:23
**populous** 89:19
**porter** 38:10
**portion** 116:23
203:15 233:21

**portions** 128:10
163:16
**pose** 110:23
214:15
**position** 85:20,21
96:18 128:2,5,6
196:8 226:2 238:8
241:2 254:18
271:17
**positions** 252:9
**positive** 152:15
**possibility** 63:10
**possible** 59:5 74:8
77:7 146:1 157:2
157:22 184:15
253:17 277:5
**possibly** 152:21
208:4 209:22
275:2 282:16
**post** 107:19 108:5
168:22 169:13
**pot** 61:13
**potential** 53:12
57:15 59:1,4 60:8
60:13 62:25 64:2
70:22,23,25 72:2
72:11,12,16,17
73:12,25 89:20
120:5 144:12,23
157:25 159:23
168:20 230:25
246:17 249:10
**potentially** 58:15
58:18,25 63:4
73:6 223:11
**pour** 266:19
**practices** 177:23
177:25 178:2
**pre** 86:7 161:11
161:16 162:4
168:23 169:13
174:20

**precedent** 226:21
**precluded** 217:20
**preference** 72:3
72:17
**preis** 38:11
**prejudice** 185:1
191:6
**prejudiced** 190:6
**preliminary** 16:9
**premature** 45:2
**premise** 178:13
**prepare** 78:24
**prepared** 159:24
178:18 234:22
**preparing** 131:4
139:23
**prepetition** 67:16
67:18 69:9
**prescribed** 88:20
92:10
**prescription**
145:1
**present** 33:23
74:23 99:25
117:24 214:1
**presentation**
184:12
**presentations**
117:25 118:3
**presented** 42:15
76:6,7,9 125:20
222:4
**presenting** 141:4
164:9
**preserve** 205:24
205:24 236:15
**preserved** 223:10
**president** 204:15
204:18
**pressure** 98:14
**pretrial** 277:6
**pretty** 67:15
228:12 273:19

**prevent** 266:25
**prevented** 110:4
**previous** 115:25
**previously** 53:9
    130:25 159:18
    260:10
**primarily** 53:19
    154:6 207:16
**primary** 144:15
    243:1
**prime** 2:25 16:10
    16:22 44:18
**principal** 136:3
**principally** 82:6
**principals** 135:24
**principles** 175:12
**prior** 98:15
    116:17 179:2,3
    180:16 210:15
    240:14
**priorities** 144:5
**priority** 103:9
    146:10 242:23
**prism** 208:16
**private** 41:2 103:8
    110:25 111:23
    116:25 117:7,14
    120:16,16 142:8
**privilege** 84:8,17
    85:8,14 96:24,25
    153:13 160:15
**privileged** 152:19
    198:12,21 254:6
**pro** 217:19 281:11
**probably** 44:3
    48:8 84:15 94:13
    104:1 117:9
    124:18,20 137:6
    177:1 251:9
    277:17 279:8,10
**probe** 219:12
**problem** 49:10
    91:21 92:15 94:20

196:24 231:5
    249:10
**problems** 49:7
    253:13 267:6
**procedure** 142:23
**procedures** 21:2
    25:21 50:8 51:2
    52:15 53:1 75:21
    78:14 83:16
    126:18 133:20
    141:12 165:20
    172:8 192:13
    195:6 252:22
**proceed** 46:19
    47:2,3,6 65:18
    79:13 82:25 87:10
    118:11 140:19
    195:18 200:11
    223:24 253:16
    255:9 262:20
    265:5
**proceeded** 162:13
**proceeding** 50:7
    120:15 133:19
    172:6 187:15,18
    223:8,18 265:25
**proceedings** 1:12
    184:21 185:2
    195:24 226:15
    268:4,20 269:4
    283:13 284:4
**proceeds** 213:7
    227:23 233:23
**process** 86:18
    150:22 188:1
    194:19 281:24
**processes** 142:14
**produce** 84:19
    275:7
**produced** 85:12
**product** 154:4
    198:22 248:13

**production**
    227:21 228:18
**products** 225:15
    227:10,13,16,23
    229:4,22,24 230:4
    248:4,4 265:21
**professional**
    146:4
**professionals**
    60:11 234:12
    267:24
**professor** 137:4
    173:12,22,23
    174:6,9,11 175:13
    175:18 176:3,8
    179:23 183:8,9
    188:2 189:11
**proffering** 252:8
**prognostication**
    281:13
**program** 100:20
    101:5
**project** 62:2 146:5
**promotion** 227:22
**pronouncing**
    47:21 191:25
**proofs** 215:18
**proper** 134:23
    178:15
**properly** 239:11
**property** 65:10
    179:16
**proponent** 55:9
    121:15 275:17
**proponents** 122:8
**proposal** 88:2
    91:4 101:11,14,18
    101:20,23 102:8
    161:6,8
**proposed** 11:1
    44:4 99:7 107:2
    115:7,10 145:2
    158:21 174:17

245:22,25 251:1
**proposing** 101:25
**proposition** 42:24
**propriety** 51:7
**prosecuting** 72:12
**protected** 84:16
    85:1 245:24
**protecting** 107:15
**protection** 31:9
**protective** 157:6
**proved** 40:24
**provide** 45:9
    147:11 179:4
    199:20,21 210:8
    260:11,12
**provided** 47:2
    57:8 136:2 195:22
    245:1 260:8
**providers** 247:20
**provides** 147:14
    169:23 237:22
**providing** 211:2,4
    234:6
**province** 9:18,23
**province's** 216:16
**provinces** 215:15
    215:17 216:4,13
    216:18 217:6,7
    219:2 221:11
**provincial** 216:10
**proving** 42:11
**provision** 141:25
    207:5 234:9 249:5
    265:12 269:4
**provisions** 86:7
    108:10 139:2,6
    266:4
**prudent** 259:8
**public** 8:4 107:7
    110:10 116:25
    138:14 152:20
    153:5,7,14 157:13
    157:14,16,23,24

157:25 161:22
**publicly** 107:25
156:15
**publish** 161:23
**published** 180:4
**pulggari** 38:12
**pull** 79:12
**pulling** 209:20
**pullman** 29:15
**pullo** 16:10,22
44:18
**purdue** 1:7 2:8,10
4:8 6:11 7:2 8:25
9:21,25 10:16
11:3,12,22 12:2,4
12:17,24 13:5,8
13:19,23,25 14:9
14:13,15,19,23,25
15:4,6,19,21 16:1
16:6,12,14,24
17:1,8,16,23
18:17,21,24 19:2
20:7,20,24 21:3,7
21:10,14,21 22:6
24:4,9,12,18,20
24:25 25:2,17,22
26:5,7,20,25 27:3
27:5 40:10 55:15
58:22 93:13
103:15 104:22
107:12 115:15
124:14 126:16
139:9 140:22
143:19 145:7
146:21 149:14,23
151:21 152:3,25
153:18 154:10
160:16 161:13
162:9,10 163:1
168:3,14,21
184:11,14,20
201:6 206:17
207:21 209:13

210:22 212:16,19
212:20,22 213:14
215:1,8 217:14,21
218:18,19 219:3
220:9,10,16,21,23
227:12 229:21
231:11,25 232:1
232:15 234:4
235:11 243:18,20
248:13 250:17
**purdue's** 162:18
230:6
**purely** 180:25
231:12
**purpose** 85:22
129:25 176:22
191:9 208:15
209:8 219:10
**purposes** 53:20
55:23 56:25
108:19 139:24
149:2 168:15
191:12 256:20
**pursuant** 11:2
13:22 14:12,22
15:3,18 26:4 27:2
**pursue** 63:7
149:21 177:16
200:20 241:3
**pursued** 162:17
**pursuing** 147:23
177:9 217:20
**put** 41:2 63:2
71:18 73:10 74:13
99:14 167:2 168:9
174:22 176:1
179:20 190:7
202:18 236:10
257:11 278:8
**puts** 86:14
**putting** 64:11
111:23 145:25
210:16

**q**

**qualification**
53:17 193:22
**qualified** 50:20
134:10 175:4
179:14 180:3
268:13
**qualify** 66:13
134:10
**quandary** 90:11
**quarropas** 1:13
**quarter** 140:7
**queen** 9:18
**question** 41:14,23
48:5 56:1,5,6,15
57:17 59:12,15
62:10,12 64:9,24
65:5 70:6 71:17
71:24 73:2 76:14
80:25 82:9 88:7
88:11,12,21 89:12
102:17 103:16,18
105:19,22 111:23
112:12 113:13
114:7,13,16
116:22 119:22
120:9,14,24 121:6
121:8,18,20
122:24,25 123:6
125:13 128:25
130:4,19 131:13
131:16 137:4,6,10
139:21 142:21
143:3,9,22 148:10
148:22 149:11
153:11,15,16,25
154:23 157:22
159:6 162:2 166:5
169:21 170:1
171:3 177:2 178:5
178:10 181:13
187:3 190:1
198:15,17 199:4

200:8,12 201:18
202:12 206:13
207:1,15 209:4
210:10,15,19
211:9 213:9
214:12,15 217:10
218:10,18 219:18
227:3 228:25
235:7 237:17
238:7,23 239:1,7
239:9,12,18,19,23
240:10,13,15,18
240:20,20 242:6
243:8 244:25
245:3,4,8,14,16
246:1,2,5,23
248:12,22 249:18
250:3 251:3
254:10 255:3
257:19 258:14
259:25 262:15,17
265:6 266:8 268:7
269:1,20 270:15
271:21,23 272:18
274:22 275:1,3,9
**questioning**
113:12,14 161:5
163:14 164:14
244:4 254:22
**questions** 48:18
65:13 68:25 72:20
74:17 77:18 80:23
86:10 90:11
102:15 103:1
110:15 114:2,3,20
115:1,2 118:8,10
120:7 121:3
123:16,18 124:22
131:11,15,21
132:19 137:10
139:13,17 141:22
146:12,13 151:12
151:13,16,21

154:19 156:10
160:6,20 163:7
164:18 167:1,5
170:11 171:7
172:19 184:13
189:20 194:8
203:4,9 206:23,25
220:6 222:13,17
222:18 225:2
237:15 241:20,24
246:13 248:7,20
249:24 250:13
256:21 263:22
264:2 267:8,13,16
269:15,21 273:17
273:18,25 274:4
275:18,20 279:14
280:8
**quibble**  95:24
96:4
**quick**  40:20
151:21
**quickly**  253:17
256:11
**quirk**  38:13
**quite**  114:8 115:4
115:4 148:10
156:2 182:23
226:9,14 243:9
277:8 281:4,6
**quote**  98:2 101:10
**quoted**  128:7
**quotes**  127:22
**quoting**  101:15

**r**

**r**  1:21 5:16 8:3
17:12 28:1 30:13
35:21 40:8 50:2,3
75:13,13 83:12
126:12 133:15
165:16 172:3,3
192:6,9,9 195:1,1
284:1

**rahul**  18:1
**rainer**  97:12
**raise**  45:2 49:23
52:6 75:4,8 83:6
126:5 133:11
141:6 165:11
171:12,23 188:3
192:2 194:22
252:13
**raised**  46:2 175:8
177:15 196:14
249:12
**raising**  155:22
**rank**  97:15
**ranking**  99:7
**rata**  217:19
**rate**  88:25 90:2
91:8 93:23 94:25
95:10 97:18
**rates**  90:4 93:16
94:19 95:5
**rationale**  212:4
**raw**  88:8,9,13
89:7
**raymond**  10:20
10:23 19:6,9,12
19:15,18,22 20:1
20:5,9,13 22:9
33:10 164:9
165:22 167:16
168:10 176:20
258:6
**rdd**  1:3 10:1
**reach**  93:7 142:19
277:12
**reached**  81:16
142:7 200:4
262:13
**reaching**  49:11
251:12
**reaction**  124:1,18
124:20

**read**  47:5,14 79:2
79:4,6,12 85:15
89:18 165:6 167:4
181:13 189:7
200:18,23 203:15
213:19 221:6,8
227:18 228:9,11
235:8 255:14
259:2 261:14,16
261:17 265:14
268:9 278:23
279:22
**reader**  56:13
**reading**  200:19
203:16 246:3
255:15 261:15
262:1 263:4,15
**reads**  79:4
**ready**  41:3,5,9
42:2 43:13 49:15
79:13 140:18
278:24
**real**  112:18 171:6
**reality**  98:20
249:21
**realize**  121:13
268:11 282:7
**really**  42:12 44:15
48:22 52:1,3 84:2
84:11 95:13
113:25 114:10,17
131:7,20 137:9
144:15 159:2
164:5 169:21
174:22 179:14
182:15,19,24
215:2 217:13
220:22 230:3
232:14 235:25
244:22 248:17
265:25 271:13
273:17 275:8
279:1,3

**reason**  44:8 73:23
91:13 96:22 182:7
209:1 213:20
217:17 240:21
**reasonably**  135:2
**reasons**  98:3
134:25 174:8
176:16
**rebecca**  18:4
**recall**  73:7 79:16
91:10 101:22
102:7 224:9
265:18,22 273:13
**receipt**  227:23
**receive**  55:11,12
61:6,8 62:21
95:20 104:4
150:13 234:3
**received**  2:16 3:3
3:10 46:1 105:7
142:4 200:2 245:1
254:6,24 260:18
**receives**  101:4
**receiving**  84:7
233:17 238:9
**recess**  140:20
**recipients**  70:22
**recite**  201:21
**recognition**
223:18
**recognize**  114:9
213:1
**recognized**  53:9
93:8
**recognizing**
100:12 126:21
**recollect**  90:17
**recollection**
265:23
**recommend**
145:10 159:24
200:1 238:10
248:19

**recommendation**
159:19 229:15
**recommending**
236:21
**record** 40:17 42:8
73:23 78:15,22
81:4 100:24
110:18 135:21
140:22 155:17
157:25 162:24
163:12 165:6
167:8 183:18,25
188:20 189:2
241:11 261:7
275:17,24 284:4
**record's** 221:18
**recover** 62:3
**recoveries** 51:9
69:25 70:1,12
143:23 144:16
**recovery** 55:11
61:8,10 72:17
127:6 144:23
145:20 160:4
**recross** 74:3,6
120:11,22 121:2
123:18 249:25
**redacted** 11:24
24:14
**redirect** 72:22,25
78:6 118:10,13
120:23 132:22
139:18 160:25
161:2 170:13
218:6 222:15
241:22 246:9,11
250:3 276:3
**redirection**
123:20
**redirects** 160:23
**redundancies**
41:3

**redundant** 275:13
**refer** 56:12 69:17
87:12 106:10
128:20 130:6
197:24 198:3
200:15 254:3
258:22 260:7
**reference** 69:8,13
69:14,15,25 130:6
199:2,5,7,9 200:8
**referenced** 57:9
70:11 104:10
129:25 184:25
185:18 213:21
265:4
**references** 132:14
234:10
**referencing** 69:11
198:7 207:9
214:25 216:25
**referred** 82:10
88:22 89:13 93:15
97:24 129:1
165:23 200:25
203:25
**referring** 54:14
54:17,24 100:5
128:6,22 129:2
136:14 163:1
199:7 225:13
238:19 240:1,8
254:5 256:7 261:3
261:17 271:6
**refers** 57:3
**reflect** 201:4
**reflecting** 89:21
208:14
**reflections** 281:2
**reflects** 109:15
**refresh** 237:16
**refusal** 96:22
**refused** 96:20

**regard** 70:15
77:20 87:4 127:4
142:12 143:3
166:5 193:5,23
245:2 263:22
**regarding** 3:6
5:20 16:10,22
44:23 66:3 127:6
128:10 166:5
184:13 196:1
198:9 226:13
237:13 264:16
265:19 266:12
**regardless** 227:25
236:6,24 237:2
255:1
**regards** 44:17
206:8
**regular** 107:10
204:22
**regulators** 227:25
**regulatory** 175:15
225:22
**rel** 5:13
**relate** 88:1 151:23
278:20
**related** 3:7,17,20
3:23 4:2,4,9,19,23
5:15 6:12,16 7:3
8:8,12,16,20 9:1,5
10:1,7 11:4,13,17
11:21 12:9,15
13:7,11,16,18,24
14:8,14,18,24
15:5,9,20 16:7,13
16:25 17:17,22
20:20 23:3,20,24
25:10,18 26:1,6
26:10,19,24 27:4
48:9 52:25 67:9
89:21 116:22
120:19 132:11
200:2,21 207:2,7

207:16 210:22
212:16,19 217:22
217:23,25 218:14
218:15 224:9
227:20 229:5,22
229:24 230:9
232:14,14,18,18
232:22,23 233:2,2
246:13 247:25
248:13,16,17,22
259:9,21 262:23
265:20,24 266:6
266:10,18 267:2,6
268:11 274:10
281:16
**relates** 46:7
164:10 220:6
**relating** 225:14
227:10 228:7,17
229:4 231:4,6
238:3
**relation** 146:21
**relationship**
89:23,25,25 90:10
**relative** 93:23
**relatively** 157:9
282:9
**release** 5:21 55:25
56:18 68:5,9
148:9,15,19
157:23 198:10
202:1,4,10,12,16
202:22,25 203:1,3
207:5,25 208:6,10
209:7,15 211:12
211:21,23 212:11
212:13,18 213:25
214:1 215:13,14
215:19 216:18
217:7,8,20 218:4
218:17 219:10
223:12 224:13,16
225:13,14,19,21

226:13 227:2,4,9
227:9,11,19,19
228:4,20 229:3,8
229:10,14 230:1
230:11,15,20,24
230:24,25 231:3
231:16 232:3,4,9
232:12,19,24
233:2,8,17 234:9
235:24 236:15,19
238:1,5,6 239:4
239:13,15,22
240:2,4,7 241:6,6
242:22 244:1,5
246:15 247:16,24
248:12,14 249:16
249:20 251:1
255:1 262:6 263:5
263:6,12 264:16
265:6,12,20,24
266:25 267:1,5,21
268:5,10,16,17
269:3 275:15
**released** 66:18,19
67:1,4,13 68:4
144:10,10 149:7
198:17 199:9,14
202:13 207:12
218:20 219:17,18
220:19 223:3
228:18 231:7
239:5 248:5 249:7
254:8,12 255:4,5
263:12 266:5
**releasees** 218:13
**releases** 55:16
144:9 148:5
156:19 159:5,9,14
197:24 198:4,7,10
200:2 201:19
213:23 218:13
226:11 239:24
240:3,5,22 245:24

250:19,20 254:3
265:16 266:13,15
266:16 280:11,19
280:25
**releasing** 213:23
244:1 250:25
**relevance** 111:8
130:24 201:8,10
**relevant** 55:22
56:2,8,10,20 57:6
119:18 169:15
174:10,24 175:1,2
177:8 178:4,4,7
179:5,10 182:1
184:18 185:24
188:20 201:23
239:21 271:13
**reliability** 176:10
**relief** 108:11
109:2 152:23
161:18,24 252:4
274:23
**relieved** 145:24
**reliever** 92:13
**rely** 48:9 57:24
58:2 178:17
268:20
**relying** 92:15
**remain** 237:23
259:20 260:4
**remainder** 187:22
**remained** 82:21
**remaining** 43:1
142:13 188:24
206:16 276:24
**remains** 162:20
**remarking** 110:7
**remedies** 91:16
**remedy** 146:1
226:7
**remember** 91:12
100:7,16 157:21
267:9

**remembers** 277:6
**reminder** 281:10
**remote** 21:2 25:21
202:2,3,6
**removed** 152:2
254:20
**removing** 42:10
**rendel** 38:14
**reorganization**
2:8 3:19 5:9,15
6:11 7:2,16,25
8:12,25 9:20
10:15,22 11:12
12:1,15,24 13:5
13:23 14:13,23
15:4,19 16:12,24
17:8,16 20:12,19
21:3,21 24:9,17
24:25 25:17,22
26:5,19 27:3
81:15 82:2 162:1
261:20 262:2
**repeat** 41:9 56:5
198:2 199:4
**repetitive** 161:17
**rephrase** 148:10
210:9,19 238:24
239:17 247:11
**reply** 10:22 12:7,7
12:14,21 13:6,10
17:6,13 20:12,17
22:1,12,18,24
23:8,14 25:1
**report** 50:7,9,11
50:16,18,22 51:17
52:23 53:4 55:17
56:16 69:19 92:14
101:24 107:25
127:5 131:3,4,14
132:4 165:21
166:1,6,11,15
167:11,13,14,15
167:19 168:7,8,16

169:16,22 170:6
174:11 175:17
177:3 180:18,19
181:13 188:13,25
192:14,18,23
193:17,23 194:1,4
271:25 272:5,12
**reported** 63:18
**reporting** 136:17
**reports** 60:24
175:9,10
**repository** 152:17
152:24 153:7,12
153:13 156:13
157:23 160:13
161:19
**represent** 54:6
65:23 125:2
137:21 151:7
155:16 169:10
224:5 264:14
**representation**
135:3 138:12
254:10
**representative**
99:21 196:9
**representatives**
97:5 124:10
195:23
**represented**
117:15,18 146:5
222:22
**representing** 81:7
105:20 149:25
151:21 253:9
**represents** 106:23
134:6 216:11
**request** 14:2 15:8
40:11 43:18 44:8
85:24
**requested** 44:22
**require** 230:24

**required** 180:22
245:2
**requirement**
107:23 139:11
**requires** 55:9
104:3 106:12
107:24 152:6
180:5 219:12
**requiring** 249:11
**reservation** 4:23
9:17
**reserve** 114:17
155:7 273:13
**reserved** 53:10
68:21 262:8
**resolution** 46:16
50:20 53:11 85:23
111:1 148:3 152:5
159:1,24 161:17
161:25
**resolve** 249:4,6,10
249:14 278:6
**resolved** 48:15,20
142:18 147:20,23
187:23 197:3
277:8
**resolving** 190:24
**resort** 139:4
**resources** 119:22
183:12
**respect** 9:19 40:22
45:10,13,17 47:25
53:18 62:22 85:3
85:4 96:5 98:9
121:7 123:7
129:18 136:20
142:23 143:6,24
149:4 152:13,13
154:8 170:8
172:25 182:21
186:21 193:23
201:9 277:2
280:18

**respectfully** 233:3
**respective** 90:18
**respond** 198:20
202:2 232:5
241:14
**responding**
187:11
**response** 10:14
11:9,10,16,20
12:13 21:18 25:15
121:7 122:25,25
123:6 163:13
182:16 240:24
**responses** 2:12
**responsibility**
84:11
**responsible** 136:1
**rest** 63:2 205:6
**restate** 240:9
**restrict** 120:18
**restructuring**
9:25
**result** 85:23 149:7
150:2 179:9
**resultant** 228:1
**resulted** 232:15
**resulting** 228:2
**resume** 276:21
**retail** 162:16
**retained** 55:25
60:5,8,17,21 74:8
128:1 169:23
**retains** 107:18
142:10
**retention** 56:1,7
57:6 139:7
**retroactive**
193:24
**retroactively**
193:25
**return** 140:17
200:12 215:12
237:9

**reuters** 14:5
**revealed** 153:4
208:25
**revenues** 94:16
**review** 69:8
134:18 162:6
165:3 167:1
174:25 182:17
237:12 279:18
**reviewed** 99:15,17
131:1,4,14 139:15
162:5 166:18
172:15,18 189:19
194:4 233:14
279:13
**reviewing** 96:23
194:5,5
**reward** 190:23
**rhode** 61:3
**rhodes** 130:16,16
130:19,19
**ricarte** 38:15
**richard** 18:16
39:2 206:19
**right** 9:18,22
41:22 43:4,22
45:4 47:14,19,21
48:21 49:1,23
50:17 51:11,15,15
52:6 53:7,16 57:1
59:20 63:11 64:12
65:15 66:10,15
74:18 75:4,8,14
76:11,13,21,22
77:5,8 78:6 83:7
83:23 88:21 98:11
98:18 103:24
104:19 109:3,17
110:6,12 111:15
113:22 114:19,25
116:15 118:7,16
122:12,24 125:16
126:5 127:1,3

128:6,11,18,22
129:19 131:13
132:18,20 133:10
133:11 136:6
139:20 140:3,4,6
140:13 141:6
149:3,11 151:4
157:18 160:16,18
163:6 164:4
165:10,11 166:15
166:17,23,25
167:10,10,12
170:13,21 171:9
171:12,22,23
172:22 173:7
174:4 180:7
181:17 184:1,5
185:10 186:3
187:19 188:3,17
189:13,14,18
191:23 192:2
193:16 194:22,22
197:14 198:18,20
207:15 210:1
211:8 214:13
215:22,24 216:1,2
216:23 219:16
220:12 221:13
222:10 223:13,21
225:4 227:5
228:12 229:12
230:4,11,17
231:16,18 232:22
232:24 234:13,18
235:19 238:20
240:4 241:21,24
241:25 244:3
246:9,22 249:22
249:24 250:2,5,8
250:16 252:13
255:3 261:1
263:18,24 264:3,7
264:9 267:24

271:22 272:5,8
273:10,13 274:17
275:20,22 276:19
277:20 280:4,7
282:18
**rightfully** 109:24
**rights** 4:23 9:17
53:10 68:22 87:1
152:13
**rise** 178:6
**risk** 63:3 209:20
210:21 231:18,19
250:12,14
**risks** 134:21
190:23 231:15
**rivera** 39:22
**road** 284:21
**rob** 39:1
**robert** 1:22 35:12
**robertson** 218:24
221:20 222:2,3,11
222:23 250:21
**robinson** 31:14
102:18,18 113:4
120:8,12,21 124:7
137:14,18 146:14
146:16 154:22
160:8 192:25
193:1,10
**robison** 137:14
**robles** 38:16
**robust** 107:23
**role** 51:1,4 135:10
139:22 143:12,22
144:2,15 204:23
205:20 270:13
276:13
**roles** 177:19
**roman** 34:3
**romas** 3:17
**room** 1:13 4:18
9:14 126:1

**rooms** 41:4
**rosen** 34:6 38:17
**rothstein** 4:19,20
29:1,6 44:14,14
44:20 45:4
**roughly** 89:3 91:4
**round** 42:20 43:9
43:21
**routinely** 60:5
92:24,24
**roxana** 34:1
**ruby** 3:17
**rule** 20:6 114:5
178:24 185:15
186:11 196:11,14
**ruled** 87:16
155:23
**rules** 176:7
180:21 188:11
**ruling** 44:22
50:19 85:4 189:1
190:5
**run** 150:10 214:16
214:16 232:19
250:12
**running** 163:17
184:14
**runs** 209:20
**russell** 38:18
**ryan** 38:19 39:25

| s |
|---|

**s** 3:7,17,20,24 4:2
4:4,9,19,19,20,24
5:16 6:12,17 7:3
8:8,13,16,20 9:1,6
10:1,7 11:4,13,17
11:21 12:3,9,16
12:25 13:7,11,18
13:24 14:8,14,18
14:24 15:5,9,20
16:13,25 17:9,17
17:18,22 18:17,21
18:24 19:2 20:6

20:24 21:7,10,13
21:13 22:5 23:4
23:21,25 24:4,10
24:19 25:10,18
26:1,6,11,19,24
27:4 28:1 29:1,6
33:24 35:8,23
36:2,23 37:12
40:6,8 50:3 52:10
52:10 126:10,10
252:18
**sac** 19:15
**sackler** 10:20,23
11:9 19:6,9,12,14
19:19,22 20:1,5,9
20:13 21:16 22:9
25:14 33:10 47:24
58:4,11 63:17
65:9 70:13 71:2
81:22 143:20
144:11 145:7
149:19,21,22
157:3 164:9,11
165:7,22 166:6
167:16 168:10
174:12 176:6,20
176:25 177:5
193:14 196:18,18
204:8 206:14,15
208:9 211:22
212:7 213:5,14
214:9 224:12,22
229:9 230:25
231:6,10 233:22
235:11 246:20
258:6 263:6
266:13 271:20
**sackler's** 157:25
206:5,14,19
209:18,21 234:3
**sacklers** 57:4,8,23
58:22 60:10,21
62:4 63:8,9 64:10

70:17,21 71:6,8
71:10,14 81:17
148:14 149:14
151:23 152:1,6,12
152:25 153:19
156:18 159:5,8
160:15 161:13
162:7 169:12,23
175:10,21 176:20
177:9,15 181:20
182:10,18,22
184:23 185:7
186:3,4 190:14
191:4,9 193:8
196:1 203:1
214:16,17,21
215:12 218:3
227:15 228:16
229:19 231:21,23
231:25 232:1
271:7,14 278:2
**sackler's** 73:24
**saint** 30:3 33:18
**sake** 224:14
281:17
**sale** 168:23
169:13 225:15
227:10,22 229:4
230:4 233:23
234:1 243:14,20
244:21,23 265:20
**sales** 214:21
**salt** 58:5
**salwen** 38:20
**sam** 35:14
**samhsa** 100:20,23
120:3
**samuel** 30:23
141:4
**sara** 26:15 33:21
34:11 38:3 39:13
173:2

sarasota 8:4
sat 111:18
satisfied 119:16
  136:9 159:9 167:4
satisfies 54:9 55:5
satisfy 187:11
saturday 279:5
satz 36:4
saunders 23:24
  196:5,20
saval 11:4 38:21
save 183:12 204:2
  282:23,24,25
saves 78:20
saw 85:16 92:9
  264:25
saying 53:9 58:6
  59:7 61:17 69:16
  100:7 122:12,14
  161:18 178:10
  199:13 208:10,23
  214:8 216:14
  219:10 231:14
  232:8 235:22
  238:11 250:12
  252:7 272:2 278:1
says 84:18 128:14
  142:13 178:24
  200:19 203:17
  208:7 235:9
  245:11
scales 95:15
scenario 56:15
  63:6 77:1 144:20
  232:5
scenarios 76:21
  76:23 77:2,3
schedule 244:20
  277:12
scheduled 80:21
  87:5 196:4
schlecker 38:22

schwartzberg
  4:10 38:23
scientific 175:15
scientifically
  186:10
scope 64:5 125:5
  148:5 168:6,7
  199:19 208:19
  212:11 224:13
  227:4 232:4
  243:22 245:4
scott 12:25 13:7
  17:9,12,18 26:20
  28:18
screen 85:17
  131:18 133:11
  191:14,24 251:11
  251:22 252:12
  260:23 264:6
  266:9 276:8
scripts 11:5,6,6
se 31:4 281:11
sean 36:10
seattle 5:10 31:12
seattle's 5:9
second 40:11
  89:20 142:6
  177:22 196:5
  225:16 226:13
  261:22 262:14
  264:6 274:13
  276:23
seconds 110:24
section 11:2 54:10
  55:6 56:13 57:2
  57:10 69:9,14
  72:2 103:6 107:22
  127:23 128:2,5,10
  128:14 130:2,5,15
  141:25 142:2
  143:9 145:17
  161:5 200:18
  205:1 213:22

see 42:1 75:3 79:3
  87:11,15 89:12
  110:19 111:7
  119:6 125:24
  126:2,4 127:22
  128:3 132:14
  133:10 141:5
  157:3,24 162:7
  164:18 165:1
  171:12,22 173:7
  177:14 188:2
  191:24 197:25
  200:22 203:8,16
  249:3 252:12
  253:19,22 254:3
  255:14,22 261:1
  262:9 263:21
  264:2 278:4 280:9
seeking 148:5
seen 40:18 43:7
  46:6 107:2 155:23
  157:7 261:10
  262:18
selected 175:20
selective 174:13
self 92:14 189:21
sell 227:12
selling 214:17
sells 214:3,20
senators 101:7
send 282:5
sending 85:11
senior 111:2,24
sense 88:6 96:12
  112:21 178:9
  190:22 201:15
  221:9 223:18
  277:12 281:18
sent 105:2 106:1
  175:10
sentence 127:23
  128:7,20 129:2
  142:15 163:22

177:14 180:11
  259:2,9 261:14
sentences 201:7
separate 44:4
  138:19 142:2
  164:22 173:16
  220:10 269:4
separately 104:21
  165:3 207:18
serve 91:25
  204:18 205:2
  256:19 258:12
served 98:19
  135:21 206:16
  245:1,12
service 247:20
services 10:5
  100:25 105:6,10
serving 143:15
  258:4
sessions 99:2
set 61:19 79:8
  104:10 106:13,19
  113:20 117:18
  128:2,5,7 159:3
  164:5 188:19
  216:19 240:12
  273:1 278:6
sets 194:1
setting 252:22
settle 93:13
  154:14
settled 104:21
  116:2,13,17
  219:13,14 230:11
  230:14
settlement 3:16
  60:14 63:3 70:13
  70:13 71:2 81:23
  92:22,23,23
  103:14 104:13,14
  108:12,21,24,25
  109:11,18 110:1,5

115:23 116:5,18
119:15 121:12
123:2,4,8,9,12,14
134:16,19,22
135:1,5 144:17,18
144:20,22 145:9
149:4,8 150:11,25
151:22 152:6
153:12 155:18,19
155:20 156:1
158:8,14 159:8,16
178:9,9 181:7,7,8
190:19,21 191:2
200:1 203:22,23
207:22 208:9
210:1,3,6 212:1
212:23 213:7
214:7,8 215:11
216:19 219:11
224:17 229:16,21
233:21 236:21
238:13,20 244:23
255:20,21 262:3
262:12,24 265:7,8
**settlements**  12:22
17:7,14 20:18
98:15 104:11
107:12 108:18,24
109:7 115:9 142:7
146:23,24 147:1,7
147:11 154:2
**settling**  121:15
217:6 248:23
**seven**  89:15
**seventh**  2:7 26:24
27:2 222:5 223:16
245:22
**severely**  100:14
**shannon**  37:16
**shape**  250:19
**share**  93:2 153:10
269:23

**shareholder**  5:21
55:25 56:18 58:13
58:16 60:14 63:3
66:18,19 67:4,10
67:12 68:4,5,8
70:13 71:4 144:10
199:25 203:12
207:4,12,25 208:6
208:8,8 211:12,21
255:16,20,21
256:14 262:3
**shareholder's**
203:21
**shareholders**
58:25 59:1 67:24
68:11 70:10,24,25
71:6,8,10,20 73:7
73:16,17 77:14,23
78:2 179:7,9
**shaw**  31:16
**sheet**  13:18 140:1
**shepherd**  38:24
**shielded**  214:22
214:22
**shift**  47:1
**shifting**  116:6
**shipped**  88:18
92:10
**shipping**  92:8
**shirley**  3:24
**shore**  12:16 38:25
**short**  52:3 113:12
172:19
**shortcut**  49:10
**shorter**  147:16
**shorthand**  201:2
**shouldn't**  49:5
**show**  181:19
186:4 191:9
200:10 202:24
**showing**  157:25
182:11

**shown**  62:20
200:20
**side**  41:2 63:17,17
117:4 164:11,17
164:18,21,24
165:5,23 166:6,21
166:24 167:8,11
167:15 191:10
196:5 198:11
199:24,25 203:18
206:10,15 208:8
215:8,8 219:11
221:14 229:3
254:16 255:16
256:14 258:5,5,20
259:6,7,8,21
262:23 279:21
**sign**  51:17 74:18
78:9 125:17
132:24 140:4
150:4,7 158:9
159:8 164:2
170:18 172:20
173:24 174:1
191:16 250:6
276:15,16 281:23
281:24 282:4,7,24
283:4
**signed**  16:4 20:16
21:1 25:13,20
84:17 281:23
**significance**  226:5
**significant**  60:23
67:15 85:22
101:15 106:23
149:22 212:14
215:13
**signing**  171:17,18
194:19
**siko**  39:1
**silbert**  39:2
**similar**  196:7
216:21 252:8

**similarly**  148:2
**simmonds**  21:9
39:3 45:11,15,19
45:22 46:6 47:18
79:16
**simple**  42:24
61:15 211:16
282:9
**simply**  61:21
112:10 132:13
168:8 174:10
175:12 176:4,14
180:11 183:13
251:17 252:7
**singer**  11:22 39:4
**single**  260:2,23
**singleton**  3:20
**singular**  129:18
**sir**  83:13 115:2
133:11 138:8
140:4 233:14
253:1 255:7,23
259:23 260:6
261:11 262:19
263:8,17 264:19
265:9 267:25
274:19 276:16
**sister**  174:17
**sit**  282:22
**sitting**  50:9 52:17
53:2 67:20 68:15
75:22 83:18
126:20 133:23
141:14 165:25
172:9 190:14
192:17 195:8
228:15 252:24
**situation**  96:13
99:5 111:5 112:18
154:13 159:17
160:5 260:16
**situations**  143:12
155:23

**six**  41:15 81:11
 281:11 282:16
**sixth**  4:7,13 5:15
 6:10 7:1,15 8:24
 9:20 10:15,21
 11:2,11 12:1,23
 13:4 14:7,12,22
 15:3,18,25 16:5
 17:7,15 20:11,18
 21:19 24:8,17,24
 25:16,21 26:4
**size**  178:19 205:21
**skapof**  39:5
**skipped**  242:9
**skorostensky**  39:6
**slightest**  95:12
 96:25
**slightly**  115:25
**small**  190:3
**smaller**  90:5
 116:5
**smooth**  277:1
**snippet**  180:10
**snyder**  39:7
**soak**  262:18
**sold**  213:6 244:13
**sole**  191:9 204:8,9
 257:2,11 269:22
 270:19
**solely**  205:11
 229:24 247:22
 256:25
**solicitation**  16:10
 16:22
**solicitous**  93:22
**solution**  96:9
**solutions**  284:20
**solve**  90:3
**solvency**  193:24
 193:24,25
**somebody**  74:14
 98:24 159:20

**someone's**  113:13
 135:8 197:8 202:5
**somewhat**  186:9
**sonya**  27:25 284:3
 284:8
**sorokin**  39:8
**sorry**  43:12 54:22
 56:4 59:11 62:7
 69:12 76:4 79:25
 88:21 89:2,16
 99:16 111:11
 114:12 119:10
 120:25 138:8
 143:17 150:6
 153:8,15 155:3
 157:5 159:6 163:9
 169:1,4 171:16
 173:14,19 179:18
 187:4 198:1 199:9
 209:5,6 210:20
 218:25 225:5
 230:17 235:15
 236:10 238:15
 240:7 246:22
 251:19 254:9
 256:8,10 257:6
 261:23,25 262:17
 264:5 265:2,18
 267:8 268:6
 272:23 276:7
**sort**  74:9 174:17
 174:21 176:6
 215:5 248:3
 276:12 279:7
 281:16
**sound**  103:2 109:8
 119:9 123:24
 124:21 130:1
 132:6 136:12
 173:18 253:9
**sources**  120:1,1
**southern**  1:2

**spare**  261:15
**sparked**  124:20
**speak**  99:20 113:7
 113:8 124:18,19
 146:3 149:8
 212:12 213:5
 251:15 280:3
**speaker**  43:11
**speaking**  64:15
 125:9 173:17
 213:6 217:11
**special**  13:17 76:7
 76:25
**specialty**  5:4 32:2
 127:10,11
**specific**  58:17
 61:12 103:15
 108:19 122:18
 132:8,12 134:15
 152:8 169:11
 170:9 185:2,19
 218:17 220:5
 234:2 237:15
 266:3 268:13
**specifically**  55:19
 93:17 97:17
 100:21 145:4
 147:1 177:22
 178:16,25 179:24
 181:5 232:13
 233:22 265:4
**specify**  66:2 68:15
 204:2
**speculate**  169:19
**speculation**
 112:11 124:6
**spend**  138:20
**spending**  120:19
**spent**  96:9 99:23
 99:24 100:10
 106:4 107:25
 110:2 138:14
 139:11 162:3

**179:18,19,22**
**spiel**  46:20
**spilling**  99:6
**spillover**  215:5
**split**  42:22 108:15
 116:24
**spoke**  101:18,19
 101:21,22
**spoken**  95:14
 100:3
**spot**  252:5 280:16
**spots**  253:16
**sprawling**  178:18
**spread**  107:11
**spring**  82:19
**springer**  39:9
**st**  6:9,13
**stacey**  6:5
**stacy**  34:23
**staff**  171:11
**stake**  79:5
**stakeholder**  111:5
**stand**  97:17 98:7
 250:12 280:17
**standalone**  91:19
 102:3
**standard**  114:5,11
 114:14 177:25
 178:2 181:16
**standards**  113:20
 114:1 178:7
 179:11
**standing**  225:24
**standpoint**  153:1
 225:22
**stands**  97:16
**staring**  259:4
**start**  83:25 103:13
 173:19 185:18
**started**  190:11
**starting**  132:20
 282:3,8 283:8

**starts** 141:25
213:22 279:10
**state** 5:13,17,25
5:25 6:1,22 7:7,8
7:9,17,19,22,23
7:23,25 10:13,17
26:16 29:16 30:1
30:2,9 31:10
32:15 33:17 48:1
53:24 54:6 61:16
61:22 62:15,15
69:10 73:5 79:3
83:2,3 84:6,13
88:3,14,18 89:19
90:5,7 92:8,12,17
92:18,22 93:2,11
94:13 95:4,4,6,20
101:8,17 102:19
106:12,20 107:19
108:6,7 111:1,3,3
112:21 113:3,7,8
115:13 123:6
124:4,15 134:5,10
137:15,21 138:17
138:18 139:4,8
142:25 143:14,17
146:15 148:13,18
148:19 160:8
172:24 181:5,14
181:14,21 193:1
207:23 228:16
236:25 237:1,6
241:10 242:23
267:2
**state's** 116:8
147:21 163:18
182:5,21,24
**stated** 113:4
145:18 205:9
241:9 243:13,15
267:9 272:20
**statement** 2:20
3:7,13,13,16,23

5:20 9:17 10:14
10:20 11:10,24,24
13:17,21 14:7,11
14:17,21 15:2,17
20:10 21:18 24:8
24:15 25:15 26:3
26:23 27:1 56:13
56:22 57:2,4
59:25 66:20 67:22
73:14 129:22
130:6,9 132:16
136:9 151:8
174:16,16 176:6
190:9 199:10,23
200:9,10 201:1,25
233:15 235:8
236:7,24 264:18
**statements** 40:15
57:3,5,24 73:24
76:8 201:18 226:4
226:15
**states** 1:1,11 4:7
4:11 5:20,22 7:8
7:24 11:16 12:22
15:11 17:6,14
20:17 29:8 31:17
42:13,23 61:2,6
61:13,21 62:2,12
63:1,1,6 65:18,23
73:5,6 79:23 81:8
81:10,13,19,25
85:19,23 86:15
88:10,11,25 90:2
90:4,6 91:24 92:1
92:3,5,11 93:7,10
93:22 94:9 96:13
96:13 98:10 99:8
101:13,16,17,19
102:1,6,12 103:8
104:3,19,20,21
105:8,11,16,25
106:25 107:6,17
107:24 108:3

109:5,25 111:1,4
111:14 112:7,8,19
115:12,21 116:1,4
116:5 117:4,4,4,6
119:20 121:12,21
121:21 122:2,14
122:16 123:23
124:1,19 127:25
142:14,16 143:9
147:5,14 148:7
150:5,7,9,12,16
150:23 158:9
165:7 181:15
182:9 183:2,6
185:3 186:14
199:14 216:20
217:1 223:24
224:5 225:7,18
226:1,3,5,15
231:9 236:11,13
236:14 237:4
239:23 241:6
259:14,16,17,18
259:20 260:3,4
264:15 267:17
275:10 277:19
278:2
**states'** 60:9 62:15
**statewide** 106:16
106:20 107:16
**stating** 135:7
237:1
**status** 222:22
**statute** 98:23 99:1
**statutory** 226:3
**stay** 43:13
**stayed** 40:25
**steadfast** 5:5
**steege** 39:10
**stem** 215:1
**stemming** 215:23
**step** 41:5 164:1

**stephanie** 35:4
36:4
**stephen** 19:11
28:11 38:9 48:3
252:17 253:5,23
264:10 267:19
269:18 274:6
**steps** 190:3 245:2
**stets** 227:12
**steve** 110:8
**steven** 36:15
**stewart** 6:18
42:14
**stipulate** 183:8,23
**stipulated** 275:19
**stipulation** 26:18
42:14 165:6 177:2
184:25 185:24
190:13 193:11
215:17 218:16
221:9 222:4
237:10,20 240:5
260:8 261:2
262:12
**stipulations**
189:22
**stodola** 39:11
**stop** 148:23
178:11 238:3
**stopped** 196:14
**story** 152:25
161:19,22 162:18
162:21,22
**strategies** 103:13
104:11 105:13,15
105:21 115:6
**strategy** 103:19
104:25 149:21
**straying** 114:9
**street** 1:13 29:3
29:10,17 30:10
31:18 32:9 33:4
33:18

strength 198:10
198:16 236:6
237:3 254:7,12,25
stressful 236:4
strictly 170:8
strike 26:9,14
111:9 173:11,21
176:16 248:24
249:14 266:4
strong 201:14
235:24 237:1
255:6
strongly 190:8
struck 100:16
174:19 269:12
structure 82:5
158:13 161:14
212:8 272:10
structured 67:17
struggling 109:13
109:16
stub 43:1
stuck 253:14
273:22
studied 153:8
style 248:15,17
subcommittee
135:25 136:5
158:11
subcontractor
210:2
subcontractors
207:17
subdivision 151:2
subdivisions
106:16,17 145:24
147:6,13,21 150:1
150:22 151:6
subheading
213:25
subject 46:2 48:10
51:10 68:21 79:16
81:17,23 85:18

109:5 115:12
138:21 147:4
158:24 210:22
212:15,18 227:15
251:10 266:18
subjected 201:12
201:16
subjective 96:11
submit 107:17
submits 108:3
submitted 12:8
40:13 50:5 52:13
52:22 75:18 76:2
77:11 78:17 80:10
80:13 83:14
107:24 125:1
126:15 132:5
133:18 141:11
165:18 172:5
188:9 192:11
195:4 219:9
252:20
submitting 125:4
subparagraph
227:19
subsequent 185:7
187:15,18 199:10
subsequently
99:22 129:9
subset 117:17
substance 92:18
100:25 254:15
substances 162:19
substantial 88:24
150:2 161:11
226:25
subsumed 50:19
53:16 193:21
successfully 203:8
succinctly 241:9
suddenly 111:25
sued 202:21
213:16 235:13,24

sufficient 159:10
sufficiently
279:17
suggest 94:7
160:13 248:7
274:22
suggestion 155:21
suing 153:18
suit 249:11
suite 29:10 31:4
31:11 33:4 284:22
suits 164:15
248:24,25 249:14
summarized
199:24
summarizing
156:1
summary 54:19
200:11
summer 82:19
sums 116:7
sun 252:5 253:16
sunday 279:2
supplement 13:22
14:12,22 15:3,18
26:4 27:2 51:3
supplemental
12:8 17:21 19:17
180:19
support 10:14,21
11:11,25 12:14
13:3 15:8 17:12
20:11 21:18 22:12
22:13,18,19,23,25
23:7,8,14,15 24:8
24:15,16,23 25:15
42:23 43:18 48:10
57:4 79:9 80:10
101:15 107:6
144:17 149:13
supported 111:1
161:8

supporters 122:9
supporting 93:4
105:12
supportive 158:8
158:12
supports 161:25
suppose 159:21
supposed 270:11
supreme 134:18
sure 41:24 45:1
62:1 64:7 77:19
81:6 82:23 87:4,6
96:15 103:3 112:2
112:20 118:12
123:3 124:17
130:3 131:7 134:9
137:2 139:16
140:18 148:12
151:11 153:17
155:8,14 156:2,20
157:8 160:1 162:9
162:24 178:19
183:14 184:9
185:5 188:4 197:9
198:4 210:11
211:3 214:6,11,12
214:24 216:12
218:3 219:1,22
223:5 227:17
235:23 239:19
240:1 243:9
248:18 250:16
251:5,16 256:11
257:4 261:1,15,16
262:14,16 263:18
263:25 267:11
268:13 270:15
271:14 273:8
275:3 277:4
281:21 282:1
surely 277:6
surprise 60:20
149:9

**surprising** 117:10
**surrounding**
57:13 58:1
**survey** 92:13
**suspicion** 103:25
138:2
**suspicions** 110:4
**sustain** 169:25
245:19
**sustained** 243:24
254:22
**swear** 49:24 52:7
75:9 83:7 126:6
133:12 141:6
165:1,11 171:13
171:24 188:5
192:3 194:23
252:14
**swore** 189:2
**sworn** 78:18
**system** 40:24

**t**

**t** 36:1 38:18 52:11
75:13 126:12
133:16,16 165:16
172:3,3,3 192:9
195:1,1 284:1,1
**table** 149:23
158:14,23 161:13
278:8
**tabulation** 16:11
16:23
**tad** 102:18 137:14
146:14 154:22
160:8 192:25
**tailor** 203:9
**take** 41:13 58:5
75:15 98:22 99:1
110:24 115:11
126:9 137:8 140:9
143:10 156:8
164:14,19 165:2
172:2 178:1

201:25 245:2
258:17 267:8
271:16 280:10
281:17
**taken** 59:3 73:19
230:2
**takes** 144:22
146:2 225:8 276:7
**talk** 113:1 116:25
137:24 220:7
**talked** 93:16,18
96:16 122:19
244:20
**talking** 94:10
100:24 101:11
112:3 157:14
178:1 214:11
229:25 230:2
237:24 238:21
244:18 246:23
278:19
**talks** 181:25,25
182:1
**tamara** 3:14
**tangential** 273:19
**tapey** 39:12
**targets** 57:24
**tax** 94:16 228:17
228:18,19 229:5
267:2
**taxes** 229:6 230:7
**taxpayers** 280:20
**tdp** 41:19,21
137:5 140:2
**tdps** 41:25 42:3
**technical** 239:18
241:16
**technologies**
130:16,19
**teed** 45:8 277:4
279:18
**tele** 1:12

**telephonically**
28:18,19,20,21
29:13,20 30:6,13
30:20,21,22,23,24
31:7,14,21 32:6
32:12,19 33:7,14
33:21,23
**tell** 49:24 52:7
67:22,25 69:23
73:9 75:9 77:12
83:7 94:19,21
95:1 97:7 101:17
119:10 126:6
133:12 141:7
146:7 158:15
165:12 171:13,24
188:5 192:3
194:23 206:2
211:18 228:15
246:15 247:3
248:2 251:24
252:14
**telling** 208:19
219:25
**tells** 95:13 152:24
161:19
**temagami** 204:9,9
204:14 205:25
**ten** 90:5,7,8
236:11 241:6
259:14
**tended** 120:2
**tender** 149:23
161:13
**tennessee** 110:8
**tens** 152:17
**tenth** 14:21
**teresa** 3:7
**term** 13:18 71:6
88:18 140:1
193:24 206:11
207:2 211:15,16
211:17 229:19

257:7 258:21,21
259:12
**terminology**
241:17
**terms** 53:19 81:16
109:5,6 132:3
136:14 138:3,22
138:22 139:4,23
144:23 145:21
147:3 150:8 153:2
154:14 158:13
178:2 231:15
234:5 238:8
242:16 275:6
**terrific** 40:20
**test** 54:9 55:5,9,23
56:3,8,11,21 57:7
61:5 128:14
249:18,19
**testified** 66:7
73:13 124:14
131:5 154:15
159:18 196:23
197:5 224:12,16
231:3 233:11
264:15 266:12
267:21
**testify** 66:3,12
80:22 87:5 140:18
166:19 196:4
197:7,9 244:22
263:19
**testifying** 177:19
196:6 243:6,25
245:10 278:22
279:17
**testimony** 25:6,9
26:10,15 45:14
46:11 48:9 50:7
50:18 51:11 52:16
52:18,24 53:2
60:5 64:6 73:7
75:20,22 76:3,12

| | | | |
|---|---|---|---|
| 78:16 79:10 80:20 | 139:13 140:3,5,6 | 55:17 56:19,23 | 96:11,16,23,25 |
| 81:24 82:3 83:17 | 140:19 141:10 | 57:9,11 58:7 60:3 | 97:12 98:13,17,25 |
| 83:23 94:7 115:4 | 146:11 151:10 | 66:6,11,16 68:8,8 | 99:1,11,14 100:3 |
| 117:2 125:1,4,6 | 154:19 155:15 | 68:18 70:4 74:2 | 101:6,12 103:12 |
| 126:19 133:21,23 | 156:5 160:19 | 75:14,15 76:22 | 103:14,15,22,23 |
| 134:3 135:6 136:3 | 163:20 164:3 | 77:6,9,15 79:6 | 107:5 108:6,13,19 |
| 136:18 141:13,20 | 167:6,17 170:11 | 80:3 82:10,11 | 109:1,20 113:21 |
| 144:12 145:17 | 170:17,19,20 | 84:15 87:3,13 | 113:22 114:2,8,15 |
| 155:22 163:15 | 171:10 172:21,22 | 88:11 92:6 | 115:13,14 117:12 |
| 165:19,24 166:8 | 173:9,10,19 174:3 | **theodore**  40:5 | 120:17 121:25 |
| 172:9,15,16 | 183:7 184:10 | **therefrom**  227:24 | 122:3,7 124:1,8 |
| 173:12 177:4,24 | 187:9,15,20 | 228:2 | 124:16,25 125:2,3 |
| 178:15 181:10 | 189:17,25 191:13 | **thereof**  77:4 | 125:6,8 129:7 |
| 185:7,14 186:8,9 | 194:13,14,15 | **theresa**  3:3 | 131:11 134:8,12 |
| 186:16,17 188:12 | 197:10,12,12,21 | **thereto**  13:6 25:2 | 134:13,24 136:8 |
| 188:14,21,22 | 197:24 199:2 | **thereunder** | 136:11,23 137:5,8 |
| 190:7 192:16 | 202:17 203:25 | 238:14 | 137:11 140:23 |
| 193:7,18 195:7,13 | 205:4,8,14 206:22 | **there's**  58:23 | 149:1,17 150:15 |
| 196:12,13,19 | 222:11,12 223:20 | 73:14 75:24 | 152:22 154:2,7 |
| 197:3,8 199:20,21 | 224:1,7,8 225:2 | **they'll**  46:17 | 155:19 159:23 |
| 229:1 235:6,17 | 225:10 227:7 | **they're**  48:12 | 161:9 164:4 165:4 |
| 247:24 252:23 | 230:21 232:20 | **they've**  78:18 | 168:8,10 169:20 |
| 253:4 271:13 | 233:10 234:16,25 | 82:21 | 170:21,22 172:25 |
| 273:6 276:16 | 235:3 236:9,14,20 | **thing**  43:5,22 49:2 | 182:13 183:12 |
| 278:20,23 | 237:6,9 241:8,19 | 94:15 221:21 | 184:6 186:8,24 |
| **text**  228:11 | 246:8 250:1,5,7 | 250:16 251:3 | 187:19,23 188:17 |
| **thank**  43:13 44:9 | 251:6 254:18 | **things**  42:11 | 188:20 189:7,13 |
| 45:4 48:25 49:16 | 255:9 256:17 | 46:18 71:16,17 | 189:20 190:9 |
| 50:14 51:18,19 | 258:24 259:10,18 | 94:10 96:11 | 191:16 193:10 |
| 54:2,25 65:5,20 | 260:2,7 261:6,7 | 119:16 122:21 | 195:21,24 198:17 |
| 66:1,12 68:19,24 | 261:24 263:23 | 134:11 171:10 | 198:24 199:12,22 |
| 72:20 74:20 76:10 | 264:13 267:12 | 219:8 244:13 | 199:22,23 200:5,8 |
| 77:17 78:10 85:11 | 269:8 274:2 | 276:25 278:4,5,9 | 202:5,18,19,22,24 |
| 87:24 90:14 91:3 | 275:21 276:18 | 280:17 281:16 | 202:25 203:1,5,8 |
| 92:25 95:18 96:4 | 283:10,12 | **think**  41:25 46:19 | 205:9 207:5 |
| 97:24 102:14 | **thanks**  75:17 | 48:17,21 54:14 | 208:17 211:9 |
| 110:10,21 114:21 | 126:4 127:19 | 57:23 58:1,7 | 212:24 213:12,19 |
| 114:24 116:19 | 174:6 191:18 | 62:11 64:18,21,24 | 213:20 214:13,15 |
| 118:15 120:6,21 | 264:14 | 65:1 72:13 73:20 | 214:25 217:16 |
| 123:15 124:23 | **that's**  46:13,14,19 | 74:12 77:1 81:3 | 218:12,13 219:19 |
| 125:15,17,18 | 48:6,19 49:13 | 86:1,17,23,25 | 220:7 221:15,18 |
| 129:15 132:18,25 | 50:4 51:10 52:12 | 87:2 92:3 94:6,19 | 222:13 225:17 |
| 133:1 136:24 | 53:4 54:19 55:14 | 95:9,12,23 96:1,3 | 228:13,22,24 |

231:10,12 232:13
233:1 234:18
235:9 238:22,25
239:6 240:12
241:1 242:9,10
244:3 246:2,3,4
248:11,25 249:17
249:22 250:21
251:2,9,23 252:12
259:23 263:22
265:14 266:8,10
268:4,24 269:2,3
269:5 271:18
274:11,17 275:10
275:16,24 277:22
278:9 279:1,3,7
279:10 280:9,22
281:1,12,22,22
282:6

**thinking** 108:23
274:11 281:5

**third** 17:21 42:20
55:16 58:24 73:4
73:15 92:13 142:9
144:13,18 148:15
156:19 159:9,14
175:17 177:16
223:12 225:19
226:11,13 227:2
229:25 233:17
247:21

**thirds** 42:22
**thirteenth** 26:3
**thomas** 3:1 10:8
31:14 34:9

**thought** 49:8 97:1
117:10 121:19
123:2 158:25
190:17 201:22
275:23 281:3

**thousand** 104:23
233:15

**thousands** 106:5,7
233:19 279:23

**threatened** 148:8

**three** 40:20 43:9
43:10,21 88:4,4,8
89:3 91:19,21
116:17 147:2,4
150:18,25 177:10
182:3 196:7 271:4

**thrown** 113:18

**tie** 89:20 230:18
232:7

**tied** 114:5,13
215:2

**ties** 45:1

**tim** 8:20

**time** 59:13 67:24
78:20 84:22 86:17
86:24 91:7 98:5
99:14,22,24
103:12 108:18
109:25 112:25
122:19 123:22
140:14 144:19
146:4 147:16
150:15,16 152:3,8
153:17,18 158:18
158:23 159:15
164:14 165:3
169:17 171:6
174:4 180:6,12
182:15 183:13
204:3 243:20
262:18 265:1
267:13 279:13
282:23,24

**times** 61:23 80:1
89:3,6 90:5,8,8
93:19 95:5,21,23
95:24 96:6,6
125:9 235:6 280:8

**timetable** 87:7

**timing** 277:9
**timney** 42:14
**timothy** 20:4 23:3
37:11 47:24 164:7
165:15,22 168:1

**tiny** 108:16,16
178:19

**title** 200:22

**tobacco** 108:21
**toback** 28:20
**tobak** 25:2

**today** 40:13 44:12
45:19 46:1,6
48:13,14,18,24
50:9 52:17 53:3
67:20 68:15 75:22
80:21 81:24 87:6
113:14,15 114:9
115:13 117:2
126:20 133:23
141:14 164:13
165:25 166:21
172:9 174:21
176:3,15 180:24
188:14 195:8
228:15 251:8
252:24 256:20
276:20 280:10

**told** 171:18
260:19

**tonnesen** 26:16
33:21 39:13 173:2
173:3,5,7,10,16
173:21 174:5,6
177:3 179:13
182:13 183:7,17
183:20 185:22
187:2,9

**topics** 114:18
167:14

**tort** 143:12

**total** 60:21 61:22
73:21 101:25

132:4,13 281:11
**totally** 245:8,8
251:22

**toto** 244:6
**touch** 280:1
**townsend** 14:3
**trainor** 39:14
**transaction** 228:6
**transcribed** 27:25
**transcript** 189:10
284:4
**transferees** 70:18
**transferred** 66:4
66:25 264:23
**transfers** 69:9,11
69:18 70:2,22
71:9,13,19,21
**travelers** 45:16
**traveling** 92:9
**treat** 127:3 162:19
**treated** 90:7 94:4
**treatment** 92:18
94:4,11,11
**trial** 59:3 78:13
78:25 153:5,6
161:21 174:20
180:21,22 278:10
281:8 282:6,8
**tribal** 142:5
**tribes** 4:14 26:2
**tried** 107:3
**tries** 176:10
**triple** 41:3
**trompetta** 19:5
39:15 47:25
170:22 171:1,11
171:21,23 172:1,3
172:4,5,12,17,19
172:21
**trompetta's**
172:14,16
**troop** 15:10 31:21
42:8 43:15 44:5

85:6,10 103:3
**true** 67:3 68:19
  92:3 104:2 109:17
  114:15 147:1
  151:3 168:4,13,19
  169:12 170:5
  186:18,19 237:2
  237:20 242:6,16
  242:24 245:21
  247:7 250:25
  268:17,21 274:8
  275:5 282:14
  284:4
**trust** 44:23 51:2
  61:9,12,23 65:9
  66:5 103:10,11
  106:12 109:25
  138:1,13,17,20,21
  139:5,10,23 140:2
  142:4,5 204:15,25
  206:1,13,18
  211:22 214:9
  233:24 243:14
  244:6,7,17 269:23
  269:25 270:1,9,10
  270:12,16,21
  271:3,18 272:17
  272:19,20 273:4
  274:8,12 280:3
**trustee** 4:7,11
  11:17 29:9 48:5
  48:18 65:18,23
  72:4 204:17,19
  205:1,2,3 223:24
  224:5 225:25
  251:2 255:15
  256:4 264:8,15
  269:25 270:8,10
  270:14,17,18,19
  270:19,22 271:14
  271:18,20 274:12
**trustee's** 12:22
  17:6,14 20:18

22:1
**trustees** 269:24
  270:17,24,25
  271:1 272:1,16,19
  272:24 273:1,4
**trusts** 51:8,10
  103:9 203:21
  204:13,17 206:18
  209:22 212:8
  234:3 245:3
  247:19 258:9
  270:23,24 271:1
  272:25 273:1
**truth** 49:24,25,25
  52:7,8,8 75:9,10
  75:10 83:8,8,8
  126:6,6,7 133:12
  133:12,13 135:7
  136:10 141:7,7,8
  165:12,12,13
  171:13,13,14,24
  171:25,25 188:6,6
  188:6 192:3,4,4
  194:23,24,24
  252:14,14,15
**try** 58:17 92:19,19
  93:12 113:12
  173:17,18 202:20
  239:17 240:9
  248:9 253:16
  268:14 273:12
  277:10 278:10
**trying** 90:3 93:6
  94:23,24 96:23,24
  98:18 99:4 112:25
  149:24 203:2,8
  204:2 208:15
  219:11 232:7
  240:12,14,19,23
  250:12 257:7
  258:2 260:25
  262:18 268:7
  280:4

**tsai** 39:16
**tsier** 39:17
**turn** 40:21 44:11
  45:8 55:18 74:22
  79:18 80:24 103:4
  127:19 131:18
  156:8 175:3
  179:12 197:21
  203:12 207:11
  211:10 253:25
  255:11 258:24
  261:12
**turned** 103:11
**turner** 21:6 39:18
  46:18 47:16 74:22
  75:1,4,5,6,11,14
  75:17,18,24 76:3
  76:14,18,20 78:5
  78:8,10
**turner's** 76:11
**turning** 89:13
  128:13 236:9
**twelfth** 15:17
**twenty** 89:15
**twice** 62:5,9
  273:20
**two** 41:12 42:22
  45:10 48:3 51:20
  52:13 53:10 66:8
  80:17 84:17 86:10
  88:25 89:8 90:2,4
  96:9 100:2,3
  104:20 110:15
  112:4 117:10
  122:7 123:18
  126:18 131:20
  137:9,9 142:2
  149:15 164:19,19
  164:22 186:23
  196:5 205:4,5
  207:1 219:7 220:7
  240:15 252:8
  271:3 276:20

278:16 281:10,12
**type** 220:8 245:14
  251:3,10 271:6
**types** 72:5 151:24
  177:15 190:6
  220:7
**typical** 43:2 92:21
**typically** 247:20

**u**

**u** 75:13 83:12
  192:6
**u.s.** 1:23 22:1 29:9
  48:5,18 132:6
  168:5 201:6 213:4
  215:1,21,21,23
  217:23 220:11,23
  225:24,24 237:24
  237:25 238:1,3,4
  239:4,4,16 240:22
  240:22 241:2
  244:6 246:4 251:2
  264:8
**ucc** 42:16 43:18
  81:18
**ultimate** 61:20
  72:14 112:17
  176:13,24 177:4
  190:25 191:2
  206:2,4 250:15
**ultimately** 43:19
  113:19 119:24
  134:22 142:10
  159:18 186:12
  220:24
**umair** 36:22
**unable** 62:23
**unavoidably**
  252:9
**unaware** 105:14
**unconditional**
  265:23 268:9
**uncontested**
  281:9,12,16

**uncovered**  149:18
153:4 159:22
**underlying**  135:7
135:8 156:3 176:2
176:24 181:4
187:3 194:6 197:4
198:16 212:13
217:22,24 236:6
**underpayment**
229:6
**underreported**
92:4
**underreporting**
92:6,16
**understand**  48:23
57:8 77:11 80:3
88:7 95:18 102:13
105:19 122:12
138:17 142:8
148:11,15,16
153:18 155:24
157:11 159:6
161:22 168:11
171:4 176:19,25
177:12 184:11
188:21 191:21
201:8,13 203:7
205:4,16 208:23
210:12 214:10,10
217:9 221:1,8
222:23 229:13
233:5,5,7 235:22
238:17 239:11,19
240:10,24 245:18
246:1 249:18
250:21 257:7
258:2 262:17
263:1 266:21,25
268:12 270:13
271:12 272:18
274:25 275:3,8
279:21 281:1,7

**understanding**
55:8 98:13 105:20
129:5 135:4 139:1
141:13 184:20
185:10 208:4
215:16 216:6,24
223:8 227:11
228:19,21 230:5
230:23 231:3
236:1 250:16
260:1 265:6,11,15
265:25 266:16
267:1,5 268:8
272:25
**understands**
279:22
**understood**  160:1
185:17 202:14
228:12 233:9
238:20 239:12
256:15 268:12
279:6
**undertake**  58:20
**underwood**  7:4
33:7 39:19 69:3,4
69:6,14,19,22
70:4,8,19,20
71:12,23,25 74:4
74:7,17 131:17,20
131:23,24,24
132:2,18 167:20
167:22,22 168:2
168:11,12 169:7
169:20 170:1,4
219:22 222:21
223:1,5,15,20
234:20 241:23
242:2,3,9,24
243:7,9,11,12,24
244:3,15,24
245:13,18,20
246:1,6,7 274:4,5
274:7,16,18 275:4

275:10,14,20,25
**underwood's**
216:9 217:12
**underwriters**  6:8
6:13
**unfair**  86:20
**unfolded**  135:12
**unfortunate**
253:15
**uniform**  100:23
**union**  9:4,7
**unique**  112:22
181:15
**unit**  94:14
**united**  1:1,11 4:7
4:10 5:20,22
11:16 12:22 17:6
17:14 20:17 29:8
65:18,23 105:7,25
107:2 111:14
112:7 185:3
216:20 217:1
223:24 224:5
225:7,18 226:1,3
226:4,14 227:12
239:23 264:15
267:17
**units**  91:8
**universal**  174:23
**universe**  58:9
70:21
**unjust**  182:2
**unknown**  242:23
**unnamed**  66:23
66:24,25 264:21
**unrelated**  217:1
243:5 256:19
**unreleased**
266:17
**unreliable**  175:18
**unsecured**  11:25
12:4 24:7,11,16
24:20 185:4

217:19
**untimely**  180:18
180:25
**unwilling**  97:2
**unworkable**
42:11
**update**  45:9
126:21
**updated**  127:5
**upheld**  85:3
**usa**  9:2
**usas**  8:24
**use**  84:4,7,10,14
84:24 92:13
108:14,18 162:19
214:2 217:12
227:23 257:7
265:17
**uses**  104:5 106:2
109:1
**usually**  96:17
117:11
**utilized**  92:21
119:5 122:22
**utilizes**  92:18
**uzzi**  10:23 19:6,8
19:12,14,18,22
20:1,5,13 22:9
39:20 218:8,8,12
218:21 219:4,20
219:24 220:1,4,13
220:16,19 221:2,4
221:6,17,19,21
222:12

| v |
|---|

**v**  252:18
**vague**  228:12,13
**validity**  194:7
**valuation**  71:1
76:5,9 77:10,12
77:15 168:14,17
**value**  56:9,14,17
56:22,24 57:22

[value - wanted]                                                                    Page 64

58:21 59:18,21
60:18 62:24 69:8
70:23 71:19,21
72:5,9 73:4,10,12
73:21,24 74:14
77:13,21,24
128:17 168:5,9,15
168:19,20,24,25
169:9,13,17,18,24
170:7,9 212:14,14
242:15,16,17
**values** 63:2
169:10
**van** 6:21 39:21
**variations** 77:1,3
77:7
**varick** 29:10
**varies** 92:17 94:13
**variety** 81:25 82:5
**various** 42:15
57:8 58:12 60:13
61:20 67:7 73:15
80:11 86:15 134:7
204:13 258:10
266:6 270:24
277:3
**vast** 122:1
**veil** 186:21 230:10
230:13
**velez** 39:22
**venditto** 39:23
**veritext** 284:20
**vermont** 7:20
61:3
**verse** 158:15
**version** 108:22
130:14
**versus** 145:7
174:15 182:2
**vice** 204:15,18
**victims** 12:14,17
**video** 1:12 14:2
15:8

**view** 96:4,11
111:2 123:23
124:3,11,13,15
125:11,12 135:6,7
135:8 152:14
153:10 159:12
161:10 174:24
181:6 204:10
208:19 209:17,20
236:16,18 238:4
242:14 247:15
251:5 259:21
**viewing** 72:7
**views** 111:21
114:17 119:17,18
134:21,24 226:16
254:23 258:17
**villnave** 8:9
**violation** 179:6
**violations** 228:16
232:1,22
**virginia** 5:13,17
30:9 84:9,10,18
85:12 88:24 89:4
89:5 93:22 94:8
95:12,21 96:14
98:1,4,6,17,23
99:7,20,21 100:2
100:17 101:3,8,14
101:23 112:21
116:4,17,20 123:4
123:5,11
**virginia's** 96:2
97:25 101:11,18
101:20
**virginians** 89:5
93:19
**virginia's** 85:21
**virtual** 40:21
**virtually** 104:7
**virtue** 168:3
**vision** 111:2,21
123:23

**visit** 258:13,16
**voice** 52:1
**volume** 147:7
213:17 235:14
**voluntarily**
107:24 120:18
**voluntary** 109:7
**vomsaal** 3:8
**vonnegut** 2:9
13:19,25 14:9,15
14:18,25 15:6,21
16:14 17:1 26:7
26:25 27:5 39:24
**voted** 44:23
105:24,25
**votes** 16:10,22
109:22
**voting** 3:23 14:17
109:21

### w

**w** 2:17 20:23
38:19 126:12
**wa** 31:12
**wagner** 30:22
39:25 80:17,24
82:24 83:4,25
84:1 85:11 103:3
**wait** 46:8 48:14
131:15 138:8
155:1 250:11
**waiting** 51:25
**waive** 87:2,14
96:25
**waived** 145:6
**waiver** 98:9
**waiving** 160:15
**walk** 49:12 159:5
**walked** 156:18
**walker** 1:25
**wall** 30:10
**want** 41:12,13,17
41:17 44:16 45:9
47:5 51:6 61:25

62:11 65:16 67:23
69:2 72:21 78:4
78:12 79:10 80:16
83:24 84:14 85:10
94:6 95:24,25
100:8 102:16
105:19 111:11
115:11 122:13
127:8 130:6
131:12 137:13,25
139:14,16 141:20
143:10 148:24,24
154:25 155:17,21
160:12 161:17
163:19 166:24
167:18 171:9
173:20 180:17
185:4 189:3,18
190:11 193:2,4
194:2 195:14
197:14 198:4
199:7 210:21,24
210:25 214:11,21
218:3 219:1,15
222:4 223:5,6,21
235:3,7,23 236:1
237:9 238:15
239:18,19 246:20
250:15 253:6
263:25 264:3
268:8 271:13
273:20 275:22
**wanted** 43:15
54:23 63:1 84:9
84:10 98:2,4,19
98:23 102:12
139:21 140:15
142:15 160:14
163:10,12,15,23
213:24 219:22
230:18 250:11
251:4,5 276:13
278:8

**wants** 86:23 156:7
167:3,3 222:16
226:16 244:10
248:23
**wardwell** 28:13
40:17 49:20
110:18
**washington** 7:8,9
7:23 31:5,10 32:4
32:15 43:13 61:2
84:13 93:18
102:19 137:15,21
138:18 139:4
146:15 160:9
165:8 193:1
195:17
**washington's**
148:13
**wasn't** 44:3 88:21
169:18
**way** 46:19 48:17
58:7 59:7 67:17
86:1 90:2 92:19
93:12 94:7 96:5
110:5 111:22
119:19 145:21
149:13,19 150:14
159:15 161:20
162:18,19 173:15
178:15,20 181:25
182:6,22 188:21
208:16 209:18
210:6 228:6
236:10 242:20
243:22 247:18
249:9 250:19
257:12,19 266:20
270:13 272:25
279:16
**ways** 106:17
188:22
**we've** 137:24
144:12 171:5

188:17 218:13
237:13
**weak** 199:3,6,14
201:3 235:25
237:1 254:19
255:6
**weber** 40:1
**week** 106:8,8
150:16 215:12
278:8,11 279:7
280:3
**weekend** 276:24
277:1 278:4,9,19
281:5
**weeks** 147:4
278:11
**weigh** 226:5
**weighed** 177:24
**weight** 91:16
102:7 114:4
**weights** 90:18
91:6,14
**weinberg** 40:2
**weinberger** 23:7
28:9 47:22 140:7
140:10,18,24
141:4,5,9,10,17
141:21,22 142:20
143:6 144:1,4,19
145:13,16 146:12
146:18,20 151:10
151:13,18,20
153:10 154:20
156:1,11,13,22,23
157:19,22 160:10
160:12,21,25
161:2,4 162:2,25
163:3,5,7 164:2,3
222:15
**weinberger's**
141:19 163:11,14
**weintraub** 40:3

**weiss** 40:4
**welcome** 154:21
**wells** 40:5
**wendy** 40:2
**went** 71:19,21
119:24 153:5
229:2 273:24
**west** 2:23,23 5:13
5:17 30:9 31:18
84:9,10,18 85:12
85:21 88:24 89:4
89:4,5 93:19,22
94:8 95:12,21
96:2,14 97:25
98:1,3,6,17,23
99:7,20,21 100:2
100:16 101:3,8,10
101:14,18,19,23
112:21 116:4,16
116:20 123:3,5,11
**we'll** 46:8,18 47:2
47:3 80:14 87:11
**we're** 41:3 43:13
43:20 51:25 84:6
**we've** 46:23 56:12
79:16 80:12 84:8
84:22,23 85:13
**what's** 47:6 57:9
**wheel** 122:5,5
**whichever** 156:7
**white** 1:14 23:20
196:6,20
**wide** 81:25
**widely** 115:5
**william** 18:12
25:6,10 26:10
38:18 40:3
**willing** 42:13
240:21
**willis** 3:3
**wilmer** 32:1
127:10

**winded** 153:9
**winthrop** 31:16
**wise** 57:23 259:8
**wish** 50:11,12,23
52:19 53:3,22,24
76:14 83:19
110:12 133:24
141:15 146:11
166:1,9 170:12
172:10,17 188:15
192:19 195:9
235:6 252:25
267:14
**wishes** 51:16
54:15 84:3 137:3
**withdraw** 183:22
200:7 262:15
**withdrawal** 25:25
**withdrew** 215:18
**witness** 43:12
45:8 46:10 47:17
49:20 59:21 71:9
74:4,20,22 75:1
76:3 78:12,18,21
79:14 82:25 89:23
98:13 110:20
111:23 115:22
116:10,12,16,20
117:9,16,23 118:6
121:25 124:16
125:19 129:11,13
130:7 133:4,8
136:18 139:25
140:7,23 163:11
164:6 170:21
171:17 172:23
185:7 189:3 191:8
191:14,24 192:1,5
192:8,10,20 193:3
193:3 194:13,16
194:25 195:3,10
196:18,23 198:14
198:24 207:3,6,9

207:13,24 208:2
208:13 209:3,6,16
210:4,9,12,14,19
211:2,3,4,7,9,14
211:19 212:3,6,17
212:24 213:12
214:6,23 215:4,6
215:10,16,23
216:1,3,6,12,24
217:3,9,15,22
218:1 219:6 227:3
228:23 229:7,13
231:17 232:11
233:7 238:22
239:2 241:10,24
243:25 244:11,22
246:25 248:14,21
249:6,16 250:7,11
251:7 253:20
255:7 260:18
263:8,14,17,19
266:22 272:4
273:23 275:10
278:24 280:16
**witness's** 177:4
**witnesses** 28:3
40:13 41:4 44:12
45:10 47:1,2,4,8,9
47:16,23 78:16
79:8,18 80:19,20
82:4 111:19
113:14 137:9
164:5 165:5,5
185:6 193:8,14
196:2,5,19 197:2
224:22 244:19
251:4 252:8
276:20,21,24
277:2,18,23,24
278:1,16 279:8
**wobbled** 266:9
**wolff** 32:14
195:17

**woman** 43:11
**wondering** 48:12
201:22
**won't** 46:5,21
48:19 87:12
**word** 50:3 52:10
75:12 83:12
126:12 195:1
209:24
**worded** 233:4
**words** 128:9
279:1
**work** 53:11 67:9
81:17 92:23
109:10 125:3
148:17 161:10,16
162:7 175:18
198:22 204:22
207:21 246:20,23
246:25 247:19
283:1
**worked** 45:23,24
46:9 79:17 81:21
**working** 46:15
106:5 143:23
212:6 229:9
246:25
**workout** 97:21
**works** 125:5
145:21 150:14
**world** 44:7 94:21
227:25
**worldwide** 170:6
**worry** 185:20
**worth** 41:18 63:13
63:18,24 186:11
186:11
**wouldn't** 64:2
**wrap** 154:12
**wrapped** 205:22
**wright** 8:20
**written** 121:11
122:18 153:8

277:10
**wrong** 69:24
82:11 123:2
148:20 178:14,14
237:11 252:1
**wrongdoing**
184:19
**wrongfully**
109:24
**wrote** 128:25

**x**

**x** 1:4,10 3:20
209:25 210:1,7,22
**xl** 4:24

**y**

**y** 133:15 192:9
195:1
**yeah** 41:24 43:12
58:7 77:9 103:22
104:7 111:9
128:25 136:16
155:8 163:22
209:5 211:7
251:23 260:24
273:21 276:22
280:23 281:10
**year** 101:6 115:24
115:24,24 119:5
146:24 147:3
174:14 190:14
**years** 86:16 96:9
119:14 146:4
147:15,15 152:20
153:16,18 179:19
179:22
**yep** 193:10 279:6
283:6
**yesterday** 40:23
41:10,14,14 44:22
47:5 49:4,8 51:1
111:18 113:12
114:7,9,16 137:4
165:6 196:10

**yesterday's**
196:12,13 276:20
**yield** 155:4
**yields** 234:1
**york** 1:2 28:16
29:11 30:11,18
31:19 32:10,17
33:12 101:25
**you'd** 63:23
**you'll** 78:16
**you're** 51:23
54:17 58:5 61:17
62:1 64:14 69:16
**you've** 64:18
78:15 89:1

**z**

**z** 39:9 126:12
**zabel** 40:6
**zero** 62:21
**zoom** 40:24 49:5
**zoom's** 41:7
**zylberberg** 40:7