Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    Tele/Video Proceedings

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    August 18, 2021

17                    10:08 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: RAI

1    HEARING re Continuance of Confirmation Hearing From August

2    17, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    WITNESSES:

4    DR. RICHARD SACKLER

5

6    DAVIS POLK WARDWELL LLP

7         Attorney for Debtors

8         450 Lexington Avenue

9         New York, NY 10017

10

11   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

12        BENJAMIN KAMINETZKY (TELEPHONICALLY)

13        JAMES I. MCCLAMMY (TELEPHONICALLY)

14

15   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

16        Attorney for State of Maryland

17        200 Saint Paul Place

18        Baltimore, MD 20852

19

20   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

21

22

23

24

25

```
 1   REED SMITH LLP

 2        Attorneys for the Debtor

 3        Reed Smith Centre

 4        225 Fifth Avenue

 5        Pittsburgh, PA, 15222

 6

 7   BY:  ANDREW J. MUHA (TELEPHONICALLY)

 8

 9   WILMER CUTLER PICKERING HALE AND DORR LLP

10        Attorneys for Navigators Specialty Insurance Company

11        1875 Pennsylvania Avenue NW

12        Washington, DC 20006

13

14   BY:  ISLEY MARKMAN GOSTIN (TELEPHONICALLY)

15

16   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

17        Attorneys for State of Washington

18        500 Fifth Avenue

19        New York, NY 10110

20

21   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

22

23

24

25
```

Page 5

1    SIMPSON THACHER & BARTLETT LLP

2        Attorneys for Gulf Underwriters Insurance Company

3        and St. Paul Fire and Marine Insurance Company

4        425 Lexington Avenue

5        New York, NY 10017

6

7    BY:  WILLIAM T. RUSSELL, JR.

8

9    JOSEPH HAGE AARONSON LLC

10        Raymond Sackler Family

11        485 Lexington Ave, 30th Floor

12        New York, NY 10017

13

14    BY:  GREGORY JOSEPH (TELEPHONICALLY)

15

16    UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18        201 Varick Street, Suite 1006

19        New York, NY 10014

20

21    BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

22

23

24

25

Page 6

1    ATTORNEY GENERAL FOR THE CONSUMER PROTECTION DIVISION AT THE

2    WASHINGTON STATE ATTORNEY GENERAL'S OFFICE

3         800 Fifth Avenue, Suite 2000

4         Seattle, WA 98104

5

6    BY:  THOMAS ROBINSON O'NEILL (TELEPHONICALLY)

7

8    FRANK OZMENT ATTORNEY AT LAW, LLC

9         Attorneys for Bridges Bloyd Fitch

10         217 Country Club Park, Box 501

11         Birmingham, AL 35213

12

13    BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

14

15    MARYLAND ATTORNEY GENERAL OFFICE

16         Attorneys for the State of Maryland

17         200 Saint Paul Street

18         Baltimore, MD 21217

19

20    BY:  SARA E. TONNESEN (TELEPHONICALLY)

21

22

23

24

25

**Page 7**

1    DEBEVOISE & PLIMPTON

2          Attorneys for Side A of the Sackler Family

3          919 Third Avenue

4          New York, NY 10022

5

6    BY:  MAURA K. MONAGHAN (TELEPHONICALLY)

7

8    ALSO PRESENT TELEPHONICALLY:

9    JILL S. ABRAMS

10   BENJAMIN ALBERT

11   ROXANA ALEALI

12   ANDREW VINCENT ALFANO

13   PHILIP D. ANKER

14   MICHAEL ATINSON

15   MITCHELL JAY AUSLANDER

16   JASMINE BALL

17   BROOKS BARKER

18   AGUSTINA BERRO

19   THOMAS MOULTRIE BESHERE

20   THOMAS BIELLI

21   DAVID E. BLABEY JR.

22   HUNTER BLAIN

23   JENNIFER BLOUIN

24   LOUIS BOGRAD

25   JOSEPH BRANDT

Page 8

1    SARA BRAUNER

2    DAVID BROWN

3    GAGE BRUNSWICK

4    JOSHUA I. BURGER

5    MARK CHALOS

6    HAYDEN COLEMAN

7    DANIEL CONNOLLY

8    DYLAN CONSLA

9    CHARLES D. COWAN

10   ABBY G. CUNNINGHAM

11   MELANIE L. CYGANOWSKI

12   MARIO D'ANGELO

13   PETER C. D'APICE

14   STACY DASARO

15   JOSEPH G. DAVIS

16   KEVIN DAVIS

17   MARK DEARMAN

18   JESSE DELACONTE

19   SHANNON DEVON

20   CLINT DOCKEN

21   JOHN C. DOUGHERTY

22   JOHN DUBEL

23   STEPHANIE EBERHARDT

24   KENNETH H. ECKSTEIN

25   BERNARD ARDAVAN ESKANDARI

1   BARBARA FARASH

2   MATHEW FARRELL

3   LAURA FEMINO

4   ROBERT FINZI

5   MATTHEW FITZSIMMONS

6   LAWRENCE FOGELMAN

7   HEATHER FRAZIER

8   BRYCE L. FRIEDMAN

9   KATHERINE GALLE

10   CAROLINE GANGE

11   GILL GELDREICH

12   MELISSA GIBSON

13   JARED GIDDENS

14   MAGALI GIDDENS

15   SCOTT GILBERT

16   JEFFREY R. GLEIT

17   IRVE J. GOLDMAN

18   MICHAEL GOLDSTEIN

19   ELAINE GOLIN

20   LESLIE A. GOLLER

21   GARY GOTTO

22   EMILY GRIM

23   WILLIAM W. GROUNDS III

24   JOHN GUARD

25   ADAM P. HABERKORN

Page 10

1   CATHERINE BEIDERMAN HEITZENRATER

2   ANGELA K. HERRING

3   JEREMY C. HILL

4   MICHELE HIRSHMAN

5   WILLIAM P. HRYCAY

6   JENNA A. HUDSON

7   MITCHELL HURLEY

8   ELISA HYDER

9   MARK S. INDELICATO

10  SAMUEL ISSACHAROFF

11  EVAN M. JONES

12  ETHAN KAMINSKY

13  NEIL F.X. KELLY

14  KAREN KENNEDY

15  MARC KESSELMAN

16  DARREN S. KLEIN

17  JEREMY C. KLEINMAN

18  LAWRENCE KOTLER

19  LAUREL K. LACKEY

20  ALEXANDER LEES

21  DANIEL LENNARD

22  MARA LEVENTHAL

23  DANIELLE J. LEVINE

24  JEFFREY LIESENMER

25  EDAN LISOVICZ

1   JOHN LONGMIRE

2   JON LOWNE

3   KEVIN MACLAY

4   TIMOTHY MARTIN

5   BRIAN S. MASUMOTO

6   PATRICK C. MAXCY

7   LAURA MCCLOUD

8   HUGH M. MCDONALD

9   CARRIE MCGAHA

10  SHANNON M. MCNULTY

11  MICHELE MEISES

12  NATHANIEL MILLER

13  JONATHAN E. MITNICK

14  AISLING MURRAY

15  SARA NADIM

16  ALISSA M. NANN

17  EDWARD E. NEIGER

18  LEE M. NICHOLSON

19  MICHAEL PATRICK O'NEIL

20  RACHEL R. OBALDO

21  JENNIFER PEANCOCK

22  MARK PLEVIN

23  STEVEN R. POPOFSKY

24  KATHERINE PORTER

25  ARIK PREIS

Page 12

1   DOUGLASS PRESS

2   NICHOLAS PREY

3   KAMI QUINN

4   MARION QUIRK

5   CHRISTINA RICARTE

6   JOSEPH RICE

7   RACHAEL RINGER

8   CHRISTOPHER ROBERTSON

9   JEFFREY J. ROSEN

10  JORDAN ROSENBAUM

11  PAUL S. ROTHSTEIN

12  JASON RUBINSTEIN

13  MEGAN PARIS RUNDLET

14  WILLIAM T. RUSSELL

15  JEREMEY W. RYAN

16  RICHARD SACKLER

17  MORTIMER D.A. SACKLER

18  RICHARD SACKLER

19  THERESA SACKLER

20  JAMES SALWEN

21  DANIEL JOSEPH SAVAL

22  SETH SCHINFELD

23  ELIZABETH SCHLECKER

24  FREDERICK E. SCHMIDT

25  PAUL KENAN SCHWARTZBERG

1    MICHAEL SHEPHERD

2    J. CHRISTOPHER SHORE

3    RICHARD SHORE

4    RICHARD SILBERT

5    LIANNA SIMMONDS

6    PAUL M. SINGER

7    MARC F. SKAPOF

8    ARTEM SKOROSTENSKY

9    D. RYAN SLAUGH

10   JOSEPH L. SOROKIN

11   CLAUDIA Z. SPRINGER

12   CATHERINE STEEGE

13   HOWARD STEEL

14   ERIC STODOLA

15   JEROME TAPLEY

16   PAMELA THURMOND

17   MARC JOSEPH TOBAK

18   ANDREW M. TROOP

19   KELLY TSAI

20   ALICE TSIER

21   JOSEPH TURNER

22   ALLEN J. UNDERWOOD

23   GERARD UZZI

24   ELI J. VONNEGUT

25   JONATHAN WAGNER

1   RYAN A. WAGNER

2   JORDAN WEBER

3   SHIRA WEINER

4   WILLIAM P. WEINTRAUB

5   MARTIN WEIS

6   ALLISON H. WEISS

7   THEODORE WELLS, JR.

8   LAUREN S. ZABEL

9   DAVID ZYLBERBERG

10  DAVID A. HART

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 15

1                    P R O C E E D I N G S

2            THE COURT:  All right, good morning, everyone.

3    This is Judge Drain and we're here on Pharma L.P., et al.,

4    continuing on with the hearing on the Debtor's request for

5    approval -- confirmation of their amended Chapter 11 plans.

6            I don't have a formal -- as I've had in the past

7    days for this hearing -- list of witnesses who will be

8    testifying today.  I understood that a couple of Sackler

9    Family member will be testifying, but if someone can update

10   me on who exactly will be testifying today.

11           MR. KAMINETZKY:  Yes, Your Honor.  Before I turn

12   it over, this is Benjamin Kaminetzky of Davis Polk for the

13   Debtors. Good morning.  So, since the true unsung hero in

14   this case, Katherine Benedict, sent that email to all the

15   parties and to chambers yesterday after the hearing with the

16   list of witnesses, there's been conversations among, quite

17   frankly, Maryland and the Sackler Families about what

18   exactly and who exactly is going to happen after Richard

19   Sackler.  So, we're certainly starting the day with Mr.

20   Richard Sackler.  After that, I think there've been

21   discussions about recent deposition testimony, and who and

22   what, and I will leave it to them.

23           I did want to, before we -- you know, I turn it

24   over to them -- it seems clear to me, it seems clear I think

25   to everybody, that one way or another we're going to be done

Page 16

1    with the testimony tomorrow.  And we would like kind of --

2    the most frequent question we're getting from the parties,

3    and we'd maybe like the judge to sign off, is when we would

4    start the argument portion of the hearing.  And we kindly

5    request that the Court perhaps set that for Monday, to give

6    the parties adequate time to digest the transcripts, apply

7    the facts to the law, streamline their presentations per

8    Your Honor's guidance at the pretrial conference, which now

9    feels like 100 years ago.

10              As we suggest to Your Honor and Your Honor agreed,

11   given the overlapping nature of the various objections, we

12   intended to have the argument by topic, and folks need to

13   then coordinate with their co-parties on how they divide up

14   the time.  So, I think you would hear a collective exhale of

15   150 people if Your Honor could just say Monday is the day

16   and...

17              THE COURT:  Right.  That actually is consistent

18   with my own thinking on this.  That if we ended on Thursday,

19   the parties and I would need some time to catch our breath

20   and focus on the record, which makes sense to have argument

21   on Monday.

22              Next Tuesday is not a Purdue day.

23              MR. KAMINETZKY:  A Sears day.

24              THE COURT:  I find it hard to believe that oral

25   argument would take more than a day, but it might.  So, I

1    could leave a little time for Wednesday.  Half a day, say.

2    I contemplate giving you my ruling either Thursday or

3    Friday.

4                MR. KAMINETZKY:  That's perfect, Your Honor.

5    Okay, I appreciate that guidance and maybe I'll -- I think

6    just to answer Your Honor's question, exactly what's

7    happening to Mr. Sackler today, I'll turn it over to Ms.

8    Monaghan and Ms. --

9                THE COURT:  Well, before we get to that, several

10   parties clearly have participated actively in this hearing.

11   They're not the only parties that have filed either

12   objections or statements in support of the plan.  Parties

13   should notify who did that -- parties who either objected to

14   the plan or filed statements in support of the plan should

15   notify the Debtor's counsel by the close of the hearing

16   tomorrow whether they want to participate in oral argument,

17   so that there can be some -- so that can be factored into

18   the planning for oral argument on Monday.

19               And if there's some issue about the length of time

20   that people think they're going to need, we can discuss it

21   on Friday in a chambers conference.

22               MR. KAMINETZKY:  That makes sense, Your Honor.

23   Appreciate it.  Send it to me.

24               THE COURT:  All right.  I mean, there are some

25   people who really have not wanted to participate in the

Page 18

1    evidentiary portion of this hearing but who do want to be

2    heard by me.  I've read all the objections and all the

3    statements, so they can be assured of that already.  But

4    they should let you know again by the close of the trial,

5    assuming it's tomorrow, whether they want to speak in

6    addition to what they filed at oral argument.

7           Okay, so I gather then that we're going to proceed

8    first with testimony by Richard Sackler?

9           MR. EDMUNDS:  Yes, but, Your Honor, there is one -

10   - Brian Edmunds for the State of Maryland -- there's one

11   matter I think is a preliminary issue that I think we'd as

12   the Court to address, and that is there was some

13   correspondence with the Court last night regarding the

14   implications or -- you know, whether certain documents are

15   wholly admitted or are admitted for the purposes Your Honor

16   has said as the hearing has moved forward in considering

17   particular witnesses who -- through whom the parties tried

18   to introduce them.  And I think that that affects what we

19   do, you know, in our case.

20           THE COURT:  Well, just for the record, which

21   documents are you referring to?  I know there were emails to

22   chambers but I just sort of tacitly refer to the emails.

23   So, if you could just let me know what documents --

24           MR. EDMUNDS:  Sure.  It's the documents that the B

25   side Sacklers have been attempting to present.  There are a

1    number of documents.  There are documents, I think, that

2    were, as I understand it, were attached to one of the

3    presentations that we considered -- Your Honor considered

4    with respect to Mr. Dubel's testimony.  Mr. Dubel had

5    testified that the Special Committee received presentations.

6    We objected to the documents coming in through that.  And I

7    think Your Honor said they were not -- would not be admitted

8    for their truth.

9            There are also documents that were attached to --

10    or part of the proposed findings of fact and conclusions of

11    law attached to Mr. Joseph's declaration and also related to

12    Professor Hamermesh's expert report that Your Honor ruled

13    would come in for the estate claims.  And I believe -- well,

14    I believe that his opinions were admitted for the estate --

15    in relation to the estate's claims, but not in relation to

16    the state's claims.  And that the underlying documents, in

17    accordance with Rule 703, did not necessarily come in for

18    their truth because -- just because Professor Hamermesh's

19    opinions were admitted for the limited purpose.

20            So, I just want to -- my understanding of the

21    scheduling order that Your Honor entered is that there is a

22    process for designating exhibits and initial exhibit lists,

23    and parties were to make objections to them to the extent

24    objections could be made.  But, again, the admission of

25    evidence, the admission of exhibits depends on who and how

Page 20

1    the documents are admitted and the purpose for which they're

2    used.  And I think that we've properly objected at the times

3    when the documents would be used.  Your Honor has ruled --

4    and I just see a reopening that we, frankly, framed our case

5    and our witnesses in the narrow sort of way that Your Honor

6    has suggested we should.  And I think we've relied on it and

7    I don't know if these documents come in, we have, you know,

8    more of a case.

9           THE COURT:  Okay, well, I'm not -- I'm not

10   changing any of the rulings that I made.  With each witness,

11   I asked whether there was any objection to the witness's

12   testimony, and in some cases there was and I ruled on that

13   objection.  So, that's not being revised.  I'm not sure what

14   else there is to say on that.

15          MR. EDMUNDS:  That's -- that's all I -- all I ask,

16   Your Honor.  So, I think that we're fine.  But I don't know

17   if other parties object to that or not.  But that was I

18   think the source of the dispute in the chambers emails last

19   night, and I just wanted to make sure --

20          MR. JOSEPH:  Your Honor, if I may.  What we're

21   talking about --

22          MR. KAMINETZKY:  I just want to -- I'm sorry, go

23   ahead, Mister -- but let me just say.  Your Honor, you've

24   made your views on these issues so clear so many times, I

25   think it's -- I'm not sure why we're arguing about this.

Page 21

1    Like, the purpose of what you -- each time this came up,

2    Your Honor ruled and Your Honor made very clear the purposes

3    in which you're going to be looking at, for example, you

4    know, the Sackler presentation or the complaints.  I think

5    it's time to move on.

6            THE COURT:  Okay, well, I think so too as far as

7    what I've heard so far, unless I'm missing something.

8            MR. JOSEPH:  Your Honor, what we're talking about

9    are documents un-objected to on the joint exhibit list that

10   Maryland is now objecting to belatedly.

11           THE COURT:  Well, when are -- Mr. Edmunds referred

12   to rulings that I've already made as opposed to other --

13           MR. JOSEPH:  Correct.  But there've been no

14   rulings on hundreds of exhibits he's really objecting to.

15   Now, there about 600 exhibits that he has not objected to,

16   did not timely object to that are on the joint exhibit list

17   that he's now objecting to without identifying them for Your

18   Honor.

19           THE COURT:  Well, I haven't heard an objection.  I

20   haven't heard an objection by Mr. Edmunds.

21           MR. JOSEPH:  Then that's fine, Your Honor --

22           THE COURT:  I thought he was referring to --

23   excuse me -- testimony that I asked whether anyone objected

24   to, and exhibits related to that testimony, and I did rule

25   on that.  So, I'm not sure what else we're focusing on at

Page 22

1    this point.

2              MR. JOSEPH:   Thank you, Your Honor.

3              THE COURT:   I do have a - -and I should have made

4    this point, I guess, when I was speaking with Mr.

5    Kaminetzky, so I'll make it now.   It's a point for oral

6    argument.   As with any large trial, and this is no

7    exception, the parties have listed and given me agreed

8    admitted exhibits in the thousands.   As with almost every

9    large trial, the actual exhibits that are brought to my

10   attention number in the teens, maybe the 20s or 30s.

11             I don't think any judge should be expected to read

12   all of the exhibits without being told which exhibit is

13   important, and I don't intend to.   I think if someone thinks

14   it's important, they need to bring it to my notice.   And if

15   there's an issue then, I can deal with it.   But it may well

16   be that you all are arguing about something that is

17   completely academic.   Because, you know, this courtroom is

18   filled with boxes of exhibits and I can tell you right now,

19   unless people are going to show me the designations and tell

20   me why they're important, for example, I'm not going to read

21   a deposition from 2012 of anybody.   So, I'm not sure what

22   you all are fighting over at this point.

23             MR. EDMUNDS:   Your Honor, that was precisely my

24   point.   Right?   Exhibits are admitted through the testimony

25   of witnesses.   And I think that sometimes you don't know for

Page 23

1   what purpose they are being put in a box until a witness

2   testifies.

3          THE COURT:  That's true and -- I agree with that,

4   Mr. Edmunds.  And I also agree with you that an exhibit that

5   may be admitted, I don't know for what purpose it's being

6   offered, and I'm not sure the parties do either.  So, again,

7   there may be plenty of exhibits that someone wants to

8   discuss at oral argument that are not the subject of

9   someone's testimony.  And it seems to me that if someone

10  wants to say at that point, I agree to its admission for

11  your consideration as to the pros and cons of the settlement

12  but not as to the underlying merits of the claims that are

13  being settled, in all likelihood I will grant that -- or I

14  will limit its admission to that -- in that way, consistent

15  with how I've done so far.

16         So, I thin going -- I hope that gives you some

17  guidance, Mr. Edmunds, as to -- and the other parties -- as

18  to what you want to get out on the record going forward over

19  the next two days.

20         MR. EDMUNDS:  No, thank you, Your Honor, that is -

21  - that's what we were asking.  So, thank you.

22         THE COURT:  Okay.  All right, very well.

23         MR. MUHA:  Your Honor, this is Andy Muha,

24  insurance coverage counsel for the Debtors with Reed Smith.

25  I have one other housekeeping matter that I'd like to bring

Page 24

1   up before we begin today's testimony, if it would please the

2   Court.

3        THE COURT:  Okay.

4        MR. MUHA:  Your Honor, the Debtors have reached

5   two stipulations with insurers who have asserted objections

6   to the plan and would have raised certain evidentiary issues

7   or objections.  The stipulations do not resolve the

8   insurers' substantive objections to plan confirmation, but

9   they do resolve the insurers' evidentiary issues.

10       The first stipulation is between the Debtors and

11   the group of insurers who, on August 10th, filed the motion

12   in limine to exclude evidence related solely to insurance

13   coverage and to strike insurance-related testimony in

14   Debtor's declarations.  That motion was filed at Docket

15   Number 3514.  This stipulation resolves the issues raised in

16   that motion in limine.  And as a result, the insurers who

17   joined in the motion in limine are withdrawing their motion.

18   Also --

19       THE COURT:  Okay.  Is there counsel on the phone,

20   just on the screen just to confirm that?

21       MS. GOSTIN:  Your Honor, this is Isley Gostin,

22   WilmerHale, on behalf of Navigators Specialty Insurance

23   Company.  We agree with the Debtor's representation.  That

24   is correct.  Thank you.

25       THE COURT:  Okay, very well.  Thank you.

1          MR. MUHA:  And, Your Honor, as a consequence of

2     that stipulation, the Debtors will not be offering the

3     declaration of Lianna Simmons into evidence at the

4     confirmation hearing, and we will not be calling Ms. Simmons

5     as a witness in these proceedings.  So Your Honor can

6     officially remove her from the list of witnesses remaining

7     to be called.

8          THE COURT:  Okay.  And her declaration was really

9     just a list of -- a list of letters, basically.

10         MR. MUHA:  It referred to -- yes, yes, exactly,

11    Your Honor.

12         THE COURT:  Very well.

13         MR. MUHA:  The second stipulation that we have,

14    Your Honor, is between the Debtors on the one hand and Gulf

15    Underwriters Insurance Company and St. Paul Fire & Marine

16    Insurance Company on the other hand.  This stipulation

17    resolves certain evidentiary issues raised in connection

18    with those insurer's objection to plan confirmation.  And I

19    believe their counsel, Mr. Russell, is also on the Zoom

20    hearing and can confirm that.

21         MR. RUSSELL:  Yes, Your Honor, I can confirm that.

22    William Russell on behalf of Gulf Underwriters Insurance

23    Company and St. Paul Fire & Marine Insurance Company.

24         THE COURT:  Okay, so I'm not sure whether there

25    was an actual motion in limine filed by these two insurers,

Page 26

1    or whether there was just the potential that there would be

2    an objection.

3              MR. RUSSELL:  Your Honor, it's not so much that we

4    had a motion in limine but it should obviate our need to

5    recall Mr. DelConte as a witness to cross-examine.

6              THE COURT:  All right.  That's fine.

7              MR. RUSSELL:  Thank you, Your Honor.

8              MR. MUHA:  And with respect to that, Your Honor,

9    as you'll recall, when Mr. DelConte ended his testimony last

10   week, it was subject to being called back for cross by both

11   Gulf and the other insurers who had joined the motion in

12   limine.  But by operation of these two stipulations, none of

13   the stipulating insurers will be needing Mr. DelConte to

14   come back for cross.  So --

15             THE COURT:  All right, so his testimony is

16   finished at this point?

17             MR. MUHA:  That's correct, Your Honor, as far as -

18   - as far as we understand it.

19             THE COURT:  Okay.

20             MR. MUHA:  Both stipulations have now been filed,

21   Your Honor.  The stipulation resolving the motion in limine

22   is filed at document number -- Docket Number 3588, and a

23   stipulation resolving the evidentiary issues raised by Gulf

24   and St. Paul Marine & Fire has been filed at Docket 3589.

25             THE COURT:  Okay.  All right.  Very well, thank

Page 27

1    you.

2           MR. MUHA:   Thank you, Your Honor.

3           MR. GOLD:   Your Honor, Matthew Gold from Kleinberg

4    Kaplan.   May I address Your Honor's comments regarding

5    evidence from a few moments ago?

6           THE COURT:   Okay.

7           MR. GOLD:   Thank you, Your Honor.   I just want to

8    observe in what we thought would be timesaving for all

9    parties.   We stipulated with the Debtors and various Sackler

10   sides to have many of our exhibits admitted without the need

11   of testimony or court time to have them be put in.   And I

12   completely understand Your Honor's suggestion that we need

13   to be directed as to which exhibits we consider important to

14   meaningful, but I'm trying to understand the best vehicle.

15   Because it seems to me, there are two possible ways we could

16   do that.

17           Either we would have to spend time during oral

18   arguments reviewing what was put in to direct Your Honor to

19   what we considered important; or we could submit some kind

20   of post-trial brief or something that would draw those

21   matters to your attention, Your Honor.   And I'm inquiring

22   which would be preferable to the Court.

23           THE COURT:   The former.

24           MR. GOLD:   Okay, thank you, Your Honor.   It' just

25   --

Page 28

1          THE COURT:  I mean, if it's that important, you

2     might as well mention it.

3          MR. GOLD:  We certainly will and we will make sure

4     to include that in our oral argument presentation.

5          THE COURT:  And I know you wouldn't do this, but I

6     just want to make sure no attorney is just going to spend 15

7     minutes of his or her oral argument just giving me a list of

8     exhibits and saying these are important.  You need to tell

9     me why.  It's part of oral argument.

10         MR. GOLD:  No, no, I understand, Your Honor.

11    Boring the Court and the (indiscernible) would not be

12    productive.

13         THE COURT:  Few things are more frustrating to a

14    trial judge than seeing, you know, 200 binders of exhibits

15    and someone who actually thinks that he or she is supposed

16    to make sense of them in the context of someone's

17    presentation when it's not highlighted.  And it's even

18    harder for the Appellate Court, of course, because they're

19    reviewing what the trial court considered.

20         So -- and I know you'll do that.  I'm not -- I'm

21    not saying that you wouldn't.  And I'm not saying that you

22    would just give me a list of things in the last part of your

23    argument.  But just so everyone is clear on this point.

24         MR. GOLD:  Thank you, Your Honor.

25         THE COURT:  And there's no -- at the risk of

1   overkill, your clients have a stipulation with the Debtors.

2   That governs all the exhibits as far as you and the Debtors

3   are concerned.  And, frankly, I think we're basically at the

4   same point, this point, with Maryland, but without a

5   stipulation.

6           Okay, so shall we turn to the witness then?

7           MR. KAMINETZKY:  And we're calling him right now

8   to get him on, Your Honor.

9           THE COURT:  Okay, very well.

10          Okay, I see Mr. Sackler on the screen.  Would you

11  raise your right hand, please?

12          MR. KAMINETZKY:  You're on mute.

13          DR. SACKLER:  Sorry.

14          THE COURT:  Okay.  Do you swear or affirm to tell

15  the truth, the whole truth, and nothing but the truth, so

16  help you God?

17          DR. SACKLER:  I do.

18          THE COURT:  Okay.  And it's Richard, S-A-C-K-L-E-

19  R?

20          DR. SACKLER:  I was just in the process of

21  changing that.  Yes, that's correct.  I was just going to

22  shell that.

23          THE COURT:  Oh, okay, very well.  The witness has

24  been called by the state of Maryland and, therefore, Mr.

25  Edmunds, you can go ahead with direct since this is not one

Page 30

1    of the witnesses, therefore, that's subject to my procedures

2    order that has direct testimony by declaration or affidavit.

3    So, you can go ahead with direct, Mr. Edmunds.

4              DIRECT EXAMINATION OF DR. RICHARD SACKLER

5    BY MR. EDMUNDS:

6    Q    Good morning, Dr. Sackler.  I'm Brian Edmunds for the

7    state of Maryland.  You were director of Purdue Pharma from

8    about 1990 to 2018, is that correct?

9    A    Approximately correct, yes.

10   Q    And you were president of Purdue from about 1999 to

11   2003?

12   A    My presidency began in 2000, January of 2000.

13   Q    January of 2000 to 2003 then?

14   A    Yes.  To March 2003.

15   Q    Okay.  And you -- you've served as chair of the board

16   or co-chair of the board, is that right?

17   A    From approximately 2008 over two or three years, I

18   don't recall.

19   Q    Okay.  Just so I could make sure I heard you correctly

20   because it's coming in a little faint -- 2008 forward two or

21   three years, but you don't recall specifically as chair?

22   A    I don't recall.

23   Q    Okay.  And you've also served as a director of MNP, or

24   as it's now known, MNC, is that right?

25   A    MNP, that is correct.

1    Q    And you're currently a director of MNP?

2    A    No, I am not.

3    Q    When did you -- when did you resign from the board of

4    MNP?

5    A    About the same time as I left the board of Purdue.

6    Q    So, approximately, 2018?

7    A    Yes.

8    Q    Okay, and MNP is the entity through which -- I guess

9    the board of MNP controls the Sackler independent affiliates

10   companies internationally, is that correct?

11   A    That is not correct.

12   Q    Okay.  Is it the case that it makes recommendations to

13   the IAC's boards for them to implement?

14   A    That is -- yes, that is -- yes.

15   Q    Okay.  And have you served as a director of any of --

16   of any of those specific pharmaceutical manufacturer IACs at

17   any time?

18   A    One or two.  I don't recall the (indiscernible) which

19   ones.

20   Q    And the pharmaceutical companies, Purdue and the others

21   -- well, Purdue makes opioids, right?  It manufactures and

22   sells opioids?

23   A    Can you specify the time?

24   Q    Between, let's say, approximately 1988 and up through

25   today?

1    A    Yes.

2    Q    And the I -- the majority of the IACs that are engaged

3    in the pharmaceutical business around the world, they sell

4    opioids in the -- in the countries in which they exist.  Is

5    that right?

6    A    Again, could you specify the time?

7    Q    Well, do they do it now?

8    A    I don't know.

9    Q    Okay.  Did they do it in 2018, when you left the MNP

10   board?

11   A    I can't say it was a majority but some did.

12   Q    Okay.  And of those that did -- had some of them done

13   so for at least a decade?

14   A    Again, a decade from what?

15   Q    From 2018?  So, from 2008 to -- approximately, 2008 to

16   2018 --

17   A    I can't recall.

18   Q    But those -- those IACs are located in places like

19   Germany, right?

20   A    Yes.

21   Q    Italy, right?

22   A    Yes.

23   Q    Australia, right?

24   A    Yes.

25   Q    Canada, is that correct?

Page 33

```
 1    A     Yes.

 2    Q     South Africa, is that correct?

 3    A     Yes.

 4    Q     Argentina, is that correct?

 5    A     I don't know.

 6    Q     There are --

 7    A     I don't recall, actually.

 8    Q     There are at least a score of other entities, right,

 9    that --

10    A     Yes.

11    Q     Okay.

12    A     There are a score of other entities, yes.

13    Q     Okay, thank you.  Are you aware of how many people have

14    died in the United States as a result of the misuse of

15    OxyContin?

16    A     I do not.  I'm sorry, the question was how many?  I

17    don't know.

18    Q     How many have died from using OxyContin?

19    A     I stand with that answer.  I don't know.

20    Q     Okay.  How many have died -- do you know how many have

21    died throughout the world from the use of OxyContin or the

22    same drug under a different name internationally?

23    A     I do not know.

24    Q     Okay.  Do you know how many people in the United States

25    have died as a result of opioids?
```

Page 34

1    A    In what period of time?

2    Q    Let's say from 2005 to 2017.

3    A    I don't know.

4    Q    Have you ever known, or do you just not know as you sit

5    there today?

6    A    I don't think I've ever known.

7    Q    Did you ever bother to look?

8    A    I looked at data occasionally.  But to the best of my

9    recollection, I don't think it would have helped inform me,

10   even if I remembered it today, to give you a number.

11   Q    Okay.  So, you knew that people were dying, but you

12   didn't know and didn't look at how many?

13   A    I looked at the same information that the media looked

14   at (indiscernible).

15   Q    You didn't think it was necessary in your role as chair

16   or as president of an opioid company to determine how many

17   people had died as a result of the use of the product?

18   A    To the best of my knowledge and recollection, that data

19   is not available.

20   Q    Okay.  So you never looked at the CDC's opioids

21   website, for example?

22   A    I have looked at the CDC.

23   Q    You have?

24   A    Yes.

25   Q    Okay.  But you don't remember the numbers that the CDC

Page 35

1   provides on its website for opioid overdoses in the United

2   States, do you?

3   A    I -- I've looked at numbers but it doesn't locate it to

4   -- I can't recollect that it located it to any point in time

5   or period of time.

6   Q    Were you aware that the public health community has

7   been concerned about the overuse and misuse of opioids for

8   more than a decade?

9   A    I can't locate the time, but the answer to the -- to

10  the question, without a timeframe, is yes, I am aware.

11  Q    Okay.  Well, in 2007, Purdue pleaded guilty to federal

12  criminal charges related to its sale of OxyContin, is that

13  right?

14  A    Purdue did so, yes.

15  Q    And you were a director of Purdue at that time?

16  A    I was.

17  Q    And at that time, the public health community was

18  clearly aware, wouldn't you agree -- was clearly...  Strike

19  that.  At that time, wouldn't you agree with me that the

20  public health community was clearly concerned with the

21  problem of overconsumption of opioids?

22  A    I don't know what you mean when you say public health

23  community.

24  Q    Well, let's say the United -- let's say the United

25  States government, the Department of Health & Human

Page 36

1    Services.  At that time, it was clearly concerned with the

2    overuse and misuse of opioids, was it not?

3    A    Yes.

4    Q    And Mr. Brownlee, the United States Attorney for the

5    Western District of Virginia, for example, brought the

6    charges against Purdue and three of its executives, to which

7    all four of the entities or individuals pleaded guilty.  Is

8    that right?

9    A    I don't remember the name of the prosecutor but the

10   charges were brought, yes.

11   Q    Okay.  And at that time, given that a United States

12   attorney had brought charges against Purdue, it was clear

13   that the Department of Justice was concerned with the

14   overuse and misuse of opioids, was it not?

15   A    Is there a distinction between the Department of

16   Justice and the U.S. Department of Justice prosecutor?

17   Q    I think there are other Departments of Justice, but the

18   U.S. Department of Justice is the one I'm asking about here.

19   A    I don't know what the level of concern and with the

20   (indiscernible) U.S. Department of Justice were concerned.

21   There were some, but I don't know if it was all or just

22   some.

23   Q    Okay.  All right, I had trouble hearing your answer,

24   Dr. Sackler.

25   A    I'm sorry.

1   Q    Could you just repeat it?  It's not coming through

2   clearly.

3   A    Parts of the U.S. Department of Justice were concerned.

4   I don't know that it was the entire U.S. Department of

5   Justice in all of their divisions and subdivisions.

6   Q    All right. How about 27 states of the United States and

7   their attorneys general?  Are you aware that they were also

8   concerned by the overprescribing and overuse or misuse of

9   opioids at the time?

10  A    I can't -- I can't answer -- I don't know that it was

11  27.  Some were.

12  Q    A significant number of states were concerned with

13  Purdue's conduct, is that right?

14  A    I don't recall.

15  Q    Okay.  Do you recall entering into judgments and

16  assurances of discontinuance with -- by you, I mean Purdue -

17  - with a number of -- a substantial number of states?

18  A    I remember a few.  I don't remember that it was

19  substantial or not.  (indiscernible) at that point.

20  Q    And in 2007, do you know how many people had died from

21  the overuse or misuse of OxyContin?

22  A    No, I do not recall.  No.

23  Q    Then between 2007 and 2020, at least according to

24  Purdue, it continued to engage in criminal conduct with

25  respect to the sale and marketing of opioids, is that right?

1    A    That's a legal question in part.  But I think that

2    (indiscernible) I -- I -- just repeat the question?

3    Q    Did the company plead -- I'm sorry, Dr. Sackler, I

4    didn't mean to talk over you.  Could you say that again,

5    though?  I missed it.

6    A    Just restate your question.

7    Q    Yeah.  The question is that -- has Purdue admitted that

8    after the time we just talked about, after 2007, it engaged

9    in criminal conduct still with respect to the sale and

10   marketing of opioids in the United States?

11              MR. JOSEPH:  Objection.  Misleading. The plea is

12   the plea.  It does not deal with sale and marketing -- at

13   least not marketing.  And we can go through this as we did

14   yesterday but it's a misleading question.

15              MR. EDMUNDS:  Well, I think I just read the plea

16   yesterday, and then I think that --

17              MR. JOSEPH:  And the plea did not reference what

18   you just said.

19              MR. EDMUNDS:  I think that's semantics.  Your

20   Honor, I'm happy to have the witness read the plea.

21              THE COURT:  Why don't we go to the plea?

22              MR. EDMUNDS:  Okay.  Give me just a second?

23   BY MR. EDMUNDS:

24   Q    Dr. Sackler, let me ask you -- you should've received a

25   packet of docket -- documents this morning.  Do you have

1    access to that?

2    A    I have not opened them yet.

3    Q    I understand that.  I just -- I just wanted to make

4    sure that you have them.

5              MR. JOSEPH:  Just to be clear, last night, between

6    10:30 and midnight, we got 6,204 pages of documents for use

7    with the witness today, which we forwarded to him.  So, it's

8    not that pile of sets.  This is a separate set that we got

9    about two minutes to ten.  So, that's the set we're talking

10   about.

11             MR. EDMUNDS:  We did try to narrow it for you.

12   And part of that has to do with the ruling that -- or at

13   least clarification of rulings that the Court made this

14   morning.

15             MR. JOSEPH:  I think it speaks for itself.  We got

16   6,204 pages of documents.

17             THE COURT:  So, Dr. Sackler, when you're looking

18   for a document, it's in the more recent morning package that

19   you got.

20             THE WITNESS:  I have --

21             THE COURT:  The morning computer (indiscernible) -

22   -

23             MR. JOSEPH:  The later -- the later one.  The one

24   at around 10 a.m.

25             THE COURT:  Right, this morning.

Page 40

1              MR. JOSEPH:  Right.

2              THE WITNESS:  Please bear with me while I find and

3     open them.

4              MR. EDMUNDS:  Dr. Sackler, you can take your time.

5     I think...

6              MR. JOSEPH:  So, it's the one at 10:20 a.m., when

7     we got the most recent set.

8              THE COURT:  Are you asking him to locate the DOJ

9     settlement agreement, Mr. Edmunds?

10             MR. EDMUNDS:  Yes, I am.  And it is.

11             THE COURT:  And at the bottom you'll find that

12    there's a -- an exhibit number.  And what is that exhibit

13    number?  JX what, Mr. Edmunds?

14             MR. EDMUNDS:  2094, Your Honor.

15             THE COURT:  2094.

16             THE WITNESS:  I'm sorry, I must have

17    (indiscernible) the password incorrectly.  I'm sorry.

18             MR. EDMUNDS:  Please, I think the Court is willing

19    to give you all the time you need, Dr. Sackler, so take your

20    time.

21             THE WITNESS:  Thank you.  Okay, I have a

22    transmission that I received that was sent at 10:21 today.

23    I assume that is not the transmission I should open.

24             MR. EDMUNDS:  10:21?

25             THE WITNESS:  10:21.

Page 41

```
 1            MR. JOSEPH:  We got multiple documents this

 2    morning after the first set, so this is in the first of the

 3    three sets from around 10 this morning.

 4            THE WITNESS:  Okay, my problem is that the

 5    password we agreed to with Attorney Taylor does not function

 6    on the 10:41 documents.

 7            MR. JOSEPH:  Try the 10:21 documents.

 8            THE WITNESS:  Let me just try the password again.

 9    Okay, I may have made a mistake.  I may have capitalized

10    something that was supposed to be lower case.  Yes, they are

11    opening.  So, that's 16 files, correct?

12            MR. EDMUNDS:  I believe so, Dr. Sackler, that

13    sounds about right.

14            MR. JOSEPH:  That is correct.

15            THE WITNESS:  So, which one should I open?

16            MR. EDMUNDS:  JX2094, Dr. Sackler.

17            THE WITNESS:  Just a second.  Can you repeat that?

18    20...?

19            MR. EDMUNDS:  2094.

20            THE COURT:  JX-2094.

21            THE WITNESS:  I see it, yes.

22    BY MR. EDMUNDS:

23    Q    Okay, and I'll ask you to open that up.

24    A    Okay, it has opened.

25    Q    Okay, and I'll ask you to turn to -- I don't know what
```

1    the best way of you getting to it is, Doctor, but if you

2    could turn to -- it's page 48 of the PDF.  And the title is

3    Schedule A.

4    A    Just a second...

5               MR. JOSEPH:  It's 16 of 97 on mine.  Is that on

6    yours?

7               WOMAN 1:  (indiscernible) 47.

8               THE WITNESS:  Just a second, I got to 48.  It

9    shows -- it's (indiscernible) of something.

10              MR. EDMUNDS:  Okay.

11              THE WITNESS:  Is that what you wanted me to open?

12              MR. EDMUNDS:  Does it have Schedule A at the top,

13   Dr. Sackler?

14              THE COURT:  Well, it wouldn't be Schedule A, it's

15   Addendum A, right?

16              THE WITNESS:  There's Addendum A --

17              MR. JOSEPH:  This is the wrong document.  This is

18   to the settlement.

19              MR. EDMUNDS:  Yeah, we need Schedule A, Dr.

20   Sackler.

21              THE WITNESS:  Well, I opened (indiscernible) that

22   you directed me to.

23              MR. EDMUNDS:  Okay, as Mr. Joseph mentioned, it is

24   actually listed as Page 16 of 97.  In my file at least,

25   which I believe is the same as yours, it's Page 48 of the

```
 1    PDF file.

 2              THE WITNESS:  (indiscernible)

 3              THE COURT:  If you're looking at the bottom where

 4    it says JX-2094, then it says .0015.

 5              THE WITNESS:  Sorry.  It directed me to open --

 6              THE COURT:  Right, I understand.

 7              THE WITNESS:  We get another file.  Okay, so I'm -

 8    -

 9              THE COURT:  No, it's the same -- it's the same

10    file.  It's just -- it's earlier in the document.

11              THE WITNESS:  Okay, just a second.

12              THE COURT:  It's Page 16 of 97 at the top, and

13    also Page 15 at the top.  It's that same document, 2094.

14              THE WITNESS:  I'm sorry.  (indiscernible) Okay,

15    it's which document again?  2094?

16              THE COURT:  Yes.

17              MR. EDMUNDS:  Yes, sir.

18              THE WITNESS:  Okay.  And it's page what?

19              THE COURT:  15.

20              THE WITNESS:  Okay.  That might be 15.  Okay.

21    This might work.  12, 13, 14 -- okay, I have Page 15.  It's

22    titled -- it starts (indiscernible) and then followed by

23    (indiscernible) count one.

24              THE COURT:  Right.

25              MR. EDMUNDS:  That is the page.  Thank you, Dr.
```

1    Sackler.

2            THE WITNESS:  Sorry. My problem.

3    Q    Do you understand that this is the count of the plea

4    agreement to which Purdue pleaded guilty recently?

5    A    If that's correct, I'm not certain without reading the

6    whole document.  I could tell, I can verify your question.

7    It says Count 1.  Do you want me to read any particular

8    section or do you want me to read all of Count 1?

9    Q    I think if you want to take time and familiarize

10   yourself with the document and then land back on this page,

11   that would be, that would be perfectly fine.

12   A    Certificate of counsel is the first page, right?

13   Q    I think it goes a little bit --

14           MR. JOSEPH:  Go to the next page after that,

15   please, Dr. Sackler.

16   BY MR. EDMUNDS:

17   A    Okay.

18           MR. JOSEPH:  While we're waiting here, Your Honor,

19   if I may.  Mr. Edmunds, just correct something, which is not

20   in dispute.  The years Dr. Sackler was the co-chair of

21   Purdue were actually from 2003 to 2007, not 2000.

22           MR. EDMUNDS:  We will take Mr. Joseph's word for

23   it, of course.  I believe it's in the record otherwise

24   anyway.

25   BY MR. EDMUNDS:

Page 45

```
 1   A    Okay.  What page should I look at?  I believe this is a

 2   little unfamiliar to me.

 3   Q    Sure, understood, Dr. Sackler.  I think you should look

 4   back at the Page 15, Schedule A, Count 1 that we were

 5   discussing.

 6   A    Page 15.  I'm going to Page 15.  I was turning to --

 7   I'm sorry.

 8   Q    It's okay.

 9   A    It's not easy.  Let me open it up again.  Remind me

10   which is the relevant document?  2094?

11              THE COURT:  Yes.

12              MR. EDMUNDS:  Yes.

13              MR. JOSEPH:  Yes.  It's Page 15.

14   BY MR. EDMUNDS:

15   A    Okay.  These are big documents.  Okay.  I'm back to

16   Schedule A.

17   Q    Okay.

18   A    Why don't you tell the Court what Schedule A is?  If

19   that's correct, maybe I can proceed from there.

20   Q    Dr. Sackler, is your understanding that Schedule A was

21   the conduct to which Purdue pleaded guilty as part of its

22   recent plea agreement?

23   A    I can't locate Schedule A.  Why don't you phrase that

24   as some sort of --

25   Q    Let me.  I'll try.
```

1    A    And then if my attorney would agree --

2              THE COURT:  Let me ask it this way, Dr. Sackler.

3    If Mr. Edmunds and your attorney, Mr. Joseph, both agreed

4    that this Schedule A is part of a settlement agreement

5    between the Department of Justice and Purdue Pharma, would

6    you have any reason to disagree with that?

7              THE WITNESS:  Well, if the agreement is the sole

8    agreement, I have no reason to dispute that.  But some of

9    these cases I believe we're going to be talking about have

10   several agreements.  And I can't -- I can't locate it, but

11   if my attorney advises me that this is --

12             MR. JOSEPH:  I think that we can stipulate

13   Schedule A, which is from Pages 15 through Page 18, are the

14   facts that Purdue admitted in connection with its guilty

15   plea.

16   BY MR. EDMUNDS:

17   Q    And --

18   A    Okay, did you ask your question?

19   Q    Sure, Dr. Sackler.  In light of that stipulation, I

20   think I will just ask you if you have an understanding that

21   Purdue pleaded guilty to the conduct contained in Counts 1,

22   2, and 3 on the following three pages of the -- Page 1 and

23   the following two pages, following three pages of the

24   stipulation --

25   A    Can I just scan them?

1   Q     -- of the Schedule?  Yes, of course.

2   A     I'm having navigational problems, sorry, when I try to

3   go to the next page.

4   Q     I can understand that.  I've had that before.

5   A     Count 2 is on Page 17, correct?

6   Q     Yes.

7   A     Count 3 is also on the same page.

8   Q     Yes, and it continues to the next page.

9   A     It continues and ends at 18.  Okay.  May I just scan

10  these --

11  Q     Yes.

12  A     -- because you're asking me about my understanding.

13  Q     Yes.  You may read them through.

14  A     Thank you.  As I'm scanning it, I think I can agree.

15  Q     All right.  When you're ready, I will ask some

16  questions.

17  A     I'm ready.  I haven't read it.  I've just kind of

18  scanned it, but yes.

19  Q     Do you agree with me that Counts 1, 2, and 3 state the

20  conduct to which Purdue pleaded guilty in 2020?

21  A     I'm so advised by my counsel.

22  Q     Okay.  And would you agree with me that that conduct

23  involves Purdue's business with respect to opioids?

24  A     I think so, yes.

25  Q     And its practices, particularly with respect to selling

Page 48

1    opioids?

2              MR. JOSEPH:  Objection, characterization,

3    misleading.

4              MR. EDMUNDS:  He's read the document.

5              THE COURT:  If you understand it, Dr. Sackler.

6              THE WITNESS:  Right, I'm sorry, understand?

7              THE COURT:  The question.

8              THE WITNESS:  Your Honor, I think I understand it,

9    yes.

10             THE COURT:  Okay.  To the best of your

11   understanding, you should answer it.

12   BY MR. EDMUNDS:

13   A    This was an agreed statement of fact.  Agreed with the

14   Department of Justice and the Company.  And it incorporated

15   the conduct to which Purdue pleaded guilty.  Is that

16   responsive to your question?

17   Q    That is --

18   A    I apologize.

19   Q    I think the question was does it relate to Purdue's

20   selling of opioids?  Is that the conduct to which Purdue

21   pleaded guilty related to the selling of opioids?

22   A    Yes.

23   Q    Thank you.  Now is it also true that you have, in

24   connection with your service as Director of Napp,

25   international affiliated companies that you own, has also

Page 49

1    run into trouble with the law enforcement regulatory

2    officials in some of the jurisdictions that they are in?  Is

3    that right?

4    A    The name Napp, I have no knowledge of that with Napp.

5    Q    Okay.  Not just Napp, but how about Mundipharma Italy?

6    A    I did hear long after the fact perhaps, I can't locate

7    it in time, but there had been issue with them.

8    Q    Okay.  There was an issue in Italy with respect to

9    Mundipharma's marketing of opioids.  Is that right?

10   A    It had something to do with one of the Mundipharmas.  I

11   don't know which opioids.  This is very broad.  So some

12   opioids I would say.  I don't know if it was all opioids.

13   Q    All right, Doctor, but some opioids and the prosecutors

14   in Italy conducted a criminal probe of whether, in fact,

15   Mundipharma Italy had paid kickbacks to Italian doctors.  Is

16   that right?

17   A    I didn't know that fact.  I don't recall that.

18   Q    Okay.  And did Mundipharma Italy settle that probe to

19   your knowledge?

20   A    I believe so, yes.

21   Q    How about Mundipharma Australia?  Are you aware of a

22   regulatory action brought there in connection with

23   Mundipharma Australia's marketing of opioids in Australia?

24   A    I have no recollection of that.

25   Q    All right.  Do you have any reason to dispute it if

Page 50

1  your son testified yesterday that there was such a problem?

2  A    I have no knowledge of it, so how can I dispute it?  I

3  can't dispute what I don't know.

4  Q    And are you aware that authorities in Canada have

5  initiated actions with respect to Purdue Canada related to

6  its marketing of opioids?

7  A    Could you restate the question?

8  Q    Yeah.  Are you aware that authorities in Canada have

9  brought actions against Purdue Canada with respect to its

10 marketing of opioids there?

11 A    I know there have been actions.  I was informed of

12 actions.  I don't know that it related to its marketing.

13 Q    All right.  Do you know that it's related to its

14 practices with respect to opioids, any practices with

15 respect to opioids whatsoever in Canada?

16 A    I believe I know enough to answer that yes.

17 Q    Okay.  Thank you.  Let me ask you now to pull up, it's

18 going to be JX2096.  And we'll just be on the first page of

19 this one.

20 A    Okay.

21        MR. JOSEPH:  It maybe number six down.  It's the

22 sixth that I'm looking at.

23 BY MR. EDMUNDS:

24 A    I'm sorry.  I'm now only showing eight documents.

25 What's the number?

Page 51

1    Q    It's JX-2096.

2    A    I'm not showing that one now.  I'm sorry.

3             MR. JOSEPH:  Let's email it to him again.

4             THE WITNESS:  You want me to go to email now?

5             MR. JOSEPH:  We're going to email it to you

6    separately so we can move this along.

7             THE WITNESS:  Okay.  So I should change to email

8    and download it again?

9             MR. JOSEPH:  Yes.  It will be a single document.

10   It's just been sent by Ben Taylor.  So you should have it

11   momentarily.

12            THE WITNESS:  All I see now is 1049.

13            THE COURT:  It will come in shortly.

14            THE WITNESS:  Okay.  I hope.

15            MR. JOSEPH:  We're going to plan on emailing each

16   document as Mr. Edmunds refers to it just to help expedite

17   this.

18            MR. EDMUNDS:  Thank you, Mr. Joseph.

19            THE WITNESS:  Okay.  It just came in.  Tap to

20   download.  Okay.  It is open.

21   BY MR. EDMUNDS:

22   Q    Okay.  Dr. Sackler, could you take a look at that

23   agreement and tell me, after you've had a chance to review

24   it, whether there is a civil settlement agreement that you

25   and other members of your family entered with the United

1    States Department of Justice in 2020?  I'll give you the

2    precise date.

3    A    Yes.  I haven't read the whole document, but I do

4    recognize the first page, or at least the preamble to the A,

5    B, C, D.

6    Q    Okay.  And you have -- you're referring to the preamble

7    -- I see what you mean.  Got it.  And this is -- I think

8    you've just confirmed, but let me just make sure.  This is

9    the agreement that you entered with the Department of

10   Justice to settle claims it has -- it asserted it had

11   against you and members of your family; is that right?

12   A    Yes, I believe.

13   Q    Okay.  Can I ask you to scroll through to page -- to

14   Schedule -- to Addendum A rather, of this document?  And

15   it's --

16   A    What page is it?  That would be helpful.

17   Q    At the bottom, it will say JX-2096.0024.

18   A    I'm sorry, okay JX -- I'm having trouble seeing the

19   bottom.  So what page should it be on?

20   Q    It's page -- so it has a bunch of numbers, but it's

21   Page 24 of the PDF and the JX number at the bottom of the

22   page will read 2096-0024.

23   A    JX-2096.0007.  Is that correct?

24   Q    .0024, sir.

25   A    Sorry.  Addendum A to Settlement Agreement.  That's

Page 53

1    what I see on Page 25.  You want me to be on page?  Page 22

2    of the PDF?

3    Q    That's fine.  If you're on Page 25, I think we're fine.

4    I was referring you to the title page, but 25 is where we're

5    going to do anyway.  That will do, I think.

6    A    Do you want me to read something or do you have a

7    question?

8    Q    I will ask you a question.  First, I'll ask you: Would

9    you agree with me that this Addendum A is a factual

10   statement that the Department of Justice submitted and

11   attached to the civil settlement you entered?

12            MR. JOSEPH:  Objection, the document speaks for

13   itself.  It specifically says on Page 3 what these are.

14            MR. EDMUNDS:  If counsel is willing to --

15            MR. JOSEPH:  It's the contentions of the United

16   States.

17            MR. EDMUNDS:  Okay.  I think that's fine for me.

18   BY MR. EDMUNDS:

19   Q    I'm going to read you some of what it said in this, Dr.

20   Sackler and ask you if, in fact, the facts are correct.  So

21   I will do that --

22            MR. JOSEPH:  I object to that.  On Page 3 it also

23   says the named Sacklers expressly deny the allegations

24   regarding the covered conduct.  It is precluded under Rule

25   408.

```
1           MR. EDMUNDS:  And, Your Honor -- I'm sorry, Your

2      Honor.

3           THE COURT:  Again, I actually think the question

4      was asked correctly this time, which is, Dr. Sackler, are

5      you going to read him specific or just ask if each one?

6           MR. EDMUNDS:  Well, I can ask them all overall

7      first, but I think I might have to go specifically at that

8      point.

9           THE COURT:  Dr. Sackler, the question I believe

10     is: Do you agree with the statements in this Addendum A?  Do

11     you agree with them?

12          THE WITNESS:  I denied all of them.  So I agree

13     it's the statements in Addendum A, but I do not agree to the

14     content of the statements.  Is that responsive, Your Honor?

15          THE COURT:  If that's your answer.  If that's what

16     you believe is true, then it's responsive.

17          THE WITNESS:  Yes.

18     BY MR. EDMUNDS:

19     Q    So just to make sure this is clear.  You deny, as you

20     sit there today, each and every factual allegation that the

21     United States Department of Justice has included in Addendum

22     A?

23     A    I do, yes.

24     Q    And to be clear, if the Department of Justice

25     specifically references a document and quotes from a
```

Page 55

1    document in Addendum A, you deny that there is a such a

2    document that contains the language quoted?

3              MR. JOSEPH:  Objection.  May we have specifics?

4    It's totally unfair to refer to a multipage document like

5    this.

6              THE COURT:  I think you should focus on specific

7    points.

8              MR. EDMUNDS:  Okay.  Well --

9              THE COURT:  I mean you're certainly free to cross-

10   examine Dr. Sackler on his answer.  So you can probe it, but

11   I wouldn't just refer generally at this point.  I think you

12   need to be more specific.

13             MR. EDMUNDS:  Okay.  I was trying to expedite it

14   if that's what the Court wanted, but I think it would be

15   better to do specifics.

16   BY MR. EDMUNDS:

17   Q    Okay.  I am going to turn you back, Dr. Sackler, if

18   you've navigated away, to Page 25, which is the document

19   atop of which is Addendum A to the settlement agreement.

20   And Roman Numeral I. Introduction.  Right?  So are you

21   there?

22             THE COURT:  I think it was the same page you were

23   on.

24             MR. EDMUNDS:  Yeah, I don't know if he has moved

25   away.

1          THE WITNESS:  I did, actually.  Okay.  I'm looking

2      now.  My page number is showing.  At the bottom I see the

3      Document No. 25.  So I'm back to 25, yes.

4      BY MR. EDMUNDS:

5      Q   Okay.  Dr. Sackler, I'm going to ask you and I'll just

6      refer and we'll go through it as slowly as you need to.  But

7      I'm going to refer to specifics and just ask you if you deny

8      the facts stated, just the assertions of fact.  It has

9      nothing to do with the overall document.  We're just going

10     through these factual statements and finding out if they are

11     correct or incorrect in your view.

12         MR. JOSEPH:  I'm objecting to a reference to these

13     as factual statements.  It's on Page 3 they're

14     (indiscernible).

15         THE COURT:  The question is when Mr. Edmunds ask

16     you do you agree with the statement, the particular

17     statement.

18         THE WITNESS:  Do I agree with the statement --

19         THE COURT:  No.  He's going to ask you -- he's

20     going to refer you to certain statements in Addendum A and

21     he's going to ask you if you agree with that statement or

22     not.

23         THE WITNESS:  True or false.

24         THE COURT:  Right, exactly.

25         MR. EDMUNDS:  Right, Dr. Sackler, true or false.

Page 57

1            THE COURT:  Okay.

2    BY MR. EDMUNDS:

3    Q    Okay, Dr. Sackler, the first one I'll refer you to is

4    in Paragraph 1, second sentence: Members of the Sackler

5    family previously served as members of the Board of

6    Directors of Purdue General Partners, including Dr. Richard

7    Sackler, Mortimer D.A. Sackler, Jonathan Sackler, Kathe

8    Sackler, and RICHARD SACKLER, the named Sacklers.  True or

9    false?

10   A    I do not recall whether we were on the Board as General

11   Partners.

12   Q    Okay.  Paragraph --

13   A    Sorry, I'm trying to be as responsive as possible.

14   Q    That's fine, Dr. Sackler.  Paragraph 2, first sentence:

15   "Purdue's profits declined in 2010 after the introduction of

16   its reformulated OxyContin, which was intended to be more

17   difficult, although not impossible, to crush or manipulate

18   for purposes of abuse and misuse."  True or false as to

19   whether Purdue's profits declined in 2010?

20   A    I don't know whether the profits declined in 2010.  I

21   just don't know.

22   Q    Do you have any reason to believe that this statement

23   is false?

24   A    I have no reason to believe that it's false or true.  I

25   don't know.

Page 58

1   Q    Next sentence, same paragraph: "The named Sacklers and

2   Purdue Executives tracked Purdue's lost sales closely and

3   regularly scrutinized sales report and related data."  Is

4   that true, Dr. Sackler?

5   A    I can speak for myself.  It is true.

6   Q    Thank you, Dr. Sackler.  The next sentence:  "They" --

7   including you -- "attributed the majority of the decline to

8   two trends: 1) individuals abusing opioids moving from

9   OxyContin to opioids that were easier to abuse through

10  insufflation and injection, or 2) increased scrutiny of

11  prescribers, pharmacists, and other actors in the opioid

12  distribution chain."  Is that true?

13  A    As stated, it is not true.

14  Q    Okay.  What is not true about it?

15  A    The word "attributed."  We hoped, not attributed.

16  Q    You, I'm sorry, hoped?

17  A    We hoped.  Let me clear.  We hoped that the majority of

18  the decline was related to the change to the abuse deterrent

19  formulation.

20  Q    Okay.  And what about the second clause: increased

21  scrutiny of prescribers, pharmacists, and other actors in

22  the opioid distribution chain?

23  A    I don't recall.

24  Q    Okay.  Paragraph 3: Although the named Sacklers knew

25  that the legitimate market for produced opioids had

Page 59

1    contracted, the named Sacklers nevertheless requested the

2    Purdue Executives recapture lost sales and increase Purdue's

3    share of the opioid market.  True or false?

4            MR. JOSEPH:  That's compound, Your Honor.  May we

5    break it up?  There's two separate statements there.

6            MR. EDMUNDS:  Sure, we can take it --

7            THE COURT:  Like you did with the last one, Mr.

8    Edmunds, if you could do that.

9            MR. EDMUNDS:  We'll go clause by clause, yes, Your

10   Honor.  Thank you.

11   BY MR. EDMUNDS:

12   Q    Although the named Sacklers knew -- I guess the first

13   one will be: The named Sacklers knew that the legitimate

14   market for Purdue's opioids had contracted.  Is that true,

15   Dr. Sackler?

16   A    That's false.

17   Q    It's false.  In what way is it false?

18   A    It's false on its face.  The market hadn't contracted.

19   Q    All right.  And the second clause: The named Sacklers

20   nevertheless requested the Purdue Executives recapture lost

21   sales and increase Purdue's share of the opioid market.  Is

22   that true?

23   A    Yes, as we understood the opioid market, yes, that's

24   true, which we believed correctly, in my opinion, was

25   expanding.

Page 60

1   Q      Thank you for the clarification.  Paragraph 4: As a

2   result of these requests from at least 2013 through 2018,

3   Purdue developed an aggressive marketing program that

4   focused on detailing over 100,000 doctors and nurse

5   practitioners nationwide each year.  And I'll stop there.

6   Is that true?

7   A      May I just read it again?

8   Q      Yes, sir.

9   A      I can't testify.  I don't recall as to the years.

10  Q      Okay.  Do you recall whether Purdue developed an

11  aggressive marketing programming that focused on detailing

12  over 100,000 doctors and nurse practitioners nationwide each

13  years?

14  A      We didn't consider the program aggressive, so that's

15  false.

16  Q      Is the rest of the statement true?

17  A      I don't recall the number.

18  Q      Do you have any reason to believe it's not true?

19  A      No.

20  Q      And moving onto the next clause: It is true -- well, it

21  is true that among those 100,000 doctors and nurse

22  practitioners there were included, thousands of prescribers

23  that the named Sacklers knew or should have known -- let me

24  just say knew were -- knew were prescribing opioids that

25  were not always for medically accepted indications.

Page 61

1    A    Can you draw my attention to that sentence, please?

2    Q    The sentence follows the one we just talked about.

3    It's the second clause.  It is the third line of Paragraph

4    4.  It begins after the comma with including.  And I guess

5    the question --

6    A    Aside from the "sometimes," we didn't know that it was

7    sometimes, but we certainly don't -- I don't agree with the

8    rest of it at all.

9            MR. HUEBNER:  Your Honor, just for one second.

10            THE WITNESS:  I'd like to just deny that if I may,

11    Your Honor.

12            THE COURT:  Okay.

13            MR. HUEBNER:  Your Honor, Marshall Huebner for the

14    Debtors, just one second.  A request for Mr. Edmunds.  As we

15    discussed at the beginning of this whole hearing, there is

16    obviously a risk that confirmation does not go through or

17    that the Sacklers breach.  We had the stipulations in place

18    to protect us against prejudices.  The questions like "Did

19    the Sacklers know," which I think are unanswerable since

20    that there are dozens of human beings in multiple countries,

21    actually run the risk of prejudice in the estate's causes of

22    action against the Sacklers should they ever need to be

23    brought.  If you wouldn't mind terribly asking Dr. Sackler

24    what he knows, or if what you want to ask about other

25    specific individuals, of course, feel free, but we're

Page 62

```
 1    actually a little bit concerned with the record being made

 2    with Dr. Sackler denying what the "Sacklers" knew, which I

 3    don't actually think anybody but God could know, versus what

 4    he or specific people you want to ask him about knew.

 5    BY MR. EDMUNDS:

 6    Q    All right.  To be very clear, Dr. Sackler, I will read

 7    facts from this.  I'm only asking you about what you know

 8    personally.  So when there's a reference to "the Sacklers"

 9    or even the "named Sacklers" unless you know personally, I

10    would ask you answer only for yourself.  Is that okay with

11    you?

12    A    That makes it easier for me, yes.

13             THE COURT:  Okay.  And then let me just reiterate,

14    the decision by any party to this hearing not to engage in

15    cross-examination of Dr. Sackler on any of these points with

16    respect to his testimony has no estoppel effect in any

17    future litigation.  So you can go ahead, Mr. Edmunds.

18             MR. EDMUNDS:  Thank you, Your Honor.

19    BY MR. EDMUNDS:

20    Q    Dr. Sackler, let me turn you to the last sentence of

21    Paragraph 4.  It carries onto the next page, which is Page

22    26.

23    A    The sentences are not highlighted.  I don't know

24    whether there's one, two, three or four sentences in

25    Statement 4.
```

Page 63

1    Q    Okay.  We'll you're welcome to read the whole thing and

2    just meet me at the last sentence, which will be what my

3    sentence is about.

4            MR. JOSEPH:  Are you talking about the last clause

5    in the first sentence, or the last sentence on Page 2?

6            MR. EDMUNDS:  I believe Dr. Sackler has denied

7    everything after "sometimes" in the other sentence.  So I

8    think we'll talk about last sentence.

9            MR. JOSEPH:  The last clause in the same sentence.

10           MR. EDMUNDS:  No, no.  I think that's after

11   "sometimes" as I understand it.  I've now moved onto --

12           MR. JOSEPH:  We're now in the "By 2013 sentence.

13           MR. EDMUNDS:  Dr. Sackler is going to read it, but

14   I'm only going to ask about the sentence beginning with

15   "This strategy" at the end.

16           THE WITNESS:  Oh, I'm sorry.

17           MR. JOSEPH:  Read the prior sentence.  Read the

18   paragraph.

19           THE WITNESS:  Okay.

20   BY MR. EDMUNDS:

21   Q    So, Dr. Sackler, I think you should be at the last

22   sentence and I'm going to ask you the same thing.  Well, let

23   me ask it this way.  Did you approve a strategy known as

24   Evolve 2 Excellence or E2E when you were a director in 2013

25   at Purdue Pharma?

Page 64

1   A    What do you mean by approved?

2   Q    Was it presented to the Board of Directors that

3   strategy?

4   A    I don't think so.

5   Q    So your testimony is you did not receive a presentation

6   about the E2E --

7   A    Let me clarify.

8   Q    Certainly.

9   A    Elements of E2E was presented, but it was not presented

10  -- I don't recollect any vote on proceeding or not

11  proceeding with the strategy.  The minutes should reflect in

12  it if there was a vote and if it passed.  You have those

13  minutes, do you not?

14  Q    I believe we do, Dr. Sackler.  But my question is just

15  generally, you are aware and was it presented to you as a

16  director that there was this Evolve to Excellence program?

17  A    I heard about it, yes.

18  Q    Did you ever express disapproval of the program?

19  A    Not that I can recall.

20  Q    And to turn you know to Paragraph 6, which is -- we'll

21  skip over Paragraph 5, if you could read Paragraph 6, do you

22  agree that you and other members of the family who were on

23  the Board of Directors transferred out billions of dollars

24  as cash distribution and profits into Sackler family holding

25  companies or trusts?

Page 65

1    A    Okay.  I got the grasp of the question.  Now may I read

2    Paragraph 6?

3    Q    Of course, sir.

4    A    It's listed as a compound statement.  So it would be

5    helpful if you just phrased -- I can't testify to the whole

6    thing without saying I don't have memory that's sufficiently

7    sharp about every element of this.

8    Q    Okay.  Is it true that during that time period

9    generally, Dr. Sackler, the Purdue Board of Directors

10   transferred out billions of dollars to Sackler family trusts

11   or holding companies?

12   A    Yes.

13   Q    Okay.  And let me turn you now to Paragraph 10 that's

14   on the next page.

15   A    But I'm not agreeing for example -- let me be clear.

16   I'm saying that your question did we transfer over the years

17   approximately 2008 to '18, yes, that we did.

18   Q    Yes, and I'm not --

19   A    Okay.

20   Q    The only thing you need to respond to -- we have this,

21   but the only thing you need to respond to is what I say in

22   my actual question.  That's what you're answering.  The rest

23   of it is not -- I'm not asking about.

24   A    Okay.

25   Q    Thank you for that, but I'll clarify that for you.

Page 66

1    A    Thank you.

2    Q    So I'll ask you now again to turn to page, Page 27,

3    Paragraph 10.

4    A    27 --

5             MR. JOSEPH:  It's the next page.

6             THE WITNESS:  Oh, I'm sorry.  I keep looking at

7    the pagination of the document.  I'm sorry.  It's quite a

8    confusing collection of numbers here.  So it's paragraph

9    what?

10            THE COURT:  10.

11   BY MR. EDMUNDS:

12   Q    Paragraph 10, sir.

13   A    What page number of the PDF?  That would help me.

14   Q    It's just the next page, Dr. Sackler.

15   A    I have now navigated --

16   Q    Okay.  It's page 27 of the PDF.

17   A    Thank you.  Page 27 of the PDF, 26, okay.  I'm now

18   looking at PDF 27.

19   Q    Did you have an office at Purdue Headquarters in

20   Stanford?

21   A    At what time?

22   Q    At any time.

23   A    Yes.

24   Q    Did you have -- and did the others, your brother

25   Jonathan, your cousin Kathe, did they have offices at

```
 1    Purdue's headquarters at any time?

 2    A    Yes, at some time, some time, yes.

 3    Q    And the Boardroom was also located there?

 4    A    Yes, it was.

 5    Q    I don't think -- I don't think the court reporter would

 6    have heard that, Dr. Sackler.

 7    A    Okay, yes, yes.

 8    Q    Okay.  Thank you.  If you look at Paragraph 11, would

 9    you agree with me that -- I'm referring specifically to the

10    first sentence, but that you had, at times, direct

11    communications with executives, including the sales and

12    marketing executives of Purdue?

13    A    Yes.

14    Q    And did those communications include -- looking at the

15    last clause of the sentence -- sales forecast -- sales and

16    marketing forecast and sales and marketing strategies?

17    A    Where are we?  Yes.

18    Q    So they did.  Is that right?

19    A    They did.

20    Q    And did they include the E2E program that we just

21    discussed earlier on?

22    A    I don't recollect.

23    Q    All right.  Fair enough.  Did you also communicate, as

24    it says in the next sentence, directly with lower-level

25    employees?
```

1        MR. JOSEPH:  May we have some clarification as to

2   what lower level means in that question?

3        MR. EDMUNDS:  Sure.  I will amend the question.

4   Let me ask it again.

5   MR. EDMUNDS:

6   Q    Did you have communications with sales representatives?

7        MR. JOSEPH:  At any time?

8   BY MR. EDMUNDS:

9   Q    At any time.

10  A    Yes.

11  Q    I'm sorry, Dr. Sackler, can you just repeat it?

12  A    At any time I was on the Board of Purdue, did I?

13  Q    Yes.

14  A    Yes.

15  Q    How about any time during the period which this

16  document covers which is about 2008 to 2018?

17  A    Just a second, excuse me.  A good friend just texted me

18  and I can't read it.  I'm sorry.  I was distracted.  Could

19  you repeat --

20  Q    Did you have communications with sales representatives

21  at any time during 2008 to 2018?

22  A    I can only remember one occasion, one representative,

23  yes.

24  Q    And did you ever go on a ride-along with sales

25  representatives during that time period?

Page 69

1    A     One half-day ride-along with the sales representative,

2    but I had -- I just testified I had communications with.

3    Q     Okay.  And by ride-along, does that mean that you rode

4    in the car with the sales representative to visit the

5    healthcare providers the sales representative called upon?

6    A     As an observer, yes.  Not as a participant in the sales

7    talk.

8    Q     So you did not speak with the healthcare provider.  You

9    simply rode along and spoke with the sales representative

10   maybe?  You didn't speak with HCPs that were called upon

11   during the sales call?

12   A     I don't recollect I did.

13   Q     But you did speak with the sales representative, is

14   that right?

15   A     While we were in the car, we held conversations.  Many

16   of them had nothing to do with anything other than we were

17   two human beings engaged in a common task.

18   Q     And what was that common task?

19   A     To get more patients in serious pain more affective

20   pain relief from their doctor.

21   Q     And that would, in fact, result in sales of opioids.

22   Is that right?

23   A     I can't tell it would.  I can tell it might have.  It

24   might have had the opposite effect too.

25   Q     Well, the sales call might have failed, but you would

Page 70

1    agree with me the purpose of sending the sales

2    representative to the healthcare providers that you both

3    visited was to promote the sale of Purdue's opioids?

4    A    That was one of the purposes, yes.

5    Q    Could you say it again, Dr. Sackler?

6    A    It was, it was part of a larger, overarching purpose,

7    which was to educate about the use of opioids.

8            MR. JOSEPH:  Can you get closer to the microphone?

9    You're getting difficult to hear.

10   BY MR. EDMUNDS:

11   A    I'm suffering from laryngitis, Your Honor, and all

12   attending.  My voice is beginning to give out.  Okay.  Can

13   you hear me now?

14           THE COURT:  Yes.

15   BY MR. EDMUNDS:

16   Q    Yes, much better, Dr. Sackler.  Okay.  Dr. Sackler, I'm

17   going to skip forward a bit in the interest of time and ask

18   you to take a look at -- let's first go to the section

19   heading, it is IV, it appears on -- there on page 29 of the

20   PDF.

21   A    Thank you.

22   Q    And the heading I'm looking at is, "The Named Sacklers

23   Knowing Caused Medically Unnecessary Prescriptions to be

24   Submitted to Federal Healthcare Programs" but I'm not going

25   to -- I don't have a question about that.  I just -- I want

Page 71

1    to orient you.

2    A    I -- (indiscernible.)

3    Q    Okay.  And just so that we're oriented there, I'm going

4    to ask you to turn to the next page in paragraph 25, and

5    I'll ask you a question about paragraph 25.

6    A    May I read it before you ask the question?

7    Q    Of course you may.

8    A    Thanks.  I'm by myself here so, I don't know why I

9    turned away, I apologize.  It's -- I've read paragraph 25.

10   Q    Okay.  Thank you, Dr. Sackler.  Would you agree with me

11   that one of Purdue's most effective tools to increase and

12   maintain sales was to send sales representatives into the

13   field to visit healthcare providers?

14   A    Yes.

15   Q    Purdue spent a lot of money on that, right?

16   A    I don't know what you mean by a lot of money, but --

17   Q    Well, I suspect that you don't -- maybe that's true.

18   It is a substantial portion of Purdue's marketing budget; is

19   that right?

20   A    If you're asking -- I'll respond to it the following

21   way.  If you're asking the question of, did the entire sales

22   department cost us substantial more than our commercial

23   budget, (indiscernible).

24   Q    All right.  Thank you.  And if you turn to page --

25   paragraph, rather, 27, I would ask -- I will ask -- I'll let

Page 72

1    you read and when you're ready, let me know.

2    A    Okay.  I have read it.

3    Q    Okay.  Did you know -- did you have information -- were

4    you aware that calling on and detailing healthcare providers

5    was correlated with the prescription -- was correlated with

6    an increase in the prescription that produced opioids?

7    A    That proposition as well.

8    Q    Okay.

9    A    The answer is no.

10   Q    All right.  So, calling -- all right.  Let me just ask

11   the clause, and I will read it.  Did you know that calling

12   on or detailing healthcare providers causes them to

13   prescribe more of Purdue's opioid drugs?

14            MR. JOSEPH:  Asked and answered.

15            THE COURT:  Well, I -- I -- you can answer that

16   question, Dr. Sackler.

17            THE WITNESS:  I'm now repeating your question to

18   myself.  I'm sorry for the pause, Your Honor.

19   A    I still say the statement is too broad to answer in any

20   other way, but it is not (indiscernible) -- if you can

21   narrow the question (indiscernible) --

22            MR. JOSEP:  Come closer to the microphone, please.

23   A    Well, I'm just doing the best I can with my voice.

24   Q    Okay.  Dr. Sackler, did -- you said if I could --

25   A    You said opioid drugs.

Page 73

1    Q    Ah, thank you.  Is it you true that with respect to

2    OxyContin?

3    Q    So, David --

4    A    But not always in every subcategory.  Sometimes it had

5    no effect at all.  Sometimes it had effect.

6    Q    How about MS CONTIN?  Was the -- there a correlation

7    there between detailing and prescribing?

8    A    We stopped the detailing MS CONTIN in '95.

9    Q    You stopped detailing MS CONTIN in what years, sir?

10   A    '95.

11        THE COURT:  I'm sorry, when?

12   Q    I think --

13   A    1995, when OxyContin was introduced, we stopped

14   detailing MS CONTIN.

15   Q    Well, how about Hysingla; is there a correlation

16   between detailing and sales?  That --

17   A    I wouldn't know.

18   Q    Butrans?

19   A    I don't know.

20   Q    Adhancia?

21   A    I'm sorry?

22   Q    Adhancia?

23   A    I don't remember that name.  I'm sorry.

24   Q    All right.  It may be the wrong -- okay.  Atencia.  Do

25   you remember Atencia?

1    A    No.

2    Q    Okay.

3    A    I do not recall.

4    Q    Okay.  Dr. Sackler, I'd refer you now to paragraph 29.

5    And you can go ahead and read it.

6    A    I did read 29.  Again, it's a compound statement, so --

7    Q    Well, I haven't asked you anything about it yet, so I

8    will try to break it down.

9    A    There's many propositions in there.

10   Q    Is it true that you took an interest in Purdue's

11   marketing and requested regular briefings on marketing and

12   strategies?

13   A    Are you asking about Purdue's Board?

14   Q    I'm asking about you personally?

15   A    Only in the context of the Board meetings, yes.

16   Q    Only in the context of the -- I think --

17   A    Well, it says, listed regular briefings and provided

18   input.  That's not true.  No, it's a compound -- it's a

19   series of statements, so it's very hard to isolate --

20   Q    You -- right --

21   A    -- any of these (indiscernible) true.

22   Q    Okay.  So, let me -- let me just try to break it down

23   in a way that, you know, doesn't require you to answer

24   collectively.

25   A    Okay.

1    Q    So, the first thing is, did you ever request regular

2    briefing -- did you request regular briefings on marketing?

3    A    As a -- in the Board?  That can -- I don't remember the

4    Board -- certainly don't remember that I requested briefings

5    from the Board.

6    Q    All right.  But how about the Board -- I'm not hearing

7    you, Dr. Sackler.

8    A    Not responsive to your question.

9    Q    Well, I didn't quite understand the response.  It

10   didn't come through.

11   A    (Indiscernible) the question, that would probably be

12   better, I'm sorry.  (Indiscernible), Your Honor.

13          THE COURT:  Sir, the -- I think the question was

14   whether you yourself requested regular briefings regarding

15   OxyContin marketing, and I think you said --

16   A    Not outside of the Board.  No, I did not.

17   Q    How about as a participant in the Board of Directors,

18   Dr. Sackler; did you receive regular briefings on marketing?

19   A    I'm -- I don't know that they were regular headings on

20   any schedule.  But the Board did get briefings

21   (indiscernible) about the progress or lack of progress the

22   sales progress or lack, so generally, it's okay.  But we got

23   many briefings.  I don't they were regular.

24   Q    And were you briefed on the sales strategies that were

25   implemented by Purdue in marketing opioids?

Page 76

1    A    I don't recall.

2    Q    Could you recall conversations with Russell Gasdia

3    about the sales strategies that he was implementing as VP of

4    Sales?

5    A    I didn't remind -- of -- (indiscernible) -- are you --

6    I think you have the data, that you're referring to emails.

7    If you're referring to, did I call him up and ask him how

8    things are doing or any open-ended question, the best of my

9    recollection, no I did not.

10   Q    Did you ever have phone calls with Russell Gasdia?

11   A    Ever?  Yes.

12   Q    Okay.  And did you have phone calls with Russell Gasdia

13   about sales and marketing?

14   A    I cannot recall.  I'm not denying it, I'm just saying I

15   can't recall it.

16   Q    You can't recall the calls, but you have no reason to

17   deny that they occurred; is that correct?

18   A    At least a few over years, yes.

19   Q    All right.

20   A    Very few.  Certainly not regular and not frequent.

21   Q    And I think we talked about the ride-along that you

22   went on at the end of paragraph 29, so I'll skip -- I won't

23   ask a question.  Could you turn to paragraph 34 on the next

24   page?

25   A    I just read it.

1    Q    All right.  Thank you.  Is it true that you -- that

2    through at least January 2014, you received weekly analyses

3    of opioid prescribing data?

4    A    For brief periods -- I can't locate it to January 2014.

5    There were brief periods that I did get weekly reports, but

6    they were, like, forward, like four weeks, eight weeks, or

7    twelve weeks.  They weren't -- they didn't extend.  They

8    were not regular and they were not frequent.

9    Q    Okay.  But you did receive reports -- or, sorry.

10   Reports are not -- well, strike that.

11        You did receive analyses of opioid prescribing data

12   from time to time?

13   A    Actually, no. I recall receiving data, not analysis.  I

14   wanted to see the data and the -- I don't recall they

15   provided that or not.

16   Q    Okay.  You got the data though on opioid prescribing?

17   A    Yes, for brief periods.

18   Q    All right.

19   A    Infrequently, I may have, yes.  We'd get that.

20   Q    Was the Board briefed on opioid prescribing data during

21   your time on the Board?

22   A    Sometimes.  It can come up in a Board meeting.  But it

23   depended on whether the marketing department was making a

24   presentation.

25   Q    Okay.  And I believe you said sometimes it would come

Page 78

1    up at Board meetings but it depended upon whether the

2    marketing department was making a presentation; is that what

3    you said?

4    A    Yes.

5    Q    All right.

6    A    The -- another department that got close to that was

7    the finance department, which made reports on financial

8    statements because it was directly related.

9    Q    All right.  And was the financial state of the business

10   related to opioid prescribing?

11   A    No, it was not related to opioid prescribing.

12   Q    It's not the case that if opioid prescribing went up,

13   the company would sell more opioids?

14   A    In general, it was (indiscernible) there would be

15   increased sales, but not always.

16   Q    Okay.  And is it true that the -- is it generally true,

17   all other things being equal, the higher the dose of opioids

18   prescribed, the higher Purdue's profits?

19   A    All else being independent, yes.  However, it's an, you

20   know, I don't think I want to add anything to that.  The

21   answer is yes.

22   Q    Okay.  So, the answer is yes and you don't think you

23   want to add anything to that, right?

24   A    No.

25   Q    I just -- there's going to be a court reporter and I'm

Page 79

1    just making sure that the --

2    A    No.  (Indiscernible.)

3    Q    -- because it is difficult to hear you.

4    A    No, I'm sorry.  No, I mean, I'm doing the best.

5    Q    And I -- I didn't hear that at all.

6    A    I'm doing my best.  I was addressing Judge Drain.

7         THE COURT:  He just said he's doing the best he

8    can to be heard.

9    Q    Oh.  Well, we understand that, and -- I'm just --

10   that's why I'm repeating, just to make sure that you are.

11   A    Okay.  Thank you.

12   Q    All right.  So, no -- I'm not -- we've all struggled

13   with difficulties.  There's -- we're not blaming, we're just

14   -- I'm just explaining what I'm doing and why I'm repeating

15   you.

16        Okay.  Turn to paragraph 40 on the next page, Dr.

17   Sackler.

18   A    Yes.  I've read it.

19   Q    Is it true -- oh, thank you.  Is it true that you

20   emailed on January 25th, 2010, other members of Purdue's

21   Board of Directors, "By way of background, the most

22   important driver of our sales growth or decline is the

23   performance of all Oxycodone extended-release forms in the

24   market, called OER.  This is comprised of OxyContin tablets

25   plus all generics in space."

1   A    I don't -- okay.  Without the document, I can't testify

2   as to whether the quotation is accurate.  But since the

3   Department of Justice quoted me, I might have said that.

4   Q    No basis for denying that you, in fact, sent an email

5   containing that language?

6   A    No.

7   Q    And is this statement you made, in fact, true?

8   A    (Indiscernible) sample (indiscernible) more complicated

9   than that.

10  Q    I understand it might be more complicated, but --

11  A    Everything else being equal, the statement is true.

12  Q    Okay.

13  A    Is that a more responsive answer?

14  Q    Every -- I think you said everything else being equal,

15  the statement is true; is that correct?

16  A    Yes, that's what I said.

17  Q    And that's fine.  Thank you.  If you continue to

18  paragraph 41, and just take a look.

19  A    Yes.

20  Q    Is it true that you were personally aware of Purdue's

21  sales targets?

22  A    As a Board member.  I'm made aware of them in Board

23  meetings.  Yes, it is --

24  Q    All right.  So, you learned that the targets of

25  Purdue's sales and marketing campaigns in your capacity as a

Page 81

1    Board member?

2    A    That's correct, in the Board meeting.  And really, the

3    named Sacklers, which is not quite, but it's misleading --

4    but it could mislead (indiscernible).  And the name Sackler

5    somehow got that the (indiscernible) things are

6    (indiscernible), at least in my opinion.  (Indiscernible)

7    the decision (indiscernible) of OxyContin's importance

8    (indiscernible) Board.

9    Q    Right.  The members of the Board would have been made

10   aware of the sales targets; that's what you're saying, yes?

11   A    Yes.

12   Q    Okay.  Thank you, Dr. Sackler.  And then at times -- is

13   it true that at times, and I'll ask you just for you, is it

14   true that at times you challenged the executives' setting of

15   sales targets?

16   A    In Board meetings, yes.

17   Q    Okay.  And you suggested that some targets were

18   inappropriate, others were -- did you ever suggest that some

19   targets are -- were inappropriate targets?

20   A    No.  No --

21   Q    Did you ever --

22   A    -- (indiscernible) inadequate in terms of results,

23   sometimes.  Sometimes I'd point out that it seemed

24   optimistic to me, but yes.

25   Q    Okay.  So, no, not inappropriate, but sometimes

1    inadequate in terms of results, and sometimes you thought

2    that it seemed optimistic; is that your testimony?

3    A    Sometimes, yes.

4    Q    All right.  Thank you.

5    A    This is only in the Board meetings.

6    Q    In the Board meetings.  I understand.

7    A    In the dialog.

8    Q    And other members of the Board also engaged in this

9    dialog?

10   A    Yes.

11   Q    Did other member of the Board sometimes challenge the

12   targets set by Purdue executives?

13   A    Yes.

14   Q    Did Mortimer D.A. Sackler do that?

15   A    Sometimes.

16   Q    Did Theresa Sackler do that?

17   A    I don't recall.

18   Q    How about Eileen Sackler Lefcourt?

19   A    I don't recall.

20   Q    How about Jonathan Sackler, your brother?

21   A    Yes.

22   Q    How about Kathe Sackler, the cousin?

23   A    Yes.

24   Q    I should have had a list.  I -- how about RICHARD

25   SACKLER, your son?

Page 83

1    A    I don't really -- I don't recall.

2    Q    All right.  Could I ask you to turn to the next page,

3    paragraph 44?

4    A    This is very helpful (indiscernible).  I was just

5    saying, Your Honor, it's (indiscernible) myself.

6          MR. JOSEPH:  I think it may be necessary, Mr.

7    Edmunds, for him to read paragraph 43, since paragraph 44

8    begins, "In response".

9          MR. EDMUNDS:  All right.  That's fine.

10   Q    Dr. Sackler, if you would read paragraph 43 also, and

11   then read paragraph 44.

12   A     I will do so.  All right.  I have read the paragraph.

13   Yes.

14   Q    Okay.  And I -- did you have a dispute with Purdue's

15   CEO at the time, 2009, 2010, I believe, that -- over the

16   budget for Purdue's -- the perspective budget for Purdue's

17   sales of -- target sales of OxyContin?

18   A    Don't remember the time frame.  Did you use the word

19   disagreement?  I think it wasn't a disagreement, a

20   difference of opinion, and I, you know, I didn't agree

21   sometimes with his opinion, yes.  But (indiscernible).

22   Q    Okay.  And if I recall correctly, tell me if you agree,

23   management had proposed, I think, a target growth of about 3

24   percent and you suggested it should be higher; is that

25   right?

1  A    I don't remember the numbers.

2  Q    All right.  But management had proposed a target, and

3  you suggested that the target should be higher; is that

4  right?

5  A    That happened, from -- you know, rarely, but it did

6  happen.

7  Q    Okay.  And that was a matter that you took up with the

8  Board of Directors; is that right?

9  A    (Indiscernible), this is what I think it may be

10  referring to as a document. It's not referenced here.

11  (Indiscernible) --

12        THE COURT:  Dr. Sackler, if you'd closer to your

13  microphone.

14  A    -- I believe it was taken up at that meeting.  If, His

15  Honor, I am recalling, it was not the time it was taken up

16  with the Board of Directors because it was a budget meeting.

17  And --

18  Q    Okay.  And -- I'm sorry, what was that, Dr. Sackler?

19  A    An annual budget meeting.

20  Q    An annual budget meeting of the Board of Directors.

21  A    If it's not -- it's the document I'm thinking of.

22        MR. JOSEPH:  Objection.  Foundation.

23        THE COURT:  What -- which -- Mr. Edmunds are you -

24  - are you now focusing on the foreign entities in the

25  foreign countries?

Page 85

1          MR. JOSEPH:  This is (indiscernible).  Perhaps we

2     could look at the document.

3          MR. EDMUNDS:  Well, we could, Mr. Joseph, but I

4     mean, I think he remembers a document and that satisfies my

5     question.  So, I don't know that we need to --

6          MR. JOSEPH:  That's fine.

7          MR. EDMUNDS:  -- put him through that.

8     Q    Okay. And do you see paragraph 45, Dr. Sackler,

9     immediately following?  Do you recall an email on January

10    25th, 2010, where you informed the Board that you had

11    engaged management on the subject of the budget targets for

12    OxyContin?

13    A    I do see that paragraph, yes.

14    Q    Do you recall the email?

15    A    No, without looking at it, I don't recall it -- all of

16    it.

17    Q    Okay.  Any reason to believe you didn't send that

18    email?

19    A    No reason.

20    Q    No reason to believe that, that you didn't --

21    A    I have no -- I don't have perfect recall, so it's --

22    Q    Understood, understood.

23    A    You're just talking about an email I don't recall.

24    Without looking, but I have no reason to deny that it may be

25    didn't, but I don't know.

Page 86

1    Q    All right.  How about -- let me.  I'll move on, Dr.

2    Sackler, to page 52.

3               THE COURT:  You mean paragraph 52?

4               MR. EDMUNDS: Paragraph 52.  Thank you, Your Honor.

5    I'm on, just to clarify that, page 34.  That's the next

6    page.

7    Q    When you're ready, Dr. Sackler, let me know.

8    A    Okay.

9    Q    Okay.  Dr. Sackler, is it true that on April 15th,

10   2012, you emailed Purdue's Vice President of Sales, I think

11   that would be Mr. Gasdia whom -- about whom we've spoken,

12   suggesting, "We should discuss the sudden decline in

13   OxyContin sales in the past year or two.  What are we doing

14   to identify corrective actions?"  Did you send that email?

15   A    I don't remember the email.  If you show me the email,

16   I might bring it back to my memory.

17               MR. JOSEPH:  Your Honor, I'm going to object to

18   this line at this point, under Rule 403.  I mean, the

19   documents have all been produced.  This is a pointless

20   exercise in testing a memory about an eight-year-old

21   document.

22               MR. EDMUNDS:  Let me ask the -- Your Honor, I

23   could -- it's a fine question, but I'll just continue.

24               THE COURT:  I -- I guess I was assuming you were

25   setting the context for another question?

 1           MR. EDMUNDS:  I'm just asking him if he has any

 2    basis for, you know, if he has any reason to deny that he

 3    sent this email.  Of course, there are thousands of

 4    documents, but --

 5           MR. JOSEPH:  From millions of pages, 100 million

 6    pages of documents.  It's totally unfair to pick out a

 7    paragraph and ask him if he remembers an email --

 8           THE COURT:  Yeah.

 9           MR. JOSEPH:  -- from eight or ten years ago.

10           THE COURT:  If you're just asking him those types

11    of questions, it's not really helpful.  If you're asking --

12           MR. EDMUNDS:  All right.

13           THE COURT:  If you're asking this question to set

14    up another question, then that's fine, you can do that.  But

15    --

16           MR. EDMUNDS:  Okay.  Well, I think what we'll --

17    I'll just move on.  I mean, we -- I'm trying to avoid the

18    need to go into that stack of documents, but that's fine.

19    We can move on.

20    BY MR. EDMUNDS:

21    Q    Dr. Sackler, if you would turn to page 61?

22           THE COURT:  Paragraph --

23           MR. EDMUNDS:  I'm sorry.  Paragraph 61 on page 36.

24    My apologies.

25           MR. JOSEPH:  Same objection.

```
 1              MR. EDMUNDS:  I haven't asked a question.

 2              THE COURT:  Again, Mr. Edmunds is entitled to set

 3    up a question.  If it's just about -- if all you're getting

 4    to is whether you agree that some document was sent or he

 5    wrote -- I think that I understand the objection.  If it's

 6    to set up a question about that topic, you can ask that

 7    question.

 8              MR. EDMUNDS:  Yeah, and no, I'm going to ask about

 9    a topic not about --

10              THE COURT:  Okay.

11              MR. EDMUNDS:  -- the document.  And I hear, Your

12    Honor, so I don't think I will be -- I understand the

13    ruling, sir.

14              THE COURT:  Okay.

15    BY MR. EDMUNDS:

16    Q    Dr. Sackler, are you at paragraph 61 now?  Sir?

17    A    I'm sorry, I did respond.  I heard your question.  I

18    said, I see 61.  I've read it.

19    Q    Oh.  Okay, thank you.  And are you aware of Region Zero

20    is?

21    A    I am not aware of what it might be today if it exists

22    at all.  But at that time, I believed I understood what

23    Region Zero was, yes.

24    Q    And what was Region Zero at that time?

25    A    It was -- the way we referred to doctors who had been
```

Page 89

1    removed from detailing and whose sales or prescription

2    performance was removed from compensation of sales for the

3    sales force.

4    Q    And why were doctors in Region Zero removed from

5    compensation for the sales force?

6    A    Based upon a longstanding, much before 2010 -- we had a

7    very elaborate division, program, I can't recall the name of

8    it, but to reduce drug addiction and abuse.  And one of the

9    elements was to stop promoting to doctors who or whom the

10   salesman or the direct first-line supervisor had concerns

11   about the quality or the -- even their integrity or honesty,

12   or the lawfulness of their practice.  And those physicians,

13   I don't know -- those physicians reported to Region Zero.

14   And removing them from compensation was not intended as a

15   punishment perhaps, but it really was a punishment for any -

16   - that a, you know, you attempt to just neutralize their

17   effect on our sales results for compensation purposes.

18   Q    Okay.  So, it would move -- it was a -- I'll let that

19   stand.  And Dr. Sackler, just going back, it's something

20   that you said, it occurred to me that I had skipped over a

21   question.

22       Did you have -- I had asked you if at any time during

23   2008 to 2018, you had had conversations with individual

24   sales representatives.  I neglected to ask you; did you have

25   conversations with sales managers?

1   A      You -- could you define what you mean by sales

2   managers?

3   Q      Well, let's start with person who -- the types of

4   employees who had -- to whom the field representatives would

5   report, those sales managers --

6   A      Are you --

7   Q      -- the first-level managers, I guess.

8   A      First-level managers.  I recall no such conversation.

9   Q      No conversation with first-level managers; is that

10  right?

11  A      Yes.

12  Q      And -- okay.  How about the supervisors of the first-

13  level managers?

14  A      I do not recall any conversations with the supervisors

15  of the first-level managers.  And let me just say, there is

16  possibility that in a large-scale sales meeting, I might

17  have conversed with them, but not as their management role.

18  I might have said hello or good job out there, or I might

19  not have said anything.  They may have addressed me.

20  Q      Okay.  Did you attend -- you attended sales meetings?

21  A      Very rarely, but I did, and two or three that I can

22  recall, over 20 years.

23  Q      Do you recall an individual named Phil Cramer?

24  A      I can recall the name, but it doesn't bring a face to

25  me.

Page 91

1    Q    I'm sorry, Dr. Sackler, that --

2    A    I recall Mr. Cramer, Phil Cramer, as a name, not

3    somebody who I remember talking to.

4    Q    Okay.  Let me ask you to move on.  We were talking

5    about Region Zero, and we were at Paragraph 61.  Let me ask

6    you to move to Paragraph 62, and ask you if you were aware

7    that, at the time, December 1st, 2010, that Region Zero had

8    accounted for a -- it says much of the sales decline that

9    had occurred in that year?

10            MR. JOSEPH:  New objection.  It's referring to a

11   chart.  It says they received a chart.

12            THE COURT:  No, but -- no, I'll overrule the

13   objection.  Were you aware on December 1, 2010, that Region

14   Zero accounted for much of the decline in sales at the

15   regional level?  Do you recall being aware of that

16   proposition?

17            THE WITNESS:  I cannot (indiscernible) in time,

18   but that proposition, I do recall at some point.  Yes.  I

19   don't recall who made it.  It almost certainly was in a

20   Board meeting.

21            MR. EDMUNDS:  All right.  Thank you, Dr. Sackler.

22   BY MR. EDMUNDS:

23   Q    If you would -- were you also aware of a time -- were

24   you also aware -- and I'd just refer you to Paragraph 65 --

25   but were you also aware that there had been a decline in 80

Page 92

1   milligram OxyContin prescriptions when prescribers were

2   placed on the do not call list?

3   A    At any time -- at any (indiscernible).  I'm just going

4   to ask for a point in time.

5   Q    Oh, I'm sorry.  Let's say this time around 2011, the

6   time referenced in the addendum.

7   A    Which paragraph are you forming this question about?

8   Q    65, Dr. Sackler.

9   A    I don't recall that.

10  Q    Okay.

11              MR. EDMUNDS:  I don't know if Your Honor would

12  entertain a short recess for me and the witness.  I think I

13  can skip over some portions, get organized, and save some

14  time in the end.

15              THE COURT:  Okay.  You think you'd like about five

16  minutes, or...?

17              MR. EDMUNDS:  Five minutes, yeah.

18              THE COURT:  That's fine.  We'll come back at 25

19  after 12:00.  You can move around too, Dr. Sackler.  Just

20  don't discuss your testimony with anyone during that short

21  break.

22              THE WITNESS:  (indiscernible)

23              THE COURT:  Don't turn off your screen or anything

24  like that.  Just leave the screen on.

25              THE WITNESS:  Okay.

```
 1              (Recess)

 2              THE COURT:  Okay.  This is Judge Drain, and we're

 3     back on the record in In Re Purdue Pharma.  Dr. Sackler, you

 4     understand that you're still under oath, correct?

 5              THE WITNESS:  Understand, Your Honor.

 6              THE COURT:  Okay.  All right.  Mr. Edmunds, you

 7     want to continue?

 8              MR. EDMUNDS:  Yes.  Thank you, Your Honor.

 9     BY MR. EDMUNDS:

10     Q    Dr. Sackler, why don't we...  Might I ask just

11     preliminarily, Dr. Sackler, make sure there are no papers on

12     top of your computer that might be muting the sound.

13     Nothing on the -- okay.

14     A    There are none.

15     Q    All right.  Thank you.

16     A    My sound -- my microphones on maximum gain.  It's

17     really not --

18              THE COURT:  We can actually hear you well at this

19     point.

20              THE WITNESS:  Oh, good.  Good.  No (indiscernible)

21     noise, I trust.

22              MR. EDMUNDS:  Dr. Sackler, I -- no, sir.

23     BY MR. EDMUNDS:

24     Q    Dr. Sackler, I'd turn you now -- we're going to skip

25     over parts of this and go to Paragraph 80, which is on Page
```

Page 94

1    39 of the document we were looking at.

2    A    I see Paragraph 80.

3    Q    And I guess I don't have a -- I guess I'd ask, do you

4    recall the consulting company McKinsey in your capacity as a

5    Board Number for work with respect to Purdue's sales and

6    marketing activities?

7    A    No, I did not.  I do not -- the answer to that question

8    -- could you restate the question?

9    Q    Do you recall --

10   A    There was a contact, but it wasn't in general.  It was

11   about their work product.

12   Q    Well, let me ask if you had a contact -- let me start

13   from what you just told me.  You had a contact with McKinsey

14   in your capacity as a Director of Purdue with respect to

15   McKinsey's work product.  Is that correct?

16   A    That is correct.  The E2E the program.

17   Q    The E2E program?  Is that what you said?

18   A    Yes.

19   Q    Okay.  And that was related to Purdue's marking and

20   sale of OxyContin.  Is that right?

21   A    I can't testify as to the entirety of the E2E program,

22   but that was the portion of the E2E program.  But I wasn't -

23   - let me restate.  I called in about their work product on

24   E2E, certain observations that they had made the situation

25   before they -- you know, as they started their study, and

Page 95

1   their findings at the beginning of this (indiscernible).

2   Q    Okay.  So the situation that was declining sales of

3   OxyContin?  Is that right?

4   A    Yes.

5   Q    And you had a call with McKinsey about their work

6   related to declining sales of OxyContin?  Is that right?

7   A    And more specifically to their observations about their

8   managing of the sales program.  Yes.

9   Q    Okay.  So you had a conversation with McKinsey about

10  observations McKinsey had made about how Purdue's sales

11  program was managed?  Is that correct?

12  A    Well, the situation that they found (indiscernible).

13  Q    Could you say that again, Dr. Sackler?  I don't think

14  it came through.

15  A    They found in the state of focus on the sales force, to

16  be more precise.

17  Q    Okay.  And did McKinsey make recommendations as part of

18  its engagement in the situation for sales practices that

19  would improve their performance of OxyContin?

20  A    Yes.

21  Q    Okay.  And did you discuss those recommendations with

22  McKinsey?

23  A    We discussed those with McKinsey, yes.

24  Q    Okay.  When you say -- I'm sorry.  Go ahead.

25  A    I discussed.

Page 96

1   Q    When you said we, who else discussed --

2   A    Nobody else I recall.  I didn't want to mislead

3   (indiscernible) It was a call I h ad.

4   Q    All right.  So you had a call, and it was just you, no

5   executives, and McKinsey?

6   A    No.  No.  This was after they (indiscernible) the

7   report.

8   Q    All right.  And was the result of the report the

9   development of the E2E program?

10  A    It was one of the things that we discussed, yeah.

11  Q    Okay.  Did they talk about --

12  A    (indiscernible) discuss (indiscernible).

13  (indiscernible) load.  Just restate the question and I'll

14  try to make it into a simple answer.  Okay?

15  Q    Did you have a discussion -- sure.  Did you have a

16  discussion with them about the E2E program?

17  A    Perhaps.  I don't recall.

18  Q    Okay.

19  A    In that phone call, I don't recall what we discussed.

20  We certainly didn't discuss the program in general.

21  Q    Okay.  Did Purdue ultimately implement the programs

22  recommended by McKinsey, including E2E?

23  A    I don't recall whether (indiscernible) every program.

24  E2E, or what came to be called E2 -- it was probably a

25  subset of everything in their report.  But I don't remember.

1    Q    Okay.  Well, you took the actions recommended by

2    McKinsey, generally?  Is that correct?

3    A    The company (indiscernible).  I didn't take any action

4    at all.

5    Q    But the Board of Directors was aware of the

6    recommendations that McKinsey had made?  Is that right?

7    A    Yes.  It was made aware of the recommendations by the

8    sales department.

9    Q    Okay.  So it was made aware of the recommendations and

10   the Board -- the company subsequently implemented all of the

11   recommendations that McKinsey had provided in its report.

12   Is that right?

13   A    I can't testify to all of (indiscernible).  I don't

14   recall.

15   Q    Do you recall specific ones that it did implement?

16   A    Yes.  I recall one clearly.

17   Q    What is the one you recall?

18   A    To stop calling on doctors who didn't prescribe opioids

19   because -- I don't have to add anything -- but to shift the

20   emphasis to (indiscernible) 8, 9 and 10 doctors.  That's my

21   recollection.

22   Q    Okay.  And 8, 9 and 10 doctors are high prescribers of

23   opioids?  Is that correct?

24   A    8, 9 and 10 are all high prescribers.

25   Q    Okay.

1    A    Yes.

2    Q    And so Purdue Pharma -- well, I think it your testimony

3    that Purdue Pharma implemented that recommendation from

4    McKinsey.  Is that right?

5    A    I can't tell you what effectiveness -- like they said

6    they would implement it.  Yes.

7    Q    All right.

8    A    And as management said to (indiscernible) that they

9    would implement (indiscernible).  I want to be really

10   precise.

11   Q    And the Board -- management said to the Board that they

12   would implement it and the company subsequently implemented

13   it after management informed the Board that it would be

14   doing that.  Is that right?

15   A    I don't recall what success -- I do recall that they

16   said that seeing the busiest doctors who used the most

17   opioids is in general very difficult to do.  So I infer that

18   they were anticipating that they could only (indiscernible)

19   subset.  But I don't have any knowledge beyond that.

20   Q    Okay.  And did -- I think we're talking about this

21   recommendation as a subset of the total McKinsey

22   recommendations.  It's your testimony that there were other

23   recommendations that the Board may have implemented, but you

24   don't recall them specifically.  Is that right?

25            MR. JOSEPH:  Objection.  Form.

1    BY MR. EDMUNDS:

2    A    I don't think the Board implemented --

3            THE COURT:  He can answer that.

4    BY MR. EDMUNDS:

5    A    I don't recall if the Board "implement" anything.

6    Q    How about the company?  Did it -- were there other

7    recommendations by McKinsey that the company implemented

8    that you simply don't recall what they were?

9    A    I can't recall what I don't recall.  But there may have

10   been.

11   Q    All right.  Fair enough.  Do you recall an

12   Individualize the Dose campaign in around 2013?  And I could

13   refer you to Paragraph 113 of the document that we're

14   looking at that might help.

15   A    I don't recall that.

16   Q    Okay.  You don't recall at all an Individualize the

17   Dose campaign?

18   A    Not at this moment.  If you showed me a document, it

19   might bring it to mind.

20   Q    Well, was there ever a point at which you ran a

21   campaign that would promote the titration of individuals,

22   individual dosages, from one level to another?

23   A    Yes.

24   Q    Okay.  And in individualizing the dose... Well, you're

25   a medical doctor, sir, are you not?

Page 100

1    A    I am.

2    Q    And so you're familiar with the phenomena, I guess I'll

3    call them, of opioid tolerance?

4    A    I've heard about it.  I think it's a disputed concept.

5    Q    Okay.  You dispute that people develop tolerance to

6    opioids?

7    A    It's (indiscernible) because it is possible that some

8    do.  But it is often misdiagnosed by physicians.

9    Q    Okay.

10   A    They say, oh, they're tolerant, so we've got to change

11   the (indiscernible) we have to do something else.

12   Q    Okay.  Is it true that at -- well, strike that.  Dr.

13   Sackler, I'm just going to go through.  I think we can skip

14   much of the rest of this.  All right.  I'm going to -- I

15   think we can put this document aside, and let me ask you,

16   you will have received, I think individually from your

17   counsel -- and maybe the plan is just to email it to you now

18   --

19            MR. JOSEPH:  We will.

20            MR. EDMUNDS:  It's not the most recent, Mr.

21   Joseph.  Just so you know, I'll read the Bates number.  It's

22   not a joint exhibit.

23            MR. JOSEPH:  Is this the one you just emailed to

24   us?

25            MR. EDMUNDS:  Nope.  That's a different one.  This

```
 1   is from earlier.

 2             MR. JOSEPH:  Okay.

 3             MR. EDMUNDS:  It is PPLP UCC 9002378586.

 4             MR. JOSEPH:  One sec.  Do we have it?  Okay.

 5   Found it.  We'll email it.  It's being emailed to you.

 6             MR. EDMUNDS:  Okay.  Thank you.

 7   BY MR. EDMUNDS:

 8   Q    Dr. Sackler, let me know when you've had a chance to

 9   open it and have it in front of you.

10   A    Yes.  I'm looking (indiscernible).

11             MR. EDMUNDS:  And may I get a copy?  Is it...

12   BY MR. EDMUNDS:

13   A    It has not come through yet.

14   Q    Okay.

15   A    It takes a minute or two.  This is a server that's at

16   quite a distance, but (indiscernible).  Okay.  Opening it.

17   No.  I don't (indiscernible).  Okay.  Okay.  Yes.  I

18   (indiscernible) management discussions, looks like Page 2 --

19   Q    All right.  This is an email about Board and management

20   discussions.  And would you agree -- I think there may be --

21   there may be an email that follows it.  I'm only concerned

22   with the first.  This is an email from you to Peter Boer of

23   --

24   A    (indiscernible) email dated (indiscernible)  Oh, no.

25   (indiscernible) it's from the 8th.
```

1   Q    Sir, if you would scroll down to the nest page, or I

2   think maybe two pages, Dr. Sackler, you'll see your email

3   signature at the bottom of the text.  Do you see that?

4   A    I do.

5   Q    Sir, do you agree with me that this is an email from

6   you to Peter Boer of December 30, 2010, at 1:06 PM?

7   A    It appears to be so.  Yes.

8   Q    Okay.  And can I ask you to just read down, there's a

9   discussion of how the company is organized.  And I would ask

10   you to just tell me there's a sentence: "There seems to be

11   consensus that the role of the board and that of management

12   is blurred compared with the distinctions made by other

13   major corporations."

14        Do you see that?

15   A    I do.

16   Q    And no reason to believe you didn't send that to Mr.

17   Boer?

18            MR. JOSEPH:  Objection; misleading.

19            THE COURT:  I'm sorry.  I don't understand.

20            MR. JOSEPH:  Your Honor, the subject --

21            THE COURT:  He's already --

22            MR. JOSEPH:  I don't want to --

23            THE COURT:  Let me -- Mr. Sackler's already

24   identified that this is his email, so I don't know if you're

25   getting at something other than that.

1          MR. JOSEPH:  (Indiscernible) without the witness

2    listening, if I may, because I don't want to be cuing the

3    witness with the objection but this is misleading.

4          THE COURT:  This what?  I'm just -- it's not an

5    objection to the --

6          MR. JOSEPH:  The subject of the email reflects a

7    text and comments --

8          THE COURT:  All right.

9          MR. JOSEPH:  -- on texts.

10          THE COURT:  All right.  Well, so it's really not

11    an objection to the question.  It's an objection to the

12    questioning on this document?

13          MR. JOSEPH:  He asked what the --

14          THE COURT:  I think you can get at this on

15    redirect, Mr. Joseph.

16    Q    I think I can just -- I think I hear Mr. Joseph, and I

17    will just let the email stand as identified and change the

18    question to did you write that sentence, Dr. Sackler?

19    A    Which sentence again are you reading?

20    Q    "There seems to be consensus that the role of the board

21    and that of management is blurred compared with the

22    distinctions made by other major corporations."  Is that

23    your sentence?

24    A    I see that, and the question is what?  What's the

25    question about that?

Page 104

1    Q    You wrote that, right?

2    A    I don't recall.

3    Q    Okay.  But this is an email -- no, okay.  All right.

4    A    It was a long time ago, too.  I don't remember every

5    email --

6    Q    Okay.

7    A    -- from years ago, 11 years ago.

8    Q    One moment, please.

9         MR. EDMUNDS:  Court's indulgence.

10        (Pause)

11        MR. EDMUNDS:  The email that Mr. Joseph, the most

12   recent document that Ms. Thomasson sent to you, could you

13   get that to Dr. Sackler, please?

14        MR. JOSEPH:  Is this December 7 of 2008?

15        MR. EDMUNDS:  Yes, sir.

16        MR. JOSEPH:  Okay.

17        THE COURT:  I'm not sure I have -- what exhibit is

18   that, Mr. Edmunds?

19        MR. EDMUNDS:  It is -- I'm not sure the Court has

20   it either.  I don't know.  I just ask Ms. Thomasson if she's

21   listening to make sure that it does.

22        MR. JOSEPH:  It's not marked as an exhibit on the

23   copy I've got.

24        MR. EDMUNDS:  It's not in the joint exhibit book.

25        THE COURT:  And I don't think  it was sent to

Page 105

```
 1    chambers unless you have it, Mike?

 2              MR. EDMUNDS:  I don't --

 3              THE COURT:  I mean I printed that out.  That's

 4    what we've been discussing.  But this is a different one, I

 5    think.

 6              MR. EDMUNDS:  Your Honor, for the preceding one, I

 7    should -- actually because it's not a joint exhibit, I would

 8    move it into evidence.

 9              THE COURT:  Okay.  We're talking about PPL UCC?

10    That one?

11              MR. EDMUNDS:  That one was the previous one, yes.

12    And I'd move --

13              THE COURT:  Is there any objection to its

14    admission?

15              MR. JOSEPH:  No, Your Honor.  Not to the document.

16              THE COURT:  Okay.  It's admitted with the next

17    number wherever you are up to the JO -- JX exhibits.

18              (JX Exhibit Entered Into Evidence)

19              MR. EDMUNDS:  Okay.  And --

20              THE COURT:  And I do -- I think the other

21    documents NCSG001, is that the one you were looking at?

22              MR. JOSEPH:  I believe you're correct, Your Honor.

23              MR. EDMUNDS:  Mr. Joseph, I'm sorry, I didn't hear

24    you.  I'm looking at a document that has the Bates number

25    PWG004493361.
```

Page 106

1           THE COURT:  No, I don't have that.

2           MR. EDMUNDS:  Would Your Honor mind if I just read

3   it into the record if the witness has it and --

4           THE COURT:  If it's short, yes.

5           MR. EDMUNDS:  -- get it to the -- it is short.

6           THE COURT:  Okay.  Go ahead.

7           MR. EDMUNDS:  An email.

8   Q    All right.  Dr. Sackler, do you have this -- have you

9   been able to get this document up?  It's a document.

10  A    Yes, I have the right PW number.

11  Q    All right.  And, I'm sorry.

12  A    I'm looking at (indiscernible) of the document.

13  Q    Doctor, I didn't hear.

14  A    I am looking at the first page of the document.

15  Q    Okay, thank you.  Dr. Sackler, would you agree with me

16  that this is an email from you to Dr. Craig Landau of

17  December 7th, 2008?

18          MR. JOSEPH:  Objection.  There are four emails in

19  this document.

20          MR. EDMUNDS:  The first one.

21          MR. JOSEPH:  The last one?  The one on the first

22  page?

23          MR. EDMUNDS:  The one that is at the top of the

24  document.

25  Q    Dr. Sackler, do you see a December 7th, 2008 9:52:31

Page 107

1    p.m. email from you to Dr. Landau?

2    A    I do.  (Indiscernible).

3    Q    Do you see it?

4    A    Yes.

5    Q    And did you send this email?

6    A    It appears so.

7    Q    Okay.  And in the email, you discuss -- the subject

8    line is "Revised OTR Briefing Document."  Does OTR refer to

9    the reformulation of OxyContin?

10   A    Yes, it did.

11   Q    Okay.  And so is it fair to say that this email

12   discusses the reformulated OxyContin that Purdue brought to

13   market in about 2010?

14   A    It refers apparently to a document.

15   Q    An FDA document related to OTR.  Is that right?

16   A    It looks that way, yes.

17   Q    Okay.  And could you read paragraph 5 of the message?

18   A    Yes.

19   Q    And would you read it in the record, please?

20   A    Paragraph 5 says -- can you hear me?

21   Q    Yes.

22   A    It has to be recorded.  "The FDA isn't concerned about

23   profitability.  But you can understand that we wouldn't do

24   this unless we believe that it may make a major difference."

25   Q    Okay.  And that is referring -- well, strike that.  I

Page 108

1    think -- Dr. Sackler, you can put that one aside.  Let me

2    just ask you a couple of additional questions.

3              MR. JOSEPH:  We would object and move to strike,

4    unless we're moving this into evidence, referring to matters

5    not in evidence.

6              MR. EDMUNDS:  I'm sorry.  I would move it into

7    evidence now as it's been authenticated and --

8              THE COURT:  Okay.  And I --

9              MR. EDMUNDS:  -- Your Honor, I would move it --

10             THE COURT:  We did get the document now, so I have

11   it too.  Does anyone object to its admission?  And I guess

12   it's just --

13             MR. JOSEPH:  No.

14             THE COURT:  -- this one email that's on the first

15   page.

16             MR. EDMUNDS:  That's the only one that we're

17   moving, yes.

18             THE COURT:  Okay.  And, Mr. Joseph, you said --

19             MR. JOSEPH:  No objection.

20             THE COURT:  Okay.  So it's admitted.  It will

21   follow in the JX numbers that the last one --

22             MR. JOSEPH:  Your Honor, I would ask that the

23   whole document be in just for context, if we may.

24             THE COURT:  Okay.  That's fine.

25             MR. EDMUNDS:  Thank you.

Page 109

1              (JX Exhibit Entered Into Evidence)

2    Q    Dr. Sackler, are you aware that there is a website that

3    is maintained in your name currently of "Judge For

4    Yourselves," I believe dot-net?

5    A    I'm aware of -- I'm aware there is a website or several

6    websites "Judge" -- I don't know whether the dot-net one is

7    our website that is -- it's not in my name.  It's on behalf

8    of the Sackler Defendants, I guess.  I'm not a lawyer, so I

9    really can't say who it's on behalf of.  But I'm not sure

10   that the dot-net is the one that we control.

11            MR. HUEBNER:  Your Honor, just to be clear, it's

12   by the B side only, not the A side.

13            MR. EDMUNDS:  Wait, so the (indiscernible).

14   Sorry.

15            MR. HUEBNER:  Mr. (indiscernible) just

16   (indiscernible).  If my memory is right, I thought Mr.

17   Joseph was going to say it.  I think that the B side one is

18   .info and the TD person's one is .com, but I'm not an expert

19   in this stuff.  I don't (indiscernible) television, so

20   (indiscernible) correct.

21            MR. EDMUNDS:  I just wasn't...

22            MR. HUEBNER:  ...the interrogation.

23            MR. EDMUNDS:  I believe that that is correct,

24   thank you, Mr. Huebner.

25   BY MR. EDMUNDS:

Page 110

1    Q    Dr. Sackler, your family, the Raymond Sackler Family,

2    maintains a website at Judgeforyourselves.info, is that

3    correct?

4    A    I was not involved in setting up the website, so I

5    really -- and I haven't looked at it extensively.  I've

6    glanced at it two times to just look at the table of

7    contents.  So, I (indiscernible) really testify about what's

8    on it.

9    Q    Alright.  Well, do you know who set it up?

10   A    No, I don't know who actually set it up.

11   Q    Do you know who maintains it?

12   A    I don't.

13   Q    Have you ever...I mean the website is in your name,

14   right?  It's in -- your father was Raymond Sackler, is that

15   right?

16   A    Yes.

17   Q    And it refers to the Raymond Sackler Family of which

18   you are an important member, is that right?

19   A    Yes.

20   Q    Who are the other members who are still living today

21   who might set up such a website?

22   A    There are quite a -- quite a few grandchildren, but

23   there are no other direct descendants other than me.

24   Q    What about your son, his -- I'm sorry, you're referring

25   to Raymond Sackler's grandchildren.

Page 111

1   A    First generation defendants.

2   Q    I see.

3   A    Descendants, sorry.  Defendants is descendants.

4   Q    When you said grandchildren, you meant Raymond

5   Sackler's grandchildren, is that right, your father's

6   grandchildren?

7   A    Yes.

8   Q    Alright.  Did you ever -- I know you said you can't

9   testify as to what's on it, but did you ever make any

10  inquiry regarding a website being maintained publicly in

11  your family's name?

12  A    I heard about it, but I don't think I made any

13  inquiries.

14  Q    Alright.  Who told you about it?

15  A    I don't know that I can testify to that because

16  (indiscernible) conversation.

17  Q    Okay.  You mean an attorney informed you that the

18  website...

19  A    The website (indiscernible) conversation unless my

20  attorney directs me to (indiscernible).

21  Q    Please, just indicate who told you that the website

22  exists.

23  A    David Goldman.

24  Q    Okay.  And is that your attorney?

25  A    No.  He's employed by Mr. Joseph's firm I believe.

Page 112

1   Q    Alright.  So, he was one of -- okay.  Is it your

2   understanding that Mr. Joseph's firm maintains the website?

3   A    I don't have an understanding.

4          MR. JOSEPH:  I can assure you that is not the case

5   nor would we be competent to do it.

6          MR. EDMUNDS:  Just trying to find out.

7   BY MR. EDMUNDS:

8   Q    Alright.  Well, did Mr. Goldman tell you who maintains

9   the website?

10  A    Did he?  Mr. Goldman?  I'm sorry, I miss --

11  (indiscernible) perhaps (indiscernible).  David Golden.

12  Q    Oh, okay.  That's...

13  A    The (indiscernible) he maintains it?  I don't recall.

14  Q    Alright.  Very well.

15          MR. EDMUNDS:  Thank you, Dr. Sackler.  No further

16  questions, Your Honor.

17          THE COURT:  Okay, does anyone else want to examine

18  Dr. Sackler before cross by Mr. Joseph?  Mr. Ozment, I take

19  it you do?

20          MR. OZMENT:  Yes, sir.  Very briefly.

21          THE COURT:  Okay.

22             CROSS-EXAMINATION OF RICHARD SACKLER

23  BY MR. OZMENT:

24  Q    Dr. Sackler, my name is Frank Ozment, and I represent

25  some individual claimants who are still alive and who are in

1     active recovery from opioid use disorder.  Did you ever

2     practice medicine?

3     A     I did.

4     Q     And would you agree with me that opioid use disorder is

5     an illness?

6     A     I (indiscernible).

7     Q     And when you were practicing medicine or after that,

8     did you ever work with the concept of triage?

9     A     Well, triage -- the concept of triage I'm familiar

10    with.

11    Q     Okay.  Go ahead.

12    A     But only in the context of opioid use disorder.

13    Q     I understand.  Your involvement with opioid use

14    disorder would have postdated your involvement with actual

15    medical practice, right?

16    A     Yes.

17    Q     Okay.

18    A     (Indiscernible) term.

19    Q     So can we take as a working definition of triage that

20    that's when you're using limited resources to maximize the

21    recovery of the patients?

22    A     I'm willing to do that.

23    Q     Does that sound fair to you?  Does that sound okay?

24    A     I understand what you're saying.  I don't -- I can't

25    give a comment on what it means.  But --

Page 114

1    Q    Okay.  Well, I guess my point is as your work as a

2    physician, as a pharmaceutical executive, is it appropriate

3    to focus resources on living patients what we're trying to

4    do is to stop opioid use disorder?

5    A    That seems on the surface to make sense, yes.

6    Q    Okay.  In the cross-examination from Mr. Edmunds, he

7    had some questions about agreements made around the same

8    time that Purdue pleaded guilty in November 2020.  And I

9    think that was a portion of your testimony where at least I

10   was having some difficulty understanding exactly what you're

11   saying, and so I want to go back and revisit that very

12   briefly if I may, okay?

13        You talked at length with Mr. Edmunds about the written

14   plea agreement.  And my questions aren't going to be focused

15   on the written plea agreement that you discussed with him at

16   length, okay.  I just want to probe your recollection about

17   any other agreements that may have been or may not have been

18   executed or entered into around that time, okay?  So I'm not

19   talking about the written plea agreement.

20   A    It would help me if you just remind me about when that

21   plea agreement was entered into.

22   Q    The one I'm talking about is November of 2020.

23   A    Thank you.

24   Q    Yeah, not the 2007 document.  As you sit here today, do

25   you recall whether there were any side agreements regarding

Page 115

1    whether the United States would require Purdue to pay for

2    the medical treatment of opioid use disorder patients?

3    A    I don't recall.

4    Q    Okay.  And I think we're going to have similar answers

5    to the other two questions, but I'm going to ask them just

6    in case, all right.

7              MR. JOSEPH:  Mr. Ozment, just --

8              MR. OZMENT:  Yes.

9              MR. JOSEPH:  -- just to be clear, Mr. Sackler

10   wasn't a party to that agreement.  That's a Purdue

11   agreement, and he wasn't on the board then.

12             MR. OZMENT:  I understand.

13             MR. JOSEPH:  Okay.

14             MR. OZMENT:  But in his -- as I --

15             MR. JOSEPH:  I'm not trying to interfere.  I'm

16   just trying to provide context.

17             MR. OZMENT:  Thank you.  And I guess what I'm --

18   he spoke about some other agreements, and I just wanted to

19   see if he had any recollection of other agreements, and I

20   think the answer is no.  But I want to clarify that in light

21   of what he testified to.

22             MR. JOSEPH:  Yeah.  I'll just state for the record

23   I don't recall any testimony about other agreements, but

24   it's fine.  Please you may proceed.

25   BY MR. OZMENT:

1    Q    Do you recall anything about other agreements made with

2    the United States regarding vocational treatment or

3    vocational rehabilitation, rather, for opioid use disorder

4    patients?

5    A    I have no recollection.

6    Q    Okay.

7    A    I think I probably have no knowledge of that.

8    Q    Okay.  But as you sit here now, you don't know whether

9    there were or there weren't?

10   A    I don't know.

11   Q    Okay.  Thank you.  Did you have any recollection or do

12   you have any recollection regarding whether there was any

13   agreement with the United States on whether the United

14   States would seek liens for those victims under mandatary

15   Victim Restitution Act?

16   A    I don't think I was involved with any -- anybody on the

17   board who might have known about that.  But I certainly

18   didn't.

19         MR. OZMENT:  Okay.  Thank you.  That's all I have,

20   Your Honor.

21         THE COURT:  Okay.  All right.

22         MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson-

23   O'Neil on behalf of the State of Washington.

24         THE COURT:  Sure.  You can go ahead.

25         MR. ROBINSON O'NEILL:  And just to be -- for the

Page 117

1    Court, I mean I'm one of the objecting states so I think

2    this is direct, as well, and cross for the State of

3    Washington just --

4              MR. JOSEPH:  If it's hostile, I'm not going to

5    object to leading.

6              MR. ROBINSON O'NEILL:  Okay.

7              MR. HUEBNER:  Sure.  Mr. O'Neill, just one

8    procedural question with the (indiscernible).  Knowing that

9    it is 1:00, if it's not prejudiced (indiscernible) answer,

10   do you have any sense of how long you think it will be going

11   just so that people can sort of figure out sort of bio

12   breaks and lunch breaks and the like?

13             MR. ROBINSON O'NEILL:  Your Honor, what were you

14   planning on in terms of a lunch break, one?

15             THE COURT:  1:30, 2:00.

16             MR. ROBINSON O'NEILL:  12:30 or --

17             THE COURT:  1:00.

18             MR. ROBINSON O'NEILL:  -- 1:30?

19             THE COURT:  1:30, 2:00.

20             MR. ROBINSON O'NEILL:  I don't have a sense

21   whether I can finish in that 30 minutes.  It's about that, I

22   would say.

23             THE COURT:  Well, go ahead.

24                CROSS-EXAMINATION OF RICHARD SACKLER

25   BY MR. ROBINSON O'NEILL:

Page 118

1   Q    Good afternoon, Dr. Sackler.  I'm Tad Robinson O'Neill

2   from the State of Washington.  Can you hear me okay?

3   A    I can hear you clearly.  I hope you can hear me.  I

4   hope you can hear me.

5   Q    I can hear you, sir.  Thank you.

6        Have you -- now you understand that you're here in this

7   court asking the Court to approve a confirmation plan in

8   which you and your family members will be released from all

9   future suits.  Is that correct?

10  A    I have a general understanding of that.

11  Q    And is your understanding square with the way I've just

12  described it?

13  A    I think it does, yes.

14  Q    Okay.  Are you -- and part of that's going to require

15  the Sackler Family Side A and Side B to pay $4.325 billion.

16  Do you understand that?

17  A    I can't testify as to the total, but I understand it is

18  about that.  Yes.

19  Q    And actually, one thing that I just wanted to clear in

20  my own head, you've referred to the two branches of the

21  Sackler Family as Side A and Side B.  That comes from the

22  classification on the board of directors, is that correct,

23  so that Class A directors are a member of Side A Family and

24  Class B directors are a member of the Side B Family?

25  A    Yes.

Page 119

```
 1              MR. HUEBNER:  Your Honor, just with apologies,

 2      objection; assumes facts not in evidence.  That was true at

 3      a point in time, but it's most assuredly not true anymore.

 4      Mr. O'Neill used the present tense, and it's actually quite

 5      important to us that that's not true anymore.  So I would

 6      ask that he just rephrase his question which I hope he'll be

 7      happy to do.

 8      Q    With Mr. Huebner's --

 9              THE COURT:  When you were on the board, Dr.

10      Sackler, is that how the -- was that the origin of the

11      classification of the directors?

12      A    I believe it was, yes.

13      Q    Mr. Sackler, are you going to be personally

14      contributing any of your own assets to the settlement

15      payments over the next nine to ten years?

16      A    I don't know -- I don't believe that's been decided

17      yet.

18      Q    Okay.  It is true that at least in part the money that

19      would be paid under those payment terms are intended to come

20      from the sale of the IACs or independent affiliated

21      companies.  Is that correct?

22      A    The sales of those companies may or may not play a role

23      in honoring this obligation if it is entered into.

24      Q    Okay.  And those IACs are currently owned by the trusts

25      of which you are a beneficiary.  Is that correct?
```

Page 120

1   A    Not all of them are owned by a trust of which I am the

2   beneficiary.  Some of them are.

3   Q    And the other ones, who owns the other ones that are

4   not owned by trusts of which you are a beneficiary?

5   A    I don't know which trusts are guaranteed performance so

6   I can't answer your question.

7   Q    All right.  Thank you.  Now you -- I believe it's your

8   position that you as a member of the board of directors of

9   Purdue Pharma complied with your legal obligations to

10  oversee that entity.  Is that correct?

11  A    Just restate the question so I have a better chance of

12  -- best chance of answering it.

13  Q    It's your position, Dr. Sackler, that as a member of

14  the board of directors of Purdue Pharma you complied with

15  your legal obligations to oversee that entity.  Is that

16  correct?

17  A    Yes.

18  Q    One of those obligations was to monitor what were

19  called --

20          MAN 1:  (Indiscernible).

21          MR. ROBINSON O'NEILL:  I'm sorry.  I didn't

22  understand that.

23  A    Nor did I.

24          MR. JOSEPH:  (Indiscernible) anybody on that's

25  visible said it.

1          MR. ROBINSON O'NEILL:  Okay.

2          THE COURT:  You can go ahead, Mr. O'Neill.

3     Q    One of those obligations was to monitor compliance

4     reports that were prepared by management.  Is that correct?

5     A    I don't know if the word "monitor" is appropriate.  To

6     take heed of, yes.  Monitor, I don't know what you mean.

7     Q    Okay.  Did you take heed of those compliance reports?

8     A    We did.

9     Q    Do you know how many -- and this is a term of art, I

10    believe, from those compliance reports.  Do you recognize

11    the term "significant compliance issues?"

12    A    In the context of these reports?

13    Q    That's correct.

14    A    I believe I understand.

15    Q    Do you know from 2007 until 2018 when you left the

16    board how many of those compliance reports found that there

17    was a significant compliance issue?

18    A    I do not know.  I can't --

19    Q    Would it --

20    A    I can't recall.

21    Q    Would it surprise you that --

22    A    I can't --

23    Q    I'm sorry.  I didn't mean to interrupt.  I apologize.

24    A    That's okay.  I interrupted your previous question.

25    Q    Would it surprise you to know that there are no

Page 122

1    significant compliance issues that were identified by

2    your -- by the management between 2007 and 2018 when you

3    left the board?

4    A    No.

5    Q    And it's in that same time period that Purdue Pharma --

6    A    May I answer --

7    Q    Go ahead.

8    A    -- would it surprise me?  The answer is

9    (indiscernible).

10          THE COURT:  I'm sorry.  That didn't come through

11   clearly, Dr. Sackler.

12   Q    Yeah.

13          THE COURT:  If you can just state it again.

14   A    I am not surprised there were no significant compliance

15   issues.  I can't recall (indiscernible), but certainly not

16   surprised.

17   Q    And it's in that same time period, 2007 until 2017 that

18   was covered in the Purdue guilty pleas.  Is that correct?

19   A    You're talking about Purdue Pharma's plea?

20   Q    That's right.  Its criminal conviction, guilty plea.

21   A    No.  Just restate the question, please.

22   Q    You're aware, Dr. Sackler, that that time period that I

23   just described in which there were no significant issues

24   identified by your compliance department is the same period

25   of time covered by the conduct described in the Purdue's

Page 123

1   guilty plea that was entered in 2020?

2   A    I'm not an attorney, but within the limits of a

3   layman's understanding, the answer is yes.

4   Q    And I assume that if you had known the criminal conduct

5   committed by the board -- I'm sorry, by Purdue Pharma, you

6   would have taken some corrective action.  Is that correct?

7   A    Correct.

8   Q    I'm sorry.  I did not hear your answer.

9   A    Yes.

10  Q    Would you agree with me that your compliance department

11  completely missed the illegal conduct that led to the

12  criminal conviction of Purdue Pharma?

13  A    I don't know what you mean by missed.

14  Q    They didn't (indiscernible).

15  A    I'm sorry.  You were cut out on my --

16  Q    Purdue Pharma's management did not call to your

17  attention the illegal conduct that led to their criminal

18  conviction, did they?

19  A    That's correct.

20  Q    That's not --

21  A    They did not.

22  Q    And that's not the first time that happened because the

23  same thing could be said of the criminal conviction in 2007.

24  Isn't that right, Dr. Sackler?

25  A    I don't recall.

Page 124

```
 1   Q    You think that the board received reports from Purdue's

 2   management prior to the 2007 conviction that Purdue was

 3   engaged in illegal activity?

 4   A    I believe so, but I can't recall whether any activity

 5   was brought to our attention would have -- it certainly

 6   wouldn't have been brought to our attention (indiscernible)

 7   -- you know -- you know, board, hear this, this is criminal.

 8   Certainly not because I would have remembered that and I

 9   would remember that (indiscernible) detail of what activity

10   -- what decision might have been as a result of that.  But I

11   -- I can't recall a period as to what we were -- I can't

12   recall compliance reports.  They're not shown to me.

13   Q    Fair enough.  I won't ask you about the specifics.

14   A    Okay.

15   Q    But there is compliance reports.  There are, as you

16   might imagine, a lot of them.  In addition to the criminal

17   plea agreements, is it also true that you were on the board

18   in 2015 and approved the settlement with the State of

19   Kentucky in which the Purdue Pharma paid $24 million to

20   resolve unlawful and unfair deceptive trade practice

21   allegations against Purdue Pharma?

22   A    Is your question was I on the board?

23   Q    Yes.

24   A    Yes, I was on for that.

25   Q    And you approved that settlement?
```

Page 125

1   A    The board.  Yes, the board approved that settlement.

2   Q    It's also true that in 2019, Purdue entered a

3   settlement agreement with the State of Oklahoma.  Is that

4   correct?

5   A    Yes.  I believe so.

6   Q    And the Sackler Family -- that was shortly before trial

7   was to commence.  Is that correct?

8   A    Yes, that's my recollection.

9   Q    And the Sackler Family contributed I think $75 million

10  to that settlement.  Is that correct?

11  A    I don't recall the exact.

12  Q    But it was --

13  A    It was a -- it was a contribution, yes.

14  Q    Did you contribute any of your own money to that

15  Oklahoma settlement?

16  A    I don't recall.

17  Q    Do you remember the amount of money that Purdue Pharma

18  paid as part of that settlement?

19  A    I don't recall.

20  Q    Mr. Sackler, Purdue Pharma has entered into multiple

21  settlements with different states.  It has entered two

22  guilty pleas.  Three of its executives have been convicted

23  of criminal charges, all of those while you were the

24  director of the company.  Is that correct?

25  A    Just restate the question, please, and I'll do my best

Page 126

1    to answer it.

2    Q    Purdue Pharma has entered into multiple settlements

3    with different states.  It has entered into two guilty pleas

4    with the federal government.  Three of its executives have

5    been convicted of criminal charges.  And all of that

6    occurred while you were the director or the conduct occurred

7    while you were the director of Purdue Pharma.  Is that

8    correct?

9              MR. JOSEPH:  A director.

10   Q    A -- excuse me, a director.

11             THE COURT:  You mean the conduct covered by those

12   settlements?

13             MR. ROBINSON O'NEILL:  That's correct.

14             THE COURT:  Okay.

15   A    That's correct.  I was director, and I cannot count up

16   all the settlements that the company entered into while I

17   was a director.  But there were many settlements, both

18   private and public.

19   Q    Mr. Sackler, you understand that you're asking for

20   global peace, that is a non-consensual release of the claims

21   of nine objecting states in this -- and part of this

22   confirmation plan?  You understand that that's your request?

23   A    I would say comprehensive peace, not global because

24   global has been misconstrued (indiscernible).

25             MR. JOSEPH:  Come closer to the microphone,

Page 127

1    please.

2    A    Comprehensive peace, yes.

3    Q    And is it your testimony that if the Court were to

4    allow the nine objecting states to opt out that you would

5    not agree to the settlement?

6    A    That's correct.

7    Q    Mr. Sackler, I'm going to ask you some questions about

8    a non-opioid product, Adhansia.  Do you know what Adhansia

9    is?

10   A    I don't recall at this point.

11   Q    Are you aware that Purdue Pharma launched that drug

12   called Adhansia before you left the board in 2018?

13   A    I'm reminded of the name, but I don't recall the drug.

14   Q    It may have had a different name when it was launched,

15   but this is a drug that treats a condition called attention

16   deficit hyperactivity disorder or ADHD.  Does that remind

17   you or re-familiarize yourself with that drug?

18   A    I don't remember what the molecular name was, but I do

19   recollect that that may have been during my tenure

20   (indiscernible).  Yes.

21   Q    And the same -- this is a molecule that's in other

22   brand-name drugs like, for example, Ritalin.  Is that what's

23   consistent with your memory?

24   A    I don't remember whether it was the same generic as

25   Ritalin, but it may have been.

Page 128

```
 1    Q     And what's different about Adhansia is that it has a
 2    delayed release mechanism so that it can be dosed for 16
 3    hours.  Does that sound familiar?
 4    A     It does.  Thank you --
 5    Q     And --
 6    A     -- for probing my memory.
 7    Q     Fair enough.  Are you aware that Adhansia carries a box
 8    warning that it carries a high potential for abuse and
 9    dependence?
10    A     I don't recollect that, no.
11    Q     Your understanding of what comprehensive peace would be
12    would be inclusion of any allegations related to your
13    conduct on the board when this drug was launched.  Is that
14    correct?
15    A     Yes.
16    Q     Now none of the complaints that have been filed by the
17    states address Adhansia, marketing for Adhansia, or the
18    clinical trials related to Adhansia.  Do they?
19    A     Is there a question there or a statement?
20    Q     Do they?  Are you aware of any allegations in any of
21    the state complaints about Purdue's Adhansia drug?
22    A     I am not aware of any, but I don't know.
23    Q     In the context of pharmaceuticals, is there often a
24    delay between the launch of (indiscernible) product
25    liability lawsuits?
```

Page 129

1           MR. JOSEPH:  You cut off for a moment, Mr.

2     O'Neill.

3           MR. ROBINSON O'NEILL:  I'm sorry.  I apologize.

4     Q    Is there often a delay between the launch of a drug and

5     product liability lawsuits?

6     A    There must be.  I don't see how somebody could sue

7     before the drug is introduced, but I'm not a lawyer.  So the

8     answer, direct answer to your direct question is, yes,

9     there's a delay.

10    Q    All right.  Mr. Sackler, is the Sackler Family -- well,

11    let me ask you about yourself.  Do you have any responsible

12    for the opioid crisis in the United States?

13    A    No.

14    Q    Does the Sackler Family have any responsibility for the

15    opioid crisis in the United States?

16    A    No.

17    Q    Does Purdue Pharma have any responsible for the opioid

18    crisis in the United States?

19    A    No.

20          MR. ROBINSON O'NEILL:  I have no more questions.

21    Thank you.

22          THE COURT:  Okay.  Anyone else on direct?

23          MR. HIGGINS:  Your Honor, this is Ben Higgins for

24    the United States Trustee.  I had a few questions, if that's

25    okay.

Page 130

```
 1              THE COURT:  Sure.  That's fine.

 2              MR. HIGGINS:  Thank you.

 3                   CROSS-EXAMINATION OF RICHARD SACKLER

 4    BY MR. HIGGINS:

 5    Q    Good afternoon, Dr. Sackler.  My name is Benjamin

 6    Higgins, and I represent the United States Trustee.  Can you

 7    hear me okay?

 8    A    I hear you clearly.  I hope you hear me.

 9    Q    I do.  I do.  I'm trying out the headphones to make

10    sure I can hear you okay.  You testified a minute ago

11    regarding the release that Mr. O'Neill brought up.  Can I

12    just ask you first have you listened to any of the trial so

13    far prior to today?

14    A    I have.

15    Q    And have you heard some of the discussion about

16    concepts such as global peace and global finality that some

17    of the witnesses have brought up?

18    A    Yes.  I've also thought that there sometimes was

19    confusion in what the word "global" means.

20    Q    Sure.  Well, I would like to focus on your

21    understanding of the releases that you're requesting.  I

22    believe you called them comprehensive or comprehensive peace

23    a few minutes ago.  Is that right?

24    A    Yes.

25    Q    Is it your understanding that if someone has a claim
```

Page 131

1    against you or your family that is in any way related to the

2    debtors, that's being released under this plan?

3    A    I am not certain I understand your question.  So if you

4    could rephrase it, it might help it.

5    Q    Sure.  I'm trying to get a sense of your understanding

6    of the scope of the release.  And my question is it your

7    understanding that claims against you that are related to

8    the debtors in any way are being released under the plan?

9    A    This is a legal issue, and the release is a legal

10   document.  And I'm not a lawyer, so I can't say yes or no.

11   I'm advised by lawyers.

12            MR. JOSEPH:  Do not get into advice by lawyers.

13   Q    Without getting into advice from your lawyers, can you

14   tell me what your understanding of a comprehensive release

15   is?

16   A    My understanding is a comprehensive release will

17   comprehensively cover any claim against the family related

18   to their board service or otherwise on the -- on the board

19   or on any other board in the United States.  I believe it's

20   limited to the U.S.

21   Q    The release releases parties who did not serve on the

22   board.  Is that correct?

23   A    Yes.  You are correct, yes.

24   Q    The release releases conduct related to the debtors'

25   non-opioid products.  Is that right?

Page 132

1    A    Yes.

2    Q    So if there are any claims related to the ADHD

3    medication that Mr. O'Neill was asking you about, those

4    claims would be released also, correct?

5    A    That's my understanding.

6    Q    And I want to get your understanding with respect to

7    how you said it was limited to the U.S.  There is some

8    language in the release that includes claims regardless of

9    where in the world those claims arose.  So I just want to

10   understand your understanding.  Can you explain to me what

11   you understand the limitation to be with respect to the

12   United States and other places in the world?

13   A    I am not an attorney, and I'm advised by counsel.

14            MR. JOSEPH:  Please don't get into legal -- were

15   you done?

16            THE WITNESS:  I was done.

17            MR. JOSEPH:  Okay.

18   Q    So you don't have -- you can't speak to your

19   understanding as to the limitation with respect to

20   geography?

21   A    I really can't.  No.

22   Q    Is it your understanding that the release includes

23   claims related to the future use or misuse of opioids?

24   A    I cannot.

25   Q    The release includes -- would release claims for fraud.

Page 133

1   Isn't that correct?

2   A    I don't know that.  I'm not denying or agreeing with

3   your (indiscernible), but I just don't know.

4   Q    Have you read the language of the release?

5   A    It is an extremely dense document.  I've read a page or

6   two and realized that it would take me an enormous amount of

7   time to fully understand.  That's all I've read.

8   Q    You testified a few moments ago that your understanding

9   of what a comprehensive release -- and I apologize if I'm

10  misstating, but I believe you said to the extent there's any

11  liability for your service on the board, that would be

12  released.  Is that part of your understanding of what a

13  comprehensive release is?

14  A    But not limited to my service on the board.  But I

15  cannot fully give an opinion as to what the board wouldn't

16  cover.

17  Q    Okay.  To the extent that there were claims for fraud

18  against you or other members of your family, is it your

19  understanding that they would be released under this plan?

20  A    I don't know.

21  Q    Are you familiar with the list of parties getting

22  released and the way the plan describes and defines the

23  parties who are getting released?

24  A    I am not.

25  Q    Have you seen the list of parties getting releases?

Page 134

1    A    At one point I saw and I have no idea, I saw a listing

2    of some of the parties, most of whom I did not recognize the

3    names of immediately.  I would have had to have studied it

4    to figure out (indiscernible) much more --

5                MR. JOSEPH:  Come closer to the microphone.

6    A    Okay.  The answer to the question -- I'm sorry, just

7    restate the question.  I'll try to answer (indiscernible).

8    Q    Have you seen the list of parties receiving releases

9    under the plan?

10   A    I saw a email from counsel, so I guess I shouldn't talk

11   about it.

12               MR. JOSEPH:  You can state whether you've seen the

13   list.  That's fine.  Go ahead.

14   A    I've seen a list a few months ago.

15               MR. HIGGINS:  Mr. Joseph, does Dr. Sackler have a

16   copy of the disclosure statement with him?

17               MR. HIGGINS:  I do not believe that was requested,

18   Mr. Higgins.  We would have provided it, but I apologize.

19   We weren't asked, and we did not provide it.  And he's at

20   home.  He's not with us.

21   Q    Dr. Sackler, were you -- did you provides name of

22   parties to be included on the list of released parties?

23   A    I don't recollect that I gave any names.  I left that

24   to the lawyers.

25   Q    Are you aware that the list --

Page 135

```
 1              MR. JOSEPH:  Excuse me.  I believe you said "I

 2      left that to the lawyers."

 3      A    Yes.

 4              MR. JOSEPH:  Okay.  (Indiscernible) sent to the

 5      board.  I just want to make sure it's clear.  Please come

 6      closer to the -- come closer to the mic.  Come closer to the

 7      mic.

 8      A    Okay.

 9      Q    Are you aware that the list of released parties

10      includes hundreds of names of identified parties and

11      entities that are getting released under the plan?

12      A    I think I heard that -- that.  I didn't know before the

13      trial that is now running that I'm testifying at.  I didn't

14      know how many people were released.  But in the trial, I

15      heard -- I heard a number that sounded like hundreds, yes.

16      But I don't recall exactly who testified or what they said.

17      Aside -- I didn't know prior to that know that it's

18      hundreds.

19      Q    You and your family have committed to paying in excess

20      of $4 billion under the plan.  Is that right?

21      A    That's correct.

22      Q    And part of the quid pro quo in exchange for that money

23      is you and your family will be receiving released.  Is that

24      correct?

25      A    That is correct.
```

1    Q    But is it your testimony here today that you didn't

2    have any input on who those released parties would be

3    despite the fact that you're paying over $4 billion to have

4    those releases?

5    A    I was confident it would include the family and several

6    or perhaps many other people.  But I had no input beyond

7    that knowledge.  And I didn't suggest the releases, no.  I

8    did not (indiscernible).

9    Q    Are you aware that the -- did you listen to the

10   testimony of Stephen Ives and Garrett Lynam?

11   A    I believe, yes.  The answer is, yes, I did.

12   Q    Did you hear them both testify that the list includes

13   parties who are not making any financial contribution to the

14   plan?

15   A    I -- I think I remember one of them, but I can't tell

16   you which one who said it.  It may have been said twice.  I

17   don't have a transcript or anything to refer to.

18   Q    Do you know that there are parties on the list who are

19   making no financial contribution to the plan?

20   A    Yes.

21   Q    Mr. O'Neill asked you about whether or not any of your

22   own assets are being sold to fund the plan payment.  And I

23   apologize if I'm misstating that.  Did you say that that

24   decision hasn't been decided yet?

25   A    I'm sorry.  Just rephrase the question.  I kind of lost

```
 1    you.

 2    Q     Sure.  Did you testify that it hasn't been decided yet

 3    whether any of your own personal assets will be sold?

 4    A     (Indiscernible) referring to me personal assets

 5    excluding my assets such as they are in trusts.  I was

 6    speaking to my (indiscernible) account, not --

 7    Q     Sure.  And I apologize.  I got distracted.  The lights

 8    went on on me for a second there.  But so I understand your

 9    testimony correctly, as of your assets that are not part of

10    the trusts, you don't know yet whether those will be part of

11    the payment under the -- whether you'll have to make any

12    payments under those assets.  Is that correct?

13    A     Yes.  I don't know yet.

14    Q     Under the plan, your family would be required to pay

15    money out over a nine-year period.  Is that right?

16    A     Maximum nine or ten years.  I've heard both stated.

17    Yes, that is correct.

18    Q     To your knowledge, has any advisor performed any

19    evaluation of the expected value of your family's assets

20    over that period?

21    A     Not to my knowledge.

22    Q     And you're not aware of any evaluation of the expected

23    value of your family's assets over that period?

24    A     That's correct.

25    Q     Thank you, Dr. Sackler.
```

1          MR. HIGGINS:  No further questions, Your Honor.

2          THE COURT:  Okay.

3          MR. HUEBNER:  Your Honor, it's Marshall Huebner.

4    One quick note before we break for lunch.  I'd like to thank

5    Mr. Edmunds, Mr. O'Neill, and Mr. Higgins for using wired

6    headsets today.  It actually made a tremendous difference.

7    Somehow Mr. Joseph can always be heard, but for no one else

8    does that actually seem possible most of the time.

9          I would ask just as sort of helper of all that

10   where possible going forward if people had the ability to

11   use headsets, it will I think make for just a

12   (indiscernible) audio experience including for the public

13   who are trying very hard to get access to these proceedings.

14         THE COURT:  That includes witnesses.

15         So, look, it's about 20 of 2.

16         MR. GOLDMAN:  Your Honor?

17         THE COURT:  I'm not ending this testimony.  I'm

18   just thinking it may make sense to break for lunch.  But,

19   Mr. Goldman, you were raising your hand?

20         MR. GOLDMAN:  Yes, Your Honor.  It's fine if we

21   break now as long as I have an opportunity to ask the

22   questions after the lunch break.

23         THE COURT:  Yeah, that's fine.

24         MR. GOLDMAN:  Irve Goldman, State of -- Pullman

25   Comley from the State of Connecticut.

Page 139

1    THE COURT:  Yeah.  I think we should break at this

2   point.  I'm not sure there's a lengthy period, but we do

3   still have cross.  So we'll break until 2:30.

4    And, Mr. Sackler, although obviously you can have

5   lunch, you shouldn't talk about your testimony with anyone

6   during that period.

7    THE WITNESS:  Mm hmm.

8    THE COURT:  Okay.  Very well.  So 2:30 New York

9   time.

10    (Recess)

11    THE COURT:  All right.  Good afternoon.  This is

12   Judge Drain.  We are back on the record in In re Purdue

13   Pharma L.P.  Dr. Sackler is being examined still.

14    Dr. Sackler, you understand that you are still

15   under oath?

16    THE WITNESS:  (indiscernible).

17    THE COURT:  Okay.  And I think when we left off,

18   the next person who was going to question Dr. Sackler on

19   direct was Mr. Goldman, right?

20    MR. GOLDMAN:  Yes, Your Honor.

21    THE COURT:  Okay.

22    MR. GOLDMAN:  May I proceed?

23    THE COURT:  Yes.

24    MR. GOLDMAN:  Yes.  Irve Goldman of the firm of

25   Pullman & Comley representing the State of Connecticut.

Page 140

1                    DIRECT EXAMINATION OF RICHARD SACKLER

2      BY MR. GOLDMAN:

3      Q    Good afternoon, Dr. Sackler.

4      A    Good afternoon.

5      Q    I just have one -- or expect to have just one question

6      to you.  Other than members of the Sackler family or trusts

7      in which they may be beneficiaries, are you aware of any

8      person or entity that will be contributing monetarily to the

9      more than $4 billion in settlement payments that are

10     contemplated by Purdue's plan?

11     A    I am not aware of any.

12          MR. GOLDMAN:  I have no further questions, Your

13     Honor.

14          THE COURT:  Okay, thank you.  All right.  Mr.

15     Underwood, did you have questions?

16          MR. UNDERWOOD:  Very, very briefly, Your Honor.

17          THE COURT:  Okay.

18          MR. UNDERWOOD:  Thank you.

19                    DIRECT EXAMINATION OF RICHARD SACKLER

20     BY MR. UNDERWOOD:

21     Q    Dr. Sackler, my name is Allen Underwood and I represent

22     certain Canadian municipalities and First Nations creditors

23     with regard to this matter.

24          First question, Dr. Sackler, do you agree that

25     significant worldwide Sackler family assets are being

Page 141

1    dedicated to U.S. state, municipal, and tribal abatement

2    under the proposed plan?

3    A    I don't know of any.

4    Q    Are you aware, for instance, that in terms of the

5    Independent Associated Companies, the IACs, that the value

6    of those companies upon sale may be contributed to the

7    trusts for the benefit of the U.S. opioid abatement?

8    A    That is my understanding.  They may be, yes.

9    Q    Okay.  Dr. Sackler, are you aware of any similar

10   abatement plan for the Canadian provinces, municipalities,

11   and first nation tribes?

12   A    I am not.

13   Q    And isn't it in fact correct that there is no abatement

14   plan for Canada under this plan?

15   A    I do not know.

16   Q    Do you agree that Purdue Canada entities are IACs,

17   Independent Associated Companies under the proposed plan?

18   A    Yes.

19   Q    And isn't it true that the net asset value of the IACs

20   that constitute Purdue Canada will be dedicated to U.S.

21   atonement under the U.S. plan and not to any Canadian

22   abatement?

23          MR. JOSEPH:  Objection.  Asked and answered.  He

24   has already answered that IACs may be contributed to the

25   abatement.

Page 142

1           THE COURT:  Right.  I don't think you're asking

2     anything new, Mr. Underwood.  Maybe I'm missing something.

3           MR. UNDERWOOD:  Okay.

4     BY MR. UNDERWOOD:

5     Q    So that being taken, Dr. Sackler -- and this is a very

6     broad question -- do you feel that the fact that they're not

7     included within any abatement process before this Court is -

8     - meaning the Canadian provinces, municipalities, and first

9     nation -- do you feel that's fair?

10          MR. JOSEPH:  Objection.

11          THE COURT:  On what basis?

12          MR. JOSEPH:  Relevance.  Whether he thinks it's

13    fair, the plan is the plan.  And do we need to dedicate it

14    to non-U.S. entities that we're not talking about --

15          THE COURT:  Well, I --

16          MR. UNDERWOOD:  I could give you some background,

17    Your Honor, of where that's coming from.

18          THE COURT:  Yeah.  I mean, I think -- I mean,

19    you're asking is it -- I don't know whether you're asking

20    whether -- from what perspective, from his own perspective

21    as a legal matter.  When you say fair, there are a lot of

22    different ways one can position oneself to see fair.

23          MR. UNDERWOOD:  Understood.  And I would only

24    expect from Dr. Sackler an answer as to himself personally.

25          THE COURT:  So such as would he prefer it if the

Page 143

1   money went also for abatement in Canada?  I'm just trying to

2   understand.  Is it with respect to the settlement?

3          MR. UNDERWOOD:  Correct.  The settlement the trust

4   established under the plan.

5          THE COURT:  The settlement money.

6          MR. UNDERWOOD:  Right, the fact that the NOATs

7   don't address the Canadian abatement claims.

8          THE COURT:  Okay.

9   BY MR. UNDERWOOD:

10  Q    So to rephrase, Dr. Sackler, and appreciate your

11  patience --

12         MR. HUEBNER:  Your Honor, with apologies, let me

13  just help with a different objection before he rephrases.

14  This time he included for the first time in a couple weeks

15  the word provinces in his questions.

16         The provinces, as the Court knows, we have a

17  stipulation with.  Mr. Underwood does have the clients that

18  are provinces.  So I would ask that you just focus if you

19  don't mind on that distinction in your line of questioning

20  so we can know what we're talking about.  Because those

21  claims are withdrawn voluntarily pursuant to a court-

22  approved stipulation.

23         THE COURT:  All right.

24         MR. UNDERWOOD:  No, I know exactly -- I know

25  exactly what I'm talking about.  And I am including the

Page 144

1    provinces because I don't believe that there is any Canadian

2    entity that's receiving benefit under this plan.

3              THE COURT:  Well, but I think actually Mr. Huebner

4    makes a fair point.  I guess the provinces have made their

5    own determination on that issue.  So I think the question

6    should be rephrased to reflect I guess the following.

7    Correct me if this is not what you have intended, Mr.

8    Underwood.

9              Is it in Dr. Sackler's view fair that the proceeds

10   of the settlement are not going to fund abatement under the

11   NOAT for the Canadian governmental entities and tribes that

12   are Mr. Underwood's client.

13             That's a question for you, Dr. Sackler.

14             THE WITNESS:  I have not considered this at all.

15   And so I don't have any opinion at the moment.

16             THE COURT:  Okay.

17   BY MR. UNDERWOOD:

18   Q    This is really my last question, Dr. Sackler.  Isn't it

19   true that the Purdue Canada entities actually originally

20   developed the original OxyContin formulation?

21   A    That's not true.

22   Q    Where was it originally developed?

23   A    In the United States.

24   Q    Without any assistance from the Canadian Entities?

25   A    None that I know of.

Page 145

1           MR. UNDERWOOD:  All right.  Thank you, Your Honor.

2    I have no further questions.

3           THE COURT:  Okay.  All right.  Does anyone else

4    want to examine Dr. Sackler before we go to cross by Mr.

5    Joseph?  All right.  You can go ahead, Mr. Joseph, if you

6    have any cross.

7           MR. JOSEPH:  No questions, Your Honor.

8           THE COURT:  Okay.  All right.  That concludes your

9    testimony, Dr. Sackler.  So you can sign off at this point.

10           THE WITNESS:  Thank you very much, Your Honor.

11    May I just --

12           THE COURT:  Oh, I'm sorry.  I may have spoken to

13    soon.  Mr. Edmunds, did you have -- I thought you were done

14    --

15           MR. EDMUNDS:  I don't think there's any cross.  I

16    was just coming on for what's next.

17           THE COURT:  Okay, fine.  So you can -- very well.

18           THE WITNESS:  Sign off.

19           THE COURT:  You can sign off, Dr. Sackler.

20           THE WITNESS:  May I just make a clarifying comment

21    that may help the Court, Your Honor?

22           THE COURT:  Well, it's up to you.  if you believe

23    you said something that --

24           THE WITNESS:  No, it wasn't related to my

25    testimony.

```
 1              THE COURT:  Oh.  Well then I think --
 2              THE WITNESS:  If it isn't the forum to share it
 3    with you, perhaps there's a better forum.  So I'll withdraw
 4    the --
 5              THE COURT:  I don't want you to share anything
 6    with me other than as part of your testimony.
 7              THE WITNESS:  Okay.  Then -- okay, I withdraw my
 8    request, Your Honor.
 9              THE COURT:  All right.  Again, if there's
10    something you said that you believe is incorrect, that's
11    different.
12              THE WITNESS:  No.
13              THE COURT:  All right, fine.  Very well.  So you
14    can sign off.
15              THE WITNESS:  I will do so as soon as I master
16    (indiscernible).
17              THE COURT:  All right.  So, Mr. Edmunds, you were
18    going to -- it wasn't -- I think you were going to consider
19    whether you were calling another Sackler witness for today.
20    And I believe you are going to, but maybe that's changed
21    during the day.
22              MR. EDMUNDS:  Well, I believe, Your Honor, that we
23    are going to -- I think that we have agreed that Ms.
24    Monaghan will correct me if I'm wrong, but Theresa Sackler
25    is the next witness on the list and the final witness for
```

Page 147

1    today.  And I believe we are going to stipulate to the

2    admission of her deposition in this case in lieu of

3    testimony -- in lieu of calling her to the stand.

4                THE COURT:  All right.

5                MR. EDMUNDS:  So Ms. Monaghan will correct me if

6    I'm wrong.

7                MS. MONAGHAN:  That's consistent with my

8    understanding as well, Your Honor.

9                THE COURT:  Okay, very well.

10                MR. EDMUNDS:  And --

11                THE COURT:  Go ahead, Mr. Edmunds.

12                MR. EDMUNDS:  I'm sorry.  I just wanted to -- I

13   believe -- and I guess it's been a lot of the day, but I

14   believe that that also requires Debtors, too.  Because I

15   believe they have objected to the admission, but it's my

16   understanding that they will consent.

17                THE COURT:  Okay.  I don't know who is handling

18   that, Mr. Kaminetzky or one of your colleagues.  Did Debtors

19   have --

20                MR. HUEBNER:  Yeah.  We already had email

21   exchanges about this with Mr. Edmunds and we already did

22   consent.

23                THE COURT:  You consent?

24                MR. HUEBNER:  That's correct, Your Honor.

25                THE COURT:  Okay.  So I just want to make sure I

1    have the right exhibit.  Is there an exhibit number for the

2    deposition?

3            MR. EDMUNDS:  I believe so, Your Honor.  My

4    apologies, I don't know that I --

5            MS. MONAGHAN:  I am not a hundred percent sure

6    that Theresa Sackler's deposition was part of the previously

7    submitted group.  But if it's not, we consent to it being

8    added.

9            THE COURT:  All right.  Well, I just need to get a

10   copy of it.  And if it doesn't have an exhibit number, it

11   should follow the last exhibit which was admitted, which I

12   think was one of Mr. Edmunds' exhibits.  There were a couple

13   admitted during the last witness testimony.  So it should

14   follow that.

15           MS. MONAGHAN:  Yeah.  I think I counted two.  So

16   it would be the third number after the last number in the

17   current set.

18           THE COURT:  Right.  So can you -- I guess the best

19   thing for you to do, Mr. Edmunds, is to email that to

20   chambers, copying Ms. Monaghan and Mr. Huebner.  And --

21           MR. EDMUNDS:  Will do, Your Honor.

22           THE COURT:  And I just want to make sure it's the

23   entire declaration.  It's not -- sometimes people designate

24   sections and then the opponent or other people counter

25   designate other sections.  In this case it's the entire

1    deposition?

2              MS. MONAGHAN:  It is, Your Honor.  That's my

3    understanding.  And just so Your Honor knows, it was a

4    single deposition, but because of the time difference, it

5    was conducted in two half days.  So it was September 23rd

6    and September 24th, each for half a day.  But it's one

7    deposition.  So I think it only needs one exhibit number.

8              THE COURT:  So there will be one transcript that

9    covers both days.

10             MS. MONAGHAN:  Correct.

11             THE COURT:  And has she reviewed and signed off on

12   the transcript?

13             MS. MONAGHAN:  It's my understanding that she has.

14   I will double-check that.

15             THE COURT:  All right.  Okay.  And I will read

16   this, unlike pouring through all of the hundreds of other

17   exhibits.  But I think my suggestion to everyone -- in this

18   case it is a suggestion as opposed to an admonition.  But my

19   suggestion to everyone this morning holds true for this as

20   well.  If there's something in here that you want to

21   emphasize, you should emphasize it in oral argument, just as

22   I would expect you would be emphasizing something from the

23   last witness we heard or witnesses that we heard the day

24   before or the day before that.  But I will review it.

25             So I will look for that I guess this afternoon.

Page 150

1          MR. EDMUNDS:  We'll get it in this afternoon, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. EDMUNDS:  Thank you.

5          THE COURT:  Thank you.

6          MR. HIGGINS:  Your Honor, this is Ben Higgins for

7     the U.S. Trustee.  I don't believe we have that yet.  And I

8     would just ask that it be circulated to any of the objecting

9     parties.

10         THE COURT:  That's fair.  You all have the email

11    list.  You don't have to include everyone on -- why don't

12    you do two emails, one to chambers just with the two CCs

13    that I mentioned.  And then you can -- someone can send it

14    out to the broader email list.

15         MR. EDMUNDS:  We'll take care of it, Your Honor.

16         THE COURT:  Okay, very well.  So where does that

17    leave us for the rest of the day and tomorrow?

18         MR. EDMUNDS:  So I think that we have three

19    Sackler witnesses tomorrow and then perhaps a final witness

20    who is an investigator from Maryland.  We have agreed to

21    speak with Ms. Monaghan tonight about whether we will need

22    those witnesses to testify live or place on the record some

23    other arrangement.  But then I believe -- and I think Mr.

24    Huebner will correct me if I am wrong -- that is the close

25    of evidence in the hearing.

Page 151

1          So we don't know yet whether they will testify,

2     but we're going to discuss it and see where we are.

3          THE COURT:  Okay.  I would ask you to, just as you

4     did and just as the Ad Hoc lawyers did yesterday, get us the

5     exhibits that you expect to be discussing with these

6     witnesses early so that I can have copies of them on the

7     bench and of course so the witness can have them, too.

8     Hopefully before -- hopefully tonight as opposed to tomorrow

9     morning.

10          MR. HUEBNER:  Your Honor, I do need to make an

11     unfortunate contingent correction of Mr. Edmunds.  We are

12     working like mad day and night to resolve the remaining

13     issues with the so-called codefendants, which are really

14     important counterparties to the Debtors.  As the Court may

15     remember, they reserved their right to cross-examine a

16     couple of our witnesses.  (indiscernible) that will not be

17     necessary and that we will get to a deal.  But if for some

18     reason that fails, which would be terrible, then in addition

19     to the three witnesses or four potential witnesses that Mr.

20     Edmunds mentioned I believe, we may be seeing some recall of

21     a couple of other witnesses.  But I still remain passionate

22     and optimistic that that will not be necessary.

23          THE COURT:  Okay.  That's fine.  I mean, I really

24     would like to finish if we can tomorrow.  I know that

25     today's witness took a long time, but that was appropriate I

Page 152

1    felt.

2            But do you have a sense that we'll be done

3    tomorrow, Mr. Edmunds?  It's only over the things that you

4    can control.  Don't address Mr. Huebner's point because

5    that's not really your issue.

6            MR. EDMUNDS:  Barring unforeseen circumstances,

7    Your Honor, I think that we will be finished tomorrow.

8            THE COURT:  All right.  I'm just wondering whether

9    we should start early or not.  It sounds like we could start

10   at 10:00.

11           MR. EDMUNDS:  Yes.  I don't think there's any

12   need.

13           MR. JOSEPH:  Your Honor, may I ask --

14           THE COURT:  One more question, Mr. Joseph.  And we

15   don't have a witness who, like, disappears and turns into a

16   pumpkin at some -- you know, at 2:30 or anything like that?

17           MS. MONAGHAN:  So, Your Honor, we do have one of

18   the three witnesses who is overseas.  And so I think -- and

19   Mr. Edmunds I think is amenable that he would go first if

20   they go.

21           THE COURT:  All right.

22           MS. MONAGHAN:  And then the other point -- I don't

23   know if Mr. O'Neill is on, Mr. Robinson O'Neill -- is one of

24   the other witnesses is the subject of the stipulation with

25   Washington, Oregon, Connecticut, and D.C., pursuant to which

Page 153

1    they have agreed to forego questioning her in exchange for

2    her deposition being included and a stipulation to certain

3    biographical facts that came across kind of disjointedly in

4    the deposition that they wanted in a single document.  So

5    that will be submitted as well.

6              THE COURT:  Okay.  All right.  Mr. O'Neill, that's

7    your understanding, too?

8              MR. O'NEILL:  Yes.  Ms. Sackler has some health

9    issues that make it better for I think everyone that we

10   adopt this policy, approach.

11             THE COURT:  Okay.  All right.

12             MR. O'NEILL:  But Maryland has not agreed to that

13   yet.  So this it between Washington --

14             THE COURT:  I understand.

15             MR. O'NEILL:  -- Oregon, Connecticut, D.C., and

16   the Sacklers.

17             MS. MONAGHAN:  Yes.  I apologize.  I wasn't trying

18   to imply that Maryland --

19             THE COURT:  I don't think you stated -- I don't

20   think you said Maryland.

21             MS. MONAGHAN:  Okay.

22             THE COURT:  All right.

23             MS. MONAGHAN:  At this point in the hearing, any

24   slip is possible.

25             THE COURT:  All right.  So, Mr. Joseph, you were

Page 154

1    going to say something?

2            MR. JOSEPH:  Yes, Your Honor.  I just would

3    appreciate it if we could get from Mr. Edmunds some clarity

4    as to whether the investigator will testify.  Because there

5    will be cross of the investigator if he testifies.  And the

6    record if they are considering stipulating to depositions is

7    pretty much set.  And I know Mr. Edmunds legitimately wanted

8    to wait until the record was set before making that

9    determination.

10           THE COURT:  All right.  Well, I don't know -- I

11   mean, are you in a position to do that now?  Or maybe later

12   tonight you can.

13           MR. EDMUNDS:  I think it's fair to ask, and I

14   think it's unlikely he will testify.  I need to kind of

15   process what happened in the examination of the witness and

16   what else is going on with these.  But that's the best I can

17   --

18           THE COURT:  Let me ask you -- I'm sorry to

19   interrupt.  Let me ask that you reach out to Mr. Joseph, I

20   don't know, by 8:00 tonight.  Is that fair?

21           MR. EDMUNDS:  Yeah, that's fine, Your Honor.  I'll

22   do that.

23           THE COURT:  Okay.

24           MR. EDMUNDS:  The other thing I was going to say

25   about Ilene Sackler is that Matt Gold's office

Page 155

1    (indiscernible) did provide you a copy of it, the

2    transcript.  So you should have it.  If not --

3              THE COURT:  I recall that.  Because I was thinking

4    she might be called today.  So we have a copy of that.

5              MR. EDMUNDS:  Okay.

6              THE COURT:  But I'm not sure it's an exhibit yet.

7    So again, we should probably designate it -- you should be

8    ready to designate it as an exhibit.

9              MR. EDMUNDS:  Right.  And we'll have a stipulation

10   that will go in as well that kind of clarifies.  And I would

11   anticipate offering that tomorrow when we finalize it, and

12   hopefully Maryland will agree.

13             THE COURT:  Right.  Okay, very well.  All right.

14   I think hearing no one else, I think that will end the

15   hearing for today.  And we will resume tomorrow at 10:00 as

16   discussed.  Thank you, everyone.

17             (Whereupon these proceedings were concluded at

18   2:54 PM)

19

20

21

22

23

24

25

Page 156

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing
transcript is a true and accurate record of the proceedings.

Sonya Ledanski
Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.08.19 14:14:15 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  August 19, 2021

[& - 425]                                                                      Page 1

**&**

**&** 4:16 5:1 7:1
25:15,23 26:24
35:25 139:25

**0**

**0015** 43:4
**0024** 52:24

**1**

**1** 42:7 44:7,8 45:4
46:21,22 47:19
57:4 58:8 91:13
120:20
**10** 39:24 41:3
65:13 66:3,10,12
97:20,22,24
**100** 16:9 87:5
**100,000** 60:4,12
60:21
**10014** 5:19
**10017** 3:9 5:5,12
**10022** 7:4
**1006** 5:18
**10110** 4:19
**1049** 51:12
**10601** 1:14
**10:00** 152:10
155:15
**10:08** 1:17
**10:20** 40:6
**10:21** 40:22,24,25
41:7
**10:30** 39:6
**10:41** 41:6
**10th** 24:11
**11** 15:5 67:8 104:7
**113** 99:13
**11501** 156:23
**12** 43:21
**12:00** 92:19
**12:30** 117:16
**13** 43:21

**14** 43:21
**15** 28:6 43:13,19
43:20,21 45:4,6,6
45:13 46:13
**150** 16:15
**15222** 4:5
**15th** 86:9
**16** 41:11 42:5,24
43:12 128:2
**17** 2:2 47:5
**18** 1:16 46:13 47:9
65:17
**1875** 4:11
**19** 156:25
**19-23649** 1:3
**1988** 31:24
**1990** 30:8
**1995** 73:13
**1999** 30:10
**1:00** 117:9,17
**1:06** 102:6
**1:30** 117:15,18,19
**1st** 91:7

**2**

**2** 46:22 47:5,19
57:14 58:10 63:5
63:24 101:18
138:15
**20** 41:18 90:22
138:15
**200** 3:17 6:17
28:14
**2000** 6:3 30:12,12
30:13 44:21
**20006** 4:12
**2003** 30:11,13,14
44:21
**2005** 34:2
**2007** 35:11 37:20
37:23 38:8 44:21
114:24 121:15
122:2,17 123:23
124:2

**2008** 30:17,20
32:15,15 65:17
68:16,21 89:23
104:14 106:17,25
**2009** 83:15
**201** 5:18
**2010** 57:15,19,20
79:20 83:15 85:10
89:6 91:7,13
102:6 107:13
**2011** 92:5
**2012** 22:21 86:10
**2013** 60:2 63:12
63:24 99:12
**2014** 77:2,4
**2015** 124:18
**2017** 34:2 122:17
**2018** 30:8 31:6
32:9,15,16 60:2
68:16,21 89:23
121:15 122:2
127:12
**2019** 125:2
**2020** 37:23 47:20
52:1 114:8,22
123:1
**2021** 1:16 2:2
156:25
**20852** 3:18
**2094** 40:14,15
41:19,20 43:4,13
43:15 45:10
**2096** 51:1
**2096-0024** 52:22
**2096.0007.** 52:23
**2096.0024.** 52:17
**20s** 22:10
**21217** 6:18
**217** 6:10
**22** 53:1
**225** 4:4
**23rd** 149:5

**24** 52:21 124:19
**248** 1:13
**24th** 149:6
**25** 53:1,3,4 55:18
56:3,3 71:4,5,9
92:18
**25th** 79:20 85:10
**26** 62:22 66:17
**27** 37:6,11 66:2,4
66:16,17,18 71:25
**29** 70:19 74:4,6
76:22
**2:00** 117:15,19
**2:30** 139:3,8
152:16
**2:54** 155:18

**3**

**3** 46:22 47:7,19
53:13,22 56:13
58:24 83:23
**30** 102:6 117:21
**300** 1:13 156:22
**30s** 22:10
**30th** 5:11
**330** 156:21
**34** 76:23 86:5
**3514** 24:15
**35213** 6:11
**3588** 26:22
**3589** 26:24
**36** 87:23
**39** 94:1

**4**

**4** 60:1 61:4 62:21
62:25 135:20
136:3 140:9
**4.325** 118:15
**40** 79:16
**403** 86:18
**408** 53:25
**41** 80:18
**425** 5:4

**43**  83:7,10
**44**  83:3,7,11
**45**  85:8
**450**  3:8
**47**  42:7
**48**  42:2,8,25
**485**  5:11

**5**

**5**  64:21 107:17,20
**500**  4:18
**501**  6:10
**52**  86:2,3,4

**6**

**6**  64:20,21 65:2
**6,204**  39:6,16
**600**  21:15
**61**  87:21,23 88:16
    88:18 91:5
**62**  91:6
**65**  91:24 92:8

**7**

**7**  104:14
**703**  19:17
**75**  125:9
**7th**  106:17,25

**8**

**8**  97:20,22,24
**80**  91:25 93:25
    94:2
**800**  6:3
**8:00**  154:20
**8th**  101:25

**9**

**9**  97:20,22,24
**9002378586**  101:3
**919**  7:3
**95**  73:8,10
**97**  42:5,24 43:12
**98104**  6:4

**a**

**a.m.**  39:24 40:6
**aaronson**  5:9
**abatement**  141:1
    141:7,10,13,22,25
    142:7 143:1,7
    144:10
**abby**  8:10
**ability**  138:10
**able**  106:9
**abrams**  7:9
**abuse**  57:18 58:9
    58:18 89:8 128:8
**abusing**  58:8
**academic**  22:17
**accepted**  60:25
**access**  39:1
    138:13
**account**  137:6
**accounted**  91:8,14
**accurate**  80:2
    156:4
**act**  116:15
**action**  49:22
    61:22 97:3 123:6
**actions**  50:5,9,11
    50:12 86:14 97:1
**active**  113:1
**actively**  17:10
**activities**  94:6
**activity**  124:3,4,9
**actors**  58:11,21
**actual**  22:9 25:25
    65:22 113:14
**ad**  96:3 151:4
**adam**  9:25
**add**  78:20,23
    97:19
**added**  148:8
**addendum**  42:15
    42:16 52:14,25
    53:9 54:10,13,21
    55:1,19 56:20

**92:6**
**addiction**  89:8
**addition**  18:6
    124:16 151:18
**additional**  108:2
**address**  18:12
    27:4 128:17 143:7
    152:4
**addressed**  90:19
**addressing**  79:6
**adequate**  16:6
**adhancia**  73:20
    73:22
**adhansia**  127:8,8
    127:12 128:1,7,17
    128:17,18,21
**adhd**  127:16
    132:2
**admission**  19:24
    19:25 23:10,14
    105:14 108:11
    147:2,15
**admitted**  18:15,15
    19:7,14,19 20:1
    22:8,24 23:5
    27:10 38:7 46:14
    105:16 108:20
    148:11,13
**admonition**
    149:18
**adopt**  153:10
**advice**  131:12,13
**advised**  47:21
    131:11 132:13
**advises**  46:11
**advisor**  137:18
**affective**  69:19
**affidavit**  30:2
**affiliated**  48:25
    119:20
**affiliates**  31:9
**affirm**  29:14

**africa**  33:2
**afternoon**  118:1
    130:5 139:11
    140:3,4 149:25
    150:1
**aggressive**  60:3
    60:11,14
**ago**  16:9 27:5 87:9
    104:4,7,7 130:10
    130:23 133:8
    134:14
**agree**  23:3,4,10
    24:23 35:18,19
    46:1 47:14,19,22
    53:9 54:10,11,12
    54:13 56:16,18,21
    61:7 64:22 67:9
    70:1 71:10 83:20
    83:22 88:4 101:20
    102:5 106:15
    113:4 123:10
    127:5 140:24
    141:16 155:12
**agreed**  16:10 22:7
    41:5 46:3 48:13
    48:13 146:23
    150:20 153:1,12
**agreeing**  65:15
    133:2
**agreement**  40:9
    44:4 45:22 46:4,7
    46:8 51:23,24
    52:9,25 55:19
    114:14,15,19,21
    115:10,11 116:13
    125:3
**agreements**  46:10
    114:7,17,25
    115:18,19,23
    116:1 124:17
**agustina**  7:18
**ah**  73:1

ahead 20:23 29:25
30:3 62:17 74:5
95:24 106:6
113:11 116:24
117:23 121:2
122:7 134:13
145:5 147:11
aisling 11:14
al 6:11 15:3
albert 7:10
aleali 7:11
alexander 10:20
alfano 7:12
alice 13:20
alissa 11:16
alive 112:25
allegation 54:20
allegations 53:23
124:21 128:12,20
allen 13:22 140:21
allison 14:6
allow 127:4
alright 110:9
111:8,14 112:1,8
112:14
amenable 152:19
amend 68:3
amended 15:5
amount 125:17
133:6
analyses 77:2,11
analysis 77:13
andrew 4:7 7:12
13:18
andy 23:23
angela 10:2
anker 7:13
annual 84:19,20
answer 17:6 33:19
35:9 36:23 37:10
48:11 50:16 54:15
55:10 62:10 72:9
72:15,19 74:23

78:21,22 80:13
94:7 96:14 99:3
115:20 117:9
120:6 122:6,8
123:3,8 126:1
129:8,8 134:6,7
136:11 142:24
answered 72:14
141:23,24
answering 65:22
120:12
answers 115:4
anticipate 155:11
anticipating
98:18
anybody 22:21
62:3 116:16
120:24
anymore 119:3,5
anyway 44:24
53:5
apologies 87:24
119:1 143:12
148:4
apologize 48:18
71:9 121:23 129:3
133:9 134:18
136:23 137:7
153:17
apparently
107:14
appears 70:19
102:7 107:6
appellate 28:18
apply 16:6
appreciate 17:5
17:23 143:10
154:3
approach 153:10
appropriate
114:2 121:5
151:25

approval 15:5
approve 63:23
118:7
approved 64:1
124:18,25 125:1
143:22
approximately
30:9,17 31:6,24
32:15 65:17
april 86:9
ardavan 8:25
argentina 33:4
arguing 20:25
22:16
argument 16:4,12
16:20,25 17:16,18
18:6 22:6 23:8
28:4,7,9,23
149:21
arguments 27:18
arik 11:25
arose 132:9
arrangement
150:23
art 121:9
artem 13:8
aside 61:6 100:15
108:1 135:17
asked 20:11 21:23
54:4 72:14 74:7
88:1 89:22 103:13
134:19 136:21
141:23
asking 23:21
36:18 40:8 47:12
61:23 62:7 65:23
71:20,21 74:13,14
87:1,10,11,13
118:7 126:19
132:3 142:1,19,19
asserted 24:5
52:10

assertions 56:8
asset 141:19
assets 119:14
136:22 137:3,4,5
137:9,12,19,23
140:25
assistance 144:24
associated 141:5
141:17
assume 40:23
123:4
assumes 119:2
assuming 18:5
86:24
assurances 37:16
assure 112:4
assured 18:3
assuredly 119:3
atencia 73:24,25
atinson 7:14
atonement 141:21
atop 55:19
attached 19:2,9
19:11 53:11
attempt 89:16
attempting 18:25
attend 90:20
attended 90:20
attending 70:12
attention 22:10
27:21 61:1 123:17
124:5,6 127:15
attorney 3:7,15
3:16 6:1,2,8,15
28:6 36:4,12 41:5
46:1,3,11 111:17
111:20,24 123:2
132:13
attorneys 4:2,10
4:17 5:2,17 6:9,16
7:2 37:7
attributed 58:7,15
58:15

[audio - bother]                                                              Page 4

audio 138:12
august 1:16 2:1
  24:11 156:25
auslander 7:15
australia 32:23
  49:21,23
australia's 49:23
authenticated
  108:7
authorities 50:4,8
available 34:19
ave 5:11
avenue 3:8 4:4,11
  4:18 5:4 6:3 7:3
avoid 87:17
aware 33:13 35:6
  35:10,18 37:7
  49:21 50:4,8
  64:15 72:4 80:20
  80:22 81:10 88:19
  88:21 91:6,13,15
  91:23,24,25 97:5
  97:7,9 109:2,5,5
  122:22 127:11
  128:7,20,22
  134:25 135:9
  136:9 137:22
  140:7,11 141:4,9

              b

b 1:21 18:24 52:5
  109:12,17 118:15
  118:21,24,24
back 26:10,14
  44:10 45:4,15
  55:17 56:3 86:16
  89:19 92:18 93:3
  114:11 139:12
background
  79:21 142:16
ball 7:16
baltimore 3:18
  6:18

bankruptcy 1:1
  1:11,23
barbara 9:1
barker 7:17
barring 152:6
bartlett 5:1
based 89:6
basically 25:9
  29:3
basis 80:4 87:2
  142:11
bates 100:21
  105:24
bear 40:2
began 30:12
beginning 61:15
  63:14 70:12 95:1
begins 61:4 83:8
behalf 24:22
  25:22 109:7,9
  116:23
beiderman 10:1
beings 61:20
  69:17
belatedly 21:10
believe 16:24
  19:13,14 25:19
  41:12 42:25 44:23
  45:1 46:9 49:20
  50:16 52:12 54:9
  54:16 57:22,24
  60:18 63:6 64:14
  77:25 83:15 84:14
  85:17,20 102:16
  105:22 107:24
  109:4,23 111:25
  119:12,16 120:7
  121:10,14 124:4
  125:5 130:22
  131:19 133:10
  134:17 135:1
  136:11 144:1
  145:22 146:10,20

146:22 147:1,13
  147:14,15 148:3
  150:7,23 151:20
believed 59:24
  88:22
ben 51:10 129:23
  150:6
bench 151:7
benedict 15:14
beneficiaries
  140:7
beneficiary
  119:25 120:2,4
benefit 141:7
  144:2
benjamin 3:12
  5:21 7:10 15:12
  130:5
bernard 8:25
berro 7:18
beshere 7:19
best 27:14 34:8,18
  42:1 48:10 72:23
  76:8 79:4,6,7
  120:12 125:25
  148:18 154:16
better 55:15 70:16
  75:12 120:11
  146:3 153:9
beyond 98:19
  136:6
bielli 7:20
big 45:15
billion 118:15
  135:20 136:3
  140:9
billions 64:23
  65:10
binders 28:14
bio 117:11
biographical
  153:3

birmingham 6:11
bit 44:13 62:1
  70:17
blabey 7:21
blain 7:22
blaming 79:13
blouin 7:23
bloyd 6:9
blurred 102:12
  103:21
board 30:15,16
  31:3,5,9 32:10
  57:5,10 64:2,23
  65:9 68:12 74:13
  74:15 75:3,4,5,6
  75:16,17,20 77:20
  77:21,22 78:1
  79:21 80:22,22
  81:1,2,8,9,16 82:5
  82:6,8,11 84:8,16
  84:20 85:10 91:20
  94:5 97:5,10
  98:11,11,13,23
  99:2,5 101:19
  102:11 103:20
  115:11 116:17
  118:22 119:9
  120:8,14 121:16
  122:3 123:5 124:1
  124:7,17,22 125:1
  125:1 127:12
  128:13 131:18,18
  131:19,22 133:11
  133:14,15 135:5
boardroom 67:3
boards 31:13
boer 101:22 102:6
  102:17
bograd 7:24
book 104:24
boring 28:11
bother 34:7

**bottom** 40:11 43:3
52:17,19,21 56:2
102:3
**box** 6:10 23:1
128:7
**boxes** 22:18
**branches** 118:20
**brand** 127:22
**brandt** 7:25
**brauner** 8:1
**breach** 61:17
**break** 59:5 74:8
74:22 92:21
117:14 138:4,18
138:21,22 139:1,3
**breaks** 117:12,12
**breath** 16:19
**brian** 3:20 11:5
18:10 30:6
**bridges** 6:9
**brief** 27:20 77:4,5
77:17
**briefed** 75:24
77:20
**briefing** 75:2
107:8
**briefings** 74:11,17
75:2,4,14,18,20
75:23
**briefly** 112:20
114:12 140:16
**bring** 22:14 23:25
86:16 90:24 99:19
**broad** 49:11 72:19
142:6
**broader** 150:14
**brooks** 7:17
**brother** 66:24
82:20
**brought** 22:9 36:5
36:10,12 49:22
50:9 61:23 107:12
124:5,6 130:11,17

**brown** 8:2
**brownlee** 36:4
**brunswick** 8:3
**bryce** 9:8
**budget** 71:18,23
83:16,16 84:16,19
84:20 85:11
**bunch** 52:20
**burger** 8:4
**busiest** 98:16
**business** 32:3
47:23 78:9
**butrans** 73:18

**c**

**c** 3:1 8:13,21 10:3
10:17 11:6 15:1
29:18 52:5 156:1
156:1
**call** 69:11,25 76:7
92:2 95:5 96:3,4
96:19 100:3
123:16
**called** 25:7 26:10
29:24 69:5,10
79:24 94:23 96:24
120:19 127:12,15
130:22 151:13
155:4
**calling** 25:4 29:7
72:4,10,11 97:18
146:19 147:3
**calls** 76:10,12,16
**campaign** 99:12
99:17,21
**campaigns** 80:25
**canada** 32:25 50:4
50:5,8,9,15
141:14,16,20
143:1 144:19
**canadian** 140:22
141:10,21 142:8
143:7 144:1,11,24

**can't** 32:11,17
35:4,9 37:10,10
**capacity** 80:25
94:4,14
**capitalized** 41:9
**car** 69:4,15
**care** 150:15
**caroline** 9:10
**carrie** 11:9
**carries** 62:21
128:7,8
**case** 1:3 15:14
18:19 20:4,8
31:12 41:10 78:12
112:4 115:6 147:2
148:25 149:18
**cases** 20:12 46:9
**cash** 64:24
**catch** 16:19
**catherine** 10:1
13:12
**caused** 70:23
**causes** 61:21
72:12
**ccs** 150:12
**cdc** 34:22,25
**cdc's** 34:20
**centre** 4:3
**ceo** 83:15
**certain** 18:14 24:6
25:17 44:5 56:20
94:24 131:3
140:22 153:2
**certainly** 15:19
28:3 55:9 61:7
64:8 75:4 76:20
91:19 96:20
116:17 122:15
124:5,8
**certificate** 44:12
**certified** 156:3
**chain** 58:12,22

**chair** 30:15,16,21
34:15 44:20
**challenge** 82:11
**challenged** 81:14
**chalos** 8:5
**chambers** 15:15
17:21 18:22 20:18
105:1 148:20
150:12
**chance** 51:23
101:8 120:11,12
**change** 51:7 58:18
100:10 103:17
**changed** 146:20
**changing** 20:10
29:21
**chapter** 15:5
**characterization**
48:2
**charges** 35:12
36:6,10,12 125:23
126:5
**charles** 8:9
**chart** 91:11,11
**check** 149:14
**christina** 12:5
**christopher** 12:8
13:2
**circulated** 150:8
**circumstances**
152:6
**civil** 51:24 53:11
**claim** 130:25
131:17
**claimants** 112:25
**claims** 19:13,15
19:16 23:12 52:10
126:20 131:7
132:2,4,8,9,23,25
133:17 143:7,21
**clarification**
39:13 60:1 68:1

clarifies  155:10
clarify  64:7 65:25
  86:5 115:20
clarifying  145:20
clarity  154:3
class  118:23,24
classification
  118:22 119:11
claudia  13:11
clause  58:20 59:9
  59:9,19 60:20
  61:3 63:4,9 67:15
  72:11
clear  15:24,24
  20:24 21:2 28:23
  36:12 39:5 54:19
  54:24 58:17 62:6
  65:15 109:11
  115:9 118:19
  135:5
clearly  17:10
  35:18,18,20 36:1
  37:2 97:16 118:3
  122:11 130:8
client  144:12
clients  29:1
  143:17
clinical  128:18
clint  8:20
close  17:15 18:4
  78:6 150:24
closely  58:2
closer  70:8 72:22
  84:12 126:25
  134:5 135:6,6,6
club  6:10
codefendants
  151:13
cohen  4:16
coleman  8:6
colleagues  147:18
collection  66:8

collective  16:14
collectively  74:24
com  109:18
come  19:13,17
  20:7 26:14 51:13
  72:22 75:10 77:22
  77:25 92:18
  101:13 119:19
  122:10 126:25
  134:5 135:5,6,6
comes  118:21
coming  19:6
  30:20 37:1 142:17
  145:16
comley  138:25
  139:25
comma  61:4
commence  125:7
comment  113:25
  145:20
comments  27:4
  103:7
commercial  71:22
committed  123:5
  135:19
committee  19:5
common  69:17,18
communicate
  67:2
communications
  67:11,14 68:6,20
  69:2
community  35:6
  35:17,20,23
companies  31:10
  31:20 48:25 64:25
  65:11 119:21,22
  141:5,6,17
company  4:10 5:2
  5:3 24:23 25:15
  25:16,23,23 34:16
  38:3 48:14 78:13
  94:4 97:3,10

98:12 99:6,7
  102:9 125:24
  126:16
compared  102:12
  103:21
compensation
  89:2,5,14,17
competent  112:5
complaints  21:4
  128:16,21
completely  22:17
  27:12 123:11
compliance  121:3
  121:7,10,11,16,17
  122:1,14,24
  123:10 124:12,15
complicated  80:8
  80:10
complied  120:9
  120:14
compound  59:4
  65:4 74:6,18
comprehensive
  126:23 127:2
  128:11 130:22,22
  131:14,16 133:9
  133:13
comprehensively
  131:17
comprised  79:24
computer  39:21
  93:12
concept  100:4
  113:8,9
concepts  130:16
concern  36:19
concerned  29:3
  35:7,20 36:1,13
  36:20 37:3,8,12
  62:1 101:21
  107:22
concerns  89:10

concluded  155:17
concludes  145:8
conclusions  19:10
condition  127:15
conduct  37:13,24
  38:9 45:21 46:21
  47:20,22 48:15,20
  53:24 122:25
  123:4,11,17 126:6
  126:11 128:13
  131:24
conducted  49:14
  149:5
conference  16:8
  17:21
confident  136:5
confirm  24:20
  25:20,21
confirmation  2:1
  15:5 24:8 25:4,18
  61:16 118:7
  126:22
confirmed  52:8
confusing  66:8
confusion  130:19
connecticut
  138:25 139:25
  152:25 153:15
connection  25:17
  46:14 48:24 49:22
connolly  8:7
cons  23:11
consensual
  126:20
consensus  102:11
  103:20
consent  147:16,22
  147:23 148:7
consequence  25:1
consider  27:13
  60:14 146:18
consideration
  23:11

**considered**  19:3,3
  27:19 28:19
  144:14
**considering**  18:16
  154:6
**consistent**  16:17
  23:14 127:23
  147:7
**consla**  8:8
**constitute**  141:20
**consulting**  94:4
**consumer**  6:1
**contact**  94:10,12
  94:13
**contained**  46:21
**containing**  80:5
**contains**  55:2
**contemplate**  17:2
**contemplated**
  140:10
**content**  54:14
**contentions**  53:15
**contents**  110:7
**context**  28:16
  74:15,16 86:25
  108:23 113:12
  115:16 121:12
  128:23
**contin**  73:6,8,9,14
**contingent**  151:11
**continuance**  2:1
**continue**  80:17
  86:23 93:7
**continued**  37:24
**continues**  47:8,9
**continuing**  15:4
**contracted**  59:1
  59:14,18
**contribute**  125:14
**contributed**  125:9
  141:6,24
**contributing**
  119:14 140:8

**contribution**
  125:13 136:13,19
**control**  109:10
  152:4
**controls**  31:9
**conversation**  90:8
  90:9 95:9 111:16
  111:19
**conversations**
  15:16 69:15 76:2
  89:23,25 90:14
**conversed**  90:17
**convicted**  125:22
  126:5
**conviction**  122:20
  123:12,18,23
  124:2
**coordinate**  16:13
**copies**  151:6
**copy**  101:11
  104:23 134:16
  148:10 155:1,4
**copying**  148:20
**corporations**
  102:13 103:22
**correct**  21:13
  24:24 26:17 29:21
  30:8,9,25 31:10
  31:11 32:25 33:2
  33:4 41:11,14
  44:5,19 45:19
  47:5 52:23 53:20
  56:11 76:17 80:15
  81:2 93:4 94:15
  94:16 95:11 97:2
  97:23 105:22
  109:20,23 110:3
  118:9,22 119:21
  119:25 120:10,16
  121:4,13 122:18
  123:6,7,19 125:4
  125:7,10,24 126:8
  126:13,15 127:6

  128:14 131:22,23
  132:4 133:1
  135:21,24,25
  137:12,17,24
  141:13 143:3
  144:7 146:24
  147:5,24 149:10
  150:24
**correction**  151:11
**corrective**  86:14
  123:6
**correctly**  30:19
  54:4 59:24 83:22
  137:9
**correlated**  72:5,5
**correlation**  73:6
  73:15
**correspondence**
  18:13
**cost**  71:22
**counsel**  17:15
  23:24 24:19 25:19
  44:12 47:21 53:14
  100:17 132:13
  134:10
**count**  43:23 44:3
  44:7,8 45:4 47:5,7
  126:15
**counted**  148:15
**counter**  148:24
**counterparties**
  151:14
**countries**  32:4
  61:20 84:25
**country**  6:10
  156:21
**counts**  46:21
  47:19
**couple**  15:8 108:2
  143:14 148:12
  151:16,21
**course**  28:18
  44:23 47:1 61:25

  65:3 71:7 87:3
  151:7
**court**  1:1,11 15:2
  16:5,17,24 17:9
  17:24 18:12,13,20
  20:9 21:6,11,19
  21:22 22:3 23:3
  23:22 24:2,3,19
  24:25 25:8,12,24
  26:6,15,19,25
  27:6,11,22,23
  28:1,5,11,13,18
  28:19,25 29:9,14
  29:18,23 38:21
  39:13,17,21,25
  40:8,11,15,18
  41:20 42:14 43:3
  43:6,9,12,16,19
  43:24 45:11,18
  46:2 48:5,7,10
  51:13 54:3,9,15
  55:6,9,14,22
  56:15,19,24 57:1
  59:7 61:12 62:13
  66:10 67:5 70:14
  72:15 73:11 75:13
  78:25 79:7 84:12
  84:23 86:3,24
  87:8,10,13,22
  88:2,10,14 91:12
  92:15,18,23 93:2
  93:6,18 99:3
  102:19,21,23
  103:4,8,10,14
  104:17,19,25
  105:3,9,13,16,20
  106:1,4,6 108:8
  108:10,14,18,20
  108:24 112:17,21
  116:21,24 117:1
  117:15,17,19,23
  118:7,7 119:9
  121:2 122:10,13

126:11,14 127:3
129:22 130:1
138:2,14,17,23
139:1,8,11,17,21
139:23 140:14,17
142:1,7,11,15,18
142:25 143:5,8,16
143:21,23 144:3
144:16 145:3,8,12
145:17,19,21,22
146:1,5,9,13,17
147:4,9,11,17,23
147:25 148:9,18
148:22 149:8,11
149:15 150:3,5,10
150:16 151:3,14
151:23 152:8,14
152:21 153:6,11
153:14,19,22,25
154:10,18,23
155:3,6,13
court's 104:9
courtroom 22:17
cousin 66:25
82:22
cover 131:17
133:16
coverage 23:24
24:13
covered 53:24
122:18,25 126:11
covers 68:16
149:9
cowan 8:9
craig 106:16
cramer 90:23
91:2,2
creditors 140:22
criminal 35:12
37:24 38:9 49:14
122:20 123:4,12
123:17,23 124:7
124:16 125:23

126:5
crisis 129:12,15
129:18
cross 26:5,10,14
55:9 62:15 112:18
112:22 114:6
117:2,24 130:3
139:3 145:4,6,15
151:15 154:5
crush 57:17
cuing 103:2
cunningham 8:10
current 148:17
currently 31:1
109:3 119:24
cut 123:15 129:1
cutler 4:9
cyganowski 8:11

d

d 1:22 7:13 8:9
13:9 15:1 52:5
d.a. 12:17 57:7
82:14
d.c. 152:25 153:15
daniel 8:7 10:21
12:21
danielle 10:23
darren 10:16
dasaro 8:14
data 34:8,18 58:3
76:6 77:3,11,13
77:14,16,20
date 52:2 156:25
dated 101:24
david 7:21 8:2
14:9,10 73:3
111:23 112:11
davis 3:6 8:15,16
15:12
day 15:19 16:15
16:22,23,25 17:1
69:1 146:21
147:13 149:6,23

149:24 150:17
151:12
days 15:7 23:19
149:5,9
dc 4:12
deal 22:15 38:12
151:17
dearman 8:17
debevoise 7:1
debtor 1:9 4:2
debtors 3:7 15:13
23:24 24:4,10
25:2,14 27:9 29:1
29:2 61:14 131:2
131:8,24 147:14
147:18 151:14
debtor's 15:4
17:15 24:14,23
decade 32:13,14
35:8
december 91:7,13
102:6 104:14
106:17,25
deceptive 124:20
decided 119:16
136:24 137:2
decision 62:14
81:7 124:10
136:24
declaration 19:11
25:3,8 30:2
148:23
declarations
24:14
decline 58:7,18
79:22 86:12 91:8
91:14,25
declined 57:15,19
57:20
declining 95:2,6
dedicate 142:13
dedicated 141:1
141:20

defendants 109:8
111:1,3
deficit 127:16
define 90:1
defines 133:22
definition 113:19
delaconte 8:18
delay 128:24
129:4,9
delayed 128:2
delconte 26:5,9,13
denied 54:12 63:6
dense 133:5
deny 53:23 54:19
55:1 56:7 61:10
76:17 85:24 87:2
denying 62:2
76:14 80:4 133:2
department 5:16
35:25 36:13,15,16
36:18,20 37:3,4
46:5 48:14 52:1,9
53:10 54:21,24
71:22 77:23 78:2
78:6,7 80:3 97:8
122:24 123:10
departments
36:17
depended 77:23
78:1
dependence 128:9
depends 19:25
deposition 15:21
22:21 147:2 148:2
148:6 149:1,4,7
153:2,4
depositions 154:6
descendants
110:23 111:3,3
described 118:12
122:23,25
describes 133:22

designate 148:23
148:25 155:7,8
designating 19:22
designations
22:19
despite 136:3
detail 124:9
detailing 60:4,11
72:4,12 73:7,8,9
73:14,16 89:1
determination
144:5 154:9
determine 34:16
deterrent 58:18
develop 100:5
developed 60:3,10
144:20,22
development 96:9
devon 8:19
dialog 82:7,9
didn't 34:12,12
34:15 38:4
died 33:14,18,20
33:21,25 34:17
37:20
difference 83:20
107:24 138:6
149:4
different 33:22
100:25 105:4
125:21 126:3
127:14 128:1
142:22 143:13
146:11
difficult 57:17
70:9 79:3 98:17
difficulties 79:13
difficulty 114:10
digest 16:6
direct 27:18 29:25
30:2,3,4 67:10
89:10 110:23
117:2 129:8,8,22

139:19 140:1,19
directed 27:13
42:22 43:5
directly 67:24
78:8
director 30:7,23
31:1,15 35:15
48:24 63:24 64:16
94:14 125:24
126:6,7,9,10,15
126:17
directors 57:6
64:2,23 65:9
75:17 79:21 84:8
84:16,20 97:5
118:22,23,24
119:11 120:8,14
directs 111:20
disagree 46:6
disagreement
83:19,19
disappears
152:15
disapproval 64:18
disclosure 134:16
discontinuance
37:16
discuss 17:20 23:8
86:12 92:20 95:21
96:12,20 107:7
151:2
discussed 61:15
67:21 95:23,25
96:1,10,19 114:15
155:16
discusses 107:12
discussing 45:5
105:4 151:5
discussion 96:15
96:16 102:9
130:15
discussions 15:21
101:18,20

disjointedly 153:3
disorder 113:1,4
113:12,14 114:4
115:2 116:3
127:16
dispute 20:18
44:20 46:8 49:25
50:2,3 83:14
100:5
disputed 100:4
distance 101:16
distinction 36:15
143:19
distinctions
102:12 103:22
distracted 68:18
137:7
distribution 58:12
58:22 64:24
district 1:2 36:5
divide 16:13
division 6:1 89:7
divisions 37:5
docken 8:20
docket 24:14
26:22,24 38:25
doctor 42:1 49:13
69:20 99:25
106:13
doctors 49:15
60:4,12,21 88:25
89:4,9 97:18,20
97:22 98:16
document 26:22
39:18 42:17 43:10
43:13,15 44:6,10
45:10 48:4 51:9
51:16 52:3,14
53:12 54:25 55:1
55:2,4,18 56:3,9
66:7 68:16 80:1
84:10,21 85:2,4
86:21 88:4,11

94:1 99:13,18
100:15 103:12
104:12 105:15,24
106:9,9,12,14,19
106:24 107:8,14
107:15 108:10,23
114:24 131:10
133:5 153:4
documents 18:14
18:21,23,24 19:1
19:1,6,9,16 20:1,3
20:7 21:9 38:25
39:6,16 41:1,6,7
45:15 50:24 86:19
87:4,6,18 105:21
doesn't 35:3
148:10
doing 72:23 76:8
79:4,6,7,14 86:13
98:14
doj 40:8
dollars 64:23
65:10
don't 15:6 20:7,16
22:11,13,25 23:5
30:18,21,22 31:18
32:8 33:5,7,17,19
34:3,6,9,25 35:22
36:9,19,21 37:4
37:10,14,18 38:21
41:25 141:3 142:1
142:19 143:7,19
144:1,15 145:15
146:5 147:17
148:4 150:7,11,11
151:1 152:4,11,15
152:22 153:19,19
154:10,20
dorr 4:9
dosages 99:22
dose 78:17 99:12
99:17,24

**dosed**  128:2
**dot**  109:4,6,10
**double**  149:14
**dougherty**  8:21
**douglass**  12:1
**download**  51:8,20
**dozens**  61:20
**dr**  3:4 29:13,17,20
  30:4,6 36:24 38:3
  38:24 39:17 40:4
  40:19 41:12,16
  42:13,19 43:25
  44:15,20 45:3,20
  46:2,19 48:5
  51:22 53:19 54:4
  54:9 55:10,17
  56:5,25 57:3,6,14
  58:4,6 59:15
  61:23 62:2,6,15
  62:20 63:6,13,21
  64:14 65:9 66:14
  67:6 68:11 70:5
  70:16,16 71:10
  72:16,24 74:4
  75:7,18 79:16
  81:12 83:10 84:12
  84:18 85:8 86:1,7
  86:9 87:21 88:16
  89:19 91:1,21
  92:8,19 93:3,10
  93:11,22,24 95:13
  100:12 101:8
  102:2 103:18
  104:13 106:8,15
  106:16,25 107:1
  108:1 109:2 110:1
  112:15,18,24
  118:1 119:9
  120:13 122:11,22
  123:24 130:5
  134:15,21 137:25
  139:13,14,18
  140:3,21,24 141:9

**142:5,24 143:10**
  144:9,13,18 145:4
  145:9,19
**drain**  1:22 15:3
  79:6 93:2 139:12
**draw**  27:20 61:1
**driver**  79:22
**drug**  33:22 89:8
  127:11,13,15,17
  128:13,21 129:4,7
**drugs**  72:13,25
  127:22
**dubel**  8:22 19:4
**dubel's**  19:4
**dying**  34:11
**dylan**  8:8
**d'angelo**  8:12
**d'apice**  8:13

**e**

**e**  1:21,21 3:1,1
  6:20 7:21 11:13
  11:17 12:24 15:1
  15:1 29:18 156:1
**e2**  96:24
**e2e**  63:24 64:6,9
  67:20 94:16,17,21
  94:22,24 96:9,16
  96:22,24
**earlier**  43:10
  67:21 101:1
**early**  151:6 152:9
**easier**  58:9 62:12
**easy**  45:9
**eberhardt**  8:23
**eckstein**  8:24
**ecro**  1:25
**edan**  10:25
**edmunds**  3:20
  18:9,10,24 20:15
  21:11,20 22:23
  23:4,17,20 29:25
  30:3,5,6 38:15,19
  38:22,23 39:11

**40:4,9,10,13,14**
  40:18,24 41:12,16
  41:19,22 42:10,12
  42:19,23 43:17,25
  44:16,19,22,25
  45:12,14 46:3,16
  48:4,12 50:23
  51:16,18,21 53:14
  53:17,18 54:1,6
  54:18 55:8,13,16
  55:24 56:4,15,25
  57:2 59:6,8,9,11
  61:14 62:5,17,18
  62:19 63:6,10,13
  63:20 66:11 68:3
  68:5,8 70:10,15
  83:7,9 84:23 85:3
  85:7 86:4,22 87:1
  87:12,16,20,23
  88:1,2,8,11,15
  91:21,22 92:11,17
  93:6,8,9,22,23
  99:1,4 100:20,25
  101:3,6,7,11,12
  104:9,11,15,18,19
  104:24 105:2,6,11
  105:19,23 106:2,5
  106:7,20,23 108:6
  108:9,16,25
  109:13,21,23,25
  112:6,7,15 114:6
  114:13 138:5
  145:13,15 146:17
  146:22 147:5,10
  147:11,12,21
  148:3,19,21 150:1
  150:4,15,18
  151:11,20 152:3,6
  152:11,19 154:3,7
  154:13,21,24
  155:5,9
**edmunds'**  148:12

**educate**  70:7
**edward**  11:17
**effect**  62:16 69:24
  73:5,5 89:17
**effective**  71:11
**effectiveness**  98:5
**eight**  50:24 77:6
  86:20 87:9
**eileen**  82:18
**either**  17:2,11,13
  23:6 27:17 104:20
**elaborate**  89:7
**elaine**  9:19
**element**  65:7
**elements**  64:9
  89:9
**eli**  13:24
**elisa**  10:8
**elizabeth**  12:23
**email**  15:14 51:3,4
  51:5,7 80:4 85:9
  85:14,18,23 86:14
  86:15,15 87:3,7
  100:17 101:5,19
  101:21,22,24
  102:2,5,24 103:6
  103:17 104:3,5,11
  106:7,16 107:1,5
  107:7,11 108:14
  134:10 147:20
  148:19 150:10,14
**emailed**  79:20
  86:10 100:23
  101:5
**emailing**  51:15
**emails**  18:21,22
  20:18 76:6 106:18
  150:12
**emily**  9:22
**emphasis**  97:20
**emphasize**  149:21
  149:21

**emphasizing** 149:22
**employed** 111:25
**employees** 67:25 90:4
**ended** 16:18 26:9 76:8
**ends** 47:9
**enforcement** 49:1
**engage** 37:24 62:14
**engaged** 32:2 38:8 69:17 82:8 85:11 124:3
**engagement** 95:18
**enormous** 133:6
**entered** 19:21 51:25 52:9 53:11 105:18 109:1 114:18,21 119:23 123:1 125:2,20,21 126:2,3,16
**entering** 37:15
**entertain** 92:12
**entire** 37:4 71:21 148:23,25
**entirety** 94:21
**entities** 33:8,12 36:7 84:24 135:11 141:16 142:14 144:11,19,24
**entitled** 88:2
**entity** 31:8 120:10 120:15 140:8 144:2
**equal** 78:17 80:11 80:14
**eric** 13:14
**eskandari** 8:25
**established** 143:4
**estate** 19:13,14
**estate's** 61:21

**estate's** 19:15
**estoppel** 62:16
**et** 15:3
**ethan** 10:12
**evaluation** 137:19 137:22
**evan** 10:11
**everybody** 15:25
**evidence** 19:25 24:12 25:3 27:5 105:8,18 108:4,5 108:7 109:1 119:2 150:25
**evidentiary** 18:1 24:6,9 25:17 26:23
**evolve** 63:24 64:16
**exact** 125:11
**exactly** 15:10,18 15:18 17:6 25:10 56:24 114:10 135:16 143:24,25
**examination** 30:4 62:15 112:22 114:6 117:24 130:3 140:1,19 154:15
**examine** 26:5 55:10 112:17 145:4 151:15
**examined** 139:13
**example** 21:3 22:20 34:21 36:5 65:15 127:22
**excellence** 63:24 64:16
**exception** 22:7
**excess** 135:19
**exchange** 135:22 153:1
**exchanges** 147:21

**exclude** 24:12
**excluding** 137:5
**excuse** 21:23 68:17 126:10 135:1
**executed** 114:18
**executive** 114:2
**executives** 36:6 58:2 59:2,20 67:11,12 81:14 82:12 96:5 125:22 126:4
**exercise** 86:20
**exhale** 16:14
**exhibit** 19:22 21:9 21:16 22:12 23:4 40:12,12 100:22 104:17,22,24 105:7,18 109:1 148:1,1,10,11 149:7 155:6,8
**exhibits** 19:22,25 21:14,15,24 22:8 22:9,12,18,24 23:7 27:10,13 28:8,14 29:2 105:17 148:12 149:17 151:5
**exist** 32:4
**exists** 88:21 111:22
**expanding** 59:25
**expect** 140:5 142:24 149:22 151:5
**expected** 22:11 137:19,22
**expedite** 51:16 55:13
**experience** 138:12
**expert** 19:12 109:18

**explain** 132:10
**explaining** 79:14
**express** 64:18
**expressly** 53:23
**extend** 77:7
**extended** 79:23
**extensively** 110:5
**extent** 19:23 133:10,17
**extremely** 133:5

| f |
| --- |

**f** 1:21 13:7 156:1
**f.x.** 10:13
**face** 59:18 90:24
**fact** 19:10 48:13 49:6,14,17 53:20 56:8 69:21 80:4,7 136:3 141:13 142:6 143:6
**factored** 17:17
**facts** 16:7 46:14 53:20 56:8 62:7 119:2 153:3
**factual** 53:9 54:20 56:10,13
**failed** 69:25
**fails** 151:18
**faint** 30:20
**fair** 67:23 99:11 107:11 113:23 124:13 128:7 142:9,13,21,22 144:4,9 150:10 154:13,20
**false** 56:23,25 57:9,18,23,24 59:3,16,17,17,18 60:15
**familiar** 100:2 113:9 128:3 133:21
**familiarize** 44:9 127:17

[families - general]                                                                    Page 12

families 15:17
family 5:10 7:2
  15:9 51:25 52:11
  57:5 64:22,24
  65:10 110:1,1,17
  118:8,15,21,23,24
  125:6,9 129:10,14
  131:1,17 133:18
  135:19,23 136:5
  137:14 140:6,25
family's 111:11
  137:19,23
far 21:6,7 23:15
  26:17,18 29:2
  130:13
farash 9:1
farrell 9:2
father 110:14
father's 111:5
fda 107:15,22
federal 35:11
  70:24 126:4
feel 61:25 142:6,9
feels 16:9
felt 152:1
femino 9:3
field 71:13 90:4
fifth 4:4,18 6:3
fighting 22:22
figure 117:11
  134:4
file 42:24 43:1,7
  43:10
filed 17:11,14
  18:6 24:11,14
  25:25 26:20,22,24
  128:16
files 41:11
filled 22:18
final 146:25
  150:19
finality 130:16

finalize 155:11
finance 78:7
financial 78:7,9
  136:13,19
find 16:24 40:2,11
  112:6
finding 56:10
findings 19:10
  95:1
fine 20:16 21:21
  26:6 44:11 53:3,3
  53:17 57:14 80:17
  83:9 85:6 86:23
  87:14,18 92:18
  108:24 115:24
  130:1 134:13
  138:20,23 145:17
  146:13 151:23
  154:21
finish 117:21
  151:24
finished 26:16
  152:7
finzi 9:4
fire 5:3 25:15,23
  26:24
firm 111:25 112:2
  139:24
first 18:8 24:10
  41:2,2 44:12
  50:18 52:4 53:8
  54:7 57:3,14
  59:12 63:5 67:10
  70:18 75:1 89:10
  90:7,8,9,12,15
  101:22 106:14,20
  106:21 108:14
  111:1 123:22
  130:12 140:22,24
  141:11 142:8
  143:14 152:19
fitch 6:9

fitzsimmons 9:5
five 92:15,17
floor 5:11
focus 16:20 55:6
  95:15 114:3
  130:20 143:18
focused 60:4,11
  114:14
focusing 21:25
  84:24
fogelman 9:6
folks 16:12
follow 108:21
  148:11,14
followed 43:22
following 46:22
  46:23,23 71:20
  85:9 144:6
follows 61:2
  101:21
force 89:3,5 95:15
forecast 67:15,16
forego 153:1
foregoing 156:3
foreign 84:24,25
form 98:25
formal 15:6
former 27:23
forming 92:7
forms 79:23
formulation 58:19
  144:20
forum 146:2,3
forward 18:16
  23:18 30:20 70:17
  77:6 138:10
forwarded 39:7
found 95:12,15
  101:5 121:16
foundation 84:22
four 36:7 62:24
  77:6 106:18
  151:19

frame 83:18
framed 20:4
frank 6:8 112:24
franklin 6:13
frankly 15:17
  20:4 29:3
fraud 132:25
  133:17
frazier 9:7
frederick 12:24
free 55:9 61:25
frequent 16:2
  76:20 77:8
friday 17:3,21
friedman 9:8
friend 68:17
front 101:9
frustrating 28:13
fully 133:7,15
function 41:5
fund 136:22
  144:10
further 112:15
  138:1 140:12
  145:2
future 62:17
  118:9 132:23

g

g 8:10,15 15:1
gage 8:3
gain 93:16
galle 9:9
gange 9:10
garrett 136:10
gary 9:21
gasdia 76:2,10,12
  86:11
gather 18:7
geldreich 9:11
general 3:15 6:1
  6:15 37:7 57:6,10
  78:14 94:10 96:20
  98:17 118:10

**generally** 55:11
64:15 65:9 75:22
78:16 97:2
**general's** 6:2
**generation** 111:1
**generic** 127:24
**generics** 79:25
**geography** 132:20
**gerard** 13:23
**germany** 32:19
**getting** 16:2 42:1
70:9 88:3 102:25
131:13 133:21,23
133:25 135:11
**gibson** 9:12
**giddens** 9:13,14
**gilbert** 9:15
**gill** 9:11
**give** 16:5 28:22
34:10 38:22 40:19
52:1 70:12 113:25
133:15 142:16
**given** 16:11 22:7
36:11
**gives** 23:16
**giving** 17:2 28:7
**glanced** 110:6
**gleit** 9:16
**global** 126:20,23
126:24 130:16,16
130:19
**go** 20:22 29:25
30:3 38:13,21
44:14 47:3 51:4
54:7 56:6 59:9
61:16 62:17 68:24
70:18 74:5 87:18
93:25 95:24
100:13 106:6
113:11 114:11
116:24 117:23
121:2 122:7
134:13 145:4,5

147:11 152:19,20
155:10
**god** 29:16 62:3
**goes** 44:13
**going** 15:18,25
17:20 18:7 21:3
22:19,20 23:16,18
28:6 29:21 45:6
46:9 50:18 51:5
51:15 53:5,19
54:5 55:17 56:5,7
56:9,19,20,21
63:13,14,22 70:17
70:24 71:3 78:25
86:17 88:8 89:19
92:3 93:24 100:13
100:14 109:17
114:14 115:4,5
117:4,10 118:14
119:13 127:7
138:10 139:18
144:10 146:18,18
146:20,23 147:1
151:2 154:1,16,24
**gold** 4:21 27:3,3,7
27:24 28:3,10,24
**golden** 112:11
**goldman** 9:17
111:23 112:8,10
138:16,19,20,24
138:24 139:19,20
139:22,24,24
140:2,12
**goldstein** 9:18
**gold's** 154:25
**golin** 9:19
**goller** 9:20
**good** 15:2,13 30:6
68:17 90:18 93:20
93:20 118:1 130:5
139:11 140:3,4
**gostin** 4:14 24:21
24:21

**gotto** 9:21
**government** 35:25
126:4
**governmental**
144:11
**governs** 29:2
**grandchildren**
110:22,25 111:4,5
111:6
**grant** 23:13
**grasp** 65:1
**gregory** 5:14
**grim** 9:22
**grounds** 9:23
**group** 24:11 148:7
**growth** 79:22
83:23
**guaranteed** 120:5
**guard** 9:24
**guess** 22:4 31:8
59:12 61:4 86:24
90:7 94:3,3 100:2
108:11 109:8
114:1 115:17
134:10 144:4,6
147:13 148:18
149:25
**guidance** 16:8
17:5 23:17
**guilty** 35:11 36:7
44:4 45:21 46:14
46:21 47:20 48:15
48:21 114:8
122:18,20 123:1
125:22 126:3
**gulf** 5:2 25:14,22
26:11,23

**h**

**h** 8:24 14:6 96:3
**haberkorn** 9:25
**hage** 5:9
**hale** 4:9

**half** 17:1 69:1
149:5,6
**hamermesh's**
19:12,18
**hand** 25:14,16
29:11 138:19
**handling** 147:17
**happen** 15:18
84:6
**happened** 84:5
123:22 154:15
**happening** 17:7
**happy** 38:20
119:7
**hard** 16:24 74:19
138:13
**harder** 28:18
**hart** 14:10
**haven't** 21:19,20
**hayden** 8:6
**hcps** 69:10
**he'll** 119:6
**head** 118:20
**heading** 70:19,22
**headings** 75:19
**headphones** 130:9
**headquarters**
66:19 67:1
**headsets** 138:6,11
**health** 35:6,17,20
35:22,25 153:8
**healthcare** 69:5,8
70:2,24 71:13
72:4,12
**hear** 16:14 49:6
70:9,13 79:3,5
88:11 93:18
103:16 105:23
106:13 107:20
118:2,3,3,4,5
123:8 124:7 130:7
130:8,8,10 136:12

**heard** 18:2 21:7
  21:19,20 30:19
  64:17 67:6 79:8
  88:17 100:4
  111:12 130:15
  135:12,15,15
  137:16 138:7
  149:23,23
**hearing** 2:1,1 15:4
  15:7,15 16:4
  17:10,15 18:1,16
  25:4,20 36:23
  61:15 62:14 75:6
  150:25 153:23
  155:14,15
**heather** 9:7
**heed** 121:6,7
**heitzenrater** 10:1
**held** 69:15
**hello** 90:18
**help** 29:16 51:16
  66:13 99:14
  114:20 131:4
  143:13 145:21
**helped** 34:9
**helper** 138:9
**helpful** 52:16 65:5
  83:4 87:11
**hero** 15:13
**herring** 10:2
**he's** 21:14,17
**higgins** 5:21
  129:23,23 130:2,4
  130:6 134:15,17
  134:18 138:1,5
  150:6,6
**high** 97:22,24
  128:8
**higher** 78:17,18
  83:24 84:3
**highlighted** 28:17
  62:23

**hill** 10:3
**hirshman** 10:4
**hmm** 139:7
**hoc** 151:4
**holding** 64:24
  65:11
**holds** 149:19
**home** 134:20
**hon** 1:22
**honesty** 89:11
**honor** 15:11 16:10
  16:10,15 17:4,22
  18:9,15 19:3,7,12
  19:21 20:3,5,16
  20:20,23 21:2,2,8
  21:18,21 22:2,23
  23:20,23 24:4,21
  25:1,5,11,14,21
  26:3,7,8,17,21
  27:2,3,7,18,21,24
  28:10,24 29:8
  38:20 40:14 44:18
  48:8 54:1,2,14
  59:4,10 61:9,11
  61:13 62:18 70:11
  72:18 75:12 83:5
  84:15 86:4,17,22
  88:12 92:11 93:5
  93:8 102:20 105:6
  105:15,22 106:2
  108:9,22 109:11
  112:16 116:20,22
  117:13 119:1
  129:23 138:1,3,16
  138:20 139:20
  140:13,16 142:17
  143:12 145:1,7,10
  145:21 146:8,22
  147:8,24 148:3,21
  149:2,3 150:2,6
  150:15 151:10
  152:7,13,17 154:2
  154:21

**honoring** 119:23
**honor's** 16:8 17:6
  27:4,12
**hope** 23:16 51:14
  118:3,4 119:6
  130:8
**hoped** 58:15,16
  58:17,17
**hopefully** 151:8,8
  155:12
**hostile** 117:4
**hours** 128:3
**housekeeping**
  23:25
**howard** 13:13
**hrycay** 10:5
**hudson** 10:6
**huebner** 3:11 61:9
  61:13,13 109:11
  109:15,22,24
  117:7 119:1 138:3
  138:3 143:12
  144:3 147:20,24
  148:20 150:24
  151:10
**huebner's** 119:8
**huebner's** 152:4
**hugh** 11:8
**human** 35:25
  61:20 69:17
**hundred** 148:5
**hundreds** 21:14
  135:10,15,18
  149:16
**hunter** 7:22
**hurley** 10:7
**hyde** 2:25 156:3,8
**hyder** 10:8
**hyperactivity**
  127:16
**hysingla** 73:15

**i**

**iacs** 31:16 32:2,18
  119:20,24 141:5
  141:16,19,24
**iac's** 31:13
**idea** 134:1
**identified** 102:24
  103:17 122:1,24
  135:10
**identify** 86:14
**identifying** 21:17
**iii** 9:23
**ilene** 154:25
**illegal** 123:11,17
  124:3
**illness** 113:5
**imagine** 124:16
**immediately** 85:9
  134:3
**implement** 31:13
  96:21 97:15 98:6
  98:9,12 99:5
**implemented**
  75:25 97:10 98:3
  98:12,23 99:2,7
**implementing**
  76:3
**implications**
  18:14
**imply** 153:18
**importance** 81:7
**important** 22:13
  22:14,20 27:13,19
  28:1,8 79:22
  110:18 119:5
  151:14
**impossible** 57:17
**improve** 95:19
**inadequate** 81:22
  82:1
**inappropriate**
  81:18,19,25

**include**  28:4
67:14,20 136:5
150:11
**included**  54:21
60:22 134:22
142:7 143:14
153:2
**includes**  132:8,22
132:25 135:10
136:12 138:14
**including**  57:6
58:7 61:4 67:11
96:22 138:12
143:25
**inclusion**  128:12
**incorporated**
48:14
**incorrect**  56:11
146:10
**incorrectly**  40:17
**increase**  59:2,21
71:11 72:6
**increased**  58:10
58:20 78:15
**indelicato**  10:9
**independent**  31:9
78:19 119:20
141:5,17
**indicate**  111:21
**indications**  60:25
**indiscernible**
28:11 31:18 34:14
36:20 37:19 38:2
39:21 40:17 42:7
42:9,21 43:2,14
43:22,23 56:14
71:2,23 72:20,21
74:21 75:11,12,21
76:5 78:14 79:2
80:8,8 81:4,5,6,6
81:7,8,22 83:4,5
83:21 84:9,11
85:1 91:17 92:3

92:22 93:20 95:1
95:12 96:3,6,12
96:12,13,23 97:3
97:13,20 98:8,9
98:18 100:7,11
101:10,16,17,18
101:24,24,25
103:1 106:12
107:2 109:13,15
109:16,19,20
110:7 111:16,19
111:20 112:11,11
112:13 113:6,18
117:8,9 120:20,24
122:9,15 123:14
124:6,9 126:24
127:20 128:24
133:3 134:4,7
135:4 136:8 137:4
137:6 138:12
139:16 146:16
151:16 155:1
**individual**  89:23
90:23 99:22
112:25
**individualize**
99:12,16
**individualizing**
99:24
**individually**
100:16
**individuals**  36:7
58:8 61:25 99:21
**indulgence**  104:9
**infer**  98:17
**info**  109:18
**inform**  34:9
**information**  34:13
72:3
**informed**  50:11
85:10 98:13
111:17

**infrequently**
77:19
**initial**  19:22
**initiated**  50:5
**injection**  58:10
**input**  74:18 136:2
136:6
**inquiries**  111:13
**inquiring**  27:21
**inquiry**  111:10
**instance**  141:4
**insufflation**  58:10
**insurance**  4:10
5:2,3 23:24 24:12
24:13,22 25:15,16
25:22,23
**insurers**  24:5,11
24:16 25:25 26:11
26:13
**insurers'**  24:8,9
**insurer's**  25:18
**integrity**  89:11
**intend**  22:13
**intended**  16:12
57:16 89:14
119:19 144:7
**interest**  70:17
74:10
**interfere**  115:15
**international**
48:25
**internationally**
31:10 33:22
**interrogation**
109:22
**interrupt**  121:23
154:19
**interrupted**
121:24
**introduce**  18:18
**introduced**  73:13
129:7

**introduction**
55:20 57:15
**investigator**
150:20 154:4,5
**involved**  110:4
116:16
**involvement**
113:13,14
**involves**  47:23
**irve**  9:17 138:24
139:24
**isley**  4:14 24:21
**isn't**  141:13,19
144:18 146:2
**isolate**  74:19
**issacharoff**  10:10
**issue**  17:19 18:11
22:15 49:7,8
121:17 131:9
144:5 152:5
**issues**  20:24 24:6
24:9,15 25:17
26:23 121:11
122:1,15,23
151:13 153:9
**italian**  49:15
**italy**  32:21 49:5,8
49:14,15,18
**it'**  27:24
**it's**  18:5,24 20:25
21:5 22:5,14 23:5
26:3 28:1,9,17,17
29:18 30:20,24
37:1 38:14 39:7
39:18 40:6 42:2,5
42:9,14,25 43:9,9
43:10,10,12,13,15
43:18,21 142:12
145:22 147:13,15
148:7,22,23,25
149:6,13 152:3
154:13,14 155:6

iv 70:19
ives 136:10
i'd 23:25
i'll 17:5,7 22:5
 41:23,25 146:3
 154:21
i'm 20:9,9,13,22
 20:25 21:7,25
 22:20,21 23:6
 25:24 27:14,21
 28:20,20,21 30:6
 33:16 36:18,25
 38:3,20 40:16,17
 43:7,14 142:2
 143:1,25 145:12
 146:24 147:6,12
 152:8 154:18
 155:6
i've 15:6 18:2
 21:7,12 23:15
 34:6 35:3

**j**

j 4:7,21 5:21 9:17
 10:23 12:9 13:2
 13:22,24
james 3:13 6:13
 12:20
january 30:12,13
 77:2,4 79:20 85:9
jared 9:13
jasmine 7:16
jason 12:12
jay 7:15
jeffrey 9:16 10:24
 12:9
jenna 10:6
jennifer 7:23
 11:21
jeremey 12:15
jeremy 10:3,17
jerome 13:15
jesse 8:18

jill 7:9
jo 105:17
job 90:18
john 8:21,22 9:24
 11:1
joined 24:17
 26:11
joint 21:9,16
 100:22 104:24
 105:7
jon 11:2
jonathan 11:13
 13:25 57:7 66:25
 82:20
jones 10:11
jordan 12:10 14:2
josep 72:22
joseph 5:9,14 7:25
 8:15 12:6,21
 13:10,17,21 20:20
 21:8,13,21 22:2
 38:11,17 39:5,15
 39:23 40:1,6 41:1
 41:7,14 42:5,17
 42:23 44:14,18
 45:13 46:3,12
 48:2 50:21 51:3,5
 51:9,15,18 53:12
 53:15,22 55:3
 56:12 59:4 63:4,9
 63:12,17 66:5
 68:1,7 70:8 72:14
 83:6 84:22 85:1,3
 85:6 86:17 87:5,9
 87:25 91:10 98:25
 100:19,21,23
 101:2,4 102:18,20
 102:22 103:1,6,9
 103:13,15,16
 104:11,14,16,22
 105:15,22,23
 106:18,21 108:3
 108:13,18,19,22

109:17 112:4,18
 115:7,9,13,15,22
 117:4 120:24
 126:9,25 129:1
 131:12 132:14,17
 134:5,12,15 135:1
 135:4 138:7
 141:23 142:10,12
 145:5,5,7 152:13
 152:14 153:25
 154:2,19
joseph's 44:22
 111:25 112:2
joseph's 19:11
joshua 8:4
jr 5:7 7:21 14:7
judge 1:23 15:3
 16:3 22:11 28:14
 79:6 93:2 109:3,6
 139:12
judgeforyoursel...
 110:2
judgments 37:15
jurisdictions 49:2
justice 5:16 36:13
 36:16,16,17,18,20
 37:3,5 46:5 48:14
 52:1,10 53:10
 54:21,24 80:3
jx 40:13 41:20
 43:4 51:1 52:17
 52:18,21,23
 105:17,18 108:21
 109:1
jx2094 41:16
jx2096 50:18

**k**

k 7:6 10:2,19
 29:19
kami 12:3
kaminetzky 3:12
 15:11,12 16:23
 17:4,22 20:22

22:5 29:7,12
 147:18
kaminsky 10:12
kaplan 4:16 27:4
karen 10:14
kathe 57:7 66:25
 82:22
katherine 9:9
 11:24 15:14
keep 66:6
kelly 10:13 13:19
kenan 12:25
kennedy 10:14
kenneth 8:24
kentucky 124:19
kesselman 10:15
kevin 8:16 11:3
kickbacks 49:15
kind 16:1 27:19
 47:17 136:25
 153:3 154:14
 155:10
kindly 16:4
klein 10:16
kleinberg 4:16
 27:3
kleinman 10:17
knew 34:11 58:24
 59:12,13 60:23,24
 60:24 62:2,4
know 15:23 18:4
 18:14,19,21,23
 20:7,7,16 21:4
 22:17,25 23:5
 28:5,14,20 32:8
 33:5,17,19,20,23
 33:24 34:3,4,12
 35:22 36:19,21
 37:4,10,20 41:25
 49:11,12,17 50:3
 50:11,12,13,16
 55:24 57:20,21,25
 61:6,19 62:3,7,9

62:23 64:20 71:8
71:16 72:1,3,11
73:17,19 74:23
75:19 78:20 83:20
84:5 85:5,25 86:7
87:2 89:13,16
92:11 94:25
100:21 101:8
102:24 104:20
109:6 110:9,10,11
111:8,15 116:8,10
119:16 120:5
121:5,6,9,15,18
121:25 123:13
124:7,7 127:8
128:22 133:2,3,20
135:12,14,17,17
136:18 137:10,13
141:3,15 142:19
143:20,24,24
144:25 147:17
148:4 151:1,24
152:16,23 154:7
154:10,20
**knowing** 70:23
117:8
**knowledge** 34:18
49:4,19 50:2
98:19 116:7 136:7
137:18,21
**known** 30:24 34:4
34:6 60:23 63:23
116:17 123:4
**knows** 61:24
143:16 149:3
**kotler** 10:18

**l**

**l** 8:11 9:8 13:10
29:18
**l.p.** 1:7 15:3
139:13
**lack** 75:21,22

**lackey** 10:19
**land** 44:10
**landau** 106:16
107:1
**language** 55:2
80:5 132:8 133:4
**large** 22:6,9 90:16
**larger** 70:6
**laryngitis** 70:11
**launch** 128:24
129:4
**launched** 127:11
127:14 128:13
**laura** 9:3 11:7
**laurel** 10:19
**lauren** 14:8
**law** 6:8 16:7 19:11
49:1
**lawfulness** 89:12
**lawrence** 9:6
10:18
**lawsuits** 128:25
129:5
**lawyer** 109:8
129:7 131:10
**lawyers** 131:11,12
131:13 134:24
135:2 151:4
**layman's** 123:3
**leading** 117:5
**learned** 80:24
**leave** 15:22 17:1
92:24 150:17
**led** 123:11,17
**ledanski** 2:25
156:3,8
**lee** 11:18
**lees** 10:20
**lefcourt** 82:18
**left** 31:5 32:9
121:15 122:3
127:12 134:23
135:2 139:17

**legal** 38:1 120:9
120:15 131:9,9
132:14 142:21
156:20
**legitimate** 58:25
59:13
**legitimately** 154:7
**length** 17:19
114:13,16
**lengthy** 139:2
**lennard** 10:21
**leslie** 9:20
**letters** 25:9
**let's** 31:24 34:2
35:24,24
**level** 36:19 67:24
68:2 90:7,8,9,13
90:15 91:15 99:22
**leventhal** 10:22
**levine** 10:23
**lexington** 3:8 5:4
5:11
**liability** 128:25
129:5 133:11
**lianna** 13:5 25:3
**liens** 116:14
**liesenmer** 10:24
**lieu** 147:2,3
**light** 46:19 115:20
**lights** 137:7
**likelihood** 23:13
**limine** 24:12,16
24:17 25:25 26:4
26:12,21
**limit** 23:14
**limitation** 132:11
132:19
**limited** 19:19
113:20 131:20
132:7 133:14
**limits** 123:2
**line** 61:3 86:18
89:10 107:8

143:19
**lisovicz** 10:25
**list** 15:7,16 21:9
21:16 25:6,9,9
28:7,22 82:24
92:2 133:21,25
134:8,13,14,22,25
135:9 136:12,18
146:25 150:11,14
**listed** 22:7 42:24
65:4 74:17
**listen** 136:9
**listened** 130:12
**listening** 103:2
104:21
**listing** 134:1
**lists** 19:22
**litigation** 62:17
**little** 17:1 30:20
44:13 45:2 62:1
**live** 150:22
**living** 110:20
114:3
**llc** 5:9 6:8
**llp** 3:6 4:1,9 5:1
**load** 96:13
**locate** 35:3,9 40:8
45:23 46:10 49:6
77:4
**located** 32:18 35:4
67:3
**long** 49:6 104:4
117:10 138:21
151:25
**longmire** 11:1
**longstanding** 89:6
**look** 34:7,12 45:1
45:3 51:22 67:8
70:18 80:18 85:2
110:6 138:15
149:25
**looked** 34:8,13,13
34:20,22 35:3

110:5
**looking** 21:3
39:17 43:3 50:22
56:1 66:6,18
67:14 70:22 85:15
85:24 94:1 99:14
101:10 105:21,24
106:12,14
**looks** 101:18
107:16
**lost** 58:2 59:2,20
136:25
**lot** 71:15,16
124:16 142:21
147:13
**louis** 7:24
**lower** 41:10 67:24
68:2
**lowne** 11:2
**lunch** 117:12,14
138:4,18,22 139:5
**lynam** 136:10

**m**

**m** 10:11 11:8,10
11:16,18 13:6,18
**maclay** 11:3
**mad** 151:12
**magali** 9:14
**maintain** 71:12
**maintained** 109:3
111:10
**maintains** 110:2
110:11 112:2,8,13
**major** 102:13
103:22 107:24
**majority** 32:2,11
58:7,17
**making** 77:23
78:2 79:1 136:13
136:19 154:8
**man** 120:20
**managed** 95:11

**management**
83:23 84:2 85:11
90:17 98:8,11,13
101:18,19 102:11
103:21 121:4
122:2 123:16
124:2
**managers** 89:25
90:2,5,7,8,9,13,15
**managing** 95:8
**mandatary**
116:14
**manipulate** 57:17
**manufacturer**
31:16
**manufactures**
31:21
**mara** 10:22
**marc** 10:15 13:7
13:17
**march** 30:14
**marine** 5:3 25:15
25:23 26:24
**mario** 8:12
**marion** 12:4
**mark** 8:5,17 10:9
11:22
**marked** 104:22
**market** 58:25
59:3,14,18,21,23
79:24 107:13
**marketing** 37:25
38:10,12,13 49:9
49:23 50:6,10,12
60:3,11 67:12,16
67:16 71:18 74:11
74:11 75:2,15,18
75:25 76:13 77:23
78:2 80:25 94:6
128:17
**marking** 94:19
**markman** 4:14

**marshall** 3:11
61:13 138:3
**martin** 11:4 14:5
**maryland** 3:15,16
6:15,16 15:17
18:10 21:10 29:4
29:24 30:7 150:20
153:12,18,20
155:12
**master** 146:15
**masumoto** 11:5
**mathew** 9:2
**matt** 154:25
**matter** 1:5 18:11
23:25 84:7 140:23
142:21
**matters** 27:21
108:4
**matthew** 4:21 9:5
27:3
**maura** 7:6
**maxcy** 11:6
**maximize** 113:20
**maximum** 93:16
137:16
**mcclammy** 3:13
**mccloud** 11:7
**mcdonald** 11:8
**mcgaha** 11:9
**mckinsey** 94:4,13
95:5,9,10,17,22
95:23 96:5,22
97:2,6,11 98:4,21
99:7
**mckinsey's** 94:15
**mcnulty** 11:10
**md** 3:18 6:18
**mean** 17:24 28:1
35:22 37:16 38:4
52:7 55:9 64:1
69:3 71:16 79:4
85:4 86:3,18
87:17 90:1 105:3

110:13 111:17
117:1 121:6,23
123:13 126:11
142:18,18 151:23
154:11
**meaning** 142:8
**meaningful** 27:14
**means** 68:2
113:25 130:19
**meant** 111:4
**mechanism** 128:2
**media** 34:13
**medical** 99:25
113:15 115:2
**medically** 60:25
70:23
**medication** 132:3
**medicine** 113:2,7
**meet** 63:2
**meeting** 77:22
81:2 84:14,16,19
84:20 90:16 91:20
**meetings** 74:15
78:1 80:23 81:16
82:5,6 90:20
**megan** 12:13
**meises** 11:11
**melanie** 8:11
**melissa** 9:12
**member** 15:9
80:22 81:1 82:11
110:18 118:23,24
120:8,13
**members** 51:25
52:11 57:4,5
64:22 79:20 81:9
82:8 110:20 118:2
133:18 140:6
**memory** 65:6
86:16,20 109:16
127:23 128:6
**mention** 28:2

**mentioned** 42:23 150:13 151:20
**merits** 23:12
**message** 107:17
**mic** 135:6,7
**michael** 7:14 9:18 11:19 13:1
**michele** 10:4 11:11
**microphone** 70:8 72:22 84:13 126:25 134:5
**microphones** 93:16
**midnight** 39:6
**mike** 105:1
**miller** 11:12
**milligram** 92:1
**million** 87:5 124:19 125:9
**millions** 87:5
**mind** 61:23 99:19 106:2 143:19
**mine** 42:5
**mineola** 156:23
**minute** 101:15 130:10
**minutes** 28:7 39:9 64:11,13 92:16,17 117:21 130:23
**misconstrued** 126:24
**misdiagnosed** 100:8
**mislead** 81:4 96:2
**misleading** 38:11 38:14 48:3 81:3 102:18 103:3
**missed** 38:5 123:11,13
**missing** 21:7 142:2

**misstating** 133:10 136:23
**mistake** 41:9
**mister** 20:23
**misuse** 33:14 35:7 36:2,14 37:8,21 57:18 132:23
**mitchell** 7:15 10:7
**mitnick** 11:13
**mm** 139:7
**mnc** 30:24
**mnp** 30:23,25 31:1,4,8,9 32:9
**molecular** 127:18
**molecule** 127:21
**moment** 99:18 104:8 129:1 144:15
**momentarily** 51:11
**moments** 27:5 133:8
**monaghan** 7:6 17:8 146:24 147:5 147:7 148:5,15,20 149:2,10,13 150:21 152:17,22 153:17,21,23
**monday** 16:5,15 16:21 17:18
**monetarily** 140:8
**money** 71:15,16 119:18 125:14,17 135:22 137:15 143:1,5
**monitor** 120:18 121:3,5,6
**months** 134:14
**morning** 15:2,13 30:6 38:25 39:14 39:18,21,25 41:2 41:3 149:19 151:9

**mortimer** 12:17 57:7 82:14
**motion** 24:11,14 24:16,17,17 25:25 26:4,11,21
**moultrie** 7:19
**move** 21:5 51:6 86:1 87:17,19 89:18 91:4,6 92:19 105:8,12 108:3,6,9
**moved** 18:16 55:24 63:11
**moving** 58:8 60:20 108:4,17
**muha** 4:7 23:23 23:23 24:4 25:1 25:10,13 26:8,17 26:20 27:2
**multipage** 55:4
**multiple** 41:1 61:20 125:20 126:2
**mundipharma** 49:5,15,18,21,23
**mundipharma's** 49:9
**mundipharmas** 49:10
**municipal** 141:1
**municipalities** 140:22 141:10 142:8
**murray** 11:14
**mute** 29:12
**muting** 93:12

**n**

**n** 3:1 15:1 156:1
**nadim** 11:15
**name** 33:22 36:9 49:4 73:23 81:4 89:7 90:24 91:2 109:3,7 110:13

111:11 112:24 127:13,14,18,22 130:5 134:21 140:21
**named** 53:23 57:8 58:1,24 59:1,12 59:13,19 60:23 62:9 70:22 81:3 90:23
**names** 134:3,23 135:10
**nann** 11:16
**napp** 48:24 49:4,4 49:5
**narrow** 20:5 39:11 72:21
**nathaniel** 11:12
**nation** 141:11 142:9
**nations** 140:22
**nationwide** 60:5 60:12
**nature** 16:11
**navigated** 55:18 66:15
**navigational** 47:2
**navigators** 4:10 24:22
**ncsgoo1** 105:21
**necessarily** 19:17
**necessary** 34:15 83:6 151:17,22
**need** 16:12,19 17:20 22:14 26:4 27:10,12 28:8 40:19 42:19 55:12 56:6 61:22 65:20 65:21 85:5 87:18 142:13 148:9 150:21 151:10 152:12 154:14
**needing** 26:13

**needs** 149:7
**neglected** 89:24
**neiger** 11:17
**neil** 10:13
**nest** 102:1
**net** 109:4,6,10
  141:19
**neutralize** 89:16
**never** 34:20
**nevertheless** 59:1
  59:20
**new** 1:2 3:9 4:19
  5:5,12,19 7:4
  91:10 139:8 142:2
**nicholas** 12:2
**nicholson** 11:18
**night** 18:13 20:19
  39:5 151:12
**nine** 119:15
  126:21 127:4
  137:15,16
**noat** 144:11
**noats** 143:6
**noise** 93:21
**non** 126:20 127:8
  131:25 142:14
**nope** 100:25
**note** 138:4
**notice** 22:14
**notify** 17:13,15
**november** 114:8
  114:22
**number** 19:1
  22:10 24:15 26:22
  26:22 34:10 37:12
  37:17,17 40:12,13
  50:21,25 52:21
  56:2 60:17 66:13
  94:5 100:21
  105:17,24 106:10
  135:15 148:1,10
  148:16,16 149:7

**numbers** 34:25
  35:3 52:20 66:8
  84:1 108:21
**numeral** 55:20
**nurse** 60:4,12,21
**nw** 4:11
**ny** 1:14 3:9 4:19
  5:5,12,19 7:4
  156:23

**o**

**o** 1:21 15:1 156:1
**o'neil** 116:23
**o'neill** 116:22,25
  117:6,7,13,16,18
  117:20,25 118:1
  119:4 120:21
  121:1,2 126:13
  129:2,3,20 130:11
  132:3 136:21
  138:5
**oath** 93:4 139:15
**obaldo** 11:20
**object** 20:17
  21:16 53:22 86:17
  108:3,11 117:5
**objected** 17:13
  19:6 20:2 21:9,15
  21:23 147:15
**objecting** 21:10
  21:14,17 56:12
  117:1 126:21
  127:4 150:8
**objection** 20:11
  20:13 21:19,20
  25:18 26:2 38:11
  48:2 53:12 55:3
  84:22 87:25 88:5
  91:10,13 98:25
  102:18 103:3,5,11
  103:11 105:13
  106:18 108:19
  119:2 141:23
  142:10 143:13

**objections** 16:11
  17:12 18:2 19:23
  19:24 24:5,7,8
**obligation** 119:23
**obligations** 120:9
  120:15,18 121:3
**observations**
  94:24 95:7,10
**observe** 27:8
**observer** 69:6
**obviate** 26:4
**obviously** 61:16
  139:4
**occasion** 68:22
**occasionally** 34:8
**occurred** 76:17
  89:20 91:9 126:6
  126:6
**oer** 79:24
**offered** 23:6
**offering** 25:2
  155:11
**office** 3:15 6:2,15
  66:19 154:25
**offices** 66:25
**officially** 25:6
**officials** 49:2
**oh** 29:23 63:16
  66:6 79:9,19
  88:19 92:5 93:20
  100:10 101:24
  112:12 145:12
  146:1
**okay** 17:5 18:7
  20:9 21:6 23:22
  24:3,19,25 25:8
  25:24 26:19,25
  27:6,24 29:6,9,10
  29:14,18,23 30:15
  30:19,23 31:8,12
  31:15 32:9,12
  33:11,13,20,24
  34:11,20,25 35:11

36:11,23 37:15
38:22 40:21 41:4
41:9,23,24,25
42:10,23 43:7,11
43:14,18,20,20,21
44:17 45:1,8,15
45:15,17 46:18
47:9,22 48:10
49:5,8,18 50:17
50:20 51:7,14,19
51:20,22 52:6,13
52:18 53:17 55:8
55:13,17 56:1,5
57:1,3,12 58:14
58:20,24 60:10
61:12 62:10,13
63:1,19 65:1,8,13
65:19,24 66:16,17
67:7,8 69:3 70:12
70:16 71:3,10
72:2,3,8,24 73:24
74:2,4,22,25
75:22 76:12 77:9
77:16,25 78:16,22
79:11,16 80:1,12
81:12,17,25 83:14
83:22 84:7,18
85:8,17 86:8,9
87:16 88:10,14,19
89:18 90:12,20
91:4 92:10,15,25
93:2,6,13 94:19
95:2,9,17,21,24
96:11,14,18,21
97:1,9,22,25
98:20 99:16,24
100:5,9,12 101:2
101:4,6,14,16,17
101:17 102:8
104:3,3,6,16
105:9,16,19 106:6
106:15 107:7,11
107:17,25 108:8

108:18,20,24
111:17,24 112:1
112:12,17,21
113:11,17,23
114:1,6,12,16,18
115:4,13 116:6,8
116:11,19,21
117:6 118:2,14
119:18,24 121:1,7
121:24 124:14
126:14 129:22,25
130:7,10 132:17
133:17 134:6
135:4,8 138:2
139:8,17,21
140:14,17 141:9
142:3 143:8
144:16 145:3,8,17
146:7,7 147:9,17
147:25 149:15
150:3,16 151:3,23
153:6,11,21
154:23 155:5,13
**oklahoma** 125:3
125:15
**old** 86:20 156:21
**ones** 31:19 97:15
120:3,3
**oneself** 142:22
**open** 40:3,23
41:15,23 42:11
43:5 45:9 51:20
76:8 101:9
**opened** 39:2 41:24
42:21
**opening** 41:11
101:16
**operation** 26:12
**opinion** 59:24
81:6 83:20,21
133:15 144:15
**opinions** 19:14,19

**opioid** 34:16 35:1
58:11,22 59:3,21
59:23 72:13,25
77:3,11,16,20
78:10,11,12 100:3
113:1,4,12,13
114:4 115:2 116:3
127:8 129:12,15
129:17 131:25
141:7
**opioids** 31:21,22
32:4 33:25 34:20
35:7,21 36:2,14
37:9,25 38:10
47:23 48:1,20,21
49:9,11,12,12,13
49:23 50:6,10,14
50:15 58:8,9,25
59:14 60:24 69:21
70:3,7 72:6 75:25
78:13,17 97:18,23
98:17 100:6
132:23
**opponent** 148:24
**opportunity**
138:21
**opposed** 21:12
149:18 151:8
**opposite** 69:24
**opt** 127:4
**optimistic** 81:24
82:2 151:22
**oral** 16:24 17:16
17:18 18:6 22:5
23:8 27:17 28:4,7
28:9 149:21
**order** 19:21 30:2
**oregon** 152:25
153:15
**organized** 92:13
102:9
**orient** 71:1

**oriented** 71:3
**origin** 119:10
**original** 144:20
**originally** 144:19
144:22
**otr** 107:8,8,15
**outside** 75:16
**overall** 54:6 56:9
**overarching** 70:6
**overconsumption**
35:21
**overdoses** 35:1
**overkill** 29:1
**overlapping**
16:11
**overprescribing**
37:8
**overrule** 91:12
**overseas** 152:18
**oversee** 120:10,15
**overuse** 35:7 36:2
36:14 37:8,21
**owned** 119:24
120:1,4
**owns** 120:3
**oxycodone** 79:23
**oxycontin** 33:15
33:18,21 35:12
37:21 57:16 58:9
73:2,13 75:15
79:24 83:17 85:12
86:13 92:1 94:20
95:3,6,19 107:9
107:12 144:20
**oxycontin's** 81:7
**ozment** 6:8,13
112:18,20,23,24
115:7,8,12,14,17
115:25 116:19
**o'neil** 11:19
**o'neill** 6:6 152:23
152:23 153:6,8,12
153:15

**p**

**p** 3:1,1 9:25 10:5
14:4 15:1
**p.c.** 4:16
**p.m.** 107:1
**pa** 4:5
**package** 39:18
**packet** 38:25
**page** 42:2,24,25
43:12,13,18,21,25
44:10,12,14 45:1
45:4,6,6,13 46:13
46:22 47:3,5,7,8
50:18 52:4,13,16
52:19,20,21,22
53:1,1,1,3,4,13,22
55:18,22 56:2,13
62:21,21 63:5
65:14 66:2,2,5,13
66:14,16,17 70:19
71:4,24 76:24
79:16 83:2 86:2,5
86:6 87:21,23
93:25 101:18
102:1 106:14,22
108:15 133:5
**pages** 39:6,16
46:13,22,23,23
87:5,6 102:2
**pagination** 66:7
**paid** 49:15 119:19
124:19 125:18
**pain** 69:19,20
**pamela** 13:16
**papers** 93:11
**paragraph** 57:4
57:12,14 58:1,24
60:1 61:3 62:21
63:18 64:20,21,21
65:2,13 66:3,8,12
67:8 71:4,5,9,25
74:4 76:22,23
79:16 80:18 83:3

[paragraph - please]                                                    Page 22

83:7,7,10,11,12
85:8,13 86:3,4
87:7,22,23 88:16
91:5,6,24 92:7
93:25 94:2 99:13
107:17,20
**paris** 12:13
**park** 6:10
**part** 19:10 28:9
28:22 38:1 39:12
45:21 46:4 70:6
95:17 118:14
119:18 125:18
126:21 133:12
135:22 137:9,10
146:6 148:6
**participant** 69:6
75:17
**participate** 17:16
17:25
**participated**
17:10
**particular** 18:17
44:7 56:16
**particularly**
47:25
**parties** 15:15 16:2
16:6,13,19 17:10
17:11,12,13 18:17
19:23 20:17 22:7
23:6,17 27:9
131:21 133:21,23
133:25 134:2,8,22
134:22 135:9,10
136:2,13,18 150:9
**partners** 57:6,11
**parts** 37:3 93:25
**party** 62:14
115:10
**passed** 64:12
**passionate** 151:21
**password** 40:17
41:5,8

**patience** 143:11
**patients** 69:19
113:21 114:3
115:2 116:4
**patrick** 11:6,19
**paul** 3:17 5:3 6:17
12:11,25 13:6
25:15,23 26:24
**pause** 72:18
104:10
**pay** 115:1 118:15
137:14
**paying** 135:19
136:3
**payment** 119:19
136:22 137:11
**payments** 119:15
137:12 140:9
**pdf** 42:2 43:1
52:21 53:2 66:13
66:16,17,18 70:20
**peace** 126:20,23
127:2 128:11
130:16,22
**peancock** 11:21
**pennsylvania**
4:11
**people** 16:15
17:20,25 22:19
33:13,24 34:11,17
37:20 62:4 100:5
117:11 135:14
136:6 138:10
148:23,24
**percent** 83:24
148:5
**perfect** 17:4 85:21
**perfectly** 44:11
**performance**
79:23 89:2 95:19
120:5
**performed** 137:18

**period** 34:1 35:5
65:8 68:15,25
122:5,17,22,24
124:11 137:15,20
137:23 139:2,6
**periods** 77:4,5,17
**person** 90:3
139:18 140:8
**person's** 109:18
**personal** 137:3,4
**personally** 62:8,9
74:14 80:20
119:13 142:24
**perspective** 83:16
142:20,20
**peter** 8:13 101:22
102:6
**pharma** 1:7 15:3
30:7 46:5 63:25
93:3 98:2,3 120:9
120:14 122:5
123:5,12 124:19
124:21 125:17,20
126:2,7 127:11
129:17 139:13
**pharma's** 122:19
123:16
**pharmaceutical**
31:16,20 32:3
114:2
**pharmaceuticals**
128:23
**pharmacists**
58:11,21
**phenomena** 100:2
**phil** 90:23 91:2
**philip** 7:13
**phone** 24:19
76:10,12 96:19
**phrase** 45:23
**phrased** 65:5
**physician** 114:2

**physicians** 89:12
89:13 100:8
**pick** 87:6
**pickering** 4:9
**pile** 39:8
**pittsburgh** 4:5
**place** 3:17 61:17
150:22
**placed** 92:2
**places** 32:18
132:12
**plains** 1:14
**plan** 17:12,14,14
24:6,8 25:18
51:15 100:17
118:7 126:22
131:2,8 133:19,22
134:9 135:11,20
136:14,19,22
137:14 140:10
141:2,10,14,14,17
141:21 142:13,13
143:4 144:2
**planning** 17:18
117:14
**plans** 15:5
**play** 119:22
**plea** 38:11,12,15
38:17,20,21 44:3
45:22 46:15
114:14,15,19,21
122:19,20 123:1
124:17
**plead** 38:3
**pleaded** 35:11
36:7 44:4 45:21
46:21 47:20 48:15
48:21 114:8
**pleas** 122:18
125:22 126:3
**please** 24:1 29:11
40:2,18 44:15
61:1 72:22 104:8

104:13 107:19
111:21 115:24
122:21 125:25
127:1 132:14
135:5
**plenty** 23:7
**plevin** 11:22
**plimpton** 7:1
**plus** 79:25
**pm** 102:6 155:18
**point** 22:1,4,5,22
22:24 23:10 26:16
28:23 29:4,4 35:4
37:19 54:8 55:11
81:23 86:18 91:18
92:4 93:19 99:20
114:1 119:3
127:10 134:1
139:2 144:4 145:9
152:4,22 153:23
**pointless** 86:19
**points** 55:7 62:15
**policy** 153:10
**polk** 3:6 15:12
**popofsky** 11:23
**porter** 11:24
**portion** 16:4 18:1
71:18 94:22 114:9
**portions** 92:13
**position** 120:8,13
142:22 154:11
**possibility** 90:16
**possible** 27:15
57:13 100:7 138:8
138:10 153:24
**post** 27:20
**postdated** 113:14
**potential** 26:1
128:8 151:19
**pouring** 149:16
**ppl** 105:9
**pplp** 101:3

**practice** 89:12
113:2,15 124:20
**practices** 47:25
50:14,14 95:18
**practicing** 113:7
**practitioners** 60:5
60:12,22
**preamble** 52:4,6
**preceding** 105:6
**precise** 52:2 95:16
98:10
**precisely** 22:23
**precluded** 53:24
**prefer** 142:25
**preferable** 27:22
**preis** 11:25
**prejudice** 61:21
**prejudiced** 117:9
**prejudices** 61:18
**preliminarily**
93:11
**preliminary**
18:11
**prepared** 121:4
**prescribe** 72:13
97:18
**prescribed** 78:18
**prescribers** 58:11
58:21 60:22 92:1
97:22,24
**prescribing** 60:24
73:7 77:3,11,16
77:20 78:10,11,12
**prescription** 72:5
72:6 89:1
**prescriptions**
70:23 92:1
**present** 7:8 18:25
119:4
**presentation** 21:4
28:4,17 64:5
77:24 78:2

**presentations**
16:7 19:3,5
**presented** 64:2,9
64:9,15
**presidency** 30:12
**president** 30:10
34:16 86:10
**press** 12:1
**pretrial** 16:8
**pretty** 154:7
**previous** 105:11
121:24
**previously** 57:5
148:6
**prey** 12:2
**printed** 105:3
**prior** 63:17 124:2
130:13 135:17
**private** 126:18
**pro** 135:22
**probably** 75:11
96:24 116:7 155:7
**probe** 49:14,18
55:10 114:16
**probing** 128:6
**problem** 35:21
41:4 44:2 50:1
**problems** 47:2
**procedural** 117:8
**procedures** 30:1
**proceed** 18:7
45:19 115:24
139:22
**proceeding** 64:10
64:11
**proceedings** 1:12
25:5 138:13
155:17 156:4
**proceeds** 144:9
**process** 19:22
29:20 142:7
154:15

**produced** 58:25
72:6 86:19
**product** 34:17
94:11,15,23 127:8
128:24 129:5
**productive** 28:12
**products** 131:25
**professor** 19:12
19:18
**profitability**
107:23
**profits** 57:15,19
57:20 64:24 78:18
**program** 60:3,14
64:16,18 67:20
89:7 94:16,17,21
94:22 95:8,11
96:9,16,20,23
**programming**
60:11
**programs** 70:24
96:21
**progress** 75:21,21
75:22
**promote** 70:3
99:21
**promoting** 89:9
**properly** 20:2
**proposed** 19:10
83:23 84:2 141:2
141:17
**proposition** 72:7
91:16,18
**propositions** 74:9
**pros** 23:11
**prosecutor** 36:9
36:16
**prosecutors** 49:13
**protect** 61:18
**protection** 6:1
**provide** 115:16
134:19 155:1

provided 74:17
77:15 97:11
134:18
provider 69:8
providers 69:5
70:2 71:13 72:4
72:12
provides 35:1
134:21
provinces 141:10
142:8 143:15,16
143:18 144:1,4
public 35:6,17,20
35:22 126:18
138:12
publicly 111:10
pull 50:17
pullman 138:24
139:25
pumpkin 152:16
punishment 89:15
89:15
purdue 1:7 16:22
30:7,10 31:5,20
31:21 35:11,14,15
36:6,12 37:16,24
38:7 44:4,21
45:21 46:5,14,21
47:20 48:15,20
50:5,9 57:6 58:2
59:2,20 60:3,10
63:25 65:9 66:19
67:12 68:12 71:15
75:25 82:12 93:3
94:14 96:21 98:2
98:3 107:12 114:8
115:1,10 120:9,14
122:5,18,19 123:5
123:12,16 124:2
124:19,21 125:2
125:17,20 126:2,7
127:11 129:17
139:12 141:16,20

144:19
purdue's 47:23
48:19 57:15,19
58:2 59:2,14,21
67:1 70:3 71:11
71:18 72:13 74:10
74:13 78:18 79:20
80:20,25 83:14,16
83:16 86:10 94:5
94:19 95:10
122:25 124:1
128:21
purdue's 37:13
140:10
purpose 19:19
20:1 21:1 23:1,5
70:1,6
purposes 18:15
21:2 57:18 70:4
89:17
pursuant 143:21
152:25
put 23:1 27:11,18
85:7 100:15 108:1
pw 106:10
pwg004493361
105:25

q

quality 89:11
quarropas 1:13
question 16:2
17:6 33:16 35:10
38:1,2,6,7,14 44:6
46:18 48:7,16,19
50:7 53:7,8 54:3,9
56:15 61:5 64:14
65:1,16,22 68:2,3
70:25 71:5,6,21
72:16,17,21 75:8
75:11,13 76:8,23
85:5 86:23,25
87:13,14 88:1,3,6
88:7,17 89:21

92:7 94:7,8 96:13
103:11,18,24,25
117:8 119:6 120:6
120:11 121:24
122:21 124:22
125:25 128:19
129:8 131:3,6
134:6,7 136:25
139:18 140:5,24
142:6 144:5,13,18
152:14
questioning
103:12 143:19
153:1
questions 47:16
61:18 87:11 108:2
112:16 114:7,14
115:5 127:7
129:20,24 138:1
138:22 140:12,15
143:15 145:2,7
quick 138:4
quid 135:22
quinn 12:3
quirk 12:4
quite 15:16 66:7
75:9 81:3 101:16
110:22,22 119:4
quo 135:22
quotation 80:2
quoted 55:2 80:3
quotes 54:25

r

r 1:21 3:1 9:16
11:20,23 15:1
29:19 156:1
rachael 12:7
rachel 11:20
rai 1:25
raise 29:11
raised 24:6,15
25:17 26:23

raising 138:19
ran 99:20
rarely 84:5 90:21
raymond 5:10
110:1,14,17,25
111:4
rdd 1:3
reach 154:19
reached 24:4
read 18:2 22:11
22:20 38:15,20
44:7,8 47:13,17
48:4 52:3,22 53:6
53:19 54:5 60:7
62:6 63:1,13,17
63:17 64:21 65:1
68:18 71:6,9 72:1
72:2,11 74:5,6
76:25 79:18 83:7
83:10,11,12 88:18
100:21 102:8
106:2 107:17,19
133:4,5,7 149:15
reading 44:5
103:19
ready 47:15,17
72:1 86:7 155:8
realized 133:6
really 17:25 21:14
25:8 81:2 83:1
87:11 89:15 93:17
98:9 103:10 109:9
110:5,7 132:21
144:18 151:13,23
152:5
reason 46:6,8
49:25 57:22,24
60:18 76:16 85:17
85:19,20,24 87:2
102:16 151:18
recall 26:5,9
30:18,21,22 31:18
32:17 33:7 37:14

37:15,22 49:17
57:10 58:23 60:9
60:10,17 64:19
74:3 76:1,2,14,15
76:16 77:13,14
82:17,19 83:1,22
85:9,14,15,21,23
89:7 90:8,14,22
90:23,24 91:2,15
91:18,19 92:9
94:4,9 96:2,17,19
96:23 97:14,15,16
97:17 98:15,15,24
99:5,8,9,9,11,15
99:16 104:2
112:13 114:25
115:3,23 116:1
121:20 122:15
123:25 124:4,11
124:12 125:11,16
125:19 127:10,13
135:16 151:20
155:3
**recalling** 84:15
**recapture** 59:2,20
**receive** 64:5 75:18
77:9,11
**received** 19:5
38:24 40:22 77:2
91:11 100:16
124:1
**receiving** 77:13
134:8 135:23
144:2
**recess** 92:12 93:1
139:10
**recognize** 52:4
121:10 134:2
**recollect** 35:4
64:10 67:22 69:12
127:19 128:10
134:23

**recollection** 34:9
34:18 49:24 76:9
97:21 114:16
115:19 116:5,11
116:12 125:8
**recommendation**
98:3,21
**recommendations**
31:12 95:17,21
97:6,7,9,11 98:22
98:23 99:7
**recommended**
96:22 97:1
**record** 16:20
18:20 23:18 44:23
62:1 93:3 106:3
107:19 115:22
139:12 150:22
154:6,8 156:4
**recorded** 107:22
**recovery** 113:1,21
**redirect** 103:15
**reduce** 89:8
**reed** 4:1,3 23:24
**refer** 18:22 55:4
55:11 56:6,7,20
57:3 74:4 91:24
99:13 107:8
136:17
**reference** 38:17
56:12 62:8
**referenced** 84:10
92:6
**references** 54:25
**referred** 21:11
25:10 88:25
118:20
**referring** 18:21
21:22 52:6 53:4
67:9 76:6,7 84:10
91:10 107:25
108:4 110:24
137:4

**refers** 51:16
107:14 110:17
**reflect** 64:11
144:6
**reflects** 103:6
**reformulated**
57:16 107:12
**reformulation**
107:9
**regard** 140:23
**regarding** 18:13
27:4 53:24 75:14
111:10 114:25
116:2,12 130:11
**regardless** 132:8
**region** 88:19,23
88:24 89:4,13
91:5,7,13
**regional** 91:15
**regular** 74:11,17
75:1,2,14,18,19
75:23 76:20 77:8
**regularly** 58:3
**regulatory** 49:1
49:22
**rehabilitation**
116:3
**reiterate** 62:13
**relate** 48:19
**related** 19:11
21:24 24:12,13
35:12 48:21 50:5
50:12,13 58:3,18
78:8,10,11 94:19
95:6 107:15
128:12,18 131:1,7
131:17,24 132:2
132:23 145:24
**relation** 19:15,15
**release** 79:23
126:20 128:2
130:11 131:6,9,14
131:16,21,24

132:8,22,25,25
133:4,9,13
**released** 118:8
131:2,8 132:4
133:12,19,22,23
134:22 135:9,11
135:14,23 136:2
**releases** 130:21
131:21,24 133:25
134:8 136:4,7
**relevance** 142:12
**relevant** 45:10
**relied** 20:6
**relief** 69:20
**remain** 151:21
**remaining** 25:6
151:12
**remember** 34:25
36:9 37:18,18
68:22 73:23,25
75:3,4 83:18 84:1
86:15 91:3 96:25
104:4 124:9
125:17 127:18,24
136:15 151:15
**remembered**
34:10 124:8
**remembers** 85:4
87:7
**remind** 45:9 76:5
114:20 127:16
**reminded** 127:13
**remove** 25:6
**removed** 89:1,2,4
**removing** 89:14
**reopening** 20:4
**repeat** 37:1 38:2
41:17 68:11,19
**repeating** 72:17
79:10,14
**rephrase** 119:6
131:4 136:25
143:10

**rephrased** 144:6
**rephrases** 143:13
**report** 19:12 58:3
  90:5 96:7,8,25
  97:11
**reported** 89:13
**reporter** 67:5
  78:25
**reports** 77:5,9,10
  78:7 121:4,7,10
  121:12,16 124:1
  124:12,15
**represent** 112:24
  130:6 140:21
**representation**
  24:23
**representative**
  68:22 69:1,4,5,9
  69:13 70:2
**representatives**
  68:6,20,25 71:12
  89:24 90:4
**representing**
  139:25
**request** 15:4 16:5
  61:14 75:1,2
  126:22 146:8
**requested** 59:1,20
  74:11 75:4,14
  134:17
**requesting** 130:21
**requests** 60:2
**require** 74:23
  115:1 118:14
**required** 137:14
**requires** 147:14
**reserved** 151:15
**resign** 31:3
**resolve** 24:7,9
  124:20 151:12
**resolves** 24:15
  25:17

**resolving** 26:21
  26:23
**resources** 113:20
  114:3
**respect** 19:4 26:8
  37:25 38:9 47:23
  47:25 49:8 50:5,9
  50:14,15 62:16
  73:1 94:5,14
  132:6,11,19 143:2
**respond** 65:20,21
  71:20 88:17
**response** 75:9
  83:8
**responsibility**
  129:14
**responsible**
  129:11,17
**responsive** 48:16
  54:14,16 57:13
  75:8 80:13
**rest** 60:16 61:8
  65:22 100:14
  150:17
**restate** 38:6 50:7
  94:8,23 96:13
  120:11 122:21
  125:25 134:7
**restitution** 116:15
**result** 24:16 33:14
  33:25 34:17 60:2
  69:21 96:8 124:10
**results** 81:22 82:1
  89:17
**resume** 155:15
**review** 51:23
  149:24
**reviewed** 149:11
**reviewing** 27:18
  28:19
**revised** 20:13
  107:8

**revisit** 114:11
**ricarte** 12:5
**rice** 12:6
**richard** 3:4 12:16
  12:18 13:3,4
  15:18,20 18:8
  29:18 30:4 57:6,8
  82:24 112:22
  117:24 130:3
  140:1,19
**ride** 68:24 69:1,3
  76:21
**right** 15:2 16:17
  17:24 22:18,24
  23:22 26:6,15,25
  29:7,11 30:16,24
  31:21 32:5,19,21
  32:23 33:8 35:13
  36:8,23 37:6,13
  37:25 39:25 40:1
  41:13 42:15 43:6
  43:24 44:12 47:15
  48:6 49:3,9,13,16
  49:25 50:13 52:11
  55:20 56:24,25
  59:19 62:6 67:18
  67:23 69:14,22
  71:15,19,24 72:10
  72:10 73:24 74:20
  75:6 76:19 77:1
  77:18 78:5,9,23
  79:12 80:24 81:9
  82:4 83:2,9,12,25
  84:2,4,8 86:1
  87:12 90:10 91:21
  93:6,15 94:20
  95:3,6 96:4,8 97:6
  97:12 98:4,7,14
  98:24 99:11
  100:14 101:19
  103:8,10 104:1,3
  106:8,10,11
  107:15 109:16

  110:14,15,18
  111:5 113:15
  115:6 116:21
  120:7 122:20
  123:24 129:10
  130:23 131:25
  135:20 137:15
  139:11,19 140:14
  142:1 143:6,23
  145:1,3,5,8 146:9
  146:13,17 147:4
  148:1,9,18 149:15
  151:15 152:8,21
  153:6,11,22,25
  154:10 155:9,13
  155:13
**ringer** 12:7
**risk** 28:25 61:16
  61:21
**ritalin** 127:22,25
**road** 156:21
**robert** 1:22 9:4
**robertson** 12:8
**robinson** 6:6
  116:22,22,25
  117:6,13,16,18,20
  117:25 118:1
  120:21 121:1
  126:13 129:3,20
  152:23
**rode** 69:3,9
**role** 34:15 90:17
  102:11 103:20
  119:22
**roman** 55:20
**room** 1:13
**rosen** 12:9
**rosenbaum** 12:10
**rothstein** 12:11
**roxana** 7:11
**rubinstein** 12:12
**rule** 19:17 21:24
  53:24 86:18

**ruled**  19:12 20:3
20:12 21:2
**ruling**  17:2 39:12
88:13
**rulings**  20:10
21:12,14 39:13
**run**  49:1 61:21
**rundlet**  12:13
**running**  135:13
**russell**  5:7 12:14
25:19,21,22 26:3
26:7 76:2,10,12
**ryan**  12:15 13:9
14:1

**s**

**s**  3:1 7:9 10:9,16
11:5 12:11 14:8
15:1 29:18
**sackler**  3:4 5:10
7:2 12:16,17,18
12:19 15:8,17,19
15:20 17:7 18:8
21:4 27:9 29:10
29:13,17,20 30:4
30:6 31:9 36:24
38:3,24 39:17
40:4,19 41:12,16
42:13,20 44:1,15
44:20 45:3,20
46:2,19 48:5
51:22 53:20 54:4
54:9 55:10,17
56:5,25 57:3,4,7,7
57:7,8,8,14 58:4,6
59:15 61:23 62:2
62:6,15,20 63:6
63:13,21 64:14,24
65:9,10 66:14
67:6 68:11 70:5
70:16,16 71:10
72:16,24 74:4
75:7,18 79:17
81:4,12 82:14,16

82:18,20,22,25
83:10 84:12,18
85:8 86:2,7,9
87:21 88:16 89:19
91:1,21 92:8,19
93:3,10,11,22,24
95:13 100:13
101:8 102:2
103:18 104:13
106:8,15,25 108:1
109:2,8 110:1,1
110:14,17 112:15
112:18,22,24
115:9 117:24
118:1,15,21
119:10,13 120:13
122:11,22 123:24
125:6,9,20 126:19
127:7 129:10,10
129:14 130:3,5
134:15,21 137:25
139:4,13,14,18
140:1,3,6,19,21
140:24,25 141:9
142:5,24 143:10
144:13,18 145:4,9
145:19 146:19,24
150:19 153:8
154:25
**sackler's**  102:23
110:25 111:5
**sacklers**  18:25
53:23 57:8 58:1
58:24 59:1,12,13
59:19 60:23 61:17
61:19,22 62:2,8,9
70:22 81:3 153:16
**sackler's**  144:9
148:6
**saint**  3:17 6:17
**sale**  35:12 37:25
38:9,12 70:3
94:20 119:20

141:6
**sales**  58:2,3 59:2
59:21 67:11,15,15
67:16 68:6,20,24
69:1,4,5,6,9,11,13
69:21,25 70:1
71:12,12,21 73:16
75:22,24 76:3,4
76:13 78:15 79:22
80:21,25 81:10,15
83:17,17 86:10,13
89:1,2,3,5,17,24
89:25 90:1,5,16
90:20 91:8,14
94:5 95:2,6,8,10
95:15,18 97:8
119:22
**salesman**  89:10
**salwen**  12:20
**sample**  80:8
**samuel**  10:10
**sara**  6:20 8:1
11:15
**satisfies**  85:4
**saval**  12:21
**save**  92:13
**saw**  134:1,1,10
**saying**  28:8,21,21
65:6,16 76:14
81:10 83:5 113:24
114:11
**says**  43:4,4 44:7
53:13,23 67:24
74:17 91:8,11
107:20
**scale**  90:16
**scan**  46:25 47:9
**scanned**  47:18
**scanning**  47:14
**schedule**  42:3,12
42:14,19 45:4,16
45:18,20,23 46:4
46:13 47:1 52:14

75:20
**scheduling**  19:21
**schinfeld**  12:22
**schlecker**  12:23
**schmidt**  12:24
**schwartzberg**
12:25
**scope**  131:6
**score**  33:8,12
**scott**  3:11 9:15
**screen**  24:20
29:10 92:23,24
**scroll**  52:13 102:1
**scrutinized**  58:3
**scrutiny**  58:10,21
**sears**  16:23
**seattle**  6:4
**sec**  101:4
**second**  25:13
38:22 41:17 42:4
42:8 43:11 57:4
58:20 59:19 61:3
61:9,14 68:17
137:8
**section**  44:8 70:18
**sections**  148:24,25
**see**  20:4 29:10
41:21 51:12 52:7
53:1 56:2 77:14
85:8,13 88:18
94:2 102:2,3,14
103:24 106:25
107:3 111:2
115:19 129:6
142:22 151:2
**seeing**  28:14
52:18 98:16
151:20
**seek**  116:14
**seen**  133:25 134:8
134:12,14
**sell**  32:3 78:13

selling 47:25
48:20,21
sells 31:22
semantics 38:19
send 17:23 71:12
85:17 86:14
102:16 107:5
150:13
sending 70:1
sense 16:20 17:22
28:16 114:5
117:10,20 131:5
138:18 152:2
sent 15:14 40:22
51:10 80:4 87:3
88:4 104:12,25
135:4
sentence 57:4,14
58:1,6 61:1,2
62:20 63:2,3,5,5,7
63:8,9,12,14,17
63:22 67:10,15,24
102:10 103:18,19
103:23
sentences 62:23
62:24
separate 39:8
59:5
separately 51:6
september 149:5
149:6
series 74:19
serious 69:19
serve 131:21
served 30:15,23
31:15 57:5
server 101:15
service 48:24
131:18 133:11,14
services 36:1
set 16:5 39:8,9
40:7 41:2 82:12
87:13 88:2,6

110:9,10,21
148:17 154:7,8
seth 12:22
sets 39:8 41:3
setting 81:14
86:25 110:4
settle 49:18 52:10
settled 23:13
settlement 23:11
40:9 42:18 46:4
51:24 52:25 53:11
55:19 119:14
124:18,25 125:1,3
125:10,15,18
127:5 140:9 143:2
143:3,5 144:10
settlements
125:21 126:2,12
126:16,17
shannon 8:19
11:10
share 59:3,21
146:2,5
sharp 65:7
shell 29:22
shepherd 13:1
shift 97:19
shira 14:3
shore 13:2,3
short 92:12,20
106:4,5
shortly 51:13
125:6
should've 38:24
show 22:19 86:15
showed 99:18
showing 50:24
51:2 56:2
shown 124:12
shows 42:9
side 7:2 18:25
109:12,12,17
114:25 118:15,15

118:21,21,23,24
sides 27:10
sign 16:3 145:9,18
145:19 146:14
signature 102:3
signed 149:11
significant 37:12
121:11,17 122:1
122:14,23 140:25
silbert 13:4
similar 115:4
141:9
simmonds 13:5
simmons 25:3,4
simple 96:14
simply 69:9 99:8
simpson 5:1
singer 13:6
single 51:9 149:4
153:4
sir 43:17 52:24
60:8 65:3 66:12
73:9 75:13 88:13
88:16 93:22 99:25
102:1,5 104:15
112:20 118:5
sit 34:4 54:20
114:24 116:8
situation 94:24
95:2,12,18
six 50:21
sixth 50:22
skapof 13:7
skip 64:21 70:17
76:22 92:13 93:24
100:13
skipped 89:20
skorostensky 13:8
slaugh 13:9
slip 153:24
slowly 56:6
smith 4:1,3 23:24

sold 136:22 137:3
sole 46:7
solely 24:12
solutions 156:20
somebody 91:3
129:6
someone's 23:9
someone's 28:16
son 50:1 82:25
110:24
sonya 2:25 156:3
156:8
soon 145:13
146:15
sorokin 13:10
sorry 20:22 29:13
33:16 36:25 38:3
40:16,17 43:5,14
44:2 45:7 47:2
48:6 50:24 51:2
52:18,25 54:1
57:13 58:16 63:16
66:6,7 68:11,18
72:18 73:11,21,23
75:12 77:9 79:4
84:18 87:23 88:17
91:1 92:5 95:24
102:19 105:23
106:11 108:6
109:14 110:24
111:3 112:10
120:21 121:23
122:10 123:5,8,15
129:3 134:6
136:25 145:12
147:12 154:18
sort 18:22 20:5
45:24 117:11,11
138:9
sound 93:12,16
113:23,23 128:3
sounded 135:15

sounds  41:13
  152:9
source  20:18
south  33:2
southern  1:2
space  79:25
speak  18:5 58:5
  69:8,10,13 132:18
  150:21
speaking  22:4
  137:6
speaks  39:15
  53:12
special  19:5
specialty  4:10
  24:22
specific  31:16
  54:5 55:6,12
  61:25 62:4 97:15
specifically  30:21
  53:13 54:7,25
  67:9 95:7 98:24
specifics  55:3,15
  56:7 124:13
specify  31:23 32:6
spend  27:17 28:6
spent  71:15
spoke  69:9 115:18
spoken  86:11
  145:12
springer  13:11
square  118:11
st  5:3 25:15,23
  26:24
stack  87:18
stacy  8:14
stand  33:19 89:19
  103:17 147:3
stanford  66:20
start  16:4 90:3
  94:12 152:9,9
started  94:25

starting  15:19
starts  43:22
state  3:15,16 4:17
  6:2,16 18:10
  29:24 30:7 47:19
  78:9 95:15 115:22
  116:23 117:2
  118:2 122:13
  124:18 125:3
  128:21 134:12
  138:24,25 139:25
  141:1
stated  56:8 58:13
  137:16 153:19
statement  48:13
  53:10 56:16,17,18
  56:21 57:22 60:16
  62:25 65:4 72:19
  74:6 80:7,11,15
  128:19 134:16
statements  17:12
  17:14 18:3 54:10
  54:13,14 56:10,13
  56:20 59:5 74:19
  78:8
states  1:1,11 5:16
  33:14,24 35:2,25
  36:4,11 37:6,6,12
  37:17 38:10 52:1
  53:16 54:21 115:1
  116:2,13,14 117:1
  125:21 126:3,21
  127:4 128:17
  129:12,15,18,24
  130:6 131:19
  132:12 144:23
state's  19:16
steege  13:12
steel  13:13
stephanie  8:23
stephen  136:10
steven  11:23

stipulate  46:12
  147:1
stipulated  27:9
stipulating  26:13
  154:6
stipulation  24:10
  24:15 25:2,13,16
  26:21,23 29:1,5
  46:19,24 143:17
  143:22 152:24
  153:2 155:9
stipulations  24:5
  24:7 26:12,20
  61:17
stodola  13:14
stop  60:5 89:9
  97:18 114:4
stopped  73:8,9,13
strategies  67:16
  74:12 75:24 76:3
strategy  63:15,23
  64:3,11
streamline  16:7
street  1:13 5:18
  6:17
strike  24:13 35:18
  77:10 100:12
  107:25 108:3
struggled  79:12
studied  134:3
study  94:25
stuff  109:19
subcategory  73:4
subdivisions  37:5
subject  23:8 26:10
  30:1 85:11 102:20
  103:6 107:7
  152:24
submit  27:19
submitted  53:10
  70:24 148:7 153:5
subsequently
  97:10 98:12

subset  96:25
  98:19,21
substantial  37:17
  37:19 71:18,22
substantive  24:8
success  98:15
sudden  86:12
sue  129:6
suffering  70:11
sufficiently  65:6
suggest  16:10
  81:18 136:7
suggested  20:6
  81:17 83:24 84:3
suggesting  86:12
suggestion  27:12
  149:17,18,19
suite  5:18 6:3
  156:22
suits  118:9
supervisor  89:10
supervisors  90:12
  90:14
support  17:12,14
supposed  28:15
  41:10
sure  18:24 20:13
  20:19,25 21:25
  22:21 23:6 25:24
  28:3,6 30:19 39:4
  45:3 46:19 52:8
  54:19 59:6 68:3
  79:1,10 93:11
  96:15 104:17,19
  104:21 109:9
  116:24 117:7
  130:1,10,20 131:5
  135:5 137:2,7
  139:2 147:25
  148:5,22 155:6
surface  114:5
surprise  121:21
  121:25 122:8

surprised  122:14
  122:16
suspect  71:17
swear  29:14

**t**

t  5:7 12:14 156:1
  156:1
table  110:6
tablets  79:24
tacitly  18:22
tad  116:22 118:1
take  16:25 40:4
  40:19 44:9,22
  51:22 59:6 70:18
  80:18 97:3 112:18
  113:19 121:6,7
  133:6 150:15
taken  84:14,15
  123:6 142:5
takes  101:15
talk  38:4 63:8
  69:7 96:11 134:10
  139:5
talked  38:8 61:2
  76:21 114:13
talking  20:21 21:8
  39:9 46:9 63:4
  85:23 91:3,4
  98:20 105:9
  114:19,22 122:19
  142:14 143:20,25
tap  51:19
tapley  13:15
target  83:17,23
  84:2,3
targets  80:21,24
  81:10,15,17,19,19
  82:12 85:11
task  69:17,18
taylor  41:5 51:10
td  109:18
teens  22:10

tele  1:12
telephonically
  3:11,12,13,20 4:7
  4:14,21 5:14,21
  6:6,13,20 7:6,8
television  109:19
tell  22:18,19 28:8
  29:14 44:6 45:18
  51:23 69:23,23
  83:22 98:5 102:10
  112:8 131:14
  136:15
ten  39:9 87:9
  119:15 137:16
tense  119:4
tenure  127:19
term  113:18 121:9
  121:11
terms  81:22 82:1
  117:14 119:19
  141:4
terrible  151:18
terribly  61:23
testified  19:5 50:1
  69:2 115:21
  130:10 133:8
  135:16
testifies  23:2
  154:5
testify  60:9 65:5
  80:1 94:21 97:13
  110:7 111:9,15
  118:17 136:12
  137:2 150:22
  151:1 154:4,14
testifying  15:8,9
  15:10 135:13
testimony  15:21
  16:1 18:8 19:4
  20:12 21:23,24
  22:24 23:9 24:1
  24:13 26:9,15
  27:11 30:2 62:16

64:5 82:2 92:20
  98:2,22 114:9
  115:23 127:3
  136:1,10 137:9
  138:17 139:5
  145:9,25 146:6
  147:3 148:13
testing  86:20
text  102:3 103:7
texted  68:17
texts  103:9
thacher  5:1
thank  22:2 23:20
  23:21 24:24,25
  26:7,25 27:2,7,24
  28:24 33:13 40:21
  43:25 47:14 48:23
  50:17 51:18 58:6
  59:10 60:1 62:18
  65:25 66:1,17
  67:8 70:21 71:10
  71:24 73:1 77:1
  79:11,19 80:17
  81:12 82:4 86:4
  88:19 91:21 93:8
  93:15 101:6
  106:15 108:25
  109:24 112:15
  114:23 115:17
  116:11,19 118:5
  120:7 128:4
  129:21 130:2
  137:25 138:4
  140:14,18 145:1
  145:10 150:4,5
  155:16
thanks  71:8
that's  17:4 20:13
  20:15,15 21:21
  23:3,21 26:6,17
  29:21 30:1 38:1
  38:19 39:9 41:11
  142:9,17 144:2,13

144:21 146:10,20
  147:7,24 149:2
  150:10 151:23
  152:5 153:6
  154:16,21
theodore  14:7
theresa  12:19
  82:16 146:24
  148:6
there's  15:16
  17:19 18:10 22:15
  28:25 40:12 42:16
  145:15 146:3,9
  149:20 152:11
there've  15:20
  21:13
they're  17:11,20
  20:1 22:20 28:18
  142:6
thin  23:16
thing  63:1,22 65:6
  65:20,21 75:1
  118:19 123:23
  148:19 154:24
things  28:13,22
  76:8 78:17 81:2
  96:10 152:3
think  15:20,24
  16:14 17:5,20
  18:11,11,18 19:1
  19:7 20:2,6,16,18
  20:25 21:4,6
  22:11,13,25 29:3
  34:6,9,15 36:17
  38:1,15,16,19
  39:15 40:5,18
  44:9,13 45:3
  46:12,20 47:14,24
  48:8,19 52:7 53:3
  53:5,17 54:3,7
  55:6,11,14,22
  61:19 62:3 63:8
  63:10,21 64:4

67:5,5 73:12
74:16 75:13,15
76:6,21 78:20,22
80:14 83:6,19,23
84:9 85:4 86:10
87:16 88:5,12
92:12,15 95:13
98:2,20 99:2
100:4,13,15,16
101:20 102:2
103:14,16,16
104:25 105:5,20
108:1 109:17
111:12 114:9
115:4,20 116:7,16
117:1,10 118:13
124:1 125:9
135:12 136:15
138:11 139:1,17
142:1,18 144:3,5
145:15 146:1,18
146:23 148:12,15
149:7,17 150:18
150:23 152:7,11
152:18,19 153:9
153:19,20 154:13
154:14 155:14,14
**thinking** 16:18
84:21 138:18
155:3
**thinks** 22:13
28:15 142:12
**third** 7:3 61:3
148:16
**thomas** 6:6 7:19
7:20
**thomasson** 104:12
104:20
**thought** 21:22
27:8 82:1 109:16
130:18 145:13
**thousands** 22:8
60:22 87:3

**three** 30:17,21
36:6 41:3 46:22
46:23 62:24 90:21
125:22 126:4
150:18 151:19
152:18
**thurmond** 13:16
**thursday** 16:18
17:2
**time** 16:6,14,19
17:1,19 21:1,5
27:11,17 31:5,17
31:23 32:6 34:1
35:4,5,9,15,17,19
36:1,11 37:9 38:8
40:4,19,20 44:9
49:7 54:4 65:8
66:21,22 67:1,2,2
68:7,9,12,15,21
68:25 70:17 77:12
77:12,21 83:15,18
84:15 88:22,24
89:22 91:7,17,23
92:3,4,5,6,14
104:4 114:8,18
119:3 122:5,17,22
122:25 123:22
133:7 138:8 139:9
143:14,14 149:4
151:25
**timeframe** 35:10
**timely** 21:16
**times** 20:2,24
67:10 81:12,13,14
110:6
**timesaving** 27:8
**timothy** 11:4
**title** 42:2 53:4
**titled** 43:22
**titration** 99:21
**tobak** 13:17
**today** 15:8,10
17:7 31:25 34:5

34:10 39:7 40:22
54:20 88:21
110:20 114:24
130:13 136:1
138:6 146:19
147:1 155:4,15
**today's** 24:1
151:25
**told** 22:12 94:13
111:14,21
**tolerance** 100:3,5
**tolerant** 100:10
**tomorrow** 16:1
17:16 18:5 150:17
150:19 151:8,24
152:3,7 155:11,15
**tonight** 150:21
151:8 154:12,20
**tonnesen** 6:20
**tools** 71:11
**top** 42:12 43:12
43:13 93:12
106:23
**topic** 16:12 88:6,9
**total** 98:21 118:17
**totally** 55:4 87:6
**tracked** 58:2
**trade** 124:20
**transcribed** 2:25
**transcript** 136:17
149:8,12 155:2
156:4
**transcripts** 16:6
**transfer** 65:16
**transferred** 64:23
65:10
**transmission**
40:22,23
**treatment** 115:2
116:2
**treats** 127:15
**tremendous** 138:6

**trends** 58:8
**triage** 113:8,9,9
113:19
**trial** 18:4 22:6,9
27:20 28:14,19
125:6 130:12
135:13,14
**trials** 128:18
**tribal** 141:1
**tribes** 141:11
144:11
**tried** 18:17
**troop** 13:18
**trouble** 36:23
49:1 52:18
**true** 15:13 23:3
48:23 54:16 56:23
56:25 57:8,18,24
58:4,5,12,13,14
59:3,14,22,24
60:6,16,18,20,21
65:8 71:17 73:1
74:10,18,21 77:1
78:16,16 79:19,19
80:7,11,15,20
81:13,14 86:9
100:12 119:2,3,5
119:18 124:17
125:2 141:19
144:19,21 149:19
156:4
**trust** 93:21 120:1
143:3
**trustee** 5:17
129:24 130:6
150:7
**trusts** 64:25 65:10
119:24 120:4,5
137:5,10 140:6
141:7
**truth** 19:8,18
29:15,15,15

[try - wanted]                                                                                    Page 32

**try**   39:11 41:7,8
45:25 47:2 74:8
74:22 96:14 134:7
**trying**   27:14
55:13 57:13 87:17
112:6 114:3
115:15,16 130:9
131:5 138:13
143:1 153:17
**tsai**   13:19
**tsier**   13:20
**tuesday**   16:22
**turn**   15:11,23
17:7 29:6 41:25
42:2 55:17 62:20
64:20 65:13 66:2
71:4,24 76:23
79:16 83:2 87:21
92:23 93:24
**turned**   71:9
**turner**   13:21
**turning**   45:6
**turns**   152:15
**twelve**   77:7
**twice**   136:16
**two**   23:19 24:5
25:25 26:12 27:15
30:17,20 31:18
39:9 46:23 58:8
59:5 62:24 69:17
86:13 90:21
101:15 102:2
110:6 115:5
118:20 125:21
126:3 133:6
148:15 149:5
150:12,12
**types**   87:10 90:3

**u**

**u.s.**   1:23 5:17
36:16,18,20 37:3
37:4 131:20 132:7
141:1,7,20,21

142:14 150:7
**ucc**   101:3 105:9
**ultimately**   96:21
**un**   21:9
**unanswerable**
61:19
**underlying**   19:16
23:12
**understand**   19:2
26:18 27:12,14
28:10 39:3 43:6
44:3 47:4 48:5,6,8
63:11 75:9 79:9
80:10 82:6 88:5
88:12 93:4,5
102:19 107:23
113:13,24 115:12
118:6,16,17
120:22 121:14
126:19,22 131:3
132:10,11 133:7
137:8 139:14
143:2 153:14
**understanding**
19:20 45:20 46:20
47:12 48:11 112:2
112:3 114:10
118:10,11 123:3
128:11 130:21,25
131:5,7,14,16
132:5,6,10,19,22
133:8,12,19 141:8
147:8,16 149:3,13
153:7
**understood**   15:8
45:3 59:23 85:22
85:22 88:22
142:23
**underwood**   13:22
140:15,16,18,20
140:21 142:2,3,4
142:16,23 143:3,6
143:9,17,24 144:8

144:17 145:1
**underwood's**
144:12
**underwriters**   5:2
25:15,22
**unfair**   55:4 87:6
124:20
**unfamiliar**   45:2
**unforeseen**   152:6
**unfortunate**
151:11
**united**   1:1,11 5:16
33:14,24 35:1,24
35:24 36:4,11
37:6 38:10 51:25
53:15 54:21 115:1
116:2,13,13
129:12,15,18,24
130:6 131:19
132:12 144:23
**unlawful**   124:20
**unnecessary**
70:23
**unsung**   15:13
**update**   15:9
**use**   33:21 34:17
39:6 70:7 83:18
113:1,4,12,13
114:4 115:2 116:3
132:23 138:11
**uzzi**   13:23

**v**

**value**   137:19,23
141:5,19
**varick**   5:18
**various**   16:11
27:9
**vehicle**   27:14
**verify**   44:6
**veritext**   156:20
**versus**   62:3
**vice**   86:10

**victim**   116:15
**victims**   116:14
**video**   1:12
**view**   56:11 144:9
**views**   20:24
**vincent**   7:12
**virginia**   36:5
**visible**   120:25
**visit**   69:4 71:13
**visited**   70:3
**vocational**   116:2
116:3
**voice**   70:12 72:23
**voluntarily**
143:21
**vonnegut**   13:24
**vote**   64:10,12
**vp**   76:3

**w**

**w**   9:23 12:15
**wa**   6:4
**wagner**   13:25
14:1
**wait**   109:13 154:8
**waiting**   44:18
**want**   15:23 17:16
18:1,5 19:20
20:22 23:18 27:7
28:6 44:7,8,9 51:4
53:1,6 61:24 62:4
70:25 78:20,23
93:7 96:2 98:9
102:22 103:2
112:17 114:11,16
115:20 132:6,9
135:5 145:4 146:5
147:25 148:22
149:20
**wanted**   17:25
20:19 39:3 42:11
55:14 77:14
115:18 118:19
147:12 153:4

154:7
**wants** 23:7,10
**wardwell** 3:6
**warning** 128:8
**washington** 4:12
  4:17 6:2 116:23
  117:3 118:2
  152:25 153:13
**wasn't** 145:24
  146:18 153:17
**way** 15:25 20:5
  23:14 42:1 46:2
  59:17 63:23 71:21
  72:20 74:23 79:21
  88:25 107:16
  118:11 131:1,8
  133:22
**ways** 27:15
  142:22
**we've** 79:12 86:11
  100:10 105:4
**weber** 14:2
**website** 34:21
  35:1 109:2,5,7
  110:2,4,13,21
  111:10,18,19,21
  112:2,9
**websites** 109:6
**wednesday** 17:1
**week** 26:10
**weekly** 77:2,5
**weeks** 77:6,6,7
  143:14
**weiner** 14:3
**weintraub** 14:4
**weis** 14:5
**weiss** 14:6
**welcome** 63:1
**wells** 14:7
**went** 76:22 78:12
  137:8 143:1
**western** 36:5

**we'd** 16:3 18:11
**we'll** 150:1,15
  152:2 155:9
**we're** 15:3,19,25
  16:2 18:7 20:16
  20:20,25 21:8,25
  29:3,7 39:9
  142:14 143:20
  151:2
**we've** 20:2,6
**whatsoever** 50:15
**what's** 17:6
  145:16
**white** 1:14
**wholly** 18:15
**william** 5:7 9:23
  10:5 12:14 14:4
  25:22
**willing** 40:18
  53:14 113:22
**wilmer** 4:9
**wilmerhale** 24:22
**wired** 138:5
**withdraw** 146:3,7
**withdrawing**
  24:17
**withdrawn**
  143:21
**witness** 20:10
  23:1 25:5 26:5
  29:6,23 38:20
  39:7,20 40:2,16
  40:21,25 41:4,8
  41:15,17,21 42:8
  42:11,16,21 43:2
  43:5,7,11,14,18
  43:20 44:2 46:7
  48:6,8 51:4,7,12
  51:14,19 54:12,17
  56:1,18,23 61:10
  63:16,19 66:6
  72:17 91:17 92:12
  92:22,25 93:5,20

103:1,3 106:3
  132:16 139:7,16
  144:14 145:10,18
  145:20,24 146:2,7
  146:12,15,19,25
  146:25 148:13
  149:23 150:19
  151:7,25 152:15
  154:15
**witnesses** 3:3 15:7
  15:16 18:17 20:5
  22:25 25:6 30:1
  130:17 138:14
  149:23 150:19,22
  151:6,16,19,21
  152:18,24
**witness's** 20:11
**wolff** 4:16
**woman** 42:7
**wondering** 152:8
**word** 44:22 58:15
  83:18 121:5
  130:19 143:15
**work** 43:21 94:5
  94:11,15,23 95:5
  113:8 114:1
**working** 113:19
  151:12
**world** 32:3 33:21
  132:9,12
**worldwide** 140:25
**wouldn't** 28:5,21
  35:18,19 42:14
**write** 103:18
**written** 114:13,15
  114:19
**wrong** 42:17
  73:24 146:24
  147:6 150:24
**wrote** 88:5 104:1

| **x** | |
| --- | --- |
| **x** 1:4,10 | |

| **y** | |
| --- | --- |

**yeah** 38:7 42:19
  50:8 55:24 87:8
  88:8 92:17 96:10
  114:24 115:22
  122:12 138:23
  139:1 142:18
  147:20 148:15
  154:21
**year** 60:5 86:13
  86:20 91:9 137:15
**years** 16:9 30:17
  30:21 44:20 60:9
  60:13 65:16 73:9
  76:18 87:9 90:22
  104:7,7 119:15
  137:16
**yesterday** 15:15
  38:14,16 50:1
  151:4
**york** 1:2 3:9 4:19
  5:5,12,19 7:4
  139:8
**you'll** 26:9 28:20
  40:11
**you're** 21:3 29:12
  31:1 39:17 43:3
  142:1,19,19
**you've** 20:23
  30:15,23

| **z** | |
| --- | --- |

**z** 13:11
**zabel** 14:8
**zero** 88:19,23,24
  89:4,13 91:5,7,14
**zoom** 25:19
**zylberberg** 14:9