DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF FIFTEENTH PLAN SUPPLEMENT PURSUANT TO THE
EIGHTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on August 23, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3632] (as modified, amended or supplemented from time to time, the "**Plan**"). Capitalized terms used  but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021 the Debtors filed the solicitation version of the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 7, 2021, the Debtors filed the Notice of Filing of *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3121] (the "**Eighth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3187] (the "**Ninth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Tenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3232] (the "**Tenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 16, 2021, the Debtors filed the Notice of Filing of *Eleventh Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3246] (the "**Eleventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 19, 2021, the Debtors filed the Notice of Filing of *Twelfth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3283] (the "**Twelfth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 10, 2021, the Debtors filed the Notice of Filing of *Thirteenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3528] (the "**Thirteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 12, 2021, the Debtors filed the Notice of Filing of *Fourteenth Plan Supplement Pursuant to the Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3547] (the "**Fourteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Fifteenth Plan Supplement Pursuant to the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Fifteenth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, the Eighth Plan Supplement, the Ninth Plan Supplement, the Tenth Plan Supplement, the Eleventh Plan Supplement, the Twelfth Plan Supplement, the Thirteenth Plan Supplement and the Fourteenth Plan Supplement each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Fifteenth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

| | |
|---|---|
| **Exhibit S** | TAFT Agreement |
| **Exhibit S-1** | Redline of TAFT Agreement against the version filed with the Thirteenth Plan Supplement |
| **Exhibit T** | Tribe Opioid LLC Operating Agreement |

| | |
|---|---|
| **Exhibit T-1** | Redline of Tribe Opioid LLC Operating Agreement against the version filed with the Thirteenth Plan Supplement |
| **Exhibit DD** | Schedule of Excluded Parties |
| **Exhibit DD-1** | Redline of Schedule of Excluded Parties against the version filed with the Ninth Plan Supplement |

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

**PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise noted, the documents contained herein are in draft form and remain subject to continuing review and negotiation among the Debtors and interested parties with respect thereto and therefore remain subject to material change. The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement any document in the Plan Supplement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Fifteenth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  August 23, 2021
        New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ Eli J. Vonnegut*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

## **EXHIBIT S**

**TAFT Agreement**

**TRIBAL ABATEMENT FUND TRUST AGREEMENT**

**Dated as of [●], 2021**

***Pursuant to the Debtors' Eighth Amended Joint Chapter 11***
***Plan of Reorganization Dated August 23, 2021***

# TRIBAL ABATEMENT FUND TRUST

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 AGREEMENT OF TRUST** ...............................................................................2

    Section 1.1        Creation and Name..............................................................2
    Section 1.2        Purposes ............................................................................3
    Section 1.3        Transfer of Assets..............................................................4
    Section 1.4        Acceptance of Assets. ........................................................4
    Section 1.5        Tribe Beneficiaries ...........................................................5
    Section 1.6        Jurisdiction.. .....................................................................5

**ARTICLE 2 POWERS AND TRUST ADMINISTRATION**.......................................................5

    Section 2.1        Powers ..............................................................................5
    Section 2.2        General Administration.......................................................8
    Section 2.3        Accounting ........................................................................8
    Section 2.4        Financial Reporting............................................................8
    Section 2.5        Tribal Opioid Abatement Reporting ....................................9
    Section 2.6        Beneficiary Reporting. .......................................................9
    Section 2.7        Limitation of the Trustees' Authority ..................................9

**ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES** ................10

    Section 3.1        Accounts..........................................................................10
    Section 3.2        Investment Guidelines.......................................................10
    Section 3.3        Payment of TAFT Operating Expenses ...............................10

**ARTICLE 4 ABATEMENT DISTRIBUTIONS**.......................................................................10

    Section 4.1        Abatement Distributions ....................................................10
    Section 4.2        Manner of Payment of Abatement Distributions. .................11
    Section 4.3        Delivery of Abatement Distributions. ..................................11

**ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE**.......................................................12

    Section 5.1        Number of Trustees; Managing Trustee ...............................12
    Section 5.2        Term of Service, Successor Trustees. ...................................12
    Section 5.3        Trustee Meetings................................................................14
    Section 5.4        Compensation and Expenses of Trustees...............................15
    Section 5.5        Trustees' Independence......................................................15
    Section 5.6        Standard of Care; Exculpation. ...........................................15
    Section 5.7        Protective Provisions.........................................................16
    Section 5.8        Indemnification. ...............................................................17

i

Section 5.9        Bond ........................................................................................18
Section 5.10      Delaware Trustee. ....................................................................18
Section 5.11      Meeting Minutes; Rights of Inspection......................................20
Section 5.12      Trust Protector..........................................................................20

**ARTICLE 6 GENERAL PROVISIONS..............................................................22**

Section 6.1        Irrevocability ............................................................................22
Section 6.2        Term; Termination. ...................................................................22
Section 6.3        Taxes. .......................................................................................22
Section 6.4        Modification..............................................................................23
Section 6.5        Communications .......................................................................24
Section 6.6        Severability ..............................................................................24
Section 6.7        Notices. ....................................................................................24
Section 6.8        Successors and Assigns..............................................................25
Section 6.9        Limitation on Transferability; Tribe Beneficiaries' Interests .............25
Section 6.10      Exemption from Registration ....................................................25
Section 6.11      Entire Agreement; No Waiver ...................................................26
Section 6.12      Headings....................................................................................26
Section 6.13      Governing Law..........................................................................26
Section 6.14      Dispute Resolution ...................................................................26
Section 6.15      Sovereign Immunity..................................................................27
Section 6.16      Effectiveness ............................................................................27
Section 6.17      Counterpart Signatures..............................................................27

**EXHIBIT 1 TAFT ASSETS ...........................................................................2**

**EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE TRIBAL
ABATEMENT FUND TRUST ........................................................................3**

**EXHIBIT 3 INVESTMENT GUIDELINES .....................................................4**

**EXHIBIT 4 TRIBE TRUST DISTRIBUTION PROCEDURES .........................5**

# TRIBAL ABATEMENT FUND
# TRUST AGREEMENT

        This Tribal Abatement Fund Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [     ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated August 23, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the Tribal Abatement Fund Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"), and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

        **WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

        **WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

        **WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust,**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan;

        **WHEREAS**, pursuant to the Plan and the Confirmation Order, this Tribal Abatement Fund Trust ("**TAFT**") shall be established as a trust of the Tribe Trust to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest, (iii) receive and distribute the TopCo Interest to the Holders of Tribe Channeled Claims (and the Holders of Tribe Channeled Claims shall contribute such TopCo Interest to Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid**

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

LLC")),[3] (iv) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (v) administer Tribe Channeled Claims and (vi) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP and (vii) carry out such other matters as are set forth in the Tribe Trust Documents.[4]

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately after, any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, TAFT, for the Tribe Trust shall (i) hold, manage and invest all funds and other Assets received by TAFT from the Master Disbursement Trust; (ii) hold and maintain the TAFT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Tribe Channeled Claims in accordance with the Tribe TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors or otherwise in accordance with the Plan, (i) the TAFT Assets (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in TAFT free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person and (ii) TAFT shall distribute its TopCo Interest to the Tribe Beneficiaries and the Tribe Beneficiaries shall contribute such TopCo Interest to Tribe Opioid LLC.

**WHEREAS**, all rights of the Holders of Tribe Channeled Claims arising under this Trust Agreement and the Tribe TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that TAFT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Tribe Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as the "Tribal Abatement Fund Trust" or "TAFT," which is provided for and referred to in the

---

[3] An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement.

[4] The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein.

Plan. The Trustees may transact the business and affairs of TAFT in the name of TAFT. It is the intention of the parties hereto that TAFT created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement (collectively, the "**Trust Documents**") constitute the governing instruments of TAFT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

   **Section 1.2    Purposes**. The purposes of TAFT are, among other things, to:

   (a)   assume all liability for the Tribe Channeled Claims;

   (b)   receive and hold the MDT Tribe Interest;

   (c)    receive and distribute the TopCo Tribe Interest to the Tribe Beneficiaries;

   (d)   collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

   (e)   administer, process, resolve and liquidate Tribe Channeled Claims;

   (f)   qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations (as defined herein);

   (g)   make Abatement Distributions to Tribe Beneficiaries for Approved Tribal Opioid Abatement Uses, in each case in accordance with the Tribe TDP;

   (h)   hold, manage, protect and monetize the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries as defined herein;

   (i)   engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

   (j)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order; and

   (k)   use the TAFT Assets to:

      (i)    make Abatement Distributions to Tribe Beneficiaries in accordance with this Trust Agreement and the Tribe TDP;

      (ii)    hold and maintain reserves to pay the fees and expenses incurred with administering TAFT (including the Tribe TDP) and managing the Assets (together, the "**TAFT Operating Expenses**") of TAFT (such reserves, the "**TAFT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by TAFT in accordance with the Tribe Documents, the Plan and the Confirmation

3

                    Order and (b) held by TAFT in a segregated account and administered by the Trustees;

(iii)      pay the TAFT Operating Expenses from the TAFT Operating Reserve; and

(iv)      replenish periodically, until the dissolution of TAFT, the TAFT Operating Reserve from Cash held or received by TAFT to the extent deemed necessary by the Trustees to satisfy and pay estimated future TAFT Operating Expenses in accordance with the Governing Documents.

**Section 1.3    Transfer of Assets**. Pursuant to the Plan and the Restructuring Steps Memorandum, TAFT shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum), and (iii) the MDT Tribe Interest in accordance with Sections 4.5(a) of the Plan (the "**TAFT Assets**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The TAFT Assets shall be transferred free and clear of any all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to TAFT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the TAFT Assets to TAFT.

**Section 1.4    Acceptance of Assets**.

(a)      In furtherance of the purposes of TAFT, the Trustees, on behalf of TAFT, hereby expressly accept the transfer to TAFT of the TAFT Assets and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Trust Documents. TAFT shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the TAFT Assets and neither the Debtors nor any other person or entity transferring such TAFT Assets will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the TAFT Assets or TAFT.

(b)      In furtherance of the purposes of TAFT, TAFT expressly assumes all liabilities and responsibility for all Tribe Channeled Claims (except as set forth in the Plan) subject to the TAFT Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Tribe TDP, the Plan, or the Master TDP, TAFT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Tribe Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; <u>provided</u> that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party. For the avoidance of doubt, all Class 5 Tribe Claims asserted against Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the Tribe TDP.

(c)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, TAFT's assumption of all liability for Tribe Channeled Claims.

(d)     In this Trust Agreement and the Tribe TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5     Tribe Beneficiaries.

(a)     The beneficial owners (within the meaning of the Act) of TAFT are the holders of Tribe Channeled Claims identified on **Schedule C** of the **Tribe TDP** hereto (each a "**Tribe Beneficiary**" and collectively, the "**Tribe Beneficiaries**").

(b)     The Tribe Beneficiaries shall have only such rights with respect to TAFT and its assets as are set forth in the Tribe TDP and no greater or other rights, including upon dissolution, liquidation or winding up of TAFT, shall be deemed to apply to such Tribe Beneficiaries. The Tribe Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)     The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the Tribe TDP.

### Section 1.6     Jurisdiction. The Bankruptcy Court shall have continuing jurisdiction over TAFT; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT; provided further, that notwithstanding the foregoing, the Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by TAFT.

### ARTICLE 2
### POWERS AND TRUST ADMINISTRATION

### Section 2.1     Powers.

(a)     The Trustees are and shall act as fiduciaries to TAFT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer TAFT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of TAFT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the Tribe TDP, the Tribe TDP shall control. In the event of a conflict between the terms or provisions of the Plan, this Trust Agreement, or any other Trust Document, the terms of the Plan

shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

  (i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

  (ii)   invest the monies and other Trust Assets held from time to time by TAFT, subject to the limitations set forth in Section 3.2 below;

  (iii)  sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine, consistent with the other terms of the Trust Documents;

  (iv)   enter into leasing, financing or other agreements with third parties as deemed by the Trustees in their discretion to be useful in carrying out the purposes of TAFT;

  (v)    determine and pay liabilities of TAFT and the TAFT Operating Expenses;

  (vi)   establish accounts and reasonable reserves within TAFT, as deemed by the Trustees in their discretion to be necessary, prudent or useful in administering TAFT;

  (vii)  bring any action in any court of competent jurisdiction, including the Bankruptcy Court;

  (viii) initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of TAFT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Tribe Channeled Claims channeled to TAFT and for enforcing the rights of TAFT under the Plan and the Plan Documents;

  (ix)   supervise and administer TAFT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the Tribe TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses;

  (x)    appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such

6

legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)   pay reasonable compensation and expenses to any of TAFT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires;

(xii)   compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)   execute and deliver such instruments as the Trustees consider advisable or necessary in administering TAFT;

(xiv)   enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of TAFT; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)   in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvii)   make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of TAFT or the Tribe Trust any claim, right, action or cause of action of the Tribe Trust, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xviii)   contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for TAFT and the Tribe Beneficiaries as described in Section 6.5 herein (the

7

"**Tribal Opioid Abatement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Abatement Website**"); and

(xix)    exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)    The Trustees shall not have the power to cause TAFT to guarantee any debt of other Persons.

(e)    Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with TAFT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2    General Administration**. The Trustees shall act in accordance with the Trust Documents. TAFT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Abatement Portal (or by other means approved by the Trustees).

**Section 2.3    Accounting**. The fiscal year of TAFT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against TAFT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of TAFT, including, without limitation, the assets and liabilities of TAFT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of TAFT's affairs and satisfaction of all of TAFT's liabilities.

**Section 2.4    Financial Reporting**.

(a)    The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

### Section 2.5    Tribal Opioid Abatement Reporting.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**").[5] The Trustees shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[6]

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than TAFT.

### Section 2.6    Beneficiary Reporting.

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the Tribe TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Trustees). The Trustees may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Trustees, provided, such modified reporting regime is not inconsistent with TAFT's reporting obligations, as determined by the Trustees in their discretion. Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)    enable TAFT to satisfy the audited Annual Report requirements described in Section 2.4 above; and

(ii)    enable TAFT to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

### Section 2.7    Limitation of the Trustees' Authority. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets.

---

[5] The TAFT Tribal Opioid Abatement Report may be coordinated or combined with the Tribe LLC Tribal Opioid Abatement Report in the discretion of the Trustees.

[6] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (and related Portals) may be maintained and administered on a combined basis.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1    Accounts**.

(a)    The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of TAFT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or TAFT) or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to the Tribe Beneficiaries and the payment of TAFT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)    The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2    Investment Guidelines**. The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3    Payment of TAFT Operating Expenses**. All TAFT Operating Expenses shall be payable out of the TAFT Operating Reserve. None of the Trustees, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT Operating Expense or any other liability of TAFT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the Tribe TDP. Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 2 of the Tribe TDP.

10

**Section 4.2     Manner of Payment of Abatement Distributions**.

(a)     The Trustees shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees); provided, however, that the Trustees may shorten such notice period in their discretion.

(b)     Abatement Distributions shall be made in accordance with the percentage interests set forth on **Schedule C** of the **Tribe TDP**.

(c)     Abatement Distributions may be made by the Trustees or by a disbursement agent retained by TAFT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the Tribe TDP on the dates approved for distribution by the Trustees.

(d)     The Trustees may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Abatement Use Report.

(e)     If the Trustees determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of TAFT is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Trustees shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Trustees in their discretion.

**Section 4.3     Delivery of Abatement Distributions**.

(a)     All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the Tribe TDP. Changes to such electronic transfer information or address, as applicable, must be provided to TAFT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)     In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(d)      A Tribe Beneficiary may timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions.

**ARTICLE 5**
**TRUSTEES AND DELAWARE TRUSTEE**

**Section 5.1      Number of Trustees; Managing Trustee**.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)      **Managing Trustee**. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of TAFT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2      Term of Service, Successor Trustees**.

(a)      **Term**. Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of TAFT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)      **Appointment of Successor Trustees**.

    (i)      In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

    (ii)      In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two

12

(2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall recommend three (3) successor Trustees for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by TAFT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the Tribal Opioid Abatement Website when it is filed with the Bankruptcy Court.

(v)    In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    **Resignation or Removal**. A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to TAFT, any substantial failure to comply with the administration of TAFT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings**. The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings**. Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of TAFT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of TAFT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**. In all matters pertaining to the affairs of TAFT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**. Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice**. Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with TAFT records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees meeting to another time and place.

(g)    **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of

14

communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4    Compensation and Expenses of Trustees**. The Trustees shall receive compensation from TAFT for their services as Trustees.[7] TAFT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5    Trustees' Independence**.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than TAFT) or any Released Parties. Notwithstanding the foregoing, the Trustees shall also serve as the Managers (as defined in the Tribal Opioid Abatement Fund, LLC Operating Agreement, dated as of the date hereof, the "**Tribe Opioid LLC Operating Agreement**") of Tribe Opioid LLC. No Trustee shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.

(b)    The Trustees, and the Delaware Trustee, shall be indemnified by TAFT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with TAFT, the Trustees, and the Delaware Trustee with respect to the affairs of TAFT, shall have recourse only to the Trust Assets to satisfy any liability incurred by TAFT, the Trustees, or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6    Standard of Care; Exculpation**.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacity as Trust Indemnified Parties, or on behalf of TAFT, except those acts found by Final Order to be arising

---

[7] Trustee compensation TBD.

15

out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TAFT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to TAFT or the Tribe Beneficiaries, it is hereby understood and agreed by the parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)     TAFT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Trustees in their discretion.

### Section 5.7     Protective Provisions.

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)     In the event the Trustees retain counsel (including, at the expense of TAFT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to TAFT or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of TAFT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8    Indemnification**.

(a)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by TAFT shall be paid by TAFT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by TAFT.

(c)    The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity

for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**Section 5.9    Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**Section 5.10   Delaware Trustee**.

(a)      There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)      The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of TAFT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on TAFT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to TAFT or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the

18

Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of TAFT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below, provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of TAFT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT in accordance with Section 3810 of the Act.

(e)    Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)    The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between TAFT and the Delaware Trustee, which

19

compensation shall be paid by TAFT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of TAFT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)    The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of TAFT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of TAFT.

### Section 5.12    Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be Stacy Leeds.

(b)       Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; provided that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)       A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees shall petition the Delaware Court of Chancery to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by TAFT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the Delaware Court of Chancery as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)       The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)       The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)       The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)       The Trust Protector shall be entitled to:

    (i)     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

    (ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by TAFT; and

    (iii)   receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

21

**ARTICLE 6**
**GENERAL PROVISIONS**

**Section 6.1    Irrevocability**. To the fullest extent permitted by applicable law, TAFT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund TAFT, and (ii) have any rights or role with respect to the management or operation of TAFT, or the Trustees' administration of TAFT.

**Section 6.2    Term; Termination**.

(a)    The term for which TAFT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    TAFT shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of TAFT, wherein (i) all reasonably expected assets have been collected by TAFT, (ii) all Abatement Distributions have been made to the extent set forth in the Tribe TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining TAFT obligations and TAFT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of TAFT's affairs by the Trustees and payment of all of TAFT's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in TAFT shall be distributed to the Tribe Beneficiaries in accordance with the Tribe TDP, except as otherwise provided in Section 4.2(e). Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of TAFT, TAFT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of TAFT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**Section 6.3    Taxes**.

(a)    TAFT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Tribe TDP shall be construed or implemented in a manner that would cause TAFT to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(b)       The Managing Trustee shall be the "administrator" of TAFT within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by TAFT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of TAFT, and (ii) comply with all applicable tax reporting and withholding obligations.

(c)       Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of TAFT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of TAFT for all taxable periods through the dissolution of TAFT. The Trustees shall be responsible for causing TAFT to satisfy all requirements necessary to qualify and maintain qualification of TAFT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause TAFT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

### Section 6.4       Modification.

(a)       Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor correcting or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor correcting or clarifying amendments as necessary to enable the Trustees to effectuate this Trust Agreement. The Trustees shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) at the time of notice to the Bankruptcy Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period only in the event that a ten (10) day notice period would be materially adverse to TAFT and the Tribe Beneficiaries.

(b)       Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) TAFT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee, or (v) the Plan or the Confirmation Order.

**Section 6.5    Communications**. The Trustees shall establish and maintain the Tribal Opioid Abatement Portal (or other means of communication approved by the Trustees) so as to (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide each Tribe Beneficiary with access to its own secure electronic data folder.

**Section 6.6    Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7    Notices**.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:

To the Trust Protector:

with a copy (which shall not constitute notice) to:

To the Settlors' Representative:

24

with a copy (which shall not constitute notice) to:

(b)      All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of TAFT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their rights or obligations under this Trust Agreement except, in the case of the Trustees, as contemplated by Sections 2.1 and 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in TAFT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses (as defined in **Exhibit 4**) and/or common Tribal Abatement Strategies (as defined in **Schedule D** of **Exhibit 4**); (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of TAFT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of TAFT but only to the extent such cash assets are declared by the Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement; provided, however, this sentence shall not to apply to the rights expressly set forth in the Tribe Opioid LLC Operating Agreement.

**Section 6.10   Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in TAFT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11   Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12   Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13   Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 the Act shall not apply to the Trust.

**Section 6.14   Dispute Resolution**.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Tribe Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

26

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of TAFT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the parties hereto.

**Section 6.17   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

Kevin K. Washburn, as Trustee

Mary L. Smith, as Trustee

Kathy Hopinkah Hannan, as Trustee

[DELAWARE TRUSTEE]

Stacy Leeds, as Trust Protector

*[Signature Page to TAFT Agreement]*

**EXHIBIT 1**

**TAFT ASSETS**

- Initial Tribe Trust Distribution in the amount of $50,000,000.

- TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum).

- MDT Tribe Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**

      This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

TRIBAL ABATEMENT FUND TRUST

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

      IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>Name:<br>Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

**<u>In General</u>**. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in TAFT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of TAFT.

**EXHIBIT 4**

**TRIBE TRUST DISTRIBUTION PROCEDURES**

# **EXHIBIT S-1**

**Redline of TAFT Agreement**

**TRIBAL ABATEMENT FUND TRUST AGREEMENT**

**Dated as of [●], 2021**

***Pursuant to the Debtors' ~~Sixth~~Eighth Amended Joint
Chapter 11 Plan of Reorganization Dated ~~July 14~~August 23,
2021***

# TRIBAL ABATEMENT FUND TRUST

## TABLE OF CONTENTS

<u>**Page**</u>

**ARTICLE 1 AGREEMENT OF TRUST**   **2**

    Section 1.1     Creation and Name   2
    Section 1.2     Purposes   3
    Section 1.3     Transfer of Assets   4
    Section 1.4     Acceptance of Assets.   4
    Section 1.5     Tribe Beneficiaries   5
    Section 1.6     Jurisdiction..   5

**ARTICLE 2 POWERS AND TRUST ADMINISTRATION**   **5**

    Section 2.1     Powers   5
    Section 2.2     General Administration   8
    Section 2.3     Accounting   8
    Section 2.4     Financial Reporting   8
    Section 2.5     Tribal Opioid Abatement Reporting   9
    Section 2.6     Beneficiary Reporting.   9
    Section 2.7     Limitation of the Trustees' Authority   9

**ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES**   **10**

    Section 3.1     Accounts.   10
    Section 3.2     Investment Guidelines.   10
    Section 3.3     Payment of TAFT Operating Expenses   10

**ARTICLE 4 ABATEMENT DISTRIBUTIONS**   **10**

    Section 4.1     Abatement Distributions   10
    Section 4.2     Manner of Payment of Abatement Distributions.   11
    Section 4.3     Delivery of Abatement Distributions.   11

**ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE**   **12**

    Section 5.1     Number of Trustees; Managing Trustee   12
    Section 5.2     Term of Service, Successor Trustees.   12
    Section 5.3     Trustee Meetings.   ~~13~~14
    Section 5.4     Compensation and Expenses of Trustees   15
    Section 5.5     Trustees' Independence   15
    Section 5.6     Standard of Care; Exculpation.   15
    Section 5.7     Protective Provisions.   16
    Section 5.8     Indemnification.   17

Section 5.9        Bond................................................................................18
Section 5.10       Delaware Trustee..............................................................18
Section 5.11       Meeting Minutes; Rights of Inspection.........................20
Section 5.12       Trust Protector.................................................................20

**ARTICLE 6 GENERAL PROVISIONS**................................................**2122**

Section 6.1        Irrevocability...................................................................**2122**
Section 6.2        Term; Termination...........................................................22
Section 6.3        Taxes.................................................................................22
Section 6.4        Modification.....................................................................23
Section 6.5        Communications..............................................................**2324**
Section 6.6        Severability......................................................................24
Section 6.7        Notices..............................................................................24
Section 6.8        Successors and Assigns...................................................25
Section 6.9        Limitation on Transferability; Tribe Beneficiaries' Interests........25
Section 6.10       Exemption from Registration..........................................25
Section 6.11       Entire Agreement; No Waiver.......................................**2526**
Section 6.12       Headings...........................................................................26
Section 6.13       Governing Law.................................................................26
Section 6.14       Dispute Resolution...........................................................26
Section 6.15       Sovereign Immunity.........................................................27
Section 6.16       Effectiveness....................................................................27
Section 6.17       Counterpart Signatures....................................................27

**EXHIBIT 1 TAFT ASSETS**.....................................................................**2**

**EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**.....................................................................**3**

**EXHIBIT 3  INVESTMENT GUIDELINES**...........................................**4**

**EXHIBIT 4  TRIBE TRUST DISTRIBUTION PROCEDURES**...........**5**

# TRIBAL ABATEMENT FUND
# TRUST AGREEMENT

This Tribal Abatement Fund Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [    ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' ~~Sixth~~Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated ~~July 14~~August 23, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the Tribal Abatement Fund Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"), and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**," consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Tribal Abatement Fund Trust ("**TAFT**") shall be established as a trust of the Tribe Trust to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest, (iii) receive and distribute the TopCo Interest to the Holders of Tribe Channeled Claims (and the Holders of Tribe Channeled

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

Claims shall contribute such TopCo Interest to Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**")),[3] (iv) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (v) administer Tribe Channeled Claims and (vi) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP and (vii) carry out such other matters as are set forth in the Tribe Trust Documents.[4]

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately after, any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, TAFT, for the Tribe Trust shall (i) hold, manage and invest all funds and other Assets received by TAFT from the Master Disbursement Trust; (ii) hold and maintain the TAFT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Tribe Channeled Claims in accordance with the Tribe TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors or otherwise in accordance with the Plan, (i) the TAFT Assets (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in TAFT free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person and (ii) TAFT shall distribute its TopCo Interest to the Tribe Beneficiaries and the Tribe Beneficiaries shall contribute such TopCo Interest to Tribe Opioid LLC.

**WHEREAS**, all rights of the Holders of Tribe Channeled Claims arising under this Trust Agreement and the Tribe TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that TAFT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Tribe Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as the "Tribal Abatement Fund Trust" or "TAFT," which is provided for and referred to in the

---

[3] An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement.

[4] The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein.

Plan. The Trustees may transact the business and affairs of TAFT in the name of TAFT. It is the intention of the parties hereto that TAFT created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement (collectively, the "**Trust Documents**") constitute the governing instruments of TAFT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

   **Section 1.2  Purposes**. The purposes of TAFT are, among other things, to:

   (a) assume all liability for the Tribe Channeled Claims;

   (b) receive and hold the MDT Tribe Interest;

   (c) receive and distribute the TopCo Tribe Interest to the Tribe Beneficiaries;

   (d) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

   (e) administer, process, resolve and liquidate Tribe Channeled Claims;

   (f) qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations (as defined herein);

   (g) make Abatement Distributions to Tribe Beneficiaries for Approved Tribal Opioid Abatement Uses, in each case in accordance with the Tribe TDP;

   (h) hold, manage, protect and monetize the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries as defined herein;

   (i) engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

   (j) to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order; and

   (k) use the TAFT Assets to:

     (i) make Abatement Distributions to Tribe Beneficiaries in accordance with this Trust Agreement and the Tribe TDP;

     (ii) hold and maintain reserves to pay the fees and expenses incurred with administering TAFT (including the Tribe TDP) and managing the Assets (together, the "**TAFT Operating Expenses**") of TAFT (such reserves, the "**TAFT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by TAFT in accordance with the Tribe Documents, the Plan and the

Confirmation Order and (b) held by TAFT in a segregated account and administered by the Trustees;

(iii)    pay the TAFT Operating Expenses from the TAFT Operating Reserve; and

(iv)    replenish periodically, until the dissolution of TAFT, the TAFT Operating Reserve from Cash held or received by TAFT to the extent deemed necessary by the Trustees to satisfy and pay estimated future TAFT Operating Expenses in accordance with the Governing Documents.

**Section 1.3    Transfer of Assets**. Pursuant to the Plan and the Restructuring Steps Memorandum, TAFT shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum), and (iii) the MDT Tribe Interest in accordance with Sections 4.5(a) of the Plan (the "**TAFT Assets**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The TAFT Assets shall be transferred free and clear of any all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to TAFT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the TAFT Assets to TAFT.

**Section 1.4    Acceptance of Assets**.

(a)    In furtherance of the purposes of TAFT, the Trustees, on behalf of TAFT, hereby expressly accept the transfer to TAFT of the TAFT Assets and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Trust Documents. TAFT shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the TAFT Assets and neither the Debtors nor any other person or entity transferring such TAFT Assets will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the TAFT Assets or TAFT.

(b)    In furtherance of the purposes of TAFT, TAFT expressly assumes all liabilities and responsibility for all Tribe Channeled Claims (except as set forth in the Plan) subject to the TAFT Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Tribe TDP, the Plan, or the Master TDP, TAFT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Tribe Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party. For the avoidance of doubt, all Class 5 Tribe Claims asserted against Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the Tribe TDP.

4

(c)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, TAFT's assumption of all liability for Tribe Channeled Claims.

(d)     In this Trust Agreement and the Tribe TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5    Tribe Beneficiaries.

(a)     The beneficial owners (within the meaning of the Act) of TAFT are the holders of Tribe Channeled Claims identified on **Schedule C** of the **Tribe TDP** hereto (each a "**Tribe Beneficiary**" and collectively, the "**Tribe Beneficiaries**").

(b)     The Tribe Beneficiaries shall have only such rights with respect to TAFT and its assets as are set forth in the Tribe TDP and no greater or other rights, including upon dissolution, liquidation or winding up of TAFT, shall be deemed to apply to such Tribe Beneficiaries. The Tribe Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)     The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the Tribe TDP.

### Section 1.6    Jurisdiction. The Bankruptcy Court shall have continuing jurisdiction over TAFT; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT; provided further, that notwithstanding the foregoing, the Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by TAFT.

### ARTICLE 2
### POWERS AND TRUST ADMINISTRATION

### Section 2.1    Powers.

(a)     The Trustees are and shall act as fiduciaries to TAFT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer TAFT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of TAFT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement

or the Tribe TDP, the Tribe TDP shall control. In the event of a conflict between the terms or provisions of the Plan, this Trust Agreement, or any other Trust Document, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

> (i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

> (ii)    invest the monies and other Trust Assets held from time to time by TAFT, subject to the limitations set forth in Section 3.2 below;

> (iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine, consistent with the other terms of the Trust Documents;

> (iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees in their discretion to be useful in carrying out the purposes of TAFT;

> (v)    determine and pay liabilities of TAFT and the TAFT Operating Expenses;

> (vi)    establish accounts and reasonable reserves within TAFT, as deemed by the Trustees in their discretion to be necessary, prudent or useful in administering TAFT;

> (vii)    bring any action in any court of competent jurisdiction, including the Bankruptcy Court;

> (viii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of TAFT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Tribe Channeled Claims channeled to TAFT and for enforcing the rights of TAFT under the Plan and the Plan Documents;

> (ix)    supervise and administer TAFT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution

recipients' compliance with the Tribe TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses;

(x)     appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of TAFT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires;

(xii)   compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)  execute and deliver such instruments as the Trustees consider advisable or necessary in administering TAFT;

(xiv)   enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of TAFT; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvii)  make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of TAFT or the

7

Tribe Trust any claim, right, action or cause of action of the Tribe Trust, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xviii)    contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for TAFT and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Abatement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Abatement Website**"); and

(xix)    exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)    The Trustees shall not have the power to cause TAFT to guarantee any debt of other Persons.

(e)    Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with TAFT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2    General Administration**. The Trustees shall act in accordance with the Trust Documents. TAFT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Abatement Portal (or by other means approved by the Trustees).

**Section 2.3    Accounting**. The fiscal year of TAFT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against TAFT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of TAFT, including, without limitation, the assets and liabilities of TAFT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of TAFT's affairs and satisfaction of all of TAFT's liabilities.

**Section 2.4    Financial Reporting**.

(a)    The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

**Section 2.5    Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**").[5] The Trustees shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[6]

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than TAFT.

**Section 2.6    Beneficiary Reporting.**

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the Tribe TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Trustees). The Trustees may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Trustees, provided, such modified reporting regime is not inconsistent with TAFT's reporting obligations, as determined by the Trustees in their discretion. Each Beneficiary Abatement Use Report shall contain the information necessary to:

---

[5] The TAFT Tribal Opioid Abatement Report may be coordinated or combined with the Tribe LLC Tribal Opioid Abatement Report in the discretion of the Trustees.

[6] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (and related Portals) may be maintained and administered on a combined basis.

9

      (i)        enable TAFT to satisfy the audited Annual Report requirements described in Section 2.4 above; and

      (ii)       enable TAFT to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

**Section 2.7     Limitation of the Trustees' Authority**. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets.

# ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1     Accounts**.

(a)     The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of TAFT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or TAFT) or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to the Tribe Beneficiaries and the payment of TAFT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2     Investment Guidelines**. The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3     Payment of TAFT Operating Expenses**. All TAFT Operating Expenses shall be payable out of the TAFT Operating Reserve. None of the Trustees, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, nor any of their employees, officers,

consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT Operating Expense or any other liability of TAFT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the Tribe TDP. Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 2 of the Tribe TDP.

**Section 4.2    Manner of Payment of Abatement Distributions**.

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees); provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with the percentage interests set forth on **Schedule C** of the **Tribe TDP**.

(c)    Abatement Distributions may be made by the Trustees or by a disbursement agent retained by TAFT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the Tribe TDP on the dates approved for distribution by the Trustees.

(d)    The Trustees may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Abatement Use Report.

(e)    If the Trustees determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of TAFT is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Trustees shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Trustees in their discretion.

**Section 4.3    Delivery of Abatement Distributions**.

(a)    All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the Tribe TDP. Changes to such electronic transfer information or address, as applicable, must be provided to TAFT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Trustees and Disbursement Agent shall have the authority, in their

11

discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)      In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(d)      A Tribe Beneficiary may timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions.

## ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

**Section 5.1      Number of Trustees; Managing Trustee**.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)      **Managing Trustee**. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of TAFT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2      Term of Service, Successor Trustees**.

(a)      **Term**. Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of TAFT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)      **Appointment of Successor Trustees**.

(i)      In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the

12

remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)     In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall recommend three (3) successor Trustees for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by TAFT.

(iv)     Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the Tribal Opioid Abatement Website when it is filed with the Bankruptcy Court.

(v)      In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)     Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)     **Resignation or Removal**. A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident,

13

physical deterioration, mental incompetence or for other good cause, <u>provided</u> such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to TAFT, any substantial failure to comply with the administration of TAFT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings**. The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings**. Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of TAFT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of TAFT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**. In all matters pertaining to the affairs of TAFT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**. Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice**. Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with TAFT records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction

14

of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)     **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees meeting to another time and place.

(g)     **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4     Compensation and Expenses of Trustees**. The Trustees shall receive compensation from TAFT for their services as Trustees.[7] TAFT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5     Trustees' Independence**.

(a)     The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than TAFT) or any Released Parties. Notwithstanding the foregoing, the Trustees shall also serve as the Managers (as defined in the Tribal Opioid Abatement Fund, LLC Operating Agreement, dated as of the date hereof, the "**Tribe Opioid LLC Operating Agreement**") of Tribe Opioid LLC. No Trustee shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.

(b)     The Trustees, and the Delaware Trustee, shall be indemnified by TAFT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)     Persons dealing with TAFT, the Trustees, and the Delaware Trustee with respect to the affairs of TAFT, shall have recourse only to the Trust Assets to satisfy any liability incurred by TAFT, the Trustees, or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the Tribe

---

[7] Trustee compensation TBD.

Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6    Standard of Care; Exculpation**.

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacity as Trust Indemnified Parties, or on behalf of TAFT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the TAFT Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to TAFT or the Tribe Beneficiaries, it is hereby understood and agreed by the parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)    TAFT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Trustees in their discretion.

**Section 5.7    Protective Provisions**.

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)    In the event the Trustees retain counsel (including, at the expense of TAFT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective

rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)    To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to TAFT or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of TAFT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8    Indemnification**.

(a)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the NAS Monitoring Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or

proceeding, whether civil, administrative or arbitrative, from which they are indemnified by TAFT shall be paid by TAFT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by TAFT.

(c)    The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**Section 5.9    Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**Section 5.10    Delaware Trustee**.

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of TAFT for the sole and limited purpose of fulfilling the

requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on TAFT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to TAFT or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of TAFT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below, provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of TAFT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following

compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between TAFT and the Delaware Trustee, which compensation shall be paid by TAFT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of TAFT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or

20

governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of TAFT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of TAFT.

### Section 5.12    Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].⁸Stacy Leeds.

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; provided that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)    A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for any reason, the Trustees may, upon unanimous consent of the Trustees then serving, appoint a new Trust Protector. If the Trustees do not appoint a new Trust Protector within thirty (30) days, then the Trustees shall petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by TAFT; provided, however, that if there are no Trustees serving at the time of the Trust Protector vacancy, then the Delaware Trustee shall petition the [Delaware Court of Chancery] as provided above. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)    The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)    The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into

---

⁸ TBD

or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)     The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)     The Trust Protector shall be entitled to:

(i)     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)     retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by TAFT; and

(iii)     receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1     Irrevocability**. To the fullest extent permitted by applicable law, TAFT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund TAFT, and (ii) have any rights or role with respect to the management or operation of TAFT, or the Trustees' administration of TAFT.

**Section 6.2     Term; Termination**.

(a)     The term for which TAFT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     TAFT shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of TAFT, wherein (i) all reasonably expected assets have been collected by TAFT, (ii) all Abatement Distributions have been made to the extent set forth in the Tribe TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining TAFT obligations and TAFT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of TAFT's affairs by the Trustees and payment of all of TAFT's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in TAFT shall be distributed to the Tribe Beneficiaries in accordance with the Tribe TDP, except as otherwise provided in Section 4.2(e). Notwithstanding any contrary provision of

the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of TAFT, TAFT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of TAFT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

### Section 6.3     Taxes.

(a)     TAFT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Tribe TDP shall be construed or implemented in a manner that would cause TAFT to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(b)     The Managing Trustee shall be the "administrator" of TAFT within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by TAFT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of TAFT, and (ii) comply with all applicable tax reporting and withholding obligations.

(c)     Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of TAFT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of TAFT for all taxable periods through the dissolution of TAFT. The Trustees shall be responsible for causing TAFT to satisfy all requirements necessary to qualify and maintain qualification of TAFT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause TAFT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

### Section 6.4     Modification.

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor correcting or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of

this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor correcting or clarifying amendments as necessary to enable the Trustees to effectuate this Trust Agreement. The Trustees shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) at the time of notice to the Bankruptcy Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period only in the event that a ten (10) day notice period would be materially adverse to TAFT and the Tribe Beneficiaries.

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) TAFT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee, or (v) the Plan or the Confirmation Order.

Section 6.5    **Communications**. The Trustees shall establish and maintain the Tribal Opioid Abatement Portal (or other means of communication approved by the Trustees) so as to (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide each Tribe Beneficiary with access to its own secure electronic data folder.

Section 6.6    **Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 6.7    **Notices**.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:

To the Trust Protector:

with a copy (which shall not constitute notice) to:

To the Settlors' Representative:

with a copy (which shall not constitute notice) to:

(b)    All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of TAFT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their rights or obligations under this Trust Agreement except, in the case of the Trustees, as contemplated by Sections 2.1 and 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in TAFT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses (as defined in **Exhibit 4**) and/or common Tribal Abatement Strategies (as defined in **Schedule D** of **Exhibit 4**); (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of TAFT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Trustee, whether by

petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of TAFT but only to the extent such cash assets are declared by the Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement; provided, however, this sentence shall not to apply to the rights expressly set forth in the Tribe Opioid LLC Operating Agreement.

**Section 6.10    Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in TAFT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11    Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of

fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 the Act shall not apply to the Trust.

### Section 6.14    Dispute Resolution.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Tribe Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of TAFT. Each counterparty shall respond to the motion within the time period allowed by the rules the

27

court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

**Section 6.16   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the parties hereto.

**Section 6.17   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

Kevin K. Washburn, as Trustee

[TRUSTEE]

Mary L. Smith, as Trustee

[TRUSTEE]

Kathy Hopinkah Hannan, as Trustee

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]Stacy Leeds, as Trust Protector

*[Signature Page to TAFT Agreement]*

**EXHIBIT 1**

**TAFT ASSETS**

- Initial Tribe Trust Distribution in the amount of $50,000,000.

- TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum).

- MDT Tribe Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**

      This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

    1.  <u>Name</u>. The name of the statutory trust formed hereby is:

TRIBAL ABATEMENT FUND TRUST

    2.  <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

    3.  <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

      IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br><br>in his/her capacity as Trustee and not individually. | |
| _____<br><br>in his/her capacity as Trustee and not individually. | By: _____<br>    Name:<br>    Title: |
| _____<br><br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)     a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

(ii) The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in TAFT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of TAFT.

**EXHIBIT 4**

**TRIBE TRUST DISTRIBUTION PROCEDURES**

## <u>EXHIBIT T</u>

**Tribe Opioid LLC Operating Agreement**

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' Eighth Amended Joint Chapter 11
Plan of Reorganization Dated August 23, 2021*

# TABLE OF CONTENTS

**Page**

**ARTICLE I**    CERTAIN DEFINITIONS ....................................................2

    1.1    **Definitions**.................................................................2
    1.2    **Interpretation.**............................................................5

**ARTICLE II**    ORGANIZATIONAL MATTERS ........................................5

    2.1    **Formation** ..................................................................5
    2.2    **The Certificate** ...........................................................5
    2.3    **Name**.........................................................................5
    2.4    **Purpose**......................................................................5
    2.5    **Principal Office; Registered Office** ...............................6
    2.6    **Term** .........................................................................7
    2.7    **No State-Law Partnership** ............................................7

**ARTICLE III** BOARD OF MANAGERS; REPORTING.........................7

    3.1    **Management by the Board of Managers.** ........................7
    3.2    **Composition and Actions of the Board of Managers**........8
    3.3    **Board Meetings and Actions by Written Consent.** ...........8

**ARTICLE IV** LLC INTERESTS; CAPITAL ACCOUNTS.......................10

    4.1    **Interest Holders.**........................................................10
    4.2    **Capital Accounts** .......................................................10
    4.3    **Capital Contributions** ................................................10
    4.4    **Negative Capital Accounts** .........................................10
    4.5    **No Withdrawal** ..........................................................10

**ARTICLE V** ALLOCATIONS; DISTRIBUTIONS ...............................11

    5.1    **Allocations of Profits and Losses** ...............................11
    5.2    **Tax Elections** ............................................................11
    5.3    **Opioid Abatement Uses** .............................................11
    5.4    **Distributions.** ............................................................11

**ARTICLE VI** TRANSFER OF LLC INTERESTS.................................12

    6.1    **No Transfers by Interest Holders** ................................12

**ARTICLE VII** GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS ........12

    7.1    **Limitation of Liability.** ...............................................12
    7.2    **Lack of Authority**.......................................................13
    7.3    **No Right of Partition** .................................................13

**ARTICLE VIII** EXCULPATION AND INDEMNIFICATION ...............................13

    8.1    **Standard of Care; Exculpation.**..................................13
    8.2    **Liabilities and Duties of Covered Persons** ...................13
    8.3    **Indemnification.** ........................................................14

**ARTICLE IX** BOOKS, RECORDS, ACCOUNTING AND REPORTS ....................................15

    **9.1**     **Records and Accounting**.................................................................................15
    **9.2**     **Fiscal Year** ........................................................................................................16
    **9.3**     **Reports** ..............................................................................................................16
    **9.4**     **Financial Reporting.**.........................................................................................16
    **9.5**     **Tribal Opioid Abatement Reporting**..............................................................16
    **9.6**     **Interest Holder Reporting.**...............................................................................17
    **9.7**     **Portal and Website** ...........................................................................................17

**ARTICLE X** TAXES .................................................................................................................17

    **10.1**    **Tax Returns** ......................................................................................................17
    **10.2**    **Partnership Treatment; Tax Elections** .........................................................17
    **10.3**    **Partnership Representative**............................................................................17

**ARTICLE XI** DISSOLUTION AND LIQUIDATION.............................................................18

    **11.1**    **Dissolution** ........................................................................................................18
    **11.2**    **Liquidation and Termination** .........................................................................18
    **11.3**    **Cancellation of Certificate** .............................................................................18
    **11.4**    **Reasonable Time for Winding Up** ..................................................................18

**ARTICLE XII** GENERAL PROVISIONS ...............................................................................19

    **12.1**    **Amendments.**.....................................................................................................19
    **12.2**    **Remedies Cumulative** ......................................................................................19
    **12.3**    **Successors and Assigns** ....................................................................................19
    **12.4**    **Severability** ......................................................................................................19
    **12.5**    **Applicable Law** ................................................................................................20
    **12.6**    **Consent to Jurisdiction** ...................................................................................20
    **12.7**    **Sovereign Immunity.**........................................................................................20
    **12.8**    **Communications** ..............................................................................................20
    **12.9**    **Addresses and Notices** .....................................................................................20
    **12.10**   **Creditors** ...........................................................................................................20
    **12.11**   **Waiver** ...............................................................................................................21
    **12.12**   **Further Action** .................................................................................................21
    **12.13**   **Entire Agreement**............................................................................................21
    **12.14**   **Delivery by Electronic Transmission** ...........................................................21

## TRIBAL OPIOID ABATEMENT FUND, LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of Tribal Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2021 and entered into by and among the managers identified on the signature pages hereto (each, a "**Manager**" and, collectively, the "**Managers**" or the "**Board**"), implements certain of the terms of the *Debtors' Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated August 23, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**"). Pursuant to the Confirmation Order, each Tribe and Tribal Organization listed on Schedule C of the LLC Distribution Procedures (as defined herein) is deemed to accept membership in, and is hereby admitted to, the Company as a "member" of the Company within the meaning of the Delaware Act (each Tribe hereafter an "**Interest Holder**" and all Tribes collectively, the "**Interest Holders**"). Terms used in this Agreement and not otherwise defined in the Plan shall have the meanings set forth in Article I of this Agreement.

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Company shall be established as a limited liability company to (i) receive and hold the TopCo Tribe Interest contributed by the Interest Holders in accordance with the Restructuring Steps Memorandum and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

collect any Public Creditor Trust Distributions received by the Company in accordance with the Public Entity Settlements and (ii) make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures and (iii) carry out such other matters as are set forth in this Agreement.

**WHEREAS**, This Agreement sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE I**

**CERTAIN DEFINITIONS**

1.1    **Definitions**

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this Article I shall have the meanings set forth in the Plan:

**"Affiliate"** of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

**"Agreement"** has the meaning set forth in the introductory paragraph hereto.

**"Annual Report"** has the meaning set forth in Section 9.1.

**"Approved Tribal Opioid Abatement Uses"** has the meaning set forth in the LLC Distribution Procedures.

**"Bankruptcy Court"** has the meaning set forth in the introductory paragraph hereto.

**"Board"** means the Board of Managers established pursuant to Section 3.2.

**"Capital Account"** means the capital account maintained for an Interest Holder pursuant to Section 4.2.

**"Certificate"** means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

"**Chairman**" has the meaning set forth in <u>Section 3.3(h)</u>.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Board's discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; <u>provided, however</u>, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Interest Holder).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in <u>Section 9.4(a)</u>.

"**Company Assets**" are those assets set forth on **Exhibit 1** hereto.

"**Covered Person**" has the meaning set forth in <u>Section 8.1(a)</u>.

"**Damages**" has the meaning set forth in <u>Section 8.3(a)</u>.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disbursement Agent**" has the meaning set forth in <u>Section 5.4(d)</u>.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to <u>Section 9.2</u>.

"**Governing Documents**" has the meaning set forth in <u>Section 2.4</u>.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereof.

"**Interest Holder Abatement Use Report**" has the meaning set forth in <u>Section 9.6(a)</u>.

"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Interest Holders and the Approved Tribal Opioid Abatement Uses for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as <u>Exhibit 4</u> to this Agreement.

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined

in the Delaware Act), the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit.

"**Manager**" means a current manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"**Officer**" has the meaning set forth in Section 3.1(b).

"**Partnership Representative**" has the meaning set forth in Section 10.3.

"**Percentage Interest**" means, with respect to any Interest Holder as of any particular time, the percentage interest assigned to that Interest Holder on Schedule C of the LLC Distribution Procedures as its interest in Abatement Distributions and any other distribution made by the Company and the Profits and Losses of the Company. The sum of all Percentage Interests shall at all times equal 100%.

"**Profits**" or "**Losses**" for each fiscal year of the Company shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**TAFT**" means the Tribal Abatement Fund Trust.

"**TAFT Agreement**" means the TAFT Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

"**Tribal Abatement Strategies**" has the meaning set forth in the LLC Distribution Procedures.

"**Tribal Organization**" means Tribal Organization as defined in 25 U.S.C. § 5304(l).

"**Tribal Opioid Abatement Portal**" has the meaning set forth in Section 9.7.

"**Tribal Opioid Abatement Report**" has the meaning set forth in Section 9.5.

"**Tribal Opioid Abatement Website**" has the meaning set forth in <u>Section 9.7</u>.

**1.2**    <u>**Interpretation.**</u>

(a)    The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c)    A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(d)    The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e)    The word "or" shall be disjunctive but not exclusive.

(f)    All references to prices, values or monetary amounts refer to United States dollars.

## ARTICLE II

## <u>ORGANIZATIONAL MATTERS</u>

**2.1**    <u>**Formation.**</u>  The Company has been organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**2.2**    <u>**The Certificate**</u>.  The Certificate was filed with the Secretary of State of the State of Delaware on [●], 2021. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.3**    <u>**Name.**</u>  The name of the Company shall be "Tribal Opioid Abatement Fund, LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.4**    <u>**Purpose.**</u>  The purposes of the Company shall be to:

(a)   receive and hold the TopCo Tribe Interest and collect any distributions received by the Company in accordance with the Public Entity Settlements;

(b)   make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures;

(c)   use the Company Assets to:

> (i)   make Abatement Distributions to Tribes in accordance with this Agreement and the LLC Distribution Procedures;
>
> (ii)   hold and maintain reserves to pay the fees and expenses incurred with administering the Company (including the LLC Distribution Procedures) and managing the Assets (together, the "**Company Operating Expenses**") of the Company (such reserves, the "**Company Operating Reserve**"), which shall be funded with Cash and cash equivalents held by the Company in accordance with the Governing Documents, as defined herein and (b) held by the Company in a segregated account and administered by the Board;
>
> (iii)   pay the Company Operating Expenses from the Company Operating Reserve; and
>
> (iv)   replenish periodically, until the dissolution of the Company, the Company Operating Reserve from Cash held or received by the Company to the extent deemed necessary by the Managers to satisfy and pay estimated future Company Operating Expenses in accordance with the Governing Documents.

(d)   to engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

(e)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets (as set forth on **Exhibit 1** hereto) in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

**2.5**   **Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be

the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.6**     **Term.** The term of the Company commenced upon the Effective Date; provided that the Certificate was filed in accordance with the Delaware Act. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

**2.7**     **No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including, but not limited to, a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise. The Interest Holders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

### 3.1     Management by the Board of Managers.

(a)     Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act, in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Delaware Act. In the event of any ambiguity or conflict between the terms of this Agreement or the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement, the LLC Distribution Procedures shall control. In the event of a conflict between the terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     Officers. Subject to direction of the Managers, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Managers. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Managers. The Officers shall hold office until their successors are appointed by the Managers, unless the Managers specify otherwise.

Any Officer appointed by the Managers may be removed by the Managers at any time and any vacancy occurring in any office of the Company may be filled by the Managers, in their discretion.

### 3.2    Composition and Actions of the Board of Managers.

(a)    Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of the TAFT.

(b)    Term. The Managers shall have the same term as the trustees of the TAFT.

(c)    Resignation or Removal. The resignation or removal of any Manager shall be consistent with the resignation or removal of any trustee of the TAFT, which shall be in accordance with the provisions of the TAFT Agreement.

(d)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive reasonable compensation from the Company for their services as Managers.[3] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers incurred in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts paid to the Managers for compensation and reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)    Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

### 3.3    Board Meetings and Actions by Written Consent.

(a)    Regular Meetings. The Board shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Board.

(b)    Special Meetings. Special meetings of the Board may be called by any Manager by giving written notice to each other Managers not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice

---

[3] Compensation of Managers TBD.

shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)     <u>Action and Quorum</u>. In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in <u>Section 3.3(f)</u>.

(d)     <u>Participation in Meetings by Telephone Conference</u>. Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this <u>Section 3.3(d)</u> shall constitute presence in person at such meeting.

(e)     <u>Waiver of Notice</u>. Notice of a meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(f)     <u>Adjournment</u>. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g)     <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Board.

(h)     <u>Chairman</u>. At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time as circumstances warrant. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

# ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1**    **Interest Holders.**

(a)    <u>Admission of Interest Holders</u>. The Interest Holders are those Tribes and Tribal Organizations identified on Schedule C of the LLC Distribution Procedures holding a Tribe Channeled Claim.

(b)    <u>Interest Holder Information</u>. The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Abatement Distributions in accordance with their Percentage Interests. Each Interest Holder's name and Percentage Interest are set forth on Schedule C of the LLC Distribution Procedures. Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Abatement Distributions of the Company, shall be based upon its LLC Interests and Percentage Interests. An Interest Holder's LLC Interest (which shall be based on such Interest Holder's Percentage Interest) and Percentage Interest shall determine such Interest Holder's allocation of Profits and Losses and Abatement Distributions of cash as set forth in <u>Article V</u>. All LLC Interests shall be uncertificated.

(c)    <u>Limited Voting Rights</u>. The Interest Holders shall have such voting rights with respect to the management of the Company as may be required by non-waivable provisions of applicable law, in which case any such action shall be approved by the (i) the majority of the Percentage Interests plus (ii) the majority of Interest Holders voting upon such action.

**4.2**    **Capital Accounts**. A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to <u>Article V</u> to have substantial economic effect under the Treasury Regulations.

**4.3**    **Capital Contributions**. Consistent with Sections 4.5(a) and 5.5(a) of the Plan, on the Effective Date, each Interest Holder shall be credited with the capital contribution of a percentage of equity interests in TopCo as set forth on **Exhibit 3** hereto. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4**    **Negative Capital Accounts**. No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5**    **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Abatement Distribution from the Company, except as expressly provided herein.

# ARTICLE V

## ALLOCATIONS; DISTRIBUTIONS

**5.1    Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period, in accordance with the Interest Holders' Percentage Interests.

**5.2    Tax Elections**. Except as otherwise provided in this Agreement, all elections required or permitted to be made by the Company under any applicable tax law shall be made by the Board.

**5.3    Opioid Abatement Uses**. The Interest Holders hereby acknowledge and agree about the need and value in developing a comprehensive abatement strategy to address the opioid crisis and, to that end, shall apply all Abatement Distributions received from the Company for the Approved Tribal Opioid Abatement Uses.

**5.4    Distributions**.

(a)    The Managers shall make Abatement Distributions to the Interest Holders only as, and to the extent set forth in this Section 5.4 and the LLC Distribution Procedures. Abatement Distributions shall be used by the Interest Holders as described in Section 2 of the LLC Distribution Procedures.

(b)    The Company shall endeavor to notify the Interest Holders of the intended Abatement Distribution date through the Tribal Opioid Abatement Portal (or by any other means determined appropriate by the Managers) not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

(c)    Abatement Distributions shall be made to the Interest Holders in accordance with their Percentage Interests set forth in Schedule C of the LLC Distribution Procedures.

(d)    Abatement Distributions may be made by the Managers or by a Disbursement Agent retained by the Company to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made on the dates approved for distribution by the Managers in accordance with the LLC Distribution Procedures.

(e)    The Board may cause Abatement Distributions to be withheld with respect to any Interest Holder that has failed to deliver timely a completed Interest Holder Abatement Use Report (as defined in Section 9.6(a) below) by the applicable due date. The Board shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Interest Holder Abatement Use Report.

(f)    All Abatement Distributions under this Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Interest Holders in accordance with the LLC Distribution Procedures. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date;

- 11 -

provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Abatement Distributions under this Agreement.

(g)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Managers have been notified of the then current wire instructions or address, as applicable, as directed by such Interest Holder, at which time such Abatement Distribution shall be made without interest. The Managers shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Interest Holders with respect to any undeliverable Abatement Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(h)    No Company Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(i)    An Interest Holder may timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions.

## ARTICLE VI

## **TRANSFER OF LLC INTERESTS**

**6.1    No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement. Nothing set forth in this Agreement shall be deemed to preclude Interest Holders from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies.

## ARTICLE VII

## **GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS**

**7.1    Limitation of Liability**.

(a)    Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated personally for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the

avoidance of doubt, the Interest Holders shall have no personal liability hereunder to the fullest extent permitted by law.

(b)   It is the intent of the Interest Holders that no Abatement Distribution to any Interest Holder pursuant to <u>Article V</u> hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Abatement Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Abatement Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Abatement Distribution to make a payment to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

**7.2**    **Lack of Authority**. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3**    **No Right of Partition**. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

**ARTICLE VIII**

**EXCULPATION AND INDEMNIFICATION**

**8.1**    **Standard of Care; Exculpation**.

(a)   As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals.

(b)   To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their capacity as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

**8.2**    **Liabilities and Duties of Covered Persons.** This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of

the Interest Holders and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Interest Holders to replace such other duties and liabilities of such Covered Person.

**8.3    Indemnification**.

(a)    To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)    The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the willful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall purchase and maintain, at its own expense (other than for the upfront premium payment which shall be paid by the Debtors), directors and officers ("**D&O**") insurance to cover Damages covered by the foregoing indemnification provisions and to otherwise

- 14 -

cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this <u>Section 8.3</u> shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)    If this <u>Section 8.3</u> or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 8.3</u> to the fullest extent permitted by any applicable portion of this <u>Section 8.3</u> that shall not have been invalidated.

(h)    The provisions of this <u>Section 8.3</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 8.3</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this <u>Section 8.3</u> that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)    The provisions of this <u>Article VIII</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE IX

## <u>BOOKS, RECORDS, ACCOUNTING AND REPORTS</u>

**9.1    <u>Records and Accounting</u>**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Managers to make a full and accurate accounting of all Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including, without limitation, the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); <u>provided, however</u>, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Abatement Distributions among the Interest Holders pursuant to and in accordance with <u>Article V</u> and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

- 15 -

**9.2    Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3    Reports**. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns. Within sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period. Within forty-five (45) days after the end of each fiscal quarter, the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

**9.4    Financial Reporting**.

(a)    The Managers shall select and engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall file with the Bankruptcy Court the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Managers shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All Materials with the Bankruptcy Court by this Section 9.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

**9.5    Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year the Board shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Board determines necessary or appropriate in its discretion (each, a "**Tribal Opioid Abatement Report**"). The Board shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[4]

---

[4] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (as defined in the NOAT Trust Agreement) (and related Portals) may be maintained and administered on a combined basis.

(b)    For the avoidance of doubt, the Board shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any entity created under the Chapter 11 Plan other than the Company.

**9.6    Interest Holder Reporting**.[5]

(a)    Reporting of Approved Tribal Opioid Abatement Uses by Interest Holders shall be required to the extent set forth in the Plan and the Confirmation Order and consistent with the LLC Distribution Procedures. The Board shall establish the form, content and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Interest Holders (each, an "**Interest Holder Abatement Use Report**") to the Board through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Board). Each Interest Holder Abatement Use Report shall contain the information necessary to:

(i)    enable the Company to satisfy the audited Annual Report requirements described in Section 9.4 above; and

(ii)    enable the Company to satisfy the Tribal Opioid Abatement Report requirements described in Section 9.5(a) above.

**9.7    Portal and Website**. The Company shall contract for the establishment and continuing maintenance of (1) a secure method of internet-based communications for the Company and the Interest Holders (the "**Tribal Opioid Abatement Portal**") and (2) a public-facing website to publish all information required or appropriate to be published (the "**Tribal Opioid Abatement Website**").

# ARTICLE X

# TAXES

**10.1    Tax Returns**. The Company shall prepare and file all necessary federal and state income Tax returns and any other required Tax returns, including making the elections described in Section 10.2.

**10.2    Partnership Treatment; Tax Elections**. It is intended that the Company shall be treated as a partnership for federal and state income tax purposes, and the Board is permitted take any actions reasonably necessary to preserve such treatment. Neither the Company nor the Interest Holders shall take any action or make any election which is inconsistent with the Company's treatment as a partnership. The Company shall make any election the Board may deem appropriate and in the best interests of the Interest Holders.

**10.3    Partnership Representative**. The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership

---

[5] The Tribal Opioid Abatement Report may be coordinated or combined with the TAFT Tribal Opioid Abatement Report (as defined in the TAFT Agreement).

representative" in Section 6221 of the Code *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

**11.1    Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the expulsion, bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all reasonably expected assets have been collected by the Company, (ii) all Abatement Distributions have been made to the extent set forth in the LLC Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company obligations and administrative and other expenses in a manner consistent with the Governing Documents and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with the Percentage Interests; provided, however, that if the Board determines, in its discretion, that making such Abatement Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Abatement Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Managers in their discretion.

**11.3    Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in Section 11.1 herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 11.3.

**11.4    Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to Section 11.2 in order to minimize any losses otherwise attendant upon such winding up.

- 18 -

## ARTICLE XII

## GENERAL PROVISIONS

**12.1**   **Amendments**.

(a)   Material modifications to this Agreement may be made by the Board only pursuant to an order of the Bankruptcy Court; provided, however, that the Managers may amend this Agreement by unanimous consent of the Managers from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor correcting or clarifying amendments necessary to enable the Managers to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Agreement shall modify this Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor correcting or clarifying amendments as necessary to enable the Managers to effectuate the provisions of this Agreement. The Managers shall provide notice to the Interest Holders of any proposed modification to this Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Managers) at the time of notice to the Bankruptcy Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Board may shorten such notice period only in the event that a ten (10) day notice period would be materially adverse to the Tribe Opioid LLC and the Interest Holders.

(b)   Notwithstanding anything set forth in this Agreement to the contrary, none of this Agreement, nor any schedule or exhibit hereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, or (iii) the Plan or the Confirmation Order.

**12.2**   **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3**   **Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4**   **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those

- 19 -

as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**12.5    Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6    Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Managers shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7    Sovereign Immunity.** Nothing in the Governing Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date. No Interest Holder shall be deemed or required to waive sovereign immunity by virtue of its membership or interest in the Company.

**12.8    Communications**. The Managers shall establish and maintain the Tribal Opioid Abatement Portal (or other means determined appropriate by the Managers) so as to (i) enable each Interest Holder to deliver the required documentation under the Tribal Opioid Abatement Report in an electronic format; (ii) enable secure communications between the Managers and each Interest Holder; and (iii) provide each Interest Holder with access to its own secure electronic data folder; provided, however, that the Managers may modify the foregoing as they determine necessary or advisable in the event such method of communication is unduly burdensome to any Interest Holder.

**12.9    Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1)business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5.

**12.10    Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect

interest in Company Profits, Losses, Abatement Distributions, capital or property other than as a secured creditor.

**12.11**  **Waiver**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.12**  **Further Action**. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.13**  **Entire Agreement**. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.14**  **Delivery by Electronic Transmission**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Page intentionally left blank.]*

*[Signature pages follow.]*

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

Kevin K. Washburn

By: _____
Name: _____
Title: _____


Mary L. Smith

By: _____
Name: _____
Title: _____


Kathy Hopinkah Hannan

By: _____
Name: _____
Title: _____

**<u>EXHIBIT 1</u>**

**<u>COMPANY ASSETS</u>**

## **EXHIBIT 2**

## **CERTIFICATE**

## **EXHIBIT 3**

**INTEREST HOLDER CAPITAL CONTRIBUTIONS**

## EXHIBIT 4

**TRIBE OPIOID LLC DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. <u>APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES</u>** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan.<br><br>To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable.<br><br>These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| **2. <u>PURPOSE</u>** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or |

| Issue | Description |
|---|---|
| | ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. <br><br> The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. <br><br> Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. <u>DISBURSEMENT OF ABATEMENT DISTRIBUTIONS</u>** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. <u>ATTORNEYS' FEES AND COSTS FUND</u>** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. <u>TRIBAL ABATEMENT FUNDING</u>** | 1. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**. <br><br> 2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, |

| Issue | Description |
|---|---|
| | practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3.  The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. <u>COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY</u>** | 1.  The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2.  The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3.  The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company.<br><br>4.  The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

**<u>Schedule A</u>**

(Intentionally Omitted)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.      **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.    Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.    Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.    Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.    Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.    Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.    Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.    Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.    Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.    Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.    Create and/or support recovery high schools.

15.    Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

D.    **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.  PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1.      Increase the number of prescribers using PDMPs;

   2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.    PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic

Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

**H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.      Public health entities providing free naloxone to anyone in the community.

3.      Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.      Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.      Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

---

## PART THREE: OTHER STRATEGIES

---

**I.      I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.      LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention

services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.    A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.    Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.    Provide resources to staff government oversight and management of opioid abatement programs.

## K.    TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.    Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**<u>Schedule C</u>**
**<u>Tribe Beneficiaries and Tribal Allocation Percentages</u>**

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use

disorder (OUD). Didgʷáličʼ provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.     **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.     **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for

Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

# EXHIBIT T-1

**Redline of Tribe Opioid LLC Operating Agreement**

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' ~~Sixth~~Eighth Amended Joint*
*Chapter 11 Plan of Reorganization Dated ~~July 14~~August 23,*
*2021*

# TABLE OF CONTENTS

**Page**

**ARTICLE I**    CERTAIN DEFINITIONS .......................................................... 2
    **1.1**    **Definitions** ........................................................................ 2
    **1.2**    **Interpretation.** ................................................................... 5

**ARTICLE II**    ORGANIZATIONAL MATTERS ................................................ 5
    **2.1**    **Formation** ......................................................................... 5
    **2.2**    **The Certificate** ................................................................. 5
    **2.3**    **Name** ................................................................................ 5
    **2.4**    **Purpose** ............................................................................ 5
    **2.5**    **Principal Office; Registered Office** ................................. 6
    **2.6**    **Term** ................................................................................. 7
    **2.7**    **No State-Law Partnership** ............................................... 7

**ARTICLE III** BOARD OF MANAGERS; REPORTING ................................. 7
    **3.1**    **Management by the Board of Managers.** ......................... 7
    **3.2**    **Composition and Actions of the Board of Managers.** ...... 8
    **3.3**    **Board Meetings and Actions by Written Consent.** .......... 8

**ARTICLE IV** LLC INTERESTS; CAPITAL ACCOUNTS ........................... 10
    **4.1**    **Interest Holders.** ............................................................ 10
    **4.2**    **Capital Accounts** ........................................................... 10
    **4.3**    **Capital Contributions** ................................................... 10
    **4.4**    **Negative Capital Accounts** ............................................ 10
    **4.5**    **No Withdrawal** .............................................................. 10

**ARTICLE V** ALLOCATIONS; DISTRIBUTIONS ................................... 11
    **5.1**    **Allocations of Profits and Losses** ................................. 11
    **5.2**    **Tax Elections** ................................................................. 11
    **5.3**    **Opioid Abatement Uses** ................................................ 11
    **5.4**    **Distributions.** ................................................................. 11

**ARTICLE VI** TRANSFER OF LLC INTERESTS ................................... 12
    **6.1**    **No Transfers by Interest Holders** ................................. 12

**ARTICLE VII** GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS ...... 12
    **7.1**    **Limitation of Liability.** ................................................. 12
    **7.2**    **Lack of Authority** ......................................................... 13
    **7.3**    **No Right of Partition** .................................................... 13

**ARTICLE VIII** EXCULPATION AND INDEMNIFICATION ..................... 13
    **8.1**    **Standard of Care; Exculpation.** ..................................... 13
    **8.2**    **Liabilities and Duties of Covered Persons** .................... 13
    **8.3**    **Indemnification.** ............................................................ 14

i

**ARTICLE IX** BOOKS, RECORDS, ACCOUNTING AND REPORTS ......................15

    **9.1**    **Records and Accounting** ......................15
    **9.2**    **Fiscal Year** ......................16
    **9.3**    **Reports** ......................16
    **9.4**    **Financial Reporting** ......................16
    **9.5**    **Tribal Opioid Abatement Reporting** ......................16
    **9.6**    **Interest Holder Reporting** ......................17
    **9.7**    **Portal and Website** ......................17

**ARTICLE X** TAXES ......................17

    **10.1**    **Tax Returns** ......................17
    **10.2**    **Partnership Treatment; Tax Elections** ......................17
    **10.3**    **Partnership Representative** ......................17

**ARTICLE XI** DISSOLUTION AND LIQUIDATION ......................18

    **11.1**    **Dissolution** ......................18
    **11.2**    **Liquidation and Termination** ......................18
    **11.3**    **Cancellation of Certificate** ......................18
    **11.4**    **Reasonable Time for Winding Up** ......................18

**ARTICLE XII** GENERAL PROVISIONS ......................19

    **12.1**    **Amendments** ......................19
    **12.2**    **Remedies Cumulative** ......................19
    **12.3**    **Successors and Assigns** ......................19
    **12.4**    **Severability** ......................19
    **12.5**    **Applicable Law** ......................20
    **12.6**    **Consent to Jurisdiction** ......................20
    **12.7**    **Sovereign Immunity** ......................20
    **12.8**    **Communications** ......................20
    **12.9**    **Addresses and Notices** ......................20
    **12.10**    **Creditors** ......................20
    **12.11**    **Waiver** ......................21
    **12.12**    **Further Action** ......................21
    **12.13**    **Entire Agreement** ......................21
    **12.14**    **Delivery by Electronic Transmission** ......................21

## TRIBAL OPIOID ABATEMENT FUND, LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of Tribal Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2021 and entered into by and among the managers identified on the signature pages hereto (each, a "**Manager**" and, collectively, the "**Managers**" or the "**Board**"), implements certain of the terms of the *Debtors' ~~Sixth~~Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated ~~July 14~~August 23, 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**"). Pursuant to the Confirmation Order, each Tribe and Tribal Organization listed on Schedule C of the LLC Distribution Procedures (as defined herein) is deemed to accept membership in, and is hereby admitted to, the Company as a "member" of the Company within the meaning of the Delaware Act (each Tribe hereafter an "**Interest Holder**" and all Tribes collectively, the "**Interest Holders**"). Terms used in this Agreement and not otherwise defined in the Plan shall have the meanings set forth in <u>Article I</u> of this Agreement.

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Company shall be established as a limited liability company to (i) receive and hold the TopCo Tribe Interest contributed by the Interest Holders in accordance with the Restructuring Steps Memorandum

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

- 1 -

and collect any Public Creditor Trust Distributions received by the Company in accordance with the Public Entity Settlements and (ii) make Abatement Distributions to Interest Holders for ~~for~~ Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures and (iii) carry out such other matters as are set forth in this Agreement.

**WHEREAS**, This Agreement sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

### 1.1    Definitions

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this Article I shall have the meanings set forth in the Plan:

**"Affiliate"** of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

**"Agreement"** has the meaning set forth in the introductory paragraph hereto.

**"Annual Report"** has the meaning set forth in Section 9.1.

**"Approved Tribal Opioid Abatement Uses"** has the meaning set forth in the LLC Distribution Procedures.

**"Bankruptcy Court"** has the meaning set forth in the introductory paragraph hereto.

**"Board"** means the Board of Managers established pursuant to Section 3.2.

**"Capital Account"** means the capital account maintained for an Interest Holder pursuant to Section 4.2.

**"Certificate"** means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

"**Chairman**" has the meaning set forth in <u>Section 3.3(h)</u>.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Board's discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; <u>provided, however</u>, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Interest Holder).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in <u>Section 9.4(a)</u>.

"**Company Assets**" are those assets set forth on **Exhibit 1** hereto.

"**Covered Person**" has the meaning set forth in <u>Section 8.1(a)</u>.

"**Damages**" has the meaning set forth in <u>Section 8.3(a)</u>.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disbursement Agent**" has the meaning set forth in <u>Section 5.4(d)</u>.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to <u>Section 9.2</u>.

"**Governing Documents**" has the meaning set forth in <u>Section 2.4</u>.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereof.

"**Interest Holder Abatement Use Report**" has the meaning set forth in <u>Section 9.6(a)</u>.

"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Interest Holders and the Approved Tribal Opioid Abatement Uses for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as <u>Exhibit 4</u> to this Agreement.

- 3 -

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined in the Delaware Act), the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit.

"**Manager**" means a current manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"**Officer**" has the meaning set forth in Section 3.1(b).

"**Partnership Representative**" has the meaning set forth in Section 10.3.

"**Percentage Interest**" means, with respect to any Interest Holder as of any particular time, the percentage interest assigned to that Interest Holder on Schedule C of the LLC Distribution Procedures as its interest in Abatement Distributions and any other distribution made by the Company and the Profits and Losses of the Company. The sum of all Percentage Interests shall at all times equal 100%.

"**Profits**" or "**Losses**" for each fiscal year of the Company shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**TAFT**" means the Tribal Abatement Fund Trust.

"**TAFT Agreement**" means the TAFT Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

"**Tribal Abatement Strategies**" has the meaning set forth in the LLC Distribution Procedures.

"**Tribal Organization**" means Tribal Organization as defined in 25 U.S.C. § 5304(l).

"**Tribal Opioid Abatement Portal**" has the meaning set forth in Section 9.7.

"**Tribal Opioid Abatement Report**" has the meaning set forth in <u>Section 9.5.</u>

"**Tribal Opioid Abatement Website**" has the meaning set forth in <u>Section 9.7</u>.

**1.2**    <u>**Interpretation.**</u>

(a)    The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c)    A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(d)    The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e)    The word "or" shall be disjunctive but not exclusive.

(f)    All references to prices, values or monetary amounts refer to United States dollars.

**ARTICLE II**

**<u>ORGANIZATIONAL MATTERS</u>**

**2.1**    <u>**Formation.**</u> The Company has been organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**2.2**    <u>**The Certificate**</u>. The Certificate was filed with the Secretary of State of the State of Delaware on [●], 2021. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.3**    <u>**Name.**</u> The name of the Company shall be "Tribal Opioid Abatement Fund, LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

    **2.4**    **Purpose.** The purposes of the Company shall be to:

    (a)  receive and hold the TopCo Tribe Interest and collect any distributions received by the Company in accordance with the Public Entity Settlements;

    (b)  make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures;

    (c)  use the Company Assets to:

        (i)    make Abatement Distributions to Tribes in accordance with this Agreement and the LLC Distribution Procedures;

        (ii)    hold and maintain reserves to pay the fees and expenses incurred with administering the Company (including the LLC Distribution Procedures) and managing the Assets (together, the "**Company Operating Expenses**") of the Company (such reserves, the "**Company Operating Reserve**"), which shall be funded with Cash and cash equivalents held by the Company in accordance with the Governing Documents, as defined herein and (b) held by the Company in a segregated account and administered by the Board;

        (iii)    pay the Company Operating Expenses from the Company Operating Reserve; and

        (iv)    replenish periodically, until the dissolution of the Company, the Company Operating Reserve from Cash held or received by the Company to the extent deemed necessary by the Managers to satisfy and pay estimated future Company Operating Expenses in accordance with the Governing Documents.

    (d)  to engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

    (e)  to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets (as set forth on **Exhibit 1** hereto) in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

    **2.5**    **Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware

shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

   **2.6**  **Term.** The term of the Company commenced upon the Effective Date; provided that the Certificate was filed in accordance with the Delaware Act. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

   **2.7**  **No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including, but not limited to, a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise. The Interest Holders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

   **3.1**  **Management by the Board of Managers**.

   (a) Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act, in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Delaware Act. In the event of any ambiguity or conflict between the terms of this Agreement or the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement, the LLC Distribution Procedures shall control. In the event of a conflict between the terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

   (b) Officers. Subject to direction of the Managers, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Managers. The Officers shall have such titles and

powers and perform such duties as shall be determined from time to time by the Managers. The Officers shall hold office until their successors are appointed by the Managers, unless the Managers specify otherwise. Any Officer appointed by the Managers may be removed by the Managers at any time and any vacancy occurring in any office of the Company may be filled by the Managers, in their discretion.

**3.2    Composition and Actions of the Board of Managers**.

(a)    Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of the TAFT.

(b)    Term. The Managers shall have the same term as the trustees of the TAFT.

(c)    Resignation or Removal. The resignation or removal of any Manager shall be consistent with the resignation or removal of any trustee of the TAFT, which shall be in accordance with the provisions of the TAFT Agreement.

(d)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive reasonable compensation from the Company for their services as Managers.[3] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers incurred in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts paid to the Managers for compensation and reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)    Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

**3.3    Board Meetings and Actions by Written Consent**.

(a)    Regular Meetings. The Board shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Board.

(b)    Special Meetings. Special meetings of the Board may be called by any Manager by giving written notice to each other Managers not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal

---

[3] Compensation of Managers TBD.

office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    Action and Quorum. In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in Section 3.3(f).

(d)    Participation in Meetings by Telephone Conference. Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this Section 3.3(d) shall constitute presence in person at such meeting.

(e)    Waiver of Notice. Notice of a meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(f)    Adjournment. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g)    Action by Unanimous Written Consent. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Board.

(h)    Chairman. At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time as circumstances warrant. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1    Interest Holders.**

(a)    Admission of Interest Holders. The Interest Holders are those Tribes and Tribal Organizations identified on Schedule C of the LLC Distribution Procedures holding a Tribe Channeled Claim.

(b)    Interest Holder Information. The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Abatement Distributions in accordance with their Percentage Interests. Each Interest Holder's name, [LLC Interests held by such Interest Holder] and Percentage Interest isare set forth on Schedule C of the LLC Distribution Procedures. Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Abatement Distributions of the Company, shall be based upon its LLC Interests and Percentage Interests. An Interest Holder's LLC Interest (which shall be based on such Interest Holder's Percentage Interest) and Percentage Interest shall determine such Interest Holder's allocation of Profits and Losses and Abatement Distributions of cash as set forth in Article V. All LLC Interests shall be uncertificated.

(c)    Limited Voting Rights. The Interest Holders shall have such voting rights with respect to the management of the Company as may be required by non-waivable provisions of applicable law, in which case any such action shall be approved by the (i) the majority of the Percentage Interests plus (ii) the majority of Interest Holders voting upon such action.

**4.2    Capital Accounts.** A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article V to have substantial economic effect under the Treasury Regulations.

**4.3    Capital Contributions.** Consistent with Sections 4.5(a) and 5.5(a) of the Plan, on the Effective Date, each Interest Holder shall be credited with the capital contribution of a percentage of equity interests in TopCo as set forth on **Exhibit 3** hereto. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4    Negative Capital Accounts.** No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5**    **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Abatement Distribution from the Company, except as expressly provided herein.

### ARTICLE V

### ALLOCATIONS; DISTRIBUTIONS

**5.1**    **Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period, in accordance with the Interest Holders' Percentage Interests.

**5.2**    **Tax Elections**. Except as otherwise provided in this Agreement, all elections required or permitted to be made by the Company under any applicable tax law shall be made by the Board.

**5.3**    **Opioid Abatement Uses**. The Interest Holders hereby acknowledge and agree about the need and value in developing a comprehensive abatement strategy to address the opioid crisis and, to that end, shall apply all Abatement Distributions received from the Company for the Approved Tribal Opioid Abatement Uses.

**5.4**    **Distributions**.

(a)    The Managers shall make Abatement Distributions to the Interest Holders only as, and to the extent set forth in this Section 5.4 and the LLC Distribution Procedures. Abatement Distributions shall be used by the Interest Holders as described in Section 2 of the LLC Distribution Procedures.

(b)    The Company shall endeavor to notify the Interest Holders of the intended Abatement Distribution date through the Tribal Opioid Abatement Portal (or by any other means determined appropriate by the Managers) not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

(c)    Abatement Distributions shall be made to the Interest Holders in accordance with their Percentage Interests set forth in Schedule C of the LLC Distribution Procedures.

(d)    Abatement Distributions may be made by the Managers or by a Disbursement Agent retained by the Company to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made on the dates approved for distribution by the Managers in accordance with the LLC Distribution Procedures.

(e)    The Board may cause Abatement Distributions to be withheld with respect to any Interest Holder that has failed to deliver timely a completed Interest Holder Abatement Use Report (as defined in Section 9.6(a) below) by the applicable due date. The Board shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Interest Holder Abatement Use Report.

(f)    All Abatement Distributions under this Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Interest Holders in accordance with the LLC Distribution Procedures. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Abatement Distributions under this Agreement.

(g)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Managers have been notified of the then current wire instructions or address, as applicable, as directed by such Interest Holder, at which time such Abatement Distribution shall be made without interest. The Managers shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Interest Holders with respect to any undeliverable Abatement Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(h)    No Company Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(i)    An Interest Holder may timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions.

## ARTICLE VI

## **TRANSFER OF LLC INTERESTS**

**6.1    No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement. Nothing set forth in this Agreement shall be deemed to preclude Interest Holders from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies.

## ARTICLE VII

## **GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS**

**7.1    Limitation of Liability**.

(a)    Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated personally for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything

contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the avoidance of doubt, the Interest Holders shall have no personal liability hereunder to the fullest extent permitted by law.

(b)    It is the intent of the Interest Holders that no Abatement Distribution to any Interest Holder pursuant to <u>Article V</u> hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Abatement Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Abatement Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Abatement Distribution to make a payment to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

7.2    <u>**Lack of Authority**</u>. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

7.3    <u>**No Right of Partition**</u>. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

**ARTICLE VIII**

<u>**EXCULPATION AND INDEMNIFICATION**</u>

8.1    <u>**Standard of Care; Exculpation**</u>.

(a)    As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals.

(b)    To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their capacity as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons),

- 13 -

in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.

**8.2** **Liabilities and Duties of Covered Persons.** This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Interest Holders and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Interest Holders to replace such other duties and liabilities of such Covered Person.

**8.3** **Indemnification**.

(a)   To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Tribe Opioid LLC Operating Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)   The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the willful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)   The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)   The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the

- 14 -

position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall purchase and maintain, at its own expense (other than for the upfront premium payment which shall be paid by the Debtors), directors and officers ("**D&O**") insurance to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)    If this Section 8.3 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 8.3 to the fullest extent permitted by any applicable portion of this Section 8.3 that shall not have been invalidated.

(h)    The provisions of this Section 8.3 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 8.3 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 8.3 that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)    The provisions of this Article VIII shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

9.1    **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Managers to make a full and accurate accounting of all Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including, without limitation, the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and

- 15 -

cash flows for such fiscal year (the "**Annual Report**"); <u>provided, however</u>, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Abatement Distributions among the Interest Holders pursuant to and in accordance with <u>Article V</u> and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

**9.2    Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3    Reports**. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns. Within sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period. Within forty-five (45) days after the end of each fiscal quarter, the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

**9.4    Financial Reporting**.

(a)    The Managers shall select and engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall file with the Bankruptcy Court the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Managers shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All Materials with the Bankruptcy Court by this <u>Section 9.4</u> need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

**9.5    Tribal Opioid Abatement Reporting**.

(a)    Within one hundred and twenty (120) days following the end of each calendar year the Board shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Board determines necessary or appropriate in its discretion (each, a "**Tribal Opioid Abatement Report**"). The Board shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid

Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[4]

(b)    For the avoidance of doubt, the Board shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any entity created under the Chapter 11 Plan other than the Company.

**9.6**    **Interest Holder Reporting**.[5]

(a)    Reporting of Approved Tribal Opioid Abatement Uses by Interest Holders shall be required to the extent set forth in the Plan and the Confirmation Order and consistent with the LLC Distribution Procedures. The Board shall establish the form, content and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Interest Holders (each, an "**Interest Holder Abatement Use Report**") to the Board through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Board). Each Interest Holder Abatement Use Report shall contain the information necessary to:

(i)    enable the Company to satisfy the audited Annual Report requirements described in Section 9.4 above; and

(ii)    enable the Company to satisfy the Tribal Opioid Abatement Report requirements described in Section 9.5(a) above.

**9.7**    **Portal and Website**. The Company shall contract for the establishment and continuing maintenance of (1) a secure method of internet-based communications for the Company and the Interest Holders (the "**Tribal Opioid Abatement Portal**") and (2) a public-facing website to publish all information required or appropriate to be published (the "**Tribal Opioid Abatement Website**").

## ARTICLE X

## TAXES

**10.1**    **Tax Returns**. The Company shall prepare and file all necessary federal and state income Tax returns and any other required Tax returns, including making the elections described in Section 10.2.

**10.2**    **Partnership Treatment; Tax Elections**. It is intended that the Company shall be treated as a partnership for federal and state income tax purposes, and the Board is permitted take any actions reasonably necessary to preserve such treatment. Neither the Company nor the Interest Holders shall take any action or make any election which is inconsistent with the

---

[4] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (as defined in the NOAT Trust Agreement) (and related Portals) may be maintained and administered on a combined basis.

[5] The Tribal Opioid Abatement Report may be coordinated or combined with the TAFT Tribal Opioid Abatement Report (as defined in the TAFT Agreement).

Company's treatment as a partnership. The Company shall make any election the Board may deem appropriate and in the best interests of the Interest Holders.

**10.3    Partnership Representative**. The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership representative" in Section 6221 of the Code *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

**11.1    Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the expulsion, bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all reasonably expected assets have been collected by the Company, (ii) all Abatement Distributions have been made to the extent set forth in the LLC Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company obligations and administrative and other expenses in a manner consistent with the Governing Documents and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with the Percentage Interests; provided, however, that if the Board determines, in its discretion, that making such Abatement Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Abatement Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Managers in their discretion.

**11.3    Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in Section 11.1 herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be

necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 11.3</u>.

**11.4    <u>Reasonable Time for Winding Up</u>**. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to <u>Section 11.2</u> in order to minimize any losses otherwise attendant upon such winding up.

## ARTICLE XII

## <u>GENERAL PROVISIONS</u>

**12.1    <u>Amendments</u>**.

(a)    Material modifications to this Agreement may be made by the Board only pursuant to an order of the Bankruptcy Court; provided, however, that the Managers may amend this Agreement by unanimous consent of the Managers from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor correcting or clarifying amendments necessary to enable the Managers to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Agreement shall modify this Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor correcting or clarifying amendments as necessary to enable the Managers to effectuate the provisions of this Agreement. The Managers shall provide notice to the Interest Holders of any proposed modification to this Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Managers) at the time of notice to the Bankruptcy Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Board may shorten such notice period only in the event that a ten (10) day notice period would be materially adverse to the Tribe Opioid LLC and the Interest Holders.

(b)    Notwithstanding anything set forth in this Agreement to the contrary, none of this Agreement, nor any schedule or exhibit hereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, or (iii) the Plan or the Confirmation Order.

**12.2    <u>Remedies Cumulative</u>**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3    <u>Successors and Assigns</u>**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights

- 19 -

or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**12.5    Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6    Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Managers shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7    Sovereign Immunity.** Nothing in the Governing Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including without limitation, any dispute resolution, action or proceeding occurring after the Effective Date. No Interest Holder shall be deemed or required to waive sovereign immunity by virtue of its membership or interest in the Company.

**12.8    Communications**. The Managers shall establish and maintain the Tribal Opioid Abatement Portal (or other means determined appropriate by the Managers) so as to (i) enable each Interest Holder to deliver the required documentation under the Tribal Opioid Abatement Report in an electronic format; (ii) enable secure communications between the Managers and each Interest Holder; and (iii) provide each Interest Holder with access to its own secure electronic data folder; provided, however, that the Managers may modify the foregoing as they determine necessary or advisable in the event such method of communication is unduly burdensome to any Interest Holder.

**12.9    Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1)business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next

business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to <u>Section 2.5</u>.

**12.10** <u>**Creditors**</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Abatement Distributions, capital or property other than as a secured creditor.

**12.11** <u>**Waiver**</u>. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.12** <u>**Further Action**</u>. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.13** <u>**Entire Agreement**</u>. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.14** <u>**Delivery by Electronic Transmission**</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Page intentionally left blank.]*

*[Signature pages follow.]*

- 21 -

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

[_____]
Kevin K. Washburn

By: _____
Name: _____
Title: _____

[_____]
Mary L. Smith

By: _____
Name: _____
Title: _____

[_____]Kathy Hopinkah Hannan

By: _____
Name: _____
Title: _____

## EXHIBIT 1

## COMPANY ASSETS

**<u>EXHIBIT 2</u>**

**CERTIFICATE**

## EXHIBIT 3

## INTEREST HOLDER CAPITAL CONTRIBUTIONS

## EXHIBIT 4

**TRIBE OPIOID LLC DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. <u>APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES</u>** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
| | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable. |
| | These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| **2. <u>PURPOSE</u>** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement |

| Issue | Description |
|---|---|
|  | Uses, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. <u>DISBURSEMENT OF ABATEMENT DISTRIBUTIONS</u>** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. <u>ATTORNEYS' FEES AND COSTS FUND</u>** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. <u>TRIBAL ABATEMENT FUNDING</u>** | 1. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of |

| Issue | Description |
|---|---|
| | representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. <u>COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY</u>** | 1. The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level. |
| | 2. The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court. |
| | 3. The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company. |
| | 4. The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Intentionally Omitted)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

**A.**    **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.     Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.     Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.     Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.     Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.     Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C.   **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.   Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.   Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.   Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.   Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.   Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.   Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.   Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.   Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.   Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.   Expand warm hand-off services to transition to recovery services.

12.   Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.   Develop and support best practices on addressing OUD in the workplace.

14.   Support assistance programs for health care providers with OUD.

15.   Engage non-profits and the faith community as a system to support outreach for treatment.

16.   Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.**   **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.   Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.   Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.   "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.   Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.   Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.   Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO: PREVENTION |
|---|

**F.      PREVENT     OVER-PRESCRIBING     AND     ENSURE     APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.  Increase the number of prescribers using PDMPs;

    2.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

**G.   <u>PREVENT MISUSE OF OPIOIDS</u>**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

4.  Drug take-back disposal or destruction programs.

5.  Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.   <u>PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)</u>

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.      Public health entities providing free naloxone to anyone in the community.

3.      Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.      Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.      Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

| PART THREE: OTHER STRATEGIES |
| --- |

## I.      I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.    LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.    A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.    Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.    Provide resources to staff government oversight and management of opioid abatement programs.

## K.    TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.    Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

L.    **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule C**
**Tribe Beneficiaries and Tribal Allocation Percentages**

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.      **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

-       Utilization of traditional healers and spiritual and traditional approaches to healing;
-       Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
-       Talking circles;
-       Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
-       Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.      **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷáli  that integrates evidence-based chemical dependency treatment with

holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didg áli provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3. **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4. **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgᵃáli treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

**Schedule E**
**Tribal Allocation Matrix**

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population.  15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

## Exhibit DD

## Schedule of Excluded Parties[1]

1. McKinsey & Company, Inc. United States and all its Related Parties, in their respective capacities as such

2. Practice Fusion, Inc. and all its Related Parties, in their respective capacities as such

3. Publicis Health Media, LLC and all its Related Parties, including without limitation, Publicis Health, LLC and Publicis Groupe S.A., in their respective capacities as such

4. ZS Associates, Inc. and all its Related Parties, in their respective capacities as such

5. Mark Timney

6. John Stewart

7. Abbott Laboratories and all its Related Parties, in their respective capacities as such

---

[1] The inclusion of any party on this Schedule of Excluded Parties is not an indication that any such party has been, or will be, accused of, or has committed any, wrongful conduct.

## **<u>EXHIBIT DD-1</u>**

**Redline of Schedule of Excluded Parties**

**<u>Exhibit DD</u>**

**Schedule of Excluded Parties[1]**

1.    McKinsey & Company, Inc. United States and all its Related Parties, in their respective capacities as such

2.    Practice Fusion, Inc. and all its Related Parties, in their respective capacities as such

3.    Publicis Health Media, LLC and all its Related Parties, including without limitation, Publicis Health, LLC and Publicis Groupe S.A., in their respective capacities as such

4.    ZS Associates, Inc. and all its Related Parties, in their respective capacities as such

5.    Mark Timney

6.    John Stewart

7.    Abbott Laboratories and all its Related Parties, in their respective capacities as such

---

[1] The inclusion of any party on this Schedule of Excluded Parties is not an indication that any such party has been, or will be, accused of, or has committed any, wrongful conduct.