Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  Tele/Video Proceedings

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 19, 2021

17                  10:02 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN WALKER

1    HEARING re Continuance of Confirmation Hearing From August

2    18, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WITNESSES:

 4   MORTIMER D. SACKLER

 5   KATHE SACKLER

 6

 7   DAVIS POLK WARDWELL LLP

 8        Attorney for Debtors

 9        450 Lexington Avenue

10        New York, NY 10017

11

12   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

13        BENJAMIN KAMINETZKY (TELEPHONICALLY)

14        JAMES I. MCCLAMMY (TELEPHONICALLY)

15

16   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

17        Attorney for State of Maryland

18        200 Saint Paul Place

19        Baltimore, MD 20852

20

21   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

22

23

24

25
```

1    DEBEVOISE & PLIMPTON

2         Attorneys for Side A of the Sackler Family

3         919 Third Avenue

4         New York, NY 10022

5

6    BY:  MAURA K. MONAGHAN (TELEPHONICALLY)

7

8    SULLIVAN WORCESTER LLP

9         Attorneys for Purdue Pharma, L.P.

10        1633 Broadway

11        New York, NY 10019

12

13   BY:  JEFFREY R. GLEIT

14

15   JENNER BLOCK

16        Attorneys for McKesson

17        353 N. Clark Street

18        Chicago, IL 60654

19

20   BY:  CATHERINE STEEGE

21

22

23

24

25

Page 5

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  BENJAMIN J. HIGGINS (TELEPHONICALLY)

7

8    FRANK OZMENT ATTORNEY AT LAW, LLC

9         Attorneys for Bridges Bloyd Fitch

10        217 Country Club Park, Box 501

11        Birmingham, AL 35213

12

13   BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

14

15   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

16        Attorneys for State of Washington

17        500 Fifth Avenue

18        New York, NY 10110

19

20   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

21

22

23

24

25

Page 6

1   PULLMAN COMLEY, LLC

2        Attorney on behalf of State of Connecticut

3        850 Main Street

4        Bridgeport, CT 06604

5

6   BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

7

8   PILLSBURY WINTHROP SHAW PITTMAN LLP

9        Attorneys for Ad Hoc Group of Non-Consenting States

10        31 West 52nd Street

11        New York, NY 10019

12

13   BY:  ANDREW M. TROOP (TELEPHONICALLY)

14

15   MARYLAND ATTORNEY GENERAL OFFICE

16        Attorneys for the State of Maryland

17        200 Saint Paul Street

18        Baltimore, MD 21217

19

20   BY:  SARA E. TONNESEN (TELEPHONICALLY)

21

22   ALSO PRESENT TELEPHONICALLY:

23   JILL S. ABRAMS

24   BENJAMIN ALBERT

25   ROXANA ALEALI

Page 7

1    ANDREW VINCENT ALFANO

2    PHILIP D. ANKER

3    MICHAEL ATINSON

4    MITCHELL JAY AUSLANDER

5    JASMINE BALL

6    PRIYA BARANPURIA

7    BROOKS BARKER

8    DAVID E. BLABEY JR.

9    LOUIS BOGRAD

10   SARA BRAUNER

11   DAVID BROWN

12   GAGE BRUNSWICK

13   JOSHUA I. BURGER

14   AARON CAHN

15   MARK CHALOS

16   GERARD CICERO

17   HAYDEN COLEMAN

18   DANIEL CONNOLLY

19   DYLAN CONSLA

20   ABBY G. CUNNINGHAM

21   MELANIE L. CYGANOWSKI

22   MARIO D'ANGELO

23   PETER C. D'APICE

24   STACY DASARO

25   JOSEPH G. DAVIS

Page 8

1  KEVIN DAVIS

2  MARK DEARMAN

3  JESSE DELACONTE

4  SHANNON DEVON

5  CLINT DOCKEN

6  JOHN DUBEL

7  STEPHANIE EBERHARDT

8  KENNETH H. ECKSTEIN

9  BERNARD ARDAVAN ESKANDARI

10  BARBARA FARASH

11  MATHEW FARRELL

12  LAURA FEMINO

13  ROBERT FINZI

14  MATTHEW FITZSIMMONS

15  LAWRENCE FOGELMAN

16  HEATHER FRAZIER

17  BRYCE L. FRIEDMAN

18  KATHERINE N. GALLE

19  CAROLINE GANGE

20  GILL GELDREICH

21  MELISSA GIBSON

22  MAGALI GIDDENS

23  SCOTT GILBERT

24  MICHAEL GOLDSTEIN

25  ELAINE P. GOLIN

Page 9

1    ISLEY MARKMAN GOSTIN

2    GARY GOTTO

3    EMILY GRIM

4    JOHN GUARD

5    ADAM P. HABERKORN

6    CATHERINE BEIDERMAN HEITZENRATER

7    ANGELA K. HERRING

8    MICHELE HIRSHMAN

9    JENNA A. HUDSON

10   MITCHELL HURLEY

11   ELISA HYDER

12   MARK S. INDELICATO

13   SAMUEL ISSACHAROFF

14   HAROLD D. ISRAEL

15   EVAN M. JONES

16   GREGORY JOSEPH

17   ETHAN KAMINSKY

18   NEIL F.X. KELLY

19   KAREN KENNEDY

20   MARC KESSELMAN

21   DARREN S. KLEIN

22   JEREMY C. KLEINMAN

23   LAWRENCE KOTLER

24   ANN KRAMER

25   ALEXANDER LEES

```
 1   DANIEL LENNARD

 2   MARA LEVENTHAL

 3   DANIELLE J. LEVINE

 4   JEFFREY LIESENMER

 5   EDAN LISOVICZ

 6   JOHN LONGMIRE

 7   JOHN LOWNE

 8   KEVIN MACLAY

 9   BRIAN S. MASUMOTO

10   PATRICK C. MAXCY

11   LAURA MCCLOUD

12   R. STEPHEN MCNEILL

13   SHANNON M. MCNULTY

14   MICHELE MEISES

15   NATHANIEL MILLER

16   JONATHAN E. MITNICK

17   DAVID MOLTON

18   ANDREW J. MUHA

19   AISLING MURRAY

20   ALISSA M. NANN

21   EDWARD E. NEIGER

22   LEE M. NICHOLSON

23   MICHAEL PATRICK O'NEIL

24   THOMAS ROBINSON O'NEILL

25   RACHEL R. OBALDO
```

1   JENNIFER PEACOCK

2   MARK PLEVIN

3   STEPHEN POHL

4   KATHERINE PORTER

5   ARIK PREIS

6   DOUGLASS PRESS

7   NICOLE PREY

8   KAMI QUINN

9   MARION QUIRK

10   CHRISTINA RICARTE

11   JOSEPH RICE

12   RACHAEL RINGER

13   CHRISTOPHER ROBERTSON

14   JEFFREY J. ROSEN

15   JORDAN ROSENBAUM

16   JASON RUBINSTEIN

17   MEGAN PARIS RUNDLET

18   JEREMEY W. RYAN

19   DAVID SACKLER

20   ILENE SACKLER

21   RICHARD SACKLER

22   JAMES SALWEN

23   DANIEL JOSEPH SAVAL

24   SETH SCHINFELD

25   FREDERICK E. SCHMIDT

1   PAUL KENAN SCHWARTZBERG

2   MICHAEL SHEPHERD

3   J. CHRISTOPHER SHORE

4   RICHARD SHORE

5   RICHARD SILBERT

6   LIANNA SIMMONDS

7   PAUL SINGER

8   PAUL M. SINGER

9   MARC F. SKAPOF

10  ARTEM SKOROSTENSKY

11  D. RYAN SLAUGH

12  JOSEPH L. SOROKIN

13  CLAUDIA Z. SPRINGER

14  HOWARD STEEL

15  ERIC STODOLA

16  JEROME TAPLEY

17  PAMELA THURMOND

18  MARC J. TOBACK

19  KARA TRAINOR

20  KELLY TSAI

21  ALICE TSIER

22  JOSEPH TURNER

23  ALLEN J. UNDERWOOD

24  GERARD UZZI

25  MICHAEL J. VENDITTO

1  ELI J. VONNEGUT

2  JONATHAN WAGNER

3  RYAN A. WAGNER

4  JORDAN WEBER

5  WILLIAM P. WEINTRAUB

6  MARTIN WEIS

7  ALLISON H. WEISS

8  THEODORE WELLS, JR.

9  DANIEL WOLF

10  LAUREN S. ZABEL

11  JAMIE ZEEVI

12  DAVID ZYLBERBERG

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 14

1                    P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  This is Judge

3    Drain.  We're here in In Re Purdue Pharma L.P., et al. on

4    the continued hearing on the Debtor's request for

5    confirmation of their amended Chapter 11 plan.  When we left

6    off yesterday, there was some discussion about who would be

7    testifying today and the extent of that testimony.  We

8    received emails early this morning that I think clarified

9    that for Mr. Edmunds, but I'm happy to hear the parties on

10   the record on it, too, which I think we should do.

11             MR. KAMINETZKY:  Hi, good morning, Your Honor.

12   This is -- let me just start us off.  Benjamin Kaminetzky of

13   Davis Polk for the Debtors.  My understanding based on the

14   email traffic is that today we'll hear -- there'll be live

15   testimony from Mortimer Sackler and Kathe Sackler.  I

16   believe that the parties have or are working on still a

17   resolution with respect to any remaining witnesses,

18   including additional Sacklers as well as the one witness,

19   Brian -- I forgot his last name -- who was going to maybe be

20   called by Maryland, but I think that's being worked out as

21   well.  So, we're hoping that the live witness testimony, if

22   you will, will conclude today with Mortimer and Kathe

23   Sackler.

24             One caveat, Your Honor, is that we're still trying

25   to -- we're still talking around the clock with the DMPs to

Page 15

1    try to work that out.  What we've done is, with Your Honor's

2    permission, we've moved the possibility of recalling Mr.

3    Lowne, Mr. DelConte, Mr. Turner for the narrow purpose of

4    answering questions from the DMPs, again, with the -- with

5    the sincere hope that that will not occur.

6              THE COURT:  Okay.  I had understood from Mr.

7    Edmunds' email that he was not going to call Ilene Sackler

8    or Mr. Sheldon but maybe that's changed in the interim.

9              MR. KAMINETZKY:  That's my understanding as well,

10   that we're going to conclude with Mortimer and Kathe and

11   that.  But, you know, why don't I just leave it to Mr.

12   Edmunds?

13             MR. EDMUNDS:  Thank you, Your Honor.  Thank you,

14   Mr. Kaminetzky.

15             MR. KAMINETZKY:  Before I do that, is that okay,

16   Your Honor, that -- to the extent we need to recall, you

17   know, just for the narrow purposes of the DMPs, we can do

18   that tomorrow?  Give us some time to hopefully --

19             THE COURT:  I guess so.  Although, as I understood

20   it, it was really -- their concern was really tied to what

21   you were seeking to have by way of findings in the

22   confirmation order.  I hope it's not expanded beyond that at

23   this point.  You're on mute, Mr. Kaminetzky.  I think you

24   hit the button by accident.

25             MR. KAMINETZKY:  Yeah.  No, I don't believe -- I

Page 16

1    believe that's the case.  And, again, we really hope --

2    we're talking literally around the clock.  So, we're trying

3    to make this go away.

4           THE COURT:  Okay.  Mr. Edmunds?

5           MR. EDMUNDS:  Yes, Your Honor.  So, what Mr.

6    Kaminetzky said is essentially right.  We will be calling

7    today for live testimony Mortimer Sackler and Kathe Sackler.

8    We have reached with Ilene Sackler through her counsel an

9    agreement in principle where we have, I think, filled in

10   enough of the details to say we are not going to call her.

11   We are going to provide a deposition and some documents as a

12   substitute for her live testimony.  And we just need to --

13   to hammer that out, which I expect us to do after the live

14   witnesses today.

15          With respect to Mr. Sheldon, both sides of the

16   Sackler Families and Debtors have agreed that we will

17   withdraw his declaration but that his documents will come

18   in.  And they've withdrawn -- I think it was Debtor's

19   objections to admission of the documents, and the documents

20   will come in except with respect to certain deposition

21   testimony related to members of the Sackler Family that will

22   come in except not for purposes of its truth, as with other

23   rulings the Court has made in this matter.

24          So, I think that we're set on that and I think

25   that we'll need to work out some paper stipulation of filing

Page 17

1    that withdraws the declaration and indicates what the

2    documents are in its place.

3              THE COURT:  Okay.  All right, very well, thank

4    you.  So, I think then, if I have the order right, you want

5    to proceed first with Mortimer Sackler?

6              WOMAN:  Correct, Your Honor.

7              MR. EDMUNDS:  Yes, Your Honor.

8              THE COURT:  Okay, all right.  Mr. Gleit, is there

9    anything more that you want to say in response, or Ms.

10   Steege?  To what Mr. Kaminetzky said.

11             (Overlapping)

12             MR. GLEIT:  Oh, I'll let Ms. Steege go first, Your

13   Honor.

14             MS. STEEGE:  Apologize.  Your Honor, Catherine --

15   for the record, Catherine Steege on behalf of McKesson and

16   speaking on behalf of our larger DMP group.  We are working

17   very hard.  We hope we will reach an agreement.  I think

18   we're very close.  But I did want to just correct one thing.

19   I mean, we have objected to confirmation of the plan.  I

20   suppose our objections could be resolved by narrowing

21   certain releases and providing certain consideration to us

22   under the plan, and in that sense, could be viewed as

23   objections to what the order is.  But I did want to clarify

24   that we have objected to the plan.

25             THE COURT:  Oh, I know.  I know you have.  I was

just focusing on the testimony.

MS. STEEGE: Thank you, Your Honor.

THE COURT: Okay.

MR. GLEIT: And with that clarification, Your Honor, I have nothing to add.

THE COURT: All right, very well. So, can we then pull up Mortimer Sackler onto the Zoom link?

MS. STEEGE: Yes, Your Honor, we've reached out to him and he should be logging in momentarily.

THE COURT: All right, I see Mr. Sackler. Would you raise your right hand, please?

MR. SACKLER: I would.

THE COURT: Do you swear or affirm to tell the truth, the whole truth and nothing but the truth, so help you God?

MR. SACKLER: I do.

THE COURT: Okay. And it's Mortimer, M-O-R-T-I-M-E-R, next word, S-A-C-K-L-E-R?

MR. SACKLER: Correct.

THE COURT: Okay, very well. All right, Mr. Edmunds, you can go ahead with your direct.

MR. EDMUNDS: Sorry, just one sec. I'm just trying to get my AirPods to hook in so the audio's better. They were working a minute ago but, of course...

THE COURT: I think we can hear you clearly.

Page 19

```
1              CLERK?:  I think you've very audible,

2     (indiscernible) and you should be okay.

3              MR. EDMUNDS:  They're working now, yes.

4              THE COURT:  Okay.  So, you go ahead, Mr. Edmunds.

5              MR. EDMUNDS:  Thank you, Your Honor.

6              DIRECT EXAMINATION OF MORTIMER D. SACKLER

7     BY MR. EDMUNDS:

8     Q    Mr. Sackler, you're -- you have been a director of

9     Purdue Pharma, is that right?

10    A    I was a director, correct.

11    Q    You resigned in early 2019?

12    A    End of '18 but yeah.

13    Q    And you've been a director for some 30 years in the

14    company, is that right?

15    A    I don't believe it was 30 years but I can't remember

16    when I -- the start date exactly.

17    Q    Since before 2000 at least?

18    A    Correct.

19    Q    Is that right?

20    A    Yeah.

21    Q    And you also served as an executive of Purdue Pharma as

22    a vice president through 2007, is that right?

23    A    In titular name only.  I did not have any executive

24    responsibilities, any line responsibilities -- really just

25    the title.
```

Page 20

1   Q    You were titled vice president at the time?

2   A    That's correct.

3   Q    And you were a member of the board at the time?

4   A    I was a board member, yes.

5   Q    And at all times when you were a member of the board,

6   you participated in the board's meetings regularly, did you

7   not?

8   A    Regularly.  I'm sure I missed some, but yes.

9   Q    Most of them you attended?

10  A    I did.

11  Q    Okay.  And you read the board reports that were

12  presented to the board, did you not?

13  A    I did.

14  Q    And did you participate in other meetings with

15  directors of the board to conduct the affairs of Purdue

16  Pharma?

17          MS. MONAGHAN:  Object to the form.  I'm sorry,

18  what do you mean by other meetings?

19  BY MR. EDMUNDS:

20  Q    Outside of regular board meetings, Mr. Sackler, did you

21  have other meetings with members of the board to conduct the

22  affairs of Purdue Pharma?

23  A    There weren't very many that I can recall.  Maybe here

24  and there, but they were generally -- as you know, we had a

25  number of independent outside directors on the board as

Page 21

1   well, and so the schedule was pretty well set in advance.

2   Q    Well, and my question is did you communicate with other

3   members of the board?  I guess that's not my question but

4   let me ask it a different way.  Did you communicate with

5   other members of the board outside of the course of the

6   regular meetings of the board?

7   A    It would be email communications, but we didn't -- but

8   not so many in person or by phone, no.  There were email

9   communications leading up to board meetings, sometimes

10  afterwards, but it was generally in the board meetings that

11  we communicated.

12  Q    You were -- you were sometimes separated

13  geographically, right?

14  A    Sometimes, yes.

15  Q    Some directors lived in the United Kingdom, some

16  directors lived in the United States.  Is that correct?

17  A    That's correct.

18  Q    But you communicated with one another and -- well, you

19  communicated with one another about the affairs of Purdue

20  Pharma, right?

21  A    Yes.  As I said, typically, during the board meetings,

22  but yes.

23  Q    But at other times, also?

24  A    Occasionally.  I mean, there were emails and, you know,

25  there was -- I'm sure there were a number -- a handful of

Page 22

1    meetings.  But, again -- you know, as a regular occurrence,

2    if that's what you're getting -- asking.

3    Q    Okay.  And most of the other board members were members

4    of the Sackler Family, is that right?

5    A    There was a mix.  I mean, there were probably four or

6    five family members from -- from our side of the family,

7    four or five from the B side of the family, and I believe

8    around four or five independent directors.

9    Q    So, then the answer is yes, most of the members of the

10   board of Purdue Pharma were members of your family?

11            MS. MONAGHAN:  Objection.  It depends how you

12   define his family.  Inside of the family --

13            THE COURT:  Well, actually (indiscernible) but

14   he's just gone through the list.  I don't think we need to

15   pursue that question.

16            MR. EDMUNDS:  Okay.

17   BY MR. EDMUNDS:

18   Q    And are you also -- or have you also been a director of

19   the entity known as MNP?

20   A    I was.

21   Q    And when did you cease being a director of MNP?

22   A    I don't recall.  MNP ended a number of years ago.

23   Q    And has it -- is it now known as MNC?

24   A    There was a new entity created called MNC, which I am a

25   member of, yes.

1    Q    So, you have been for at least 20 years continuously a

2    director of MNP or MNC?

3    A    I believe that's right.  Again, I can't recall the

4    exact timing.

5    Q    And MNC or MNP -- I'll just call it MNP and we'll agree

6    that, depending on what time, we're talking about the same

7    thing.  Is that okay?

8    A    Okay.

9    Q    The role of that entity is to make recommendations to

10   the boards of other Sackler-owned companies, is that right?

11   A    It is.  Correct, it's an advisory board that makes

12   recommendations to those other entities, yes.

13   Q    It's an advisory board.  And do the board's

14   recommendations typically, are they followed?

15   A    Typically.  But I wouldn't say, like -- I'd say there

16   are likely some exceptions.  But, yes, typically they're

17   followed, to my knowledge.

18   Q    And, in fact, the members of the board of MNP are the

19   same members of your family who are members of the board of

20   Purdue Pharma, at least up through 2018, is that right?

21   A    There were a lot -- there was a lot of restructuring

22   going on when MNP ended and MNC started.  You know, my uncle

23   Raymond, who was the last of the remaining founders, passed

24   away in 2017.  And so the families at that point really

25   started a process of restructuring the boards to bring in

Page 24

1    more outside directors to make them more independent.  So, I

2    can't recall exactly.  There was a period of time with

3    overlap and then today, they're not at all overlapping, and

4    the MNC board is made up of predominantly nonfamily members.

5    Q    As of today.  But as of 2000-say-17, the members of

6    your family who sat on the board of Purdue Pharma at that

7    time were members of the board of -- of MNP?  Is that right?

8    A    Or whichever was in existence.  I believe so.  I don't

9    know for sure.

10   Q    But the members (indiscernible) --

11   A    There was overlap, yes.

12   Q    Okay.  And -- and the companies that MNP or C advises,

13   those companies are -- include the Mundipharma corporations

14   throughout the world that your family owns and that are in

15   the business of -- in the pharmaceutical business, is that

16   right?

17   A    Well, to be clear, I don't own any of those companies

18   directly.  They're owned in trusts that I'm a beneficiary

19   of.  So, when you say that my family owns -- I can't vote

20   those shares, I don't have any control of those companies

21   that are held by trusts.  But, yes, those boards -- an

22   advisory board gives advice to the international group of

23   companies, the IACs.

24   Q    Okay.  So, ultimately, your family are the

25   beneficiaries of the trusts.  The trusts own the

Page 25

1   corporations.  And in that respect, you are a beneficial

2   owner of those corporations, is that right?

3   A    Correct.

4   Q    Okay.  So, I'm going to -- when we talk about this, I

5   will shorthand y questions for what you've just explained to

6   me and we'll understand what I'm talking about.  Is that

7   fair?

8   A    Okay.

9   Q    Okay.

10          MS. MONAGHAN:  Can I drop in a clarification for a

11   second?  Mr. Edmunds, is what you're saying that when you

12   say "you," you mean to include the trusts when you're

13   referring to ownership of the IACs?

14          MR. EDMUNDS:  When I say -- when I refer to his

15   ownership of the IACs, we will incorporate that structure

16   that he's just explained.  That's my -- that's all I

17   suggest.

18          MS. MONAGHAN:  Okay, thank you.

19          MR. EDMUNDS:  Thanks.

20   BY MR. EDMUNDS:

21   Q    All right.  And I believe you answered that those

22   entities are engaged like Purdue in the pharmaceutical

23   business, is that right?

24   A    That's correct.

25   Q    Okay.  And most of them sell opioids in the countries

Page 26

1    in which they are present, is that right?

2    A    Well, let me correct my last answer to be a little more

3    precise.  They're not all in the pharmaceutical business.

4    There are some IACs that are not in the pharmaceutical

5    business.  And, likewise, there are some that don't sell

6    opioids.

7    Q    Right.  There are a few pharmaceutical IACs that do not

8    sell opioids in those countries, is that right?

9    A    Correct.  That's correct.

10   Q    Okay.  But, by in large, at least the ones engaged in

11   the pharmaceutical business sell opioids like OxyContin or

12   it may be under a different brand name in certain countries,

13   I understand, but they sell opioids similar to those that

14   are sold by Purdue Pharma, is that right?

15   A    That's correct.

16   Q    And chemically identical, in fact, is that right?

17   A    Not always but yes.

18   Q    Okay.  All right.  And to turn back to Purdue Pharma,

19   from -- the business of Purdue Pharma has -- most of Purdue

20   Pharma's revenue has come from selling opioids, is that

21   right?

22   A    In recent -- in the last, you know, period of time,

23   yes, that's correct.  In the last 20 years or so.

24   Q    Since the 1990s --

25   A    That's correct.

Page 27

1    Q    Since around the 1990s, it has derived its revenue from

2    selling opioids?

3    A    That's correct.  Yeah.

4    Q    Okay.  And, in fact, that revenue has been substantial,

5    right?

6    A    It has been.

7    Q    In fact, over -- since around 2007, the board of Purdue

8    Pharma has caused over $10 billion to be distributed to the

9    family-owned trusts, is that correct?

10   A    I believe that figure includes tax distributions as

11   well that went to the IRS.  In our family's case, directly

12   to the IRS, not to us.  But I believe that's roughly

13   correct, yes.  If you're including the tax distributions, I

14   think that number's correct.

15   Q    Including the tax distributions, it has distributed

16   over $10 billion to -- for the benefit of members of the

17   Sackler Family or to the trusts, is that right?

18   A    I believe so.

19            MS. MONAGHAN:  Object to the form.

20            THE COURT:  Well, on what basis?

21            MS. MONAGHAN:  Because Mr. Edmunds' question

22   presumes that the payments to the IRS were for the benefit

23   of the Sackler Family.  What Mr. Sackler was saying is that

24   money went directly to the IRS, not through the trusts.  And

25   I think whether --

```
 1              THE COURT:  (indiscernible)

 2              MS. MONAGHAN:  Okay.  Thank you, Your Honor.

 3   BY MR. EDMUNDS:

 4   Q    Okay, did the money that went to the IRS benefit the

 5   members of the Sackler Family?

 6   A    It benefitted the trust to the extent...  I mean, I

 7   guess the owners of Purdue who owe the taxes.  I mean, I

 8   think it was, you know, paying the taxes that were owed.

 9   Q    It benefitted the trust, which in turn benefitted

10   member of the family who are the trust beneficiaries, is

11   that right?

12   A    Sure.

13   Q    With respect to those distributions that we just

14   discussed, would you agree with me that those distributions

15   are in excess of what other comparable corporations

16   distributed to shareholders?

17              MS. MONAGHAN:  Objection.  I don't know what you

18   mean by other comparable companies, and I also don't know

19   what you mean by those distributions, whether you mean those

20   tax distributions or the total distributions?

21              MR. EDMUNDS:  The total --

22              THE COURT:  Well, let's deal with the -- the last

23   point first.  Do you mean all -- all -- all the ten -- over

24   10 billion?

25              MR. EDMUNDS:  All 10 billion, Your Honor.
```

Page 29

1            THE COURT:  Okay.

2            MR. EDMUNDS:  All the distributions.

3            THE COURT:  And then, so, as far as comparable

4    companies, are you focusing on companies that have the same

5    ownership and tax structure, including a pass-through tax

6    structure to the owners?

7            MR. EDMUNDS:  Maybe I should -- I should --

8            THE COURT:  So that the corporation itself isn't

9    paying the taxes?

10           MR. EDMUNDS:  I think I mean pharmaceutical

11   companies in the marketplace.  Why don't I ask him what he'd

12   use as sort of similar businesses to Purdue?  And I can get

13   it in that way, Your Honor, if that's --

14           THE COURT:  Okay.

15   BY MR. EDMUNDS:

16   A    I'm sorry, I don't under -- I'm not sure I understand

17   the question.

18   Q    Okay, Mr. Sackler, let me ask you, are there other

19   businesses that are similar in your mind to Purdue?

20   A    You know, there are other pharmaceutical businesses.

21   Yeah, midsized -- other midsized pharmaceutical businesses.

22   Most of them are publicly owned, not privately owned.  Most

23   of them are corporations, not partnerships.  You know, so --

24   so, you know, if -- in our range, there are definitely other

25   companies that were our size and had our profitability.

Page 30

```
 1   Q    Okay, so thinking about those companies, do you have an

 2   understanding of whether the distributions made to members

 3   of the Sackler Families were greater than the distributions

 4   of capital made by those companies to their shareholders'

 5   shareholders?

 6   A    I think if you look over a long enough average period

 7   of time, I don't think they were.  Because public companies

 8   buy back their shares all the time as a means of

 9   distributing funds to their shareholders.  They pay

10   dividends as well.  And one thing to keep in mind is these

11   dividends and these distributions were all done from excess

12   cash that Purdue did not require.  It was very clear, and

13   the board in making those decisions of distributions,

14   including the outside directors who voted on them -- who

15   were voting on distributing excess cash that was not

16   required in the business.

17   Q    That may be your view, but was there a disagreement

18   among members of the board as to whether, in fact, that was

19   -- your opinion was, in fact, correct?

20   A    I mean, there were disagreements all the time about the

21   proper level of distributions and the proper level of

22   diversifications.  I don't think it's a secret our family

23   wanted to diversify our assets more outside the

24   pharmaceutical business than the B side of the family, who

25   wanted to keep more and reinvest more in the pharmaceutical
```

Page 31

1   business.  And so there was a -- just discussions and

2   debates about that between the sides.

3   Q    And did members of the board of directors, particularly

4   those among the B side family, communicate to you that they

5   believed that the distributions being made by the company

6   were in excess of those that similar pharmaceutical

7   corporations were making to shareholders?

8   A    I don't recall specifically.  I mean, we had a lot of

9   discussions and back and forths on that fact.  You know, my

10  view was we were a privately owned company, the business had

11  excess cash that it didn't require, and so there was

12  discussion about what to do with that excess cash.  Do you

13  keep it and reinvest it even more heavily within the

14  pharmaceutical business in Purdue, or do you distribute it

15  out for the shareholders to invest in other work -- in other

16  businesses?

17  Q    Okay.  If you distributed it out for the shareholders

18  to invest in other businesses, you would be taking the money

19  from Purdue and then using it to expand those other

20  businesses.  Wouldn't you be?

21  A    You would be using it for whatever the shareholders or

22  the trusts who received it, others, chose to do with that

23  excess cash, yes.

24  Q    Well, but it was your position that it should be taken

25  from Purdue and invested in other businesses, right?  That's

Page 32

1   what you just said, isn't it?

2   A     Other businesses, stock markets, other investments.

3   Q     Personal use of the beneficiaries of the trust?

4   A     Some through the trust and some for the beneficiaries

5   directly to invest, yeah.

6   Q     Okay.  Could I ask you -- you have a -- let me just, as

7   a housekeeping matter, you have a packet of documents I

8   think electronically from us?

9   A     I received one an hour ago, yes.

10  Q     Okay.  And you have it in electronic form?

11  A     I do.

12  Q     Or paper.  Could you -- could you please look at that

13  and open the file that will be named PWG004483596?

14  A     Okay.

15  Q     Okay.  And do you have that document on your screen?

16  And there's an email at the top that looks like it's a

17  forward from -- from Richard Sackler, I want to -- from your

18  cousin Richard Sackler.  I'm going to ask you to scroll down

19  to the line where you see your name, under the words highly

20  confidential, and take a look at that email.

21  A     Okay.

22  Q     I'm sorry.  Your name is in the email -- but the first

23  -- the second email, I guess, on the page.

24          MS. MONAGHAN:  In the -- I'm sorry, Mr. Edmunds,

25  the two line, is that what you're asking him?

```
 1              MR. EDMUNDS:  In the two line, right.  It's an

 2    email from Jonathan Sackler to other members of the family,

 3    including Mr. Mortimer Sackler here.

 4              THE WITNESS:  And the independent directors of the

 5    board I see are also copied on it.

 6              MR. EDMUNDS:  All right, they are copied on it.

 7    BY MR. EDMUNDS:

 8    Q    Can you tell me if -- if you received this email?

 9    A    I mean, I don't recall it offhand but I see that I was

10    copied, so I believe so.

11    Q    Any reason to dispute that you received it?

12    A    No.

13    Q    Okay.  And would you scroll down for me, please, to the

14    -- I think it's the very -- the second to last paragraph of

15    Jonathan Sackler's email to you and others?

16              MS. MONAGHAN:  Mr. Edmunds, is that the paragraph

17    that begins given all of the above?

18              MR. EDMUNDS:  That is.

19              MS. MONAGHAN:  Okay.

20    BY MR. EDMUNDS:

21    Q    Do you see that Jonathan Sackler wrote that he believed

22    the distributions for that year of 105 million so far, I

23    guess, were well in excess of industry peer group norms?

24    A    I see he said that, yes.

25    Q    Do you have any reason to dispute that fact?
```

Page 34

1    A    Like I said, I'm in -- I don't know what he was

2    referring to.  Which industry, peer group, norms?  You know,

3    I disagreed with him from time to time over the fact that --

4    you know, do you look at dividends, to you look at stock

5    repurchases?  You know, and, frankly, the company -- as I

6    said, this was all about the excess cash that was not

7    required within Purdue.

8    Q    Okay.  But if you would take some time to look at the -

9    - I think that this email, it's fair to say -- well, tell me

10   if it's -- let me ask you if it's fair to say that this

11   email from -- that is from Jonathan Sackler and is written

12   on behalf of the B side family members offers a different

13   position than the one that  you're stating here in your

14   testimony today?

15   A    As I stated, the B side had a stronger inclination to

16   want to invest even further within the pharmaceutical

17   business and leave those excess funds in the business to

18   invest within it, and our side wanted more diversity.  And

19   that's what the debate was about.  And, you know, I can tell

20   you Purdue was never lacking in funds to pursue any deal or

21   strategy which management presented to the board.  There was

22   not, you know, a lack of funds ever that got in the way of

23   pursuing any deal or strategy that they wanted to pursue.

24   Q    But you would agree with me that the B side position

25   that advanced in this email -- and you should take the time

Page 35

1   to read it -- is exactly the opposite of what you're saying?

2   A   No, I don't think it is.  I think the B side position

3   is that they wanted to keep more excess cash in the business

4   to invest even more.  But those -- what I'm saying is those

5   even more deals never came up, never came before the board,

6   and the company was never limited in what it could do based

7   on the funds it had on hand.

8   Q   Okay.  Let me ask you to now open up what should be

9   JX1718.

10  A   Okay.

11  Q   And do you see that this is an email from -- at the top

12  of the page there is an email from your sister Ilene Sackler

13  Lefcourt to you that replies to an email from you on October

14  27, 2013, is that right?

15  A   I see that, yes.

16  Q   And did you receive this email from your sister Ilene?

17  A   I believe so.

18  Q   And did you send the email that she responds to?

19  A   I believe so, yes.

20  Q   Okay.  And would you agree with me that you say in this

21  email in 2013, because sales are declining, that in your

22  opinion, we would be better off laying -- we would be better

23  off laying everyone off and noking the business than doing

24  this.  And I think this -- you see that line, you wrote

25  that?

Page 36

```
 1    A    I see the line.

 2    Q    And by this, you meant the budget proposal advocated by

 3    management of Purdue Pharma, is that right?

 4    A    I believe so, yes.

 5    Q    Okay.  And you also -- if you go further down, if

 6    you'll go down to the paragraph beginning with the word

 7    clearly.  Do you see that?

 8    A    Yes.

 9    Q    You also advocate that the business "must figure out

10    how to do more with less.  And if they can't, which seems to

11    be the case, then they should say so and maybe they should

12    retire as well."  Is that -- that's what you wrote, right?

13    A    I see that, yes.

14    Q    And you say that you're spending too much money -- WAY

15    too much money -- all caps, WAY -- in areas where we are

16    getting no return for it.  Is that right?

17    A    Yes, I think what I'm referring to here is the very

18    large S&P spend.  That I'm questioning whether we should

19    even continue to spend so much I S&P for opioids and others

20    if this is the forecast.  And maybe we're better off cutting

21    that S&P, not spending it on promotion, and using it for

22    other commercial deals or other deals to find new products.

23    Q    Is that what you're saying?  I mean, I see -- if you

24    look above the paragraph, the preceding paragraph, you say,

25    what is clear to me is two things:  One, we must cut costs.
```

```
 1   But, two, we need to spend time focusing on and discussing
 2   how we will reverse this trend.  You said that, didn't you?
 3   A    And I said at the end of the first paragraph, why
 4   assign any S&P against it if they can't grow the volumes?
 5   Why do we spend -- my whole questioning here in this period
 6   of time is why are we spending so much in S&P and in
 7   promoting if the volumes are just going to keep declining.
 8   And, you know, as a board member, I think it's a legitimate
 9   question to add and to ask.  You know, does the -- is the
10   expense justified for the business and for the business plan
11   going forward?
12   Q    And are you aware of whether the company took steps to
13   change the business plan rather than cutting the S&P budget,
14   as you suggested in your email?
15   A    I don't recall what happened.  I mean, the reference to
16   a new CEO -- I believe this might've been a transitory
17   period when we were bringing in -- I can't recall the dates
18   exactly.  And I imagine -- I think when a new CEO came in,
19   they had a new -- they put in place a new plan, yes.
20   Q    And it is, in fact, the case that the company did not
21   drop sales and promotion -- the sales and promotion budget.
22   It, instead, came up with new programs in response to
23   concerns in 2013, isn't that the case?
24   A    Like I said, I can't recall specifically what they did
25   at this period of time...
```

```
 1   Q    We'll come back to this and see if we can refresh your

 2   recollection later.  You're aware, are you not, that opioids

 3   kill some people who take them?

 4   A    I'm aware that -- yeah, opioids are Schedule 2

 5   prescription drugs.  They're the most regulated and always

 6   carry a warning of addiction, abuse, and overdose, and

 7   death, yes.

 8   Q    How many people have died in the United States since

 9   about 1999 from drug overdose -- from opioid overdoses?

10   A    Are you including all opioids, illicit opioids...?

11   Q    I'll include all of them.

12   A    Heroine, everything?

13   Q    Start with --

14   A    I -- you know, I believe the number that I've read in

15   the headlines is 500,000, if you're including heroine, and

16   fentanyl, and all other opioids.

17   Q    Well, you're aware, are you not, that heroine and

18   fentanyl -- illicit heroine and fentanyl use is ascribed by

19   the public health community, including the United States

20   Department of Health & Human Services, to initiation with

21   the improper use of prescription opioids?  Are you aware of

22   that fact?

23   A    I'm sorry, I don't...understand.  Which fact?

24   Q    Are you -- are you aware of the position of the United

25   States Department of Health & Human Services that some 80
```

1    percent of illicit opioid use has its start in the misuse of

2    prescription opioids?

3    A    In the misuse of prescription -- I think I've heard

4    that headline.  I don't know the study or the research

5    behind it, but I've heard the headline on the illicit use of

6    prescription opioids, correct.  It's often quoted without

7    that -- that specific term, which is obviously key.

8    Q    Well, I think they're talking -- well, in any case --

9    so, my question about the more than 500,000 who have died,

10   right -- strike that.  Are you aware of how many people die

11   each day from opioid overdoses?

12   A    I am not.

13   Q    You're not.  You're not aware that the number is

14   somewhere near 140 per day in the United States?

15   A    I wasn't.  But --

16   Q    You haven't seen that before?

17   A    I may have seen it in an article but I don't recall it.

18   Q    Well, it's also possible that it could've been a lower

19   number because that number has been going it, hasn't it?

20   A    Yeah, I mean, to my understanding, you know, overdose

21   deaths in America have been inclining exponentially since

22   1979.  And it's a horrible problem.

23   Q    And how many --

24   A    It's a truly horrible problem that the country is

25   facing, that it's been growing literally exponentially for

Page 40

1   such a long period of time.

2   Q    Well, it is a truly horrible problem, but you continue

3   to sell opioids in mass amounts, do you not?

4              MS. MONAGHAN:  Objection.

5              THE COURT:  What basis?

6              MS. MONAGHAN:  Well, I don't know what he means by

7   "you."  Mr. Sackler does not sell opioids anywhere at all at

8   any time.  I don't know whether he's asking whether certain

9   companies sell opioids or --

10             THE COURT:  Let's put it in the present tense.

11  You're asking in the present tense right now, Mr. Edmunds?

12  I mean, I think you know the answer to that one, right?  But

13  maybe you don't.

14             MR. EDMUNDS:  Yeah.  Oh, whether I'm asking --

15  yeah, present -- present tense is fine.

16  BY MR. EDMUNDS:

17  Q    You continue -- you continue to sell opioids -- and by

18  "you," I would say the companies that you direct?

19             MS. MONAGHAN:  Objection.

20             MR. HUEBNER:  Your Honor, I'm going to object to

21  that as well.  Assumes facts not in evidence.  The Sacklers

22  have not directed Purdue since the end of 2018 when they all

23  left the board.  So, I don't think that's accurate from the

24  company's perspective, which is, as we discussed the other

25  day, is actually quite important to us.

1      MR. EDMUNDS:  Yeah, I don't think I'm asking -- I

2  think I'm asking now about the companies he now directs, and

3  we've established on the record what that is.

4      MS. MONAGHAN:  So, your question is whether any

5  company on which he is currently a board member sells

6  opioids.  Is that a correct statement of the question, Mr.

7  Edmunds?

8      MR. EDMUNDS:  That is a correct statement of the

9  question.

10      THE COURT:  Yeah, you can answer that question,

11  Mr. Sackler.

12      MR. KAMINETZKY:  Your Honor, just before that, I

13  have to object.  He -- Mr. Edmunds just misstated the

14  testimony.  I mean, he said companies that you currently

15  direct.  I think the testimony -- one of your first

16  questions was when he left the board.

17      THE COURT:  No, I think he -- I think he just said

18  where you're a director.  I think he changed the question in

19  response to Ms. Monaghan's statement.

20      MR. KAMINETZKY:  I don't believe so but okay, I

21  (indiscernible)...

22      THE COURT:  Mr. Edmunds, you can ask it however I

23  want to.  That's how I heard it.

24  BY MR. EDMUNDS:

25  Q    Sure.  Okay.  So, the question, Mr. Sackler is the

Page 42

1   companies of which you are a director currently continue to

2   market or sell opioids, is that right?

3   A    Again, I -- I am a director right now of MNC, which is

4   an advisory board that advises companies that do continue to

5   sell opioids within their jurisdictions, and the guidelines,

6   and rules of those countries.

7   Q    And to the extent you are aware the corporation Purdue

8   Pharma, of which you remain a beneficial owner, continues to

9   sell opioids despite the deaths that are occurring in the

10  United States, is that right?

11          MS. MONAGHAN:   I'm going to object to the form

12  because, among other things, it's not a corporation.   But if

13  you can answer the question, you can go ahead.

14  BY MR. EDMUNDS:

15  A    To my knowledge, Purdue continues to sell opioids, yes.

16  Q    Okay.   And it did continue to sell at all times in

17  which you were a director of Purdue Pharma, is that right?

18  A    It did.

19  Q    And, in fact, you, along with other members of the

20  board, participated in -- or -- in fact, you and other

21  members of the board of directors of Purdue Pharma acted to

22  cause it to attempt to increase its sales of opioids during

23  the time period in which you were a director, is that right?

24  A    I don't think I would say it that way.   I mean, I think

25  it depends what time period you're talking about.   You know,

Page 43

1    look, the board of Purdue was always faced in dealing with

2    two -- two issues, okay?  These products, prescription

3    opioids, are incredible medicines that help people suffering

4    in severe pain.  And one of the goals that the board had was

5    to ensure that those medicines were made available for

6    physicians to prescribe to relieve the pain of those

7    patients who were suffering.

8            The balancing part from when we heard about --

9    from early on, when we heard about the abuse and

10   diversioning of that product, which we felt horrible for the

11   fact that this medicine that, you know, is intended to

12   really help people and relieve pain, was getting diverted

13   and abused by others and causing pain.  You know, that

14   became a balancing focus on the board where we were trying

15   to do everything and -- you know, asking management in the

16   company to do whatever they can to minimize the abuse and

17   diversion of the product, while still ensuring that

18   physicians had it available for those patients and the

19   legitimate patients who needed it.  So, that balance was

20   always something that the board dealt with.

21   Q    Okay.  Do you still have the document, JX1718 in front

22   of you, Mr. Sackler?

23   A    I do.

24   Q    Would you agree with me that there your focus is to

25   reverse the trend of declining sales volume for all of

Page 44

1  Purdue's products, which are mostly opioids, as you've

2  testified?

3  A    No.  My focus as I read this document is that it's to

4  question if the high level of S&P expenditure that they were

5  putting in this budget was justified, given their projected

6  sales and revenue, and if we should continue other paths or

7  other ways forward from a business investment point of view.

8  Q    You say, under Number 2, we need to spend time focusing

9  on and discussing how we will reverse this trend.  Is that

10 right?  Those are your words?

11 A    I see that.  And what the future truly holds for our

12 pipeline given the current realities of the market.

13 Q    Those are you words, that we need to spend time

14 discussing how we will reverse this trend?

15         MS. MONAGHAN:  Objection.  Asked and answered,

16 and, as Mr. Sackler pointed out, it's taken out of context.

17         THE COURT:  Why are -- you can answer that

18 question.

19 BY MR. EDMUNDS:

20 A    Yeah, I say that in the context of -- look, if -- first

21 of all, this was also the world's first abuse deterrent

22 opioid.  And if I recall correctly, 2013 or so was the year

23 that the FDA had granted Purdue a change in its package

24 insert, which made it the first time it could actually say

25 something about the abuse of deterrent properties of the

Page 45

1    newly formulated OxyContin.  And, you know, it was important

2    to the board that the market share of abuse deterrent

3    opioids grew because we believed, and were told repeatedly

4    by management, that abuse deterrent products would save

5    lives, would reduce overdoses, and would help.  And if we

6    could move patients from non-abuse deterrent proper opioids

7    to an abuse deterrent opioid, that would be for societal

8    good.  That would help.  And if we could move patients from

9    non-abuse deterrent proper opioids to an abuse deterrent

10   opioid, that would be Earth, societal good, that would help.

11   And that (indiscernible) --

12   Q    It's a humanitarian --

13   A    -- withdrawals.

14   Q    So, you're saying it's a humanitarian cause; is that

15   your testimony?

16   A    I wouldn't put it in those words, no.  But I'm saying,

17   you know, we were always trying to do here the right thing

18   and the right balance between getting a needed FDA approved

19   medicine to doctors who needed it and trying to make it as

20   safe as possible, and keep it out of hands of people who

21   would otherwise, you know, who would abuse it or get harmed

22   by it.

23   Q    So, when you said, in your opinion, you would be better

24   off laying everyone off and milking the business, you were

25   trying to do the right thing?

1    A    Well, again, that's a little heated language, but I

2    think what I was saying is, instead of cutting the S&P,

3    stopping the -- if management truly believed that the trend

4    in the decline was going to continue no matter what we did,

5    then we should stop promoting it.

6    Q    You should lay everyone off and milk the business,

7    that's what you said?

8    A    On the S&S side, we should stop promoting the opioids

9    on the S&P side.  Yes, let -- and redirect them towards

10    other products and use those funds to try to get new

11    products.

12    Q    Okay.  And incidentally, you mentioned abuse deterrent

13    OxyContin, but this is also about other opioids; is it not?

14    A    I don't recall -- well, Butrans -- yes, I mentioned

15    Butrans, which was an opioid agonist/antagonist,

16    buprenorphine patch product.

17    Q    Yeah, how about Dilaudid in the -- in the second to

18    last paragraph.  "Dilaudid is way behind budget."

19    A    Yes, I see that.

20    Q    So, it mentions all of Purdue's opioids, not simply the

21    abuse-deterrent formulation of OxyContin, right?

22    A    Right.  I mean, the question was, the entire opioid

23    market is shrinking -- the entire prescription opioid market

24    was shrinking dramatically.  And basically, I'm saying, you

25    know, does it pay to keep investing behind this given those

Page 47

1    facts.

2    Q    So all of this philanthropy, like, led to criminal

3    charges against Purdue -- criminal please that Purdue

4    entered in 2007 and 2020, right?

5             MS. MONAGHAN:  I object to the term, philanthropy.

6             THE COURT:  Well, I guess, yeah, you need to be

7    more specific, Mr. Edmunds.

8             MR. EDMUNDS:  Okay.

9             THE COURT:  Are we moving away from the 2013 email

10   and going back to something else to deal with 20 -- 2007?

11            MR. EDMUNDS:  Yeah.  Yeah, let me --

12   Q    You testified that Purdue is trying to do the right

13   things --

14   A    Mm hmm.

15   Q    -- but, in fact, bookending this email, like, Purdue

16   pleaded guilty to criminal charges in 2007 and 2020 to the -

17   - to federal crimes committed in the promotion of opioids;

18   is that right?

19   A    That's right, and I was shocked by that.  Because we

20   were repeatedly told on the Board by management that they

21   were, you know, maintaining the highest level of compliance,

22   that they were following the laws, and it was -- it was

23   shocking and hugely disappointing to hear about, you know,

24   their pleas 2020.

25   Q    Well, what about in 2015 when the State of New York,

Page 48

1    you know, initiated an investigation resulting in an

2    assurance of discontinuance by Purdue for the very same kind

3    of misconducts alleged in the guilty pleas that bookended

4    the 2013 email?

5    A    I'm sorry, I don't recall the 2015 item you're

6    referring to.

7    Q    Sir, an action by the State of -- okay.  An action --

8    you don't remember a settlement with the State of New York

9    in 2015 for marketing related --

10   A    I vaguely remember there was the settlement for the

11   very de minimis amount of money, that matter's been handled,

12   and reported to the Board, but I can't recall more than that

13   what it was about.

14   Q    And as a director, you received reports both before

15   2007 and well before 2020 that Purdue was, in fact, under

16   investigation by the federal government and state

17   governments; did you not?

18   A    I believe we did, pre-2007.  I can't recall in my last

19   years on the Board, when, you know, I mean, I -- when the

20   federal government -- you know, when we were made aware of

21   it by management of investigation by the federal government.

22   I can't recall when that was.

23   Q    You can't recall when it was.  But you were, in fact,

24   made aware of an investigation by the federal government

25   into Purdue's marketing of opioids; were you not?

Page 49

1    A    Like I said, I can't recall specifically.

2    Q    Okay.  How about for Mundipharma Italy?  Do you recall

3    Mundipharma Italy coming under investigation by Italian

4    prosecutors' offices for paying kickbacks to doctors who

5    prescribed Mundipharma Italy's opioids; do you recall that?

6    A    No, I recall that the Italian company, we were advised

7    from the MMC Advisory Board that the Italian company had

8    changed management and had settled a matter with the Italian

9    authorities.  I don't recall if it was kickback or other

10   related, but that they had -- the local Board had changed

11   the manager and had taken appropriate action to settle the

12   matters with the Italian authorities.  And I believe it

13   included other companies as well in that.

14   Q    Okay.  And what about in Australia, do you recall

15   regulatory action in Australia related to Mundipharma

16   Australia's marketing of opioids?

17   A    I don't recall regulatory action there, no.

18   Q    So, you weren't aware of that?

19   A    I do not recall.

20   Q    Do you -- right.  Okay.  Do you -- are you aware of

21   regulatory activity and actions taken in Canada with respect

22   to Purdue Canada's actions?

23   A    I'm aware of the litigation in Canada and some of the

24   regulatory actions and that the company's been working

25   closely with the regulatory authorities in following all the

1    legal requirements in Canada, yes.

2    Q    And were you aware generally of the opioid crisis

3    having been declared a national emergency by the President

4    of the United -- a national emergency or similar -- by the

5    President of the United States?

6    A    As I said, I think the opioid crisis and the overdose

7    crisis in America is a -- is a national emergency.  It is a

8    horrible situation that to my understanding has been

9    increasing since the late '70s.  And yes, something, you

10   know, a lot needs to come together to do something about

11   that.

12   Q    A lot does need to come together.  And as a director of

13   Purdue Pharma from 2008 to 2020, having been a director and

14   executive of the company during the time when it previously

15   -- or during the time when it committed conduct it

16   previously pleaded guilty to, don't you think you should

17   have been aware of the practices that subsequently violated

18   federal law?

19          MS. MONAGHAN:  Object to the form.  The question

20   is very hard for me to follow.  I don't --

21          MR. EDMUNDS:  Yeah.

22          MS. MONAGHAN:  -- I just can't.

23          THE COURT:  I think it was kind of a two or three-

24   part question.  If you could break it down, Mr. Edmunds?

25          MR. EDMUNDS:  Sure.  Sure.

1          MR. KAMINETZKY:  It also misstates the testimony.

2          MS. MONAGHAN:  I join in that objection.

3    Q    As a director for Purdue Pharma -- you were a director

4    and an executive at the time that Purdue Pharma committed

5    the conduct for which it pleaded guilty to federal -- to a

6    federal count in 2007, right?

7    A    As I said, I was not an executive with any line

8    responsibility or any duties other than it was it was a

9    retention title that my father had given me and others, but

10   I have no executive responsibility whatsoever.  I did not

11   work in the company day to day.  I was a member of the

12   Board, yes.

13   Q    Okay.  You were a member of the Board of Directors and

14   at the time that the conduct occurred to which the company

15   pleaded guilty in 2007, right?

16   A    I was, yes.

17   Q    And you held the title, whatever it meant, of Vice

18   President of the company; did you not?

19   A    I don't recall when I gave it up, but yes.

20   Q    Okay.  And in fact, you entered into a corporate

21   integrity agreement --

22   A    The company --

23   Q    -- resulting from the 2007 -- the company did -- the

24   company entered into a corporate integrity agreement

25   resulting from the 2007 guilty plea --

1   A     Correct.

2   Q     -- that right?  And you became aware at some point of

3   again, rising levels of opioid abuse and death as a result

4   of the opioids including prescription opioids, right?

5            MS. MONAGHAN:  Object to the form.  At what time?

6   Q     After 2007?

7   A     What I was aware of is that overdose deaths and --

8   well, it continued to rise through this entire period as

9   they had been since the late '70s in the United States.  And

10  they continued to rise even after prescriptions for

11  prescription opioids started plummeting.  The overdose

12  deaths kept going up and up.  And yes, I was aware of that.

13       And, you know, you mentioned the corporate integrity

14  agreement, we on the Board, actually, you know, very much

15  appreciated having the Office of the Inspector General

16  overseeing the sales and marketing at Purdue for over -- for

17  five years following the 2007 plea.  And we got repeated

18  reports on the Board that it is in compliance with us, with

19  the corporate integrity agreement, that the OIG monitor did

20  not have -- raise any issues about it.  That gave us -- you

21  know, that gave us comfort that that -- to the point that as

22  it was coming to a close, I recall even asking in a Board

23  meeting, can we extend this CIA for another five years, can

24  we keep the OIG here longer because I like that they are

25  helping and another level of oversight at Purdue.  And I was

Page 53

1   told by management that that's not possible, it's not

2   something we could extend.

3   Q    Okay.  But again, you remained a Board member from 2007

4   on to early 2019 or late 2018, whichever it is, and in fact,

5   shortly after you resigned from the Board, Purdue Pharma

6   pleaded guilty to three federal felony counts; is that

7   right?

8           MS. MONAGHAN:  Objection.  I'm not sure what you

9   mean by shortly after he resigned from the Board.

10          MR. EDMUNDS:  I mean the day that -- I mean 2020.

11          MS. MONAGHAN:  Yeah, October 2020.

12          MR. EDMUNDS:  Okay.  Well, the year.

13  Q    Given that -- you remained a member of the Board

14  through 2019, and Purdue Pharma and --

15  A    Until the end of 2018.

16  Q    Right.

17  A    I remained on the Board until the year 2018, correct.

18  Q    Until the end of that, and Purdue Pharma pleaded guilty

19  in 2020 to federal criminal charges related to the conduct

20  of the company that occurred while you remained a member of

21  the Board; is that?

22  A    They did that.  And as I said before, I was, you know,

23  unbelievably shocked and disappointed that that happened

24  again.

25  Q    Hard to believe.

1          MS. MONAGHAN:  I'm going to object to that, Your

2    Honor.

3          THE COURT:  I'll let it pass.

4    Q    Mr. Sackler, could I ask you to -- let's take a look at

5    this.  Could I ask you to please pull up the document in the

6    folder that is JX-2094?

7    A    Okay.

8    Q    Okay.  You have that in front of you?  I'm going to

9    skip to page 48 of the PDF.

10          MS. MONAGHAN:  By the page of the PDF, Mr.

11    Edmunds, you mean the page that appears at the top where it

12    says, blank of 97?

13          MR. EDMUNDS:  I think I mean the page of the file

14    overall.  And at the top of the page, that would be 16 of

15    97.  But if you're looking at the slides in the PDF here, it

16    will 48th one of those.  And I believe it has, although my

17    copy here does not -- I believe it will say  J -- it will

18    have a JX page number that ends in 48 at the bottom.

19          MS. MONAGHAN:  Are you sure?  What I see is JX-

20    2094.0015, if what you're referring to is Schedule A.

21          MR. EDMUNDS:  I am referring to Schedule A.  And

22    if that's what it is, then I'm mistaken.

23          MS. MONAGHAN:  Okay.  And so --

24          MR. EDMUNDS:  But --

25          MS. MONAGHAN:  And so, Mr. Sackler, it's got a

Page 55

1    page 15 in the upper right corner, and at the bottom of the

2    page it says, JX-2094.0015.

3              MR. EDMUNDS:  0015.  Thank you, Ms. Monaghan.

4              THE WITNESS:  At page 15 says, Schedule A on the

5    top.

6              MS. MONAGHAN:  That's right.

7              THE WITNESS:  15 of 96.  Okay.

8    BY MR. EDMUNDS:

9    Q    Okay.  And you see where it says Count I, and then

10   there are lettered paragraphs beneath that that continue on

11   for a -- to the -- for two pages.  There is a Count II and a

12   Count III following that, and those continue on one more

13   page.  Do you see that?

14   A    I see that.

15   Q    Do you understand these to be the counts to which

16   Purdue Pharma pleaded guilty in 2020?

17   A    I believe so, yes.

18   Q    And these counts relate to Purdue's failure to maintain

19   diversion controls; is that right?

20   A    I don't recall the absolute specifics of this.

21   Q    Okay.  But do you --

22              MS. MONAGHAN:  Do you want to direct him to a

23   particular --

24              MR. EDMUNDS:  I will --

25              MS. MONAGHAN:  -- portion of the document.

1            MR. EDMUNDS:  -- I will direct him to Count I-B.

2    Q    And note that this relates to, does it not, to Purdue's

3    calling upon healthcare providers from 2007 to February

4    2018?

5    A    I see that, yes.

6    Q    Okay.  And if you would scroll -- I mean, there are

7    other allegations, but if you would scroll further to

8    subparagraph -- start -- I guess, Count I-G, which is a few

9    pages ahead of you, ahead of where you are.

10           MS. MONAGHAN:  The paragraph that begins,

11   "Beginning in or about May of 2007"?

12           MR. EDMUNDS:  That's correct.

13   Q    It says that "Purdue knowingly and intentionally

14   conspired and agreed with other to aid and abet HCP's

15   dispensing without a legitimate medical purpose, and outside

16   the usual course of professional practices, and thus,

17   without a valid prescription.  Prescription drugs held for

18   sale after shipment and interstate commerce thereby

19   rendering the dispense of drugs misbranded, in violation of

20   the Federal Food, Drug, and Cosmetic Act."  Do you see that?

21   A    Okay.

22   Q    And that is the conduct in your -- some of the conduct

23   in your understanding, to which Purdue pleaded guilty?

24   A    I believe it is.  I mean, it's stated here, so yes,

25   must be.

Page 57

```
 1    Q    Okay.  And Purdue also in 2007 had pleaded guilty to a
 2    similar count of misbranding; is that right?
 3    A    My -- I can't recall specifically, but I believe the
 4    2007 settlement and pleas were all -- had to do with actions
 5    that occurred prior to 2001.  They had looked at our old
 6    actions all the way up to 2007 and they found instances of
 7    problematic sales and marketing from 2001 and earlier.  When
 8    -- and, yeah.
 9    Q    That resulted in the -- in the --
10    A    The result of misbranding.
11    Q    Yeah.  Okay.  And then Count II, there is a discussion
12    of -- if you would read Count II?  "Between June 2009 and
13    continuing to about March 2017, Purdue Pharma offered
14    payments of speaker fees as kickbacks to healthcare
15    providers in exchange for prescribing Purdue's opioids"; is
16    that right?
17    A    Offer payments, speak -- speaker fees and other
18    payments -- I see it -- I see what it says in the form of
19    speaker fees and other payments to two healthcare providers
20    with at least one prefaced to induce those healthcare
21    providers to write more prescriptions of Purdue opioid
22    products.
23    Q    Okay.  And Purdue pleaded guilty to that conduct; is
24    that right?
25    A    Yes.
```

Page 58

1    Q    And in Count III, details a -- I guess an application -

2    - well, a platform that -- that Purdue utilized in

3    connection with the corporation Practice Fusion; is that

4    right?

5    A    I see that here, yes.

6    Q    And it pleaded guilty to misconduct involving the use

7    of that platform; is that right?

8    A    I believe so.

9    Q    Okay.  And in fact, the allegations underlying that

10   count were that Purdue used that platform to try to expand

11   the opioids market generally, not just its market share; is

12   that right?

13   A    That I -- that I don't know.  Just if you'd point me to

14   the point on that, but I had not -- until the settlement,

15   until Purdue entered the settlement, I had not heard of

16   Practice Fusion.  You know, it's not something that had come

17   to the Board or to my attention at all.

18   Q    All right.  Well, then I won't ask you about it.  But -

19   - now, as part of this criminal plea, right, there was a

20   separate -- well, at the time of this criminal plea, there

21   was a separate civil settlement with the Department of

22   Justice entered with you and members of your family; is that

23   right?

24   A    That's correct.

25   Q    And you entered that settlement to resolve allegations

1    of misconduct against you; is that right?

2    A    We did.

3    Q    And those allegations of misconduct were that you, in

4    your capacity as the Director of Purdue Pharma, from 2008 to

5    2018, had, in fact, been involved in some of the criminal

6    conduct to which Purdue pleaded guilty; is that not correct?

7              MS. MONAGHAN:  Objection.  I think that

8    mischaracterizes the document.  If you want to ask him about

9    the document, I think you should put it in front of him.

10             MR. EDMUNDS:  Well, I will put it in front of him

11   in a minute.

12   Q    But is that your understanding of the document?

13             THE COURT:  You can answer that question.

14   A    I know -- my understanding is that we strongly deny the

15   allegations in the settlement with the DOJ.  We do not

16   believe we acted wrongly.  We feel strongly we acted

17   ethically and legally throughout the period, and we state

18   that in the settlement.

19        We reached a settlement with the DOJ for the same

20   reason that we are trying to reach a settlement here in this

21   case, which is that we're trying to provide a very large

22   amount of funds to the communities and to the individuals

23   who are in need of them, rather than squandering them for

24   years and years in litigation, which was really the only two

25   choices that we faced that's as we, you know, the thousands

Page 60

1    of lawsuits against Purdue and the family and grows up.

2    Q    Okay.  You were under investigate -- well, let's just

3    pull it up.  Mr. Sackler, if you could please turn to the

4    document that is JX-2096?  It is in your folder.

5    A    Okay.

6    Q    And this is this -- if you take a look, this is the

7    settlement agreement that you reached with the Department of

8    Justice along with other members of your family?

9    A    Yes.

10   Q    Okay.  I want to turn you to the Department of

11   Justice's Addendum A, which follows the signature pages of

12   the agreement.  And that is on the -- I guess, page marker

13   begins on JX-2096.0024, but the substance begins on the next

14   page, which is page 25.  Do you see that?

15   A    I'm scrolling down to it.  Addendum A.  Yes.

16   Q    Okay.  And you -- in the document, you denied the

17   allegations that are in Addendum A; is that right?

18   A    I believe that's correct.

19   Q    Okay.  But let's take a look at them.  If I could refer

20   you to Paragraph 2?  Purdue's profits declined in 2010 after

21   the introduction of its reformulated OxyContin, which was

22   intended to be more difficult, though not impossible to

23   crush or manipulate for purposes of abuse and misuse; is

24   that true?  Did its profits decline?

25   A    I believe so, yes.

Page 61

1   Q    Okay.  And then it stays, the named Sacklers, which

2   includes you, and I'll only ask you about yourself.  Okay?

3   I'm only asking about you.

4        "The named Sacklers and Purdue executives tracked

5   Purdue's lost sales closely and regularly scrutinized sales

6   reports and related data"; is that true?

7   A    No, I -- not from me.  I, you know, I sat on the Board.

8   I got Board reports that I reviewed on sales and budgets,

9   but I did not regularly scrutinize sales reports or related

10  data.

11  Q    Did you ever scrutinize sales reports or related data?

12  A    As I said, on the Board -- when the Board was sent,

13  including the entire Board, which included the independent

14  outside Directors which sent sales reports or budget

15  proposals, yes, then I would look at them and work on them,

16  yes.

17  Q    Okay.  One moment, Mr. Sackler.  Okay.  Could I ask you

18  to open up another document.  Put the -- we'll come back to

19  this one, but let me ask you to open up JX-1674 and turn to

20  page 5.  Do you have that, Mr. Sackler?

21  A    I have it.  I'm just scrolling down to page 5.

22  Q    You did -- do you see the paragraph where it says, "Can

23  someone also please send me a couple charts on the market

24  share development for controlled release analgesics over the

25  last few years and the projection for next year?  One of

1    those charts should show the breakdown of OxyContin market

2    share by strength against competitors.  I would like to

3    understand more the recent dynamics of the market and where

4    patients are shifting to, but we are losing.  Regards,

5    Mortimer."  You wrote that, right?

6    A    I did.

7    Q    Okay.  You can put that aside, and turn back, please,

8    to the other document.  And what --

9         MS. MONAGHAN:  I'm sorry, back to the Settlement

10   Agreement, Addendum A, or --

11        MR. EDMUNDS:  To the Settlement Agreement,

12   Addendum A, which is JX-2096 at page 25.

13   Q    Okay?

14   A    Okay.

15   Q    Do you recall -- rather, if you would turn to the third

16   sentence?  Do you recall whether Board members and Purdue

17   executives attributed the majority of the sales decline

18   referenced at the beginning of the paragraph to individuals

19   abusing opioids moving from OxyContin what were easier to

20   abuse drugs, and also, to increase scrutiny of prescribers,

21   pharmacists, and other actors?  Do you remember that?

22   A    Yeah, I -- I recall management reporting to the Board

23   that the decline in OxyContin had several factors associated

24   with it, one of which was that abusers were shifting to

25   other products.  And that, for us, was, like, great news

Page 63

1    because that was the purpose of the reformulation of

2    OxyContin, was to make it harder to abuse and, you know, we

3    never wanted people who didn't have a legitimate need for

4    the product to ever be using it.

5        And so the -- to the factor -- some portion, and

6    management could never pinpoint the -- what portion, but

7    that some portion of the decline was due to that, would --

8    was welcome news and was good news.  And the other part that

9    they said was the market dynamics, yes, was the change, was

10   that -- as I referred earlier, the prescription opioid

11   market as a whole started declining quite rapidly.

12       And so, those were the two factors that the management

13   reported were contributing to the decline in OxyContin.

14   Q    But once again, your language was that you wanted to

15   reverse the trend of the declined in OxyContin, right?

16            MS. MONAGHAN:  Objection.  Asked and answered.

17            THE COURT:  No, you can answer that question.

18   A    Again, understand, this was, I think -- well, the

19   email that you referred to me before was 2013.  And 2013, as

20   I recall, was the year the FDA approved the change in the

21   package insert for the reformulated OxyContin.  And the

22   Board wanted to -- even though we had a declining overall

23   market, we wanted to grow our market share in that market

24   because we were in abuse the term, because we felt it

25   allowed doctors to prescribe this for legitimate patients,

Page 64

1    yet made it harder for those people suffer from an addiction

2    to abuse the product.  We were looking to shift market share

3    to more abusable products into OxyContin, an abuse deterrent

4    product, to help with the situation.

5    Q    But again, the email that we were talking about before,

6    referred to Dilaudid; did it not?

7    A    It referred to that in the context of our entire opioid

8    platform and (indiscernible) --

9    Q    It referred to Dilaudid.

10   A    It referred -- it also referred to Butrans and it

11   referred to --

12   Q    It --

13   A    -- our pipeline, yes.

14   Q    Sure, Mr. Sackler.  But my question was, did it refer

15   to Dilaudid, and my next question would be, is Dilaudid

16   abuse deter?

17   A    At that -- no, it is not, although the company was

18   working on making all the opioids abuse deterrent.  They

19   were working on expanding the platform of abuse deterrence

20   for all opioids.

21   Q    Was the company still selling non-abuse deterrent

22   Dilaudid?

23   A    I believe it was at that time, yes.

24   Q    And other non-abuse deterrent opioids?

25   A    I -- I can't recall.  I mean, I -- yeah, I mean,

1    Butrans technically is not an abuse deterrent.

2    Q    And there was another entity that worked in parallel

3    called Rhodes, right?

4    A    Rhodes sold generic products, correct.

5    Q    Generic products, generic opioids, right?

6    A    And other products, yes.

7    Q    Well, we can talk about those, but generic opioids

8    including generic oxycodone, right?

9    A    It did and it had a project underway to try to come up

10   with an abuse deterrent immediate release oxycodone.

11   Q    But at the time, and including continuing up to now,

12   Rhodes does not make an abuse deterrent immediate release

13   oxycodone product, does it?

14   A    No, it doesn't, but also it doesn't promote those

15   products and it doesn't have SNP and salesman going to

16   doctor's offices either.

17   Q    It still sells them?

18   A    It sells them, but it doesn't promote them.

19   Q    Okay.

20   A    I thought your question was around the promotion.

21   Q    I think it's -- let me turn you -- we'll go back to the

22   Addendum A to the Civil Settlement.  Would you turn to

23   Paragraph 4 and let me ask you about one part of the first

24   clause of the first sentence of Paragraph 4.  Purdue

25   detailed over 100,000 doctors.  Is that right?

Page 66

1   A    I can't recall specifically.  I see the paragraph says

2   that.

3   Q    Do you think it detailed over 100,000 doctors?

4   A    It's possible.

5   Q    Do you have any reason to think that it didn't?

6   A    No.  Like I said, it's possible.  I don't recall the

7   specific number.

8   Q    Do you have any idea how many sales calls Purdue sales

9   reps engaged in in the United States between 2013 and 2018?

10  A    I do not.

11  Q    Do you know if it was more than 100,000?

12  A    Like I said, I don't know.

13  Q    In fact, it was some multiple of 100,000, right?  It's

14  hundreds of thousands, if not millions.  Is that right?

15          MS. MONAGHAN:  Objection.  What is the "it" that

16  you're referring to?

17          MR. EDMUNDS:  The number of detailing calls.

18          MS. MONAGHAN:  So not how many physicians, but how

19  many calls?

20          MR. EDMUNDS:  We had moved on from that, yes, to

21  how many calls.

22          MS. MONAGHAN:  Okay.

23  BY MR. EDMUNDS:

24  A    Like I said, I don't recall what the actual number was.

25  Q    But you aware, were you not, that Purdue sales reps

Page 67

1    were making calls on healthcare providers repeatedly, right?

2    A    Yes.

3    Q    And they returned to the same healthcare providers

4    repeatedly go promote opioids, right?

5    A    Yes, to promote the abuse deterrent, reformulated

6    OxyContin.

7    Q    Well, they promoted other opioids too, did they not?

8    A    They did.

9    Q    They did.  And they also distributed unbranded material

10   that promoted all opioids, did they not?

11   A    I'm not aware.  That level of detail I don't know.

12   Q    Okay.  Do you know if there was a correlation in the

13   number of Purdue's visits and the prescribing of OxyContin?

14   A    I do not know, no.

15   Q    Were you aware of Purdue's work with a consultant known

16   as McKinsey & Company?

17   A    I'm aware of it.

18   Q    And did Purdue retain McKinsey to provide

19   recommendations regarding declining sales of Purdue's

20   opioids?

21   A    In what year?

22   Q    I believe in multiple years.  Is it your understanding

23   that McKinsey worked in multiple years on that purpose?

24   A    It's my understanding that, yes, Management would bring

25   in consulting firms to help them on a variety of topics over

Page 68

1   many different years.

2   Q    And in fact, McKinsey & Company was brought in in

3   several different years to provide consulting regarding

4   Purdue's sales and marketing of opioids; is that not true?

5   A    Again, as I said, they were Management initiatives.  I

6   couldn't tell you what years or when.

7   Q    Wait a minute.  Did Management take these initiatives

8   without the Board knowing?

9   A    In some cases they would have.  In some cases they

10  would have notified the Board.  Management did have the

11  leeway to bring in consultants on their own without the

12  Board knowing, yes.

13  Q    And when they brought in McKinsey, in fact, because

14  you're able to talk about it today, you knew.  Is that

15  right?

16  A    Like I said in which year?  Which year and which

17  engagement of McKinsey?

18  Q    In 2010.

19  A    I don't know if there was.  I don't recall if there was

20  one in 2010.

21  Q    Okay.  How about in 2013?

22  A    Yeah, I believe and I know more from having reviewed it

23  around the Settlement Agreement with the DOJ.  I believe it

24  was in 2013 that Management, in advance of the knowledge of

25  the Board, had engaged McKinsey to work with them.  As I

1    understood it, it was around the fact that that was the year

2    that Purdue had received the FDA approval to change the

3    label to the reformulated OxyContin with the abuse deterrent

4    properties for the first time on the label.  It was the

5    first time they could say anything about the abuse deterrent

6    properties because the FDA was extremely careful and the

7    company was very careful prior to that, not allowing them to

8    say anything.  So they, as I understood it, brought in

9    McKinsey to help them figure out how best to deliver those

10   messages to physicians.

11   Q    Okay.  And, in fact, you were made aware that they were

12   bringing in McKinsey, were you not?

13   A    Like I said, I believe when I found out about it, the

14   management had already engaged them and brought them in.

15   Q    You didn't have any discussions with McKinsey?

16   A    I didn't say that.  I said I believed they already

17   started and had been brought in and then they brought them

18   to the Board.

19   Q    And so you did, you engaged in discussions directly

20   with McKinsey?

21   A    The Board did.  I took part I believe in, I can't

22   remember specifically, but I believe Management brought

23   McKinsey to the Board in one of the Board meetings in which

24   I participated.

25   Q    So you participated in a meeting with McKinsey when

Page 70

1    McKinsey was brought in to consult with Purdue on how it

2    could improve its sales of opioids.  Is that right?

3    A    Correct.  I believe that's right.

4    Q    And, in fact, you understood the programs that McKinsey

5    had proposed to expand Purdue's sales of opioids; did you

6    not?

7    A    I wouldn't say I understood all the programs.  I had a

8    presentation from them at that Board meeting alongside the

9    rest of the Board members.  To my knowledge and

10   recollection, I don't believe we ever voted on it.  I think

11   it was an initiative Management continued to pursue

12   thereafter.

13   Q    You didn't vote on it.  Did you ever vote to stop it?

14   A    Like I said, I don't think we ever voted on it either

15   way.  We deferred to Management on those issues.  There was

16   the Management -- the CEO had the option to do that.

17   Q    So you knew, but you knew as the Board of the programs

18   that were being implemented by the corporation in light of

19   McKinsey's reporting and you did not stop those activities.

20   Is that right?

21   A    Like I said, I don't know if I was aware of all the

22   programs, but we had a presentation.  I don't know if I was

23   made or if the Board was made aware of every program they

24   were pursuing thereafter.

25   Q    Were you aware of the Evolve 2 Excellence program?

Page 71

1   A    Like I reviewed some of this.  It didn't ring a bell,

2   but when I reviewed it at the time with the DOJ, I saw that

3   name.

4   Q    If McKinsey had presented to you on its recommendations

5   that were implemented by you say the Management of Purdue,

6   you would have been aware of the Evolve 2 Excellence program

7   would you not have?

8   A    Like I said, I've heard the name.  I wasn't

9   specifically focused on it.  I didn't remember it prior

10  really to the settlement agreement when we reviewed some of

11  the documents with regard to the settlement with the DOJ.

12  It was not a major feature in my recollection or from my

13  time on the Board.

14  Q    Okay.  Let me ask you to turn to Paragraph 92 of the

15  Settlement Agreement you have in front of you.  Let's back

16  it up.  We'll look at 91 first.  Do you recall a discussion

17  with Purdue's Management on August 15th, 2013, discussing

18  McKinsey's progress on evaluating growth opportunities for

19  OxyContin with Board, including the named Sacklers.  Do you

20  recall that?

21  A    Like I said, I recall attending a Board meeting where

22  Management raised and discussed the work of McKinsey.

23  Q    How about Paragraph 92.  Do you recall receiving an

24  email from Richard Sackler that the discoveries of McKinsey

25  are astonishing?

Page 72

1    A    Again, I didn't recall that until I reviewed it in

2    light of the Settlement Agreement with the DOJ.

3    Q    But you did, in fact, you did, in fact receive that?

4    A    I believe so, yeah.

5    Q    And you wrote in response, you wrote in response -- let

6    me ask you actually to pull this document up.  It should be

7    in your materials.  It's PPL UCC 9002451449.  If you could

8    bring that up.

9    A    Can you say the number again?

10   Q    Yes.  PPL UCC 9002451449.

11   A    Got it.

12   Q    And do you see this is your email responding to the

13   email referenced in Paragraph 91 of the Settlement Addendum

14   of August 15th, 2013, at 6:24 p.m. to Richard Sackler.  Do

15   you see that?

16   A    I see that.

17          MS. MONAGHAN:  Objection.  I thought the

18   paragraph, the email you're referring to had the word

19   "astonishing" in it and I don't see that here.

20          MR. EDMUNDS:  Well, it is.  We'll get to that.

21   BY MR. EDMUNDS:

22   A    Yeah, I don't see that here.

23   Q    Do you see the subject line is a reply to subject line:

24   The discoveries of McKinsey are astonishing?

25          MS. MONAGHAN:  Okay.  So the text is not -- it's

Page 73

1    in the subject line.

2              MR. EDMUNDS:   This is the second email.   This is

3    his response.

4    BY MR. EDMUNDS:

5    Q    So this is your response to the email that Richard

6    Sackler sent you with the discoveries of McKinsey are

7    astonishing, right?

8    A    Yes.

9    Q    Okay.  And why don't you read what you said in response

10   to Richard Sackler's email?

11   A    Yes, no kidding.  I said this last Board meeting when I

12   saw the initial report.  Really damning of our organization.

13   I'm really surprised John Stewart hasn't recommended

14   strengthening our management in that area.  Regards,

15   Mortimer.

16   Q    So, in fact -- I opened at Stanford.  If I could turn

17   you back to Settlement Agreement that you have in front of

18   you.  Is it the case -- I'll turn you to paragraph -- turn

19   you back to Paragraph -- I jumped around a little bit -- let

20   me ask you just generally, I can't find it now.  Is it the

21   case that you and the other members of the Board were

22   involved in the hiring and retention of Purdue's executives?

23   A    The Board was involved in the hiring and appointing of

24   the CEO, as Boards generally are.  It's one of the most

25   important roles for the Board of Directors to select the

Page 74

1    CEO.  So yes, we were involved, the entire Board was

2    involved in the search for new CEOs or changes in CEO when

3    that happened.

4    Q    What about other executives of the company like the

5    Vice President of Sales?

6    A    No.  Those were appointments made by the CEO.

7    Depending on the CEO, they had a practice of after they ran

8    a search and narrowed it down with HR or whichever groups

9    they were working with, they had a practice of offering the

10   final candidate the opportunity -- or for the Board members

11   the opportunity to meet with the final candidate they were

12   going to choose, but we were not involved in the search for

13   one.  Those were management searches under the CEO.

14   Q    If you go back to the last documents you had up, you

15   were referring, aren't you, to whether the CEO then, John

16   Stewart, hasn't -- why hasn't he recommended strengthening

17   our management in that area, in the area being sales?  Are

18   you not?

19   A    I'm adding that as a question.  I'm surprised in that

20   email and again, I don't recall other than seeing it in this

21   context, you know, questioning why the CEO hadn't come to

22   the Board to want to make -- strength that area of the

23   organization.

24   Q    So it wasn't the CEO's ability to appoint executives

25   then because he had to come to the Board, did he not?

1           MS. MONAGHAN:  Object to the form.

2    Mischaracterizes his testimony.

3           THE COURT:  It was just a question.  You can

4    answer that.

5    BY MR. EDMUNDS:

6    A    It was the CEO's role to do that.

7    Q    To come to the Board for a recommendation?

8    A    No.  The CEO appoint it, would select and appoint his

9    direct reports.  And he would often make then available for

10   interviews with the Board, but it was the CEO who controlled

11   those positions and who they reported to.

12   Q    By making a recommendation to the Board, right?  That's

13   what your email says.

14          THE COURT:  Actually, it doesn't Mr. Edmunds.

15   You're really stretching at this point from that email at

16   least.

17   BY MR. EDMUNDS:

18   Q    It recommend strengthening our management.  Is that not

19   what it says?

20   A    It's normal for the CEO if they're going to make big

21   structural changes in the organization to discuss that with

22   their Board of Directors, yes, especially at senior

23   management levels and that's what I was referring to.

24   Q    Okay.  So you would engage in discussions about senior

25   -- about the personnel employed in senior management levels

Page 76

1   among the directors.  Is that right?

2   A    I'm saying it's normal for a CEO to engage in those

3   discussions if they're going to make -- and they did over

4   the years.  The CEO would come to the Board and say I am

5   planning to make this change.  I'm launching a search.  We

6   didn't approve or disapprove that.  It was information.  He

7   was telling us of his objectives or his changes and then as

8   a courtesy, he would make the final candidate available for

9   the Board members to meet if they so choose.

10  Q    Okay.  So the Board did meet with and discuss with the

11  CEO the candidates for positions like Vice President of

12  Sales.  Is that right?

13          MS. MONAGHAN:  This is mischaracterizing his

14  testimony.

15          MR. EDMUNDS:  It's a question.

16  BY MR. EDMUNDS:

17  A    No.

18          THE COURT:  You've asked it four or five times

19  now.  You can answer this one, but I really think you're

20  going up a blind alley here, Mr. Edmunds.

21          MR. EDMUNDS:  I'll move on then after -- I'll

22  allow him --

23          THE COURT:  You can answer that question then, Mr.

24  Sackler.

25  BY MR. EDMUNDS:

Page 77

1    A    I said during the time I was on the Board, the CEOs

2    would come and talk to their Board about their plans for

3    organization structure and their plan for changing senior

4    executives, but it was the CEO's initiative and it was the

5    CEO who ran the searches.  It was the CEO who hired those

6    individuals who reported to them.

7    Q    Okay.

8              THE COURT:  But just to be clear, Mr. Sackler.

9    You were unhappy with the CEO in your email as far as the

10   team he had assembled, right?

11             THE WITNESS:  I was -- as I recall, I was

12   surprised given some of those -- and I can't remember the

13   details of the report -- but I believe I was surprised given

14   some of the criticisms in the report that he wasn't coming

15   forward and asking for certain changes to that, yeah.

16             MR. EDMUNDS:  I'll move on, Your Honor.

17   BY MR. EDMUNDS:

18   Q    Mr. Sackler, could you turn to Page 61 of this

19   Agreement Addendum -- rather the Addendum to the Agreement?

20   A    Okay.

21   Q    And so it is true in or around August of 2010, you and

22   other named Board members received a Board package that

23   included Region 0 sales data, including the names of Region

24   0 prescribers?

25   A    I don't recall that, no.

Page 78

1   Q    Is it not true or did you not recall it?

2   A    I don't recall it.

3   Q    Is there any reason for believing that it's not true?

4   A    Like I said, you know, Region 0 was a Management

5   initiative that they would report to the Board on

6   occasionally.  I don't remember ever seeing names of

7   specific prescribers, but it's possible Management made

8   presentations to the Board on Region 0.  That is possible.

9   Q    And did -- if you could turn to Paragraph 62, do you

10  see in the -- is it true that on December 1st, 2010, you

11  were made aware of Management's findings concerning the drop

12  in sales that occurred post reformulation?

13  A    I don't remember the date, but yes, that's certainly

14  possible.

15  Q    And do you recall whether -- for reference -- whether

16  you were briefed on the fact that Region 0 accounts for much

17  of the transaction decline at the regional level?

18  A    I believe that's total prescription decline, not

19  transaction, TRX.  But that is consistent with them

20  reporting on that and that would have been very welcomed and

21  very good news.  Because as we said, the purpose of the

22  reformulated OxyContin was to try to get it out of the hands

23  of people suffering from addiction and people who were

24  looking to abuse it and try to ensure it was only

25  legitimately prescribed for physicians for those who needed

1    it and who would benefit by the medicine.

2    Q    Okay.  So at that time then -- first what is Region 0?

3    I don't think we've established that?

4    A    As I said, my recollection is that this was a

5    Management initiative in order to identify -- when they

6    found out through sales reports or others or news stories

7    that a certain physician was potentially prescribing the

8    opioids or our products inappropriately or selling

9    prescriptions or doing things against the law, Management

10   would put them into Region 0, which would prevent them from

11   getting --receiving any further sales calls from our sales

12   people.  It would prevent any of their data or sales being

13   counted in any compensation package or bonus package for

14   salesman.  So it was Management's work to try to cut out bad

15   doctors, to try to count out any incentive for any salesman

16   or anyone in the company to encourage bad practices.  So

17   that's why they created Region 0 as I understand it.

18   Q    So is it fair to say that when you cut those doctors

19   out, Purdue's sales then declined from what they had been

20   significantly?

21   A    Again, I don't know that level of detail.  I couldn't

22   say that.

23   Q    But that's the detail that was presented to you, was it

24   not, at this December meeting?

25   A    The sales is not because of them being added to Region

1   0, but because of the reformulation and the abuse deterrent

2   OxyContin was launched in 2010.  And so, you know, this

3   presentation, you know, that I believe was saying, look, the

4   good news is the doctors we put in Region 0 that we feel

5   were bad docs had a very large or disproportionate amount of

6   the decline because they don't like the reformulated

7   OxyContin which is harder to abuse.  That's a good thing.

8   That is exactly why we spent years and years almost a

9   billion dollars reformulating the product was to get to that

10  result.

11  Q    I guess that's my point.  Before that, the sales were

12  higher because those doctors were prescribing significant

13  amounts of OxyContin, were they not?

14  A    And we did not want that, correct.

15  Q    But that's what was happening right?

16  A    There were doctors that were acting inappropriately and

17  Management, to the best of their ability, tried to as they

18  could identify them and not call on them, not promote them,

19  not include them in incentive compensation plans.  Really,

20  because we -- as I said all along, the Board had a very

21  clear dual focus here.  How do we ensure this medicine is

22  available for physicians to legitimately prescribe to

23  patients who need it while at the same time minimizing the

24  abuse diversion and harm that could be caused if they were

25  used by others who did not require it medically.  We were

1  told repeatedly, repeatedly over these years that, you know,

2  by Management that Purdue is going above and beyond.  We

3  were doing things no other company had ever done in terms of

4  trying to do that, trying to reduce prescription opioid

5  abuse.  There is a long, long list of programs Purdue

6  Management undertook to try to reduce the abuse and

7  diversion of prescription opioids.  Their reformulating

8  OxyContin had a massive cost and replacing the project out

9  there was just one piece of that.  But there were many, many

10  things that had never been done before in the country or in

11  the world including the first ever abuse deterrent opioid

12  that the company did to try to deal with that problem, to

13  really try to get that balance between how do you make this

14  really important medicine available for those who need it

15  and who otherwise are suffering debilitating pain while

16  keeping it out of the hands who don't need it and who are

17  suffering in a different way from addition.

18  Q    And yet at the end of all that, during that period of

19  time, it is a fact, is it not, that Purdue pleaded guilty to

20  three counts, one of which included that Purdue was putting

21  opioids in the hands of doctors who should not have been

22  prescribing it because their prescriptions were not ripe for

23  legitimate medical use.  Is that right?

24  A    That level of detail of what Purdue pled to, I'm not an

25  expert enough to opine on what they specifically pled to in

1   that.

2   Q    But before everything you said, you actually reread it,

3   right?  We read that.  And you agreed that's what it pleaded

4   guilty to.

5          THE COURT:  By "that" you mean the actual plea,

6   right?

7   BY MR. EDMUNDS:

8   Q    The actual plea.

9   A    I agree with what's in the plea.

10  Q    Okay.  During this time, Mr. Sackler -- and of course

11  the more opioids Purdue sold, the more money it received as

12  a general matter.  Is that right?

13  A    The more product any company sells, the higher it's

14  revenues, yes.

15  Q    Sales drive -- drive revenues and profits, right?

16  A    Correct.

17  Q    And when you -- and I think we've already talked about

18  the distributions of those profits, what you call the excess

19  cash like to the trusts that benefit you and other members

20  of your family, right?

21  A    Correct.

22  Q    And you are not the trustee of those trusts, right?

23  A    I am not.

24  Q    But what is the Family Council?

25  A    Look on our side, we have a very diverse family.  There

Page 83

1    are eight different groups around the world.  The Family

2    Council is something that we put together when my father was

3    still around, but it was intended to really operate as a

4    mechanism for family members to get together a couple times

5    a year to discuss things we worked together, predominately

6    really philanthropy and the philanthropy that we worked on

7    together.  And that's -- it was a way for our family members

8    to come together and talk about those items.

9    Q    Okay.  Let me ask you, Mr. Sackler, to pull up the

10   document you should have that is labeled PPLP UCC 00718353.

11   And the document should have the title, MDS Family Charter.

12   A    Okay.

13   Q    And by MDS, is it your understanding in this document

14   that this means the Mortimer D. Sackler Family Charter?

15   Beginning BEN KAMIN live from Mortimer Sackler and Kathy

16   Sackler.

17   A    Yeah, my father.  The Dr. Mortimer D. Sackler Family

18   Charter --

19   Q    Dr. Mortimer D. Sackler was your father?

20   A    Correct.

21   Q    And this is the charter of the family that establishes

22   the Family Council.  Is that correct?

23   A    I believe so, yes.

24   Q    Okay.  And this document sort of sets forth procedures

25   for the Family Council and explains how it is -- how it

1    functions.  Is that right?

2    A    I believe so, yes.

3    Q    Okay.  And it says under meetings, the Family Council

4    shall meet four times each year.  Right?

5    A    Again, I haven't seen this in a long, long time, so

6    give me a moment to remind myself about it.

7    Q    Sure.

8    A    I mean, this is --

9    Q    Go ahead --

10   A    I don't know when this is dated.  I believe 2003?

11   Q    Does have the date of 2003 at the top.

12   A    And it was something we put together, but it wasn't

13   really something that we wholeheartedly stuck to, but it was

14   kind of an outline.

15   Q    Okay.  Well, let's just stick with what it is in my

16   questions on the docket, and we can talk more about what it

17   was.

18   A    What section would you like me to look at?

19   Q    I think I had asked about four meetings a year, which

20   if I scroll down a little bit -- let me just scroll back.

21   It's going slowly for me today.  It is Section 1.4.4 on Page

22   2.

23   A    Okay.

24   Q    Okay.  And so it meets four times a year, according to

25   this document.  Do you agree with me?

1    A    That's what it says.  Yes.

2    Q    Okay.  And under Section 1.5, it list the functions of

3    the Family Council, and that includes appointing members to

4    four family committees.  Is that right?

5    A    That's correct.

6    Q    There's a Trust and Legal Committee?  Is that right?

7    A    Yes.

8    Q    A Finance and Investment Committee?  Is that right?

9    A    Yes?

10   Q    Pharmaceutical Business Committee?  Is that right?

11   A    Yes.

12   Q    And a Philanthropic Committee.  Is that right?

13   A    Correct.

14   Q    Okay.  If you would scroll down further, I think onto

15   the next page, Section 2.2, there is a Trust and Legal

16   Family Committee, and this outlines that committee, right?

17   A    Yeah.

18   Q    And it says the committee initially comprises Samantha

19   Sackler Hunt -- who is the KEL?  Do you know who that is?

20   A    Karen Lefcourt.

21   Q    Okay.  And MTS, which is Marissa -- is that Marissa

22   Sackler.

23   A    Correct.

24   Q    Okay.  And Samantha Sackler Hunt is the First Chair,

25   right?

Page 86

1    A    Yes.

2    Q    Okay.  And if you would scroll down -- it doesn't list

3    the functions of the Trust and Legal Family Committee,

4    right?

5    A    It does --

6    Q    (indiscernible)

7    A    And let me just say that, you know, many of these never

8    really went into effect.  I would say the two that really

9    were activated and actually did something was the Investment

10   Committee and the Philanthropic Committee.

11   Q    Okay.

12   A    (indiscernible)

13   Q    And this is a 2003 document, just --

14   A    Correct.

15   Q    Do you agree with me?  Okay.  So nevertheless, this

16   document to which is the charter of the family, list says

17   the functions of the Trust and Legal Committee -- we'll skip

18   the first two -- but the third bullet point says to follow

19   on an ongoing basis the trust structure generally and

20   changes that may be recommended by advisors and family

21   trustees, to the intent that the structure should continue

22   to meet and protect the interests of the family generally,

23   and where concerns exist as to the structure being in the

24   interest of the majority, but not necessarily all of the

25   family, to work with any family members who expressed

Page 87

1    concerns as to their own position.  Is that right?

2    A    That's correct.

3    Q    And if you scroll down to...  I think I am missing part

4    of the document, but I will come back to it.  Let's go on to

5    the next committee, which is 2.4.  It discusses the

6    Pharmaceutical Business Family Committee.  Is that right?

7    A    That is what it says, yes.

8    Q    Okay.  And there is such a committee, and it has the

9    function -- or according to this document, it has the

10   functions listed.

11   A    As I said, that committee really didn't ever get off

12   the ground or get formed.  The two main ones, as I recall,

13   really actually came out of this were the Investment

14   Committee and the Philanthropy Committee.

15   Q    Okay.  Well, I've heard you say that several times.

16   Let me take you to another document, and we can test that

17   out, while someone emails me a correct version of this

18   document.

19           So let me ask you to pull up on your screen

20   Document Number PPLP UCC 002451764.  Could you pull that up?

21   A    Can you repeat the number again, because I don't see

22   that.

23   Q    Yeah, sure.

24           MS. MONAGHAN:  I don't either, I have to say, Mr.

25   Edmunds.

Page 88

1                MR. EDMUNDS:  Well, let me repeat it, just to be

2       sure.  PPLP UCC 002451751.  You don't have that?

3                MS. MONAGHAN:  I do have that.  I think you --

4                MR. EDMUNDS:  I might have --

5                MS. MONAGHAN:  (indiscernible) read differently.

6                MR. EDMUNDS:  Okay.

7       BY MR. EDMUNDS:

8       A     451751.  Okay.

9       Q     Yeah.  Ending in 751.  I'm sorry if I read it

10      incorrectly.  And so that first document, Mr. Sackler, was a

11      2003 document that you described as -- well you described

12      how you described it.  But if you look at this document,

13      this is a document with a date of 2012, is it not?

14      A     It is.

15      Q     In it lists all these meetings of those committees,

16      doesn't it?

17      A     I don't know if this is meetings of those committees.

18      No.

19      Q     Well, does it --

20      A     It does -- it -- no, sir.

21      Q     Go ahead, Mr. Sackler.

22      A     Yeah, I mean, I believe what this document is -- again

23      I don't know where you got -- where this is from -- but I

24      believe this would have been the Trustee's sharing in

25      advance with family members the proposed calendar of

1    meetings for 2012.  So it would have been sent to us in 2011

2    to clear dates or to confirm dates of meetings of, you know,

3    the Investment Committee.  And the Trust Admin meetings

4    would have been the Trustee meetings.  Accounts meetings

5    would have been, I believe, the Account Trustee, or the

6    Investment -- the accountants and the trustees, possibly

7    with family members or not.  And then the Family Council

8    meeting -- right.

9    Q    Okay.  Well, there is an Investment Committee, is there

10   not, of the Family Council?

11   A    Family Council.  Yes.

12   Q    (indiscernible)

13   A    And they (indiscernible) meet regularly.  Yes.

14   Q    And so that committee and the Family Council did meet

15   regularly, as did the Family Council?

16   A    Correct.

17   Q    Itself, right?  And so, you know, in fact, this is nine

18   years after the first document, there are meetings of the

19   Family Council taking place in -- this document covers

20   February 8 to, I guess, Thanksgiving, you know November --

21   around November 28th.  And in fact, there are regular

22   meetings within it of the Family Council and of at least one

23   of its committees.  Is that right?

24   A    That's correct, as I said.  Yes.

25   Q    Okay.  And the Investment Committee functions to

1    discuss the investments of the trusts, right, and of

2    distributions to the family members, does it not?

3    A    No.  The Investment Committee's purpose was to advise

4    trusts and family members, included outside investment

5    professionals on investing funds, either held personally by

6    family members or in their trusts.  And it was to give them

7    advice on those investments, i.e. identify new fund

8    managers, identify other investments.

9    Q    Okay.  Mr. Sackler, I am getting back the document that

10   I didn't have correctly here, so I might take you back.

11   Give me just one second.

12            MR. EDMUNDS:  Court's indulgence, please.

13   BY MR. EDMUNDS:

14   Q    Okay.  My apologies.  Let me take you back, Mr.

15   Sackler, to the doc, the MDS Family Charter.  And I'll give

16   you the number again.  I now have the complete document.  So

17   let's go back there.  It's PPLP UCC 000718353, is where the

18   document begins.  And let me know when you have that back

19   up.  You got it?

20   A    Mm hmm.

21   Q    Okay.  So let's scroll back down to -- this is --

22   scroll back down to the Trust and Legal Family Committee

23   that appears in Section 2.2 on the document with the Bates

24   number ending in 18357.  Do you see that?

25   A    Sorry, 18 -- I got it, yes.  Ending, I think it's on

Page 91

1    Page 6, 2.2 Trust and Legal Family Committee?

2    Q    Right.  And you may be reading the same -- I was

3    reading, I think, a different -- well, I think I'm probably

4    having you go through an exercise that we just did.  But if

5    you could look at the third bullet, because mine was

6    incorrect, in this document.  The third bullet of the

7    functions of the Trust and Legal Family Committee is to

8    follow on an ongoing basis the trust structure generally,

9    and any changes that may be recommended by advisors and

10    family trustees.  Is that right?

11    A    Yes.

12    Q    Okay.  And then at the bottom of the page -- or further

13    down the page, I guess in about the middle, there is Section

14    2.3.  And in this document -- first of all, the membership

15    of this committee appears to be you, with you as the First

16    Chair.  Is that right?

17    A    That's correct.

18          MS. MONAGHAN:  I'm just going to object.  For the

19    record, you mean the Investment and Finance Family

20    Committee?

21          MR. EDMUNDS:  Yes, I do.

22    BY MR. EDMUNDS:

23    Q    It's called the Invest -- the official name is the

24    Investment and Finance Committee.  Is that right??

25    A    Yes.

Page 92

1   Q    And sometimes called the Investment Committee?  Is that

2   fair?

3   A    Correct.

4   Q    Okay.  And so that committee consists of you, as Chair;

5   your sister, Kathe Sackler -- is that right?

6   A    Correct.

7   Q    And is it -- I don't remember his first name, but can

8   you say who JML is?

9   A    Jeffrey Lefcourt.

10  Q    Okay.  Thank you.  And it lists here in these bullets

11  the functions of the Investment and Finance Committee.  Is

12  that right?

13  A    Yes.

14  Q    Okay.  And one function is to make recommendations to

15  the trustees and investment advisors of the investments of

16  the trust assets, I guess, they report to.  Is that right?

17  A    That's correct.

18          MS. MONAGHAN:  I'm just going to object, because

19  it's correct but incomplete.

20          MR. EDMUNDS:  All right.  One function, I think I

21  said, is that it does that --

22          MS. MONAGHAN:  No, but the end of the bullet, Mr.

23  Edmund, says the final decision for making investments is

24  reserved to the family trustees.

25          MR. EDMUNDS:  Right.  I don't think that anything

Page 93

1    I asked him about implied that it did not say that.  But

2    with that clarification, thank you.

3    BY MR. EDMUNDS:

4    Q    And do you see the third bullet, to review asset

5    allocations for family members generally, together with

6    family trustees and investment advisors?

7    A    Yes.

8    Q    Okay.  All right.  And then if you go on, there are

9    descriptions, are there not, of the Pharmaceutical Business

10   Family Committee and the Philanthropic Family Committee?

11   A    Yes.

12   Q    Okay.

13          MR. EDMUNDS:  Your Honor, this is not a joint

14   exhibit, but I will move the admission of this document into

15   the record.

16          THE COURT:  Okay.  Any objection to its admission?

17          MS. MONAGHAN:  No objection here, Your Honor.

18          THE COURT:  All right.  I think this is the fourth

19   new exhibit.

20          MR. EDMUNDS:  It is, isn't it?  Yeah, I --

21          THE COURT:  No, no, I'm not complaining.  I'm just

22   saying --

23          MR. EDMUNDS:  Yeah.

24          THE COURT:  -- in the order, that's where it

25   should come up.

Page 94

```
 1              MR. EDMUNDS:  Right.

 2              THE COURT:  That's how it should be referenced,

 3    whatever number we're up to.

 4              (State of Maryland Exhibit 4 admitted into

 5    evidence.)

 6    BY MR. EDMUNDS:

 7    Q    Okay.  And if we could go back -- because I think I

 8    jumped around without doing it to the schedule of meetings

 9    that you had in front of you before, Mr. Sackler, which I

10    believe is PPLP UCC 002451751, that schedule that you had

11    identified before, Mr. Sackler.

12    A    Yes.

13              MR. EDMUNDS:  Your Honor, I'll move this into

14    evidence too.

15              THE COURT:  Okay.  Any objection to that?

16              MS. MONAGHAN:  No objection, Your Honor.

17              THE COURT:  All right.  That's admitted --

18              MR. EDMUNDS:  Okay.

19              THE COURT:  -- with the nest number.

20              (State of Maryland Exhibit 5 admitted into

21    evidence.)

22    BY MR. EDMUNDS:

23    Q    Okay.  And let me turn you now to Document Number --

24    which you should have -- PPLP UCC 002937188.  Could you open

25    that up, please, Mr. Sackler?
```

Page 95

```
 1    A    Okay.

 2    Q    I'll just ask you if it's correct that this is an email

 3    to you and to others from a Geraldine McNaney, of October 8,

 4    2008, that attaches a draft agenda for the Family Council

 5    Meeting?

 6    A    Yes.

 7    Q    And this Geraldine McNaney, she is an employee of the

 8    trust company that acts as trustee for the Mortimer Sackler

 9    Family Trust?  Is that right?

10              MS. MONAGHAN:  At the time?

11              MR. EDMUNDS:  Right.

12    BY MR. EDMUNDS:

13    A    At that time, yeah.  It's what it -- she was the

14    Assistant Manager at Ogier Fiduciary Services.

15    Q    Okay.  And she transmits to you an agenda, it appears?

16    A    Yeah.

17    Q    Okay.  And so that indicates that the Family Council is

18    still meeting, right?

19              THE COURT:  Well, in 2008.

20              THE WITNESS:  Yeah.

21              MR. EDMUNDS:  Right.

22    BY MR. EDMUNDS:

23    Q    It is meeting during that period.  Okay.  And in fact,

24    the Family Council still operates today, does it not, Mr.

25    Sackler?
```

Page 96

1   A    It does.

2   Q    Okay.  All right.  I'm going to turn you to another

3   document you should have, which is PPLP UCC 9002636907, and

4   ask you to open that up.  So if you have that -- you have

5   it?

6   A    I have it.  It's sideways, but I have it.  Yes.

7   Q    Oh, I'm sorry that it's sideways.  Are you able to

8   rotate it?  I would be happy to have you do that if you can.

9   A    It's fine.  It's okay.

10  Q    Okay.  Well, would you agree with me that this is the

11  2004 calendar of Mortimer Family Meetings?

12  A    2014.

13          THE COURT:  Mr. Edmunds, honestly, he's already

14  testified that it still meets.  I'm not sure why we're

15  spending time on this.  Unless you're going to go into the

16  substance of this exhibit.

17          MR. EDMUNDS:  I'm just going to ask him to

18  identify this and I will ask whether there is a similar --

19  first of all, whether this in fact indicates that the Family

20  Council and several of its committees continue to meet.

21  BY MR. EDMUNDS:

22  A    As I said, yes, the Family Council continues to meet.

23  The Family Philanthropy Committee continues to meet.

24  Q    Okay

25  A    The Investment Committee does not anymore.

Page 97

```
 1    Q    When did it stop?

 2    A    A year or two ago, I believe.

 3    Q    Okay.  Now what is this Supervisory Council?  Is that

 4    something different?  It's not on this document.  I'm just -

 5    - I'm turning away from this document.

 6         MR. EDMUNDS:  I'll move the document into

 7    evidence, Your Honor.

 8         THE COURT:  Any objection?

 9         MS. MONAGHAN:  (indiscernible)

10         THE COURT:  It's admitted.

11         (State of Maryland Exhibit 6 admitted into

12    evidence.)

13    BY MR. EDMUNDS:

14    Q    What is the Supervisory Council, Mr. Sackler?

15    A    I don't what you're referring to.

16    Q    Okay.  When there is a candidate for trustee of the

17    trust, does the Family Council interview that candidate?

18         MS. MONAGHAN:  Object to the form.  Lack of

19    foundation.

20    BY MR. EDMUNDS:

21    Q    Is there ever a time --

22         MR. EDMUNDS:  Your Honor, I could rephrase.

23    BY MR. EDMUNDS:

24    Q    Is there ever a time -- have there ever times at which

25    directors of the trust company need to be replaced with
```

Page 98

1    successor directors?

2    A    Oh, there have been some times, yes.

3    Q    And in those instances, does the family interview the

4    director candidates?

5    A    I don't know if interview is the right word.  I think,

6    you know, the trustees, you know, make them available to

7    meet with the family.  Generally, if they're putting them

8    forward as a trustee, it's someone the family already knows.

9    But yeah, they'll put them forward and, you know, make sure

10   the family's comfortable with it before they move forward

11   one way or the other.

12   Q    Okay.  Let me -- I want to -- there is a document that

13   you would have received separately, and I want to ask if

14   you've received it, and also if the Court received it.  We

15   sent it subsequent to the original set of documents.

16           MS. MONAGHAN:  Can you give us the number, Brian -

17   - Mr. Edmunds -- I'm sorry.

18           MR. EDMUNDS:  Sure.  Sure, I was going to try to

19   orient you to its initial -- its whereabouts first.  But the

20   document number is PPLP UCC 000724271.  It's

21   (indiscernible).

22   BY MR. EDMUNDS:

23   Q    Do you have that, Mr. Sackler?

24   A    I -- what was the number again?  If it's not -- I have

25   not received anything other than the original --

Page 99

1    Q    Okay.  This would be --

2    A    -- this is -- I have 20 documents.

3    Q    I emailed subsequently to your counsel...

4              MR. EDMUNDS:  Ms. Monaghan, I don't know.  Do you

5    have an email from me, PPLP UCC 000724271?  A single

6    document and a single email?

7              THE WITNESS:  We can't hear you, Maura.

8              MS. MONAGHAN:  I'm sorry.  I accidentally got

9    muted.  I do have it.  And we can make sure Mr. Sackler has

10   it.  Just give us a second and we'll email it to you

11   separately, Mortimer.  It'll come up in a minute.

12             MR. EDMUNDS:  Thank you, Ms. Monaghan.

13             MS. MONAGHAN:  Just give me one second.  Mortimer,

14   did it come up yet.

15             THE WITNESS:  I just received it from Jacob, yes.

16   BY MR. EDMUNDS:

17   Q    I'll just ask you, is this an email from you to

18   Jonathan White of June 14, 2003, regarding investments?

19             MS. MONAGHAN:  Mr. Edmunds, can I just ask, are

20   you representing that this -- my copy has blue highlighting

21   on it.  Did your office put that, or is that in the

22   original?

23             MR. EDMUNDS:  I do not know if -- I think we

24   should assume it's not.  But I was unable to remove it, and

25   it's not my highlighting.  And I don't think it's

Page 100

1    highlighting...  I don't know where it comes from.  So I

2    would, I guess, simply focus on the text and use the

3    highlighting as a reference to the point in the document I'm

4    going to ask about anyway.

5    BY MR. EDMUNDS:

6    Q    Do you see that this is a --

7    A    Can I have just --

8    Q    Sure.

9    A    I'm just reading it.  Yeah.  Okay.

10   Q    Mr. Sackler, you agree with me this is the email that

11   you sent to Mr. White on the date indicated of June 14,

12   2003?

13   A    Correct.

14   Q    And in this email, you say that the current structure

15   is inefficient, right?  And you feel strongly that the

16   Family Finance Committee, with the help and advice of

17   investment advisors to the Family and the Trustee, can and

18   should be empowered to make all the investment decisions.

19   This is precisely what the Family decided when it created

20   the committee.  Do you agree that you said that?

21   A    I see that, yes.

22   Q    Okay.

23        MR. EDMUNDS:  Your Honor, I would move this

24   document into evidence.

25        THE COURT:  When you say the document, you mean

Page 101

```
 1    the whole email chain?

 2    BY MR. EDMUNDS:

 3    Q    Did you receive all -- are these...

 4              MR. EDMUNDS:  I think we could just move the first

 5    one, but I'm happy to move them all.  I don't think I've

 6    asked him about the others.

 7              THE WITNESS:  Well, I think the one below refers

 8    to what I'm replying to here.

 9              MR. EDMUNDS:  Right.  It does.

10              THE WITNESS:  And again, this is --

11              THE COURT:  Is there any objection to the

12    admission of the whole document into evidence?

13              MS. MONAGHAN:  No objection, Your Honor.

14              THE COURT:  Okay.  So it's admitted.

15              (State of Maryland Exhibit 7 admitted into

16    evidence.)

17              MR. EDMUNDS:  Okay.  All right.  Okay.  Your

18    Honor, with that...  Just one second.  All right.  I think

19    with that, no further questions.  Thank you, Mr. Sackler.

20              THE COURT:  All right.  Does anyone else wish to

21    examine Mr. Sackler?

22              MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson

23    O'Neill, on behalf of the State of Washington.

24              THE COURT:  Okay.  You can go ahead.

25              DIRECT EXAMINATION OF MORTIMER D. SACKLER
```

Page 102

1    BY MR. ROBINSON O'NEILL:

2    Q    Good afternoon, Mr. Sackler.  Can you hear me okay?

3    A    I can.  Good afternoon.

4    Q    I have a couple of follow-up questions on what Mr.

5    Edmunds asked you, and then I have some additional questions

6    of my own.  Just to clarify, the Board that you sat on when

7    you sat on the Board of Purdue, you did have the power to

8    have stopped Purdue from engaging in illegal activities,

9    didn't you?

10              MS. MONAGHAN:  Object to form.

11              THE COURT:  On what basis?

12              MS. MONAGHAN:  I don't know what he means.  The

13    power to stop?  They don't have law enforcement powers.

14              THE COURT:  Mr. O'Neill, it is a broad question.

15    I mean, you could (indiscernible) illegal activities that he

16    would know nothing about and some that he would.  I'm just

17    not sure.  I think you need to refine it.

18              MR. ROBINSON O'NEILL:  Sure.

19    BY MR. ROBINSON O'NEILL:

20    Q    If you had uncovered information that Purdue was

21    violating the law while you were on the Board, would you

22    have been able to take actions to stop that illegal conduct?

23    A    Yeah.  I believe the Board -- if the Board had become

24    aware, which we had not.  And as I said earlier, we were

25    repeatedly told by management that they were in compliance.

Page 103

1    We were told by the OIG monitor as well that they didn't

2    have any concerns for the five years following the 2007

3    settlement.  But clearly, if the Board had found out that

4    anyone within Purdue was not acting appropriately and in

5    compliance, the Board would have come down very hard on

6    management to change that.  Yeah.

7    Q    And you did have the power to make those changes, if

8    you discovered such illegal activity?

9    A    Power (indiscernible) --

10   Q    (indiscernible) Go ahead.

11   A    A Board -- yeah, I mean, a Board can, you know, direct

12   a CEO or the ultimate thing, the Board can change the CEO,

13   as Boards can do.

14   Q    Okay.  You are asking questions about S&P, which is

15   Sales and Promotion.  Is that correct?

16   A    Yes.

17   Q    While you were on the Board, did the management present

18   you or the Board members with return of investment data on

19   their sales and promotions activities?

20   A    I can't recall.  I mean, I assume they did on some

21   things, but I can't recall specifically.  I mean, they

22   certainly, you know, would talk about the effectiveness of

23   investments in promotion and -- if that's what you're

24   referring to.

25   Q    And effectiveness, in that answer that you just gave,

Page 104

1    means the number of sales or the number of prescriptions?

2    A    Yes.

3    Q    So you did receive information from management that

4    your sales and promotions affected prescribing.  Is that

5    correct?

6    A    Yeah.  I mean, it did.  It didn't always work the way

7    they thought it would, right?  They invested -- launched

8    products, thinking they would achieve certain top lines, and

9    products didn't sell.  There were times they thought they

10   could invest and drive sales higher, and sales continued

11   lower.  I mean, you know, no one has a crystal ball.  And

12   you know, management makes proposals to the Board about

13   their budgets; the Board reviews them, asks questions about

14   them, and either approves them or doesn't.

15   Q    Do you have Exhibit JX-2096?  That's the Addendum A to

16   the Sackler Settlement Agreement with the Department of

17   Justice.

18   A    Yes.

19   Q    And Paragraph 88 of that Addendum?

20   A    Okay.

21   Q    If you need to familiarize yourself with the section,

22   this is the section of the Addendum A dealing with the

23   McKinsey program.  That's where it says consulting company.

24   Do you see that?

25   A    Yes.

Page 105

1    Q    And are you comfortable that that refers to McKinsey?

2    A    I believe you that that's what this refers to here.

3    Q    And you're aware that McKinsey did make reports both to

4    the Board and then -- I mean, both to the management and

5    then to the Board about the effect that marketing had on

6    prescribing?

7    A    As I said earlier, I believe -- yeah, management had

8    engaged McKinsey and brought them to the Board to report on

9    their findings and work, in that one or two meetings.

10           MS. MONAGHAN:  Is it frozen for you too?  I'm

11    sorry.  Can people hear me?  Because our connection has

12    suddenly gone unstable.

13           THE COURT:  Yes.  We can hear you, although your

14    video is a little off from your voice.  But we can hear you

15    fine.

16           MR. ROBINSON O'NEILL:  Did you miss -- Ms.

17    Monaghan, did you miss any of the testimony?  I don't know -

18    -

19           MS. MONAGHAN:  I did --

20           MR. ROBINSON O'NEILL:  -- how far (indiscernible)

21    --

22           MS. MONAGHAN:  I did.  But I'm comfortable going

23    forward.  Can I just ask the Court -- and I'm sorry -- for a

24    two-minute break so that I can check if the technical issue

25    is at our end, because I don't want to interrupt further?

Page 106

1              THE COURT:  Okay.  That's fine.  We'll come back

2      at -- oh, I don't know -- 25 after.

3              MS. MONAGHAN:  Thank you, Your Honor.

4              THE COURT:  Mr. Sackler, you can step away, but

5      don't talk about your testimony with anyone.

6              THE WITNESS:  Okay.  Thank you.

7              (Recess)

8              THE COURT:  -- Pharma LP.  Ms. Monaghan, has the

9      glitch been fixed, as far as we know?

10             MS. MONAGHAN:  I hope so.  I believe so, Your

11     Honor.  Thank you.  And I apologize.

12             THE COURT:  All right.  So you can go ahead, Mr.

13     O'Neill.

14     MR. ROBINSON O'NEILL:

15     Q   Mr. Sackler, we were on Paragraph 88 of the JX-2096,

16     the Addendum A to the Settlement Agreement between the

17     Sackler Family and the DOJ?

18     A   I'm there.  I see that.  Yeah.

19     Q   Okay.  And do you recall McKinsey reporting to the

20     Board that detailing resulted in a 53 percent increase in

21     prescriptions of the highest volume prescribers?

22     A   I don't -- I may -- I don't recall those specifics.  As

23     I said, the -- you know, the presentation by McKinsey and

24     management to the Board of those findings was not a major

25     moment.  I don't recall it, but I see them here.  So I have

Page 107

1   no question to doubt that.

2   Q    So, you may not recall the specifics, but you would

3   agree that you received information that sales and marketing

4   did lead to an increase in prescribing.

5   A    Again --

6          MS. MONAGHAN:  Objection to form.  Whose sales and

7   marketing?  In the industry generally, or Purdue's?

8          MR. ROBINSON O'NEILL:  I mean, I believe McKinsey

9   was valuating Purdue's sales and marketing.

10  BY MR. ROBINSON O'NEILL:

11  Q    So, with that qualification, Mr. Sackler.

12  A    Again, I don't -- I don't know if this is talking about

13  industry benchmarks or Purdue's benchmarks, or what -- where

14  it comes from in the report.  But like I said earlier, I

15  mean, yeah, the purpose of sales and marketing and promotion

16  -- and again, this is -- as I recall this McKinsey

17  engagement that management pursued was in 2013, around the

18  abuse-deterrent formulation and trying to get the message

19  out there about the abuse-deterrent formulation, in order to

20  shift prescriptions from non-abuse-deterrent opioids to

21  abuse-deterrent opioids, and specifically to abuse-deterrent

22  OxyContin.  Because, you know, we felt it would help the

23  issue of the opioid crisis, the overdoses, by reducing it.

24  Q    I understand the issue about (indiscernible).  We'll

25  get to that in a minute.  But for now, it is true that the

Page 108

1    Board received information that your sales and marketing --

2    Purdue's sales and marketing affected prescribing, one of

3    the highest prescribers of opioids.  Isn't that correct?

4    A    Like I said --

5    Q    It's a yes or no --

6    A    -- it's true --

7    Q    It's a yes or no.  It's a yes or no question.

8         MS. MONAGHAN:  Well, objection.  It could be an I

9    don't recall question.  I don't think it's true that it's a

10   yes or no question.

11   BY MR. ROBINSON O'NEILL:

12   A    I don't recall the statistics here, as I said before,

13   on this detail of their report and what it was referring to.

14   Q    Okay.  You testified when Mr. Edmunds was asking you

15   questions -- well, let me come back just for a moment to

16   this.  The Board had the authority required to approve the

17   budgets, is that correct, every year?

18   A    The Board approved the budgets presented by management.

19   Yes.

20   Q    And every year, the Board would approve the budget for

21   sales and marketing.  Is that correct?

22   A    The sales and marketing was contained within the

23   overall budget.  Yes.  We didn't --

24   Q    Do you recall --

25   A    -- the members specifically doing it, as opposed to

Page 109

1    approving the overall budget.

2    Q    Would you agree with me that from 2007 until 2017, that

3    line item in your budget was in the hundreds of millions of

4    dollars every year?

5    A    Again, I don't recall the specific numbers of that.

6    It's very possible.

7    Q    Okay.  When you were being asked questions by Mr.

8    Edmunds, you testified that the Board's goal was to balance

9    access to a very valuable product to relieve pain, with the

10   need to avoid diversion.  Do you remember that testimony?

11   A    I do.

12   Q    And it's fair to say that Purdue Pharma and your family

13   personally received -- well, let's talk about your family

14   and your trust.  You received over $10 billion in

15   compensation from 2007 to 2018 for the provision of those

16   products to relieve pain.  Is that right?

17        MS. MONAGHAN:  I'm going to just object.  Do you

18   mean the A Side Family or both the A Side and the B Side?

19        MR. ROBINSON O'NEILL:  Both.  Both A and B.  I

20   apologize.

21        MS. MONAGHAN:  Okay.

22   BY MR. ROBINSON O'NEILL:

23   A    I don't agree -- you said compensation.  I mean, it's

24   true, as we discussed before, that the companies distributed

25   excess cash roughly in those amounts, if you include roughly

Page 110

1    half of that amount that went to taxes and on our side

2    directly to the IRS.

3    Q    And there was an additional $1.4 billion of

4    compensation delivered in non-monetary transfers to IACs

5    that your trusts own.

6    A    Again, I don't say -- I disagree with the term

7    compensation.  There were additional distributions made that

8    Purdue's holding company invested in IACs.  That is correct.

9    Q    Now, you're also aware, sir, that in this case, in this

10   bankruptcy case, that there are several trillion dollars'

11   worth of claims filed for the harm that was caused by the

12   opioid crisis in the United States.  Are you aware of that?

13   A    Sorry, you broke up a little.  Could you please repeat?

14   Q    Sure.  You're aware that in this case there were

15   trillions of dollars of damage claims filed against Purdue

16   Pharma.  Are you aware of that?

17   A    I am.

18   Q    Didn't you say that you got the balancing act wrong?

19   A    I'm not sure I understand the question there.  I mean,

20   how trillion of dollars of allegations, you know -- we

21   didn't -- Purdue and the Family -- there have been thousands

22   of lawsuits against Purdue and the Family, making all sorts

23   of allegations and using all sorts of novel legal theories,

24   and everything under the sun.  And I think, as you said, the

25   amount, I believe, totals more than the global GDP around

Page 111

```
 1    the world.
 2          You know, I -- what I know is myself and the other
 3    Board Members acted appropriately, ethically and legally
 4    while we were on the Board.  We were repeatedly told by
 5    management that the company was doing the same and was in
 6    compliance, pursuing compliance.  The OIG, the Government
 7    Office of the Inspector General that was there for five
 8    years following the 2007 settlement also didn't find or
 9    raise any issues of wrongdoing or problems.
10          So, you know, no, I don't -- you know, I mean, I
11    don't think we got it wrong with what we were told and what
12    information we had.
13    Q    All right.  Mr. Sackler, you are aware that Purdue pled
14    guilty in 2007 to criminal charges and three of its
15    executives also pled guilty in 2007?
16    A    Yes.
17    Q    And you were on the Board at the time?
18    A    I was.
19          MS. MONAGHAN:  Object.  This was already asked and
20    answered.
21          THE COURT:  Right.  Mr. O'Neill, unless you're
22    going down a new avenue -- I mean, Mr. Edmunds went through
23    this at length before.
24          MR. ROBINSON O'NEILL:  Your Honor, my next
25    question is going to be if his defense is that he didn't
```

Page 112

1    know in 2007, why should we believe him in 2020?

2             THE COURT:  All right.

3             MS. MONAGHAN:  I don't --

4             THE COURT:  Well, you can answer that, I suppose.

5    BY MR. ROBINSON O'NEILL:

6    A    I'm not sure I understand it.  You know, in 2007, as I

7    think I stated earlier, the company pled guilty to certain

8    actions of certain individuals in sales and marketing prior

9    to 2001, who had done things that were not correct, were not

10   company policy, were not at all the Board policy or the

11   Family's policy, or our views, and which the Family was not

12   at all aware of, or the Board was not at all aware of.

13            And yes, if you're asking me did those situations

14   continue?  As I said, you know, we were repeatedly told by

15   management, by the compliance group, and even by the Office

16   of the Inspector General, for the five years following that

17   settlement, that you know, that the company was continuing -

18   - was acting in compliance and doing the right thing.

19   Q    I'd like to shift a little bit now.  You said in the

20   balancing act analysis that you believed that sales and

21   marketing was necessary to ensure access to the valuable

22   pain medication that your -- that Purdue sold.  Do you

23   recall that testimony?

24   A    I do.

25   Q    In 2008 -- February of 2008 -- while you were on the

Page 113

1    board, Purdue Pharma ceased all marketing in the United

2    States.  Is that correct?

3              MS. MONAGHAN:  I think you mean 2018.

4              MR. O'NEILL:  I meant 2018.  I apologize -- in

5    2018.

6              THE WITNESS:  It did -- opioids.

7              MR. O'NEILL:  Yes, of opioids.

8    BY MR. O'NEILL:

9    Q    Is it true, then, in 2018, you didn't think that

10   marketing was necessary to maintain access to the valuable

11   drug of OxyContin?

12   A    Look, it was a management recommendation.  The CEO came

13   to the board and requested that -- he had come to the

14   decision that it was time to stop the sales and marketing

15   and promotion of opioid.  And the board supported him in

16   that decision.

17   Q    So sales and promotion activity wasn't necessary to

18   continue access to the Purdue opioid products, was it?

19   A    At that point of time -- you know, I think you're --

20   you're conflating different times.  In 2014, when the FDA

21   changed and the package insert for the reformulated

22   OxyContin, Purdue had never been able to speak to any

23   physicians about the properties and (indiscernible) the term

24   properties of OxyContin at that point.  So at that point, it

25   was important to get that message out there in a balanced

Page 114

1    and correct way to physicians about what this new

2    formulation meant, what the FDA said they could say about

3    it.  Five years later, for the CEO to say, you know, we've

4    done that.  We've let physicians know.  We've educated them

5    on the abuse deterrents, pros and cons and risks and decide

6    at that point to end it.  You know, the board supported that

7    decision.

8    Q    It's your testimony that the board decided in -- or,

9    I'm sorry -- the Purdue's executive team in 2018 decided

10   that they had done enough advertising so that they no longer

11   needed to market products in 2018?  That's why they changed

12   their policy?

13             MS. MONAGHAN:  Objection.  Mischaracterization of

14   his testimony.

15             THE COURT:  No, he's asking that.  He's asking why

16   -- why did they change.

17             THE WITNESS:  You know, I think you'd have to ask

18   management or (indiscernible) particular what drove his

19   recommendation to make those changes and to come to the

20   board and request that.

21   BY MR. O'NEILL:

22   Q    Okay.  And I want to ask you a couple questions about

23   the (indiscernible) formulation.  In -- are you aware that

24   in September of 2020, an FDA panel met to discuss and issue

25   findings on whether or not to use the term formulation

Page 115

1    reduced -- or, I'm sorry -- abuse in the United States.  Are

2    you not?

3    A    I'm not aware of that.

4             MS. MONAGHAN:  Objection.  (indiscernible) didn't

5    understand the question.

6             MR. O'NEILL:  I'm sorry.  You're not aware?

7             THE COURT:  Well, I think Mr. Sackler did.

8             MS. MONAGHAN:  Okay.

9    BY MR. O'NEILL:

10   Q    You're not aware?

11   A    Not -- I was not on the board in 2020 is, I think, the

12   year you were citing.  I was no longer on the board and I

13   was not aware of any FDA panel finding on abuse deterrents.

14   Q    You were not aware that the FDA panel voted 26 to 1

15   that ADF -- abuse deterrent formulation -- of opioids does

16   not reduce abuse?

17   A    Like I said, I'm not aware of that finding or what that

18   panel was, no.

19   Q    Okay.  I'm not going to ask my own questions

20   (indiscernible) different than Mr. Edmunds.  Have you

21   personally approved the Sackler settlement that's a part of

22   this confirmation (indiscernible)?

23   A    I'm sorry.  What's the question?

24             THE COURT:  Have you -- I'm sorry.  Go ahead, Mr.

25   O'Neill.

Page 116

1    BY MR. O'NEILL:

2    Q    Did you personally approve the settlement agreement

3    that's proposed as a part of this confirmation

4    (indiscernible)?

5    A    I am in favor of the settlement agreement, yes.

6    Q    And have you signed the settlement agreement or

7    otherwise endorsed it?  Not yet?

8    A    Not yet?

9    Q    Are you going to be contributing any of your own

10   personal assets to fund those payment obligations?

11   A    Yes.

12   Q    What are you going to be personally paying?

13   A    I mean, you know, my share of -- you know, first of all

14   as I said earlier, you know, on our side of the family, you

15   have a much more diverse and broad family.  There are eight

16   different groups, many of whom never were involved with

17   Purdue who had to come together to make this size of

18   settlement an contribution possible.  My share of the

19   settlement agreement which is one-eighth of our family's

20   share is larger than my personal -- is substantially larger

21   than my personal net worth.  So myself and trust for my

22   benefit will be contributing, you know, my share towards

23   that.

24   Q    Do you know how much of your own personal assets will

25   be expended or is it all going to be covered by the trusts?

Page 117

1    A    Well, the -- a trust that I'm a beneficiary of that's

2    for me, you know, is -- for me and my children and

3    grandchildren is, in my view, is my contributing as well.

4    You know, in terms of how much ends up coming out of my

5    personal estate versus my trust, I don't know at this time.

6    Q    All right.  You said earlier that you're aware of the

7    numerous claims that are filed against you and I think you

8    used the word "inventive" claims.  Is that -- I may be

9    missed -- I maybe conflating it --

10   A    I believe I used novel legal theories --

11   Q    Novel.  Novel legal theories.  Fair enough.  In 2019,

12   you are aware that Purdue Pharma settled with the state of

13   Oklahoma.

14   A    I am.

15   Q    And you're aware that Purdue Pharma paid $200 million

16   as part of that exchange or part of that settlement.

17   A    Yeah.  I thought it was more than that but, yes.

18   Q    Well -- and $75 million was paid by the Sackler

19   families.  Is that correct?

20   A    That's correct.

21   Q    Do you make a habit of paying $75 million to settle

22   novel legal claims?

23            MS. MONAGHAN:  Object to the form.

24            THE COURT:  I think you should rephrase it.  You

25   can ask why.

Page 118

1           MR. O'NEILL:  I will move on, Your Honor.  I won't

2     --

3           THE COURT:  Okay.

4     BY MR. O'NEILL:

5     Q    Mr. Sackler, have you been able to listen to any of the

6     testimony in this matter -- in this bankruptcy proceeding?

7     A    I have not.

8     Q    Okay.  You're aware that as a condition of this

9     settlement agreement, the claims of nine objecting states

10    are going to be extinguished if this confirmation plan is

11    approved?

12    A    I'm aware that -- yes.  The -- you know, for this plan

13    to get confirmed, which I understand has, you know, very,

14    very strong support among all our creditors, that that --

15    you know, there needs to be closure to these issues, yes.

16    Q    If you were -- if those states were carved out of this

17    settlement agreement, would you still support it?

18    A    No, I would not.

19    Q    So it's an absolute condition of this plan for you to

20    contribute money is that your family receives releases so

21    that it doesn't have to face questions like the ones I'm

22    asking you today?

23    A    No.  I think that's mischaracterizing it.  I think -- I

24    said earlier, our family had a very -- you know, when these

25    thousands of lawsuits against Purdue and then the family

Page 119

```
 1    arose, we had a very clear decision that we had to make.  We
 2    could fight those lawsuits for years and years and probably
 3    decades and expend a vast and crazy amount of money on legal
 4    fees and lawyers and everything else, or we could try to
 5    reach a settlement and get those monies to the communities
 6    and the individuals out there who are suffering.  And that,
 7    for our family, is an easy choice to make.  And so, you
 8    know, that's why we're here today because for us, you know,
 9    one of the key goals in this settlement was to ensure the
10    actual -- that the money went and helped those communities
11    and individuals who are suffering, and so we're here
12    settling because we'd rather see that happen than spend it -
13    - than fight it for years and years and have it wasted in
14    legal fees.
15    Q    The releases that you're asking for in this matter are
16    broad.  You're aware of that?
17    A    I am.
18    Q    And they would include releases for all conduct, not
19    just conduct related to the sale of opioids.  You're aware
20    of that?
21    A    I am.
22    Q    For example, your -- you are on the board --
23              MR. HUEBNER:  Your Honor, I'm actually going to
24    have to object to that.  That is actually not what the
25    releases do.  They're actually complicated, to be sure.
```

Page 120

1    They most assuredly do not give them (indiscernible) from

2    all conduct and it's actually not appropriate for Mr.

3    O'Neill to mischaracterize the plan documents that are in

4    evidence in this case.  There are a variety of excluded

5    claims and other matters that absolutely negotiated by

6    multiple parties to be outside the scope of their releases.

7    If he wants to ask questions, he's more than welcome to, but

8    he's not welcome to misdescribe the settlement agreement.

9              THE COURT:  Okay.  Well, I think you've made your

10   point, but why don't we just move along with the

11   questioning.

12   BY MR. O'NEILL:

13   Q    You're aware that Purdue Pharma, while you were on the

14   board, launched a drug called adhansia?

15   A    I am, yes.  I don't recall if it was Purdue or one of

16   the subsidiaries that launched it but, yes.

17   Q    And that's a drug to treat attention deficit

18   hyperactivity disorder or ADHD?  Is that right?

19   A    Correct, yes.

20   Q    And the thing that's unique about adhansia is that --

21   well, you're aware that it has the same chemical components

22   as a drug called Ritalin?

23   A    Yes.

24   Q    But what's new about adhansia is that it puts it in a

25   delay release formulation so that it can be dosed for up to

Page 121

1    16 hours.  Is that correct?

2    A    That's correct.

3    Q    And it's approved for use in children as young as six

4    years old.

5    A    I don't recall the specifics of that but it's possible.

6    Q    Adhansia carries a black box warning that it contains

7    the high potential for abuse and dependence.  Are you aware

8    of that?

9    A    I believe so, yes.

10   Q    And you understand the releases that you're seeking in

11   this confirmation plan would extinguish claims related to

12   adhansia?

13   A    I believe, you know, the relief is -- covers everything

14   that ties in with the period of time that I was on the board

15   of Purdue.

16   Q    Are you aware of whether any of the states -- state

17   complaints -- filed against Purdue Pharma address the issue

18   of adhansia or adhansia marketing?

19   A    I don't know.

20   Q    All right.  Mr. Sackler, do you believe that you have

21   any personal responsibility for the opioid crisis in the

22   United States?

23   A    No, I believe -- I think I said earlier, I think the

24   opioid crisis is an incredibly complex crisis with a lot of

25   -- many, many factors that contribute to it.  And I think

Page 122

```
 1   I've said and my family have said, you know, the fact that
 2   OxyContin, a product that was sold to help people to relieve
 3   pain, also went out and got diverted and abused in whatever
 4   amount and caused pain and hurt people is horrible.  It guts
 5   me.  It guts our family.  It is not at all what was intended
 6   and what we were, you know, trying to do by releasing this
 7   medicine and the company releasing this medicine.  And I
 8   believe that you're in a position to help, you have a
 9   responsibility to help.  And so, you know, we're here trying
10   to get the settlement done so then we can get these vast
11   sums to these communities and to these people to help them,
12   rather than, you know, spend it on litigation forever.
13   Q    You're aware that in order to fund the settlement that
14   the Sackler families intend to sell off their IACs or
15   independent affiliated companies?  Is it affiliated or
16   associated -- who ones of those -- IACs anyway --
17   A    Associated.
18   Q    -- associate companies in order to fund this settlement
19   with the United States?
20   A    I am.
21   Q    You're also aware that those IACs continue to market
22   opioids, including OxyContin, in the rest of the world, are
23   you not?
24   A    Some of them do, some don't and they market them within
25   the legal jurisdictions and laws of those countries, yes,
```

Page 123

1    and some of them aren't promoting opioid anymore either.  So

2    there's a mix.

3        Q    Does your responsibility to avoid the harms

4    causing by OxyContin not extend to those countries where you

5    continue to market opioids?

6    A    Like I said, I think OxyContin is an incredibly

7    valuable medicine. It's -- it is still an FDA-approved

8    medicine.  It carries risks with it as do many medicines if

9    not used appropriately, but I think it is, even in the

10   United States, still needed today to treat people who are

11   suffering and in severe, severe pain.  And that has to --

12   you know, and the medicine needs to be -- continued to be

13   made available because, unfortunately, today, we don't have

14   better pain medicines that have less risks associated with

15   them.  And hopefully, those will get developed in the coming

16   decade.  But today, you know, opioids, you know, are still

17   needed to treat patients who are -- have those painful

18   conditions.

19   Q    Mr. Sackler, there have been tens of thousands of

20   personal injury claims filed in this matter.  Do you have

21   any words of apology for those people who've been harmed by

22   your product?

23   A    Like I said, I -- myself, my family feel horrible to

24   families who have lost loved ones or individuals suffering

25   from addiction.  It's -- you know, it's horrible.  I'm truly

Page 124

1    sorry that there -- you know, those families are going

2    through that.  The overdose -- the opioid crisis and the

3    overdose crisis or however you want to refer to it the

4    country's been going through is a horrible problem that

5    really is going to take everyone coming together.  Everyone

6    in society and government -- any company that can, any

7    individuals that can, local communities, organizations to

8    really get at this to help those people who are suffering

9    from addiction.  I feel -- this is a health care crisis.

10   Addiction is a health care crisis.  It's not in my mind at

11   all a legal problem.  This -- these people are suffering.

12   They should not be locked up.  They should be getting

13   treatment and they should be getting help.  And I think

14   until the country and everyone comes together to help those

15   people and deal with that, I think, unfortunately, the

16   crisis is going to keep getting worse because that's what's

17   been happening since the late 1970s in America.

18   Q    Mr. Sackler, is that what you consider to be an

19   apology?

20   A    I said I feel horrible that, you know, these families

21   that have been affected by the opioid crisis and by

22   addiction have suffered in that way.  And we feel horrible,

23   and, yes, we're sorry if a medicine that we put out that was

24   intended to relieve pain has caused pain to those families.

25   We're sorry if that happened.  That was an unintended

Page 125

1    consequence.  It was not the purpose of this medicine.  It

2    was not what we were focused on.  In fact, the opposite was

3    the case.  As soon as we started hearing about it,

4    management and the board were focused on, what can we do to

5    balance the availability of this needed medicine while

6    reducing the risk of its diversion and abuse and harm.

7    Q    And you're willing to enter into this settlement to

8    help ameliorate that crisis that you just described?

9    A    As I said, yes, our goal -- one of our guiding goals in

10   this from the beginning was for those funds -- we wanted to

11   ensure that in the settlement the funds would actually make

12   it to the communities, actually be spent to help those and

13   not get, you know, wasted the way, for example, the tobacco

14   settlement funds got wasted and actually didn't make it.

15   Q    But you're only willing to make that contribution so

16   long as your family retains billions of dollars for you own

17   personal benefit.

18   A    I don't understand the question there.

19             MR. O'NEILL:  No more questions, Your Honor.

20             THE COURT:  Okay.  All right.  Mr. Ozment, do you

21   have any questions?

22             MR. OZMENT:  Yes, Your Honor, I'll do it if I

23   could get this set up.

24             CROSS-EXAMINATION OF MORTIMER D. SACKLER

25   BY MR. OZMENT:

Page 126

1   Q    Mr. Sackler, my name is Frank Ozment, and I represent

2   some individual claimants.  They're Charles Fitch is one,

3   Stacey Bridges is another.  Mr. Fitch, I'll represent to you

4   has some felony convictions, Ms. Bridges has some

5   misdemeanor convictions and I relate that to you because I

6   want to emphasize that it is not my clients' position

7   publicly to excoriate anybody about a mistake.  Okay?  So

8   I'm not heRE to pile them on, if you will, with respect to

9   any accusations that people made against you or your family

10  about your guilt.

11      I'm going to ask you some questions about the guilty

12  plea that Mr. Edmunds reviewed.  Okay?  So he asked you --

13          MS. MONAGHAN:  Mr. Ozment, are you referring to

14  the 2020 guilty plea?  Just so we're all the same page?

15          MR. OZMENT:  I was just about to -- I was just

16  about to clarify that.  Thank you, yes.  The 2020 guilty

17  plea.  All of my questions have to do with the 2020 guilty

18  plea.  None of them have to do with the 2007 plea, unless I

19  specifically state otherwise.

20          THE COURT:  Well (indiscernible) --

21          MS. MONAGHAN:  Or with the civil settlement by the

22  family members.  You're talking about the --

23          MR. OZMENT:  That's correct.

24          MS. MONAGHAN:  -- (indiscernible) guilty plea?

25          MR. OZMENT:  That's correct.  I'm not asking about

Page 127

1    the civil settlement.

2            MS. MONAGHAN:  Okay.  Thank you.

3            MR. ALBERT:  Yeah, Your Honor, we've got

4    (indiscernible) through multiple witnesses.  The record in

5    this case is clear that Mr. Sackler left the Board at the

6    end of 2018.  I believe Stern really his letter was

7    effective January 16th, 2019.  We've been very patient with

8    Mr. Ozment has asked person after person who left the Board

9    if two years before the guilty pleas and the settlements at

10   issue about them.  I would ask that he tailor his questions

11   to the admitted plea, and Mr. Sackler was just gone from the

12   Board at the end of 2018, and these deals were released in

13   2020.  Other than that, I have no problem with anybody

14   asking Mr. Sackler any question.  Ask away, but we do need

15   to, you know, be mindful of the realities and the cost of

16   this proceeding.

17           THE COURT:  Okay.  You -- you can go ahead, Mr.

18   Ozment.

19           MR. OZMENT:  Thank you.

20   BY MR. OZMENT:

21   Q    My first question to you is about a statement made in

22   connection with that 2020 guilty plea, and my question to

23   you has to do with whether you recall this statement or

24   something like it.  Okay?  Not whether you agree with it.

25   Do you recall that the United States more or less accused

Page 128

1    people of corrupting the doctor patient relationship?

2    A    I don't recall that, no,

3    Q    Okay.  I'm going to represent to you that they made

4    that accusation.

5    A    (Indiscernible).

6    Q    Was -- is it your understanding that the victim in any

7    sort of alleged corruption of the doctor patient

8    relationship, would it be the Government, Perdue or the

9    patient, or somebody else?

10   A    Sorry, could you repeat that?  I'm not sure -- I was

11   having problems with my (indiscernible).

12          THE COURT:  Mr. Ozment, we're going pretty far

13   afield here.  You -- you --

14          MR. OZMENT:  Your Honor, may I explain the context

15   of this question without overt suggestive user?

16          THE COURT:  Okay.  But --

17          MR. OZMENT:  Thank you.

18          THE COURT:  -- you're talking about a settlement

19   that he wasn't -- he wasn't involved with.  So I just -- if

20   you're -- if you're tying it to the settlement, I'm just not

21   sure what the purpose is of this questioning.

22          MR. OZMENT:  Well, the -- he testified at some

23   length regarding the relationship with the Office of

24   Inspector General.  He testified about the agreement and my

25   question to him isn't about the agreement -- I mean the plea

Page 129

1    agreement.  My question to him is who was the victim there?

2    What did he understand the victim to be?  Did he -- was the

3    victim the LIG?  I don't think so.  I think the victim was -

4    - was the patients, but I'd like to ask him if that was his

5    understanding.

6            MS. MONAGHAN:  I'm sorry, I still don't understand

7    the question and I'm not sure in what capacity you're asking

8    him, is just a -- he wasn't a Board member at the time of

9    the plea.  As just a person who he thinks --

10           MR. OZMENT:  Right.

11           MS. MONAGHAN:  -- is the victim or --

12           MR. OZMENT:  Right.  He's -- he's talked about his

13   legacy in trying to solve this problem.  He's talked about

14   institution, and I want to get at who does he think the

15   victim.

16           THE COURT:  Okay.  That's a -- that's a fair

17   question.  Just as a -- as a person concerned about the

18   opioid crisis, who do you believe was the victim of the

19   conduct described in the 2020 settlement agreement with the

20   Department of Justice?

21   BY MR. OZMENT:

22   A    With the company -- I mean with the company?

23   Q    And just to be clear, Mr. Sackler, my question,

24   originally, was about the plea agreement, but go ahead.

25   A    You know, I mean, I think it was the communities and

Page 130

1    the individuals suffering from addiction.

2    Q    Thank you.  You also gave some testimony about the

3    version and the efforts that the company made to stop that.

4    In each sentocrucion, you know illegal diversion of the

5    drug, can you explain to me what they're talking about here?

6            MR. ALBERT:  Your Honor, with apologies.  I want

7    to be very clear.  Mr. Ozment filed a less than three page

8    objection, which centers entirely on the notice to

9    claimants, and the fairness of distribution under the plan,

10   with respect to incarcerated persons.  I have it opened.  It

11   cites no case law, and that's all it does.  His questions

12   witness after witness about their philosophical views on

13   public health issues, candidly, I'm not sure why I care what

14   Mortimer Sackler's views on Diversionary.  If he can tie it

15   to his objection, which was only about notice and

16   distribution procedures, then I think it's appropriate, but

17   you know, I don't want to interrupt people.  It's just --

18   it's not, you know, I don't understand how this is remotely

19   tethered to what we're here today to be accomplishing.

20           MR. OZMENT:  Your Honor, I'll be glad to put it --

21           THE COURT:  (Indiscernible) --

22           MR. OZMENT:  -- it might --

23           THE COURT:  What is your definition of diversion,

24   Mr. Sackler?

25           MR. SACKLER:  My definition of diversion would be

Page 131

1    any improper use of, you know, in the case of OxyContin, any

2    physician who prescribed it for non-intended use, or uses

3    not (indiscernible).  Anyone who stole it from a medicine

4    cabinet, sold it illegally, you know, any use that is not as

5    intended under the FDA label packaging or (indiscernible).

6              THE COURT:  Okay. And sir, I noticed you took out

7    your ear bud, did it just die or -- because you -- the sound

8    really -- the sound quality really went down when you did

9    that.

10             MS. MONAGHAN:  It did.

11             MR. SACKLER:  If you can give me a minute I can

12   try to get it to work again.  It stopped working, so.

13             THE COURT:  Okay.

14             MR. OZMENT:  Thank you, Mr. Sackler, is it working

15   now?

16             MR. SACKLER:  No, it's -- I am not connected, so

17   what I'm going to try to get them to reconnect.

18             MR. ALBERT:  Okay.

19             MR. SACKLER:  See if that works.  Can you hear me

20   better?

21             THE COURT:  Yes.

22             MS. MONAGHAN:  Yeah.

23             THE COURT:  Much better.

24             MR. SACKLER:  Okay.  Sorry about that.

25             MR. OZMENT:  You got it?

Page 132

```
 1                THE COURT:  Yes.

 2                MR. SACKLER:  Yep.

 3                MR. OZMENT:  Thank you.

 4     BY MR. OZMENT:

 5     Q    I think I followed your answer, but I'm going to ask

 6     you one more question, just to make sure that we're on the

 7     same page.  If a patient went to a physician for medical

 8     treatment and received a prescription for one of your

 9     company's products, and then consumed that, you know, that

10     product that was prescribed.  That wouldn't be diversion

11     would it?

12     A    If they consumed it as per the doctor's --

13     Q    Right.

14     A    -- instruction and prescriptions, like they took the

15     right amount and the times of day that they are meant to, et

16     cetera, and then, no, if they used the product

17     appropriately, and the physician prescribed it appropriately

18     for an underlying pain condition that was severe enough to

19     warrant the use of an opioid, then that would not be

20     diversion.

21     Q    If I follow your answer, but I'm asking about it just

22     from the patient's perspective, okay.

23                THE COURT:  Mr. Ozment, honestly, this really is

24     going -- I'm not sure where you're headed with this, how it

25     pertains to --
```

Page 133

1           MR. OZMENT:  Well, I'm -- Your Honor, where I'm

2     headed with it is, I don't think he suggested that a patient

3     was diverting medication if they took it as prescribed.  But

4     when he answers the question, it sounds like perhaps he's

5     hedging on that.

6           THE COURT:  No, I don't -- if -- if it were -- I'm

7     going to a different point, which is -- I thought you were

8     asking a -- I'm not sure where you're headed with this.  I

9     really am not.  There's no objections to your client's

10    claims based on this.  Whether they're responsible or the

11    doctor's responsible, or I just don't know where you're

12    headed with this.

13          MR. OZMENT:  Well, I think there's been a

14    suggestion, and it -- perhaps it's just really to meritless

15    to address, that people who took OxyContin, by prescription,

16    after visiting a doctor for medical treatment, might somehow

17    be at fault and thus not entitled to --

18          THE COURT:  I -- I understand what --

19          MR. OZMENT:  -- (indiscernible) blood.

20          THE COURT:  -- again, that's not -- that's not

21    part of your objection to the plan.  The plan actually, the

22    trust procedures require to establish a personal injury

23    claim, actually one of the things they want -- they ask for

24    is a prescription for the drug. So I'm just --

25          MR. OZMENT:  I understand.  I'll move on, Your

Page 134

1    Honor, thank you.

2              THE COURT:  Okay.

3              MR. OZMENT:  My apologies. That's all I have.

4              THE COURT:  Okay.  All right.

5              MR. OZMENT:  Thank you, Mr. Sackler.

6              THE COURT:  Okay.

7              MR. SACKLER:  Thank you.

8              THE COURT:  All right.  Mr. Higgins, do you have

9    questions?

10             MR. HIGGINS:  Yes, good afternoon, Your Honor.

11             CROSS-EXAMINATION OF MORTIMER D. SACKLER

12   BY MR. HIGGINS:

13   Q    Good afternoon Mr. Sackler.  My name is Benjamin

14   Higgins and I represent the United States Trustee, can you

15   hear me okay?

16   A    I can.  Good afternoon.

17   Q    You're getting a release under the plan, correct?

18   A    I am.

19   Q    Any other members of the Side A Sackler Family are

20   getting releases under the plan, correct?

21   A    Correct.

22   Q    And the spouses, children, and grandchildren of the

23   Side A Sackler Family members are getting releases, correct?

24   A    Correct.

25   Q    And entities or individuals to which any of your assets

Page 135

1   are transferred are also getting released; did you know

2   that?

3   A      Correct.

4   Q    Do you know how many people you've transferred assets

5   to?

6   A      Off-hand, not I do not.

7   Q    Could it be in the hundreds?

8           MS. MONAGHAN:  Objecting, in any transfer?  So,

9   you know, if he bought a pack of gum, that would be a

10  transfer?

11          MR. HIGGINS:  I'm just working off the language in

12  the disclosure statement.  It says any entities or

13  individuals to which any assets of the above are

14  transferred.

15          MS. MONAGHAN:  And that -- okay.

16  BY MR. HIGGINS:

17  A    I -- I don't know the number.

18  Q    Do you know how many entities you transferred assets

19  to?

20  A      Not off-hand, no.

21  Q    Do you know how many entities or individuals the other

22  Side A family members have transferred assets to?

23  A      I do not.

24  Q    The release also includes any assets, businesses, or

25  entities that you own; did you know that?

Page 136

1    A    Yes.

2    Q    How many businesses do you own?

3    A    I couldn't tell you off-hand.  I have a varied

4    investment portfolio of a lot of different investments.

5    Q    And you're an active investor and a venture capitalist;

6    is that right?

7    A    Correct.

8    Q    And you've helped found and develop numerous companies

9    across technology, consumer goods, and hospitality sectors;

10   is that right?

11   A    I invest in those sectors; that is correct, yes.

12   Q    And you don't know how many such companies you've

13   invested in, do you?

14   A    I do not.

15   Q    Okay.  Are any of those companies contributing money

16   towards the debtor's plan?

17   A    They are not.

18   Q    Do you know how many assets, businesses, or entities

19   the other Side A Sackly -- excuse me, the other Side A

20   Sackler Family Members own?

21   A    I do not.

22   Q    So sitting here today, you don't know how many people

23   or entities are getting released  under this plan; isn't

24   that correct?

25   A    That's correct.  I've been shown a schedule that breaks

Page 137

1    it down into different groups, and the groups, I believe are

2    labeled as to the types of entities and why they're under

3    there.  But I couldn't tell you the total number.

4    Q    Are you familiar with the Shareholder's Settlement

5    Agreement?

6    A    I don't know which one, but I -- which Shareholder

7    Settlement --

8    Q    The -- the broad one that's being incorporated under

9    the plan -- I think you testified earlier that your -- that

10   you support the Shareholder Settlement Agreement.

11   A    The current -- the current settlement agreement, yes.

12   Q    Yes.  And you testified earlier that it has not been

13   executed yet, is that correct?

14   A    I don't believe it has.

15   Q    Are you aware that the most recently filed public

16   version of the Shareholder's Settlement Agreement contains

17   an exhibit of designated shareholder release parties that

18   has been left blank?

19   A    I'm not aware of that.

20   Q    Do you know if the list of parties getting releases

21   could be expanded beyond what's been disclosed so far?

22   A    I don't know.

23   Q    Mr. O'Neill asked you about contributing personal

24   assets and I think he -- he asked you specifically about how

25   much you're contributing of your assets that are not held in

Page 138

1    trust, do you remember that exchange?

2    A    I do.

3    Q    And I think you testified that you don't know how much

4    of your non-trust assets are being contributed to the plan;

5    is that correct?

6    A    I think I said that, you know, on our side of the

7    family there are eight different groups that needed to come

8    together to make this settlement possible.  With many of

9    them who were never even involved in Purdue, and that need

10   though, we're all contributing, you know, one-eighth of our

11   A Side Family's contribution to the settlement, but that

12   amount for me is substantially larger than my personal net

13   worth.  And so both the trusts for my benefit, as well as

14   myself, will be contributing to that.  But, you know,

15   whether it comes out for a trust that's for my benefit, or

16   my kids benefit, or it comes out of my -- me personally, I'm

17   still contributing, you know, one-eighth of the value of our

18   side's share.

19   Q    My question is with respect to the money that you

20   personally could be contributing that doesn't come out of

21   the trust that you're a beneficiary of, do you know the

22   number -- how much that you're contributing?

23   A    I do not yet, because, you know, a lot of it will

24   depend on the sale of the IEC's and the proceeds of the sale

25   of the NIC's, and a number of other factors.

Page 139

1    Q    Do you know if any of the other Side A family members

2    are contributing non-trust assets under the plan?

3    A    I don't know.

4    Q    Mr. O'Neill asked you about the release provision under

5    the plan, and Mr. Huebner, debtor's counselor -- debtor's

6    counsel, jumped on and described the -- the plan provisions

7    as complicated.  Do you remember that exchange?

8    A    I -- I do.

9    Q    Have you read the release provision in the plan under

10   which your family is seeking non-consensual third party

11   releases?

12   A    I've gone through it, yes.

13   Q    Do you understand it?

14   A    I don't know if I could say I understand it all in

15   detail, but I think generally -- generally, I think I

16   (indiscernible) okay understanding about it and have

17   discussed it with my lawyers.

18   Q    And do you understand the full extent of the claims of

19   against you and your family that are being released?

20   A    I believe so.

21   Q    You have a bachelor's degree from Harvard, is that

22   correct?

23   A    That's correct.

24   Q    And you have an MBA from the NYU Strong School of

25   Business; is that correct?

Page 140

1    A      That's correct.

2    Q      And you feel that you understand it okay after having

3    spoken with the lawyers that wrote the provision; is that

4    right?

5    A      Yes.

6    Q      Mr. Edmunds asked you about the distribution of funds

7    out of the company during your time on the Board; do you

8    remember that exchange?

9    A      Yes.

10   Q      You testified that Purdue was never lacking in funds.

11   Do you remember saying that?

12   A      Yes.

13   Q      Does Purdue have sufficient funds to pay in full all of

14   the opioid related claims against it?

15   A      I don't know.  Again, I haven't been on the Board of

16   Purdue since the end of 2018.  And so I don't -- I don't

17   know the details of their current financial position, or

18   their settlements and claims.

19   Q      Do you know how much money it'll be with victims with

20   claims against Purdue are getting paid under the plan?

21   A      I do not.

22   Q      Did you ever bother to look?

23   A      You know, I mean, I -- I know that in totality, you

24   know, what our families are contributing towards the plan is

25   about $4.5 Billion dollars, plus our ownership of Purdue and

Page 141

1   all the other U.S. entities with in the U.S. and as I said,

2   you know, it's our family's hope that those funds can

3   actually go and make it to the communities and to the

4   individuals who have suffered and that they can get the

5   treatment that they need.

6   Q    Thank you, Mr. Sackler.

7           MR. HIGGINS:  No further questions, Your Honor.

8           THE COURT:  Okay.

9           MR. HIGGINS:  Thank you.

10          THE COURT:  Any cross?  I'm sorry.

11          MR. KELLY:  Your Honor, Neil Kelly, Assistant

12   Attorney General for Rhode Island.  I have a few

13   questions --

14          THE COURT:  I'm sorry, from?

15          MR. KELLY:  Rhode Island.

16          THE COURT:  Yes.  Okay.

17          MR. KELLY:  I have a few questions for Mr.

18   Sackler.

19          THE COURT:  All right.  Go ahead.

20          CROSS-EXAMINATION OF MORTIMER D. SACKLER

21   BY MR. KELLY:

22   Q    Well, Mr. Sackler, I'm not sure what time it is where

23   you are, but good evening or afternoon.

24   A    Good afternoon.

25   Q    Do you recall that we have a -- you had a deposition in

1   this case?

2   A    I do.

3   Q    Yeah.  And did you read your deposition before your

4   testimony here today?

5   A    I did not.

6   Q    Okay.  Do you recall during your deposition and -- and

7   I have a deposition with you in November 10th of 2020, do

8   you recall that?

9   A    Yes.

10  Q    Do you have the deposition with you there in front of

11  you?

12  A    I do not.

13  Q    Oh, you don't.  Do you recall that we spoke about the

14  New York article from 2017, during your deposition?

15          THE COURT:  You -- you cut out -- the what?  The

16  what from 2017?

17          MR. KELLY:  The New Yorker article from 2017.

18  BY MR. KELLY:

19  A    I vaguely remember that, yes.

20  Q    Okay.  And you have a property in Amagansett, I take it

21  that's on Long Island in New York, is that correct?

22  A    That's correct.

23  Q    And in that story, though, is a person working on your

24  property name Jeff, in the article, if you recall?

25  A    I don't recall the name.  I -- I recall the -- the

Page 143

1    story mentioned that supposedly there was a gardener working

2    on the property.

3    Q    Right.  And the gardener was sitting in his truck

4    snorting one of the -- snorting an OxyContin pill; do you

5    recall that?

6    A    I -- I don't recall that it said it was an OxyContin

7    pill, but I, you know, I -- I recall the article, vaguely,

8    yeah.

9    Q    Okay.  And do you recall that whether you reached out

10   to Jeff after reading that article or trying to find him; do

11   you recall that, whether you did or not?

12            MS. MONAGHAN:  Objection.  Lack of foundation.

13            THE COURT:  Foundation that would mean -- I'm

14   sorry, in what way?

15            MS. MONAGHAN:  Mr. Sackler testified that there

16   was a reference in the article to the existence of this

17   person, but not that he, himself, was aware that there was

18   any such person, or that in fact there was any such person

19   to be reached out to.

20            THE COURT:  Okay.  That's a -- you need to lay a

21   foundation, Mr. Kelly for your question.  Do you have

22   earphones, Mr. Kelly?  We can't hear you at all now and you

23   were not coming through clear before then.

24            MR. KELLY:  I don't, Your Honor.  I'm back.  I was

25   on mute for a second.

Page 144

```
 1              THE COURT:  Okay.  Go ahead.

 2    BY MR. KELLY:

 3    Q    Mr. Sackler, do you have your deposition with you?

 4              THE COURT:  He does not.

 5              MS. MONAGHAN:  Asked and answered. No.

 6              MR. KELLY:  Okay.

 7    BY MR. KELLY:

 8    Q    Do you recall trying to find out who the person was who

 9    was referenced in that article and who was in his truck

10    taking OxyContin?

11              MS. MONAGHAN:  Objection.

12              THE COURT:  What --

13              MR. KELLY:  Again, Your Honor.

14              THE COURT:  -- what time are you focusing on, Mr.

15    Kelly?  After the article came out?

16              MR. KELLY:  Yes.

17              THE COURT:  Okay.  You can answer that question.

18    BY MR. KELLY:

19    A    As I said, I had no knowledge of -- of any such

20    individual or who they were, or if they were -- or if it was

21    even a true story. I had absolutely no knowledge about it.

22    Q    Did you follow up to find out wrote a true story or if

23    there was such an individual?

24              MS. MONAGHAN:  Objection.  How?

25              THE COURT:  No, you can --
```

Page 145

1              MR. KELLY:  I'm asking if he did.

2              THE COURT:  You can answer that question if -- you

3    can answer that question.

4    BY MR. KELLY:

5    A    I wouldn't know how to.  It was not something I ever

6    knew or saw and as I recall, the article had numerous

7    mistakes in it and problems, so --

8    Q    Okay.  So you didn't reach out to the author of the

9    article or follow up in any way then did you?

10             MS. MONAGHAN:  Mr. Kelly representing that if

11   somebody called a journalist --

12             THE COURT:  No, but it --

13             MS. MONAGHAN:  -- and said remove your story, I

14   would say yes.

15             THE COURT:  -- Ms. Monaghan --

16             MS. MONAGHAN:  There's a --

17             THE COURT:  -- that's just fine.  You could answer

18   the question.

19   BY MR. KELLY:

20   A    I -- I did not reach out to the author of the article,

21   no.

22             MR. KELLY:  Nothing further.

23             THE COURT:  Okay.

24             MR. HIGGINS:  Your Honor, I was just going to

25   interject, I don't know if this will assist Mr. Kelly in the

Page 146

1    --

2              THE COURT:  No it won't, Mr. Edmunds --

3              MR. EDMUNDS:  -- and the witness --

4              THE COURT:  -- this is -- this is really getting

5    sort of the --

6              MR. EDMUNDS:  He -- he doesn't --

7              THE COURT:  -- height of --

8              MR. EDMUNDS:  I was just going to point out that

9    he has in his deposition in front of him and that it is JX -

10   - I had it just a second ago. I opened a document and so

11   I've lost it, but he does (indiscernible)--

12             THE COURT:  It's not -- Mr. Edmunds, it doesn't

13   matter.

14             MR. EDMUNDS:  Okay.

15             THE COURT:  Mr. Fogelman, did you have any

16   questions?

17             MR. FOGELMAN:  Good afternoon, Your Honor.  Yes.

18             CROSS-EXAMINATION OF MORTIMER D. SACKLER

19   BY MR. FOGELMAN:

20   Q    Mr. Sackler, you testified earlier today that a trust,

21   for which you are the beneficiary, or your children are the

22   beneficiary of, a contribution made by that trust is your

23   contribution as well; is that true?  Do you recall that

24   testimony?

25   A    Would I -- yeah, I believe what I said is whether the

Page 147

1   funds come from a trust of which I'm a beneficiary or

2   whether they come from me, personally, in the agreement, the

3   settlement agreement that contribute to my one-eighth share

4   of the A Side contribution.  And yet they are coming out of

5   my family's total wealth, if you -- if you look at it in

6   that way.

7   Q    So you do view it as your contribution then, right?

8           MS. MONAGHAN:  Objection, he's answered and

9   explained.

10          THE COURT:  I think he did answer that, Mr.

11  Fogelman, if you have a follow up, though, you can go ahead.

12  BY MR. FOGELMAN:

13  Q    But if you are found personally liable in lawsuits

14  filed against you, would those trust assets be available for

15  collection by your judgement creditors?

16  A    That's a very technical question and I'd have to defer

17  to my lawyers.  I don't believe they would be.  The trusts

18  are independent, and they do not have to contribute in such

19  a judgement, if I were to go bankrupt.  They are for me my

20  futures -- my issue, my kids, my grandkids, so no, they

21  would not -- I don't believe, technically, they would have

22  to contribute, no.

23  Q    Okay.  So contributions by a trust then, aren't your

24  personal contributions, right?

25          MS. MONAGHAN:  Objection.  He was referencing to

Page 148

1    contributions to the settlement agreement.  Voluntary

2    contributions.

3                MR. FOGELMAN:  That -- that's not my question.

4                MS. MONAGHAN:  But that's his testimony.

5    BY MR. FOGELMAN:

6    Q    Would you agree that contributions by the trust for the

7    settlement, are not your personal contributions?

8    A    If you're specifically, technically asking are they

9    coning from me personally, no, obviously they're not.  But

10   in the settlement agreement, they are counted towards my

11   family's one-eighth share of the A Side contribution towards

12   the settlement.

13   Q    Thank you.

14               MR. FOGELMAN:  Nothing further, Your Honor.

15               THE COURT:  Okay.

16               MR. FOGELMAN:  Thank you.

17               THE COURT:  All right.

18               MR. HUEBNER:  Your Honor, I have about seven

19   minutes or so, maybe five minutes of questions for Mr.

20   Sackler.

21               THE COURT:  Okay.

22               CROSS-EXAMINATION OF MORTIMER D. SACKLER

23   BY MR. HUEBNER:

24   Q    Good afternoon, Mr. Sackler, Marshall Huebner of Davis

25   Polk for the debtors.

Page 149

1    A    Good afternoon.

2    Q    I assume you remember, Mr. Sackler, that various people

3    asked you about distributions out of the company, while you

4    were on the Board?

5    A    Yes.

6    Q    Are you are aware of the existence of a report by the

7    Special Committed of the Board of Directors, 356 pages long,

8    detailing all cash transfers out of Purdue for the benefit

9    or to shareholders from 2008 to 2019?

10   A    Yes, I am.

11   Q    Are you aware that that report concludes that $10.4

12   Billion was transferred out to or for the benefit of the

13   Sacklers during that time period?

14   A    Yes. Including the (indiscernible) transfers.

15   Q    Do you have any reason to believe that that report is

16   inaccurate in any material respect?

17   A    I do not.

18   Q    Are you aware of the existence of a Special -- of a

19   second report of a Special Committee of 401 pages, I'm not

20   asking you to verify the page number, obviously, also filed

21   on the public docket listing all intra-company and non-cash

22   transfers from Purdue to or for the benefit of the

23   shareholders, including IEC's during this same time period?

24   A    Yes.

25   Q    Are you aware that the debtors, special committee

Page 150

1    expert has concluded that in our view of those $1.4 Billion

2    -- are under compensation, as it were, for those transfer.

3    I'm asking if you agree with number?  I'm asking you if you

4    were aware that that is the debtor's special committee

5    valuation of the under compensation for the estates?

6    A    I'm not aware of that.  I didn't -- it's the first I'm

7    hearing of that.

8    Q    Okay.  Which is fine.  Are you aware that absent a

9    settlement, the estate will be pursuing you and your family,

10   and your trusts and the IEC's for either billions or more

11   than billions of dollars?

12   A    I believe so, yes.

13   Q    Okay.  Mr. Sackler, you testified before that you left

14   the Board at the end of 2018, I think technically, your

15   letter was dated, January 6th, 2019, but there were no Board

16   meetings during the first two weeks of 2019, so do we

17   effectively agree that you were off the Board at the end of

18   2018?

19   A    Yes.

20   Q    And were you the last Sackler relative to leave the

21   Board (indiscernible) Purdue?

22   A    I was, by a matter of weeks, I believe.

23   Q    Since your departure, Mr. Sackler, have you, or to your

24   knowledge, any member of your family attempted to have any

25   role at the debtors or to control or influence them?

Page 151

1   A    No, I can say for myself, with certainty, no.  I can't

2   say for certain what other members of my family.

3   Q    Mr. Sackler, I'm sorry.  I'm asking if you're aware of

4   so you (indiscernible).  Are you aware of any attempts by

5   any other member of your family, starting --

6          MR. EDMUNDS:   Objection.  Lack of foundation.

7   How would he know?

8          MR. HUEBNER:  It's a -- I wanted to ask him his

9   knowledge without laying the foundation.  I'm not asking for

10  a fact.  That's an incorrect objection.

11         MR. EDMUNDS:  I don't think it is.

12         THE COURT:  I'll overrule the objection.  He's

13  just asking awareness and he's already testified -- in fact,

14  it'd be response to your question, Mr. Edmunds, as far as

15  the interaction of Side A at meetings that take place at

16  least a couple of times a year.

17         MR. HUEBNER:  Thank you, Your Honor.

18  BY MR. HUEBNER:

19  Q    Mr. Sackler, I'm going to restate the second part of

20  that question so we're clear and get a clear record.  Are

21  you aware of any attempt by any member of your family to

22  control or influence the debtors since you all left the

23  Board in late 2018?

24  A    I am not aware of any.

25  Q    And is that also true with respect to the special

Page 152

1    committee of the debtors?

2    A    That is also true with that I am not aware of any.

3    Q    Mr. Sackler, are you aware that this Court directed the

4    appointment of an examiner, which was then appointed by the

5    Department of Justice to investigate independence in the

6    Special Committee from the Sackler family?

7    A    I am.

8    Q    Have you read the examiner's report?

9    A    I don't recall if I've read it or not.  I -- I heard

10   the conclusion, but I can't recall if I've read the whole

11   report.

12   Q    And how would you describe the conclusion, Mr. Sackler?

13   A    My understanding is that the examiner found no

14   interference on behalf of the family members with the

15   special committee.

16   Q    And Mr. Sackler, do you have any -- any knowledge that

17   leads you to believe that the examiner missed something, and

18   do you know something that we should know that would make

19   his conclusions incorrect?

20   A    I do not, no.

21   Q    Follow up question, Mr. Sackler, leaving aside the

22   money, I just want to ask you about one convenient in the

23   settlement agreement.  Do  you understand that your family

24   has an obligation to leave the pharmaceutical business

25   worldwide, within a specified period, under the settlement

Page 153

1    agreement?

2    A    I do have an understanding that we need to sell the

3    IEC's within the seven year period, if that's the question,

4    yes.

5    Q    Right.  It's actually not the question, and I'll just

6    state it to make sure.

7    A    Okay.

8    Q    In other words, there are two different -- which Mr.

9    Edmund asked you about and others, is are you likely have to

10   sell the IEC's to raise cash to pay the settlement.  I

11   believe your testimony was that -- you believed the answer

12   was yes, and you would be selling --

13   A    Right.

14   Q    -- them to raise money.  I'm asking you a different

15   question.  Were you aware that there is a covenant that

16   irrespective of your net worth and what you would otherwise

17   pay, were separately obligated to leave the pharmaceutical

18   business, worldwide, within a specified period?

19   A    In my understanding is that we're obligated to sell the

20   IEC's within the seven year period, and that we need to be

21   out of the opioid business worldwide.

22   Q    Okay.  I -- I -- I'll take that as good enough.

23           MR. HUEBNER:  Your Honor, I have nothing further,

24   thank you.

25           THE COURT:  Okay.

Page 154

1            MS. MONAGHAN:  And Your Honor, I just wanted to

2    make sure there wasn't confusion about one thing.  Mr.

3    Sackler testified to family counsel meetings.  I think Mr.

4    Huebner was asking about meetings between family members and

5    the Board?

6            THE COURT:  No, I know, I was responding to Mr.

7    Edmunds' objection which said --

8            MS. MONAGHAN:  Okay.

9            THE COURT:  -- that a foundation had to be laid

10   for the question are you aware of any --

11           MS. MONAGHAN:  I got it.

12           THE COURT:  -- family members --

13           MS. MONAGHAN:  I see.

14           THE COURT:  -- and I think they, I mean, obviously

15   this family consults with the members periodically every

16   year.

17           MR. HUEBNER:  Yeah, Your Honor, --

18           THE COURT:  It's something update, and it's just

19   an awareness the answer, so --

20           MS. MONAGHAN:  I understand.

21           MR. HUEBNER:  Yes, and -- and for the

22   (indiscernible) that I do want to be clear, Ms. Monaghan, I

23   was not limiting my question to any particular organization

24   within the family structure.  I meant the question as

25   broadly as I asked it, which is was he aware of any attempt

1   by any family members, or maybe I should have added through

2   an agent, to improperly influence the -- to influence the --

3   again, I believe he gave me the answer I was looking for.

4   I'm sorry, for not narrowing my question because it was not

5   narrow.

6          MS. MONAGHAN:  Not at all.  It was merely to make

7   sure there was no confusion about what those meetings were.

8   That's all.

9          THE COURT:  Okay.  All right.

10          MR. HUEBNER:  Perfect.  Thank you.

11          THE COURT:  All right.  All right.  Mr. Edmunds,

12  you're still on the screen, I don't know if have any more

13  questions?  No.  Okay.  So Ms. Monaghan --

14          MR. EDMUNDS:  (Indiscernible).

15          THE COURT:  -- do you have any cross?

16          MS. MONAGHAN:  I do not, Your Honor.  I have no

17  questions.

18          THE COURT:  Okay.  All right.  Mr. Sackler, you

19  can sign off at this point.  Your testimony is complete,

20  thank you.

21          MR. SACKLER:  Thank you.

22          THE COURT:  All right.  I think this is a good

23  point to stop for lunch before the next witness.  So let's

24  resume at 2:30 for the last witness, which is Kathe Sackler,

25  I believe, correct, Ms. Monaghan?

Page 156

1          MS. MONAGHAN:  That is correct, Your Honor.

2          THE COURT:  All right.  Very well. Thank you.

3          (Recess)

4          THE COURT:  Okay.  Good afternoon.  This is Judge

5     Drain, and we're back on the record in In re:  Purdue

6     Pharma, et al., L.P.  I'm hesitating, because there's a

7     block on my screen.  Now, it's gone.  Okay.  And --

8          MR. HUEBNER:  Your Honor?

9          THE COURT:  Yes.

10         MR. HUEBNER:  If I may, with apologies.  For the

11    record, Marshall Huebner of Davis Polk.  One very small

12    point before what I believe is the next witness.  I was

13    advised by several people that I (indiscernible) in my last

14    (indiscernible).  I meant to ask Mortimer Sackler whether he

15    was aware of the opioid business covenant.  I was advised I

16    misspoke and said pharmaceutical.  He actually corrected me

17    in his answer,

18         THE COURT:  He did.

19         MR. HUEBNER:  -- and since I am trying to hold

20    everybody --

21         THE COURT:  I noted that.  I noted his answer.

22         MR. HUEBNER:  Okay, and I just -- since I'm trying

23    to hold everybody to accurate recitations of the settlement

24    agreement, I'm actually rather mortified that I misspoke

25    myself, but it's been corrected.  The record is clear.  If I

Page 157

1   confused the witness or the court, I apologize.  The

2   covenant is, of course, very complicated, as all things in

3   this case are, but it is about the opioid business, not

4   pharmaceuticals more generally.  So, apologies to all.

5            THE COURT:  That's fine.  Thank you.  All right.

6   Our next, and I believe last witness is Kathe Sackler, and I

7   see her on the screen, so I'm going to ask you, ma'am, to

8   raise your right hand, please.  Do you swear or --

9            MS. MONAGHAN:  Kathe, can you unmute, please?  I'm

10  sorry, Your Honor.

11           THE COURT:  Sure.

12           MS. MONAGHAN:  You need to unmute, Kathe.

13           MS. SACKLER:  How's that?

14           THE COURT:  All right.

15           MS. MONAGHAN:  Good.

16           THE COURT:  Would you raise your right hand,

17  please?  Do you swear or affirm to tell the truth, the whole

18  truth, and nothing but the truth, so help you God?

19           THE WITNESS:  I do.

20           THE COURT:  Okay.  And it's K-A-T-H-E, next word,

21  S-A-C-K-L-E-R?

22           THE WITNESS:  Correct.

23           THE COURT:  Okay.  And Ms. Tonnesen, you're going

24  to do the direct for the State of Maryland?

25           MS. TONNESEN:  Yes.

Page 158

1          THE COURT:  Okay, you can go ahead.

2               DIRECT EXAMINATION OF KATHY SACKLER

3    BY MS. TONNESEN:

4    Q    Good afternoon, Dr. Sackler.

5    A    Good afternoon.

6    Q    Sarah Tonnesen for the State of Maryland.  Okay, Dr.

7    Sackler, you served on the board of directors of Purdue

8    Pharma for nearly 30 years.  Isn't that right?

9    A    I don't know the exact number, but it was a very long

10   time, yes.

11   Q    Began in 19 -- about 1990?

12   A    That sounds about right.

13   Q    And you left the board of Purdue in September 2018;

14   isn't that right?

15   A    Yes.

16   Q    And you served as a senior vice president of Purdue for

17   a number of years; isn't that right?

18   A    Yes.

19   Q    And you had office -- you had an office at the Purdue

20   headquarters, right?

21   A    Yes.

22   Q    And you had an assistant there?

23   A    Correct.

24   Q    And up to the time that you resigned from the board of

25   Purdue, the majority of the board was comprised of members

Page 159

1    of the Sackler family, right?

2            MS. MONAGHAN:  Objection.  Are you counting Side A

3    and Side B?

4            MS. TONNESEN:  Yes.

5            THE COURT:  So, you can answer the question, Ms.

6    Sackler.

7    BY MS. TONNESEN:

8    A    Side A and Side B (indiscernible).  There were -- it's

9    (indiscernible) majority (indiscernible).  There were four

10   or five independent (indiscernible) and the balance of the

11   directors were (indiscernible).

12   Q    I apologize, Dr. Sackler.  I'm having a little bit of a

13   hard time hearing you, but I think I understood that you

14   just testified that at one point, there was four to five

15   independent directors on the board?

16   A    Yes.

17   Q    Was there ever a time period where there were more or

18   an equal number of independent directors as compared to

19   members of Side A and Side B Sacklers combined?

20           MS. MONAGHAN:  counting the time that Kathe was on

21   the board?

22           MS. TONNESEN:  (indiscernible) the time that Kathe

23   was on the board.

24   MS. TONNESEN:

25   A    I don't think so.

Page 160

1    Q    And concurrent to your service on the board of Purdue,

2    you were also on the advisory board of MNP, right?

3    A    Yeah.

4    Q    And the role of that entity, MNP, is to act as an

5    advisory board to make recommendations to the Independent

6    Associated Companies, the IACs, right?

7    A    I think the recommendations were made to the boards of

8    the independent (indiscernible).

9            THE COURT:  I'm sorry, we're having --

10           MS. TONNESEN:  (indiscernible).

11           THE COURT:   We're having a hard time hearing Dr.

12    Sackler.  I -- is there --

13           MS. MONAGHAN:  Do you have your --

14           THE WITNESS:  I'll to speak up.

15           THE COURT:  Okay.

16           MS. MONAGHAN:  Do you have your AirPods, Kathe?

17           THE WITNESS:  They're charging right now.  I just

18    learned about having --

19           MS. MONAGHAN:  Okay.

20           THE COURT:  Okay.

21    BY MS. TONNESEN:

22    Q    We can hear you a little better when you're -- now.

23    thank you.

24           THE COURT:  So, you were -- we couldn't really

25    hear the answer to that last question, which was what was

Page 161

1    the role of the advisory board.

2             THE WITNESS:  The advisory board issued its

3    advice, not to the management of the companies, per se, but

4    through the board of directors of each of the IACs.  And I

5    guess -- well, that's how I think it worked.

6    BY MS. TONNESEN:

7    Q    And the board of MNP, which I think later became MNC,

8    was likewise always made up in majority by -- at least,

9    during the time that you were there, by members of the

10   Sackler family, right?

11   A    Yes.

12   Q    And Purdue has pleaded guilty twice to conduct that

13   occurred in whole or in part during your tenure as a

14   director, right?

15   A    Yes.

16   Q    First in 2007, correct?

17   A    Yes.

18   Q    And again in 2020, Purdue pled guilty to conduct that

19   spanned at least from 2007 to 2018?

20   A    Yes.

21   Q    Okay.  And in 2020, four members of the Sackler family

22   and the estate of Jonathan Sackler separately entered a

23   civil settlement agreement with the Department of Justice;

24   isn't that right?

25   A    Yes.

Page 162

1   Q    I'm going to ask you some questions about that

2   settlement agreement.  You should have received some

3   documents from your attorneys.  You can open those now.

4   You're looking for a document titled, "Settlement

5   Agreement."  It will most likely have the number JX-2096 for

6   exhibit number.

7            MS. MONAGHAN:  I believe, Kathe, that it would be

8   Tab 4 in your binder.  Kathe, this would be in a binder, not

9   an envelope.

10           THE WITNESS:  The binder is in the envelope

11   (indiscernible).

12           MS. MONAGHAN:  That looks like it.  Is Tab 4 in

13   that document, entitled "Settlement Agreement"?

14           THE WITNESS:  Tab 4 is titled "Settlement

15   Agreement" (indiscernible) have the number and the table of

16   contents that was (indiscernible).

17           MS. MONAGHAN:  I think it's at the bottom of the

18   first page, JX-2098.0001.

19           THE WITNESS:  Yes, that's correct.

20           MS. MONAGHAN:  I think we're all on the same --

21           THE WITNESS:  (indiscernible).  It doesn't say 98

22   (indiscernible).

23           MS. MONAGHAN:  96 -- 2006 dot -- I might've

24   misspoken, 0001.

25           THE WITNESS:  Yes, that's it.

Page 163

1          MS. MONAGHAN:  Okay.

2     BY MS. TONNESEN:

3     Q    And I'll give you a moment to familiarize yourself with

4     this document, but this is the settlement agreement entered

5     into between the United States Department of Justice with

6     Dr. Rupert Sackler, David Sackler, Mortimer D. A. Sackler,

7     yourself Kathe Sackler -- Dr. Kathe Sackler and the estate

8     of Jonathan Sackler.  Isn't that correct?

9     A    Yes.  (indiscernible), yeah.

10    Q    And if you would, go to Page 3.  On the third page,

11    it'll have a (indiscernible).  I apologize.  The third page

12    of Addendum A, which starts at JX-2096.0025.

13    A    Sorry, I'm on the wrong -- I'm sorry.  Could you give

14    me the number again?

15    Q    Yeah, of course.  JX-2096.0025.  That should be the

16    beginning of Addendum A.

17    A    025.  (indiscernible) further, because -- okay, now I

18    got to 0025.  It says, "Addendum to Settlement Agreement" --

19    "Addendum A to Settlement Agreement."

20    Q    Okay.  On the third page of that document of Addendum A

21    is a footnote to just -- does this footnote that says, "The

22    following reflects the tenures of the Sackler family members

23    on the Purdue Pharma, Inc. board of directors," and then on

24    the third line, it says "Kathe A. Sackler, 10/2/1990 to

25    9/27/2018."  Those are the dates that you were on the board

Page 164

1    of Purdue, right?

2    A    I think (indiscernible), right?  Is that

3    (indiscernible)?

4    Q    Earlier, you testified you weren't sure if your tenure

5    on the board started in 1990, and I was just asking if this

6    refreshes your recollection that your tenure at Purdue is

7    October 1990 to September 27, 2018.

8    A    Okay.

9    Q    That consistent with your recollection?

10    A    I really don't have a recollection of the year, the

11    date, actually in my mind, but I'm not great with dates.

12    (indiscernible) that as we go on.  Apologies for that.

13    Q    No apologies needed.  No reason to think that's wrong?

14    A    Okay.  No, no.

15    Q    All right.  (indiscernible) to Paragraph 9 of this

16    addendum.  I'll give you a second to get there.

17    A    Paragraph 9 of the addendum.  Can you give me a page?

18            MS. MONAGHAN:  Same page as the footnote, Kathe.

19    Just look up on the page.

20            THE WITNESS:  Sorry, yeah.  Got it.

21    BY MS. TONNESEN:

22    Q    "(indiscernible) the named Sacklers were not merely

23    passive recipients of information."  That's true, right?

24    You did more than merely passively receive information.

25    A    We (indiscernible) very good listeners (indiscernible)

Page 165

1    and (indiscernible) cases that (indiscernible).

2            MS. MONAGHAN:  Kathe, can you --

3            THE COURT:  I'm sorry, this just isn't working.

4    Ms. Sackler, if you could -- I mean hoping your earbuds are

5    charged, because that's what's really -- not wearing those -

6    -

7            THE WITNESS:  All right, I'm going to try.

8            THE COURT:  You get interference with your

9    computer and you're just not coming through clearly.

10           THE WITNESS:  I'll try them on now.

11           THE COURT:  Okay.

12           THE WITNESS:  I've never used these before, so --

13   does that help?

14           THE COURT:  Much.

15           MS. MONAGHAN:  Much better.

16           THE COURT:  That's much better.  Thank you.

17           THE WITNESS:  Good.  Okay.  (indiscernible), but

18   that's okay.

19   BY MS. TONNESEN:

20   A    All right, so I was just trying to answer your

21   question.  I don't -- wouldn't describe the board as passive

22   listeners.  I would describe the board of the Sackler member

23   directors and the non-Sackler independent directors as

24   listeners -- attentive listeners, asking questions,

25   thoughtful questions, engaged in some debate over some

Page 166

1    questions from time to time, and (indiscernible) pretty much

2    -- and tried to understand the full meaning of what was

3    being presented.

4    Q    I would ask you to turn to a document that was produced

5    to you.  It's an email of March 18th, 2009 and it has a

6    number in the bottom righthand corner, a Bates number PWG-

7    004448824, that helps you find it.

8    A    (indiscernible) is it the same tab?

9            MS. MONAGHAN:  I think it's -- it's Tab 14 in your

10   binder, Kathe.

11           THE WITNESS:  Tab 14.

12           MS. MONAGHAN:  And Ms. Tonnesen, is it a October

13   5th, 2001 email?

14           MS. TONNESEN:  No, it's March 19th -- it's

15   probably not the most --

16           MS. MONAGHAN:  I'm sorry, Kathe.  I think it's Tab

17   14 in your binder.

18           THE WITNESS:  Tab 14, yeah.  I'm there.

19           MS. MONAGHAN:  March 18th, 2009, Ms. Tonnesen?

20           MS. TONNESEN:  Yes, yes.  Okay.

21   BY MS. TONNESEN:

22   Q    Just let me know when you're there, Dr. Sackler.  Take

23   your time.

24   A    I'm trying to look for the dates.  March 18th, 2009?

25   Q    Right.  That's correct.

Page 167

1    A    (indiscernible).

2    Q    All right.  I'll give you a moment to familiarize

3    yourself with the document, but we'll see that -- I can

4    represent to you the bottom, the last 30 pages in that

5    series of emails between Dr. Sackler and some of the

6    executives at the company, but I want to focus you on just

7    that first page, the, I guess, penultimate email in time.

8    It was an email from Dr. Richard Sackler to John Stewart,

9    cc-ing a number of board members and executives.  It says,

10   "John, I'm troubled by our continued losing of position to

11   other opioids, especially morphine and methadone.  You

12   should easily (indiscernible) to compete against and

13   difficult for people to argue.  Can we set 2009 a specific

14   goal of turning this decline around?"  That's

15   (indiscernible), that's right?

16   A    You know, as helpful as these EarPods are for you to

17   hear me, they create kind of an echo of your voices and my

18   hearing, so I have to ask you to speak just a tiny bit

19   slower, because I'm getting words (indiscernible) on each

20   other.  I couldn't hear you.

21   Q    Sure.  And if it's easier, you can read -- I just

22   wanted you to know what the email that you're replying to

23   says below it, so if you would prefer, you can just read the

24   email right below it from Dr. Richard Sackler,

25   (indiscernible) March 17th at 12:19, 2009.

Page 168

1   A    Okay.

2   Q    Then you reply -- this is an email from you, Dr. Kathe

3   Sackler, isn't that right?  You say, "Dear John:  Please

4   include this item on the agenda the next opportunity with

5   the board.  Please present an overview of the data bearing

6   on this observation and your view as to its disproportionate

7   impact to date and your expectations and planning going

8   forward.  Best, Kathe."  Is this an -- this is an email from

9   you to John Stewart; isn't that right?

10  A    I don't think it has any relationship to Dr. Richard's

11  email, does it?

12  Q    It was produced to us in this form and it looks -- it

13  appears to me that this is an email that you replied to.

14  You look at the subject matter, they say, "Oxycodone ER

15  share," Dr. Richard's email says subject matter, "oxycodone

16  ER share, and then subject matter (indiscernible) specific

17  agenda item, oxycodone ER share.

18  A    This is -- I don't recall the email, so it's hard for

19  me to give you any clarity on that, but what was the

20  question, please?

21  Q    (indiscernible) reason to think that this top email is

22  not from you, correct, the one sent on March 18th, 2009 at

23  8:37 p.m., directing John Stewart about an agenda item, most

24  likely to the board (indiscernible) board meeting, I would

25  guess.

Page 169

1    A    I think this is asking -- what I understand this email

2    is asking John Stewart to clarify the (indiscernible), but I

3    don't recall the content of this (indiscernible).

4    Q    I'm sorry, Dr. Sackler, I had a hard time picking that

5    up, but I think we can move on.  I think the document speaks

6    for itself.  Okay.  Can you open JX-1684?

7            MS. MONAGHAN:  I believe that's Tab 2 in your

8    binder, Kathe.

9            THE WITNESS:  I'm going to try it with one pod in,

10   because quite honestly, I can't hear when the pods are in.

11           MS. MONAGHAN:  -- seems to work okay for

12   audibility, so --

13           THE WITNESS:  I'm okay for audibility?  Let me try

14   that.  Put it in my left ear.  I could leave the left one in

15   (indiscernible) my worst (indiscernible).  Okay, let's try

16   that.  Where do I go to, please?

17           MS. MONAGHAN:  It's Tab 2 in your binder, Kathe, I

18   believe is the document.  Is it, Ms. Tonnesen, budget

19   presentation 2010, November 2nd and 3rd, 2009?

20           MS. TONNESEN:  Yes, it is.

21           MS. MONAGHAN:  That's two in your binder, Kathe.

22           THE WITNESS:  Tab 2.  Got it.

23   BY MS. TONNESEN:

24   Q    Okay.  Dr. Sackler, I'm going to ask you review this

25   document in its title, "Purdue Pharma, L.P. Budget

Page 170

1    Presentation 2010 -- November 2nd and 3rd, 2009, Notes and

2    Actions."  You see the first is a number one, and it says,

3    "OxyContin AQ.  Dr. Richard and Dr. Kathe asked for," and

4    there's a series of roman numerals.  "I, a detailed review

5    of the long-acting SCO market, the OER market, and OxyContin

6    growth rate for purposes of projecting into the future.  II,

7    identifying specific programs of sales and marketing will

8    implement to profitably grow the OER market and OxyContin in

9    light of competition.  III, provide (indiscernible) around

10   why that/how the proposed increase in share of

11   (indiscernible) translates into sales and profitability

12   growth.  IV, clarifies the situation with respect to

13   OxyContin being used by 30 percent of new patients, but only

14   retaining 30 percent of ongoing patients.  And V, provide a

15   copy of the OxyContin McKinsey report on possible ways to

16   increase OxyContin sales and market share."

17        You have no basis, no reason to dispute that you asked

18   for these items at roman numerals one through five, do you?

19   A    I don't remember asking for them and I don't remember

20   this email.  Is -- this isn't an email, is it?  It's a --

21   was it an email?

22   Q    No, Dr. Sackler, it's not an email.  It's a document

23   that was produced to us by Purdue and I am not sure you ever

24   saw it, but it appears to reflect notes and action items to

25   be taken away and reflects request -- I'll just read the

Page 171

1    document -- Dr. Richard and Dr. Kathe asked for the series

2    of asks.  There's no reason -- whoever took these notes,

3    there's no reason to believe that you didn't ask for these

4    items.  Is that correct?

5    A    There's document that shows that I asked for the items?

6    Because I don't remember ever asking for these items.  I

7    wouldn't -- this doesn't sound like me.  It's not the way I

8    would address, you know, a question to management.  It's --

9    and I don't understand even format of it.  Oh, it's a budget

10   presentation -- budget presentation.  I don't know.  This --

11   I don't recall being involved in this discussion, actually.

12   Q    You were involved in -- during your time at the board

13   of Purdue, did you receive budget presentations from

14   executives or management at Purdue Pharma?

15   A    There were budget meetings twice a year and

16   presentations were prepared for those budget meetings.

17   Those were probably the meetings which the budget and

18   planning for the budget, including marketing planning and

19   product development planning and so forth were most deeply

20   (indiscernible) detail.

21   Q    And there is a name here about two-thirds of the way

22   down the page.  It says, "Action, Russ Gasdia."  That's

23   Russell Gasdia, right?

24   A    Yes, I know who Russ Gasdia is.  Yes.

25   Q    He was the vice president of sales at this time at

Page 172

```
 1   Purdue?

 2   A    Correct.

 3   Q    And he may have been part of those budget meetings?

 4   A    Yes.

 5   Q    And I'm going to -- I'm going to direct you to look at

 6   the A in response to that series of questions, is the word -

 7   - the letter A and it says, "Response to questions 1 through

 8   5 were provided to Dr. Kathe and Dr. Richard by email from

 9   Mike" -- apologize, I'm going to mispronounce his name --

10   "Innaurato, 12/3/09, 1345 hours, copy attached."  Any reason

11   to believe you didn't receive that email?

12   A    I don't have any reason to believe one way or the

13   other, but I don't recall it, I'm sorry.  You know, it's

14   interesting that my name is spelled correctly here under A,

15   but up at the top here, supposedly I had asked for something

16   with Richard (indiscernible) not spelled correctly, but I

17   don't know what that means.

18   Q    Okay.  You can set that document aside.

19   A    The other thing is that sometimes questions will --

20   Q    I apologize, Dr. Sackler, but there's not a question

21   pending.

22   A    Oh, sorry.

23   Q    If you could turn to PPLPC-013000454422.  Actually, I

24   apologize.  I think that was just an extraneous note in my

25   outline, so --
```

Page 173

1          MS. MONAGHAN:  I was just going to say, I can't

2     find that one.

3          MS. TONNESEN:  Sorry, everyone.

4     BY MS. TONNESEN:

5     Q    Okay.  I'm going to actually ask you to turn back to

6     the addendum to the settlement agreement.

7     A    That's Tab 4?

8          MS. MONAGHAN:  Yes, Tab 4, and then you'd like her

9     to go Addendum A?

10    BY MS. TONNESEN:

11    Q    Yeah, you can turn to Paragraph 11 of Addendum A.

12    A    Yeah.  Addendum A, Paragraph 11.  Yeah.

13    Q    Just going to focus on the first sentence for a minute.

14    It says, "Richard Sackler, Jonathan Sackler, Kathe Sackler,

15    Mortimer D. A. Sackler, all had direct communications with

16    Purdue executives, including sales and marketing executives

17    concerning forecasts and strategies."  That's right, right?

18    A    It's very, very rare that I would have any direct

19    communications with marketing and sales executives.  Maybe

20    once in a number of years.  I didn't have any kind of

21    ongoing dialog with anyone (indiscernible).

22    Q    I'm going to ask you to look at JX-3132.  It's an email

23    from March 11th (indiscernible).

24          MS. MONAGHAN:  I think that's Tab 5, Kathe.

25          THE WITNESS:  Okay.

Page 174

1          MS. MONAGHAN:  March 16th, 2008 is the top email,

2    Ms. Tonnesen?

3          MS. TONNESEN:  Yes.

4          MS. MONAGHAN:  Okay.  (indiscernible).

5    BY MS. TONNESEN:

6    Q    Dr. Sackler, once you have that up, just take a moment

7    -- a minute, to familiarize yourself with the document.  I'm

8    going to be asking you about your email that appears in this

9    bottom half of the first page with the number at the bottom,

10   JX-3132.0001.  If you want to review the emails that came

11   before, feel free.

12   A    Okay, this one, I do remember.

13   Q    In the bottom email on the first page, you write to Ed

14   Mahony, Dr. Sackler, Russ Gasdia, and John Stewart.

15   Actually, back up.  Ed.  Ed Mahony, that's the former CFO,

16   right?

17   A    CFO, yes.

18   Q    And we know who Dr. Richard Sackler is.  John Stewart,

19   he was the CEO?

20   A    Correct.

21   Q    And Russ Gasdia, he was the vice president of sales,

22   right?

23   A    Correct.

24   Q    And you write, "Ed, please identify which pressures you

25   refer to in your email below and provide some quantification

Page 175

1    of the negative impact on productive sales which you have

2    built into your proposed budget for 2008 and the developing

3    new five-year plan.  Thanks, Kathe."  Then -- you wrote

4    that, right?

5    A    I don't remember it, but I don't not remember it.  I

6    mean, yes, I -- what I remember is that I was trying to get

7    clarification on what Ed meant by pressures, because he had

8    described pressures and I was concerned to know what those

9    pressures might be that were --

10   Q    And -- okay.  You can set that document aside.  I'm

11   going to ask you to pull up JX-3138.

12            MS. MONAGHAN:  That's six, I believe, in your

13   binder, Kathe.

14   BY MS. TONNESEN:

15   Q    That's an email form Mike Innaurato to yourself and Dr.

16   Richard, right?

17   A    I don't remember this one, either, actually, but I read

18   it, yes.

19   Q    If I represented to you that -- I apologize.  Just give

20   me one moment.

21   A    Sure.

22   Q    I'm sorry.  The pleasures of working from home are

23   innumerable.  I'm sorry.  Okay, so Dr. Sackler, this is an

24   email from Mr. Innaurato to yourself and Dr. Richard,

25   (indiscernible), and is Dr. Innaurato -- I'm sorry, Mr.

Page 176

1    Innaurato the -- was he the head of marketing for a period

2    of time at Purdue Pharma?

3    A    I'm not sure if he was the head of marketing or maybe a

4    vice president in marketing.  I'm not sure what his exact

5    title is, but he was an important marketing person.

6    Q    And it looks like you met with him in -- yourself and

7    Dr. Richard met with him in 2009 to discuss, among other

8    things, the budget and market forecast.  Is that right?

9    A    I'm not sure that meeting ever happened or didn't --

10   whether it happened or didn't happen, quite honestly.  I

11   can't recall it.  And you know, sometimes, Richard would

12   reach out with questions or trying to set up meetings that I

13   would be included in, but I might not participate in, so I

14   really don't know. I don't recall this meeting, but you have

15   anything else that would remind me?

16   Q    No, that's all right.  Dr. Richard Sackler was very

17   involved in the day to day at the company, wasn't he?

18   A    I can't really say how involved he was, because I

19   wasn't really watching him there day to day to see what he

20   was doing, but certainly more involved than I was, by far.

21   And I kind of -- the way I understood my role as a director

22   was to listen to the presentations, follow -- read the

23   materials that were provided in advance of the meetings and

24   come to the meetings with thoughtful, intelligent questions

25   and try to participate in the discussion with the other

Page 177

1    directors.  I kind of modeled myself more on the independent

2    board directors' approach to board behavior, which is --

3    Q    Right.

4    A    (indiscernible).

5    Q    Thank you.  I'd ask you to turn to JX-3207.

6          MS. MONAGHAN:  That's, I think, eight in your

7    binder, Kathe.  And Ms. Tonnesen, is it a December 2nd, 2013

8    email?

9          MS. TONNESEN:  Yes, it is.  Thank you.

10   BY MS. TONNESEN:

11   Q    And Dr. Sackler, this is an email to you from Mr.

12   Stewart on December 2nd, 2013; isn't that right?

13   A    Yes, I see that.

14   Q    John Stewart is the CEO?

15   A    Correct.

16   Q    And he says, "Kathe, here are the prescription reports

17   I mentioned during today's telephone conversation."  It says

18   "burans," but I'm assuming that's butrans.  Butrans is an

19   opioid product that Purdue sold, correct?

20   A    Yes, it's a buprenorphine product.

21   Q    "Butrans has had a fourth consecutive week of hitting a

22   new high and appears poised to break through the 12,000 per

23   week level.  Prescriptions are up slightly, but certainly

24   not to a record level.  Also, the growth in OxyContin

25   prescriptions is primarily occurring in (indiscernible).

Page 178

1   The total kilograms, which track more closely with actual

2   sales, are still showing a declining trend.  Nevertheless,

3   those trends are more positive than was the case a few

4   months back, and when the E2E project, the changes arising

5   out of the McKinsey analysis is slowly implemented, there

6   will certainly be additional increases."

7        No reason to think you didn't get that email, right?

8   A    You know, it's very hard to remember one email among

9   emails, but -- and -- but this was 2020, is that right?  No,

10  this was 2013.  Sorry, 2013.  So, this --

11  Q    Okay --

12  A    This was just at the time that the abuse-deterrent

13  formulation was approved by the FDA to allow Purdue to make

14  claims about the product and explain how the product works,

15  and I don't --

16  Q    Dr. Sackler, unless -- I apologize, but unless this is

17  going to go back to the question about the email, I

18  (indiscernible) getting off -- unresponsive at this point.

19  Let's go back to the addendum at Paragraph 12.  Again, that

20  was in JX-2096.

21  A    (indiscernible) on four.

22  Q    Going to read this to you.  It says, "The named

23  Sacklers as members of the Purdue board exercise substantial

24  oversight over management's operations of Purdue.  In

25  February of 2011, a memorandum observed," and then there's a

1    quotation mark, 'There seems to be a consensus that the role

2    of the board and that of the management is blurred compared

3    with the distinctions made by other major corporations.'

4        "He further observed that certain members of the

5    Sackler family functioned as" -- and then the quote begins

6    again -- "'executives, management, board, and shareholders

7    all in one, and worked collaboratively with other managers

8    on a daily basis.'  As late as 2017, a high-level Purdue

9    executive commented, 'three distinct business types branded

10   Rx including Purdue, biosimilars, consumer OPC generics, are

11   being run through four separate regions (indiscernible)

12   included and with the board of directors serving as the de

13   facto CEO.'"

14       I want to ask you about that first memo that's referred

15   to, the February 2011 memo that says, "There seems to be a

16   consensus that the role of the board and that of management

17   is blurred, compared with the distinctions made by other

18   major corporations."  Is that language a quote from a memo

19   circulated by Bill Loomis in 2010?

20   A    I couldn't catch the name.  By who?

21   Q    Bill Loomis.

22   A    Bill Loomis.  Bill Loomis didn't work -- well, I don't

23   know that he ever -- I think he may have been on the board

24   for a very, very short term.  He was someone that was

25   introduced to the company by Richard's family and brought to

Page 180

1    observe board meetings because I think they were considering

2    appointing him as an independent director, but that's about

3    all I know about Bill Loomis.  I never communicated with him

4    or discussed with him anything else.

5    Q    Okay.  The next document I want you to turn to is

6    PPLPUCC-001658754.  And Dr. Sackler, I don't want to read

7    the entirety of this email into the record.  I know this

8    email is one of a personal nature.  I'm just going to ask

9    you about a sentence or two at the bottom of the second

10   page, so you can, obviously, look at it to familiarize

11   yourself with it, and then, when you're ready, just turn to

12   the bottom of the second page.

13            THE WITNESS:  Maura, can you help me find, which

14   tab?

15            MS. MONAGHAN:  I'm having trouble myself, I have

16   to say.  Could you read that number again, Ms. Tonnesen?

17            MS. TONNESEN:  Yeah, of course.

18            MS. MONAGHAN:  Oh, I believe it's Tab 15, someone

19   who's better acquainted with the binder is telling me.  Is

20   this October 4th -- October 5th, 2001, Ms. Tonnesen?

21            MS. TONNESEN:  Yeah, yeah, yeah.

22            MS. TONNESEN:  And I'm not going to ask you about

23   most of what's in here.  As I mentioned, it's of a personal

24   nature and I just want to ask her about the last paragraph

25   on the second page.  And because I'm -- actually strike

Page 181

```
 1   that.

 2   MS. TONNESEN:

 3   Q    Just let me know when you're ready.

 4           MS. MONAGHAN:  Is it the paragraph that begins,

 5   "These past several months"?

 6           MS. TONNESEN:  Yes.

 7           MS. MONAGHAN:  If you can find that, Kathe, once

 8   you've had a chance to look.

 9           THE WITNESS:  I don't understand how this got into

10   Purdue's documents.  That's disturbing.

11   BY MS. TONNESEN:

12   Q    So in the paragraph immediately above, there's a

13   reference to litigation and I'm just giving you that context

14   so I don't have to read it, but it says in that paragraph --

15   in the paragraph I'm going to ask you about, it says, "These

16   past several months, you've had a taste of the threat of

17   financial insecurity.  Even with the vast fortune you have

18   built and the layers and layers that would have to be

19   penetrated before your true support system would be

20   affected, still I could see that you were visibly concerned

21   and distressed."  Did you wrote that, Dr. Kathe -- Dr.

22   Sackler, I apologize.

23   A    I'm going to -- Dr. Kathe is okay, too.  Even Kathe is

24   okay.

25   Q    I know you worked hard for that, so I don't want to --
```

Page 182

1    A    Very difficult to -- I don't remember these words.  I

2    remember some of the thoughts in here and I remember that I

3    had some exchanges with my father at this time because of

4    some estate planning that he was engaged in that I found

5    harsh and inequitable in somewhat regards, but I don't -- I

6    can't say whether I wrote this particular language.  I don't

7    know.  I have -- is there a question that's --

8    Q    Is it -- sure.  Is it true that your families amassed a

9    vast fortune and that there are "layers and layers that

10   would have to be penetrated before your true support system

11   would be affected"?

12   A    That sounds like a bit of naïve exaggeration to me, but

13   I was a lot younger and less nuanced in those days.  But I

14   think that it refers to, you know, to me, millions of

15   dollars are a fortune.  I grew up in a middle-class family

16   and went to public school, west side of Manhattan, and have

17   a different perspective about money than maybe some other

18   family members might have.  And --

19   Q    I'm going turn you to document -- it's 3177121.1.

20            MS. MONAGHAN:  I think it's -- go ahead.  I'm

21   sorry, Ms. Tonnesen.

22   BY MS. TONNESEN:

23   Q    I'm sorry.  I was just going to say it's your

24   deposition transcript, but it is true, I think there's a

25   pound sign in front that, pound 3177121.62

Page 183

1          MS. MONAGHAN:  It's the first tab in your binder,

2     Kathe.

3     BY MS. TONNESEN:

4     Q    I'm going to direct you to page 62 of this document.

5          MS. MONAGHAN:  I'm sorry, what page did you say,

6     Ms. Tonnesen?

7          MS. TONNESEN:  Sixty-two.

8     BY MS. TONNESEN:

9     Q    And --

10    A    Okay.

11    Q    At Page 62, Line 13, you're asked the question, "Do you

12    agree that diversion of opioids, including OxyContin, was a

13    big problem in 2008?"  And your answer at 62, Line 16, is "I

14    think the diversion of opioids has always been a problem and

15    I think also the misuse of opioids has always been a

16    problem."  (indiscernible).  Flipped upside down in my

17    (indiscernible).

18         And your answer is cut off a bit, and there's another

19    question that says, "The most common method of abuse of

20    OxyContin is (indiscernible) abuse, correct?"

21         Then the answer reads, "I'm not -- I'm really not

22    learned in that.  I don't know if it's the most common.

23    It's certainly a possible mode of abuse.  But the

24    reformulation up here referred to as the OTR product, the

25    abuse-deterrent product, the abuse-deterrent formulation,

Page 184

1    the ADF, as it's known, that (indiscernible) took ten years

2    and over a billion dollars for Purdue to develop, that

3    incremental improvement in the formulation of oxycodone

4    controlled-release product, so would help doctors be able to

5    treat pain patients."

6        I'm going to stop it, because this development part is

7    over.  Dr. Sackler, is that -- was that your (indiscernible)

8    at your deposition on November 5th, 2020?

9    A    I trust that I have the correct document, so I guess

10   if that's what I said, that's what I said.  I don't --

11   Q    And Purdue began marketing a reformulated version of

12   OxyContin in 2010, right?

13   A    Purdue, yeah.  Did you say Purdue?  I couldn't hear.

14   Q    Yeah, I'm sorry.  Purdue began marketing a reformulated

15   version of OxyContin in 2010, right?

16   A    Yes.  I think it was 2010.  Dates, again.

17   Q    Yeah, sure.  And it marketed the drug as abuse-

18   deterrent?

19   A    No, they weren't permitted by the FDA for several years

20   to say anything about the abuse deterrent features in the

21   formulation.  They were only allowed to say, to describe the

22   physical properties of the formulation, of the medicine.

23   (indiscernible).

24   Q    I'm sorry, Dr. Sackler, I was having a bit of a hard

25   time understanding you.  You don't mind, just speaking up a

Page 185

1    little --

2    A    2010, the approval to market the abuse deterrent

3    formulation did not include -- was prohibited to make any

4    claims about the formulation or the abuse deterrence

5    features.  The FDA only granted that it -- later in, I

6    think, around 2013 or thereabouts.

7    Q    (indiscernible).  And in 2013, Purdue started marketing

8    an ADF product and abuse-deterrent formulation, correct?

9         MS. MONAGHAN:  Objection.  I think that

10   misunderstands it.  They started selling the abuse-deterrent

11   formulation in 2010; they could only sell it as an abuse-

12   deterrent formulation as a claim in 2013.

13        MS. TONNESEN:  Understood.

14   BY MS. TONNESEN:

15   Q    And that did not mean the drug was abuse proof, right?

16   A    No, it was never abuse proof.  It was only an

17   incremental reduction in the risk of abuse, because of

18   certain physical properties of the formulation.

19   Q    Physical properties of the formulation that made it

20   more difficult to abuse through certain routes, right?

21   A    Through nasal inhalation or though injection, but it

22   could always be abused through swallowing more pills.

23   Q    And in fact, didn't oral abuse of OxyContin increase by

24   more than 50 percent after the reformulated OxyContin

25   launched?

Page 186

1    A    No, I -- orally -- I don't know what you mean.  Oral --

2    I'm not sure.  I don't understand what you're asking.  The -

3    -

4    Q    (indiscernible).

5              MS. MONAGHAN:  -- objection.  Are you saying that

6    the percentage of patients who abused OxyContin were more

7    likely to abuse it orally after the reformulation or are you

8    saying more patients --

9              MS. TONNESEN:  (indiscernible).  Yeah.  No, I'm

10   happy to rephrase to make myself a little bit more clear.

11   BY MS. TONNESEN:

12   Q    Did abuse of OxyContin by the oral route increase after

13   reformulated OxyContin launched?

14             THE COURT:  It's the same issue, though.  Increase

15   in proportion to other route abuse or increase as an

16   absolute matter?

17   BY MS. TONNESEN:

18   Q    Increased as an absolute manner -- matter.

19   A    I don't know the data.  You want me to answer what I

20   think?

21   Q    If you don't know, that's fine and we'll move on.

22   Thank you.

23   A    Yeah.

24   Q    At the -- and at the time that the reformulation

25   launched in 2010, there were no longitudinal epidemiologic

Page 187

1    studies demonstrating that the reformulation was effective

2    in preventing abuse, right?

3    A    No, the -- there were -- I think I recall that there

4    were requirements from the FDA that longitudinal studies be

5    conducted, but that would, of course, take time, and they --

6    but I think there might've been a requirement after

7    marketing, after approval of the -- like a post-NDA approval

8    requirement.  I vaguely remember that.

9    Q    But there were no long-term studies of the ADF product

10    at the time it launched in 2010, right?  It's okay if you

11    don't know.  That's perfectly fine.  I don't have any more

12    questions, Dr. Sackler.  Thank you very much.

13                THE COURT:  Okay.  Does anyone else want to

14    question Dr. Sackler on direct?

15                MR. ROBINSON O'NEILL:  Your Honor, Tad Robinson

16    O'Neill on behalf of the State of Washington.

17                THE COURT:  You can go ahead.

18                    DIRECT EXAMINATION OF KATHE SACKLER

19    BY MR. ROBINSON O'NEILL:

20    Q    Good afternoon, Dr. Sackler.  Can you hear -- excuse

21    me.  Can you hear me okay?

22    A    I hear you fine, thank you.

23    Q    On that issue of abuse-deterrent formulation, are you

24    aware of whether the FDA convened a panel on whether ADF

25    drugs reduced overall abuse in the United States?

Page 188

1    A    I'm aware that there are a number of different panel

2    discussions about abuse-deterrent drugs and there was a very

3    deep dive by FDA to try to pull together experts and as much

4    knowledge and information as they could.  I don't know the

5    particulars of every panel.

6    Q    Do you recall that in September of 2020, the FDA panel

7    issued a finding that ADF formulations of oral medications -

8    - oral opiate medications did not reduce abuse in the United

9    States and the vote was 26 to 1?

10   A    No, I'm not aware of that.

11   Q    Dr. Sackler, you're aware that as part of this deal,

12   the Sackler families, both Side A and B, are going to --

13   have obligated themselves to contribute $4.325 billion?

14   You're aware of that?

15   A    Yes.

16   Q    Do you know how much of that -- of those obligations

17   are going to be paid for out of your own personal assets?

18   A    My understanding is that the proposed settlement

19   agreement including the family's contribution that you're

20   citing is equally divided between the 16 family members,

21   family groups, as you call them.  So, I suppose --

22   Q    Do you know --

23   A    -- that's one-sixteenth.

24   Q    And do you know how much of that one-sixteenth that

25   your share will come out of trust assets or how much will

Page 189

```
 1   come out of your own personal assets?
 2   A    My trust assets or my personal are my assets as well.
 3   I don't really differentiate the -- other than for estate
 4   planning purposes.
 5   Q    Do you have personal control over the money that's in
 6   your trust?
 7   A    No, of course, not.  They're trusts.
 8   Q    Okay.  All right.  And you were on the board of Purdue
 9   Pharma in February of 2018.  Is that correct?
10   A    February 2018.
11   Q    Maybe I can give you some context for that date --
12   A    yeah.
13   Q    -- Dr. Sackler, that may help orient you.  Do you
14   recall that Purdue Pharma ceased all opioid marketing in the
15   United States?
16   A    Yes.
17   Q    Were you on the board when that decision was reached?
18   A    Yes.
19   Q    Why -- and did you approve of that decision to cease
20   all opioid marketing in the United States?
21   A    Yes.
22   Q    What were the reasons that the board gave you -- or the
23   Purdue management gave you for ceasing opioid marketing?
24   A    I think the -- I thought that idea evolved from a board
25   member.  I didn't know it came from management.
```

Page 190

1    Q     All right.  Which board member proposed that idea?

2    A     Not sure, but I --

3    Q     What were the reasons?

4    A     I don't remember management proposing it to the board.

5    Q     What were the reasons that Purdue Pharma ceases

6    marketing of opioids in the United States?

7    A     I think because the company -- that's a good question.

8    I think because there was -- I think because the company was

9    under such tremendous attack of litigation cases and if it -

10   - if ceasing marketing could, in any way, contribute to

11   reducing any incidence of suffering or loss of life or if it

12   had any -- could possibly have any positive effect, I think

13   it was important for the company to do that, to

14   (indiscernible).

15        And also, because doctors were under -- as long as the

16   product was still available to doctors to prescribe to

17   patients who need the medicine, I think that it was a good

18   decision.  I'm -- I don't really know more reasons for it.

19   I guess because of what was happening with the litigation

20   and the company and it seemed like the right thing to do at

21   that time.

22   Q     Thank you for that testimony -- I didn't mean to

23   interrupt you.  Go ahead.

24   A     I think I've said what I remember.

25   Q     Thank you for that testimony.  I'd like to go a little

Page 191

1    bit more slowly now and ask you about the first part of that

2    answer.  You indicated that it was because the company was

3    under tremendous attack of litigation case and if ceasing

4    marketing any way contributed to the reduction of incidents

5    of suffering, that that was the right thing to do.  Is it

6    your testimony that you believed that stopping marketing of

7    opioids could help reduce suffering in the United States?

8    A    I don't think it did.  Actually, the incidence of

9    overdose deaths increased after the board made that decision

10   and management executed, you know, stopping marketing.

11   Q    But that's why you did it, because you thought it would

12   help?

13   A    No.  I said I think it was the right thing to do

14   because the company was being accused of being responsible.

15   There was so much media and false allegations against the

16   company of being responsible for the entire opioid crisis.

17   It just didn't -- you know, at that time, I think it was the

18   right thing to do at that time.

19   Q    You are aware that the plan, the fund, the Sackler

20   payments that are part of this confirmation plan

21   contemplates the sale of independent affiliated companies

22   throughout the world, is that correct?

23   A    Yes.  And the sale of those companies are required

24   anyway because --

25   Q    That's right.  One of the conditions of the plan.

Page 192

1    A    Right, is that the family discontinue any controlling

2    activity or investment activity in companies that market

3    opioids.

4    Q    As of right now, those IACs, some of them anyway,

5    continue to market opioids, is that right?

6    A    Of course.

7    Q    I'm sorry, I didn't hear you.

8    A    Yes, of course.

9    Q    Is it not the right thing to cease marketing of this --

10   of these drugs in foreign countries?

11   A    I think the United States has its own particular --

12   every country is different in terms of their medical health

13   and infrastructure in terms of how they regulate controlled

14   substances, how they regulate prescriptions, how they

15   educate their doctors.  I think it's different -- different

16   countries have different problems and different litigation.

17   It seems that the United States is in a very unique and

18   tragic, sad -- has a very tragic and sad history of having

19   abuse -- opioid abuse and opioid overdose problems and other

20   drug problems that flares up from time to time and gets out

21   of hand, seriously out of hand.

22        But this is the biggest crisis I've ever seen in my

23   lifetime.  The influx of illicit drugs from Mexico and from

24   China, the fentanyl, other opioid products, and the

25   different kinds of heroin coming into the country.  And

Page 193

1  somehow we can't seem to stop it.  I don't really understand

2  it.  It's beyond me.  But it's tragic.  And just the culture

3  of drug use is very extreme in the United States.  It's in

4  the movies, it's in the TV programs.  It's all over.  You

5  know, cocaine is a very serious problem.

6  Q    Dr. Sackler, we're straying a little bit from the

7  question, so I'm going to stop you.

8  A    Yes.  Yes.

9  Q    But I do want to respond to that.  When you say there

10 is a drug problem in the United States, you are aware that

11 United States consumes more than 80 percent of the opioids

12 produced in the world, aren't you?

13 A    I have heard that.

14 Q    So wouldn't it be fair to say that when you say drug

15 culture in the United States, it is the drug culture for

16 doctors' offices that sparked this particular epidemic?

17 A    No, I don't believe that.  I don't know if that -- I

18 don't think that's fair to say.  I mean, I think it's -- I

19 really don't know the answer to that.  It's very

20 complicated.  It's very multifaceted.  You have the illicit

21 drug market, you have the prescription drug abuse, you have

22 the prescription drug diversion.  You have all these other

23 black market things going on.  I don't know enough about it

24 to even speculate.  But it's very complex.

25       And I just hope our government and our government

Page 194

1    agencies, our regulatory agencies can get their minds around

2    it and figure out how to change our healthcare system and

3    give patients better access to medical care.  In other

4    countries -- not all, but some -- there's national

5    healthcare and patients -- you know, all patients of all

6    socioeconomic possibilities can have access to the same

7    quality of medical care.  That makes a big difference I

8    think in a society that's trying to regulate, you know,

9    misuse of controlled substances.

10   Q    That all may be true, Dr. Sackler, but wouldn't you

11   agree with me it's also the role of government to try to

12   regulate companies that produce dangerously addictive drugs

13   and make sure they don't make misstatements about it?

14   A    Absolutely.  And it's also the role of those regulatory

15   agencies to control, you know, the distribution of drugs

16   into communities.  You know, there are a lot of different

17   pieces to the puzzle and they're all moving parts.  And it's

18   really more than one company.  But --

19   Q    But in this case -- sorry, I apologize.  I didn't mean

20   to interrupt.  I thought you were done.

21   A    I was just trying to say that it's -- you can't boil it

22   down to one simple solution and point your finger at one

23   company as the thing that caused the opioid crisis.

24   Q    In this case, however, you are asking this Court to

25   approve a settlement which would extinguish those claims and

Page 195

1    fund it from the continued sale of opioids and marketing

2    abroad.

3    A    The most important part of the settlement is -- you

4    know, we may be fundamentally of a different point of view

5    about certain medicines.  Because as far as I know, there is

6    no other medicine that is as effective in managing extreme

7    pain, severe pain, debilitating pain, chronic pain, whether

8    it's cancer pain or another etiology, there is no other

9    medicine at this time that we have that doctors can use to

10   help manage patients' pain and help them be able to continue

11   to function.  And it's true that the risk is serious.  It

12   has serious risk of abuse and addiction.  And that's why it

13   has a black box on it, and that's why it's a Schedule II

14   drug, and that's why the DEA is supposed to be all over it

15   and knowing what's happening and how it's being produced and

16   distributed and so forth.

17        But the patients still need to be treated.  Their pain

18   still needs to be addressed with an effective medicine.  And

19   this medicine is still approved by the FDA and is and has

20   been used over -- since its launch in 1996 to be able to

21   manage patients' severe debilitating pain.

22        And so it's -- I guess the question is if you believe

23   that the best way of offering healthcare is between the

24   doctor and patient one-on-one relationship, then we have to

25   -- or doctors have to have the task and the regulatory

Page 196

1   agencies have the task of figuring out how to mitigate and

2   balance that risk-benefit ratio.  The benefit of pain

3   management and relief of that suffering.  And

4   (indiscernible) suffering.  There were also some issues and

5   it has been shown that people in severe pain, there's also a

6   risk of suicide.  There are suicides.  And people can only

7   tolerate so much when it comes to pain.  So -- and then --

8   Q    I think, Doctor, you've gone on for quite a while.  And

9   again, I think we've gotten away from the question.  So I'm

10  going to have one last series of questions for you, Dr.

11  Sackler.  Do you believe that you have any responsibility

12  for the opioid crisis in the United States?

13  A    I don't believe that I have a legal responsibility, but

14  I deeply feel distressed and recognize a moral

15  responsibility that I do have and that we all have, and that

16  we've got to somehow bring enough resources and intellectual

17  resources, financial resources, all resources together to

18  change the picture.

19  Q    There have been tens of thousands of people who have

20  filed claims in this bankruptcy that have suffered harm from

21  abuse of your products, the products produced by Purdue

22  Pharma.  Do you have any words of apology for them?

23  A    I've said before and I'll say again, I am deeply,

24  deeply sorry for what any individual person who has suffered

25  with addiction, and I'm tragically sorry for any loss of

Page 197

1   life.  It's devastating.  It's hard to even grasp.  And it's

2   very disturbing.  It is absolutely disturbing that the

3   company, Purdue, that was intended to develop this product

4   to help people, to relieve suffering, to help doctors be

5   able to relieve suffering, has become part of this crisis.

6           MR. O'NEILL:  I don't have any more questions,

7   Your Honor.

8           THE COURT:  Okay.  Mr. Higgins, do you have

9   questions?

10          MR. HIGGINS:  Yes, Your Honor.  Thank you very

11  much.  For the record, Ben Higgins for the U.S. Trustee.

12              DIRECT EXAMINATION OF KATHE SACKLER

13  BY MR. HIGGINS:

14  Q    Good afternoon, Ms. Sackler.  Can you hear me okay?

15  A    Yes, fine.

16  Q    My name is Benjamin Higgins and I represent the United

17  States Trustee.  You are getting a release under the

18  Debtor's plan, is that correct?

19  A    Yes.

20  Q    And other -- I'm sorry, I didn't mean to interrupt.

21  A    Yes.  Sorry.

22  Q    And the other members of the Side A family are getting

23  releases, is that correct?

24  A    Yes.

25  Q    And the spouses, children, and grandchildren of the

Page 198

1    Side A family members are getting releases.  Is that right?

2    A    Yes.

3    Q    And any entities or individuals to which any of your

4    assets are transferred are getting released.  Is that right?

5    A    Yes.

6    Q    Do you know how many people you've transferred assets

7    to?

8    A    No.

9    Q    Do you know how many entities you've transferred assets

10   to?

11   A    No.

12   Q    Do you know how many entities or individuals the other

13   Side A Sackler family members have transferred assets to?

14   A    No.

15   Q    The release also includes any assets, businesses, or

16   entities that you own.  Did you know that?

17   A    I haven't actually read the document that describes the

18   releases yet.  I've heard it from my attorneys, but I don't

19   know (indiscernible).

20   Q    You haven't looked at the list of released parties?

21   A    No.

22   Q    Can you tell me -- do you know how many businesses or

23   entities you have an ownership interest in?

24   A    My ownership interest is through trusts.  I don't know

25   exactly what the --

Page 199

1    Q    Do you know how many assets, businesses, or entities

2    the other Side A family members have?

3    A    No.

4    Q    Sitting here today, you don't know how many people are

5    getting released under the plan.  Is that correct?

6    A    I don't know an exact number, but I know it's a lot of

7    people.

8    Q    And you don't know how many entities are getting

9    released under the plan.  Is that correct?

10   A    No.  It's really a matter for the attorneys who the

11   proper parties are (indiscernible) releases.

12   Q    Do you recall a few minutes ago the attorney from the

13   State of Maryland was asking you about an email you wrote

14   referencing a vast fortune that your family had accumulated.

15   Do you remember that exchange?

16           MS. MONAGHAN:  Objection.  Mischaracterizes the

17   testimony.

18           THE COURT:  That's sustained.  If you want to

19   refer to the email, you can, Mr. Higgins.  If you want to

20   use the actual language, or if you want to ask the question

21   differently.

22           MR. HIGGINS:  I'll try to rephrase the question,

23   Your Honor.

24   BY MR. HIGGINS:

25   Q    Ms. Tonneson asked you if you had written an email that

Page 200

1    stated that your family amassed a vast fortune of wealth,

2    and there are layers and layers before your true support

3    system would be affected.  Do you recall that exchange?

4    A    Yes, I think I answered that when I was asked the

5    question.  I think I answered that at that time, my idea of

6    vast wealth was considerably different.

7    Q    Sure.  I wanted to focus on the layers and layers

8    reference.  From your understanding, are there layers of

9    Sackler family entities that protect a fortune?

10   A    Well, I think there's a complex trust structure and

11   different companies and holding company.  I think all of

12   this information has been reported and revealed and

13   submitted and negotiated.  But I'm not -- you know, that's

14   for the lawyers to figure out.  I really don't get involved

15   with that level of (indiscernible).

16   Q    Sure.  I'll move on to a different question.  Did you

17   say that you had not read the plan's release provision?  Is

18   that what you said previously?

19   A    That's right.

20   Q    And you have left that to your lawyers to figure out

21   what that means.  Is that right?

22   A    Well, I think my lawyers have advised that the releases

23   are being structured to bring about -- I guess to bring

24   closure to the situation.  It's a resolution that brings

25   closure which enables the family to make this very

Page 201

1    substantial contribution to the Purdue bankruptcy settlement

2    and provides those resources to do good and be available to

3    the communities and people who have suffered in this crisis.

4    And so it's a constructive resolution.  Rather than -- you

5    know, rather than -- there are thousands of cases that

6    (indiscernible).  And if the family has to defend itself in

7    Court case after case after case over years of litigation,

8    obviously then it cannot provide those resources in

9    settlement.  So it's two sides of a coin.

10        I think the more constructive side is to have the

11   settlement and provide the resources for the communities and

12   build the abatement so that people who have suffered and

13   people who are at risk right now as we speak who need access

14   to medical care or who need medicine or who need social

15   support (indiscernible).  There's an opportunity here to

16   (indiscernible) fighting and litigation and paying lawyers'

17   fees (indiscernible).

18   Q    I don't want to cut you off, Ms. Sackler.  I'm having a

19   little trouble hearing you.  Can you hear me okay?

20   A    I hear you fine.

21   Q    Okay.

22   A    I'm getting a little tired, but I was trying to speak

23   up.

24   Q    Sure.  I'm just about done, Ms. Sackler.  Are you aware

25   that several parties, including my office and nine states

Page 202

1    and the District of Columbia have all argued that third

2    party releases as currently proposed are impermissible?

3    A    I (indiscernible).  I think (indiscernible).

4    Q    I'm sorry --

5              MS. MONAGHAN:  I think the question, Kathe, was

6    whether you are aware, not whether you agree that they are

7    impermissible.  Are you aware that there have been

8    objections raised?

9    BY MR. HIGGINS:

10   A    Yes.  Yes.  I am aware of all of the continuing and

11   continuing objections that are wasting time and wasting more

12   resources and holding back the abatement that should be

13   going a year ago or three years ago to the people in the

14   communities that need it.

15             MR. HUEBNER:  Your Honor, I move to strike that

16   response as non-responsive.  We're not actually interested

17   in Dr. Sackler's views on these hearings, with all due

18   respect, Your Honor.  She is a fact witness and she is going

19   to answer the questions that are asked of her.

20             THE COURT:  I won't strike it.  It's a judge

21   trial, so I don't think I need to strike it.

22             You can go ahead, Mr. Higgins.

23             MR. HIGGINS:  Thank you, Your Honor.

24   BY MR. HIGGINS:

25   Q    So, Dr. Sackler, my final question to that was going to

Page 203

1    be if the bankruptcy court decides that the releases cannot

2    be approved because they're not permissible under applicable

3    law, would your family be willing to offer the funds in

4    exchange for a narrower set of releases?

5    A    I've been advised by my attorneys that these are the

6    releases that are required to bring closure to this

7    situation constructive, positively, and allow the optimal

8    amount of resources to be made available to the communities

9    and the people who are in need.  I have to address that.

10   Q    And when you refer to closure, are you speaking closure

11   from the perspective of the Sackler family?

12   A    No, I'm speaking closure from everyone's perspective.

13   I think everyone is wasting their time and money.  Not just

14   the Sacklers.

15            MR. HIGGINS:  Okay.  No further questions, Your

16   Honor.  Thank you, Dr. Sackler.

17            THE WITNESS: Thank you.

18            THE COURT:  Okay.  All right.  Anyone else wish to

19   cross-examine Dr. Sackler?  I mean, not cross examine,

20   excuse me, examine Dr. Sackler?

21            MR. OZMENT:  Your Honor, this is Frank Ozment.

22   And I'll be as brief as possible.

23            THE COURT:  Okay.

24            MR. OZMENT:  Thank you.

25            DIRECT EXAMINATION OF KATHE SACKLER

Page 204

1    BY MR. OZMENT:

2    Q    Dr. Sackler, my name is Frank Ozment and I represent

3    some individual claimants.  I'd like to ask you a couple of

4    questions about some of your testimony that you just went

5    over.  Can you hear me okay?

6    A    I hear you (indiscernible).

7    Q    Thank you.  I know that you've never practiced medicine

8    for a living, but you did go to medical school, right?

9    A    I also took care of patients as a house officer in a

10   hospital.

11   Q    Right.  So you had doctor-patient relationships with

12   people, right?

13   A    Yes.

14   Q    And I am going to ask you about a statement that the

15   government made.  And I don't want to suggest for a moment

16   that the statement is accurate or true.  Okay?  But I just

17   want to ask you about the statement.  So please don't be

18   offended.

19   A    Okay.

20   Q    Are you aware whether the government accused Purdue

21   Pharmaceutical of corrupting the patient-doctor privilege or

22   relationship?

23   A    I've never heard that, actually.

24   Q    Well, I'm going to submit to you that they did make a

25   statement to that effect.  Okay?  Is it true that you would

Page 205

1    never have done anything personally to corrupt that

2    relationship?

3    A    Absolutely not.

4    Q    You would not have done that, would you?

5    A    I would not knowingly do anything to corrupt any

6    relationship, especially the relationship with the patient.

7    Q    And if that did happen, the patient would be the

8    victim, would they not?

9    A    I'm not sure what you mean by corrupt, but I would not

10   do anything to harm a patient knowingly.  The oath, the

11   Hippocratic oath.  You swear as a physician (indiscernible)

12   to not do harm to patients.  To do no harm.  To relieve

13   suffering and do no harm.

14   Q    Right.  And if somebody interfered with your ability to

15   do that, the victim would be the patient, wouldn't it?

16            MS. MONAGHAN:  I've got to object.  I'm now

17   confused.  If somebody interfered with her -- with Kathe's

18   ability to do what?

19            MR. OZMENT:  As a physician.  She said she had

20   patients when she was a physician.  And I guess what I'm

21   asking her is based on her knowledge of practicing medicine,

22   if somebody interfered with your relationship with a

23   patient, then the victim of that interference would be the

24   patient.  Is that right?

25            MAN:  Objection on relevance grounds.

Page 206

1          MR. OZMENT:  Your Honor, may I explain the

2     relevance briefly?

3          THE COURT:  Yes.

4          MR. OZMENT:  Thank you.  If the government

5     contends that a patient's -- that Purdue interfered with

6     patient-physician relationship and that's, you know, what

7     happened when Purdue committed the crimes to which it pled

8     guilty, then those patients are victims and they are

9     entitled to relief under federal law, and that impacts the

10    (indiscernible) to which they were entitled to receive.

11         MS. MONAGHAN:  Objection.  I don't think Kathe is

12    in any position to opine on this or --

13         THE COURT:  I think the issue on relevance here is

14    that this is really a legal question.  If there is a factual

15    issue, although I don't think it is, it's really with

16    someone else.  But I expect that having read the

17    Government's settlement agreement with Purdue, the

18    Government would disagree with your position, Mr. Ozment.

19    And you can argue that with the Government.  But I think one

20    thing is clear.  It's not really a proper subject for this

21    witness's testimony.

22         MR. OZMENT:  I have nothing further for this

23    witness.  Thank you, Your Honor.

24         THE COURT:  Okay.  Okay.  Anyone else?

25         MR. HUEBNER:  Your Honor, nothing while the

Page 207

1    witness is still on the stand.  But there is one thing once

2    the witness is dismissed that the Debtors feel obligated to

3    do.

4            THE COURT:  Okay, that's fine.  Ms. Monaghan, do

5    you have any cross?

6            MS. MONAGHAN:  I do not, Your Honor.

7            THE COURT:  Okay.  All right.  Very well then.

8    And hearing no one further, Dr. Sackler, you can sign off at

9    this point.  Thank you.

10           THE WITNESS:  Thank you.

11           THE COURT:  Can I just -- I'm going to take my

12   microphone off for a second because -- oh -- it keeps -- it

13   was great for about -- most of that testimony, and now it's

14   gotten choppy again.

15           I'm sorry.  We were -- I don't know if you are

16   experiencing this.  The video has been somewhat spotty.  It

17   was actually quite good for most of the last witness's

18   testimony.  It's spotty again right now.  And I was trying

19   to figure out if there's something we could do about it.

20   And I'm told that there's something in the overall building

21   that is affecting the reception.

22           So can you all see me and hear me?

23           MR. HUEBNER:  Yes, Your Honor, perfectly.

24           THE COURT:  All right.

25           MR. KAMINETZKY:  I don't know that we can see you,

Page 208

1    Your Honor, but we can hear you.

2              THE COURT:  All right.

3              MR. HUEBNER:  Many of us can, interestingly

4    enough.  So it seems to be a select list.

5              THE COURT:  All right.  Well, the hearing is the

6    most important part.

7              So why don't you go ahead, Mr. Huebner?

8              MR. HUEBNER:  Your Honor, I want to thread the

9    needle carefully because (indiscernible) progress that I

10   made, I think everyone on the first day of this case almost

11   two years ago was that nobody would ever hear me defending

12   the conduct of Purdue certainly prior to the time Davis Polk

13   arrived for the first time.

14             Mr. O'Neill -- and I know he did not do it

15   intentionally -- I think several times actually misstated

16   the conclusions of the FDA Advisory Committee in the way he

17   phrased his question.  And because it's actually quite

18   important, with some caution, I just want to point out

19   because it's important that the record be clear.

20             There were three separate votes taken by the Ad

21   Com.  And the 26 to 1 vote that he referred to in his

22   question was not a vote that (indiscernible) not reduce

23   abuse.  I actually don't want to characterize --

24             MR. O'NEILL:  Your Honor, I'm sorry --

25             THE COURT:  Can I just interrupt?  Mr. O'Neill

1   asked a question about a document that I don't believe is in

2   evidence, unless it's one of the joint exhibits.  If it is

3   in evidence, people can refer to it at oral argument.

4   Again, this is a judge trial.  I understand if someone asks

5   a question of a witness, the witness isn't familiar with the

6   document, I don't accept the lawyer's characterization of

7   the document as evidence.  It may be somewhere in the record

8   as an admitted exhibit, but it's -- whatever it is, it's a

9   passing remark that is not evidence.

10          MR. HUEBNER:  That's perfect.  I was trying to go

11   as light as I could.  And (indiscernible) document on its

12   website that speaks for itself.  They have the three

13   questions.  Everyone who wants to can go read them.  That's

14   the only point I wanted to make.

15          And again, with regard to (indiscernible) I did

16   not want to interrupt.  You were being kind.  But it's

17   actually important for the record.  I apologize --

18          THE COURT:  All right.  And again, the record --

19   the record as far as the trial is concerned, you know, Mr.

20   O'Neill is a fine lawyer and he's entitled to be listened to

21   as a lawyer.  He's entitled to be listened to.  But he's not

22   able to testify as to a document that isn't in the record.

23   So it's really not part of the record, or the record doesn't

24   need to be corrected.

25          MR. HUEBNER:  Okay.

Page 210

1              THE COURT:  The document, if it is part of the

2     record, will speak for itself.

3              MR. O'NEILL:  I'm also not a doctor and I make no

4     pretense to understand it.  So if I mischaracterized it,

5     then I apologize to the Court.

6              THE COURT:  Well, that's fine.

7              MR. O'NEILL:  Yeah.  It's not evidence.  I agree.

8              THE COURT:  Again, if there were a jury, this

9     might be a different discussion.  But I would have to

10    explain to them, for example, the difference between

11    evidence marked by an attorney.

12             MR. HUEBNER:  Thank you, Your Honor.

13             THE COURT:  Okay.  All right.

14             MR. HUEBNER:  I think that takes us to a

15    procedure.  So if it's helpful, I can give the Court an

16    update unless someone else has something they need to do

17    first.

18             MR. KAMINETZKY:  I think the last thing is a

19    stipulation as to the last witness on the admissibility of

20    the deposition.  I think Mr. Monaghan really -- I think the

21    parties all have to stipulate to the admission of Ilene

22    Sackler's deposition along with a short stipulation that

23    we're finalizing to provide Your Honor with some facts that

24    are to be stipulated just because they're a little unclear

25    in the deposition.

Page 211

1             THE COURT:  Okay.  I think that's consistent with

2     what I was told this morning.  But, Ms. Monaghan, is that

3     your understanding, too?

4             MS. MONAGHAN:  That is.  I understand that Mr.

5     Edmunds on behalf of Maryland may have a couple of

6     additional documents that he wants to add to that

7     stipulation.  So we were going to work that out in the

8     hearing before formally submitting the stipulation.

9             THE COURT:  All right.  And you will both file

10    that stipulation on the docket and also email it to chambers

11    along with the deposition?

12            MS. MONAGHAN:  Yes, Your Honor.

13            MR. EDMUNDS:  Yes, Your Honor.

14            THE COURT:  Okay, that's fine.

15            MR. EDMUNDS:  And, Your Honor, I guess now is

16    probably the time to do it.  I had mentioned I think that we

17    would withdraw the declaration of Mr. Sheldon pursuant to a

18    stipulation reached by both sides of the family and Debtors

19    and the State of Maryland.  And we will do that.  I think

20    this morning I did not mention what the joint exhibit

21    numbers are, and so I could now state them into the record.

22    It is JX-1753 to JX-1758, JX-2710 to JX-2721, JX-2760, and

23    JX-2874 to 2896.  And those are the ones covered by the

24    stipulation that we mentioned this morning, Your Honor.

25            THE COURT:  Okay.  And correct me if I'm wrong,

Page 212

1    some or all of those exhibits are being admitted, but not

2    for the truth.  Simply rather it for they are reflecting

3    documents that would be submitted if there were a trial on

4    the underlying merits of the litigation.

5             MR. EDMUNDS:  I think actually most of it --

6    again, it's a lot of documents.  But, Your Honor, I think a

7    lot of it is being just admitted -- it is pleadings for

8    Maryland, for example.  I think that the qualification was

9    that there are some deposition transcripts within this that

10   have statements about members of the family, and those

11   statements will not be admitted for their truth against

12   members of the family.

13            THE COURT:  Okay.  Well, I mean, look.  If someone

14   -- if -- I haven't gone through the documents.  I did bring

15   the declaration to my bench in case someone was going to be

16   questioned on it.  But if an exhibit is for example a

17   complaint or a claim, obviously I would not be accepting the

18   allegations in the complaint or the claim as true, I would

19   be accepting it as a complaint.  Right?

20            MR. EDMUNDS:  Right.  And I think in this case

21   it's just historical, the fact that it was filed.

22            THE COURT:  Fine, okay.

23            MR. EDMUNDS:  But it contains what it contains.

24   Yeah.

25            THE COURT:  Okay.  Okay, very well.  So I'll be --

Page 213

1          MR. EDMUNDS:  Thank you, Your Honor.

2          THE COURT:  That's fine.  So I'll look for that

3     stipulation.  And I think we have the exhibits already, but

4     you've now listed them, so they're going to be covered by

5     the stipulation.

6          MR. EDMUNDS:  Thank you, Your Honor.

7          THE COURT:  So, Mr. Huebner, are we -- are you

8     done with Ms. Steege and her group?

9          MR. HUEBNER:  (indiscernible) on that.  So I was

10    about to say that with one exception, I think the evidence

11    is now closed.  As you saw in yesterday's email, there are

12    three witnesses that are potentially subject to recall,

13    ideally tomorrow morning if the Court is available.  There

14    is an email -- I'm not sure what time it arrived to chambers

15    today -- in which I think Ms. Steege will keep me honest

16    that it will be about 30 minutes per witness, not much more

17    than that.  Davis Polk has (indiscernible).  We're not

18    handling this.  It's sort of like (indiscernible), Your

19    Honor.  We keep getting closer and closer to resolved, but

20    each time, you know, the gaps get split in half, but they're

21    not quite at zero yet.  I remain optimistic, having resolved

22    a hundred thousand things so far, that we're going to

23    resolve this last one and a (indiscernible) hearing will not

24    be necessary.  It's not done quite yet.  If it is, I think

25    it will be short (indiscernible) morning, which we very much

Page 214

1    hope to avoid and will not be the case.  But I believe other

2    than that, (indiscernible) Debtor witnesses, everything else

3    is included from a factual matter.

4         I see Ms. Steege is here so I'll let her speak for

5    herself.  And then I'll talk to you about the rest of the

6    hearing and what's on your email that has been sent a little

7    while ago.

8         MS. STEEGE:  Your Honor, I think Mr. Huebner has

9    accurately reported it.  We are very, very close to getting

10   the agreement resolved.  I do have some thoughts potentially

11   on how to streamline tomorrow if we aren't quite over the

12   finish line, which I'll discuss with his colleagues if we

13   have to do that.  But hopefully we're sending an email to

14   chambers letting Your Honor know that we've reached

15   agreement with regard to our issues.

16        MR. HUEBNER:  Your Honor, actually --

17        THE COURT:  So it's conceivable at least that

18   there wouldn't be testimony tomorrow?

19        MS. STEEGE:  Yes, Your Honor.

20        THE COURT:  Okay.

21        MR. HUEBNER:  Yeah.  And, Your Honor, what I was

22   trying to say was (indiscernible) the lines never touch.

23   That's a bad analogy.  Hopefully (indiscernible).

24        But, Your Honor, with respect to next week, just

25   as a reminder to all those who are listening, I believe we

Page 215

1    are scheduled for Monday at 10:00 and Wednesday at 10:00.

2    Your Honor directed at the (indiscernible) yesterday that we

3    all fit oral argument into (indiscernible).  The Debtors

4    actually (indiscernible) proposal (indiscernible) two days

5    into one-and-a-half days.

6            We've asked supporters to coordinate to split up

7    their time in a clear and organized fashion, that the

8    objectors do that as well on an issue-by-issue basis, and

9    that by 9:00 a.m. Monday morning, whoever took the lead for

10   the objectors as well as the debtors who will do it for the

11   supporters send you in the intra, you know, sort of time

12   allocations so that it's very clear to everybody sort of who

13   is doing what for how long.  Because otherwise, I think

14   based off our experience, you know, there are many issues

15   which many parties have passionate views.  And if we just

16   let people sort of run, we'll be here forever.  I'm not

17   asking you for anybody's consent to this.  We wrote to

18   chambers, we copied all parties.  People are welcome to

19   express their views.  But (indiscernible) we were dealing

20   and addressing the Court's clear order and request.  There

21   are 330 parties on this email.  And so we just can't simply

22   have like a free-for-all.  We did the best we could in our

23   capacity as fiduciaries splitting the time 50/50 and all

24   (indiscernible) objectors and supporters and (indiscernible)

25   time as we see sort of the gravity and weight of the issues.

Page 216

```
1              So we could have three other people come up

2      (indiscernible).  I think that's totally inappropriate.  I

3      think (indiscernible) welcome to, you know, (indiscernible)

4      or contact us directly.  We did the best (indiscernible)

5      fiduciaries for all to set up a fair and appropriate

6      structure consistent with the Court's directive of

7      (indiscernible) oral argument, and people need to work out

8      the (indiscernible).

9              THE COURT:  Okay.

10             MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

11     from the U.S. Trustee's Office.

12             THE COURT:  Just a moment.  My clerk handed me

13     these two emails, but I haven't had a chance to review them.

14     So why don't you go ahead, Mr. Schwartzberg?

15             MR. SCHWARTZBERG:  Davis Polk had circulated that

16     email, and it was unclear from that email whether the

17     Debtors were going to go first or whether the objectors were

18     going to be allowed to go first.

19             MR. HUEBNER:  Oh, that's a great --

20             THE COURT:  I mean, the Debtors have the burden of

21     proof.  But if they want to be replying to the objections,

22     I'm happy to have the objectors go first.  I think you

23     should talk about that among yourselves.

24             I do think it makes sense to divide it up by topic

25     or by, you know, nature of objection.
```

Pg 217 of 275

1            MR. GOLD:  Your Honor, Matthew Gold --

2            MR. HUEBNER:  We will just follow your --

3            MR. GOLD:  Your Honor, Matthew Gold from Kleinberg

4    Kaplan.  May I speak?

5            THE COURT:  Yes.

6            MR. GOLD:  Thank you.  I will try to be a lot more

7    brief than Mr. Huebner.  I will simply note that the -- that

8    his firm sent this around this afternoon.  None of us have

9    really had a chance to review it or react to it first.  We

10   will take it as a good faith attempt by the Debtors to set

11   forth their resolution about how these things should be

12   organized, and we will endeavor to get back to the Debtors

13   after review and attempt to coordinate with many of the

14   other objecting states to make sure that it works from our

15   perspective as well.  We don't believe there's any necessity

16   to burden the Court further with this at this time.  It's

17   something that I trust we'll be able to resolve.  Thank you.

18           THE COURT:  Okay.  Anyone else?

19           MR. GOLDMAN:  Your Honor, Irve Goldman on behalf

20   of the State of Connecticut.

21           Just to let the Court know, it's always been our

22   intention to coordinate on presenting legal arguments.  And

23   there is a reference in the email to some objectors

24   insisting on presenting their view of overlapping issues.

25   We are not one of those objectors.

Page 218

1          THE COURT:  Okay.

2          MR. GOLDMAN:  So I just want to make that clear.

3          THE COURT:  Well, I haven't read the email.  I'm

4    not sure what you're referring to, but I understand what

5    you're saying.

6          MR. GOLDMAN:  Thank you, Your Honor.

7          THE COURT:  Okay.  All right.  I mean, look, I've

8    set a day-and-a-half.  Frankly, to my mind, that builds in

9    time for questioning by me that may go beyond what you all

10   are expecting to present.  But that won't add more than

11   another half day.  So we're going to be done on Wednesday.

12   But don't expand this beyond the day-and-a-half, because I'm

13   already assuming that it may be somewhat expanded based on

14   my own questioning of various parties on their legal

15   argument.

16          MR. TROOP:  Your Honor, Andrew Troop for the non-

17   consenting states.  This doesn't have to do with oral

18   argument about the issues that have been presented to you.

19   But as I'm sure you know, there remain unfinished documents

20   and documents submitted, for example, in connection with the

21   proposed conformation order that are particularly delineated

22   as still under negotiation.

23          I would just suggest that at the end of argument

24   and before you rule, we try to get our arms around a process

25   for being able to work through and resolve those issues and

Page 219

1    engage the Court if appropriate to do so.

2             THE COURT:  Absolutely.  And, look, I mentioned

3    this to the parties last week.  I would hope that the

4    parties would focus on some of the issues that have been

5    raised during this hearing with respect to the breadth of

6    the release.  I think as good lawyers, you know what those

7    issues are.  I think you are -- I'm not asking you to

8    address issues about carving a party out, but I am asking --

9    that's the subject of oral argument in my ruling, and I

10   understand that.

11            But I am asking you to focus on some of the other

12   issues that have been raised, such as releases for

13   transferees that could be boundless.  Releases for --

14   related to non-opioid related activity, things like that.

15   And if you do that, I think that would be helpful.

16            MR. HUEBNER:  Your Honor --

17            THE COURT:  But if you do it, I would like to see

18   the revision before oral argument.  That's separate from Mr.

19   Troop's point.  It may well be that there needs to be a

20   process to make sure the final documents are the final

21   documents and there's no, you know, TBD unless it's, you

22   know, you have an extremely detailed term sheet and the

23   final document has to be consistent with the term sheet.

24   But I understand Mr. Troop's point, which is really similar

25   to my point.

1            But I just wanted to say that if you are

2    addressing some of the issues that the U.S. Trustee, for

3    example, has raised in questioning, it would be helpful to

4    do that if you can before oral argument as opposed to after.

5            MR. HUEBNER:  Your Honor, let me give the Court

6    assurance.  As I said at the very -- literally at the first

7    day hearing, you know, our phone lines are open 24 hours a

8    day.  We believe we've been listening carefully.

9            To give one example, the U.S. Trustee raised the

10   any other persons issue.  Not only did we remove that from

11   the Seventh Amended Plan, we emailed both the U.S. Trustee

12   and the DOJ to make sure that they saw that it was there.

13           We are working now as we speak on issues raised by

14   the Court and other parties during the hearing.  Where we

15   can, we will be addressing them.  And we will of course

16   provide updated documents to all relevant parties.  Because

17   if you're working hard to, you know, address people's

18   concerns, not telling them (indiscernible) foolish

19   (indiscernible) not to take.  And we are very deeply engaged

20   in doing what we can to, frankly, assuage and address the

21   concerns of objectors where we can and to hopefully give us

22   all a smoother route to the best possible outcome of these

23   cases.  So whether we've listened hard enough, we'll find

24   out.  But we certainly believe that we are listening hard.

25           THE COURT:  Okay.  And I'm not referring just to

Page 221

1    the Debtors.  I understand that the DOJ and the U.S. Trustee

2    are governmental entities, but they are also entities that

3    engage in bankruptcy cases.  And I see no harm and a lot of

4    good in their interacting with the Debtors and other parties

5    on this issue as opposed to waiting to the hearing and then

6    saying, oh, never mind, like Emily Litella.  I mean, it's

7    good to actually focus on these issues beforehand.  You're

8    much more productive if you do that.

9           So I'm not speaking just to the Debtors and to the

10   people on the other side, the Sacklers.  I'm speaking to

11   others who have concerns.  And by engaging in those --

12   resolving those issues, you're not waiving any other

13   arguments that you have, obviously.  So I just would hope --

14   you work at busy offices -- that the lawyers for the DOJ and

15   the U.S. Trustee would actually be proactive in engaging in

16   those sorts of discussions.

17          MR. HUEBNER:  And, Your Honor, to give credit to

18   where it is due, they absolutely are.  I probably email with

19   one or both of those two offices ten times every day.

20          THE COURT:  Okay, good.

21          MR. HUEBNER:  And we are very engaged.  We're

22   working -- as I hope the Court knows from the beginning, we

23   would like to get it as good as we can possibly get it.  And

24   that involves engaging with everyone and not firing off

25   missiles or pleadings without talking first or anything like

Page 222

1    that.  And that's just not our way, and I hope the Court

2    knows that.

3              THE COURT:  Okay.  All right.  Anyone else about

4    the argument for next week?  No.

5              All right.  So with the exception of the possible

6    testimony that Ms. Steege's clients might take if they can't

7    resolve all of those related issues with the debtors

8    overnight.

9              I believe the record then for this trial, this

10   hearing is closed, but I say that with one exception.  And I

11   say it because I believe it's important to get this out,

12   although it is unusual.  And it reflects the unusual nature

13   of this case.  Someone at the beginning of this trial -- and

14   I'm not sure who because they were not actually someone who

15   was offering evidence at the time -- said I think that the

16   individual people who have been affected by the opioid

17   crisis and the Debtor's role in it need to be addressed in

18   this trial.  And I said and others, including Mr. Huebner,

19   said, indeed, they will be.  And they have to some extent.

20   But a trial covers a lot of ground, as this trial did.  And

21   I want to make sure that those people know that they are

22   being taken into account.  Not just by me, but by the

23   Creditors' Committee, the Debtors, the states, both those

24   who are objecting to the plan and those who are supporting

25   the plan, and the various governmental entities, Native

Page 223

1    American tribes, and the like.

2            This is I believe the most complex case certainly

3    I have ever presided over.  It presents very difficult

4    choices.  I am very aware of the impact that this company's

5    products have had on hundreds of thousands of people, as

6    again, I believe almost everyone who has worked on this case

7    does as well.

8            I have received letters from people that speak

9    eloquently and bravely about that impact.  Some of them are

10   on the docket, because they were willing to put them on the

11   docket.  And if anyone doubts their affect, you should read

12   them.  Not as advocacy pieces, but simply as evidence of the

13   effect of this company's products.  And that's the only

14   reason I raise them now.

15           I will note two.  One is from Tamara Graham dated

16   June 25, 2021.  It was actually filed July 6th of this year.

17   And one is from Stephanie Lubinski.  It's dated January 6th,

18   2021, but was, again, filed last month, in July of this

19   year.

20           (Whereupon these proceedings were concluded at

21   4:34 PM)

22

23

24

25

Page 224

1                    C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5     Sonya

6     Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.08.20 13:27:11 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 20, 2021

[& - 2020]                                                                              Page 1

**&**

**&**   4:1 5:15 38:20
38:25 67:16 68:2

**0**

**0**   77:23,24 78:4,8
78:16 79:2,10,17
80:1,4
**0001**   162:24
**000718353**   90:17
**000724271**   98:20
99:5
**0015**   55:3
**001658754**   180:6
**002451751**   88:2
94:10
**002451764**   87:20
**0025**   163:18
**002937188**   94:24
**004448824**   166:7
**00718353**   83:10
**013000454422**
172:23
**025**   163:17
**06604**   6:4

**1**

**1**   115:14 172:7
188:9 208:21
**1.4**   110:3 150:1
**1.4.4**   84:21
**1.5**   85:2
**10**   27:8,16 28:24
28:25 109:14
**10.4**   149:11
**10/2/1990**   163:24
**100,000**   65:25
66:3,11,13
**10014**   5:4
**10017**   3:10
**10019**   4:11 6:11
**10022**   4:4
**1006**   5:3

**10110**   5:18
**105**   33:22
**10601**   1:14
**10:00**   215:1,1
**10:02**   1:17
**10th**   142:7
**11**   14:5 173:11,12
**11501**   224:23
**11th**   173:23
**12**   178:19
**12,000**   177:22
**12/3/09**   172:10
**12:19**   167:25
**13**   183:11
**1345**   172:10
**14**   99:18 100:11
166:9,11,17,18
**140**   39:14
**15**   55:1,4,7 180:18
**15th**   71:17 72:14
**16**   54:14 121:1
183:13 188:20
**1633**   4:10
**1674**   61:19
**1684**   169:6
**16th**   127:7 174:1
**17**   24:5
**1753**   211:22
**1758**   211:22
**17th**   167:25
**18**   2:2 90:25
**18357**   90:24
**18th**   166:5,19,24
168:22
**19**   1:16 158:11
**19-23649**   1:3
**1970s**   124:17
**1979**   39:22
**1990**   158:11 164:5
164:7
**1990s**   26:24 27:1
**1996**   195:20

**1999**   38:9
**19th**   166:14
**1st**   78:10

**2**

**2**   38:4 44:8 60:20
70:25 71:6 84:22
169:7,17,22
**2.2**   85:15 90:23
91:1
**2.3.**   91:14
**2.4.**   87:5
**20**   23:1 26:23
47:10 99:2 224:25
**200**   3:18 6:17
117:15
**2000**   19:17 24:5
**2001**   57:5,7 112:9
166:13 180:20
**2003**   84:10,11
86:13 88:11 99:18
100:12
**2004**   96:11
**2006**   162:23
**2007**   19:22 27:7
47:4,10,16 48:15
48:18 51:6,15,23
51:25 52:6,17
53:3 56:3,11 57:1
57:4,6 103:2
109:2,15 111:8,14
111:15 112:1,6
126:18 161:16,19
**2008**   50:13 59:4
95:4,19 112:25,25
149:9 174:1 175:2
183:13
**2009**   57:12 166:5
166:19,24 167:13
167:25 168:22
169:19 170:1
176:7
**201**   5:3

**2010**   60:20 68:18
68:20 77:21 78:10
80:2 169:19 170:1
179:19 184:12,15
184:16 185:2,11
186:25 187:10
**2011**   89:1 178:25
179:15
**2012**   88:13 89:1
**2013**   35:14,21
37:23 44:22 47:9
48:4 63:19,19
66:9 68:21,24
71:17 72:14
107:17 177:7,12
178:10,10 185:6,7
185:12
**2014**   96:12 113:20
**2015**   47:25 48:5,9
**2017**   23:24 57:13
109:2 142:14,16
142:17 179:8
**2018**   23:20 40:22
53:4,15,17 56:4
59:5 66:9 109:15
113:3,4,5,9 114:9
114:11 127:6,12
140:16 150:14,18
151:23 158:13
161:19 164:7
189:9,10
**2019**   19:11 53:4
53:14 117:11
127:7 149:9
150:15,16
**2020**   47:4,16,24
48:15 50:13 53:10
53:11,19 55:16
112:1 114:24
115:11 126:14,16
126:17 127:13,22
129:19 142:7
161:18,21 178:9

[2020 - accepting]    Page 2

184:8 188:6
**2021**  1:16 2:2
223:16,18 224:25
**20852**  3:19
**2094**  54:6
**2094.0015**  54:20
**2094.0015.**  55:2
**2096**  60:4 62:12
104:15 106:15
162:5 178:20
**2096.0024**  60:13
**2096.0025.**  163:12
163:15
**2098.0001.**  162:18
**21217**  6:18
**217**  5:10
**24**  220:7
**248**  1:13
**25**  60:14 62:12
106:2 223:16
**26**  115:14 188:9
208:21
**27**  35:14 164:7
**2710**  211:22
**2721**  211:22
**2760**  211:22
**2874**  211:23
**2896**  211:23
**28th**  89:21
**2:30**  155:24
**2nd**  169:19 170:1
177:7,12

**3**

**3**  163:10
**30**  19:13,15 158:8
167:4 170:13,14
213:16
**300**  1:13 224:22
**31**  6:10
**3132**  173:22
**3132.0001.**  174:10
**3138**  175:11

**3177121.1.**  182:19
**3177121.62**
182:25
**3207**  177:5
**330**  215:21 224:21
**35213**  5:11
**353**  4:17
**356**  149:7
**3rd**  169:19 170:1

**4**

**4**  65:23,24 94:4
162:8,12,14 173:7
173:8
**4.325**  188:13
**4.5**  140:25
**401**  149:19
**450**  3:9
**451751**  88:8
**48**  54:9,18
**48th**  54:16
**4:34**  223:21
**4th**  180:20

**5**

**5**  61:20,21 94:20
172:8 173:24
**50**  185:24
**50/50**  215:23
**500**  5:17
**500,000**  38:15
39:9
**501**  5:10
**52nd**  6:10
**53**  106:20
**5th**  166:13 180:20
184:8

**6**

**6**  91:1 97:11
**60654**  4:18
**61**  77:18
**62**  78:9 183:4,11
183:13

**6:24**  72:14
**6th**  150:15 223:16
223:17

**7**

**7**  101:15
**70s**  50:9 52:9
**75**  117:18,21
**751**  88:9

**8**

**8**  89:20 95:3
**80**  38:25 193:11
**850**  6:3
**88**  104:19 106:15
**8:37**  168:23

**9**

**9**  164:15,17
**9/27/2018**  163:25
**9002451449**  72:7
72:10
**9002636907**  96:3
**91**  71:16 72:13
**919**  4:3
**92**  71:14,23
**96**  55:7 162:23
**97**  54:12,15
**98**  162:21
**9:00**  215:9

**a**

**a.m.**  215:9
**aaron**  7:14
**abatement**  201:12
202:12
**abby**  7:20
**abet**  56:14
**ability**  74:24
80:17 205:14,18
**able**  68:14 96:7
102:22 113:22
118:5 184:4
195:10,20 197:5
209:22 217:17
218:25

**abrams**  6:23
**abroad**  195:2
**absent**  150:8
**absolute**  55:20
118:19 186:16,18
**absolutely**  120:5
144:21 194:14
197:2 205:3 219:2
221:18
**abusable**  64:3
**abuse**  38:6 43:9
43:16 44:21,25
45:2,4,6,7,9,9,21
46:12,21 52:3
60:23 62:20 63:2
63:24 64:2,3,16
64:18,19,21,24
65:1,10,12 67:5
69:3,5 78:24 80:1
80:7,24 81:5,6,11
107:18,19,20,21
107:21 114:5
115:1,13,15,16
121:7 125:6
178:12 183:19,20
183:23,25,25
184:17,20 185:2,4
185:8,10,11,15,16
185:17,20,23
186:7,12,15 187:2
187:23,25 188:2,8
192:19,19 193:21
195:12 196:21
208:23
**abused**  43:13
122:3 185:22
186:6
**abusers**  62:24
**abusing**  62:19
**accept**  209:6
**accepting**  212:17
212:19

[access - agreement]                                                              Page 3

access 109:9
112:21 113:10,18
194:3,6 201:13
accident 15:24
accidentally 99:8
accomplishing
130:19
account 89:5
222:22
accountants 89:6
accounts 78:16
89:4
accumulated
199:14
accurate 40:23
156:23 204:16
224:4
accurately 214:9
accusation 128:4
accusations 126:9
accused 127:25
191:14 204:20
achieve 104:8
acquainted
180:19
act 56:20 110:18
112:20 160:4
acted 42:21 59:16
59:16 111:3
acting 80:16
103:4 112:18
170:5
action 48:7,7
49:11,15,17
170:24 171:22
actions 49:21,22
49:24 57:4,6
102:22 112:8
170:2
activated 86:9
active 136:5
activities 70:19
102:8,15 103:19

activity 49:21
103:8 113:17
192:2,2 219:14
actors 62:21
acts 95:8
actual 66:24 82:5
82:8 119:10 178:1
199:20
ad 6:9 208:20
adam 9:5
add 18:5 37:9
211:6 218:10
added 79:25
155:1
addendum 60:11
60:15,17 62:10,12
65:22 72:13 77:19
77:19 104:15,19
104:22 106:16
163:12,16,18,19
163:20 164:16,17
173:6,9,11,12
178:19
addiction 38:6
64:1 78:23 123:25
124:9,10,22 130:1
195:12 196:25
addictive 194:12
adding 74:19
addition 81:17
additional 14:18
102:5 110:3,7
178:6 211:6
address 121:17
133:15 171:8
203:9 219:8
220:17,20
addressed 195:18
222:17
addressing
215:20 220:2,15
adf 115:15 184:1
185:8 187:9,24

188:7
adhansia 120:14
120:20,24 121:6
121:12,18,18
adhd 120:18
admin 89:3
admissibility
210:19
admission 16:19
93:14,16 101:12
210:21
admitted 94:4,17
94:20 97:10,11
101:14,15 127:11
209:8 212:1,7,11
advance 21:1
68:24 88:25
176:23
advanced 34:25
advertising
114:10
advice 24:22 90:7
100:16 161:3
advise 90:3
advised 49:6
156:13,15 200:22
203:5
advises 24:12 42:4
advisors 86:20
91:9 92:15 93:6
100:17
advisory 23:11,13
24:22 42:4 49:7
160:2,5 161:1,2
208:16
advocacy 223:12
advocate 36:9
advocated 36:2
affairs 20:15,22
21:19
affect 223:11
affiliated 122:15
122:15 191:21

affirm 18:13
157:17
afield 128:13
afternoon 102:2,3
134:10,13,16
141:23,24 146:17
148:24 149:1
156:4 158:4,5
187:20 197:14
217:8
agencies 194:1,1
194:15 196:1
agenda 95:4,15
168:4,17,23
agent 155:2
ago 18:24 22:22
32:9 97:2 146:10
199:12 202:13,13
208:11 214:7
agonist 46:15
agree 23:5 28:14
34:24 35:20 43:24
82:9 84:25 86:15
96:10 100:10,20
107:3 109:2,23
127:24 148:6
150:3,17 183:12
194:11 202:6
210:7
agreed 16:16
56:14 82:3
agreement 16:9
17:17 51:21,24
52:14,19 60:7,12
62:10,11 68:23
71:10,15 72:2
73:17 77:19,19
104:16 106:16
116:2,5,6,19
118:9,17 120:8
128:24,25 129:1
129:19,24 137:5
137:10,11,16

147:2,3 148:1,10
152:23 153:1
156:24 161:23
162:2,5,13,15
163:4,18,19 173:6
188:19 206:17
214:10,15
**ahead** 18:21 19:4
42:13 56:9,9 84:9
88:21 101:24
103:10 106:12
115:24 127:17
129:24 141:19
144:1 147:11
158:1 182:20
187:17 190:23
202:22 208:7
216:14
**aid** 56:14
**airpods** 18:23
160:16
**aisling** 10:19
**al** 5:11 14:3 156:6
**albert** 6:24 127:3
130:6 131:18
**aleali** 6:25
**alexander** 9:25
**alfano** 7:1
**alice** 12:21
**alissa** 10:20
**allegations** 56:7
58:9,25 59:3,15
60:17 110:20,23
191:15 212:18
**alleged** 48:3 128:7
**allen** 12:23
**alley** 76:20
**allison** 13:7
**allocations** 93:5
215:12
**allow** 76:22
178:13 203:7

**allowed** 63:25
184:21 216:18
**allowing** 69:7
**alongside** 70:8
**amagansett**
142:20
**amassed** 182:8
200:1
**ameliorate** 125:8
**amended** 14:5
220:11
**america** 39:21
50:7 124:17
**american** 223:1
**amount** 48:11
59:22 80:5 110:1
110:25 119:3
122:4 132:15
138:12 203:8
**amounts** 40:3
80:13 109:25
**analgesics** 61:24
**analogy** 214:23
**analysis** 112:20
178:5
**andrew** 6:13 7:1
10:18 218:16
**angela** 9:7
**anker** 7:2
**ann** 9:24
**answer** 22:9 26:2
40:12 41:10 42:13
44:17 59:13 63:17
75:4 76:19,23
103:25 112:4
132:5,21 144:17
145:2,3,17 147:10
153:11 154:19
155:3 156:17,21
159:5 160:25
165:20 183:13,18
183:21 186:19
191:2 193:19

202:19
**answered** 25:21
44:15 63:16
111:20 144:5
147:8 200:4,5
**answering** 15:4
**answers** 133:4
**antagonist** 46:15
**anybody** 126:7
127:13
**anybody's** 215:17
**anymore** 96:25
123:1
**anyway** 100:4
122:16 191:24
192:4
**apologies** 90:14
130:6 134:3
156:10 157:4
164:12,13
**apologize** 17:14
106:11 109:20
113:4 157:1
159:12 163:11
172:9,20,24
175:19 178:16
181:22 194:19
209:17 210:5
**apology** 123:21
124:19 196:22
**appears** 54:11
90:23 91:15 95:15
168:13 170:24
174:8 177:22
**applicable** 203:2
**application** 58:1
**appoint** 74:24
75:8,8
**appointed** 152:4
**appointing** 73:23
85:3 180:2
**appointment**
152:4

**appointments**
74:6
**appreciated** 52:15
**approach** 177:2
**appropriate**
49:11 120:2
130:16 216:5
219:1
**appropriately**
103:4 111:3 123:9
132:17,17
**approval** 69:2
185:2 187:7,7
**approve** 76:6
108:16,20 116:2
189:19 194:25
**approved** 45:18
63:20 108:18
115:21 118:11
121:3 123:7
178:13 195:19
203:2
**approves** 104:14
**approving** 109:1
**aq** 170:3
**ardavan** 8:9
**area** 73:14 74:17
74:17,22
**areas** 36:15
**aren't** 193:12
214:11
**argue** 167:13
206:19
**argued** 202:1
**argument** 209:3
215:3 216:7
218:15,18,23
219:9,18 220:4
222:4
**arguments** 217:22
221:13
**arik** 11:5

arising 178:4
arms 218:24
arose 119:1
arrived 208:13
  213:14
artem 12:10
article 39:17
  142:14,17,24
  143:7,10,16 144:9
  144:15 145:6,9,20
ascribed 38:18
aside 62:7 152:21
  172:18 175:10
asked 44:15 63:16
  76:18 84:19 93:1
  101:6 102:5 109:7
  111:19 126:12
  127:8 137:23,24
  139:4 140:6 144:5
  149:3 153:9
  154:25 170:3,17
  171:1,5 172:15
  183:11 199:25
  200:4 202:19
  209:1 215:6
asking 22:2 32:25
  40:8,11,14 41:1,2
  43:15 52:22 61:3
  77:15 103:14
  108:14 112:13
  114:15,15 118:22
  119:15 126:25
  127:14 129:7
  132:21 133:8
  145:1 148:8
  149:20 150:3,3
  151:3,9,13 153:14
  154:4 164:5
  165:24 169:1,2
  170:19 171:6
  174:8 186:2
  194:24 199:13
  205:21 215:17

219:7,8,11
asks 104:13 171:2
  209:4
assembled 77:10
asset 93:4
assets 30:23 92:16
  116:10,24 134:25
  135:4,13,18,22,24
  136:18 137:24,25
  138:4 139:2
  147:14 188:17,25
  189:1,2,2 198:4,6
  198:9,13,15 199:1
assign 37:4
assist 145:25
assistant 95:14
  141:11 158:22
associate 122:18
associated 62:23
  122:16,17 123:14
  160:6
assuage 220:20
assume 99:24
  103:20 149:2
assumes 40:21
assuming 177:18
  218:13
assurance 48:2
  220:6
assuredly 120:1
astonishing 71:25
  72:19,24 73:7
atinson 7:3
attached 172:10
attaches 95:4
attack 190:9
  191:3
attempt 42:22
  151:21 154:25
  217:10,13
attempted 150:24
attempts 151:4

attended 20:9
attending 71:21
attention 58:17
  120:17
attentive 165:24
attorney 3:8,16
  3:17 5:8 6:2,15
  141:12 199:12
  210:11
attorneys 4:2,9,16
  5:2,9,16 6:9,16
  162:3 198:18
  199:10 203:5
attributed 62:17
audibility 169:12
  169:13
audible 19:1
audio's 18:23
august 1:16 2:1
  71:17 72:14 77:21
  224:25
auslander 7:4
australia 49:14,15
australia's 49:16
author 145:8,20
authorities 49:9
  49:12,25
authority 108:16
availability 125:5
available 43:5,18
  75:9 76:8 80:22
  81:14 98:6 123:13
  147:14 190:16
  201:2 203:8
  213:13
avenue 3:9 4:3
  5:17 111:22
average 30:6
avoid 109:10
  123:3 214:1
aware 37:12 38:2
  38:4,17,21,24
  39:10,13 42:7

48:20,24 49:18,20
49:23 50:2,17
52:2,7,12 66:25
67:11,15,17 69:11
70:21,23,25 71:6
78:11 102:24
105:3 110:9,12,14
110:16 111:13
112:12,12 114:23
115:3,6,10,13,14
115:17 117:6,12
117:15 118:8,12
119:16,19 120:13
120:21 121:7,16
122:13,21 137:15
137:19 143:17
149:6,11,18,25
150:4,6,8 151:3,4
151:21,24 152:2,3
153:15 154:10,25
156:15 187:24
188:1,10,11,14
191:19 193:10
201:24 202:6,7,10
204:20 223:4
awareness 151:13
154:19

**b**

b 1:21 22:7 30:24
  31:4 34:12,15,24
  35:2 56:1 109:18
  109:19 159:3,8,19
  188:12
bachelor's 139:21
back 26:18 30:8
  31:9 38:1 47:10
  61:18 62:7,9
  65:21 71:15 73:17
  73:19 74:14 84:20
  87:4 90:9,10,14
  90:17,18,21,22
  94:7 106:1 108:15
  143:24 156:5

173:5 174:15
178:4,17,19
202:12 217:12
**bad** 79:14,16 80:5
214:23
**balance** 43:19
45:18 81:13 109:8
125:5 159:10
196:2
**balanced** 113:25
**balancing** 43:8,14
110:18 112:20
**ball** 7:5 104:11
**baltimore** 3:19
6:18
**bankrupt** 147:19
**bankruptcy** 1:1
1:11,23 110:10
118:6 196:20
201:1 203:1 221:3
**baranpuria** 7:6
**barbara** 8:10
**barker** 7:7
**based** 14:13 35:6
133:10 205:21
215:14 218:13
**basically** 46:24
**basis** 27:20 40:5
86:19 91:8 102:11
170:17 179:8
215:8
**bates** 90:23 166:6
**bearing** 168:5
**began** 158:11
184:11,14
**beginning** 36:6
56:11 62:18 83:15
125:10 163:16
221:22 222:13
**begins** 33:17
56:10 60:13,13
90:18 179:5 181:4

**behalf** 6:2 17:15
17:16 34:12
101:23 152:14
187:16 211:5
217:19
**behavior** 177:2
**beiderman** 9:6
**believe** 14:16
15:25 16:1 19:15
22:7 23:3 24:8
25:21 27:10,12,18
33:10 35:17,19
36:4 37:16 38:14
41:20 48:18 49:12
53:25 54:16,17
55:17 56:24 57:3
58:8 59:16 60:18
60:25 64:23 67:22
68:22,23 69:13,21
69:22 70:3,10
72:4 77:13 78:18
80:3 83:23 84:2
84:10 88:22,24
89:5 94:10 97:2
102:23 105:2,7
106:10 107:8
110:25 112:1
117:10 121:9,13
121:20,23 122:8
127:6 129:18
137:1,14 139:20
146:25 147:17,21
149:15 150:12,22
152:17 153:11
155:3,25 156:12
157:6 162:7 169:7
169:18 171:3
172:11,12 175:12
180:18 193:17
195:22 196:11,13
209:1 214:1,25
217:15 220:8,24
222:9,11 223:2,6

**believed** 31:5
33:21 45:3 46:3
69:16 112:20
153:11 191:6
**believing** 78:3
**bell** 71:1
**ben** 83:15 197:11
**bench** 212:15
**benchmarks**
107:13,13
**beneath** 55:10
**beneficial** 25:1
42:8
**beneficiaries**
24:25 28:10 32:3
32:4
**beneficiary** 24:18
117:1 138:21
146:21,22 147:1
**benefit** 27:16,22
28:4 79:1 82:19
116:22 125:17
138:13,15,16
149:8,12,22 196:2
196:2
**benefitted** 28:6,9
28:9
**benjamin** 3:13 5:6
6:24 14:12 134:13
197:16
**bernard** 8:9
**best** 69:9 80:17
168:8 195:23
215:22 216:4
220:22
**better** 18:23 35:22
35:22 36:20 45:23
123:14 131:20,23
160:22 165:15,16
180:19 194:3
**beyond** 15:22
81:2 137:21 193:2
218:9,12

**big** 75:20 183:13
194:7
**biggest** 192:22
**bill** 179:19,21,22
179:22 180:3
**billion** 27:8,16
28:24,25 80:9
109:14 110:3
140:25 149:12
150:1 184:2
188:13
**billions** 125:16
150:10,11
**binder** 162:8,8,10
166:10,17 169:8
169:17,21 175:13
177:7 180:19
183:1
**biosimilars**
179:10
**birmingham** 5:11
**bit** 73:19 84:20
112:19 159:12
167:18 182:12
183:18 184:24
186:10 191:1
193:6
**blabey** 7:8
**black** 121:6
193:23 195:13
**blank** 54:12
137:18
**blind** 76:20
**block** 4:15 156:7
**blood** 133:19
**bloyd** 5:9
**blue** 99:20
**blurred** 179:2,17
**board** 20:3,4,5,11
20:12,15,20,21,25
21:3,5,6,9,10,21
22:3,10 23:11,13
23:18,19 24:4,6,7

24:22 27:7 30:13
30:18 31:3 33:5
34:21 35:5 37:8
40:23 41:5,16
42:4,20,21 43:1,4
43:14,20 45:2
47:20 48:12,19
49:7,10 51:12,13
52:14,18,22 53:3
53:5,9,13,17,21
58:17 61:7,8,12
61:12,13 62:16,22
63:22 68:8,10,12
68:25 69:18,21,23
69:23 70:8,9,17
70:23 71:13,19,21
73:11,21,23,25
74:1,10,22,25
75:7,10,12,22
76:4,9,10 77:1,2
77:22,22 78:5,8
80:20 102:6,7,21
102:23,23 103:3,5
103:11,11,12,17
103:18 104:12,13
105:4,5,8 106:20
106:24 108:1,16
108:18,20 111:3,4
111:17 112:10,12
113:1,13,15 114:6
114:8,20 115:11
115:12 119:22
120:14 121:14
125:4 127:5,8,12
129:8 140:7,15
149:4,7 150:14,15
150:17,21 151:23
154:5 158:7,13,24
158:25 159:15,21
159:23 160:1,2,5
161:1,2,4,7
163:23,25 164:5
165:21,22 167:9

168:5,24,24
171:12 177:2,2
178:23 179:2,6,12
179:16,23 180:1
189:8,17,22,24
190:1,4 191:9
**board's** 109:8
**boards** 23:10,25
24:21 73:24
103:13 160:7
**board's** 20:6
23:13
**bograd** 7:9
**boil** 194:21
**bonus** 79:13
**bookended** 48:3
**bookending** 47:15
**bother** 140:22
**bottom** 54:18 55:1
91:12 162:17
166:6 167:4 174:9
174:9,13 180:9,12
**bought** 135:9
**boundless** 219:13
**box** 5:10 121:6
195:13
**brand** 26:12
**branded** 179:9
**brauner** 7:10
**bravely** 223:9
**breadth** 219:5
**break** 50:24
105:24 177:22
**breakdown** 62:1
**breaks** 136:25
**brian** 3:21 10:9
14:19 98:16
**bridgeport** 6:4
**bridges** 5:9 126:3
126:4
**brief** 203:22 217:7
**briefed** 78:16

**briefly** 206:2
**bring** 23:25 67:24
68:11 72:8 196:16
200:23,23 203:6
212:14
**bringing** 37:17
69:12
**brings** 200:24
**broad** 102:14
116:15 119:16
137:8
**broadly** 154:25
**broadway** 4:10
**broke** 110:13
**brooks** 7:7
**brought** 68:2,13
69:8,14,17,17,22
70:1 105:8 179:25
**brown** 7:11
**brunswick** 7:12
**bryce** 8:17
**bud** 131:7
**budget** 36:2 37:13
37:21 44:5 46:18
61:14 108:20,23
109:1,3 169:18,25
171:9,10,13,15,16
171:17,18 172:3
175:2 176:8
**budgets** 61:8
104:13 108:17,18
**build** 201:12
**building** 207:20
**builds** 218:8
**built** 175:2 181:18
**bullet** 86:18 91:5
91:6 92:22 93:4
**bullets** 92:10
**buprenorphine**
46:16 177:20
**burans** 177:18
**burden** 216:20
217:16

**burger** 7:13
**business** 24:15,15
25:23 26:3,5,11
26:19 30:16,24
31:1,10,14 34:17
34:17 35:3,23
36:9 37:10,10,13
44:7 45:24 46:6
85:10 87:6 93:9
139:25 152:24
153:18,21 156:15
157:3 179:9
**businesses** 29:12
29:19,20,21 31:16
31:18,20,25 32:2
135:24 136:2,18
198:15,22 199:1
**busy** 221:14
**butrans** 46:14,15
64:10 65:1 177:18
177:18,21
**button** 15:24
**buy** 30:8

### c

**c** 3:1 7:23 9:22
10:10 14:1 18:18
24:12 157:21
224:1,1
**cabinet** 131:4
**cahn** 7:14
**calendar** 88:25
96:11
**call** 15:7 16:10
23:5 80:18 82:18
188:21
**called** 14:20 22:24
65:3 91:23 92:1
120:14,22 145:11
**calling** 16:6 56:3
**calls** 66:8,17,19
66:21 67:1 79:11
**canada** 49:21,23
50:1

canada's 49:22
cancer 195:8
candidate 74:10
74:11 76:8 97:16
97:17
candidates 76:11
98:4
candidly 130:13
can't 19:15 23:3
24:2,19 36:10
37:4,17,24 193:1
194:21 215:21
222:6
capacity 59:4
129:7 215:23
capital 30:4
capitalist 136:5
caps 36:15
care 124:9,10
130:13 194:3,7
201:14 204:9
careful 69:6,7
carefully 208:9
220:8
caroline 8:19
carries 121:6
123:8
carry 38:6
carved 118:16
carving 219:8
case 1:3 16:1
27:11 36:11 37:20
37:23 39:8 59:21
73:18,21 110:9,10
110:14 120:4
125:3 127:5
130:11 131:1
142:1 157:3 178:3
191:3 194:19,24
201:7,7,7 208:10
212:15,20 214:1
222:13 223:2,6

cases 68:9,9 165:1
190:9 201:5
220:23 221:3
cash 30:12,15
31:11,12,23 34:6
35:3 82:19 109:25
149:8,21 153:10
catch 179:20
catherine 4:20 9:6
17:14,15
cause 42:22 45:14
caused 27:8 80:24
110:11 122:4
124:24 194:23
causing 43:13
123:4
caution 208:18
caveat 14:24
cc 167:9
cease 22:21
189:19 192:9
ceased 113:1
189:14
ceases 190:5
ceasing 189:23
190:10 191:3
centers 130:8
ceo 37:16,18
70:16 73:24 74:1
74:2,6,7,13,15,21
75:8,10,20 76:2,4
76:11 77:5,5,9
103:12,12 113:12
114:3 174:19
177:14 179:13
ceo's 74:24 75:6
77:4
ceos 74:2 77:1
certain 16:20
17:21,21 26:12
40:8 77:15 79:7
104:8 112:7,8
151:2 179:4

185:18,20 195:5
certainly 78:13
103:22 176:20
177:23 178:6
183:23 208:12
220:24 223:2
certainty 151:1
certified 224:3
cetera 132:16
cfo 174:15,17
chain 101:1
chair 85:24 91:16
92:4
chalos 7:15
chambers 211:10
213:14 214:14
215:18
chance 181:8
216:13 217:9
change 37:13
44:23 63:9,20
69:2 76:5 103:6
103:12 114:16
194:2 196:18
changed 15:8
41:18 49:8,10
113:21 114:11
changes 74:2
75:21 76:7 77:15
86:20 91:9 103:7
114:19 178:4
changing 77:3
chapter 14:5
characterization
209:6
characterize
208:23
charged 165:5
charges 47:3,16
53:19 111:14
charging 160:17
charles 126:2

charter 83:11,14
83:18,21 86:16
90:15
charts 61:23 62:1
check 105:24
chemical 120:21
chemically 26:16
chicago 4:18
children 117:2
121:3 134:22
146:21 197:25
china 192:24
choice 119:7
choices 59:25
223:4
choose 74:12 76:9
choppy 207:14
chose 31:22
christina 11:10
christopher 11:13
12:3
chronic 195:7
cia 52:23
cicero 7:16
circulated 179:19
216:15
cites 130:11
citing 115:12
188:20
civil 58:21 65:22
126:21 127:1
161:23
claim 133:23
185:12 212:17,18
claimants 126:2
130:9 204:3
claims 110:11,15
117:7,8,22 118:9
120:5 121:11
123:20 133:10
139:18 140:14,18
140:20 178:14
185:4 194:25

196:20
clarification 18:4
  25:10 93:2 175:7
clarified 14:8
clarifies 170:12
clarify 17:23
  102:6 126:16
  169:2
clarity 168:19
clark 4:17
class 182:15
claudia 12:13
clause 65:24
clear 24:17 30:12
  36:25 77:8 80:21
  89:2 119:1 127:5
  129:23 130:7
  143:23 151:20,20
  154:22 156:25
  186:10 206:20
  208:19 215:7,12
  215:20 218:2
clearly 18:25 36:7
  103:3 165:9
clerk 19:1 216:12
client's 133:9
clients 126:6
  222:6
clint 8:5
clock 14:25 16:2
close 17:18 52:22
  214:9
closed 213:11
  222:10
closely 49:25 61:5
  178:1
closer 213:19,19
closure 118:15
  200:24,25 203:6
  203:10,10,12
club 5:10
cocaine 193:5

cohen 5:15
coin 201:9
coleman 7:17
collaboratively
  179:7
colleagues 214:12
collection 147:15
columbia 202:1
com 208:21
combined 159:19
come 16:17,20,22
  26:20 38:1 50:10
  50:12 58:16 61:18
  65:9 74:21,25
  75:7 76:4 77:2
  83:8 87:4 93:25
  99:11,14 103:5
  106:1 108:15
  113:13 114:19
  116:17 138:7,20
  147:1,2 176:24
  188:25 189:1
  216:1
comes 100:1
  107:14 124:14
  138:15,16 196:7
comfort 52:21
comfortable
  98:10 105:1,22
coming 49:3
  52:22 77:14 117:4
  123:15 124:5
  143:23 147:4
  165:9 192:25
comley 6:1
commented 179:9
commerce 56:18
commercial 36:22
committed 47:17
  50:15 51:4 149:7
  206:7
committee 85:6,8
  85:10,12,16,16,18

86:3,10,10,17
87:5,6,8,11,14,14
89:3,9,14,25
90:22 91:1,7,15
91:20,24 92:1,4
92:11 93:10,10
96:23,25 100:16
100:20 149:19,25
150:4 152:1,6,15
208:16 222:23
committee's 90:3
committees 85:4
  88:15,17 89:23
  96:20
common 183:19
  183:22
communicate
  21:2,4 31:4
communicated
  21:11,18,19 180:3
communications
  21:7,9 173:15,19
communities
  59:22 119:5,10
  122:11 124:7
  125:12 129:25
  141:3 194:16
  201:3,11 202:14
  203:8
community 38:19
companies 23:10
  24:12,13,17,20,23
  28:18 29:4,4,11
  29:25 30:1,4,7
  40:9,18 41:2,14
  42:1,4 49:13
  109:24 122:15,18
  136:8,12,15 160:6
  161:3 191:21,23
  192:2 194:12
  200:11
company 19:14
  31:5,10 34:5 35:6

37:12,20 41:5
43:16 49:6,7
50:14 51:11,14,18
51:22,23,24 53:20
64:17,21 67:16
68:2 69:7 74:4
79:16 81:3,12
82:13 95:8 97:25
104:23 110:8
111:5 112:7,10,17
122:7 124:6
129:22,22 130:3
140:7 149:3,21
167:6 176:17
179:25 190:7,8,13
190:20 191:2,14
191:16 194:18,23
197:3 200:11
company's 49:24
  132:9
company's 40:24
  223:4,13
comparable 28:15
  28:18 29:3
compared 159:18
  179:2,17
compensation
  79:13 80:19
  109:15,23 110:4,7
  150:2,5
compete 167:12
competition 170:9
competitors 62:2
complaining
  93:21
complaint 212:17
  212:18,19
complaints
  121:17
complete 90:16
  155:19
complex 121:24
  193:24 200:10

223:2
**compliance**  47:21
  52:18 102:25
  103:5 111:6,6
  112:15,18
**complicated**
  119:25 139:7
  157:2 193:20
**components**
  120:21
**comprised**  158:25
**comprises**  85:18
**computer**  165:9
**conceivable**
  214:17
**concern**  15:20
**concerned**  129:17
  175:8 181:20
  209:19
**concerning**  78:11
  173:17
**concerns**  37:23
  86:23 87:1 103:2
  220:18,21 221:11
**conclude**  14:22
  15:10
**concluded**  150:1
  223:20
**concludes**  149:11
**conclusion**  152:10
  152:12
**conclusions**
  152:19 208:16
**concurrent**  160:1
**condition**  118:8
  118:19 132:18
**conditions**  123:18
  191:25
**conduct**  20:15,21
  50:15 51:5,14
  53:19 56:22,22
  57:23 59:6 102:22
  119:18,19 120:2

129:19 161:12,18
  208:12
**conducted**  187:5
**confidential**  32:20
**confirm**  89:2
**confirmation**  2:1
  14:5 15:22 17:19
  115:22 116:3
  118:10 121:11
  191:20
**confirmed**  118:13
**conflating**  113:20
  117:9
**conformation**
  218:21
**confused**  157:1
  205:17
**confusion**  154:2
  155:7
**coning**  148:9
**connected**  131:16
**connecticut**  6:2
  217:20
**connection**  58:3
  105:11 127:22
  218:20
**connolly**  7:18
**cons**  114:5
**consecutive**
  177:21
**consensual**
  139:10
**consensus**  179:1
  179:16
**consent**  215:17
**consenting**  6:9
  218:17
**consequence**
  125:1
**consider**  124:18
**considerably**
  200:6

**consideration**
  17:21
**considering**  180:1
**consistent**  78:19
  164:9 211:1 216:6
  219:23
**consists**  92:4
**consla**  7:19
**conspired**  56:14
**constructive**
  201:4,10 203:7
**consult**  70:1
**consultant**  67:15
**consultants**  68:11
**consulting**  67:25
  68:3 104:23
**consults**  154:15
**consumed**  132:9
  132:12
**consumer**  136:9
  179:10
**consumes**  193:11
**contact**  216:4
**contained**  108:22
**contains**  121:6
  137:16 212:23,23
**contemplates**
  191:21
**contends**  206:5
**content**  169:3
**contents**  162:16
**context**  44:16,20
  64:7 74:21 128:14
  181:13 189:11
**continuance**  2:1
**continue**  36:19
  40:2,17,17 42:1,4
  42:16 44:6 46:4
  55:10,12 86:21
  96:20 112:14
  113:18 122:21
  123:5 192:5
  195:10

**continued**  14:4
  52:8,10 70:11
  104:10 123:12
  167:10 195:1
**continues**  42:8,15
  96:22,23
**continuing**  57:13
  65:11 112:17
  202:10,11
**continuously**  23:1
**contribute**  118:20
  121:25 147:3,18
  147:22 188:13
  190:10
**contributed**  138:4
  191:4
**contributing**
  63:13 116:9,22
  117:3 136:15
  137:23,25 138:10
  138:14,17,20,22
  139:2 140:24
**contribution**
  116:18 125:15
  138:11 146:22,23
  147:4,7 148:11
  188:19 201:1
**contributions**
  147:23,24 148:1,2
  148:6,7
**control**  24:20
  150:25 151:22
  189:5 194:15
**controlled**  61:24
  75:10 184:4
  192:13 194:9
**controlling**  192:1
**controls**  55:19
**convened**  187:24
**convenient**
  152:22
**conversation**
  177:17

convictions   126:4
  126:5
coordinate   215:6
  217:13,22
copied   33:5,6,10
  215:18
copy   54:17 99:20
  170:15 172:10
corner   55:1 166:6
corporate   51:20
  51:24 52:13,19
corporation   29:8
  42:7,12 58:3
  70:18
corporations
  24:13 25:1,2
  28:15 29:23 31:7
  179:3,18
correct   17:6,18
  18:19 19:10,18
  20:2 21:16,17
  23:11 25:3,24
  26:2,9,9,15,23,25
  27:3,9,13,14
  30:19 39:6 41:6,8
  52:1 53:17 56:12
  58:24 59:6 60:18
  65:4 70:3 80:14
  82:16,21 83:20,22
  85:5,13,23 86:14
  87:2,17 89:16,24
  91:17 92:3,6,17
  92:19 95:2 100:13
  103:15 104:5
  108:3,17,21 110:8
  112:9 113:2 114:1
  117:19,20 120:19
  121:1,2 126:23,25
  134:17,20,21,23
  134:24 135:3
  136:7,11,24,25
  137:13 138:5
  139:22,23,25

140:1 142:21,22
  155:25 156:1
  157:22 158:23
  161:16 162:19
  163:8 166:25
  168:22 171:4
  172:1 174:20,23
  177:15,19 183:20
  184:9 185:8 189:9
  191:22 197:18,23
  199:5,9 211:25
corrected   156:16
  156:25 209:24
correctly   44:22
  90:10 172:14,16
correlation   67:12
corrupt   205:1,5,9
corrupting   128:1
  204:21
corruption   128:7
cosmetic   56:20
cost   81:8 127:15
costs   36:25
could've   39:18
council   82:24 83:2
  83:22,25 84:3
  85:3 89:7,10,11
  89:14,15,19,22
  95:4,17,24 96:20
  96:22 97:3,14,17
counsel   16:8 99:3
  139:6 154:3
counselor   139:5
count   51:6 55:9
  55:11,12 56:1,8
  57:2,11,12 58:1
  58:10 79:15
counted   79:13
  148:10
counting   159:2,20
countries   25:25
  26:8,12 42:6
  122:25 123:4

192:10,16 194:4
country   5:10
  39:24 81:10
  124:14 192:12,25
  224:21
country's   124:4
counts   53:6 55:15
  55:18 81:20
couple   61:23 83:4
  102:4 114:22
  151:16 204:3
  211:5
course   18:24 21:5
  56:16 82:10 157:2
  163:15 180:17
  187:5 189:7 192:6
  192:8 220:15
court   1:1,11 14:2
  15:6,19 16:4,23
  17:3,8,25 18:3,6
  18:10,13,17,20,25
  19:4 22:13 27:20
  28:1,22 29:1,3,8
  29:14 40:5,10
  41:10,17,22 44:17
  47:6,9 50:23 54:3
  59:13 63:17 75:3
  75:14 76:18,23
  77:8 82:5 93:16
  93:18,21,24 94:2
  94:15,17,19 95:19
  96:13 97:8,10
  98:14 100:25
  101:11,14,20,24
  102:11,14 105:13
  105:23 106:1,4,8
  106:12 111:21
  112:2,4 114:15
  115:7,24 117:24
  118:3 120:9
  125:20 126:20
  127:17 128:12,16
  128:18 129:16

130:21,23 131:6
  131:13,21,23
  132:1,23 133:6,18
  133:20 134:2,4,6
  134:8 141:8,10,14
  141:16,19 142:15
  143:13,20 144:1,4
  144:12,14,17,25
  145:2,12,15,17,23
  146:2,4,7,12,15
  147:10 148:15,17
  148:21 151:12
  152:3 153:25
  154:6,9,12,14,18
  155:9,11,15,18,22
  156:2,4,9,18,21
  157:1,5,11,14,16
  157:20,23 158:1
  159:5 160:9,11,15
  160:20,24 165:3,8
  165:11,14,16
  186:14 187:13,17
  194:24 197:8
  199:18 201:7
  202:20 203:1,18
  203:23 206:3,13
  206:24 207:4,7,11
  207:24 208:2,5,25
  209:18 210:1,5,6
  210:8,13,15 211:1
  211:9,14,25
  212:13,22,25
  213:2,7,13 214:17
  214:20 216:9,12
  216:20 217:5,16
  217:18,21 218:1,3
  218:7 219:1,2,17
  220:5,14,25
  221:20,22 222:1,3
court's   90:12
courtesy   76:8
court's   215:20
  216:6

[cousin - defer]                                                                        Page 12

cousin 32:18
covenant 153:15
  156:15 157:2
covered 116:25
  211:23 213:4
covers 89:19
  121:13 222:20
crazy 119:3
create 167:17
created 22:24
  79:17 100:19
credit 221:17
creditors 118:14
  147:15
creditors' 222:23
crimes 47:17
  206:7
criminal 47:2,3,16
  53:19 58:19,20
  59:5 111:14
crisis 50:2,6,7
  107:23 110:12
  121:21,24,24
  124:2,3,9,10,16
  124:21 125:8
  129:18 191:16
  192:22 194:23
  196:12 197:5
  201:3 222:17
criticisms 77:14
cross 125:24
  134:11 141:10,20
  146:18 148:22
  155:15 203:19,19
  207:5
crush 60:23
crystal 104:11
ct 6:4
culture 193:2,15
  193:15
cunningham 7:20
current 44:12
  100:14 137:11,11

140:17
currently 41:5,14
  42:1 202:2
cut 36:25 79:14
  79:18 142:15
  183:18 201:18
cutting 36:20
  37:13 46:2
cyganowski 7:21

**d**

d 1:22 3:4 7:2
  9:14 12:11 14:1
  19:6 83:14,17,19
  101:25 125:24
  134:11 141:20
  146:18 148:22
  163:6 173:15
daily 179:8
damage 110:15
damning 73:12
dangerously
  194:12
daniel 7:18 10:1
  11:23 13:9
danielle 10:3
darren 9:21
dasaro 7:24
data 61:6,10,11
  77:23 79:12
  103:18 168:5
  186:19
date 19:16 78:13
  84:11 88:13
  100:11 164:11
  168:7 189:11
  224:25
dated 84:10
  150:15 223:15,17
dates 37:17 89:2,2
  163:25 164:11
  166:24 184:16
david 7:8,11
  10:17 11:19 13:12

163:6
davis 3:7 7:25 8:1
  14:13 148:24
  156:11 208:12
  213:17 216:15
day 39:11,14
  40:25 51:11,11
  53:10 132:15
  176:17,17,19,19
  208:10 218:8,11
  218:12 220:7,8
  221:19
days 182:13 215:4
  215:5
de 48:11 179:12
dea 195:14
deal 28:22 34:20
  34:23 47:10 81:12
  124:15 188:11
dealing 43:1
  104:22 215:19
deals 35:5 36:22
  36:22 127:12
dealt 43:20
dear 168:3
dearman 8:2
death 38:7 52:3
deaths 39:21 42:9
  52:7,12 191:9
debate 34:19
  165:25
debates 31:2
debevoise 4:1
debilitating 81:15
  195:7,21
debtor 1:9 214:2
debtor's 136:16
  139:5,5 150:4
debtors 3:8 14:13
  16:16 148:25
  149:25 150:25
  151:22 152:1
  207:2 211:18

215:3,10 216:17
  216:20 217:10,12
  221:1,4,9 222:7
  222:23
debtor's 14:4
  16:18 197:18
  222:17
decade 123:16
decades 119:3
december 78:10
  79:24 177:7,12
decide 114:5
decided 100:19
  114:8,9
decides 203:1
decision 92:23
  113:14,16 114:7
  119:1 189:17,19
  190:18 191:9
decisions 30:13
  100:18
declaration 16:17
  17:1 211:17
  212:15
declared 50:3
decline 46:4 60:24
  62:17,23 63:7,13
  78:17,18 80:6
  167:14
declined 60:20
  63:15 79:19
declining 35:21
  37:7 43:25 63:11
  63:22 67:19 178:2
deep 188:3
deeply 171:19
  196:14,23,24
  220:19
defend 201:6
defending 208:11
defense 111:25
defer 147:16

**deferred** 70:15
**deficit** 120:17
**define** 22:12
**definitely** 29:24
**definition** 130:23
  130:25
**degree** 139:21
**delaconte** 8:3
**delay** 120:25
**delconte** 15:3
**delineated** 218:21
**deliver** 69:9
**delivered** 110:4
**demonstrating**
  187:1
**denied** 60:16
**deny** 59:14
**department** 5:1
  38:20,25 58:21
  60:7,10 104:16
  129:20 152:5
  161:23 163:5
**departure** 150:23
**depend** 138:24
**dependence** 121:7
**depending** 23:6
  74:7
**depends** 22:11
  42:25
**deposition** 16:11
  16:20 141:25
  142:3,6,7,10,14
  144:3 146:9
  182:24 184:8
  210:20,22,25
  211:11 212:9
**derived** 27:1
**describe** 152:12
  165:21,22 184:21
**described** 88:11
  88:11,12 125:8
  129:19 139:6
  175:8

**describes** 198:17
**descriptions** 93:9
**designated** 137:17
**despite** 42:9
**detail** 67:11 79:21
  79:23 81:24
  108:13 139:15
  171:20
**detailed** 65:25
  66:3 170:4 219:22
**detailing** 66:17
  106:20 149:8
**details** 16:10 58:1
  77:13 140:17
**deter** 64:16
**deterrence** 64:19
  185:4
**deterrent** 44:21
  44:25 45:2,4,6,7,9
  45:9 46:12,21
  64:3,18,21,24
  65:1,10,12 67:5
  69:3,5 80:1 81:11
  107:18,19,20,21
  107:21 115:15
  178:12 183:25,25
  184:18,20 185:2,8
  185:10,12 187:23
  188:2
**deterrents** 114:5
  115:13
**devastating** 197:1
**develop** 136:8
  184:2 197:3
**developed** 123:15
**developing** 175:2
**development**
  61:24 171:19
  184:6
**devon** 8:4
**dialog** 173:21
**didn't** 21:7 31:11
  37:2 190:22

191:17 192:7
  194:19 197:20
**die** 39:10 131:7
**died** 38:8 39:9
**difference** 194:7
  210:10
**different** 21:4
  26:12 34:12 68:1
  68:3 81:17 83:1
  91:3 97:4 113:20
  115:20 116:16
  133:7 136:4 137:1
  138:7 153:8,14
  182:17 188:1
  192:12,15,15,16
  192:16,25 194:16
  195:4 200:6,11,16
  210:9
**differentiate**
  189:3
**differently** 88:5
  199:21
**difficult** 60:22
  167:13 182:1
  185:20 223:3
**dilaudid** 46:17,18
  64:6,9,15,15,22
**direct** 18:21 19:6
  40:18 41:15 55:22
  56:1 75:9 101:25
  103:11 157:24
  158:2 172:5
  173:15,18 183:4
  187:14,18 197:12
  203:25
**directed** 40:22
  152:3 215:2
**directing** 168:23
**directive** 216:6
**directly** 24:18
  27:11,24 32:5
  69:19 110:2 216:4

**director** 19:8,10
  19:13 22:18,21
  23:2 41:18 42:1,3
  42:17,23 48:14
  50:12,13 51:3,3
  59:4 98:4 161:14
  176:21 180:2
**directors** 20:15,25
  21:15,16 22:8
  24:1 30:14 31:3
  33:4 42:21 51:13
  61:14 73:25 75:22
  76:1 97:25 98:1
  149:7 158:7
  159:11,15,18
  161:4 163:23
  165:23,23 177:1,2
  179:12
**directs** 41:2
**disagree** 110:6
  206:18
**disagreed** 34:3
**disagreement**
  30:17
**disagreements**
  30:20
**disappointed**
  53:23
**disappointing**
  47:23
**disapprove** 76:6
**disclosed** 137:21
**disclosure** 135:12
**discontinuance**
  48:2
**discontinue** 192:1
**discovered** 103:8
**discoveries** 71:24
  72:24 73:6
**discuss** 75:21
  76:10 83:5 90:1
  114:24 176:7
  214:12

**discussed** 28:14 40:24 71:22 109:24 139:17 180:4
**discusses** 87:5
**discussing** 37:1 44:9,14 71:17
**discussion** 14:6 31:12 57:11 71:16 171:11 176:25 210:9
**discussions** 31:1,9 69:15,19 75:24 76:3 188:2 221:16
**dismissed** 207:2
**disorder** 120:18
**dispense** 56:19
**dispensing** 56:15
**disproportionate** 80:5 168:6
**dispute** 33:11,25 170:17
**distinct** 179:9
**distinctions** 179:3 179:17
**distressed** 181:21 196:14
**distribute** 31:14
**distributed** 27:8 27:15 28:16 31:17 67:9 109:24 195:16
**distributing** 30:9 30:15
**distribution** 130:9 130:16 140:6 194:15
**distributions** 27:10,13,15 28:13 28:14,19,20,20 29:2 30:2,3,11,13 30:21 31:5 33:22 82:18 90:2 110:7

149:3
**district** 1:2 202:1
**disturbing** 181:10 197:2,2
**dive** 188:3
**diverse** 82:25 116:15
**diversifications** 30:22
**diversify** 30:23
**diversion** 43:17 55:19 80:24 81:7 109:10 125:6 130:4,23,25 132:10,20 183:12 183:14 193:22
**diversionary** 130:14
**diversioning** 43:10
**diversity** 34:18
**diverted** 43:12 122:3
**diverting** 133:3
**divide** 216:24
**divided** 188:20
**dividends** 30:10 30:11 34:4
**dmp** 17:16
**dmps** 14:25 15:4 15:17
**doc** 90:15
**docken** 8:5
**docket** 84:16 149:21 211:10 223:10,11
**docs** 80:5
**doctor** 128:1,7 133:16 195:24 196:8 204:11,21 210:3
**doctor's** 65:16 132:12 133:11

**doctors** 45:19 49:4 63:25 65:25 66:3 79:15,18 80:4,12,16 81:21 184:4 190:15,16 192:15 195:9,25 197:4
**doctors'** 193:16
**document** 32:15 43:21 44:3 54:5 55:25 59:8,9,12 60:4,16 61:18 62:8 72:6 83:10 83:11,13,24 84:25 86:13,16 87:4,9 87:16,18,20 88:10 88:11,12,13,22 89:18,19 90:9,16 90:18,23 91:6,14 93:14 94:23 96:3 97:4,5,6 98:12,20 99:6 100:3,24,25 101:12 146:10 162:4,13 163:4,20 166:4 167:3 169:5 169:18,25 170:22 171:1,5 172:18 174:7 175:10 180:5 182:19 183:4 184:9 198:17 209:1,6,7 209:11,22 210:1 219:23
**documents** 16:11 16:17,19,19 17:2 32:7 71:11 74:14 98:15 99:2 120:3 162:3 181:10 211:6 212:3,6,14 218:19,20 219:20 219:21 220:16
**doesn't** 209:23 218:17

**doing** 35:23 79:9 81:3 94:8 108:25 111:5 112:18 176:20 215:13 220:20
**doj** 59:15,19 68:23 71:2,11 72:2 106:17 220:12 221:1,14
**dollars** 80:9 109:4 110:10,15,20 125:16 140:25 150:11 182:15 184:2
**don't** 15:11,25 19:15 22:14,22 24:8,17,20 26:5 28:17,18 29:11,16 30:7,22 31:8 33:9 34:1 35:2 37:15 38:23 39:4,17 40:6,8,13,23 41:1 41:20 42:24 99:25 105:25 191:8 193:1,17,17,18,19 193:23 194:13 196:13 197:6 198:18,24 199:4,6 199:8 200:14 201:18 202:21 204:15,17 206:11 206:15 207:15,25 208:7,23 209:1,6 216:14 217:15 218:12
**dosed** 120:25
**dot** 162:23
**doubt** 107:1
**doubts** 223:11
**douglass** 11:6
**dr** 83:17,19 158:4 158:6 159:12 160:11 163:6,7

166:22 167:5,8,24
168:2,10,15 169:4
169:24 170:3,3,22
171:1,1 172:8,8
172:20 174:6,14
174:18 175:15,23
175:24,25 176:7
176:16 177:11
178:16 180:6
181:21,21,23
184:7,24 187:12
187:14,20 188:11
189:13 193:6
194:10 196:10
202:17,25 203:16
203:19,20 204:2
207:8
**draft**   95:4
**drain**   1:22 14:3
156:5
**dramatically**
46:24
**drive**   82:15,15
104:10
**drop**   25:10 37:21
78:11
**drove**   114:18
**drug**   38:9 56:20
113:11 120:14,17
120:22 130:5
133:24 184:17
185:15 192:20
193:3,10,14,15,21
193:21,22 195:14
**drugs**   38:5 56:17
56:19 62:20
187:25 188:2
192:10,23 194:12
194:15
**dual**   80:21
**dubel**   8:6
**due**   63:7 202:17
221:18

**duties**   51:8
**dylan**   7:19
**dynamics**   62:3
63:9
**d'angelo**   7:22
**d'apice**   7:23

### e

**e**   1:21,21 3:1,1
6:20 7:8 10:16,21
11:25 14:1,1
18:18,18 157:20
157:21 224:1
**e2e**   178:4
**ear**   131:7 169:14
**earbuds**   165:4
**earlier**   57:7 63:10
102:24 105:7
107:14 112:7
116:14 117:6
118:24 121:23
137:9,12 146:20
164:4
**early**   14:8 19:11
43:9 53:4
**earphones**   143:22
**earpods**   167:16
**earth**   45:10
**easier**   62:19
167:21
**easily**   167:12
**easy**   119:7
**eberhardt**   8:7
**echo**   167:17
**eckstein**   8:8
**ecro**   1:25
**ed**   174:13,15,15
174:24 175:7
**edan**   10:5
**edmund**   92:23
153:9
**edmunds**   3:21
14:9 15:12,13
16:4,5 17:7 18:21

18:22 19:3,4,5,7
20:19 22:16,17
25:11,14,19,20
28:3,21,25 29:2,7
29:10,15 32:24
33:1,6,7,16,18,20
40:11,14,16 41:1
41:7,8,13,22,24
42:14 44:19 47:7
47:8,11 50:21,24
50:25 53:10,12
54:11,13,21,24
55:3,8,24 56:1,12
59:10 62:11 66:17
66:20,23 72:20,21
73:2,4 75:5,14,17
76:15,16,20,21,25
77:16,17 82:7
87:25 88:1,4,6,7
90:12,13 91:21,22
92:20,25 93:3,13
93:20,23 94:1,6
94:13,18,22 95:11
95:12,21,22 96:13
96:17,21 97:6,13
97:20,22,23 98:17
98:18,22 99:4,12
99:16,19,23 100:5
100:23 101:2,4,9
101:17 102:5
108:14 109:8
111:22 115:20
126:12 140:6
146:2,3,6,8,12,14
151:6,11,14 154:7
155:11,14 211:5
211:13,15 212:5
212:20,23 213:1,6
**edmunds'**   15:7
27:21
**educate**   192:15
**educated**   114:4

**edward**   10:21
**effect**   86:8 105:5
190:12 204:25
223:13
**effective**   127:7
187:1 195:6,18
**effectively**   150:17
**effectiveness**
103:22,25
**efforts**   130:3
**eight**   83:1 116:15
138:7 177:6
**eighth**   116:19
138:10,17 147:3
148:11
**either**   65:16 70:14
87:24 90:5 104:14
123:1 150:10
175:17
**elaine**   8:25
**electronic**   32:10
**electronically**
32:8
**eli**   13:1
**elisa**   9:11
**eloquently**   223:9
**email**   14:14 15:7
21:7,8 32:16,20
32:22,23 33:2,8
33:15 34:9,11,25
35:11,12,13,16,18
35:21 37:14 47:9
47:15 48:4 63:19
64:5 71:24 72:12
72:13,18 73:2,5
73:10 74:20 75:13
75:15 77:9 95:2
99:5,6,10,17
100:10,14 101:1
166:5,13 167:7,8
167:22,24 168:2,8
168:11,13,15,18
168:21 169:1

170:20,20,21,22
172:8,11 173:22
174:1,8,13,25
175:15,24 177:8
177:11 178:7,8,17
180:7,8 199:13,19
199:25 211:10
213:11,14 214:6
214:13 215:21
216:16,16 217:23
218:3 221:18
**emailed** 99:3
220:11
**emails** 14:8 21:24
87:17 167:5
174:10 178:9
216:13
**emergency** 50:3,4
50:7
**emily** 9:3 221:6
**emphasize** 126:6
**employed** 75:25
**employee** 95:7
**empowered**
100:18
**enables** 200:25
**encourage** 79:16
**endeavor** 217:12
**ended** 22:22 23:22
**endorsed** 116:7
**ends** 54:18 117:4
**enforcement**
102:13
**engage** 75:24 76:2
219:1 221:3
**engaged** 25:22
26:10 66:9 68:25
69:14,19 105:8
165:25 182:4
220:19 221:21
**engagement** 68:17
107:17

**engaging** 102:8
221:11,15,24
**ensure** 43:5 78:24
80:21 112:21
119:9 125:11
**ensuring** 43:17
**enter** 125:7
**entered** 47:4
51:20,24 58:15,22
58:25 161:22
163:4
**entire** 46:22,23
52:8 61:13 64:7
74:1 191:16
**entirely** 130:8
**entirety** 180:7
**entities** 23:12
25:22 134:25
135:12,18,21,25
136:18,23 137:2
141:1 198:3,9,12
198:16,23 199:1,8
200:9 221:2,2
222:25
**entitled** 133:17
162:13 206:9,10
209:20,21
**entity** 22:19,24
23:9 65:2 160:4
**envelope** 162:9,10
**epidemic** 193:16
**epidemiologic**
186:25
**equal** 159:18
**equally** 188:20
**er** 168:14,16,17
**eric** 12:15
**eskandari** 8:9
**especially** 75:22
167:11 205:6
**essentially** 16:6
**establish** 133:22

**established** 41:3
79:3
**establishes** 83:21
**estate** 117:5 150:9
161:22 163:7
182:4 189:3
**estates** 150:5
**et** 14:3 132:15
156:6
**ethan** 9:17
**ethically** 59:17
111:3
**etiology** 195:8
**evaluating** 71:18
**evan** 9:15
**evening** 141:23
**everybody** 156:20
156:23 215:12
**everyone's** 203:12
**evidence** 40:21
94:5,14,21 97:7
97:12 100:24
101:12,16 120:4
209:2,3,7,9 210:7
210:11 213:10
222:15 223:12
**evolve** 70:25 71:6
**evolved** 189:24
**exact** 23:4 158:9
176:4 199:6
**exactly** 19:16 24:2
35:1 37:18 80:8
198:25
**exaggeration**
182:12
**examination** 19:6
101:25 125:24
134:11 141:20
146:18 148:22
158:2 187:18
197:12 203:25
**examine** 101:21
203:19,19,20

**examiner** 152:4
152:13,17
**examiner's** 152:8
**example** 119:22
125:13 210:10
212:8,16 218:20
220:3,9
**excellence** 70:25
71:6
**exception** 213:10
222:5,10
**exceptions** 23:16
**excess** 28:15
30:11,15 31:6,11
31:12,23 33:23
34:6,17 35:3
82:18 109:25
**exchange** 57:15
117:16 138:1
139:7 140:8
199:15 200:3
203:4
**exchanges** 182:3
**excluded** 120:4
**excoriate** 126:7
**excuse** 136:19
187:20 203:20
**executed** 137:13
191:10
**executive** 19:21
19:23 50:14 51:4
51:7,10 114:9
179:9
**executives** 61:4
62:17 73:22 74:4
74:24 77:4 111:15
167:6,9 171:14
173:16,16,19
179:6
**exercise** 91:4
178:23
**exhibit** 93:14,19
94:4,20 96:16

97:11 101:15
104:15 137:17
162:6 209:8
211:20 212:16
**exhibits**  209:2
212:1 213:3
**exist**  86:23
**existence**  24:8
143:16 149:6,18
**expand**  31:19
58:10 70:5 218:12
**expanded**  15:22
137:21 218:13
**expanding**  64:19
**expect**  16:13
206:16
**expectations**
168:7
**expecting**  218:10
**expend**  119:3
**expended**  116:25
**expenditure**  44:4
**expense**  37:10
**experience**  215:14
**experiencing**
207:16
**expert**  81:25
150:1
**experts**  188:3
**explain**  128:14
130:5 178:14
206:1 210:10
**explained**  25:5,16
147:9
**explains**  83:25
**exponentially**
39:21,25
**express**  215:19
**expressed**  86:25
**extend**  52:23 53:2
123:4
**extent**  14:7 15:16
28:6 42:7 139:18

222:19
**extinguish**  121:11
194:25
**extinguished**
118:10
**extraneous**
172:24
**extreme**  193:3
195:6
**extremely**  69:6
219:22

**f**

**f**  1:21 12:9 224:1
**f.x.**  9:18
**face**  118:21
**faced**  43:1 59:25
**facing**  39:25
**fact**  23:18 26:16
27:4,7 30:18,19
31:9 33:25 34:3
37:20 38:22,23
42:19,20 43:11
47:15 48:15,23
51:20 53:4 58:9
59:5 66:13 68:2
68:13 69:1,11
70:4 72:3,3 73:16
78:16 81:19 89:17
89:21 95:23 96:19
122:1 125:2
143:18 151:10,13
185:23 202:18
212:21
**facto**  179:13
**factor**  63:5
**factors**  62:23
63:12 121:25
138:25
**facts**  40:21 47:1
210:23
**factual**  206:14
214:3

**failure**  55:18
**fair**  25:7 34:9,10
79:18 92:2 109:12
117:11 129:16
193:14,18 216:5
**fairness**  130:9
**faith**  217:10
**false**  191:15
**familiar**  137:4
209:5
**familiarize**  104:21
163:3 167:2 174:7
180:10
**families**  16:16
23:24 30:3 117:19
122:14 123:24
124:1,20,24
140:24 182:8
188:12
**family**  4:2 16:21
22:4,6,6,7,10,12
22:12 23:19 24:6
24:14,19,24 27:9
27:17,23 28:5,10
30:22,24 31:4
33:2 34:12 58:22
60:1,8 82:20,24
82:25 83:1,4,7,11
83:14,17,21,22,25
84:3 85:3,4,16
86:3,16,20,22,25
86:25 87:6 88:25
89:7,7,10,11,14
89:15,19,22 90:2
90:4,6,15,22 91:1
91:7,10,19 92:24
93:5,6,10,10 95:4
95:9,17,24 96:11
96:19,22,23 97:17
98:3,7,8 100:16
100:17,19 106:17
109:12,13,18
110:21,22 112:11

116:14,15 118:20
118:24,25 119:7
122:1,5 123:23
125:16 126:9,22
134:19,23 135:22
136:20 138:7
139:1,10,19 150:9
150:24 151:2,5,21
152:6,14,23 154:3
154:4,12,15,24
155:1 159:1
161:10,21 163:22
179:5,25 182:15
182:18 188:20,21
192:1 197:22
198:1,13 199:2,14
200:1,9,25 201:6
203:3,11 211:18
212:10,12
**family's**  98:10
112:11 116:19
138:11 141:2
147:5 148:11
188:19
**family's**  27:11
**far**  29:3 33:22
77:9 105:20 106:9
128:12 137:21
151:14 176:20
195:5 209:19
213:22
**farash**  8:10
**farrell**  8:11
**fashion**  215:7
**father**  51:9 83:2
83:17,19 182:3
**fault**  133:17
**favor**  116:5
**fda**  44:23 45:18
63:20 69:2,6
113:20 114:2,24
115:13,14 123:7
131:5 178:13

184:19 185:5
187:4,24 188:3,6
195:19 208:16
**feature** 71:12
**features** 184:20
185:5
**february** 56:3
89:20 112:25
178:25 179:15
189:9,10
**federal** 47:17
48:16,20,21,24
50:18 51:5,6 53:6
53:19 56:20 206:9
**feel** 59:16 80:4
100:15 123:23
124:9,20,22 140:2
174:11 196:14
207:2
**fees** 57:14,17,19
119:4,14 201:17
**felony** 53:6 126:4
**felt** 43:10 63:24
107:22
**femino** 8:12
**fentanyl** 38:16,18
38:18 192:24
**fiduciaries** 215:23
216:5
**fiduciary** 95:14
**fifth** 5:17
**fight** 119:2,13
**fighting** 201:16
**figure** 27:10 36:9
69:9 194:2 200:14
200:20 207:19
**figuring** 196:1
**file** 32:13 54:13
211:9
**filed** 110:11,15
117:7 121:17
123:20 130:7
137:15 147:14

149:20 196:20
212:21 223:16,18
**filing** 16:25
**filled** 16:9
**final** 74:10,11
76:8 92:23 202:25
219:20,20,23
**finalizing** 210:23
**finance** 85:8
91:19,24 92:11
100:16
**financial** 140:17
181:17 196:17
**find** 36:22 73:20
111:8 143:10
144:8,22 166:7
173:2 180:13
181:7 220:23
**finding** 115:13,17
188:7
**findings** 15:21
78:11 105:9
106:24 114:25
**fine** 40:15 96:9
105:15 106:1
145:17 150:8
157:5 186:21
187:11,22 197:15
201:20 207:4
209:20 210:6
211:14 212:22
213:2
**finger** 194:22
**finish** 214:12
**finzi** 8:13
**firing** 221:24
**firm** 217:8
**firms** 67:25
**first** 17:5,12 28:23
32:22 37:3 41:15
44:20,21,24 65:23
65:24 69:4,5
71:16 79:2 81:11

85:24 86:18 88:10
89:18 91:14,15
92:7 96:19 98:19
101:4 116:13
127:21 150:6,16
161:16 162:18
167:7 170:2
173:13 174:9,13
179:14 183:1
191:1 208:10,13
210:17 216:17,18
216:22 217:9
220:6 221:25
**fit** 215:3
**fitch** 5:9 126:2,3
**fitzsimmons** 8:14
**five** 22:6,7,8 52:17
52:23 76:18 103:2
111:7 112:16
114:3 148:19
159:10,14 170:18
175:3
**fixed** 106:9
**flares** 192:20
**flipped** 183:16
**focus** 43:14,24
44:3 80:21 100:2
167:6 173:13
200:7 219:4,11
221:7
**focused** 71:9
125:2,4
**focusing** 18:1 29:4
37:1 44:8 144:14
**fogelman** 8:15
146:15,17,19
147:11,12 148:3,5
148:14,16
**folder** 54:6 60:4
**follow** 50:20
86:18 91:8 102:4
132:21 144:22
145:9 147:11

152:21 176:22
217:2
**followed** 23:14,17
132:5
**following** 47:22
49:25 52:17 55:12
103:2 111:8
112:16 163:22
**follows** 60:11
**food** 56:20
**foolish** 220:18
**footnote** 163:21
163:21 164:18
**forecast** 36:20
176:8
**forecasts** 173:17
**foregoing** 224:3
**foreign** 192:10
**forever** 122:12
215:16
**forgot** 14:19
**form** 20:17 27:19
32:10 42:11 50:19
52:5 57:18 75:1
97:18 102:10
107:6 117:23
168:12 175:15
**formally** 211:8
**format** 171:9
**formed** 87:12
**former** 174:15
**formulated** 45:1
**formulation** 46:21
107:18,19 114:2
114:23,25 115:15
120:25 178:13
183:25 184:3,21
184:22 185:3,4,8
185:11,12,18,19
187:23
**formulations**
188:7

forth 83:24
171:19 195:16
217:11
forths 31:9
fortune 181:17
182:9,15 199:14
200:1,9
forward 32:17
37:11 44:7 77:15
98:8,9,10 105:23
168:8
found 57:6 69:13
79:6 103:3 136:8
147:13 152:13
182:4
foundation 97:19
143:12,13,21
151:6,9 154:9
founders 23:23
four 22:5,7,8
76:18 84:4,19,24
85:4 159:9,14
161:21 178:21
179:11
fourth 93:18
177:21
frank 5:8 126:1
203:21 204:2
franklin 5:13
frankly 34:5
218:8 220:20
frazier 8:16
frederick 11:25
free 174:11
215:22
friedman 8:17
front 43:21 54:8
59:9,10 71:15
73:17 94:9 142:10
146:9 182:25
frozen 105:10
full 139:18 140:13
166:2

function 87:9
92:14,20 195:11
functioned 179:5
functions 84:1
85:2 86:3,17
87:10 89:25 91:7
92:11
fund 90:7 116:10
122:13,18 191:19
195:1
fundamentally
195:4
funds 30:9 34:17
34:20,22 35:7
46:10 59:22 90:5
125:10,11,14
140:6,10,13 141:2
147:1 203:3
further 34:16
36:5 56:7 79:11
85:14 91:12
101:19 105:25
141:7 145:22
148:14 153:23
163:17 179:4
203:15 206:22
207:8 217:16
fusion 58:3,16
future 44:11
170:6
futures 147:20

g
g 7:20,25 14:1
56:8
gage 7:12
galle 8:18
gange 8:19
gaps 213:20
gardener 143:1,3
gary 9:2
gasdia 171:22,23
171:24 174:14,21

gdp 110:25
geldreich 8:20
general 3:16 6:15
52:15 82:12 111:7
112:16 128:24
141:12
generally 20:24
21:10 50:2 58:11
73:20,24 86:19,22
91:8 93:5 98:7
107:7 139:15,15
157:4
generic 65:4,5,7
65:8
generics 179:10
geographically
21:13
geraldine 95:3,7
gerard 7:16 12:24
getting 22:2 36:16
43:12 45:18 79:11
90:9 124:12,13,16
134:17,20,23
135:1 136:23
137:20 140:20
146:4 167:19
178:18 197:17,22
198:1,4 199:5,8
201:22 213:19
214:9
gibson 8:21
giddens 8:22
gilbert 8:23
gill 8:20
give 15:18 84:6
90:6,11,15 98:16
99:10,13 120:1
131:11 163:3,13
164:16,17 167:2
168:19 175:19
189:11 194:3
210:15 220:5,9,21
221:17

given 33:17 44:5
44:12 46:25 51:9
53:13 77:12,13
gives 24:22
giving 181:13
glad 130:20
gleit 4:13 17:8,12
18:4
glitch 106:9
global 110:25
go 16:3 17:12
18:21 19:4 36:5,6
42:13 65:21 67:4
74:14 84:9 87:4
88:21 90:17 91:4
93:8 94:7 96:15
101:24 103:10
106:12 115:24
127:17 129:24
141:3,19 144:1
147:11,19 158:1
163:10 164:12
169:16 173:9
178:17,19 182:20
187:17 190:23,25
202:22 204:8
208:7 209:10,13
216:14,17,18,22
218:9
goal 109:8 125:9
167:14
goals 43:4 119:9
125:9
god 18:15 157:18
going 14:19 15:7
15:10 16:10,11
23:22 25:4 32:18
37:7,11 39:19
40:20 42:11 46:4
47:10 52:12 54:1
54:8 65:15 74:12
75:20 76:3,20
81:2 84:21 91:18

92:18 96:2,15,17
98:18 100:4
105:22 109:17
111:22,25 115:19
116:9,12,25
118:10 119:23
124:1,4,5,16
126:11 128:3,12
131:17 132:5,24
133:7 145:24
146:8 151:19
157:7,23 162:1
165:7 168:7 169:9
169:24 172:5,5,9
173:1,5,13,22
174:8 175:11
178:17,22 180:8
180:22 181:15,23
182:19,23 183:4
184:6 188:12,17
193:7,23 196:10
202:13,18,25
204:14,24 207:11
211:7 212:15
213:4,22 216:17
216:18 218:11
**gold**   5:20 217:1,1
217:3,3,6
**goldman**   6:6
217:19,19 218:2,6
**goldstein**   8:24
**golin**   8:25
**good**   14:2,11 45:8
45:10 63:8 78:21
80:4,7 102:2,3
134:10,13,16
141:23,24 146:17
148:24 149:1
153:22 155:22
156:4 157:15
158:4,5 164:25
165:17 187:20
190:7,17 197:14

201:2 207:17
217:10 219:6
221:4,7,20,23
**goods**   136:9
**gostin**   9:1
**gotten**   196:9
207:14
**gotto**   9:2
**government**   48:16
48:20,21,24 111:6
124:6 128:8
193:25,25 194:11
204:15,20 206:4
206:18,19
**governmental**
221:2 222:25
**governments**
48:17
**government's**
206:17
**graham**   223:15
**grandchildren**
117:3 134:22
197:25
**grandkids**   147:20
**granted**   44:23
185:5
**grasp**   197:1
**gravity**   215:25
**great**   62:25
164:11 207:13
216:19
**greater**   30:3
**gregory**   9:16
**grew**   45:3 182:15
**grim**   9:3
**ground**   87:12
222:20
**grounds**   205:25
**group**   6:9 17:16
24:22 33:23 34:2
112:15 213:8

**groups**   74:8 83:1
116:16 137:1,1
138:7 188:21
**grow**   37:4 63:23
170:8
**growing**   39:25
**grows**   60:1
**growth**   71:18
170:6,12 177:24
**guard**   9:4
**guess**   15:19 21:3
28:7 32:23 33:23
47:6 56:8 58:1
60:12 80:11 89:20
91:13 92:16 100:2
161:5 167:7
168:25 184:9
190:19 195:22
200:23 205:20
211:15
**guidelines**   42:5
**guiding**   125:9
**guilt**   126:10
**guilty**   47:16 48:3
50:16 51:5,15,25
53:6,18 55:16
56:23 57:1,23
58:6 59:6 81:19
82:4 111:14,15
112:7 126:11,14
126:16,17,24
127:9,22 161:12
161:18 206:8
**gum**   135:9
**guts**   122:4,5

**h**

**h**   8:8 13:7 157:20
**haberkorn**   9:5
**habit**   117:21
**half**   110:1 174:9
213:20 215:5
218:8,11,12

**hammer**   16:13
**hand**   18:11 35:7
135:6,20 136:3
157:8,16 192:21
192:21
**handed**   216:12
**handful**   21:25
**handled**   48:11
**handling**   213:18
**hands**   45:20 78:22
81:16,21
**happen**   119:12
176:10 205:7
**happened**   37:15
53:23 74:3 124:25
176:9,10 206:7
**happening**   80:15
124:17 190:19
195:15
**happy**   14:9 96:8
101:5 186:10
216:22
**hard**   17:17 50:20
53:25 103:5
159:13 160:11
168:18 169:4
178:8 181:25
184:24 197:1
220:17,23,24
**harder**   63:2 64:1
80:7
**harm**   80:24
110:11 125:6
196:20 205:10,12
205:12,13 221:3
**harmed**   45:21
123:21
**harms**   123:3
**harold**   9:14
**harsh**   182:5
**harvard**   139:21
**hasn't**   39:19

haven't 39:16
198:17,20 212:14
216:13 218:3
hayden 7:17
hcp's 56:14
head 176:1,3
headed 132:24
133:2,8,12
headline 39:4,5
headlines 38:15
headquarters
158:20
health 38:19,20
38:25 124:9,10
130:13 192:12
healthcare 56:3
57:14,19,20 67:1
67:3 194:2,5
195:23
hear 14:9,14
18:25 47:23 99:7
102:2 105:11,13
105:14 131:19
134:15 143:22
160:22,25 167:17
167:20 169:10
184:13 187:20,21
187:22 192:7
197:14 201:19,20
204:5,6 207:22
208:1,11
heard 39:3,5
41:23 43:8,9
58:15 71:8 87:15
152:9 193:13
198:18 204:23
hearing 2:1,1 14:4
125:3 150:7
159:13 160:11
167:18 201:19
207:8 208:5 211:8
213:23 214:6
219:5 220:7,14

221:5 222:10
hearings 202:17
heated 46:1
heather 8:16
heavily 31:13
hedging 133:5
height 146:7
heitzenrater 9:6
held 24:21 51:17
56:17 90:5 137:25
help 18:14 43:3
43:12 45:5,8,10
64:4 67:25 69:9
100:16 107:22
122:2,8,9,11
124:8,13,14 125:8
125:12 157:18
165:13 180:13
184:4 189:13
191:7,12 195:10
195:10 197:4,4
helped 119:10
136:8
helpful 167:16
210:15 219:15
220:3
helping 52:25
helps 166:7
heroin 192:25
heroine 38:12,15
38:17,18
herring 9:7
hesitating 156:6
he'd 29:11
he's 22:14 25:16
40:8 209:20,21,21
hi 14:11
higgins 5:6 134:8
134:10,12,14
135:11,16 141:7,9
145:24 197:8,10
197:11,13,16
199:19,22,24

202:9,22,23,24
203:15
high 44:4 121:7
177:22 179:8
higher 80:12
82:13 104:10
highest 47:21
106:21 108:3
highlighting
99:20,25 100:1,3
highly 32:19
hippocratic
205:11
hired 77:5
hiring 73:22,23
hirshman 9:8
historical 212:21
history 192:18
hit 15:24
hitting 177:21
hmm 47:14 90:20
hoc 6:9
hold 156:19,23
holding 110:8
200:11 202:12
holds 44:11
home 175:22
hon 1:22
honest 213:15
honestly 96:13
132:23 169:10
176:10
honor 14:11,24
15:13,16 16:5
17:6,7,13,14 18:2
18:5,8 19:5 28:2
28:25 29:13 40:20
41:12 54:2 77:16
93:13,17 94:13,16
97:7,22 100:23
101:13,18,22
106:3,11 111:24
118:1 119:23

125:19,22 127:3
128:14 130:6,20
133:1 134:1,10
141:7,11 143:24
144:13 145:24
146:17 148:14,18
151:17 153:23
154:1,17 155:16
156:1,8 157:10
187:15 197:7,10
199:23 202:15,18
202:23 203:16,21
206:1,23,25 207:6
207:23 208:1,8,24
210:12,23 211:12
211:13,15,24
212:6 213:1,6,19
214:8,14,16,19,21
214:24 215:2
216:10 217:1,3,19
218:6,16 219:16
220:5 221:17
honor's 15:1
hook 18:23
hope 15:5,22 16:1
17:17 106:10
141:2 193:25
214:1 219:3
221:13,22 222:1
hopefully 15:18
123:15 214:13,23
220:21
hoping 14:21
165:4
horrible 39:22,24
40:2 43:10 50:8
122:4 123:23,25
124:4,20,22
hospital 204:10
hospitality 136:9
hour 32:9
hours 121:1
172:10 220:7

[house - indiscernible]                                                    Page 22

**house** 204:9
**housekeeping**
  32:7
**how's** 157:13
**howard** 12:14
**hr** 74:8
**hudson** 9:9
**huebner** 3:12
  40:20 119:23
  139:5 148:18,23
  148:24 151:8,17
  151:18 153:23
  154:4,17,21
  155:10 156:8,10
  156:11,19,22
  202:15 206:25
  207:23 208:3,7,8
  209:10,25 210:12
  210:14 213:7,9
  214:8,16,21
  216:19 217:2,7
  219:16 220:5
  221:17,21 222:18
**hugely** 47:23
**human** 38:20,25
**humanitarian**
  45:12,14
**hundred** 213:22
**hundreds** 66:14
  109:3 135:7 223:5
**hunt** 85:19,24
**hurley** 9:10
**hurt** 122:4
**hyde** 2:25 224:3,8
**hyder** 9:11
**hyperactivity**
  120:18

**i**

**i.e.** 90:7
**iacs** 24:23 25:13
  25:15 26:4,7
  110:4,8 122:14,16
  122:21 160:6

161:4 192:4
**idea** 66:8 189:24
  190:1 200:5
**ideally** 213:13
**identical** 26:16
**identified** 94:11
**identify** 79:5
  80:18 90:7,8
  96:18 174:24
**identifying** 170:7
**iec's** 138:24
  149:23 150:10
  153:3,10,20
**ii** 55:11 57:11,12
  170:6 195:13
**iii** 55:12 58:1
  170:9
**il** 4:18
**ilene** 11:20 15:7
  16:8 35:12,16
  210:21
**illegal** 102:8,15,22
  103:8 130:4
**illegally** 131:4
**illicit** 38:10,18
  39:1,5 192:23
  193:20
**imagine** 37:18
**immediate** 65:10
  65:12
**immediately**
  181:12
**impact** 168:7
  175:1 223:4,9
**impacts** 206:9
**impermissible**
  202:2,7
**implement** 170:8
**implemented**
  70:18 71:5 178:5
**implied** 93:1
**important** 40:25
  45:1 73:25 81:14

113:25 176:5
  190:13 195:3
  208:6,18,19
  209:17 222:11
**impossible** 60:22
**improper** 38:21
  131:1
**improperly** 155:2
**improve** 70:2
**improvement**
  184:3
**inaccurate** 149:16
**inappropriate**
  216:2
**inappropriately**
  79:8 80:16
**incarcerated**
  130:10
**incentive** 79:15
  80:19
**incidence** 190:11
  191:8
**incidentally** 46:12
**incidents** 191:4
**inclination** 34:15
**inclining** 39:21
**include** 24:13
  25:12 38:11 80:19
  109:25 119:18
  168:4 185:3
**included** 49:13
  61:13 77:23 81:20
  90:4 176:13
  179:12 214:3
**includes** 27:10
  61:2 85:3 135:24
  198:15
**including** 14:18
  27:13,15 29:5
  30:14 33:3 38:10
  38:15,19 52:4
  61:13 65:8,11
  71:19 77:23 81:11

122:22 149:14,23
  171:18 173:16
  179:10 183:12
  188:19 201:25
  222:18
**incomplete** 92:19
**incorporate** 25:15
**incorporated**
  137:8
**incorrect** 91:6
  151:10 152:19
**incorrectly** 88:10
**increase** 42:22
  62:20 106:20
  107:4 170:10,16
  185:23 186:12,14
  186:15
**increased** 186:18
  191:9
**increases** 178:6
**increasing** 50:9
**incredible** 43:3
**incredibly** 121:24
  123:6
**incremental** 184:3
  185:17
**indelicato** 9:12
**independence**
  152:5
**independent**
  20:25 22:8 24:1
  33:4 61:13 122:15
  147:18 159:10,15
  159:18 160:5,8
  165:23 177:1
  180:2 191:21
**indicated** 100:11
  191:2
**indicates** 17:1
  95:17 96:19
**indiscernible** 19:2
  22:13 24:10 28:1
  41:21 45:11 64:8

86:6,12 88:5
89:12,13 97:9
98:21 102:15
103:9,10 105:20
107:24 113:23
114:18,23 115:4
115:20,22 116:4
120:1 126:20,24
127:4 128:5,11
130:21 131:3,5
133:19 139:16
146:11 149:14
150:21 151:4
154:22 155:14
156:13,14 159:8,9
159:9,10,11,22
160:8,10 162:11
162:15,16,21,22
163:9,11,17 164:2
164:3,12,15,22,25
164:25 165:1,1,17
166:1,8 167:1,12
167:15,19,25
168:16,21,24
169:2,3,15,15
170:9,11 171:20
172:16 173:21,23
174:4 175:25
177:4,25 178:18
178:21 179:11
183:16,17,20
184:1,7,23 185:7
186:4,9 190:14
196:4 198:19
199:11 200:15
201:6,15,16,17
202:3,3 204:6
205:11 206:10
208:9,22 209:11
209:15 213:9,17
213:18,23,25
214:2,22,23 215:2
215:3,4,4,19,24

215:24 216:2,3,3
216:4,7,8 220:18
220:19
**individual**  126:2
144:20,23 196:24
204:3 222:16
**individuals**  59:22
62:18 77:6 112:8
119:6,11 123:24
124:7 130:1
134:25 135:13,21
141:4 198:3,12
**induce**  57:20
**indulgence**  90:12
**industry**  33:23
34:2 107:7,13
**inefficient**  100:15
**inequitable**  182:5
**influence**  150:25
151:22 155:2,2
**influx**  192:23
**information**  76:6
102:20 104:3
107:3 108:1
111:12 164:23,24
188:4 200:12
**infrastructure**
192:13
**ing**  167:9
**inhalation**  185:21
**initial**  73:12 98:19
**initially**  85:18
**initiated**  48:1
**initiation**  38:20
**initiative**  70:11
77:4 78:5 79:5
**initiatives**  68:5,7
**injection**  185:21
**injury**  123:20
133:22
**innaurato**  172:10
175:15,24,25
176:1

**innumerable**
175:23
**insecurity**  181:17
**insert**  44:24 63:21
113:21
**inside**  22:12
**insisting**  217:24
**inspector**  52:15
111:7 112:16
128:24
**instances**  57:6
98:3
**institution**  129:14
**instruction**
132:14
**integrity**  51:21,24
52:13,19
**intellectual**
196:16
**intelligent**  176:24
**intend**  122:14
**intended**  43:11
60:22 83:3 122:5
124:24 131:2,5
197:3
**intent**  86:21
**intention**  217:22
**intentionally**
56:13 208:15
**interacting**  221:4
**interaction**
151:15
**interest**  86:24
198:23,24
**interested**  202:16
**interesting**  172:14
**interestingly**
208:3
**interests**  86:22
**interfered**  205:14
205:17,22 206:5
**interference**
152:14 165:8

205:23
**interim**  15:8
**interject**  145:25
**international**
24:22
**interrupt**  105:25
130:17 190:23
194:20 197:20
208:25 209:16
**interstate**  56:18
**interview**  97:17
98:3,5
**interviews**  75:10
**intra**  149:21
215:11
**introduced**
179:25
**introduction**
60:21
**inventive**  117:8
**invest**  31:15,18
32:5 34:16,18
35:4 91:23 104:10
136:11
**invested**  31:25
104:7 110:8
136:13
**investigate**  60:2
152:5
**investigation**  48:1
48:16,21,24 49:3
**investing**  46:25
90:5
**investment**  44:7
85:8 86:9 87:13
89:3,6,9,25 90:3,4
91:19,24 92:1,11
92:15 93:6 96:25
100:17,18 103:18
136:4 192:2
**investments**  32:2
90:1,7,8 92:15,23
99:18 103:23

136:4
**investor** 136:5
**involved** 59:5
  73:22,23 74:1,2
  74:12 116:16
  128:19 138:9
  171:11,12 176:17
  176:18,20 200:14
**involves** 221:24
**involving** 58:6
**irrespective**
  153:16
**irs** 27:11,12,22,24
  28:4 110:2
**irve** 6:6 217:19
**island** 141:12,15
  142:21
**isley** 9:1
**isn't** 29:8 32:1
  37:23 209:5,22
**israel** 9:14
**issacharoff** 9:13
**issue** 105:24
  107:23,24 114:24
  121:17 127:10
  147:20 186:14
  187:23 206:13,15
  215:8,8 220:10
  221:5
**issued** 161:2
  188:7
**issues** 43:2 52:20
  70:15 111:9
  118:15 130:13
  196:4 214:15
  215:14,25 217:24
  218:18,25 219:4,7
  219:8,12 220:2,13
  221:7,12 222:7
**it'd** 151:14
**it'll** 99:11 140:19
  163:11

**italian** 49:3,6,7,8
  49:12
**italy** 49:2,3
**italy's** 49:5
**item** 48:5 109:3
  168:4,17,23
**items** 83:8 170:18
  170:24 171:4,5,6
**it's** 15:22 18:17
  23:11,13 30:22
  32:16 33:1,14
  34:9,10,10 37:8
  39:6,18,22,24,25
  42:12 44:3,16
  192:15 193:2,2,3
  193:4,4,18,19,20
  193:24 194:11,14
  194:17,21 195:11
  195:13,15,22
  197:1,1,1 199:6
  199:10 200:24
  201:4,9 202:20
  206:15,20 207:13
  207:18 208:17,19
  209:2,8,8,16,23
  210:7,15 212:6,21
  213:18,24 214:17
  215:12 217:16,21
  219:21 221:6
  222:11 223:17
**iv** 170:12
**i'd** 23:15 190:25
  204:3
**i'll** 17:12 23:5
  38:11 196:23
  199:22 200:16
  203:22 212:25
  213:2 214:4,5,12
**i'm** 14:9 18:22
  20:8,17 21:25
  24:18 25:4,6
  29:16,16 32:18,22
  32:24 34:1 35:4

36:17,18 38:4,23
  40:14,20 41:1,2
  42:11 192:7 193:7
  196:9,25 197:20
  200:13 201:18,22
  201:24 202:4
  203:12 204:24
  205:9,16,20
  207:11,15,20
  208:24 210:3
  211:25 213:14
  215:16 216:22
  218:3,12,19 219:7
  220:25 221:9,10
  222:14
**i've** 38:14 39:3,5
  190:24 192:22
  196:23 198:18
  203:5 204:23
  205:16 218:7

**j**

**j** 5:6,20 6:6 10:3
  10:18 11:14 12:3
  12:18,23,25 13:1
  54:17
**jacob** 99:15
**james** 3:14 5:13
  11:22
**jamie** 13:11
**january** 127:7
  150:15 223:17
**jasmine** 7:5
**jason** 11:16
**jay** 7:4
**jeff** 142:24 143:10
**jeffrey** 4:13 10:4
  11:14 92:9
**jenna** 9:9
**jenner** 4:15
**jennifer** 11:1
**jeremey** 11:18
**jeremy** 9:22

**jerome** 12:16
**jesse** 8:3
**jill** 6:23
**jml** 92:8
**john** 8:6 9:4 10:6
  10:7 73:13 74:15
  167:8,10 168:3,9
  168:23 169:2
  174:14,18 177:14
**join** 51:2
**joint** 93:13 209:2
  211:20
**jonathan** 10:16
  13:2 33:2,15,21
  34:11 99:18
  161:22 163:8
  173:14
**jones** 9:15
**jordan** 11:15 13:4
**joseph** 7:25 9:16
  11:11,23 12:12,22
**joshua** 7:13
**journalist** 145:11
**jr** 7:8 13:8
**judge** 1:23 14:2
  156:4 202:20
  209:4
**judgement** 147:15
  147:19
**july** 223:16,18
**jumped** 73:19
  94:8 139:6
**june** 57:12 99:18
  100:11 223:16
**jurisdictions** 42:5
  122:25
**jury** 210:8
**justice** 5:1 58:22
  60:8 104:17
  129:20 152:5
  161:23 163:5
**justice's** 60:11

justified   37:10
    44:5
justin   1:25
jx   54:6,18,19 55:2
    60:4,13 61:19
    62:12 104:15
    106:15 146:9
    162:5,18 163:12
    163:15 169:6
    173:22 174:10
    175:11 177:5
    178:20 211:22,22
    211:22,22,22,23
jx1718   35:9 43:21

**k**

k   4:6 9:7 18:18
    157:20,21
kami   11:8
kamin   83:15
kaminetzky   3:13
    14:11,12 15:9,14
    15:15,23,25 16:6
    17:10 41:12,20
    51:1 207:25
    210:18
kaminsky   9:17
kaplan   5:15 217:4
kara   12:19
karen   9:19 85:20
kathe   3:5 14:15
    14:22 15:10 16:7
    92:5 155:24 157:6
    157:9,12 159:20
    159:22 160:16
    162:7,8 163:7,7
    163:24 164:18
    165:2 166:10,16
    168:2,8 169:8,17
    169:21 170:3
    171:1 172:8
    173:14,24 175:3
    175:13 177:7,16
    181:7,21,23,23

183:2 187:18
    197:12 202:5
    203:25 206:11
katherine   8:18
    11:4
kathe's   205:17
kathy   83:15 158:2
keep   30:10,25
    31:13 35:3 37:7
    45:20 46:25 52:24
    124:16 213:15,19
keeping   81:16
keeps   207:12
kel   85:19
kelly   9:18 12:20
    141:11,11,15,17
    141:21 142:17,18
    143:21,22,24
    144:2,6,7,13,15
    144:16,18 145:1,4
    145:10,19,22,25
kenan   12:1
kennedy   9:19
kenneth   8:8
kept   52:12
kesselman   9:20
kevin   8:1 10:8
key   39:7 119:9
kickback   49:9
kickbacks   49:4
    57:14
kidding   73:11
kids   138:16
    147:20
kill   38:3
kilograms   178:1
kind   48:2 50:23
    84:14 167:17
    173:20 176:21
    177:1 209:16
kinds   192:25
kingdom   21:15

klein   9:21
kleinberg   5:15
    217:3
kleinman   9:22
knew   68:14 70:17
    70:17 145:6
know   15:11,17
    17:25,25 20:24
    21:24 22:1 23:22
    24:9 26:22 28:8
    28:17,18 29:20,23
    29:24 31:9 34:1,2
    34:4,5,19,22 37:8
    37:9 38:14 39:4
    39:20 40:6,8,12
    42:25 43:11,13,15
    45:1,17,21 46:25
    47:21,23 48:1,19
    48:20 50:10 52:13
    52:14,21 53:22
    58:13,16 59:14,25
    61:7 63:2 66:11
    66:12 67:11,12,14
    68:19,22 70:21,22
    74:21 78:4 79:21
    80:2,3 81:1 84:10
    85:19 86:7 88:17
    88:23 89:2,17,20
    90:18 98:5,6,6,9
    99:4,23 100:1
    102:12,16 103:11
    103:22 104:11,12
    105:17 106:2,9,23
    107:12,22 110:20
    111:2,2,10,10
    112:1,6,14,17
    113:19 114:3,4,6
    114:17 116:13,13
    116:14,22,24
    117:2,4,5 118:12
    118:13,15,24
    119:8,8 121:13,19
    122:1,6,9,12

123:12,16,16,25
    124:1,20 125:13
    127:15 129:25
    130:4,17,18 131:1
    131:4 132:9
    133:11 135:1,4,9
    135:17,18,21,25
    136:12,18,22
    137:6,20,22 138:3
    138:6,10,14,17,21
    138:23 139:1,3,14
    140:15,17,19,23
    140:23,24 141:2
    143:7 145:5,25
    151:7 152:18,18
    154:6 155:12
    158:9 166:22
    167:16,22 171:8
    171:10,24 172:13
    172:17 174:18
    175:8 176:11,14
    178:8 179:23
    180:3,7 181:3,25
    182:7,14 183:22
    186:1,19,21
    187:11 188:4,16
    188:22,24 189:25
    190:18 191:10,17
    193:5,17,19,23
    194:5,8,15,16
    195:4,5 198:6,9
    198:12,16,19,22
    198:24 199:1,4,6
    199:6,8 200:13
    201:5 204:7 206:6
    207:15,25 208:14
    209:19 213:20
    214:14 215:11,14
    216:3,25 217:21
    218:19 219:6,21
    219:22 220:7,17
    222:21

**knowing** 68:8,12
195:15
**knowingly** 56:13
205:5,10
**knowledge** 23:17
42:15 68:24 70:9
144:19,21 150:24
151:9 152:16
188:4 205:21
**known** 22:19,23
67:15 184:1
**knows** 98:8
221:22 222:2
**kotler** 9:23
**kramer** 9:24

**l**

**l** 7:21 8:17 12:12
18:18 157:21
**l.p.** 1:7 4:9 14:3
156:6 169:25
**label** 69:3,4 131:5
**labeled** 83:10
137:2
**lack** 34:22 97:18
143:12 151:6
**lacking** 34:20
140:10
**laid** 154:9
**language** 46:1
63:14 135:11
179:18 182:6
199:20
**large** 26:10 36:18
59:21 80:5
**larger** 17:16
116:20,20 138:12
**late** 50:9 52:9
53:4 124:17
151:23 179:8
**launch** 195:20
**launched** 80:2
104:7 120:14,16
185:25 186:13,25

187:10
**launching** 76:5
**laura** 8:12 10:11
**lauren** 13:10
**law** 5:8 50:18 79:9
102:13,21 130:11
203:3 206:9
**lawrence** 8:15
9:23
**laws** 47:22 122:25
**lawsuits** 60:1
110:22 118:25
119:2 147:13
**lawyer** 209:20,21
**lawyers** 119:4
139:17 140:3
147:17 200:14,20
200:22 219:6
221:14
**lawyers'** 201:16
**lawyer's** 209:6
**lay** 46:6 143:20
**layers** 181:18,18
182:9,9 200:2,2,7
200:7,8
**laying** 35:22,23
45:24 151:9
**lead** 107:4 215:9
**leading** 21:9
**leads** 152:17
**learned** 160:18
183:22
**leave** 15:11 34:17
150:20 152:24
153:17 169:14
**leaving** 152:21
**led** 47:2
**ledanski** 2:25
224:3,8
**lee** 10:22
**lees** 9:25
**leeway** 68:11

**lefcourt** 35:13
85:20 92:9
**left** 14:5 40:23
41:16 127:5,8
137:18 150:13
151:22 158:13
169:14,14 200:20
**legacy** 129:13
**legal** 50:1 85:6,15
86:3,17 90:2
91:1,7 110:23
117:10,11,22
119:3,14 122:25
124:11 196:13
206:14 217:22
218:14 224:20
**legally** 59:17
111:3
**legitimate** 37:8
43:19 56:15 63:3
63:25 81:23
**legitimately** 78:25
80:22
**length** 111:23
128:23
**lennard** 10:1
**letter** 127:6
150:15 172:7
**lettered** 55:10
**letters** 223:8
**letting** 214:14
**let's** 28:22 40:10
**level** 30:21,21
44:4 47:21 52:25
67:11 78:17 79:21
81:24 177:23,24
179:8 200:15
**levels** 52:3 75:23
75:25
**leventhal** 10:2
**levine** 10:3
**lexington** 3:9

**liable** 147:13
**lianna** 12:6
**liesenmer** 10:4
**life** 190:11 197:1
**lifetime** 192:23
**lig** 129:3
**light** 70:18 72:2
170:9 209:11
**likewise** 26:5
161:8
**limited** 35:6
**limiting** 154:23
**line** 19:24 32:19
32:25 33:1 35:24
36:1 51:7 72:23
72:23 73:1 109:3
163:24 183:11,13
214:12
**lines** 104:8 214:22
220:7
**link** 18:7
**lisovicz** 10:5
**list** 22:14 81:5
85:2 86:2,16
137:20 198:20
208:4
**listed** 87:10 213:4
**listen** 118:5
176:22
**listened** 209:20,21
220:23
**listeners** 164:25
165:22,24,24
**listening** 214:25
220:8,24
**listing** 149:21
**lists** 88:15 92:10
**litella** 221:6
**literally** 16:2
39:25 220:6
**litigation** 49:23
59:24 122:12
181:13 190:9,19

191:3 192:16
201:7,16 212:4
**little** 26:2 46:1
73:19 84:20
105:14 110:13
112:19 159:12
160:22 185:1
186:10 190:25
193:6 201:19,22
210:24 214:6
**live** 14:14,21 16:7
16:12,13 83:15
**lived** 21:15,16
**lives** 45:5
**living** 204:8
**llc** 5:8 6:1
**llp** 3:7 4:8 6:8
**local** 49:10 124:7
**locked** 124:12
**logging** 18:9
**long** 30:6 40:1
81:5,5 84:5,5
125:16 142:21
149:7 158:9 170:5
187:9 190:15
215:13
**longer** 52:24
114:10 115:12
**longitudinal**
186:25 187:4
**longmire** 10:6
**look** 30:6 32:12
32:20 34:4,4,8
36:24 43:1 44:20
54:4 60:6,19
61:15 71:16 80:3
82:25 84:18 88:12
91:5 113:12
140:22 147:5
164:19 166:24
168:14 172:5
173:22 180:10
181:8 212:13

**looked** 57:5
198:20
**looking** 54:15
64:2 78:24 155:3
162:4
**looks** 32:16
162:12 168:12
176:6
**loomis** 179:19,21
179:22,22 180:3
**losing** 62:4 167:10
**loss** 190:11 196:25
**lost** 61:5 123:24
146:11
**lot** 23:21,21 31:8
50:10,12 121:24
136:4 138:23
182:13 194:16
199:6 212:6,7
217:6 221:3
222:20
**louis** 7:9
**loved** 123:24
**lower** 39:18
104:11
**lowne** 10:7 15:3
**lp** 106:8
**lubinski** 223:17
**lunch** 155:23

**m**

**m** 6:13 9:15 10:13
10:20,22 12:8
18:17,17
**ma'am** 157:7
**maclay** 10:8
**magali** 8:22
**mahony** 174:14
174:15
**main** 6:3 87:12
**maintain** 55:18
113:10

**maintaining**
47:21
**major** 71:12
106:24 179:3,18
**majority** 62:17
86:24 158:25
159:9 161:8
**making** 30:13
31:7 64:18 67:1
75:12 92:23
110:22
**man** 205:25
**manage** 195:10,21
**management**
34:21 36:3 43:15
45:4 46:3 47:20
48:21 49:8 53:1
62:22 63:6,12
67:24 68:5,7,10
68:24 69:14,22
70:11,15,16 71:5
71:17,22 73:14
74:13,17 75:18,23
75:25 78:4,7 79:5
79:9 80:17 81:2,6
102:25 103:6,17
104:3,12 105:4,7
106:24 107:17
108:18 111:5
112:15 113:12
114:18 125:4
161:3 171:8,14
179:2,6,16 189:23
189:25 190:4
191:10 196:3
**management's**
78:11 79:14
178:24
**manager** 49:11
95:14
**managers** 90:8
179:7

**managing** 195:6
**manhattan**
182:16
**manipulate** 60:23
**manner** 186:18
**mara** 10:2
**marc** 9:20 12:9,18
**march** 57:13
166:5,14,19,24
167:25 168:22
173:23 174:1
**mario** 7:22
**marion** 11:9
**marissa** 85:21,21
**mark** 7:15 8:2
9:12 11:2 179:1
**marked** 210:11
**marker** 60:12
**market** 42:2
44:12 45:2 46:23
46:23 58:11,11
61:23 62:1,3 63:9
63:11,23,23,23
64:2 114:11
122:21,24 123:5
170:5,5,8,16
176:8 185:2 192:2
192:5 193:21,23
**marketed** 184:17
**marketing** 48:9
48:25 49:16 52:16
57:7 68:4 105:5
107:3,7,9,15
108:1,2,21,22
112:8,21 113:1,10
113:14 121:18
170:7 171:18
173:16,19 176:1,3
176:4,5 184:11,14
185:7 187:7
189:14,20,23
190:6,10 191:4,6
191:10 192:9

195:1
**marketplace**
  29:11
**markets** 32:2
**markman** 9:1
**marshall** 3:12
  148:24 156:11
**martin** 13:6
**maryland** 3:16,17
  6:15,16 14:20
  94:4,20 97:11
  101:15 157:24
  158:6 199:13
  211:5,19 212:8
**mass** 40:3
**massive** 81:8
**masumoto** 10:9
**material** 67:9
  149:16
**materials** 72:7
  176:23
**mathew** 8:11
**matter** 1:5 16:23
  32:7 46:4 49:8
  82:12 118:6
  119:15 123:20
  146:13 150:22
  168:14,15,16
  186:16,18 199:10
  214:3
**matter's** 48:11
**matters** 49:12
  120:5
**matthew** 5:20
  8:14 217:1,3
**maura** 4:6 99:7
  180:13
**maxcy** 10:10
**mba** 139:24
**mcclammy** 3:14
**mccloud** 10:11
**mckesson** 4:16
  17:15

**mckinsey** 67:16
  67:18,23 68:2,13
  68:17,25 69:9,12
  69:15,20,23,25
  70:1,4 71:4,22,24
  72:24 73:6 104:23
  105:1,3,8 106:19
  106:23 107:8,16
  170:15 178:5
**mckinsey's** 70:19
  71:18
**mcnaney** 95:3,7
**mcneill** 10:12
**mcnulty** 10:13
**md** 3:19 6:18
**mds** 83:11,13
  90:15
**mean** 17:19 20:18
  21:24 22:5 25:12
  28:6,7,18,19,19
  28:23 29:10 30:20
  31:8 33:9 36:23
  37:15 39:20 40:12
  41:14 42:24 46:22
  48:19 53:9,10,10
  54:11,13 56:6,24
  64:25,25 82:5
  84:8 88:22 91:19
  100:25 102:15
  103:11,20,21
  104:6,11 105:4
  107:8,15 109:18
  109:23 110:19
  111:10,22 113:3
  116:13 128:25
  129:22,25 140:23
  143:13 154:14
  165:4 175:6
  185:15 186:1
  190:22 193:18
  194:19 197:20
  203:19 205:9
  212:13 216:20

**meaning** 166:2
**means** 30:8 40:6
  83:14 102:12
  104:1 172:17
  200:21
**meant** 36:2 51:17
  113:4 114:2
  132:15 154:24
  156:14 175:7
**mechanism** 83:4
**media** 191:15
**medical** 56:15
  81:23 132:7
  133:16 192:12
  194:3,7 201:14
  204:8
**medically** 80:25
**medication**
  112:22 133:3
**medications** 188:7
  188:8
**medicine** 43:11
  45:19 79:1 80:21
  81:14 122:7,7
  123:7,8,12 124:23
  125:1,5 131:3
  184:22 190:17
  195:6,9,18,19
  201:14 204:7
  205:21
**medicines** 43:3,5
  123:8,14 195:5
**meet** 74:11 76:9
  76:10 84:4 86:22
  89:13,14 96:20,22
  96:23 98:7
**meeting** 52:23
  69:25 70:8 71:21
  73:11 79:24 89:8
  95:5,18,23 168:24
  176:9,14

**meetings** 20:6,14
  20:18,20,21 21:6
  21:9,10,21 22:1
  69:23 84:3,19
  88:15,17 89:1,2,3
  89:4,4,18,22 94:8
  96:11 105:9
  150:16 151:15
  154:3,4 155:7
  171:15,16,17
  172:3 176:12,23
  176:24 180:1
**meets** 84:24 96:14
**megan** 11:17
**meises** 10:14
**melanie** 7:21
**melissa** 8:21
**member** 20:3,4,5
  22:25 28:10 37:8
  41:5 51:11,13
  53:3,13,20 129:8
  150:24 151:5,21
  165:22 189:25
  190:1
**members** 16:21
  20:21 21:3,5 22:3
  22:3,6,9,10 23:18
  23:19,19 24:4,5,7
  24:10 27:16 28:5
  30:2,18 31:3 33:2
  34:12 42:19,21
  58:22 60:8 62:16
  70:9 73:21 74:10
  76:9 77:22 82:19
  83:4,7 85:3 86:25
  88:25 89:7 90:2,4
  90:6 93:5 103:18
  108:25 111:3
  126:22 134:19,23
  135:22 136:20
  139:1 151:2
  152:14 154:4,12
  154:15 155:1

158:25 159:19
161:9,21 163:22
167:9 178:23
179:4 182:18
188:20 197:22
198:1,13 199:2
212:10,12
**membership**
91:14
**memo**  179:14,15
179:18
**memorandum**
178:25
**mention**  211:20
**mentioned**  46:12
46:14 52:13 143:1
177:17 180:23
211:16,24 219:2
**mentions**  46:20
**merely**  155:6
164:22,24
**meritless**  133:14
**merits**  212:4
**message**  107:18
113:25
**messages**  69:10
**met**  114:24 176:6
176:7
**methadone**
167:11
**method**  183:19
**mexico**  192:23
**michael**  7:3 8:24
10:23 12:2,25
**michele**  9:8 10:14
**microphone**
207:12
**middle**  91:13
182:15
**midsized**  29:21,21
**might've**  162:23
187:6

**might've**  37:16
**mike**  172:9
175:15
**milk**  46:6
**milking**  45:24
**miller**  10:15
**million**  33:22
117:15,18,21
**millions**  66:14
109:3 182:14
**mind**  29:19 30:10
124:10 164:11
184:25 218:8
221:6
**mindful**  127:15
**minds**  194:1
**mine**  91:5
**mineola**  224:23
**minimis**  48:11
**minimize**  43:16
**minimizing**  80:23
**minute**  18:24
59:11 68:7 99:11
105:24 107:25
131:11 173:13
174:7
**minutes**  148:19
148:19 199:12
213:16
**misbranded**  56:19
**misbranding**  57:2
57:10
**mischaracteriza...**
114:13
**mischaracterize**
120:3
**mischaracterized**
210:4
**mischaracterizes**
59:8 75:2 199:16
**mischaracterizing**
76:13 118:23

**misconduct**  58:6
59:1,3
**misconducts**  48:3
**misdemeanor**
126:5
**misdescribe**  120:8
**mispronounce**
172:9
**missed**  20:8 117:9
152:17
**missiles**  221:25
**missing**  87:3
**misspoke**  156:16
156:24
**misspoken**  162:24
**misstated**  41:13
208:15
**misstatements**
194:13
**misstates**  51:1
**mistake**  126:7
**mistaken**  54:22
**mistakes**  145:7
**misunderstands**
185:10
**misuse**  39:1,3
60:23 183:15
194:9
**mitchell**  7:4 9:10
**mitigate**  196:1
**mitnick**  10:16
**mix**  22:5 123:2
**mm**  47:14 90:20
**mmc**  49:7
**mnc**  22:23,24 23:2
23:5,22 24:4 42:3
161:7
**mnp**  22:19,21,22
23:2,5,5,18,22
24:7,12 160:2,4
161:7
**mode**  183:23

**modeled**  177:1
**molton**  10:17
**moment**  61:17
84:6 106:25
108:15 163:3
167:2 174:6
175:20 204:15
216:12
**momentarily**  18:9
**monaghan**  4:6
20:17 22:11 25:10
25:18 27:19,21
28:2,17 32:24
33:16,19 40:4,6
40:19 41:4 42:11
44:15 47:5 50:19
50:22 51:2 52:5
53:8,11 54:1,10
54:19,23,25 55:3
55:6,22,25 56:10
59:7 62:9 63:16
66:15,18,22 72:17
72:25 75:1 76:13
87:24 88:3,5
91:18 92:18,22
93:17 94:16 95:10
97:9,18 98:16
99:4,8,12,13,19
101:13 102:10,12
105:10,17,19,22
106:3,8,10 107:6
108:8 109:17,21
111:19 112:3
113:3 114:13
115:4,8 117:23
126:13,21,24
127:2 129:6,11
131:10,22 135:8
135:15 143:12,15
144:5,11,24
145:10,13,15,16
147:8,25 148:4
154:1,8,11,13,20

154:22 155:6,13
155:16,25 156:1
157:9,12,15 159:2
159:20 160:13,16
160:19 162:7,12
162:17,20,23
163:1 164:18
165:2,15 166:9,12
166:16,19 169:7
169:11,17,21
173:1,8,24 174:1
174:4 175:12
177:6 180:15,18
181:4,7 182:20
183:1,5 185:9
186:5 199:16
202:5 205:16
206:11 207:4,6
210:20 211:2,4,12
**monaghan's**
41:19
**monday** 215:1,9
**monetary** 110:4
**money** 27:24 28:4
31:18 36:14,15
48:11 82:11
118:20 119:3,10
136:15 138:19
140:19 152:22
153:14 182:17
189:5 203:13
**monies** 119:5
**monitor** 52:19
103:1
**month** 223:18
**months** 178:4
181:5,16
**moral** 196:14
**morning** 14:2,8
14:11 211:2,20,24
213:13,25 215:9
**morphine** 167:11

**mortified** 156:24
**mortimer** 3:4
14:15,22 15:10
16:7 17:5 18:7,17
19:6 33:3 62:5
73:15 83:14,15,17
83:19 95:8 96:11
99:11,13 101:25
125:24 130:14
134:11 141:20
146:18 148:22
156:14 163:6
173:15
**move** 45:6,8 76:21
77:16 93:14 94:13
97:6 98:10 100:23
101:4,5 118:1
120:10 133:25
169:5 186:21
200:16 202:15
**moved** 15:2 66:20
**movies** 193:4
**moving** 47:9
62:19 194:17
**mts** 85:21
**muha** 10:18
**multifaceted**
193:20
**multiple** 66:13
67:22,23 120:6
127:4
**mundipharma**
24:13 49:2,3,5,15
**murray** 10:19
**mute** 15:23
143:25
**muted** 99:9

**n**

**n** 3:1 4:1 8:18
14:1 224:1
**name** 14:19 19:23
26:12 32:19,22
71:3,8 91:23 92:7

126:1 134:13
142:24,25 171:21
172:9,14 179:20
197:16 204:2
**named** 32:13 61:1
61:4 71:19 77:22
164:22 178:22
**names** 77:23 78:6
**nann** 10:20
**narrow** 15:3,17
155:5
**narrowed** 74:8
**narrower** 203:4
**narrowing** 17:20
155:4
**nasal** 185:21
**nathaniel** 10:15
**national** 50:3,4,7
194:4
**native** 222:25
**nature** 180:8,24
216:25 222:12
**naïve** 182:12
**nda** 187:7
**near** 39:14
**nearly** 158:8
**necessarily** 86:24
**necessary** 112:21
113:10,17 213:24
**necessity** 217:15
**need** 15:16 16:12
16:25 22:14 37:1
44:8,13 47:6
50:12 59:23 63:3
80:23 81:14,16
97:25 102:17
104:21 109:10
127:14 138:9
141:5 143:20
153:2,20 157:12
190:17 195:17
201:13,14,14
202:14,21 203:9

209:24 210:16
216:7 222:17
**needed** 43:19
45:18,19 78:25
114:11 123:10,17
125:5 138:7
164:13
**needle** 208:9
**needs** 50:10
118:15 123:12
195:18 219:19
**negative** 175:1
**negotiated** 120:5
200:13
**negotiation**
218:22
**neiger** 10:21
**neil** 9:18 141:11
**nest** 94:19
**net** 116:21 138:12
153:16
**never** 34:20 35:5
35:5,6 63:3,6
81:10 86:7 113:22
116:16 138:9
140:10 165:12
180:3 185:16
204:7,23 205:1
214:22 221:6
**nevertheless**
86:15 178:2
**new** 1:2 3:10 4:4
4:11 5:4,18 6:11
22:24 36:22 37:16
37:18,19,19,22
46:10 47:25 48:8
74:2 90:7 93:19
111:22 114:1
120:24 142:14,17
142:21 170:13
175:3 177:22
**newly** 45:1

news 62:25 63:8,8
78:21 79:6 80:4
nic's 138:25
nicholson 10:22
nicole 11:7
nine 89:17 118:9
201:25
noking 35:23
non 6:9 45:6,9
64:21,24 107:20
110:4 131:2 138:4
139:2,10 149:21
165:23 202:16
218:16 219:14
nonfamily 24:4
normal 75:20
76:2
norms 33:23 34:2
note 56:2 172:24
217:7 223:15
noted 156:21,21
notes 170:1,24
171:2
notice 130:8,15
noticed 131:6
notified 68:10
novel 110:23
117:10,11,11,22
november 89:20
89:21 142:7
169:19 170:1
184:8
nuanced 182:13
number 20:25
21:25 22:22 38:14
39:13,19,19 44:8
54:18 66:7,17,24
67:13 72:9 87:20
87:21 90:16,24
94:3,19,23 98:16
98:20,24 104:1,1
135:17 137:3
138:22,25 149:20

150:3 158:9,17
159:18 162:5,6,15
163:14 166:6,6
167:9 170:2
173:20 174:9
180:16 188:1
199:6
numbers 109:5
211:21
number's 27:14
numerals 170:4
170:18
numerous 117:7
136:8 145:6
ny 1:14 3:10 4:4
4:11 5:4,18 6:11
224:23
nyu 139:24

o

o 1:21 14:1 18:17
224:1
o'neill 101:22,23
102:1,14,18,19
105:16,20 106:13
106:14 107:8,10
108:11 109:19,22
111:21,24 112:5
113:4,7,8 114:21
115:6,9,25 116:1
118:1,4 120:3,12
125:19 137:23
139:4 187:15,16
187:19
oath 205:10,11
obaldo 10:25
object 20:17
27:19 40:20 41:13
42:11 47:5 50:19
52:5 54:1 75:1
91:18 92:18 97:18
102:10 109:17
111:19 117:23
119:24 205:16

objected 17:19,24
objecting 118:9
135:8 217:14
222:24
objection 22:11
28:17 40:4,19
44:15 51:2 53:8
59:7 63:16 66:15
72:17 93:16,17
94:15,16 97:8
101:11,13 107:6
108:8 114:13
115:4 130:8,15
133:21 143:12
144:11,24 147:8
147:25 151:6,10
151:12 154:7
159:2 185:9 186:5
199:16 205:25
206:11 216:25
objections 16:19
17:20,23 133:9
202:8,11 216:21
objectives 76:7
objectors 215:8
215:10,24 216:17
216:22 217:23,25
220:21
obligated 153:17
153:19 188:13
207:2
obligation 152:24
obligations
116:10 188:16
observation 168:6
observe 180:1
observed 178:25
179:4
obviously 39:7
148:9 149:20
154:14 180:10
201:8 212:17
221:13

occasionally
21:24 78:6
occur 15:5
occurred 51:14
53:20 57:5 78:12
161:13
occurrence 22:1
occurring 42:9
177:25
october 35:13
53:11 95:3 164:7
166:12 180:20,20
oer 170:5,8
offended 204:18
offer 57:17 203:3
offered 57:13
offering 74:9
195:23 222:15
offers 34:12
offhand 33:9
office 3:16 6:15
52:15 99:21 111:7
112:15 128:23
158:19,19 201:25
216:11
officer 204:9
offices 49:4 65:16
193:16 221:14,19
official 91:23
ogier 95:14
oh 17:12,25 40:14
96:7 98:2 106:2
142:13 171:9
172:22 180:18
207:12 216:19
221:6
oig 52:19,24 103:1
111:6
okay 14:2 15:6,15
16:4 17:3,8 18:3
18:17,20 19:2,4
20:11 22:3,16
23:7,8 24:12,24

25:4,8,9,18,25
26:10,18 27:4
28:2,4 29:1,14,18
30:1 31:17 32:6
32:10,14,15,21
33:13,19 34:8
35:8,10,20 36:5
41:20,25 42:16
43:2,21 46:12
47:8 48:7 49:2,14
49:20 51:13,20
53:3,12 54:7,8,23
55:7,9,21 56:6,21
57:1,11,23 58:9
60:2,5,10,16,19
61:1,2,17,17 62:7
62:13,14 65:19
66:22 67:12 68:21
69:11 71:14 72:25
73:9 75:24 76:10
77:7,20 79:2
82:10 83:9,12,24
84:3,15,23,24
85:2,14,21,24
86:2,11,15 87:8
87:15 88:6,8 89:9
89:25 90:9,14,21
91:12 92:4,10,14
93:8,12,16 94:7
94:15,18,23 95:1
95:15,17,23 96:2
96:9,10,24 97:3
97:16 98:12 99:1
100:9,22 101:14
101:17,17,24
102:2 103:14
104:20 106:1,6,19
108:14 109:7,21
114:22 115:8,19
118:3,8 120:9
125:20 126:7,12
127:2,17,24 128:3
128:16 129:16

131:6,13,18,24
132:22 134:2,4,6
134:15 135:15
136:15 139:16
140:2 141:8,16
142:6,20 143:9,20
144:1,6,17 145:8
145:23 146:14
147:23 148:15,21
150:8,13 153:7,22
153:25 154:8
155:9,13,18 156:4
156:7,22 157:20
157:23 158:1,6
160:15,19,20
161:21 163:1,17
163:20 164:8,14
165:11,17,18
166:20 168:1
169:6,11,13,15,24
172:18 173:5,25
174:4,12 175:10
175:23 178:11
180:5 181:23,24
183:10 187:10,13
187:21 189:8
197:8,14 201:19
201:21 203:15,18
203:23 204:5,16
204:19,25 206:24
206:24 207:4,7
209:25 210:13
211:1,14,25
212:13,22,25,25
214:20 216:9
217:18 218:1,7
220:25 221:20
222:3
**oklahoma**   117:13
**old**   57:5 121:4
224:21
**once**   63:14 173:20
174:6 181:7 207:1

**ones**   26:10 87:12
118:21 122:16
123:24 211:23
**ongoing**   86:19
91:8 170:14
173:21
**opc**   179:10
**open**   32:13 35:8
61:18,19 94:24
96:4 162:3 169:6
220:7
**opened**   73:16
130:10 146:10
**operate**   83:3
**operates**   95:24
**operations**   178:24
**opiate**   188:8
**opine**   81:25
206:12
**opinion**   30:19
35:22 45:23
**opioid**   38:9 39:1
39:11 44:22 45:7
45:10 46:15,22,23
50:2,6 52:3 57:21
63:10 64:7 81:4
81:11 107:23
110:12 113:15,18
121:21,24 123:1
124:2,21 129:18
132:19 140:14
153:21 156:15
157:3 177:19
189:14,20,23
191:16 192:19,19
192:24 194:23
196:12 219:14
222:16
**opioids**   25:25 26:6
26:8,11,13,20
27:2 36:19 38:2,4
38:10,10,16,21
39:2,6 40:3,7,9,17

41:6 42:2,5,9,15
42:22 43:3 44:1
45:3,6,9 46:8,13
46:20 47:17 48:25
49:5,16 52:4,4,11
57:15 58:11 62:19
64:18,20,24 65:5
65:7 67:4,7,10,20
68:4 70:2,5 79:8
81:7,21 82:11
107:20,21 108:3
113:6,7 115:15
119:19 122:22
123:5,16 167:11
183:12,14,15
190:6 191:7 192:3
192:5 193:11
195:1
**opportunities**
71:18
**opportunity**
74:10,11 168:4
201:15
**opposed**   108:25
220:4 221:5
**opposite**   35:1
125:2
**optimal**   203:7
**optimistic**   213:21
**option**   70:16
**oral**   185:23 186:1
186:12 188:7,8
209:3 215:3 216:7
218:17 219:9,18
220:4
**orally**   186:1,7
**order**   15:22 17:4
17:23 79:5 93:24
107:19 122:13,18
215:20 218:21
**organization**
73:12 74:23 75:21
77:3 154:23

organizations 124:7
organized 215:7 217:12
orient 98:19 189:13
original 98:15,25 99:22
originally 129:24
otr 183:24
outcome 220:22
outline 84:14 172:25
outlines 85:16
outside 20:20,25 21:5 24:1 30:14 30:23 56:15 61:14 90:4 120:6
overall 54:14 63:22 108:23 109:1 187:25 207:20
overdose 38:6,9 39:20 50:6 52:7 52:11 124:2,3 191:9 192:19
overdoses 38:9 39:11 45:5 107:23
overlap 24:3,11
overlapping 17:11 24:3 217:24
overnight 222:8
overrule 151:12
overseeing 52:16
oversight 52:25 178:24
overt 128:15
overview 168:5
owe 28:7
owed 28:8
owned 23:10 24:18 27:9 29:22 29:22 31:10

owner 25:2 42:8
owners 28:7 29:6
ownership 25:13 25:15 29:5 140:25 198:23,24
owns 24:14,19
oxycodone 65:8 65:10,13 168:14 168:15,17 184:3
oxycontin 26:11 45:1 46:13,21 60:21 62:1,19,23 63:2,13,15,21 64:3 67:6,13 69:3 71:19 78:22 80:2 80:7,13 81:8 107:22 113:11,22 113:24 122:2,22 123:4,6 131:1 133:15 143:4,6 144:10 170:3,5,8 170:13,15,16 177:24 183:12,20 184:12,15 185:23 185:24 186:6,12 186:13
ozment 5:8,13 125:20,22,25 126:1,13,15,23,25 127:8,18,19,20 128:12,14,17,22 129:10,12,21 130:7,20,22 131:14,25 132:3,4 132:23 133:1,13 133:19,25 134:3,5 203:21,21,24 204:1,2 205:19 206:1,4,18,22
o'neil 10:23
o'neill 10:24 197:6 208:14,24 208:25 209:20

210:3,7

**p**

p 3:1,1 8:25 9:5 13:5 14:1
p.c. 5:15
p.m. 72:14 168:23
pack 135:9
package 44:23 63:21 77:22 79:13 79:13 113:21
packaging 131:5
packet 32:7
page 32:23 35:12 54:9,10,11,13,14 54:18 55:1,2,4,13 60:12,14,14 61:20 61:21 62:12 77:18 84:21 85:15 91:1 91:12,13 126:14 130:7 132:7 149:20 162:18 163:10,10,11,20 164:17,18,19 167:7 171:22 174:9,13 180:10 180:12,25 183:4,5 183:11
pages 55:11 56:9 60:11 149:7,19 167:4
paid 117:15,18 140:20 188:17
pain 43:4,6,12,13 81:15 109:9,16 112:22 122:3,4 123:11,14 124:24 124:24 132:18 184:5 195:7,7,7,7 195:8,10,17,21 196:2,5,7
painful 123:17
pamela 12:17

panel 114:24 115:13,14,18 187:24 188:1,5,6
paper 16:25 32:12
paragraph 33:14 33:16 36:6,24,24 37:3 46:18 56:10 60:20 61:22 62:18 65:23,24 66:1 71:14,23 72:13,18 73:18,19 78:9 104:19 106:15 164:15,17 173:11 173:12 178:19 180:24 181:4,12 181:14,15
paragraphs 55:10
parallel 65:2
paris 11:17
park 5:10
part 43:8 50:24 58:19 63:8 65:23 69:21 87:3 115:21 116:3 117:16,16 133:21 151:19 161:13 172:3 184:6 188:11 191:1,20 195:3 197:5 208:6 209:23 210:1
participate 20:14 176:13,25
participated 20:6 42:20 69:24,25
particular 55:23 114:18 154:23 182:6 192:11 193:16
particularly 31:3 218:21
particulars 188:5
parties 14:9,16 120:6 137:17,20

198:20 199:11
201:25 210:21
215:15,18,21
218:14 219:3,4
220:14,16 221:4
**partnerships**
29:23
**parts** 194:17
**party** 139:10
202:2 219:8
**pass** 29:5 54:3
**passed** 23:23
**passing** 209:9
**passionate** 215:15
**passive** 164:23
165:21
**passively** 164:24
**patch** 46:16
**paths** 44:6
**patient** 127:7
128:1,7,9 132:7
133:2 195:24
204:11,21 205:6,7
205:10,15,23,24
206:6
**patient's** 132:22
**patients** 43:7,18
43:19 45:6,8 62:4
63:25 80:23
123:17 129:4
170:13,14 184:5
186:6,8 190:17
194:3,5,5 195:17
204:9 205:12,20
206:8
**patients'** 195:10
195:21
**patient's** 206:5
**patrick** 10:10,23
**paul** 3:18 6:17
12:1,7,8 216:10
**pay** 30:9 46:25
140:13 153:10,17

**paying** 28:8 29:9
49:4 116:12
117:21 201:16
**payment** 116:10
**payments** 27:22
57:14,17,18,19
191:20
**pdf** 54:9,10,15
**peacock** 11:1
**peer** 33:23 34:2
**pending** 172:21
**penetrated**
181:19 182:10
**penultimate** 167:7
**people** 38:3,8
39:10 43:3,12
45:20 63:3 64:1
78:23,23 79:12
105:11 122:2,4,11
123:10,21 124:8
124:11,15 126:9
128:1 130:17
133:15 135:4
136:22 149:2
156:13 167:13
196:5,6,19 197:4
198:6 199:4,7
201:3,12,13
202:13 203:9
204:12 209:3
215:16,18 216:1,7
221:10 222:16,21
223:5,8
**people's** 220:17
**percent** 39:1
106:20 170:13,14
185:24 193:11
**percentage** 186:6
**perdue** 128:8
**perfect** 155:10
209:10
**perfectly** 187:11
207:23

**period** 24:2 26:22
30:6 37:5,17,25
40:1 42:23,25
52:8 59:17 81:18
95:23 121:14
149:13,23 152:25
153:3,18,20
159:17 176:1
**periodically**
154:15
**permissible** 203:2
**permission** 15:2
**permitted** 184:19
**person** 21:8 127:8
127:8 129:9,17
142:23 143:17,18
143:18 144:8
176:5 196:24
**personal** 32:3
116:10,20,21,24
117:5 121:21
123:20 125:17
133:22 137:23
138:12 147:24
148:7 180:8,23
188:17 189:1,2,5
**personally** 90:5
109:13 115:21
116:2,12 138:16
138:20 147:2,13
148:9 205:1
**personnel** 75:25
**persons** 130:10
220:10
**perspective** 40:24
132:22 182:17
203:11,12 217:15
**pertains** 132:25
**peter** 7:23
**pharma** 1:7 4:9
14:3 19:9,21
20:16,22 21:20
22:10 23:20 24:6

26:14,18,19 27:8
36:3 42:8,17,21
50:13 51:3,4 53:5
53:14,18 55:16
57:13 59:4 106:8
109:12 110:16
113:1 117:12,15
120:13 121:17
156:6 158:8
163:23 169:25
171:14 176:2
189:9,14 190:5
196:22
**pharmaceutical**
24:15 25:22 26:3
26:4,7,11 29:10
29:20,21 30:24,25
31:6,14 34:16
85:10 87:6 93:9
152:24 153:17
156:16 204:21
**pharmaceuticals**
157:4
**pharmacists**
62:21
**pharma's** 26:20
**philanthropic**
85:12 86:10 93:10
**philanthropy**
47:2,5 83:6,6
87:14 96:23
**philip** 7:2
**philosophical**
130:12
**phone** 21:8 220:7
**phrased** 208:17
**physical** 184:22
185:18,19
**physician** 79:7
131:2 132:7,17
205:11,19,20
206:6

physicians 43:6
43:18 66:18 69:10
78:25 80:22
113:23 114:1,4
picking 169:4
picture 196:18
piece 81:9
pieces 194:17
223:12
pile 126:8
pill 143:4,7
pills 185:22
pillsbury 6:8
pinpoint 63:6
pipeline 44:12
64:13
pittman 6:8
place 3:18 17:2
37:19 89:19
151:15
plains 1:14
plan 14:5 17:19
17:22,24 37:10,13
37:19 77:3 118:10
118:12,19 120:3
121:11 130:9
133:21,21 134:17
134:20 136:16,23
137:9 138:4 139:2
139:5,6,9 140:20
140:24 175:3
191:19,20,25
197:18 199:5,9
220:11 222:24,25
planning 76:5
168:7 171:18,18
171:19 182:4
189:4
plans 77:2 80:19
plan's 200:17
platform 58:2,7
58:10 64:8,19

plea 51:25 52:17
58:19,20 82:5,8,9
126:12,14,17,18
126:18,24 127:11
127:22 128:25
129:9,24
pleaded 47:16
50:16 51:5,15
53:6,18 55:16
56:23 57:1,23
58:6 59:6 81:19
82:3 161:12
pleadings 212:7
221:25
pleas 47:24 48:3
57:4 127:9
please 18:11
32:12 33:13 47:3
54:5 60:3 61:23
62:7 90:12 94:25
110:13 157:8,9,17
168:3,5,20 169:16
174:24 204:17
pleasures 175:22
pled 81:24,25
111:13,15 112:7
161:18 206:7
plevin 11:2
plimpton 4:1
plummeting
52:11
plus 140:25
pm 223:21
pod 169:9
pods 169:10
pohl 11:3
point 15:23 23:24
28:23 44:7 52:2
52:21 58:13,14
75:15 80:11 86:18
100:3 113:19,24
113:24 114:6
120:10 133:7

146:8 155:19,23
156:12 159:14
178:18 194:22
195:4 207:9
208:18 209:14
219:19,24,25
pointed 44:16
poised 177:22
policy 112:10,10
112:11 114:12
polk 3:7 14:13
148:25 156:11
208:12 213:17
216:15
porter 11:4
portfolio 136:4
portion 55:25
63:5,6,7
position 31:24
34:13,24 35:2
38:24 87:1 122:8
126:6 140:17
167:10 206:12,18
positions 75:11
76:11
positive 178:3
190:12
positively 203:7
possibilities 194:6
possibility 15:2
possible 39:18
45:20 53:1 66:4,6
78:7,8,14 109:6
116:18 121:5
138:8 170:15
183:23 203:22
220:22 222:5
possibly 89:6
190:12 221:23
post 78:12 187:7
potential 121:7
potentially 79:7
213:12 214:10

pound 182:25,25
power 102:7,13
103:7,9
powers 102:13
ppl 72:7,10
pplp 83:10 87:20
88:2 90:17 94:10
94:24 96:3 98:20
99:5
pplpc 172:23
pplpucc 180:6
practice 58:3,16
74:7,9
practiced 204:7
practices 50:17
56:16 79:16
practicing 205:21
pre 48:18
preceding 36:24
precise 26:3
precisely 100:19
predominantly
24:4
predominately
83:5
prefaced 57:20
prefer 167:23
preis 11:5
prepared 171:16
prescribe 43:6
63:25 80:22
190:16
prescribed 49:5
78:25 131:2
132:10,17 133:3
prescribers 62:20
77:24 78:7 106:21
108:3
prescribing 57:15
67:13 79:7 80:12
81:22 104:4 105:6
107:4 108:2

[prescription - protect]                                                     Page 36

**prescription** 38:5
38:21 39:2,3,6
43:2 46:23 52:4
52:11 56:17,17
63:10 78:18 81:4
81:7 132:8 133:15
133:24 177:16
193:21,22
**prescriptions**
52:10 57:21 79:9
81:22 104:1
106:21 107:20
132:14 177:23,25
192:14
**present** 6:22 26:1
40:10,11,15,15
103:17 168:5
218:10
**presentation** 70:8
70:22 80:3 106:23
169:19 170:1
171:10,10
**presentations**
78:8 171:13,16
176:22
**presented** 20:12
34:21 71:4 79:23
108:18 166:3
218:18
**presenting** 217:22
217:24
**presents** 223:3
**presided** 223:3
**president** 19:22
20:1 50:3,5 51:18
74:5 76:11 158:16
171:25 174:21
176:4
**press** 11:6
**pressures** 174:24
175:7,8,9
**presumes** 27:22

**pretense** 210:4
**pretty** 21:1
128:12 166:1
**prevent** 79:10,12
**preventing** 187:2
**previously** 50:14
50:16 200:18
**prey** 11:7
**primarily** 177:25
**principle** 16:9
**prior** 57:5 69:7
71:9 112:8 208:12
**privately** 29:22
31:10
**privilege** 204:21
**priya** 7:6
**proactive** 221:15
**probably** 22:5
91:3 119:2 166:15
171:17 211:16
221:18
**problem** 39:22,24
40:2 81:12 124:4
124:11 127:13
129:13 183:13,14
183:16 193:5,10
**problematic** 57:7
**problems** 111:9
128:11 145:7
192:16,19,20
**procedure** 210:15
**procedures** 83:24
130:16 133:22
**proceed** 17:5
**proceeding** 118:6
127:16
**proceedings** 1:12
223:20 224:4
**proceeds** 138:24
**process** 23:25
218:24 219:20
**produce** 194:12

**produced** 166:4
168:12 170:23
193:12 195:15
196:21
**product** 43:10,17
46:16 63:4 64:2,4
65:13 80:9 82:13
109:9 122:2
123:22 132:10,16
171:19 177:19,20
178:14,14 183:24
183:25 184:4
185:8 187:9
190:16 197:3
**productive** 175:1
221:8
**products** 36:22
43:2 44:1 45:4
46:10,11 57:22
62:25 64:3 65:4,5
65:6,15 79:8
104:8,9 109:16
113:18 114:11
132:9 192:24
196:21,21 223:5
223:13
**professional**
56:16
**professionals** 90:5
**profitability**
29:25 170:11
**profitably** 170:8
**profits** 60:20,24
82:15,18
**program** 70:23,25
71:6 104:23
**programs** 37:22
70:4,7,17,22 81:5
170:7 193:4
**progress** 71:18
208:9
**prohibited** 185:3

**project** 65:9 81:8
178:4
**projected** 44:5
**projecting** 170:6
**projection** 61:25
**promote** 65:14,18
67:4,5 80:18
**promoted** 67:7,10
**promoting** 37:7
46:5,8 123:1
**promotion** 36:21
37:21,21 47:17
65:20 103:15,23
107:15 113:15,17
**promotions**
103:19 104:4
**proof** 185:15,16
216:21
**proper** 30:21,21
45:6,9 199:11
206:20
**properties** 44:25
69:4,6 113:23,24
184:22 185:18,19
**property** 142:20
142:24 143:2
**proportion**
186:15
**proposal** 36:2
215:4
**proposals** 61:15
104:12
**proposed** 70:5
88:25 116:3
170:10 175:2
188:18 190:1
202:2 218:21
**proposing** 190:4
**pros** 114:5
**prosecutors** 49:4
**protect** 86:22
200:9

**provide** 16:11
59:21 67:18 68:3
170:9,14 174:25
201:8,11 210:23
220:16
**provided** 172:8
176:23
**providers** 56:3
57:15,19,21 67:1
67:3
**provides** 201:2
**providing** 17:21
**provision** 109:15
139:4,9 140:3
200:17
**provisions** 139:6
**public** 30:7 38:19
130:13 137:15
149:21 182:16
**publicly** 29:22
126:7
**pull** 18:7 54:5
60:3 72:6 83:9
87:19,20 175:11
188:3
**pullman** 6:1
**purdue** 1:7 4:9
14:3 19:9,21
20:15,22 21:19
22:10 23:20 24:6
25:22 26:14,18,19
26:19 27:7 28:7
29:12,19 30:12
31:14,19,25 34:7
34:20 36:3 40:22
42:7,15,17,21
43:1 44:23 47:3,3
47:12,15 48:2,15
49:22 50:13 51:3
51:4 52:16,25
53:5,14,18 55:16
56:13,23 57:1,13
57:21,23 58:2,10

58:15 59:4,6 60:1
61:4 62:16 65:24
66:8,25 67:18
69:2 70:1 71:5
81:2,5,19,20,24
82:11 102:7,8,20
103:4 109:12
110:15,21,22
111:13 112:22
113:1,18,22
116:17 117:12,15
118:25 120:13,15
121:15,17 138:9
140:10,13,16,20
140:25 149:8,22
150:21 156:5
158:7,13,16,19,25
160:1 161:12,18
163:23 164:1,6
169:25 170:23
171:13,14 172:1
173:16 176:2
177:19 178:13,23
178:24 179:8,10
184:2,11,13,13,14
185:7 189:8,14,23
190:5 196:21
197:3 201:1
204:20 206:5,7,17
208:12
**purdue's** 46:20
48:25 55:18 56:2
57:15 60:20 61:5
67:13,15,19 68:4
70:5 71:17 73:22
79:19 107:7,9,13
108:2 110:8 114:9
181:10
**purdue's** 44:1
**purpose** 15:3
56:15 63:1 67:23
78:21 90:3 107:15
125:1 128:21

**purposes** 15:17
16:22 60:23 170:6
189:4
**pursuant** 211:17
**pursue** 22:15
34:20,23 70:11
**pursued** 107:17
**pursuing** 34:23
70:24 111:6 150:9
**put** 37:19 40:10
45:16 59:9,10
61:18 62:7 79:10
80:4 83:2 84:12
98:9 99:21 124:23
130:20 169:14
223:10
**puts** 120:24
**putting** 44:5
81:20 98:7
**puzzle** 194:17
**pwg** 166:6
**pwg004483596**
32:13

**q**

**qualification**
107:11 212:8
**quality** 131:8
194:7
**quantification**
174:25
**quarropas** 1:13
**question** 21:2,3
22:15 27:21 29:17
37:9 39:9 41:4,6,9
41:10,18,25 42:13
44:4,18 46:22
50:19,24 59:13
63:17 64:14,15
65:20 74:19 75:3
76:15,23 102:14
107:1 108:7,9,10
110:19 111:25
115:5,23 125:18

127:14,21,22
128:15,25 129:1,7
129:17,23 132:6
133:4 138:19
143:21 144:17
145:2,3,18 147:16
148:3 151:14,20
152:21 153:3,5,15
154:10,23,24
155:4 159:5
160:25 165:21
168:20 171:8
172:20 178:17
182:7 183:11,19
187:14 190:7
193:7 195:22
196:9 199:20,22
200:5,16 202:5,25
206:14 208:17,22
209:1,5
**questioned**
212:16
**questioning** 36:18
37:5 74:21 120:11
128:21 218:9,14
220:3
**questions** 15:4
25:5 41:16 84:16
101:19 102:4,5
103:14 104:13
108:15 109:7
114:22 115:19
118:21 120:7
125:19,21 126:11
126:17 127:10
130:11 134:9
141:7,13,17
146:16 148:19
155:13,17 162:1
165:24,25 166:1
172:6,7,19 176:12
176:24 187:12
196:10 197:6,9

202:19 203:15
204:4 209:13
**quinn** 11:8
**quirk** 11:9
**quite** 40:25 63:11
169:10 176:10
196:8 207:17
208:17 213:21,24
214:11
**quotation** 179:1
**quote** 179:5,18
**quoted** 39:6

**r**

**r** 1:21 3:1 4:13
10:12,25 14:1
18:17,18,18
157:21 224:1
**rachael** 11:12
**rachel** 10:25
**raise** 18:11 52:20
111:9 153:10,14
157:8,16 223:14
**raised** 71:22
202:8 219:5,12
220:3,9,13
**ran** 74:7 77:5
**range** 29:24
**rapidly** 63:11
**rare** 173:18
**rate** 170:6
**ratio** 196:2
**raymond** 23:23
**rdd** 1:3
**reach** 17:17 59:20
119:5 145:8,20
176:12
**reached** 16:8 18:8
59:19 60:7 143:9
143:19 189:17
211:18 214:14
**react** 217:9
**read** 20:11 35:1
38:14 44:3 57:12

73:9 82:3 88:5,9
139:9 142:3 152:8
152:9,10 167:21
167:23 170:25
175:17 176:22
178:22 180:6,16
181:14 198:17
200:17 206:16
209:13 218:3
223:11
**reading** 91:2,3
100:9 143:10
**reads** 183:21
**ready** 180:11
181:3
**realities** 44:12
127:15
**really** 15:20,20
16:1 19:24 23:24
43:12 59:24 71:10
73:12,13 75:15
76:19 80:19 81:13
81:14 83:3,6
84:13 86:8,8
87:11,13 124:5,8
127:6 131:8,8
132:23 133:9,14
146:4 160:24
164:10 165:5
176:14,18,19
183:21 189:3
190:18 193:1,19
194:18 199:10
200:14 206:14,15
206:20 209:23
210:20 217:9
219:24
**reason** 33:11,25
59:20 66:5 78:3
149:15 164:13
168:21 170:17
171:2,3 172:10,12
178:7 223:14

**reasons** 189:22
190:3,5,18
**recall** 15:16 20:23
22:22 23:3 24:2
31:8 33:9 37:15
37:17,24 39:17
44:22 46:14 48:5
48:12,18,22,23
49:1,2,5,6,9,14,17
49:19 51:19 52:22
55:20 57:3 62:15
62:16,22 63:20
64:25 66:1,6,24
68:19 71:16,20,21
71:23 72:1 74:20
77:11,25 78:1,2
78:15 87:12
103:20,21 106:19
106:22,25 107:2
107:16 108:9,12
108:24 109:5
112:23 120:15
121:5 127:23,25
128:2 141:25
142:6,8,13,24,25
142:25 143:5,6,7
143:9,11 144:8
145:6 146:23
152:9,10 168:18
169:3 171:11
172:13 176:11,14
187:3 188:6
189:14 199:12
200:3 213:12
**recalling** 15:2
**receive** 35:16 72:3
101:3 104:3
164:24 171:13
172:11 206:10
**received** 14:8
31:22 32:9 33:8
33:11 48:14 69:2
77:22 82:11 98:13

98:14,14,25 99:15
107:3 108:1
109:13,14 132:8
162:2 223:8
**receives** 118:20
**receiving** 71:23
79:11
**reception** 207:21
**recess** 106:7 156:3
**recipients** 164:23
**recitations** 156:23
**recognize** 196:14
**recollection** 38:2
70:10 71:12 79:4
164:6,9,10
**recommend** 75:18
**recommendation**
75:7,12 113:12
114:19
**recommendations**
23:9,12,14 67:19
71:4 92:14 160:5
160:7
**recommended**
73:13 74:16 86:20
91:9
**reconnect** 131:17
**record** 14:10
17:15 41:3 91:19
93:15 127:4
151:20 156:5,11
156:25 177:24
180:7 197:11
208:19 209:7,17
209:18,19,22,23
209:23 210:2
211:21 222:9
224:4
**redirect** 46:9
**reduce** 45:5 81:4
81:6 115:16 188:8
191:7 208:22

**reduced** 115:1
187:25
**reducing** 107:23
125:6 190:11
**reduction** 185:17
191:4
**refer** 25:14 60:19
64:14 124:3
174:25 199:19
203:10 209:3
**reference** 37:15
78:15 100:3
143:16 181:13
200:8 217:23
**referenced** 62:18
72:13 94:2 144:9
**referencing**
147:25 199:14
**referred** 63:10,19
64:6,7,9,10,10,11
179:14 183:24
208:21
**referring** 25:13
34:2 36:17 48:6
54:20,21 66:16
72:18 74:15 75:23
97:15 103:24
108:13 126:13
218:4 220:25
**refers** 101:7 105:1
105:2 182:14
**refine** 102:17
**reflect** 170:24
**reflecting** 212:2
**reflects** 163:22
170:25 222:12
**reformulated**
60:21 63:21 67:5
69:3 78:22 80:6
113:21 184:11,14
185:24 186:13
**reformulating**
80:9 81:7

**reformulation**
63:1 78:12 80:1
183:24 186:7,24
187:1
**refresh** 38:1
**refreshes** 164:6
**regard** 71:11
209:15 214:15
**regarding** 67:19
68:3 99:18 128:23
**regards** 62:4
73:14 182:5
**region** 77:23,23
78:4,8,16 79:2,10
79:17,25 80:4
**regional** 78:17
**regions** 179:11
**regular** 20:20
21:6 22:1 89:21
**regularly** 20:6,8
61:5,9 89:13,15
**regulate** 192:13
192:14 194:8,12
**regulated** 38:5
**regulatory** 49:15
49:17,21,24,25
194:1,14 195:25
**reinvest** 30:25
31:13
**relate** 55:18 126:5
**related** 16:21 48:9
49:10,15 53:19
61:6,9,11 119:19
121:11 140:14
219:14,14 222:7
**relates** 56:2
**relationship**
128:1,8,23 168:10
195:24 204:22
205:2,6,6,22
206:6
**relationships**
204:11

**relative** 150:20
**release** 61:24
65:10,12 120:25
134:17 135:24
137:17 139:4,9
184:4 197:17
198:15 200:17
219:6
**released** 127:12
135:1 136:23
139:19 198:4,20
199:5,9
**releases** 17:21
118:20 119:15,18
119:25 120:6
121:10 134:20,23
137:20 139:11
197:23 198:1,18
199:11 200:22
202:2 203:1,4,6
219:12,13
**releasing** 122:6,7
**relevance** 205:25
206:2,13
**relevant** 220:16
**relief** 121:13
196:3 206:9
**relieve** 43:6,12
109:9,16 122:2
124:24 197:4,5
205:12
**remain** 42:8
213:21 218:19
**remained** 53:3,13
53:17,20
**remaining** 14:17
23:23
**remark** 209:9
**remember** 19:15
48:8,10 62:21
69:22 71:9 77:12
78:6,13 92:7
109:10 138:1

139:7 140:8,11
142:19 149:2
170:19,19 171:6
174:12 175:5,5,6
175:17 178:8
182:1,2,2 187:8
190:4,24 199:15
**remind** 84:6
176:15
**reminder** 214:25
**remotely** 130:18
**remove** 99:24
145:13 220:10
**rendering** 56:19
**repeat** 87:21 88:1
110:13 128:10
**repeated** 52:17
**repeatedly** 45:3
47:20 67:1,4 81:1
81:1 102:25 111:4
112:14
**rephrase** 97:22
117:24 186:10
199:22
**replaced** 97:25
**replacing** 81:8
**replied** 168:13
**replies** 35:13
**reply** 72:23 168:2
**replying** 101:8
167:22 216:21
**report** 73:12
77:13,14 78:5
92:16 105:8
107:14 108:13
149:6,11,15,19
152:8,11 170:15
**reported** 48:12
63:13 75:11 77:6
200:12 214:9
**reporting** 62:22
70:19 78:20
106:19

reports 20:11
48:14 52:18 61:6
61:8,9,11,14 75:9
79:6 105:3 177:16
represent 126:1,3
128:3 134:14
167:4 197:16
204:2
represented
175:19
representing
99:20 145:10
reps 66:9,25
repurchases 34:5
request 14:4
114:20 170:25
215:20
requested 113:13
require 30:12
31:11 80:25
133:22
required 30:16
34:7 108:16
191:23 203:6
requirement
187:6,8
requirements
50:1 187:4
reread 82:2
research 39:4
reserved 92:24
resigned 19:11
53:5,9 158:24
resolution 14:17
200:24 201:4
217:11
resolve 58:25
213:23 217:17
218:25 222:7
resolved 17:20
213:19,21 214:10
resolving 221:12

resources 196:16
196:17,17,17
201:2,8,11 202:12
203:8
respect 14:17
16:15,20 25:1
28:13 49:21 126:8
130:10 138:19
149:16 151:25
170:12 202:18
214:24 219:5
respond 193:9
responding 72:12
154:6
responds 35:18
response 17:9
37:22 41:19 72:5
72:5 73:3,5,9
151:14 172:6,7
202:16
responsibilities
19:24,24
responsibility
51:8,10 121:21
122:9 123:3
196:11,13,15
responsible
133:10,11 191:14
191:16
responsive 202:16
rest 70:9 122:22
214:5
restate 151:19
restructuring
23:21,25
result 52:3 57:10
80:10
resulted 57:9
106:20
resulting 48:1
51:23,25
resume 155:24

retain 67:18
retaining 170:14
retains 125:16
retention 51:9
73:22
retire 36:12
return 36:16
103:18
returned 67:3
revealed 200:12
revenue 26:20
27:1,4 44:6
revenues 82:14,15
reverse 37:2
43:25 44:9,14
63:15
review 93:4
169:24 170:4
174:10 216:13
217:9,13
reviewed 61:8
68:22 71:1,2,10
72:1 126:12
reviews 104:13
revision 219:18
rhode 141:12,15
rhodes 65:3,4,12
ricarte 11:10
rice 11:11
richard 11:21
12:4,5 32:17,18
71:24 72:14 73:5
73:10 167:8,24
170:3 171:1 172:8
172:16 173:14
174:18 175:16,24
176:7,11,16
richard's 168:10
168:15 179:25
right 16:6 17:3,4
17:8 18:6,10,11
18:20 19:9,14,19
19:22 21:13,20

22:4 23:3,10,20
24:7,16 25:2,21
25:23 26:1,7,8,14
26:16,18,21 27:5
27:17 28:11 31:25
33:1,6 35:14 36:3
36:12,16 39:10
40:11,12 42:2,3
42:10,17,23 44:10
45:17,18,25 46:21
46:22 47:4,12,18
47:19 49:20 51:6
51:15 52:2,4 53:7
53:16 55:1,6,19
57:2,16,24 58:4,7
58:12,18,19,23
59:1 60:17 62:5
63:15 65:3,5,8,25
66:13,14 67:1,4
68:15 70:2,3,20
73:7 75:12 76:1
76:12 77:10 80:15
81:23 82:3,6,12
82:15,20,22 84:1
84:4 85:4,6,8,10
85:12,16,25 86:4
87:1,6 89:8,17,23
90:1 91:2,10,16
91:24 92:5,12,16
92:20,25 93:8,18
94:1,17 95:9,11
95:18,21 96:2
98:5 100:15 101:9
101:17,18,20
104:7 106:12
109:16 111:13,21
112:2,18 117:6
120:18 121:20
125:20 129:10,12
132:13,15 134:4,8
136:6,10 140:4
141:19 143:3
147:7,24 148:17

153:5,13 155:9,11
155:11,18,22
156:2 157:5,8,14
157:16 158:8,12
158:14,17,20
159:1 160:2,6,17
161:10,14,24
164:1,2,15,23
165:7,20 166:25
167:2,15,24 168:3
168:9 171:23
173:17,17 174:16
174:22 175:4,16
176:8,16 177:3,12
178:7,9 184:12,15
185:15,20 187:2
187:10 189:8
190:1,20 191:5,13
191:18,25 192:1,4
192:5,9 198:1,4
200:19,21 201:13
203:18 204:8,11
204:12 205:14,24
207:7,18,24 208:2
208:5 209:18
210:13 211:9
212:19,20 218:7
222:3,5
**righthand** 166:6
**ring** 71:1
**ringer** 11:12
**ripe** 81:22
**rise** 52:8,10
**rising** 52:3
**risk** 125:6 185:17
195:11,12 196:2,6
201:13
**risks** 114:5 123:8
123:14
**ritalin** 120:22
**road** 224:21
**robert** 1:22 8:13

**robertson** 11:13
**robinson** 10:24
101:22,22 102:1
102:18,19 105:16
105:20 106:14
107:8,10 108:11
109:19,22 111:24
112:5 187:15,15
187:19
**role** 23:9 75:6
150:25 160:4
161:1 176:21
179:1,16 194:11
194:14 222:17
**roles** 73:25
**roman** 170:4,18
**room** 1:13
**rosen** 11:14
**rosenbaum** 11:15
**rotate** 96:8
**roughly** 27:12
109:25,25
**route** 186:12,15
220:22
**routes** 185:20
**roxana** 6:25
**rubinstein** 11:16
**rule** 218:24
**rules** 42:6
**ruling** 219:9
**rulings** 16:23
**run** 179:11 215:16
**rundlet** 11:17
**rupert** 163:6
**russ** 171:22,24
174:14,21
**russell** 171:23
**rx** 179:10
**ryan** 11:18 12:11
13:3

**s**

**s** 3:1 6:23 9:12,21
10:9 13:10 14:1
18:18 157:21
**s&p** 36:18,19,21
37:4,6,13 44:4
46:2,9 103:14
**s&s** 46:8
**sackler** 3:4,5 4:2
11:19,20,21 14:15
14:15,23 15:7
16:7,7,8,16,21
17:5 18:7,10,12
18:16,19 19:6,8
20:20 22:4 23:10
27:17,23,23 28:5
29:18 30:3 32:17
32:18 33:2,3,21
34:11 35:12 40:7
41:11,25 43:22
44:16 54:4,25
60:3 61:17,20
64:14 71:24 72:14
73:6 76:24 77:8
77:18 82:10 83:9
83:14,15,16,17,19
85:19,22,24 88:10
88:21 90:9,15
92:5 94:9,11,25
95:8,25 97:14
98:23 99:9 100:10
101:19,21,25
102:2 104:16
106:4,15,17
107:11 111:13
115:7,21 117:18
118:5 121:20
122:14 123:19
124:18 125:24
126:1 127:5,11,14
129:23 130:24,25
131:11,14,16,19
131:24 132:2

134:5,7,11,13,19
134:23 136:20
141:6,18,20,22
143:15 144:3
146:18,20 148:20
148:22,24 149:2
150:13,20,23
151:3,19 152:3,6
152:12,16,21
154:3 155:18,21
155:24 156:14
157:6,13 158:2,4
158:7 159:1,6,12
160:12 161:10,21
161:22 163:6,6,6
163:7,7,8,22,24
165:4,22,23
166:22 167:5,8,24
168:3 169:4,24
170:22 172:20
173:14,14,14,15
174:6,14,18
175:23 176:16
177:11 178:16
179:5 180:6
181:22 184:7,24
187:12,14,18,20
188:11,12 189:13
191:19 193:6
194:10 196:11
197:12,14 198:13
200:9 201:18,24
202:25 203:11,16
203:19,20,25
204:2 207:8
**sackler's** 73:10
130:14
**sacklers** 14:18
40:21 61:1,4
71:19 149:13
159:19 164:22
178:23 203:14
221:10

**sackler's** 33:15
202:17 210:22
**sackly** 136:19
**sad** 192:18,18
**safe** 45:20
**saint** 3:18 6:17
**sale** 56:18 119:19
138:24,24 191:21
191:23 195:1
**sales** 35:21 37:21
37:21 42:22 43:25
44:6 52:16 57:7
61:5,5,8,9,11,14
62:17 66:8,8,25
67:19 68:4 70:2,5
74:5,17 76:12
77:23 78:12 79:6
79:11,11,12,19,25
80:11 82:15
103:15,19 104:1,4
104:10,10 107:3,6
107:9,15 108:1,2
108:21,22 112:8
112:20 113:14,17
170:7,11,16
171:25 173:16,19
174:21 175:1
178:2
**salesman** 65:15
79:14,15
**salwen** 11:22
**samantha** 85:18
85:24
**samuel** 9:13
**sara** 6:20 7:10
**sarah** 158:6
**sat** 24:6 61:7
102:6,7
**saval** 11:23
**save** 45:4
**saw** 71:2 73:12
145:6 170:24
213:11 220:12

**saying** 25:11
27:23 35:1,4
36:23 45:14,16
46:2,24 76:2 80:3
93:22 140:11
186:5,8 218:5
221:6
**says** 54:12 55:2,4
55:9 56:13 57:18
61:22 66:1 75:13
75:19 84:3 85:1
85:18 86:16,18
87:7 92:23 104:23
135:12 163:18,21
163:24 167:9,23
168:15 170:2
171:22 172:7
173:14 177:16,17
178:22 179:15
181:14,15 183:19
**schedule** 21:1
38:4 54:20,21
55:4 94:8,10
136:25 195:13
**scheduled** 215:1
**schinfeld** 11:24
**schmidt** 11:25
**school** 139:24
182:16 204:8
**schwartzberg**
12:1 216:10,10,14
216:15
**sco** 170:5
**scope** 120:6
**scott** 3:12 8:23
**screen** 32:15
87:19 155:12
156:7 157:7
**scroll** 32:18 33:13
56:6,7 84:20,20
85:14 86:2 87:3
90:21,22

**scrolling** 60:15
61:21
**scrutinize** 61:9,11
**scrutinized** 61:5
**scrutiny** 62:20
**se** 161:3
**search** 74:2,8,12
76:5
**searches** 74:13
77:5
**sec** 18:22
**second** 25:11
32:23 33:14 46:17
73:2 90:11 99:10
99:13 101:18
143:25 146:10
149:19 151:19
164:16 180:9,12
180:25 207:12
**secret** 30:22
**section** 84:18,21
85:2,15 90:23
91:13 104:21,22
**sectors** 136:9,11
**see** 18:10 32:19
33:5,9,21,24
35:11,15,24 36:1
36:7,13,23 38:1
44:11 46:19 54:19
55:9,13,14 56:5
56:20 57:18,18
58:5 60:14 61:22
66:1 72:12,15,16
72:19,22,23 78:10
87:21 90:24 93:4
100:6,21 104:24
106:18,25 119:12
131:19 154:13
157:7 167:3 170:2
176:19 177:13
181:20 207:22,25
214:4 215:25
219:17 221:3

**seeing** 74:20 78:6
**seeking** 15:21
121:10 139:10
**seen** 39:16,17
84:5 192:22
**select** 73:25 75:8
208:4
**sell** 25:25 26:5,8
26:11,13 40:3,7,9
40:17 42:2,5,9,15
42:16 104:9
122:14 153:2,10
153:19 185:11
**selling** 26:20 27:2
64:21 79:8 153:12
185:10
**sells** 41:5 65:17,18
82:13
**send** 35:18 61:23
215:11
**sending** 214:13
**senior** 75:22,24
75:25 77:3 158:16
**sense** 17:22
216:24
**sent** 61:12,14 73:6
89:1 98:15 100:11
168:22 214:6
217:8
**sentence** 62:16
65:24 173:13
180:9
**sentocrucion**
130:4
**separate** 58:20,21
179:11 208:20
219:18
**separated** 21:12
**separately** 98:13
99:11 153:17
161:22
**september** 114:24
158:13 164:7

188:6
series 167:5 170:4
  171:1 172:6
  196:10
serious 193:5
  195:11,12
seriously 192:21
served 19:21
  158:7,16
service 160:1
services 38:20,25
  95:14
serving 179:12
set 16:24 21:1
  98:15 125:23
  167:13 172:18
  175:10 176:12
  203:4 216:5
  217:10 218:8
seth 11:24
sets 83:24
settle 49:11
  117:21
settled 49:8
  117:12
settlement 48:8
  48:10 57:4 58:14
  58:15,21,25 59:15
  59:18,19,20 60:7
  62:9,11 65:22
  68:23 71:10,11,15
  72:2,13 73:17
  103:3 104:16
  106:16 111:8
  112:17 115:21
  116:2,5,6,18,19
  117:16 118:9,17
  119:5,9 120:8
  122:10,13,18
  125:7,11,14
  126:21 127:1
  128:18,20 129:19
  137:4,7,10,11,16

138:8,11 147:3
  148:1,7,10,12
  150:9 152:23,25
  153:10 156:23
  161:23 162:2,4,13
  162:14 163:4,18
  163:19 173:6
  188:18 194:25
  195:3 201:1,9,11
  206:17
settlements 127:9
  140:18
settling 119:12
seven 148:18
  153:3,20
seventh 220:11
severe 43:4
  123:11,11 132:18
  195:7,21 196:5
shannon 8:4
  10:13
share 45:2 58:11
  61:24 62:2 63:23
  64:2 116:13,18,20
  116:22 138:18
  147:3 148:11
  168:15,16,17
  170:10,16 188:25
shareholder
  137:6,10,17
shareholder's
  137:4,16
shareholders
  28:16 30:5,9 31:7
  31:15,17,21 149:9
  149:23 179:6
shareholders'
  30:4
shares 24:20 30:8
sharing 88:24
shaw 6:8
sheet 219:22,23

sheldon 15:8
  16:15 211:17
shepherd 12:2
shift 64:2 107:20
  112:19
shifting 62:4,24
shipment 56:18
shocked 47:19
  53:23
shocking 47:23
shore 12:3,4
short 179:24
  210:22 213:25
shorthand 25:5
shortly 53:5,9
show 62:1
showing 178:2
shown 136:25
  196:5
shows 171:5
shrinking 46:23
  46:24
side 4:2 22:6,7
  30:24 31:4 34:12
  34:15,18,24 35:2
  46:8,9 82:25
  109:18,18,18
  110:1 116:14
  134:19,23 135:22
  136:19,19 138:6
  138:11 139:1
  147:4 148:11
  151:15 159:2,3,8
  159:8,19,19
  182:16 188:12
  197:22 198:1,13
  199:2 201:10
  221:10
side's 138:18
sides 16:15 31:2
  201:9 211:18
sideways 96:6,7

sign 155:19
  182:25 207:8
signature 60:11
signed 116:6
significant 80:12
significantly
  79:20
silbert 12:5
similar 26:13
  29:12,19 31:6
  50:4 57:2 96:18
  219:24
simmonds 12:6
simple 194:22
simply 46:20
  100:2 212:2
  215:21 217:7
  223:12
sincere 15:5
singer 12:7,8
single 99:5,6
sir 48:7 88:20
  110:9 131:6
sister 35:12,16
  92:5
sitting 136:22
  143:3 199:4
situation 50:8
  64:4 170:12
  200:24 203:7
situations 112:13
six 121:3 175:12
sixteenth 188:23
  188:24
sixty 183:7
size 29:25 116:17
skapof 12:9
skip 54:9 86:17
skorostensky
  12:10
slaugh 12:11
slides 54:15

slightly 177:23
slower 167:19
slowly 84:21
  178:5 191:1
small 156:11
smoother 220:22
snorting 143:4,4
snp 65:15
social 201:14
societal 45:7,10
society 124:6
  194:8
socioeconomic
  194:6
sold 26:14 65:4
  82:11 112:22
  122:2 131:4
  177:19
solution 194:22
solutions 224:20
solve 129:13
somebody 128:9
  145:11 205:14,17
  205:22
somewhat 182:5
  207:16 218:13
sonya 2:25 224:3
  224:8
soon 125:3
sorokin 12:12
sorry 18:22 20:17
  29:16 32:22,24
  38:23 48:5 62:9
  88:9 90:25 96:7
  98:17 99:8 105:11
  105:23 110:13
  114:9 115:1,6,23
  115:24 124:1,23
  124:25 128:10
  129:6 131:24
  141:10,14 143:14
  151:3 155:4
  157:10 160:9

163:13,13 164:20
  165:3 166:16
  169:4 172:13,22
  173:3 175:22,23
  175:25 178:10
  182:21,23 183:5
  184:14,24 192:7
  194:19 196:24,25
  197:20,21 202:4
  207:15 208:24
sort 29:12 83:24
  128:7 146:5
  213:18 215:11,12
  215:16,25
sorts 110:22,23
  221:16
sound 131:7,8
  171:7
sounds 133:4
  158:12 182:12
southern 1:2
spanned 161:19
sparked 193:16
speak 57:17
  113:22 160:14
  167:18 201:13,22
  210:2 214:4 217:4
  220:13 223:8
speaker 57:14,17
  57:19
speaking 17:16
  184:25 203:10,12
  221:9,10
speaks 169:5
  209:12
special 149:7,18
  149:19,25 150:4
  151:25 152:6,15
specific 39:7 47:7
  66:7 78:7 109:5
  167:13 168:16
  170:7

specifically 31:8
  37:24 49:1 57:3
  66:1 69:22 71:9
  81:25 103:21
  107:21 108:25
  126:19 137:24
  148:8
specifics 55:20
  106:22 107:2
  121:5
specified 152:25
  153:18
speculate 193:24
spelled 172:14,16
spend 36:18,19
  37:1,5 44:8,13
  119:12 122:12
spending 36:14,21
  37:6 96:15
spent 80:8 125:12
split 213:20 215:6
splitting 215:23
spoke 142:13
spoken 140:3
spotty 207:16,18
spouses 134:22
  197:25
springer 12:13
squandering
  59:23
stacey 126:3
stacy 7:24
stand 207:1
stanford 73:16
start 14:12 19:16
  38:13 39:1 56:8
started 23:22,25
  52:11 63:11 69:17
  125:3 164:5 185:7
  185:10
starting 151:5
starts 163:12

state 3:16,17 5:16
  6:2,16 47:25 48:7
  48:8,16 59:17
  94:4,20 97:11
  101:15,23 117:12
  121:16 126:19
  153:6 157:24
  158:6 187:16
  199:13 211:19,21
  217:20
stated 34:15 56:24
  112:7 200:1
statement 41:6,8
  41:19 127:21,23
  135:12 204:14,16
  204:17,25
statements 212:10
  212:11
states 1:1,11 5:1
  6:9 21:16 38:8,19
  38:25 39:14 42:10
  50:5 52:9 66:9
  110:12 113:2
  115:1 118:9,16
  121:16,22 122:19
  123:10 127:25
  134:14 163:5
  187:25 188:9
  189:15,20 190:6
  191:7 192:11,17
  193:3,10,11,15
  196:12 197:17
  201:25 217:14
  218:17 222:23
stating 34:13
statistics 108:12
stays 61:1
steege 4:20 17:10
  17:12,14,15 18:2
  18:8 213:8,15
  214:4,8,19
steege's 222:6

steel  12:14
step  106:4
stephanie  8:7
  223:17
stephen  10:12
  11:3
steps  37:12
stern  127:6
stewart  73:13
  74:16 167:8 168:9
  168:23 169:2
  174:14,18 177:12
  177:14
stick  84:15
stipulate  210:21
stipulated  210:24
stipulation  16:25
  210:19,22 211:7,8
  211:10,18,24
  213:3,5
stock  32:2 34:4
stodola  12:15
stole  131:3
stop  46:5,8 70:13
  70:19 97:1 102:13
  102:22 113:14
  130:3 155:23
  184:6 193:1,7
stopped  102:8
  131:12
stopping  46:3
  191:6,10
stories  79:6
story  142:23
  143:1 144:21,22
  145:13
strategies  173:17
strategy  34:21,23
straying  193:6
streamline  214:11
street  1:13 4:17
  5:3 6:3,10,17

strength  62:2
  74:22
strengthening
  73:14 74:16 75:18
stretching  75:15
strike  39:10
  180:25 202:15,20
  202:21
strong  118:14
  139:24
stronger  34:15
strongly  59:14,16
  100:15
structural  75:21
structure  25:15
  29:5,6 77:3 86:19
  86:21,23 91:8
  100:14 154:24
  200:10 216:6
structured  200:23
stuck  84:13
studies  187:1,4,9
study  39:4
subject  72:23,23
  73:1 168:14,15,16
  206:20 213:12
  219:9
submit  204:24
submitted  200:13
  212:3 218:20
submitting  211:8
subparagraph
  56:8
subsequent  98:15
subsequently
  50:17 99:3
subsidiaries
  120:16
substance  60:13
  96:16
substances  192:14
  194:9

substantial  27:4
  178:23 201:1
substantially
  116:20 138:12
substitute  16:12
successor  98:1
suddenly  105:12
suffer  64:1
suffered  124:22
  141:4 196:20,24
  201:3,12
suffering  43:3,7
  78:23 81:15,17
  119:6,11 123:11
  123:24 124:8,11
  130:1 190:11
  191:5,7 196:3,4
  197:4,5 205:13
sufficient  140:13
suggest  25:17
  204:15 218:23
suggested  37:14
  133:2
suggestion  133:14
suggestive  128:15
suicide  196:6
suicides  196:6
suite  5:3 224:22
sullivan  4:8
sums  122:11
sun  110:24
supervisory  97:3
  97:14
support  118:14,17
  137:10 181:19
  182:10 200:2
  201:15
supported  113:15
  114:6
supporters  215:6
  215:11,24
supporting
  222:24

suppose  17:20
  112:4 188:21
supposed  195:14
supposedly  143:1
  172:15
sure  20:8 21:25
  24:9 28:12 29:16
  41:25 50:25,25
  53:8 54:19 64:14
  84:7 87:23 88:2
  96:14 98:9,18,18
  99:9 100:8 102:17
  102:18 110:14,19
  112:6 119:25
  128:10,21 129:7
  130:13 132:6,24
  133:8 141:22
  153:6 154:2 155:7
  157:11 164:4
  167:21 170:23
  175:21 176:3,4,9
  182:8 184:17
  186:2 190:2
  194:13 200:7,16
  201:24 205:9
  213:14 217:14
  218:4,19 219:20
  220:12 222:14,21
surprised  73:13
  74:19 77:12,13
sustained  199:18
swallowing
  185:22
swear  18:13 157:8
  157:17 205:11
system  181:19
  182:10 194:2
  200:3

| t |
| --- |

t  18:17 157:20
  224:1,1
tab  162:8,12,14
  166:8,9,11,16,18

169:7,17,22 173:7
173:8,24 180:14
180:18 183:1
**table** 162:15
**tad** 101:22 187:15
**tailor** 127:10
**take** 32:20 34:8
34:25 38:3 54:4
60:6,19 68:7
87:16 90:10,14
102:22 124:5
142:20 151:15
153:22 166:22
174:6 187:5
207:11 217:10
220:19 222:6
**taken** 31:24 44:16
49:11,21 170:25
208:20 222:22
**takes** 210:14
**talk** 25:4 65:7
68:14 77:2 83:8
84:16 103:22
106:5 109:13
214:5 216:23
**talked** 82:17
129:12,13
**talking** 14:25 16:2
23:6 25:6 39:8
42:25 64:5 107:12
126:22 128:18
130:5 221:25
**tamara** 223:15
**tapley** 12:16
**task** 195:25 196:1
**taste** 181:16
**tax** 27:10,13,15
28:20 29:5,5
**taxes** 28:7,8 29:9
110:1
**tbd** 219:21
**team** 77:10 114:9

**technical** 105:24
147:16
**technically** 65:1
147:21 148:8
150:14
**technology** 136:9
**tele** 1:12
**telephone** 177:17
**telephonically**
3:12,13,14,21 4:6
5:6,13,20 6:6,13
6:20,22
**tell** 18:13 33:8
34:9,19 68:6
136:3 137:3
157:17 198:22
**telling** 76:7
180:19 220:18
**ten** 28:23 184:1
221:19
**tens** 123:19
196:19
**tense** 40:10,11,15
**tenure** 161:13
164:4,6
**tenures** 163:22
**term** 39:7 47:5
63:24 110:6
113:23 114:25
179:24 187:9
219:22,23
**terms** 81:3 117:4
192:12,13
**test** 87:16
**testified** 44:2
47:12 96:14
108:14 109:8
128:22,24 137:9
137:12 138:3
140:10 143:15
146:20 150:13
151:13 154:3
159:14 164:4

**testify** 209:22
**testifying** 14:7
**testimony** 14:7,15
14:21 16:7,12,21
18:1 34:14 41:14
41:15 45:15 51:1
75:2 76:14 105:17
106:5 109:10
112:23 114:8,14
118:6 130:2 142:4
146:24 148:4
153:11 155:19
190:22,25 191:6
199:17 204:4
206:21 207:13,18
214:18 222:6
**tethered** 130:19
**text** 72:25 100:2
**thank** 15:13,13
17:3 18:2 19:5
25:18 28:2 55:3
92:10 93:2 99:12
101:19 106:3,6,11
126:16 127:2,19
128:17 130:2
131:14 132:3
134:1,5,7 141:6,9
148:13,16 151:17
153:24 155:10,20
155:21 156:2
157:5 160:23
165:16 177:5,9
186:22 187:12,22
190:22,25 197:10
202:23 203:16,17
203:24 204:7
206:4,23 207:9,10
210:12 213:1,6
217:6,17 218:6
**thanks** 25:19
175:3
**thanksgiving**
89:20

**that's** 14:20 15:8
15:9 16:1 20:2
21:3,17 22:2 23:3
25:16,16,24 26:9
26:15,23,25 27:3
27:12 29:13 31:25
34:19 36:12 40:23
41:23 191:11,25
193:18 194:8
195:12,13,14
199:18 200:13,19
206:6 207:4
209:10,13 210:6
211:1,14 213:2
214:23 216:2,19
219:9,18 222:1
223:13
**theodore** 13:8
**theories** 110:23
117:10,11
**thereabouts** 185:6
**there'll** 14:14
**there's** 32:16
194:4 196:5
200:10 201:15
207:19,20 217:15
219:21
**they're** 19:3 23:16
24:3,18 26:3 38:5
39:8 194:17 203:2
210:24 213:4,20
**they've** 16:18
**thing** 17:18 23:7
30:10 45:17,25
80:7 103:12
112:18 120:20
154:2 172:19
190:20 191:5,13
191:18 192:9
194:23 206:20
207:1 210:18
**things** 36:25
42:12 47:13 79:9

81:3,10 83:5
103:21 112:9
133:23 157:2
176:8 193:23
213:22 217:11
219:14
**think** 14:8,10,20
15:23 16:9,18,24
16:24 17:4,17
18:25 19:1 22:14
27:14,25 28:8
29:10 30:6,7,22
32:8 33:14 34:9
35:2,2,24 36:17
37:8,18 39:3,8
40:12,23 41:1,2
41:15,17,17,18
42:24,24 46:2
50:6,16,23 54:13
59:7,9 63:18
65:21 66:3,5
70:10,14 76:19
79:3 82:17 84:19
85:14 87:3 88:3
90:25 91:3,3
92:20,25 93:18
94:7 98:5 99:23
99:25 101:4,5,7
101:18 102:17
108:9 110:24
111:11 112:7
113:3,9,19 114:17
115:7,11 117:7,24
118:23,23 120:9
121:23,23,25
123:6,9 124:13,15
129:3,3,14,25
130:16 132:5
133:2,13 137:9,24
138:3,6 139:15,15
147:10 150:14
151:11 154:3,14
155:22 159:13,25

160:7 161:5,7
162:17,20 164:2
164:13 166:9,16
168:10,21 169:1,5
169:5 172:24
173:24 177:6
178:7 179:23
180:1 182:14,20
182:24 183:14,15
184:16 185:6,9
186:20 187:3,6
189:24 190:7,8,8
190:12,17,24
191:8,13,17
192:11,15 193:18
193:18 194:8
196:8,9 200:4,5
200:10,11,22
201:10 202:3,5,21
203:13 206:11,13
206:15,19 208:10
208:15 210:14,18
210:20,20 211:1
211:16,19 212:5,6
212:8,20 213:3,10
213:15,24 214:8
215:13 216:2,3,22
216:24 219:6,7,15
222:15
**thinking** 30:1
104:8
**thinks** 129:9
**third** 4:3 62:15
86:18 91:5,6 93:4
139:10 163:10,11
163:20,24 202:1
**thirds** 171:21
**thomas** 10:24
**thought** 65:20
72:17 104:7,9
117:17 133:7
189:24 191:11
194:20

**thoughtful** 165:25
176:24
**thoughts** 182:2
214:10
**thousand** 213:22
**thousands** 59:25
66:14 110:21
118:25 123:19
196:19 201:5
223:5
**thread** 208:8
**threat** 181:16
**three** 50:23 53:6
81:20 111:14
130:7 179:9
202:13 208:20
209:12 213:12
216:1
**thurmond** 12:17
**tie** 130:14
**tied** 15:20
**ties** 121:14
**time** 15:18 20:1,3
23:6 24:2,7 26:22
30:7,8,20 34:3,3,8
34:25 37:1,6,25
40:1,8 42:23,25
44:8,13,24 50:14
50:15 51:4,14
52:5 58:20 64:23
65:11 69:4,5 71:2
71:13 77:1 79:2
80:23 81:19 82:10
84:5 95:10,13
96:15 97:21,24
111:17 113:14,19
117:5 121:14
129:8 140:7
141:22 144:14
149:13,23 158:10
158:24 159:13,17
159:20,22 160:11
161:9 166:1,1,23

167:7 169:4
171:12,25 176:2
178:12 182:3
184:25 186:24
187:5,10 190:21
191:17,18 192:20
192:20 195:9
200:5 202:11
203:13 208:12,13
211:16 213:14,20
215:7,11,23,25
217:16 218:9
222:15
**times** 20:5 21:23
42:16 76:18 83:4
84:4,24 87:15
97:24 98:2 104:9
113:20 132:15
151:16 208:15
221:19
**timing** 23:4
**tiny** 167:18
**tired** 201:22
**title** 19:25 51:9,17
83:11 169:25
176:5
**titled** 20:1 162:4
162:14
**titular** 19:23
**tobacco** 125:13
**toback** 12:18
**today** 14:7,14,22
16:7,14 24:3,5
34:14 68:14 84:21
95:24 118:22
119:8 123:10,13
123:16 130:19
136:22 142:4
146:20 199:4
213:15
**today's** 177:17
**told** 45:3 47:20
53:1 81:1 102:25

103:1 111:4,11
112:14 207:20
211:2
**tolerate** 196:7
**tomorrow** 15:18
213:13 214:11,18
**tonnesen** 6:20
157:23,25 158:3,6
159:4,7,22,24
160:10,21 161:6
163:2 164:21
165:19 166:12,14
166:19,20,21
169:18,20,23
173:3,4,10 174:2
174:3,5 175:14
177:7,9,10 180:16
180:17,20,21,22
181:2,6,11 182:21
182:22 183:3,6,7
183:8 185:13,14
186:9,11,17
**tonneson** 199:25
**top** 32:16 35:11
54:11,14 55:5
84:11 104:8
168:21 172:15
174:1
**topic** 216:24
**topics** 67:25
**total** 28:20,21
78:18 137:3 147:5
178:1
**totality** 140:23
**totally** 216:2
**totals** 110:25
**touch** 214:22
**track** 178:1
**tracked** 61:4
**traffic** 14:14
**tragic** 192:18,18
193:2

**tragically** 196:25
**trainor** 12:19
**transaction** 78:17
78:19
**transcribed** 2:25
**transcript** 182:24
224:4
**transcripts** 212:9
**transfer** 135:8,10
150:2
**transferees**
219:13
**transferred** 135:1
135:4,14,18,22
149:12 198:4,6,9
198:13
**transfers** 110:4
149:8,14,22
**transitory** 37:16
**translates** 170:11
**transmits** 95:15
**treat** 120:17
123:10,17 184:5
**treated** 195:17
**treatment** 124:13
132:8 133:16
141:5
**tremendous** 190:9
191:3
**trend** 37:2 43:25
44:9,14 46:3
63:15 178:2
**trends** 178:3
**trial** 202:21 209:4
209:19 212:3
222:9,13,18,20,20
**tribes** 223:1
**tried** 80:17 166:2
**trillion** 110:10,20
**trillions** 110:15
**troop** 6:13 218:16
218:16

**troop's** 219:19,24
**trouble** 180:15
201:19
**troubled** 167:10
**truck** 143:3 144:9
**true** 60:24 61:6
68:4 77:21 78:1,3
78:10 107:25
108:6,9 109:24
113:9 144:21,22
146:23 151:25
152:2 164:23
181:19 182:8,10
182:24 194:10
195:11 200:2
204:16,25 212:18
224:4
**truly** 39:24 40:2
44:11 46:3 123:25
**trust** 28:6,9,10
32:3,4 85:6,15
86:3,17,19 89:3
90:22 91:1,7,8
92:16 95:8,9
97:17,25 109:14
116:21 117:1,5
133:22 138:1,4,15
138:21 139:2
146:20,22 147:1
147:14,23 148:6
184:9 188:25
189:2,6 200:10
217:17
**trustee** 5:2 82:22
89:4,5 95:8 97:16
98:8 100:17
134:14 197:11,17
220:2,9,11 221:1
221:15
**trustee's** 88:24
**trustees** 86:21
89:6 91:10 92:15
92:24 93:6 98:6

**trustee's** 216:11
**trusts** 24:18,21,25
24:25 25:12 27:9
27:17,24 31:22
82:19,22 90:1,4,6
110:5 116:25
138:13 147:17
150:10 189:7
198:24
**truth** 16:22 18:14
18:14,14 157:17
157:18,18 212:2
212:11
**trx** 78:19
**try** 15:1 46:10
58:10 65:9 78:22
78:24 79:14,15
81:6,12,13 98:18
119:4 131:12,17
165:7,10 169:9,13
169:15 176:25
188:3 194:11
199:22 217:6
218:24
**trying** 14:24 16:2
18:23 43:14 45:17
45:19,25 47:12
59:20,21 81:4,4
107:18 122:6,9
129:13 143:10
144:8 156:19,22
165:20 166:24
175:6 176:12
194:8,21 201:22
207:18 209:10
214:22
**tsai** 12:20
**tsier** 12:21
**turn** 26:18 28:9
60:3,10 61:19
62:7,15 65:21,22
71:14 73:16,18,18
77:18 78:9 94:23

96:2 166:4 172:23
173:5,11 177:5
180:5,11 182:19
**turner** 12:22 15:3
**turning** 97:5
167:14
**tv** 193:4
**twice** 161:12
171:15
**two** 32:25 33:1
36:25 37:1 43:2,2
50:23 55:11 57:19
59:24 63:12 86:8
86:18 87:12 97:2
105:9,24 127:9
150:16 153:8
169:21 171:21
180:9 183:7 201:9
208:11 215:4
216:13 221:19
223:15
**tying** 128:20
**types** 137:2 179:9
**typically** 21:21
23:14,15,16

**u**

**u.s.** 1:23 5:2 141:1
141:1 197:11
216:11 220:2,9,11
221:1,15
**ucc** 72:7,10 83:10
87:20 88:2 90:17
94:10,24 96:3
98:20 99:5
**ultimate** 103:12
**ultimately** 24:24
**unable** 99:24
**unbelievably**
53:23
**unbranded** 67:9
**uncle** 23:22
**unclear** 210:24
216:16

**uncovered** 102:20
**underlying** 58:9
132:18 212:4
**understand** 25:6
26:13 29:16 38:23
55:15 62:3 63:18
79:17 107:24
110:19 112:6
115:5 118:13
121:10 125:18
129:2,6 130:18
133:18,25 139:13
139:14,18 140:2
152:23 154:20
166:2 169:1 171:9
181:9 186:2 193:1
209:4 210:4 211:4
218:4 219:10,24
221:1
**understanding**
14:13 15:9 30:2
39:20 50:8 56:23
59:12,14 67:22,24
83:13 128:6 129:5
139:16 152:13
153:2,19 184:25
188:18 200:8
211:3
**understood** 15:6
15:19 69:1,8 70:4
70:7 159:13
176:21 185:13
**undertook** 81:6
**underway** 65:9
**underwood** 12:23
**unfinished** 218:19
**unfortunately**
123:13 124:15
**unhappy** 77:9
**unintended**
124:25
**unique** 120:20
192:17

**united** 1:1,11 5:1
21:15,16 38:8,19
38:24 39:14 42:10
50:4,5 52:9 66:9
110:12 113:1
115:1 121:22
122:19 123:10
127:25 134:14
163:5 187:25
188:8 189:15,20
190:6 191:7
192:11,17 193:3
193:10,11,15
196:12 197:16
**unmute** 157:9,12
**unresponsive**
178:18
**unstable** 105:12
**unusual** 222:12
222:12
**update** 154:18
210:16
**updated** 220:16
**upper** 55:1
**upside** 183:16
**use** 29:12 32:3
38:18,21 39:1,5
46:10 58:6 81:23
100:2 114:25
121:3 131:1,2,4
132:19 193:3
195:9 199:20
**user** 128:15
**uses** 131:2
**usual** 56:16
**utilized** 58:2
**uzzi** 12:24

**v**

**v** 170:14
**vaguely** 48:10
142:19 143:7
187:8

**valid** 56:17
**valuable** 109:9
112:21 113:10
123:7
**valuating** 107:9
**valuation** 150:5
**value** 138:17
**varick** 5:3
**varied** 136:3
**variety** 67:25
120:4
**various** 149:2
218:14 222:25
**vast** 119:3 122:10
181:17 182:9
199:14 200:1,6
**venditto** 12:25
**venture** 136:5
**verify** 149:20
**veritext** 224:20
**version** 87:17
130:3 137:16
184:11,15
**versus** 117:5
**vice** 19:22 20:1
51:17 74:5 76:11
158:16 171:25
174:21 176:4
**victim** 128:6
129:1,2,3,3,11,15
129:18 205:8,15
205:23
**victims** 140:19
206:8
**video** 1:12 105:14
207:16
**view** 30:17 31:10
44:7 117:3 147:7
150:1 168:6 195:4
217:24
**viewed** 17:22
**views** 112:11
130:12,14 202:17

215:15,19
**vincent**  7:1
**violated**  50:17
**violating**  102:21
**violation**  56:19
**visibly**  181:20
**visiting**  133:16
**visits**  67:13
**voice**  105:14
**voices**  167:17
**volume**  43:25
106:21
**volumes**  37:4,7
**voluntary**  148:1
**vonnegut**  13:1
**vote**  24:19 70:13
70:13 188:9
208:21,22
**voted**  30:14 70:10
70:14 115:14
**votes**  208:20
**voting**  30:15

**w**

**w**  11:18
**wagner**  13:2,3
**wait**  68:7
**waiting**  221:5
**waiving**  221:12
**walker**  1:25
**want**  17:4,9,18,23
32:17 34:16 41:23
55:22 59:8 60:10
74:22 80:14 98:12
98:13 105:25
114:22 124:3
126:6 129:14
130:6,17 133:23
152:22 154:22
167:6 174:10
179:14 180:5,6,24
181:25 186:19
187:13 193:9
199:18,19,20

201:18 204:15,17
208:8,18,23
209:16 216:21
218:2 222:21
**wanted**  30:23,25
34:18,23 35:3
63:3,14,22,23
125:10 151:8
154:1 167:22
200:7 209:14
220:1
**wants**  120:7
209:13 211:6
**wardwell**  3:7
**warning**  38:6
121:6
**warrant**  132:19
**washington**  5:16
101:23 187:16
**wasn't**  39:15
77:14
**wasted**  119:13
125:13,14
**wasting**  202:11,11
203:13
**watching**  176:19
**way**  15:21 21:4
29:13 34:22 36:14
36:15 42:24 46:18
57:6 70:15 81:17
83:7 98:11 104:6
114:1 124:22
125:13 143:14
145:9 147:6 171:7
171:21 172:12
176:21 190:10
191:4 195:23
208:16 222:1
**ways**  44:7 170:15
**we've**  79:3 82:17
114:3,4,4 127:3,7
**wealth**  147:5
200:1,6

**wearing**  165:5
**weber**  13:4
**website**  209:12
**wednesday**  215:1
218:11
**week**  177:21,23
214:24 219:3
222:4
**weeks**  150:16,22
**weight**  215:25
**weintraub**  13:5
**weis**  13:6
**weiss**  13:7
**welcome**  63:8
120:7,8 215:18
216:3
**welcomed**  78:20
**wells**  13:8
**went**  27:11,24
28:4 86:8 110:1
111:22 119:10
122:3 131:8 132:7
182:16 204:4
**weren't**  20:23
**west**  6:10 182:16
**we'll**  14:14 16:25
23:5 25:6 38:1
215:16 217:17
220:23
**we're**  14:3,21,24
14:25 15:10 16:2
16:2,24 17:18
23:6 36:20 193:6
202:16 210:23
213:17,22 214:13
218:11 221:21
**we've**  15:1,2 18:8
41:3 196:9,16
214:14 215:6
220:8,23
**whatsoever**  51:10
**what's**  195:15
214:6

**whereabouts**
98:19
**whichever**  24:8
53:4 74:8
**white**  1:14 99:18
100:11
**who've**  123:21
**wholeheartedly**
84:13
**william**  13:5
**willing**  125:7,15
203:3 223:10
**winthrop**  6:8
**wish**  101:20
203:18
**withdraw**  16:17
211:17
**withdrawals**
45:13
**withdrawn**  16:18
**withdraws**  17:1
**witness**  14:18,21
33:4 55:4,7 77:11
95:20 99:7,15
101:7,10 106:6
113:6 114:17
130:12,12 146:3
155:23,24 156:12
157:1,6,19,22
160:14,17 161:2
162:10,14,19,21
162:25 164:20
165:7,10,12,17
166:11,18 169:9
169:13,22 173:25
180:13 181:9
202:18 203:17
206:23 207:1,2,10
209:5,5 210:19
213:16
**witnesses**  3:3
14:17 16:14 127:4
213:12 214:2

**witness's** 206:21
207:17
**wolf** 13:9
**wolff** 5:15
**woman** 17:6
**won't** 202:20
218:10
**worcester** 4:8
**word** 18:18 36:6
72:18 98:5 117:8
157:20 172:6
**words** 32:19
44:10,13 45:16
123:21 153:8
167:19 182:1
196:22
**work** 15:1 16:25
31:15 51:11 61:15
67:15 68:25 71:22
79:14 86:25 104:6
105:9 131:12
169:11 179:22
211:7 216:7
218:25 221:14
**worked** 14:20
65:2 67:23 83:5,6
161:5 179:7
181:25 223:6
**working** 14:16
17:16 18:24 19:3
49:24 64:18,19
74:9 131:12,14
135:11 142:23
143:1 165:3
175:22 220:13,17
221:22
**works** 131:19
178:14 217:14
**world** 24:14 81:11
83:1 111:1 122:22
191:22 193:12
**worldwide** 152:25
153:18,21

**world's** 44:21
**worse** 124:16
**worst** 169:15
**worth** 110:11
116:21 138:13
153:16
**wouldn't** 23:15
31:20 193:14
194:10 205:15
214:18
**write** 57:21
174:13,24
**written** 34:11
199:25
**wrong** 110:18
111:11 163:13
164:13 211:25
**wrongdoing**
111:9
**wrongly** 59:16
**wrote** 33:21 35:24
36:12 62:5 72:5,5
140:3 144:22
175:3 181:21
182:6 199:13
215:17

**x**

**x** 1:4,10

**y**

**y** 25:5
**yeah** 15:25 19:12
19:20 27:3 29:21
32:5 38:4 39:20
40:14,15 41:1,10
44:20 46:17 47:6
47:11,11 50:21
53:11 57:8,11
62:22 64:25 68:22
72:4,22 77:15
83:17 85:17 87:23
88:9,22 93:20,23
95:13,16,20 98:9
100:9 102:23

103:6,11 104:6
105:7 106:18
107:15 117:17
127:3 131:22
142:3 143:8
146:25 154:17
160:3 163:9,15
164:20 166:18
173:11,12,12
180:17,21,21,21
184:13,14,17
186:9,23 189:12
210:7 212:24
214:21
**year** 33:22 44:22
53:12,17 61:25
63:20 67:21 68:16
68:16 69:1 83:5
84:4,19,24 97:2
108:17,20 109:4
115:12 151:16
153:3,20 154:16
164:10 171:15
175:3 202:13
223:16,19
**years** 19:13,15
22:22 23:1 26:23
48:19 52:17,23
59:24,24 61:25
67:22,23 68:1,3,6
76:4 80:8,8 81:1
89:18 103:2 111:8
112:16 114:3
119:2,2,13,13
121:4 127:9 158:8
158:17 173:20
184:1,19 201:7
202:13 208:11
**yep** 132:2
**yesterday** 14:6
215:2
**yesterday's**
213:11

**york** 1:2 3:10 4:4
4:11 5:4,18 6:11
47:25 48:8 142:14
142:21
**yorker** 142:17
**young** 121:3
**younger** 182:13
**you'll** 36:6
**you're** 15:23 19:8
22:2 25:11,12
27:13 32:25 34:13
35:1 36:14,23
38:2,15,17 39:13
39:13 40:11 41:18
42:25 218:4,5
220:17 221:7,12
**you've** 19:1,13
25:5 44:1 196:8
198:6,9 204:7
213:4

**z**

**z** 12:13
**zabel** 13:10
**zeevi** 13:11
**zero** 213:21
**zoom** 18:7
**zylberberg** 13:12

**,**

**'18** 19:12