# EXHIBIT A

# PURDUE BANKRUPTCY:
# INSURANCE-RELATED FINDINGS

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| Finding E(h) | All parties in interest including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved. | "Upon final analysis, the Bar Date Notice Plan, which provided notice of the General Bar Date and Extended General Bar Date to both known and unknown claimants and parties in interest, ultimately reached an estimated 98% of all adults in the United States ("U.S.") 18 years and older with an average frequency of message exposure of eight times, and an estimated 86% of all adults in Canada 18 years and older with an average frequency of message exposure of four times." Finegan Third Suppl. Decl. ¶ 5, ECF No. 3403.<br><br>"The Bar Date package, which included the Bar Date Notice and the applicable proof of claim form(s), was mailed to all known claimants by February 18, 2020. In addition, on or before February 18, 2020, the two-page, full-color Bar Date Flyer was mailed to approximately 1.2 million individuals and entities including (i) all prescribers of Purdue brand name medications, (ii) U.S. pharmacies and institutions that received Purdue Opioids, and (iii) third-party organizations such as tribal leaders, veterans communities, treatment and addiction centers, mobile health teams, mining communities, religious leaders, homeless and women's shelters, prison outreach organizations, and government agencies." Finegan Decl. ¶ 6, ECF No. 3403.<br><br>"Building on the awareness created by the Bar Date Notice Plan in connection with the General Bar Date and Extended General Bar Date, the Supplemental Confirmation Hearing Notice Plan reached an estimated 87% of all U.S. adults 18 years and older with an average frequency of message exposure of five times, and an estimated 82% of all Canadian adults 18 years and older with an average frequency of message exposure of six times." Finegan Decl. ¶ 15, ECF No. 3403.<br><br>"As set forth in the Affidavit of Service [Dkt. No. 3319], the Debtors served via first-class mail the Confirmation Hearing Notice on all known holders of Claims and Interests, which I was advised by counsel to the Debtors includes all known holders of Shareholder Released Claims, all parties known to the Debtors as having potential claims against the Debtors' estates as defined in paragraph 18(i) of the Bar Date Order (excluding those parties who have requested not to receive notice), and the Notice Parties (regardless of whether such parties are entitled to vote on the Plan) prior to the Solicitation Deadline." Finegan Decl. ¶ 18, ECF No. 3403.<br><br>"The Supplemental Confirmation Hearing Notice Plan began in the U.S. and Canada on June 16, 2021, with a press release and earned media outreach. The press release was titled, "Did you File a Claim Against Purdue Pharma as Part of its Bankruptcy Proceeding? Do You have a Claim Against Purdue Pharma's Owners?" It provided information about the Confirmation Hearing, an overview of the Disclosure Statement Order, and deadlines for voting on the Plan, objecting to the Plan, and filing an allowance request. The press release also directed claimants to www.PurduePharmaClaims.com, the Claims Website that has, since June 16, 2021, been repurposed to focus on Confirmation Hearing information, and included a prominent section on the "Sackler Family Releases." JX-0938 is a true and correct copy of the press release. The press release and earned media outreach generated over 3,700 news stories across the U.S. and Canada, affecting a potential audience of approximately 1,355,035,380. As of July 19, 2021, the Supplemental Confirmation Hearing Notice Plan efforts drove more than 292,200 users to the Claims Website, with over 344,100 page views." Finegan Decl. ¶ 19, ECF No. 3403.<br><br>"In my opinion, the robust and comprehensive outreach efforts employed for the Debtors' notice procedures, including the Bar Date Notice Plan and the Supplemental Confirmation Hearing Notice Plan, have been historic in the context of | Objection: There is no factual support that Certain Insurers had a meaningful opportunity to participate in the bankruptcy proceedings. See Certain Insurers' Obj. to the Form of Debtors' Proposed Confirmation Order 3–4, ECF No. 3618.<br><br>Revised Language:<br>All parties including, without limitation, the Debtors' insurers, had notice of the filing of the Chapter 11 cases Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved. | Response: Certain Insurers' objection is contradicted by voluminous evidence of the Debtors' robust and comprehensive notice program, the numerous mediation orders and reports filed on the bankruptcy docket, detailed descriptions of the mediation in the Disclosure Statement, extensive media coverage regarding the negotiations, and the fact that various parties who were not defined as "Mediation Parties" in this Court's mediation order intervened in those proceedings with seemingly little difficulty—not to mention that Certain Insurers are here now objecting to the Plan and Proposed Confirmation Order. |

---

[1] The language that appears in blue in this column was added to the Debtors' Proposed Findings and Conclusions after Certain Insurers filed their objection.

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | | bankruptcy notice. Notice efforts employed were particularly appropriate, highly targeted, efficient, and afforded a modern way to provide notice to known and unknown claimants. The Debtors' notice procedures were broad and multifaceted and were designed to reach the target population in a variety of different ways. Ultimately, when combined with the other methods of notice—including unmeasured methods such as community outreach—I believe that the overall effort likely achieved even greater results than described above." Finegan Decl. ¶ 25, ECF No. 3403.<br><br>See Order Appointing Mediators, ECF No. 895, Mar. 4, 2020; Mediators' Report, ECF No. 1716, Sept. 23, 2020 (summarizing mediation between non-federal public claimants and private claimants); Mediator's Report, ECF No. 3119, July 7, 2021 (summarizing mediation between the Non-Consenting States and Sacklers); Mediator's Report, ECF No. 3339, July 28, 2021 (summarizing additional issues resolved by mediation, including negotiations among private creditor groups and contingency fees).<br><br>See Mot. to Intervene on Behalf of the NAACP, ECF No. 1555 (seeking intervention in bankruptcy proceedings).<br><br>See Disclosure Statement § III.S, ECF No. 2983 (describing mediation, including participation by parties who were not "Mediation Parties" as defined in the Mediation Order).<br><br>See also Brian Mann, *15 States Drop Opposition to Controversial Purdue Pharma OxyContin Bankruptcy*, NPR (July 8, 2021), https://www.npr.org/2021/07/08/1014043094/fifteen-states-drop-opposition-to-controversial-purdue-pharma-oxycontin-bankrupt; Jef Feeley and Jeremy Hill, *Purdue Talks Stall on Demand for More Cash from Sacklers*, Bloomberg (Jan. 27, 2021), https://www.bloomberg.com/news/articles/2021-01-27/purdue-talks-said-to-stall-on-demand-for-more-cash-from-sacklers; "Bankrupt Purdue Pharma Seeks Mediation for Opioid Payout Talks," Bloomberg Law (Feb. 21, 2020), https://news.bloomberglaw.com/bankruptcy-law/bankrupt-purdue-pharma-seeks-mediation-for-opioid-payout-talks. | | |
| Finding L(e) | The Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law. | The clear and unambiguous language of Section 1123(a)(5) of the Bankruptcy Code means that a plan may assign insurance rights to a trust notwithstanding any anti-policy-assignment clause. AHC Br. ¶¶ 107, 110–11, ECF No. 3465 (citing *In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 369 (3d Cir. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 1999 n.189 (D. Del. 2012) (collecting cases); *In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *16–17 (Bankr. E.D. La. Nov. 9, 2004), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005)).<br><br>The Bankruptcy Code's preemption of anti-assignment clauses is not limited to 524(g) trusts. AHC Br. ¶¶ 108–09, ECF No. 3465 (citing *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Sept. 17, 2020)).<br><br>Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation, which the plan achieves by, *inter alia*, establishing the MDT and vesting the MDT Transferred Assets in the MDT. Debtors' Mem. in Supp. of Confirmation of Debtors' Sixth Am. Joint Chapter 11 Plan ¶ 190, ECF No. 3461.<br><br>The Plan requires that the Bankruptcy Court confirm that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting, as a condition precedent to the occurrence of the Effective Date. Seventh Am. Joint Chapter 11 Plan § 9.1(o), ECF No. 3545. | Objection: Certain Insurers previously notified Debtors that they do not object to the transfer of the MDT Insurance Rights, and the Court need not render an advisory ruling regarding whether the Bankruptcy Code authorizes such transfer. *See* Certain Insurers' Obj. to the Form of Debtors' Proposed Confirmation Order 4–5, ECF No. 3618.<br><br>Revised Language:<br><br>~~The Bankruptcy Code authorizes~~ The Insurers who joined in "Certain Insurers' Limited Objection to Plan Confirmation and Reservation of Rights," Dkt. No. 3263 (the "Insurers") have represented that they do not, in the specific circumstances of these Chapter 11 Cases, oppose the transfer and vesting of the MDT Transferred Assets to and in the Master Distribution Trust, and no | Response: In addition to being an accurate statement of the law, this finding addresses a crucial component of the Plan, and its inclusion in the Confirmation Order is a condition precedent to Plan confirmation. A ruling to this effect is not "advisory," as another insurer—Chubb Insurance USA—has objected to the transfer. *See* Chubb Insurance USA's Objection to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [Dkt. No. 3301]. The language proposed by Certain Insurers does not indicate universal commitment from all insurers not to challenge the transfer of the MDT Transferred Assets (which include the MDT Insurance Rights), and thus provides no protection to the Debtors and their creditors. |

2

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | | | other insurance company or other party in interest has objected to such transfer and vesting. In the absence of any outstanding objections, such transfer and vesting of the MDT Insurance Rights is authorized ~~notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law~~ | |
| Finding JJ(a), first sentence | Pursuant to the Bankruptcy Code, including section 1123 of the Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and negotiate a resolution of their opioid-related liabilities and, with approval of the Court, enter into a resolution of their opioid-related liabilities through the Plan. | The Settlements embodied in the Plan are fair and equitable and should be approved. Debtors' Br. § I, ECF No. 3461.<br>• There are three principle settlements in the Plan (Shareholder Settlement; Public Entity Settlements; Private Entity Settlements).<br>• "Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may include a settlement of any claim belonging to the estates and 'any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code].' 11 U.S.C. § 1123(b)(3)(A), (b)(6). In the Second Circuit, courts evaluate a settlement included in a chapter 11 plan under the same standards applied under Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019"): they assess whether the settlement is 'fair and equitable' and in the 'best interests of the estate.'" Debtors' Br. ¶ 55, ECF No. 3461.<br>• Each of the settlements is reasonable, in the best interests of the estates, and should be approved. Debtors' Br. ¶¶ 60–114, ECF No. 3461 (Shareholder Settlement); 115–19 (Public Settlements and Private Settlements).<br><br>*See also* AHC Br. ¶¶ 25–26, ECF No. 3465 (allocation among states satisfies Rule 9019); 115–19 (remainder of the plan settlement is reasonable and in the best interests of the estates and should be approved). | No objection. | None. |
| Finding JJ(a), second and third sentences | The settlements reached between the Debtors and the opioid-related claimants, as embodied in the Plan, are reasonable and were entered into in good faith based on arm's-length negotiations. Such negotiation, settlement, and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy | "The fact that the Debtors are subject to well over 2,600 lawsuits and potentially growing at least potentially under the 362(b)(4) exception to the automatic stay, argues that there should be a serious effort undertaken with appropriate safeguards to enable the Debtors and their creditors as a whole to try to resolve the allocation issues in this case." Hr'g Tr. 256:6-12, *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Oct. 11, 2019).<br><br>"Continued litigation will drain the estate of many millions of dollars of value in direct and indirect cost. This is a company, Your Honor, that spends more than a quarter of a billion dollars a year on legal fees, a significant portion of which is driven by the litigation morass. . . . The Debtors spend more than 60 million – spent more than $60 million a year in the first half of 2019 on litigating defending actions. That means if no stay is issued, the Debtors would project spending another 60 million during the 180-day period of our requested stay. 60 million less for communities affected by the opioid crisis and 60 million more for lawyers and professionals. And that doesn't count the indirect costs of the burdens and distraction on litigation." Hr'g Tr. 43:16-21; 44:3–12, *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Oct. 11, 2019) (Benjamin Kaminetzky, on behalf of the Debtors).<br><br>"I understand that discussions among the Sackler Families and the Debtors' creditors continued to progress during the pendency of these Chapter 11 Cases, and that, on September 30, 2020, the Bankruptcy Court authorized the Mediators, the Honorable Layn Phillips and Mr. Kenneth Feinberg, to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in the supplemental mediation commonly referred to as the 'Phase 2 Mediation.' This Phase 2 Mediation was important because it was critical that any potential settlement of claims against | Objection: The Court need only find the first sentence of the proposed language; any other finding should be resolved in the adversary proceeding. *See* Certain Insurers' Obj. to the Form of Debtors' Proposed Confirmation Order 5–6, ECF No. 3618.<br><br>Revised Language: The settlements reached between the Debtors (viewed collectively) and the opioid-related claimants, as embodied in the Plan, are reasonable and were entered into in good faith based on arms-length negotiations. ~~Such negotiation, settlement and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy (including any consent~~ | Response: This finding does not require the Court to determine that coverage exists. It requires the Court to determine that the Plan itself does not diminish the value of whatever rights the Debtors had under the policies pre-petition. The finding is required by the Plan and furthers the purposes of the Bankruptcy Code. |

3

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | (including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law. | the Sackler Families that was to be reflected in the Debtors' plan of reorganization receive substantial creditor support. Without that support, any reorganization predicated upon such a settlement would not be viable." Dubel Decl. ¶ 38, ECF No. 3433.<br><br>"On January 31, 2021, the Mediation formally concluded pursuant to the Bankruptcy Court's order, but settlement negotiations continued among the Sackler Families, the Debtors, the Non-Consenting States Group, the Creditors' Committee, the Ad Hoc Committee, and the MSGE. From January 29, 2021 to February 18, 2021, the Sackler Families and the Debtors, together with the Creditors' Committee, the Ad Hoc Committee, and the MSGE, exchanged eight offers and counteroffers. Each of the Creditors' Committee, the Ad Hoc Committee, and the MSGE supported each of the counteroffers." Dubel Decl. ¶ 44, ECF No. 3433.<br><br>"I, and other members of the Special Committee, determined that the Shareholder Settlement embodied in the Plan is in the best interest of the Debtors' Estates and their creditors. To be clear, this view is based on my own judgment and the judgment of the other members of the Special Committee, as informed by the legal and professional advisors to Special Committee." Dubel Decl. ¶ 48, ECF No. 3433.<br><br>"After careful consideration of the Debtors' and third parties' potential claims against the Sackler Families, the Special Committee's investigation, the arm's length mediation and negotiation of the Shareholder Settlement, and the extent of creditor support for the Shareholder Settlement, I and other members of the Special Committee determined that the settlement is fair, equitable, and reasonable. I believe that the benefits of the settlement are many and that they outweigh the potential benefits of pursuing litigation against the Sackler Families. The settlement, in my view, reflects a reasoned judgment as to the trade-off between a possible but uncertain recovery of a larger amount through continued litigation versus an agreed recovery of settlement payments that are certain, but may be less than what the Debtors potentially could obtain in litigation. The settlement promises very significant future benefits for the Debtors' Estates, while success in litigating the Debtors' potential claims against the Sackler Families is not guaranteed." Dubel Decl. ¶ 49, ECF No. 3433.<br><br>"The many benefits of the settlement evaluated in March 2021 include $4.275 billion in shareholder payments to the Debtors' estates and their successor trusts, over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years). These payments provide billions of dollars of value that will fund distributions to personal injury claimants and to abatement trusts for the benefit of private and public claimants. These payments also exceed the benefits contemplated by the Settlement Framework that was under consideration at the time these Chapter 11 Cases commenced in September 2019." Dubel Decl. ¶ 50, ECF No. 3433.<br><br>"In June and July 2021, I and other members of the Special Committee received regular updates from the Debtors' counsel regarding mediation between the Non-Consenting States Group, on the one hand, and members of the Sackler Families, on the other, overseen by Judge Shelly C. Chapman. In July 2021, I learned that, as a result of the successful mediation, the Sackler Families agreed to increase the shareholder payments by $50 million, to $4.325 billion, and to accelerate the payment dates of $50 million in previously agreed settlement payments. As described above, I and the other members of the Special Committee determined that the settlement was fair, equitable, and reasonable before these enhancements were made. These agreed improvements to the economic terms of the settlement further confirmed my determination that the benefits of the settlement outweigh the potential benefits of pursuing litigation against the Sackler Families." Dubel Decl. ¶ 56, ECF No. 3433.<br><br>"[I]t is my opinion the Plan as a whole, and the settlements it embodies, were reached in good faith and are reasonable in the context of these cases." Guard Decl. ¶ 2, ECF No. 3446. | ~~to settle or pay-first provisions) or provisions of non-bankruptcy law.~~ | Certain Insurers' papers make clear clear that the purpose of their insertion of "viewed collectively" in the first sentence is to support an argument in post-confirmation coverage litigation that the settlement is not, in fact, reasonable as to Rhodes Pharma L.P., which Certain Insurers assert had no liability for opioid claims. This contradicts insurers' commitment to this Court in the insurance adversary proceeding that they would treat the findings of this Court in the Confirmation Order, including findings as to the reasonableness of the Plan's settlements, as binding. Therefore, there is no reasonable basis on which to add this language. |

4

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | | "Since late 2018, I have been deeply involved with the work many parties have been doing to devise and negotiate a plan to allocate settlement proceeds from opioid defendants among states. This work, which has now gone on for more than two years, involved negotiating a compromise that would balance the disparate interests of many parties. The work successfully resulted in a compromise on an allocation formula. That formula is complex, but its complexity reflects a highly negotiated compromise among many parties balancing their disparate interests and viewpoints." Guard Decl. ¶ 10, ECF No. 3446.<br><br>"After the states, subdivisions, and tribes were able to reach an agreement, the mediation then turned to how to split monies between the private and public creditors. While each private creditor may have had one or two meetings a week during this phase of the negotiations, the AHC and NCSG members involved in the negotiations often had multiple multi-hour meetings a day, sometimes multiple times in a week with the varied private creditor groups. In addition, there were frequent calls with the mediators and calls coordinating strategy." Guard Decl. ¶ 66, ECF No. 3446; *see also id.* ¶¶ 68–70 (describing negotiations with the U.S. Department of Justice, Debtors, and Sacklers).<br><br>"Both TDPs [the Non-NAS PI TDP and the NAS PI TDP] employ terms that are designed to foster equitable distribution and equal treatment among similarly situated claimants, to maximize assets for claimants in the aggregate, and to minimize administrative costs." Greenspan Decl. at 10, ECF No. 3412-1.<br><br>Section 1123(a)(5) of the Bankruptcy Code preempts any consent-to-settle provisions in a debtor's insurance policy. AHC Br. ¶ 110, ECF No. 3465 (citing *In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *16–17 (Bankr. E.D. La. Nov. 9, 2004), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005)).<br><br>Section 524(e) of the Bankruptcy Code provides the debtor, but not third parties, a "fresh start." AHC Br. ¶¶ 112–13, ECF No. 3465 (citing *In re Petition of the Bd. of Dirs. of Hopewell Int'l Ins.*, 281 B.R. 200, 210 (Bankr. S.D.N.Y. 2002)).<br><br>Applicable state law requires insurers to perform their obligations, even in the event of the policyholder's insolvency. AHC Br. ¶ 114, ECF No. 3465 (citing *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 282 (Bankr. E.D.N.Y. 2009)).<br><br>Debtors are free to enter into a reasonable settlement of their liabilities without implicating the policies' consent-to-settle provisions, given the insurers' denials of coverage or reservation of rights regarding coverage, as well as the inherent conflict between a debtor and its insurers in Chapter 11 proceedings. AHC Br. ¶¶ 122–25, ECF No. 3465 (citing, *e.g.*, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 58 N.Y.S. 3d 38, 39–40 (N.Y. App. Div. 2017)). | | |

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| Finding JJ(a), sixth sentence | Any reasonable estimate, projection, or valuation of their total liability and obligation to pay for Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), and 10(b), if the Debtors had the ability to pay those Claims and that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all assets of the Debtors' Estates, including but not limited to the value of the Debtors' business, contributions from third parties and the full face value of all of Purdue's insurance. | "Based on my experience; my knowledge of the Debtors' business, operations, financial performance, and restructuring efforts; and analysis that I have conducted in connection with the Debtors' Plan including the Liquidation Analysis, I conclude that estimated recoveries for all creditor groups under the Plan are no less than, and in many cases significantly greater than, the estimated recoveries for creditor groups in a hypothetical chapter 7 liquidation. As described below, based on the Liquidation Analysis, I estimate that liquidation of the Debtors' assets would result in net liquidation proceeds to be distributed to creditors ranging from $281.1 million to $3,195.6 million, with a midpoint of $1,801.6 million. In all but the high scenario, no net liquidation proceeds would be distributed to holders of contingent liability claims—claims alleging opioid-related liability—in significant part because the $2 billion DOJ Forfeiture Judgment Claim would absorb nearly all of the net liquidation proceeds. Estimated recoveries to holders of contingent liability claims are not materially better even in the high scenario. While the Liquidation Analysis estimates that $699.1 million will remain to be distributed to contingent liability claims in the high case, that amount is greatly exceeded by the asserted face amount of contingent liability claims—for every dollar of asserted claims there would be about seventeen ten-thousandths of a cent (.0017) of distributable value. To consider this from a different perspective, the Liquidation Analysis estimates that in the high case, $699.1 million will remain to be distributed to contingent liability claims (and that $0 will remain to be distributed to these claims in the low and mid cases). Under the Plan, the contingent liability claims receive an estimated $5.5 billion as outlined in the table below." DelConte Am. Expert Report ¶¶ 8–9, ECF No. 3411-1.<br><br>"Finally, one notable aspect of this case is that more than 614,000 Proofs of Claim that allege liability arising out of or in connection with Opioid-Related Activities filed against the Debtors were filed before the General Bar Date. Approximately 10% of the submitted Proofs of Claim assert a specific amount of liability. Taken together, these 10% of the submitted Proofs of Claim allege liability totaling approximately $41 trillion (excluding one personal injury claim that asserted liability of $100 trillion)." DelConte Am. Expert Report ¶ 15, ECF No. 3411-1.<br><br>*See generally* Horewitz Expert Report and Decl., ECF No. 3450. | No objection. | None. |
| Finding NN | Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation to pay the Debtors' opioid-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those | Section 524(e) of the Bankruptcy Code provides the debtor, but not third parties, a "fresh start." AHC Br. ¶¶ 112–13, 119, ECF No. 3465 (citing *In re Petition of the Bd. of Dirs. of Hopewell Int'l Ins.*, 281 B.R. 200, 210 (Bankr. S.D.N.Y. 2002)).<br><br>Insurers cannot reduce their coverage obligations based on a debtor's inability to pay the full value of the claims against them. AHC Br. ¶¶ 116–117, ECF No. 3465 (citing *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, No. CIV CCB-03-3408, 2012 WL 734176, at *1 (D. Md. Mar. 6, 2012) ("The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations. The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established."); *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356 (N.D. Ill. Sept. 30, 2011); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir 1991) ("[The insurer] may profit greatly from UNR's bankruptcy if its obligations are based on the arbitrarily discounted amount that the . . . victims actually receive from the Trust.")).<br><br>Insurers must use the full amount of allowed claims, even where a post-bankruptcy trust pays only *pro rata* shares, to determine whether a self-insured retention or underlying policy has been exhausted. AHC Br. ¶ 118, ECF No. 3465 (citing, *e.g.*, *Home Ins. Co. of Ill. v. Hooper*, 691 N.E.2d 65, 69–70 (Ill. App. Ct. 1998) ((rejecting the insurer's argument that a bankrupt policyholder had to satisfy a policy's self-insured retention by payment of the actual amount of a liability before a claimant could obtain the proceeds of the policy); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255 (5th Cir. 1988) (applying allowed amount of claims to determine satisfaction of deductible, as the insurer "should not be allowed to escape its obligations under the insurance policy simply because its insured is in bankruptcy")). | Objection: The Bankruptcy Code speaks only to discharges, not releases. The insurance coverage consequences of the plan and confirmation order should be determined in the adversary proceeding. *See* Certain Insurers' Obj. to the Form of Debtors' Proposed Confirmation Order 8, ECF No. 3618.<br><br>Revised Language:<br>Except as expressly provided in this Order or the Plan, the discharge ~~or release~~ of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation, if any, to pay the Debtors' opioid-related liabilities~~, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those~~ | Response: This finding does not require the Court to determine that coverage exists. It requires the Court to determine that the Plan itself does not diminish the value of whatever rights the Debtors had under the policies pre-petition. Any distinction between a "discharge" or "release" is irrelevant for that purpose. The finding is required by the Plan and furthers the purpose of the Bankruptcy Code. |

6

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law. The Plan discharges or releases Debtors for their opioid-related liabilities. | *See* Debtors' Br. ¶ 144, ECF No. 3461 ("The discharge that section 1141 grants to a debtor upon confirmation applies to nearly every prepetition claim not subject to one of the narrowly-tailored exceptions to discharge."). "Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation[.]" 11 U.S.C. § 1141(d)(1)(A). "Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan." Disclosure Statement § IV, ECF No. 2983; *see also id.* § I.F (describing in detail the release and injunction provisions in the Plan). *See also* Seventh Am. Joint Chapter 11 Plan § 10.2, ECF No. 3545 ("Discharge of Claims against and Interests in the Debtors"); *Id.* § 10.6 ("Releases"). | ~~liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law~~. The Plan discharges ~~or releases~~ Debtors for their opioid-related liabilities. | |
| Paragraph 63 | Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and <u>after the expiration of 14 days</u> after the entry of this Order, the provisions of the Plan, the Plan Documents, and this Order shall bind the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases, including the Debtors' insurers, and each of their respective heirs, executors, | A confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation. This basic tenet applies to insurers as it applies to all other parties to a bankruptcy. AHC Br. ¶ 101, ECF No. 3465 (citing *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW), 2016 WL 3212493, at *9 (Bankr. S.D.N.Y. June 1, 2016), *aff'd*, 696 F. App'x 26 (2d Cir. 2017); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991)). "Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan." 11 U.S.C. § 1141(a). "Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan." Disclosure Statement § IV, ECF No. 2983. "It would appear to me that my rulings would all be facts that would be before an arbitration panel, and the movants have contended that—not contended, have assured the Court, and I am relying in part upon this assurance, that they would not challenge this Court's rulings and seek to relitigate those rulings in the insurance litigation in the arbitration panel context." Hr'g Tr. 98:4–10, *Avrio Health L.P. v. AIG Specialty Ins. Co.*, Adv. Pro. No. 21-07005 (June 21, 2021). | No objection. | None. |

**PURDUE BANKRUPTCY:**
**INSURANCE-RELATED FINDINGS**

| Confirmation Order Cite | Debtors' Proposed Language (ECF No. 3635-1)[1] | Factual and Legal Support for Debtors' Proposed Findings and Conclusions | Insurers' Objection and Revised Language | Debtor/AHC Response |
|---|---|---|---|---|
| | administrators, estates, successors and assigns. | | | |