August 19, 2021

The Honorable Robert D. Drain
U.S. Bankruptcy Court
The Southern District of New York
300 Quarropas Street
Room 147
White Plains, New York 10601

RE: Claim Against Debtors-Purdue Pharma LP Cases, 19-23649

Subject: Personal Injury Opioid Related Claim of Christopher M. Aiello, by Cheryl Aiello, His Attorney In Fact, Date of Submission, May 8, 2020

Creditor Claim Number 17141


Dear Judge Drain,

There is a saying in the Jewish religion: "If you save one person's life, you save the world."

I realize that there are thousands of claimants who have been affected by the actions of Purdue Pharma in the marketing of Oxycontin that no doubt helped fuel the opioid pandemic. When my brother, Christopher, was first prescribed Oxycontin in 2009, little did I know that this energetic businessman and once shining pillar of our community for his work with children, would do the unspeakable: He would eventually begin to inject opioids and heroin.

My brother was my business partner and my hero; he was the brightest light and kindest person whom I've ever known. We built a very successful real estate and home building business together, aptly named after the two of us, "Cher-Chris Homes." We were inseparable. Christopher, my brother, was very involved in coaching youth sports teams. Our business was recognized for his work with a youth football league and we attracted the attention of the professional football franchise, The Cleveland Browns. The team was moving to Baltimore in 1996 and Cher-Chris Homes received nearly all contracts to find existing homes or to build new homes for team players and personnel of The Baltimore Ravens. I've attached one related news article from The Baltimore Sun entitled "Roosts For The Ravens."

About thirteen years later, in 2009, my brother, Christopher, was prescribed Oxycontin. In some of my attachments, herein, and extensively (with hundreds of pages in catalogued binders) in my claim, I have a synopsis of the opioids Christopher was prescribed. Two weeks before his arm was amputated at the shoulder, on May 8, 2012, Christopher received an 80 pill count prescription of opioids from a doctor in Nevada. It is still incomprehensible to me that this doctor, Alafuro Oruene, did not determine how severely ill my brother was and that he was injecting the drugs at the time the doctor wrote the prescription. Two weeks later to the day I received a call from Spring Valley Hospital, asking for consent to amputate Christopher's arm at the shoulder due to necrotizing fasciitis. Had I not agreed Christopher would have died within a few hours. They had given him less than a twenty (20) percent chance to live, even after the amputation. After the surgery the hospital called to say that my brother had died and that his body would be sent to Davis Funeral Home. This record is in the report that I sent in my creditor claim. Before I had a chance to absorb the shock, the hospital called back to say that, unbelievably, they had made an error and that Christopher was still alive.
About a month later, as Christopher laid on life support, one of the infectious disease doctors observed the extent of his brain damage and realizing that my brother no longer would have a quality of life, he said to me of my brother's 'life saving' amputation surgery,

"Sometimes we do our jobs too well."
After the coma my brother never walked again and has been bed bound and hospitalized, completely incapacitated for eight (8) years. I have moved him from a nursing home (Las Vegas Post Acute) where conditions were deplorable, to TLC Care Center in Henderson, Nevada, where he has been 'living' since 2017. While I do not think that my pain is any greater than that of family members who have lost loved ones due to opioid abuse, I believe that barely living may be a worst-case scenario than death. I have tried unsuccessfully to move him to Maryland so that I can be close to him. The logistics of a flight across the country, short of a medical jet transfer, has proven to be impossible and cost prohibitive. If I were to get a settlement from Purdue, I would move Christopher immediately to a private hospital in Maryland near to where I live.

Another tragedy of my brother Christopher's addiction unfolded when his two young sons began finding and experimenting with their father's prescriptions and ultimately become heroin addicts. Fortunately I was able to find my young nephews in 2012 in Nevada and fly them back to New York City where I lived at the time. I was able to get them both into treatment. Anthony became editor of The Helping Up Mission Newsletter and has since gotten a masters degree. He is a teacher. Nicholas has been a program coordinator at the Helping Up Mission where he has inspired many to recovery. I am not a hero, just a concerned aunt who saw my one chance to get the boys to safety. I spent years in addiction recovery clinics with my youngest nephew, Nicholas, and met many children who did not have an advocate like my nephews had. There was one sixteen (16) year old African American boy at Phoenix House in Queens, New York, who told me he had spent a year and a half already in federal prison for possession of marijuana. It was one of the saddest things I've ever heard.

In 2012, I was fortunate to be living and working as a real estate agent in New York City where there were Medicaid program options and hospitals like Bellevue and Harlem Hospital. I was able to admit both boys to these facilities. While I was showing real estate in Trump Tower in 2013, my young nephew, Nicholas and I, met Donald Trump on the elevator. My nephew was on heroin at that time and I was taking him on appointments with me and watching him constantly so that he would not overdose. In my desperation I had my nephew write to Mr. Trump the next day. I hoped against all odds that there would be someone more powerful than I who could help. I produced a video just before Trump became president, featuring my nephew pleading for financial assistance for addiction recovery in the event that he became president. I have attached the flash drive with Nicholas's video to this letter. I hope you will take a few minutes to look at it. I had written to Dr. Drew, Dr Phil, Donald Trump, state legislators., etc., to no avail. It was the program at Baltimore's Helping Up Mission that saved both my nephews lives after every other one failed them.

A financial claim from this settlement would help me bring Christopher back home and care for him at a private facility. It will also help me with my dream of building a non-profit addiction recovery center based on the Baltimore Helping Up Mission model, the goal of which would be to give hope to the hopeless.

Thank you for your consideration.

Very Respectfully,


Cheryl Aiello
Cheryl Aiello, Creditor for Christopher Aiello
14714 Lindsey Lane
Silver Spring, MD 20906
240-994-2251

Cherylaiello1@gmail.com

From: Cheryl Aiello, POA for incapacitated patient Christopher Aiello and CreditorAddress:

14714 Lindsey Lane

Silver Spring, Md. 20906

Email: Cheryjo10@aol.com

Cell phone: 917-572-0485

To: Purdue Pharma Claims Processing Center

c/o Prime Clerk LLC

850 Third Avenue, Suite 412

Brooklyn, New York 11232

Subject: Personal Injury Opioid Related Claim of Christopher M. Aiello

Date: May 8, 2020

RE: Claim Against the "Debtors" in Cases 19-23649

To Whom It May Concern,

I am the designated Power of Attorney for my brother, Christopher Aiello.

There are two Purdue Pharma opioid drugs that did irreparable harm to Christopher and explain why his arm was amputated at the shoulder and why he is incapacitated: prescriptions for OxyContin and for Dilaudid. At Spring Valley Hospital, in July of 2013, Dr. A. Dhillon suggested Christopher begin another Purdue drug, MSContin, per the attached record, and I assume that her protocol was followed as Christopher was subsequently prescribed morphine sulphate 15 mg. oral tablets.

Christopher was a very successful custom home builder by trade. This letter will explain that in 2010, during the exact time that Christopher was being prescribed both OxyContin, oxycodone and hydrocodone, he failed to work and did not attend a property closing on March 30, 2010 which resulted in his forfeiture of any proceeds from that $265,000 home sale(#1), and later, in September of 2010, he was foreclosed upon by Cecil Bank for a new construction loan amount of $625,000 and lost the 4 plus acre parcel of land he had owned outright since 1984, valued at $253,700.00 according to the attached valuation by Casey Overs of Cecil Bank(#2). Christopher lost any and all proceeds from the sale of property #1 at 5008 West Heaps Rd. Pylesville, Md., due to his inability to complete the house construction and show at the property closing date of 3/30/2010, and he was foreclosed upon six months later on property #2 at 15819 Yeoho Rd.,Sparks, Md. 21152, wherein Christopher lost a building lot containing 4.037 acres which he had owned since 1984. Both heavy losses occurred during

the exact time frame Christopher had been prescribed twenty three (23) legal prescriptions for opioids, some prescriptions of which contained the highest dosages available.

Although this letter and the attached 'synopsis' will show that Christopher has received many opioid prescriptions in the decade following 2009, in August of 2019 (and presently), he was and is still being prescribed oxycodone HCl 10 mg, 2x every six hours, a prescription which continues until present day. Christopher has been bed bound since 2013 and labeled by doctors as 'opioid dependent.' Christopher's hospital records chronicle his compromised kidney function, yet he was continually prescribed Dilaudid IV push injections hundreds, if not thousands of times between June of 2013 and April of 2017. Attached doctor notes from Spring Valley Hospital suggest that Christopher not be given opioids, yet on August 31, 2012, at Valley Hospital, he was administered both OxyContin and Dilaudid exactly two hours apart.

Christopher's constant state of sedation from the Dilaudid made him unable to cooperate with the physical therapists in the hospital, despite his one time positive outlook for rehabilitation. If he was ever to walk again, the time to do so was back in 2013 before the heavy sedation began from a combination of Dilaudid and other opioids. He missed that critical time and Christopher's legs and body are atrophied. He will never walk again and has been bed bound these seven years, labelled as a total 'self-care deficit,' requiring 24 hour nursing care.

Christopher was brought by ambulance to Spring Valley Hospital Medical Center, Las Vegas, NV, in an altered state and in withdrawals on May 20, 2013. I was told later in the hospital by an attending physician that my brother had either 'overdosed on opioids or was in septic shock' or a combination of both. Christopher had 'necrotizing fasciitis' of his right arm. For two days, the doctors tried debridement of his damaged tissue, unsuccessfully. Christopher's heart had been 'converted' on at least three occasions prior to and including this one on May 20, 2013, by the doctors use of 'amiodarone.' I am not a doctor but Christopher's opioid dependence had no doubt created his heart problems. On May 22, 2013, Christopher's right arm was amputated at the shoulder. He was in respiratory failure and put on a ventilator. My brother's prognosis was poor and guarded. A tracheotomy was done and a PEG feeding tube placed at my mother's request. Christopher had an MRI on May 20, 2020 and was diagnosed with CVST, stroke and brain damage. He presented at this time with multiple organ, kidney and liver failure. Christopher's kidney problems adversely affected his health from 2013 or earlier until the present and are the direct result of his extreme opioid dependence. On May 25, 2013, the nursing staff at Spring Valley Hospital pronounced Christopher dead. They made arrangements to move his body to Davis Funeral Home. Upon closer observation the staff detected Christopher was still alive. Since May 20, 2013, Christopher has been hospitalized and bed bound, unable to walk, and requiring 24 hour nursing care, completely incapacitated. He was in a coma for over a month following the amputation and had 'ventilator respiratory failure.' I was told he had less than a 20 percent chance to live. The doctors said that such opioid dependence weakens the lungs and they doubted his 'lungs' could ever come off the ventilator. One of the doctors told me to 'say goodbye and make my peace with him.' My mother asked the hospital to reverse the Do Not Resuscitate order on June 24, 2013. The hospital informed us that we must consider hospice if there was no improvement. My mother asked for a priest to be sent to his room. Throughout the month of

June the doctors noted my mother's distress as she asked them time and again, "Will he come out of this?"

Miraculously, he did come out of the coma and was weaned off the ventilator. A subsequent MRI in July, 2013, showed that in addition to the 'old' stroke, there were new areas of evidence of bilateral cerebrovascular injury, new stroke, caused from possible lack of oxygen and/or the coma. As I sat by his bedside, I still had hope that Christopher could one day walk again. I ask myself now, "how was that possible when the hundreds if not thousands of Dilaudid injections he would receive kept him in a sedated and immobilized state." At many times throughout his multiple documented hospitalizations, I begged the doctors to wean him off this drug. After all, wasn't it a prescription for cancer patients? In the hospital notes from June 2013, the doctor writes, "patient is out of withdrawals and off heroin in the hospital." After this notation that Christopher has detoxified, why is he then injected with hundreds, if not thousands of prescriptions for Dilaudid, the equivalent of starting him over again on 'controlled' heroin? In December, 2013, his hospital records note, "Patient has good chance for rehabilitation." Yet Christopher was always too sedated from Dilaudid when the physical therapy and occupational therapy staff came in to work with him and was unable to cooperate. Eventually the OT and PT staff stopped coming because Christopher was always asleep. This is duly noted in his Spring Valley Hospital records in December of 2013. Because he was in a constant state of sedation from the Dilaudid, Christopher missed the critical time frame where rehabilitation needed to occur if he was ever to walk again.

Although Christopher had been admitted to hospitals on repeated occasions prior to May 20, 2013, since this time he has been 100% hospitalized, bed bound, with the inability to walk and dependent upon 24 hour nursing care. He was opioid dependent prior to and during this seven year period, and presently (unbelievably) is receiving a prescription for oxycodone HCl 10mg, 2 tablets, every 6 hours. He was hospitalized for nine (9) months at Spring Valley, beginning on May 20, 2013, before being transferred on January 7, 2014 to Las Vegas Post Acute Rehab Facility. Three years ago, on February 19, 2017 I had him removed from Las Vegas Post Acute Rehab Facility in Las Vegas after seeing many bedsores on his body. It was the weekend and the facility would not discharge him. I called the police to intervene and he was transferred to the emergency room at Spring Valley Hospital where he was treated for the bedsores and a massive urinary tract infection. If Christopher had never gotten addicted to opioids he would not have had to endure the neglect by this nursing home which resulted in multiple painful bedsores on his body and a massive urinary tract infection due to the fact, in part, that he was dehydrated. After his removal from Las Vegas Post Acute, Christopher required hospitalization at Spring Valley Hospital (again), St Rose De Lima and Henderson Hospital, before he finally was permanently admitted on April 6, 2017, to TLC Care Center, a skilled nursing facility in Henderson, Nevada. At the time of the writing of this letter, my brother, Christopher, is hospitalized requiring 24 hour care at TLC in Henderson, Nevada. In the attached binders I have documented his complete opioid dependence for 11 years. Christopher's opioid use began in 2009 with the introduction of prescriptions by doctors for oxycodone and OxyContin. He began IV drug use in 2011 due to his inability to obtain prescriptions for oxycodone and OxyContin.

Christopher is now 59 years old. He was the President of Cher-Chris Construction Company with an average salary upwards of $150,000. His business generated much more profit than he paid himself and he reinvested these profits back into his business on a yearly basis. We worked very closely together and remain as close as any brother and sister could be. My brother, Christopher, spent a

great deal of time coaching underprivileged children in Little League Football. On one occasion, I hosted a group of these children at my home for the weekend. Many had no families. Recently, one of the boys, Nathaniel Yarborough, said that Christopher set a shining example for him that had forever changed his life. I have attached a few of photos of these good memories. It was because of attention he received as a football coach for children (attention he did not seek), that Christopher was able to get contracts to build homes and sell residences to sports figures from the Ravens, Orioles, Baltimore area sportscasters, as well as business leaders. He was involved in chairing fundraising efforts for underprivileged children in Baltimore, Md. Christopher relocated the Baltimore Ravens Football Team from Cleveland to Baltimore in 1996. Christopher was the subject of a front page news article in The Baltimore Sun entitled "Roosts for the Ravens" that same year. He built incredible homes for many of the Ravens coaches and players, and for the Maryland/ DC community during the years leading up to 2008. Christopher even expanded his construction and real estate business from one office location in Baltimore County, Md to include another office in Olney, Md., near Washington, D.C. His business had been extremely successful prior to his addiction to prescription opioids.

I loved my brother as my entire family did. He was an amazing businessman, bright, talented, creative, honest and kind. He had the biggest heart of anyone whom I've ever known. Christopher was a wonderful father, brother, husband and son before the prescriptions to oxycodone, oxyContin and other opioids quickly took hold of him and ruined his life, his family, and our immediate family. Beginning in 2009 and to present, as a result of his many legal opioid prescriptions, and dependence on opioids, Christopher eventually lost his business and his income. A 4.037 acre building lot that Christopher had purchased in 1984 at 15819 Yeoho Rd., with funds he had earned through his work at Cher-Chris, the company of which he was president, was foreclosed upon in September, 2010, and his land, estimated at a value of $253,700, was taken by Cecil Bank. The loan he had from Cecil Bank, pledged against this lot, for $625,000, was foreclosed upon in September of 2010, according to bank representative Casey Overs and documented in this file. Ms. Overs would be willing to speak with the court; she can be contacted at 410-398-1650, ex. 139. Christopher was also unable to repay our mother for the line of credit she took out in April of 2008 in the amount of $500,000, for the purpose of buying a building lot in Harford County and for building two houses, (one in Harford County and one on the four plus acres he owned in Sparks, Md). This $500,000 loan was collateralized against my mother's home which had been in our family for over 100 years. My mother sold her home due to financial stress. She repaid Cecil Bank on October 21, 2010 for $532,733.86 (penalties and interest). My mother had also taken out a second loan for $50,000 to further pay for construction costs, a loan that was secured against a CD she once had at Cecil Bank. My mother used the money in the CD to repay the $50,000 loan on October 13, 2010.

I have attached documentation from Cecil Bank for both Christopher's foreclosure of the $625,000 loan on the lot/new construction house at 15819 Yeoho Rd. Christopher lost the $253,700 building lot he owned outright when the bank foreclosed on him in September of 2010, and my mother lost her credit line (from which the money was wired to build, in part, this house at 15819 Yeoho and another house at 5008A West Heaps Rd in Harford County, Md. My mother also lost the $50,000 loan she had taken out when additional money was needed for the construction projects.

In 2008 Christopher complained to me of severe migraine headaches and facial pain. The building business had been spiraling downward beginning in 2006. Then the home building business collapsed altogether during the recession of 2008. Our mother wanted to help Christopher reestablish in the

custom home building business that same year to give him, as she called it, 'a new lease on life.' Because Christopher had been so successful in previous years in custom home building, my mother thought taking out the loans would be a good investment.

Then in 2009 Christopher began to receive pain medication from Dr. Eric Carr. Dr. Carr noted that Christopher was suffering from depression yet still prescribed him the highest dosages available of oxycodone (30 mg). On January 12, 2010, Christopher was a passenger in an automobile that was hit head on. I have gone on to document his subsequent visits to GBMC Hospital Medical Center where he was treated by Dr. Alvin Detterline. At this time, Christopher was already addicted to prescription opioids. He is seen after the auto accident by Dr. Detterline who notes that Christopher had a prescription for pain medication filled by Dr. Eric Carr earlier that day. Both doctors are under the same umbrella at GBMC in Baltimore. That notwithstanding, in seven visits, Dr. Detterline wrote Christopher six prescriptions from St. Josephs hospital for oxyContin, oxycodone, and hydrocodone. Christopher had these prescriptions filled at the St Josephs Hospital outpatient Pharmacy in the O'Dea Building at 7601 Osler Drive, Baltimore, Md., a pharmacy which has since closed. While I have attached the prescription notes written by Dr. Alvin Detterline for three OxyContins, I am unable to provide the pharmacy records at this time due to the closing of the outpatient location at St. Josephs Hospital. Christopher also had profiles from CVS Pharmacy at 1001 York Rd., and possibly 401 York Rd.,Towson, Md., however, because their database only goes back a certain number of years, they were unable to access the prescription histories from these (profile) locations. Due to the automobile accident on January 12, 2010, Christopher had shoulder surgery performed by Dr. Detterline on February 25, 2010. During the month of March 2010 as Christopher receives the highest dosages available in some prescriptions for these powerful narcotics, Christopher fails to attend a property settlement for 5008A West Heaps Rd: a building lot and house construction paid for, in part, by the $500,000 credit line taken out by Mary Aiello. The forfeiture of his house and lot at 5008A West Heaps was in the same month Dr. Detterline prescribed three prescriptions for OxyContin out of St. Josephs Hospital. Mary Aiello pledged the $500k credit line against her ancestral home. A representative for Christopher's company, now Yeoho Properties, LLC, attended the closing/settlement on March 30, 2010 and signed off on the deed. There are no proceeds to the seller from the sale of this house. The HUD-1 attached settlement/closing sheet will show that the buyer had to pay some of the sellers (Mary and Christopher's) closing costs ($345). Mary Aiello lost her entire investment in this house and was obligated to repay her $500,000 credit line and $50,000 additional loan. Christopher also lost everything he had worked for in the ten months from the time his addiction to opioids began (November 2009 through September of 2010).

On August 31, 2010 Christopher checked himself into The Serenity Lodge in Nicholson, Pennsylvania and my mother, Mary, paid $25,000 for treatment there. The administrator, Dino Campitelli, noted that he sent Chris to Clearbrook first, a detox facility also in PA., before allowing him to enter the addiction recovery program at Serenity. Please see attached receipt from Serenity Lodge. Clearbrook's price was $500 per day for the twenty-one (21) day inpatient detoxification. Christopher was in severe withdrawals at Clearbrook and on many occasions prior to this and after this time in hospitals.

Tragically, as a result of the multiple pain pill prescriptions, Christopher's young sons witnessed the effect these powerful narcotics had on their father. Two of the boys, Nicholas and Anthony, began experimenting with their father's prescriptions. His youngest son, Nicholas, was arrested in a

pharmacy after stealing a doctor's pad and forging a prescription. In 2013, I began to try and rehabilitate both of my brother's sons, eventually succeeding with the older of the two, Anthony. I have documented their struggles in letters attached. Both boys deny receiving legal prescriptions for opioids, but the theft of their father's enormous supply led them both to become heroin addicts. As a result of Christopher's opioid addiction he sustained the following damages:

Heart complications, multiple organ and kidney failure issues, amputation of his right arm at the shoulder, severe brain damage accompanied by his inability to walk, subsequent addiction to street drugs, loss of his business and assets (foreclosure of $625,000 construction draw loan by Cecil Bank, which took over the prime real estate building lot Christopher owned outright), loss of his future income, estrangement from his three sons (loss of family), and criminal behavior, (he was arrested in Las Vegas in 2013 due to his addiction; Christopher had no prior criminal history before his addiction began).

I have attached documentation including all medications prescribed to Christopher M. Aiello beginning, in 2009, after he was diagnosed by Dr. Eric Carr with TMJ, Bell's Palsey and severe pain in his head/face/migraine headaches. The opioids I have documented (as of the date of this letter) which Christopher has been on day in and day out for 11 years are as follows (please see all attached doctor and hospital records): Oxycontin, OxyContin ER, Oxycodone, Oxycodone IR, Dilaudid, Hydrocodone, Hydrocodone and acetaminophen tablets, Tramadol (Ultram), Morphine Inj, Morphine Sulfate 15 mg. tablets, Roxicodone, and Norco. Due to 'narcotic related psychosis' Christopher has steadily been on Haloperidol. Again, I am not a doctor, but Christopher's steady administration in the hospitals of another drug, 'Gabapentin,' mixed with constant opioids appear to be contraindicated. Opioids have caused numerous problems and health risks for Christopher.

Christopher began using heroin in 2011 when he could no longer get prescription opioids. His records indicate he has inhaled opioids and heroin. Today, all records on Christopher indicate he is 'opioid dependent.' Prior to 2011, Christopher never used heroin and he had no arrest record. Christopher left Maryland in the winter of 2011 and flew to Las Vegas. He never again returned to Maryland. In 2013, Christopher was arrested in Clark County Las Vegas. My mother bailed him out of jail. She kept and I have attached 'bail bonds' information documenting his arrest. During this time both my mother and I were wiring him money via Western Union since he had no other income. I was not aware that he was on heroin. His two sons, already addicted to heroin, left Maryland in 2012 and drove to Las Vegas to live at the Budget Suites with Christopher. They lived there together until May of 2013.

In May of 2013, Christopher was found extremely disoriented on the grounds of Las Vegas hotel by a good Samaritan who called an ambulance. He was taken to Spring Valley Hospital Medical Center. As an emergency life saving measure, Christopher's right arm was amputated at the shoulder. The attending physician said that the amputation was performed 'due to apparent needle use coupled with an overdose and septic shock from an aggressive bacteriological infection'.

Christopher was given less than a twenty percent chance to live and was on a ventilator for six weeks. (As I explained earlier, the hospital pronounced him dead on May 25, 2013). I was told by the respiratory therapist that he would never come off the ventilator after having been on it for so long. I was also told that he would be brain damaged. Subsequent MRI's confirmed the significant extent of his brain damage, I sat by his bedside and held his hand, telling stories of our days in the sun, as he lay

intubated in a coma for weeks. Miraculously, my brother, after being in a coma for six weeks, did come off the ventilator. While he is alive at the time I am writing this letter, he is severely brain damaged, has been unable to walk since May of 2013, and requires 24 hour care in a nursing home. He is, what the caregivers term, 'total selfcare deficit.' He has no relationship with any family other than myself. His sons and the rest of my family are estranged from him.

I have documented that from the years 2013 to 2017, despite my alerting hospital staff on many occasions to refrain from giving opioids to my brother, he continued to be administered Dilaudid, repeatedly, and sometimes these 4mg infusions by IV were given as frequently as 40 minutes apart. I have attached hundreds of pages of hospital records, for his multiple admission dates, notating Christopher's administration by doctors and nurses of 'Dilaudid' IV push, various mg and mL dosages. On one occasion at St. Rose De Lima hospital, in Henderson, Nevada, my friend, Morris Fox, pleaded with the doctors to stop giving Christopher Dilaudid. I was speaking to Morris on his cell phone in March of 2017 and my brother could be heard loudly protesting that Morris was interfering with his ability to get pain medication. Due to Christopher's abundant supply of prescription drugs both Anthony and Nicholas began to experiment with and became addicted to oxyContin and/or oxycodone. I asked Anthony to file a claim but he told me 'that's my father, not I' (who was prescribed the opioids). Nicholas was sent to Cross Creek Academy Rehabilitation Facility. The total bill for Cross Creek academy was $54,000.00 and $7500.00 for an 'escort' fee. (In April 2020, I attempted to contact Cross Creek Academy to get a receipt but learned that the facility is closed). I have attached photos of my mother visiting Cross Creek facility while Nicholas was being treated there. My mother chose the facility because she was told that they had the 'highest success rate in the country.' She described the facility recently as 'the most pristine' of all those attended by Nicholas. Despite our efforts, Nicholas and Anthony became heroin addicts. Additional rehabilitation centers where Nicholas was an inpatient include: 1st Step, Shepherd Pratt Detox, Phoenix Recovery in Edgewater, MD., 1st Sober Living in Del Ray, Fla., Transformations, Fla., Our Masters Camp in Tennessee, and Half Way, GA. The treatment centers collectively cost more than $110,000, with Cross Creek having been the most expensive of the facilities. At the time of this writing we have attempted to get receipts from these facilities.

I am filing this claim to recover monetary losses Christopher sustained as a result of his inability to work as a direct result of his prescription opioid addiction : The foreclosure by Cecil bank on a $625,000 loan tied to the lot Christopher owned outright at 15819 Yeoho Rd., Parcel 472, valued by the bank at an estimated $253,700, and the forfeiture of the costs of the house that he had partially built through his Yeoho Properties LLC (funded, in part, by the $500,000 line of credit secured against Mary Aiello's home and in part by the $625,000 loan Christopher originated on 9/30/2008). Mr. Bill Pursley, Christopher's construction manager, is now deceased, however, he did not make payments on the $625,000 loan originated on September 30, 2008. Christopher personally made payments of approximately $61,000 on the Yeoho loan, which he lost along with his land in the foreclosure. Additional losses include negative proceeds from the sale on March 30, 2010 of 5008 A West Heaps, the loss of the lot which my mother bought for $109,000 (from the credit line of $500k) on May 23, 2008, and the improvements thereupon. I also seek to recover Christopher's loss of income from 2009 to 2020; he had a promising career and his longtime Certified Public Accountant predicts Christopher could have earned $150,000 per year or more. I have attached a letter supporting his potential for future income from Donald Hoffman, CPA. I have requested copies of Christopher's tax return filings

from the IRS for the years 1984 to 2009. At the time I am writing this letter I am awaiting the return of these copies from the IRS.

Christopher introduced me into his business and taught me the ropes in real estate. Together we were the subject of a front page news article appearing in The Baltimore Sun in 1996. Christopher's company, Cher-Chris, Inc., named after the two of us, was on Maryland's top tier contractor advisory list. He was recipient of business leader awards. I revered my brother; I thought he was the most wonderful person I had ever known.

I ask you to please award me (6 million) $6,000,000.00, in compensatory and punitive damages on behalf of Christopher for his loss of income from 2009 to present and future earnings, the $625,000 loan foreclosure by Cecil Bank which resulted in the loss of his prime Baltimore County real estate building lot (valued at $253,700 per Casey Overs/Cecil Bank's attached valuation; land that was owned outright by Christopher since 1984), his unimaginable suffering created by his opioid addiction, including severe brain damage, loss of his arm, severe kidney and other organ damage, loss of his ability to walk and his total 'self- care deficit,' loss of enjoyment of life, and estrangement from his children and family. Christopher is incapacitated and bed bound requiring round the clock care. Christopher's salary, had he not become addicted to prescription opioids, may have been half this amount, if he was able to work from 2009-2020. There is not enough money, punitively, that compensate him for the punishment inflicted on him by opioids. I know Christopher was in excruciating pain in 2008 from the headaches and facial pain from TMJ. He told me that the auto accident on January 12, 2010 compounded his pain. I also know that opioids are not good medicines for long term pain. As my brother became totally opioid dependent, his pain was exacerbated by his inability to get more opioids at higher dosages. At one point he was being prescribed the highest dosages (of oxycodone) in which these narcotics were available. Where does one go from there when one has become tolerant? Opioids actually create pain in the patient. I was there when my brother was screaming for more meds and for higher dosages. I also believe that the shame he felt from his addiction was equally as excruciating. Sadly, rather than confronting and beating his addiction, he chose to deny it and leave for Las Vegas so he would not have to face the family that loved him and, sadly, still does. All I can do is try my best to keep him comfortable now. I have tried over the years to move my brother, first to New York, where I previously lived, then to Maryland. I was turned down by Genesis in Maryland after the nursing staff in Las Vegas shared notes with the Genesis staff. I was also turned down by two skilled nursing facilities in New York. It is also unlikely that I would have the ability to get Christopher any type of insurance approval, even Medicaid, because he is a totally opioid dependent and 'high needs' patient. I have attached hospital records which show that he wants nothing more than to be close to me. Christopher has been in such despair and the attached documentation will show that he has threatened suicide because of the isolation he feels. I am in Maryland and he is in a nursing facility in Las Vegas with no source of family or comfort. I believe strongly that if I had Christopher in a facility near me I would be able to     assist in helping him discontinue his opioid dependence and in recovering some quality of life.

As his designated Power of Attorney, upon receipt of this claim, I will use the funds in part to transfer Christopher to a private facility in Maryland, close to where I now live in Silver Spring, Md. I have investigated a Medical Jet to transfer him and have imagined the possibility of having him close to me.

My brother Christopher and I have always been as close as any two siblings could be. Christopher begged me to 'take me with you, don't leave me alone', on one occasion when I was leaving Spring Valley Hospital to return to New York. He said, "You are the reason why I lived (came out of the coma) and now you are going to let me die here." I live every day with the worry that Christopher will die in Las Vegas alone without anyone at his bedside. I worry that the nursing home could be hit with coronavirus and that his lungs, so scarred from having been on a ventilator for more than a month in 2013, will fail him if he was to contract the virus.

This award will enable me to bring Christopher home to Maryland and to provide for his care in a private care facility.

I hope that the bankruptcy restructuring will make this possible. I thank the court for your consideration of Christopher's case.

Cheryl A. Aiello

**Submitted by Cheryl Aiello, Power of Attorney for Christopher Aiello and Creditor**

**Enclosures**