## **Exhibit B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**[DEBTORS' PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE [EIGHTH]NINTH AMENDED JOINT CHAPTER 11 PLAN OF <u>REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS</u>**

The Debtors[2] having:

a. filed the *Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated March 15, 2021 [D.I. 2487], which the Debtors revised on April 23, 2021 [D.I. 2731], on May 7, 2021 [D.I. 2823], on May 24, 2021 [D.I. 2904], on May 26, 2021 [D.I. 2935], on June 2, 2021 [D.I. 2967], and on June 3, 2021 [D.I. 2982] (as so revised and supplemented, the "**Solicitation Plan**" and, as revised pursuant to the Sixth Amended Plan, the Seventh Amended Plan~~and~~, the Eighth <u>Amended Plan and the Ninth</u> Amended Plan (each, as defined herein) and as may be further amended, supplemented, or modified in accordance with the terms thereof, the "**Plan**"); and

b. filed the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated March 15, 2021 [D.I. 2488], which the Debtors revised on April 24, 2021 [D.I. 2734], on April 30, 2021 [D.I. 2788], on May 8, 2021 [D.I. 2825], on May 24, 2021 [D.I. 2907], on May 26, 2021 [D.I. 2937], on June 2, 2021 [D.I. 2969], and on June 3, 2021 [D.I. 2983] (as so revised, the "**Disclosure Statement**");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, or Solicitation Order (each as defined herein), as applicable. The rules of interpretation set forth in Section 1.2 of the Plan shall apply to this Order.

the United States Bankruptcy Court for the Southern District of New York (the "**Court**") having:

a. entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto,* dated June 3, 2021 [D.I. 2988] (the "**Solicitation Order**");

b. approved, pursuant to the Solicitation Order, among other things, (i) the Disclosure Statement and (ii) the transmission to Holders of Claims against the Debtors' Estates of the Solicitation Plan, the Disclosure Statement, and the associated Ballots and notices in compliance with title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"); and

c. set, pursuant to the *Third Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 3347], August 12, 2021 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the hearing to consider Confirmation of the Plan (the "**Confirmation Hearing**");

the Debtors having:

a. timely and properly solicited the Plan and Disclosure Statement and provided due notice of the Confirmation Hearing, all in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials*, dated July 25, 2021 [D.I. 3319] (the "**Solicitation Affidavit**");

b. timely and properly filed and served, on April 23, 2021 [D.I. 2732], April 25, 2021 [D.I. 2737], May 15, 2021 [D.I. 2867], May 17, 2021 [D.I. 2868], May 26, 2021 [D.I. 2938], June 2, 2021 [D.I. 2977], June 30, 2021 [D.I. 3098], July 7, 2021 [D.I. 3121], July 15, 2021 [D.I. 3187], July 15, 2021 [D.I. 3232], July 16, 2021 [D.I. 3246], July 19, 2021 [D.I. 3283], and August 10, 2021 [D.I. 3528], notices of filing of Plan Supplement documents (such Plan Supplement documents, collectively, as may be amended or supplemented from time to time, the "**Plan Supplement**");

c. filed, (i) on July 14, 2021, the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "**Sixth Amended Plan**"), (ii) on August 12, 2021, the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3545] (the "**Seventh Amended Plan**") ~~and~~, (iii) on August 23, 2021, the *Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3632] (the "**Eighth Amended Plan**")~~;~~, and (iv); on August 25, 2021, the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3652] (the "**Ninth Amended Plan**");

d. filed, on August 5, 2021, the *Declaration of Lianna E. Simmonds* [D.I. 3432] (the "**Simmonds Declaration**"), the *Third Supplemental Declaration of Jeanne C. Finegan*

[D.I. 3403] (the "**Third Supplemental Finegan Declaration**"), the *Declaration of Deborah E. Greenspan* [D.I. 3412] (the "**Greenspan Declaration**"), the *Declaration of Jesse DelConte* [D.I. 3411] (the "**First DelConte Declaration**"), the *Declaration of Richard A. Collura* [D.I. 3410] (the "**Collura Declaration**"), the *Declaration of Gautam Gowrisankaran* [D.I. 3414] (the "**Gowrisankaran Declaration**"), the *Declaration of Mark F. Rule* [D.I. 3424] (the "**Rule Declaration**"), the *Declaration of Davis W. DeRamus* [D.I. 3428] (the "**DeRamus Declaration**"), the *Declaration of John S. Dubel* [D.I. 3433] (the "**Dubel Declaration**"), the *Declaration of Joseph L. Turner* [D.I. 3431] (the "**Turner Declaration**"), the *Declaration of Jon Lowne* [D.I. 3440] (the "**Lowne Declaration**"), and the *Declaration of Jesse DelConte* [D.I. 3456] (the "**Second DelConte Declaration**");

e.  submitted, on August 2, 2021, the *Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3372] (the "**Tabulation Declaration**"), describing the methodology used for the tabulation of votes and the results of voting with respect to the Plan; and

f.  filed, on August 5, 2021, the *Debtors' Memorandum of Law in Support of Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3461] (the "**Confirmation Brief**");

the Court having:

a.  found that the notice provided regarding the Confirmation Hearing, and the opportunity for any party in interest (including, without limitation, any Releasing Party) to object to Confirmation of the Plan, have been adequate and appropriate under the circumstances and no further notice is required;

b.  considered, and having taken judicial notice of, the entire record of the Chapter 11 Cases;

c.  held the Confirmation Hearing;

d.  considered the entire record of the Confirmation Hearing, including, but not limited to,

     i.  the Plan (including, without limitation, the Plan Documents), the Disclosure Statement, and the Solicitation Order,

     ii.  the Solicitation Affidavit and Tabulation Declaration,

iii. the objections, reservations of rights, and other responses submitted with respect to the Plan (collectively, the "**Objections**"), including the following: [D.I. 3256], [D.I. 3257], [D.I. 3262], [D.I. 3263], [D.I. 3264], [D.I. 3265], [D.I. 3268], [D.I. 3270], [D.I. 3271], [D.I. 3272], [D.I. 3273], [D.I. 3274], [D.I. 3275], [D.I. 3276], [D.I. 3277], [D.I. 3278], [D.I. 3279], [D.I. 3280], [D.I. 3288, D.I. 3292], [D.I. 3293], [D.I. 3298], [D.I. 3299], [D.I. 3301], [D.I. 3304], [D.I. 3306], [D.I. 3323], [D.I. 3335], [D.I. 3357], [D.I. 3359], [D.I. 3368], and [D.I. 3404],

iv. the Simmonds Declaration, the Third Supplemental Finegan Declaration, the Greenspan Declaration, the First DelConte Declaration, the Collura Declaration, the Gowrisankaran Declaration, the Rule Declaration, the DeRamus Declaration, the Dubel Declaration, the Turner Declaration, the Lowne Declaration, the Second DelConte Declaration, the *Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3327], the Tabulation Declaration, the *Declaration of Scott R. Bickford, Esq. In Support of The Ad Hoc Committee of NAS Children's Reply To The United States Trustee's Objection To The Fee Settlements Included In The Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. And Its Affiliated Debtors* [ECF No. 3398], the *Declaration of Rahul Gupta, MD, MPH, MBA, FACP Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals* [ECF No. 3565 and JX-3270], the *Declaration of Gayle A. Galan, M.D. FACEP Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals* [ECF No. 3565 and JX-3270], the *Declaration of William Legier Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals* [ECF No. 3567 and JX-3272], the *Declaration of Carl J. Trompetta filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3415], the *Declaration of Garrett Lynam filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3416], the *Declaration of Stephen A. Ives filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3417], the *Declaration of David Sackler filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3418], the *Supplemental Declaration of Jennifer L. Blouin filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3419], the *Declaration of Maureen M. Chakraborty filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3420], the *Declaration of Lawrence A. Hamermesh filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3421], the *Declaration of Timothy J. Martin filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3422], the *Declaration of Gary A. Gotto in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3443], the *Declaration of John M. Guard in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan*

*Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3446], the *Declaration of Jayne Conroy in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3447], the *Declaration of Timothy J. Martin filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3448], the *Declaration of Peter H. Weinberger in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3449], the *Declaration of Jessica B. Horewitz, Ph.D in Support of the Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3450], the *Declaration of Jonathan Greville White filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3451], the *Declaration of Alexa M. Saunders filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3452], and the *Redacted Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3460],

v.   the Confirmation Brief, and

vi.  arguments of counsel and the evidence proffered, adduced, and/or presented at the Confirmation Hearing; and

e. overruled any and all Objections to the Plan and to Confirmation, as well as all statements and reservations of rights not consensually resolved or withdrawn, except as otherwise expressly provided herein; and

after due deliberation thereon and good cause appearing

therefor, and based on the decision set forth on the

record, it is hereby **FOUND, ORDERED, and**

**ADJUDGED that:**

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

A.    The findings and conclusions set forth herein and on the record at the

Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to

Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules

7052 and 9014.  To the extent that any of the following findings of fact constitute conclusions of

law, they are adopted as such.  To the extent any of the following conclusions of law constitute

findings of fact, they are adopted as such.

B.    Jurisdiction and Venue.  The Court has jurisdiction over the Chapter 11 Cases

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*,

dated January 31, 2012 (Preska, C.J.).  Confirmation of the Plan is a core proceeding pursuant to

28 U.S.C. §§ 157(b)(2)(A), (L), and (O), and the Court may enter a Final Order with respect

thereto in accordance with Article III of the United States Constitution.  Each of the Debtors was

an eligible debtor under section 109 of the Bankruptcy Code.  Venue was proper in the Southern

District of New York as of the Petition Date and continues to be proper pursuant to 28 U.S.C.

§§ 1408 and 1409.

C.    Commencement and Joint Administration of Chapter 11 Cases.  On September

15, 2019 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11

of the Bankruptcy Code.  By order of the Court [D.I. 59], the Chapter 11 Cases are being jointly

administered for procedural purposes only pursuant to Bankruptcy Rule 1015.  The Debtors have

continued in possession of their property and have continued to operate and manage their

businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  On September 27, 2019, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "**Creditors' Committee**").  *See Notice of Appointment*

*of Committee of Unsecured Creditors* [D.I. 131].

D.    Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11

Cases maintained by the Clerk of the Court, including, but not limited to, all pleadings and other

documents filed, all orders entered, and all evidence and arguments made, proffered, adduced, and/or presented at the various hearings held before the Court during the pendency of the Chapter 11 Cases.

     E.    <u>Solicitation Order, Solicitation, and Notice</u>.

     (a)    On June 3, 2021, the Court entered the Solicitation Order.

     (b)    The Disclosure Statement as transmitted pursuant to the Solicitation Order (i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable non-bankruptcy laws, including the Securities Act, and (ii) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, the Shareholder Settlement, and the transactions contemplated therein.

     (c)    The Disclosure Statement (including all applicable exhibits thereto and the notices provided for therein) provided holders of Claims, holders of Interests and all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim or any Shareholder Released Claim with sufficient notice of the releases, exculpatory provisions, and injunctions, including the Channeling Injunction and Releases by Holders of Claims and Interests, set forth in <u>Sections 10.6</u>, <u>10.7</u>, <u>10.8</u>, <u>10.9</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, and <u>10.13</u> of the Plan, as well as in the Shareholder Settlement, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

     (d)    Promptly following entry of the Solicitation Order, in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order, and as evidenced by the Solicitation Affidavit, the Claims and Solicitation Agent effectuated:

(i)    filing and service on all parties in interest of a notice concerning the Disclosure Statement and the Plan, and deadlines and hearing dates with respect thereto, including, but not limited to, setting forth the proposed release, exculpation, and injunction provisions in the Plan, the dates applicable to, and procedures regarding, the solicitation of votes on the Plan, the date of the Confirmation Hearing, and the procedures for objecting to Confirmation of the Plan;

(ii)    service of the appropriate solicitation materials (collectively, the "**Solicitation Materials**") on (A) each Holder of Claims entitled to vote on the Plan (i.e., Class 3 (Federal Government Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), and Class 11(c) (Other General Unsecured Claims)) (the Classes of Claims entitled to vote to accept or reject the Plan, the "**Voting Classes**"), including, but not limited to, (I) the Disclosure Statement, (II) the Plan, (III) the Solicitation Order, (IV) the Confirmation Hearing Notice, (V) an appropriate number of Ballots (with voting instructions with respect thereto), and (VI) the Cover Letters, and (B) each Holder of Claims or Interests in a Class not entitled to vote on the Plan (i.e., Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests), and Class 17 (PPI Interests)), including (I) the Confirmation Hearing Notice and (II) the applicable Notice of Non-Voting Status; and

(iii)    the Supplemental Confirmation Hearing Notice Plan (as defined in the Solicitation Order), including providing supplemental notice by means of (A) direct mailings

to certain additional individuals and entities, (B) print media, (C) online display, (D) internet search terms, (E) social media campaigns, and (F) earned media, which collectively served over 3.7 billion impressions.

(e)    The Debtors were not required to solicit votes from the Holders of Claims and Interests in Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests) as each such Class either (i) will receive no distribution under the Plan and is deemed to reject the Plan or (ii) will be Unimpaired and is presumed to accept the Plan.  Further, the Debtors did not send Holders of Claims and Interests in each such Class a Confirmation Hearing Notice or Notice of Non-Voting Status as such Holders are Debtors.

(f)    As described in the Solicitation Order and as evidenced by the Solicitation Affidavit, service of the Solicitation Materials was adequate and sufficient under the circumstances of the Chapter 11 Cases, and adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Solicitation Order (i) was timely and properly provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order and (ii) provided due process, and an opportunity to appear and to be heard, to all parties in interest, all holders of Claims, all holders of Interests, and all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Channeled Claim or any Shareholder Released Claim.

(g)    Because the foregoing transmittals, notices, and service set forth above were adequate and sufficient, no other or further notice is necessary or shall be required.

(h)    All parties in interest, including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and

were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved.

F.    <u>Voting and Solicitation</u>.    Votes on the Plan were solicited, including, where applicable, by Master Ballot Solicitation Method and by Direct Solicitation Method, after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code.    As evidenced by the Solicitation Affidavit and Tabulation Declaration, votes to accept the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.    Neither the Raymond Sackler family making publicly available the website www.JudgeforYourselves.info, nor the many postings, press releases, statements, and news conferences of various parties, constituted improper solicitations of the Plan under 11 U.S.C. 1125.

G.    <u>Plan Supplement</u>.    The filing and notice of the Plan Supplement (and any subsequent amendments, modifications, and supplements thereto filed with the Court) were proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Orders, and no other or further notice is or shall be required.

H.    <u>Plan Modifications</u>.    Any modifications to the Plan since the commencement of solicitation described or set forth herein following entry of the Solicitation Order comply with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.    Such modifications constitute immaterial modifications and/or do not adversely affect or change the treatment of any Claims or Interests of any Holders that have not accepted such modifications. Pursuant to Bankruptcy Rule 3019, the modifications do not require either (a) any additional disclosure under section 1125 of the Bankruptcy Code and/or the re-solicitation of votes under

section 1126 of the Bankruptcy Code or (b) that the Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

I.    Burden of Proof.  The Debtors, as proponents of the Plan, have met their burden of proving the satisfaction of the requirements for Confirmation of the Plan set forth in section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard.  Further, but subject in all instances to paragraph 42 of this Order, each witness who testified (by declaration or otherwise) at or in connection with the Confirmation Hearing in support of the Plan was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

J.    Tabulation.  As described in and evidenced by the Voting Report, Claims in Class 3 (Federal Governmental Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), and Class 11(c) (Other General Unsecured Claims) are Impaired under the Plan. With the exception of Class 3 (Federal Governmental Unsecured Claims), which did not vote to accept or reject the Plan and is therefore presumed to accept the Plan pursuant to Section 3.3 of the Plan, each of the foregoing Classes has voted to accept the Plan by the numbers and amounts of Claims required by section 1126 of the Bankruptcy Code.  No Class that was entitled to vote on the Plan voted to reject the Plan.

K.    Bankruptcy Rule 3016.  The Plan is dated and identifies the Debtors as the entities submitting the Plan, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

### COMPLIANCE WITH SECTION 1129 OF BANKRUPTCY CODE

L.     Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).  As further

detailed below, the Plan complies with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(a)    *Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)).*  Article III of

the Plan designates all Claims and Interests, other than the Claims of the type described in

sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code, into 21 Classes.  The Claims

or Interests in each designated Class have the same or substantially similar rights as the other

Claims or Interests in such Class.  Valid business, legal, and factual reasons exist for separately

classifying the various Classes of Claims and Interests under the Plan.  Had the states been

separately classified, both (i) such class and (ii) the class comprised of the remaining

Non-Federal Domestic Governmental Claims would still have voted to accept the Plan.  The

Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)    *Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).*  The Plan

specifies that Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio

General Unsecured Claims), and Class 11(b) (Adlon General Unsecured Claims) are Unimpaired

Classes and Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests) are

potentially Unimpaired Classes under the Plan, each within the meaning of section 1124 of the

Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)    *Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).*  The

Plan specifies that Class 3 (Federal Government Unsecured Claims), Class 4 (Non-Federal

Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7

(Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims),

Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), Class 11(c) (Other General
Unsecured Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15
(Other Subordinated Claims), Class 16 (PPLP Interests), and Class 17 (PPI Interests) are
Impaired Classes under the Plan and Class 12 (Intercompany Claims) and Class 18
(Intercompany Interests) are potentially Impaired Classes under the Plan, each within the
meaning of section 1124 of the Bankruptcy Code, and specifies the treatment of each such
Class, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(d)    *No Disparate Treatment (11 U.S.C. § 1123(a)(4))*.  The Plan provides for
the same treatment for each Claim or Interest in each respective Class unless the Holder of a
particular Claim or Interest has agreed to less favorable treatment on account of such Claim or
Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)    *Implementation of Plan (11 U.S.C. § 1123(a)(5))*.  Article V of the Plan
and the other provisions of the Plan, the various documents included in the Plan Supplement, and
the terms of this order (this "**Order**") provide adequate and proper means for the implementation
of the Plan, including, but not limited to, authorization for the Debtors to consummate the
Restructuring Transactions and to take all actions consistent with the Plan as may be necessary
or appropriate to effect any transaction described in, approved by, contemplated by, or necessary
to effectuate the Restructuring Transactions under and in connection with the Plan.  The
Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets,
notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law.

(f)    *Voting Power of Equity Securities (11 U.S.C. 1123(a)(6))*.  The NewCo
Operating Agreement will prohibit the issuance of non-voting securities to the extent prohibited

by section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements

of section 1123(a)(6) of the Bankruptcy Code.

      (g)    *Designation of Directors, Officers, and Trustees (11 U.S.C. § 1123(a)(7)).*

The Plan and the Plan Supplement are consistent with the interests of Holders of Claims and

with public policy with respect to the manner of selection of the NewCo Manager, the TopCo

Managers, the Plan Administration Trustee, the MDT Trustees, the MDT Executive Director, the

Creditor Trustees, and the Creditor Trust Overseers.  Thus, section 1123(a)(7) of the Bankruptcy

Code is satisfied.

      (h)    *Inapplicable Provisions (11 U.S.C. §§ 1123(a)(8)).*  None of the Debtors is

an individual, as such term is used in the Bankruptcy Code.  Accordingly, section 1123(a)(8) of

the Bankruptcy Code is inapplicable.

      (i)    *Additional Plan Provisions (11 U.S.C. § 1123(b)).*  As set forth below, the

discretionary provisions of the Plan comply with section 1123(b) of the Bankruptcy Code and are

not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b)

of the Bankruptcy Code is satisfied.

      (i)    *Impairment/Unimpairment of Classes (11 U.S.C. § 1123(b)(1)).*  In

accordance with section 1123(b)(1) of the Bankruptcy Code, (A) Classes 1, 2, 11(a), and 11(b)

are Unimpaired, (B) Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b), 11(c), 13, 14, 15, 16 and 17 are

Impaired, and (C) Classes 12 and 18 are Unimpaired or Impaired under the Plan.

      (ii)    *Assumption and Rejection of Executory Contracts and Unexpired
Leases (11 U.S.C. § 1123(b)(2)).*  In accordance with section 1123(b)(2) of the Bankruptcy Code,

Article VIII of the Plan provides that each executory contract and unexpired lease to which any

Debtor is a party, as amended pursuant to Section 8.4 of the Plan, shall be deemed assumed by

the applicable Debtor and, except with respect to any contract or lease held by a Transferred

Debtor, assigned to NewCo or its designee, except if it (A) has previously been assumed or

rejected pursuant to a Final Order of the Bankruptcy Court, (B) is specifically identified on the

Schedule of Rejected Contracts, (C) is the subject of a separate assumption or rejection motion

filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation

Date, (D) is the subject of a pending Contract Dispute, or (E) is being otherwise treated pursuant

to the Plan. The Debtors have exercised reasonable business judgment in determining whether to

reject, assume, or assume and assign each of their executory contracts and unexpired leases

under the terms of the Plan. Accordingly, the Debtors' assumption, assumption and assignment,

or rejection of each executory contract and unexpired lease under the Plan satisfies the

requirements of section 365(b) of the Bankruptcy Code and, therefore, the requirements of

section 1123(b)(2) of the Bankruptcy Code.

(iii)    *Settlement, Releases, Exculpation, and Injunction of Claims*
*(11 U.S.C. § 1123(b)(3)(A)).*  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code,
the Plan contains appropriate settlement, releases, exculpation and injunction provisions as
described in more detail in Paragraph II.

(iv)    *Preservation of Claims and Retention of Claims (11 U.S.C.*
*§ 1123(b)(3)(B)).*  In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Master
Disbursement Trust, the Plan Administration Trust, the Creditor Trusts, and NewCo shall have
rights to prosecute Retained Causes of Action as and to the extent set forth in the Plan, as of the
Effective Date.

(v)    *Additional Plan Provisions (11 U.S.C. § 1123(b)(6)).*  The Plan's
other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy

Code, including, but not limited to, provisions for (A) distributions to Holders of Claims, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) indemnification obligations, (E) releases by the Debtors of certain parties, (F) releases by certain parties, (G) exculpations of certain parties, (H) injunctions from certain actions, and (I) retention of the Court's jurisdiction, thereby satisfying the requirements of section 1123(b)(6) of the Bankruptcy Code.

M.    The Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)). As further detailed below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically:

(a)    Each of the Debtor entities is a proper debtor under section 109 of the Bankruptcy Code.

(b)    The Debtors have complied with all applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

(c)    The Debtors have complied with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code, in (i) transmitting the Solicitation Materials and related documents and (ii) soliciting and tabulating votes with respect to the Plan.

(d)    Good, sufficient, and timely notice of the Confirmation Hearing has been provided as further described in Paragraph E above.

N.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). The Plan is the product of the good faith process through which the Debtors have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's-length negotiations among the Debtors, the Creditors'

Committee, and the Debtors' key stakeholders and their respective professionals. The Plan Documents are the product of good faith efforts of the Debtors and applicable non-Debtor parties who assisted in the drafting of the Plan Documents. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims. Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates. Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code. Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the hearing with respect to the Disclosure Statement, the Confirmation Hearing, the Simmonds Declaration, the Third Supplemental Finegan Declaration, the Greenspan Declaration, the First DelConte Declaration, the Collura Declaration, the Gowrisankaran Declaration, the Rule Declaration, the DeRamus Declaration, the Dubel Declaration, the Turner Declaration, the Lowne Declaration, and the Second DelConte Declaration, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

O.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).    All payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are subject to the approval of the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code. With respect to payments being made to stakeholder professionals out of distributions to creditors under the several private creditor trusts under Section 5.8 of the Plan and otherwise, such payments are not

within the scope of section 1129(a)(4); alternatively, to the extent any such payments are within

the scope of section 1129(a)(4), based upon the record, the Court finds that such fees and costs

are reasonable.

P.      <u>Service of Certain Individuals (11 U.S.C. § 1129(a)(5))</u>.    To the extent not

disclosed in the Plan Supplement, the identities and affiliations of the MDT Trustees, the MDT

Executive Director, the NewCo Managers, the TopCo Managers, the Plan Administration

Trustee and PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers shall be

determined in accordance with <u>Article V</u> of the Plan.    The appointment of such individuals to

such positions, or the process by which such individuals will be identified or appointed, is

consistent with the interests of Holders of Claims and public policy.    Accordingly, the Debtors

have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

Q.      <u>Rate Changes (11 U.S.C. § 1129(a)(6))</u>.    The Plan does not provide for any rate

changes over which a governmental regulatory commission has jurisdiction, and, accordingly,

section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

R.      <u>Best Interest of Creditors (11 U.S.C. § 1129(a)(7))</u>.

(a)      The Plan satisfies section 1129(a)(7) of the Bankruptcy Code because each

Holder of a Claim or Interest (i) has voted to accept or is presumed to have accepted the Plan, (ii)

is Unimpaired and deemed to have accepted the Plan, or (iii) shall receive or retain under the

Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the

Plan, that is not less than the amount that such Holder would receive or retain if the Debtors

were to be liquidated under chapter 7 of the Bankruptcy Code on such date.

(b)      In addition, the liquidation analysis attached as Appendix B to the

solicitation version of the Disclosure Statement (the "**Liquidation Analysis**"), as well as the

other evidence related thereto in support of the Plan that was proffered or adduced at, prior to, or

in affidavits and declarations in connection with the Confirmation Hearing, (i) are reasonable,

persuasive, credible, and accurate as of the dates such analysis or evidence was proffered,

adduced, and/or presented, (ii) utilize reasonable and appropriate methodologies and

assumptions, (iii) have not been controverted by other evidence, and (iv) establish that, with

respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or

Interest in such Class shall receive under the Plan on account of such Allowed Claim or Interest

property of a value, as of the Effective Date, that is not less than the amount such Holder would

receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy

Code.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(7) of the

Bankruptcy Code.

     S.    <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.

     (a)    Holders of Claims in Class 1 (Secured Claims), Class 2 (Other Priority

Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured

Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are Unimpaired

or potentially Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are

conclusively presumed to have accepted the Plan, thus meeting the requirements of section

1128(a)(8) of the Bankruptcy Code.

     (b)    As reflected in the Tabulation Declaration, each Impaired Voting Class

affirmatively voted to accept the Plan or is presumed to have accepted the Plan.  Class 4

(Non-Federal Domestic Governmental Claims) voted, in the aggregate, 96.87% in number and

96.87% in amount to accept the Plan; Class 5 (Tribe Claims) voted, in the aggregate, 96.17% in

number and 96.17% in amount to accept the Plan; Class 6 (Hospital Claims) voted, in the

aggregate, 88.26% in number and 88.26% in amount to accept the Plan; Class 7 (Third-Party

Payor Claims) voted, in the aggregate, 93.54% in number and 93.54% in amount to accept the

Plan; Class 8 (Ratepayer Claims) voted, in the aggregate, 100% in number and 100% in amount

to accept the Plan; Class 9 (NAS Monitoring Claims) voted, in the aggregate, 99.78% in number

and 99.78% in amount to accept the Plan; Class 10(a) (NAS PI Claims) voted, in the aggregate,

98.08% in number and 98.08% in amount to accept the Plan; Class 10(b) (Non-NAS PI Claims)

voted, in the aggregate, 95.72% in number and 95.72% in amount to accept the Plan; and Class

11(c) (Other General Unsecured Claims) voted, in the aggregate, 93.28% in number and 96.44%

in amount to accept the Plan.  Class 3 (Federal Governmental Unsecured Claims), did not submit

votes to accept or reject the Plan; accordingly, pursuant to Section 3.3 of the Plan, Class 3

(Federal Governmental Unsecured Claims) is presumed to have accepted the Plan.

(c)    Accordingly, the Debtors have satisfied the requirements of section

1129(a)(8) of the Bankruptcy Code with respect to such Impaired Voting Classes of Claims.

T.    Treatment of Administrative Claims, Priority Tax Claims, Secured Claims, and

Other Priority Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Claims,

Priority Tax Claims, Secured Claims, and Other Priority Claims under Articles II and III of the

Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

U.    Acceptance by Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).  The Voting

Classes are Impaired Classes, and each Voting Class has voted to or is presumed to have

accepted the Plan.  Accordingly, at least one Class of Claims against the Debtors that is Impaired

under the Plan has voted to accept the Plan by the requisite majorities, determined without

including any acceptance of the Plan by any insider, thus satisfying the requirements of section

1129(a)(10) of the Bankruptcy Code.

V.      Feasibility (11 U.S.C. § 1129(a)(11)).    The information in the Disclosure Statement, including financial projections attached as Appendix D to the Disclosure Statement and the evidence that was proffered or adduced at or prior to the Confirmation Hearing by the Debtors: (a) are reasonable, persuasive, and credible; (b) have not been controverted by other evidence; (c) utilize reasonable and appropriate methodologies and assumptions; (d) establish that the Plan is feasible and that there is a reasonable prospect of NewCo being able to meet its financial obligations under the Plan and in the ordinary course of business, and that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of, NewCo or any other successor to the Debtor under the Plan; and (e) establish that NewCo will have sufficient funds available to meet its obligations under the Plan. Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

W.      Payment of Fees (11 U.S.C. § 1129(a)(12)).    All fees payable under section 1930 of title 28 of the United States Code shall be paid in accordance with Section 12.5 of the Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

X.      Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).    The Debtors do not maintain retirement plans or other benefits obligations.  Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

Y.      Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).    The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation and, accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan.

Z.      Plan of an Individual Debtor (11 U.S.C. § 1129(a)(15)).    None of the Debtors is an individual and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

AA.    <u>Transfers in Accordance with Non-Bankruptcy Law (11 U.S.C. § 1129(a)(16))</u>.
None of the Debtor entities is a nonprofit entity and, accordingly, section 1129(a)(16) of the
Bankruptcy Code is inapplicable to the Plan.

BB.    <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>.    Each
Voting Class has voted to or is deemed to have accepted the Plan.   Therefore, section 1129(b) of
the Bankruptcy Code is inapplicable to the Voting Classes in the Chapter 11 Cases.   The Plan
does not "discriminate unfairly" with respect to the Classes that are Impaired and deemed to
have rejected the Plan, or with respect to the Voting Classes if section 1129(b) of the Bankruptcy
Code were applicable to the Voting Classes in the Chapter 11 Cases, because the Debtors have a
valid rationale for the Plan's classification scheme and treatment provided for different
Classes; the Plan is also "fair and equitable" with respect to the Classes that are Impaired and
deemed to have rejected the Plan because no Class senior to any rejecting Class is being paid
more than in full and the Plan does not provide a recovery on account of any Claim or Interest
that is junior to such rejecting Classes.   Thus, the Debtors have demonstrated that the Plan
satisfies section 1129(b) of the Bankruptcy Code to the extent such provision is applicable.

CC.    <u>Only One Plan (11 U.S.C. § 1129(c))</u>.   The Plan is the only plan that has been
filed in the Chapter 11 Cases and meets the requirements of sections 1129(a) and (b) of the
Bankruptcy Code, thereby satisfying the requirements of section 1129(c) of the Bankruptcy
Code.

DD.    <u>Principal Purpose of Plan (11 U.S.C. § 1129(d))</u>.   The principal purpose of the
Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the
Securities Act, thereby satisfying the requirements of section 1129(d) of the Bankruptcy Code.

EE.   <u>Not Small Business Cases (11 U.S.C. § 1129(e))</u>.  The Chapter 11 Cases are not

small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to

the Chapter 11 Cases.

FF.   <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.   Based on the record of the

Chapter 11 Cases, including, but not limited to, the evidence proffered, adduced, and/or

presented at the Confirmation Hearing by the Debtors and the Supporting Claimants, which is

reasonable, persuasive, and credible, utilizes reasonable and appropriate methodologies and

assumptions, and has not been controverted by other evidence, the Debtors and each of their

successors, predecessors, control persons, members, agents, employees, officers, directors,

financial advisors, investment bankers, attorneys, accountants, consultants, and other

professionals have solicited acceptances of the Plan in good faith, and the law firms that utilized

the Master Ballot Solicitation Procedures have collected votes on the Plan in good faith, and in

compliance with the applicable provisions of the Bankruptcy Code, including, but not limited to,

section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or

regulation governing the adequacy of disclosure in connection with such solicitation, and,

therefore, (a) are not liable at any time for any violation of any applicable law, rule, or regulation

governing the solicitation of acceptances or rejections of the Plan and (b) are entitled to the

protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions

set forth in <u>Article X</u> of the Plan.  In addition, the Debtors have acted and entered into the

documents effectuating the Debtors' reorganization pursuant to the Plan in good faith and shall

be deemed to continue to act in good faith if they (x) proceed to consummate the Plan and

transactions contemplated thereby pursuant thereto and (y) take the actions authorized and

directed by this Order.  The Debtors negotiated the transactions effectuating the Debtors'

reorganization pursuant to the Plan in good faith and the resulting terms of the agreements effectuating the Debtors' reorganization are in the best interests of the Debtors and the Estates.

GG.    Satisfaction of Confirmation Requirements.  Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Confirmation Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**ADDITIONAL FINDINGS REGARDING CHAPTER 11 CASES AND PLAN**

HH.    Implementation.  All documents and agreements necessary to implement the Plan, including, but not limited to, any Plan Document, are essential elements of the Plan and have been negotiated in good faith and at arm's length by the Debtors and the other parties thereto, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and the Holders of Claims, and each such document and agreement shall, upon completion of documentation and execution, be valid, binding, and enforceable against the parties which are a party thereto and not be in conflict with any federal, state, or local law.  The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.

II.    Injunction, Exculpation, and Releases.

(a)    The Court has jurisdiction under section 1334 of title 28 of the United States Code to approve the injunctions, releases, and exculpation set forth in Article X of the Plan, including, but not limited to, jurisdiction to release claims against the Shareholder Released Parties.  Section 105(a) of the Bankruptcy Code permits issuance of the injunction and

approval of the releases and exculpations set forth in <u>Article X</u> of the Plan.  With respect to the

Third-Party Releases (defined below), as has been established based upon the record in the

Chapter 11 Cases and the evidence presented at the Confirmation Hearing, the Court has subject

matter jurisdiction to approve the Third-Party Releases because (i) confirmation of a plan of

reorganization is a core proceeding and the Third-Party Releases are integral to confirmation of

the Plan, and (ii) the Released Claims and Shareholder Released Claims that are the subject of

the Third-Party Releases could have a conceivable effect on the Debtors' Estates.  Released

Claims and Shareholder Released Claims have factual and legal issues in common with actual or

potential claims or causes of action against the Debtors and actual or potential claims or causes

of action of the Estates against third parties, including the Shareholder Released Parties.  The

litigation of the Released Claims and the Shareholder Released Claims would have conceivable

effects on the *res* of the Estates.  Litigation of such claims could deplete the value of certain

insurance policies, could lead to the assertion of indemnification and contribution claims against

the Estates, and could prejudice the Estates or the Master Distribution Trust (and therefore

reduce the value available for distribution to the Creditor Trusts) in future litigation of such

claims or causes of action.  Litigation over a disputed indemnification or contribution claim is

itself an effect upon the Estates.  Moreover, the Court has the power to render a final decision

confirming the Plan, including such provisions, under the United States Constitution.  Failure to

approve these injunctions, exculpations, and releases would render the Debtors unable to confirm

and implement the Plan.

    (b)  The injunctions, releases, and exculpations set forth in <u>Article X</u> of the

Plan, including the Debtor Releases (defined below), the Third-Party Releases and the

Channeling Injunction, were adequately disclosed and explained in the Disclosure Statement, on

the Ballots, through the Supplemental Confirmation Hearing Notice Plan, in the Notices of
Non-Voting Status and in the Plan.

(c)     The releases granted by the Debtors and their Estates pursuant to Sections
10.6 and 10.7 of the Plan (the "**Debtor Releases**") represent a valid exercise of the Debtors'
business judgment.  For the reasons set forth in the Disclosure Statement and the Confirmation
Brief and based on the evidence proffered or adduced at the Confirmation Hearing, the Debtor
Releases are (i) an integral and necessary part of the Plan, (ii) a good faith settlement and
compromise of the claims and Causes of Action released, (iii) given in exchange for good and
valuable consideration, (iv) appropriately tailored to the facts and circumstances of the
Chapter 11 Cases, and (v) given after due notice and opportunity for objection. The Debtor
Releases shall constitute a bar to the Debtors, the Liquidating Debtors, the Transferred Debtors,
the Estates, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts,
NewCo, TopCo, any other newly formed Persons that shall be continuing the Debtors'
businesses after the Effective Date, or any party purporting to claim through any of the
foregoing, from asserting any Released Claim or Shareholder Released Claim released pursuant
to Section 10.6 or 10.7 of the Plan, except as otherwise set forth in the Plan.  The Debtor
Releases were negotiated by sophisticated parties represented by able counsel and financial
advisors and are the result of an arm's-length negotiation process.  The Debtors' pursuit of any
Released Claims or Shareholder Released Claims against the Released Parties or the Shareholder
Released Parties would not be in the interests of the Estates' various constituencies because the
benefits to the Estates obtained in exchange for granting the releases, including the benefit to the
Estate's creditors by virtue of the various intercreditor allocation agreements and settlements
reached in Mediation, likely outweigh any potential benefit from pursuing such claims

considering the costs and uncertainty involved therein, and the fact that all of the intercreditor allocation agreements and settlements reached in Mediation were conditioned upon the Shareholder Settlement.  In light of, among other things, the concessions and contributions provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are appropriate.

(d)    The non-Debtor releases set forth in <u>Sections 10.6</u> and <u>10.7</u> of the Plan (the "**Third-Party Releases**") are appropriate.  The Third-Party Releases satisfy the applicable standard for approval of nonconsensual third-party releases set forth in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("**Metromedia**").  The record of the Confirmation Hearing demonstrates the following:

(i)    The Third-Party Releases set forth in the Plan and implemented by this Order are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), including as a result of their relationship to the intercreditor allocation agreements and settlements.  An overwhelming number of creditors support the Plan, with 96.01% in number of Holders of Claims in Voting Classes having voted to accept the Plan as reflected in the Tabulation Declaration.  The Third-Party Releases are consensual, and not involuntary, as to those creditors who voted in favor of the Plan, including the Consenting States and Newly Consenting States.  As of the close of the Confirmation Hearing, only [●] parties object to entry of the Releases and Shareholder Releases.

(ii)    The complexity of the litigation against the Debtors and potential claims among the Debtors and co-defendants in that litigation or against the Shareholder

Released Parties make these chapter 11 cases both "rare" and "unusual." As of the Petition Date, the Debtors faced over 2,600 lawsuits arising from the Debtors' marketing of opioid medications. Many of these suits sought to hold the Debtors and other parties jointly and severally liable for injuries related to opioid use. Many of these suits also name certain of the Debtors' officers, directors, and shareholders, including members of the Sackler Families, as defendants. In addition, the claims that are the subject of the Shareholder Settlement are, in part, premised upon the alleged liability of the Debtors and assert trillions of dollars in damages.

(iii)    The Third-Party Releases are an integral and necessary part of the Plan. The Plan, and the global resolution embodied in the Plan and Plan Settlements, would not be possible without the Third-Party Releases. The Shareholder Settlement would not be possible without the Shareholder Releases because the Sackler Families would not enter into the Shareholder Settlement, and make the payments and other concessions contemplated therein, without the Shareholder Releases and Channeling Injunction. The Plan Settlements, including the intercreditor allocation agreements and settlements reached in Mediation, are premised upon the consideration under the Shareholder Settlement Agreement and the term sheets agreed to by the private claimants in Mediation were conditioned on the participation of the Sackler Families in the Plan. In the absence of the Plan Settlements, the Debtors would not be able to take advantage of the DOJ Forfeiture Judgment Credit provided for in the DOJ Resolution. The Third-Party Releases, by way of the consideration under the Shareholder Settlement Agreement, also preserve the agreed allocations among creditors that underlie the Plan Settlements. Without the Third-Party Releases, and therefore without the consideration under the Shareholder Settlement Agreement, there could be no certainty that such agreed upon allocations would not be undermined by collateral litigation. Absent the consideration provided to the Debtors' Estates

under the Shareholder Settlement, the Plan would not have been feasible. In the absence of the

Plan Settlement, of which the Third-Party Releases are a key and inextricable element, the

litigation of thousands of pending actions to judgment and through appeals in the civil court

system would likely result in the destruction of the significant value that would otherwise have

been distributed to opioid abatement efforts and personal injury claimants. The resumption of

litigation that would otherwise be the subject of the Shareholder Settlement would implicate

NewCo and could have an impact on the operations of NewCo and NewCo's ability to support

abatement. The Restructuring Transactions contemplated by the Plan, the Plan Supplement, and

other instruments, releases, and other agreements related to the Plan would not be possible

absent the Shareholder Settlement and the consideration received by the Debtors' Estates

thereunder. As such, the Chapter 11 Cases present unique and extraordinary circumstances

where release of non-Debtors is proper and appropriate.

(iv)    The consideration under the Shareholder Settlement Agreement

described in the Disclosure Statement (including in Article 11.2 thereof), including $4.275

billion in cash and 100% of the equity interests in Purdue Pharma L.P., which does not include

the enhancements described in the Mediators Report [D.I. 3119] that have since been added to

the settlement consideration, constitutes a substantial contribution to the Estates. The

consideration under the Shareholder Settlement Agreement includes payments totaling $4.325

billion to estates over nine or ten years. Such payments total at least twice the value of the

Debtors as a going concern. Such payments also allow the Debtors to make the payments

required under the DOJ Resolution and the Plan Settlements.

(v)    The Plan provides for channeling of the Released Claims and Shareholder Released Claims.  Applicable Channeled Claims are eligible for treatment by the Creditor Trusts.

(vi)    The Released Claims and Shareholder Released Claims directly impact the Debtors' reorganization.  The appropriate resolution of these claims has been the subject of significant litigation and mediation in these cases by sophisticated parties from multiple creditor constituencies that were represented by able counsel and financial advisors.

(e)    The injunction provisions set forth in Article X of the Plan, including, without limitation, the Channeling Injunction: (i) are essential to the Plan; (ii) are necessary to preserve and enforce the discharge and releases set forth in Sections 10.2, 10.6, and 10.7 of the Plan, the exculpation provisions in Section 10.12 of the Plan, and the compromises and settlements implemented under the Plan; (iii) are appropriately tailored to achieve that purpose; (iv) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (v) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (vi) are an integral element of the transactions incorporated into the Plan; (vii) confer material benefits on, and are in the best interests of, the Debtors and their Estates, creditors, and other stakeholders; (viii) are critical to the overall objectives of the Plan; and (ix) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The injunction provisions set forth in Article X of the Plan, including, without limitation, the Channeling Injunction, were adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article X of the Plan.

(f)     The Creditors' Committee, the Ad Hoc Committee, the MSGE Group, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, the Public School District Claimants, and the NAS Committee affirmatively support the Plan, which includes the release and injunction provisions in favor of the Released Parties, the Shareholder Released Parties, and the Protected Parties (as applicable).  The Newly Consenting States[3] do not object to approval of the Plan.

(g)     The Exculpated Parties made significant contributions to the Chapter 11 Cases and played an integral role in working towards the resolution of the Chapter 11 Cases. Accordingly, the exculpations contemplated by Section 10.12 of the Plan are part of a fair and valid exercise of the Debtors' business judgment and are fair, reasonable, and appropriate under the circumstances of the Chapter 11 Cases.

(h)     The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunctions, releases, and exculpations set forth in Article X of the Plan. Based on the record of the Chapter 11 Cases, the representations of the parties, and the evidence proffered, adduced, and presented at the Confirmation Hearing, this Court finds that the injunctions, releases, and exculpations set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement such provisions would render the Debtors unable to confirm and consummate the Plan.

JJ.     Compromise of Controversies.

---

[3] Newly Consenting States include the former members of the Ad Hoc Group of Non-Consenting States Group that agreed to support the Plan on the terms set forth in the *Mediator's Report* filed with the Bankruptcy Court on July 7, 2021 [D.I. 3119].

(a)    Pursuant to the Bankruptcy Code, including section 1123 of the
Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and
negotiate a resolution of their opioid-related liabilities and, with approval of the Court, enter into
a resolution of their opioid-related liabilities through the Plan.  The settlements reached between
the Debtors and the opioid-related claimants, as embodied in the Plan, are reasonable and were
entered into in good faith based on arm's-length negotiations.  Such negotiation, settlement, and
resolution of liabilities shall not operate to excuse any insurer from its obligations under any
insurance policy, notwithstanding any terms of such insurance policy (including any
consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law.  The Plan
Settlement is in the best interests of the Debtors, their Estates, and the Holders of Claims and
Interests and is fair, equitable, and reasonable.  The Plan Settlement is necessary and integral to
the Plan and the Plan Documents and the success of the Chapter 11 Cases.  Any reasonable
estimate, projection, or valuation of their total liability and obligation to pay for Claims in
Classes 3, 4, 5, 6, 7, 8, 9, 10(a), and 10(b), if the Debtors had the ability to pay those Claims and
that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all
assets of the Debtors' Estates, including but not limited to the value of the Debtors' business,
contributions from third parties and the full face value of all of Purdue's insurance.

KK.    Shareholder Settlement.[4]

(a)    The Debtors' Special Committee was vested with exclusive authority to
provide approval on behalf of the Debtors with respect to all transactions between Purdue and
members of the Sackler Families and the prosecution, defense, and settlement of any causes of

---

[4] Capitalized terms used solely in this paragraph KK but not otherwise defined herein or in the Plan, Disclosure
Statement, or Solicitation Order shall have the meanings ascribed to such terms in the Shareholder Settlement
Agreement.

action against the Debtors' shareholders and members of the Sackler Families and their affiliates. The members of the Special Committee were well qualified, independent, and acted independently and not under the direction or influence of the Sackler Families, including with respect to the negotiation and approval of the Shareholder Settlement, as evidenced by the record of the Chapter 11 Cases, including, without limitation, by the *Report of Stephen D. Lender, Examiner* [D.I. 3285].    The Special Committee conducted a comprehensive and thorough investigation into potential claims against the Sackler Families and associated entities.    The Debtors have exercised reasonable business judgment in determining to enter into the Shareholder Settlement Agreement, Collateral Documents, and other Definitive Documents.

(b)    The Official Committee, Ad Hoc Committee, and MSGE Group and its members, through their respective experienced and well-qualified advisors, each also separately conducted their own comprehensive and thorough investigation into potential claims against the Sackler Families and their associated entities.    Based on such investigations, as well as all of the facts and circumstances of these Chapter 11 Cases, the Official Committee, Ad Hoc Committee, and MSGE Group each made its own independent judgment—free of influence or coercion from any party in the case, and acting solely on behalf of, and in the best interests of, its constituents, in each case—to support the Plan, including all of its component parts.

(c)    The Shareholder Settlement is necessary and integral to the Plan and the success of the Chapter 11 Cases, is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, is fair, equitable, and reasonable, and satisfies the standard for approval set forth in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

(i)    The balance between the litigation's possibility of success (including, specifically, issues regarding collectibility) and the Shareholders Settlement's future

benefits—when considered in light of all of the facts and circumstances of these Chapter 11 Cases—weigh in favor of approving the Shareholder Settlement. There are many benefits of the Shareholder Settlement, including the consideration under the Shareholder Settlement Agreement, the ability to implement the intercreditor allocation agreements and settlements reached in Mediation and the DOJ Resolution, and avoiding costly, lengthy, value-destructive litigation and likely delay in stakeholder recovery. The quantum and timing of success in, and collection with respect to, litigation against the Sackler Families is not certain and could require resolution of numerous complex and disputed legal and factual issues, including—depending upon the theory of liability and which party is the defendant—jurisdiction, statute of limitations, prejudgment interest, solvency, reasonably equivalent value, intent to hinder, delay, or defraud creditors, and fiduciary duties.

(ii)    Litigation of the claims resolved in the Shareholder Settlement would be complex, protracted, and expensive and delay resolution of these Chapter 11 Cases. Fraudulent transfer litigation is often lengthy and expensive, all the more so when dozens of defendants in multiple jurisdictions are involved. Before the Petition Date, the Debtors were incurring professional fees at an average rate of over $2 million per week directly related to the Pending Actions. Representatives of the Sackler Families have stated that if the Shareholder Settlement, the Shareholder Releases, and the channeling injunction are not approved, the Sackler Families will ~~litigate objections to proofs of claim filed against the Debtors and~~ vigorously defend any litigation against them. The Sackler Families have also asserted that recoveries would be limited by the amount of assets held by individual members of the Sackler Families and by obstacles in recovering against trusts held for the benefit of members of the Sackler Families. The Sackler Families have stated that, absent settlement, they would

-34-

vigorously assert various defenses to the claims against them (both claims held by the Estates and by third parties), assert that substantial evidence supports their defenses, and argue that the Estates and third parties would face obstacles to their ability to collect on any judgments against members of the Sackler Families and trusts of which they are beneficiaries.

(iii)    The Shareholder Settlement is in the paramount interest of creditors. The Shareholder Settlement confers substantial benefit on the Debtors' creditors. The consideration under the Shareholder Settlement Agreement includes payments to the Debtors' Estates totaling at least $4.325 billion. The Shareholder Settlement also avoids value-destructive litigation on many fronts.

(iv)    The Shareholder Settlement is an integral part of the Plan. The Plan has overwhelming support. The Tabulation Report establishes that 96.01% in number of Holders of Claims in Voting Classes having voted to accept the Plan.

(v)    Counsel to the multiple parties to the Shareholder Settlement are experienced and competent.

(vi)    As described above, the breadth of the Releases and Shareholder Releases are appropriate under the facts and circumstances of these cases and satisfy the standard for granting such releases articulated in *Metromedia*.

(vii)    The Shareholder Settlement is the product of arm's-length bargaining. The parties have engaged in extraordinarily broad discovery at a significant expense to the Estates and the Sackler families. The discovery exchanged has exceeded the scope of discovery that would be obtainable before judgment in civil litigation. The Shareholder Settlement is the product of mediation by court-appointed mediators the Honorable Layn Phillips (ret.), Kenneth Feinberg, and the Honorable Shelley C. Chapman.

(d)    All documents and agreements necessary to implement the Shareholder Settlement, including, but not limited to, the Shareholder Settlement Agreement, Collateral Documents, and other Definitive Documents, are essential elements of the Plan and have been negotiated in good faith, at arm's length, and without collusion or fraud, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and the Holders of Claims and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements of the parties which are a party thereto and not be in conflict with any federal, state, or local law.

LL.    Foundations.

(a)    At a March 24, 2021 hearing concerning, among other things, the adequacy of the disclosures to the Plan, the Court, in suggesting that parties should continue to pursue additional support for the Plan, observed that: "historically the Sacklers have given lots of money to charity . . . [and] there's absolutely nothing preventing the Sacklers from making an additional charitable contribution in a meaningful way . . . ." Tr. at 107:4–10, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. Mar. 24, 2021).

(b)    On May 7, 2021, the Court appointed Bankruptcy Judge Shelley C. Chapman to mediate between the nonconsenting states, the Initial Covered Sackler Persons and the Additional Covered Sackler Persons (each as defined in the Mediator's Report) (the "**Sackler Mediation Parties**"), with the Debtors also party to the mediation. *See Order Appointing the Honorable Shelley C. Chapman as Mediator* [D.I. 2820]; *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 2879] (the "**Appointment Order**"). As described in Judge Chapman's Mediator's Report, in the ensuing

weeks, Judge Chapman conducted an in-person mediation among certain parties.  *Mediator's Report* [D.I. 3119] (the "**Mediator's Report**").

(c)    Following the mediation, Judge Chapman issued the Mediator's Report outlining the terms of a proposal made by Judge Chapman and accepted by a majority of the ~~previously noncensenting states~~Ad Hoc Group of Non-Consenting States (consisting of the following 15 states: Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin), the Sacklers Mediation Parties and the Debtors.  *Id.* at 2.

(d)    The terms of Judge Chapman's proposal included, among other things:  (i) "[e]nhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments . . . as well as acceleration of $50 million in previously agreed settlement payments"; (ii) "[a] material expansion of the scope of the public document repository to be established" pursuant to the Plan, including "tens of millions of documents and approximately 13 categories of attorney-client privileged documents"; (iii) "[a] prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses that engage in the manufacturing or sale of opioids"; and (iv) modification of certain aspects of the Plan concerning the sale of assets of the new company that will be formed to continue Purdue's businesses, and concerning the distribution of funds from the National Opioid Abatement Trust ("**NOAT**").  *Id.* at 2–3.

(e)    Judge Chapman's proposal also provided that:  (i) "the individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond

and Beverly Sackler Foundation (the "**Foundation**") and the Raymond and Beverly Sackler Fund for the Arts and Sciences (the "**Fund**"),", which "shall have an aggregate value of at least $175 million," *id.* at 4; and (ii) the party or parties selected to become controlling members of the Foundation and the Fund (the "**Continuing Foundation Members**") must " and will be required to limit the purposes of the Foundation [and the Fund]Foundations to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis." *Id.* at 4.

(f)    The Raymond and Beverly Sackler Foundation (the "**Foundation**") is a New York not-for-profit corporation.  *See* Certificate of Incorporation of the Raymond and Beverly Sackler Foundation, Inc., dated November 28, 1967 at Art. 2.  Pursuant to its Certificate of Incorporation, the Foundation's purposes are to be "a charitable fund" to which donations may be made, and invested and reinvested, and whose directors are authorized to (i) "mak[e] and establish[] scholarships, awards, grants, endowments, gifts, loans, prizes, and/or contests for educational, cultural, scientific, and/or research purposes" and also (ii) "devote [its assets]. . . to any other charitable, scientific, literary, artistic, benevolent, social and/or educational use," in each case in a manner that is not inconsistent with other provisions of its Certificate of Incorporation or applicable law.  *Id*. at Art. 2.

(g)    The Raymond and Beverly Sackler Fund for the Arts and Sciences (the "**Fund**") is a Delaware not-for-profit corporation.  *See* Certificate of Incorporation of the Raymond and Beverly Sackler Fund for the Arts and Sciences, dated October 13, 1999 at 1.  Pursuant to its Certificate of Incorporation, the Fund was "formed exclusively for charitable, scientific, medical and educational purposes," including making distributions to organizations described in Section 501(c)(3) of the Internal Revenue Code.  *Id.* at Art. 3.

(h)       In agreeing to step down from their positions as members of the Foundation and the Fund in accordance with the proposal outlined in the Mediator's Report, the current members of the Foundation and the Fund will be voluntarily relinquishing control of the Foundation and the Fund to new members (the "**Continuing Foundation Members**").   The Continuing Foundation Members will be the Persons appointed to serve as members of the Foundations in accordance with Section 5.7(l) of the Plan, which Persons shall be (i) the individuals appointed to serve as Creditor Trustees of the NOAT; and/or (ii) such other qualified Person or Persons appointed by the Bankruptcy Court in the event any of those individuals is unwilling or unable to be a member of the Foundation or the Fund, or as otherwise agreed to by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States.

(i)       The assets of the Foundation and the Fund will not be transferred to NOAT or to the Tribe Trust.  Consistent with the governing documents of the Foundation and the Fund, and in accordance with Section 5.7(l) of the Plan, unless otherwise agreed by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States, the Continuing Foundation Members are to file certificates of amendment of their respective certificates of incorporation under applicable New York or Delaware law (in accordance with the rules of the respective states of incorporation and which, in the case of the RBS Foundation, requires the approval of either (I) the Attorney General of the State of New York or (II) a justice of the Supreme Court of the New York judicial district in which the office of the Foundation is located) limiting "the purposes of the Foundation [and the Fund] set forth in the certificates of incorporation of the Foundation [and the Fund] . . . to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis." *See* EighthNinth Amended Plan.  By virtue of the amended certificates of incorporation, the Foundation and the Fund will be required to use

such assets for charitable purposes in a manner consistent with Section 5.7(l) of the Plan, and the

Plan also recognizes that Foundation and Fund members and directors will remain subject to all

relevant fiduciary duties in the administration of the Foundation and the Fund.  *Id.*

(j)    Consistent with the proposal outlined in the Mediator's Report and

Section 5.7(l) of the Plan, (i) the members of the Foundation and the Fund are to relinquish

control of the Foundation and the Fund on or before the Effective Date of the Plan, and (ii)

consequently, the current members will no longer be entitled to make further decisions

concerning the governance or operations of the Foundation and the Fund, including the use of the

corporations' assets.

(k)    Deployment of the assets of the Foundation and the Fund by the

Continuing Foundation Members for opioid abatement would be consistent with the broad

charitable purposes of the corporations as set forth in their current certificates of incorporation.

(l)    The Shareholder Settlement Amount is sufficient consideration for the

Shareholder Releases under the facts and circumstances of these chapter 11 cases, the accepting

votes of the Newly Consenting States were not necessary for acceptance of the Plan by Class 4,

and the Plan's treatment of Claims satisfies the requirements for confirmation of the Plan;

therefore, relinquishment of control of the Foundation and the Fund is not required to justify the

Shareholder Releases or confirm the Plan.

(m)    The actions taken pursuant to Section 5.7(l) of the Plan with respect to the

relinquishment of control of the Foundation and the Fund constitute conduct relating to the Plan

for purposes of Section 10.7(b) thereof.

MM.    Additional Findings Related to Section 1129(a)(7).    The Plan provides for

recoveries that are no less than, and in many cases greater than, what creditors might receive in a

hypothetical chapter 7 liquidation with specific regard to creditors in classes 4 through 10(b). The testimony of the Debtors' expert witnesses, Jesse DelConte, evidenced that the creditors in such classes in the aggregate would recover zero in the low case and mid-case scenarios and would recover in the aggregate $699.1 million in the high case scenario. Under the Plan, an estimated $5.5 billion will be distributed on account of contingent liability claims. The majority of that $5.5 billion will be provided to the Creditor Trusts. The evidence at the Confirmation Hearing established that the value of claims against the Sackler Families that any individual creditor would retain or recover in a hypothetical chapter 7 liquidation is speculative and not capable of estimation. No party put forth an estimate of the value of such claims or directed the court to evidence in the record from which such an estimate could be made. Representatives of the Sackler Families have testified that they would vigorously litigate any claims brought against them relating to the Debtors. The outcome of such litigation is not certain. The Sackler Families have asserted that claimants would face uncertainty in collection, including because a substantial portion of the Sackler Families' assets are held in trusts, the contents of which they assert cannot be used to satisfy the personal liabilities of beneficiaries. An overwhelming majority of the voting creditors, including 38 out of 48 voting U.S. States, voted to accept the Plan. The Plan provides for the release of such creditors' potential third party claims against the Sackler Families. This support further indicates their belief that recoveries under the Plan are not less than the recoveries they would obtain in hypothetical chapter 7 liquidation, including recoveries on account of such third-party claims.

NN.  <u>Scope of Discharge</u>. Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation to pay the Debtors' opioid-related liabilities,

without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law. The Plan discharges or releases Debtors for their opioid-related liabilities.

OO. _Attorney Fees and Costs_. The Attorney Fees and Costs provisions set forth in Section 5.8 of the Plan are fair, appropriate, and constitute an integral part of the resolution of the Chapter 11 Cases. Such provisions embody negotiated settlements as described in the _Mediator's Report_ filed by Kenneth R. Feinberg on July 28, 2021. The _Mediator's Report_ is persuasive and credible. The Attorney Fees and Costs provisions set forth in Section 5.8 of the Plan (i) were the product of good-faith, hard fought arm's-length discussions and mediations that spanned many months; (ii) with respect to the contingency fee resolutions with respect to the payment of (a) Local Government and Tribe Costs and Expenses Fund, (b) State Costs and Expenses Fund, (c) Ratepayer Costs and Expenses, (d) PI Claimant Costs and Expenses, and (e) Public Schools Costs and Expenses, as well as the funding of the Common Benefit Fund Escrow (items (a)-(e) and the Common Benefit Escrow shall be referred to as the "Public/Private Fee and Expense Settlement") are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort cases; (iii) with respect to the fee settlements reached between the Debtors, the Ad Hoc Group of Hospitals and the Public Side Claimants, as well as the Ad Hoc Group of NAS Children and the Public Side Claimants (collectively, the "Hospital/NAS/Public Fee Settlement"), are consistent with fee awards, arrangements, and assessments in similar mass tort situations; (iv) with respect to the percentages agreed upon in Section 5.8 of the Plan are well within the range of reasonableness; (v) with respect to the Common Benefit Fund

assessments were the reasonable result of the work of the public creditor contingency fee counsel that has benefited all other opioid claimant constituents;  and (vi) as evidenced by the Public/Private Fee and Expense Settlement and Hospital/NAS/Public Fee Settlement are necessary and integral to the Plan and the success of the Chapter 11 Cases, are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, are fair, equitable, and reasonable and meet the standard for approval under Bankruptcy Rule 9019 and *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) for the foregoing reasons as they (w) will avoid costly, protracted litigation over Confirmation of the Plan; (x) are far above the lowest range of reasonableness; (y) were heavily negotiated and extensively disclosed in the Disclosure Statement; and (z) were approved overwhelmingly by creditors voting on the Plan.

PP.    Value Distributed in Respect of Non-Federal Domestic Governmental Claims and Tribe Claims.  The aggregate amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims under the Plan exceeds $1.775 billion.

QQ.    Disputed Claims Reserve and Effective Date Distributions.  Based on the evidence proffered, adduced, and/or presented by the Debtors at the Confirmation Hearing, the procedures for establishing Disputed Claims Reserves, as set forth more fully in Article VII of the Plan, are adequate to ensure that each Holder of a Claim that is Disputed on any particular distribution date but Allowed thereafter shall receive distributions equal to the Distributions such Disputed Claim would be entitled to on the applicable distribution date if such Disputed Claim were Allowed in its full amount on the Effective Date.

RR.    Notice and Future Claims Issues.

(a)     The uncontroverted testimony set forth in the Declaration of Jeanne C. Finegan [D.I. 719], the Supplemental Declaration of Jeanne C. Finegan [D.I. 1179], and the Third Supplemental Declaration of Jeanne C. Finegan [D.I. 3403], confirms that the Bar Date Notice Plan approved by this Court was incredibly extensive in its reach, having reached an estimated 98% of all adults 18 years and older in the United States with an average frequency of message exposure of eight times, and an estimated 86% of all adults 18 years and older in Canada, with an average frequency of message exposure of four times, through (i) direct mailings to certain individuals and entities, (ii) network broadcast, cable, and streaming television, (iii) terrestrial and streaming radio, (iv) print media (e.g., magazines and newspapers), (v) out-of-home advertising (e.g., billboards), (vi) online display (e.g., banner advertising on websites), (vii) internet search terms (e.g., Google and Bing),  (viii) digital video and social media campaigns (e.g., Facebook, Instagram, LinkedIn, Twitter, and YouTube), and (ix) earned media (e.g., press releases).   Print media served approximately 143 million impressions, television advertisements served over 1.1 billion impressions, and the digital campaign served over 1.6 billion impressions.  As a result, this Court determines that the Notice of the General Bar Date provided, in part, through the Bar Date Notice Plan, was reasonable and appropriate, and provided due, proper, adequate, timely, and sufficient notice of the General Bar Date and the procedures for filing proofs of claim such that both known and unknown Holders of Claims and/or Channeled Claims are bound by the terms of the Plan, including the Shareholder Settlement.   The court also finds that notice was reasonably calculated, under all the circumstances, to apprise interested parties of the chapter 11 cases and the confirmation hearing, and afford them an opportunity to present their objections as set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

(b)     Similarly, according to the uncontroverted testimony set forth in the
Second Supplemental Declaration of Jeanne C. Finegan [D.I. 2917] and the Third Supplemental
Finegan Declaration, the Supplemental Confirmation Hearing Notice Plan reached an estimated
87% of adults 18 years and older in the U.S., with an average frequency of message exposure of
five times, 82% of all adults 18 years and older in Canada, with an average frequency of message
exposure of six times, and served over 2.6 billion digital media impressions in 39 other
countries, through (i) direct mailings to certain individuals and entities, (ii) print media (e.g.,
magazines and newspapers), (iii) online display (e.g., banner advertising on websites), (iv)
internet search terms (e.g., Google); (v) social media campaigns (e.g., Facebook, Instagram,
LinkedIn, Twitter, and YouTube), and (vi) earned media (e.g., press releases).    The
Supplemental Confirmation Hearing Notice Plan was conducted in 27 different languages and
served over 3.6 billion online and social media impressions.  As a result, this Court determines
that notice of the Confirmation Hearing (which included notice of the settlement of potential
claims and Causes of Action against the Shareholder Released Parties) provided, in part, through
the Supplemental Confirmation Hearing Notice Plan, was reasonable and appropriate, and
provided due, proper, adequate, timely, and sufficient notice of the Confirmation Hearing, the
releases, the exculpatory provisions, and the injunctions set forth in Article X of the Plan,
including the Channeling Injunction, the Releases and the Shareholder Releases, as well as the
Shareholder Settlement in satisfaction of the requirements of Bankruptcy Rule 3016(c), to both
known and unknown Holders of Claims and/or Channeled Claims, as well as Persons that may in
the future assert any Claim and/or Channeled Claim or otherwise be bound by the Plan and this
Order, and that such parties have had an opportunity to appear and be heard with respect thereto.

(c)    The Court also finds, based upon the facts and legal argument presented, that the appointment of a future claims representative in these cases (which no party requested of this Court at any time in these Chapter 11 Cases) was not warranted, including because (i) the Debtors ceased all promotional activities, including the promotion of opioid medications through a sales force, advertisements in printed journals and electronic media, and speaker programs, by February 2018, (ii) the Sackler Families ended their tenure as directors on Purdue's board and relinquished all direct control over Purdue by January 2019, (iii) the Debtors and the Sackler Families have been subject to, and in compliance with, a voluntary injunction preventing the Debtors from promoting opioids or opioid products and prohibiting the Sackler Families from actively engaging in the opioid business in the United States since October 11, 2019 and November 6, 2019, respectively, and (iv) in light of these facts and the facts presented and arguments made in the Debtors' Confirmation Brief, the Court believes there are no viable future claims. To the extent a Person attempts to bring a Future PI Channeled Claim against the Debtors, the other Released Parties, the Sackler Families, and/or the Shareholder Released Parties, such claimants are provided for in the Plan, which, in order to preserve the bargained for consideration of the Shareholder Settlement, properly sets forth a procedure for the assertion of such a claim or Cause of Action pursuant to Section 6.21 of the Plan, establishes the PI Futures Trust to litigate Future PI Channeled Claims, and—to the extent any Future PI Channeled Claim is found by a court to be viable—provides procedures for recovery that is consistent with that afforded to Holders of PI Claims.

(d)    The $5 million set aside for the PI Futures Trust under the Plan is fair and reasonable in light of the purpose of the trust, which is to defend against such claims, and in the

-46-

unlikely event that any such claim is found by a court to be viable, compensate any such claim in a manner consistent with Non-NAS PI Claims or NAS PI Claims.

SS.    <u>Public Document Repository</u>.  The Public Document Repository is an appropriate method of ensuring that the public is granted access to the Debtors' and Sackler Family Members' documents relevant to understanding the facts and circumstances underlying the Pending Opioid Actions, and the settlement reached with the Newly Consenting States in the third and final phase of mediation before the Honorable Shelley Chapman is in the public interest.[5]

TT.    <u>Retention of Jurisdiction</u>.  The Court may properly retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, *provided* that the resolution of Channeled Claims and the forum in which such resolution shall be determined shall be governed by, and in accordance with, <u>Section 6.21</u> of the Plan, the Master TDP and the Creditor Trust TDPs, as applicable.

UU.    <u>Likelihood of Satisfaction of Conditions Precedent</u>.  Each of the conditions precedent to the Effective Date, as set forth in <u>Article IX</u> of the Plan, is reasonably likely to be satisfied or waived in accordance with the provisions of the Plan.

VV.    <u>Good Faith</u>.  The Exculpated Parties have been and will be acting in good faith if they proceed to (a) consummate the Plan and the agreements, transactions, and transfers contemplated thereby and (b) take the actions authorized by this Order.

---

[5] The members of the Ad Hoc Group of Non-Consenting States other than the Newly Consenting States also endorse the Public Document Repository.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

2.    <u>Confirmation</u>.  All requirements for the Confirmation of the Plan have been satisfied.  Accordingly, the Plan, in its entirety, is CONFIRMED pursuant to section 1129 of the Bankruptcy Code.  Each of the terms and conditions of the Plan and the exhibits and schedules thereto, including, but not limited to, the Plan Documents, and any amendments, modifications, and supplements thereto, are an integral part of the Plan and are incorporated by reference into this Order.  Any failure to specifically describe or include a particular provision of the Plan (or any Plan Document) in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan (including all Plan Documents) be approved and confirmed in its entirety.  The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  A copy of the confirmed Plan is attached hereto as <u>Exhibit A</u>.  Once finalized and executed, the documents comprising the Plan Documents and all other documents contemplated by the Plan shall, as applicable, constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable against such persons in accordance with their terms and the terms of the Plan and this Order.  All persons who hold or may in the future hold or assert any Shareholder Released Claim have received adequate notice that complies with due process and are bound by the releases in the Plan and Shareholder Settlement.

3.    <u>Objections</u>.  All parties have had a fair opportunity to litigate all issues raised by Objections, or which might have been raised, and the Objections have been fully and fairly

litigated.    All Objections, responses, statements, reservation of rights, and comments in opposition to the Plan, other than those withdrawn with prejudice in their entirety, waived, settled, or resolved prior to the Confirmation Hearing, or otherwise resolved on the record of the Confirmation Hearing and/or herein, are hereby overruled.   The record of the Confirmation Hearing is hereby closed.

4.       Solicitation and Notice.  Notice of the Confirmation Hearing and the Plan, and all related documents, the solicitation of votes on the Plan, and the Solicitation Materials (a) complied with the solicitation procedures in the Solicitation Order, (b) were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and (c) were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

5.       Plan Classification.   The categories listed in Article III of the Plan classify Claims against, and Interests in, each of the Debtors, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, for all purposes, including, but not limited to, voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling.  The Court hereby holds that (a) the classifications of Claims and Interests under the Plan (i) are fair, reasonable, and appropriate and (ii) were not done for any improper purpose, (b) valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan, and (c) the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

6.       Compromise of Controversies.   The provisions of the Plan (including the provisions contained in Section 5.8 of the Plan and the release and injunctive provisions contained in Article X of the Plan) and the other Plan Documents constitute a good faith compromise and settlement of Claims, ~~Causes of Action~~ and controversies among the Debtors,

the Supporting Claimants, the Shareholder Payment Parties, certain other participants in the

Mediation and other parties in interest reached in connection with the Mediation and otherwise.

The Debtors are hereby authorized and directed to enter into the Plan Settlement under section

1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The Plan, the Plan Settlement, the

Plan Documents and this Order constitute a good faith, full and final comprehensive compromise

and settlement of all Claims, Interests and controversies described in the Plan based upon the

unique circumstances of these Chapter 11 Cases (such as the total distributable value available,

the unique facts and circumstances relating to these Debtors and the need for an accelerated

resolution without additional avoidable litigation) such that (a) none of the foregoing documents

(including the provisions contained in Section 5.8 of the Plan), nor any materials used in

furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any

notes related to, and drafts of, such documents and materials), may be offered into evidence,

deemed an admission, used as precedent or used by any party or Person in any context

whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as

necessary, and as admissible in such context, to enforce their terms and to evidence the terms of

the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent

jurisdiction and (b) any obligation by any party, in furtherance of such compromise and

settlement, to not exercise rights that might be otherwise available to such party shall be

understood to be an obligation solely in connection with this specific compromise and settlement

and to be inapplicable in the absence of such compromise and settlement.  The Plan, the Plan

Settlement, the Plan Documents and this Order will be binding as to the matters and issues

described therein, but will not be binding with respect to similar matters or issues that might

arise in any other litigation or proceeding in which none of the Debtors or any other Protected

Party is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents or this Order.  Any Person's support of, or position or action taken in connection with, the Plan, the Plan Settlement, the Plan Documents and this Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases.  Further, and, as all parties to the Mediation agreed, the Plan Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation, or litigation.

      7.        <u>Shareholder Settlement Agreement</u>.[46]

      (a)      The Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Master Disbursement Trust, as applicable, in connection therewith, are hereby approved.

      (b)      The Debtors and the Master Disbursement Trust, as applicable, are authorized in all respects, without further approval of the Bankruptcy Court, act or action under applicable law, regulation, order, rule or vote, or the consent, authorization or approval of any Person except as otherwise required by the Shareholder Settlement Agreement, the Collateral Documents or any of the other Definitive Documents, to (i) execute and deliver, or cause to be executed and delivered the Shareholder Settlement Agreement, the Collateral Documents and all other Definitive Documents and to perform their obligations thereunder, except as otherwise

---

[46] Capitalized terms used solely in this paragraph |7 but not otherwise defined herein or in the Plan, Disclosure Statement, or Solicitation Order shall have the meanings ascribed to such terms in the Shareholder Settlement Agreement.

required by the Shareholder Settlement Agreement, any of the Collateral Documents or any of the other Definitive Documents and (ii) perform all obligations under the Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents, in each case consistent with the terms of the Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents.

(c)    ~~Effective as of the Agreement Effective Date (as defined in the Shareholder Settlement), subject~~Subject to the terms and conditions of the Shareholder Settlement Agreement ~~and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases~~, Purdue Pharma Inc. shall surrender, cancel and/or redeem its de minimis interests in Pharmaceutical Research Associates L.P.

(d)    Each party to the Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents (as defined in the Settlement Agreement) shall comply in good faith with the applicable terms of such agreements to which they are a party. Each provision of the Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents shall have the full force and effect of a binding Court order <u>as of the Agreement Effective Date (as defined in the Shareholder Settlement Agreement).  The Plan and this Order shall be binding upon each of the Shareholder Released Parties.</u>

(e)    Pursuant to the Shareholder Settlement Agreement, each party to the Shareholder Settlement Agreement will (i) submit to the jurisdiction of the Court, (ii) consent to the authority of the Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that any Proceeding (as defined in the Shareholder Settlement Agreement) arising under, related to, or in connection with the Shareholder Settlement Agreement is or must be

adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Court is an improper or inconvenient forum or venue.

8.      <u>Plan Transactions</u>.  All of the transactions contemplated by the Plan are hereby approved.  The Debtors are authorized to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  All implementing actions required or contemplated by the Plan, including, but not limited to, (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions and (e) any transactions described in the Restructuring Steps Memorandum, are hereby authorized and approved in all respects.

9.      <u>Establishment and Purpose of the Trusts</u>. Each of the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts shall be established as a trust (or, in the case of Tribe Opioid Abatement Fund LLC, a limited liability company) under applicable state law for the purposes described in the Plan and the applicable Plan Documents. Each of the Master Disbursement Trust <u>and the Creditor Trusts</u> is being established to resolve or satisfy Claims that have resulted or may result from an event (or related series of events) that has

occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

10.    <u>Beneficiaries</u>. Beneficiaries of the Plan Administration Trust, the Master Disbursement Trust and each of the Creditor Trusts shall have only such rights and interests in and with respect to the applicable trust assets as set forth in the Plan and the applicable Plan Documents. The Plan Administration Trustee, the MDT Trustees and the Creditor Trustees shall be entitled to take the actions set forth in, and in each case in accordance with, the Plan and the applicable Plan Documents. The Creditor Trusts shall be subject to the continuing jurisdiction of the Bankruptcy Court.

11.    <u>U.S. Federal Income Tax Matters Relating to Trusts</u>.

(a)    <u>U.S. Federal Income Tax Matters Relating to Plan Administration Trust</u>. The Plan Administration Trust shall be structured to qualify as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this paragraph shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

      (b)    <u>U.S. Federal Income Tax Matters Relating to the Master Disbursement</u> <u>Trust</u>. The Master Disbursement Trust shall be structured to qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing. An MDT Trustee or the MDT Executive Director, as determined in accordance with the MDT Agreement, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust.

      (c)    <u>U.S. Federal Income Tax Matters Relating to the Creditor Trusts</u>.  Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) shall be structured to qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be

the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust.

(d)     Nothing in the Plan or this Order, including without limitation this Paragraph 10, shall be deemed to (A) determine the United States federal tax liability of any Person, including but not limited to the Debtors, (B) have determined the United States federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or this Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to United States federal tax liability and United States federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

12.     Approval of the Master TDP and the Creditor Trust TDPs. The Master TDP and the Creditor Trust TDPs, copies of which are attached hereto in **Exhibit B**, are hereby approved.

13.     Appointment of Managers, Trustees, Etc. The appointment of the MDT Trustees, the MDT Executive Director, the NewCo Managers, the TopCo Managers, the Plan Administration Trustee, the PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers in accordance with Article V of the Plan and the exculpation thereof pursuant to Article V of the Plan, and the appointment of the PI Claims Administrator pursuant to Section 2.3 of the PI Trust Agreement, is hereby approved.

14.     <u>Corporate Action</u>.  Prior to or after the Effective Date, all actions contemplated under the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, and any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Plan Supplement.

15.     <u>Preservation of Causes of Action and Reservation of Rights</u>.  As of the Effective Date, the Master Disbursement Trust, the Plan Administration Trust, each Creditor Trust and NewCo shall have the right to prosecute Retained Causes of Action as and to the extent set forth in the Plan.

16.     <u>Executory Contracts and Unexpired Leases</u>.  Entry of this Order shall constitute approval of all amendments, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases provided for under the Plan pursuant to section 365 of the Bankruptcy Code. Amendments, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law.  Any motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date, entry of which shall result in such assumption, assumption and assignment, or rejection becoming effective without need for any further action that may otherwise be required under applicable non-bankruptcy law.

17.     <u>Cigna Health and Life Insurance Objection to Assumption and Assignment of Executory Contracts</u>. Cigna Health and Life Insurance Company reserves its rights to renew *Cigna Health and Life Insurance Company's Limited Objection to Assumption and Assignment*

*of Executory Contracts* [D.I. 3358] ("**Cigna's Assumption and Assignment Objection**") to the

extent of a future default under the Employee Benefits Agreement (as defined in Cigna's

Assumption and Assignment Objection) occurring prior to the Effective Date.

18.    <u>Disputed Claims</u>.  The provisions of <u>Article VII</u> of the Plan, including, but not

limited to, the provisions governing procedures for resolving certain Disputed Claims, are fair

and reasonable and are approved.

19.    <u>No Post-Petition or Post-Effective Date Interest on Claims</u>.  Unless otherwise

specifically provided for in the Plan or this Order, or required by applicable bankruptcy law,

post-petition and post-Effective Date interest shall not accrue or be paid on any Claims, and no

Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition

Date.

20.    <u>Full and Final Satisfaction of Claims</u>.  Unless otherwise provided in the Plan,

the Distributions and deliveries to be made on account of Allowed Claims under the Plan shall,

in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange

for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims

under the Plan shall additionally be in consideration of the release and discharge of any and all

Released Claims and Shareholder Released Claims related to or arising from such Claims.

21.    <u>Release of Liens</u>.  Except as otherwise provided in the Plan or in any contract,

instrument, release, or other agreement or document created pursuant to the Plan or this Order,

on the Effective Date and concurrently with the applicable distributions made pursuant to the

Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim

that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of

trust, Liens, pledges, or other security interests against any property of the Estates shall be fully

released, settled, discharged, and compromised, without any further approval or order of the

Court and without any action or Filing being required to be made by the Debtors or the

Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such

mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the

Estates shall revert to the Liquidating Debtors and their successors and assigns.  The Liquidating

Debtors are authorized to File any necessary or desirable documents to evidence such release in

the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens,

pledges, or other security interests.

22.    <u>Approval of Releases, Injunctions, and Exculpations</u>.    The record in the

Confirmation Hearing and the Chapter 11 Cases is sufficient to support the approval of each of

the releases, injunctions, and exculpations provided in the Plan, including those, without

limitation, set forth in Article X thereof.  Accordingly, based upon the record of the Chapter 11

Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or

presented at the Confirmation Hearing, the releases, settlements, injunctions, and exculpations

set forth in the Plan, including those set forth in Article X thereof, are (i) appropriate and

consistent with the Bankruptcy Code and applicable law, (ii) incorporated herein in their entirety,

(iii) are hereby approved and authorized in all respects, and (iv) shall be immediately effective

and binding on all Persons and Entities on the Effective Date, to the extent provided in the Plan,

without further order or action on the part of this Court or any other party.

23.    <u>Injunction Against Interference with Plan</u>.  In accordance with Section 10.4

of the Plan, subject to <u>Section 12.4</u> of the Plan, upon entry of this Order, all Holders of Claims

against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released

Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking

any actions to interfere with the implementation or consummation of the Plan and the Plan Documents.

24.        <u>Injunction Regarding Post-Confirmation Claims</u>.  In accordance with <u>Section 6.21</u> of the Plan, except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Channeled Claim that is or was channeled to a Creditor Trust under the Master TDP and grants such Person leave to assert such Channeled Claim against such Creditor Trust. If such leave is granted, such Person shall be entitled to seek to recover on such Channeled Claim solely from the Creditor Trust to which such Channeled Claim is or was channeled pursuant to the Master TDP, as determined by the Bankruptcy Court, and any such recovery shall be solely in accordance with and to the extent provided in the Creditor Trust TDP for such Creditor Trust. After the Effective Date, in addition to the Person seeking to assert such Channeled Claim and any Person against which such Channeled Claim is purportedly asserted, only the MDT Trustees, the Creditor Trustees and NewCo shall have standing to participate in any action before the Bankruptcy Court in respect of the foregoing. For the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify or amend the terms and conditions of any Creditor Trust TDP or the

Master TDP or the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

   25.  <u>Releases by Debtors</u>.[57]

    (a)  **As set forth in <u>Section 10.6(a)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in this Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all** ~~Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights,~~ **Causes of Action,** ~~Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever,~~ **including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates** ~~(including any Causes of Action arising under chapter 5 of the Bankruptcy Code)~~ **and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any**

---

[57] For the avoidance of doubt, paragraphs 25 through 33 hereof do not override the corresponding sections of the Plan and, in the event of any inconsistency between such paragraphs and the corresponding sections of the Plan, such corresponding sections of the Plan govern.

jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether ~~liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued,~~ existing or hereinafter arising, ~~choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time,~~ in each case, based on or relating to, or in any manner arising from, in whole or in part, **(i)** the Debtors ~~(~~**,** as such Entities existed prior to or after the Petition Date~~), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or~~

advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the

Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this subparagraph and Section 10.6(a) of the Plan.

(b)      Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim and (y) nothing in this Order or Section 10.6(a) of the Plan shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions; *provided* that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Cause of Action against any Shareholder Release Snapback Party, (C) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided, however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

26.      Releases by Releasing Parties.

(a)      As set forth in Section 10.6(b) of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in

this Order, the Released Parties[8] shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases.

(b)    For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign

---

[8] Co-Defendants are not Released Parties under Section 10.6(b) of the Plan.

enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

(c)    Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in the this Order or the Plan shall release any Excluded Claim and (y) nothing in this Order or <u>Section 10.6(b)</u> of the Plan shall (A) release any Cause of Action against any Shareholder Release Snapback Party, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, or (C) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

(d)    Notwithstanding anything herein or in the Plan to the contrary, but subject to the MDT Insurer Injunction and the Settling MDT Insurer Injunction, the Debtors shall not be released from liability for any Claim (other than any Co-Defendant Claim) that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies.  The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier

of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

        27.      <u>Releases by Debtors of Holders of Claims</u>.

        (a)      **As set forth in <u>Section 10.6(c)</u> of the Plan, as of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions.  The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this paragraph and <u>Section 10.6(c)</u> of the Plan.**

(b)    **As of the Effective Date, all Holders of PI Channeled Claims and Holders of NAS Monitoring Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases, including, in each case, without limitation, any act, conduct, omission, event, transaction, occurrence, injury, damage, or continuing condition in any way relating to the foregoing.**

(c)    **Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim and (y) nothing in this Order or Section 10.6(c) of the Plan shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions, provided that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C)**

release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

      28.     Shareholder Releases by Debtors.

      (a)     As set forth in **Section 10.7(a)** of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of **Section 10.7(a)** of the Plan, by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning

Opioid-Related Activities or Products, and involvement in the subject matter of the

Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a

Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan

Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo,

TopCo and any other newly-formed Persons that shall be continuing the Debtors'

businesses after the Effective Date shall be bound, to the same extent the Debtors are

bound, by the Shareholder Releases set forth in Section 10.7(a) of the Plan.

(b)      Notwithstanding anything herein or in the Plan to the contrary,

(x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this

Order or Section 10.7(a) of the Plan shall be construed to impair in any way the Effective

Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan

Documents, this Order or the Restructuring Transactions, including the Shareholder

Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice

of Shareholder Release Snapback, (A) the Shareholder Releases set forth in paragraph

28(a) of this Order and Section 10.7(a) of the Plan shall be entirely null and void, revoked

and invalidated, as of the Effective Date, with respect to all members of the Breaching

Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status*

*quo ante* shall be restored in all respects for the Debtors and the Master Disbursement

Trust with respect to the members of the Breaching Shareholder Family Group and the

Designated Shareholder Released Parties (C) the Master Disbursement Trust shall be

deemed to have received and accepted all of the rights with respect to any member of the

Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in

each case, that the Debtors and their Estates had prior to the Effective Date and that the

Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of paragraph 28(a) of this Order and **Section 10.7(a)** of the Plan had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

29.     Shareholder Releases by Non-Debtors.

(a)     **As set forth in Section 10.7(b) of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Shareholder Released Parties, other than any Shareholder Released Parties identified in clause (vii)(C) of the definition of Shareholder Released Parties (and in no other clause of such definition) shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(b) of the Plan, by the Releasing Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing**

Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. In addition, as of the Effective Date, notwithstanding anything to the contrary herein, and notwithstanding that the Shareholder Released Parties are not otherwise Releasing Parties, each Shareholder Released Party shall be released by each otherany Person (regardless of whether such Person otherwise is a Releasing Party) that is a Shareholder Released PartyParty's current or former officer, director, principal, member, employee, financial advisor, attorney (including, without limitation, any attorney retained by any director, in his or her capacity as such), accountant, investment banker (including, without limitation, investment banker retained by any director, in his or her capacity as such), consultant, expert or other professional, from any Cause of Action for indemnification, contribution or any similar liability-sharing theory based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present

~~or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases~~**preceding paragraph**.

(b)    For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

(c)    Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this Order or Section 10.7(b) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Order and Section 10.7(b) of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding,

revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

      30.      <u>Releases by Shareholder Released Parties</u>.

      (a)    **As set forth in <u>Section 10.7(c)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of <u>Section 10.7(c)</u> of the Plan, by the Shareholder Released Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the**

Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a
Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases.

(b)    Notwithstanding anything herein or in the Plan to the contrary,
(x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this
Order or <u>Section 10.7(c)</u> of the Plan shall be construed to impair in any way the Effective
Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan
Documents, this Order or the Restructuring Transactions, including the Shareholder
Settlement Agreement and the Separation Agreements, and including the rights of any
Shareholder Released Party that is a current or former director, officer or employee of the
Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held
by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the
commencement or continuation of any action or proceeding against a member of a
Breaching Shareholder Family Group or a Designated Shareholder Released Party by any
Reciprocal Releasee, (A) the releases set forth in this Order and <u>Section 10.7(c)</u> of the Plan
of any Reciprocal Releasee that has commenced or continued any such action shall be
entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the
members of the Breaching Shareholder Family Group and the Designated Shareholder
Released Parties and (B) the *status quo ante* shall be restored in all respects for the
members of the Breaching Shareholder Family Group and the Designated Shareholder
Released Parties with respect to any Reciprocal Releasee that has commenced or continued
any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the
nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the
releases set forth in paragraph 30(a) of this Order and <u>Section 10.7(c)</u> of the Plan shall

continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

31.    <u>Channeling Injunction</u>.

(a)    **As of the Effective Date, in order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in <u>Sections 10.5, 10.6, and 10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:**

(i)    **commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;**

(ii)    **enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against**

any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)    creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)    Notwithstanding anything to the contrary in <u>Section 10.8</u> of the Plan

or this Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)    the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

(ii)    the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii)    the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv)    the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;

(v)    the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

      (vi)     **the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents;**

      (vii)    **the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or**

      (viii)   **NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.**

(c)     Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by paragraph 32(a) of this Order and Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this paragraph and Section 10.8(c) of the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(d)     Except as expressly set forth in paragraph 31(c) above and paragraph (c) of Section 10.8 of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)     Except as expressly set forth in paragraphs (b) and (c) of this Order and paragraphs (b) and (c) of Section 10.8 of the Plan, nothing in the Plan, the MDT Documents or

the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)     The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

32.     <u>Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction</u>.

(a)     *Tolling of Shareholder Released Claims*.  If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreement; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to <u>Section 10.20</u> of the Plan.

(b)    *Violations of Shareholder Releases and Channeling Injunction.* In the

event that any Person takes any action that a Shareholder Released Party believes violates the

Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party,

such Shareholder Released Party shall be entitled to make an emergency application to the

Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary

proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in

connection with any dispute over whether an action violates the Shareholder Releases or

Channeling Injunction. Upon determining that a violation of the Shareholder Releases or

Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any

appropriate relief against such violating Person, including, but not limited to, (i) disgorgement

from the violating Person of any funds, assets or other value received, directly or indirectly,

pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or

Plan Documents on account of legal or other advisory services rendered to or for the benefit of

the violating Person); (ii) the termination of any rights of the violating Person to receive any

funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any

payments owed by any Shareholder Released Parties under the Shareholder Settlement

Agreement to the violating Person in an amount equal to the amount of disgorgement ordered

from, or the reduction of future payments ordered to be made to, or on account of, the violating

Person (subject to the right of the violating Person to request that any amounts actually disgorged

from such violating Person offset any reduction of future payments ordered to be made to, or on

account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of

contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy

Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the

Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

33.    <u>Special Provisions for United States</u>.

(a)    As set forth in <u>Section 10.21</u> of the Plan, as to the United States, notwithstanding anything contained in the Plan or this Order to the contrary (except <u>Section 5.2(h)</u> of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement), including but not limited to <u>Article X</u> of the Plan, nothing in the Plan or this Order (except <u>Section 5.2(h)</u> of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement) shall:

(i)    limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and this Order are not intended and shall not be construed to bar the United States from, subsequent to this Order, pursuing any police or regulatory action, or any criminal action;

(ii)    discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; *provided*, *however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under

-81-

section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

(iii)    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided*, *however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A)–(D) in clause (ii) are likewise fully preserved;

(iv)    affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided*, *however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or this Order that may extinguish setoff or recoupment rights);

(v)    divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Order, the Plan or the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)    be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or this Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in paragraph 31 of this Order or Section 10.8 of the Plan does not apply to the rights and causes of action protected by this paragraph or Section 10.21 of the Plan.

(b)    Notwithstanding anything to the contrary herein, nothing in the Plan, this Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, this Order, the

Shareholder Settlement Agreement or any other document filed in connection with the Plan shall limit the releases contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(c)    Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

(i)    The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-114A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. The Centers for Medicare & Medicaid Services requires that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)    The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912);

(iii)    Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912); and

(iv)    The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or this Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

(d)    Notwithstanding anything to the contrary herein, nothing in the Plan, this

Order, the Shareholder Settlement Agreement or any other document filed in connection with the

Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "**Medicaid Program**") or in section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

34.    <u>MDT Insurer Injunction</u>.

(a)    **In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

(i)    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(ii)    **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

      (iv)      **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and**

      (v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.**

(b)      The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan or (iii) the terms of the Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights.

(c)      To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority

at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that (i) any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement and (1)(ii) the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(d)    Except as set forth in this Order and paragraphs (b) and (c) of <u>Section 10.10</u> of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

35.    <u>Settling MDT Insurer Injunction</u>.

(a)    **In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:**

(i)    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(ii)    **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

(iv)    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and**

(v)    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.**

(b)    Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that

Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)    There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)    Except as set forth in this Order and paragraphs (b) and (c) of <u>Section 10.11</u> of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

36.    <u>Exculpation</u>.    To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Cause of Action for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Causes of Action arising out of, or related to, any act or omission of an Exculpated

Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this paragraph and Section 10.12 of the Plan shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Causes of Action that may be asserted against any Excluded Party.

37.    Injunction Related to Releases and Exculpation.    To the maximum extent permitted under applicable law, this Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to the Plan, including, without limitation, the Causes of Action released or exculpated in the Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in Section 5.3(b), 5.4(c) or 5.6(b) of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

38.    Channeling of Future PI Channeled Claims and Injunction in Support of PI Futures Trust. As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Futures Trust. Each Future PI Channeled Claim shall be asserted exclusively against the PI Futures Trust and resolved solely in accordance with the terms, provisions and procedures of the PI Futures TDP. The sole recourse of any Person on

account of any Future PI Channeled Claim, whether or not the Holder thereof participated in the

Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases,

shall be to the PI Futures Trust as and to the extent provided in the PI Futures TDP. Holders of

Future PI Channeled Claims are enjoined from asserting against any Debtor or other Protected

Party any Channeled Claim, and may not proceed in any manner against any Debtor or other

Protected Party on account of any Channeled Claim in any forum whatsoever, including any

state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue

Future PI Channeled Claims exclusively against the PI Futures Trust, solely as and to the extent

provided in the PI Futures TDP.

39.    _Operating Injunction and Governance Covenants_. The operating injunction set

forth in **Exhibit C** hereto and the governance covenants set forth in **Exhibit D** hereto shall bind

NewCo and any successor owner of NewCo's opioid business to the extent set forth therein.

40.    _Plan Modifications_.  The Plan may not be modified except in accordance with

Section 12.3 of the Plan.  The Debtors are authorized to make modifications to the Plan as and to

the extent provided under Section 12.3 of the Plan.

41.    _Co-Defendant Defensive Rights_.    Except as provided in the MDT Insurer

Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of

Section 10.18 of the Plan, notwithstanding anything to the contrary in Article X of the Plan or in

the Plan as it currently exists or as it might be further amended, this Order or any order entered in

connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or

supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the

Plan or any of the foregoing documents or orders (including, without limitation, the

classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction

or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in this Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or this Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the Plan, any of the Plan Documents or this Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of any Co-Defendant Defensive Rights. Co-Defendant Defensive Rights (i) may be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek judgment reduction or otherwise defend against any Cause of Action brought by any Person against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part on Opioid-Related Activities and (ii) shall in no case be used to seek or obtain any affirmative monetary recovery from any Protected Party or any Asset of any Protected Party (including from any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of any Released Claim or Shareholder Released Claim. The foregoing does not constitute a release of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

42.    <u>Evidentiary Stipulations</u>.

(a)    This Order shall incorporate, as if set forth fully herein, the terms of the so-ordered *Stipulation Between and Among the Raymond Sackler Family, the Mortimer Sackler Family, the States of Connecticut, Oregon, Washington, and the District of Columbia* [ECF No. 3601], the *Joint Stipulation of Facts Between and Among the Mortimer-side Initial Covered Sackler Persons and the State of Washington, State of Oregon, State of Connecticut, and the District of Columbia* [ECF No. 3631], and the *Joint Stipulation as to Facts Between and Among the Mortimer-side Initial Covered Sackler Persons and the State of Maryland* [ECF No. 3642].

(b)    The following stipulation, which was read into the record at the Confirmation Hearing and further confirmed during oral argument, is hereby approved and so-ordered as set forth herein: In the event there is litigation against a Shareholder Released Party as a result of a Notice of Shareholder Release Snapback, as defined in the ~~Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [Dkt. No. 3185]~~Plan, no party (a "**Non-Prejudiced Party**") and no party formed as a result of the Plan (a "**Future Party**") shall be prejudiced in any way in connection with such snapback litigation by its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forego or not participate in any argument regarding such evidence during oral argument, in each case in connection with the confirmation of the Plan (including at the Confirmation Hearing).  If Plan confirmation is reversed on appeal, no Non-Prejudiced Party nor Future Party shall be prejudiced in any way in connection with any future proceeding based on its decision to (a) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forego or not participate in any argument regarding such evidence during oral argument, in each case in connection with the confirmation of the Plan (including at the Confirmation Hearing).  Nothing that occurs at the Confirmation Hearing (or related thereto)

shall constitute or be deemed agreement or disagreement in any future proceeding or snapback litigation by any Non-Prejudiced Party or Future Party with any position taken or evidence offered or argument made (at oral argument) by any other party at the Confirmation Hearing, provided that nothing herein shall operate to limit or reduce the binding nature of the Plan, this Order, and any related findings on any party.  For the avoidance of doubt, all parties agree and acknowledge that the Debtors, the UCC, any Public or Private Claimant that is not objecting to the Plan, any Shareholder Released Party subject to snapback litigation, and any Future Party is intended to be a "Non-Prejudiced Party."

43.     Timney and Stewart Stipulation.   The *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [ECF No. 3543] between the Debtors, Mark Timney, a former officer of Purdue, and John H. Stewart, a former officer of Purdue, and acknowledged and agreed to by the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Multi-State Governmental Entities Group and the Ad Hoc Group of Non-Consenting States, was entered into as of August 11, 2021, and is hereby approved and so ordered.

44.     West Boca Medical Center.   Notwithstanding anything in the Plan, the Plan Supplement or elsewhere in this Order to the contrary, West Boca Medical Center, its ultimate parent Tenet Healthcare Corporation, and their respective affiliates (together with the Related Parties of each of the foregoing, including any affiliated medical practices, the "West Boca Parties") shall retain any Co-Defendant Defensive Rights they may have regardless of whether the West Boca Parties are or are not each a Co-Defendant under the Plan.

45.     Revocation or Withdrawal of Plan.   The Debtors shall have the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors in accordance

with the terms of the Plan. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreement that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

46.     Retention of Jurisdiction.   Except as provided in Section 11.1 of the Plan, notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for the purposes set forth in Section 11.1 of the Plan.

47.     Successors and Assigns.   The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

48.    <u>Further Assurances</u>.  The Holders of Claims and Channeled Claims receiving

Distributions under the Plan and all other parties in interest shall, from time to time, prepare,

execute, and deliver any agreements or documents and take any other actions as may be

necessary or advisable to effectuate the provisions and intent of the Plan.

49.    <u>Service of Documents</u>.  Any pleading, notice, or other document required by the

Plan to be served on the Debtors shall be served pursuant to the terms of <u>Section 12.13</u> of the

Plan.

50.    <u>Effectiveness of All Actions</u>.  All actions authorized to be taken pursuant to the

Plan shall be effective on, prior to, or after the Effective Date pursuant to this Order, as

applicable, without further notice to, or action, order, or approval of, the Court or further action

by the respective shareholders, affiliates, subsidiaries, members (including, but not limited to,

ex-officio members), officers, directors, principals, managers, trustees, employees, partners,

agents, or representatives of the Debtors and with the effect that such actions had been taken by

unanimous action of such shareholders, affiliates, subsidiaries, members (including, but not

limited to, ex-officio members), officers, directors, principals, managers, trustees, employees,

partners, agents, or representatives.

51.    <u>Notice of Confirmation Date and Effective Date; Substantial Consummation of</u>

<u>Plan</u>.  The Claims and Solicitation Agent may serve notice of the entry of this Order on (a) all

Holders of Claims and (b) those other parties on whom the Plan, Disclosure Statement, and

related documents were served.  Such service constitutes good and sufficient notice pursuant to

Bankruptcy Rules 2002(f)(7) and 3020(c).  On the Effective Date, or as soon thereafter as is

reasonably practicable, the Debtors shall file with the Court a "Notice of Effective Date"

(the "**Notice of Effective Date**") and shall mail or cause to be mailed by first-class mail to

Holders of Claims or Interests a copy of the Notice of Effective Date; *provided*, *however*, that the Debtors shall not be required to transmit the Notice of Effective Date to Holders of Claims or Interests in Classes 12 and 18 or to any Holders of Claims or Interest for which applicable Solicitation Materials were returned to the Debtors' Claims and Solicitation Agent as undeliverable.  Upon the Effective Date, the Plan shall be deemed substantially consummated as to each Debtor, consistent with the definition of "substantial consummation" in section 1101(2) of the Bankruptcy Code.

52.    <u>Transactions on Business Days</u>.  If any payment, distribution, act, or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

53.    <u>General Authorizations</u>.  Pursuant to section 1142 of the Bankruptcy Code, Section 303 of the Delaware General Corporation Law, and any comparable provisions of the business corporation or similar law of any applicable state, the Debtors and any other necessary parties are authorized and empowered on, prior to, or after the Effective Date pursuant to this Order, as applicable, without further corporate action or action by the Debtors' directors, members, partners, shareholders, or any other person to (a) execute and deliver any instrument, agreement, or document, (b) adopt amendments to by-laws or similar governing documents, (c) appoint the PPLP Liquidator to serve as the sole officer, director, or manager of each of the Liquidating Debtors, and (d) perform any act that is necessary, desirable, or required to comply with the terms and conditions of the Plan and this Order and consummation of the Plan, and are authorized and empowered, without limitation, to take all actions necessary or appropriate to

enter into, implement, perform under, and consummate the contracts, instruments, and other agreements or documents created in connection with the Plan, including, without limitation, entering into the Plan Documents.

54.     Administrative Claim Bar Date.  All requests for payment of Administrative Claims that accrued on or before the Effective Date must be Filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating Debtors, counsel for the Creditors' Committee, [the Plan Administration Trustee and the PPLP Liquidator] by [(a) 30 days after the Confirmation Date with respect to Claims that arose before the Confirmation Date and (b) 30 days after the Effective Date with respect to Claims that arose on or after the Confirmation Date] (the "**Administrative Claim Bar Date**").  Any requests for payment of Administrative Claims pursuant to Article II of the Plan that are not properly Filed and served by the Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or any action by the Court.

55.     Payment of Statutory Fees.  All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid pursuant to Section 12.5 of the Plan.

56.     Term of Injunctions or Stays and Case Stipulation.

(a)     Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)     Notwithstanding the foregoing paragraph 56(a), on the Effective Date, without further action by or order of the Bankruptcy Court: (i) any and all obligations of the

Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be withdrawn, vacated and superseded by this Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan; (ii) any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by this Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and (iii) any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives,*

*Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal*

*Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)     Any and all information shared or produced by any Shareholder Released

Party pursuant to the agreements or orders referenced in the foregoing paragraph 56(b), including

any such information also shared with Persons not party to the Case Stipulation shall remain

subject to the confidentiality terms under which it was shared, including any information that

was designated under the Protective Order (or confidentiality agreement that was superseded by

the Protective Order), which such information shall remain confidential under the terms of the

Protective Order unless such information, materials or documents are included in the Public

Document Repository in accordance with the Plan and the Shareholder Settlement Agreement.

Names or other identifying information of investments or specific third-party counterparties or

advisors with whom or with which a Shareholder Released Party has or had a third-party

investment, advisory or business relationship that was disclosed in documents or information

produced by a Shareholder Released Party and designated Outside Professional Eyes Only

Information under the Protective Order shall retain such designation and be protected

accordingly.

57.     Plan Supplement.  All materials included in the Plan Supplement (as may be

amended in accordance with the terms of the Plan or this Order) are integral to, part of, and

incorporated by reference into the Plan.  The Plan Supplement (as may be altered, modified, or

amended in accordance with the terms of the Plan or this Order) and all related documents are

hereby approved, including, but not limited to, the Shareholder Settlement Agreement, the MDT

Documents, the NewCo Transfer Agreement, the NewCo Operating Agreement, the TopCo

Operating Agreement, the PAT Agreement, the PI Trust Documents (including the LRP

Agreement), the PI Futures Trust Documents, the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents, the Tribe Trust Documents and the NewCo Credit Support Agreement.

58.    <u>Rhodes Debtors</u>.  Rhodes Debtors shall mean Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries.

59.    <u>Purdue Pension Plan</u>.  Notwithstanding any provision in this Order to the contrary, no provision contained in this Order, the Plan, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. The PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of this Order, the Plan, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases.

60.    Independent Emergency Room Physician Payment. On the Effective Date, the Debtors shall make a payment of $375,000 from Effective Date Cash (the "**Independent Emergency Room Physician Payment**") to independent emergency room physician Dr. Michael Masiowski ("**Masiowski**").  In consideration for the Independent Emergency Room Physician Payment, Masiowksi and his advisors and representatives, including his counsel in these Chapter 11 Cases, have withdrawn all of their objections to confirmation of the Plan and have agreed that any and all Claims or Causes of Action against, and/or any other purported right to payment from, any Protected Party, including without limitation any Claim set forth in Proof of Claim No. 29085, shall be deemed released and extinguished without any further payment or

distribution and without any further action by or order of the Bankruptcy Court, and such Proof of Claim shall be expunged and shall be of no further force or effect.

61.    ~~59.~~ Westchester Fire Insurance Company.

(a)    Notwithstanding anything to the contrary in the Plan Documents, the Disclosure Statement, or this Order, or any agreements or documents relating to the foregoing, including, without limitation, any transition agreements and trust agreements (for purposes of this section, the "**Plan Documents**"), nothing in the Plan Documents shall in any way prime, discharge, impair, modify, subordinate or affect the rights of Westchester Fire Insurance Company and/or its past, present or future U.S.-based affiliated sureties (each as surety in its role as an issuer of bonds, individually and collectively referred to herein as "**Westchester**" or "**Surety**") as to:

(i)    any indemnity or collateral obligations or agreements relating to bonds or related instruments issued and/or executed by Surety and assumed by the Debtors and/or NewCo (each such bond or related instrument, a "**Bond**", and, collectively, the "**Bonds**");

(ii)    any collateral or letter of credit related to any Bond; or

(iii)    any indemnity agreement related to any of the Bonds (collectively, the "**Indemnity Agreements**"), which include, without limitation, the General Agreement of Indemnity dated December 13, 2016 and the General Agreement of Indemnity dated August 2, 2017 which are hereby assumed and assigned to NewCo.

(b)    Notwithstanding any provision in the Plan Documents to the contrary, including, without limitation, the third-party releases in the Plan,

(i)    any and all collateral, including cash collateral and letters of credit, held by Surety and/or on Surety's behalf in connection with the Bonds shall be retained by Surety and/or on Surety's behalf to secure the obligations of the Debtors and/or NewCo under such Bonds;

(ii)    Surety has no obligation to issue or execute any new bond or related indemnity agreement on behalf of any entity, and Surety

has no obligation to extend, modify and/or increase the amount of any Bond or related indemnity agreement;

(iii)    any rights, remedies and/or defenses Surety may now or in the future have with respect to the Bonds are preserved;

(iv)    any current or future setoff, recoupment rights, lien rights, trust fund claims of Surety or any party to whose rights the Surety has or may be subrogated, and/or any existing or future subrogation or other common law rights of the Surety are preserved;

(v)    It shall not be necessary for Surety to file an administrative proof of claim, file a request for payment, and/or file a fee application to protect any of its claims related to the Indemnity Agreements and Bonds;

(vi)    Sections 6.13 and 6.18 of the Plan shall not have the effect of disallowing Surety's claims related to the Bonds and Indemnity Agreements and/or the claims that Surety may assert via subrogation, and Section 7.5 of the Plan shall not apply to such claims; and

(vii)    Surety shall have access to any and all books and records held by the Debtors and/or NewCo relating to the Bonds and Indemnity Agreements and Surety shall receive no less than thirty (30) days written notice by the entity holding such books and records prior to destruction or abandonment of any such books and records. Without limitation to any other rights of the Surety, if a claim or claims is or are asserted against any Bonds and/or related instruments, then the Surety shall be granted access to, and may make copies of, any books and records related to such Bonds upon Surety's request.

62.    60. Headings.   The headings contained within this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.

63.    61. Severability.   Notwithstanding anything else contained in the Plan, but solely to the extent provided in the Shareholder Settlement Agreement, each of the provisions of the Shareholder Settlement, including, without limitation, the Shareholder Releases and the Channeling Injunction, is (a) integrated with and integral to all other provisions of the Shareholder Settlement and the remainder of the Plan and the Plan Documents, and shall not be

severable from the remainder of the Shareholder Settlement, the Plan or the Plan Documents, (b) is (a)valid and enforceable pursuant to its terms, (b)integral to both the entirety of the Shareholder Settlement and the Plan and may not be excised or modified other than in accordance with the Shareholder Settlement Agreement, and (c) nonseverable from and mutually dependent on each other term in the Shareholder Settlement and the Plan.  In the event that any one or more provisions of the Shareholder Settlement are deemed null, void, illegal or unenforceable, the Shareholder Settlement, the Plan, this Order and the Plan Documents shall be null and void, solely to the extent set forth in the Shareholder Settlement Agreement.

64.    ~~62.~~ Final Order.  This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

65.    ~~63.~~ Binding Effect; Bankruptcy Rules 3020(e), 6004(h), and 7062; Waiver of Any Other Stays.  Pursuant to Bankruptcy Rules 3020(e), 6004(h), and 7062, this Order shall be stayed until the expiration of 14 days after the entry of this Order.  Notwithstanding any Bankruptcy Rules, nonbankruptcy law, or otherwise, this Order shall be immediately effective and enforceable after the expiration of 14 days after the entry of this Order and shall not be subject to any other stay, sufficient cause having been shown. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the expiration of 14 days after the entry of this Order, the provisions of the Plan, the Plan Documents, and this Order shall bind the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases, including the Debtors' insurers, and each of their respective heirs, executors, administrators, estates, successors and assigns.

66.    64.  Conflicts with This Order; Controlling Document.  The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between any provision of the Plan and any provision of this Order that cannot be reconciled, then, (a) with regard to paragraphs 25 through 33 of this Order, the Plan shall govern and (b) with regard to all other paragraphs of this Order, the provisions of this Order shall govern, and any such provisions of this Order shall be deemed a modification of the Plan solely to the extent of such inconsistency.  In the event of an inconsistency between Articles I through XII of the Plan and the Plan Supplement, the terms of Articles I through XII of the Plan shall control, except that in the event of an inconsistency between Articles I through XII of the Plan and the Shareholder Settlement Agreement (or any agreements ancillary to the Shareholder Settlement Agreement), the Shareholder Settlement Agreement (or such ancillary agreement) shall control. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.

Dated: _____, 2021
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Plan of Reorganization**

[Filed at ECF No. 3632]

## EXHIBIT B

**Master TDP and the Creditor Trust TDPs**

# EXHIBIT C

## Operating Injunction

# EXHIBIT D

**Governance Covenants**

| Summary report: Litera® Change-Pro for Word 10.14.0.46 Document comparison done on 8/25/2021 3:04:17 AM | |
|---|---|
| **Style name:** Color Legislative Moves+Images | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMSWEB/AmericasActive/94679545/107 | |
| **Modified DMS:** iw://DMSWEB/AmericasActive/94679545/123 | |
| **Changes:** | |
| Add | 69 |
| Delete | 53 |
| Move From | 8 |
| Move To | 8 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 138 |