**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF SIXTEENTH PLAN SUPPLEMENT PURSUANT TO THE NINTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on August 25, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3652] (as modified, amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 3, 2021 the Debtors filed the solicitation version of the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 7, 2021, the Debtors filed the Notice of Filing of *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3121] (the "**Eighth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Ninth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3187] (the "**Ninth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 15, 2021, the Debtors filed the Notice of Filing of *Tenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3232] (the "**Tenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 16, 2021, the Debtors filed the Notice of Filing of *Eleventh Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3246] (the "**Eleventh Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on July 19, 2021, the Debtors filed the Notice of Filing of *Twelfth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3283] (the "**Twelfth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 10, 2021, the Debtors filed the Notice of Filing of *Thirteenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3528] (the "**Thirteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 12, 2021, the Debtors filed the Notice of Filing of *Fourteenth Plan Supplement Pursuant to the Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3547] (the "**Fourteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on August 23, 2021, the Debtors filed the Notice of Filing of *Fifteenth Plan Supplement Pursuant to the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3634] (the "**Fifteenth Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Sixteenth Plan Supplement Pursuant to the Ninth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Sixteenth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, the Eighth Plan Supplement, the Ninth Plan Supplement, the Tenth Plan Supplement, the Eleventh Plan Supplement, the Twelfth Plan Supplement, the Thirteenth Plan Supplement, the Fourteenth Plan Supplement and the Fifteenth Plan Supplement each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Sixteenth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

**Exhibit I**        Non-NAS PI TDP

| | |
|---|---|
| **Exhibit I-1** | Redline of Non-NAS PI TDP against the version filed with the Thirteenth Plan Supplement |
| **Exhibit J** | NAS PI TDP |
| **Exhibit J-1** | Redline of NAS PI TDP against the version filed with the Thirteenth Plan Supplement |
| **Exhibit N** | PI Futures TDP |
| **Exhibit N-1** | Redline of PI Futures TDP against the version filed with the Thirteenth Plan Supplement |
| **Exhibit AA** | Shareholder Settlement Agreement |
| **Exhibit AA-1** | Redline of Shareholder Settlement Agreement against the version filed with the Fourteenth Plan Supplement |
| **Exhibit AA-2** | Redline of Exhibit X to the Shareholder Settlement Agreement against Appendix H of the Disclosure Schedule[2] |

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

      **PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise noted, the documents contained herein are in draft form and remain subject to continuing review and negotiation among the Debtors and interested parties with respect thereto and therefore remain subject to material change. The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement any document in the Plan Supplement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Sixteenth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

---

[2] Exhibit X to the Shareholder Settlement Agreement replaces Appendix H to the Disclosure Statement for purposes of the definition of Shareholder Released Parties in the Plan.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  August 25, 2021
      New York, New York

                          DAVIS POLK & WARDWELL LLP

                          By:  */s/ Eli J. Vonnegut*

                          450 Lexington Avenue
                          New York, New York 10017
                          Telephone: (212) 450-4000
                          Facsimile: (212) 701-5800
                          Marshall S. Huebner
                          Benjamin S. Kaminetzky
                          Timothy Graulich
                          Eli J. Vonnegut
                          Christopher S. Robertson

                          *Counsel to the Debtors*
                          *and Debtors in Possession*

## **EXHIBIT I**

**Non-NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related Causes of Action against any Debtor, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury or that are similar opioid-related Causes of Action, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered and resolved pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C)  amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]    Submission instructions to be added after solicitation.

> **ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
> TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**
>
> **A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B hereto, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**
>
> **OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer and resolve PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "<u>Trustee</u>"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "<u>Claims Administrator</u>") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)    The Trustee and the Claims Administrator[5] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this Non-NAS PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.    INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant <u>must, with respect to that Non-NAS PI Channeled Claim</u>:

(a)    <u>Hold such Non-NAS PI Channeled Claim against one or more Debtors;</u>

(b)    <u>Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")</u>

(i)    Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying

---

[5]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)  Have already timely[6] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)  Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[7] by the date that is 90 days[8] after the Non-NAS PI Claim Form is disseminated[9] to Non-NAS PI Claimants;[10]

(e)  Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)  If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[11]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

---

[6]  If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[7]  In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[8]  Subject to extension in the discretion of the Claims Administrator.

[9]  Within 60 days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[10]  If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[11]  Exhibit F hereto contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[12] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4.    DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

    (a)    A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

    (b)    In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

        (i)    The product's corresponding NDC number, which is set forth in Exhibit E;[13] or

        (ii)    A notation in the record submitted that the product is manufactured or sold by Rhodes or Purdue.

    (c)    A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

        (i)    Oxycodone CR (or controlled release); or

        (ii)    Oxycodone ER (or extended release).

## § 5.    TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence (a)-(e):[14]

---

[12]    Subject to extensions which the Claims Administrator may give in his discretion.

[13]    Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

(a)    Pharmacy prescription records;

(b)    Prescription records, including without limitation:

    (i)    A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

    (ii)    A signed prescription from a doctor for one of the Qualifying Opioids;

(c)    A historical reference to one of the Qualifying Opioids, including but not limited to:[15]

    (i)    A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

    (ii)    A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

    (iii)    A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

    (iv)    A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)    A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

(e)    A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)    If a Non-NAS PI Claimant holds a Non-NAS PI Channeled Claim based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and cannot meet the evidentiary requirements of § 5(a)-(e) above,[16] s/he may still qualify if s/he can demonstrate both of the following:[17]

---

[14]    Subject to the exceptions set forth in provisions (f) and (g) of this Section 5.

[15]    The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

[16]    Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as

(i)     By a declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(ii)    By an *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)     In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates all of the following:

(i)     That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, and all known insurance explanations of benefits. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains required evidence and the basis for that assessment of probability); and

(ii)    By a declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a

---

a minor. In the absence of that historical reference in the medical records, this declaration requirement can be used under the conditions set forth in this subsection.

[17]    Sample affidavits will be made available on the PI Trust website.

third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)    By a supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)    The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)    In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)    Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)    The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.    ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" _or_ a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)    Easy Payment of $3,500 per qualifying Non-NAS PI Claimant[18] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)    Base Payments and Level Awards to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of Awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.    ADDITIONAL AWARD DETERMINATION.

(a)    Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[19] as follows:

(i)    **Tier 1A**:

A.    Base Payment:

---

[18]    If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

[19]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

1.  For a Non-NAS PI Claimant who demonstrates that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

2.  Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

    aa.  However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

        a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any licensed medical professional;

        b. treatment in a rehabilitation center for opioid use disorder;

        c. overdose, withdrawal, or detox from an opioid;

        d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

        e. use of illegal opioids; or

        f. use of medication-assisted treatment ("MAT") like methadone.

B.  Level Awards: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

    1.  *Level A*:

        aa.  For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder ("OUD");[20]

b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

c. Administration of Narcan, Evzio or Naloxone.

2. *Level B*:

aa. For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C. <u>Additional Evidence for Level Awards</u>:

1. If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2. If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3. If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No declarations may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii) **Tier 1B:** Claims based on opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin qualifies under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim

---

[20] The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii)    **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for 6 months or more; however, the usage does not have to be consecutive.

    A.    <u>Base Payment</u>: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

    B.    <u>Level Awards</u>: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

        1.   *Level A*:

           aa.   For Non-NAS PI Claimants who demonstrate one or more of the following:

              a. Opioid Use Disorder (OUD);

              b. MAT $\geqslant$ 6 months days; or

              c. Administration of Narcan, Evzio or Naloxone.

        2.   *Level B*:

           aa.   For Non-NAS PI Claimants who demonstrate death caused by an opioid.

    C.    <u>Additional Evidence for Level Awards</u>:

        1.   If making a claim for a Tier 2 Level Award based on OUD diagnosis, then medical records—including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a licensed medical or health professional—can serve as additional evidence. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

2. If making a claim for a for a Tier 2 Level Award based on MAT or on Narcan, Evzio or Naloxone use, then pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone can serve as additional evidence. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No declarations may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

3. If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports can serve as additional evidence. The records do not have to coincide in time with the qualifying product use. No affidavits may be used to meet this requirement.

(iv) **Tier 3:** Claims based on the use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claims. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.    BASE PAYMENTS AND LEVEL AWARDS.

(a)    Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

(b)    Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

|  | **Tier 1A**<br>*Addiction from Purdue Opioids* | **Tier 1B**<br>*Death on OxyContin* | **Tier 2**<br>*Purdue Opioids Use ≥6 months* | **Tier 3**<br>*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[21] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[22]** |  |  |  |  |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9.   ADDITIONAL CLAIM FACTORS AND VALUATION.

(a)     To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

(b)     This grid is based in part on other scoring grids developed in comparable cases with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

(c)     Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

(d)     Only reported injuries are to be scored.

(e)     In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)     Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

---

[21]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[22]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

## § 10.    BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.    CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.    APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

## **EXHIBIT I-1**

**Redline of Non-NAS PI TDP**

**INDIVIDUAL PURDUE PHARMA L.P.**
**PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are ~~claims~~Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related ~~claims or~~ Causes of Action against any Debtor, ~~and~~in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are ~~claims~~ for alleged opioid-related personal injury or that are similar opioid-related ~~claims or~~ Causes of Action, ~~and~~in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered and resolved pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Program (the "<u>LRP Agreement</u>") to settle liens held by private insurance companies against that Award, if any; (C)  amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]    Submission instructions to be added after solicitation.

> **ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
> TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**
>
> **A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B hereto, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**
>
> **OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and

3

the PI Trust Documents, (3) administer and resolve PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "<u>Trustee</u>"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "<u>Claims Administrator</u>") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii) The Trustee and the Claims Administrator[5] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this Non-NAS PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.   INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant <u>must, with respect to that Non-NAS PI Channeled Claim</u>:

(a) <u>Hold such Non-NAS PI Channeled Claim against one or more Debtors;</u>

(b) <u>Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")</u>

(i) Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying

---

[5] As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)     Have already timely[6] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)     Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[7] by the date that is 90 days[8] after the Non-NAS PI Claim Form is disseminated[9] to Non-NAS PI Claimants;[10]

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)     If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[11]

---

[6]    If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[7]    In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[8]    Subject to extension in the discretion of the Claims Administrator.

[9]    Within 60 days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[10]   If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[11]   Exhibit F hereto contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[12] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4.    DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

(a)    A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

(b)    In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

(i)    The product's corresponding NDC number, which is set forth in Exhibit E;[13] or

(ii)    A notation in the record submitted that the product is manufactured or sold by Rhodes or Purdue.

(c)    A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

(i)    Oxycodone CR (or controlled release); or

(ii)    Oxycodone ER (or extended release).

---

[12]    Subject to extensions which the Claims Administrator may give in his discretion.

[13]    Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

## § 5.    TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence (a)-(e):[14]

(a)    Pharmacy prescription records;

(b)    Prescription records, including without limitation:

    (i)    A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

    (ii)    A signed prescription from a doctor for one of the Qualifying Opioids;

(c)    A historical reference to one of the Qualifying Opioids, including but not limited to:[15]

    (i)    A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

    (ii)    A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

    (iii)    A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

    (iv)    A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)    A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

(e)    A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

---

[14]    Subject to the exceptions set forth in provisions (f) and (g) of this Section 5.

[15]    The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

(f)    If a Non-NAS PI Claimant holds a Non-NAS PI Channeled Claim based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and cannot meet the evidentiary requirements of § 5(a)-(e) above,[16] s/he may still qualify if s/he can demonstrate <u>both</u> of the following:[17]

    (i)    By a declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

    (ii)    By an *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)    In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates <u>all</u> of the following:

    (i)    That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, <u>and</u> all known insurance explanations of benefits. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some

---

[16]  Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as a minor. In the absence of that historical reference in the medical records, this declaration requirement can be used under the conditions set forth in this subsection.

[17]  Sample affidavits will be made available on the PI Trust website.

medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains required evidence and the basis for that assessment of probability); and

(ii)     By a declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)     By a supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)     The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)     In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)     Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)     The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her

authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.   ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" _or_ a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)     Easy Payment of $3,500 per qualifying Non-NAS PI Claimant[18] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)     Base Payments and Level Awards to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of Awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.   ADDITIONAL AWARD DETERMINATION.

---

[18]   If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

(a)    Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[19] as follows:

    (i)    **Tier 1A**:

        A.    Base Payment:

            1.    For a Non-NAS PI Claimant who demonstrates that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

            2.    Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

              aa.    However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

                a.    diagnosis of addiction, dependence or substance abuse relating to opioid use made by any licensed medical professional;

                b.    treatment in a rehabilitation center for opioid use disorder;

                c.    overdose, withdrawal, or detox from an opioid;

                d.    consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

                e.    use of illegal opioids; or

---

[19]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

      f.    use of medication-assisted treatment ("MAT") like methadone.

B.    Level Awards: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

    1.   *Level A*:

        aa.    For Non-NAS PI Claimants who demonstrate one or more of the following:

            a.    Opioid Use Disorder ("OUD");[20]

            b.    MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

            c.    Administration of Narcan, Evzio or Naloxone.

    2.   *Level B*:

        aa.    For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C.    Additional Evidence for Level Awards:

    1.   If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

    2.   If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

    3.   If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No declarations may be used to meet this requirement.

---

[20]    The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii) **Tier 1B:** Claims based on opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin qualifies under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii) **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for 6 months or more; however, the usage does not have to be consecutive.

A. <u>Base Payment</u>: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

B. <u>Level Awards</u>: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

1. *Level A*:

aa. For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder (OUD);

b. MAT    6 months days; or

c. Administration of Narcan, Evzio or Naloxone.

2. *Level B*:

13

aa.   For Non-NAS PI Claimants who demonstrate death caused by an opioid.

C.    Additional Evidence for Level Awards:

1.   If making a claim for a Tier 2 Level Award based on OUD diagnosis, then medical records—including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a licensed medical or health professional—can serve as additional evidence. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

2.   If making a claim for a for a Tier 2 Level Award based on MAT or on Narcan, Evzio or Naloxone use, then pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone can serve as additional evidence. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No declarations may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

3.   If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports can serve as additional evidence. The records do not have to coincide in time with the qualifying product use. No affidavits may be used to meet this requirement.

(iv)   **Tier 3:** Claims based on the use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claims. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.    BASE PAYMENTS AND LEVEL AWARDS.

(a)    Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per

point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

       (b)      Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

| | **Tier 1A** *Addiction from Purdue Opioids* | **Tier 1B** *Death on OxyContin* | **Tier 2** *Purdue Opioids Use 6 months* | **Tier 3** *No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[21] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[22]** | | | | |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for 6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for 6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9. ADDITIONAL CLAIM FACTORS AND VALUATION.

       (a)      To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

       (b)      This grid is based in part on other scoring grids developed in comparable cases with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

       (c)      Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

---

[21]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[22]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

(d)      Only reported injuries are to be scored.

(e)      In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)      Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

## § 10.   BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.   SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.   FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.   CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.    APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

## <u>EXHIBIT J</u>

**NAS PI TDP**

**INDIVIDUAL PURDUE PHARMA L.P.**
**PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related Causes of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related Causes of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "NAS Opt-Out Claimant"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]    Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)      Claims Administrator.

(i)      The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)      The Trustee and the Claims Administrator[4] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as

---

[4]      As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.   INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)   Hold such NAS PI Channeled Claim against one or more Debtors;

(b)   Have already timely[5] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)   Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("NAS"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)   Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[6] after the NAS PI Claim Form is disseminated[7] to NAS PI Claimants;[8]

---

[5]   If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("WV NAS Claimants") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

[6]   Subject to extension in the discretion of the Claims Administrator.

[7]   Within 60 days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)     If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[9]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[10] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)     To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

(i)     A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

(ii)    A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)   Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid

---

[8]   If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[9]   Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[10]  Subject to extension in the discretion of the Claims Administrator.

exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

(b)    The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[11] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)    The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)    If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.    AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a

---

[11]    Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are

deemed unreliable.  In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.f

## __EXHIBIT J-1__

**Redline of NAS PI TDP**

**INDIVIDUAL PURDUE PHARMA L.P.**
**PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are ~~claims~~Claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related ~~claims or~~ Causes of Action against any Debtor asserted by or on behalf of an NAS Child, ~~and~~in each case, that arose prior to the Petition Date, and that are not (A) ~~a~~ Third-Party Payor ~~Claim~~Claims, ~~an~~ NAS Monitoring ~~Claim~~Claims or ~~a~~ Hospital ~~Claim~~Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are ~~claims~~ for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related ~~claims or~~ Causes of Action asserted by or on behalf of an NAS Child, ~~and~~in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare,

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "NAS Opt-Out Claimant"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]    Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)    The Trustee and the Claims Administrator[4] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as

---

[4]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.   INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)     Hold such NAS PI Channeled Claim against one or more Debtors;

(b)     Have already timely[5] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)     Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("NAS"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)     Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[6] after the NAS PI Claim Form is disseminated[7] to NAS PI Claimants;[8]

---

[5]     If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("WV NAS Claimants") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

[6]     Subject to extension in the discretion of the Claims Administrator.

[7]     Within 60 days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)     If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[9]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[10] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)     To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

(i)     A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

(ii)     A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)     Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid

---

[8]     If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[9]     Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[10]     Subject to extension in the discretion of the Claims Administrator.

exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

(b)     The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[11] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)     The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)     If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.    AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a

---

[11]   Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are

deemed unreliable.  In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.f

# **EXHIBIT N**

**PI Futures TDP**

### PURDUE PHARMA L.P.
### TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS

## § 1.    APPLICABILITY AND PURPOSE.

This trust distribution procedure for Future PI Channeled Claims (as defined below) (the "PI Futures TDP") sets forth the manner in which Future PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Futures Trust.[1] Distributions in respect of Future PI Channeled Claims shall be exclusively in the form of Distributions from the PI Futures Trust to Holders of Allowed Future PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Future PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Futures Trust as of the Effective Date of the Plan: any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the subject matter described in subclause (i) of Sections 10.6(b) and 10.7(b) of the Plan), the Estates or the Chapter 11 Cases, and that is not (i) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (ii) held by a Domestic Governmental Entity or (iii) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business. Pursuant to section 6.21 of the Plan, in the event a Holder of a Future PI Channeled Claim seeks payment at any time on account of such Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Future PI Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Future PI Channeled Claim that is or was channeled to the PI Futures Trust under the Master TDP and grants such Holder leave to assert such Future PI Channeled Claim against such the PI Futures Trust.

Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from the PI Futures Trust. Holders of Future PI Channeled Claims are referred to herein as "Future PI Claimants."

## § 2.    PI FUTURES TRUST AND TRUSTEE.

### a)   *Allocations of Funds to the PI Futures Trust.*

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Under the Plan, the PI Futures Trust will receive a distribution of $5 million (the "PI Futures Trust Distribution").

### b) PI Futures Trust.

The PI Futures Trust shall be established in accordance with section 5.7 of the Plan to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents. The trustee of the PI Futures Trust (the "Trustee") is Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, and he will carry out the duties of the Trustee as set forth in the Plan and PI Futures Trust Documents.

## § 3.    SUITS IN THE TORT SYSTEM.

Subject to satisfaction of section 6.21 of the Plan, Future PI Claimants have the right to commence a lawsuit in the tort system against the PI Futures Trust with respect to any Future PI Channeled Claim which, prior to channeling, was held against a Debtor or would have been held against a Debtor but for the Releases and Channeling Injunction pursuant to the Plan. Such lawsuit may be commenced against only the PI Futures Trust (and including no other parties as defendants[2]) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[3] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which such Future PI Channeled Claim arose.

Any such lawsuit must be filed by the applicable Future PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[4] All defenses (including, with respect to the PI Futures Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[5]

A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim formerly held or that would have been held against a non-Debtor party.

---

[2]    For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the existence of or following the dissolution of, the PI Futures Trust or at any other time.

[3]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Future PI Claimants against the PI Futures Trust must be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[4]    The Trustee shall be empowered (i) to bring one or more consolidated actions against multiple Future PI Claimants and (ii) to seek to consolidate multiple lawsuits commenced by individual Future PI Claimants.

[5]    Among other things, the PI Futures Trust shall be empowered to assert that the claim that is the subject of a Future PI Claimant's lawsuit is not a "Future PI Channeled Claim" within the meaning of the Plan.

However, any Distribution to a Future PI Claimant on a Final Judgment (as defined below) in respect of his or her Future PI Channeled Claim formerly held or that would have been held (but for the Releases and Channeling Injunction pursuant to the Plan) against a Debtor is deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the injuries that are the subject of his or her Future PI Channeled Claim against a Debtor.

Subject to the commencement of a lawsuit in the tort system against the PI Futures Trust by a Future PI Claimant that is not barred by section 6.21 of the Plan, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit(s) as discovery material. Any Future PI Claimant that has commenced such a lawsuit will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Future PI Claimant who propounds on the PI Futures Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such Future PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Future PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Futures Trust shall not be liable for any costs incurred by parties other than the PI Futures Trust in connection with third-party discovery propounded by any party other than the PI Futures Trust.[6]

If Future PI Claimant obtains a judgment against the PI Futures Trust on his or her Future PI Channeled Claim in the tort system and such judgment becomes a Final Order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Futures Trust, subject to the applicable limitations of Sections 4 through 10, inclusive, of this PI Futures TDP. No other Future PI Channeled Claims shall be Allowed.

## § 4.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Future PI Channeled Claim litigated against the PI Futures Trust in the tort system.

---

[6]    In order to minimize costs incurred by the PI Futures Trust in connection with third-party discovery, the Trustee shall be empowered to seek to consolidate discovery propounded by Future PI Claimants or the PI Futures Trust in multiple lawsuits.

## § 5.    NAS FUTURE PI CHANNELED CLAIMS AND NON-NAS FUTURE PI CHANNELED CLAIMS

If a Future PI Claimant obtains a Final Judgment on his or her Future PI Channeled Claim, the Trustee shall determine, in his or her sole discretion and in accordance with the definitions set forth herein, whether such Future PI Channeled Claim is a "NAS Future PI Channeled Claim" or a "Non-NAS Future PI Channeled Claim," defined as follows:

- A "NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child.

- A "Non-NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is not an NAS Future PI Channeled Claim.

## § 6.    NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 6 only applies to NAS Future PI Channeled Claims.

### a)  *NAS Maximum Value.*

Payment on a Final Judgment issued in respect of an NAS Future PI Channeled Claim shall not exceed $21,000 (the "NAS Maximum Value"), which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for an NAS PI Claim that is Allowed under the NAS PI TDP.

### b)  *NAS Payment Percentage.*

A Final Judgment issued in respect of an NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the NAS Payment Percentage, as defined in Exhibit B to the NAS PI TDP. As discussed in Exhibit B to the NAS PI TDP, the initial NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of an NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her NAS Future PI Channeled Claim multiplied by the NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced NAS Future PI Channeled Claim").

### c)  *NAS Future Award*

A Future PI Claimant who obtains a Final Judgment on an NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the NAS Maximum Value, and (ii) the Percentage-Reduced NAS Future PI Channeled Claim (the "NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

4

An NAS Future Award is payable by the PI Futures Trust in a single lump sum, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced NAS Future PI Channeled Claim, the NAS Maximum Value, or the NAS Future Award is subject to any appeal or reconsideration.

## § 7.    NON-NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 7 applies only to Non-NAS Future PI Channeled Claims.

### a)  Non-NAS Maximum Value.

Payment on a Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim shall not exceed the dollar-equivalent of 120,000 points (the "Non-NAS Maximum Value"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the dollar-award-per-point then in effect as set forth in Section 8 of the Non-NAS PI TDP.

### b)  Non-NAS Payment Percentage.

A Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the Non-NAS Payment Percentage, as defined in Exhibit B to the Non-NAS PI TDP. As discussed in Exhibit B to the Non-NAS PI TDP, the initial Non-NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of a Non-NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her Non-NAS Future PI Channeled Claim multiplied by the Non-NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced Non-NAS Future PI Channeled Claim").

### c)  Non-NAS Future Award.

A Future PI Claimant who obtains a Final Judgment on a Non-NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the Non-NAS Maximum Value then in effect and (ii) the Percentage-Reduced Non-NAS Future PI Channeled Claim (the "Non-NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

A Non-NAS Future Award is payable by the PI Futures Trust in a single lump sum payment, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such Non-NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's

reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced Non-NAS Future PI Channeled Claim, the Non-NAS Maximum Value, or the Non-NAS Future Award is subject to any appeal or reconsideration.

## § 8.   PI FUTURES TRUST OPERATING EXPENSES

The Creditor Trust Operating Expenses of the PI Futures Trust shall be paid solely from the PI Futures Trust. Creditor Trust Operating Expenses of the PI Futures Trust, including any amounts due to the Trustee in respect of indemnification and reimbursement as described in Section 5.7(m) of the Plan, shall be paid on an ongoing basis with first priority before any payments hereunder are made on Allowed Future PI Channeled Claims. The Trustee shall also be entitled to reserve a reasonable amount of funds needed to wind down the PI Futures Trust, indemnify the Trustee for claims that may be brought against the Trustee in the future, and any other reserves for future costs or expenses that the Trustee reasonably believes are necessary before making payments hereunder on any Allowed Future PI Channeled Claim.

If insufficient funds remain in the PI Futures Trust to pay one or more outstanding Non-NAS Future Awards and/or NAS Future Awards that are otherwise ripe for payment hereunder, the Trustee shall, after reserving funds as necessary pursuant to the preceding paragraph, use any remaining funds to pay all such outstanding awards a pro-rata portion of their face value, in full and final satisfaction of such Final Judgments.

## § 9.   RESOLUTION OF HEALTH CARE LIENS.

The PI Futures Trust shall not issue any payment on a Non-NAS Future Award or NAS Future Award until the Trustee has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 10.   APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

If a Future PI Claimant is a minor under applicable law at the time amounts are payable by the PI Futures Trust to such Future PI Claimant under this PI Futures TDP, any such amounts shall be paid at such time, to such recipient, and in such manner as ordered by the court that issued the Final Judgment, by a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or by the United States Bankruptcy Court for the Southern District of New York.  Anyone seeking a Distribution from the PI Futures Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached hereto as Exhibit A.[7]

---

[7]   Exhibit A contains two declaration forms. One applies if the Decedent named the Future PI Claimant as executor in his or her will; the other applies if the Decedent had no will.

## EXHIBIT A

## SAMPLE HEIRSHIP DECLARATIONS FOR THE PURDUE PHARMA L.P. TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| SD-1 | SWORN DECLARATION:<br>SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "Future PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last Will and Testament of the Decedent.

### I.   DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \| \_ \| \_ \| \_ \| - \| \_ \| \_ \| - \| \_ \| \_ \| \_ \| \_ \| | | Date of Death | ____/____/____<br>(Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

### II.   FUTURE PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \| \_ \| \_ \| \_ \| - \| \_ \| \_ \| - \| \_ \| \_ \| \_ \| \_ \| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

1

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____.<br><br>2. |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | III.    HEIRS AND BENEFICIARIES OF DECEDENT (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | |
|---|---|---|
| | Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified. | |
| | **Name** | **Information** |

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____<br>☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____<br>☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____<br>☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ | |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| IV.  FUTURE PI CLAIMANT CERTIFICATION |
|---|

This Sworn Declaration is an official document for submission to the PI Futures Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a)  I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b)  I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c)  No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d)  The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e)  No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f)  I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(g) I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    FUTURE PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | | **Date** ___/___/___ (Month/Day/Year) |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "Future PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I. DECEDENT INFORMATION

| | | | |
|---|---|---|---|
| **Name** | First Name | M.I. | Last Name |
| **Social Security Number** | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | **Date of Death** | ___/___/___ (Month/Day/Year) |
| **Residence/Legal Domicile Address at Time of Death** | Street | | |
| | City | State | Zip Code |

## II. FUTURE PI CLAIMANT INFORMATION

| | | | |
|---|---|---|---|
| **Your Name** | First Name | M.I. | Last Name |
| **Your Social Security Number** | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | |
| **Prime Clerk POC Number assigned to your PI Claim** | | | |
| **Your Address** | Street | | |
| | City | State | Zip Code |
| **Your Relationship to Decedent** | | | |
| **Basis of Your Authority to Act for the Decedent** | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.
[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death.<br><br>2. |
| --- | --- |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | III.   HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified.

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

3

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | |
|---|---|---|---|
| **4.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **5.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

| IV. FUTURE PI CLAIMANT CERTIFICATION |
|---|

This Sworn Declaration is an official document for submission to the PI Futures Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(f)  I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust on account of the  injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI Futures Trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    FUTURE PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** | ____/____/____ <br>(Month/Day/Year) |

**<u>EXHIBIT N-1</u>**

**Redline of PI Futures TDP**

**PURDUE PHARMA L.P.**
**TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND PURPOSE.

This trust distribution procedure for Future PI Channeled Claims (as defined below) (the "PI Futures TDP") sets forth the manner in which Future PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Futures Trust.[1] Distributions in respect of Future PI Channeled Claims shall be exclusively in the form of Distributions from the PI Futures Trust to Holders of Allowed Future PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Future PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Futures Trust as of the Effective Date of the Plan: ~~each Released Claim and Shareholder Released Claim that is for~~any alleged opioid-related personal injury or ~~that is a~~ similar opioid-related ~~claim or~~ Cause of Action~~,~~ against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the subject matter described in subclause (i) of Sections 10.6(b) and 10.7(b) of the Plan), the Estates or the Chapter 11 Cases, and that is not (i) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (ii) held by a Domestic Governmental Entity or (iii) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business. Pursuant to section 6.21 of the Plan, in the event a Holder of a Future PI Channeled Claim seeks payment at any time on account of such Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Future PI Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Future PI Channeled Claim that is or was channeled to the PI Futures Trust under the Master TDP and grants such Holder leave to assert such Future PI Channeled Claim against such the PI Futures Trust.

Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from the PI Futures Trust. Holders of Future PI Channeled Claims are referred to herein as "Future PI Claimants."

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

## § 2.    PI FUTURES TRUST AND TRUSTEE.

### a)  *Allocations of Funds to the PI Futures Trust.*

Under the Plan, the PI Futures Trust will receive a distribution of $5 million (the "PI Futures Trust Distribution").

### b)  *PI Futures Trust.*

The PI Futures Trust shall be established in accordance with section 5.7 of the Plan to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents. The trustee of the PI Futures Trust (the "Trustee") is Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, and he will carry out the duties of the Trustee as set forth in the Plan and PI Futures Trust Documents.

## § 3.    SUITS IN THE TORT SYSTEM.

Subject to satisfaction of section 6.21 of the Plan, Future PI Claimants have the right to commence a lawsuit in the tort system against the PI Futures Trust with respect to any Future PI Channeled Claim which, prior to channeling, was held against a Debtor or would have been held against a Debtor but for the Releases and Channeling Injunction pursuant to the Plan. Such lawsuit may be commenced against only the PI Futures Trust (and including no other parties as defendants[2]) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[3] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which such Future PI Channeled Claim arose.

Any such lawsuit must be filed by the applicable Future PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[4] All defenses (including,

---

[2]   For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Futures Trust or at any other time.

[3]   The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Future PI Claimants against the PI Futures Trust must be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[4]   The Trustee shall be empowered (i) to bring one or more consolidated actions against multiple Future PI Claimants and (ii) to seek to consolidate multiple lawsuits commenced by individual Future PI Claimants.

with respect to the PI Futures Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[5]

A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim formerly held or that would have been held against a non-Debtor party. However, any Distribution to a Future PI Claimant on a Final Judgment (as defined below) in respect of his or her Future PI Channeled Claim formerly held or that would have been held (but for the Releases and Channeling Injunction pursuant to the Plan) against a Debtor is deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the injuries that are the subject of his or her Future PI Channeled Claim against a Debtor.

Subject to the commencement of a lawsuit in the tort system against the PI Futures Trust by a Future PI Claimant that is not barred by section 6.21 of the Plan, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit(s) as discovery material. Any Future PI Claimant that has commenced such a lawsuit will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Future PI Claimant who propounds on the PI Futures Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such Future PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Future PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Futures Trust shall not be liable for any costs incurred by parties other than the PI Futures Trust in connection with third-party discovery propounded by any party other than the PI Futures Trust.[6]

If Future PI Claimant obtains a judgment against the PI Futures Trust on his or her Future PI Channeled Claim in the tort system and such judgment becomes a Final Order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Futures Trust, subject to the applicable limitations of Sections 4 through 10, inclusive, of this PI Futures TDP. No other Future PI Channeled Claims shall be Allowed.

---

[5]    Among other things, the PI Futures Trust shall be empowered to assert that the claim that is the subject of a Future PI Claimant's lawsuit is not a "Future PI Channeled Claim" within the meaning of the Plan.

[6]    In order to minimize costs incurred by the PI Futures Trust in connection with third-party discovery, the Trustee shall be empowered to seek to consolidate discovery propounded by Future PI Claimants or the PI Futures Trust in multiple lawsuits.

## § 4.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Future PI Channeled Claim litigated against the PI Futures Trust in the tort system.

## § 5.    NAS FUTURE PI CHANNELED CLAIMS AND NON-NAS FUTURE PI CHANNELED CLAIMS

If a Future PI Claimant obtains a Final Judgment on his or her Future PI Channeled Claim, the Trustee shall determine, in his or her sole discretion and in accordance with the definitions set forth herein, whether such Future PI Channeled Claim is a "NAS Future PI Channeled Claim" or a "Non-NAS Future PI Channeled Claim," defined as follows:

- A "NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related ~~claim or~~ Cause of Action asserted by or on behalf of an NAS Child.

- A "Non-NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is not an NAS Future PI Channeled Claim.

## § 6.    NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 6 only applies to NAS Future PI Channeled Claims.

### a)  NAS Maximum Value.

Payment on a Final Judgment issued in respect of an NAS Future PI Channeled Claim shall not exceed $21,000 (the "NAS Maximum Value"), which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for an NAS PI Claim that is Allowed under the NAS PI TDP.

### b)  NAS Payment Percentage.

A Final Judgment issued in respect of an NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the NAS Payment Percentage, as defined in Exhibit B to the NAS PI TDP. As discussed in Exhibit B to the NAS PI TDP, the initial NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of an NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her NAS Future PI Channeled Claim multiplied by the NAS Payment

Percentage then in effect (such value so reduced, the "Percentage-Reduced NAS Future PI Channeled Claim").

### c) *NAS Future Award*

A Future PI Claimant who obtains a Final Judgment on an NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the NAS Maximum Value, and (ii) the Percentage-Reduced NAS Future PI Channeled Claim (the "NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

An NAS Future Award is payable by the PI Futures Trust in a single lump sum, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced NAS Future PI Channeled Claim, the NAS Maximum Value, or the NAS Future Award is subject to any appeal or reconsideration.

## § 7.   NON-NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 7 applies only to Non-NAS Future PI Channeled Claims.

### a) *Non-NAS Maximum Value.*

Payment on a Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim shall not exceed the dollar-equivalent of 120,000 points (the "Non-NAS Maximum Value"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the dollar-award-per-point then in effect as set forth in Section 8 of the Non-NAS PI TDP.

### b) *Non-NAS Payment Percentage.*

A Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the Non-NAS Payment Percentage, as defined in Exhibit B to the Non-NAS PI TDP. As discussed in Exhibit B to the Non-NAS PI TDP, the initial Non-NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of a Non-NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her Non-NAS Future PI Channeled Claim multiplied by the Non-NAS

Payment Percentage then in effect (such value so reduced, the "<u>Percentage-Reduced Non-NAS Future PI Channeled Claim</u>").

### c) *Non-NAS Future Award.*

A Future PI Claimant who obtains a Final Judgment on a Non-NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the Non-NAS Maximum Value then in effect and (ii) the Percentage-Reduced Non-NAS Future PI Channeled Claim (the "<u>Non-NAS Future Award</u>"), subject to any reductions or reserves taken in accordance with <u>Section 8</u> hereof.

A Non-NAS Future Award is payable by the PI Futures Trust in a single lump sum payment, subject to <u>Sections 8, 9 and 10</u> below. The PI Futures Trust shall pay such Non-NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to <u>Section 9</u> below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced Non-NAS Future PI Channeled Claim, the Non-NAS Maximum Value, or the Non-NAS Future Award is subject to any appeal or reconsideration.

## § 8.    PI FUTURES TRUST OPERATING EXPENSES

The Creditor Trust Operating Expenses of the PI Futures Trust shall be paid solely from the PI Futures Trust. Creditor Trust Operating Expenses of the PI Futures Trust, including any amounts due to the Trustee in respect of indemnification and reimbursement as described in Section 5.7(m) of the Plan, shall be paid on an ongoing basis with first priority before any payments hereunder are made on Allowed Future PI Channeled Claims. The Trustee shall also be entitled to reserve a reasonable amount of funds needed to wind down the PI Futures Trust, indemnify the Trustee for claims that may be brought against the Trustee in the future, and any other reserves for future costs or expenses that the Trustee reasonably believes are necessary before making payments hereunder on any Allowed Future PI Channeled Claim.

If insufficient funds remain in the PI Futures Trust to pay one or more outstanding Non-NAS Future Awards and/or NAS Future Awards that are otherwise ripe for payment hereunder, the Trustee shall, after reserving funds as necessary pursuant to the preceding paragraph, use any remaining funds to pay all such outstanding awards a pro-rata portion of their face value, in full and final satisfaction of such Final Judgments.

## § 9.    RESOLUTION OF HEALTH CARE LIENS.

The PI Futures Trust shall not issue any payment on a Non-NAS Future Award or NAS Future Award until the Trustee has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 10.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

If a Future PI Claimant is a minor under applicable law at the time amounts are payable by the PI Futures Trust to such Future PI Claimant under this PI Futures TDP, any such amounts shall be paid at such time, to such recipient, and in such manner as ordered by the court that issued the Final Judgment, by a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or by the United States Bankruptcy Court for the Southern District of New York. Anyone seeking a Distribution from the PI Futures Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached hereto as Exhibit A.[7]

---

[7]    Exhibit A contains two declaration forms. One applies if the Decedent named the Future PI Claimant as executor in his or her will; the other applies if the Decedent had no will.

7

# **EXHIBIT AA**

**Shareholder Settlement Agreement**

DRAFT

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**THE MASTER DISBURSEMENT TRUST,**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**AND**

**PRA L.P.**

**[_____], 2021**

# TABLE OF CONTENTS

PAGE

ARTICLE 1. DEFINITIONS ................................................................................................ 3

    Section 1.01    Definitions ........................................................................... 3
    Section 1.02    Interpretative Provisions ...................................................... 26

ARTICLE 2. SETTLEMENT PAYMENTS .......................................................................... 27

    Section 2.01    Required Settlement Payment.................................................. 27
    Section 2.02    Payment of Net Proceeds ....................................................... 34
    Section 2.03    Collar ................................................................................... 35
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties............... 36
    Section 2.05    Intentionally Omitted ............................................................ 38
    Section 2.06    No Change to Aggregate Settlement Amount .......................... 38
    Section 2.07    Illustrative Examples ............................................................ 39
    Section 2.08    Payments Pending Appeals.................................................... 39
    Section 2.09    Appeals; Motion to Stay ....................................................... 41
    Section 2.10    Certain Additional A-Side Payment Obligations.................... 41
    Section 2.11    Pre-Plan Effective Date Net Proceeds ................................... 42

ARTICLE 3. SALE OF IACS ............................................................................................. 42

    Section 3.01    Covenant to Sell.................................................................... 42
    Section 3.02    IAC Information Rights; Access; Waiver............................... 44
    Section 3.03    Other IAC-Related Covenants ............................................... 46
    Section 3.04    Reimbursement of Certain Expenses Relating to a Sale..................... 49
    Section 3.05    Implementation Limitations................................................... 49
    Section 3.06    Termination of Sale Obligations ............................................ 49
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account ............................ 50
    Section 3.08    Failure to Sell IACs ............................................................. 52

ARTICLE 4. TAX MATTERS............................................................................................ 53

    Section 4.01    Restitution Payments ............................................................ 54
    Section 4.02    Qualified Settlement Funds ................................................... 55
    Section 4.03    Settlement Agreement............................................................ 55
    Section 4.04    Forms W-9 ........................................................................... 55
    Section 4.05    Intentionally Omitted............................................................ 55
    Section 4.06    Tax Reporting ...................................................................... 55

ARTICLE 5. INTENTIONALLY OMITTED........................................................................ 55

ARTICLE 6. TERMINATION. ........................................................................................... 55

    Section 6.01    Termination of Agreement..................................................... 55

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES................. 55

    Section 7.01    Formation and Power............................................................ 56

Section 7.02    Authority; Enforceability ........................................................ 57
Section 7.03    No Contravention.................................................................... 58
Section 7.04    Net Asset Reports .................................................................. 58
Section 7.05    List of IACs ........................................................................... 58
Section 7.06    List of Assuring Parties.......................................................... 60

ARTICLE 8. COVENANTS ............................................................................. 60

Section 8.01    Intentionally Omitted............................................................. 60
Section 8.02    Non-Circumvention. ............................................................... 60
Section 8.03    No Interference....................................................................... 60
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests ................................................................................. 60
Section 8.05    MDT Shareholder Insurance Rights ...................................... 61
Section 8.06    Naming Rights ....................................................................... 61
Section 8.07    No Side Agreements ............................................................... 61
Section 8.08    Notification of Breach ........................................................... 61
Section 8.09    Opioid Business ..................................................................... 61
Section 8.10    Additional Assuring Parties ................................................... 62
Section 8.11    Opinions of Counsel .............................................................. 62
Section 8.12    Refundings ............................................................................. 62
Section 8.13    Additional IACs ..................................................................... 63

ARTICLE 9. BREACH AND REMEDIES ....................................................... 63

Section 9.01    Breach .................................................................................... 63
Section 9.02    Remedies................................................................................. 68
Section 9.03    Certain Limitations ............................................................... 76
Section 9.04    Trustee and Personal Representative Liability ...................... 77
Section 9.05    Breach Fee ............................................................................. 77
Section 9.06    Reinstatement ........................................................................ 78

ARTICLE 10. CONDITIONS PRECEDENT ................................................... 78

Section 10.01    Settlement Effective Date .................................................... 78

ARTICLE 11. MISCELLANEOUS ................................................................. 80

Section 11.01    Notices .................................................................................. 80
Section 11.02    Payments Received ............................................................... 80
Section 11.03    Survival of Representations and Warranties ........................ 81
Section 11.04    Remedies Cumulative; Specific Performance ...................... 81
Section 11.05    Confession of Judgment........................................................ 81
Section 11.06    Entire Agreement; Severability; Amendments and Waivers ............. 82
Section 11.07    Intentionally Omitted ........................................................... 82
Section 11.08    Sackler Parties' Representative. ........................................... 82
Section 11.09    Binding Effect; Benefit; Assignment..................................... 83
Section 11.10    Governing Law ...................................................................... 84
Section 11.11    Jurisdiction; Contested Matter ............................................. 84
Section 11.12    Waiver of Jury Trial.............................................................. 84
Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness ..................... 84

Section 11.14   Document Repository ........................................................................................ 85
Section 11.15   Defense of Shareholder Releases........................................................................ 85
Section 11.16   Certain Shareholder Released Party Insolvencies................................................ 85
Section 11.17   Survival................................................................................................................. 86

Exhibits[1]

| | |
|---|---|
| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Opioid Business |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |
| Exhibit R | Form of Estate Certification |
| Exhibit S | Designated Shareholder Released Parties |
| Exhibit T | De Minimis Payment Parties |
| Exhibit U | Illustrative Examples |
| Exhibit V | Joinder Agreement |
| Exhibit W | Form of IAC Tax Distributions Report |
| Exhibit X | Certain Shareholder Released Parties |
| Exhibit Y | Form of B-Side IAC Payment Party Loan Permitted Withdrawal Promissory Note |

Annexes

| | |
|---|---|
| Annex A | A-Side Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Annex for A-Side Payment Group 2 |
| Annex C | A-Side Credit Support Annex for A-Side Payment Group 4 |
| Annex D | B-Side Credit Support Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits under review.

**SETTLEMENT AGREEMENT**

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [_____], 2021 (the "Agreement Effective Date"), is entered into by and among (i) the MDT (as defined below), (ii) the Sackler Parties (as defined below), (iii) each of the parties listed on Exhibit B hereto (collectively, the "Debtors"), and, (iv) solely for purposes of Article 4 (Tax Matters), Section 2.01(j) (Payments by Beacon Trust), Section 2.01(k) (Payments by 74A Trust), Section 2.02(c), Section 2.02(d) and Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), PRA L.P. (as defined below; and, together with the MDT and the Sackler Parties, the "Parties" and each, a "Party").

RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3185] in the Bankruptcy Cases;

WHEREAS, on August 12, 2021, the Debtors filed the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3545] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, the Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, certain of the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the Full Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side

1

Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis (subject to the terms and limitations set forth herein) among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit E-1;

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell or cause to be sold, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests"), and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests");

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests and De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes")), which such Credit Support Annexes are hereby incorporated by reference herein) and the Collateral Documents (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

**Section 1.01    Definitions**.

(a)    As used in this Agreement, the following terms have the following meanings:

"2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

"Ad Hoc Committee" has the meaning set forth in the Plan.

"A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)    With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment *multiplied by* seven (7); and

(ii)    With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"<u>A-Side Payment Group 8</u>" means the A-Side Payment Group indicated as such on <u>Exhibit A</u>.

"<u>A-Side Payment Group Adjusted 2.01 Amount</u>" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to <u>Section 2.01(h)</u>.

"<u>A-Side Payment Group Portion</u>" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"<u>A-Side Payment Party</u>" means a Party designated as an "A-Side Payment Party" on <u>Exhibit A</u>. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"<u>A-Side Reallocation Payment</u>" has the meaning set forth in <u>Section 2.01(h)</u>.

"<u>Actual Taxes</u>" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC, a Sale or an IAC Distribution, without duplication and taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"<u>Additional A-Side Amount</u>" has the meaning set forth in <u>Section 2.10</u>.

"<u>Additional A-Side Amount Payments</u>" means the two (2) payments of $3.125 million by each A-Side Payment Group pursuant to <u>Section 2.10</u>.

"<u>Advanced Contribution</u>" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, such Payment Group to the MDT pursuant to <u>Section 2.02(b)</u> prior to such date of determination, *less* (c) without duplication, the aggregate amount of Net Proceeds paid by, or deemed to have been made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"<u>Advisors</u>" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"<u>Aggregate Payments</u>" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to <u>Sections 2.01(c)</u> and <u>(d)</u> and <u>2.02(a)</u> and <u>(b)</u>, but excluding the amount of any prepayments made by such Payment Group pursuant to <u>Section 2.01(e)</u> unless and until such prepayments have been applied to satisfy and reduce either

(i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any payments pursuant to <u>Section 2.02(a)</u> or <u>Section 2.02(b)</u>. For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals Account will be deemed to be amounts actually paid to the MDT.

"<u>Aggregate Settlement Amount</u>" means $4,275,000,000.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Agreement Effective Date</u>" has the meaning set forth in the preamble.

"<u>Allowed Claim</u>" has the meaning set forth in the Plan.

"<u>Appeal</u>" has the meaning set forth in <u>Section 2.09(a)</u>.

"<u>Appeals Account</u>" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by <u>Section 2.08</u>.

"<u>Approved Accountant</u>" means a third-party accountant from the list set forth on <u>Exhibit L</u>.

"<u>Approved Financial Advisor</u>" means an independent financial advisor from the list set forth on <u>Exhibit M</u>.

"<u>Assuring Parties</u>" means (i) the Possible Refunding Trusts of each Trust, (ii) the Power Holders of each Trust and of the JDS Estate, (iii) the Required Interested Persons of the JDS Estate and each Trust (other than each A-Side Payment Party which is a Trust that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee), and (iv) the persons not otherwise included in the foregoing <u>clauses (ii) and (iii)</u> who are Beneficiary Interested Persons of any Trust or the JDS Estate.

"<u>Authorized Action</u>" has the meaning set forth in <u>Section 11.08(c)</u>.

"<u>B-Side Excess Amount</u>" has the meaning set forth in <u>Section 2.01(g)</u>.

"<u>B-Side Funding Deadline Obligation</u>" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to <u>Sections 2.03(b)</u> and <u>(c)</u> and <u>2.01(e)</u> in that order.

"<u>B-Side IAC Payment Party</u>" means a Party designated as a "B-Side IAC Payment Party" on <u>Exhibit A</u>. Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on <u>Exhibit A</u>.

"<u>B-Side IAC Payment Party Loan</u>" means an unsecured payment-in-kind toggle loan from a B-Side IAC Payment Party to the AJ Irrevocable Trust or the AR Irrevocable Trust (or any successor(s) thereof) that (a) is subordinated in right of payment to the Obligations of the AJ Irrevocable Trust or the AR Irrevocable Trust (or any successor(s) thereof), as applicable, to the MDT pursuant to this Agreement and the Collateral Documents, (b) contains no scheduled amortization and matures no earlier than the

eleventh (11th) anniversary of the Plan Effective Date, (c) provides that the borrower may pay cash interest or prepay the obligations thereunder at any time only to the extent permitted by Section 4.02(c)(i) or (ii) of the Credit Support Annex concerning B-Side Payment Group 1 or B-Side Payment Group 2, as applicable, (d) bears interest at a rate no greater than the applicable federal rate in effect at the time such loan is made, and (e) is evidenced by a promissory note in form and substance substantially similar to the form attached hereto as <u>Exhibit Y</u>.

"<u>B-Side Payment Group</u>" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in <u>Exhibit A</u>.

"<u>B-Side Payment Group 2.01 Amount</u>" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to <u>Sections 2.01(f)</u> and <u>2.01(g)</u> in that order.

"<u>B-Side Payment Group Adjusted 2.01 Amount</u>" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to <u>Section 2.01(h)</u>.

"<u>B-Side Payment Group Portion</u>" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"<u>B-Side Payment Party</u>" means a Party designated as a "B-Side Payment Party" on <u>Exhibit A</u>. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"<u>Bankruptcy Cases</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Beneficiary Interested Person</u>" means, at any time with respect to a Trust and the JDS Estate, each surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or for whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"<u>Breach</u>" shall mean a Specified Breach or a Non-Specified Breach.

"<u>Breach Fee</u>" has the meaning set forth in <u>Section 9.05</u>.

"<u>Breach Notice</u>" has the meaning set forth in <u>Section 9.02(a)(i)</u>.

"<u>Breach Trigger</u>" means any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in <u>Section 9.01</u>, would be a Breach.

"<u>Breaching Party</u>" has the meaning set forth in <u>Section 9.02(a)(i)</u>.

"<u>Business Day</u>" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"Case Stipulation" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

"Cash and Cash Equivalents" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.

"Channeling Injunction" has the meaning set forth in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million. For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"Collar B-Side Amount" has the meaning set forth in Section 2.03(d).

"Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to an A-Side IAC Payment Party or its Subsidiary party thereto and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".

"Collar Recipient" means each A-Side Payment Group identified as a "Collar Recipient" on Exhibit D.

"Collar Top-Up Amount" has the meaning set forth in Section 2.03(a).

"Collateral" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the amendments,

modifications and supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) the Channeling Injunction, (iii) this Agreement, (iv) the Collateral Documents, and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(e).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"Court Approval" has the meaning set forth in Section 7.02(b).

"Credit Support Annex" has the meaning set forth in the recitals.

"Creditors' Committee" has the meaning set forth in the Plan.

"Creditor Trust" has the meaning set forth in the Plan.

"Creditor Trust Documents" has the meaning set forth in the Plan.

"Crossover Member" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"Cumulative Minimum Required Settlement Payments" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline. For purposes of illustration, the Cumulative Minimum Required Settlement Payments are (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1.025 billion as of the third Funding Deadline, and (d) without duplication, $1.4 billion as of the fourth Funding Deadline.

"Debtors" has the meaning set forth in the preamble.

"Definitive Documents" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances Undertakings, the Separation Agreements, the Tax Matters Agreement and any and all other documentation required to implement the Settlement.

"De Minimis Payment Party" means the Sackler Parties set forth in Exhibit T; *provided* that if any Sackler Party transfers any assets or property to a De Minimis Payment Party on or after March 31, 2021, the De Minimis Sackler Party that receives such assets or property shall not, from and after the date of receipt, constitute a De Minimis Sackler Party.

"De Minimis PRA LP Interests" has the meaning set forth in the recitals.

"Designated Release Remedy Event" shall be deemed to have occurred if Option 2 of Section 9.02(a)(ii)(B) is available in respect of a Specified Breach (or Specified Breaches) by any Payment Group.

"Designated Shareholder Released Parties" means the parties set forth on Exhibit S, *provided* that (i) if any Designated Shareholder Released Party is an officer, director, trustee or protector with respect to trusts or trust companies of Family Groups that are not Breaching Parties, such Designated Release Remedy Event shall not include such Designated Shareholder Released Party in their capacities as officers, directors, trustees or protectors of such trusts or trust companies that are not part of the Family Groups of the Breaching Parties and no recourse may be had against any such trusts or trust companies, and (ii) the Designated Shareholder Released Parties shall not include the estate of any natural person and the Designated Release Remedy Event shall not apply (or shall cease to continue to apply) to any person on Exhibit S who has become deceased, *provided* that, for the avoidance of doubt, nothing herein shall prevent the estate of any such natural person from cooperating with the MDT with respect to any discovery process with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities.

"Direct Appeal" has the meaning set forth in Section 2.09(a).

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement. For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan. For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Effective Date Cash" has the meaning set forth in the Plan.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated,

9

whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estate Certification" means, with respect to the JDS Estate, a certification of the personal representative(s) thereof substantially in the form of Exhibit R, which includes a recent copy of the fiduciary probate certificate issued by the court having primary supervision of the administration of the decedent's estate.

"Estates" has the meaning set forth in the Plan.

"Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not required for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).

"Excess Group 8 Payment Obligation" has the meaning set forth in Section 2.01(i)(i).

"Excess IAC Proceeds" has the meaning set forth in Section 2.01(i)(ii).

"Excluded Beneficiary" means Samantha Hunt, the children of Samantha Hunt and the children of Kathe A. Sackler and any minor or other person under a legal disability.

"Excluded Trusts" means the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on Exhibit A.

"Expense Allocation Principles" means, with respect to fees, costs and expenses described in clause (ii) of each of the definitions of Sales Proceeds Deductions and IAC Distribution Deductions, that each IAC Payment Party shall receive an allocation of such fees, costs and expenses proportionate to such IAC Payment Party's share of the total Sale Proceeds or IAC Non-Tax Distributions received by all IAC Payment Parties (including, for the avoidance of doubt, amounts treated as actually received by an IAC Payment Party as described in clause (x)(I) through (IV) or clause (y)(I) through (IV) of the definition of Net Proceeds, as applicable).

"Family Group" means each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

"Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less*

(c) if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) without duplication, the amount of any prepayments made by such Payment Group pursuant to Section 2.10. For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Funding Deadline Report" has the meaning set forth in Section 9.02(e)(i).

"Funding Trusts" means the trusts for the benefit of beneficiaries including one or more beneficiaries of the Rosetta Trust bearing the names KAS 2010 Family Trust and KAS 2011 Family Trust governed by the laws of Jersey (Channel Islands).

"Funding Trust Appointment" means, with respect to a Funding Trust that provided all or any portion of the funding set forth in Section 10.01(a)(iv), an instrument by which the appointment in further trust of such Funding Trust's share of such funding of the Rosetta Trust was exercised.

"Further Assurances Undertaking" means, in the case of an Assuring Party with respect to a Trust that is part of the A-Side Payment Group, an undertaking of such Person substantially in form of Exhibit O-1 and, in the case of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group, an undertaking of such Person substantially in the form of Exhibit O-2.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means, with respect to a trust, the law or laws governing the ongoing operation of the trust under the terms of the documents constituting its current governing instruments, which law may vary as to particular matters such as with respect to administration, validity and construction.

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit E-1, as it may be amended from time to time in accordance herewith (including pursuant to Section 8.13).

"IAC Account" means, in each case, (i) a deposit account subject to an IAC Control Agreement or (ii) an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S., Jersey or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC

Distribution shall be deposited and maintained pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S., Jersey or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

"IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of the IAC Payment Parties or under which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Party and the IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such IAC Account to secure the payment in full when due of all Obligations of the applicable IAC Payment Party is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Holding Company, IAC Payment Party, or a Subsidiary of an IAC Payment Party, including, but not limited to, any IAC Tax Distribution and any IAC Non-Tax Distribution. For the avoidance of doubt, a distribution of Sale Proceeds shall not constitute an IAC Distribution.

"IAC Distribution Deductions" means, with respect to any IAC Non-Tax Distribution actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC

Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Distribution Expenses incurred in connection with such IAC Non-Tax Distribution; *plus*

        (iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party ) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes.

"IAC Distribution Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with an IAC Non-Tax Distribution.

"IAC Escrow Agreement" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and (ii) one or more B-Side IAC Payment Parties.

"IAC Loans" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (y) on the other hand, any IAC or IAC Holding Company.

"IAC Non-Tax Distributions" means any cash distributions or other payments made by an IAC and received by an IAC Payment Party in respect of (a) its direct or indirect interest in any IAC or (b) repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of an IAC Non-Tax Distribution (other than a Permitted Withdrawal), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04; *provided* that no such distribution shall be considered an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided*, *further*, that the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period. To the extent any IAC Non-Tax Distributions made by an IAC (or the proceeds thereof) are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such amounts, to the extent received by an IAC Payment Party (as the payee with respect to such Intercompany Loan or in respect of its direct or indirect interests in a Subsidiary that is the payee with respect to such

13

Intercompany Loan), shall be considered IAC Non-Tax Distributions only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

"IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of net taxable income (as determined for U.S. federal income tax purposes) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of non-U.S. Taxes and state and local Taxes for U.S. federal income tax purposes; *provided,* that (i) IAC Tax Distributions may be calculated using a good faith estimate of the book net income of such IAC as reflected in such IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by such IAC in such prior taxable period in respect of its net taxable income. If after the actual U.S. federal net taxable income in respect of an IAC is determined for a relevant taxable year or such actual U.S. federal net taxable income in respect of such IAC is redetermined in connection with an income tax audit or the filing of an amended income tax return, (a) the sum of all IAC Tax Distributions previously received by an IAC Payment Party in respect of its interest in such IAC for such taxable year and not previously recharacterized as a Non-Tax Distribution exceeds (b) such IAC Payment Party's allocable share of such actual or redetermined net U.S. federal net taxable income in respect of such IAC for such taxable year *multiplied by* the tax rate described in clause (y) of this paragraph for such taxable year, then the excess of (a) over (b) shall be deemed an IAC Non-Tax Distribution made at the time of such determination.

"IACPP Efforts" means, with respect to an IAC Payment Party in reference to the applicable provisions in Article 3, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such

14

covenant, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding clause (b), exercise such right. For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.

"IFRS" means the International Financial Reporting Standards.

"Implementation Limitations" has the meaning set forth in Section 3.05.

"Indebtedness" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); *provided* that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination and (b) the amount of such indebtedness of such other Person, and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"Initial Public Creditor Trust Distributions" has the meaning set forth in the Plan.

"Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group, 1,287,500,000. The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).

"Intercompany Loans" means intercompany loans made by: (x)(i) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (ii) any other IAC Payment Party or Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company); or (y)(i) on one hand, any IAC or IAC Holding Company to (ii) any other IAC or IAC Holding Company.

"IRS" means the United States Internal Revenue Service.

"JDS Estate" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"Jersey" means the Bailiwick of Jersey, Channel Islands.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

15

"<u>Jurisdiction of Administration</u>" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"<u>Law</u>" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"<u>Lien</u>" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

"<u>Master Disbursement Trust</u>" has the meaning set forth in the Plan.

"<u>MDT</u>" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, (A) for all purposes hereunder other than <u>Section 2.09</u>, the Master Disbursement Trust and (B) for purposes of <u>Section 2.09</u>, the Plan Administration Trust.

"<u>MDT Dispute Notice</u>" has the meaning set forth in <u>Section 9.02(e)(ii)</u>.

"<u>MDT Operating Reserve</u>" has the meaning set forth in the Plan.

"<u>MDT Shareholder Insurance Rights</u>" has the meaning set forth in the Plan.

"<u>Mediator's Report</u>" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"<u>Minimum Required Settlement Payment</u>" has the meaning set forth in <u>Section 2.01(b)</u>.

"<u>Net Assets</u>" means, with respect to any Person, as of any date of determination, the aggregate value of all assets of such Person, as of such date, less the aggregate amount of all liabilities of such Person (which liabilities shall exclude the Obligations owed by such Person under this Agreement), as of such date, as determined by an Approved Financial Advisor, which determination and valuation methodologies shall be made using methodologies consistent with those used to prepare the Net Asset Presentations.

"<u>Net Asset Presentations</u>" means the financial reports regarding the net assets of certain Sackler Parties produced pursuant to the Case Stipulation on or around January 15, 2020, as such financial reports may be updated from time to time, including reports filed at Docket Nos. [3448 and 3422] in connection with the Confirmation Hearing.

"<u>Net Proceeds</u>" means, with respect to each IAC Payment Party:

(x) with respect to any Sale, (a) fifty-five percent (55%) of the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this <u>clause (x)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though such IAC Payment Party's allocable portion of (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC

Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of Sale Proceeds Deductions described in <u>clause (ii)</u> of the definition thereof directly related to the Sale of such IAC, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with <u>Section 3.01(a)(iii)</u>) was, in each case, actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any Sale Proceeds Deductions described in <u>clause (i)</u> or <u>(iii)</u> of the definition thereof of such IAC Payment Party, *less* (c) 55% of any Sale Proceeds Deductions described in <u>clause (ii)</u> of the definition thereof directly related to the Sale of such IAC; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC that is treated as a corporation for U.S. federal income tax purposes to the extent there has been, is and will be no IAC Tax Distribution with respect to such IAC Non-Tax Distribution) or 100% (with respect to any other IAC Non-Tax Distribution), of the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this <u>clause (y)</u>, the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though such IAC Payment Party's allocable portion of (I) income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC Distribution Deductions described in <u>clause (ii)</u> of the definition thereof directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with <u>Section 3.01(a)(iii)</u>) was, in each case, actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any IAC Distribution Deductions described in <u>clause (i)</u> or <u>(iii)</u> of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC Distribution Deductions described in <u>clause (ii)</u> of the definition thereof directly related to such IAC Non-Tax Distribution.

"<u>Net Proceeds Payment</u>" has the meaning set forth in <u>Section 2.02(a)</u>.

"<u>NewCo</u>" has the meaning set forth in the Plan.

"<u>NewCo Transferred Assets</u>" has the meaning set forth in the Plan.

"<u>New Trust</u>" means the Rosetta Trust.

"<u>NOAT TDP</u>" has the meaning set forth in the Plan.

"<u>Non-Collar Recipient</u>" means any A-Side Payment Group that is not a Collar Recipient.

"<u>Non-Collar Recipient 2.01 Adjustment</u>" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to <u>Section 2.01(f)</u> exceeds such Non-Collar Recipient's Settlement Amount Balance.

"<u>Non-Specified Breach</u>" has the meaning set forth in <u>Section 9.01</u>.

"Notices Addendum" has the meaning set forth in Section 11.01.

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opinion of Counsel" means a customary written opinion in form and substance and from legal counsel reasonably acceptable to the MDT.

"Opioid-Related Activities" has the meaning set forth in the Plan.

"Original Jurisdiction of Creation" means, with respect to a trust, the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith, without giving effect to any express choice of law provision in the trust's governing instrument that the trust or its governing instrument is to be governed by the laws of another jurisdiction as to validity and construction.

"Other Parties" has the meaning set forth in Section 4.01(c).

"Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, less (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that do not yet constitute Aggregate Payments.

"Overpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"Overpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(ii)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

"Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal:

(i) with respect to an A-Side IAC Payment Party, (A) any amounts used to pay Actual Taxes, (B) any IAC Distribution Deductions described in clause (ii) or (iii) of the definition thereof

or any Sale Proceeds Deductions described in clause (ii) or (iii) of the definition thereof and any similar expenses (other than any Taxes) incurred by or on behalf of any IAC Payment Party or any Subsidiary of an IAC Payment Party, (C) the costs (including legal, tax advisory and trustee costs and excluding any Taxes) of administering the IAC Payment Parties and their Subsidiaries, (D) the costs of the IAC Payment Parties and their Subsidiaries of complying with this Agreement, [or (E) the third-party legal and accounting fees and related expenses incurred by PRA L.P. in respect of this Agreement (but not, for the avoidance of doubt, the costs of any judgment against PRA L.P.); *provided* that the aggregate Permitted Withdrawals that may be made by all A-Side IAC Payment Parties in respect of the third-party legal and accounting fees and related expenses described in this clause (E) shall be limited such total third-party legal and accounting fees and related expenses that are allocated to the A-Side Payment Groups; *provided further* that all Permitted Withdrawals pursuant to this clause (E) must be paid, dollar for dollar, to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) to be paid, dollar for dollar, to such third-party legal and accounting fees and related expenses,][1]

(ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds, and

(iii) with respect to any B-Side IAC Payment Party, an amount equal to the amount distributed (or to be distributed) to the 74A Trust by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02 (provided that any Permitted Withdrawal pursuant to this clause (iii) prior to the payment to the MDT of an equal amount of such Permitted Withdrawal must be in the form of a B-Side IAC Payment Party Loan used to fund such distribution to the 74A Trust by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02); *provided*, in the case of this clause (iii) with respect to all B-Side IAC Payment Parties other than Raymond R. Sackler Trust 1 dtd 12/23/89 and Raymond R. Sackler Trust 2 dtd 12/23/89 (and any B-Side IAC Payment Party owned directly or indirectly by either or both of the foregoing trusts, but solely to the extent (X) of their respective ownership of such B-Side IAC Payment Party and (Y) such Permitted Withdrawal is paid, dollar-for-dollar, to either or both of the foregoing trusts), that the portion of such Permitted Withdrawal equal to (A) the aggregate amount of such Permitted Withdrawal pursuant to this clause (iii) *less* (B) the aggregate amount that would have been permitted to be distributed by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as applicable, pursuant (at the election of such distributing trust) to Section 4.01(c)(i) or the Trust Distribution Incurrence Test under the applicable Credit Support Annex (determined immediately prior to the distribution to the 74A Trust by AJ Irrevocable Trust and AR Irrevocable Trust (and any successor(s) thereof)) if (and to the extent) such trust(s) elect(s) to treat all or part of such distribution to the 74A Trust as a distribution pursuant to Section 4.01(c)(i) or the Trust Distribution Incurrence Test under the applicable Credit Support Annex, is evidenced by one or more B-Side IAC Payment Party Loans pursuant to promissory notes that are in a form substantially similar to the form attached hereto as Exhibit Y.

"Person" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association or other entity or organization, including a Governmental Authority.

---

[1] Note to Draft: Under discussion.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement, (iv) Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. [3545] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Plan Administration Trust" has the meaning set forth in the Plan.

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

"Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated.

"Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust (including without limitation as referred to in Sections 4.06, 4.08 and 4.10 of Annexes A, C, D and E of this Agreement and Sections 4.03, 4.04 and 4.05 of Annex B of this Agreement), including any Consent Person.

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

"Products" has the meaning set forth in the Plan.

"Protected Party" has the meaning set forth in the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a)(i).

"Purdue" means Purdue Pharma L.P.

"Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.01(e).

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor, any IAC Pledged Entity and any other Subsidiary of an IAC Payment Party (in each case so long as such Person continues to be Controlled by one or more Sackler Parties); (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) and (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a)(ii).

"Related Person" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

"Releasing Parties" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against, or Interests in, the Debtors, (iii) all Holders of Future PI Channeled Claims, (iv) with respect to each of the Persons in the foregoing clauses (i) through (iii), each of their Related Parties, and (v) each of the Debtors' Related Parties, in each case, other than any Shareholder Released Party. All capitalized terms in this definition shall have the meanings corresponding to such terms as set forth in the Plan.

"Relevant Jersey Trust" means each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) and, in addition, each Funding Trust that funded the Rosetta Trust as set forth in Section 10.01(a)(iv).

"Relevant Parties" has the meaning set forth in Section 4.01(c).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Required Interested Persons" means, (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat. § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, *provided* that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.

"Restitution" has the meaning set forth in Section 4.01(a).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Restricted Person" has the meaning set forth in Section 8.09.

"Retained Interest" has the meaning set forth in Section 3.01(b).

"Rosetta Trust" means the trust bearing that name governed by the laws of Jersey (Channel Islands) of which Stone Fiduciary Management Inc., a Wyoming corporation, is the trustee.

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [●], a [●] organized under the laws of [●].

"Sale" means (i) any sale of an IAC Payment Party's direct and/or indirect Equity Interests (whether in whole or in part) in an IAC, (ii) any sale of all or substantially all of the assets of an IAC and (iii) any sale of assets or Equity Interests in connection with (i) and (ii) above, in each case to a third party.

"Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale.

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including, in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets or (b) received in connection with the repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of a Sale (other than a Permitted Withdrawal) and without duplication to amounts included in the definition of "IAC Non-Tax Distributions", in each case of clauses (a) and (b), as calculated in U.S. dollars at the relevant spot exchange rate published by Bloomberg on any date on which such proceeds are deposited into an IAC Account or otherwise paid to the MDT. To the extent Sale Proceeds are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such Sale Proceeds shall be considered Sale Proceeds only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"Sale Proceeds Deductions" means, with respect to any Sale Proceeds actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (B) any Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC; *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include income Taxes or withholding Taxes. For the avoidance of doubt, Sale Proceeds Deductions shall not include the repayment of Intercompany Loans or IAC Loans funded directly or indirectly from Sale Proceeds.

"Secondary Restricted Person" means (i) any child of a Restricted Person who is a natural person or, for Restricted Persons that are estates, any child of the deceased person associated with such estate, who is older than 18 years of age as of September 15, 2019 and (ii) any trusts of which any of the Persons in the foregoing clause (i) are beneficiaries and the trustees thereof (solely in their capacities as such), in each case to the extent such Person is not a Restricted Person.

"Second Circuit" means the United States Court of Appeals for the Second Circuit.

"Secured Party" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"Separation Agreements" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships among the Debtors, NewCo and other entities owned directly or indirectly by the Sackler Parties and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"Settlement" has the meaning set forth in the recitals.

"Settlement Amount Balance" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by Section 2.03.

"Settlement Effective Date" has the meaning set forth in Section 10.01(a).

"Shareholder Released Claims" has the meaning set forth in the Plan.

"Shareholder Released Parties" has the meaning set forth in the Plan.

"Shareholder Releases" has the meaning set forth in the Plan.

"Specified Breach" has the meaning set forth in Section 9.01.

"Specified Breach Trigger" means a Breach Trigger with respect to a Specified Breach.

"Subsidiary" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Tax" or "Taxes" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall

profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Advisor" means an accounting or law firm with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.

"Tax Matters Agreement" means the series of separate selected tax matters agreements in form and substance reasonably acceptable to the Sackler Parties' Representative, the MDT and any other parties thereto, between, on the one hand, the Payor Parties (as defined in such agreements) and, on the other hand, each of NewCo, the Master Disbursement Trust, the NOAT (as defined in the Plan), and the TAFT (as defined in the Plan) and certain other parties as may be agreed.

"Tax Treatment" has the meaning set forth in Section 4.01(c).

"Third Party Payee" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution, or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).

"TopCo" has the meaning set forth in the Plan.

"Tribe TDP" has the meaning set forth in the Plan.

"Tribe Trust" has the meaning set forth in the Plan.

"Trust Certification" means, with respect to a Trust, a certification of the trustees thereof substantially in the form of Exhibit P.

"Trusts" means the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.

"Unapplied Advanced Contributions" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)    the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii)    the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)    without duplication, the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or

IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties. In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

"Underpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"Underpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

**Section 1.02     Interpretative Provisions**.

(a)     The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)     All Exhibits and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Annex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)     Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)     The use of the word "or" shall not be exclusive.

(g)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)     The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement. Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's estate, legal and personal representatives, successors and permitted assigns.

(i)        Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)        Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)        Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)        All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)        All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)        Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)        A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)        Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement. No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence. Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)        Unless the context otherwise requires, references to Net Proceeds, Sale Proceeds or Distributions "received by" or "actually received by" an IAC Payment Party, or to the "receipt" of Net Proceeds, Sale Proceeds or Distributions by an IAC Payment Party shall include Net Proceeds, Sale Proceeds, or Distributions that have been received by PRA L.P. and would be received by such IAC Payment Party in a pro rata distribution thereof by PRA L.P. to its equityholders.

## ARTICLE 2.
## SETTLEMENT PAYMENTS

**Section 2.01      Required Settlement Payment**.

(a)      Payment of the Outstanding Settlement Amount.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group on the terms and subject to the limitations set forth herein, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to Section 2.02, by the applicable Funding Deadlines pursuant to this Section 2.01, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group. Except as provided in Sections 2.01(i), 2.04, 2.05 or 2.10, the Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.01 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero. For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this Section 2.01 until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)      Minimum Required Settlement Payment.

(i)      Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below. Each such payment deadline set forth in the schedule below shall be referred to herein as a "Funding Deadline" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "Minimum Required Settlement Payment".

| # | Funding Deadline | Minimum Required Settlement Payment |
|---|---|---|
| 1. | Plan Effective Date | $300 million |
| 2. | June 30, 2022 | $350 million |
| 3. | June 30, 2023 | $375 million |
| 4. | June 30, 2024 | $375 million |
| 5. | June 30, 2025 | $350 million |
| 6. | June 30, 2026 | $300 million |
| 7. | June 30, 2027 | $1,000 million |
| 8. | June 30, 2028 | $475 million |
| 9. | June 30, 2029 | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030 | $325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031 | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million.

(ii)      Notwithstanding the foregoing clause (i), (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022

28

shall be extended in increments of one calendar month (and due at the end of such month) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

(iii)    Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.

(c)    <u>Payment of A-Side Funding Deadline Obligations</u>. With respect to each A-Side Payment Group, on each Funding Deadline,

(i)    The A-Side General Obligors shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, on behalf of the A-Side Payment Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

(ii)    the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "bare trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i)</u>; and

(iii)    the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to <u>clause (i)</u> or <u>(ii)</u>;

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or, in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); (3) no A-Side General Obligor shall have any obligation to make any payment pursuant to this <u>Section 2.01</u> (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and to the extent it does not have sufficient liquid assets (not including any amounts reserved in good faith for the payment of Taxes or any other Permitted Withdrawals applicable to such A-Side General Obligor) to do so; and (4) nothing in this <u>Section 2.01(c)</u> shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

29

(d)      Payment of B-Side Funding Deadline Obligations. With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)      Prepayment of Outstanding Settlement Amount. Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty. Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of any IAC Payment Party in its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's succeeding such funding obligation. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.

(f)      Reallocation of A-Side Payments on the First Three Funding Deadlines to B-Side. If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i) the payment obligation under Section 2.01(d) of each B-Side Payment Group on such Funding Deadline shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines. For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)      B-Side Excess Amount Adjustment. If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount and (B) one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)      A-Side Allocable Portion Adjustment. If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)      on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser of (x) one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth or tenth Funding Deadline;

30

*provided* that the aggregate amount determined pursuant to this <u>Section 2.01(h)(i)</u> on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts on such Funding Deadline (each such payment pursuant to this <u>subparagraph (i)</u>, an "<u>A-Side Reallocation Payment</u>"); and

    (ii)    each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to <u>Section 2.01(c)</u>, (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

    (i)    <u>Family Group 8 Cap</u>.

    (i)    Notwithstanding anything in this <u>Section 2.01</u> or <u>Section 2.03</u> to the contrary if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to <u>Sections 2.01(c)(ii)</u>, <u>2.01(e)</u> and <u>2.10</u> (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to <u>Section 2.01(l)</u>), then, with respect to any other payment Obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to <u>Sections 2.01(c)(ii)</u> and <u>Section 2.10</u> (any such amount, an "<u>Excess Group 8 Payment Obligation</u>"):

    (A)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

    (B)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment Obligation; and

    (C)    the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this <u>Section 2.01(i)</u> shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Payment Group 8 of their obligations under <u>Sections 2.01</u>, <u>2.02</u>, <u>2.03</u>, and <u>2.10</u> and (ii) the payment of any such Excess Group 8 Payment Obligation (other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side Amount) will be included in the calculation of the Aggregate Payments of A-Side Payment Group 8 (and not of the members of the Payment Group actually making such payment).

(ii)        Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the Excess Group 8 Payment Obligation) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives proceeds from a Sale or Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)). Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (ii)).

(iii)        Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph (ii) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which the Full Outstanding Settlement Amounts of all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)        Payments by Beacon Trust. All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below. All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)        Payments by 74A Trust. All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with

Section 2.01(l) below. All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    <u>Allocation of Payments</u>.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to <u>Section 2.02(a)</u> or <u>(b)</u> but excluding any payment pursuant to <u>Section 2.10</u> (the allocation of which shall be governed by <u>Section 2.10</u>)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, *provided* that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made in equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; *provided* that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.

(iii)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "<u>Common B-Side Payment Party</u>"), shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; *provided* that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to <u>Section 2.01(k)</u> or <u>Section 2.02(d)</u>, then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    Except as provided in <u>Section 9.03</u>, (1) each Payment Party agrees that its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by its Payment Group, and such Payment Party's obligations arising as a result of its joint and several liability with each other Payment Party within its Payment Group as provided herein, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party and (2) if a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy in connection with such Specified Breach pursuant to <u>Section 9.02</u>, the MDT may, solely in accordance with <u>Section 9.02</u> and subject to <u>Section 9.03</u>, proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount and all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount and all other Obligations of such Payment Group. Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)      Subject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

**Section 2.02    Payment of Net Proceeds**.

(a)      Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, within forty-five (45) calendar days following receipt (or as soon thereafter as legally permissible or, if the IAC Payment Party is not entitled to receive any cash in respect of Net Proceeds, the receipt of Net Proceeds by any other IAC Payment Party), an amount equal to 100% of all Net Proceeds in respect of such IAC Payment Party to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 3.07(d). The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero. For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)      In the event that a B-Side IAC Payment Party's Net Proceeds is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)      All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)      All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made

directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)      For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)      each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with <u>Section 2.01(l)(i)</u>;

(ii)      each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with <u>Section 2.01(l)(iii)</u>; and

(iii)      any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to <u>Sections 2.02(c)</u> and <u>2.01(j)</u> or a B-Side IAC Payment Party or the 74A Trust pursuant to <u>Sections 2.02(d)</u> and <u>2.01(k)</u>), shall be deemed to have been paid by each IAC Payment Party that holds equity interests in PRA L.P. in accordance with <u>Section 1.02(q)</u>.

**Section 2.03      Collar.**

(a)      If any Sale or IAC Non-Tax Distribution results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "<u>Collar Top-Up Amount</u>"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount *multiplied by* seven (7).

(b)      If on any Funding Deadline:

(i)      (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)      a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)      If on any Funding Deadline:

(i)      (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount

Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients. Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

(e)    With respect to each Payment Group and each IAC Payment Party within such Payment Group, until the earlier of (i) the final Sale of all IACs the interests of which are held, directly or indirectly, by such IAC Payment Party (excluding Retained Interests) and the funding of any associated final Net Proceeds Payment to the MDT, and (ii) such time as all amounts payable by such Payment Group hereunder have been paid in full in cash, such Payment Group shall not (A) sell, dispose, assign or otherwise transfer any beneficial interest in such IAC Payment Party to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), (B) permit such IAC Payment Party to issue additional equity interests to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), or (C) amend any organizational or trust documents of such IAC Payment Party to add beneficiaries thereto or otherwise adjust the economic entitlements or beneficial interests of the equity owners thereof, in each case, to the extent any such beneficiaries or equity owners would not be included in such Payment Group (or a Subsidiary of a Person included in such Payment Group).

**Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties.**

(a)    If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Section 2.01(c)(ii) or Section 2.10 when due and payable, and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"), as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties'

Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least ninety (90) days:

> (i)        the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

> (ii)        the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500. Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, *provided* that such Payment Parties shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash. For the avoidance of doubt, the payment of any such A-Side Capped Payment Party Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

> (b)        Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the A-Side Capped Payment Party Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)). Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

> (c)        Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the

relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

**Section 2.05    Intentionally Omitted**.

**Section 2.06    No Change to Aggregate Settlement Amount**.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount, (ii) as of either the second or fifth Funding Deadline, the MDT receiving less than $25 million in Additional A-Side Amount Payments as of each such Funding Deadline, (iii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (iv) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional A-Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof). If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)    All payment obligations of any non-breaching Payment Group to the MDT hereunder shall terminate at such time when such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement). For the avoidance of doubt, (A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive, (B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

**Section 2.07    Illustrative Examples**.    Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in Exhibit U.

**Section 2.08    Payments Pending Appeals**.

(a)    Notwithstanding anything in Section 2.01, 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01, 2.02 and 2.10 shall be deposited into the Appeals Account to satisfy the Obligations under this Agreement; *provided* that:

(i)    on the Funding Deadline that is the Plan Effective Date, the Minimum Required Settlement Payment that is due to the MDT on such Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT. Such payment will be funded pursuant to Section 2.11; *provided* that any amounts that are not funded pursuant to Section 2.11 shall instead by funded pursuant to Sections 2.01(c) and (d);

(ii)    on the date of the second Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), (A) the Minimum Required Settlement Payment that is due to the MDT on the second Funding Deadline and (B) any amounts required to be paid to the MDT pursuant to Section 2.10 shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that is due to the MDT on the third Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)    a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing <u>clause (B)</u> or <u>(C)</u> are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to <u>Section 2.01(b)(ii)</u>), the Minimum Required Settlement Payment that was due to the MDT on the third Funding Deadline (including any portion thereof deposited into the Appeals Account on such Funding Deadline pursuant to this <u>Section 2.08(a)</u>) shall be released from the Appeals Account and paid directly to the MDT.

(b)    Notwithstanding the foregoing <u>clause (a)</u>, all amounts held in the Appeals Account (including earnings thereon) shall be released to the MDT, and <u>Section 2.08(a)</u> shall no longer apply and shall not be in effect if (i) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (ii) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (iii) no court has issued a decision with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties that does not affirm the Confirmation Order and (iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)    If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; (iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases; and (iv) all amounts remaining in the Appeals Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Account.

(d)    For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)    If this Agreement is rescinded as provided in <u>Section 2.08(c)</u> or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to <u>Section 2.01(d)</u> as a result of <u>Section 2.01(f)</u>, such payment to be made no later than 60 days following such rescission or termination.

(f)    With respect to any payment otherwise required to be made under <u>Section 2.08</u> into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09        Appeals; Motion to Stay**.

(a)        <u>Direct Appeal</u>. In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "<u>Appeal</u>"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "<u>Direct Appeal</u>") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal. If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a majority of such appellants and appellees to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii). If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal. Upon receiving certification for the Direct Appeal, whether by the Bankruptcy Court order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)        <u>Expedited Appeal</u>. Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)        <u>Motion to Stay</u>. The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order. The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10        Certain Additional A-Side Payment Obligations**.  In addition to the amounts required to be paid pursuant to <u>Sections 2.01</u> and <u>2.02</u>, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "<u>Additional A-Side Amount</u>") to the MDT as follows:

(i)        on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in <u>Section 2.01(c)</u>, shall pay to the MDT $3.125 million; and

(ii)        on the fifth Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in <u>Section 2.01(c)</u>, shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing <u>clause (i)</u> shall be $3.125 million on the second Funding Deadline and the payment obligation of each A-Side Payment Group pursuant to the foregoing <u>clause (ii)</u> shall be $3.125 million on the fifth Funding Deadline.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty. For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an

Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount. Any portion of the Additional A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. For the avoidance of doubt, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional A-Side Amount in accordance with this Section 2.10.

Section 2.11    **Pre-Plan Effective Date Net Proceeds**.  If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

# ARTICLE 3.
# SALE OF IACS

Section 3.01    **Covenant to Sell**.

(a)    Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall:

(i)    use their best efforts to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of such IACs;

(ii)    use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and

(iii)    cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party from each Sale to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sale or the distribution of proceeds therefrom,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments shall be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon receipt by such IAC Payment Parties of Sale Proceeds, deposited into an IAC Account in accordance with Section 3.07(c);

*provided* that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; *provided, further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

(b)    If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section 8.09 of this Agreement and (iii) the Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest"). For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of all or substantially all assets or direct and/or indirect Equity Interests of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, that (A) the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing, (B) no Sale of a Controlling interest in an IAC shall be permitted unless at least 51% of the economic interest in such IAC is sold, and (C) any Equity Interest retained following a Sale of Equity Interests shall not be subject to any restrictions on transfer except for customary transfer restrictions (*e.g.*, rights of first refusal, drag-along rights, limits on sale to prohibited parties, and no-sale restrictions) that will not in any case extend beyond the later of one year from the closing of the transfer of a controlling interest in such IAC and six months prior to the end of the Sale Period.

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale, including with respect to (x) any Implementation Limitations or provisions in organizational documents, joint venture agreements or material contracts of the Sackler Parties, their Affiliates or the IACs that would materially restrict or limit the ability of the IAC Payment Parties to effectuate the Sale of any IAC (to the extent identified by or known to the Sackler Parties' Representative and the Advisors at the time of such consultation) and (y) any IACs for which any letters of intent and purchase or similar acquisition agreements have been entered into in connection with any potential Sale (except to the extent such letter of intent or similar agreement was delivered on a confidential basis), the contemplated purchase price in connection therewith and expected timing of consummation of such Sale, to the extent permitted under existing contractual restrictions; *provided* that (i) the MDT will not request consultation more than two (2) times within any 12-month period, (ii) in connection with such consultation, the Sackler Parties' Representative shall provide the MDT with a written report that includes a summary in reasonable detail of such updates with respect to the Sales process described in the foregoing <u>Section 3.01(c)</u> for each IAC, and (iii) the MDT shall agree to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

**Section 3.02    IAC Information Rights; Access; Waiver**.

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of <u>clauses (v)</u> and <u>(vi)</u> below, which only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)    reports in a form substantially similar to the forms attached hereto as <u>Exhibits W-1 and W-2</u> to be delivered on or before the date set forth on such forms and which include: (A) a quarterly report prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 1 thereto, with respect to each applicable IAC or IAC Payment Party, (i) a good faith estimate of the book net income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) any foreign income taxes paid or estimated in good faith to be paid in respect of such income; (iii) the rate of any applicable foreign withholding taxes; (iv) any foreign withholding taxes paid or estimated in good faith to be paid in respect of any Tax Distributions made directly or indirectly to the relevant IAC Payment Party; (v) the then-current highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes for U.S. federal income tax purposes and the character of the income allocated to the applicable IAC Payment Party by the IAC); (vi) based on the foregoing, the amount of IAC Tax Distributions payable pursuant to the Settlement Agreement; and (vii) the amount of any IAC Tax Distributions received for the current taxable period as of the date of the report, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC; and (y) confirming that the amounts set forth on Schedule 1 thereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (B) an annual report that only the B-Side IAC Payment Parties shall be required to provide, or cause to be provided, to the MDT and the Approved Accountant, which report shall be prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 2 thereto, with respect to each applicable IAC and IAC Payment Party, (i) the amount of net book income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes, allocated to the applicable IAC Payment Party; (ii) the sources,

44

amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year; (iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; (iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution with respect to such amounts; (v) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC); (vi) based on the foregoing, the total amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement; (vii) the amount of such IAC Tax Distributions received as of the date of the report in respect of the applicable IAC for the relevant taxable year; (viii) any amount of such IAC Tax Distributions to be recharacterized as IAC Non-Tax Distributions, and (ix) any remaining amount of IAC Tax Distributions that are permitted to be paid under the Settlement Agreement with respect to the applicable taxable year, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC and reflected in the U.S. federal income tax returns filed by the IAC Payment Parties; and (y) confirming that (i) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 thereto are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (ii) the U.S. federal income tax items set forth on Schedule 2 thereto accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (iii) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2; and (C) an annual report provided by the Approved Accountant that only the B-Side IAC Payment Parties shall be required to furnish to the MDT, which report shall be prepared by the Approved Accountant confirming (w) that it has received the Schedule 2 described in clause (B) of this Section 3.02(a)(ii) for the relevant taxable year, (x) the items described in subclauses (ii) through (iv) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 are correct based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns provided to the Approved Accountant, (y) the tax rate described in subclause (v) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct, and (z) the calculation described in subclause (vi) of Section 3.02(a)(ii)(B)(x) on such Schedule 2 is correct.

(iii)    (A) as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Collar Amount relating to such Sale Proceeds or IAC Non-Tax Distribution, which calculation shall be in substantially the form attached hereto as Exhibit N and (B) as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal, a report setting forth a good faith calculation of such Permitted Withdrawal, in the case of each of clause (A) and (B), which report shall be prepared by an Approved Accountant and, solely in the case of any B-Side IAC Payment Party, may be included in the report described in Section 3.02(a)(iii)(A); provided that upon the request of the MDT, each relevant A-Side IAC Payment Party will provide the MDT with evidence of the payment of such amounts to the relevant payees;

(iv)    no later than the earlier of (x) the forty-fifth (45th) day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with Section 3.03(c)(i), a good faith determination of the amount of Excess Cash of such IAC;

(v)    as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a notice indicating the amount of such Actual

45

Taxes, which report shall be prepared by an Approved Accountant; *provided* that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such Actual Taxes to the relevant taxing authority; and

(vi)    no later than fifteen (15) days prior to each Quarterly Sweep Date, a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant setting forth the amount of cash in its IAC Account, the amounts reserved pursuant to Section 3.07(e), and the amount to be paid pursuant to Section 3.07(e).

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to clause (ii), (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided and (y) no such confidentiality or similar obligations with respect to the information described in this Section 3.02 shall be entered into after the Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

### Section 3.03    Other IAC-Related Covenants.

(a)    The IAC Payment Parties covenant and agree that, with respect to each IAC directly or indirectly owned by the IAC Payment Parties in whole or in part, from the Settlement Effective Date until the consummation of the Sale of all or substantially all assets or direct and/or indirect Equity Interests in such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use IACPP Efforts to cause such IAC not to:

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Related Party (other than any IACs or their respective Subsidiaries, or any officers, directors or employees of any IACs or any Subsidiaries thereof (in their capacity as such)), on the other hand (each, a "Related Party Transaction"), except for a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $5,000,000, such IAC has delivered to the MDT an officers' certificate or a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and (B) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $10,000,000, such IAC has delivered a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Related Party Transaction; *provided*, *further* that this subparagraph (ii) shall not restrict any IAC Distribution permitted

hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes a distribution of Sale Proceeds or an IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies and Subsidiaries of IAC Payment Parties that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other Subsidiary of an IAC, IAC Holding Company or IAC Payment Party other than (i) to another IAC Payment Party that is within the same Payment Group so long as the interests in each IAC held, directly or indirectly, by such IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, *provided*, such actions do not adversely affect the perfection or priority of the Secured Party's security interest in the IAC Pledged Shares,(ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale of all or substantially all assets or direct and/or indirect Equity Interests has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use IACPP Efforts to cause such IAC to comply with this Section 3.03.

In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), such Sackler Party (or the Payment Parties in the Family Group of such Family Member) shall pay the amount of such consideration (or such portion thereof that was prohibited by Section 3.03(a)) that consists of the Cash and Cash Equivalents (and the cash value of any consideration that is not Cash and Cash Equivalents) to the MDT as a prepayment pursuant to Section 2.01(e), in which event no Breach with respect to this Section 3.03(a) shall have occurred in connection with such transaction, subject to the terms of Section 9.01(b) (and so long as such payment has been made within the applicable cure period under Section 9.01(b)).

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests

47

of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x); *provided further* that (I) the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and is subject to the Sale Obligations hereunder and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, IAC Loans, Intercompany Loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) (I) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and an IAC Pledged Entity and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.

(c)      Each IAC Payment Party shall:

(i)      use IACPP Efforts to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the Agreement Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively;

(ii)      cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party, to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to IAC Distribution,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments may be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such proceeds

48

shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon the receipt by an IAC Payment Party of such proceeds, deposited into an IAC Account in accordance with Section 3.07(c).

**Section 3.04    Reimbursement of Certain Expenses Relating to a Sale**.  Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to reimburse such seller for such liability net of any Tax benefits (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed 10% of the Sale Proceeds actually received by such seller from the applicable Sale. Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with Section 2.02(a).

**Section 3.05    Implementation Limitations**.  The Sale Obligations of the IAC Payment Parties shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations"). In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the Sale Obligations, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds, *provided* that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in clause (i) or (ii) of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.

**Section 3.06    Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in Section 3.01 through Section 3.05 and Section 3.08 (collectively, the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02. For the avoidance of doubt, the obligations set forth in the other provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

### Section 3.07    Pledge of Shares; Net Proceeds Collateral Account.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of such IAC Payment Party, (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account (other than any IAC Account established in the name of the escrow agent in respect of such IAC Account and subject to an IAC Escrow Agreement) of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; provided, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.

(d)    Until the date on which the MDT has been paid the Full Outstanding Settlement Amount and all other payment Obligations of the Payment Group(s) of which such IAC Payment Party is a member and all other payment Obligations of such IAC Payment Party, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; provided that, notwithstanding the provisions of this subparagraph (d), if the Full Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member and all other payment Obligations (other than those relating to the payment of the Full Outstanding Settlement Amount or any portion thereof) of such IAC Payment Party is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account multiplied by (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Full Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s)[2]

---

[2] Note to Draft: IAC Pledge and Security Agreements to provide that collateral limitations apply only until payment Obligations paid in full.

of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)     By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes (including amounts reserved for future audit adjustments) of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect equityholders or beneficiaries in respect of any Sale (but not, for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals) and (2) the Full Outstanding Settlement Amount of the A-Side Payment Groups and all other payment Obligations of such IAC Payment Party, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) and/or a prepayment pursuant to Section 2.10 (or, in the case of any payment made on a Funding Deadline, as a payment of an A-Side Funding Deadline Obligation pursuant to Section 2.01(c)(i) and/or an Additional A-Side Amount Payment due on such date, as applicable).

(f)     Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledgor or IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)     The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the direct or indirect owner of all or a portion of the Equity Interests of any IAC Pledged Entity, which Equity Interests have not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, (ii) in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements, (iii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in such additional IAC Pledged Shares without lapse or change in priority and (iv) deliver proof of corporate (or comparable) action or incumbency of officers as any Secured Party shall reasonably request. If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledgor or an IAC Pledged Entity (x) changes its legal name, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period

as permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in the relevant IAC Pledged Shares without change in priority.

(h)      No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless (i) such IAC Assets remain subject to the Sale Obligations or (ii) such Restricted Payment consists of Sale Proceeds or qualifies as an IAC Distribution; *provided*, that if such Restricted Payment is of IAC Pledged Shares, such Restricted Payment shall not affect the perfection or priority of the Liens in such IAC Pledged Shares granted in favor of the Secured Party. For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets or IAC Pledged Shares (to the extent such IAC Pledged Shares do not otherwise constitute IAC Assets) and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.

**Section 3.08      Failure to Sell IACs.**

(a)      If the Sackler Parties' Representative does not reasonably believe that the IAC Payment Parties will have completed the sale of all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of each of the IACs on or prior to the expiration of the Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT of such determination, no more than 270 days and no less than 180 days prior to the expiration of the applicable Sale Period, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the applicable IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure on the IAC Pledged Shares in accordance with Section 3.08(d) and the IAC Collateral Documents, a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other direct or indirect Equity Interests in the IACs, a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT in accordance with this Section 3.08, or otherwise).

(b)      If any IAC Payment Party has not completed the sale of all or substantially all of (A) its direct and/or indirect Equity Interests in all of the IACs and/or (B) the assets of each of the IACs on or prior to the date that is 30 days prior to the expiration of the applicable Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure on the IAC Pledged Shares in accordance with Section 3.08(d) and the IAC Collateral Documents, a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other direct or indirect Equity Interests in the IACs, a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT in accordance with this Section 3.08, or otherwise).

(c)      Each IAC Payment Party shall, and shall cause its relevant Affiliates to, (i) take all actions reasonably necessary to comply with a good faith direction (if any) delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a), (b), or (d)(ii) involving solely a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT and (ii) use its reasonable best efforts to comply with a reasonable direction (if any) delivered by the MDT in response to any other notice delivered pursuant to Section 3.08(a), (b), or (d)(iii); *provided* that nothing in this Section 3.08(c) shall (x) prevent or constrain

any IAC Payment Party from continuing to pursue Sales to any Purchaser, to the extent such Sales are proposed to be consummated on or prior to the expiration of the applicable Sale Period or (y) give the MDT the right to interfere with or otherwise adversely impact the applicable Sales during the remainder of the applicable Sale Period. For the avoidance of doubt, for purposes of the preceding proviso, the MDT delivering any direction contemplated by this Section 3.08 shall not be deemed to prevent or constrain any IAC Payment Party from continuing to pursue Sales to any Purchaser and shall not be deemed to interfere with or otherwise adversely impact the any Sales.

(d)    If, at the end of the Sale Period with respect to any IAC, a Sale of all or substantially all of the assets or direct and/or indirect Equity Interests of such IAC has not been effectuated with respect to such IAC (excluding any Retained Interests), the MDT shall be permitted to:

(i)    exercise all powers, rights, and remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents (including through foreclosure on the IAC Pledged Shares), with the proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents;

(ii)    direct the IAC Payment Parties to transfer the IAC Pledged Shares to the MDT in lieu of foreclosure, in which case the MDT will be obligated to attempt to sell (*provided* that the MDT shall control the sale process in all respects in its sole discretion, including, without limitation, with respect to the time, place and manner of any such sale) such unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity) with the proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents; and/or

(iii)    otherwise direct the IAC Payment Parties to dispose of all or substantially all of the direct or indirect Equity Interests of such IACs or all or substantially all of the assets of such IACs (other than Retained Interests), as the case may be (including a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other direct or indirect Equity Interests in such IACs, a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT in accordance with this Section 3.08, or otherwise), with proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents; *provided* that the remedies set forth in this Section 3.08(d)(iii) shall only be exercisable for a period of two (2) years following the expiration of the applicable Sale Period.

Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement

**ARTICLE 4.**
**TAX MATTERS**

**Section 4.01    Restitution Payments**.

(a)    The Restitution Amounts (as defined in the following paragraph) paid in Cash and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the IAC Payment Parties, or PRA L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP. Nothing in this Agreement, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the IRS regarding whether the amounts paid as described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the MDT pursuant to this Agreement in the aggregate amount of $4.325 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f). Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts and (ii) neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts. All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)    For purposes of this Section 4.01, (x) the amount of any payment made in Cash and Cash Equivalents shall be equal to the face amount of such Cash and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section 4.01 shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)    For the avoidance of doubt, nothing in this Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor Related Persons and other Sackler Parties (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Related Person of any of the foregoing

54

(collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.

Section 4.02    **Qualified Settlement Funds**.  All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

Section 4.03    **Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable Tax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section 9.05 of this Agreement shall be treated for all applicable Tax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

Section 4.04    **Forms W-9**.  On or before the Settlement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax. Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9 previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

Section 4.05    **Intentionally Omitted**.

Section 4.06    **Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.

## ARTICLE 5.
## INTENTIONALLY OMITTED.

## ARTICLE 6.
## TERMINATION.

Section 6.01    **Termination of Agreement**.   This Agreement shall terminate under the circumstances set forth on Exhibit I, Section 2.08(c) or Section 11.06(c).

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date (provided that any A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) represents and warrants as of the date such A-Side

Payment Party receives a Court Order applicable to it described in Section 10.01(a)(v)), the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    Each such Sackler Party that is a Trust (i) was duly created under the laws of its Original Jurisdiction of Creation as set forth on Exhibit Q, (ii) has its situs and principal place of administration, and validly exists under the laws of, its Jurisdiction of Administration as set forth on Exhibit Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its Governing Law Jurisdiction as set forth on Exhibit Q. With respect to such Trust, Exhibit Q sets forth a true and complete list of (A) its currently acting trustees, (B) its Power Holders, (C) its Required Interested Persons, (D) its Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name) and (E) its Possible Refunding Trusts, if any. The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided* that notice and a copy of such amendment shall be provided promptly to the MDT, in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)    With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court set forth on Exhibit Q. Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders, (C) the JDS Estate's Required Interested Persons, and (D) the JDS Estate's Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such beneficiary under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name).

(d)    In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their

respective principal place of business as set forth on Exhibit Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute, deliver and perform such Sackler Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party.

(e)    Except (i) to the extent investment discretion has been delegated to investment managers, and (ii) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(e), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust and the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the governing instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person"), which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit Q, in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(e) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

### Section 7.02    Authority; Enforceability

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or

performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)        The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a Trust or the JDS Estate and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trust or estate administration action, as applicable (including without limitation by any requisite action of any applicable Consent Person and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings on the part of such Sackler Party is necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party or any Consent Person. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles which, for the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.

(c)        The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

Section 7.03      No Contravention. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, (d) violate any other agreement, instrument or trust or other restrictions to which such Sackler Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of clauses (b) through (e), except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

Section 7.04      Net Asset Reports.    Except with respect to any projections, forecasts or other forward-looking information set forth therein, and subject to the qualifications, estimates and methodology set forth therein, (i) if such Sackler Party is an Initial Covered Sackler Person (as defined in the Case Stipulation), then the applicable Net Asset Presentations fairly present, in all material respects, the balance sheets of such Sackler Party as of the respective dates set forth therein, and (ii) if such Sackler Party is not an Initial Covered Sackler Person, then the additional balance sheet information provided to the Debtors and their advisors by Huron Consulting Group with respect to such Sackler Party and the other members of such Sackler Party's Family Group fairly presents, in all material respects, the balance sheets of such Persons as of the respective dates set forth therein.

Section 7.05      List of IACs.   Each of the representations made in clauses (a) through (i) of this Section 7.05 is made by the members of each Payment Group solely with respect to the members of their

Family Group, and, any such representation made by the members of a particular Payment Group, to the extent necessary, assumes the accuracy of any corresponding representation made by any Sackler Party that is not a member of such Payment Group.

(a)    Exhibit E-1 sets forth:

(i)    a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties, other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement); and

(ii)    with respect to the A-Side IAC Payment Parties and the B-Side IAC Payment Parties, respectively, a true and complete list of all Subsidiaries of such A-Side IAC Payment Parties and B-Side IAC Payment Parties that directly or indirectly holds any common and preferred equity interests in any IAC (and with respect to each such Subsidiary that is not wholly-owned by a single A-Side IAC Payment Party or B-Side IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)    Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity.

(c)    All Equity Interests in each IAC that are owned, directly or indirectly by a member of a Family Group or any other Sackler Party are owned through one or more IAC Pledged Entities.

(d)    All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)    Except as set forth in Exhibit E-3, (i) the A-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs and (ii) the B-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs.

(f)    Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.

(g)    The IAC Pledgors are comprised of all or certain of the IAC Payment Parties and their Subsidiaries.

(h)    All loans owed by an IAC to a Sackler Party are either an Intercompany Loan or an IAC Loan.

(i)    Any option to purchase any Equity Interests in an IAC held by any IAC Holding Company or any Subsidiary of an IAC Payment Party has been exercised.

**Section 7.06      List of Assuring Parties**. Exhibit K represents a true and complete list of each of the Assuring Parties included in such Sackler Party's Family Group.

**ARTICLE 8.**
**COVENANTS**

**Section 8.01      Intentionally Omitted.**

**Section 8.02      Non-Circumvention.** Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement (including the Credit Support Annexes) or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as Exhibit V, (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) and also complies with all applicable limitations and requirements imposed under each Collateral Document to which such Sackler Party is a party, (C) the resulting entity or Trust is in the same Payment Group as its predecessor, (D) in the case of a Trust, each trustee and each Assuring Party that is a Power Holder of the continuing or resulting Trust shall have delivered to the MDT a Trust Certification and Further Assurances Undertaking, respectively, and (E) in the case of any change in the personal representatives of the JDS Estate, each personal representative and each Assuring Party that is a Power Holder of the JDS Estate shall have delivered to the MDT an Estate Certification and Further Assurances Undertaking, respectively.

**Section 8.03      No Interference.**  Each Sackler Party hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.  Each Sackler Party further covenants and agrees to comply with the provisions of the Plan applicable to it.

**Section 8.04      Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)      PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

60

(b)    The Parties agree, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPI Interests and the De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

Section 8.05    **MDT Shareholder Insurance Rights**.  The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

Section 8.06    **Naming Rights**.  Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09. For the avoidance of doubt, nothing in this Section 8.06 or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

Section 8.07    **No Side Agreements**.  No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.

Section 8.08    **Notification of Breach**.  If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties). Until the earlier of (i) the commencement of a Dispute Proceeding and (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a) of this Agreement, the Parties shall not disclose any occurrence or notice of Breach Trigger or Breach except (a) to the other Parties, (b) to their respective representatives and advisors to whom the confidential nature of such information is also disclosed, (c) as required by applicable law, rule, regulation, or ethical requirement, or by any governmental, judicial, administrative, regulatory or quasi-regulatory body or process or any self-regulatory organization or (d) as necessary, in the sole discretion of the MDT, to evaluate or consider enforcement of its rights and remedies in connection with such Breach Trigger or Breach or as necessary to notify potential affected parties as to the impact of such Breach Trigger or Breach on the MDT's abilities to fulfill its contractual or fiduciary duties (including its obligations under the Plan); *provided* that notice to potential affected parties shall not be through the making of a public announcement or public disclosure (whether by press release, social media posting or otherwise).

Section 8.09    **Opioid Business**.  Each Person listed on Exhibit H-1 (each a "Restricted Person") shall not, other than by way of ownership of the IACs (unless and to the extent such IAC is no longer owned (directly or indirectly) by such Person (other than Retained Interests)), engage directly or indirectly in the manufacturing or sale of opioids, provided, however, that this provision shall not prohibit: (a) any

61

investment in any third-party investment vehicle that is not controlled by any Restricted Person(s) and that makes investment decisions over which such Restricted Person has no discretion; *provided* that it is not an express investment purpose or objective of such third party investment vehicle to make investments in the opioid business or in entities engaged in the manufacturing or sale of opioids; (b) any investment in less than 5% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine or engaging in academic research on opioids); (d) investments held by such Restricted Person on the Agreement Effective Date and identified on Exhibit H-2 (or received as proceeds from dispositions of such investments); (e) only for so long as any IAC Payment Party directly or indirectly owns an IAC, activities related to MN Consulting LLC (as identified of Exhibit H-2), including serving as a director or officer thereof; or (f) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine or engaging in academic research on opioids. To the extent that any Restricted Person engages in dispositions, sales or other transfers in order to comply with this provision, such dispositions, sales or other transfers shall not be with Persons known to such Restricted Person to be Related Parties, *provided* that for the purposes of this provision, Related Parties shall not include any IAC, any IAC Holding Company or any IAC Pledged Entity that is as of the time of determination not still owned or controlled by any of the Sackler Parties. In the event a Restricted Person holds an investment or interest in a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this Section 8.09 but for this sentence, the holding of such interest or investment shall not be a violation of Section 8.09 so long as (i) such Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible within 90 days (in the case of marketable securities) or 180 days (in the case of non-marketable securities) of learning of the pertinent facts of such acquisitions or change in business, and (ii) such Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

Section 8.10    **Additional Assuring Parties**. The Sackler Parties shall use reasonable best efforts to cause each Power Holder promptly to execute a Further Assurances Undertaking upon such Person becoming a new Power Holder with respect to any relevant power and promptly notify the MDT of any difficulties encountered in obtaining the same.

Section 8.11    **Opinions of Counsel**. If counsel to the Ad Hoc Committee or counsel to the Creditors' Committee seeks to secure any Opinions of Counsel as to (1) the enforceability of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents or (2) the perfection of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents, then the applicable Payment Parties and IAC Pledgors shall cooperate with the reasonable requests of such counsel related to the provision of such Opinions of Counsel, *provided* that such cooperation shall not be required if counsel to the applicable Sackler Party has provided the applicable Opinion of Counsel or has communicated to counsel to the Ad Hoc Committee and counsel to the Creditors' Committee that it will provide the applicable Opinion of Counsel (and such Opinion of Counsel is actually provided) .

Section 8.12    **Refundings**. Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all

other obligations of the recipient Trust to the fullest extent permitted by applicable law), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

**Section 8.13    Additional IACs**.  Each Sackler Party hereby covenants and agrees that, in the event there is an entity that is as of the Agreement Effective Date a non-U.S. pharmaceutical operating company Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties is not listed in Exhibit E-1 (other than those entities set forth on Exhibit E-2), the applicable Sackler Parties shall, within 90 days of becoming aware of any such entity and that it is not listed on Exhibit E-1, deliver to the Parties an amended Exhibit E-1 that includes such company and such company shall constitute an "IAC" for all purposes under this Agreement as of the date of such delivery.  Each Sackler Party that owns (directly or indirectly) Equity Interests in such IAC, as may reasonably be requested by the MDT, shall become an IAC Payment Party under this Agreement and/or shall cause any of its Controlled Affiliates that own any Equity Interest in such IAC to become an IAC Payment Party under this Agreement (in each case to the extent it is not already an IAC Payment Party).  Each such Sackler Party shall (or shall cause a Controlled Affiliate to) grant a security interest in an entity that directly or indirectly owns 100% of the Equity Interests of such IAC owned (directly or indirectly) by such Sackler Party to the MDT pursuant to Section 3.07.  For the avoidance of doubt, any IAC Payment Party that becomes party to this Agreement subsequent to the Agreement Effective Date pursuant to this Section 8.13 shall be bound by, and subject to the terms of, this Agreement applicable to IAC Payment Parties (including with respect to such newly added IAC) as of the date an amended Exhibit E-1 is delivered to the Parties pursuant to this Section 8.13 (and any representations and warranties made pursuant to this Agreement shall be made as of the date of such delivery) and all references in this Agreement to "Agreement Effective Date" and "Settlement Effective Date" shall, with respect to any such new IAC Payment Party and IAC, be understood to be the date of such delivery.

## ARTICLE 9.
## BREACH AND REMEDIES

**Section 9.01    Breach**.  The events described in this Section 9.01 shall, as specified herein, constitute a "Breach Trigger", "Specified Breach" or "Non-Specified Breach":

(a)    Non-Payment

(i)    The Payment Parties in a Payment Group fail to pay when due all or any portion of (A) the Full Outstanding Settlement Amount (including any Funding Deadline Obligation and, if applicable, any Additional A-Side Amount Payment) owed by such Payment Group pursuant to Article 2 (excluding obligations referenced in the succeeding clause (ii)) or (B) any Breach Fee pursuant to Section 9.05, each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)    Any IAC Payment Party fails to (A) pay when due all or any portion of any Net Proceeds Payment pursuant to Section 2.02 or (B) deposit Sale Proceeds or IAC Distributions in an IAC Account pursuant to Section 3.07(c), each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

For the avoidance of doubt, no Specified Breach by any Payment Group under this Section 9.01(a) shall be a Specified Breach by any other Payment Group and no obligations of any Payment Group shall be affected by a Breach by any Payment Party pursuant to this Section 9.01(a), other than a Payment Party in such

Payment Group. For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this <u>Section 9.01(a)</u>.

(b)    <u>IAC-Related Specified Breaches</u>.  Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days (or such different period solely to the extent set forth in this <u>Section 9.01(b)</u>), shall constitute a Specified Breach with respect to such IAC Payment Party (or, with respect to <u>Section 9.01(b)(iv)</u>, the applicable Payment Parties specified therein):

(i)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in <u>Section 3.01(a)(iii)</u>;

(ii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in <u>Section 3.07(c)</u> or <u>Section 3.07(e)</u>;

(iii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in <u>Section 3.07(d)</u>, <u>Section 3.07(f)</u> or <u>Section 3.07(g)</u>; *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger continues for 60 or more days; and

(iv)    Any Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) fails to comply with the obligation set forth in the last paragraph of <u>Section 3.03(a)</u>, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party (or Payment Group associated with the Family Group of the applicable Family Member). For the avoidance of doubt, upon a payment by the applicable Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) of amounts due to the MDT under the last paragraph of <u>Section 3.03(a)</u>, a Breach Trigger or Breach shall no longer be continuing with respect to this subparagraph.

(c)    <u>End of Sale Period</u>.

(i)    Any IAC Payment Party has failed to perform or observe any term, covenant or agreement contained in <u>Section 3.08(c)(i)</u> with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such IAC or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, notwithstanding <u>Section 9.03</u>, shall constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party

(ii)    Any IAC Payment Party has failed to perform or observe any term, covenant or agreement contained in <u>Section 3.08(c)(ii)</u> with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such IAC or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party.

(iii)    If a Sale has not been effectuated with respect to all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in any of the IACs and/or (B) the assets of any of the IACs (excluding any Retained Interests) prior to the end of the Sale Period (and if any IAC Payment Party has not transferred the Pledged Shares to the MDT in lieu of foreclosure in accordance with a direction by the MDT pursuant to Section 3.08), such failure shall constitute a Non-Specified Breach with respect to each IAC Payment Party holding direct and/or indirect Equity Interests in such IACs; *provided* that, with respect to a Non-Specified Breach described in this Section 9.01(c)(iii), the sole remedy of the MDT shall be to exercise the Payment Remedy (notwithstanding that such Breach is a Non-Specified Breach) in respect of the Non-Specified Breach and to foreclose on the IAC Pledged Shares or liquidate or direct the liquidation thereof in accordance with the applicable IAC Collateral Documents and otherwise exercise remedies against the IAC Collateral as provided in (and subject to) this Agreement and the applicable IAC Collateral Documents; *provided*, *further*, that (A) no Breach Fee shall be applicable as a result of the exercise of such Payment Remedy, (B) the exercise of such Payment Remedy against any IAC Pledgor shall not create, impose or accelerate any Obligation of any other Payment Party, (C) in the case of a Payment Remedy pursuant to this Section 9.01(c)(iii), the MDT shall only be permitted to exercise remedies with respect to the IAC Collateral in accordance with the IAC Collateral Documents and not with respect to any other assets or any other Collateral of any IAC Payment Party and, subject to the rights and remedies of the MDT under the IAC Collateral Documents, the MDT shall otherwise forbear from seeking to collect any payment from any Payment Party (including the breaching IAC Payment Party), (D) such IAC Payment Party shall continue to comply with its obligations hereunder and the IAC Collateral Documents, subject to the terms and limitation set forth herein and therein (and the exercise of the Payment Remedy pursuant to this Section 9.01(c)(iii) shall not give rise to any obligation of any IAC Payment Party to make any payments other than pursuant to such terms and subject to such limitations), and (E) this Section 9.01(c)(iii) shall not be deemed or construed to affect or impair any rights or remedies that the MDT or any other Secured Party now or may in the future have (and in no event shall the MDT or any other Secured Party be deemed to have waived any of its rights or remedies) under this Agreement, any Collateral Document, any other Definitive Document or applicable law in connection with any other Breaches by an IAC Payment Party or any other Party.

(d)    Confessions of Judgment.  Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 11.05 (Confession of Judgment), which shall (i) with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties); and (ii) with respect to any other term, covenant or agreement contained in Section 11.05, constitute a Breach Trigger upon notice by the MDT to the Sackler Parties' Representative of such Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties).

(e)    Clawback of Payment.  If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by

65

the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)    Contest of Validity of Agreement.    Any Sackler Party, through a legal proceeding, (i) contests in writing the validity or enforceability of any provision of this Agreement or any Definitive Document (including in any judicial forum or by asserting that the Agreement or any Definitive Document to which such Sackler Party is a party does not constitute a valid and binding obligation of such Sackler Party), (ii) denies in writing that it has any further liability or obligation under the Agreement or any other Definitive Document (other than in accordance with its terms including as a result of payment in full of its Payment Group's Full Outstanding Settlement Amount and all other Obligations), (iii) purports in writing to revoke or rescind the Agreement or the Collateral Documents to which it is a party or (iv) purports in writing to challenge the validity, enforceability or perfected nature of the liens created thereby, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party; *provided* that (A) this provision shall not limit any Party's rights to assert arguments with respect to the interpretation or applicability of any provision of this Agreement and (B) any act or omission by a Sackler Party that would otherwise constitute a Breach Trigger or Breach under this Section 9.01(f) with respect to the Payment Group that includes such Sackler Party shall instead constitute a Breach Trigger or Breach under this Section 9.01(f) solely with respect to such Sackler Party if the Breach Trigger or Breach occurs after such Sackler Party becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding.

(g)    Insolvency.    (i) Any Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Payment Party and the appointment is undischarged or unstayed for 30 days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Payment Party or to all or a material part of its property is instituted without the consent of such Payment Party and continues undismissed or unstayed for 30 days, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in clauses (i) through (iv), as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)    Inability to Pay Debts; Attachment. (i) Any Sackler Party enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) or (ii) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within 30 days after its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with

respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(i)    Judgments.  There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(j)    Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including any successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee thereof) or (2) is not enforceable against such Payment Party (or any successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to Section 9.02(a)(v), upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(k)    Intentionally omitted.

(l)    Collateral.  Except as otherwise provided in this Agreement or any Collateral Document, including to the extent any such perfection is not required hereunder or thereunder, and except as the direct and exclusive result of an action or a failure to act on the part of the Secured Party (including the failure to maintain possession of certificates or instruments actually delivered to it representing securities or other possessory collateral pledged under the Collateral Documents or to file Uniform Commercial Code continuation statement), (i) except as set forth in clause (ii) of this clause (l), any security interest and Lien on any of the Collateral purported to be created by any Collateral Document shall cease to be in full force and effect, or shall cease to give the Secured Party the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in and Lien on the Collateral thereunder in favor of the Secured Party), (ii) the Secured Party fails to have a validly perfected, first priority lien on and security interest in 100% of the Equity Interests of the IAC Pledged Entities or (iii) it shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days shall constitute a Specified Breach (x) in the case of a Breach by an IAC Payment Party, with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party), and (y) in the case of a Breach by any other Payment Party, with respect to the Payment Group whose obligations are secured by such Collateral.

(m)    Credit Support Annex Breaches.  Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)    A-Side Payment Group 1 Cross-Breach. If any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches this Agreement in a manner that constitutes a Specified Breach, such breach shall also constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)    Other Breaches.  To the extent not enumerated in this Section 9.01 or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

**Section 9.02    Remedies**.

(a)    Payment Group Breaches.

(i)    Upon notice (such notice, a "Breach Notice") from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in Section 9.01, a Payment Party (such Payment Group or Payment Party, as applicable, asserted to be in breach, the "Breaching Party"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to Section 11.11(b) of this Agreement or otherwise (such proceeding brought pursuant to this Section 9.02(a)(i), a "Dispute Proceeding"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice (and the Remedies Forbearance Period shall be deemed to have expired after such ten (10) Business Day period if such Dispute Proceedings are not brought), (C) the sole issue that such Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to

whether such Breach Trigger or Specified Breach has occurred. The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period shall not apply to (x) the Specified Breaches referenced in Section 9.01(a)(i) (Non-Payment), *provided* that the MDT complies with its obligations set forth in Section 9.02(e), (y) the Specified Breaches referenced in Section 9.01(a)(ii) with respect to amounts that are not disputed in good faith and (z) Non-Specified Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying such Breach Trigger. For the avoidance of doubt, the MDT may exercise its rights and remedies under Article 9 through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii) If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in Section 9.03, with respect to each applicable Breaching Party, the MDT may:

(A) Option 1:

(i) Declare the Full Outstanding Settlement Amount of the Payment Group of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Breaching Party (the "Payment Remedy"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in Section 9.01(g) (Insolvency), the Payment Remedy shall be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii) The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount and the other Obligations of the applicable Payment Group from the Breaching Party or to enforce the performance by the Breaching Party of any provision of this Agreement and the Collateral Documents; and

69

(iii)    The Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)    Option 2: If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members (it being understood for all purposes of this section that with respect to any such member of a Family Group that is an officer, director, trustee or protector with respect to trusts in the pertinent Family Group, such party is liable solely in their capacities as such) and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties; whereupon (ii) the members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred), the Debtors, the MDT, and each of the Releasing Parties (as defined in the Plan) with respect to the members of such Family Group and the Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred); (iv) this Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, except for any provisions thereof regarding reinstatement or any provisions contemplated to survive pursuant to Section 11.17 that shall survive indefinitely, *provided* that this Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iii)    The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in Section 9.02(a)(ii)(A) simultaneously with the Release Remedy. If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release

Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)). The MDT's exercise of remedies shall also be subject to the following:

> (A)    Following the election of the Payment Remedy with respect to a Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided* that during such period, the MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to continue or continue to exercise the Payment Remedy with respect to such Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties. For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Breaching Party, but such Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation in connection with the exercise of the Release Remedy. For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

> (B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to this Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)    Intentionally omitted.

(v)    In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(j) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

> (A)    [such Sackler Party is a De Minimis Payment Party; *provided* that the Net Assets of such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) and (j) and applied this Section 9.02(a)(v)(A) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement Amount of such Sackler Party's Payment Group as of the Settlement Effective Date; or

(B)    the Net Assets of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the 90th day following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.][3]

(vi)    With respect to A-Side Payment Group 1 and A-Side Payment Group 7 (each of which includes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall give rise to remedies in respect of, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to, Millennium Trust and Perelle Bay Trust in addition to all other Payment Parties within such Payment Group that are not Crossover Members; *provided* that the proceeds resulting from any such exercise of remedies shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7, with the proceeds segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)    In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)    If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)    The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)    Delay or Omission. A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)    Waiver of Past Breaches. The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in

---

[3] Note to Draft: Under discussion.

Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    <u>Priorities</u>. If a Breach has occurred, and the Secured Party collects any cash or property from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order: *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party into an escrow account to secure the Obligations of A-Side Payment Group 7.

(e)    <u>Funding Deadline Notification</u>.

(i)    <u>Sackler Parties' Representative's Obligation to Deliver Funding Deadline Report</u>. No later than (A) 180 days prior to any Funding Deadline (other than the second Funding Deadline) and (B) 90 days prior to the second Funding Deadline (provided that, with respect to <u>clauses (A) and (B)</u> of this <u>Section 9.02(e)(i)</u>, if the day the period expires is not a Business Day, then the Funding Deadline Report will be due two business days after the day the period expires), the Sackler Parties' Representative shall provide MDT with a report (a "<u>Funding Deadline Report</u>") setting forth reasonably detailed, good faith calculations of (v)(1) the Cumulative Minimum Required Settlement Amount as of such Funding Deadline, (2) the Aggregate Payments made or required to have been made by all Payment Groups as of such Funding Deadline (but without giving effect to payments required to be made on such Funding Deadline and (3) the amount of any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of such Funding Deadline Report, (w) the Full Outstanding Settlement Amount of each Payment Group, with reasonable detail regarding the Outstanding Settlement Amount of each Payment Group and any remaining obligations to make Additional A-Side Amount Payments of each A-Side Payment Group, (x) the Settlement Amount Balance of each Payment Group, (y) the amount of all prepayments by each Payment Group that are not yet Aggregate Payments, and (z) the Funding Deadline Obligation and any Additional A-Side Amount Payment owed by each Payment Group on the next Funding Deadline; *provided* that (A) if a payment is made to the MDT pursuant to <u>Section 2.02</u> or any prepayment pursuant to <u>Section 2.01(e)</u> or <u>Section 2.10</u> or payment pursuant to the last paragraph of <u>Section 3.03(a)</u> or pursuant to <u>Section 3.07(e)</u> or (B) any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of delivery of the Funding Deadline Report, in each case, is made after the Sackler Parties' Representative has provided an initial Funding Deadline Report with respect to a particular Funding Deadline in accordance with this <u>Section 9.02(e)(i)</u>, then no later than (x) 10 Business Days following any payment to the MDT pursuant to <u>Section 2.02</u> or (y) 10 Business Days following any prepayment pursuant to <u>Section 2.01(e)</u> or <u>Section 2.10</u> or payment pursuant to the last paragraph of <u>Section 3.03(a)</u> or pursuant to <u>Section 3.07(e)</u>, or payment of any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of delivery of the Funding

Deadline Report, the Sackler Parties' Representative shall provide an updated Funding Deadline Report, which updated Funding Deadline Report shall constitute the Funding Deadline Report for purposes hereof.  Notwithstanding anything to the contrary herein, if the Sackler Parties' Representative delivers an updated Funding Deadline Report, pursuant to the immediately preceding sentence, less than 60 days prior to any Funding Deadline, the MDT shall have the right (exercisable by written notice to the Sackler Parties' Representative on or prior to the earlier of the Business Day immediately preceding the applicable Funding Deadline and the day that is 10 Business Days following receipt of such report), to disregard such updated Funding Deadline Report (except with respect to any additional payments made to the MDT), solely for purposes of calculating the amount due at such Funding Deadline pursuant to this Section 9.02(e).

(ii)    MDT Right to Deliver Dispute Notice.  If the MDT disagrees with any of the amounts in the Funding Deadline Report, the MDT may deliver a notice of dispute to the Sackler Parties' Representative setting forth the MDT's reasonably detailed, good faith calculation of such amounts and the basis for its dispute (an "MDT Dispute Notice"). Delivery of such MDT Dispute Notice to the Sackler Parties' Representative shall trigger a period of 15 Business Days wherein the Parties shall work in good faith to resolve the dispute. If the dispute remains unresolved after such period of 15 Business Days, the MDT shall request that the Bankruptcy Court make a determination to resolve the dispute.

(iii)    Payment Following Resolution. Following the resolution of any dispute over the Funding Deadline Obligation and/or Additional A-Side Amount Payments of any Payment Group on a Funding Deadline (whether by resolution of the Parties or by determination of the Bankruptcy Court), (A) if the dispute is resolved on or after the 10th Business Day prior to such Funding Deadline but on or prior to such Funding Deadline, the applicable Payment Group shall pay, at its election, either (1) on such Funding Deadline, the amount payable by such Payment Group pursuant to such resolution or (2) on such Funding Deadline, the amount that would have been payable by such Payment Group pursuant to Section 9.02(e)(iv) had such dispute not been resolved on or prior to such Funding Deadline, and  on the 10th Business Day following such resolution, the balance of the amount payable pursuant to such resolution and (B) if the dispute is settled prior to the 10th Business Day prior to such Funding Deadline or after such Funding Deadline the applicable Payment Group shall pay all disputed amounts on the applicable Funding Deadline (it being understood that failure by the applicable Payment Group to pay such amounts by the applicable deadline or deadlines shall give rise, with respect to such Payment Group, to a Specified Breach by the Payment Group that is not subject to Section 9.02(a)(i)). For the avoidance of doubt, notwithstanding the foregoing sentence, if any such dispute is resolved prior to the applicable Funding Deadline, all undisputed amounts shall be paid on such Funding Deadline in accordance with Article 2.

(iv)    Payments if Dispute Unresolved at Funding Deadline.  If, on any Funding Deadline, any dispute with respect to any Payment Group's Funding Deadline Obligation and/or Additional A-Side Amount Payment has not been resolved, notwithstanding anything else contained in this Agreement, each Payment Group shall pay, on or before such applicable Funding Deadline (and there shall be no Specified Breach by any Payment Group or any Payment Party if the applicable Payment Group or Payment Party pays):

(A)    If the MDT delivered an MDT Dispute Notice within 60 days of receipt of the last Funding Deadline Report: such Payment Group's Funding Deadline Obligation as set forth in the MDT Dispute Notice; provided, if (1) the sum of (X) the Funding Deadline Obligations set forth in the Funding Deadline Report of the Payment Groups for which the MDT has not delivered an MDT Dispute Notice (or which the MDT does not dispute in

the MDT Dispute Notice) plus (Y) the Funding Deadline Obligations set forth in any MDT Dispute Notices of the Payment Groups for which the MDT has delivered an MDT Dispute Notice, is greater than (2)(X) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline minus (Y) the aggregate payments made or required to have been made by all Payment Groups pursuant to Article 2 of this Agreement (other than Section 2.10) as of immediately prior to such Funding Deadline, then each applicable Payment Group or Payment Party shall pay the amount set forth in the Funding Deadline Report;

(B)    If the MDT delivered an MDT Dispute Notice more than 60 days after receipt of the last Funding Deadline Report or if the MDT did not deliver an MDT Dispute Notice: the Funding Deadline Obligation set forth in the last Funding Deadline Report delivered to the MDT by the Sackler Parties' Representative prior to the Funding Deadline; and

(C)    If the MDT delivered an MDT Dispute Notice disputing the calculation of such Payment Group's A-Side Additional Amount Payment: the lesser of (1) the A-Side Additional Amount Payment of such Payment Group set forth in the MDT's Funding Deadline Notice or (2) $3.125 million.

*provided* that, any payment made by a Payment Group pursuant to this Section 9.02(e) shall be deemed a payment made pursuant to Section 2.01(c) or (d), as applicable; and *provided further*, that contemporaneously with any payments required by Section 9.02(e)(A) and (B), the A-Side Payment Groups shall pay, or cause to be paid, in the aggregate, the Additional A-Side Amounts due pursuant to Section 2.10 to the extent such amount is payable pursuant to Section 2.10; and *provided further*, that if at any time after the applicable Funding Deadline the MDT determines that any additional amounts are due and owing on such Funding Deadline in respect of a Payment Group's Funding Deadline Obligation or Additional A-Side Amount Payment, in each case, after receipt of the payments contemplated by Section 9.02(e)(iii) or (iv) by such Payment Group, the MDT may serve a Breach Notice to such Payment Group for failure to pay such additional amounts, which shall constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Payment Group, *provided* that, notwithstanding anything else contained in this Agreement, (i) the terms of Section 9.02(a)(i) shall apply to such Breach Trigger or Breach, including the Remedies Forbearance Period, and (ii) if the applicable Payment Parties pay any such additional amounts while such Breach Trigger is continuing or during any Remedies Forbearance Period, no Breach Fee shall be payable with respect to any such amounts.

(v)    Post-Resolution True-Ups. If the Bankruptcy Court determines (or the Parties subsequently determined) that the amount paid by any Payment Group in accordance with Section 2.01(c) or (d), as applicable (including pursuant to the foregoing Section 9.02(e)(iii) or (iv)) is (A) in excess of the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Overpaying Payment Group" and the amount of such excess with respect to an Overpaying Payment Group, the "Overpayment Amount"), then the Overpayment Amount shall be deemed to be a prepayment pursuant to Section 2.01(e) or Section 2.10, as applicable, by the Overpayment Payment Group and (B) less than the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Underpaying Payment Group" and the amount of such underpayment with respect to an Underpaying Payment Group, the "Underpayment Amount"), then the Underpaying Payment Group shall pay or cause to be paid, on the next Funding Deadline, the Underpayment Amount to the MDT in addition to any Funding Deadline Obligation or Additional A-Side Amount owing by

the Underpaying Payment Group on such Funding Deadline; provided, to the extent that the aggregate payments made by all Payment Groups on such Funding Deadline are less than the aggregate amount required to be paid by all Payment Groups on such Funding Deadline, then each Underpaying Payment Group shall pay or cause to be paid its Underpayment Amount within 30 days following the determination by the Bankruptcy Court.

(vi)    Updated Funding Report. Within 30 days of any determination by the Bankruptcy Court set forth in the foregoing Section 9.02(e)(v) the Sackler Parties' Representative shall deliver to the MDT an updated Funding Deadline Report setting forth in reasonable detail a good faith calculation (which calculations shall be consistent with such determination by the Bankruptcy Court) of the amounts set forth in clauses (v) through (z) in the foregoing Section 9.02(e)(i).

(vii)    Use of Net Proceeds Reports. Any calculations provided pursuant to these terms by either the MDT or the Sackler Parties' Representative shall incorporate, without alternation, the information provided in the applicable Net Proceeds reports prepared by an Approved Accountant pursuant to Section 3.02(a)(iii).

(viii)    Confirmation of Receipt of Payments. Following receipt of each payment by or on behalf of a Payment Group, the MDT shall provide the Sackler Parties' Representative with notice of receipt of such payment, which notice shall include (A) the amount of such payment, (B) the aggregate payments received as of such date, and (C) any payments to the MDT, the Appeals Account, any Creditor Trust, or any recipient of a distribution from the Creditor Trust that, to the MDT's knowledge, have been disgorged, turned over, or otherwise paid as Recovery.

(ix)    Payment Obligations Independent. Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that no failure of the Sackler Parties' Representative to deliver the notice contemplated by Section 9.02(e)(i) shall relieve any Payment Party of its payment Obligations hereunder.

**Section 9.03    Certain Limitations**. Notwithstanding anything to the contrary set forth herein, except for the matters set forth in Section 9.01(c)(i) and Section 9.01(c)(ii), with respect to any A-Side General Obligor or any other Crossover Member (other than Millennium Trust and Perelle Bay Trust), and any Payment Group that contains any such Crossover Member (including each A-Side Payment Group with respect to the A-Side General Obligors):

(a)    No A-Side General Obligor shall have any liability or obligation in respect of any covenant or other obligation of any other Payment Party, but shall be liable only for the obligations specifically applicable to such A-Side General Obligor (excluding, for the avoidance of doubt, any such obligations that arise solely as a result of being included in a Payment Group but including, for the avoidance of doubt, its obligations as an A-Side General Obligor under Section 2.01(c)).

(b)    A Breach by a Crossover Member (including any A-Side General Obligor, but excluding Millennium Trust and Perelle Bay Trust) shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member.

(c)    A Breach by any Payment Party that is not a Crossover Member (or a Breach by any Payment Group of which such Crossover Member is a member that is not the result of a Breach by such Crossover Member) shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover

Member (including any A-Side General Obligor but excluding Millennium Trust and Perelle Bay Trust). For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group and, as applicable, the Designated Shareholder Released Parties.

(d)    No A-Side General Obligor shall have any obligation in respect of any Breach Fee payable by any Payment Group (or by any other Payment Party), but shall be liable only for any Breach Fee payable in respect of a Breach by such A-Side General Obligor pursuant to Section 9.01.

**Section 9.04    Trustee and Personal Representative Liability**.    The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; any remedy, recourse or right of recovery against a Trust or the JDS Estate is limited to the assets of such Trust or the JDS Estate, as the case may be; and the trustees of such Trusts or personal representative of the JDS Estate shall have no personal liability hereunder except in the case of a trustee's or personal representative's own fraud or willful misconduct. For purposes of this Section 9.04, the term "willful misconduct" means action taken (or not taken) in bad faith and with actual knowledge that such action (or failure to act) is unlawful, prohibited or false and will be harmful to the MDT with respect to its rights or remedies under this Agreement.

**Section 9.05    Breach Fee**.    The Breaching Party shall pay a fee to the MDT on (A) the Full Outstanding Settlement Amounts and (B) any other Obligations (other than Breach Fee amounts) that are, in the case of this clause (B), then due and owing by the Breaching Party, in each case in an amount equal to 10% per annum (a "Breach Fee"), which fee shall accrue from and after the date of the occurrence of a Specified Breach and be payable upon demand and shall continue until the earlier of the date (i) such Specified Breach is no longer continuing or (ii) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid; *provided* that:

(A) no Breach Fee shall accrue from and after the date of the occurrence of a Specified Breach or be payable in accordance with the foregoing if the Breaching Party has cured such Specified Breach prior to the expiration of the Remedies Forbearance Period;

(B) if the Breaching Party initiates a Dispute Proceeding in accordance with Section 9.02(a)(i), the Breaching Party shall reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding unless the Bankruptcy Court determines that a Specified Breach has not occurred; and

(C) the Breaching Party acknowledges and agrees that if no Breach Fee is payable as a result of clause (A) of this proviso, the MDT may seek compensatory damages from the Breaching Party (either during a Dispute Proceeding or in a subsequent proceeding) in connection with such Specified Breach.

For the avoidance of doubt:

(A) If the Breaching Party seeks to initiate a Dispute Proceeding in accordance with Section 9.02(a)(i) and the Bankruptcy Court determines that there is not a good faith dispute with respect to the Specified Breach, (i) the Breach Fee shall accrue from and after the date of the occurrence of a Specified Breach and be payable upon demand and shall continue until the earlier of the date (x) such Specified Breach is no longer continuing or (y) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid, and (ii) the Breaching

Party will reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding; and

(B) if the Bankruptcy Court determines following a Dispute Proceeding in accordance with Section 9.02(a)(i) that a Specified Breach has not occurred, no Breach Fee or any other amounts shall be owed or payable in connection therewith by the Breaching Party (and the Breaching Party shall not be required to reimburse the MDT for any legal fees or expenses incurred in connection with such Dispute Proceeding).

The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.

Section 9.06    Reinstatement.  In the event the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any Recovery as contemplated under Section 9.01(e), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery. If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been paid to the MDT pursuant to Section 9.01(e).

## ARTICLE 10.
## CONDITIONS PRECEDENT

Section 10.01    Settlement Effective Date.

(a)    The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Sackler Parties' Representative and the MDT, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed) (except with respect to the conditions in subparagraphs (iv)-(vi), (viii)-(x), and (xii)-(xvii) in this Section 10.01(a), which may be waived by the MDT in its sole discretion, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed)) (provided that should the MDT waive any of the conditions specified below without the consent of the Sackler Parties' Representative, the failure of a Sackler Party to satisfy such waived condition shall not be a basis for the MDT (or any other Party) to subsequently claim that there has been a Breach due to such failure):

(i)    the Disclosure Statement Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)    the Confirmation Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)    the Rosetta Trust shall have been funded by one or both of the Funding Trusts with Cash Equivalents (as defined in Annex B) in an amount not less than the Initial Collateral Account Amount (as defined in Annex B);

(v)        the approval of the terms of this Agreement and the Definitive Documents, and of the appointment in further trust of the funding of the Rosetta Trust by one or both of the Funding Trusts as set forth in Section 10.01(a)(iv) and the confirmation of the authority of the trustees of each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a pleading to be brought before that court by each Relevant Jersey Trust and to which all beneficiaries required for the Royal Court of Jersey to issue an order binding on all trust beneficiaries thereof (including those not in attendance) are to be convened and shall have the ability/opportunity to object to the grant of such approval to the trustees of each such Relevant Jersey Trust;

(vi)        the MDT shall have received a certificate executed by the trustees of the Rosetta Trust certifying which of the Funding Trusts provided all or any portion of the funding set forth in Section 10.01(a)(iv) and that attached thereto is a true and correct copy of the Funding Trust Appointment with respect to each such Funding Trust and that each such Funding Trust Appointment was consented to by all of the beneficiaries necessary under the laws of such Funding Trust's Jurisdiction of Administration to non-judicially settle an account of proceedings of the trustees thereof covering the exercise of the power of appointment referred to in Section 10.01(a)(iv);

(vii)        the Master Disbursement Trust has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement;

(viii)        the MDT shall have received a copy of the Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(a)(v) above;

(ix)        the MDT shall have received Opinions of Counsel regarding:

(A)        The corporate and/or trustee authority of the Sackler Parties that are not natural persons to enter into this Agreement and the Collateral Documents except, with respect to any Trust, solely to the extent such authority is addressed to the reasonable satisfaction of the MDT in the Court Order received by the MDT pursuant to Section 10.01(a)(viii); and

(B)        The corporate and/or trustee authority of the IAC Payment Parties that are not natural persons and the IAC Pledgors to enter into the IAC Collateral Documents;

(x)        each of the Persons listed on Exhibit K shall have executed and delivered to the MDT a Further Assurances Undertaking substantially in the form of Exhibit O;

(xi)        the Plan Effective Date shall have occurred;

(xii)        the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group;

(xiii)        the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith;

(xiv)    the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P;

(xv)    the personal representative of the JDS Estate shall have provided an Estate Certification to the MDT substantially in the form of Exhibit R;

(xvi)    each Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by the covenant set forth in Section 8.09; and

(xvii)    each Secondary Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by the covenant set forth in Exhibit H-3.

(b)    The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date. Notwithstanding the foregoing sentence, the following obligations (and only the following obligations) shall become effective upon the Agreement Effective Date (provided that the obligations of any A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) shall become effective only on the date such A-Side Payment Party receives a Court Order applicable to it described in Section 10.01(a)(v)):

(i)    The obligations set forth in Section 2.11 (Pre-Plan Effective Date Net Proceeds), Section 8.03 (No Interference), Section 8.07 (No Side Agreements), Section 8.08 (Notification of Breach), Section 8.09 (Opioid Business), and Section 8.11 (Opinions);

(ii)    each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)    the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.

## ARTICLE 11.
## MISCELLANEOUS

**Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon receipt after dispatch by registered or certified mail, postage prepaid, (c) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (d) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as provided in a separately provided addendum to this Agreement (the "Notices Addendum").

Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this Section 11.01; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in the Notices Addendum by notice to the other Parties hereto.

**Section 11.02   Payments Received**.  Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense,

recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

**Section 11.03    Survival of Representations and Warranties**. All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

**Section 11.04    Remedies Cumulative; Specific Performance**. The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

**Section 11.05    Confession of Judgment**.

(a)    On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance reasonably satisfactory to the MDT, with respect to the obligations of such Sackler Party under this Agreement (assuming the maximum amount that may be owed by such Sackler Party under this Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement) (each, a "Confession of Judgment") and agrees, from time to time upon written request by the MDT, to deliver all supplements (or if so required, new Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such Confession of Judgment. For the avoidance of doubt, such supplements or new Confessions of Judgment may be signed on behalf of a Sackler Party by a guardian, conservator or other Person duly appointed to represent such Sackler Party and empowered to execute a Confession of Judgment binding on such Sackler Party under all applicable Law.

(b)    Each Sackler Party hereby irrevocably authorizes any attorney-at-law to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.

**Section 11.06    Entire Agreement; Severability; Amendments and Waivers**.

(a)        This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)        Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(c)        Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement. If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.

(d)        No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)        Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09). No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.

**Section 11.07    Intentionally Omitted**.

**Section 11.08    Sackler Parties' Representative**.

(a)      Designation.  Subject to the terms and conditions of this Section 11.08, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)      Authority.  By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby. Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party. All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)      Reliance. Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "Authorized Action"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)      Limitation of Liability. Each Sackler Party (including but not limited to each Sackler Party) acknowledges and agrees that the Sackler Parties' Representative shall have no liability to, and shall not be responsible for any costs or expenses, judgments, fines, losses, claims, damages or liabilities of, any Party or to or of any of their respective officers, directors, employees, Affiliates and/or agents in connection with any actions taken or omitted to be taken by the Sackler Parties' Representative under or in respect of this Agreement, except to the extent resulting from fraud or willful misconduct by the Sackler Parties' Representative.

(e)      Survival. All of the immunities and powers granted to the Sackler Parties' Representative hereunder shall survive the termination of this Agreement.

**Section 11.09    Binding Effect; Benefit; Assignment**.

(a)      The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns, except that the Creditors' Committee and the Ad Hoc Committee shall be third party beneficiaries of Section 10.01, entitled to enforce the provisions thereof as if party hereto.

(b)      No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to Exhibit F hereto to reflect changes not expressly contemplated by this Section 11.09, shall require the consent of the MDT). Any purported assignment of this Agreement in violation of this Section 11.09(b) shall be null and *void ab initio*.

**Section 11.10    Governing Law**.    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on Exhibit Q, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.

**Section 11.11    Jurisdiction; Contested Matter**.

(a)    The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided this Section 11.11(a) shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.11(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

(b)    The Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.

**Section 11.12    Waiver of Jury Trial**.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness**.    This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same

instrument. To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date. For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

Section 11.14   **Document Repository**.  The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

Section 11.15   **Defense of Shareholder Releases**.  If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or Cause of Action (as defined in the Plan) of any kind whatsoever against any Shareholder Released Party, in violation of the Shareholder Releases or based on an allegation that the Shareholder Releases do not apply to such Shareholder Released Party with respect to such proceeding, claim, or Cause of Action (and the Shareholder Released Party has a reasonable basis to believe that the Shareholder Releases do apply with respect to such proceeding, claim or Causes of Action), including by making a request for leave under Section 11.01(e) of the Plan that the applicable Shareholder Released Party has a reasonable basis to challenge, then the MDT shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT of such proceeding, claim, or Cause of Action and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel, to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement (which may include, for example and if appropriate under the applicable facts and circumstances, filing motions, pleadings, briefs, or other documents or papers; advancing arguments or positions; seeking available relief or remedies; supporting any arguments and any requests for a determination that such proceeding, claim, or Cause of Action is covered and barred by the Shareholder Releases; and taking other actions reasonably necessary and appropriate consistent with applicable Law to enforce the provisions of this Agreement), and the costs of doing so shall be borne exclusively by the MDT. For the avoidance of doubt, any Shareholder Released Party that is determined by a court of competent jurisdiction not to be covered by the Shareholder Releases with respect to any civil proceeding, claim, or Cause of Action shall retain, or shall have restored, all associated defenses, cross-claims, counterclaims, third-party claims, offsets and recoupments under applicable law that were, or would otherwise have been, transferred to the MDT or subsequently transferred to any Creditor Trust in accordance with Section 5.6(g) of the Plan and Section 10 of the Master TDP (as included in the Plan Documents) for the purposes of such civil proceeding, claim, or Cause of Action; *provided* that (i) no such defenses, claims or rights may be asserted by any Person, directly or indirectly, to seek or obtain any affirmative monetary recovery from any such Protected Party, unless such Protected Party is the Person initiating, pursuing, or prosecuting the applicable civil proceeding, claim, or Cause of Action (as defined in the Plan)) and (ii) nothing in the foregoing shall limit or affect the transfer of the MDT Shareholder Insurance Rights to the MDT under Section 5.6(j) of the Plan.

Section 11.16   **Certain Shareholder Released Party Insolvencies**.  Notwithstanding the Plan or anything to the contrary in this Agreement, if any Subsidiary of a Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, solely upon election by notice from the Sackler Party Representative to the MDT and with consent from the MDT, any Estate Cause of Action (as defined in the Plan) against such Subsidiary of a Payment Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunctions shall terminate, be rescinded and have no application with respect thereto) and the MDT, in its sole discretion

and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding. To the extent that any amounts are recovered on such Estate Causes of Action, such amounts shall be credited against the last (by year) amounts due under this Agreement from the Payment Group(s) corresponding to the Family Group(s) of which the applicable Subsidiary of a Payment Party is a member; *provided* that if the applicable Subsidiary of a Payment Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; *provided further* that any such amounts in excess of amounts due under this Agreement shall be paid directly to the applicable Payment Group or Payment Groups.

     **Section 11.17   Survival**. Notwithstanding anything to the contrary in this Agreement, <u>Sections 2.01(i)(ii)</u>, <u>2.01(i)(iii)</u>, <u>2.03(d)</u>, <u>2.04(b)</u>, <u>2.04(c)</u>, and <u>2.08(e)</u> shall survive termination of this Agreement solely as between the Sackler Parties and shall continue in full force and effect for the benefit of the applicable Parties in accordance with the terms hereof.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

[Debtor 2]


By: _____
    Name:
    Title:


[Debtor 3]


By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

**<u>Exhibit A</u>**
**Payment Groups and IAC Payment Parties[1]**

---

[1] <u>Note to Draft</u>: Exhibit under review.

**A-Side Payment Parties: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| *Second Tier Obligors*<br>Theresa E. Sackler 1988 Trust<br>Theresa E. Sackler 2008 Trust<br>Millennium Trust<br>Perelle Bay Trust | *Second Tier Obligor*<br>Rosetta Trust |
|  | *Third Tier Obligor*<br>Kathe Sackler |
| *Third Tier Obligor*<br>Theresa Sackler | *Fourth Tier Obligor*<br>None |
| *Fourth Tier Obligor*<br>None |  |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| *Second Tier Obligors*<br>Ilene S. Lefcourt Trust 88<br>Ilene S. Lefcourt Trust 96<br>ISL 2010 Family Trust<br>ISL 2011 Family Trust | *Second Tier Obligors*<br>MDAS Investment Trust<br>Mortimer DA Sackler Trust 1996<br>Mortimer DA Sackler Trust 2002<br>MDAS 2010 Family Trust<br>MDAS 2011 Family Trust<br>Trust Under Declaration of Trust No. 2 dated November 25, 1996<br>Trust under Agreement dated the 11th day of May 2005<br>Trust Under Declaration of Trust No. 1 dated November 25, 1996<br>MDAS Children's Trust 2012<br>Nixie Trust<br>Indian Wells Trust |
| *Third Tier Obligor*<br>Ilene Sackler Lefcourt | *Third Tier Obligor*<br>Mortimer D.A. Sackler |
| *Fourth Tier Obligor*<br>None | *Fourth Tier Obligor*<br>None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| *Second Tier Obligors*<br>MDS 2006 Trust<br>MDS 1992 Trust<br>MDS Beacon 2010 Trust<br>MDS Beacon 2011 Trust | *Second Tier Obligors*<br>MTS 2013 Family Trust<br>MTS 2016 Trust<br>MTS Beacon 2013 Trust<br>MTS Beacon 2014 Trust |

| MDS Family Trust 2010 | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| *Third Tier Obligor* | MTS Beacon Trust 2011 |
| None | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| *Fourth Tier Obligor* | |
| Theresa Sackler | *Third Tier Obligor* |
| | None |
| | |
| | *Fourth Tier Obligor* |
| | Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| SDS 1992 Trust | Romas Trust |
| SDS Beacon 2011 Trust | Sheffield Trust |
| SDS Family Trust 2010 | SSSH 2013 Family Trust |
| Millennium Trust | SSSH Beacon 2013 Trust |
| Perelle Bay Trust | Samantha Hunt 1996 Trust |
| | Samantha S Hunt 2002 Trust |
| *Third Tier Obligor* | |
| None | *Third Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |

**B-Side Payment Parties**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | New AJ Holding Company LLC[4] |
| New AR Holding Company LLC[2] | New 2A Trust Holding Company LLC[5] |
| New 1A Trust Holding Company LLC[3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | JDS Revocable Pourover Trust |
| RGT One LLC | JGT One LLC |
| RGT Three LLC | JGT Three LLC |
| RGT Two LLC | JGT Two LLC |
| Dr. Richard S. Sackler | Meridian International, Ltd. |
| Rosebay Medical Company, Inc. | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Temagami LLC |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
|  | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties |
| --- |
| Beacon Trust |
| Canadian Partnership Trust |
| Clover Trust |
| Fidinc Trust |
| Halm Trust |
| Hercules Trust |
| Medichem Trust |
| Memphis Pharma Trust |
| MIL Trust |
| Milton Trust |
| Mundilab Trust |
| Pickering Trust |
| Tom & Kelly Trust |
| Varus Trust |
| Taddeo Trust |
| Diagonal Blue Trust |

| B-Side IAC Payment Parties | |
| --- | --- |
| B-Side Payment Group 1 | B-Side Payment Group 2 |
| China Sea Company, Inc. | 1JM LLC |
| G3A LLC | 2JM LLC |
| G3D LLC | 3JM LLC |
| G3R LLC | China Sea Company, Inc. |
| Hudson River Partners | Estate of Jonathan D. Sackler |
| Meridian International, Ltd. | Hudson River Partners |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Hudson Trust |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | Irrevocable Trust under Declaration dated as of |
| RGT One LLC | December 29, 1992 |
| RGT Three LLC | JDS Revocable Pourover Trust |
| RGT Two LLC | JGT One LLC |
| Dr. Richard S. Sackler | JGT Three LLC |
| Rosebay Medical Company, Inc. | JGT Two LLC |
| Trust U/A 11/5/74 fbo Beverly Sackler | Meridian International, Ltd. |
| Trust under agreement dated December 23, 1980 | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| f/b/o Richard S. Sackler | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Trust under agreement dated December 3, 1979 | Rosebay Medical Company, Inc. |
| f/b/o Richard S. Sackler | Temagami LLC |
| Trust under agreement dated June 16, 1980 f/b/o | Trust U/A 11/5/74 fbo Beverly Sackler |
| Richard S. Sackler | Trust under agreement dated December 23, 1980 |
| | f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 |
| | f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o |
| | Jonathan D. Sackler |

**A-Side General Obligors**

| A-Side General Obligors |
| --- |

A-Side IAC Payment Parties

**Exhibit B**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

## Exhibit C
**Family Groups and Corresponding Payment Groups**

**A-Side Family Groups[1]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | BJSS 2010 Trust |
| Theresa E. Sackler 1988 Trust | BJSS 2013 Trust |
| Theresa E. Sackler 2008 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2012 Trust | JHSS 2010 Trust |
| TES Beacon 2013 Trust | JHSS 2013 Trust |
| TES Beacon 2014 Trust | KAS 2010 Family Trust |
| Millennium Trust[2] | KAS 2011 Family Trust |
| Perelle Bay Trust[3] | Kathe A. Sackler 2001 Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | Kathe A. Sackler Trust 88 |
|  | Kathe A. Sackler Trust 96 |
|  | SASS 2010 Trust |
|  | SASS 2013 Trust |
|  | SS Tanager Trust |
|  | Trust under Agreement dated the 13th day of March 2009 |
|  | Trust under Settlement dated 14 September 1998 |
|  | Trust under Settlement dated 16 September 1998 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Rosetta Trust |
|  | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |

---

[1] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

[2] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

[3] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.t.

| | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
|---|---|

| A-Side Family Group 3<br>*Corresponds to A-Side Payment Group 3* | A-Side Family Group 4<br>*Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| 533 Canal Trust | Indian Wells Trust |
| Ilene S. Lefcourt Trust 88 | MDAS 2010 Family Trust |
| Ilene S. Lefcourt Trust 96 | MDAS 2011 Family Trust |
| Ilene Sackler Lefcourt Revocable Trust | MDAS Children's Trust 2012 |
| ISL 2010 Family Trust | MDAS Investment Trust |
| ISL 2011 Family Trust | Mortimer DA Sackler Trust 1996 |
| ISL JML OSHA Trust | Mortimer DA Sackler Trust 2002 |
| ISL LT Children's Trust | Nixie Trust |
| JML 2010 Family Trust | Trust under Agreement dated the 11th day of May 2005 |
| JML 2011 Family Trust | |
| JML Investment Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML OSHA Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML Pour-Over Trust | |
| KLT 2010 Family Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) |
| Trust under Settlement dated 19 December 2000 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |

| | |
|---|---|
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 5 *Corresponds to A-Side Payment Group 5* | A-Side Family Group 6 *Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
|  | MTS Beacon Trust 2010 |
|  | MTS Beacon Trust 2011 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | MTS Beacon Trust 2012 |
|  | MTS Family Trust 2010 |
|  | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
|  | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7 *Corresponds to A-Side Payment Group 7* | A-Side Family Group 8 *Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |

| | |
|---|---|
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | |
| Millennium Trust[4] | |
| Perelle Bay Trust[5] | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

---

[4] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

[5] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

**B-Side Family Groups**

| B-Side Family Group 1[6]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
| --- |
| Dr. Richard S. Sackler[7] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |

---

[6] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[7] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[8]

New 1A Trust Holding Company LLC[9]

Property and entities possessed or owned by any Person within this Family Group at any time (or
the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not

---

[8] Entity to be included once formed.

[9] Entity to be included once formed.

directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

| B-Side Family Group 2[10]<br>*Corresponds to B-Side Payment Group 2*<br>(Jonathan Sackler Family) |
| --- |
| The surviving spouse of Jonathan D. Sackler |
| The descendants of Jonathan D. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[10] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler

MC Trust

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[11]

New 2A Trust Holding Company LLC[12]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

---

[11] Entity to be included once formed.

[12] Entity to be included once formed.

**<u>Exhibit D</u>**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

---

[11] <u>Note to Draft</u>: Exhibit under review.

**Exhibit E-1**
**(Section 7.05(a)(i))**

**IACs**

| IAC Name | Jurisdiction |
|---|---|
| Mundipharma Pharmaceuticals Argentina S.r.l. | Argentina |
| Mundipharma Healthcare Pty. Limited | Australia |
| Mundipharma Oncology Pty. Limited | Australia |
| Mundipharma Pty Limited | Australia |
| Mundipharma GesmbH | Austria |
| Mundipharma Medical CEE GmbH | Austria |
| Mundipharma BV | Belgium |
| Mundipharma Pharmaceuticals (Belgium) BV | Belgium |
| Bermag Limited | Bermuda |
| L.P. Clover Limited | Bermuda |
| Mundipharma International Corporation Limited | Bermuda |
| Mundipharma International Holdings Limited | Bermuda |
| Mundipharma International Limited | Bermuda |
| Mundipharma Laboratories Limited | Bermuda |
| Mundipharma Limited | Bermuda |
| Mundipharma Medical Company | Bermuda |
| Mundipharma Ophthalmology Corporation Limited | Bermuda |
| Mundipharma Ophthalmology Products Limited | Bermuda |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda. | Brazil |
| IAF Limited | British Virgin Islands |
| Mundipharma Medical S.ar.l. | Bulgaria Branch of Swiss Company |
| Bard Pharmaceuticals (1990) Inc. | Canada |
| Elvium Life Sciences GP Inc. | Canada |
| Elvium Life Sciences Limited Partnership | Canada |
| Elvium ULC | Canada |
| Mundipharma International (Canada) Inc. | Canada |
| Purdue Frederick Inc. | Canada |
| Purdue Pharma | Canada |
| Purdue Pharma Inc. | Canada |
| Mundipharma (China) Pharmaceutical Company Limited | China |
| Mundipharma (Shanghai) International Trade Company Limited | China |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. | China |
| Mundipharma (Colombia) S.A.S. | Colombia |
| Mundipharma Pharmaceuticals Limited | Cyprus |
| Mundipharma GesmbH | Czech Republic Branch of Austrian Company |

| | |
|---|---|
| Mundipharma A/S | Denmark |
| Mundipharma Middle East FZ-LLC | Dubai |
| Mundipharma Egypt LLC | Egypt |
| Scientific Office of Mundipharma MEA GmbH | Egypt |
| Mundipharma Oy | Finland |
| Mundipharma SAS | France |
| Krugmann GmbH | Germany |
| Mundichemie GmbH | Germany |
| Mundipharma Biologics GmbH | Germany |
| Mundipharma Deutschland GmbH & Co. KG | Germany |
| Mundipharma GmbH | Germany |
| Mundipharma Medical GmbH | Germany |
| Mundipharma Research GmbH & Co. KG | Germany |
| Mundipharma Research Verwaltungs GmbH | Germany |
| Mundipharma Verwaltungsgesellschaft mbH | Germany |
| Mundipharma (Hong Kong) Limited | Hong Kong |
| Mundipharma Medical GmbH | Hungary Branch of Swiss Company |
| Mundipharma Laboratories GmbH | Indonesian Branch of Swiss Company |
| PT. Mundipharma Healthcare Indonesia | Indonesia |
| Mundipharma Corporation (Ireland) Limited | Ireland |
| Mundipharma Pharmaceuticals Limited | Ireland |
| Mundipharma Pharmaceuticals S.r.l. | Italy |
| Mundipharma Kabushiki Kaishe | Japan |
| Mundipharma TK | Japanese Silent Partnership |
| Mundipharma Distribution Limited | Korea |
| Mundipharma Korea Limited | Korea |
| Euro-Celtique S.A. | Luxembourg |
| Mundipharma International Services S.ar.l. | Luxembourg |
| Mundipharma Pharmaceuticals Sdn. Bhd. | Malaysia |
| Mundipharma de Mexico, S. de R.L. de C.V. | Mexico |
| Mundipharma Maroc | Morocco |
| Mundipharma (Myanmar) Co., Limited | Myanmar |
| Alfa Generics B.V. | Netherlands |
| Bradenton Products B.V. | Netherlands |
| Ladenburg B.V. | Netherlands |
| Mundipharma B.V. | Netherlands |
| Mundipharma Bradenton B.V. | Netherlands |
| Mundipharma DC B.V. | Netherlands |
| Mundipharma Pharmaceuticals B.V. | Netherlands |
| Mundipharma New Zealand Limited | New Zealand |
| Mundipharma A.S. | Norway |
| Mundipharma Distribution GmbH | Philippine Branch of Swiss Company |

| | |
|---|---|
| Mundipharma Polska SP. Z.O.O. | Poland |
| Mundipharma Farmaceutica LDA. | Portugal |
| Mundipharma GesmbH | Russian Branch of Austrian Company |
| Technical Scientific Office of Mundipharma Near East GmbH | Saudi Arabia |
| Mundipharma Healthcare Pte. Limited | Singapore |
| Mundipharma IT Services Pte. Limited | Singapore |
| Mundipharma Manufacturing Pte. Limited | Singapore |
| Mundipharma Pharmaceuticals Private Limited | Singapore |
| Mundipharma Pte Limited | Singapore |
| Mundipharma Singapore Holding Pte. Limited | Singapore |
| Mundipharma GesmbH | Slovak Republic Branch of Austrian Company |
| Mundipharma (Proprietary) Limited | South Africa |
| Mundipharma Biologics S.L. | Spain |
| Mundipharma Pharmaceuticals S.L. | Spain |
| Mundipharma AB | Sweden |
| Mundipharma AG | Switzerland |
| Mundipharma Distribution GmbH | Switzerland |
| Mundipharma EDO GmbH | Switzerland |
| Mundipharma Holding AG | Switzerland |
| Mundipharma International Services GmbH | Switzerland |
| Mundipharma IT GmbH | Switzerland |
| Mundipharma IT Services GmbH | Switzerland |
| Mundipharma Laboratories GmbH | Switzerland |
| Mundipharma LATAM GmbH | Switzerland |
| Mundipharma MEA GmbH | Switzerland |
| Mundipharma Medical Company | Swiss Branch of Bermuda Company |
| Mundipharma Medical GmbH | Switzerland |
| Mundipharma Near East GmbH | Switzerland |
| Taiwan Mundipharma Pharmaceuticals Limited | Taiwan |
| Mundipharma (Thailand) Limited | Thailand |
| Mundipharma Pharmaceuticals Industry and Trade Limited | Turkey |
| Bard Pharmaceuticals Limited | United Kingdom |
| Clinical Designs Limited | United Kingdom |
| Mundibiopharma Limited | United Kingdom |
| Mundipharma Corporation Limited | United Kingdom |
| Mundipharma International Limited | United Kingdom |
| Mundipharma International Services Limited | United Kingdom |
| Mundipharma International Technical Operations Limited | United Kingdom |
| Mundipharma IT Services Limited | United Kingdom |
| Mundipharma Medical Company Limited | United Kingdom |
| Mundipharma Research Limited | United Kingdom |
| Napp Laboratories Limited | United Kingdom |

| | |
|---|---|
| Napp Pharmaceutical Group Limited | United Kingdom |
| Napp Pharmaceutical Holdings Limited | United Kingdom |
| Napp Pharmaceuticals Limited | United Kingdom |
| Napp Research Centre Limited | United Kingdom |
| Qdem Pharmaceuticals Limited | United Kingdom |
| Mundipharma Healthcare Corporation | United States of America |
| Mundipharma Healthcare LLC | United States of America |
| Mundipharma International Limited | United States of America (Delaware) |
| Mundipharma International Technical Operations Limited | United States of America (Delaware) |
| Mundipharma IT Services Inc. | United States of America (Delaware) |
| Mundipharma Pharmaceuticals Inc. | United States of America (New York) |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City | Vietnamese Branch of Singapore Company |

**Exhibit E-1**
**(Section 7.05(a)(ii))**

**A-Side and B-Side Entities that Directly or Indirectly Own IACs**

| **A-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)** |
| --- |
| A-Side Subsidiaries Owned Directly or Indirectly by a Single A-Side IAC Payment Party:<br><br>Baha Holdings S.ar.l. (Luxembourg)<br>BCN Holdings L.P. (Delaware)<br>Beacon Company (Delaware)<br>Norroy S.ar.l. (Luxembourg)<br>Stanhope Gate Corp. (BVI)<br>Clover Company Limited (Bermuda)<br>Diagonal Blue S.ar.l. (Luxembourg)<br>Diagonal Blue Corp. (BVI)<br>Fideurop Inc. (Panama)<br>Bengal Moon (Delaware) LLC (Delaware)<br>Bengal Moon Corporation (BVI)<br>Cedar Rock Investment Corporation (BVI)<br>Cedar Rock Corporation Ltd. (Malta)<br>Banela Corporation (BVI)<br>Betal Limited (Bermuda)<br>Betal Malta Limited (Malta)<br>Lemures LLC (Delaware)<br>Medichem Consultants (Intercontinental) Limited (Jersey, Channel Islands)<br>Pacific Moon Corp. (BVI)<br>Mundilab Company Limited (Bermuda)<br>Pickering (Delaware) LLC (Delaware)<br>Pickering Pharmaceuticals Corporation (BVI)<br>Pickhold Limited (BVI)<br>Taddeo LLC (Delaware)<br>Kelly Pharmaceuticals Limited (BVI)<br>TK International Limited (Bermuda)<br>Hazell Holdings Limited (Jersey, Channel Islands)<br>Rushleigh Limited (Jersey, Channel Islands) |
| A-Side Entities Owned Directly or Indirectly by More than One A-Side IAC Payment Party:<br><br>Halm Holdings S.ar.l. (Luxembourg) is owned 50% each by Betal Malta Limited (Malta) and Cedar Rock Corporation Ltd. (Malta)<br><br>Halm S.ar.l. (Luxembourg) is owned 100% by Halm Holdings S.ar.l. (Luxembourg)<br><br>Hambert B.V. (Netherlands) is owned 100% by Halm Holdings S.ar.l. (Luxembourg) |

**B-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)**

B-Side Subsidiaries Owned Directly or Indirectly by a Single B-Side IAC Payment Party:

1JM LLC (Delaware)
2JM LLC (Delaware)
3JM LLC (Delaware)
G3A LLC (Delaware)
G3D LLC (Delaware)
G3R LLC (Delaware)
Linarite Holdings LLC (Delaware)
Little Menlo LLC (Delaware)
Menlo Park Investors Inc. (BVI)
Moonstone Holdings LLC (Delaware)
Neji S.ar.l. (Luxembourg)
Nerula S.ar.l. (Luxembourg)
Perthlite Holdings LLC (Delaware)
R Napp Holdings LLC (Delaware)
Roselite Holdings LLC (Delaware)
Temagami LLC (Delaware)

B-Side Entities Owned Directly or Indirectly by More than One B-Side IAC Payment Party:

Ankersea Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler and (iii) 8.6% by Richard S. Sackler, M.D.

B.L. Carrolton Limited (Bermuda) is owned by Pacific Partners Company (New York).

China Sea Company L.P. (Delaware) is owned (i) 4% by China Sea Company, Inc. (Delaware) and (ii) 96% by Hudson River Partners (New York).

China Sea Company, Inc. (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

Crissaire Corporation (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

East Hudson Inc. (BVI) is owned (i) 37.6% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 37.6% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 8.2% by Hudson Trust, (iv) 8.2% by Richard S. Sackler, M.D. and (v) 8.4% by Meridian International, Ltd. (Delaware).

G.H. Carrell Limited (Bermuda) is owned 100% by St. Lawrence Associates (New York).

Hudson River (Delaware) Inc. (Delaware) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Hudson River Partners (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

JGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/29/89 F.B.O. Miles R.C. Sackler.

JGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/30/89 F.B.O. Miles R.C. Sackler.

JGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/28/89 F.B.O. Miles R.C. Sackler.

JWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by JGT One LLC, (ii) 33 ⅓% by JGT Two LLC and (iii) 33 ⅓% by JGT Three LLC.

Laysan Limited (Bermuda) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

Lodestone Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler and (iii) 8.6% by JDS Revocable Pourover Trust.

Mallard Limited (Bermuda) is owned 100% by Hudson River (Delaware) Inc. (Delaware).

Meridian International, Ltd. (Delaware) is owned (i) 15.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 15.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 34.6% by Richard S. Sackler, M.D. and (iv) 34.6% by JDS Revocable Pourover Trust.

Pacific Partners Company (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

RBMC Holdings LLC (Delaware) is owned 100% by Rosebay Medical Company L.P.

RGT One LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 1 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/21/89 F.B.O.

Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 1 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Two LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 2 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 2 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Three LLC (Delaware) is owned (i) 33 ⅓% by Beverly Sackler Trust 3 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 ⅓% by Beverly Sackler Trust 3 dated 12/22/89 F.B.O. Rebecca K. Sackler.

Rosebay Medical Company L.P. (Delaware) is owned (i) 2% by Rosebay Medical Company, Inc. and (ii) 98% by Trust U/A 11/5/74 fbo Beverly Sackler.

Rosebay Medical Company, Inc. (Delaware) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

RWA Holdings LLC (Delaware) is owned (i) 33 ⅓% by RGT One LLC, (ii) 33 ⅓% by RGT Two LLC and (iii) 33 ⅓% by RGT Three LLC.

St. Lawrence Associates (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Standard Pharmaceuticals Corporation (Delaware) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Tradewind Company (New York) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Triangle Holdings LLC (Delaware) is owned 100% by Tradewind Company (New York).

Triangle Industries Limited (Bermuda) is owned 100% by Triangle Holdings LLC (Delaware).

WA Canada L.P. (Delaware) is owned 16 ⅔% by each of (i) G3D LLC (Delaware), (ii) G3A LLC (Delaware), (iii) G3R LLC (Delaware), (iv) 1JM LLC (Delaware), (v) 2JM LLC (Delaware) and (vi) 3JM LLC (Delaware); each of Richard S. Sackler M.D. and Temagami LLC (Delaware) is a general partner of WA Canada L.P. with a 0% equity interest.

**Exhibit E-2**

**Entities Excluded from the Definition of IAC (Section 7.05(a)(i))**

| Entity Name | Jurisdiction |
|---|---|
| Bangladesh Beauty Products Private Limited | Bangladesh |
| Mundipharma Bangladesh Private Limited | Bangladesh |
| Mundipharma Trading Bangladesh Private Limited | Bangladesh |
| MN Consulting LLC | Bermuda |
| MNB Company | Bermuda |
| Transworld Pharma Limited | Bermuda |
| Modi-Mundipharma Beauty Products Private Limited | India |
| Modi-Mundipharma Healthcare Private Limited | India |
| Modi-Mundipharma Private Limited | India |
| Win-Healthcare Private Limited | India |
| Win-Medicare Private Limited | India |
| Beauty Products Lanka (Private) Limited | Sri Lanka |
| Signutra Inc. | United States |

## **Exhibit E-3**

## **IACs Not Wholly Owned by Sackler Parties (Section 7.05(c))**

Mundipharma Pharmaceuticals Limited (Cyprus) is owned (i) 25% by Halm Holdings S.ar.l. (Luxembourg), (ii) 12.5% by Raymond R. Sackler Trust 1 dtd 12/23/89, (iii) 12.5% by Raymond R. Sackler Trust 2 dtd 12/23/89 and (iv) 50% by third parties none of which is a Sackler Party or an Affiliate of a Sackler Party.

Mundipharma Limited (Bermuda) is owned (i) 47.62% by Kelly Pharmaceuticals Limited, (ii) 47.62% by Mallard Limited (Bermuda) and (iii) 4.76% by The Fitness Foundation, a third party that is neither a Sackler Party nor an Affiliate of a Sackler Party.

**Exhibit F**
**IAC Pledged Entities**

| IAC Pledged Entity | Jurisdiction | IAC Pledgor(s)[1] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| Beacon Company | Delaware | Stanhope Gate Corp. |
| Purdue Pharma | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| Betal Limited | Bermuda | Lemures LLC |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering (Delaware) LLC |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; |

---

[1] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler;<br>Temagami LLC;<br>G3D LLC;<br>1JM LLC;<br>G3A LLC;<br>2JM LLC;<br>G3R LLC;<br>3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.;<br>Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler;<br>JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler;<br>Raymond R. Sackler Trust 1 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust;<br>Raymond R. Sackler Trust 2 dtd 12/23/89;<br>Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC;<br>RGT Two LLC;<br>RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC;<br>JGT Two LLC;<br>JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |

| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of December 29, 1992 |
|---|---|---|
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

*To be updated prior to the Plan Effective Date.*

**Exhibit H**
**Opioid Business**

**Exhibit H-1**
**Restricted Persons**

Estate of Beverly Sackler
David A. Sackler
Ilene Sackler
Estate of Jonathan D. Sackler
Kathe Sackler
Mortimer D.A. Sackler
Richard S. Sackler
Theresa Sackler
Any trusts of which any of the foregoing are beneficiaries and the trustees thereof (solely in their capacities as such)

**Exhibit H-2**
**Schedule of Investments**

1. Modi-Mundipharma Private Limited and its subsidiaries[1]:
    a. Mundipharma Bangladesh Private Limited
    b. Win-Medicare Private Limited
    c. Win-Healthcare Private Limited
    d. Modi-Mundipharma Beauty Products Private Limited
    e. Modi-Mundipharma Healthcare Private Limited
    f. Mundipharma Trading Bangladesh Private Limited
    g. Beauty Products Lanka (Private) Limited
    h. Bangladesh Beauty Products Private Limited
2. MNB Company[2]
3. Transworld Pharma Limited[3]
4. MN Consulting LLC[4]

---

[1] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[2] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[3] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[4] MN Consulting LLC to be included on this Schedule of Investments only for so long as any IAC Payment Party directly or indirectly owns an IAC.

### Exhibit H-3
### Secondary Restricted Person Covenant

Each Secondary Restricted Person shall not, other than by way of ownership of the IACs, until the Payment Group that is in the Family Group that the Secondary Restricted Person is a member of has paid its Full Outstanding Settlement Amount in full, either (i) own any investment in more than 49% of the voting power or equity value in or (ii) be an executive officer or director of any entity which has as one of its principal business segments the manufacture or sale of opioids, *provided*, *however*, that this provision shall not prohibit investments held by such Secondary Restricted Person on the Agreement Effective Date and scheduled on <u>Exhibit [●]</u> (or received as proceeds from dispositions of such investments). In the event a Secondary Restricted Person holds an investment or interest in or a position with a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest or position to be impermissible under this paragraph but for this sentence, the holding of such interest, investment or position shall not be a violation of this covenant so long as (i) such Secondary Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible, and (ii) such Secondary Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

## Exhibit I
## Termination Events

(a)    <u>Sackler Parties Termination Events</u>.  The Sackler Parties' Representative may terminate this Agreement, including the obligations of the Parties hereunder, by delivery of a written notice to the Debtors and the Governmental Consent Parties (as defined in the Plan) upon the occurrence and continuation of any of the following events, in each case prior to the Plan Effective Date:

(i)    the Bankruptcy Court (A) enters an order denying confirmation of the Plan, (B) enters an order finding that any action taken by any Debtor (or any successor in interest of any Debtor) would render confirmation of the Plan impossible, or (C) otherwise declines to confirm the Plan, in each case, on grounds related to the Shareholder Releases, the Channeling Injunction, this Agreement, the Collateral Documents, and, in each case, (X) the Bankruptcy Court does not enter an order confirming the Plan (or, in the case of foregoing <u>clause (B)</u>, otherwise reversing its decision) within 90 days thereafter or (Y) the Debtors cease to diligently pursue confirmation of the Plan;

(ii)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of a liquidator, judicial manager, trustee, receiver, or examiner with expanded powers or a trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Bankruptcy Cases, in each case, the effect of which would render the Shareholder Settlement (as defined in the Plan) incapable of consummation on the terms set forth therein;

(iii)    any of the Debtors supports another Person in filing any plan of reorganization or liquidation other than the Plan and has not rescinded such support within 10 Business Days of receipt of notice from the Sackler Parties' Representative;

(iv)    any of the Debtors sells a material portion of the Debtors' assets or files a motion or pleading (A) seeking to sell a material portion of the Debtors' assets or (B) asserting (or seeking standing to assert) any purported claims or causes of action against any Shareholder Released Party that is subject to the Shareholder Releases (as defined in the Plan), and, in each case has not, within 5 Business Days of receipt of notice from the Sackler Parties' Representative, withdrawn such motion or pleading;

(v)    any of the Debtors (A) withdraws the Plan and has not, within 60 days of receipt of notice from the Sackler Parties' Representative, replaced the Plan with a chapter 11 plan consistent with the Sackler Parties' Representative's consent rights under this Agreement and, (B) modifies the Shareholder Releases, the Channeling Injunction, this Agreement or the Collateral Documents (or files a new Plan with such modified terms) to the extent such modification would require the consent of the Sackler Parties' Representative under this Agreement and the Debtors have not, within 30 days of receipt of notice from the Sackler Parties' Representative, reversed such modification or further modified the Plan in a manner consistent with the Sackler Parties' Representative's consent rights under this Agreement or (C) the Sackler Parties' Representative has received an order from the Bankruptcy Court that any modification to the Plan is inconsistent with the Sackler Parties' Representative's consent rights under this Agreement and the Debtors have not, within 5 Business Days of receipt of notice from the Sackler Parties' Representative, revised the Plan on terms consistent with such consent rights;

(vi)      the Bankruptcy Court enters an order terminating the Preliminary Injunction[1] or the Preliminary Injunction otherwise terminates;

(vii)      the Settlement Effective Date has not occurred by the earlier of (A) three months after the entry of the Confirmation Order, provided that such three month period shall be extended if the Settlement Effective Date is delayed as a result of any delay in obtaining any state or federal regulatory licenses, consents, or approvals, or in transferring, assigning, or novating any state or federal government contracts necessary to implement and effectuate the Plan (*provided*, with respect to this clause (A), that the Sackler Parties' Representative shall not have the right to terminate this Agreement for any delay to the Settlement Effective Date due to the fault or failure to act on the part of any Sackler Party or Family Member and (B) June 30, 2022.

Notwithstanding anything to the contrary herein, if the Shareholder Releases are not approved or are modified by the Bankruptcy Court solely on grounds related to the inclusion of "Causes of Action" in the definition of "Releasing Parties" (as defined in the Plan), or the Debtors modify the Plan pursuant to such Bankruptcy Court order, then the Sackler Parties' Representative shall not have the right to terminate this Agreement solely as a result thereof.

(b)      Debtors' Termination Event.  The Debtors may terminate this Agreement, including the obligations of the Parties hereunder, by delivery of a written notice to the Sackler Parties upon the determination by the Board of Directors of Purdue Pharma Inc. (acting through the Special Committee of such Board), after consultation with the Creditors' Committee (as defined in the Plan) and the Governmental Consent Parties that continuing to seek approval of a plan of reorganization that includes the Shareholder Releases would be inconsistent with the exercise of such Board of Directors' fiduciary duties.

---

[1] "Preliminary Injunction" means the preliminary injunction halting litigation against the Debtors and other parties as set forth in the *Nineteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Pro. No. 19-08289 (RDD) [Docket No. 274].

**<u>Exhibit J</u>**
**IAC Pledge and Security Agreement**

**<u>Exhibit K</u>**
**Assuring Parties**

*A-Side Assuring Parties*

Theresa E. Sackler
Ilene Sackler Lefcourt
Jeffrey M. Lefcourt
Karen Lefcourt
Kathe Sackler
Mortimer D.A. Sackler
Marissa T. Sackler
Sophia Dalrymple
Michael D. Sackler
Jacqueline Pugh Sackler
Hermance Schaepman
Alexa M. Saunders
Leslie J. Schreyer
Jeffrey A. Robins
Jorg Fischer
Bowland Company Limited
Millborne Trust Company Limited
Meerkat Trust
Cobo Bay Trust
Jackson River Trust
Lune River Trust
Mondai Trust
MTS 2006 Trust
Racine Trust
Reserve Trust
SDS 2006 Trust
SDS Beacon 2014 Trust
Silver Trust
KAS 2010 Family Trust
KAS 2011 Family Trust

*B-Side Assuring Parties*

Richard S. Sackler
David A. Sackler
Marianna Sackler
Rebecca Sackler
Mary Corson
Madeleine Sackler
Clare Sackler
Miles Sackler
Jaseleen Sackler
Leslie J. Schreyer
Stephen A. Ives
Brian Olson
Garrett Lynam
1974 Irrevocable Trust fbo BS and RSS
1974 Irrevocable Trust fbo BS and JDS
Mary Corson Trust
JDS Revocable Pourover Trust

**Exhibit L**
**List of Approved Third Party Accountants[1]**

BDO
Deloitte
Ernst & Young
Grant Thornton
KPMG
PricewaterhouseCoopers
RSM Tenon
RSM
Smith & Williamson
Baker Tilly
Moore Stephens
Mazars Group
Haines Watts
Crowe Clark Whitehill
Saffery Champness
Begbies Traynor
UHY Hacker Young
Kingston Smith
Zolfo Cooper
MHA MacIntyre Hudson
Johnston Carmichael
Friedman
Cohn Reznick
Balmer-Etienne
Berdon
Huron Consulting Group
Michael Constanza, CPA
Revinova Truehand
Any other independent accounting firm registered with the Public Company Accounting
Oversight Board that is not a Related Party.
Any other independent accounting firm reasonably acceptable to the MDT and the Sackler
Parties' Representative.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other multinational associations of such firms.

**Exhibit M**
**List of Approved Financial Advisors[1]**

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners
Cohn Reznick
Deloitte
Ducera Partners
Ernst & Young
Evercore
Friedman
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisory firm registered with the Public Company Accounting
Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry
Regulatory Authority (FINRA) that is not a Related Party.
Any other independent financial advisor reasonably acceptable to the Secured Party and the Trust
Pledgors.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

**<u>Exhibit N</u>**
**Form of Net Proceeds Report**

## FORM OF NET PROCEEDS REPORT

**[_____ __], 20[__]**

Reference is made to Section 3.02(a)(iii) of the Settlement Agreement by and among the Master Disbursement Trust, each of the parties listed on Exhibit A thereto, and each of the parties listed on Exhibit B thereto, dated as of [_____], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "**Settlement Agreement**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(iii) of the Settlement Agreement in connection with our good faith calculation of Net Proceeds relating to the Sale Proceeds or IAC Non-Tax Distribution described below.

On [_____], 20[__], the IAC Payment Parties named on Schedule 1 received [Sale Proceeds / IAC Non-Tax Distributions] in connection with [*description of event that triggered Sale Proceeds / IAC Non-Tax Distributions*].

The table on Schedule 1 describes our good faith calculation of the Net Proceeds relating to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. In addition, Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. Finally, Schedule 3 describes our good faith calculation of the Permitted Withdrawal related to such related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(B) of the Settlement Agreement.

[Name of Approved Accountant]

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (SALE PROCEEDS)**

**[_____ __], 20[__]**

*Table for Sale Proceeds Calculations*

Sale Proceeds: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | D = C's "Total" * 0.55 | | | G = D – E – F | | | J = Lesser of G and I | | L = J – K |
| Name of IAC Payment Party Receiving Sale Proceeds and Date of Receipt | Name of Payment Group | Sale Proceeds Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 55% | 100% of any Sale Proceeds Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any Sale Proceeds Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | Payment Group's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K) |
| [_____][1]<br><br>[Date of Receipt] | [_____] | 1. Amounts Actually Received: [$___]<br>2. Amounts Deemed Received: [$___], the Components of Which Are:*<br>  a. [$___]<br>  b. [$___]<br>  c. [$___]<br>  d. [$___]<br>3. "Total:" Sum of (1) and (2) (i.e., the Payment | [$___] | 1. Unapplied Advanced Contributions: [$___]<br>2. Post-Effective Date IAC Funding (Clause (iii) of Sale Proceeds Deductions): [$___]<br>3. Sum of (1) and (2) (the "Total"): [$___] | 1. Amount of Clause (ii) of Sale Proceeds Deductions [$___], the Components of which Are***:<br>  a. [$___]<br>  b. [$___]<br>  c. [$___]<br>2. 55% of aggregate (1) amount above (such resulting amount, the "Total"): [$___] | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

[1] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]")" and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (Inon behalf of B-Side Payment Group [1, 2]")".

| | | Group's "Gross Sale Proceeds"): [$____] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL: | [ . . .] | [ . . .]** | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [ . . .] | [ . . .] | [ . . .] |

*Note:  In Column C, "Amounts Deemed Received" refers to the IAC Payment Party's allocable portion of (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii) which amounts are, in each case, treated as actually received by such IAC Payment Party for purposes of these calculations.  Each of these amounts are categorized as (I), (II), (III) and (IV) in Column C. Also, payments by or on account of a Crossover Member are allocated pursuant to Section 2.01(l).

** Note: Aggregate "Total" in Column C will equal "Sale Proceeds" set forth above.

*** Note: In Column F, the components of "Clause (ii) of Sale Proceeds Deductions" are the documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (I) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (II) any Sale Expenses incurred in connection with such Sale, and (III) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC. Items (I), (II) and (III) in this note correspond to the amounts in Column F for each IAC Payment Party (apportioned in the case of Crossover Members).

SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (Cont.)

[____ __], 20[__]

*Table for IAC Non-Tax Distribution Calculations*

IAC Non-Tax Distribution: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | D = C's "Total" * 0.55 | | | G = D – E – F | | | J = Lesser of G and I | | L = J – K |
| Name of IAC Payment Party Receiving IAC Non-Tax Distribution and Date of Receipt | Name of Payment Group | IAC Non-Tax Distribution Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members) | Column C's "Total" Multiplied by 55% | 100% of any IAC Distribution Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party | 55% of any IAC Distribution Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party | Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero) | Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable) | Outstanding Settlement Amount ("OSA") (Immediately Before and After) | IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)) | Payment Group's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | Portion of IAC Payment Party's Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K) |
| [_____][2]  [Date of Receipt] | [_____] | 1. Amounts Actually Received: [$___] 2. Amounts Deemed Received: [$___], the Components of Which Are:* (I)  [$___] (II)  [$___] (III)  [$___] (IV)  [$___] 3. "Total:" Sum of (1) and (2) (i.e., the | [$___] | 1. Unapplied Advanced Contributions: [$___] 2. Post-Effective Date IAC Funding (Clause (iii) of IAC Distribution Deductions): [$___] 3. Sum of (1) and (2) (the "Total"): [$___] | 1. Amount of Clause (ii) of IAC Distribution Deductions [$___], the Components of which Are***: (I)  [$___] (II)  [$___] 2. 55% of aggregate (1) amount above (such resulting amount, the "Total"):  [$___] | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

---

[2] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.])" and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2])".

| | | Payment Group's "Gross IAC Non-Tax Distribution"): [$___] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL: | [ . . .] | [ . . .]** | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [ . . .] | [ . . .] | [ . . .] |

*Note:  In Column C, "Amounts Deemed Received" refers to the IAC Payment Party's allocable portion of (I) any income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC Distribution Deductions described in clause (ii) of the definition thereof directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii) which amounts are, in each case, treated as actually received by such IAC Payment Party for purposes of these calculations.  Each of these amounts are categorized as (I), (II), (III) and (IV) in Column C. Also, payments by or on account of a Crossover Member are allocated pursuant to Section 2.01(l).

** Note: Aggregate "Total" in Column C will equal "IAC Non-Tax Distribution" set forth above.

*** Note:  In Column F, the components of "Clause (ii) of IAC Distribution Deductions" are the documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (I) transfer Taxes incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Distribution Expenses incurred in connection with such IAC Non-Tax Distribution.  Items (I) and (II) in this note correspond to the amounts in Column F for each IAC Payment Party (apportioned in the case of Crossover Members).

## SCHEDULE 2 TO FORM OF NET PROCEEDS REPORT

**[_____ __], 20[__]**

*Collar Computation Proceeds and the Collar Amount*

1.  Collar Computation Proceeds (See Table Below): [$_____]

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Date of Determination | Aggregate "Column G" Totals from Schedule 1 (Both Sale Proceeds Schedule and IAC Non-Tax Distributions Schedule) | Reductions for Unapplied Advanced Contributions (i.e., Aggregate "Column E, Item 1" Totals from Schedule 1 (Both Sale Proceeds Schedule and IAC Non-Tax Distributions Schedule) Applied to Reduce Net Proceeds to Not Less than Zero | Reductions for Payments Pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to [an A-Side IAC Payment Party or its Subsidiary party thereto] and not related to the IAC subject to the applicable Sale) | Column B plus Column C plus Column D | Column E Divided by 0.55 | 0.60 Multiplied by Column F (i.e., Collar Computation Proceeds) |
| [_____] | [$___] | [$___] | [$___] | [$___] | [$___] | [$___] |

2.  Collar Amount:  [$_____]

<u>Notes:</u>

*"Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to an A-Side IAC Payment Party or its Subsidiary party thereto and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".*

*"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, plus (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million. For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation*

*Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.*

## SCHEDULE 3 TO FORM OF NET PROCEEDS REPORT

### [_____ __], 20[__]

*Permitted Withdrawals*

### B-Side IAC Payment Parties

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Name of IAC Payment Party | Name of Payment Group | Amount of IAC Payment Party's Sale Proceeds or IAC Distribution that Do Not Constitute Net Proceeds (i.e., Amount Remaining in IAC Account After Payment of Net Proceeds to MDT, per Schedule 1, and/or Permitted Withdrawals Described in Columns D and E). | Amounts Loaned to AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as Applicable for Payment Group, Pursuant to Clause (iii) of the Definition of Permitted Withdrawals | Amounts Not Required to Be Loaned to AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as Applicable for Payment Group, Pursuant to the Proviso in Clause (iii) of the Definition of Permitted Withdrawals | Amount of Permitted Withdrawal (i.e., the Sum of Columns C, D and E). |
| [_____][1] | [___] | [$_____] | [$_____] | [$_____] | [$_____] |
| TOTAL | [___] | [$_____] | [$_____] | [$_____] | [$_____] |

---

[1] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (i.e., a Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

**<u>Exhibit O</u>**
**Form of Further Assurances Undertaking**

## [FORM OF] FURTHER ASSURANCES UNDERTAKING[1]

THIS FURTHER ASSURANCES UNDERTAKING (this "Agreement") is entered into by the undersigned party (the "Signing Assuring Party") as of the date set forth next to the Signing Assuring Party's signature on the signature page hereto.[2]

RECITALS[3]

WHEREAS, a condition precedent to the effectiveness of the Settlement Agreement (as defined below) and, thus, the granting of certain releases in the manner and to the extent set forth therein is the receipt by the Master Disbursement Trust (as defined in the Settlement Agreement) (the "MDT") of an agreement substantially in the form of this Agreement from the Signing Assuring Party (as an Assuring Party as defined in the Settlement Agreement).

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, including the granting of releases in the manner and to the extent set forth in the Settlement Agreement, the adequacy and sufficiency of which are hereby acknowledged, the Signing Assuring Party does hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS AND INTERPRETATION

**Section 1.01    Definitions.** Unless otherwise defined herein, capitalized terms as used herein have the meanings given them in the Settlement Agreement; *provided*, that in the event a term is defined both herein and in the Settlement Agreement, it is defined herein for purposes of convenience only, and the meaning given that term in the Settlement Agreement shall control.

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or for whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

---

[1] Note to Draft: To be divided into A-Side document and B Side documents with identical language except as indicated.

[2] Note to Draft:  All condition precedent Agreements to be dated the Effective Date.

[3] Note to Draft: Future Further Assurances Undertakings to be modified to reflect relevant reasons for delivery by Signing Assuring Party.

"Excluded Beneficiary" means the children of Kathe A. Sackler, Samantha Hunt and the children of Samantha Hunt and any minor or other person under a legal disability.

"Excluded Trusts" means the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on Exhibit A of the Settlement Agreement.

"Family Member" has the meaning set forth in the Settlement Agreement.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

"Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated.

 "Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust [(including without limitation as referred to in Sections 4.06, 4.08, 4.10 of Annexes A, C, D and E of the Settlement Agreement and Sections 4.03, 4.04 and 4.05 of Annex B of the Settlement Agreement)], including any Consent Person.

[4] ["Non-Judicial Settlement Agreement" means, with respect to a Trust and a Trust Beneficiary, a document to which such Trust Beneficiary is a party prepared by counsel for the trustees of the Trust for execution by trust beneficiaries to non-judicially settle certain matters relating to the administration of such Trust and which sets forth the consents, acknowledgments, agreements and approvals of such Trust Beneficiary as further described in (A) through (C) of Section 3.01 below.]

"Required Interested Persons" means (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, provided that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

---

[4] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

"Restricted Person" has the meaning set forth in Section 3.06 below.

"Shareholder Released Person" means a Person who is one of the Designated Shareholder Released Parties (as defined in the Settlement Agreement).

"Sackler Agreement Person" has the meaning set forth in Section 2.01(d) below.

"Secondary Restricted Person" has the meaning set forth in the Settlement Agreement.

"Settlement Agreement" means [the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                    ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors.

"Settlement Documents" means each Definitive Document other than this Further Assurances Undertaking, including the Settlement Agreement and the Collateral Documents.

"Signing Assuring Party" means the signatory hereto who is one or more of (x) a (i) trustee of a Possible Refunding Trust, (ii) Power Holder of a Trust or of the JDS Estate or (iii) Trust Beneficiary and (y) if applicable, also a Family Member, Restricted Person, Secondary Restricted Person or Shareholder Released Person, in the case of each of the foregoing categories as indicated on the signature page hereto.

"Trust Beneficiary"  means a Beneficiary Interested Person or a Required Interested Person of a Sackler Party that is a Trust or of the JDS Estate.

**Section 1.02    Interpretative Provisions.**

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles and Sections are to the Articles and Sections of this Agreement unless otherwise specified.

(c)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning, *mutatis mutandis*.

(d)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(e)    The use of the word "or" shall not be exclusive.

(f)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(g)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's heirs, legal and personal representatives, successors and permitted assigns.

(h)     Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(i)     Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(j)     Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, it is intended that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

## ARTICLE 2.
## REPRESENTATIONS AND WARRANTIES

**Section 2.01     Representations and Warranties.** The Signing Assuring Party does hereby represent and warrant to the MDT as follows:

(a)     The Signing Assuring Party is a Signing Assuring Party of the type indicated on the signature page hereto.

(b)     The Signing Assuring Party has all requisite power and authority to execute, deliver and perform the Signing Assuring Party's obligations under this Agreement.

(c)     The Signing Assuring Party is aware that Sackler Parties, including certain Beneficiary Interested Persons, and additional trustees, personal representatives, counsel and other advisers of and to the Sackler Parties (including officers, directors, partners and employees of trustees, personal representatives, counsel and other advisers, as applicable) and others are to be released from certain actual or potential liabilities on the terms and conditions, and to the extent, set forth in the Settlement Agreement.

(d)     [5][The Signing Assuring Party, if a Trust Beneficiary, is aware of the formation and prior funding of Sackler Parties directly or indirectly owned by any one or more Sackler Parties of which such Signing Assuring Party is a beneficiary (each a "Sackler Agreement Person").]

(e)     The Signing Assuring Party has been offered the opportunity to review with counsel (to the extent desired) this Agreement, each of the Settlement Documents and any other additional information

---

[5] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

5

(including without limitation [6][the governing instruments of any Sackler Agreement Person and] with respect to actual and potential conflicts of interest of trustees and personal representatives of, and other fiduciaries and advisers to, a Sackler Party), and to consult with such advisors, as such Signing Assuring Party believes advisable or desirable to understand the provisions hereof and thereof before entering into this Agreement.

(f)    This Agreement has been duly and validly executed and delivered by the Signing Assuring Party and constitutes a valid and binding obligation of the Signing Assuring Party enforceable against the Signing Assuring Party in accordance with its terms.

## ARTICLE 3.
## CONSENTS, ACKNOWLEDGMENTS AND AGREEMENTS

**Section 3.01    Trust Beneficiary Acknowledgment and Consent.** [7] If the Signing Assuring Party is a Trust Beneficiary, the Signing Assuring Party does hereby: (A) consent to (i) the execution and delivery of the Settlement Documents by each applicable Sackler Party (including the trustees or personal representatives thereof in their capacities as such trustees and personal representatives) of which such Signing Assuring Party is a beneficiary and by each Sackler Agreement Person and (ii) the performance by each Sackler Party of which such Signing Assuring Party is a beneficiary and by each Sackler Agreement Person of its obligations under the Settlement Documents to which it is a party and of the transactions contemplated thereby; (B) acknowledge and agree that he or she has fully consented to and approved of the formation and funding of any Sackler Agreement Person by means of the execution of one or more Non-Judicial Settlement Agreements that, to the best of the Signing Assuring Party's knowledge, are binding on all current and future beneficiaries of the relevant Sackler Parties, and does hereby further ratify and confirm the same; and (C) if relevant to the administration of any one or more Sackler Parties that are Trusts of which such Signing Assuring Party is a beneficiary, further specifically ratify and confirm his or her acknowledgement and agreement that any provision in the governing instruments of such Trusts restricting the ability of the trustees of such Trusts to make payments of income or principal to satisfy the legal obligation of any person other than a beneficiary of such a Trust does not in any way limit or constrain the ability of such Trusts to enter into the Settlement Documents to which they are parties and perform their obligations thereunder and the transactions contemplated thereby, including to be jointly and severally liable under the Settlement Documents to which they are parties to the maximum extent set forth therein, such acknowledgement and agreement having been given by the Signing Assuring Party by means of the execution of one or more Non-Judicial Settlement Agreements that, to the best of the Signing Assuring Party's knowledge, are binding on all current and future beneficiaries of the relevant Sackler Parties.]

[8][If the Signing Assuring Party is a Trust Beneficiary for any reason other than being a beneficiary of one or more [A-Side Payment Parties] that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee, the Signing Assuring Party does hereby consent to the execution and delivery of the Settlement Documents by each applicable Sackler Party (including the trustees thereof in their capacities as such trustees) of which such Signing Assuring Party is a beneficiary and the performance by each Sackler Party of which such Signing Assuring Party is a beneficiary of its obligations under the Settlement Documents to which it is a party and of the transactions contemplated thereby].

---

[6] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

[7] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only; consent to be further adjusted if Non-Judicial Agreement not being executed by all relevant B-Side Sackler Parties.

[8] Note to Draft: Anticipated to be included in A-Side Form of Further Assurances Undertaking only.

**Section 3.02    Further Trust Beneficiary Acknowledgment.** If the Signing Assuring Party is a Trust Beneficiary, such Signing Assuring Party further acknowledges that the MDT and each Sackler Party that is a Trust of which the Signing Assuring Party is a beneficiary will be executing the Settlement Documents and will be performing its obligations under the Settlement Documents and the transactions contemplated thereby in reliance on the Signing Assuring Party's representations, covenants and agreements hereunder, including without limitation the non-circumvention covenant under Section [3.08] and the MDT shall have enforcement rights as a third-party beneficiary of such representations, covenants and agreements hereunder.

**Section 3.03    Power Holder Covenant.** If the Signing Assuring Party is a Power Holder with respect to a Sackler Party, the Signing Assuring Party hereby covenants and agrees that such Signing Assuring Party shall not (i) intentionally and with knowledge that it is a violation of this Section 3.03 or (ii) in reckless disregard of its obligations under this Section 3.03 exercise or fail to exercise any of the Signing Assuring Party's powers and authorities as a Power Holder with respect to such Sackler Party in a manner that, if such Power Holder were a trustee of such Sackler Party, would prevent such Sackler Party from fulfilling, and being in full compliance with, all of its obligations under the Settlement Documents to which it is a party, including without limitation, to not be in violation of the provisions of the Settlement Documents relating to the appointment and replacement of trustees of a Sackler Party that is a trust or the amendment of its governing instruments (including without limitation as referred to in [Sections 4.06, 4.08, 4.10 of Annexes A, C, D and E of the Settlement Agreement] and [Sections 4.03, 4.04 and 4.05 of Annex B of the Settlement Agreement]).

**Section 3.04    Possible Refunding Trust Covenant.** If the Signing Assuring Party is a Possible Refunding Trust, such Signing Assuring Party hereby covenants and agrees that any property reverting or required to be refunded to such Signing Assuring Party by or from any Sackler Party that is a Trust shall be held by the trustees of the Possible Refunding Trust as a separate resulting trust that will remain subject to such Sackler Party's obligations under the Settlement Documents as if still held by such Sackler Party (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, the same priority with respect to all other obligations of such Possible Refunding Trust as it would have had had the Possible Refunding Trust been a party to the Settlement Documents in the same capacity or capacities as such Sackler Party), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

**Section 3.05    Naming Rights.** If the Signing Assuring Party is a Family Member, such Signing Assuring Party shall not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero [(accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for under the Settlement Agreement)] and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b) of the Settlement Agreement); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09 of the Settlement Agreement.  For the avoidance of doubt, nothing in this Section 3.05, Section 8.06 of the Settlement Agreement or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

**Section 3.06    Opioid Business.** If the Signing Assuring Party is a Person listed on Exhibit H-1 of the Settlement Agreement (a "Restricted Person"), such Signing Assuring Party acknowledges and agrees that the Signing Assuring Party, as a Restricted Person, is subject to the terms and conditions of Section 8.09 of the Settlement Agreement, and agrees to abide by the covenant set forth therein and to deliver a further agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by that covenant in the event that this covenant shall for any reason fail to meet that requirement.  If the Signing Assuring Party is a Secondary Restricted Person, such Signing Assuring Party acknowledges and agrees that the Signing Assuring Party, as a Secondary Restricted Person, is subject to the terms and conditions of Exhibit H-3 of the Settlement Agreement, and agrees to abide by the covenant set forth therein and to deliver a further agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by that covenant in the event that this covenant shall for any reason fail to meet that requirement.

**Section 3.07    Shareholder Release Parties.** The Signing Assuring Party acknowledges that the Shareholder Releases with respect to certain Shareholder Released Parties are subject to the Release Remedy, including without limitation Section 9.02(a)(ii)(B) and Section 9.02(a)(iii)(A) of the Settlement Agreement, each as defined therein.

**Section 3.08    Non-Circumvention.** The Signing Assuring Party hereby covenants and agrees that the Signing Assuring Party shall not, and shall cause all Persons under its Control not to, (i) [intentionally take or fail to take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the confirmation or consummation of the Plan;][9] (ii) intentionally take or fail to take any action to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its obligations under the Settlement Documents, including but not limited to the ability of any member of any Payment Group to pay the Settlement Amount and any other amount due under the Settlement Documents; or (iii) directly or indirectly, in any manner (w) contest or oppose the validity of any Sackler Party; (x) attack or try to impair or invalidate the governing instruments of any Sackler Party or any provision of the Settlement Documents including the transactions contemplated thereby (including by challenging the binding nature thereof on additional or successor trustees or personal representatives of each applicable Sackler Party); (y) contest, oppose, try to invalidate or in any way limit or constrain, based on any provisions of such Sackler Party's governing instruments or applicable law, the ability of such Sackler Party to enter into the Settlement Documents to which it is party (and to consummate the transactions contemplated thereby) and to be jointly and severally liable thereunder to the maximum extent set forth in the Settlement Documents; or (z) conspire with or voluntarily assist any other Person taking any action described in the foregoing clauses (w), (x) or (y); *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) or by any other Assuring Party that is a direct party thereto without the involvement of the undersigned Signing Assuring Party is not an act or failure to act described in this Section [3.08].

## ARTICLE 4.
## SEVERABILITY; SAME AS COURT ORDER; AMENDMENTS AND WAIVERS

**Section 4.01    Severability.** If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the

---

[9] Note to Draft: To be removed for subsequent Further Assurances Undertakings.

economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, MDT and the Signing Assuring Party shall negotiate in good faith to modify this Agreement (taking into account the provisions of the Settlement Documents) so as to effect the original intent as closely as possible in an acceptable manner in order that the transactions contemplated under the Settlement Documents be consummated as originally contemplated to the fullest extent possible.

**Section 4.02    Same as Court Order.** The Signing Assuring Party acknowledges and agrees that the Further Assurances Undertakings actually provided by beneficiaries or each Sackler Party that is a trust or estate are together [10][with the Court Approval, to the extent applicable,] intended and shall to the fullest extent permitted by applicable law have the same binding effect on all Persons who currently, or may in the future, have an interest in such trust or estate as a final, non-appealable order or decree of a Court of competent jurisdiction approving and directing (i) the execution and delivery by the trustees and personal representatives of each such Sackler Party of the Settlement Documents to which such Sackler Party is a party and (ii) the performance by such trustees and personal representatives of each such Sackler Party's obligations under the Settlement Documents and the transactions contemplated thereby [11][, and that in the case of any Sackler Party which is a Trust that has received Court Approval, that the Royal Court of Jersey (Channel Islands) was the appropriate forum to address all related matters.]

### Section 4.03    Successors; Waivers; Amendments.

(a)    This Agreement shall be binding upon the Signing Assuring Party and its heirs, legal and personal representatives, successors and assigns, as the case may be, and shall inure to the benefit of MDT and its successors and assigns.

(b)    No failure or delay by MDT in exercising any right, remedy, power or privilege hereunder or under any Settlement Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)    Any provision of this Agreement may be amended only in a writing signed by the MDT and the Signing Assuring Party.

**Section 4.04    Governing Law.** This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. For the avoidance of doubt, the MDT shall have the benefit in connection with any matter arising from or related to the administration of a Sackler Party that is a trust or estate of the most favorable protections afforded parties dealing in good faith with the trustees and personal representatives thereof under any applicable law.

### Section 4.05    Jurisdiction; Contested Matter.

(a)    [12][The Signing Assuring Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement or the Settlement Documents

---

[10] <u>Note to Draft</u>: To be included in A-Side Form of Further Assurances Undertaking only.

[11] <u>Note to Draft</u>: To be included in A-Side Form of Further Assurances Undertaking only.

[12] <u>Note to Draft</u>: [Language under review].

or the transactions contemplated thereby shall be brought in the Bankruptcy Court, and the Signing Assuring Party hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding.  The Signing Assuring Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, the Signing Assuring Party agrees that service of process on such party as provided in Section [X] shall be deemed effective service of process on such party. The Signing Assuring Party agrees that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Signing Assuring Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.] **Section 4.06 Waiver of Jury Trial.** THE SIGNING ASSURING PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY SETTLEMENT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**Section 4.07    Agreement to Specified Performance Remedy.** In addition to any remedies available to it under the Settlement Documents, the MDT shall have the right to seek any additional remedy or remedies available at law or equity, including without limitation specific performance, against the Signing Assuring Party.

**Section 4.08    Effectiveness.** This Agreement shall become effective upon [the later of (i)] the satisfaction of all of the conditions  to the effectiveness of the Settlement Agreement and [(ii)] the delivery thereof to the MDT.  The delivery of a fully executed Agreement by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the Signing Assuring Party to the terms and conditions of this Agreement, but shall in all events be followed by delivery of a manually signed original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Signing Assuring Party has duly executed this Agreement or, in the case of a Signing Assuring Party that is an entity, caused this Agreement to be duly executed by its authorized officer on its behalf, as of the date set forth next to the Signing Assuring Party's signature.

| Signing Assuring Party Type | Relevant Sackler Parties[1] |
|---|---|
| ☐ Trust Beneficiary with respect to: | [Name of Each Related Sackler Party] |
| ☐ Power Holder with respect to: | [Name of Each Related Sackler Party] |
| ☐ Trustee of Possible Refunding Trust with respect to: | [Name of Each Related Sackler Party] |
| ☐ Family Member (who is also at least one of above) | |
| ☐ Restricted Person (who is also at least one of above) | |
| ☐ Secondary Restricted Person (who is also at least one of above) | |
| ☐ Shareholder Released Person (who is also at least one of above) | |

SIGNING ASSURING PARTY

_____        Date: _____

Name:

[Name of Entity]

By: _____        Date: _____

    Name:

    Title:

[Name of Trust]

_____        Date: _____

Name:_____, as Trustee

[Name of Entity, as Trustee]

By: _____        Date: _____

    Name:

    Title:

---

[1] In lieu of including the name of each Related Sackler Party on the signature page itself, reference may be made to a schedule to be attached to this Agreement naming each Related Sackler Party.

**Exhibit P**
**Form of Trust Certification**

### [FORM OF] CERTIFICATION OF TRUST

THIS CERTIFICATION OF TRUST (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law, which for the avoidance of doubt in the event that the laws of two or more jurisdictions may be applicable with respect to the administration of a particular trust, is intended to be the law providing the most protection to third-parties entering into transactions with the trustees thereof, acting in their capacities as such trustees and not in their own individual or company capacities.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

RECITALS

WHEREAS, [the receipt by the MDT of a Certification of Trust [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

AGREEMENT

1.  NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

a)  The undersigned Certifying Party constitutes all of the currently acting trustees of the [TRUST DESCRIPTION] (the "Trust").

b)  [The trust instrument creating the Trust (the "Trust Agreement") was originally executed on [DATE] and has not been amended [or restated other than by subsequent instruments dated [DATES]].

c)  The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the Trust is true and correct as of the date hereof and the Certifying Party [has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as a trustee of the Trust].

d)  Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual or company capacity and (ii) will not in

its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations, *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) is not an act or failure to act described in this clause (d); *provided further* that the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in <u>Section 9.04</u> of the Settlement Agreement).

e) The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (e) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

f) [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Trust Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

2. If the Certifying Party is not or includes a Person who is not a natural person, the Certifying Party is providing the separate Secretary's Certificate in connection herewith.

[*Signature Page Follows Containing Signatures of All Trustees of the Trust*]

[NAME OF COMPANY TRUSTEE]


By

_____
Name:
Title:
Date:



_____
[Name of Individual Trustee]

Signature Page to Certification  of  Trust with respect to the [TRUST DESCRIPTION]

## SCHEDULE A
### SECRETARY'S CERTIFICATE

1. The undersigned [Title] of [Name of Company], a [jurisdiction][company type] (the "<u>Company</u>"), solely in his/her capacity as [Title] of the Company and not individually, hereby certifies, as follows:

a) Unless otherwise defined herein, capitalized terms used herein but otherwise not defined shall have the meanings given them in the Certification of Trust to which this Secretary's Certification is a Schedule;

b) That on the date hereof [Name] is the duly elected and qualified [Title] of the Company and the signature set forth below on the signature line for such officer is such officer's true and genuine signature, and such officer is duly authorized to execute and deliver this Certificate on behalf of the Company and to execute and deliver on behalf of the Company in its capacity as trustee of the Trust the Settlement Documents to which it is a party in such capacity and any certificate or other document to be delivered by such Sackler Party pursuant to the Settlement Documents;

c) Attached hereto as Exhibit A is a complete and correct copy of the resolutions duly adopted by [the Committee] of the board of [managers][directors] of the Company on [DATE] authorizing the execution, delivery and performance of the Settlement Documents (and any agreements relating thereto) to which the Company, in its capacity as a trustee, is a party; such resolutions have not in any way been amended, modified, revoked or rescinded and have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect; and such resolutions are the only proceedings of [the Committee of] the board of [managers][directors] of the Company now in force relating to or affecting the matters referred to therein;

d) [Attached hereto as Exhibit B is a complete and correct copy of the [limited liability company agreement/certificate of incorporation and by-laws] of the Company, together with all amendments thereto adopted through the date hereof, as in effect at all times since the adoption thereof to and including the date hereof;] and

e) Attached hereto as Exhibit C is a certificate of good standing for the Company from the [Secretary of the State of Wyoming][Jersey good standing authority], the Company's jurisdiction of organization, dated as of a recent date.

**Exhibit Q**
**Trust Information**

A-Side Payment Parties

Theresa E. Sackler 1988 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013) |

|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Alexa M. Saunders |
|  | Theresa Sackler |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
|  | Lune River Trust |
|  | Mondai Trust |
|  | Silver Trust |

<u>Theresa E. Sackler 2008 Trust</u>

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child 1 (2019) |
|  | MDS Minor Child 2 (2021) |

| Power Holders | Hermance Schaepman |
| --- | --- |
| | Alexa M. Saunders |
| | Theresa E. Sackler |
| | Marissa T. Sackler |
| | Sophia Dalrymple |
| | Michael D. Sackler |
| Possible Refunding Trust(s) | N/A |

Millennium Trust

| | |
| --- | --- |
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Marissa T. Sackler |
| |    MTS Minor Child (2017) |
| | Sophia Dalrymple |
| |    SD Minor Child 1 (2013) |
| |    SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| |    MDS Minor Child 1 (2019) |
| |    MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | Meerkat Trust |

|  | MTS 2006 Trust |
|  | Reserve Trust |
|  | SDS 2006 Trust |

### Perelle Bay Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Tenzin Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Marissa T. Sackler<br><br>MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders<br><br>Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Rosetta Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |

| | |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Stone Fiduciary Management Inc. |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Kathe Sackler |
| **Power Holders** | Kathe Sackler |
| **Possible Refunding Trust(s)** | KAS 2010 Family Trust<br><br>KAS 2011 Family Trust |

<u>Ilene S. Lefcourt Trust 88</u>

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| **Required Interested Persons** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| **Power Holders** | Hermance Schaepman |

|  | Leslie J. Schreyer |
|  | Jeffrey A. Robins |
|  | Ilene Sackler Lefcourt |
|  | Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Ilene S. Lefcourt Trust 96

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Ilene Sackler Lefcourt |
| **Possible Refunding Trust(s)** | Mondai Trust<br><br>Silver Trust |

ISL 2010 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| **Required Interested Persons** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Ilene Sackler Lefcourt |
| **Possible Refunding Trust(s)** | Jackson River Trust |

ISL 2011 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
|---|---|
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| **Required Interested Persons** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Ilene Sackler Lefcourt |
| **Possible Refunding Trust(s)** | N/A |

<br>

MDAS Investment Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Mortimer D.A. Sackler (Managing Trustee)<br><br>Flat Creek Fiduciary Management LLC (Non-Managing Trustee) |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler |

|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Jacqueline Pugh Sackler |
| **Required Interested Persons** | Mortimer D.A. Sackler |
|  | Jacqueline Pugh Sackler |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Mortimer DA Sackler Trust 96

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
| **Power Holders** | Hermance Schaepman |
|  | Mortimer D.A. Sackler |
|  | Leslie J. Schreyer |
| **Possible Refunding Trust(s)** | Mondai Trust |
|  | Silver Trust |

Mortimer DA Sackler Trust 2002

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDAS 2010 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |

| Required Interested Persons | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
|---|---|
| Power Holders | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | Jackson River Trust |

### MDAS 2011 Family Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| Required Interested Persons | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| Power Holders | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | N/A |

Trust Under Declaration of Trust No. 2 dated November 25, 1996

| | |
|---|---|
| **Original Jurisdiction of Creation** | New York |
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Stuart D. Baker |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust Under Agreement dated the 11th day of May 2005

| | |
|---|---|
| **Original Jurisdiction of Creation** | New York |
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Mortimer D.A. Sackler |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler |
| **Required Interested Persons** | Mortimer D.A. Sackler |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust Under Declaration of Trust No. 1 dated November 25, 1996

| | |
|---|---|
| **Original Jurisdiction of Creation** | New York |
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Stuart D. Baker<br><br>Leslie J. Schreyer |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | Meerkat Trust |

MDAS Children's Trust 2012

| | |
|---|---|
| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Jacqueline Pugh Sackler, as representative of minor beneficiaries |

| Power Holders | Mortimer D.A. Sackler |
|---|---|
| Possible Refunding Trust(s) | N/A |

### Nixie Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Leslie J. Schreyer |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Jacqueline Pugh Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| Required Interested Persons | Jacqueline Pugh Sackler |
| Power Holders | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | N/A |

### Indian Wells Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Leslie J. Schreyer<br><br>Jacqueline Pugh Sackler |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Jacqueline Pugh Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007) |

|  | MDAS Minor Child 3 (2014) |
|---|---|
| **Required Interested Persons** | Jacqueline Pugh Sackler |
| **Power Holders** | Mortimer D.A. Sackler |
|  | Jacqueline Pugh Sackler |
| **Possible Refunding Trust(s)** | N/A |

### MDS 2006 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Michael D. Sackler |
|  | MDS Minor Child 1 (2019) |
|  | MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Alexa M. Saunders |
|  | Michael D. Sackler |
|  | Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

### MDS 1992 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| Current Trustee(s) | Chelsea Trust Company Limited |
|---|---|
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>    MDS Minor Child 1 (2019)<br><br>    MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Theresa Sackler<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | Silver Trust |

<u>MDS Beacon 2010 Trust</u>

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>    MDS Minor Child 1 (2019)<br><br>    MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | N/A |

<u>MDS Beacon 2011 Trust</u>

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|

| Jurisdiction of Administration | Jersey, Channel Islands |
|---|---|
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| Possible Refunding Trust(s) | N/A |

## MDS Family Trust 2010

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| Possible Refunding Trust(s) | Cobo Bay Trust<br><br>Lune River Trust<br><br>Mondai Trust |

|  | Silver Trust |
|---|---|

## MTS 2013 Family Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

## MTS 2016 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017) |

|  |  |
|---|---|
|  | MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

## MTS Beacon 2013 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

## MTS Beacon 2014 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |

| | |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Beacon 2015 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman |

| | |
|---|---|
| | Leslie J. Schreyer |
| | Jeffrey A. Robins |
| | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

## MTS Beacon Trust 2010

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

## MTS Beacon Trust 2011

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler |

| | MTS Minor Child 1 (2017) |
|---|---|
| | MTS Minor Child 2 (2019) |
| | MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman |
| | Alexa M. Saunders |
| | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Beacon Trust 2012

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler |
| | MTS Minor Child 1 (2017) |
| | MTS Minor Child 2 (2019) |
| | MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman |
| | Alexa M. Saunders |
| | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Family Trust 2010

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |

| | |
|---|---|
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | Cobo Bay Trust<br><br>Lune River Trust<br><br>Mondai Trust<br><br>Silver Trust |

SDS 1992 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Sophia Dalrymple<br><br>Theresa Sackler |

| Possible Refunding Trust(s) | Silver Trust |
|---|---|

### SDS Beacon 2011 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Sophia Dalrymple |
| Possible Refunding Trust(s) | N/A |

### SDS Family Trust 2010

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders |

| | Sophia Dalrymple |
|---|---|
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
| | Lune River Trust |
| | Mondai Trust |
| | SDS Beacon 2014 Trust |
| | Silver Trust |

Romas Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | All beneficiaries are Excluded Beneficiaries |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Sheffield Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | All beneficiaries are Excluded Beneficiaries |

| Power Holders | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| | Mortimer D.A. Sackler |
| | Leslie J. Schreyer |
| Possible Refunding Trust(s) | Mondai Trust |
| | Racine Trust |

### SSSH 2013 Family Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

### SSSH Beacon 2013 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |

| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

### Samantha Hunt 1996 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | Silver Trust |

### Samantha S. Hunt 2002 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

A-Side IAC Payment Parties

Beacon Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Heatheridge Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015)<br><br>Michael D. Sackler |

|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Bowland Company Limited |
|  | Alexa M. Saunders |
|  | Leslie J. Schreyer |
|  | Jorg Fischer |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
|  | Lune River Trust |

Canadian Partnership Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Sandiway Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |

|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Bowland Company Limited |
| **Possible Refunding Trust(s)** | N/A |

## Clover Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |

|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Fidinc Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hagen Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |

| | |
|---|---|
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| | MDAS Minor Child 1 (2004) |
| | MDAS Minor Child 2 (2007) |
| | MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Halm Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Hillside Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br> JML Minor Child 1 (2009)<br><br> JML Minor Child 2 (2011)<br><br> JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br> KL Minor Child 1 (2009)<br><br> KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br> MDAS Minor Child 1 (2004)<br><br> MDAS Minor Child 2 (2007)<br><br> MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br> MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br> SD Minor Child 1 (2013)<br><br> SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br> MDS Minor Child (2019) |

|  | MDS Minor Child (2021) |
|---|---|
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Hercules Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler |

| | |
|---|---|
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |

Medichem Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hillside Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |

|  | Kathe Sackler |
|---|---|
|  | Mortimer D.A. Sackler |
|  |    MDAS Minor Child 1 (2004) |
|  |    MDAS Minor Child 2 (2007) |
|  |    MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  |    MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  |    SD Minor Child 1 (2013) |
|  |    SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  |    MDS Minor Child (2019) |
|  |    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Memphis Pharma Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Maydean Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |

| | |
|---|---|
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| | MDAS Minor Child 1 (2004) |
| | MDAS Minor Child 2 (2007) |
| | MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

MIL Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|

| | |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br>    MDS Minor Child (2019)<br><br>    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |

|  | Bowland Company Limited<br><br>Alexa M. Saunders |
|---|---|
| **Possible Refunding Trust(s)** | N/A |

## Milton Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hillside Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple |

| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

<u>Mundilab Trust</u>

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Tayleigh Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |

|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

## Pickering Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Themar Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |

|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  |    KL Minor Child 1 (2009) |
|  |    KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  |    MDAS Minor Child 1 (2004) |
|  |    MDAS Minor Child 2 (2007) |
|  |    MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  |    MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  |    SD Minor Child 1 (2013) |
|  |    SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  |    MDS Minor Child (2019) |
|  |    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders |
| **Possible Refunding Trust(s)** | Silver Trust |

## Tom & Kelly Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| | |
|---|---|
| **Current Trustee(s)** | Sandiway Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| |    JML Minor Child 1 (2009) |
| |    JML Minor Child 2 (2011) |
| |    JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| |    KL Minor Child 1 (2009) |
| |    KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| |    MDAS Minor Child 1 (2004) |
| |    MDAS Minor Child 2 (2007) |
| |    MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| |    MTS Minor Child (2017) |
| | Sophia Dalrymple |
| |    SD Minor Child 1 (2013) |
| |    SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| |    MDS Minor Child (2019) |
| |    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |

| Possible Refunding Trust(s) | Mondai Trust |
|---|---|

Varus Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Millborne Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015) |

|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

<br>

Taddeo Trust

| **Original Jurisdiction of Creation** | Wyoming |
| --- | --- |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Taddeo Fiduciary Management Inc. |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |

| Required Interested Persons | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | Karen Lefcourt |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| | Jacqueline Pugh Sackler, as representative of minor children of MDAS |
| **Power Holders** | Jeffrey A. Robins |
| **Possible Refunding Trust(s)** | Jackson River Trust |

Diagonal Blue Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| |     JML Minor Child 1 (2009) |
| |     JML Minor Child 2 (2011) |
| |     JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| |     KL Minor Child 1 (2009) |
| |     KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |

| | |
|---|---|
| | MDAS Minor Child 1 (2004) |
| | MDAS Minor Child 2 (2007) |
| | MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| | Millborne Trust Company Limited, as trustee of the MIL Trust |
| **Possible Refunding Trust(s)** | N/A |

<u>B-Side Sackler Party Trusts</u>

<u>Trust U/A 11/5/1974 fbo Beverly Sackler</u>

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Richard S. Sackler<br><br>Cedar Cliff Fiduciary Management, Inc. |
| **Beneficiary Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>    DAS Minor Child 1 (2014)<br><br>    DAS Minor Child 2 (2014)<br><br>    DAS Minor Child 3 (2016)<br><br>Marianna Sackler<br><br>MS Minor Child 1 (2015)<br><br>MS Minor Child 2 (2019)<br><br>MS Minor Child 3 (2021)<br><br>Rebecca Sackler<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>Jaseleen Sackler, as representative of minor children of DAS |

| | |
|---|---|
| | Marianna Sackler |
| | Rebecca Sackler |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Power Holders** | Richard S. Sackler |
| | David A. Sackler |
| | Marianna Sackler |
| | Rebecca Sackler |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

AR Irrevocable Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
| | New York as to validity and construction |
| **Current Trustee(s)** | Crystal Fiduciary Company LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
| | David A. Sackler |
| |    DAS Minor Child 1 (2014) |
| |    DAS Minor Child 2 (2014) |
| |    DAS Minor Child 3 (2016) |
| | Marianna Sackler |

|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
|  | David A. Sackler |
|  | Jaseleen Sackler, as representative of minor children of DAS |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
|  | David A. Sackler |
|  | Rebecca Sackler |
|  | Marianna Sackler |
|  | Leslie J. Schreyer |
|  | Stephen A. Ives |
| **Possible Refunding Trust(s)** | 1974 Irrevocable Trust fbo BS and RSS |

### RRS Trust 1 dtd 12/23/1989

| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
|  | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | David A. Sackler |
|  | DAS Minor Child 1 (2014) |

|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | David A. Sackler |
|  | Jaseleen Sackler, as representative of minor children of DAS |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
|  | David A. Sackler |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Possible Refunding Trust(s)** | N/A |

RRS Trust 1B dtd 12/23/1989

| **Original Jurisdiction of Creation** | Connecticut |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
|  | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | David A. Sackler |
|  | DAS Minor Child 1 (2014) |

|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | David A. Sackler |
|  | Jaseleen Sackler, as representative of minor children of DAS |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
|  | David A. Sackler |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Possible Refunding Trust(s)** | N/A |

<u>Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler</u>

| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
|  | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
|  | David A. Sackler |

|  | DAS Minor Child 1 (2014) |
|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

| **Original Jurisdiction of Creation** | Connecticut |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
|  | David A. Sackler |
|  | DAS Minor Child 1 (2014) |
|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |

| | MS Minor Child 3 (2021) |
| | |
| | Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |


Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>    DAS Minor Child 1 (2014)<br><br>    DAS Minor Child 2 (2014)<br><br>    DAS Minor Child 3 (2016)<br><br>Marianna Sackler<br><br>MS Minor Child 1 (2015)<br><br>MS Minor Child 2 (2019)<br><br>MS Minor Child 3 (2021)<br><br>Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |

AJ Irrevocable Trust

| Original Jurisdiction of Creation | Wyoming |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Power Holders | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler<br><br>Brian Olson<br><br>Garrett Lynam |
| Possible Refunding Trust(s) | 1974 Irrevocable Trust fbo BS and JDS |

RRS Trust 2 dtd 12/23/1989

| Original Jurisdiction of Creation | Connecticut |
|---|---|
| Jurisdiction of Administration | Wyoming |

| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
|---|---|
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Power Holders | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Possible Refunding Trust(s) | N/A |

### RRS Trust 2B dtd 12/23/1989

| Original Jurisdiction of Creation | Connecticut |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Madeleine Sackler |

| | Clare Sackler |
| | Miles Sackler |
| **Power Holders** | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
| | New York as to validity and construction |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| |    CS Minor Child (2019) |
| | Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| **Power Holders** | N/A |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |

| Governing Law Jurisdiction | Wyoming as to Administration |
| --- | --- |
| | New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| |    CS Minor Child (2019) |
| | Miles Sackler |
| Required Interested Persons | Mary Corson |
| Power Holders | N/A |
| Possible Refunding Trust(s) | N/A |

<u>Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler</u>

| Original Jurisdiction of Creation | Connecticut |
| --- | --- |
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to Administration |
| | New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| |    CS Minor Child (2019) |
| | Miles Sackler |
| Required Interested Persons | Mary Corson |
| Power Holders | N/A |

| Possible Refunding Trust(s) | N/A |
|---|---|

### Hudson Trust

| Original Jurisdiction of Creation | Wyoming |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Person | Mary Corson |
| Power Holders | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Possible Refunding Trust(s) | Mary Corson Trust |

### Irrevocable Trust under Declaration dated as of December 29, 1992

| Original Jurisdiction of Creation | Connecticut |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to administration<br><br>New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |

| | |
|---|---|
| **Beneficiary Interested Persons** | Madeleine Sackler<br><br>Clare Sackler<br><br>   CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Power Holders** | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

JDS Revocable Pourover Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>   CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |

| Power Holders | Mary Corson |
| --- | --- |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Estate of Jonathan D. Sackler

| Situs and Principal Place of Administration | Connecticut |
| --- | --- |
| **Court Admitting Original Will to Probate and Issuing Permanent Letters to Personal Representative** | Greenwich Probate Court |
| **Current Personal Representative** | Garrett Lynam |
| **Beneficiary Interested Persons** | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| | Cornice Fiduciary Management LLC, as Trustee of the JDS Revocable Pourover Trust |
| **Power Holders** | N/A |

**Exhibit R**
**Form of Estate Certification**

## [FORM OF] ESTATE CERTIFICATION

THIS ESTATE CERTIFICATION (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                        ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

### RECITALS

WHEREAS, [the receipt by the MDT of an Estate Certification [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

### AGREEMENT

3. NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

g) The undersigned Certifying Party is the sole personal representative of the Estate of Jonathan D. Sackler, date of death June 30, 2020 (the "JDS Estate").

h) The last Will and Testament of Jonathan D. Sackler, dated August 15, 2019 was admitted to probate in the Greenwich County, Connecticut probate court (the "Probate Court") on July 14, 2020 (the "Last Will and Testament"), and no codicils or documents purporting to be the last Will and Testament of Jonathan D. Sackler have been filed with the Probate Court or any other probate court.

i) Letters testamentary were issued to the Certifying Party on July 14, 2020 (a recent copy of the Fiduciary's Probate Certificate being attached hereto as Schedule A) and the Certifying Party has sole control over the JDS Estate as the sole personal representative thereof.

j)   The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the JDS Estate is true and correct as of the date hereof and the Certifying Party has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as personal representative of the JDS Estate.

k)   Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations; *provided* that, the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

l)   The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (f) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

m)   [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of

the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

[*Signature Page Follows Containing Signature of Personal Representative of the JDS Estate*]

_____
[Name of Personal Representative]

Signature Page to Estate Certification with respect to the JDS Estate

**SCHEDULE A**
**FIDUCIARY'S PROBATE CERTIFICATE**

**<u>Exhibit S</u>**
**Designated Shareholder Released Parties**

**Exhibit T**
**De Minimis Payment Parties**

**De Minimis Payment Parties (A-Side Payment Parties)**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
| --- | --- |
| None | None |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
| --- | --- |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| | Mortimer DA Sackler Trust 2002 |
| | MDAS 2011 Family Trust |
| | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| | Trust under Agreement dated the 11th day of May 2005 |
| | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
| --- | --- |
| MDS 2006 Trust | MTS Beacon 2014 Trust |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
| --- | --- |
| None | SSSH Beacon 2013 Trust |

**De Minimis Payment Parties (B-Side Payment Parties)**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
|---|---|
| Raymond R. Sackler Trust 1B dtd 12/23/89 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Rosebay Medical Company, Inc. | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

**<u>Exhibit U</u>**
**Illustrative Examples**

**<u>Exhibit V</u>**
**Joinder Agreement**

**JOINDER AGREEMENT**

THIS JOINDER AGREEMENT (this "**Agreement**") is made as of the date indicated in the signature block below (the "**Effective Date**") by the undersigned (the "**Joining Party**").

1.    <u>Joinder</u>. The Joining Party hereby confirms that it has been furnished with a copy of, and has carefully read, the Settlement Agreement, dated August [●], 2021, by and among the MDT (as defined therein), the Sackler Parties listed on Exhibit A thereto and Debtors listed on Exhibit B thereto, as may be amended from time to time (the "**Settlement Agreement**"), prior to its execution of this Agreement. By executing this Agreement, the Joining Party becomes a party to, and agrees to be bound by and subject to the terms of, the Settlement Agreement as a (a) Sackler Party, (b) Payment Party or IAC Payment Party and (c) as a member of the Payment Group, with respect to clauses (b) and (c) above, each as indicated in the signature block below[, and hereby expressly assumes, and agrees to pay and perform, any and all obligations of _____ pursuant to the Settlement Agreement].

2.    <u>Definitions</u>. Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the Settlement Agreement.

3.    <u>Interpretive Provisions</u>. The Interpretive Provisions set forth in Section 1.02 of the Settlement Agreement shall apply, *mutatis mutandis*, to this Joinder Agreement (including without limitation that the rights and obligations of a trust that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the trustees of such trusts, in their capacity as such).

4.    <u>Representations and Warranties</u>. The Joining Party makes, in its capacity as a Sackler Party and as of the Effective Date, the representations and warranties contained in <u>Sections 7.01</u>, <u>7.02</u> and <u>7.03</u> of the Settlement Agreement, as applicable. [In addition, the Joining Party represents and warrants that its Jurisdiction of Administration is as set out on the signature page hereto.]

5.    <u>Full Force and Effect</u>. All of the terms, covenants, agreements, conditions and other provisions of the Settlement Agreement shall remain in full force and effect in accordance with their respective terms.

6.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction; *provided, however*, that for the avoidance of doubt and as set forth in Section 11.10 of the Settlement Agreement, each of MDT and the Debtors shall have the benefit in connection with any matter with respect to a party to this Joinder Agreement that is a Trust arising from or related to this Joinder Agreement of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on the representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has executed and delivered this Agreement as of the date first above written.

JOINING PARTY:

_____

Name: _____

Date: _____

Payment Party: ☐

IAC Payment Party: ☐

Payment Group: _____

Jurisdiction of Administration:

**Exhibit W**
**Form of IAC Tax Distributions Report**

**Exhibit W-1**
**IAC Tax Distributions Quarterly Report (Schedule 1)**

**EXHIBIT W-1**

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)**
**(MODEL TEMPLATE)**

[_____], 20[___]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions.

Reference is made to the taxable year ending December 31, 20[___].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity as an authorized officer of [        ], and not in any individual capacity, hereby states that the amounts set forth on Schedule 1 hereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties:

[              ]

By:  _____
Name:
Title:

This report is to be delivered thirty (30) days following the quarter close

**EXHIBIT W-1**

# IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)
## (MODEL TEMPLATE)

### Calculation of Quarterly Tax Distributions Received [FN1/FN2]

| *Tax Distributions Computations* | *Totals* | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| *Amount of projected book net income for relevant quarter* [FN3] | | U.S. $ [        ] | U.S. $ [        ] |
| *Foreign income taxes paid (or estimated in good faith to be paid) in respect of projected book net income (company level)* [FN3/FN4] | | U.S. $ [        ] | U.S. $ [        ] |
| *Foreign income taxes paid (or estimated in good faith to be paid) in respect of projected book net income (shareholder level)* [FN5] | | U.S. $ [        ] | U.S. $ [        ] |
| *Foreign withholding tax rate* [FN6] | | _____% | _____% |
| *Foreign withholding taxes paid (or estimated in good faith to be paid) in respect of Tax Distribution* [FN4] | | U.S. $ [        ] | U.S. $ [        ] |
| *Amount of projected book net income for relevant quarter net of deduction for foreign taxes* | | U.S. $ [        ] | U.S. $ [        ] |
| *Highest marginal combined U.S. federal, state, and local income tax rate* [FN7] | | _____% | _____% |
| *Highest marginal foreign income tax rate* [FN8] | | _____% | _____% |
| *Tax Distribution payable* [FN9] | | U.S. $ [        ] | U.S. $ [        ] |
| *Tax Distribution received for the quarter* | | U.S. $ [        ] | U.S. $ [        ] |
| *Total Tax Distributions received for relevant quarter and any prior quarters of relevant taxable year* | | U.S. $ [        ] | U.S. $ [        ] |

[1]  The IACs do not necessarily make quarterly tax distribution. Schedule 1 needs to be adapted accordingly. Also, the IACs may adjust their projected book net income, foreign taxes, etc. as the year goes on.  IAC Tax Distributions as  the year progresses should be based on the running cumulative totals and not each quarter in isolation. Any such prior period adjustments that are taken into account in the current period line entries should be reflected in footnotes to Schedule 1.

[2]  The template report may need to be expanded/modified based on the tiers of entities and the tax character and tax attributes of the IAC and any intermediate entities.

[3]  Determined based on the IAC's management accounts without adjustments for US federal income tax purposes.

[4]  This amount will be taken into account as a reduction in determining the Tax Distribution payable.

[5]  Based on the highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.  Additional line entries will be needed for any intermediate company taxes.

[6]  The foreign withholding tax rate for such period imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut.

[7] The highest marginal U.S. federal, state, and local income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of U.S. state and local taxes.

2

[8] The highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.

[9]  The greater of projected book net income less applicable deductions multiplied by (x) the highest marginal combined U.S. federal, state and local income tax rate or (y) the highest marginal applicable foreign income tax rate.

**Exhibit W-2**
**IAC Tax Distributions Annual Report (Schedule 2)**

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE) [APPROVED ACCOUNTANT]**

[_____], 20[__]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions.

I, on behalf of an [Approved Accountant] and not in any individual capacity, hereby state that the attached Schedule 2 correctly reflects the following items described in subclauses (ii) through (iv) of Section 3.02(a)(ii)(B)(x) based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns and any related work papers or other information provided to me as well as the following items described in subclauses (v) and (vi) of Section 3.02(a)(ii)(B)(x):

(ii) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year;

(iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; and

(iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution with respect to such amounts.

(v) the highest marginal U.S. federal, state, and local income and withholding tax rate for the relevant tax year applicable to a U.S. citizen who is a resident of the State of Connecticut (taking into account the deductibility, as applicable, of U.S. state and local taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC) and the highest foreign withholding tax rate and the highest marginal foreign income tax rate for the relevant tax year applicable to a U.S. citizen who is a resident of the State of Connecticut; and

(vi) the calculation of the total amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement.

[Approved Accountant]

By:    _____
Name:
Title:

This report is to be delivered sixty (60) days following the extended due date
(now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE)**

[_____], 20[__]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions.

Reference is made to the taxable year ending December 31, 20[__]. Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity on behalf of [      ], and not in any individual capacity, hereby states that

(i) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 hereto are accurate based on the information provided by the relevant IACs and IAC Payment Parties;

(ii) the U.S. federal income tax items set forth on Schedule 2 hereto accurately reflect the amount reported in the applicable U.S. federal income tax returns, including

(a) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year;

(b) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; and

(c) the amount of net U.S. federal taxable income net of all deductions including deductions of foreign taxes; and

(iii) the calculations for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.

[                ]]

By: _____
Name:
Title:

This report is to be delivered thirty (30) days following the extended due date
(now October 15) for filing individual US federal income tax returns.

2

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE)**

**Calculation of IAC Tax Distributions**
**U.S. federal income tax adjustments** [FN1]

| *Tax Distribution Computation* | Totals | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| *Amount of book net income (management accounts)* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of U.S. federal taxable income, net of all deductions other than deductions of foreign taxes, allocated to the IAC Payment Party* [FN2] | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Ordinary* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Capital gain  (long-term)* | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Other* [FN3] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of foreign income taxes paid (or reasonably expected to be paid) in respect of such U.S. federal taxable income* [FN2] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Foreign withholding tax rate* [FN4] | | *[   %   ]* | *[   %   ]* |
| *Amount of foreign withholding taxes paid (or reasonably expected to be paid) in respect of Tax Distribution* [FN5] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of net U.S. federal taxable income net of all deductions including deductions of foreign taxes* [FN2/ FN6] | | *U.S. $[    ]* | *U.S. $[    ]* |
| • *Ordinary income* | | | |
| • *Capital gain (long-term)* | | | |
| • *Other* [FN3] | | | |
| *Highest marginal U.S. federal, state, and local income and withholding tax rate* [FN7] | | | |
| • *Ordinary income* | | *[   %   ]* | *[   %   ]* |
| • *Capital gain (long-term)* | | *[   %   ]* | *[   %   ]* |
| • *Other* [FN3] | | | |
| *Highest marginal foreign income tax rate* [FN8] | | *[   %   ]* | *[   %   ]* |
| *Total Tax Distributions payable* [FN9] | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Tax Distributions received in respect of an IAC for relevant taxable year* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of Tax Distributions to be recharacterized as IAC Non-Tax Distribution* | | *U.S. $[    ]* | *U.S. $[    ]* |
| *Amount of Tax Distributions remaining to be paid* | | *U.S. $[    ]* | *U.S. $[    ]* |

---

[1]  The template report may need to be expanded/modified based on the tiers of entities and the tax character and tax attributes of the IAC and any intermediate entities.

[2]  Amount reflected on US federal income tax return.

[3]  This is intended to cover any other categories that may become relevant.

[4]  The foreign withholding tax rate for such period imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut.

[5]  This is the amount reflected on Schedule 1 for the year.

[6]  This amount is equal to the "Amount of U.S. federal taxable income" less "Amount of foreign income taxes" less "Amount of foreign withholding taxes."  The deduction for foreign income and withholding taxes will be allocated as a deduction to capital gain, ordinary income, and other income in accordance with applicable law.  Such deduction will only be taken into account where the deduction is

available to such U.S. citizen (e.g., because such foreign taxes are paid by a pass-through entity of such U.S. citizen for U.S. federal income tax purposes).

[7] The highest marginal U.S. federal, state, and local income and withholding tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of U.S. state and local taxes.

[8] The highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.

[9] The greater of U.S. federal taxable income less applicable deductions multiplied by (x) the highest marginal combined U.S. federal, state and local income tax rate or (y) the highest marginal applicable foreign income tax rate.

**<u>Exhibit X</u>**
**Certain Shareholder Released Parties**

**CERTAIN A-SIDE RELEASE PARTIES**[1]

Individual Family Members

1. Theresa E. Sackler
2. Ilene Sackler Lefcourt
3. Kathe A. Sackler
4. Mortimer D.A. Sackler
5. Michael Sackler
6. Marissa Sackler
7. Sophie Dalrymple
8. Samantha Hunt
9. The spouses, children and grandchildren of the above
10. The assets, businesses and entities owned by the above.
Trusts, Trustees and Protectors

1. 533 Canal Trust
2. Alexa M. Saunders
3. Anthony M. Roncalli
4. Angonoka Trust
5. Beacon Trust
6. Beacon Trust Company Limited
7. BJSS 2010 Trust
8. BJSS 2013 Trust
9. BJSS and JHSS 2012 K Trust
10. Benjamin Shack Sackler Trust 98
11. Bowland Company Limited
12. Canadian Partnership Trust
13. Charles G. Lubar
14. Christopher B. Mitchell (and the estate of Christopher B. Mitchell)
15. Chelsea Trust Company Limited
16. Christopher M. Reimer
17. Clover Trust
18. Cobo Bay Trust
19. Codan Trust Company Limited
20. Diagonal Blue Trust
21. Estera Services (Bermuda) Limited/Ocorian Services (Bermuda) Limited
22. Fidinc Trust
23. Flat Creek Fiduciary Management LLC
24. Flat Creek Purpose Trust
25. Frontier Directed Fiduciary Services LLC
26. Gorey Trust

---

[1] For the avoidance of doubt, the inclusion of any person on this list who also fits within a category on this list that is also a category in the release shall not be construed to narrow such category or to support an inference that another person within such category but not on this list is not a released party.

27.     Glebe Trust II
28.     Hagen Trust Company Limited
29.     Halm Trust
30.     Heatheridge Trust Company Limited
31.     Hercules Trust
32.     Hermance Schaepman
33.     Highland Court Trust
34.     Hillside Trust Company Limited
35.     Ilene S. Lefcourt Trust 88
36.     Ilene S. Lefcourt Trust 96
37.     Ilene Sackler Lefcourt Revocable Trust
38.     Indian Wells Trust
39.     Inholmes Trust
40.     ISL 2010 Family Trust
41.     ISL 2011 Family Trust
42.     ISL JML OSHA Trust
43.     ISL LT Children's Trust
44.     Jackson River Trust
45.     Jeffrey A. Robins
46.     JHSS 2010 Trust
47.     JHSS 2013 Trust
48.     JML 2010 Family Trust
49.     JML 2011 Family Trust
50.     JML Investment Trust
51.     JML OSHA Trust
52.     JML Pour-Over Trust
53.     Joerg Fischer
54.     Jonathan G. White
55.     Julia Shack Sackler Trust 98
56.     Karen Lefcourt Trust
57.     KAS 2010 Family Trust
58.     KAS 2011 Family Trust
59.     Kathe A. Sackler 2001 Trust
60.     Kathe A. Sackler Trust 88
61.     Kathe A. Sackler Trust 96
62.     Kerry J. Sulkowicz
63.     KLT 2010 Family Trust
64.     KLT 2011 Family Trust
65.     KLT Pour-Over Trust
66.     La Coupe Trust
67.     La Digue Limited
68.     Leslie J. Schreyer
69.     LSRR Family Trust
70.     Lune River Trust
71.     May Trust
72.     Maydean Trust Company Limited
73.     MDAS 2010 Family Trust

3

74.   MDAS 2011 Family Trust
75.   MDAS 2012 Children's Trust
76.   MDAS Investment Trust
77.   Michael D. Sackler 1992 Trust
78.   Michael D. Sackler 2002 Trust
79.   Michael D. Sackler 2006 Trust
80.   MDS Beacon 2010 Trust
81.   MDS Beacon 2011 Trust
82.   MDS Beacon 2012 Trust
83.   MDS Beacon 2013 Trust
84.   MDS Family Trust
85.   Medichem Trust
86.   Meerkat Trust
87.   Memphis Pharma Trust
88.   MIL Trust
89.   Millborne Trust Company Limited
90.   Millennium Trust
91.   Milton Trust
92.   Mondai Trust
93.   Mordas Consolidated Purpose Trust
94.   Mordas Trust Company Limited
95.   Mortimer DA Sackler Trust 1995
96.   Mortimer DA Sackler Trust 2002
97.   Morvetta Trust
98.   MTS 2002 Trust
99.   MTS 2006 Trust
100.   MTS 2013 Family Trust
101.   MTS 2016 Trust
102.   MTS Bare Trust
103.   MTS Beacon 2010 Trust
104.   MTS Beacon 2011 Trust
105.   MTS Beacon 2012 Trust
106.   MTS Beacon 2013 Trust
107.   MTS Beacon 2014 Trust
108.   MTS Beacon 2015 Trust
109.   MTS Family Trust
110.   MTS Trust 2006
111.   Mundi Lab Trust
112.   Nixie Trust
113.   PALP Trust
114.   Perelle Bay Trust
115.   Peter M. Ward (and the estate of Peter M. Ward)
116.   Pickering Trust
117.   Racine Trust
118.   Reserve Trust
119.   Romas Trust 2002
120.   Sandiway Trust Company Limited

121. Samantha Hunt 1996 Trust
122. Samantha S. Hunt 2002 Trust
123. SASS 2010 Trust
124. SASS 2013 Trust
125. SDS 1992 Trust
126. SDS 2002 Trust
127. SDS 2006 Trust
128. SDS Bare Trust
129. SDS Beacon 2011 Trust
130. SDS Beacon 2012 Trust
131. SDS Beacon 2014 Trust
132. SDS Family Trust
133. Sheffield Trust
134. Silver Trust
135. Soft River Fiduciary Management LLC
136. Soft River Purpose Trust
137. SS Tanager Trust
138. SSSH 2013 Family Trust
139. SSSH Beacon 2013 Trust
140. Stuart D. Baker
141. Taddeo Fiduciary Management Inc.
142. Taddeo Purpose Trust
143. Taddeo Trust
144. Tayleigh Trust Company Limited
145. Tenzin Trust Company Limited
146. TES Bare Trust
147. TES Beacon 2012 Trust
148. TES Beacon 2013 Trust
149. TES Beacon 2014 Trust
150. Themar Consolidated Purpose Trust
151. Themar Trust Company Limited
152. Theresa E. Sackler 1988 Trust
153. Theresa E. Sackler 2008 Trust
154. Tom & Kelly Trust
155. Trust under Agreement dated the 11th day of May 2005
156. Trust under Agreement dated the 13th day of March 2009
157. Trust Under Declaration dated April 11, 2002
158. Trust Under Declaration of Trust No. 1 dated November 25, 1996
159. Trust Under Declaration of Trust No. 2 dated November 25, 1996
160. Varus Trust
161. The assets, businesses and entities owned by the above.
     Purdue Parent Entities

1. Banela Corporation
2. Beacon Company
3. BR Holdings Associates Inc.
4. BR Holdings Associates L.P.

5

5.      Heatheridge Trust Company Limited, as Trustee under Settlement dated 31 December 1993
        F.B.O. the issue of Mortimer D. Sackler M.D., Theresa E. Sackler and certain charitable objects
6.      Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust
        dated 2 March 1999 F.B.O. Theresa E. Sackler, the issue of Mortimer D. Sackler, M.D. and
        certain charitable objects
7.      Pharmaceutical Research Associates L.P. (formerly Purdue Holdings L.P.)
8.      PLP Associates Holdings Inc.
9.      PLP Associates Holdings L.P.
10.     Purdue Pharma Inc.
11.     Stanhope Gate Corp.
12.     The assets, businesses and entities owned by the above (excluding the Debtors).
        Independent Associated Companies

1.      Accardi B.V.
2.      Accardi S.àr.l.
3.      Alfa Generics B.V.
4.      Arsago B.V.
5.      Bard Pharmaceuticals (1990) Inc.
6.      Bard Pharmaceuticals Limited
7.      Bermag Limited
8.      Boetti Corporation
9.      Boldini Corporation
10.     Bradenton Products B.V.
11.     Bulla S.àr.l.
12.     Clinical Designs Limited
13.     Clovio Corporation
14.     E.R.G. Realty, Inc.
15.     Elvium Life Sciences GP Inc.
16.     Elvium Life Sciences Limited Partnership
17.     Elvium ULC
18.     Euro-Celtique S.A.
19.     Evening Star Services Limited
20.     Filti S.àr.l.
21.     Flira S.àr.l.
22.     Hayez Corporation
23.     Ind S.àr.l.
24.     Irey S.àr.l.
25.     Krugmann GmbH
26.     Ladenburg B.V.
27.     Lake Claire Investments Limited
28.     L.P. Clover Limited
29.     Lucien Holdings S.àr.l.
30.     Lymit Holdings S.àr.l.
31.     Maltus Corporation
32.     Marnine Holdings Pte. Limited
33.     Martone Holdings Pte. Limited
34.     Mexcus Corporation

35.     MN Consulting LLC
36.     MNP Consulting Limited
37.     Mundibiopharma Limited
38.     Mundichemie GmbH
39.     Mundipharma (Argentina) S.r.l.
40.     Mundipharma (China) Pharmaceutical Company Limited
41.     Mundipharma (Colombia) S.A.S.
42.     Mundipharma (Hong Kong) Limited
43.     Mundipharma (Myanmar) Co., Limited
44.     Mundipharma (Proprietary) Limited
45.     Mundipharma (Shanghai) International Trade Company Limited
46.     Mundipharma (Thailand) Limited
47.     Mundipharma A.S.
48.     Mundipharma A/S
49.     Mundipharma AB
50.     Mundipharma AG
51.     Mundipharma B.V.
52.     Mundipharma Biologics GmbH
53.     Mundipharma Biologics Inc.
54.     Mundipharma Bradenton B.V.
55.     Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
56.     Mundipharma BV
57.     Mundipharma Company
58.     Mundipharma Corporation (Ireland) Limited
59.     Mundipharma Corporation Limited
60.     Mundipharma DC B.V.
61.     Mundipharma de Mexico, S. de R.L. de C.V.
62.     Mundipharma Deutschland GmbH & Co. KG
63.     Mundipharma Development Pte. Limited
64.     Mundipharma Distribution GmbH
65.     Mundipharma Distribution Limited
66.     Mundipharma EDO GmbH
67.     Mundipharma Egypt LLC
68.     Mundipharma Farmaceutica LDA.
69.     Mundipharma FZ-LLC
70.     Mundipharma GesmbH
71.     Mundipharma GmbH
72.     Mundipharma Healthcare Corporation
73.     Mundipharma Healthcare LLC
74.     Mundipharma Healthcare Pte. Limited
75.     Mundipharma Healthcare Pty. Limited
76.     Mundipharma Holding AG
77.     Mundipharma International Services GmbH
78.     Mundipharma International Services Limited
79.     Mundipharma International Services S.ar.l.
80.     Mundipharma International Corporation Limited
81.     Mundipharma International Holdings Limited

82.    Mundipharma International Limited
83.    Mundipharma International Services GmbH
84.    Mundipharma International Services Limited
85.    Mundipharma International Services S.àr.l.
86.    Mundipharma International Technical Operations Limited
87.    Mundipharma IT GmbH
88.    Mundipharma IT Services GmbH
89.    Mundipharma IT Services Inc.
90.    Mundipharma IT Services Limited
91.    Mundipharma IT Services Pte. Limited
92.    Mundipharma Kabushiki Kaishe
93.    Mundipharma Korea Limited
94.    Mundipharma Laboratories GmbH
95.    Mundipharma Laboratories Limited
96.    Mundipharma LATAM GmbH
97.    Mundipharma Limited
98.    Mundipharma Ltd.
99.    Mundipharma Management S.ar.l.
100.    Mundipharma Manufacturing Pte. Limited
101.    Mundipharma MEA GmbH
102.    Mundipharma Medical CEE GmbH
103.    Mundipharma Medical Company
104.    Mundipharma Medical Company Limited
105.    Mundipharma Medical GmbH
106.    Mundipharma Medical S.ar.l.
107.    Mundipharma Middle East FZ-LLC
108.    Mundipharma Near East GmbH
109.    Mundipharma New Zealand Limited
110.    Mundipharma Oncology Pty. Limited
111.    Mundipharma Ophthalmology Corporation Limited
112.    Mundipharma Ophthalmology Products Limited
113.    Mundipharma Oy
114.    Mundipharma Pharmaceutical Company
115.    Mundipharma Pharmaceuticals (Chile) Limitada
116.    Mundipharma Pharmaceuticals Argentina S.r.l.
117.    Mundipharma Pharmaceuticals B.V.
118.    Mundipharma Pharmaceuticals Belgium BV
119.    Mundipharma Pharmaceuticals Inc.
120.    Mundipharma Pharmaceuticals Industry and Trade Limited
121.    Mundipharma Pharmaceuticals Limited
122.    Mundipharma Pharmaceuticals Private Limited
123.    Mundipharma Pharmaceuticals S.L.
124.    Mundipharma Pharmaceuticals S.r.l.
125.    Mundipharma Pharmaceuticals Sdn. Bhd.
126.    Mundipharma Polska SP. Z.O.O.
127.    Mundipharma Pte Limited
128.    Mundipharma Pty Limited

129. Mundipharma Research Company Limited
130. Mundipharma Research GmbH & Co. KG
131. Mundipharma Research Limited
132. Mundipharma Research Verwaltungs GmbH
133. Mundipharma SAS
134. Scientific Office of Mundipharma MEA GmbH
135. Mundipharma Singapore Holding Pte. Limited
136. Mundipharma TK
137. Mundipharma Verwaltungsgesellschaft mbH
138. Napp Laboratories Limited
139. Napp Pension Trustees Limited
140. Napp Pharmaceutical Group Limited
141. Napp Pharmaceutical Holdings Limited
142. Napp Pharmaceuticals Limited
143. Napp Research Centre Limited
144. Nitid S.àr.l.
145. Nontag S.àr.l.
146. One Stamford Realty L.P.
147. Paineurope Limited
148. Par-La-Ville Properties Limited
149. Porthos S.àr.l.
150. PT. Mundipharma Healthcare Indonesia
151. Purdue BioPharma Inc.
152. Purdue BioPharma L.P.
153. Purdue Frederick Inc.
154. Purdue Pharma Inc. (Canadian Company)
155. Purdue Pharma Technologies Inc.
156. Purdue Pharma Pty. Ltd.
157. Purdue Pharma ULC
158. Qdem Pharmaceuticals Limited
159. Rafa Laboratories Ltd.
160. Sofy S.àr.l.
161. Songol S.àr.l.
162. Sonti S.àr.l.
163. Tacca B.V.
164. Taiwan Mundipharma Pharmaceuticals Limited
165. Technical Scientific Office of Mundipharma Near East GmbH
166. Tenna B.V.
167. The Napp Educational Foundation
168. The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City
169. Vaccaro B.V.
170. Venusti B.V.
171. Win – Healthcare Private Ltd.
172. Win – Medicare Private Ltd.
173. Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.
174. The assets, businesses and entities owned by the above.

### CERTAIN B-SIDE RELEASED PARTIES

| Certain Shareholder Released Parties | |
|---|---|
| **Shareholder Released Party** | **Relationship to Proceedings** |
| Raymond R. Sackler/Estate of Raymond R. Sackler | Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity[1] in Purdue Pharma L.P. chain of ownership; current and/or former trustee |
| Beverly Sackler/Estate of Beverly Sackler | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former trustee |
| Jonathan D. Sackler/Estate of Jonathan D. Sackler | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way[2] entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Richard S. Sackler, M.D. | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Beth Cohen (formerly Sackler) | Family member; trust beneficiary; current and/or former trustee |
| David A. Sackler | Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |

---

[1]     A II-way entity is an entity directly or indirectly owned by persons or trusts associated with both the Raymond Sackler Family (the "RRS Family") and the Mortimer Sackler Family (the "MDS Family"), with equal interests associated with each family.

[2]     A I-way entity is an entity directly or indirectly owned by persons or trusts associated solely with either the RRS Family or the MDS Family.

| Children of David Sackler | Family members; trust beneficiaries |
|---|---|
| Jaseleen Ruggles | Family member |
| Marianna Sackler Frame | Family member; trust beneficiary |
| Children of Marianna Sackler Frame | Family members; trust beneficiaries |
| James Frame | Family member |
| Rebecca Sackler | Family member; trust beneficiary; current and/or former trustee |
| Jeffrey Selikoff | Family member; trust beneficiary; current and/or former trustee |
| Mary Corson | Family member; trust beneficiary; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Madeleine Sackler | Family member; trust beneficiary |
| Clare E. Sackler | Family member; trust beneficiary |
| Children of Clare E. Sackler | Family members; trust beneficiaries |
| Miles R.C. Sackler | Family member; trust beneficiary |
| Garrett Lynam | Executor of estate; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Stuart D. Baker | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Anthony M. Roncalli | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Philip C. Strassburger | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Edward B. Mahony | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Peter Boer | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Paulo Costa | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Ralph Snyderman | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |

| | |
|---|---|
| William Loomis | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Stephen A. Ives | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Leslie J. Schreyer | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Danny Parks | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; employee of RRS Family I-way entity |
| Jeffrey A. Robins | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Beatriz V. Iriondo/Betty Andrikopoulos | Current and/or former director, manager and/or officer of trust company |
| Christopher Reimer | Current and/or former director, manager and/or officer of trust company |
| Jared Giddens | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Stephen L. Schreiner | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Frank S. Vellucci | Employee of RRS Family I-way entity |
| Rory Held | Employee of RRS Family I-way entity |
| BRJ Fiduciary Management LLC | Current and/or former trustee |
| Cedar Cliff Fiduciary Management Inc. | Current and/or former trustee |
| Cornice Fiduciary Management LLC | Current and/or former trustee |
| Crystal Fiduciary Company LLC | Current and/or former trustee |
| Data LLC | Current and/or former trustee |
| MCM Fiduciary Management LLC | Current and/or former trustee |
| North Bay Trust Company Inc. | Current and/or former trustee |
| Brian Olson | Current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Elizabeth A. Whalen | Current and/or former trustee |
| Lauren D. Kelly | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |

| | |
|---|---|
| John N. Irwin III | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| John Wilcox/Estate of John Wilcox | Current and/or former trustee |
| Michael Kassen | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Peter M. Ward/Estate of Peter M. Ward | Current and/or former trustee |
| Ruth Edelson | Current and/or former trustee |
| Susan C. Frunzi | Current and/or former trustee |
| Thomas A. Russo | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Janet Pomerantz | Current and/or former trustee |
| Alex Troy | Current and/or former trustee |
| Josephine Hoh | Trust beneficiary |
| Scott Bulua | Family member |
| Molly B. Johnson | Family member |
| Trust U/A 11/5/74 fbo Beverly Sackler | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 2 dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 2B dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Trust B U/A 11/5/74 fbo Beverly Sackler | RRS Family trust |
| The 1974 Irrevocable Investment Trust | RRS Family trust |
| 1974 Irrevocable Trust fbo BS and RSS | RRS Family trust |
| 1974 Irrevocable Trust fbo BS and JDS | RRS Family trust |
| AR Irrevocable Trust | RRS Family trust |
| AJ Irrevocable Trust | RRS Family trust |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler | RRS Family trust |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |

4

| | |
|---|---|
| Beverly Sackler Trust 2 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Miles Raymond Sackler 12/29/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Miles Raymond Sackler 12/30/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Miles Raymond Sackler 12/28/1989 | RRS Family trust |
| David A. Sackler 2012 Trust | RRS Family trust |
| Marianna R. Sackler 2012 Trust | RRS Family trust |
| Rebecca K. Sackler 2012 Trust | RRS Family trust |
| Madeleine Sackler 2012 Trust | RRS Family trust |
| Clare E. Sackler 2012 Trust | RRS Family trust |
| Miles R.C. Sackler 2012 Trust | RRS Family trust |
| Irrevocable Trust under Declaration dated as of April 25, 1991 | RRS Family trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | RRS Family trust |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | RRS Family trust |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler | RRS Family trust |

| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | RRS Family trust |
|---|---|
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler | RRS Family trust |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | RRS Family trust |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler | RRS Family trust |
| Beth B. Sackler Trust | RRS Family trust |
| Beth Sackler 2013 Trust | RRS Family trust |
| Mary Corson Trust | RRS Family trust |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | RRS Family trust |
| Trust Agreement dated August 29, 2003 f/b/o Mary Corson and Issue of Jonathan D. Sackler | RRS Family trust |
| Irrevocable Trust under Declaration dated as of August 25, 1992 | RRS Family trust |
| Irrevocable Trust under Declaration dated as of December 29, 1992 | RRS Family trust |
| Richard S. Sackler Life Insurance Trust | RRS Family trust |
| Jonathan D. Sackler Life Insurance Trust | RRS Family trust |
| Richard S. Sackler Trust U/A 9/30/04 | RRS Family trust |
| Jonathan D. Sackler Trust U/A 9/30/04 | RRS Family trust |
| Hudson Trust | RRS Family trust |
| Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | RRS Family trust |
| Richard S. Sackler Trust f/b/o Marianna R. Sackler 3/8/90 | RRS Family trust |
| Richard S. Sackler Trust f/b/o Rebecca K. Sackler 3/8/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Clare Elizabeth Sackler 4/11/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Madeleine Sackler 4/11/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Miles Raymond Corson Sackler, 4/11/90 | RRS Family trust |
| The RSS 2012 Family Trust | RRS Family trust |
| Marianna R. Sackler Captain Trust | RRS Family trust |
| Rebecca K. Sackler Captain Trust | RRS Family trust |
| RSS Fiduciary Management Trust | RRS Family trust |
| JDS Fiduciary Management Trust | RRS Family trust |
| Crystal Trust | RRS Family trust |
| MCM Fiduciary Management Trust | RRS Family trust |
| Data Trust | RRS Family trust |
| Cornice Trust | RRS Family trust |
| DABB Trust | RRS Family trust |
| Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 | RRS Family trust |
| Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 | RRS Family trust |
| Raymond R. Sackler Marital Trust u/a 3/29/2012 | RRS Family trust |
| Beverly Sackler Revocable Trust u/a 3/29/12 | RRS Family trust |

| RSS Revocable Pourover Trust | RRS Family trust |
|---|---|
| JDS Revocable Pourover Trust | RRS Family trust |
| Cedar Cliff Trust | RRS Family trust |
| Selikoff Family Investment Trust | RRS Family trust |
| 1959 Irrevocable Trust | RRS Family trust (terminated) |
| 1969 Irrevocable Trust | RRS Family trust (terminated) |
| FTA Trust | RRS Family trust (terminated) |
| 1974 Revocable Trust | RRS Family trust (terminated) |
| RSS Pourover Trust | RRS Family trust (terminated) |
| JDS Pourover Trust | RRS Family trust (terminated) |
| RSS 2/2/98 Trust | RRS Family trust (terminated) |
| JDS 2/2/98 Trust | RRS Family trust (terminated) |
| RSS 1992 Insurance Trust | RRS Family trust (terminated) |
| JDS 1992 Insurance Trust | RRS Family trust (terminated) |
| The Richard S. Sackler Revocable Pourover Trust | RRS Family trust (terminated) |
| The Jonathan D. Sackler Revocable Pourover Trust dated 12/12/2010 | RRS Family trust (terminated) |
| Moonstone Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Linarite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Perthlite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Roselite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Rosebay Medical Company L.P. [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Rosebay Medical Company, Inc. [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| BR Holdings Associates Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| BR Holdings Associates L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| PLP Associates Holdings Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| PLP Associates Holdings L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Purdue Pharma Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| Pharmaceutical Research Associates L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Purdue Pharma L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Atlantic Laboratories Limited [Bermuda] | RRS Family I-way entity |
| B.L. Carrolton Limited [Bermuda] | RRS Family I-way entity |
| G.H. Carrell Limited [Bermuda] | RRS Family I-way entity |
| Laysan Limited [Bermuda] | RRS Family I-way entity |
| Mallard Limited [Bermuda] | RRS Family I-way entity |
| The Research Foundation Ltd. [Bermuda] | RRS Family I-way entity |

| | |
|---|---|
| Triangle Industries Ltd. [Bermuda] | RRS Family I-way entity |
| East Hudson Inc. [British Virgin Islands] | RRS Family I-way entity |
| East River Partners Ltd. [British Virgin Islands] | RRS Family I-way entity |
| Hobart Corporation [British Virgin Islands] | RRS Family I-way entity |
| Mauna Kea Limited [British Virgin Islands] | RRS Family I-way entity |
| Menlo Park Investors Inc. [British Virgin Islands] | RRS Family I-way entity |
| Meridian B.V.I. Limited [British Virgin Islands] | RRS Family I-way entity |
| Silk Crest Corp. [British Virgin Islands] | RRS Family I-way entity |
| Cheyenne Canada Limited Partnership [Canada] | RRS Family I-way entity |
| CPC Canada Corporation [Canada] | RRS Family I-way entity |
| CPC Canada Partnership 1 [Canada] | RRS Family I-way entity |
| CPC Canada Partnership 2 [Canada] | RRS Family I-way entity |
| The Raymond And Beverly Sackler Foundation [Canada] | RRS Family I-way entity |
| Boiling Bay S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Neji S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Nerula S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Aquebogue Holdings Corporation [Mauritius] | RRS Family I-way entity |
| Boiling Bay Corporation B.V. [Netherlands] | RRS Family I-way entity |
| The Raymond and Beverly Sackler Foundation [United Kingdom] | RRS Family I-way entity |
| The Raymond and Beverly Sackler 1988 Foundation [United Kingdom] | RRS Family I-way entity |
| 1987 Fund LLC [DE] | RRS Family I-way entity |
| 60 FPC Remainder (J) LLC [CT] | RRS Family I-way entity |
| 60 FPC Residence (J) LLC [CT] | RRS Family I-way entity |
| 95 Percent LLC [NY] | RRS Family I-way entity |
| 1JM LLC [DE] | RRS Family I-way entity |
| 2JM LLC [DE] | RRS Family I-way entity |
| 3JM LLC [DE] | RRS Family I-way entity |
| A5 Atlas LLC [DE] | RRS Family I-way entity |
| Aim High Productions [DE] | RRS Family I-way entity |
| Akutan Bay LLC [AK] | RRS Family I-way entity |
| AJ Managed Holdings LLC [DE] | RRS Family I-way entity |
| Alexander Road Capital LLC [NY] | RRS Family I-way entity |
| Altaa LLC [DE] | RRS Family I-way entity |
| Alta Ridge, LLC [DE] | RRS Family I-way entity |
| Alta Ridge Capital LLC [DE] | RRS Family I-way entity |
| Alta Ridge Investments LLC [DE] | RRS Family I-way entity |
| Ankersea Limited Liability Company [DE] | RRS Family I-way entity |
| Antler LLC [DE] | RRS Family I-way entity |
| Azurite Holdings LLC [DE] | RRS Family I-way entity |
| Bapricot LLC [NY] | RRS Family I-way entity |
| Beryl Holdings LLC [DE] | RRS Family I-way entity |
| Berrybrook LLC [NY] | RRS Family I-way entity |
| BHPH LLC [DE] | RRS Family I-way entity |
| Boiling Bay Corporation [DE] | RRS Family I-way entity |
| Bowford Company [NY General Partnership] | RRS Family I-way entity |
| BRC Special Partners LLC [DE] | RRS Family I-way entity |
| Brook Holdings [NY General Partnership] | RRS Family I-way entity |

| | |
|---|---|
| BRJ Fiduciary Management LLC [WY] | RRS Family I-way entity |
| Calhoun Advisors LLC [DE] | RRS Family I-way entity |
| Camelot Hotel Holdings LLC [DE] | RRS Family I-way entity |
| Cap 1 LLC [DE] | RRS Family I-way entity |
| Cap 2 LLC [DE] | RRS Family I-way entity |
| Captain Leasing LLC [DE] | RRS Family I-way entity |
| Cedar Cliff Fiduciary Management Inc. [WY] | RRS Family I-way entity |
| CHBR LLC [DE] | RRS Family I-way entity |
| Cheviot LLC [DE] | RRS Family I-way entity |
| Cheyenne Energy Services LLC [OK] | RRS Family I-way entity |
| Cheyenne International Corporation [OK] | RRS Family I-way entity |
| Cheyenne Petroleum Company [NY Limited Partnership] | RRS Family I-way entity |
| Chez Ellie LLC [DE] | RRS Family I-way entity |
| China Sea Company, Inc. [DE] | RRS Family I-way entity |
| China Sea Company L.P. [DE Limited Partnership] | RRS Family I-way entity |
| Cornice Fiduciary Management LLC [WY] | RRS Family I-way entity |
| CPC 2001 LLC [DE] | RRS Family I-way entity |
| CPT 1A PE-AA LLC [DE] | RRS Family I-way entity |
| Crissaire Corporation [DE] | RRS Family I-way entity |
| Crystal Fiduciary Company LLC [WY] | RRS Family I-way entity |
| Curson Capital L.P. [CA] | RRS Family I-way entity |
| Curson Dev LLC [DE] | RRS Family I-way entity |
| CWC LLC [DE] | RRS Family I-way entity |
| DABB LLC [DE] | RRS Family I-way entity |
| Data LLC [WY] | RRS Family I-way entity |
| Deckstone International Company [CT General Partnership] | RRS Family I-way entity |
| DNKA LLC [DE] | RRS Family I-way entity |
| Dravite Holdings LLC [DE] | RRS Family I-way entity |
| Dolcedo LLC [DE] | RRS Family I-way entity |
| Elbanite Holdings LLC [DE] | RRS Family I-way entity |
| Exmoor Horn LLC [DE] | RRS Family I-way entity |
| Expert Philanthropy LLC [DE] | RRS Family I-way entity |
| Finnest Pharma LLC [DE] | RRS Family I-way entity |
| Foley Properties LLC [DE] | RRS Family I-way entity |
| G3A LLC [DE] | RRS Family I-way entity |
| G3D LLC [DE] | RRS Family I-way entity |
| G3R LLC [DE] | RRS Family I-way entity |
| GGM Company [DE General Partnership] | RRS Family I-way entity |
| Great Curve Films, LLC [DE] | RRS Family I-way entity |
| Golden Gun Capital, LLC [CA] | RRS Family I-way entity |
| Halesworth Corporation [DE] | RRS Family I-way entity |
| Haystacks Investments Partners LLC [DE] | RRS Family I-way entity |
| Haystacks Endure LLC [DE] | RRS Family I-way entity |
| HCRB LLC [NY] | RRS Family I-way entity |
| Hudson River (Delaware) Inc. [DE] | RRS Family I-way entity |
| Hudson River Partners [NY General Partnership] | RRS Family I-way entity |
| Inactive Holdings LLC [DE] | RRS Family I-way entity |
| Interrogation 2008 LLC [NY] | RRS Family I-way entity |

| | |
|---|---|
| Intrepidus Holdings LLC [DE] | RRS Family I-way entity |
| IS-BEP LLC [DE] | RRS Family I-way entity |
| JGT One LLC [DE] | RRS Family I-way entity |
| JGT Three LLC [DE] | RRS Family I-way entity |
| JGT Two LLC [DE] | RRS Family I-way entity |
| Jibwind Company [NY] | RRS Family I-way entity |
| JR Learning LLC [DE] | RRS Family I-way entity |
| JV Fuel LLC [DE] | RRS Family I-way entity |
| JWA Holdings LLC [DE] | RRS Family I-way entity |
| K-BEP LP [DE] | RRS Family I-way entity |
| K-BEP III L.P. [DE] | RRS Family I-way entity |
| K-Neptune LLC [DE] | RRS Family I-way entity |
| K-S Medical LLC [DE] | RRS Family I-way entity |
| K-SR Holdings LLC [DE] | RRS Family I-way entity |
| K-SR Performance LLC [DE] | RRS Family I-way entity |
| K-Ventures I LLC [DE] | RRS Family I-way entity |
| KB Managed Holdings LLC [DE] (Formerly Haystacks HH LLC) | RRS Family I-way entity |
| Kernite Holdings LLC [DE] | RRS Family I-way entity |
| Kokino Corporation [DE] | RRS Family I-way entity |
| Kokino LLC [DE] | RRS Family I-way entity |
| Kokino Maj Holdings LLC [DE] | RRS Family I-way entity |
| KRA Associates, Ltd. [CT General Partnership] | RRS Family I-way entity |
| KRA Associates, Ltd. [DE] | RRS Family I-way entity |
| Landings Financial Limited Liability Company [DE] | RRS Family I-way entity |
| LBV Non-Profit, Inc. [DE] | RRS Family I-way entity |
| LBV Inc. [DE] (Formerly Les Bouledogues Vigneronnes Inc.) | RRS Family I-way entity |
| Laramide LLC [DE] | RRS Family I-way entity |
| Level 4 Films LLC [NY] | RRS Family I-way entity |
| Lightship Company [NY General Partnership] | RRS Family I-way entity |
| Little Menlo LLC [DE] | RRS Family I-way entity |
| Llama Bay LLC [DE] | RRS Family I-way entity |
| Lodestone Limited Liability Company [DE] | RRS Family I-way entity |
| Longbrook Corporation [DE] | RRS Family I-way entity |
| M3C Holdings LLC [DE] | RRS Family I-way entity |
| MD60 LLC [DE] | RRS Family I-way entity |
| Meridian International, Ltd. [DE] | RRS Family I-way entity |
| MCM Fiduciary Management LLC [DE] | RRS Family I-way entity |
| Mill Shoals LLC [DE] | RRS Family I-way entity |
| Minimalist Project LLC [NY] | RRS Family I-way entity |
| MKL Haystacks Holdings LLC [DE] | RRS Family I-way entity |
| Moxietec LLC [DE] | RRS Family I-way entity |
| MXE LLC [DE] | RRS Family I-way entity |
| MXE Leasing, LLC [DE] | RRS Family I-way entity |
| NE SOL LLC [DE] | RRS Family I-way entity |
| Newhall & Company, Ltd. [DE] | RRS Family I-way entity |
| North Bay Associates [DE General Partnership] | RRS Family I-way entity |
| North Bay Eagle LLC [DE] | RRS Family I-way entity |

| North Bay Trust Company Inc. [OK] | RRS Family I-way entity |
|---|---|
| OG Film LLC [NY] | RRS Family I-way entity |
| OG Picture Inc. [NY] | RRS Family I-way entity |
| Orchids LLC [DE] | RRS Family I-way entity |
| Orcus Corporation [DE] | RRS Family I-way entity |
| Otavite Holdings LLC [DE] | RRS Family I-way entity |
| Pacific Partners Company [NY] | RRS Family I-way entity |
| Paloma Partners L.P. [DE] | RRS Family I-way entity |
| Park View Properties L.L.C. [DE] | RRS Family I-way entity |
| PBC - AC [NY General Partnership] | RRS Family I-way entity |
| PBC - ABS [NY General Partnership] | RRS Family I-way entity |
| PBC - ABSJS [DE General Partnership] | RRS Family I-way entity |
| PBC-ALF [NY General Partnership] | RRS Family I-way entity |
| PBC - Alternative Investments [NY General Partnership] | RRS Family I-way entity |
| PBC - Bear Stearns Healthcare Value Partners [NY General Partnership] | RRS Family I-way entity |
| PBC - Brook Holdings [NY General Partnership] | RRS Family I-way entity |
| PBC - BSM [NY General Partnership] | RRS Family I-way entity |
| PBC - Centaur [NY General Partnership] | RRS Family I-way entity |
| PBC - Glenhill Capital [NY General Partnership] | RRS Family I-way entity |
| PBC - GCLP [NY General Partnership] | RRS Family I-way entity |
| PBC - Lone Cascade [NY General Partnership] | RRS Family I-way entity |
| PBC – LP [NY General Partnership] | RRS Family I-way entity |
| PBC – LR [NY General Partnership] | RRS Family I-way entity |
| PBC - Marathon Structured Finance Fund [NY General Partnership] | RRS Family I-way entity |
| PBC – PP [NY General Partnership] | RRS Family I-way entity |
| PBC – R Domestic Fund [NY General Partnership] | RRS Family I-way entity |
| PBC-RLCP [NY General Partnership] | RRS Family I-way entity |
| PBC - Seneca Capital [NY General Partnership] | RRS Family I-way entity |
| PBC - Silver Point Capital Fund [NY General Partnership] | RRS Family I-way entity |
| PBC - Swiftcurrent Partners [NY General Partnership] | RRS Family I-way entity |
| PBC - Visium Balanced Fund [NY General Partnership] | RRS Family I-way entity |
| Piton Capital Management LLC [DE] | RRS Family I-way entity |
| Piton Capital Partners LLC [DE] | RRS Family I-way entity |
| Poco Bay Company [DE General Partnership] | RRS Family I-way entity |
| Poco Bay Realty LLC [DE] | RRS Family I-way entity |
| Poco Yield LLC [DE] | RRS Family I-way entity |
| PSART LLC [DE] | RRS Family I-way entity |
| QBEC LLC [DE] | RRS Family I-way entity |
| R Napp Holdings LLC [DE] | RRS Family I-way entity |
| Radstock Corporation [DE] | RRS Family I-way entity |
| RAR Investments LLC [DE] | RRS Family I-way entity |
| Raylodie LLC [NY] | RRS Family I-way entity |
| Raymond and Beverly Sackler Foundation, Inc. [NY] | RRS Family I-way entity; trust beneficiary |
| Raymond and Beverly Sackler Fund for the Arts and Sciences [DE] (Non-Profit) | RRS Family I-way entity; trust beneficiary |
| RBMC Holdings LLC [DE] | RRS Family I-way entity |

| | |
|---|---|
| RBS Institute LLC [DE] | RRS Family I-way entity |
| Rees Holdings LLC [NY] | RRS Family I-way entity |
| Refocus Foundation Inc. [DE] | RRS Family I-way entity |
| RLC Affiliates LLC [DE] | RRS Family I-way entity |
| RLC Affiliates [NY General Partnership] | RRS Family I-way entity |
| RGT One LLC [DE] | RRS Family I-way entity |
| RGT Three LLC [DE] | RRS Family I-way entity |
| RGT Two LLC [DE] | RRS Family I-way entity |
| Richard Sackler Family Foundation, Inc. [DE] | RRS Family I-way entity |
| Riverside Seven LLC [DE] | RRS Family I-way entity |
| Riviera Outlook LLC [DE] | RRS Family I-way entity |
| RJ Dan LLC [DE] | RRS Family I-way entity |
| Rockpoint Land LLC [CT] | RRS Family I-way entity |
| Rockpoint Residence LLC [CT] | RRS Family I-way entity |
| Rosebay Medical Company LLC [DE] | RRS Family I-way entity |
| RSHRS LLC [DE] | RRS Family I-way entity |
| Runham Corporation [DE] | RRS Family I-way entity |
| RWA Holdings LLC [DE] | RRS Family I-way entity |
| Sarbonne LLC [DE] | RRS Family I-way entity |
| Seabright Partners [DE General Partnership] | RRS Family I-way entity |
| Seadog Partners [DE General Partnership] | RRS Family I-way entity |
| SFP Holdings LLC [DE] | RRS Family I-way entity |
| Smokering LLC [DE] | RRS Family I-way entity |
| SO 32 Mack LLC [DE] | RRS Family I-way entity |
| SO-BFR LLC [DE] | RRS Family I-way entity |
| SO-CCS LLC [DE] | RRS Family I-way entity |
| SO-CSH LLC [DE] | RRS Family I-way entity |
| SO-ESH LLC [DE] | RRS Family I-way entity |
| SO-MSS LLC [DE] | RRS Family I-way entity |
| SO-SHSH LLC [DE] | RRS Family I-way entity |
| SO-WSH LLC [DE] | RRS Family I-way entity |
| SO-WSR LLC [DE] | RRS Family I-way entity |
| Solar SO Ware LLC [DE] | RRS Family I-way entity |
| Solar SO Wotton LLC [DE] | RRS Family I-way entity |
| Somac LLC [DE] | RRS Family I-way entity |
| Southern Alta LLC [DE] | RRS Family I-way entity |
| SR-GA RE LLC [DE] | RRS Family I-way entity |
| SR VC TP LLC [DE] | RRS Family I-way entity |
| SRMS LLC [DE] | RRS Family I-way entity |
| Standard Pharmaceuticals Corporation [DE] | RRS Family I-way entity |
| Stibnite Holdings LLC [DE] | RRS Family I-way entity |
| St. Lawrence Associates [NY General Partnership] | RRS Family I-way entity |
| Summer Road LLC [DE] | RRS Family I-way entity |
| Superior View L.L.C. [DE] | RRS Family I-way entity |
| Swipe Right LLC [DE] | RRS Family I-way entity |
| Tacitus Therapeutics Inc. [DE] | RRS Family I-way entity |
| The Bouncer Foundation, Inc. [DE] | RRS Family I-way entity |
| The Lottery, LLC [DE] | RRS Family I-way entity |

| The Neuroendocrine Tumor Research Foundation [DE] (Non-Profit) | RRS Family I-way entity |
|---|---|
| Temagami LLC [DE] | RRS Family I-way entity |
| TPART LLC [DE] | RRS Family I-way entity |
| Tradewind Company [NY General Partnership] | RRS Family I-way entity |
| Tremolite Holdings LLC [DE] | RRS Family I-way entity |
| TQD 1 LLC [DE] | RRS Family I-way entity |
| TQD 2 LLC [DE] | RRS Family I-way entity |
| Tract SRMS LLC [DE] | RRS Family I-way entity |
| Triangle Holding LLC [DE] | RRS Family I-way entity |
| Tukiewings LLC [DE] | RRS Family I-way entity |
| Twin Springs Holdings [NY General Partnership] | RRS Family I-way entity |
| UNCH Corp. [DE] | RRS Family I-way entity |
| UNCHADA LLC [DE] | RRS Family I-way entity |
| Unstable Elements LLC [DE] | RRS Family I-way entity |
| Valdiva Films LLC [DE] | RRS Family I-way entity |
| Verto Institute LLC [DE] | RRS Family I-way entity |
| VLS LLC [DE] | RRS Family I-way entity |
| WA Canada L.P. [DE] | RRS Family I-way entity |
| Wasatch LLC [DE] | RRS Family I-way entity |
| Westward Home LLC [DE] | RRS Family I-way entity |
| Whilton Corporation [DE] | RRS Family I-way entity |
| WP Leasing LLC [DE] | RRS Family I-way entity |
| Yamashiro Development LLC [DE] | RRS Family I-way entity |
| Mundipharma (Argentina) S.r.l. [Argentina]*[3] | II-way entity |
| Mundipharma Pharmaceuticals Argentina S.r.l. [Argentina]* | II-way entity |
| Mundipharma ANZ Pty. Limited [Australia] | II-way entity |
| Mundipharma Healthcare Pty. Limited [Australia] * | II-way entity |
| Mundipharma Oncology Pty. Limited [Australia] * | II-way entity |
| Mundipharma Pty Limited [Australia] * | II-way entity |
| Mundipharma GesmbH [Austria] * | II-way entity |
| Mundipharma Medical CEE GmbH [Austria]* | II-way entity |
| Bangladesh Beauty Products Private Limited [Bangladesh] | II-way entity |
| Mundipharma Bangladesh Private Limited [Bangladesh] | II-way entity |
| Mundipharma Trading Bangladesh Private Limited [Bangladesh] | II-way entity |
| Mundipharma BV [Belgium]* | II-way entity |
| Mundipharma Pharmaceuticals Belgium BV [Belgium]* | II-way entity |
| Bermag Limited [Bermuda]* | II-way entity |
| L.P. Clover Limited [Bermuda]* | II-way entity |
| MN Consulting LLC [Bermuda] | II-way entity |
| MNB Company [Bermuda] | II-way entity |
| Mundipharma Company [Bermuda] | II-way entity |

---

[3] Persons designated with "*" are IACs, as defined in this Agreement.

13

| | |
|---|---|
| Mundipharma International Corporation Limited [Bermuda]* | II-way entity |
| Mundipharma International Holdings Limited [Bermuda]* | II-way entity |
| Mundipharma International Limited [Bermuda]* | II-way entity |
| Mundipharma Laboratories Limited [Bermuda]* | II-way entity |
| Mundipharma Limited [Bermuda]* | II-way entity |
| Mundipharma Medical Company [Bermuda]* | II-way entity |
| Mundipharma Ophthalmology Corporation Limited [Bermuda]* | II-way entity |
| Mundipharma Ophthalmology Products Limited [Bermuda]* | II-way entity |
| Mundipharma Pharmaceutical Company [Bermuda] | II-way entity |
| Mundipharma Research Company Limited [Bermuda] | II-way entity |
| Par-La-Ville Properties Limited [Bermuda] | II-way entity |
| SICO Ltd. [Bermuda] | II-way entity |
| Transworld Pharma Limited [Bermuda] | II-way entity |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda. [Brazil]* | II-way entity |
| Boetti Corporation [British Virgin Islands] | II-way entity |
| Boldini Corporation [British Virgin Islands] | II-way entity |
| Clovio Corporation [British Virgin Islands] | II-way entity |
| Evening Star Services Limited [British Virgin Islands] | II-way entity |
| Hayez Corporation [British Virgin Islands] | II-way entity |
| IAF Limited [British Virgin Islands]* | II-way entity |
| Lake Claire Investments Limited [British Virgin Islands] | II-way entity |
| Maltus Corporation [British Virgin Islands] | II-way entity |
| Mexcus Corporation [British Virgin Islands] | II-way entity |
| Mundipharma GesmbH (Bulgarian branch of Austrian company) [Bulgaria] | II-way entity |
| Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company) [Bulgaria]* | II-way entity |
| Bard Pharmaceuticals (1990) Inc. [Canada]* | II-way entity |
| Elvium Life Sciences GP Inc. [Canada]* | II-way entity |
| Elvium Life Sciences Limited Partnership [Canada]* | II-way entity |
| Elvium ULC [Canada]* | II-way entity |
| Mundipharma International (Canada) Inc. [Canada]* | II-way entity |
| Purdue Frederick Inc. [Canada]* | II-way entity |
| Purdue Pharma [Canada]* | II-way entity |
| Purdue Pharma Inc. [Canada]* | II-way entity |
| Purdue Pharma ULC [Canada] | II-way entity |
| Mundipharma Pharmaceuticals (Chile) Limitada [Chile] | II-way entity |
| Mundipharma (China) Pharmaceutical Company Limited [China]* | II-way entity |
| Mundipharma (Shanghai) International Trade Company Limited [China]* | II-way entity |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. [China]* | II-way entity |
| Mundipharma (Colombia) S.A.S. [Colombia]* | II-way entity |

| | |
|---|---|
| Mundipharma Pharmaceuticals Limited [Cyprus]* | II-way entity |
| Mundipharma GesmbH (Czech Republic Branch of Austrian company) [Czech Republic]* | II-way entity |
| Mundipharma A/S [Denmark]* | II-way entity |
| Mundipharma FZ-LLC [Dubai] | II-way entity |
| Mundipharma Middle East FZ-LLC [Dubai]* | II-way entity |
| Mundipharma Egypt LLC [Egypt]* | II-way entity |
| Scientific Office of Mundipharma MEA GmbH [Egypt]* | II-way entity |
| Mundipharma Oy [Finland]* | II-way entity |
| Mundipharma Management S.ar.l. [France] | II-way entity |
| Mundipharma SAS [France]* | II-way entity |
| Krugmann GmbH [Germany]* | II-way entity |
| Mundichemie GmbH [Germany]* | II-way entity |
| Mundipharma Biologics GmbH [Germany]* | II-way entity |
| Mundipharma Deutschland GmbH & Co. KG [Germany]* | II-way entity |
| Mundipharma GmbH [Germany]* | II-way entity |
| Mundipharma Medical GmbH [Germany]* | II-way entity |
| Mundipharma Research GmbH & Co. KG [Germany]* | II-way entity |
| Mundipharma Research Verwaltungs GmbH [Germany]* | II-way entity |
| Mundipharma Verwaltungsgesellschaft mbH [Germany]* | II-way entity |
| Mundipharma (Hong Kong) Limited [Hong Kong]* | II-way entity |
| Mundipharma Medical GmbH (Hungary Branch of Swiss Company) [Hungary]* | II-way entity |
| Modi-Mundipharma Beauty Products Private Limited [India] | II-way entity |
| Modi-Mundipharma Healthcare Private Limited [India] | II-way entity |
| Modi-Mundipharma Private Limited [India] | II-way entity |
| Win-Healthcare Private Limited [India] | II-way entity |
| Win-Medicare Private Limited [India] | II-way entity |
| Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company) [Indonesia]* | II-way entity |
| PT. Mundipharma Healthcare Indonesia [Indonesia]* | II-way entity |
| Mundipharma Corporation (Ireland) Limited [Ireland]* | II-way entity |
| Mundipharma Pharmaceuticals Limited [Ireland]* | II-way entity |
| Peer Hotzvim Ltd. [Israel] | II-way entity |
| Rafa Laboratories Limited [Israel] | II-way entity |
| Mundipharma Pharmaceuticals S.r.l. [Italy]* | II-way entity |
| Mundipharma Kabushiki Kaishe [Japan]* | II-way entity |
| Mundipharma TK [Japan]* | II-way entity |
| Mundipharma Medical CEE GmbH (Kazakhstan branch of Austrian company merged with Mundipharma GesmbH) [Kazakhstan] | II-way entity |
| Mundipharma Distribution Limited [Korea]* | II-way entity |
| Mundipharma Korea Limited [Korea]* | II-way entity |
| Accardi S.àr.l. [Luxembourg] | II-way entity |
| Bulla S.àr.l. [Luxembourg] | II-way entity |
| Euro-Celtique S.A. [Luxembourg]* | II-way entity |

| | |
|---|---|
| Filti S.àr.l. [Luxembourg] | II-way entity |
| Flira S.àr.l. [Luxembourg] | II-way entity |
| Ind S.àr.l. [Luxembourg] | II-way entity |
| Irey S.àr.l. [Luxembourg] | II-way entity |
| Lucien Holdings S.àr.l. [Luxembourg] | II-way entity |
| Lymit Holdings S.àr.l. [Luxembourg] | II-way entity |
| Mundipharma International Services S.ar.l. [Luxembourg]* | II-way entity |
| Nitid S.àr.l. [Luxembourg] | II-way entity |
| Nontag S.àr.l. [Luxembourg] | II-way entity |
| Porthos S.àr.l. [Luxembourg] | II-way entity |
| Sofy S.àr.l. [Luxembourg] | II-way entity |
| Songol S.àr.l. [Luxembourg] | II-way entity |
| Sonti S.àr.l. [Luxembourg] | II-way entity |
| Mundipharma Pharmaceuticals Sdn. Bhd. [Malaysia]* | II-way entity |
| Cutchogue Holdings Limited [Mauritius] | II-way entity |
| Mundipharma Ltd. [Mauritius] | II-way entity |
| Mundipharma de Mexico, S. de R.L. de C.V. [Mexico]* | II-way entity |
| Mundipharma Maroc [Morocco]* | II-way entity |
| Mundipharma (Myanmar) Co., Limited [Myanmar]* | II-way entity |
| Accardi B.V. [Netherlands] | II-way entity |
| Alfa Generics B.V. [Netherlands]* | II-way entity |
| Arsago B.V. [Netherlands] | II-way entity |
| Bradenton Products B.V. [Netherlands]* | II-way entity |
| Ladenburg B.V. [Netherlands]* | II-way entity |
| Mundipharma B.V. [Netherlands]* | II-way entity |
| Mundipharma Bradenton B.V. [Netherlands]* | II-way entity |
| Mundipharma DC B.V. [Netherlands]* | II-way entity |
| Mundipharma Pharmaceuticals B.V. [Netherlands]* | II-way entity |
| Tacca B.V. [Netherlands] | II-way entity |
| Tenna B.V. [Netherlands] | II-way entity |
| Vaccaro B.V. [Netherlands] | II-way entity |
| Venusti B.V. [Netherlands] | II-way entity |
| Mundipharma New Zealand Limited [New Zealand]* | II-way entity |
| Mundipharma A.S. [Norway]* | II-way entity |
| Mundipharma Distribution GmbH (Philippine Branch of Swiss Company) [Philippines]* | II-way entity |
| Mundipharma Polska SP. Z.O.O. [Poland]* | II-way entity |
| Mundipharma Farmaceutica LDA. [Portugal]* | II-way entity |
| Mundipharma GesmbH (Russian Branch of Austrian company) [Russia]* | II-way entity |
| Technical Scientific Office of Mundipharma Near East GmbH [Saudi Arabia]* | II-way entity |
| Marnine Holdings Pte. Limited [Singapore] | II-way entity |
| Martone Holdings Pte. Limited [Singapore] | II-way entity |
| Mundipharma Development Pte. Limited [Singapore] | II-way entity |
| Mundipharma Healthcare Pte. Limited [Singapore]* | II-way entity |
| Mundipharma IT Services Pte. Limited [Singapore]* | II-way entity |
| Mundipharma Manufacturing Pte. Limited [Singapore]* | II-way entity |

| | |
|---|---|
| Mundipharma Pharmaceuticals Private Limited [Singapore]* | II-way entity |
| Mundipharma Pte Limited [Singapore]* | II-way entity |
| Mundipharma Singapore Holding Pte. Limited [Singapore]* | II-way entity |
| Mundipharma GesmbH (Slovak Republic Branch of Austrian company) [Slovak Republic]* | II-way entity |
| Mundipharma (Proprietary) Limited [South Africa]* | II-way entity |
| Mundipharma Biologics S.L. [Spain]* | II-way entity |
| Mundipharma Pharmaceuticals S.L. [Spain]* | II-way entity |
| Beauty Products Lanka (Private) Limited [Sri Lanka] | II-way entity |
| Mundipharma AB [Sweden]* | II-way entity |
| Mundipharma AG [Switzerland] | II-way entity |
| Mundipharma Distribution GmbH [Switzerland]* | II-way entity |
| Mundipharma EDO GmbH [Switzerland]* | II-way entity |
| Mundipharma Holding AG [Switzerland]* | II-way entity |
| Mundipharma International Services GmbH [Switzerland]* | II-way entity |
| Mundipharma IT GmbH [Switzerland]* | II-way entity |
| Mundipharma IT Services GmbH [Switzerland]* | II-way entity |
| Mundipharma Laboratories GmbH [Switzerland]* | II-way entity |
| Mundipharma LATAM GmbH [Switzerland]* | II-way entity |
| Mundipharma MEA GmbH [Switzerland]* | II-way entity |
| Mundipharma Medical Company (Swiss branch of Mundipharma Medical Company, Bermuda) [Switzerland]* | II-way entity |
| Mundipharma Medical GmbH* | II-way entity |
| Mundipharma Near East GmbH [Switzerland]* | II-way entity |
| Taiwan Mundipharma Pharmaceuticals Limited [Taiwan]* | II-way entity |
| Mundipharma (Thailand) Limited [Thailand]* | II-way entity |
| Mundipharma Pharmaceuticals Industry and Trade Limited [Turkey]* | II-way entity |
| Bard Pharmaceuticals Limited [United Kingdom]* | II-way entity |
| Clinical Designs Limited [United Kingdom]* | II-way entity |
| Mundibiopharma Limited [United Kingdom]* | II-way entity |
| Mundipharma Corporation Limited [United Kingdom]* | II-way entity |
| Mundipharma International Limited [United Kingdom]* | II-way entity |
| Mundipharma International Services Limited [United Kingdom]* | II-way entity |
| Mundipharma International Technical Operations Limited [United Kingdom]* | II-way entity |
| Mundipharma IT Services Limited [United Kingdom]* | II-way entity |
| Mundipharma Limited [United Kingdom] | II-way entity |
| Mundipharma Medical Company Limited [United Kingdom]* | II-way entity |
| Mundipharma Research Limited [United Kingdom]* | II-way entity |
| Napp Laboratories Limited [United Kingdom]* | II-way entity |
| Napp Pension Trustees Limited [United Kingdom] | II-way entity |

| | |
|---|---|
| Napp Pharmaceutical Group Limited [United Kingdom]* | II-way entity |
| Napp Pharmaceutical Holdings Limited [United Kingdom]* | II-way entity |
| Napp Pharmaceuticals Limited [United Kingdom]* | II-way entity |
| Napp Research Centre Limited [United Kingdom]* | II-way entity |
| Paineurope Limited [United Kingdom] | II-way entity |
| Private Medical Trustees Limited [United Kingdom] | II-way entity |
| Qdem Pharmaceuticals Limited [United Kingdom]* | II-way entity |
| The Napp Educational Foundation [United Kingdom] | II-way entity |
| Avrio Health Inc. [United States] | II-way entity |
| Caas Leasing, Inc. [United States] | II-way entity |
| Connecticut Avenue Realty Co., Inc. [United States] | II-way entity |
| Coventry Technologies L.P. [United States] | II-way entity |
| E.R.G. Realty, Inc. [United States] | II-way entity |
| HS Holdings Inc. [United States] | II-way entity |
| IAF Corporation [United States] | II-way entity |
| Midvale Chemical Company [United States] | II-way entity |
| MNP Consulting Limited [United States] | II-way entity |
| Mundipharma Biologics Inc. [United States] | II-way entity |
| Mundipharma Biologics L.P. [United States] | II-way entity |
| Mundipharma Healthcare Corporation [United States]* | II-way entity |
| Mundipharma Healthcare LLC [United States]* | II-way entity |
| Mundipharma Inc. [United States] | II-way entity |
| Mundipharma International Limited [United States]* | II-way entity |
| Mundipharma International Technical Operations Limited [United States]* | II-way entity |
| Mundipharma IT Services Inc. [United States]* | II-way entity |
| Mundipharma Ltd. [United States] | II-way entity |
| Mundipharma Pharmaceuticals Inc. [United States]* | II-way entity |
| Nappwood Land Corporation [United States] | II-way entity |
| New Suffolk Holdings LLP [United States] | II-way entity |
| One Stamford Land Inc. [United States] | II-way entity |
| One Stamford Realty L.P. [United States] | II-way entity |
| Pharma Associates Inc. [United States] | II-way entity |
| Pharma Associates L.P. [United States] | II-way entity |
| Pharma Technologies Inc. [United States] | II-way entity |
| Pharmaceutical Research Associates, Inc. [United States] | II-way entity |
| Pharmaceutical Research Associates, Inc. [United States] | II-way entity |
| PRA Holdings, Inc. [United States] | II-way entity |
| Purdue BioPharma Inc. [United States] | II-way entity |
| Purdue BioPharma L.P. [United States] | II-way entity |
| Purdue Healthcare Technologies Inc. [United States] | II-way entity |
| Purdue Healthcare Technologies L.P. [United States] | II-way entity |
| Purdue Pharma Technologies Inc. [United States] | II-way entity |
| Purdue Pharmaceutical Products Inc. [United States] | II-way entity |
| Rhodes Pharmaceuticals Inc. [United States] | II-way entity |
| Rhodes Technologies Inc. [United States] | II-way entity |
| RSJ Company L.P. [United States] | II-way entity |
| Sawwood Land Corporation [United States] | II-way entity |

| | |
|---|---|
| Signutra Inc. [United States] | II-way entity |
| The P.F. Betadine Products Co. Inc. [United States] | II-way entity |
| The P.F. Laboratories, Inc. [United States] | II-way entity |
| The Purdue Frederick Company Inc. d/b/a The Purdue Frederick Company [United States] | II-way entity |
| The Seven Hundred Realty Corporation [United States] | II-way entity |
| The Terramar Foundation, Inc. [United States] | II-way entity |
| TXP Services Inc. [United States] | II-way entity |
| Vitamerican Chemicals, Inc. [United States] | II-way entity |
| Vitamerican Corporation [United States] | II-way entity |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City [Vietnam]* | II-way entity |
| Norton Rose Fulbright US LLP | Service Provider: legal counsel to Shareholder Released Parties and the Debtors |

**Exhibit Y**
**Form of B-Side IAC Payment Party Loan Permitted Withdrawal Promissory Note**

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**

**Annex C**
**Credit Support Annex for A-Side Payment Group 4**

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

# EXHIBIT AA-1

**Redline of Shareholder Settlement Agreement**

DRAFT

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**THE MASTER DISBURSEMENT TRUST,**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**AND**

**PRA L.P.**

**[_____], 2021**

# TABLE OF CONTENTS

PAGE

ARTICLE 1. DEFINITIONS ................................................................................................... 3

    Section 1.01    Definitions ................................................................................... 3
    Section 1.02    Interpretative Provisions ............................................................ 2526

ARTICLE 2. SETTLEMENT PAYMENTS ............................................................................ 2627

    Section 2.01    Required Settlement Payment .................................................... 2627
    Section 2.02    Payment of Net Proceeds ........................................................... 3234
    Section 2.03    Collar ......................................................................................... 3435
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties ......... 3536
    Section 2.05    Intentionally Omitted ................................................................ 3638
    Section 2.06    No Change to Aggregate Settlement Amount ............................. 3638
    Section 2.07    Illustrative Examples ................................................................. 3739
    Section 2.08    Payments Pending Appeals ........................................................ 3739
    Section 2.09    Appeals; Motion to Stay ............................................................ 3941
    Section 2.10    Certain Additional A-Side Payment Obligations ...................... 4041
    Section 2.11    Pre-Plan Effective Date Net Proceeds ...................................... 4042

ARTICLE 3. SALE OF IACS ................................................................................................. 4142

    Section 3.01    Covenant to Sell ........................................................................ 4142
    Section 3.02    IAC Information Rights; Access; Waiver ................................... 4344
    Section 3.03    Other IAC-Related Covenants ................................................... 4546
    Section 3.04    Reimbursement of Certain Expenses Relating to a Sale ............ 4749
    Section 3.05    Implementation Limitations ....................................................... 4849
    Section 3.06    Termination of Sale Obligations ................................................ 4849
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account .................. 4850
    Section 3.08    Failure to Sell IACs .................................................................. 5152

ARTICLE 4. TAX MATTERS ............................................................................................... 5253

    Section 4.01    Restitution Payments ................................................................. 5254
    Section 4.02    Qualified Settlement Funds ....................................................... 5355
    Section 4.03    Settlement Agreement ................................................................ 5355
    Section 4.04    Forms W-9 ................................................................................. 5355
    Section 4.05    Reserved ....................................................... 53Intentionally Omitted    55
    Section 4.06    Tax Reporting ............................................................................ 5355

ARTICLE 5. RESERVEDINTENTIONALLY OMITTED. ................................................ 5455

ARTICLE 6. TERMINATION. .............................................................................................. 5455

    Section 6.01    Termination of Agreement ......................................................... 5455

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES ...... 5455

    Section 7.01    Formation and Power ................................................................. 5456

Section 7.02    Authority; Enforceability ....................................................... 5657
Section 7.03    No Contravention ................................................................. 5658
Section 7.04    Net Asset Reports ................................................................ 5758
Section 7.05    List of IACs ......................................................................... 5758
Section 7.06    List of Assuring Parties ...................................................... 5860

ARTICLE 8. COVENANTS ....................................................................... 5860

Section 8.01    Intentionally Omitted. ........................................................ 60
Section 8.02    Non-Circumvention. ........................................................... 5860
Section 8.03    No Interference. ................................................................... 5860
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests ............................................................................... 5960
Section 8.05    MDT Shareholder Insurance Rights ................................... 5961
Section 8.06    Naming Rights ..................................................................... 5961
Section 8.07    No Side Agreements ............................................................ 5961
Section 8.08    Notification of Breach ........................................................ 5961
Section 8.09    Opioid Business ................................................................... 6061
Section 8.10    Additional Assuring Parties ............................................... 6062
Section 8.11    Intentionally Omitted    60Opinions of Counsel ............ 62
Section 8.12    Intentionally Omitted ......................................................... 60
Section 8.138.12    Refundings ................................................................ 6062
Section 8.13    Additional IACs .................................................................. 63

ARTICLE 9. BREACH AND REMEDIES ................................................ 6163

Section 9.01    Breach .................................................................................. 6163
Section 9.02    Remedies ............................................................................. 6568
Section 9.03    Certain Limitations. ............................................................ 7276
Section 9.04    Trustee and Personal Representative Liability ................... 7377
Section 9.05    Breach Fee ........................................................................... 7377
Section 9.06    Reinstatement ...................................................................... 7378

ARTICLE 10. CONDITIONS PRECEDENT ............................................ 7478

Section 10.01    Settlement Effective Date .................................................. 7478

ARTICLE 11. MISCELLANEOUS ........................................................... 7680

Section 11.01    Notices ................................................................................ 7680
Section 11.02    Payments Received ............................................................. 7780
Section 11.03    Survival of Representations and Warranties ...................... 7781
Section 11.04    Remedies Cumulative; Specific Performance .................... 7881
Section 11.05    Confession of Judgment ..................................................... 7881
Section 11.06    Entire Agreement; Severability; Amendments and Waivers ... 7882
Section 11.07    Reserved    79Intentionally Omitted ............................. 82
Section 11.08    Sackler Parties' Representative. ......................................... 7982
Section 11.09    Binding Effect; Benefit; Assignment ................................. 8083
Section 11.10    Governing Law .................................................................... 8084
Section 11.11    Jurisdiction; Contested Matter ........................................... 8084
Section 11.12    Waiver of Jury Trial ........................................................... 8184

2

Section 11.13    Counterparts; Trustee of Multiple Trusts; Effectiveness ................................ 81 84
Section 11.14    Document Repository ................................................................................ 81 85
Section 11.15    Defense of Shareholder Releases .............................................................. 81 85
Section 11.16    Certain Shareholder Released Party Insolvencies ...................................... 82 85
Section 11.17    Survival .................................................................................................. 82 86

Exhibits[1]

| | |
|---|---|
| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Opioid Business |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |
| Exhibit N | Form of Net Proceeds Report |
| Exhibit O | Form of Further Assurances Undertaking |
| Exhibit P | Form of Trust Certification |
| Exhibit Q | Trust Information |
| Exhibit R | Form of Estate Certification |
| Exhibit S | Designated Shareholder Released Parties |
| Exhibit T | De Minimis Payment Parties |
| Exhibit U | Illustrative Examples |
| Exhibit V | Joinder Agreement |
| Exhibit W | Form of IAC Tax Distributions Report |
| Exhibit X | Certain Shareholder Released Parties |
| Exhibit Y | Form of B-Side IAC Payment Party Loan Permitted Withdrawal Promissory Note |

Annexes

| | |
|---|---|
| Annex A | A-Side Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Annex for A-Side Payment Group 2 |
| Annex C | A-Side Credit Support Annex for A-Side Payment Group 4 |
| Annex D | B-Side Credit Support Annex for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Annex for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits under review.

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (together with the Credit Support Annexes (as defined below), this "Agreement"), dated as of [____], 2021 (the "Agreement Effective Date"), is entered into by and among (i) the MDT (as defined below), (ii) the Sackler Parties (as defined below), (iii) each of the parties listed on Exhibit B hereto (collectively, the "Debtors"), and, (iv) solely for purposes of Article 4 (Tax Matters), Section 2.01(j) (Payments by Beacon Trust), Section 2.01(k) (Payments by 74A Trust), Section 2.02(c), Section 2.02(d) and Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), PRA L.P. (as defined below; and, together with the MDT and the Sackler Parties, the "Parties" and each, a "Party").

## RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2982] in the Bankruptcy Cases;

WHEREAS, on June 3, 2021, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. 2988] in the Bankruptcy Cases;

WHEREAS, on July 14, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3185] in the Bankruptcy Cases;

WHEREAS, on August 12, 2021, the Debtors filed the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 3545] in the Bankruptcy Cases;

WHEREAS, for the purposes of this Agreement, the Sackler Parties are included in distinct Payment Groups (as defined below) as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, certain of the Shareholder Released Parties (as defined below) are included in distinct Family Groups (as defined below) as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties as contemplated and effectuated pursuant to the Plan (as defined below) (the "Settlement"), the B-Side Payment Groups (as defined below) and the A-Side Payment Groups (as defined below) have agreed to pay the Full Settlement Amount (as defined below) to the MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a

B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount (as defined below), subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties (as defined below) agree to pay, or cause to be paid, on a joint and several basis (subject to the terms and limitations set forth herein) among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount and portion of the Additional A-Side Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs (as defined below) set forth on Exhibit E-1;

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell or cause to be sold, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales and IAC Non-Tax Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests"), and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests");

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests and De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights (as defined below) on the terms and conditions set forth in the Plan;

WHEREAS, in furtherance of the Settlement, the Family Members have agreed to not seek, request or permit any new naming rights with respect to charitable or similar donations to organizations, subject to the terms and conditions of this Agreement and the Confirmation Order (as defined below); and

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien (as defined below) on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes")), which such Credit Support Annexes are hereby incorporated by reference herein) and the Collateral Documents (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

**Section 1.01    Definitions**.

(a)    As used in this Agreement, the following terms have the following meanings:

"2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

"Ad Hoc Committee" has the meaning set forth in the Plan.

"A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in A-Side Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)    With respect to each Non-Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *less* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment *multiplied by* seven (7); and

(ii)    With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 4" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the A-Side General Obligors and A-Side IAC Payment Parties is an A-Side Payment Party.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its Subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC, a Sale or an IAC Distribution, without duplication and taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.

"Additional A-Side Amount" has the meaning set forth in Section 2.10.

"Additional A-Side Amount Payments" means the two (2) payments of $3.125 million by each A-Side Payment Group pursuant to Section 2.10.

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made by, or deemed to have been made on behalf of, such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, *less* (c) without duplication, the aggregate amount of Net Proceeds paid by, or deemed to have been made on behalf of, such Payment Group to the MDT prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to the MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party, or any other Crossover Member, all cash amounts actually paid to the MDT that are deemed to be paid by such Payment Group) pursuant to

4

Sections 2.01(c) and (d) and 2.02(a) and (b), but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments have been applied to satisfy and reduce either (i) a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable, or (ii) the obligations of any IAC Payment Party within such Payment Group to make any payments pursuant to Section 2.02(a) or Section 2.02(b). For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees or Additional A-Side Amounts or any payment of fees and expenses payable to the MDT or any Secured Party pursuant to the terms of the Definitive Documents and (ii) amounts paid to the Appeals Account will be deemed to be amounts actually paid to the MDT.

"Aggregate Settlement Amount" means $4,275,000,000.

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

"Allowed Claim" has the meaning set forth in the Plan.

"Appeal" has the meaning set forth in Section 2.09(a).

"Appeals Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained, solely to the extent required by Section 2.08.

"Approved Accountant" means a third-party accountant from the list set forth on Exhibit L.

"Approved Financial Advisor" means an independent financial advisor from the list set forth on Exhibit M.

"Assuring Parties" means (i) the Possible Refunding Trusts of each Trust, (ii) the Power Holders of each Trust and of the JDS Estate, (iii) the Required Interested Persons of the JDS Estate and each Trust (other than each A-Side Payment Party which is a Trust that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee), and (iv) the persons not otherwise included in the foregoing clauses (ii) and (iii) who are Beneficiary Interested Persons of any Trust or the JDS Estate.

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03(b) and (c) and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A. Each B-Side IAC Payment Party is a member of the applicable B-Side Payment Group described on Exhibit A.

"B-Side IAC Payment Party Loan" means an unsecured payment-in-kind toggle loan from a B-Side IAC Payment Party to the AJ Irrevocable Trust or the AR Irrevocable Trust (or any successor(s) thereof) that (a) is subordinated in right of payment to the Obligations of the AJ Irrevocable Trust or the

AR Irrevocable Trust (or any successor(s) thereof), as applicable, to the MDT pursuant to this Agreement and the Collateral Documents, (b) contains no scheduled amortization and matures no earlier than the eleventh (11th) anniversary of the Plan Effective Date, (c) provides that the borrower may pay cash interest or prepay the obligations thereunder at any time only to the extent permitted by Section 4.02(c)(i) or (ii) of the Credit Support Annex concerning B-Side Payment Group 1 or B-Side Payment Group 2, as applicable, (d) bears interest at a rate no greater than the applicable federal rate in effect at the time such loan is made, and (e) is evidenced by a promissory note in form and substance substantially similar to the form attached hereto as Exhibit Y.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

"B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline, 25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.

"B-Side Payment Group Adjusted 2.01 Amount" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"B-Side Payment Group Portion" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"B-Side Payment Party" means a Party designated as a "B-Side Payment Party" on Exhibit A. For the avoidance of doubt, each of the B-Side IAC Payment Parties is a B-Side Payment Party.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or for whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"Breach" shall mean a Specified Breach or a Non-Specified Breach.

"Breach Fee" has the meaning set forth in Section 9.05.

"Breach Notice" has the meaning set forth in Section 9.02(a)(i).

"Breach Trigger" means any event or condition that, with the giving of any notice, the passage of time, both, or satisfaction of such other condition as set forth in Section 9.01, would be a Breach.

"Breaching Party" has the meaning set forth in ~~section~~ Section 9.02(a)(i).

"<u>Business Day</u>" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"<u>Case Stipulation</u>" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

"<u>Cash and Cash Equivalents</u>" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.

"<u>Channeling Injunction</u>" has the meaning set forth in the Plan.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Collar Amount</u>" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million. For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"<u>Collar B-Side Amount</u>" has the meaning set forth in <u>Section 2.03(d)</u>.

"<u>Collar Computation Proceeds</u>" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to <u>Section 3.04</u> (but only to the extent arising from breaches of the applicable Sale agreement related to [an A-Side IAC Payment Party or its Subsidiary party thereto] and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".

"<u>Collar Recipient</u>" means each A-Side Payment Group identified as a "Collar Recipient" on <u>Exhibit D</u>.

"<u>Collar Top-Up Amount</u>" has the meaning set forth in <u>Section 2.03(a)</u>.

"<u>Collateral</u>" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the amendments, modifications and supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confession of Judgment" has the meaning set forth in Section 11.05 and in the Credit Support Annexes.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) the Channeling Injunction, (iii) this Agreement, (iv) the Collateral Documents, and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [  ] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(e).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"Court Approval" has the meaning set forth in Section 7.02(b).

"Credit Support Annex" has the meaning set forth in the recitals.

"Creditors' Committee" has the meaning set forth in the Plan.

"Creditor Trust" has the meaning set forth in the Plan.

"Creditor Trust Documents" has the meaning set forth in the Plan.

"Crossover Member" means a Payment Party that is a member of more than one Payment Group other than a Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes.

"Cumulative Minimum Required Settlement Payments" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline. For purposes of illustration, the Cumulative Minimum Required Settlement Payments are (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1.025 billion as of the third Funding Deadline, and (d) without duplication, $1.375 1.4 billion as of the fourth Funding Deadline.

"Debtors" has the meaning set forth in the preamble.

"Definitive Documents" means this Agreement, the Collateral Documents, the Confessions of Judgment, the Further Assurances Undertakings, the Separation Agreements, the Tax Matters Agreement and any and all other documentation required to implement the Settlement.

"De Minimis Payment Party" means the Sackler Parties set forth in Exhibit T; *provided* that if any Sackler Party transfers any assets or property to a De Minimis Payment Party on or after March 31, 2021, the De Minimis Sackler Party that receives such assets or property shall not, from and after the date of receipt, constitute a De Minimis Sackler Party.

"De Minimis PRA LP Interests" has the meaning set forth in the recitals.

"Designated Release Remedy Event" shall be deemed to have occurred if Option 2 of Section 9.02(a)(ii)(B) is available in respect of a Specified Breach (or Specified Breaches) by any Payment Group.

"Designated Shareholder Released Parties" means the parties set forth on Exhibit S, *provided* that (i) if any Designated Shareholder Released Party is an officer, director, trustee or protector with respect to trusts or trust companies of Family Groups that are not Breaching Parties, such Designated Release Remedy Event shall not include such Designated Shareholder Released Party in their capacities as officers, directors, trustees or protectors of such trusts or trust companies that are not part of the Family Groups of the Breaching Parties and no recourse may be had against any such trusts or trust companies, and (ii) the Designated Shareholder Released Parties shall not include the estate of any natural person and the Designated Release Remedy Event shall not apply (or shall cease to continue to apply) to any person on Exhibit S who has become deceased, *provided* that, for the avoidance of doubt, nothing herein shall prevent the estate of any such natural person from cooperating with the MDT with respect to any discovery process with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities.

"Direct Appeal" has the meaning set forth in Section 2.09(a).

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement. For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2983 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the

Plan. For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"<u>Dispute Proceeding</u>" has the meaning set forth in <u>Section 9.02(a)(i)</u>.

"<u>District Court</u>" means the United States District Court for the Southern District of New York.

"<u>Effective Date Cash</u>" has the meaning set forth in the Plan.

"<u>Equity Interest</u>" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"<u>Estate Certification</u>" means, with respect to the JDS Estate, a certification of the personal representative(s) thereof substantially in the form of <u>Exhibit R</u>, which includes a recent copy of the fiduciary probate certificate issued by the court having primary supervision of the administration of the decedent's estate.

"<u>Estates</u>" has the meaning set forth in the Plan.

"<u>Excess Cash</u>" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not required for the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).

"<u>Excess Group 8 Payment Obligation</u>" has the meaning set forth in <u>Section 2.01(i)(i)</u>.

"<u>Excess IAC Proceeds</u>" has the meaning set forth in <u>Section 2.01(i)(ii)</u>.

"<u>Excluded Beneficiary</u>" means Samantha Hunt, the children of Samantha Hunt and the children of Kathe A. Sackler and any minor or other person under a legal disability.

"<u>Excluded Trusts</u>" means [the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on <u>Exhibit A</u>.]

"<u>Expense Allocation Principles</u>" means, with respect to fees, costs and expenses described in <u>clause (ii)</u> of each of the definitions of Sales Proceeds Deductions and IAC Distribution Deductions, that each IAC Payment Party shall receive an allocation of such fees, costs and expenses proportionate to such IAC Payment Party's share of the total Sale Proceeds or IAC Non-Tax Distributions received by all IAC Payment Parties (including, for the avoidance of doubt, amounts treated as actually received by an IAC Payment Party as described in <u>clause (x)(I) through (IV)</u> or <u>clause (y)(I) through (IV)</u> of the definition of Net Proceeds, as applicable).

"<u>Family Group</u>" means each of the groups comprised of Payment Parties and certain Shareholder Released Parties, which are designated as a "Family Group" as set forth in <u>Exhibit C</u>.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit C.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" means a Payment Party identified as the "Fourth Tier Obligor" in the Credit Support Annexes.

"Full Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Outstanding Settlement Amount, *plus* (b), if applicable to such Payment Group, such Payment Group's Payment Group Portion of the Additional A-Side Amount, *less* (c), if applicable to such Payment Group, the aggregate Additional A-Side Amount Payments made by such Payment Group, *less* (d) without duplication, the amount of any prepayments made by such Payment Group pursuant to Section 2.10. For the avoidance of doubt, the Full Outstanding Settlement Amount of each B-Side Payment Group shall equal such B-Side Payment Group's Outstanding Settlement Amount.

"Full Settlement Amount" means $4,325,000,000, which is the sum of the Aggregate Settlement Amount and the Additional A-Side Amount.

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Funding Deadline Obligation" means, (i) with respect to an A-Side Payment Group, its A-Side Funding Deadline Obligation and (ii) with respect to a B-Side Payment Group, its B-Side Funding Deadline Obligation.

"Funding Deadline Report" has the meaning set forth in Section 9.02(e)(i).

"Funding Trusts" means the trusts for the benefit of beneficiaries including one or more beneficiaries of the Rosetta Trust bearing the names KAS 2010 Family Trust and KAS 2011 Family Trust governed by the laws of Jersey (Channel Islands).

"Funding Trust Appointment" means, with respect to a Funding Trust that provided all or any portion of the funding set forth in Section 10.01(a)(iv), an instrument by which the appointment in further trust of such Funding Trust's share of such funding of the Rosetta Trust was exercised.

"Further Assurances Undertaking" means, in the case of an Assuring Party with respect to a Trust that is part of the A-Side Payment Group, an undertaking of such Person substantially in form of Exhibit O-1 and, in the case of an Assuring Party with respect to the JDS Estate or a Trust that is part of the B-Side Payment Group, an undertaking of such Person substantially in the form of Exhibit O-2.

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governing Law Jurisdiction" means, with respect to a trust, the law or laws governing the ongoing operation of the trust under the terms of the documents constituting its current governing instruments, which law may vary as to particular matters such as with respect to administration, validity and construction.

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Holder" has the meaning set forth in the Plan.

"IAC" means an entity or Person set forth on Exhibit E-1, as it may be amended from time to time in accordance herewith (including pursuant to Section 8.13).

"IAC Account" means, in each case, (i) a deposit account subject to an IAC Control Agreement or (ii) an escrow account subject to an IAC Escrow Agreement, in each case located in the U.S., Jersey or such other jurisdiction as reasonably acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution shall be deposited and maintained pursuant to the terms of this Agreement and the IAC Collateral Documents.

"IAC Account Bank" means a financial institution in the U.S., Jersey or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of an IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Asset" has the meaning set forth in Section 3.07(h).

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, in each case, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to this Agreement or any IAC Collateral Document, including all proceeds and products thereof.

"IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens in the IAC Collateral to secure the payment in full when due of all Obligations of the IAC Payment Parties or under which the Secured Party's rights and remedies with respect to the IAC Collateral are governed, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form required by the applicable IAC Account Bank and otherwise in form and substance reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Party and the IAC Account Bank in respect of an IAC Account and pursuant to which (a) the Secured Party is granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and (b) the Secured Party's first-priority Lien on such

IAC Account to secure the payment in full when due of all Obligations of the applicable IAC Payment Party is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Holding Company, IAC Payment Party, or a Subsidiary of an IAC Payment Party, including, but not limited to, any IAC Tax Distribution and any IAC Non-Tax Distribution. For the avoidance of doubt, a distribution of Sale Proceeds shall not constitute an IAC Distribution.

"IAC Distribution Deductions" means, with respect to any IAC Non-Tax Distribution actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Distribution Expenses incurred in connection with such IAC Non-Tax Distribution; *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party ) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes.

"IAC Distribution Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with an IAC Non-Tax Distribution.

"IAC Escrow Agreement" means an escrow agreement, in customary form and otherwise in form reasonably acceptable to the MDT, executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from an IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and (ii) one or more B-Side IAC Payment Parties.

"IAC Loans" means intercompany loans made by (x) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (y) on the other hand, any IAC or IAC Holding Company.

"IAC Non-Tax Distributions" means any cash distributions or other payments made by an IAC and received by an IAC Payment Party in respect of (a) its direct or indirect interest in any IAC or (b) repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of an IAC Non-Tax Distribution (other than a Permitted Withdrawal), other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04; *provided* that no such distribution shall be considered an IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided, further*, that the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC or IAC Holding Company during such sixty (60) day period. To the extent any IAC Non-Tax Distributions made by an IAC (or the proceeds thereof) are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such amounts, to the extent received by an IAC Payment Party (as the payee with respect to such Intercompany Loan or in respect of its direct or indirect interests in a Subsidiary that is the payee with respect to such Intercompany Loan), shall be considered IAC Non-Tax Distributions only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each IAC Payment Party and each Subsidiary of an IAC Payment Party that grants a security interest in IAC Pledged Shares pursuant to Section 3.07.

"IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of net taxable income (as determined for U.S. federal income tax purposes) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) the highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of non-U.S. Taxes and state and local Taxes for U.S. federal income tax purposes; *provided,* that (i) IAC Tax Distributions may be calculated using a good faith estimate of the book net income of such IAC as reflected in such IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) IAC Tax Distributions may be paid in installments during or after the relevant

14

taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by such IAC in such prior taxable period in respect of its net taxable income. If after the actual U.S. federal net taxable income in respect of an IAC is determined for a relevant taxable year or such actual U.S. federal net taxable income in respect of such IAC is redetermined in connection with an income tax audit or the filing of an amended income tax return, (a) the sum of all IAC Tax Distributions previously received by an IAC Payment Party in respect of its interest in such IAC for such taxable year and not previously recharacterized as a Non-Tax Distribution exceeds (b) such IAC Payment Party's allocable share of such actual or redetermined net U.S. federal net taxable income in respect of such IAC for such taxable year *multiplied by* the tax rate described in <u>clause (y)</u> of this paragraph for such taxable year, then the excess of <u>(a)</u> over <u>(b)</u> shall be deemed an IAC Non-Tax Distribution made at the time of such determination.

"<u>IACPP Efforts</u>" means, with respect to an IAC Payment Party in reference to the applicable provisions in <u>Article 3</u>, that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such covenant, which failure cannot be cured or has not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding <u>clause (b)</u>, exercise such right. For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.

"<u>IFRS</u>" means the International Financial Reporting Standards.

"<u>Implementation Limitations</u>" has the meaning set forth in <u>Section 3.05</u>.

"<u>Indebtedness</u>" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); *provided* that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person, and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"<u>Initial Public Creditor Trust Distributions</u>" has the meaning set forth in the Plan.

"<u>Initial Settlement Amount</u>" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment

Group, 1,287,500,000. The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).

"Intercompany Loans" means intercompany loans made by: (x)(i) on one hand, any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company), to (ii) any other IAC Payment Party or Subsidiary of an IAC Payment Party (other than an IAC or an IAC Holding Company); or (y)(i) on one hand, any IAC or IAC Holding Company to (ii) any other IAC or IAC Holding Company.

"IRS" means the United States Internal Revenue Service.

"JDS Estate" means the estate of Jonathan D. Sackler, deceased, on account of its personal representative(s) entering into this Agreement, in their capacity as such.

"Jersey" means the Bailiwick of Jersey, Channel Islands.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

"Jurisdiction of Administration" means with respect to a Trust or the JDS Estate, the principal situs of administration of such Trust or JDS Estate, whose court has primary supervision over the administration of the same.

"Law" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"Lien" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

"Master Disbursement Trust" has the meaning set forth in the Plan.

"MDT" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, (A) for all purposes hereunder other than Section 2.09, the Master Disbursement Trust, as such term is defined in and (B) for purposes of Section 2.09, the Plan Administration Trust.

"MDT Dispute Notice" has the meaning set forth in Section 9.02(e)(ii).

"MDT Operating Reserve" has the meaning set forth in the Plan.

"MDT Shareholder Insurance Rights" has the meaning set forth in the Plan.

"Mediator's Report" means the *Mediator's Report* filed at Docket No. 3119 in the Bankruptcy Cases.

"Minimum Required Settlement Payment" has the meaning set forth in Section 2.01(b).

"Net Assets" means, with respect to any Person, as of any date of determination, the aggregate value of all assets of such Person, as of such date, less the aggregate amount of all liabilities of such

Person (which liabilities shall exclude the Obligations owed by such Person under this Agreement), as of such date, as determined by an Approved Financial Advisor, which determination and valuation methodologies shall be made using methodologies consistent with those used to prepare the Net Asset Presentations.

"Net Asset Presentations" means the financial reports regarding the net assets of certain Sackler Parties produced pursuant to the Case Stipulation on or around January 15, 2020, as such financial reports may be updated from time to time, including reports filed at Docket Nos. [3448 and 3422] in connection with the Confirmation Hearing.

"Net Proceeds" means, with respect to each IAC Payment Party:

(x) with respect to any Sale, (a) fifty-five percent (55%) of the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this clause (x), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though such IAC Payment Party's allocable portion of (I) any income Taxes or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) ~~were~~was, in each case, actually received by such IAC Payment Party, *less* (b) one hundred percent (100%) of any Sale Proceeds Deductions described in ~~clauses~~clause (i) or (iii) of the definition thereof of such IAC Payment Party, *less* (c) 55% of any Sale Proceeds Deductions described in clause (ii) of the definition thereof directly related to the Sale of such IAC; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC that is treated as a corporation for U.S. federal income tax purposes to the extent there has been, is and will be no IAC Tax Distribution with respect to such IAC Non-Tax Distribution) or 100% (with respect to any other IAC Non-Tax Distribution), of the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this clause (y), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though such IAC Payment Party's allocable portion of (I) any income Taxes or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of IAC Distribution Deductions described in clause (ii) of the definition thereof directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) ~~were~~was, in each case, actually received

by such IAC Payment Party, *less* (b) one hundred percent (100%) of any IAC Distribution Deductions described in ~~clauses~~clause (i) or (iii) of the definition thereof of such IAC Payment Party, *less* (c) 55% of any IAC Distribution Deductions described in clause (ii) of the definition thereof directly related to such IAC Non-Tax Distribution.

"Net Proceeds Payment" has the meaning set forth in Section 2.02(a).

"NewCo" has the meaning set forth in the Plan.

"NewCo Transferred Assets" has the meaning set forth in the Plan.

"New Trust" means [~~the Rosetta Trust~~].

"NOAT TDP" has the meaning set forth in the Plan.

"Non-Collar Recipient" means any A-Side Payment Group that is not a Collar Recipient.

"Non-Collar Recipient 2.01 Adjustment" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f) exceeds such Non-Collar Recipient's Settlement Amount Balance.

"Non-Specified Breach" has the meaning set forth in Section 9.01.

"~~Objection Notice~~Notices Addendum" has the meaning set forth in Section ~~9.02(e)(ii)~~11.01.

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Full Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Opinion of Counsel" means a customary written opinion in form and substance and from legal counsel reasonably acceptable to the MDT.

"Opioid-Related Activities" has the meaning set forth in the Plan.

"Original Jurisdiction of Creation" means, with respect to a trust, the original jurisdiction in which the trust was validity created upon the execution of the relevant trust organizational document and the original trustees receipt of the initial funding thereof in connection therewith, without giving effect to any express choice of law provision in the trust's governing instrument that the trust or its governing instrument is to be governed by the laws of another jurisdiction as to validity and construction.

"Other Parties" has the meaning set forth in Section 4.01(c).

"Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that do not yet constitute Aggregate Payments.

"Overpaying Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"Overpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "Payment Group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(ii)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

"Permitted Withdrawals" means, without duplication and to the extent not previously applied in determining a Permitted Withdrawal~~,~~:

(i) with respect to an A-Side IAC Payment Party, (~~w~~A) any amounts used to pay Actual Taxes, (~~x~~B) any IAC Distribution Deductions described in ~~clauses~~clause (ii) or (iii) of the definition thereof or any Sale Proceeds Deductions described in ~~clauses~~clause (ii) or (iii) of the definition thereof and any similar expenses (other than any Taxes) incurred by or on behalf of any IAC Payment Party or any Subsidiary of an IAC Payment Party, ~~or (y~~C) the costs (including legal, tax advisory and trustee costs and excluding any Taxes) of administering the IAC Payment Parties and their Subsidiaries ~~and~~, (~~z~~D) the costs of the IAC Payment Parties and their Subsidiaries of complying with this Agreement, ~~(~~[or (E) the third-party legal and accounting fees and related expenses incurred by PRA L.P. in respect of this Agreement (but not, for the avoidance of doubt, the costs of any judgment against PRA L.P.); *provided* that the aggregate Permitted Withdrawals that may be made by all A-Side IAC Payment Parties in respect of the third-party legal and accounting fees and related expenses described in this clause (E) shall be limited such total third-party legal and accounting fees and related expenses that are allocated to the A-Side Payment Groups; *provided further* that all Permitted Withdrawals pursuant to this clause (E) must be paid, dollar for dollar, to PRA L.P. (or any direct or indirect owner of PRA L.P., which owner shall promptly contribute the funds to PRA L.P., if such owner is a direct owner of PRA L.P., or, if such owner is an indirect owner of PRA L.P., to such owner's Subsidiaries until such funds are received by PRA L.P.) to be paid, dollar for dollar, to such third-party legal and accounting fees and related expenses,]¹

(ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds ~~and (iii) with respect to any IAC Payment Party, [the amounts distributed to the 74A Trust by AJ Irrevocable Trust and AR Irrevocable Trust (and~~

---

¹ Note to Draft: Under discussion.

any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02]¹.; and

(iii) with respect to any B-Side IAC Payment Party, an amount equal to the amount distributed (or to be distributed) to the 74A Trust by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02 (provided that any Permitted Withdrawal pursuant to this clause (iii) prior to the payment to the MDT of an equal amount of such Permitted Withdrawal must be in the form of a B-Side IAC Payment Party Loan used to fund such distribution to the 74A Trust by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof) and subsequently paid to the MDT by PRA L.P. in respect of such IAC Payment Party's Obligations under Section 2.02); *provided*, in the case of this clause (iii) with respect to all B-Side IAC Payment Parties other than Raymond R. Sackler Trust 1 dtd 12/23/89 and Raymond R. Sackler Trust 2 dtd 12/23/89 (and any B-Side IAC Payment Party owned directly or indirectly by either or both of the foregoing trusts, but solely to the extent (X) of their respective ownership of such B-Side IAC Payment Party and (Y) such Permitted Withdrawal is paid, dollar-for-dollar, to either or both of the foregoing trusts), that the portion of such Permitted Withdrawal equal to (A) the aggregate amount of such Permitted Withdrawal pursuant to this clause (iii) *less* (B) the aggregate amount that would have been permitted to be distributed by AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as applicable, pursuant (at the election of such distributing trust) to Section 4.01(c)(i) or the Trust Distribution Incurrence Test under the applicable Credit Support Annex (determined immediately prior to the distribution to the 74A Trust by AJ Irrevocable Trust and AR Irrevocable Trust (and any successor(s) thereof)) if (and to the extent) such trust(s) elect(s) to treat all or part of such distribution to the 74A Trust as a distribution pursuant to Section 4.01(c)(i) or the Trust Distribution Incurrence Test under the applicable Credit Support Annex, is evidenced by one or more B-Side IAC Payment Party Loans pursuant to promissory notes that are in a form substantially similar to the form attached hereto as Exhibit Y.

"Person" means an individual, trust, estate of a deceased individual, corporation, partnership, limited liability company, association or other entity or organization, including a Governmental Authority.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement, (iv) Collateral Documents and (v) Escrow Period (as defined in the Plan) and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties. For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 3185[3545] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Plan Administration Trust" has the meaning set forth in the Plan.

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

---

¹ Note to Draft: Under discussion.

"Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated.

"Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust referred to in [   ]²hereof or, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust (including without limitation as referred to in Sections 4.06, 4.08 and 4.10 of Annexes A, C, D and E of this Agreement and Sections 4.03, 4.04 and 4.05 of Annex B of this Agreement), including any Consent Person.

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

"Products" has the meaning set forth in the Plan.

"Protected Party" has the meaning set forth in the Plan.

"Purchaser" has the meaning set forth in Section 3.01(a)(i).

"Purdue" means Purdue Pharma L.P.

"Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.

"Quarterly Sweep Date" has the meaning set forth in Section 3.07(e).

"Recovery" has the meaning set forth in Section 9.01(e).

---

² Note to Draft: To include provisions of Settlement Agreement and/or Credit Support Annexes that restrict distributions, changes in trustees, amendment/modification and other fundamental changes.

"Related Parties" means, as of any time of determination, any Person who is at such time (a) any member of a Family Group; (b) a current or former spouse, qualified domestic partner, stepparent, sibling of the whole or half-blood descendant (including adoptive relationships), stepchild or current or former spouse of any descendant (including adoptive relationships) of any of the Persons described in the preceding clause (a); (c) trusts for the benefit of any one or more of the Persons described in the preceding clauses (a) and (b); (d) any Person identified on Exhibits E-1 or E-2, any IAC Holding Company, any IAC Pledgor, any IAC Pledged Entity and any other Subsidiary of an IAC Payment Party (in each case so long as such Person continues to be Controlled by one or more Sackler Parties); (e) a current beneficiary, trustee or protector to any of the Persons described in the preceding clauses (a) and (c); (f) a current Controlling equity owner, principal, executive officer, director or other equivalent member of senior management to any of the Persons described in the preceding clauses (a), and (d), but in the case of clause (d) only with respect to IACs that are Controlled by one or more Sackler Parties; and (g) any entities directly or indirectly controlling, controlled by, or under common control with any of the Persons described in the preceding clauses (a) and (b).

"Related Party Transaction" has the meaning set forth in Section 3.03(a)(ii).

"Related Person" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"Release Remedy" has the meaning set forth in Section 9.02(a)(ii)(B).

"Releasing Parties" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against, or Interests in, the Debtors, (iii) all Holders of Future PI Channeled Claims, (iv) with respect to each of the Persons in the foregoing clauses (i) through (iii), each of their Related Parties, and (v) each of the Debtors' Related Parties, in each case, other than any Shareholder Released Party. All capitalized terms in this definition shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include clause (vi) in the definition thereto.meanings corresponding to such terms as set forth in the Plan.

"Relevant Jersey Trust" means each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) and, in addition, each Funding Trust that funded the Rosetta Trust as set forth in Section 10.01(a)(iv).

"Relevant Parties" has the meaning set forth in Section 4.01(c).

"Remedies Forbearance Period" has the meaning set forth in Section 9.02(a)(i).

"Required Interested Persons" means, (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party

if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat. § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, *provided* that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

"Required Settlement Payment" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.

"Restitution" has the meaning set forth in Section 4.01(a).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"Restricted Person" has the meaning set forth in Section 8.09.

"Retained Interest" has the meaning set forth in Section 3.01(ab).

"Rosetta Trust" means the trust bearing that name governed by the laws of Jersey (Channel Islands) of which Stone Fiduciary Management Inc., a Wyoming corporation, is the trustee.

"Sackler Party" means a Payment Party or an IAC Payment Party.

"Sackler Parties' Representative" means [  ], a [  ] organized under the laws of [  ].

"Sale" means (i) any sale of an IAC Payment Party's direct and/or indirect Equity Interests (whether in whole or in part) in an IAC, (ii) any sale of all or substantially all of the assets of an IAC and (iii) any sale of assets or Equity Interests in connection with (i) and (ii) above, in each case to a third party.

"Sale Expenses" means all documented, out-of-pocket fees, charges, expenses, and other amounts (excluding Taxes) incurred in connection with presale restructuring of any IACs, the marketing of such IACs and general publicity and lobbying efforts in each case, incurred in connection with a Sale.

"Sale Obligations" has the meaning set forth in Section 3.06.

"Sale Period" has the meaning set forth in Section 3.01(a).

"Sale Proceeds" means the gross cash proceeds (a) of a Sale, including, in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the gross cash proceeds from the sale of such assets or (b) received in connection with the repayment of an IAC Loan or Intercompany Loan to the extent such repayment was made with proceeds of a Sale (other than a Permitted Withdrawal) and without duplication to amounts included in the definition of "IAC Non-Tax Distributions", in each case of ~~clause~~clauses (a) and (b), as calculated in U.S. dollars at the relevant spot exchange rate published by Bloomberg on any date on which such proceeds are deposited into an IAC Account or otherwise paid to the MDT. To the extent Sale Proceeds are used to repay an Intercompany Loan (including, for the avoidance of doubt, an Intercompany Loan between IAC Payment Parties), such Sale Proceeds shall be considered Sale Proceeds only of the IAC Payment Party that is the payee (or whose Subsidiary is the payee) with respect to such Intercompany Loan.

"Sale Proceeds Deductions" means, with respect to any Sale Proceeds actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (A) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (B) any Sale Expenses incurred in connection with such Sale, and (C) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC; *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded to any IAC by such IAC Payment Party (whether funded directly to the IAC or funded through one or more IAC Holding Companies and/or Subsidiaries of such IAC Payment Party) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution").

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include income Taxes or withholding Taxes. For the avoidance of doubt, Sale Proceeds ~~Distributions~~Deductions shall not include the repayment of Intercompany Loans or IAC Loans funded directly or indirectly from Sale Proceeds.

"Secondary Restricted Person" means (i) any child of a Restricted Person who is a natural person or, for Restricted Persons that are estates, any child of the deceased person associated with such estate, who is older than 18 years of age as of September 15, 2019 and (ii) any trusts of which any of the Persons in the foregoing clause (i) are beneficiaries and the trustees thereof (solely in their capacities as such), in each case to the extent such Person is not a Restricted Person.

"Second Circuit" means the United States Court of Appeals for the Second Circuit.

"Secured Party" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"Separation Agreements" means the agreements entered into in accordance with this Agreement to govern continuing business and other commercial relationships among the Debtors, NewCo and other entities owned directly or indirectly by the Sackler Parties and to clarify and confirm such parties' respective rights under certain intellectual property rights.

"Settlement" has the meaning set forth in the recitals.

"Settlement Amount Balance" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by Section 2.03.

"Settlement Effective Date" has the meaning set forth in Section 10.01(a).

"Shareholder Released Claims" has the meaning set forth in the Plan.

"Shareholder Released Parties" has the meaning set forth in the Plan.

"Shareholder Releases" has the meaning set forth in the Plan.

"Specified Breach" has the meaning set forth in Section 9.01.

"Specified Breach Trigger" means a Breach Trigger with respect to a Specified Breach.

"Subsidiary" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Tax" or "Taxes" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Advisor" means an accounting or law firm with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.

"Tax Matters Agreement" means the series of separate selected tax matters agreements in form and substance reasonably acceptable to the Sackler Parties' Representative, the MDT and any other parties thereto, between, on the one hand, the Payor Parties (as defined in such agreements) and, on the other hand, each of NewCo, the Master Disbursement Trust, the NOAT (as defined in the Plan), and the TAFT (as defined in the Plan) and certain other parties as may be agreed.

"Tax Treatment" has the meaning set forth in Section 4.01(c).

"Third Party Payee" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any contract counterparty that is not a Sackler Party or Related Party whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor or professional services company that is not a Sackler Party or Related Party that provides services in connection with such Sale or IAC Distribution, or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).

"TopCo" has the meaning set forth in the Plan.

"Tribe TDP" has the meaning set forth in the Plan.

"Tribe Trust" has the meaning set forth in the Plan.

"Trust Certification" means, with respect to a Trust, a certification of the trustees thereof substantially in the form of Exhibit P.

"Trusts" means the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.

"Unapplied Advanced Contributions" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i)     the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii)    the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii)   without duplication, the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with

respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties. In addition, if proceeds from such Sale or IAC Non-Tax Distribution are received by a Crossover Member (e.g., a Common B-Side Payment Party), then such Unapplied Advanced Contributions shall be allocated proportionately among the Payment Groups in which such Crossover Member is a member for all purposes of this Agreement.

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

"Underpaying ~~Amount~~Payment Group" has the meaning set forth in Section 9.02(e)(iv).

"~~Underpaying Payment Group~~Underpayment Amount" has the meaning set forth in Section 9.02(e)(iv).

**Section 1.02    Interpretative Provisions**.

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Annexes and Exhibits are to the Articles, Sections, Annexes and Exhibits of this Agreement unless otherwise specified.

(c)    All Exhibits and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Annex but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)    The use of the word "or" shall not be exclusive.

(g)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement. Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's estate, legal and personal representatives, successors and permitted assigns.

(i)    Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may

require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(j)    Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a personal representative or trustee that is a natural person acting solely in such person's capacity as a personal representative or trustee of a deceased individual's estate or a trust, respectively.

(k)    Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(l)    All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)    All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)    Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)    A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)    Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement. No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence. Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)    [Unless the context otherwise requires, references to Net Proceeds, Sale Proceeds or Distributions "received by" or "actually received by" an IAC Payment Party, or to the "receipt" of Net Proceeds, Sale Proceeds or Distributions by an IAC Payment Party shall include Net Proceeds, Sale Proceeds, or Distributions that have been received by PRA L.P. and would be received by such IAC Payment Party in a pro rata distribution thereof by PRA L.P. to its ~~equity holders~~equityholders.]

## ARTICLE 2.
## SETTLEMENT PAYMENTS

**Section 2.01    Required Settlement Payment**.

(a)    <u>Payment of the Outstanding Settlement Amount</u>.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group on the terms and subject to the limitations set forth herein, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to <u>Section 2.02</u>, by the applicable Funding Deadlines pursuant to this <u>Section 2.01</u>, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group. Except as provided in <u>Sections 2.01(i)</u>, <u>2.04</u>, <u>2.05</u> or <u>2.10</u>, the Payment Parties within a Payment Group shall have no further payment obligation under this <u>Section 2.01</u> once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero. For the avoidance of doubt, if, at any time, the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this <u>Section 2.01</u> until its Outstanding Settlement Amount is again reduced to (and for so long as it remains) zero.

(b)    <u>Minimum Required Settlement Payment</u>.

(i)    Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below. Each such payment deadline set forth in the schedule below shall be referred to herein as a "<u>Funding Deadline</u>" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "<u>Minimum Required Settlement Payment</u>".

| <u>#</u> | <u>Funding Deadline</u> | <u>Minimum Required Settlement Payment</u> |
|---|---|---|
| 1. | Plan Effective Date | $300 million |
| 2. | June 30, 2022 | $350 million |
| 3. | June 30, 2023 | $375 million |
| 4. | June 30, 2024 | $[375] million |
| 5. | June 30, 2025 | $[350]‡ million |
| 6. | June 30, 2026 | $300 million |
| 7. | June 30, 2027 | $1,000 million |
| 8. | June 30, 2028 | $475 million |
| 9. | June 30, 2029 | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030 | $325 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031 | Up to $200 million, as set forth in the proviso immediately below this schedule |

*provided* that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; *provided*, *however*, that

---

‡ Note to Draft: Under review.

deferrals shall only be made pursuant to the foregoing proviso if the aggregate amount available for deferral pursuant thereto equals or exceeds $25 million.

(ii)    Notwithstanding the foregoing clause (i), (A) for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022 shall be extended in increments of one calendar month (and due at the end of such month) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, and (B) in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

(iii)    Notwithstanding anything in this Agreement to the contrary, if the Debtors renotice the Confirmation Hearing in accordance with Section 12.3(c) of the Plan, then, unless the Debtors and the Sackler Parties shall agree otherwise in their sole and absolute discretion, the Parties agree to amend this Agreement to remove the agreements and concessions made by the Debtors and the Sackler Parties reflected in the Mediator's Report.

(c)    Payment of A-Side Funding Deadline Obligations. With respect to each A-Side Payment Group, on each Funding Deadline,

(i)    The A-Side General Obligors shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, on behalf of the A-Side Payment Groups, the A-Side Funding Deadline Obligation of such A-Side Payment Groups by the applicable Funding Deadline;

(ii)    the A-Side Payment Parties that are trusts (other than the A-Side General Obligors and "bare trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i); and

(iii)    the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i) or (ii);

provided that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero; (or, in the case of any A-Side General Obligor, so long as the Outstanding Settlement Amounts of all A-Side Payment Groups is zero); (3) no A-Side General Obligor shall have any obligation to make any payment pursuant to this Section 2.01 (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and to the extent it does not have sufficient liquid assets (not including any amounts reserved

in good faith for the payment of Taxes or any other Permitted Withdrawals applicable to such A-Side General Obligor) to do so; and (4) nothing in this Section 2.01(c) shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)    Payment of B-Side Funding Deadline Obligations. With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)    Prepayment of Outstanding Settlement Amount. Any Payment Group (including, for the avoidance of doubt, any A-Side General Obligor on behalf of the A-Side Payment Groups) shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty. Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, the next due funding obligation of such Payment Group pursuant to Section 2.01(a) or (b) (or, at the option of such Payment Group, the next funding obligation of any IAC Payment Party in its Payment Group pursuant to Section 2.02(a) or (b)), it being understood that any unapplied prepayment shall carry over and be used to satisfy and reduce, dollar-for-dollar, such Payment Group's succeeding such funding obligation. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.

(f)    Reallocation of A-Side Payments on the First Three Funding Deadlines to B-Side. If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i) the payment obligation under Section 2.01(d) of each B-Side Payment Group on such Funding Deadline shall be an amount equal to fifty percent (50%) of such Required Settlement Payment due on such Funding Deadline and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment due on any such Funding Deadlines. For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)    B-Side Excess Amount Adjustment. If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of (A) fifty percent (50%) of the B-Side Excess Amount and (B) one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)  A-Side Allocable Portion Adjustment. If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)  on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group's A-Side Payment Group 2.01 Amount shall be increased by an amount equal to the lesser of (x) one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline and (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth or tenth Funding Deadline; *provided* that the aggregate amount determined pursuant to this Section 2.01(h)(i) on any given Funding Deadline shall not exceed the aggregate B-Side Payment Group 2.01 Amounts on such Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment"); and

(ii)  each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by an A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is included in its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)  Family Group 8 Cap.

(i)  Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), 2.01(e) and 2.10 (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment Obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and Section 2.10 (any such amount, an "Excess Group 8 Payment Obligation"):

(A)  the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(B)  the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment Obligation; and

(C)     the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.

For the avoidance of doubt, (i) nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Payment Group 8 of their obligations under Sections 2.01, 2.02, 2.03, and 2.10 and (ii) the payment of any such Excess Group 8 Payment Obligation (other than an Excess Group 8 Payment Obligation in respect of the Additional A-Side Amount) will be included in the calculation of the Aggregate Payments of A-Side Payment Group 8 (and not of the members of the Payment Group actually making such payment).

(ii)     Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the Excess Group 8 Payment Obligation) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives proceeds from a Sale or Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (ii)). Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party or receives any Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (ii)).

(iii)     Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph (ii) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which the Full Outstanding Settlement Amounts of all A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder), and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)    _Payments by Beacon Trust_. All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below. All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)    _Payments by 74A Trust_.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below. All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    Allocation of Payments.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by an A-Side General Obligor (including any payment pursuant to Section 2.02(a) or (b) but excluding any payment pursuant to Section 2.10 (the allocation of which shall be governed by Section 2.10)), shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, _provided_ that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made in equal proportion by each of the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    Any payment by a Payment Party that is a Crossover Member (other than any A-Side General Obligor or Common B-Side Payment Party), shall be deemed to have been made in equal amounts by each Payment Group of which such Crossover Member is a member; _provided_ that if the Settlement Amount Balance of any such A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by a such Crossover Member shall be deemed to have been made in equal proportion by each of such A-Side Payment Group(s) of whose Settlement Amount Balances are greater than zero.

(iii)    For all purposes of this Agreement (including the definitions of Aggregate Payments, Outstanding Settlement Amount and Settlement Amount Balance), any payment by any B-Side Payment Party that is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), shall be deemed to have been made by each B-Side Payment Group, in an amount equal to the lesser of (A) one-half (1/2) of such payment and (B) such B-Side Payment Group's Settlement Amount Balance; _provided_ that if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)    Except as provided in Section 9.03, (1) each Payment Party agrees that its obligations with respect to the Full Outstanding Settlement Amount and all other Obligations owed by its Payment Group, and such Payment Party's obligations arising as a result of its joint and several liability with each other Payment Party within its Payment Group as provided herein, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each such Payment Party and (2) if a Specified Breach has occurred and is continuing with respect to any Payment Group and the MDT has elected to exercise the Payment Remedy in connection with such Specified Breach pursuant to Section 9.02, the MDT may, solely in accordance with Section 9.02 and subject to Section 9.03, proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Full Outstanding Settlement Amount and all other Obligations, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Full Outstanding Settlement Amount and all other Obligations of such Payment Group. Each Payment Party waives all suretyship defenses and consents and agrees that the MDT (and all other Secured Parties) shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Full Outstanding Settlement Amount and all other Obligations.

(n)    Subject to Section 2.08, all payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

### Section 2.02    Payment of Net Proceeds.

(a)    Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, within forty-five (45) calendar days following receipt (or as soon thereafter as legally permissible or, if the IAC Payment Party is not entitled to receive any cash in respect of Net Proceeds, the receipt of Net Proceeds by any other IAC Payment Party), an amount equal to 100% of all Net Proceeds in respect of such IAC Payment Party to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 3.07(d). The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to (and remains) zero. For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)    In the event that a B-Side IAC Payment Party's Net Proceeds is greater than the Settlement Amount Balance(s) of the B-Side Payment Group(s) in which such B-Side IAC Payment Party is a member (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, on the date such Net Proceeds would otherwise have been payable by the B-Side IAC Payment Party, to the MDT an additional amount equal to the lesser of (x) the

Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)    All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this <u>Section 2.02</u> to the account set forth on <u>Exhibit G</u> (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with <u>Section 11.02</u>) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)    All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this <u>Section 2.02</u> to the account set forth on <u>Exhibit G</u> (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with <u>Section 11.02</u>) by wire transfer of immediately available funds. All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)    For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)    each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with <u>Section 2.01(l)(i)</u>;

(ii)    each Net Proceeds Payment made by a Common B-Side Payment Party shall be deemed to have been made by the B-Side Payment Groups in accordance with <u>Section 2.01(l)(iii)</u>; and

(iii)    any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to ~~Section~~<u>Sections 2.02(c)</u> and <u>2.01(j)</u> or a B-Side IAC Payment Party or the 74A Trust pursuant to ~~Section~~<u>Sections 2.02(d)</u> and <u>2.01(k))</u>, shall be deemed to have been paid by each IAC Payment Party that holds equity interests in PRA L.P. in accordance with <u>Section 1.02(q)</u>.

**Section 2.03    Collar.**

(a)    If any Sale or IAC Non-Tax Distribution results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "<u>Collar Top-Up Amount</u>"), then, effective immediately prior to such Sale or IAC Non-Tax Distribution (as applicable), (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount *multiplied by* seven (7).

(b)    If on any Funding Deadline:

(i)    (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding

Deadline shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)    a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)    If on any Funding Deadline:

(i)    (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients. Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

37

(e)    With respect to each Payment Group and each IAC Payment Party within such Payment Group, until the earlier of (i) the final Sale of all IACs the interests of which are held, directly or indirectly, by such IAC Payment Party (excluding Retained Interests) and the funding of any associated final Net Proceeds Payment to the MDT, and (ii) such time as all amounts payable by such Payment Group hereunder have been paid in full in cash, such Payment Group shall not (A) sell, dispose, assign or otherwise transfer any beneficial interest in such IAC Payment Party to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), (B) permit such IAC Payment Party to issue additional equity interests to any Person that is not included within such Payment Group (or a Subsidiary of a Person included in such Payment Group), or (C) amend any organizational or trust documents of such IAC Payment Party to add beneficiaries thereto or otherwise adjust the economic entitlements or beneficial interests of the equity owners thereof, in each case, to the extent any such beneficiaries or equity owners would not be included in such Payment Group (or a Subsidiary of a Person included in such Payment Group).

**Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties**.

(a)    If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to ~~Sections~~ Section 2.01(c)(ii) or Section 2.10 when due and payable, and, an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"), as promptly as practicable (and in any event, within ten (10) Business Days) after the MDT delivers a certification to the Sackler Parties' Representative that is has diligently pursued available rights and remedies against A-Side Capped Payment Parties for at least ninety (90) days:

(i)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT an amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

(ii)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500. Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment, *provided* that such Payment Parties shall not be entitled to exercise any rights and remedies against such A-Side Capped Payment Party until the A-Side Capped Payment Party's Obligations to the MDT have been paid in full in cash. For the avoidance of doubt, the payment of any such A-Side Capped Payment Party Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8 and not the Payment Party making such payment.

(b)    Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date on which the Full Outstanding Settlement Amount of A-Side Payment Group 8 (inclusive of the A-Side Capped Payment

Party Payment Shortfall) and of all other A-Side Payment Groups have been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of Excess IAC Proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph (b)). Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph (b)).

(c)    Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph (b) will be paid solely upon the later to occur of (x) the date that is thirty (30) days after the date on which all Full Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero (accounting for the maximum amount the A-Side Payment Groups may be liable for hereunder) and (y) the date that is thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01. For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

**Section 2.05    Intentionally Omitted**.

**Section 2.06    No Change to Aggregate Settlement Amount**.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments required to have been made by all of the Payment Groups as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount, (ii) as of either the second or [fifth][2] Funding Deadline, the MDT receiving less than $25 million in Additional A-Side Amount Payments as of each such Funding Deadline, (iii) the Aggregate Payments required to have been made by all of the Payment Groups as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline, or (iv) the MDT being entitled hereunder to receive less than the Aggregate Settlement Amount (plus the Additional A-Side Amount) in cash by June 30, 2031 (as such date may be extended pursuant to Section 2.01(b) hereof). If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group

---

[2] Note to Draft: Under review.

shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall, which shortfall shall be due and payable promptly.

(b)       Notwithstanding anything to the contrary herein:

(i)       In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to the MDT hereunder (other than payments pursuant to Article 9) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion and the Additional A-Side Amount Payments paid by all Payment Groups equal $50 million.

(ii)       All payment obligations of any non-breaching Payment Group to the MDT hereunder shall terminate at such time when such Payment Group's payment obligations hereunder have been paid in full in cash in accordance with the provisions hereof (regardless of whether another Payment Group is in Breach, including if such other Payment Group has not yet paid its Obligations hereunder), with the intent being that the payment obligations of each non-breaching Payment Group shall not be increased, accelerated or otherwise impacted by any other Payment Group's Breach (except to the extent such non-breaching Payment Group has expressly agreed otherwise in this Agreement). For the avoidance of doubt, (A) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive, (B) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group and (C) this paragraph (ii) shall not affect the obligations of the Payment Parties pursuant to Section 2.05.

**Section 2.07     Illustrative Examples**.   Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, 2.03, and 2.04 (and related definitions) based on various enumerated assumptions are included in Exhibit U.

**Section 2.08     Payments Pending Appeals**.

(a)       Notwithstanding anything in Section 2.01, 2.02, or 2.10 or Article 3 to the contrary, and subject to Section 2.08(f), all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01, 2.02 and 2.10 shall be deposited into the Appeals Account to satisfy the Obligations under this Agreement; provided that:

(i)       on the Funding Deadline that is the Plan Effective Date, the Minimum Required Settlement Payment that is due to the MDT on such Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT. Such payment will be funded pursuant to Section 2.11; provided that any amounts that are not funded pursuant to Section 2.11 shall instead by funded pursuant to Sections 2.01(c) and (d);

(ii)       on the date of the second Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), (A) the Minimum Required Settlement Payment that is due to the MDT on the second Funding Deadline and (B) any amounts required to be paid to the MDT pursuant to Section 2.10 shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that is due to the MDT on the third Funding Deadline shall be paid directly to the MDT or, to the extent funds are available in the Appeals Account, released from the Appeals Account and paid directly to the MDT; *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)    a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, and the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties.

*provided*, *further*, that if all conditions in the foregoing ~~clauses~~clause (B) or (C) are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to Section 2.01(b)(ii)), the Minimum Required Settlement Payment that was due to the MDT on the third Funding Deadline (including any portion thereof deposited into the Appeals Account on such Funding Deadline pursuant to this Section 2.08(a)) shall be released from the Appeals Account and paid directly to the MDT.

(b)    Notwithstanding the foregoing clause (a), all amounts held in the Appeals Account (including earnings thereon) shall be released to the MDT, and ~~Sections~~Section 2.08(a) shall no longer apply and shall not be in effect if (i) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (ii) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (iii) no court has issued a decision ~~that does not affirm the Confirmation Order~~ with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties that does not affirm the Confirmation Order and (iv) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(c)    If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such rescission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; (iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Full Outstanding Settlement Amount or other

Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases; and (iv) all amounts remaining in the Appeals Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Account.

(d)    For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(e)    If this Agreement is rescinded as provided in Section 2.08(c) or otherwise terminated, then the A-Side Payment Parties within each A-Side Payment Group shall promptly pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group an amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT (or made to the Appeals Account and subsequently released to the MDT) by such B-Side Payment Group pursuant to Section 2.01(d) as a result of Section 2.01(f), such payment to be made no later than [60] days following such rescission or termination.

(f)    With respect to any payment otherwise required to be made under Section 2.08 into the Appeals Account, each Payment Party and IAC Payment Party obligated to make such payment shall have the right, in its sole and absolute discretion, instead to make any or all of its respective share of such payment to the MDT directly (i.e., not to the Appeals Account), on or before the date such payment is due hereunder. With respect to any amounts in the Appeals Account, each Payment Party and IAC Payment Party shall have the right, in its sole and absolute discretion, to cause the release of any or all of its respective proportionate share of such amounts to the MDT directly on or before the date on which such release otherwise would have been required hereunder.

**Section 2.09    Appeals; Motion to Stay**.

(a)    Direct Appeal. In the event the Confirmation Order is not entered by the United States District Court for the Southern District of New York in first instance, if any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases (any particular such appeal, the "Appeal"), the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit (any particular such direct appeal, the "Direct Appeal") in accordance with 28 U.S.C. § 158(d)(2), and to certify jointly with the MDT that at least one of either 28 U.S.C. § 158(d)(2)(A)(i), 28 U.S.C. § 158(d)(2)(A)(ii), or 28 U.S.C. § 158(d)(2)(A)(iii) applies with respect to the Appeal. If such consent and joint certification cannot be obtained promptly with respect to all such appellants and appellees, the MDT shall promptly request such consent with respect to a majority of such appellants and appellees to make a joint request for certification under 28 U.S.C. § 158(d)(2)(B)(ii). If such consent cannot be promptly obtained, the MDT shall promptly make a motion to the Bankruptcy Court under 28 U.S.C. § 158(d)(2)(B)(i) requesting that the Appeal be certified for Direct Appeal. Upon receiving certification for the Direct Appeal, whether by the Bankruptcy Court order or otherwise, the MDT shall immediately request, on an expedited basis, that the Second Circuit authorize the Direct Appeal.

(b)    Expedited Appeal. Immediately after the filing of any Appeal, and again after the Appeal is certified and the Second Circuit grants the Direct Appeal, the MDT shall (i) make a motion in the court then assigned to hear such Appeal, requesting that the Appeal be expedited on the fastest feasible schedule and (ii) seek to have such motion heard on an expedited basis.

(c)        Motion to Stay. The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order. The MDT also shall request in the appropriate court that, if such challenge is unsuccessful or such objection is overruled, that any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (including, for the avoidance of doubt, the Sackler Parties) that would or could be harmed as a result of such stay, as determined by the appropriate court.

**Section 2.10    Certain Additional A-Side Payment Obligations**.    In addition to the amounts required to be paid pursuant to ~~Section~~Sections 2.01 and 2.02, the A-Side Payment Groups shall collectively pay, or cause to be paid, an additional $50 million (the "Additional A-Side Amount") to the MDT as follows:

(i)        on the second Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT $3.125 million; and

(ii)        on the [fifth][3] Funding Deadline, the A-Side Payment Parties within each A-Side Payment Group, jointly and severally but in the order set forth in Section 2.01(c), shall pay to the MDT an additional $3.125 million.

For the avoidance of doubt, the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (i) shall be $3.125 million on the second Funding Deadline and the payment obligation of each A-Side Payment Group pursuant to the foregoing clause (ii) shall be $3.125 million on the [fifth][4] Funding Deadline.

Each A-Side Payment Group shall have the right to prepay its portion of the Additional A-Side Amount at any time, in whole or in part, without premium or penalty. For the avoidance of doubt, the Additional A-Side Amount does not constitute a Required Settlement Payment and the payment thereof will not be taken into account in determining any A-Side Payment Group's Aggregate Payments, will not give rise to an Advanced Contribution and Unapplied Advanced Contribution, and will not reduce any A-Side Payment Group's Settlement Amount Balance or Outstanding Settlement Amount. Any portion of the Additional A-Side Amount that is paid by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to one-eighth (1/8) of such payment. For the avoidance of doubt, reduction of the Outstanding Settlement Amount to zero shall not limit or otherwise modify the obligation of the A-Side Payment Groups to pay the Additional A-Side Amount in accordance with this Section 2.10.

**Section 2.11    Pre-Plan Effective Date Net Proceeds**. If a Sale or IAC Non-Tax Distribution occurs after the Agreement Effective Date and prior to the Settlement Effective Date, then (a) the proceeds therefrom shall be applied in accordance with this Agreement (*provided* that any resulting Net Proceeds received by an IAC Payment Party prior to the Settlement Effective Date shall be deposited in the Appeals Account and, prior to the Plan Effective Date, shall not be deemed to have satisfied the obligations of any IAC Payment Party pursuant to Section 2.02), (b) on the Plan Effective Date, any Net Proceeds in the Appeals Account shall be deemed to have been received by the depositing IAC Payment Parties and deposited in the Appeals Account in satisfaction of such depositing IAC Payment Parties' obligations pursuant to Section 2.02 immediately prior to the deadline for payment of the amount required

---

[3] ~~Note to Draft: Under review.~~

[4] ~~Note to Draft: Under review.~~

to be paid to the MDT pursuant to Sections 2.01(c) and (d) on the first Funding Deadline, and (c) the amount required to be released from the Appeals Account to the MDT pursuant to Section 2.08(a) shall be released in accordance with Section 2.08(a).

## ARTICLE 3.
## SALE OF IACS

**Section 3.01    Covenant to Sell**.

(a)    Subject to Section 3.01(b) and (c), during the seven (7)-year period commencing on the Plan Effective Date (the "Sale Period"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall:

(i)    use their best efforts to sell or cause to be sold to one or more unaffiliated third parties (each, a "Purchaser"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of such IACs;

(ii)    use their best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and

(iii)    cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party from each Sale to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sale or the distribution of proceeds therefrom,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments shall be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such Sale Proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon receipt by such IAC Payment Parties of Sale Proceeds, deposited into an IAC Account in accordance with Section 3.07(c);

*provided* that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other

than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; *provided, further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

(b)    If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, in each case, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section 8.09 of this Agreement and (iii) the Equity Interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest"). For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of all or substantially all assets or direct and/or indirect Equity Interests of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)    The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, that (A) the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing, (B) no Sale of a Controlling interest in an IAC shall be permitted unless at least 51% of the economic interest in such IAC is sold, and (C) any Equity Interest retained following a Sale of Equity Interests shall not be subject to any restrictions on transfer except for customary transfer restrictions (*e.g.*, rights of first refusal, drag-along rights, limits on sale to prohibited parties, and no-sale restrictions) that will not in any case extend beyond the later of one year from the closing of the transfer of a controlling interest in such IAC and six months prior to the end of the Sale Period.

(d)    The Sackler Parties' Representative shall make the Advisors available for consultation to provide the MDT with updates with respect to any Sale or prospective Sale, including with respect to (x) any Implementation Limitations or provisions in organizational documents, joint venture agreements or material contracts of the Sackler Parties, their Affiliates or the IACs ~~which~~that would materially restrict or limit the ability of the IAC Payment Parties to effectuate the Sale of any IAC (to the extent identified by or known to the Sackler Parties' Representative and the Advisors at the time of such consultation) and (y) any IACs for which any letters of intent and purchase or similar acquisition agreements have been entered into in connection with any potential Sale (except to the extent such letter of intent or similar agreement was ~~provided~~delivered on a confidential basis), the contemplated purchase price in connection therewith and expected timing of consummation of such Sale, to the extent permitted under existing contractual restrictions; *provided* that (i) the MDT will not request consultation more than two (2) times

within any 12-month period, (ii) in connection with such consultation, the Sackler Parties' Representative shall provide the MDT with a written report that includes a summary in reasonable detail of (A)such updates with respect to the Sales process described in the foregoing Section 3.01(c) for each IAC, and (iii) the MDT shall agree to (and comply with) customary confidentiality obligations pursuant to a mutually acceptable confidentiality agreement.

**Section 3.02    IAC Information Rights; Access; Waiver**.

(a)    The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of clauses (v) and (vi) below, which only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)    as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)    reports in a form substantially similar to the forms attached hereto as Exhibits W-1 and W-2 to be delivered on or before the date set forth on such forms and which include: (A) a quarterly report prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 1 thereto, with respect to each applicable IAC or IAC Payment Party, (i) a good faith estimate of the book net income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes; (ii) any foreign income taxes paid or estimated in good faith to be paid in respect of such income; (iii) the rate of any applicable foreign withholding taxes; (iv) any foreign withholding taxes paid or estimated in good faith to be paid in respect of any Tax Distributions made directly or indirectly to the relevant IAC Payment Party; (v) the then-current highest marginal U.S. federal, state, local and non-U.S. income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes for U.S. federal income tax purposes and the character of the income allocated to the applicable IAC Payment Party by the IAC); (vi) based on the foregoing, the amount of IAC Tax Distributions payable pursuant to the Settlement Agreement; and (vii) the amount of any IAC Tax Distributions received for the current taxable period as of the date of the report, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC; and (y) confirming that the amounts set forth on Schedule 1 thereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (B) an annual report that only the B-Side IAC Payment Parties shall be required to provide, or cause to be provided, to the MDT and the Approved Accountant, which report shall be prepared in connection with the calculation of IAC Tax Distributions (x) indicating on Schedule 2 thereto, with respect to each applicable IAC and IAC Payment Party, (i) the amount of net book income, as reflected in the IAC's management accounts without adjustment for U.S. federal income tax purposes, allocated to the applicable IAC Payment Party; (ii) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year; (iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; (iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution with respect to such amounts; (v) the then-current highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut (which rate shall take into account the deductibility of non-U.S. Taxes and U.S. state and local Taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC); (vi) based on the foregoing, the total

46

amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement; (vii) the amount of such IAC Tax Distributions received as of the date of the report in respect of the applicable IAC for the relevant taxable year; (viii) any amount of such IAC Tax Distributions to be recharacterized as IAC Non-Tax Distributions, and (ix) any remaining amount of IAC Tax Distributions that are permitted to be paid under the Settlement Agreement with respect to the applicable taxable year, which report shall be prepared on the basis of information provided to the IAC Payment Parties by management of the applicable IAC and reflected in the U.S. federal income tax returns filed by the IAC Payment Parties; and (y) confirming that (i) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 thereto are accurate based on the information provided by the relevant IACs and IAC Payment Parties; (ii) the U.S. federal income tax items set forth on Schedule 2 thereto accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (iii) the calculation for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2; and (C) an annual report provided by the Approved Accountant that only the B-Side IAC Payment Parties shall be required to furnish to the MDT, which report shall be prepared by the Approved Accountant confirming (w) that it has received the Schedule 2 described in clause (B) of this <u>Section 3.02(a)(ii)</u> for the relevant taxable year, (x) the items described in <u>subclauses (ii) through (iv)</u> of <u>Section 3.02(a)(ii)(B)(x)</u> on such Schedule 2 are correct based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns provided to the Approved Accountant, (y) the tax rate described in <u>subclause (v)</u> of <u>Section 3.02(a)(ii)(B)(x)</u> on such Schedule 2 is correct, and (z) the calculation described in <u>subclause (vi)</u> of <u>Section 3.02(a)(ii)(B)(x)</u> on such Schedule 2 is correct.

(iii)    (A) as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds, Collar Computation Proceeds and Collar Amount relating to such Sale Proceeds or IAC Non-Tax Distribution, which calculation shall be in substantially the form attached hereto as <u>Exhibit N</u> and (B) as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal, a report setting forth a good faith calculation of such Permitted Withdrawal, in the case of each of <u>clause (A) and (B)</u>, which report shall be prepared by an Approved Accountant and, solely in the case of any B-Side IAC Payment Party, may be included in the report described in <u>Section 3.02(a)(iii)(A)</u>; *provided* that upon the request of the MDT, the ~~the~~each relevant <u>A-Side </u>IAC Payment Party will provide the MDT with evidence of the payment of such amounts to the relevant payees;

(iv)    no later than the earlier of (x) the <u>forty-fifth (</u>45th) day of the first and third quarters of each fiscal year and (y) to the extent there is Excess Cash, the payment date for Excess Cash in accordance with <u>Section 3.03(c)(i)</u>, a good faith determination of the amount of Excess Cash of such IAC;

(v)    as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a notice indicating the amount of such Actual Taxes, which report shall be prepared by an Approved Accountant; *provided* that upon the request of the MDT, the relevant IAC Payment Party will provide the MDT with evidence of the payment of such Actual Taxes to the relevant taxing authority; and

(vi)    no later than fifteen (15) days prior to each Quarterly Sweep Date, a report indicating the amount and calculation in reasonable detail prepared by an Approved Accountant

setting forth the amount of cash in its IAC Account, the amounts reserved pursuant to <u>Section 3.07(e)</u>, and the amount to be paid pursuant to <u>Section 3.07(e)</u>.

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this <u>Section 3.02</u> to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to <u>clause (ii)</u>, (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided and (y) no such confidentiality or similar obligations with respect to the information described in this <u>Section 3.02</u> shall be entered into after the Settlement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

**Section 3.03    Other IAC-Related Covenants**.

(a)    The IAC Payment Parties covenant and agree that, with respect to each IAC directly or indirectly owned by the IAC Payment Parties in whole or in part, from the Settlement Effective Date until the consummation of the Sale of all or substantially all assets or direct and/or indirect Equity Interests in such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use IACPP Efforts to cause such IAC not to:

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Settlement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Related Party (other than any IACs or their respective Subsidiaries, or any officers, directors or employees of any IACs or any Subsidiaries thereof (in their capacity as such)), on the other hand (each, a "<u>Related Party Transaction</u>"), except for a Related Party Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[5,000,000], such IAC has delivered to the MDT an officers' certificate or a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and (B) with respect to any Related Party Transaction or series of Related Party Transactions involving aggregate consideration in excess of $[10,000,000], such IAC has delivered a written opinion by an Approved Financial Advisor certifying that such Related Party Transaction or series of Related Party Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Related Party Transaction; *provided*, *further* that this <u>subparagraph (ii)</u> shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes a distribution of Sale Proceeds or an IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies and Subsidiaries of IAC Payment Parties that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other Subsidiary of an IAC, IAC Holding Company or IAC Payment Party other than (i) to another IAC Payment Party that is within the same Payment Group so long as the interests in each IAC held, directly or indirectly, by such IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, *provided*, such actions do not adversely affect the perfection or priority of the Secured Party's security interest in the IAC Pledged Shares,(ii) in connection with and in furtherance of a Sale, or (iii) to the MDT pursuant to the IAC Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

With respect to an IAC, if, at any time from the Settlement Effective Date until a Sale of all or substantially all assets or direct and/or indirect Equity Interests has been consummated with respect to such IAC in accordance with Section 3.01(a), such IAC is not or ceases to be Controlled by any IAC Payment Party but is Controlled by one or more other Sackler Parties, then each such Sackler Party shall use IACPP Efforts to cause such IAC to comply with this Section 3.03.

In the event any Sackler Party or Family Member receives consideration in any transaction with an IAC, IAC Holding Company, IAC Payment Party (or Subsidiary thereof) that is prohibited by Section 3.03(a), such Sackler Party (or the Payment Parties in the Family Group of such Family Member) shall pay the amount of such consideration (or such portion thereof that was prohibited by Section 3.03(a)) that consists of the Cash and Cash Equivalents (and the cash value of any consideration that is not Cash and Cash Equivalents) to the MDT as a prepayment pursuant to Section 2.01(e), in which event no Breach with respect to this Section 3.03(a) shall have occurred in connection with such transaction, subject to the terms of Section 9.01(b) (and so long as such payment has been made within the applicable cure period under Section 9.01(b)).

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause

(x); *provided further* that (I) the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and is subject to the Sale Obligations hereunder and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, IAC Loans, Intercompany Loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Full Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) (I) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by the same IAC Payment Parties (or by IAC Payment Parties within the same Payment Group as such IAC Payment Party) and an IAC Pledged Entity and (II) the interests in each IAC held, directly or indirectly, by each IAC Payment Party continue to be IAC Pledged Entities or owned, directly or indirectly, by an IAC Pledged Entity, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct and indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.

(c)    Each IAC Payment Party shall:

(i)    use IACPP Efforts to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the [Agreement] Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively;

(ii)    cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, an IAC Payment Party or any other Subsidiary of an IAC Payment Party, to be:

(A) paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to IAC Distribution,

(B) paid, to the applicable Third Party Payees, in respect of any amounts identified in clause (ii) of the definition of "Sale Proceeds Deductions" (other than amounts with respect to Taxes),

(C) solely with respect to Sale Proceeds received by PRA L.P., paid by PRA L.P. to the MDT (or, if applicable, the Appeals Account) in respect of the payment Obligation under Section 2.02, which payments may be made to the MDT in accordance with Section 2.02(c) and (d), or

(D) distributed or otherwise paid to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or Subsidiaries of such IAC Payment Parties (in which case such proceeds shall be further distributed or paid to the parent entities of such Subsidiaries until they are actually received by an IAC Payment Party) and, upon the

receipt by an IAC Payment Party of such proceeds, deposited into an IAC Account in accordance with Section 3.07(c).

**Section 3.04    Reimbursement of Certain Expenses Relating to a Sale**.  Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for income or withholding Taxes resulting from such Sale and any liability arising out of willful misconduct of any Sackler Party or any Family Member), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to reimburse such seller for such liability net of any Tax benefits (including any reductions in withholding Taxes that would result from such indemnification payment) actually realized, up to an aggregate amount not to exceed [  ]10% of the Sale Proceeds actually received by such seller from the applicable Sale. Any Tax benefits with respect to such liability actually realized after Net Proceeds have been reduced to reimburse such seller shall be treated as Net Proceeds at the time realized and paid over to the MDT in accordance with Section 2.02(a).

**Section 3.05    Implementation Limitations**.  The Sale Obligations of the IAC Payment Parties shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations"). In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the Sale Obligations, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to (i) compensate any Governmental Authority or other Person or (ii) offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds, *provided* that if, after the expiration of the Sale Period, the MDT takes any of the actions or otherwise makes a payment referenced in ~~clauses~~clause (i) or (ii) of this sentence, such payment of compensation, costs or expenses shall constitute an Obligation hereunder for all purposes, which Obligation shall be repaid from proceeds of the relevant Sale prior to the application of any Sale Proceeds to the relevant Outstanding Settlement Amount.

**Section 3.06    Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in Section 3.01 through Section 3.05 (and Section 3.08 (collectively, the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02. For the avoidance of doubt, the obligations set forth in the other provisions of this Agreement shall not be affected by the termination of the Sale Obligations.

**Section 3.07    Pledge of Shares; Net Proceeds Collateral Account**.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of such IAC Payment Party, (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by such IAC Payment Party, and shall cause each Subsidiary of such IAC Payment Party that is an IAC Pledgor to grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds and products thereof) held by each such Subsidiary to secure such Obligations, and (ii) shall grant a security interest in and Lien on each IAC Account (other than any IAC Account established in the name of the escrow agent in respect of such IAC Account and subject to an IAC Escrow Agreement) of such IAC Payment Party (and the proceeds and products thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees, and shall cause each of its Subsidiaries that are IAC Pledgors to agree, (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    Each IAC Payment Party shall promptly deposit and maintain on deposit at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions (and in the case of any A-Side IAC Payment Party or Subsidiary thereof, any refunds of Taxes previously paid to a Tax authority out of Sale Proceeds received by such A-Side IAC Payment Party or a Subsidiary thereof (in which case such refund shall be further distributed or paid to the parent entities of such Subsidiaries until it is actually received by an A-Side IAC Payment Party)) received by such IAC Payment Party in an IAC Account; *provided*, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement; and (ii) such IAC Payment Party or its Subsidiary may (A) pay all or a portion of such Sale Proceeds or IAC Non-Tax Distributions to another IAC Payment Party for deposit in its IAC Account pursuant this Agreement or (B) make payments to Third Party Payees or Tax authorities or to the MDT, to the extent such payments would be Permitted Withdrawals from an IAC Account.

(d)    Until the date on which the MDT has been paid the Full Outstanding Settlement Amount and all other payment Obligations of the Payment Group(s) of which such IAC Payment Party is a member and all other payment Obligations of such IAC Payment Party, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; *provided* that, notwithstanding the provisions of this subparagraph (d), if the Full Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member and all other payment Obligations (other than those relating to the payment of the Full Outstanding Settlement Amount or any portion ~~thererof~~thereof) of such IAC Payment Party is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder), then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account *multiplied by* (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Full Outstanding Settlement Amount is $0 or less than $0 (after giving effect to the maximum amount of payment Obligations of the Payment Group hereunder) and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be

collateral security for the Obligations of the Payment Group(s)[52] of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party or any of its Subsidiaries receives any Sale Proceeds or IAC Distributions that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account and shall be promptly deposited in the IAC Account pursuant to Section 3.07(c) hereof.

(e)        By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Actual Taxes (including amounts reserved for future audit adjustments) of such A-Side IAC Payment Party or of any of its Subsidiaries or its direct or indirect ~~equity holders~~equityholders or beneficiaries in respect of any Sale (but not, for the avoidance of doubt, any potential Sale) of any IAC directly or indirectly held by such IAC Payment Party or (y) any other Permitted Withdrawals) and (2) the Full Outstanding Settlement Amount of the A-Side Payment Groups and all other payment Obligations of such IAC Payment Party, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) and/or a prepayment pursuant to Section 2.10 (or, in the case of any payment made on a Funding Deadline, as a payment of an A-Side Funding Deadline Obligation pursuant to Section 2.01(c)(i) and/or an Additional A-Side Amount Payment due on such date, as applicable).

(f)        Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledgor or IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)        The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the direct or indirect owner of all or a portion of the Equity Interests of any IAC Pledged Entity, which Equity Interests have not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, (ii) in the case of Equity Interests of such IAC Pledged Entity in the form of uncertificated securities, execute and deliver (or cause to be executed and delivered) uncertificated securities control agreements, (iii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in such additional IAC Pledged Shares without lapse or change in priority and (iv) deliver proof of corporate (or comparable) action or incumbency of officers as any Secured Party shall reasonably request. If any IAC Payment Party or any of its Subsidiaries that is an IAC

---

[52] Note to Draft: IAC Pledge and Security Agreements to provide that collateral limitations apply only until payment Obligations paid in full.

Pledgor or an IAC Pledged Entity (x) changes its legal name, (y) converts to a different form or to a different jurisdiction of organization or (z) changes the location of its chief executive office or principal place of business (or, if applicable, the location of the chief executive office, principal place of business or residence of any trustee of such IAC Payment Party or Subsidiary), such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as permitted by MDT, which permission shall not be unreasonably withheld) of such change shall execute and/or deliver (or cause its Subsidiaries to execute and deliver) such other IAC Collateral Documents and/or amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, in order to maintain the validity and perfection of the security interests in the relevant IAC Pledged Shares without change in priority.

(h)        No Restricted Payment of any asset owned by any IAC, any IAC Holding Company or any Subsidiary of an IAC or IAC Holding Company (such asset, an "IAC Asset") may be made by an IAC, IAC Holding Company or any Subsidiary of any of the foregoing, unless (i) such IAC Assets remain subject to the Sale Obligations or (ii) such Restricted Payment consists of Sale Proceeds or qualifies as an IAC Distribution; *provided*, that if such Restricted Payment is of IAC Pledged Shares, such Restricted Payment shall not affect the perfection or priority of the Liens in such IAC Pledged Shares granted in favor of the Secured Party. For the avoidance of doubt and notwithstanding anything to the contrary herein, (i) nothing in this paragraph limits or restricts any Person's ability to use, apply, or make distributions of, and the terms and conditions of Section 3.07(a), (b), (f) and (g) and the IAC Collateral Documents shall not apply to, assets that are not IAC Assets or IAC Pledged Shares (to the extent such IAC Pledged Shares do not otherwise constitute IAC Assets) and (ii) nothing in this paragraph limits or otherwise modifies the definition of IAC Non-Tax Distributions or the requirement to make Net Proceeds Payments.

**Section 3.08      Failure to Sell IACs**.

(a)        If the Sackler Parties' Representative does not reasonably believe that the IAC Payment Parties will have completed the sale of all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in the IACs and/or (B) the assets of each of the IACs on or prior to the expiration of the Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT of such determination, no more than 270 days and no less than 180 days prior to the expiration of the applicable Sale Period, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the applicable IACs or all or substantially all of the assets of the IACs, as the case may be, by the IAC Payment Parties (whether implemented through foreclosure on the IAC Pledged Shares in accordance with Section 3.08(d) and the IAC Collateral Documents, a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other ~~equity interests~~direct or indirect Equity Interests in the IACs, ~~[the forfeiture~~a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT~~,]~~[6] in accordance with this Section 3.08, or otherwise).

(b)        If any IAC Payment Party has not completed the sale of all or substantially all of (A) its direct and/or indirect Equity Interests in all of the IACs and/or (B) the assets of each of the IACs on or prior to the date that is 30 days prior to the expiration of the applicable Sale Period (other than any Retained Interests), then the Sackler Parties' Representative shall provide written notice to the MDT, and request the MDT's direction with respect to ensuring the disposition of all or substantially all of the direct or indirect Equity Interests of the IACs or all or substantially all of the assets of the IACs, as the case may

_____

[6] ~~Note to Draft: Under discussion.~~

be, by the IAC Payment Parties (whether implemented through foreclosure ~~of~~on the IAC Pledged Shares in accordance with Section 3.08(d) and the IAC Collateral Documents, a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other ~~equity interests~~direct or indirect Equity Interests in the IACs, ~~[the forfeiture~~a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT~~]⁷~~ in accordance with this Section 3.08, or otherwise).

(c)      Each IAC Payment Party shall, and shall cause its relevant Affiliates to, (i) take all actions reasonably necessary to comply with ~~any~~a good faith direction (if any) delivered by the MDT in response to any notice delivered pursuant to Section 3.08(a), (b), or (d)(ii) involving solely a transfer ~~of~~in lieu of foreclosure of the IAC Pledged ~~Interests~~Shares to the MDT and (ii) use its reasonable best efforts to comply with ~~any good faith~~a reasonable direction (if any) delivered by the MDT in response to any other notice delivered pursuant to Section 3.08(a) ~~other than an action described in Section 3.08(~~c, (b), or (d)(iii); *provided* that ~~(i)~~nothing in this Section 3.08(c) shall (x) prevent or constrain any IAC Payment Party from continuing to pursue Sales to any Purchaser, to the extent such Sales are proposed to be consummated on or prior to the expiration of the applicable Sale Period ~~and~~or (~~ii~~y) give the MDT ~~shall not be permitted~~the right to interfere with or otherwise adversely impact the applicable Sales during the remainder of the applicable Sale Period.  For the avoidance of doubt, for purposes of the preceding proviso, the MDT delivering any direction contemplated by this Section 3.08 shall not be deemed to prevent or constrain any IAC Payment Party from continuing to pursue Sales to any Purchaser and shall not be deemed to interfere with or otherwise adversely impact the any Sales.

(d)      If, at the end of the Sale Period with respect to any IAC, a Sale of all or substantially all of the assets or direct and/or indirect Equity Interests of such IAC has not been effectuated with respect to such IAC (excluding any Retained Interests), the MDT shall be permitted to:

(i)      exercise all powers, rights, and remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents~~ The~~ (including through foreclosure on the IAC Pledged Shares), with the proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents ~~will provide, in relevant part, that if the MDT forecloses on~~and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents;

(ii)      direct the IAC Payment Parties to transfer the IAC Pledged Shares~~,~~ to the MDT in lieu of foreclosure, in which case the MDT will be obligated to attempt to sell (~~in a manner and time acceptable to the MDT in its discretion) the~~*provided* that the MDT shall control the sale process in all respects in its sole discretion, including, without limitation, with respect to the time, place and manner of any such sale) such unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity) with the proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents~~.~~; and/or

---

⁷ ~~Note to Draft: Under discussion.~~

(iii)    otherwise direct the IAC Payment Parties to dispose of all or substantially all of the direct or indirect Equity Interests of such IACs or all or substantially all of the assets of such IACs (other than Retained Interests), as the case may be (including a direction for the IAC Payment Parties to auction the IAC Pledged Shares or any other direct or indirect Equity Interests in such IACs, a transfer in lieu of foreclosure of the IAC Pledged Shares to the MDT in accordance with this Section 3.08, or otherwise), with proceeds therefrom being applied to satisfy all Full Outstanding Settlement Amounts and other Obligations (including costs to effect such Sale of an IAC, enforce this Agreement or the IAC Collateral Documents and to exercise remedies, Breach Fees and other expenses of the MDT owed hereunder) and any excess proceeds therefrom shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents; *provided* that the remedies set forth in this Section 3.08(d)(iii) shall only be exercisable for a period of two (2) years following the expiration of the applicable Sale Period.

Such remedies shall be in addition to, and shall not limit in any way, the remedies set forth in Article 9 of this Agreement.

## ARTICLE 4.
## TAX MATTERS

**Section 4.01    Restitution Payments**.

(a)    The Restitution Amounts (as defined in the following paragraph) paid in Cash and Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the IAC Payment Parties, or PRA L.P. or any of its direct or indirect interest holders (the "Payors") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "Restitution"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products, as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP. Nothing in this documentAgreement, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the IRS regarding whether the amounts paid as described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the MDT pursuant to this Agreement in the aggregate amount of $4.325 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid-Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f). Notwithstanding the foregoing, (i) no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts and (ii) neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts. All Restitution Amounts shall be used in

accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and the Tribe TDP, as applicable), as more fully set forth in such documents.

(b)    For purposes of this Section 4.01, (x) the amount of any payment made in Cash and Cash Equivalents shall be equal to the face amount of such Cash and Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property as of the time of each such transfer; (y) the terms used in this Section 4.01 shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(c)    For the avoidance of doubt, nothing in this Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA L.P., the IAC Payment Parties, the Shareholder Released Parties and their non-Debtor Related Persons [and other Sackler Parties]  (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the MDT, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Related Person of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.

**Section 4.02    Qualified Settlement Funds**.  All Parties agree to treat the Master Disbursement Trust, NOAT, the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust (each as defined in the Plan), the Appeals Account and the Tribe Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) as "qualified settlement funds" for U.S. federal income tax purposes, and all Parties shall report consistently with the foregoing for all applicable U.S. federal income or other Tax purposes.

**Section 4.03    Settlement Agreement**. All Parties intend and agree that this Agreement shall be treated for all applicable taxTax purposes as a contractual agreement to make payments in respect of an agreed settlement of claims.  Breach Fees payable pursuant to Section 9.05 of this Agreement shall be treated for all applicable taxTax purposes as a contractual late payment fee in respect of late or delayed transfer of payments due pursuant to this Agreement.

**Section 4.04    Forms W-9**.  On or before the AgreementSettlement Effective Date, each of PRA L.P. and MDT shall provide the other with a properly completed and validly executed IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding and U.S. federal income withholding tax. Each of PRA L.P. and the Master Disbursement Trust agrees that if the IRS Form W-9

previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly provide the other party with a properly completed and validly executed IRS Form W-9 (or successor form).

**Section 4.05** ~~Reserved~~**Intentionally Omitted**.

**Section 4.06    Tax Reporting**.  For U.S. federal income tax purposes, the relevant IAC Payment Party(ies) is intended to be treated as the owner of each IAC Account. All interest or other income earned in any IAC Account shall be properly reported to all relevant taxing authorities by the relevant IAC Payment Party(ies) as owner of the IAC Account for all tax purposes whether or not such income has been distributed during such year.

**ARTICLE 5.**
~~RESERVED~~**INTENTIONALLY OMITTED**.

**ARTICLE 6.**
**TERMINATION.**

**Section 6.01    Termination of Agreement**.  This Agreement shall terminate under the circumstances set forth on Exhibit I, Section 2.08(c) or Section 11.06(c).

**ARTICLE 7.**
**REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES**

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date (provided that any A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) represents and warrants as of the date such A-Side Payment Party receives a Court Order applicable to it described in Section 10.01(a)(v)), the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust, decedent's estate or natural person, including a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    Each such Sackler Party that is a Trust (i) was duly created under the laws of its Original Jurisdiction of Creation as set forth on Exhibit Q, (ii) has its situs and principal place of administration, and validly exists under the laws of, its Jurisdiction of Administration as set forth on Exhibit Q and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its Governing Law Jurisdiction as set forth on Exhibit Q. With respect to such Trust, Exhibit Q sets forth a

true and complete list of (A) its currently acting trustees, (B) its Power Holders, (C) its Required Interested Persons, (D) its Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such individual under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name) and (E) its Possible Refunding Trusts, if any. The information in Exhibit Q related to the information regarding the Trusts described in this Section 7.01(b) may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring with respect thereto after the date hereof, *provided* that notice and a copy of such amendment shall be provided promptly to the MDT, in which case the representation and warranty set forth above with respect to such Exhibit Q shall be true and correct as of the date of such amendment.

(c)       With respect to the Sackler Party that is the JDS Estate, the JDS Estate (i) has its situs and principal place of administration as set forth on Exhibit Q, and (ii) has a governing instrument that was admitted to original probate, with permanent letters issuing to its personal representative(s), by the court set forth on Exhibit Q. Exhibit Q sets forth a true and complete list of (A) the JDS Estate's currently acting personal representatives, (B) the JDS Estate's Power Holders, (C) the JDS Estate's Required Interested Persons, and (D) the JDS Estate's Beneficiary Interested Persons and beneficiaries under a legal disability (with an accurate notation identifying each such beneficiary, if any, that is under a legal disability (e.g., is a minor) and the date of birth of any such beneficiary under a legal disability who is not a minor and with minors identified by year of birth and familial relationship such as "Child # 1 of [Name], [year of birth]" and not by actual name).

(d)       In the case of a Sackler Party that is a Trust or the JDS Estate, the trustees of each Trust and the personal representatives of the JDS Estate (i) have been duly appointed and are validly acting as the trustees and personal representatives of each Trust and the JDS Estate, (ii) are resident and/or have their respective principal place of business as set forth on Exhibit Q, (iii) in the case of trustees and personal representatives that are not individuals (x) are duly formed, validly existing and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee or personal representative of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing or the equivalent thereof (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees or personal representatives of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust or the JDS Estate as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, personal representative or otherwise join in the administration, of the Trust and the JDS Estate) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party (or such trustee or personal representative in its own capacity on their behalf) to enter into this Agreement or the Collateral Documents to which such Sackler Party is a party and perform its obligations hereunder and thereunder (if applicable), (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees and personal representatives of such Sackler Party, and (v) have all requisite power and authority in their capacities as trustees and personal representatives of such Sackler Party to execute, deliver and perform such Sackler Party's obligations (which for the avoidance of doubt are the obligations of the trustees or personal representatives thereof in their capacities as trustees and personal representatives thereof) under this Agreement and the Collateral Documents to which such Sackler Party is a party.

(e)     Except (ai) to the extent investment discretion has been delegated to investment managers, and (bii) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust and each personal representative of the JDS Estate (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(e), in the case of a Trust with more than one trustee or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate, the trustees of such Trust and the personal representatives of the JDS Estate) has sole discretion, power and authority to manage and control the assets of the Trust and the JDS Estate, as applicable, for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust and the JDS Estate, as applicable, including the IAC Pledged Shares and the other Collateral owned by such Person, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications (if any) set forth in the governing instruments of such Trust or the JDS Estate requiring the trustee or personal representative, as applicable, to obtain the consent of a protector or other Person (a "Consent Person"), which restrictions and qualifications (including the identity of all Consent Persons) are each listed on Exhibit Q, in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees (or if at the time of the making of this representation there shall be more than one personal representative of the JDS Estate), the representation made in this Section 7.01(e) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees (or personal representative or representatives) having such discretion, power or authority.

### Section 7.02    Authority; Enforceability

(a)     The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust, the JDS Estate or a natural person, including a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)     The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a Trust or the JDS Estate and the consummation by such Sackler Party of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trust or estate administration action, as applicable (including without limitation by any requisite action of any applicable Consent Person and approval by the Royal Court of Jersey (Channel Islands) ("Court Approval")) and no other proceedings on the part of such Sackler Party is necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party or any Consent Person. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles which, for

the avoidance of doubt, do not include for these purposes any limitations for such purpose by reason of trustee or personal representative fiduciary duties, including duties of prudence and undivided loyalty.

(c)     The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is a natural person have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute valid and binding obligations of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

**Section 7.03    No Contravention**. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, (d) violate any other agreement, instrument or trust or other restrictions to which such Sackler Party (or the trustees thereof in their capacities as such trustees) are subject or (e) violate or contravene any order or approval of any court or other governmental or judicial authority; in the case of <u>clauses (b) through (e)</u>, except as would not materially adversely affect the ability of such Sackler Party (or the applicable trustee on their behalf) to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

**Section 7.04    Net Asset Reports**.   Except with respect to any projections, forecasts or other forward-looking information set forth therein, and subject to the qualifications, estimates and methodology set forth therein, (i) if such Sackler Party is an Initial Covered Sackler Person (as defined in the Case Stipulation), then the applicable Net Asset Presentations fairly present, in all material respects, the balance sheets of such Sackler Party as of the respective dates set forth therein, and (ii) if such Sackler Party is not an Initial Covered Sackler Person, then the additional ~~financial~~<u>balance sheet</u> information provided to the Debtors and their advisors by Huron Consulting Group with respect to such Sackler Party and the other members of such Sackler Party's Family Group fairly presents, in all material respects, the balance sheets of such Persons as of the respective dates set forth therein.

**Section 7.05    List of IACs**.  Each of the representations made in <u>clauses (a) through (i)</u> of this <u>Section 7.05</u> is made by the members of each Payment Group solely with respect to the members of their Family Group, and, any such representation made by the members of a particular Payment Group, to the extent necessary, assumes the accuracy of any corresponding representation made by any Sackler Party that is not a member of such Payment Group.

(a)     <u>Exhibit E-1</u> sets forth:

(i)     a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties, other than those entities set forth on <u>Exhibit E-2</u> (which for the avoidance of doubt, are not IACs for purposes of this Agreement); and

(ii)     with respect to the A-Side IAC Payment Parties and the B-Side IAC Payment Parties, respectively, a true and complete list of all Subsidiaries of such A-Side IAC Payment Parties and B-Side IAC Payment Parties that directly or indirectly holds any common and preferred equity interests in any IAC (and with respect to each such Subsidiary that is not

wholly-owned by a single A-Side IAC Payment Party or B-Side IAC Payment Party, each other equity owner and the percentage interest thereof).

(b)    Besides the IACs and the entities listed on Exhibit E-2, the members of each Payment Group are, solely with respect to the members of their Family Group, not aware of any other operating non-U.S. pharmaceutical headquartered company in which any of their members holds an equity interest in excess of 5% of such company's outstanding equity.

(c)    All Equity Interests in each IAC that are owned, directly or indirectly by a member of a Family Group or any other Sackler Party are owned through one or more IAC Pledged Entities.

(d)    All of the debt that has been provided directly or indirectly to an IAC or Subsidiary of an IAC by a Related Party of such IAC or Subsidiary of such IAC is ultimately owed, directly or indirectly, to the IAC Payment Parties.

(e)    Except as set forth in Exhibit E-3, (i) the A-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs and (ii) the B-Side IAC Payment Parties directly or indirectly own 50% of the Equity Interests of the IACs.

(f)    Each IAC Pledgor is the record owner, and holds good and valid title to, the IAC Pledged Shares to be pledged by it pursuant to Section 3.07, free and clear of any and all Liens, and has not granted any option to purchase or agreed to sell any such IAC Pledged Shares to any third party. All Equity Interests in each IAC Pledged Entity are held directly by one or more IAC Pledgors and, collectively, the IAC Pledgors hold one hundred percent (100%) of the Equity Interests in the IAC Pledged Entities.

(g)    The IAC Pledgors are comprised of all or certain of the IAC Payment Parties and their Subsidiaries.

(h)    All loans owed by an IAC to a Sackler Party are either an Intercompany Loan or an IAC Loan.

(i)    Any option to purchase any Equity Interests in an IAC held by any IAC Holding Company or any Subsidiary of an IAC Payment Party has been exercised.

**Section 7.06    List of Assuring Parties**. Exhibit K represents a true and complete list of each of the Assuring Parties included in such Sackler Party's Family Group.

### ARTICLE 8.
### COVENANTS

**Section 8.01    Intentionally Omitted.**

**Section 8.02    Non-Circumvention.**  Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement (including the Credit Support Annexes) or the

Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or personal representatives or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or trust assumes the obligations of such Sackler Party in this Agreement pursuant to a joinder agreement in the form attached hereto as <u>Exhibit V</u>, (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected or adversely affect the priority thereof and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without lapse or change in priority) and also complies with all applicable limitations and requirements imposed under each Collateral Document to which such Sackler Party is a party, (C) the resulting entity or Trust is in the same Payment Group as its predecessor, (D) in the case of a Trust, each trustee and each Assuring Party that is a Power Holder of the continuing or resulting Trust shall have delivered to the MDT a Trust Certification and Further Assurances Undertaking, respectively, and (E) in the case of any change in the personal representatives of the JDS Estate, each personal representative and each Assuring Party that is a Power Holder of the JDS Estate shall have delivered to the MDT an Estate Certification and Further Assurances Undertaking, respectively.

**Section 8.03    No Interference.**    Each Sackler Party hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the confirmation or consummation of the Plan and implementation of the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party. <u>Each Sackler Party further covenants and agrees to comply with the provisions of the Plan applicable to it.</u>

**Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)    ~~Effective as of the Agreement Effective Date,~~ PRA L.P. hereby agrees, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

(b)    ~~Effective as of the Agreement Effective Date, the~~<u>The</u> Parties agree, subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases, to the deemed surrender, cancellation and/or redemption of the PPI Interests and the De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

**Section 8.05    MDT Shareholder Insurance Rights**.    The Sackler Parties agree to the treatment of the MDT Shareholder Insurance Rights on the terms and conditions set forth in the Plan.

**Section 8.06    Naming Rights**.    Each Payment Party covenants and agrees that it shall, and the Confirmation Order shall provide that each Family Member that is a member of the Payment Group to which such Payment Party is a member shall, not seek, request, or permit any new naming rights with

respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder) and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b)); *provided* that at such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09. For the avoidance of doubt, nothing in this Section 8.06 or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

Section 8.07    **No Side Agreements**.  No Sackler Party shall maintain or enter into any written or oral agreement with any other Sackler Party with respect to the transactions and obligations contemplated hereby that would adversely affect the ability of such Sackler Party to perform its obligations hereunder.

Section 8.08    **Notification of Breach**. If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Parties' Representative shall constitute notice provided on behalf of all applicable Sackler Parties). Until the earlier of (i) the commencement of a Dispute Proceeding and (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a) of this Agreement, the Parties shall not disclose any occurrence or notice of Breach Trigger or Breach except (a) to the other Parties, (b) to their respective representatives and advisors to whom the confidential nature of such information is also disclosed, (c) as required by applicable law, rule, regulation, or ethical requirement, or by any governmental, judicial, administrative, regulatory or quasi-regulatory body or process or any self-regulatory organization or (d) as necessary, in the sole discretion of the MDT, to evaluate or consider enforcement of its rights and remedies in connection with such Breach Trigger or Breach or as necessary to notify potential affected parties as to the impact of such Breach Trigger or Breach on the MDT's abilities to fulfill its contractual or fiduciary duties (including its obligations under the Plan); *provided* that notice to potential affected parties shall not be through the making of a public announcement or public disclosure (whether by press release, social media posting or otherwise).

Section 8.09    **Opioid Business**.  Each Person listed on Exhibit H-1 (each a "Restricted Person") shall not, other than by way of ownership of the IACs (unless and to the extent such IAC is no longer owned (directly or indirectly) by such Person (other than Retained Interests)), engage directly or indirectly in the manufacturing or sale of opioids, provided, however, that this provision shall not prohibit: (a) any investment in any third-party investment vehicle that is not controlled by any Restricted Person(s) and that makes investment decisions over which such Restricted Person has no discretion; *provided* that it is not an express investment purpose or objective of such third party investment vehicle to make investments in the opioid business or in entities engaged in the manufacturing or sale of opioids; (b) any investment in less than 5% of the equity of any Person; (c) investments in any Person for whom the researching, development, manufacturing, distribution or sale of opioids is incidental or does not constitute one of such Person's principle businesses or business segments (including, without limitation, the practice of medicine or engaging in academic research on opioids); (d) investments held by such Restricted Person on the Agreement Effective Date and scheduledidentified on Exhibit H-2 (or received as proceeds from dispositions of such investments); or (e) only for so long as any IAC Payment Party

directly or indirectly owns an IAC, activities related to MN Consulting LLC (as identified of Exhibit H-2), including serving as a director or officer thereof; or (f) engaging in activities for which the researching, development, manufacturing, distribution or sale of opioids is incidental, including, without limitation, the practice of medicine or engaging in academic research on opioids. To the extent that any Restricted Person engages in dispositions, sales or other transfers in order to comply with this provision, such dispositions, sales or other transfers shall not be with Persons known to such Restricted Person to be Related Parties, *provided* that for the purposes of this provision, Related Parties shall not include any IAC, any IAC Holding Company or any IAC Pledged Entity that is as of the time of determination not still owned or controlled by any of the Sackler Parties. In the event a Restricted Person holds an investment or interest in a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest to be impermissible under this Section 8.09 but for this sentence, the holding of such interest or investment shall not be a violation of Section 8.09 so long as (i) such Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible within 90 days (in the case of marketable securities) or 180 days (in the case of non marketablenon-marketable securities) of learning of the pertinent facts of such acquisitions or change in business, and (ii) such Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

Section 8.10    **Additional Assuring Parties**.  The Sackler Parties shall use reasonable best efforts to cause each Power Holder promptly to execute a Further Assurances Undertaking upon such Person becoming a new Power Holder with respect to any relevant power and promptly notify the MDT of any difficulties encountered in obtaining the same.

Section 8.11    Intentionally Omitted**Opinions of Counsel**. If counsel to the Ad Hoc Committee or counsel to the Creditors' Committee seeks to secure any Opinions of Counsel as to (1) the enforceability of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents or (2) the perfection of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents, then the applicable Payment Parties and IAC Pledgors shall cooperate with the reasonable requests of such counsel related to the provision of such Opinions of Counsel, *provided* that such cooperation shall not be required if counsel to the applicable Sackler Party has provided the applicable Opinion of Counsel or has communicated to counsel to the Ad Hoc Committee and counsel to the Creditors' Committee that it will provide the applicable Opinion of Counsel (and such Opinion of Counsel is actually provided) .

.

Intentionally Omitted.

**Section 8.12**    Section  8.13 **Refundings**.  Each Trust hereby covenants and agrees that any property reverting or required to be refunded to such Trust by or from any other Trust shall be held by the trustees of such recipient Trust as a separate resulting trust that will remain subject to the transferring Trust's obligations under the Settlement Documents as if still held by such transferring Trust (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, priority over all other obligations of the recipient Trust to the fullest extent permitted by applicable law), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

Section 8.13    **Additional IACs**.  Each Sackler Party hereby covenants and agrees that, in the event there is an entity that is as of the Agreement Effective Date a non-U.S. pharmaceutical operating

company Controlled, directly or indirectly, individually or acting together with other Sackler Parties or their Affiliates, by one or more Sackler Parties is not listed in Exhibit E-1 (other than those entities set forth on Exhibit E-2), the applicable Sackler Parties shall, within 90 days of becoming aware of any such entity and that it is not listed on Exhibit E-1, deliver to the Parties an amended Exhibit E-1 that includes such company and such company shall constitute an "IAC" for all purposes under this Agreement as of the date of such delivery.  Each Sackler Party that owns (directly or indirectly) Equity Interests in such IAC, as may reasonably be requested by the MDT, shall become an IAC Payment Party under this Agreement and/or shall cause any of its Controlled Affiliates that own any Equity Interest in such IAC to become an IAC Payment Party under this Agreement (in each case to the extent it is not already an IAC Payment Party).  Each such Sackler Party shall (or shall cause a Controlled Affiliate to) grant a security interest in an entity that directly or indirectly owns 100% of the Equity Interests of such IAC owned (directly or indirectly) by such Sackler Party to the MDT pursuant to Section 3.07.  For the avoidance of doubt, any IAC Payment Party that becomes party to this Agreement subsequent to the Agreement Effective Date  pursuant to this Section 8.13 shall be bound by, and subject to the terms of, this Agreement applicable to IAC Payment Parties (including with respect to such newly added IAC) as of the date an amended Exhibit E-1 is delivered to the Parties pursuant to this Section 8.13 (and any representations and warranties made pursuant to this Agreement shall be made as of the date of such delivery) and all references in this Agreement to "Agreement Effective Date" and "Settlement Effective Date" shall, with respect to any such new IAC Payment Party and IAC, be understood to be the date of such delivery.

## ARTICLE 9.
## BREACH AND REMEDIES

**Section 9.01    Breach**.  The events described in this Section 9.01 shall, as specified herein, constitute a "Breach Trigger", "Specified Breach" or "Non-Specified Breach":

(a)    Non-Payment

(i)    The Payment Parties in a Payment Group fail to pay when due all or any portion of (A) the Full Outstanding Settlement Amount (including any Funding Deadline Obligation and, if applicable, any Additional A-Side Amount Payment) owed by such Payment Group pursuant to Article 2 (excluding obligations referenced in the succeeding clause (ii)) or (B) any Breach Fee pursuant to Section 9.05, each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(ii)    Any IAC Payment Party fails to (A) pay when due all or any portion of any Net Proceeds Payment pursuant to Section 2.02 or (B) deposit Sale Proceeds or IAC Distributions in an IAC ~~account~~Account pursuant to Section 3.07(c), each of which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Specified Breach with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

For the avoidance of doubt, no Specified Breach by any Payment Group under this Section 9.01(a) shall be a Specified Breach by any other Payment Group and no obligations of any Payment Group shall be affected by a Breach by any Payment Party pursuant to this Section 9.01(a), other than a Payment Party in such Payment Group. For the avoidance of doubt, there shall be no Breach Trigger associated with the Specified Breaches in this Section 9.01(a).

(b)    IAC-Related Specified Breaches.  Each of the following shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days (or such different period solely to the extent set forth in this Section 9.01(b)), shall constitute a Specified Breach with respect to such IAC Payment Party (or, with respect to Section 9.01(b)(iv), the applicable Payment Parties specified therein):

(i)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.01(a)(iii);

(ii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(c) (Deposits into IAC Account) or Section 3.07(e) (Quarterly Sweep);

(iii)    Any IAC Payment Party fails to perform or observe any term, covenant or agreement contained in Section 3.07(d) (Permitted Withdrawals), Section 3.07(f) (Further Acts) or Section 3.07(g) (After Acquired Collateral); *provided* that the Breach Trigger for this subparagraph shall constitute a Specified Breach if such Breach Trigger continues for 60 or more days; and

(iv)    Any Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) fails to comply with the obligation set forth in the last paragraph of Section 3.03(a), which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party (or Payment Group associated with the Family Group of the applicable Family Member). For the avoidance of doubt, upon a payment by the applicable Sackler Party (or Payment Parties in the Family Group of the applicable Family Member) of amounts due to the MDT under the last paragraph of Section 3.03(a), a Breach Trigger or Breach shall no longer be continuing with respect to this subparagraph.

(c)    End of Sale Period.

(i)    Any IAC Payment Party has failed to comply with any instruction delivered by the MDT pursuant to perform or observe any term, covenant or agreement contained in Section 3.08(c)(i) with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such IAC or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, notwithstanding Section 9.03, shall constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party.

(ii)    Any IAC Payment Party has failed to perform or observe any term, covenant or agreement contained in Section 3.08(c)(ii) with respect to any IAC after the expiration of the Sale Period for such IAC (and the IAC Payment Party has not completed a sale of all or substantially all of its direct and/or indirect Equity Interests in such IAC or the assets of such IAC prior to the expiration of the Sale Period (excluding any Retained Interests)), which, notwithstanding Section 9.03, shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, constitute a Specified Breach by each IAC Payment Party within the Payment Group(s) of the breaching IAC Payment Party.

(iii)    ~~(ii)~~ If a Sale has not been effectuated with respect to all or substantially all of (A) each IAC Payment Parties' respective direct and/or indirect Equity Interests in any of the IACs and/or (B) the assets of any of the IACs (excluding any Retained Interests) prior to the end of the Sale Period~~,~~ (and if any IAC Payment Party has not transferred the Pledged Shares to the MDT in lieu of foreclosure in accordance with a direction by the MDT pursuant to Section 3.08), such failure shall constitute a Non-Specified Breach with respect to each IAC Payment Party holding direct and/or indirect Equity Interests in such IACs; *provided* that, with respect to a Non-Specified Breach described in this Section 9.01(c)(iii), the sole remedy of the MDT shall be to ~~elect to~~ exercise the Payment Remedy ~~and all other remedies set forth in Section 9.02(a)(ii)(A) with respect to the applicable IAC Payment Parties~~ (notwithstanding that such Breach is a Non-Specified Breach) in respect of the Non-Specified Breach and to ~~exercise remedies~~ foreclose on the IAC Pledged Shares or liquidate or direct the liquidation thereof in accordance with ~~Section 3.08.~~ the applicable IAC Collateral Documents and otherwise exercise remedies against the IAC Collateral as provided in (and subject to) this Agreement and the applicable IAC Collateral Documents; *provided, further,* that (A) no Breach Fee shall be applicable as a result of the exercise of such Payment Remedy, (B) the exercise of such Payment Remedy against any IAC Pledgor shall not create, impose or accelerate any Obligation of any other Payment Party, (C) in the case of a Payment Remedy pursuant to this Section 9.01(c)(iii), the MDT shall only be permitted to exercise remedies with respect to the IAC Collateral in accordance with the IAC Collateral Documents and not with respect to any other assets or any other Collateral of any IAC Payment Party and, subject to the rights and remedies of the MDT under the IAC Collateral Documents, the MDT shall otherwise forbear from seeking to collect any payment from any Payment Party (including the breaching IAC Payment Party), (D) such IAC Payment Party shall continue to comply with its obligations hereunder and the IAC Collateral Documents, subject to the terms and limitation set forth herein and therein (and the exercise of the Payment Remedy pursuant to this Section 9.01(c)(iii) shall not give rise to any obligation of any IAC Payment Party to make any payments other than pursuant to such terms and subject to such limitations), and (E) this Section 9.01(c)(iii) shall not be deemed or construed to affect or impair any rights or remedies that the MDT or any other Secured Party now or may in the future have (and in no event shall the MDT or any other Secured Party be deemed to have waived any of its rights or remedies) under this Agreement, any Collateral Document, any other Definitive Document or applicable law in connection with any other Breaches by an IAC Payment Party or any other Party.

(d)    Confessions of Judgment. Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 11.05 (Confession of Judgment), which shall (i) with respect to the obligation to maintain regular renewals as necessary under applicable law of the Confessions of Judgment, constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties); and (ii) with respect to any other term, covenant or agreement contained in Section 11.05, constitute a Breach Trigger upon notice by the MDT to the Sackler Parties' Representative of such Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to such Sackler Party (but not, for the avoidance of doubt, with respect to other Sackler Parties).

(e)    Clawback of Payment. If the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether from the Appeals Account or otherwise to the estate of any Sackler Party (or any trustee, receiver or

similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, whether received as proceeds of security, enforcement of any right of setoff or otherwise, and the MDT has not been made whole with respect to such amount, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party.

(f)    <u>Contest of Validity of Agreement</u>.    Any Sackler Party <s>(</s>, through a legal proceeding, (i) contests in writing the validity or enforceability of any provision of this Agreement or any Definitive Document (including in any judicial forum or by asserting that the Agreement or any Definitive Document to which such Sackler Party is a party does not constitute a valid and binding obligation of such Sackler Party), (ii) denies in writing that it has any further liability or obligation under the Agreement or any other Definitive Document (other than in accordance with its terms including as a result of payment in full of its Payment Group's Full Outstanding Settlement Amount and all other Obligations), (iii) purports in writing to revoke or rescind the Agreement or the Collateral Documents to which it is a party or (iv) purports in writing to challenge the validity, enforceability or perfected nature of the liens created thereby, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, shall constitute a Breach Trigger, and if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party; *provided* that (A) this provision shall not limit any Party's rights to assert arguments with respect to the interpretation or applicability of any provision of this Agreement and (B) any act or omission by a Sackler Party that would otherwise constitute a Breach Trigger or Breach under this Section 9.01(f) with respect to the Payment Group that includes such Sackler Party shall instead constitute a Breach Trigger or Breach under this Section 9.01(f) solely with respect to such Sackler Party if the Breach Trigger or Breach occurs after such Sackler Party becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding.

(g)    <u>Insolvency</u>.    (i) Any Payment Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Payment Party appoints, applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Payment Party and the appointment is undischarged or unstayed for 30 days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Payment Party or to all or a material part of its property is instituted without the consent of such Payment Party and continues undismissed or unstayed for 30 days, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to <u>Section 9.02(a)(v)</u>, upon the earlier of (x) actual knowledge of such Breach by any member of the Payment Group (other than the breaching Payment Party referenced in <u>clauses (i) through (iv)</u>, as applicable) and (y) notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(h)    <u>Inability to Pay Debts; Attachment</u>. (i) Any Sackler Party enters into a moratorium or standstill arrangement in relation to its Indebtedness having an aggregate outstanding principal amount equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case

of a B-Side Payment Party) or ~~is taken to have failed to comply with a statutory demand (or otherwise be presumed to be insolvent by applicable Law) or~~ (ii) any writ or warrant of attachment or execution or similar process is issued, commenced or levied against all or substantially all of the property of any such Sackler Party and is not released, vacated or fully bonded within 30 days after its issue, commencement or levy, or any analogous procedure or step is taken in any jurisdiction, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(i)    Judgments.  There is entered against any Sackler Party a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) equal to or greater than $10,000,000 (in the case of an A-Side Payment Party) or $50,000,000 (in the case of a B-Side Payment Party) (to the extent not paid and not covered by (i) independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny coverage or (ii) an enforceable indemnity to the extent that such Sackler Party shall have made a claim for indemnification and the applicable indemnifying party shall not have disputed such claim) and there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, which shall constitute a Specified Breach only with respect to such Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party).

(j)    Invalidity and Enforceability of Agreement.  A court of competent jurisdiction, in a final judgment, determines that any Obligation of a Payment Party (including ~~the~~any successor trustees thereof) under this Agreement or the Collateral Documents (1) is not a valid and binding obligation of such Payment Party (or any successor trustee ~~or property~~ thereof) or (2) is not enforceable against such Payment Party (or <u>any</u> successor trustee or property thereof) in accordance with its terms, each of which shall (A) constitute a Specified Breach with respect to such Payment Party and (B) subject to <u>Section 9.02(a)(v)</u>, <u>upon</u> notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to all the Payment Parties in such Payment Group.

(k)    ~~[Reserved.]~~<u>Intentionally omitted.</u>

(l)    Collateral.  Except as otherwise provided in this Agreement or any Collateral Document, including to the extent any such perfection is not required hereunder or thereunder, and except as the direct and exclusive result of an action or a failure to act on the part of the Secured Party (including the failure to maintain possession of certificates or instruments actually delivered to it representing securities or other possessory collateral pledged under the Collateral Documents or to file Uniform Commercial Code continuation statement), (i) except as set forth in <u>clause (ii)</u> of this <u>clause (l)</u>, any security interest and Lien on any of the Collateral purported to be created by any Collateral Document shall cease to be in full force and effect, or shall cease to give the Secured Party the Liens, rights, powers and privileges purported to be created and granted under such Collateral Document (including a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in and Lien on the Collateral thereunder in favor of the Secured Party), (ii) the Secured Party fails to have a validly perfected, first priority lien on and security interest in 100% of the Equity Interests of the IAC Pledged Entities or (iii) it shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which shall, upon notice by the MDT to the Sackler Parties' Representative pursuant to <u>Section 11.01</u>, constitute a Breach Trigger and which, if such Breach Trigger continues for 30 or more days shall constitute a Specified Breach (x) in the case of a Breach by an IAC Payment Party, with respect to such IAC Payment Party (but not, for the avoidance of doubt, with respect to any other Payment Party), and (y)

in the case of a Breach by any other Payment Party, with respect to the Payment Group whose obligations are secured by such Collateral.

(m)   Credit Support Annex Breaches.   Each Breach Trigger, Specified Breach or Non-Specified Breach set forth in the Credit Support Annexes shall constitute a Breach Trigger, Specified Breach or Non-Specified Breach as expressly specified in and pursuant to the terms of the Credit Support Annexes.

(n)   A-Side Payment Group 1 Cross-Breach. AnyIf any of A-Side Payment Group 5, A-Side Payment Group 6, A-Side Payment Group 7 (each of which includes the Fourth Tier Obligor as a member) breaches this Agreement in a manner that constitutes a Specified Breach, whichsuch breach shall also constitute a Specified Breach with respect to A-Side Payment Group 1.

(o)   Other Breaches.   To the extent not enumerated in this Section 9.01 or otherwise under this Agreement as a Specified Breach (or Breach Trigger associated with a Specified Breach), any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which, upon notice by the MDT to the Sackler Parties' Representative pursuant to Section 11.01, shall constitute a Breach Trigger, and which, if such Breach Trigger continues for 30 or more days, shall constitute a Non-Specified Breach with respect to the Payment Group that includes such Sackler Party.

**Section 9.02   Remedies**.

(a)   Payment Group Breaches.

(ii)   Upon notice (such notice, a "Breach Notice") from the MDT of either a Specified Breach Trigger or a Specified Breach with respect to a Payment Group or, in the case of certain Specified Breaches as described in Section 9.01, a Payment Party (such breaching Payment Group or Payment Party, as applicable, asserted to be in breach, the "Breaching Party"), the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Breaching Party shall have the opportunity to contest in good faith that such Breach Trigger or Specified Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to Section 11.11(b) of this Agreement or otherwise (such proceeding brought pursuant to this Section 9.02(a)(i), a "Dispute Proceeding"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Breaching Party believes in good faith that such Breach Trigger or Specified Breach has not occurred and the basis therefor, (B) the foregoing provision shall not apply, and shall not require MDT to forbear from exercising any and all remedies with respect to such Breaching Party, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (and the Remedies Forbearance Period shall be deemed to have expired after such ten (10) Business Day period if such Dispute Proceedings are not brought), (C) the sole issue that such Breaching Party may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Specified Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Breaching Party shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and all Sackler Parties party to the

71

Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Breaching Party on account of such Breach Trigger or Specified Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a corresponding Specified Breach, if applicable and (II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Specified Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Specified Breach has occurred. The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period shall not apply to (x) the Specified Breaches referenced in Section 9.01(a)(i) (Non-Payment), *provided* that the MDT complies with its obligations set forth in Section 9.02(e), (y) the Specified Breaches referenced in Section 9.01(a)(ii) with respect to amounts that are not disputed in good faith and (z) Non-Specified Breaches (and Breach Triggers with respect thereto). For the avoidance of doubt, a Breaching Party shall not be permitted to bring a Dispute Proceeding with respect to a Specified Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Specified Breach, except to the extent that the facts underlying such Specified Breach differ from those underlying such Breach Trigger. For the avoidance of doubt, the MDT may exercise its rights and remedies under Article 9 through a Secured Party or a designee (as appropriate), in its sole discretion.

(iii)    If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in Section 9.03, with respect to each applicable Breaching Party, the MDT may:

(A)    Option 1:

(i)    Declare the Full Outstanding Settlement Amount of the Payment Group of which the Breaching Party is a member and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Breaching Party, and thereupon the Full Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Breaching Party (the "Payment Remedy"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Specified Breach specified in Section 9.01(g) (Insolvency), the Payment Remedy shall be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)      The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Breaching Party or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Full Outstanding Settlement Amount and the other Obligations of the applicable Payment Group from the Breaching Party or to enforce the performance by the Breaching Party of any provision of this Agreement and the Collateral Documents; and

(iii)     The Breaching Party shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Specified Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)    Option 2: If the Breaching Party is a Payment Group, (i) declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members (it being understood for all purposes of this section that with respect to any such member of a Family Group that is an officer, director, trustee or protector with respect to trusts in the pertinent Family Group, such party is liable solely in their capacities as such) and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties; whereupon (ii) the members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group, such Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred), the Debtors, the MDT, and each of the [Releasing Parties (as defined in the Plan)] with respect to the members of such Family Group and the Designated Shareholder Released Parties (if a Designated Release Remedy Event has occurred); (iv) this Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties, except for any provisions thereof regarding reinstatement or any provisions contemplated to survive pursuant to Section 11.17 ~~which~~that shall survive indefinitely, *provided* that this Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group and, if a Designated Release Remedy Event has occurred, the Designated

Shareholder Released Parties as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "<u>Release Remedy</u>"). If the Breaching Party is a Payment Party and not a Payment Group, the Release Remedy shall only apply to such Payment Party.

(iv)    The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in <u>Section 9.02(a)(ii)(A)</u> or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in <u>Section 9.02(a)(ii)(A)</u> simultaneously with the Release Remedy. If the MDT elects the Payment Remedy (or other remedies set forth in <u>Section 9.02(a)(ii)(A)</u>), it shall not be prohibited from electing the Release Remedy (subject to <u>Section 9.02(a)(iii)(A)</u> below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in <u>Section 9.02(a)(ii)(A)</u>). The MDT's exercise of remedies shall also be subject to the following:

(A)    Following the election of the Payment Remedy with respect to a Breaching Party, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative (*provided* that during such period, the MDT shall be entitled to seek (without limitation) a temporary restraining order or similar relief enjoining the Breaching Party and the corresponding Family Group from taking actions with respect to any material amount of his, her or its property with the intent or material effect of frustrating the enforcement of the Shareholder Released Claims), elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Breaching Party and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members and, if a Designated Release Remedy Event has occurred, the Designated Shareholder Released Parties. For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Full Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Breaching Party, but such Breaching Party shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation in connection with the exercise of the Release Remedy. For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to this Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(v)        Intentionally omitted.

(vi)       In the event of a Breach referenced in Section 9.01(g) (Insolvency) or Section 9.01(j) (Invalidity and Enforceability of Agreement) by a Sackler Party, such Breach will constitute a Specified Breach with respect to the Payment Group that includes such Sackler Party unless:

(A)        [such Sackler Party is a De Minimis Payment Party; *provided* that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v)(A) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement Amount of such Sackler Party's Payment Group as of the Settlement Effective Date; or

(B)        the Net Assets of such Payment Group (not including the Sackler Party subject to such Breach), determined as of date no later than the 90th day following the date of such Breach, inclusive of any additional parties added to such Payment Group during such period, are at least (i) if such Breach occurs prior to the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 100% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination or (ii) if such Breach occurs on or after the end of the Sale Period (or, if earlier, the date on which all IACs have been sold), 120% of the Full Outstanding Settlement Amount of such Payment Group as of such date of determination.]³

*provided* that the Net Assets of the such Sackler Party, as of the date of this Agreement, when added to the sum of the Net Assets, as of the Agreement Effective Date, of all other Sackler Parties within such Sackler Party's Payment Group that have previously been in breach of Section 9.01(g) or (j) and applied this Section 9.02(a)(v) to limit the applicable Specified Breach to the breaching Sackler Party (rather than its entire Payment Group) shall not exceed 10% of the Full Outstanding Settlement of such Sackler Party's Payment Group as of the Settlement Effective Date.

(vi)       With respect to A-Side Payment Group 1 and A-Side Payment Group 7 (each of which includes Millennium Trust and Perelle Bay Trust as members), a Breach by any such Payment Group shall give rise to remedies in respect of, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to, Millennium Trust and Perelle Bay Trust in addition to all other Payment Parties within such Payment Group that are not Crossover Members; *provided* that the proceeds resulting from any such exercise of remedies shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7, with the proceeds segregated and allocated to any breaching Payment Group being applied in accordance with Section 9.02(d) and any proceeds allocated to a non-breaching Payment Group being deposited into an escrow account of the Secured Party to secure the obligations of such non-breaching Payment Group.

(vii)      In the event the MDT is entitled to exercise remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to any A-Side General Obligor, the proceeds resulting from any such exercise of remedies shall be segregated and shall

---

³ Note to Draft: Under discussion.

be allocated ratably (i.e. 12.5% each) to each A-Side Payment Group, with the proceeds allocated to any breaching A-Side Payment Group being applied in accordance with Section 9.02(d) and the proceeds allocated to the non-breaching Payment Groups being deposited into an escrow account of the Secured Party for the benefit of each A-Side Payment Groups that are not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

(viii)    If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(ix)    The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)    Delay or Omission. A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative.

(c)    Waiver of Past Breaches. The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    Priorities. If a Breach has occurred, and the Secured Party collects any cash or property from the members of the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order: *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Full Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from (i) A-Side Payment Group 1 (including the Fourth Tier Obligor but excluding Millennium Trust and Perelle Bay Trust), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 and (ii) Millennium Trust and Perelle Bay Trust, to be deposited by the Secured Party into an escrow account to secure the Obligations of A-Side Payment Group 7.

(e)    Funding Deadline Notification.

(i)    Sackler Parties' Representative's Obligation to Deliver Funding Deadline Report. No later than (A) 180 days prior to any Funding Deadline (other than the second Funding Deadline) and (B) 90 days prior to the second Funding Deadline (provided that, with respect to clauses (A) and (B) of this Section 9.02(e)(i), if the day the period expires is not a Business Day, then the Funding Deadline Report will be due two business days after the day the period expires),

the Sackler Parties' Representative shall provide MDT with a report (a "Funding Deadline Report") setting forth reasonably detailed, good faith calculations of (v)(1) the Cumulative Minimum Required Settlement Amount as of such Funding Deadline, (2) the Aggregate Payments made or required to have been made by all Payment Groups as of such Funding Deadline (but without giving effect to payments required to be made on such Funding Deadline and (3) the amount of any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of such Funding Deadline Report, (w) the Full Outstanding Settlement Amount of each Payment Group, with reasonable detail regarding the Outstanding Settlement Amount of each Payment Group and any remaining obligations to make Additional A-Side Amount Payments of each A-Side Payment Group, (x) the Settlement Amount Balance of each Payment Group, (y) the amount of all prepayments by each Payment Group that are not yet Aggregate Payments, and (z) the Funding Deadline Obligation and any Additional A-Side Amount Payment owed by each Payment Group on the next Funding Deadline; *provided* that if Net Proceeds are received(A) if a payment is made to the MDT pursuant to Section 2.02 or any prepayment pursuant to Section 2.01(e) or Section 2.10 or payment pursuant to the last paragraph of Section 3.03(a) or pursuant to Section 3.07(e) or (B) any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of delivery of the Funding Deadline Report, in each case, is made after the Sackler Parties' Representative has provided an initial Funding Deadline Report with respect to a particular Funding Deadline in accordance with this Section 9.02(e)(i), then no later than (x) 10 Business Days following the date on which any report to be deliveredany payment to the MDT pursuant to Section 3.02(a)(iii) of this Agreement is due2.02 or (y) 10 Business Days following any prepayment pursuant to Section 2.01(e) or Section 2.10 or payment pursuant to the last paragraph of Section 3.03(a) or pursuant to Section 3.07(e), or payment of any payments required to have been made by any Payment Group prior to the date of such Funding Deadline Report that remain unpaid as of delivery of the Funding Deadline Report, the Sackler Parties' Representative shall provide an updated Funding Deadline Report., which updated Funding Deadline Report shall constitute the Funding Deadline Report for purposes hereof.  Notwithstanding anything to the contrary herein, if the Sackler Parties' Representative delivers an updated Funding Deadline Report, pursuant to the immediately preceding sentence, less than 60 days prior to any Funding Deadline, the MDT shall have the right (exercisable by written notice to the Sackler Parties' Representative on or prior to the earlier of the Business Day immediately preceding the applicable Funding Deadline and the day that is 10 Business Days following receipt of such report), to disregard such updated Funding Deadline Report (except with respect to any additional payments made to the MDT), solely for purposes of calculating the amount due at such Funding Deadline pursuant to this Section 9.02(e).

(ii)     MDT Right to Deliver Dispute Notice.  If the MDT disagrees with any of the amounts in the Funding Deadline Report, the MDT may deliver a notice of dispute to the Sackler Parties' Representative setting forth the MDT's reasonably detailed, good faith calculation of such amounts and the basis for its dispute (an "MDT Dispute Notice"). Delivery of such MDT Dispute Notice to the Sackler Parties' Representative shall trigger a period of 15 Business Days wherein the Parties shall work in good faith to resolve the dispute. If the dispute remains unresolved after such period of 15 Business Days, the MDT shall request that the Bankruptcy Court make a determination to resolve the dispute.

(iii)     Payment Following Resolution. Following the resolution of any dispute over the Funding Deadline Obligation and/or Additional A-Side Amount Payments of any Payment Group payable on the nexton a Funding Deadline (whether by resolution of the Parties or by determination of the Bankruptcy Court), (A) if the dispute is resolved on or after the 10th Business Day prior to such Funding Deadline but on or prior to such Funding Deadline, the

applicable Payment Group shall pay, at its election, either (1) on such Funding Deadline, the amount payable by such Payment Group pursuant to such resolution or (2) on such Funding Deadline, the amount that would have been payable by such Payment Group pursuant to Section 9.02(e)(iv) had such dispute not been resolved on or prior to such Funding Deadline, and on the 10th Business Day following such resolution, the balance of the amount payable pursuant to such resolution and (B) if the dispute is settled prior to the 10th Business Day prior to such Funding Deadline or after such Funding Deadline the applicable Payment Group shall pay all disputed amounts on the ~~later of (x) the~~ applicable Funding Deadline ~~and (y) 15 Business Days following the resolution of the dispute~~ (it being understood that failure by the applicable Payment Group to pay such amounts by ~~such~~the applicable deadline or deadlines shall give rise, with respect to such Payment Group, to a Specified Breach by the Payment Group that is not subject to Section 9.02(a)(i)). For the avoidance of doubt, notwithstanding the foregoing sentence, if any such dispute is resolved prior to the applicable Funding Deadline, all undisputed amounts shall be paid on such Funding Deadline in accordance with Article 2.

(iv)    ~~(iii)~~ Payments if Dispute Unresolved at Funding Deadline.   If, on any Funding Deadline, any dispute with respect to any Payment Group's Funding Deadline Obligation and/or Additional A-Side Amount Payment has not been resolved, notwithstanding anything else contained in this Agreement, each Payment Group shall pay, on or before such applicable Funding Deadline (and there shall be no Specified Breach by any Payment Group or any Payment Party if the applicable Payment Group or Payment Party pays):

(A)    If the MDT delivered an MDT Dispute Notice within ~~15 Business Days~~60 days of receipt of the last Funding Deadline Report: ~~the lesser of (1)~~ such Payment Group's Funding Deadline Obligation as set forth in the MDT Dispute Notice ~~and (2) (x) such Payment Group's Funding Deadline Obligation as of such Funding Deadline determined for such purposes by substituting the Cumulative Minimum Required Settlement Payments for the Required Settlement Payment as of such Funding Deadline in the calculation thereof (provided, that if the sum of the amounts determined pursuant to this clause (x) does not equal 100% of~~; *provided*, if (1) the sum of (X) the Funding Deadline Obligations set forth in the Funding Deadline Report of the Payment Groups for which the MDT has not delivered an MDT Dispute Notice (or which the MDT does not dispute in the MDT Dispute Notice) plus (Y) the Funding Deadline Obligations set forth in any MDT Dispute Notices of the Payment Groups for which the MDT has delivered an MDT Dispute Notice, is greater than (2)(X) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline, ~~then in lieu of such amounts, each A-Side Payment Group shall be allocated 6.25%, and each B-Side Payment Group shall be allocated 25%, of the Cumulative Minimum Required Settlement Payments as of~~ such Funding Deadline ~~pursuant to this clause (x)  (y) minus (y~~ minus (Y) the aggregate payments made ~~by such~~or required to have been made by all Payment ~~Group~~Groups pursuant to Article 2 of this Agreement (other than Section 2.10) as of immediately prior to such Funding Deadline~~; and~~, then each applicable Payment Group or Payment Party shall pay the amount set forth in the Funding Deadline Report;

(B)    If the MDT delivered an MDT Dispute Notice more than ~~15 Business Days~~60 days after receipt of the last Funding Deadline Report or if the MDT did not deliver an MDT Dispute Notice: the Funding Deadline Obligation set forth in the last Funding Deadline Report delivered to the MDT by the Sackler Parties' Representative prior to the Funding Deadline; and

(C)  If the MDT delivered an MDT Dispute Notice disputing the calculation of such Payment Group's A-Side Additional Amount Payment: the lesser of (1) the A-Side Additional Amount Payment of such Payment Group set forth in the MDT's Funding Deadline Notice or (2) $3.125 million.

*provided* that, any payment made by a Payment Group pursuant to this Section 9.02(e) shall be deemed a payment made pursuant to Section 2.01(c) or (d), as applicable; and *provided further*, that contemporaneously with any payments required by Section 9.02(e)(A) and (B), the A-Side Payment Groups shall pay, or cause to be paid, in the aggregate, the Additional A-Side Amounts due pursuant to Section 2.10 to the extent such amount is payable pursuant to Section 2.10; and *provided further, that* if at any time after the applicable Funding Deadline the MDT determines that any additional amounts are due and owing on such Funding Deadline in respect of a Payment Group's Funding Deadline Obligation or Additional A-Side Amount Payment, in each case, after receipt of the payments contemplated by Section 9.02(e)(iii) or (iv) by such Payment Group, the MDT may serve a Breach Notice to such Payment Group for failure to pay such additional amounts, which shall constitute a Breach Trigger and, if such Breach Trigger continues for 30 or more days, shall constitute a Specified Breach with respect to such Payment Group, *provided* that, notwithstanding anything else contained in this Agreement, (i) the terms of Section 9.02(a)(i) shall apply to such Breach Trigger or Breach, including the Remedies Forbearance Period, and, (ii) if the applicable Payment Parties pay any such additional amounts while such Breach Trigger is continuing or during any Remedies Forbearance Period, no Breach Fee shall be payable with respect to any such amounts.

(v)  (iv) Post-Resolution True-Ups. If the Bankruptcy Court determines (or the Parties subsequently determined) that the amount paid by any Payment Group in accordance with Section 2.01(c) or (d), as applicable (including pursuant to the foregoing clause Section 9.02(e)(iii) or (iv)) is (A) in excess of the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Overpaying Payment Group" and the amount of such excess with respect to an Overpaying Payment Group, the "Overpayment Amount"), then the Overpayment Amount shall be deemed to be a prepayment pursuant to Section 2.01(e) or Section 2.10, as applicable, by the Overpayment Payment Group and (B) less than the amount actually required to be paid on such Funding Deadline by such Payment Group (any such Payment Group, an "Underpaying Payment Group" and the amount of such underpayment with respect to an Overpaying Underpayment Payment Group, the "Underpayment Amount"), then the Underpaying Payment Group shall pay or cause to be paid, on the next Funding Deadline, the Underpayment Amount to the MDT in addition to any Funding Deadline Obligation or Additional A-Side Amount owing by the Underpaying Payment Group on such Funding Deadline; provided, to the extent that the aggregate payments made by all Payment Groups on such Funding Deadline are less than the aggregate amount required to be paid by all Payment Groups on such Funding Deadline, then each Underpaying Payment Group shall pay or cause to be paid its Underpayment Amount within 30 days following the determination by the Bankruptcy Court.

(vi)  (v) Updated Funding Report.  Within 30 days of any determination by the Bankruptcy Court set forth in the foregoing Section 9.02(e)(iv v) the Sackler Parties' Representative shall deliver to the MDT an updated Funding Deadline Report setting forth in reasonable detail a good faith calculation (which calculations shall be consistent with such determination by the Bankruptcy Court) of the amounts set forth in clauses (w v) through (z) in the foregoing Section 9.02(e)(i).

(vii)    (vi) Use of Net Proceeds Reports. Any calculations provided pursuant to these terms by either the MDT or the Sackler Parties' Representative shall incorporate, without alternation, the information provided in the applicable Net Proceeds reports prepared by an Approved Accountant pursuant to Section 3.02(a)(iii).

(viii)    (vii) Confirmation of Receipt of Payments. Following receipt of each payment by or on behalf of a Payment Group, the MDT shall provide the Sackler Parties' Representative with notice of receipt of such payment, which notice shall include (A) the amount of such payment, (B) the aggregate payments received as of such date, and (C) any payments to the MDT, the Appeals Account, any Creditor Trust, or any recipient of a distribution from the Creditor Trust that, to the MDT's knowledge, have been disgorged, turned over, or otherwise paid as Recovery.

(ix)    (viii) Payment Obligations Independent. Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that no failure of the Sackler Parties' Representative to deliver the notice contemplated by Section 9.02(e)(i) shall relieve any Payment Party of its payment Obligations hereunder.

**Section 9.03    Certain Limitations**. Notwithstanding anything to the contrary set forth herein, except for the matters set forth in Section 9.01(c)(i) and Section 9.01(c)(ii), with respect to any A-Side General Obligor or any other Crossover Member (other than Millennium Trust and Perelle Bay Trust), and any Payment Group that contains any such Crossover Member (including each A-Side Payment Group with respect to the A-Side General Obligors):

(a)    No A-Side General Obligor shall have any liability or obligation in respect of any covenant or other obligation of any other Payment Party, but shall be liable only for the obligations specifically applicable to such A-Side General Obligor (excluding, for the avoidance of doubt, any such obligations that arise solely as a result of being included in a Payment Group but including, for the avoidance of doubt, its obligations as an A-Side General Obligor under Section 2.01(c)).

(b)    A Breach by a Crossover Member (including any A-Side General Obligor, but excluding Millennium Trust and Perelle Bay Trust) shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member.

(c)    A Breach by any Payment Party that is not a Crossover Member (or a Breach by any Payment Group of which such Crossover Member is a member that is not the result of a Breach by such Crossover Member) shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member (including any A-Side General Obligor but excluding Millennium Trust and Perelle Bay Trust). For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group and, as applicable, the Designated Shareholder Released Parties.

(d)    No A-Side General Obligor shall have any obligation in respect of any Breach Fee payable by any Payment Group (or by any other Payment Party), but shall be liable only for any Breach Fee payable in respect of a Breach by such A-Side General Obligor pursuant to Section 9.01.

**Section 9.04    Trustee and Personal Representative Liability**.  The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; any remedy, recourse or right of recovery against a Trust or the JDS Estate is limited to the assets of such Trust or the JDS Estate, as the case may be; and the trustees of such Trusts or personal representative of the JDS Estate shall have no personal liability hereunder except in the case of a trustee's or personal representative's own fraud or willful misconduct. For purposes of this <u>Section 9.04</u>, the term "willful misconduct" means action taken (or not taken) in bad faith and with actual knowledge that such action (or failure to act) is unlawful, prohibited or false and will be harmful to the MDT with respect to its rights or remedies under this Agreement.

**Section 9.05    Breach Fee**.  The Breaching Party shall pay a fee to the MDT on (A) the Full Outstanding Settlement Amounts and (B) any other Obligations (other than Breach Fee amounts) that <u>are</u>, in the case of <u>this</u> clause (B) ~~is~~, then due and owing by the Breaching Party ~~(including any amounts that have become due upon any acceleration of the Full Outstanding Settlement Amount if the MDT has exercised the Payment Remedy against such Breaching Party)~~, in each case in an amount equal to 10% per annum (a "Breach Fee"), which fee shall accrue from and after the date of the occurrence of a Specified Breach and be payable upon demand and shall continue until the earlier of the date (i) such Specified Breach is no longer continuing or (ii) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid; *provided* that ~~if the Breaching Party initiates a Dispute Proceeding in accordance with Section 9.02~~:

~~(a)(i), and either (a) the Bankruptcy Court determines that there is not a good faith dispute with respect to the~~ <u>A) no Breach Fee shall accrue from and after the date of the occurrence of a</u> Specified Breach or ~~(b) the Bankruptcy Court determines that a Specified Breach has occurred and~~<u>be payable in accordance with the foregoing if</u> the Breaching Party has ~~not~~ cured such Specified Breach ~~during~~<u>prior to the expiration of</u> the Remedies Forbearance Period<u>:</u>

<u>(B) if the Breaching Party initiates a Dispute Proceeding</u> in accordance with <u>Section 9.02(a)(i)</u>, ~~then, in each case, (1) such Breach Fee shall accrue from and after the date of the occurrence of such Specified Breach and be payable on demand and (2)~~ the Breaching Party shall ~~be obligated to~~ reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding <u>unless the Bankruptcy Court determines that a Specified Breach has not occurred;</u> and ~~damages.~~

<u>(C) the Breaching Party acknowledges and agrees that if no Breach Fee is payable as a result of clause (A) of this proviso, the MDT may seek compensatory damages from the Breaching Party (either during a Dispute Proceeding or in a subsequent proceeding) in connection with such Specified Breach.</u>

<u>For the avoidance of doubt:</u>

~~In addition to the foregoing paragraph, (1~~<u>A</u>) ~~if~~<u>If</u> the Breaching Party ~~(x) properly initiates~~<u>seeks to initiate</u> a Dispute Proceeding in accordance with Section 9.02(a)(i)~~, (y)~~ <u>and</u> the Bankruptcy Court determines that <u>there is not a good faith dispute with respect to the Specified Breach, (i) the Breach Fee shall accrue from and after the date of the occurrence of</u> a Specified Breach ~~has occurred~~<u>and be payable upon demand and shall continue until the earlier of the date (x) such Specified Breach is no longer continuing or (y) the Full Outstanding Settlement Amount and all the other Obligations (including accrued Breach Fees) have been paid,</u> and (~~z~~<u>ii</u>) the Breaching Party ~~cures such Specified Breach during the Remedies Forbearance Period in accordance with Section 9.02(a)(i), no Breach Fee shall be owed or payable in connection with such Specified~~

Breach; *provided* that the Breaching Party shallwill reimburse the MDT for all legal fees and expenses incurred in connection with such Dispute Proceeding; and acknowledges and agrees that the MDT may seek compensatory damages from the Breaching Party

(either during such Dispute Proceeding or in a subsequent proceeding) in connection with such Specified Breach and (2B) if the Bankruptcy Court determines following a Dispute Proceeding in accordance with Section 9.02(a)(i) that a Specified Breach has not occurred, no Breach Fee or any other amounts shall be owed or payable in connection therewith by the Breaching Party (and the Breaching Party shall not be required to reimburse the MDT for any legal fees or expenses incurred in connection with such Dispute Proceeding).

The foregoing computation shall be made on the basis of a year of 365 or 366 days, as the case may be.

**Section 9.06    Reinstatement**.  In the event the MDT, the Appeals Account, any Creditor Trust or any recipient of a distribution from a Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any Recovery as contemplated under Section 9.01(e), whether from the Appeals Account or otherwise, then the Full Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding and the MDT shall be entitled to the benefits of this Agreement until the payment in full of the Full Outstanding Settlement Amounts with respect to such Recovery. If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents (and the Liens granted thereunder) shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto, until such time as such Recovery has been paid to the MDT pursuant to Section 9.01(e).

# ARTICLE 10.
## CONDITIONS PRECEDENT

**Section 10.01   Settlement Effective Date**.

(a)    The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Sackler Parties' Representative and the MDT, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed) (except with respect to the conditions in subparagraphs (iv)-(vi), (viii), -(ix), (x), and (xii)-(xvii) in this Section 10.01(a), which may be waived by the MDT in its sole discretion, with the consent of the Ad Hoc Committee and the Creditors' Committee (which consent shall not be unreasonably withheld or delayed)); (*provided* that should the MDT waive any of the conditions specified below without the consent of the Sackler Parties' Representative, the failure of a Sackler Party to satisfy such waived condition shall not be a basis for the MDT (or any other Party) to subsequently claim that there has been a Breach due to such failure):

(i)    the Disclosure Statement Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)    the Confirmation Order (a) shall be in full force and effect and (b) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)     the Rosetta Trust shall have been funded by one or both of the Funding Trusts with Cash Equivalents (as defined in <u>Annex B</u>) in an amount not less than the Initial Collateral Account Amount (as defined in <u>Annex B</u>);

(v)     the approval of the terms of this Agreement and the Definitive Documents, and of the appointment in further trust of the funding of the Rosetta Trust by one or both of the Funding Trusts as set forth in <u>Section 10.01(a)(iv)</u> and the confirmation of the authority of the trustees of each A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a pleading to be brought before that court by each Relevant Jersey Trust and to which all beneficiaries required for the Royal Court of Jersey to issue an order binding on all trust beneficiaries thereof (including those not in attendance) are to be convened and shall have the ability/opportunity to object to the grant of such approval to the trustees of each such Relevant Jersey Trust;

(vi)     the MDT shall have received a certificate executed by the trustees of the Rosetta Trust certifying which of the Funding Trusts provided all or any portion of the funding set forth in <u>Section 10.01(a)(iv)</u> and that attached thereto is a true and correct copy of the Funding Trust Appointment with respect to each such Funding Trust and that each such Funding Trust Appointment was consented to by all of the beneficiaries necessary under the laws of such Funding Trust's Jurisdiction of Administration to non-judicially settle an account of proceedings of the trustees thereof covering the exercise of the power of appointment referred to in <u>Section 10.01(a)(iv)</u>;

(vii)     the Master Disbursement Trust has become party to and bound by this Agreement and has assumed all obligations of the MDT as provided in this Agreement;

(viii)     the MDT shall have received a copy of the Court Order issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in <u>Section 10.01(a)(v)</u> above;

(ix)     ~~[the Sackler Parties shall have delivered to the MDT~~<u>the MDT shall have received</u> Opinions of Counsel regarding:

(A)     The corporate and/or trustee authority of the Sackler Parties <u>that are not natural persons</u> to enter into this Agreement ~~[and the other Definitive Documents];~~ <u>and</u><u>and the Collateral Documents except, with respect to any Trust, solely to the extent such authority is addressed to the reasonable satisfaction of the MDT in the Court Order received by the MDT pursuant to Section 10.01(a)(viii); and</u>

(B)     The corporate and/or trustee authority of the IAC Payment Parties <u>that are not natural persons</u> and the IAC Pledgors to enter into the IAC Collateral Documents ~~[and any other Definitive Documents];~~

*provided* that, if counsel to the Ad Hoc Committee or counsel to the Creditors' Committee provides any Opinions of Counsel as to (1) the enforceability of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents or (2) the perfection of the security interests with respect to the Collateral granted by the applicable Payment Parties and the IAC Pledgors to the Secured Party pursuant to the Collateral Documents, then the applicable Payment Parties and IAC

~~Pledgors agree to cooperate with the reasonable requests of such counsel related to the provision of such Opinions of Counsel;~~

(x)    each of the Persons listed on Exhibit K shall have executed and delivered to the MDT a Further Assurances Undertaking substantially in the form of Exhibit O;

(xi)    the Plan Effective Date shall have occurred;

(xii)    the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group;

(xiii)    the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith;

(xiv)    the Trustees of each Sackler Party that is a Trust shall have provided a Trust Certification to the MDT substantially in the form of Exhibit P;

(xv)    the personal representative of the JDS Estate shall have provided an Estate Certification to the MDT substantially in the form of Exhibit R;

(xvi)    each Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by the covenant set forth in Section 8.09; and

(xvii)    each Secondary Restricted Person that is not a Sackler Party shall have delivered an agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by the covenant set forth in Exhibit H-3.

(b)    The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date. Notwithstanding the foregoing sentence, the following obligations (and only the following obligations) shall become effective upon the Agreement Effective Date: (provided that the obligations of any A-Side Payment Party that is a Trust whose Governing Law Jurisdiction is or includes the law of Jersey (Channel Islands) shall become effective only on the date such A-Side Payment Party receives a Court Order applicable to it described in Section 10.01(a)(v)):

(i)    [The obligations set forth in Section 2.11 (Pre-Plan Effective Date Net Proceeds), Section 8.03 (No Interference), Section 8.04 (Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests), Section 8.05 (MDT Shareholder Insurance Rights), Section 8.07 (No Side Agreements), Section 8.08 (Notification of Breach), Section 8.09 (Opioid Business), and Section 8.11 (Opinions);]

(ii)    each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)    the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.

## ARTICLE 11.
## MISCELLANEOUS

**Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon receipt after dispatch by registered or certified mail, postage prepaid, (c) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (d) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as ~~follows:~~provided in a separately provided addendum to this Agreement (the "Notices Addendum").

~~if to the MDT, to:~~

~~[_____]~~

~~with a copy to (which shall not constitute notice):~~

~~[_____]~~

~~if to the Sackler Parties' Representative, to:~~

~~[_____]~~

~~with a copy to (which shall not constitute notice):~~

~~[_____]~~

~~if to any Sackler Party within A-Side Payment Group [___], to:~~

~~[_____]~~

~~with a copy to (which shall not constitute notice):~~

~~[_____]~~

~~if to any Sackler Party within B-Side Payment Group 1, to:~~

~~[_____]~~

~~with a copy to (which shall not constitute notice):~~

~~[_____]~~

~~if to any Sackler Party within B-Side Payment Group 2, to:~~

~~[_____]~~

~~with a copy to (which shall not constitute notice):~~

~~[_____]~~

~~if to any Debtor, to:~~

[_____]

~~with a copy to (which shall not constitute notice):~~

[_____]

~~or to such other address as such party may hereafter specify for the purpose by notice to the other parties hereto.~~ Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this <u>Section 11.01</u>; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or other communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in ~~this Section 11.01~~ <u>the Notices Addendum</u> by notice to the other Parties hereto.

**Section 11.02  Payments Received**.  Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

**Section 11.03  Survival of Representations and Warranties**.  All representations and warranties made by a Sackler Party hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof for so long as the Full Outstanding Settlement Amount of the Payment Groups of which such Sackler Party is a member and any other amounts owed hereunder by such Payment Groups remain outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder). Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Full Outstanding Settlement Amount of the Payment Groups of which such Sackler is a member and any other amounts owed hereunder by such Payment Groups remains outstanding (accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for hereunder).

**Section 11.04   Remedies Cumulative; Specific Performance**.  The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

**Section 11.05   Confession of Judgment**.

(a)    On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance reasonably satisfactory to the MDT, with respect to the obligations of such Sackler Party under this Agreement (assuming the maximum amount that may be owed by such Sackler Party under this Agreement and Collateral Documents after giving effect to the

terms of Article 2 of this Settlement Agreement) (each, a "Confession of ~~Judgement~~Judgment") and agrees, from time to time upon written request by the MDT, to deliver all supplements (or if so required, new Confessions of Judgment) that the MDT determines are reasonably necessary to maintain the effectiveness and validity of any such Confession of Judgment. For the avoidance of doubt, such supplements or new Confessions of ~~Judgement~~Judgment may be signed on behalf of a Sackler Party by a guardian, conservator or other Person duly appointed to represent such Sackler Party and empowered to execute a Confession of Judgment binding on such Sackler Party under all applicable Law.

(b)      Each Sackler Party hereby irrevocably authorizes any attorney-at-law to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.

**Section 11.06   Entire Agreement; Severability; Amendments and Waivers**.

(a)      This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)      Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(c)      Notwithstanding anything else contained in this Agreement or in the Plan or the Plan Documents, the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction, (i) are integrated with and integral to this Agreement and the Shareholder Settlement, (ii) are not and shall not be severable from this Agreement, the Shareholder Settlement, and those provisions of the Plan or the Plan Documents that do not relate to releases, and (iii) shall not be excised or modified other than in accordance with the Plan and this Agreement. If the Plan provisions effectuating the Shareholder Releases provided by the Debtors, their Estates, and the Releasing Parties and the Channeling Injunction are deemed null, void, illegal or unenforceable, then the terms, provisions, covenants, and restrictions of this Agreement shall be void and shall not remain in force or effect, except as specifically and expressly stated otherwise in this Agreement or the Plan, or as specifically and expressly agreed in writing by all Parties to this Agreement.

(d)      No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)     Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09). No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.

**Section 11.07**   ~~Reserved~~**Intentionally Omitted**.

**Section 11.08   Sackler Parties' Representative**.

(a)     Designation.   Subject to the terms and conditions of this Section 11.08, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)     Authority.   By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby. Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party. All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)     Reliance. Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "Authorized Action"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)     Limitation of Liability. Each Sackler Party (including but not limited to each Sackler Party) acknowledges and agrees that the Sackler Parties' Representative shall have no liability to, and shall not be responsible for any costs or expenses, judgments, fines, losses, claims, damages or liabilities of, any Party or to or of any of their respective officers, directors, employees, Affiliates and/or agents in connection with any actions taken or omitted to be taken by the Sackler Parties' Representative under or in respect of this Agreement, except to the extent resulting from fraud or willful misconduct by the Sackler Parties' Representative.

(e)      Survival. All of the immunities and powers granted to the Sackler Parties' Representative hereunder shall survive the termination of this Agreement.

**Section 11.09   Binding Effect; Benefit; Assignment**.

(a)      The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns[, except that the Creditors' Committee and the Ad Hoc Committee shall be third party beneficiaries of Section 10.01, entitled to enforce the provisions thereof as if party hereto].

(b)      No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to Exhibit F hereto to reflect changes not expressly contemplated by this Section 11.09, shall require the consent of the MDT). Any purported assignment of this Agreement in violation of this Section 11.09(b) shall be null and *void ab initio*.

**Section 11.10   Governing Law**.   This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on Exhibit Q, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.

**Section 11.11   Jurisdiction; Contested Matter**.

(a)      The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided this Section 11.11(a) shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.11(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

(b)      The Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.

Section 11.12  **Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.13  **Counterparts; Trustee of Multiple Trusts; Effectiveness**.  This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same instrument. To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date. For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

Section 11.14  **Document Repository**.  The Sackler Parties agree to participate in the public document repository to be established pursuant to the Plan on the terms and conditions set forth in the Plan.

Section 11.15  **Defense of Shareholder Releases**.  If any Person initiates, pursues, or prosecutes in any United States forum any civil proceeding, claim, or Cause of Action (as defined in the Plan) of any kind whatsoever against any Shareholder Released Party, in violation of the Shareholder Releases or based on an allegation that the Shareholder Releases do not apply to such Shareholder Released Party with respect to such proceeding, claim, or Cause of Action (and the Shareholder Released Party has a reasonable basis to believe that the Shareholder Releases do apply with respect to such proceeding, claim or Causes of Action), including by making a request for leave under Section 11.01(e) of the Plan that the applicable Shareholder Released Party has a reasonable basis to challenge, then the MDT shall appear in the relevant United States forum as soon as reasonably practicable after any Shareholder Released Party has provided notice to the MDT of such proceeding, claim, or Cause of Action and shall use commercially reasonable efforts, based on the advice of the MDT's legal counsel, to assist the applicable Shareholder Released Party and its counsel with their enforcement of the provisions of this Agreement (which may include, for example and if appropriate under the applicable facts and circumstances, filing motions, pleadings, briefs, or other documents or papers; advancing arguments or positions; seeking available relief or remedies; supporting any arguments and any requests for a determination that such proceeding, claim, or Cause of Action is covered and barred by the Shareholder Releases; and taking

other actions reasonably necessary and appropriate consistent with applicable Law to enforce the provisions of this Agreement), and the costs of doing so shall be borne exclusively by the MDT. For the avoidance of doubt, any Shareholder Released Party that is determined by a court of competent jurisdiction not to be covered by the Shareholder Releases with respect to any civil proceeding, claim, or Cause of Action shall retain, or shall have restored, all associated defenses, cross-claims, counterclaims, third-party claims, offsets and recoupments under applicable law that were, or would otherwise have been, transferred to the MDT or subsequently transferred to any Creditor Trust in accordance with Section 5.6(g) of the Plan and Section 10 of the Master TDP (as included in the Plan Documents) for the purposes of such civil proceeding, claim, or Cause of Action; *provided* that (i) no such defenses, claims or rights may be asserted ~~against any Protected Party~~by any Person, directly or indirectly, to seek or obtain any affirmative monetary recovery from any such Protected Party, unless such Protected Party is the Person initiating, pursuing, or prosecuting the applicable civil proceeding, claim, or Cause of Action (as defined in the Plan) ~~other than any other Shareholder Released Party~~) and (ii) nothing in the foregoing shall limit or affect the transfer of the MDT Shareholder Insurance Rights to the MDT under Section 5.6(j) of the Plan.

**Section 11.16   Certain Shareholder Released Party Insolvencies**.  Notwithstanding the Plan or anything to the contrary in this Agreement, if any Subsidiary of a Payment Party voluntarily or involuntarily becomes subject to an insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, solely upon election by notice from the Sackler Party Representative to the MDT and with consent from the MDT, any Estate Cause of Action (as defined in the Plan) against such Subsidiary of a Payment Party that were previously held by the Debtors and that were released pursuant to Section 10.7(a) of the Plan shall be reinstated in full (and the Shareholder Release provided under Section 10.7(a) of the Plan shall be deemed null and void with respect thereto, and the Channeling Injunctions shall terminate, be rescinded and have no application with respect thereto) and the MDT, in its sole discretion and upon receipt of an advance for fees and expenses provided by the Shareholder Released Parties in an amount determined by the MDT in its sole discretion (which advance shall be repaid to the extent not used), shall utilize commercially reasonable efforts to maximize the value of any such Estate Causes of Action in such insolvency or liquidation proceeding. To the extent that any amounts are recovered on such Estate Causes of Action, such amounts shall be credited against the last (by year) amounts due under this Agreement from the Payment Group(s) corresponding to the Family Group(s) of which the applicable Subsidiary of a Payment Party is a member,; *provided* that if the applicable Subsidiary of a Payment Party is not a member of any Family Group, such amounts shall be credited pro rata across all Payment Groups; *provided further* that any such amounts in excess of amounts due under this Agreement shall be paid directly to the applicable Payment Group or Payment Groups.

**Section 11.17   Survival**. Notwithstanding anything to the contrary in this Agreement, Sections 2.01(i)(ii), 2.01(i)(iii), 2.03(d), 2.04(b), 2.04(c), and 2.08(e) shall survive termination of this Agreement solely as between the Sackler Parties and shall continue in full force and effect for the benefit of the applicable Parties in accordance with the terms hereof.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

[Signature Page to Settlement Agreement]

By: _____
    Name:
    Title:

[Debtor 2]

By: _____
    Name:
    Title:

[Debtor 3]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

#94066539v210

**Exhibit A**
**Payment Groups and IAC Payment Parties[1]**

---

[11] Note to Draft: Exhibit under review.

**A-Side Payment Parties: Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligor* |
| Theresa E. Sackler 1988 Trust | [Rosetta Trust ~~to be named that will hold~~ |
| Theresa E. Sackler 2008 Trust | ~~collateral account~~] |
| Millennium Trust | |
| Perelle Bay Trust | |
| | *Third Tier Obligor* |
| | Kathe Sackler |
| *Third Tier Obligor* | |
| Theresa Sackler | *Fourth Tier Obligor* |
| | None |
| *Fourth Tier Obligor* | |
| None | |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| Ilene S. Lefcourt Trust 88 | MDAS Investment Trust |
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | MDAS 2010 Family Trust |
| | MDAS 2011 Family Trust |
| *Third Tier Obligor* | Trust Under Declaration of Trust No. 2 dated |
| Ilene Sackler Lefcourt | November 25, 1996 |
| | Trust under Agreement dated the 11th day of May |
| *Fourth Tier Obligor* | 2005 |
| None | Trust Under Declaration of Trust No. 1 dated |
| | November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |
| | Indian Wells Trust |
| | |
| | *Third Tier Obligor* |
| | Mortimer D.A. Sackler |
| | |
| | *Fourth Tier Obligor* |
| | None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| A-Side General Obligors | A-Side General Obligors |
| | |
| *Second Tier Obligors* | *Second Tier Obligors* |
| MDS 2006 Trust | MTS 2013 Family Trust |
| MDS 1992 Trust | MTS 2016 Trust |

| | |
|---|---|
| MDS Beacon 2010 Trust<br>MDS Beacon 2011 Trust<br>MDS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | MTS Beacon 2013 Trust<br>MTS Beacon 2014 Trust<br>MTS Beacon 2015 Trust<br>MTS Beacon Trust 2010<br>MTS Beacon Trust 2011<br>MTS Beacon Trust 2012<br>MTS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| A-Side General Obligors<br><br>*Second Tier Obligors*<br>SDS 1992 Trust<br>SDS Beacon 2011 Trust<br>SDS Family Trust 2010<br>Millennium Trust<br>Perelle Bay Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | A-Side General Obligors<br><br>*Second Tier Obligors*<br>Romas Trust<br>Sheffield Trust<br>SSSH 2013 Family Trust<br>SSSH Beacon 2013 Trust<br>Samantha Hunt 1996 Trust<br>Samantha S Hunt 2002 Trust<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>None |

**B-Side Payment Parties**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | December 29, 1992 |
| RGT One LLC | JDS Revocable Pourover Trust |
| RGT Three LLC | JGT One LLC |
| RGT Two LLC | JGT Three LLC |
| Dr. Richard S. Sackler | JGT Two LLC |
| Rosebay Medical Company, Inc. | Meridian International, Ltd. |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 | Temagami LLC |
| f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| Trust under agreement dated June 16, 1980 f/b/o | Trust under agreement dated December 23, 1980 |
| Richard S. Sackler | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated December 3, 1979 |
|  | f/b/o Jonathan D. Sackler |
|  | Trust under agreement dated June 16, 1980 f/b/o |
|  | Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| ~~B-Side IAC Payment Parties~~A-Side IAC Payment Parties[1] |
|---|
| Beacon Trust |
| Canadian Partnership Trust |
| Clover Trust |
| Fidinc Trust |
| Halm Trust |
| Hercules Trust |
| Medichem Trust |
| Memphis Pharma Trust |
| MIL Trust |
| Milton Trust |
| Mundilab Trust |
| Pickering Trust |
| Tom & Kelly Trust |
| Varus Trust |
| Taddeo Trust |
| Diagonal Blue Trust |

| B-Side IAC Payment Parties | |
|---|---|
| B-Side Payment Group 1 | B-Side Payment Group 2 |
| China Sea Company, Inc. | 1JM LLC |
| G3A LLC | 2JM LLC |
| G3D LLC | 3JM LLC |
| G3R LLC | China Sea Company, Inc. |
| Hudson River Partners | Estate of Jonathan D. Sackler |
| Meridian International, Ltd. | ~~G3A LLC~~ |
| ~~Beacon~~Raymond R. Sackler Trust 1 dtd 12/23/89 | ~~G3D LLC~~ |
| ~~Canadian Partnership Trust~~ | ~~G3R LLC~~ |
| ~~Clover~~Raymond R. Sackler Trust 1B dtd 12/23/89 | Hudson River Partners |
| RGT One LLC | Hudson Trust |
| RGT Three LLC | Irrevocable Trust under Declaration dated as of |
| RGT Two LLC | December 29, 1992 |
| Dr. Richard S. Sackler | JDS Revocable Pourover Trust |
| Rosebay Medical Company, Inc. | JGT One LLC |
| ~~Fidinc~~ Trust U/A 11/5/74 fbo Beverly Sackler | JGT Three LLC |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | JGT Two LLC |
| | Meridian International, Ltd. |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Raymond R. Sackler Trust ~~1 dtd 12/23/89~~ |
| | ~~Raymond R. Sackler Trust 1B dtd 12/23/89~~ |
| | ~~Raymond R. Sackler Trust~~ 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | ~~RGT One LLC~~ |

---

[1] ~~Note to Draft: Bengal Moon (Delaware) LLC, Lemures LLC and Stanhope Gate Corp. are subject to further discussion.~~

| | |
|---|---|
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | RGT Three LLC |
| Halm Trust | RGT Two LLC |
| Hercules Trust | Dr. Richard S. Sackler |
| Medichem Trust | Rosebay Medical Company, Inc. |
| Memphis Pharma Trust | Temagami LLC |
| MIL Trust | Trust U/A 11/5/74 fbo Beverly Sackler |
| Milton Trust | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| Mundi Lab Trust | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Pickering Trust | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| Tom & Kelly Trust | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Varus Trust | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| [Taddeo Trust | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Diagonal Blue Trust] | |

**A-Side General Obligors**

| A-Side General Obligors |
| --- |
| A-Side IAC Payment Parties |

**Exhibit B**
**Debtors**

Purdue Pharma L.P.
Purdue Pharma Inc.
Purdue Transdermal Technologies L.P.
Purdue Pharma Manufacturing L.P.
Purdue Pharmaceuticals L.P.
Imbrium Therapeutics L.P.
Adlon Therapeutics L.P.
Greenfield BioVentures L.P.
Seven Seas Hill Corp.
Ophir Green Corp.
Purdue Pharma of Puerto Rico
Avrio Health L.P.
Purdue Pharmaceutical Products L.P.
Purdue Neuroscience Company
Nayatt Cove Lifescience Inc.
Button Land L.P.
Rhodes Associates L.P.
Paul Land Inc.
Quidnick Land L.P.
Rhodes Pharmaceuticals L.P.
Rhodes Technologies
UDF LP
SVC Pharma LP
SVC Pharma Inc.

**Exhibit C**
**Family Groups and Corresponding Payment Groups**

**A-Side Family Groups[1]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler and any current or former spouses of Theresa Sackler | Kathe Sackler |
| TES Bare Trust | BJSS 2010 Trust |
| Theresa E. Sackler 1988 Trust | BJSS 2013 Trust |
| Theresa E. Sackler 2008 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2012 Trust | JHSS 2010 Trust |
| TES Beacon 2013 Trust | JHSS 2013 Trust |
| TES Beacon 2014 Trust | KAS 2010 Family Trust |
| Millennium Trust[2] | KAS 2011 Family Trust |
| Perelle Bay Trust[3] | Kathe A. Sackler 2001 Trust |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | Kathe A. Sackler Trust 88 |
|  | Kathe A. Sackler Trust 96 |
|  | SASS 2010 Trust |
|  | SASS 2013 Trust |
|  | SS Tanager Trust |
|  | Trust under Agreement dated the 13th day of March 2009 |
|  | Trust under Settlement dated 14 September 1998 |
|  | Trust under Settlement dated 16 September 1998 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | [Rosetta Trust to be identified that will create the collateral account, if not already listed above] |
|  | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |

[1] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

[2] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

[3] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.t.

|  | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
|---|---|

| A-Side Family Group 3<br>*Corresponds to A-Side Payment Group 3* | A-Side Family Group 4<br>*Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| 533 Canal Trust | Indian Wells Trust |
| Ilene S. Lefcourt Trust 88 | MDAS 2010 Family Trust |
| Ilene S. Lefcourt Trust 96 | MDAS 2011 Family Trust |
| Ilene Sackler Lefcourt Revocable Trust | MDAS Children's Trust 2012 |
| ISL 2010 Family Trust | MDAS Investment Trust |
| ISL 2011 Family Trust | Mortimer DA Sackler Trust 1996 |
| ISL JML OSHA Trust | Mortimer DA Sackler Trust 2002 |
| ISL LT Children's Trust | Nixie Trust |
| JML 2010 Family Trust | Trust under Agreement dated the 11th day of May 2005 |
| JML 2011 Family Trust | |
| JML Investment Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML OSHA Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML Pour-Over Trust | |
| KLT 2010 Family Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) |
| Trust under Settlement dated 19 December 2000 | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |

| | |
|---|---|
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>.<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 5<br>*Corresponds to A-Side Payment Group 5* | A-Side Family Group 6<br>*Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| | MTS Beacon Trust 2011 |
| | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>. | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this <u>Exhibit C</u>), (ii) any entity (or interest therein) identified on <u>Exhibit E</u>, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on <u>Exhibit E</u> that is not otherwise identified on this <u>Exhibit C</u>. |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7<br>*Corresponds to A-Side Payment Group 7* | A-Side Family Group 8<br>*Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |

| | |
|---|---|
| SDS 2006 Trust | SSSH 2013 Family Trust |
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) |
| SDS Family Trust 2010 | |
| Millennium Trust[4] | Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. |
| Perelle Bay Trust[5] | |
| The spouses and descendants of each individual within this Family Group (and the current and former spouses of such descendants) | |
| Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C. | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

---

[4] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

[5] For the avoidance of doubt, the proceeds resulting from any exercise of the Release Remedy with respect to this Family member shall be allocated ratably (i.e., 50/50) to A-Side Payment Group 1 and A-Side Payment Group 7 in accordance with the proviso in Section 9.02(a)(vi) of this Agreement.

**B-Side Family Groups**

| B-Side Family Group 1[6]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
|---|
| Dr. Richard S. Sackler[7] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The descendants of Dr. Richard S. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |

---

[6] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[7] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[8]

New 1A Trust Holding Company LLC[9]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this

[8] Entity to be included once formed.

[9] Entity to be included once formed.

Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

| B-Side Family Group 2[10]<br>*Corresponds to B-Side Payment Group 2*<br>(Jonathan Sackler Family) |
| --- |
| The surviving spouse of Jonathan D. Sackler |
| The descendants of Jonathan D. Sackler and the current and former spouses of such descendants |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| MC Trust |

[10] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[11]

New 2A Trust Holding Company LLC[12]

Property and entities possessed or owned by any Person within this Family Group at any time (or the proceeds therefrom), excluding (i) entities that any Person within this Family Group does not directly or indirectly control (either individually or with one or more Person(s) identified on this Exhibit C), (ii) any entity (or interest therein) identified on Exhibit E, and (iii) any entity (or interest therein) with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C.

---

[11] Entity to be included once formed.

[12] Entity to be included once formed.

**Exhibit D**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

---

[1] <u>Note to Draft</u>: Exhibit under review.

**Exhibit E-1**
**(Section 7.05(a)(i))**

**IACs**

| IAC Name | Jurisdiction |
|---|---|
| Mundipharma Pharmaceuticals Argentina S.r.l. | Argentina |
| Mundipharma Healthcare Pty. Limited | Australia |
| Mundipharma Oncology Pty. Limited | Australia |
| Mundipharma Pty Limited | Australia |
| Mundipharma GesmbH | Austria |
| Mundipharma Medical CEE GmbH | Austria |
| Mundipharma BV | Belgium |
| Mundipharma Pharmaceuticals (Belgium) BV | Belgium |
| Bermag Limited | Bermuda |
| L.P. Clover Limited | Bermuda |
| Mundipharma International Corporation Limited | Bermuda |
| Mundipharma International Holdings Limited | Bermuda |
| Mundipharma International Limited | Bermuda |
| Mundipharma Laboratories Limited | Bermuda |
| Mundipharma Limited | Bermuda |
| Mundipharma Medical Company | Bermuda |
| Mundipharma Ophthalmology Corporation Limited | Bermuda |
| Mundipharma Ophthalmology Products Limited | Bermuda |
| Mundipharma Brasil Productos Médicos e Farmac uticos Ltda. | Brazil |
| IAF Limited | British Virgin Islands |
| Mundipharma Medical S.ar.l. | Bulgaria Branch of Swiss Company |
| Bard Pharmaceuticals (1990) Inc. | Canada |
| Elvium Life Sciences GP Inc. | Canada |
| Elvium Life Sciences Limited Partnership | Canada |
| Elvium ULC | Canada |
| Mundipharma International (Canada) Inc. | Canada |
| Purdue Frederick Inc. | Canada |
| Purdue Pharma | Canada |
| Purdue Pharma Inc. | Canada |
| Mundipharma (China) Pharmaceutical Company Limited | China |
| Mundipharma (Shanghai) International Trade Company Limited | China |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. | China |
| Mundipharma (Colombia) S.A.S. | Colombia |
| Mundipharma Pharmaceuticals Limited | Cyprus |
| Mundipharma GesmbH | Czech Republic Branch of |

| | |
|---|---|
| | Austrian Company |
| Mundipharma A/S | Denmark |
| Mundipharma Middle East FZ-LLC | Dubai |
| Mundipharma Egypt LLC | Egypt |
| Scientific Office of Mundipharma MEA GmbH | Egypt |
| Mundipharma Oy | Finland |
| Mundipharma SAS | France |
| Krugmann GmbH | Germany |
| Mundichemie GmbH | Germany |
| Mundipharma Biologics GmbH | Germany |
| Mundipharma Deutschland GmbH & Co. KG | Germany |
| Mundipharma GmbH | Germany |
| Mundipharma Medical GmbH | Germany |
| Mundipharma Research GmbH & Co. KG | Germany |
| Mundipharma Research Verwaltungs GmbH | Germany |
| Mundipharma Verwaltungsgesellschaft mbH | Germany |
| Mundipharma (Hong Kong) Limited | Hong Kong |
| Mundipharma Medical GmbH | Hungary Branch of Swiss Company |
| Mundipharma Laboratories GmbH | Indonesian Branch of Swiss Company |
| PT. Mundipharma Healthcare Indonesia | Indonesia |
| Mundipharma Corporation (Ireland) Limited | Ireland |
| Mundipharma Pharmaceuticals Limited | Ireland |
| Mundipharma Pharmaceuticals S.r.l. | Italy |
| Mundipharma Kabushiki Kaishe | Japan |
| Mundipharma TK | Japanese Silent Partnership |
| Mundipharma Distribution Limited | Korea |
| Mundipharma Korea Limited | Korea |
| Euro-Celtique S.A. | Luxembourg |
| Mundipharma International Services S.ar.l. | Luxembourg |
| Mundipharma Pharmaceuticals Sdn. Bhd. | Malaysia |
| Mundipharma de Mexico, S. de R.L. de C.V. | Mexico |
| Mundipharma Maroc | Morocco |
| Mundipharma (Myanmar) Co., Limited | Myanmar |
| Alfa Generics B.V. | Netherlands |
| Bradenton Products B.V. | Netherlands |
| Ladenburg B.V. | Netherlands |
| Mundipharma B.V. | Netherlands |
| Mundipharma Bradenton B.V. | Netherlands |
| Mundipharma DC B.V. | Netherlands |
| Mundipharma Pharmaceuticals B.V. | Netherlands |
| Mundipharma New Zealand Limited | New Zealand |
| Mundipharma A.S. | Norway |
| Mundipharma Distribution GmbH | Philippine Branch of Swiss |

| | Company |
|---|---|
| Mundipharma Polska SP. Z.O.O. | Poland |
| Mundipharma Farmaceutica LDA. | Portugal |
| Mundipharma GesmbH | Russian Branch of Austrian Company |
| Technical Scientific Office of Mundipharma Near East GmbH | Saudi Arabia |
| Mundipharma Healthcare Pte. Limited | Singapore |
| Mundipharma IT Services Pte. Limited | Singapore |
| Mundipharma Manufacturing Pte. Limited | Singapore |
| Mundipharma Pharmaceuticals Private Limited | Singapore |
| Mundipharma Pte Limited | Singapore |
| Mundipharma Singapore Holding Pte. Limited | Singapore |
| Mundipharma GesmbH | Slovak Republic Branch of Austrian Company |
| Mundipharma (Proprietary) Limited | South Africa |
| Mundipharma Biologics S.L. | Spain |
| Mundipharma Pharmaceuticals S.L. | Spain |
| Mundipharma AB | Sweden |
| Mundipharma AG | Switzerland |
| Mundipharma Distribution GmbH | Switzerland |
| Mundipharma EDO GmbH | Switzerland |
| Mundipharma Holding AG | Switzerland |
| Mundipharma International Services GmbH | Switzerland |
| Mundipharma IT GmbH | Switzerland |
| Mundipharma IT Services GmbH | Switzerland |
| Mundipharma Laboratories GmbH | Switzerland |
| Mundipharma LATAM GmbH | Switzerland |
| Mundipharma MEA GmbH | Switzerland |
| Mundipharma Medical Company | Swiss Branch of Bermuda Company |
| Mundipharma Medical GmbH | Switzerland |
| Mundipharma Near East GmbH | Switzerland |
| Taiwan Mundipharma Pharmaceuticals Limited | Taiwan |
| Mundipharma (Thailand) Limited | Thailand |
| Mundipharma Pharmaceuticals Industry and Trade Limited | Turkey |
| Bard Pharmaceuticals Limited | United Kingdom |
| Clinical Designs Limited | United Kingdom |
| Mundibiopharma Limited | United Kingdom |
| Mundipharma Corporation Limited | United Kingdom |
| Mundipharma International Limited | United Kingdom |
| Mundipharma International Services Limited | United Kingdom |
| Mundipharma International Technical Operations Limited | United Kingdom |
| Mundipharma IT Services Limited | United Kingdom |
| Mundipharma Medical Company Limited | United Kingdom |

| | |
|---|---|
| Mundipharma Research Limited | United Kingdom |
| Napp Laboratories Limited | United Kingdom |
| Napp Pharmaceutical Group Limited | United Kingdom |
| Napp Pharmaceutical Holdings Limited | United Kingdom |
| Napp Pharmaceuticals Limited | United Kingdom |
| Napp Research Centre Limited | United Kingdom |
| Qdem Pharmaceuticals Limited | United Kingdom |
| Mundipharma Healthcare Corporation | United States of America |
| Mundipharma Healthcare LLC | United States of America |
| Mundipharma International Limited | United States of America (Delaware) |
| Mundipharma International Technical Operations Limited | United States of America (Delaware) |
| Mundipharma IT Services Inc. | United States of America (Delaware) |
| Mundipharma Pharmaceuticals Inc. | United States of America (New York) |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City | Vietnamese Branch of Singapore Company |

**Exhibit E-1**
**(Section 7.05(a)(ii))**

**A-Side and B-Side Entities that Directly or Indirectly Own IACs**

| |
|---|
| **A-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)** |
| <u>A-Side Subsidiaries Owned Directly or Indirectly by a Single A-Side IAC Payment Party</u>:<br><br>Baha Holdings S.ar.l. (Luxembourg)<br>BCN Holdings L.P. (Delaware)<br>Beacon Company (Delaware)<br>Norroy S.ar.l. (Luxembourg)<br>Stanhope Gate Corp. (BVI)<br>Clover Company Limited (Bermuda)<br>Diagonal Blue S.ar.l. (Luxembourg)<br>Diagonal Blue Corp. (BVI)<br>Fideurop Inc. (Panama)<br>Bengal Moon (Delaware) LLC (Delaware)<br>Bengal Moon Corporation (BVI)<br>Cedar Rock Investment Corporation (BVI)<br>Cedar Rock Corporation Ltd. (Malta)<br>Banela Corporation (BVI)<br>Betal Limited (Bermuda)<br>Betal Malta Limited (Malta)<br>Lemures LLC (Delaware)<br>Medichem Consultants (Intercontinental) Limited (Jersey, Channel Islands)<br>Pacific Moon Corp. (BVI)<br>Mundilab Company Limited (Bermuda)<br>Pickering (Delaware) LLC (Delaware)<br>Pickering Pharmaceuticals Corporation (BVI)<br>Pickhold Limited (BVI)<br>Taddeo LLC (Delaware)<br>Kelly Pharmaceuticals Limited (BVI)<br>TK International Limited (Bermuda)<br>Hazell Holdings Limited (Jersey, Channel Islands)<br>Rushleigh Limited (Jersey, Channel Islands) |
| <u>A-Side Entities Owned Directly or Indirectly by More than One A-Side IAC Payment Party</u>:<br><br>Halm Holdings S.ar.l. (Luxembourg) is owned 50% each by Betal Malta Limited (Malta) and Cedar Rock Corporation Ltd. (Malta)<br><br>Halm S.ar.l. (Luxembourg) is owned 100% by Halm Holdings S.ar.l. (Luxembourg) |

Hambert B.V. (Netherlands) is owned 100% by Halm Holdings S.ar.l. (Luxembourg)

**B-Side Entities for Purposes of Exhibit E-1/Section 7.05(a)(ii)**

B-Side Subsidiaries Owned Directly or Indirectly by a Single B-Side IAC Payment Party:

1JM LLC (Delaware)
2JM LLC (Delaware)
3JM LLC (Delaware)
G3A LLC (Delaware)
G3D LLC (Delaware)
G3R LLC (Delaware)
Linarite Holdings LLC (Delaware)
Little Menlo LLC (Delaware)
Menlo Park Investors Inc. (BVI)
Moonstone Holdings LLC (Delaware)
Neji S.ar.l. (Luxembourg)
Nerula S.ar.l. (Luxembourg)
Perthlite Holdings LLC (Delaware)
R Napp Holdings LLC (Delaware)
Roselite Holdings LLC (Delaware)
Temagami LLC (Delaware)

B-Side Entities Owned Directly or Indirectly by More than One B-Side IAC Payment Party:

Ankersea Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler and (iii) 8.6% by Richard S. Sackler, M.D.

B.L. Carrolton Limited (Bermuda) is owned by Pacific Partners Company (New York).

China Sea Company L.P. (Delaware) is owned (i) 4% by China Sea Company, Inc. (Delaware) and (ii) 96% by Hudson River Partners (New York).

China Sea Company, Inc. (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

Crissaire Corporation (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

East Hudson Inc. (BVI) is owned (i) 37.6% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 37.6% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 8.2% by Hudson Trust, (iv) 8.2% by Richard S. Sackler, M.D. and (v) 8.4% by Meridian International, Ltd. (Delaware).

G.H. Carrell Limited (Bermuda) is owned 100% by St. Lawrence Associates (New York).

Hudson River (Delaware) Inc. (Delaware) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable

Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Hudson River Partners (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

JGT One LLC (Delaware) is owned (i) 33 % by Beverly Sackler Trust 1 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 % by Beverly Sackler Trust 1 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 % by Beverly Sackler Trust 1 dated 12/29/89 F.B.O. Miles R.C. Sackler.

JGT Two LLC (Delaware) is owned (i) 33 % by Beverly Sackler Trust 2 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 % by Beverly Sackler Trust 2 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 % by Beverly Sackler Trust 2 dated 12/30/89 F.B.O. Miles R.C. Sackler.

JGT Three LLC (Delaware) is owned (i) 33 % by Beverly Sackler Trust 3 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33 % by Beverly Sackler Trust 3 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33 % by Beverly Sackler Trust 3 dated 12/28/89 F.B.O. Miles R.C. Sackler.

JWA Holdings LLC (Delaware) is owned (i) 33 % by JGT One LLC, (ii) 33 % by JGT Two LLC and (iii) 33 % by JGT Three LLC.

Laysan Limited (Bermuda) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

Lodestone Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler and (iii) 8.6% by JDS Revocable Pourover Trust.

Mallard Limited (Bermuda) is owned 100% by Hudson River (Delaware) Inc. (Delaware).

Meridian International, Ltd. (Delaware) is owned (i) 15.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 15.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 34.6% by Richard S. Sackler, M.D. and (iv) 34.6% by JDS Revocable Pourover Trust.

Pacific Partners Company (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

RBMC Holdings LLC (Delaware) is owned 100% by Rosebay Medical Company L.P.

RGT One LLC (Delaware) is owned (i) 33 % by Beverly Sackler Trust 1 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33 % by Beverly Sackler Trust 1 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33 % by Beverly Sackler Trust 1 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Two LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 2 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33⅓% by Beverly Sackler Trust 2 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33⅓% by Beverly Sackler Trust 2 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Three LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 3 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33⅓% by Beverly Sackler Trust 3 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33⅓% by Beverly Sackler Trust 3 dated 12/22/89 F.B.O. Rebecca K. Sackler.

Rosebay Medical Company L.P. (Delaware) is owned (i) 2% by Rosebay Medical Company, Inc. and (ii) 98% by Trust U/A 11/5/74 fbo Beverly Sackler.

Rosebay Medical Company, Inc. (Delaware) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

RWA Holdings LLC (Delaware) is owned (i) 33⅓% by RGT One LLC, (ii) 33⅓% by RGT Two LLC and (iii) 33⅓% by RGT Three LLC.

St. Lawrence Associates (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Standard Pharmaceuticals Corporation (Delaware) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Tradewind Company (New York) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Triangle Holdings LLC (Delaware) is owned 100% by Tradewind Company (New York).

Triangle Industries Limited (Bermuda) is owned 100% by Triangle Holdings LLC (Delaware).

B-Side Entities Owned Directly or Indirectly by More than One B-Side IAC Payment Party:

Ankersea Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler and (iii) 8.6% by Richard S. Sackler, M.D.

B.L. Carrolton Limited (Bermuda) is owned by Pacific Partners Company (New York).

China Sea Company L.P. (Delaware) is owned (i) 4% by China Sea Company, Inc. (Delaware) and (ii) 96% by Hudson River Partners (New York).

China Sea Company, Inc. (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS Revocable Pourover Trust.

Crissaire Corporation (Delaware) is owned 50% each by Richard S. Sackler, M.D. and JDS

Revocable Pourover Trust.

East Hudson Inc. (BVI) is owned (i) 37.6% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 37.6% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 8.2% by Hudson Trust, (iv) 8.2% by Richard S. Sackler, M.D. and (v) 8.4% by Meridian International, Ltd. (Delaware).

G.H. Carrell Limited (Bermuda) is owned 100% by St. Lawrence Associates (New York).

Hudson River (Delaware) Inc. (Delaware) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Hudson River Partners (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

JGT One LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 1 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33⅓% by Beverly Sackler Trust 1 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33⅓% by Beverly Sackler Trust 1 dated 12/29/89 F.B.O. Miles R.C. Sackler.

JGT Two LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 2 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33⅓% by Beverly Sackler Trust 2 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33⅓% by Beverly Sackler Trust 2 dated 12/30/89 F.B.O. Miles R.C. Sackler.

JGT Three LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 3 dated 12/26/89 F.B.O. Madeleine Sackler, (ii) 33⅓% by Beverly Sackler Trust 3 dated 12/27/89 F.B.O. Clare E. Sackler and (iii) 33⅓% by Beverly Sackler Trust 3 dated 12/28/89 F.B.O. Miles R.C. Sackler.

JWA Holdings LLC (Delaware) is owned (i) 33⅓% by JGT One LLC, (ii) 33⅓% by JGT Two LLC and (iii) 33⅓% by JGT Three LLC.

Laysan Limited (Bermuda) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

Lodestone Limited Liability Company (Delaware) is owned (i) 71.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (ii) 20% by Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler and (iii) 8.6% by JDS Revocable Pourover Trust.

Mallard Limited (Bermuda) is owned 100% by Hudson River (Delaware) Inc. (Delaware).

Meridian International, Ltd. (Delaware) is owned (i) 15.4% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 15.4% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 34.6% by Richard S. Sackler, M.D. and (iv) 34.6% by JDS Revocable Pourover Trust.

Pacific Partners Company (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd

12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

RBMC Holdings LLC (Delaware) is owned 100% by Rosebay Medical Company L.P.

RGT One LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 1 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33⅓% by Beverly Sackler Trust 1 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33⅓% by Beverly Sackler Trust 1 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Two LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 2 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33⅓% by Beverly Sackler Trust 2 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33⅓% by Beverly Sackler Trust 2 dated 12/22/89 F.B.O. Rebecca K. Sackler.

RGT Three LLC (Delaware) is owned (i) 33⅓% by Beverly Sackler Trust 3 dated 12/20/89 F.B.O. David A. Sackler, (ii) 33⅓% by Beverly Sackler Trust 3 dated 12/21/89 F.B.O. Marianna R. Sackler and (iii) 33⅓% by Beverly Sackler Trust 3 dated 12/22/89 F.B.O. Rebecca K. Sackler.

Rosebay Medical Company L.P. (Delaware) is owned (i) 2% by Rosebay Medical Company, Inc. and (ii) 98% by Trust U/A 11/5/74 fbo Beverly Sackler.

Rosebay Medical Company, Inc. (Delaware) is owned (i) 50% by Raymond R. Sackler Trust 1 dtd 12/23/89 and (ii) 50% by Raymond R. Sackler Trust 2 dtd 12/23/89.

RWA Holdings LLC (Delaware) is owned (i) 33⅓% by RGT One LLC, (ii) 33⅓% by RGT Two LLC and (iii) 33⅓% by RGT Three LLC.

St. Lawrence Associates (New York) is owned (i) 45% by Raymond R. Sackler Trust 1 dtd 12/23/89, (ii) 45% by Raymond R. Sackler Trust 2 dtd 12/23/89, (iii) 5% by JDS Revocable Pourover Trust and (iv) 5% by Richard S. Sackler, M.D.

Standard Pharmaceuticals Corporation (Delaware) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Tradewind Company (New York) is owned (i) 50% by Richard S. Sackler, M.D. and (ii) 50% by JDS Revocable Pourover Trust.

Triangle Holdings LLC (Delaware) is owned 100% by Tradewind Company (New York).

Triangle Industries Limited (Bermuda) is owned 100% by Triangle Holdings LLC (Delaware).

WA Canada L.P. (Delaware) is owned 16⅔% by each of (i) G3D LLC (Delaware), (ii) G3A LLC (Delaware), (iii) G3R LLC (Delaware), (iv) 1JM LLC (Delaware), (v) 2JM LLC (Delaware) and (vi) 3JM LLC (Delaware); each of Richard S. Sackler M.D. and Temagami LLC (Delaware) is a general partner of WA Canada L.P. with a 0% equity interest.

**Exhibit E-2**

**Entities Excluded from the Definition of IAC (Section 7.05(a)(i))**

| Entity Name | Jurisdiction |
|---|---|
| Bangladesh Beauty Products Private Limited | Bangladesh |
| Mundipharma Bangladesh Private Limited | Bangladesh |
| Mundipharma Trading Bangladesh Private Limited | Bangladesh |
| MN Consulting LLC | Bermuda |
| MNB Company | Bermuda |
| Transworld Pharma Limited | Bermuda |
| Modi-Mundipharma Beauty Products Private Limited | India |
| Modi-Mundipharma Healthcare Private Limited | India |
| Modi-Mundipharma Private Limited | India |
| Win-Healthcare Private Limited | India |
| Win-Medicare Private Limited | India |
| Beauty Products Lanka (Private) Limited | Sri Lanka |
| Signutra Inc. | United States |

**Exhibit E-3**

**IACs Not Wholly Owned by Sackler Parties (Section 7.05(c))**

Mundipharma Pharmaceuticals Limited (Cyprus) is owned (i) 25% by Halm Holdings S.ar.l. (Luxembourg), (ii) 12.5% by Raymond R. Sackler Trust 1 dtd 12/23/89, (iii) 12.5% by Raymond R. Sackler Trust 2 dtd 12/23/89 and (iv) 50% by third parties none of which is a Sackler Party or an Affiliate of a Sackler Party.

Mundipharma Limited (Bermuda) is owned (i) 47.62% by Kelly Pharmaceuticals Limited, (ii) 47.62% by Mallard Limited (Bermuda) and (iii) 4.76% by The Fitness Foundation, a third party that is neither a Sackler Party nor an Affiliate of a Sackler Party.

**Exhibit F**
**IAC Pledged Entities**

| IAC Pledged Entity | Jurisdiction | IAC Pledgor(s)[1] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering (Delaware) LLC |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; |

---

[1] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler; Temagami LLC; G3D LLC; 1JM LLC; G3A LLC; 2JM LLC; G3R LLC; 3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.; Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC; RGT Two LLC; RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC; JGT Two LLC; JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of |

| | | December 29, 1992 |
|---|---|---|
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

*<u>To be updated prior to the Plan Effective Date.</u>*

**Exhibit H**
**Opioid Business**

**Exhibit H-1**
**Restricted Persons**

Estate of Beverly Sackler
David A. Sackler
Ilene Sackler
Estate of Jonathan D. Sackler
Kathe Sackler
Mortimer D.A. Sackler
Richard S. Sackler
Theresa Sackler
Any trusts of which any of the foregoing are beneficiaries and the trustees thereof (solely in their capacities as such)

**Exhibit H-2**
**Schedule of Investments**

1.  Modi-Mundipharma Private Limited and its subsidiaries[1]:
    a.  Mundipharma Bangladesh Private Limited
    b.  Win-Medicare Private Limited
    c.  Win-Healthcare Private Limited
    d.  Modi-Mundipharma Beauty Products Private Limited
    e.  Modi-Mundipharma Healthcare Private Limited
    f.  Mundipharma Trading Bangladesh Private Limited
    g.  Beauty Products Lanka (Private) Limited
    h.  Bangladesh Beauty Products Private Limited
2.  MNB Company[2]
3.  Transworld Pharma Limited[3]
4.  MN Consulting LLC[4]

---

[1] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[2] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[3] Covenants to be included regarding Restricted Person obligations (i) to sell or dispose of interests held in these entities once applicable transfer restrictions lapse, (ii) to negotiate with applicable joint venture partners regarding the sale or disposition of such interests, (iii) not to accept management roles in such entities and (iv) not to consent to any action of such entities that is intended to materially increase its involvement in the opioid business.

[4] MN Consulting LLC to be included on this Schedule of Investments only for so long as any IAC Payment Party directly or indirectly owns an IAC.

**Exhibit H-3**
**Secondary Restricted Person Covenant**

Each Secondary Restricted Person shall not, other than by way of ownership of the IACs, until the Payment Group that is in the Family Group that the Secondary Restricted Person is a member of has paid its Full Outstanding Settlement Amount in full, either (i) own any investment in more than 49% of the voting power or equity value in or (ii) be an executive officer or director of any entity which has as one of its principal business segments the manufacture or sale of opioids, *provided*, *however*, that this provision shall not prohibit investments held by such Secondary Restricted Person on the Agreement Effective Date and scheduled on <u>Exhibit [●]</u> (or received as proceeds from dispositions of such investments). In the event a Secondary Restricted Person holds an investment or interest in or a position with a Person and such Person makes acquisitions or changes its business to cause such investment or the holding of such interest or position to be impermissible under this paragraph but for this sentence, the holding of such interest, investment or position shall not be a violation of this covenant so long as (i) such Secondary Restricted Person uses its best efforts to dispose of all or a portion of such investment sufficient to cause it no longer to be impermissible, and (ii) such Secondary Restricted Person has disposed of all or a portion of such investment sufficient to cause it no longer to be impermissible hereunder prior to the second anniversary of learning of the pertinent facts of such acquisitions or change in business.

**Exhibit I**
**Termination Events**[1]

(a)    Sackler Parties Termination Events.  The Sackler Parties' Representative may terminate this Agreement, including the obligations of the Parties hereunder, by delivery of a written notice to the Debtors and the Governmental Consent Parties (as defined in the Plan) upon the occurrence and continuation of any of the following events, in each case prior to the Plan Effective Date:

(i)    the Bankruptcy Court (A) enters an order denying confirmation of the Plan, (B) enters an order finding that any action taken by any Debtor (or any successor in interest of any Debtor) would render confirmation of the Plan impossible, or (C) otherwise declines to confirm the Plan, in each case, on grounds related to the Shareholder Releases, the Channeling Injunction, this Agreement, the Collateral Documents, and, in each case, (X) the Bankruptcy Court does not enter an order confirming the Plan (or, in the case of foregoing clause (B), otherwise reversing its decision) within 90 days thereafter or (Y) the Debtors cease to diligently pursue confirmation of the Plan;

(ii)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of a liquidator, judicial manager, trustee, receiver, or examiner with expanded powers or a trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Bankruptcy Cases, in each case, the effect of which would render the Shareholder Settlement (as defined in the Plan) incapable of consummation on the terms set forth therein;

(iii)    any of the Debtors supports another Person in filing any plan of reorganization or liquidation other than the Plan and has not rescinded such support within 10 Business Days of receipt of notice from the Sackler Parties' Representative;

(iv)    any of the Debtors sells a material portion of the Debtors' assets or files a motion or pleading (A) seeking to sell a material portion of the Debtors' assets or (B) asserting (or seeking standing to assert) any purported claims or causes of action against any Shareholder Released Party that is subject to the Shareholder Releases (as defined in the Plan), and, in each case has not, within 5 Business Days of receipt of notice from the Sackler Parties' Representative, withdrawn such motion or pleading;

(v)    any of the Debtors (A) withdraws the Plan and has not, within 60 days of receipt of notice from the Sackler Parties' Representative, replaced the Plan with a chapter 11 plan consistent with the Sackler Parties' Representative's consent rights under this Agreement and, (B) modifies the Shareholder Releases, the Channeling Injunction, this Agreement or the Collateral Documents (or files a new Plan with such modified terms) to the extent such modification would require the consent of the Sackler Parties' Representative under this Agreement and the Debtors have not, within 30 days of receipt of notice from the Sackler Parties' Representative, reversed such modification or further modified the Plan in a manner consistent with the Sackler Parties' Representative's consent rights under this Agreement or (C) the Sackler Parties' Representative has received an order from the Bankruptcy Court that any modification to the Plan is inconsistent with the Sackler Parties' Representative's consent rights under this Agreement and the Debtors

---

[1] Note to Draft: Exhibit I (Termination Events) subject to further discussion.

have not, within 5 Business Days of receipt of notice from the Sackler Parties' Representative, revised the Plan on terms consistent with such consent rights;

(vi)    the Bankruptcy Court enters an order terminating the Preliminary Injunction[1] or the Preliminary Injunction otherwise terminates;

(vii)    the Settlement Effective Date has not occurred by the earlier of (A) three months after the entry of the Confirmation Order, provided that such three month period shall be extended if the Settlement Effective Date is delayed as a result of any delay in obtaining any state or federal regulatory licenses, consents, or approvals, or in transferring, assigning, or novating any state or federal government contracts necessary to implement and effectuate the Plan (*provided*, with respect to this clause (A), that the Sackler Parties' Representative shall not have the right to terminate this Agreement for any delay to the Settlement Effective Date due to the fault or failure to act on the part of any Sackler Party or Family Member and (B) June 30, 2022.

Notwithstanding anything to the contrary herein, if the Shareholder Releases are not approved or are modified by the Bankruptcy Court solely on grounds related to the inclusion of "Causes of Action" in the definition of "Releasing Parties" (as defined in the Plan), or the Debtors modify the Plan pursuant to such Bankruptcy Court order, then the Sackler Parties' Representative shall not have the right to terminate this Agreement solely as a result thereof.

(b)    Debtors' Termination Event.  The Debtors may terminate this Agreement, including the obligations of the Parties hereunder, by delivery of a written notice to the Sackler Parties upon the determination by the Board of Directors of Purdue Pharma Inc. (acting through the Special Committee of such Board), after consultation with the Creditors' Committee (as defined in the Plan) and the Governmental Consent Parties that continuing to seek approval of a plan of reorganization that includes the Shareholder Releases would be inconsistent with the exercise of such Board of Directors' fiduciary duties.

---

[1] "Preliminary Injunction" means the preliminary injunction halting litigation against the Debtors and other parties as set forth in the *Nineteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction,* Adv. Pro. No. 19-08289 (RDD) [Docket No. 274].

**<u>Exhibit J</u>**
**IAC Pledge and Security Agreement**

**Exhibit K**
**Assuring Parties**

*A-Side Assuring Parties*

Theresa E. Sackler
Ilene Sackler Lefcourt
Jeffrey M. Lefcourt
Karen Lefcourt
Kathe Sackler
Mortimer D.A. Sackler
Marissa T. Sackler
Sophia Dalrymple
Michael D. Sackler
Jacqueline Pugh Sackler
Hermance Schaepman
Alexa M. Saunders
Leslie J. Schreyer
Jeffrey A. Robins
Jorg Fischer
Bowland Company Limited
Millborne Trust Company Limited
Meerkat Trust
Cobo Bay Trust
Jackson River Trust
Lune River Trust
Mondai Trust
MTS 2006 Trust
Racine Trust
Reserve Trust
SDS 2006 Trust
SDS Beacon 2014 Trust
Silver Trust
KAS 2010 Family Trust
KAS 2011 Family Trust

*B-Side Assuring Parties*

Richard S. Sackler

David A. Sackler

Marianna Sackler

Rebecca Sackler

Mary Corson

Madeleine Sackler

Clare Sackler

Miles Sackler

Jaseleen Sackler

Leslie J. Schreyer

Stephen A. Ives

Brian Olson

Garrett Lynam

1974 Irrevocable Trust fbo BS and RSS

1974 Irrevocable Trust fbo BS and JDS

Mary Corson Trust

JDS Revocable Pourover Trust

**Exhibit L**
**List of Approved Third Party Accountants[1]**

BDO
Deloitte
Ernst & Young
Grant Thornton
KPMG
PricewaterhouseCoopers
RSM Tenon
RSM
Smith & Williamson
Baker Tilly
Moore Stephens
Mazars Group
Haines Watts
Crowe Clark Whitehill
Saffery Champness
Begbies Traynor
UHY Hacker Young
Kingston Smith
Zolfo Cooper
MHA MacIntyre Hudson
Johnston Carmichael
Friedman
Cohn Reznick
Balmer-Etienne
Berdon
Huron Consulting Group
~~Management Revisions~~
Michael Constanza, CPA
Revinova Truehand
Any other independent accounting firm registered with the Public Company Accounting
Oversight Board that is not a Related Party.
Any other independent accounting firm reasonably acceptable to the MDT and the Sackler
Parties' Representative.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

**Exhibit M**
**List of Approved Financial Advisors[1]**

Accenture
AlixPartners
Alvarez and Marsal
Analysis Group
AT Kearney
Bain & Company
BDO
Booz Allen Hamilton
Boston Consulting Group
Centerview Partners
Cohn Reznick
Deloitte
Ducera Partners
Ernst & Young
Evercore
Friedman
FTI Consulting
Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group
KPMG
L.E.K Consulting
Lazard
Mercer
Oliver Wyman
Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisory firm registered with the Public Company Accounting
Oversight Board, the U.S. Securities and Exchange Commission and/or Financial Industry
Regulatory Authority (FINRA) that is not a Related Party.
Any other independent financial advisor reasonably acceptable to the Secured Party and the
Trust Pledgors.

---

[1] Includes any successor(s) of firms on this list, along with any non-U.S. offices, affiliates, branches or other
multinational associations of such firms.

## Exhibit N
**Form of Net Proceeds Report**

## FORM OF NET PROCEEDS REPORT

### [_____ __], 20[__]

Reference is made to Section 3.02(a)(iii) of the Settlement Agreement by and among the Master Disbursement Trust, each of the parties listed on Exhibit A thereto, and each of the parties listed on Exhibit B thereto, dated as of [____], 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "**Settlement Agreement**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(iii) of the Settlement Agreement in connection with our good faith calculation of Net Proceeds relating to the Sale Proceeds or IAC Non-Tax Distribution described below.

On [_____], 20[__], the IAC Payment Parties named on Schedule 1 received [Sale Proceeds / IAC Non-Tax Distributions] in connection with [*description of event that triggered Sale Proceeds / IAC Non-Tax Distributions*].

The table on Schedule 1 describes our good faith calculation of the Net Proceeds relating to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. In addition, Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(A) of the Settlement Agreement. Finally, Schedule 3 describes our good faith calculation of the Permitted Withdrawal related to such related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail, as required by Section 3.02(a)(iii)(B) of the Settlement Agreement.

[Name of Approved Accountant]

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (SALE PROCEEDS)**

[_____ __], 20[__]

*Table for Sale Proceeds Calculations*

Sale Proceeds: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **D = C's "Total" * 0.55** | | | **G = D – E = F** | | | **J = Lesser of G and I** | | **L = J – K** |
| **Name of IAC Payment Party Receiving Sale Proceeds and Date of Receipt** | **Name of Payment Group** | **Sale Proceeds Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members)** | **Column C's "Total" Multiplied by 55%** | **100% of any Sale Proceeds Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party** | **55% of any Sale Proceeds Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party** | **Net Proceeds (Column D Minus Column E's "Total" Minus Column F's "Total") (Not Less Than Zero)** | **Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable)** | **Outstanding Settlement Amount ("OSA") (Immediately Before and After)** | **IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I))** | ~~IAC~~ Payment ~~Party's~~Group 's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any) | **Portion of IAC Payment Party's Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K)** |
| [_____][1]<br><br>[Date of Receipt] | [_____] | 1. Amounts Actually Received: [$____]<br><br>2. Amounts Deemed Received:*<br>[$____], the Components of Which Are:*<br><br>a. [$____]<br>b. [$____] | [$____] | 1. Unapplied Advanced Contributions: [$____]<br><br>2. Post-Effective Date IAC Funding (Clause (iii) of Sale Proceeds Deductions): [$____]<br><br>3. Sum of (1) and (2) (the "Total"): [$____] | 1. ~~Out-of-Pocket Fees/Expenses~~ (Amount of Clause (ii) of Sale Proceeds Deductions): [$____], the Components of which Are***:<br><br>a. [$____]<br>b. [$____]<br>c. [$____]<br><br>2. 55% of aggregate (1) amount above (such resulting amount, the "Total"): [$____] | [$____] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$____] | [$____] | [$____] |

---

[1] NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]" and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (~~on~~Inon behalf of B-Side Payment Group [1, 2]").

| | | c. [$___]<br>d. [$___]<br><br>3. "Total:" Sum of (1) and (2) (the "Total i.e., the Payment Group's "Gross Sale Proceeds"): [$___] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL: | [ . . .] | [ . . .]** | [ . . .] | [ . . .] | [ . . .] | [ . . .] | [ . . .(Before)] / [$(After)] | [ . . .$(Before)] / [$(After)] | [ . . .] | [ . . .] | [ . . .] |

\*Note:  In Column C, "Amounts Deemed Received" refers to the IAC Payment Party's allocable portion of (I) any income Taxes, or withholding Taxes, imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such Sale Proceeds on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party) in respect of Sale Proceeds Deductions described in clause (ii) of the definition thereof, and any other amounts that are directly related to the Sale of such IAC, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii) which amounts are, in each case, treated as actually received by the such IAC Payment Party pursuant to the clause (x)(a) of the Net Proceeds definition for purposes of these calculations.  Each of these amounts are categorized as (I), (II), (III) and (IV) in Column C. Also, payments by or on account of a Crossover Member are allocated pursuant to Section 2.01 2.01(l).

\*\* Note: Aggregate "Total" in Column C will equal "Sale Proceeds" set forth above.

\*\*\* Note: In Column F, the components of "Clause (ii) of Sale Proceeds Deductions" are the documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (I) transfer Taxes, legal and other fees and expenses incurred in connection with such Sale, (II) any Sale Expenses incurred in connection with such Sale, and (III) reimbursement amounts specified in Section 3.04 with respect to the Sale of any IAC. Items (I), (II) and (III) in this note correspond to the amounts in Column F for each IAC Payment Party (apportioned in the case of Crossover Members).

**SCHEDULE 1 TO FORM OF NET PROCEEDS REPORT (Cont.)**

**[_____ __], 20[__]**

*Table for IAC Non-Tax Distribution Calculations*

~~Aggregate Value of~~ IAC Non-Tax Distribution: [$_____]

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **D = C's "Total" * 0.55** | | | **G = D – E = F** | | | **J = Lesser of G and I** | | **L = J – K** |
| **Name of IAC Payment Party Receiving IAC Non-Tax Distribution and Date of Receipt** | **Name of Payment Group** | **IAC Non-Tax Distribution Actually Received by such IAC Payment Party (Apportioned in the Case of Crossover Members)** | **Column C's "Total" Multiplied by ~~100% or~~ 55%~~, as Applicable~~** | **100% of any IAC Distribution Deductions Described in Clauses (i) or (iii) of the Definition Thereof of such IAC Payment Party** | **55% of any IAC Distribution Deductions Described in Clause (ii) of the Definition Thereof of such IAC Payment Party** | **Net Proceeds (Column D Minus E's "Total" Minus F's "Total") (Not Less Than Zero)** | **Settlement Amount Balance (Immediately Before and After, Including Impact of Section 2.03(a), If Applicable)** | **Outstanding Settlement Amount ("OSA") (Immediately Before and After)** | **IAC Payment Party's Net Proceeds Payment Pursuant to Section 2.02(a) (Lesser of Column G and Pre-Payment OSA (Column I)** | **~~IAC~~ Payment ~~Party's~~Group's Section 2.01(e) Prepayments Applied Towards Its Net Proceeds Payment (If Any)** | **Portion of IAC Payment Party's ~~IAC Non-Tax Distribution that Constitutes~~ Sales Proceeds that Constitute Net Proceeds Payable to MDT (Column J minus Column K)** |
| [_____]² <br> [Date of Receipt] | [____] | 1. Amounts Actually Received: [$___] <br> 2. Amounts Deemed | [$___] | 1. Unapplied Advanced Contributions: [$___] <br> 2. Post-Effective Date IAC Funding (Clause (iii) of IAC Distribution Deductions): [$___] <br> 3. Sum of (1) and (2) (the "Total"): | 1. ~~Out-of-Pocket Fees/Expenses~~ (Amount of Clause (ii) of IAC Distribution Deductions)~~:~~ [$___], the Components of which Are***: <br> (I) [$___] <br> (II) [$___] <br> 2. 55% of | [$___] | [$(Before)] / [$(After)] | [$(Before)] / [$(After)] | [$___] | [$___] | [$___] |

² NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (e.g., an A-Side General Obligor or Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, (i) a Net Proceeds Payment by an A-Side General Obligor will require eight rows, with the eight corresponding Column A entries reading "[Name of A-Side General Obligor] (on behalf of A-Side Payment Group [1, 2, 3, etc.]") and (ii) a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Received:* [$___], the Components of Which Are:* <br><br> (I) [$___] <br> (II) [$___] <br> (III) [$___] <br> (IV) [$___] <br><br> 3. "Total:" Sum of (1) and (2) (the "Total" i.e., the Payment Group's "Gross IAC Non-Tax Distribution"): [$___] | [$___] | [$___]*) amount above (such resulting amount, the "Total"): [$___] | | | | | | | | |
| TOTAL: | [ . . . ] | [ . . . ]** | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . ] | [ . . . $(Before)] / [$(After)] | [ . . . $(Before)] / [$(After)] | [ . . . ] | [ . . . ] | [ . . . ] |

*Notes Note:  In Column C, "Amounts Deemed Received" refers to the IAC Payment Party's allocable portion of (I) any income Taxes, or withholding Taxes, imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company or Subsidiary of an IAC Payment Party or IAC Holding Company, (II) any withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC Payment Party, (III) any amounts paid directly to any Third Party Payee (rather than being paid to such IAC Payment Party ) in respect of IAC Distribution Deductions described in clause (ii) of the definition thereof, and any other amounts that are directly related to such IAC Non-Tax Distributions, and (IV) any amounts paid directly to the MDT (rather than being paid to such IAC Payment Party) in accordance with Section 3.01(a)(iii)) which amounts are, in each case, treated as actually received by the such IAC Payment Party pursuant to the clause (y)(a) of the Net Proceeds definition for purposes of these calculations.  Each of these amounts are categorized as (I), (II), (III) and (IV) in Column C. Also, payments by or on account of a Crossover Member are allocated pursuant to Section 2..01 2.01(l).

** Note: Aggregate "Total" in Column C will equal "IAC Non-Tax Distribution" set forth above.

*** Note:  In Column F, the components of "Clause (ii) of IAC Distribution Deductions" are the documented, out-of-pocket fees, costs and expenses incurred by any IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company (but, for the avoidance of doubt, not including fees, costs and expenses incurred by any IAC Payment Party or any Subsidiary of an IAC Payment Party (other than an IAC Holding Company or any entity whose equity interests are held, directly or indirectly, by an IAC Holding Company), in each case solely in the amounts allocated to such IAC Payment Party pursuant to the Expense Allocation Principles), solely to the extent such fees, costs and expenses are paid or payable to Third Party Payees: (I) transfer Taxes incurred in connection with such IAC Non-Tax Distribution and (B) any IAC Distribution Expenses incurred in connection with such IAC Non-Tax Distribution.  Items (I) and (II) in this note correspond to the amounts in Column F for each IAC Payment Party (apportioned in the case of Crossover Members).

**SCHEDULE 2 TO FORM OF NET PROCEEDS REPORT**

**[_____ __], 20[__]**

*Collar Computation Proceeds and the Collar Amount*

Schedule 2 describes our good faith calculation of Collar Computation Proceeds and the Collar Amount (if any) related to such [Sale Proceeds / IAC Non-Tax Distribution] in reasonable detail pursuant to Section 3.02(a)(iii)(A) of the Settlement Agreement

1. Collar Computation Proceeds (See Table Below): [$_____]

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| Date of Determination | Aggregate "Column G" Totals from Schedule 1 (Both Sale Proceeds Schedule and IAC Non-Tax Distributions Schedule) | Reductions for Unapplied Advanced Contributions (i.e., Aggregate "Column E, Item 1" Totals from Schedule 1 (Both Sale Proceeds Schedule and IAC Non-Tax Distributions Schedule) Applied to Reduce Net Proceeds to Not Less than Zero | Reductions for Payments Pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to [an A-Side IAC Payment Party or its Subsidiary party thereto] and not related to the IAC subject to the applicable Sale) | Column B plus Column C plus Column D | Column E Divided by 0.55 | 0.60 Multiplied by Column F (i.e., Collar Computation Proceeds) |
| [_____] | [$____] | [$____] | [$____] | [$____] | [$____] | [$____] |

2. Collar Amount: [$_____]

<u>Notes</u>:

*†"Collar Computation Proceeds" means, as at any date of determination, the aggregate Net Proceeds with respect to all IAC Payment Parties as of such date, but without giving effect to any reduction for payments pursuant to Section 3.04 (but only to the extent arising from breaches of the applicable Sale agreement related to ~~one or more sellers~~an A-Side IAC Payment Party or its Subsidiary party thereto and not related to the IAC subject to the applicable Sale) or Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".†*

*"Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, plus (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million. For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to*

*$1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.*

**SCHEDULE 3 TO FORM OF NET PROCEEDS REPORT**

**[_____ __], 20[__]**

*Permitted Withdrawals*

**~~A-Side IAC Payment Parties~~**

*~~[Debevoise to propose report for A-Side Permitted Withdrawals.]~~*

**B-Side IAC Payment Parties**

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Name of IAC Payment Party | Name of Payment Group | Amount of IAC Payment Party's Sale Proceeds or IAC Distribution that ~~Does~~Do Not Constitute Net Proceeds (i.e., Amount Remaining in IAC Account After Payment of Net Proceeds to MDT, per Schedule 1, and/or Permitted Withdrawals Described in Columns D and E). | [~~Amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in Respect of such IAC Payment Party's Obligations under Section 2.02]~~Loaned to AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as Applicable for Payment Group, Pursuant to Clause (iii) of the Definition of Permitted Withdrawals | ~~Amount of Permitted Withdrawal (i.e., the sum of Column C and Column D)~~Amounts Not Required to Be Loaned to AJ Irrevocable Trust or AR Irrevocable Trust (and any successor(s) thereof), as Applicable for Payment Group, Pursuant to the Proviso in Clause (iii) of the Definition of Permitted Withdrawals | Amount of Permitted Withdrawal (i.e., the Sum of Columns C, D and E). |
| [_____]¹ | [__] | [$_____] | [$_____] | [$_____] | [$_____] |
| TOTAL | [__] | [$_____] | [$_____] | [$_____] | [$_____] |

---

¹ NOTE:  Column A will list the applicable IAC Payment Parties.  If any such IAC Payment Party is a Crossover Member (i.e., a Common B-Side Payment Party), then Column A will break out the amounts deemed to be paid by and credited to such Crossover Member on behalf of each applicable Payment Group.  For example, a Net Proceeds Payment by a Common B-Side Payment Party will require two rows, with the two corresponding Column A entries reading "[Name of Common B-Side Payment Party] (on behalf of B-Side Payment Group [1, 2]").

**Exhibit O**
**Form of Further Assurances Undertaking**

## [FORM OF] FURTHER ASSURANCES UNDERTAKING[1]

THIS FURTHER ASSURANCES UNDERTAKING (this "Agreement") is entered into by the undersigned party (the "Signing Assuring Party") as of the date set forth next to the Signing Assuring Party's signature on the signature page hereto.[2]

### RECITALS[3]

WHEREAS, a condition precedent to the effectiveness of the Settlement Agreement (as defined below) and, thus, the granting of certain releases in the manner and to the extent set forth therein is the receipt by the Master Disbursement Trust (as defined in the Settlement Agreement) (the "MDT") of an agreement substantially in the form of this Agreement from the Signing Assuring Party (as an Assuring Party as defined in the Settlement Agreement).

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, including the granting of releases in the manner and to the extent set forth in the Settlement Agreement, the adequacy and sufficiency of which are hereby acknowledged, the Signing Assuring Party does hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS AND INTERPRETATION

**Section 1.01    Definitions.** Unless otherwise defined herein, capitalized terms as used herein have the meanings given them in the Settlement Agreement; *provided*, that in the event a term is defined both herein and in the Settlement Agreement, it is defined herein for purposes of convenience only, and the meaning given that term in the Settlement Agreement shall control.

"Beneficiary Interested Person" means, at any time with respect to a Trust and the JDS Estate, each surviving spouse and descendant (including adoptees) of Mortimer Sackler or Raymond Sackler, and the spouses of any such descendant, to whom, or for whose use, income or principal of such Sackler Party may or is required to be distributed, excluding any Excluded Beneficiary and any person who would at such time be eligible or entitled to receive such a distribution only after the initial or further exercise of a power of appointment or other power to add beneficiaries but, for the avoidance of doubt, including contingent takers in default of the exercise of a power of appointment.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

---

[1] Note to Draft: To be divided into A-Side document and B Side documents with identical language except as indicated.

[2] Note to Draft:  All condition precedent Agreements to be dated the Effective Date.

[3] Note to Draft: Future Further Assurances Undertakings to be modified to reflect relevant reasons for delivery by Signing Assuring Party.

"Excluded Beneficiary" means the children of Kathe A. Sackler, Samantha Hunt and the children of Samantha Hunt and any minor or other person under a legal disability.

"Excluded Trusts" means the Trust Under Declaration of Trust No. 2 dated November 25, 1996 and Trust Under Declaration of Trust No. 1 dated November 25, 1996, each as referred to on Exhibit A of the Settlement Agreement.

"Family Member" has the meaning set forth in the Settlement Agreement.

"Jersey Administered Trust" means each Trust that is an A-Side Payment Party that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee.

"Possible Refunding Trust" means a trust that is not a Sackler Party over which a power was exercised to cause property of such trust having a cumulative aggregate value (based on the date of contribution value of each contribution) in excess of $500,000 to pass to a Sackler Party that is a Trust other than as part of a transaction intended to provide the holder of the power full and adequate consideration in exchange for the exercise of the power, excluding, however, any trust that has already terminated.

"Power Holder" means, with respect to any Trust, any Person (other than a trustee thereof acting in its capacity as such trustee and Samantha Hunt and the children of Samantha Hunt) possessing any trust power, including protectors, whether held in a fiduciary or non-fiduciary capacity or exercisable by such Person alone or only in conjunction with other Persons, with respect to any aspect of the administration or modification of such Trust, including powers to remove, replace or appoint trustees and protectors, to modify governing instruments and to consent to (or deny consent to) or direct others to take or refrain from taking any action relating to that aspect of administering or modifying such trust [(including without limitation as referred to in Sections 4.06, 4.08, 4.10 of Annexes A, C, D and E of the Settlement Agreement and Sections 4.03, 4.04 and 4.05 of Annex B of the Settlement Agreement)], including any Consent Person.

[4] ["Non-Judicial Settlement Agreement" means, with respect to a Trust and a Trust Beneficiary, a document to which such Trust Beneficiary is a party prepared by counsel for the trustees of the Trust for execution by trust beneficiaries to non-judicially settle certain matters relating to the administration of such Trust and which sets forth the consents, acknowledgments, agreements and approvals of such Trust Beneficiary as further described in (A) through (C) of Section 3.01 below.]

"Required Interested Persons" means (i) at any time with respect to a Trust other than a Jersey Administered Trust, each Person (other than the settlor, if deceased, and the trustees of such Sackler Party if not also beneficiaries thereof) who would be required under the laws of the Jurisdiction of Administration of such Sackler Party to cause an agreement settling each matter described in WY Stat § 4-10-111 (to the extent the same may be settled by agreement without court involvement under the laws of the Jurisdiction of Administration of such Sackler Party) to be binding on all beneficiaries (including for the avoidance of doubt after application of any applicable rules of virtual representation of minors and other beneficiaries), including beneficiaries not parties thereto, provided that an Excluded Beneficiary shall not be a Required Interested Person within the meaning of such term with respect to, but only with respect to, the Excluded Trusts and (ii) at any time with respect to the JDS Estate, each beneficiary

---

[4] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

thereof who is at that time entitled to receive a further distribution on account of their beneficial interests in the estate, including any unpaid legatee or residuary beneficiary thereof.

"Restricted Person" has the meaning set forth in Section 3.06 below.

"Shareholder Released Person" means a Person who is one of the Designated Shareholder Released Parties (as defined in the Settlement Agreement).

"Sackler Agreement Person" has the meaning set forth in Section 2.01(d) below.

"Secondary Restricted Person" has the meaning set forth in the Settlement Agreement.

"Settlement Agreement" means [the Settlement Agreement [dated as of [_____], 2021] among the MDT, the Sackler Parties (as defined therein and including [_____]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors.

"Settlement Documents" means each Definitive Document other than this Further Assurances Undertaking, including the Settlement Agreement and the Collateral Documents.

"Signing Assuring Party" means the signatory hereto who is one or more of (x) a (i) trustee of a Possible Refunding Trust, (ii) Power Holder of a Trust or of the JDS Estate or (iii) Trust Beneficiary and (y) if applicable, also a Family Member, Restricted Person, Secondary Restricted Person or Shareholder Released Person, in the case of each of the foregoing categories as indicated on the signature page hereto.

"Trust Beneficiary"  means a Beneficiary Interested Person or a Required Interested Person of a Sackler Party that is a Trust or of the JDS Estate.

**Section 1.02    Interpretative Provisions.**

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles and Sections are to the Articles and Sections of this Agreement unless otherwise specified.

(c)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning, *mutatis mutandis*.

(d)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(e)    The use of the word "or" shall not be exclusive.

(f)    The word "will" shall be construed to have the same meaning and effect as the word "shall."

(g)    The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document

contemplated hereby shall include such party's heirs, legal and personal representatives, successors and permitted assigns.

(h)    Any reference in this Agreement to an estate of a deceased individual or trust as a person or party shall, unless the context otherwise requires, be construed to be or include, as the context may require, the personal representatives and trustees thereof, respectively, acting in their capacity as such personal representatives and trustees.

(i)    Any reference in this Agreement to the rights and obligations of the estate of a deceased individual (including the JDS Estate) or a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the personal representatives of such estate (including the JDS Estate) and the trustees of those trusts (including the Trusts), respectively, in their capacity as such.

(j)    Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.  No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, it is intended that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

## ARTICLE 2.
## REPRESENTATIONS AND WARRANTIES

Section 2.01    Representations and Warranties.  The Signing Assuring Party does hereby represent and warrant to the MDT as follows:

(a)    The Signing Assuring Party is a Signing Assuring Party of the type indicated on the signature page hereto.

(b)    The Signing Assuring Party has all requisite power and authority to execute, deliver and perform the Signing Assuring Party's obligations under this Agreement.

(c)    The Signing Assuring Party is aware that Sackler Parties, including certain Beneficiary Interested Persons, and additional trustees, personal representatives, counsel and other advisers of and to the Sackler Parties (including officers, directors, partners and employees of trustees, personal representatives, counsel and other advisers, as applicable) and others are to be released from certain actual or potential liabilities on the terms and conditions, and to the extent, set forth in the Settlement Agreement.

(d)    [5][The Signing Assuring Party, if a Trust Beneficiary, is aware of the formation and prior funding of Sackler Parties directly or indirectly owned by any one or more Sackler Parties of which such Signing Assuring Party is a beneficiary (each a "Sackler Agreement Person").]

---

[5] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

(e)     The Signing Assuring Party has been offered the opportunity to review with counsel (to the extent desired) this Agreement, each of the Settlement Documents and any other additional information (including without limitation [6][the governing instruments of any Sackler Agreement Person and] with respect to actual and potential conflicts of interest of trustees and personal representatives of, and other fiduciaries and advisers to, a Sackler Party), and to consult with such advisors, as such Signing Assuring Party believes advisable or desirable to understand the provisions hereof and thereof before entering into this Agreement.

(f)     This Agreement has been duly and validly executed and delivered by the Signing Assuring Party and constitutes a valid and binding obligation of the Signing Assuring Party enforceable against the Signing Assuring Party in accordance with its terms.

## ARTICLE 3.
## CONSENTS, ACKNOWLEDGMENTS AND AGREEMENTS

**Section 3.01    Trust Beneficiary Acknowledgment and Consent.** [7] If the Signing Assuring Party is a Trust Beneficiary, the Signing Assuring Party does hereby: (A) consent to (i) the execution and delivery of the Settlement Documents by each applicable Sackler Party (including the trustees or personal representatives thereof in their capacities as such trustees and personal representatives) of which such Signing Assuring Party is a beneficiary and by each Sackler Agreement Person and (ii) the performance by each Sackler Party of which such Signing Assuring Party is a beneficiary and by each Sackler Agreement Person of its obligations under the Settlement Documents to which it is a party and of the transactions contemplated thereby; (B) acknowledge and agree that he or she has fully consented to and approved of the formation and funding of any Sackler Agreement Person by means of the execution of one or more Non-Judicial Settlement Agreements that, to the best of the Signing Assuring Party's knowledge, are binding on all current and future beneficiaries of the relevant Sackler Parties, and does hereby further ratify and confirm the same; and (C) if relevant to the administration of any one or more Sackler Parties that are Trusts of which such Signing Assuring Party is a beneficiary, further specifically ratify and confirm his or her acknowledgement and agreement that any provision in the governing instruments of such Trusts restricting the ability of the trustees of such Trusts to make payments of income or principal to satisfy the legal obligation of any person other than a beneficiary of such a Trust does not in any way limit or constrain the ability of such Trusts to enter into the Settlement Documents to which they are parties and perform their obligations thereunder and the transactions contemplated thereby, including to be jointly and severally liable under the Settlement Documents to which they are parties to the maximum extent set forth therein, such acknowledgement and agreement having been given by the Signing Assuring Party by means of the execution of one or more Non-Judicial Settlement Agreements that, to the best of the Signing Assuring Party's knowledge, are binding on all current and future beneficiaries of the relevant Sackler Parties.]

[8][If the Signing Assuring Party is a Trust Beneficiary for any reason other than being a beneficiary of one or more [A-Side Payment Parties] that has received Court Approval and has a Jersey (Channel Islands) Jurisdiction of Administration and no non-Jersey (Channel Islands) trustee, the Signing Assuring Party does hereby consent to the execution and delivery of the Settlement Documents by each applicable Sackler Party (including the trustees thereof in their capacities as such trustees) of which such Signing Assuring Party is a beneficiary and the performance by each Sackler Party of which such Signing

---

[6] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only.

[7] Note to Draft: Anticipated to be included in B-Side Form of Further Assurances Undertaking only; consent to be further adjusted if Non-Judicial Agreement not being executed by all relevant B-Side Sackler Parties.

[8] Note to Draft: Anticipated to be included in A-Side Form of Further Assurances Undertaking only.

Assuring Party is a beneficiary of its obligations under the Settlement Documents to which it is a party and of the transactions contemplated thereby].

**Section 3.02    Further Trust Beneficiary Acknowledgment.** If the Signing Assuring Party is a Trust Beneficiary, such Signing Assuring Party further acknowledges that the MDT and each Sackler Party that is a Trust of which the Signing Assuring Party is a beneficiary will be executing the Settlement Documents and will be performing its obligations under the Settlement Documents and the transactions contemplated thereby in reliance on the Signing Assuring Party's representations, covenants and agreements hereunder, including without limitation the non-circumvention covenant under Section [3.08] and the MDT shall have enforcement rights as a third-party beneficiary of such representations, covenants and agreements hereunder.

**Section 3.03    Power Holder Covenant.** If the Signing Assuring Party is a Power Holder with respect to a Sackler Party, the Signing Assuring Party hereby covenants and agrees that such Signing Assuring Party shall not (i) intentionally and with knowledge that it is a violation of this Section 3.03 or (ii) in reckless disregard of its obligations under this Section 3.03 exercise or fail to exercise any of the Signing Assuring Party's powers and authorities as a Power Holder with respect to such Sackler Party in a manner that, if such Power Holder were a trustee of such Sackler Party, would prevent such Sackler Party from fulfilling, and being in full compliance with, all of its obligations under the Settlement Documents to which it is a party, including without limitation, to not be in violation of the provisions of the Settlement Documents relating to the appointment and replacement of trustees of a Sackler Party that is a trust or the amendment of its governing instruments (including without limitation as referred to in [Sections 4.06, 4.08, 4.10 of Annexes A, C, D and E of the Settlement Agreement] and [Sections 4.03, 4.04 and 4.05 of Annex B of the Settlement Agreement]).

**Section 3.04    Possible Refunding Trust Covenant.** If the Signing Assuring Party is a Possible Refunding Trust, such Signing Assuring Party hereby covenants and agrees that any property reverting or required to be refunded to such Signing Assuring Party by or from any Sackler Party that is a Trust shall be held by the trustees of the Possible Refunding Trust as a separate resulting trust that will remain subject to such Sackler Party's obligations under the Settlement Documents as if still held by such Sackler Party (with the satisfaction of obligations due MDT having, with respect to such resulting trust and the property thereof, the same priority with respect to all other obligations of such Possible Refunding Trust as it would have had had the Possible Refunding Trust been a party to the Settlement Documents in the same capacity or capacities as such Sackler Party), and to execute such further documents as the MDT may reasonably request to evidence and confirm the same.

**Section 3.05    Naming Rights.** If the Signing Assuring Party is a Family Member, such Signing Assuring Party shall not seek, request, or permit any new naming rights with respect to charitable or similar donations to organizations (irrespective of when such funds were donated or from what source) until the later to occur of (1) the date on which the Full Outstanding Settlement Amount of the Payment Groups that such Family Member is a member has been reduced to zero [(accounting, in the case of an A-Side Payment Group, for the maximum amount the A-Side Payment Group may be liable for under the Settlement Agreement)] and (2) the first date on which the IAC Payment Parties of such Payment Groups are no longer the owners or holders of any interest in any IAC (other than Retained Interests permitted by Section 3.01(b) of the Settlement Agreement); *provided* that such time such Payment Party and its associated Payment Group and Family Members are in compliance with their obligations under Section 8.09 of the Settlement Agreement. For the avoidance of doubt, nothing in this Section 3.05, Section 8.06 of the Settlement Agreement or the Confirmation Order shall prohibit (x) any Payment Party or Family Member from making any charitable or similar donations or (y) the publication of the name of any Payment Party or Family Member making a charitable or similar donation in connection with such donation, provided such publication is not pursuant to a naming right.

**Section 3.06    Opioid Business.** If the Signing Assuring Party is a Person listed on Exhibit H-1 of the Settlement Agreement (a "Restricted Person"), such Signing Assuring Party acknowledges and agrees that the Signing Assuring Party, as a Restricted Person, is subject to the terms and conditions of Section 8.09 of the Settlement Agreement, and agrees to abide by the covenant set forth therein and to deliver a further agreement reasonably satisfactory to the MDT to the effect that such Restricted Person has agreed to abide by that covenant in the event that this covenant shall for any reason fail to meet that requirement. If the Signing Assuring Party is a Secondary Restricted Person, such Signing Assuring Party acknowledges and agrees that the Signing Assuring Party, as a Secondary Restricted Person, is subject to the terms and conditions of Exhibit H-3 of the Settlement Agreement, and agrees to abide by the covenant set forth therein and to deliver a further agreement reasonably satisfactory to the MDT to the effect that such Secondary Restricted Person has agreed to abide by that covenant in the event that this covenant shall for any reason fail to meet that requirement.

**Section 3.07    Shareholder Release Parties.** The Signing Assuring Party acknowledges that the Shareholder Releases with respect to certain Shareholder Released Parties are subject to the Release Remedy, including without limitation Section 9.02(a)(ii)(B) and Section 9.02(a)(iii)(A) of the Settlement Agreement, each as defined therein.

**Section 3.08    Non-Circumvention.** The Signing Assuring Party hereby covenants and agrees that the Signing Assuring Party shall not, and shall cause all Persons under its Control not to, (i) [intentionally take or fail to take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the confirmation or consummation of the Plan;][9] (ii) intentionally take or fail to take any action to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its obligations under the Settlement Documents, including but not limited to the ability of any member of any Payment Group to pay the Settlement Amount and any other amount due under the Settlement Documents; or (iii) directly or indirectly, in any manner (w) contest or oppose the validity of any Sackler Party; (x) attack or try to impair or invalidate the governing instruments of any Sackler Party or any provision of the Settlement Documents including the transactions contemplated thereby (including by challenging the binding nature thereof on additional or successor trustees or personal representatives of each applicable Sackler Party); (y) contest, oppose, try to invalidate or in any way limit or constrain, based on any provisions of such Sackler Party's governing instruments or applicable law, the ability of such Sackler Party to enter into the Settlement Documents to which it is party (and to consummate the transactions contemplated thereby) and to be jointly and severally liable thereunder to the maximum extent set forth in the Settlement Documents; or (z) conspire with or voluntarily assist any other Person taking any action described in the foregoing clauses (w), (x) or (y); *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) or by any other Assuring Party that is a direct party thereto without the involvement of the undersigned Signing Assuring Party is not an act or failure to act described in this Section [3.08].

**ARTICLE 4.
SEVERABILITY; SAME AS COURT ORDER; AMENDMENTS AND WAIVERS**

**Section 4.01    Severability.** If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so

---

[9] Note to Draft: To be removed for subsequent Further Assurances Undertakings.

long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, MDT and the Signing Assuring Party shall negotiate in good faith to modify this Agreement (taking into account the provisions of the Settlement Documents) so as to effect the original intent as closely as possible in an acceptable manner in order that the transactions contemplated under the Settlement Documents be consummated as originally contemplated to the fullest extent possible.

**Section 4.02**    **Same as Court Order.** The Signing Assuring Party acknowledges and agrees that the Further Assurances Undertakings actually provided by beneficiaries or each Sackler Party that is a trust or estate are together [10][with the Court Approval, to the extent applicable,] intended and shall to the fullest extent permitted by applicable law have the same binding effect on all Persons who currently, or may in the future, have an interest in such trust or estate as a final, non-appealable order or decree of a Court of competent jurisdiction approving and directing (i) the execution and delivery by the trustees and personal representatives of each such Sackler Party of the Settlement Documents to which such Sackler Party is a party and (ii) the performance by such trustees and personal representatives of each such Sackler Party's obligations under the Settlement Documents and the transactions contemplated thereby [11][, and that in the case of any Sackler Party which is a Trust that has received Court Approval, that the Royal Court of Jersey (Channel Islands) was the appropriate forum to address all related matters.]

**Section 4.03**    **Successors; Waivers; Amendments.**

(a)    This Agreement shall be binding upon the Signing Assuring Party and its heirs, legal and personal representatives, successors and assigns, as the case may be, and shall inure to the benefit of MDT and its successors and assigns.

(b)    No failure or delay by MDT in exercising any right, remedy, power or privilege hereunder or under any Settlement Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)    Any provision of this Agreement may be amended only in a writing signed by the MDT and the Signing Assuring Party.

**Section 4.04**    **Governing Law.** This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. For the avoidance of doubt, the MDT shall have the benefit in connection with any matter arising from or related to the administration of a Sackler Party that is a trust or estate of the most favorable protections afforded parties dealing in good faith with the trustees and personal representatives thereof under any applicable law.

**Section 4.05**    **Jurisdiction; Contested Matter.**

(a)    [12][The Signing Assuring Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement or the Settlement

---

[10] Note to Draft: To be included in A-Side Form of Further Assurances Undertaking only.

[11] Note to Draft: To be included in A-Side Form of Further Assurances Undertaking only.

[12] Note to Draft: [Language under review].

Documents or the transactions contemplated thereby shall be brought in the Bankruptcy Court, and the Signing Assuring Party hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding.  The Signing Assuring Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, the Signing Assuring Party agrees that service of process on such party as provided in Section [X] shall be deemed effective service of process on such party. The Signing Assuring Party agrees that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Signing Assuring Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.] **Section 4.06    Waiver of Jury Trial.** THE SIGNING ASSURING PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY SETTLEMENT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**Section 4.07    Agreement to Specified Performance Remedy.** In addition to any remedies available to it under the Settlement Documents, the MDT shall have the right to seek any additional remedy or remedies available at law or equity, including without limitation specific performance, against the Signing Assuring Party.

**Section 4.08    Effectiveness.** This Agreement shall become effective upon [the later of (i)] the satisfaction of all of the conditions  to the effectiveness of the Settlement Agreement and [(ii)] the delivery thereof to the MDT.  The delivery of a fully executed Agreement by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the Signing Assuring Party to the terms and conditions of this Agreement, but shall in all events be followed by delivery of a manually signed original.

*[Signature Page Follows]*

10

IN WITNESS WHEREOF, the Signing Assuring Party has duly executed this Agreement or, in the case of a Signing Assuring Party that is an entity, caused this Agreement to be duly executed by its authorized officer on its behalf, as of the date set forth next to the Signing Assuring Party's signature.

| Signing Assuring Party Type | Relevant Sackler Parties[1] |
|---|---|
| ☐ Trust Beneficiary with respect to: | [Name of Each Related Sackler Party] |
| ☐ Power Holder with respect to: | [Name of Each Related Sackler Party] |
| ☐ Trustee of Possible Refunding Trust with respect to: | [Name of Each Related Sackler Party] |
| ☐ Family Member (who is also at least one of above) | |
| ☐ Restricted Person (who is also at least one of above) | |
| ☐ Secondary Restricted Person (who is also at least one of above) | |
| ☐ Shareholder Released Person (who is also at least one of above) | |

SIGNING ASSURING PARTY

_____    Date: ____

Name: _____

[Name of Entity]

By: _____    Date: ____

  Name: _____
  Title: _____

[Name of Trust]

_____    Date: ____

Name: _____, as Trustee

[Name of Entity, as Trustee]

By: _____    Date: ____

  Name: _____
  Title: _____

---

[1] In lieu of including the name of each Related Sackler Party on the signature page itself, reference may be made to a schedule to be attached to this Agreement naming each Related Sackler Party.

**<u>Exhibit P</u>**
**Form of Trust Certification**

## [FORM OF] CERTIFICATION OF TRUST

THIS CERTIFICATION OF TRUST (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law, which for the avoidance of doubt in the event that the laws of two or more jurisdictions may be applicable with respect to the administration of a particular trust, is intended to be the law providing the most protection to third-parties entering into transactions with the trustees thereof, acting in their capacities as such trustees and not in their own individual or company capacities.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                    ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

RECITALS

WHEREAS, [the receipt by the MDT of a Certification of Trust [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

AGREEMENT

1. NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

a) The undersigned Certifying Party constitutes all of the currently acting trustees of the [TRUST DESCRIPTION] (the "Trust").

b) [The trust instrument creating the Trust (the "Trust Agreement") was originally executed on [DATE] and has not been amended [or restated other than by subsequent instruments dated [DATES]].

c) The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the Trust is true and correct as of the date hereof and the Certifying Party [has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as a trustee of the Trust].

d) Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual or company capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations, *provided* that, for the avoidance of doubt, any act permitted to be taken under any Settlement Document by the Trust or its trustees in their capacities as trustees (but, for the further avoidance of doubt, only if such act does not violate any implied contractual duty of good faith and fair dealing to MDT) is not an act or failure to act described in this clause (d); *provided further* that the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

e) The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (e) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

f) [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Trust Certification [or the Settlement Documents], including any action seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding

shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

2.   If the Certifying Party is not or includes a Person who is not a natural person, the Certifying Party is providing the separate Secretary's Certificate in connection herewith.


[*Signature Page Follows Containing Signatures of All Trustees of the Trust*]

[NAME OF COMPANY TRUSTEE]


By

_____
Name:
Title:
Date:



_____
[Name of Individual Trustee]

Signature Page to Certification  of  Trust with respect to the [TRUST DESCRIPTION]

**SCHEDULE A**
**SECRETARY'S CERTIFICATE**

1. The undersigned [Title] of [Name of Company], a [jurisdiction][company type] (the "Company"), solely in his/her capacity as [Title] of the Company and not individually, hereby certifies, as follows:

a) Unless otherwise defined herein, capitalized terms used herein but otherwise not defined shall have the meanings given them in the Certification of Trust to which this Secretary's Certification is a Schedule;

b) That on the date hereof [Name] is the duly elected and qualified [Title] of the Company and the signature set forth below on the signature line for such officer is such officer's true and genuine signature, and such officer is duly authorized to execute and deliver this Certificate on behalf of the Company and to execute and deliver on behalf of the Company in its capacity as trustee of the Trust the Settlement Documents to which it is a party in such capacity and any certificate or other document to be delivered by such Sackler Party pursuant to the Settlement Documents;

c) Attached hereto as Exhibit A is a complete and correct copy of the resolutions duly adopted by [the Committee] of the board of [managers][directors] of the Company on [DATE] authorizing the execution, delivery and performance of the Settlement Documents (and any agreements relating thereto) to which the Company, in its capacity as a trustee, is a party; such resolutions have not in any way been amended, modified, revoked or rescinded and have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect; and such resolutions are the only proceedings of [the Committee of] the board of [managers][directors] of the Company now in force relating to or affecting the matters referred to therein;

d) [Attached hereto as Exhibit B is a complete and correct copy of the [limited liability company agreement/certificate of incorporation and by-laws] of the Company, together with all amendments thereto adopted through the date hereof, as in effect at all times since the adoption thereof to and including the date hereof;] and

e) Attached hereto as Exhibit C is a certificate of good standing for the Company from the [Secretary of the State of Wyoming][Jersey good standing authority], the Company's jurisdiction of organization, dated as of a recent date.

**Exhibit Q**
**Trust Information**

A-Side Payment Parties

Theresa E. Sackler 1988 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013) |

| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Alexa M. Saunders |
| | Theresa Sackler |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
| | Lune River Trust |
| | Mondai Trust |
| | Silver Trust |

Theresa E. Sackler 2008 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child 1 (2019) |
| | MDS Minor Child 2 (2021) |

| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| | Theresa E. Sackler |
| | Marissa T. Sackler |
| | Sophia Dalrymple |
| | Michael D. Sackler |
| Possible Refunding Trust(s) | N/A |

Millennium Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
| --- | --- |
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Theresa Sackler |
| | Marissa T. Sackler |
| |     MTS Minor Child (2017) |
| | Sophia Dalrymple |
| |     SD Minor Child 1 (2013) |
| |     SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| |     MDS Minor Child 1 (2019) |
| |     MDS Minor Child 2 (2021) |
| Power Holders | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | Meerkat Trust |

|  | MTS 2006 Trust |
|  | Reserve Trust |
|  | SDS 2006 Trust |

### Perelle Bay Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Tenzin Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child 1 (2019) |
|  | MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
|  | Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Rosetta Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|

| Jurisdiction of Administration | Wyoming |
|---|---|
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Stone Fiduciary Management Inc. |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Kathe Sackler |
| Power Holders | Kathe Sackler |
| Possible Refunding Trust(s) | KAS 2010 Family Trust<br><br>KAS 2011 Family Trust |

### Ilene S. Lefcourt Trust 88

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| Required Interested Persons | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| Power Holders | Hermance Schaepman |

| | |
|---|---|
| | Leslie J. Schreyer |
| | Jeffrey A. Robins |
| | Ilene Sackler Lefcourt |
| | Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Ilene S. Lefcourt Trust 96

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>JML Minor Child 1 (2009)<br><br>JML Minor Child 2 (2011)<br><br>JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>KL Minor Child 1 (2009)<br><br>KL Minor Child 2 (2012) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Ilene Sackler Lefcourt |
| **Possible Refunding Trust(s)** | Mondai Trust<br><br>Silver Trust |

### ISL 2010 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| **Required Interested Persons** | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Ilene Sackler Lefcourt |
| **Possible Refunding Trust(s)** | Jackson River Trust |

### ISL 2011 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
|---|---|
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012) |
| Required Interested Persons | Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>Karen Lefcourt |
| Power Holders | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Ilene Sackler Lefcourt |
| Possible Refunding Trust(s) | N/A |

MDAS Investment Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Mortimer D.A. Sackler (Managing Trustee)<br><br>Flat Creek Fiduciary Management LLC (Non-Managing Trustee) |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Mortimer D.A. Sackler |

|  | MDAS Minor Child 1 (2004) |
|---|---|
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Jacqueline Pugh Sackler |
| **Required Interested Persons** | Mortimer D.A. Sackler |
|  | Jacqueline Pugh Sackler |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Mortimer DA Sackler Trust 96

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
| **Power Holders** | Hermance Schaepman |
|  | Mortimer D.A. Sackler |
|  | Leslie J. Schreyer |
| **Possible Refunding Trust(s)** | Mondai Trust |
|  | Silver Trust |

Mortimer DA Sackler Trust 2002

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDAS 2010 Family Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |

| Required Interested Persons | Mortimer D.A. Sackler |
| --- | --- |
|  | Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| Power Holders | Hermance Schaepman |
|  | Leslie J. Schreyer |
|  | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | Jackson River Trust |

MDAS 2011 Family Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
| --- | --- |
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
| Required Interested Persons | Mortimer D.A. Sackler |
|  | Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| Power Holders | Hermance Schaepman |
|  | Leslie J. Schreyer |
|  | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | N/A |

### Trust Under Declaration of Trust No. 2 dated November 25, 1996

| | |
|---|---|
| **Original Jurisdiction of Creation** | New York |
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Stuart D. Baker |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| **Required Interested Persons** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

### Trust Under Agreement dated the 11th day of May 2005

| | |
|---|---|
| **Original Jurisdiction of Creation** | New York |
| **Jurisdiction of Administration** | New York |
| **Governing Law Jurisdiction** | New York |
| **Current Trustee(s)** | Mortimer D.A. Sackler |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Mortimer D.A. Sackler |
| **Required Interested Persons** | Mortimer D.A. Sackler |
| **Power Holders** | Mortimer D.A. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust Under Declaration of Trust No. 1 dated November 25, 1996

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Stuart D. Baker<br><br>Leslie J. Schreyer |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Mortimer D.A. Sackler<br><br>  MDAS Minor Child 1 (2004)<br><br>  MDAS Minor Child 2 (2007)<br><br>  MDAS Minor Child 3 (2014) |
| Required Interested Persons | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler, as representative of minor beneficiaries |
| Power Holders | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | Meerkat Trust |

MDAS Children's Trust 2012

| Original Jurisdiction of Creation | Wyoming |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| Required Interested Persons | Jacqueline Pugh Sackler, as representative of minor beneficiaries |

| Power Holders | Mortimer D.A. Sackler |
|---|---|
| Possible Refunding Trust(s) | N/A |

### Nixie Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Leslie J. Schreyer |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Jacqueline Pugh Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007)<br><br>MDAS Minor Child 3 (2014) |
| Required Interested Persons | Jacqueline Pugh Sackler |
| Power Holders | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | N/A |

### Indian Wells Trust

| Original Jurisdiction of Creation | New York |
|---|---|
| Jurisdiction of Administration | New York |
| Governing Law Jurisdiction | New York |
| Current Trustee(s) | Leslie J. Schreyer<br><br>Jacqueline Pugh Sackler |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Jacqueline Pugh Sackler<br><br>MDAS Minor Child 1 (2004)<br><br>MDAS Minor Child 2 (2007) |

|  | MDAS Minor Child 3 (2014) |
|---|---|
| **Required Interested Persons** | Jacqueline Pugh Sackler |
| **Power Holders** | Mortimer D.A. Sackler<br><br>Jacqueline Pugh Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDS 2006 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Michael D. Sackler<br><br>    MDS Minor Child 1 (2019)<br><br>    MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler<br><br>Theresa Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDS 1992 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| Current Trustee(s) | Chelsea Trust Company Limited |
|---|---|
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Theresa Sackler<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | Silver Trust |

MDS Beacon 2010 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDS Beacon 2011 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|

| | |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MDS Family Trust 2010

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Michael D. Sackler<br><br>MDS Minor Child 1 (2019)<br><br>MDS Minor Child 2 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Michael D. Sackler |
| **Possible Refunding Trust(s)** | Cobo Bay Trust<br><br>Lune River Trust<br><br>Mondai Trust |

| | Silver Trust |
|---|---|

### MTS 2013 Family Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

### MTS 2016 Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017) |

| | |
|---|---|
| | MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Beacon 2013 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Flat Creek Fiduciary Management LLC |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Required Interested Persons** | Marissa T. Sackler |
| **Power Holders** | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Beacon 2014 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |

| Jurisdiction of Administration | Wyoming |
|---|---|
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| Required Interested Persons | Marissa T. Sackler |
| Power Holders | Hermance Schaepman<br><br>Leslie J. Schreyer<br><br>Jeffrey A. Robins<br><br>Marissa T. Sackler |
| Possible Refunding Trust(s) | N/A |

MTS Beacon 2015 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Flat Creek Fiduciary Management LLC |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| Required Interested Persons | Marissa T. Sackler |
| Power Holders | Hermance Schaepman |

|  | Leslie J. Schreyer |
|  | Jeffrey A. Robins |
|  | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

### MTS Beacon Trust 2010

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

### MTS Beacon Trust 2011

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler |

|  | MTS Minor Child 1 (2017) |
|  | MTS Minor Child 2 (2019) |
|  | MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Alexa M. Saunders |
|  | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Beacon Trust 2012

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler |
|  | MTS Minor Child 1 (2017) |
|  | MTS Minor Child 2 (2019) |
|  | MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Alexa M. Saunders |
|  | Marissa T. Sackler |
| **Possible Refunding Trust(s)** | N/A |

MTS Family Trust 2010

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |

| | |
|---|---|
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Marissa T. Sackler<br><br>MTS Minor Child 1 (2017)<br><br>MTS Minor Child 2 (2019)<br><br>MTS Minor Child 3 (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Marissa T. Sackler |
| **Possible Refunding Trust(s)** | Cobo Bay Trust<br><br>Lune River Trust<br><br>Mondai Trust<br><br>Silver Trust |

SDS 1992 Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| **Power Holders** | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Sophia Dalrymple<br><br>Theresa Sackler |

| Possible Refunding Trust(s) | Silver Trust |
|---|---|

### SDS Beacon 2011 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders<br><br>Sophia Dalrymple |
| Possible Refunding Trust(s) | N/A |

### SDS Family Trust 2010

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Sophia Dalrymple<br><br>SD Minor Child 1 (2013)<br><br>SD Minor Child 2 (2015) |
| Power Holders | Hermance Schaepman<br><br>Alexa M. Saunders |

|  | Sophia Dalrymple |
| --- | --- |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
|  | Lune River Trust |
|  | Mondai Trust |
|  | SDS Beacon 2014 Trust |
|  | Silver Trust |

Romas Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| --- | --- |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | All beneficiaries are Excluded Beneficiaries |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Sheffield Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| --- | --- |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Chelsea Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | All beneficiaries are Excluded Beneficiaries |

| Power Holders | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| | Mortimer D.A. Sackler |
| | Leslie J. Schreyer |
| Possible Refunding Trust(s) | Mondai Trust |
| | Racine Trust |

### SSSH 2013 Family Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

### SSSH Beacon 2013 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |

| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

### Samantha Hunt 1996 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
| --- | --- |
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| | Mortimer D.A. Sackler |
| Possible Refunding Trust(s) | Silver Trust |

### Samantha S. Hunt 2002 Trust

| Original Jurisdiction of Creation | Jersey, Channel Islands |
| --- | --- |
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Chelsea Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | All beneficiaries are Excluded Beneficiaries |
| Power Holders | Hermance Schaepman |
| | Alexa M. Saunders |
| Possible Refunding Trust(s) | N/A |

A-Side IAC Payment Parties

Beacon Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Heatheridge Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015) |

| | Michael D. Sackler |
| --- | --- |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Bowland Company Limited |
| | Alexa M. Saunders |
| | Leslie J. Schreyer |
| | Jorg Fischer |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |
| | Lune River Trust |

Canadian Partnership Trust

| | |
| --- | --- |
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Sandiway Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |

| | MDAS Minor Child 1 (2004) |
|---|---|
| | MDAS Minor Child 2 (2007) |
| | MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Bowland Company Limited |
| **Possible Refunding Trust(s)** | N/A |

Clover Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |

|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Fidinc Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hagen Trust Company Limited |
| **Beneficiary Interested Persons and** | Theresa Sackler |

| **Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt |
| --- | --- |
| | Jeffrey M. Lefcourt |
| |     JML Minor Child 1 (2009) |
| |     JML Minor Child 2 (2011) |
| |     JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| |     KL Minor Child 1 (2009) |
| |     KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| |     MDAS Minor Child 1 (2004) |
| |     MDAS Minor Child 2 (2007) |
| |     MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| |     MTS Minor Child (2017) |
| | Sophia Dalrymple |
| |     SD Minor Child 1 (2013) |
| |     SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| |     MDS Minor Child (2019) |
| |     MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
| | Bowland Company Limited |
| | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Halm Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hillside Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br>    MDS Minor Child (2019) |

|  | MDS Minor Child (2021) |
|---|---|
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Hercules Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>　JML Minor Child 1 (2009)<br><br>　JML Minor Child 2 (2011)<br><br>　JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>　KL Minor Child 1 (2009)<br><br>　KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>　MDAS Minor Child 1 (2004)<br><br>　MDAS Minor Child 2 (2007)<br><br>　MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler |

|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | Cobo Bay Trust |

Medichem Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hillside Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |

|  |  |
|---|---|
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  |    MDAS Minor Child 1 (2004) |
|  |    MDAS Minor Child 2 (2007) |
|  |    MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  |    MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  |    SD Minor Child 1 (2013) |
|  |    SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  |    MDS Minor Child (2019) |
|  |    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Memphis Pharma Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Maydean Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt |

|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

MIL Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |

| **Jurisdiction of Administration** | Jersey, Channel Islands |
|---|---|
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br>    MDS Minor Child (2019)<br><br>    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |

|  | Bowland Company Limited<br><br>Alexa M. Saunders |
|---|---|
| **Possible Refunding Trust(s)** | N/A |

Milton Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Hillside Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple |

|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Mundilab Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Tayleigh Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |

|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Pickering Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
|---|---|
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Themar Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
|  | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |

|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |
|  | Marissa T. Sackler |
|  | MTS Minor Child (2017) |
|  | Sophia Dalrymple |
|  | SD Minor Child 1 (2013) |
|  | SD Minor Child 2 (2015) |
|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | Silver Trust |

Tom & Kelly Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |

| **Current Trustee(s)** | Sandiway Trust Company Limited |
|---|---|
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015)<br><br>Michael D. Sackler<br><br>    MDS Minor Child (2019)<br><br>    MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders |

| Possible Refunding Trust(s) | Mondai Trust |
|---|---|

**Varus Trust**

| Original Jurisdiction of Creation | Jersey, Channel Islands |
|---|---|
| Jurisdiction of Administration | Jersey, Channel Islands |
| Governing Law Jurisdiction | Jersey, Channel Islands |
| Current Trustee(s) | Millborne Trust Company Limited |
| Beneficiary Interested Persons and Beneficiaries Under Legal Disability | Theresa Sackler<br><br>Ilene Sackler Lefcourt<br><br>Jeffrey M. Lefcourt<br><br>    JML Minor Child 1 (2009)<br><br>    JML Minor Child 2 (2011)<br><br>    JML Minor Child 3 (2017)<br><br>Karen Lefcourt<br><br>    KL Minor Child 1 (2009)<br><br>    KL Minor Child 2 (2012)<br><br>Kathe Sackler<br><br>Mortimer D.A. Sackler<br><br>    MDAS Minor Child 1 (2004)<br><br>    MDAS Minor Child 2 (2007)<br><br>    MDAS Minor Child 3 (2014)<br><br>Marissa T. Sackler<br><br>    MTS Minor Child (2017)<br><br>Sophia Dalrymple<br><br>    SD Minor Child 1 (2013)<br><br>    SD Minor Child 2 (2015) |

|  | Michael D. Sackler |
|  | MDS Minor Child (2019) |
|  | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman |
|  | Bowland Company Limited |
|  | Alexa M. Saunders |
| **Possible Refunding Trust(s)** | N/A |

Taddeo Trust

| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Taddeo Fiduciary Management Inc. |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Ilene Sackler Lefcourt |
|  | Jeffrey M. Lefcourt |
|  | JML Minor Child 1 (2009) |
|  | JML Minor Child 2 (2011) |
|  | JML Minor Child 3 (2017) |
|  | Karen Lefcourt |
|  | KL Minor Child 1 (2009) |
|  | KL Minor Child 2 (2012) |
|  | Kathe Sackler |
|  | Mortimer D.A. Sackler |
|  | MDAS Minor Child 1 (2004) |
|  | MDAS Minor Child 2 (2007) |
|  | MDAS Minor Child 3 (2014) |

| **Required Interested Persons** | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | Karen Lefcourt |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |
| | Jacqueline Pugh Sackler, as representative of minor children of MDAS |
| **Power Holders** | Jeffrey A. Robins |
| **Possible Refunding Trust(s)** | Jackson River Trust |

Diagonal Blue Trust

| **Original Jurisdiction of Creation** | Jersey, Channel Islands |
| **Jurisdiction of Administration** | Jersey, Channel Islands |
| **Governing Law Jurisdiction** | Jersey, Channel Islands |
| **Current Trustee(s)** | Millborne Trust Company Limited |
| **Beneficiary Interested Persons and Beneficiaries Under Legal Disability** | Theresa Sackler |
| | Ilene Sackler Lefcourt |
| | Jeffrey M. Lefcourt |
| | JML Minor Child 1 (2009) |
| | JML Minor Child 2 (2011) |
| | JML Minor Child 3 (2017) |
| | Karen Lefcourt |
| | KL Minor Child 1 (2009) |
| | KL Minor Child 2 (2012) |
| | Kathe Sackler |
| | Mortimer D.A. Sackler |

| | |
|---|---|
| | MDAS Minor Child 1 (2004) |
| | MDAS Minor Child 2 (2007) |
| | MDAS Minor Child 3 (2014) |
| | Marissa T. Sackler |
| | MTS Minor Child (2017) |
| | Sophia Dalrymple |
| | SD Minor Child 1 (2013) |
| | SD Minor Child 2 (2015) |
| | Michael D. Sackler |
| | MDS Minor Child (2019) |
| | MDS Minor Child (2021) |
| **Power Holders** | Hermance Schaepman<br><br>Bowland Company Limited<br><br>Alexa M. Saunders<br><br>Millborne Trust Company Limited, as trustee of the MIL Trust |
| **Possible Refunding Trust(s)** | N/A |

**B-Side Sackler Party Trusts**

**Trust U/A 11/5/1974 fbo Beverly Sackler**

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Richard S. Sackler<br><br>Cedar Cliff Fiduciary Management, Inc. |
| **Beneficiary Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>　DAS Minor Child 1 (2014)<br><br>　DAS Minor Child 2 (2014)<br><br>　DAS Minor Child 3 (2016)<br><br>Marianna Sackler<br><br>MS Minor Child 1 (2015)<br><br>MS Minor Child 2 (2019)<br><br>MS Minor Child 3 (2021)<br><br>Rebecca Sackler<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>　CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>Jaseleen Sackler, as representative of minor children of DAS |

| | Marianna Sackler |
| | Rebecca Sackler |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Power Holders** | Richard S. Sackler |
| | David A. Sackler |
| | Marianna Sackler |
| | Rebecca Sackler |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

AR Irrevocable Trust

| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Crystal Fiduciary Company LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
| | David A. Sackler |
| |    DAS Minor Child 1 (2014) |
| |    DAS Minor Child 2 (2014) |
| |    DAS Minor Child 3 (2016) |
| | Marianna Sackler |

|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
|  | David A. Sackler |
|  | Jaseleen Sackler, as representative of minor children of DAS |
|  | Marianna Sackler |
|  | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
|  | David A. Sackler |
|  | Rebecca Sackler |
|  | Marianna Sackler |
|  | Leslie J. Schreyer |
|  | Stephen A. Ives |
| **Possible Refunding Trust(s)** | 1974 Irrevocable Trust fbo BS and RSS |

RRS Trust 1 dtd 12/23/1989

| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
|  | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | David A. Sackler |
|  | DAS Minor Child 1 (2014) |

| | |
|---|---|
| | DAS Minor Child 2 (2014) |
| | DAS Minor Child 3 (2016) |
| | Marianna Sackler |
| | MS Minor Child 1 (2015) |
| | MS Minor Child 2 (2019) |
| | MS Minor Child 3 (2021) |
| | Rebecca Sackler |
| **Required Interested Persons** | David A. Sackler |
| | Jaseleen Sackler, as representative of minor children of DAS |
| | Marianna Sackler |
| | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
| | David A. Sackler |
| | Marianna Sackler |
| | Rebecca Sackler |
| **Possible Refunding Trust(s)** | N/A |

RRS Trust 1B dtd 12/23/1989

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
| | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | David A. Sackler |
| | DAS Minor Child 1 (2014) |

| | |
|---|---|
| | DAS Minor Child 2 (2014) |
| | DAS Minor Child 3 (2016) |
| | Marianna Sackler |
| | MS Minor Child 1 (2015) |
| | MS Minor Child 2 (2019) |
| | MS Minor Child 3 (2021) |
| | Rebecca Sackler |
| **Required Interested Persons** | David A. Sackler |
| | Jaseleen Sackler, as representative of minor children of DAS |
| | Marianna Sackler |
| | Rebecca Sackler |
| **Power Holders** | Richard S. Sackler |
| | David A. Sackler |
| | Marianna Sackler |
| | Rebecca Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration |
| | New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
| | David A. Sackler |

|  | DAS Minor Child 1 (2014) |
|---|---|
|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |
|  | MS Minor Child 3 (2021) |
|  | Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

| **Original Jurisdiction of Creation** | Connecticut |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler |
|  | David A. Sackler |
|  | DAS Minor Child 1 (2014) |
|  | DAS Minor Child 2 (2014) |
|  | DAS Minor Child 3 (2016) |
|  | Marianna Sackler |
|  | MS Minor Child 1 (2015) |
|  | MS Minor Child 2 (2019) |

|  | MS Minor Child 3 (2021)<br><br>Rebecca Sackler |
|---|---|
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |

**Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler**

| **Original Jurisdiction of Creation** | Connecticut |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Data LLC |
| **Beneficiary Interested Persons** | Richard S. Sackler<br><br>David A. Sackler<br><br>　DAS Minor Child 1 (2014)<br><br>　DAS Minor Child 2 (2014)<br><br>　DAS Minor Child 3 (2016)<br><br>Marianna Sackler<br><br>MS Minor Child 1 (2015)<br><br>MS Minor Child 2 (2019)<br><br>MS Minor Child 3 (2021)<br><br>Rebecca Sackler |
| **Required Interested Persons** | Richard S. Sackler |
| **Power Holders** | Richard S. Sackler |
| **Possible Refunding Trust(s)** | N/A |

AJ Irrevocable Trust

| Original Jurisdiction of Creation | Wyoming |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>   CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Power Holders | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler<br><br>Brian Olson<br><br>Garrett Lynam |
| Possible Refunding Trust(s) | 1974 Irrevocable Trust fbo BS and JDS |

RRS Trust 2 dtd 12/23/1989

| Original Jurisdiction of Creation | Connecticut |
|---|---|
| Jurisdiction of Administration | Wyoming |

| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
|---|---|
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>　CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Power Holders | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| Possible Refunding Trust(s) | N/A |

RRS Trust 2B dtd 12/23/1989

| Original Jurisdiction of Creation | Connecticut |
|---|---|
| Jurisdiction of Administration | Wyoming |
| Governing Law Jurisdiction | Wyoming as to Administration<br><br>New York as to validity and construction |
| Current Trustee(s) | Cornice Fiduciary Management LLC |
| Beneficiary Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>　CS Minor Child (2019)<br><br>Miles Sackler |
| Required Interested Persons | Madeleine Sackler |

|  |  |
|---|---|
|  | Clare Sackler<br><br>Miles Sackler |
| **Power Holders** | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| **Power Holders** | N/A |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |

| | |
|---|---|
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>   CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| **Power Holders** | N/A |
| **Possible Refunding Trust(s)** | N/A |

Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to Administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>   CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| **Power Holders** | N/A |

| | |
|---|---|
| **Possible Refunding Trust(s)** | N/A |

## Hudson Trust

| | |
|---|---|
| **Original Jurisdiction of Creation** | Wyoming |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Person** | Mary Corson |
| **Power Holders** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Possible Refunding Trust(s)** | Mary Corson Trust |

## Irrevocable Trust under Declaration dated as of December 29, 1992

| | |
|---|---|
| **Original Jurisdiction of Creation** | Connecticut |
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming as to administration<br><br>New York as to validity and construction |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |

| Beneficiary Interested Persons | Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
|---|---|
| **Required Interested Persons** | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Power Holders** | Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

JDS Revocable Pourover Trust

| Original Jurisdiction of Creation | Wyoming |
|---|---|
| **Jurisdiction of Administration** | Wyoming |
| **Governing Law Jurisdiction** | Wyoming |
| **Current Trustee(s)** | Cornice Fiduciary Management LLC |
| **Beneficiary Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>    CS Minor Child (2019)<br><br>Miles Sackler |
| **Required Interested Persons** | Mary Corson<br><br>Madeleine Sackler<br><br>Clare Sackler<br><br>Miles Sackler |

| Power Holders | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Possible Refunding Trust(s)** | N/A |

Estate of Jonathan D. Sackler

| **Situs and Principal Place of Administration** | Connecticut |
| **Court Admitting Original Will to Probate and Issuing Permanent Letters to Personal Representative** | Greenwich Probate Court |
| **Current Personal Representative** | Garrett Lynam |
| **Beneficiary Interested Persons** | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| **Required Interested Persons** | Mary Corson |
| | Madeleine Sackler |
| | Clare Sackler |
| | Miles Sackler |
| | Cornice Fiduciary Management LLC, as Trustee of the JDS Revocable Pourover Trust |
| **Power Holders** | N/A |

**Exhibit R**
**Form of Estate Certification**

## [FORM OF] ESTATE CERTIFICATION

THIS ESTATE CERTIFICATION (this "Certification") is being delivered to [Master Disbursement Trust], a Delaware statutory trust (the "MDT"), by the undersigned party or parties (the "Certifying Party") as of the [Effective Date][this _____ day of _____]. MDT shall be entitled to rely on this Certification to the fullest extent permitted by applicable law.

Capitalized terms as used herein but otherwise not defined shall have the meanings given them, in the Settlement Agreement [dated as of [____], 2021] among the MDT, the Sackler Parties (as defined therein and including [                    ]) and the Debtors (as defined therein) as contemplated by the chapter 11 plan filed by the Debtors (the "Settlement Agreement"). Any singular term in this Certificate shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein or in the Settlement Agreement, each of its other grammatical forms shall have a corresponding meaning.

RECITALS

WHEREAS, [the receipt by the MDT of an Estate Certification [substantially] in the form of this Certification from the Certifying Party [is a condition precedent [to the MDT entering into, and] to the effectiveness of the Settlement Agreement and the granting of certain releases in the manner and to the extent set forth therein] OR [is required under a Settlement Document (as defined in the Settlement Agreement) for [describe]; and

WHEREAS, the Certifying Party understands that [the MDT is entering into the Settlement Documents and consummating the transactions contemplated thereby in reliance on this Certification] OR [describe other specific requirement being satisfied and goal accomplished by executing Certification and causing an original thereof to be delivered to MDT].

AGREEMENT

3.  NOW, THEREFORE, the undersigned Certifying Party does hereby represent, warrant, certify, acknowledge and agree as follows:

g)  The undersigned Certifying Party is the sole personal representative of the Estate of Jonathan D. Sackler, date of death June 30, 2020 (the "JDS Estate").

h)  The last Will and Testament of Jonathan D. Sackler, dated August 15, 2019 was admitted to probate in the Greenwich County, Connecticut probate court (the "Probate Court") on July 14, 2020 (the "Last Will and Testament"), and no codicils or documents purporting to be the last Will and Testament of Jonathan D. Sackler have been filed with the Probate Court or any other probate court.

i)  Letters testamentary were issued to the Certifying Party on July 14, 2020 (a recent copy of the Fiduciary's Probate Certificate being attached hereto as Schedule A) and the

Certifying Party has sole control over the JDS Estate as the sole personal representative thereof.

j)  The information set forth in Exhibits [K and Q] of the Settlement Agreement as it relates to the Certifying Party and the JDS Estate is true and correct as of the date hereof and the Certifying Party has not engaged in any act of fraud or willful misconduct in making any representation or warranty in any Settlement Document in its capacity as personal representative of the JDS Estate.

k)  Notwithstanding anything to the contrary in any Settlement Document, the Certifying Party (i) is providing this Certification to MDT in its own individual capacity and (ii) will not in its own or any other capacity intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under the Settlement Agreement or the Settlement Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations; *provided* that, the Certifying Party shall have no personal liability hereunder except in the case of such Certifying Party's own fraud or willful misconduct (as such term is defined in Section 9.04 of the Settlement Agreement).

l)  The Certifying Party agrees that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Certification or in any Settlement Document shall be brought in the Bankruptcy Court, and hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event the Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. The Certifying Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on the Certifying Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, the Certifying Party agrees that service of process on such Certifying Party as provided in Section 11.01 of the Settlement Agreement shall be deemed effective service of process on the Certifying Party. For the avoidance of doubt, nothing in this Section 1 (f) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.

m) [The Certifying Party agrees that any Proceeding arising under, related to, or in connection with this Certification [or the Settlement Documents], including any action

seeking specific performance of any provision of or declaratory judgment concerning this Certification [or the Settlement Documents], shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, the Certifying Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.]

[*Signature Page Follows Containing Signature of Personal Representative of the JDS Estate*]

_____

[Name of Personal Representative]

Signature Page to Estate Certification with respect to the JDS Estate

**SCHEDULE A**
**FIDUCIARY'S PROBATE CERTIFICATE**

**<u>Exhibit S</u>**
**Designated Shareholder Released Parties**

**Exhibit T**
**De Minimis Payment Parties**

De Minimis Payment Parties (A-Side Payment Parties)

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| None | None |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| Ilene S. Lefcourt Trust 96 | Mortimer DA Sackler Trust 1996 |
| | Mortimer DA Sackler Trust 2002 |
| | MDAS 2011 Family Trust |
| | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| | Trust under Agreement dated the 11th day of May 2005 |
| | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| | MDAS Children's Trust 2012 |
| | Nixie Trust |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| MDS 2006 Trust | MTS Beacon 2014 Trust |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| None | SSSH Beacon 2013 Trust |

**De Minimis Payment Parties (B-Side Payment Parties)**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Rosebay Medical Company, Inc. | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

**<u>Exhibit U</u>**
**Illustrative Examples**

## **Exhibit V**
**Joinder Agreement**

## JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "**Agreement**") is made as of the date indicated in the signature block below (the "**Effective Date**") by the undersigned (the "**Joining Party**").

1.    Joinder. The Joining Party hereby confirms that it has been furnished with a copy of, and has carefully read, the Settlement Agreement, dated August [ ], 2021, by and among the MDT (as defined therein), the Sackler Parties listed on Exhibit A thereto and Debtors listed on Exhibit B thereto, as may be amended from time to time (the "**Settlement Agreement**"), prior to its execution of this Agreement.  By executing this Agreement, the Joining Party becomes a party to, and agrees to be bound by and subject to the terms of, the Settlement Agreement as a (a) Sackler Party, (b) Payment Party or IAC Payment Party and (c) as a member of the Payment Group, with respect to clauses (b) and (c) above, each as indicated in the signature block below[, and hereby expressly assumes, and agrees to pay and perform, any and all obligations of _____ pursuant to the Settlement Agreement].

2.    Definitions. Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the Settlement Agreement.

3.    Interpretive Provisions. The Interpretive Provisions set forth in Section 1.02 of the Settlement Agreement shall apply, *mutatis mutandis*, to this Joinder Agreement (including without limitation that the rights and obligations of a trust that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the trustees of such trusts, in their capacity as such).

4.    Representations and Warranties.  The Joining Party makes, in its capacity as a Sackler Party and as of the Effective Date, the representations and warranties contained in Sections 7.01, 7.02 and 7.03 of the Settlement Agreement, as applicable. [In addition, the Joining Party represents and warrants that its Jurisdiction of Administration is as set out on the signature page hereto.]

5.    Full Force and Effect. All of the terms, covenants, agreements, conditions and other provisions of the Settlement Agreement shall remain in full force and effect in accordance with their respective terms.

6.    Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction; *provided, however,* that for the avoidance of doubt and as set forth in Section 11.10 of the Settlement Agreement, each of MDT and the Debtors shall have the benefit in connection with any matter with respect to a party to this Joinder Agreement that is a Trust arising from or related to this Joinder Agreement of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on the representations made by them in their capacities as trustees under the internal laws of such Trust's Jurisdiction of Administration, but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Joining Party has executed and delivered this Agreement as of the date first above written.

JOINING PARTY:

_____

Name: _____

Date: _____

Payment Party:

IAC Payment Party:

Payment Group: _____

Jurisdiction of Administration:

**<u>Exhibit W</u>**
**Form of IAC Tax Distributions Report**

**Exhibit W-1**
**IAC Tax Distributions Quarterly Report (Schedule 1)**

**EXHIBIT [X] W-1**

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)**
**(MODEL TEMPLATE) [NORTH BAY ASSOCIATES]**

[_____], 20[___]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions.

Reference is made to the taxable year ending December 31, 20[___].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity as an authorized officer of [North Bay Associates ], and not in any individual capacity, hereby states that the amounts set forth on Schedule 1 hereto of quarterly Tax Distributions received are accurate based on the information provided by the relevant IACs and IAC Payment Parties:

[North Bay Associates                    ]

By:      _____
Name:
Title:

This report is to be delivered thirty (30) days following the quarter close

EXHIBIT [X] -2W-1

**IAC TAX DISTRIBUTIONS QUARTERLY REPORT (SCHEDULE 1)**
**(MODEL TEMPLATE)**

~~Calculation of Quarterly Tax Distributions Received~~ [FN1]

**Calculation of Quarterly Tax Distributions Received** [FN1/FN2]

| Tax Distributions Computations | Totals | [Company 1] | [Company 2] |
|---|---|---|---|
| Amount of projected ~~net~~ book net income for relevant quarter [FN2][FN3] | | U.S. $ [        ] | U.S. $ [        ] |
| ~~Estimated foreign taxes~~Foreign income taxes paid (or estimated in good faith to be paid) in respect of projected book net ~~foreign~~ income (company level) [FN2][FN3/FN4] | | U.S. $ [        ] | U.S. $ [        ] |
| ~~Estimated foreign~~Foreign income taxes paid (or estimated in good faith to be paid) in respect of projected book net ~~foreign~~ income (shareholder level) [FN4][FN5] | | U.S. $ [        ] | U.S. $ [        ] |
| ~~Combined U.S. federal, state and local~~Foreign withholding tax rate [FN5][FN6] | | _____% | _____% |
| Foreign withholding ~~tax rate~~ taxes paid (or estimated in good faith to be paid) in respect of Tax Distribution [FN4] | | ~~_____%~~U.S. $ [_____] | ~~_____%~~U.S. $ [_____] |
| ~~Foreign withholding~~Amount of projected book net income for relevant quarter net of deduction for foreign taxes [FN3] | | U.S. $ [        ] | U.S. $ [        ] |
| Highest marginal combined U.S. federal, state, and local income tax rate [FN7] | | _____% | _____% |
| Highest marginal foreign income tax rate [FN8] | | _____% | _____% |
| Tax Distribution payable [FN9] | | U.S. $ [        ] | U.S. $ [        ] |
| Tax Distribution received for the quarter | | U.S. $ [        ] | U.S. $ [        ] |
| Total Tax Distributions received for relevant quarter and any prior quarters of relevant taxable year | | U.S. $ [        ] | U.S. $ [        ] |

---

[1]  The IACs do not necessarily make quarterly tax distribution. Schedule 1 needs to be adapted accordingly. Also, the IACs may adjust their projected book net income, foreign taxes, etc. as the year goes on.  IAC Tax Distributions as  the year progresses should be based on the running cumulative totals and not each quarter in isolation. Any such prior period adjustments that are taken into account in the current period line entries should be reflected in footnotes to Schedule 2̶1.

[2]  The template report may need to be expanded/modified based on the tiers of entities and the tax character and tax attributes of the IAC and any intermediate entities.

[3]̶3̶  Determined based on the IAC's management accounts without adjustments for US federal income tax purposes.

[4]̶3̶  This amount will be taken into account as a reduction in determining the Tax Distribution payable.

[5]̶ ̶T̶h̶e̶  Based on the highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.  Additional line entries will be needed for any intermediate company taxes.

2

[6] The foreign withholding tax rate for such period imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut.

[67] The highest marginal U.S. federal, state, and local income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of U.S. state and local ~~income~~ taxes.

[68] The highest marginal foreign ~~withholding~~income tax rate for such period ~~imposed on distributions~~applicable to a U.S. citizen who is a resident of the State of Connecticut.

[9] The greater of projected book net income less applicable deductions multiplied by (x) the highest marginal combined U.S. federal, state and local income tax rate or (y) the highest marginal applicable foreign income tax rate.

**Exhibit W-2**
**IAC Tax Distributions Annual Report (Schedule 2)**

**~~AC~~IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE) [~~INDEPENDENT~~APPROVED ACCOUNTANT]**

[_____], 20[__]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions ~~(U.S. federal income tax adjustments)~~.

I, on behalf of an [~~Independent~~Approved Accountant] and not in any individual capacity, hereby state that the attached Schedule 2 correctly reflects the ~~"Amount of U.S. federal taxable income," (ordinary income, capital gain (long-term) and other), "Amount of foreign taxes" and the "Amount of foreign withholding tax" shown on the attached Schedule 2 as the amount that was~~following items described in subclauses (ii) through (iv) of Section 3.02(a)(ii)(B)(x) based on the relevant amounts reported in the relevant portions of the U.S. federal income tax returns ~~(~~and any related work papers or other information~~)~~ provided to me ~~and that the calculations for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.~~ as well as the following items described in subclauses (v) and (vi) of Section 3.02(a)(ii)(B)(x):

(ii) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year;

(iii) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; and

(iv) any foreign withholding taxes paid or reasonably expected to be paid in respect of a Tax Distribution with respect to such amounts.

(v) the highest marginal U.S. federal, state, and local income and withholding tax rate for the relevant tax year applicable to a U.S. citizen who is a resident of the State of Connecticut (taking into account the deductibility, as applicable, of U.S. state and local taxes and the character of the income allocated to the applicable IAC Payment Party by the applicable IAC) and the highest foreign withholding tax rate and the highest marginal foreign income tax rate for the relevant tax year applicable to a U.S. citizen who is a resident of the State of Connecticut; and

(vi) the calculation of the total amount of IAC Tax Distributions payable with respect to the applicable taxable year pursuant to the Settlement Agreement.

[~~Independent~~Approved Accountant]

By: _____

Name:
Title:

This report is to be delivered sixty (60) days following the extended due date
(now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE) [NORTH BAY ASSOCIATES]**

[_____], 20[___]

Reference is made to the Settlement Agreement dated as of [_____], 2021 (the "Settlement Agreement") by and among the MDT, the Sackler Parties, the Debtors, and PRA L.P. (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Settlement Agreement.

This report is being delivered pursuant to Section 3.02(a)(ii) of the Settlement Agreement in connection with the Calculation of IAC Tax Distributions (U.S. federal income tax adjustments).

Reference is made to the taxable year ending December 31, 20[___].  Pursuant to Section 3.02(a)(ii) of the Settlement Agreement, the undersigned, in his/her capacity on behalf of [North Bay Associates            ], and not in any individual capacity, hereby states that

(xi) the amounts of book net income and IAC foreign taxes set forth on Schedule 2 hereto are accurate based on the information provided by the relevant IACs; and IAC Payment Parties;

(yii) the U.S. federal income tax items set forth on Schedule 2 (FN 1 items)hereto accurately reflect the amount reported in the applicable U.S. federal income tax returns; and (z) the calculation, including

(a) the sources, amounts and character for U.S. federal income Tax purposes of taxable income, net of all deductions other than deductions of foreign taxes, allocated to the applicable IAC Payment Party for the relevant tax year;

(b) any foreign income taxes paid or reasonably expected to be paid relating to such amounts; and

(c) the amount of net U.S. federal taxable income net of all deductions including deductions of foreign taxes; and

(iii) the calculations for Schedule 2 of "Total Tax Distribution Payable" are correct based on the information provided in Schedule 2.

[North Bay Associates            ]]

By:    _____
Name:
Title:

3

This report is to be delivered thirty (30) days following the extended due date
(now October 15) for filing individual US federal income tax returns.

**IAC TAX DISTRIBUTION ANNUAL REPORT (SCHEDULE 2)**
**(MODEL TEMPLATE)**

**Calculation of IAC Tax Distributions**
**U.S. federal income tax adjustments** [FN1]

| *Tax Distribution Computation* | *Totals* | *[Company 1]* | *[Company 2]* |
|---|---|---|---|
| Amount of ~~net~~ book *net* income (management accounts) | | U.S. $[    ] | U.S. $[    ] |
| Amount of U.S. federal taxable income [FN1], *net of all deductions other than deductions of foreign taxes, allocated to the IAC Payment Party* [FN2]<br><br>• Ordinary<br>• Capital gain  (long-term)<br>• Other [FN3] | | <br><br>U.S. $[    ]<br>U.S. $[    ]<br>U.S. $[    ] | <br><br>U.S. $[    ]<br>U.S. $[    ]<br>U.S. $[    ] |
| Amount of foreign *income* taxes *paid (or reasonably expected to be paid)* in respect of *such* U.S. *federal* taxable income [FN2] | | U.S. $[    ] | U.S. $[    ] |
| *Foreign withholding tax rate* [FN4] | | [    %    ] | [    %    ] |
| Amount of foreign withholding taxes paid *(or reasonably expected to be paid)* in respect of Tax Distribution [FN3]FN5 | | U.S. $[    ] | U.S. $[    ] |
| Amount of net U.S. federal taxable income ~~FN1, FN5~~*net of all deductions including deductions of foreign taxes* [FN2] [FN6]<br><br>Ordinary income<br>Capital gain (long-term)<br>Other [FN3] | | U.S. $[    ]<br><br>~~U.S. $[    ]~~<br><br>~~U.S. $[    ]~~ | U.S. $[    ]<br>~~U.S. $[    ]~~<br>~~U.S. $[    ]~~ |
| ~~Combined~~*Highest marginal* U.S. federal, state, *and* local *income and withholding* tax rate ~~FN4FN7~~<br><br>• Ordinary income<br>• Capital gain (long-term)<br>• Other [FN3] | | <br><br>[    %    ]<br><br>[    %    ] | <br><br>[    %    ]<br><br>[    %    ] |
| ~~Combined U.S. federal state and local taxes~~<br>• ~~Ordinary income~~<br>• ~~Capital gain~~<br>• ~~Other~~ [FN2]*Highest marginal foreign income tax rate* [FN8] | | ~~U.S. $[    ]~~<br>~~U.S. $[    ]~~<br>~~U.S. $~~ [ %    ] | ~~U.S. $[    ]~~<br>~~U.S. $[    ]~~<br>~~U.S. $~~ [   %    ] |
| *Total Tax Distributions payable* [FN9] | | U.S. $[    ] | U.S. $[    ] |
| *Tax Distributions received in respect of ~~IAC's~~an IAC for relevant taxable year* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of Tax Distributions to be recharacterized as IAC Non-Tax Distribution* | | U.S. $[    ] | U.S. $[    ] |
| *Amount of Tax Distributions remaining to be paid* | | U.S. $[    ] | U.S. $[    ] |

[1]  The template report may need to be expanded/modified based on the tiers of entities and the tax character and tax attributes of the IAC and any intermediate entities.

[2]  Amount reflected on US federal income tax return.

5

<sup>23</sup> This is intended to cover any other categories that may become relevant.

<sup>3</sup> ~~This is the amount reflected on Schedule 1 for the year.~~

<sup>4</sup> The ~~highest marginal U.S. federal, state, and local income and~~foreign withholding tax rate for such period ~~applicable~~imposed on distributions to a U.S. citizen who is a resident of the State of Connecticut~~, taking into account the deductibility, as applicable, of state and local income taxes~~.

<sup>5</sup> This is the amount reflected on Schedule 1 for the year.

<sup>56</sup> This amount is equal to the "Amount of U.S. federal taxable income" less "Amount of foreign income taxes" less "Amount of foreign withholding taxes<sup>7</sup>." The deduction for foreign income and withholding taxes will be allocated as a deduction to capital gain ~~or~~, ordinary income, and other income in accordance with applicable law. Such deduction will only be ~~claimed for IAC structures that include~~taken into account where the deduction is available to such U.S. citizen (e.g., because such foreign taxes are paid by a pass-through ~~entities~~entity of such U.S. citizen for U.S. federal income tax purposes).

<sup>7</sup> The highest marginal U.S. federal, state, and local income and withholding tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the deductibility, as applicable, of U.S. state and local taxes.

<sup>8</sup> The highest marginal foreign income tax rate for such period applicable to a U.S. citizen who is a resident of the State of Connecticut.

<sup>9</sup> The greater of U.S. federal taxable income less applicable deductions multiplied by (x) the highest marginal combined U.S. federal, state and local income tax rate or (y) the highest marginal applicable foreign income tax rate.

**Exhibit X**
**Certain Shareholder Released Parties**

**CERTAIN A-SIDE RELEASE PARTIES[1]**

**Individual Family Members**

1. Theresa E. Sackler
2. Ilene Sackler Lefcourt
3. Kathe A. Sackler
4. Mortimer D.A. Sackler
5. Michael Sackler
6. Marissa Sackler
7. Sophie Dalrymple
8. Samantha Hunt
9. The spouses, children and grandchildren of the above
10. The assets, businesses and entities owned by the above.

**Trusts, Trustees and Protectors**

11. 533 Canal Trust
12. Alexa M. Saunders
13. Anthony M. Roncalli
14. Angonoka Trust
15. Beacon Trust
16. Beacon Trust Company Limited
17. BJSS 2010 Trust
18. BJSS 2013 Trust
19. BJSS and JHSS 2012 K Trust
20. Benjamin Shack Sackler Trust 98
21. Bowland Company Limited
22. Canadian Partnership Trust
23. Charles G. Lubar
24. Christopher B. Mitchell (and the estate of Christopher B. Mitchell)
25. Chelsea Trust Company Limited
26. Christopher M. Reimer
27. Clover Trust
28. Cobo Bay Trust
29. Codan Trust Company Limited
30. Diagonal Blue Trust
31. Estera Services (Bermuda) Limited/Ocorian Services (Bermuda) Limited
32. Fidinc Trust
33. Flat Creek Fiduciary Management LLC
34. Flat Creek Purpose Trust
35. Frontier Directed Fiduciary Services LLC

---

[1] For the avoidance of doubt, the inclusion of any person on this list who also fits within a category on this list that is also a category in the release shall not be construed to narrow such category or to support an inference that another person within such category but not on this list is not a released party.

| 36. | Gorey Trust |
| 37. | Glebe Trust II |
| 38. | Hagen Trust Company Limited |
| 39. | Halm Trust |
| 40. | Heatheridge Trust Company Limited |
| 41. | Hercules Trust |
| 42. | Hermance Schaepman |
| 43. | Highland Court Trust |
| 44. | Hillside Trust Company Limited |
| 45. | Ilene S. Lefcourt Trust 88 |
| 46. | Ilene S. Lefcourt Trust 96 |
| 47. | Ilene Sackler Lefcourt Revocable Trust |
| 48. | Indian Wells Trust |
| 49. | Inholmes Trust |
| 50. | ISL 2010 Family Trust |
| 51. | ISL 2011 Family Trust |
| 52. | ISL JML OSHA Trust |
| 53. | ISL LT Children's Trust |
| 54. | Jackson River Trust |
| 55. | Jeffrey A. Robins |
| 56. | JHSS 2010 Trust |
| 57. | JHSS 2013 Trust |
| 58. | JML 2010 Family Trust |
| 59. | JML 2011 Family Trust |
| 60. | JML Investment Trust |
| 61. | JML OSHA Trust |
| 62. | JML Pour-Over Trust |
| 63. | Joerg Fischer |
| 64. | Jonathan G. White |
| 65. | Julia Shack Sackler Trust 98 |
| 66. | Karen Lefcourt Trust |
| 67. | KAS 2010 Family Trust |
| 68. | KAS 2011 Family Trust |
| 69. | Kathe A. Sackler 2001 Trust |
| 70. | Kathe A. Sackler Trust 88 |
| 71. | Kathe A. Sackler Trust 96 |
| 72. | Kerry J. Sulkowicz |
| 73. | KLT 2010 Family Trust |
| 74. | KLT 2011 Family Trust |
| 75. | KLT Pour-Over Trust |
| 76. | La Coupe Trust |
| 77. | La Digue Limited |
| 78. | Leslie J. Schreyer |
| 79. | LSRR Family Trust |
| 80. | Lune River Trust |
| 81. | May Trust |
| 82. | Maydean Trust Company Limited |

3

83.   MDAS 2010 Family Trust
84.   MDAS 2011 Family Trust
85.   MDAS 2012 Children's Trust
86.   MDAS Investment Trust
87.   Michael D. Sackler 1992 Trust
88.   Michael D. Sackler 2002 Trust
89.   Michael D. Sackler 2006 Trust
90.   MDS Beacon 2010 Trust
91.   MDS Beacon 2011 Trust
92.   MDS Beacon 2012 Trust
93.   MDS Beacon 2013 Trust
94.   MDS Family Trust
95.   Medichem Trust
96.   Meerkat Trust
97.   Memphis Pharma Trust
98.   MIL Trust
99.   Millborne Trust Company Limited
100.  Millennium Trust
101.  Milton Trust
102.  Mondai Trust
103.  Mordas Consolidated Purpose Trust
104.  Mordas Trust Company Limited
105.  Mortimer DA Sackler Trust 1996
106.  Mortimer DA Sackler Trust 2002
107.  Morvetta Trust
108.  MTS 2002 Trust
109.  MTS 2006 Trust
110.  MTS 2013 Family Trust
111.  MTS 2016 Trust
112.  MTS Bare Trust
113.  MTS Beacon 2010 Trust
114.  MTS Beacon 2011 Trust
115.  MTS Beacon 2012 Trust
116.  MTS Beacon 2013 Trust
117.  MTS Beacon 2014 Trust
118.  MTS Beacon 2015 Trust
119.  MTS Family Trust
120.  MTS Trust 2006
121.  Mundi Lab Trust
122.  Nixie Trust
123.  PALP Trust
124.  Perelle Bay Trust
125.  Peter M. Ward (and the estate of Peter M. Ward)
126.  Pickering Trust
127.  Racine Trust
128.  Reserve Trust
129.  Romas Trust 2002

130. Sandiway Trust Company Limited
131. Samantha Hunt 1996 Trust
132. Samantha S. Hunt 2002 Trust
133. SASS 2010 Trust
134. SASS 2013 Trust
135. SDS 1992 Trust
136. SDS 2002 Trust
137. SDS 2006 Trust
138. SDS Bare Trust
139. SDS Beacon 2011 Trust
140. SDS Beacon 2012 Trust
141. SDS Beacon 2014 Trust
142. SDS Family Trust
143. Sheffield Trust
144. Silver Trust
145. Soft River Fiduciary Management LLC
146. Soft River Purpose Trust
147. SS Tanager Trust
148. SSSH 2013 Family Trust
149. SSSH Beacon 2013 Trust
150. Stuart D. Baker
151. Taddeo Fiduciary Management Inc.
152. Taddeo Purpose Trust
153. Taddeo Trust
154. Tayleigh Trust Company Limited
155. Tenzin Trust Company Limited
156. TES Bare Trust
157. TES Beacon 2012 Trust
158. TES Beacon 2013 Trust
159. TES Beacon 2014 Trust
160. Themar Consolidated Purpose Trust
161. Themar Trust Company Limited
162. Theresa E. Sackler 1988 Trust
163. Theresa E. Sackler 2008 Trust
164. Tom & Kelly Trust
165. Trust under Agreement dated the 11th day of May 2005
166. Trust under Agreement dated the 13th day of March 2009
167. Trust Under Declaration dated April 11, 2002
168. Trust Under Declaration of Trust No. 1 dated November 25, 1996
169. Trust Under Declaration of Trust No. 2 dated November 25, 1996
170. Varus Trust
171. The assets, businesses and entities owned by the above.

Purdue Parent Entities

172. Banela Corporation
173. Beacon Company
174. BR Holdings Associates Inc.

5

175.  BR Holdings Associates L.P.
176.  Heatheridge Trust Company Limited, as Trustee under Settlement dated 31 December 1993 F.B.O. the issue of Mortimer D. Sackler M.D., Theresa E. Sackler and certain charitable objects
177.  Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated 2 March 1999 F.B.O. Theresa E. Sackler, the issue of Mortimer D. Sackler, M.D. and certain charitable objects
178.  Pharmaceutical Research Associates L.P. (formerly Purdue Holdings L.P.)
179.  PLP Associates Holdings Inc.
180.  PLP Associates Holdings L.P.
181.  Purdue Pharma Inc.
182.  Stanhope Gate Corp.
183.  The assets, businesses and entities owned by the above (excluding the Debtors).
      Independent Associated Companies

184.  Accardi B.V.
185.  Accardi S.àr.l.
186.  Alfa Generics B.V.
187.  Arsago B.V.
188.  Bard Pharmaceuticals (1990) Inc.
189.  Bard Pharmaceuticals Limited
190.  Bermag Limited
191.  Boetti Corporation
192.  Boldini Corporation
193.  Bradenton Products B.V.
194.  Bulla S.àr.l.
195.  Clinical Designs Limited
196.  Clovio Corporation
197.  E.R.G. Realty, Inc.
198.  Elvium Life Sciences GP Inc.
199.  Elvium Life Sciences Limited Partnership
200.  Elvium ULC
201.  Euro-Celtique S.A.
202.  Evening Star Services Limited
203.  Filti S.àr.l.
204.  Flira S.àr.l.
205.  Hayez Corporation
206.  Ind S.àr.l.
207.  Irey S.àr.l.
208.  Krugmann GmbH
209.  Ladenburg B.V.
210.  Lake Claire Investments Limited
211.  L.P. Clover Limited
212.  Lucien Holdings S.àr.l.
213.  Lymit Holdings S.àr.l.
214.  Maltus Corporation
215.  Marnine Holdings Pte. Limited
216.  Martone Holdings Pte. Limited

217.  Mexcus Corporation
218.  MN Consulting LLC
219.  MNP Consulting Limited
220.  Mundibiopharma Limited
221.  Mundichemie GmbH
222.  Mundipharma (Argentina) S.r.l.
223.  Mundipharma (China) Pharmaceutical Company Limited
224.  Mundipharma (Colombia) S.A.S.
225.  Mundipharma (Hong Kong) Limited
226.  Mundipharma (Myanmar) Co., Limited
227.  Mundipharma (Proprietary) Limited
228.  Mundipharma (Shanghai) International Trade Company Limited
229.  Mundipharma (Thailand) Limited
230.  Mundipharma A.S.
231.  Mundipharma A/S
232.  Mundipharma AB
233.  Mundipharma AG
234.  Mundipharma B.V.
235.  Mundipharma Biologics GmbH
236.  Mundipharma Biologics Inc.
237.  Mundipharma Bradenton B.V.
238.  Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
239.  Mundipharma BV
240.  Mundipharma Company
241.  Mundipharma Corporation (Ireland) Limited
242.  Mundipharma Corporation Limited
243.  Mundipharma DC B.V.
244.  Mundipharma de Mexico, S. de R.L. de C.V.
245.  Mundipharma Deutschland GmbH & Co. KG
246.  Mundipharma Development Pte. Limited
247.  Mundipharma Distribution GmbH
248.  Mundipharma Distribution Limited
249.  Mundipharma EDO GmbH
250.  Mundipharma Egypt LLC
251.  Mundipharma Farmaceutica LDA.
252.  Mundipharma FZ-LLC
253.  Mundipharma GesmbH
254.  Mundipharma GmbH
255.  Mundipharma Healthcare Corporation
256.  Mundipharma Healthcare LLC
257.  Mundipharma Healthcare Pte. Limited
258.  Mundipharma Healthcare Pty. Limited
259.  Mundipharma Holding AG
260.  Mundipharma International Services GmbH
261.  Mundipharma International Services Limited
262.  Mundipharma International Services S.ar.l.
263.  Mundipharma International Corporation Limited

264. Mundipharma International Holdings Limited
265. Mundipharma International Limited
266. Mundipharma International Services GmbH
267. Mundipharma International Services Limited
268. Mundipharma International Services S.àr.l.
269. Mundipharma International Technical Operations Limited
270. Mundipharma IT GmbH
271. Mundipharma IT Services GmbH
272. Mundipharma IT Services Inc.
273. Mundipharma IT Services Limited
274. Mundipharma IT Services Pte. Limited
275. Mundipharma Kabushiki Kaishe
276. Mundipharma Korea Limited
277. Mundipharma Laboratories GmbH
278. Mundipharma Laboratories Limited
279. Mundipharma LATAM GmbH
280. Mundipharma Limited
281. Mundipharma Ltd.
282. Mundipharma Management S.ar.l.
283. Mundipharma Manufacturing Pte. Limited
284. Mundipharma MEA GmbH
285. Mundipharma Medical CEE GmbH
286. Mundipharma Medical Company
287. Mundipharma Medical Company Limited
288. Mundipharma Medical GmbH
289. Mundipharma Medical S.ar.l.
290. Mundipharma Middle East FZ-LLC
291. Mundipharma Near East GmbH
292. Mundipharma New Zealand Limited
293. Mundipharma Oncology Pty. Limited
294. Mundipharma Ophthalmology Corporation Limited
295. Mundipharma Ophthalmology Products Limited
296. Mundipharma Oy
297. Mundipharma Pharmaceutical Company
298. Mundipharma Pharmaceuticals (Chile) Limitada
299. Mundipharma Pharmaceuticals Argentina S.r.l.
300. Mundipharma Pharmaceuticals B.V.
301. Mundipharma Pharmaceuticals Belgium BV
302. Mundipharma Pharmaceuticals Inc.
303. Mundipharma Pharmaceuticals Industry and Trade Limited
304. Mundipharma Pharmaceuticals Limited
305. Mundipharma Pharmaceuticals Private Limited
306. Mundipharma Pharmaceuticals S.L.
307. Mundipharma Pharmaceuticals S.r.l.
308. Mundipharma Pharmaceuticals Sdn. Bhd.
309. Mundipharma Polska SP. Z.O.O.
310. Mundipharma Pte Limited

8

311. Mundipharma Pty Limited
312. Mundipharma Research Company Limited
313. Mundipharma Research GmbH & Co. KG
314. Mundipharma Research Limited
315. Mundipharma Research Verwaltungs GmbH
316. Mundipharma SAS
317. Scientific Office of Mundipharma MEA GmbH
318. Mundipharma Singapore Holding Pte. Limited
319. Mundipharma TK
320. Mundipharma Verwaltungsgesellschaft mbH
321. Napp Laboratories Limited
322. Napp Pension Trustees Limited
323. Napp Pharmaceutical Group Limited
324. Napp Pharmaceutical Holdings Limited
325. Napp Pharmaceuticals Limited
326. Napp Research Centre Limited
327. Nitid S.àr.l.
328. Nontag S.àr.l.
329. One Stamford Realty L.P.
330. Paineurope Limited
331. Par-La-Ville Properties Limited
332. Porthos S.àr.l.
333. PT. Mundipharma Healthcare Indonesia
334. Purdue BioPharma Inc.
335. Purdue BioPharma L.P.
336. Purdue Frederick Inc.
337. Purdue Pharma Inc. (Canadian Company)
338. Purdue Pharma Technologies Inc.
339. Purdue Pharma Pty. Ltd.
340. Purdue Pharma ULC
341. Qdem Pharmaceuticals Limited
342. Rafa Laboratories Ltd.
343. Sofy S.àr.l.
344. Songol S.àr.l.
345. Sonti S.àr.l.
346. Tacca B.V.
347. Taiwan Mundipharma Pharmaceuticals Limited
348. Technical Scientific Office of Mundipharma Near East GmbH
349. Tenna B.V.
350. The Napp Educational Foundation
351. The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City
352. Vaccaro B.V.
353. Venusti B.V.
354. Win – Healthcare Private Ltd.
355. Win – Medicare Private Ltd.
356. Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.
357. The assets, businesses and entities owned by the above.

**CERTAIN B-SIDE RELEASED PARTIES**

| Certain Shareholder Released Parties | |
|---|---|
| **Shareholder Released Party** | **Relationship to Proceedings** |
| Raymond R. Sackler/Estate of Raymond R. Sackler | Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity[1] in Purdue Pharma L.P. chain of ownership; current and/or former trustee |
| Beverly Sackler/Estate of Beverly Sackler | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former trustee |
| Jonathan D. Sackler/Estate of Jonathan D. Sackler | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way[2] entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Richard S. Sackler, M.D. | Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Beth Cohen (formerly Sackler) | Family member; trust beneficiary; current and/or former trustee |
| David A. Sackler | Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Children of David Sackler | Family members; trust beneficiaries |
| Jaseleen Ruggles | Family member |

---

[1]    A II-way entity is an entity directly or indirectly owned by persons or trusts associated with both the Raymond Sackler Family (the "RRS Family") and the Mortimer Sackler Family (the "MDS Family"), with equal interests associated with each family.

[2]    A I-way entity is an entity directly or indirectly owned by persons or trusts associated solely with either the RRS Family or the MDS Family.

| Marianna Sackler Frame | Family member; trust beneficiary |
|---|---|
| Children of Marianna Sackler Frame | Family members; trust beneficiaries |
| James Frame | Family member |
| Rebecca Sackler | Family member; trust beneficiary; current and/or former trustee |
| Jeffrey Selikoff | Family member; trust beneficiary; current and/or former trustee |
| Mary Corson | Family member; trust beneficiary; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Madeleine Sackler | Family member; trust beneficiary |
| Clare E. Sackler | Family member; trust beneficiary |
| Children of Clare E. Sackler | Family members; trust beneficiaries |
| Miles R.C. Sackler | Family member; trust beneficiary |
| Garrett Lynam | Executor of estate; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Stuart D. Baker | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Anthony M. Roncalli | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Philip C. Strassburger | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Edward B. Mahony | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Peter Boer | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Paulo Costa | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Ralph Snyderman | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| William Loomis | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Stephen A. Ives | Current and/or former director, manager |

| | |
|---|---|
| | and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Leslie J. Schreyer | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Danny Parks | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; employee of RRS Family I-way entity |
| Jeffrey A. Robins | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Beatriz V. Iriondo/Betty Andrikopoulos | Current and/or former director, manager and/or officer of trust company |
| Christopher Reimer | Current and/or former director, manager and/or officer of trust company |
| Jared Giddens | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Stephen L. Schreiner | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Frank S. Vellucci | Employee of RRS Family I-way entity |
| Rory Held | Employee of RRS Family I-way entity |
| BRJ Fiduciary Management LLC | Current and/or former trustee |
| Cedar Cliff Fiduciary Management Inc. | Current and/or former trustee |
| Cornice Fiduciary Management LLC | Current and/or former trustee |
| Crystal Fiduciary Company LLC | Current and/or former trustee |
| Data LLC | Current and/or former trustee |
| MCM Fiduciary Management LLC | Current and/or former trustee |
| North Bay Trust Company Inc. | Current and/or former trustee |
| Brian Olson | Current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Elizabeth A. Whalen | Current and/or former trustee |
| Lauren D. Kelly | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| John N. Irwin III | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| John Wilcox/Estate of John Wilcox | Current and/or former trustee |

3

| | |
|---|---|
| Michael Kassen | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Peter M. Ward/Estate of Peter M. Ward | Current and/or former trustee |
| Ruth Edelson | Current and/or former trustee |
| Susan C. Frunzi | Current and/or former trustee |
| Thomas A. Russo | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Janet Pomerantz | Current and/or former trustee |
| Alex Troy | Current and/or former trustee |
| Josephine Hoh | Trust beneficiary |
| Scott Bulua | Family member |
| Molly B. Johnson | Family member |
| Trust U/A 11/5/74 fbo Beverly Sackler | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 2 dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Raymond R. Sackler Trust 2B dtd 12/23/89 | RRS Family trust indirectly owning Purdue |
| Trust B U/A 11/5/74 fbo Beverly Sackler | RRS Family trust |
| The 1974 Irrevocable Investment Trust | RRS Family trust |
| 1974 Irrevocable Trust fbo BS and RSS | RRS Family trust |
| 1974 Irrevocable Trust fbo BS and JDS | RRS Family trust |
| AR Irrevocable Trust | RRS Family trust |
| AJ Irrevocable Trust | RRS Family trust |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler | RRS Family trust |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Marianna Rose Sackler 12/21/1989 | RRS Family trust |

| | |
|---|---|
| Beverly Sackler Trust 3 f/b/o Rebecca Kate Sackler 12/22/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 1 f/b/o Miles Raymond Sackler 12/29/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 2 f/b/o Miles Raymond Sackler 12/30/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Madeleine Sackler 12/26/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Clare Elizabeth Sackler 12/27/1989 | RRS Family trust |
| Beverly Sackler Trust 3 f/b/o Miles Raymond Sackler 12/28/1989 | RRS Family trust |
| David A. Sackler 2012 Trust | RRS Family trust |
| Marianna R. Sackler 2012 Trust | RRS Family trust |
| Rebecca K. Sackler 2012 Trust | RRS Family trust |
| Madeleine Sackler 2012 Trust | RRS Family trust |
| Clare E. Sackler 2012 Trust | RRS Family trust |
| Miles R.C. Sackler 2012 Trust | RRS Family trust |
| Irrevocable Trust under Declaration dated as of April 25, 1991 | RRS Family trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | RRS Family trust |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | RRS Family trust |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | RRS Family trust |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler | RRS Family trust |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | RRS Family trust |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler | RRS Family trust |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | RRS Family trust |
| Trust under agreement dated December 23, 1980 f/b/o | RRS Family trust |

| | |
|---|---|
| Jonathan D. Sackler | |
| Beth B. Sackler Trust | RRS Family trust |
| Beth Sackler 2013 Trust | RRS Family trust |
| Mary Corson Trust | RRS Family trust |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | RRS Family trust |
| Trust Agreement dated August 29, 2003 f/b/o Mary Corson and Issue of Jonathan D. Sackler | RRS Family trust |
| Irrevocable Trust under Declaration dated as of August 25, 1992 | RRS Family trust |
| Irrevocable Trust under Declaration dated as of December 29, 1992 | RRS Family trust |
| Richard S. Sackler Life Insurance Trust | RRS Family trust |
| Jonathan D. Sackler Life Insurance Trust | RRS Family trust |
| Richard S. Sackler Trust U/A 9/30/04 | RRS Family trust |
| Jonathan D. Sackler Trust U/A 9/30/04 | RRS Family trust |
| Hudson Trust | RRS Family trust |
| Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | RRS Family trust |
| Richard S. Sackler Trust f/b/o Marianna R. Sackler 3/8/90 | RRS Family trust |
| Richard S. Sackler Trust f/b/o Rebecca K. Sackler 3/8/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Clare Elizabeth Sackler 4/11/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Madeleine Sackler 4/11/90 | RRS Family trust |
| Jonathan D. Sackler Trust f/b/o Miles Raymond Corson Sackler, 4/11/90 | RRS Family trust |
| The RSS 2012 Family Trust | RRS Family trust |
| Marianna R. Sackler Captain Trust | RRS Family trust |
| Rebecca K. Sackler Captain Trust | RRS Family trust |
| RSS Fiduciary Management Trust | RRS Family trust |
| JDS Fiduciary Management Trust | RRS Family trust |
| Crystal Trust | RRS Family trust |
| MCM Fiduciary Management Trust | RRS Family trust |
| Data Trust | RRS Family trust |
| Cornice Trust | RRS Family trust |
| DABB Trust | RRS Family trust |
| Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 | RRS Family trust |
| Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 | RRS Family trust |
| Raymond R. Sackler Marital Trust u/a 3/29/2012 | RRS Family trust |
| Beverly Sackler Revocable Trust u/a 3/29/12 | RRS Family trust |
| RSS Revocable Pourover Trust | RRS Family trust |
| JDS Revocable Pourover Trust | RRS Family trust |
| Cedar Cliff Trust | RRS Family trust |
| Selikoff Family Investment Trust | RRS Family trust |
| 1959 Irrevocable Trust | RRS Family trust (terminated) |
| 1969 Irrevocable Trust | RRS Family trust (terminated) |
| FTA Trust | RRS Family trust (terminated) |

| 1974 Revocable Trust | RRS Family trust (terminated) |
|---|---|
| RSS Pourover Trust | RRS Family trust (terminated) |
| JDS Pourover Trust | RRS Family trust (terminated) |
| RSS 2/2/98 Trust | RRS Family trust (terminated) |
| JDS 2/2/98 Trust | RRS Family trust (terminated) |
| RSS 1992 Insurance Trust | RRS Family trust (terminated) |
| JDS 1992 Insurance Trust | RRS Family trust (terminated) |
| The Richard S. Sackler Revocable Pourover Trust | RRS Family trust (terminated) |
| The Jonathan D. Sackler Revocable Pourover Trust dated 12/12/2010 | RRS Family trust (terminated) |
| Moonstone Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Linarite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Perthlite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Roselite Holdings LLC [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Rosebay Medical Company L.P. [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| Rosebay Medical Company, Inc. [DE] | RRS Family I-way entity in Purdue Pharma L.P. ownership chain |
| BR Holdings Associates Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| BR Holdings Associates L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| PLP Associates Holdings Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| PLP Associates Holdings L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Purdue Pharma Inc. [NY] | II-way entity in Purdue Pharma L.P. ownership chain |
| Pharmaceutical Research Associates L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Purdue Pharma L.P. [DE] | II-way entity in Purdue Pharma L.P. ownership chain |
| Atlantic Laboratories Limited [Bermuda] | RRS Family I-way entity |
| B.L. Carrolton Limited [Bermuda] | RRS Family I-way entity |
| G.H. Carrell Limited [Bermuda] | RRS Family I-way entity |
| Laysan Limited [Bermuda] | RRS Family I-way entity |
| Mallard Limited [Bermuda] | RRS Family I-way entity |
| The Research Foundation Ltd. [Bermuda] | RRS Family I-way entity |
| Triangle Industries Ltd. [Bermuda] | RRS Family I-way entity |
| East Hudson Inc. [British Virgin Islands] | RRS Family I-way entity |
| East River Partners Ltd. [British Virgin Islands] | RRS Family I-way entity |
| Hobart Corporation [British Virgin Islands] | RRS Family I-way entity |
| Mauna Kea Limited [British Virgin Islands] | RRS Family I-way entity |
| Menlo Park Investors Inc. [British Virgin Islands] | RRS Family I-way entity |
| Meridian B.V.I. Limited [British Virgin Islands] | RRS Family I-way entity |

7

| | |
|---|---|
| Silk Crest Corp. [British Virgin Islands] | RRS Family I-way entity |
| Cheyenne Canada Limited Partnership [Canada] | RRS Family I-way entity |
| CPC Canada Corporation [Canada] | RRS Family I-way entity |
| CPC Canada Partnership 1 [Canada] | RRS Family I-way entity |
| CPC Canada Partnership 2 [Canada] | RRS Family I-way entity |
| The Raymond And Beverly Sackler Foundation [Canada] | RRS Family I-way entity |
| Boiling Bay S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Neji S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Nerula S.àr.l. [Luxembourg] | RRS Family I-way entity |
| Aquebogue Holdings Corporation [Mauritius] | RRS Family I-way entity |
| Boiling Bay Corporation B.V. [Netherlands] | RRS Family I-way entity |
| The Raymond and Beverly Sackler Foundation [United Kingdom] | RRS Family I-way entity |
| The Raymond and Beverly Sackler 1988 Foundation [United Kingdom] | RRS Family I-way entity |
| 1987 Fund LLC [DE] | RRS Family I-way entity |
| 60 FPC Remainder (J) LLC [CT] | RRS Family I-way entity |
| 60 FPC Residence (J) LLC [CT] | RRS Family I-way entity |
| 95 Percent LLC [NY] | RRS Family I-way entity |
| 1JM LLC [DE] | RRS Family I-way entity |
| 2JM LLC [DE] | RRS Family I-way entity |
| 3JM LLC [DE] | RRS Family I-way entity |
| A5 Atlas LLC [DE] | RRS Family I-way entity |
| Aim High Productions [DE] | RRS Family I-way entity |
| Akutan Bay LLC [AK] | RRS Family I-way entity |
| AJ Managed Holdings LLC [DE] | RRS Family I-way entity |
| Alexander Road Capital LLC [NY] | RRS Family I-way entity |
| Altaa LLC [DE] | RRS Family I-way entity |
| Alta Ridge, LLC [DE] | RRS Family I-way entity |
| Alta Ridge Capital LLC [DE] | RRS Family I-way entity |
| Alta Ridge Investments LLC [DE] | RRS Family I-way entity |
| Ankersea Limited Liability Company [DE] | RRS Family I-way entity |
| Antler LLC [DE] | RRS Family I-way entity |
| Azurite Holdings LLC [DE] | RRS Family I-way entity |
| Bapricot LLC [NY] | RRS Family I-way entity |
| Beryl Holdings LLC [DE] | RRS Family I-way entity |
| Berrybrook LLC [NY] | RRS Family I-way entity |
| BHPH LLC [DE] | RRS Family I-way entity |
| Boiling Bay Corporation [DE] | RRS Family I-way entity |
| Bowford Company [NY General Partnership] | RRS Family I-way entity |
| BRC Special Partners LLC [DE] | RRS Family I-way entity |
| Brook Holdings [NY General Partnership] | RRS Family I-way entity |
| BRJ Fiduciary Management LLC [WY] | RRS Family I-way entity |
| Calhoun Advisors LLC [DE] | RRS Family I-way entity |
| Camelot Hotel Holdings LLC [DE] | RRS Family I-way entity |
| Cap 1 LLC [DE] | RRS Family I-way entity |
| Cap 2 LLC [DE] | RRS Family I-way entity |
| Captain Leasing LLC [DE] | RRS Family I-way entity |
| Cedar Cliff Fiduciary Management Inc. [WY] | RRS Family I-way entity |

| | |
|---|---|
| CHBR LLC [DE] | RRS Family I-way entity |
| Cheviot LLC [DE] | RRS Family I-way entity |
| Cheyenne Energy Services LLC [OK] | RRS Family I-way entity |
| Cheyenne International Corporation [OK] | RRS Family I-way entity |
| Cheyenne Petroleum Company [NY Limited Partnership] | RRS Family I-way entity |
| Chez Ellie LLC [DE] | RRS Family I-way entity |
| China Sea Company, Inc. [DE] | RRS Family I-way entity |
| China Sea Company L.P. [DE Limited Partnership] | RRS Family I-way entity |
| Cornice Fiduciary Management LLC [WY] | RRS Family I-way entity |
| CPC 2001 LLC [DE] | RRS Family I-way entity |
| CPT 1A PE-AA LLC [DE] | RRS Family I-way entity |
| Crissaire Corporation [DE] | RRS Family I-way entity |
| Crystal Fiduciary Company LLC [WY] | RRS Family I-way entity |
| Curson Capital L.P. [CA] | RRS Family I-way entity |
| Curson Dev LLC [DE] | RRS Family I-way entity |
| CWC LLC [DE] | RRS Family I-way entity |
| DABB LLC [DE] | RRS Family I-way entity |
| Data LLC [WY] | RRS Family I-way entity |
| Deckstone International Company [CT General Partnership] | RRS Family I-way entity |
| DNKA LLC [DE] | RRS Family I-way entity |
| Dravite Holdings LLC [DE] | RRS Family I-way entity |
| Dolcedo LLC [DE] | RRS Family I-way entity |
| Elbanite Holdings LLC [DE] | RRS Family I-way entity |
| Exmoor Horn LLC [DE] | RRS Family I-way entity |
| Expert Philanthropy LLC [DE] | RRS Family I-way entity |
| Finnest Pharma LLC [DE] | RRS Family I-way entity |
| Foley Properties LLC [DE] | RRS Family I-way entity |
| G3A LLC [DE] | RRS Family I-way entity |
| G3D LLC [DE] | RRS Family I-way entity |
| G3R LLC [DE] | RRS Family I-way entity |
| GGM Company [DE General Partnership] | RRS Family I-way entity |
| Great Curve Films, LLC [DE] | RRS Family I-way entity |
| Golden Gun Capital, LLC [CA] | RRS Family I-way entity |
| Halesworth Corporation [DE] | RRS Family I-way entity |
| Haystacks Investments Partners LLC [DE] | RRS Family I-way entity |
| Haystacks Endure LLC [DE] | RRS Family I-way entity |
| HCRB LLC [NY] | RRS Family I-way entity |
| Hudson River (Delaware) Inc. [DE] | RRS Family I-way entity |
| Hudson River Partners [NY General Partnership] | RRS Family I-way entity |
| Inactive Holdings LLC [DE] | RRS Family I-way entity |
| Interrogation 2008 LLC [NY] | RRS Family I-way entity |
| Intrepidus Holdings LLC [DE] | RRS Family I-way entity |
| IS-BEP LLC [DE] | RRS Family I-way entity |
| JGT One LLC [DE] | RRS Family I-way entity |
| JGT Three LLC [DE] | RRS Family I-way entity |
| JGT Two LLC [DE] | RRS Family I-way entity |
| Jibwind Company [NY] | RRS Family I-way entity |
| JR Learning LLC [DE] | RRS Family I-way entity |

| | |
|---|---|
| JV Fuel LLC [DE] | RRS Family I-way entity |
| JWA Holdings LLC [DE] | RRS Family I-way entity |
| K-BEP LP [DE] | RRS Family I-way entity |
| K-BEP III L.P. [DE] | RRS Family I-way entity |
| K-Neptune LLC [DE] | RRS Family I-way entity |
| K-S Medical LLC [DE] | RRS Family I-way entity |
| K-SR Holdings LLC [DE] | RRS Family I-way entity |
| K-SR Performance LLC [DE] | RRS Family I-way entity |
| K-Ventures I LLC [DE] | RRS Family I-way entity |
| KB Managed Holdings LLC [DE] (Formerly Haystacks HH LLC) | RRS Family I-way entity |
| Kernite Holdings LLC [DE] | RRS Family I-way entity |
| Kokino Corporation [DE] | RRS Family I-way entity |
| Kokino LLC [DE] | RRS Family I-way entity |
| Kokino Maj Holdings LLC [DE] | RRS Family I-way entity |
| KRA Associates, Ltd. [CT General Partnership] | RRS Family I-way entity |
| KRA Associates, Ltd. [DE] | RRS Family I-way entity |
| Landings Financial Limited Liability Company [DE] | RRS Family I-way entity |
| LBV Non-Profit, Inc. [DE] | RRS Family I-way entity |
| LBV Inc. [DE] (Formerly Les Bouledogues Vigneronnes Inc.) | RRS Family I-way entity |
| Laramide LLC [DE] | RRS Family I-way entity |
| Level 4 Films LLC [NY] | RRS Family I-way entity |
| Lightship Company [NY General Partnership] | RRS Family I-way entity |
| Little Menlo LLC [DE] | RRS Family I-way entity |
| Llama Bay LLC [DE] | RRS Family I-way entity |
| Lodestone Limited Liability Company [DE] | RRS Family I-way entity |
| Longbrook Corporation [DE] | RRS Family I-way entity |
| M3C Holdings LLC [DE] | RRS Family I-way entity |
| MD60 LLC [DE] | RRS Family I-way entity |
| Meridian International, Ltd. [DE] | RRS Family I-way entity |
| MCM Fiduciary Management LLC [DE] | RRS Family I-way entity |
| Mill Shoals LLC [DE] | RRS Family I-way entity |
| Minimalist Project LLC [NY] | RRS Family I-way entity |
| MKL Haystacks Holdings LLC [DE] | RRS Family I-way entity |
| Moxietec LLC [DE] | RRS Family I-way entity |
| MXE LLC [DE] | RRS Family I-way entity |
| MXE Leasing, LLC [DE] | RRS Family I-way entity |
| NE SOL LLC [DE] | RRS Family I-way entity |
| Newhall & Company, Ltd. [DE] | RRS Family I-way entity |
| North Bay Associates [DE General Partnership] | RRS Family I-way entity |
| North Bay Eagle LLC [DE] | RRS Family I-way entity |
| North Bay Trust Company Inc. [OK] | RRS Family I-way entity |
| OG Film LLC [NY] | RRS Family I-way entity |
| OG Picture Inc. [NY] | RRS Family I-way entity |
| Orchids LLC [DE] | RRS Family I-way entity |
| Orcus Corporation [DE] | RRS Family I-way entity |
| Otavite Holdings LLC [DE] | RRS Family I-way entity |
| Pacific Partners Company [NY] | RRS Family I-way entity |

| | |
|---|---|
| Paloma Partners L.P. [DE] | RRS Family I-way entity |
| Park View Properties L.L.C. [DE] | RRS Family I-way entity |
| PBC - AC [NY General Partnership] | RRS Family I-way entity |
| PBC - ABS [NY General Partnership] | RRS Family I-way entity |
| PBC - ABSJS [DE General Partnership] | RRS Family I-way entity |
| PBC-ALF [NY General Partnership] | RRS Family I-way entity |
| PBC - Alternative Investments [NY General Partnership] | RRS Family I-way entity |
| PBC - Bear Stearns Healthcare Value Partners [NY General Partnership] | RRS Family I-way entity |
| PBC - Brook Holdings [NY General Partnership] | RRS Family I-way entity |
| PBC - BSM [NY General Partnership] | RRS Family I-way entity |
| PBC - Centaur [NY General Partnership] | RRS Family I-way entity |
| PBC - Glenhill Capital [NY General Partnership] | RRS Family I-way entity |
| PBC - GCLP [NY General Partnership] | RRS Family I-way entity |
| PBC - Lone Cascade [NY General Partnership] | RRS Family I-way entity |
| PBC – LP [NY General Partnership] | RRS Family I-way entity |
| PBC – LR [NY General Partnership] | RRS Family I-way entity |
| PBC - Marathon Structured Finance Fund [NY General Partnership] | RRS Family I-way entity |
| PBC – PP [NY General Partnership] | RRS Family I-way entity |
| PBC – R Domestic Fund [NY General Partnership] | RRS Family I-way entity |
| PBC-RLCP [NY General Partnership] | RRS Family I-way entity |
| PBC - Seneca Capital [NY General Partnership] | RRS Family I-way entity |
| PBC - Silver Point Capital Fund [NY General Partnership] | RRS Family I-way entity |
| PBC - Swiftcurrent Partners [NY General Partnership] | RRS Family I-way entity |
| PBC - Visium Balanced Fund [NY General Partnership] | RRS Family I-way entity |
| Piton Capital Management LLC [DE] | RRS Family I-way entity |
| Piton Capital Partners LLC [DE] | RRS Family I-way entity |
| Poco Bay Company [DE General Partnership] | RRS Family I-way entity |
| Poco Bay Realty LLC [DE] | RRS Family I-way entity |
| Poco Yield LLC [DE] | RRS Family I-way entity |
| PSART LLC [DE] | RRS Family I-way entity |
| QBEC LLC [DE] | RRS Family I-way entity |
| R Napp Holdings LLC [DE] | RRS Family I-way entity |
| Radstock Corporation [DE] | RRS Family I-way entity |
| RAR Investments LLC [DE] | RRS Family I-way entity |
| Raylodie LLC [NY] | RRS Family I-way entity |
| Raymond and Beverly Sackler Foundation, Inc. [NY] | RRS Family I-way entity; trust beneficiary |
| Raymond and Beverly Sackler Fund for the Arts and Sciences [DE] (Non-Profit) | RRS Family I-way entity; trust beneficiary |
| RBMC Holdings LLC [DE] | RRS Family I-way entity |
| RBS Institute LLC [DE] | RRS Family I-way entity |
| Rees Holdings LLC [NY] | RRS Family I-way entity |
| Refocus Foundation Inc. [DE] | RRS Family I-way entity |
| RLC Affiliates LLC [DE] | RRS Family I-way entity |
| RLC Affiliates [NY General Partnership] | RRS Family I-way entity |
| RGT One LLC [DE] | RRS Family I-way entity |
| RGT Three LLC [DE] | RRS Family I-way entity |

| | |
|---|---|
| RGT Two LLC [DE] | RRS Family I-way entity |
| Richard Sackler Family Foundation, Inc. [DE] | RRS Family I-way entity |
| Riverside Seven LLC [DE] | RRS Family I-way entity |
| Riviera Outlook LLC [DE] | RRS Family I-way entity |
| RJ Dan LLC [DE] | RRS Family I-way entity |
| Rockpoint Land LLC [CT] | RRS Family I-way entity |
| Rockpoint Residence LLC [CT] | RRS Family I-way entity |
| Rosebay Medical Company LLC [DE] | RRS Family I-way entity |
| RSHRS LLC [DE] | RRS Family I-way entity |
| Runham Corporation [DE] | RRS Family I-way entity |
| RWA Holdings LLC [DE] | RRS Family I-way entity |
| Sarbonne LLC [DE] | RRS Family I-way entity |
| Seabright Partners [DE General Partnership] | RRS Family I-way entity |
| Seadog Partners [DE General Partnership] | RRS Family I-way entity |
| SFP Holdings LLC [DE] | RRS Family I-way entity |
| Smokering LLC [DE] | RRS Family I-way entity |
| SO 32 Mack LLC [DE] | RRS Family I-way entity |
| SO-BFR LLC [DE] | RRS Family I-way entity |
| SO-CCS LLC [DE] | RRS Family I-way entity |
| SO-CSH LLC [DE] | RRS Family I-way entity |
| SO-ESH LLC [DE] | RRS Family I-way entity |
| SO-MSS LLC [DE] | RRS Family I-way entity |
| SO-SHSH LLC [DE] | RRS Family I-way entity |
| SO-WSH LLC [DE] | RRS Family I-way entity |
| SO-WSR LLC [DE] | RRS Family I-way entity |
| Solar SO Ware LLC [DE] | RRS Family I-way entity |
| Solar SO Wotton LLC [DE] | RRS Family I-way entity |
| Somac LLC [DE] | RRS Family I-way entity |
| Southern Alta LLC [DE] | RRS Family I-way entity |
| SR-GA RE LLC [DE] | RRS Family I-way entity |
| SR VC TP LLC [DE] | RRS Family I-way entity |
| SRMS LLC [DE] | RRS Family I-way entity |
| Standard Pharmaceuticals Corporation [DE] | RRS Family I-way entity |
| Stibnite Holdings LLC [DE] | RRS Family I-way entity |
| St. Lawrence Associates [NY General Partnership] | RRS Family I-way entity |
| Summer Road LLC [DE] | RRS Family I-way entity |
| Superior View L.L.C. [DE] | RRS Family I-way entity |
| Swipe Right LLC [DE] | RRS Family I-way entity |
| Tacitus Therapeutics Inc. [DE] | RRS Family I-way entity |
| The Bouncer Foundation, Inc. [DE] | RRS Family I-way entity |
| The Lottery, LLC [DE] | RRS Family I-way entity |
| The Neuroendocrine Tumor Research Foundation [DE] (Non-Profit) | RRS Family I-way entity |
| Temagami LLC [DE] | RRS Family I-way entity |
| TPART LLC [DE] | RRS Family I-way entity |
| Tradewind Company [NY General Partnership] | RRS Family I-way entity |
| Tremolite Holdings LLC [DE] | RRS Family I-way entity |
| TQD 1 LLC [DE] | RRS Family I-way entity |
| TQD 2 LLC [DE] | RRS Family I-way entity |

| | |
|---|---|
| Tract SRMS LLC [DE] | RRS Family I-way entity |
| Triangle Holding LLC [DE] | RRS Family I-way entity |
| Tukiewings LLC [DE] | RRS Family I-way entity |
| Twin Springs Holdings [NY General Partnership] | RRS Family I-way entity |
| UNCH Corp. [DE] | RRS Family I-way entity |
| UNCHADA LLC [DE] | RRS Family I-way entity |
| Unstable Elements LLC [DE] | RRS Family I-way entity |
| Valdiva Films LLC [DE] | RRS Family I-way entity |
| Verto Institute LLC [DE] | RRS Family I-way entity |
| VLS LLC [DE] | RRS Family I-way entity |
| WA Canada L.P. [DE] | RRS Family I-way entity |
| Wasatch LLC [DE] | RRS Family I-way entity |
| Westward Home LLC [DE] | RRS Family I-way entity |
| Whilton Corporation [DE] | RRS Family I-way entity |
| WP Leasing LLC [DE] | RRS Family I-way entity |
| Yamashiro Development LLC [DE] | RRS Family I-way entity |
| Mundipharma (Argentina) S.r.l. [Argentina]*[3] | II-way entity |
| Mundipharma Pharmaceuticals Argentina S.r.l. [Argentina]* | II-way entity |
| Mundipharma ANZ Pty. Limited [Australia] | II-way entity |
| Mundipharma Healthcare Pty. Limited [Australia] * | II-way entity |
| Mundipharma Oncology Pty. Limited [Australia] * | II-way entity |
| Mundipharma Pty Limited [Australia] * | II-way entity |
| Mundipharma GesmbH [Austria] * | II-way entity |
| Mundipharma Medical CEE GmbH [Austria]* | II-way entity |
| Bangladesh Beauty Products Private Limited [Bangladesh] | II-way entity |
| Mundipharma Bangladesh Private Limited [Bangladesh] | II-way entity |
| Mundipharma Trading Bangladesh Private Limited [Bangladesh] | II-way entity |
| Mundipharma BV [Belgium]* | II-way entity |
| Mundipharma Pharmaceuticals Belgium BV [Belgium]* | II-way entity |
| Bermag Limited [Bermuda]* | II-way entity |
| L.P. Clover Limited [Bermuda]* | II-way entity |
| MN Consulting LLC [Bermuda] | II-way entity |
| MNB Company [Bermuda] | II-way entity |
| Mundipharma Company [Bermuda] | II-way entity |
| Mundipharma International Corporation Limited [Bermuda]* | II-way entity |
| Mundipharma International Holdings Limited [Bermuda]* | II-way entity |
| Mundipharma International Limited [Bermuda]* | II-way entity |
| Mundipharma Laboratories Limited [Bermuda]* | II-way entity |
| Mundipharma Limited [Bermuda]* | II-way entity |

[3] Persons designated with "*" are IACs, as defined in this Agreement.

13

| | |
|---|---|
| Mundipharma Medical Company [Bermuda]* | II-way entity |
| Mundipharma Ophthalmology Corporation Limited [Bermuda]* | II-way entity |
| Mundipharma Ophthalmology Products Limited [Bermuda]* | II-way entity |
| Mundipharma Pharmaceutical Company [Bermuda] | II-way entity |
| Mundipharma Research Company Limited [Bermuda] | II-way entity |
| Par-La-Ville Properties Limited [Bermuda] | II-way entity |
| SICO Ltd. [Bermuda] | II-way entity |
| Transworld Pharma Limited [Bermuda] | II-way entity |
| Mundipharma Brasil Productos Médicos e Farmac_uticos Ltda. [Brazil]* | II-way entity |
| Boetti Corporation [British Virgin Islands] | II-way entity |
| Boldini Corporation [British Virgin Islands] | II-way entity |
| Clovio Corporation [British Virgin Islands] | II-way entity |
| Evening Star Services Limited [British Virgin Islands] | II-way entity |
| Hayez Corporation [British Virgin Islands] | II-way entity |
| IAF Limited [British Virgin Islands]* | II-way entity |
| Lake Claire Investments Limited [British Virgin Islands] | II-way entity |
| Maltus Corporation [British Virgin Islands] | II-way entity |
| Mexcus Corporation [British Virgin Islands] | II-way entity |
| Mundipharma GesmbH (Bulgarian branch of Austrian company) [Bulgaria] | II-way entity |
| Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company) [Bulgaria]* | II-way entity |
| Bard Pharmaceuticals (1990) Inc. [Canada]* | II-way entity |
| Elvium Life Sciences GP Inc. [Canada]* | II-way entity |
| Elvium Life Sciences Limited Partnership [Canada]* | II-way entity |
| Elvium ULC [Canada]* | II-way entity |
| Mundipharma International (Canada) Inc. [Canada]* | II-way entity |
| Purdue Frederick Inc. [Canada]* | II-way entity |
| Purdue Pharma [Canada]* | II-way entity |
| Purdue Pharma Inc. [Canada]* | II-way entity |
| Purdue Pharma ULC [Canada] | II-way entity |
| Mundipharma Pharmaceuticals (Chile) Limitada [Chile] | II-way entity |
| Mundipharma (China) Pharmaceutical Company Limited [China]* | II-way entity |
| Mundipharma (Shanghai) International Trade Company Limited [China]* | II-way entity |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. [China]* | II-way entity |
| Mundipharma (Colombia) S.A.S. [Colombia]* | II-way entity |
| Mundipharma Pharmaceuticals Limited [Cyprus]* | II-way entity |
| Mundipharma GesmbH (Czech Republic Branch of Austrian company) [Czech Republic]* | II-way entity |
| Mundipharma A/S [Denmark]* | II-way entity |
| Mundipharma FZ-LLC [Dubai] | II-way entity |
| Mundipharma Middle East FZ-LLC [Dubai]* | II-way entity |
| Mundipharma Egypt LLC [Egypt]* | II-way entity |

| | |
|---|---|
| Scientific Office of Mundipharma MEA GmbH [Egypt]* | II-way entity |
| Mundipharma Oy [Finland]* | II-way entity |
| Mundipharma Management S.ar.l. [France] | II-way entity |
| Mundipharma SAS [France]* | II-way entity |
| Krugmann GmbH [Germany]* | II-way entity |
| Mundichemie GmbH [Germany]* | II-way entity |
| Mundipharma Biologics GmbH [Germany]* | II-way entity |
| Mundipharma Deutschland GmbH & Co. KG [Germany]* | II-way entity |
| Mundipharma GmbH [Germany]* | II-way entity |
| Mundipharma Medical GmbH [Germany]* | II-way entity |
| Mundipharma Research GmbH & Co. KG [Germany]* | II-way entity |
| Mundipharma Research Verwaltungs GmbH [Germany]* | II-way entity |
| Mundipharma Verwaltungsgesellschaft mbH [Germany]* | II-way entity |
| Mundipharma (Hong Kong) Limited [Hong Kong]* | II-way entity |
| Mundipharma Medical GmbH (Hungary Branch of Swiss Company) [Hungary]* | II-way entity |
| Modi-Mundipharma Beauty Products Private Limited [India] | II-way entity |
| Modi-Mundipharma Healthcare Private Limited [India] | II-way entity |
| Modi-Mundipharma Private Limited [India] | II-way entity |
| Win-Healthcare Private Limited [India] | II-way entity |
| Win-Medicare Private Limited [India] | II-way entity |
| Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company) [Indonesia]* | II-way entity |
| PT. Mundipharma Healthcare Indonesia [Indonesia]* | II-way entity |
| Mundipharma Corporation (Ireland) Limited [Ireland]* | II-way entity |
| Mundipharma Pharmaceuticals Limited [Ireland]* | II-way entity |
| Peer Hotzvim Ltd. [Israel] | II-way entity |
| Rafa Laboratories Limited [Israel] | II-way entity |
| Mundipharma Pharmaceuticals S.r.l. [Italy]* | II-way entity |
| Mundipharma Kabushiki Kaishe [Japan]* | II-way entity |
| Mundipharma TK [Japan]* | II-way entity |
| Mundipharma Medical CEE GmbH (Kazakhstan branch of Austrian company merged with Mundipharma GesmbH) [Kazakhstan] | II-way entity |
| Mundipharma Distribution Limited [Korea]* | II-way entity |
| Mundipharma Korea Limited [Korea]* | II-way entity |
| Accardi S.àr.l. [Luxembourg] | II-way entity |
| Bulla S.àr.l. [Luxembourg] | II-way entity |
| Euro-Celtique S.A. [Luxembourg]* | II-way entity |
| Filti S.àr.l. [Luxembourg] | II-way entity |
| Flira S.àr.l. [Luxembourg] | II-way entity |
| Ind S.àr.l. [Luxembourg] | II-way entity |
| Irey S.àr.l. [Luxembourg] | II-way entity |
| Lucien Holdings S.àr.l. [Luxembourg] | II-way entity |
| Lymit Holdings S.àr.l. [Luxembourg] | II-way entity |
| Mundipharma International Services S.ar.l. [Luxembourg]* | II-way entity |

15

| | |
|---|---|
| Nitid S.àr.l. [Luxembourg] | II-way entity |
| Nontag S.àr.l. [Luxembourg] | II-way entity |
| Porthos S.àr.l. [Luxembourg] | II-way entity |
| Sofy S.àr.l. [Luxembourg] | II-way entity |
| Songol S.àr.l. [Luxembourg] | II-way entity |
| Sonti S.àr.l. [Luxembourg] | II-way entity |
| Mundipharma Pharmaceuticals Sdn. Bhd. [Malaysia]* | II-way entity |
| Cutchogue Holdings Limited [Mauritius] | II-way entity |
| Mundipharma Ltd. [Mauritius] | II-way entity |
| Mundipharma de Mexico, S. de R.L. de C.V. [Mexico]* | II-way entity |
| Mundipharma Maroc [Morocco]* | II-way entity |
| Mundipharma (Myanmar) Co., Limited [Myanmar]* | II-way entity |
| Accardi B.V. [Netherland] | II-way entity |
| Alfa Generics B.V. [Netherlands]* | II-way entity |
| Arsago B.V. [Netherlands] | II-way entity |
| Bradenton Products B.V. [Netherlands]* | II-way entity |
| Ladenburg B.V. [Netherlands]* | II-way entity |
| Mundipharma B.V. [Netherlands]* | II-way entity |
| Mundipharma Bradenton B.V. [Netherlands]* | II-way entity |
| Mundipharma DC B.V. [Netherlands]* | II-way entity |
| Mundipharma Pharmaceuticals B.V. [Netherlands]* | II-way entity |
| Tacca B.V. [Netherlands] | II-way entity |
| Tenna B.V. [Netherlands] | II-way entity |
| Vaccaro B.V. [Netherlands] | II-way entity |
| Venusti B.V. [Netherlands] | II-way entity |
| Mundipharma New Zealand Limited [New Zealand]* | II-way entity |
| Mundipharma A.S. [Norway]* | II-way entity |
| Mundipharma Distribution GmbH (Philippine Branch of Swiss Company) [Philippines]* | II-way entity |
| Mundipharma Polska SP. Z.O.O. [Poland]* | II-way entity |
| Mundipharma Farmaceutica LDA. [Portugal]* | II-way entity |
| Mundipharma GesmbH (Russian Branch of Austrian company) [Russia]* | II-way entity |
| Technical Scientific Office of Mundipharma Near East GmbH [Saudi Arabia]* | II-way entity |
| Marnine Holdings Pte. Limited [Singapore] | II-way entity |
| Martone Holdings Pte. Limited [Singapore] | II-way entity |
| Mundipharma Development Pte. Limited [Singapore] | II-way entity |
| Mundipharma Healthcare Pte. Limited [Singapore]* | II-way entity |
| Mundipharma IT Services Pte. Limited [Singapore]* | II-way entity |
| Mundipharma Manufacturing Pte. Limited [Singapore]* | II-way entity |
| Mundipharma Pharmaceuticals Private Limited [Singapore]* | II-way entity |
| Mundipharma Pte Limited [Singapore]* | II-way entity |
| Mundipharma Singapore Holding Pte. Limited [Singapore]* | II-way entity |
| Mundipharma GesmbH (Slovak Republic Branch of Austrian company) [Slovak Republic]* | II-way entity |
| Mundipharma (Proprietary) Limited [South Africa]* | II-way entity |

| Mundipharma Biologics S.L. [Spain]* | II-way entity |
|---|---|
| Mundipharma Pharmaceuticals S.L. [Spain]* | II-way entity |
| Beauty Products Lanka (Private) Limited [Sri Lanka] | II-way entity |
| Mundipharma AB [Sweden]* | II-way entity |
| Mundipharma AG [Switzerland] | II-way entity |
| Mundipharma Distribution GmbH [Switzerland]* | II-way entity |
| Mundipharma EDO GmbH [Switzerland]* | II-way entity |
| Mundipharma Holding AG [Switzerland]* | II-way entity |
| Mundipharma International Services GmbH [Switzerland]* | II-way entity |
| Mundipharma IT GmbH [Switzerland]* | II-way entity |
| Mundipharma IT Services GmbH [Switzerland]* | II-way entity |
| Mundipharma Laboratories GmbH [Switzerland]* | II-way entity |
| Mundipharma LATAM GmbH [Switzerland]* | II-way entity |
| Mundipharma MEA GmbH [Switzerland]* | II-way entity |
| Mundipharma Medical Company (Swiss branch of Mundipharma Medical Company, Bermuda) [Switzerland]* | II-way entity |
| Mundipharma Medical GmbH* | II-way entity |
| Mundipharma Near East GmbH [Switzerland]* | II-way entity |
| Taiwan Mundipharma Pharmaceuticals Limited [Taiwan]* | II-way entity |
| Mundipharma (Thailand) Limited [Thailand]* | II-way entity |
| Mundipharma Pharmaceuticals Industry and Trade Limited [Turkey]* | II-way entity |
| Bard Pharmaceuticals Limited [United Kingdom]* | II-way entity |
| Clinical Designs Limited [United Kingdom]* | II-way entity |
| Mundibiopharma Limited [United Kingdom]* | II-way entity |
| Mundipharma Corporation Limited [United Kingdom]* | II-way entity |
| Mundipharma International Limited [United Kingdom]* | II-way entity |
| Mundipharma International Services Limited [United Kingdom] | II-way entity |
| Mundipharma International Technical Operations Limited [United Kingdom]* | II-way entity |
| Mundipharma IT Services Limited [United Kingdom]* | II-way entity |
| Mundipharma Limited [United Kingdom] | II-way entity |
| Mundipharma Medical Company Limited [United Kingdom]* | II-way entity |
| Mundipharma Research Limited [United Kingdom]* | II-way entity |
| Napp Laboratories Limited [United Kingdom]* | II-way entity |
| Napp Pension Trustees Limited [United Kingdom] | II-way entity |
| Napp Pharmaceutical Group Limited [United Kingdom]* | II-way entity |
| Napp Pharmaceutical Holdings Limited [United Kingdom]* | II-way entity |
| Napp Pharmaceuticals Limited [United Kingdom]* | II-way entity |
| Napp Research Centre Limited [United Kingdom]* | II-way entity |
| Paineurope Limited [United Kingdom] | II-way entity |
| Private Medical Trustees Limited [United Kingdom] | II-way entity |
| Qdem Pharmaceuticals Limited [United Kingdom]* | II-way entity |

| | |
|---|---|
| The Napp Educational Foundation [United Kingdom] | II-way entity |
| Avrio Health Inc. [United States] | II-way entity |
| Caas Leasing, Inc. [United States] | II-way entity |
| Connecticut Avenue Realty Co., Inc. [United States] | II-way entity |
| Coventry Technologies L.P. [United States] | II-way entity |
| E.R.G. Realty, Inc. [United States] | II-way entity |
| HS Holdings Inc. [United States] | II-way entity |
| IAF Corporation [United States] | II-way entity |
| Midvale Chemical Company [United States] | II-way entity |
| MNP Consulting Limited [United States] | II-way entity |
| Mundipharma Biologics Inc. [United States] | II-way entity |
| Mundipharma Biologics L.P. [United States] | II-way entity |
| Mundipharma Healthcare Corporation [United States]* | II-way entity |
| Mundipharma Healthcare LLC [United States]* | II-way entity |
| Mundipharma Inc. [United States] | II-way entity |
| Mundipharma International Limited [United States]* | II-way entity |
| Mundipharma International Technical Operations Limited [United States]* | II-way entity |
| Mundipharma IT Services Inc. [United States]* | II-way entity |
| Mundipharma Ltd. [United States] | II-way entity |
| Mundipharma Pharmaceuticals Inc. [United States]* | II-way entity |
| Nappwood Land Corporation [United States] | II-way entity |
| New Suffolk Holdings LLP [United States] | II-way entity |
| One Stamford Land Inc. [United States] | II-way entity |
| One Stamford Realty L.P. [United States] | II-way entity |
| Pharma Associates Inc. [United States] | II-way entity |
| Pharma Associates L.P. [United States] | II-way entity |
| Pharma Technologies Inc. [United States] | II-way entity |
| Pharmaceutical Research Associates, Inc. [United States] | II-way entity |
| Pharmaceutical Research Associates, Inc. [United States] | II-way entity |
| PRA Holdings, Inc. [United States] | II-way entity |
| Purdue BioPharma Inc. [United States] | II-way entity |
| Purdue BioPharma L.P. [United States] | II-way entity |
| Purdue Healthcare Technologies Inc. [United States] | II-way entity |
| Purdue Healthcare Technologies L.P. [United States] | II-way entity |
| Purdue Pharma Technologies Inc. [United States] | II-way entity |
| Purdue Pharmaceutical Products Inc. [United States] | II-way entity |
| Rhodes Pharmaceuticals Inc. [United States] | II-way entity |
| Rhodes Technologies Inc. [United States] | II-way entity |
| RSJ Company L.P. [United States] | II-way entity |
| Sawwood Land Corporation [United States] | II-way entity |
| Signutra Inc. [United States] | II-way entity |
| The P.F. Betadine Products Co. Inc. [United States] | II-way entity |
| The P.F. Laboratories, Inc. [United States] | II-way entity |
| The Purdue Frederick Company Inc. d/b/a The Purdue Frederick Company [United States] | II-way entity |
| The Seven Hundred Realty Corporation [United States] | II-way entity |
| The Terramar Foundation, Inc. [United States] | II-way entity |
| TXP Services Inc. [United States] | II-way entity |

| Vitamerican Chemicals, Inc. [United States] | II-way entity |
|---|---|
| Vitamerican Corporation [United States] | II-way entity |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City [Vietnam]* | II-way entity |
| Norton Rose Fulbright US LLP | Service Provider: legal counsel to Shareholder Released Parties and the Debtors |

**Exhibit Y**
**Form of B-Side IAC Payment Party Loan Permitted**
**Withdrawal Promissory Note**

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3,
5, 6, 7 and 8**

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**

**Annex C**
**Credit Support Annex for A-Side Payment Group 4**

**<u>Annex D</u>**

**Credit Support Annex for B-Side Payment Group 1**

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

**<u>EXHIBIT AA-2</u>**

**Redline of Exhibit X to the Shareholder Settlement Agreement against Appendix H of the Disclosure Schedule**

## CERTAIN A-SIDE RELEASE PARTIES[1]

### Individual Family Members
1.    Theresa E. Sackler
2.    Ilene Sackler Lefcourt
3.    Kathe A. Sackler
4.    Mortimer D.A. Sackler
5.    Michael Sackler
6.    Marissa Sackler
7.    Sophie Dalrymple
8.    Samantha Hunt
9.    The spouses, children and grandchildren of the above
10.   The assets, businesses and entities owned by the above.
11.   Any entities or individuals to which any assets of the above are transferred.

### Trusts, Trustees and Protectors
1.    533 Canal Trust
2.    Alexa M. Saunders
3.    Anthony M. Roncalli
4.    Angonoka Trust
5.    Beacon Trust
6.    Beacon Trust Company Limited
7.    BJSS 2010 Trust
8.    BJSS 2013 Trust
9.    BJSS and JHSS 2012 K Trust
10.   Benjamin Shack Sackler Trust 98
11.   Bowland Company Limited
12.   Canadian Partnership Trust
13.   Charles G. Lubar
14.   Christopher B. Mitchell (and the estate of Christopher B. Mitchell)
15.   Chelsea Trust Company Limited
16.   Christopher M. Reimer
17.   Clover Trust
18.   Cobo Bay Trust
19.   Codan Trust Company Limited
20.   Diagonal Blue Trust
21.   Estera Services (Bermuda) Limited/Ocorian Services (Bermuda) Limited
22.   Fidinc Trust
23.   Flat Creek Fiduciary Management LLC
24.   Flat Creek Purpose Trust

---

[1] For the avoidance of doubt, the inclusion of any person on this list who also fits within a category on this list that is also a category in the release shall not be construed to narrow such category or to support an inference that another person within such category but not on this list is not a released party.

25. Frontier Directed Fiduciary Services LLC
26. Gorey Trust
27. Glebe Trust II
28. Hagen Trust Company Limited
29. Halm Trust
30. Heatheridge Trust Company Limited
31. Hercules Trust
32. Hermance Schaepman
33. Highland Court Trust
34. Hillside Trust Company Limited
35. Ilene S. Lefcourt Trust 88
36. Ilene S. Lefcourt Trust 96
37. Ilene Sackler Lefcourt Revocable Trust
38. Indian Wells Trust
39. Inholmes Trust
40. ISL 2010 Family Trust
41. ISL 2011 Family Trust
42. ISL JML OSHA Trust
43. ISL LT Children's Trust
44. Jackson River Trust
45. Jeffrey A. Robins
46. JHSS 2010 Trust
47. JHSS 2013 Trust
48. JML 2010 Family Trust
49. JML 2011 Family Trust
50. JML Investment Trust
51. JML OSHA Trust
52. JML Pour-Over Trust
53. Joerg Fischer
54. Jonathan G. White
55. Julia Shack Sackler Trust 98
56. Karen Lefcourt Trust
57. KAS 2010 Family Trust
58. KAS 2011 Family Trust
59. Kathe A. Sackler 2001 Trust
60. Kathe A. Sackler Trust 88
61. Kathe A. Sackler Trust 96
62. Kerry J. Sulkowicz
63. KLT 2010 Family Trust
64. KLT 2011 Family Trust
65. KLT Pour-Over Trust
66. La Coupe Trust
67. La Digue Limited

2

68.     Leslie J. Schreyer
69.     LSRR Family Trust
70.     Lune River Trust
71.     May Trust
72.     Maydean Trust Company Limited
73.     MDAS 2010 Family Trust
74.     MDAS 2011 Family Trust
75.     MDAS 2012 Children's Trust
76.     MDAS Investment Trust
77.     Michael D. Sackler 1992 Trust
78.     Michael D. Sackler 2002 Trust
79.     Michael D. Sackler 2006 Trust
80.     MDS Beacon 2010 Trust
81.     MDS Beacon 2011 Trust
82.     MDS Beacon 2012 Trust
83.     MDS Beacon 2013 Trust
84.     MDS Family Trust
85.     Medichem Trust
86.     Meerkat Trust
87.     Memphis Pharma Trust
88.     MIL Trust
89.     Millborne Trust Company Limited
90.     Millennium Trust
91.     Milton Trust
92.     Mondai Trust
93.     Mordas Consolidated Purpose Trust
94.     Mordas Trust Company Limited
95.     Mortimer DA Sackler Trust 1996
96.     Mortimer DA Sackler Trust 2002
97.     Morvetta Trust
98.     MTS 2002 Trust
99.     MTS 2006 Trust
100.    MTS 2013 Family Trust
101.    MTS 2016 Trust
102.    MTS Bare Trust
103.    MTS Beacon 2010 Trust
104.    MTS Beacon 2011 Trust
105.    MTS Beacon 2012 Trust
106.    MTS Beacon 2013 Trust
107.    MTS Beacon 2014 Trust
108.    MTS Beacon 2015 Trust
109.    MTS Family Trust
110.    MTS Trust 2006

3

111.    Mundi Lab Trust
112.    Nixie Trust
113.    PALP Trust
114.    Perelle Bay Trust
115.    Peter M. Ward (and the estate of Peter M. Ward)
116.    Pickering Trust
117.    Racine Trust
118.    Reserve Trust
119.    Romas Trust 2002
120.    Sandiway Trust Company Limited
121.    Samantha Hunt 1996 Trust
122.    Samantha S. Hunt 2002 Trust
123.    SASS 2010 Trust
124.    SASS 2013 Trust
125.    SDS 1992 Trust
126.    SDS 2002 Trust
127.    SDS 2006 Trust
128.    SDS Bare Trust
129.    SDS Beacon 2011 Trust
130.    SDS Beacon 2012 Trust
131.    SDS Beacon 2014 Trust
132.    SDS Family Trust
133.    Sheffield Trust
134.    Silver Trust
135.    Soft River Fiduciary Management LLC
136.    Soft River Purpose Trust
137.    SS Tanager Trust
138.    SSSH 2013 Family Trust
139.    SSSH Beacon 2013 Trust
140.    Stuart D. Baker
141.    Taddeo Fiduciary Management Inc.
142.    Taddeo Purpose Trust
143.    Taddeo Trust
144.    Tayleigh Trust Company Limited
145.    Tenzin Trust Company Limited
146.    TES Bare Trust
147.    TES Beacon 2012 Trust
148.    TES Beacon 2013 Trust
149.    TES Beacon 2014 Trust
150.    Themar Consolidated Purpose Trust
151.    Themar Trust Company Limited
152.    Theresa E. Sackler 1988 Trust
153.    Theresa E. Sackler 2008 Trust

4

154.    Tom & Kelly Trust
155.    Trust under Agreement dated the 11th day of May 2005
156.    Trust under Agreement dated the 13th day of March 2009
157.    Trust Under Declaration dated April 11, 2002
158.    Trust Under Declaration of Trust No. 1 dated November 25, 1996
159.    Trust Under Declaration of Trust No. 2 dated November 25, 1996
160.    Varus Trust
161.    The assets, businesses and entities owned by the above.
162. Any entities or individuals to which any assets of the above are transferred.

### Purdue Parent Entities
1.    Banela Corporation
2.    Beacon Company
3.    BR Holdings Associates Inc.
4.    BR Holdings Associates L.P.
5.    Heatheridge Trust Company Limited, as Trustee under Settlement dated 31 December 1993 F.B.O. the issue of Mortimer D. Sackler M.D., Theresa E. Sackler and certain charitable objects
6.    Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated 2 March 1999 F.B.O. Theresa E. Sackler, the issue of Mortimer D. Sackler, M.D. and certain charitable objects
7.    Pharmaceutical Research Associates L.P. (formerly Purdue Holdings L.P.)
8.    PLP Associates Holdings Inc.
9.    PLP Associates Holdings L.P.
10.    Purdue Pharma Inc.
11.    Stanhope Gate Corp.
12.    The assets, businesses and entities owned by the above (excluding the Debtors).
13. Any entities or individuals to which any assets of the above are transferred (excluding the Debtors).

### Independent Associated Companies
1.    Accardi B.V.
2.    Accardi S.àr.l.
3.    Alfa Generics B.V.
4.    Arsago B.V.
5.    Bard Pharmaceuticals (1990) Inc.
6.    Bard Pharmaceuticals Limited
7.    Bermag Limited
8.    Boetti Corporation
9.    Boldini Corporation
10.    Bradenton Products B.V.
11.    Bulla S.àr.l.
12.    Clinical Designs Limited
13.    Clovio Corporation

5

14.     E.R.G. Realty, Inc.
15.     Elvium Life Sciences GP Inc.
16.     Elvium Life Sciences Limited Partnership
17.     Elvium ULC
18.     Euro-Celtique S.A.
19.     Evening Star Services Limited
20.     Filti S.àr.l.
21.     Flira S.àr.l.
22.     Hayez Corporation
23.     Ind S.àr.l.
24.     Irey S.àr.l.
25.     Krugmann GmbH
26.     Ladenburg B.V.
27.     Lake Claire Investments Limited
28.     L.P. Clover Limited
29.     Lucien Holdings S.àr.l.
30.     Lymit Holdings S.àr.l.
31.     Maltus Corporation
32.     Marnine Holdings Pte. Limited
33.     Martone Holdings Pte. Limited
34.     Mexcus Corporation
35.     MN Consulting LLC
36.     MNP Consulting Limited
37.     Mundibiopharma Limited
38.     Mundichemie GmbH
39.     Mundipharma (Argentina) S.r.l.
40.     Mundipharma (China) Pharmaceutical Company Limited
41.     Mundipharma (Colombia) S.A.S.
42.     Mundipharma (Hong Kong) Limited
43.     Mundipharma (Myanmar) Co., Limited
44.     Mundipharma (Proprietary) Limited
45.     Mundipharma (Shanghai) International Trade Company Limited
46.     Mundipharma (Thailand) Limited
47.     Mundipharma A.S.
48.     Mundipharma A/S
49.     Mundipharma AB
50.     Mundipharma AG
51.     Mundipharma B.V.
52.     Mundipharma Biologics GmbH
53.     Mundipharma Biologics Inc.
54.     Mundipharma Bradenton B.V.
55.     Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda.
56.     Mundipharma BV

6

57.     Mundipharma Company
58.     Mundipharma Corporation (Ireland) Limited
59.     Mundipharma Corporation Limited
60.     Mundipharma DC B.V.
61.     Mundipharma de Mexico, S. de R.L. de C.V.
62.     Mundipharma Deutschland GmbH & Co. KG
63.     Mundipharma Development Pte. Limited
64.     Mundipharma Distribution GmbH
65.     Mundipharma Distribution Limited
66.     Mundipharma EDO GmbH
67.     Mundipharma Egypt LLC
68.     Mundipharma Farmaceutica LDA.
69.     Mundipharma FZ-LLC
70.     Mundipharma GesmbH
71.     Mundipharma GmbH
72.     Mundipharma Healthcare Corporation
73.     Mundipharma Healthcare LLC
74.     Mundipharma Healthcare Pte. Limited
75.     Mundipharma Healthcare Pty. Limited
76.     Mundipharma Holding AG
77.     Mundipharma International Services GmbH
78.     Mundipharma International Services Limited
79.     Mundipharma International Services S.ar.l.
80.     Mundipharma International Corporation Limited
81.     Mundipharma International Holdings Limited
82.     Mundipharma International Limited
83.     Mundipharma International Services GmbH
84.     Mundipharma International Services Limited
85.     Mundipharma International Services S.àr.l.
86.     Mundipharma International Technical Operations Limited
87.     Mundipharma IT GmbH
88.     Mundipharma IT Services GmbH
89.     Mundipharma IT Services Inc.
90.     Mundipharma IT Services Limited
91.     Mundipharma IT Services Pte. Limited
92.     Mundipharma Kabushiki Kaishe
93.     Mundipharma Korea Limited
94.     Mundipharma Laboratories GmbH
95.     Mundipharma Laboratories Limited
96.     Mundipharma LATAM GmbH
97.     Mundipharma Limited
98.     Mundipharma Ltd.
99.     Mundipharma Management S.ar.l.

7

100.  Mundipharma Manufacturing Pte. Limited
101.  Mundipharma MEA GmbH
102.  Mundipharma Medical CEE GmbH
103.  Mundipharma Medical Company
104.  Mundipharma Medical Company Limited
105.  Mundipharma Medical GmbH
106.  Mundipharma Medical S.ar.l.
107.  Mundipharma Middle East FZ-LLC
108.  Mundipharma Near East GmbH
109.  Mundipharma New Zealand Limited
110.  Mundipharma Oncology Pty. Limited
111.  Mundipharma Ophthalmology Corporation Limited
112.  Mundipharma Ophthalmology Products Limited
113.  Mundipharma Oy
114.  Mundipharma Pharmaceutical Company
115.  Mundipharma Pharmaceuticals (Chile) Limitada
116.  Mundipharma Pharmaceuticals Argentina S.r.l.
117.  Mundipharma Pharmaceuticals B.V.
118.  Mundipharma Pharmaceuticals Belgium BV
119.  Mundipharma Pharmaceuticals Inc.
120.  Mundipharma Pharmaceuticals Industry and Trade Limited
121.  Mundipharma Pharmaceuticals Limited
122.  Mundipharma Pharmaceuticals Private Limited
123.  Mundipharma Pharmaceuticals S.L.
124.  Mundipharma Pharmaceuticals S.r.l.
125.  Mundipharma Pharmaceuticals Sdn. Bhd.
126.  Mundipharma Polska SP. Z.O.O.
127.  Mundipharma Pte Limited
128.  Mundipharma Pty Limited
129.  Mundipharma Research Company Limited
130.  Mundipharma Research GmbH & Co. KG
131.  Mundipharma Research Limited
132.  Mundipharma Research Verwaltungs GmbH
133.  Mundipharma SAS
134.  Scientific Office of Mundipharma MEA GmbH
135.  Mundipharma Singapore Holding Pte. Limited
136.  Mundipharma TK
137.  Mundipharma Verwaltungsgesellschaft mbH
138.  Napp Laboratories Limited
139.  Napp Pension Trustees Limited
140.  Napp Pharmaceutical Group Limited
141.  Napp Pharmaceutical Holdings Limited
142.  Napp Pharmaceuticals Limited

143.   Napp Research Centre Limited
144.   Nitid S.àr.l.
145.   Nontag S.àr.l.
146.   One Stamford Realty L.P.
147.   Paineurope Limited
148.   Par-La-Ville Properties Limited
149.   Porthos S.àr.l.
150.   PT. Mundipharma Healthcare Indonesia
151.   Purdue BioPharma Inc.
152.   Purdue BioPharma L.P.
153.   Purdue Frederick Inc.
154.   Purdue Pharma Inc. (Canadian Company)
155.   Purdue Pharma Technologies Inc.
156.   Purdue Pharma Pty. Ltd.
157.   Purdue Pharma ULC
158.   Qdem Pharmaceuticals Limited
159.   Rafa Laboratories Ltd.
160.   Sofy S.àr.l.
161.   Songol S.àr.l.
162.   Sonti S.àr.l.
163.   Tacca B.V.
164.   Taiwan Mundipharma Pharmaceuticals Limited
165.   Technical Scientific Office of Mundipharma Near East GmbH
166.   Tenna B.V.
167.   The Napp Educational Foundation
168.   The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City
169.   Vaccaro B.V.
170.   Venusti B.V.
171.   Win – Healthcare Private Ltd.
172.   Win – Medicare Private Ltd.
173.   Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd.
174.   The assets, businesses and entities owned by the above.
175.   Any entities or individuals to which any assets of the above are transferred.

9

## CERTAIN B-SIDE ~~RELEASE~~RELEASED PARTIES

| Certain Shareholder Released Parties | |
|---|---|
| **Shareholder Released Party** | **Relationship to Proceedings** |
| Raymond R. Sackler/Estate of Raymond R. Sackler | **Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity[1] in Purdue Pharma L.P. chain of ownership; current and/or former trustee** |
| Beverly Sackler/Estate of Beverly Sackler | **Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former trustee** |
| Jonathan D. Sackler/Estate of Jonathan D. Sackler | **Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way[2] entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Richard S. Sackler, M.D. | **Family member; trust beneficiary; executor of estate; current and/or former director, manager and/or officer of II-way** |

---

[1]    **A II-way entity is an entity directly or indirectly owned by persons or trusts associated with both the Raymond Sackler Family (the "RRS Family") and the Mortimer Sackler Family (the "MDS Family"), with equal interests associated with each family.**

[2]    **A I-way entity is an entity directly or indirectly owned by persons or trusts associated solely with either the RRS Family or the MDS Family.**

| | |
|---|---|
| | **entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Beth Cohen (formerly Sackler) | **Family member; trust beneficiary; current and/or former trustee** |
| David A. Sackler | **Family member; trust beneficiary; current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Children of David Sackler | **Family members; trust beneficiaries** |
| Jaseleen Ruggles | **Family member** |
| Marianna Sackler Frame | **Family member; trust beneficiary** |
| Children of Marianna Sackler Frame | **Family members; trust beneficiaries** |
| James Frame | **Family member** |
| Rebecca Sackler | **Family member; trust beneficiary; current and/or former trustee** |
| Jeffrey Selikoff | **Family member; trust beneficiary; current and/or former trustee** |
| Mary Corson | **Family member; trust beneficiary; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Madeleine Sackler | **Family member; trust beneficiary** |
| Clare E. Sackler | **Family member; trust beneficiary** |

| | |
|---|---|
| Children of Clare E. Sackler | **Family members; trust beneficiaries** |
| Miles R.C. Sackler | **Family member; trust beneficiary** |
| Garrett Lynam | **Executor of estate; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity** |
| ~~Howard R. Udell/Estate of Howard R. Udell~~Stuart D. Baker | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| ~~Stuart D. Baker~~ | |
| Anthony M. Roncalli | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Philip C. Strassburger | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership** |
| Edward B. Mahony | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership** |
| Peter Boer | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership** |
| Paulo Costa | **Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership** |
| Ralph Snyderman | **Current and/or former** |

| | director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
|---|---|
| William Loomis | Current and/or former director, manager and/or officer of II-way entity in Purdue Pharma L.P. chain of ownership |
| Stephen A. Ives | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity |
| Leslie J. Schreyer | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Danny Parks | Current and/or former director, manager and/or officer of RRS I-way entity in Purdue Pharma L.P. chain of ownership; employee of RRS Family I-way entity |
| Jeffrey A. Robins | Current and/or former director, manager and/or officer of trust company; current and/or former trustee |
| Beatriz V. Iriondo/Betty Andrikopoulos | Current and/or former director, manager and/or officer of trust company |
| Christopher Reimer | Current and/or former director, manager and/or officer of trust company |
| Jared Giddens | Current and/or former director, manager and/or officer of trust company; |

| | |
|---|---|
| | **current and/or former trustee** |
| Stephen L. Schreiner | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Frank S. Vellucci | **Employee of RRS Family I-way entity** |
| Rory Held | **Employee of RRS Family I-way entity** |
| BRJ Fiduciary Management LLC | **Current and/or former trustee** |
| Cedar Cliff Fiduciary Management Inc. | **Current and/or former trustee** |
| Cornice Fiduciary Management LLC | **Current and/or former trustee** |
| Crystal Fiduciary Company LLC | **Current and/or former trustee** |
| Data LLC | **Current and/or former trustee** |
| MCM Fiduciary Management LLC | **Current and/or former trustee** |
| North Bay Trust Company Inc. | **Current and/or former trustee** |
| Brian Olson | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee; employee of RRS Family I-way entity** |
| Elizabeth A. Whalen | **Current and/or former trustee** |
| Lauren D. Kelly | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| John N. Irwin III | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| John Wilcox/Estate of John Wilcox | **Current and/or former trustee** |
| Michael Kassen | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee** |

- 5 -

| | |
|---|---|
| Peter M. Ward/Estate of Peter M. Ward | **Current and/or former trustee** |
| Ruth Edelson | **Current and/or former trustee** |
| Susan C. Frunzi | **Current and/or former trustee** |
| Thomas A. Russo | **Current and/or former director, manager and/or officer of trust company; current and/or former trustee** |
| Janet Pomerantz | **Current and/or former trustee** |
| Alex Troy | **Current and/or former trustee** |
| Josephine Hoh | **Trust beneficiary** |
| Scott Bulua | **Family member** |
| Molly B. Johnson | **Family member** |
| Trust U/A 11/5/74 fbo Beverly Sackler | **RRS Family trust indirectly owning Purdue** |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | **RRS Family trust indirectly owning Purdue** |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | **RRS Family trust indirectly owning Purdue** |
| Raymond R. Sackler Trust 2 dtd 12/23/89 | **RRS Family trust indirectly owning Purdue** |
| Raymond R. Sackler Trust 2B dtd 12/23/89 | **RRS Family trust indirectly owning Purdue** |
| Trust B U/A 11/5/74 fbo Beverly Sackler | **RRS Family trust** |
| The 1974 Irrevocable Investment Trust | **RRS Family trust** |
| 1974 Irrevocable Trust fbo BS and RSS | **RRS Family trust** |
| 1974 Irrevocable Trust fbo BS and JDS | **RRS Family trust** |
| AR Irrevocable Trust | **RRS Family trust** |
| AJ Irrevocable Trust | **RRS Family trust** |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler | **RRS Family trust** |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o Marianna Rose Sackler 12/21/1989 | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o Rebecca Kate Sackler 12/22/1989 | **RRS Family trust** |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 | **RRS Family trust** |
| Beverly Sackler Trust 2 f/b/o Marianna Rose Sackler 12/21/1989 | **RRS Family trust** |
| Beverly Sackler Trust 2 f/b/o Rebecca Kate Sackler 12/22/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o Marianna Rose Sackler 12/21/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o Rebecca Kate Sackler 12/22/1989 | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o Madeleine Sackler 12/26/1989 | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o Clare Elizabeth Sackler 12/27/1989 | **RRS Family trust** |
| Beverly Sackler Trust 1 f/b/o Miles Raymond Sackler 12/29/1989 | **RRS Family trust** |

| | |
|---|---|
| Beverly Sackler Trust 2 f/b/o Madeleine Sackler 12/26/1989 | **RRS Family trust** |
| Beverly Sackler Trust 2 f/b/o Clare Elizabeth Sackler 12/27/1989 | **RRS Family trust** |
| Beverly Sackler Trust 2 f/b/o Miles Raymond Sackler 12/30/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o Madeleine Sackler 12/26/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o Clare Elizabeth Sackler 12/27/1989 | **RRS Family trust** |
| Beverly Sackler Trust 3 f/b/o Miles Raymond Sackler 12/28/1989 | **RRS Family trust** |
| David A. Sackler 2012 Trust | **RRS Family trust** |
| Marianna R. Sackler 2012 Trust | **RRS Family trust** |
| Rebecca K. Sackler 2012 Trust | **RRS Family trust** |
| Madeleine Sackler 2012 Trust | **RRS Family trust** |
| Clare E. Sackler 2012 Trust | **RRS Family trust** |
| Miles R.C. Sackler 2012 Trust | **RRS Family trust** |
| Irrevocable Trust under Declaration dated as of April 25, 1991 | **RRS Family trust** |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | **RRS Family trust** |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | **RRS Family trust** |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | **RRS Family trust** |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | **RRS Family trust** |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | **RRS Family trust** |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler | **RRS Family trust** |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | **RRS Family trust** |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler | **RRS Family trust** |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | **RRS Family trust** |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler | **RRS Family trust** |
| Beth B. Sackler Trust | **RRS Family trust** |
| Beth Sackler 2013 Trust | **RRS Family trust** |
| Mary Corson Trust | **RRS Family trust** |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | **RRS Family trust** |
| Trust Agreement dated August 29, 2003 f/b/o Mary Corson and Issue of Jonathan D. Sackler | **RRS Family trust** |
| Irrevocable Trust under Declaration dated as of August 25, 1992 | **RRS Family trust** |
| Irrevocable Trust under Declaration dated as of December 29, 1992 | **RRS Family trust** |
| Richard S. Sackler Life Insurance Trust | **RRS Family trust** |
| Jonathan D. Sackler Life Insurance Trust | **RRS Family trust** |
| Richard S. Sackler Trust U/A 9/30/04 | **RRS Family trust** |
| Jonathan D. Sackler Trust U/A 9/30/04 | **RRS Family trust** |
| Hudson Trust | **RRS Family trust** |
| Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | **RRS Family trust** |
| Richard S. Sackler Trust f/b/o Marianna R. Sackler 3/8/90 | **RRS Family trust** |
| Richard S. Sackler Trust f/b/o Rebecca K. Sackler 3/8/90 | **RRS Family trust** |
| Jonathan D. Sackler Trust f/b/o Clare Elizabeth Sackler 4/11/90 | **RRS Family trust** |

| | |
|---|---|
| Jonathan D. Sackler Trust f/b/o Madeleine Sackler 4/11/90 | **RRS Family trust** |
| Jonathan D. Sackler Trust f/b/o Miles Raymond Corson Sackler, 4/11/90 | **RRS Family trust** |
| The RSS 2012 Family Trust | **RRS Family trust** |
| Marianna R. Sackler Captain Trust | **RRS Family trust** |
| Rebecca K. Sackler Captain Trust | **RRS Family trust** |
| RSS Fiduciary Management Trust | **RRS Family trust** |
| JDS Fiduciary Management Trust | **RRS Family trust** |
| Crystal Trust | **RRS Family trust** |
| MCM Fiduciary Management Trust | **RRS Family trust** |
| Data Trust | **RRS Family trust** |
| Cornice Trust | **RRS Family trust** |
| DABB Trust | **RRS Family trust** |
| Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 | **RRS Family trust** |
| Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 | **RRS Family trust** |
| Raymond R. Sackler Marital Trust u/a 3/29/2012 | **RRS Family trust** |
| Beverly Sackler Revocable Trust u/a 3/29/12 | **RRS Family trust** |
| RSS Revocable Pourover Trust | **RRS Family trust** |
| JDS Revocable Pourover Trust | **RRS Family trust** |
| Cedar Cliff Trust | **RRS Family trust** |
| Selikoff Family Investment Trust | **RRS Family trust** |
| 1959 Irrevocable Trust | **RRS Family trust (terminated)** |
| 1969 Irrevocable Trust | **RRS Family trust (terminated)** |
| FTA Trust | **RRS Family trust (terminated)** |
| 1974 Revocable Trust | **RRS Family trust (terminated)** |
| RSS Pourover Trust | **RRS Family trust (terminated)** |
| JDS Pourover Trust | **RRS Family trust (terminated)** |
| RSS 2/2/98 Trust | **RRS Family trust (terminated)** |
| JDS 2/2/98 Trust | **RRS Family trust (terminated)** |
| RSS 1992 Insurance Trust | **RRS Family trust (terminated)** |
| JDS 1992 Insurance Trust | **RRS Family trust (terminated)** |
| The Richard S. Sackler Revocable Pourover Trust | **RRS Family trust (terminated)** |
| The Jonathan D. Sackler Revocable Pourover Trust dated 12/12/2010 | **RRS Family trust (terminated)** |
| Moonstone Holdings LLC [DE] | **RRS Family I-way entity in Purdue Pharma L.P. ownership chain** |
| Linarite Holdings LLC [DE] | **RRS Family I-way entity in Purdue Pharma L.P.** |

| | |
|---|---|
| | **ownership chain** |
| Perthlite Holdings LLC [DE] | **RRS Family I-way entity in Purdue Pharma L.P. ownership chain** |
| Roselite Holdings LLC [DE] | **RRS Family I-way entity in Purdue Pharma L.P. ownership chain** |
| Rosebay Medical Company L.P. [DE] | **RRS Family I-way entity in Purdue Pharma L.P. ownership chain** |
| Rosebay Medical Company, Inc. [DE] | **RRS Family I-way entity in Purdue Pharma L.P. ownership chain** |
| BR Holdings Associates Inc. [NY] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| BR Holdings Associates L.P. [DE] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| PLP Associates Holdings Inc. [NY] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| PLP Associates Holdings L.P. [DE] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| Purdue Pharma Inc. [NY] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| Pharmaceutical Research Associates L.P. [DE] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| Purdue Pharma L.P. [DE] | **II-way entity in Purdue Pharma L.P. ownership chain** |
| Atlantic Laboratories Limited [Bermuda] | **RRS Family I-way entity** |
| B.L. Carrolton Limited [Bermuda] | **RRS Family I-way entity** |
| G.H. Carrell Limited [Bermuda] | **RRS Family I-way entity** |
| Laysan Limited [Bermuda] | **RRS Family I-way entity** |
| Mallard Limited [Bermuda] | **RRS Family I-way entity** |
| The Research Foundation Ltd. [Bermuda] | **RRS Family I-way entity** |
| Triangle Industries Ltd. [Bermuda] | **RRS Family I-way entity** |
| East Hudson Inc. [British Virgin Islands] | **RRS Family I-way entity** |
| East River Partners Ltd. [British Virgin Islands] | **RRS Family I-way entity** |
| Hobart Corporation [British Virgin Islands] | **RRS Family I-way entity** |
| Mauna Kea Limited [British Virgin Islands] | **RRS Family I-way entity** |
| Menlo Park Investors Inc. [British Virgin Islands] | **RRS Family I-way entity** |
| Meridian B.V.I. Limited [British Virgin Islands] | **RRS Family I-way entity** |
| Silk Crest Corp. [British Virgin Islands] | **RRS Family I-way entity** |
| Cheyenne Canada Limited Partnership [Canada] | **RRS Family I-way entity** |
| CPC Canada Corporation [Canada] | **RRS Family I-way entity** |

| CPC Canada Partnership 1 [Canada] | **RRS Family I-way entity** |
|---|---|
| CPC Canada Partnership 2 [Canada] | **RRS Family I-way entity** |
| The Raymond And Beverly Sackler Foundation [Canada] | **RRS Family I-way entity** |
| Boiling Bay S.àr.l. [Luxembourg] | **RRS Family I-way entity** |
| Neji S.àr.l. [Luxembourg] | **RRS Family I-way entity** |
| Nerula S.àr.l. [Luxembourg] | **RRS Family I-way entity** |
| Aquebogue Holdings Corporation [Mauritius] | **RRS Family I-way entity** |
| Boiling Bay Corporation B.V. [Netherlands] | **RRS Family I-way entity** |
| The Raymond and Beverly Sackler Foundation [United Kingdom] | **RRS Family I-way entity** |
| The Raymond and Beverly Sackler 1988 Foundation [United Kingdom] | **RRS Family I-way entity** |
| 1987 Fund LLC [DE] | **RRS Family I-way entity** |
| 60 FPC Remainder (J) LLC [CT] | **RRS Family I-way entity** |
| 60 FPC Residence (J) LLC [CT] | **RRS Family I-way entity** |
| 95 Percent LLC [NY] | **RRS Family I-way entity** |
| 1JM LLC [DE] | **RRS Family I-way entity** |
| 2JM LLC [DE] | **RRS Family I-way entity** |
| 3JM LLC [DE] | **RRS Family I-way entity** |
| A5 Atlas LLC [DE] | **RRS Family I-way entity** |
| Aim High Productions [DE] | **RRS Family I-way entity** |
| Akutan Bay LLC [AK] | **RRS Family I-way entity** |
| AJ Managed Holdings LLC [DE] | **RRS Family I-way entity** |
| Alexander Road Capital LLC [NY] | **RRS Family I-way entity** |
| Altaa LLC [DE] | **RRS Family I-way entity** |
| Alta Ridge, LLC [DE] | **RRS Family I-way entity** |
| Alta Ridge Capital LLC [DE] | **RRS Family I-way entity** |
| Alta Ridge Investments LLC [DE] | **RRS Family I-way entity** |
| Ankersea Limited Liability Company [DE] | **RRS Family I-way entity** |
| Antler LLC [DE] | **RRS Family I-way entity** |
| Azurite Holdings LLC [DE] | **RRS Family I-way entity** |
| Bapricot LLC [NY] | **RRS Family I-way entity** |
| Beryl Holdings LLC [DE] | **RRS Family I-way entity** |
| Berrybrook LLC [NY] | **RRS Family I-way entity** |
| BHPH LLC [DE] | **RRS Family I-way entity** |
| Boiling Bay Corporation [DE] | **RRS Family I-way entity** |
| Bowford Company [NY General Partnership] | **RRS Family I-way entity** |
| BRC Special Partners LLC [DE] | **RRS Family I-way entity** |
| Brook Holdings [NY General Partnership] | **RRS Family I-way entity** |
| BRJ Fiduciary Management LLC [WY] | **RRS Family I-way entity** |
| Calhoun Advisors LLC [DE] | **RRS Family I-way entity** |
| Camelot Hotel Holdings LLC [DE] | **RRS Family I-way entity** |
| Cap 1 LLC [DE] | **RRS Family I-way entity** |
| Cap 2 LLC [DE] | **RRS Family I-way entity** |
| Captain Leasing LLC [DE] | **RRS Family I-way entity** |
| Cedar Cliff Fiduciary Management Inc. [WY] | **RRS Family I-way entity** |
| CHBR LLC [DE] | **RRS Family I-way entity** |
| Cheviot LLC [DE] | **RRS Family I-way entity** |
| Cheyenne Energy Services LLC [OK] | **RRS Family I-way entity** |
| Cheyenne International Corporation [OK] | **RRS Family I-way entity** |

| | |
|---|---|
| Cheyenne Petroleum Company [NY Limited Partnership] | **RRS Family I-way entity** |
| Chez Ellie LLC [DE] | **RRS Family I-way entity** |
| China Sea Company, Inc. [DE] | **RRS Family I-way entity** |
| China Sea Company L.P. [DE Limited Partnership] | **RRS Family I-way entity** |
| Cornice Fiduciary Management LLC [WY] | **RRS Family I-way entity** |
| CPC 2001 LLC [DE] | **RRS Family I-way entity** |
| CPT 1A PE-AA LLC [DE] | **RRS Family I-way entity** |
| Crissaire Corporation [DE] | **RRS Family I-way entity** |
| Crystal Fiduciary Company LLC [WY] | **RRS Family I-way entity** |
| Curson Capital L.P. [CA] | **RRS Family I-way entity** |
| Curson Dev LLC [DE] | **RRS Family I-way entity** |
| CWC LLC [DE] | **RRS Family I-way entity** |
| DABB LLC [DE] | **RRS Family I-way entity** |
| Data LLC [WY] | **RRS Family I-way entity** |
| Deckstone International Company [CT General Partnership] | **RRS Family I-way entity** |
| DNKA LLC [DE] | **RRS Family I-way entity** |
| Dravite Holdings LLC [DE] | **RRS Family I-way entity** |
| Dolcedo LLC [DE] | **RRS Family I-way entity** |
| Elbanite Holdings LLC [DE] | **RRS Family I-way entity** |
| Exmoor Horn LLC [DE] | **RRS Family I-way entity** |
| Expert Philanthropy LLC [DE] | **RRS Family I-way entity** |
| Finnest Pharma LLC [DE] | **RRS Family I-way entity** |
| Foley Properties LLC [DE] | **RRS Family I-way entity** |
| G3A LLC [DE] | **RRS Family I-way entity** |
| G3D LLC [DE] | **RRS Family I-way entity** |
| G3R LLC [DE] | **RRS Family I-way entity** |
| GGM Company [DE General Partnership] | **RRS Family I-way entity** |
| Great Curve Films, LLC [DE] | **RRS Family I-way entity** |
| Golden Gun Capital, LLC [CA] | **RRS Family I-way entity** |
| Halesworth Corporation [DE] | **RRS Family I-way entity** |
| Haystacks Investments Partners LLC [DE] | **RRS Family I-way entity** |
| Haystacks Endure LLC [DE] | **RRS Family I-way entity** |
| HCRB LLC [NY] | **RRS Family I-way entity** |
| Hudson River (Delaware) Inc. [DE] | **RRS Family I-way entity** |
| Hudson River Partners [NY General Partnership] | **RRS Family I-way entity** |
| Inactive Holdings LLC [DE] | **RRS Family I-way entity** |
| Interrogation 2008 LLC [NY] | **RRS Family I-way entity** |
| Intrepidus Holdings LLC [DE] | **RRS Family I-way entity** |
| IS-BEP LLC [DE] | **RRS Family I-way entity** |
| JGT One LLC [DE] | **RRS Family I-way entity** |
| JGT Three LLC [DE] | **RRS Family I-way entity** |
| JGT Two LLC [DE] | **RRS Family I-way entity** |
| Jibwind Company [NY] | **RRS Family I-way entity** |
| JR Learning LLC [DE] | **RRS Family I-way entity** |
| JV Fuel LLC [DE] | **RRS Family I-way entity** |
| JWA Holdings LLC [DE] | **RRS Family I-way entity** |
| K-BEP LP [DE] | **RRS Family I-way entity** |
| K-BEP III L.P. [DE] | **RRS Family I-way entity** |
| K-Neptune LLC [DE] | **RRS Family I-way entity** |

| K-S Medical LLC [DE] | **RRS Family I-way entity** |
|---|---|
| K-SR Holdings LLC [DE] | **RRS Family I-way entity** |
| K-SR Performance LLC [DE] | **RRS Family I-way entity** |
| K-Ventures I LLC [DE] | **RRS Family I-way entity** |
| KB Managed Holdings LLC [DE] (Formerly Haystacks HH LLC) | **RRS Family I-way entity** |
| Kernite Holdings LLC [DE] | **RRS Family I-way entity** |
| Kokino Corporation [DE] | **RRS Family I-way entity** |
| Kokino LLC [DE] | **RRS Family I-way entity** |
| Kokino Maj Holdings LLC [DE] | **RRS Family I-way entity** |
| KRA Associates, Ltd. [CT General Partnership] | **RRS Family I-way entity** |
| KRA Associates, Ltd. [DE] | **RRS Family I-way entity** |
| Landings Financial Limited Liability Company [DE] | **RRS Family I-way entity** |
| LBV Non-Profit, Inc. [DE] | **RRS Family I-way entity** |
| LBV Inc. [DE] (Formerly Les Bouledogues Vigneronnes Inc.) | **RRS Family I-way entity** |
| Laramide LLC [DE] | **RRS Family I-way entity** |
| Level 4 Films LLC [NY] | **RRS Family I-way entity** |
| Lightship Company [NY General Partnership] | **RRS Family I-way entity** |
| Little Menlo LLC [DE] | **RRS Family I-way entity** |
| Llama Bay LLC [DE] | **RRS Family I-way entity** |
| Lodestone Limited Liability Company [DE] | **RRS Family I-way entity** |
| Longbrook Corporation [DE] | **RRS Family I-way entity** |
| M3C Holdings LLC [DE] | **RRS Family I-way entity** |
| MD60 LLC [DE] | **RRS Family I-way entity** |
| Meridian International, Ltd. [DE] | **RRS Family I-way entity** |
| MCM Fiduciary Management LLC [DE] | **RRS Family I-way entity** |
| Mill Shoals LLC [DE] | **RRS Family I-way entity** |
| Minimalist Project LLC [NY] | **RRS Family I-way entity** |
| MKL Haystacks Holdings LLC [DE] | **RRS Family I-way entity** |
| Moxietec LLC [DE] | **RRS Family I-way entity** |
| MXE LLC [DE] | **RRS Family I-way entity** |
| MXE Leasing, LLC [DE] | **RRS Family I-way entity** |
| NE SOL LLC [DE] | **RRS Family I-way entity** |
| Newhall & Company, Ltd. [DE] | **RRS Family I-way entity** |
| North Bay Associates [DE General Partnership] | **RRS Family I-way entity** |
| North Bay Eagle LLC [DE] | **RRS Family I-way entity** |
| North Bay Trust Company Inc. [OK] | **RRS Family I-way entity** |
| OG Film LLC [NY] | **RRS Family I-way entity** |
| OG Picture Inc. [NY] | **RRS Family I-way entity** |
| Orchids LLC [DE] | **RRS Family I-way entity** |
| Orcus Corporation [DE] | **RRS Family I-way entity** |
| Otavite Holdings LLC [DE] | **RRS Family I-way entity** |
| Pacific Partners Company [NY] | **RRS Family I-way entity** |
| Paloma Partners L.P. [DE] | **RRS Family I-way entity** |
| Park View Properties L.L.C. [DE] | **RRS Family I-way entity** |
| PBC - AC [NY General Partnership] | **RRS Family I-way entity** |
| PBC - ABS [NY General Partnership] | **RRS Family I-way entity** |
| PBC - ABSJS [DE General Partnership] | **RRS Family I-way entity** |
| PBC-ALF [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Alternative Investments [NY General Partnership] | **RRS Family I-way entity** |

| | |
|---|---|
| PBC - Bear Stearns Healthcare Value Partners [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Brook Holdings [NY General Partnership] | **RRS Family I-way entity** |
| PBC - BSM [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Centaur [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Glenhill Capital [NY General Partnership] | **RRS Family I-way entity** |
| PBC - GCLP [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Lone Cascade [NY General Partnership] | **RRS Family I-way entity** |
| PBC – LP [NY General Partnership] | **RRS Family I-way entity** |
| PBC – LR [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Marathon Structured Finance Fund [NY General Partnership] | **RRS Family I-way entity** |
| PBC – PP [NY General Partnership] | **RRS Family I-way entity** |
| PBC – R Domestic Fund [NY General Partnership] | **RRS Family I-way entity** |
| PBC-RLCP [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Seneca Capital [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Silver Point Capital Fund [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Swiftcurrent Partners [NY General Partnership] | **RRS Family I-way entity** |
| PBC - Visium Balanced Fund [NY General Partnership] | **RRS Family I-way entity** |
| Piton Capital Management LLC [DE] | **RRS Family I-way entity** |
| Piton Capital Partners LLC [DE] | **RRS Family I-way entity** |
| Poco Bay Company [DE General Partnership] | **RRS Family I-way entity** |
| Poco Bay Realty LLC [DE] | **RRS Family I-way entity** |
| Poco Yield LLC [DE] | **RRS Family I-way entity** |
| PSART LLC [DE] | **RRS Family I-way entity** |
| QBEC LLC [DE] | **RRS Family I-way entity** |
| R Napp Holdings LLC [DE] | **RRS Family I-way entity** |
| Radstock Corporation [DE] | **RRS Family I-way entity** |
| RAR Investments LLC [DE] | **RRS Family I-way entity** |
| Raylodie LLC [NY] | **RRS Family I-way entity** |
| Raymond and Beverly Sackler Foundation, Inc. [NY] | **RRS Family I-way entity; trust beneficiary** |
| Raymond and Beverly Sackler Fund for the Arts and Sciences [DE] (Non-Profit) | **RRS Family I-way entity; trust beneficiary** |
| RBMC Holdings LLC [DE] | **RRS Family I-way entity** |
| RBS Institute LLC [DE] | **RRS Family I-way entity** |
| Rees Holdings LLC [NY] | **RRS Family I-way entity** |
| Refocus Foundation Inc. [DE] | **RRS Family I-way entity** |
| RLC Affiliates LLC [DE] | **RRS Family I-way entity** |
| RLC Affiliates [NY General Partnership] | **RRS Family I-way entity** |
| RGT One LLC [DE] | **RRS Family I-way entity** |
| RGT Three LLC [DE] | **RRS Family I-way entity** |
| RGT Two LLC [DE] | **RRS Family I-way entity** |
| Richard Sackler Family Foundation, Inc. [DE] | **RRS Family I-way entity** |
| Riverside Seven LLC [DE] | **RRS Family I-way entity** |
| Riviera Outlook LLC [DE] | **RRS Family I-way entity** |
| RJ Dan LLC [DE] | **RRS Family I-way entity** |
| Rockpoint Land LLC [CT] | **RRS Family I-way entity** |
| Rockpoint Residence LLC [CT] | **RRS Family I-way entity** |
| Rosebay Medical Company LLC [DE] | **RRS Family I-way entity** |

| RSHRS LLC [DE] | **RRS Family I-way entity** |
|---|---|
| Runham Corporation [DE] | **RRS Family I-way entity** |
| RWA Holdings LLC [DE] | **RRS Family I-way entity** |
| Sarbonne LLC [DE] | **RRS Family I-way entity** |
| Seabright Partners [DE General Partnership] | **RRS Family I-way entity** |
| Seadog Partners [DE General Partnership] | **RRS Family I-way entity** |
| SFP Holdings LLC [DE] | **RRS Family I-way entity** |
| Smokering LLC [DE] | **RRS Family I-way entity** |
| SO 32 Mack LLC [DE] | **RRS Family I-way entity** |
| SO-BFR LLC [DE] | **RRS Family I-way entity** |
| SO-CCS LLC [DE] | **RRS Family I-way entity** |
| SO-CSH LLC [DE] | **RRS Family I-way entity** |
| SO-ESH LLC [DE] | **RRS Family I-way entity** |
| SO-MSS LLC [DE] | **RRS Family I-way entity** |
| SO-SHSH LLC [DE] | **RRS Family I-way entity** |
| SO-WSH LLC [DE] | **RRS Family I-way entity** |
| SO-WSR LLC [DE] | **RRS Family I-way entity** |
| Solar SO Ware LLC [DE] | **RRS Family I-way entity** |
| Solar SO Wotton LLC [DE] | **RRS Family I-way entity** |
| Somac LLC [DE] | **RRS Family I-way entity** |
| Southern Alta LLC [DE] | **RRS Family I-way entity** |
| SR-GA RE LLC [DE] | **RRS Family I-way entity** |
| SR VC TP LLC [DE] | **RRS Family I-way entity** |
| SRMS LLC [DE] | **RRS Family I-way entity** |
| Standard Pharmaceuticals Corporation [DE] | **RRS Family I-way entity** |
| Stibnite Holdings LLC [DE] | **RRS Family I-way entity** |
| St. Lawrence Associates [NY General Partnership] | **RRS Family I-way entity** |
| Summer Road LLC [DE] | **RRS Family I-way entity** |
| Superior View L.L.C. [DE] | **RRS Family I-way entity** |
| Swipe Right LLC [DE] | **RRS Family I-way entity** |
| Tacitus Therapeutics Inc. [DE] | **RRS Family I-way entity** |
| The Bouncer Foundation, Inc. [DE] | **RRS Family I-way entity** |
| The Lottery, LLC [DE] | **RRS Family I-way entity** |
| The Neuroendocrine Tumor Research Foundation [DE] (Non-Profit) | **RRS Family I-way entity** |
| Temagami LLC [DE] | **RRS Family I-way entity** |
| TPART LLC [DE] | **RRS Family I-way entity** |
| Tradewind Company [NY General Partnership] | **RRS Family I-way entity** |
| Tremolite Holdings LLC [DE] | **RRS Family I-way entity** |
| TQD 1 LLC [DE] | **RRS Family I-way entity** |
| TQD 2 LLC [DE] | **RRS Family I-way entity** |
| Tract SRMS LLC [DE] | **RRS Family I-way entity** |
| Triangle Holding LLC [DE] | **RRS Family I-way entity** |
| Tukiewings LLC [DE] | **RRS Family I-way entity** |
| Twin Springs Holdings [NY General Partnership] | **RRS Family I-way entity** |
| UNCH Corp. [DE] | **RRS Family I-way entity** |
| UNCHADA LLC [DE] | **RRS Family I-way entity** |
| Unstable Elements LLC [DE] | **RRS Family I-way entity** |
| Valdiva Films LLC [DE] | **RRS Family I-way entity** |
| Verto Institute LLC [DE] | **RRS Family I-way entity** |

- 14 -

| | |
|---|---|
| VLS LLC [DE] | **RRS Family I-way entity** |
| WA Canada L.P. [DE] | **RRS Family I-way entity** |
| Wasatch LLC [DE] | **RRS Family I-way entity** |
| Westward Home LLC [DE] | **RRS Family I-way entity** |
| Whilton Corporation [DE] | **RRS Family I-way entity** |
| WP Leasing LLC [DE] | **RRS Family I-way entity** |
| Yamashiro Development LLC [DE] | **RRS Family I-way entity** |
| Mundipharma (Argentina) S.r.l. [Argentina]*[3] | **II-way entity** |
| Mundipharma Pharmaceuticals Argentina S.r.l. [Argentina]* | **II-way entity** |
| Mundipharma ANZ Pty. Limited [Australia] | **II-way entity** |
| Mundipharma Healthcare Pty. Limited [Australia] * | **II-way entity** |
| Mundipharma Oncology Pty. Limited [Australia] * | **II-way entity** |
| Mundipharma Pty Limited [Australia] * | **II-way entity** |
| Mundipharma GesmbH [Austria] * | **II-way entity** |
| Mundipharma Medical CEE GmbH [Austria]* | **II-way entity** |
| Bangladesh Beauty Products Private Limited [Bangladesh] | **II-way entity** |
| Mundipharma Bangladesh Private Limited [Bangladesh] | **II-way entity** |
| Mundipharma Trading Bangladesh Private Limited [Bangladesh] | **II-way entity** |
| Mundipharma BV [Belgium]* | **II-way entity** |
| Mundipharma Pharmaceuticals Belgium BV [Belgium]* | **II-way entity** |
| Bermag Limited [Bermuda]* | **II-way entity** |
| L.P. Clover Limited [Bermuda]* | **II-way entity** |
| MN Consulting LLC [Bermuda] | **II-way entity** |
| MNB Company [Bermuda] | **II-way entity** |
| Mundipharma Company [Bermuda] | **II-way entity** |
| Mundipharma International Corporation Limited [Bermuda]* | **II-way entity** |
| Mundipharma International Holdings Limited [Bermuda]* | **II-way entity** |
| Mundipharma International Limited [Bermuda]* | **II-way entity** |
| Mundipharma Laboratories Limited [Bermuda]* | **II-way entity** |
| Mundipharma Limited [Bermuda]* | **II-way entity** |
| Mundipharma Medical Company [Bermuda]* | **II-way entity** |
| Mundipharma Ophthalmology Corporation Limited [Bermuda]* | **II-way entity** |
| Mundipharma Ophthalmology Products Limited [Bermuda]* | **II-way entity** |
| Mundipharma Pharmaceutical Company [Bermuda] | **II-way entity** |
| Mundipharma Research Company Limited [Bermuda] | **II-way entity** |
| Par-La-Ville Properties Limited [Bermuda] | **II-way entity** |
| SICO Ltd. [Bermuda] | **II-way entity** |
| Transworld Pharma Limited [Bermuda] | **II-way entity** |
| Mundipharma Brasil Productos Médicos e Farmac uticos Ltda. [Brazil]* | **II-way entity** |
| Boetti Corporation [British Virgin Islands] | **II-way entity** |
| Boldini Corporation [British Virgin Islands] | **II-way entity** |
| Clovio Corporation [British Virgin Islands] | **II-way entity** |
| Evening Star Services Limited [British Virgin Islands] | **II-way entity** |
| Hayez Corporation [British Virgin Islands] | **II-way entity** |
| IAF Limited [British Virgin Islands]* | **II-way entity** |
| Lake Claire Investments Limited [British Virgin Islands] | **II-way entity** |

**[3] Persons designated with "*" are IACs, as defined in this Agreement.**

| | |
|---|---|
| Maltus Corporation [British Virgin Islands] | **II-way entity** |
| Mexcus Corporation [British Virgin Islands] | **II-way entity** |
| Mundipharma GesmbH (Bulgarian branch of Austrian company) [Bulgaria] | **II-way entity** |
| Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company) [Bulgaria]* | **II-way entity** |
| Bard Pharmaceuticals (1990) Inc. [Canada]* | **II-way entity** |
| Elvium Life Sciences GP Inc. [Canada]* | **II-way entity** |
| Elvium Life Sciences Limited Partnership [Canada]* | **II-way entity** |
| Elvium ULC [Canada]* | **II-way entity** |
| Mundipharma International (Canada) Inc. [Canada]* | **II-way entity** |
| Purdue Frederick Inc. [Canada]* | **II-way entity** |
| Purdue Pharma [Canada]* | **II-way entity** |
| Purdue Pharma Inc. [Canada]* | **II-way entity** |
| Purdue Pharma ULC [Canada] | **II-way entity** |
| Mundipharma Pharmaceuticals (Chile) Limitada [Chile] | **II-way entity** |
| Mundipharma (China) Pharmaceutical Company Limited [China]* | **II-way entity** |
| Mundipharma (Shanghai) International Trade Company Limited [China]* | **II-way entity** |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. [China]* | **II-way entity** |
| Mundipharma (Colombia) S.A.S. [Colombia]* | **II-way entity** |
| Mundipharma Pharmaceuticals Limited [Cyprus]* | **II-way entity** |
| Mundipharma GesmbH (Czech Republic Branch of Austrian company) [Czech Republic]* | **II-way entity** |
| Mundipharma A/S [Denmark]* | **II-way entity** |
| Mundipharma FZ-LLC [Dubai] | **II-way entity** |
| Mundipharma Middle East FZ-LLC [Dubai]* | **II-way entity** |
| Mundipharma Egypt LLC [Egypt]* | **II-way entity** |
| Scientific Office of Mundipharma MEA GmbH [Egypt]* | **II-way entity** |
| Mundipharma Oy [Finland]* | **II-way entity** |
| Mundipharma Management S.ar.l. [France] | **II-way entity** |
| Mundipharma SAS [France]* | **II-way entity** |
| Krugmann GmbH [Germany]* | **II-way entity** |
| Mundichemie GmbH [Germany]* | **II-way entity** |
| Mundipharma Biologics GmbH [Germany]* | **II-way entity** |
| Mundipharma Deutschland GmbH & Co. KG [Germany]* | **II-way entity** |
| Mundipharma GmbH [Germany]* | **II-way entity** |
| Mundipharma Medical GmbH [Germany]* | **II-way entity** |
| Mundipharma Research GmbH & Co. KG [Germany]* | **II-way entity** |
| Mundipharma Research Verwaltungs GmbH [Germany]* | **II-way entity** |
| Mundipharma Verwaltungsgesellschaft mbH [Germany]* | **II-way entity** |
| Mundipharma (Hong Kong) Limited [Hong Kong]* | **II-way entity** |
| Mundipharma Medical GmbH (Hungary Branch of Swiss Company) [Hungary]* | **II-way entity** |
| Modi-Mundipharma Beauty Products Private Limited [India] | **II-way entity** |
| Modi-Mundipharma Healthcare Private Limited [India] | **II-way entity** |
| Modi-Mundipharma Private Limited [India] | **II-way entity** |
| Win-Healthcare Private Limited [India] | **II-way entity** |
| Win-Medicare Private Limited [India] | **II-way entity** |

| | |
|---|---|
| Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company) [Indonesia]* | **II-way entity** |
| PT. Mundipharma Healthcare Indonesia [Indonesia]* | **II-way entity** |
| Mundipharma Corporation (Ireland) Limited [Ireland]* | **II-way entity** |
| Mundipharma Pharmaceuticals Limited [Ireland]* | **II-way entity** |
| Peer Hotzvim Ltd. [Israel] | **II-way entity** |
| Rafa Laboratories Limited [Israel] | **II-way entity** |
| Mundipharma Pharmaceuticals S.r.l. [Italy]* | **II-way entity** |
| Mundipharma Kabushiki Kaishe [Japan]* | **II-way entity** |
| Mundipharma TK [Japan]* | **II-way entity** |
| Mundipharma Medical CEE GmbH (Kazakhstan branch of Austrian company merged with Mundipharma GesmbH) [Kazakhstan] | **II-way entity** |
| Mundipharma Distribution Limited [Korea]* | **II-way entity** |
| Mundipharma Korea Limited [Korea]* | **II-way entity** |
| Accardi S.àr.l. [Luxembourg] | **II-way entity** |
| Bulla S.àr.l. [Luxembourg] | **II-way entity** |
| Euro-Celtique S.A. [Luxembourg]* | **II-way entity** |
| Filti S.àr.l. [Luxembourg] | **II-way entity** |
| Flira S.àr.l. [Luxembourg] | **II-way entity** |
| Ind S.àr.l. [Luxembourg] | **II-way entity** |
| Irey S.àr.l. [Luxembourg] | **II-way entity** |
| Lucien Holdings S.àr.l. [Luxembourg] | **II-way entity** |
| Lymit Holdings S.àr.l. [Luxembourg] | **II-way entity** |
| Mundipharma International Services S.ar.l. [Luxembourg]* | **II-way entity** |
| Nitid S.àr.l. [Luxembourg] | **II-way entity** |
| Nontag S.àr.l. [Luxembourg] | **II-way entity** |
| Porthos S.àr.l. [Luxembourg] | **II-way entity** |
| Sofy S.àr.l. [Luxembourg] | **II-way entity** |
| Songol S.àr.l. [Luxembourg] | **II-way entity** |
| Sonti S.àr.l. [Luxembourg] | **II-way entity** |
| Mundipharma Pharmaceuticals Sdn. Bhd. [Malaysia]* | **II-way entity** |
| Cutchogue Holdings Limited [Mauritius] | **II-way entity** |
| Mundipharma Ltd. [Mauritius] | **II-way entity** |
| Mundipharma de Mexico, S. de R.L. de C.V. [Mexico]* | **II-way entity** |
| Mundipharma Maroc [Morocco]* | **II-way entity** |
| Mundipharma (Myanmar) Co., Limited [Myanmar]* | **II-way entity** |
| Accardi B.V. [Netherlands] | **II-way entity** |
| Alfa Generics B.V. [Netherlands]* | **II-way entity** |
| Arsago B.V. [Netherlands] | **II-way entity** |
| Bradenton Products B.V. [Netherlands]* | **II-way entity** |
| Ladenburg B.V. [Netherlands]* | **II-way entity** |
| Mundipharma B.V. [Netherlands]* | **II-way entity** |
| Mundipharma Bradenton B.V. [Netherlands]* | **II-way entity** |
| Mundipharma DC B.V. [Netherlands]* | **II-way entity** |
| Mundipharma Pharmaceuticals B.V. [Netherlands]* | **II-way entity** |
| Tacca B.V. [Netherlands] | **II-way entity** |
| Tenna B.V. [Netherlands] | **II-way entity** |
| Vaccaro B.V. [Netherlands] | **II-way entity** |
| Venusti B.V. [Netherlands] | **II-way entity** |

| | |
|---|---|
| Mundipharma New Zealand Limited [New Zealand]* | **II-way entity** |
| Mundipharma A.S. [Norway]* | **II-way entity** |
| Mundipharma Distribution GmbH (Philippine Branch of Swiss Company) [Philippines]* | **II-way entity** |
| Mundipharma Polska SP. Z.O.O. [Poland]* | **II-way entity** |
| Mundipharma Farmaceutica LDA. [Portugal]* | **II-way entity** |
| Mundipharma GesmbH (Russian Branch of Austrian company) [Russia]* | **II-way entity** |
| Technical Scientific Office of Mundipharma Near East GmbH [Saudi Arabia]* | **II-way entity** |
| Marnine Holdings Pte. Limited [Singapore] | **II-way entity** |
| Martone Holdings Pte. Limited [Singapore] | **II-way entity** |
| Mundipharma Development Pte. Limited [Singapore] | **II-way entity** |
| Mundipharma Healthcare Pte. Limited [Singapore]* | **II-way entity** |
| Mundipharma IT Services Pte. Limited [Singapore]* | **II-way entity** |
| Mundipharma Manufacturing Pte. Limited [Singapore]* | **II-way entity** |
| Mundipharma Pharmaceuticals Private Limited [Singapore]* | **II-way entity** |
| Mundipharma Pte Limited [Singapore]* | **II-way entity** |
| Mundipharma Singapore Holding Pte. Limited [Singapore]* | **II-way entity** |
| Mundipharma GesmbH (Slovak Republic Branch of Austrian company) [Slovak Republic]* | **II-way entity** |
| Mundipharma (Proprietary) Limited [South Africa]* | **II-way entity** |
| Mundipharma Biologics S.L. [Spain]* | **II-way entity** |
| Mundipharma Pharmaceuticals S.L. [Spain]* | **II-way entity** |
| Beauty Products Lanka (Private) Limited [Sri Lanka] | **II-way entity** |
| Mundipharma AB [Sweden]* | **II-way entity** |
| Mundipharma AG [Switzerland] | **II-way entity** |
| Mundipharma Distribution GmbH [Switzerland]* | **II-way entity** |
| Mundipharma EDO GmbH [Switzerland]* | **II-way entity** |
| Mundipharma Holding AG [Switzerland]* | **II-way entity** |
| Mundipharma International Services GmbH [Switzerland]* | **II-way entity** |
| Mundipharma IT GmbH [Switzerland]* | **II-way entity** |
| Mundipharma IT Services GmbH [Switzerland]* | **II-way entity** |
| Mundipharma Laboratories GmbH [Switzerland]* | **II-way entity** |
| Mundipharma LATAM GmbH [Switzerland]* | **II-way entity** |
| Mundipharma MEA GmbH [Switzerland]* | **II-way entity** |
| Mundipharma Medical Company (Swiss branch of Mundipharma Medical Company, Bermuda) [Switzerland]* | **II-way entity** |
| Mundipharma Medical GmbH* | **II-way entity** |
| Mundipharma Near East GmbH [Switzerland]* | **II-way entity** |
| Taiwan Mundipharma Pharmaceuticals Limited [Taiwan]* | **II-way entity** |
| Mundipharma (Thailand) Limited [Thailand]* | **II-way entity** |
| Mundipharma Pharmaceuticals Industry and Trade Limited [Turkey]* | **II-way entity** |
| Bard Pharmaceuticals Limited [United Kingdom]* | **II-way entity** |
| Clinical Designs Limited [United Kingdom]* | **II-way entity** |
| Mundibiopharma Limited [United Kingdom]* | **II-way entity** |
| Mundipharma Corporation Limited [United Kingdom]* | **II-way entity** |
| Mundipharma International Limited [United Kingdom]* | **II-way entity** |
| Mundipharma International Services Limited [United Kingdom]* | **II-way entity** |

| | |
|---|---|
| Mundipharma International Technical Operations Limited [United Kingdom]* | **II-way entity** |
| Mundipharma IT Services Limited [United Kingdom]* | **II-way entity** |
| Mundipharma Limited [United Kingdom] | **II-way entity** |
| Mundipharma Medical Company Limited [United Kingdom]* | **II-way entity** |
| Mundipharma Research Limited [United Kingdom]* | **II-way entity** |
| Napp Laboratories Limited [United Kingdom]* | **II-way entity** |
| Napp Pension Trustees Limited [United Kingdom] | **II-way entity** |
| Napp Pharmaceutical Group Limited [United Kingdom]* | **II-way entity** |
| Napp Pharmaceutical Holdings Limited [United Kingdom]* | **II-way entity** |
| Napp Pharmaceuticals Limited [United Kingdom]* | **II-way entity** |
| Napp Research Centre Limited [United Kingdom]* | **II-way entity** |
| Paineurope Limited [United Kingdom] | **II-way entity** |
| Private Medical Trustees Limited [United Kingdom] | **II-way entity** |
| Qdem Pharmaceuticals Limited [United Kingdom]* | **II-way entity** |
| The Napp Educational Foundation [United Kingdom] | **II-way entity** |
| Avrio Health Inc. [United States] | **II-way entity** |
| Caas Leasing, Inc. [United States] | **II-way entity** |
| Connecticut Avenue Realty Co., Inc. [United States] | **II-way entity** |
| Coventry Technologies L.P. [United States] | **II-way entity** |
| E.R.G. Realty, Inc. [United States] | **II-way entity** |
| HS Holdings Inc. [United States] | **II-way entity** |
| IAF Corporation [United States] | **II-way entity** |
| Midvale Chemical Company [United States] | **II-way entity** |
| MNP Consulting Limited [United States] | **II-way entity** |
| Mundipharma Biologics Inc. [United States] | **II-way entity** |
| Mundipharma Biologics L.P. [United States] | **II-way entity** |
| Mundipharma Healthcare Corporation [United States]* | **II-way entity** |
| Mundipharma Healthcare LLC [United States]* | **II-way entity** |
| Mundipharma Inc. [United States] | **II-way entity** |
| Mundipharma International Limited [United States]* | **II-way entity** |
| Mundipharma International Technical Operations Limited [United States]* | **II-way entity** |
| Mundipharma IT Services Inc. [United States]* | **II-way entity** |
| Mundipharma Ltd. [United States] | **II-way entity** |
| Mundipharma Pharmaceuticals Inc. [United States]* | **II-way entity** |
| Nappwood Land Corporation [United States] | **II-way entity** |
| New Suffolk Holdings LLP [United States] | **II-way entity** |
| One Stamford Land Inc. [United States] | **II-way entity** |
| One Stamford Realty L.P. [United States] | **II-way entity** |
| Pharma Associates Inc. [United States] | **II-way entity** |
| Pharma Associates L.P. [United States] | **II-way entity** |
| Pharma Technologies Inc. [United States] | **II-way entity** |
| Pharmaceutical Research Associates, Inc. [United States] | **II-way entity** |
| Pharmaceutical Research Associates, Inc. [United States] | **II-way entity** |
| PRA Holdings, Inc. [United States] | **II-way entity** |
| Purdue BioPharma Inc. [United States] | **II-way entity** |
| Purdue BioPharma L.P. [United States] | **II-way entity** |
| Purdue Healthcare Technologies Inc. [United States] | **II-way entity** |

| | |
|---|---|
| Purdue Healthcare Technologies L.P. [United States] | **II-way entity** |
| Purdue Pharma Technologies Inc. [United States] | **II-way entity** |
| Purdue Pharmaceutical Products Inc. [United States] | **II-way entity** |
| Rhodes Pharmaceuticals Inc. [United States] | **II-way entity** |
| Rhodes Technologies Inc. [United States] | **II-way entity** |
| RSJ Company L.P. [United States] | **II-way entity** |
| Sawwood Land Corporation [United States] | **II-way entity** |
| Signutra Inc. [United States] | **II-way entity** |
| The P.F. Betadine Products Co. Inc. [United States] | **II-way entity** |
| The P.F. Laboratories, Inc. [United States] | **II-way entity** |
| The Purdue Frederick Company Inc. d/b/a The Purdue Frederick Company [United States] | **II-way entity** |
| The Seven Hundred Realty Corporation [United States] | **II-way entity** |
| The Terramar Foundation, Inc. [United States] | **II-way entity** |
| TXP Services Inc. [United States] | **II-way entity** |
| Vitamerican Chemicals, Inc. [United States] | **II-way entity** |
| Vitamerican Corporation [United States] | **II-way entity** |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City [Vietnam]* | **II-way entity** |
| ~~Milbank LLP~~ | |
| ~~Joseph Hage Aaronson LLC~~ | |
| ~~Bracewell LLP~~ | |
| ~~Huron Consulting Services LLC~~ | |
| ~~Goldin Solutions~~ | |
| ~~Luther Strange & Associates, LLC~~ | |
| ~~Impact Trial Consulting LLC~~ | |
| Norton Rose Fulbright US LLP | **Service Provider: legal counsel to Shareholder Released Parties and the Debtors** |
| ~~Paul, Weiss, Rifkind, Wharton & Garrison LLP~~ | |
| ~~Consilio~~ | |
| ~~Innovative Discovery, LLC~~ | |
| ~~Solomon Ward Seidenwurm Smith, LLP~~ | |