Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.

8

9        Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11               United States Bankruptcy Court

12               Tele/Video Proceedings

13               300 Quarropas Street, Room 248

14               White Plains, NY 10601

15

16               August 23, 2021

17               9:50 AM

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: UNKNOWN

1    HEARING re Notice of Continuation of Hearing on Confirmation

2    of Seventh Amended Joint Chapter 11 Plan of Reorganization

3    of Purdue Pharma L.P. and Its Affiliated Debtors filed by

4    Eli J. Vonnegut on behalf of Purdue Pharma L.P.. with

5    hearing to be held on 8/23/2021 at 10:00 AM (ECF #3617)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
                                                        Page 3

 1    A P P E A R A N C E S :

 2

 3    DAVIS POLK WARDWELL LLP

 4         Attorney for Debtors

 5         450 Lexington Avenue

 6         New York, NY 10017

 7

 8    BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

 9         BENJAMIN KAMINETZKY (TELEPHONICALLY)

10         JAMES I. MCCLAMMY (TELEPHONICALLY)

11         ELI J. VONNEGUT (TELEPHONICALLY)

12

13    WHITE & CASE LLP

14         Attorneys for The Ad Hoc Group of Individual Victims of

15         Purdue Pharma

16         1221 Avenue of the Americas

17         New York, NY 10020

18

19    BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

20

21

22

23

24

25
```

Page 4

1   SULLIVAN WORCESTER LLP

2        Attorneys for Purdue Pharma, L.P.

3        1633 Broadway

4        New York, NY 10019

5

6   BY:  JEFFREY R. GLEIT (TELEPHONICALLY)

7

8   JENNER BLOCK

9        Attorneys for McKesson

10       353 N. Clark Street

11       Chicago, IL 60654

12

13  BY:  CATHERINE STEEGE (TELEPHONICALLY)

14

15  PILLSBURY WINTHROP SHAW PITTMAN LLP

16       Attorneys for Ad Hoc Group of Non-Consenting States

17       31 West 52nd Street

18       New York, NY 10019

19

20  BY:  ANDREW M. TROOP (TELEPHONICALLY)

21

22

23

24

25

```
 1   O'MELVENY MYERS

 2        Attorneys for Johnson & Johnson

 3        7 Times Square

 4        Los Angeles, CA 90067

 5

 6   BY:  EVAN JONES (TELEPHONICALLY)

 7

 8   AKIN GUMP STRAUSS HAUER & FELD LLP

 9        Attorneys for The Official Committee of Unsecured

10        Creditors

11        One Bryant Park

12        New York, NY 10036

13

14   BY:  ARIK PREIS (TELEPHONICALLY)

15

16   CAPLIN DRYSDALE

17        Attorneys for Multi State Governmental Entities Group

18        One Thomas Circle

19        Washington, DC 20005

20

21   BY:  KEVIN MACLAY (TELEPHONICALLY)

22

23

24

25
```

Page 6

1    Lite DePalma Greenberg Afanador, LLC

2         Attorneys for Canadian Municipality and First Nation

3         Creditors

4         570 Broad Street, Suite 1201

5         Newark, NJ 07102

6

7    BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

8

9    UNITED STATES DEPARTMENT OF JUSTICE

10        Attorneys for the U.S. Trustee

11        201 Varick Street, Suite 1006

12        New York, NY 10014

13

14   BY:  PAUL KENAN SCHWARTZBERG (TELEPHONICALLY)

15

16   PULLMAN COMLEY

17        Attorneys for State of Connecticut

18        850 Main Street

19        Bridgeport, CT 06604

20

21   BY:  IRVE GOLDMAN (TELEPHONICALLY)

22

23

24

25

Page 7

1   KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

2       Attorneys for State of Washington

3       500 Fifth Avenue

4       New York, NY 10110

5

6   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

7

8   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

9       Attorney for State of Maryland

10      200 Saint Paul Place

11      Baltimore, MD 20852

12

13  BY:  BRIAN EDMUNDS (TELEPHONICALLY)

14

15  ATTORNEY GENERAL OFFICE OF WASHINGTON

16      Attorneys for State of Washington

17      800 Fifth Avenue, Suite 2000

18      Seattle, WA 98104

19

20  BY:  THOMAS ROBINSON O'NEILL

21

22  ALSO PRESENT TELEPHONICALLY:

23  JILL S. ABRAMS

24  ROXANA ALEALI

25  ANDREW VINCENT ALFANO

Page 8

```
 1   PHILIP D. ANKER

 2   MICHAEL ATINSON

 3   MITCHELL JAY AUSLANDER

 4   JASMINE BALL

 5   PRIYA BARANPURIA

 6   BROOKS BARKER

 7   DAVID E. BLABEY JR.

 8   LOUIS BOGRAD

 9   SARA BRAUNER

10   DAVID BROWN

11   GABE BRUNSWICK

12   AARON CAHN

13   MARK CHALOS

14   GERARD CICERO

15   HAYDEN COLEMAN

16   DANIEL CONNOLLY

17   ABBY G. CUNNINGHAM

18   MELANIE L. CYGANOWSKI

19   MARIO D'ANGELO

20   PETER C. D'APICE

21   STACY DASARO

22   JOSEPH G. DAVIS

23   KEVIN DAVIS

24   MARK DEARMAN

25   JESSE DELACONTE
```

1   SHANNON DEVON

2   CLINT DOCKEN

3   JOHN C. DOUGHERTY

4   JOHN DUBEL

5   STEPHANIE EBERHARDT

6   KENNETH H. ECKSTEIN

7   BERNARD ARDAVAN ESKANDARI

8   MATHEW FARRELL

9   JENNIFER S. FEENEY

10   LAURA FEMINO

11   ROBERT FINZI

12   MATTHEW FITZSIMMONS

13   PAMELA FLETCHER

14   LAWRENCE FOGELMAN

15   SAM FRAIDIN

16   HEATHER FRAZIER

17   BRYCE L. FRIEDMAN

18   KATHERINE GALLE

19   CAROLINE GANGE

20   JOSEPHINE GARTRELL

21   GILL GELDREICH

22   MELISSA GIBSON

23   JARED GIDDENS

24   MAGALI GIDDENS

25   SCOTT GILBERT

1   MICHAEL GOLDSTEIN

2   GEOFFREY S. GOODMAN

3   ISLEY MARKMAN GOSTIN

4   GARY GOTTO

5   JARED T. GREEN

6   JAMES S. GREEN, JR.

7   DEBORAH GREENSPAN

8   EMILY GRIM

9   JOHN GUARD

10   ADAM P. HABERKORN

11   CATHERINE BEIDERMAN HEITZENRATER

12   ANGELA K. HERRING

13   MICHELE HIRSHMAN

14   JENNA A. HUDSON

15   MITCHELL HURLEY

16   ELISA HYDER

17   LINDA IMES

18   MARK S. INDELICATO

19   HAROLD D. ISRAEL

20   SAMUEL ISSACHAROFF

21   STEVEN IVES

22   ETHAN KAMINETZKY

23   NICKOLAS KARAVOLAS

24   KAREN KENNEDY

25   MARC KESSELMAN

1    DARREN S. KLEIN

2    JEREMY C. KLEINMAN

3    LAWRENCE KOTLER

4    ANN KRAMER

5    M. NATASHA LABOVITZ

6    ALEXANDER LEES

7    DANIEL LENNARD

8    NICOLE A. LEONARD

9    MARA LEVENTHAL

10   DANIELLE J. LEVINE

11   RUTH LICHTENFELD

12   JEFFREY LIESENMER

13   EDAN LISOVICZ

14   JOHN LONGMIRE

15   JOHN LOWNE

16   MICHAEL LUSKIN

17   BRIAN S. MASUMOTO

18   PATRICK C. MAXCY

19   LAURA MCCLOUD

20   HUGH M. MCDONALD

21   CARRIE MCGAHA

22   SHANNON M. MCNULTY

23   MICHELE MEISES

24   LIVY MEZEI

25   NATHANIEL MILLER

Page 12

1   JONATHAN E. MITNICK

2   DAVID MOLTON

3   MAURA KATHLEEN MONAGHAN

4   ANDREW J. MUHA

5   AISLING MURRAY

6   EDWARD E. NEIGER

7   MICHAEL PATRICK O'NEIL

8   DAMIAN O'SULLIVAN

9   JAMES FRANKLIN OZMENT

10   JENNIFER PEACOCK

11   STEPHEN POHL

12   KATHERINE PORTER

13   DOUGLASS PRESS

14   NICHOLAS PREY

15   MICHELE PULGGARI

16   KAMI QUINN

17   MARION QUIRK

18   GILLIAN RENDEL

19   CHRISTINA RICARTE

20   JOSEPH RICE

21   RACHAEL RINGER

22   CHRISTOPHER ROBERTSON

23   JEFFREY J. ROSEN

24   JORDAN ROSENBAUM

25   PAUL S. ROTHSTEIN

```
 1   JASON RUBINSTEIN

 2   MEGAN PARIS RUNDLET

 3   WILLIAM T. RUSSELL

 4   JEREMEY W. RYAN

 5   JAMES SALWEN

 6   DANIEL JOSEPH SAVAL

 7   SETH SCHINFELD

 8   ELIZABETH SCHLECKER

 9   FREDERICK E. SCHMIDT

10   MICHAEL SHEPHERD

11   RICHARD SHORE

12   RICHARD SILBERT

13   LIANNA SIMMONDS

14   PAUL SINGER

15   PAUL M. SINGER

16   MARC F. SKAPOF

17   ARTEM SKOROSTENSKY

18   D. RYAN SLAUGH

19   JOSEPH L. SOROKIN

20   CLAUDIA Z. SPRINGER

21   HOWARD STEEL

22   ERIC STODOLA

23   ADAM SWINGLE

24   JEROME TAPLEY

25   PAMELA THURMOND
```

Page 14

1    MARC J. TOBACK

2    SARA E. TONNESEN

3    KELLY TSAI

4    JOSEPH TURNER

5    GERARD UZZI

6    MELISSA L. VAN ECK

7    MICHAEL J. VENDITTO

8    JONATHAN WAGNER

9    RYAN A. WAGNER

10   JORDAN A. WEBER

11   WENDY WEINBERG

12   SHIRA WEINER

13   WILLIAM P. WEINTRAUB

14   MARTIN WEIS

15   MARTIN JAMES WEIS

16   ALLISON H. WEISS

17   THEODORE WELLS, JR.

18   STEVEN WILAMOWSKY

19   DANIEL WOLF

20   LAUREN S. ZABEL

21   JAMIE ZEEVI

22   DAVID ZYLBERBERG

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  On oral argument, the record having

3    been closed at the end of last week's hearing, I know

4    there's been some back and forth by the parties as to the

5    time allotted, as opposed to the actual issues and the order

6    in which they would be heard.  I don't actually think this

7    really is the appropriate subject of a -- any sort of

8    additional conference or discussion.  This meaning, how much

9    time the parties are going to take.  Ultimately oral

10   argument is for the Court's benefit.  The Court has already

11   received lengthy, in fact, over the page limit, although I

12   authorized it, briefing on most of these issues, including

13   the one that the parties propose taking the most time on.

14   I'll just cut people off if they're being repetitive.

15          So, I'm happy to begin with oral argument, unless

16   there's any other announcement that the parties would like

17   to make.

18          MR. HUEBNER:  Your Honor, good morning, for the

19   record, Marshall Huebner, Davis Polk & Wardwell, on behalf

20   of the Debtors.  Can I be heard and seen clearly?

21          THE COURT:  Yes.

22          MR. HUEBNER:  Terrific.  Thank you, Your Honor.

23   Your Honor, before we actually start oral argument, in our

24   other capacity as just resharing and stewards of the cases,

25   we have three things to announce on what the Court, through

Page 16

1    it and others, these things more or less, two of them

2    appeared on the docket, but it is important, I think,

3    because it does narrow the issues.

4            The newest piece of news is that Dr. Rothfein and

5    his client, the Emergency Room Physician, we have reached a

6    settlement, and so their issues are going to be resolved.

7    That settlement has the support of the AHC and the MSGE, and

8    the UCC does not expect any problem in approving it.  It

9    essentially, on its face, contemplates a $375,000 broadly

10   supported substantial contribution claim for the work that

11   the doctor and his counsel have done.  There have been some

12   changes, obviously, into some of the issues that they

13   raised, periodically throughout the case, and with that,

14   that issue is resolved and needs no other further

15   discussion, nor oral argument.

16           We will, obviously, file appropriate papers as we

17   did with, for example, Mr. Stuart (indiscernible), resolving

18   their objections, and again, we already have, I believe, the

19   support we need since I was able to note is the residual

20   money that the Debtors hope to be able to make available to

21   abatement, or it goes to non-Federal Governmental creditors,

22   and so between the UCC, AHC, and MSG, those are all of the

23   organized groups, essentially, whose representatives, in

24   essence, having their recoveries diminished by that amount

25   and they are all either supportive over all or they

Page 17

1    (indiscernible) supported.  So hopefully we can -- one third

2    of one box, I'll have it can make to (indiscernible)

3    chambers.

4              I would like to apologize to the NCSG and the two

5    halves, or really 62 percent and 37 percent, who just did

6    not have time, this only happened a few minutes ago, but

7    although, Peter (indiscernible) and Mr. (indiscernible), by

8    seeming looking happy on the webcam, as Your Honor was

9    walking out.  He obviously he will explain this either to

10   Mr. Troop, if he is still representing the full group, per

11   this is other than confirmation, to which I believe he is,

12   plus obviously, happened to talk to any individual non-

13   consenting states, but, you know, to say it in its more

14   simple form, we would probably save more for these very

15   creditors by not continuing to wrestle with these issues,

16   but an opinion contemplates, which is one of many reasons

17   why we believe the settlement is appropriate.  I hope that

18   no party is offended, but we're desperately looking to

19   settle things, and my other attorneys that were on phone

20   calls, literally this happened, Mr. McClammy stepped out and

21   made these phone calls in about the last 120 seconds, and so

22   this is about as hot and breaking a piece of news as one

23   could possibly have.

24             THE COURT:  Okay.  So just to -- just to be clear,

25   this is a -- an agreement to support a substantial

Page 18

1    contribution claim in that amount?

2           MR. HUEBNER:  Mr. McClammy, please keep me honest,

3    is that correct?  That's what I've been told.  We got this -

4    - literally just happened.

5           THE COURT:  Okay.  Okay.

6           MR. HUEBNER:  Your Honor, the second piece of good

7    news, and I'm about to turn over the podium, because I think

8    both of the next two things are from Mr. Vonnegut, they are

9    complicated and -- and not for me, I have no capacity and

10   ability to describe them, are that we have settled with the

11   DMP's.  And this is a very material development in the case,

12   letting the Court knows it avoided needing to -- oh, it's

13   not a full settlement, but Mr. Vonnegut will walk us through

14   it.  And then the third thing, which he will also walk us

15   through is taking our cue as we have from the first moment

16   of this case, both from what creditors and other

17   stakeholders articulate to us, as their needs and concerns

18   and issues, and of course, listening to the Court as be as

19   we know how.  We did file, I believe in the middle of the

20   night last night, because there has been negotiating until

21   moments before it was filed, amended documents that I do

22   believe narrow and change a variety of things that have been

23   the subject of objections, and so, probably to avoid

24   inaccuracy, which would help no one, I think I will probably

25   sit down and ask Mr. Vonnegut to walk the Court and parties,

Page 19

1  and Ms. Deedee, I'm sure, will keep him honest of the DMP

2  side, where we are on those two issues, and then after that

3  we can turn to oral argument on the --

4           THE COURT:  Okay.  I -- I did see the eighth

5  amended plan, and I -- actually, I was a little late getting

6  onto the bench because I was reviewing the black line.  But

7  I'm happy to hear a brief explanation of the settlement with

8  the, so called, DMP group.

9           MR. VONNEGUT:  Good morning, Your Honor, for the

10  record, I'm Eli Vonnegut of the Davis Polk & Wardwell, on

11  behalf of the Debtors, can you hear me clearly?

12           THE COURT:  Yes, thanks.

13           MR. VONNEGUT:  Thank you.  So to respect the

14  allocation of time for argument, I will only be giving a

15  factual explanation of the plan revisions that were filed

16  overnight.

17           Those revisions, in the eighth amended plan, fall

18  into a few principal categories.  First, we have revisions

19  agreed to with the distributors, manufacturers, and

20  pharmacies, I will call them the DMP's to resolve the bulk

21  of their objections to the plan. On this I will be

22  describing only the agreed revisions.  My co-counsel,

23  Jeffrey Gleit of Sullivan, and Worcester, is acting as

24  conflicts counsel for the Debtor, with respect to the sole

25  component that the DMP's objection that remains unresolved,

Page 20

1    and he will be addressing that later in argument.

2            Next we have revisions to the release provisions

3    to attempt to narrow concerns that have been raised, and

4    also, hopefully just to make it a little easier to

5    understand the releases.  Lastly, there are three

6    miscellaneous changes that I will just cover very briefly.

7            So first, with respect to the DMP settlement, the

8    agreement reached with the DMP's resolves all aspects of

9    their objections other than those related to the Debtor's

10   insurance policies, which Mr. Gleit will be addressing

11   later.  The crux of the agreement is very simple.  It's a

12   bilateral release.  The DMP's have agreed to release their

13   co-defendant claims against the Debtors, and to the

14   assumption of their contracts without payment of those

15   claims.  The Debtors, in turn, have agreed to release their

16   claims against the DMP's, including those that arise under

17   the assumed contract and to remove the DMP's from the

18   schedule of excluded parties.

19           The DMP's have also now been added to the

20   reciprocal release, meaning that they receive a release from

21   the Sacklers and the other shareholder release parties.

22   There are a couple exceptions to this overall framework.

23   Both the Debtors and the DMP's preserve their ordinary

24   course, claims that are not related to opioid litigation,

25   and as before, all holders of co-defendant claims, continue

Page 21

1    to retain what we call their co-defendant defensive rights.

2    Those are rights that they have to attempt to reduce their

3    liabilities, judgements, or obligations, but those co-

4    defendant, defensive rights cannot be used to seek or obtain

5    any affirmative recovery from any protected party.

6            Mechanically, this settlement is implemented in a

7    few different places in the plan.  In Section 4.16, which

8    covers the treatment of co-defendant claims, we've just

9    simplified this a lot.  It now just says that co-defendant

10   claimholders don't receive any distributions but do retain

11   their defensive rights.  Section 8.4, addressed treatment of

12   co-defendant contracts, contracts that have -- that give

13   rise to co-defendant claims.  That now just says that those

14   agreements are assumed with all co-defendant claims arising

15   under those contracts, having been released.

16           This treatment, with the exception of the issue

17   that Mr. Gleit is going to address, is now consensual as to

18   all counterparties.  The DMP's withdrew the objections that

19   they filed for this treatment and no other parties objected

20   to this treatment prior to the deadline, which was August

21   2nd.

22           Lastly, for the DMP settlement, excluded party,

23   the defining term now does not include any settling co-

24   defendants.  Settling co-defendants is the DMP's.  These

25   parties also become reciprocal releasees, which means that's

Page 22

1    how they get a release from the Sacklers and the other

2    shareholder related parties.  The settling co-defendants

3    have also been added to both releasing parties and released

4    parties, so on both sides.  And then lastly, 10.6 preserves

5    the ordinary commercial claims I referred to earlier, and

6    Section 10.18 preserves the defensive rights of the co-

7    defendants.

8              Unless, Your Honor, has any questions about the

9    DMP settlement --

10             THE COURT:  I did have -- I did have a question,

11   you describe this essentially as a mutual release of claims

12   with the exceptions for ordinary course claims, and the

13   like, so given that, there is no third-party release of the

14   DMP's under the plan?  If someone has a third-party claim

15   against them, that's not being released?

16             MR. VONNEGUT:  The DMP's are now removed from the

17   excluded party schedule, which means that if they are -- if

18   they are a released party in other capacities, that they

19   would be included in the third-party release, by virtue of

20   having them removed from the excluded party schedule.

21             THE COURT:  See I -- I don't understand that

22   provision.  There are -- I'm not sure who is included within

23   the DMP group, but there's pending litigation against

24   distributors and manufacturers, it's not stayed by me,

25   around the country, including in the MDL, and I wouldn't

Page 23

1    think that the plan would be able to release them in that

2    litigation.

3              MR. VONNEGUT:  I'm -- I'm sorry, Your Honor.  No,

4    that litigation is -- is not released.  So in -- in the

5    definition of released parties, I actually, in the inserted

6    language, clause 3, Subsection B, the settling co-defendants

7    and their related parties are become released parties for

8    Section 10.6A, which is the release granted by the Debtor.

9              THE COURT:  Okay.

10             MR. TROOP:  Your Honor, Andrew Troop, on behalf of

11   the Non-Consenting States --

12             THE COURT:  Go ahead.

13             MR. TROOP:  -- thank you for asking my question.

14   But it seems to me that the plan should be perfectly clear

15   about this (indiscernible) --

16             THE COURT:  I -- I agree.  I just wanted to make

17   sure I understood the intent.  I think you do, Mr. Vonnegut,

18   did point me, correctly, to the fact that that for purposes

19   of the definition, it's just for 1.06, but I think you

20   probably should beef that up, because just based on the

21   breadth of the third-party litigation around the country,

22   there shouldn't be any confusion on this point.

23             MR. VONNEGUT:  Thank you, Your Honor, happy to

24   clarify that.

25             THE COURT:  Okay.

1           MS. STEEGE:  Your Honor, this is Catherine Steege,

2    on behalf of the DMP's, I think no one thought to go through

3    the language, it is very clear that the relief they're

4    receiving is from the Debtor and from the Sackler

5    shareholder parties, or whatever that terms is.  It does not

6    in --

7           THE COURT:  I think --

8           MS. STEEGE:  -- in any way suggest that other

9    parties are released from this.

10          THE COURT:  I think that's right, but I -- I

11    understand that to be the case, but since the third-party

12    release also uses the term, released parties, maybe -- I

13    mean, my suggestion might be that you drop a footnote in the

14    definition of released parties where it says in Section

15    10.6A, and just make it clear that -- that this is the

16    Debtor release and not any third-party release.

17          MR. VONNEGUT:  We're happy to do that, Your Honor.

18          THE COURT:  Okay.

19          MS. STEEGE:  And Your Honor, we would expect the

20    Debtor would share whatever language it's requesting --

21          THE COURT:  Of course, sure.

22          MS. STEEGE:  -- with the Court.

23          MR. VONNEGUT:  Both parties.

24          THE COURT:  Right.

25          MS. STEEGE:  The other point, Your Honor, I'd make

Page 25

1    about the withdrawal of our objection to the plan, is we

2    have preserved one objection, which is the objection to the

3    provisions that only insurance flights, we've agreed to rest

4    on our brief's in connection with that objection.  In

5    addition, many of the DMP's are involved in litigation up in

6    Canada, or are only involved in Canadian litigation, and

7    they all reserve their rights to make the appropriate

8    arguments in the Canadian courts, including in the

9    recommended decision.

10            THE COURT:  With respect to -- with respect to

11   what?

12            MS. STEEGE:  With respect to preservation of their

13   defensive rights up there and there are other issues up

14   there that interplay with the litigation that they need to

15   be able to argue in the Canadian Courts.

16            THE COURT:  But I just want to make sure, is it

17   the preservation of their rights goes to the reserved issue

18   here that the parties have briefed as to rights to

19   insurance, and the -- and the carveout for their defenses

20   judgement reduction, those sorts of points?

21            MS. STEEGE:  Yes, Your Honor, that's correct.

22            THE COURT:  All right.  Not that they will --

23   then we argue in Canada, in the recognition proceeding, the

24   objection that they've waived here?

25            MS. STEEGE:  No, Your Honor, well, we would not be

Page 26

1   rearguing the objections that we've agreed to in the plan

2   here.

3               THE COURT:  All right.  Fine.  Thank you.  Okay.

4   Thanks for those two updates.

5               MR. JONES:  Your Honor, Evan Jones of O'Melveny

6   Myers, we represent Johnson and Johnson, which is one of the

7   DMP's.  In Your Honor's question, we do believe under

8   Canadian law, it may be appropriate to (indiscernible) the

9   recognition of this Court's order, if the plan is confirmed,

10  and we're reserving that.  We're not going to reargue an

11  objection to the plan, but to the extent Canadian law limits

12  recognition, we believe it is appropriate to reserve.

13              THE COURT:  All right.  I -- my point's a very

14  simple one.  I wanted to make sure that that reservation of

15  rights doesn't include raising the same objection that has

16  been settled here.

17              MR. EVANS:  Understood, Your Honor.

18              THE COURT:  Okay.  All right.  Very well, thank

19  you.

20              MR. VONNEGUT:  Thank you, Your Honor.  Next I will

21  outline the revisions made to the release provisions on our

22  few miscellaneous changes.  So on the releases, I'd just

23  like to revisit, briefly the basic architecture of the

24  releases, I think it's -- it's helpful in understanding

25  them.

Page 27

1          In order to be released, a claim has to be first,

2     held by a releasing party.  Second, asserted against either

3     a released party or a shareholder released party, and third,

4     based on relating to or arising from, in full or in-part,

5     the Debtors, their states, or the in the Chapter 11 cases.

6     It also has to be not held by the federal government, not

7     against an excluded party and not an excluded claim.

8          The simplest revisions to the releases that we

9     made fall into the category of just fixing bad drafting,

10    that tends to result when you have a document being

11    commented on by as many intensely interested parties as we

12    have in this case.  So you'll see, throughout, we've removed

13    duplicative language; in many cases we've attempted to

14    streamline use of defining terms, like cause of action.  I

15    won't go through that in detail, unless, Your Honor, has any

16    questions.

17         Sections 10.6 and 10.7, they've gotten a lot

18    shorter, and we hope a lot clearer.  We've removed

19    duplicative or otherwise unnecessary language, and our core

20    standard in sections 10.6 and 10.7 is that in order to be

21    released, the cause of action must be based on or relating

22    to, or in any manner arising from, in whole or in part, the

23    Debtors, the estates, or the Chapter 11 cases, and we have a

24    parenthetical illustrating certain types of claims that

25    might relate to the Debtors, but that does not expand their

Page 28

1    provision in any way.  Those claims still all have to relate

2    to the Debtors.  We don't do any of those revisions as

3    substantively changing the scope, we're just trying to make

4    things a little bit easier to read.

5            On the more substantive side, we have revised both

6    what is an excluded claim and who is a shareholder released

7    party, to attempt to address concerns about the breadth of

8    the releases.  So in the definition of excluded claim, the

9    two most substantive additions are 1) mindful of, Your

10   Honor's commentary and input from creditors regarding claims

11   related to non-opioid issues.  We've now excluded from the

12   releases non-opioid related claims against shareholder

13   released parties, or those shareholder released parties on

14   willful misconduct.  There are a set of definitions that

15   impact this.  We've added new defining terms for what

16   constitutes willful misconduct, and what constitutes a

17   willful non-opioid claim, which is a non-opioid claim

18   arising from willful misconduct.

19           We also heard concerns regarding the breadth of

20   the releases for advisors and contractors of the Sacklers,

21   and so we have also excluded claims against those parties

22   for their own willful misconduct, regardless of whether they

23   are opioid related or not opioid related.  That provision,

24   again, is founded on the definition of willful misconduct

25   and the term for those claims that are excluded is willful

Page 29

1   party related claim, which means a claim against a

2   shareholder, released party that is identified in Subsection

3   VII(b) of Shareholder released party or such parties,

4   actually and separate, willful misconduct.  And that means

5   it's their own conduct, not conduct that was imputed to

6   them.

7         Both of these provisions have a deep keeping

8   function pertinent to the plan to provide some protection

9   against strike suits.  This lives in new Section 11.01(e),

10  and that requires a claimant that believes they have a claim

11  that fits one of these carveouts, before they prosecute that

12  claim, to first come to the bankruptcy court and make a

13  showing that their claim is both colorable and within one of

14  the two definitions.

15        Also, in excluded claim, we did some less

16  substantive cleanup to just try to address some provisions

17  that seem to have been causing confusion.  First in II, we

18  made clear that nobody is getting income tax claims

19  released.  This was always the case, but we took apart that

20  use to apply to only to shareholder released parties and

21  make -- and made it global, just to make clear what we're

22  doing there.

23        Next in V, we eliminated a provision that only

24  applied to releases among different shareholder released

25  parties.  That now lives in its own provision in Section

Page 30

1    10.7(b), and lastly, we excluded any cause of action based

2    on conduct after the effective date.  This again was always

3    the case, but there were a lot of questions about future

4    conduct during the -- during the presentation of evidence,

5    so we just wanted to make that very clear.

6              Next in the definition of shareholder released

7    party.  We've heard concerns about the scope of releases for

8    transferees of the Sacklers, and so in VI, we have

9    simplified that prong so that persons in which the Sackler's

10   own an interest are no longer released parties, and we've

11   replaced that with a provision for mediate and immediate

12   transferees of the Sacklers, but that is very strictly

13   limited to make clear that those parties are only released

14   in their capacity as such, and only for the amounts that

15   they received.

16             Other revisions to that -- that term, were just

17   clarifying and we did not give a substantives.  Unless, Your

18   Honor, has any questions, I can briefly cover the -- the few

19   other revisions that were made to the plan.

20             THE COURT:  Okay.  I -- I had a couple of

21   questions on this topic.

22             MR. VONNEGUT:  Sure.

23             THE COURT:  First, in the definition of willful

24   misconduct, it -- it comes under an action taken or not

25   taken in bad faith and with actual knowledge that such

Page 31

```
 1   action or failure to act is unlawful, prohibited, or false,

 2   and will be harmful to another.  It -- it doesn't include

 3   the word fraud, and much of the litigation here, asserts

 4   fraud claims, one way or another, including under Consumer

 5   Protection Act statutes, and I just want to make sure is

 6   fraud included within this?

 7            MR. VONNEGUT:  Well, I don't want to get ahead of

 8   Mr. Uzzi, who looks like he's ready to address that.

 9            MR. UZZI:  Your Honor, for the record, Gerard

10   Uzzi, Milbank, on behalf of the Raymond Sackler Family.  It

11   was actually rose to address just a clarification on the --

12   the prior statements with which I -- which I can address,

13   but to answer this question.  Your Honor, I -- I -- I think

14   we mean what we say here.  It's not intended to -- to pick

15   up fraud.  It's intended to pick up what it says here.

16            THE COURT:  I think you should pick up fraud.

17            MR. UZZI:  All right.  Understood, Your Honor.  We

18   will -- we will -- we will take -- we will discuss that with

19   our clients, Your Honor.

20            THE COURT:  Okay.

21            MR. UZZI:  The clarification I wanted to make,

22   Your Honor, is Mr. Vonnegut had made -- we made -- we made a

23   correction as it relates to -- I'm sorry, I'm just flipping

24   the page to get there, Your Honor, but the definition of

25   shareholder of these parties, as it related to transferees
```

Page 32

1     and we did clarify that and we limited that language, but

2     Mr. Vonnegut made a statement that we had taken out the

3     reference to Sackler owned entities, that's true as a

4     cleanup comment, but that's just simply because it's picked

5     up later in the definition as far as a catchall for

6     subsidiaries and controlled affiliates.

7                 THE COURT:  Right.

8                 MR. UZZI:  So it was a cleanup on transferees.

9                 THE COURT:  The purpose -- the purposes of this

10    change was to limit the release to -- to those that would be

11    otherwise sued, as being the recipient of a fraudulent

12    transfer that's released under the plan, right, and in that

13    accord --

14                MR. UZZI:  Correct, Your Honor -- correct, Your

15    Honor.

16                THE COURT:  All right.

17                MR. UZZI:  Or similar theories.

18                THE COURT:  Right.  Okay.  All right.  The

19    other -- the other point I had is a much smaller one, and

20    again, I'm not -- I'm just trying to understand what's in

21    here, I'm not -- I'm not commenting the merits of the

22    changes or whether they're enough.  Although, I appreciate

23    the work done to narrow the release.  If you go to the last

24    paragraph of 10.6, I think there's -- I think there's

25    potential for a little confusion in the fourth line there.

Page 33

1    It says, in each case, unrelated to the Chapter 11 cases or

2    the subject matter of the pending opioid actions, I think

3    you probably should put unrelated, and then add the word

4    either to the Chapter 11 cases or to, I think that's

5    supposed to be disjunctive, right?  It's unrelated to either

6    one of those two or both?

7             MR. UZZI:  Yes, sir, that's right.

8             THE COURT:  All right.  I had to read that a

9    couple of times to figure that out and I think that would

10   make it clearer.

11            MR. UZZI:  We will fix that, Your Honor.

12            THE COURT:  Okay.  Okay.

13            MR. UZZI:  Your Honor, so, but the last three

14   changes, just to highlight for the Court and the parties,

15   one in continuing foundation members, which describes the

16   individuals that will be appointed to run the two Sackler

17   Family Foundations, we've just removed from -- from that

18   term, the possibility of the Court appointing those people,

19   which the State of New York didn't like and didn't like and

20   frankly we thought the Court might not like, so now that --

21   those foundations will just be run by either the NOAT

22   Trustees or people otherwise agreed to by the Debtors, the

23   governmental consent parties, and counsel for the newly

24   consenting states.

25            THE COURT:  A good change.

Page 34

1              MR. UZZI:  Thank you.  In Section 11.1, XVII, we

2    fixed a conflict between the plan and the NOAT and Prime

3    Trust documents regarding jurisdiction over those documents,

4    to make clear that they will be concurrent and not exclusive

5    bankruptcy court jurisdiction over those entities.  And

6    lastly, to conform to the revisions to the confirmation

7    order, we've removed the waiver of the 14 days stay imposed

8    under Rule 3020, from 9.2, and we adjusted Section 12.8 to

9    conform there.

10             THE COURT:  Okay.

11             MR. UZZI:  And that is it, Your Honor.

12             THE COURT:  Okay.  Very well.

13             MR. FOGELMAN:  Your Honor, Lawrence Fogelman from

14   the US Attorney's office.  I wanted to quick thank the

15   (indiscernible), we did get a draft on Saturday of some of

16   the changes, but just this morning when we woke up, a lot of

17   the changes that we had discussed over the weekend weren't

18   there, and some others were different.  So and a lot of it

19   deals with the releases, which are an important part to what

20   my offices has been the states, and the Debtors in our

21   office don't necessarily always agree on interpretation of

22   the same language.  So to the extent that we -- we can

23   (indiscernible), I guess the new language that came up,

24   since it's hard to do it on the fly, I just would ask that

25   to be involved in this and to be allowed to revisit an

Page 35

1    issue, if we discover something prior to the final -- final

2    (indiscernible).

3            THE COURT:  Okay.

4            MR. VONNEGUT:  Your Honor, that's very much

5    understood.  We were just describing the revisions made and

6    did not mean to suggest that they resolved anybody's

7    objection, unless somebody has said their own objection is

8    resolved.

9            THE COURT:  Right. I -- I --

10           MR. FOGELMAN:  We would not think, Your Honor,

11   that revisions developed a new issue that we didn't know

12   about 12 hours ago.  We want to be able to look at those

13   documents and figure that out.

14           THE COURT:  That -- that's fair, but I also think

15   it's helpful to confine the oral argument on this point to

16   the actual wording of the plan, at this point.  Which, as I

17   said, may or may not be sufficiently narrow.

18           MR. FOGELMAN:  Thank you, Your Honor.

19           THE COURT:  Okay.

20           MR. VONNEGUT:  Okay.  Thank you, Your Honor, I

21   think I will turn the podium over to Mr. Huebner.

22           THE COURT:  Okay.

23           MR. TROOP:  Your Honor -- Your Honor, Andrew Troop

24   for the Non-consenting States, just -- just quickly on this

25   point.  I have not objected, nor have I reserved any time as

Page 36

1   part of the oral argument, but in light of this particular

2   change, there is a question that has been raised about the

3   formulation with regard to what the third-parties and state

4   law, that a Uniformed Deceptive Trade Practices, I have to

5   thank for the uniform one, that -- that imposes liability

6   without there having to be a proof of willful misconduct or

7   fraud, and so we may need to fold some time in for me when

8   other parties are talking about releases or later, as I come

9   up to speed on that particular issue.

10              THE COURT:  Okay.

11              MR. TROOP:  If that's fine with everyone, just to

12   be clear.

13              THE COURT:  That's fine. I mean, I think -- I

14   mean, my view on this is that when you're covering related

15   parties, which are independent contractors, co-promotors,

16   third-party sales representatives, medical liaisons,

17   subcontractors, agents, and the like, it's a big step

18   forward to carve out the defined term, willful misconduct,

19   but there may well be other types of misconduct that should

20   fit into that definition.  I think, generally, independent

21   conduct that is wrongful is what is really meant by that

22   language, and if an applicable law covers that, as opposed

23   to just some form of strict liability, because you're in the

24   -- in the same room or the same building, then I think it

25   probably should be covered by the carve out.

1          MR. TROOP:  Okay.  Thank you, Your Honor.  We'll

2     review that language again and make a proposal to the

3     Debtors before the close of argument on Wednesday, so that

4     if we have to revisit it --

5          THE COURT:  I mean, to be fair, I think that the

6     consumer laws that might apply here all are largely

7     addressed to engaging in activity that's misleading or

8     fraudulent.  They may not use the word fraud, they may use

9     the word misleading, but it's some activity that where

10    someone has their own independent role in it.

11         Okay.

12         MR. TROOP:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         MR. VONNEGUT:  Thank you, Your Honor.

15         MR. HUEBNER:  Good morning, Your Honor.  Again,

16    for the record, Marshall Huebner, Davis Polk.  Can the Court

17    hear and see me clearly?

18         THE COURT:  Yes.

19         MR. HUEBNER:  Your Honor, Mr. Kaminetzky and I are

20    splitting the Debtors' -- well, what we thought was an

21    allocated one hour, 50/50.  I will be handling more of the

22    Iridium and TMT Trailer and explain the releases.  Mr.

23    Kaminetzky will be doing the more technical legal issues of

24    equal important on constitutionality, due process,

25    Metromedia, et cetera, just to give the Court some sign

Page 38

1    posting on how we're splitting things up.

2              THE COURT:  Okay.

3              MR. HUEBNER:  Your Honor, let me begin with an

4    admission.  This Plan is most assuredly not perfect.  No

5    plan in these unthinkably painful and complex cases possibly

6    could be.  There is no allocation, no plan, no settlement,

7    no amount of money that could ever compensate for the loss

8    and devastation suffered by those impacted.  The imperfect

9    task that is, in fact, before us is to find the best

10   available resolution for over 614,000 contingent opioid-

11   related civil claims for money, by which the objectors'

12   civil claims for money are one part.

13             At the beginning of this journey, the most likely

14   scenario for the Purdue Bankruptcy was years of endless

15   wasteful litigation.  We had many -- a myriad of creditor

16   claims, federal, state, and local governments, commercial

17   counterparties, hospitals, personal injury victims, and

18   others.  Each fought with one another and with the Sacklers

19   year after year over a diminishing asset.

20             So, during -- there will no doubt be two

21   contentious days of legal arguments -- let's not lose sight

22   of the extraordinary thing so many have collectively

23   achieved.  More than 95 percent of Purdue's creditors,

24   including 97 percent of its governmental creditors, have

25   come together in support of a Plan that will allow as much

1    pot value as possible to be used as soon as possible, for

2    only two purposes and no others, abatement of the opioid

3    crisis and compensation of the individual victims, to save,

4    ameliorate, and improve as many human lives as possible in

5    the face of one of the worst health crises in world history.

6         If we do no seize this opportunity, if we squander

7    this moment, billions of dollars, and the creation of a

8    public benefit company, all dedicated to abatement of the

9    opioid crisis will be lost.

10        The legal inquiry at the heart of this hearing is

11   whether the many interlocking, interdependent settlements

12   embodied in the Plan and the releases are "fair and

13   equitable" in the best interests of the estates, which of

14   course, include their stakeholders, consistent the Supreme

15   Court's TMT Trailer decision and the seven Iridium factors.

16        The Plan is a tighten woven tapestry of no fewer

17   than 14 incredibly complex and totally mutually dependent

18   sets of settlements among tens of thousands of the Debtors'

19   creditors, including:

20        1.   The split of value between the public and

21   private side, agreed to in phase one mediation;

22        2.   Allocation among the many private groups from

23   phase one mediation;

24        3.   Allocation of funds among different

25   individual victims;

Page 40

1                    4.    The interstate allocation incorporate into

2     NOAT;

3                    5.    The intrastate allocation among the states

4     and municipalities incorporated into NOAT;

5                    6.    Resolution of the claims of the public

6     schools;

7                    7.    Allocation to Tribal creditors;

8                    8.    Resolution of the civil and criminal claims

9     of the United States;

10                   9.    Allocation of the resolution of the fees due

11    to the attorneys of both public and private creditors;

12                   10.   Resolution of federal healthcare claims and

13    liens pertaining to personal injury recoveries;

14                   11.   Resolution of private healthcare claims and

15    liens relating to personal injury recoveries;

16                   12.   Resolution among the United States and the

17    AHC of certain claims of the United States that could easily

18    -- or could have massively impacted the recovery of non-

19    federal governmental entities;

20                   13.   The Shareholder Settlement itself; and

21                   14.   Allocation among the 10 family groups of the

22    Sackler family.

23                    And this list of 14, Your Honor, most of which

24    were fully supported by the group formerly, and sort of

25    currently known, as the nonconsenting states, that includes

Page 41

1    the objecting states, is a simplified count.  Mr. Price's

2    number is 30 interconnected settlements.  This is likely,

3    whatever the number, whether it's 14 or 24 or 34, the most

4    complex set of interlocking mutually dependent settlements

5    involving the representatives of hundreds of thousands of

6    partis, more than 10 ad hoc groups, and the federal

7    government ever reached in the history of Chapter 11.  Pull

8    out a core thread, and the tapestry unravels.

9             At face, Your Honor, maybe it's an

10   oversimplification, but I have always thought that a court's

11   job is to apply the facts to the law, and that a lawyer's

12   job is to demonstrate that the law is on their side when

13   applied to the facts.

14            At face, the Sackler aspect of the settlement

15   involves the giving of releases and getting $4.325 billion

16   in cash, and scores of pages of binding covenants and other

17   material concessions.  So, it is truly remarkable that not a

18   single one of the objectors even cites TMT Trailer.  That's

19   right, Your Honor, there's not one cite to the Supreme

20   Court's governing decision in a single objection.  Almost as

21   remarkably, only two objectors, Washington and Oregon, even

22   mention Iridium, the governing Second Circuit case, and even

23   then, it is only in passing.

24            The objections are no less empty with respect to

25   the facts.  Despite 450 pages of objections and six trial

Page 42

1    days, the affirmative factual case, including direct

2    testimony by 17 expert witnesses and 18 fact witnesses, is

3    virtually uncontroverted.  For the record, of the 35

4    witnesses offered by the Plan proponents, 14 of them, 3 fact

5    witnesses and 11 expert witnesses, had their direct

6    testimony admitted with no objection and no cross-

7    examination by any party.

8            In our view, clearly the objectors will it

9    somewhat differently, there remaining 21 witnesses were

10   asked non-germane questions, and not very many of those

11   either, and their written and oral testimony is overwhelming

12   in support of confirmation.

13           Not only have the objectors not challenged the

14   overwhelming affirmative evidence of the Debtors, the UCC,

15   fiduciary for all creditors, the AHC, and other parties,

16   which includes over 4,000 pages of sworn declarations and

17   expert reports -- 4,000 pages of evidence, Your Honor, had

18   we had to put those witnesses on, we would have heard weeks

19   of affirmative testimony that went unchallenged.  Perhaps

20   even more shockingly, they have no facts of their own, no

21   evidence, none.

22           So, the objectors totally ignore the governing

23   law, both from the Supreme Court of the United States of

24   America and the Court of Appeals for the Second Circuit.

25   They have no evidence and they have done nothing to even tap

Page 43

1   the massive overwhelming fact record in favor of

2   confirmation.

3           Please allow me now to turn to the Iridium factors

4   which will frame out the necessity and propriety of these

5   releases.

6           Factor one, the balance between the litigation's

7   possibility of success and the settlement's future benefits.

8   The enormous, monumental, varied benefits of the Plan

9   settlements are undeniable and unobtainable other than under

10  the Plan.  As so many parties have advised in their briefs,

11  and testified under oath, and the UCC has it in their

12  letter, the Plan is the only, only viable solution that can

13  provide this extraordinary set of benefits to the

14  stakeholders of this case and the American people.

15          Among these benefits:

16          1.    The preservation and dedication of 100

17  percent of the Debtors' very material assets to opioid

18  abatement and victims, all while maintaining continuity of

19  supply of the many medicines made by the Debtors to ensure

20  access for appropriate patients, subject to comprehensive

21  covenants and injunctions and under the oversight of both a

22  monitor and a new Board of Directors.

23          2.    Comprehensive resolution of all claims

24  relating to these Debtors, thereby avoiding years and

25  probably decades of intercreditor and other litigation.

Page 44

1    More on that to come.

2         3.    $4.325 billion of additional value on top of

3    everything the estate has.

4         4.    The commitment to spend all of those billions

5    specifically for funding opioid abatement and the PIs.

6         On the first day of the case, every one of us

7    swore that this would not be another tobacco, this would not

8    be a case where the money went to potholes and redecorating.

9    Only this Plan and no other can deliver on this collective

10   vow.  Because, Your Honor, absent the NOAT structure, and we

11   checked, we believe that pretty much every state attorney

12   general is legally bound to deposit settlement monies in

13   their general state treasuries, just like they did in

14   tobacco.  See, e.g., Section 7-310.1 of Maryland State

15   Finance and Procurement Code, which provides, and I quote,

16   "Any money received by the State or otherwise subject to the

17   director or control of a State official, as a result of a

18   settlement, judgment, or consent decree...shall be deposited

19   in the State treasury."

20        5.    The ability to maximize value even further to all

21   parties through the public good spillover and multiplier

22   effect of abatement spending.  This is the evidence in this

23   case, and it is uncontroverted.

24        Professor Gaurisankaran testified, both in writing

25   at length, and quite eloquently on the witness stand, about

Page 45

1    the material public good and poverty spillover effect and

2    multiplier, economic value provided to yet far more

3    Americans than even the many hundreds of thousands of direct

4    beneficiaries under the Plan.

5         6.    Of tremendous import to noneconomic benefits.

6    Let's start with the public document repository.  Tens of

7    millions of documents, the most in history, including tens

8    of thousands of attorney-client privileged documents,

9    basically never before in any major case in history,

10   released to the public as far as we know.

11           And, Your Honor, there was testimony on this.

12   It's not lawyer argument.  There's testimony of Mr.

13   Weinberger and Ms. Conroy about the monumental importance to

14   our society of this unprecedented repository and its

15   potential to reveal lessons to stop a crisis like this from

16   ever happening to the American people again.

17           Next, the creation of a public benefit company,

18   that will operate with substantial oversight in a

19   responsible and sustainable manner, not only providing cash

20   to the abatement trust, but also developing or providing at

21   or below-cost life-saving medicines for the treatment of

22   opioid use disorder and for reversing overdoses.

23           Next, the complete removal of the Sackler families

24   from any and all involvement with Purdue or its assets from

25   the end of 2018 until the end of time.

Page 46

1           Next, the Sackler families' exit from the opioid

2    business globally over time, under a complex reticulated

3    covenant that many have been involved in negotiating.

4           And next, barring the Sackler families for seeking

5    or requesting any new naming rights with respect to

6    charitable or similar donations for years until they have

7    fulfilled their core obligations under the Settlement

8    Agreement.

9           But, Your Honor, now we need to flip it over

10   because equally important, and maybe even more important

11   than the extraordinary, monumental benefits of the Plan is

12   avoiding the Hobbesian Horror that is its only alternative.

13          But without the shareholder settlement the many

14   other mutually dependent and equally important complex

15   settlements fail.  For example, first the phase one

16   mediation agreement expressly conditioned by the states

17   themselves including the objecting states on Sackler

18   participating in the Plan, all fail.  There are no more any

19   agreed public/private splits.  There are no more intra-

20   private splits.  There are no more intrastate splits, and no

21   more interstate splits.  All gone, replaced by a maelstrom

22   of years of litigation.

23          Second, there is not enough value, nor the

24   emergence of a public benefit corporation or similar entity

25   to satisfy the conditions precedent for the $1.775 billion

Page 47

1    DOJ forfeiture judgment credit.  This would require the

2    Debtors to pay the DOJ at least $2 billion in cash that the

3    Debtors do not have.  It would also raise the specter of the

4    DOJ having billions and billions of other potentially

5    priority non-dischargeable claims.

6              Third, billions of dollars that will not go to

7    abatement.  The evidence -- it is evidence, it is not

8    argument -- is clear and uncontested that the only

9    alternative to the Debtors' Plan is the global May deal

10   scenario described by Mr. Turner in his declaration.

11             Mr. DelConte testified that the alternative would

12   provide, at most, $669.1 million in aggregate recoveries for

13   all than the more than 614,000 contingent liability

14   creditors who have asserted tens of trillions of dollars in

15   damages.

16             And for the record, no objector challenged the

17   results of Mr. Turner's alternative plan analysis for the

18   scenarios considered.  No objector identified any other

19   feasible scenario.  No objector submitted a competing

20   liquidation analysis.  The facts are uncontroverted and

21   incontrovertible.

22             Fourth, unthinkable intercreditor warfare for

23   years.  Other than under this Plan, the over 600,000 private

24   creditors absolutely, positively, under no circumstances

25   would agree to limit their collective recoveries to only

Page 48

1   about 20 percent of their recoveries from Purdue and the

2   Sacklers.  Rather, as they have told us again and again,

3   absent this deal, they will object to the claims of the

4   states, they will seek to subordinate the claims of the

5   states, while asserting their own trillions of dollars of

6   damage claims.

7           Fifth, uncontrollable and uncoordinated litigation

8   by thousands or tens of thousands of creditors and the

9   Estate itself against the Sacklers.  The creditors would be

10  brutally competing against one another in hundreds or

11  thousands of suits, each seeking hundreds of millions or

12  billions or tens of billions or hundreds of billions,

13  collectively seeking tens of trillions against the same set

14  of defendants.

15          Sixth, a delay of years or decades in getting

16  money out to help victims and facilitate abatement because

17  while this fire tornado of inter and intra-creditor

18  litigation and claim allowance and reconciliation grievously

19  eroded value month after month, year after year, there would

20  likely be no material cash flows from the Debtors' business,

21  no public health initiative to save lives, and a significant

22  risk of supply disruption of much needed approved drugs.

23          And seventh, and finally, Your Honor, hundreds of

24  millions of dollars, perhaps $1.56 billion or more in legal

25  fees, not even counting the additional public and private

Page 49

1    resources that would need to be spent as creditors, the

2    estates, and state, and local governments, and the Sacklers,

3    engaged in a war of all against all.  And this is not

4    speculation, this is not a lawyer spouting a doomsday

5    scenario, it is in the record evidence, including the

6    declarations of Mr. DelConte and Mr. O'Connell.  Your Honor,

7    that's just factor one.

8              Now, please let me turn to Iridium factor two.

9    The likelihood of complex and protracted litigation with its

10   attendant expense, inconvenience and delay, including the

11   difficulty in collecting on the judgment.  Your Honor,

12   probably happily for all, I actually will be quite brief on

13   this point because from Page 69 to Page 103 of our

14   confirmation brief, we address this factor at great length,

15   and tie it to the record evidence that is now undisputed

16   again and again.

17             So, I will tap this only very lightly.  The road

18   to winning and collecting net judgments in excess of $4.325

19   billion against the Sacklers would be a fight that would be

20   long, hard-fought, uncertain, and incredibly expensive.  I

21   don't think anybody disputes that.

22             The Debtors, like many other parties, passionately

23   believe that they have strong and material claims against

24   the Sacklers.  But even the most valuable claims, including

25   intentional or constructive fraudulent transfer will of

Page 50

1    course be litigated to the bitter end by the Sacklers,

2    including as to statutes of limitation, solvency, intent,

3    and recoverability of tax distributions, and the many other

4    factors described both in our disclosure statement and in

5    the UCC Plan support letter.

6           The issues are many and they are not simple, and

7    material loss on even one of them could be a material

8    potential hit to the recovery profile.

9           Finally, Your Honor, for very good reason, we have

10   all used the phrase, "the Sacklers" as shorthand throughout

11   these cases.  But if it ever comes to it, you can't file a

12   lawsuit and have the defendant be "the Sacklers."  You

13   actually have to sue, and serve process, and mitigate, and

14   win, and collect judgments against actual persons and trusts

15   and companies.

16          To give one sense of this -- and then I'll turn

17   Iridium three -- there are 204 Sackler Trusts in six

18   jurisdictions.  There are 57 individual members of the

19   Sackler families, including spouses, children, minors, and

20   decedent estates, in five jurisdictions.  And many of the

21   Sacklers were never on the Board, live overseas, and are not

22   U.S. citizens.  And there are 201 IACs and 2(a) entities in

23   58 jurisdictions.

24          Iridium factor three, the paramount interests of

25   the creditors.  I believe I already addressed in factors one

Page 51

1   and two, so I will actually not address it further at all.

2   As I've indicated, it's so clear and so overwhelming that it

3   was also tied to factor four, whether other parties in

4   interest affirmatively support a proposed settlement.

5          The facts are in.  97 percent of the 4,924-voting

6   governmental non-federal creditors and 95 -- it's actually

7   really 96, but we usually say 95, so nobody can say, which

8   way did you do it -- of a over 120,000 voting creditors, the

9   most voting creditors in the history of Chapter 11, support

10  the Plan.  Every single voting class carried by massive

11  margins, and every single one of the 10 ad hoc groups and

12  the UCC supports the Plan.

13         The group include (1) the UCC, (2) the AHC, (3)

14  the MSG, (4) the Native American Tribes, (5) the adult PI

15  victims, (6) the NASBI victims, (7) the NAS medical

16  monitoring claimants, (8) the hospitals, (9) the third-party

17  payors, (10) the late payers, and (11) of the independent

18  school districts.

19         As to the states, of course, Your Honor, let us

20  not lose sight of this.  15 of the 24 formerly nonconsenting

21  states that fought us all through the case, more than 62

22  percent, now support the Plan.  Which brings us, after the

23  further improvements they got in phase three of mediation,

24  to 38 of the 48 states participating in these cases, and

25  also Puerto Rico -- which when I checked a couple of years

Page 52

1    ago, I think was something like the 21st most populous, had

2    to be considered a state.

3            In dramatic, dramatic contrast, the objectors to

4    the settlements are the attorneys general of nine states the

5    District of Columbia, one city, and the U.S. Trustee, who

6    collectively comprise less than one, five-hundredth of one

7    percent of the Debtors' creditors -- one five-hundredth of

8    one percent.

9            Out of the approximately 22,495 cities, towns,

10   villages, and counties in the United States, one city,

11   Seattle, literally one, objected.

12           As to the nine states and the District of

13   Columbia, even if we stick them into their own states-only

14   class, more on that later, that class carried by 80 percent,

15   well over the 66 and two-thirds in 1,126, which is really 50

16   percent, paint by number, and even greater than the 75

17   percent arguably, analogously, intellectually relevant in

18   the 524.  The class they were actually in, Class 4, had

19   4,924 voters, and carried by 97 percent.

20           Moreover, Your Honor, and I say this with some

21   trepidation, but unfortunately, I mean it, it is not

22   actually clear to me who the few objecting attorneys general

23   are even speaking for because on average 95 percent of the

24   private and 97 percent of the governmental stakeholder

25   within their own states, all support the Plan.  And

1    basically, zero claimants -- basically, literally zero in

2    each of the states who has objected has joined them in

3    objecting.

4              THE COURT:  Can I --

5              MR. HUEBNER:  In other words --

6              THE COURT:  -- can I get in a word for a second?

7    How do you -- how do you arrive at the figure -- how do you

8    know that those supporting the Plan are voting in favor of

9    the Plan, comprise -- in the states where there have been

10   objections, comprise 95 percent of those, that group?

11             MR. HUEBNER:  Your Honor, I don't know, which I

12   said on average.  Your Honor, we don't -- we didn't use

13   Prime Clerk to give us customized analysis to use at trial.

14   I don't know the break down per state, I just know on

15   average across the country.  It's certainly possible that in

16   some of those states the vote was 99 percent, and in some

17   states it was lower.  And of course, each class had a

18   different voting percentage, right?  They ranged from 88

19   percent to 100 percent.  So, I can't know how exactly it

20   splits.  It's more of the point that looking overall, the

21   creditor acceptance is overwhelming, including as to the

22   governmental units and divisions within the states.

23             Is it possible that within a specific state, if we

24   did a state-by-state analysis my rhetorical point would be

25   lost as to the some of the objectors?   Absolutely.  I'm not

Page 54

1    stating it as a fact, I said, on average, because I don't

2    know the answer to the Court's question.

3              THE COURT:  Okay.  I might as well as this to you.

4    Now, how -- what's the basis for stating that the actual

5    vote here was the largest in Chapter 11 history?

6              MR. HUEBNER:  Your Honor, we can provide a chart.

7    Our team looked very, very hard at all of the biggest cases

8    that we know of, and we've been doing this for rather a

9    while.  It's possible somebody could say a case you didn't

10   know of it, what -- had more voters.  But Lehman Puerto

11   Rico, G.M., PG&E -- we have a very long chart, in which we

12   went through every case we could find to verify the veracity

13   of the statement.  I would not be comfortable putting it in

14   a sworn declaration because it's possible I'm wrong, but we

15   looked very, very hard and have a long list of all the mega

16   cases, and believe we have the highest number of voters.

17             THE COURT:  Okay.  Thanks.

18             MR. HUEBNER:  Iridium factor five, Your Honor, the

19   competency and experience of counsel supporting, and the

20   experience and knowledge of the bankruptcy judge reviewing

21   settlement, and seven -- I'm going to combine them, "the

22   extent to which the settlement is the product of arm's

23   length bargaining."

24             Your Honor, we're obviously going down the why on

25   all seven factors, and we think each one is overwhelming.

Page 55

1   No party has contested or possibly could contest that these

2   agreements, when tensely negotiated, indeed brutally

3   negotiated, over a period of years by sophisticated counsel

4   on all sides, and with over a year -- a year of assistance,

5   from three of the most highly respected mediators in the

6   country, the Honorable Layn Phillips, and Mr. Kenneth

7   Feinberg, the Honorable Shelley Chapman, whose selection was

8   supported by the objectors.

9           These are not someone else's mediators.

10          Mr. Feinberg and Judge Phillips are the mediators

11  we all agreed on and jointly presented to the Court.  With

12  respect to negotiations, Your Honor, the testimony is thick

13  and uncontroverted.  Mr. Atkinson, Mr. Guard, and Mr. Gotto

14  all testified about the negotiations.  We also heard from

15  Mr. Weinberger and Ms. Conroy who have spent over twenty

16  years suing Purdue and the Sacklers.

17          The UCC described all this in their letter

18  facilitated by tens of millions of legal documents conducted

19  in a no-stone-left-unturned investigation into these issues.

20  And, of course, Your Honor, a 4.275-billion-dollar number

21  which came out Phase 2 mediation was the joint proposal of

22  the mediators.  It didn't come from the Debtors.  It didn't

23  come from the UCC.  It didn't come from the AHC, didn't come

24  from the NCSG.  It came from the mediators after almost a

25  year of full-time work on these pieces.

1            And, of course, the final number, 4.325 billion

2    dollars with further material concessions came from the

3    third mediator, a sitting federal judge.

4            So let's turn to Factor Six, which is the only one

5    that is left.  The nature and breadth of the releases

6    obtained by officers and directors, which in this case, of

7    course, we'll expand to include released parties, not just

8    officers and directors.

9            Your Honor, no one ever would suggest that these

10   releases are not broad.  Of course they are broad, but they

11   are the only way these cases can be resolved for many

12   reasons.  The objecting states are singularly focused on the

13   fact that the Sacklers will not pay 4.325 billion without

14   the finality that come from broad, binding third-party

15   releases.  But this is only one of the very many reasons

16   that the plan must have third-party releases and could never

17   go effective without them because, Your Honor, even if the

18   Sacklers agreed to pay over four billion dollars and still

19   be sued for hundreds of billions of dollars, the plan dies.

20   This has been totally misunderstood by so many parties.

21   It's time to hopefully make it clear.

22           Why would the plan never, ever work, irrespective

23   of the wishes of the Sacklers without third-party releases?

24           One, fundamental fairness and equal treatment.

25   Let us consider arguendo, a world in which the objecting

Page 57

1    states or other material creditors are allowed to opt out

2    from the third-party releases.  The nine objecting states

3    and the District of Columbia have filed proofs of claim

4    alleging under penalty of perjury over 439 billion dollars

5    in damages against Purdue and based on their theory, by

6    extension, against the Sacklers.

7            Let us assume that they recover only 5 percent of

8    the 439 billion dollars they say they are owed and they get

9    judgments for 22 billion dollars.  Even if the Sacklers

10   somehow could pay both this 22 billion dollars, which is

11   only 5 percent of the claims they've sworn they have, and

12   also the 4.326 billion for the whole rest of the country,

13   that would mean that only nine states and D.C. get 22

14   billion dollars, while 38 states, 614,000 creditors and

15   every other Ad Hoc Group is supposed to share only 4.325

16   billion dollars.  That does not and could not ever work for

17   anyone.

18           But, of course, it's much worse than that because

19   the Sacklers don't have 26.325 billion dollars to pay 22 and

20   then another 4.325.

21           So in this hypothetical opt-out scenario, even if

22   the objecting states only get judgment for five cents of

23   what they claim they are owed, everything will fail and

24   collapse if the Sacklers can't pay the settlement.

25           And to add insult to the extraordinary collective

Page 58

1    national injury, if any of the objecting states were

2    successful, they might be able to assert judgment liens and

3    prime everybody else.  So everyone else in American might

4    literally end up sharing little or nothing, not even 4.325

5    billion, while an opt-out state could get a judgment lien

6    for billions.  Of course no one is going to do that deal,

7    which is reason number two, no one will do that deal.

8            No creditor group in these cases, to my knowledge,

9    would or will agree to a resolution of their claim if any

10   material party remains free to pursue direct claims against

11   the Sacklers for tens or hundreds of billions of dollars.  A

12   tragedy of the common cannot be solved by only some parties

13   agreeing not to drain a common resource.  It can only be

14   solved if everyone is bound to the deal.

15           Mr. Preis and I stopped at six.  But between us,

16   we confirmed and I hereby represent that the UCC and the

17   AHC, the NSGE and Adult PIs, the NES Committee and the

18   Hospitals will not support a plan that allows for opt-outs

19   that are material along the lines requested by the objecting

20   states.  Even if the Sacklers consented to the carve out,

21   everyone of those six groups would instantly support --

22   withdraw -- excuse me -- would instantly withdraw their

23   support for the plan and fiercely oppose it.  And of course

24   they would because they wouldn't ever get paid what they've

25   agreed to.

Page 59

1           This is precisely why, Your Honor, the objectors

2      should be held to this.  The Phase 1 Mediation Agreements

3      agreed to among the publics and the privates with virtually

4      no involvement of the Debtors and no involvement of any

5      kind, of any kind by the Sacklers who were not Phase 1

6      mediation parties are expressed conditioned on Sackler

7      participation in the plan.

8           Number three, Your Honor, 1129(a)(11), there

9      actually is a bankruptcy code that governs what you need to

10     make a plan go effective.  1129(a)(11) requires that a plan

11     be feasible.  I cannot and would not ever ask a federal

12     judge to confirm a plan that I did not believe was feasible.

13     If there are no third-party releases and material opt-out

14     parties are allowed to sue the Sacklers for tens or hundreds

15     of billions of dollars, I could not stand here and represent

16     to the stakeholders, with whom I am a sworn fiduciary, or to

17     this Court, to whom I have obligations as an officer, that

18     the plan and its many settlements would or could be

19     successfully consummated.

20          The people who so desperately need it and deserve

21     it would get what they bargained for and what they voted

22     for, including, because the overwhelming creditor support we

23     have built after years of effort, would instantly supernova.

24     The Sacklers have no right to vote on our plan, but our

25     creditors do.

Page 60

1          Four, without the third-party releases objected to

2     by 1/500th of 1 percent of our creditors, everything

3     collapses and those directly impacted by the opioid crisis

4     would lose the billions in hand under the plan and have to

5     wait for recoveries they may never receive and abatement

6     programs that may never launch.

7          Five -- and this is very, very important to me.  I

8     find the professed outrage and shock from the objectors

9     about the number of parties on the Sackler side being

10    released to be some combination of confusing, misguided, or

11    utterly hypocritical.  Let me explain why with details.

12         I would venture a guess that every single lawyer

13    listening to this hearing right now has done five or ten or

14    twenty or fifty settlements that have releases in the last

15    several years.  And I would further venture a guess that

16    virtually every single one of those settlements with any

17    large company or enterprise expressly releases its present

18    and former officers, directors, affiliates, subsidiaries,

19    attorneys, accountants, and representatives or a substantial

20    subset of those representative category because otherwise,

21    the releases are of gossamer spun and essentially worthless.

22         And now I'm not going to speculate.  Now I'm going

23    to tell you facts because I know for a fact that of these

24    exact objecting parties, every one of them, including in the

25    last few months, and including in the opioid states, agreed

Page 61

1    to releases with parties with whom they settled.  This is

2    exactly how they structured them.

3            For example, in the McKinsey settlement, trumpeted

4    by many Attorneys General as critical and a milestone, guess

5    who was released?  And I quote: "By execution of this

6    judgment order, the State of California -- there is a model

7    they all used, 47 separate settlements, very complicated,

8    allows you to do the same for all of them -- releases and

9    discharges McKinsey and its past and present officers,

10   directors, partners, employees, representatives, agents,

11   affiliates, parents, subsidiaries, operating companies,

12   predecessors, assigns, and successors, collectively the

13   releasees.

14           I don' know what some of these categories mean.  I

15   don't know what an operating company is separate from the

16   affiliate, but I guess everyone else does.  Your Honor,

17   that's all true in Insys, and Medtronic, and Career

18   Education, and Johnson & Johnson, and Apple, and Emarsys

19   and, and, and.  I have a demonstrative in the end, I'm

20   actually not going to use because it's very dense and its

21   very intent.  It does on for (indiscernible) and I'm happy

22   to send it in to the Court and all parties.  I was told by

23   the litigators that it is very usable because it was all

24   just quotes from public dockets which shows you how the

25   release language works for case, after case, after case

Page 62

1    including many cases to which the objectors are party as to

2    categories of released parties: Oregon, Connecticut,

3    Maryland, D.C., New Hampshire, California, Delaware, Rhode

4    Island, Vermont, Washington, West Virginia.  There's

5    McKinsey.  There's Apple.  There's Honda.  There's Johnson &

6    Johnson.  There's Medtronics.  All subsets and I'm not going

7    to read them all.  I'll just send it if Your Honor would

8    find it useful -- past and present, directors, officers,

9    employees, representatives, affiliates, parents,

10   subsidiaries, predecessors, assigned, and successors.

11          Your Honor, we would have given you two hundred

12   examples from the public dockets but we stopped at ten

13   including many that included the objecting states of which

14   Your Honor can take judicial notice.

15          It is quite clever actually that the handful of

16   objectors have often repeated the phrase -- I'm so used to

17   seeing it getting used by the media -- that the Sacklers are

18   getting "immunity."  That is a gross mischaracterization of

19   what is happening.  This is a civil settlement of civil

20   claims.  A non-opt-out, civil-only settlement with historic,

21   overwhelming support.  While it is nothing less, it is also

22   nothing more.

23          Now I grant you that the drafting may have been a

24   little bit unusual.  May I list by name some of the people

25   and entities in this ubiquitous, omnipresent categorical

Page 63

1    approach to who gets released in a complex situation because

2    the number of releasees in every case like this numbers in

3    the hundreds or thousands or more.  Our plan, ironically,

4    provides more information about the identify of the parties

5    being released than the many, many settlements to which

6    everybody, including the objectors, are so frequently a

7    party.

8              And, Your Honor, I'm going to venture a guess that

9    McKinsey, Apple, Honda, Johnson & Johnson had tens and tens

10   of thousands more present and former directors, officers,

11   and employees, representatives, affiliates and subsidiaries

12   than do the Sacklers and the objecting AGs were that

13   categorical approach in all of those cases and dozens or

14   hundreds of others.

15             Your Honor, I'm about a minute from done, so let

16   me wrap up.  At bottom, these broad releases are unavoidable

17   and indispensable first because fairness among victims and

18   creditors demands them.  Among victims and creditors, not

19   against the Sacklers.

20             Two, because the tragedy of the commons cannot be

21   solved any other way.  It is impossible.  Believe me, we've

22   all tried for years.

23             Three, because we have no creditor support for the

24   plan without them.  It's not just that the Sacklers are

25   insisting on them.  It's that the plan doesn't work.

Page 64

1              And four, because 1129(a)(11) cannot be satisfied

2      without them.

3              Your Honor, the plan is the only way to avoid

4      years or decades of Hobbesian hell and billions of dollars

5      of added costs and lost value.  It is for very good reason

6      that very creditor class, every creditor group, and

7      virtually every voting creditor has accepted it not only as

8      the best, but as the only viable outcome.  Thirty-five

9      witnesses, over 4,000 pages of sworn declaration and expert

10     reports, TMT Trailer, Iridium, et cetera, et cetera.

11             The plan and it's 14 or 24 or 34 totally

12     interdependent, mutually conditioned settlement is

13     indispensable and is in everyone's best interest and we ask

14     that it be approved.

15             Your Honor, as promised, I will now turn the

16     podium over to Mr. Kaminetzky for the legal factors on the

17     release.

18             THE COURT:  Okay.

19             MR. KAMINETZKY:  Good morning, Your Honor,

20     Benjamin Kaminetzky of Davis Pope for the Debtors.

21             As the Court has recognized repeatedly and, in

22     fact, as recently has the final pretrial conference, the law

23     governing the availability of third-party releases is well

24     established in this Circuit dating back to the 1980s since

25     the historic mass tort bankruptcy of Johns Manville.

1          In Johns Manville, the court fashioned a Section

2     105(a) injunction to channel asbestos personal injury claims

3     against third-parties to a trust set up to handle asbestos-

4     related claims.  And the propriety of that injunction has

5     been upheld on direct appeal and collateral attack for over

6     30 years.  Most recently in Metromedia, the Second Circuit

7     reaffirmed that non-consensual third-party releases may be

8     granted in the "unique" or "rare" cases, including non-

9     asbestos cases where such releases are "important to the

10    success of the plan."

11         And this followed the Drexel case in the Second

12    Circuit where the court held "in bankruptcy cases, a court

13    may adjoin a creditor from suing a third-party provided the

14    injunction plays an important part in the Debtor's

15    reorganization plan."

16         The centerpiece of the plan, as we just heard, is

17    the 4.325 billion in cash that the Sacklers will contribute

18    in exchange for these third-party releases.  Without the

19    third-party releases, however, any one state, county, tribe,

20    city, town, or other governmental claimant could make the

21    unthinkable value-destructive scenario that Mr. Huebner just

22    vividly described earlier a reality.

23         For all of their pages and words, the objectors

24    have no response to this.  They offer no alternative nor any

25    hope for anything other than a meltdown.  The objectors

Page 66

1   merely allege without submitting a shred of factual, expert

2   or any other support, and I quote from Washington's

3   objection at Paragraph 7, they actually say this "Had Purdue

4   Pharma simply reorganized as a business entity, this case

5   would have been a relatively simple one.  The structure

6   would have essentially been the same as the current plan

7   with the Sackler settlement excised."

8            There is simply nothing in the evidentiary record

9   that supports this, nothing.  The current plan would not be

10  possible without the releases.  This is spelled out in black

11  and white in the unrebutted testimony of John Dubel, John

12  Guard, Mike Atkinson.  These are precisely the sort of

13  unique and rare circumstances in the words of the Second

14  Circuit, demanding the application of non-consensual third-

15  party releases.

16           Now turning to the objections, to the extent the

17  objections address Metromedia on its own terms at all rather

18  than just arguing that it was wrongly decided, they resort

19  to arguments that many of the paradigmatic circumstances

20  justifying third-party releases discussed in Metromedia are

21  not present here.  But the Second Circuit in Metromedia

22  explained that whether third-party releases are appropriate

23  in any particular plan is -- and I quote -- "not a matter of

24  factors and prongs," 416 F.3d at 142.

25           Instead, the point is whether under the particular

Page 67

1    facts of the case, the third-party releases play "an

2    important part of the Debtor's reorganization plan," same

3    case at 143.

4              And for all the reasons Mr. Huebner discussed,

5    they absolutely do.  But even if we just look at the factors

6    and prongs as the objectors would have the Court do, we win

7    because those factors are, indeed, present here.

8              First, the Metromedia court recognized that third-

9    party releases are appropriate in cases where estates

10   receive "substantial consideration."  That's at Page 142 of

11   Metromedia.  Here, the Sackler families are making a

12   substantial contribution by parting with $4.325 billion

13   among other terms.  This is substantial from any reasonable

14   measure.

15             From a qualitative perspective, it is critical and

16   necessary consideration that enables the value maximizing

17   resolution contained in the plan.  In other words, the

18   shareholder contribution ensures that the plan is feasible

19   and that contingent liability creditors receive significant

20   and defined, as opposed to potentially de minimis or

21   actually zero value on account of their claims.

22             We note in our brief at Paragraph 136 that this

23   alone is sufficient to support a finding that the

24   contribution is substantial.

25             Now the shareholder contribution is no less

Page 68

1    substantial from a quantitative perspective.  4.325 billion

2    is a large sum.  It is at least twice the value of the

3    Debtor's business as a going concern, which Mr. Turner

4    testified is roughly 1.6 billion to 2 billion.  That's

5    Turner's declaration at Paragraph 22.  It is also more than

6    the number in the mediator's proposal made during the Phase

7    2 mediation and is the number that induced the UCC and AHC,

8    the MSGE and 15 of the 25 then non-consenting states to

9    support the shareholder settlement.  There is absolutely no

10   support whatsoever for an ability-to-pay standard that the

11   objection seemed to be suggesting.  That would be a

12   dangerous precedent.

13          With that said, I think it's relevant and hopeful,

14   Your Honor, to remember that combined net worth of every

15   single Sackler that is an actual defendant in the action,

16   i.e. an alleged wrongdoer, is 400 million on Side A and 700

17   million on Side B.  That is 1.1 billion compared to a

18   payment of 4.325 billion.  That's less than a quarter.  And

19   Your Honor you can find that at JX-0408, which is Martin's

20   report on the Mortimer side of the Sackler family and JX-

21   192, which is the Martin report on the Raymond side.

22          THE COURT:  That's ex the trusts, right?  This is

23   just their own net worth separate from putting their

24   interests in the trust.

25          MR. KAMINETZKY:  Yes.

Page 69

1          THE COURT:  Okay.

2          MR. KAMINETZKY:  Second, under Metromedia, third-

3    party releases may be appropriate in cases where the

4    "enjoined claims would indirectly impact the Debtor's

5    reorganization by way of indemnity or contribution."  That's

6    on Page 142 of Metromedia.

7          Here, the release claims would have an effect on

8    the Debtor's reorganization.  Without the third-party

9    releases as we set out in detail in our brief, released

10   parties or shareholder released parties would certainly

11   deplete shared insurance policies that constitute a

12   significant asset of the estates or assert contribution or

13   indemnification claims against the estate.  In fact, many

14   already have submitted proofs of claims asserting such

15   claim.

16         The objectors contest whether these claims would

17   ultimately succeed, but that's not right question.  The

18   outcome of those claims is uncertain and the fact that they

19   could have an impact on the value of the estates further

20   supports a finding that third-party releases here are

21   appropriate and necessary.

22         Third, Metromedia recognized that third-party

23   releases are appropriate in cases where the "enjoined claims

24   were channeled to a settlement fund rather than

25   extinguished."

1          Here, the domestic opioid litigation claims are to

2    be channeled to the trust created by the plan rather than

3    extinguished, a fact, that at least one of the objectors has

4    not acknowledged, Washington objection at Paragraph 59,

5    under Metromedia, the circumstances to illustrate that the

6    third-party releases are appropriate.

7          Fourth, and last, but certainly not least, some

8    cases have looked at and considered the level of support for

9    a plan as relevant and here the plan has overwhelming

10   support.  As you've heard, Your Honor, over 95 percent of

11   voting creditors have voted to accept the plan.  More

12   specifically, over 96 percent of domestic government

13   entities that voted have voted to accept the plan.  The fact

14   that roughly 80 percent of the States support the plan would

15   be more than sufficient level of support even in an

16   analogous context of an asbestos-related channeling

17   injunction where channel classes must vote in favor of a

18   plan by least 75 percent.

19         This takes me to the remainder of the arguments

20   raised by the objecting states, the U.S. Trustee, and the

21   DOJ, all of which boil down to nothing more than an attack

22   on well-established Second Circuit law.  Their arguments

23   basically fall into four buckets.

24         First, third-party releases should not be

25   permitted under the bankruptcy code.

Page 71

1            Second, even if third-party releases are

2    authorized by law, this Court should craft a new exception

3    to Metromedia for the so-called police power actions.

4            Third, they argue that third-party releases cannot

5    be imposed because they violate due process, which, as Your

6    Honor will see, is really just their first argument recast

7    as a constitutional argument.

8            And finally, they argue this Court lacks

9    jurisdiction or power to confirm the plan containing these

10   releases.

11           Now each of these arguments are meritless.  Let me

12   begin with the first bucket of arguments which are just an

13   attack on Metromedia itself, and I'll be brief.

14           Along these lines, the DOJ and U.S. Trustee, for

15   example, claim that a third-party release should not be

16   allowed in any case other than asbestos case because the

17   only provision under the code expressly and specifically

18   authorizing the injunction of third-party claims, Section

19   524(g), is limited to asbestos cases.  Note that there is no

20   limiting principle.  They say it is categorically

21   unavailable.  Any single objector, according to them, the

22   law mandates if there is a single objector according to the

23   DOJ and the U.S. Trustee, the law mandates utter

24   destruction.  This is despite the unbelievably collaborative

25   work we have done with the DOJ to craft an abatement plan, a

Page 72

1    public benefit corporation, and public health initiatives

2    that the DOJ fully supports, but would disappear, simply

3    disappear if the objection is sustained.

4            The objectors also claim that third-party releases

5    should be categorically prohibited as they operate as a

6    broader discharge than would be available to a Debtor.

7    Suffice to say though that the Second Circuit indisputably

8    permits non-consensual third-party releases under

9    appropriate circumstances, as do the majority of Circuits.

10   And the Second Circuit on Page 142 of Metromedia actually

11   addresses both of these arguments, the 524(g) argument and

12   the discharge argument and nonetheless concludes that third-

13   party releases are permissible.

14           So I will not spend more time on these particular

15   arguments unless the Court has any questions because the

16   Court of Appeals has already decided this issue.

17           Now, the second argument raised by the objecting

18   states is that even if Metromedia is good law, this Court

19   should essentially craft an exception to it for the

20   objecting states so-called police power claims, the

21   automatic stay police power exception in 362(d)(4) for

22   governmental units.

23           Now, let's be clear what about the objecting

24   states are asking for when they seek the creation of a carve

25   out from Metromedia for their claims.  They are seeking a

Page 73

1    veto power that would effectively allow them or any one of

2    them to decide whether the plan may be confirmed even though

3    a super-majority of the states and over 95 percent of voting

4    creditors have said that it should.

5           And to be clear, this requested police power veto

6    would not be limited just to states.  The Objecting States

7    make much of their supposedly unique sovereign status, but

8    the Bankruptcy Code makes no categorical distinction between

9    them and their political subdivisions.

10          The definition of governmental unit under the Code

11   also includes any "district, territory, municipality,

12   foreign state, or any department, agency or instrumentality

13   of the state."  So if there was an exception for so-called

14   police power claims brought by governmental units, each and

15   every one of these entities would also have a unilateral

16   power to impede in otherwise consensual and value-maximizing

17   resolution, even if, say, every single state in the country

18   was onboard.  And Your Honor, you don't have to look too far

19   to see how absolutely absurd this would be.

20          In this case, the State of Washington objects to

21   the plan.  And the City of Seattle joins that objection.

22   But King County or Washington County, in which Seattle is

23   located, is a member of the AHC, and whose lawyer, Mr.

24   Donado, testified in favor of the plan in this case.  Any

25   one of these parties would have a veto over the others in

Page 74

1    the Objecting States world.

2            It is therefore unsurprising that the objectors

3    cannot cite a single authority, not one, remotely suggesting

4    that there is or should be an exception to Metromedia for

5    police powers.

6            Now, the Objecting States say that their consumer

7    protection claims or public nuisance claims cannot be

8    released because enforcement of their laws is

9    "constitutionally protected function", or because states are

10   "independent sovereigns in the Federal system or because

11   their actions are parens patriae actions that seek to

12   enforce non-monetary interests."  But none of the

13   authorities on which they rely come close to establishing

14   that their claims should be treated any differently from

15   others.

16           Let me just address a few examples, beginning with

17   their purported statutory authorities.  The Objecting States

18   first point to the police and regulatory power exception to

19   the automatic stay under 362(b)(4).  But the provision

20   provides no support for their carveout.  For one, the

21   exception to the automatic stay is just that.  It just means

22   that stays don't apply automatically, nothing more.

23           As this Court already ruled in the preliminary

24   injunction context, and Judge McMahon affirmed on appeal,

25   this Court has the power to enjoin police power actions

Page 75

1   under 105(a), notwithstanding 362's exception.  And the

2   Objecting States, of course, do not dispute that Section 362

3   does not apply to the confirmation context at all.

4           Let's also be clear about something.  Section

5   362(b)(4) creates an exception to the automatic stay for

6   governmental units' enforcement of police and regulatory

7   power, but not to the collection of money judgments.  Here,

8   make no mistake, the Objecting States are seeking not only

9   to enforce their laws, but also to collect on any judgment

10  they may ultimately obtain outside of bankruptcy, in real

11  dollars, not in bankruptcy dollars.

12          Your Honor, I have never heard and of the

13  Objecting States once say that they would share their

14  resulting recoveries with any other states.  Nor have they

15  agreed to provide the recoveries to NOAT to be distributed

16  for abatement purposes, or to only those deposit recoveries

17  into their treasuries once the privates are paid off per

18  Phase 1 mediation.

19          In reality, the carveout they seek is instead just

20  another attempt in a long succession of attempts to jump the

21  line to pursue their billion dollar money damages claims for

22  their own state treasuries at the cost of causing the entire

23  abatement-centric enterprise, the entire value-maximizing

24  plan, to collapse.

25          Now, next, the Objecting States state in Paragraph

Page 76

1    37 of Washington's objection that 524(g) of the Code, which

2    covers injunctions of third-party claims in asbestos cases,

3    does not clearly apply to governmental units, which they say

4    indicates a Congressional intent not to allow third-party

5    releases of claims by government units.  But this is just

6    plain wrong.

7            Section 524(g) does clearly authorize courts to

8    enjoin is asbestos claims held by government units.  It

9    applies to "entities", which is defined under Section 101,

10   to include governmental units.

11           They also cite 28 U.S.C. 1452(a), which governs

12   the removal of police power actions to federal court.  But

13   that is irrelevant.  The issue here is not whether this

14   Court may remove and hear the state's claim, but enjoin the

15   pursuit of those claims under 105(a) as part of a plan of

16   reorganization.  It's a different issue.

17           The Objecting States also say an exception to

18   Metromedia should be gleaned or implied from 523(a)(7),

19   which makes claims for fines, penalties or forfeiture

20   against individuals nondischargeable.  But as I noted

21   earlier, Metromedia considered this general concern and

22   rejected it as a basis to bar third-party releases

23   categorically.

24           Indeed, Johns Manville case considered and

25   rejected this argument back in 1988 at 837 F.2d at 91.  And

Page 77

1    I'm going to quote, and just substitute names of our

2    parties.  And I'm quoting now Johns Manville.  The flaw in

3    the objector's reasoning is that injunction orders do not

4    offer umbrella protection of a discharge in bankruptcy.

5    Rather, they preclude only those suits against the Sacklers

6    that arise out of or relate to Purdue.  And again, 837 F.2d

7    91.

8            The Objecting States' case law citations cited

9    more for sound bites than applicable law are even further

10   appealed.  For example, many of the cases cited by the

11   Objecting States are invoked for the vague notion that a

12   state's ability to enforce its own regulatory laws is an

13   essential function of its sovereignty.  But these cases

14   stand only for the narrow and irrelevant proposition that a

15   parens patriae action does not fall within the statutory

16   definition of class action under the Class Action Fairness

17   Act, and thus cannot be removed to federal court under that

18   statute.

19           This Court's power in no way depends on that

20   statute here, of course,  in those cases say nothing about

21   it Bankruptcy Court's ability to enjoin parens patriae

22   actions in the context of confirming a plan.

23           The states also cite a pair of Supreme Court

24   cases, White and Medtronic, to assert that public health

25   regulation is an important function of state government.

Page 78

1   That's Washington Objection at Paragraph 34.

2          These cases, however, address the extent to which

3   federal regulatory approval of drugs or medical devices

4   preempts state law liability in suits by private plaintiffs.

5   They do not support any special treatment for enforcement of

6   actions brought by state governments during the plan

7   confirmation process.

8          Now, the Objecting States rely most heavily on a

9   single out-of-circuit case.  It's called In Re First

10  Alliance Mortgage Company, where a district court reversed a

11  preliminary injunction against a governmental unit pursuing

12  certain claims arising from subprime lending.  In the

13  state's view, this case somehow supports a categorical

14  carveout in a plan confirmation context.  It simply does

15  not.

16         Putting aside that this case is factually

17  inapposite, I actually love this case because it fully

18  exposes what's going on here.  The First Alliance Court

19  found in balancing the risk of harm to the parties in the

20  preliminary injunction context, that there was, "no risk of

21  unequal treatment of creditors because, as the governmental

22  unit agreed, while they are allowed by the regulatory and

23  police power exception to proceed to judgment against the

24  Debtor in other forums, they are not allowed to enforce any

25  money judgments against the Debtor in any proceeding other

Page 79

1    than the bankruptcy proceeding."  264 BR 658.

2          That could not be further from the case here,

3    where the Objecting States seek not only to enforce their

4    claims, but to collect on them outside of bankruptcy.  To

5    jump the line and to gather funds for themselves in front of

6    everybody else.

7          Now, Your Honor, taking a step back, if there were

8    any case where the Court should feel compelled to create a

9    Metromedia police power exception from whole cloth, this is

10   certainly not it.  The Objecting States, for example,

11   suggest that third-party releases "block the Attorneys

12   General in their efforts to exercise the states' police

13   powers to protect their vulnerable population from the

14   massive ongoing scourge of the opioid epidemic.  Washington

15   Objection, at Paragraphs 1 and 4.

16          The plan of the third-party releases here,

17   however, no such thing.  As this Court has recognized again

18   and again, these Chapter 11 cases are about money.  And now,

19   after nearly two years and these Chapter 11 cases and

20   numerous days of testimony at the confirmation hearing, I

21   think the record is clear on this point.

22          The Debtor stopped marketing opioids almost four

23   years ago.  They have been subject to an involuntary

24   injunction overseen by this Court and two preeminent

25   monitors for almost two years.  Purdue will be dissolved

Page 80

1    under the plan.  NewCo will be required to operate under

2    numerous, onerous injunctions and covenants ensuring it acts

3    in the public interest.  And pursuant to the shareholders'

4    settlement, the Sackler Family will have no involvement with

5    the post-emergent Debtors or the opioid business worldwide

6    after the sale of the IACs under the plan.

7            The Objecting States' only response is that their

8    claims cannot be released because they also serve "non-

9    monetary interests", as Washington says in Paragraph 34 of

10   its objection, or because, "bringing the Sacklers to justice

11   through the adversarial process, however that might turn

12   out, is a legitimate consideration," as Mr. Goldman

13   suggested in his cross-examination on August 12, on Page 187

14   of the hearing transcript.  But that, frankly, does not

15   withstand scrutiny either.

16           The overwhelming majority of states and all but

17   one municipality out of thousands, as well as hundreds of

18   thousands of other creditors, have manifested the public

19   interest in their votes in favor of the plan.  In the face

20   of the near universal support for the plan, the onus must be

21   on the objectors to explain to this Court how these so-

22   called nonmonetary interests, whatever those might be, under

23   the facts of this case could possibly justify the massive

24   destruction to a plan that will provide literally --

25   literally -- billions of dollars to communities and

Page 81

1    individuals in need, including their own constituents.  They

2    have not and they cannot.

3            The Objecting States next supposed justification

4    for a carveout is that their claims cannot be released

5    because -- and I quote again from Washington's pleading --

6    "that a process has been shielded from public view and

7    scrutiny."  Then that's Washington's Objection at Paragraph

8    5.

9            This assertion is not only false but is also

10   belied by the very public trial this Court is currently

11   presiding over, which included the cross-examination of

12   multiple Sacklers, as well as the enormous amount of

13   disclosure and information that has been produced by the

14   Debtors, the Sacklers, the IACs, and their financial

15   institution.

16           As this Court observed, "More information has been

17   provided with respect to this plan, and more specifically

18   with respect to the elements of a settlement with the

19   Sacklers, than the Court has ever seen, and perhaps has ever

20   been provided in any Chapter 11."  And I'm quoting Your

21   Honor from the March 24th hearing.

22           To recap just briefly what the Court well knows,

23   discovery included the production of over 100 million pages

24   of material from dozens of custodians, going back decades.

25   Publication on the docket of hundreds of pages of forensic

Page 82

1    reports.  That's the 1A and 1B Report detailing all

2    transfers of value to the Sacklers, both cash -- announced

3    cash -- or for their benefit.  Production of millions of

4    pages of materials by the Sackler Families.  The UCC and the

5    non-consenting states also took the deposition of over a

6    dozen Sackler Family members and current and former Board

7    members and others.

8            The extensive disclosure of the Sackler wealth,

9    extensive disclosures from the Sacklers law firm, Norton

10   Rose.  Extensive disclosure by foreign entities, which would

11   likely never happen in a context of normal litigation.

12           And as Mr. Huebner noted, the plan will result in

13   the creation of a public document repository that will

14   include all material produced in these cases, and tens of

15   millions of additional documents and privileged documents,

16   which a number of witnesses touted as an important essential

17   element of the plan.

18           Finally, the Objecting States claim at Paragraph 5

19   of Washington's objection that the principal parties making

20   the critical determination are not public health officials,

21   but rather bankruptcy professionals.  That is false.

22           As the Objecting States must surely know, the

23   decision to support the plan was made by thousands of

24   elected officials, including the Attorney General of the

25   death majority of states, and representatives of thousands

Page 83

1    of personal injury claimants, including lawyers, who have

2    pursued Purdue and the Sacklers for decades.

3              At bottom, Your Honor, the Objecting States'

4    claims are trying to collect money from the Debtors and

5    their related parties.  There is no basis in law or in fact

6    the craft and exception to Metromedia previously

7    unrecognized in the case law.

8              Moreover, the objectors articulate no limiting

9    principles that they espouse.  One Objecting State is

10   enough.  One objecting County.  For any reason, financial or

11   political or otherwise, according to them, this exception

12   would doom any plan by one no vote by any governmental unit.

13   There is no basis to grant the objectors, actually each

14   objector, an effective veto over historic, almost entirely

15   consensual, value-maximizing reorganization, that in inures

16   fully to the benefit of the American public.

17             Your Honor, the third set of objections raised by

18   the U.S. Trustee and the DOJ is that third-party releases

19   somehow contravene the due process clause.  When attacked,

20   however, it becomes apparent that this argument is really

21   just an attack on Metromedia by another name.

22             The first due process argument clearly illustrates

23   that point.  The DOJ and U.S. Trustee assert that in order

24   to satisfy due process, a holder of the claim must receive

25   an opportunity to either litigate the final judgment or

Page 84

1   settle on their own accord.  But if the holders of release

2   claims must still be able to litigate those claims, as the

3   DOJ and U.S. Trustee argue, then bankruptcy courts have no

4   power whatsoever to impose nonconsensual releases of such

5   claims, despite finding Second Circuit law to the contrary.

6          It is, therefore, hardly surprising that the DOJ

7   and U.S. Trustee cannot cite a single case, not a single

8   case, concluding that third-party releases violate due

9   process because they do not provide an opportunity to be

10  heard.  Holders of claims do in fact have an opportunity to

11  be heard on the propriety of third-party releases.  Many

12  have filed objections in this very case on this very issue.

13  This very hearing is indeed proof positive of the

14  opportunity to be heard.

15         So the DOJ and U.S. Trustee then quickly pivot to

16  claiming that the notice of third-party releases in this

17  case was not constitutionally sufficient.  As an initial

18  matter, Your Honor, this Court's June 3rd order approving

19  the disclosure statement, so as to (indiscernible)

20  procedures and voting procedures at Docket Number 2988,

21  Paragraph 17, expressly provides -- and I quote -- "that the

22  Confirmation Hearing Notice, Publication Notice, and plain

23  language summary of the Confirmation Notice each, if

24  properly delivered or published, provides sufficient notice

25  of the releases and injunctions to any holder of a Channeled

Page 85

1    Claim or Shareholder Release Claim."

2              In other words, the Court already found that the

3    notice provided of this confirmation hearing was sufficient

4    and constitutionally adequate.  And the U.S. Trustee and DOJ

5    certainly did not raise any alleged notice deficiency back

6    in May.  So the government's belated attempt to litigate

7    that issue as a basis to deny confirmation should be

8    rejected as out of hand.

9              In any event, the record in this confirmation

10   hearing is clear that the notice provided in these

11   proceedings, including on third-party releases, has been one

12   of the most extensive, expensive, and effective noticing

13   programs in Chapter 11 history.  And although the third-

14   party release terms are complex, the notice was simple,

15   clear and unmistakable.

16             The confirmation hearing notice, which was mailed

17   to all known holders of claims in these cases, sets out the

18   release expressly.  I'm looking JX-0937.

19             The Debtors also undertook an extensive

20   supplemental publication notice campaign.  A key component

21   of the supplemental publication hearing notice plan was a

22   plain English noticing of the potential for third-party

23   releases that made clear in no uncertain terms that the plan

24   could potentially release all claims and causes of action

25   against the Sackler Families.

Page 86

1              Take, for example, Your Honor, the Debtors'

2       publication notice, which I'm putting up now, which was

3       published in "The Wall Street Journal", "New York Times",

4       "U.S.A. Today", "Financial Times", and "International Herald

5       Tribune", that appears at JX-0939.

6              1:50:36 And if we could just blow it up here, it

7       says very clearly, the plan contemplates the shareholders

8       that have been fighting among the Debtors, the master

9       distribution trust, and certain of the shareholders'

10      released parties, including members of the Sackler Family,

11      and certain other individual (indiscernible).

12      (indiscernible) for that release of any actual or potential

13      claims or causes of actions against the shareholder lien

14      parties relating to the Debtors, including claims in

15      connection with opioid related activities.

16             The Debtors also broadly distributed a shorter,

17      plain-language version of the confirmation hearing notice in

18      the form of fliers, magazine ads and newspaper ads, and

19      bought online advertisements across the U.S., Canada and 39

20      countries.

21             Here is an example of a magazine ad.  Did you file

22      a claim against Purdue Pharma as part of its bankruptcy

23      proceeding?  Do you have a claim against Purdue Pharma's

24      owners?  And it goes on to say, releases of any actual

25      counterclaims against Sacklers Family members and certain

Page 87

1    other individuals and related entities.

2            Now, one more, Your Honor.  And now here is what

3    you would find on an online display ad.  These are the

4    various online ads that we had.  And again, let's just blow

5    one up.  Could not be clearer.  Did you file a claim against

6    Purdue Pharma?  Did you have a claim against the Sacklers or

7    any of Purdue Pharma's owners?

8            Now, in the cross-examination of Ms. Finegan,

9    counsel for the U.S. Trustee seemed to make much of the fact

10    that neither the publication version nor the plain-language

11    version of the confirmation hearing notice contained the

12    full text of the releases or the full list of shareholder-

13    released parties.  But for all the supposed complexity and

14    length of the shareholder releases in the plan, the plain

15    English descriptions in the notices could not have been any

16    more clear or simple.

17            As Your Honor just saw, the releases reach any

18    actual potential claims against members of the Sackler

19    Families.  It said it loud and clear.  It's  not clear to me

20    what else could be done to make this point more plain.

21    Indeed, I would respectfully submit that if the Debtors were

22    to have included the full text of the releases and full list

23    of shareholder release parties, that notice would not have

24    been nearly as effective, or easily understood, and I'm sure

25    the Court would agree.

Page 88

1          The record is also crystal clear that the reach of

2     the -- crystal clear as to the reach of the supplemental

3     confirmation hearing notice plan and how effective it was.

4     It was conducted in 27 different languages, served over 3.6

5     billion online and social media impressions, and resulted in

6     over 3,700 news stories across the U.S. and Canada.  And

7     Your Honor, this was all in addition to the extensive bar

8     date notice and plans.

9          On this truly extraordinary record, set out in

10    even more detail in our papers, and in the absence of any

11    evidence to the contrary, there can be no doubt that the

12    holders of release claims received adequate notice, both of

13    these bankruptcy proceedings and the general bar date, and

14    that there claims against the Sackler Families and related

15    entities would be released under the plan.

16         Finally, Your Honor, just a minute on this,

17    because Your Honor know this better than anybody.  Several

18    objectors, including the Objecting States, the U.S. Trustee

19    and the DOJ, claim that this Court lacks even the power to

20    enter an order approving the plan or the third-party

21    releases, including because the Court lacks jurisdiction

22    under Section 1334, statutory authority under Section 157,

23    or constitutional authority under Stern v. Marshall.  Now,

24    each of these arguments is meritless and this is just going

25    over well-tread case law.

Page 89

1              Let me begin with the Court's subject matter

2    jurisdiction, because it frankly is not controversial in the

3    least, that this Court has jurisdiction to approve the

4    third-party releases.  Congress granted comprehensive

5    jurisdiction over all civil proceedings that are arising

6    under or arising in cases under Title 11 U.S.C. 1334(b).

7              Confirmation of a plan of reorganization is

8    without a doubt a proceeding that arises under or arises in

9    a case under Title 11.  And as Judge McMahon explained in

10   the Tier 1 case, this does not change merely because a plan

11   would contain third-party releases.  As Judge McMahon

12   explained, and I quote, "A confirmed reorganization plan

13   that includes such releases does not address the merits of

14   the claims being released. . . rather, it effectively

15   cancels those claims so as to permit a total reorganization

16   of the Debtors' total affairs in a manner available only in

17   bankruptcy."

18             She continues, "That a bankruptcy court's decision

19   may have a preclusive incidental effect on claims beyond the

20   scope of the immediate bankruptcy proceeding does not render

21   the bankruptcy court jurisdiction non-core, i.e., outside

22   the arising under grant of jurisdiction."

23             Now, the Objecting States' only response is that

24   Kerwin did not address a release of so-called police power

25   claims.  But that, of course, is analytically irrelevant.

Page 90

1    There is no please power exception to Metromedia.  And in

2    any case, whether the Court has subject matter jurisdiction,

3    and whether there are substantive limits on how it should

4    exercise that power are entirely separate.  And even if the

5    Court did not have arising under or arising in jurisdiction

6    related to jurisdiction also provides a separate basis for

7    approving the third-party releases as part of a plan.

8              As set out at length in our papers, Your Honor,

9    the release claims and shareholder claims without a doubt

10   have an all you need -- "a conceivable effect on the

11   estates, either because such claims will result in a

12   diminution of the Debtors' insurance policies, or would

13   result in an indemnification or contribution claims, or

14   would potentially prejudice the rights of the MPT and future

15   Snap Act litigation.

16             That brings us to the last set of arguments raised

17   only by the U.S. Trustee and the DOJ, that subject matter

18   jurisdiction aside, this Court lacks either the statutory or

19   constitutional authority to enter a final order confirming

20   the plan, including -- that includes third-party releases.

21   Those suggestions are meritless.  Confirmation of the plan

22   is clearly a core proceeding under Section 157(b)(2)(l).

23             Numerous courts, including the Kerwin court and

24   this one, have held that where, as here, a Bankruptcy Court

25   considers nonconsensual third-party releases in connection

Page 91

1    with plan confirmation, it acts pursuant to its core

2    statutory authority, and thus has the statutory power to

3    enter a final order.  That's Kerwin case, 592 BR at 504.

4              Similarly, there can be no doubt that the Court

5    also has constitutional authority to enter a final order

6    confirming a plan with third-party releases.  The Third

7    Circuit, in Millenium Labs Holding, and the District Court

8    in Kerwin, both held these are both recent decisions that

9    are directly on point, a Bankruptcy Court has constitutional

10   authority to confirm a plan containing third-party releases,

11   so long as the injunction is integral to the plan.  And

12   that's Millenium Labs at 945 F.3d 137-140, and In Re Kerwin,

13   592 BR 509-512.  And Your Honor made your views very clear

14   in the In Re N

15             PN Silicon case.

16             So, for the reasons that we have just discussed,

17   third-party releases are integral to Debtors' plan and

18   therefore pass constitutional muster.

19             In sum, Your Honor, the third-party releases are

20   the bedrock of the plan.  They are also lawful, well-

21   established law in this and the majority of the Circuit.  In

22   a way, it all comes down to one test.  All of these issues

23   all combine into one question.  Are these releases integral,

24   important, necessary, indispensable?  Use any word you like,

25   and we still win, because if they are, Metromedia is

Page 92

1    satisfied, subject matter jurisdiction under 1334 is

2    satisfied.  It is a core proceeding under 157, and the

3    constitutional Stern V. Marshall test is satisfied.  And

4    there is not a shred of evidence offered by the other side

5    that these releases are not integral, important, necessary

6    and indispensable.

7              Thank you, Your Honor.  I believe I'm going to

8    turn the podium now to Arik Preis, from the UCC.

9              MR. PREIS:  Actually, Your Honor --

10             THE COURT:  I think the AHC, one of you, are ahead

11   of --

12             MR. KAMINETZKY:  I apologize.  That was my

13   mistake.

14             MR. ECKSTEIN:  That's fine, Your Honor.  Good

15   morning, Your Honor.

16             WOMAN:  Wait.

17             MR. ECKSTEIN:  We'll try to adjust our cameras so

18   that I zoom in a bit.  Your Honor, I guess it's good

19   afternoon.  Is this close enough to me?

20             THE COURT:  Yes.  I can see and hear you fine.

21             MR. ECKSTEIN:  Thank you, Your Honor.  Your Honor,

22   good afternoon.  Kenneth Eckstein, of Kramer Levin, on

23   behalf of the Ad Hoc Committee of Consenting States and

24   Local Governments.

25             Your Honor, before I begin my remarks, I want to

Page 93

1   acknowledge the law firm of Brown, Rudnick & Otterbourg, our

2   co-counsel in this case, who have worked side-by-side with

3   Kramer Levin on all aspects of the Chapter 11 case and join

4   in their remarks.

5           Your Honor, thank you for the opportunity to

6   address the Court at this momentous time.  And I would like

7   to supplement the very substantial, effective and

8   comprehensive presentations made by Mr. Huebner and Mr.

9   Kaminetzky.

10          Your Honor, I think as you have heard from all of

11  the presenters, this case is truly unprecedented.  Rarely,

12  if ever, has the Bankruptcy Court been called upon to

13  address matters of such public importance, both to the

14  states, municipalities, tribes and other non-federal

15  governmental creditors represented in this case by the Ad

16  Hoc Committee and to the public at large.

17          Your Honor, the opioid crisis is a horrible and

18  intractable public health emergency, one that the members of

19  the Ad Hoc Committee have been working arduously to address

20  for many years, together with many other constituents who

21  have been active in this Chapter 11 case.

22          This plan is a concrete step towards a resolution,

23  a vehicle to attempt to address this national health crisis

24  in an extremely creative and constructive manner.  The

25  centerpiece of the plan is a voluntary agreement by the

Page 94

1    Sackler Family to turn over the Purdue business, including

2    all of its insurance policies, as well as contribute an

3    additional $4.325 billion to their creditors, and the

4    related agreements by the public and private creditors to

5    devote substantially all of the plan proceeds to abate the

6    opioid crisis.

7             There is no precedent for such a Chapter 11 plan.

8    And the fact that the parties have agreed to this

9    arrangement, with overwhelming consensus, in and of itself

10   is a remarkable achievement.

11            The plan, importantly, is a global settlement of

12   many disparate issues and it required multiple integrated

13   agreements to get there.  There is, as just mentioned, the

14   financial settlement with the Sackler Family and the

15   agreement by creditors to contribute essentially all of the

16   settlement monies to abatement.

17            But there are also other crucial component parts

18   of the settlement, including the detailed agreement among

19   the States and Local Governments and Tribes as to how the

20   funds will be distributed and employed within states to

21   abate the crisis.

22            There is the allocation among the states, which

23   will be addressed in more detail by my partner, Mr. Wagner,

24   in a later segment of oral argument.  There is a settlement

25   between public and private creditors, which spared the

Page 95

1    parties years of debilitating litigation and was resolved in

2    Phase 1 of the mediation in this case.

3              There is the DOJ settlement, which like the

4    Sackler settlement helped enable the public-private

5    allocations and permitted the parties to focus their efforts

6    on an abatement plan.  And there is the attorneys fee

7    resolution set forth in Section 5.8 of the plan, which will

8    also be discussed in more detail at a later stage of the

9    argument.

10             As the undisputed evidence shows, and as I will

11   highlight, each of these settlements are interrelated and

12   the removal of any piece would jeopardize the plan and the

13   important abatement objectives it serves.

14             Since Mr. Huebner and Mr. Kaminetzky have

15   thoroughly addressed the factual and legal underpinnings of

16   both the settlement and the releases, I will focus on three

17   specific points.

18             First, the dissenting states and others have

19   focused much attention on what the plan arguably takes away

20   from them, including the argument that they are being

21   deprived of the opportunity to have a public airing of their

22   claim against the Sackler Family.  But what is lost in their

23   objections is what the plan confers on the states and all

24   creditors.  Not just by way of monetary compensation and the

25   opportunity to begin abating the opioid crisis, which are

Page 96

1    extremely important on their own, but also in terms of how

2    the plan helps to facilitate the very goals that the

3    dissenting states highlight in their objections.

4              The plan does not, as an initial matter, provide

5    criminal (indiscernible).  This is not a criminal trial.

6    This is a Chapter 11 bankruptcy case.  The plan represents a

7    substantial financial settlement that dedicates more than $6

8    billion over the life of the settlement to abate the opioid

9    crisis.

10             The plan also provides for an unprecedented public

11   presentation of the history of Purdue's and the Sacklers'

12   involvement in the opioid crisis.  The document repository

13   is the centerpiece of that presentation.

14             I would point Your Honor to the testimony of Jayne

15   Conroy, who spoke eloquently of the importance of the

16   document repository.  That testimony can be found at the

17   August 16th hearing transcript at Pages 83-84.  According to

18   Ms. Conroy, who has been litigating against Purdue for

19   longer than almost anyone, "In addition to any monetary

20   settlement, it could be that the document repository is

21   actually the most valuable piece of this settlement."

22             This is on top of the testimony elicited through

23   the confirmation hearing from three members of the Sackler

24   Family and their advisors.  Even if the Court were to allow

25   parties to go to trial outside of the bankruptcy, it is

Page 97

1    inconceivable that the volume of documents that Purdue is

2    committed to disclose through the repository, including

3    documents that are privileged and confidential, would ever

4    become public through a non-bankruptcy proceeding.

5            So at the end of the day, while individual

6    creditors will not have an actual trial on the Purdue or

7    Sackler civil liability, the benefits of the trial are

8    largely achieved in terms of substantial monetary

9    compensation, through the public airing of the facts of the

10   case, and through the injunctive relief that will shut off

11   the dangerous prepetition marketing practices and prevent

12   the Sackler Family from having any continued role in Purdue,

13   and ultimately, the opioid industry.

14           Second, Your Honor, I want to highlight the

15   importance of the third-party release to this case and to

16   the non-governmental creditors who are supporting the plan.

17   Simply put, without a comprehensive release that is binding

18   on all of the states and other public creditors, there

19   simply cannot be a deal that will hold this case.

20           The public creditors that have agreed to the deal

21   have agreed to accept a nine-year payment schedule, with

22   substantial amounts due to the public creditors in years 5-

23   9.   Those settling creditors would never agree to a

24   structure under which their own recoveries were delayed and

25   in fact exposed to the threat of complete dissipation if

Page 98

1    other similarly situated creditors asserting claims in the

2    billions of dollars were allowed to pursue their claims to

3    judgment now against the Sacklers.

4          So putting aside what the Sackers themselves would

5    do, and the testimony is clear that they will not agree to a

6    partial settlement and release, the states and other public

7    creditors would not agree to such a structure either.

8          Third, I want to spend a short amount of time

9    highlighting some of the critical pieces of evidence put

10   into the record by the Ad Hoc Committee witnesses.  This

11   uncontroverted testimony establishes that each of the prongs

12   of the global settlement, and indeed the entire abatement

13   plan, could not survive if any leg of the stool was removed.

14         For instance, as to the interrelated nature of the

15   Sackler settlement and the public-private settlement, Mr.

16   John Guard testified, "Without the availability of the

17   Sackler assets, compromise between the non-federal public

18   claimants and the private claimants would not have been

19   possible, in my opinion.  Absent the large pool of assets to

20   divide that the Sackler contribution gives, it is my opinion

21   that each side would have likely been at an impasse and

22   asserted its various defenses to allowance of the other's

23   claims, and there would've been a lengthy set of estimation

24   hearings in this bankruptcy matter, further dissipating this

25   estate."  That's the Guard declaration at Paragraph 67.

Page 99

1          As to the importance of the DOJ settlement, Mr.

2    Guard testified, "The DOJ settlement itself likely would not

3    have been possible absent the Sackler contribution.  Had

4    those funds not been available and the federal government

5    not as interested in monies going to abatement through the

6    states, the states would've had no choice but to fight the

7    allowance of federal government claims to the extent they

8    reduce or eliminate assets available for abatement."  That's

9    the Guard declaration at Paragraph 68.

10          As to the critical issue of whether any states or

11   other parties could "opt out" of the plan without upsetting

12   its delicate balance, Mr. Guard testified, "The Sackler

13   settlement is predicated on the understanding that no state

14   will retain its claims against the Sacklers, and outcome

15   that could cause all other states to revisit allocation and

16   settlement."  That's the Guard declaration at Paragraph 71.

17          The testimony of Jayne Conroy at the August 16th

18   hearing also makes clear that no opt-outs were contemplated,

19   and that the "peace premium" included in the Sackler

20   settlement would not have been available with the prospect

21   of opt-outs.  That's the August 16th hearing transcript at

22   Page 76-77, and at Page 87.

23          As to the role of the attorneys fee resolution in

24   facilitating an abatement plan, Mr. Guard testified, "Absent

25   some sort of attorney fee fund, there would have been no way

Page 100

1    to set up an abatement fund because governmental creditors,

2    needing to pay their counsel, could not have relinquished

3    control over monies distributed on account of their claims,

4    and attorneys would not have been comfortable waiving the

5    contractual fees owed to them."  That's the Guard

6    declaration at Paragraph 75.

7            The testimony of Mr. Gary Gotto and Peter

8    Weinberger is also supportive of this point.  See the Gotto

9    declaration at Paragraph 25(g) and the Weinberger

10   declaration at Paragraph 49 and Paragraph 59-60.

11           In sum, Your Honor, the plan reflects a global

12   resolution to this Chapter 11 case, with a substantial

13   financial settlement dedicating funds to opioid abatement

14   and a public presentation of the record, unlikely to be

15   obtained by going to trial.  But the plan reflects a

16   resolution of many disparate issues and is an important step

17   toward healing the nation from the devastating impacts of

18   the opioid crisis.

19           On these bases, the Ad Hoc Committee supports

20   confirmation of the plan.  Unless Your Honor has any further

21   questions, I thank Your Honor for the time.

22           MR. PREIS:  Good morning, Your Honor.  Can you

23   hear me?

24           THE COURT:  Yes.  I can hear you and see you fine.

25           MR. PREIS:  Okay. Good morning.  For the record,

Page 101

1    Your Honor, Arik Preis from Akin Gump Strauss Hauer & Feld,

2    on behalf of the Official Committee of Unsecured Creditors.

3    I will try very hard not to repeat anything that the Debtor

4    said or that Mr. Eckstein said, although I will touch on

5    some of the issues that they mentioned in the UCC

6    (indiscernible).  Also, while I will briefly discuss certain

7    issues related to the third party releases, I will not be

8    discussing any of the underlying law of such releases.  Mr.

9    Kaminetzky handled that, and I'll be handling that on

10   rebuttal.

11            I'll divide my comments (indiscernible).  First,

12   I'll make a few preliminary remarks about the settlements of

13   the objections (indiscernible).  Second, I'll address three

14   items regarding the objections of the states and the

15   pleadings of the federal governmental entities.  Third, I

16   will conclude with three remarks about the settlement, the

17   public good and the personal injury victim.

18            As I mentioned the first time we were before Your

19   Honor, then repeated a number of times since.  The case is

20   fundamentally about three issues:  First locating valuable

21   opioid (indiscernible).  Second, maximizing that value.

22   And, third, utilizing that value and utilizing these cases

23   for the public good.

24            Today, we're using the Court to confirm a plan

25   that addresses these three issues in a manner that, as Mr.

Page 102

1    Huebner pointedly started with, is not perfect but it's the

2    most viable path.  It's important to emphasize, as Mr.

3    Huebner did, that the plan has the support not only of the

4    UCC but the numerous ad hoc groups, and it's not objected to

5    by 15 of the previously nonconsenting states.  Then Mr.

6    Huebner went through the vote.  No need to repeat that.

7           Despite this overwhelming support and putting

8    aside the prosaic (indiscernible) there are a few

9    objectives.  In light of the unique facts of the cases and

10   the fact that this plan is the only agreed upon way to get

11   what could be more than 7 billion in values to communities

12   to abate the opioid crisis and victims to compensate them

13   for their loss, it's difficult to understand the position of

14   the objectives.  Why are they objecting?  What happens if

15   they (indiscernible)?  Do they not understand that they

16   cannot demand (indiscernible) for one of the claim without

17   the balance of crumbling?

18          As Mr. Huebner and Mr. Eckstein pointed out, the

19   plan is a path (indiscernible) we count 30 (indiscernible)

20   settled that have been reached on various far-reaching

21   (indiscernible).  This case is the prototype of a case that

22   hangs by a thread with the Sackler dollars as a foundation.

23   As obvious as that it is for those of us who have lived the

24   case for the last two years, the objectors missed it or

25   willfully ignore this fundamental fact.

Page 103

1           They seem to think if you make just one change

2      here with allowing a class of incarcerated (indiscernible)

3      to have a class, or to change the states' allocation so that

4      West Virginia gets more, or to give an opt-out to certain

5      states so that they can imperil the distribution to everyone

6      else, the rest of the plan will simply hang together.  Not

7      true.

8           Even more frustrating is that certain of the

9      objectors, mainly the states, are merely trying to create a

10     record because they fully intend on appealing any order of

11     this Court, if the Court confirms the plan, all the way

12     perhaps to the Supreme Court, as they say, regardless of the

13     impact that such a lengthy and complex appeal might have on

14     the Debtor's ability to get the (indiscernible) to the

15     creditors.  A long messy appeal does not help the still

16     struggling people, nor does it help rebuild communities

17     devastated by the crisis.  It will have the opposite effect,

18     by delaying recoveries for those who gave them the most.

19          Next, I will address three points of the objecting

20     states of the federal government.  First, the inter-

21     (indiscernible) allocation.  A lot has been said by Mr.

22     Huebner and Mr. Huebner and Mr. Kaminetzky and Ms.

23     (indiscernible) about mediation Phase 1 and informal Phase 3

24     that resulted in numerous settlements, including the

25     allocation deals.  It's impossible for those who

Page 104

1    (indiscernible) this case to fully understand how difficult

2    and hard-fought the mediation was, as Mr. Guard testified

3    to.

4              I think it's safe to say that there were many

5    times it was unclear that any settlement was reached, or

6    that if settlements were reached, certain groups would be

7    left out and subject to the -- object to the plan.  The fact

8    that it took six months to reach four or five two-page term-

9    sheets and another nine months to close out the

10   (indiscernible) tells you all you need to know.

11             To be clear, the UCC does not believe the

12   allocations are perfect, and every party, as Mr. Huebner

13   pointed out, would undoubtedly say it's begotten more.  If

14   every supporting party is willing to live with those

15   settlements, because not only would doing so result in

16   claimant versus claimant litigation, which is not only

17   costly and time consuming, but, as many people forget, would

18   result in a lot of unhelpful dialogue about alleged

19   weaknesses in each other's claims.  They also understand

20   that we need to focus on moving forward, abating the crisis

21   and compensating victims.

22             The objecting states and the District of Columbia

23   were part of those negotiations.  They know exactly how hard

24   they were, and they agreed to those (indiscernible) and now

25   they want to throw them away.  In fact, as Mr. Atkinson

Page 105

1    stated in his declaration and Mr. Kaminetzky alluded to, the

2    states refuse to agree that the private public negotiated

3    (indiscernible) which would be honored if there was no

4    settlement with the Sacklers.

5            In other words, the objectors now know full well

6    that if the Sackler contribution is removed, the allocation

7    settlements go away, and we would be back in claimant versus

8    claimant litigation where the states who are far along in

9    their prepetition litigation would think they have a leg up.

10   And as importantly, but something not one of these attorney

11   generals has publicly admitted to their citizens, they will

12   have reneged on the negotiated resolution with public or

13   private citizens.

14           Second, some facts about the (indiscernible) and

15   use of the Sackler fund.  The objecting states have stressed

16   that Purdue distributed more than $10 billion in cash -- the

17   Sacker could've made more than $1 billion in non-cash

18   transfers for a decade.  As you know, we have strong views

19   about whether these were intentional or constructive

20   thoughts on (indiscernible).  But the objecting states like

21   to gloss over the fact that because the transferees of more

22   than 4 billion of the 10.4 billion in cash for the state and

23   the federal government through various tax statements made

24   by the Sacklers and their affiliates on their behalf.

25           In other words, they're putting aside a

1    substantial amount for prejudgment interest, a total value

2    to non-cash transfers.  About 40 percent of the cash

3    transfers went to the very political bodies they're

4    objecting to.  Ironically, the objecting states and the

5    federal government are filing a (indiscernible) that would

6    prevent their citizens and others from receiving the

7    settlements that (indiscernible) negotiated.  And yet, at no

8    point has any objecting party, one, offered to give back

9    their ill-gotten value into the estate for equitable

10   distribution among creditors.  Two, agreed to a full

11   deduction on their distribution on account of the fact the

12   party receives (indiscernible) value.  Or, three, earmarked

13   any of the they received in the last decade during the

14   Sackler (indiscernible).

15           And, in addition, the federal government, one, had

16   already taken another $225 million from the Sacklers while

17   every other party in the case is still waiting for its

18   distribution.  And, two, is looking to stop a plan that will

19   permit distribution.

20           You'll recall, Your Honor, that at the beginning

21   of the case, we pushed for an ERF that was for less than

22   (indiscernible) million, and recall when the federal

23   government sought approval of a settlement with the

24   Sacklers, we urged them to use the 225 million for

25   abatement, to give to victims, or for an ERF, and they

1    refused.  It's almost tragic that now, as we stand on the

2    precipice of potentially getting more than $7 billion to use

3    for abatement and compensate victims, the objectors, who

4    have received more than 4 billion from the Sacklers and

5    Purdue since 2008, want to stand in the way.

6         Third, the DOJ and the US Trustee.  Throughout

7    these cases, the DOJ has taken some confusing

8    (indiscernible).  For instance, during mediation, they chose

9    to be -- not to be in mediation but to be an observer and to

10   maintain their right to reopen the settlements, once

11   reached.  And once the settlements were reached, the DOJ did

12   exactly that.  This included, most dishearteningly, reaching

13   into the distribution that was supposed to go the PI plan

14   and negotiating with them, which resulted in almost 4

15   percent of the guaranteed PI (indiscernible) to go into the

16   DOJ.  And now as we get to confirmation, the DOJ has not

17   filed an objection, has not voted against the plan, under

18   the plan will get $225 million, plus 50 million for their

19   unsecured claim, plus 26 million they've taken for the

20   (indiscernible).  They've already taken from the Sacklers an

21   additional 225 million in addition to 4 billion of tax

22   revenue, and yet filed a scathing statement about the non-

23   consent (indiscernible) releases.  And the U.S. Trustee, an

24   arm and a component of the DOJ, has filed a scathing

25   objection to releases.

Page 108

1           Your Honor, the DOJ failed to vote, did not file

2    an objection and made its settlement with Purdue and the

3    Sacklers.  The DOJ's statement should be ignored, and the

4    U.S. Trustee's objection should be viewed (indiscernible).

5           I want to conclude, Your Honor, by addressing the

6    Sackler agreement and the releases, the public good, and the

7    PIs.  First, let's talk about the Sackler settlement and the

8    releases.  During the evidentiary portion of the trial, we

9    were silenced because of the no prejudice stipulations, but,

10   unfortunately, there were a number of communications during

11   the trial that could leave people with quite a few

12   misunderstandings.  We want to create -- we want to somewhat

13   fix the record and give you the example.

14          First, a lot has been said about the so-called

15   opioid business (indiscernible) whereby certain individuals

16   have agreed in general terms to no longer (indiscernible)

17   opioid business.  It's actually contained in 80901 separate

18   (indiscernible) agreement.  To be clear, there are three

19   tiers of individuals who it applies to.  The first tier

20   being the ICSBs, the second being all the living Sacklers

21   over the age of 18, other than certain specified individuals

22   in one of the (indiscernible), and the third tier being

23   every other living Sackler Family member.

24          The first tier has the most stringent restrictions

25   and the longest period for the (indiscernible).  That's the

Page 109

1    ICS tier.  The second tier has looser restrictions, and the

2    covenant's only applicable so long as the settlement

3    payments have not been paid in full.  In other words, when

4    the settlements are paid, the second tier no longer is bound

5    by (indiscernible).  And the third tier has no requirements

6    whatsoever.

7            A second example is the IACs and the use of the

8    sale proceed for the IACs to pay down the Sackler

9    obligation.  It's true, the Sacklers are required to take

10   (indiscernible) sell their interest in the IACs when they're

11   out of their ownership of the IACs for seven years.  But the

12   proceeds from such sales are not, as has been implied, used

13   to pay for the settlement.  Rather, the settlement agreement

14   requires (indiscernible) to make yearly (indiscernible) to

15   the NBT regardless of the sale of the IACs.

16           Further, to the extent that an IAC is

17   (indiscernible) the proceeds from such sale will be used to

18   pay transaction cost and taxes from the sale and then to

19   repay the Sacklers for any amounts they previously paid to

20   the (indiscernible).  Only if there are proceeds left over,

21   after both of those, will the proceeds be used to prepay

22   upcoming payment due for the Sacklers.

23           Third, with regard to the nonconsensual

24   (indiscernible) -- in a vacuum, of course the UCC did not

25   want to agree to the breadth of relief, but were prepared to

Page 110

1   live with it in order to see the (indiscernible).  A lot has

2   been made about the fact that a lot of parties are getting

3   releases and not providing any financial contribution.  This

4   is (indiscernible).  It was a condition to the deal.  But

5   because our focus had always been (indiscernible) transfer,

6   we were not concerned about getting releases (indiscernible)

7   solely in their capacity business.  And as you heard earlier

8   from Mr. Vonnegut, even those releases have been

9   (indiscernible).

10          That being said, and to provide some people's --

11  people some comfort, if one pod defaults, every entity and

12  person within the pod loses its relief if the NDT chooses to

13  step back.  For people not within a specific pod, for

14  instance, there's in (indiscernible) etc., who don't fall

15  into a pod, we negotiated for something called

16  (indiscernible) parties.  These are people who lose their

17  (indiscernible) and the NDT determines to step back.  From

18  our perspective, these are also some of the people we

19  believe know the most about what the Sacklers did, and would

20  be the most dangerous if they were concerned about their own

21  liability.

22          Second, the public good aspect of these cases.  I

23  just want to highlight some of the aspects of the plan

24  settlement that relate to the public good, which both Mr.

25  Huebner and Mr. Eckstein alluded to, but I want to make a

1    few notes about them.

2         First, the use of the money for abatement.  Is

3    this the better off principle of the plan?  And while

4    there's no specific language that prevents supplanting of

5    funds, we sincerely hope that the state and other parties

6    will work to ensure that the funds distributed through this

7    plan, if confirmed, supplement and do no supplant

8    preexisting funds designated to abate the opioid epidemic.

9    We believe they will and we've had conversations with them.

10        Second, the breadth and scope of the document

11   repository.  A lot has been said about this.  I'm not going

12   to repeat it.

13        Third, the continuation of the voluntary business

14   development and, importantly, the fact that any buyer of the

15   business has to continue (indiscernible).  Fourth, the

16   continuance of the job of the monitor who oversees the

17   voluntary business injunctions.  And, fifth, the

18   establishment of Newco as a PBC and the use of funds by

19   Newco for potential public (indiscernible).

20        Third, and finally, Your Honor, I want to touch on

21   the personal injury victim, the (indiscernible).  As you may

22   know, (indiscernible) is a member of the UCC.  He was

23   selected to be on the UCC on the basis of a claim that she

24   filed on one of her three sons, Cory, who died of an opioid

25   overdose in 2011 at the age of 23 after starting to take

Page 112

1    opioids at the age 15, when he was given them by his doctor

2    after hernia surgery.  When he died, he had a four and a

3    half month old child.

4           Unfortunately, while this is very sad and traffic,

5    (indiscernible) grew up without a biological father -- it's

6    not terribly unique, but the story didn't end there.

7    (indiscernible) dutifully served on the UCC for almost two

8    years.  In June, two months ago, her middle son, Sean, also

9    died of an opioid overdose on June 25th.  Sean had actually

10   turned his life around and was working to help other people

11   with OUD when he relapsed and ultimately died alone.  He too

12   left a daughter and a son.  One family, two opioid overdose

13   deaths, three children being raised without their father

14   (indiscernible).

15          I raise this story not because I want to make

16   people angry or grandstand about the plight of victims, or

17   highlight Cheryl's story.  This is more important than the

18   audio.  I raise this because, like Your Honor, we're all

19   very touched and personally (indiscernible).  Like Your

20   Honor said, we need to remember the (indiscernible)  but

21   most poignantly, I raise this because one would think that

22   people like Cheryl may want to keep pursuing this

23   (indiscernible) like the states do.

24          After all, it's the human tendency -- reactions of

25   revenge.  But Cheryl, like the other fiduciary members of

Page 113

```
 1    the UCC, agrees that it's time to move on.  Time to stop

 2    chasing and start abating the epidemic, start combating the

 3    crisis, start compensating the victims and their families so

 4    that less people die, less people become victims to OUD,

 5    more people can get recovery support, more people can get to

 6    community organizations and more victims and families of

 7    victims can get the support they need.

 8             We wish the objecting politicians agreed.  Thank

 9    you, Your Honor.

10             THE COURT:  Okay, thank you.  Mr. Shore, I think

11    you're next in line.

12             MR. SHORE:  I think I am, Your Honor.  Good

13    afternoon. (indiscernible)

14             THE COURT:  Mr. Shore, can you get a little closer

15    to the microphone?  You're fading out some.

16             MR. SHORE:  Sure.  Let me turn (indiscernible).

17    All right.  Perhaps the Court has noticed that during this

18    confirmation hearing we've been very quiet, and I intend to

19    remain quiet.  I'll just addressing three points.  I'm going

20    to touch on the releases now and how they affect the

21    personal injury victims.  I'm going to address the provision

22    in the TDP allowing for payment of the ad hoc group fees.

23    And I'm around to address -- and maybe I will, in any event,

24    address any issues that the Court has or any questions the

25    Court has with respect to the PIT (indiscernible).
```

Page 114

1              On the releases, I'm not going to address the U.S.

2      Trustee's objection, other than to say this:  As bankruptcy

3      professionals, we can all understand the need for the UST to

4      make its policy points and the importance of the protection

5      of the law without regard to any economic interest in the

6      outcome of the case.  We just hope that, given the

7      extraordinary nature of this case, the U.S. Trustee would

8      have, as it has in many other cases, let this case proceed

9      without creating more risk around the releases.

10             Hopefully, in light of the material revisions, the

11     release provisions noted by Mr. Vonnegut, the U.S. Trustee

12     can see its way to avoid pressing objections which

13     ultimately are not legally supported, and let the actual

14     victims get the closure.

15             With respect to the state, there's already been a

16     good deal of talk regarding the victims by people other than

17     the victims throughout the case in the hearing today.  I'm

18     not going to do that.  I don't feel eloquent enough to try

19     to (indiscernible).  What I do want to do is focus on what

20     the actual victims had said for themselves in the

21     evidentiary record.

22             If the Court looks at the final declaration of

23     Christine Pullo of Prime Clerk -- it's ECF3372 -- it

24     establishes three key uncontested facts.  Fact one.  After

25     having received a detailed disclosure statement explaining

Page 115

1    the case, total yes votes on the plan were 114,307.   Fact

2    two.   If the Court combines Classes N, A and B -- that's the

3    (indiscernible) claimants and the adult PI claimants, 62,433

4    of them voted in favor of the plan.

5              And let me pause here.   The record establishes

6    that if 5 percent of all yes votes in number and amount, in

7    this case -- and everybody voted with $1 claim -- are from

8    personal injury victims.   The personal injury victims are,

9    in fact, the largest supporting voice in this case for this

10   plan.

11             Point three.   Classes 10A and B accepted a

12   (indiscernible) rate of approximately 97 percent in number

13   and amount.   We pause again.   The notion that you could get

14   97 percent of a cross section of individuals in America to

15   agree on anything, much less the (indiscernible) of such

16   passion and personal import is to whether the Sacklers

17   should ever receive closure is astonishing.   But for those

18   who are not familiar with bankruptcy cases, we hardly ever

19   see a class of this size of individuals accept at such a

20   high rate, unless the commercial deal is so overwhelmingly

21   compelling to the class (indiscernible).

22             The evidence shows that whatever pundits may say

23   about this plan, it represents the best available commercial

24   deal for the victims in every state.   We pause for a moment

25   on the point raised by Mr. Huebner and Mr. (indiscernible).

Page 116

1    This is a bankruptcy case.  Bankruptcy cases and courts and

2    professionals cannot fix everything.  All we can do is apply

3    the law to the facts to reach a commercial resolution of

4    (indiscernible) issues consistent with the law.

5            This is not a criminal case or a regulatory

6    investigation, as Your Honor has repeatedly pointed out.

7    Each state reserves all of its police powers consistent with

8    the Code and the law.  But with respect to the commercial

9    people, it's a completely mystery why any state would refuse

10   money on the table and choose uncertain chaos when so many

11   of their own citizens support.

12           Your Honor raised the question of whether you

13   could break down the claims data state by state.  You can't

14   because the individuals' addresses have been redacted.  I'd

15   certainly like to see who my own state of Connecticut is

16   purporting to represent in objecting to this deal.  But the

17   Court just has to look at the total no votes.

18   (indiscernible) declaration in evidence.  Only 2,600

19   individuals in classes NA and B voted no.

20           To be clear, there's absolutely nothing wrong with

21   any individual exercising their right to say no, for good

22   reasons or no reason at all.  It's a terribly emotional

23   issue for all of us.  But it seems unimaginable that eight

24   states are spending millions of dollars of their own money

25   and causing other people to spend millions of dollars of

Page 117

```
 1    their own money, vindicating the rights of 2,600 people --

 2    particularly given the state's historical (indiscernible)

 3    towards their opioid victim citizens and the tens of

 4    thousands of citizens who have voted yes for

 5    (indiscernible).

 6             But let's give Connecticut and the other states

 7    the benefit of the doubt, that this is a matter of

 8    principle.  It's not as if the rhetorical objection is

 9    without effect if their objections are sustained.  Under

10    this plan, the actual victims have set aside $750 million

11    for payment of injury.  That is an unprecedented and

12    monumental achievement only made possible by this Court, the

13    mediators, the professionals, and the process participated

14    in in good faith by all the claimants in the case.

15             In the absence of this deal, it is hard to see how

16    there will ever be money set aside for victims.  Remember,

17    the prepetition deal that was cut set aside zero for

18    personal injury victims.  Maybe the objecting

19    (indiscernible) have the wherewithal and patience to chase

20    the Sacklers into eternity.  The victims didn't before and

21    they don't now.  For that reason, the ad hoc group supports

22    confirmation of the plan, even if it means that Purdue will

23    continue on as a business.  Factors (indiscernible) own form

24    of closure and release it.

25             Given the balancing of the risks and the rewards,
```

Page 118

1   97 percent of actual people who were harmed by the conduct

2   of the Sacklers and Purdue want this deal done.

3           THE COURT:  Okay.

4           MR. SHORE:  And other than -- if Your Honor

5   doesn't have any questions, I'll just respond later in the

6   hearing...

7           THE COURT:  All right, fine.  Thank you.  I don't

8   at this point.  So, the Multistate Governmental Entities

9   Group, I believe, is next?

10          MR. MACLAY:  Thank you, Your Honor.  Kevin Maclay

11  for the Multistate Governmental Entities Group.  And, of

12  course, we've just heard a lot of argument and I will do my

13  best, Your Honor, not to repeat any of it but to hit on a

14  couple of points that are important to my group and I think

15  to the case.

16          As Your Honor knows, I represent the Multistate

17  Governmental Entities Group, a group of approximately 1,300

18  local governmental entities and tribes across 38 states and

19  territories.  And, Your Honor, one thing that I would like

20  to highlight in my comments here today is the difficulty of

21  getting to the resolutions reached.  As Your Honor knows, it

22  took many months of extensive negotiations involving the

23  services of two of the most highly qualified mediators in

24  the country in former Judge Lane Phillips and in Ken

25  Feinberg, to get to the deal we have today.

1            As the mediators reported on September 23rd to

2    Your Honor, that mediation resulted in Phase 1, in the

3    agreement that all value received by the state and local

4    governments would be exclusively dedicated to programs

5    designed to abate the opioid crisis, and that such value

6    cannot be used for any other purpose other than an amount

7    (indiscernible) administration of the (indiscernible)

8    themselves and to pay legal fees and costs.

9            And that was followed, Your Honor, by Phase 2o of

10   the mediation by those same two esteemed mediators, which

11   resulted, as of March 23, 2021, in a report noting a

12   consensual agreement as to the allocation percentage between

13   and among the public and private creditor groups engaged in

14   the mediation.  As that same mediator's report also noted,

15   Your Honor, it also achieved an allocation inter se among

16   the public and private creditor groups, among the

17   overwhelming number of mediation participants.  Of course,

18   it resulted in a contribution of over $4 billion from the

19   Sackler Family and associated entity, as also noted by that

20   same mediator's report.

21           And that was followed, Your Honor, by the able

22   assistance of a sitting a sitting court judge, Judge

23   Chapman, who successfully concluded Phase 3 of the

24   mediation, which resulted in additional funds and additional

25   terms that were favorable to both state and local government

Page 120

1    and all private entities.

2            And so, as a result of those very difficult and

3    time-consuming negotiations overseen by extremely able and

4    experienced advisors, the global settlement was reached.

5    Each aspect of that global settlement is a crucial component

6    of the basis of this plan, and all of them are

7    interconnected (indiscernible) a couple of other people

8    speaking here today.

9            So, just to make it completely clear, Your Honor,

10   the releases are necessary as part of that global

11   settlement, as part of that global deal for the public

12   creditors and the private creditors to receive the funds

13   they have been allocated under the plan, to put towards

14   abatement of the opioid crisis.  (indiscernible) releases

15   could be (indiscernible) class of this carefully negotiated

16   and very difficult to achieve settlement.  It would allow

17   other creditors to potentially cut in line and obtain funds

18   that would otherwise go towards abatement by the states and

19   local governments.

20           And that, Your Honor, is why the MSG group

21   believes strongly that this plan should be approved.  And

22   that's what I have to say about that, Your Honor.

23           THE COURT:  Okay, thank you.

24           MR. MACLAY:  Thank you.

25           (Recess)

Page 121

1              CLERK:  Good afternoon, everyone.  If everyone

2      could just turn on their video feeds, just to make sure that

3      everyone is able to connect.  And at this time, can everyone

4      just give me a thumb's up if they could hear me clearly?

5              MAN 1:  Yes.

6              CLERK:  That sounds fantastic.  Okay, so we're

7      just going to go through a few house rules just to set the

8      expectations for today's hearing -- afternoon hearing

9      continuation.  Please keep in mind to have your mics on mute

10     when not speaking, to avoid any background noise.  Also,

11     make sure to unmute yourself when you do need to speak so

12     that the judge, all the parties and the court reporter could

13     keep track of who's speaking at the time.

14              Also, when you're not part of the -- part of the

15     hearing and you're also -- let's see, when you're not part

16     of the hearing or part of that portion of the hearing, can

17     you please turn off your video feed so that way you're able

18     to continue if you need to multitask in the background and

19     it's not a disruption for the other parties?

20              Also, although this is a -- this is a video

21     hearing, also make sure that you remind yourself that only

22     the audio is being recorded, so please state your name again

23     every time you speak.  And although it's being conducted

24     through Zoom, the hearing constitutes the court proceeding,

25     and any recording other than the official court version is

Page 122

1    prohibited.  No party may record images, sounds from any

2    location.  The formalities of the courtroom must be

3    observed.

4              And with all that said, also, please make sure

5    that you could also use the AT&T telephonic listening line

6    only, the dial conference bridge.  The phone number is 844-

7    867-6163.  Again, the number is 844-867-6163.  And we

8    encourage everyone that, if you're not going to be taking

9    part in the hearing and you just want to listen, to please

10   utilize that system.  And the access code is 9263332-pound.

11   Again, the access code is 9263332-pound.

12             Finally, make sure that -- make sure that all --

13   all of you guys have your full name displayed on the screen

14   so that we could make sure and keep track of the person

15   who's speaking and the judge also could know who he's

16   speaking to.  And also, you could rename yourself under the

17   participant part of the Zoom or the app.  If you guys have

18   any questions, you may ask now.  If not, we're going to

19   start soon.  The judge should be joining us shortly.  Thank

20   you for your cooperation.

21             THE COURT:  Okay, good afternoon.  This is Judge

22   Drain and we're back on the record in In Re Purdue Pharma

23   L.P., et al. with resumed oral argument now by the objectors

24   to the plan, as to the issues that were addressed in the

25   oral argument this morning by the parties who support the

Page 123

1    plan, namely, the plan's Rule 9019 settlements and the issue

2    of third party releases and injunctions.

3            I have a statement of allocation by those parties

4    that has the United States Trustee being the first person or

5    the first objector to speak.  And I see Mr. Schwartzberg

6    there for the U.S. Trustee, so you can go ahead, Mr.

7    Schwartzberg.

8            MR. SCHWARTZBERG:  Good afternoon, Your Honor.

9            THE COURT:  Good afternoon.

10           MR. SCHWARTZBERG:  Your Honor, as you know, the

11   U.S. Trustee has objected to the confirmation of the Purdue

12   Pharma plan on statutory, constitutional and prevailing

13   circuit law grounds.

14           THE COURT:  I'm sorry, you're going to have --

15   we're having a hard time hearing you, Mr. Schwartzberg.

16           MR. SCHWARTZBERG:  I'll talk up, Your Honor, and

17   if that doesn't work, I'll put on -- I'll put on some

18   earphones.

19           THE COURT:  Okay.

20           MR. SCHWARTZBERG:  And I'm going to adjust my

21   volume as well.

22           THE COURT:  All right.

23           MR. SCHWARTZBERG:  But, Your Honor, as you well

24   know, the United States Trustee has objected to confirmation

25   of the Purdue Plan on statutory, constitutional and

Page 124

1    prevailing circuit law grounds.  Testimony -- testimony

2    (indiscernible) over the past several days -- over the past

3    several days only reinforces our argument.  The Debtors

4    assert that third party releases may be granted in rare and

5    extraordinary cases.  We do not concede that that is a valid

6    legal justification, but we do concede that this case is

7    rare and exceptional, which were the reasons the Debtors do

8    not profess.

9           The plan is breathtaking, Your Honor, and probably

10   unprecedented in releasing the claims of a countless number

11   of victims who hold direct claims against the Sackler Family

12   members and related entities, many of whose members are not

13   named and who may number on the thousands.  The plan is also

14   extraordinary in granting a discharge of liabilities in

15   favor of the Sackler Family that far exceeds any discharge

16   that would be available to individuals who, like the Sackler

17   Family members, actually filed bankruptcy (indiscernible).

18          By the terms of the plan and testimony of the

19   witnesses, the Sacklers are to be discharged from the

20   consequences of opioid-related fraud that may -- that they

21   may have committed and for any future harm that grows out of

22   that fraud.  By evading the obligations currently posed on

23   every bankruptcy Debtor while also seeking the benefits of a

24   court-ordered discharge, the Sackler Family members attempt

25   to purchase for themselves a bespoke bankruptcy

Page 125

1    (indiscernible), an extra statutory tailor-made scheme to

2    preserve their wealth and avoid a public reckoning.  While

3    those who hold direct claims against the Sacklers get

4    nothing for those claims, some of them will receive $3,500

5    for the claims against Purdue.  The direct claims of the

6    Sacklers -- the direct claimants of the Sacklers receive no

7    adequate notice that they may lose their day in court, and

8    the Sacklers and they -- against the Sacklers, and that they

9    will receive no compensation for their claim against the

10   Sacklers.

11          Your Honor, why are we in this situation?  Because

12   the Sacklers say so.  There's plentiful testimony, including

13   from David Sackler himself, (indiscernible) the Sackler

14   Family adamantly refuse to pay a penny unless they received

15   an extraordinary release.  Interestingly, they gave no

16   reason except they bare no legal responsibility for the

17   opioids crisis.  And the Sackler Family promises that,

18   unless they receive this extraordinary release, they will

19   fight tooth and nail against anyone who sues them from the

20   District of Connecticut to the isles of Jersey.

21          They even say they're untouchable because their

22   trust was put together so intricately that the money is

23   beyond the reach of the victim.  In contrast, the victims,

24   who have no adequate notice of the release provision of the

25   plan, are losing their right to sue the Sackler Family.  In

Page 126

1   effect, Your Honor, the Sackler Family and Purdue Pharma say

2   to the victims they're within the jurisdiction of this court

3   and thereby within the reach of the Sackler Family, but the

4   Sacklers are beyond your reach.

5           Your Honor, that cannot be so under the Bankruptcy

6   Code, the Constitution, (indiscernible) and valid case law.

7   As the Court is aware, the United States Trustee objects to

8   the third party releases of the Sackler Family on all three

9   grounds. Your Honor, first I will (indiscernible) the Code.

10          As we state in our objection, Your Honor,

11  nonconsensual releases of claims held by non-debtors against

12  other non-debtors are not allowed under the Bankruptcy Code.

13  Section 524(a) of the Code describes the discharge of non-

14  debtors, and Section 1129(a)(1) prohibits confirmation of a

15  plan that does not comply with the applicable provisions of

16  the Bankruptcy Code.

17          Section 1141(d) specifies the scope of discharge

18  upon confirmation and does not include non-debtor parties

19  within its scope.  And, Your Honor, Law v. Siegel bars the

20  equitable powers of Section 105 and being used -- used to

21  allow that Section 524 and Section 1141(d)(2) neither

22  authorized or (indiscernible).

23          Simply put, Your Honor, these charges are for

24  debtors.  The Bankruptcy Code says so.  And as the Debtors

25  (indiscernible) full stop, end of discussion.  Metromedia,

Page 127

1    the sole authority on which the Debtors rely as legal

2    justification for the (indiscernible) releases, the Second

3    Circuit itself recognizes that there's no authorization in

4    the Code for approval of involuntary releases.  And if the

5    individual members --

6             THE COURT:  That's your reading of Metromedia?

7             MR. SCHWARTZBERG:  I'm sorry, Your Honor?

8             THE COURT:  That's your reading of Metromedia?

9             MR. SCHWARTZBERG:  Your Honor, Metromedia -- a few

10   things indicated that if there's a blanket of releases that

11   could potentially be abusive, then --

12            THE COURT:  That's different than what you said.

13   I understand your point now.

14            MR. SCHWARTZBERG:  Oh.  Also, Your Honor, there is

15   no code section in the Bankruptcy Code that authorizes non-

16   debtor limits.

17            THE COURT:  Well, there wasn't one in the Mandel

18   case either, as 524(h) and the legislative history to 524(g)

19   recognize.

20            MR. SCHWARTZBERG:  Yes, Your Honor.  Because

21   there's no exclusive authorization in the code, we believe

22   if Congress wanted to allow the debtors -- non-debtors

23   discharges, what we believe is an extraordinary

24   (indiscernible) due process, they would have done so

25   explicitly, as they did with 524 (indiscernible).

Page 128

1          THE COURT:  Well, except -- except in 524(h), they

2     make it clear that the enactment of 524(g) does not undo any

3     such release that was entered before the enactment of

4     524(g).  And the legislative history makes clear that

5     Congress very clearly wanted the law to develop in that

6     area, and was not limiting it just to the asbestos trusts in

7     524(g).

8          MR. SCHWARTZBERG:  Your Honor, if you're talking

9     about the legislative history, I read that as dealing just

10    with normal plan injunctions, such as assets transferred

11    from one -- from the Debtor to a third party and the

12    injunction --

13         THE COURT:  Really?  Well, maybe you weren't in

14    the room when it was being drafted.

15         MR. SCHWARTZBERG:  I was not, Your Honor.

16         THE COURT:  Or representing the companies that

17    needed the protection, and had already gotten the

18    injunctions before 524(g).

19         MR. SCHWARTZBERG:  I do point out, Your Honor, the

20    Mandel injunction is based on enjoining claims that are

21    derivative of the debtor, whereas the injunction here that

22    the parties received more of a direct indiscernible)...

23         THE COURT:  Okay.

24         MR. SCHWARTZBERG:  Your Honor, if individual

25    members of the Sackler Family have filed their own Chapter

Page 129

1    11, they did not obtain the (indiscernible) the third party

2    releases being given here, which absolves them from fraud

3    claims, the result of (indiscernible) by growing individual

4    and hypothetical bankruptcy cases.  Moreover, if the Sackler

5    Family plan (indiscernible) in exchange for the broadest

6    brief possible, and actually propose individual bankruptcies

7    to the Sackler Family, it would almost certainly not be

8    confirmed under the best interest test of creditors, the

9    text that requires creditors to be treated (indiscernible)

10   Chapter 11, they would in a Chapter 7 liquidation.  In other

11   words, virtually all the Debtor's assets must be liquidated

12   and paid to creditors.

13          Why?  Because all available information suggested

14   the collective assets of the Sackler -- of the

15   (indiscernible) Sackler Family exceed $10-11 billion.

16          THE COURT:  Can we stop there?  What information

17   are you referring to?  What evidence are you referring to?

18   You heard the testimony and you read the declarations where

19   there was no cross as to the Sackler Family's assets.  So,

20   which evidence are you referring to?

21          MR. SCHWARTZBERG:  Your Honor, I'm referring to

22   the Debtor's disclosure statement.

23          THE COURT:  You're not referring to the -- to the

24   declarations as to the Sacklers' assets that were admitted

25   without cross-examination in this hearing?

1          MR. SCHWARTZBERG:  Your Honor, in the Debtor's

2     disclosure statement, they indicated that it was estimated

3     that the value --

4          THE COURT:  So, the answer's no.  You're not --

5     you're not citing any of the evidence in this hearing?

6          MR. SCHWARTZBERG:  I'm citing the disclosure

7     statement, Your Honor.

8          THE COURT:  All right.  Fine.  Can I ask you one

9     more question, Mr. Schwartzberg?

10          MR. SCHWARTZBERG:  Absolutely.

11          THE COURT:  You've couched this so far as the

12     Sacklers' plan.  Now, you've heard the oral argument today,

13     including the remarks by counsel for the Official Creditors

14     Committee and the Multistate Governmental Entities Ad Hoc

15     Committee, the lawyer for the Personal Injury Ad Hoc

16     Committee and the AHC, the committee of setting governmental

17     entities.  None of them referred to this as the Sacklers'

18     plan or the Sacklers' deal.  None of them referred to the

19     condition that the Sacklers were placing on it.  They said

20     that if there was no such release, they would not be

21     supporting the plan because they believe that the plan was

22     necessarily as a whole for their recovery.  What is your

23     response to that argument?

24          MR. SCHWARTZBERG:  Your Honor, in most cases or in

25     a lot of cases that we see where an entity files for

Page 131

1    bankruptcy and there are individuals who own that entity who

2    also have liabilities in connection with it -- those

3    individuals themselves file bankruptcy and they get a

4    discharge.  We believe here the Sackler Family, or the

5    members who are seeking releases, are seeking the discharge

6    for things they just thought that should not be permitted,

7    especially since that, in some instances, victims are only

8    getting $4,500.

9              Whereas I was discussing, Your Honor, if the

10   Sacklers as a whole filed bankruptcy, there would

11   potentially be significantly more money than --

12   (indiscernible) put on the table for that.

13             THE COURT:  So, essentially, you're ignoring the

14   statements by the representatives of all of the people that

15   spoke today that speak for the roughly 95 percent of the

16   people that voted in favor of the plan?

17             MR. SCHWARTZBERG:  Your Honor, we don't believe

18   the plan complies with the Constitution.  And we believe

19   that Your Honor is only authorized to do what is authorized

20   under the Bankruptcy Code, and that therefore the plan could

21   not be (indiscernible).

22             THE COURT:  Okay.  So, it's your principle against

23   their vote?

24             MR. SCHWARTZBERG:  Your Honor, I believe it's the

25   Constitution and the Bankruptcy Code against their vote.

Page 132

1           THE COURT:  Okay.  I was just curious about the --

2      who you were speaking for.  I understand now.

3           MR. SCHWARTZBERG:  Thank you, Your Honor.

4           THE COURT:  Okay.

5           MR. SCHWARTZBERG:  As I was indicating, Your

6      Honor, the 4 billion being put into this case may be a huge

7      amount of money but it is less than the -- what we believe

8      is the 10 billion that would be considered in the best

9      interest of the nation test.

10          THE COURT:  So, you think all of that would come

11     in?  All of that $11 billion would come in in a bankruptcy -

12     - in a liquidation?

13          MR. SCHWARTZBERG:  You know, it's hard to say,

14     Your Honor, because unlike the Debtor, the Sacklers have not

15     provided -- the Sackler Family has not provided a fulsome

16     set of financial information.

17          THE COURT:  Well, you didn't cross-examine the

18     expert who provided the liquidation analysis.

19          MR. SCHWARTZBERG:  We did not, Your Honor.

20          THE COURT:  And you didn't cross-examine the

21     expert who provided the analysis of the Sacklers' wealth and

22     where it lies, right?

23          MR. SCHWARTZBERG:  We did not, Your Honor.

24          THE COURT:  And so you're just, therefore,

25     assuming that money would be available?  Those transfers

Page 133

1    would be avoidable and recoverable?

2              MR. SCHWARTZBERG:  My argument, Your Honor, is we

3    don't know because there has not been a fulsome disclosure

4    of the Sackler Family (indiscernible) which would be --

5              THE COURT:  Well, there was a declaration.

6    Actually, there were two declarations.  So, I -- I should

7    rely on that, right?  No one cross-examined, no one

8    questioned the declarations -- the declarants.

9              MR. SCHWARTZBERG:  I believe there was one,

10   although I don't know what Your Honor's final decision on it

11   was -- indicated after the period of ten years, the Sackler

12   Family wealth would be in excess of 15 --

13             THE COURT:  No, that's wealth.  We're talking

14   about recovery in a liquidation.

15             MR. SCHWARTZBERG:  Your Honor, we do concede that

16   there are -- there is money that's in a trust, and that

17   would have to be a (indiscernible) asset.

18             THE COURT:  And your -- obviously, your office

19   isn't able to do that, right?

20             MR. SCHWARTZBERG:  Your Honor, I believe there are

21   un-consenting -- or nonconsenting, excuse me, states that

22   could pursue that as well as -- if the plan (indiscernible)

23   perhaps the Committee could pursue that.

24             THE COURT:  Okay.  The Committee that has

25   supported the plan?

Page 134

1          MR. SCHWARTZBERG:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. SCHWARTZBERG:  As I was saying, Your Honor,

4   because the Sackler Family members are not debtors, they've

5   not been subject to the comprehensive disclosure obligations

6   required of (indiscernible).  The testimony does show that

7   certain of the Sackler Family trust went to Royal Court in

8   (indiscernible) Jersey where secret proceedings

9   (indiscernible) no parties in this case other than perhaps

10  the Sackler Family could obtain a court order preventing the

11  sale of the (indiscernible) unless the Sackler Family

12  receives a release of fraud and other conduct.

13          Does this court enjoin the hundreds of pending

14  lawsuits against the Sackler Family when the Debtor for

15  Chapter 11 -- no lawsuits (indiscernible) judgment

16  (indiscernible) have been liquidated.  The trial testimony

17  establishes that, despite effectively discharging the

18  Sackler Family in this -- excuse me -- from discharging the

19  Sackler Family in this bankruptcy from the claims of opioid

20  victims, the Debtors liquidate -- either try to evaluate the

21  assets and liabilities --

22          THE COURT:  Mr. Schwartzberg, can you go a little

23  slower?  Your -- I'm not sure the court reporter will be

24  picking up what you're saying.

25          MR. SCHWARTZBERG:  Yes, I apologize, Your Honor.

Page 135

1    The Debtor's liquidation analysis didn't even try to

2    evaluate the assets or liabilities of the Sackler Family,

3    including the opioid-related liabilities.  But if the

4    Sackler Family members are being discharged as if they were

5    Debtors, then their assets and liabilities should be

6    included in the liquidation effort.

7            Simply put, the Sackler Family members are

8    reliable for only an infinitesimal portion of the 41

9    trillion opioid liability in the Debtor's liquidation

10   analysis.  The (indiscernible) arithmetic reality is that

11   they were -- that if they were debtors (indiscernible)

12   liquidate all of their assets (indiscernible) under the

13   plan.

14           Moreover, in a Chapter 7 case, the Sackler Family

15   wouldn't be granted the luxury of liquidating their assets

16   over a decade (indiscernible) effectively retain

17   (indiscernible) normally paid creditors for investment

18   income generated over a decade, which is precisely what is

19   being allowed here with the decades-long payout of

20   (indiscernible).

21           When asked on cross-examination what the Sackler

22   Family loss would be after the decades-long payout, David

23   Sackler did not know what the net effect will be.  He said,

24   I don't think anybody can say that with certainty.  Other

25   witnesses were forced to draw conclusions based on the

Page 136

1    incomplete information precisely that there's no Sackler

2    Family member as a debtor, who made -- who has made the

3    complete and public disclosure required of debtors so that

4    their complete financial situation can be understood in

5    (indiscernible).

6          Your Honor, not only did the releases violate the

7    Bankruptcy Code, but they're also fundamentally at odds with

8    the U.S. Constitution, both the Due Process clause and the

9    Bankruptcy clause.  (indiscernible) of claims against the

10   Sackler Family for their role in the opioid crisis

11   (indiscernible) is at the consent of this Court.  Due

12   process provides that those litigation claims

13   (indiscernible) both notice and a meaningful opportunity to

14   be heard.

15         Debtors repeatedly and (indiscernible) conflate

16   the due process afforded Purdue creditors for their claims

17   against Purdue and their participation of Purdue's

18   bankruptcy with due process for those with claims against

19   the non-debtor Sackler Family members.  For example, the

20   reply brief goes to great lengths to extol the notice given

21   of the bar date in this bankruptcy.  That is a red herring,

22   Your Honor, because the United States Trustee does not

23   challenge the adequacy of notice to produce creditors

24   regarding the treatment of their claims against Purdue.  But

25   there was no bar date for filing (indiscernible) claims

Page 137

1    against the Sackler Family precisely because they are not

2    Debtors.  We don't even know the universe of claims against

3    them beyond the 400 lawsuits that were enjoined.

4           Moreover, all the notice in the world can't

5    legitimize the Court's dictating settlements (indiscernible)

6    not agreed to sell or forcing -- or being forced to

7    relinquish their claims without the consent of their day in

8    court.

9           THE COURT:  Well, can we -- can we break that

10   down?  I'm not -- I'm not quite sure what the last point

11   makes.  But as far as due process is concerned, there's,

12   again, I believe, evidence of extensive notice of the

13   release that built on the notice to creditors and potential

14   creditors of the case, as well as extensive media notice of

15   the release.  And there was certainly an opportunity to

16   object in this court to the release.

17          So, at one level I think what you're arguing is an

18   issue for the future, as the Second Circuit discussed in the

19   Motors liquidation case.  The analysis of whether some party

20   who arguably is subject to an injunction got notice

21   sufficient to oppose the injunction is a fact-based inquiry

22   based upon their own particular circumstances and the

23   debtor's knowledge of them.  So, isn't that really an issue

24   for the future?

25          MR. SCHWARTZBERG:  Well, I think we don't believe

Page 138

1    the notice is appropriate and, therefore, this Court should

2    not approve the --

3            THE COURT:   Why -- on what basis do you say the

4    notice was not appropriate?

5            MR. SCHWARTZBERG:   Well, Your Honor, with

6    testimony that the confirmation notice, the publication

7    notice, the plain language notice did not include a

8    (indiscernible) list of the releasing parties.  All it did

9    would say the Sackler Family members or the Sackler Family.

10   It didn't include the thousands of other people that were

11   being released.

12           In addition, Your Honor, the actual notice or the

13   actual solicitation packet that went out was

14   incomprehensible.  Richard Sackler himself said reading

15   Section 10.7(b) was too dense and he couldn't get through

16   it.  And John Long, the CFO and the man who actually signed

17   the petition -- the schedules -- the schedules, I'm sorry --

18   the disclosure statement in the plan, indicated that he

19   could not identify all of the release parties, and he didn't

20   believe that an opioid -- an average opioid victim could

21   either.

22           We believe that if you're going to take away

23   someone's right to sue a person or an entity that you --

24   they should -- that entity should be identified.  So, that

25   is reasons why we don't think there was appropriate notice.

Page 139

1    As well as future claims, Your Honor. (indiscernible) future

2    claims did not receive notice and there was no future claims

3    representative.  But I'll continue, Your Honor.

4        The releases -- as I was saying -- the uncertain

5    and amorphous definitions of the releases and who was being

6    released, it was virtually impossible to understand who are

7    the released parties and releasing parties, and what are

8    released.  So, we believe no matter how many times the

9    Debtor advertised the shareholder releases on CNN, those

10   advertisements never provided adequate notice because those

11   releasing and those released were never adequately

12   specified.

13       The (indiscernible) even hearing the advertisement

14   and then sought out the plan and read every word of Section

15   10.7(b), basically it still wouldn't have notice, because it

16   was incomprehensible.  And as I indicated, Your Honor, Mr.

17   Lowne didn't appear to have knowledge of all released

18   parties.  In fact, on cross-examination we asked if it would

19   be possible for an average opioid victim, based on publicly

20   available information, to identify all the assets in

21   individuals that are getting released, he indicated, I would

22   presume if I'm not, they would not be able to, no.

23       And he further testified he couldn't identify the

24   Sackler Family's children and grandchildren included in the

25   releases, and he didn't know that this is an entity Sackler

Page 140

1    Family members --

2               THE COURT:  Well, let me just stop you there.  You

3    have referred consistently to the Sacklers, right, as a

4    collective?

5               MR. SCHWARTZBERG:  Yes, Your Honor.

6               THE COURT:  And the notice itself said the

7    Sacklers, right?

8               MR. SCHWARTZBERG:  Yes, Your Honor.

9               THE COURT:  Doesn't that include children and

10   grandchildren?

11              MR. SCHWARTZBERG:  The average person looking at

12   it may or may not know that.

13              THE COURT:  All right.

14              MR. SCHWARTZBERG:  And they would --

15              THE COURT:  Let's move on, Mr. Schwartzberg.

16              MR. SCHWARTZBERG:  Your Honor, the purported --

17   purported narrowing in both the seventh amended plan and the

18   eighth amended plan, both filed on the morning of the trial,

19   eliminated -- eliminated certain references.  For example,

20   the seventh amended plan got rid of the reference to all

21   other persons.  We still believe, even though those changes

22   were made, they don't do anything to clarify or materially

23   limit the scope of the extraordinary (indiscernible)

24   releases.

25              From the trial testimony, we have ascertained that

Page 141

1     the releases extend the fraud claim to non-opioid

2     liabilities related to Purdue's manufacture, sale and

3     distribution of many other pharmaceuticals into future

4     conduct -- meaning, the parties who have not yet been

5     injured and not credited to the Debtors are having future

6     claims extinguished.  And, Your Honor --

7             THE COURT:  Can I -- can I stop you on that point?

8     I'm not quite sure...  As far as future conduct is

9     concerned, if they are excluded -- I'm talking now from the

10    Sacklers -- from having anything to do with -- with Purdue

11    or Newco in the future, what are we talking about by future

12    conduct?

13            MR. SCHWARTZBERG:  Your Honor, we're talking about

14    acts that would have occurred prior to the effective date.

15    So, for instance, appropriate (indiscernible) prior to the

16    effective date that are used after the effective date, that

17    would be a future claim -- that a claimant would have --

18            THE COURT:  But the evidence is clear that the

19    Sacklers themselves have not been involved with this company

20    in any way, shape or form in terms of running it since

21    before the commencement of the bankruptcy case.

22            MR. SCHWARTZBERG:  Your Honor, then if that's --

23    there are no (indiscernible) claims, they should eliminate

24    the future claims from releases.

25            THE COURT:  I'm sorry, you're going to have to

Page 142

1    slow down.  I couldn't really hear that.

2            MR. SCHWARTZBERG:  I said, Your Honor, if there

3    are no future claims, they should eliminate them through the

4    releases.  But it appears that any actions that occurred

5    before the effective date, whatever they may be, if it

6    causes harm after the effective date, those claims are being

7    released.

8            THE COURT:  Right.  But you're not aware of any

9    claims that would exist against them?

10           MR. SCHWARTZBERG:  I'm not aware of any, Your

11   Honor, but I do know that they're being released under the

12   plan and there must be reason for that -- or there may be a

13   reason for that.

14           THE COURT:  Okay.

15           MR. SCHWARTZBERG:  Your Honor, the Court also, we

16   believe, does not have the power to -- or authority to

17   enjoin claims by one third party against another third party

18   (indiscernible) there both parties to the same bankruptcy

19   proceeding.  (indiscernible) Section 105 was used to create

20   it.  The Bankruptcy Clause grants Congress power to enact

21   uniform laws on bankruptcy.  Bankruptcy reorders the

22   rightful debtors and the creditors.  It does not reorder the

23   rights of non-debtors against non-debtors, and any effort to

24   do so exceeds the constitutional authority granted.

25           It is ironic that the Debtor -- that the Debtors

Page 143

1    and the shareholder release parties go to great lengths to

2    explain how creditors could never obtain personal

3    jurisdiction of the shareholder release parties and how

4    their assets are in trusts and (indiscernible) accounts

5    beyond the reach of creditors, while dismissing the United

6    States (indiscernible) argument that the Bankruptcy Court

7    does not have unlimited related to jurisdiction to

8    adjudicate or distinguish claims between non-debtors.

9            And, Your Honor, I'd like to turn to Metromedia

10   because that was discussed.  Despite much argument

11   otherwise, we didn't believe that Metromedia reflects the

12   imposition of third party releases or dictates the outcome

13   in this case.

14           First, Your Honor, Metromedia did not decide or

15   discuss the issue of constitutional due process.  Second,

16   (indiscernible) Supreme Court decisions undercut

17   Metromedia's analysis.  Law v. Siegel established yet again

18   that Section 105 cannot be used to grant relief that the

19   Bankruptcy Code does not authorize.  And even the Second

20   Circuit picks up -- it expressed doubt with Metromedia about

21   relying on Section 105.

22           And Stern v. Marshall established that article in

23   Bankruptcy Courts that constitutional authority to

24   adjudicate many state law claims.  The Bankruptcy Court

25   cannot adjudicate a claim held by one debtor against another

Page 144

1   non-debtor -- it certainly cannot extinguish that claim

2   their a plan confirmation.

3           Third, Your Honor, the statements in Metromedia on

4   third party releases were not beholding of the case.  The

5   Court ultimately dismissed the appeal for equitable

6   (indiscernible).

7           And, fourth, Your Honor, Metromedia doesn't set

8   out factors and filings, but it does suggest that releases

9   can't be a discharge, as this one is; a release can confirm

10  blanket immunity, as this one does, and --

11          THE COURT:  Can we stop on that point?  It's not a

12  discharge, right?  It doesn't discharge all their debts.

13          MR. SCHWARTZBERG:  But, Your Honor --

14          THE COURT:  And it doesn't provide blanket

15  immunity.

16          MR. SCHWARTZBERG:  But, Your Honor, as it said in

17  the Second Circuit in Metromedia, a third party release may

18  operate as a bankruptcy discharge arranged without a filing

19  and (indiscernible) safeguard to (indiscernible).  In fact,

20  Your Honor, this discharge provides a greater -- a super-

21  discharge.  The shareholder released parties -- if the

22  Sackler Family filed for bankruptcy, they wouldn't be

23  discharged from fraud.  And in this case, they're getting --

24  they're getting fraud as part of (indiscernible) against

25  them.

Page 145

```
 1              THE COURT:  So, what is your view about the
 2    MacArthur-Manville case then that deals with this issue?
 3              MR. SCHWARTZBERG:  Your Honor, I'm not familiar
 4    with this case -- that case.
 5              THE COURT:  Okay.
 6              MR. SCHWARTZBERG:  But Metromedia did establish
 7    factors and -- although it did not establish factors and
 8    filings, it did at least require some types of substantial
 9    contribution for the parties being released.  Mr. Lynam
10    testified to a litany of parties being released -- perhaps
11    hundreds of people or entities, without paying so much as a
12    dime into the estate.  And, indeed, Richard Sackler himself
13    did not know his personal assets, including his checking
14    account would be used for the final count.
15              Your Honor, I just want to point -- before I go
16    into my next point.  Mr. Huebner, in his presentation, had a
17    whole litany of cases where there are fraud releases, and I
18    just wanted to note that it appears that those were all
19    consensual.  Here, we're talking about nonconsensual
20    releases, we're talking about settlement.  And just before I
21    forget that, I wanted to just address that issue.
22              And then regarding something that came up on
23    cross-examination, Your Honor.  The United States Trustee
24    (indiscernible) the vote-counting rules of Section 1126 and
25    does not contest the Debtors have established acceptance of
```

Page 146

1    a plan by the voting process.  It is well established that

2    1126, as interpreted, only counts votes actually cast and

3    does not direct courts to consider the toll number

4    (indiscernible) of the votes -- the voters.

5            But Purdue and the Sackler Family have misused the

6    voting percentage to create the impression that the

7    stakeholders overwhelmingly support the non-debtor

8    involuntary releases, and that's simply not true.  And to

9    give the final (indiscernible) is not deserved.  The Debtors

10   represent that each and every class of creditors that voted

11   has overwhelmingly voted to accept the plan.  However, they

12   also say in Paragraph 243 of the reply brief that 95 percent

13   of all the creditors voted in favor of it.

14           Your Honor, 95 percent of all the creditors did

15   not vote in favor of the plan.  However, 95 percent of 20

16   percent of the creditors who voted --

17           THE COURT:  Mr. Schwartzberg, how do you propose

18   to measure overwhelming support except by how everyone

19   measures an election, which is based on those who actually

20   vote?  Can you name me one election that counts people who

21   just answer polls or say later what they think, as opposed

22   to those who actually vote?

23           MR. SCHWARTZBERG:  Your Honor, we're noting that

24   in the --

25           THE COURT:  You live -- I know you live in this

Page 147

```
 1    area instead of Washington, D.C., but I think it would be a

 2    surprise to politicians that you don't count the vote, you

 3    count something else, something amorphous?

 4              MR. SCHWARTZBERG:  Your Honor, I am not -- we are

 5    not challenging what 1126 --

 6              THE COURT:  Are you aware of any case that has

 7    looked at support, as far as overwhelming support, other

 8    than by the vote?

 9              MR. SCHWARTZBERG:  Your Honor, what we're doing is

10    we're challenging Debtor's talking points by --

11              THE COURT:  But on what basis?

12              MR. SCHWARTZBERG:  Your Honor, 95 percent of all

13    the creditors did not vote --

14              THE COURT:  So, you don't answer my question.  You

15    would poll the man on the street?

16              MR. SCHWARTZBERG:  We're not talking about

17    polling, Your Honor.  We're not talking about --

18              THE COURT:  No, you're not talking about counting

19    at all.  Just move on from this point.  I think the

20    politicians who are objecting to this plan at least

21    understand how elections work.

22              MR. SCHWARTZBERG:  Your Honor, if the Debtors

23    wanted to establish that the creditors consent to the

24    releasing of claims, all they had to do was ask, but they

25    did not.
```

Page 148

1          Your Honor, in conclusion, the Bankruptcy Code is

2     a carefully drafted, comprehensive statutory scheme that

3     strikes a balance between the rights and obligations of

4     debtors and creditors.  But what the Debtors and the Sackler

5     family propose here turns that scheme on its head and

6     eviscerates both the statutory and constitutional

7     protections to which creditors are entitled.  It creates a

8     bankruptcy-like option for the Sackler family without their

9     actually filing for bankruptcy and being subject to

10    obligations (indiscernible).

11         Neither the Bankruptcy Code nor the Constitution

12    allow this Court to approve a plan that cuts off the rights

13    of individuals (indiscernible) parties other than the

14    debtors, yet that is exactly what the Debtors ask this Court

15    to do.

16         Millions have already been victimized by the

17    opioid crisis that the Sackler family helped create.  They

18    shouldn't be victimized a second time by having the claims

19    against them extinguished in the bankruptcy case against

20    those who are not debtors.

21         And so I (indiscernible) where I began.  This plan

22    is indeed extraordinary, and it is extraordinary for all the

23    wrong reasons and confirmation should be denied.  Thank you,

24    Your Honor.

25         THE COURT:  Okay, thank you.  Okay.  I think --

Page 149

1    Mr. Goldman, are you next?

2            MR. GOLDMAN:  I believe I am, Your Honor.

3            THE COURT:  Okay.  For the State of Connecticut.

4            MR. GOLDMAN:  Yes.  Thank you, Your Honor.  Irve

5    Goldman, Pullman & Comley, for the State of Connecticut and

6    also for -- we've agreed to coordinate our arguments and

7    I'll be presenting also for Delaware, Vermont, Oregon, Rhode

8    Island, District of Columbia, and Washington, to conserve

9    argument time.

10           THE COURT:  Okay.

11           MR. GOLDMAN:  And just also preliminarily, Your

12   Honor, Mr. Gold and I will be dividing up the arguments.

13   I'll be addressing for the most part subject matter

14   jurisdiction and certain other aspects of the third party

15   releases.  And then Mr. Gold will be addressing Metromedia.

16           THE COURT:  Okay.

17           MR. GOLDMAN:  Okay.  Thank you, Your Honor.

18           Before I proceed with my prepared remarks, if I

19   could just go over or respond to the points that were raised

20   by the plan proponents this morning and into the afternoon.

21           First, it's been suggested, although I'm not

22   entirely clear on this point, that 9019 would govern a

23   settlement of a creditor's direct non-state claims against

24   non-debtors, which are really not the property of the

25   Debtors to sell.  I'm not aware of any authority that exists

Page 150

1    for the proposition that a debtor or a trustee can attempt

2    to force a settlement of non-state claims held by creditors

3    based on the TMT standard that essentially says that if the

4    settlement does not fall below the lowest in the range of

5    reasonableness, it should be approved.

6            THE COURT:  Yeah.  I don't think that was Mr.

7    Huebner's intention.  I think he was covering the 9019

8    Iridium TMT Trailer Ferry argument, the one that Mr. Gold is

9    going to cover.

10           MR. GOLDMAN:  Okay.  I just wanted to be sure.

11           THE COURT:  Having said that, it's not a factor

12   that the courts in the Second Circuit regularly consider, at

13   least expressly as a factor when considering a release of a

14   third party claim.  But in the Third Circuit, they do

15   discuss fairness or unfairness.  They say that the third

16   party release should not be unfair.  So I guess at least in

17   other jurisdictions, fairness does come in in some respects.

18   And it probably does indirectly in the Metromedia factors by

19   focusing on the consideration provided and who it goes to.

20           MR. GOLDMAN:  Point well taken, Your Honor.  So

21   I'll go to the next point that I wanted to respond to.

22           I don't believe anything said by Mr. Huebner

23   justifies overriding the sovereign judgements of nine states

24   and the District of Columbia, that their view of justice and

25   an acceptable resolution with the Sacklers given the amounts

Page 151

1    that they propose to contribute requires a full airing of

2    their alleged culpability in the courts of the objecting

3    states.

4              The very concept of sovereignty requires that the

5    judgements of those states be respected and that they not be

6    forced to give up their property rights against non-debtors

7    by a majority or even a supermajority vote.

8              As Ms. Conroy, who others have invoked earlier,

9    had to acknowledge in her testimony, reasonable minds can

10   differ about the amounts the Sacklers should be contributing

11   in order to get a third-party release.  And you have kind of

12   those minds in the he objecting states falling on the side

13   of inadequacy.

14             There was also a point that the current state of

15   affairs was portrayed as leaving a binary choice of taking a

16   stand or liquidating.  However, there is a scenario in which

17   additional consideration could be provided in order to

18   achieve full consensus, but the parties have simply chosen

19   to draw the line here and attempt to force a resolution on

20   the objecting states.

21             There was another point made about --

22             THE COURT:  Can I stop you -- can interrupt you on

23   that point?

24             MR. GOLDMAN:  Certainly, Your Honor.

25             THE COURT:  Let's assume for the moment that

Page 152

1    Connecticut agreed -- let's assume for the moment that we

2    had a fourth mediation and the Sacklers agreed to contribute

3    another $50 million like they did in the third mediation,

4    the one that Judge Chapman supervised.  And Connecticut,

5    Washington, Oregon, they all went along with it except one

6    state.  Or even just the City of Seattle.  Do you say that

7    the whole thing should still be put aside for that

8    creditor's rights?

9            MR. GOLDMAN:  Your Honor, that would be assuming

10   that with that one holdout the Sacklers would refuse to go

11   forward with the contribution?

12           THE COURT:  Yeah.  Let's just say one holdout just

13   decided that no amount of money was enough.

14           MR. GOLDMAN:  Well, that is the difficult question

15   to be answered.  I think to be principled about things, we

16   would have to respect the judgement of that one holdout.

17   And if we believed that truly it was an adequate settlement

18   ourselves, I think it would be up to us to prevail on that

19   one holdout, to see it our way.  And that's the best way I

20   can answer Your Honor's question.

21           If I could move to my next point that I wanted to

22   respond to.

23           There was a reference to other claimants in our

24   state or maybe in the other objecting states to claimants

25   who may have voted in favor of the plan.  And as Your Honor

Page 153

1   brought out, there really is no evidence of that.  But even

2   if they did, they're not elected officials of the objecting

3   states who are charged with protecting what they believe to

4   be in the public interest.  So it really is a beside the

5   point type of observation that was made.

6           There was also an observation made that

7   municipalities overwhelmingly voted in favor of the plan,

8   and we acknowledge that.  But again, just like the

9   individual claimant that might have voted in favor of the

10  plan, they have no authority to assert the (indiscernible)

11  claims on behalf of a state's citizenry, as the attorneys

12  general in the objecting states do.

13          THE COURT:  Do you say that applies in all of the

14  objecting states?

15          MR. GOLDMAN:  Your Honor --

16          THE COURT:  Notwithstanding the home rule laws?

17          MR. GOLDMAN:  Notwithstanding the home rule laws?

18          THE COURT:  Yes.

19          MR. GOLDMAN:  That I can't -- I'm honestly not

20  sure about home rule law, but I do know that one of the --

21  at least one of the cases was -- of the municipalities, I

22  believe it was the City of New Haven that was dismissed

23  because they didn't have standing to assert the type of

24  claims that the State of Connecticut AG has asserted.

25          And there was also a reference I believe by the

Page 154

1    Unsecured Creditors' Committee that the state AGs have

2    reneged on the allocations formula.  I don't believe that is

3    the case.  That allocation formula was formulated and agreed

4    to on the premise that there would be a fully-consensual

5    settlement as part of a plan.  And that obviously has not

6    occurred.  So those are my points in response to the points

7    that were made this morning and this afternoon.

8           And if I can now turn to my formal part of my

9    argument.

10          It was observed by Circuit Judge Henry Friendly in

11   the pre-Code days that conduct of bankruptcy proceedings

12   should not only be right, but seem right.  And it's our view

13   and the view of the other objecting state that the breadth

14   of the releases provided for the Sacklers given what we

15   believe they've done leading up to this bankruptcy.  It does

16   not seem right to us, and we would contend is not right.

17   And that belief is based on the recognition that if the plan

18   is confirmed, they will have gotten every bit of protection

19   and more than they would have received in their own

20   bankruptcies and will be able to put a permanent halt to all

21   of these suits, which certainly have exposure.  Yes, I

22   understand they submitted what they believe to be strong

23   defenses.  But they will be wiped away without having to

24   undergo the rigors of their own personal bankruptcy, which I

25   think is a really important consideration for the Court to

Page 155

1   take into account.  And unlike individual debtors --

2            THE COURT:  Can I interrupt you on that?

3            MR. GOLDMAN:  Yes, Your Honor.

4            THE COURT:  There's two parts to that.  There's

5   the rigorous part and there's the personal bankruptcy part.

6   As far as the rigors, we'll come back to that.  But if it's

7   putting them into or forcing them to go into personal

8   bankruptcy, if one would get less or recover less or

9   materially less in a personal bankruptcy scenario than the

10  states would be getting under the plan, that's really just a

11  punishment, right, at that point?  That's what you're

12  talking about, as opposed to doing an analysis of recovery

13  under either scenario.

14           MR. GOLDMAN:  Well, if you assume that you would

15  be getting less and --

16           THE COURT:  Right.

17           MR. GOLDMAN:  -- I'm not sure that --

18           THE COURT:  We can explore that in a minute.  But,

19  I mean, assume that for the moment.

20           MR. GOLDMAN:  I think to a certain degree you can

21  view it as penal.  But that is one of the purposes of the

22  consumer protection laws as well as providing a deterrent to

23  future wrongdoers that in essence sends a message that they

24  can't be bailed out by piggybacking on a corporate

25  bankruptcy to get a discharge.  I mean, most individual --

Page 156

1          THE COURT:  But again, the -- to me -- and you

2    were quite candid about this, and I think I understand the

3    logic behind it.  Reasonable minds may differ about the

4    amount and the other consideration to be paid.  But it is

5    one thing to say I want punishment, it's another thing to

6    say we're not getting enough money.  Those are two different

7    things.  Right?  I think.

8          MR. GOLDMAN:  Well, I would -- I do understand.

9    And I think that I would say that if the amount of

10   compensation, so to speak, in the sense of cumulative

11   damages reaches an amount that the states can say -- all

12   states can say, you know, this is sufficient punishment, or

13   however you want to phrase it, and what we believe these

14   people caused, what we believe, then I don't see an issue

15   with the dichotomy that Your Honor proposed.

16         THE COURT:  Okay.  And can we focus on the rigor

17   part for a second?

18         MR. GOLDMAN:  Absolutely.

19         THE COURT:  I don't know whether Connecticut is a

20   party with the McKinsey lawsuit.

21         MR. GOLDMAN:  I'm not a hundred percent sure.  I

22   believe we are, but I'm not a hundred percent sure.

23         MR. HUEBNER:  Okay.  I mean, there was certainly,

24   I think you'd have to agree, much less rigor as far as the

25   disclosure regarding McKinsey and the claims against it and

Page 157

1    its involvement and the rigor in this case with regard to

2    the discovery pertaining to various Sackler family members'

3    role in Purdue and their assets and liabilities.  You would

4    agree with that, right?

5           MR. GOLDMAN:  Well, not knowing what was provided

6    in McKinsey, I'm at a little bit of a disability to respond.

7           THE COURT:  Okay.  Well, as far as the discovery

8    taken of the Sacklers in this case, can you imagine that

9    there would be any other discovery taken if they filed

10   bankruptcy as far as their liabilities, their assets, and

11   claims against them?

12          MR. GOLDMAN:  I'm not sure that I know what you're

13   getting at.  There was extensive discovery.  You know,

14   whether that should serve as a substitute for what one goes

15   through in the bankruptcy process, I would question.

16          THE COURT:  Well, I mean, there are schedules that

17   you have to fill out.  There are forms you have to fill out

18   in bankruptcy.  They're not tens of millions of pages.  And

19   the discovery and the disclosure with regard to assets that

20   you have a beneficial interest in are even less rigorous in

21   your own personal bankruptcy.  Wouldn't the discovery just

22   repeat itself if various members of the Sackler family were

23   compelled to file bankruptcy that we've already had?

24          MR. GOLDMAN:  Well, to the extent that Rule 2004

25   exams would be taken --

Page 158

1           THE COURT:  But wouldn't it just be updated?  I

2    mean, that's all been done, right?  And in fact, more than

3    done, because I insisted that it be broader than even normal

4    2004 discovery as a condition for the preliminary

5    injunction.

6           MR. GOLDMAN:  Well, I understand what you're

7    saying, Your Honor.  But it just seems to me that it's not

8    really a complete substitute for having to go through the

9    bankruptcy process oneself.  You know, obviously there are

10   non-dischargeability concerns and deadlines.  And all of

11   that could -- would likely be brought to bear on a

12   settlement that everyone would consider acceptable, the

13   prospect of that I would think would naturally bring parties

14   together.  But since we don't have that dynamic, I could

15   understand why the parties here are pushing this when they

16   have a critical mass.  So that's the best response I can

17   give.

18          THE COURT:  Okay.  That's a good response.

19          MR. GOLDMAN:  So I think that was my last point.

20   And that was on to my argument as well.

21          THE COURT:  Right.

22          MR. GOLDMAN:  So the other point I was going to

23   make is that they are contributing an amount which in the

24   abstract could be considered substantial.  But it's a

25   negotiated amount of their considerable wealth.  And that

Page 159

1    wealth was in substantial part obtained by the cash and non-

2    cash transfers that they acknowledge receiving over a 10 or

3    11-year period, $11 billion, yes.  $4 billion of it was used

4    to pay taxes, but that's a benefit to them as well.

5            And it's apparent that those distributions were

6    made in response to concerns like those expressed by David

7    Sackler in an email to Richard Sackler dated May 17th, 2007

8    that, quote, "We will be sued", end quote.  That is Exhibit

9    JX2237.  And that family offshore trusts were set up to

10   protect the Sackler wealth from the claims they expected to

11   -- that would be asserted against them, as board member

12   Peter Boer advised Jonathan Sackler to do in his

13   confidential email, memorandum --

14           THE COURT:  But, Mr. Goldman, those claims are

15   estate claims, right?  That isn't a third-party claim.

16           MR. GOLDMAN:  Absolutely agreed, Your Honor.  I'm

17   just making the point that they set up this offshore trust

18   with the idea of protecting for claims they knew would be

19   coming in this confidential memorandum, which is JX --

20           THE COURT:  But isn't this Mr. Gold's point?

21   Isn't this the Iridium analysis?

22           MR. GOLDMAN:  Well, I'm at the point of the

23   argument where I'm just making our preliminary view of why

24   this does not seem right to us, the whole leadup to the --

25           THE COURT:  Is the State of Connecticut prepared

Page 160

1    to give back the $285 million in taxes it received from this

2    company that was engaged in illegal practices?  It got the

3    most other than the federal government by way of tax

4    payments.

5         MR. GOLDMAN:  Well, there was income that was

6    derived on which taxes were owed.  I don't know why we would

7    be giving it back.  But I understand the point you're

8    making, that we benefitted also.  But it pales in comparison

9    to what was taken out by the Sacklers, surely.

10         THE COURT:  Although as far as the tax payments

11    are concerned, I do have an uncontroverted affidavit that

12    says that most of those payments, if they have not been --

13    if it had not been a partnership structure, would have been

14    paid by the Debtors directly.  Right?  They would have --

15    they relieved the Debtors of the tax obligation.

16         MR. GOLDMAN:  Well, the fact is they set the

17    structure up this way, they took the money out, and they

18    owed the taxes.  And they had Purdue pay the taxes on their

19    behalf.  But I do understand Your Honor's point.

20         THE COURT:  Okay.

21         MR. GOLDMAN:  If I could just complete the memo

22    for the benefit of the Court for what it's worth.  I was

23    going to give you the exhibit number.  It was JX2241.  And

24    Mr. Boer told Jonathan Sackler, quote, "For the family, it

25    may be that overseas assets with limited transparency and

Page 161

1    jurisdictional shielding from U.S. judgments will be less

2    attractive to litigants than domestic assets."  And that

3    suggestion proved to be prophetic, as the Debtors and the

4    Sacklers are now using the difficulty of collecting any

5    judgements against offshore trusts as one of the reasons why

6    the shareholder settlement agreement should be approved.

7              So under these circumstances, we do not believe

8    the non-consensual releases here seem right or are right --

9              THE COURT:  But can you wish that away?  Can you

10   wish those consequences away?

11             MR. GOLDMAN:  The most we can do I think is doing

12   what we're doing, Your Honor.  And that is to try to prevent

13   it from happening.

14             THE COURT:  But, again, I think the avoidable

15   transfer issue really is an estate issue.  In other words,

16   the Creditors' Committee and the Debtors and all the other

17   parties have their say.  You all have your say, too.  But

18   it's not a third-party release issue, it's an estate issue.

19   And one could certainly come to the conclusion that as far

20   as the avoidable transfers are concerned, the range of the

21   settlement is within what is reasonable given the risks on

22   the underlying liability and the risks of collection.  I

23   mean, if you want to go to the Isle of Jersey and seek to

24   avoid the transfers under Jersey law and deal with

25   enforcement with the Viscount of Jersey, there are obviously

Page 162

1    some issues involved with that.

2              MR. GOLDMAN:  I acknowledge that, Your Honor.

3              THE COURT:  Okay.

4              MR. GOLDMAN:  I do acknowledge that.  But I think

5    that what this goes to also, apart from the settlement, is

6    really to the fairness of the release itself.  Because it

7    has to be put in context.  You know, why are they getting

8    these releases when they are really just giving back a lot

9    of what was taken out over that period of time when they

10   knew that claims were coming.  And so that's really -- I'm

11   not so much commenting on the Iridium settlement factors as

12   I am on how that really should bear on the permissibility of

13   the releases themselves, taking that -- in other words, you

14   would really take that into account as to how they got that

15   (indiscernible).

16             THE COURT:  Well, that's a fair point.  And I have

17   thought carefully and listened carefully and read the

18   evidence carefully to see how much of this $4.325 billion

19   would be attributable to estate claims and how much would be

20   attributable arguably to non-estate claims.  And no one has

21   really addressed that issue directly.  I do have arguments,

22   and they're just arguments, because given that it is a

23   settlement, we didn't try the merits directly.  But I have a

24   fair amount of facts and arguments that would lead one to

25   think, I believe, that the value here is not all on account

Page 163

1    of the estate claims necessarily, that you can evaluate this

2    settlement as covering both.  But no one particularly wants

3    to allocate the value to one or the other set of claims

4    because they're all quite aware of the possibility of a

5    default in the future where they want to litigate as hard as

6    they can.

7            But just the simple point as far as the non-estate

8    claims are concerned that only -- or I actually think less

9    than a handful of Sacklers served on the board.  And I think

10   two or three were officers out of the entire family group.

11   So, you know, people refer to the Sacklers as a unit, but

12   they're actually -- the testimony shows 16, eight within

13   Side A and eight with Side B, sets of contributors, some of

14   whom I have to assume would have much stronger defenses to

15   these types of claims than others.  So it's -- you know,

16   it's not an easy calculus.

17           MR. GOLDMAN:  It is not, Your Honor.  And I do not

18   --

19           THE COURT:  I agree with you on one point.  Given

20   the size of the claims here, which have not been liquidated,

21   but they are gigantic, one could always and fairly easily

22   say this is not enough, this $4.325 billion isn't enough.

23   And at one level, that's clearly the case.  Everyone should

24   get paid in full, right?  On the other hand, we know, at

25   least on the personal injury side, that payments on these

Page 164

1    types of claims historically are fairly low, unfortunately.

2    You know, the settlement that is in Ms. Conroy's declaration

3    where she says her firm pretty much had the people with the

4    best claims, who had prescriptions, et cetera, if you assume

5    a reasonable contingency fee, it's about $13,500 per person

6    under that settlement.  And I realize that was a while ago.

7    But it's hard to look someone in the eye and say that's

8    enough.

9           So at one level it would be quite easy for me to

10   say to the Sacklers it's not enough.  On the other hand,

11   it's hard for me to say to Mr. Price and his committee you

12   have to take the risk that this all falls apart over -- and

13   it's never going to be enough, so it has to be some other

14   bid or ask, whether it's another $50 million or another 25

15   or another $100 million.  And at some point, there's a big

16   risk.

17          And certainly AGs, who have been very aggressive

18   in pursuing the Sacklers, including the State of New York

19   and the State of Maryland -- I'm sorry, State of

20   Massachusetts, excuse me, reached their point where they

21   weren't willing to take any more risk of the whole thing

22   falling apart.

23          So I would love for the Sacklers to pay enough to

24   get your clients on board.  I don't think that will happen

25   if we adopt a rule that says any one governmental entity can

Page 165

1    kill the whole thing.  So it's hard for me to see how you

2    reconcile that ultimately without leaving somebody at least

3    saying that they're not on board with the plan.

4            MR. GOLDMAN:  All points well taken.  I think

5    that, you know, it's a question of line drying as I tried to

6    get Mr. Weinberger to acknowledge he didn't quite do it.

7    But I think that it really is (indiscernible).  And I think

8    that what happened here, or at least what I perceive to have

9    happened is there was a certain amount of fatigue that set

10   in.  Some states just threw up their hands and maybe saw the

11   writing on the wall.  But whatever it is, I do think that

12   this does come back to our sovereign right to make these

13   decisions for ourselves and not to be out voting and told to

14   give up claims that aren't held by the estate.

15           THE COURT:  But there's no -- there's no case in a

16   bankruptcy context that holds that as far as states, right?

17           MR. GOLDMAN:  Well, not that I could find, Your

18   Honor.  But then again, there's nothing that goes the other

19   way either on this.

20           THE COURT:  Well, there's plenty of caselaw that

21   says that police and regulatory monetary claims get

22   discharged in a bankruptcy case.  Now, those are claims

23   against the debtor, I understand.  But they don't -- those

24   cases don't distinguish between state claims and private

25   claims if it's to collect money, like Peabody Coal, for

Page 166

1    example.

2              MR. GOLDMAN:  Your Honor, I had cited in our

3    objection a line of cases holding that these type of claims,

4    consumer protection claims, claims brought under unfair and

5    deceptive acts and practices acts are non-dischargeable

6    under either Section 523(a)(7), again, I'm speaking now

7    individual case, or in the Section 523(a)(2)(A).

8              In my brief in the section of the plan -- or

9    argument that the plan usurped our rights to have those

10   declared non-dischargeable.

11             THE COURT:  Right.  But that's for individuals.

12   And if you're dealing with a Chapter 11 case, those wouldn't

13   be applying except by analogy.  And again, I think the

14   circuit in the MacArthur case dealt with the 523 point.

15             MR. GOLDMAN:  Well, I was directing it to the

16   Sacklers and the point that the effect of discharge that we

17   viewed they are getting by these releases really

18   circumvented those non-dischargeability provisions, if they

19   had --

20             THE COURT:  I understand.  I understand.  But --

21   well, we're dealing with a concept that I guess when you're

22   talking about the payment of money under a plan has not been

23   directly addressed, but it's certainly been indirectly

24   addressed by the Courts.

25             MR. GOLDMAN:  Can I flesh out for a moment what I

Page 167

1      believe the response is to the MacArthur argument?

2              THE COURT:  Sure, yeah.

3              MR. GOLDMAN:  So I'm looking at the case.  And it

4      says MacArthur argues that the injunctive orders constitute

5      a de facto discharge in bankruptcy of non-debtor parties as

6      not entitled to the protection of Chapter 11.

7              But that was directed to MacArthur, a corporation.

8      It didn't really deal with the issue that I'm raising.  And

9      that is that the effect of discharge here in favor of the

10     Sacklers really does circumvent the non-dischargeability

11     provisions that would apply if they filed their own

12     bankruptcy.  That was not a -- the comment that the Second

13     Circuit was addressing.

14             THE COURT:  Except that you're not getting a

15     discharge under this plan.  They're settling claims in

16     return for a release.  And the MacArthur Manville case I

17     think went off on that ground, as do a lot of the other

18     cases.  It's not the same thing as a discharge.

19             MR. GOLDMAN:  It is not quite the same thing.  But

20     for the clear majority of their debts and for the clear

21     majority of their current financial problems is solved by

22     this release, we'll call it, not a discharge.

23             THE COURT:  That's fair.

24             MR. GOLDMAN:  And so I think it's as close as the

25     discharges we're going to get, even though it's technically

Page 168

1    not an actual discharge.  I understand.

2              THE COURT:  Right.

3              MR. GOLDMAN:  But if I can turn now just to the

4    subject matter jurisdiction argument, which I think is

5    governed by Manville III cited in our papers, which was

6    decided three years after (indiscernible).

7              And in the context of striking down the third

8    party release there, the Second Circuit instructed us to

9    look to a state's laws to see whether the claims are

10   derivative of the Debtors or whether they are based on some

11   wrongdoing of the third party to independent legal duty.

12             And if we look to state law here, I don't think

13   there's any question that the Sacklers engaged, at least as

14   alleged, in independent wrongdoing of their own as opposed

15   to Purdue under state law.

16             The laws of some of the objecting states are

17   directly on point on this.  For example, in Connecticut, an

18   individual can be liable for unfair deceptive acts of a

19   business entity if the individual either participated

20   directly in the entity's deceptive or unfair acts or had the

21   authority to control them.  To the same effect is Maryland

22   law.  As long as there is authority to control the acts,

23   they can be liable under unfair and deceptive practices

24   acts.  To the same effect as Vermont law, where an

25   individual could be liable under their consumer protection

1       act if he or she directly participates in the acts or gives

2       direct aid to the corporate actor.  And also too with

3       Washington's Consumer Protection Act, where they can be

4       liable for corporate wrongdoing if the individual

5       participates in the wrongful conduct or with knowledge

6       approves of it.

7               So all of those are independent legal duties that

8       run to the Sacklers and that would satisfy the Second

9       Circuit's testare of independent wrongdoing.

10              Now, I know that the Debtors have argued that the

11      indemnity obligations and the insurance policies are part of

12      the calculus here in determining whether there is

13      jurisdiction.  And I acknowledge the conceivable effects

14      test, but maintain it is not so liberal a standard as to

15      preclude consideration of the likelihood or probability that

16      the indemnification claim will be upheld.

17              In the UBS case that the Debtor cited in their

18      brief, the Second Circuit holds that there must be a

19      reasonable legal basis for the claim of indemnity.  And we

20      contend here that that just doesn't exist.  And they cite

21      two sources for their obligation to indemnify the Sacklers,

22      the Purdue Pharma bylaws and Purdue Pharma's latest limited

23      partnership agreement, both of which require the indemnity

24      to act in good faith in order to ultimately be entitled to

25      indemnity.

Page 170

1            But preliminary at least as to the limited

2    partnership agreement, the Debtors overlooked that it's an

3    executory contract that can be rejected along with the

4    indemnity obligation.  Judge --

5            THE COURT:  It still creates a claim.

6            MR. GOLDMAN:  It does.  It would create a

7    contingent claim of indemnity under the contract, no doubt.

8    But it would remove those obligations at least going forward

9    to indemnify.  For example, for a defense clause.  And there

10   are a couple of cases that do hold it executory.  In re

11   Heafitz, 85 B.R. 274 (Bankr. S.D.N.Y. 1988) and the court in

12   Phar-Mor, Inc. v. Strouss Bldg. Associates, 204 B.R. 948

13   (N.D. Ohio 1997) strongly suggested it was executory.

14           But even if it was not rejected, the limited

15   partnership agreement, which is at JX0872, states that the

16   partnership shall not be obligated to indemnify the

17   indemnity to the extent a final decision by a court having

18   jurisdiction in the matter shall establish that the

19   indemnity did not act in good faith.

20           THE COURT:  But again, in SPV OSUS v. UBS, the

21   putative claimant that gave the -- you know, it was third

22   party versus third party, the putative claimant that would

23   argue contribution claims was someone who was being sued

24   independently for having knowledge and participating in

25   Bernie Madoff's fraud, aiding and abetting BLMIS.

Page 171

1    Nevertheless, notwithstanding all of that dirty linen, the

2    Circuit said that there was a basis for related to

3    jurisdiction.

4            MR. GOLDMAN:  Acknowledged, but I'm not sure that

5    there was the level of dirty laundry presented to the court

6    there as we have here.  You know, we have --

7            THE COURT:  The fundamental point, which is

8    Manville II, 517 F.3d 52.

9            MR. GOLDMAN:  Yes.

10           THE COURT:  I mean, the case was vacated, right?

11           MR. GOLDMAN:  Yes, it was.

12           THE COURT:  And if the Circuit -- which, by the

13   way, was dealing with a plan that had already been

14   implemented, so it was actually accurate that these lawsuits

15   at this time against the insurers really didn't affect the

16   estate, because this was many years after the Manville Trust

17   or the Manville Plan went into effect.

18           But leave that -- leave both of those things

19   aside, that it was vacated and that under those facts, there

20   really was no effect on the estate because the plan was

21   already in place, I think over a decade, and the trust was -

22   - had already been paying out billions of dollars of claims,

23   in part from the insurance settlements.  If the case really

24   does stand for the notion, which it says that only

25   derivative claims can be enjoined, it really stands for the

Page 172

1    proposition that these injunctions really aren't including,

2    in Metromedia and Drexel and the like, are really not what

3    they purport to be.  Because you don't need an injunction to

4    enjoin derivative claims because the Circuit law has been

5    clear since the '80s that derivative claims are property of

6    the estate.

7                MR. GOLDMAN:  Well, I believe -- I believe in that

8    case they were asserting the derivative claims of Manville-

9    - well, actually, if we're going to take Manville III, the

10   claim against Travelers was -- were their own independent --

11               THE COURT:  Right.

12               MR. GOLDMAN:  -- wrongdoing --

13               THE COURT:  Right.

14               MR. GOLDMAN:  -- in failing to lead to the

15   attention, I mean, --

16               THE COURT:  But --

17               MR. GOLDMAN:  -- is dangerous.

18               THE COURT:  -- but I think the point is that

19   Drexel and Metromedia say that under the unusual

20   circumstance where the injunction is necessary for the plan,

21   it's an integral part of the plan, it could be granted if

22   you meet other factors as well, including overwhelming

23   support for it.

24               The injunction at this point, according to the

25   Circuit in the subsequently vacated opinion, wasn't

Page 173

1    necessary because the plan was already in effect and it was

2    operating.  The plan wasn't going to be unwound.  Using Mr.

3    Huebner's metaphor, there was no string to pull to unwind

4    the Plan.  Travelers probably would have gotten the raw --

5    or whoever it was that was the settling insurer, would

6    probably have gotten a raw deal, but there was -- it was

7    after the fact.

8            MR. GOLDMAN:  It was, indeed, after the fact, but

9    they certainly offset their reliance interest, having paid -

10   - I know it project -- it was upwards of $100 million, maybe

11   not that much, into the plan.  But --

12           THE COURT:  Well, then I guess that was why --

13           MR. GOLDMAN:  I --

14           THE COURT:  -- they were -- they reversed, is that

15   Judge Lifland had found there was, in fact, jurisdiction,

16   and no one had challenged that, and therefore, it stood.

17           MR. GOLDMAN:  It was, I thought, reversed on other

18   grounds by the Supreme Court.

19           THE COURT:  Right.  Which said that take -- it

20   takes no position on the jurisdictional issue in the

21   reversal at 557 U.S. 137.

22           MR. GOLDMAN:  So, I suppose -- technically having

23   vacated, it may not have precedent, but --

24           THE COURT:  Well, I guess --

25           MR. GOLDMAN:  -- certainly --

Page 174

1          THE COURT:  -- you know, I looked at -- there were

2     very good lawyers involved in this case, obviously.

3          MR. GOLDMAN:  True.

4          THE COURT:  But they were not the lawyers who were

5     involved in the bankruptcy case.  They were not the lawyers

6     who were telling Judge Lifland, the District Court, and the

7     Circuit Court, in Manville, this is absolutely essential to

8     get our Plan done.  They were lawyers who were looking to

9     protect an insurance company after the fact.

10          And, by the way, in connection with a subsequent

11     settlement where notwithstanding their argument that the

12     order relieved them of liability, insurance companies agreed

13     to pay $500 million more, so you could see why perhaps the

14     Circuit at that point thought that there something more to

15     squeeze here.

16          MR. GOLDMAN:  It doesn't appear that way.  But I

17     still think for purposes of analysis, it's still good law

18     for determining whether there is subject matter jurisdiction

19     for these type of released, irrespective of the fact that no

20     threat needed to be -- or was pulled --

21          THE COURT:  Well, it's odd though because --

22          MR. GOLDMAN:  -- to unravel the fabric.

23          THE COURT:  -- they didn't say that they were

24     reversing their earlier case law.

25          But anyway, I -- look, there's only -- there's

Page 175

1    only so much someone can say on these cases.  And certainly,

2    the Osus case -- and it relies heavily on Celotex, of

3    course, the Supreme Court case, as far as with the breadth

4    of jurisdiction over third-party disputes.

5            MR. GOLDMAN:  I would just make the point, Your

6    Honor, then in assessing the indemnity obligation, that you

7    do need to take into account to some degree the probability

8    that indemnity would be upheld.  And I just think there is

9    just too much on the record here of findings that would --

10   will take it against a finding of good faith.

11           THE COURT:  Well, I'm not, you know, again, the

12   record here is in the context of a request to approve a

13   settlement, not a trial on the merits.  But having said

14   that, the settlement here is with the entire Sackler family,

15   some of whom, many of who -- I think the majority of whom

16   had no role with these Debtors other than being a

17   shareholder.

18           So, it's hard to, you know -- and as far as the

19   others, we heard from three different Board member -- four

20   different Board members, and two who were at some level,

21   executives.  They're being sued, I think, those people, for

22   every claim throughout the relevant period, which I think is

23   after 2007.  And it's fairly clear from the testimony that

24   while they may have been informed of marketing efforts, and

25   in fact, some of them may have been pushing for greater

Page 176

1      sales, there is still a callable issue as to whether they're

2      liable for all of those claims.

3              MR. GOLDMAN:  It didn't come as any surprise to me

4      that they were proclaiming their innocence, and --

5              THE COURT:  I -- I understand -- I understand.

6      And I -- and one is skeptical, obviously, about this.  I

7      didn't use the word "pushing" lightly.  But, you know, it's

8      -- we certainly didn't have any Perry Mason moments, let's

9      put it that way.

10             MR. GOLDMAN:  Well, acknowledge, Your Honor.  But

11     I would say that the states were under a substantial

12     disability, having been had their actions stayed for the

13     entire duration of the case, and really being forced to try

14     -- not effectively try or -- the claims that were against

15     the Sackler on this expedited track.

16             THE COURT:  Well, they had --

17             MR. GOLDMAN:  So --

18             THE COURT:  -- they had approximately 10 million

19     documents with a Creditors' Committee and an Ad Hoc group of

20     Non-Consenting States combing them for any signs of active

21     management.

22             If, for example, I was shown a document about one

23     ride with a salesperson, you would think that if that was

24     unearthed and there were more then the others would be too

25     in those 10-millions of documents.

Page 177

1              So, I appreciate that, again, this was in the

2      context of a trial of the merits of a settlement instead of

3      the underlying issues and I have no brief for the Sacklers

4      nor do I believe any of the proponents of the Plan.  But I

5      think even if one is to do some analysis of the validity of

6      an indemnification claim, it's hard to see that there

7      wouldn't be some effect, some conceivable effect on an asset

8      of the estate.

9              MR. GOLDMAN:  I'm -- I would just make a point in

10     that regard, Your Honor, that it's hard to believe that

11     after being under investigation from the United States

12     Department of Justice since June of 2016, that the DOJ would

13     come up with a document like Addendum A to the Sackler

14     Settlement Agreement, which is the JX-2096.  With the level

15     of detail that is in there implicating the named players,

16     after four years of investigation I think it's hard to

17     believe that they were not well supported and then weren't

18     proceeded by a thorough investigation.

19             THE COURT:  Well, again --

20             MR. GOLDMAN:  I'm saying, it's not --

21             THE COURT:  -- I heard -- I heard the direct

22     examination on those documents, and I'll push back a little

23     bit in the level of detail.  There are certainly a number of

24     allegations, but a lot is left for the imagination.  And I'm

25     -- it is obviously very conceivable to me that there is

Page 178

1    substantial potential liability here.  I'm just -- I just,

2    on this record, it's hard to see that there's no conceivable

3    effect on the estate based on that potential.

4            MR. GOLDMAN:  Well, I'll also add the point that -

5    - and this references the guilty plea in 2020, which covers

6    the conduct from -- Purdue's conduct from May 2007 to March

7    2017.

8            THE COURT:  Right.

9            MR. GOLDMAN:  Some rather serious allegations

10   there about ceasing detailing prescribers that they knew

11   were not prescribing correctly, and for medically and

12   necessary reasons, and the kickbacks in the Practice Fusion.

13           THE COURT:  I agree.

14           MR. GOLDMAN:  Right.

15           THE COURT:  Although, I also note that there was -

16   - although there were four Sacklers examined, I don't think

17   any of them was asked about Practice Fusion.  Maybe one was,

18   who said, I didn't -- I never heard of Practice Fusion.  So,

19   look, I think -- I think we've probably said enough on this

20   one.

21           I want to be clear.  I think there is substantial

22   risk that the Sacklers, or some of them, would be liable for

23   huge amounts of money, no question, both to the Debtors and

24   to third parties.  The question is where you draw the line

25   given the risks on the other side of not just the merits,

Page 179

1    but maybe even more importantly the effect on who gets what

2    under -- from them, the allocation issues, the abatement

3    issues that were discussed, and collectability.

4              MR. GOLDMAN:  Your Honor, I don't mean to take

5    more than my allocated time.  Can I --

6              THE COURT:  That's fine.  I --

7              MR. GOLDMAN:  -- make a --

8              THE COURT:  -- I'm prolonging it, so you're not to

9    blame.

10             MR. GOLDMAN:  I just want to make a quick few

11   points about the Kirwan decision.  And, you know, I --

12   what's notable about Manville III is that it did not hold as

13   did Kirwan.  That's simply because it challenged third-party

14   release position as part of a confirmed plan.  The

15   Bankruptcy Court therefore had core jurisdiction.

16             I think they were asserting related to

17   jurisdiction there, and if the fact that that particular

18   release was in the plan, you would think that if the

19   reasoning in Kirwan, is thought to be correct, they would

20   have just said, well, its core was in the plan.  That's not

21   what Manville III held.

22             THE COURT:  But no one argued that because it --

23   they weren't -- they weren't at confirmation.  They were

24   after the fact.  It was a bunch of insurance companies

25   fighting each other and a bunch of plaintiffs' lawyers.  It

Page 180

1    was not --

2            MR. GOLDMAN:  But even so, after the fact, they

3    certainly could have argued there was core jurisdiction

4    because it was part of the Plan.

5            THE COURT:  They didn't need to.  They just needed

6    -- well, the whole thing was academic because they -- they

7    missed, because no one briefed it to them perhaps, that the

8    key point, which the Supreme Court picked up on, which is

9    the jurisdictional argument had decided 10 years before, or

10   20 years before by Judge Lifland's order.

11           MR. GOLDMAN:  Well, I would just make the point

12   that the determination of whether something is core, really

13   should depend on whether it happens to be inserted in the

14   plan.  It's just too convenient.  And I understand that the

15   Kirwan decision's response to that is that it has to be

16   sufficiently related to the issues before the court, that's

17   what the response was to that --

18           THE COURT:  Right.

19           MR. GOLDMAN:  -- argument.  But if that's the

20   case, every third-party release of an officer or director

21   could be found could be -- could be related to the issues --

22           THE COURT:  Well, not necessarily.  I mean, those

23   types of release may well be abused, no doubt.  But I -- you

24   know, the Third Circuit dealt with this from Judge

25   Silverstein up to the other circuit in Millennium, same

Page 181

1     point as CareOne.

2          MR. GOLDMAN:  I understand and I still don't

3     disagree -- still don't agree with the decision --

4          THE COURT:  Okay.

5          MR. GOLDMAN:  -- as it's, you know, simply form

6     over substance really when they say, if it's put in a plan,

7     it must be poor, and the third-party releases really don't

8     address the merits of the claims, but effectively cancel

9     them in furtherance of the reorganization.

10          THE COURT:  Except that --

11          MR. GOLDMAN:  And whether the claims --

12          THE COURT:  -- again, the Third Circuit standard

13    includes fairness and whether you agree with Judge Garrity's

14    interpretation of 1129(a)(7) as applied here in Dietech or

15    not, that is at least a fairness element, a fairness

16    analysis.

17          And again, you know, there is a difference if it's

18    in a plan.  You have the voting.  You see how people voted,

19    you see whether it's, you know, just barely accepted or

20    overwhelmingly accepted, you have it in the context of a

21    confirmation hearing with, in this case, six days of

22    evidence being presented and, you know, approximately --

23    well, a little under 40 witnesses.  I mean, it's -- there is

24    -- there is -- I think there is a difference by doing it

25    through a plan, including the jurisdictional hook, which is

Page 182

1    1123 and 1141.

2            This is not just a property of the estate issue.

3    You have -- you have Congress providing for -- the

4    proponents would argue, extraordinarily powerful tools in

5    the confirmation context in Sections 1123 and 1141, that 105

6    would be in assistance of.

7            MR. GOLDMAN:  Well, the final point I'll make on

8    this, Your Honor, and I understand you may have a different

9    view on this.  But, I mean, whether the claims are cancelled

10   as part of a plan or are adjudicated on the merits, the

11   result is the same from the perspective of the party who is

12   being forced to give up the release.  They're claims are

13   gone, they can't prosecute them anymore, and their claims,

14   although they might be channeled into a trust, are severely

15   limited by what it is put into that pot.  And the balance of

16   their claim is extinguished.

17           So, to me it is form over substance to join up a

18   dichotomy, but I understand the Third Circuit and Judge

19   McMahon see it differently.

20           THE COURT:  Okay.  And frankly, I think the

21   Circuit Courts generally see it differently.  At this point,

22   at least in the Blixseth case, the Ninth Circuit has said

23   that some types of third-party claims could be eliminated

24   under a Plan.  In Pacific Lumber, Judge Jones actually

25   seemed to say that perhaps in the mass tort context you

Page 183

1    could do that, but not in this sort of general release of

2    the Os and Ds.

3         So, I think at this point, the only Circuit on

4    record, as opposed to several, like, the Seventh, Second,

5    Third, First, Sixth, Eighth, support third-party releases,

6    is the Tenth Circuit.  But they haven't had a case since

7    1990 really on this point.

8         So, I -- look, this is the -- the cases, the

9    courts, the Circuit Courts, that say that these types of

10   releases are proper, and therefore, I think, supported

11   jurisdictionally, do so requiring the bankruptcy court to

12   take a very exacting hard look at all the facts and

13   circumstances.  That's different than the normal settlement

14   where you take a look, and a good look if someone's

15   objecting, but not that type of level of inquiry.

16        But they do say that if it's within those

17   parameters, which of course, appellate courts are free to

18   say, well, no, it really didn't fit within those parameters,

19   but if it does fit within those parameters, that this is

20   authorized.

21        MR. GOLDMAN:  With that, Your Honor, I'll just

22   make one final point in which I haven't addressed yet.  And

23   that -- and that deals with what I view as preemption, and

24   relating to Section 1123, which states, notwithstanding any

25   --

Page 184

1            THE COURT:  Right.

2            MR. GOLDMAN:   -- estate are, but the plan can

3     provide adequate means for its implementation, which the

4     Debtors would argue would include a third-party release.

5     But I think that what that does, is it effectively is

6     preempting the police power claims of the states that we're

7     arguing here for by, you know, effectively eliminating them.

8            And there is case law that I cited in our

9     objection, the PG&E case in the Ninth Circuit and -- as well

10    as the Urban Tanner decision in the First Circuit, that hold

11    basically that the -- a plan has no right to preempt these

12    type of police power claims.

13           THE COURT:  No.  Except in those cases, what the

14    plan was doing was not channeling a monetary claim to a

15    fund.  What the plan in PG&E was doing was changing the

16    regulatory oversight of the debtor as far as the UC approval

17    of fundamental corporate changes.  They're really a couple

18    different things.  I mean, the Third Circuit's federal Mogul

19    case, I think is pretty impeccable in its analysis of 1123

20    and what can be done under it and what can't be done under.

21    And, of course, that didn't involve something exactly like

22    this either.

23           But clearly, the statute means something, and it's

24    hard to see the logic of applying PG&E to channeling money.

25    In fact, PG&E itself said, 1123 applies to only financial

Page 185

1    matters.  Well, I think nothing's really more financial than

2    wanting to get more than the agreed allocation for each

3    state; that's money.

4         MR. GOLDMAN:  I had viewed that -- and I know what

5    Your Honor's referring to, the holding that it -- I had

6    viewed that to be directly to the notwithstanding state law,

7    applicable state law.  I had viewed the court to meant that

8    the state law they were talking about, being notwithstanding

9    to, was financial related.

10        THE COURT:  Well --

11        MR. GOLDMAN:  So -- but that's the way I took --

12        THE COURT:  -- to me, I mean, you don't -- you

13   don't need -- you know, that's too narrow a description

14   because then, you know, Ohio v. Kovacs doesn't matter.

15   Right?  I mean, you -- the statute to say it, instead of the

16   fact that it's a discharge anyway.  I mean, again, state law

17   claims for money are discharged in corporate bankruptcies.

18   So, I -- it has to -- it has to be broader than just getting

19   rid of a claim.

20        But that's just my take on it.  There's no holding

21   exactly on point; I understand that.

22        MR. GOLDMAN:  Okay.  Well, with that, Your Honor,

23   I will yield to my colleague to finish up on the Metromedia

24   factors.

25        THE COURT:  Okay.

Page 186

1          MR. GOLDMAN:  And thank you for your time, Your

2     Honor.

3          THE COURT:  Well, on the -- on Iridium I thought,

4     but maybe not.  Maybe I'm missing --

5          MR. GOLDMAN:  Okay.

6          THE COURT:  Anyway, Mr. Gold?

7          MR. GOLDMAN:  Yes.  Thanks, Your Honor.

8          THE COURT:  Okay.

9          MR. GOLD:  Thank you, Your Honor.  Matthew Gold,

10    Kleinberg Kaplan Wolff & Cohen, representing the states of

11    Washington, Oregon, and the District of Columbia.

12          And I'll just say it again that we have

13    coordinated with the attorneys' generals' offices of

14    Connecticut, Delaware, Rhode Island, and Vermont in order to

15    provide a unified presentation to the Court.

16          The parties were concerned because of some

17    comments the Court had made in the context of joinders, that

18    somehow their cooperating with us could be held against

19    them.  But -- and I am confident that that is not how the

20    Court sees it.

21          THE COURT:  No.  The only issue that I was

22    addressing is that if someone doesn't file their own

23    objection and just files a joinder, if the party to whose

24    objection they joined settles or withdraws their objection,

25    the joining party has nothing, and that's all, and nothing

Page 187

1    more than that.

2            MR. GOLD:  Thank you, Your Honor.  And I guess I

3    should have started just to make sure that you can hear me

4    okay, and that I'm --

5            THE COURT:  I can, but when you -- when you rock

6    back, I can't.  So, if you could -- I hate to say it, if you

7    could stay at a rigid position, or at least closer to the

8    microphone, that would be good.

9            MR. GOLD:  I will try to stay this way, Your

10   Honor.  Thank you.

11           THE COURT:  All right.

12           MR. GOLD:  Okay.  Your Honor, we urge you not to

13   make the historic mistake of confirming this Plan.  The Plan

14   contains fatal flaws, will be reversed on appeal.  The pain

15   for all the people who are hoping for benefits under the

16   Plan will be far, far worse if the Plan is confirmed and

17   then reversed.

18           This Plan is like a huge rocket ship.  Many people

19   have worked long and hard to put it together, but it is

20   clear upon inspection that the engineer's plans contain

21   terrible flaws, in this case, the non-consensual third-party

22   releases in favor of the Sacklers, imposed upon sovereign

23   states.

24           The Debtors are saying, we worked so hard to put

25   this rocket ship together, so we can't stop now.  We'll keep

Page 188

1    our fingers crossed that nothing bad happens after liftoff.

2    But it clear that the wiser course of action is to keep the

3    rocket on the ground and work hard to correct the flaws now.

4    The parties need to focus on their joint goal of getting

5    help to victims, but without the mistaken premise that

6    sovereign states can be compelled to grant releases of

7    police power actions against the Sacklers and against their

8    will.

9            Now, Your Honor, I'm going to give you a brief

10   road map into what our argument is going to be about.  We

11   have preserved in our papers for appeal the argument that

12   Metromedia was wrongly decided, and the United States

13   Trustee discussed that.  But we will not repeat that for

14   Your Honor.  We understand that Your Honor was bound by

15   Metromedia.

16           The focus of our argument today is that the

17   proposed injunction, non-consensual third-party release are

18   improper under Metromedia.  The impropriety is based both on

19   the nature of what is being enjoined, states exercising

20   police powers, which I will address briefly -- shortly, and

21   the beneficiaries of the injunction, the Sackler family, the

22   legal standards we think are relatively -- should be

23   uncontroverted here.

24           Metromedia states that it is ultimately a matter

25   of facts and circumstances, as the Debtors themselves

Page 189

1   pointed out.  But in addition, it is an elementary and

2   ancient element of our laws that equitable relief, including

3   the injunctions that are contained in the Plan, do not go to

4   those who have unclean hands.  The clean hands doctrine

5   involves bad acts by the beneficiaries of the proposed

6   injunction that relate to the relief sought, and that is

7   exactly what our evidence does.  It shows bad acts by the

8   Sacklers that relate to the injunction being sought.

9           Now, one other housekeeping matter I need to clear

10  up, Your Honor.  It's not clear to me exactly why anyone had

11  the impression, except for the way that the Debtors

12  structured their chart, and I would be addressing Rule

13  9019/TMT Trailer/Iridium.

14          First of all, as Your Honor pointed out, the

15  standards under Rule 9019 and the standards for non-

16  consensual third-party releases are very different things.

17  Rule 9019 covers settlements of estate causes of action.  It

18  has nothing to do with non-consensual third-party releases.

19  Whether the Estate has satisfied its burden under Rule 9019,

20  Iridium or TMT Trailer is irrelevant to direct claims of

21  third-parties against non-Debtors.

22          In any event, we have nothing to add to what was

23  in our papers regarding Rule 9019, Iridium or TMT Trailer

24  with respect to the settlement of the Estate causes of

25  action and I will be focusing my argument with respect to

Page 190

1    non-consensual third-party releases and Metromedia.

2              I will -- I think it is important to note about

3    Metromedia that like all the decisions, it stuck to the

4    facts in the case.  The Debtors are trying to read into the

5    case more than that.  The main takeaway of the case is that

6    releases are subject to abuse and should be used rarely.

7    That holding is being mocked by the reported use here.

8              I will also note that the decision surveyed

9    earlier decisions dealing with the topic and that is why,

10   because no earlier decisions dealt with the circumstances

11   here, that there's nothing in Metromedia that deals with our

12   particular circumstances.

13             The Debtors have made the astonishing argument

14   that the central holding in Metromedia is that releases are

15   appropriate as long as they are important to the Debtor's

16   restructuring.  I submit that the Debtors got it backwards.

17   Metromedia held that releases are inappropriate unless they

18   are important to the Debtor's restructure.  In other words,

19   importance to restructuring is necessary but not sufficient.

20             Debtors also argue that payments to be made by the

21   Sacklers are substantial.  Their argument is basically, it's

22   billions of dollars.  Of course it is substantial, but it is

23   easy to lose sight of the fact that claims in this case are

24   in the trillions of dollars.  In other words, the Debtors,

25   under the stewardship of the Sacklers caused trillions of

Page 191

1    dollars of harm to the people of the states of the United

2    States.  As a result, the Sacklers are facing exposure to

3    those states that measures in the trillions of dollars.

4    Getting rid of trillions of dollars of exposure through the

5    payment of a billion dollars is a pretty sweet deal.

6              In short, there are a lot of cases --

7              THE COURT:  Can we explore that?

8              MR. GOLD:  Certainly, Your Honor.

9              THE COURT:  That sounds like you're accepting that

10   they would be liable for the trillions of dollars and that

11   more than, or materially more than the settlement sum would

12   be collected.  What is your basis for saying that?

13             MR. GOLD:  Your Honor, I am not accepting that.  I

14   carefully used the word "exposure" --

15             THE COURT:  Okay.

16             MR. GOLD:  -- because there is the potential for

17   that.  We have not asked this Court -- I think all the

18   parties have agreed that it is not for this Court to

19   actually make findings regarding the exact merits of such

20   actions and --

21             THE COURT:  But I'm supposed to consider the risks

22   and the rewards of both alternatives: the alternative of the

23   plan versus the alternative where I deny confirmation of the

24   plan.

25             MR. GOLD:  Well, Your Honor, your -- I think that

Page 192

1    is taken into account in our argument.  I'm not sure exactly

2    what you're asking me here.

3              THE COURT:  I think, again, if you're going to get

4    to that, fine.  But I just don't accept the premise that

5    because they face substantial exposure, they're not paying

6    enough.

7              MR. GOLD:  Well, no, that's not the argument that

8    I'm making, Your Honor.  I'm simply marking the argument

9    that it's a very good deal from their perspective.  And that

10   the --

11             THE COURT:  That's the same point.  Not paying

12   enough means it's a good deal.  It's the same point.

13             MR. GOLD:  That could be.  I'm simply comparing

14   the relative sizes of the two, Your Honor.  But the Debtors

15   have certainly not shown any case where a payment that was

16   so trifling in connection with the claims in the case was

17   deemed substantial.

18             Debtors also argue that we are --

19             THE COURT:  But, again, trifling -- you can define

20   trifling in a couple of different ways, but ultimately, it

21   would seem to me that trifling means, if it really is

22   trifling, that it is not sufficient in terms of the actual

23   legal risk faced by both sides.

24             MR. GOLD:  Well, first, Your Honor, we do not

25   believe that it is for this Court to make an evaluation of

Page 193

1   the risks faced by the sovereign states in determining

2   whether or not to accept a settlement or to prosecute claims

3   against the Sacklers.

4           THE COURT:  But you were just telling me under

5   Metromedia this is insufficient.  So how am I supposed to

6   determine sufficiency unless I do that?

7           MR. GOLD:  What I am saying --

8           THE COURT:  There are 38 sovereign states that say

9   it is sufficient.  So I think I need to ultimately make that

10  determination as to whether they're right or you're right if

11  I'm going to be applying the Metromedia factors.  I

12  understood Mr. Goldman that I shouldn't even get there.  I

13  got that point.  But now we're at applying the factors and

14  one of them is a materially sufficient contribution.  So

15  don't I have to inquire as to whether it's sufficient or not

16  and just the fact that a state says it isn't shouldn't, end

17  the day there if I'm applying the Metromedia Factors?  And

18  logically, because 38 states and thousands of governmental

19  entities say it is sufficient.

20          MR. GOLD: Your Honor, I think we're talking about

21  two different things here.

22          THE COURT:  Okay.

23          MR. GOLD:  The fact that -- we do not dispute that

24  reasonable minds can differ about whether or not the deal

25  that is proposed by the Debtors can be accepted or not be

Page 194

1    accepted and the fact that 38 states have decided that they

2    wish to take this deal does not, in our view, mean that the

3    Court can determine that they are being more reasonable than

4    states that are not and therefore, their view should be

5    imposed on them.

6              However, with respect to the substantiality prong,

7    if you will, under Metromedia, we think that that can be

8    measured in a couple different ways.  What I was addressing

9    right here was the matter which I think is fairly undisputed

10   before the Court of comparing the amount of money that is

11   being paid with the amounts of claims in the case.  The

12   amount of money that's being paid here is a tenth of a cent

13   on payments to Unsecured Creditors in this case.  And what I

14   am simply saying is that none of the cases involving an

15   application of the substantiality decision under Metromedia

16   or otherwise have found that a payment was substantial when

17   it was such a tiny percentage of the amounts of claims in

18   the case.

19             THE COURT:  Do you have any cases that talk about

20   a percentage?  I know that there is language in Metromedia

21   and in other cases that talk about paying all or

22   substantially all of the claims.  I'm aware of that

23   language, but I'm also aware of decisions that support a

24   payment and injunction where there is a substantial payment

25   or contribution of consideration.  So I'm not aware of --

1    other than that language that I alluded to -- there being

2    any analysis of a percentage versus the claims.

3          MR. GOLD:  Your Honor, I agree with what you have

4    stated.  Some cases, yes, have talked about substantial

5    payment of claims, which is certainly not the case there.

6    And other cases, although they did not expressly go through

7    that analysis, we tried to look at what was happening in

8    those cases and we have not found a single case where there

9    was such a disparity between the return to Creditors and the

10   amounts being paid.

11         THE COURT:  Nor I expect have you found an amount

12   as large as 4.325 billion dollars either.

13         MR. GOLD:  But also not any case where the number

14   of claims were in the trillions, Your Honor.  We believe

15   those two are inextricably linked.

16         THE COURT:  Well, not necessarily.

17         MR. GOLD:  Okay.  Well, that is at least our

18   argument, Your Honor.

19         THE COURT:  Okay.

20         MR. GOLD:  The Debtors argue that we are inventing

21   a police powers exception to non-consensual third-party

22   release juris prudence.  It is not entirely a blank slate.

23         First of all, we are not arguing for an exception

24   to Metromedia or carve out from Metromedia.  We are

25   suggesting that Metromedia properly applied would result in

Page 196

1    no third-party releases being imposed on sovereign states,

2    not that it's an exception to the case.

3            But we also note that there are strong hints, if

4    you will, from related context regarding the importance of

5    claims asserted by governmental entities.

6            THE COURT:  Can I -- I think I'm going to do this

7    and I apologize, but your colleague, Mr. Goldman, really did

8    cover it.  We spent a good 45 minutes on this police power

9    argument.  You've also briefed it.  I just don't know if it

10   really makes sense to spend more time on it.

11           MR. GOLD:  Well, Your Honor, I will try to make

12   just a few brief points then even though -- I apologize if I

13   am running over on what Mr. Goldman said.

14           THE COURT:  Okay.

15           MR. GOLD:  I will fist note that Mr. Kaminetzky

16   tried to distinguish the First Alliance case -- I don't

17   believe Mr. Goldman addressed that -- because the

18   governmental entities would not enforce judgments against

19   the Debtors.  That is not the issue here.  Here we are

20   talking proceeding against non-Debtors.

21           I will also note caselaw in the Southern District

22   in Ion Media, 419 Bankruptcy Reporter 585, the court

23   approved third-party releases after governmental claims have

24   been carved out.  And I will also state that the Debtor has

25   argued that, in connection with this, that we are trying to

Page 197

1    create an exception here, we would just note -- and I don't

2    think that I need to cite them -- that there several

3    provisions in the Bankruptcy Code as we've noted the rule

4    statute, the automatic stay provision, that creates special

5    rules protecting claims asserted by governmental entities.

6              But the circumstances though --

7              THE COURT:  Actually, those rules don't protect

8    against the constraints on paying those claims.

9              MR. GOLD:  All I'm saying, Your Honor, is they

10   demonstrate that Congress had in mind that claims and police

11   power actions could be treated differently from other claims

12   in areas where Congress had specifically provided a power in

13   the first place.  Where Congress provided that there was an

14   automatic stay, they provided that there would be exceptions

15   for police power actions.  Where Congress provided a removal

16   statute -- excuse me, Your Honor.

17             THE COURT:  Yes, they did it specifically and

18   narrowly the way they actually laid it out.

19             MR. GOLD:  But only in connection with the power

20   that they had first granted.  Likewise with removal.  They

21   had a removal power.  They provided an exception.  Congress

22   has not provided for non-consensual third-party releases and

23   so it has not had an opportunity to carve out an exception

24   that demonstrates the special treatment that such claims

25   should be afforded.

1          THE COURT:  Well, they've certainly known about it

2     since the enactment of 524(g).

3          MR. GOLD:  They've known about it but they've not

4     added an expressed provision that provides any breadth to

5     it, so we are left with a statutory void.

6          THE COURT:  They actually did acknowledge the

7     validity of the pre-524(g) injunctions and then Legislature

8     said this should be worked out in the caselaw, which has

9     happened.  If they want to act, they will act in the future

10    which is before Congress this very day so I'm not sure how

11    much one can take away from their lack of acting other than

12    that they've been aware of these issues for decades.

13         MR. GOLD:  I agree with Your Honor and clearly, we

14    are not dealing here with previous injunctions of the sort

15    that are referred to in 524(h).  I simply note that Congress

16    should not be faulted for not crafting an exception to a

17    rule that they have yet to legislate on specifically.

18         Now the Debtors also argue that this case is not

19    about police powers, but instead about money and point out

20    that criminal conduct is being carved out of the releases

21    that are being granted.  With all respect, this shows a

22    fundamental misunderstanding of police powers.

23         Police powers go well beyond the criminal law and

24    the carve out of criminal violations, though laudable, is

25    completely inadequate.  The Estate claims that we are

Page 199

1   addressing here are brought in the State's parens patriae

2   capacity.  Now I want to briefly address parens patriae.

3          THE COURT:  I'm sorry.  You guys have done this in

4   your briefs.  I think you should tell me why this isn't

5   about money and leave it at that.  Isn't that all this is

6   about?

7          MR. GOLD:  That's why --

8          THE COURT:  I mean the point that I think both you

9   and either Mr. Goldman or Mr. O'Neill made is if there'd be

10  a little more money, we might be on board, or a lot more

11  money.  There's no injunctive relief that you're seeking

12  here.  The allocation has been agreed.  In fact, Mr. O'Neill

13  touted it as the best thing since sliced bread, almost a

14  miracle.  So we're just talking about money.

15         MR. GOLD:  With respect, Your Honor, we are not

16  talking about money until the State agrees to take money.

17  We are talking about a regulatory -- and if the State

18  Attorney General decides --

19         THE COURT:  What other relief would be sought?  If

20  the plan were confirmed and your clients were carved out,

21  what other relief would be sought other than money?

22         MR. GOLD:  Your Honor, our clients are very

23  concerned about the public perception and the precedent that

24  this case sets.  They are very concerned that this case

25  establishes the situation which I could call the perfect

1   crime.  Now I have to backtrack because I'm not literally

2   talking about accusations of criminal wrongdoing against the

3   Sacklers.  That's just the phrase that describes what I'm

4   thinking of.

5          What I'm talking about here is the situation where

6   a family in control of a company that is, itself, admittedly

7   engaged in criminal activity, takes the proceeds of that

8   activity, then dangles those proceeds in order to obtain a

9   full release from the consequences of that action or maybe

10  not a full release, maybe just a very, very huge release.

11  The point is that our clients are very concerned about that

12  precedent that is being set and recognize that the actions

13  that are being brought here have a -- the actions that are

14  being not brought here, the actions that are proposed to be

15  stopped in part have the effect of disincentivizing

16  wrongdoing on this scale.  And by --

17          THE COURT:  So, how do they make -- I've already

18  asked Mr. Goldman.  They're going to keep the tax money

19  though, right?

20          MR. GOLD: Your Honor, honestly, I -- if a request

21  is made for tax money to be returned -- this is a context

22  that I'm not particularly -- that I don't think has been

23  addressed in any caselaw in this context and is honestly an

24  issue that has yet to be addressed, but I've heard of a case

25  that faulted a state for accepting tax money under what, at

Page 201

1    the time, it thought was a legitimate tax payment.

2              THE COURT:  And Connecticut is not going to see

3    the return of charitable contributions to various colleges

4    in Connecticut and other charities?  And let's just move to

5    a different topic than that, which is -- does this mean that

6    the State of Connecticut won't, in the future, settle with

7    the McKinsey's and J&Js of the world?

8              MR. GOLD:  Your Honor, just to be clear, I

9    represent the State of Washington, not the State of

10   Connecticut.

11             THE COURT:  Okay.  The State of Washington won't

12   settle with the J&Js and McKinsey's of the world?

13             MR. GOLD:  They may, Your Honor, and, in fact,

14   they have reached a settlement with the McKinsey's, but that

15   was their choice to do so.  We maintain that there is a huge

16   and significant difference for the State of Washington to

17   reach a settlement that is its choice or to have this Court

18   tell the State that that is the choice it has make.

19             THE COURT:  All right, but that's really what it

20   comes down to, right?  That's really, ultimately, all of

21   this police power argument in this context boils down to,

22   which is the states that are objecting want to have the

23   ability to decide whether the settlement money should be

24   paid or not, right?  And I guess what you're telling me is

25   one of two things: either there is no amount of money that

Page 202

1    would be sufficient or there just hasn't been enough so far.

2    One of those two.

3              MR. GOLD:  Your Honor, I am not telling you either

4    of those.  I am just telling you that the Attorney General

5    of the State of Washington and likely the other Attorneys

6    General who are part of the Objecting States, have weighed

7    the package.  It's a complex package.  It has what I'll call

8    apples and oranges because there's several different

9    components to it.  Money is a part of it.  Money is not the

10   only part of it.  And they have weighed those in determining

11   whether or not the settlement has the right elements in

12   that.  THE COURT:  Well, I --

13             MR. GOLD:  Even if the settlement is brought

14   forward here --

15             THE COURT:  -- haven't heard anything other than

16   -- I'm sorry, Mr. Gold.  I haven't heard anything other than

17   their dissatisfaction with the money.  I don't -- I haven't

18   heard anything else about the plan being objectionable.

19             MR. GOLD:  Your Honor, honestly, to begin with, I

20   think properly so that Your Honor has not been privy to all

21   of the discussions that have gone on --

22             THE COURT:  I know, but --

23             MR. GOLD:  -- in mediation --

24             THE COURT:  -- as far as the --

25             MR. GOLD:  -- that discuss the --

Page 203

1              THE COURT:  -- settlement is concerned, I haven't

2       heard any aspect.  I mean, a major part of the planned

3       proponent support for this settlement is based upon their

4       argument that it is not just one settlement, but it's an

5       integrated multi-settlement settlement, and you can't pull

6       out the Sackler piece without destroying the rest of it.

7       And if there's something about the Sackler piece beyond the

8       amount of money being paid that is affecting the objecting

9       states' determination, I should know about it because so far

10      I'm thinking that this is just about money.  Now, money's

11      important.

12              MR. GOLD:  Your Honor, I --

13              THE COURT:  Believe me, and I --

14              MR. GOLD:  -- I think that --

15              THE COURT:  -- understand your argument about each

16      state and each municipality should have the right to say I'd

17      need to be carved out.  And I understand that issue.  We

18      don't need to cover it anymore, but if there is something

19      other than money here that the settlement is deficient on, I

20      should know about it.

21              MR. GOLD:  Well, Your Honor, I think that the

22      answer to that question I can start with a few easy items.

23      For one thing, as you've heard repeatedly, the settlement

24      also contains provisions carefully negotiated regarding

25      making public certain documents and not other documents in a

Page 204

1    document repository.

2              THE COURT:  Oh, so, okay.  We don't have any --

3              MR. GOLD:  And --

4              THE COURT:  -- document repository at all, and

5    we'll waive the attorney-client privilege.  We'll have the

6    Sacklers waive the attorney-client privilege, which I'm sure

7    the AGs would like to have established as a precedent for

8    their privilege in the future.

9              MR. GOLD:  Your Honor, we ask the --

10             THE COURT:  Let's be realistic, Mr. Gold (sic),

11   all right?

12             MR. GOLD:  Yes.

13             THE COURT:  So I guess what you're saying is you

14   want to have a trial without a document depository, right?

15   Or repository.  You want to have a --

16             MR. GOLD:  Your Honor --

17             THE COURT:  -- full trial on the merits.

18             MR. GOLD:  I -- I've not said that, Your Honor.

19             THE COURT:  Okay.

20             MR. GOLD:  I will try to restate what I am saying

21   here.

22             THE COURT:  All right.

23             MR. GOLD:  First of all, I just -- let me mention

24   by comparison.  Mr. Huebner and I -- this may seem slightly

25   roundabout, but I am honestly answering Your Honor's

Page 205

1    question.  Mr. Huebner put up a very fine chart during his

2    presentation earlier where he showed a whole bunch of other

3    cases that -- dealing with opioid liability.  And his point

4    was that, in those cases, there were complete releases that

5    were granted of the scope like what was being done here.

6         But he left out the most compelling parts of his

7    chart.  First of all, in those cases, there were no non-

8    consensual third-party releases imposed.  The cases got

9    resolved without having to have non-consensual third-party

10   releases.  And those cases did not devolve into the

11   dystopian Hobbesian nightmare that the Debtor sketched out

12   as the only alternative to the plan.

13        In fact, I would submit that they demonstrate the

14   exact opposite, that the States Attorneys General are not

15   wild, crazy actors, but extremely responsible public

16   servants who, while trying to obtain justice and payments

17   for their states, are mindful of trying to avoid chaotic

18   situations and are very capable of negotiating with each

19   other to keep things from devolving into chaos.

20        We submit that if this case does not proceed from

21   the mistaken premise that non-consensual third party

22   releases could be imposed on the states that it is likely

23   that responsible heads would come up with a solution that

24   protected the public interest and achieved some kind of

25   justice.  Exactly what that would be would have to be

Page 206

1   thrashed out.

2           But the experience in these other cases suggests

3   that the dismissive comments posed to Washington to say that

4   you just want chaos, you just want to sue, you want

5   everything to go away is far from the truth in that while

6   what happens in one case doesn't necessarily prove what's

7   happening in another case, it certainly gives strong reason

8   to believe that cooler heads will prevail and that the

9   parties, once they understand what the bounds of their

10  jurisdiction and what they can get are, can reach a

11  resolution.

12          Very compelling evidence was presented in the case

13  by the Sacklers about how much they want the resolution,

14  about how important it is that they have a resolution, that

15  they need and want global finality.  And they are, in fact,

16  paying $4.25 billion, albeit over ten years, in order to

17  obtain that, which suggests that they -- that that is

18  important to them too.  So we submit that it is -- even

19  though no one can make predictions, especially about the

20  future, the -- that the likelihood here is that there are

21  plenty of different possible outcomes, and that it is a

22  mistake to assume that, while chaos would come from having

23  parties be able to negotiate from the premise that it is up

24  to them when to grant a release rather than up to the Court

25  through bankruptcy power.

1           THE COURT:  Okay.  Now, I did direct a second

2    mediation on this issue, and I think the Sacklers, because I

3    know they're well-represented, would've understood that that

4    was a pretty good indication.  I didn't believe that they

5    had dug deep enough.  Are you saying I should just deny

6    confirmation and just trust that, as these cases proceeded,

7    there would be some organization, including as to reviving

8    all of the allocation provisions in the plan as between

9    private and public, and within the public, and as far as

10   abatement is concerned?  Or are you saying something else?

11          MR. GOLD:  Well, Your Honor, I'm saying something

12   close to that, but not exactly that.  I am saying, first of

13   all, this would be far from the first case where the parties

14   have come together to try to propose a plan have learned

15   that there was some problem or legal problem with the plan,

16   had been sent back to the drawing board by the Court because

17   they have to work out that problem.  And then after a period

18   of time, negotiations produced a new plan.

19          And the -- and you scarcely need me to list the

20   various tools that judges use in order to reach that point

21   between mediations, consideration about whether the

22   effective theory, whether other plans could be permitted to

23   be filed, and so forth.  I'm just saying that we've seen

24   this process in many cases, and that there is ample scope if

25   the parties are proceeding under a realistic assessment of

Page 208

```
 1    what they can achieve, that they will be able to reach a

 2    resolution.

 3            Just by way of an example because it came up in

 4    our testimony, the Sacklers understood, the Debtors

 5    understood that the reach of this Court did not encompass

 6    the claims of certain Canadian creditors.  They understood

 7    based on that premise that they were going to have to allow

 8    the liability and exposure to stay on one side and to

 9    address what was left.  And in all these other cases that

10    are not Perdue, resolutions have been reached where parties

11    have negotiated around the problem that they can't compel

12    all of the states to reach a resolution.  We just submit

13    that that would likely be here.  And it's a shame we agree

14    --

15            THE COURT:  Look, your group --

16            MR. GOLD:  -- that this case has reached this

17    point.

18            THE COURT:  -- can't even agree on how to submit

19    evidence, right?  You had your client's and you had

20    Maryland.  What assurance would I have that the extra time

21    spent here would actually achieve anything given the

22    theories that you are ultimately relying upon, and the

23    apparent inability of your group to act as a unit?

24            MR. GOLD:  Your Honor, I will not contest Your

25    Honor's observation that sometimes dealing with this group
```

Page 209

1    resembles the Seamus herding of cats.  What I will say,

2    though, is that this is far from the only situation that

3    that has occurred.  And again, I simply culled out the facts

4    of so many things that the states have managed to agree on.

5    They've managed to agree on allocations amongst themselves.

6    They've managed to agree on many issues.

7          They have not been able as of yet to reach

8    agreements under all issues.  And that can be frustrating, I

9    understand, but that does -- the fact that it may be

10   painstaking and frustrating does not create a standard under

11   Metro Media where the Court can grant releases of non -- of

12   state claims that it wouldn't otherwise have.

13          THE COURT:  Well, I don't know.  When I've already

14   had two mediations by two of the best mediators in the world

15   on this issue?

16          MR. GOLD:  And Your Honor, progress has been made.

17   The -- I would submit that part of the problem with the

18   mediation process so far is that the parties were proceeding

19   under the premise that they would be able to get -- if this

20   Court would rule that under Metro Media and otherwise that

21   non-consensual third-party releases could be imposed on the

22   states.

23          If the parties had an indication that that was not

24   the case, I think you would see a lot of movement in the

25   litigation because the parties have to reassess.  This is

Page 210

1    true of all mediations.  Parties make their assessment based

2    on where they think the law is going to go.  So that has

3    affected what -- how these mediations have gone.

4            THE COURT:  I'm sorry.  I have not talked to Judge

5    Chapman about her mediation, but I view these issues, I am

6    sure, very much the same because we're guided by precedent.

7    So what you're asking would actually artificially tilt the

8    playing field.  But maybe we should move on.  I think I did

9    have an answer to my question.

10           MR. GOLD:  Okay.  The -- thank you, Your Honor.  I

11   will ask your indulgence for 30 seconds to address parens

12   patriae because I don't believe Mr. Goldman addressed this

13   point specifically.  But because -- and I don't believe it's

14   been properly explained in the Debtor's response.  I believe

15   it evidences a confusion regarding its significance here.

16           The -- I will just say that -- it's an odd Latin

17   phrase that I'm probably mispronouncing.  It's been

18   mentioned in the briefs, but they show so little

19   understanding of the concept that the Debtor's simply argue

20   -- excuse me, but this is not a parens patriae case.

21   Nothing could be further from the truth.  My definition of

22   parens patriae is democracy.  Or to take Abraham Lincoln's

23   definition, government of the people, for the people, by the

24   people.

25           The attorneys general are elected officials.  That

Page 211

1    is government by the people.  Parens patriae is nothing less

2    than government for the people the principle that the state

3    has the right and the obligation to protect its people from

4    harm.  And as exercised by the people's elected officials so

5    that the people can judge them.  The Creditors Committee is

6    constituted to look at the financial interests of creditors.

7    It is not looking at protecting the people of the states

8    from harm.  The Debtor's Special Committee is not looking at

9    that.  The Debtors are not looking at that, and we --

10          THE COURT:  All right.  But Mr. Gold --

11          MR. GOLD:  -- submit that --

12          THE COURT:  -- we've already covered this.  The

13   way the states are protecting people from harm here is by

14   asking for more money.  It's not to stop someone or make

15   someone build a better fence.  It's not to stop someone from

16   polluting.  It's to get more money.  So it is financial.  So

17   let's move on.  I understand parens patriae very well.

18          MR. GOLD:  Thank you, Your Honor.  The -- I will

19   -- there's been a lot of discussion about how difficult a

20   case this is, and that's been mentioned by many parties.  I

21   just want to again say that the attorneys general, including

22   Attorney General Ferguson of Washington -- I've been

23   grappling with this process for a long time, and I hope that

24   the parties grant him the respect of recognizing that the

25   actions of him and the other attorneys general are based on

Page 212

1    a full and serious grappling of what they consider to be the

2    proper response to this.

3           And again, which we say, buck stops with the

4    attorneys general, not with these other parties.  Mr.

5    Huebner revealed what I consider to be a shocking ignorance

6    of how our country is organized.  The municipalities are

7    subsets of the state, but more to the point, Mr. Huebner and

8    Mr. Price had the audacity to ask in argument who supports

9    the attorneys general.

10          My answer is very simple.  Attorney General

11   Ferguson of Washington received 2,226,418 votes in his last

12   election.  That's who supports Attorney General Ferguson,

13   and he will have to face the voters again who can weigh in

14   on whether he has made the proper choice in connection with

15   these releases.  And we again submit that's an issue for him

16   and the voters, and not for this Court.

17          The Debtors argue that giving the Sacklers non-

18   consensual third-party releases produces the best result for

19   creditors.  Now, that's a value judgment that weighs the

20   dollars brought in this case.  It ignores that I've already

21   described as the perfect crime message that can be -- that

22   can also be read in the result of this case.

23          But the key point that I want to emphasize here is

24   that it is easy to produce a better result when one

25   contributes value that one doesn't own.  I will illustrate

Page 213

1    this with a simple analogy.  The Debtors could've improved

2    the plan greatly and produced much more value for Creditors

3    and opioid victims if they included the plan an injunction

4    requiring Bill Gates to contribute several billion dollars

5    to the plan trusts.  Now, the flaw here is obvious.  It is

6    Bill Gates' money.  It is up to him whether to contribute to

7    the plan trusts.

8            My point is that the good that can be done with

9    the money is irrelevant to the question of whether the

10   debtors have the right to compel the contribution, and the

11   same is true here.  All the good that can be done with the

12   money is not relevant.  All the hard work that everyone has

13   done is not relevant.  The results of plan voting is

14   irrelevant.  What is relevant is that the Court cannot and

15   should not grant these releases.

16           THE COURT:  Well --

17           MR. GOLD:  The --

18           THE COURT:  -- I -- that sounds pretty odd.  I

19   don't think your attorney general really means that, right?

20   Ignore the good result because, and the "because" is what?

21   What can be done better?

22           MR. GOLD:  Oh, I'd --

23           THE COURT:  Not what could be done better, right?

24           MR. GOLD:  Well --

25           THE COURT:  Something else?

Page 214

1           MR. GOLD:  Because one of two things has to

2    happen, Your Honor.  Either a -- either an offer can be made

3    with all its components, including money, but not

4    exclusively money, that is satisfactory to the attorney

5    general, or litigation continues until the parties are ready

6    to reach a resolution that is satisfactory.  That's the rule

7    in most litigation.  Happens all the time.

8           Now, I understand that in some contexts it's

9    convenience to jump ahead there and to compel parties to do

10   that, but we submit that this is not an area where the Court

11   has the authority to do that.  And so he -- so in this case,

12   yes, it has to await the elected properly constituted

13   attorney generals deciding that either the -- whatever's

14   offered with all its component are adequate or to continue

15   until a different resolution can be reached.  The --

16          THE COURT:  That's not really a Metro Media

17   argument, though.  That's really Mr. Golden -- Goldman's

18   argument.  So I think we're probably coming to the area of

19   diminishing returns at this point.

20          MR. GOLD:  Okay.  Well, I will -- I have one more

21   legal point to make, Your Honor, and then I'll move onto the

22   next part of my presentation.  The -- Mr. Huebner invokes

23   the tragedy of the commons in his argument, but it's really

24   the same issue.  What would be the commons here?  It seems,

25   to understand his analogy, that the commons has to be the

Page 215

1    Sackler family and its property.

2              THE COURT:  No, that's not --

3              MR. GOLD:  Yes.

4              THE COURT:  -- at all what he's talking about.

5    You guys just aren't listening.  You have hundred and

6    thousands of people who hate the Sacklers who have agreed to

7    this.  It's not for the Sacklers' benefit.  It's because

8    they have made a calculation that they do better, "they" the

9    creditors do better, "they" the victims do better.  They

10   would love to have the Sacklers pay more money.  This is not

11   a plan for the Sacklers.  You just get over that rhetoric,

12   all right?  I agree with you --

13             MR. GOLD:  I'm sorry --

14             THE COURT:  -- and I agree with Mr. Goldman.

15   Reasonable minds can disagree as to what is the best result,

16   but this rhetoric really doesn't help.  And frankly, it just

17   -- it's just not consistent with the record or with the

18   constituents in this case or --

19             MR. GOLD:  And I'm sorry --

20             THE COURT:  -- with my view of it, which is I

21   could care less what the Sacklers want other than the effect

22   of pushing them too far so that you do have a tragedy of the

23   commons.  So actually address the tragedy of the commons

24   instead of just bloviating about a plan being for the

25   Sacklers' benefit.

Page 216

1                    MR. GOLD:  Your Honor, I am sorry if I did not

2       express my thought properly, and I certainly don't wish to

3       upset the Court.  I am simply trying to understand the

4       analogy that when someone refers to the tragedy of the

5       commons, that refers to some common asset that is being used

6       by some parties to the detriment of others.  A lake,

7       perhaps, that some are polluting in so that others cannot

8       use.  I understand the basic concept, and I'm asking myself

9       in this context what is meant by the commons.

10                   What is the commons here that is -- that we are

11      being accused of spoiling for the benefit of others?  What I

12      am suggesting here is that the commons in this context

13      cannot mean the debtors or their estates because we are

14      really not contesting what is happening with the property of

15      the Debtors' estates --

16                   THE COURT:  Wait.

17                   MR. GOLD:  -- and what is being done there.

18                   THE COURT:  But the record is crystal clear that

19      the current plan at least, and the work that the parties

20      spent for over a year in allocating the value of the

21      Debtors' estates wouldn't survive the collapse of the

22      settlement with the Sacklers.

23                   MR. GOLD:  I understand that, Your Honor, and it

24      was carefully constructed that way.  I simply wish to

25      observe that -- and I did not bring the analogy of the

Page 217

1    tragedy of the commons into this.  This was the Debtors'

2    argument.

3              THE COURT:  Right.

4              MR. GOLD:  My only point is that the commons here,

5    if I'm understanding the Debtors' analogy, is the money that

6    the Sacklers are contributing or the assets of the Sacklers

7    in general, that's what is meant by the commons in applying

8    this analogy.  And it is not really the Debtors' property at

9    issue, and that's --

10             THE COURT:  All right.  I guess -- I think they

11   would disagree with you, which is that the commons is the

12   entire set of agreements that the parties have agreed to,

13   not just the Sackler piece of it.

14             MR. GOLD:  Well, that --

15             THE COURT:  And I do understand your point, but

16   we're just coming back to the same point every time, which

17   is that you believe every state needs to agree to this, and

18   perhaps every governmental entity.

19             MR. GOLD:  Well, I'm not arguing --

20             THE COURT:  And that's really what it comes down

21   to --

22             MR. GOLD:  -- with respect to other --

23             THE COURT:  -- because there's really not a whole

24   lot of on-point, directly on-point, precedent on that issue.

25             MR. GOLD:  We agree, Your Honor, and that's why

Page 218

1    I'm now ready to move onto new points.

2            THE COURT:  Okay.

3            MR. GOLD:  The -- which are the factual issues.

4    Pursuant to a stipulation and order that the state's reached

5    with various parties, it's on the docket at, excuse me,

6    number 3601, all of our exhibits have been admitted into

7    evidence without an objection for all purposes.  I just note

8    that we submitted a fair amount of evidence, and the amount

9    of evidence we introduced is very much part of the point.

10            Our argument, as I said before, is that the

11    conduct of the Sacklers weighs tremendously upon whether or

12    not the leases are proper under Metro Media and under

13    general federal law.  And so that when we say that the

14    Sacklers' conduct renders them undeserving of the benefits,

15    it is significant that we are not talking about isolated

16    pieces of evidence.

17            Mr. Huebner made the incredible statement that the

18    objectors have introduced no evidence.  Nothing could be

19    further from the truth, as I've said before.  Now, I'm going

20    to -- now, Your Honor, I'm -- what I am prepared to do, but

21    Your Honor can stop me at any point, is to address the

22    evidence that we put forward, some of which was addressed by

23    Mr. Goldman, and I will not repeat any piece of evidence

24    that he discussed.  But I feel that I am caught between a

25    rock and a hard place here candidly, Your Honor, because --

Page 219

1            THE COURT:  No, I wanted you to get to the

2    evidence about an hour ago.  So please do it, yes.

3            MR. GOLD:  Okay.  I'm sorry.  Okay.  Very good.

4    So the -- I will summarize the evidence that we submitted as

5    first a series of state complaints.  I could give the joint

6    exhibit numbers if necessary.  The Debtor guilty plea and

7    DOJ statement.  The DOJ Sackler settlement.  Those documents

8    are, we believe -- certainly the last several -- well-known

9    to Your Honor.  Several of them are on the court docket and

10   were part of motions that were approved.

11           However, these documents have not been given their

12   due in this context.  The point has been made all too often

13   that the salient point of these documents is that the

14   Sacklers have not conceded that they are true, and we don't

15   dispute that point.  But this leads to what I call the

16   fallacy of they-said-we-said.  The argument is essentially

17   being made that if a statement is made and the Sacklers deny

18   it, that all that one can do in that circumstance is to

19   simply not know what the answer is, or to consider that as

20   equally likely that the fact be true or not true.  And --

21           THE COURT:  Well, you can assume that I don't

22   approach it that way.

23           MR. GOLD:  Okay.  Thank you, Your Honor.  That's

24   why we think it is significant that the complaints that

25   we're talking about here are not fishing expedition

Page 220

1    allegations from some commercial complaint, but are based on

2    years of investigations by the U.S. attorneys and the state

3    attorneys general.  And we submit that it is simply not

4    credible that anyone would conclude that no one has any idea

5    whether these allegations are true.

6            Furthermore, due to this Court's injunction, the

7    state of knowledge is somewhat frozen in place from 2019.

8    Now, I recognize that discovery was taken in the court

9    process, but the Debtors and the Sacklers have often pointed

10   to statements like, these are the only Sacklers who have

11   been named in complaints.  Well, no new complaints could be

12   filed, so the -- even as new information came out, no new

13   Sacklers could be named in any complaints.

14           THE COURT:  Well --

15           MR. GOLD:  Without that freeze, we would --

16           THE COURT:  -- are there any documents that

17   actually show other Sacklers in a management role or a

18   hands-on board role that are in evidence?

19           MR. GOLD:  Well, Your Honor, the -- let me turn to

20   what the documents are.  The -- we would start by urging the

21   Court to carefully consider addendum A to the Sacklers'

22   settlement.  It's 31 pages long and contained 170 numbered

23   paragraphs.  It contains in detail the manner in which the

24   named Sacklers abused their stewardship of Perdue.

25           I can cite to some highlights if that's helpful to

Page 221

1    the Court, or if the Court's familiar with it I can skip

2    through that at the Court's discretion.

3              THE COURT:  No, we've spent a lot of time on it,

4    and I am very familiar with it.

5              MR. GOLD:  Okay.  Then I will presume that Your

6    Honor is familiar with this.  The -- those allegations are

7    corroborated, the statements really, are corroborated by

8    significant extrinsic evidence, such as the Practice Fusion

9    guilty plea, the McKenzie judgment, what I have referred to

10   as the Price exhibits, and the exhibits that were attached

11   to motion by the non-consenting state group at docket number

12   2012.

13             THE COURT:  I'm sorry.  The McKenzie -- you said

14   the McKenzie judgment?

15             MR. GOLD:  It was a settlement that was

16   incorporated in the judgment --

17             THE COURT:  All right.  So it's a settlement with

18   --

19             MR. GOLD:  -- that are part of our papers --

20             THE COURT:  -- McKenzie.

21             MR. GOLD:  Yes.

22             THE COURT:  All right.  And the Practice Fusion

23   judgment.

24             MR. GOLD:  Yes, and please.

25             THE COURT:  And the motion that you referred to is

Page 222

1    the one seeking further discovery to waive the privilege?

2    Is that the one you're referring to?

3              MR. GOLD:  Yes.  The purpose of the motions

4    clearly was not -- and some of the legal issues involved in

5    that motion are not directly germane to our issue here.  But

6    facts can be relevant to several different legal issues at

7    the same time, and we submit that the facts that were

8    adduced in connection with that are very relevant to an

9    assessment of the -- whether the Sacklers are deserving

10   parties to receive the benefit of a federal injunction.

11             I can -- again, Your Honor, I can indicate some of

12   the elements that are taken from there or I can assume that

13   Your Honor is familiar with all of them and that it is not

14   necessary for me --

15             THE COURT:  Well, I'm not familiar with the --

16             MR. GOLD:  -- to go through them.

17             THE COURT:  -- Practice Fusion judgment.  Does

18   that judgment refer to the Sacklers' role in dealing with

19   Practice Fusion?

20             MR. GOLD:  It pulls together, Your Honor, the -- a

21   -- we submit that has two components to it.  On one hand,

22   the Debtors' interactions with Practice Fusion were part of

23   the Debtors' guilty plea.  The -- but again, we have this

24   curious construct with respect to the guilty plea where the

25   guilty pleas was done by the Debtors as an entity, but no

Page 223

1    admissions were made regarding the underlying factors that

2    went into it.

3           We submit that the facts of the Practice Fusion

4    guilty plea, which are consistent with and support the

5    elements that are described in the relevant statement, and

6    that provide corroborating independent evidence to suggest

7    that certainly the portions of those statements that deal

8    with activities with Practice Fusion are, in fact, true,

9    notwithstanding the blanket denials that have been issued by

10   the Sacklers and the Debtors.

11          THE COURT:  I think -- I'm not sure about the

12   blanket -- I don't think there is a blanket denial by the

13   Debtors, one.  Two, my question really went to whether the

14   Practice Fusion judgment or any other document related to

15   Practice Fusion in evidence adds to the examination that was

16   had on Addendum A, as far as any Sacklers role vis-à-vis

17   Practice Fusion.

18          MR. GOLD:  Honestly, Your Honor, I'm not sure I

19   can give you a specific answer to the question the way you

20   have phrased it there.

21          THE COURT:  Well, I would have thought during the

22   examination, one of the attorneys that was doing it would

23   have pointed to some document besides Addendum A if it

24   pertained to the Sacklers role with Practice Fusion.  And

25   I'm leaving aside general testimony that I've received as to

Page 224

1      the four witnesses role at Purdue.

2              MR. GOLD:  Well, Your Honor, I will simply note

3      that Mr. Edmunds from Maryland is going to be wrapping up

4      the presentation, at least this side, and he is probably

5      better suited to answer that particular question than I.

6              Okay.  I will mention, subject to Your Honor

7      telling me you're familiar with these things, a few items

8      from what we're calling the UCC exhibits, if Your Honor

9      understands what I'm referring to.  They're all independent

10     -- they have all been admitted as part of the joint exhibit

11     book.

12              There is an email from 2012 -- this is JX-2938 --

13     that describes the Sacklers as providing micromanaging the

14     sales team beyond belief.

15              There is a memo -- this is JX-2943 --  in which

16     Dr. Landeau identifies as a problem that the board was

17     serving as de facto CEO.

18              There is an email exchange -- this is JX-2943 --

19     between Richard and Jonathan Sackler from February of 2011,

20     attaching a memorandum discussing the board that states,

21     "There seems to be a consensus that the role of the board

22     and that of management is blurred, compared with the

23     distinctions made by other major corporations."

24              THE COURT:  I'm sorry.  I think you gave me the

25     exhibit number for both of those two, the Landeau memo and

Page 225

1   the one you just went to.

2           MR. GOLD:  I believe you are correct, Your Honor.

3   If you give me just a moment, I will give you the correct

4   numbers here.  I'm sorry.  The first of the two I mentioned

5   is 2943 and the second is 2941.

6           THE COURT:  Okay.  And what's the date of that

7   memo?

8           MR. GOLD:  If by memo, you mean the second one,

9   that is February 15th, 2011.

10          THE COURT:  Okay.

11          MR. GOLD:  There is an October 2013 business plan

12  -- this is JX-2995 -- that are excerpt.  Section 5(b) is a

13  focus for the board on increasing sales by targeting high

14  volume prescribers.

15          There is JX-2951, a September 2013 memorandum,

16  which reflects a McKinsey presentation to the Purdue board

17  that suggests turbocharging the sales engine, and it's a

18  quote.  There are corroborating matters also from what I'm

19  referring to the non-consenting state group -- this was

20  originally filed as Docket 2012, but JX-2931 are emails from

21  2013 reflecting that the board gave a ringing endorsement of

22  the McKinsey proposal.

23          And JX-2925, a 2008 McKinsey email, describing

24  that decision making at Purdue was an utter failure due to

25  board interference.

1          THE COURT:  All right.  Never mind, you can go

2     ahead, Mr. Gold.

3          MR. GOLD:  Thank you, Your Honor.  I will also

4     note that this relates now to Ilene Sackler.  Due to a

5     stipulation that was entered just at the very end of the

6     trial, rather than having her be examined at trial, her

7     deposition was admitted into evidence.

8          It is JX-3298.  She admitted at Pages 84 and 85 of

9     her deposition that she didn't pay much attention during

10    board meetings.  At a minimum, that cinches the case for

11    breach of fiduciary duty that could be brought with respect

12    to her.

13          Counsel for Maryland --

14          THE COURT:  All right, but that's not a third-

15    party claim, right?

16          MR. GOLD:  No.  That reflects to -- that reflects

17    the proprietary of the state claims more than third-party

18    claims, I believe, Your Honor.  I'm not going to say that

19    they're completely irrelevant.  It just jumped off the page

20    at me in one consequence.

21          THE COURT:  Well, I mean, it's hard for me to --

22    the ultimate issue here, as far as the third-party claims,

23    is the balance between being what you just described Miss

24    Ilene Sackler admitting to and someone being more than a

25    proper board member in terms of being hands on, so why don't

Page 227

1    we just focus on the third-party claim documents.

2              MR. GOLD:  Thank you, Your Honor.  In conclusion,

3    I just wish to respond to the question that has been asked

4    by plan proponents:  Why are estates opposing this

5    settlement?

6              I will simply say that we have not questioned the

7    good faith that states and other parties who've accepted the

8    settlement.  I think we've established, Your Honor, that we

9    recognize it's a difficult decision that involves weighing

10   apples and oranges, and we ask that the decision of the

11   objecting states be respected as well.

12             With respect to respect and good faith, I will not

13   respond specifically to the cruel comments that Mr. Price

14   made regarding the Attorneys' General of several states.  I

15   will simply say that just speaking for Washington in this

16   regard, we suggest that you look at what Washington has done

17   rather than what anyone might insinuate.

18             And for instance, the funds that McKinsey -- that

19   Washington received in the McKinsey settlement have gone to

20   abatement, and that was done by Washington without the need

21   of having the Bankruptcy Court or anyone else direct

22   Washington that that's what they had to do.

23             Unless the Court has any --

24             THE COURT:  Is that in the record?

25             MR. GOLD:  I do not believe it is on the record,

Page 228

1    Your Honor.  It's only a matter that this was raised for the

2    first time to me by Mr. Price's comment earlier.

3                  THE COURT:  Okay.

4                  MR. GOLD:  I believe it's a matter of public

5    record and that the Court could take judicial notice of it

6    if we had to brief that one.

7                  THE COURT:  Did it enhance abatement or just

8    replace funds that had already been allocated towards

9    abatement?

10                 MR. GOLD:  Actually, I would ask -- I see that Mr.

11   O'Neill is Mr. O'Neil is here and he can answer that

12   specific question better than I can if I can yield to him

13   for this, Your Honor.

14                 THE COURT:  Okay.  I guess Mr. Gold put you on the

15   spot, Mr. O'Neil, so if you could answer that question.

16                 MR. O'NEIL:  The State of Washington would be

17   happy to supplement the record, Your Honor.  It was

18   appropriated for abatement services, and it was not

19   replacement money.  It was appropriated ad initio by the

20   legislature on the recommendation of the attorney general.

21                 THE COURT:  All right.  Thank you, Mr. Gold.

22                 MR. GOLD:  Thank you, Your Honor.  Yes, unless you

23   have any questions, I am ready to yield to Mr. Edmunds.

24                 THE COURT:  Okay, that's fine.  Thanks.

25                 MR. EDMUNDS:  Your Honor, if you're ready for me,

Page 229

1    I'm here.

2            THE COURT:  Yes, and I can see you and hear you

3    fine.

4            MR. EDMUNDS:  All right.  Thank you, Your Honor.

5    Brian Edmunds for the State of Maryland.

6            Let me first of all say that I will adopt for our

7    state the arguments that Mr. Goldman and Mr. Gold have made

8    on behalf of the other states.  And I'm going to kind of --

9    there are specific points that were assigned to me today.  I

10    think the Court has gotten into them to some extent in its

11    questions, so I'm just going to try to, at this point,

12    address the questions that I think may be left over that the

13    Court has at this stage of a lengthy argument.

14            I mean, I think the first one that is important

15    and what I was going to talk about anyway, is what it is

16    that we are seeking here to do.  Is it just about money?

17    It's not.  What this is is about implementing the police

18    power that we have, and specifically about achieving

19    deterrence and regulating the opioid market.

20            Money is certainly important, receiving money in

21    the form of compensation, disgorgement, penalties that are

22    authorized under not only the Maryland statutes, but all of

23    the state's statutes that I'm aware of, is important.  But

24    it's important not just for the purpose of compensation.

25    It's important for the purpose of deterrence, for the

Page 230

1    purpose of the regulation that it provides to the conduct of

2    businesses in the marketplace, especially in a marketplace

3    as important as the prescription drug marketplace.

4              To that end, the statutes that we proceed under,

5    Maryland's is mentioned in our separate objection, but they

6    give -- ours is called a cease and desist proceeding, and we

7    are authorized in that context incidentally to recover

8    compensatory damages.

9              But the proceeding generally operates for an

10   injunction, which we would I think, you know, certainly, we

11   would seek an expansive one against both Debtors and the

12   Sacklers in the proceeding in Maryland, and it also permits

13   the recovery of disgorgement, of damages as I said, and of

14   civil penalties among other things that the statute provides

15   for.

16             And when I look at this, when we look at this,

17   right, my full-time job is to assist our attorney general in

18   carrying out the police powers that are assigned to him by

19   our Constitution and statutes.  What I look at here and what

20   he looks at is whether this actually will bring about a

21   change in conduct, and from that standpoint, it's not

22   enough.

23             And that, I think, is also the reason why to have

24   our claims sort of brought in the same context -- and

25   everything I heard this morning, you know, relegates us to

Page 231

1    the status, I think, of a co-creditor, of a private creditor

2    is the problem that we're dealing with, right.

3              We have a set of responsibilities that is greater

4    than the responsibilities of counsel who appear here for

5    private creditors.  We have a set of responsibilities to the

6    public that yet elects our attorney general that instituted

7    our government, for which the protection of which is what we

8    are paid for, to see to it that conduct is changed, and we

9    don't think that this settlement does that.

10             I think that when you look at it from the ex-ante

11   perspective of somebody who operates within the marketplace,

12   what you see from this is that the Sacklers were able to get

13   away with a majority of the money that they took, both from

14   Purdue and from consumers.  And that, I think, as well as a

15   full airing of the conduct and the full adjudication of the

16   conduct is what, more than anything else, we seek.

17             I mean, money is certainly important, Your Honor.

18   It is.

19             THE COURT:  Can we just stop on that point?  So I

20   have no doubt, Mr. Edmunds, that you're a dedicated public

21   official.  So you're saying that you need a full litigation

22   of the claims against the Sacklers; is that what you're

23   saying?

24             MR. EDMUNDS:  I am saying that that is one thing

25   that we would seek and that is one thing that I think would

Page 232

```
 1    have value.  Is it the only thing we would seek; is it

 2    something we would pursue --

 3               THE COURT:  Well, if you're going to seek money --

 4               MR. EDMUNDS:  -- or everything else?

 5               THE COURT:  -- and that in any form other than --

 6    if you're seeking money in the form of a settlement, I think

 7    you'd have to agree with me that you wouldn't have a full

 8    public airing and a trial.

 9               MR. EDMUNDS:  I think that's true, Your Honor.

10               THE COURT:  Okay.

11               MR. EDMUNDS:  I mean, and I think that there are

12    tradeoffs that have to be made, right?

13               THE COURT:  So it isn't the main thing you're

14    seeking.

15               MR. EDMUNDS:  I didn't say it was.  I said it's

16    one --

17               THE COURT:  Well, I thought I heard you actually

18    say it was the most important thing, but maybe I misheard

19    you.

20               MR. EDMUNDS:  Deterrence and changing conduct are

21    what I've said.  And if I misspoke -- to be very clear,

22    those are the most important things, right?  I think they're

23    the same thing, but that is what is most important to the

24    State of Maryland.  I believe that that is what is most

25    important to the other objecting states.
```

Page 233

```
 1            THE COURT:  And the --

 2            MR. EDMUNDS:  There are other thing- --

 3            THE COURT:  Could I just focus.  The conduct that

 4    you're seeking to deter is fraudulent transfers?

 5            MR. EDMUNDS:  No, Your Honor.

 6            THE COURT:  No, okay.

 7            MR. EDMUNDS:  That is some conduct.  Well, I

 8    should -- our action against the Sacklers and against Purdue

 9    did not have as its focus fraudulent transfers.

10            THE COURT:  All right.

11            MR. EDMUNDS:  But I think we are the State and

12    fraudulent transfers are something that we prohibit, so I

13    would not carve them out completely from what I think is in

14    the State's interest to seek to redress.

15            THE COURT:  Well, except it's not covered by any

16    of your unique statutes.  It's an estate -- not estate, a

17    estate cause of action.

18            MR. EDMUNDS:  I would -- I mean, I --

19            THE COURT:  There's no dispute about that, Mr.

20    Edmunds.

21            MR. EDMUNDS:  I would actually --

22            THE COURT:  There's literally no dispute about

23    that proposition.  And I hope your boss doesn't understand

24    it differently because then that person is operating on a

25    misconception.
```

1           MR. EDMUNDS:  I don't think that we understand

2    that differently, Your Honor, that those are the estate's

3    causes of action.

4           THE COURT:  Okay.

5           MR. EDMUNDS:  But I do think we have an interest

6    in seeing that even the estate's causes of action are

7    successful and maintained.

8           THE COURT:  But that's not a --

9           MR. EDMUNDS:  But for our part --

10          THE COURT:  -- that's not a state parens patriae

11   protected interest.

12          MR. EDMUNDS:  Your Honor, that's certainly not the

13   interest, as I said, for which we brought actions against

14   Purdue and the Sacklers, the members of the Sackler family

15   who served as its directors.

16          THE COURT:  Right.

17          MR. EDMUNDS:  But those actions relate to what

18   they have done in the marketing and sale of OxyContin and

19   other opioids.  And our interest is clearly in preventing

20   the deaths that result from when people commit unlawful

21   practices in the marketing and sale of dangerous drugs, and

22   we have --

23          THE COURT:  So let me be clear.  When you're

24   talking about a cease and desist proceeding, you're not

25   talking about having the Sacklers ceasing and desisting,

Page 235

1    right?  Because under this agreement, consistent with their

2    actions for the last two years, they have ceased and

3    desisted, right?

4              MR. EDMUNDS:  I'm not sure that that's true.

5              THE COURT:  You're talking about someone else

6    ceasing and desisting, not the Sacklers, right?

7              MR. EDMUNDS:  I think that this -- no, I'm talking

8    about direct claims against the Sacklers, Your Honor, and I

9    think it's --

10             THE COURT:  Well, you referred to a cease and

11   desist proceeding, which means stopping something from

12   happening.  And I'm assuming what you're referring to is

13   other people, stopping other people, right?

14             MR. EDMUNDS:  It can also stop conduct that has

15   happened from further happening, right?  I mean, we don't

16   lose the relief just because the actor, when faced with a

17   suit, stops committing the problematic conduct.  We still

18   have the right to continue.

19             THE COURT:  But as far as that actor is concerned,

20   it's not a cease and desist relief that you're seeking at

21   that point.  I'm not disputing that you wouldn't have a

22   claim, you're seeking money still.  But if they've stopped,

23   they've stopped.

24             MR. EDMUNDS:  Your Honor, first of all, I think

25   factually, there is room for disagreement that they have

Page 236

1    stopped.  They have stopped serving as members of the board

2    of Purdue.  There is a website that is out there now that

3    makes false claims about OxyContin on behalf of part of the

4    Sackler family that is at issue here.

5            So, I mean, I don't -- you know, stopping -- they

6    have stopped some of the conduct perhaps.  But I still think

7    in a cease and desist order proceeding and a proceeding we

8    would bring under our Consumer Protection Act, we still have

9    the ability to seek a cease and desist order and an

10   injunction that keeps them from restarting the conduct, for

11   example.

12           THE COURT:  And isn't this -- doesn't the plan do

13   that very thing with an injunction?

14           MR. EDMUNDS:  I think that the injunction in the

15   plan would be perhaps broader and have more in it if we were

16   to do it separately.

17           THE COURT:  Have you made any suggestions to that

18   effect on how to make it broader?

19           MR. EDMUNDS:  I have not personally, but I believe

20   that members of the NCSG have, and I would have to leave it

21   to them to explain because it's been a while since I looked

22   at it.  But I know that that has been something that is in

23   the works.  You know, you have to divide up, I guess, and

24   that's a part that I have not looked at specifically for

25   purposes of what I would say to Your Honor today.

1              THE COURT:  Okay.

2              MR. EDMUNDS:  But I do think that there is that

3      issue, right?  I mean, we are concerned -- and not just

4      conduct that relates to opioids.  If we sought an injunction

5      at the state level against the Sacklers, I think we would be

6      looking at more broadly prohibiting them from engaging in

7      future violations in the pharmaceutical space and perhaps

8      just future violations in the sale and marketing of products

9      in the state in general, which I believe that this

10     injunction does not do.

11             So I think that that is the issue here, right?

12     The money is important, but to put it in perspective, Your

13     Honor, I mean, we spend -- the last figure I saw was

14     something close to a billion dollars a year on the opioid

15     crisis.  And so, our share of this gets paid out in weeks,

16     maybe a month, right, by money that we are already spending.

17             And I would note, Mr. Huebner I think erroneously

18     cited the Maryland statute as the example of what states

19     would do with the money were it not for the plan.  In fact,

20     Mr. Huebner overlooked our 2019 statute that dedicates all

21     money we receive by virtue or settlement or by judgments

22     against opioid industry participants to opioid abatement

23     period.

24             There's no need for that language in Maryland's

25     case.  There's no need for the plan to commit it to

Page 238

1    abatement.  And so, if that was his example for all of the

2    states, I can't -- I don't have a 50 state survey prepared,

3    but I do know that a lot of others have statutes and the

4    ones that do not have agreed.

5              THE COURT:  Although the statutes, in some

6    instances, have subsequently been amended as far as other

7    types of settlements, right, and they can be amended.

8              MR. EDMUNDS:  Your Honor, they can be amended.

9    But, I mean, I think that they are as committed as they can

10   get when there is a statute that dedicates opioid -- you

11   know, when the legislature enacts, and the governor signs a

12   statute that provides the money from opioid crisis related

13   litigation goes for relief of the opioid crisis and cannot

14   be replaced, I think that that's, you know, maybe the gold

15   standard.

16             But I know that other states, like Washington as

17   Mr. Robinson O'Neill just mentioned, have done it in other

18   ways, not by statute.  But there is a lot of money that I

19   think the states have worked hard on recovering for

20   themselves and for their citizens that are being spent on

21   abatement without the need to impose a bankruptcy plan of

22   reorganization that, you know, mandates that they do that.

23             So I think that -- but I think that, you know,

24   money is important certainly, but the bottom line is that

25   this is conduct that will keep going on and in our judgment

1    as we look and make decisions about what is necessary to

2    protect our citizens and what is necessary to kind of avert

3    a crisis that leaves I think 140 in the United States dead

4    each day, almost seven in Maryland dead each day.  We look

5    at this and we don't think that it does it.  We don't -- we

6    think it --

7                THE COURT:  Well, again, that's my question.

8    Whose conduct are you referring to?

9                MR. EDMUNDS:  The Sacklers here, Your Honor.

10               THE COURT:  All right.

11               MR. EDMUNDS:  I mean, the particular -- I know

12   that there has been some question as to how broad that

13   category of the Sacklers is and how far into the family it

14   reaches.  But I would say for at least the ones who served

15   as directors, their conduct needs to be addressed and they

16   need to --

17               THE COURT:  Well, listen.  I think if that is your

18   state's issue, that can certainly be address very easily I

19   believe by the Sacklers, consistent with all that has been

20   represented to me during this trial as to their lack of a

21   role going forward.  So I don't -- I really -- you know, but

22   that's fine.

23               MR. EDMUNDS:  But I suppose, Your Honor, it's the

24   Sacklers plus, right?  It's also future people who engage in

25   the marketplace, future directors, because we don't -- you

Page 240

1    know, we can't, we don't have the resources to regulate all

2    conduct.  I think that the deterrent effect, the general

3    deterrent effect I think is the word that the law professors

4    would use for it, is important too.

5           We are worried about the conduct that the Sacklers

6    engaged in here, but we are also worried that it will be

7    repeated by others.  And I think that the idea the amount,

8    you know, 4.3 billion in this context when you've taken so

9    much more and when your conduct has caused so much harm, I

10   think that the amount is insufficient to effectuate that

11   kind of deterrence.

12          It doesn't -- it's our tool to kind of stop bad

13   conduct that we're exercising here.  That's what the police

14   power is, and I think that we don't succeed in doing that

15   from this settlement.

16          THE COURT:  Well, do you succeed if the result is

17   years of litigation and, in all likelihood, a lower

18   recovery?

19          MR. EDMUNDS:  I don't -- I just don't agree with

20   that.

21          THE COURT:  I'm not asking you to accept the truth

22   of that.  I'm just posing you a hypothetical, and I should

23   have introduced what I was saying by saying that.

24          MR. EDMUNDS:  I think that the issue -- I mean,

25   obviously, you can compare outcomes, right, and you can

Page 241

1    hypothesize the outcome that wouldn't be as good but might

2    be what happened and compare it and you see what the

3    comparison is.  But I think that the issue is that, you

4    know, we can't know and it's our decision to make, right?

5              THE COURT:  Well, I guess that comes back.  You

6    can actually make a fairly well-informed decision on that

7    point, and that's why we have a six-day trial with, you

8    know, 200 binders of evidence and thirty some plus

9    witnesses.

10             MR. EDMUNDS:  Right.  I could talk about that.

11             THE COURT:  Okay.

12             MR. EDMUNDS:  Well, I'm sorry, I didn't mean to --

13             THE COURT:  No, no.  So I think that that is a

14   point that needs to be addressed.

15             MR. EDMUNDS:  Okay.  Well, what I saw from the

16   trial, right, our standard, the standard under the Maryland

17   Consumer Protection Act.  I believe it's the standard in all

18   states.  It derives from a case in I think the Seventh

19   Circuit called FTC v. Amy Travel Services, and that's a case

20   where the Seventh Circuit sets out the standard for holding

21   people, you know, corporate individuals, individuals who are

22   in business associations liable for conduct.

23             And the standard it sets is that, one, is

24   obviously direct participation, and I think that there is

25   evidence of that, clear evidence of that.  In particular, in

Page 242

1    Richard Sackler's concession that he engaged in things like

2    the McKinsey marketing, the McKinsey marketing plan, and you

3    know, had by himself a call with McKinsey's -- with the

4    McKinsey employees that were proposing these things, and

5    that the board then subsequently implemented their

6    recommendations and that the board also discussed them, and

7    it certainly didn't change them.

8              So I think that -- so the Amy Travel standard is

9    direct participation, and then there's another prong and it

10   is the right to control the conduct and knowledge or

11   constructive knowledge of what the conduct is.  And each of

12   the board members who testified before Your Honor said that

13   they read the board materials, which are in evidence and

14   are, you know, among -- I think there's more, but there are

15   documents that have been presented to the Court.

16             And each of them made clear that the board

17   discussed and engaged in, you know, the review of proposals

18   on marketing and sales put forward by management.  They have

19   -- two of the board members who testified have a

20   disagreement as to what their purposes were in doing that,

21   but I think they all admit to the fact that they, in fact,

22   had the right to control the conduct and were, on some

23   level, aware of what the conduct was.

24             THE COURT:  What do you think the degree of that

25   awareness was as far as the evidence shows and the conduct

Page 243

1    that you're referring to?

2            MR. EDMUNDS:  Well, I have to get to another

3    point, and I will answer that.  But I have to answer that

4    based on what we've been permitted to do.  Right?  I was

5    careful.  We were careful to follow what Your Honor had

6    ruled as to what evidence we were allowed to present.  And

7    as you know, you know, there is more that we did not use.

8            So I think that the evidence on that shows a high

9    level of awareness of at least two of the Sackler Family

10   members.  The documents for Mortimer Sackler, the few on

11   which we actually cross-examined him because they had a

12   relevance directly to other issues before the court, such as

13   the milking the business email demonstrate a degree of

14   participation in sales and marketing that is sufficient to

15   establish liability under Maryland, and I think, under other

16   states' law.

17           So I think that the evidence, just the limited

18   evidence before the Court, which was presented not for the

19   purposes of establishing these claims, demonstrates that we

20   have what we need if we were to go forward.  You know,

21   Richard Sackler's testimony goes pretty far to establishing

22   his liability and the liability of others.

23           And I think that Mortimer Sackler, even, who

24   defended his conduct, the evidence still shows that he has

25   his hands in the sales operation and is aware of it, and is

Page 244

1    reading reports, and is participating in discussions.  And

2    the email and documentary evidence, limited though it was --

3                THE COURT:  Well, can we --

4                MR. EDMUNDS:  -- under the circumstances --

5                THE COURT:  You've said that three or four times.

6    I limited it so that it would be necessarily for the truth,

7    but you are certainly entitled to examine each witness on

8    whatever documents you had.

9                MR. EDMUNDS:  I had understood the Court as having

10   made relevance rulings as to whether -- because Debtors'

11   case, you know, sort of carved out the states' claims

12   against the Sacklers from what Debtors were presented that

13   we were not allowed to go beyond what I would call a very

14   limited -- you know, I mean, set of things that we did.

15               THE COURT:  Well, I don't know why --

16               MR. EDMUNDS:  Because that wouldn't be --

17               THE COURT:  -- you asked --

18               MR. EDMUNDS:  -- relevant to the --

19               THE COURT:  -- Richard Sackler --

20               MR. EDMUNDS:  -- determining --

21               THE COURT:  -- about his participation in actual

22   settlement marketing calls, then.

23               MR. EDMUNDS:  I asked that to establish the

24   repeated conduct.  I mean, I cross-examined him based on the

25   document.

Page 245

```
 1              THE COURT:  Right.  I know.

 2              MR. EDMUNDS:  But as relevant to the issue that I

 3      mentioned before, which is the need to change conduct, the

 4      need for the settlement to --

 5              THE COURT:  That's why --

 6              MR. EDMUNDS:  -- (indiscernible) the conduct.

 7              THE COURT:  -- you were cross-examining him on

 8      that?  Okay, fine.

 9              MR. EDMUNDS:  That is why I was.

10              THE COURT:  All right.

11              MR. EDMUNDS:  I mean, the issue there is that they

12      had to guilty pleas, 2007 and 2020, and that they continued

13      after 2007, and to some extent, the conduct in 2018 was

14      repeated with respect to other foreign entities.  I mean,

15      that was the purpose.  And so we did not dig underneath that

16      to show the documents that the DOJ may have had in its

17      possession when it came up with those allegations and

18      incorporated them into what it did.

19              THE COURT:  Are you representing to me that you

20      have those documents?

21              MR. EDMUNDS:  I have some of them.  Certainly.

22              THE COURT:  And they were offered to be introduced

23      ever in this case?

24              MR. EDMUNDS:  Your Honor, we understood that the

25      underlying merits of the states' claims were not at issue,
```

Page 246

1    and so limited ourselves to a short cross, short direct,

2    rather, of each of these witnesses.  I mean, you know, at

3    one point I had sent, I think Mr. Joseph said, 6,200 pages

4    for use.  And we didn't do that.  But we had those

5    documents.  The Court received them.

6          So, I mean, that was the...  You know, we had had

7    before the bankruptcy a much longer trial planned than the

8    State of Maryland.  It was on the schedule, I believe.  And

9    that, I think, would have been necessary to fully present

10   the claims.

11          But in any case, the point is that it's the

12   conduct, right?  And to the extent the states are being

13   treated as if they were -- you know, needed to make

14   decisions in the same way that private creditors do here,

15   which I'm not faulting, that's just not our consideration.

16          THE COURT:  Okay, well --

17          MR. EDMUNDS:  We have more.

18          THE COURT:  I've heard them from all three

19   lawyers, and I don't need to hear it again, because you guys

20   have made that point and that's fine.

21          MR. EDMUNDS:  Okay.  Your Honor, let me just -- I

22   wanted to talk -- I have one more point, and that is about

23   the third-party -- and I think that maybe this is going to

24   be addressed more in what the parties to over the next night

25   and into Wednesday on the third-party releases, to the

Page 247

1    extent they apply to third parties other than the Sacklers.

2    Right?

3              And the issue is just that that -- when Mr.

4    Huebner presented this morning, he referenced some other

5    settlements.  I think that the list of released parties in

6    this case is broader than any of those that he mentioned.

7    The consultants, advisory board representatives, contract

8    sales representatives of Purdue Pharma, whose conduct is

9    released related to at least Purdue's opioids.

10             And I think that that is a broad area, that if

11   changes aren't made we need to talk about, because those

12   releases are so broad as to even further prevent us from

13   changing the conduct here.  Everybody who participated with

14   Purdue and what Purdue did gets out of it.  Some of them

15   have not contributed a thing to the plan.  And, you know, I

16   hope that we are still -- I have received confirmation, but

17   I hope that we are still discussing those issues and can

18   present something different to the Court for its

19   consideration jointly with other parties on Wednesday.

20             And I guess I'll stop at that for now.  I don't

21   think it makes sense to go farther until we know the answer

22   to that.

23             THE COURT:  Okay.

24             MR. EDMUNDS:  But that is a concern.  And so with

25   that, yeah, I think that that -- those are the points that I

Page 248

1   would like to make in addition to what Mr. Gold and Mr.

2   Goldman said.

3              THE COURT:  Okay.  Very well.  Thank you.

4              MR. EDMUNDS:  Thank you, Your Honor.

5              MR. ROBINSON-O'NEILL:  Your Honor, this is Tad

6   Robinson-O'Neill from Washington.  You had asked if the

7   McKinsey documents are in the record.  They are.  It's JX-

8   2623 and JX-2624.  The operative provision of the 2/4

9   document, which is the McKinsey settlement in Washington

10  state is Paragraph 2 under the payment information, which

11  obligates the State of Washington to spend all of the

12  proceeds from the McKinsey settlement on opioid abatement.

13             I don't think Your Honor really wants me to track

14  down the budget allocations --

15             THE COURT:  No, that's fine.

16             MR. ROBINSON-O'NEILL:  -- into the program --

17             THE COURT:  That's fine.  I also know there were

18  similar provisions in the tobacco settlement.  But states

19  have developed since then.  I appreciate that.

20             MR. ROBINSON-O'NEILL:  Thank you, Your Honor.  If

21  you have no more questions, I'll step down.

22             THE COURT:  Okay.  All right.  Mr. Fogleman,

23  you're going to go?

24             MR. FOGELMAN:  If that's all right with the Court.

25             THE COURT:  Yeah.  Go ahead.

Page 249

1              MR. FOGELMAN:  Thank you, Your Honor.  My name is

2    Larry Fogelman, and I represent the United States of America

3    in these proceedings.  I would like to make a few points on

4    three key issues: due process, Metromedia, and subject

5    matter jurisdiction.

6              Your Honor, it would violate the due process

7    clause of the Constitution if this Court strips the rights

8    of sovereign states as to the Sacklers and the rights of

9    individual victims of the opioid crisis due to the Sacklers.

10   The states and individuals must be provided with reasonable

11   notice and an opportunity to be heard before their property

12   interests are taken away.

13             And let's make no mistake.  This third-party

14   release takes away property rights of states and individuals

15   in their causes of actions against the Sacklers.  The

16   release is effectively a judgment on the merits.  It has res

17   judicada affect and it will render their claims worthless.

18             The Second Circuit in Metromedia recognized this

19   point.  The Court said, on Page 142, "In form, it is a

20   release; in effect, it may operate as a bankruptcy discharge

21   arranged without a filing and without the safeguards of the

22   Code."

23             Now, let's talk about notice, Your Honor.  The

24   notice provided in this case was not a summons and complaint

25   seeking to take away property rights of states and

Page 250

1    individuals against the Sacklers.  Rather, it was noticed

2    that there would be a confirmation hearing with disclosure

3    about losing your right to sue the Sacklers.  But this short

4    form of notice in a bankruptcy proceeding to which the

5    Sacklers are not even debtors, is not a substitute for

6    service of a summons and a complaint.

7              A notice of an impending confirmation hearing does

8    not confer personal jurisdiction over states and individual

9    victims, and their claims against the Sacklers, and it is

10   not sufficient to give the Court power over those claims.

11   Rather, formal service of process is required.

12             As Mr. Huebner said this morning regarding the

13   Sacklers, to sue the Sacklers, you have to sue --

14             THE COURT:  Did the Second Circuit --

15             MR. FOGELMAN:  -- and secure --

16             THE COURT:  -- require that in the Motors

17   Liquidation case?  The service of a summons and complaint?

18   The most recent Second Circuit case --

19             MR. FOGELMAN:  Your Honor, that --

20             THE COURT:  -- discusses due process in this area?

21             MR. FOGELMAN:  That case address claims against

22   the estate, not third --

23             THE COURT:  And against the --

24             MR. FOGELMAN:  -- not claims against third parties

25   --

Page 251

1          THE COURT:  -- and against the successor entity?

2          MR. FOGELMAN:  Well, yes, Your Honor.  But again,

3   there was no third-party release at issue in GM, so it's a

4   totally --

5          THE COURT:  You know, Mr. Fogelman --

6          MR. FOGELMAN:  -- distinct issue.

7          THE COURT:  -- I think I understand this argument.

8   I also understand that if this plan is not confirmed, your

9   client gets roughly $2 billion more and essentially all of

10   the value of the Debtors.  So I will read your brief.  I

11   really don't think I need to hear anything more on this.

12   You're at a complete conflict --

13          MR. FOGELMAN:  Your Honor, that is not true, Your

14   Honor.

15          THE COURT:  I've said enough.

16          MR. FOGELMAN:  May I address that point?

17          THE COURT:  I've read your brief.  Your brief is

18   thorough.  But I just, frankly, do not understand the

19   position of the United States, and I don't believe it can be

20   articulated in this case.

21          MR. FOGELMAN:  I believe it can, Your Honor.  And

22   I'd be happy to do so, if you'd give me an opportunity.

23          THE COURT:  You should do that now.

24          MR. FOGELMAN:  Yes, Your Honor.  First of all, it

25   is not true that if this plan is not confirmed, then

Page 252

```
1    automatically the government has a $2 billion claim.  Purdue

2    has a right to back out of the settlement if this plan is

3    not confirmed.  And in terms of having different positions,

4    Your Honor, it is --

5              THE COURT:  You have a $1.7 billion --

6              MR. FOGELMAN:  The government did (indiscernible)

7    --

8              THE COURT:  -- superpriority claim.  And there's

9    no --

10             MR. FOGELMAN:  That's right, Your Honor.

11             THE COURT:  And there's no --

12             MR. FOGELMAN:  But the Debtors have the right --

13             THE COURT:  Then there's no abatement trust,

14   right?

15             MR. FOGELMAN:  Your Honor, the Debtors have the

16   right unilaterally to pull out of its resolutions with the

17   government.  If the plan is not confirmed, that creates the

18   PVC.  We have worked very hard, Your Honor, to come up with

19   resolutions that work towards the public interest, that

20   create a PVC.

21             We have been working tirelessly throughout this

22   process to help draft documents relating to the covenants of

23   the new company, the injunction relief of the new company.

24   We have worked nights, we have worked weekends, even leading

25   up to this confirmation hearing, towards that end.
```

Page 253

```
 1              At the same time, Your Honor, it is also true that

 2      we believe that this release violates the due process

 3      provisions of the Constitution, and we feel it is incumbent

 4      upon us to explain that view to the Court.

 5              THE COURT:  Okay.  And that's --

 6              MR. FOGELMAN:  We don't think that is --

 7              THE COURT:  -- been explained.

 8              MR. FOGELMAN:  -- inconsistent, Your Honor.

 9              THE COURT:  I've read the brief and I don't need

10      to hear more on this, Mr. Fogelman.

11              MR. FOGELMAN:  May I move on, then to, briefly,

12      the Metromedia and subject matter jurisdiction points?

13              THE COURT:  Briefly, because it's been covered

14      already, and again, it's covered in your brief.

15              MR. FOGELMAN:  Thank you, Your Honor.  With regard

16      to Metromedia, I'll just make a few quick points.  First,

17      with regard to one of the factors described by the Second

18      Circuit that enjoined claims were channeled to the

19      settlement fund, rather than extinguished.

20              Well, the only settlement fund that's set up here

21      is for the opioid claims relating to Purdue's conduct.  But

22      the release that's at issue covers a far broader, almost

23      incomprehensible, number of topics for which there is no

24      settlement fund that's set up.  It would cover -- I mean,

25      the language in the release is, anything based on or
```

Page 254

1   relating to or in any manner arising from in whole or in

2   part, the Debtors as such entities existed prior to or after

3   the petition date, including the Debtors' opioid-related

4   activities, manufacture, marketing and sale of products,

5   interactions with regulators concerning opioid-related

6   activities or products, and involvement in the subject

7   matter of the pending opioid actions, and the past, present

8   or future use --

9           THE COURT:  And I --

10          MR. FOGELMAN:  -- or (indiscernible) use.

11          THE COURT:  I understand that point, Mr. Fogelman,

12   and I'm very sympathetic to it.  And I think I've made my

13   views known to the Debtors.

14          MR. FOGELMAN:  I appreciate that, Your Honor.  But

15   it's not just the fraud claims that are a problem.

16          THE COURT:  No, no.

17          MR. EDMUNDS:  This release covers --

18          THE COURT:  I understand that.  I understand that.

19          MR. EDMUNDS:  -- everything, from -- okay.

20          THE COURT:  And in fact, some of the testimony by,

21   I believe, the Sacklers who are closest to the issues, have

22   focused on a release related to Purdue's opioid-related

23   activities.  That was what they're looking for.  Although

24   then they said, well, we're going to rely on our lawyers.

25   And I think I made it very clear that the lawyers run a real

Page 255

```
1    risk of proposing a release that is far too broad, and that

2    will have the effect of not being approved, as opposed --

3    instead, proposing one that's consistent with the

4    consideration is being paid for.

5              MR. FOGELMAN:  I appreciate that, Your Honor.  And

6    in fact, that language is so broad, as to reach things like

7    workplace safety claims, if they existed, employment packs

8    issues, environmental law, civil fraud, beyond opioids,

9    contracting fraud, state ADA laws, labor laws.  I mean, this

10   list is so broad that it would cover the example Your Honor

11   gave that if somebody ran over a pedestrian while delivering

12   opioids, the Sacklers get a release for that too.  I mean,

13   it's just an impossibly broad release that shouldn't be

14   approved by the Court.

15             And Your Honor, who does it cover?  It doesn't

16   just cover the Sacklers.  It covers financial advisors,

17   attorneys, accountants, investment bankers, consultants,

18   experts, other professionals.  I mean, why is Paul Weiss

19   getting a release in this case?  It's incomprehensibly

20   broad.  And there's  no evidence that any third party has

21   contributed to the releases, and so they're not entitled to

22   get them.

23             THE COURT:  Well, except they're --

24             MR. FOGELMAN:  Garrett Lynam testified --

25             THE COURT:  I'll check on only one point on that,
```

Page 256

1    which is -- and we're leaving out the excluded parties, of

2    course -- but there are --

3              MR. FOGELMAN:  Yes.

4              THE COURT:  -- directors and officers who are

5    contributing their insurance rights.  So they are

6    contributive something.  But I understand your broader

7    point.

8              MR.  FOGELMAN:  Yes.  No matter how you slice it,

9    Your Honor, maybe there's a handful of people who are

10   contributing something, but it is not the thousand-plus

11   people on Schedule H and all of their attorneys,

12   accountants, investment bankers and so forth.  I mean, this

13   release would cover the McKinsey example that Your Honor

14   given court.  And I'm calling it McKinsey because they're an

15   excluded party, but you can call it Company X, and McKinsey

16   is off the hook or, you know, if there's turbocharging and

17   what McKinsey did.

18             And Your Honor, carving out just fraud isn't

19   enough, because a lot of state statutes that are based on

20   the False Claims Act, you can find somebody liable for

21   acting in reckless disregard.  And so if a McKinsey type

22   acted with reckless disregard, that's enough for a fault of

23   claims act liability.  And so, the idea that you're just

24   going to carve out fraud doesn't get you there.

25             And public nuisance, another big issue we've heard

Page 257

1    about throughout this case, that there's -- according to

2    this release, you can't bring a public nuisance claim

3    against McKinsey or other consulting firm that's engaging

4    turbocharging.

5              Your Honor, another factor in the Metromedia

6    standard is that the enjoined claims would directly impact

7    the Debtors' reorganization by way of indemnity or

8    contributions.  I take Your Honor's point that there may be

9    a few of those.  But again, there's been very limited, if

10   any, evidence presented on that point.  And so the Debtors

11   have not met the Metromedia standard for the vast majority

12   of entities and people covered by the release.

13             THE COURT:  But the --

14             MR. FOGELMAN:  Another factor the Second -- yes?

15             HE COURT:  No, I think you're making the same

16   point.  And I'm trying to say as clearly as I can, generally

17   I agree with you.

18             MR. FOGELMAN:  Yes.

19             THE COURT:  So, okay.

20             MR. FOGELMAN:  Okay.  Thank you, Your Honor.  Just

21   a couple more here on Metromedia, and then I move on to

22   subject matter jurisdiction.  Another factor that the Court

23   mentioned you had looked at is whether the plan provided for

24   the full payment of the enjoined claims.  That's obviously

25   not the case here.  I think creditors are getting less than

Page 258

1    a tenth of a cent on the dollar.

2             And then there's the question of the estate

3    receiving substantial contributions.  And I'm not --

4             THE COURT:  You know --

5             MR. FOGELMAN:  -- Your Honor, I --

6             THE COURT:  If you had full payment, you wouldn't

7    need a release.  So clearly, there's something wrong with

8    that point.  I think --

9             MR. FOGELMAN:  I'm just raising it --

10            THE COURT:  -- it has to be if you --

11            MR. FOGELMAN:  -- because it's one of the

12   standards --

13            THE COURT:  I understand.

14            MR. FOGELMAN:  -- the Second Circuit set.

15            THE COURT:  But it's --

16            MR. FOGELMAN:  I --

17            THE COURT:  It has to be reviewed.  I think,

18   frankly, the Third Circuit formulation, which is, is it

19   fair, is a better way to look at it than that factor, which

20   just can't...  I mean, it just seems really boneheaded to

21   say that because $4.325 billion won't pay off or resolve the

22   opioid crisis, you shouldn't take it.  I think you need to

23   really analyze what the alternatives are, and of course, how

24   tied in it is to the plan, and who is covered by the

25   release.

Page 259

1              MR. FOGELMAN:  Understood, Your Honor.  One other

2      factor that the Court in the Second Circuit mentioned was

3      whether the estate receives substantial consideration.  We

4      address that point in terms of Exhibit H and in terms of

5      very few, if any, individuals providing contribution.

6              I want to just point out that Garrett Lynam, the

7      Executor of the Sackler Estate, was asked a question.  "So,

8      for example, all the facts that the release provision -- and

9      I believe it's discussed before -- but it references his

10     financial advisor, his attorneys, accountants, investment

11     bankers, consultants, experts, and other professionals, none

12     of those are giving a financial contribution to the estate,

13     right?:  And he answered, "Correct."

14             Richard Sackler testified that, "Question: I have

15     just one, or expect to have just one question to you, other

16     than members of the Sackler Family or Trust, in which they

17     may be beneficiaries, are you aware of any personal entity

18     that will be contributing monetarily to the more than $4

19     billion in settlement payments that are contemplated by

20     Purdue's plan.  Answer: I am not aware of any."

21             And Your Honor, with regard to the Sacklers

22     themselves, I think there is a really important question

23     here about the use of their trust fund assets as opposed to

24     their personal assets.  It's not clear on this record that

25     the Sacklers themselves are actually personally contributing

Page 260

1    anything.  They're using their trust as a sword and a

2    shield, Your Honor --

3              THE COURT:  But can we --

4              MR. FOGELMAN:  It's a sword because they're trying

5    to use their contribution into the estate by their trust to

6    say, aha, look at what we're doing; we're entitled to a

7    release.  But then, when you ask them, well, you know, is

8    that money -- like could you be sued for that amount?  And

9    you know, if you have a judgment creditor, if the judgment

10   creditor gets a judgment against you, can you be sued?  I

11   asked that to Mortimer Sackler.  He essentially said no.  So

12   u sing your trust as a sword and a shield, and it's all

13   their money?

14             THE COURT:  Why is that -- I don't --

15             MR. FOGELMAN:  It's coming from the trust, and why

16   are the Sacklers getting a release?

17             THE COURT:  But I guess I really would push back

18   on that one.  First of all, they're obligated for an amount.

19   They're not obligated, you know, just from a particular

20   asset.

21             Secondly, if in fact their own assets would be

22   insufficient to make the payments and there is, as I think

23   the record is clear, at least say an issue as to whether in

24   a contested context, third parties could get at the trust

25   assets, why shouldn't the trust assets be viewed as a

Page 261

1    positive being contributed to the relief?  Because they

2    couldn't find it without it.

3                MR. FOGELMAN:  They're trying to have it both

4    ways.

5                THE COURT:  No, but --

6                MR. FOGELMAN:  They're trying to have it both

7    ways.

8                THE COURT:  But --

9                MR. FOGELMAN:  They should acknowledge, then, that

10   it's their money.  I mean, I think a few of them did testify

11   to that --

12               THE COURT:  I'm not sure --

13               MR. FOGELMAN:  -- and that, you know, if this plan

14   is --

15               THE COURT:  To me, these are both clichés.  But

16   sometimes a negotiation is a win-win, where is if you

17   litigate, it's a lose-lose.  So maybe --

18               MR. FOGELMAN:  Your Honor, Kathe Sacker said, "My

19   trust assets or my personal assets are my assets as well."

20               THE COURT:  I agree.  That --

21               MR. FOGELMAN:  She treated them like they were

22   hers.

23               THE COURT:  That is an issue that we'll --

24               MR. FOGELMAN:  But then when she was asked --

25               THE COURT:  No, no.  That is an issue that will be

Page 262

1    litigated.

2            MR. FOGELMAN:  -- do you have personal control --

3            THE COURT:  That is an issue that would be

4    litigated, and I don't know how it would ultimately come out

5    because I'm not ruling on the merits.  But I can see how it

6    could come out either way, if this was a litigated attempt

7    to reach a judgment.  And this settlement avoids that issue.

8    And to me it's --

9            MR. FOGELMAN:  Understood, Your Honor.

10           THE COURT:  -- you know, I don't see a problem

11   with it because in fact the record, I believe, is

12   uncontested that without those trust assets, neither side of

13   the family could pay this settlement.  They could pay about

14   $1.1 billion --

15           MR. FOGELMAN:  Your Honor --

16           THE COURT:  -- at most.  And that's before

17   lawyers.

18           MR. FOGELMAN:  I have a simpler point.  I have a

19   simpler point, Your Honor.  There's no evidence in the

20   record, I don't think -- someone can correct me if I'm

21   mistaken -- that the Sacklers actually are making any

22   personal contributions.  When Mortimer Sackler was asked

23   that question, he said, you know, in terms of how much ends

24   up coming out of my personal estate versus my trust, I don't

25   know at this time.

Page 263

```
 1              Kathe Sackler --
 2              THE COURT:  But that's because it's --
 3              MR. FOGELMAN:  (indiscernible)
 4              THE COURT:  -- it's an aggregate number that they
 5    have to pay, and ultimately, the estate doesn't care where
 6    it comes from.  They have bargained to have them be out of
 7    these foreign companies by a certain date.  But it's an
 8    aggregate number --
 9              MR. FOGELMAN:  Understood.  But --
10              THE COURT:  -- so those answers were accurate
11    answers.  They don't know, because it could be under either
12    source.  But it is also true --
13              MR. FOGELMAN:  But it's a test in the Second --
14              THE COURT:  -- that they don't have the money on
15    their own to make the payments in a contested context.  So
16    to have --
17              MR. FOGELMAN:  Your Honor, it's --
18              THE COURT:  -- to have the --
19              MR. FOGELMAN:  -- it's a test in the Second
20    Circuit --
21              THE COURT:  -- the trust agree to make the payment
22    to go to the Royal Court of Jersey and asked for permission
23    to do it is actually -- I actually think a win for the
24    estate, because they don't have to fight that issue.  They
25    might ultimately win the issue  --
```

Page 264

```
 1                 MR. FOGELMAN:  But it --

 2                 THE COURT:  -- but they don't have to fight it

 3     this way.  So I think we're being a bit --

 4                 MR. FOGELMAN:  Okay.  Your Honor, I --

 5                 THE COURT:  -- a bit metaphysical on this point,

 6     Mr. Fogelman.

 7                 MR. FOGELMAN:  I'll move on to subject matter

 8     jurisdiction, Your Honor.

 9                 THE COURT:  Okay.

10                 MR. FOGELMAN:  I just wanted to make the point

11     that it's a test of, you know, who's provided substantial

12     contributions.  On this record, it's not clear if the

13     Sacklers personally are providing --

14                 THE COURT:  Well, they're --

15                 MR. FOGELMAN:  -- their (indiscernible).

16                 THE COURT:  -- on the hook for it.  They're

17     definitely on the hook for it.

18                 MR. FOGELMAN:  Yes.  Yes, Your Honor.  On subject

19     matter jurisdiction, Your Honor, I just wanted to briefly

20     touch a couple of points that have been raised.  Your Honor,

21     third-party releases do not arise under Title 11.  There's

22     nothing in the lawsuits of the States and individuals

23     against the Sacklers, lawsuits that predated the bankruptcy,

24     that arise under Title 11.  They instead arose under the

25     State substantive laws cited in those complaints that
```

Page 265

1    alleged causes of actions against the Sacklers.

2           And so, you know, just because there is a plan and

3    releases are included in the plan, does not mean that the

4    settlement agreement -- I'm sorry -- that the litigations

5    themselves arise under the Court's core jurisdiction.

6           The correct question is whether the Court has

7    jurisdiction over the lawsuits filed by the sovereign states

8    and individuals, not whether the Court has subject matter

9    jurisdiction over confirming a plan.  And that issue was

10   addressed in the Ninth Circuit Dunmore v. United States, 358

11   F.3d 1107 (9th Cir. 2004).  The Ninth Circuit said, when

12   presented with a mixture of core and non-THE COURT:  core

13   claims, you must employ a claim-by-claim analysis to

14   determine whether the Bankruptcy Court could enter a final

15   order for that claim.  And that's a similar holding from the

16   matter of Zale in the Fifth Circuit, that landed in our

17   brief as well.

18          Judge Bernstein wrote in the Drier case, 429 B.R.

19   112, 131 (S.D.N.Y. 2010), the question is not whether the

20   court has jurisdiction over the settlement, but whether it

21   has jurisdiction over the attempt to enjoin the creditors'

22   unasserted claims against the third party.  You've got to

23   break it down and look at what's at issue.  In this case,

24   it's the lawsuits themselves, not just the plan.  The plan,

25   the fact that it's part of a plan, doesn't confer core

Page 266

1    jurisdiction over the third-party release.  And the reason

2    that has to be right --

3              THE COURT:  So, I guess --

4              MR. FOGELMAN:  -- Your Honor, is that --

5              THE COURT:  I guess this is why I was somewhat

6    upset with the government's stance here.  I understand these

7    are live issues.  I understand that there are courts that

8    disagree with your position, including the Third Circuit.

9    And frankly, even the Ninth Circuit in the (indiscernible)

10   case?

11             But I don't see why the United States is picking

12   this case to raise this issue.  And we'll just leave it at

13   that.

14             MR. FOGELMAN:  We're doing our best to get it

15   right, Your Honor.  And we believe this is the correct --

16             THE COURT:  Right.

17             MR. FOGELMAN:  -- legal analysis.

18             THE COURT:  Right.  Notwithstanding --

19             MR. FOGELMAN:  And it's a case that --

20             THE COURT:  -- what would happen as a result.

21             MR. FOGELMAN:  Your Honor, there are 10 sovereign

22   states that are going to lose their rights to file lawsuits.

23   We think that's really important.  As well as individuals

24   who filed lawsuits against the Sacklers --

25             THE COURT:  Right.  So they --

Page 267

1          MR. FOGELMAN:  -- who are losing their rights --

2          THE COURT:  -- will have a lawsuit --

3          MR. FOGELMAN:  -- and that's why we're here.

4          THE COURT:  -- and the United States will have a

5    $1.7 priority claim, superpriority claim.

6          MR. FOGELMAN:  Again, Your Honor --

7          THE COURT:  So I think there must be --

8          MR. FOGELMAN:  -- they do have the right to pull

9    out of the settlement.

10         THE COURT:  -- very grateful that you're looking

11   after their interests as you pick their pocket.  Let's move

12   on.

13         MR. FOGELMAN:  I disagree with Your Honor's

14   characterization.  I don't think that's fair --

15         THE COURT:  Well --

16         MR. FOGELMAN:  -- or correct.  Your Honor, the

17   reason that it has to be the case that Your Honor -- that

18   you can't have core jurisdiction over a lawsuit between

19   third parties that is included in a plan, the reason that

20   has to be true is that it's a bedrock principle of subject

21   matter jurisdiction.

22         The Supreme Court, in Insurance Corporation of

23   Ireland v. Compagnie Des Bauxites, 456 U.S. 694, 702, from

24   1982, wrote, "No action of the parties can confer subject

25   matter jurisdiction upon a federal court."

Page 268

1              And so, Your Honor, if the Court doesn't have

2    jurisdiction over the lawsuit from one third party against

3    the Sacklers, then simply by putting it in a plan, if that

4    were permitted, you'd be doing exactly what Insurance Corp.

5    of Ireland said you can't, which is manufactured in

6    jurisdiction.  Plans are not magic.  It can't be that

7    anything you put inside a plan automatically comes within

8    the Court's core jurisdiction.

9              The Johns Manville case also noted it was

10   inappropriate for the Bankruptcy Court to enjoin third-party

11   claims against third-party non-debtors solely on the basis

12   of that third-party's financial contribution to a Debtor's

13   estate.  If that were possible, a debtor could create

14   subject matter jurisdiction over any non-debtor third party

15   by structuring a plan in such a way that it depended upon

16   the third-party contributions.

17             As we have made clear, subject matter jurisdiction

18   cannot be conferred by consent of the parties.  And so too

19   here, Your Honor, again, just by including these releases in

20   the plan does not confer jurisdiction.  Even if Your Honor

21   disagreed and you found that because this is a plan, it was

22   core jurisdiction of the Court, it would violate Article 3

23   of the Constitution for a bankruptcy judge to ultimately

24   make the decision on whether the lawsuits filed by sovereign

25   states and individuals against the Sacklers can be released.

Page 269

1    The Bankruptcy Court simply can't reach (indiscernible) when

2    it's the final adjudication of the merits of the state law

3    claims, when neither the states nor the parties are parties

4    to the bankruptcy proceeding.  And that's Stern v. Marshall.

5    The Supreme Court held there that just because the Code --

6              THE COURT:  Mr. Fogelman --

7              MR. FOGELMAN:  -- with certain --

8              THE COURT:  I --

9              MR. FOGELMAN:  You know Stern well.  I get it,

10   Your Honor.

11             THE COURT:  Right.

12             MR. FOGELMAN:  But Your Honor, look, just because

13   the Bankruptcy Court -- look.  In that case, the Bankruptcy

14   Court lacked constitutional authority to hear Anna Nicole

15   Smith's cross-claims --

16             THE COURT:  I don't need to hear about Anna Nicole

17   Smith, for the 5,000th time.  All right, please.  You

18   covered this in your brief.  You're apparently going to

19   appeal this --

20             MR. FOGELMAN:  Yes, Your Honor, my point --

21             THE COURT:  -- whenever, and hold up the

22   distributions to these people forever, and that's the United

23   States' choice.  So, be my guest, all right.  I'm done with

24   this argument.  I want to hear the Canadian municipality --

25             MR. FOGELMAN:  Your Honor, my point is simply that

Page 270

1    it --

2            THE COURT:  No.  I want to hear the Canadian

3    municipality creditors.  I don't understand this.  There has

4    to be some level of prosecutorial discretion here.  So, Mr.

5    Underwood, you're next.

6            MR. UNDERWOOD:  Good evening, Your Honor, Alan

7    Underwood from Lite DePalma Greenberg Afanador, on behalf of

8    certain Canadian municipal creditors, Canadian First Nations

9    creditors.

10           We want to make clear, first of all, Your Honor,

11   is that Canadian creditors not -- and there's testimony to

12   this -- they were approached.  Mr. Dubel testified to this

13   fact -- they were not approached by the Debtors' Special

14   Committee, they were not approached by Debtors' counsel.

15   They did independently try to become involved in this case,

16   but unfortunately it didn't result in -- what they hoped

17   for.

18           So, the irony here is, Judge, you've got ten

19   parties that really are trying to figure out whether they

20   want to be a part of the abatement and claims process here.

21   And if you've got one foreign, or a group of foreign parties

22   that desperately wanted to be a part of this, expected to be

23   a part of this, and were ultimately not.

24           And so, ultimately, where we are today --

25   actually, my understanding is there's 17 -- in the year

Page 271

1      2020, there were 17 Canadians who died each day from opioid

2      toxicity.  Ultimately, in terms of the plan, the proposed

3      plan that is before this Court, I think it's a close call,

4      but I think it probably, ultimately is in favor of the

5      Debtors in terms of the scope of the releases that can be

6      granted with regard to the US States.

7              I think the answer is different with regard to the

8      Canadian municipalities.  And that's why -- and certainly,

9      as to the First Nations -- and that is why when the

10     objection, a limited objection to the Provinces settlement

11     was filed, we attempted to alert the Court to

12     (indiscernible).

13             So, ultimately, in terms of what is pending right

14     now, before you -- there is issue with regard to the fact

15     that subject matter jurisdiction of this Court may not

16     extend to these claims, and there's a couple of different

17     reasons for that.  And these claims are different from the

18     state, 50 state and territory claims that we've otherwise

19     addressed at great length before this Court.

20             In terms of --

21             THE COURT:  It's not really a subject matter

22     jurisdiction point, is it?  Because they filed their claims

23     here.  And again, there may be a recognition issue; I

24     understand point.  The Canadian Court may feel that these

25     Canadian creditors' claims against the US entities --

Page 272

1    because that's all we're talking about here; we're not their

2    claims against the Canadian entities.  The release doesn't

3    extend to that.  So, the Canadian Court may feel that their

4    claims against the US entities aren't being sufficiently

5    well-treated under the plan for recognition to be granted.

6    But I don't think it's a jurisdictional issue.

7                MR. UNDERWOOD:  Well, I think it is an interesting

8    -- I understand the distinction the Court is making with

9    regard to subject matter jurisdiction.  I think, though,

10   that the distinction may be a little bit finer.  In the

11   first case --

12               MR. HUEBNER:  Your Honor.  Your Honor,

13   (indiscernible) I apologize, the parties may have forgotten

14   that we actually have a separate allocation of time for Mr.

15   Underwood, on Wednesday, to discuss Canadian jurisdiction.

16   This is only third-party releases.  I think he already

17   expressed his view.  I certainly don't mean to cut anybody

18   off, but there's actually a different pod for this exact

19   issue.  We obviously need to respond to some of the things

20   that were said --

21               THE COURT:  That's fair.  I think -- and I didn't

22   appreciate which way you were going there, Mr. Underwood.

23   If this isn't on the release, we'll cover you later.  We'll

24   cover you on Wednesday.

25               MR. UNDERWOOD:  I think, you know, it relates to

Page 273

1    the release, but it relates to the release in a different

2    way than almost every other party, so I have no problem, as

3    long as I'm afforded the time that I would have had here to

4    address this independently later on.  And I appreciate the

5    Court's time.

6              THE COURT:  Okay.  I didn't want to cut you off

7    totally.  I just thought, on this one point, as we got into

8    your argument, it seemed to be covering jurisdiction

9    generally, as opposed to just the release.  But if you could

10   cover both points on Wednesday, that's fine.  But I don't

11   know if you have any other points on the release?

12             MR. UNDERWOOD:  With the respect to the releases,

13   if you'll just give me one very quick comment.  Ultimately,

14   I don't think that there are points that can't be addressed

15   on Wednesday, other than I can tell you that the Canadian

16   creditors are not beneficiaries of any form of channeling,

17   injunction or trust.  And that's a --

18             THE COURT:  They do get -- I'm paraphrasing, I

19   think, the Debtors' argument on this, although I'll ask them

20   about it.  You're not getting money directly as part of the

21   Sackler settlement, as I understand it, as an unsecured

22   creditor in that class.  But I think the Debtors would say

23   two things:  First, it's far from clear that your clients

24   have claims that are subject to the release, i.e., claims

25   against the US entities as opposed to the Canadian entities.

Page 274

1    And when you read the proofs of claim, I think there is some

2    question as to, you know, how is the claim actually against

3    the US entities?  That's point one.

4              Point two is, I think they would say that the

5    money that is going to unsecured creditors wouldn't go to

6    them but for the release, and but for the Sackler

7    settlement, because the parties that, in essence, would

8    swallow up that money, that would be going to the unsecured

9    creditors, aren't swallowing it up because of the money that

10   the Sacklers are paying, which is supported by the

11   liquidation analysis, which has unsecured creditors getting

12   nothing.  So, I think that's their argument.

13             MR. UNDERWOOD:  Right.  I mean, Your Honor, I

14   don't know if you want to put this of until Wednesday or you

15   want to carry forward with your --

16             THE COURT:  Well, if you have a response to that.

17             MR. UNDERWOOD:  Yeah, well, I do, and I think that

18   there's a linkage there that may be the step too far under

19   Second Circuit's holdings, meaning, you know, if we look

20   back at where this comes from under, you know, 542(g) Johns

21   Manville and this whole progeny of cases, I think that there

22   is a legislative intent and a judicial intent, in most

23   cases, to link the channel injunction, the establishment of

24   a trust with the relief that's provided.  That link is

25   missing here.

Page 275

1              I would also say, you know, that look, if you look

2    at the breadth of case law, there are releases, and there

3    are releases.  I would suggest that there are Section 105(a)

4    releases that are related to the Debtors' business and

5    professionals that are -- and no question -- commonplace.  I

6    think that the scope of these releases is something greater,

7    much more in the fashion of a mass tort release -- that's

8    what it is -- and I think it requires a different analysis.

9    That's my position on that, Your Honor.

10             THE COURT:  Thank you, that's helpful.  Okay, and

11   I think the last group to speak to this is the Gulf

12   Underwriters and St. Paul and Marine, et al.

13             MR. LUSKIN:  Yes, Your Honor, Michael Luskin,

14   Luskin, Stern & Eisler for Gulf and for St. Paul.  This is

15   very limited objection to the scope of the release insofar

16   as it covers three non-debtor entities.  We have a

17   settlement agreement; the contract with six Purdue entities:

18   three are debtors, three are non-debtors.  And under the

19   terms of the release provisions in the plan, the non-debtors

20   who are listed as Side B Shareholders in Appendix H --

21   that's at page 498 of 499 in the disclosure statement are --

22   their indemnity obligations are being released.

23             These are third-party claims, direct claims

24   against the insurers.  For instance, a coverage claim by the

25   Committee against Gulf.  I'll be very, very brief, since

Page 276

1    Your Honor has heard the full book on third-party releases

2    today, but look, Metromedia is not satisfied with --

3            THE COURT:  Can I interrupt you -- I'm sorry, Mr.

4    Luskin.

5            MR. LUSKIN:  Yes, you may.

6            THE COURT:  I just want to make sure, who is

7    giving a release of what, that you're objecting to?  Gulf

8    and St. Paul are releasing who?

9            MR. LUSKIN:  No, no, no.  Gulf and St. Paul are my

10   clients.  The plan is releasing my counterparties.  They are

11   Purdue Frederick, PF Laboratories, and PRA Holdings.  Those

12   three companies owe -- have agreed under an agreement back

13   in 2006, to indemnify the insurance companies for defense

14   costs, for instance, in third-party suites that exist now,

15   at that may exist in the future.

16            That was part of a -- the facts on this, they're

17   very simple and they're set out in a stipulation which is

18   ECF3589.

19            THE COURT:  Okay.

20            MR. LUSKIN:  It's a two-page stipulation.  So,

21   what we have is a contract that's from 2006 --

22            THE COURT:  I got it.  I just -- it wasn't --

23            MR. LUSKIN:  You got it, okay.  Okay, I'm sorry, I

24   wasn't clear.  So, what the plan does, is it, it gives the

25   three debtor parties, the three, my three -- three of the

Page 277

1    six debtor counterparties, my counterparties, it gives them

2    the benefit of the plan release.  Fine, we don't have a

3    problem with debtor parties getting release.  These are non-

4    debtor parties who have made no contribution, who have not

5    participated in this case, who will owe us money, or do owe

6    us money on the indemnities.

7             And, frankly, there's been zero showing

8    whatsoever, that this release, for these three non-debtors

9    is necessary for the plan.  I do not see how a -- the

10   elimination of a bargain for commercial benefit by non-

11   debtors is fair, to use the Third Circuit, and I believe

12   also the Second Circuit standard.  I --

13            THE COURT:  And because they're non-debtors

14   there's no 502(e) or 509 issue.

15            MR. LUSKIN:  Correct.

16            THE COURT:  Okay.

17            MR. LUSKIN:  They're non-debtors and I think that,

18   under the standard, that seems to be a common theme in

19   today's arguments.  This is -- removal of this thread will

20   not cause the tapestry to unravel.  This is a loose end that

21   can safely be trimmed off and should be trimmed off.  I

22   think that if the Court applies the exacting hard look that

23   is required under Metromedia, you will require the Debtors

24   to revise the plan to allow these -- to remove these

25   releases and to allow the indemnity provisions to continue.

Page 278

1                  That's all I have, Your Honor.

2                  THE COURT:  Okay, thank you.

3                  MR. LUSKIN:  Thank you.

4                  THE COURT:  I think those are all of the people on

5       the list.  I know it's fairly late, but I would like the

6       Debtors -- unless they have someone else to do it -- to

7       respond to the last two arguments, Mr. Underwood's and Mr.

8       Luskin's.

9                  MR. HUEBNER:  Your Honor, may I ask the Court a

10      question --?

11                 THE COURT:  Sure.

12                 MR. HUEBNER:  -- before we  -- sonto that.  The

13      objectors went for four hours, and obviously, the Court had

14      many questions for them and that's fair.  A bunch of things

15      were said that I believe, on behalf of the estates -- and

16      based on emails and texts I've been getting, I think with

17      the exception of two minutes for the UCC, I will make an

18      omnibus response that will be relatively brief and targeted.

19      But many things were said factually; many things were said

20      about the Debtors and the plan and other constituencies.

21      But I actually feel relatively strongly, in a case of this

22      import, probably do merit a response.

23                 Obviously, if the Court's view is -- you know, I

24      read every single thing and I don't not need or want to hear

25      from the Debtors or, in general, the proponents in the

Page 279

1    aggregate, to the Debtors; clearly, we will take the Court's

2    direction.  But there are some points that I actually think

3    are very important, but obviously, in this and in all things

4    we're guided by what the Court thinks is important; not by

5    what we think is important.  Meanwhile --

6              THE COURT:  I would like to hear the response to

7    Mr. Underwood's point that there's no channeling injunction

8    for a fund to his clients, and then a response to Mr.

9    Luskin.

10             And then, it would seem to me, that if you think

11   there was a clear factual misstatement, you should point me

12   that and point me to the evidence that would show why.  I

13   don't think I need extensive rebuttal on the arguments

14   though, or any rebuttal, frankly.  I think it's really just

15   -- I have to confess, I want to focus on those last two

16   points:  channeling, not for the unsecured, and the Gulf

17   Underwriters' point.  And then, if you feel that you have to

18   correct the record you should do that too, with cites to the

19   record.

20             MR. HUEBNER:  You know, what I'll do is, I will

21   cut out about 95 percent of what I was going to say and

22   confine myself to cites to the record that I believe are

23   important.  I'll have to take a little extra pause between

24   the two points, which I hope the Court is okay with, because

25   I'll be skipping so very many things that are important to

Page 280

1    us.  But obviously, that's what I'm going to do.

2            In the interim, there will be Mr. Tobak getting

3    read to address both of those points, to which I think we're

4    actually quite comfortable with our answers, which in part

5    are in our papers, and part you will hear in a few minutes.

6            Your Honor, first of all, we heard from several of

7    the objectors who sort of testified about the lack of

8    adequate notice and the fact that they were stayed during

9    the case, and they attempted to impress on the Court that

10   that limited their ability, including with respect to

11   disclosure of the assets and liabilities of the Sacklers.

12           Here are the record cites, Your Honor, that I

13   think belie that claim.  There are 2,188 pages of

14   disclosures and forensic examination of the Sacklers assets

15   and liabilities that are on the docket.  Mr. Collura

16   testified to the 355-page report, 1A.  Mr. Rule testified to

17   the 400-page report, 1B.  Neither of those witnesses was

18   cross-examined.  Mr. DeRamus testified to the valuation of

19   the non-cash transfers and set forth his findings in a 520-

20   page report.  No party cross-examined our witness Mr.

21   DeRamus.

22           Mr. Martin, who submitted two declarations,

23   spanning 913 pages, analyzed the assets of the A Side and B

24   Side of the Sackler family.  No one other than Mr. Underwood

25   cross-examined Mr. Martin.

Page 281

1           The UCC letter which was attached to Mr.

2     Atkinson's declaration goes on for about 15 pages, providing

3     record evidence of the extraordinary diligence done by the

4     Creditors Committee, specifically about -- sorry, someone is

5     on camera who I'm guessing does not want to be, in the plaid

6     shirt -- thank you -- specifically summarizing the

7     discovery, the financial information and the analysis of the

8     liability and culpability of the Sacklers.  That evidence,

9     Docket Number 3460, among many other things, talks about

10    450,000 documents produced by the Sacklers; 800,000

11    documents produced by the ACs; 40,000 documents produced by

12    the other 2A entities, which are a form of IAC, and close to

13    200,000 documents produced by Norton Rose.

14           In addition, Your Honor, Dubel declaration,

15    paragraph 23, contains record evidence of the Special

16    Committee of the Board, reviewed over 960,000 documents

17    through its advisors.

18           A stipulation entered into, lo those many months

19    ago, at the beginning of the case, Docket Number 518, called

20    the Tripartite or UCC Stipulation, required the Sacklers to

21    make detailed financial presentations.  Paragraph 17, which

22    I will not read, is very long and has many subparts, of all

23    the financial information that the Sacklers were required to

24    provide or risk contempt under the stipulation approved by

25    this Court, to no objection.  I believe, if my memory is

Page 282

1    right -- and maybe it's not on that point, because it's been

2    along day -- on Docket Number 518.

3            So, Your Honor, with respect to that, I'll say

4    only one other thing:  257 parties signed the protective

5    order entered in this case, that provided, I believe, 100

6    million pages of documents, to basically any and every party

7    that participated in this case, to use as a treasure trove

8    and a hunting ground to find things with respect to the

9    liability and culpability of the Sacklers, 257.

10           So, when lawyers talk about lack of information

11   and lack of transparency, it just seems so utterly belied by

12   the record that it's not a surprise that they never have

13   citations.  Obviously, I will not cite Your Honor to Your

14   Honor, since I'm directed to record evidence, but much of

15   this information is about the foreign assets and the foreign

16   entities where the money is.  And it would be very, very

17   difficult and arguably impossible to get in discovery

18   without letters rogatory and (indiscernible) getting the

19   cooperation of foreign jurisdictions, etc.

20           Item number two, which is factual.  You know, I

21   want to apologize to the State of Washington and to the

22   State of Maryland.  Apparently, in pulling together cites

23   for the general proposition, that many states are obligated

24   to put recoveries in their treasuries, I picked two bad

25   examples.  It was my fault and I take responsibility for

Page 283

1    that.

2             There are many states who not only don't have such

3    a special provision, but have the opposite provision.  In

4    Oklahoma, for example, right after we settled with them pre-

5    filing, they passed 74 Oklahoma Statute annotated 30.6, to

6    bar the attorney general from doing settlements and putting

7    money directly into opioid as opposed to in the state

8    treasuries.

9             So, there are many devoted public servants and

10   many elected officials, each doing the best they can.  I

11   should have left the point more general, which is there can

12   be no assurance that the money will go to abatement if there

13   are direct recoveries, as opposed to, I think citing

14   Maryland -- and I apologize again, both to Mr. Edmunds and

15   to the AG for my mistake in not knowing that there was a

16   subsequent, more specific statute that, praise the Lord,

17   directed opioid recoveries to abatement.

18            Your Honor, with respect to transparency and

19   notice, I will rest on the extraordinary record -- I won't

20   respond to that at all.

21            Your Honor, it's not record evidence, and forgive

22   for straying for a nanosecond -- you know what, scrap that;

23   delete it and retract it.

24            Your Honor, this is in order and this is fact:

25   Your Honor asked Mr. Gold, and got what I actually think --

Page 284

1    actually from Mr. Goldman, excuse me -- possibly the most

2    important question that is the cornerstone of the entire

3    hearing.  Under your theory, what happens if one

4    governmental entity potentially is against the will of

5    everyone else, if it's literally 613,999 creditors to one?

6    Whether because that governmental entity is acting in the

7    best of all possible fates and believes that the terms,

8    etc., is not satisfied; or whether it's -- just wants much

9    more than it deserves, and the now has ultimate extortion in

10   a situation where a single foreign town or domestic town or

11   municipality, or state, under 10127 which, as Mr. Kaminetzky

12   pointed out, defines governmental units with breathtaking

13   precision, the term that is incorporated as used in the

14   Police Power Provision at 364.

15           And I apologize for picking on Connecticut, Mr.

16   Shore's home state, as we learned today.  But here's the

17   fact?  Connecticut's proof of claim, under penalty of

18   perjury, asserts $50,686,000,000 against Purdue.  And of

19   course, we know that -- and believe me, I'm not pushing back

20   -- that many people believe that any claim against Purdue is

21   a claim against the Sacklers.

22           So, on some level, that's all you need to know;

23   which is, since individual states, almost all of them, are

24   asserting claims in the tens of billions of dollars, and

25   many municipalities are asserting massive claims, what they

Page 285

1    are, in essence telling you, is that in their view, 99.999

2    percent consensus is irrelevant because one entity -- and

3    under, you know, some of the theories we heard today,

4    including my often very dear friend Mr. Fogelman -- and how

5    he lives with the dissonance of being one of the hardest

6    working people in this case, for abatement and for a PHI,

7    and working on the injunction day and night, to make sure

8    the DA is satisfied with it, to make the new company cleaner

9    than any company ever, while at the same time filing a

10   statement and arguing passionately, as far as I can tell, an

11   objector; not only has the settlement of a $2 billion claim

12   - I don't understand any of that.

13          But under his theory, defining the governmental

14   entity, if any entity -- any entity in the world -- can put

15   a proverbial block, even if all 50 states -- and we even get

16   Seattle on board -- and all 22,495 cities, counties

17   (indiscernible) support, with one group of tort plaintiffs,

18   with one lawyer, with a $20 billion asserted claim, says

19   they're not in the deal, everything crumbles to the ground.

20   There's no way that anybody actually believes that that can

21   be the right answer.

22          You Honor, with respect to record evidence, sort

23   of, on the direct claims versus estate claims, I would point

24   the Court to paragraph 239 of our brief, where we clearly

25   state that we believe that the estate claims are very

Page 286

1    substantially stronger than any of the direct claims.

2    Because when it comes to invading the corpus of trusts, when

3    you have a (indiscernible) claim for estate value that was

4    transferred into a trust, you stand very differently than

5    having an in personam claim against a beneficiary of the

6    trust when you try to pierce the trust to get the value out

7    of your trust.

8            Suffice it to say, Your Honor, I was as bewildered

9    as you were by your colloquy with Mr. Fogelman.  The fact

10   that someone is agreeing to dip into a trust where there is

11   an additional layer of recovery risk, I think speaks to the

12   wisdom and strength of the settlement.  There's no sword and

13   shield at all.  It's the opposite; they're putting down a

14   force field and making the trust obligors, instead of saying

15   that they have no liability and will only pay out of

16   personal assets.

17           Your Honor, the record evidence I think also shows

18   -- I actually don't have pin cite for this.

19           You know what?  Before I say that, I want to say

20   something else, actually of extraordinary import

21   (indiscernible) personally.  And some of the new arrivals

22   who are participating in this hearing probably do not know

23   this, you know, we arrived, Davis Polk, for the first time,

24   in March 2018 -- no prior connection to the Sacklers, no

25   prior connection to Purdue.

Page 287

1              I'll just let the facts speak for themselves;

2     which is, by January 2019, every Saclker was gone from the

3     Board and out of management.  And there was a majority of

4     new blue chip, independent directors, who not only were four

5     of the seven, but were the entirety of the Special

6     Committee, to whom there was irrevocable delegation.

7              I think it's fair to say that we understand

8     cleaning house and deterrents and propriety.

9              So, now onto this point:  It is simply a fact that

10    out of the 57 human beings who, I believe, are descendants

11    of Mortimer and Raymond Saclker, only 11, to our knowledge,

12    were ever on the Board at any time.  And as I said before, a

13    fair number of them are not US citizens, do not live in the

14    United States and have never been involved.

15             So, those are just the facts that inform the

16    landscape.  And, you know, when people … I'll leave that

17    alone.

18             Next fact, Your Honor, the GDP of the United

19    States of America in 2020, was $20,930,000,000,000.  That's

20    a fact.  Why is that fact relevant?  Because what you heard

21    from many people is a totally unsupported new theory that

22    the ratio of harm alleged to the settlement, is somehow

23    legally relevant.  Under that theory, if the Sacklers had

24    the entire wealth of the United States of America's 2000

25    GDP, and they contributed the whole thing, it would still be

Page 288

1    insufficient.  Because the $40 trillion number, that we

2    constantly remind people, is the amount of filed proofs of

3    claim -- there's only 10 percent of them, because 90 percent

4    were filed in an unliquidated amount.

5            So, if you extrapolate out, there could be $400

6    trillion worth of claims, which means that the United States

7    of America donated its GDP, would be about 5.2 percent of

8    the alleged harm, and would not be sufficient to settle, due

9    to the amount alleged.

10           Your Honor, with respect to the police and

11   regulatory dimension -- and this is so important -- and

12   again, I'm not going to make argument; I'm going to stick

13   what's in the record.  The covenants contained in the Eighth

14   Amended Plan and in the Mediator's Report, supported by 80

15   percent of the states and the MSGE Group, speak passionately

16   and directly to this exact point.  We don't begrudge anyone

17   who wishes we were getting a lot more from the Sacklers.  I

18   hereby swear that I would rather take another billion or two

19   billion or three billion from the Sacklers, and put it to

20   work on abatement.  So does everyone; that's not the issue.

21   The issue is, did all the rest of the states and almost all

22   the mutants -- and we'll talk the parens patriae and I'll

23   direct Your Honor to the citations for that in just a moment

24   -- are they entitled to have their views effectuated?  Or

25   does any individual not on board get a blocking right?

Page 289

```
 1              So what is the record evidence, Your Honor?  The
 2      record evidence is that by the time the third mediation was
 3      concluded, the covenants to the deal that directly address
 4      deterrence and regulatory and even frankly penal include the
 5      following: the Sacklers are barred for life from any further
 6      connection to Purdue.  Purdue is stomped out of existence in
 7      Chapter 11, and its assets are transferred to NewCo.
 8      NewCo's governors are picked by the government.  They will
 9      pick the board and the overseeing trusts.  There will be a
10      monitor continuing.  We have had two illustrative --
11      illustrious monitors.
12              And it was Your Honor's suggestion, and we did it
13      at the very beginning of the case and it is not going away.
14      There is an injunction that is going to be in place, and I
15      was very confused by Mr. Edmunds until he said, quite
16      understandably, because we're all overwhelmed by the needs
17      of this case, that people had to divide and conquer, right?
18              The NCSG, as this Court remembers well, doubled in
19      length the original injunction from 2019 after three or four
20      or five weeks of negotiation.  And we are now very close to
21      an agreed injunction that goes yet further still that all of
22      the states are involved in negotiating.  And hopefully we
23      will reach global piece.
24              Mr. Fogelman and the DEA is also deeply involved.
25      And my understanding is that document is just about done and
```

Page 290

1    has just about universal agreement.  So there's that and

2    then there's the repository which I'm not going to repeat

3    the terms of because Your Honor has heard them enough.  And

4    then there are the naming rights, and then and then and

5    then.

6           And so if you want to talk about deterrence and

7    messaging to say we will take your company away from you, we

8    will rip it out of your hands, we will stomp it out of

9    existence, we will transfer its assets to a trust for the

10   benefit of the American people, they will have a monitor, we

11   will pick the board, you will be barred and you have to sell

12   all your overseas companies and give us over $4 billion, the

13   largest settlement in the history of Chapter 11, it's not

14   what I think matters because that's irrelevant.  It's what

15   97 percent of our governmental creditors, 80 percent of the

16   states, and as Mr. Shore and Mr. Arik so eloquently noted,

17   an even higher percentage of the actual human beings

18   injured.

19          Back to record evidence, Mr. Gold testified that

20   there will not by dystopia of the plan fails.  That's not

21   what the record evidence shows because in this case, the

22   past is a very excellent prediction of future performance.

23   And Mr. Delconte's liquidation analysis, which I'll be

24   talking a fair bit more about when we get to best interest

25   on Wednesday, is the evidence on this as is what the Court

Page 291

1    of course will take judicial notice of which was described

2    at length in our pre-filing brief, the so-called

3    informational brief, that describes exactly what was going

4    on pre-filing, that states and municipalities and tribes and

5    plaintiffs competing against one another to get there first

6    and get value from the Sacklers with new litigations being

7    filed, sometimes 20 a day, in different courthouses, et

8    cetera.

9              And that's what the evidence shows.  It's not that

10   the AGs thought that it would be irresponsible.  There are

11   600,000 people, each who passionately believe they have

12   enormous claims that deserve vindication.

13             Your Honor, with respect to sovereignism --

14   sovereignty, I'm not going to repeat what was in Mr.

15   Maclay's brief, except to note that he goes on starting at

16   Paragraph 9 on Page 5 for quite a few pages with a lot of

17   pretty convincing-looking case law and statutory cites to me

18   about home rule including ironically -- I'm not going to

19   take the fall for this one if it's wrong since it's not my

20   brief -- California, Oregon, Washington, Connecticut and

21   Delaware are among the states that provide for home rule

22   either in their constitutions or by legislation.  Then he

23   cites a lot of stuff.

24             So states are unquestionably critical sovereigns

25   and it's true.  It's true.  I guess I don't know enough

Page 292

1    about American politics as maybe I should.  I don't -- I

2    don't know that I'm profoundly ignorant.  I think that may

3    have been a little bit much.  But I do know that out of the

4    4,924 U.S. governments who voted, 4,914 are not objecting to

5    the plan and ten are.

6           Finally, Your Honor, I think, I want to note that

7    every one of the objectors disclaimed a desire to talk about

8    Iridium.  They said, not my thing, I'm not talking about

9    Iridium, that's not me.  But then they all did, every one of

10   them, because what they did was they cited a document or two

11   or three or five that, you know, suggests that the Sacklers

12   have a lot of risk here.

13          Let me be very clear because you can assume that

14   the special committee, which has looked at 960,000 documents

15   and the UCC that has done the same, share that view

16   passionately.  The Sacklers have very substantial risk here,

17   in the billions of dollars.  I've said it at so many

18   hearings that only new entrants to the case, I think, could

19   possibly believe to the contrary.  It is to settle that risk

20   that they are agreeing to all of these covenants and paying

21   this money.

22          Whether it's enough money is for the creditors to

23   decide.  And they have decided decisively and definitively.

24   If it is truly unlawful, that's for the Court to decide.

25   But for people to give you one or two documents and say,

Page 293

```
 1    look, Mortimer knew, that Dr. Richard knew, do you think we

 2    don't know that?  Do you think the Court doesn't know that?

 3    This has been three-and-a-half years full-time.  We know

 4    much more than this were the tip of iceberg, and we never

 5    would have allowed the Sacklers to get on the stand for

 6    three days and tell their story and defend themselves.

 7              To say that there were no Perry Mason moments is

 8    an understatement.  But this is for bankruptcy is for.  It's

 9    for collective action to solve otherwise unsolvable problems

10    and to do the best or the most that one knows how.  If it's

11    truly illegal, then Your Honor will turn it down, and I

12    actually terribly fear what will happen, as you have heard

13    from me in spades.  But to say that it shouldn't go through

14    because they found a document or two or three that suggested

15    that the Sacklers had risk, we found hundreds.

16              We know what the risk is.  And that's in the

17    negotiation and the mediation, there Judge Layn Phillips and

18    Mr. Ken Feinberg spent 11 months full-time.  No one's even

19    heard of hiring a mediator by the month, full-time for a

20    year.  All they did, without breaching mediation privilege,

21    was get presentations, hundreds of pages long with

22    attachments and excerpts and arguments and quotes.  And they

23    then jointly recommended 4.275.

24              So I don't appreciate the kind of, you know, sub

25    silentio Iridium testimony to people who keep saying that's
```

Page 294

1    not their issue.  We are very comfortable that the will of

2    the overall number of creditors and governmental creditors

3    supports the deal.  The issues that are left are really

4    entirely legal, and we stand both on Mr. Kaminetzky's

5    argument which I think address everything, along with the

6    papers of all the supporting parties.

7              So with that, Your Honor, I've left out a lot of

8    what I wanted to say.  But I would ask you to indulge me.  I

9    just want to say one last thing, I promise, and then I'll

10   turn to Mr. Tobak.

11             When either litigants in this case or those who

12   report on what's happening refer to this plan as the Sackler

13   plan or the Sacklers, you know, exploiting a loophole in the

14   Bankruptcy Code, it's almost impossible to overstate how

15   painful that is, not to me, but to the UCC and the AHC and

16   the MSGE and the Native American tribes and the adult PI

17   victims and the NASPI victims and the MAS medical monitoring

18   claims and the hospitals and the third-party payers and the

19   ratepayers and the schools.

20             Every one of those groups had to look deep inside

21   and figure out whether they would support this plan or not.

22   The Sacklers are the defendants.  That's all they are.

23   They're not the voters.  They're not the proponents.

24   They're not the supporters.  They're not the craftsmen.  In

25   fact, they didn't even see this plan for months.  They sent

Page 295

1    Howard to get copies of it because it wasn't their business.

2    We are the plaintiffs.  And they are the defendants.

3           Unless the plan is unlawful, the 4,500 pages of

4    uncontested testimony and expert reports make it clear there

5    is no better way out of this.  We all wish there was more.

6    But the consensus of everyone in the case, except for ten

7    people basically, is that we're not getting more voluntarily

8    and the involuntary route is vastly, vastly worse.

9           With that, Your Honor, I'll ask Mr. Tobak to

10   please come up and address the two technical questions.

11   Your Honor, I promise you I cut out 90 percent of what I was

12   going to say.  I apologize for straying a little bit from

13   record evidence.  Obviously this is a case of tremendous,

14   tremendous import to the Debtors who, while not government

15   officials, are in fact the fiduciaries for all parties for

16   whom we actually care rather desperately and passionately.

17          THE COURT:  Okay.  Thank you.

18          MR. TOBAK:  Marc Tobak -- oh, sorry.  Thank you,

19   Your Honor.  Marc Tobak, Davis Polk & Wardwell for the

20   Debtors.  With respect to Mr. Underwood's point that his

21   clients' claims are not channeled, that's entirely correct

22   and appropriate for four reasons.  One is simply that the

23   Canadian munis' claims are fundamentally different from

24   those of domestic non-federal-governmental entities.

25          As has been discussed over the course of these

Page 296

1    hearings, the plan treats claims against the Debtors and has

2    refocused at length today on claims against release parties

3    and shareholder release parties that relate to the Debtors.

4    Thus the plan treats Canadian municipal and First Nation

5    creditors' claims against the Debtors or claims against the

6    shareholder release parties that relate to the Debtors.

7           But unlike the domestic federal -- domestic non-

8    federal public claimants, the Canadian municipalities and

9    Canadian First Nations can look to a separate company, to

10   Purdue Canada for recoveries and, to the extent that they

11   have claims against any shareholder release party that

12   relates to the conduct of Purdue Canada and not the conduct

13   of the Debtors, can look to those parties for those non-

14   debtor-related claims.  That means that they're both

15   fundamentally different from the claims that are treated

16   through NOAT.

17          As a consequence of that, they've received

18   different classification and treatment under the plan.

19   They're classified in the class 11-C as a general unsecured

20   creditor and, unlike the participants in NOAT, don't receive

21   distributions on account of abatement.  They could however,

22   to the extent that they succeed in proving their claim and

23   withstand the objection that the Debtors would intend to

24   pursue, would receive those recoveries directly in the form

25   of a recovery from the pool of money set aside from those

Page 297

1    creditors, unlike NOAT that receive abatement funds which

2    are obviously subject to a great deal of carefully

3    negotiated covenants and promises about how those funds

4    would be used.

5          To the extent that this argument is intended as an

6    argument that the releases -- the fact that these claims

7    would not be channeled matters for the Metromedia analysis,

8    Your Honor, I would say as we sorted out and as Mr.

9    Kaminetzky noted, Metromedia is not a matter of factors and

10   prongs and ultimately turns on the importance of the release

11   to the plan and the fact that these claims, as is

12   appropriate given their different treatment, are not

13   channeled does not matter for the Metromedia analysis of why

14   the third-party release of those claims with respect to

15   claims against or related to the Debtors is appropriate.

16         Finally, to turn to the sovereign immunity

17   argument, I think it's very clear, as we set forth in our

18   brief, that Section 106 of the Bankruptcy Code abrogates

19   sovereign immunity and abrogates the sovereign immunity of a

20   foreign -- of a foreign entity, whether it be a foreign

21   state or one of its instrumentalities.  And there's really

22   no case that we've been pointed to or evidence that we've

23   been shown that a foreign sovereign immunity has any

24   application here.

25         That's I think all we had to say on that argument,

Page 298

1   unless Your Honor has any further questions.

2           THE COURT:  Okay.  No, that's fine.  And then you

3   were also going to address the insurance companies'

4   argument.

5           MR. TOBAK:  Yes.  With respect to Gulf

6   Underwriters, ultimately I think the safest thing to point

7   out is that we obviously do not represent the IACs or non-

8   debtor entities that were party to that settlement

9   agreement.  And I think the safest point is to say that that

10  point has been the subject of discussion and I think should

11  be continuing to be the subject of discussion.  On the other

12  hand, to the extent the analysis for the release of those

13  claims is really the same as the analysis for all those

14  which we've discussed.

15          THE COURT:  Okay.  All right.

16          MR. TOBAK:  I see Mr. Underwood is on.

17          THE COURT:  Okay.  Mr. Underwood, you've made your

18  point too.  I just wanted to hear a response to it.  I don't

19  think I needed any point/counterpoint at this point.

20          MR. UNDERWOOD:  Thank you, Your Honor.

21          THE COURT:  All right.  Mr. Preis, I see you

22  there.  I don't know if you have anything brief to say in

23  rebuttal.

24          MR. PREIS:  I do, Your Honor.  It will be less

25  than 60 seconds.  Can you hear me?

Page 299

1           THE COURT:  Yes.

2           MR. PREIS:  Thank you, Your Honor.  Just for the

3    record again, Arik Preis, on behalf of the Official

4    Committee of Unsecured Creditors.  As Mr. Peter pointed out,

5    there are a lot of misquotes, a number of factual assertions

6    that were simply wrong including about things that -- but it

7    doesn't really change the legal argument.  So I'm not going

8    to take Your Honor's time.

9           What I did want to ask, and just to get

10   confirmation to this point, is that the stipulation that we

11   agreed to at the beginning of the evidentiary -- of the

12   hearing also extends to anything that was said about the

13   evidence during the oral argument.  One could read that

14   stipulation as not extending further.

15          But there was some colloquy that you had with Mr.

16   Gold or Mr. Goldman about evidence that they had or didn't

17   have.  Obviously we're staying out of it, as we did during

18   the evidentiary portion.  But I just wanted to make sure

19   that the stipulation also extends to the oral argument.

20          THE COURT:  Right.  That's my understanding.

21   Again, I think the stipulation ultimately is built in

22   suspenders in any event because I can't imagine anything

23   being effective collateral estoppel.  But yes, that's my

24   understanding.

25          MR. PREIS:  Thank you, Your Honor.  That's all.

Page 300

```
 1              THE COURT:  Okay.  All right.  I'm not sure --

 2              MR. UZZI:  Your Honor?

 3              THE COURT:  Yes?

 4              MR. UZZI:  Just -- Gerard Uzzi, from Milbank on

 5     behalf of the Raymond Sackler Family.  Just to deal with a

 6     factual issue on the Gulf Underwriters objection, and I

 7     appreciate Mr. Tobak saying that there are discussions going

 8     on and we're happy to continue those discussions.

 9              But just in case we don't come back to this topic,

10     just to explain, you know, the background here, these relate

11     to -- the indemnification obligations relate to policies

12     that predate or ended in 2003.  So it all deals with prior

13     conduct prior to 2003.  The only parties that can make a

14     claim under this policy would be the MDT.

15              We have given not just in connection with this but

16     other things, the Sackler family and the related parties

17     have turned over all their insurance rights to the Debtors.

18     So this release is just to make sure something doesn't come

19     back through the back door just like any other claim that

20     could be made against us for the debtor's conduct, Your

21     Honor.

22              And again, I'm happy to continue the conversations

23     with the Debtors, with Mr. Luskin as well.  But in case we

24     don't come back to it, I just wanted to put some context

25     around that, Your Honor.  And I'm happy to answer any
```

Page 301

1    question you have.

2              THE COURT:  Okay.  No.  That's fine.  Thanks.

3              MR. UZZI:  Thank you, Your Honor.

4              MR. LUSKIN:  Your Honor, may I -- I just wanted to

5    --

6              THE COURT:  Yes.  But you're not coming through

7    clearly for some reason.

8              MR. LUSKIN:  Because I'm not using my microphone

9    and now I am.

10             THE COURT:  There you go.

11             MR. LUSKIN:  I took Mr. Huebner's admonition and

12   got myself a headphone, and I don't know how to use it.

13             THE COURT:  Okay.  All right.

14             MR. LUSKIN:  I apologize.  I certainly welcome the

15   opportunity to talk to Mr. Uzzi.  Please do call.  And also

16   our objection -- we have no idea whether additional claims

17   can or will be made.  These are indemnity claims.  The point

18   is they have not been -- or the possibility of such claims

19   has not been obliterated.

20             They still could be asserted.  And there are some

21   litigations pending where we do have defense costs that are

22   covered under the settlement.  So there are both existing

23   claims and potential claims.  But we are happy to discuss

24   any resolution.  Give me a call.  Thank you, Your Honor.

25             THE COURT:  Okay.  And just for the record, that

Page 302

1    was Mr. Luskin on behalf of Gulf Underwriters.

2              MR. LUSKIN:  Oh, sorry.  Yes.

3              THE COURT:  And I guess I had thought that there

4    was some preservation of insurers' rights in the MDT.  But

5    maybe I'm missing that.  I'll just leave it at that.  I know

6    that that subject is heavily documented.  Okay.  Anything

7    else before we break?

8              MR. UNDERWOOD:  Your Honor, if I may, this is

9    Allen Underwood on behalf of the Canadian municipalities and

10   First Nations.  I do want to reserve the right on Wednesday

11   to very briefly unpack this issue, a little bit of sovereign

12   immunity as well as why --

13             THE COURT:  Right.  No.  That's -- that's fine,

14   and that's the jurisdictional issue.  But that's fine.

15             MR. UNDERWOOD:  Thank you, Your Honor.

16             THE COURT:  Okay.  All right.  Let's break until

17   Wednesday morning then.  This -- these two issues have taken

18   up a full day.  But I have little doubt that we would finish

19   on the remaining issues in a full day.  These issues were

20   much more significant, I believe, not to really belittle the

21   other issues, but I think they require more time so that the

22   parties' arguments could be fully understood.

23             I hope the parties use that day productively, not

24   just on the last issue that we were discussing, but also on

25   the release issues in two ways: first, in narrowing the

Page 303

1    release further; secondly, while I believe I fully

2    understand Mr. Huebner's point, that it just can't be the

3    case that one creditor or one public creditor could veto or

4    crater this plan, there is still risk on all sides with

5    respect to the plan and potential appeals of the plan if

6    only insofar as it would pertain to delay and cost and of

7    course the delay here includes not only getting money to

8    individual personal injury creditors but also in getting

9    money to governmental entities to abate or help to abate the

10   opioid crisis.

11           I told the parties once that they should have

12   another mediation.  That mediation went to Judge Chapman.  I

13   can't imagine anyone who would be able better to get the

14   parties to see the pros and cons of their cases and to

15   facilitate a settlement than Judge Chapman.  I'm not going

16   to direct further mediation.  I think this hearing should

17   illustrate to the parties on both sides of the table, that

18   is the objecting states on the one hand and the Sacklers on

19   the other, the risks that they face.

20           I will note that I found Kathe Sackler's testimony

21   cogent and her stating that she and her family members

22   wanted to avoid spending more money on lawyers and have that

23   money directed to abating the opioid crisis and to personal

24   injury creditors.

25           I will note however that a lot of money has been

Page 304

1    spent on lawyers in getting to this point.  If there is any

2    message in what I've just said, it is that if an agreement

3    can be reached with the objecting -- remaining objecting

4    states that involves not only narrowing the release but

5    providing for additional funds or clarifying the injunctive

6    relief in the plan, the parties should focus on that tonight

7    and Wednesday.

8            That will clearly be your best opportunity to do

9    so.  And you should use it.  The time has passed at this

10   point to speechify.  One really needs to focus on the type

11   of analysis that I was discussing with Mr. Goldman.  And I'm

12   speaking not just to the states but also to the Sacklers.

13   So please use that time productively.  Thank you all.  I'll

14   see you all on Wednesday at 10:00.

15           (Whereupon these proceedings were concluded at

16   6:41 PM)

17

18

19

20

21

22

23

24

25

Page 305

1                          C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya

      Ledanski Hyde

7

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.08.24 20:53:22 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 24, 2021

[& - 2007]                                                                          Page 1

## &

**&**   3:13 5:2,8
15:19 19:10 61:18
62:5 63:9 93:1
101:1 149:5
186:10 275:14
295:19

## 0

**0408**   68:19
**06604**   6:19
**07102**   6:5
**0937**   85:18
**0939**   86:5

## 1

**1**   28:9 39:20 43:16
51:13 59:2,5 60:2
75:18 79:15 89:10
95:2 103:23
105:17 115:7
119:2 121:5
126:14
**1,126**   52:15
**1,300**   118:17
**1.06**   23:19
**1.1**   68:17 262:14
**1.56**   48:24
**1.6**   68:4
**1.7**   252:5 267:5
**1.775**   46:25
**1/500th**   60:2
**10**   40:12,21 41:6
51:11,17 105:16
132:8 159:2
176:18,25 180:9
266:21 288:3
**10-11**   129:15
**10.18**   22:6
**10.4**   105:22
**10.6**   22:4 27:17,20
32:24
**10.6a**   23:8 24:15

**10.7**   27:17,20 30:1
138:15 139:15
**100**   43:16 53:19
81:23 164:15
173:10 282:5
**10014**   6:12
**10017**   3:6
**10019**   4:4,18
**10020**   3:17
**10036**   5:12
**1006**   6:11
**101**   76:9
**10110**   7:4
**10127**   284:11
**103**   49:13
**105**   65:2 75:1
76:15 126:20
142:19 143:18,21
182:5 275:3
**106**   297:18
**10601**   1:14
**10:00**   2:5 304:14
**10a**   115:11
**11**   2:2 27:5,23
33:1,4 40:14 41:7
42:5 51:9,17 54:5
59:8,10 64:1
79:18,19 81:20
85:13 89:6,9 93:3
93:21 94:7 96:6
100:12 129:1,10
132:11 134:15
159:3,3 166:12
167:6 264:21,24
287:11 289:7
290:13 293:18
296:19
**11.01**   29:9
**11.1**   34:1
**1107**   265:11
**112**   265:19
**1123**   182:1,5
183:24 184:19,25

**1126**   145:24 146:2
147:5
**1129**   59:8,10 64:1
126:14 181:14
**114,307**   115:1
**1141**   126:17,21
182:1,5
**11501**   305:23
**12**   35:12 40:16
80:13
**12.8**   34:8
**120**   17:21
**120,000**   51:8
**1201**   6:4
**1221**   3:16
**13**   40:20
**13,500**   164:5
**131**   265:19
**1334**   88:22 89:6
92:1
**136**   67:22
**137**   173:21
**137-140**   91:12
**14**   34:7 39:17
40:21,23 41:3
42:4 64:11
**140**   239:3
**142**   66:24 67:10
69:6 72:10 249:19
**143**   67:3
**1452**   76:11
**15**   51:20 68:8
102:5 112:1
133:12 281:2
**157**   88:22 90:22
92:2
**15th**   225:9
**16**   163:12
**1633**   4:3
**16th**   96:17 99:17
99:21
**17**   42:2 84:21
270:25 271:1

281:21
**170**   220:22
**17th**   159:7
**18**   42:2 108:21
**187**   80:13
**19-23649**   1:3
**192**   68:21
**1980s**   64:24
**1982**   267:24
**1988**   76:25 170:11
**1990**   183:7
**1997**   170:13
**1:50:36**   86:6
**1a**   82:1 280:16
**1b**   82:1 280:17

## 2

**2**   39:22 43:23 47:2
50:22 51:13 55:21
68:4,7 90:22
126:21 166:7
248:10 251:9
252:1 285:11
**2,188**   280:13
**2,226,418**   212:11
**2,600**   116:18
117:1
**2/4**   248:8
**20**   48:1 146:15
180:10 285:18
291:7
**20,930,000,000,...**
287:19
**200**   7:10 241:8
**200,000**   281:13
**2000**   7:17 287:24
**20005**   5:19
**2003**   300:12,13
**2004**   157:24 158:4
265:11
**2006**   276:13,21
**2007**   159:7 175:23
178:6 245:12,13

**[2008 - 52]**                                                                                  Page 2

**2008**  107:5 225:23
**201**  6:11 50:22
**2010**  265:19
**2011**  111:25
    224:19 225:9
**2012**  221:12
    224:12 225:20
**2013**  225:11,15,21
**2016**  177:12
**2017**  178:7
**2018**  45:25 245:13
    286:24
**2019**  220:7 237:20
    287:2 289:19
**2020**  178:5 245:12
    271:1 287:19
**2021**  1:16 119:11
    305:25
**204**  50:17 170:12
**20852**  7:11
**2096**  177:14
**21**  42:9
**21st**  52:1
**22**  57:9,10,13,19
    68:5
**22,495**  52:9
    285:16
**225**  106:16,24
    107:18,21
**23**  1:16 111:25
    119:11 281:15
**239**  285:24
**23rd**  119:1
**24**  41:3 51:20
    64:11 305:25
**243**  146:12
**248**  1:13
**24th**  81:21
**25**  68:8 100:9
    164:14
**257**  282:4,9
**25th**  112:9

**26**  107:19
**26.325**  57:19
**2623**  248:8
**2624**  248:8
**264**  79:1
**27**  88:4
**274**  170:11
**28**  76:11
**285**  160:1
**2925**  225:23
**2931**  225:20
**2938**  224:12
**2941**  225:5
**2943**  224:15,18
    225:5
**2951**  225:15
**2988**  84:20
**2995**  225:12
**2a**  281:12
**2nd**  21:21
**2o**  119:9

**3**

**3**  23:6 39:24 42:4
    44:2 51:13 103:23
    119:23 268:22
**3,500**  125:4
**3,700**  88:6
**3.6**  88:4
**30**  41:2 65:6
    102:19 210:11
**30.6**  283:5
**300**  1:13 305:22
**3020**  34:8
**31**  4:17 220:22
**3298**  226:8
**330**  305:21
**34**  41:3 64:11 78:1
    80:9
**3460**  281:9
**35**  42:3
**353**  4:10
**355**  280:16

**358**  265:10
**3601**  218:6
**3617**  2:5
**362**  72:21 74:19
    75:2,5
**362's**  75:1
**364**  284:14
**37**  17:5 76:1
**375,000**  16:9
**38**  51:24 57:14
    118:18 193:8,18
    194:1
**39**  86:19
**3rd**  84:18

**4**

**4**  40:1 44:4 51:14
    52:18 72:21 74:19
    75:5 79:15 105:22
    107:4,14,21
    119:18 132:6
    159:3 259:18
    290:12
**4,000**  42:16,17
    64:9
**4,500**  131:8 295:3
**4,914**  292:4
**4,924**  51:5 52:19
    292:4
**4.16**  21:7
**4.25**  206:16
**4.275**  55:20
**4.275.**  293:23
**4.3**  240:8
**4.325**  41:15 44:2
    49:18 56:1,13
    57:15 58:4 65:17
    67:12 68:1,18
    94:3 162:18
    163:22 195:12
    258:21
**4.325.**  57:20
**4.326**  57:12

**40**  106:2 181:23
    288:1
**40,000**  281:11
**400**  68:16 137:3
    280:17 288:5
**41**  135:8
**416**  66:24
**419**  196:22
**429**  265:18
**439**  57:4,8
**45**  196:8
**450**  3:5 41:25
**450,000**  281:10
**456**  267:23
**47**  61:7
**48**  51:24
**49**  100:10
**498**  275:21
**499**  275:21

**5**

**5**  40:3 44:20 51:14
    57:7,11 81:8
    82:18 97:22 115:6
    225:12 291:16
**5,000th**  269:17
**5.2**  288:7
**5.8**  95:7
**50**  52:15 107:18
    152:3 164:14
    238:2 271:18
    285:15
**50,686,000,000**
    284:18
**50/50**  37:21
**500**  7:3 174:13
**502**  277:14
**504**  91:3
**509**  277:14
**509-512**  91:13
**517**  171:8
**518**  281:19 282:2
**52**  171:8

**[520 - abused]**                                                      Page 3

**520**  280:19
**523**  76:18 166:6,7
   166:14
**524**  52:18 71:19
   72:11 76:1,7
   126:13,21 127:18
   127:18,25 128:1,2
   128:4,7,18 198:2
   198:7,15
**52nd**  4:17
**542**  274:20
**557**  173:21
**57**  50:18 287:10
**570**  6:4
**58**  50:23
**585**  196:22
**59**  70:4
**59-60**  100:10
**592**  91:3,13

**6**

**6**  40:5 45:5 51:15
   96:7
**6,200**  246:3
**60**  298:25
**600,000**  47:23
   291:11
**60654**  4:11
**613,999**  284:5
**614,000**  38:10
   47:13 57:14
**62**  17:5 51:21
**62,433**  115:3
**658**  79:1
**66**  52:15
**669.1**  47:12
**67**  98:25
**68**  99:9
**69**  49:13
**694**  267:23
**6:41**  304:16

**7**

**7**  5:3 40:7 51:15
   66:3 76:18 102:11
   107:2 129:10
   135:14 166:6
   181:14
**7-310.1**  44:14
**700**  68:16
**702**  267:23
**71**  99:16
**74**  283:5
**75**  52:16 70:18
   100:6
**750**  117:10
**76-77**  99:22

**8**

**8**  40:8 51:16
**8.4**  21:11
**8/23/2021**  2:5
**80**  52:14 70:14
   288:14 290:15
**800**  7:17
**800,000**  281:10
**80901**  108:17
**80s**  172:5
**83-84**  96:17
**837**  76:25 77:6
**84**  226:8
**844**  122:6
**844-867-6163**
   122:7
**85**  170:11 226:8
**850**  6:18
**867-6163**  122:7
**87**  99:22
**88**  53:18

**9**

**9**  40:10 51:16
   97:23 291:16
**9.2**  34:8
**90**  288:3 295:11

**90067**  5:4
**9019**  123:1 149:22
   150:7 189:13,15
   189:17,19,23
**91**  76:25 77:7
**913**  280:23
**9263332**  122:10
   122:11
**945**  91:12
**948**  170:12
**95**  38:23 51:6,7
   52:23 53:10 70:10
   73:3 131:15
   146:12,14,15
   147:12 279:21
**96**  51:7 70:12
**960,000**  281:16
   292:14
**97**  38:24 51:5
   52:19,24 115:12
   115:14 118:1
   290:15
**98104**  7:18
**99**  53:16
**99.999**  285:1
**9:50**  1:17
**9th**  265:11

**a**

**aaron**  8:12
**abate**  94:5,21
   96:8 102:12 111:8
   119:5 303:9,9
**abatement**  16:21
   39:2,8 43:18 44:5
   44:22 45:20 47:7
   48:16 60:5 71:25
   75:16,23 94:16
   95:6,13 98:12
   99:5,8,24 100:1
   100:13 106:25
   107:3 111:2
   120:14,18 179:2
   207:10 227:20

228:7,9,18 237:22
   238:1,21 248:12
   252:13 270:20
   283:12,17 285:6
   288:20 296:21
   297:1
**abating**  95:25
   104:20 113:2
   303:23
**abby**  8:17
**abetting**  170:25
**ability**  18:10
   44:20 68:10 77:12
   77:21 103:14
   201:23 236:9
   280:10
**able**  16:19,20 23:1
   25:15 35:12 58:2
   84:2 119:21 120:3
   121:3,17 133:19
   139:22 154:20
   206:23 208:1
   209:7,19 231:12
   303:13
**abraham**  210:22
**abrams**  7:23
**abrogates**  297:18
   297:19
**absence**  88:10
   117:15
**absent**  44:10 48:3
   98:19 99:3,24
**absolutely**  47:24
   53:25 67:5 68:9
   73:19 116:20
   130:10 156:18
   159:16 174:7
**absolves**  129:2
**abstract**  158:24
**absurd**  73:19
**abuse**  190:6
**abused**  180:23
   220:24

abusive 127:11
academic 180:6
accept 70:11,13
  97:21 115:19
  146:11 192:4
  193:2 240:21
acceptable 150:25
  158:12
acceptance 53:21
  145:25
accepted 64:7
  115:11 181:19,20
  193:25 194:1
  227:7
accepting 191:9
  191:13 200:25
access 43:20
  122:10,11
accord 32:13 84:1
account 67:21
  100:3 106:11
  145:14 155:1
  162:14,25 175:7
  192:1 296:21
accountants
  60:19 255:17
  256:12 259:10
accounts 143:4
accurate 171:14
  263:10 305:4
accusations 200:2
accused 216:11
achieve 120:16
  151:18 208:1,21
achieved 38:23
  97:8 119:15
  205:24
achievement
  94:10 117:12
achieving 229:18
acknowledge 93:1
  151:9 153:8 159:2
  162:2,4 165:6

169:13 176:10
198:6 261:9
acknowledged
  70:4 171:4
acs 281:11
act 31:1,5 77:17
  90:15 169:1,3,24
  170:19 198:9,9
  208:23 236:8
  241:17 256:20,23
acted 256:22
acting 19:23
  198:11 256:21
  284:6
action 27:14,21
  30:1,24 31:1
  68:15 77:15,16,16
  85:24 188:2
  189:17,25 200:9
  233:8,17 234:3,6
  267:24 293:9
actions 33:2 71:3
  74:11,11,25 76:12
  77:22 78:6 86:13
  142:4 176:12
  188:7 191:20
  197:11,15 200:12
  200:13,14 211:25
  234:13,17 235:2
  249:15 254:7
  265:1
active 93:21
  176:20
activities 86:15
  223:8 254:4,6,23
activity 37:7,9
  200:7,8
actor 169:2
  235:16,19
actors 205:15
acts 80:2 91:1
  141:14 166:5,5
  168:18,20,22,24

169:1 189:5,7
actual 15:5 30:25
  35:16 50:14 54:4
  68:15 86:12,24
  87:18 97:6 114:13
  114:20 117:10
  118:1 138:12,13
  168:1 192:22
  244:21 290:17
ad 3:14 4:16 41:6
  51:11 57:15 86:21
  87:3 92:23 93:15
  93:19 98:10
  100:19 102:4
  113:22 117:21
  130:14,15 176:19
  228:19
ada 255:9
adam 10:10 13:23
adamantly 125:14
add 33:3 57:25
  178:4 189:22
added 20:19 22:3
  28:15 64:5 198:4
addendum 177:13
  220:21 223:16,23
addition 25:5 88:7
  96:19 106:15
  107:21 138:12
  189:1 248:1
  281:14
additional 15:8
  44:2 48:25 82:15
  94:3 107:21
  119:24,24 151:17
  286:11 301:16
  304:5
additions 28:9
address 21:17
  28:7 29:16 31:8
  31:11,12 49:14
  51:1 66:17 74:16
  78:2 89:13,24

93:6,13,19,23
101:13 103:19
113:21,23,24
114:1 145:21
181:8 188:20
199:2 208:9
210:11 215:23
218:21 229:12
239:18 250:21
251:16 259:4
273:4 280:3 289:3
294:5 295:10
298:3
addressed 21:11
  37:7 50:25 94:23
  95:15 122:24
  162:21 166:23,24
  183:22 196:17
  200:23,24 210:12
  218:22 239:15
  241:14 246:24
  265:10 271:19
  273:14
addresses 72:11
  101:25 116:14
addressing 20:1
  20:10 108:5
  113:19 149:13,15
  167:13 186:22
  189:12 194:8
  199:1
adds 223:15
adduced 222:8
adequacy 136:23
adequate 85:4
  88:12 125:7,24
  139:10 152:17
  184:3 214:14
  280:8
adequately
  139:11
adjoin 65:13

adjudicate 143:8
143:24,25
adjudicated
182:10
adjudication
231:15 269:2
adjust 92:17
123:20
adjusted 34:8
administration
119:7
admission 38:4
admissions 223:1
admit 242:21
admitted 42:6
105:11 129:24
218:6 224:10
226:7,8
admittedly 200:6
admitting 226:24
admonition
301:11
adopt 164:25
229:6
ads 86:18,18 87:4
adult 51:14 58:17
115:3 294:16
adversarial 80:11
advertised 139:9
advertisement
139:13
advertisements
86:19 139:10
advised 43:10
159:12
advisor 259:10
advisors 28:20
96:24 120:4
255:16 281:17
advisory 247:7
afanador 6:1
270:7

affairs 89:16
151:15
affect 113:20
171:15 249:17
affidavit 160:11
affiliate 61:16
affiliated 2:3
affiliates 32:6
60:18 61:11 62:9
63:11 105:24
affirmative 21:5
42:1,14,19
affirmatively 51:4
affirmed 74:24
afforded 136:16
197:25 273:3
afternoon 92:19
92:22 113:13
121:1,8 122:21
123:8,9 149:20
154:7
ag 153:24 283:15
age 108:21 111:25
112:1
agency 73:12
agents 36:17
61:10
aggregate 47:12
263:4,8 279:1
aggressive 164:17
ago 17:6 35:12
52:1 79:23 112:8
164:6 219:2
281:19
agree 23:16 34:21
47:25 58:9 87:25
97:23 98:5,7
105:2 109:25
115:15 156:24
157:4 163:19
178:13 181:3,13
195:3 198:13
208:13,18 209:4,5

209:6 215:12,14
217:17,25 232:7
240:19 257:17
261:20 263:21
agreed 19:19,22
20:12,15 25:3
26:1 33:22 39:21
46:19 55:11 56:18
58:25 59:3 60:25
75:15 78:22 94:8
97:20,21 102:10
104:24 106:10
108:16 113:8
137:6 149:6 152:1
152:2 154:3
159:16 174:12
185:2 191:18
199:12 215:6
217:12 238:4
276:12 289:21
299:11
agreeing 58:13
286:10 292:20
agreement 17:25
20:8,11 46:8,16
93:25 94:15,18
108:6,18 109:13
119:3,12 161:6
169:23 170:2,15
177:14 235:1
265:4 275:17
276:12 290:1
298:9 304:2
agreements 21:14
55:2 59:2 94:4,13
209:8 217:12
agrees 113:1
199:16
ags 63:12 154:1
164:17 204:7
291:10
aha 260:6

ahc 16:7,22 40:17
42:15 51:13 55:23
58:17 68:7 73:23
92:10 130:16
294:15
ahead 23:12 31:7
92:10 123:6 214:9
226:2 248:25
aid 169:2
aiding 170:25
airing 95:21 97:9
151:1 231:15
232:8
aisling 12:5
akin 5:8 101:1
al 122:23 275:12
alan 270:6
albeit 206:16
aleali 7:24
alert 271:11
alexander 11:6
alfano 7:25
allegations 177:24
178:9 220:1,5
221:6 245:17
allege 66:1
alleged 68:16 85:5
104:18 151:2
168:14 265:1
287:22 288:8,9
alleging 57:4
allen 6:7 302:9
alliance 78:10,18
196:16
allison 14:16
allocate 163:3
allocated 37:21
120:13 179:5
228:8
allocating 216:20
allocation 19:14
38:6 39:22,24
40:1,3,7,10,21

94:22 99:15 103:3
103:21,25 105:6
119:12,15 123:3
154:3 179:2 185:2
199:12 207:8
272:14
**allocations** 95:5
104:12 154:2
209:5 248:14
**allotted** 15:5
**allow** 38:25 43:3
73:1 76:4 96:24
120:16 126:21
127:22 148:12
208:7 277:24,25
**allowance** 48:18
98:22 99:7
**allowed** 34:25
57:1 59:14 71:16
78:22,24 98:2
126:12 135:19
243:6 244:13
293:5
**allowing** 103:2
113:22
**allows** 58:18 61:8
**alluded** 105:1
110:25 195:1
**alternative** 46:12
47:9,11,17 65:24
191:22,23 205:12
**alternatives**
191:22 258:23
**ameliorate** 39:4
**amended** 2:2
18:21 19:5,17
140:17,18,20
238:6,7,8 288:14
**america** 42:24
115:14 249:2
287:19 288:7
**america's** 287:24

**american** 43:14
45:16 51:14 58:3
83:16 290:10
292:1 294:16
**americans** 45:3
**americas** 3:16
**amorphous** 139:5
147:3
**amount** 16:24
18:1 38:7 81:12
98:8 106:1 115:6
115:13 119:6
132:7 152:13
156:4,9,11 158:23
158:25 162:24
165:9 194:10,12
195:11 201:25
203:8 218:8,8
240:7,10 260:8,18
288:2,4,9
**amounts** 30:14
97:22 109:19
150:25 151:10
178:23 194:11,17
195:10
**ample** 207:24
**amy** 241:19 242:8
**analogous** 70:16
**analogously** 52:17
**analogy** 166:13
213:1 214:25
216:4,25 217:5,8
**analysis** 47:17,20
53:13,24 132:18
132:21 135:1,10
137:19 143:17
155:12 159:21
174:17 177:5
181:16 184:19
195:2,7 265:13
266:17 274:11
275:8 281:7
290:23 297:7,13

298:12,13 304:11
**analytically** 89:25
**analyze** 258:23
**analyzed** 280:23
**ancient** 189:2
**andrew** 4:20 7:25
12:4 23:10 35:23
**angela** 10:12
**angeles** 5:4
**angry** 112:16
**anker** 8:1
**ann** 11:4
**anna** 269:14,16
**annotated** 283:5
**announce** 15:25
**announced** 82:2
**announcement**
15:16
**answer** 31:13 54:2
146:21 147:14
152:20 203:22
210:9 212:10
219:19 223:19
224:5 228:11,15
243:3,3 247:21
259:20 271:7
285:21 300:25
**answered** 152:15
259:13
**answering** 204:25
**answers** 263:10
263:11 280:4
**answer's** 130:4
**ante** 231:10
**anybody** 49:21
88:17 135:24
272:17 285:20
**anybody's** 35:6
**anymore** 182:13
203:18
**anyway** 174:25
185:16 186:6
229:15

**apart** 29:19 162:5
164:12,22
**apologize** 17:4
92:12 134:25
196:7,12 272:13
282:21 283:14
284:15 295:12
301:14
**app** 122:17
**apparent** 83:20
159:5 208:23
**apparently**
269:18 282:22
**appeal** 65:5 74:24
103:13,15 144:5
187:14 188:11
269:19
**appealed** 77:10
**appealing** 103:10
**appeals** 42:24
72:16 303:5
**appear** 139:17
174:16 231:4
**appeared** 16:2
**appears** 86:5
142:4 145:18
**appellate** 183:17
**appendix** 275:20
**apple** 61:18 62:5
63:9
**apples** 202:8
227:10
**applicable** 36:22
77:9 109:2 126:15
185:7
**application** 66:14
194:15 297:24
**applied** 29:24
41:13 181:14
195:25
**applies** 76:9
108:19 153:13
184:25 277:22

**apply** 29:20 37:6
41:11 74:22 75:3
76:3 116:2 167:11
247:1
**applying** 166:13
184:24 193:11,13
193:17 217:7
**appointed** 33:16
**appointing** 33:18
**appreciate** 32:22
177:1 248:19
254:14 255:5
272:22 273:4
293:24 300:7
**approach** 63:1,13
219:22
**approached**
270:12,13,14
**appropriate** 15:7
16:16 17:17 25:7
26:8,12 43:20
66:22 67:9 69:3
69:21,23 70:6
72:9 138:1,4,25
141:15 190:15
295:22 297:12,15
**appropriated**
228:18,19
**approval** 78:3
106:23 127:4
184:16
**approve** 89:3
138:2 148:12
175:12
**approved** 48:22
64:14 120:21
150:5 161:6
196:23 219:10
255:2,14 281:24
**approves** 169:6
**approving** 16:8
84:18 88:20 90:7

**approximately**
52:9 115:12
118:17 176:18
181:22
**architecture**
26:23
**ardavan** 9:7
**arduously** 93:19
**area** 128:6 147:1
214:10,18 247:10
250:20
**areas** 197:12
**aren't** 165:14
**arguably** 52:17
95:19 137:20
162:20 282:17
**argue** 25:15,23
71:4,8 84:3
170:23 182:4
184:4 190:20
192:18 195:20
198:18 210:19
212:17
**argued** 169:10
179:22 180:3
196:25
**arguendo** 56:25
**argues** 167:4
**arguing** 66:18
137:17 184:7
195:23 217:19
285:10
**argument** 15:2,10
15:15,23 16:15
19:3,14 20:1
35:15 36:1 37:3
45:12 47:8 71:6,7
72:11,12,17 76:25
83:20,22 94:24
95:9,20 118:12
122:23,25 124:3
130:12,23 133:2
143:6,10 149:9

150:8 154:9
158:20 159:23
166:9 167:1 168:4
174:11 180:9,19
188:10,11,16
189:25 190:13,21
192:1,7,8 195:18
196:9 201:21
203:4,15 212:8
214:17,18,23
217:2 218:10
219:16 229:13
251:7 269:24
273:8,19 274:12
288:12 294:5
297:5,6,17,25
298:4 299:7,13,19
**arguments** 25:8
38:21 66:19 70:19
70:22 71:11,12
72:11,15 88:24
90:16 149:6,12
162:21,22,24
229:7 277:19
278:7 279:13
293:22 302:22
**arik** 5:14 92:8
101:1 290:16
299:3
**arises** 89:8,8
**arising** 21:14 27:4
27:22 28:18 78:12
89:5,6,22 90:5,5
254:1
**arithmetic** 135:10
**arm** 107:24
**arm's** 54:22
**arose** 264:24
**arranged** 144:18
249:21
**arrangement** 94:9
**arrivals** 286:21

**arrive** 53:7
**arrived** 286:23
**artem** 13:17
**article** 143:22
268:22
**articulate** 18:17
83:8
**articulated**
251:20
**artificially** 210:7
**asbestos** 65:2,3,9
70:16 71:16,19
76:2,8 128:6
**ascertained**
140:25
**aside** 78:16 90:18
98:4 102:8 105:25
117:10,16,17
152:7 171:19
223:25 296:25
**asked** 42:10
135:21 139:18
178:17 191:17
200:18 227:3
244:17,23 248:6
259:7 260:11
261:24 262:22
263:22 283:25
**asking** 23:13
72:24 192:2 210:7
211:14 216:8
240:21
**aspect** 41:14
110:22 120:5
203:2
**aspects** 20:8 93:3
110:23 149:14
**assert** 58:2 69:12
77:24 83:23 124:4
153:10,23
**asserted** 27:2
47:14 98:22
153:24 159:11

196:5 197:5
285:18 301:20
**asserting** 48:5
69:14 98:1 172:8
179:16 284:24,25
**assertion** 81:9
**assertions** 299:5
**asserts** 31:3
284:18
**assessing** 175:6
**assessment**
207:25 210:1
222:9
**asset** 38:19 69:12
133:17 177:7
216:5 260:20
**assets** 43:17 45:24
98:17,19 99:8
128:10 129:11,14
129:19,24 134:21
135:2,5,12,15
139:20 143:4
145:13 157:3,10
157:19 160:25
161:2 217:6
259:23,24 260:21
260:25,25 261:19
261:19,19 262:12
280:11,14,23
282:15 286:16
289:7 290:9
**assigned** 62:10
229:9 230:18
**assigns** 61:12
**assist** 230:17
**assistance** 55:4
119:22 182:6
**associated** 119:19
**associates** 170:12
**associations**
241:22
**assume** 57:7
151:25 152:1

155:14,19 163:14
164:4 206:22
219:21 222:12
292:13
**assumed** 20:17
21:14
**assuming** 132:25
152:9 235:12
**assumption** 20:14
**assurance** 208:20
283:12
**assuredly** 38:4
**astonishing**
115:17 190:13
**at&t** 122:5
**atinson** 8:2
**atkinson** 55:13
66:12 104:25
**atkinson's** 281:2
**attached** 221:10
281:1
**attaching** 224:20
**attachments**
293:22
**attack** 65:5 70:21
71:13 83:21
**attacked** 83:19
**attempt** 20:3 21:2
28:7 75:20 85:6
93:23 124:24
150:1 151:19
262:6 265:21
**attempted** 27:13
271:11 280:9
**attempts** 75:20
**attendant** 49:10
**attention** 95:19
172:15 226:9
**attorney** 3:4 7:8,9
7:15 44:11 45:8
82:24 99:25
105:10 199:18
202:4 204:5,6

211:22 212:10,12
213:19 214:4,13
228:20 230:17
231:6 283:6
**attorney's** 34:14
**attorneys** 3:14 4:2
4:9,16 5:2,9,17
6:2,10,17 7:2,16
17:19 40:11 52:4
52:22 60:19 61:4
79:11 95:6 99:23
100:4 153:11
186:13 202:5
205:14 210:25
211:21,25 212:4,9
220:2,3 223:22
227:14 255:17
256:11 259:10
**attractive** 161:2
**attributable**
162:19,20
**audacity** 212:8
**audio** 112:18
121:22
**august** 1:16 21:20
80:13 96:17 99:17
99:21 305:25
**auslander** 8:3
**authorities** 74:13
74:17
**authority** 74:3
88:22,23 90:19
91:2,5,10 127:1
142:16,24 143:23
149:25 153:10
168:21,22 214:11
269:14
**authorization**
127:3,21
**authorize** 76:7
143:19
**authorized** 15:12
71:2 126:22

131:19,19 183:20
229:22 230:7
**authorizes** 127:15
**authorizing** 71:18
**automatic** 72:21
74:19,21 75:5
197:4,14
**automatically**
74:22 252:1 268:7
**availability** 64:23
98:16
**available** 16:20
38:10 72:6 89:16
99:4,8,20 115:23
124:16 129:13
132:25 139:20
**avenue** 3:5,16 7:3
7:17
**average** 52:23
53:12,15 54:1
138:20 139:19
140:11
**avert** 239:2
**avoid** 18:23 64:3
114:12 121:10
125:2 161:24
205:17 303:22
**avoidable** 133:1
161:14,20
**avoided** 18:12
**avoiding** 43:24
46:12
**avoids** 262:7
**await** 214:12
**aware** 126:5
142:8,10 147:6
149:25 163:4
194:22,23,25
198:12 229:23
242:23 243:25
259:17,20
**awareness** 242:25
243:9

**b**

**b**  1:21 23:6 29:3
30:1 68:17 74:19
75:5 89:6 90:22
115:2,11 116:19
138:15 139:15
163:13 225:12
275:20 280:23
**b.r.**  170:11,12
265:18
**back**  15:4 64:24
76:25 79:7 81:24
85:5 105:7 106:8
110:13,17 122:22
155:6 160:1,7
162:8 165:12
177:22 187:6
207:16 217:16
241:5 252:2
260:17 274:20
276:12 284:19
290:19 300:9,19
300:19,24
**background**
121:10,18 300:10
**backtrack**  200:1
**backwards**
190:16
**bad**  27:9 30:25
188:1 189:5,7
240:12 282:24
**bailed**  155:24
**balance**  43:6
99:12 102:17
148:3 182:15
226:23
**balancing**  78:19
117:25
**ball**  8:4
**baltimore**  7:11
**bankers**  255:17
256:12 259:11

**bankr**  170:11
**bankruptcies**
129:6 154:20
185:17
**bankruptcy**  1:1
1:11,23 29:12
34:5 38:14 54:20
59:9 64:25 65:12
70:25 73:8 75:10
75:11 77:4,21
79:1,4 82:21 84:3
86:22 88:13 89:17
89:18,20,21 90:24
91:9 93:12 96:6
96:25 97:4 98:24
114:2 115:18
116:1,1 124:17,23
124:25 126:5,12
126:16,24 127:15
129:4 131:1,3,10
131:20,25 132:11
134:19 136:7,9,18
136:21 141:21
142:18,20,21,21
143:6,19,23,24
144:18,22 148:1,8
148:9,11,19
154:11,15,24
155:5,8,9,25
157:10,15,18,21
157:23 158:9
165:16,22 167:5
167:12 174:5
179:15 183:11
196:22 197:3
206:25 227:21
238:21 246:7
249:20 250:4
264:23 265:14
268:10,23 269:1,4
269:13,13 293:8
294:14 297:18

**bar**  76:22 88:7,13
136:21,25 283:6
**baranpuria**  8:5
**bare**  125:16
**barely**  181:19
**bargain**  277:10
**bargained**  59:21
263:6
**bargaining**  54:23
**barker**  8:6
**barred**  289:5
290:11
**barring**  46:4
**bars**  126:19
**based**  23:20 27:4
27:21 30:1 57:5
128:20 135:25
137:21,22 139:19
146:19 150:3
154:17 168:10
178:3 188:18
203:3 208:7 210:1
211:25 220:1
243:4 244:24
253:25 256:19
278:16
**bases**  100:19
**basic**  26:23 216:8
**basically**  45:9
53:1,1 70:23
139:15 184:11
190:21 282:6
295:7
**basis**  54:4 76:22
83:5,13 85:7 90:6
111:23 120:6
138:3 147:11
169:19 171:2
191:12 268:11
**bauxites**  267:23
**bear**  158:11
162:12

**bedrock**  91:20
267:20
**beef**  23:20
**began**  148:21
**beginning**  38:13
74:16 106:20
281:19 289:13
299:11
**begotten**  104:13
**begrudge**  288:16
**behalf**  2:4 15:19
19:11 23:10 24:2
31:10 92:23 101:2
105:24 153:11
160:19 229:8
236:3 270:7
278:15 299:3
300:5 302:1,9
**beholding**  144:4
**beiderman**  10:11
**beings**  287:10
290:17
**belated**  85:6
**belie**  280:13
**belied**  81:10
282:11
**belief**  154:17
224:14
**believe**  16:18
17:11,17 18:19,22
26:7,12 44:11
49:23 50:25 54:16
59:12 63:21 92:7
104:11 110:19
111:9 118:9
127:21,23 130:21
131:4,17,18,24
132:7 133:9,20
137:12,25 138:20
138:22 139:8
140:21 142:16
143:11 149:2
150:22 153:3,22

153:25 154:2,15
154:22 156:13,14
156:22 161:7
162:25 167:1
172:7,7 177:4,10
177:17 192:25
195:14 196:17
203:13 206:8
207:4 210:12,13
210:14 217:17
219:8 225:2
226:18 227:25
228:4 232:24
236:19 237:9
239:19 241:17
246:8 251:19,21
253:2 254:21
259:9 262:11
266:15 277:11
278:15 279:22
281:25 282:5
284:19,20 285:25
287:10 291:11
292:19 302:20
303:1
**believed** 152:17
**believes** 29:10
120:21 284:7
285:20
**belittle** 302:20
**bench** 19:6
**beneficial** 157:20
**beneficiaries** 45:4
188:21 189:5
259:17 273:16
**beneficiary** 286:5
**benefit** 15:10 39:8
45:17 46:24 72:1
82:3 83:16 117:7
159:4 160:22
215:7,25 216:11
222:10 277:2,10
290:10

**benefits** 43:7,8,13
43:15 45:5 46:11
97:7 124:23
187:15 218:14
**benefitted** 160:8
**benjamin** 3:9
64:20
**bernard** 9:7
**bernie** 170:25
**bernstein** 265:18
**bespoke** 124:25
**best** 38:9 39:13
64:8,13 115:23
118:13 129:8
132:8 152:19
158:16 164:4
199:13 209:14
212:18 215:15
266:14 283:10
284:7 290:24
293:10 304:8
**better** 88:17 111:3
211:15 212:24
213:21,23 215:8,9
215:9 224:5
228:12 258:19
295:5 303:13
**bewildered** 286:8
**beyond** 89:19
125:23 126:4
137:3 143:5
198:23 203:7
224:14 244:13
255:8
**bid** 164:14
**big** 36:17 164:15
256:25
**biggest** 54:7
**bilateral** 20:12
**bill** 213:4,6
**billion** 41:15 44:2
46:25 47:2 48:24
49:19 55:20 56:1

56:13,18 57:4,8,9
57:10,12,14,16,19
58:5 65:17 67:12
68:1,4,4,17,18
75:21 88:5 94:3
96:8 102:11
105:16,17,22,22
107:2,4,21 119:18
129:15 132:6,8,11
159:3,3 162:18
163:22 191:5
195:12 206:16
213:4 237:14
240:8 251:9 252:1
252:5 258:21
259:19 262:14
285:11,18 288:18
288:19,19 290:12
**billions** 39:7 44:4
47:4,4,6 48:12,12
48:12 56:19 58:6
58:11 59:15 60:4
64:4 80:25 98:2
171:22 190:22
284:24 292:17
**binary** 151:15
**binders** 241:8
**binding** 41:16
56:14 97:17
**biological** 112:5
**bit** 28:4 62:24
92:18 154:18
157:6 177:23
264:3,5 272:10
290:24 292:3
295:12 302:11
**bites** 77:9
**bitter** 50:1
**blabey** 8:7
**black** 19:6 66:10
**blame** 179:9
**blank** 195:22

**blanket** 127:10
144:10,14 223:9
223:12,12
**bldg** 170:12
**blixseth** 182:22
**blmis** 170:25
**block** 4:8 79:11
285:15
**blocking** 288:25
**bloviating** 215:24
**blow** 86:6 87:4
**blue** 287:4
**blurred** 224:22
**board** 43:22 50:21
82:6 159:11 163:9
164:24 165:3
175:19,20 199:10
207:16 220:18
224:16,20,21
225:13,16,21,25
226:10,25 236:1
242:5,6,12,13,16
242:19 247:7
281:16 285:16
287:3,12 288:25
289:9 290:11
**bodies** 106:3
**boer** 159:12
160:24
**bograd** 8:8
**boil** 70:21
**boils** 201:21
**boneheaded**
258:20
**book** 224:11
276:1
**boss** 233:23
**bottom** 63:16 83:3
238:24
**bought** 86:19
**bound** 44:12
58:14 109:4
188:14

**bounds** 206:9
**box** 17:2
**br** 79:1 91:3,13
**brauner** 8:9
**breach** 226:11
**breaching** 293:20
**bread** 199:13
**breadth** 23:21
  28:7,19 56:5
  109:25 111:10
  154:13 175:3
  198:4 275:2
**break** 53:14
  116:13 137:9
  265:23 302:7,16
**breaking** 17:22
**breathtaking**
  124:9 284:12
**brian** 7:13 11:17
  229:5
**bridge** 122:6
**bridgeport** 6:19
**brief** 19:7 49:12
  49:14 67:22 69:9
  71:13 129:6
  136:20 146:12
  166:8 169:18
  177:3 188:9
  196:12 228:6
  251:10,17,17
  253:9,14 265:17
  269:18 275:25
  278:18 285:24
  291:2,3,15,20
  297:18 298:22
**brief's** 25:4
**briefed** 25:18
  180:7 196:9
**briefing** 15:12
**briefly** 20:6 26:23
  30:18 81:22 101:6
  188:20 199:2
  253:11,13 264:19

302:11
**briefs** 43:10 199:4
  210:18
**bring** 158:13
  216:25 230:20
  236:8 257:2
**bringing** 80:10
**brings** 51:22
  90:16
**broad** 6:4 56:10
  56:10,14 63:16
  239:12 247:10,12
  255:1,6,10,13,20
**broader** 72:6
  158:3 185:18
  236:15,18 247:6
  253:22 256:6
**broadest** 129:5
**broadly** 16:9
  86:16 237:6
**broadway** 4:3
**brooks** 8:6
**brought** 73:14
  78:6 153:1 158:11
  166:4 199:1
  200:13,14 202:13
  212:20 226:11
  230:24 234:13
**brown** 8:10 93:1
**brunswick** 8:11
**brutally** 48:10
  55:2
**bryant** 5:11
**bryce** 9:17
**buck** 212:3
**bucket** 71:12
**buckets** 70:23
**budget** 248:14
**build** 211:15
**building** 36:24
**built** 59:23 137:13
  299:21

**bulk** 19:20
**bunch** 179:24,25
  205:2 278:14
**burden** 189:19
**business** 46:2
  48:20 66:4 68:3
  80:5 94:1 108:15
  108:17 110:7
  111:13,15,17
  117:23 168:19
  225:11 241:22
  243:13 275:4
  295:1
**businesses** 230:2
**buyer** 111:14
**bylaws** 169:22

**c**

**c** 3:1 8:20 9:3 11:2
  11:18 15:1 296:19
  305:1,1
**ca** 5:4
**cahn** 8:12
**calculation** 215:8
**calculus** 163:16
  169:12
**california** 61:6
  62:3 291:20
**call** 19:20 21:1
  167:22 199:25
  202:7 219:15
  242:3 244:13
  256:15 271:3
  301:15,24
**callable** 176:1
**called** 19:8 71:3
  72:20 73:13 78:9
  80:22 89:24 93:12
  108:14 110:15
  230:6 241:19
  281:19 291:2
**calling** 224:8
  256:14

**calls** 17:20,21
  244:22
**camera** 281:5
**cameras** 92:17
**campaign** 85:20
**canada** 25:6,23
  86:19 88:6 296:10
  296:12
**canadian** 6:2 25:6
  25:8,15 26:8,11
  208:6 269:24
  270:2,8,8,11
  271:8,24,25 272:2
  272:3,15 273:15
  273:25 295:23
  296:4,8,9 302:9
**canadians** 271:1
**cancel** 181:8
**cancelled** 182:9
**cancels** 89:15
**candid** 156:2
**candidly** 218:25
**can't** 116:13
  137:4 144:9
  153:19 155:24
**capable** 205:18
**capacities** 22:18
**capacity** 15:24
  18:9 30:14 110:7
  199:2
**caplin** 5:16
**care** 215:21 263:5
  295:16
**career** 61:17
**careful** 243:5,5
**carefully** 120:15
  148:2 162:17,17
  162:18 191:14
  203:24 216:24
  220:21 297:2
**careone** 181:1
**caroline** 9:19

carrie  11:21
carried  51:10
  52:14,19
carry  274:15
carrying  230:18
carve  36:18,25
  58:20 72:24
  195:24 197:23
  198:24 233:13
  256:24
carved  196:24
  198:20 199:20
  203:17 244:11
carveout  25:19
  74:20 75:19 78:14
  81:4
carveouts  29:11
carving  256:18
case  1:3 3:13
  16:13 18:11,16
  24:11 27:12 29:19
  30:3 33:1 41:22
  42:1 43:14 44:6,8
  44:23 45:9 51:21
  54:9,12 56:6
  61:25,25,25 63:2
  65:11 66:4 67:1,3
  71:16,16 73:20,24
  76:24 77:8 78:9
  78:13,16,17 79:2
  79:8 80:23 83:7
  84:7,8,12,17
  88:25 89:9,10
  90:2 91:3,15 93:2
  93:3,11,15,21
  95:2 96:6 97:10
  97:15,19 100:12
  101:19 102:21,21
  102:24 104:1
  106:17,21 114:6,7
  114:8,17 115:1,7
  115:9 116:1,5
  117:14 118:15

124:6 126:6
127:18 132:6
134:9 135:14
137:14,19 141:21
143:13 144:4,23
145:2,4,4 147:6
148:19 154:3
157:1,8 163:23
165:15,22 166:7
166:12,14 167:3
167:16 169:17
171:10,23 172:8
174:2,5,24 175:2
175:3 176:13
180:20 181:21
182:22 183:6
184:8,9,19 187:21
190:4,5,5,23
192:15,16 194:11
194:13,18 195:5,8
195:13 196:2,16
198:18 199:24,24
200:24 205:20
206:6,7,12 207:13
208:16 209:24
210:20 211:20
212:20,22 214:11
215:18 226:10
237:25 241:18,19
244:11 245:23
246:11 247:6
249:24 250:17,18
250:21 251:20
255:19 257:1,25
265:18,23 266:10
266:12,19 267:17
268:9 269:13
270:15 272:11
275:2 277:5
278:21 280:9
281:19 282:5,7
285:6 289:13,17
290:21 291:17

292:18 294:11
295:6,13 297:22
300:9,23 303:3
caselaw  165:20
  196:21 198:8
  200:23
cases  15:24 27:5
  27:13,23 33:1,4
  38:5 50:11 51:24
  54:7,16 56:11
  58:8 62:1 63:13
  65:8,9,12 67:9
  69:3,23 70:8
  71:19 76:2 77:10
  77:13,20,24 78:2
  79:18,19 82:14
  85:17 89:6 101:22
  102:9 107:7
  110:22 114:8
  115:18 116:1
  124:5 129:4
  130:24,25 145:17
  153:21 165:24
  166:3 167:18
  170:10 175:1
  183:8 184:13
  191:6 194:14,19
  194:21 195:4,6,8
  205:3,4,7,8,10
  206:2 207:6,24
  208:9 274:21,23
  303:14
cash  41:16 45:19
  47:2 48:20 65:17
  82:2,3 105:16,17
  105:22 106:2,2
  159:1,2 280:19
cast  146:2
catchall  32:5
categorical  62:25
  63:13 73:8 78:13
categorically
  71:20 72:5 76:23

categories  19:18
  61:14 62:2
category  27:9
  60:20 239:13
catherine  4:13
  10:11 24:1
cats  209:1
caught  218:24
cause  27:14,21
  30:1 99:15 233:17
  277:20
caused  156:14
  190:25 240:9
causes  85:24
  86:13 142:6
  189:17,24 234:3,6
  249:15 265:1
causing  29:17
  75:22 116:25
cease  230:6
  234:24 235:10,20
  236:7,9
ceased  235:2
ceasing  178:10
  234:25 235:6
celotex  175:2
cent  194:12 258:1
centerpiece  65:16
  93:25 96:13
central  190:14
centric  75:23
cents  57:22
ceo  224:17
certain  27:24
  40:17 78:12 86:9
  86:11,25 101:6
  103:4,8 104:6
  108:15,21 134:7
  140:19 149:14
  155:20 165:9
  203:25 208:6
  263:7 269:7 270:8

**certainly** 53:15
69:10 70:7 79:10
85:5 116:15 129:7
137:15 144:1
151:24 154:21
156:23 161:19
164:17 166:23
173:9,25 175:1
176:8 177:23
180:3 191:8
192:15 195:5
198:1 206:7 216:2
219:8 223:7
229:20 230:10
231:17 234:12
238:24 239:18
242:7 244:7
245:21 271:8
272:17 301:14
**certainty** 135:24
**certified** 305:3
**cetera** 37:25
64:10,10 164:4
291:8
**cfo** 138:16
**challenge** 136:23
**challenged** 42:13
47:16 173:16
179:13
**challenging** 147:5
147:10
**chalos** 8:13
**chambers** 17:3
**change** 18:22
32:10 33:25 36:2
89:10 103:1,3
230:21 242:7
245:3 299:7
**changed** 231:8
**changes** 16:12
20:6 26:22 32:22
33:14 34:16,17
140:21 184:17

247:11
**changing** 28:3
184:15 232:20
247:13
**channel** 65:2
70:17 274:23
**channeled** 69:24
70:2 84:25 182:14
253:18 295:21
297:7,13
**channeling** 70:16
184:14,24 273:16
279:7,16
**chaos** 116:10
205:19 206:4,22
**chaotic** 205:17
**chapman** 55:7
119:23 152:4
210:5 303:12,15
**chapter** 2:2 27:5
27:23 33:1,4 41:7
51:9 54:5 79:18
79:19 81:20 85:13
93:3,21 94:7 96:6
100:12 128:25
129:10,10 134:15
135:14 166:12
167:6 289:7
290:13
**characterization**
267:14
**charged** 153:3
**charges** 126:23
**charitable** 46:6
201:3
**charities** 201:4
**chart** 54:6,11
189:12 205:1,7
**chase** 117:19
**chasing** 113:2
**check** 255:25
**checked** 44:11
51:25

**checking** 145:13
**cheryl** 112:22,25
**cheryl's** 112:17
**chicago** 4:11
**child** 112:3
**children** 50:19
112:13 139:24
140:9
**chip** 287:4
**choice** 99:6
151:15 201:15,17
201:18 212:14
269:23
**choose** 116:10
**chooses** 110:12
**chose** 107:8
**chosen** 151:18
**christina** 12:19
**christine** 114:23
**christopher** 3:19
12:22
**cicero** 8:14
**cinches** 226:10
**cir** 265:11
**circle** 5:18
**circuit** 41:22
42:24 64:24 65:6
65:12 66:14,21
70:22 72:7,10
78:9 84:5 91:7,21
123:13 124:1
127:3 137:18
143:20 144:17
150:12,14 154:10
166:14 167:13
168:8 169:18
171:2,12 172:4,25
174:7,14 180:24
180:25 181:12
182:18,21,22
183:3,6,9 184:9
184:10 241:19,20
249:18 250:14,18

253:18 258:14,18
259:2 263:20
265:10,11,16
266:8,9 277:11,12
**circuit's** 184:18
274:19
**circuits** 72:9
**circuit's** 169:9
**circumstance**
172:20 219:18
**circumstances**
47:24 66:13,19
70:5 72:9 137:22
161:7 183:13
188:25 190:10,12
197:6 244:4
**circumvent**
167:10
**circumvented**
166:18
**citations** 77:8
282:13 288:23
**cite** 41:19 74:3
76:11 77:23 84:7
169:20 197:2
220:25 282:13
286:18
**cited** 77:8,10
166:2 168:5
169:17 184:8
237:18 264:25
292:10
**cites** 41:18 279:18
279:22 280:12
282:22 291:17,23
**cities** 52:9 285:16
**citing** 130:5,6
283:13
**citizenry** 153:11
**citizens** 50:22
105:11,13 106:6
116:11 117:3,4
238:20 239:2

287:13
**city**   52:5,10 65:20
  73:21 152:6
  153:22
**civil**   38:11,12 40:8
  62:19,19,20 89:5
  97:7 230:14 255:8
**claim**   16:10 18:1
  22:14 27:1,7 28:6
  28:8,17,17 29:1,1
  29:10,12,13,15
  48:18 57:3,23
  58:9 69:15 71:15
  72:4 76:14 82:18
  83:24 85:1,1
  86:22,23 87:5,6
  88:19 95:22
  102:16 107:19
  111:23 115:7
  125:9 141:1,17
  143:25 144:1
  150:14 159:15
  169:16,19 170:5,7
  172:10 175:22
  177:6 182:16
  184:14 185:19
  226:15 227:1
  235:22 252:1,8
  257:2 265:13,13
  265:15 267:5,5
  274:1,2 275:24
  280:13 284:17,20
  284:21 285:11,18
  286:3,5 288:3
  296:22 300:14,19
**claimant**   29:10
  65:20 104:16,16
  105:7,8 141:17
  153:9 170:21,22
**claimants**   51:16
  53:1 83:1 98:18
  98:18 115:3,3
  117:14 125:6

152:23,24 296:8
**claimholders**
  21:10
**claiming**   84:16
**claims**   20:13,15
  20:16,24,25 21:8
  21:13,14 22:5,11
  22:12 27:24 28:1
  28:10,12,21,25
  29:18 31:4 38:11
  38:12,16 40:5,8
  40:12,14,17 43:23
  47:5 48:3,4,6
  49:23,24 57:11
  58:10 62:20 65:2
  65:4 67:21 69:4,7
  69:13,14,16,18,23
  70:1 71:18 72:20
  72:25 73:14 74:7
  74:7,14 75:21
  76:2,5,8,15,19
  78:12 79:4 80:8
  81:4 83:4 84:2,2,5
  84:10 85:17,24
  86:13,14 87:18
  88:12,14 89:14,15
  89:19,25 90:9,9
  90:11,13 98:1,2
  98:23 99:7,14
  100:3 104:19
  116:13 124:10,11
  125:3,4,5,5
  126:11 128:20
  129:3 134:19
  136:9,12,16,18,24
  136:25 137:2,7
  139:1,2,2 141:6
  141:23,24 142:3,6
  142:9,17 143:8,24
  147:24 148:18
  149:23 150:2
  153:11,24 156:25
  157:11 159:10,14

159:15,18 162:10
  162:19,20 163:1,3
  163:8,15,20 164:1
  164:4 165:14,21
  165:22,24,25
  166:3,4,7 167:15
  168:9 170:23
  171:22,25 172:4,5
  172:8 176:2,14
  181:8,11 182:9,12
  182:13,23 184:6
  184:12 185:17
  189:20 190:23
  192:16 193:2
  194:11,17,22
  195:2,5,14 196:5
  196:23 197:5,8,10
  197:11,24 198:25
  208:6 209:12
  226:17,18,22
  230:24 231:22
  235:8 236:3
  243:19 244:11
  245:25 246:10
  249:17 250:9,10
  250:21,24 253:18
  253:21 254:15
  255:7 256:20,23
  257:6,24 265:13
  265:22 268:11
  269:3,15 270:20
  271:16,17,18,22
  271:25 272:2,4
  273:24,24 275:23
  275:23 284:24,25
  285:23,23,25
  286:1 288:6
  291:12 294:18
  295:21,23 296:1,2
  296:5,5,11,14,15
  297:6,11,14,15
  298:13 301:16,17
  301:18,23,23

**clarification**
  31:11,21
**clarify**   23:24 32:1
  140:22
**clarifying**   30:17
  304:5
**clark**   4:10
**class**   51:10 52:14
  52:14,18,18 53:17
  64:6 77:16,16
  103:2,3 115:19,21
  120:15 146:10
  273:22 296:19
**classes**   70:17
  115:2,11 116:19
**classification**
  296:18
**classified**   296:19
**claudia**   13:20
**clause**   23:6 83:19
  136:8,9 142:20
  170:9 249:7
**clean**   189:4
**cleaner**   285:8
**cleaning**   287:8
**cleanup**   29:16
  32:4,8
**clear**   17:24 23:14
  24:3,15 29:18,21
  30:5,13 34:4
  36:12 47:8 51:2
  52:22 56:21 72:23
  73:5 75:4 79:21
  85:10,15,23 87:16
  87:19,19 88:1,2
  91:13 98:5 99:18
  104:11 108:18
  116:20 120:9
  128:2,4 141:18
  149:22 167:20,20
  172:5 175:23
  178:21 187:20
  188:2 189:9,10

201:8 216:18
232:21 234:23
241:25 242:16
254:25 259:24
260:23 264:12
268:17 270:10
273:23 276:24
279:11 292:13
295:4 297:17
**clearer** 27:18
33:10 87:5
**clearly** 15:20
19:11 37:17 42:8
76:3,7 83:22 86:7
90:22 121:4 128:5
163:23 184:23
198:13 222:4
234:19 257:16
258:7 279:1
285:24 301:7
304:8
**clerk** 53:13
114:23 121:1,6
**clever** 62:15
**clichés** 261:15
**client** 16:5 45:8
204:5,6 251:9
**client's** 208:19
**clients** 31:19
164:24 199:20,22
200:11 273:23
276:10 279:8
295:21
**clint** 9:2
**close** 37:3 74:13
92:19 104:9
167:24 207:12
237:14 271:3
281:12 289:20
**closed** 15:3
**closer** 113:14
187:7

**closest** 254:21
**closure** 114:14
115:17 117:24
**cloth** 79:9
**cnn** 139:9
**coal** 165:25
**code** 44:15 59:9
70:25 71:17 73:8
73:10 76:1 116:8
122:10,11 126:6,9
126:12,13,16,24
127:4,15,15,21
131:20,25 136:7
143:19 148:1,11
154:11 197:3
249:22 269:5
294:14 297:18
**cogent** 303:21
**cohen** 7:1 186:10
**coleman** 8:15
**collaborative**
71:24
**collapse** 57:24
75:24 216:21
**collapses** 60:3
**collateral** 65:5
299:23
**colleague** 185:23
196:7
**collect** 50:14 75:9
79:4 83:4 165:25
**collectability**
179:3
**collected** 191:12
**collecting** 49:11
49:18 161:4
**collection** 75:7
161:22
**collective** 44:9
47:25 57:25
129:14 140:4
293:9

**collectively** 38:22
48:13 52:6 61:12
**colleges** 201:3
**colloquy** 286:9
299:15
**collura** 280:15
**colorable** 29:13
**columbia** 52:5,13
57:3 104:22 149:8
150:24 186:11
**combating** 113:2
**combination**
60:10
**combine** 54:21
91:23
**combined** 68:14
**combines** 115:2
**combing** 176:20
**come** 29:12 36:8
38:25 44:1 55:22
55:23,23,23 56:14
74:13 132:10,11
150:17 155:6
161:19 165:12
176:3 177:13
205:23 206:22
207:14 252:18
262:4,6 295:10
300:9,18,24
**comes** 30:24
50:11 91:22
201:20 217:20
241:5 263:6 268:7
274:20 286:2
**comfort** 110:11
**comfortable**
54:13 100:4 280:4
294:1
**coming** 159:19
162:10 214:18
217:16 260:15
262:24 301:6

**comley** 6:16 149:5
**commencement**
141:21
**comment** 32:4
167:12 228:2
273:13
**commentary**
28:10
**commented** 27:11
**commenting**
32:21 162:11
**comments** 101:11
118:20 186:17
206:3 227:13
**commercial** 22:5
38:16 115:20,23
116:3,8 220:1
277:10
**commit** 234:20
237:25
**commitment** 44:4
**committed** 97:2
124:21 238:9
**committee** 5:9
58:17 92:23 93:16
93:19 98:10
100:19 101:2
130:14,15,16,16
133:23,24 154:1
161:16 164:11
176:19 211:5,8
270:14 275:25
281:4,16 287:6
292:14 299:4
**committing**
235:17
**common** 58:12,13
216:5 277:18
**commonplace**
275:5
**commons** 63:20
214:23,24,25
215:23,23 216:5,9

216:10,12 217:1,4
217:7,11
**communications**
108:10
**communities**
80:25 102:11
103:16
**community** 113:6
**compagnie** 267:23
**companies** 50:15
61:11 128:16
174:12 179:24
263:7 276:12,13
290:12 298:3
**company** 39:8
45:17 60:17 61:15
78:10 141:19
160:2 174:9 200:6
252:23,23 256:15
285:8,9 290:7
296:9
**compare** 240:25
241:2
**compared** 68:17
224:22
**comparing** 192:13
194:10
**comparison** 160:8
204:24 241:3
**compel** 208:11
213:10 214:9
**compelled** 79:8
157:23 188:6
**compelling**
115:21 205:6
206:12
**compensate** 38:7
102:12 107:3
**compensating**
104:21 113:3
**compensation**
39:3 95:24 97:9
125:9 156:10

229:21,24
**compensatory**
230:8
**competency** 54:19
**competing** 47:19
48:10 291:5
**complaint** 220:1
249:24 250:6,17
**complaints** 219:5
219:24 220:11,11
220:13 264:25
**complete** 45:23
97:25 136:3,4
158:8 160:21
205:4 251:12
**completely** 116:9
120:9 198:25
226:19 233:13
**complex** 38:5
39:17 41:4 46:2
46:14 49:9 63:1
85:14 103:13
202:7
**complexity** 87:13
**complicated** 18:9
61:7
**complies** 131:18
**comply** 126:15
**component** 19:25
85:20 94:17
107:24 120:5
214:14
**components** 202:9
214:3 222:21
**comprehensive**
43:20,23 89:4
93:8 97:17 134:5
148:2
**comprise** 52:6
53:9,10
**compromise**
98:17

**concede** 124:5,6
133:15
**conceded** 219:14
**conceivable** 90:10
169:13 177:7,25
178:2
**concept** 151:4
166:21 210:19
216:8
**concern** 68:3
76:21 247:24
**concerned** 110:6
110:20 137:11
141:9 160:11
161:20 163:8
186:16 199:23,24
200:11 203:1
207:10 235:19
237:3
**concerning** 254:5
**concerns** 18:17
20:3 28:7,19 30:7
158:10 159:6
**concession** 242:1
**concessions** 41:17
56:2
**conclude** 101:16
108:5 220:4
**concluded** 119:23
289:3 304:15
**concludes** 72:12
**concluding** 84:8
**conclusion** 148:1
161:19 227:2
**conclusions**
135:25
**concrete** 93:22
**concurrent** 34:4
**condition** 110:4
130:19 158:4
**conditioned** 46:16
59:6 64:12

**conditions** 46:25
**conduct** 29:5,5
30:2,4 36:21
118:1 134:12
141:4,8,12 154:11
169:5 178:6,6
198:20 218:11,14
230:1,21 231:8,15
231:16 232:20
233:3,7 235:14,17
236:6,10 237:4
238:25 239:8,15
240:2,5,9,13
241:22 242:10,11
242:22,23,25
243:24 244:24
245:3,6,13 246:12
247:8,13 253:21
296:12,12 300:13
300:20
**conducted** 55:18
88:4 121:23
**confer** 250:8
265:25 267:24
268:20
**conference** 15:8
64:22 122:6
**conferred** 268:18
**confers** 95:23
**confess** 279:15
**confident** 186:19
**confidential** 97:3
159:13,19
**confine** 35:15
279:22
**confirm** 59:12
71:9 91:10 101:24
144:9
**confirmation** 2:1
17:11 34:6 42:12
43:2 49:14 75:3
78:7,14 79:20
84:22,23 85:3,7,9

85:16 86:17 87:11
88:3 89:7 90:21
91:1 96:23 100:20
107:16 113:18
117:22 123:11,24
126:14,18 138:6
144:2 148:23
179:23 181:21
182:5 191:23
207:6 247:16
250:2,7 252:25
299:10
**confirmed**  26:9
58:16 73:2 89:12
111:7 129:8
154:18 179:14
187:16 199:20
251:8,25 252:3,17
**confirming**  77:22
90:19 91:6 187:13
265:9
**confirms**  103:11
**conflate**  136:15
**conflict**  34:2
251:12
**conflicts**  19:24
**conform**  34:6,9
**confused**  289:15
**confusing**  60:10
107:7
**confusion**  23:22
29:17 32:25
210:15
**congress**  89:4
127:22 128:5
142:20 182:3
197:10,12,13,15
197:21 198:10,15
**congressional**
76:4
**connect**  121:3
**connecticut**  6:17
62:2 116:15 117:6

125:20 149:3,5
152:1,4 153:24
156:19 159:25
168:17 186:14
201:2,4,6,10
284:15 291:20
**connecticut's**
284:17
**connection**  25:4
86:15 90:25 131:2
174:10 192:16
196:25 197:19
212:14 222:8
286:24,25 289:6
300:15
**connolly**  8:16
**conquer**  289:17
**conroy**  45:13
55:15 96:15,18
99:17 151:8
**conroy's**  164:2
**cons**  303:14
**consensual**  21:17
65:7 66:14 72:8
73:16 83:15
119:12 145:19
154:4 161:8
187:21 188:17
189:16,18 190:1
195:21 197:22
205:8,9,21 209:21
212:18
**consensus**  94:9
151:18 224:21
285:2 295:6
**consent**  33:23
44:18 107:23
136:11 137:7
147:23 268:18
**consented**  58:20
**consenting**  4:16
17:13 23:11 33:24
35:24 68:8 82:5

92:23 133:21
176:20 221:11
225:19
**consequence**
226:20 296:17
**consequences**
124:20 161:10
200:9
**conserve**  149:8
**consider**  56:25
146:3 150:12
158:12 191:21
212:1,5 219:19
220:21
**considerable**
158:25
**consideration**
67:10,16 80:12
150:19 151:17
154:25 156:4
169:15 194:25
207:21 246:15
247:19 255:4
259:3
**considered**  47:18
52:2 70:8 76:21
76:24 132:8
158:24
**considering**
150:13
**considers**  90:25
**consistent**  39:14
116:4,7 215:17
223:4 235:1
239:19 255:3
**consistently**  140:3
**constantly**  288:2
**constituencies**
278:20
**constituents**  81:1
93:20 215:18
**constitute**  69:11
167:4

**constituted**  211:6
214:12
**constitutes**  28:16
28:16 121:24
**constitution**  126:6
131:18,25 136:8
148:11 230:19
249:7 253:3
268:23
**constitutional**
71:7 88:23 90:19
91:5,9,18 92:3
123:12,25 142:24
143:15,23 148:6
269:14
**constitutionality**
37:24
**constitutionally**
74:9 84:17 85:4
**constitutions**
291:22
**constraints**  197:8
**construct**  222:24
**constructed**
216:24
**constructive**
49:25 93:24
105:19 242:11
**consultants**  247:7
255:17 259:11
**consulting**  257:3
**consumer**  31:4
37:6 74:6 155:22
166:4 168:25
169:3 236:8
241:17
**consumers**  231:14
**consuming**  104:17
120:3
**consummated**
59:19
**contain**  89:11
187:20

contained  67:17
  87:11 108:17
  189:3 220:22
  288:13
containing  71:9
  91:10
contains  187:14
  203:24 220:23
  281:15
contemplated
  99:18 259:19
contemplates  16:9
  17:16 86:7
contempt  281:24
contend  154:16
  169:20
contentious  38:21
contest  55:1 69:16
  145:25 208:24
contested  55:1
  260:24 263:15
contesting  216:14
context  70:16
  74:24 75:3 77:22
  78:14,20 82:11
  162:7 165:16
  168:7 175:12
  177:2 181:20
  182:5,25 186:17
  196:4 200:21,23
  201:21 216:9,12
  219:12 230:7,24
  240:8 260:24
  263:15 300:24
contexts  214:8
contingency
  164:5
contingent  38:10
  47:13 67:19 170:7
continuance
  111:16
continuation  2:1
  111:13 121:9

continue  20:25
  111:15 117:23
  121:18 139:3
  214:14 235:18
  277:25 300:8,22
continued  97:12
  245:12
continues  89:18
  214:5
continuing  17:15
  33:15 289:10
  298:11
continuity  43:18
contract  20:17
  170:3,7 247:7
  275:17 276:21
contracting  255:9
contractors  28:20
  36:15
contracts  20:14
  21:12,12,15
contractual  100:5
contrary  84:5
  88:11 292:19
contrast  52:3
  125:23
contravene  83:19
contribute  65:17
  94:2,15 151:1
  152:2 213:4,6
contributed
  247:15 255:21
  261:1 287:25
contributes
  212:25
contributing
  151:10 158:23
  217:6 256:5,10
  259:18,25
contribution
  16:10 18:1 67:12
  67:18,24,25 69:5
  69:12 90:13 98:20

99:3 105:6 110:3
  119:18 145:9
  152:11 170:23
  193:14 194:25
  213:10 259:5,12
  260:5 268:12
  277:4
contributions
  201:3 257:8 258:3
  262:22 264:12
  268:16
contributive
  256:6
contributors
  163:13
control  44:17
  100:3 168:21,22
  200:6 242:10,22
  262:2
controlled  32:6
controversial
  89:2
convenience
  214:9
convenient
  180:14
conversations
  111:9 300:22
convincing
  291:17
cooler  206:8
cooperating
  186:18
cooperation
  122:20 282:19
coordinate  149:6
coordinated
  186:13
copies  295:1
core  27:19 41:8
  46:7 89:21 90:22
  91:1 92:2 179:15
  179:20 180:3,12

265:5,12,12,25
  267:18 268:8,22
cornerstone  284:2
corp  268:4
corporate  155:24
  169:2,4 184:17
  185:17 241:21
corporation  46:24
  72:1 167:7 267:22
corporations
  224:23
corpus  286:2
correct  18:3 25:21
  32:14,14 179:19
  188:3 225:2,3
  259:13 262:20
  265:6 266:15
  267:16 277:15
  279:18 295:21
correction  31:23
correctly  23:18
  178:11
corroborated
  221:7,7
corroborating
  223:6 225:18
cory  111:24
cost  45:21 75:22
  109:18 303:6
costly  104:17
costs  64:5 119:8
  276:14 301:21
couched  130:11
could've  213:1
couldn't  138:15
  139:23 142:1
could've  105:17
counsel  16:11
  19:22,24 33:23
  54:19 55:3 87:9
  93:2 100:2 130:13
  226:13 231:4
  270:14

| | | | |
|---|---|---|---|
| **count** 41:1 102:19 | 295:25 303:7 | 127:12,17 128:1 | 181:4,10,12 |
| 145:14 147:2,3 | **court** 1:1,11 15:2 | 128:13,16,23 | 182:20 183:11 |
| **counterclaims** | 15:10,21,25 17:24 | 129:16,23 130:4,8 | 184:1,13 185:7,10 |
| 86:25 | 18:5,12,18,25 | 130:11 131:13,22 | 185:12,25 186:3,6 |
| **counterparties** | 19:4,12 22:10,21 | 132:1,4,10,17,20 | 186:8,15,17,20,21 |
| 21:18 38:17 | 23:9,12,16,25 | 132:24 133:5,13 | 187:5,11 191:7,9 |
| 276:10 277:1,1 | 24:7,10,18,21,22 | 133:18,24 134:2,7 | 191:15,17,18,21 |
| **counterpoint** | 24:24 25:10,16,22 | 134:10,13,22,23 | 192:3,11,19,25 |
| 298:19 | 26:3,13,18 29:12 | 136:11 137:8,9,16 | 193:4,8,22 194:3 |
| **counties** 52:10 | 30:20,23 31:16,20 | 138:1,3 140:2,6,9 | 194:10,19 195:11 |
| 285:16 | 32:7,9,16,18 33:8 | 140:13,15 141:7 | 195:16,19 196:6 |
| **counting** 48:25 | 33:12,14,18,20,25 | 141:18,25 142:8 | 196:14,22 197:7 |
| 145:24 147:18 | 34:5,10,12 35:3,9 | 142:14,15 143:6 | 197:17 198:1,6 |
| **countless** 124:10 | 35:14,19,22 36:10 | 143:16,24 144:5 | 199:3,8,19 200:17 |
| **countries** 86:20 | 36:13 37:5,13,16 | 144:11,14 145:1,5 | 201:2,11,17,19 |
| **country** 22:25 | 37:18,25 38:2 | 146:17,25 147:6 | 202:12,15,22,24 |
| 23:21 53:15 55:6 | 42:23,24 53:4,6 | 147:11,14,18 | 203:1,13,15 204:2 |
| 57:12 73:17 | 54:3,17 55:11 | 148:12,14,25 | 204:4,10,13,17,19 |
| 118:24 212:6 | 59:17 61:22 64:18 | 149:3,10,16 150:6 | 204:22 206:24 |
| 305:21 | 64:21 65:1,12,12 | 150:11 151:22,25 | 207:1,16 208:5,15 |
| **counts** 146:2,20 | 67:6,8 68:22 69:1 | 152:12 153:13,16 | 208:18 209:11,13 |
| **county** 65:19 | 71:2,8 72:15,16 | 153:18 154:25 | 209:20 210:4 |
| 73:22,22 83:10 | 72:18 74:23,25 | 155:2,4,16,18 | 211:10,12 212:16 |
| **couple** 20:22 | 76:12,14 77:17,23 | 156:1,16,19 157:7 | 213:14,16,18,23 |
| 30:20 33:9 51:25 | 78:10,18 79:8,17 | 157:16 158:1,18 | 213:25 214:10,16 |
| 118:14 120:7 | 79:24 80:21 81:10 | 158:21 159:14,20 | 215:2,4,14,20 |
| 170:10 184:17 | 81:16,19,22 85:2 | 159:25 160:10,20 | 216:3,16,18 217:3 |
| 192:20 194:8 | 87:25 88:19,21 | 160:22 161:9,14 | 217:10,15,20,23 |
| 257:21 264:20 | 89:3,21 90:2,5,18 | 162:3,16 163:19 | 218:2 219:1,9,21 |
| 271:16 | 90:23,24 91:4,7,9 | 165:15,20 166:11 | 220:8,14,16,21 |
| **course** 18:18 | 92:10,20 93:6,12 | 166:20 167:2,14 | 221:1,3,13,17,20 |
| 20:24 22:12 24:21 | 96:24 100:24 | 167:23 168:2 | 221:22,25 222:15 |
| 39:14 50:1 51:19 | 101:24 103:11,11 | 170:5,11,17,20 | 222:17 223:11,21 |
| 53:17 55:20 56:1 | 103:12 113:10,14 | 171:5,7,10,12 | 224:24 225:6,10 |
| 56:7,10 57:18 | 113:17,24,25 | 172:11,13,16,18 | 226:1,14,21 |
| 58:6,23 75:2 | 114:22 115:2 | 173:12,14,18,19 | 227:21,23,24 |
| 77:20 89:25 | 116:17 117:12 | 173:24 174:1,4,6 | 228:3,5,7,14,21 |
| 109:24 118:12 | 118:3,7 119:22 | 174:7,21,23 175:3 | 228:24 229:2,10 |
| 119:17 175:3 | 120:23 121:12,24 | 175:11 176:5,16 | 229:13 231:19 |
| 183:17 184:21 | 121:25 122:21 | 176:18 177:19,21 | 232:3,5,10,13,17 |
| 188:2 190:22 | 123:9,14,19,22 | 178:8,13,15 179:6 | 233:1,3,6,10,15 |
| 256:2 258:23 | 124:24 125:7 | 179:8,15,22 180:5 | 233:19,22 234:4,8 |
| 284:19 291:1 | 126:2,7 127:6,8 | 180:8,16,18,22 | 234:10,16,23 |

235:5,10,19
236:12,17 237:1
238:5 239:7,10,17
240:16,21 241:5
241:11,13 242:15
242:24 243:12,18
244:3,5,9,15,17
244:19,21 245:1,5
245:7,10,19,22
246:5,16,18
247:18,23 248:3
248:15,17,22,24
248:25 249:7,19
250:10,14,16,20
250:23 251:1,5,7
251:15,17,23
252:5,8,11,13
253:4,5,7,9,13
254:9,11,16,18,20
255:14,23,25
256:4,14 257:13
257:15,19,22
258:4,6,10,13,15
258:17 259:2
260:3,14,17 261:5
261:8,12,15,20,23
261:25 262:3,10
262:16 263:2,4,10
263:14,18,21,22
264:2,5,9,14,16
265:6,8,12,14,20
266:3,5,16,18,20
266:25 267:2,4,7
267:10,15,22,25
268:1,10,22 269:1
269:5,6,8,11,13
269:14,16,21
270:2 271:3,11,15
271:19,21,24
272:3,8,21 273:6
273:18 274:16
275:10 276:3,6,19
276:22 277:13,16

277:22 278:2,4,9
278:11,13 279:4,6
279:24 280:9
281:25 285:24
289:18 290:25
292:24 293:2
295:17 298:2,15
298:17,21 299:1
299:20 300:1,3
301:2,6,10,13,25
302:3,13,16
**court's**  15:10 26:9
39:15 41:10,20
54:2 77:19,21
84:18 89:1,18
220:6 221:1,2
265:5 268:8 273:5
278:23 279:1
**courthouses**
291:7
**courtroom**  122:2
**courts**  25:8,15
76:7 84:3 90:23
116:1 143:23
146:3 150:12
151:2 166:24
182:21 183:9,9,17
266:7
**court's**  137:5
**covenant**  46:3
**covenants**  41:16
43:21 80:2 252:22
288:13 289:3
292:20 297:3
**covenant's**  109:2
**cover**  20:6 30:18
150:9 196:8
203:18 253:24
255:10,15,16
256:13 272:23,24
273:10
**coverage**  275:24

**covered**  36:25
211:12 233:15
253:13,14 257:12
258:24 269:18
301:22
**covering**  36:14
150:7 163:2 273:8
**covers**  21:8 36:22
76:2 178:5 189:17
253:22 254:17
255:16 275:16
**craft**  71:2,25
72:19 83:6
**crafting**  198:16
**craftsmen**  294:24
**crater**  303:4
**crazy**  205:15
**create**  79:8 103:9
108:12 142:19
146:6 148:17
170:6 197:1
209:10 252:20
268:13
**created**  70:2
**creates**  75:5 148:7
170:5 197:4
252:17
**creating**  114:9
**creation**  39:7
45:17 72:24 82:13
**creative**  93:24
**credible**  220:4
**credit**  47:1
**credited**  141:5
**creditor**  38:15
48:17 53:21 58:8
59:22 63:23 64:6
64:6,7 65:13
119:13,16 231:1,1
260:9,10 273:22
296:20 303:3,3
**creditors**  5:10 6:3
16:21 17:15 18:16

28:10 38:23,24
39:19 40:7,11
42:15 47:14,24
48:8,9 49:1 50:25
51:6,8,9 52:7 57:1
57:14 59:25 60:2
63:18,18 67:19
70:11 73:4 78:21
80:18 93:15 94:3
94:4,15,25 95:24
97:6,16,18,20,22
97:23 98:1,7
100:1 101:2
103:15 106:10
120:12,12,17
129:8,9,12 130:13
135:17 136:16,23
137:13,14 142:22
143:2,5 146:10,13
146:14,16 147:13
147:23 148:4,7
150:2 176:19
194:13 195:9
208:6 211:5,6
212:19 213:2
215:9 231:5
246:14 257:25
265:21 270:3,8,9
270:11 271:25
273:16 274:5,9,11
281:4 284:5
290:15 292:22
294:2,2 296:5
297:1 299:4 303:8
303:24
**creditors'**  154:1
161:16
**creditor's**  149:23
152:8
**crime**  200:1
212:21
**criminal**  40:8
96:5,5 116:5

198:20,23,24
200:2,7
**crises** 39:5
**crisis** 39:3,9 45:15
60:3 93:17,23
94:6,21 95:25
96:9,12 100:18
102:12 103:17
104:20 113:3
119:5 120:14
125:17 136:10
148:17 237:15
238:12,13 239:3
249:9 258:22
303:10,23
**critical** 61:4 67:15
82:20 98:9 99:10
158:16 291:24
**cross** 42:6 80:13
81:11 87:8 115:14
129:19,25 132:17
132:20 133:7
135:21 139:18
145:23 243:11
244:24 245:7
246:1 269:15
280:18,20,25
**crossed** 188:1
**crucial** 94:17
120:5
**cruel** 227:13
**crumbles** 285:19
**crumbling** 102:17
**crux** 20:11
**crystal** 88:1,2
216:18
**ct** 6:19
**cue** 18:15
**culled** 209:3
**culpability** 151:2
281:8 282:9
**cumulative**
156:10

**cunningham** 8:17
**curious** 132:1
222:24
**current** 66:6,9
82:6 151:14
167:21 216:19
**currently** 40:25
81:10 124:22
**custodians** 81:24
**customized** 53:13
**cut** 15:14 117:17
120:17 272:17
273:6 279:21
295:11
**cuts** 148:12
**cyganowski** 8:18

**d**

**d** 1:22 8:1 10:19
13:18 15:1 72:21
126:17,21
**d.c.** 57:13 62:3
147:1
**da** 285:8
**damage** 48:6
**damages** 47:15
57:5 75:21 156:11
230:8,13
**damian** 12:8
**dangerous** 68:12
97:11 110:20
172:17 234:21
**dangles** 200:8
**daniel** 8:16 11:7
13:6 14:19
**danielle** 11:10
**darren** 11:1
**dasaro** 8:21
**data** 116:13
**date** 30:2 88:8,13
136:21,25 141:14
141:16,16 142:5,6
225:6 254:3 263:7
305:25

**dated** 159:7
**dating** 64:24
**daughter** 112:12
**david** 8:7,10 12:2
14:22 125:13
135:22 159:6
**davis** 3:3 8:22,23
15:19 19:10 37:16
64:20 286:23
295:19
**day** 44:6 97:5
125:7 137:7
193:17 198:10
239:4,24 241:7
271:1 282:2 285:7
291:7 302:18,19
302:23
**days** 34:7 38:21
42:1 79:20 124:2
124:3 154:11
181:21 293:6
**dc** 5:19
**de** 67:20 167:5
224:17
**dea** 289:24
**dead** 239:3,4
**deadline** 21:20
**deadlines** 158:10
**deal** 47:9 48:3
58:6,7,14 97:19
97:20 110:4
114:16 115:20,24
116:16 117:15,17
118:2,25 120:11
130:18 161:24
167:8 173:6 191:5
192:9,12 193:24
194:2 223:7
285:19 289:3
294:3 297:2 300:5
**dealing** 128:9
166:12,21 171:13
190:9 198:14

205:3 208:25
222:18 231:2
**deals** 34:19
103:25 145:2
183:23 190:11
300:12
**dealt** 166:14
180:24 190:10
**dear** 285:4
**dearman** 8:24
**death** 82:25
**deaths** 112:13
234:20
**debilitating** 95:1
**deborah** 10:7
**debtor** 1:9 19:24
23:8 24:4,16,20
72:6 78:24,25
79:22 101:3
124:23 126:18
127:16 128:11,21
132:14 134:14
136:2,19 139:9
142:25 143:25
144:1 146:7 150:1
165:23 167:5
169:17 184:16
196:24 205:11
219:6 268:13,14
275:16 276:25
277:1,3,4 296:14
298:8
**debtor's** 20:9
65:14 67:2 68:3
69:4,8 190:15,18
210:14,19 211:8
268:12 300:20
**debtors** 2:3 3:4
15:20 16:20 19:11
20:13,15,23 27:5
27:23,25 28:2
33:22 34:20 37:3
37:20 39:18 42:14

43:17,19,24 47:2
47:3,9 48:20
49:22 52:7 55:22
59:4 64:20 80:5
81:14 83:4 85:19
86:1,8,14,16
87:21 89:16 90:12
91:17 124:3,7
126:11,12,14,24
126:24 127:1,22
127:22 134:4,20
135:5,11 136:3,15
137:2 141:5
142:22,23,23,25
143:8 145:25
146:9 147:22
148:4,4,14,14,20
149:24,25 151:6
155:1 160:14,15
161:3,16 168:10
169:10 170:2
175:16 178:23
184:4 187:24
188:25 189:11,21
190:4,13,16,20,24
192:14,18 193:25
195:20 196:19,20
198:18 208:4
211:9 212:17
213:1,10 216:13
216:15,21 217:1,5
217:8 220:9
222:22,23,25
223:10,13 230:11
244:10,12 250:5
251:10 252:12,15
254:2,3,13 257:7
257:10 268:11
270:13,14 271:5
273:19,22 275:4
275:18,18,19
277:8,11,13,17,23
278:6,20,25 279:1

295:14,20 296:1,3
296:5,6,13,23
297:15 300:17,23
**debtor's** 103:14
129:11,22 130:1
135:1,9 137:23
147:10
**debts** 144:12
167:20
**decade** 105:18
106:13 135:16,18
171:21
**decades** 43:25
48:15 64:4 81:24
83:2 135:19,22
198:12
**decedent** 50:20
**deceptive** 36:4
166:5 168:18,20
168:23
**decide** 73:2
143:14 201:23
292:23,24
**decided** 66:18
72:16 152:13
168:6 180:9
188:12 194:1
292:23
**decides** 199:18
**deciding** 214:13
**decision** 25:9
39:15 41:20 82:23
89:18 133:10
170:17 179:11
181:3 184:10
190:8 194:15
225:24 227:9,10
241:4,6 268:24
**decision's** 180:15
**decisions** 91:8
143:16 165:13
190:3,9,10 194:23
239:1 246:14

**decisively** 292:23
**declarants** 133:8
**declaration** 47:10
54:14 64:9 68:5
98:25 99:9,16
100:6,9,10 105:1
114:22 116:18
133:5 164:2 281:2
281:14
**declarations**
42:16 49:6 129:18
129:24 133:6,8
280:22
**declared** 166:10
**decree** 44:18
**dedicated** 39:8
119:4 231:20
**dedicates** 96:7
237:20 238:10
**dedicating** 100:13
**dedication** 43:16
**deduction** 106:11
**deedee** 19:1
**deemed** 192:17
**deep** 29:7 207:5
294:20
**deeply** 289:24
**default** 163:5
**defaults** 110:11
**defend** 293:6
**defendant** 20:13
20:25 21:1,4,8,9
21:12,13,14 50:12
68:15
**defendants** 21:24
21:24 22:2,7 23:6
48:14 294:22
295:2
**defended** 243:24
**defense** 170:9
276:13 301:21
**defenses** 25:19
98:22 154:23

163:14
**defensive** 21:1,4
21:11 22:6 25:13
**deficiency** 85:5
**deficient** 203:19
**define** 192:19
**defined** 36:18
67:20 76:9
**defines** 284:12
**defining** 21:23
27:14 28:15
285:13
**definitely** 264:17
**definition** 23:5,19
24:14 28:8,24
30:6,23 31:24
32:5 36:20 73:10
77:16 210:21,23
**definitions** 28:14
29:14 139:5
**definitively**
292:23
**degree** 155:20
175:7 242:24
243:13
**delaconte** 8:25
**delaware** 62:3
149:7 186:14
291:21
**delay** 48:15 49:10
303:6,7
**delayed** 97:24
**delaying** 103:18
**delconte** 47:11
49:6
**delconte's** 290:23
**delegation** 287:6
**delete** 283:23
**delicate** 99:12
**deliver** 44:9
**delivered** 84:24
**delivering** 255:11

| | | | |
|---|---|---|---|
| demand 102:16 | derives 241:18 | destructive 65:21 | devon 9:1 |
| demanding 66:14 | des 267:23 | detail 27:15 69:9 | devote 94:5 |
| demands 63:18 | descendants | 88:10 94:23 95:8 | devoted 283:9 |
| democracy | 287:10 | 177:15,23 220:23 | dial 122:6 |
| 210:22 | describe 18:10 | detailed 94:18 | dialogue 104:18 |
| demonstrate | 22:11 | 114:25 281:21 | dichotomy 156:15 |
| 41:12 197:10 | described 47:10 | detailing 82:1 | 182:18 |
| 205:13 243:13 | 50:4 55:17 65:22 | 178:10 | dictates 143:12 |
| demonstrates | 212:21 223:5 | details 60:11 | dictating 137:5 |
| 197:24 243:19 | 226:23 253:17 | deter 233:4 | didn't 112:6 |
| demonstrative | 291:1 | determination | 117:20 132:17,20 |
| 61:19 | describes 33:15 | 82:20 180:12 | 135:1 138:10,19 |
| denial 223:12 | 126:13 200:3 | 193:10 203:9 | 139:17,25 143:11 |
| denials 223:9 | 224:13 291:3 | determine 193:6 | 153:23 162:23 |
| denied 148:23 | describing 19:22 | 194:3 265:14 | 165:6 167:8 |
| dense 61:20 | 35:5 225:23 | determines | 171:15 246:4 |
| 138:15 | description | 110:17 | die 113:4 |
| deny 85:7 191:23 | 185:13 | determining | died 111:24 112:2 |
| 207:5 219:17 | descriptions | 169:12 174:18 | 112:9,11 271:1 |
| depalma 6:1 | 87:15 | 193:1 202:10 | dies 56:19 |
| 270:7 | deserve 59:20 | 244:20 | dietech 181:14 |
| department 6:9 | 291:12 | deterrence 229:19 | differ 151:10 |
| 73:12 177:12 | deserved 146:9 | 229:25 232:20 | 156:3 193:24 |
| depend 180:13 | deserves 284:9 | 240:11 289:4 | difference 181:17 |
| depended 268:15 | deserving 222:9 | 290:6 | 181:24 201:16 |
| dependent 39:17 | designated 111:8 | deterrent 155:22 | different 21:7 |
| 41:4 46:14 | designed 119:5 | 240:2,3 | 29:24 34:18 39:24 |
| depends 77:19 | desire 292:7 | deterrents 287:8 | 53:18 76:16 88:4 |
| deplete 69:11 | desist 230:6 | detriment 216:6 | 127:12 156:6 |
| deposit 44:12 | 234:24 235:11,20 | devastated 103:17 | 175:19,20 182:8 |
| 75:16 | 236:7,9 | devastating | 183:13 184:18 |
| deposited 44:18 | desisted 235:3 | 100:17 | 189:16 192:20 |
| deposition 82:5 | desisting 234:25 | devastation 38:8 | 193:21 194:8 |
| 226:7,9 | 235:6 | develop 128:5 | 201:5 202:8 |
| depository 204:14 | desperately 17:18 | developed 35:11 | 206:21 214:15 |
| deprived 95:21 | 59:20 270:22 | 248:19 | 222:6 247:18 |
| deramus 280:18 | 295:16 | developing 45:20 | 252:3 271:7,16,17 |
| 280:21 | despite 41:25 | development | 272:18 273:1 |
| derivative 128:21 | 71:24 84:5 102:7 | 18:11 111:14 | 275:8 291:7 |
| 168:10 171:25 | 134:17 143:10 | devices 78:3 | 295:23 296:15,18 |
| 172:4,5,8 | destroying 203:6 | devolve 205:10 | 297:12 |
| derived 160:6 | destruction 71:24 | devolving 205:19 | differently 42:9 |
| | 80:24 | | 74:14 182:19,21 |

197:11 233:24
234:2 286:4
**difficult** 102:13
104:1 120:2,16
152:14 211:19
227:9 282:17
**difficulty** 49:11
118:20 161:4
**dig** 245:15
**diligence** 281:3
**dime** 145:12
**dimension** 288:11
**diminished** 16:24
**diminishing** 38:19
214:19
**diminution** 90:12
**dip** 286:10
**direct** 42:1,5 45:3
58:10 65:5 124:11
125:3,5,6 128:22
146:3 149:23
169:2 177:21
189:20 207:1
227:21 235:8
241:24 242:9
246:1 275:23
283:13 285:23
286:1 288:23
303:16
**directed** 167:7
282:14 283:17
303:23
**directing** 166:15
**direction** 279:2
**directly** 60:3 91:9
160:14 162:21,23
166:23 168:17,20
169:1 185:6
217:24 222:5
243:12 257:6
273:20 283:7
288:16 289:3
296:24

**director** 44:17
180:20
**directors** 43:22
56:6,8 60:18
61:10 62:8 63:10
234:15 239:15,25
256:4 287:4
**dirty** 171:1,5
**disability** 157:6
176:12
**disagree** 181:3
215:15 217:11
266:8 267:13
**disagreed** 268:21
**disagreement**
235:25 242:20
**disappear** 72:2,3
**discharge** 72:6,12
77:4 124:14,15,24
126:13,17 131:4,5
144:9,12,13,18,20
144:21 155:25
166:16 167:5,9,15
167:18,22 168:1
185:16 249:20
**dischargeability**
158:10 166:18
167:10
**dischargeable**
47:5 166:5,10
**discharged**
124:19 135:4
144:23 165:22
185:17
**discharges** 61:9
127:23 167:25
**discharging**
134:17,18
**disclaimed** 292:7
**disclose** 97:2
**disclosure** 50:4
81:13 82:8,10
84:19 114:25

129:22 130:2,6
133:3 134:5 136:3
138:18 156:25
157:19 250:2
275:21 280:11
**disclosures** 82:9
280:14
**discover** 35:1
**discovery** 81:23
157:2,7,9,13,19
157:21 158:4
220:8 222:1 281:7
282:17
**discretion** 221:2
270:4
**discuss** 31:18
101:6 143:15
150:15 202:25
272:15 301:23
**discussed** 34:17
66:20 67:4 91:16
95:8 137:18
143:10 179:3
188:13 218:24
242:6,17 259:9
295:25 298:14
**discusses** 250:20
**discussing** 101:8
131:9 224:20
247:17 302:24
304:11
**discussion** 15:8
16:15 126:25
211:19 298:10,11
**discussions**
202:21 244:1
300:7,8
**disgorgement**
229:21 230:13
**dishearteningly**
107:12
**disincentivizing**
200:15

**disjunctive** 33:5
**dismissed** 144:5
153:22
**dismissing** 143:5
**dismissive** 206:3
**disorder** 45:22
**disparate** 94:12
100:16
**disparity** 195:9
**display** 87:3
**displayed** 122:13
**dispute** 75:2
193:23 219:15
233:19,22
**disputes** 49:21
175:4
**disputing** 235:21
**disregard** 256:21
256:22
**disruption** 48:22
121:19
**dissatisfaction**
202:17
**dissenting** 95:18
96:3
**dissipating** 98:24
**dissipation** 97:25
**dissolved** 79:25
**dissonance** 285:5
**distinct** 251:6
**distinction** 73:8
272:8,10
**distinctions**
224:23
**distinguish** 143:8
165:24 196:16
**distributed** 75:15
86:16 94:20 100:3
105:16 111:6
**distribution** 86:9
103:5 106:10,11
106:18,19 107:13
141:3

**distributions**
21:10 50:3 159:5
269:22 296:21
**distributors** 19:19
22:24
**district** 1:2 52:5
52:12 57:3 73:11
78:10 91:7 104:22
125:20 149:8
150:24 174:6
186:11 196:21
**districts** 51:18
**divide** 98:20
101:11 236:23
289:17
**dividing** 149:12
**divisions** 53:22
**dmp** 19:1,8 20:7
21:22 22:9,23
**dmp's** 18:11
19:20,25 20:8,12
20:16,17,19,23
21:18,24 22:14,16
24:2 25:5 26:7
**docken** 9:2
**docket** 16:2 81:25
84:20 218:5 219:9
221:11 225:20
280:15 281:9,19
282:2
**dockets** 61:24
62:12
**doctor** 16:11
112:1
**doctrine** 189:4
**document** 27:10
45:6 82:13 96:12
96:16,20 111:10
176:22 177:13
204:1,4,14 223:14
223:23 244:25
248:9 289:25
292:10 293:14

**documentary**
244:2
**documented**
302:6
**documents** 18:21
34:3,3 35:13 45:7
45:8 55:18 82:15
82:15 97:1,3
176:19,25 177:22
203:25,25 219:7
219:11,13 220:16
220:20 227:1
242:15 243:10
244:8 245:16,20
246:5 248:7
252:22 281:10,11
281:11,13,16
282:6 292:14,25
**doesn't** 118:5
123:17 140:9
144:7,12,14
169:20
**doing** 29:22 37:23
54:8 104:15 147:9
155:12 161:11,12
181:24 184:14,15
223:22 240:14
242:20 260:6
266:14 268:4
283:6,10
**doj** 47:1,2,4 70:21
71:14,23,25 72:2
83:18,23 84:3,6
84:15 85:4 88:19
90:17 95:3 99:1,2
107:6,7,11,16,16
107:24 108:1
177:12 219:7,7
245:16
**doj's** 108:3
**dollar** 55:20 75:21
258:1

**dollars** 39:7 47:6
47:14 48:5,24
56:2,18,19 57:4,8
57:9,10,14,16,19
58:11 59:15 64:4
75:11,11 80:25
98:2 102:22
116:24,25 171:22
190:22,24 191:1,3
191:4,5,10 195:12
212:20 213:4
237:14 284:24
292:17
**domestic** 70:1,12
161:2 284:10
295:24 296:7,7
**don** 61:14
**donado** 73:24
**donated** 288:7
**donations** 46:6
**don't** 110:14
114:18 117:21
118:7 131:17
133:3,10 135:24
137:2,25 138:25
140:22 147:2,14
150:6,22 154:2
156:14,19 158:14
160:6 164:24
165:23,24 168:12
253:6 291:25
292:1,2 293:2,24
296:20 298:18,22
300:9,24 301:12
**doom** 83:12
**doomsday** 49:4
**door** 300:19
**doubled** 289:18
**doubt** 38:20 88:11
89:8 90:9 91:4
117:7 143:20
170:7 180:23
231:20 302:18

**dougherty** 9:3
**douglass** 12:13
**dozen** 82:6
**dozens** 63:13
81:24
**dr** 16:4 224:16
293:1
**draft** 34:15
252:22
**drafted** 128:14
148:2
**drafting** 27:9
62:23
**drain** 1:22 58:13
122:22
**dramatic** 52:3,3
**draw** 135:25
151:19 178:24
**drawing** 207:16
**drexel** 65:11
172:2,19
**drier** 265:18
**drop** 24:13
**drug** 230:3
**drugs** 48:22 78:3
234:21
**drying** 165:5
**drysdale** 5:16
**ds** 183:2
**dubel** 9:4 66:11
270:12 281:14
**due** 37:24 40:10
71:5 83:19,22,24
84:8 97:22 109:22
127:24 136:8,11
136:16,18 137:11
143:15 219:12
220:6 225:24
226:4 249:4,6,9
250:20 253:2
288:8
**dug** 207:5

dunmore 265:10
duplicative 27:13
  27:19
duration 176:13
duties 169:7
dutifully 112:7
duty 168:11
  226:11
dynamic 158:14
dystopia 290:20
dystopian 205:11
d'angelo 8:19
d'apice 8:20

**e**

e 1:21,21 3:1,1 8:7
  12:1,6 13:9 14:2
  15:1,1 29:9
  277:14 305:1
e.g. 44:14
earlier 22:5 65:22
  76:21 110:7 151:8
  174:24 190:9,10
  205:2 228:2
earmarked
  106:12
earphones 123:18
easier 20:4 28:4
easily 40:17 87:24
  163:21 239:18
easy 163:16 164:9
  190:23 203:22
  212:24
eberhardt 9:5
ecf 2:5
ecf3372 114:23
ecf3589 276:18
eck 14:6
eckstein 9:6 92:14
  92:17,21,22 101:4
  102:18 110:25
economic 45:2
  114:5

ecro 1:25
edan 11:13
edmunds 7:13
  224:3 228:23,25
  229:4,5 231:20,24
  232:4,9,11,15,20
  233:2,5,7,11,18
  233:20,21 234:1,5
  234:9,12,17 235:4
  235:7,14,24
  236:14,19 237:2
  238:8 239:9,11,23
  240:19,24 241:10
  241:12,15 243:2
  244:4,9,16,18,20
  244:23 245:2,6,9
  245:11,21,24
  246:17,21 247:24
  248:4 254:17,19
  283:14 289:15
education 61:18
edward 12:6
effect 44:22 45:1
  69:7 89:19 90:10
  103:17 117:9
  126:1 135:23
  166:16 167:9
  168:21,24 171:17
  171:20 173:1
  177:7,7 178:3
  179:1 200:15
  215:21 236:18
  240:2,3 249:20
  255:2
effective 30:2
  56:17 59:10 83:14
  85:12 87:24 88:3
  93:7 141:14,16,16
  142:5,6 207:22
  299:23
effectively 73:1
  89:14 134:17
  135:16 176:14

  181:8 184:5,7
  249:16
effects 169:13
effectuate 240:10
effectuated
  288:24
effort 59:23 135:6
  142:23
efforts 79:12 95:5
  175:24
eight 116:23
  163:12,13
eighth 19:4,17
  140:18 183:5
  288:13
eisler 275:14
either 16:25 17:9
  27:2 33:4,5,21
  42:11 80:15 83:25
  90:11,18 98:7
  127:18 134:20
  138:21 155:13
  165:19 166:6
  168:19 184:22
  195:12 199:9
  201:25 202:3
  214:2,2,13 262:6
  263:11 291:22
  294:11
elected 82:24
  153:2 210:25
  211:4 214:12
  283:10
election 146:19,20
  212:12
elections 147:21
elects 231:6
element 82:17
  181:15 189:2
elementary 189:1
elements 81:18
  202:11 222:12
  223:5

eli 2:4 3:11 19:10
elicited 96:22
eliminate 99:8
  141:23 142:3
eliminated 29:23
  140:19,19 182:23
eliminating 184:7
elimination
  277:10
elisa 10:16
elizabeth 13:8
eloquent 114:18
eloquently 44:25
  96:15 290:16
else's 55:9
email 159:7,13
  224:12,18 225:23
  243:13 244:2
emails 225:20
  278:16
emarsys 61:18
embodied 39:12
emergence 46:24
emergency 16:5
  93:18
emergent 80:5
emily 10:8
emotional 116:22
emphasize 102:2
  212:23
employ 265:13
employed 94:20
employees 61:10
  62:9 63:11 242:4
employment
  255:7
empty 41:24
enable 95:4
enables 67:16
enact 142:20
enactment 128:2
  128:3 198:2

**enacts** 238:11
**encompass** 208:5
**encourage** 122:8
**ended** 300:12
**endless** 38:14
**endorsement** 225:21
**ends** 262:23
**enforce** 74:12
  75:9 77:12 78:24
  79:3 196:18
**enforcement** 74:8
  75:6 78:5 161:25
**engage** 239:24
**engaged** 49:3
  119:13 160:2
  168:13 200:7
  240:6 242:1,17
**engaging** 37:7
  237:6 257:3
**engine** 225:17
**engineer's** 187:20
**english** 85:22
  87:15
**enhance** 228:7
**enjoin** 74:25 76:8
  76:14 77:21
  134:13 142:17
  172:4 265:21
  268:10
**enjoined** 69:4,23
  137:3 171:25
  188:19 253:18
  257:6,24
**enjoining** 128:20
**enormous** 43:8
  81:12 291:12
**ensure** 43:19
  111:6
**ensures** 67:18
**ensuring** 80:2
**enter** 88:20 90:19
  91:3,5 265:14

**entered** 128:3
  226:5 281:18
  282:5
**enterprise** 60:17
  75:23
**entire** 75:22,23
  98:12 163:10
  175:14 176:13
  217:12 284:2
  287:24
**entirely** 83:14
  90:4 149:22
  195:22 294:4
  295:21
**entirety** 287:5
**entities** 5:17 32:3
  34:5 40:19 50:22
  62:25 70:13 73:15
  76:9 82:10 87:1
  88:15 101:15
  118:8,11,17,18
  120:1 124:12
  130:14,17 145:11
  193:19 196:5,18
  197:5 245:14
  254:2 257:12
  271:25 272:2,4
  273:25,25 274:3
  275:16,17 281:12
  282:16 295:24
  298:8 303:9
**entitled** 148:7
  167:6 169:24
  244:7 255:21
  260:6 288:24
**entity** 46:24 66:4
  110:11 119:19
  130:25 131:1
  138:23,24 139:25
  164:25 168:19
  217:18 222:25
  251:1 259:17
  284:4,6 285:2,14

  285:14,14 297:20
**entity's** 168:20
**entrants** 292:18
**environmental** 255:8
**epidemic** 79:14
  111:8 113:2
**equal** 37:24 56:24
**equally** 46:10,14
  219:20
**equitable** 39:13
  106:9 126:20
  144:5 189:2
**erf** 106:21,25
**eric** 13:22
**eroded** 48:19
**erroneously** 237:17
**eskandari** 9:7
**especially** 131:7
  206:19 230:2
**espouse** 83:9
**essence** 16:24
  155:23 274:7
  285:1
**essential** 77:13
  82:16 174:7
**essentially** 16:9
  16:23 22:11 60:21
  66:6 72:19 94:15
  131:13 150:3
  219:16 251:9
  260:11
**establish** 145:6,7
  147:23 170:18
  243:15 244:23
**established** 64:24
  70:22 91:21
  143:17,22 145:25
  146:1 204:7 227:8
**establishes** 98:11
  114:24 115:5
  134:17 199:25

**establishing** 74:13
  243:19,21
**establishment** 111:18 274:23
**estate** 44:3 48:9
  69:13 98:25 106:9
  145:12 159:15
  161:15,18 162:19
  162:20 163:1,7
  165:14 171:16,20
  172:6 177:8 178:3
  182:2 184:2
  189:17,19,24
  198:25 233:16,16
  233:17 250:22
  258:2 259:3,7,12
  260:5 262:24
  263:5,24 268:13
  285:23,25 286:3
**estate's** 234:2,6
**estates** 27:23
  39:13 49:2 50:20
  67:9 69:12,19
  90:11 216:13,15
  216:21 227:4
  278:15
**esteemed** 119:10
**estimated** 130:2
**estimation** 98:23
**estoppel** 299:23
**et** 37:25 64:10,10
  122:23 164:4
  275:12 291:7
**eternity** 117:20
**ethan** 10:22
**evading** 124:22
**evaluate** 134:20
  135:2 163:1
**evaluation** 192:25
**evan** 5:6 26:5
**evans** 26:17
**evening** 270:6

**event** 85:9 113:23
189:22 299:22
**everybody** 58:3
63:6 79:6 115:7
247:13
**everyone's** 64:13
**evidence** 30:4
42:14,17,21,25
44:22 47:7,7 49:5
49:15 88:11 92:4
95:10 98:9 115:22
116:18 129:17,20
130:5 137:12
141:18 153:1
162:18 181:22
189:7 206:12
208:19 218:7,8,9
218:16,18,22,23
219:2,4 220:18
221:8 223:6,15
226:7 241:8,25,25
242:13,25 243:6,8
243:17,18,24
244:2 255:20
257:10 262:19
279:12 281:3,8,15
282:14 283:21
285:22 286:17
289:1,2 290:19,21
290:25 291:9
295:13 297:22
299:13,16
**evidences** 210:15
**evidentiary** 66:8
108:8 114:21
299:11,18
**eviscerates** 148:6
**ex** 68:22 231:10
**exact** 60:24
191:19 205:14
272:18 288:16
**exacting** 183:12
277:22

**exactly** 53:19 61:2
104:23 107:12
148:14 184:21
185:21 189:7,10
192:1 205:25
207:12 268:4
291:3
**examination** 42:7
80:13 81:11 87:8
129:25 135:21
139:18 145:23
177:22 223:15,22
280:14
**examine** 132:17
132:20 244:7
**examined** 133:7
178:16 226:6
243:11 244:24
280:18,20,25
**examining** 245:7
**example** 16:17
46:15 61:3 71:15
77:10 79:10 86:1
86:21 108:13
109:7 136:19
140:19 166:1
168:17 170:9
176:22 208:3
236:11 237:18
238:1 255:10
256:13 259:8
283:4
**examples** 62:12
74:16 282:25
**exams** 157:25
**exceed** 129:15
**exceeds** 124:15
142:24
**excellent** 290:22
**exception** 21:16
71:2 72:19,21
73:13 74:4,18,21
75:1,5 76:17

78:23 79:9 83:6
83:11 90:1 195:21
195:23 196:2
197:1,21,23
198:16 278:17
**exceptional** 124:7
**exceptions** 20:22
22:12 197:14
**excerpt** 225:12
**excerpts** 293:22
**excess** 49:18
133:12
**exchange** 65:18
129:5 224:18
**excised** 66:7
**excluded** 20:18
21:22 22:17,20
27:7,7 28:6,8,11
28:21,25 29:15
30:1 141:9 256:1
256:15
**exclusive** 34:4
127:21
**exclusively** 119:4
214:4
**excuse** 58:22
133:21 134:18
164:20 197:16
210:20 218:5
284:1
**execution** 61:5
**executives** 175:21
**executor** 259:7
**executory** 170:3
170:10,13
**exercise** 79:12
90:4
**exercised** 211:4
**exercising** 116:21
188:19 240:13
**exhibit** 159:8
160:23 219:6
224:10,25 259:4

**exhibits** 218:6
221:10,10 224:8
**exist** 142:9 169:20
276:14,15
**existed** 254:2
255:7
**existence** 289:6
290:9
**existing** 301:22
**exists** 149:25
**exit** 46:1
**expand** 27:25
56:7
**expansive** 230:11
**expect** 16:8 24:19
195:11 259:15
**expectations**
121:8
**expected** 159:10
270:22
**expedited** 176:15
**expedition** 219:25
**expense** 49:10
**expensive** 49:20
85:12
**experience** 54:19
54:20 206:2
**experienced**
120:4
**expert** 42:2,5,17
64:9 66:1 132:18
132:21 295:4
**experts** 255:18
259:11
**explain** 17:9
37:22 60:11 80:21
143:2 236:21
253:4 300:10
**explained** 66:22
89:9,12 210:14
253:7
**explaining** 114:25

**explanation** 19:7
19:15
**explicitly** 127:25
**exploiting** 294:13
**explore** 155:18
191:7
**exposed** 97:25
**exposes** 78:18
**exposure** 154:21
191:2,4,14 192:5
208:8
**express** 216:2
**expressed** 59:6
143:20 159:6
198:4 272:17
**expressly** 46:16
60:17 71:17 84:21
85:18 150:13
195:6
**extend** 141:1
271:16 272:3
**extending** 299:14
**extends** 299:12,19
**extension** 57:6
**extensive** 82:8,9
82:10 85:12,19
88:7 118:22
137:12,14 157:13
279:13
**extent** 26:11
34:22 54:22 66:16
78:2 99:7 109:16
157:24 170:17
229:10 245:13
246:12 247:1
296:10,22 297:5
298:12
**extinguish** 144:1
**extinguished**
69:25 70:3 141:6
148:19 182:16
253:19

**extol** 136:20
**extortion** 284:9
**extra** 125:1
208:20 279:23
**extraordinarily**
182:4
**extraordinary**
38:22 43:13 46:11
57:25 88:9 114:7
124:5,14 125:15
125:18 127:23
140:23 148:22,22
281:3 283:19
286:20
**extrapolate** 288:5
**extremely** 93:24
96:1 120:3 205:15
**extrinsic** 221:8
**eye** 164:7

**f**

**f** 1:21 13:16 305:1
**f.2d** 76:25 77:6
**f.3d** 66:24 91:12
171:8 265:11
**fabric** 174:22
**face** 16:9 39:5
41:9,14 80:19
192:5 212:13
303:19
**faced** 192:23
193:1 235:16
**facilitate** 48:16
96:2 303:15
**facilitated** 55:18
**facilitating** 99:24
**facing** 191:2
**fact** 15:11 23:18
38:9 42:2,4 43:1
54:1 56:13 60:23
64:22 69:13,18
70:3,13 83:5
84:10 87:9 94:8
97:25 102:10,25

104:7,25 105:21
106:11 110:2
111:14 114:24
115:1,9 137:21
139:18 144:19
158:2 160:16
173:7,8,15 174:9
174:19 175:25
179:17,24 180:2
184:25 185:16
190:23 193:16,23
194:1 199:12
201:13 205:13
206:15 209:9
219:20 223:8
237:19 242:21,21
254:20 255:6
260:21 262:11
265:25 270:13
271:14 280:8
283:24 284:17
286:9 287:9,18,20
287:20 294:25
295:15 297:6,11
**facto** 167:5
224:17
**factor** 43:6 49:7,8
49:14 50:24 51:3
54:18 56:4 150:11
150:13 257:5,14
257:22 258:19
259:2
**factors** 39:15 43:3
50:4,25 54:25
64:16 66:24 67:5
67:7 117:23 144:8
145:7,7 150:18
162:11 172:22
185:24 193:11,13
193:17 223:1
253:17 297:9
**facts** 41:11,13,25
42:20 47:20 51:5

60:23 67:1 80:23
97:9 102:9 105:14
114:24 116:3
162:24 171:19
183:12 188:25
190:4 209:3 222:6
222:7 223:3 259:8
276:16 287:1,15
**factual** 19:15 42:1
66:1 95:15 218:3
279:11 282:20
299:5 300:6
**factually** 78:16
235:25 278:19
**fading** 113:15
**fail** 46:15,18
57:23
**failed** 108:1
**failing** 172:14
**fails** 290:20
**failure** 31:1
225:24
**fair** 35:14 37:5
39:12 162:16,24
167:23 218:8
258:19 267:14
272:21 277:11
278:14 287:7,13
290:24
**fairly** 163:21
164:1 175:23
194:9 241:6 278:5
**fairness** 56:24
63:17 77:16
150:15,17 162:6
181:13,15,15
**faith** 30:25 117:14
169:24 170:19
175:10 227:7,12
**fall** 19:17 27:9
70:23 77:15
110:14 150:4
291:19

fallacy 219:16
falling 151:12
  164:22
falls 164:12
false 31:1 81:9
  82:21 236:3
  256:20
familiar 115:18
  145:3 221:1,4,6
  222:13,15 224:7
families 45:23
  46:1,4 50:19
  67:11 82:4 85:25
  87:19 88:14 113:3
  113:6
family 31:10
  33:17 40:21,22
  68:20 80:4 82:6
  86:10,25 94:1,14
  95:22 96:24 97:12
  108:23 112:12
  119:19 124:11,15
  124:17,24 125:14
  125:17,25 126:1,3
  126:8 128:25
  129:5,7,15 131:4
  132:15 133:4,12
  134:4,7,10,11,14
  134:18,19 135:2,4
  135:7,14,22 136:2
  136:10,19 137:1
  138:9,9 140:1
  144:22 146:5
  148:5,8,17 157:2
  157:22 159:9
  160:24 163:10
  175:14 188:21
  200:6 215:1
  234:14 236:4
  239:13 243:9
  259:16 262:13
  280:24 300:5,16
  303:21

family's 129:19
  139:24
fantastic 121:6
far 32:5 45:2,10
  73:18 102:20
  105:8 124:15
  130:11 137:11
  141:8 147:7 155:6
  156:24 157:7,10
  160:10 161:19
  163:7 165:16
  175:3,18 184:16
  187:16,16 202:1
  202:24 203:9
  206:5 207:9,13
  209:2,18 215:22
  223:16 226:22
  235:19 238:6
  239:13 242:25
  243:21 253:22
  255:1 273:23
  274:18 285:10
farrell 9:8
farther 247:21
fashion 275:7
fashioned 65:1
fatal 187:14
fates 284:7
father 112:5,13
fatigue 165:9
fault 256:22
  282:25
faulted 198:16
  200:25
faulting 246:15
favor 43:1 53:8
  70:17 73:24 80:19
  115:4 124:15
  131:16 146:13,15
  152:25 153:7,9
  167:9 187:22
  271:4

favorable 119:25
fear 293:12
feasible 47:19
  59:11,12 67:18
february 224:19
  225:9
federal 16:21 27:6
  38:16 40:12,19
  41:6 51:6 56:3
  59:11 74:10 76:12
  77:17 78:3 93:14
  98:17 99:4,7
  101:15 103:20
  105:23 106:5,15
  106:22 160:3
  184:18 218:13
  222:10 267:25
  295:24 296:7,8
fee 95:6 99:23,25
  164:5
feed 121:17
feeds 121:2
feel 79:8 114:18
  218:24 253:3
  271:24 272:3
  278:21 279:17
feeney 9:9
fees 40:10 48:25
  100:5 113:22
  119:8
feinberg 55:7,10
  118:25 293:18
feld 5:8 101:1
femino 9:10
fence 211:15
ferguson 211:22
  212:11,12
ferry 150:8
fewer 39:16
fiduciaries 295:15
fiduciary 42:15
  59:16 112:25
  226:11

field 210:8 286:14
fiercely 58:23
fifth 7:3,17 48:7
  111:17 265:16
fifty 60:14
fight 49:19 99:6
  125:19 263:24
  264:2
fighting 86:8
  179:25
figure 33:9 35:13
  53:7 237:13
  270:19 294:21
file 16:16 18:19
  50:11 86:21 87:5
  108:1 131:3
  157:23 186:22
  266:22
filed 2:3 18:21
  19:15 21:19 57:3
  84:12 107:17,22
  107:24 111:24
  124:17 128:25
  131:10 140:18
  144:22 157:9
  167:11 207:23
  220:12 225:20
  265:7 266:24
  268:24 271:11,22
  288:2,4 291:7
files 130:25
  186:23
filing 106:5
  136:25 144:18
  148:9 249:21
  283:5 285:9 291:2
  291:4
filings 144:8
  145:8
fill 157:17,17
final 35:1,1 56:1
  64:22 83:25 90:19
  91:3,5 114:22

133:10 145:14
146:9 170:17
182:7 183:22
265:14 269:2
**finality** 56:14
206:15
**finally** 48:23 50:9
71:8 82:18 88:16
111:20 122:12
292:6 297:16
**finance** 44:15
**financial** 81:14
83:10 86:4 94:14
96:7 100:13 110:3
132:16 136:4
167:21 184:25
185:1,9 211:6,16
255:16 259:10,12
268:12 281:7,21
281:23
**find** 38:9 54:12
60:8 62:8 68:19
87:3 165:17
256:20 261:2
282:8
**finding** 67:23
69:20 84:5 175:10
**findings** 175:9
191:19 280:19
**fine** 26:3 36:11,13
92:14,20 100:24
118:7 130:8 179:6
192:4 205:1
228:24 229:3
239:22 245:8
246:20 248:15,17
273:10 277:2
298:2 301:2
302:13,14
**finegan** 87:8
**finer** 272:10
**fines** 76:19

**fingers** 188:1
**finish** 185:23
302:18
**finzi** 9:11
**fire** 48:17
**firm** 82:9 93:1
164:3 257:3
**first** 6:2 18:15
19:18 20:7 27:1
29:12,17 30:23
44:6 46:15 63:17
67:8 70:24 71:6
71:12 74:18 78:9
78:18 83:22 95:18
101:11,18,20
103:20 108:7,14
108:19,24 111:2
123:4,5 126:9
143:14 149:21
183:5 184:10
189:14 192:24
195:23 196:16
197:13,20 204:23
205:7 207:12,13
219:5 225:4 228:2
229:6,14 235:24
251:24 253:16
260:18 270:8,10
271:9 272:11
273:23 280:6
286:23 291:5
296:4,9 302:10,25
**fishing** 219:25
**fist** 196:15
**fit** 36:20 183:18
183:19
**fits** 29:11
**fitzsimmons** 9:12
**five** 50:20 52:6,7
54:18 57:22 60:7
60:13 64:8 104:8
289:20 292:11

**fix** 33:11 108:13
116:2
**fixed** 34:2
**fixing** 27:9
**flaw** 77:2 213:5
**flaws** 187:14,21
188:3
**flesh** 166:25
**fletcher** 9:13
**fliers** 86:18
**flights** 25:3
**flip** 46:9
**flipping** 31:23
**flows** 48:20
**fly** 34:24
**focus** 95:5,16
104:20 110:5
114:19 156:16
188:4,16 225:13
227:1 233:3,9
279:15 304:6,10
**focused** 56:12
95:19 254:22
**focusing** 150:19
189:25
**fogelman** 9:14
34:13,13 35:10,18
248:24 249:1,2
250:15,19,21,24
251:2,5,6,13,16
251:21,24 252:6
252:10,12,15
253:6,8,10,11,15
254:10,11,14
255:5,24 256:3,8
257:14,18,20
258:5,9,11,14,16
259:1 260:4,15
261:3,6,9,13,18
261:21,24 262:2,9
262:15,18 263:3,9
263:13,17,19
264:1,4,6,7,10,15

264:18 266:4,14
266:17,19,21
267:1,3,6,8,13,16
269:6,7,9,12,20
269:25 285:4
286:9 289:24
**fogleman** 248:22
**fold** 36:7
**follow** 243:5
**followed** 65:11
119:9,21
**following** 289:5
**footnote** 24:13
**force** 150:2
151:19 286:14
**forced** 135:25
137:6 151:6
176:13 182:12
**forcing** 137:6
155:7
**foregoing** 305:3
**foreign** 73:12
82:10 245:14
263:7 270:21,21
282:15,15,19
284:10 297:20,20
297:20,23
**forensic** 81:25
280:14
**forever** 269:22
**forfeiture** 47:1
76:19
**forget** 104:17
145:21
**forgive** 283:21
**forgotten** 272:13
**form** 17:14 36:23
86:18 117:23
141:20 181:5
182:17 229:21
232:5,6 249:19
250:4 273:16
281:12 296:24

**formal** 154:8
250:11
**formalities** 122:2
**former** 60:18
63:10 82:6 118:24
**formerly** 40:24
51:20
**forms** 157:17
**formula** 154:2,3
**formulated** 154:3
**formulation** 36:3
258:18
**forth** 15:4 95:7
207:23 256:12
280:19 297:17
**forums** 78:24
**forward** 36:18
104:20 152:11
170:8 202:14
218:22 239:21
242:18 243:20
274:15
**fought** 38:18
49:20 51:21 104:2
**found** 78:19 85:2
96:16 173:15
180:21 194:16
195:8,11 268:21
293:14,15 303:20
**foundation** 33:15
102:22
**foundations** 33:17
33:21
**founded** 28:24
**four** 51:3 56:18
60:1 64:1 70:23
79:22 104:8 112:2
175:19 177:16
178:16 224:1
244:5 278:13
287:4 289:19
295:22

**fourth** 32:25
47:22 70:7 111:15
144:7 152:2
**fraidin** 9:15
**frame** 43:4
**framework** 20:22
**franklin** 12:9
**frankly** 33:20
80:14 89:2 182:20
215:16 251:18
258:18 266:9
277:7 279:14
289:4
**fraud** 31:3,4,6,15
31:16 36:7 37:8
124:20,22 129:2
134:12 141:1
144:23,24 145:17
170:25 254:15
255:8,9 256:18,24
**fraudulent** 32:11
37:8 49:25 233:4
233:9,12
**frazier** 9:16
**frederick** 13:9
276:11
**free** 58:10 183:17
**freeze** 220:15
**frequently** 63:6
**friedman** 9:17
**friend** 285:4
**friendly** 154:10
**front** 79:5
**frozen** 220:7
**frustrating** 103:8
209:8,10
**ftc** 241:19
**fulfilled** 46:7
**full** 17:10 18:13
27:4 55:25 87:12
87:12,22,22 105:5
106:10 109:3
122:13 126:25

151:1,18 163:24
200:9,10 204:17
212:1 230:17
231:15,15,21
232:7 257:24
258:6 276:1 293:3
293:18,19 302:18
302:19
**fully** 40:24 72:2
78:17 83:16
103:10 104:1
154:4 246:9
302:22 303:1
**fulsome** 132:15
133:3
**function** 29:8 74:9
77:13,25
**fund** 69:24 99:25
100:1 105:15
184:15 253:19,20
253:24 259:23
279:8
**fundamental**
56:24 102:25
171:7 184:17
198:22
**fundamentally**
101:20 136:7
295:23 296:15
**funding** 44:5
**funds** 39:24 79:5
94:20 99:4 100:13
111:5,6,8,18
119:24 120:12,17
227:18 228:8
297:1,3 304:5
**further** 16:14
44:20 51:1,23
56:2 60:15 69:19
77:9 79:2 98:24
100:20 109:16
139:23 210:21
218:19 222:1

235:15 247:12
289:5,21 298:1
299:14 303:1,16
**furtherance** 181:9
**furthermore**
220:6
**fusion** 178:12,17
178:18 221:8,22
222:17,19,22
223:3,8,14,15,17
223:24
**future** 30:3 43:7
90:14 124:21
137:18,24 139:1,1
139:2 141:3,5,8
141:11,11,17,24
142:3 155:23
163:5 198:9 201:6
204:8 206:20
237:7,8 239:24,25
254:8 276:15
290:22

---

**g**

**g** 8:17,22 15:1
71:19 72:11 76:1
76:7 100:9 127:18
128:2,4,7,18
198:2,7 274:20
**g.m.** 54:11
**gabe** 8:11
**galle** 9:18
**gange** 9:19
**garrett** 255:24
259:6
**garrity's** 181:13
**gartrell** 9:20
**gary** 10:4 100:7
**gates** 213:4,6
**gather** 79:5
**gaurisankaran**
44:24
**gdp** 287:18,25
288:7

geldreich   9:21
general   7:8,15
  44:12,13 52:4,22
  61:4 76:21 79:12
  82:24 88:13
  108:16 153:12
  183:1 199:18
  202:4,6 205:14
  210:25 211:21,22
  211:25 212:4,9,10
  212:12 213:19
  214:5 217:7
  218:13 220:3
  223:25 227:14
  228:20 230:17
  231:6 237:9 240:2
  278:25 282:23
  283:6,11 296:19
generally   36:20
  182:21 230:9
  257:16 273:9
generals   105:11
  186:13 214:13
generated   135:18
geoffrey   10:2
gerard   8:14 14:5
  31:9 300:4
germane   42:10
  222:5
getting   19:5 29:18
  41:15 48:15 62:17
  62:18 107:2 110:2
  110:6 118:21
  131:8 139:21
  144:23,24 155:10
  155:15 156:6
  157:13 162:7
  166:17 167:14
  185:18 188:4
  191:4 255:19
  257:25 260:16
  273:20 274:11
  277:3 278:16

280:2 282:18
  288:17 295:7
  303:7,8 304:1
gibson   9:22
giddens   9:23,24
gigantic   163:21
gilbert   9:25
gill   9:21
gillian   12:18
give   21:12 30:17
  37:25 50:16 53:13
  103:4 106:8,25
  108:13 117:6
  121:4 146:9 151:6
  158:17 160:1,23
  165:14 182:12
  188:9 219:5
  223:19 225:3,3
  230:6 250:10
  251:22 273:13
  290:12 292:25
  301:24
given   22:13 62:11
  112:1 114:6 117:2
  117:25 129:2
  136:20 150:25
  154:14 161:21
  162:22 163:19
  178:25 208:21
  219:11 256:14
  297:12 300:15
gives   98:20 169:1
  206:7 276:24
  277:1
giving   19:14
  41:15 160:7 162:8
  212:17 259:12
  276:7
gleaned   76:18
gleit   4:6 19:23
  20:10 21:17
global   29:21 47:9
  94:11 98:12

100:11 120:4,5,10
  120:11 206:15
  289:23
globally   46:2
gloss   105:21
gm   251:3
go   23:12 24:2
  27:15 32:23 47:6
  56:17 59:10 96:25
  105:7 107:13,15
  120:18 121:7
  123:6 134:22
  143:1 145:15
  149:19 150:21
  152:10 155:7
  158:8 161:23
  189:3 195:6
  198:23 206:5
  210:2 222:16
  226:1 243:20
  244:13 247:21
  248:23,25 263:22
  274:5 283:12
  293:13 301:10
goal   188:4
goals   96:2
goes   16:21 25:17
  86:24 136:20
  150:19 157:14
  162:5 165:18
  238:13 243:21
  281:2 289:21
  291:15
going   15:9 16:6
  21:17 26:10 54:21
  54:24 58:6 60:22
  60:22 61:20 62:6
  63:8 68:3 77:1
  78:18 81:24 88:24
  92:7 99:5 100:15
  111:11 113:19,21
  114:1,18 121:7
  122:8,18 123:14

123:20 138:22
  141:25 150:9
  158:22 160:23
  164:13 167:25
  170:8 172:9 173:2
  188:9,10 192:3
  193:11 196:6
  200:18 201:2
  208:7 210:2
  218:19 224:3
  226:18 229:8,11
  229:15 232:3
  238:25 239:21
  246:23 248:23
  254:24 256:24
  266:22 269:18
  272:22 274:5,8
  279:21 280:1
  288:12,12 289:13
  289:14 290:2
  291:3,14,18
  295:12 298:3
  299:7 300:7
  303:15
gold   7:6 149:12
  149:15 150:8
  186:6,9,9 187:2,9
  187:12 191:8,13
  191:16,25 192:7
  192:13,24 193:7
  193:20,23 195:3
  195:13,17,20
  196:11,15 197:9
  197:19 198:3,13
  199:7,15,22
  200:20 201:8,13
  202:3,13,16,19,23
  202:25 203:12,14
  203:21 204:3,9,10
  204:12,16,18,20
  204:23 207:11
  208:16,24 209:16
  210:10 211:10,11

211:18 213:17,22
213:24 214:1,20
215:3,13,19 216:1
216:17,23 217:4
217:14,19,22,25
218:3 219:3,23
220:15,19 221:5
221:15,19,21,24
222:3,16,20
223:18 224:2
225:2,8,11 226:2
226:3,16 227:2,25
228:4,10,14,21,22
229:7 238:14
248:1 283:25
290:19 299:16
**golden** 214:17
**goldman** 6:21
80:12 149:1,2,4,5
149:11,17 150:10
150:20 151:24
152:9,14 153:15
153:17,19 155:3
155:14,17,20
156:8,18,21 157:5
157:12,24 158:6
158:19,22 159:14
159:16,22 160:5
160:16,21 161:11
162:2,4 163:17
165:4,17 166:2,15
166:25 167:3,19
167:24 168:3
170:6 171:4,9,11
172:7,12,14,17
173:8,13,17,22,25
174:3,16,22 175:5
176:3,10,17 177:9
177:20 178:4,9,14
179:4,7,10 180:2
180:11,19 181:2,5
181:11 182:7
183:21 184:2

185:4,11,22 186:1
186:5,7 193:12
196:7,13,17 199:9
200:18 210:12
215:14 218:23
229:7 248:2 284:1
299:16 304:11
**goldman's** 214:17
**goldstein** 10:1
**gold's** 159:20
**good** 15:18 18:6
19:9 33:25 37:15
44:21 45:1 50:9
64:5,19 72:18
92:14,18,22
100:22,25 101:17
101:23 108:6
110:22,24 113:12
114:16 116:21
117:14 121:1
122:21 123:8,9
158:18 169:24
170:19 174:2,17
175:10 183:14
187:8 192:9,12
196:8 207:4 213:8
213:11,20 219:3
227:7,12 241:1
270:6
**goodman** 10:2
**gossamer** 60:21
**gostin** 10:3
**gotten** 27:17
106:9 128:17
154:18 173:4,6
229:10
**gotto** 10:4 55:13
100:7,8
**govern** 149:22
**governed** 168:5
**governing** 41:20
41:22 42:22 64:23

**government** 27:6
41:7 70:12 76:5,8
77:25 99:4,7
103:20 105:23
106:5,15,23
119:25 160:3
203:21 211:1,2
231:7 252:1,6,17
289:8 295:14
**government's**
85:6 266:6
**governmental**
5:17 16:21 33:23
38:24 40:19 51:6
52:24 53:22 65:20
72:22 73:10,14
75:6 76:3,10
78:11,21 83:12
93:15 97:16 100:1
101:15 118:8,11
118:17,18 130:14
130:16 164:25
193:18 196:5,18
196:23 197:5
217:18 284:4,6,12
285:13 290:15
294:2 295:24
303:9
**governments**
38:16 49:2 78:6
92:24 94:19 119:4
120:19 292:4
**governor** 238:11
**governors** 289:8
**governs** 59:9
76:11
**grandchildren**
139:24 140:10
**grandstand**
112:16
**grant** 62:23 83:13
89:22 143:18
188:6 206:24

209:11 211:24
213:15
**granted** 23:8 65:8
89:4 124:4 135:15
142:24 172:21
197:20 198:21
205:5 271:6 272:5
**granting** 124:14
**grants** 142:20
**grappling** 211:23
212:1
**grateful** 267:10
**great** 49:14
136:20 143:1
271:19 297:2
**greater** 52:16
144:20 175:25
231:3 275:6
**greatly** 213:2
**green** 10:5,6
**greenberg** 6:1
270:7
**greenspan** 10:7
**grew** 112:5
**grievously** 48:18
**grim** 10:8
**gross** 62:18
**ground** 167:17
188:3 282:8
285:19
**grounds** 123:13
124:1 126:9
173:18
**group** 3:14 4:16
5:17 17:10 19:8
22:23 40:24 51:13
53:10 57:15 58:8
64:6 113:22
117:21 118:9,11
118:14,17,17
120:20 163:10
176:19 208:15,23
208:25 221:11

225:19 270:21
275:11 285:17
288:15
**groups**  16:23
39:22 40:21 41:6
51:11 58:21 102:4
104:6 119:13,16
294:20
**growing**  129:3
**grows**  124:21
**guaranteed**
107:15
**guard**  10:9 55:13
66:12 98:16,25
99:2,9,12,16,24
100:5 104:2
**guess**  34:23 60:12
60:15 61:4,16
63:8 92:18 150:16
166:21 173:12,24
187:2 201:24
204:13 217:10
228:14 236:23
241:5 247:20
260:17 266:3,5
291:25 302:3
**guessing**  281:5
**guest**  269:23
**guided**  210:6
279:4
**guilty**  178:5 219:6
221:9 222:23,24
222:25 223:4
245:12
**gulf**  275:11,14,25
276:7,9 279:16
298:5 300:6 302:1
**gump**  5:8 101:1
**guys**  122:13,17
199:3 215:5
246:19

**h**

**h**  9:6 14:16
127:18 128:1
198:15 256:11
259:4 275:20
**haberkorn**  10:10
**half**  112:3 293:3
**halt**  154:20
**halves**  17:5
**hampshire**  62:3
**hand**  60:4 85:8
163:24 164:10
222:21 298:12
303:18
**handful**  62:15
163:9 256:9
**handle**  65:3
**handled**  101:9
**handling**  37:21
101:9
**hands**  165:10
189:4,4 220:18
226:25 243:25
290:8
**hang**  103:6
**hangs**  102:22
**happen**  82:11
164:24 214:2
266:20 293:12
**happened**  17:6,12
17:20 18:4 165:8
165:9 198:9
235:15 241:2
**happening**  45:16
62:19 161:13
195:7 206:7
216:14 235:12,15
294:12
**happens**  102:14
180:13 188:1
206:6 214:7 284:3
**happily**  49:12

**happy**  15:15 17:8
19:7 23:23 24:17
61:21 228:17
251:22 300:8,22
300:25 301:23
**hard**  34:24 49:20
54:7,15 101:3
104:2,23 117:15
123:15 132:13
163:5 164:7,11
165:1 175:18
177:6,10,16 178:2
183:12 184:24
187:19,24 188:3
213:12 218:25
226:21 238:19
252:18 277:22
**hardest**  285:5
**harm**  78:19
124:21 142:6
191:1 211:4,8,13
240:9 287:22
288:8
**harmed**  118:1
**harmful**  31:2
**harold**  10:19
**hate**  187:6 215:6
**hauer**  5:8 101:1
**haven**  153:22
**hayden**  8:15
**head**  148:5
**headphone**
301:12
**heads**  205:23
206:8
**heafitz**  170:11
**healing**  100:17
**health**  39:5 48:21
72:1 77:24 82:20
93:18,23
**healthcare**  40:12
40:14

**hear**  19:7,11
37:17 76:14 92:20
100:23,24 121:4
142:1 187:3 229:2
246:19 251:11
253:10 269:14,16
269:24 270:2
278:24 279:6
280:5 298:18,25
**heard**  15:6,20
28:19 30:7 42:18
55:14 65:16 70:10
75:12 84:10,11,14
93:10 110:7
118:12 129:18
130:12 136:14
175:19 177:21,21
178:18 200:24
202:15,16,18
203:2,23 230:25
232:17 246:18
249:11 256:25
276:1 280:6 285:3
287:20 290:3
293:12,19
**hearing**  2:1,1,5
15:3 39:10 60:13
79:20 80:14 81:21
84:13,22 85:3,10
85:16,21 86:17
87:11 88:3 96:17
96:23 99:18,21
113:18 114:17
118:6 121:8,8,15
121:16,16,21,24
122:9 123:15
129:25 130:5
139:13 181:21
250:2,7 252:25
284:3 286:22
299:12 303:16
**hearings**  98:24
292:18 296:1

heart 39:10
heather 9:16
heavily 78:8 175:2
  302:6
heitzenrater
  10:11
held 2:5 27:2,6
  59:2 65:12 76:8
  90:24 91:8 126:11
  143:25 150:2
  165:14 179:21
  186:18 190:17
  269:5
hell 64:4
help 18:24 48:16
  103:15,16 112:10
  188:5 215:16
  252:22 303:9
helped 95:4
  148:17
helpful 26:24
  35:15 220:25
  275:10
helps 96:2
henry 154:10
herald 86:4
herding 209:1
hernia 112:2
herring 10:12
  136:21
he's 122:15
high 115:20
  225:13 243:8
higher 290:17
highest 54:16
highlight 33:14
  95:11 96:3 97:14
  110:23 112:17
  118:20
highlighting 98:9
highlights 220:25
highly 55:5
  118:23

hints 196:3
hiring 293:19
hirshman 10:13
historic 62:20
  64:25 83:14
  187:13
historical 117:2
historically 164:1
history 39:5 41:7
  45:7,9 51:9 54:5
  85:13 96:11
  127:18 128:4,9
  290:13
hit 50:8 118:13
hobbesian 46:12
  64:4 205:11
hoc 3:14 4:16 41:6
  51:11 57:15 92:23
  93:16,19 98:10
  100:19 102:4
  113:22 117:21
  130:14,15 176:19
hold 97:19 124:11
  125:3 170:10
  179:12 184:10
  269:21
holder 83:24
  84:25
holders 20:25
  84:1,10 85:17
  88:12
holding 91:7
  166:3 185:5,20
  190:7,14 241:20
  265:15
holdings 274:19
  276:11
holdout 152:10,12
  152:16,19
holds 165:16
  169:18
home 153:16,17
  153:20 284:16

291:18,21
hon 1:22
honda 62:5 63:9
honest 18:2 19:1
honestly 153:19
  200:20,23 202:19
  204:25 223:18
honor 15:18,22,23
  17:8 18:6 19:9
  22:8 23:3,10,23
  24:1,17,19,25
  25:21,25 26:5,17
  26:20 27:15 30:18
  31:9,13,17,19,22
  31:24 32:14,15
  33:11,13 34:11,13
  35:4,10,18,20,23
  35:23 37:1,12,14
  37:15,19 38:3
  40:23 41:9,19
  42:17 44:10 45:11
  46:9 48:23 49:6
  49:11 50:9 51:19
  52:20 53:11,12
  54:6,18,24 55:12
  55:20 56:9,17
  59:1,8 61:16 62:7
  62:11,14 63:8,15
  64:3,15,19 68:14
  68:19 70:10 71:6
  73:18 75:12 79:7
  81:21 83:3,17
  84:18 86:1 87:2
  87:17 88:7,16,17
  90:8 91:13,19
  92:7,9,14,15,18
  92:21,21,25 93:5
  93:10,17 96:14
  97:14 100:11,20
  100:21,22 101:1
  101:19 106:20
  108:1,5 111:20
  112:18,20 113:9

113:12 116:6,12
118:4,10,13,16,19
118:21 119:2,9,15
119:21 120:9,20
120:22 123:8,10
123:16,23 124:9
125:11 126:1,5,9
126:10,19,23
127:7,9,14,20
128:8,15,19,24
129:21 130:1,7,24
131:9,17,19,24
132:3,6,14,19,23
133:2,15,20 134:1
134:3,25 136:6,22
138:5,12 139:1,3
139:16 140:5,8,16
141:6,13,22 142:2
142:11,15 143:9
143:14 144:3,7,13
144:16,20 145:3
145:15,23 146:14
146:23 147:4,9,12
147:17,22 148:1
148:24 149:2,4,12
149:17 150:20
151:24 152:9,25
153:15 155:3
156:15 158:7
159:16 161:12
162:2 163:17
165:18 166:2
175:6 176:10
177:10 179:4
182:8 183:21
185:22 186:2,7,9
187:2,10,12 188:9
188:14,14 189:10
189:14 191:8,13
191:25 192:8,14
192:24 193:20
195:3,14,18
196:11 197:9,16

198:13 199:15,22
200:20 201:8,13
202:3,19,20
203:12,21 204:9
204:16,18 207:11
208:24 209:16
210:10 211:18
214:2,21 216:1,23
217:25 218:20,21
218:25 219:9,23
220:19 221:6
222:11,13,20
223:18 224:2,6,8
225:2 226:3,18
227:2,8 228:1,13
228:17,22,25
229:4 231:17
232:9 233:5 234:2
234:12 235:8,24
236:25 237:13
238:8 239:9,23
242:12 243:5
245:24 246:21
248:4,5,13,20
249:1,6,23 250:19
251:2,13,14,21,24
252:4,10,15,18
253:1,8,15 254:14
255:5,10,15 256:9
256:13,18 257:5
257:20 258:5
259:1,21 260:2
261:18 262:9,15
262:19 263:17
264:4,8,18,19,20
266:4,15,21 267:6
267:16,17 268:1
268:19,20 269:10
269:12,20,25
270:6,10 272:12
272:12 274:13
275:9,13 276:1
278:1,9 280:6,12

281:14 282:3,13
282:14 283:18,21
283:24,25 285:22
286:8,17 287:18
288:10,23 289:1
290:3 291:13
292:6 293:11
294:7 295:9,11,19
297:8 298:1,20,24
299:2,25 300:2,21
300:25 301:3,4,24
302:8,15
**honor's** 26:7
28:10 185:5
204:25 208:25
257:8 267:13
289:12 299:8
**honorable** 55:6,7
**honored** 105:3
**honor's** 133:10
152:20 160:19
**hook** 181:25
256:16 264:16,17
**hope** 16:20 17:17
27:18 65:25 111:5
114:6 211:23
233:23 247:16,17
279:24 302:23
**hoped** 270:16
**hopeful** 68:13
**hopefully** 17:1
20:4 56:21 114:10
289:22
**hoping** 187:15
**horrible** 93:17
**horror** 46:12
**hospitals** 38:17
51:16 58:18
294:18
**hot** 17:22
**hour** 37:21 219:2
**hours** 35:12
278:13

**house** 121:7 287:8
**housekeeping**
189:9
**howard** 13:21
295:1
**hudson** 10:14
**huebner** 3:8 15:18
15:19,22 18:2,6
35:21 37:15,16,19
38:3 53:5,11 54:6
54:18 65:21 67:4
82:12 93:8 95:14
102:1,3,6,18
103:22,22 104:12
110:25 115:25
145:16 150:22
156:23 204:24
205:1 212:5,7
214:22 218:17
237:17,20 247:4
250:12 272:12
278:9,12 279:20
**huebner's** 173:3
301:11 303:2
**huebner's** 150:7
**huge** 132:6 178:23
187:18 200:10
201:15
**hugh** 11:20
**human** 39:4
112:24 287:10
290:17
**hundred** 62:11
156:21,22 215:5
**hundreds** 41:5
45:3 48:10,11,12
48:23 56:19 58:11
59:14 63:3,14
80:17 81:25
134:13 145:11
293:15,21
**hundredth** 52:6,7

**hunting** 282:8
**hurley** 10:15
**hyde** 2:25 305:3,8
**hyder** 10:16
**hypocritical**
60:11
**hypothesize** 241:1
**hypothetical**
57:21 129:4
240:22

### i

**i.e.** 68:16 89:21
273:24
**iac** 109:16 281:12
**iacs** 50:22 80:6
81:14 109:7,8,10
109:11,15 298:7
**iceberg** 293:4
**ics** 109:1
**icsbs** 108:20
**idea** 159:18 220:4
240:7 256:23
301:16
**identified** 29:2
47:18 138:24
**identifies** 224:16
**identify** 63:4
138:19 139:20,23
**ignorance** 212:5
**ignorant** 292:2
**ignore** 42:22
102:25 213:20
**ignored** 108:3
**ignores** 212:20
**ignoring** 131:13
**ii** 29:17 171:8
**iii** 168:5 172:9
179:12,21
**il** 4:11
**ilene** 226:4,24
**illegal** 160:2
293:11

**illustrate** 70:5
212:25 303:17
**illustrates** 83:22
**illustrating** 27:24
**illustrative**
289:10
**illustrious** 289:11
**images** 122:1
**imagination**
177:24
**imagine** 157:8
299:22 303:13
**imes** 10:17
**immediate** 30:11
89:20
**immunity** 62:18
144:10,15 297:16
297:19,19,23
302:12
**impact** 28:15 69:4
69:19 103:13
257:6
**impacted** 38:8
40:18 60:3
**impacts** 100:17
**impasse** 98:21
**impeccable**
184:19
**impede** 73:16
**impending** 250:7
**imperfect** 38:8
**imperil** 103:5
**implementation**
184:3
**implemented** 21:6
171:14 242:5
**implementing**
229:17
**implicating**
177:15
**implied** 76:18
109:12

**import** 45:5
115:16 278:22
286:20 295:14
**importance** 45:13
93:13 96:15 97:15
99:1 114:4 190:19
196:4 297:10
**important** 16:2
34:19 37:24 46:10
46:10,14 60:7
65:9,14 67:2
77:25 82:16 91:24
92:5 95:13 96:1
100:16 102:2
112:17 118:14
154:25 190:2,15
190:18 203:11
206:14,18 229:14
229:20,23,24,25
230:3 231:17
232:18,22,23,25
237:12 238:24
240:4 259:22
266:23 279:3,4,5
279:23,25 284:2
288:11
**importantly**
94:11 105:10
111:14 179:1
**impose** 84:4
238:21
**imposed** 34:7 71:5
187:22 194:5
196:1 205:8,22
209:21
**imposes** 36:5
**imposition** 143:12
**impossible** 63:21
103:25 139:6
282:17 294:14
**impossibly** 255:13
**impress** 280:9

**impression** 146:6
189:11
**impressions** 88:5
**improper** 188:18
**impropriety**
188:18
**improve** 39:4
**improved** 213:1
**improvements**
51:23
**imputed** 29:5
**inability** 208:23
**inaccuracy** 18:24
**inadequacy**
151:13
**inadequate**
198:25
**inapposite** 78:17
**inappropriate**
190:17 268:10
**incarcerated**
103:2
**incidental** 89:19
**incidentally** 230:7
**include** 21:23
26:15 31:2 39:14
51:13 56:7 76:10
82:14 126:18
138:7,10 140:9
184:4 289:4
**included** 22:19,22
31:6 62:13 81:11
81:23 87:22 99:19
107:12 135:6
139:24 213:3
265:3 267:19
**includes** 40:25
42:16 73:11 89:13
90:20 181:13
303:7
**including** 15:12
20:16 22:25 25:8
31:4 38:24 39:19

42:1 45:7 46:17
49:5,10,24 50:2
50:19 53:21 59:22
60:24,25 62:1,13
63:6 65:8 81:1
82:24 83:1 85:11
86:10,14 88:18,21
90:20,23 94:1,18
95:20 97:2 103:24
125:12 130:13
135:3 145:13
164:18 172:1,22
181:25 189:2
207:7 211:21
214:3 254:3 266:8
268:19 280:10
285:4 291:18
299:6
**income** 29:18
135:18 160:5
**incomplete** 136:1
**incomprehensible**
138:14 139:16
253:23
**incomprehensibly**
255:19
**inconceivable**
97:1
**inconsistent** 253:8
**incontrovertible**
47:21
**inconvenience**
49:10
**incorporate** 40:1
**incorporated** 40:4
221:16 245:18
284:13
**increasing** 225:13
**incredible** 218:17
**incredibly** 39:17
49:20
**incumbent** 253:3

indelicato 10:18
indemnification
  69:13 90:13
  169:16 177:6
  300:11
indemnify 169:21
  170:9,16 276:13
indemnities 277:6
indemnity 69:5
  169:11,19,23,25
  170:4,7,17,19
  175:6,8 257:7
  275:22 277:25
  301:17
independent
  36:15,20 37:10
  51:17 74:10
  168:11,14 169:7,9
  172:10 223:6
  224:9 287:4
independently
  170:24 270:15
  273:4
indicate 222:11
indicated 51:2
  127:10 130:2
  133:11 138:18
  139:16,21
indicates 76:4
indicating 132:5
indication 207:4
  209:23
indirectly 69:4
  150:18 166:23
indiscernible
  16:17 17:1,2,7,7
  23:15 26:8 34:15
  34:23 35:2 61:21
  84:19 86:11,12
  96:5 101:6,11,13
  101:21 102:8,15
  102:16,19,19,21
  103:2,14,21,23

104:1,10,24 105:3
105:14,20 106:5,7
106:12,14,22
107:8,15,20,23
108:4,15,16,18,22
108:25 109:5,10
109:14,14,17,20
109:24 110:1,4,5
110:6,9,14,16,17
111:15,19,21,22
112:5,7,14,19,20
112:23 113:13,16
113:25 114:19
115:3,12,15,21,25
116:4,18 117:2,5
117:19,23 119:7,7
120:7,14,15 124:2
124:17 125:1,13
126:6,9,22,25
127:2,24,25
128:22 129:1,3,5
129:9,15 131:12
131:21 133:4,17
133:22 134:6,8,9
134:11,15,16
135:10,11,12,16
135:17,20 136:5,9
136:11,13,15,25
137:5 138:8 139:1
139:13 140:23
141:15,23 142:18
142:19 143:4,6,16
144:6,19,19,24
145:24 146:4,9
148:10,13,21
153:10 162:15
165:7 168:6 245:6
252:6 254:10
263:3 264:15
266:9 269:1
271:12 272:13
282:18 285:17
286:3,21

indispensable
  63:17 64:13 91:24
  92:6
indisputably 72:7
individual 3:14
  17:12 39:3,25
  50:18 86:11 97:5
  116:21 127:5
  128:24 129:3,6
  153:9 155:1,25
  166:7 168:18,19
  168:25 169:4
  249:9 250:8
  284:23 288:25
  303:8
individuals 33:16
  76:20 81:1 87:1
  108:15,19,21
  115:14,19 116:19
  124:16 131:1,3
  139:21 148:13
  166:11 241:21,21
  249:10,14 250:1
  259:5 264:22
  265:8 266:23
  268:25
individuals'
  116:14
induced 68:7
indulge 294:8
indulgence
  210:11
industry 97:13
  237:22
inextricably
  195:15
infinitesimal
  135:8
inform 287:15
informal 103:23
information 63:4
  81:13,16 129:13
  129:16 132:16

136:1 139:20
220:12 248:10
281:7,23 282:10
282:15
informational
  291:3
informed 175:24
  241:6
initial 84:17 96:4
initiative 48:21
initiatives 72:1
initio 228:19
injunction 65:2,4
  65:14 70:17 71:18
  74:24 77:3 78:11
  78:20 79:24 91:11
  128:12,20,21
  137:20,21 158:5
  172:3,20,24
  188:17,21 189:6,8
  194:24 213:3
  220:6 222:10
  230:10 236:10,13
  236:14 237:4,10
  252:23 273:17
  274:23 279:7
  285:7 289:14,19
  289:21
injunctions 43:21
  76:2 80:2 84:25
  111:17 123:2
  128:10,18 172:1
  189:3 198:7,14
injunctive 97:10
  167:4 199:11
  304:5
injured 141:5
  290:18
injury 38:17
  40:13,15 58:1
  65:2 83:1 101:17
  111:21 113:21
  115:8,8 117:11,18

130:15 163:25
303:8,24
**innocence** 176:4
**input** 28:10
**inquire** 193:15
**inquiry** 39:10
137:21 183:15
**inserted** 23:5
180:13
**inside** 268:7
294:20
**insinuate** 227:17
**insisted** 158:3
**insisting** 63:25
**insofar** 275:15
303:6
**inspection** 187:20
**instance** 98:14
107:8 110:14
141:15 227:18
275:24 276:14
**instances** 131:7
238:6
**instantly** 58:21,22
59:23
**instituted** 231:6
**institution** 81:15
**instructed** 168:8
**instrumentalities**
297:21
**instrumentality**
73:12
**insufficient** 193:5
240:10 260:22
288:1
**insult** 57:25
**insurance** 20:10
25:3,19 69:11
90:12 94:2 169:11
171:23 174:9,12
179:24 256:5
267:22 268:4
276:13 298:3

300:17
**insurer** 173:5
**insurers** 171:15
275:24 302:4
**insys** 61:17
**integral** 91:11,17
91:23 92:5 172:21
**integrated** 94:12
203:5
**intellectually**
52:17
**intend** 103:10
113:18 296:23
**intended** 31:14,15
297:5
**intensely** 27:11
**intent** 23:17 50:2
61:21 76:4 274:22
274:22
**intention** 150:7
**intentional** 49:25
105:19
**inter** 48:17 103:20
119:15
**interactions**
222:22 254:5
**interconnected**
41:2 120:7
**intercreditor**
43:25 47:22
**interdependent**
39:11 64:12
**interest** 30:10
51:4 64:13 80:3
80:19 106:1
109:10 114:5
129:8 132:9 153:4
157:20 173:9
205:24 233:14
234:5,11,13,19
252:19 290:24
**interested** 27:11
99:5

**interesting** 272:7
**interestingly**
125:15
**interests** 39:13
50:24 68:24 74:12
80:9,22 211:6
249:12 267:11
**interference**
225:25
**interim** 280:2
**interlocking**
39:11 41:4
**international** 86:4
**interplay** 25:14
**interpretation**
34:21 181:14
**interpreted** 146:2
**interrelated** 95:11
98:14
**interrupt** 151:22
155:2 276:3
**interstate** 40:1
46:21
**intra** 46:19 48:17
**intractable** 93:18
**intrastate** 40:3
46:20
**intricately** 125:22
**introduced** 218:9
218:18 240:23
245:22
**inures** 83:15
**invading** 286:2
**inventing** 195:20
**investigation**
55:19 116:6
177:11,16,18
**investigations**
220:2
**investment**
135:17 255:17
256:12 259:10

**invoked** 77:11
151:8
**invokes** 214:22
**involuntary** 79:23
127:4 146:8 295:8
**involve** 184:21
**involved** 25:5,6
34:25 46:3 141:19
162:1 174:2,5
222:4 270:15
287:14 289:22,24
**involvement**
45:24 59:4,4 80:4
96:12 157:1 254:6
**involves** 41:15
189:5 227:9 304:4
**involving** 41:5
118:22 194:14
**ion** 196:22
**ireland** 267:23
268:5
**iridium** 37:22
39:15 41:22 43:3
49:8 50:17,24
54:18 64:10 150:8
159:21 162:11
186:3 189:13,20
189:23 292:8,9
293:25
**ironic** 142:25
**ironically** 63:3
106:4 291:18
**irony** 270:18
**irrelevant** 76:13
77:14 89:25
189:20 213:9,14
226:19 285:2
290:14
**irrespective** 56:22
174:19
**irresponsible**
291:10

irrevocable  287:6
irve  6:21 149:4
island  62:4 149:8
  186:14
isle  161:23
isles  125:20
isley  10:3
isn't  133:19
  137:23 159:15,20
  159:21 163:22
isolated  218:15
israel  10:19
issacharoff  10:20
issue  16:14 21:16
  25:17 35:1,11
  36:9 72:16 76:13
  76:16 84:12 85:7
  99:10 116:23
  123:1 137:18,23
  143:15 145:2,21
  156:14 161:15,15
  161:18,18 162:21
  167:8 173:20
  176:1 182:2
  186:21 196:19
  200:24 203:17
  207:2 209:15
  212:15 214:24
  217:9,24 222:5
  226:22 236:4
  237:3,11 239:18
  240:24 241:3
  245:2,11,25 247:3
  251:3,6 253:22
  256:25 260:23
  261:23,25 262:3,7
  263:24,25 265:9
  265:23 266:12
  271:14,23 272:6
  272:19 277:14
  288:20,21 294:1
  300:6 302:11,14
  302:24

issued  223:9
issues  15:5,12
  16:3,6,12 17:15
  18:18 19:2 25:13
  28:11 37:23 50:6
  55:19 91:22 94:12
  100:16 101:5,7,20
  101:25 113:24
  116:4 122:24
  162:1 177:3 179:2
  179:3 180:16,21
  198:12 209:6,8
  210:5 218:3 222:4
  222:6 243:12
  247:17 249:4
  254:21 255:8
  266:7 294:3
  302:17,19,19,21
  302:25
item  282:20
items  101:14
  203:22 224:7
it's  102:1,2,4,13
  103:25 104:4,13
  107:1 108:17
  109:9 112:5,24
  113:1 114:23
  116:9,22 117:8
  121:19,23 131:22
  131:24 132:13
  144:11 149:21
  150:11 154:12
  155:6 156:5 158:7
  158:24 159:5
  160:22 161:18,18
  163:15,16 164:5,7
  164:10,11,13,14
  165:1,5,25 166:23
  167:18,24,25
  170:2 265:24
ives  10:21
i'd  116:14 143:9

i'll  101:9,11,12,13
  113:19 118:5
  123:16,17,17
  139:3 149:7,13
  150:21
i'm  111:11 113:19
  113:21,23 114:1
  114:17 123:14,20
  127:7 129:21
  130:6 134:23
  137:10,10 138:17
  139:22 141:8,9,25
  142:10 145:3
  149:21,25 153:19
  155:17 156:21,22
  157:6,12 159:16
  159:22,23 162:10
  164:19 166:6
  167:3,8 171:4
  229:1

            j

j  2:4 3:11,19 6:7
  7:6 11:10 12:4,23
  14:1,7
j&js  201:7,12
james  3:10 10:6
  12:9 13:5 14:15
jamie  14:21
january  287:2
jared  9:23 10:5
jasmine  8:4
jason  13:1
jay  8:3
jayne  96:14 99:17
jeffrey  4:6 11:12
  12:23 19:23
jenna  10:14
jenner  4:8
jennifer  9:9 12:10
jeopardize  95:12
jeremey  13:4
jeremy  11:2

jerome  13:24
jersey  125:20
  134:8 161:23,24
  161:25 263:22
jesse  8:25
jill  7:23
job  41:11,12
  111:16 230:17
john  9:3,4 10:9
  11:14,15 66:11,11
  98:16 138:16
johns  64:25 65:1
  76:24 77:2 268:9
  274:20
johnson  5:2,2
  26:6,6 61:18,18
  62:5,6 63:9,9
join  93:3 182:17
joinder  186:23
joinders  186:17
joined  53:2
  186:24
joining  122:19
  186:25
joins  73:21
joint  2:2 55:21
  188:4 219:5
  224:10
jointly  55:11
  247:19 293:23
jonathan  12:1
  14:8 159:12
  160:24 224:19
jones  5:6 26:5,5
  182:24
jordan  12:24
  14:10
joseph  8:22 12:20
  13:6,19 14:4
  246:3
josephine  9:20
journal  86:3

**journey** 38:13
**jr** 8:7 10:6 14:17
**judge** 1:23 54:20
  55:10 56:3 59:12
  74:24 89:9,11
  118:24 119:22,22
  121:12 122:15,19
  122:21 152:4
  154:10 170:4
  173:15 174:6
  180:10,24 181:13
  182:18,24 210:4
  211:5 265:18
  268:23 270:18
  293:17 303:12,15
**judgement** 25:20
  152:16
**judgements** 21:3
  150:23 151:5
  161:5
**judges** 207:20
**judgment** 44:18
  47:1 49:11 57:22
  58:2,5 61:6 75:9
  78:23 83:25 98:3
  134:15 212:19
  221:9,14,16,23
  222:17,18 223:14
  238:25 249:16
  260:9,9,10 262:7
**judgments** 49:18
  50:14 57:9 75:7
  78:25 161:1
  196:18 237:21
**judicada** 249:17
**judicial** 62:14
  228:5 274:22
  291:1
**jump** 75:20 79:5
  214:9
**jumped** 226:19
**june** 84:18 112:8
  112:9 177:12

**juris** 195:22
**jurisdiction** 34:3
  34:5 71:9 88:21
  89:2,3,5,21,22
  90:2,5,6,18 92:1
  126:2 143:3,7
  149:14 168:4
  169:13 170:18
  171:3 173:15
  174:18 175:4
  179:15,17 180:3
  206:10 249:5
  250:8 253:12
  257:22 264:8,19
  265:5,7,9,20,21
  266:1 267:18,21
  267:25 268:2,6,8
  268:14,17,20,22
  271:15,22 272:9
  272:15 273:8
**jurisdictional**
  161:1 173:20
  180:9 181:25
  272:6 302:14
**jurisdictionally**
  183:11
**jurisdictions**
  50:18,20,23
  150:17 282:19
**justice** 6:9 80:10
  150:24 177:12
  205:16,25
**justification** 81:3
  124:6 127:2
**justifies** 150:23
**justify** 80:23
**justifying** 66:20
**jx** 68:19,20 85:18
  86:5 159:19
  177:14 224:12,15
  224:18 225:12,15
  225:20,23 226:8
  248:7,8

**jx0872** 170:15
**jx2237** 159:9
**jx2241** 160:23

**k**

**k** 10:12
**kami** 12:16
**kaminetzky** 3:9
  10:22 37:19,23
  64:16,19,20 68:25
  69:2 92:12 93:9
  95:14 101:9
  103:22 105:1
  196:15 284:11
  297:9
**kaminetzky's**
  294:4
**kaplan** 7:1 186:10
**karavolas** 10:23
**karen** 10:24
**kathe** 261:18
  263:1 303:20
**katherine** 9:18
  12:12
**kathleen** 12:3
**keep** 18:2 19:1
  112:22 121:9,13
  122:14 187:25
  188:2 200:18
  205:19 238:25
  293:25
**keeping** 29:7
**keeps** 236:10
**kelly** 14:3
**ken** 118:24 293:18
**kenan** 6:14
**kennedy** 10:24
**kenneth** 9:6 55:6
  92:22
**kerwin** 89:24
  90:23 91:3,8,12
**kesselman** 10:25
**kevin** 5:21 8:23
  118:10

**key** 85:20 114:24
  180:8 212:23
  249:4
**kickbacks** 178:12
**kill** 165:1
**kind** 59:5,5
  151:11 205:24
  229:8 239:2
  240:11,12 293:24
**king** 73:22
**kirwan** 179:11,13
  179:19 180:15
**klein** 11:1
**kleinberg** 7:1
  186:10
**kleinman** 11:2
**knew** 159:18
  162:10 178:10
  293:1,1
**know** 15:3 17:13
  18:19 35:11 45:10
  53:8,11,14,14,19
  54:2,8,10 60:23
  61:14,15 82:22
  88:17 104:10,23
  105:5,18 110:19
  111:22 122:15
  123:10,24 132:13
  133:3,10 135:23
  137:2 139:25
  140:12 142:11
  145:13 146:25
  153:20 156:12,19
  157:12,13 158:9
  160:6 162:7
  163:11,15,24
  164:2 165:5
  169:10 170:21
  171:6 173:10
  174:1 175:11,18
  176:7 179:11
  180:24 181:5,17
  181:19,22 184:7

185:4,13,14
194:20 196:9
202:22 203:9,20
207:3 209:13
219:19 230:10,25
236:5,22,23 238:3
238:11,14,16,22
238:23 239:11,21
240:1,8 241:4,4,8
241:21 242:3,14
242:17 243:7,7,20
244:11,14,15
245:1 246:2,6,13
247:15,21 248:17
251:5 256:16
258:4 260:7,9,19
261:13 262:4,10
262:23,25 263:11
264:11 265:2
269:9 272:25
273:11 274:2,14
274:19,20 275:1
278:5,23 279:20
282:20 283:22
284:19,22 285:3
286:19,22,23
287:16 291:25
292:2,3,11 293:2
293:2,3,16,24
294:13 298:22
300:10 301:12
302:5
**knowing** 157:5
283:15
**knowledge** 30:25
54:20 58:8 137:23
139:17 169:5
170:24 220:7
242:10,11 287:11
**known** 40:25
85:17 198:1,3
219:8 254:13

**knows** 18:12
81:22 118:16,21
293:10
**kotler** 11:3
**kovacs** 185:14
**kramer** 11:4
92:22 93:3

**l**

**l** 8:18 9:17 13:19
14:6 90:22
**l.p.** 1:7 2:3 4:2
122:23
**l.p..** 2:4
**labor** 255:9
**laboratories**
276:11
**labovitz** 11:5
**labs** 91:7,12
**lack** 198:11
239:20 280:7
282:10,11
**lacked** 269:14
**lacks** 71:8 88:19
88:21 90:18
**laid** 197:18
**lake** 216:6
**landeau** 224:16
224:25
**landed** 265:16
**landscape** 287:16
**lane** 118:24
**language** 23:6
24:3,20 27:13,19
32:1 34:22,23
36:22 37:2 61:25
84:23 86:17 87:10
111:4 138:7
194:20,23 195:1
237:24 253:25
255:6
**languages** 88:4
**large** 60:17 68:2
93:16 98:19

195:12
**largely** 37:6 97:8
**largest** 54:5 115:9
290:13
**larry** 249:2
**lastly** 20:5 21:22
22:4 30:1 34:6
**late** 19:5 51:17
278:5
**latest** 169:22
**latin** 210:16
**laudable** 198:24
**launch** 60:6
**laundry** 171:5
**laura** 9:10 11:19
**lauren** 14:20
**law** 26:8,11 36:4
36:22 41:11,12
42:23 64:22 70:22
71:2,22,23 72:18
77:8,9 78:4 82:9
83:5,7 84:5 88:25
91:21 93:1 101:8
114:5 116:3,4,8
123:13 124:1
126:6,19 128:5
143:17,24 153:20
161:24 168:12,15
168:22,24 172:4
174:17,24 184:8
185:6,7,8,16
198:23 210:2
218:13 240:3
243:16 255:8
269:2 275:2
291:17
**lawful** 91:20
**lawrence** 9:14
11:3 34:13
**laws** 37:6 74:8
75:9 77:12 142:21
153:16,17 155:22
168:9,16 189:2

255:9,9 264:25
**lawsuit** 50:12
156:20 267:2,18
268:2
**lawsuits** 134:14
134:15 137:3
171:14 264:22,23
265:7,24 266:22
266:24 268:24
**lawyer** 45:12 49:4
60:12 73:23
130:15 285:18
**lawyer's** 41:11
**lawyers** 83:1
174:2,4,5,8
179:25 246:19
254:24,25 262:17
282:10 303:22
304:1
**layer** 286:11
**layn** 55:6 293:17
**lead** 162:24
172:14
**leading** 154:15
252:24
**leads** 219:15
**leadup** 159:24
**learned** 207:14
284:16
**leases** 218:12
**leave** 108:11
171:18,18 199:5
236:20 266:12
287:16 302:5
**leaves** 239:3
**leaving** 151:15
165:2 223:25
256:1
**ledanski** 2:25
305:3,8
**lees** 11:6
**left** 55:19 56:5
104:7 109:20

112:12 177:24
198:5 205:6 208:9
229:12 283:11
294:3,7
**leg** 98:13 105:9
**legal** 37:23 38:21
39:10 48:24 55:18
64:16 95:15 119:8
124:6 125:16
127:1 168:11
169:7,19 188:22
192:23 207:15
214:21 222:4,6
266:17 294:4
299:7 305:20
**legally** 44:12
114:13 287:23
**legislate** 198:17
**legislation** 291:22
**legislative** 127:18
128:4,9 274:22
**legislature** 198:7
228:20 238:11
**legitimate** 80:12
201:1
**legitimize** 137:5
**lehman** 54:10
**lending** 78:12
**length** 44:25
49:14 54:23 87:14
90:8 271:19
289:19 291:2
296:2
**lengths** 136:20
143:1
**lengthy** 15:11
98:23 103:13
229:13
**lennard** 11:7
**leonard** 11:8
**lessons** 45:15
**letter** 43:12 50:5
55:17 281:1

**letters** 282:18
**letting** 18:12
**let's** 108:7 117:6
121:15 140:15
151:25 152:1,12
**level** 70:8,15
137:17 163:23
164:9 171:5
175:20 177:14,23
183:15 237:5
242:23 243:9
270:4 284:22
**leventhal** 11:9
**levin** 92:22 93:3
**levine** 11:10
**lexington** 3:5
**liabilities** 21:3
124:14 131:2
134:21 135:2,3,5
141:2 157:3,10
280:11,15
**liability** 36:5,23
47:13 67:19 78:4
97:7 110:21 135:9
161:22 174:12
178:1 205:3 208:8
243:15,22,22
256:23 281:8
282:9 286:15
**liable** 168:18,23
168:25 169:4
176:2 178:22
191:10 241:22
256:20
**liaisons** 36:16
**lianna** 13:13
**liberal** 169:14
**lichtenfeld** 11:11
**lien** 58:5 86:13
**liens** 40:13,15
58:2
**lies** 132:22

**liesenmer** 11:12
**life** 45:21 96:8
112:10 289:5
**lifland** 173:15
174:6
**lifland's** 180:10
**liftoff** 188:1
**light** 36:1 102:9
114:10
**lightly** 49:17
176:7
**likelihood** 49:9
169:15 206:20
240:17
**likewise** 197:20
**limit** 15:11 32:10
47:25 140:23
**limitation** 50:2
**limited** 30:13 32:1
71:19 73:6 160:25
169:22 170:1,14
182:15 243:17
244:2,6,14 246:1
257:9 271:10
275:15 280:10
**limiting** 71:20
83:8 128:6
**limits** 26:11 90:3
127:16
**lincoln's** 210:22
**linda** 10:17
**line** 19:6 32:25
75:21 79:5 113:11
120:17 122:5
151:19 165:5
166:3 178:24
238:24
**linen** 171:1
**lines** 58:19 71:14
**link** 274:23,24
**linkage** 274:18
**linked** 195:15

**liquidate** 134:20
135:12
**liquidated** 129:11
134:16 163:20
**liquidating**
135:15 151:16
**liquidation** 47:20
129:10 132:12,18
133:14 135:1,6,9
137:19 250:17
274:11 290:23
**lisovicz** 11:13
**list** 40:23 54:15
62:24 87:12,22
138:8 207:19
247:5 255:10
278:5
**listed** 275:20
**listen** 122:9
239:17
**listened** 162:17
**listening** 18:18
60:13 122:5 215:5
**litany** 145:10,17
**lite** 6:1 270:7
**literally** 17:20
18:4 52:11 53:1
58:4 80:24,25
200:1 233:22
284:5
**litigants** 161:2
294:11
**litigate** 83:25 84:2
85:6 163:5 261:17
**litigated** 50:1
262:1,4,6
**litigating** 96:18
**litigation** 20:24
22:23 23:2,4,21
25:5,6,14 31:3
38:15 43:25 46:22
48:7,18 49:9 70:1
82:11 90:15 95:1

104:16 105:8,9
136:12 209:25
214:5,7 231:21
238:13 240:17
**litigation's** 43:6
**litigations** 265:4
291:6 301:21
**litigators** 61:23
**little** 19:5 20:4
28:4 32:25 58:4
62:24 113:14
134:22 157:6
177:22 181:23
199:10 210:18
272:10 279:23
292:3 295:12
302:11,18
**live** 50:21 104:14
110:1 146:25,25
266:7 287:13
**lived** 102:23
**lives** 29:9,25 39:4
48:21 285:5
**living** 108:20,23
**livy** 11:24
**llc** 6:1
**llp** 3:3,13 4:1,15
5:8
**lo** 281:18
**local** 38:16 49:2
92:24 94:19
118:18 119:3,25
120:19
**located** 73:23
**locating** 101:20
**location** 122:2
**logic** 156:3 184:24
**logically** 193:18
**long** 49:20 54:11
54:15 75:20 91:11
103:15 109:2
135:19,22 138:16
168:22 187:19

190:15 211:23
220:22 273:3
281:22 293:21
**longer** 30:10
96:19 108:16
109:4 246:7
**longest** 108:25
**longmire** 11:14
**look** 35:12 67:5
73:18 116:17
164:7 168:9,12
174:25 178:19
183:8,12,14,14
195:7 208:15
211:6 227:16
230:16,16,19
231:10 239:1,4
258:19 260:6
265:23 269:12,13
274:19 275:1,1
276:2 277:22
293:1 294:20
296:9,13
**looked** 54:7,15
70:8 147:7 174:1
236:21,24 257:23
292:14
**looking** 17:8,18
53:20 85:18
106:18 140:11
167:3 174:8 211:7
211:8,9 237:6
254:23 267:10
291:17
**looks** 31:8 114:22
230:20
**loophole** 294:13
**loose** 277:20
**looser** 109:1
**lord** 283:16
**los** 5:4
**lose** 38:21 51:20
60:4 110:16 125:7

190:23 235:16
261:17,17 266:22
**loses** 110:12
**losing** 125:25
250:3 267:1
**loss** 38:7 50:7
102:13 135:22
**lost** 39:9 53:25
64:5 95:22
**lot** 21:9 27:17,18
30:3 34:16,18
103:21 104:18
108:14 110:1,2
111:11 118:12
130:25 162:8
167:17 177:24
191:6 199:10
209:24 211:19
217:24 221:3
238:3,18 256:19
288:17 291:16,23
292:12 294:7
299:5 303:25
**loud** 87:19
**louis** 8:8
**love** 78:17 164:23
215:10
**low** 164:1
**lower** 53:17
240:17
**lowest** 150:4
**lowne** 11:15
139:17
**lumber** 182:24
**luskin** 11:16
275:13,13,14
276:4,5,9,20,23
277:15,17 278:3
279:9 300:23
301:4,8,11,14
302:1,2
**luskin's** 278:8

**luxury** 135:15
**lynam** 145:9
255:24 259:6

## m

**m** 4:20 11:5,20,22
13:15
**macarthur** 145:2
166:14 167:1,4,7
167:16
**maclay** 5:21
118:10,10 120:24
**maclay's** 291:15
**madoff's** 170:25
**maelstrom** 46:21
**magali** 9:24
**magazine** 86:18
86:21
**magic** 268:6
**mailed** 85:16
**main** 6:18 190:5
232:13
**maintain** 107:10
169:14 201:15
**maintained** 234:7
**maintaining**
43:18
**major** 45:9 203:2
224:23
**majority** 72:9
73:3 80:16 82:25
91:21 151:7
167:20,21 175:15
231:13 257:11
287:3
**making** 67:11
82:19 159:17,23
160:8 192:8
203:25 225:24
257:15 262:21
272:8 286:14
**man** 121:5 138:16
147:15

managed 209:4,5
  209:6
management
  176:21 220:17
  224:22 242:18
  287:3
mandates 71:22
  71:23 238:22
mandel 127:17
  128:20
manifested 80:18
manner 27:22
  45:19 89:16 93:24
  101:25 220:23
  254:1
manufacture
  141:2 254:4
manufactured
  268:5
manufacturers
  19:19 22:24
manville 64:25
  65:1 76:24 77:2
  145:2 167:16
  168:5 171:8,16,17
  172:8,9 174:7
  179:12,21 268:9
  274:21
map 188:10
mara 11:9
marc 10:25 13:16
  14:1 295:18,19
march 81:21
  119:11 178:6
  286:24
margins 51:11
marine 275:12
mario 8:19
marion 12:17
mark 8:13,24
  10:18
market 229:19

marketing 79:22
  97:11 175:24
  234:18,21 237:8
  242:2,2,18 243:14
  244:22 254:4
marketplace
  230:2,2,3 231:11
  239:25
marking 192:8
markman 10:3
marshall 3:8
  15:19 37:16 88:23
  92:3 143:22 269:4
martin 14:14,15
  68:21 280:22,25
martin's 68:19
maryland 7:8,9
  44:14 62:3 164:19
  168:21 208:20
  224:3 226:13
  229:5,22 230:12
  232:24 237:18
  239:4 241:16
  243:15 246:8
  282:22 283:14
maryland's 230:5
  237:24
mas 294:17
mason 176:8
  293:7
mass 64:25
  158:16 182:25
  275:7
massachusetts
  164:20
massive 43:1
  51:10 79:14 80:23
  284:25
massively 40:18
master 86:8
masumoto 11:17
material 18:11
  41:17 43:17 45:1

48:20 49:23 50:7
  50:7 56:2 57:1
  58:10,19 59:13
  81:24 82:14
  114:10
materially 140:22
  155:9 191:11
  193:14
materials 82:4
  242:13
mathew 9:8
matter 1:5 33:2
  66:23 84:18 89:1
  90:2,17 92:1 96:4
  98:24 117:7 139:8
  149:13 168:4
  170:18 174:18
  185:14 188:24
  189:9 194:9 228:1
  228:4 249:5
  253:12 254:7
  256:8 257:22
  264:7,19 265:8,16
  267:21,25 268:14
  268:17 271:15,21
  272:9 297:9,13
matters 93:13
  185:1 225:18
  290:14 297:7
matthew 7:6 9:12
  186:9
maura 12:3
maxcy 11:18
maximize 44:20
maximizing 67:16
  73:16 75:23 83:15
  101:21
mcclammy 3:10
  17:20 18:2
mccloud 11:19
mcdonald 11:20
mcgaha 11:21

mckenzie 221:9
  221:13,14,20
mckesson 4:9
mckinsey 61:3,9
  62:5 63:9 156:20
  156:25 157:6
  225:16,22,23
  227:18,19 242:2,2
  242:4 248:7,9,12
  256:13,14,15,17
  256:21 257:3
mckinsey's 201:7
  201:12,14 242:3
mcmahon 74:24
  89:9,11 182:19
mcnulty 11:22
md 7:11
mdl 22:25
mdt 300:14 302:4
mean 24:13 31:14
  35:6 36:13,14
  37:5 52:21 57:13
  61:14 155:19,25
  156:23 157:16
  158:2 161:23
  171:10 172:15
  179:4 180:22
  181:23 182:9
  184:18 185:12,15
  185:16 194:2
  199:8 201:5 203:2
  216:13 225:8
  226:21 229:14
  231:17 232:11
  233:18 235:15
  236:5 237:3,13
  238:9 239:11
  240:24 241:12
  244:14,24 245:11
  245:14 246:2,6
  253:24 255:9,12
  255:18 256:12
  258:20 261:10

265:3 272:17
274:13
**meaning** 15:8
20:20 141:4
274:19
**meaningful**
136:13
**means** 21:25
22:17 29:1,4
74:21 117:22
184:3,23 192:12
192:21 213:19
235:11 288:6
296:14
**meant** 36:21
185:7 216:9 217:7
**measure** 67:14
146:18
**measured** 194:8
**measures** 146:19
191:3
**mechanically**
21:6
**media** 62:17 88:5
137:14 196:22
209:11,20 214:16
218:12
**mediate** 30:11
**mediation** 39:21
39:23 46:16 51:23
55:21 59:2,6 68:7
75:18 95:2 103:23
104:2 107:8,9
119:2,10,14,17,24
152:2,3 202:23
207:2 209:18
210:5 289:2
293:17,20 303:12
303:12,16
**mediations**
207:21 209:14
210:1,3

**mediator** 56:3
293:19
**mediator's** 68:6
288:14
**mediators** 55:5,9
55:10,22,24
117:13 118:23
119:1,10 209:14
**mediator's** 119:14
119:20
**medical** 36:16
51:15 78:3 294:17
**medically** 178:11
**medicines** 43:19
45:21
**medtronic** 61:17
77:24
**medtronics** 62:6
**meet** 172:22
**meetings** 226:10
**mega** 54:15
**megan** 13:2
**meises** 11:23
**melanie** 8:18
**melissa** 9:22 14:6
**meltdown** 65:25
**member** 73:23
108:23 111:22
136:2 159:11
175:19 226:25
**members** 33:15
50:18 82:6,7
86:10,25 87:18
93:18 96:23
112:25 124:12,12
124:17,24 127:5
128:25 131:5
134:4 135:4,7
136:19 138:9
140:1 157:22
175:20 234:14
236:1,20 242:12
242:19 243:10

259:16 303:21
**members'** 157:2
**memo** 160:21
224:15,25 225:7,8
**memorandum**
159:13,19 224:20
225:15
**memory** 281:25
**mention** 41:22
204:23 224:6
**mentioned** 94:13
101:5,18 210:18
211:20 225:4
230:5 238:17
245:3 247:6
257:23 259:2
**merely** 66:1 89:10
103:9
**merit** 278:22
**meritless** 71:11
88:24 90:21
**merits** 32:21
89:13 162:23
175:13 177:2
178:25 181:8
182:10 191:19
204:17 245:25
249:16 262:5
269:2
**message** 155:23
212:21 304:2
**messaging** 290:7
**messy** 103:15
**met** 257:11
**metaphor** 173:3
**metaphysical**
264:5
**metro** 209:11,20
214:16 218:12
**metromedia**
37:25 65:6 66:17
66:20,21 67:8,11
69:2,6,22 70:5

71:3,13 72:10,18
72:25 74:4 76:18
76:21 79:9 83:6
83:21 90:1 91:25
126:25 127:6,8,9
143:9,11,14,20
144:3,7,17 145:6
149:15 150:18
172:2,19 185:23
188:12,15,18,24
190:1,3,11,14,17
193:5,11,17 194:7
194:15,20 195:24
195:24,25 249:4
249:18 253:12,16
257:5,11,21 276:2
277:23 297:7,9,13
**metromedia's**
143:17
**mezei** 11:24
**michael** 8:2 10:1
11:16 12:7 13:10
14:7 275:13
**michele** 10:13
11:23 12:15
**micromanaging**
224:13
**microphone**
113:15 187:8
301:8
**mics** 121:9
**middle** 18:19
112:8
**mike** 66:12
**milbank** 31:10
300:4
**milestone** 61:4
**milking** 243:13
**millenium** 91:7,12
**millennium**
180:25
**miller** 11:25

| | | | |
|---|---|---|---|
| **million** 47:12 | **misleading** 37:7,9 | **monetary** 74:12 | **monitoring** 51:16 |
| 68:16,17 81:23 | **mispronouncing** | 80:9 95:24 96:19 | 294:17 |
| 106:16,22,24 | 210:17 | 97:8 165:21 | **monitors** 79:25 |
| 107:18,18,19,21 | **misquotes** 299:5 | 184:14 | 289:11 |
| 117:10 152:3 | **missed** 102:24 | **money** 16:20 38:7 | **month** 48:19,19 |
| 160:1 164:14,15 | 180:7 | 38:11,12 44:8,16 | 112:3 237:16 |
| 173:10 174:13 | **missing** 186:4 | 48:16 75:7,21 | 293:19 |
| 176:18 282:6 | 274:25 302:5 | 78:25 79:18 83:4 | **months** 60:25 |
| **millions** 45:7 | **misspoke** 232:21 | 111:2 116:10,24 | 104:8,9 112:8 |
| 48:11,24 55:18 | **misstatement** | 117:1,16 125:22 | 118:22 281:18 |
| 82:3,15 116:24,25 | 279:11 | 131:11 132:7,25 | 293:18 294:25 |
| 148:16 157:18 | **mistake** 75:8 | 133:16 152:13 | **monumental** 43:8 |
| 176:25 | 92:13 187:13 | 156:6 160:17 | 45:13 46:11 |
| **mind** 121:9 | 206:22 249:13 | 165:25 166:22 | 117:12 |
| 197:10 226:1 | 283:15 | 178:23 184:24 | **mor** 170:12 |
| **mindful** 28:9 | **mistaken** 188:5 | 185:3,17 194:10 | **morning** 15:18 |
| 205:17 | 205:21 262:21 | 194:12 198:19 | 19:9 34:16 37:15 |
| **minds** 151:9,12 | **misunderstanding** | 199:5,10,11,14,16 | 64:19 92:15 |
| 156:3 193:24 | 198:22 | 199:16,21 200:18 | 100:22,25 122:25 |
| 215:15 | **misunderstandi...** | 200:21,25 201:23 | 140:18 149:20 |
| **mineola** 305:23 | 108:12 | 201:25 202:9,9,17 | 154:7 230:25 |
| **minimis** 67:20 | **misunderstood** | 203:8,10,19 | 247:4 250:12 |
| **minimum** 226:10 | 56:20 | 211:14,16 213:6,9 | 302:17 |
| **minors** 50:19 | **misused** 146:5 | 213:12 214:3,4 | **mortgage** 78:10 |
| **minute** 63:15 | **mitchell** 8:3 10:15 | 215:10 217:5 | **mortimer** 68:20 |
| 88:16 155:18 | **mitigate** 50:13 | 228:19 229:16,20 | 243:10,23 260:11 |
| **minutes** 17:6 | **mitnick** 12:1 | 229:20 231:13,17 | 262:22 287:11 |
| 196:8 278:17 | **mixture** 265:12 | 232:3,6 235:22 | 293:1 |
| 280:5 | **mocked** 190:7 | 237:12,16,19,21 | **motion** 221:11,25 |
| **miracle** 199:14 | **model** 61:6 | 238:12,18,24 | 222:5 |
| **miscellaneous** | **mogul** 184:18 | 260:8,13 261:10 | **motions** 219:10 |
| 20:6 26:22 | **molton** 12:2 | 263:14 273:20 | 222:3 |
| **mischaracteriza...** | **moment** 18:15 | 274:5,8,9 277:5,6 | **motors** 137:19 |
| 62:18 | 39:7 115:24 | 282:16 283:7,12 | 250:16 |
| **misconception** | 151:25 152:1 | 292:21,22 296:25 | **move** 113:1 |
| 233:25 | 155:19 166:25 | 303:7,9,22,23,25 | 140:15 147:19 |
| **misconduct** 28:14 | 225:3 288:23 | **money's** 203:10 | 152:21 201:4 |
| 28:16,18,22,24 | **momentous** 93:6 | **monies** 44:12 | 210:8 211:17 |
| 29:4 30:24 36:6 | **moments** 18:21 | 94:16 99:5 100:3 | 214:21 218:1 |
| 36:18,19 | 176:8 293:7 | **monitor** 43:22 | 253:11 257:21 |
| **misguided** 60:10 | **monaghan** 12:3 | 111:16 289:10 | 264:7 267:11 |
| **misheard** 232:18 | **monetarily** | 290:10 | **movement** 209:24 |
| | 259:18 | | |

moving 104:20
mpt 90:14
msg 16:22 51:14
  120:20
msge 16:7 68:8
  288:15 294:16
muha 12:4
multi 5:17 203:5
multiple 81:12
  94:12
multiplier 44:21
  45:2
multistate 118:8
  118:11,16 130:14
multitask 121:18
municipal 270:8
  296:4
municipalities
  40:4 93:14 153:7
  153:21 212:6
  271:8 284:25
  291:4 296:8 302:9
municipality 6:2
  73:11 80:17
  203:16 269:24
  270:3 284:11
munis 295:23
murray 12:5
muster 91:18
mutants 288:22
mute 121:9
mutual 22:11
mutually 39:17
  41:4 46:14 64:12
myers 5:1 26:6
myriad 38:15
mystery 116:9

**n**

n 3:1 4:10 15:1
  91:14 115:2 305:1
n.d. 170:13
nail 125:19

name 62:24 83:21
  121:22 122:13
  146:20 249:1
named 124:13
  177:15 220:11,13
  220:24
names 77:1
naming 46:5
  290:4
nanosecond
  283:22
narrow 16:3
  18:22 20:3 32:23
  35:17 77:14
  185:13
narrowing 140:17
  302:25 304:4
narrowly 197:18
nas 51:15
nasbi 51:15
naspi 294:17
natasha 11:5
nathaniel 11:25
nation 6:2 100:17
  132:9 296:4
national 58:1
  93:23
nations 270:8
  271:9 296:9
  302:10
native 51:14
  294:16
naturally 158:13
nature 56:5 98:14
  114:7 188:19
nbt 109:15
ncsg 17:4 55:24
  236:20 289:18
ndt 110:12,17
near 80:20
nearly 79:19
  87:24

necessarily 34:21
  130:22 163:1
  180:22 195:16
  206:6 244:6
necessary 67:16
  69:21 91:24 92:5
  120:10 172:20
  173:1 178:12
  190:19 219:6
  222:14 239:1,2
  246:9 277:9
necessity 43:4
need 16:19 25:14
  36:7 46:9 49:1
  59:9,20 81:1
  90:10 102:6
  104:10,20 112:20
  113:7 114:3
  121:11,18 172:3
  175:7 180:5
  185:13 188:4
  189:9 193:9 197:2
  203:17,18 206:15
  207:19 227:20
  231:21 237:24,25
  238:21 239:16
  243:20 245:3,4
  246:19 247:11
  251:11 253:9
  258:7,22 269:16
  272:19 278:24
  279:13 284:22
needed 48:22
  128:17 174:20
  180:5 246:13
  298:19
needing 18:12
  100:2
needs 16:14 18:17
  217:17 239:15
  241:14 289:16
  304:10

negotiate 206:23
negotiated 55:2,3
  105:2,12 106:7
  110:15 120:15
  158:25 203:24
  208:11 297:3
negotiating 18:20
  46:3 107:14
  205:18 289:22
negotiation
  261:16 289:20
  293:17
negotiations
  55:12,14 104:23
  118:22 120:3
  207:18
neiger 12:6
neither 87:10
  126:21 148:11
  262:12 269:3
  280:17
nes 58:17
net 49:18 68:14
  68:23 135:23
never 45:9 50:21
  56:16,22 60:5,6
  75:12 82:11 97:23
  139:10,11 143:2
  164:13 178:18
  226:1 282:12
  287:14 293:4
nevertheless
  171:1
new 1:2 3:6,17 4:4
  4:18 5:12 6:12 7:4
  28:15 29:9 33:19
  34:23 35:11 43:22
  46:5 62:3 71:2
  86:3 153:22
  164:18 207:18
  218:1 220:11,12
  220:12 252:23,23
  285:8 286:21

287:4,21 291:6
292:18
newark   6:5
newco   80:1
  111:18,19 141:11
  289:7
newco's   289:8
newest   16:4
newly   33:23
news   16:4 17:22
  18:7 88:6
newspaper   86:18
nicholas   12:14
nickolas   10:23
nicole   11:8 269:14
  269:16
night   18:20,20
  246:24 285:7
nightmare   205:11
nights   252:24
nine   52:4,12 57:2
  57:13 97:21 104:9
  150:23
ninth   182:22
  184:9 265:10,11
  266:9
nj   6:5
noat   33:21 34:2
  40:2,4 44:10
  75:15 296:16,20
  297:1
noise   121:10
non   4:16 16:21
  17:12 23:11 28:11
  28:12,17,17 35:24
  40:18 42:10 47:5
  51:6 62:20 65:7,8
  66:14 68:8 72:8
  74:12 80:8 82:5
  89:21 93:14 97:4
  97:16 98:17
  105:17 106:2
  107:22 126:11,12

126:13,18 127:15
127:22 136:19
141:1 142:23,23
143:8 144:1 146:7
149:23,24 150:2
151:6 158:10
159:1 161:8
162:20 163:7
166:5,10,18 167:5
167:10 176:20
187:21 188:17
189:15,18,21
190:1 195:21
196:20 197:22
205:7,9,21 209:11
209:21 212:17
221:11 225:19
265:12 268:11,14
275:16,18,19
277:3,8,10,13,17
280:19 295:24
296:7,13 298:7
nonconsensual
  84:4 90:25 109:23
  126:11 145:19
nonconsenting
  40:25 51:20 102:5
  133:21
nondischargeable
  76:20
noneconomic   45:5
nonmonetary
  80:22
normal   82:11
  128:10 158:3
  183:13
normally   135:17
norton   82:9
  281:13
notable   179:12
note   16:19 67:22
  71:19 145:18
  178:15 190:2,8

196:3,15,21 197:1
198:15 218:7
224:2 226:4
237:17 291:15
292:6 303:20,25
noted   76:20 82:12
  114:11 119:14,19
  197:3 268:9
  290:16 297:9
notes   111:1
nothing's   185:1
notice   2:1 62:14
  84:16,22,22,23,24
  85:3,5,10,14,16
  85:20,21 86:2,17
  87:11,23 88:3,8
  88:12 125:7,24
  136:13,20,23
  137:4,12,13,14,20
  138:1,4,6,7,7,12
  138:25 139:2,10
  139:15 140:6
  228:5 249:11,23
  249:24 250:4,7
  280:8 283:19
  291:1
noticed   113:17
  250:1
notices   87:15
noticing   85:12,22
noting   119:11
  146:23
notion   77:11
  115:13 171:24
notwithstanding
  75:1 153:16,17
  171:1 174:11
  183:24 185:6,8
  223:9 266:18
nsge   58:17
nuisance   74:7
  256:25 257:2

number   41:2,3
52:16 54:16 55:20
56:1 58:7 59:8
60:9 63:2 68:6,7
82:16 84:20
101:19 108:10
115:6,12 119:17
122:6,7 124:10,13
146:3 160:23
177:23 195:13
218:6 221:11
224:25 253:23
263:4,8 281:9,19
282:2,20 287:13
288:1 294:2 299:5
numbered   220:22
numbers   63:2
  219:6 225:4
numerous   79:20
  80:2 90:23 102:4
  103:24
ny   1:14 3:6,17 4:4
  4:18 5:12 6:12 7:4
  305:23

o

o   1:21 15:1 305:1
o'connell   49:6
o'melveny   5:1
  26:5
o'neil   228:11,15
  228:16
o'neill   199:9,12
  228:11 238:17
  248:5,6,16,20
oath   43:11
object   48:3 104:7
  137:16
objected   21:19
  35:25 52:11 53:2
  60:1 102:4 123:11
  123:24
objecting   41:1
  46:17 52:22 53:3

56:12,25 57:2,22
58:1,19 60:24
62:13 63:12 70:20
72:17,20,23 73:6
74:1,6,17 75:2,8
75:13,25 76:17
77:8,11 78:8 79:3
79:10 80:7 81:3
82:18,22 83:3,9
83:10 88:18 89:23
102:14 103:19
104:22 105:15,20
106:4,4,8 113:8
116:16 117:18
147:20 151:2,12
151:20 152:24
153:2,12,14
154:13 168:16
183:15 201:22
202:6 203:8
227:11 232:25
276:7 292:4
303:18 304:3,3
**objection**  19:25
25:1,2,2,4,24
26:11,15 35:7,7
41:20 42:6 66:3
68:11 70:4 72:3
73:21 76:1 78:1
79:15 80:10 81:7
82:19 107:17,25
108:2,4 114:2
117:8 126:10
166:3 184:9
186:23,24,24
218:7 230:5
271:10,10 275:15
281:25 296:23
300:6 301:16
**objectionable**
202:18
**objections**  16:18
18:23 19:21 20:9

21:18 26:1 41:24
41:25 53:10 66:16
66:17 83:17 84:12
95:23 96:3 101:13
101:14 114:12
117:9
**objectives**  95:13
102:9,14
**objector**  47:16,18
47:19 71:21,22
83:14 123:5
285:11
**objector's**  77:3
**objectors**  38:11
41:18,21 42:8,13
42:22 52:3 53:25
55:8 59:1 60:8
62:1,16 63:6
65:23,25 67:6
69:16 70:3 72:4
74:2 80:21 83:8
83:13 88:18
102:24 103:9
105:5 107:3
122:23 218:18
278:13 280:7
292:7
**objects**  73:20
126:7
**obligated**  170:16
260:18,19 282:23
**obligates**  248:11
**obligation**  109:9
160:15 169:21
170:4 175:6 211:3
**obligations**  21:3
46:7 59:17 124:22
134:5 148:3,10
169:11 170:8
275:22 300:11
**obligors**  286:14
**obliterated**
301:19

**observation**  153:5
153:6 208:25
**observe**  216:25
**observed**  81:16
122:3 154:10
**observer**  107:9
**obtain**  21:4 75:10
120:17 129:1
134:10 143:2
200:8 205:16
206:17
**obtained**  56:6
100:15 159:1
**obvious**  102:23
213:5
**obviously**  16:12
16:16 17:9,12
54:24 133:18
154:5 158:9
161:25 174:2
176:6 177:25
240:25 241:24
257:24 272:19
278:13,23 279:3
280:1 282:13
295:13 297:2
298:7 299:17
**occurred**  141:14
142:4 154:6 209:3
**october**  225:11
**odd**  174:21
210:16 213:18
**odds**  136:7
**offended**  17:18
**offer**  65:24 77:4
214:2
**offered**  42:4 92:4
106:8 214:14
245:22
**office**  7:8,15
34:14,21 133:18
**officer**  59:17
180:20

**officers**  56:6,8
60:18 61:9 62:8
63:10 163:10
256:4
**offices**  34:20
186:13
**official**  5:9 44:17
101:2 121:25
130:13 231:21
299:3
**officials**  82:20,24
153:2 210:25
211:4 283:10
295:15
**offset**  173:9
**offshore**  159:9,17
161:5
**oh**  18:12 127:14
204:2 213:22
295:18 302:2
**ohio**  170:13
185:14
**okay**  17:24 18:5,5
19:4 23:9,25
24:18 26:3,18
30:20 31:20 32:18
33:12,12 34:10,12
35:3,19,20,22
36:10 37:1,11,13
38:2 54:3,17
64:18 69:1 100:25
113:10 118:3
120:23 121:6
122:21 123:19
128:23 131:22
132:1,4 133:24
134:2 142:14
145:5 148:25,25
149:3,10,16,17
150:10 156:16,23
157:7 158:18
160:20 162:3
181:4 182:20

185:22,25 186:5,8
187:4,12 191:15
193:22 195:17,19
196:14 201:11
204:2,19 207:1
210:10 214:20
218:2 219:3,3,23
221:5 224:6 225:6
225:10 228:3,14
228:24 232:10
233:6 234:4 237:1
241:11,15 245:8
246:16,21 247:23
248:3,22 253:5
254:19 257:19,20
264:4,9 273:6
275:10 276:19,23
276:23 277:16
278:2 279:24
295:17 298:2,15
298:17 300:1
301:2,13,25 302:6
302:16
**oklahoma** 283:4,5
**old** 112:3 305:21
**omnibus** 278:18
**omnipresent**
62:25
**onboard** 73:18
**once** 75:13,17
107:10,11 206:9
303:11
**one's** 293:18
**onerous** 80:2
**ones** 238:4 239:14
**oneself** 158:9
**ongoing** 79:14
**online** 86:19 87:3
87:4 88:5
**onus** 80:20
**operate** 45:18
72:5 80:1 144:18
249:20

**operates** 230:9
231:11
**operating** 61:11
61:15 173:2
233:24
**operation** 243:25
**operative** 248:8
**opinion** 17:16
98:19,20 172:25
**opioid** 20:24
28:11,12,17,17,23
28:23 33:2 38:10
39:2,9 43:17 44:5
45:22 46:1 60:3
60:25 70:1 79:14
80:5 86:15 93:17
94:6 95:25 96:8
96:12 97:13
100:13,18 101:21
102:12 108:15,17
111:8,24 112:9,12
117:3 119:5
120:14 124:20
134:19 135:3,9
136:10 138:20,20
139:19 141:1
148:17 205:3
213:3 229:19
237:14,22,22
238:10,12,13
248:12 249:9
253:21 254:3,5,7
254:22 258:22
271:1 283:7,17
303:10,23
**opioids** 79:22
112:1 125:17
234:19 237:4
247:9 255:8,12
**opportunity** 39:6
83:25 84:9,10,14
93:5 95:21,25
136:13 137:15

197:23 249:11
251:22 301:15
304:8
**oppose** 58:23
137:21
**opposed** 15:5
36:22 67:20
146:21 155:12
168:14 183:4
255:2 259:23
273:9,25 283:7,13
**opposing** 227:4
**opposite** 103:17
205:14 283:3
286:13
**opt** 57:1,21 58:5
58:18 59:13 62:20
99:11,18,21 103:4
**option** 148:8
**oral** 15:2,9,15,23
16:15 19:3 35:15
36:1 42:11 94:24
122:23,25 130:12
299:13,19
**oranges** 202:8
227:10
**order** 15:5 26:9
27:1,20 34:7 61:6
83:23 84:18 88:20
90:19 91:3,5
103:10 110:1
134:10 151:11,17
169:24 174:12
180:10 186:14
200:8 206:16
207:20 218:4
236:7,9 265:15
282:5 283:24
**ordered** 124:24
**orders** 77:3 167:4
**ordinary** 20:23
22:5,12

**oregon** 41:21 62:2
149:7 152:5
186:11 291:20
**organization**
207:7
**organizations**
113:6
**organized** 16:23
212:6
**original** 289:19
**originally** 225:20
**os** 183:2
**osus** 170:20 175:2
**other's** 104:19
**otterbourg** 93:1
**oud** 112:11 113:4
**outcome** 64:8
69:18 99:14 114:6
143:12 241:1
**outcomes** 206:21
240:25
**outline** 26:21
**outrage** 60:8
**outs** 58:18 99:18
99:21
**outside** 75:10 79:4
89:21 96:25
**overall** 20:22
53:20 294:2
**overdose** 111:25
112:9,12
**overdoses** 45:22
**overlooked** 170:2
237:20
**overnight** 19:16
**overriding** 150:23
**overseas** 50:21
160:25 290:12
**overseeing** 289:9
**overseen** 79:24
120:3
**oversees** 111:16

oversight 43:21
45:18 184:16
oversimplificati...
41:10
overstate 294:14
overwhelmed
289:16
overwhelming
42:11,14 43:1
51:2 53:21 54:25
59:22 62:21 70:9
80:16 94:9 102:7
119:17 146:18
147:7 172:22
overwhelmingly
115:20 146:7,11
153:7 181:20
owe 276:12 277:5
277:5
owed 57:8,23
100:5 160:6,18
owned 32:3
owners 86:24 87:7
ownership 109:11
oxycontin 234:18
236:3
ozment 12:9
o'neil 12:7
o'neill 7:20
o'sullivan 12:8

**p**

p 3:1,1 10:10
14:13 15:1
p.c. 7:1
pacific 182:24
package 202:7,7
packet 138:13
packs 255:7
page 15:11 31:24
49:13,13 67:10
69:6 72:10 80:13
99:22,22 104:8
226:19 249:19

275:21 276:20
280:16,17,20
291:16
pages 41:16,25
42:16,17 64:9
65:23 81:23,25
82:4 96:17 157:18
220:22 226:8
246:3 280:13,23
281:2 282:6
291:16 293:21
295:3
paid 58:24 75:17
109:3,4,19 129:12
135:17 156:4
160:14 163:24
173:9 194:11,12
195:10 201:24
203:8 231:8
237:15 255:4
pain 187:14
painful 38:5
294:15
painstaking
209:10
paint 52:16
pair 77:23
pales 160:8
pamela 9:13
13:25
papers 16:16
88:10 90:8 168:5
188:11 189:23
221:19 280:5
294:6
paradigmatic
66:19
paragraph 32:24
66:3 67:22 68:5
70:4 75:25 78:1
80:9 81:7 82:18
84:21 98:25 99:9
99:16 100:6,9,10

100:10 146:12
248:10 281:15,21
285:24 291:16
paragraphs 79:15
220:23
parameters
183:17,18,19
paramount 50:24
paraphrasing
273:18
parens 74:11
77:15,21 199:1,2
210:11,20,22
211:1,17 234:10
288:22
parenthetical
27:24
parents 61:11
62:9
paris 13:2
park 5:11
part 27:4,22
34:19 36:1 38:12
65:14 67:2 76:15
86:22 90:7 104:23
120:10,11 121:14
121:14,15,16
122:9,17 144:24
149:13 154:5,8
155:5,5 156:17
159:1 169:11
171:23 172:21
179:14 180:4
182:10 200:15
202:6,9,10 203:2
209:17 214:22
218:9 219:10
221:19 222:22
224:10 234:9
236:3,24 254:2
265:25 270:20,22
270:23 273:20
276:16 280:4,5

partial 98:6
participant
122:17
participants
119:17 237:22
296:20
participated
117:13 168:19
247:13 277:5
282:7
participates 169:1
169:5
participating
46:18 51:24
170:24 244:1
286:22
participation 59:7
136:17 241:24
242:9 243:14
244:21
particular 36:1,9
66:23,25 72:14
137:22 179:17
190:12 224:5
239:11 241:25
260:19
particularly
117:2 163:2
200:22
parties 15:4,9,13
15:16 18:25 20:18
20:21 21:19,25
22:2,3,4 23:5,7,7
24:5,9,12,14,23
25:18 27:11 28:13
28:13,21 29:3,20
29:25 30:10,13
31:25 33:14,23
36:3,8,15 42:15
43:10 44:21 49:22
51:3 56:7,20
58:12 59:6,14
60:9,24 61:1,22

62:2 63:4 65:3
69:10,10 73:25
77:2 78:19 82:19
83:5 86:10,14
87:13,23 94:8
95:1,5 96:25
99:11 110:2,16
111:5 121:12,19
122:25 123:3
126:18 128:22
134:9 138:8,19
139:7,7,18 141:4
142:18 143:1,3
144:21 145:9,10
148:13 151:18
158:13,15 161:17
167:5 178:24
186:16 188:4
189:21 191:18
206:9,23 207:13
207:25 208:10
209:18,23,25
210:1 211:20,24
212:4 214:5,9
216:6,19 217:12
218:5 222:10
227:7 246:24
247:1,5,19 250:24
256:1 260:24
267:19,24 268:18
269:3,3 270:19,21
272:13 274:7
276:25 277:3,4
282:4 294:6
295:15 296:2,3,6
296:13 300:13,16
302:22,23 303:11
303:14,17 304:6
**parting** 67:12
**partis** 41:6
**partner** 94:23
**partners** 61:10

**partnership**
160:13 169:23
170:2,15,16
**parts** 94:17 155:4
205:6
**party** 17:18 21:5
21:22 22:13,14,17
22:18,19,20 23:21
24:11,16 27:2,3,3
27:7 28:7 29:1,2,3
30:7 36:16 42:7
51:16 55:1 56:14
56:16,23 57:2
58:10 59:13 60:1
62:1 63:7 64:23
65:7,13,18,19
66:15,20,22 67:1
67:9 69:3,8,20,22
70:6,24 71:1,4,15
71:18 72:4,8,13
76:2,4,22 79:11
79:16 83:18 84:8
84:11,16 85:11,14
85:22 88:20 89:4
89:11 90:7,20,25
91:6,10,17,19
97:15 101:7
104:12,14 106:8
106:12,17 122:1
123:2 124:4 126:8
128:11 129:1
137:19 142:17,17
143:12 144:4,17
149:14 150:14,16
151:11 156:20
159:15 161:18
168:8,11 170:22
170:22 175:4
179:13 180:20
181:7 182:11,23
183:5 184:4
186:23,25 187:21
188:17 189:16,18

190:1 195:21
196:1,23 197:22
205:8,9,21 209:21
212:18 226:15,17
226:22 227:1
246:23,25 249:13
251:3 255:20
256:15 264:21
265:22 266:1
268:2,10,11,14,16
272:16 273:2
275:23 276:1,14
280:20 282:6
294:18 296:11
297:14 298:8
**party's** 268:12
**pass** 91:18
**passed** 283:5
304:9
**passing** 41:23
**passion** 115:16
**passionately**
49:22 285:10
288:15 291:11
292:16 295:16
**path** 102:2,19
**patience** 117:19
**patients** 43:20
**patriae** 74:11
77:15,21 199:1,2
210:12,20,22
211:1,17 234:10
288:22
**patrick** 11:18
12:7
**paul** 6:14 7:10
12:25 13:14,15
255:18 275:12,14
276:8,9
**pause** 115:5,13,24
279:23
**pay** 47:2 56:13,18
57:10,19,24 68:10

100:2 109:8,13,18
119:8 125:14
159:4 160:18
164:23 174:13
215:10 226:9
258:21 262:13,13
263:5 286:15
**payers** 51:17
294:18
**paying** 145:11
171:22 192:5,11
194:21 197:8
206:16 274:10
292:20
**payment** 20:14
68:18 97:21
109:22 113:22
117:11 166:22
191:5 192:15
194:16,24,24
195:5 201:1
248:10 257:24
258:6 263:21
**payments** 109:3
160:4,10,12
163:25 190:20
194:13 205:16
259:19 260:22
263:15
**payors** 51:17
**payout** 135:19,22
**pbc** 111:18
**peabody** 165:25
**peace** 99:19
**peacock** 12:10
**pedestrian** 255:11
**penal** 155:21
289:4
**penalties** 76:19
229:21 230:14
**penalty** 57:4
284:17

pending   22:23
  33:2 134:13 254:7
  271:13 301:21
penny   125:14
people   15:14
  33:18,22 43:14
  45:16 59:20 62:24
  103:16 104:17
  108:11 110:11,13
  110:16,18 112:10
  112:16,22 113:4,4
  113:5,5 114:16
  116:9,25 117:1
  118:1 120:7
  131:14,16 138:10
  145:11 146:20
  156:14 163:11
  164:3 175:21
  181:18 187:15,18
  191:1 210:23,23
  210:24 211:1,2,3
  211:5,7,13 215:6
  234:20 235:13,13
  239:24 241:21
  256:9,11 257:12
  269:22 278:4
  284:20 285:6
  287:16,21 288:2
  289:17 290:10
  291:11 292:25
  293:25 295:7
people's   211:4
people's   110:10
perceive   165:8
percent   17:5,5
  38:23,24 43:17
  48:1 51:5,22 52:7
  52:8,14,16,17,19
  52:23,24 53:10,16
  53:19,19 57:7,11
  60:2 70:10,12,14
  70:18 73:3 106:2
  107:15 115:6,12

115:14 118:1
  131:15 146:12,14
  146:15,16 147:12
  156:21,22 279:21
  285:2 288:3,3,7
  288:15 290:15,15
  295:11
percentage   53:18
  119:12 146:6
  194:17,20 195:2
  290:17
perception   199:23
perdue   208:10
  220:24
perfect   38:4 102:1
  104:12 199:25
  212:21
perfectly   23:14
performance
  290:22
period   55:3
  108:25 133:11
  159:3 162:9
  175:22 207:17
  237:23
periodically   16:13
perjury   57:4
  284:18
permanent
  154:20
permissibility
  162:12
permissible   72:13
permission
  263:22
permit   89:15
  106:19
permits   72:8
  230:12
permitted   70:25
  95:5 131:6 207:22
  243:4 268:4

perry   176:8 293:7
person   110:12
  122:14 123:4
  138:23 140:11
  164:5 233:24
personal   38:17
  40:13,15 65:2
  83:1 101:17
  111:21 113:21
  115:8,8,16 117:18
  130:15 143:2
  145:13 154:24
  155:5,7,9 157:21
  163:25 250:8
  259:17,24 261:19
  262:2,22,24
  286:16 303:8,23
personally   112:19
  236:19 259:25
  264:13 286:21
personam   286:5
persons   30:9
  50:14 140:21
perspective   67:15
  68:1 110:18
  182:11 192:9
  231:11 237:12
pertain   303:6
pertained   223:24
pertaining   40:13
  157:2
pertinent   29:8
peter   8:20 17:7
  100:7 159:12
  299:4
petition   138:17
  254:3
pf   276:11
pg&e   54:11 184:9
  184:15,24,25
phar   170:12
pharma   1:7 2:3,4
  3:15 4:2 66:4

86:22 87:6 122:22
  123:12 126:1
  169:22 247:8
pharma's   86:23
  87:7
pharmaceutical
  237:7
pharmaceuticals
  141:3
pharmacies   19:20
pharma's   169:22
phase   39:21,23
  46:15 51:23 55:21
  59:2,5 68:6 75:18
  95:2 103:23,23
  119:2,9,23
phi   285:6
philip   8:1
phillips   55:6,10
  118:24 293:17
phone   17:19,21
  122:6
phrase   50:10
  62:16 156:13
  200:3 210:17
phrased   223:20
physician   16:5
pi   51:14 107:13
  107:15 115:3
  294:16
pick   31:14,15,16
  267:11 289:9
  290:11
picked   32:4 180:8
  282:24 289:8
picking   134:24
  266:11 284:15
picks   143:20
piece   16:4 17:22
  18:6 95:12 96:21
  203:6,7 217:13
  218:23 289:23

**pieces**  55:25 98:9
  218:16
**pierce**  286:6
**piggybacking**
  155:24
**pillsbury**  4:15
**pin**  286:18
**pis**  44:5 58:17
  108:7
**pit**  113:25
**pittman**  4:15
**pivot**  84:15
**place**  7:10 171:21
  197:13 218:25
  220:7 289:14
**places**  21:7
**placing**  130:19
**plaid**  281:5
**plain**  76:6 84:22
  85:22 86:17 87:10
  87:14,20 138:7
**plains**  1:14
**plaintiffs**  78:4
  179:25 285:17
  291:5 295:2
**plan**  2:2 19:5,15
  19:17,21 21:7
  22:14 23:1,14
  25:1 26:1,9,11
  29:8 30:19 32:12
  34:2 35:16 38:4,5
  38:6,25 39:12,16
  42:4 43:8,10,12
  44:9 45:4 46:11
  46:18 47:9,17,23
  50:5 51:10,12,22
  52:25 53:8,9
  56:16,19,22 58:18
  58:23 59:7,10,10
  59:12,18,24 60:4
  63:3,24,25 64:3
  64:11 65:10,15,16
  66:6,9,23 67:2,17

67:18 70:2,9,9,11
  70:13,14,18 71:9
  71:25 73:2,21,24
  75:24 76:15 77:22
  78:6,14 79:16
  80:1,6,19,20,24
  81:17 82:12,17,23
  83:12 85:21,23
  86:7 87:14 88:3
  88:15,20 89:7,10
  89:12 90:7,20,21
  91:1,6,10,11,17
  91:20 93:22,25
  94:5,7,11 95:6,7
  95:12,19,23 96:2
  96:4,6,10 97:16
  98:13 99:11,24
  100:11,15,20
  101:24 102:3,10
  102:19 103:6,11
  104:7 106:18
  107:13,17,18
  110:23 111:3,7
  115:1,4,10,23
  117:10,22 120:6
  120:13,21 122:24
  123:1,12,25 124:9
  124:13,18 125:25
  126:15 128:10
  129:5 130:12,18
  130:21,21 131:16
  131:18,20 133:22
  133:25 135:13
  138:18 139:14
  140:17,18,20
  142:12 144:2
  146:1,11,15
  147:20 148:12,21
  149:20 152:25
  153:7,10 154:5,17
  155:10 165:3
  166:8,9,22 167:15
  171:13,17,20

172:20,21 173:1,2
  173:4,11 174:8
  177:4 179:14,18
  179:20 180:4,14
  181:6,18,25
  182:10,24 184:2
  184:11,14,15
  187:13,13,16,16
  187:18 189:3
  191:23,24 199:20
  202:18 205:12
  207:8,14,15,18
  213:2,3,5,7,13
  215:11,24 216:19
  225:11 227:4
  236:12,15 237:19
  237:25 238:21
  242:2 247:15
  251:8,25 252:2,17
  257:23 258:24
  259:20 261:13
  265:2,3,9,24,24
  265:25 267:19
  268:3,7,15,20,21
  271:2,3 272:5
  275:19 276:10,24
  277:2,9,24 278:20
  288:14 290:20
  292:5 294:12,13
  294:21,25 295:3
  296:1,4,18 297:11
  303:4,5,5 304:6
**planned**  203:2
  246:7
**plans**  88:8 187:20
  207:22 268:6
**plan's**  123:1
**play**  67:1
**players**  177:15
**playing**  210:8
**plays**  65:14
**plea**  178:5 219:6
  221:9 222:23,24

223:4
**pleading**  81:5
**pleadings**  101:15
**pleas**  222:25
  245:12
**please**  18:2 43:3
  49:8 90:1 121:9
  121:17,22 122:4,9
  219:2 221:24
  269:17 295:10
  301:15 304:13
**plentiful**  125:12
**plenty**  165:20
  206:21
**plight**  112:16
**plus**  17:12 107:18
  107:19 239:24
  241:8 256:10
**pm**  304:16
**pn**  91:15
**pocket**  267:11
**pod**  110:11,12,13
  110:15 272:18
**podium**  18:7
  35:21 64:16 92:8
**pohl**  12:11
**poignantly**  112:21
**point**  23:18,22
  24:25 32:19 35:15
  35:16,25 49:13
  53:20,24 66:25
  74:18 79:21 83:23
  87:20 91:9 96:14
  100:8 106:8
  115:11,25 118:8
  127:13 128:19
  137:10 141:7
  144:11 145:15,16
  147:19 149:22
  150:20,21 151:14
  151:21,23 152:21
  153:5 155:11
  158:19,22 159:17

159:20,22 160:7
160:19 162:16
163:7,19 164:15
164:20 166:14,16
168:17 171:7
172:18,24 174:14
175:5 177:9 178:4
180:8,11 181:1
182:7,21 183:3,7
183:22 185:21
192:11,12 193:13
198:19 199:8
200:11 205:3
207:20 208:17
210:13 212:7,23
213:8 214:19,21
217:4,15,16,24,24
218:9,21 219:12
219:13,15 229:11
231:19 235:21
241:7,14 243:3
246:3,11,20,22
249:19 251:16
254:11 255:25
256:7 257:8,10,16
258:8 259:4,6
262:18,19 264:5
264:10 269:20,25
271:22,24 273:7
274:3,4 279:7,11
279:12,17 282:1
283:11 285:23
287:9 288:16
295:20 298:6,9,10
298:18,19,19
299:10 301:17
303:2 304:1,10
**point's** 26:13
**pointed** 102:18
104:13 116:6
189:1,14 220:9
223:23 284:12
297:22 299:4

**pointedly** 102:1
**points** 25:20
95:17 103:19
113:19 114:4
118:14 147:10
149:19 154:6,6
165:4 179:11
196:12 218:1
229:9 247:25
249:3 253:12,16
264:20 273:10,11
273:14 279:2,16
279:24 280:3
**police** 71:3 72:20
72:21 73:5,14
74:5,18,25 75:6
76:12 78:23 79:9
79:12 89:24 116:7
165:21 184:6,12
188:7,20 195:21
196:8 197:10,15
198:19,22,23
201:21 229:17
230:18 240:13
284:14 288:10
**policies** 20:10
69:11 90:12 94:2
169:11 300:11
**policy** 114:4
300:14
**political** 73:9
83:11 106:3
**politicians** 113:8
147:2,20
**politics** 292:1
**polk** 3:3 15:19
19:10 37:16
286:23 295:19
**poll** 147:15
**polling** 147:17
**polls** 146:21
**polluting** 211:16
216:7

**pool** 98:19 296:25
**poor** 181:7
**pope** 64:20
**population** 79:13
**populous** 52:1
**porter** 12:12
**portion** 108:8
121:16 135:8
299:18
**portions** 223:7
**portrayed** 151:15
**posed** 124:22
206:3
**posing** 240:22
**position** 102:13
173:20 179:14
187:7 251:19
266:8 275:9
**positions** 252:3
**positive** 84:13
261:1
**positively** 47:24
**possession** 245:17
**possibility** 33:18
43:7 163:4 301:18
**possible** 39:1,1,4
53:15,23 54:9,14
66:10 98:19 99:3
117:12 129:6
139:19 206:21
268:13 284:7
**possibly** 17:23
38:5 55:1 80:23
284:1 292:19
**post** 80:5
**posting** 38:1
**pot** 39:1 182:15
**potential** 32:25
45:15 50:8 85:22
86:12 87:18
111:19 137:13
178:1,3 191:16
301:23 303:5

**potentially** 47:4
67:20 85:24 90:14
107:2 120:17
127:11 131:11
284:4
**potholes** 44:8
**pound** 122:10,11
**poverty** 45:1
**power** 71:3,9
72:20,21 73:1,5
73:14,16 74:18,25
74:25 75:7 76:12
77:19 78:23 79:9
84:4 88:19 89:24
90:1,4 91:2
142:16,20 184:6
184:12 188:7
196:8 197:11,12
197:15,19,21
201:21 206:25
229:18 240:14
250:10 284:14
**powerful** 182:4
**powers** 74:5 79:13
116:7 126:20
188:20 195:21
198:19,22,23
230:18
**pra** 276:11
**practice** 178:12
178:17,18 221:8
221:22 222:17,19
222:22 223:3,8,14
223:15,17,24
**practices** 36:4
97:11 160:2 166:5
168:23 234:21
**praise** 283:16
**pre** 154:11 198:7
283:4 291:2,4
**precedent** 46:25
68:12 94:7 173:23
199:23 200:12

204:7 210:6
217:24
**precipice** 107:2
**precisely** 59:1
66:12 135:18
136:1 137:1
**precision** 284:13
**preclude** 77:5
169:15
**preclusive** 89:19
**predate** 300:12
**predated** 264:23
**predecessors**
61:12 62:10
**predicated** 99:13
**prediction** 290:22
**predictions**
206:19
**preeminent** 79:24
**preempt** 184:11
**preempting** 184:6
**preemption**
183:23
**preempts** 78:4
**preexisting** 111:8
**preis** 5:14 58:15
92:8,9 100:22,25
101:1 298:21,24
299:2,3,25
**prejudgment**
106:1
**prejudice** 90:14
108:9
**preliminarily**
149:11
**preliminary**
74:23 78:11,20
101:12 158:4
159:23 170:1
**premise** 154:4
188:5 192:4
205:21 206:23
208:7 209:19

**premium** 99:19
**prepared** 109:25
149:18 159:25
218:20 238:2
**prepay** 109:21
**prepetition** 97:11
105:9 117:17
**prescribers**
178:10 225:14
**prescribing**
178:11
**prescription**
230:3
**prescriptions**
164:4
**present** 7:22
60:17 61:9 62:8
63:10 66:21 67:7
243:6 246:9
247:18 254:7
**presentation** 30:4
96:11,13 100:14
145:16 186:15
205:2 214:22
224:4 225:16
**presentations**
93:8 281:21
293:21
**presented** 55:11
171:5 181:22
206:12 242:15
243:18 244:12
247:4 257:10
265:12
**presenters** 93:11
**presenting** 149:7
**preservation**
25:12,17 43:16
302:4
**preserve** 20:23
125:2
**preserved** 25:2
188:11

**preserves** 22:4,6
**presiding** 81:11
**press** 12:13
**pressing** 114:12
**presume** 139:22
221:5
**pretrial** 64:22
**pretty** 44:11
164:3 184:19
191:5 207:4
213:18 243:21
291:17
**prevail** 152:18
206:8
**prevailing** 123:12
124:1
**prevent** 97:11
106:6 161:12
247:12
**preventing**
134:10 234:19
**prevents** 111:4
**previous** 198:14
**previously** 83:6
102:5 109:19
**prey** 12:14
**price** 164:11
212:8 221:10
227:13
**price's** 41:1 228:2
**prime** 34:2 53:13
58:3 114:23
**principal** 19:18
82:19
**principle** 71:20
111:3 117:8
131:22 211:2
267:20
**principled** 152:15
**principles** 83:9
**prior** 21:20 31:12
35:1 141:14,15
254:2 286:24,25

300:12,13
**priority** 47:5
267:5
**private** 39:21,22
40:11,14 46:19,20
47:23 48:25 52:24
78:4 94:4,25 95:4
98:15,18 105:2,13
119:13,16 120:1
120:12 165:24
207:9 231:1,5
246:14
**privates** 59:3
75:17
**privilege** 204:5,6
204:8 222:1
293:20
**privileged** 45:8
82:15 97:3
**privy** 202:20
**priya** 8:5
**probability**
169:15 175:7
**probably** 17:14
18:23,24 23:20
33:3 36:25 43:25
49:12 124:9
150:18 173:4,6
178:19 210:17
214:18 224:4
271:4 278:22
286:22
**problem** 16:8
207:15,15,17
208:11 209:17
224:16 231:2
254:15 262:10
273:2 277:3
**problematic**
235:17
**problems** 167:21
293:9

procedures 84:20
84:20
proceed 78:23
109:8 114:8
149:18 205:20
230:4
proceeded 177:18
207:6
proceeding 25:23
78:25 79:1 86:23
89:8,20 90:22
92:2 97:4 121:24
142:19 196:20
207:25 209:18
230:6,9,12 234:24
235:11 236:7,7
250:4 269:4
proceedings 1:12
85:11 88:13 89:5
134:8 154:11
249:3 304:15
305:4
proceeds 94:5
109:12,17,20,21
200:7,8 248:12
process 37:24
50:13 71:5 78:7
80:11 81:6 83:19
83:22,24 84:9
117:13 127:24
136:8,12,16,18
137:11 143:15
146:1 157:15
158:9 207:24
209:18 211:23
220:9 249:4,6
250:11,20 252:22
253:2 270:20
proclaiming
176:4
procurement
44:15

produce 136:23
212:24
produced 81:13
82:14 207:18
213:2 281:10,11
281:11,13
produces 212:18
product 54:22
production 81:23
82:3
productively
302:23 304:13
products 237:8
254:4,6
profess 124:8
professed 60:8
professionals
82:21 114:3 116:2
117:13 255:18
259:11 275:5
professor 44:24
professors 240:3
profile 50:8
profoundly 292:2
progeny 274:21
program 248:16
programs 60:6
85:13 119:4
progress 209:16
prohibit 233:12
prohibited 31:1
72:5 122:1
prohibiting 237:6
prohibits 126:14
project 173:10
prolonging 179:8
promise 294:9
295:11
promised 64:15
promises 125:17
297:3
promotors 36:15

prong 30:9 194:6
242:9
prongs 66:24 67:6
98:11 297:10
proof 36:6 84:13
284:17
proofs 57:3 69:14
274:1 288:2
proper 183:10
212:2,14 218:12
226:25
properly 84:24
195:25 202:20
210:14 214:12
216:2
property 149:24
151:6 172:5 182:2
215:1 216:14
217:8 249:11,14
249:25
prophetic 161:3
proponent 203:3
proponents 42:4
149:20 177:4
182:4 227:4
278:25 294:23
proposal 37:2
55:21 68:6 225:22
proposals 242:17
propose 15:13
129:6 146:17
148:5 151:1
207:14
proposed 51:4
156:15 188:17
189:5 193:25
200:14 271:2
proposing 242:4
255:1,3
proposition 77:14
150:1 172:1
233:23 282:23

proprietary
226:17
propriety 43:4
65:4 84:11 287:8
pros 303:14
prosaic 102:8
prosecute 29:11
182:13 193:2
prosecutorial
270:4
prospect 99:20
158:13
protect 79:13
159:10 174:9
197:7 211:3 239:2
protected 21:5
74:9 205:24
234:11
protecting 153:3
159:18 197:5
211:7,13
protection 29:8
31:5 74:7 77:4
114:4 128:17
154:18 155:22
166:4 167:6
168:25 169:3
231:7 236:8
241:17
protections 148:7
protective 282:4
prototype 102:21
protracted 49:9
prove 206:6
proved 161:3
proverbial 285:15
provide 29:8
43:13 47:12 54:6
75:15 80:24 84:9
96:4 110:10
144:14 184:3
186:15 223:6
281:24 291:21

provided 45:2
  65:13 81:17,20
  85:3,10 132:15,15
  132:18,21 139:10
  150:19 151:17
  154:14 157:5
  197:12,13,14,15
  197:21,22 249:10
  249:24 257:23
  264:11 274:24
  282:5
provides 44:15
  63:4 74:20 84:21
  84:24 90:6 96:10
  136:12 144:20
  198:4 230:1,14
  238:12
providing 45:19
  45:20 110:3
  155:22 182:3
  224:13 259:5
  264:13 281:2
  304:5
provinces 271:10
proving 296:22
provision 22:22
  28:1,23 29:23,25
  30:11 71:17 74:19
  113:21 125:24
  197:4 198:4 248:8
  259:8 283:3,3
  284:14
provisions 20:2
  25:3 26:21 29:7
  29:16 114:11
  126:15 166:18
  167:11 197:3
  203:24 207:8
  248:18 253:3
  275:19 277:25
prudence 195:22
public 39:8,20
  40:5,11 44:21

  45:1,6,10,17
  46:19,24 48:21,25
  61:24 62:12 72:1
  72:1 74:7 77:24
  80:3,18 81:6,10
  82:13,20 83:16
  93:13,16,18 94:4
  94:25 95:4,21
  96:10 97:4,9,18
  97:20,22 98:6,15
  98:17 100:14
  101:17,23 105:2
  105:12 108:6
  110:22,24 111:19
  119:13,16 120:11
  125:2 136:3 153:4
  199:23 203:25
  205:15,24 207:9,9
  228:4 231:6,20
  232:8 252:19
  256:25 257:2
  283:9 296:8 303:3
publication 81:25
  84:22 85:20,21
  86:2 87:10 138:6
publicly 105:11
  139:19
publics 59:3
published 84:24
  86:3
puerto 51:25
  54:10
pulggari 12:15
pull 41:7 173:3
  203:5 252:16
  267:8
pulled 174:20
pulling 282:22
pullman 6:16
  149:5
pullo 114:23
pulls 222:20

pundits 115:22
punishment
  155:11 156:5,12
purchase 124:25
purdue 1:7 2:3,4
  3:15 4:2 38:14
  45:24 48:1 55:16
  57:5 66:3 77:6
  79:25 83:2 86:22
  86:23 87:6,7 94:1
  96:18 97:1,6,12
  105:16 107:5
  108:2 117:22
  118:2 122:22
  123:11,25 125:5
  126:1 136:16,17
  136:24 141:10
  146:5 157:3
  160:18 168:15
  169:22,22 224:1
  225:16,24 231:14
  233:8 234:14
  236:2 247:8,14,14
  252:1 275:17
  276:11 284:18,20
  286:25 289:6,6
  296:10,12
purdue's 38:23
  96:11 178:6 247:9
  253:21 254:22
  259:20
purdue's 136:17
  141:2
purport 172:3
purported 74:17
  140:16,17
purporting
  116:16
purpose 32:9
  119:6 222:3
  229:24,25 230:1
  245:15

purposes 23:18
  32:9 39:2 75:16
  155:21 174:17
  218:7 236:25
  242:20 243:19
pursuant 80:3
  91:1 218:4
pursue 58:10
  75:21 98:2 133:22
  133:23 232:2
  296:24
pursued 83:2
pursuing 78:11
  112:22 164:18
pursuit 76:15
push 177:22
  260:17
pushed 106:21
pushing 158:15
  175:25 176:7
  215:22 284:19
put 33:3 42:18
  97:17 98:9 120:13
  123:17,17 125:22
  126:23 131:12
  132:6 135:7 152:7
  154:20 162:7
  176:9 181:6
  182:15 187:19,24
  205:1 218:22
  228:14 237:12
  242:18 268:7
  274:14 282:24
  285:14 288:19
  300:24
putative 170:21
  170:22
putting 54:13
  68:23 78:16 86:2
  98:4 102:7 105:25
  155:7 268:3 283:6
  286:13

**pvc** 252:18,20

**q**

**qualified** 118:23
**qualitative** 67:15
**quantitative** 68:1
**quarropas** 1:13
**quarter** 68:18
**question** 22:10
23:13 26:7 31:13
36:2 54:2 69:17
91:23 116:12
130:9 147:14
152:14,20 157:15
165:5 168:13
178:23,24 203:22
205:1 210:9 213:9
223:13,19 224:5
227:3 228:12,15
239:7,12 258:2
259:7,14,15,22
262:23 265:6,19
274:2 275:5
278:10 284:2
301:1
**questioned** 133:8
227:6
**questions** 22:8
27:16 30:3,18,21
42:10 72:15
100:21 113:24
118:5 122:18
228:23 229:11,12
248:21 278:14
295:10 298:1
**quick** 34:14
179:10 253:16
273:13
**quickly** 35:24
84:15
**quiet** 113:18,19
**quinn** 12:16
**quirk** 12:17

**quite** 44:25 49:12
62:15 108:11
137:10 141:8
156:2 163:4 164:9
165:6 167:19
280:4 289:15
291:16
**quote** 44:15 61:5
66:2,23 77:1 81:5
84:21 89:12 159:8
159:8 160:24
225:18
**quotes** 61:24
293:22
**quoting** 77:2
81:20

**r**

**r** 1:21 3:1 4:6 15:1
305:1
**rachael** 12:21
**raise** 47:3 85:5
112:15,18,21
266:12
**raised** 16:13 20:3
36:2 70:20 72:17
83:17 90:16
112:13 115:25
116:12 149:19
228:1 264:20
**raising** 26:15
167:8 258:9
**ran** 255:11
**range** 150:4
161:20
**ranged** 53:18
**rare** 65:8 66:13
124:4,7
**rarely** 93:11
190:6
**rate** 115:12,20
**ratepayers** 294:19
**ratio** 287:22

**raw** 173:4,6
**raymond** 31:10
68:21 287:11
300:5
**rdd** 1:3
**reach** 87:17 88:1
88:2 104:8 116:3
125:23 126:3,4
143:5 201:17
206:10 207:20
208:1,5,12 209:7
214:6 255:6 262:7
269:1 289:23
**reached** 16:5 20:8
41:7 102:20 104:5
104:6 107:11,11
118:21 120:4
164:20 201:14
208:10,16 214:15
218:4 304:3
**reaches** 156:11
239:14
**reaching** 102:20
107:12
**reactions** 112:24
**read** 28:4 33:8
62:7 128:9 129:18
139:14 162:17
190:4 212:22
242:13 251:10,17
253:9 274:1
278:24 280:3
281:22 299:13
**reading** 127:6,8
138:14 244:1
**ready** 31:8 214:5
218:1 228:23,25
**reaffirmed** 65:7
**real** 75:10 254:25
**realistic** 204:10
207:25
**reality** 65:22
75:19 135:10

**realize** 164:6
**really** 15:7 17:5
36:21 51:7 52:15
71:6 83:20 128:13
137:23 142:1
149:24 153:1,4
154:25 155:10
158:8 161:15
162:6,8,10,12,14
162:21 165:7
166:17 167:8,10
171:15,20,23,25
172:1,2 176:13
180:12 181:6,7
183:7,18 184:17
185:1 192:21
196:7,10 201:19
201:20 213:19
214:16,17,23
215:16 216:14
217:8,20,23 221:7
223:13 239:21
248:13 251:11
258:20,23 259:22
260:17 266:23
270:19 271:21
279:14 294:3
297:21 298:13
299:7 302:20
304:10
**reargue** 26:10
**rearguing** 26:1
**reason** 50:9 58:7
64:5 83:10 116:22
117:21 125:16
142:12,13 206:7
230:23 266:1
267:17,19 301:7
**reasonable** 67:13
151:9 156:3
161:21 164:5
169:19 193:24
194:3 215:15

249:10
**reasonableness**
150:5
**reasoning** 77:3
179:19
**reasons** 17:16
56:12,15 67:4
91:16 116:22
124:7 138:25
148:23 161:5
178:12 271:17
295:22
**reassess** 209:25
**rebuild** 103:16
**rebuttal** 101:10
279:13,14 298:23
**recall** 106:20,22
**recap** 81:22
**recast** 71:6
**receive** 20:20
21:10 60:5 67:10
67:19 83:24
115:17 120:12
125:4,6,9,18
139:2 222:10
237:21 296:20,24
297:1
**received** 15:11
30:15 44:16 88:12
106:13 107:4
114:25 119:3
125:14 128:22
154:19 160:1
212:11 223:25
227:19 246:5
247:16 296:17
**receives** 106:12
134:12 259:3
**receiving** 24:4
106:6 159:2
229:20 258:3
**recess** 120:25

**recipient** 32:11
**reciprocal** 20:20
21:25
**reckless** 256:21
256:22
**reckoning** 125:2
**recognition** 25:23
26:9,12 154:17
271:23 272:5
**recognize** 127:19
200:12 220:8
227:9
**recognized** 64:21
67:8 69:22 79:17
249:18
**recognizes** 127:3
**recognizing**
211:24
**recommendation**
228:20
**recommendations**
242:6
**recommended**
25:9 293:23
**reconcile** 165:2
**reconciliation**
48:18
**record** 15:2,19
19:10 31:9 37:16
42:3 43:1 47:16
49:5,15 66:8
79:21 85:9 88:1,9
98:10 100:14,25
103:10 108:13
114:21 115:5
122:1,22 175:9,12
178:2 183:4
215:17 216:18
227:24,25 228:5
228:17 248:7
259:24 260:23
262:11,20 264:12
279:18,19,22

280:12 281:3,15
282:12,14 283:19
283:21 285:22
286:17 288:13
289:1,2 290:19,21
295:13 299:3
301:25 305:4
**recorded** 121:22
**recording** 121:25
**recover** 57:7
155:8 230:7
**recoverability**
50:3
**recoverable** 133:1
**recoveries** 16:24
40:13,15 47:12,25
48:1 60:5 75:14
75:15,16 97:24
103:18 282:24
283:13,17 296:10
296:24
**recovering** 238:19
**recovery** 21:5
40:18 50:8 113:5
130:22 133:14
155:12 230:13
240:18 286:11
296:25
**red** 136:21
**redacted** 116:14
**redecorating** 44:8
**redress** 233:14
**reduce** 21:2 99:8
**reduction** 25:20
**refer** 163:11
222:18 294:12
**reference** 32:3
140:20 152:23
153:25
**referenced** 247:4
**references** 140:19
178:5 259:9

**referred** 22:5
130:17,18 140:3
198:15 221:9,25
235:10
**referring** 129:17
129:17,20,21,23
185:5 222:2 224:9
225:19 235:12
239:8 243:1
**refers** 216:4,5
**reflecting** 225:21
**reflects** 100:11,15
143:11 225:16
226:16,16
**refocused** 296:2
**refuse** 105:2
116:9 125:14
152:10
**refused** 107:1
**regard** 36:3
109:23 114:5
157:1,19 177:10
227:16 253:15,17
259:21 271:6,7,14
272:9
**regarding** 28:10
28:19 34:3 101:14
114:16 136:24
145:22 156:25
189:23 191:19
196:4 203:24
210:15 223:1
227:14 250:12
**regardless** 28:22
103:12 109:15
**regularly** 150:12
**regulate** 240:1
**regulating** 229:19
**regulation** 77:25
230:1
**regulators** 254:5
**regulatory** 74:18
75:6 77:12 78:3

78:22 116:5
165:21 184:16
199:17 288:11
289:4
**reinforces** 124:3
**rejected** 76:22,25
85:8 170:3,14
**relapsed** 112:11
**relate** 27:25 28:1
77:6 110:24 189:6
189:8 234:17
296:3,6 300:10,11
**related** 20:9,24
22:2 23:7 28:11
28:12,23,23 29:1
31:25 36:14 38:11
65:4 70:16 83:5
86:15 87:1 88:14
90:6 94:4 101:7
124:12,20 135:3
141:2 143:7 171:2
179:16 180:16,21
185:9 196:4
223:14 238:12
247:9 254:3,5,22
254:22 275:4
296:14 297:15
300:16
**relates** 31:23
226:4 237:4
272:25 273:1
296:12
**relating** 27:4,21
40:15 43:24 86:14
183:24 252:22
253:21 254:1
**relative** 192:14
**relatively** 66:5
188:22 278:18,21
**release** 20:2,12,12
20:15,20,20,21
22:1,11,13,19
23:1,8 24:12,16

24:16 26:21 32:10
32:23 61:25 64:17
69:7 71:15 84:1
85:1,14,18,24
86:12 87:23 88:12
89:24 90:9 97:15
97:17 98:6 114:11
117:24 125:15,18
125:24 128:3
130:20 134:12
137:13,15,16
138:19 143:1,3
144:9,17 150:13
150:16 151:11
161:18 162:6
167:16,22 168:8
179:14,18 180:20
180:23 182:12
183:1 184:4
188:17 195:22
200:9,10,10
206:24 249:14,16
249:20 251:3
253:2,22,25
254:17,22 255:1
255:12,13,19
256:13 257:2,12
258:7,25 259:8
260:7,16 266:1
272:2,23 273:1,1
273:9,11,24 274:6
275:7,15,19 276:7
277:2,3,8 296:2,3
296:6,11 297:10
297:14 298:12
300:18 302:25
303:1 304:4
**released** 21:15
22:3,15,18 23:4,5
23:7 24:9,12,14
27:1,3,3,21 28:6
28:13,13 29:2,3
29:19,20,24 30:6

30:10,13 32:12
45:10 56:7 60:10
61:5 62:2 63:1,5
69:9,10 74:8 80:8
81:4 86:10 87:13
88:15 89:14
138:11 139:6,7,8
139:11,17,21
142:7,11 144:21
145:9,10 174:19
247:5,9 268:25
275:22
**releasees** 21:25
61:13 63:2
**releases** 20:5
26:22,24 27:8
28:8,12,20 29:24
30:7 34:19 36:8
37:22 39:12 41:15
43:5 56:5,10,15
56:16,23 57:2
59:13 60:1,14,17
60:21 61:1,8
63:16 64:23 65:7
65:9,18,19 66:10
66:15,20,22 67:1
67:9 69:3,9,20,23
70:6,24 71:1,4,10
72:4,8,13 76:5,22
79:11,16 83:18
84:4,8,11,16,25
85:11,23 86:24
87:12,14,17,22
88:21 89:4,11,13
90:7,20,25 91:6
91:10,17,19,23
92:5 95:16 101:7
101:8 107:23,25
108:6,8 110:3,6,8
113:20 114:1,9
120:10,14 123:2
124:4 126:8,11
127:2,4,10 129:2

131:5 136:6 139:4
139:5,9,25 140:24
141:1,24 142:4
143:12 144:4,8
145:17,20 146:8
149:15 154:14
161:8 162:8,13
166:17 181:7
183:5,10 187:22
188:6 189:16,18
190:1,6,14,17
196:1,23 197:22
198:20 205:4,8,10
205:22 209:11,21
212:15,18 213:15
246:25 247:12
255:21 264:21
265:3 268:19
271:5 272:16
273:12 275:2,3,4
275:6 276:1
277:25 297:6
**releasing** 22:3
27:2 124:10 138:8
139:7,11 147:24
276:8,10
**relegates** 230:25
**relevance** 243:12
244:10
**relevant** 52:17
68:13 70:9 175:22
213:12,13,14
222:6,8 223:5
244:18 245:2
287:20,23
**reliable** 135:8
**reliance** 173:9
**relief** 24:3 97:10
109:25 110:12
143:18 189:2,6
199:11,19,21
235:16,20 238:13
252:23 261:1

274:24 304:6
**relies** 175:2
**relieved** 160:15
174:12
**relinquish** 137:7
**relinquished**
100:2
**rely** 74:13 78:8
127:1 133:7
254:24
**relying** 143:21
208:22
**remain** 113:19
**remainder** 70:19
**remaining** 42:9
302:19 304:3
**remains** 19:25
58:10
**remarkable** 41:17
94:10
**remarkably** 41:21
**remarks** 92:25
93:4 101:12,16
130:13 149:18
**remember** 68:14
112:20 117:16
**remembers**
289:18
**remind** 121:21
288:2
**remotely** 74:3
**removal** 45:23
76:12 95:12
197:15,20,21
277:19
**remove** 20:17
76:14 170:8
277:24
**removed** 22:16,20
27:12,18 33:17
34:7 77:17 98:13
105:6

**rename** 122:16
**rendel** 12:18
**render** 89:20
249:17
**renders** 218:14
**reneged** 105:12
154:2
**reopen** 107:10
**reorder** 142:22
**reorders** 142:21
**reorganization**
2:2 65:15 67:2
69:5,8 76:16
83:15 89:7,12,15
181:9 238:22
257:7
**reorganized** 66:4
**repay** 109:19
**repeat** 101:3
102:6 111:12
118:13 157:22
188:13 218:23
290:2 291:14
**repeated** 62:16
101:19 240:7
244:24 245:14
**repeatedly** 64:21
116:6 136:15
203:23
**repetitive** 15:14
**replace** 228:8
**replaced** 30:11
46:21 238:14
**replacement**
228:19
**reply** 136:20
146:12
**report** 68:20,21
82:1 119:11,14,20
280:16,17,20
288:14 294:12
**reported** 119:1
190:7

**reporter** 121:12
134:23 196:22
**reports** 42:17
64:10 82:1 244:1
295:4
**repository** 45:6
45:14 82:13 96:12
96:16,20 97:2
111:11 204:1,4,15
290:2
**represent** 26:6
58:16 59:15
116:16 118:16
146:10 201:9
249:2 298:7
**representative**
60:20 139:3
**representatives**
16:23 36:16 41:5
60:19 61:10 62:9
63:11 82:25
131:14 247:7,8
**represented** 93:15
207:3 239:20
**representing**
17:10 128:16
186:10 245:19
**represents** 96:6
115:23
**request** 175:12
200:20
**requested** 58:19
73:5
**requesting** 24:20
46:5
**require** 47:1
145:8 169:23
250:16 277:23
302:21
**required** 80:1
94:12 109:9 134:6
136:3 250:11
277:23 281:20,23

**requirements**
109:5
**requires** 29:10
59:10 109:14
129:9 151:1,4
275:8
**requiring** 183:11
213:4
**res** 249:16
**resembles** 209:1
**reservation** 26:14
**reserve** 25:7
26:12 302:10
**reserved** 25:17
35:25
**reserves** 116:7
**reserving** 26:10
**resharing** 15:24
**residual** 16:19
**resolution** 38:10
40:5,8,10,12,14
40:16 43:23 58:9
67:17 73:17 93:22
95:7 99:23 100:12
100:16 105:12
116:3 150:25
151:19 206:11,13
206:14 208:2,12
214:6,15 301:24
**resolutions**
118:21 208:10
252:16,19
**resolve** 19:20
258:21
**resolved** 16:6,14
35:6,8 56:11 95:1
205:9
**resolves** 20:8
**resolving** 16:17
**resort** 66:18
**resource** 58:13
**resources** 49:1
240:1

**respect** 19:13,24
20:7 25:10,10,12
41:24 46:5 55:12
81:17,18 113:25
114:15 116:8
152:16 189:24,25
194:6 198:21
199:15 211:24
217:22 222:24
226:11 227:12,12
245:14 273:12
280:10 282:3,8
283:18 285:22
288:10 291:13
295:20 297:14
298:5 303:5
**respected** 55:5
151:5 227:11
**respectfully** 87:21
**respects** 150:17
**respond** 118:5
149:19 150:21
152:22 157:6
227:3,13 272:19
278:7 283:20
**response** 65:24
80:7 89:23 130:23
154:6 158:16,18
159:6 167:1
180:15,17 210:14
212:2 274:16
278:18,22 279:6,8
298:18
**responsibilities**
231:3,4,5
**responsibility**
125:16 282:25
**responsible** 45:19
205:15,23
**rest** 25:3 57:12
103:6 203:6
283:19 288:21

**restarting** 236:10
**restate** 204:20
**restrictions**
108:24 109:1
**restructure**
190:18
**restructuring**
190:16,19
**result** 27:10 44:17
82:12 90:11,13
104:15,18 120:2
129:3 182:11
191:2 195:25
212:18,22,24
213:20 215:15
234:20 240:16
266:20 270:16
**resulted** 88:5
103:24 107:14
119:2,11,18,24
**resulting** 75:14
**results** 47:17
213:13
**resumed** 122:23
**retain** 21:1,10
99:14 135:16
**reticulated** 46:2
**retract** 283:23
**return** 167:16
195:9 201:3
**returned** 200:21
**returns** 214:19
**reveal** 45:15
**revealed** 212:5
**revenge** 112:25
**revenue** 107:22
**reversal** 173:21
**reversed** 78:10
173:14,17 187:14
187:17
**reversing** 45:22
174:24

**review** 37:2
242:17
**reviewed** 258:17
281:16
**reviewing** 19:6
54:20
**revise** 277:24
**revised** 28:5
**revisions** 19:15,17
19:18,22 20:2
26:21 27:8 28:2
30:16,19 34:6
35:5,11 114:10
**revisit** 26:23
34:25 37:4 99:15
**reviving** 207:7
**rewards** 117:25
191:22
**rhetoric** 215:11
215:16
**rhetorical** 53:24
117:8
**rhode** 62:3 149:7
186:14
**ricarte** 12:19
**rice** 12:20
**richard** 13:11,12
138:14 145:12
159:7 224:19
242:1 243:21
244:19 259:14
293:1
**rico** 51:25 54:11
**rid** 140:20 185:19
191:4
**ride** 176:23
**right** 24:10,24
25:22 26:3,13,18
31:17 32:7,12,16
32:18,18 33:5,7,8
35:9 41:19 53:18
59:24 60:13 68:22
69:17 107:10

113:17 116:21
118:7 123:22
125:25 130:8
132:22 133:7,19
138:23 140:3,7,13
142:8 144:12
154:12,12,16,16
155:11,16 156:7
157:4 158:2,21
159:15,24 160:14
161:8,8 163:24
165:12,16 166:11
168:2 171:10
172:11,13 173:19
178:8,14 180:18
184:1,11 185:15
187:11 193:10,10
194:9 200:19
201:19,20,24
202:11 203:16
204:11,14,22
208:19 211:3,10
213:10,19,23
215:12 217:3,10
221:17,22 226:1
226:14,15 228:21
229:4 230:17
231:2 232:12,22
233:10 234:16
235:1,3,6,13,15
235:18 237:3,11
237:16 238:7
239:10,24 240:25
241:4,10,16
242:10,22 243:4
245:1,10 246:12
247:2 248:22,24
250:3 252:2,10,12
252:14,16 259:13
266:2,15,16,18,25
267:8 269:11,17
269:23 271:13
274:13 282:1

283:4 285:21
288:25 289:17
298:15,21 299:20
300:1 301:13
302:10,13,16
**rightful** 142:22
**rights** 21:1,2,4,11
22:6 25:7,13,17
25:18 26:15 46:5
90:14 117:1
142:23 148:3,12
151:6 152:8 166:9
249:7,8,14,25
256:5 266:22
267:1 290:4
300:17 302:4
**rigid** 187:7
**rigor** 156:16,24
157:1
**rigorous** 155:5
157:20
**rigors** 154:24
155:6
**ringer** 12:21
**ringing** 225:21
**rip** 290:8
**rise** 21:13
**risk** 48:22 78:19
78:20 114:9
164:12,16,21
178:22 192:23
255:1 281:24
286:11 292:12,16
292:19 293:15,16
303:4
**risks** 117:25
161:21,22 178:25
191:21 193:1
303:19
**road** 49:17 188:10
305:21
**robert** 1:22 9:11

**robertson** 12:22
**robinson** 7:20
238:17 248:5,6,16
248:20
**rock** 187:5 218:25
**rocket** 187:18,25
188:3
**rogatory** 282:18
**role** 37:10 97:12
99:23 136:10
157:3 175:16
220:17,18 222:18
223:16,24 224:1
224:21 239:21
**room** 1:13 16:5
36:24 128:14
235:25
**rose** 31:11 82:10
281:13
**rosen** 12:23
**rosenbaum** 12:24
**rothfein** 16:4
**rothstein** 12:25
**roughly** 68:4
70:14 131:15
251:9
**roundabout**
204:25
**route** 295:8
**roxana** 7:24
**royal** 134:7
263:22
**rubinstein** 13:1
**rudnick** 93:1
**rule** 34:8 123:1
153:16,17,20
157:24 164:25
189:12,15,17,19
189:23 197:3
198:17 209:20
214:6 280:16
291:18,21

**ruled** 74:23 243:6
**rules** 121:7
145:24 197:5,7
**ruling** 262:5
**rulings** 244:10
**run** 33:16,21
169:8 254:25
**rundlet** 13:2
**running** 141:20
196:13
**russell** 13:3
**ruth** 11:11
**ryan** 13:4,18 14:9

**s**

**s** 3:1 7:23 9:9 10:2
10:6,18 11:1,17
12:25 14:20 15:1
**s.d.n.y.** 170:11
265:19
**sacker** 105:17
261:18
**sackers** 98:4
**sackler** 24:4 31:10
32:3 33:16 40:22
41:14 45:23 46:1
46:4,17 50:17,19
59:6 60:9 66:7
67:11 68:15,20
80:4 82:4,6,8
85:25 86:10 87:18
88:14 94:1,14
95:4,22 96:23
97:7,12 98:15,17
98:20 99:3,12,19
102:22 105:6,15
106:14 108:6,7,23
109:8 119:19
124:11,15,16,24
125:13,13,17,25
126:1,3,8 128:25
129:4,7,14,15,19
131:4 132:15
133:4,11 134:4,7

134:10,11,14,18
134:19 135:2,4,7
135:14,21,23
136:1,10,19 137:1
138:9,9,14 139:24
139:25 144:22
145:12 146:5
148:4,8,17 157:2
157:22 159:7,7,10
159:12 160:24
175:14 176:15
177:13 188:21
203:6,7 215:1
217:13 219:7
224:19 226:4,24
234:14 236:4
243:9,10,23
244:19 259:7,14
259:16 260:11
262:22 263:1
273:21 274:6
280:24 294:12
300:5,16
**sackler's** 30:9
242:1 243:21
303:20
**sacklers** 20:21
22:1 28:20 30:8
30:12 38:18 48:2
48:9 49:2,19,24
50:1,10,12,21
55:16 56:13,18,23
57:6,9,19,24
58:11,20 59:5,14
59:24 62:17 63:12
63:19,24 65:17
77:5 80:10 81:12
81:14,19 82:2,9
83:2 86:25 87:6
96:11 98:3 99:14
105:4,24 106:16
106:24 107:4,20
108:3,20 109:9,19

109:22 110:19
115:16 117:20
118:2 124:19
125:3,6,6,8,8,10
125:12 126:4
130:19 131:10
132:14 140:3,7
141:10,19 150:25
151:10 152:2,10
154:14 157:8
160:9 161:4 163:9
163:11 164:10,18
164:23 166:16
167:10 168:13
169:8,21 177:3
178:16,22 187:22
188:7 189:8
190:21,25 191:2
193:3 200:3 204:6
206:13 207:2
208:4 212:17
215:6,7,10,11,21
215:25 216:22
217:6,6 218:11,14
219:14,17 220:9
220:10,13,17,21
220:24 222:9,18
223:10,16,24
224:13 230:12
231:12,22 233:8
234:14,25 235:6,8
237:5 239:9,13,19
239:24 240:5
244:12 247:1
249:8,9,15 250:1
250:3,5,9,13,13
254:21 255:12,16
259:21,25 260:16
262:21 264:13,23
265:1 266:24
268:3,25 274:10
280:11,14 281:8
281:10,20,23

282:9 284:21
286:24 287:23
288:17,19 289:5
291:6 292:11,16
293:5,15 294:13
294:22 303:18
304:12
**sacklers'** 129:24
130:12,17,18
132:21
**saclker** 287:2,11
**sad** 112:4
**safe** 104:4
**safeguard** 144:19
**safeguards**
249:21
**safely** 277:21
**safest** 298:6,9
**safety** 255:7
**saint** 7:10
**sale** 80:6 109:8,15
109:17,18 134:11
141:2 234:18,21
237:8 254:4
**sales** 36:16 109:12
176:1 224:14
225:13,17 242:18
243:14,25 247:8
**salesperson**
176:23
**salient** 219:13
**salwen** 13:5
**sam** 9:15
**samuel** 10:20
**sara** 8:9 14:2
**satisfactory** 214:4
214:6
**satisfied** 64:1 92:1
92:2,3 189:19
276:2 284:8 285:8
**satisfy** 46:25
83:24 169:8

**saturday** 34:15
**saval** 13:6
**save** 17:14 39:3
48:21
**saving** 45:21
**saw** 87:17 165:10
237:13 241:15
**saying** 134:3,24
139:4 158:7 165:3
177:20 187:24
191:12 193:7
194:14 197:9
204:13,20 207:5
207:10,11,12,23
231:21,23,24
240:23,23 286:14
293:25 300:7
**says** 21:9,13 24:14
31:15 33:1 80:9
86:7 126:24 150:3
160:12 164:3,25
165:21 167:4
171:24 193:16
285:18
**scale** 200:16
**scarcely** 207:19
**scathing** 107:22
107:24
**scenario** 38:14
47:10,19 49:5
57:21 65:21
151:16 155:9,13
**scenarios** 47:18
**schedule** 20:18
22:17,20 97:21
246:8 256:11
**schedules** 138:17
138:17 157:16
**scheme** 125:1
148:2,5
**schinfeld** 13:7
**schlecker** 13:8

**schmidt** 13:9
**school** 51:18
**schools** 40:6
294:19
**schwartzberg**
6:14 123:5,7,8,10
123:15,16,20,23
127:7,9,14,20
128:8,15,19,24
129:21 130:1,6,9
130:10,24 131:17
131:24 132:3,5,13
132:19,23 133:2,9
133:15,20 134:1,3
134:22,25 137:25
138:5 140:5,8,11
140:14,15,16
141:13,22 142:2
142:10,15 144:13
144:16 145:3,6
146:17,23 147:4,9
147:12,16,22
**scope** 28:3 30:7
89:20 111:10
126:17,19 140:23
205:5 207:24
271:5 275:6,15
**scores** 41:16
**scott** 3:8 9:25
**scourge** 79:14
**scrap** 283:22
**screen** 122:13
**scrutiny** 80:15
81:7
**se** 119:15
**seamus** 209:1
**sean** 112:8,9
**seattle** 7:18 52:11
73:21,22 152:6
285:16
**second** 18:6 27:2
41:22 42:24 46:23
53:6 65:6,11

66:13,21 69:2
70:22 71:1 72:7
72:10,17 84:5
97:14 101:13,21
105:14 108:20
109:1,4,7 110:22
111:10 127:2
137:18 143:15,19
144:17 148:18
150:12 156:17
167:12 168:8
169:8,18 183:4
207:1 225:5,8
249:18 250:14,18
253:17 257:14
258:14 259:2
263:13,19 274:19
277:12
**secondly**  260:21
303:1
**seconds**  17:21
210:11 298:25
**secret**  134:8
**section**  21:7,11
22:6 23:8 24:14
29:9,25 34:1,8
44:14 65:1 71:18
75:2,4 76:7,9
88:22,22 90:22
95:7 115:14
126:13,14,17,20
126:21,21 127:15
138:15 139:14
142:19 143:18,21
145:24 166:6,7,8
183:24 225:12
275:3 297:18
**sections**  27:17,20
182:5
**secure**  250:15
**see**  19:4 22:21
27:12 37:17 44:14
71:6 73:19 92:20

100:8,24 110:1
114:12 115:19
116:15 117:15
121:15 123:5
130:25 152:19
156:14 162:18
165:1 168:9
174:13 177:6
178:2 181:18,19
182:19,21 184:24
201:2 209:24
228:10 229:2
231:8,12 241:2
262:5,10 266:11
277:9 294:25
298:16,21 303:14
304:14
**seeing**  62:17
234:6
**seek**  21:4 48:4
72:24 74:11 75:19
79:3 161:23
230:11 231:16,25
232:1,3 233:14
236:9
**seeking**  46:4
48:11,13 72:25
75:8 124:23 131:5
131:5 199:11
222:1 229:16
232:6,14 233:4
235:20,22 249:25
**seen**  15:20 81:19
207:23
**sees**  186:20
**segment**  94:24
**seize**  39:6
**selected**  111:23
**selection**  55:7
**sell**  109:10 137:6
149:25 290:11
**send**  61:22 62:7

**sends**  155:23
**sense**  50:16
156:10 196:10
247:21
**sent**  207:16 246:3
294:25
**separate**  29:4
61:7,15 68:23
90:4,6 108:17
230:5 272:14
296:9
**separately**  236:16
**september**  119:1
225:15
**series**  219:5
**serious**  178:9
212:1
**servants**  205:16
283:9
**serve**  50:13 80:8
157:14
**served**  88:4 112:7
163:9 234:15
239:14
**serves**  95:13
**service**  250:6,11
250:17
**services**  118:23
228:18 241:19
**serving**  224:17
236:1
**set**  28:14 41:4
43:13 48:13 65:3
69:9 83:17 88:9
90:8,16 95:7
98:23 100:1
117:10,16,17
121:7 132:16
144:7 159:9,17
160:16 163:3
165:9 200:12
217:12 231:3,5
244:14 253:20,24

258:14 276:17
280:19 296:25
297:17
**seth**  13:7
**sets**  39:18 85:17
163:13 199:24
241:20,23
**setting**  130:16
**settle**  17:19 84:1
201:6,12 288:8
292:19
**settled**  18:10
26:16 61:1 102:20
283:4
**settlement**  16:6,7
17:17 18:13 19:7
20:7 21:6,22 22:9
38:6 40:20 41:14
44:12,18 46:7,13
51:4 54:21,22
57:24 61:3 62:19
62:20 64:12 66:7
68:9 69:24 80:4
81:18 94:11,14,16
94:18,24 95:3,4
95:16 96:7,8,20
96:21 98:6,12,15
98:15 99:1,2,13
99:16,20 100:13
101:16 104:5
105:4 106:23
108:2,7 109:2,13
109:13 110:24
120:4,5,11,16
145:20 149:23
150:2,4 152:17
154:5 158:12
161:6,21 162:5,11
162:23 163:2
164:2,6 174:11
175:13,14 177:2
177:14 183:13
189:24 191:11

193:2 201:14,17
201:23 202:11,13
203:1,3,4,5,5,19
203:23 216:22
219:7 220:22
221:15,17 227:5,8
227:19 231:9
232:6 237:21
240:15 244:22
245:4 248:9,12,18
252:2 253:19,20
253:24 259:19
262:7,13 265:4,20
267:9 271:10
273:21 274:7
275:17 285:11
286:12 287:22
290:13 298:8
301:22 303:15
**settlement's** 43:7
**settlements** 39:11
39:18 41:2,4 43:9
46:15 52:4 59:18
60:14,16 61:7
63:5 95:11 101:12
103:24 104:6,15
105:7 106:7
107:10,11 109:4
123:1 137:5
171:23 189:17
238:7 247:5 283:6
**settles** 186:24
**settling** 21:23,24
22:2 23:6 97:23
167:15 173:5
**seven** 39:15 54:21
54:25 109:11
239:4 287:5
**seventh** 2:2 48:23
140:17,20 183:4
241:18,20
**severely** 182:14

**shame** 208:13
**shannon** 9:1
11:22
**shape** 141:20
**share** 24:20 57:15
75:13 237:15
292:15
**shared** 69:11
**shareholder**
20:21 22:2 24:5
27:3 28:6,12,13
29:2,3,20,24 30:6
31:25 40:20 46:13
67:18,25 68:9
69:10 85:1 86:13
87:12,14,23 90:9
139:9 143:1,3
144:21 161:6
175:17 296:3,6,11
**shareholders** 80:3
86:7,9 275:20
**sharing** 58:4
**shaw** 4:15
**sheets** 104:9
**shelley** 55:7
**shepherd** 13:10
**shield** 260:2,12
286:13
**shielded** 81:6
**shielding** 161:1
**ship** 187:18,25
**shira** 14:12
**shirt** 281:6
**shock** 60:8
**shocking** 212:5
**shockingly** 42:20
**shore** 3:19 13:11
113:10,12,14,16
118:4 290:16
**shore's** 284:16
**short** 98:8 191:6
246:1,1 250:3

**shorter** 27:18
86:16
**shorthand** 50:10
**shortly** 122:19
188:20
**shouldn't** 148:18
**show** 134:6
210:18 220:17
245:16 279:12
**showed** 205:2
**showing** 29:13
277:7
**shown** 176:22
192:15 297:23
**shows** 61:24 95:10
115:22 163:12
189:7 198:21
242:25 243:8,24
286:17 290:21
291:9
**shred** 66:1 92:4
**shut** 97:10
**sic** 204:10
**side** 19:2 28:5
39:21 41:12 60:9
68:16,17,20,21
92:4 93:2,2 98:21
151:12 163:13,13
163:25 178:25
208:8 224:4
262:12 275:20
280:23,24
**sides** 22:4 55:4
192:23 303:4,17
**siegel** 126:19
143:17
**sight** 38:21 51:20
190:23
**sign** 37:25
**signed** 138:16
282:4
**significance**
210:15

**significant** 48:21
67:19 69:12
201:16 218:15
219:24 221:8
302:20
**significantly**
131:11
**signs** 176:20
238:11
**silbert** 13:12
**silenced** 108:9
**silentio** 293:25
**silicon** 91:15
**silverstein** 180:25
**similar** 32:17 46:6
46:24 248:18
265:15
**similarly** 91:4
98:1
**simmonds** 13:13
**simple** 17:14
20:11 26:14 50:6
66:5 85:14 87:16
163:7 212:10
213:1 276:17
**simpler** 262:18,19
**simplest** 27:8
**simplified** 21:9
30:9 41:1
**simply** 32:4 66:4
66:8 72:2 78:14
97:17,19 103:6
126:23 135:7
146:8 151:18
179:13 181:5
192:8,13 194:14
198:15 209:3
210:19 216:3,24
219:19 220:3
224:2 227:6,15
268:3 269:1,25
287:9 295:22
299:6

sincerely 111:5
sing 260:12
singer 13:14,15
single 41:18,20
  51:10,11 60:12,16
  68:15 71:21,22
  73:17 74:3 78:9
  84:7,7 195:8
  278:24 284:10
singularly 56:12
sir 33:7
sit 18:25
sitting 56:3
  119:22,22
situated 98:1
situation 63:1
  125:11 136:4
  199:25 200:5
  209:2 284:10
situations 205:18
six 41:25 50:17
  56:4 58:15,21
  104:8 181:21
  241:7 275:17
  277:1
sixth 48:15 183:5
size 115:19 163:20
sizes 192:14
skapof 13:16
skeptical 176:6
sketched 205:11
skip 221:1
skipping 279:25
skorostensky
  13:17
slate 195:22
slaugh 13:18
slice 256:8
sliced 199:13
slightly 204:24
slow 142:1
slower 134:23

smaller 32:19
smith 269:17
smith's 269:15
snap 90:15
social 88:5
society 45:14
sole 19:24 127:1
solely 110:7
  268:11
solicitation
  138:13
solution 43:12
  205:23
solutions 305:20
solve 293:9
solved 58:12,14
  63:21 167:21
solvency 50:2
somebody 35:7
  54:9 165:2 231:11
  255:11 256:20
someone's 183:14
someone's 138:23
somewhat 42:9
  108:12 220:7
  266:5
son 112:8,12
sons 111:24
sonto 278:12
sonya 2:25 305:3
  305:8
soon 39:1 122:19
sophisticated 55:3
sorokin 13:19
sorry 23:3 31:23
  123:14 127:7
  138:17 141:25
  164:19 199:3
  202:16 210:4
  215:13,19 216:1
  219:3 221:13
  224:24 225:4
  241:12 265:4

276:3,23 281:4
  295:18 302:2
sort 15:7 40:24
  66:12 99:25 183:1
  198:14 230:24
  244:11 280:7
  285:22
sorted 297:8
sorts 25:20
sought 106:23
  139:14 189:6,8
  199:19,21 237:4
sound 77:9
sounds 121:6
  122:1 191:9
  213:18
source 263:12
sources 169:21
southern 1:2
  196:21
sovereign 73:7
  150:23 165:12
  187:22 188:6
  193:1,8 196:1
  249:8 265:7
  266:21 268:24
  297:16,19,19,23
  302:11
sovereignism
  291:13
sovereigns 74:10
  291:24
sovereignty 77:13
  151:4 291:14
space 237:7
spades 293:13
spanning 280:23
spared 94:25
speak 121:11,23
  123:5 131:15
  156:10 275:11
  287:1 288:15

speaking 52:23
  120:8 121:10,13
  122:15,16 132:2
  166:6 227:15
  304:12
speaks 286:11
special 78:5 197:4
  197:24 211:8
  270:13 281:15
  283:3 287:5
  292:14
specific 53:23
  95:17 110:13
  111:4 223:19
  228:12 229:9
  283:16
specifically 44:5
  70:12 71:17 81:17
  197:12,17 198:17
  210:13 227:13
  229:18 236:24
  281:4,6
specified 108:21
  139:12
specifies 126:17
specter 47:3
speculate 60:22
speculation 49:4
speechify 304:10
speed 36:9
spelled 66:10
spend 44:4 72:14
  98:8 116:25
  196:10 237:13
  248:11
spending 44:22
  116:24 237:16
  303:22
spent 49:1 55:15
  196:8 208:21
  216:20 221:3
  238:20 293:18
  304:1

spillover  44:21
  45:1
split  39:20
splits  46:19,20,20
  46:21 53:20
splitting  37:20
  38:1
spoiling  216:11
spoke  96:15
  131:15
spot  228:15
spouses  50:19
spouting  49:4
springer  13:20
spun  60:21
spv  170:20
squander  39:6
square  5:3
squeeze  174:15
st  275:12,14 276:8
  276:9
stacy  8:21
stage  95:8 229:13
stakeholder  52:24
stakeholders
  18:17 39:14 43:14
  59:16 146:7
stance  266:6
stand  44:25 59:15
  77:14 107:1,5
  151:16 171:24
  286:4 293:5 294:4
standard  27:20
  68:10 150:3
  169:14 181:12
  209:10 238:15
  241:16,16,17,20
  241:23 242:8
  257:6,11 277:12
  277:18
standards  188:22
  189:15,15 258:12

standing  153:23
standpoint  230:21
stands  171:25
start  15:23 45:6
  113:2,2,3 122:19
  203:22 220:20
started  102:1
  187:3
starting  111:25
  291:15
state  5:17 6:17 7:2
  7:8,9,16 33:19
  36:3 38:16 44:11
  44:13,14,16,17,19
  49:2 52:2 53:14
  53:23,24,24 58:5
  61:6 65:19 73:12
  73:13,17,20 75:22
  75:25 77:25 78:4
  78:6 83:9 99:13
  105:22 111:5
  114:15 115:24
  116:7,9,13,13,15
  119:3,25 121:22
  126:10 143:24
  149:3,5,23 150:2
  151:14 152:6,24
  153:24 154:1,13
  159:25 164:18,19
  164:19 165:24
  168:12,15 185:3,6
  185:7,8,16 193:16
  196:24 199:16,17
  200:25 201:6,9,9
  201:11,16,18
  202:5 203:16
  209:12 211:2
  212:7 217:17
  219:5 220:2,7
  221:11 225:19
  226:17 228:16
  229:5,7 232:24
  233:11 234:10

237:5,9 238:2
  246:8 248:10,11
  255:9 256:19
  264:25 269:2
  271:18,18 282:21
  282:22 283:7
  284:11,16 285:25
  297:21
state's  76:14
  77:12 78:13 199:1
  218:4 229:23
  233:14 239:18
stated  105:1 195:4
statement  32:2
  50:4 54:13 84:19
  107:22 108:3
  114:25 123:3
  129:22 130:2,7
  138:18 218:17
  219:7,17 223:5
  275:21 285:10
statements  31:12
  105:23 131:14
  144:3 220:10
  221:7 223:7
states  1:1,11 4:16
  6:9 17:13 23:11
  27:5 33:24 34:20
  35:24 40:3,9,16
  40:17,25 41:1
  42:23 46:16,17
  48:4,5 51:19,21
  51:24 52:4,10,12
  52:13,25 53:2,9
  53:16,17,22 56:12
  57:1,2,13,14,22
  58:1,20 60:25
  62:13 68:8 70:14
  70:20 72:18,20,24
  73:3,6,6 74:1,6,9
  74:17 75:2,8,13
  75:14,25 76:17
  77:8,11,23 78:8

79:3,10,12 80:7
  80:16 81:3 82:5
  82:18,22,25 83:3
  88:18 89:23 92:23
  93:14 94:19,20,22
  95:18,23 96:3
  97:18 98:6 99:6,6
  99:10,15 101:14
  102:5 103:5,9,20
  104:22 105:2,8,15
  105:20 106:4
  112:23 116:24
  117:6 118:18
  120:18 123:4,24
  126:7 133:21
  136:22 143:6
  145:23 150:23
  151:3,5,12,20
  152:24 153:3,12
  153:14 155:10
  156:11,12 165:10
  165:16 168:16
  170:15 176:11,20
  177:11 183:24
  184:6 186:10
  187:23 188:6,12
  188:19,24 191:1,2
  191:3 193:1,8,18
  194:1,4 196:1
  201:2 202:6
  203:9 205:14,17
  205:22 208:12
  209:4,22 211:7,13
  224:20 227:7,11
  227:14 229:8
  232:25 237:18
  238:2,16,19 239:3
  241:18 243:16
  244:11 245:25
  246:12 248:18
  249:2,8,10,14,25
  250:8 251:19
  264:22 265:7,10

266:11,22 267:4
268:25 269:3,23
271:6 282:23
283:2 284:23
285:15 287:14,19
287:24 288:6,15
288:21 289:22
290:16 291:4,21
291:24 303:18
304:4,12
**states'** 103:3
**state's** 117:2
153:11 168:9
**stating** 54:1,4
303:21
**status** 73:7 231:1
**statute** 77:18,20
184:23 185:15
197:4,16 230:14
237:18,20 238:10
238:12,18 283:5
283:16
**statutes** 31:5 50:2
229:22,23 230:4
230:19 233:16
238:3,5 256:19
**statutory** 74:17
77:15 88:22 90:18
91:2,2 123:12,25
125:1 148:2,6
198:5 291:17
**stay** 34:7 72:21
74:19,21 75:5
187:7,9 197:4,14
208:8
**stayed** 22:24
176:12 280:8
**staying** 299:17
**stays** 74:22
**steege** 4:13 24:1,1
24:8,19,22,25
25:12,21,25

**steel** 13:21
**step** 36:17 79:7
93:22 100:16
110:13,17 248:21
274:18
**stephanie** 9:5
**stephen** 12:11
**stepped** 17:20
**stern** 88:23 92:3
143:22 269:4,9
275:14
**steven** 10:21
14:18
**stewards** 15:24
**stewardship**
190:25 220:24
**stick** 52:13 288:12
**stipulation** 218:4
226:5 276:17,20
281:18,20,24
299:10,14,19,21
**stipulations** 108:9
**stodola** 13:22
**stomp** 290:8
**stomped** 289:6
**stone** 55:19
**stood** 173:16
**stool** 98:13
**stop** 45:15 106:18
113:1 126:25
129:16 140:2
141:7 144:11
151:22 187:25
211:14,15 218:21
231:19 235:14
240:12 247:20
**stopped** 58:15
62:12 79:22
200:15 235:22,23
236:1,1,6
**stopping** 235:11
235:13 236:5

**stops** 212:3
235:17
**stories** 88:6
**story** 112:6,15,17
293:6
**strauss** 5:8 101:1
**straying** 283:22
295:12
**streamline** 27:14
**street** 1:13 4:10
4:17 6:4,11,18
86:3 147:15
**strength** 286:12
**stressed** 105:15
**strict** 36:23
**strictly** 30:12
**strike** 29:9
**strikes** 148:3
**striking** 168:7
**string** 173:3
**stringent** 108:24
**strips** 249:7
**strong** 49:23
105:18 154:22
196:3 206:7
**stronger** 163:14
286:1
**strongly** 120:21
170:13 278:21
**strouss** 170:12
**structure** 44:10
66:5 97:24 98:7
160:13,17
**structured** 61:2
189:12
**structuring**
268:15
**struggling** 103:16
**stuart** 16:17
**stuck** 190:3
**stuff** 291:23
**sub** 293:24

**subcontractors**
36:17
**subdivisions** 73:9
**subject** 15:7 18:23
33:2 43:20 44:16
79:23 89:1 90:2
90:17 92:1 104:7
134:5 137:20
148:9 149:13
168:4 174:18
190:6 224:6 249:4
253:12 254:6
257:22 264:7,18
265:8 267:20,24
268:14,17 271:15
271:21 272:9
273:24 297:2
298:10,11 302:6
**submit** 87:21
190:16 205:13,20
206:18 208:12,18
209:17 211:11
212:15 214:10
220:3 222:7,21
223:3
**submitted** 47:19
69:14 154:22
218:8 219:4
280:22
**submitting** 66:1
**subordinate** 48:4
**subparts** 281:22
**subprime** 78:12
**subsection** 23:6
29:2
**subsequent**
174:10 283:16
**subsequently**
172:25 238:6
242:5
**subset** 60:20
**subsets** 62:6 212:7

subsidiaries   32:6
60:18 61:11 62:10
63:11
substance   181:6
182:17
substantial   16:10
17:25 45:18 60:19
67:10,12,13,24
68:1 93:7 96:7
97:8,22 100:12
106:1 145:8
158:24 159:1
176:11 178:1,21
190:21,22 192:5
192:17 194:16,24
195:4 258:3 259:3
264:11 292:16
substantiality
194:6,15
substantially   94:5
194:22 286:1
substantive   28:5,9
29:16 90:3 264:25
substantively
28:3
substantives
30:17
substitute   77:1
157:14 158:8
250:5
succeed   69:17
240:14,16 296:22
success   43:7 65:10
successful   58:2
234:7
successfully   59:19
119:23
succession   75:20
successor   251:1
successors   61:12
62:10
sue   50:13 59:14
125:25 138:23

206:4 250:3,13,13
sued   32:11 56:19
159:8 170:23
175:21 260:8,10
sues   125:19
suffered   38:8
suffice   72:7 286:8
sufficiency   193:6
sufficient   67:23
70:15 84:17,24
85:3 137:21
156:12 190:19
192:22 193:9,14
193:15,19 202:1
243:14 250:10
288:8
sufficiently   35:17
180:16 272:4
suggest   24:8 35:6
56:9 79:11 144:8
223:6 227:16
275:3
suggested   80:13
129:13 149:21
170:13 293:14
suggesting   68:11
74:3 195:25
216:12
suggestion   24:13
161:3 289:12
suggestions   90:21
236:17
suggests   206:2,17
225:17 292:11
suing   55:16 65:13
suit   235:17
suite   6:4,11 7:17
305:22
suited   224:5
suites   276:14
suits   29:9 48:11
77:5 78:4 154:21

sullivan   4:1 19:23
sum   68:2 91:19
100:11 191:11
summarize   219:4
summarizing
281:6
summary   84:23
summons   249:24
250:6,17
super   73:3 144:20
supermajority
151:7
supernova   59:23
superpriority
252:8 267:5
supervised   152:4
supplant   111:7
supplanting   111:4
supplement   93:7
111:7 228:17
supplemental
85:20,21 88:2
supply   43:19
48:22
support   16:7,19
17:25 38:25 42:12
50:5 51:4,9,22
52:25 58:18,21,23
59:22 62:21 63:23
66:2 67:23 68:9
68:10 70:8,10,14
70:15 74:20 78:5
80:20 82:23 102:3
102:7 113:5,7
116:11 122:25
146:7,18 147:7,7
172:23 183:5
194:23 203:3
223:4 285:17
294:21
supported   16:10
17:1 40:24 55:8
114:13 133:25

177:17 183:10
274:10 288:14
supporters
294:24
supporting   53:8
54:19 97:16
104:14 115:9
130:21 294:6
supportive   16:25
100:8
supports   51:12
66:9 69:20 72:2
78:13 100:19
117:21 212:8,12
294:3
suppose   173:22
239:23
supposed   33:5
57:15 81:3 87:13
107:13 191:21
193:5
supposedly   73:7
supreme   39:14
41:19 42:23 77:23
103:12 143:16
173:18 175:3
180:8 267:22
269:5
sure   19:1 22:22
23:17 24:21 25:16
26:14 30:22 31:5
87:24 113:16
121:2,11,21 122:4
122:12,12,14
134:23 137:10
141:8 150:10
153:20 155:17
156:21,22 157:12
167:2 171:4 187:3
192:1 198:10
204:6 210:6
223:11,18 235:4
261:12 276:6

278:11 285:7
299:18 300:1,18
**surely** 82:22
160:9
**surgery** 112:2
**surprise** 147:2
176:3 282:12
**surprising** 84:6
**survey** 238:2
**surveyed** 190:8
**survive** 98:13
216:21
**suspenders**
299:22
**sustainable** 45:19
**sustained** 72:3
117:9
**swallow** 274:8
**swallowing** 274:9
**swear** 288:18
**sweet** 191:5
**swingle** 13:23
**sword** 260:1,4,12
286:12
**swore** 44:7
**sworn** 42:16
54:14 57:11 59:16
64:9
**sympathetic**
254:12
**system** 74:10
122:10

**t**

**t** 10:5 13:3 305:1
305:1
**table** 116:10
131:12 303:17
**tad** 248:5
**tailor** 125:1
**take** 15:9 31:18
62:14 86:1 109:9
111:25 138:22
155:1 162:14

164:12,21 172:9
173:19 175:7,10
179:4 183:12,14
185:20 194:2
198:11 199:16
210:22 228:5
249:25 257:8
258:22 279:1,23
282:25 288:18
290:7 291:1,19
299:8
**takeaway** 190:5
**taken** 30:24,25
32:2 106:16 107:7
107:19,20 150:20
157:8,9,25 160:9
162:9 165:4 192:1
220:8 222:12
240:8 249:12
302:17
**takes** 70:19 95:19
173:20 200:7
249:14
**talk** 17:12 108:7
114:16 123:16
194:19,21 229:15
241:10 246:22
247:11 249:23
282:10 288:22
290:6 292:7
301:15
**talked** 195:4
210:4
**talking** 36:8 128:8
133:13 141:9,11
141:13 145:19,20
147:10,16,17,18
155:12 166:22
185:8 193:20
196:20 199:14,16
199:17 200:2,5
215:4 218:15
219:25 234:24,25

235:5,7 272:1
290:24 292:8
**talks** 281:9
**tanner** 184:10
**tap** 42:25 49:17
**tapestry** 39:16
41:8 277:20
**tapley** 13:24
**targeted** 278:18
**targeting** 225:13
**task** 38:9
**tax** 29:18 50:3
105:23 107:21
160:3,10,15
200:18,21,25
201:1
**taxes** 109:18
159:4 160:1,6,18
160:18
**tdp** 113:22
**team** 54:7 224:14
**technical** 37:23
295:10
**technically**
167:25 173:22
**tele** 1:12
**telephonic** 122:5
**telephonically** 3:8
3:9,10,11,19 4:6
4:13,20 5:6,14,21
6:7,14,21 7:6,13
7:22
**tell** 60:23 199:4
201:18 273:15
285:10 293:6
**telling** 174:6
193:4 201:24
202:3,4 224:7
285:1
**tells** 104:10
**ten** 60:13 62:12
133:11 206:16
270:18 292:5

295:6
**tendency** 112:24
**tends** 27:10
**tens** 39:18 45:6,7
47:14 48:8,12,13
55:18 58:11 59:14
63:9,9 82:14
117:3 157:18
284:24
**tensely** 55:2
**tenth** 183:6
194:12 258:1
**term** 21:23 24:12
28:25 30:16 33:18
36:18 104:8
284:13
**terms** 24:5 27:14
28:15 66:17 67:13
85:14,23 96:1
97:8 108:16
119:25 124:18
141:20 192:22
226:25 252:3
259:4,4 262:23
271:2,5,13,20
275:19 284:7
290:3
**terrible** 187:21
**terribly** 112:6
116:22 293:12
**terrific** 15:22
**territories** 118:19
**territory** 73:11
271:18
**test** 91:22 92:3
129:8 132:9
169:14 263:13,19
264:11
**testare** 169:9
**testified** 43:11
44:24 47:11 55:14
68:4 73:24 98:16
99:2,12,24 104:2

139:23 145:10
242:12,19 255:24
259:14 270:12
280:7,16,16,18
290:19
**testify** 261:10
**testimony** 42:2,6
42:11,19 45:11,12
55:12 66:11 79:20
96:14,16,22 98:5
98:11 99:17 100:7
124:1,1,18 125:12
129:18 134:6,16
138:6 140:25
151:9 163:12
175:23 208:4
223:25 243:21
254:20 270:11
293:25 295:4
303:20
**text** 87:12,22
129:9
**texts** 278:16
**thank** 15:22 19:13
23:13,23 26:3,18
26:20 34:1,14
35:18,20 36:5
37:1,12,14 92:7
92:21 93:5 100:21
113:8,10 118:7,10
120:23,24 122:19
132:3 148:23,25
149:4,17 186:1,9
187:2,10 210:10
211:18 219:23
226:3 227:2
228:21,22 229:4
248:3,4,20 249:1
253:15 257:20
275:10 278:2,3
281:6 295:17,18
298:20 299:2,25
301:3,24 302:15

304:13
**thanks** 19:12 26:4
54:17 186:7
228:24 301:2
**that's** 108:25
115:2 120:22
127:6,8,12 133:13
133:16 141:22
146:8 152:19
155:10,11 158:2
158:16,18 159:4
162:10,16 163:23
164:7 166:11
167:23
**theme** 277:18
**theodore** 14:17
**theories** 32:17
208:22 285:3
**theory** 57:5
207:22 284:3
285:13 287:21,23
**there's** 110:14
111:4 114:15
116:20 125:12
127:3,10,21 136:1
137:11 155:4,4,5
164:15 165:15,15
165:18,20 168:13
**they're** 105:25
106:3 109:10
125:21 126:2
136:7 142:11
144:23,24 153:2
157:18 162:22
163:4,12 165:3
167:15
**they've** 107:19,20
134:4 154:15
**thick** 55:12
**thing** 18:14 38:22
79:17 118:19
152:7 156:5,5
164:21 165:1

167:18,19 180:6
199:13 203:23
231:24,25 232:1
232:13,18,23
233:2 236:13
247:15 278:24
282:4 287:25
292:8 294:9 298:6
**things** 15:25 16:1
17:19 18:8,22
28:4 38:1 127:10
131:6 152:15
156:7 171:18
184:18 189:16
193:21 201:25
205:19 209:4
214:1 224:7
230:14 232:22
242:1,4 244:14
255:6 272:19
273:23 278:14,19
278:19 279:3,25
281:9 282:8 299:6
300:16
**think** 15:6 16:2
18:7,24 23:1,17
23:19 24:2,7,10
26:24 31:13,16
32:24,24 33:2,4,9
35:10,14,21 36:13
36:20,24 37:5
49:21 52:1 54:25
68:13 79:21 92:10
93:10 103:1 104:4
105:9 112:21
113:10,12 118:14
132:10 135:24
137:17,25 138:25
146:21 147:1,19
148:25 150:6,7
152:15,18 154:25
155:20 156:2,7,9
156:24 158:13,19

161:11,14 162:4
162:25 163:8,9
164:24 165:4,7,7
165:11 166:13
167:17,24 168:4
168:12 171:21
172:18 174:17
175:8,15,21,22
176:23 177:5,16
178:16,19,19,21
179:16,18 181:24
182:20 183:3,10
184:5,19 185:1
188:22 190:2
191:17,25 192:3
193:9,20 194:7,9
196:6 197:2 199:4
199:8 200:22
202:20 203:14,21
207:2 209:24
210:2,8 213:19
214:18 217:10
219:24 223:11,12
224:24 227:8
229:10,12,14
230:10,23 231:1,9
231:10,14,25
232:6,9,11,22
233:11,13 234:1,5
235:7,9,24 236:6
236:14 237:2,5,11
237:17 238:9,14
238:19,23,23
239:3,5,6,17
240:2,3,7,10,14
240:24 241:3,13
241:18,24 242:8
242:14,21,24
243:8,15,17,23
246:3,9,23 247:5
247:10,21,25
248:13 251:7,11
253:6 254:12,25

257:15,25 258:8
258:17,22 259:22
260:22 261:10
262:20 263:23
264:3 266:23
267:7,14 271:3,4
271:7 272:6,7,9
272:16,21,25
273:14,19,22
274:1,4,12,17,21
275:6,8,11 277:17
277:22 278:4,16
279:2,5,10,13,14
280:3,13 283:13
283:25 286:11,17
287:7 290:14
292:2,6,18 293:1
293:2 294:5
297:17,25 298:6,9
298:10,19 299:21
302:21 303:16
**thinking**  200:4
203:10
**thinks**  279:4
**third**  17:1 18:14
22:13,14,19 23:21
24:11,16 27:3
36:3,16 47:6
51:16 56:3,14,16
56:23 57:2 59:13
60:1 64:23 65:3,7
65:13,18,19 66:14
66:20,22 67:1,8
69:2,8,20,22,22
70:6,24 71:1,4,4
71:15,18 72:4,8
72:12 76:2,4,22
79:11,16 83:17,18
84:8,11,16 85:11
85:13,22 88:20
89:4,11 90:7,20
90:25 91:6,6,10
91:17,19 97:15

98:8 101:7,15,22
107:6 108:22
109:5,23 111:13
111:20 123:2
124:4 126:8
128:11 129:1
142:17,17 143:12
144:3,4,17 149:14
150:14,14,15
151:11 152:3
159:15 161:18
168:7,11 170:21
170:22 175:4
178:24 179:13
180:20,24 181:7
181:12 182:18,23
183:5,5 184:4,18
187:21 188:17
189:16,18,21
190:1 195:21
196:1,23 197:22
205:8,9,21 209:21
212:18 226:14,17
226:22 227:1
246:23,25 247:1
249:13 250:22,24
251:3 255:20
258:18 260:24
264:21 265:22
266:1,8 267:19
268:2,10,11,12,14
268:16 272:16
275:23 276:1,14
277:11 289:2
294:18 297:14
**thirds**  52:15
**thirty**  64:8 241:8
**thomas**  5:18 7:20
**thorough**  177:18
251:18
**thoroughly**  95:15
**thought**  24:2
33:20 37:20 41:10

131:6 162:17
173:17 174:14
179:19 186:3
201:1 216:2
223:21 232:17
273:7 291:10
302:3
**thoughts**  105:20
**thousand**  256:10
**thousands**  39:18
41:5 45:3,8 48:8,8
48:11 63:3,10
80:17,18 82:23,25
117:4 124:13
138:10 193:18
215:6
**thrashed**  206:1
**thread**  41:8
102:22 277:19
**threat**  97:25
174:20
**three**  15:25 20:5
33:13 50:17,24
51:23 55:5 59:8
63:23 95:16 96:23
101:13,16,20,25
103:19 106:12
108:18 111:24
112:13 113:19
114:24 115:11
126:8 163:10
168:6 175:19
244:5 246:18
249:4 275:16,18
275:18 276:12,25
276:25,25,25
277:8 288:19
289:19 292:11
293:3,6,14
**threw**  165:10
**throw**  104:25
**thumb's**  121:4

**thurmond**  13:25
**tie**  49:15
**tied**  51:3 258:24
**tier**  89:10 108:19
108:22,24 109:1,1
109:4,5
**tiers**  108:19
**tighten**  39:16
**tilt**  210:7
**time**  15:5,9,13
17:6 19:14 35:25
36:7 45:25 46:2
55:25 56:21 72:14
93:6 98:8 100:21
101:18 104:17
113:1,1 120:3
121:3,13,23
123:15 148:18
149:9 162:9
171:15 179:5
186:1 196:10
201:1 207:18
208:20 211:23
214:7 217:16
221:3 222:7 228:2
230:17 253:1
262:25 269:17
272:14 273:3,5
285:9 286:23
287:12 289:2
293:3,18,19 299:8
302:21 304:9,13
**times**  5:3 33:9
86:3,4 101:19
104:5 139:8 244:5
**tiny**  194:17
**tip**  293:4
**tirelessly**  252:21
**title**  89:6,9 264:21
264:24
**tmt**  37:22 39:15
41:18 64:10 150:3
150:8 189:13,20

189:23
tobacco  44:7,14
  248:18
toback  14:1
tobak  280:2
  294:10 295:9,18
  295:18,19 298:5
  298:16 300:7
today  86:4 101:24
  114:17 118:20,25
  120:8 130:12
  131:15 188:16
  229:9 236:25
  270:24 276:2
  284:16 285:3
  296:2
today's  277:19
today's  121:8
told  18:3 48:2
  61:22 160:24
  165:13 303:11
toll  146:3
tonight  304:6
tonnesen  14:2
tool  240:12
tools  182:4 207:20
tooth  125:19
top  44:2 96:22
topic  30:21 190:9
  201:5 300:9
topics  253:23
tornado  48:17
tort  64:25 182:25
  275:7 285:17
total  89:15,16
  106:1 115:1
  116:17
totally  39:17
  42:22 56:20 64:11
  251:4 273:7
  287:21
touch  101:4
  111:20 113:20

264:20
touched  112:19
touted  82:16
  199:13
town  65:20
  284:10,10
towns  52:9
toxicity  271:2
track  121:13
  122:14 176:15
  248:13
trade  36:4
tradeoffs  232:12
traffic  112:4
tragedy  58:12
  63:20 214:23
  215:22,23 216:4
  217:1
tragic  107:1
trailer  37:22
  39:15 41:18 64:10
  150:8 189:13,20
  189:23
transaction
  109:18
transcribed  2:25
transcript  80:14
  96:17 99:21 305:4
transfer  32:12
  49:25 110:5
  161:15 290:9
transferees  30:8
  30:12 31:25 32:8
  105:21
transferred
  128:10 286:4
  289:7
transfers  82:2
  105:18 106:2,3
  132:25 159:2
  161:20,24 233:4,9
  233:12 280:19

transparency
  160:25 282:11
  283:18
travel  241:19
  242:8
travelers  172:10
  173:4
tread  88:25
treasure  282:7
treasuries  44:13
  75:17,22 282:24
  283:8
treasury  44:19
treated  74:14
  129:9 197:11
  246:13 261:21
  272:5 296:15
treatment  21:8,11
  21:16,19,20 45:21
  56:24 78:5,21
  136:24 197:24
  296:18 297:12
treats  296:1,4
tremendous  45:5
  295:13,14
tremendously
  218:11
trepidation  52:21
trial  41:25 53:13
  81:10 96:5,25
  97:6,7 100:15
  108:8,11 134:16
  140:18,25 175:13
  177:2 204:14,17
  226:6,6 232:8
  239:20 241:7,16
  246:7
tribal  40:7
tribe  65:19
tribes  51:14 93:14
  94:19 118:18
  291:4 294:16

tribune  86:5
tried  63:22 165:5
  195:7 196:16
trifling  192:16,19
  192:20,21,22
trillion  135:9
  288:1,6
trillions  47:14
  48:5,13 190:24,25
  191:3,4,10 195:14
trimmed  277:21
  277:21
tripartite  281:20
troop  4:20 17:10
  23:10,10,13 35:23
  35:23 36:11 37:1
  37:12
trove  282:7
true  32:3 61:17
  103:7 109:9 146:8
  174:3 210:1
  213:11 219:14,20
  219:20 220:5
  223:8 232:9 235:4
  251:13,25 253:1
  263:12 267:20
  291:25,25 305:4
truly  41:17 88:9
  93:11 152:17
  292:24 293:11
trumpeted  61:3
trust  34:3 45:20
  65:3 68:24 70:2
  86:9 125:22
  133:16 134:7
  159:17 171:16,21
  182:14 207:6
  252:13 259:16,23
  260:1,5,12,15,24
  260:25 261:19
  262:12,24 263:21
  273:17 274:24
  286:4,6,6,7,10,14

290:9
**trustee**  6:10 52:5
  70:20 71:14,23
  83:18,23 84:3,7
  84:15 85:4 87:9
  88:18 90:17 107:6
  107:23 114:7,11
  123:4,6,11,24
  126:7 136:22
  145:23 150:1
  188:13
**trustees**  33:22
**trustee's**  108:4
  114:2
**trusts**  50:14,17
  68:22 128:6 143:4
  159:9 161:5 213:5
  213:7 286:2 289:9
**truth**  206:5
  210:21 218:19
  240:21 244:6
**try**  29:16 92:17
  101:3 114:18
  134:20 135:1
  161:12 162:23
  176:13,14 187:9
  196:11 204:20
  207:14 229:11
  270:15 286:6
**trying**  28:3 32:20
  83:4 103:9 190:4
  196:25 205:16,17
  216:3 257:16
  260:4 261:3,6
  270:19
**tsai**  14:3
**turbocharging**
  225:17 256:16
  257:4
**turn**  18:7 19:3
  20:15 35:21 43:3
  49:8 50:16 56:4
  64:15 80:11 92:8

94:1 113:16 121:2
  121:17 143:9
  154:8 168:3
  220:19 293:11
  294:10 297:16
**turned**  112:10
  300:17
**turner**  14:4 47:10
  68:3
**turner's**  47:17
  68:5
**turning**  66:16
**turns**  148:5
  297:10
**twenty**  55:15
  60:14
**twice**  68:2
**two**  16:1 17:4
  18:8 19:2 26:4
  28:9 29:14 33:6
  33:16 38:20 39:2
  41:21 49:8 51:1
  52:15 58:7 62:11
  63:20 79:19,24,25
  102:24 104:8
  106:10,18 112:7,8
  112:12 115:2
  118:23 119:10
  133:6 155:4 156:6
  163:10 169:21
  175:20 192:14
  193:21 195:15
  201:25 202:2
  209:14,14 214:1
  222:21 223:13
  224:25 225:4
  235:2 242:19
  243:9 273:23
  274:4 276:20
  278:7,17 279:15
  279:24 280:22
  282:20,24 288:18
  289:10 292:10,25

293:14 295:10
  302:17,25
**type**  153:5,23
  166:3 174:19
  183:15 184:12
  256:21 304:10
**types**  27:24 36:19
  145:8 163:15
  164:1 180:23
  182:23 183:9
  238:7

## u

**u**  260:12
**u.s.**  1:23 6:10
  50:22 52:5 70:20
  71:14,23 83:18,23
  84:3,7,15 85:4
  86:19 87:9 88:6
  88:18 90:17
  107:23 108:4
  114:1,7,11 123:6
  123:11 136:8
  161:1 173:21
  220:2 267:23
  292:4
**u.s.a.**  86:4
**u.s.c.**  76:11 89:6
**ubiquitous**  62:25
**ubs**  169:17 170:20
**uc**  184:16
**ucc**  16:8,22 42:14
  43:11 50:5 51:12
  51:13 55:17,23
  58:16 68:7 82:4
  92:8 101:5 102:4
  104:11 109:24
  111:22,23 112:7
  113:1 224:8
  278:17 281:1,20
  292:15 294:15
**ultimate**  226:22
  284:9

**ultimately**  15:9
  69:17 75:10 97:13
  112:11 114:13
  144:5 165:2
  169:24 188:24
  192:20 193:9
  201:20 208:22
  262:4 263:5,25
  268:23 270:23,24
  271:2,4,13 273:13
  297:10 298:6
  299:21
**umbrella**  77:4
**un**  133:21
**unasserted**
  265:22
**unavailable**  71:21
**unavoidable**
  63:16
**unbelievably**
  71:24
**uncertain**  49:20
  69:18 85:23
  116:10 139:4
**unchallenged**
  42:19
**unclean**  189:4
**unclear**  104:5
**uncontested**  47:8
  114:24 262:12
  295:4
**uncontrollable**
  48:7
**uncontroverted**
  42:3 44:23 47:20
  55:13 98:11
  160:11 188:23
**uncoordinated**
  48:7
**undeniable**  43:9
**undercut**  143:16
**undergo**  154:24

**underlying** 101:8
161:22 177:3
223:1 245:25
**underneath**
245:15
**underpinnings**
95:15
**understand** 20:5
22:21 24:11 32:20
102:13,15 104:1
104:19 114:3
127:13 132:2
154:22 156:2,8
158:6,15 160:7,19
165:23 166:20,20
168:1 176:5,5
180:14 181:2
182:8,18 185:21
188:14 203:15,17
206:9 209:9
211:17 214:8,25
216:3,8,23 217:15
233:23 234:1
251:7,8,18 254:11
254:18,18 256:6
258:13 266:6,7
270:3 271:24
272:8 273:21
285:12 287:7
303:2
**understandably**
289:16
**understanding**
26:24 99:13
210:19 217:5
270:25 289:25
299:20,24
**understands**
224:9
**understatement**
293:8

**understood** 23:17
26:17 31:17 35:5
87:24 136:4
193:12 207:3
208:4,5,6 244:9
245:24 259:1
262:9 263:9
302:22
**undertook** 85:19
**underwood** 6:7
270:5,6,7 272:7
272:15,22,25
273:12 274:13,17
280:24 298:16,17
298:20 302:8,9,15
**underwood's**
278:7 279:7
295:20
**underwriters**
275:12 279:17
298:6 300:6 302:1
**undeserving**
218:14
**undisputed** 49:15
95:10 194:9
**undo** 128:2
**undoubtedly**
104:13
**unearthed** 176:24
**unequal** 78:21
**unfair** 150:16
166:4 168:18,20
168:23
**unfairness** 150:15
**unfortunately**
52:21 108:10
112:4 164:1
270:16
**unhelpful** 104:18
**unified** 186:15
**uniform** 36:5
142:21

**uniformed** 36:4
**unilateral** 73:15
**unilaterally**
252:16
**unimaginable**
116:23
**unique** 65:8 66:13
73:7 102:9 112:6
233:16
**unit** 73:10 78:11
78:22 83:12
163:11 208:23
**united** 1:1,11 6:9
40:9,16,17 42:23
52:10 123:4,24
126:7 136:22
143:5 145:23
177:11 188:12
191:1 239:3 249:2
251:19 265:10
266:11 267:4
269:22 287:14,18
287:24 288:6
**units** 53:22 72:22
73:14 75:6 76:3,5
76:8,10 284:12
**universal** 80:20
290:1
**universe** 137:2
**unknown** 1:25
**unlawful** 31:1
234:20 292:24
295:3
**unlimited** 143:7
**unliquidated**
288:4
**unmistakable**
85:15
**unmute** 121:11
**unnecessary**
27:19
**unobtainable**
43:9

**unpack** 302:11
**unprecedented**
45:14 93:11 96:10
117:11 124:10
**unquestionably**
291:24
**unravel** 174:22
277:20
**unravels** 41:8
**unrebutted** 66:11
**unrecognized**
83:7
**unrelated** 33:1,3
33:5
**unresolved** 19:25
**unsecured** 5:9
101:2 107:19
154:1 194:13
273:21 274:5,8,11
279:16 296:19
299:4
**unsolvable** 293:9
**unsupported**
287:21
**unsurprising** 74:2
**unthinkable**
47:22 65:21
**unthinkably** 38:5
**untouchable**
125:21
**unturned** 55:19
**unusual** 62:24
172:19
**unwind** 173:3
**unwound** 173:2
**upcoming** 109:22
**updated** 158:1
**updates** 26:4
**upheld** 65:5
169:16 175:8
**upset** 216:3 266:6
**upsetting** 99:11

**upwards** 173:10
**urban** 184:10
**urge** 187:12
**urged** 106:24
**urging** 220:20
**usable** 61:23
**use** 27:14 29:20
  37:8,8 45:22
  53:12,13 61:20
  91:24 105:15
  106:24 107:2
  109:7 111:2,18
  122:5 176:7 190:7
  207:20 216:8
  240:4 243:7 246:4
  254:8,10 259:23
  260:5 277:11
  282:7 301:12
  302:23 304:9,13
**useful** 62:8
**uses** 24:12
**ust** 114:3
**usually** 51:7
**usurped** 166:9
**utilize** 122:10
**utilizing** 101:22
  101:22
**utter** 71:23
  225:24
**utterly** 60:11
  282:11
**uzzi** 14:5 31:8,9
  31:10,17,21 32:8
  32:14,17 33:7,11
  33:13 34:1,11
  300:2,4,4 301:3
  301:15

**v**

**v** 29:23 88:23 92:3
  126:19 143:17,22
  170:12,20 185:14
  241:19 265:10
  267:23 269:4

**vacated** 171:10,19
  172:25 173:23
**vacuum** 109:24
**vague** 77:11
**valid** 124:5 126:6
**validity** 177:5
  198:7
**valuable** 49:24
  96:21 101:20
**valuation** 280:18
**value** 39:1,20 44:2
  44:20 45:2 46:23
  48:19 64:5 65:21
  67:16,21 68:2
  69:19 73:16 75:23
  82:2 83:15 101:21
  101:22 106:1,9,12
  119:3,5 130:3
  162:25 163:3
  212:19,25 213:2
  216:20 232:1
  251:10 286:3,6
  291:6
**values** 102:11
**van** 14:6
**varick** 6:11
**varied** 43:8
**variety** 18:22
**various** 87:4
  98:22 102:20
  105:23 157:2,22
  201:3 207:20
  218:5
**vast** 257:11
**vastly** 295:8,8
**vehicle** 93:23
**venditto** 14:7
**venture** 60:12,15
  63:8
**veracity** 54:12
**verify** 54:12
**veritext** 305:20

**vermont** 62:4
  149:7 168:24
  186:14
**version** 86:17
  87:10,11 121:25
**versus** 104:16
  105:7 170:22
  191:23 195:2
  262:24 285:23
**veto** 73:1,5,25
  83:14 303:3
**vi** 30:8
**viable** 43:12 64:8
  102:2
**victim** 101:17
  111:21 117:3
  125:23 138:20
  139:19
**victimized** 148:16
  148:18
**victims** 3:14 38:17
  39:3,25 43:18
  48:16 51:15,15
  63:17,18 102:12
  104:21 106:25
  107:3 112:16
  113:3,4,6,7,21
  114:14,16,17,20
  115:8,8,24 117:10
  117:16,18,20
  124:11 125:23
  126:2 131:7
  134:20 188:5
  213:3 215:9 249:9
  250:9 294:17,17
**video** 1:12 121:2
  121:17,20
**view** 36:14 42:8
  78:13 81:6 145:1
  150:24 154:12,13
  155:21 159:23
  182:9 183:23
  194:2,4 210:5

  215:20 253:4
  272:17 278:23
  285:1 292:15
**viewed** 108:4
  166:17 185:4,6,7
  260:25
**views** 91:13
  105:18 254:13
  288:24
**vii** 29:3
**villages** 52:10
**vincent** 7:25
**vindicating** 117:1
**vindication**
  291:12
**violate** 71:5 84:8
  136:6 249:6
  268:22
**violates** 253:2
**violations** 198:24
  237:7,8
**virginia** 62:4
  103:4
**virtually** 42:3
  59:3 60:16 64:7
  129:11 139:6
**virtue** 22:19
  237:21
**vis** 223:16,16
**viscount** 161:25
**vividly** 65:22
**voice** 115:9
**void** 198:5
**volume** 97:1
  123:21 225:14
**voluntarily** 295:7
**voluntary** 93:25
  111:13,17
**vonnegut** 2:4 3:11
  18:8,13,25 19:9
  19:10,13 22:16
  23:3,17,23 24:17
  24:23 26:20 30:22

31:7,22 32:2 35:4
35:20 37:14 110:8
114:11
**vote** 53:16 54:5
59:24 70:17 83:12
102:6 108:1
131:23,25 145:24
146:15,20,22
147:2,8,13 151:7
**voted** 59:21 70:11
70:13,13 107:17
115:4,7 116:19
117:4 131:16
146:10,11,13,16
152:25 153:7,9
181:18 292:4
**voters** 52:19
54:10,16 146:4
212:13,16 294:23
**votes** 80:19 115:1
115:6 116:17
146:2,4 212:11
**voting** 51:5,8,9,10
53:8,18 64:7
70:11 73:3 84:20
146:1,6 165:13
181:18 213:13
**vow** 44:10
**vulnerable** 79:13

**w**

**w** 13:4
**wa** 7:18
**wagner** 14:8,9
94:23
**wait** 60:5 92:16
216:16
**waiting** 106:17
**waive** 204:5,6
222:1
**waived** 25:24
**waiver** 34:7
**waiving** 100:4

**walk** 18:13,14,25
**walking** 17:9
**wall** 86:3 165:11
**want** 25:16 31:5,7
35:12 92:25 97:14
98:8 104:25 107:5
108:5,12,12
109:25 110:23,25
111:20 112:15,22
114:19 118:2
122:9 145:15
156:5,13 161:23
163:5 178:21
179:10 198:9
199:2 201:22
204:14,15 206:4,4
206:4,13,15
211:21 212:23
215:21 259:6
269:24 270:2,10
270:20 273:6
274:14,15 276:6
278:24 279:15
281:5 282:21
286:19 290:6
292:6 294:9 299:9
302:10
**wanted** 23:16
26:14 30:5 31:21
34:14 127:22
128:5 145:18,21
147:23 150:10,21
152:21 219:1
246:22 264:10,19
270:22 294:8
298:18 299:18
300:24 301:4
303:22
**wanting** 185:2
**wants** 163:2
248:13 284:8
**war** 49:3

**wardwell** 3:3
15:19 19:10
295:19
**warfare** 47:22
**washington** 5:19
7:2,15,16 41:21
62:4 70:4 73:20
73:22 78:1 79:14
80:9 147:1 149:8
152:5 186:11
201:9,11,16 202:5
206:3 211:22
212:11 227:15,16
227:19,20,22
228:16 238:16
248:6,9,11 282:21
291:20
**washington's** 66:2
76:1 81:5,7 82:19
**washington's** 
169:3
**wasn't** 127:17
**wasteful** 38:15
**way** 24:8 28:1
31:4 51:8 56:11
63:21 64:3 69:5
77:19 91:22 95:24
99:25 102:10
103:11 107:5
114:12 121:17
141:20 152:19,19
160:3,17 165:19
171:13 174:10,16
176:9 185:11
187:9 189:11
197:18 208:3
211:13 216:24
219:22 223:19
246:14 257:7
258:19 262:6
264:3 268:15
272:22 273:2
285:20 295:5

**ways** 192:20
194:8 238:18
261:4,7 302:25
**we've** 21:8 25:3
26:1 27:12,13,18
28:11,15 30:7,10
33:17 34:7 54:8
63:21 178:19
197:3 207:23
211:12 221:3
227:8 243:4
256:25 271:18
297:22,22 298:14
**weaknesses**
104:19
**wealth** 82:8 125:2
132:21 133:12,13
158:25 159:1,10
287:24
**webcam** 17:8
**weber** 14:10
**website** 236:2
**wednesday** 37:3
246:25 247:19
272:15,24 273:10
273:15 274:14
290:25 302:10,17
304:7,14
**week's** 15:3
**weekend** 34:17
**weekends** 252:24
**weeks** 42:18
237:15 289:20
**weigh** 212:13
**weighed** 202:6,10
**weighing** 227:9
**weighs** 212:19
218:11
**weinberg** 14:11
**weinberger** 45:13
55:15 100:8,9
165:6

weiner 14:12
weintraub 14:13
weis 14:14,15
weiss 14:16
  255:18
welcome 301:14
wells 14:17
wendy 14:11
went 42:19 44:8
  54:12 102:6 106:3
  134:7 138:13
  152:5 167:17
  171:17 223:2,13
  225:1 278:13
  303:12
weren't 128:13
  164:21
west 4:17 62:4
  103:4
we'll 155:6 167:22
we're 17:18
  101:24 112:18
  121:6 122:18,22
  123:15 133:13
  141:13 145:19,20
  146:23 147:9,10
  147:16,17 156:6
  161:12 166:21
  167:25
we've 111:9
  113:18 118:12
  149:6 157:23
whatever's
  214:13
whatsoever 68:10
  84:4 109:6 277:8
wherewithal
  117:19
white 1:14 3:13
  66:11 77:24
who've 227:7
who's 121:13
  122:15

wilamowsky
  14:18
wild 205:15
willful 28:14,16
  28:17,18,22,24,25
  29:4 30:23 36:6
  36:18
willfully 102:25
william 13:3
  14:13
willing 104:14
  164:21
win 50:14 67:6
  91:25 261:16,16
  263:23,25
winning 49:18
winthrop 4:15
wiped 154:23
wisdom 286:12
wiser 188:2
wish 113:8 161:9
  161:10 194:2
  216:2,24 227:3
  295:5
wishes 56:23
  288:17
withdraw 58:22
  58:22
withdrawal 25:1
withdraws 186:24
withdrew 21:18
withstand 80:15
  296:23
witness 44:25
  244:7 280:20
witnesses 42:2,2,4
  42:5,5,9,18 64:9
  82:16 98:10
  124:19 135:25
  181:23 224:1
  241:9 246:2
  280:17

woke 34:16
wolf 14:19
wolff 7:1 186:10
woman 92:16
worcester 4:1
  19:23
word 31:3 33:3
  37:8,9 53:6 91:24
  139:14 176:7
  191:14 240:3
wording 35:16
words 53:5 65:23
  66:13 67:17 85:2
  105:5,25 109:3
  129:11 161:15
  162:13 190:18,24
work 16:10 32:23
  55:25 56:22 57:16
  63:25 71:25 111:6
  123:17 147:21
  188:3 207:17
  213:12 216:19
  252:19 288:20
worked 93:2
  187:19,24 198:8
  238:19 252:18,24
  252:24
working 93:19
  112:10 252:21
  285:6,7
workplace 255:7
works 61:25
  236:23
world 39:5 56:25
  74:1 137:4 201:7
  201:12 209:14
  285:14
worldwide 80:5
worried 240:5,6
worse 57:18
  187:16 295:8
worst 39:5

worth 68:14,23
  160:22 288:6
worthless 60:21
  249:17
would've 98:23
  99:6 207:3
wouldn't 135:15
  139:15 144:22
  157:21 158:1
  166:12 258:6
woven 39:16
wrap 63:16
wrapping 224:3
wrestle 17:15
writing 44:24
  165:11
written 42:11
wrong 54:14 76:6
  116:20 148:23
  258:7 291:19
  299:6
wrongdoer 68:16
wrongdoers
  155:23
wrongdoing
  168:11,14 169:4,9
  172:12 200:2,16
wrongful 36:21
  169:5
wrongly 66:18
  188:12
wrote 265:18
  267:24

---
            x
---
x 1:4,10 256:15
xvii 34:1

---
            y
---
yeah 150:6 152:12
  167:2 247:25
  248:25 274:17
year 38:19,19
  48:19,19 55:4,4
  55:25 97:21 159:3

216:20 237:14
270:25 293:20
**yearly**  109:14
**years**  38:14 43:24
46:6,22 47:23
48:15 51:25 55:3
55:16 59:23 60:15
63:22 64:4 65:6
79:19,23,25 93:20
95:1 97:22 102:24
109:11 112:8
133:11 168:6
171:16 177:16
180:9,10 206:16
220:2 235:2
240:17 293:3
**yield**  185:23
228:12,23
**york**  1:2 3:6,17
4:4,18 5:12 6:12
7:4 33:19 86:3
164:18
**you'd**  156:24
**you'll**  106:20
**you're**  113:11,15
121:14,15,15,17
122:8 123:14
128:8 129:23
130:4,5 131:13
132:24 134:24
137:17 138:22
141:25 142:8
147:18 155:11
157:12 158:6
160:7 166:12,21
167:14
**you've**  130:11,12

**z**

**z**  13:20
**zabel**  14:20
**zale**  265:16
**zeevi**  14:21

**zero**  53:1,1 67:21
117:17 277:7
**zoom**  92:18
121:24 122:17
**zylberberg**  14:22

**à**

**à**  223:16