Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                United States Bankruptcy Court

12                Tele/Video Proceedings

13                300 Quarropas Street, Room 248

14                White Plains, NY 10601

15

16                August 27, 2021

17                10:03 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN WALKER

1    HEARING re Continuance of Confirmation Hearing

2

3    HEARING re Notice of Adjournment of Hearing on Motion to

4    Authorize Key Employee Incentive Plan, Trust Authorization

5    Motion and Protective Order Motion (related

6    document(s)3077, 3137, 3484, 3486, 3485, 3077) with hearing

7    to be held on 9/13/2021 at 10:00 AM

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    DAVIS POLK WARDWELL LLP

 4         Attorney for Debtors

 5         450 Lexington Avenue

 6         New York, NY 10017

 7

 8    BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

 9         ELI J. VONNEGUT (TELEPHONICALLY)

10         BENJAMIN S. KAMINETZKY (TELEPHONICALLY)

11

12    MILBANK, TWEED, HADLEY & MCCLOY LLP

13         Attorneys for the Raymond Sackler Family

14         55 Hudson Yards

15         New York, NY 10001

16

17    BY:  GERARD UZZI (TELEPHONICALLY)

18

19    US ATTORNEY'S OFFICE

20         86 Chambers Street, 3rd Floor

21         New York, NY 10007

22

23    BY:  LAWRENCE FOGELMAN (TELEPHONICALLY)

24

25
```

Page 4

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  PAUL SCHWARTZBERG (TELEPHONICALLY)

7

8    PILLSBURY WINTHROP SHAW PITTMAN LLP

9         Attorneys for Ad Hoc Group of Non-Consenting States

10        31 West 52nd Street

11        New York, NY 10019

12

13   BY:  ANDREW M. TROOP (TELEPHONICALLY)

14

15   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

16        Attorney for State of Maryland

17        200 Saint Paul Place

18        Baltimore, MD 20852

19

20   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

21

22

23

24

25

Page 5

1    LEVENFELD PEARLSTEIN, LLC

2         Attorneys for Ad Hoc Group of NAS Babies

3         2 North LaSalle, Suite 1300

4         Chicago, IL 60602

5

6    BY:  HAROLD D. ISRAEL

7

8    KRAMER LEVIN NAFTALIS & FRANKEL LLP

9         Attorneys for

10        1177 Avenue of the Americas

11        New York, NY 10036

12

13   BY: KENNETH H. ECKSTEIN

14

15   ALSO PRESENT TELEPHONICALLY:

16   ROXANA ALEALI

17   ANDREW VINCENT ALFANO

18   PHILIP D. ANKER

19   MICHAEL ATINSON

20   MITCHELL JAY AUSLANDER

21   PRIYA BARANPURIA

22   DAVID E. BLABEY

23   LOUIS BOGRAD

24   SARA BRAUNER

25   GARY BRESSLER

1   DAVID BROWN

2   GABE BRUNSWICK

3   AARON R CAHN

4   MARK CHALOS

5   GERARD CICERO

6   HAYDEN COLEMAN

7   DANIEL CONNOLLY

8   HAYDEN COLEMAN

9   DYLAN CONSLA

10   ABBY G. CUNNINGHAM

11   MARIO D'ANGELO

12   PETER C. D'APICE

13   STACY DASARO

14   JOSEPH G. DAVIS

15   MARK DEARMAN

16   CLINT DOCKEN

17   JOHN C. DOUGHERTY

18   JOHN DUBEL

19   STEPHANIE EBERHARDT

20   KENNETH H. ECKSTEIN

21   BERNARD ARDAVAN ESKANDARI

22   MATHEW FARRELL

23   LAURA FEMINO

24   ROBERT FINZI

25   MATTHEW FITZSIMMONS

1   HEATHER FRAZIER

2   BRYCE L. FRIEDMAN

3   KATHERINE N. GALLE

4   CAROLINE GANGE

5   GILL GELDREICH

6   MELISSA GIBSON

7   MAGALI GIDDENS

8   SCOTT GILBERT

9   JEFFREY R. GLEIT

10   MATTHEW J. GOLD

11   MICHAEL GOLDSTEIN

12   GEOFFREY S. GOODMAN

13   ISLEY MARKMAN GOSTIN

14   GARY GOTTO

15   JARED T. GREEN

16   JAMES S. GREEN, JR.

17   DEBORAH GREENSPAN

18   EMILY GRIM

19   JOHN GUARD

20   ADAM P. HABERKORN

21   CATHERINE BEIDERMAN HEITZENRATER

22   ANGELA K. HERRING

23   MICHELE HIRSHMAN

24   JENNA A. HUDSON

25   TIMOTHY J. HURLEY

Page 8

```
 1 │ MITCHELL HURLEY

 2 │ ELISA HYDER

 3 │ LINDA IMES

 4 │ MARK S. INDELICATO

 5 │ SAMUEL ISSACHAROFF

 6 │ EVAN JONES

 7 │ EVAN M. JONES

 8 │ GREGORY JOSEPH

 9 │ ETHAN KAMINETZKY

10 │ NICKOLAS KARAVOLAS

11 │ NEIL FX KELLY

12 │ KAREN KENNEDY

13 │ MARC KESSELMAN

14 │ DARREN S. KLEIN

15 │ JEREMY C. KLEINMAN

16 │ LAWRENCE KOTLER

17 │ ANN KRAMER

18 │ ALEXANDER LEES

19 │ DANIEL LENNARD

20 │ MARA LEVENTHAL

21 │ DANIELLE J. LEVINE

22 │ JEFFREY LIESENMER

23 │ EDAN LISOVICZ

24 │ JOHN LONGMIRE

25 │ JOHN LOWNE
```

1    ROBERT MACKENZIE

2    KEVIN MACLAY

3    ROBERT MARSTERS

4    BRIAN S. MASUMOTO

5    DOUGLAS KIRK MAYER

6    JAMES I. MCCLAMMY

7    LAURA MCCLOUD

8    HUGH M. MCDONALD

9    SHANNON M. MCNULTY

10   MICHELE MEISES

11   LIVY MEZEI

12   NATHANIEL MILLER

13   JONATHAN E. MITNICK

14   DAVID MOLTON

15   MAURA KATHLEEN MONAGHAN

16   AMANDA MORALES

17   ANDREW J. MUHA

18   AISLING MURRAY

19   EDWARD E. NEIGER

20   NATHALIE E. NIEVES

21   MICHAEL PATRICK O'NEIL

22   THOMAS ROBINSON O'NEILL

23   DAMIAN O'SULLIVAN

24   RACHEL R. OBALDO

25   JAMES FRANKLIN OZMENT

1    JENNIFER PEACOCK

2    MARK PLEVIN

3    STEPHEN POHL

4    KATHERINE PORTER

5    ARIK PREIS

6    DOUGLASS PRESS

7    NICHOLAS PREY

8    MICHELE PULGGARI

9    KAMI QUINN

10   MARION QUIRK

11   CHRISTINA RICARTE

12   JOSEPH RICE

13   RACHAEL RINGER

14   CHRISTOPHER ROBERTSON

15   JEFFREY J. ROSEN

16   JORDAN ROSENBAUM

17   PAUL S. ROTHSTEIN

18   JASON RUBINSTEIN

19   MEGAN PARIS RUNDLET

20   WILLIAM T. RUSSELL

21   JEREMEY RYAN

22   JAMES SALWEN

23   DANIEL JOSEPH SAVAL

24   SETH SCHINFELD

25   ELIZABETH SCHLECKER

1   FREDERICK E. SCHMIDT

2   MICHAEL SHEPHERD

3   RICHARD SHORE

4   J. CHRISTOPHER SHORE

5   RICHARD SILBERT

6   LIANNA SIMMONDS

7   PAUL SINGER

8   PAUL M. SINGER

9   MARC F. SKAPOF

10  ARTEM SKOROSTENSKY

11  D. RYAN SLAUGH

12  JOSEPH SORKIN

13  CLAUDIA Z. SPRINGER

14  CATHERINE STEEGE

15  HOWARD STEEL

16  ERIC STODOLA

17  ADAM SWINGLE

18  JEROME TAPLEY

19  PAMELA THURMOND

20  MARC J. TOBAK

21  SARA E. TONNESEN

22  ALICE TSIER

23  JOSEPH TURNER

24  ALLEN J. UNDERWOOD

25  MELISSA L. VAN ECK

1   MICHAEL J. VENDITTO

2   JOYCE M. VILLNAVE

3   JONATHAN WAGNER

4   RYAN A. WAGNER

5   JORDAN A. WEBER

6   WENDY WEINBERG

7   SHIRA WEINER

8   WILLIAM P. WEINTRAUB

9   MARTIN WEIS

10   MARTIN JAMES WEIS

11   ALLISON H. WEISS

12   THEODORE WELLS, JR.

13   DANIEL WOLF

14   LAUREN S. ZABEL

15   DAVID ZYLBERBERG

16   LAUREN DEL VALLE

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.  This is Judge Drain.

3    We're here in In Re Purdue Pharma L.P., et al.

4           As I asked the Debtors to circulate to the wide

5    email list yesterday in working on my ruling on the Debtors'

6    request for confirmation of their amended Chapter 11 plan, I

7    realized that although the parties believed that they could

8    rely on their pleadings with respect to issues that were

9    contested related to plan confirmation, my review of the

10   pleadings left open some questions that I wanted to address

11   with the parties.

12          Those issues pertain to the sole remaining

13   objection by the Co-Defendant group and certain aspects of

14   the plan's treatment of these for those other than the

15   professionals that fall under the definition of professional

16   persons under the plan.  So I asked that the parties to

17   those disputes be available today so I could discuss them

18   with them.

19          In addition, I wanted an update on one issue that

20   had been left open involving the rights of Gulf and St. Paul

21   insurers.  I was informed this morning that that limited

22   remaining objection by those two parties has been resolved,

23   so we don't need to address that further.

24          I also was told that one aspect of the State of

25   West Virginia's objection to the plan had been resolved, I

Page 14

```
 1    think in part based on questions that I had from the bench,

 2    which involved California's -- the State of California's,

 3    that is -- carveout from contributing to the so-called one

 4    percent fund for small states, which I gather, again from

 5    hearing from the Debtors, has now been eliminated, and

 6    instead, California is going to be contributed to the one

 7    percent fund.

 8              And then, finally, I noted that I had not seen a

 9    revised plan that addressed the release issues that were the

10    subject of a fair amount of discussion during oral argument,

11    and that I would really benefit from seeing the changes.

12    I've been provided with a blacklined amended Chapter 11 plan

13    that reflects the parties' work to narrow the release

14    further, in light of my comments and other parties'

15    comments.

16              So that's what I want to address this morning.

17    That obviously meant that I would put off my bench ruling

18    that I had originally said I would give you all this

19    morning.  Given my hearing schedule, I will use every effort

20    to give you that ruling on Wednesday, September 1st.

21              So, unless anyone wants to make any further

22    announcement, I'd like to address the two issues that the

23    parties had left in their briefing.  I'm sure they

24    understand them fully, but I did have a couple of questions

25    that I wanted to raise with them in each case.
```

1         MR. HUEBNER:  Your Honor, Marshall Huebner, for

2    the Debtors.  Can you hear me clearly?

3         THE COURT:  Yes.

4         MR. HUEBNER:  Just very quickly, Your Honor.

5    Obviously, I was going to announce that very good news on

6    California, and the good news on Gulf, and both apologize

7    and make sure that everybody knows that we were able to

8    negotiate substantially revised releases.  Obviously, given

9    the number of parties, it took a lot of yesterday.

10        With respect to California, Your Honor, let me say

11   two quick things, and then I'll turn it over, if Your Honor

12   would like, to Mr. Vonnegut to walk you through the changes

13   to the plan, because there are just a couple of other very

14   minor ones.  We're happy to do that if, as is typically the

15   case, Your Honor has read everything and is ready to go,

16   then obviously, we'll skip that.

17        With respect to California, Your Honor, I do want

18   to say two things.  Number one, I think we and probably many

19   of the parties really appreciate that California changed

20   their decision and agreed to make what was a voluntary

21   contribution under the structure to the intensity fund.

22        We are waiting to get back to West Virginia.  We

23   don't know, and nothing is decided yet, whether that means

24   that it resolved their objection in toto, or that was

25   something that (indiscernible) was obviously very upset and

Page 16

1    ineloquent about, or whether they're still pressing for the

2    remainder of their -- for an allocation objection.

3    Obviously, as soon as there is an update, we will advise the

4    Court.

5              Finally, I should note that Your Honor very

6    clearly encouraged everybody to try to remain in

7    conversation and we will never stop trying to get a deal

8    with a very, very small number of remaining objectors.  You

9    know, there is certainly nothing to announce, but there are

10   still some conversations going on, and we, for our part,

11   will never stop trying to bring everybody into the deal and

12   see what else is possible.

13             And so with that, Your Honor, I guess the question

14   is would like Mr. Vonnegut to (indiscernible) or do you have

15   them and we should deal with Your Honor's questions for

16   whichever parties you'd like to question?

17             THE COURT:  Well, I see that there are 164 parties

18   on the line today.  I doubt that most of them are on the

19   line for the Co-Defendant and fee issues.  So it probably

20   does make sense to go through the amended plan, or the

21   changes in the amended plan.  I have reviewed them, though.

22   So it may make sense to very briefly summarize them.  And

23   then, I regret to have to say this, but I do have some

24   questions about them.

25             MR. HUEBNER:  Absolutely, Your Honor.  And let me

1   just ask all parties.  I'm already hearing that the sound is

2   not great, so I've put in my headphones and would ask, as we

3   have on the prior dates, that anyone who has the ability to

4   use either wired or wireless headphones please do so, which

5   I just do think improves the audio.

6           So with that, I will go on mute and off camera,

7   and Mr. Vonnegut to please go off mute and on camera and do

8   the quick walk-through that the Court has requested.

9           THE COURT:  Okay.  That's fine.

10          MR. VONNEGUT:  Thank you.  Your Honor, for the

11   record, Eli Vonnegut, of Davis Polk & Wardwell, on behalf of

12   the Debtors.  Can you hear me clearly?

13          THE COURT:  Yes, I can, thanks.

14          MR. VONNEGUT:  Thank you.  Your Honor, the tenth

15   amended plan filed overnight reflects a pretty new set of

16   changes to the ninth amended plan, and I'll just walk to

17   them briefly.

18          First, in the definition of excluded claim, we've

19   made clear, as we discussed in court the other day, that the

20   carveout for taxes applies to all taxes.  It's not limited

21   to income taxes, so we've just deleted the word income in II

22   of that defined term.

23          Next, you'll see a little change in the

24   architecture of how we carved out non-opioid claims from the

25   releases.  So they are no longer a subset of the defined

Page 18

1    term excluded claim.  Instead, they are carved out directly

2    in the two third-party release sections in 10.6(B) and

3    10.7(B) in the plan.

4             Then in excluded party, this is not a substantive

5    change.  This was just cleanup related to the way that we

6    effectuated the DMP settlement that was discussed with some

7    creditors after we filed the initial set of changes.

8             Then, Your Honor, you'll see -- and I'll turn it

9    over to Mr. Uzzi very shortly to discuss the substance of

10   this -- but the next two changes were related to the

11   broadening of the carveout for non-opioid claims.  So you'll

12   see our new term is non-opioid excluded claim.  Those are

13   the claims that are excluded from the releases and that are

14   carved out directly in sections 10.6(B) and 10.7(B).

15            In releasing parties, that is also a change

16   intended to narrow the scope of the releases.  So just to go

17   back to the architecture again, in order to be encompassed

18   in a third-party release, a claim needs to be held by a

19   releasing party.  And the Sacklers have agreed here to

20   remove holders of causes of action and to limit the

21   releasing parties to holders of claims.

22            And there's just a parenthetical here illustrating

23   exactly what is meant by the defined term, claim, although

24   that is defined as defined in the Bankruptcy Code.

25            In shareholder released parties, we've just

1    corrected a cross-cite.  It turns out to be an exhibit, not

2    a schedule, to the shareholder settlement agreement that we

3    are citing to.

4              In Section 10.3(d), as discussed and as agreed

5    with Maryland, we've added a provision making very clear

6    that nobody who benefits from a release is excused from

7    ongoing compliance with the discovery.  Again, that was

8    always the case.  We just wanted to make it very blunt.

9              And then you will see, Your Honor, in Sections

10   10.6(B) and 10.7(B), the carveout from those third-party

11   releases for the non-opioid excluded claims.

12             I believe that covers the entirety of the changes

13   in the tenth amended plan, Your Honor.

14             THE COURT:  Okay.

15             MR. VONNEGUT:  So I'll turn it over to Mr. Uzzi to

16   discuss the substance of the non-opioid excluded claims.

17             THE COURT:  Okay.  That's fine.

18             MR. UZZI:  Your Honor, it's Gerard Uzzi, from

19   Milbank.  Can you hear and see me?

20             THE COURT:  Yes, I can, thanks.

21             MR. UZZI:  All right.  Your Honor, I can make a

22   brief presentation if you'd like.  Otherwise, we could just

23   go straight to the questions.  It's --

24             THE COURT:  Why don't we go to the questions,

25   because I think your answers will, in essence, be the

1    presentation.

2              MR. UZZI:  Okay.

3              THE COURT:  My first one was, I did see the change

4    to the definition of releasing parties, that limits the

5    releasing parties to all holders of claims and strikes

6    causes of action.

7              I think this is probably just stay scriveners

8    error, therefore, because -- or maybe you need to explain it

9    to me, when you actually turn to 10.6(B) and 10.7(B).  But I

10   think...  Well, let me just go back to one point.  Let me

11   just confirm one point first...  Yeah.

12             Each of those provides for a release of all causes

13   of action.  And I want to make sure that it's not coming in

14   the back door; the change that you all made to the

15   definition of releasing parties isn't coming in the back

16   door.  I don't think so, but I guess where it really comes

17   up, I guess, is it says in (b), releases by non-debtors.

18   And...

19             MR. UZZI:  Your Honor, let me explain what we were

20   trying to do, and I think it may answer the question.

21             THE COURT:  Well, maybe it's just the title.

22   Maybe it should say releases by non-debtor releasing

23   parties, and maybe that gets you there.  I think what you're

24   trying to do -- this was really a question, as opposed to a

25   criticism -- I think what you're trying to do is say that

Page 21

```
1     the releasing parties are the ones who are giving the

2     release here, and they are releasing all causes of action.

3     Right?

4               MR. UZZI:  That's correct, Your Honor.  That is

5     correct.

6               THE COURT:  It's not a backdoor way to say that in

7     10.7(B), the release is expanded beyond releasing parties to

8     other non-debtors.

9               MR. UZZI:  That is correct, Your Honor.

10              THE COURT:  Okay.  So maybe it's just the heading

11    that confused me.  The second question I had -- well, this

12    also may be a drafting point.  Originally, obviously, this

13    was a pretty carefully drafted set of defined terms and

14    provisions that all interlocked.  And by making them

15    narrower, maybe some of them became redundant.

16              You have a defined term on Page 32, protected

17    parties.  I don't see where that comes in.

18              MR. UZZI:  Your Honor, that's used throughout the

19    plan to cover parties that are protected by the channeling

20    injunction.

21              THE COURT:  All right.  Okay.  Because, again, it

22    includes -- the definition of protected parties includes

23    each of the Debtors' related parties, which is a defined

24    term, related parties.

25              MR. UZZI:  Yes, sir.
```

1          THE COURT:  And as I read that definition, that

2    includes equity holders.  So it would include the

3    shareholders.  So I just want to make sure that the narrowed

4    terms of the plan aren't vitiated by the use of protected

5    parties somewhere else.

6          MR. UZZI:  Understood, Your Honor.  It's a very

7    good point.  We'll double check.

8          THE COURT:  Okay.  And then another point, I

9    think.  The defined term, related parties, I believe was

10   intended to be narrowed as far as the shareholder release is

11   concerned -- the release of the shareholding settling

12   parties.  The defined term, related parties, includes, for

13   example, independent contractors, co-promoters, third-party

14   sales reps, medical liaisons --

15         MR. VONNEGUT:  Yes.  Your Honor, I can help with

16   this one.  The defined term, related parties, isn't actually

17   used for the releases of the shareholders.  The term for the

18   shareholders is shareholder released parties.  And that's

19   where what we did was we put attorneys, independent

20   contractors, et cetera, in their own clause, and then made

21   clear in the third-party release that those shareholder

22   released parties are not covered by the third-party release.

23         THE COURT:  I don't know if someone is --

24         MR. HUEBNER:  So related parties is only used --

25         THE COURT:  I don't know who Lauren

1    (indiscernible), or Danny Benjamin is, but he's trying to

2    speak and he's on the screen.  I'm not sure why.

3              CLERK:  (indiscernible)

4              THE COURT:  Okay.

5              CLERK:  We're going to turn it off.

6              THE COURT:  All right.  I'm sorry to interrupt

7    you.

8              MR. VONNEGUT:  No.  No problem, Your Honor.

9              THE COURT:  All right.  And again, this is a term

10    that is picked up in the definition of released parties.  It

11    includes each of the Debtors' related parties.

12              MR. VONNEGUT:  That's right.  Released parties and

13    shareholder released parties are separate, Your Honor.

14    Released parties are addressed in Section 10.6 and

15    shareholder released parties are addressed in Section 10.7.

16              THE COURT:  Okay.  But let's go to -- 10.6(B)

17    covers releases by releasing parties.  And releasing parties

18    includes holders of claims.

19              MR. VONNEGUT:  Yes.

20              THE COURT:  So the released parties are released

21    in 10.B, which I view as a third-party release.  In fact,

22    I'm not quite sure why we have 10.B and 10.7(B), since they

23    seem to in effect be doing the same thing.

24              MR. VONNEGUT:  Your Honor, they apply to different

25    groups of people.  Again, we wanted to have --

1               THE COURT:  But again, related parties -- the

2       released parties includes the Debtors' related parties,

3       which includes equity holders and their related parties,

4       which would bring in independent contractors, et cetera, et

5       cetera.

6               I don't think this was intentional, but I think

7       10.6(B) --

8               MR. VONNEGUT:  Your Honor --

9               THE COURT:  -- actually could have the effect of

10      broadening what you narrowed in 10.7.

11              MR. VONNEGUT:  That's definitely not the

12      intention, Your Honor.  Again, we'll revisit it and make

13      sure.

14              THE COURT:  10.7(B) --

15              MR. VONNEGUT:  And I --

16              THE COURT:  -- I think is what you intended to do

17      in response to my comments, which was in part in responses

18      to objectors' comments.  I think -- again, I don't believe

19      you were -- the intention was to do this, to back door to

20      10.6(B).  But I think the effect of it --

21              MR. VONNEGUT:  No.

22              THE COURT:  -- can be, because of the definition

23      of Debtors' related parties.  And given the broad definition

24      of related parties, which includes equity holders and their

25      related parties in their capacity, it really does...  You

1      see what I'm saying, I think.

2            MR. VONNEGUT:  I do, Your Honor.  We carved out

3      the shareholder payment parties from released parties.  We

4      also included the carveout for non-opioid excluded claims in

5      Section 10.6(B) and Section 10.7.  But again, we'll triple

6      scrub and make sure there's no holes that shouldn't be

7      there.

8            THE COURT:  Okay.  And why are we having...  I

9      mean, I guess...  Is the intention, then, not to have the

10     parties who are the subject of 10.7(B) be covered by

11     10.6(B)?

12           MR. VONNEGUT:  That's correct.  And frankly, maybe

13     the --

14           THE COURT:  So that --

15           MR. VONNEGUT:  -- simplest way to deal with this

16     is the way we handled co-defendants and just bluntly carve

17     all of them out 10.6(B).

18           THE COURT:  Okay.  All right.  Now, related to

19     that, you have a good -- clearly the most work was done here

20     on 10.7, which is fair, because the focus was on that.  You

21     have -- if I can find it now -- maybe I lost it.  Yeah.  In

22     the definition of shareholder released parties, you have a

23     much more narrow list of other entities related to the

24     shareholder released parties that would be covered.  You

25     know, as Mr. Uzzi mentioned the other day, it grammatically

Page 26

1   carved out subcontractors, et cetera.  That still exists in

2   the related parties definition, which again was, I think,

3   originally meant to just be applicable to the shareholders

4   as well.

5           But there's stuff in it now that I don't really

6   think fits for the other released parties, including, you

7   know, trusts, independent contractors, subcontractors.  I'm

8   just not sure why those people are being covered anymore.  I

9   think that's a holdover.

10          MR. VONNEGUT:  Those were intended to be, as Your

11  Honor mentioned yesterday, ways of preventing back door

12  assertion of claims that are really against the Debtor.

13          THE COURT:  All right.  Well, I guess it really

14  comes back to, again, making it clear that the shareholder

15  released parties are not part of 10.6(B).

16          MR. VONNEGUT:  I think that's the solution, Your

17  Honor --

18          THE COURT:  Okay.

19          MR. VONNEGUT:  -- is to just have a very firm

20  brick wall between shareholder released parties and other

21  released parties.

22          THE COURT:  Okay.  Now, you have in the

23  shareholder released parties definition a sentence towards

24  the end that says, "For purposes of this definition of

25  shareholder released parties, the phrase solely in their

1   respective capacities as such, means with respect to a

2   person solely to the extent that,", and then you have X and

3   Y.  I think that would be useful to put in the definition of

4   related parties as well.

5           MR. VONNEGUT:  Sure.

6           THE COURT:  Because there's -- I mean, otherwise,

7   you have it in one place or the other and people are going

8   to say, well, it must be broader than all related parties,

9   because you don't say it there.

10          Lastly -- and this was probably very far from

11  people's minds when they were focusing on this -- the Debtor

12  release in 10.6(A) releases causes of action, which is

13  broadly defined, including against officers and employees.

14          We've carefully put in the compensation orders

15  that there's a disgorgement obligation.  And there shouldn't

16  be any doubt that that's not being released, that

17  disgorgement obligation.  And I think --

18          MR. VONNEGUT:  Understood, Your Honor.

19          THE COURT:  I think, arguably, there might be if

20  you have this here the way it is.

21          MR. VONNEGUT:  We can clarify that.

22          THE COURT:  All right.  Okay.  So those are my

23  questions and comments.  I think -- well, I think Mr.

24  Fogelman and perhaps one or two other parties may want to

25  address this markup, again, just specifically with respect

Page 28

1    to the language and what it does and doesn't do.  And I'm

2    happy to hear from them.

3              MR. FOGELMAN:  Good morning, Your Honor.  This is

4    Larry Fogelman on behalf of the United States.  We did have

5    a few concerns to raise about the language.  But, to be

6    clear, we're reserving all of our objections raised in our

7    brief but --

8              THE COURT:  Right.

9              MR. FOGELMAN:  -- we raised these points in an

10   effort to assist to the extent the Court is trying to

11   implement directions we understood it to give the other day.

12             THE COURT:  That's right.

13             MR. FOGELMAN:  Thank you, Your Honor.

14             So our first comment relates to the definition of

15   non-opioid excluded claims and, specifically, most

16   concerning (iii).  What we understood Your Honor to be

17   saying yesterday is that to the extent that there's a

18   concern about potential derivative liability, that that's

19   already addressed under the Debtor's release and that there

20   doesn't necessarily need to be any language.  Like so in

21   other words, (iii) could be struck in its entirety because

22   anything derivative would be picked up from the Debtor's

23   release.

24             You know, and the concern we have of (iii) is that

25   it could potentially be read to suggest that if the

Page 29

1    shareholder release parties took actions while on the board,

2    that may lead to their direct liability, not derivative

3    liability but direct liability, that somehow because that

4    action was done while they were on the board or working with

5    the company, that that is now getting a release under this

6    (iii).

7            So we would submit the simplest way to deal with

8    it is to just strike (iii).  To the extent that there's any

9    need for it at all, it should use the word "derivative

10   liability" expressly like -- or something simple like (iii)

11   could be something like it's solely based on derivative

12   liability of the Debtors if that's even necessary at all.

13   But otherwise, we're just concerned that all of this

14   language here may create the implication that there is a

15   release for direct claims against the shareholder release

16   parties.

17           That's point one.  I'm happy to move on unless

18   Your Honor wants to engage about this point first.

19           THE COURT:  Well, let's just stop on point one.

20           MAN:  Your Honor, it's (indiscernible).

21           THE COURT:  No, I'm just reading the language.  I

22   think -- I don't really see how (iii)(a) through (c) hurts.

23   It would -- I think you're probably right.  I think you are

24   right that it's language that ensures that derivative

25   liability is not being asserted since the Debtors are

1    settling it.  But I don't see how it hurts to make it clear

2    that -- so that third parties know that, too.

3              MR. FOGELMAN:  If Your Honor wants to make it

4    clear, would it not be simpler just to say in (iii) it's

5    solely based on derivative liability of the Debtors?

6              THE COURT:  Well, but that took the Second Circuit

7    four opinions to address in the Manville and Quigley cases.

8              MR. HUEBNER:  Yeah.  And, Your Honor, for the

9    record, that is what was guiding.  You know, once you start

10   getting into standards like "solely" and "like," we think

11   this strikes the right balance and we're with Your Honor on

12   this point.  And we actually obviously all gave it a lot of

13   thought to try to cue perfectly to what we thought the Court

14   was saying.

15             THE COURT:  I mean I think the courts are still

16   discussing what derivative liability means in this context.

17   But this uses the language from 524, which is, you know, I

18   think the clearest guide since there's been the most

19   commentary on it.

20             MR. FOGELMAN:  If the concept, Your Honor, is that

21   derivative liability is what's excluded here, you know, no

22   matter how the courts interpret it, wouldn't the phrase

23   "derivative liability" cover all the scenarios defined by

24   the Court?  Here, there's an attempt based on 524(g) to come

25   up with language that -- you know, I mean, frankly, who

1   knows how that language bears under the Second Circuit cases

2   that Your Honor alluded to.

3          But if the concept is simply derivative liability,

4   you know, is what the exclusive is for, I think if it simply

5   says that, rather than trying to enumerate what that means,

6   that would be the more --

7          THE COURT:  Well, I don't mind it saying "does not

8   allege derivative liability including without limitation"

9   and then going through (a) through (c).

10          MR. HUEBNER:  Your Honor, with all due respect to

11   Mr. Fogelman, he's in essence repeated the same request

12   three times and the Court has addressed the view three

13   times.  I think if there are other points, just I don't mean

14   to be unkind but he keeps saying can we do this instead, and

15   the Court just keeps saying no and he just keeps asking it

16   again without new analysis or reasoning.

17          This is not a markup session in a conference room.

18   This is a court of law.

19          THE COURT:  Again, I understand his main point.

20   The point was that this wouldn't be a back door.  So I don't

21   mind saying "derivative liability including without

22   limitation" and then listing those three categories (a)

23   through (c).

24          MR. HUEBNER:  Thank you.  Thank you, Your Honor.

25          MR. FOGELMAN:  Thank you.

Page 32

1          The second point we had, Your Honor, relates to

2     the 11.1(E) language that's incorporated into non-opioid

3     excluded claims.  And specifically, Your Honor, the concern

4     is that let's say a state has a clearly (indiscernible)

5     state cause of action under a state consumer (indiscernible)

6     against the Debtors for clearly non-opioid conduct.

7          I don't think this Court would have jurisdiction

8     to require California or whatever state would bring this

9     claim, for example, to come into court and have to make a

10    showing on an evidentiary record that the claim is

11    colorable.  It would -- you know, the point could be best

12    achieved by putting the burden on the shareholder release

13    parties if they want to claim that a lawsuit is somehow a

14    violation of this, for that party to have the burden to make

15    a showing that the complaint somehow is an end run or is

16    really, you know, an opioid claim dressed up (indiscernible)

17    with clothing rather than having a state which might not

18    even be subject to this Court's jurisdiction have to go into

19    this Court and make an evidentiary showing that its claim is

20    colorable.

21          THE COURT:  Well, that's a fair point.  You know,

22    this is -- I -- the colorable point I didn't understand.

23    It's really "is within the definition of."  The only

24    gatekeeping function I have here is as to the injunction,

25    not as to whether it's colorable.  So I agree with that

1    point.

2            MR. HUEBNER:  Your Honor, one I think overall

3    thing that does bear mention because it's actually important

4    and there's a little bit of a bizarre quality to all of

5    these colloquies.  Mr. Fogelman and the United States

6    refused and would not agree to be part of NOAT and would not

7    agree to take -- give me a minute, Your Honor, because it's

8    actually important.

9            And the United States of America has carved out

10   entirely from every one of these releases.

11           THE COURT:  I understand all of that.  I get that

12   Mr. Huebner, but I had actually forgotten to mention this

13   point.  I didn't understand why the phrase "is colorable"

14   and "is within the definition."  I get the definition part

15   because the purpose of this is to, in essence, protect the

16   injunction.  But the "is colorable," I didn't -- that's

17   really -- if I determine that it's not enjoined, then really

18   whether it's colorable or not is for another court.

19           MR. HUEBNER:  Correct, Your Honor.  I just -- I

20   didn't actually make the point yet.  If you give me one more

21   second, I promise I'm just about done.

22           THE COURT:  Okay.

23           MR. HUEBNER:  The reason the states have a

24   different view on these things and have signed off on many

25   of these things is because, unlike Mr. Fogelman, it is their

1   entity that will bear all the costs of dealing with this.

2   And so I just want to note because it's important the people

3   who actually -- whose claims we're talking about and whose

4   MDT has to pay for all this are not objecting.  And the

5   person who has not agreed to be part of any of this and

6   bears no cost is trying to change the releases that the

7   affected state governmental entities have agreed to.

8            So there are reasons why many of us agreed on this

9   language that are relevant to maximizing value for the

10  states.

11           THE COURT:  Okay.

12           MR. HUEBNER:  That's really the point I wanted to

13  make.

14           THE COURT:  All right.  I'm not --

15           MR. HUEBNER:  We've obviously fixed anything that

16  needs to be fixed.

17           THE COURT:  Look, I'm not faulting you all on this

18  at all.  But I understand that point, so --

19           MR. HUEBNER:  And that's all I had, Your Honor.

20  I'm not --

21           THE COURT:  Okay.

22           MR. HUEBNER:  -- I'm just really not pushing back

23  on the gatekeeping issue but --

24           THE COURT:  All right.

25           MR. HUEBNER:  -- the context matters here as does

Page 35

1    who's speaking and who's not.

2              THE COURT:  That's fair.

3              MR. UZZI:  Your Honor, Gerard Uzzi of Milbank.

4    Just what we were trying to -- what we were attempting to

5    accomplish with the colorable language is making sure the

6    gatekeeper function was a true gatekeeping function, and

7    that's it.  And the compare and contrast is that it

8    shouldn't be just bare allegations that if it's going to be

9    carved out here, there should be something more than a

10   simple bare allegation that allows parties to bring

11   lawsuits.  And that's all we were trying to say by colorable

12   that there's something real.

13             THE COURT:  Well, I understand that, but I think

14   you have other devices on that point like Rule 11 and state

15   law equivalents.

16             MR. FOGELMAN:  And, you know, while Mr. Huebner

17   may disagree with this point, shouldn't it also be the

18   burden of the shareholder release parties to make that

19   showing rather than having --

20             THE COURT:  No, I don't think  so.

21             MR. FOGELMAN:  -- states who might not --

22             THE COURT:  I don't think so.  If someone's

23   violating an injunction, I'm not -- I think it's fine this

24   way.  I think -- I don't think that should be changed.

25             MR. FOGELMAN:  Okay.  Your Honor, I think the last

1    point I have is on Schedule X which was not revealed until

2    just before I think the previous hearing.  It looks like a

3    law firm named Norton Rose is getting a release.  And just

4    as other law firms like Paul Weiss and Milbank were cut if

5    they're not contributing anything to the plan, you know,

6    likewise, Norton Rose should not be included on that list

7    either.

8              THE COURT:  Well, all right, but that's really not

9    a drafting issue.  I mean I think I understand the rationale

10   for that which is that, in essence, they've been the subject

11   of enormous discovery here.

12             MR. FOGELMAN:  Okay.  Your Honor, I have nothing

13   further except just to reiterate I think Your Honor's point

14   under 10.6(B) was a very good one and an important one that,

15   you know, to the extent there's a McKinsey out there who

16   worked with the Debtors, they shouldn't be getting a release

17   through the definition of related parties (indiscernible)

18   through the definition of released parties in 10.6(B).

19             THE COURT:  Okay.

20             MR. ECKSTEIN:  Your Honor, can I just step in for

21   one moment?  This is Ken Eckstein from Kramer Levin?

22             THE COURT:  Sure.

23             MR. ECKSTEIN:  Thank you.  I just didn't want my

24   silence to be misinterpreted.  We've worked very closely

25   with the Debtor and the Sackler entities over the last few

Page 37

1    days as we have throughout.  But as Mr. Huebner indicated,

2    the recent expansion or narrowing, let's say, of the release

3    with respect to non-opioid claims is a significant issue to

4    the governmental entities and will be very important to the

5    MDT because the MDT has committed in the settlement

6    agreement and in the plan to support the enforceability of

7    the release and has agreed to do so at its own expense.

8            And that was something that we were comfortable

9    agreeing to at a point in time when the release was viewed

10   as being more comprehensive.  But to the extent this release

11   becomes any less clearer or any more murky and to the extent

12   there is going to be the risk of any greater post-effective

13   date jocking for seeing if claims can be created post-

14   effective date that potentially flip through very

15   complicated releases, we are concerned about finding

16   ourselves sort of as the MDT on behalf of the beneficiaries

17   of the plan.  And that's both the private creditors and the

18   public creditors who will be receiving funds through the

19   MDT.

20           We're concerned about being burdened by expensive

21   and distracting litigation.  And the MDT will have very

22   significant obligations that we've committed to.  So we are

23   directly concerned about making sure that wherever we come

24   to rest, that this release is as clear as possible and that

25   there is little ambiguity because we're not looking to

Page 38

1   encourage litigation post-effective date to the extent we

2   can avoid it.

3           THE COURT:  Okay.  Well, I mean that was -- that's

4   why I think this was in some sense a drafting session

5   because I was trying to make sure there wasn't ambiguity.

6   And I do understand --

7           MR. FOGELMAN:  Thank you, Your Honor.

8           THE COURT:  I do understand the concern that both

9   you and Mr. Huebner raised on that point.

10          MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

11  from the U.S. Trustee's Office.

12          THE COURT:  Yes.

13          MR. SCHWARTZBERG:  Your Honor, I just raised to

14  bring up two points, but first clear these are in additional

15  to our objection and our oral argument.

16          THE COURT:  Right.

17          MR. SCHWARTZBERG:  The first is that we do adopt

18  the comments by the U.S. Attorneys Office.  And, second,

19  Your Honor, in regard to the releasing parties where they

20  have the parenthetical, the new definition of releasing

21  parties where they have the parenthetical, at the end where

22  it says "under this plan or treated otherwise," well,

23  "otherwise" is -- we believe is vague and maybe once again

24  trying to get in people or entities that may not be

25  creditors of this case.

1           And I think plan or otherwise is not in the

2     definition of claim under 101.

3           THE COURT:  But a claim is a defined term.

4           MAN:  That's correct, Your Honor.

5           THE COURT:  This is a point that the Seventh

6     Circuit actually disagrees with you on as a fundamental

7     point, so I would take this as a win, Mr. Schwartzberg.  You

8     might well have lost on this point if they hadn't made this

9     concession.

10          MR. SCHWARTZBERG:  Thank you, Your Honor.

11          THE COURT:  At least the Seventh Circuit thinks so

12    in their most recent case on this issue, Ingersoll.

13          MR. SCHWARTZBERG:  Thank you, Your Honor.

14          MR. EDMUNDS:  Your Honor, Brian Edmunds for the

15    State of Maryland and I think in all likelihood for the

16    other objecting states, I just want to note if I can with

17    respect to the matter I raised on Wednesday regarding the

18    10.6(B) releases that while it does appear that Debtors have

19    taken steps to clarify them and to, you know, ensure that

20    the released party -- that the undiscovered McKinsey is

21    excluded from the releases, I have not had time that the

22    plan filed at 11 last night to discuss with other states

23    these issues in full and to fully trace out what the changes

24    have been.

25          And so, you know, I agree for I'm sure completely

1    different reasons than Mr. Eckstein agrees that we need to

2    be clear and have clear language on the releases.  And I

3    just wanted to say that while I think this is a step in the

4    right direction, it may be that after fully reviewing this,

5    states have a different view of whether this reaches the

6    level of clarity that we need.

7         And so I'd ask the Court to allow, you know, us

8    the additional time to discuss and comment on the plan that

9    we really didn't understand was being filed at 11 last

10   night.

11        The other thing is the same would go for the

12   shareholder related releases and the changes made there.

13   And I would adopt what Mr. Fogelman has said for the states.

14   But, again, we need to be precise here.  I think that this

15   is pretty important to how the states' police powers get

16   discharged in the future.  And I think we're going to take a

17   closer look than we've been able to at this point.

18        MR. VONNEGUT:  Your Honor, I'd like to address

19   those comments briefly, if I may.

20        THE COURT:  Okay.  That's fine.

21        MR. VONNEGUT:  Okay.  Your Honor, we've been

22   attempting to work with Mr. Edmunds to address his concerns

23   this week.  I would note the plan with this release

24   structure was filed on March 15th five months past without

25   comments received from Mr. Edmunds other than we want the

1    releases deleted.  We asked repeatedly whether there were

2    other revisions to the releases that would be helpful to

3    narrow them.

4           This week I've had several conversations and,

5    frankly, I've continued to ask repeatedly if you have a

6    markup, if you want words changed, please tell us.  It's

7    getting to be a little bit much when we show up at a hearing

8    which was originally scheduled to be the ruling on

9    confirmation to simply be told again we don't think it's

10   clear enough.

11          If parties do not think the releases are clear

12   enough at this stage in the game, we really need to know

13   why.

14          MR. EDMUNDS:  Your Honor, if I could respond.  I

15   mean with all due respect to Mr. Vonnegut, he doesn't quite

16   know the discussions that have happened and that have

17   occurred and is not fully disclosing the level of off-the-

18   record communication between the states and the Debtors with

19   respect to these releases.  And I don't think we need to

20   point fingers on the record here.  I think we just need to

21   get the job done, which is to make sure that this new

22   language filed at 11 last night --

23          THE COURT:  Look, that's fair, Mr. Edmunds.  But I

24   think there's -- it appears to me subject to the cleanup

25   questions that I had raised that the Debtor release is with

Page 42

1    respect to claims that the Debtors have and that the

2    releasing parties would have, one that as far as non-opioid

3    claims is I think as cabined as one can make it to a true

4    Debtor claim release.

5             And if there's any doubt about that, I think you

6    just have to read the Quigley case and Judge Chan's

7    interpretation of it in her 2019 W.R. Grace opinion.  And as

8    far as the third-party release of the shareholders is

9    concerned, I think it is clear too that except for making

10   clear again that it's cabined as to non-opioid claims by the

11   definition of the excluded non-opioid claims, as is the

12   other release.

13            So I think we're -- at this point, subject to the

14   cleanup, and I think it is just true cleanup that we've

15   discussed, is clear.  But if you see something here that

16   isn't, I guess you can let me know Monday or Tuesday -- no,

17   Monday, not Tuesday.  Monday.  But I just don't really see

18   it here at this point.

19            MR. EDMUNDS:  Thank you, Your Honor.  We're not

20   trying to delay --

21            THE COURT:  No, I understand.  You have a group of

22   people you're dealing with.  I get that.  You're one lawyer.

23   You have to talk to eight other lawyers or seven other

24   lawyers.

25            MR. EDMUNDS:  Thank you, Your Honor

Page 43

1   (indiscernible).

2          MR. HUEBNER:  So, Your Honor, two quick things

3   from the Debtors' side that I think are quite important to

4   note.  First of all, since we didn't have any colloquy on

5   Mr. Schwartzberg's point, just very quickly, because I think

6   the world should understand the evolution and it will take

7   30 seconds and then I have one other point, then I'm done.

8          This provision with the parenthetical after claims

9   is what began as the "any other person" language that the

10  U.S. Trustee and the DOJ have a lot of difficulty with.  We

11  changed it to "causes of action" and took out "any other

12  person" several rounds ago, which we actually believed until

13  the closing 20 seconds of Wednesday's hearing solved

14  everybody's problems.  Mr. Schwartzberg absolutely

15  appropriately stood up and said, "For the record, I'm still

16  not (indiscernible) because of causes of action."

17         We've now deleted causes of action and put in only

18  a parenthetical not applying a defined term.  This has moved

19  and moved and moved, and I believe they have prevailed in --

20  in -- in -- in -- you know -- in -- in -- in  -- and I think

21  that's a lot to say about that.

22         THE COURT:  Okay.

23         MR. HUEBNER:   With respect to Mr. Edmund's point,

24  I think it's critically important that the record be clear

25  and, Your Honor, we understand and Mr. Edmunds, like many of

1    the other AG's are working around the clock on this, you

2    know, and we respect that deeply, but I just wanted the

3    record to bear, when he says working with the states, he

4    means a very small number of objecting states.  The

5    overwhelming majority of states were part of this draft --

6              THE COURT:  I understand it --

7              MR. HUEBNER:   -- I know, but Your Honor, he kept

8    saying the states --

9              THE COURT:  No, it's -- it's -- it's the objecting

10   states.

11             MR. HUEBNER:  (Indiscernible) it's a very small

12   number of states.

13             THE COURT:  I understand.

14             MR. HUEBNER:   And as long as the record is privy

15   the article saying the states are objecting to the releases,

16   sometimes, as you heard on Wednesday, oh it's one of them,

17   sometimes it's three of them, sometimes it's eight of them,

18   but it's never 48 of them who are on the other side.  And I

19   just wanted to make that clear.  There's --

20             THE COURT:  It's a --

21             MR. HUEBNER:  -- no confusion in anybody's mind.

22             THE COURT:  All right.

23             MR. HUEBNER:   So with that, Your Honor, I think

24   the releases are behind us.  If we missed anything else,

25   along with the Court's, you know, kind of electron

1   microscope reading, we will fix it.  I think we all

2   understand each other now, about what the business deal is,

3   hopefully there is nothing else, given the Court's tape

4   flags and post-it's and highlights, but (indiscernible) at

5   least from the debtor's perspective, these releases have

6   been radically, radically narrowed in the last ten days as

7   to parties and scope, and hopefully that gives many parties

8   a very different view of what is being paid for and what is

9   being consensually given by the creditors and stakeholders

10  of the case.

11          THE COURT:  Okay.  Very well, thank you all.  It

12  would be helpful if I got these revisions by Tuesday, in

13  anticipation of a ruling on Wednesday morning.

14          MR. EDMUNDS:  Of course, Your Honor.

15          THE COURT:  And I -- I -- I may sound like a

16  record with a scratch in it, but it would also be, I think,

17  a real service to millions, if not tens of millions of

18  people, if the objecting states or some subset of them, were

19  able to resolve their differences with the Sackler's.  One

20  benefit of a lengthy hearing like is, is that the evidence

21  does come out to a great extent, and there will be a ruling

22  on this that goes through the evidence.  That makes it hard

23  for either side just to take rhetorical positions in the

24  future.

25          A ruling also makes it very hard to settle

Page 46

1    thereafter.  So the parties basically are left with a choice

2    of resolving their differences now or taking the time,

3    primarily, but also spending the money to fight thereafter.

4    One way or another, either on appeal or in connection with

5    some other form of bankruptcy process.  And one thing that

6    is crystal clear from the record of the trial, on the

7    confirmation hearing, is that time is no one's friend.  And

8    by that, I really mean, the people who would benefit

9    immeasurably from implementing what all of the states have

10   agreed to, as well as, frankly, all of the other

11   constituents in the case, as far as abatement and

12   distributions.  So there really is a very narrow window here

13   that can be used, and I think having heard the lawyers from

14   both sides, they're very talented lawyers.  They know the

15   risks they face.  I would hope their clients would also be

16   realistic about those risks, and just a function of these

17   extra couple of days gives you the opportunity to address

18   them without running the risk of substantial delay of

19   implementing a plan that, at least as far as it's operative

20   effects, is something that I have, I believe, perhaps with

21   the exception of the remaining portion, if there is one of

22   West Virginia's objection, 100% consensus on.

23            So, why don't I turn to the other two matters that

24   also delayed my ruling, and I don't care in which order I

25   take them in.  Why don't I take the -- the so called MDT's

Page 47

1    or the co-defendant issue first.  And on this one, I really

2    have just a -- a fundamental question.  As I -- as I read

3    the plan, and it's definition of co-defendant claim, which

4    includes any claim to any MDT insurance policy, or attempt

5    to recover from any MDT insurance policy, and the treatment

6    of Class 14, which is the co-defendant claims.  It appears

7    clear to me that to the extent that a co-defendant has a

8    claim, whether it is a named insured or co-insured or not,

9    it will not have any interest in the MDT trust or the MDT

10   insurance, under this plan.  Is that right?

11           MR. GLEIT:  Your Honor, Jeff Gleit, on behalf of

12   the debtors, and that is correct.

13           THE COURT:  Okay.  Even it -- even if, and it's

14   not clear from the exhibits whether this is the case, it's

15   actually a named insured or co-insured?

16           MR. GLEIT:  We, there are a few insurance policies

17   that are in -- in the record and I can give you either a

18   list of them or not, but they're -- well, they're blanket

19   endorsements and they're endorsed -- that they are

20   additional insureds and do not have any greater rights than

21   an additional insured in any of the debtor's policies.

22           THE COURT:  All right.

23           MR. GLEIT:  So they're not a direct named party,

24   their -- their right is as an additional insured based upon

25   whatever contracts they have with the debtors.

1             THE COURT:  All right.

2             MR. GLEIT:  So it's not an independent insurance

3    right.

4             THE COURT:  Well, but -- I guess that begs the

5    question, right?  If it were an independent right, if they

6    did have an independent right to collect on the insurance,

7    they would still not -- they would be precluded not only

8    from collecting on the insurance, but collecting on the fund

9    or the trust?

10            MR. GLEIT:  I'm just going to -- I'm pausing for a

11   second before I answer, Your Honor.

12            THE COURT:  I mean, I think that --

13            MR GLEIT:  (Indiscernible).

14            THE COURT:  I think answer is they would under

15   this -- under this -- under this plan.

16            MR. GLEIT:  If they had an independent right

17   outside to -- to an insurance policy, that -- the plan

18   should not -- I don't believe it's drafted to bar it.  It's

19   drafted here to bar rights against the insurance -- against

20   the debtor's insurance policies where -- where they're just

21   an endorsee, and in -- in addition.

22            THE COURT:  Well, but that -- I guess that begs

23   the question as to whether they actually have an interest in

24   the policy, right?  Which may depend on the nature of -- I

25   mean, there are lots of policies.

1          MR. GLEIT:  Yes, Your Honor.

2          THE COURT:  It may depend on the nature of their,

3     you know, the particular policy and how they're named?

4     Could I -- maybe I -- maybe I'll just cut to the chase.  It

5     seems to me --

6          MS. STEEGE:  But Your Honor --

7          THE COURT:  -- that if a co-defendant has a

8     contract with the debtor that says you shall take steps to

9     name us a co-insured or -- or a party to the insurance, and

10    the debtor didn't do it, so they're not named, the co-

11    defendant has a contract claim against the debtor.  And I

12    understand the structure of the plan, with respect to that

13    fact pattern, because it's just really taking, literally,

14    through the contract, which the debtor hasn't actually acted

15    on.  On the other hand, if the debtor did act on the

16    contract, in a way that gave the co-defendant an actual,

17    enforceable right, in the insurance, I don't understand the

18    debtor's plan.  And unfortunately, I think that can't be

19    decided -- that fact pattern can only be described and not

20    decided.  And this plan, I think just decides it as if all

21    of those contracts are the same and their rights under the

22    contracts are the same.

23         MR. GLEIT:  But Your Honor --

24         THE COURT:  The contracts with the insurer, that

25    is, not the debtor, the insurance contracts.

1            MR. GLEIT:  Understood, Your Honor, may I respond?

2            THE COURT:  Sure.

3            MR. GLEIT:  A few things.  We worked on the

4    stipulation with the so called, DMP's which highlighted the

5    insurance requests in their contracts, which said -- take

6    for an example, Walgreen's would be named as an additional

7    insured under a debtor's policy.  Okay.  And we -- and I --

8    I could either send it by separate letter or I could read it

9    into the record, the insurance policies that are part of the

10   evidentiary record, including the endorsements, which would

11   handle the DMP group, but our argument is based on the

12   Manvel case, that their rights, as additional insureds, and

13   I think it's Page 92, are merely derivative of the debtors -

14   -

15           THE COURT:  That's fine, but -- but, this is the

16   quote from the Manvel case, McArthur, who in essence is a

17   stand in for the DMP's here.  Quote --

18           MR. GLEIT:  Sure.

19           THE COURT:  -- McArthur is not left without a

20   remedy.  It may proceed in the bankruptcy court against the

21   $770 million settlement fund.  Which was the insurance

22   settlement.

23           MR. GLEIT:  (Indiscernible), Your Honor.

24           THE COURT:  And they're not, under this plan, they

25   don't -- they don't have that right.  They don't have any

Page 51

```
 1     right.  They get nothing.

 2             MR. GLEIT:  You're correct, Your Honor, and that's

 3     why it's so -- the way, when I read my statement on Monday,

 4     was, we have reached an agreement on the DMP's for those --

 5     for their treatment under the plan, where they reserved some

 6     claims and rights, but when it comes to insurance, they're

 7     resting on their papers and we're asking you to find that

 8     the claims are not derivative, and if they -- I mean that

 9     they are derivative and assuming they are derivative, they

10     basically waive their adequate protection right, under

11     Manvel.  So I understand --

12             THE COURT:  But that's --

13             MR. GLEIT:  -- what Your Honor's --

14             THE COURT:  -- how do they waive their adequate

15     protection rights?

16             MR. GLEIT:  It was -- that's part of the

17     settlement with the debtors.

18             THE COURT:  I thought they reserved this issue to

19     litigate?

20             MR. GLEIT:  No they reserved the issue and

21     (indiscernible) can explain, they reserved the issue to go

22     after the insureds directly outside of the insurance

23     junction.

24             THE COURT:  But they're enjoined.

25             MR. GLEIT:  That's my (indiscernible) --
```

1              THE COURT:  But I thought they were enjoined.  So

2      they -- that's no right because the plan prevents them from

3      doing it.

4              MS. STEEGE:  And Your Honor, pardon me, Catherine

5      Steege, on behalf of the distributor group, and I represent

6      McKesson.  What we agreed was that with regard to -- we

7      believe we have direct claims against the insurance

8      policies, and we think the insurance injunction fails to the

9      extent it doesn't recognize those direct claims.  That's the

10     objection we preserved.  We agreed to rest on our briefs.

11     The record contains a stipulation showing the contractual

12     provision for those distributors and pharmacies who have

13     these provisions, where the debtor was required to name this

14     as an additional insured, and the policies are part of the

15     record, then they contain the language that would indicate

16     what the debtor did to effectuate that right.  So I think

17     the issue before, Your Honor, is if we have direct rights

18     that live with the decision, we have determined we have

19     derivative rights as counsel argues, that yields a different

20     decision.

21             THE COURT:  But neither of you have briefed what

22     that means, derivative rights.  You just haven't covered

23     that.  I -- I don't -- you haven't -- you haven't tied it to

24     the language.  You're asking me to do -- you're asking me,

25     in essence, to decide -- I mean, this is why I had these

1   questions.  I don't -- I -- when you say the issue is

2   whether we have derivative rights or direct rights.  Are you

3   asking me to interpret the policy terms to -- to see whether

4   you have a right to proceed directly against the insurer, as

5   opposed to proceeding against the debtor to get -- and to

6   compel the debtor to collect from the insurer?  Is that what

7   -- is that the issue you want me to decide?

8              MS. STEEGE:  Yes, Your Honor, I believe that's

9   correct.  What we're -- what we're saying is, we have

10  independent contractual rights, as additional insureds that

11  the policies that are in the record, indicate what the

12  debtor did to effectuate that, and the contract provisions

13  that required them to do so, and that therefore, because we

14  have these direct rights, the insurance injunction can't bar

15  us from asserting those.  That's the objection that we've

16  preserved.

17             THE COURT:  But -- I -- I --

18             MS. STEEGE:  I supposed (indiscernible) claiming

19  from the estate, we have waived that.

20             THE COURT:  All right.  But -- I've read --

21             MS. FRAZIER:  Your Honor --

22             THE COURT:  -- I've read your briefs carefully.  I

23  don't think there is one case in either brief that

24  interprets whether a -- a -- a party in the same position as

25  the MDP's, can proceed directly against an insurer or not.

1    That's just not covered.  On the debtor's side, they argue

2    Manvel, but Manvel is all about a channeling injunction, and

3    there's no channeling here.  So if you --

4            MS. FRAZIER:  Your Honor --

5            THE COURT:  -- you're really asking me to, I

6    think, interpret an issue of insurance law, and no one's

7    briefed insurance law.  So my suggestion to you all is to

8    say that in the plan, you have direct rights to the extent

9    it's determined you have direct rights and leave it at that.

10   And if someone wants to pursue their direct rights, they can

11   pursue them.  And they can litigate that in front of the

12   state court or federal court, arguing that the merits of the

13   insurance coverage issue as to whether it's direct or not.

14           MS. FRAZIER:  Your Honor, Heather Frazier of

15   Gilbert LLP on behalf of the Ad Hoc Committee of

16   Governmental Claimants and other contingent litigation

17   claims.  Our position is that, Your Honor, need not decide

18   this coverage issues.  As Your Honor, started out this --

19   this -- your questioning today, we believe the releases are

20   clear.  They have released all of their claims.  It does not

21   matter if their claims are derivative or direct under the

22   insurance policies --

23           THE COURT:  Well, no one's briefed that issue

24   either.  No one's briefed the terms of the release.  You --

25   so that could be preserved too, include whether these direct

Page 55

1    claims are released.  To me that -- look, I -- I'm not quite

2    sure this is --

3              MS. FRAZIER:  Your Honor it --

4              THE COURT:  -- being litigated in this context,

5    since the parties have agreed that these rights, to the

6    extent they exist, are preserved.  So why not -- why not

7    spell out, clearly, what those rights are that are

8    preserved, and the debtors' reservations to them, including

9    that they may have been waived as part of a release.

10             MR. HUEBNER:  Your Honor, may I make a procedural

11   suggestion?

12             THE COURT:  Okay.

13             MR. HUEBNER:   Davis Polk is not handling this

14   because we are conflicted because many of these counter

15   parties are, in fact, clients of our firm.  I feel like

16   there is a resolution in here, somewhere, that people did

17   not intend to ask the Court to do something that they were

18   not comfortable with.  And I'm not sure we're going to reach

19   it groping around on this hearing.

20             THE COURT:  Well --

21             MR. HUEBNER:   So if I'll make a suggestion, we

22   have until Wednesday, we have Ms. Frazier, we have Mr. Gleit

23   as (indiscernible) counsel, we have Ms. Steege and a great

24   number of other people, who thought they worked this all out

25   in a way that was acceptable.  If I could ask and forgive me

Page 56

1    for trying to be Master of Ceremonies as opposed to advocate

2    and litigant, because we are conflicted and that's why my

3    boss is staying off.

4            I think there are answers, and I think it might

5    make sense to let people to think about it and package them

6    up, just like on the release in the section in the first

7    part, Your Honor, catches stuff.  Somehow you read more

8    carefully than 500 lawyers, who thought it was all done

9    right, and we need to adjust and fix it, as the Court sort

10   of needs it.  Let the parties who are working on this figure

11   it out, because I don't think any of them think they're

12   asking you to do something that -- that they're not -- that

13   they don't think is appropriate, but it may make sense to

14   let them caucus and come back.

15           THE COURT:  All right.  Well, I just want to be

16   clear.  I am not deciding, as part of this confirmation

17   hearing, an insurance coverage dispute as to whether someone

18   has a direct right against an insurer or only can recover

19   through the debtor.  I'm also not deciding, as part of

20   confirmation, whether if a party does have a direct right,

21   it waived it as part of a release.  Which again, has not

22   been briefed to me.  The parties can reserve that issue.  I

23   -- it's not a condition to confirmation.  It's I think an

24   issue that the parties have already agreed to reserve to be

25   decided post confirmation, and that's a good idea.  So if

1    you just want to, you know, preserve your rights, and lay

2    that out and only those rights are preserved, that's fine.

3    I think that's how you should deal with it.  I appreciate

4    that --

5              MAN:  Your Honor --

6              THE COURT:  -- you all were working very hard to

7    narrow all your disputes and have left this one for last,

8    but until I actually focused on it over the last couple of

9    days --

10             MS. SHANNON:  (Indiscernible) --

11             THE COURT:  -- it just --

12             MS. SHANNON:  (Indiscernible) --

13             THE COURT:  -- it wasn't --

14             MAN:  I'm sorry.  Ms. Shannon from Pennsylvania, I

15   believe, if you could please put your phone back on mute

16   (indiscernible).

17             THE COURT:  So anyway, I think it is -- I do now

18   understand it.  I think it is a reserved issue as opposed to

19   a plan confirmation issue, which is the Manville issue.

20   That is a plan confirmation issue.  I don't think that's

21   what we're talking about here now that I've had my questions

22   answered.

23             MAN:  Right.  So I see Mr. Eckstein has come off

24   mute, and unlike me he is able to be involved.  So let us

25   perhaps hear that he has a magic answer for everybody.

1           MR. ECKSTEIN:  Your Honor, I don't have a magic

2    answer, but I actually think that I concur with Mr.

3    Huebner's suggestion.  This is an extremely important issue.

4    I don't think it's fair to necessarily view this as an

5    agreement to defer disputes with respect to insurance to

6    post-effective date.  I think it is going to be important

7    for the parties following this hearing to sit down and

8    continue to speak about maybe clarifying what was intended

9    here because I fear that we could take steps backward and I

10   don't want to --

11          THE COURT:  Right.  Well --

12          MR. ECKSTEIN:  -- do that at this point in time.

13          THE COURT:  -- if you --

14          MR. ECKSTEIN:  So I think we need some time to

15   talk this through.

16          THE COURT:  That's fine.  That's fine, but I want

17   to be very frank with you all.  The issue, I believe, is a

18   narrow issue, but I think it is an issue of reserved rights.

19   I don't think it's a condition to confirmation, and it's not

20   opening up all the other things that the parties have

21   resolved.  It really is just -- I guess if the narrow issue

22   is whether this release covers this set of facts or not, I

23   guess I can decide that issue.  That certainly was not

24   something that was briefed to me.  I mean, not one word of

25   it was briefed to me unless there was a brief that I didn't

Page 59

1    get, you know, that we couldn't find on the docket.  So, but

2    as far as the coverage issue is concerned -- I think I've

3    said what I want to say.

4              MR. ECKSTEIN:  I think your point is clear, Your

5    Honor, but I think Your Honor appreciates from a slant

6    standpoint and from a settlement standpoint, the MDT is

7    expecting to utilize the proceeds of insurance for the

8    benefit of the abatement funds and the creditors have relied

9    very directly on the insurance.

10             THE COURT:  Well, that's true.

11             MR. ECKSTEIN:  And I think what we want to avoid

12   is competition with the insurance.

13             THE COURT:  That -- I understand that, but if they

14   actually have a property right in the insurance that they

15   can enforce, I think that was a vain hope because they're

16   not getting --

17             MR. ECKSTEIN:  That's why I think --

18             THE COURT:  -- anything on account of that --

19             MR. ECKSTEIN:  -- we need to have some more --

20             THE COURT:  -- property right under the plan.

21             MR. ECKSTEIN:  That's why I think we need to have

22   some more discussions because we think that they are getting

23   very significant benefits under the plan.  The releases are

24   very valuable, and so I think -- I'm hoping we can work this

25   out through a little more discussion.

1          THE COURT:  Okay.  Very well.  All right.  Then

2     the other point I had was a whole different set of --

3     involved a whole different set of lawyers, which is --

4     pertains to the U.S. Trustee's objection to certain aspects

5     of the plan treatment of fee claims.  And I'm not talking

6     here about the defined term "professional fee claims" and

7     the incorporated term "professional persons", but instead

8     Section 5.8, which, based on the evidence before me, was a

9     carefully and heavily negotiated set of provisions to deal

10    primarily with what appear to me to be pre-petition claims

11    against the Debtors' estates, but some post-petition claims.

12          And I have testimony generally as to the

13    reasonableness of these provisions with -- I think two

14    exceptions.  And I -- and that's all I really want to

15    address because the parties have adequately briefed

16    everything else.  And I didn't -- do I have Mr. Schwartzberg

17    on since it's his objection?  Yes.  Good.  And I'm -- as you

18    were careful to note last time in your responding to my

19    questions on this set of issues, I'm not assuming that

20    you're waiving all your other arguments.  I just really

21    wanted to have some clarity on these issues.

22          MR. SCHWARTZBERG:  Yes, Your Honor.

23          THE COURT:  And that goes for everyone else too.

24    Assume for the moment, and I'm not binding anyone to this

25    assumption because I know there are arguments that would

Page 61

1    render the assumption irrelevant.  But assume for the moment

2    that one concludes that 1129(a)(4) would apply to the

3    payments contemplated, albeit not as an administrative

4    expense, but just contemplated by Section 5.8 of the plan.

5           And assume for the moment that there's ample

6    testimony that where 5.8 covers what would be a contingency

7    fee or spelled out in terms of a percent fee, and the

8    evidence makes it clear that those fees are reasonable in

9    the marketplace and negotiated down as part of the overall

10   settlement with an increase in the settlement to pay for

11   them.  So I'm asking you to assume all that.

12          There are a couple of categories of fees that are

13   not covered by a percent for a frankly contingency fee type

14   mechanism.  They are the PI Claimant costs and expenses in

15   5.08(g) and the public schools costs and expenses, I think,

16   maybe not, in 4.08(h).  Those are, I believe, going to be

17   the case of the PI Claimant costs both for the Ad Hoc Group

18   of Individual Victims and the NAS Committee in connection

19   with the Chapter 11 cases determine or presented based on

20   the hourly rates of those counts.

21          And as far as the public schools, there's a

22   dedicated amount that I think also is going to be based, or

23   at least evaluated as far as reasonableness is concerned

24   based on an hourly rate.  Or with regard to H

25   (indiscernible), a contingency fee that's not been disclosed

Page 62

1   for the class counsel.  Again, I'm asking you to assume but

2   not agree that these two categories are subject to

3   1129(a)(4).  How is it contemplated that the Court would

4   review the reasonableness of those two categories?  It's

5   really a question for the -- I guess maybe for Mr. Shore.

6           MR. SHORE:  Your Honor, Chris Shore from White,

7   White and Case on behalf of the Ad Hoc Group of Personal

8   Injury Victims.  There is no current contemplation in the

9   plan with respect to a reasonableness review of those fees

10  because, I don't want to fight here, assumption with respect

11  to 1129(a)(4) --

12          THE COURT:  Right.

13          MR. SHORE:  -- applying to the technical way in

14  which the distributions are structured.  So you know --

15          THE COURT:  Okay.

16          MR. SHORE:  -- there seem to be options that would

17  be available for that, and we could discuss that, but the

18  current -- to answer your question, there's no current drug

19  (indiscernible).

20          THE COURT:  Okay.  And I think I saw briefly, I

21  think it's counsel for the public schools come on.  I don't

22  know if I have the public schools' counsel on or not.  No.

23  Okay.  Well, I just wanted to make sure I understood the

24  answer to that question.  I mean, one option would simply be

25  an application, which obviously Mr. Schwartzberg says I

Page 63

1    should review under 503(b), but it may well be that I come

2    out that I review it under 1129(a)(4).

3            I will also note that both of these groups have

4    been so active in these cases that it's hard to see why they

5    wouldn't be covered by 503(b).  But I am troubled by the

6    notion that there's no reasonableness review under

7    1129(a)(4) for those two categories.

8            MR. SCHWARTZBERG:  Your Honor?

9            THE COURT:  Well, I don't know if, Mr. Shore, you

10   were going to say something first.  Then I'll hear from you,

11   Mr. Schwartzberg.

12           MR. SHORE:  I was.  Let me address the only

13   pending objection, which is with respect to there has to be

14   a 503(b) application.

15           THE COURT:  Right.

16           MR. SHORE:  As we pointed out in our papers, the

17   Debtors are not paying these expenses.  The expenses --

18           THE COURT:  No, I get the 503(b).  I'm really

19   focusing on 1129(a)(4).

20           MR. SHORE:  Well, let me just -- with 503(b), the

21   consequence of a 503(b) application is that if the state

22   pays the fees, given the way the plan is structured, that

23   technically would come out of the public (indiscernible)

24   because they bear all the risk of admin expenses.  The deal

25   was that the money put into the trust --

 1              THE COURT:  I understand.

 2              MR. SHORE:  -- to spread out -- right.

 3              THE COURT:  I understand.

 4              MR. SHORE:  So --

 5              THE COURT:  That's why I'm focusing on 1129(a)(4).

 6              MR. SHORE:  I just wanted to, you know, tie up the

 7     record on --

 8              THE COURT:  Right.

 9              MR. SHORE:  -- on 503.

10              THE COURT:  Right.

11              MR. SHORE:  On 1129(a)(4), the distinction here is

12     that the disclosures were made to the group, and the -- who

13     bears the risk of (indiscernible).  And I'm not suggesting

14     that if Your Honor reviewed the invoices of White Case or

15     the invoices of Ask, LLP and Niger who worked throughout

16     this case that you're going to find anything unreasonable.

17     The issue would be who bears the burden of the

18     unreasonableness.

19              THE COURT:  Not the burden of proof --

20              MR. SHORE:  So let's this is --

21              THE COURT:  -- but who suffers if it is

22     unreasonable.

23              MR. SHORE:  Right.  Well, the way that the

24     structure works is the -- unlike the other groups, the

25     contingency fees of the individual members of the ad hoc

Page 65

1    group are carved out under 5.8(i).  And so they're going to

2    be a bottom-of-the-line deduction from the -- or below-the-

3    line deduction from the recoveries of personal injury

4    victims who, for example, have hired (indiscernible)

5    Thornton, who has worked throughout this case

6    (indiscernible).  Right?

7            So what ends up happening is with respect to

8    anything that would be unreasonable, the members of the ad

9    hoc group would still have to pay those -- get double-taxed,

10   right?  They don't get their contingency fee reimbursed.

11   They have to pay those fees, and the 95 percent of other

12   creditors who voted in favor of this get relief from that,

13   which is just an allocation of the risk there that people

14   have accepted in the context of the plan.

15           So that -- that's -- and I think 1129(8)(4) argued

16   that the trust which is receiving a distribution from the

17   master distribution trust is really not receiving property

18   of the Debtor directly.  So it is a -- the argument would be

19   that it's a form over substance matter.  And what I'm saying

20   is there is substance to the distinction in the way we've

21   done this.  Because otherwise, those fees get spread out

22   throughout the entire Creditor body, which was not to be.

23           THE COURT:  Well, that's if it -- if 503 applies.

24           MR. SHORE:  Right, but even if -- the way this is

25   structured that it was put through, the other way to do it

Page 66

1   would be to put the fees up at the MVT and then the free-

2   rider problem is spread differently, as opposed to the fees

3   getting inserted at the PI trust.

4           THE COURT:  All right.

5           MR. SHORE:  But there is a distinct -- a real

6   distinction to the way the plan was set up where the Debtor

7   is distributing to the MVT, and that the MVT, not a debtor,

8   is distributing to the PI trust.

9           THE COURT:  I understand, although it does provide

10  for the fees.  So I think I have the answers to my

11  questions.  I don't really have the answers on the public

12  schools, but --

13          MR. HUEBNER:  Your Honor, if I could jump in for a

14  second.  I'm trying to get you the answer on the public

15  schools.  I've emailed their counsel (indiscernible), though

16  I'm guessing that while we all sit here that's probably not

17  going to happen in time.  So it may be that we ask them to

18  put in a letter to help explain.  I don't (indiscernible) --

19  they might not have just known, you know, that their issues

20  were resolved several months ago, that this hearing frankly

21  was on for today --

22          THE COURT:  Right.

23          MR. HUEBNER:  -- about their fees.  Your Honor,

24  let me help with some --

25          THE COURT:  Well, can I just say --

1            MR. HUEBNER:  -- because it actually might --

2            THE COURT:  -- I think you could relay this to

3    them.  There are two categories of fees and expenses covered

4    by the --

5            MR. HUEBNER:  H.

6            THE COURT:  -- the H, right, for the public

7    schools.

8            MR. HUEBNER:  Yeah, you mean H(ii).  I have a

9    note, Your Honor.

10           THE COURT:  5.8H, and then (i) is 500,000 for

11   payment of reimbursement and expenses, such as for special

12   bankruptcy counsel.  Now --

13           MR. HUEBNER:  Yep.

14           THE COURT:  -- I -- just because it says special

15   bankruptcy counsel, I'm assuming that's post-petition, so

16   it's not covered by UM&M.  It's not covered by United

17   Merchants and Manufacturers, so it is a post-petition

18   amount.  And you know, if the people that are getting this

19   $500,000 worked, you know, 20 hours for it, that's not

20   reasonable.  I have no idea.  When two, the (II) is to pay

21   or reimburse the punitive class counsel.  And I'm assuming

22   probably there is a contingency fee analysis there, but I

23   don't know what it is.  Unlike the amount for the others,

24   which I have ample testimony is reasonable, you know?  I

25   think -- this --

1          MR. HUEBNER:  And Your Honor ---

2          THE COURT:  -- might be a 50 percent contingency.

3    I don't know.  So that's really what I'm focusing on.

4          MR. HUEBNER:  Your Honor, I agree, and I actually

5    have H1 and (ii) open in front of me and so I've been

6    following along.  It also may be, frankly, that the better

7    approach would've simply have been because it may be that

8    the contingency fee is unusually low and that it should be

9    wrapped into a single approach, which is reasonable and --

10         THE COURT:  Well, yeah.  If I knew --

11         MR. HUEBNER:  -- maybe it'd (indiscernible).

12         THE COURT:  -- that it was 20 percent or 10

13   percent or whatever, that shouldn't be a problem.  And --

14         MR. HUEBNER:  Exactly.

15         THE COURT:  -- if that were the case --

16         MR. HUEBNER:  So (indiscernible) --

17         THE COURT:  -- I think I would need --

18         MR. HUEBNER:  -- (indiscernible) --

19         THE COURT:  -- an 1129(a)(4) application.  I think

20   I may for the 500,000 because that doesn't seem to be tied

21   necessarily even to hourly rates.

22         MR. HUEBNER:  Yep.  And it may be that combining

23   them into a number and having the contingency lawyers pay

24   the bankruptcy things out of a very reasonable fee is an

25   even easier approach.  So we -- as steward of the process,

Page 69

1    we will chase it down.  Your Honor, let me, if I may,

2    because I think it's actually very -- I hope it will helpful

3    for 45 seconds zoom out on this because it's important and I

4    think it will give context to the answers both that you got

5    and that you did not get.

6         So Your Honor, Mr. Price, as I told you on Monday,

7    as counsel to the UCC, I've counted 30 intra-Creditor and

8    other settlements in the plan of which this is one, and I

9    only counted 14.  Probably had I listed 30, I think somebody

10   would've come and found me and done things to me.  So I

11   stopped at 14.

12        As I think I made clear, sometimes the Debtors

13   were deeply involved in those.  Sometimes they were utterly

14   not involved at all, and they were told this is the deal we

15   have reached, put it in the plan.  Sometimes we facilitate

16   it.  Sometimes we actually mediated.  When this attorney fee

17   came up to us, we were flummoxed because essentially we were

18   told the states are refusing to allow the amount of

19   attorneys' fees negotiated for between private parties and

20   their creditors.

21        And some states are refusing to allow other states

22   to be paid with their contingency fee contracts required.

23   And we said we're confused, and they said, well, we're not

24   just creditors, we're states, and we want to ensure that as

25   much money as humanly possible goes to abatement and less

Page 70

1   money goes to lawyers.  And that made a lot of sense when

2   you remember their twin hats.  So then went in and hammered

3   on everyone and on each other, including states who had

4   outside counsel and states who didn't.  Because I think the

5   evidence makes clear they dramatically by hundreds of

6   millions of dollars lowered the attorney's fees otherwise

7   applicable.

8           THE COURT:  Right.  And the --

9           MR. HUEBNER:  In essence --

10          THE COURT:  -- record is clear on that point.  I

11  understand that.

12          MR. HUEBNER:  Understood, Your Honor.  And so I --

13  but let -- and I apologize.  I know that I take too long to

14  get to the punchline, and I'm sorry for that.  It's just a

15  character flaw.  So the issue is as follows: in any other

16  case, the Debtor's Estate would be directed to just send the

17  money to the Claimants and the lawyers would just scoop

18  whatever it is their contracts say and we know it would be

19  much, much higher than this.  What 5.8 does is it

20  substantially limits the fees and that's the overall

21  context.  I know that Mr. Schwartzberg is certainly,

22  certainly not objecting because he's trying to take 800

23  million dollars away from victims and instead give it back

24  to lawyers who have conceded it to their clients.

25          So I'm confident we will figure it out.  It's just

Page 71

1    again, it's important that it be clear to everybody.  The

2    context of 5.8 is taking hundreds of millions of dollars

3    away from lawyers who had contracted for those amounts and

4    instead makes sure that their clients get it.  And so this

5    was one of the very many intercreditor public policy

6    settlements embedded in the plan.

7            And, you know, it brings me to my final point,

8    which is on many levels, I wish I had never said one word at

9    this confirmation hearing because it would have actually

10   been a truer representation of this plan if the

11   representatives of the tort victims had themselves done the

12   argument as to why this settlement is in everyone's best

13   interest and the representatives of the states had made oral

14   argument about how they insisted that hundreds of millions

15   of dollars be transferred from lawyers to victims.  The

16   Creditors Committee should have testified orally, not just

17   in their awesome brief and made argument about how the

18   Iridium standard is satisfied.

19           So on some level, the fact that the Debtors'

20   counsel in our many meetings kept getting allocated all the

21   oral arguments in some ways cast a misimpression.  This is

22   not the Debtors' plan; it's everyone's plan.  It's the

23   victims' plan and the states' plan and the PIs plan, and the

24   hospitals' plan, and the tribes' plan.  And that's the most

25   important thing of anything that I hope this confirmation

Page 72

1    hearing conveyed.  It's not Purdue's plan.  It's the plan of

2    the victims for the victims, supported by the victims and

3    this attorney fee thing, with which I will close, is a

4    tremendous public policy win for the victims that is cloaked

5    in lawyer language and 5.8(Q)(h)(1)(i), but it's important

6    that people understand this was public servants hammering on

7    lawyers to take 10 percent and 12 percent and 14 percent

8    instead of 20 or 30 or 40.  And I hope that helps inform why

9    we believe that 5.8 is defensible and why analytically --

10   and this is in the briefs -- it's not at all obvious that

11   1129(a)(4) applies because it wouldn't have applied in any

12   other case but for the insistence that the fees be lowered.

13   Otherwise, the Claimant Representatives would have just

14   gotten the money and they would have just scooped a much

15   larger amount as their contracts contemplated.

16          So, Your Honor, I just wanted to frame it because

17   it's just a public, important case.  I hope, I just hope

18   that it is helpful and I have nothing further.

19          THE COURT:  Okay.  Well, I think that was largely

20   for perhaps the public because I think you-all can tell from

21   my questions that all of what you said came through with

22   this regard to this provision in the parties' briefs and the

23   evidence presented in the declarations with the two

24   exceptions that I was addressing because, you know, I don't

25   know, I don't think that the PI Group and the NAS Group were

Page 73

1   hammered because there's no -- it just says they'll get paid

2   what they get paid.  So I also think they're being paid on

3   hourly rates.

4           I've seen their counsel.  They've been responsible

5   counsel in the case, but I do have some concern that

6   notwithstanding the arguments that have been made, that

7   technically 1129(a)(4) doesn't apply, that there should be a

8   mechanism to address the reasonableness of these two

9   categories that hasn't really been addressed in the evidence

10  for far.

11          MR. HUEBNER:  Understood.  As I said, we will get

12  to the schools as soon as this hearing is over and figure

13  out what the facts are to get the Court hopefully quite

14  comfortable and I can see Mr. Shore.  We'll figure out his

15  side of things and we'll respond to the Court in the way

16  that he seems, he believes most appropriate.

17          THE COURT:  Okay.  All right.  Mr. Schwartzberg,

18  it was mostly a question for the plan proponent side, but I

19  don't know if you have anything to say on this?

20          MR. SCHWARTZBERG:  I do, Your Honor.

21          THE COURT:  This is isn't intended to be oral

22  argument on all the issues, because all the fee issues were

23  briefed and I heard evidence on them and I got evidence on

24  them.  I was really just focusing on this fairly narrow

25  point.

1           MR. SCHWARTZBERG:  Yes, Your Honor.  What we

2    believed it boiled down to was transparency and oversight.

3    Victims' monies being used to pay attorney fees and we

4    appreciate and are happy that they are being less, but we

5    believe there should be oversight and transparency of those

6    fees so that when the money gets paid, victims know where

7    it's going and how much is being paid.

8           THE COURT:  Well, I think it spells out and I have

9    uncontested affidavits on every category of fee here, I

10   believe, except for the PI claimant costs and expenses in

11   the public schools.  So frankly, I think I have

12   transparency.

13          MR. SCHWARTZBERG:  And, if I may, Your Honor, it's

14   not a question with respect to the PI Trustee, there will be

15   transparency with respect to money coming in and money out.

16          THE COURT:  Oh, I understand that.  There is a

17   mechanism in the plan for the allocation of the money and

18   how it's paid over time.  So we're not talking about

19   administrative expenses here.  This is not, this is not a

20   503 issue, I don't believe.  I think it's an 1129(a)(4)

21   issue.

22          MR. SCHWARTZBERG:  And I will speak to Mr. Huebner

23   to the extent that Your Honor were to rule that 1129(a)(4)

24   does apply here, notwithstanding the objection to that,

25   we'll work out a mechanism for who does the reasonableness

Page 75

1   review and how --

2            THE COURT:  It says the Court.  1129(a)(4) says

3   the Court.  So, I have, as the Court, I have evidence on all

4   the other ones, which is uncontroverted.  I don't think we

5   can delegate it to some other group or some other person.

6   Okay, thank you.

7            MR. ISRAEL:  Your Honor, Harold Israel very

8   briefly on behalf of NAS Committee and with respect to our

9   relatively small portion of the PI Trust, I would submit

10  that the declaration does support the war that we are

11  getting paid on and perhaps to be carved out of that, but

12  understand that Your Honor may feel different.

13           THE COURT:  It supports -- look, you group has

14  been very active in the case and frankly I think if they

15  wanted to, could prevail on a substantial contribution, 503

16  application, but they decided that they're willing to be

17  paid this way instead, which is not as good as a means of

18  payment than getting the money up front.  On the other hand,

19  the quality of the work isn't the issue.  It's really just a

20  loadstar, you know, looking at the hours.  If you did really

21  good work, but it turns out that the hours were five times

22  as much than a normal firm would make to do that good work,

23  then that's a problem.  On the other hand, you get a gold

24  star if it's actually one-half the time.

25           MR. ISRAEL:  Understood, Your Honor.  Thank you.

1            THE COURT:  I think Congress, in this context,

2    really did want the Court to make that reasonableness

3    determination, although they left it up to, Congress left it

4    up to the Court how to do that.  And that includes

5    evaluating a contingency fee.  I don't think your firm is on

6    a contingency fee, your group.  I think they're hourly.  I

7    don't think I have evidence on the NAS PI groups being on a

8    contingency fee.  If I missed that, you should let me know,

9    but I think it's an hourly calculation, which requires my

10   looking at the hours.

11           MR. ISRAEL:  Understood, Your Honor.  Thank you.

12           THE COURT:  All right.  Thank you.  Okay.  That

13   was very helpful to me on both of those issues: the 508

14   issue and the codefendant issue.  So I appreciate everyone

15   taking the extra time to clarify that for me, those

16   questions.

17           I don't know if there's anything else?

18           MR. KAMINETZKY:  Your Honor, I have one

19   administrative issue, if you could give me another 90

20   seconds, or give us another 90 seconds.

21           THE COURT:  Okay.

22           MR. KAMINETZKY:  Benjamin Kaminetzky of Davis Polk

23   on behalf of the Debtors.  The most recent preliminary

24   injunction with this Court entered on June 17th, at Docket

25   274 in the Adversary Proceeding No. 19-08289 is set to

Page 77

1    expire this Monday, August 30th.  So there will be a small

2    gap in the protection afforded by the preliminary injection

3    and the voluntary injection between Monday and Wednesday,

4    September 1st, which is when the Court intends to issue its

5    ruling on confirmation.

6           We thought through this and we believe the most

7    expedient way to deal with this issue is for the Court to

8    enter a very modest bridge order extending the preliminary

9    injunction through its ruling on confirmation on Wednesday,

10   September 1st.

11          At that time, should the Court confirm the plan,

12   the Debtors intend to request that the Court grant another

13   short bridge extension.  There's a provision in the proposed

14   confirmation order that would extend the preliminary

15   injunction through the effective date.  That is at Paragraph

16   56(a) of the proposed confirmation order.  It may be,

17   however, or likely will be that the actual order is not

18   entered on Wednesday if this plan is confirmed on that day

19   and in any event, Bankruptcy Rule 3020(e) provides that the

20   confirmation order is stayed until the expiration of 14 days

21   after entry of the order.  So the Debtors would seek a

22   bridge order at that time between September 1st and the

23   expiration of the 14-day stay.

24          If the Court does not confirm the plan on

25   Wednesday, the Debtors would also seek short extension to

Page 78

1    assess the appropriateness of seeking a further extension as

2    well as the appropriate contours of form of any such

3    extension.  The UCC, the AHC, the MSGE support this request.

4              So what the Debtors have done is we've prepared a

5    form of order that is virtually identical to the forms of

6    order previous entered by the Court.  This includes the

7    provision allowing the states to agree to voluntarily abide

8    by the preliminary injunction rather than be formally bound

9    by it.  The Debtors assume that the states and other

10   governmental entities, including the plan objectors, will

11   want to continue to voluntarily abide by the order rather

12   than be bound by it.

13             So, in sum, Your Honor, we just need a bridge to

14   get us to Wednesday and then on Wednesday we can see what

15   happens and then see what other further bridge is necessary.

16             THE COURT:  Okay.

17             MR. TROOP:  Your Honor, if I may, it's Andy Troop

18   for the non-consenting states.  I remained flummoxed by the

19   Debtors continuing inability to reach out to us and talk to

20   us about these issues that really are focused on members of

21   the non-consenting states and not the other groups that have

22   consented to the relief that they're requesting.  I clearly

23   have no authority from my group to make any recommendation

24   for that.

25             THE COURT:  That's fine.  Can I ask you when does

Page 79

1    this expire?  At the end of the day on Monday?

2              MR. KAMINETZKY:  Monday.

3              THE COURT:  At the end of the day.

4              MR. KAMINETZKY:  Yeah.

5              THE COURT:  Okay.  My strong inclination would be

6    to provide that bridge order on Monday, but you should talk

7    it through with Mr. Troop.  Given, given the short extension

8    sought and the state of the case at this point, it would be

9    highly unlikely that I wouldn't grant the relief, but I

10   think you just ought to run it by Mr. Troop's clients.

11             MR. KAMINETZKY:  Yeah.  The flummoxed, with all

12   due respect, is due to the fact we thought we would get a

13   ruling today.

14             THE COURT:  I understand.

15             MR. KAMINETZKY:  So this is as modest a request as

16   we would imagine.  So.

17             THE COURT:  Frankly, I'm glad that you remembered

18   it.  I thought that the injection went through the

19   confirmation hearing, but now recall that you-all tailored

20   it to be time-sensitive because you were worried -- people

21   were worried it would be unduly delayed, the confirmation

22   hearing, which as you can see --

23             MR. KAMINETZKY:  Right --

24             THE COURT:  -- was just the opposite.  So why

25   don't we leave it at that?

1           MR. TROOP:  Thank you, Your Honor.

2           THE COURT:  Okay.

3           MR. EDMUNDS:  Your Honor, if I may quickly, Brian

4    Edmunds for the State of Maryland.  I would just echo that

5    for specifically the objecting states, echo what Mr. Troop

6    said for the objecting states, though I think communication

7    through him will cover us.

8           THE COURT:  Okay.  Thank you.  Look, this is -- to

9    me, this is a technical administrative extension and, in all

10   likelihood, I would grant it, but I also want to let you

11   know that I have two battling rabbi brothers in court on

12   Monday for most of the day and while you may be sweating

13   bullets that it has not been entered by four in the

14   afternoon, it will get entered one way or the other, I'm

15   confident, on Monday.  If you haven't heard from my

16   chambers, don't panic.  It's just I have to deal with the

17   Sacks brother.

18           MR. EDMUNDS:  Okay.

19           THE COURT:  Okay, thank you.  All right, thank you

20   all.

21           (Whereupon, these proceedings were concluded at

22   11:48 AM)

23

24

25

Page 81

1              C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 27, 2021