**Exhibit B**

**Engagement Agreement**



August 10, 2021

The Honorable Stephen C. Bullock
Monitor
Purdue Pharma L.P

**Re: Pricing Practices Review & Analysis**

Dear Mr. Bullock,

Thank you for the opportunity to complete the requested services we have previously discussed and outlined in the enclosed Statement of Work. The services consist of review and analysis of Purdue Pharma L.P. contractual arrangements resulting in standard industry payments (rebates and chargebacks) to confirm that they are consistent with the terms of the Voluntary Injunction.

The work will be undertaken primarily by John Glover and Beril Pekin. They and anyone else engaged in this project by Pearl will sign and be bound by a protective order outlining the confidentiality and use of Purdue Pharma L.P. documents and other information prior to receiving any such documents or other information.

We look forward to working with you on this project.

Regards,

John Glover
Partner
Pearl Management Consulting, LLC


Enclosures:

(1) Services Agreement

(2) Statement of Work 001: Pricing Practices Review & Analysis

**SERVICES AGREEMENT**

This Services Agreement (this "Agreement") is made and entered into as of the date signed by the last party to sign below (the "Effective Date") and is by and between:

PEARL MANAGEMENT CONSULTING LLC with a principal place of business at 177 East 75th Street 5D, New York, NY, 10021 ("PEARL")

and

NEXTCHAPTER, LLC with a principal place of business at 201 East Broadway Street, Suite A, Helena, MT. 59601 ("COMPANY").

(each herein individually referred to as a "Party" or collectively as the "Parties").

Stephen C. Bullock, Manager-Member of NextChapter, LLC, serves as duly appointed Independent Monitor ("Monitor") for Purdue Pharma L.P. ("Purdue") pursuant to an Order issued in the Chapter 11 Bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York entitled *In re: Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD). NextChapter, LLC is entering into the Agreement with PEARL as part of Mr. Bullock's duties and responsibilities as Monitor.

1. **SERVICES**

    1.1. Pursuant to its engagement on behalf of COMPANY, PEARL services will consist of the Statement of Work ("SOW) to be duly signed by authorized representatives of the Parties and annexed hereto and incorporated herein by reference as a sequentially numbered SOW (*i.e.*, Statement of Work 001, Statement of Work 002, etc.) (hereinafter referred to as the "Services")

    1.2. In the event that COMPANY requests a change in the scope of the Services, PEARL shall provide COMPANY with a new SOW reflecting such changes and costs associated with such changes. Such SOW shall be duly signed by authorized representatives of the Parties and shall be attached as a new SOW in accordance with Section 1.1.

    1.3. <u>No Legal Advice</u>. PEARL is not licensed to provide, and does not provide, any legal advice. Findings and recommendations made by PEARL are provided to COMPANY for consideration and review. COMPANY is responsible for all COMPANY legal and/or business decisions made by COMPANY.

2. **INDEPENDENT CONTRACTOR**

    2.1. Nothing in this Agreement shall be construed to make either Party the joint venturer, partner, employee, or agent of the other. Neither party shall exercise control over the business or activities of the other.

    2.2. In undertaking to perform the Services for COMPANY, it is understood that PEARL is doing so as an independent contractor and not as an employee of COMPANY. As an independent contractor PEARL, shall only be entitled to the payments set out in this Agreement and the relevant SOW.

    2.3. Neither party shall have the power or authority to bind the other party or to assume or create any obligation or responsibility, express or implied, on the other party's part or in the other party's name and

neither party shall represent to any person or entity that either party has such power or authority to act on behalf of the other party.

3. **COMPENSATION**

   3.1. COMPANY shall pay PEARL the fees (collectively, the "Fee") in exchange for performance of the Services as set forth in the applicable Statement of Work. The delivery and payment schedule and agreed time commitments per role (each as applicable) for performance of the Services shall be set forth in detail in each Statement of Work, and in the case of time and materials billing shall not exceed the negotiated hourly rates per role that are set forth in the Rate Card attached hereto and made a part hereof as Appendix B.

   3.2. All invoices for the Fees shall be emailed to the COMPANY on a monthly basis.  The COMPANY will review such invoices and, absent any issues with the invoices warranting further discussion, payment is due 60 days from submission.

   3.3. In addition to the Fee, PEARL shall be reimbursed for all reasonable, documented out-of-pocket expenses incurred by PEARL on behalf of COMPANY.

   3.4. Payments made to PEARL for the Services rendered under this Agreement shall be made in full, without any deductions for taxes of any kind whatsoever.

4. **CONFIDENTIALITY**

   4.1. In the course of PEARL'S work, PEARL may be supplied with certain confidential information and documents in connection with the Services.  In addition, PEARL may also generate certain confidential information and documents.  All communications and transmission of documents between or among the Monitor and PEARL (and any agents working for or retained by or for any of the foregoing), as well  as well as any information or documents developed by PEARL, in connection with the Services, are solely for the purposes of assisting and advising the Monitor.  These communications and documents are or may be subject to privilege or other protections, including, but not limited to, the attorney-client and work-product privileges, and must, therefore be treated with the strictest confidentiality.

5. **INDEMNIFICATION**

   5.1. PEARL will indemnify and hold harmless the COMPANY against any and all losses, damages, liabilities, claims, demands, suits and expenses, including reasonable attorney's fees and court costs (including such fees incurred in responding to any and all claims or suits), resulting from: (i) PEARL's breach of the Agreement or (ii) PEARL's negligence and/or willful misconduct in its performance of the Services under this Agreement.

   5.2. COMPANY will indemnify and hold harmless PEARL against any and all losses, damages, liabilities, claims, demands, suits and expenses, including reasonable attorney's fees and court costs (including such fees incurred in responding to any and all claims or suits), resulting from: (i) COMPANY's breach of the Agreement or (ii) COMPANY's negligence and/or willful misconduct in connection with this Agreement.

5.3. In the event that an indemnified party receives notice of, or becomes aware of, a Claim in respect of which indemnity may be sought hereunder, and the indemnified party intends to seek indemnity hereunder, the indemnified party will promptly provide the indemnifying party with notice of such Claim and the intention to seek indemnity. The indemnifying party will have the right, at its option and its own expense, to be represented by counsel of its own choice and to defend against, negotiate, settle or otherwise deal with any such Claim, provided that the indemnifying party will not enter into any settlement or compromise of any such Claim which could lead to liability or create any financial or other obligation on the part of the indemnified party without the indemnified party's prior written consent. The indemnified party may participate in the defense of any Claim with counsel of its own choice and at its own expense. The parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Claim. In the event that the indemnifying party does not undertake the defense, compromise or settlement of a Claim the indemnified party will have the right to control the defense or settlement of such Claim with counsel of its choosing provided, however, that the indemnified party will not settle or compromise any such claim without the indemnifying party's prior written consent, which consent will not be unreasonably withheld. Notwithstanding the foregoing, indemnifying party shall not be responsible for providing indemnification for any such Claim to the extent that the failure to provide prompt notice has prejudiced the defense of such Claim.

6. **LIMITATION OF LIABILITY**

    6.1. CAP ON DIRECT DAMAGES: Except for damages arising out of or relating to a Party's indemnification obligations, COMPANY's obligation to pay fees, or any other liability which may not be excluded by law, each Party's aggregate liability to the other Party arising under this Agreement will be limited to the amount paid for the services subject of the claim during the six (6) months prior to the occurrence of the events giving rise to the claim.

    6.2. LIMITATION ON TYPES OF RECOVERABLE DAMAGES: In no event will either Party be liable for the following types of loss: loss of profits or revenue, loss of business or goodwill, loss of data or business interruption, or any punitive or indirect, special, or consequential damages arising out of this Agreement, a SOW or the performance or breach thereof, whether based in contract, tort, or any other theory, even if a Party has been advised of the possibility of such claim.

    6.3. ACKNOWLEDGEMENT: Both Parties acknowledge and agree that these negation of damages and limitations of liability are fundamental elements of this Agreement. Furthermore, both Parties agree that these services would not be provided without such limitations. Without limiting the foregoing, in the event any remedy under this Agreement is determined to have failed of its essential purpose, the parties intend that all limitations of liability and remedies, and all exclusions of damages, provided for in this Agreement will remain in full force and effect. As some jurisdictions do not allow exclusion or limitation of certain categories of damages, both Parties agree that the liability of each Party will be limited to the fullest extent permitted in such jurisdictions.

7. **TERM AND TERMINATION**

    7.1. TERM: This Agreement shall remain in effect from the data signed until the completion of the work described herein, unless termination earlier by written agreement as described below.

    7.2. TERMINATION: This Agreement may be terminated by either Party at any time upon thirty (30) days' written notice. In case of termination under this Section, Company will pay Pearl all outstanding invoices and fees owed as of the date of termination. In addition, Company will reimburse Pearl for all non-cancelable obligations entered into by Pearl, for which Pearl can show written proof satisfactory to Company.

    7.3. TERMINATION IN CASE OF MATERIAL BREACH: In case of material breach of any obligation contained in this Agreement by either of the Parties (hereinafter referred to as the "Breaching Party"), the other Party (hereinafter referred to as the "Non-breaching Party") shall give the Breaching Party notice thereof and allow a ten (10) day period in which the Breaching Party shall cure the material breach. If the Breaching Party does not cure the material breach within the ten (10) day period, the Non-breaching Party shall have the right to terminate the Agreement as of the date it first gave notice to the Breaching Party thereof.

    7.4. TERMINATION OF STATEMENTS OF WORK: An SOW attached to this Agreement may be terminated individually for the specific assignment set out in such SOW in accordance with the provisions set out in this Section. In the event an individual SOW is terminated in accordance with this Section, this Agreement and any remaining Statements of Work shall continue to be in force and effective between the Parties.

8. **MISCELLANEOUS**

    8.1. <u>Entire Agreement; Modifications</u>. This Agreement, together with any appendices, constitutes the entire agreement between the parties. No amendment, modification or discharge of this Agreement shall be valid or binding unless set forth in writing and executed by both parties.

    8.2. <u>Severability</u>. If any term or provision of this Agreement shall be found to be invalid or unenforceable, the remainder of this Agreement shall remain valid and in full force and effect.

    8.3. <u>Survivability</u>. The obligations set forth in Section 4 (CONFIDENTIALITY) and Section 5 (INDEMNIFICATION) shall survive the termination of this Agreement regardless of the cause of termination, as well as any other terms which by their intent or meaning are intended to so survive.

    8.4. <u>Counterparts</u>. This Agreement may be executed in counterparts, which together constitute a single agreement and each of which will serve as evidence of the parties' binding agreement. The Parties agree that electronic versions of this Agreement and SOWs may serve as originals, provided they have been signed by each party.

    8.5. <u>Headings</u>. Headings to this Agreement's provisions are for reference only and will not affect their interpretation.

8.6. <u>Conflict</u>. To the extent any provision of this Agreement conflicts with any provision of any SOW attached hereto, the provisions of this Agreement shall govern unless the SOW explicitly states otherwise.

8.7. <u>Non-Exclusivity</u>. This Agreement, including any attached SOW(s), do not prevent PEARL from entering into any other agreement to perform similar services for other entities.

This Agreement shall be effective as of the last day indicated below ("Effective Date").

PEARL MANAGEMENT CONSULTING LLC             COMPANY

_____             _____
By:    John Glover                          By:    Stephen C. Bullock
       Partner                                     Manager-Member

Date:  __August 16, 2021__                  Date:  _____

## Statement of Work 001: Pricing Practices Review & Analysis

This Statement of Work 001 ("SOW") is entered into between Pearl Management Consulting LLC (Pearl") and NextChapter, LLC, defines the consulting services to be provided by Pearl to Stephen C. Bullock, duly appointed Independent Monitor ("Monitor") for Purdue Pharma L.P. and its subsidiaries[1] (hereinafter "Company"), in his duties and responsibilities as Monitor. The SOW shall be effective as of the last day indicated on the signature page.

### Project Background

Company entered a Voluntary Injunction which states, among other things, "The Company shall not Promote Opioids or Opioid Products"[2] and defines "promote" as "dissemination of information by the Company to a Third Party that is either likely or intended to influence prescribing practices of Health Care Providers in favor of prescribing greater amounts, quantities, doses and/or strengths of Opioid Products." The Voluntary Injunction further clarifies that "The Company shall not offer or pay any remuneration directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of Opioid Product. For the avoidance of doubt, this shall not prohibit the provision of rebates and/or chargebacks."[3] Therefore, while the Company is not allowed to promote or make remuneration to any party for the use of Opioid Products, the Company is allowed to provide Opioid Products to meet marketplace demand and may pay chargebacks and rebates to a second party in so doing. An independent Monitor has been retained by the Company to confirm and oversee compliance by the Company with the Voluntary Injunction.

### Project Scope

Pearl will review and analyze the policy, practices and outcomes of the Company's pricing practices, including specifically differences between scheduled and non-scheduled products. Pearl will identify possible concerns through a review of Company pricing practices and governance structure and analysis of channel-by-channel consequences of Company pricing decisions as outlined below. Pearl will identify actions the Company may wish to take to mitigate such concerns in order to confirm chargebacks and rebates paid by the Company are in compliance with the Voluntary Injunction's prohibition on promotion.

Pearl will perform the following activities on behalf of the Monitor:

(1) Review Company policy and standard operating procedure documentation related to pricing practices
(2) Review structure of the Company Pricing Committee and the frameworks and analyses used by Company for scheduled and non-scheduled products when considering:
   a. WAC price changes
   b. New contractual arrangements and changes to existing contractual agreements
(3) Catalogue Company pricing arrangements in place since January 1, 2018 identifying:
   a. Net price(s) for all products included in the arrangement
   b. Formulary positioning (if applicable) of the products included in the arrangement

---

[1] The complete list of debtors are found in *In re Purdue Pharma L.P. et al.,* Case No. 19-23649-RDD (S.D.N.Y.)
[2] The terms "Opioid" and "Opioid Products" are defined in section I.M and I.N, respectively, of the Voluntary Injunction
[3] The terms Renumeration, Person, Rebates and Chargebacks are not defined by the Voluntary Injunction

      c. Requirements for customers to achieve pricing, including but not limited to any inter-product dependencies, volume thresholds and/or market share tiers

(4) Analyze utilization data from rebate agreements active from January 1, 2018 through March 31, 2021 to:
   a. Determine utilization of Opioid Products as a whole and Company market share for periods under the arrangements
   b. Compare performance of Company products vs competitor products and changes in overall market utilization of Opioid Products
   c. Identify differences in Company product and overall Opioid Product utilization that can be explained by contractual provisions, such as formulary tier positioning and rebates paid

(5) Review Company Government Pricing policies, procedures, modeling and calculations to identify possible scenarios that create unintended financial incentives likely to increase Opioid Product prescriptions

(6) Analyze sales data under direct and indirect purchase agreements active from for January 1, 2018 through March 31, 2021 to:
   a. Determine overall purchases of Company Opioid products
   b. Analyze purchasing patterns across customers by type and analyze the extent to which such differences may be due to Company pricing practices
   c. Identify changes (if any) in purchasing patterns for each customer if/when the terms of pricing arrangements change

To meet these objectives, Pearl will

(1) Review Company documentation provided by the Company and/or Monitor
(2) Interview Company stakeholders to discuss the governance practices in place
(3) Analyze Company sales and utilization data provided by the Company and/or Monitor

## Project Outcome, Timing & Fees

At the conclusion of the project, Pearl will present to Monitor a report outlining the findings of the review and analysis. The report will include the following areas, with particular emphasis on differences in approach to scheduled versus non-scheduled products:

    i. Company Pricing Practices Overview
    ii. Company Pricing Arrangements Review
    iii. Channel Impact Analysis of Pricing Arrangements on Opioid Product Utilization
    iv. Summarization of Findings and Recommendations

Following review of the report with the Monitor, Pearl will support the Monitor in discussions with the Company and other parties, as deemed necessary and appropriate by the Monitor. Such support may include additional analyses, if directed to do so by the Monitor.

Pearl estimates the review will take 10-12 weeks from receipt of documentation and data through delivery of the project report. The work will be undertaken primarily by John Glover and Beril Pekin. They and anyone else engaged in this project by Pearl will sign and be bound by a protective order outlining the confidentiality and use of documents and other information prior to receiving any such documents or other information. Services will be paid for on an hourly basis. Pearl rates for this project are as follows:

| Individual  | Role                  | Hourly Rate |
|-------------|-----------------------|-------------|
| John Glover | Partner               | $ 650.00    |
| Beril Pekin | Director              | $ 450.00    |
| TBD         | Analyst (if required) | $ 200.00    |

The work under this SOW will be performed primarily remotely, but may also include travel to the office of Purdue Pharma L.P. in Stamford, CT.

AGREED TO AND ACCEPTED:

PEARL MANAGEMENT CONSULTING LLC				NEXTCHAPTER, LLC

_____				_____

By:	John Glover					By:	Stephen C. Bullock
	Partner							Manager-Member

Date:	August 16, 2021					Date:	_____