**Hospital TDP**

## HOSPITAL TRUST
## DISTRIBUTION PROCEDURES[1]

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Hospital Channeled Claims") shall be channeled to and liability therefor shall be assumed by the Hospital Trust as of the Effective Date: (i) all Hospital Claims,[3] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities.    Hospital Channeled Claims shall be administered, liquidated and discharged pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in these distribution procedures (this "Hospital TDP"). This Hospital TDP sets forth the manner in which the Hospital Trust shall make Abatement Distributions to Holders of Hospital Channeled Claims (such Abatement Distributions, "Hospital Abatement Distributions") that satisfy the eligibility criteria for Authorized Recipients set forth herein.    Hospital Channeled Claims shall be fully discharged pursuant to this Hospital TDP.

Hospital Authorized Recipients (as defined below) are required to use all funds distributed to them from the Hospital Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth in § 7 or (ii) the payment of attorneys' fees and costs of Holders of Hospital Channeled Claims (including counsel to the Ad Hoc Group of Hospitals) (such Authorized Abatement Purposes, collectively, "Hospital Authorized Abatement Purposes").

### § 2.    CLAIMS ADMINISTRATION.

The Plan contemplates that the Hospital Trust will receive a total of $250 million over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date (the "Initial Hospital Trust Distribution") and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022, (ii) $45 million on July 31, 2023, (iii) $45 million on July 31, 2024, (iv) $50 million on July 31, 2025, and (v) $50 million on July 31, 2026.[4]    So long as he is able to serve as of the Effective Date, the presumptive trustee of the Hospital Trust is Hon. Thomas Hogan (Ret.) (the "Trustee").    If Judge Hogan is not

---

[1]    These procedures are qualified by the terms of the Plan. Holders of Hospital Channeled Claims are strongly advised to review the Plan as well as all of the Hospital Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Hospital Channeled Claims.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, (i) the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers and (ii) Claims against the Debtors held by Non-Federal Acute Care Hospitals.

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

able to serve, then a new Trustee will be selected in accordance with the Plan in advance of the Effective Date by the Ad Hoc Group of Hospitals with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).[5]  The Ad Hoc Group of Hospitals is a group of certain Holders of Hospital Channeled Claims consisting of the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

The Trustee shall have the power and authority to perform all functions on behalf of the Hospital Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the Hospital Trust Documents.[6]  The Trustee shall be responsible for all decisions and duties with respect to the Hospital Trust.[7]

The Trustee shall have the authority to determine the eligibility of Hospital Authorized Recipients and the amount of Hospital Abatement Distributions made by the Hospital Trust.  In order to qualify as a Hospital Authorized Recipient and be eligible to receive a Hospital Abatement Distribution, Holders of Hospital Channeled Claims must comply with the terms, provisions and procedures set forth herein, including the Hospital Abatement Distribution Form Deadline and the timely submission of all forms required pursuant hereto.  The Trustee may investigate any Hospital Channeled Claim, and may request information from any Holder of a Hospital Channeled Claim to ensure compliance with the terms set forth in this Hospital TDP, the other Hospital Trust Documents and the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the Trustee shall be and is appointed as the successor-in-interest to, and the representative of, the

---

[5]    The Hospital Trust Agreement shall provide that, in the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the Hospital Trust Advisory Committee (the "TAC"); in the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

[6]    The Hospital Trust Agreement shall provide that the Trustee shall have the power to appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Hospital Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deem advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation the Delaware Trustee, and any third-party claims or noticing agent deemed necessary or convenient by the Trustee, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities).

[7]    The Hospital Trust Agreement shall provide that: (i) the Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually; (ii) hourly time shall first be billed and applied to the annual retainer; (iii) hourly time in excess of the annual retainer shall be paid by the Hospital Trust; (iv) for all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $525 per hour; (v) for all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour; (vi) all time shall be computed on a decimal (1/10th) hour basis; and (vii) the Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Hospital Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Hospital Claims on the Effective Date, and shall be entitled to make reasonable requests to NewCo for additional information and documents reasonably necessary for the administration of the Hospital Trust, which may include those medical, prescription or business records of the Debtors related to the Hospital Channeled Claims, which records shall be transferred to NewCo on the Effective Date.

## § 3.    QUALIFYING CERTIFICATION.

To qualify as a Hospital Authorized Recipient, a Holder of a Hospital Channeled Claim must certify in its Hospital Abatement Distribution Form (as defined below) that:

(a)    It adheres to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment; and

(b)    It provides discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

A Holder of a Hospital Channeled Claim must demonstrate through the Requisite Hospital Claims data that it has been damaged in the past and reasonably anticipates incurring additional abatement expenses in the future arising from patients suffering from OUD; if it does not do so, then it will not receive any Hospital Abatement Distribution.

## § 4.    ELIGIBILITY FOR HOSPITAL ABATEMENT DISTRIBUTIONS; NOTICES.

(a)    Eligibility for Hospital Abatement Distributions

To qualify as a Hospital Authorized Recipient eligible to receive Hospital Abatement Distributions from the Hospital Trust, each applicable Holder of a Hospital Channeled Claim must:

(i)    Have timely filed a Proof of Claim in the Debtors' Chapter 11 case (that is, on or before July 30, 2020); provided, that this requirement shall not apply to a Holder of a Hospital Channeled Claim that (a) is listed on the national registry of hospitals maintained by the American Hospital Directory®, as in effect on the Effective Date and (b) is a Non-Federal Acute Care Hospital;

(ii)    Timely submit the form attached hereto as Exhibit A (the "Hospital Abatement Distribution Form") containing:

A.    the certification set forth in § 3;

       B.      a certification signed by the Holder of a Hospital Channeled Claim or its attorney attesting to the accuracy and truthfulness of the Holder of a Hospital Channeled Claim's submission. Such certification must include an attestation that no data required for claims processing and distribution valuation, and no records or information that would reasonably be relevant to the valuation of the distribution, have been misrepresented or withheld; and

       C.      the certification that the Holder of a Hospital Channeled Claim will comply with § 7 in its use of any funds distributed to it; and

    (iii)    Provided all of the requisite claims data (as described in § 5 the "Requisite Claims Data") as part of a timely filed Proof of Claim or in connection with submitting a Hospital Abatement Distribution Form.

Any Holder of a Hospital Channeled Claim who meets all of the above criteria (i)-(iii) (each, a "Hospital Authorized Recipient") shall qualify for Hospital Abatement Distributions, subject to the limitations otherwise set forth herein; however, if such Holder does not meet such criteria, then it will not qualify as a Hospital Authorized Recipient and will not receive any Hospital Abatement Distributions. Any discrepancy as to whether a Holder of a Hospital Channeled Claim qualifies as a Hospital Authorized Recipient pursuant to the criteria as set forth in this § 4(a) will be resolved by the Trustee.

Those Hospital Claims that are evidenced by timely filed Proofs of Claim in the Debtors' Chapter 11 Cases (that is, for which Proofs of Claim were filed prior to or on the General Bar Date of July 30, 2020, i.e., D.I. 1536) that contained all of the Requisite Claims Data for such Hospital Claims have satisfied the requirements of §§ 4(a)(i) and 4(a)(iii), and shall be required to submit only a Hospital Abatement Distribution Form that provides the certifications set forth in § 4(a)(ii) to qualify for Hospital Abatement Distributions.[8]

FOR AVOIDANCE OF DOUBT, FOR A HOLDER OF A HOSPITAL CHANNELED CLAIM TO QUALIFY AS A HOSPITAL AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A HOSPITAL ABATEMENT DISTRIBUTION, SUCH HOLDER OF A HOSPITAL CHANNELED CLAIM MUST TIMELY SUBMIT A FULLY COMPLETED HOSPITAL ABATEMENT DISTRIBUTION FORM BY OR BEFORE THE HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE (THAT IS, FORTY-FIVE (45) DAYS AFTER THE DATE OF THE APPLICABLE HOSPITAL ABATEMENT DISTRIBUTION DEADLINE NOTICE, AS SET FORTH HEREIN).

    (b)    Notices

---

[8] There are approximately 1,180 Hospital Claims believed to satisfy the requirements of §§ 4(a)(i) and 4(a)(iii), comprising approximately 1,030 Proofs of Claim filed by hospitals and 150 Proofs of Claim filed by other treatment providers; this Hospital TDP does not constitute an admission by the Trustee that such Proofs of Claim in fact contained all applicable Requisite Claims Data, and the Trustee reserves the right to request additional information from any Holder of a Hospital Channeled Claim before such Holder of a Hospital Channeled Claim is determined to be a Hospital Authorized Recipient.

(i)      As soon as reasonably practicable after the Effective Date of the Plan, the Trustee or the Claims Administrator, as applicable, shall cause a notice to be served on each Holder of a Hospital Channeled Claim that (i) is listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date *and* (ii) is a Non-Federal Acute Care Hospital.  Such notice shall contain, among other things that the Trustee deems reasonable and appropriate under the circumstances, (i) this Hospital TDP, including the Hospital Abatement Distribution Form attached hereto, (ii) the URL for the Debtors' claims and noticing website where such Hospitals can locate the Plan (https://restructuring.primeclerk.com/purduepharma), and (iii) clear instructions for submitting a Hospital Abatement Distribution Form to the Trustee, the deadline set forth in each such Hospital Abatement Distribution Form for submitting the Hospital Abatement Distribution Form being 45 days after the date of such notice.

(ii)     Also as soon as reasonably practicable after the Effective Date, the Trustee or the Claims Administrator, as applicable, shall cause a notice (each such notice, and each notice delivered pursuant to § 4(b)(i) above, a "<u>Hospital Abatement Distribution Deadline Notice</u>") to be served on each of the Holders of the approximately 1,180 Hospital Claims for which there are timely filed Proofs of Claim, indicating whether such Proof of Claim contained the Requisite Claims Data for such Hospital Claim, and providing each such Holder of a Hospital Channeled Claim with 45 days from the date of such notice to submit a Hospital Abatement Distribution Form that complies with this § 4.  Such notice shall make clear whether the applicable Proof of Claim (i) contained the Requisite Claims Data (and therefore such Holder of a Hospital Channeled Claim is required to provide only the certifications set forth in § 4(a)(ii)) or (ii) did <u>not</u> contain the Requisite Claims Data in its Proof of Claim (and therefore such Holder of a Hospital Channeled Claim is required to satisfy both §§ 4(a)(ii) and 4(a)(iii) hereof when it submits its Hospital Abatement Distribution Form).

(iii)    For any Holder of a Hospital Channeled Claim that receives a Hospital Abatement Distribution Deadline Notice pursuant to §§ 4(b)(i) or 4(b)(ii) hereof and submits a Hospital Abatement Distribution Form, and all of its parts, by the applicable deadline (with respect to each such notice, the "<u>Hospital Abatement Distribution Form Deadline</u>") and whose Hospital Abatement Distribution Form is substantially complete but otherwise defective in such a manner as to render such Holder of a Hospital Channeled Claim ineligible to receive Hospital Abatement Distributions, and to the extent such defect is determined by the Trustee to be curable, the Trustee, as applicable, shall provide such Holder of a Hospital Channeled Claim with notice of the defect and a reasonable period of time following delivery of such notice for such Holder of a Hospital Channeled Claim to cure such defective Hospital Abatement Distribution Form. The Trustee shall exercise discretion in determining defect, curability and the period of time in which

5

a defect may be cured. Under no circumstance is the Trustee obligated to send a notice of defect for Hospital Abatement Distribution Forms that do not provide responses to the requirements set forth under §§ 4(a)(ii) and 4(a)(iii).

(iv)    Other than pursuant to the cure procedures set forth herein, any Holder of a Hospital Channeled Claim that does not submit a Hospital Abatement Distribution Form shall not qualify as a Hospital Authorized Recipient, and any Holder of a Hospital Channeled Claim that submits a Hospital Abatement Distribution Form after the Hospital Abatement Distribution Form Deadline shall not qualify as a Hospital Authorized Recipient. No Hospital Abatement Distribution Form shall be accepted after the Hospital Abatement Distribution Form Deadline.

## § 5.    EVIDENCE FOR DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTIONS.

(a)    To permit the Trustee to evaluate the amount each Hospital Authorized Recipient is to receive as a Hospital Abatement Distribution, and to the extent not already submitted in connection with its Proof of Claim, a Holder of a Hospital Channeled Claim must submit all of the following, non-exhaustive, data and types of documents, unless otherwise determined in the discretion of the Trustee in consultation with the TAC and consistent with § 4(b)(iii):

(i)    A properly and fully completed Hospital Abatement Distribution Form, with all its parts and requisite submissions, as established by the Trustee, consistent with the requirements set forth in § 4; and

(ii)    copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that a Holder of a Hospital Channeled Claim submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to such Holder of a Hospital Channeled Claim's OUD program or related to any of the injuries that underlie that claim presented to the Trustee.

The Trustee may request additional information as reasonably necessary in the opinion of the Trustee to determine the amount to be distributed to a Hospital Authorized Recipient. The Trustee shall establish a reasonable timeframe in which a Hospital Authorized Recipient must provide any requested information.

## § 6.    DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTION AMOUNTS.

(a)    The Trustee (or its agents or representatives) shall review the timely submitted Hospital Abatement Distribution Forms.

(b)    The Trustee shall utilize (but shall have no rights in or to the intellectual property contained in) the proprietary Legier Model and Algorithm (the "Model"), prepared

6

and operated by Legier & Company, apac, for determining the amount of each Hospital Abatement Distribution. The amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient shall be determined within 120 days after the applicable Hospital Abatement Distribution Form Deadline or in a period of time determined by the Trustee to be most practicable.

(c)     The Model shall determine the amount distributable to each Hospital Authorized Recipient based on (1) the diagnostic codes associated with operational charges incurred by the Hospital Authorized Recipient in connection with the treatment of Opioid Use Disorder, (2) the portion of such charges that were not reimbursed, and (3) the following distribution determination factors and weights:[9]

(i)     Units of morphine milligram equivalents (MME) dispensed in the Hospital Authorized Recipient's service area ("Service Area") during the period January 1, 2006-December 31, 2014 (the <u>Measurement Period</u>") (to be weighted at 10%);

(ii)     Opioid use disorder rates at the State level, pro-rated for each Hospital Authorized Recipient (to be weighted at 10%);

(iii)     Opioid overdose deaths in the Hospital Authorized Recipient's Service Area (to be weighted at 8.75%);

(iv)     Operational impact calculated using the Model, to include opioid diagnoses, and charge and reimbursement data (to be weighted at 35%);

(v)     Hospital Authorized Recipient's opioid related patients as a percentage of its total patients (to be weighted at 18.75%);

(vi)     17.5% for either

A.     such Hospital Authorized Recipient having filed a timely Proof of Claim in the Purdue Pharma bankruptcy claim filing process, or

B.     such Hospital Authorized Recipient having been designated as a "Safety Net Hospital"[10] on the Effective Date.

---

[9]     The Model calculates a Hospital Authorized Recipient's loss resulting from its treatment of patients with OUD and other opioid diagnoses, considering the total charges and collections for each, among other things, including a causation algorithm applied to each patient encounter.

[10]     A "Safety Net Hospital" has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

## § 7.    HOSPITAL AUTHORIZED ABATEMENT PURPOSES.

(a)    All net funds (after the deduction of all legal fees and litigation expenses, as described herein, and in the Hospital Trust Agreement) distributed to Hospital Authorized Recipients shall be used solely and exclusively for Opioid Use Disorder ("OUD") abatement programs, whether currently existing or newly initiated.  As a condition of receiving a Hospital Abatement Distribution, each Hospital Authorized Recipient must submit to the Trustee on its Hospital Abatement Distribution Form a written statement that all funds will be spent only in the Authorized Recipient's Service Area for one or more of the following Hospital Authorized Abatement Purposes:

(i)    Providing transportation to treatment facilities for patients with OUD.

(ii)    Providing continuing professional education in addiction medicine, including addressing programs addressing stigma.

(iii)    Counteracting diversion of prescribed medication in ED or practice, consistent with the following goal:  reducing opioid misuse, OUD, overdose deaths, and related health consequences throughout the hospital Service Area (county or region).

(iv)    Participating in community efforts to provide OUD treatment to others in the community, such as those in jails, prisons, or other detention facilities.

(v)    Providing community education events on opioids and OUD.

(vi)    Providing Naloxone kits and instruction to patients upon discharge.

(vii)    Implementing needle exchange in hospital or adjacent clinic and providing on-site MAT services if possible.

(viii)    Prospectively providing otherwise unreimbursed or under-reimbursed future medical services for patients with OUD or other opioid related diagnoses.

(ix)    Building or leasing space to add half-way house beds.

(x)    Participating in research regarding development of innovative OUD treatment practices.

(xi)    Directing moneys to any other public or private Authorized Recipient of funds concerning the treatment of persons with OUD or other opioid-related diagnoses; provided that such recipient's use of such funds would otherwise constitute an Authorized Abatement Purpose.

(xii)    Medication-Assisted Treatment ("MAT") Programs: an aggregate of $50 million may be earmarked for Holders of Hospital Channeled Claims to

8

establish and implement a MAT program or to continue, complete and/or implement an existing MAT program already under development.[11]

(xiii)   Engaging in any other abatement activity with the express permission of the Court, at the request of the Trustee.

(b)   In addition, the Hospital Trust shall, in accordance with the Plan, the Confirmation Order and the Hospital Trust Documents, make Hospital Abatement Distributions to Hospital Authorized Recipients exclusively for Hospital Authorized Abatement Purposes within each Hospital Authorized Recipients' respective Service Area identified in the claim. Decisions concerning Hospital Abatement Distributions made by the Hospital Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(c)   To the extent any Holder of a Hospital Channeled Claim that is otherwise a Hospital Authorized Recipient does not comply with this § 7, such Holder of a Hospital Channeled Claim shall not be a Hospital Authorized Recipient and shall be disqualified from receiving Hospital Abatement Distributions, notwithstanding any other eligibility determination pursuant to other sections or procedures set forth herein or in the other Hospital Trust Documents.

## § 8.   HOSPITAL ABATEMENT DISTRIBUTIONS BY HOSPITAL TRUST.

(a)   Once the Trustee has calculated the amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient, and also calculated each Hospital Authorized Recipient's *pro rata* share of the total sum of all Hospital Abatement Distributions to be paid to all Hospital Authorized Recipients, then the Trustee shall make interim Hospital Abatement Distributions, from time to time in its judgment, to those Hospital Authorized Recipients that have complied with all of the criteria and procedures described herein. Unless otherwise determined by the Trustee, such Hospital Authorized Recipients may receive one interim, and one final, distribution.

(b)   All payments made for one or more of said Hospital Authorized Abatement Purposes shall be subject to audit by the Trustee of the Hospital Trust and shall be repaid with a ten percent (10%) penalty added for any funds found by audit to have been spent for an unauthorized purpose. Such audit may occur any time prior to the wind-down of the Trust.

(c)   Hospital Abatement Distributions will be subject to a common benefit assessment and may be subject to certain additional assessments for payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals in accordance with Section 5.8 of the Plan.

---

[11]   The Hospital Abatement Distribution Form will provide an opportunity to indicate the proportion and amount of Hospital Abatement Distributions that the Hospital Authorized Recipient intends to apply to MAT programs.

## § 9.    REPORTING BY HOSPITAL AUTHORIZED RECIPIENTS.

(a)    Within ninety (90) days after the end of a distribution period (that being the twelve (12) month period following each annual distribution date), each Hospital Authorized Recipient that received a distribution must submit to the Hospital Trust a certification regarding its satisfaction of the minimum spending requirements on Hospital Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its distribution.

(b)    If the Hospital Authorized Recipient has not met the requirements during that period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the Hospital Authorized Recipient meets the relevant spending requirements for Hospital Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the Hospital Authorized Recipient meets the relevant spending requirements.  A Hospital Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its Hospital Abatement Distribution during a given distribution period.

(c)    The Hospital Trust shall have the right to audit a claimant to determine whether the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements set forth in the Hospital Trust Documents.

(d)    Each Hospital Authorized Recipient, if and when requested by the Hospital Trustee (or its agents or representatives), shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements of the Hospital Trust Documents.  All Proofs of Claim, Hospital Abatement Distribution Forms and certifications filed or submitted by Holders of Hospital Channeled Claims are subject to audit by the Hospital Trustee (or its agents or representatives).  If the Hospital Trustee finds a material misstatement in a Holder of a Hospital Channeled Claim's Proof of Claim, Hospital Abatement Distribution Form or certification, the Hospital Trustee may allow that Holder of a Hospital Channeled Claim up to 30 days to resubmit its Proof of Claim, Hospital Abatement Distribution Form or certification with supporting documentation or revisions.  Failure of the Holder of a Hospital Channeled Claim to timely correct its misstatement in a manner acceptable to the Hospital Trustee may result in forfeiture of all or part of the Holder of a Hospital Channeled Claim's qualification as a Hospital Authorized Recipient or right to receive Hospital Abatement Distributions.

(e)    The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of Hospital Trust. The Hospital Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this Hospital TDP.

## § 10.    REPORTING BY THE HOSPITAL TRUST.

The Hospital Trust shall file an annual report with the Bankruptcy Court after each year that the Hospital Trust is in existence, summarizing the distributions made from the Hospital Trust and detailing the status of any Hospital Authorized Recipient audits, and any recommendations made by the Trustee relating to such audits.

## EXHIBIT A
## HOSPITAL ABATEMENT DISTRIBUTION FORM

## HOSPITAL ABATEMENT DISTRIBUTION FORM

**HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE: [_____]**
Please read the instructions carefully before filling out this Hospital Abatement Distribution Form
(this "Form"). Capitalized terms used herein and not otherwise defined, shall have the meanings
ascribed to them in the *Eleventh Amended Joint Plan of Reorganization of Purdue Pharma L.P.
and its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan")
[Docket No. 3706] or the Hospital Trust Distribution Procedures (as modified, amended or
supplemented from time to time, the "Hospital TDP")," dated August 10, 2021 [Docket No. 3528].

Each Holder of a Hospital Channeled Claim, which includes (i) all Hospital Claims,[12] which
include all Claims against the Debtors held by providers of healthcare treatment services or any
social services, in their capacity as such, that are not Domestic Governmental Entities and (ii) all
Released Claims and Shareholder Released Claims held by providers of healthcare treatment
services or any social services, in their capacity as such, that are not Domestic Governmental
Entities, is required to complete and submit this Form in order to be eligible to receive Hospital
Abatement Distributions from the Hospital Trust.

In this proceeding, "Purdue Opioid" means all natural, semi-synthetic or synthetic chemicals that
interact with opioid receptors on nerve cells in the body and brain, and that are approved by the
U.S. Food & Drug Administration  and listed by the U.S. Drug Enforcement Administration  as
Schedule II or III drugs pursuant to the federal Controlled Substances Act, 21 U.S.C. § 801 et seq.
produced, marketed, or sold by the Debtors as: (i) the following Brand Name Medications:
OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®,
DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone
extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release
tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-
release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets
(generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).
The submission of the completed Form by the Hospital Abatement Distribution Form Deadline set
forth above is a prerequisite to eligibility for a Hospital Abatement Distribution, but does not
guarantee a Holder of a Hospital Channeled Claim will be deemed eligible for a Hospital
Abatement Distribution. If a Holder of a Hospital Channeled Claim is deemed eligible by the
Hospital Trustee pursuant to the Hospital TDP to receive Hospital Abatement Distributions, the
information provided in this Form will be used to determine each such Hospital Authorized
Recipient's Hospital Abatement Distribution from the Hospital Trust (as defined in the Plan, the
"Hospital Trust"). Holders of Hospital Channeled Claims may redact information on this Form or
any attached documents, as they deem necessary. A Holder of a Hospital Channeled Claim shall
only attach *copies* of any documents that support a claim, and shall not submit original documents;
**documents submitted may be destroyed after scanning and will not be returned to the Holder
of a Hospital Channeled Claim**. A person who files a fraudulent claim on behalf of a Holder of
a Hospital Channeled Claim may, at a minimum, be fined up to $500,000.00, imprisoned for up to

---

[12] For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, the Claims set
forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers.

5 years, or both.  18 U.S.C. §§ 152,157.  Holders of Hospital Channeled Claims shall provide the information requested that is, to the best of their knowledge, current and valid as of the date this Form is completed and delivered to the Hospital Trustee by such a Holder of a Hospital Channeled Claim:

**Please provide the following information to the Hospital Trustee by delivering this completed Hospital Abatement Distribution Form by email, online or mail at the addresses reflected online at www.purduehospitalsettlement.com prior to the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form.**
**Failure to submit a completed copy of this Form and requisite claims data (as described in #23 herein) by the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form may disqualify you from receiving a Hospital Abatement Distribution. Additionally, failure to complete any portion of the Form may result in a reduced Hospital Abatement Distribution or disqualification from receiving a Hospital Abatement Distribution.**

The name, address, and the Federal Employer Tax Identification Number ("EIN") of the entity claiming to be a Holder of a Hospital Channeled Claim OR the name, address, and Social Security Number if the Holder of a Hospital Channeled Claim is a natural person:

_____
_____
_____

The contact name, address, phone number ***and email address*** for where notices and Hospital Abatement Distribution(s) should be sent:

_____
_____
_____

By filling out this Form, you are deemed to consent to receipt of notice by email.  If you do not consent to receipt of notice by email, **please check this box:** ☐

The name, address and duration of your ownership of each facility owned and/or operated by the above referenced entity OR the name and address of the facility at which the Holder of a Hospital Channeled Claim provides healthcare treatment services or any social services and the duration of that Holder of a Hospital Channeled Claim's provision of such services at such facility for which this claim is filed. (Please list on Exhibit A)

_____

1. Did you file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020 that
   a. Included a dollar amount of financial losses in the Purdue bankruptcy?
      ___ Yes ___ No
   b. As of the date of this Form, provided to the Ad Hoc Group of Hospitals or its agent substantially all of the requisite claims data (as described in #23 herein) for any facility to the best of your knowledge  ___ Yes ___ No

If yes to both (a) and (b) then proceed to final page of Form to complete and sign.

2.  Are you listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are a Non-Federal Acute Care Hospital and did not timely file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020? __ Yes __ No

3.  Are you a named Plaintiff in any active cause of action against opioids manufacturers, distributors, or pharmacies? ___ Yes ___ No
    a.  If yes, please provide whether the active cause of action is filed (check one):
        i.  in the MDL: _____
        ii. in state court: _____
    b.  Attach a copy of the most recently filed Complaint.

4.  Service Area.  Please list on Exhibit B the counties that each of the above-described facilities serve, the population of those counties and the percentage of the total population of those counties served by the facility.  Attach any supporting documents that you deem to be helpful.

5.  For each of the facilities listed on Exhibit A, please provide the payor mix (% of payor payments to total of all payor payments) on Exhibit C:
    a.  % Medicare;
    b.  % Medicaid;
    c.  % TRICARE;
    d.  % Commercial, e.g., Blue Cross Blue Shield, other non-governmental payors;
    e.  % Self-pay;
    f.  % All Other Payors;
    g.  Describe the name of each payor that comprises "All Other Payors";

6.  Please provide on Exhibit D the amounts of funding, if any, received by you and/or for each facility listed on Exhibit A for the period of January 1, 2009 through September 15, 2019 in each of the following:
    a.  Grants;
    b.  Taxing authorities;
    c.  Health-care authorities;
    d.  State funded programs for indigent care;

    e.   "Disproportionate Share"[13];

    f.   Foundations/charities;

    g.   Others;

7. Unless a filed Complaint is attached to the Form, describe on Exhibit E, the opioid problem that has impacted each of the facilities listed on Exhibit A, and include with particularity, data reflecting overdose and deaths from overdoses in your respective service area(s), for the period of time ranging from January 1, 2009 through September 15, 2019.

8. List and describe with particularity on Exhibit F, all Hospital Authorized Abatement Purposes instituted by you at and/or in each facility listed on Exhibit A that are intended to treat, reduce, abate and prevent opioid addiction.  Include in your description the year(s) such program(s) began; whether they presently remain operational; and, the prospective end date for the program(s), if any. In addition, please provide the extent that any funding received, as described in No. 6 above, was used to pay for the abatement programs described herein.

9. Prescribing practices:
    a.   For you and/or for each of the facilities listed on Exhibit A, please provide on Exhibit G the national ranking for prescribing the following opioids: (i) Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®);
    b.   Did you and/or any or all of the facilities listed on Exhibit A provide pain management care in a pain management clinic during the period of January 1, 2009 through September 15, 2019? ___ Yes ___No. If yes, please provide the dates for which each of your pain management clinic were in operation on Exhibit G.

10. Are any of the facilities listed on Exhibit A a "safety net" hospital as defined in the CARES ACT?[14] ___ Yes ___No.  If yes, please indicate this "safety net" designation next to each applicable facility on Exhibit A and provide proof of each such designation, therein.

---

[13] Disproportionate Share Hospitals serve a significantly disproportionate number of low-income patients and receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients.

[14] A "safety net" hospital has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

11. Are any of the facilities listed on Exhibit A a tertiary referral center?  (A hospital provides tertiary healthcare if it provides "care of a highly technical and specialized nature, in a medical center, usually one affiliated with a university, for patients with unusually severe, complex, or uncommon health problems."  See Flegel, Ken, Tertiary Hospitals Must Provide General Care (March 3, 2015), Nat'l Ctr. for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347764).

___ Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

12. Do you and/or any of the facilities listed on Exhibit A perform "Screening Brief Intervention Referral to Treatment" ("SBIRT") in the emergency department? _____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

13. Do any of the facilities listed on Exhibit A equip emergency departments to treat acute withdrawal and initiate treatment for Opioid Use Disorder ("OUD") with medications, including buprenorphine, suboxone, and subutex, etc.? ___Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

14. To qualify for distributions from the Hospital Trust, a Holder of a Hospital Channeled Claim must certify that:
    a. You and/or it adhere to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment, AND

    b. You and/or it provide discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

    Do you and/or each of the facilities listed on Exhibit A satisfy A? ___ Yes ___No;

    Do you and/or each of the facilities listed on Exhibit A satisfy B? ___ Yes ___No.

15. Do you and/or any of the facilities listed on Exhibit A make discharge planning and post-discharge care coordination mandatory for patients with OUD? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

16. Do you and/or any of the facilities listed on Exhibit A provide bridge programs to encourage access to treatment for patients with OUD? ___ Yes ___ No. If yes, please

provide this designation and describe the bridge program next to each applicable facility on Exhibit A.

17. Do you and/or any of the facilities listed on Exhibit A participate in community efforts to provide OUD treatment to others in the community, such as those in jails, or other detention facilities? ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

18. Do you and/or any of the facilities listed on Exhibit A provide transportation to OUD treatment facilities? __Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

19. Do you and/or any of the facilities listed on Exhibit A implement needle exchange in the hospital or an adjacent clinic and/or provide on-site medication-assisted treatment ("MAT") services? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

20. Do you and/or any of the facilities listed on Exhibit A use telemedicine, telehealth, and/or teleconsulting to support treatment and to support "spoke" entities? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

21. Do you and/or any of the facilities listed on Exhibit A perform heart valve replacements? ___ Yes ___ No. If yes, please provide this designation and the percentage of all heart valve replacements performed that are secondary to opioid addiction next to each applicable facility on Exhibit A.

22. Do any of the facilities listed on Exhibit A have a Neonatal Intensive Care Unit ("NICU") that treats babies with Neonatal Abstinence Syndrome ("NAS")?
    ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A for #22 and 22(a) and 22(b) below:

    a. Do any of the facilities have a dedicated NAS NICU? ___ Yes ___ No

    b. Do you and/or any of the facilities provide obstetric and perinatal services to treat mothers with OUD? ____Yes ___ No

23. For all inpatient and outpatient discharges during the period January 1, 2009, to September 15, 2019, from you and/or each qualifying facility operated by you, please provide the following data in CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File to be used in connection with the calculation of each of your financial damages. **An example of the data formatting is set forth in Exhibit H.  This data should be in a**

**separate CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File for each Holder of a Hospital Channeled Claim**. Physician office visits and non-acute care visits should **NOT** be included in data provided.

For the CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File, please include in the file name the name of the Holder of a Hospital Channeled Claim, City and State where located and Date Range of Data Provided, for example, PhoenixGeneral-Phoenix-AZ-Jan09-Dec12.csv. If more than one file is provided due to size limitation, each file name will be the same with only the date range of the data provided changing e.g. PhoenixGeneral-Phoenix-AZ-Jan13-Dec20.csv

It is important to note, and as further described below, that the following data (except for ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority) for each visit/discharge will need to be repeated on each row corresponding to each different ICD diagnosis code.  The data for the ICD diagnosis codes, ICD diagnosis code descriptions and ICD diagnosis code priority for each visit/discharge will therefore be unique to each row.  For example, if a visit has 18 ICD diagnosis codes, there would be 18 rows/lines for that visit/discharge with each line containing a different ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority. For all other data fields such as Patient Medical Record Number, Date of Discharge, etc. this data will be the same, and thus repeated, on all 18 rows/lines for that visit/discharge.

Once the CSV (Comma Delimited) or Pipe Delimited Text File is prepared, please review to confirm the data in each column contains the applicable data for that respective columns data field description. **After submission of this completed Form and execution of the Business Associate Agreement (as described in #25 herein), each claimant will be provided a secure portal by the Hospital Trustee to upload this requisite claims data.**

| Column | Data Fields | Definitions and Clarifications |
|---|---|---|
| a. | **Name** | Name of facility for which data is provided. |
| b. | **Address** | Address of facility for which data is provided. |
| c. | **City** | City of facility for which data is provided. |
| d. | **State** | State of facility for which data is provided. |
| e. | **Zip** | Zip of facility for which data is provided. |
| f. | **CMS Certification Number** | Center for Medicare & Medicaid Services – Formerly known as the Medicare Provider Number.  This should |

19

| | | |
|---|---|---|
| | | be a six-digit Medicare certification number for a facility. |
| g. | **Patient Medical Record #** | |
| h. | **Patient Account #** | |
| i. | **Payor Financial Class Description** | e.g., Blue Cross, Medicaid, Private Pay, etc. |
| j. | **Patient Type** | e.g., Inpatient or Outpatient. Hospital related clinics or physician office visits should NOT be included in data provided. |
| k. | **Custom Patient Type** | e.g., Inpatient Psych, Outpatient Single Visit, Surgery, Lab, etc. Hospital related clinics or physician office visits should NOT be included in data provided. |
| l. | **Date of Admission** | |
| m. | **Date of Discharge** | |
| n. | **Length of Stay (days)** | |
| o. | **Admission Type Description** | e.g., Emergency, Reservation, Reference Lab, etc. |
| p. | **Discharge Disposition Description** | e.g., Discharge Home, Nursing Home, Expired, etc. |
| q. | **Patient Date of Birth** | |
| r. | **Patient Age at Discharge** | |
| s. | **Patient Gender** | |
| t. | **Patient Race** | |
| u. | **Patient City** | |
| v. | **Patient State** | |

| | | |
|---|---|---|
| w. | **Patient Zip Code** | |
| x. | **Attending Physician Name** | |
| y. | **Total Charges** | |
| z. | **Total Payments** | Total Payments should only contain actual payments received (e.g. insurance/self-pay).  It should NOT include adjustments, bad debt, write-offs or contractual adjustments. |
| aa. | **DRG Code** | Provide Diagnosis Related Group (DRG) code for each inpatient visit/discharge. |
| ab. | **DRG Code Description** | Provide DRG description for the above DRG code. |
| ac. | **All ICD Diagnosis Code** | For each visit/discharge, provide all International Classification of Disease (ICD) diagnosis codes (ICD-9 or ICD-10, as applicable) associated with each patient visit/discharge.  Each of these ICD Diagnosis Codes related to each patient's visit should NOT be listed in multiple columns but rather each ICD Code should be listed in the same single column with each ICD Code shown on separate rows within the same single column.  See Exhibit H. |
| ad. | **ICD Diagnosis Code Descriptions** | Provide ICD Diagnosis description for the above ICD Diagnosis Code. |
| ae. | **ICD Diagnosis Code Priority** | Provide whether each ICD Diagnosis Code is a Primary, Secondary, Tertiary, etc. diagnosis.  These categories must be expressed in terms of a numerical code such as 1=Primary, 2=Secondary, 3=Tertiary, etc. |
| af. | **Mom's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit.  If this visit/charge is for a birth mother, then this field should be blank as it would be the same MRN as the patient reported in #g above.  However, if this visit/charge pertains to a baby, then this field should contain the mother's MRN so that there can be a mother/baby link associated therewith. |

| ag. | **Baby's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit. If this visit/charge is for a baby, then this field should be blank as it would be the same MRN as the patient reported in #g above. However, if this visit/charge pertains to a birth mother, then this field should contain the Baby's MRN so that there can be a mother/baby link associated therewith. |
|---|---|---|

24. Please attach your "charge master"[15] for the calendar years 2009 through 2019 for yourself and/or each of the facilities listed on Exhibit A.

25. Please execute the Business Associates Agreement attached as Exhibit J and return with the Form for each facility listed on Exhibit A.

26. Funds received from the Hospital Trust may only be used for specific abatement purposes as set forth in Section 7 of the Hospital TDP. If the Holder of a Hospital Channeled Claim on whose behalf this claim has been prepared is allocated a Hospital Abatement Distribution from the Hospital Trust, as a condition of receiving the funds, then it will use the funds for one or more specific uses as listed on Exhibit I.

27. Please complete the W-9 attached hereto for each entity OR the natural person claiming to be a Holder of a Hospital Channeled Claim and return the W-9 with this Form.

---

[15] The "charge master" is a list of all the billable services and items billed to a patient or a patient's health insurance provider. The charge master captures the costs of each procedure, service, supply, prescription drug, and diagnostic test provided at the hospital to a patient, as well as any fees associated with such services, such as equipment fees and room charges.

**I certify that I am authorized to sign this Hospital Abatement Distribution Form and I understand that an authorized signature on this Form serves as an acknowledgement that I have a reasonable belief that the information is true and correct.**

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Signature: _____

Executed on date: (MM/DD/YYYY) _____

Print the name of the person who is completing and signing this claim.

Name (First, Middle, Last):    _____

Title:    _____

Hospital:    _____

Address:    _____

_____

Contact phone:    _____

Email:    _____

**NAS Monitoring TDP**

## NAS MONITORING TRUST DISTRIBUTION PROCEDURES

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[1] and the Master TDP, the following claims ("NAS Monitoring Channeled Claims") shall be channeled to and liability therefor shall be assumed by the NAS Monitoring Trust as of the Effective Date: (i) all NAS Monitoring Claims, which include all Claims against any Debtor held on account of an NAS Child (with respect to such Claims, an "NAS Monitoring Claimant") that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief,[2] and (ii) all Released Claims and Shareholder Released Claims that are held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and are not for alleged personal injuries suffered by an NAS Child.  NAS Monitoring Channeled Claims shall be administered, liquidated and discharged pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in these distribution procedures (this "NAS Monitoring TDP").  This NAS Monitoring TDP sets forth the manner in which the NAS Monitoring Trust shall make Abatement Distributions to Authorized Recipients (such Abatement Distributions, "NAS Monitoring Grants")[3] that satisfy the eligibility criteria for Authorized Recipients set forth herein.  All Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of (i) NAS Monitoring Grants to be used exclusively for the Authorized Abatement Purposes set forth Section 2(h), or (ii) the payment of the attorneys' fees and costs of counsel constituting the NAS Committee (such Authorized Abatement Purposes, collectively, "NAS Monitoring Authorized Abatement Purposes").  No Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with this NAS Monitoring TDP.

### § 2.    ADMINISTRATION BY TRUSTEE; ELIGIBILITY.

(a)    The trustee of the NAS Monitoring Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by [____] with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(b)    The Trustee shall have the power and authority to perform all functions on behalf of the NAS Monitoring Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the NAS Monitoring Trust

---

[1]    Capitalized terms used but not defined herein or in the other NAS Monitoring Trust Documents shall have the meaning ascribed to them in the Plan.

[2]    For the avoidance of doubt, NAS Monitoring Claims do not include any Claim that is for an alleged personal injury suffered by an NAS Child.

[3]    As used herein, NAS Monitoring Grants may refer to Abatement Distributions, either in part or in whole, as the context requires, that the NAS Monitoring Trust has Awarded to an Authorized Recipient.

Documents.  The Trustee shall be responsible for all decisions and duties with respect to the NAS Monitoring Trust.

(c)     The Trustee (in consultation with the members of the Trust Advisory Committee (the "TAC")) shall have the authority to determine the eligibility of NAS Authorized Recipients (as defined below) and the amount of NAS Monitoring Grants made by the NAS Monitoring Trust.

(d)     A potential Grant Recipient or Grantee, in order to qualify as an Authorized Recipient and be eligible to receive an NAS Monitoring Grant, a potential Grant Recipient must:

     (i)     Submit a Grant Proposal Form (as defined below) that complies with the requirements set forth in Section 3 hereof;

     (ii)     Execute a Grant Agreement (as defined below) that complies with the requirements set forth in Section 6 hereof; and

     (iii)     Agree to comply with and be bound by the reporting obligations set forth in Section 7 hereof.

(e)     Only a potential Grant Recipient or Grantee[4] who is Awarded[5] an NAS Monitoring Grant by the NAS Monitoring Trust and complies with the foregoing requirements set forth in this Section 2 shall be an Authorized Recipient and eligible to receive Abatement Distributions in the form of an NAS Monitoring Grant from the NAS Monitoring Trust (each such eligible Grant Recipient or Grantee, an "NAS Authorized Recipient").

(f)     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the NAS Monitoring Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the NAS Monitoring Channeled Claims.

(g)     Pursuant to that authority, the Trustee (in consultation with the TAC) may evaluate any Grant Proposal (as defined below), and the member of the TAC which undertakes such review and consideration of a Grant Proposal may request information from the potential Grant Recipient or Grantee to ensure compliance with the NAS Monitoring Trust Documents.

---

[4]   "Grant Recipient" or "Grantee" means the recipient of an NAS Monitoring Grant from the NAS Monitoring Trust who, prior to receipt of such NAS Monitoring Grant, shall agree to abide by and perform all conditions and requirements which may be established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant.

[5]   "Award" or "Awarded" or "Awarding" means a determination by the NAS Monitoring Trust to award an NAS Monitoring Grant for the purpose of funding an NAS Abatement Program sponsored by a Grant Recipient or Grantee.

(h)    All NAS Monitoring Grants to NAS Authorized Recipients shall be received subject to the obligation of such NAS Authorized Recipient to any NAS Monitoring Grant funds solely for a program relating to neonatal abstinence syndrome sponsored by a Grant Recipient or Grantee, which advances all or any of the following goals: (1) preparing children with a history of NAS to be ready to enter or to succeed in school; (2) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (3) enhancing the Mother-Child Dyad (any program relating to any of the NAS Monitoring Authorized Abatement Purposes, an "NAS Abatement Program").

(i)    NAS Monitoring Grants will be subject to a common benefit assessment and certain additional assessments for payment of attorneys' fees and costs of the NAS Committee in accordance with Section 5.8 of the Plan.

## § 3.    FORM OF GRANT PROPOSALS.[6]

(a)    Prior to the Effective Date of the Plan, the Trustee, in consultation with the TAC, shall devise a Grant Proposal form (the "Grant Proposal Form") which shall include, at a minimum, the following necessary information for the evaluation of Grant Proposals:

(i)    a historical chronology of the establishment, function, and region of operation of the proposed NAS Abatement Program;

(ii)    a description of the mission, purpose, and methods of the proposed NAS Abatement Program;

(iii)    identification of the States or territories of the United States, or the regions thereof, in which the program is located and operates;

(iv)    a description of the population served by the proposed NAS Abatement Program, including the approximate number of such population and a statement of the specific needs of the population that the program is designed to serve;

(v)    evidence of the efficacy of the program in addressing its mission or purpose;

(vi)    the requested monetary amount of the NAS Monitoring Grant sought by the proposed NAS Abatement Program from the NAS Monitoring Trust;

---

[6]    "Grant Proposal" means a proposal for the Awarding of an NAS Monitoring Grant for funding of an NAS Abatement Program sponsored by a potential Grant Recipient or Grantee, which proposal shall comply with all requirements for Grant Proposals established by this Agreement.

(vii)     a statement of the intended uses of any NAS Monitoring Grant Awarded and NAS Abatement Distribution by the NAS Monitoring Trust to the potential Grant Recipient;

(viii)    the projected time period over which any Awarded NAS Monitoring Abatement Distribution will be utilized or expended;

(ix)      a projected budget for the proposed NAS Abatement Program, including line items identifying the purpose(s) of the proposed expenditures and a schedule for such expenditures;

(x)       identification by the program of its financial or internal documents which will be utilized to account for and track the proposed expenditures, including an agreement of the Grant Recipient or Grantee to provide the same to the NAS Monitoring Trust for the purpose of monitoring the expenditures made from any Awarded NAS Monitoring Grant;

(xi)      a pledge and agreement by the potential Grant Recipient or Grantee to regularly report, on a quarterly basis, the expenditures that are made from any Awarded Abatement Distribution, and to produce for review and monitoring by the NAS Monitoring Trust, on a quarterly basis, the identified financial or internal documents which verify, account for and track such expenditures; and

(xii)     *an acknowledgement and agreement by the potential Grant Recipient or Grantee that the Award of an NAS Monitoring Grant does not constitute a contractual agreement between the Grant Recipient or Grantee and the NAS Monitoring Trust; that the amount of any Abatement Distribution of an Award will be made from a Fund[7] established for such purpose by the NAS Monitoring Trust, and that such Grant Recipient or Grantee's sole recourse is to such Fund, rather than to the Trust, its Corpus or any other Fund established by the Trust; that receipt by the Grant Recipient or Grantee of an Abatement Distribution is conditioned upon execution and return by the Grant Recipient or Grantee of a "Grant Agreement" which shall contain, inter alia, the Trust's requirements for receipt and use of the Abatement Distribution; and that no binding agreement shall arise as between the NAS Monitoring Trust and the Grant Recipient or Grantee until such time as the Abatement Distribution is received by the Grant Recipient or Grantee, at which time the Grant Agreement shall become effective*

---

[7]    Fund shall have the meaning ascribed to such term in the Delaware Statutory Trust Act, Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§3801 et seq.

## § 4.    REVIEW AND CONSIDERATION OF GRANT PROPOSALS.

(a)    Upon receipt by the Trust, a Grant Proposal in proper form shall be tendered to a member of the TAC for review and investigation.  In the exercise of his or her office, the TAC member undertaking such review and investigation is encouraged to communicate directly with the potential Grant Recipient or Grantee, or its representatives, and may request therefrom any additional documents or information which such member of the TAC believes necessary for his or her review and consideration of the Grant Proposal.

(b)    The member of the TAC which undertakes such review and consideration of the Grant Proposal shall prepare a written report, to be distributed to the Trustee and all other members of the TAC, which summarizes the Grant Proposal and the results of the review and investigation of the Grant Proposal.

(c)    After distribution of such written report, and at the next regularly occurring meeting or special meeting of the Trustee and the TAC, the Grant Proposal shall be presented for discussion and deliberation.  The TAC may, but is not required to, vote on Awarding an NAS Monitoring Grant to the potential Grant Recipient or Grantee with respect to such Grant Proposal and/or vote as to the amount of such Abatement Distribution from a Fund to be established by the Trust, if the NAS Monitoring Grant is Awarded.  At any subsequent meeting of the Trustee and the TAC, the TAC may take up, consider, discuss, and vote upon any pending Grant Proposal.

(d)    In the event of a vote of a majority of the members of the TAC to Award any NAS Monitoring Grant for the funding of an NAS Abatement Program sponsored by any Grant Recipient or Grantee, the Trustee shall inform the Grant Recipient or Grantee of the Award and of the amount of the Abatement Distribution to be made by the NAS Monitoring Trust to the Grant Recipient or Grantee, provided that no binding agreement for the Award of the NAS Monitoring Grant or the Abatement Distribution shall exist until execution and return of the Grant Agreement by the Grant Recipient or Grantee and the receipt of the Abatement Distribution by the Grant Recipient or Grantee.

(e)    Review of Grant Proposals shall occur at regularly scheduled intervals in accordance with the below:

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| New | Renewal / Resubmission / Revision (as allowed) | AIDS | Scientific Merit Review | Advisory Council Review | Earliest Start Date |
| March 08, 2022 | March 08, 2022 | March 08, 2022 | May 2022 | July 2022 | October 2022 |
| June 10, 2022 | June 10, 2022 | June 17, 2022 | September 2022 | November 2022 | January 2023 |
| March 08, 2023 | March 08, 2023 | March 08, 2023 | May 2023 | July 2023 | October 2023 |
| June 10, 2023 | June 10, 2023 | June 10, 2023 | September 2023 | November 2023 | January 2024 |
| March 08, 2024 | March 08, 2024 | March 08, 2024 | May 2024 | July 2024 | October 2024 |
| June 10, 2024 | June 10, 2024 | June 10, 2024 | September 2024 | November 2024 | January 2025 |

## § 5.    REQUIREMENTS, CONSIDERATIONS AND PREFERENCES FOR AWARDING OF NAS MONITORING GRANTS.

(a)    Requirements for Awarding NAS Monitoring Grants:

(i)    All NAS Monitoring Grants Awarded by the NAS Monitoring Trust shall relate to NAS and shall advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (iii) enhancing the Mother-Child Dyad.

(ii)    For all NAS Abatement Programs which propose to span an operational period of three years and which have a goal of either preparing children in the Identified Group to be ready to enter or succeed in school or of enhancing the Mother-Child Dyad ("Eligible Programs"), NAS Monitoring Grants should be made (i) to entities operating or planning to operate evidence-based programs such as, by way of example only, The Child First Program (https://www.childfirst.org), and (ii) NAS Monitoring Grants should be prioritized to Grant Recipients or Grantees which service populations in States, Reservations, Counties or Cities with excessive rates of NAS births and otherwise underserved communities. No less than eighty-nine percent (89%) of the Net-Assets or Corpus shall be used for the NAS Monitoring Grants referenced in this Section 5(a)(ii).

(iii)    Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may, if approved by a vote of the majority of the TAC and as necessary to address a

demonstrated need in significant parts of the country, Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed one percent (1%) of the Net-Assets or Corpus of the Trust, for the development of a scalable program serving the families of the Identified Group, for the purposes of (i) providing clinical and in-home assessment of latent medical and developmental conditions; (ii) identifying and providing access to necessary services for the individual families of the Identified Group; and/or (iii) maintaining accountable reporting of program metrics.

(iv)    Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed five percent (5%) of the Net-Assets or Corpus of the Trust, to research institution(s) to conduct and publish the results of research into the approaches for helping children and families harmed, impacted or at risk of fetal opioid exposure.  Grant Recipients or Grantees under this Section 5(a)(iv) will receive access to the de-identified health outcome metrics provided by other Grant Recipients and to the scientific documents of Purdue, the Purdue Debtors, and the IAC to the extent such scientific documents are part of a public record or in the public domain, including documents relating to preclinical toxicology.

(v)    The NAS Monitoring Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Monitoring Trust Documents, make Abatement Distributions to Grant Recipients or Grantees exclusively for Authorized Abatement Purposes.  Decisions concerning Abatement Distributions made by the NAS Monitoring Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(b)    Preference:  For purposes of the Awarding of NAS Monitoring Grants, an existing and operational NAS Abatement Program with an evidence-based record of efficacy shall be preferred over a new or start-up NAS Abatement Program which has yet to begin operation.

(c)    Additional Considerations:    In Awarding NAS Monitoring Grants and determining the amount thereof, the Trustee and the TAC shall consider the following non-exhaustive factors pertinent to NAS Abatement Program(s) (each, a "Program") proposed by potential Grant Recipients or Grantees:

(i)    Whether the proposed Program serves a region of the United States which has been greatly impacted by opioid use disorder and the occurrence of Neonatal Abstinence Syndrome in infants born in such region;

(ii)    Whether the proposed Program will benefit an underserved population of NAS Children and their families;

(iii)    Whether the proposed Program places a focus on early intervention to improve the outcomes for the Mother-Child Dyad with respect to NAS;

(iv)    Whether the proposed Program offers a comprehensive assessment of children and/or families impacted by NAS;

(v)    Whether the proposed Program offers or provides medical care access or medical care coordination to children and families impacted by NAS;

(vi)    Whether the proposed Program offers counseling, individually or in group sessions, to Birth Mothers and/or Guardians with regard to best practices in caring for an NAS Child or NAS Children;

(vii)    Whether the proposed Program addresses emotional, behavioral, developmental, or learning problems experienced by NAS Children and provides educational, counseling, treatment or care coordination options with regard to the same;

(viii)    Whether the proposed Program involves any data collection, data analysis, or data reporting components, including without limitation, reporting of data to the NAS Monitoring Trust or to state or federal governmental offices or agencies, such as the Center for Disease Control's National Center on Birth Defects and Developmental Disabilities;

(ix)    Whether the proposed Program is designed to compare health outcomes across opioid use disorder treatment regimens to inform with regard to best practice guidelines for pregnant Birth Mothers with respect to mitigating or preventing the occurrence of NAS in infants;

(x)    Whether the proposed Program involves the education of Birth Mothers and potential Birth Mothers with regard to the risks and danger of opioid use during pregnancy and/or is designed to reduce the usage of opioids during pregnancy by Birth Mothers and potential Birth Mothers;

(xi)    Whether the proposed Program is designed to connect pregnant Birth Mothers with prenatal care, substance abuse treatment, or necessary multi-specialty services; and

(xii)    Whether the proposed Program provides medical or other care coordination for children who were diagnosed with NAS or who experienced intrauterine opioid exposure.

## § 6.  THE GRANT AGREEMENT.

(a)    All Grant Recipients or Grantees which are Awarded an NAS Monitoring Grant for funding of an NAS Abatement Program shall execute a Grant Agreement prior to receipt of any Abatement Distribution from any Fund of the NAS Monitoring Trust.

(b)    The Grant Agreement shall contain, at a minimum, an acknowledgement by the Grant Recipient or Grantee that:

(i)    the sole recourse of the Grant Recipient or Grantee is to the Fund established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant;

(ii)    the Grant Agreement shall not be effective and binding until the Grant Recipient or Grantee's receipt of an Abatement Distribution and that the NAS Monitoring Trust reserves the right to make or pay such Abatement Distribution(s) in installments;

(iii)    the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals shall have no responsibility or liability for administration or operation of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iv)    the Grant Recipient or Grantee agrees to indemnify and hold harmless the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals from any and all claims arising out of operation or administration of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(v)    the Grant Recipient or Grantee agrees that monies yet to be distributed to the Grant Recipient or Grantee by the NAS Monitoring Trust for an Awarded NAS Abatement Program may be withheld or withdrawn by the NAS Monitoring Trust in the event of the financial inability of the NAS Monitoring Trust to pay Abatement Distribution(s), or in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Grant.  The Grant Recipient or Grantee agrees and acknowledges that the NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of the NAS Monitoring Grant; and

(vi)    the Grant Recipient or Grantee agrees to make financial and other disclosures, on at least an annual basis, to the NAS Monitoring Trust relating to the implementation and operation of the Awarded NAS Abatement Program, including but not limited to data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program, provided that the disclosure of personal identifying information of the individual(s) or population(s) served by the program shall not be required.

(c)    In addition, each Grant Agreement shall contain the NAS Monitoring Trust's requirements of the Grant Recipient or Grantee in the operation and administration of the Awarded NAS Abatement Program, which requirements shall be program specific and are to be determined by the members of the TAC,

utilizing and drawing upon their independent and collective medical, scientific, technical or other expertise.

## § 7.  MONITORING OF AWARDED NAS MONITORING GRANTS AND ABATEMENT DISTRIBUTIONS.

(a)   In addition to the quarterly reports on expenditures set forth in Section 3(a)(xi), Grant Recipients and Grantees which received Abatement Distributions for the funding of NAS Abatement Programs shall be required to report annually to the NAS Monitoring Trust.  Such reports and supporting documentation submitted by the Grant Recipient or Grantee shall contain information sufficient for the Trustee and TAC to monitor whether:

(i)    Awards and Abatement Distributions are being used by the Grant Recipient or Grantee as intended by the NAS Monitoring Trust and within the scope of the NAS Abatement Program for which the Award and Abatement Distribution was made;

(ii)   The Grant Recipient or Grantee is complying with the projected budget for the NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iii)  The status of the Grant Recipient or Grantee's achievement of the milestones, efficacies, or benefits for which the NAS Abatement Program was designed or is being operated; and

(iv)   Data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program.

(b)   The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of NAS Monitoring Trust. The NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this NAS Monitoring TDP.

**TPP TDP**

# TPP TRUST DISTRIBUTION PROCEDURES[1]

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Third-Party Payor Channeled Claims") shall be channeled to and liability therefor shall be assumed by the TPP Trust as of the Effective Date: (i) all Third-Party Payor Claims, which include all Claims against the Debtors held by Third-Party Payors that are not Domestic Governmental Entities ("TPP Claimants"),[3] and (ii) all Released Claims and Shareholder Released Claims held by Third-Party Payors that are not Domestic Governmental Entities. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in these trust distribution procedures (this "TPP TDP"). This TPP TDP sets forth the manner in which the TPP Trust shall make Abatement Distributions to TPP Claimants that satisfy the eligibility criteria for TPP Authorized Recipients set forth herein, including the timely filing of a TPP Abatement Claim Form, as defined in Section 4 herein (such Abatement Distributions, "TPP Abatement Distributions"). Third-Party Payor Channeled Claims shall be fully discharged pursuant to this TPP TDP. All Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of TPP Abatement Distributions, shall be based upon the Purdue-Related Opioid Spend, as defined herein, set forth in the TPP Abatement Claim Form and the TPP Trust's determination with respect to that asserted TPP Abatement Claim, and may be used exclusively for the Authorized Abatement Purposes set forth herein.

## § 2.    RECEIPT AND USE OF FUNDS BY THE TPP TRUST.

The Plan contemplates that the TPP Trust will receive a total of $365 million over time, with an initial payment of $5 million to the TPP Trust on the Effective Date (the "Initial TPP Trust Distribution") and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $120 million on July 31, 2022, (ii) $120 million on July 31,

---

[1]    These procedures are qualified by the terms of the Plan. TPP Claimants are strongly advised to review the Plan as well as all of the TPP Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Third-Party Payor Channeled Claims. In addition, you are advised to review the LRP Agreement, which describes lien resolution procedures with respect to claims that Third-Party Payors may have in connection with Distributions to Holders of PI Claims against the Debtors. Although the LRP Agreement is a PI Trust Document, it has been attached to this TPP TDP as Exhibit 1 purely for ease of reference for TPP Claimants and potential TPP Authorized Recipients.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Third-Party Payor Claims" include any Claims against any Debtor that are held by Third-Party Payors (including any Claims based on the subrogation rights of the Holder thereof that are not Other Subordinated Claims) that are not Domestic Governmental Entities; provided that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." Claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims." The claims of Third-Party Payors against Holders of PI Claims and Distributions payable to Holders of PI Claims are addressed in the LRP Agreement, as noted in Section 2 hereof and in Exhibit 1. See supra n.1.

2023 and (iii) $120 million on July 31, 2024.[4] The funds paid to the TPP Trust shall be used for the administration (including the payment of expenses) of the TPP Trust, and to make the TPP Abatement Distributions to TPP Claimants that qualify as TPP Authorized Recipients (as defined below), subject to the assessments payable to the Common Benefit Escrow (and, later, the Common Benefit Fund) pursuant to Section 5.8 of the Plan. On the Effective Date, a Common Benefit Escrow shall be established and funded by assessments of 5% of each TPP Abatement Distribution made by the TPP Trust. Such assessments will be paid by the TPP Trust in respect of TPP Abatement Distributions made by the TPP Trust to the Common Benefit Escrow and then, upon its establishment, directly to the Common Benefit Fund established by the MDL Court, on periodic schedules acceptable to the Third-Party Payor Group, The amounts in the Common Benefit Escrow shall be held in escrow until an order is entered by the MDL Court establishing a Common Benefit Fund, at which time the amounts held by the Common Benefit Escrow and all subsequent assessments of 5% of each TPP Abatement Distribution made by the TPP Trust shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund.

TPP Authorized Recipients are required to use all funds distributed to them from the TPP Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth herein in Section 8 and Appendices C and D or (ii) the payment of attorneys' fees and costs of TPP Authorized Recipients (including counsel to the Third-Party Payor Group) (collectively, the "TPP Authorized Abatement Purposes"); provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

CLAIMS THAT THIRD-PARTY PAYORS MAY HAVE AGAINST DISTRIBUTIONS PAYABLE TO HOLDERS OF PI CLAIMS (SUCH AS REIMBURSEMENT AND LIEN CLAIMS) ARE NOT BEING ADMINISTERED BY THE TPP TRUST AND ARE NOT SUBJECT TO THE PROCEDURES SET FORTH HEREIN. THIRD-PARTY PAYORS MAY ELECT TO RESOLVE SUCH CLAIMS THROUGH THE LIEN RESOLUTION PROCEDURES UNDER THE LRP AGREEMENT, WHICH SHALL BE ATTACHED AS EXHIBIT D TO THE PI TRUST AGREEMENT (AND IS ATTACHED HEREIN AS EXHIBIT 1 FOR EASE OF REFERENCE), AND WHICH SHALL BE FILED WITH THE PLAN SUPPLEMENT. THE PLAN SUPPLEMENT (INCLUDING THE LRP AGREEMENT) MAY BE OBTAINED FREE OF CHARGE AT HTTPS://RESTRUCTURING.PRIMECLERK.COM/PURDUEPHARMA.

DISTRIBUTIONS TO PARTICIPATING THIRD-PARTY PAYORS UNDER THE LRP AGREEMENT WILL BE MADE BY THE PI TRUSTEE FROM FUNDS HELD BY THE PI TRUST.

---

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## § 3.    ADMINISTRATION BY TRUSTEE.

The trustee of the TPP Trust (the "<u>Trustee</u>") will be selected in accordance with the Plan in advance of the Effective Date by the Third-Party Payor Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed, or denied.).[5] Alan D. Halperin has been selected and approved to serve as the Trustee.

The Trustee shall have the power and authority to perform all functions on behalf of the TPP Trust, and shall undertake all administrative responsibilities of the TPP Trust (whether directly or through professionals and agents engaged by the TPP Trust, including a claims administrator) as are provided in the Plan and the TPP Trust Documents.[6] The Trustee shall be responsible for all decisions and duties with respect to the TPP Trust, as more fully set forth in the TPP Trust Agreement.[7]

The Trustee shall have the exclusive authority to determine the eligibility of TPP Claimants to be TPP Authorized Recipients and the amount of TPP Abatement Distributions to be made by the TPP Trust. In order to qualify as a TPP Authorized Recipient and be eligible to receive a TPP Abatement Distribution, TPP Claimants must comply with the terms, provisions and procedures set forth herein, including the TPP Abatement Claim Deadline (defined below) and the timely submission of all forms required pursuant hereto (which shall be in addition to, and not in substitution of, Proofs of Claim filed in the Chapter 11 Cases). The Trustee may investigate any Third-Party Payor Channeled Claim, may request information from any TPP Claimant to ensure compliance with the terms set forth in this TPP TDP, the other TPP Trust Documents and the Plan, and make determinations about the TPP Abatement Distribution amounts to be made to TPP Authorized Recipients.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the TPP Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Third-Party Payor Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Third-Party Payor Channeled Claims on the Effective Date, and shall be entitled

---

[5]    The TPP Trust Agreement will be filed on or prior to the Plan Supplement Deadline.

[6]    The TPP Trust Agreement shall provide that the Trustee shall have the authority to, in his/her discretion, consult with and retain attorneys, financial advisors, accountants, or other professionals and employees, including any third-party claims administrators or claims and noticing agent, as the Trustee deems appropriate in the reasonable exercise of his/her discretion, and who the Trustee reasonably determines to have qualifications necessary to assist the Trustee in the proper administration of the TPP Trust. The TPP Trust Agreement defines such parties as Trust Professionals. The Trustee may pay the reasonable fees, costs and expenses of such persons (including to him/herself and his/her firm) out of the assets of the TPP Trust in the ordinary course of business, pursuant to the terms of the TPP Trust Agreement. There will also be a Trust Advisory Committee, comprised of representatives of five Third-Party Payors, and the members of that committee will have certain oversight and advisory rights, which are described in the TPP Trust Agreement.

[7]    The TPP Trust Agreement shall provide for the compensation of the Trustee. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

to reasonably request and receive from NewCo such additional information and documents as reasonably necessary for the administration of the TPP Trust, which may include those medical, prescription or business records of the Debtors related to the Third-Party Payor Channeled Claims, which records shall be transferred from the Debtors to NewCo on the Effective Date.

## § 4.    ELIGIBILITY FOR TPP ABATEMENT DISTRIBUTIONS.

To qualify as a TPP Authorized Recipient and be entitled to receive TPP Abatement Distributions from the TPP Trust, each TPP Claimant must:

   a.  Have timely filed a Proof of Claim in the Debtors' Chapter 11 Cases (that is, on or before July 30, 2020) and checked the box identifying itself as a Third-Party Payor, or have timely filed a Proof of Claim and amended that Proof of Claim prior to the Effective Date of the Plan to properly identify itself as a Third-Party Payor;

   b.  **Timely submit an additional, completed form (the "TPP Abatement Claim Form," available at Appendix A) to the TPP Trust by the TPP Abatement Claim Deadline, which shall be no later than sixty (60) days after the Effective Date of the Plan[8] (the "TPP Abatement Claim Deadline")** in accordance with the instructions provided with the TPP Abatement Claim Form; and

   c.  Have provided in connection with such TPP Abatement Claim Form, by or before the TPP Abatement Claim Deadline, a calculation of its Purdue-Related Opioid Spend (as defined in Appendix B), utilizing the Maximum Eligible Amount Calculation Methodology (for each TPP Claimant, its "TPP Abatement Claim").[9]

Any TPP Claimant who meets all of the above criteria (a)-(c) (each such TPP Claimant, a "TPP Authorized Recipient") shall qualify for TPP Abatement Distributions, subject to the limitations otherwise set forth herein. **To receive a TPP Abatement Distribution from the TPP Trust, a TPP Authorized Recipient must also complete and return to the TPP Trust an IRS form W-9 or an IRS form W-8, as applicable. Copies of such forms are available at Exhibit 2 to this document.**

FOR AVOIDANCE OF DOUBT, FOR A TPP CLAIMANT TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A TPP ABATEMENT DISTRIBUTION, SUCH TPP CLAIMANT MUST HAVE (i) TIMELY FILED A PROOF OF CLAIM IDENTIFYING ITSELF AS A THIRD-PARTY PAYOR BY OR BEFORE THE GENERAL BAR DATE, (ii) MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE (THAT IS, SIXTY (60) DAYS AFTER THE EFFECTIVE DATE OF THE PLAN, AS SET FORTH BELOW), USING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY, AND (iii) MUST

---

[8]    In the event that the deadline (i.e., the sixtieth day after the Effective Date) falls on a date that is not a Business Day, then the deadline shall be the next succeeding Business Day,

[9]    The Maximum Eligible Amount Calculation Methodology is attached as Appendix B.

PROVIDE A COMPLETED IRS FORM W-9 OR W-8 TO THE TPP TRUST. MORE DETAIL ABOUT EACH OF THESE POINTS IS PROVIDED BELOW.

(a)     **Initial Proof of Claim**

All TPP Claimants were required, in order to preserve their claims against the Debtors, to file Proofs of Claim by the General Bar Date (that is, July 30, 2020) established by the Bankruptcy Court. More than 467,108 such Proofs of Claim were filed (some as part of consolidated Proofs of Claim filed on behalf of numerous TPP Claimants). Many, though not all, were filed using estimated or unliquidated amounts.

Any TPP Claimant that did not timely file a Proof of Claim and check the box on the Proof of Claim form identifying itself as a Third-Party Payor or that did not timely file a Proof of Claim and amend that claim before the Effective Date to properly identify itself as a Third-Party Payor is barred from asserting or seeking to enforce its Third-Party Payor Channeled Claim, pursuant to the Bar Date Order, and shall not be a TPP Authorized Recipient or eligible to receive a TPP Abatement Distribution from the TPP Trust.

(b)     **TPP Abatement Claim Deadline**

All TPP Claimants that timely filed a Proof of Claim on or before July 30, 2020 shall be required to submit a TPP Abatement Claim Form by the TPP Abatement Claim Deadline. Any TPP Claimant that does not submit a TPP Abatement Claim Form shall not qualify as a TPP Authorized Recipient, and any TPP Claimant that submits a TPP Abatement Claim Form after the TPP Abatement Claim Deadline shall not qualify as a TPP Authorized Recipient, and shall have no right to any distribution from the TPP Trust. No TPP Abatement Claim Form shall be accepted after the TPP Abatement Claim Deadline, unless that TPP Claimant has made a written request for an extension to the Trustee prior to the TPP Abatement Claim Deadline, and that request has been granted by the Trustee in writing. Requests for extension must be **actually received** by the Trustee prior to the TPP Abatement Claim Deadline, and the determination as to whether to grant any requested extension is wholly within the discretion of the Trustee.

The TPP Abatement Claim Form requires all TPP Claimants to use the Maximum Eligible Amount Calculation Methodology to determine the amount of their Purdue-Related Opioid Spend, which shall be used to determine the maximum amount they are eligible to receive as a TPP Abatement Distribution. However, the actual amount of the TPP Abatement Distribution to a TPP Authorized Recipient will depend on the total dollar amounts of (i) the TPP Abatement Distribution to all TPP Authorized Recipients and (ii) the Purdue-Related Opioid Spend of all TPP Authorized Recipients.

The TPP Abatement Claim Form (including instructions for the required calculations and the deadlines and instructions for the submission of such TPP Abatement Claim Form on the website to be maintained by the TPP Trust) will be distributed by the Trustee (or an agent thereof) to each TPP Claimant that timely filed a Proof of Claim promptly after the Effective Date and in no event more than three business days after the Effective Date (such notice, the "TPP Abatement Claim Form Notice"). The TPP Abatement Claim Form Notice will make it clear that after the TPP Abatement Claim Forms are reviewed by the Trustee, the TPP website will be the sole form of notice of the TPP Trust's determination of the TPP Abatement Distribution amount each TPP

Authorized Recipient is to receive. The deadline for the posting of such determinations on the website is described in Section 5(a) herein.

As set forth in more detail in the instructions attached to the TPP Abatement Claim Form, for those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach a chart or spreadsheet containing such aggregate information. For each TPP Claimant included in the consolidated TPP Abatement Claim Form, the chart or spreadsheet shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii)  the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) the responses to each of questions 1 through 6 in the instructions accompanying the TPP Abatement Claim Form (described as the Maximum Eligible Amount Calculation Methodology) for that TPP Claimant, (iv) the dollar amount of that TPP Claimant's Purdue-Related Opioid Spend, as calculated pursuant to the instructions set forth in this TDP, and (v) the claim number of the previously filed Proof of Claim.

A TPP Claimant (or its attorney) must deliver, as part of the TPP Abatement Claim Form, a certification signed by the TPP Claimant or its attorney attesting to the accuracy and truthfulness of the TPP Claimant's submission. Such certification must include an attestation that the TPP Claimant utilized the Maximum Eligible Amount Calculation Methodology to determine the Purdue-Related Opioid Spend of its TPP Abatement Claim and that no data required for claims processing and valuation, and no records or information that would reasonably be relevant to the valuation of the TPP Abatement Claim, have been misrepresented or omitted.

A TPP CLAIMANT THAT FILED AN INITIAL PROOF OF CLAIM MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM IN ORDER TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND TO BE ELIGIBLE FOR TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST SHALL BE THE SOLE SOURCE OF RECOVERY IN RESPECT OF THIRD-PARTY PAYOR CHANNELED CLAIMS, AND NO TPP CLAIMANT SHALL HAVE ANY OTHER OR FURTHER RECOURSE TO THE DEBTORS OR THEIR ESTATES, THE TPP TRUST OR ANY OTHER RELEASED PARTY OR SHAREHOLDER RELEASED PARTY IN RESPECT OF ITS THIRD-PARTY PAYOR CHANNELED CLAIMS.

      (c)      **Use of Maximum Eligible Amount Calculation Methodology to Determine Purdue-Related Opioid Spend**

In addition to the requirements set forth above, each TPP Claimant must use the Maximum Eligible Amount Calculation Methodology to identify its Purdue-Related Opioid Spend on a TPP Abatement Claim Form in order to qualify as a TPP Authorized Recipient and to be eligible to receive a TPP Abatement Distribution hereunder. On the TPP Abatement Claim Form, each TPP Claimant must set forth, inter alia, the total amount of its Purdue-Related Opioid Spend, certifying that it used the Maximum Eligible Amount Calculation Methodology, as set forth on Appendix B attached hereto, to calculate its Maximum Eligible Amount (as defined below).

TPP Claimants shall not be required to submit the data underlying the amount of their Purdue-Related Opioid Spend with the TPP Abatement Claim Form but shall promptly provide supporting documentation and data, if and when requested by the Trustee, sufficient to enable confirmation of the amounts.

      **(d)**       **The Submission of IRS Form W-9 or IRS Form W-8 to the TPP Trust**

Each TPP Claimant must also furnish to the Trustee in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and a completed IRS Form W-9 or, if applicable, IRS Form W-8. Such form may be submitted with the TPP Abatement Claim Form or may be sent separately via email to [●]. **If such completed form is not received by the Trustee within three hundred sixty-five days (365) days of the TPP Abatement Claim Form Notice, which shall include notice of the deadline for submitting a completed IRS Form W-9 or W-8, each such TPP Claimant shall be deemed to have forfeited his/her/its entire interest in the TPP Trust, any and all claims to the TPP Trust Assets, and all rights to any TPP Abatement Distribution under the TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and such forfeited amounts shall re-vest in the TPP Trust to be distributed to other TPP Authorized Recipients.**

## § 5.    DETERMINATION OF TPP ABATEMENT DISTRIBUTIONS.

      (a)       **Claims Review and Reconciliation**

The Trustee shall review the timely submitted TPP Abatement Claim Forms.

As part of this review and aggregation process, the Trustee and Trust Professional(s) shall identify and eliminate duplicative TPP Abatement Claims, if any, submitted by more than one TPP Authorized Recipient (e.g., by a Self-Funded Health Plan[10] independently and as an ASO[11] included in a consolidated TPP Abatement Claim Form) to ensure a TPP Authorized Recipient does not receive multiple TPP Abatement Distributions in connection with the same Purdue-Related Opioid Spend. In the event that the Trustee identifies TPP Abatement Claims as duplicative, the Trustee (or Trust Professionals acting on behalf of the Trustee) shall notify the submitting parties via email of the duplication and request joint written instructions or alternatively, instruction from the Self-Funded Health Plan that submitted on its own behalf within thirty (30) days of the date of the email, as to which TPP Abatement Claim should be deemed withdrawn. Absent such timely instructions, the Trustee shall treat the TPP Abatement Claim Form submitted earlier in time as the TPP Abatement Claim Form for notice and distribution purposes, and the other TPP Abatement Claims shall be deemed disqualified.

---

[10]   The term Self-Funded Health Plan ("SFHP") means a health or disability benefits plan provided by an employer, association, union, or other such entity (the "entity") to its employees, members, or other such beneficiaries entitled to receive benefits under the plan, using the entity's own funds, whereby the entity assumes most of the financial risk relating to health insurance. A SFHP may secure stop-loss coverage from an insurer only to cover unexpectedly large or catastrophic claims.

[11]   Self-Funded Health Plans for which a Third-Party Payor performs administrative services only are referred to herein as Administrative Services Only customers or "ASO" or "ASO customers."

No later than 270 days after the TPP Abatement Claim Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients (with respect to each TPP Authorized Recipient, its "Maximum Eligible Amount") and initial percentage of total TPP Abatement Distributions represented by such Maximum Eligible Amount (with respect to each TPP Authorized Recipient, its "Initial Allocation Percentage"). This will require that the TPP Trust match the TPP Abatement Claim Forms to the Proofs of Claim that were timely filed as Third-Party Payor Channeled Claims in connection with the General Bar Date,  review the TPP Abatement Claim Forms and any supporting documentation and data, make determinations about the amount and validity of the TPP Abatement Claims submitted by TPP Authorized Recipients, and eliminate any duplicative TPP Abatement Claims or TPP Abatement Claim Forms that request TPP Abatement Distributions for the same Purdue-Related Opioid Spend. The Maximum Eligible Amount may be shown as zero dollars ($0) and the TPP Abatement Claim disqualified in its entirety, or may be an amount different from that asserted on the TPP Abatement Claim Form, as appropriate, if no Proof of Claim was timely filed in connection with the General Bar Date, if no TPP Abatement Claim Form was timely submitted by the TPP Abatement Claim Deadline, if the TPP Claimant did not fully comply with the requirements of the TPP Abatement Claim Form and instructions, if the TPP Claimant was directed to provide the TPP Trust with documentation or data and did not promptly do so, or on any other basis. The Trustee's determination as to the Maximum Eligible Amount of each TPP Abatement Claim shall be the amount reflected on the updated website.

Each TPP Authorized Recipient's Initial Allocation Percentage will be calculated by dividing (i) the final dollar amount of such TPP Authorized Recipient's Maximum Eligible Amount by (ii) the total dollar amount of all TPP Authorized Recipients' Maximum Eligible Amounts plus the disputed, unresolved TPP Abatement Claims for which funds must be reserved (see below).

Within five business days of updating the website to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients, the Trustee will, via email, notify each TPP Claimant that has submitted or is included in a TPP Abatement Claim Form (via notice to the representative identified as the notice party on the TPP Abatement Claim Form) that the website has been updated. For avoidance of doubt, with respect to consolidated TPP Abatement Claims included in one TPP Abatement Claim Form, email notice will be sent only to the notice party identified on the TPP Abatement Claim Form.

(b)     **Challenges to Determinations by the TPP Trust**

TPP Authorized Recipients will have thirty (30) days from the date that the Trustee emails notice of the updating of the TPP Trust website as set forth in Section 5(a) hereof, to submit a letter or letters to the TPP Trust, by submitting such letter or letters on the TPP Trust website, challenging the TPP Trust's determination regarding its Maximum Eligible Amount or Initial Allocation Percentages and/or the Maximum Eligible Amounts or Initial Allocation Percentages of any other TPP Authorized Recipient (the "Challenge Deadline"). A separate letter must be submitted for each challenged Maximum Eligible Amounts and/or Initial Allocation Percentages.

A TPP Authorized Recipient may challenge the Maximum Eligible Amounts and/or Initial Allocation Percentages of as many other TPP Authorized Recipients as it wishes, though each

8

challenge must be made separately by one TPP Authorized Recipient against a single other TPP Authorized Recipient, made on a good faith basis, and accompanied by a detailed letter identifying the basis or bases for the challenge. A TPP Claimant that did not timely file a Proof of Claim and does not timely submit a TPP Abatement Claim Form shall not have the right to challenge the amount of any other TPP Authorized Recipient's Maximum Eligible Amounts and/or Initial Allocation Percentages.

The TPP Trust will have up to forty-five (45) days after the Challenge Deadline to resolve challenges (the "Resolution Deadline"). If a TPP Abatement Claim has been timely challenged and no agreement can be reached between the TPP Trust and the TPP Authorized Recipient or TPP Authorized Recipients (i.e., the TPP Authorized Recipient challenging the determination of the TPP Trust, and in the event that the challenge relates to the Maximum Eligible Amount and/or Initial Allocation Percentage of a different TPP Authorized Recipient, that TPP Authorized Recipient), the TPP Authorized Recipient that brought the challenge has the right to file a motion with respect to such challenge with the Bankruptcy Court, within thirty (30) days from the Resolution Deadline (the "Motion Deadline").

**If there is a timely challenge, the amount of the challenged Maximum Eligible Amount and/or Initial Allocation Percentage shall be determined by negotiated resolution if possible, or, in the absence of agreement, the TPP Trust's determination of the Maximum Eligible Amount and/or Initial Allocation Percentage will control, if no motion is filed with the Bankruptcy Court by or before the Motion Deadline. If a motion is timely filed, the amount of the Maximum Eligible Amount and/or Initial Allocation Percentage will be determined by the Bankruptcy Court.**

If appropriate due to a successful challenge, the Trustee shall modify one or more amounts of Maximum Eligible Amounts and/or Initial Allocation Percentages accordingly.

Challenges that do not result in a change to the amount of any Maximum Eligible Amount and/or Initial Allocation Percentages shall be deemed unsuccessful and the challenging TPP Authorized Recipient shall be charged for all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated TPP Trust professionals; such fees and expenses shall be subtracted from the challenging TPP Authorized Recipient's TPP Abatement Distribution payment. To the extent that the challenging TPP Authorized Recipient's TPP Abatement Distribution payment is insufficient to fully reimburse such expenses, the challenging TPP Authorized Recipient and the challenging TPP Authorized Recipient's professionals that filed the unsuccessful challenge shall be liable for payment of all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated Trust Professionals.

If no challenge is timely received, the TPP Trust's determination shall become a final determination as to the amount of that Maximum Eligible Amount and/or Initial Allocation Percentage (with the allocation percentage being subject to adjustment based on the outcome of other challenges).

Promptly    following    the    Motion    Deadline,    the    Trustee    shall    cause    the    website [www._____.com] to be updated to reflect the final determination of each TPP Authorized

Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, which shall become such TPP Authorized Recipient's "Final Allocation Percentage." The website shall also reflect which, if any, TPP Abatement Claims continue to be subject to dispute as a result of timely filed motions.

## § 6.    TPP ABATEMENT DISTRIBUTIONS BY TPP TRUST.

(a)    **Timing and Manner of Distributions**.

There will be three annual distributions by the TPP Trust, and the TPP Trust will provide a distribution report on the TPP Trust website in advance of each of the distributions.

The first distribution report will be due on or before February 15, 2023 (or, if February 15, 2023 is not a Business Day, the next Business Day), provided that February 15, 2023 is at least fifteen (15) months after the Effective Date. If it is not, the first distribution report will be due on the date that is fifteen (15) months after the Effective Date. The second and third distribution reports will be due on or before one year and two years, respectively, after the date of the filing of the first distribution report.

**Distributions to TPP Authorized Recipients will begin thirty (30) days after the filing of each distribution report, with the date on which that distribution begins being a "Distribution Date."**

The maximum amount each TPP Authorized Recipient shall be allowed to receive from a distribution shall be equal to the total gross distributable amount for all TPP Authorized Recipients eligible to receive TPP Abatement Distributions, multiplied by each TPP Authorized Recipient's Final Allocation Percentage, all subject to any amounts reserved on account of disputed Third-Party Payor Channeled Claims, consistent with Section 7. The existence of a Final Allocation Percentage for a particular TPP Authorized Recipient does not entitle that TPP Authorized Recipient to receive any funds, however, unless it has also complied with the terms of the TPP Trust and the funding of delineated opioid abatement initiatives therein.

At the option of the Trustee, any Cash payment may be made by a check or wire transfer or as otherwise required or provided in the TPP Trust Agreement.

(b)    *De Minimis* **Distributions**

The Trustee shall not be required to make any TPP Abatement Distributions of Cash in an amount less than $100, or such lower amount as determined by the Trustee in accordance with the TPP Trust Agreement to any TPP Authorized Recipient; provided, however, that if any TPP Abatement Distribution is not made pursuant to this Section, such TPP Abatement Distribution shall be added to any subsequent TPP Abatement Distribution to be made to such TPP Authorized Recipient. The Trustee shall not be required to make any final distribution of Cash in an amount less than $100 to any TPP Authorized Recipient. If the amount of any final TPP Abatement Distribution to any TPP Authorized Recipient would be $100 or less, then such distribution shall be made available for distribution to all TPP Authorized Recipients receiving final distributions of at least $100.

In the event that following all distributions and upon completion of the TPP Trust's tasks, the TPP Trust is left with *de minimis* funds, the Trustee may donate such *de minimis* funds to an IRS accredited charity.

**(c)       Undeliverable Distributions; Uncashed Checks**

In the event that any TPP Abatement Distribution is returned as undeliverable, no TPP Abatement Distribution shall be made to such TPP Authorized Recipient (or its designated agent) unless and until the Trustee is notified in writing of such TPP Authorized Recipient's (or its authorized representative's) then-current address, at which time or as reasonably practicable thereafter, such TPP Abatement Distribution shall be made without interest, subject to the limitations of the following paragraph. The Trustee may, in his or her sole discretion, attempt to determine a TPP Authorized Recipient's current address or otherwise locate a TPP Authorized Recipient but nothing in this TPP TDP, the TPP Trust Agreement or the Plan shall require the Trustee to do so.

In the event that a TPP Abatement Distribution is returned as undeliverable or otherwise unclaimed for a period of six (6) months after the Distribution Date, and no updated address information is provided during that time, such Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to or for the benefit of such TPP Authorized Recipient, the TPP Abatement Claim(s) of such TPP Authorized Recipient shall be discharged and forever barred from receiving Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and shall be redistributed in accordance with the Plan, the TPP Trust Agreement, and this TPP TDP.

Likewise, in the event any check in respect of a TPP Abatement Distribution to a TPP Authorized Recipient or its authorized representative has not been cashed or otherwise negotiated within six (6) months of the date of such TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution(s) shall be made to such TPP Authorized Recipient or representative on account of such TPP Abatement Claim, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, and the Third-Party Payor Channeled Claims of the TPP Authorized Recipient shall be discharged and forever barred from receiving TPP Abatement Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the TPP Trust, and shall be redistributed in accordance with the Plan, the TPP Trust Agreement and this TPP TDP.

## § 7.    TREATMENT OF DISPUTED TPP ABATEMENT CLAIMS.

If thirty (30) days prior to the due date of a distribution report, the Maximum Eligible Amount and/or Initial Allocation Percentage of a TPP Abatement Claim remains disputed, funds shall be reserved on account of that Maximum Eligible Amount and/or Initial Allocation Percentage. Once the Trustee or the Bankruptcy Court, as applicable, makes a determination as to the amount of the TPP Authorized Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, that TPP Authorized Recipient may be entitled to a "catch-up" payment in connection with the next distribution report and Distribution Date, consistent with the determination.

**THE TPP TRUST SHALL NOT BE REQUIRED TO RESERVE FUNDS FOR A DISPUTED TPP ABATEMENT CLAIM UNLESS A TPP CLAIMANT TIMELY SATISFIED THE REQUIREMENTS OF SECTIONS 3 AND 5 HEREIN, INCLUDING BUT NOT LIMITED TO HAVING FILED (I) A PROOF OF CLAIM BY OR BEFORE THE GENERAL BAR DATE AND (II) A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY. A TPP CLAIMANT THAT FAILED TO TIMELY FILE A PROOF OF CLAIM OR TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY SHALL HAVE NO CLAIM AGAINST THE TPP TRUST AND NO RIGHT TO ANY TPP ABATEMENT DISTRIBUTION FROM THE TPP TRUST.**

## § 8.    USE OF TPP ABATEMENT DISTRIBUTIONS.

TPP Authorized Recipients are required to use all net funds distributed to them from the TPP Trust solely and exclusively for TPP Authorized Abatement Purposes which consist of (i) Approved MAT Expenses and Approved Uses/Programs[12] and (ii) the payment of attorneys' fees and costs; provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

A TPP Authorized Recipient that receives a TPP Abatement Distribution from the TPP Trust must certify, pursuant to Section 9, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, and affiliate companies), an aggregate amount equal to or exceeding its share of the annual TPP Abatement Distribution for TPP Authorized Abatement Purposes, and that it has complied with this Section, during the Distribution Period.[13] A TPP Authorized Recipient that submitted an aggregate Proof of Claim on behalf of ASO customers may distribute amounts received to ASO customers; provided that the TPP Authorized Recipient certify, pursuant to Section 9 herein, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount equal to or exceeding its TPP Abatement Distribution for TPP Authorized Abatement

---

[12]    See Appendices C and D hereto.

[13]    The Distribution Period is defined as the twelve (12) month period following each annual Distribution Date.

Purposes, and that it has complied with this Section 8, during the Distribution Period. An ASO customer included in an aggregate Proof of Claim will not be subject to independent certification or usage requirements relating to the ASO's share of the TPP Abatement Distribution.

The TPP Trust shall, in accordance with the Plan, the Confirmation Order and the applicable TPP Trust Documents, make TPP Abatement Distributions to TPP Authorized Recipients exclusively for TPP Authorized Abatement Purposes. Decisions made by the TPP Trust concerning Abatement Distributions will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

### (a)    Approved MAT Expenses and Approved Uses/Programs

TPP Authorized Abatement Purposes include Approved MAT Expenses and Approved Uses/Programs.

Approved MAT Expenses shall include all or part of the costs paid by TPP Authorized Recipients for Allowed MAT Therapy as defined in Appendix C attached hereto.

Approved Uses/Programs focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") and are defined in Appendix D attached hereto.[14]

### (b)    Requirements for Self-Funded Health Plans

In each Distribution Period, a TPP Authorized Recipient that qualifies as a Self-Funded Health Plan: i) must have spent an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent an aggregate amount at least equal to, or exceeding, 50% of the Self-Funded Health Plan's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto. This provision does not apply to the extent a Self-Funded Health Plan is an ASO included in an aggregate Proof of Claim.

### (c)    Requirements for all TPPs other than Self-Funded Health Plans

In each Distribution Period, a TPP Authorized Recipient (including a TPP Authorized Recipient that filed an aggregate Proof of Claim on behalf of ASOs), other than a Self-Funded Health Plan that independently filed a Proof of Claim: i) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, 50%

---

[14]    As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

of the TPP Authorized Recipient's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto.

## § 9.    REPORTING BY TPP AUTHORIZED RECIPIENTS.

Within ninety (90) days after the end of a Distribution Period, each TPP Authorized Recipient that received a TPP Abatement Distribution, other than an ASO included in an aggregate Proof of Claim, must submit to the TPP Trust a certification regarding its satisfaction of the minimum spending requirements on TPP Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its TPP Abatement Distribution.

If a TPP Authorized Recipient that received a TPP Abatement Distribution is unable to meet or has not met the minimum spending requirements set forth in Section 8 above during the Distribution Period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the TPP Authorized Recipient meets the relevant spending requirements for TPP Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the TPP Authorized Recipient meets the relevant spending requirements. A TPP Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its TPP Abatement Distribution during a given Distribution Period.

The TPP Trust shall have the right to audit a TPP Authorized Recipient to determine whether the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements set forth in the TPP Trust Documents.

Each TPP Authorized Recipient, other than an ASO included in an aggregate Proof of Claim, if and when requested by the Trustee, shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements of the TPP Trust Documents. All Proofs of Claim, TPP Abatement Claim Forms and certifications filed or submitted by TPP Claimants are subject to audit by the Trustee, at the Trustee's discretion. If the Trustee finds a material misstatement in a TPP Claimant's Proof of Claim, TPP Abatement Claim Form or certification, the Trustee may allow that TPP Claimant up to 30 days to resubmit its Proof of Claim, TPP Abatement Claim Form or certification with supporting documentation or revisions. Failure of the TPP Claimant to timely correct its misstatement in a manner acceptable to the Trustee may result in forfeiture of all or part of the TPP Claimant's qualification as a TPP Authorized Recipient or right to receive TPP Abatement Distributions.

The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of TPP Trust. The TPP Trust retains the right to seek return by legal means of any expenditures that fail to comply with the requirements of this TPP TDP.

## § 10.    ADDITIONAL REPORTING BY THE TPP TRUST.

The TPP Trust shall (i) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes

14

set forth in the applicable TPP Trust Documents, and (ii) prepare and file with the Bankruptcy Court and on the TPP website, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the TPP Trust after each year that the TPP Trust is in existence. The annual report will contain, among other things, a summary regarding the number of claims resolved during the period covered by the financial statements, the status of any audits of TPP Authorized Recipients and any recommendations made by the Trustee relating to such audits.

*[Remainder of Page Intentionally Left Blank]*

## APPENDICES AND EXHIBITS

**APPENDIX A: TPP Abatement Claim Form**

**APPENDIX B: Maximum Eligible Amount Calculation Methodology**

**APPENDIX C: Approved MAT Expenses**

**APPENDIX D: Approved Uses/Programs**


**EXHIBIT 1:  LRP Agreement**

**EXHIBIT 2:   IRS forms W-9 and W-8**

**APPENDIX A: TPP Abatement Claim Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors. | **(Jointly Administered)** |

# <u>Third-Party Payor Abatement Claim Form</u>

This form (this "TPP Abatement Claim Form") is only for Holders of Third-Party Payor Channeled Claims, as defined in the *Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Plan"),[1] that timely filed a Proof of Claim by the General Bar Date (July 30, 2020) established by the Bankruptcy Court (each, a "TPP Claimant").

If you are a TPP Claimant and want to have your TPP Abatement Claim reviewed by the TPP Trust that will come into existence upon the Effective Date of the Plan, you or your authorized representative must complete and submit this TPP Abatement Claim Form so that it received on or before [•], 2021 (the "TPP Abatement Claim Deadline"). You may file your TPP Abatement Claim Form using any of the following methods:

| If by E-Submission: | If by standard or overnight | If by hand delivery: |
|---|---|---|
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit Third-Party Payor Channeled Claim Form" link | Purdue Pharma<br>TPP Supplemental Claims<br>c/o Prime Clerk, LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 | Purdue Pharma<br>TPP Supplemental Claims<br>c/o Prime Clerk, LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165<br><br>If you plan to hand deliver your TPP Abatement Claim Form to Prime Clerk's office, please email _____@primeclerk.com at least one business day in advance to arrange delivery. |

**Instructions regarding how to calculate your claim are attached to this TPP Abatement Claim Form.**

**For questions regarding this TPP Abatement Claim Form, please call [_____] or visit [WEBSITE].**

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan or the TPP TDP.

*Notwithstanding a previously filed Proof of Claim in In re Purdue Pharma L.P., et al., Case No. 19-23649 (RDD), failure to submit this TPP Abatement Claim Form by the TPP Abatement Claim Deadline ([•], 2021) will result in disqualification of your Proof of Claim and will mean that you are not entitled to any distribution from the TPP Trust.*

**PURSUANT TO THE PLAN, ALL THIRD-PARTY PAYOR CHANNELED CLAIMS AGAINST THE DEBTORS IN THESE CHAPTER 11 CASES WILL BE CHANNELED TO THE TPP TRUST UPON THE EFFECTIVE DATE, AND THE ONLY POTENTIAL SOURCE OF DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS WILL BE TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. AS SET FORTH IN THE PLAN, TPP ABATEMENT DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS BY THE TPP TRUST MUST BE USED FOR TPP AUTHORIZED ABATEMENT PURPOSES.**

**IN ORDER TO HAVE THE TPP TRUST REVIEW AND MAKE A DETERMINATION OF YOUR MAXIMUM ELIGIBLE AMOUNT, IF ANY, OF YOUR TPP ABATEMENT CLAIM, YOU MUST HAVE TIMELY FILED A PROOF OF CLAIM BY THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES AND YOU MUST TIMELY FILE THIS TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE SET FORTH ABOVE.**

| Part 1: | Identify the Proof of Claim |
|---|---|
| **1. Who is the current creditor?** | _____<br>Name of the entity to be paid for this claim (including other names the creditor used with the debtor, including d/b/a) |
| **2. What is the claim number of your previously filed Proof of Claim?** | Claim Number: _____ |
| **3. Has anyone else filed a claim on behalf of this creditor?** | _____<br><br>If yes, please provide the filer and the claim number<br><br>_____ |
| **4. Last 4 digits of creditor's federal tax identification number (FEIN)?** | FEIN:___ _____ |

| Part 2: | Notices and Distributions |
|---|---|

| **1. Who should receive notice?** | Name: _____ <br> First name    Middle name    Last name <br><br> Title: _____ <br><br> Company: _____ <br> Identify the corporate servicer as the company if the authorized agent is a servicer <br><br> Address: _____ <br> Number    Street <br><br> _____ <br> City    State    Zip code <br><br> Phone Number: _____ <br><br> E-mail Address: _____ (required) |
|---|---|
| **2. Where should TPP Abatement Distributions be sent?** | Name: _____ <br> First name    Middle name    Last name <br><br> Title: _____ <br><br> Company: _____ <br> Identify the corporate servicer as the company if the authorized agent is a servicer <br><br> Address: _____ <br> Number    Street <br><br> _____ <br> City    State    Zip code |

| Part 3: | Amount of TPP Abatement Claim |
|---|---|

| **1. Total amount of the TPP Abatement Claim, as calculated by the methodology set forth in the instructions that begin on page 5 herein.** | Claim Amount: $_____ |
|---|---|
| **2. Components of TPP Abatement Claim, per instructions for calculation.** | 1. Number of creditor's plan members, subscribers, or covered dependents prescribed drugs identified on NDC List on Appendix A between 1/1/2008 and 12/31/2019.(Note: Count each member only once regardless of the number of prescriptions they had): _____ |

2. Number of prescriptions paid by creditor for drugs in item 1: _____

3. Total dollars paid by creditor for such prescriptions:_____

4. Number of plan members in item 1 who were diagnosed with Opioid Use Disorder (Appendix B):_____

5. For members in item 4, dollar amount of medical claims with ICD, CPT or HCPS codes (Appendix C):_____

6. The total number of members, subscribers, and covered dependents covered by your plan or administered by your plan as of January 1, 2020:_____

| Part 4: | Sign Below |
| --- | --- |

**The person completing this TPP Abatement Claim must sign and date it.**

**If you file this claim electronically, FRBP 5005(a)(2) establishes a local rule specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*
□ I am the creditor
□ I am the creditor's attorney or authorized agent

I understand that an authorized signature on this *TPP Abatement Claim Form* serves as an acknowledgement and certification that when calculating the amount of the TPP Abatement Claim, the Third-Party Payor on whose behalf the form is submitted has complied with the Maximum Eligible Amount Calculation Methodology set forth in the Instructions.

I have examined the information in this *TPP Abatement Claim Form* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

**Print the name of the person who is completing and signing this form**

Name:  _____
First name          Middle name          Last name

Title:  _____

Company:  _____
Identify the corporate servicer as the company if the authorized agent is a servicer

Address:  _____
Number                Street

_____
City                   State                 Zip code

## INSTRUCTIONS FOR TPP ABATEMENT CLAIM FORM

### How to Calculate Your TPP Abatement Claim

Each TPP Claimant (also referred to as "You" or "Your" throughout) shall provide information responsive to the questions set forth below, which shall set forth, *inter alia*, the total amount of Your Purdue-Related Opioid Spend, certifying that You used the Maximum Eligible Amount Calculation Methodology, as set forth below, to arrive at the amount. Each TPP Claimant, if and when requested by the TPP Trust Trustee, shall provide supporting documentation and data, in the requested format, underlying the TPP Claimant's calculation of its Purdue-Related Opioid Spend, sufficient to enable confirmation of the amount.

### Consolidated TPP Abatement Claims

For those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach to the completed TPP Abatement Claim Form a chart identifying the TPP Claimants included in the consolidated TPP Abatement Claim. For each TPP Claimant included in the consolidated TPP Abatement Claim, the chart shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii) the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) responses to each of questions 1 through 6 in these instructions; (iv) the amount of that TPP Claimant's TPP Abatement Claim, as calculated pursuant to the instructions below; and (v) the claim number of the previously filed Proof of Claim.

Filers of consolidated TPP Abatement Claims that provide unique identifiers rather than the names of the TPP Claimants in the charts that accompany their TPP Abatement Claims are required to submit charts with the names of the TPP Claimants that correspond to the unique identifiers directly to the TPP Trust by emailing such charts to [_____]. The names of such TPP Claimants shall not appear on the TPP website.

For avoidance of doubt: Filers of consolidated TPP Abatement Claims that used unique identifiers rather than the names of the TPP Claimants in connection with the Proofs of Claim filed by or before the General Bar Date shall use the same unique identifiers in connection with the filing of this TPP Abatement Claim Form, but are required to concurrently provide the TPP Trust with a chart that provides the unique identifier, the name of the TPP Claimant that corresponds to that identifier, the information required for each claimant under the TPP Claim Calculation Methodology below, the claim number of the previously filed Proof of Claim, and the amount of that TPP Claimant's TPP Abatement Claim.

### Maximum Eligible Amount Calculation Methodology

For the period of January 1, 2008 through December 31, 2019, You must provide the following:

1. The number of unique members who were prescribed one or more of the drugs identified on the NDC List, attached as Appendix A. Count each member only once regardless of the number of prescriptions they had.
2. The number of unique prescriptions paid, all or in part, by Your plan for the drugs identified on the NDC List, attached as Appendix A.
3. The total final dollars paid by Your plan for the prescriptions for the drugs identified in 2 above.
4. The number of unique members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 9 and 10 List, attached as Appendix B.

5. For the members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, attached as Appendix C, paid for those members.
6. The total number of members, subscribers and covered dependents covered by your plan or administered by your plan as of January 1, 2020.

**The amount of Your TPP Abatement Claim (Part 3, question 1 of the TPP Abatement Claim Form) should be calculated by adding the answers to questions 3 and 5 of Part 3 of the TPP Abatement Claim Form.**

You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your TPP Abatement Claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect. You may append one or more pages to provide or supplement your responses hereto.

*You must leave out or redact* information that is entitled to privacy on this form or on any attached documents.

The documents that support your calculations need not be submitted with this TPP Abatement Claim Form. However, the TPP Trustee shall have the right to require that you provide such documentation promptly upon request.

**Confirmation that the TPP Abatement Claim Form has been filed**

To receive confirmation that the TPP Abatement Claim has been filed, enclose a stamped self-addressed envelope and a copy of this completed form. You may also view a list of filed TPP Abatement Claims by visiting the Claims and Noticing Agent's website at [PurduePharmaClaims.com/_____]

*Information that is entitled to privacy.* The TPP Abatement Claim Form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the TPP Trustee so requests or someone else objects to the TPP Abatement Claim.

*Redaction of information.* Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to privacy on the TPP Abatement Claim Form and any attached documents.

## APPENDIX A: NDC LIST

| NDC | DRUG NAME |
|-----|-----------|
| 42858000101 | oxyCODONE HCl |
| 42858000110 | oxyCODONE HCl |
| 42858000201 | oxyCODONE HCl |
| 42858000210 | oxyCODONE HCl |
| 42858000301 | oxyCODONE HCl |
| 42858000401 | oxyCODONE HCl |
| 42858000501 | oxyCODONE HCl |
| 42858004001 | HYDROcodone-Acetaminophen |
| 42858010201 | oxyCODONE-Acetaminophen |
| 42858010250 | oxyCODONE-Acetaminophen |
| 42858010301 | oxyCODONE-Acetaminophen |
| 42858010350 | oxyCODONE-Acetaminophen |
| 42858010401 | oxyCODONE-Acetaminophen |
| 42858010450 | oxyCODONE-Acetaminophen |
| 42858012201 | Dilaudid |
| 42858013901 | HYDROcodone-Acetaminophen |
| 42858020101 | HYDROcodone-Acetaminophen |
| 42858020150 | HYDROcodone-Acetaminophen |
| 42858020201 | HYDROcodone-Acetaminophen |
| 42858020301 | HYDROcodone-Acetaminophen |
| 42858020350 | HYDROcodone-Acetaminophen |
| 42858023401 | Dilaudid |
| 42858023450 | Dilaudid |
| 42858023801 | HYDROcodone-Acetaminophen |
| 42858030101 | HYDROmorphone HCl |
| 42858030125 | HYDROmorphone HCl |
| 42858030201 | HYDROmorphone HCl |
| 42858030225 | HYDROmorphone HCl |
| 42858030250 | HYDROmorphone HCl |
| 42858030301 | HYDROmorphone HCl |
| 42858030416 | HYDROmorphone HCl |
| 42858033801 | Dilaudid |
| 42858035340 | Buprenorphine |

| NDC | DRUG NAME |
|-----|-----------|
| 42858041616 | Dilaudid |
| 42858049340 | Buprenorphine |
| 42858050103 | Buprenorphine HCl |
| 42858050203 | Buprenorphine HCl |
| 42858051501 | MS Contin |
| 42858058640 | Buprenorphine |
| 42858063101 | MS Contin |
| 42858075040 | Buprenorphine |
| 42858076001 | MS Contin |
| 42858079901 | MS Contin |
| 42858080101 | Morphine Sulfate ER |
| 42858080201 | Morphine Sulfate ER |
| 42858080301 | Morphine Sulfate ER |
| 42858080401 | Morphine Sulfate ER |
| 42858080501 | Morphine Sulfate ER |
| 42858083940 | Buprenorphine |
| 42858090001 | MS Contin |
| 42858090103 | TRAMADOL HCL ER |
| 42858090203 | TRAMADOL HCL ER |
| 42858090303 | TRAMADOL HCL ER |
| 59011010010 | OXYCONTIN |
| 59011010020 | OXYCONTIN |
| 59011010025 | OXYCONTIN |
| 59011010310 | OXYCONTIN |
| 59011010320 | OXYCONTIN |
| 59011010325 | OXYCONTIN |
| 59011010510 | OXYCONTIN |
| 59011010520 | OXYCONTIN |
| 59011010525 | OXYCONTIN |
| 59011010610 | NULL |
| 59011010710 | OXYCONTIN |
| 59011010720 | OXYCONTIN |
| 59011010725 | OXYCONTIN |

| NDC | DRUG NAME | NDC | DRUG NAME |
|---|---|---|---|
| 59011010910 | OXYCONTIN | 59011041520 | OxyCONTIN |
| 59011010925 | OXYCONTIN | 59011042010 | OxyCONTIN |
| 59011020110 | OXYIR | 59011042020 | OxyCONTIN |
| 59011022520 | OXYFAST | 59011043010 | OxyCONTIN |
| 59011026005 | MS CONTIN | 59011043020 | OxyCONTIN |
| 59011026010 | MS Contin | 59011044010 | OxyCONTIN |
| 59011026105 | MS CONTIN | 59011044020 | OxyCONTIN |
| 59011026125 | MS Contin | 59011044110 | DILAUDID |
| 59011026205 | MS CONTIN | 59011044210 | DILAUDID |
| 59011026210 | MS Contin | 59011044225 | Dilaudid |
| 59011026305 | MS CONTIN | 59011044410 | Dilaudid |
| 59011026310 | MS Contin | 59011044501 | Dilaudid-HP |
| 59011026410 | MS Contin | 59011044505 | Dilaudid-HP |
| 59011027160 | Hysingla ER | 59011044550 | DILAUDID-HP |
| 59011027260 | Hysingla ER | 59011044625 | DILAUDID-HP |
| 59011027360 | Hysingla ER | 59011045101 | Dilaudid |
| 59011027460 | Hysingla ER | 59011045201 | Dilaudid |
| 59011027560 | Hysingla ER | 59011045210 | Dilaudid |
| 59011027660 | Hysingla ER | 59011045401 | Dilaudid |
| 59011027760 | Hysingla ER | 59011045405 | Dilaudid |
| 59011031220 | PALLADONE | 59011045410 | Dilaudid |
| 59011031260 | PALLADONE | 59011045810 | Dilaudid |
| 59011031320 | PALLADONE | 59011046010 | OxyCONTIN |
| 59011031360 | PALLADONE | 59011046020 | OxyCONTIN |
| 59011031420 | PALLADONE | 59011048010 | OxyCONTIN |
| 59011031460 | PALLADONE | 59011048020 | OxyCONTIN |
| 59011031520 | PALLADONE | 59011075004 | Butrans |
| 59011031560 | PALLADONE | 59011075104 | Butrans |
| 59011033430 | RYZOLT | 59011075204 | Butrans |
| 59011033530 | RYZOLT | 59011075704 | Butrans |
| 59011033630 | RYZOLT | 59011075804 | Butrans |
| 59011041010 | OxyCONTIN | 59011081510 | OXYCONTIN |
| 59011041020 | OxyCONTIN | 59011083010 | OXYCONTIN |
| 59011041510 | OxyCONTIN | 59011086010 | OXYCONTIN |

## APPENDIX B: OUD ICD 9 AND 10 LIST

**ICD 9 Codes for OUD**:

304.00   OPIOID DEPENDENCE-UNSPECIFIED
304.01   OPIOID DEPENDENCE-CONTINUOUS
304.02   OPIOID DEPENDENCE-EPISODIC
304.03   OPIOID DEPENDENCE, IN REMISSION
304.70   OPIOID OTHER DEP-UNSPECIFIED
304.71   OPIOID OTHER DEP-CONTINUOUS
304.72   OPIOID OTHER DEP-EPISODIC
304.73   OPIOID OTHER DEP-IN REMISSION
305.50   OPIOID ABUSE-UNSPECIFIED
305.51   OPIOID ABUSE-CONTINUOUS
305.52   OPIOID ABUSE-EPISODIC
305.53   OPIOID ABUSE-IN REMISSION

**ICD 10 Codes for OUD**:

F11.1         Opioid abuse
F11.10       Opioid abuse, uncomplicated
F11.11       Opioid abuse, in remission
F11.12       Opioid abuse with intoxication
F11.120     Opioid abuse with intoxication, uncomplicated
F11.121     Opioid abuse with intoxication delirium
F11.122     Opioid abuse with intoxication with perceptual disturbance
F11.129     Opioid abuse with intoxication, unspecified
F11.13       Opioid abuse with withdrawal
F11.14       Opioid abuse with opioid-induced mood disorder
F11.15       Opioid abuse with opioid-induced psychotic disorder
F11.150     Opioid abuse with opioid-induced psychotic disorder with delusions
F11.151     Opioid abuse with opioid-induced psychotic disorder with hallucinations
F11.159     Opioid abuse with opioid-induced psychotic disorder, unspecified
F11.18       Opioid abuse with other opioid-induced disorder
F11.181      Opioid abuse with opioid-induced sexual dysfunction
F11.182     Opioid abuse with opioid-induced sleep disorder
F11.188     Opioid abuse with other opioid-induced disorder
F11.19       Opioid abuse with unspecified opioid-induced disorder
F11.20       Opioid Dependence uncomplicated
F11.21       Opioid Dependence in remission
F11.22       Opioid dependence with intoxication
F11.220     Opioid Dependence uncomplicated
F11.221     Opioid Dependence delirium
F11.222     Opioid dependence w intoxication with perceptual disturbance
F11.229     Opioid Dependence unspecified
F11.23       Opioid Dependence with withdrawal
F11.24       Opioid Dependence with opioid-induced mood disorder
F11.25       Opioid Dependence with opioid-induced psychotic disorder
F11.250     Opioid Dependence with delusions
F11.251     Opioid Dependence with hallucinations
F11.259     Opioid Dependence unspecified
F11.28       Opioid Dependence with other opioid-induced disorder
F11.281     Opioid Dependence with opioid-induced sexual dysfunction
F11.282     Opioid Dependence with opioid-induced sleep disorder
F11.288     Opioid Dependence with other opioid-induced disorder

## APPENDIX C: OUD MEDICAL CLAIMS CODES LIST

1.  Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2.  Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3.  New Patient: code 99205, 99201

4.  Established Patient: code 9921199215

5.  Visit type: MAT medication induction.

6.  Established Patient E/M: 99211–99215

7.  Patient Consult: 99241-45(*)[2]

8.  Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9.  Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof   HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23. 99233 – E/M inpatient visit/G0463 – outpatient clinic visit

24. 99223 – E/M inpatient visit/H0011 - acute/subacute detox

25. 99284 – E/M ER visit/H0007 outpatient crisis intervention

26. 99204 – E/M office visit/G0482 – UDT definitive

27. 99231 – E/M inpatient visit/G0483 – UDT definitive

28. 99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29. 99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30. 99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

---

[2] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

31.     99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32.     99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34.     J2315 - Injection, naltrexone, depot form, 1 mg

35.     3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37.     Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38.     Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.     G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40.     G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41.     G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42.     G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.     G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.     G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.     G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.     G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.     G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.     G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program

physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49. G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50. G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51. G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52. G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53. G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54. G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55. G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56. G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57. G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58. G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

    G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.

60. 11981 – Insertion of single non-biodegradable implant

61. 11982 – Removal of single non-biodegradable implant

62. 11983 – Removal and re-insertion of single nonbiodegradable implant

63. 17999 – unlisted   procedure, skin, mucous mem

64. S9475 –Ambulatory setting substance abuse treatment or detoxification services

65. H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66. H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67. J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68. J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69. J0571 BUPRENORPHINE ORAL 1 MG

70. J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71. J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.    J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.    J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.    J1230 Methadone

75.    J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.    S0109 METHADONE ORAL 5MG

77.    Rev Code 900 + H0020 (methadone)

78.    Rev Code 900 + H0001 or H0004 or H0005 or H0006

79.    Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone
Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone
(buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex
(buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv
(buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release);
Methadone]

| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
|---|---|---|
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |

| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |
| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |

| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |
| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |

| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |
| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |

| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |
| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |

| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |
| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |

| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |

| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |
| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |

| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

*[Remainder of Page Intentionally Left Blank]*

*[Page Intentionally Left Blank]*

## APPENDIX B: Maximum Eligible Amount Calculation Methodology

TPP Claimants shall use the following methodology for calculating the Maximum Eligible Amount distributable to them:

For the period of January 1, 2008 through December 31, 2019, provide the following:

1. The number of subscribers or dependents covered under the TPP Claimant's plan during some or all of the period from January 1, 2008 through December 31, 2019 (each, a "Unique Member") who were prescribed one or more of the drugs identified on the NDC List.

2. The number of unique prescriptions paid, all or in part, by your plan for the drugs identified on the NDC List.

3. The total final dollars paid by your plan for the prescriptions for the drugs identified in 2 above.

4. The number of Unique Members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 10 List.

5. For the Unique Members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, paid for those Unique Members.

The NDC List, OUD ICD 10 List, and OUD Medical Claims Codes List will be attached to and included with the TPP Abatement Claim Form.

## APPENDIX C: Approved MAT Expenses

*Approved MAT Expenses.* All or part of the expenses incurred by TPP Authorized Recipients for Allowed MAT Therapy, defined as claims paid for the following therapies or under the following ICD/CPT/HCPS codes:

1.    Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2.    Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3.    New Patient: code 99205, 99201

4.    Established Patient: code 99211-99215

5.    Visit type: MAT medication induction.

6.    Established Patient E/M: 99211–99215

7.    Patient Consult: 99241-45(*)[15]

8.    Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9.    Prolonged visits codes (99354, 99355) (*)

10.    30-74 minutes: 99354(*)

11.    75-104 minutes: 99355(*)

12.    105+ minutes: 99354+99355x2(*)

13.    Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14.    Established Patient: 99212-15

15.    SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16.    CPT/Prof    HCPC/FAC

17.    99214 – E/M office visit/G0480 – UDT definitive

18.    99213 – E/M office visit/H0015 - IOP

19.    99285 – E/M ER visit/H2035 – drug treatment program per hour

20.    99215 – E/M office visit/G0481 – UDT definitive

21.    80307 – UDT presumptive/H0010 – acute/subacute detox

22.    99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23.    99233 – E/M inpatient visit/G0463 – outpatient clinic visit

---

[15]    Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

24.     99223 – E/M inpatient visit/H0011 - acute/subacute detox

25.     99284 – E/M ER visit/H0007 outpatient crisis intervention

26.     99204 – E/M office visit/G0482 – UDT definitive

27.     99231 – E/M inpatient visit/G0483 – UDT definitive

28.     99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29.     99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone
        administration

30.     99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief
        intervention

31.     99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment
        and brief intervention (15 to 30 mins)

32.     99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment
        and brief intervention (more than 30 mins)

33.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected);
        subcutaneous or intramuscular

34.     J2315 - Injection, naltrexone, depot form, 1 mg

35.     3E023GC - Introduction of other therapeutic substance into muscle, percutaneous
        approach

36.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected);
        subcutaneous or intramuscular (same as Vivitrol)

37.     Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to
        100 mg

38.     Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.     G2067 Medication assisted treatment, methadone; weekly bundle including dispensing
        and/or administration, substance use counseling, individual and group therapy, and
        toxicology testing, if performed (provision of the services by a Medicare-enrolled
        Opioid Treatment Program)

40.     G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including
        dispensing and/or administration, substance use counseling, individual and group
        therapy, and toxicology testing if performed (provision of the services by a Medicare-
        enrolled Opioid Treatment Program)

41.     G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle
        including dispensing and/ or administration, substance use counseling, individual and
        group therapy, and toxicology testing if performed (provision of the services by a
        Medicare-enrolled Opioid Treatment Program)

42.     G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle
        including dispensing and/or administration, substance use counseling, individual and

group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.     G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.     G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.     G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.     G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.     G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.     G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49.     G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50.     G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51.     G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52.     G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53.    G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54.    G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55.    G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56.    G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57.    G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58.    G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.    G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

60.    11981 – Insertion of single non-biodegradable implant

61.    11982 – Removal of single non-biodegradable implant

62.    11983 – Removal and re-insertion of single nonbiodegradable implant

63.    17999 – unlisted    procedure, skin, mucous mem

64.    S9475 –Ambulatory setting substance abuse treatment or detoxification services

65.    H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66.    H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67.    J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68.    J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69.    J0571 BUPRENORPHINE ORAL 1 MG

70.    J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71.    J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.    J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.    J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.    J1230 Methadone

75.    J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.    S0109 METHADONE ORAL 5MG

77.    Rev Code 900 + H0020 (methadone)

78.    Rev Code 900 + H0001 or H0004 or H0005 or H0006

79.    Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone

| | | |
|---|---|---|
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |
| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |

| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |

| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |
| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |

| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |
| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |

| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |
| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |

| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |
| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |

| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |

| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |

| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |
| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |

| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |
| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |

| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX D: Approved Uses/Programs

*Approved Uses/Programs.* Approved Uses/Programs are those that satisfy the following criteria (the "Approved Uses/Programs Criteria"): they (a) focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") conditions, and/or grants to organizations focused on providing treatment of OUD and/or any SUD/MH conditions, (b) employ evidence-based or evidence-informed strategies, and (c) do not include reimbursements to health care providers or payments to covered persons under the plan of a TPP Authorized Recipient (or ASO, if applicable). Approved Uses/Programs follow:[16]

1) Support programs that increase the availability or quality of treatment for OUD and/or any SUD/MH conditions or are designed to prevent OUD, including, but not limited to:

   a) Expand telehealth networks and availability to increase access to treatment for OUD and/or any SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

   b) Support mobile, community-based crisis intervention services, including outpatient hospitals, community health centers, mental health centers and other clinics delivering mobile crisis intervention by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and/or any SUD/MH conditions and for persons who have experienced an opioid overdose. All supported services should make medications for opioid use disorder available through the mobile interventions.

   c) Train health care personnel to identify and treat trauma of individuals with OUD and/or any SUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), including training of health care personnel supporting residential treatment, partial hospitalization, and intensive outpatient services.

   d) Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("DATA 2000") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

   e) Support academic-led training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including tele-mentoring to assist community-based providers in rural or underserved areas.

   f) Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment and peer recovery and support specialists. These efforts should be based on research evidence of what works for stigma reduction and include an evaluation of efforts.

---

[16] As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

g) Support programs offering physical health and behavioral health services for members with OUD and/or any SUD/MH conditions, including but not limited to care management.

h) Support utilization management programs designed to prevent OUD.

i) Fund programs providing locations for safe and free disposal of opioids and other controlled substances.

j) Fund programs tailored to support patient adherence to MAT treatment.

k) Support educational programs on correct coding for OUD.

l) Fund programs to develop predictive modeling for earlier identification of OUD and SUD.

m) Support hospitals to deliver provision of MAT to patients.

2) Support programs that decrease the cost to the patient of treatment for OUD and/or any SUD/MH conditions.

a) Waive co-payments and other non-covered (or unreimbursed) patient costs for treatment for opioid use disorder with buprenorphine and methadone.

b) Provide or support transportation to treatment or recovery programs or services for persons with OUD and/or any SUD/MH conditions.

c) Provide community support services, including social and legal services, to assist in the living conditions of persons with OUD and/or any SUD/MH conditions.

d) Provide employment training or educational services for persons in treatment for or recovery from OUD and/or any SUD/MH conditions.

3) Grants to organizations whose mission is to provide, expand access to and/or improve the delivery of treatment for OUD and/or any SUD/MH conditions through evidence-based or evidence-informed strategies.

Examples include:

Liberation Programs Inc. (CT)

Boston Medical Center (Grayken Center) (MA)

Institutes for Behavioral Resources - Reach Health Services (MD)

Montefiore Medical Center (opioid treatment programs) (NY)

Pennsylvania Psychiatric Institute: Advancement in Recovery (PA)

Evergreen Treatment Services (WA)

Shatterproof

The Alliance for Addiction Payment Reform

National Council for Behavioral Health

   Faces and Voices of Recovery

   National Alliance for Recovery Residences

   Supportive Housing

   National Association for Mental Illness

   Mental Health of America

The Trustee can add to the list of Approved Uses/Programs in this Appendix D programs that satisfy the Approved Uses/Programs Criteria; _provided_ that the Trustee provides each State Attorney General at least forty-five (45) days advance written notice that both identifies the program or programs to be added to this Appendix D and explains how the program or programs to be added satisfy the Approved Uses/Programs Criteria.

**EXHIBIT 1: LRP Agreement**

# MASTER AGREEMENT GOVERNING THE
# OPIOIDS PRIVATE LIEN RESOLUTION PROGRAM

# PREAMBLE

This agreement (the "LRP Agreement")[1] is made and entered into as of the Effective Date, by and between the following parties (the "Parties"):

- Each Holder of a Third Party Payor Claim authorized to participate in the TPP Trust and signatory hereto (each such Holder individually, a "Participating TPP," and collectively, the "Participating TPPs");

- Each Holder of an Allowed PI Claim (each such Holder referred to herein as a "Participating Claimant") upon and by virtue of the submission of a Claim Form to the PI Trust;

- Each Claimant's Counsel signatory hereto, in its capacity as counsel to one or more Participating Claimants;

- MASSIVE: Medical and Subrogation Specialists ("MASSIVE"), as the third-party lien resolution administrator ("PI LRP Administrator") as designated under the PI Trust Agreement;

- The administrator(s) (each, a "TPP Administrator") designated by the undersigned counsel to the Participating TPPs in accordance with the provisions hereof;

- Ed Gentle of Gentle, Turner, Sexton & Harbison, LLC, in his capacity as the claim administrator for the PI Trust ("PI Claim Administrator"); and

- The Creditor Trustee for the TPP Trust ("TPP Trustee"), exclusively for the limited purposes of monitoring and enforcement as set forth in Section V(B)(3) hereof.

WHEREAS, the Parties to this LRP Agreement desire to create a fair, swift, and cost-effective program (the "Private Lien Resolution Program") under which a Participating Claimant shall be provided an expedited resolution process on favorable terms used for resolution of liens asserted or that may be asserted by Participating TPPs against recoveries of Participating Claimants under the Plan;

WHEREAS, upon conclusion of the matching and reimbursement processes and receipt of funds by the Participating TPPs as provided herein, any and all claims of the Participating TPPs against the Participating Claimants' recoveries under the Plan shall be resolved and discharged, and all liens of the Participating TPPs on Participating Claimants' recoveries under the Plan shall be released. Participating TPPs are entitled to receive only the reimbursements described below as against the Participating Claimants or from the PI Trust. Participating TPPs are not releasing any subrogation or reimbursement rights, liens, or claims they may have against recoveries other than recoveries under the Plan, including any rights or claims against recoveries other than Plan

---

[1] Capitalized terms used herein that are not defined in the body of this LRP Agreement, the Declarations Page, or Appendix A: Definitions have the meanings ascribed to them in the Plan or the PI Trust Documents, as applicable.

recoveries that are received on account of the conduct of entities that are not affiliated with the Debtors.

WHEREAS, the following sets forth the agreement between and among the Parties concerning their respective obligations;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is stipulated and agreed by and between the Parties as follows:

## I.    ESTABLISHING THE PRIVATE LIEN RESOLUTION PROGRAM

### A.    Participating Claimant Obligations.

Within twenty (20) days after Effective Date, the PI LRP Administrator shall provide to each TPP Administrator in electronic form and in the manner established by the PI Claim Administrator and the members of the Third-Party Payor Group, the following information about each Participating Claimant: (a) First name; (b) Middle name or initial; (c) Last name; (d) Residential address; (e) Full social security number; (f) Date of birth; (g) Date of first qualifying opioid ingestion; and (h) Injury relating to any Allowed PI Claim.  The PI LRP Administrator shall supplement this information and provide the new information to each TPP Administrator every thirty days, to add information about PI Claimants who become Participating Claimants upon allowance of their claims in whole or in part.

Participating TPPs shall make their best effort to locate Participating Claimants in limited circumstances where a full social security number is not available.

### B.    Participating TPP Obligations

Within ten (10) days after the Effective Date, each Participating TPP shall designate the individual or entity which shall serve as its TPP Administrator.  Such designation shall be made by sending written notice of that election to undersigned TPP counsel, the PI LRP Administrator and the PI Claim Administrator, it being agreed that a Participating TPP that provides such designation on the consent form/signature page evidencing its participation in this agreement shall have satisfied the notice requirement.  If any Participating TPP fails to timely make such a designation, such Participating TPP shall be considered to have designated the creditor identified in Part 1, Question 1, of its Proof of Claim as its TPP Administrator, and any notice required under this LRP shall be sent to the address indicated in Part 1, Question 4, of its Proof of Claim.[2]

## II.    DETERMINING THE INITIAL LIEN AMOUNT

### A.    The Participating Claimant List

Within twenty (20) days after the Effective Date, or as soon thereafter as practicable, the PI LRP Administrator shall provide each TPP Administrator with the Participating Claimant List, in the

---

[2] A Participating TPP who elects to administer its own liens is encompassed within term "TPP Administrator" as used throughout this LRP Agreement.

form of an electronic file in a format mutually agreed to by the majority of TPPs. The date on which the PI LRP Administrator provides the Participating Claimant List to the TPP Administrator(s) shall be considered the "Notice Date" as to each Participating Claimant identified therein. The PI LRP Administrator shall supplement this list as set forth in Section I(A) hereof.

If a TPP Administrator identifies a Participating Claimant with any missing, incomplete, or invalid data, that TPP Administrator shall, no later than forty five (45) days after the Notice Date, notify the PI LRP Administrator of the missing, incomplete, or invalid data, and the Notice Date for such Participating Claimant shall not occur as to any Participating TPP(s) represented by that TPP Administrator until such data is complete and provided to that TPP Administrator in the form of a supplemental Participating Claimants List.

Any Participating Claimant determined to have missing, incomplete, or invalid data shall be excluded from the below-noted timeframes. Participating Claimants identified with missing or incomplete data shall be resubmitted with complete data by the PI LRP Administrator to the TPP Administrator which notified the PI LRP Administrator of the incomplete data. The first day which is the 15th of the month following the day on which the PI LRP Administrator provides complete data to the TPP Administrator(s) shall be considered the "Notice Date" as to each Participating Claimant previously identified to have had missing, incomplete, or invalid data. The Notice Date in respect of Participating Claimants with complete data shall not be delayed due to other Participating Claimants with missing, incomplete, or invalid data. Those Participating Claimants with complete data shall be addressed under the below-noted timeframes.

The Participating Claimant List shall be provided by the PI LRP Administrator to TPP Administrators only, shall not be provided by any Party to any other Person, including any Non-Participating TPPs, and shall not be used for any purpose other than those provided for in this LRP Agreement. For example, the Participating Claimant List shall not be used for identification of reimbursement claims of any Non-Participating TPPs, or for identification of any claims against recoveries outside of these Chapter 11 Cases. Furthermore, in the event a Participating Claimant List is provided to counsel for any Participating TPP prior to the Effective Date of the Plan, that Participating Claimant List shall not be shared with any Participating TPP until such time as that Participating TPP or its agent has confirmed in writing that each such Participating TPP agrees to be bound by the terms of this LRP Agreement. In the event of termination of this LRP Agreement with respect to a Participating Claimant pursuant to Section V(C) hereof, the information provided under this LRP Agreement with respect to such Participating Claimant shall not be used to enforce liens against such Participating Claimant.

Each original or later-provided Participating Claimant List shall be treated as an individual Participating Claimant List with its own timeline for purposes of this LRP Agreement. The Notice Date for a Participating Claimant submitted on multiple Participating Claimant Lists shall be the latest-submitted Participating Claimant List on which that Participating Claimant appears.

## B.    Identifying Matched and Unmatched Claimants

Within three (3) months of the 15th day of the month immediately following the Notice Date, each TPP Administrator shall provide the PI LRP Administrator with an itemized claims history ("Initial Claims History") for the Matched Claimants of the Participating TPPs represented by such TPP

Administrator.  Once the Initial Claims History for a Matched Claimant is delivered to the PI LRP Administrator, it may be amended before an Audited Lien Amount for such Matched Claimant is returned or by agreement of the PI LRP Administrator.

Within ninety days of the 15th day of the month immediately following the Notice Date, the PI LRP Administrator shall identify any Matched Claimant for whom multiple Initial Lien Amounts have been received and notify TPP Administrators who have matched such Participating Claimant.

Any Participating Claimant for whom no Initial Claims History is provided by or on behalf of any Participating TPPs following the Claimant Matching Period shall be deemed an "Unmatched Claimant."

### C.    Treatment of Unmatched Claimants

Participating TPPs shall receive no recovery from any distributions to Unmatched Claimant(s) on account of Allowed PI Claims.

### D.    Waiver of liens as to certain recoveries

Notwithstanding anything else in this LRP Agreement, each Participating TPP expressly waives any and all claims and liens against the recoveries of Participating Claimants' PI Claims under the Plan with respect to any Participating Claimant whose total Gross Recovery does not exceed $3,500.00 (the "Waived Recovery Amount").

## III.    DETERMINING THE FINAL LIEN AMOUNT

### A.    Determination of Approved Lien Amount

The PI LRP Administrator shall have sixty (60) calendar days from the date on which it receives each Participating Claimant's Initial Lien Amount from a TPP Administrator representing a Participating TPP, or a reasonable agreed extension, to provide that TPP Administrator for that Participating TPP with an Audited Lien Amount for that Participating Claimant.  To determine the Audited Lien Amount, and in strict accordance with the Claims Audit Protocol, the PI LRP Administrator shall confirm that all the claims secured by the lien are related to the Participating Claimant's opioid use.

The lien amounts produced in accordance with the Claims Audit Protocol may only be disputed based on the following: (1) whether the claimed lien expense was actually incurred by the Participating Claimant; or (2) whether one or more of the claimed lien expenses was actually related to a Compensable Injury.  No other grounds for protest will be considered.  The party protesting the lien must identify the specific claims being challenged.

If the PI LRP Administrator does not submit an Audited Lien Amount within sixty (60) calendar days (subject to reasonable agreed extension) following the receipt by the PI LRP Administrator of the Initial Lien Amount, or if the PI LRP Administrator gives notice to a Participating TPP that it does not object to the Initial Lien Amount, the Initial Lien Amount provided on behalf of the Participating TPP shall become the approved lien amount hereunder (the "Approved Lien Amount") and be non-appealable by any Party; provided, however, that for any PI Claim that has

not yet been Allowed or Disallowed by the PI Trust or PI Claim Administrator, the PI LRP Administrator will within sixty (60) calendar days from the date on which it receives the Initial Lien Amount on behalf of a Participating TPP, notify that Participating TPP that such PI Claim has yet to be Allowed or Disallowed under the trust distribution procedure for the PI Trust (the "PI TDP").

If an audit cannot be completed by the PI LRP Administrator because of extenuating circumstances, the PI LRP Administrator shall provide ten (10) business days' notice to the appropriate TPP Administrator(s) prior to the expiration of the sixty (60) day period and confer with the same in good faith as to whether a reasonable extension of deadlines may be warranted.

Within thirty (30) calendar days (subject to reasonable agreed extension) of receiving an Audited Lien Amount, the TPP Administrator shall review the Audited Lien Amounts and provide written notice to the PI LRP Administrator of any Protest thereof. If the TPP Administrator does not submit a Protest within this time period, the Audited Lien Amount shall become the Approved Lien Amount and shall be non-appealable by the Participating TPP.

If the TPP Administrator or PI LRP Administrator submits a Protest within the applicable time period and the TPP Administrator and PI LRP Administrator cannot agree on whether a given treatment is related, they shall initially work in good faith to resolve the issue.

If the issue cannot be resolved by good faith negotiations, the TPP Administrator and PI LRP Administrator will submit the dispute to the lien resolution officer ("LRO"), to be appointed by the PI Claim Administrator, PI LRP Administrator and the TPP Administrator by unanimous consent. The LRO shall be experienced in lien resolution and cannot be terminated and replaced except by unanimous consent of such parties, or for good cause cited by one or more of such parties, brought to the attention of all such parties, and failing to be cured. The TPP Administrator and PI LRP Administrator shall initially seek the opinion of the LRO as to resolution of their dispute. If this does not result in an agreed resolution, the TPP Administrator and PI LRP Administrator shall then engage in non-binding mediation with the LRO.

If such mediation fails, the LRO will make a mediator's final recommendation that shall be a final and binding determination of the Approved Lien Amount, unless either the TPP Administrator or the PI LRP Administrator requests that the matter be decided by binding arbitration of the LRO. The procedure to be followed will be informal in nature to the extent practicable. The LRO's arbitration decision shall be final and binding.

The costs of the LRO for all functions other than binding arbitration will be split by the Participating TPP and the PI Trust, with the LRO providing a budget agreed to by the parties to each Protest before the LRO is engaged in each individual lien dispute. Arbitration costs shall be paid by the Party who seeks arbitration.

## B.    Determination of the Proposed Payable Lien Amount

The Participating TPPs agree to offset and/or cap each Participating TPP's lien with respect to the PI Claims of the Participating Claimants as follows:

The applicable "Lien Cap" shall be:

1) For any statutory lien (*i.e.* MA, MCOs, FEHBA, etc.): 25%.

2) For all preemptive liens (*i.e.* ERISA self-funded, etc.): 25%.

3) For all non-preemptive liens in an Anti-Subrogation State: Liens are waived.

4) For all non-preemptive liens in a Non-Equity State without contractual recovery rights: Liens are waived.

5) For all non-preemptive liens not waived pursuant to (3) or (4) of this Section (B) or otherwise:

   a) Gross Recovery above $50,000: 19.5%.
   b) Gross Recovery between $25,000 and $50,000: 18%.
   c) Gross Recovery below $25,000: 15%.

The "Lien Offset" shall be 30%.

Any Participating Claimant whose Gross Recovery is subject to one or more reimbursable Participating TPP liens shall not have its applicable Lien Caps, Lien Offset, or Holdback Percentage increased by virtue of those multiple liens (i.e., multiple Participating TPPs share a single Lien Cap, Lien Offset, and Holdback Percentage and may not aggregate these limits).

If, in addition to one or more Participating TPP lien(s), a Participating Claimant's Gross Recovery is also subject to one or more reimbursable Governmental Liens, and all of the governmental entities holding such Governmental Liens agree to share in the Lien Cap and Lien Offset with respect to such Participating Claimant, then

   i. each of the Holdback Percentage and Lien Cap with respect to such Participating Claimant shall be increased by 2.5%;

   ii. the Participating TPP(s) and the holder(s) of the Governmental Lien(s) shall share in a single Lien Cap, Holdback Percentage, and Lien Offset with respect to such Participating Claimant; and

   iii. such Participating TPP(s) and such holder(s) of the Governmental Lien(s) shall be reimbursed from such Participating Claimant's total Holdback in an amount pro rata to each lienholder's total reimbursable lien.

If, in addition to one or more Participating TPP lien(s), a Participating Claimant's Gross Recovery is also subject to one or more reimbursable Governmental Liens, and one or more of the governmental entities holding such Governmental Liens do not agree to share in the Lien Cap and Lien Offset with respect to such Participating Claimant, then such Participating Claimant's Lien Cap and Lien Offset shall be reduced by a percentage number equal to half the total lien percentage number claimed by the holder(s) of the Governmental Lien(s). For example, if there is only one holder of a Governmental Lien and such holder takes 30% of a Participating Claimant's Gross Recovery, then the Lien Cap and Lien Offset for a Participating TPP claiming against the same

Participating Claimant would be reduced by 15%. Notwithstanding the foregoing, this paragraph shall not be used to reduce the Lien Cap for a Participating TPP below 5% with respect to any given Participating Claimant.

The PI LRP Administrator shall calculate the "Proposed Payable Lien Amount" as the *lesser* of:

    i.   The aggregate of each Approved Lien Amount multiplied by the applicable Lien Offset; and

    ii.  A Participating Claimant's Gross Recovery multiplied by the applicable Lien Cap (the "Capped Lien Amount");

provided, however, that a given Proposed Payable Lien Amount shall not be calculated until the following conditions are met:

    i.   The three (3) month Claimant Matching Period related to such Participating Claimant as defined in Section II(B) has expired as to all Participating TPPs with claims and liens against such Participating Claimant; and

    ii.  An Approved Lien Amount for each of the Participating Claimant's liens has been identified from the Claimant Matching Period.

Within ten (10) calendar days after a given Proposed Payable Lien Amount is calculated, the PI LRP Administrator shall provide the Claimant's Counsel (or the Participating Claimant, if not represented) and the TPP Administrator with notice of such Proposed Payable Lien Amount.

### C.    Determination of the Final Lien Amount

Within the ten (10) calendar days following receipt of the notice of a Proposed Payable Lien Amount, the TPP Administrator may object to the Proposed Payable Lien Amount only on the grounds that the Proposed Payable Lien Amount was improperly calculated pursuant to the formula set forth above. If the TPP Administrator does not raise such objection, or following resolution of such objection, the Proposed Payable Lien Amount shall become final (the "Final Lien Amount").

## IV.    RESOLUTION OF LIENS, PAYMENTS MADE, AND RELEASES EXCHANGED

### A.    Holdback

The Parties agree that an amount equal to the Holdback Percentage of each individual Distribution to a Holder of an Allowed PI Claim in accordance with the Plan and the PI Trust Documents shall be held in escrow by [_____] (the "TPP LRP Escrow Agent") and used to satisfy all liens of Participating TPPs resolved under this Private Lien Resolution Program. The escrow shall be funded from funds received by the PI Trust pursuant to the Plan, and the TPP LRP Escrow Agent shall be Ed Gentle of Gentle, Turner, Sexton & Harbison, LLC, in his capacity as the Creditor Trustee of the PI Trust (the "PI Trustee"), or an authorized agent of the PI Trustee.

Non-Participating TPPs' reimbursement interests are not limited by the amount of the Holdback, and the Participating TPPs' recoveries under this LRP Agreement shall not be affected by any Non-Participating TPP's reimbursement interests.

Upon a Participating Claimant becoming a Matched Claimant, or upon determination that there is no match for such Participating Claimant, the Holdback shall be reduced to the Final Lien Amount (if lower) or reduced to $0 if the Participating Claimant's Gross Recovery is less than or equal to the Waived Recovery Amount, that is, $3,500.

### B.    Final payment for Participating Claimants

#### *1.    Matched Claimants*

Within thirty (30) calendar days after establishing the Final Lien Amount with respect to a Participating Claimant, the PI LRP Administrator shall send notice of the Final Lien Amount with respect to such Claimant to the TPP LRP Escrow Agent (with a copy sent to the Participating TPP). Upon receipt of such notice and pursuant to the time periods set forth below, the TPP LRP Escrow Agent shall make the following payments:

i.    To the Participating TPP or its designated agent: No later than twenty (20) business days after receiving notice of the Final Lien Amount, payment in the amount of the Final Lien Amount.  Each Participating TPP shall be responsible for paying to its TPP Administrator any fee charged by such TPP Administrator out of its recovery under this LRP.

ii.    To Claimant's Counsel or its designee for the benefit of the Participating Claimant (or to the Participating Claimant, if not represented): Within ten (10) business days following completion of the payments in clause (i) of this Section IV(B)(1), payment of the remainder, if any, of the Holdback.

#### *2.    Unmatched Claimants*

Beginning seven (7) days after a Participating Claimant is determined to be an Unmatched Claimant as to all Participating TPPs, the PI Claim Administrator or TPP LRP Escrow Agent shall be authorized to make payment of the entire Holdback associated with that particular Unmatched Claimant to the Claimant's Counsel or its designee for the benefit of that particular Unmatched Claimant (or to the Participating Claimant, if not represented).

### C.    Releases

A Participating Claimant shall be entitled to a release of all claims and liens of a Participating TPP against him/her and his/her recovery under the Plan in connection with his/her PI Claim, in the form attached hereto as Exhibit [   ], upon the occurrence of any of the following under the terms of this LRP Agreement:

(a) Such Participating TPP's receipt of final payment for the Participating Claimant's Final Lien Amount; or

(b) the determination that the total Final Lien Amount for the Participating Claimant is $0.00; or

(c) the determination that the Participating Claimant's total Gross Recovery under the Plan does not exceed the $3,500.00 Waived Recovery Amount.

**D.    Claimants not subject to release**

No release will be given to Non-Participating Claimants.

## V.    MISCELLANEOUS

**A.    HIPAA**

The Parties shall take all reasonable actions (including entering into all necessary agreements) reasonably necessary to ensure compliance with federal requirements of confidentiality, including (a) the Health Insurance Portability and Accountability Act (HIPAA) and (b) section 543 of the Public Health Service Act, 42 U.S.C. 290dd-2, and its implementing regulation, 42 CFR Part 2 (together, "Part 2").  All Participating Claimants shall be deemed to have consented to the disclosure and sharing (solely to the extent agreed pursuant to the terms hereof) of their information for the purpose of resolving the liens under this LRP Agreement.

**B.    Governing Law and Adjudication of Disputes**

***1.    Governing Law***

This LRP Agreement shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without regard to conflict of laws principles, except with respect to the anti-subrogation statutes of Anti-Subrogation States and the non-equity laws and rules of Non-Equity States as referenced herein.

***2.    Adjudication of Disputes***

Subject only to the terms of the following paragraph (3), all actions, disputes, claims, and controversies under common law, statutory law, or in equity of any type or nature whatsoever relating to this LRP Agreement will be subject to and resolved by binding arbitration in Washington, D.C. under the rules of the American Arbitration Association.  Any award or order rendered therein may be confirmed as a judgment or order in any state or federal court of competent jurisdiction within the federal judicial district in which the party against whom such award or order was entered resides.

***3.    Jurisdiction of Bankruptcy Court and Rights of TPP Trust***

The TPP Trustee shall have the right (i) to inquire periodically with the PI Trustee, the PI Claim Administrator and the escrow agent for the TPP LRP Escrow Account as to whether the TPP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under this LRP Agreement, and to request evidence of the same and (ii) to seek entry of an order by the Bankruptcy Court enforcing this LRP Agreement, including the obligations to provide such information and evidence, in the event the TPP Trustee reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by this LRP Agreement, payments have not been made to LRP Participating TPPs as required by this LRP

Agreement, and/or any of the PI Trustee, the PI Claim Administrator and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the TPP Trustee for such information and evidence.

Notwithstanding the foregoing, the TPP Trustee shall have such monitoring and enforcement rights only as to the PI Trust's *general compliance* with the funding and payment terms of this LRP Agreement, and shall not monitor or enforce individual payments owed to particular Participating TPPs at the single entity level.

### C.    Severability and Termination

If any provision is construed to be invalid, illegal, or unenforceable, the remaining provisions shall not be affected thereby; provided, however, that any determination that the Lien Offset or Lien Cap are unenforceable by the Participating Claimant shall give to such Participating Claimant or Participating TPP a right to terminate this LRP Agreement with respect to such Participating Claimant only.

### D.    Amendment only in writing

This LRP Agreement may be amended in writing, in whole or in part, only with the written consent of Claimant's Counsel representing more than 50% of the Participating Claimants and counsel representing more than 50% of the Participating TPPs; provided, however, that this LRP Agreement may not be amended in a way that imposes upon one or more Participating Claimants or Participating TPPs worse treatment than that afforded to one or more other Participating Claimants or Participating TPPs without the consent of the Participating Claimants or Participating TPPs negatively impacted. Upon the successful amendment of this LRP Agreement, the PI LRP Administrator shall cause a copy of the amended LRP Agreement to either be filed on the Bankruptcy Court docket for *In re Purdue Pharma L.P. et al.*, Case No. 19-23649, or posted to an easily accessible website.

### E.    No admission of liability

Participation in the Private Lien Resolution Program will not constitute any admission of fact, law, liability, or strength or weakness of any claim or defense for any Participating Claimant or Participating TPP.

### F.    Best efforts

The Parties shall exercise reasonable best efforts to engage in ongoing cooperation to make the Private Lien Resolution Program successful. The Parties recognize that a Holder of a PI Claim may choose to participate even if their health plan is not then a Participating TPP.

### G.    Counterparts

This LRP Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any Party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

## APPENDIX A: DEFINITIONS

"*Anti-Subrogation Laws*" shall mean statutes, rules or regulations enacted in any of the Anti-Subrogation States which eliminate a Participating Claimant's obligation to repay liens.

The "*Anti-Subrogation States*" shall mean Arizona, Connecticut, Kansas, Missouri, North Carolina, New Jersey, New York and Virginia.

The "*Appeals Masters*" shall be [          ].

"*Audited Lien Amount*" shall mean that portion of the Initial Lien Amount that is determined by the PI LRP Administrator to be related to medical care for the Compensable Injury.

"*Claim Form*" means the Claim Form attached as Exhibit B to the TDP.

"*Claimant's Counsel*" shall be the law firm or other legal counsel representing a particular Participating Claimant or group of Participating Claimants in connection with the Participating Claimants' PI Claims.

"*Claims Audit Protocol*" shall mean the protocols agreed to by counsel representing more than 50% of the Participating TPPs and the PI LRP Claim Administrator, and applied by the PI LRP Claim Administrator for auditing liens under the Private Lien Resolution Program governed by this LRP Agreement. The Claims Audit Protocol may be amended and updated from time to time by agreement of the PI Claim Administrator and counsel representing more than 50% of the TPPs, shall be considered highly confidential, and may only be distributed or shown on a confidential basis to the Participating TPPs, Claimant's Counsel, the PI LRP Claim Administrator and/or Participating Claimants (upon request of such Participating Claimant to the PI LRP Administrator).

"*Compensable Injuries*" are those set forth in Attachment A. Compensable Injuries shall not include loss of consortium claims, and Participating TPPs shall not assert liens for loss of consortium claims.

"*Debtors*" shall mean Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

"*Governmental Lien*" shall mean a related lien asserted by, or on behalf of a healthcare-related governmental entity, including but not limited to, liens asserted under Medicare Part A, Medicare Part B, Medicaid, Tricare, Champus, Indian Benefit Services and/or the Veteran's Administration.

"*Gross Recovery*" shall mean the total Distributions issued to any Holder of an Allowed PI Claim in accordance with the Plan and the PI Trust Documents on account of such PI Claim, before the deduction of any fees.

"*Holdback*" shall mean that portion of each Claimant's Settlement which the Parties have agreed will be held back and placed in the TPP LRP Escrow Account to satisfy the liens being resolved under this LRP Agreement.  The amount of the Holdback shall be determined by multiplying the Gross Recovery times the Holdback Percentage.

The "*Holdback Percentage*" shall be 27.5%.

"*Initial Lien Amount*" shall mean the amount of medical care expended on a Participating Claimant's behalf by a Participating TPP related to the Compensable Injury, as determined by the Participating TPP *prior* to any auditing and *prior* to the application of any Lien Cap or Lien Offset.

"*Law Firm*" shall mean any law firm who represents Participating Claimants in connection with the pursuit of PI Claims.

"*Matched Claimant*" shall mean a Participating Claimant whose name has been provided to a Participating TPP, run against the Plan's data, and determined to be a "match" (that is, the Participating Claimant is, or was at the time of treatment, insured by the Participating TPP).

"*Non-Equity Laws*" shall mean any statutes, rules or regulations enacted in any of the Non-Equity States which require a Participating Claimant's obligation to repay healthcare liens to be contractual.

The "*Non-Equity States*" shall mean Illinois, Louisiana, Maine, Michigan, New Hampshire, Ohio and South Carolina.

"*Non-Participating Claimant*" shall mean a Holder of a PI Claim who has not elected to participate in this Private Lien Resolution Program and is not receiving a recovery on account of its PI Claim under the Plan.

"*Non-Participating TPP*" shall mean a private third-party payor who is not participating in this Private Lien Resolution Program.  The terms of this Lien Resolution Program will not impact the liens, if any, asserted by a Non-Participating TPP.

"*Participating Claimant List*" shall mean the list compiled periodically by the PI LRP Administrator and sent to the TPP Administrators identifying all new Participating Claimants (*i.e.,* those who have been identified since the prior list was sent).  The Participating Claimant information contained on each such list shall be sufficient to allow Participating TPPs to determine if a Claimant "matches" any of its insureds and shall, at a minimum, include (a) First name; (b) Middle name or initial; (c) Last name; (d) Residential address; (e) Full social security number; (f) Date of birth; (g) Date of first qualifying opioid ingestion; and (h) Injury relating to any Allowed PI Claim.  The Participating Claimant information contained on this list shall relate to the individual who actually suffered the Compensable Injury (and not to any person representing that Participating Claimant in a representative capacity).

"*Protest*" shall mean a written protest of the Audited Lien Amount. The sole bases for any Protest shall be (i) the relatedness of medical care to the Compensable Injury and/or (ii) whether a claimed lien expense was actually incurred by the Participating Claimant for treatment received by the Participating Claimant.

"*TPP LRP Escrow Account*" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds, the aggregate Holdback, received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of this LRP Agreement.

"*Unmatched Claimant*" shall mean a Participating Claimant whose name has been provided to each Participating TPP Administrator and has been run against the plan's data and determined not to "match" (that is, the Participating Claimant was not covered with respect to its Compensable Injury(ies) by any Participating TPP).

## ATTACHMENT A: COMPENSABLE INJURIES

[Attachment pending]

In no event may a prescription for any opioid, other than Medication-Assisted Treatment (MAT) such as Methadone, Suboxone, buprenorphine, be deemed related medical care to a Compensable Injury or otherwise be recoverable under this Private Lien Resolution Program.

**NOAT TDP**

**NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES[1]**

| Issue | Description |
|-------|-------------|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by NOAT under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**")[2] in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in respect of the Public Creditor Trust Distributions (including the Initial Public Creditor Trust Distribution and all amounts distributed in respect of the TopCo Interests and the MDT Interests), which shall be distributed among (i) the states, territories and the District of Columbia (each a "**State**" as defined in the Plan), and (ii) each county, city, town, parish, village, and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Claim that is otherwise not a "State" as defined in the Plan (collectively, the "**Local Governments**"), whose Claims in Class 4 (Non-Federal Domestic Governmental Claims), along with all other Non-Federal Domestic Governmental Channeled Claims, are channeled to the National Opioid Abatement Trust ("**NOAT**") under the Plan and the Master TDP. To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, the trust |

---

[1] Oklahoma local governments set forth in **Schedule D** (the "**Oklahoma Local Governments**") will receive the equivalent of the Regional Apportionment portion of the allocation for Oklahoma less the $12.5 million designated for the Oklahoma political subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and the Sacklers (the "**Purdue Oklahoma Political Subdivision Fund**"). The release requirement contained in the State of Oklahoma settlement with the Debtors and the Sacklers for a political subdivision to participate in the Purdue Oklahoma Political Subdivision Fund, as defined in that agreement, shall be waived by the Debtors and any other party to that agreement as part of the documentation related to their Plan of Reorganization such that Oklahoma Local Governments may participate in both the Purdue Oklahoma Political Subdivision Fund and receive distributions from the National Opioid Abatement Trust. Debtors and the Sacklers also waive any requirement in the State of Oklahoma pre-petition settlement that funds not distributed by the Purdue Oklahoma Political Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment created by the State of Oklahoma's pre-petition settlement, and acknowledges that the entire Purdue Oklahoma Political Subdivision Fund shall be distributed to Oklahoma political subdivisions. Each of the Oklahoma Local Governments will be treated as a Qualifying Block Grantee, as that term is utilized in these National Opioid Abatement Trust Distribution Procedures, regardless of their population or other qualifications. Distributions from NOAT to Oklahoma Local Governments shall be in accordance with the ratios set forth in **Schedule E**. The Oklahoma Local Governments shall either hire an administrator for the funds from NOAT or receive the funds directly from NOAT. Funds distributed to Oklahoma Local Governments shall only be used for Approved Uses, as that term is defined in these National Opioid Abatement Trust Distribution Procedures, and Oklahoma Local Governments shall be required to publish and submit documentation of the use of funds to an administrator for the purpose of reporting to NOAT as is required for a Qualifying Block Grantee under these National Opioid Abatement Trust Distribution Procedures. The administrator may be reasonably compensated to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Local Governments by NOAT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Chapter 11 Plan or NOAT Agreement, as applicable.

| Issue | Description |
|---|---|
| | agreement for the National Opioid Abatement Trust (the **"NOAT Agreement"**) and the NOAT Documents, as applicable.<br><br>These terms set forth the manner in which NOAT shall make Abatement Distributions to States and Local Governments (such entities, "**Authorized Recipients**"), which may be used exclusively on the parameters set forth herein.[3] |
| **2. PURPOSE** | Virtually all creditors and the Court itself in the Purdue Chapter 11 Cases recognize the need for and value in developing a comprehensive abatement strategy to address the opioid crisis as the most effective use of the funds that can be derived from the Purdue estate (including without limitation insurance proceeds and, if included in the Chapter 11 Plan, payments by third parties seeking releases). Because of the unique impact the crisis has had throughout all regions of the United States, and as repeatedly recognized by the Bankruptcy Court, distribution of a substantial portion of the estates should occur through an established governmental structure, with the use of such funds strictly limited to abatement purposes as provided herein.[4] This approach recognizes that funding abatement efforts – which would benefit most creditors and the public by reducing future effects of the crisis through treatment and other programs – is a much more efficient use of limited funds than dividing thin slices among all creditors with no obligation to use it to abate the opioid crisis. Because maximizing abatement of the opioid crisis requires coordination of efforts by all levels of government, particularly when the abatement needs far exceed the |

---

[3] Subject to the approved settlement between the United States Department of Justice and the Debtors, resolution of States' and Local Governments' claims under this model presumes reaching satisfactory agreement regarding all claims asserted by the federal government in the Chapter 11 Cases.

[4] *See, e.g.,* Hrg. Tr at 149:22-150:5 (Oct. 11, 2019) ("I would hope that those public health steps, once the difficult allocation issues that the parties have addressed here, can be largely left up to the states and municipalities so that they can use their own unique knowledge about their own citizens and how to address them. It may be that some states think it's more of a law enforcement issue, i.e. interdicting illegal opioids at this point. Others may think education is more important. Others may think treatment is more important."); *id.* At 175:24-176:6 ("I also think, and again, I didn't say this lightly, that my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that[,] subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance from the states primarily."); Hr'g Tr. At 165:3-165:14 (Nov. 19, 2019) ("I continue to believe that the states play a major role in [the allocation] process. The role I'm envisioning for them is not one where they say we get everything. I think that should be clear and I think it is clear to them. But, rather, where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."); Hr'g Tr. at 75:19-76:1 (Jan. 24, 2020) ("Even if there ultimately is an allocation here – and there's not a deal now, obviously, at this point on a plan. But if there is an allocation that leaves a substantial amount of the Debtors' value to the states and territories, one of the primary benefits of a bankruptcy case is that the plan can lock in, perhaps only in general ways, but perhaps more in specific ways, how the states use that money . . . .").

| Issue | Description |
|-------|-------------|
| | available funds, this structure requires a collaborative process between each State and its Local Governments.<br><br>These distribution procedures (these "**National Opioid Abatement Trust Distribution Procedures**") are intended to establish the mechanisms for the distribution and allocation of funds distributed by NOAT to the States and Local Governments. All funds described in the foregoing sentence are referred to herein as "**NOAT Funds**." 100% of the **NOAT Funds** distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. Specifically, (i) no less than ninety five percent (95%) of the **NOAT Funds** distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in <u>Schedule B</u> (the "**Approved Opioid Abatement Uses**"); (ii) priority should be given to the core abatement strategies ("**Core Strategies**") as identified on <u>Schedule A</u>; and (iii) no more than five percent (5%) of the **NOAT Funds** may be used to fund expenses incurred in administering the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of **NOAT Funds** for implementing those programs and in connection with the Government Participation Mechanism[5] ("**Approved Administrative Expenses**") and together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**".<br><br>Each State and Qualifying Block Grantee shall agree that **NOAT Funds** received by it are to be used only in compliance with the requirements for Approved Opioid Abatement Uses and Approved Administrative Expenses set forth herein. Each State and Qualifying Block Grantee shall use best efforts to create a separate account or subaccount to hold **NOAT Funds** apart from such party's general funds pending use of such funds consistent with this NOAT TDP, and if such segregation of **NOAT Funds** by such party is impracticable notwithstanding use of best efforts or impermissible as a matter of law, such party shall nevertheless be required to report to the NOAT Trustees that **NOAT Funds** have been used solely for Approved Opioid Abatement Uses and Approved Administrative Expenses.<br><br>NOAT shall, in accordance with the Plan, the Confirmation Order and the NOAT Documents, distribute **NOAT Funds** to States and Local Governments exclusively for Approved Uses. Decisions concerning NOAT Funds made by NOAT will consider the need to ensure that |

---

[5] Capitalized terms not defined where first used shall have the meanings later ascribed to them in these National Opioid Abatement Trust Distribution Procedures.

| Issue | Description |
|---|---|
| | underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these National Opioid Abatement Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute **Approved Opioid Abatement Uses** may be provided by States, State agencies, Local Governments, Local Government agencies or nongovernmental parties and funded from **NOAT Funds**. |
| **3. DISBURSEMENT OF FUNDS** | The Chapter 11 Plan shall provide for the establishment of NOAT and the appointment of NOAT Trustees.[6]  The NOAT Trustees shall distribute the **NOAT Funds** consistent with the allocation attached as **Schedule C** and in accordance with the NOAT Agreement. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. DIVISION OF NOAT FUNDS** | **NOAT Funds** shall be allocated among the States, the District of Columbia, and Territories in the percentages set forth on **Schedule C**.<br><br>A.   Except as set forth below in Section 5(B) for the District of Columbia and Territories, each State's Schedule C share shall then be allocated within the State in accordance with the following:<br><br>    1.   **Default Allocation Mechanism (excluding Territories and DC addressed below).**  The **NOAT Funds** allocable to a State that is |

---

[6] Pursuant to the Plan, the NOAT Trustees shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The NOAT Agreement shall provide that: (i) the Trustees shall receive compensation from NOAT for their services as Trustees; (ii) the amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report; (iii) the Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court; (iv) the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and (v) the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.

| Issue | Description |
|-------|-------------|
|  | not party to a **Statewide Abatement Agreement** as defined in Section 5(A)(2) below (each a "**Non-SAA State**") shall be allocated as between the State and its Local Governments to be used only for **Approved Uses**, in accordance with this Section 5(A)(1) (the "**Default Allocation Mechanism**"). |
|  | i.   **Regions.**   Except as provided in the final sentence of this paragraph, each **Non-SAA State** shall be divided into "**Regions**" as follows:  (a) each **Qualifying Block Grantee** (as defined below) shall constitute a **Region**; and (b) the balance of the State shall be divided into **Regions** (such **Regions** to be designated by the State agency with primary responsibility (referred to herein as a "**lead agency**")[7] for opioid use disorder services employing, to the maximum extent practical, existing regions established in that State for opioid use disorder treatment or similar public health purposes); such non-**Qualifying Block Grantee Regions** are referred to herein as "**Standard Regions**".   The **Non-SAA States** which have populations under four (4) million and do not have existing regions described in the foregoing clause (b) shall not be required to establish **Regions**;[8] such a State that does not establish **Regions** but which does contain one or more **Qualifying Block Grantees** shall be deemed to consist of one **Region** for each **Qualifying Block Grantee** and one **Standard Region** for the balance of the State. |
|  | ii.   **Regional Apportionment.  NOAT Funds** shall be allocated to each **Non-SAA State** as (a) a **Regional Apportionment** or (b) a **Non-Regional Apportionment** based on the amount of **NOAT Funds** dispersed under a confirmed Chapter 11 Plan as follows: |
|  | A.   **First $1 billion** – 70% Regional Apportionment /30% Non-Regional Apportionment |
|  | B.   **$1-$2.5 billion –** 64% Regional Apportionment /36% Non-Regional Apportionment |

---

[7] A list of lead agencies will be made available on the NOAT website.

[8] To the extent they are not parties to a Statewide Abatement Agreement, the following States will qualify as a Non-SAA State that does not have to establish Regions: Connecticut, Delaware, Hawai'i, Iowa, Maine, Nevada, New Hampshire, New Mexico, Rhode Island, Vermont.

| Issue | Description |
|-------|-------------|
|  | C. **$2.5-$3.5 billion** – 60% Regional Apportionment /40% Non-Regional Apportionment |

C. **$2.5-$3.5 billion** – 60% Regional Apportionment /40% Non-Regional Apportionment

D. **Above $3.5 billion** – 50% Regional Apportionment /50% Non-Regional Apportionment

iii. **Qualifying Block Grantee.** A "**Qualifying Local Government**" means a county or parish (or in the cases of States that do not have counties or parishes that function as political subdivisions, a city), that (a) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more and (b) has funded or otherwise manages an established, health care and/or treatment infrastructure (e.g., health department or similar agency) to evaluate, award, manage and administer a Local Government Block Grant.[9] A **Qualifying Local Government** that is eligible and wishes to receive **NOAT Funds** through Local Government Block Grants shall elect to receive funds in such manner no later than (90) ninety days following the Agreement Date. A **Qualifying Local Government** that elects to receive **NOAT Funds** through Local Government Block Grants is referred to herein as a **Qualifying Block Grantee**.

iv. **Proportionate Shares of Regional Apportionment.** As used herein, the "**Proportionate Share**" of each **Region** in each **Non-SAA State** shall be (a) for States in which counties or parishes function as Local Governments, the aggregate shares of the counties or parishes located in such **Region** under the applicable allocation model employed in connection with the Purdue Chapter 11 Cases (the "**Allocation Model**"),[10] divided by the aggregate shares for all counties or parishes in the State under that **Allocation Model**; and (b) for all other States, the aggregate shares of the cities and towns in that **Region** under that **Allocation Model's** intra-county allocation formula,

---

[9] As noted in footnote 11, the population for each State shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[10] The Allocation Model shall be the allocation model available at www.opioidnegotiationclass.info implemented in In re: National Prescription Opiates Litigation, MDL No. 2804 (N.D. Ohio) (the "**Negotiation Class Allocation Model**"), provided, however, that notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), available at _____.

| Issue | Description |
|---|---|
|  | divided by the aggregate shares for all cities and towns in the State under that **Allocation Model**.<br><br>v. **Expenditure or Disbursement of Regional Apportionment.** Subject to Section 5(A)(1)(ix) below regarding **Approved Administrative Expenses**, all **Regional Apportionments** shall be disbursed or expended in the form of **Local Government Block Grants** or otherwise for **Approved Opioid Abatement Uses** in the **Standard Regions** of each **Non-SAA State**.<br><br>vi. **Qualifying Block Grantees.** Each **Qualifying Block Grantee** shall receive its **Regional Apportionment** as a block grant (a "**Local Government Block Grant**").<br><br>**Local Government Block Grants** shall be used only for **Approved Opioid Abatement Uses** by the **Qualifying Block Grantee** or for grants to organizations within its jurisdiction for **Approved Opioid Abatement Uses** and for **Approved Administrative Expenses** in accordance with Section 5(A)(1)(ix) below. Where a municipality located wholly within a **Qualifying Block Grantee** would independently qualify as a block grant recipient (an "**Independently Qualifying Municipality**"), the **Qualifying Block Grantee** and **Independently Qualifying Municipality** must make a substantial and good faith effort to reach agreement on use of **NOAT Funds** as between the qualifying jurisdictions. If the **Independently Qualifying Municipality** and the **Qualifying Block Grantee** cannot reach such an agreement on or before the Effective Date of the Chapter 11 Plan, the **Qualifying Block Grantee** will receive the **Local Government Block Grant** for its full **Proportionate Share** and commit programming expenditures to the benefit of the **Independently Qualifying Municipality** in general proportion to **Proportionate Shares** (determined as provided in Section 5(A)(2)(iv) above) of the municipalities within the **Qualifying Block Grantee**. Notwithstanding the allocation of the **Proportionate Share** of each **Regional Apportionment** to the **Qualifying Block Grantee**, a **Qualifying Block Grantee** may choose to contribute a portion of its **Proportionate Share** towards a statewide program.<br><br>vii. **Standard Regions.** The portions of each **Regional Apportionment** not disbursed in the form of **Local Government Block Grants** shall be expended throughout the **Standard Regions** of each **Non-SAA State** in accordance with 95%-105% of the respective **Proportionate Shares** of such |

| Issue | Description |
|---|---|
|  | **Standard Regions**.  Such expenditures will be in a manner that will best address opioid abatement within the State as determined by the State with the input, advice and recommendations of the **Government Participation Mechanism** described in Section 6 below.  This regional spending requirement may be met by delivering **Approved Opioid Abatement Use** services or programs to a **Standard Region** or its residents.  Delivery of such services or programs can be accomplished directly or indirectly through many different infrastructures and approaches, including without limitation the following: <br><br> A.  State agencies, including local offices; <br><br> B.  Local governments, including local government health departments; <br><br> C.  State public hospital or health systems; <br><br> D.  Health care delivery districts; <br><br> E.  Contracting with abatement service providers, including nonprofit and commercial entities; or <br><br> F.  Awarding grants to local programs. <br><br> viii.  **Expenditure or Disbursement of NOAT Funds Other Than Regional Apportionment.**  All **NOAT Funds** allocable to a **Non-SAA State** that are not included in the State's **Regional Apportionment** shall be expended only on **Approved Uses**.  The expenditure of such funds shall be at the direction of the State's lead agency (or other point of contact designated by the State) and may be expended on a statewide and/or localized manner, including in the manners described herein.    **Qualifying Block Grantees** will be eligible to participate in or receive the benefits of any such expenditures on the same basis as other **Regions**. <br><br> ix.  **Approved Administrative Expenses.**  States may use up to five percent (5%) of their **Non-Regional Apportionments** plus five percent (5%) of the **Regional Apportionment** not used to fund **Local Government Block Grants**, for **Approved Administrative Expenses**.  **Qualifying Block Grantees** may use up to five percent (5%) of their **Local Government Block Grants** to fund their **Approved Administrative Expenses**. |

| Issue | Description |
|-------|-------------|
|  | 2. **Statewide Abatement Agreement.**  Each State and its Local Governments will have until fourteen (14) days after the Effective Date of the Chapter 11 Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the **NOAT Funds** for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").  Any State and its Local Governments that have reached agreement before the Agreement Date of the Chapter 11 Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available; no SAA shall become effective without such filing.  Any dispute regarding allocation within a State that has adopted a **Statewide Abatement Agreement** will be resolved as provided by that **Statewide Abatement Agreement**; *provided* that no **Statewide Abatement Agreement** may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement and Sections 5(A)(3) and 7 hereof. <br><br> A **Statewide Abatement Agreement** shall be agreed when it has been approved by the State and either (a) representatives[11] of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent fifteen percent (15%) or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, fifteen percent (15%) of or more of the State's incorporated cities or towns), by number.[12] <br><br> Population Percentages shall be determined as follows: |

---

[11] An authorized "representative" of local, or even State, government can differ in these National Opioid Abatement Trust Distribution Procedures depending on the context.

[12] All references to population in these National Opioid Abatement Trust Distribution Procedures shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

19-23649-shl   Doc 3715-1   Filed 08/31/21   Entered 08/31/21 23:07:07   Exhibit A-1
Hospital TDP   Pg 121 of 343

| Issue | Description |
|---|---|
|  | For States with counties or parishes that function as Local Governments,[13] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality. The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population. For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.<br><br>The **Statewide Abatement Agreement** will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>A State and its Local Governments may revise, supplement, or refine a **Statewide Abatement Agreement** by filing an amended **Statewide Abatement Agreement** that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>3. **Records.** The States shall maintain records of abatement expenditures and their required reporting, as set forth in further detail in Section 7, will include data on regional expenditures so it can be verified that the **Regional Distribution** mechanism guarantees are being met. **Qualifying Block Grantees** shall |

[13] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont. All other States have counties or parishes that function as Local Governments.

| Issue | Description |
|-------|-------------|
| | maintain records of abatement expenditures and shall provide those records periodically to their State for inclusion in their State's required periodic reporting. |
| | B. **Allocation for Territories and the District of Columbia Only.** The allocation of **NOAT Funds** within a Territory or the District of Columbia will be determined by its local legislative body within one year of the Effective Date, unless that legislative body is not in session, in which case, the allocation of **NOAT Funds** shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its Government Participation Mechanism. |
| **6.  GOVERNMENT PARTICIPATION MECHANISM** | In each **Non-SAA State**, as defined in Section 5(A)(1) above, there shall be a process, preferably pre-existing, whereby the State shall allocate funds under the **Regional Distribution** mechanism only after meaningfully consulting with its respective Local Governments.  Each such State shall identify its mechanism (whether be it a council, board, committee, commission, taskforce, or other efficient and transparent structure) for consulting with its respective Local Governments (the "**Government Participation Mechanism**" or "**GPM**") in a notice filed with the Bankruptcy Court identifying what **GPM** has been formed and describing the participation of its Local Governments in connection therewith.  States may combine these notices into one or more notices for filing with the Bankruptcy Court.  These notices are reviewable by the Bankruptcy Court upon the motion of any Local Government in that State asserting that no **GPM** has been formed. |
| | **Government Participation Mechanisms** shall conform to the following: |
| | A. *Composition*.  For each State, |
| |    1.  the State, on the one hand, and State's Local Governments, on the other hand, shall have equal representation on a **GPM**; |
| |    2.  Local Government representation on a **GPM** shall be weighted in favor of the **Standard Regions** but can include representation from the State's **Qualifying Block Grantees**; |
| |    3.  the **GPM** will be chaired by a non-voting chairperson appointed by the State; |
| |    4.  Groups formed by the States' executive or legislature may be used as a **GPM**, provided that the group has equal representation by the State and the State's Local Governments. |

| Issue | Description |
|---|---|
| | A **GPM** should have appointees such that as a group they possess experience, expertise and education with respect to one or more of the following: public health, substance abuse, healthcare equity and other related topics as is necessary to assure the effective functioning of the **GPM**. |
| | B. *Consensus*.  Members of the **GPMs** should attempt to reach consensus with respect to **GPM Recommendations** and other actions of the **GPM**.  Consensus is defined in this process as a general agreement achieved by the members that reflects, from as many members as possible, their active support, support with reservations, or willingness to abide by the decision of the other members.  Consensus does not require unanimity or other set threshold and may include objectors.  In all events, however, actions of a **GPM** shall be effective if supported by at least a majority of its members.  **GPM Recommendations** and other actions shall note the existence and summarize the substance of objections where requested by the objector(s). |
| | C. *Proceedings*.  Each **GPM** shall hold no fewer than four (4) public meetings annually, to be publicized and located in a manner reasonably designed to facilitate attendance by residents throughout the State. Each **GPM** shall function in a manner consistent with its State's open meeting, open government or similar laws, and with the Americans with Disabilities Act.  **GPM** members shall be subject to State conflict of interest and similar ethics in government laws. |
| | D. *Consultation and Discretion*.  The **GPM** shall be a mechanism by which the State consults with community stakeholders, including Local Governments (including those not a part of the **GPM**), state and local public health officials and public health advocates, in connection with opioid abatement priorities and expenditure decisions for the use of **NOAT Funds** on **Approved Opioid Abatement Uses**.

The **GPM** is authorized to identify and recommend that non-**Qualifying Local Government(s)** (individually or in combination) should be considered for a block grant to be funded from an applicable **Regional Apportionment**.  "**Non-Qualifying Local Government(s)**" individually or in combination are Local Governments that are not **Qualifying Local Governments** but they fund or otherwise manage an established, health care and/or treatment infrastructure (*e.g.*, health department or similar agency) to evaluate, award, manage and administer a block grant for programs constituting **Approved Uses**. |
| | E. *Recommendations*.  A **GPM** shall make recommendations regarding specific opioid abatement priorities and expenditures for the use of **NOAT Funds** on **Approved Opioid Abatement Uses** to the State or the agency designated by a State for this purpose ("**GPM** |

| Issue | Description |
|---|---|
| | Recommendations"). In carrying out its obligations to provide **GPM Recommendations,** a **GPM** may consider local, state and federal initiatives and activities related to education, prevention, treatment and services for individuals and families experiencing and affected by opioid use disorder; recommend priorities to address the State's opioid epidemic, which recommendations may be Statewide or specific to **Regions**; recommend Statewide or **Regional** funding with respect to specific programs or initiatives; recommend measurable outcomes to determine the effectiveness of funds expended for **Approved Opioid Abatement Uses**; and monitor the level of **Approved Administrative Expenses** expended from **NOAT Funds**. <br><br> The goal is for a process that produces **GPM Recommendations** that are recognized as being an efficient, evidence-based approach to abatement that addresses the State's greatest needs while also including programs reflecting particularized needs in local communities. It is anticipated that such a process, particularly given the active participation of state representatives, will inform and assist the state in making decisions about the spending of the **NOAT Funds**. To the extent a State chooses not to follow a **GPM Recommendation**, it will make publicly available within fourteen (14) days after the decision is made a written explanation of the reasons for its decision, and allow seven (7) days for the **GPM** to respond. <br><br> F. ***Non-SAA States Review***. In Non-SAA States, Local Governments and States may object to any apportionment, allocation, use or expenditure of **NOAT Funds** (an "**Allocation**") solely on the basis that: the Allocation at issue (i) is inconsistent with the provisions of Section 5(A)(1)(ii) hereof with respect to the levels of **Regional Apportionments** and **Non-Regional Apportionments**, (ii) is inconsistent with the provisions of Section 5(A)(1) hereof with respect to the amounts of **Local Government Block Grants** or **Regional Apportionment** expenditures, (iii) is not for an **Approved Use** or (iv) violates the limitations set forth herein with respect to **Approved Administrative Expenses**. The objector shall have the right to bring that objection to either (a) a state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed (each an "**Objection**"). If an **Objection** is filed within fourteen (14) days of approval of an **Allocation**, then no funds shall be distributed on account of the aspect of the **Allocation** that is the subject of the **Objection** until the **Objection** is resolved or decided by the Bankruptcy Court or **State Court**, as applicable. There shall be no other basis for bringing an **Objection** to the approval of an **Allocation**. |

| Issue | Description |
|---|---|
| **7. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. At least annually, each State shall publish on its lead agency's website and/or on its Attorney General's website and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **NOAT Funds** received, (ii) the allocation awards approved (indicating the recipient, the amount of the allocation, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations, to **Qualifying Local Governments** for **Local Government Block Grants** and **Approved Administrative Expenses**.<br><br>2. At least annually, each **Qualifying Block Grantee** which has elected to take a **Local Government Block Grant** shall publish on its lead agency's or Local Government's website, and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **Local Government Block Grants** received, (ii) the allocation awards approved (indicating the recipient, the amount of the grant, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations.<br><br>3. As applicable, each State or Local Government shall impose reporting requirements on each recipient to ensure that **NOAT Funds** are only being used for **Approved Uses**, in accordance with the terms of the allocation.<br><br>4. NOAT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the NOAT Agreement, which audited **Annual Report** shall be filed annually with the Bankruptcy Court, and the States and **Qualifying Block Grantees** shall provide NOAT with any information reasonably required regarding the expenditure and disbursement of **NOAT Funds** to satisfy the requirements of such an audited **Annual Report** of NOAT.<br><br>5.  (a) A state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed shall have jurisdiction to enforce the terms of these National Opioid Abatement Trust Distribution Procedures, and as applicable, a **Statewide Abatement Agreement** or default mechanism; *provided* that nothing herein is intended to expand the scope of the Bankruptcy Court's post-confirmation jurisdiction.  For the avoidance of doubt, the Bankruptcy Court shall have continuing jurisdiction over NOAT, *provided, however*, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT, *provided further*, that the foregoing shall not preclude **State Court** jurisdiction in any State with respect to any matter arising under the National Opioid Abatement Trust Distribution |

| Issue | Description |
|---|---|
| | Procedures involving that State and one or more of its political subdivisions or agencies. |
| | 6. The NOAT Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of NOAT, including the requirement that 100% of the NOAT Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## Schedule A
## Core Strategies

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**").[1]

A.    **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

1.    Expand training for first responders, schools, community support groups and families; and

2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B.    **MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4.    Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

C.    **PREGNANT & POSTPARTUM WOMEN**

1.    Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

3.    Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D.    **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.    Expand comprehensive evidence-based and recovery support for NAS babies;

2.    Expand services for better continuum of care with infant-need dyad; and

3.    Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.    **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.    Expand warm hand-off services to transition to recovery services;

3.    Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.    Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.    Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.    **TREATMENT FOR INCARCERATED POPULATION**

1.    Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.    Increase funding for jails to provide treatment to inmates with OUD.

G.    **PREVENTION PROGRAMS**

1.    Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.    Funding for evidence-based prevention programs in schools.;

3.    Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.    Funding for community drug disposal programs; and

5.    Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.    **EXPANDING SYRINGE SERVICE PROGRAMS**

1.    Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.    **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.**

## Schedule B
### Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

### PART ONE: TREATMENT

---

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.      Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.      Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.      Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.      Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.      Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

20

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

21

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.      ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.    Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.    Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.    Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.   Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

```
┌─────────────────────────────────────────────────────────┐
│              PART TWO: PREVENTION                         │
└─────────────────────────────────────────────────────────┘
```

**F.    PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.    Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.    Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.    Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.    Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.    Increase the number of prescribers using PDMPs;

    2.    Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.    Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

## G.    PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

4.  Drug take-back disposal or destruction programs.

5.  Fund community anti-drug coalitions that engage in drug prevention efforts.

6.  Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.  Engage non-profits and faith-based communities as systems to support prevention.

8.  Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.  Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.  Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.     **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

**I.     I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.     Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.     LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

**K.     TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.  Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.  Research non-opioid treatment of chronic pain.

3.  Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.  Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.  Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.  Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.  Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.  Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.  Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
### State Allocation Percentages

| State | Final Percentage Division of Funds |
|-------|-----------------------------------|
| Alabama | 1.6579015983% |
| Alaska | 0.2681241169% |
| American Samoa* | 0.0175102976% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9779907816% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3490069542% |
| Delaware | 0.5061239962% |
| District of Columbia | 0.2129072934% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0518835714% |
| Hawaii | 0.3476670198% |
| Idaho | 0.5364838684% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7639415424% |
| Kansas | 0.8114241462% |
| Kentucky | 1.5963344879% |
| Louisiana | 1.5326855153% |
| Maine | 0.5725492304% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8994318052% |
| Missouri | 2.0056475170% |
| Montana | 0.3517745904% |
| N. Mariana Islands* | 0.0191942445% |
| Nebraska | 0.4335719578% |
| Nevada | 1.2651495115% |
| New Hampshire | 0.6419355371% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8749406830% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1910712849% |
| Ohio | 4.3567051408% |
| Oklahoma | 0.6073894708% |
| Oregon | 1.4405383452% |
| Pennsylvania | 4.5882419559% |

| | |
|---|---|
| Puerto Rico** | 0.7324076274% |
| Rhode Island | 0.5040770915% |
| South Carolina | 1.5989037696% |
| South Dakota | 0.2231552882% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.2039654451% |
| Vermont | 0.2945952769% |
| Virgin Islands* | 0.0348486384% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.1614558107% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.2046300910% |

\* Allocations for American Samoa, Guam, N. Mariana Islands, and Virgin Islands are 100% based on population because of lack of available information for the other metrics.

\*\* Allocations for Puerto Rico are 25% based on MMEs and 75% based on population because of lack of available information for the other metrics.

The metrics noted above are calculated as follows:

A.    Amount of Prescription Opioids Sold as Measured by MME

The MME metric reflects the intensity of prescription opioid sales by state over a nine-year period from 2006 to 2014. This measure accounts for the flow of prescription opioids from manufacturers to distributors to pharmacies. The MME metric uses sales data for 12 categories of prescription opioids and was collected in a standardized manner by the Drug Enforcement Administration (DEA) in its Automation of Reports and Consolidated Orders System (ARCOS) database. As part of the National Prescription Opiate Litigation Multi-District Litigation, Case No. 1:17-MD-2804 (N.D. Ohio) (Opioid MDL), the DEA agreed to produce the nine years of data from 2006-2014, which encompassed the peak years of opioid sales in most states. The ARCOS data is standardized by converting data from varying products and prescription strengths into uniform MME totals to accurately reflect higher doses and stronger drugs in the data.

B.    Pain Reliever Use Disorder

This metric consists of the number of people in each state with pain reliever use disorder, as identified by the annual National Survey on Drug Use and Health conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA survey is widely used by federal and other agencies. This metric included all three prior years in which pain reliever use disorder was broken down by state, 2015-2017, and included both people receiving treatment and those who are not.

C.    Overdose Deaths

The overdose death metric includes two measures: (1) overdose deaths caused by opioids and (2) overdose deaths caused by all drugs. The overdose death figures used for the metric are from the years 2007-2017, with data drawn from a database compiled by the Centers for Disease Control and Prevention ("**CDC**"). The CDC database does not adjust for local reporting problems

that differ from state to state and over time.  To mitigate this data collection issue, figures for all drug overdose deaths, which captures some unidentified opioid overdoses as well as overdoses unrelated to opioids.

D.    Population

Population is measured by the 2018 U.S. Census estimate.

E.    Negotiation Class Metrics

The Opioid MDL Plaintiffs' proposed "negotiation class" metrics weighting factor consists of the Negotiating Class Allocation Model (defined below) applied at the state level.

ii.    Intrastate Allocation of NOAT Abatement Funds

Each State and its Local Governments will have until (14) fourteen days after the Effective Date of the Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the NOAT Funds for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").   Any State and its Local Governments that have reached agreement before the Effective Date of the Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available for the SAA to be effective for the Purdue Bankruptcy. Any dispute regarding allocation within a State will be resolved as provided by the Statewide Abatement Agreement; *provided* that no Statewide Abatement Agreement may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement.

A Statewide Abatement Agreement shall be agreed when it has been approved by the State and either (a) representatives of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent 15% or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, 15% of or more of the State's incorporated cities or towns), by number.

Population Percentages shall be determined as follows: For States with counties or parishes that function as Local Governments,[1] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population.  A "**Primary Incorporated Municipality**"

---

[1] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont.  All other States have counties or parishes that function as Local Governments.

means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality. The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population. For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.

The Statewide Abatement Agreement will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

A State and its Local Governments may revise, supplement, or refine a Statewide Abatement Agreement by filing an amended Statewide Abatement Agreement that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court

Under the Plan, NOAT Funds allocated to each Non-SAA State are allocated between a "**Regional Apportionment**" and a "**Non-Regional Apportionment.**" The Proportionate Share of the Regional Apportionment for each Region in a Non-SAA State is determined by reference to the aggregate shares of counties (as used herein, the term county includes parishes), and cities or towns in the cases of a Non-SAA States in which counties do not function as Local Governments, in the Region either (i) under the allocation model available at www.opioidnegotiationclass.info that was developed as part of the establishment of a negotiation class procedure implemented in *In re: National Prescription Opiates Litigation*, MDL No. 2804 (N.D. Ohio) (the "**Negotiating Class Allocation Model**"), or (ii) the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model")**, attached hereto as Exhibit 1, (collectively with the Negotiating Class Allocation Model, the "**Allocation Models**.").

a.    The Negotiating Class Allocation Model

The Negotiating Class Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties. The three factors are:

> A.    Opioid Use Disorder ("**OUD**"). Under this factor, each county is assigned a percentage derived by dividing the number of people in the county with OUD by the total number of people nationwide with OUD. The Model uses data reported in the National Survey on Drug Use and Health ("**NSDUH**") for 2017. The data is accessible at https://bit.ly/2HqF554.

33

B.    Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The percentage is based on Multiple Causes of Death ("**MCOD**") data reported by the National Center for Health Statistics ("**NCHS**"), the Centers for Disease Control ("**CDC**") and the Department of Health and Human Services ("**DHHS**").  The data so reported is adjusted using a standard, accepted method (the "**Ruhm Adjustment**") designed to address the well-established under-reporting of deaths by opioids overdose.

C.    Amount of Opioids.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the U.S. Drug Enforcement Agency ("**DEA**") in its ARCOS (Automation of Reports and Consolidated Orders System) database.  Each county's share of national shipments is multiplied by the higher of two ratios:  (1) the ratio of the percentage of people in the county with OUD to the percentage of people nationwide with OUD; or (2) the ratio of the percentage of people in the county who died of an opioids overdose between 2006-2016 to the national percentages of opioids overdose deaths during that time.

The Negotiating Class Allocation Model gives equal weight to each of these factors. Thus, a hypothetical county with an OUD percentage of .3%, and overdose deaths percentage of .2% and an amounts of opioids percentage of .16% would receive an overall allocation of .22%.

Where a county and its cities and towns are unable to reach agreement regarding the sharing of the county's overall allocation, the Negotiating Class Allocation Model provides for such sharing based on how the county and its cities and towns have historically split funding for opioids abatement.  This historical analysis employs data reported by the U.S. Census Bureau on local government spending by certain functions.  The Negotiating Class Allocation Model assigns to each incorporated city and town a portion of the county's overall allocation based on this historical data.

b.    The Ruhm Allocation Model

The Ruhm Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties.  The three factors are:

A.    Number of Persons with Opioid Use Disorder ("**OUD**").  **NSDUH** data from 2007-2016 is used to estimate the number of persons in the state with OUD.  The county share of OUD cases was assumed to be the same as its share of opioid-involved overdose deaths, calculated as described in (B) below.

B.    Opioid-Related Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The

34

percentage is based on **MCOD** data reported by the **NCHS**, **CDC** and **DHHS**.  The data so reported is adjusted using the **Ruhm Adjustment** designed to address the well-established under-reporting of deaths by opioids overdose.

C.    Opioid Shipments.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the **DEA** in its ARCOS. No additional adjustments are used.

Under the Plan, the Allocation Models' shares of each county in a Region are aggregated. Those aggregate Allocation Model shares are then divided by the total Allocation Model shares for all Regions in the State to determine the subject Region's Proportionate Share.  For Non-SAA States in which counties do not function as Local Governments, the Allocation Model shares for each city and town in a Region are aggregated, and the aggregate is divided by the total Allocation Model shares for all cities and towns in the State to determine the Region's Proportionate Share.

On September 30, 2020, the Bankruptcy Court entered the *Order Expanding Scope of Mediation* [D.I. 1756] (the "**Supplemental Mediation Order**"), which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Mediators' Report, as well as to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in Phase 2 of Mediation.

## Schedule D
### Oklahoma Local Governments

| | |
|---|---|
| City of Ada | City of Lawton |
| City of Altus | Le Flore County |
| City of Anadarko | Lincoln County |
| Town of Asher | Logan County |
| Atoka County | Love County |
| Town of Avant | Major County |
| Beckham County | Mayes County |
| City of Bethany | McClain County |
| City of Broken Arrow | Town of McCurtain |
| Caddo County | McCurtain County |
| Choctaw County | City of McLoud |
| Cimarron County | City of Midwest City |
| Town of Clayton | City of Muskogee |
| Cleveland County | Muskogee County |
| Coal County | City of Mustang |
| Town of Colbert | Noble County |
| City of Collinsville | City of Nowata |
| Comanche County | Nowata County |
| Town of Copan | Okfuskee County |
| Craig County | City of Oklahoma City |
| Creek County | Oklahoma County |
| Custer County | Okmulgee County |
| Delaware County | Town of Oologah |
| Dewey County | Osage County |
| Town of Dover | Ottawa County |
| City of Duncan | City of Owasso |
| City of Edmond | Pawnee County |
| City of El Reno | Payne County |
| City of Elk City | Pittsburg County |

City of Enid

City of Garber

Garvin County

Grady County

Greer County

City of Guthrie

Harmon County

Harper County

Town of Haskell

Haskell County

City of Holdenville

Hughes County

Jackson County

Jefferson County

City of Jenks

Johnston County

Kay County

Town of Kingston

Town of Kiowa

Kiowa County

City of Krebs

Latimer County

City of Ponca City

Pottawatomie County

Roger Mills County

Rogers County

City of Savanna

City of Seminole

Seminole County

City of Shawnee

City of Skiatook

Town of Sperry

Stephens County

City of Stillwater

City of Tecumseh

Texas County

Tillman County

City of Tulsa

Tulsa County

Washington County

Town of Welch

Woods County

Woodward County

City of Yukon

**Schedule E**
**Oklahoma Local Government Allocation Percentages**

Table 1: Opioid Settlement Allocation Shares to Oklahoma Counties, Cities and Towns

| Municipal Area | Area % of Total | Municipal Area | Area % of Total |
|---|---|---|---|
| City of Ada | 1.063% | City of Lawton | 0.459% |
| City of Altus | 0.084% | Le Flore County | 1.049% |
| City of Anadarko | 0.296% | Lincoln County | 0.331% |
| Town of Asher | 0.022% | Logan County | 0.702% |
| Atoka County | 0.262% | Love County | 0.133% |
| Town of Avant | 0.003% | Major County | 0.015% |
| Beckham County | 0.233% | Mayes County | 0.617% |
| City of Bethany | 0.322% | McClain County | 0.263% |
| City of Broken Arrow | 2.616% | Town of McCurtain | 0.010% |
| Caddo County | 0.395% | McCurtain County | 0.577% |
| Choctaw County | 0.272% | City of McLoud | 0.088% |
| Cimarron County | 0.043% | City of Midwest City | 1.772% |
| Town of Clayton | 0.019% | City of Muskogee | 2.750% |
| Cleveland County | 0.344% | Muskogee County | 0.141% |
| Coal County | 0.133% | City of Mustang | 0.207% |
| Town of Colbert | 0.066% | Noble County | 0.037% |
| City of Collinsville | 0.160% | City of Nowata | 0.115% |
| Comanche County | 2.865% | Nowata County | 0.101% |
| Town of Copan | 0.001% | Okfuskee County | 0.189% |
| Craig County | 0.133% | City of Oklahoma City | 18.654% |
| Creek County | 1.050% | Oklahoma County | 3.716% |
| Custer County | 0.257% | Okmulgee County | 0.282% |
| Delaware County | 0.310% | Town of Oologah | 0.028% |
| Dewey County | 0.016% | Osage County | 0.598% |
| Town of Dover | 0.000% | Ottawa County | 0.238% |
| City of Duncan | 0.959% | City of Owasso | 0.955% |
| City of Edmond | 1.896% | Pawnee County | 0.292% |
| City of El Reno | 0.257% | Payne County | 0.474% |
| City of Elk City | 0.414% | Pittsburg County | 0.129% |

| | | | |
|---|---|---|---|
| City of Enid | 0.963% | City of Ponca City | 0.578% |
| City of Garber | 0.003% | Pottawatomie County | 0.651% |
| Garvin County | 0.106% | Roger Mills County | 0.074% |
| Grady County | 1.310% | Rogers County | 1.169% |
| Greer County | 0.055% | City of Savanna | 0.002% |
| City of Guthrie | 0.275% | City of Seminole | 0.317% |
| Harmon County | 0.039% | Seminole County | 0.400% |
| Harper County | 0.053% | City of Shawnee | 1.480% |
| Town of Haskell | 0.012% | City of Skiatook | 0.221% |
| Haskell County | 0.207% | Town of Sperry | 0.012% |
| City of Holdenville | 0.111% | Stephens County | 0.554% |
| Hughes County | 0.159% | City of Stillwater | 1.149% |
| Jackson County | 0.643% | City of Tecumseh | 0.103% |
| Jefferson County | 0.175% | Texas County | 0.414% |
| City of Jenks | 0.230% | Tillman County | 0.122% |
| Johnston County | 0.210% | City of Tulsa | 15.192% |
| Kay County | 0.404% | Tulsa County | 6.580% |
| Town of Kingston | 0.043% | Washington County | 0.471% |
| Town of Kiowa | 0.009% | Town of Welch | 0.006% |
| Kiowa County | 0.143% | Woods County | 0.038% |
| City of Krebs | 0.002% | Woodward County | 0.183% |
| Latimer County | 0.330% | City of Yukon | 0.389% |

Note: Fifteen Percent (15%) of each distribution received from NOAT will be held by the Administrator. Ten Percent (10%) will be maintained as a reserve fund for cities, counties and towns to appeal the amount they are distributed under the model. All appeals will be decided by a Special Master hired by the Administrator. Any money not distributed from the 10% reserve fund within a year of a receipt of NOAT shall be distributed pro rata in accordance with the schedule below for "Prorata Distribution for Cities, Towns and Counties of Unused Appeal Funds." The remaining five percent (5%) shall be paid to the Administrator for expenses incurred and work performed in the distribution of funds, the reporting of the use of funds to NOAT for Approved Opioid Abatement Uses, and to pay the Special Master in connection with the appeals process.

Table 2: Prorata Distribution for Counties, Cities and Towns of Unused Appeal Funds

| Municipal Area | Area % of Total | Municipal Area | Area % of Total |
|---|---|---|---|
| City of Ada | 1.251% | City of Lawton | 0.540% |
| City of Altus | 0.098% | Le Flore County | 1.234% |
| City of Anadarko | 0.348% | Lincoln County | 0.389% |
| Town of Asher | 0.026% | Logan County | 0.826% |
| Atoka County | 0.308% | Love County | 0.156% |
| Town of Avant | 0.003% | Major County | 0.018% |
| Beckham County | 0.274% | Mayes County | 0.726% |
| City of Bethany | 0.379% | McClain County | 0.309% |
| City of Broken Arrow | 3.078% | Town of McCurtain | 0.011% |
| Caddo County | 0.465% | McCurtain County | 0.679% |
| Choctaw County | 0.321% | City of McLoud | 0.104% |
| Cimarron County | 0.050% | City of Midwest City | 2.084% |
| Town of Clayton | 0.022% | City of Muskogee | 3.236% |
| Cleveland County | 0.404% | Muskogee County | 0.166% |
| Coal County | 0.157% | City of Mustang | 0.244% |
| Town of Colbert | 0.078% | Noble County | 0.044% |
| City of Collinsville | 0.188% | City of Nowata | 0.135% |
| Comanche County | 3.371% | Nowata County | 0.118% |
| Town of Copan | 0.001% | Okfuskee County | 0.222% |
| Craig County | 0.157% | City of Oklahoma City | 21.946% |
| Creek County | 1.236% | Oklahoma County | 4.372% |
| Custer County | 0.302% | Okmulgee County | 0.331% |
| Delaware County | 0.365% | Town of Oologah | 0.032% |
| Dewey County | 0.018% | Osage County | 0.704% |
| Town of Dover | 0.000% | Ottawa County | 0.280% |
| City of Duncan | 1.128% | City of Owasso | 1.124% |
| City of Edmond | 2.230% | Pawnee County | 0.343% |
| City of El Reno | 0.303% | Payne County | 0.558% |
| City of Elk City | 0.487% | Pittsburg County | 0.152% |

| | | | |
|---|---|---|---|
| City of Enid | 1.133% | City of Ponca City | 0.680% |
| City of Garber | 0.004% | Pottawatomie County | 0.766% |
| Garvin County | 0.124% | Roger Mills County | 0.087% |
| Grady County | 1.541% | Rogers County | 1.376% |
| Greer County | 0.064% | City of Savanna | 0.002% |
| City of Guthrie | 0.324% | City of Seminole | 0.373% |
| Harmon County | 0.045% | Seminole County | 0.471% |
| Harper County | 0.062% | City of Shawnee | 1.741% |
| Town of Haskell | 0.015% | City of Skiatook | 0.259% |
| Haskell County | 0.244% | Town of Sperry | 0.014% |
| City of Holdenville | 0.131% | Stephens County | 0.652% |
| Hughes County | 0.187% | City of Stillwater | 1.352% |
| Jackson County | 0.756% | City of Tecumseh | 0.122% |
| Jefferson County | 0.205% | Texas County | 0.487% |
| City of Jenks | 0.271% | Tillman County | 0.144% |
| Johnston County | 0.247% | City of Tulsa | 17.873% |
| Kay County | 0.476% | Tulsa County | 7.741% |
| Town of Kingston | 0.050% | Washington County | 0.554% |
| Town of Kiowa | 0.010% | Town of Welch | 0.007% |
| Kiowa County | 0.169% | Woods County | 0.045% |
| City of Krebs | 0.002% | Woodward County | 0.215% |
| Latimer County | 0.388% | City of Yukon | 0.458% |

**Tribe TDP**

## PURDUE PHARMA L.P.

## TRIBE TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the Tribal Abatement Fund Trust ("**TAFT**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in § 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
| | Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe. The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures. |
| | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for TAFT (the "**TAFT Agreement**"), as applicable. |
| | These terms set forth the manner in which TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the TAFT Agreement.

| Issue | Description |
|-------|-------------|
| **2. PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by TAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the TAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**"). |
| | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. |
| | TAFT shall, in accordance with the Plan, the Confirmation Order and the TAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions of Abatement Funds to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. |
| | Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set |

| Issue | Description |
|---|---|
| | forth on **Schedule C**, which will immediately contribute such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| **4. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Chapter 11 Plan shall provide for the establishment of TAFT and the appointment of Tribe Trustees. The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **5. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **6. TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| **7. COMPLIANCE, REPORTING,** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved |

| Issue | Description |
|---|---|
| **AUDIT AND ACCOUNTABILITY** | Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. TAFT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the TAFT Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over TAFT, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT.<br><br>4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Reserved)

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

```
PART ONE: TREATMENT
```

## A.    TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.     Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.     Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.     Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.     Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.     Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.    Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.    Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.    Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.    Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.    Create and/or support recovery high schools.

15.    Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.      Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.      Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.      Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.      Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.      Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.      Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.      Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.      Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.      Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.      Expand warm hand-off services to transition to recovery services.

12.      Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.      Develop and support best practices on addressing OUD in the workplace.

14.      Support assistance programs for health care providers with OUD.

15.      Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.  Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.  Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.  Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.  Increase the number of prescribers using PDMPs;

    2.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.     Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.     Increase electronic prescribing to prevent diversion or forgery.

8.     Educate Dispensers on appropriate opioid dispensing.

## G.   <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Fund media campaigns to prevent opioid misuse.

2.     Corrective advertising or affirmative public education campaigns based on evidence.

3.     Public education relating to drug disposal.

4.     Drug take-back disposal or destruction programs.

5.     Fund community anti-drug coalitions that engage in drug prevention efforts.

6.     Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.     Engage non-profits and faith-based communities as systems to support prevention.

8.     Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.     School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.    Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.    Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.    Public health entities providing free naloxone to anyone in the community.

3.    Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.    Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.    Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.    Public education relating to immunity and Good Samaritan laws.

8.    Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.    Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

**I.** **I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.** **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

**K.** **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.   **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
## Tribe Beneficiaries and Tribal Allocation Percentages

## <u>RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX</u>

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)    PowerPoint summary of the intertribal allocation model

2)    One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)    Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011

By:    _____
        Layn R. Phillips

**Allocation of Settlement Among Tribes**

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Total | 100.0000% |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguexo Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*\* 50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a

model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.    **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources

and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

> Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

> Example: Part of the Swinomish Tribe's Didgʷáličʼ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census). In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

## TRIBE OPIOID LLC DISTRIBUTION PROCEDURES

| Issue | Description |
|-------|-------------|
| 1. **<u>APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES</u>** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. <br><br> To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable. <br><br> These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| 2. **<u>PURPOSE</u>** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. <br><br> Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**"). <br><br> For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or |

| Issue | Description |
|---|---|
| | ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. <u>DISBURSEMENT OF ABATEMENT DISTRIBUTIONS</u>** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. <u>ATTORNEYS' FEES AND COSTS FUND</u>** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. <u>TRIBAL ABATEMENT FUNDING</u>** | 1. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, |

| Issue | Description |
|---|---|
| | practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. <u>COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY</u>** | 1. The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level. |
| | 2. The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court. |
| | 3. The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company. |
| | 4. The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Intentionally Omitted)

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

PART ONE: TREATMENT

---

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.  **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.   Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.   Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.   Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.   Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.   Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.   Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.   Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.   Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.  Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.  Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F.    PREVENT    OVER-PRESCRIBING    AND    ENSURE    APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.     Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.     Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.     Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1.     Increase the number of prescribers using PDMPs;

   2.     Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3.     Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.     Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.     Increase electronic prescribing to prevent diversion or forgery.

8.     Educate Dispensers on appropriate opioid dispensing.

## G.     PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Fund media campaigns to prevent opioid misuse.

2.     Corrective advertising or affirmative public education campaigns based on evidence.

3.     Public education relating to drug disposal.

4.     Drug take-back disposal or destruction programs.

5.     Fund community anti-drug coalitions that engage in drug prevention efforts.

6.     Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic

Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.  Engage non-profits and faith-based communities as systems to support prevention.

8.  Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.  **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.  Public health entities providing free naloxone to anyone in the community.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.    Public education relating to immunity and Good Samaritan laws.

8.    Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.    Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.    Support screening for fentanyl in routine clinical toxicology testing.

| PART THREE: OTHER STRATEGIES |
| --- |

I.    **I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

J.    **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention

services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K.   TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.   RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**<u>Schedule C</u>**
**<u>Tribe Beneficiaries and Tribal Allocation Percentages</u>**

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)    PowerPoint summary of the intertribal allocation model

2)    One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)    Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011


By:    _____
          Layn R. Phillips

**Allocation of Settlement Among Tribes**

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguено Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*\* 50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷáličᶜ that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use

disorder (OUD). Didgʷáličᵉ provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.      **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for

Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.      **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census). In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

**Non-NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS

## § 1.   APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related Causes of Action against any Debtor, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury or that are similar opioid-related Causes of Action, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered and resolved pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706] in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]   "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [_____].[4]

---

[3]  If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]  Submission instructions to be added after solicitation.

**ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**

**A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B hereto, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer and resolve PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "<u>Trustee</u>"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "<u>Claims Administrator</u>") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)    The Trustee and the Claims Administrator[5] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this Non-NAS PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.   INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant <u>must, with respect to that Non-NAS PI Channeled Claim</u>:

(a)    <u>Hold such Non-NAS PI Channeled Claim against one or more Debtors</u>;

(b)    <u>Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")</u>

(i)    Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying

---

[5]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)    Have already timely[6] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)    Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[7] by the date that is 90 days[8] after the Non-NAS PI Claim Form is disseminated[9] to Non-NAS PI Claimants;[10]

(e)    Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)    If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[11]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

---

[6]    If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[7]    In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[8]    Subject to extension in the discretion of the Claims Administrator.

[9]    Within 60 days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[10]    If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[11]    Exhibit F hereto contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[12] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4.   DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

(a)   A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

(b)   In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

(i)   The product's corresponding NDC number, which is set forth in Exhibit E;[13] or

(ii)   A notation in the record submitted that the product is manufactured or sold by Rhodes or Purdue.

(c)   A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

(i)   Oxycodone CR (or controlled release); or

(ii)   Oxycodone ER (or extended release).

---

[12]   Subject to extensions which the Claims Administrator may give in his discretion.

[13]   Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

## § 5.    TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence (a)-(e):[14]

(a)    Pharmacy prescription records;

(b)    Prescription records, including without limitation:

    (i)    A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

    (ii)    A signed prescription from a doctor for one of the Qualifying Opioids;

(c)    A historical reference to one of the Qualifying Opioids, including but not limited to:[15]

    (i)    A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

    (ii)    A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

    (iii)    A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

    (iv)    A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)    A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

(e)    A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)    If a Non-NAS PI Claimant holds a Non-NAS PI Channeled Claim based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful

---

[14]    Subject to the exceptions set forth in provisions (f) and (g) of this Section 5.

[15]    The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and cannot meet the evidentiary requirements of § 5(a)-(e) above,[16] s/he may still qualify if s/he can demonstrate <u>both</u> of the following:[17]

(i)     By a declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(ii)    By an *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)     In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates <u>all</u> of the following:

(i)     That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, <u>and</u> all known insurance explanations of benefits. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were

---

[16]   Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as a minor. In the absence of that historical reference in the medical records, this declaration requirement can be used under the conditions set forth in this subsection.

[17]   Sample affidavits will be made available on the PI Trust website.

produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains required evidence and the basis for that assessment of probability); and

(ii)     By a declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)    By a supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)     The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)     In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)     Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)     The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he

concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.   ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" *or* a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)     Easy Payment of $3,500 per qualifying Non-NAS PI Claimant[18] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)     Base Payments and Level Awards to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of Awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.   ADDITIONAL AWARD DETERMINATION.

(a)     Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[19] as follows:

---

[18]    If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

[19]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

(i)    **Tier 1A**:

A.    <u>Base Payment</u>:

1.    For a Non-NAS PI Claimant who demonstrates that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

2.    Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

aa.    However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any licensed medical professional;

b. treatment in a rehabilitation center for opioid use disorder;

c. overdose, withdrawal, or detox from an opioid;

d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

e. use of illegal opioids; or

f. use of medication-assisted treatment ("<u>MAT</u>") like methadone.

B.    <u>Level Awards</u>: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

1.    *Level A*:

11

aa.  For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder ("OUD");[20]

b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

c. Administration of Narcan, Evzio or Naloxone.

2. *Level B*:

aa.  For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C.    Additional Evidence for Level Awards:

1. If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2. If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3. If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No declarations may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii)    **Tier 1B:** Claims based on opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded

---

[20]  The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

OxyContin qualifies under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii)   **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for 6 months or more; however, the usage does not have to be consecutive.

    A.   <u>Base Payment</u>: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

    B.   <u>Level Awards</u>: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

        1.   *Level A*:

            aa.   For Non-NAS PI Claimants who demonstrate one or more of the following:

                a. Opioid Use Disorder (OUD);

                b. MAT $\geqslant$ 6 months days; or

                c. Administration of Narcan, Evzio or Naloxone.

        2.   *Level B*:

            aa.   For Non-NAS PI Claimants who demonstrate death caused by an opioid.

    C.   <u>Additional Evidence for Level Awards</u>:

        1.   If making a claim for a Tier 2 Level Award based on OUD diagnosis, then medical records—including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a licensed medical or health professional—can serve as additional evidence. No affidavits may be used to meet this requirement. The

13

records do not have to coincide in time with the qualifying product use.

2. If making a claim for a for a Tier 2 Level Award based on MAT or on Narcan, Evzio or Naloxone use, then pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone can serve as additional evidence. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No declarations may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

3. If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports can serve as additional evidence. The records do not have to coincide in time with the qualifying product use. No affidavits may be used to meet this requirement.

(iv)  **Tier 3:** Claims based on the use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claims. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.   BASE PAYMENTS AND LEVEL AWARDS.

(a)     Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

(b)     Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

|  | **Tier 1A**<br>*Addiction from Purdue Opioids* | **Tier 1B**<br>*Death on OxyContin* | **Tier 2**<br>*Purdue Opioids Use ≥6 months* | **Tier 3**<br>*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[21] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[22]** |  |  |  |  |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9.    ADDITIONAL CLAIM FACTORS AND VALUATION.

(a)    To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

(b)    This grid is based in part on other scoring grids developed in comparable cases with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

(c)    Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

(d)    Only reported injuries are to be scored.

(e)    In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)    Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

---

[21]    Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[22]    If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

## § 10.  BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.  SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.  FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.  CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.  APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

## EXHIBIT A

## SAMPLE CLAIM FORM FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
## PROCEDURE FOR NON-NAS PI CLAIMS

# PURDUE PHARMA PI TDP
# NON-NAS CLAIM FORM
# INSTRUCTIONS PAGE

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed by each Non-NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on its Non-NAS PI Channeled Claim(s).[1]  IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NON-NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NON-NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NON-NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you hold multiple Non-NAS PI Claims against the Debtors on account of injuries to *more than one* person who used opioids, then fill out one Claim Form for each of those Non-NAS PI Claims. If you hold multiple Non-NAS PI Claims on account of multiple injuries to *the same* person who used opioids, then fill out only one Claim Form. One Claim Form submitted for a Non-NAS PI Claim shall be deemed to be a Claim Form in respect of that Non-NAS PI Claim and also any Non-NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that Non-NAS PI Claim.

**Follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. If any section does not pertain to your claim, leave it blank. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth in the Non-NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the Non-NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited Non-NAS PI TDP liquidation process with respect to any Non-NAS PI Claim against one or more of the Debtors, and instead pursue that Non-NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense. You may litigate in court only with respect to a Non-NAS PI Claim held against one or more Debtors, and may not litigate other Non-NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive the Easy Payment or any "Base Payment" or "Level Award." Furthermore, you will not be allowed to opt back in to the Non-NAS PI TDP if your lawsuit is unsuccessful in the tort system. Any final judgment you obtain in the tort system against the Non-NAS PI Trust will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the Non-NAS PI TDP.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out," this Claim Form requires you to choose between receiving an "Easy Payment" of $3,500 or seeking a "Base Payment" and "Level Award." If your Non-NAS PI Claim is eligible for

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Non-NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

payment, then the "Easy Payment" choice will get you money faster, but may not pay as much as a "Base Payment" or "Level Award" would ultimately pay.

By submitting this Claim Form and choosing to liquidate your Claim under the Non-NAS TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the Non-NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [   ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at ███████████████, or by mailing back the completed Claim Form to █████████████████████
████████████████████████████████████████

# PURDUE PHARMA PI TDP
# NON-NAS CLAIM FORM

## PART ONE: PERSONAL INFORMATION OF NON-NAS PI CLAIMANT

What is the Claim Number assigned to your claim by Prime Clerk? ███████████████

Please only fill out **one** of the following sections (Section 1.A or 1.B).

- If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), fill out Section 1A.

- If you hold a PI Claim due to use of opioids by a deceased person (or you are completing this form on behalf of such a holder as his/her representative), fill out Section 1.B.

**Section 1.A: If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), then the term "Claimant" in this Claim Form refers to the person who used opioids, whether that is you or the person you represent.  Please fill out the information below:**

Claimant's Name**:** ████████████████████████████████

Claimant's Date of Birth: ████████████████████████████

Claimant's Address: ██████████████████████████████████

Claimant's Social Security Number (or Taxpayer ID): ████████████

**Representative Name (if applicable):** █████████████████

**Legal Authority for Representative (if applicable):** █████████████
 **(e.g., POA, Legal Guardian, Conservator):**

**Section 1.B: If you are filing a PI Claim due to another's death from use of opioids, or you are completing this form as the representative of an individual with a claim due to another's death from use of opioids, please fill out the information below.**

Name of Deceased Person Who Used Opioids: ████████████████

Address at Time of Death of Deceased
Person Who Used Opioids : ████████████████████████████

Date of Birth of Deceased Person Who Used Opioids: ███████████████

Date of Death: █████████████████████████████

Cause of Death: ████████████████████████████

Social Security Number (or Taxpayer ID) of Person Who Used Opioids: ███████████

Name of Claimant Filing Claim
on behalf of the Person Who Used Opioids: ███████████████

Claimant's Address: ███████████████

Claimant's Relationship to Person Who Used Opioids: ███████████
(i.e., parent, sibling, child, spouse, etc.)

**Representative Name (if applicable):** ███████████

**Legal Authority for Representative (if applicable):** ███████████
 **(e.g., POA, Legal Guardian, Conservator):**

If a Court has appointed you as Executor, Administrator or Personal Representative of the deceased person's estate, then submit the court order so appointing you along with your Claim Form.  If a Court has not appointed you as Executor, Administrator, or Personal Representative of the deceased person's estate, then also execute and submit the appropriate Heirship Declaration attached**.**

---

## PART TWO: "OPT OUT" OF THE NON-NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have your Non-NAS PI Channeled Claim(s) liquidated under the Non-NAS PI TDP and instead to pursue your Non-NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box. If you "opt out," you will not be eligible to receive an "Easy Payment," "Base Payment," or "Level Award" from the  PI Trust.

Mark the following box **only if** you **elect to "opt out" of the Non-NAS PI TDP liquidation process and instead pursue your Non-NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense**:

---

## PART THREE: EASY PAYMENT ELECTION (If you selected "Opt Out," then skip this Part Three)

**Section 3.A:** You may elect to receive an "Easy Payment" in lieu of other compensation. If you elect to receive an Easy Payment, you will receive a one-time payment of $3,500 within a reasonably short amount of time after receipt of your Claims Package by the Claims Administrator and resolution of any healthcare liens. The Easy Payment is expected to be free of many but not all types of health care liens. Even if you select the Easy Payment option, you must comply with the requirements of the Non-NAS PI TDP. **WARNING: If you elect to receive an Easy Payment, you are not eligible to receive any additional Awards for your Non-NAS PI Channeled Claims. On the other hand, declining the Easy Payment election and seeking a "Base Payment" and "Level Award" may result in receiving payment at a later date and through installments.**

Mark the following box **only if** you **elect to receive the Easy Payment** and **waive all additional Awards** or compensation:

---

**PART FOUR: TIERING AND LEVEL DESIGNATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Four)**

**Section 4.A:** In this section, please mark the tier that applies to your Non-NAS PI Claim. **IF MULTIPLE TIERS APPLY, CHECK THE HIGHEST TIER THAT APPLIES TO YOUR CLAIM. Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria.**

Highest

**Tier 1B (highest tier):**

☐ You can demonstrate opioid-related death (such as overdose or withdrawal) while on Oxycontin.

**Tier 1A:**

☐ You can demonstrate that addiction, dependence, or substance abuse began while using one of the qualifying opioids.

**Tier 2:**

☐ You can demonstrate use of a qualifying product for 6 months or more (does not have to be consecutive use).

**Tier 3 (lowest tier):**

Lowest

☐ You can demonstrate use of a qualifying product for less than 6 months and otherwise do not meet the criteria of any of the above tiers.

**Section 4.B:** If you selected **Tier 1A** or **Tier 2** above, please mark the level designation that applies to your Non-NAS PI Claim. **IF BOTH LEVEL B AND LEVEL A APPLY TO YOU, CHOOSE LEVEL B.** Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria. (If you checked a Tier 1B or Tier 3 Claim above, SKIP this section.)

Highest

**Level B (highest level):**

☐ You can demonstrate death caused by an opioid (e.g., death caused by overdose or withdrawal).

**Level A (lowest level):**

Lowest

☐ You can demonstrate (1) a diagnosis of Opioid Use Disorder (OUD), (2) MAT usage of 6 months or more, or (3) administration of Narcan, Evzio, or Naloxone.

**PART FIVE: PRESCRIBED MEDICATIONS** (If you selected "Opt Out," SKIP this Part Five)

**Section 5.A:** Identify any of the following Purdue-brand opioids that the person whose opioid use is the subject of your Non-NAS PI Claim was **prescribed**. *Include evidence of the prescriptions when submitting this Claim Form. (A claim may qualify without prescription if the person who used opioids was a minor at the time the use began.)*

|  | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| OxyContin ☐ |  |  |  |
| MSContin ☐ |  |  |  |
| Dilaudid ☐ |  |  |  |
| Butrans ☐ |  |  |  |
| Hysingla ☐ |  |  |  |
| DHC Plus ☐ |  |  |  |
| MSIR ☐ |  |  |  |
| OxyFast ☐ |  |  |  |
| Oxy IR ☐ |  |  |  |
| Palladone ☐ |  |  |  |
| Ryzolt ☐ |  |  |  |
| Rhodes Generic (name) _____ ☐ |  |  |  |

**Section 5.B:** Identify any of the following Medication Assistance Treatment (MAT) drugs prescribed to the person whose opioid use is the subject of your Non-NAS PI Claim. *Include evidence of the prescriptions when submitting this Claim Form.* (If you selected Easy Payment, SKIP this Section.)

|  | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| Buprenorphine: ☐ |  |  |  |
| Butrans: ☐ |  |  |  |
| Methadone: ☐ |  |  |  |
| Suboxone ☐ |  |  |  |
| Zubsoly: ☐ |  |  |  |
| Naltrexone: ☐ |  |  |  |

**Section 5.C:** Identify any of the following medications provided to the person whose opioid use is the subject of your Non-NAS PI Claim during or after an opioid overdose. *Include evidence of the prescriptions or administration when submitting this Claim Form.* **(If you selected Easy Payment, SKIP this Section.)**

| | | Date administered: |
|---|---|---|
| Narcan: | ☐ | |
| Evzio: | ☐ | |
| Naloxone: | ☐ | |

---

## PART SIX: INJURIES SUFFERED BY THE PERSON WHO USED OPIOIDS (If you selected "Opt Out," SKIP this Part Six)

**WARNING: IF YOU DO NOT CHECK ANY INJURIES ON THIS LIST, THEN YOUR NON-NAS PI CHANNELED CLAIMS WILL BE DISALLOWED AND YOU WILL RECEIVE NO RECOVERY**

**Section 6.A:**

**Please mark all that are applicable to your claim.**

_____ ADDICTION
　　　Date addiction began: _____
　　　Opioid that started the addiction: _____
　　　Diagnosis and Date of Opioid Use Disorder: _____

_____ WITHDRAWALS
　　　Date(s) withdrawal(s) occurred: _____

_____ OVERDOSE
　　　Date(s) overdose(s) occurred: _____

_____ JAIL
　　　Date(s) jail sentence(s) began/ended: _____
　　　The charge(s): _____

_____ REHAB
　　　Dates of inpatient or outpatient rehabilitation: _____

**PART SEVEN: MEDICAL PROVIDER INFORMATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Seven)**

**Section 7.A:** In this section, please identify information for the medical providers (prescribing doctors and pharmacies) who prescribed opioids to the person whose opioid use is the subject of your Non-NAS PI Claim:

| Name of Prescriber/Pharmacy | Address | City | State | Zip | Date Range From | Date Range To |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**PART EIGHT: MEDICAL LIENS (If you selected "Opt Out," SKIP this Part Eight)**

**Section 8.A:** Did any insurance company pay for medical treatment for the opioid-related injuries that gave rise to your Non-NAS PI Claim?

Yes: ☐

No: ☐

**Section 8.B:** In the last 20 years, was the person whose opioid use is the subject of your Non-NAS PI Claim eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs? Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the person who used opioids is not listed below, please write in that carrier's name and information at the bottom of the chart.

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare | | | | | | |
| Medicaid | | | | | | |
| Tricare | | | | | | |
| VA | | | | | | |
| Champus | | | | | | |
| Private (Name Below): | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**PART NINE: SIGNATURE (You must complete this Part Nine regardless of your elections above)**

**Section 9.A: Please sign this section when you have completed this Claim Form.**

Name of person who is signing this form: _____

E-mail address of person who is signing this form: _____

Phone Number of person who is signing this form: _____

I am including the evidence requested above in my submission of this form: ☐

*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

_____

*Signature of Non-NAS PI Claimant (or signature of Representative Completing this Form for a Non-NAS PI Claimant)*

**EXHIBIT B**

**PROCEDURES FOR NON-NAS PI CLAIMANTS WHO OPT
TO LIQUIDATE THEIR NON-NAS PI CLAIMS IN THE TORT
SYSTEM RATHER THAN UNDER THE INDIVIDUAL PURDUE
PHARMA L.P. NON-NAS TRUST DISTRIBUTION PROCEDURE**

The following procedures shall apply in the case of a Non-NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her Non-NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her Non-NAS PI Claim Form. By so electing, such Non-NAS PI Claimant forfeits any right to have his or her Non-NAS PI Claim liquidated under sections 6 through 9 (inclusive) of the Non-NAS PI TDP, and instead shall have the right to liquidate his or her Non-NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "Non-NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of a Non-NAS PI Claim in the tort system shall be deemed to be an adjudication of that Non-NAS PI Claim and any associated Non-NAS PI Channeled Claims of the Non-NAS PI Claimant regarding the same injuries that are the subject of his or her Non-NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such Non-NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such Non-NAS PI Claim and such associated Non-NAS PI Channeled Claims.

## § 1.    SUITS IN THE TORT SYSTEM.

If a Non-NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her Non-NAS PI Claim, then he or she may elect to liquidate such Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP by checking the box so indicating on his or her Non-NAS PI Claim Form, which Non-NAS PI Claim Form must be filed by the date that is ninety (90) days[2] after the applicable Non-NAS PI Claim Form is disseminated to him/her.[3] If the Non-NAS PI Claimant makes such election, then the Non-NAS PI Claimant may file a lawsuit regarding only his or her Non-NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Non-NAS PI TDP or, if not defined in the Non-NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]    Within sixty (60) days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if the Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, each Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[3]    The filing of a Non-NAS PI Claim Form indicating that a Non-NAS PI Claimant has elected to liquidate his or her Non-NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the Non-NAS PI Claims asserted by such Non-NAS PI Claimant.

[4]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

§ 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the Non-NAS PI Claim arose.

Any such lawsuit shall be filed by the Non-NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of a Non-NAS PI Claim Form so indicating that a Non-NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such Non-NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Non-NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such Non-NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Non-NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If a Non-NAS PI Claimant obtains a judgment on his or her Non-NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the Non-NAS Payment Percentage and Non-

---

[5]   The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6]   Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of a Non-NAS PI Claimant's lawsuit is not a "Non-NAS PI Claim" within the meaning of the Plan.

[7]   In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

NAS Maximum Value (each as defined below), as provided in <u>Section 6</u> below, the deductions as set forth in <u>Section 6</u> below, and the resolution of healthcare liens, as provided in <u>Section 7</u> below.

## § 2.   LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Non-NAS PI Claim litigated against the PI Trust in the tort system.

## § 3.   NON-NAS MAXIMUM VALUE.

Payment on a Final Judgment for a Non-NAS PI Claim shall not exceed the dollar-equivalent of 120,000 points (the "<u>Non-NAS Maximum Value</u>"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the conversion set forth in section 8 of the Non-NAS PI TDP. As set forth in more detail in the Non-NAS PI TDP, the dollar amount ultimately awarded per point will be determined with reference to the funds remaining in the PI Trust and to the pool of claims remaining against the PI Trust. It will vary depending on how many people choose to opt out their claims and how expensive it is for the PI Trust to defend those claims in the tort system. It will also depend on the payment elections made by those who are liquidating their claims under sections 6 through 9 (inclusive) of the Non-NAS PI TDP. At this time, it is estimated that the dollar award amount per point will be between $0.80 and $1.20.

## § 4.   NON-NAS PAYMENT PERCENTAGE.

A Final Judgment on a Non-NAS Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that Non-NAS PI Claims liquidated under the Non-NAS PI TDP are reduced prior to payment. In other words, a Non-NAS PI Claimant who elects to liquidate his or her Non-NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all Non-NAS PI Channeled Claims entitled to a recovery pursuant to the Non-NAS PI TDP. Based upon the work of the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject-matter experts for the Ad Hoc Group of Individual Victims and other Holders of PI Claims, review of judgments obtained in lawsuits, settlement history, and collaborative discussions with stakeholders, the Base Payments and Level Awards described in the Non-NAS PI TDP represent an estimated pro-rata percentage recovery by PI Claimants holding Allowed PI Channeled Claims of approximately 2.0% (such pro-rata percentage recovery as may be altered over time, the "<u>Non-NAS Payment Percentage</u>"). Accordingly, the initial Non-NAS Payment Percentage is 2.0%.

No Holder of a Non-NAS PI Claim who elects to liquidate his or her Non-NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her Non-NAS PI Claim multiplied by the Non-NAS Payment Percentage in effect at the time of payment (such value so reduced, the "<u>Non-NAS Percentage-Reduced Claim</u>"); *provided, however*, that if there is

a reduction in the Non-NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the Non-NAS PI Trust to pay a Non-NAS PI Claim based on the Non-NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such Non-NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new Non-NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such Non-NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the Non-NAS PI Claimant or the Claimant's Counsel (as applicable).

## § 5.    ADJUSTMENT OF THE NON-NAS PAYMENT PERCENTAGE.

The Non-NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable Non-NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and with the consent of the Oversight Committee, change the Non-NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable Non-NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the Non-NAS Payment Percentage on current estimates of the number, types, and values of Non-NAS PI Channeled Claims, the value of the assets of the PI Trust Non-NAS Fund available for the payment of Allowed Non-NAS PI Channeled Claims pursuant to the Non-NAS PI TDP and amounts due and estimated to become due pursuant to the Non-NAS PI TDP in respect of Final Judgments obtained by Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed Non-NAS PI Channeled Claims and (ii) the Non-NAS Maximum Value to Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the Non-NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the Non-NAS Payment Percentage has not yet been adopted by the Oversight Committee, a Non-NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current Non-NAS Payment Percentage and the proposed Non-NAS Payment Percentage. However, if the proposed Non-NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the Non-NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Non-NAS Payment Percentage is the higher amount and subsequent adopted, the Non-NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the Non-NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the Non-NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the Non-NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust Non-NAS Fund, the Claims Administrator shall make supplemental payments to all Non-NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower Non-NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the Non-NAS PI Channeled Claim in question multiplied by the newly-adjusted Non-NAS Payment Percentage, less all amounts paid previously to the Non-NAS PI Claimant in respect of such Non-NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to a Non-NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such Non-NAS PI Claimant, at such time that the total exceeds $100.00.

## § 6.    PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

A Non-NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust Non-NAS Fund in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the Non-NAS Percentage-Reduced Claim and (ii) the Non-NAS Maximum Value, in each case as then in effect (as described next) (such lesser amount, the "Non-NAS Gross Amount"). A Non-NAS PI Claimant's Non-NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases as and to the extent provided in the PI Trust Agreement, subject to Section 5.8(g) of the Plan, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, which deduction shall be taken by such individual attorney and reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan. The resulting net amount shall be paid to the Non-NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the Non-NAS Percentage-Reduced Claim, the Non-NAS Maximum Value, the Non-NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.    RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

The special procedures set forth in Exhibit G to the Non-NAS PI TDP shall apply to all Non-NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their Non-NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the Non-NAS PI TDP as Exhibit F.[8]

---

[8]    Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

1

## EXHIBIT C

## PROCEDURE FOR DEFICIENCIES AND APPEALS FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE
## FOR NON-NAS PI CLAIMS

These procedures apply only to PI Channeled Claims liquidated under sections 6 through 9 (inclusive) of the PI Trust Distribution Procedure for Non-NAS Claims (the "Non-NAS PI TDP"), and are not available for NAS PI Claims or for any PI Claims liquated in the tort system.

**1.01    Curing Deficiencies.**    If the Claims Administrator[1] determines that a claim submitted pursuant to the Non-NAS PI TDP is incomplete, (s)he will notify the PI Claimant and afford a 14-day period to cure any such deficiency.    Such deficiencies include, but are not limited to, failure to sign the Claim Form (Exhibit A to the Non-NAS PI TDP), failure to complete the Claim Form, failure to execute a HIPAA authorization (Exhibit D to the Non-NAS PI TDP), or submission of a declaration that fails to meet the requirements of § 5 of the Non-NAS PI TDP.    If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying Claim.    If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the Non-NAS PI Claimant from receiving all or part of any award (s)he would otherwise be entitled to.

**1.02    Appeals to the Claims Administrator.**    If a Non-NAS PI Claimant is dissatisfied with his/her award determination pursuant to the Non-NAS PI TDP or a determination by the Claims Administrator thereunder to limit or prohibit an award pursuant to the deficiency process described in Section 1.01 above or any other determination made by the Claims Administrator under the Non-NAS PI TDP, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the Non-NAS PI Claimant should identify the determination with which the Non-NAS PI Claimant disagrees and state the reasons for the disagreement. The Non-NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.    Only one appeal is permitted per Proof of Claim.    The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the Non-NAS PI Claimant and/or his/her counsel, as applicable.    In the event that the Claims Office determines that the records submitted in support of the Non-NAS PI Claimant's claim are unreliable, the notification of status shall advise the Non-NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.    The Claims Administrator shall not change the Non-NAS PI TDP allowance criteria.    The Non-NAS PI Claimant shall have the right to appeal any such determination to the Appeals Master as set forth in Section 1.03 herein.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Non-NAS PI TDP.

2

**1.03**    **Appeals to Appeals Master.**    Non-NAS PI Claimants who disagree with the ruling of the Claims Administrator may appeal to the Appeals Master within fourteen (14) days of notice of such ruling by submitting a written statement outlining the Non-NAS PI Claimant's position and why he/she believes the Claims Administrator has erred.    An appeal fee of $1,000 shall be assessed against the Non-NAS PI Claimant's recovery from the PI Trust regardless of the outcome of the appeal.    The Appeals Master shall review only the appeal record and claim file in deciding the appeal.    The Appeals Master shall apply the guidelines and procedures established in the Non-NAS PI TDP, and the appeals process shall not result in any modification of substantive eligibility criteria.    The Appeals Master shall issue a determination on the appeal in writing, which shall be served on the Non-NAS PI Claimant (and his/her counsel, where applicable) and the Claims Administrator.    Decisions of the Appeals Master pursuant hereto are final and binding, and Non-NAS PI Claimants have no further appeal rights beyond those set forth herein.

## **EXHIBIT D**

## **HIPAA FORMS FOR**
## **THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION**
## **PROCEDURE FOR NON-NAS CLAIMS**

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE**

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ▉▉▉▉▉▉▉▉▉    Date: ▉▉▉▉▉▉▉▉▉

Date of Birth: ▉▉▉▉▉▉▉▉▉    SSN: ▉▉▉▉▉▉▉▉▉

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  <u>If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties</u>):**

_____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. <u>If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges</u>).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774     (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                    Date

Relationship to Patient (If signed by Legal Representative)

<span style="color:red">**SAMPLE FORM – DO NOT COMPLETE. A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE**</span>

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ███████████████   Date: ███████████████

Date of Birth: ███████████████   SSN: ███████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.** __If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties__**):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**(p) 205-716-3000    (f) 205-716-2364**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

███████████████████████████████████████████

Patient or Legal Representative                                    Date

███████████████████████████████████████████

Relationship to Patient (If signed by Legal Representative)

**EXHIBIT E**

**QUALIFYING OPIOIDS FOR
THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE
FOR NON-NAS PI CLAIMS**

| **Drug Name** | **NDC Labeler and Drug Prefix** |
|---|---|
| OxyContin | 59011-410-[1] |
| OxyContin | 59011-415- |
| OxyContin | 59011-420- |
| OxyContin | 59011-430- |
| OxyContin | 59011-440- |
| OxyContin | 59011-460- |
| OxyContin | 59011-480- |
| OxyContin | 59011-0100- |
| OxyContin | 59011-0103- |
| OxyContin | 59011-0105- |
| OxyContin | 59011-0107- |
| OxyContin | 59011-0109- |
| OxyContin | 43063-0244- |
| OxyContin | 43063-0245- |
| OxyContin | 43063-0246- |
| OxyContin | 43063-0354- |
| Butrans | 59011-750- |
| Butrans | 59011-751- |
| Butrans | 59011-752- |
| Butrans | 59011-757- |
| Butrans | 59011-758- |
| Hysingla ER | 59011-271- |
| Hysingla ER | 59011-272- |
| Hysingla ER | 59011-273- |
| Hysingla ER | 59011-274- |
| Hysingla ER | 59011-275- |
| Hysingla ER | 59011-276- |
| Hysingla ER | 59011-277- |
| MS Contin | 42858-515- |
| MS Contin | 42858-631- |
| MS Contin | 42858-760- |
| MS Contin | 42858-799- |
| MS Contin | 42858-900- |
| MS Contin | 00034-0513- |
| MS Contin | 00034-0514- |
| MS Contin | 00034-0515- |

---

[1] Pharmacies may include an additional "0" in the second segment of NDC Labeler and Drug Prefixes, such that, in respect of eight digit NDC Labeler and Drug Prefixes listed herein (for example, 59011-410-), a pharmacy record may include a "0" as a ninth digit (for example, 59011-0410).

| | |
|---|---|
| MS Contin | 00034-0516- |
| MS Contin | 00034-0517- |
| MS Contin | 16590-884- |
| Dilaudid | 42858-122- |
| Dilaudid | 42858-234- |
| Dilaudid | 42858-338- |
| Dilaudid | 42858-416- |
| Dilaudid | 76045-009- |
| Dilaudid | 76045-010- |
| Dilaudid | 0074-2414- |
| Dilaudid | 0074-2415- |
| Dilaudid | 0074-2416- |
| Dilaudid | 0074-2426- |
| Dilaudid | 0074-2451- |
| Dilaudid | 0074-2452- |
| OxyIR | 59011-0201- |
| OxyFast | 59011-0225- |
| MSIR | 00034-0518- |
| MSIR | 00034-0519- |
| MSIR | 00034-0521- |
| MSIR | 00034-0522- |
| MSIR | 00034-0523- |
| Palladone | 59011-0312- |
| Palladone | 59011-0313- |
| Palladone | 59011-0314- |
| Palladone | 59011-0315- |
| Buprenorphine | 42858-353- |
| Buprenorphine | 42858-493- |
| Buprenorphine | 42858-501- |
| Buprenorphine | 42858-502- |
| Buprenorphine | 42858-586- |
| Buprenorphine | 42858-750- |
| Buprenorphine | 42858-839- |
| Hydromorphone Hydrochloride | 42858-301- |
| Hydromorphone Hydrochloride | 42858-302- |
| Hydromorphone Hydrochloride | 42858-303- |
| Hydromorphone Hydrochloride | 42858-304- |
| Morphine Sulfate | 42858-801- |
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-804- |
| Morphine Sulfate | 42858-805- |
| Morphine Sulfate | 0904-6557- |
| Morphine Sulfate | 0904-6558- |
| Morphine Sulfate | 0904-6559- |
| Morphine Sulfate | 35356-833- |
| Morphine Sulfate | 35356-836- |
| Morphine Sulfate | 35356-838- |
| Morphine Sulfate | 42858-801- |

| | |
|---|---|
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-810- |
| Morphine Sulfate | 42858-811- |
| Morphine Sulfate | 42858-812- |
| Morphine Sulfate | 61919-966- |
| Morphine Sulfate | 67296-1561- |
| Morphine Sulfate | 68084-157- |
| Morphine Sulfate | 68084-158- |
| Morphine Sulfate | 16590-966- |
| Oxycodone Hydrochloride | 0406-0595- |
| Oxycodone Hydrochloride | 0093-0031- |
| Oxycodone Hydrochloride | 0093-0032- |
| Oxycodone Hydrochloride | 0093-0033- |
| Oxycodone Hydrochloride | 0093-5731- |
| Oxycodone Hydrochloride | 0093-5732- |
| Oxycodone Hydrochloride | 0093-5733- |
| Oxycodone Hydrochloride | 0093-5734- |
| Oxycodone Hydrochloride | 0115-1556- |
| Oxycodone Hydrochloride | 0115-1557- |
| Oxycodone Hydrochloride | 0115-1558- |
| Oxycodone Hydrochloride | 0115-1559- |
| Oxycodone Hydrochloride | 0115-1560- |
| Oxycodone Hydrochloride | 0115-1561- |
| Oxycodone Hydrochloride | 0115-1562- |
| Oxycodone Hydrochloride | 0591-2693- |
| Oxycodone Hydrochloride | 0591-2708- |
| Oxycodone Hydrochloride | 0591-3503- |
| Oxycodone Hydrochloride | 0781-5703- |
| Oxycodone Hydrochloride | 0781-5726- |
| Oxycodone Hydrochloride | 0781-5767- |
| Oxycodone Hydrochloride | 0781-5785- |
| Oxycodone Hydrochloride | 10702-801- |
| Oxycodone Hydrochloride | 10702-803- |
| Oxycodone Hydrochloride | 42858-001- |
| Oxycodone Hydrochloride | 42858-002- |
| Oxycodone Hydrochloride | 42858-003- |
| Oxycodone Hydrochloride | 42858-004- |
| Oxycodone Hydrochloride | 42858-005- |
| Oxycodone Hydrochloride | 49884-136- |
| Oxycodone Hydrochloride | 49884-137- |
| Oxycodone Hydrochloride | 49884-138- |
| Oxycodone Hydrochloride | 49884-197- |
| Oxycodone Hydrochloride | 60505-3537- |
| Oxycodone Hydrochloride | 60505-3538- |
| Oxycodone Hydrochloride | 60505-3539- |
| Oxycodone Hydrochloride | 60505-3540- |
| Oxycodone Hydrochloride | 60951-0702- |
| Oxycodone Hydrochloride | 60951-0703- |

| | |
|---|---|
| Oxycodone Hydrochloride | 60951-0705- |
| Oxycodone Hydrochloride | 60951-0710- |
| Oxycodone Hydrochloride | 63304-400- |
| Oxycodone Hydrochloride | 63304-401- |
| Oxycodone Hydrochloride | 67296-1376- |
| Oxycodone Hydrochloride | 67296-1560- |
| Oxycodone Hydrochloride | 68774-0161- |
| Oxycodone Hydrochloride | 68774-0162- |
| Oxycodone Hydrochloride | 68774-0163- |
| Oxycodone Hydrochloride | 68774-0164- |
| Oxycodone Hydrochloride | 00093-0024- |
| Oxycodone Hydrochloride | 00093-0031- |
| Oxycodone Hydrochloride | 00093-0032- |
| Oxycodone Hydrochloride | 00093-0033- |
| Oxycodone Hydrochloride | 00115-1644- |
| Oxycodone Hydrochloride | 00172-6354- |
| Oxycodone Hydrochloride | 00172-6355- |
| Oxycodone Hydrochloride | 00172-6356- |
| Oxycodone Hydrochloride | 00172-6357- |
| Oxycodone Hydrochloride | 00591-3501- |
| Oxycodone Hydrochloride | 00591-3502- |
| Oxycodone Hydrochloride | 00591-3503- |
| Oxycodone Hydrochloride | 00591-3504- |
| Oxycodone Hydrochloride | 52152-0408- |
| Oxycodone Hydrochloride | 52152-0409- |
| Oxycodone Hydrochloride | 52152-0410- |
| Oxycodone Hydrochloride | 52152-0411- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-040- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-139- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-201- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-202- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-203- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-238- |
| Oxycodone/Acetaminophen | 42858-102- |
| Oxycodone/Acetaminophen | 42858-103- |
| Oxycodone/Acetaminophen | 42858-104- |

## EXHIBIT F

## HEIRSHIP DECLARATION FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
## PROCEDURE FOR NON-NAS PI CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-1 | SWORN DECLARATION: SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I.   DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | Date of Death | ____/____/____ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II.   PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706].

1

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |

2

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | **III. HEIRS AND BENEFICIARIES OF DECEDENT**<br>**(ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED)** | | |
|---|---|---|---|
| | Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified. | | |

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

## IV.  PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a)  I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b)  I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c)  No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d)  The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e)  No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f)  I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g)  I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h)  No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j)  I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.   PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** _____/_____/_____ <br>(Month/Day/Year) |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | Date of Death | ____/____/____ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706].

1

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |
|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. | HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|---|
| | | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |

3

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

|  | Name | Information | |
|---|---|---|---|
| **4.** |  | **Address** | |
|  |  | **Relationship to Decedent** | |
|  |  | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **5.** |  | **Address** | |
|  |  | **Relationship to Decedent** | |
|  |  | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

## IV.    PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)  I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | | **Date** | ____/____/____ <br> (Month/Day/Year) |

## EXHIBIT G

## DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to Section 2 below. The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP. The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by Section 5 below). These actions include, where

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI Claimant, making

a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to

the PI Trust on behalf of a Minor Claimant shall include along with such submission

documentation of his/her authority to act on behalf of the Minor Claimant, consisting of

the following:

    a.  If the purported Proxy is the Guardian of the Minor Claimant, then the court order

appointing that Proxy as Guardian, or other documents reasonably acceptable to the

Claims Administrator as sufficient under applicable law to evidence the

guardianship.

    b.  If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn

statement that such Proxy is the custodial parent of the Minor Claimant.

    c.  If the purported Proxy is neither the Guardian nor custodial parent of the Minor

Claimant, then a sworn statement by the purported Proxy that he/she is providing

custody and care to the Minor Claimant, stating for how long he/she has been

providing such care and custody, explaining his/her relationship to the Minor

Claimant and the circumstances around the provision of care and custody, as well

as a statement and/or records from one or more of the following in support of his/her

sworn statement:

        1.  Minor Claimant's school

        2.  Purported Proxy's landlord or property manager

        3.  Minor Claimant's health provider

        4.  Minor Claimant's child care provider

5. Purported Proxy's placement agency

6. Governmental social services agency

7. Indian tribe officials

8. Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

3. **Distributions to Minor Claimants.**    When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known).  Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined.  Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

4. **Payments of attorneys' fees.**

Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery. It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses. Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5. **Early Distributions.**  Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI
TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for
payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS
PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS
Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled
Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the
Effective Date of the Plan: (i) all NAS PI Claims, which are Claims against any Debtor for
alleged opioid-related personal injury to an NAS Child or similar opioid-related Causes of
Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose
prior to the Petition Date, and that are not (A) Third-Party Payor Claims, NAS Monitoring
Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released
Claims or Shareholder Released Claims that are for alleged opioid-related personal injury to an
NAS Child or that are similar opioid-related Causes of Action asserted by or on behalf of an
NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party
Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or
(B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered,
liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust
NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as
"NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or
Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled
Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross
amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI
TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before
deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the
operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program
(the "LRP Agreement") to settle liens held by private insurance companies against that Award, if
any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical
Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare,
Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh
Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as
modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706] in the chapter 11 cases of
Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court
for the Southern District of New York (the "Bankruptcy Court").

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "<u>NAS Opt-Out Claimant</u>"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

**§ 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.**

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]    Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)   The Trustee and the Claims Administrator[4] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as

---

[4]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.    INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)     Hold such NAS PI Channeled Claim against one or more Debtors;

(b)     Have already timely[5] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)     Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("NAS"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)     Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[6] after the NAS PI Claim Form is disseminated[7] to NAS PI Claimants;[8]

---

[5]     If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("WV NAS Claimants") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

[6]     Subject to extension in the discretion of the Claims Administrator.

[7]     Within 60 days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)     If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[9]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[10] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)     To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

(i)     A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

(ii)     A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)     Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid

---

[8]     If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[9]     Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[10]     Subject to extension in the discretion of the Claims Administrator.

exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

(b)    The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[11] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)    The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)    If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.    AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a

---

[11]    Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are

deemed unreliable.  In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.f

## <u>EXHIBIT A</u>

## <u>SAMPLE CLAIM FORM FOR</u>
## <u>THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST</u>
## <u>DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS</u>

# PURDUE PHARMA PI TDP
# NAS CLAIM FORM
# INSTRUCTIONS PAGE

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed for each NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (the "PI Trust") on its NAS PI Channeled Claim(s).[1]  IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you represent the interests of an NAS Child and are seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on account of an that NAS Child's NAS PI Channeled Claim(s), you must complete this Claim Form (the "Claim Form") and return the form as instructed below.  If you do not complete the form, you will NOT qualify to receive funds on behalf of the child you represent.

If you believe that the NAS Child you represent holds multiple NAS PI Claims against the Debtors on account of multiple injuries, you should still submit only one Claim Form. One Claim Form submitted for a NAS PI Claim shall be deemed to be a Claim Form in respect of that NAS PI Claim and also any NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that NAS PI Claim.

If you represent the interests of more than one NAS Child, you must file a Claim Form on behalf of each individual NAS Child.  YOU CANNOT file one Claim Form on behalf of multiple children.

**Please follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth on this Claim Form and further detailed in the NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited NAS PI TDP liquidation process with respect to any NAS PI Claim against one or more of the Debtors, and instead pursue that NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense.  You may litigate in court only with respect to a NAS PI Claim held against one or more Debtors, and may not litigate any other NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive any distribution under the streamlined liquidation procedures of the NAS PI TDP. Furthermore, you will not be allowed to opt back in to the liquidation provisions of the NAS PI TDP if your lawsuit is unsuccessful in the tort system. In other words, if you lose your lawsuit, you cannot return to the NAS PI Trust and ask for money.  And importantly, if you do

---

[1] Capitalized terms used but not defined herein have the meanings ascribed in the NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

obtain a judgment in a court against the PI Trust, that award will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the NAS PI TDP.  See the procedures set forth in Exhibit B to the NAS PI TDP for more detail.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out:" If your claim is Allowed by the Claims Administrator of the PI Trust, your claim will be liquidated and paid according to the NAS PI TDP.  If your claim is Disallowed by the Claims Administrator, you will not receive a distribution from the PI Trust.  All claimants whose NAS PI Channeled Claims are Allowed by the Claims Administrator shall receive an equal distribution from the PI Trust NAS Fund, subject to the deductions described in the NAS PI TDP.

By submitting this Claim Form and choosing to liquidate your NAS PI Claim under the NAS PI TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [  ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at ████████, or by mailing back the completed Claim Form to █████████

# PURDUE PHARMA PI TDP
# NAS CLAIM FORM

## PART ONE: PERSONAL INFORMATION OF NAS PI CLAIMANT AND HIS/HER REPRESENTATIVE

What is the Claim Number assigned to the NAS Child's claim by Prime Clerk? ████████

**Section 1.A**: Fill out the information of the NAS Child below:

NAS Child's Name**:** ███████████████

NAS Child's Date of Birth: ███████████████

NAS Child's Address: ███████████████

NAS Child's Social Security Number (or taxpayer ID): ███████████████

**Section 1.B**: Fill out your own information below:

Your Name: ███████████████

Your Date of Birth: ███████████████

Your Address: ███████████████

Your Social Security Number: ███████████████

Your Phone Number: ███████████████

State whether you are the "natural parent," "legal guardian," or "other custodian" of the NAS Child: ███████████████

## PART TWO: "OPT OUT" OF LIQUIDATION UNDER THE NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have the NAS PI Claimant's NAS PI Channeled Claim(s) liquidated under the NAS PI TDP and instead pursue the NAS PI Claimant's NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box and provide the additional information sought in this PART TWO.  **WARNING:   Mark the box in this paragraph of PART TWO only if you elect to "opt out" of the NAS PI TDP liquidation process and instead pursue your NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense.**

☐     **I have checked this box to opt out of the liquidation procedures of the NAS PI TDP and the PI Trust NAS Fund.**

---

## PART THREE: MEDICAL PROVIDER INFORMATION  (skip this section if you elected to "opt out")

**Section 3.A:** This section concerns licensed medical providers who have diagnosed the NAS Child with any medical, physical, cognitive or emotional condition resulting from his/her intrauterine exposure to opioids or opioid replacement or treatment medication(s).  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").   Fill out and provide the following information, if known:

| Name of Licensed Medical Provider | Address | City | State | Zip | Date of Diagnosis | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Section 3.B:  Even if you do not know the information sought in Section 3.A, please include with your submission of this Claim Form Competent Evidence that a licensed medical provider has diagnosed the NAS PI Claimant with any medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication(s).  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").  The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselors or therapists, or professionals at a rehabilitation center. Evidence can include, among other things, medical records evidencing that the NAS Child had a NAS diagnosis, including post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.**

**Section 3.C**: Was the NAS Child born in a medical facility? If so:

Name of the Facility where
the NAS Child was born:       ████████████████████████

Location (city and state)
where the NAS Child was born:    ████████████████████████

---

**PART FOUR: MEDICAL LIENS** (skip this section if you elected to "opt out")

**Section 4.A**: Did any insurance company pay for medical treatment for the NAS Child's opioid-related injuries?

Yes:     ☐

No:      ☐

**Section 4.B**: In the last 20 years, was the NAS Child eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs?  Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the NAS Child is not identified, please fill in that carrier's name and information at the bottom of the chart.

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare | | | | | | |
| Medicaid | | | | | | |
| Tricare | | | | | | |
| VA | | | | | | |
| Champus | | | | | | |
| Private   (Name Below): | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

---

**PART FIVE: SIGNATURE (You must complete this Part Five regardless of your elections above)**

**Please fill out and sign this section when you have completed this Claim Form.**

NAS Child's Name:            _____

NAS Child's E-mail (if any):    _____

NAS Child's Phone Number (if any):    _____

Your Name: _____

Your E-mail: _____

Your Phone Number: _____


I am including the evidence requested in Section 3.B above in my submission of this form: ☐


*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

_____

*Signature of NAS PI Claimant or individual*
*acting on behalf of the NAS PI Claimant*

**EXHIBIT B**

**PROCEDURES FOR NAS PI CLAIMANTS WHO OPT TO LIQUIDATE
THEIR NAS PI CLAIMS IN THE TORT SYSTEM RATHER THAN UNDER THE
INDIVIDUAL PURDUE PHARMA L.P. NAS TRUST DISTRIBUTION PROCEDURE**

The following procedures shall apply in the case of an NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her NAS PI Claim Form. By so electing, such NAS PI Claimant forfeits any right to have his or her NAS PI Claim liquidated under the liquidation provisions of the NAS PI TDP, and instead shall have the right to liquidate his or her NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of an NAS PI Claim in the tort system shall be deemed to be an adjudication of that NAS PI Claim and any associated NAS PI Channeled Claims of the NAS PI Claimant regarding the same injuries that are the subject of his or her NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such NAS PI Claim and such associated NAS PI Channeled Claims.

**§ 1.    SUITS IN THE TORT SYSTEM.**

If an NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her NAS PI Claim, then he or she may elect to liquidate such NAS PI Claim in the tort system rather than under the NAS PI TDP by checking the box so indicating on his or her NAS PI Claim Form, which NAS PI Claim Form must be filed by the date that is one hundred and fifty (150) days[2] after the applicable NAS PI Claim Form is disseminated to him/her.[3] If the NAS PI Claimant makes such election, then the NAS PI Claimant may file a lawsuit regarding only his or her NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the NAS PI Claim arose.

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the NAS PI TDP or, if not defined in the NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]   Within sixty (60) days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if the NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, each NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

[3]   The filing of an NAS PI Claim Form indicating that an NAS PI Claimant has elected to liquidate his or her NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the NAS PI Claims asserted by such NAS PI Claimant.

[4]   The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

Any such lawsuit shall be filed by the NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of an NAS PI Claim Form so indicating that an NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If an NAS PI Claimant obtains a judgment on his or her NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the applicable NAS Payment Percentage and NAS Maximum Value (each as defined below), as provided in Section 6 below, the deductions as set forth in Section 6 below, and the resolution of healthcare liens, as provided in Section 7 below.

---

[5]    The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6]    Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of an NAS PI Claimant's lawsuit is not an "NAS PI Claim" within the meaning of the Plan.

[7]    In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

## § 2.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any NAS PI Claim litigated against the PI Trust in the tort system.

## § 3.    NAS MAXIMUM VALUE.

Payment on a Final Judgment for an NAS Child shall not exceed $21,000 (the "NAS Maximum Value") which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for a given NAS PI Claim.

## § 4.    NAS PAYMENT PERCENTAGE.

A Final Judgment on an NAS PI Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that NAS PI Claims liquidated under the NAS PI TDP are reduced prior to payment. In other words, an NAS PI Claimant who elects to liquidate his or her NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all NAS PI Channeled Claims entitled to a recovery pursuant to the NAS PI TDP. Subject to Section 5.2(c) of the Plan, the estimated awards for NAS PI Claims liquidated under the NAS PI TDP represent an estimated pro-rata percentage recovery by NAS PI Claimants holding Allowed NAS PI Channeled Claims of approximately 2% (such pro-rata percentage recovery as may be altered over time, the "NAS Payment Percentage"). The initial NAS Payment Percentage is 2%**.

No Holder of an NAS PI Claim who elects to liquidate his or her NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her NAS PI Claim multiplied by the NAS Payment Percentage in effect at the time of payment (such value so reduced, the "NAS Percentage-Reduced Claim"); *provided, however*, that if there is a reduction in the NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the NAS PI Trust Fund to pay an NAS PI Claim based on the NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the NAS PI Claimant or the NAS PI Claimant's Counsel (as applicable).

## § 5.    ADJUSTMENT OF THE NAS PAYMENT PERCENTAGE.

The NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and

with the consent of the Oversight Committee, change the NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the NAS Payment Percentage on current estimates of the number of NAS PI Channeled Claims, the value of the assets of the PI Trust NAS Fund available for the payment of Allowed NAS PI Channeled Claims pursuant to the NAS PI TDP and amounts due and estimated to become due pursuant to the NAS PI TDP in respect of Final Judgments obtained by NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed NAS PI Channeled Claims and (ii) the NAS Maximum Value to NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the NAS Payment Percentage has not yet been adopted by the Oversight Committee, a NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current NAS Payment Percentage and the proposed NAS Payment Percentage. However, if the proposed NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed NAS Payment Percentage is the higher amount and subsequent adopted, the NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust NAS Fund, the Claims Administrator shall make supplemental payments to all NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the NAS PI Channeled Claim in question multiplied by the newly-adjusted NAS Payment Percentage, less all amounts paid previously to the NAS PI Claimant in respect of such NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to an NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such NAS PI Claimant, at such time that the total exceeds $100.00.

## § 6.    PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

An NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust NAS Fund, in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the NAS Percentage-Reduced Claim (using the NAS Payment Percentage then in effect) and (ii) the NAS Maximum Value (such lesser amount, the "NAS Gross Amount"). A NAS PI Claimant's NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan and the Trust Agreement, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[8]  The resulting net amount shall be paid to the NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the NAS Percentage-Reduced Claim, the NAS Maximum Value, the NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.    RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

 The special procedures set forth in Exhibit E to the NAS PI TDP shall apply to all NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the NAS PI TDP as Exhibit D.[9]

---

[8]    Your individual attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from the award.

[9]    Exhibit D contains two declaration forms. One applies if the NAS-Decedent named the NAS PI Claimant as executor in his/her will; the other applies if the NAS Decedent had no will.

# EXHIBIT C

## SAMPLE HIPAA FORMS FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST
## DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE**

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: █████████████     Date: ████████████

Date of Birth: ███████████████     SSN: ████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774     (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time.  I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization.  I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.  Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility  for benefits on my signing of this authorization.  I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524.  I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA.  If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

<div style="background:black"> </div>

Patient or Legal Representative                                              Date

<div style="background:black"> </div>

Relationship to Patient (If signed by Legal Representative)

<span style="color:red">**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE**</span>

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ▮▮▮▮▮▮▮▮▮▮▮▮    Date: ▮▮▮▮▮▮▮▮▮▮▮▮

Date of Birth: ▮▮▮▮▮▮▮▮▮▮▮▮    SSN: ▮▮▮▮▮▮▮▮▮▮▮▮

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  <u>If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties</u>):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. <u>If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges</u>).**

   Dates of Services: From: _____    To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**(p) 205-716-3000    (f) 205-716-2364**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                    Date

Relationship to Patient (If signed by Legal Representative)

## EXHIBIT D

## SAMPLE HEIRSHIP DECLARATIONS FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST
## DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-1 | SWORN DECLARATION:<br>SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | Date of Death | ___/___/___<br>(Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706].

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |
|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | **III.** **HEIRS AND BENEFICIARIES OF DECEDENT** |
|---|---|
| | **(ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED)** |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

3

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | |
|---|---|---|---|
| **4.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **5.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

## IV. PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e) No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g) I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids. The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct. I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

## V.   PI CLAIMANT SIGNATURE

| Signature | | Date | ____/____/____ (Month/Day/Year) |
|---|---|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| **SD-2** | **SWORN DECLARATION:** **DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT** |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I.    DECEDENT INFORMATION

| Name | First Name | | | M.I. | Last Name | |
|---|---|---|---|---|---|---|
| | | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | Date of Death | ___/___/___ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | | |
| | City | | | State | Zip Code | |

## II.    PI CLAIMANT INFORMATION

| Your Name | First Name | | | M.I. | Last Name | |
|---|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | | |
| Your Address | Street | | | | | |
| | City | | | State | Zip Code | |
| Your Relationship to Decedent | | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706].

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |
|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III.    HEIRS AND BENEFICIARIES OF DECEDENT | |
|---|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

## IV.    PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)  I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** | _____/_____/_____ <br> (Month/Day/Year) |

5

## EXHIBIT E

## DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to paragraph 2 below.  The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP.  The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by paragraph 5 below).  These actions include, where permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

Claimant, making a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to the PI Trust on behalf of a Minor Claimant shall include along with such submission documentation of his/her authority to act on behalf of the Minor Claimant, consisting of the following:

   a. If the purported Proxy is the Guardian of the Minor Claimant, then the court order appointing that Proxy as Guardian, or other documents reasonably acceptable to the Claims Administrator as sufficient under applicable law to evidence the guardianship.

   b. If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn statement that such Proxy is the custodial parent of the Minor Claimant.

   c. If the purported Proxy is neither the Guardian nor custodial parent of the Minor Claimant, then a sworn statement by the purported Proxy that he/she is providing custody and care to the Minor Claimant, stating for how long he/she has been providing such care and custody, explaining his/her relationship to the Minor Claimant and the circumstances around the provision of care and custody, as well as a statement and/or records from one or more of the following in support of his/her sworn statement:

      1. Minor Claimant's school

      2. Purported Proxy's landlord or property manager

      3. Minor Claimant's health provider

      4. Minor Claimant's child care provider

    5.   Purported Proxy's placement agency

    6.   Governmental social services agency

    7.   Indian tribe officials

    8.   Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

3. **Distributions to Minor Claimants.**    When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known).  Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined.  Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

4.  **Payments of attorneys' fees.**

Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery.  It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses.  Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5.  **Early Distributions.**  Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**PI Futures TDP**

**PURDUE PHARMA L.P.**
**TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND PURPOSE.

This trust distribution procedure for Future PI Channeled Claims (as defined below) (the "PI Futures TDP") sets forth the manner in which Future PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Futures Trust.[1] Distributions in respect of Future PI Channeled Claims shall be exclusively in the form of Distributions from the PI Futures Trust to Holders of Allowed Future PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Future PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Futures Trust as of the Effective Date of the Plan: any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the subject matter described in subclause (i) of Sections 10.6(b) and 10.7(b) of the Plan), the Estates or the Chapter 11 Cases, and that is not (i) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (ii) held by a Domestic Governmental Entity or (iii) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business. Pursuant to section 6.21 of the Plan, in the event a Holder of a Future PI Channeled Claim seeks payment at any time on account of such Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Future PI Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Future PI Channeled Claim that is or was channeled to the PI Futures Trust under the Master TDP and grants such Holder leave to assert such Future PI Channeled Claim against such the PI Futures Trust.

Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from the PI Futures Trust. Holders of Future PI Channeled Claims are referred to herein as "Future PI Claimants."

## § 2.    PI FUTURES TRUST AND TRUSTEE.

### a)    *Allocations of Funds to the PI Futures Trust.*

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706] in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Under the Plan, the PI Futures Trust will receive a distribution of $5 million (the "PI Futures Trust Distribution").

###### *b)  PI Futures Trust.*

The PI Futures Trust shall be established in accordance with section 5.7 of the Plan to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents. The trustee of the PI Futures Trust (the "Trustee") is Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, and he will carry out the duties of the Trustee as set forth in the Plan and PI Futures Trust Documents.

## § 3.    SUITS IN THE TORT SYSTEM.

Subject to satisfaction of section 6.21 of the Plan, Future PI Claimants have the right to commence a lawsuit in the tort system against the PI Futures Trust with respect to any Future PI Channeled Claim which, prior to channeling, was held against a Debtor or would have been held against a Debtor but for the Releases and Channeling Injunction pursuant to the Plan. Such lawsuit may be commenced against only the PI Futures Trust (and including no other parties as defendants[2]) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[3] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which such Future PI Channeled Claim arose.

Any such lawsuit must be filed by the applicable Future PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[4] All defenses (including, with respect to the PI Futures Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[5]

A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim formerly held or that would have been held against a non-Debtor party.

---

[2]    For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the existence of, during the existence of or following the dissolution of, the PI Futures Trust or at any other time.

[3]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Future PI Claimants against the PI Futures Trust must be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[4]    The Trustee shall be empowered (i) to bring one or more consolidated actions against multiple Future PI Claimants and (ii) to seek to consolidate multiple lawsuits commenced by individual Future PI Claimants.

[5]    Among other things, the PI Futures Trust shall be empowered to assert that the claim that is the subject of a Future PI Claimant's lawsuit is not a "Future PI Channeled Claim" within the meaning of the Plan.

However, any Distribution to a Future PI Claimant on a Final Judgment (as defined below) in respect of his or her Future PI Channeled Claim formerly held or that would have been held (but for the Releases and Channeling Injunction pursuant to the Plan) against a Debtor is deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the injuries that are the subject of his or her Future PI Channeled Claim against a Debtor.

Subject to the commencement of a lawsuit in the tort system against the PI Futures Trust by a Future PI Claimant that is not barred by section 6.21 of the Plan, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit(s) as discovery material. Any Future PI Claimant that has commenced such a lawsuit will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Future PI Claimant who propounds on the PI Futures Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such Future PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Future PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Futures Trust shall not be liable for any costs incurred by parties other than the PI Futures Trust in connection with third-party discovery propounded by any party other than the PI Futures Trust.[6]

If Future PI Claimant obtains a judgment against the PI Futures Trust on his or her Future PI Channeled Claim in the tort system and such judgment becomes a Final Order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Futures Trust, subject to the applicable limitations of Sections 4 through 10, inclusive, of this PI Futures TDP. No other Future PI Channeled Claims shall be Allowed.

## § 4.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Future PI Channeled Claim litigated against the PI Futures Trust in the tort system.

---

[6]    In order to minimize costs incurred by the PI Futures Trust in connection with third-party discovery, the Trustee shall be empowered to seek to consolidate discovery propounded by Future PI Claimants or the PI Futures Trust in multiple lawsuits.

## § 5.    NAS FUTURE PI CHANNELED CLAIMS AND NON-NAS FUTURE PI CHANNELED CLAIMS

If a Future PI Claimant obtains a Final Judgment on his or her Future PI Channeled Claim, the Trustee shall determine, in his or her sole discretion and in accordance with the definitions set forth herein, whether such Future PI Channeled Claim is a "NAS Future PI Channeled Claim" or a "Non-NAS Future PI Channeled Claim," defined as follows:

- A "NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child.

- A "Non-NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is not an NAS Future PI Channeled Claim.

## § 6.    NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 6 only applies to NAS Future PI Channeled Claims.

### a)  *NAS Maximum Value.*

Payment on a Final Judgment issued in respect of an NAS Future PI Channeled Claim shall not exceed $21,000 (the "NAS Maximum Value"), which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for an NAS PI Claim that is Allowed under the NAS PI TDP.

### b)  *NAS Payment Percentage.*

A Final Judgment issued in respect of an NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the NAS Payment Percentage, as defined in Exhibit B to the NAS PI TDP. As discussed in Exhibit B to the NAS PI TDP, the initial NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of an NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her NAS Future PI Channeled Claim multiplied by the NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced NAS Future PI Channeled Claim").

### c)  *NAS Future Award*

A Future PI Claimant who obtains a Final Judgment on an NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the NAS Maximum Value, and (ii) the Percentage-Reduced NAS Future PI Channeled Claim (the "NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

4

An NAS Future Award is payable by the PI Futures Trust in a single lump sum, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced NAS Future PI Channeled Claim, the NAS Maximum Value, or the NAS Future Award is subject to any appeal or reconsideration.

## § 7.    NON-NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 7 applies only to Non-NAS Future PI Channeled Claims.

### a)  Non-NAS Maximum Value.

Payment on a Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim shall not exceed the dollar-equivalent of 120,000 points (the "Non-NAS Maximum Value"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the dollar-award-per-point then in effect as set forth in Section 8 of the Non-NAS PI TDP.

### b)  Non-NAS Payment Percentage.

A Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the Non-NAS Payment Percentage, as defined in Exhibit B to the Non-NAS PI TDP. As discussed in Exhibit B to the Non-NAS PI TDP, the initial Non-NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of a Non-NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her Non-NAS Future PI Channeled Claim multiplied by the Non-NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced Non-NAS Future PI Channeled Claim").

### c)  Non-NAS Future Award.

A Future PI Claimant who obtains a Final Judgment on a Non-NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the Non-NAS Maximum Value then in effect and (ii) the Percentage-Reduced Non-NAS Future PI Channeled Claim (the "Non-NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

A Non-NAS Future Award is payable by the PI Futures Trust in a single lump sum payment, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such Non-NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's

reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced Non-NAS Future PI Channeled Claim, the Non-NAS Maximum Value, or the Non-NAS Future Award is subject to any appeal or reconsideration.

## § 8.    PI FUTURES TRUST OPERATING EXPENSES

The Creditor Trust Operating Expenses of the PI Futures Trust shall be paid solely from the PI Futures Trust. Creditor Trust Operating Expenses of the PI Futures Trust, including any amounts due to the Trustee in respect of indemnification and reimbursement as described in Section 5.7(m) of the Plan, shall be paid on an ongoing basis with first priority before any payments hereunder are made on Allowed Future PI Channeled Claims. The Trustee shall also be entitled to reserve a reasonable amount of funds needed to wind down the PI Futures Trust, indemnify the Trustee for claims that may be brought against the Trustee in the future, and any other reserves for future costs or expenses that the Trustee reasonably believes are necessary before making payments hereunder on any Allowed Future PI Channeled Claim.

If insufficient funds remain in the PI Futures Trust to pay one or more outstanding Non-NAS Future Awards and/or NAS Future Awards that are otherwise ripe for payment hereunder, the Trustee shall, after reserving funds as necessary pursuant to the preceding paragraph, use any remaining funds to pay all such outstanding awards a pro-rata portion of their face value, in full and final satisfaction of such Final Judgments.

## § 9.    RESOLUTION OF HEALTH CARE LIENS.

The PI Futures Trust shall not issue any payment on a Non-NAS Future Award or NAS Future Award until the Trustee has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 10.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

If a Future PI Claimant is a minor under applicable law at the time amounts are payable by the PI Futures Trust to such Future PI Claimant under this PI Futures TDP, any such amounts shall be paid at such time, to such recipient, and in such manner as ordered by the court that issued the Final Judgment, by a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or by the United States Bankruptcy Court for the Southern District of New York.  Anyone seeking a Distribution from the PI Futures Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached hereto as Exhibit A.[7]

---

[7]    Exhibit A contains two declaration forms. One applies if the Decedent named the Future PI Claimant as executor in his or her will; the other applies if the Decedent had no will.

## EXHIBIT A

## SAMPLE HEIRSHIP DECLARATIONS FOR THE PURDUE PHARMA L.P. TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| SD-1 | SWORN DECLARATION: SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "<u>Future PI Claimant</u>") regarding the opioid-related death of another person (the "<u>Decedent</u>"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last Will and Testament of the Decedent.

## I.    DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \| \_ \| \_ \| \_ \| - \| \_ \| \_ \| - \| \_ \| \_ \| \_ \| \_ \| | | Date of Death | ___/___/___ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II.    FUTURE PI CLAIMANT INFORMATION

| Your Name | First Name | M.I. | Last Name | |
|---|---|---|---|---|
| Your Social Security Number | \| \_ \| \_ \| \_ \| - \| \_ \| \_ \| - \| \_ \| \_ \| \_ \| \_ \| | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | |
| Your Address | Street | | | |
| | City | | State | Zip Code |
| Your Relationship to Decedent | | | | |
| Basis of Your Authority to Act for the Decedent | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "<u>Plan</u>") [ECF No. 3706].

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | | III.    HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|---|
| | | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified.

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| IV.  FUTURE PI CLAIMANT CERTIFICATION |
| --- |

This Sworn Declaration is an official document for submission to the PI Futures Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a)  I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b)  I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c)  No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d)  The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e)  No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f)  I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(g)  I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h)  No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust in respect of the injuries of the Decedent.

(i)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j)  I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    FUTURE PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | | **Date** ___/___/___ (Month/Day/Year) |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "Future PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| | | Date of Death | ___/___/___ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II. FUTURE PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3706].

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| III. HEIRS AND BENEFICIARIES OF DECEDENT | |
|---|---|
| (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | |
| Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified. | |
| **Name** | **Information** |

**1.**

| | |
|---|---|
| **Address** | |
| **Relationship to Decedent** | |
| **Notified of distribution?** | ☐ Yes. How Notified: _____  ☐ No. Why Not: _____ |

**2.**

| | |
|---|---|
| **Address** | |
| **Relationship to Decedent** | |
| **Notified of distribution?** | ☐ Yes. How Notified: _____  ☐ No. Why Not: _____ |

**3.**

| | |
|---|---|
| **Address** | |
| **Relationship to Decedent** | |
| **Notified of distribution?** | ☐ Yes. How Notified: _____  ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

## IV.    FUTURE PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Futures Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(f)  I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust on account of the  injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI Futures Trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| **V.    FUTURE PI CLAIMANT SIGNATURE** | | |
|---|---|---|
| **Signature** | _____ | **Date** | _____/_____/_____ <br> (Month/Day/Year) |

**Master TDP**

## MASTER DISBURSEMENT TRUST
## MASTER TRUST DISTRIBUTION PROCEDURES

SECTION 1.    APPLICABILITY.

Pursuant to the *Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "Master TDP"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2.    PROCEDURES GENERALLY.

This Master TDP provides procedures pursuant to which (a) each Channeled Claim shall automatically be further channeled to and assumed exclusively by a Creditor Trust in accordance with Sections 3 through 9 of this Master TDP or shall otherwise be Disallowed and released in full pursuant to Section 12 of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to the National Opioid Abatement Trust ("NOAT") and the Tribal Abatement Fund Trust ("TAFT"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered and resolved pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to any Protected Party, including from the Master Disbursement Trust.

SECTION 3.    NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1    Non-Federal Domestic Governmental Channeled Claims Defined.

A Non-Federal Domestic Governmental Channeled Claim is (a) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

3.2  Channeling of Non-Federal Domestic Governmental Channeled Claims to NOAT.

On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered and resolved solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3  Effective Date Distributions to NOAT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution) to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4.  TRIBE CHANNELED CLAIMS.

4.1  Tribe Channeled Claims Defined.

A Tribe Channeled Claim is (a) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim ("Tribe Claim"), or (b) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2  Channeling of Tribe Channeled Claims to TAFT.

On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered and resolved solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

4.3  Effective Date Distributions to TAFT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC

("Tribe Opioid LLC") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

## SECTION 5.   HOSPITAL CHANNELED CLAIMS.

5.1   Hospital Channeled Claims Defined.

A Hospital Channeled Claim is (a) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (b) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2   Channeling of Hospital Channeled Claims to the Hospital Trust.

On the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered and resolved solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3   Effective Date Distributions to the Hospital Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

## SECTION 6.   THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1   Third-Party Payor Channeled Claims Defined.

A Third-Party Payor Channeled Claim is (a) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims include Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors, but do not include (i) Federal Government Unsecured Claims, or (ii) claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2    Channeling of Third-Party Payor Channeled Claims to the TPP Trust.

On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered and resolved solely pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3    Effective Date Distribution to the TPP Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7.    NAS MONITORING CHANNELED CLAIMS.

7.1    NAS Monitoring Channeled Claims Defined.

An NAS Monitoring Channeled Claim is (a) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (b) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2    Channeling of NAS Monitoring Claims to the NAS Monitoring Trust.

On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered and resolved solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3    Effective Date Distribution to the NAS Monitoring Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8.    PI CHANNELED CLAIMS.

8.1    NAS PI Channeled Claims Defined.

An NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related Cause of Action

4

against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2    <u>Channeling of NAS PI Channeled Claims to the PI Trust</u>.

On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

8.3    <u>Non-NAS PI Channeled Claims Defined</u>.

A Non-NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4    <u>Channeling of Non-NAS PI Channeled Claims to the PI Trust</u>.

On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5    <u>Effective Date Distribution to the PI Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9.   FUTURE PI CHANNELED CLAIMS.

9.1    Future PI Channeled Claims Defined.

A Future PI Channeled Claim is any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date) (including but not limited to the subject matter described in subclauses (i) through (vi) of Sections 10.6(b) and 10.7(b) of the Plan), and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2    Channeling of Future PI Channeled Claims to the PI Futures Trust.

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3    Effective Date Distribution to the PI Futures Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

6

SECTION 11. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION 12. DETERMINATION BY THE BANKRUPTCY COURT.

In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.