KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
Matthew J. Gold
Robert Tuchman
500 Fifth Avenue
New York, New York 10110
Tel:  (212) 986-6000

*Counsel to the State of Washington*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| **In re:** | : | Chapter 11 |
| | : | |
| **PURDUE PHARMA L.P.,** *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | (Jointly Administered) |
| **Debtors.** | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:  Identify the appellant(s):**

  1.  The State of Washington, a Creditor.

**Part 2:  Identify the subject of this appeal**

  2.  This appeal is from the Decision of Judge Drain (the "<u>Decision</u>") confirming the Debtors' Eleventh Amended Joint Chapter 11 Plan of Reorganization (the "<u>Plan</u>").

  3.  The Decision was rendered on September 1, 2021.  A rough copy of the transcript of the Decision is attached herewith.

**Part 3:  Identify the other parties to the appeal**

  4.  The names of all other parties to the Decision, and the names, addresses and telephone numbers of their respective attorneys, are as follows:

| <u>Party</u> | <u>Attorney</u> |
|---|---|
| 1.  Purdue Pharma L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017 |

|     |     | Tel:  (212) 450-4000 |
| --- | --- | --- |
| 2. | Purdue Pharma Inc. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 3. | Purdue Transdermal Technologies L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 4. | Purdue Pharma Manufacturing L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 5. | Purdue Pharmaceuticals L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 6. | Imbrium Therapeutics L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 7. | Adlon Therapeutics L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 8. | Greenfield BioVentures L.P. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 9. | Seven Seas Hill Corp. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 10. | Ophir Green Corp. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 11. | Purdue Pharma of Puerto Rico | Davis Polk & Wardwell LLP<br>450 Lexington Avenue |

|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 12. | Avrio Health L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 13. | Purdue Pharmaceutical Products L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 14. | Purdue Neuroscience Company | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 15. | Nyatt Cove Lifescience Inc. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 16. | Button Land L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 17. | Rhodes Associates L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 18. | Paul Land Inc. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 19. | Quidnick Land L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |
| 20. | Rhodes Pharmaceuticals L.P. | Davis Polk & Wardwell LLP |
|  |  | 450 Lexington Avenue |
|  |  | New York, NY  10017 |
|  |  | Tel:  (212) 450-4000 |

| | | |
|---|---|---|
| 21. | Rhodes Technologies | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 22. | UDF LP | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 23. | SVC Pharma LP | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |
| 24. | SVC Pharma Inc. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY  10017<br>Tel:  (212) 450-4000 |

**Part 4:  Optional election to have appeal heard by District Court**

5.     Appellant elects to have the appeal heard by the United States District Court rather than the Bankruptcy Appellate Panel.

**Part 5:  Sign below**

Dated: September 1, 2021
          New York, New York

Respectfully submitted,

KLEINBERG, KAPLAN, WOLFF &
COHEN, P.C.

By:  */s/ Matthew J. Gold*
Matthew J. Gold
Robert M. Tuchman

500 Fifth Avenue
New York, New York 10110
Tel:  (212) 986-6000
Fax: (212) 986-8866
E-mail:    mgold@kkwc.com
               rtuchman@kkwc.com


*Attorneys for the State of Washington*

ROBERT W. FERGUSON
Attorney General of the State of Washington

By:  */s/ Tad Robinson O'Neill*
Tad Robinson O'Neill

Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
Tel:  (206) 254-0570
E-mail:    tad.oneill@atg.wa.gov


*Attorneys for the State of Washington*

## CERTIFICATE OF SERVICE

I, Juliet Remi, hereby certify that, on September 1, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

/s/ Juliet Remi
Juliet Remi

THE COURT:  Okay good morning, this
is Judge Drain, we're here in in re:
Purdue Pharma LP et al.  This mornings
hearing was scheduled for me to give me
bench ruling on the debtors request for
confirmation of their amended chapter 11
plan.  I received a black lined version
of certain important but still
relatively minor changes to the debtors
10th amended joint chapter 11 plan
yesterday.  Which is now in light of
those changes the 11th amended joint
chapter 11 plan.  I also received a
revised proposed confirmation order
including proposed findings of fact and
conclusions of law.  Which is over a
hundred pages long, I have not gone
through it in detail, my ruling will be
in detail and I'm comfortable with the
proposed findings and conclusions,ly
keep them and I may add to them and my
ruling will be part of the record as far
as the proposed findings and conclusions
are concerned.
    But I understand that the debtors
wanted to address the court briefly
regarding the changes to the plan and
the resolution of at least one objection
and I'm happy to hear that.
    MR. HUEBNER:  Thank you very much,
your Honor, can you see and hear me
clearly?
    THE COURT:  Yes.
    MR. HUEBNER:  Okay.  Your Honor, for
the record, Marshall Huebner on behalf
of the debtors and debtors concession.
A couple of quick updates, which I think
are hopefully positive.  Number one, you
know, since the court's direction at
several of the hearings including both
Wednesday and Friday, various documents
have been amended in a way that we hope
now comports with the court's vision.
The primary changes to the plan that we
are not going to walkthrough unless the
court has questions are to finalize what
I would call the material or maybe even
radical narrowing of the Sackler
releases, which is really three
different axis.  Number one, which
parties are covered and get the benefit
of the releases and those changes I
believe are now in.  Number two, what is
the cope of the releases and of course

the court gave quite clear direction
limited very substantially /TAOZ scope
compared to the original set of
agreements reached and filed by the
parties and number three, I guess who is
bound by the releases, this is the sort
of any other person to holders of claims
and causes of action to just holders of
claims.  And I believe that hopefully we
got it right after several tries and the
court's continuing clear interim rulings
or direction tos narrow the releases.
The second item, your Honor, just for
the benefit of everyone's knowledge is
the operating injunction for NewCo.
That is one of the many documents along
with many other structures in the plan,
including a brand new board of directors
and other things selected by
governmental entities to ensure that
NewCo does only the things and everybody
would want it to be doing and doesn't do
any of the things that people would not
want it to be doing and that's obviously
I think part of the sacred mission of
many of the parties who worked on this
case.  That operating injunction was
negotiated by the Department of Justice,
by the ad hoc committee which of course
includes a huge number of AGs, by the
NCSG which includes all the rest of the
AGs getting us up to 48 and the MSG as
well.  That is now in fully agreed form
and is final and was filed as Exhibit C
like Carly to the confirmation order,
see ins /THAEUFPLT document quite
frankly that making sure on a go forward
basis everybody can hopefully take
comfort from the incredible involvement
of governmental entities and of course
the UCC as well, who I of course need to
mention as the official appointee of the
Department of Justice to oversee and
assist all unsecured creditors in the
case.
     Next, your Honor, also filed, I
believe yesterday is the final Sackler
settlement agreement, which has been a
very long time coming, just so that the
record is clear, that document was
negotiated by the official committee of
unsecured creditors appointed by the
Department of Justice, by the AHC, by
the MDL PEC members who are part of the

ad hoc committee which includes
obviously several dozen attorneys
general and lastly by the special
committee of the board which of course
as everybody knows after an examination
was like wise found to be fulfilling its
fiduciary responsibilities with complete
and total independence.  So that
document is now done as well, it
contains very important things, this is
a thing deal the Sacklers are paying
over time and frankly something that
sounds lawyerly and technical, which are
the collateral and credit support annual
/STPHAOEUFPLT frankly involves some of
the most brutal negotiations that
actually took months because all of the
fiduciaries on our side of the V who
represent the plaintiffs in the case
and, you know, frankly the states and
the cities and the victims and the like,
need tone sure that the Sacklers are
going to pay and obviously credit and
collateral and covenants and promises
and oversight rights and the like are
critical to that and those have I
believe been negotiated to a place we
can live with.  As the court has heard
me say many times, this is not a perfect
deal, we would have liked more and
earlier, but this is the deal that
everybody was ultimately willing to
agree to under very, very complex
circumstances.

     Finally, your Honor, it goes without
saying, I believe we incorporated
everything the court said, one of the
things that the court will see is
paragraph 7A of the proposed
confirmation order now further clarifies
that no material or substantive changes
can be made to the settlement agreement
essentially and it's not, this is the
deal, the deal is done, there will not
be any further material certainly
concessions to the defendants in this
case.  Subsequent to the order being
entered and the documents having gone
final.  Number four, your Honor, there
was a filing we had a little bit
candidly by the U.S. trustee yesterday,
they called us yesterday and raised a
question about language in our proposed
confirmation order that we believed

could be read ambiguously as somehow
being, I think the theory was a ruling
by this court that this and other courts
can't grant future stays, we didn't
remotely read it that way, and certainly
was nobody's intend /STPHAOEUFPLT dozen
of confirmation orders, we said
absolutely, let's clarify it, we thought
they were sending language, they didn't,
and instead they just filed a pleading
on the docket expressing their concern
of the ambiguity, I guess that's fine.
And we jumped right on it and instantly
drafted language that we think makes it
clear beyond per venture there's no
possible argument since of course this
court never would, never could and no
one would ever ask it to to issue
something about future stays.  The point
is we took out the rule 3020E waiver of
the 14-day stay, so this case does have
the 14-day stay under rule 3020E and all
the language says is that other than
that stay, no other stays are currently
in place.  Obviously if somebody moves
first day and they get a stay, we'll
deal with that at the time, we'll be
read to ask /STPHAOEUFPLT certainly have
strong views.  That has been addressed,
they did make a point about 1127, I just
want to be clear, I think all many
fiduciaries in this case are /STRAED
/TPHAERL comfortable beyond a shadow of
a doubt frankly that the changes to the
plan have just made it better and better
for the estate.  As for example to give
the primary example, we are continued to
narrow the scope of the releases in
draft after draft while getting the same
amount of consideration from the
defendants.  So there's no limitation on
the number of times you can amend a
plan, the law is very clear, which is
you can't adversely effect creditors and
stake holders at a juncture like
/TH-RBGS the U.S. trustee is not
suggesting we have, it almost seems more
like a musing to me, but I do want to be
very clear, we believe all of the
changes in this plan that have happened
really since it was originally filed in
March and certainly collectively, but
even individually have done nothing but
improve it further and further and

further for the stake holders for whom
many of us serve as fiduciaries.

Obviously they also indicate that
they stand on their objection as to both
legal fees and the legality of
third-party releases, we certainly
understand that, nobody else refiled
their objection to make sure it's still
standing, we understand, we don't
pre/STPHAOEUFPLT all objections are
resolved, certainly things have been
narrowed and many items have been
resolved.  Finally, your Honor, the last
I think good news announcement and I'll
alternative to /PHRAOFPLT /#123450EU6789
I believe there is now agreed language
to effectuate the court's, in essence
ruling on Friday about what the court
was and was not willing to do with
respect to the DMPs based both on the
pleadings and the factual record of the
case and so while that's not a
settlement, it is simply language that
we believe effectuates the court's
ruling, I'm hoping that issue is now
behind us as well.  Your Honor, with all
of those updates, I think it's fair to
say I should stop talking except to note
 I think we're down to at the ended
 a very small number of the core
 objections about which we heard
 both extensive trial testimony and
 argument and so I have no further
 updates can I announce because it's
 not where we are, the final, you
 know, 10 or so objections have been
 /STPHAOEUFPLT we continue to work
 with all parties and hope we can
 come to resolutions, but it's not
 just not where we are this morning,
 so unless the court has questions
 for me, I think that sort of
 updates the court and all parties
 on what's been filed, why it was
 filed, which things are now in the
 done pile, obviously but for your
 Honor's comments, it goes without
 saying, and I would propose to turn
 my Mike off and is ask
Mr. Congratulate to summarize the
DMP issue that your Honor gave
guidance on and I believe we have
nothing to say further from the
debtors.

THE COURT:  Okay, thank you.

MR. GLEIT:  /STPHAOEUFPLT for the debtors.

THE COURT:  Good morning.

MR. GLEIT:  Good morning. Your Honor, we heard you loud and clear last Friday and over the weekend and beginning of this week, we worked with the DMPs and the AHC to work on language which I'm just going to briefly now put in the record with a brief statement which says, the debtors and the DMPs have agreed that the language insert indeed 10.10B of the 11th plan reflects the courts statements made in connection with the DMPs concerned objection.  The parties agreed that the debtors would state on the record, which I'm doing now, section 8.8B of the plan settling co-defendants and lastly a provision was added to the confirmation order which is going to make clear that any MDT insurance settlements going forward are going to be upon notice and according to bankruptcy rule 99E. So unless your Honor has any questions, I think the issue's now resolved, hopefully.

THE COURT:  Okay.  All right, and Ms. Steege; is that correct, is that language in the plan and the statement that Mr. Gleit just made resolve the remaining objection by the MDP parties or sometimes referred to as the co-defendants.

MS. STEEGE:  Yes, your Honor, it does, thank you.

THE COURT:  Okay.  And I just want to be clear, as I understand it, it leaves open the issues that I said should be left open which includes potentially as a defense whether the rights to coverage under a policy were released under the agreement between the parties. But if in fact those rights are direct and established then as I read the plan it gives the, that party that has that those rights access, they're not enjoined by the insurance injunction.

MS. STEEGE:  That's our understanding your Honor, thank you.

THE COURT:  Okay, very well, I appreciate the parties work on that.

All right, I think that concludes the first part of this hearing, which really just went to clarify as noted the recent changes to the plan.  And updated me on the status of the settlement agreement with the Sackler parties.  So I'll give you my bench ruling now on the debtors request for confirmation of the amended joint chapter 11 plan.

It is clear that the wrongful use, including marketing of opioid products has contributed to a massive public health crisis in this country and elsewhere.  The role of these debtors and their owners, and this is a closely held set of debtors, to that crisis makes the bankruptcy cases before me highly unusual and complex.

This is so primarily because of the nature of the creditor body. Given the extraordinarily harmful effects of the debtors' primary product, Oxycontin, and other opioids on ordinary people, as well as on the local governments, Indian tribes, hospitals and other first responders, states and territories in the United States, who must address these effects on a daily basis.

In a very real sense, every person in the range of the debtors sale of opioid products is a potential creditor.  Bankruptcy cases that present a unique and perhaps the only means to resolve the collective problem presented by an insolvent debtor in a large body of creditors competing for its insufficient assets.  Including, especially when dealing with mass claims premised on a harmful product that as is the case here causes massive harms or mass harms. Bankruptcy cases focus the solution away from individual litigation to

a fair collective result subject to
the unique ability under the
bankruptcy laws to under generally
rare defined circumstances bind
holdouts who could not otherwise be
bound under applicable law.

Over the years, courts and
the parties to bankruptcy cases
have refined and improved on these
solutions.  They clearly have been
brought to bear here in these
cases, involving in all likelihood
the largest creditor body ever and
I'm not speaking solely of the
roughly 614 thousand claims that
were filed, although I believe that
is a record.  But also as I noted
before, the people who could
arguably be said to be represented
by their local governments and
their state governments as well as
by the United States.

Here to the parties have
worked in unique and trail blazing
ways to address the public health
controversy that underlice those
claims /STPHAOEUFPLT because the
debtors assets include enormous
claims against their controlling
shareholders and in some instances
directors and officers who are
members of the Sackler family.

Whose aggregate net worth no
greater than the debtors also may
well be insufficient to satisfy
such claims and other very closely
related claims against them that
are asserted by third parties who
also are creditors of the debtors,
that is have claims against the
debtors.

The questions then are how
can such claims be resolved to best
effect for the claimants and is
such resolution authorized under
the Bankruptcy Code and law.

The primary questions for me
in this case focusing on the
chapter 11 plan that is before the
court for confirmation is can these
issues be resolved by the court by
approval of the plan and should
they?  It is clear to me after a
lengthy trial that there is now no

other reasonably conceivable means
to achieve this result.  I believe
it is also clear under well
established precedent that with a
sufficient factual record, Congress
and the Bankruptcy Code and the
courts interpreting it provide the
authority for such a resolution.
That leaves the question, should
this resolution be implemented.
This ruling explains that my
findings and conclusions with
respect to all of those issues
informed by the record of these
cases, the parties votes on the
plan, the parties' briefing and the
record of a 6-day trial involving
41 witnesses and a courtroom full
of exhibits and two full days of
oral argument.

          I will note before I proceed
that I am giving this ruling as an
oral bench ruling as opposed to
writing a written opinion because I
believe it is of critical
importance that the parties to
these cases learn the result of my
analysis as promptly as
practicable.

          As I often do with lengthy
bench rulings, I will go over the
transcript of my ruling and if I
feel that I have said something
inartfully or left something out
that I should have said and of
course in addition to correcting
any typos or missed citations or
citations in improper form, I will
modify my bench ruling and file it
as a modified bench ruling, not
obviously as a transcript.

          But again as with any case of
this size, and particularly given
this case, where the parties I
think universally have made it
clear and I fully understand them,
that it is important to devote the
debtors resources as soon as
possible to paying victims claims
and otherwise abating the opioid
crisis.  That there should not be
any further delay in my delivering
this ruling.

          The notice of the debtors

request for confirmation of the
plan was set forth by jeans fin
began in her declaration and
testimony primarily her third
declaration, but also referred to
prior declarations she had provided
with respect to the noticing of
claimants and potential claimants
in these cases.  It is clear from
her testimony that the notice of A,
these cases, B, right to assert a
claim against /THAOETSors, C, the
request for confirmation of the
plan, and D, the proposed broad
release of third parties claims
against the released parties in the
plan, which is primarily of the
Sacklers and their related
entities, was unprecedentedly
broad.  With only one caveat,
Ms. Finnegan's testimony was
undisputed that the debtors
noticing program as implemented
under Ms. Finnegan's supervision
reached roughly 98 percent of the
population in the United States.
And only marginally smaller number
or percentage of the population in
Canada and also was extensive
throughout the world where the
debtors own products might have
caused harm.  The program was
carefully tailored to each known
creditors but also to reach the
population at large, including
through various types of media
aimed at people who may have been
harmed by the debtors products.
        Ms. Finnegan's calculations
reflect literally billions of hits
on the social media and internet
notices, as well as of course
reliable studies of the reach of
the other means of notice.
        The caveat that I would have
is that the notice to those in
prison was in part effective, I
believe, in providing notices to
prisons and to groups working with
or known to work with people who
are in prison and suffering from
opioid use I disorder or other
adverse effects of opoids.  But
Social Security certainly within my

contemplation that given prison
regulations and lack of access to
TV, radio and other media.
Prisoners may not have gotten the
same high level and I'm talking
again about approximately 98
percent of the entire U.S.
population, of notice of the case
the party, the confirmation request
and releases in the plan.  On the
other hand, the debtors and the
plan including the personal injury
trust procedures have made it clear
that they are flexible with regard
to late claims against the personal
injury trust and the assertion of
evidence to the trust by prisoners
in light of prisoners unique
circumstances.

United States trustee also
suggested that referencing to the
plan in the notice would have sent
a party to a lengthy and complex
set of release provisions.  This is
true and it clearly does take a
lawyer to parse through those
provisions and even then as
reflected by the record of the
parties responses to my comments,
those provisions were subject to
some potential for differing
interpretation, although I believe
that is not the case now that they
have been narrowed.

However, the notice that was
most widespread was a very simple
one that made it quite clear that
the plan contemplated a broad civil
release of the debtors
shareholders, the Sacklers, and
their related entities.

In addition, the extensive
media coverage of this case also
made that point crystal clear.  And
it is that aspect of the release,
rather than parsing through it,
that is the basis for the
objections that have been filed and
therefore that could have been
filed, i.e., that it is too broad
and not authorized under applicable
law.  Which I believe was
pervasively spread throughout the
country and in Canada.

So I conclude that the debtors notice of the confirmation hearing and the proposed releases in the plan was sufficient and again unprecedentedly broad.

Next I should note the vote on the plan by the classes entitled to vote. It is important to address this issue up front because if a plan is not accepted by an impaired class in its vote, the plan proponent must proceed under the so called cram down provision of the Bankruptcy Code section 1129B. On the other hand, if all of the impaired classes have voted in favor of confirmation of the plan, the court analyzes only section 1129A's requirements for confirmation. And the imported provisions of the Bankruptcy Code relate today it such as section 1122 and 1123 of the code.

Based on the ballot declaration and testimony of Christine paw low, this plan received, I believe, also an unprecedented number of votes cast. And of the votes cast, the plan that was in fact accepted by every voting class thus obviating the need to proceed with the cram down provisions of the Bankruptcy Code.

In addition, and significantly, each voting class voted overwhelmingly in favor of confirmation of the plan. On average, the vote was over 95 percent in favor of confirmation of the plan.

That too is a remarkable result given the very large number of people who got notice who are entitled to vote, and who actually voted. And the unprecedented large number applies to each of those categories.

On the personal injury claim side, the vote was roughly 97 percent. In all cases it was above 95 percent, except with regard to the hospital class which was just under 90 percent.

Which however -- no member of

which however has objected or has
entered an objection to the plan.

I will address separately two
objections that alleged that the
vote should be looked at
differently, first that the plan
improperly classified certain
claims with other claims and that
if they had been classified
differently in a separate class,
the vote would not have been as
overwhelming, although it's
acknowledged by those objectors
that it would still have been over
75 percent as far as the
supermajority voting in the class,
which is that figure that Congress
provided for in section 524G of the
Bankruptcy Code when setting a
higher bar for the release or
channelling of third-party claims
in cases where the claims are
asbestos liability related.

Again I will address those
classification points separately.
In addition, and frankly baffling
to me, the United States trustee
has argued that I shouldn't just
look at the votes cast, but at the
votes that were not cast in
determining whether the plan was
overwhelmingly accepted.  That of
course is not how elections are
conducted.  There is no conceivable
way to determine the preferences of
those who didn't vote other than
that they didn't object and they
took no position in a no vote.

But where a vote is as
extensive as this with hundred --
well over a hundred thousand people
voting, under any measure, this
plan has been overwhelmingly
accepted.

And of course it is the vote
that counts under section 1126 of
the Bankruptcy Code and in every
election.  Not a statement by a
bureaucrat or his or her sense of
where the wind is blowing, that's
why we have elections.

A plant proponent has the
burden of proof on all elements of
section 1129A that must be

satisfied for a plan to be
confirmed that burden of proof of
satisfied by a showing that the
applicable provision has been met
by a preponderance of the evidence
in redie tech holding code
/STPHAOEUFPLT bankruptcy SDNY2019
and the cases cited therein.

Many of the provisions of
section 1129A that are applicable
to this plan are uncontested.  And
based on my review of the relevant
witness declarations, including the
declaration of John L-O-W-N-E,
first name J-O-N, John do bell and
Jesse Delconte, I conclude that the
uncontested -- that with respect to
the uncontested provisions of
section 1129A, the debtors have
carried their burden of proof.

The provisions of section
1129A that have been contested by
the remaining objections are
section 1129A1 which states that
the plan must comply with the
applicable provisions of this
title, i.e., the Bankruptcy Code.
Which incorporate -- which
incorporates for purposes of the
objections that were filed sections
1122 and 1123A4 of the Bankruptcy
Code.

In addition, certain object
/*PBTs have intended that the
debtors have not satisfied their
burden to show under section 1129A3
that the plan has been proposed in
good faith and not by any means
forbidden by law.

The United States trustee has
objected that the payment of
certain fees, that is legal fees
and expenses under paragraph 5.8 of
the plan violates section 1129A4 of
the code, which states that it is a
requirement for confirmation that
any payment made be /STPHAOEUFPLT
by a debtor or person issuing
securities or acquiring property
under the plan for services or cost
of expenses in or in connection
with the case or in connection with
the plan and incident to the case
has been approved by or is subject

to the approval of the court as
reasonable.

Certain objectors have also
contended that the plan has not
satisfied the so called best
interests test of section 1129A7 of
the Bankruptcy Code, which requires
a showing that with respect to each
impaired class of claims or
interest, each holder of a claim or
interest of such class has accepted
the plan or that is for those who
have not accepted the plan will
receive or retain under the plan on
account of such claim or interest
property of a value as of the
effective date of the plan that is
not less than the amount that such
holder would so receive or retain
if the debtor were liquidated under
chapter 7 of this title on such
date.

The objectors though have
raised this provision contend that
because their third-party claims
against the released parties, the
shareholder released parties are
being channelled to the plan trust
or otherwise precluded because of
the distribution that they would be
receiving under the plan or as they
would not be in a chapter 7
liquidation, the plan fails the so
called best interest test comparing
that liquidation recovery to the
recovery under the plan.

Finally, there has been a
suggestion, although of the
faintest kind that the plan does
not satisfy section 1129A11 of the
plan, the so called feasibility
test, which states that
confirmation of the plan is not
likely to be followed by the
liquidation or the need for further
financial reorganization of the
debtor or any successor to the
debtor under the plan unless such
liquidation or reorganization is
proposed in the plan.

I will address each of those
individual objections shortly.

Although I can find at this
point that the plan does satisfy

the so called feasibility test
under section 1129A11 as set forth
in the uncontested fact declaration
of Mr. Delconte showing projections
and the assignability of the
debtors insurance.  The only, and I
say this again nebulous objection
of this point was by the holders of
certain claims asserted by certain
Canadian /PHAOU anies palates and
first nations which contended,
albeit I think only at oral
arguments that the treatment of
those creditors under the plan
would be sufficiently disagreeable
to the Canadian court presiding
over the ancillary CCAA proceeding
in Canada when the debtors request
recognition of the plan.

First based on my
understanding of the model law on
cross border in/SOL van Is which
forms the basis of chapter 15 of
the Bankruptcy Code, as well as the
CCAA provisions providing for
recognition, I am reasonably
comfort /THABL the Canadian court
will recognize the plan, although
that is a decision for the Canadian
court.

And not view the plan as
unduly discriminatory against
Canadian debtors in light of what
they would reasonably recover from
the debtors if this plan were not
confirmed and the different nature
of the regulatory regime that
covers the Canadian creditors.
Then their U.S. counter parts,
i.e., Native American tribes and
municipalities in the U.S.  It is
also my belief that the public
policy exception to recognition
under the model law acourse bored
insolvencies would not be applied
by the Canadian court given the
narrow nature of that public policy
exception.  Although again of
course that decision is one to be
made by the Canadian court.
Further, it appears to me again
paved upon Mr. Delconte's
declaration that while recognition
is important and would bring

clarity and finality to the claims
of Canadian creditors against these
debtors, the absence of recognition
is not critical to the survival of
NewCo under the plan.

And therefore that in any
event, the feasibility test would
be met.  I will note further that
the plan makes it clear that with
respect to any Canadian creditor
that has a claim against Purdue
Canada, which is not a debtor here,
or a claim against any of the
shareholder released parties that
is unrelated to a claim against the
debtors here, i.e., for example, a
claim against them because of their
rule in Purdue Canada, those rights
are expressly preserved under the
plan.

Most of the objections to
confirmation of the plan are based
on the object ants con/STPHAOEUFPLT
settlements provided for in the
plan either are not warranted under
applicable bankruptcy law or are
beyond the court's power even if
awarded under the bankruptcy law to
approve and propose.  Before
addressing those issues, however, I
will address the other remaining
objections to the plan's
confirmation.

The first set of objections
that I will address have been
raised by certain insurers
navigating specialty insurance
company, American guarantee
liability insurance company, stead
fast insurers enjoined in by
national union insurance company, I
will note that another insurer
objection made by the Chubb
Insurance U.S.A. group has been
withdrawn.

The debtors seek certain
findings in the confirmation order
regarding the effectiveness of the
transfer of a debtors insurance or
insurance rights to the trust
established under the plan to fund
and make distributions to
creditors.  They also seek findings
regarding plans settlement of

opioid claims namely that the
treatment of opioid claims under
the plan or insured claims under
the plan or arguably insured claims
under the plan, does not have the
effect of comparing any applicable
insurance coverage as a bona fide
fair settlement on the due notice
to objecting insurers, as well as
the other insurers who did not
object.  The plan does not seek
extensive findings as to the
debtors insurance, it for example
does not seek a declaration that
any insurance coverage or insurance
rights actually apply, that is the
subject of a separate litigation
that will take its own course,
rather the findings that the
debtors seek are integral simply to
the effectation of the transfer and
transfer of insurance rights to the
trust from the debtors and to
obviate a defense that the plan
itself in providing for a means to
pay opioid related claims somehow
/TKER gates the insurers rights to
review and consent to the payment
of an insured claim.  The objectors
contend that the plan and
confirmation order should be quote
insurance neutral, i.e., postponed
for another of the day, the need
for even these findings.  There is
no such concept or requirement that
a plan be insurance neutral and
where a plan provides for as an
element of the plan the transfer
ever a debtors insurance or
insurance rights to a trust, the
issue has been joined in the
confirmation hearing and the court
is properly situated to decide it.
        This is in contrast to again
general coverage issues, i.e.,
whether any particular claim
against the insurance is excluded
because of a coverage exclusion,
which is not an element that the
plan requested a determination of
or hinges upon and/or the plan is
clear in the reservation of rights
by the insurance, by the trustees
of the trust that will hold the

insurance and insurance rights on
the one hand and the insurers on
the other.

The insurance neutral
argument that the objecting
insurance companies make therefore
is not grounded on an underlying
principle of bankruptcy law, but
rather only on a due process
concern they contend that as
originally filed the plan was
arguably completely insurance
neutral and did not seek these
types of determinations.

However, I believe that the
record is clear that the objecting
insurers and all other insurers
have had sufficient notice for
months now that the debtors were
going to seek these limited
findings in the confirmation order.

The insurers are extremely
well represented, highly
sophisticated as evidenced by the
negotiations over the plan
provisions relating to them and the
proposed confirmation order and
they had a full opportunity to
challenge the findings that I just
outlined that are being sought by
the debtors and their allies, the
parties that is who would receive
the benefits of the insurance under
the plan.  Mainly the creditors.

That notice is really been
made to them at least since May of
2021.  And for the statutory and
bankruptcy rules notice period for
the confirmation hearing as well.

The plan also resolves the
remaining issue that raised as
originally drafted, it left over
the possibility that additional
findings could be sought or
documents could be filed that the
insurers would not have notice of
and that might nevertheless be
binding on them, the plan has been
amended to make it clear that is
not going to happen.

As far as the finding as to
the plans resolution of arguably
insured claims by providing for the
distribution of 100 percent of the

value of the debtors on account of
the claims asserted against them in
the form of payments between 700
and 750 million to personal injury
trusts and remaining amounts of at
least 5 billion to abate the opioid
crisis in various forms.

It is almost impossible to
see how, in fact I believe
impossible to see how an insurer
could claim that its consent rights
were somehow violated by notice of
the plan and the implementation of
it.

As far as the filed claims
are concerned, the claims assert
roughly $40 trillion excluding a
sole hundred trillion dollar claim
that was filed by an individual,
and that is only roughly 10 percent
of the claims, the others asserting
unliquidated amounts or unasserted
amounts as set forth in the
declaration of Jessica B Horowitz,
Ph.D., which was an expert
declaration.  She calculated that
the actual fixed claim of the
Department of Justice under the
settlement agreement entered into
by the debtors during the course of
this case provides for less than a
1 percent recovery on the asserted
claim.  Your Honor the
circumstances given the wide notice
and the absence of any objection to
the plans, the allocation of value,
either to opioid victims or to
abate the opioid crisis and the
fact that insurers consent rights
just like any other contract
parties consent rights are
circumscribed by the bankruptcy
codes own separate hearing and
process.

The debtors request for
finding as to applicable consent
provisions is justified and
appropriate.

In addition, ample case law
establishes the authority under
sections 1123A5B and B2 and 6, to
transfer as part of a plan and in
furtherance of a plan insurance
rights and insurance policies to a

trust to pay mass claims as existed
in this case.

The analysis set forth by the
third circuit in in refederal
/STPHAOEUFPLT third 355, there's
circuit 2012, I believe cannot be
improved on in this context, I will
note that although that was a case
driven by asbestos claims, the
logic behind the court's analysis
was based on section 1123A5 and
1141, not section 524G of the code
and therefore would apply here.
See also in re-WR grace company
/STPHAOEUFPLT VR34139 note 189 deed
Delaware 2012 a/STPHAOEUFPLT F
third 311 third circuit 2015 and
the cases cited therein.  Which
show the vast and I think perhaps
unanimous authority for the finding
and conclusion that the debtors
seek here that notwithstanding any
anti assignment provision in any
applicable insurance under the plan
the insurance policies or the
insurance coverage rights or the
rights to the proceeds can be
assigned to the MDT, the master
distribution trust.
/STPHAOEUFPLTly also note warranted
it appears at this point the
insurers who have objected the
disclaimed coverage /STPHAOEUFPLT
reserving their rights to do so see
JP Morgan Securities Inc. V
vigilant insurance company 58NY
third 38, I'm sorry NYS third 38
first department 2017 in /SKP* the
cases cited therein.  So I will
overrule the remaining portions of
the insurers objection to the
extent they actually do remain and
I will note that in light of the
colloquy during oral argument with
the insurers counsel and counsel
handling insurance issues in this
case, Reed Smith, it appeared to me
that most if not all of the
objections actually had been
resolved by the changes to the plan
that I've already described.

The next objection I want to
address is an objection by the
United States trustee not to the

planned settlement and release
provisions pertaining to the
shareholder release theed parties,
the Sacklers and related entities.
But rather a separate objection,
which is to section 5.8 of the
plan.  The plan provides for
compensation of defined term
professionals which are a state
retained professionals or
professionals such as counsel for
the official committee of unsecured
creditors who are retained per
/SAOUPBT to an order of the
/STPHAOEUFPLT post petition, that
is post bankruptcy filing work.

Two other groups of
professionals are also covered by
orders of the court previously
entered in the case and will
continue to be so with respect to
their fees through the effective
date or the confirmation date of
the plan under those orders.
Mainly the AHC and the multi state
governmental entities group.
Section 5.8 of the plan sets forth
the treatment of fee claims for
other counsel, not counsel formally
retained by and whose retention was
approved by an order off the court
or /STPHAOEUFPLT of the court even
if retained separately.

That section lays out the
settlement regarding the payment of
these counsel.  Namely funds from
the so called no act and tribal
abatement fund trusts for political
subdivision and tribes counsel.  In
addition, it lays out payment of
attorneys involved in the pursuit
by hospitals of their claims,
called NAS monitoring claimant
costs that is the counsel for NAS
victims for the payment costs and
expenses, payments for personal
injury costs and expenses, payment
for the public schools costs and
expenses.

The U.S. trustee contends
that the only way the plan could
provide for such payments is
pursuant to section 503B304 of the
Bankruptcy Code.  Which provides

that after notice in the hearing there should be allowed administrative expenses, that is expenses against the estate for post petition claims including the actual necessary expenses comprising reasonable compensation for professional services rendered by an attorney or account of an entity whose expense is allowable under sub paragraph A, B, C, he D or E of paragraph 3 based on the time, the nature and the extent of value of such services and the cost of comparable services under the case of this title and reimbursement of actual necessarily expenses /KOEURD by this account. That section takes you back to to section 503B3, which requires that a creditor show that it made a quote substantial contribution in a case under chapter 11 of the Bankruptcy Code.

This contention by the U.S. trustee is wrong in two critical respects. First, the bulk of the fees that it is objecting to are not for post petition work. But rather for prepetition work in bringing and pursuing claims against Purdue and to some extent the Sacklers before the commencement of the bankruptcy case, including in the multi district litigation that was pending before the start of the case.

Unsecured creditors claims for collection of costs, including attorneys fees, are based in contract ultimately as well as rights under applicable nonbankruptcy law and enforceable in bankruptcy, without the necessity to comply with section 503B3 and 4 which applies only to post petition services or services leading up to a plan if one seeks an administrative expense. See in re: United mergers and manufacturers Inc., 134138 second circuit 1982.

The U.S. trustee is wrong on

this point also because the
remaining fees to be sought again
are not being sought as an
administrative expense but rather
as a part of a highly negotiated
compromise of those fees and
client's obligation to pay those
fees reached during the mediation
in this case conducted by Messrs.
Feinberg and Phillips.  The
settlements laid out in section 5.8
that resulted from that mediation
are subject to court review, both
under bankruptcy rule 919 and I
believe, although there are
arguments to the contrary, under
section 1129A4 of the Bankruptcy
Code, which I previously read and
have been so recognized in this
district.  See in resterns holding
LLC, 681 /STPHAOEUFPLT bankruptcy
SDNY2019 and in resubpoena order
oil and gas Corp., 55 /STPHAOEUFPLT
258 bankruptcy SDNY2016.

          The U.S. trustee relies upon
a case that is imminently
distinguishable /STPHAOEUFPLT
SDNY2014, in that case, district
court noted that Congress had
specifically precluded recoveries
by creditor committee members ever
their post bankruptcy fees and
expenses.  Therefore, any
settlement of those expenses would
be improper as controverted by that
provision see in contrast in re-AMR
Corp. /STPHAOEUFPLT 690695
bankruptcy SDNY2013.

          The mediators report has made
it clear and there is unrefuted
testimony in the record in addition
to the mediators report on the
docket by Mr. Gary L got tow, Peter
Weinberger and Jane conRoy as to
the, not only the reasonableness of
the contingency fees provided for
in section 5.8, again almost all of
which were prepetition or for
services rendered prepetition, but
also the significant compromise of
those fees as set forth in section
5.8 and from a range of 24 percent
to the ranges set forth in the, in
section 5.8.  As stated in the

mediators report, the contingency
fee resolutions as well as the
common benefit assessments reached
in this mediation are consistent
with fee awards, arrangements and
assessments agreed upon in other
similar mass tort situations.  See
also the deck Lars of AG guard
paragraphs 67 through /STPHAOEUFPLT
77 and 78, the Weinberg
declarations in paragraphs 23 and
31 through 32, and the Conroy
declaration at 11 and 15.

        I do believe given Congress's
concern that the court be the
ultimate say on the reasonableness
of the attorneys fees paid through
a chapter 11 plan, albeit that here
they're not being paid by the
debtors, but rather they're being
paid by the clients and the trusts
that the clients agreed to set up,
as part of the client's recovery,
Congress did that however with
section 1129A4, not 503B and 4,
which requires only that the fees
be found to be reasonable.

        That inquiry should not be
turned into a mandate for an
expensive or unnecessary review in
rejournal registry company 537
through 38, bankruptcy SDNY2009
quoted /STPHAOEUFPLT south earn
electric power company KG electric
power could op sing 5035175th
circuit 1998.  Based upon the
uncontested representations, and I
note that the /UFT U.S. trustee has
made absolutely no effort
whatsoever to contest them, but
nevertheless somehow contended that
the fees were improper.  In the
guard conroadway Weinberger
declarations and the mediators
report I find that the contingency
fees provided for in the plan
paragraph 5.08 and the mechanism
for allocating them among counsel
are reasonable.  And in fact to the
benefit of the state by a reduction
of the attorneys claims.  Sometimes
being a watch dog that has no
regulatory power requires backing
off when the facts show that a

provision is reasonable and for the
benefit of the estate, not its
detriment.  This is one of those
instances.
          There are two sets I fees
that I cannot on this record make a
reasonableness finding on, I noted
them during oral argument on this
issue, they are fees that are based
on not contingencies that the
parties have analyzed /STPHAOEUFPLT
that is the parties have analyzed
and analyzed mediators have analyzed
/STPHAOEUFPLT and on hourly rates,
I have not seen any time records to
the amount of time spent or the
rates and so I believe I need to
make a reasonableness finding as to
those counsel.  Which are the
counsel to the TI ad hoc committee
and the school districts committee.
The plan has been amended to
reflect that opinion that I voiced
during oral argument with one
wrinkle, it contemplated or it
reflects that one portion of the
school district's claim may
actually be a contingency fee
claim.
          It suggests that the court
will not review it if it is
determined by one of the mediators,
Mr. Feinberg to be reasonable.  I'm
not prepared to accept that
mechanism, I will certainly take
into account as I have with regard
to the other contingency fee
compromises that are set forth in
paragraph 5.8, Mr. Feinberg's views
but I believe I ultimately had to
make the reasonableness
determination on notice to parties
and interest including the U.S.
trustee.
          I recognize this is a
compromise or the contingency fee
amount is a compromise, but given
that I don't have evidence in this
record to show that it was a
reasonable compromise, I need to
under section 1129A4 have the last
say on it.  But fob clear, this is
an exercise I /STPHAOEUFPLT on my
review of the contingency fee take

intoing account the evidence
presented before me which I
anticipate will be some statement
by Mr. Feinberg in any other
statement that would support that
level of contingency fee.  So the
U.S. trustees objection on this
point is overruled.  And just to be
clear because insinuations really
shouldn't go unanswered, there is
absolutely no evidence for any
insinuation in the U.S. trustees
filings that the fees provided for
in paragraph 5.8 are somehow
improper, in fact to the contrary,
they are settlements of claims that
could be substantially higher and
were settled as part of the
mediation resolving the allocation
of claims between public and
private creditors and the amount
creditors were willing to accept
coming from the Sacklers.  The
record is crystal clear on that.
        Again, the settlements are to
the benefit of the creditors, not
their detriment.
        The next objections are by
individuals clay ton Boyd, Stacy
bridges and Charles Fitch in their
individual capacities.  They object
contending that there was
insufficient notice of the bar date
to those incarcerated in prison,
notwithstanding as I noted before
or earlier the extensive notice
that's testified to by
/STPHAOEUFPLT.
        There is a fundamental
problem with this objection, all
three of the objectors have
actually filed a proof of claim
timely, i.e. before the bar date.
They therefore lack standing on
article three of the constitution
and this court lacks the power to
decide their objection because as
to them and again their proceeding
in their individual capacity, there
is no remedy that the court can
grant.  Again they have filed a
timely proof of claim in this case.
As recently stated by the court and
/STPHAOEUFPLT Ramirez 2202 through

2203 from this year 2021 but to
have standing and whether there be
a case in controversy, the party
raising a matter with the federal
court must have a personal stake in
fact.  And if they don't, there is
no case or controversy.  Which
includes determination of the
objection under article three of
the constitution.  See also cane V.
Johns manville Corp. /STPHAOEUFPLT
642 through 646 second circuit 1988
which dealt with almost the same
issue.  Mr. Boyd also filed a
second individual objection based
on what he believes might be the
consequences of the debtors
criminal plea in their 2021
settlement with the Department of
Justice.  Mr. Boyd's counsel
acknowledged at argument that this
issue was properly raised not here,
but at the debtors sentencing
before the New Jersey district
court.  In which it can be argued
that persons such as Mr. Boyd might
have an individual right to the
proceeds to be paid by the debtors
under the DOJ settlements.  Even if
that wasn't conceded, I rule that
that issue is not a plan
confirmation issue, but rather an
issue as to the allocation.  But
rather an issue of the payment
after the DOJ makes it.  I don't
believe it effects the feasibility
of the plan.  More over, it's based
on my review of the discorrection
that the district court would have
under the applicable act that
Mr. Boyd is going to rely on where
there is such a large number of
potential victims for which the DOJ
could be said to be acting.  The
individual rights of the
restitution fund can be foregone.
          There is arguably a
suggestion by Mr. Boyd that the
debtors and the Department of
Justice colluded in agreeing to the
settlement agreement and therefore
in that they did not provide
individual rights of restitution
from the payments or the rights of

the DOJ under the settlement
agreement.

        This is not supported by the
record.  The debtors have
established that as far as the
plans treatment of the Department
of Justice, the plan has been
proposed in good faith under
section 1129A3, there's no evidence
of any attempt to improperly cut
off rights that individual victims
would have under the DOJ
settlement.  And indeed the
personal injury class was actively
and well represented in the
mediations in this case, which came
up with the funding of the personal
injury trusts.  It's well
established in the second circuit,
including in the Drexel case I'll
be citing in a moment that the fact
that some creditors did not
participate in a mediation that
does not render the results of a
mediation improper or not in good
faith.  The /TEPBGTS of the vote of
the personal injury class,
97 percent in favor of the plan
also argues for the good faith
treatment of the personal injury
creditors here, vis-ÔøΩ-vis the DOJ
settlement.  And again I've noted
the flexibility in the settlement
and the applicable statute that
would govern restitution rights,
which of course the district court
in New Jersey will consider at the
appropriate time.

        So I will overrule Mr. Boyd's
second objection to the plan.  I
had mentioned earlier that certain
Canadian municipalities and first
nation /STPHAOEUFPLT I approved the
proofs of claim they had filed in
these cases against these debtors,
it is not clear from those claims
which essentially attach complaints
against both nondebtor Purdue
Canada and other non-debtors and
these debtors, whether the claims
really are against the debtors.  To
the extent against Purdue Canada
and other foreign non-debtors,
those recoveries are fully

preserved, they're not effected by
the plan and claims against third
parties including the Sacklers
related to those types of claims as
opposed to claims against these
debtors are not enjoined.  The gist
of the objection is that rather
than be treated as general
unsecured creditors in class 11,
Canadian municipalities and first
nation, /STPHAOEUFPLT must be
classified with /STPHAOEUFPLT and
classes four and 5 respectively and
participate in the abatement trusts
created under the plan for those
creditors.  It should be noted that
these objectors have made no
contention that the value to them
to be paid to them as a class 11
creditor is unfairly different than
the value to them if they
participated in the no act Native
American tribes abatement trust.

        But in any event, it is
conceded by these objectors that if
their vote were count indeed class
11 as opposed to in classes 4 and
5, class 11 would still have
overwhelmingly accepted the plan,
thus the revision in section 1129B
cram down requirement that there be
no unfair discrimination among
similarly situated creditors in
different classes does not apply.
Instead, the objection is if at all
properly couched under different
provisions of the Bankruptcy Code.
I will note that there is some
suggestion during oral argument and
one sentence in the objection that
stated that claims and
municipalities of first nations
should not be allowed for voting
purposes at $1 as provided for in
the court's confirmation/disclosure
statement order.

        However there's been no
request for /STPHAOEUFPLT for
claims under section 502C of the
Bankruptcy Code for rule 4018 and
further /STPHAOEUFPLT temporary
allowance for what would otherwise
be a disputed and unliquidated
claim, arguably not even against

these debtors for mass tort
liability is well recognized as
being fair.  I see the discussion
in in re-Lloyd, that's L-L-O-Y-D-E,
Mitchell Inc., 37B3R416428 given
the vast number of claims asserted
that are unliquidated like these
and subject to dispute to subject
the process to fixing the amounts
of such claims would defeat the
whole conduct of the bankruptcy
case.

Given section 1129B doesn't
apply to the issue of the class
vote, the issue is whether the plan
separate classification of these
objecting creditors in class 11 as
opposed to the class that they want
to be in is proper.

Separate classification of
similar claims is a right that a
plan proponent has under the
Bankruptcy Code if there's a
reasonable basis to classify the
claims separately, see generosity
/STPHAOEUFPLT bankruptcy paragraph
1122.03 (1) (C) edition 2021.  In
relight squared Inc. 513
/STPHAOEUFPLT bankruptcy SDNY2014
and in re/STPHAOEUFPLT lamb better
ink 32 /STPHAOEUFPLT 1992.

Section 1122 of the
Bankruptcy Code, which again is
incorporated into section 1129A1
states merely that notwithstanding
any otherwise applicable
nonbankruptcy law a plan shall, I'm
sorry, I'm focusing on section 11
/STPHAOEUFPLT and section 1122 of
this title, classes of claims
section 1122 except as provided in
subsection B applicable here a plan
may Mrs. A claim, in a particular
class only as such claim or
interest is substantially similar
to other claims or interest in such
class.  It doesn't require all
substantially similar claims to be
placed in the same class, only that
if you are putting claims in a
class they need to be substantially
similar.

Here there is a basis for
separately classifying these

objectors claims from the U.S. from
the U.S. and Native American
tribes.  Based upon the different
regulatory regimes that the
objectors operate under with regard
to opioids and abatement as well as
the fact that the allocation
mediation, which I'll be discussing
at length later, which allocated
the debtors assets and third-party
claim assets among private and
public claimants and then
separately among the public
claimants, involved U.S. public
claimants and their own regulatory
interests and futures.  The record
reflects that there was no request
by any of the objecting creditors
to participate in that mediation.
The record is also clear and I can
take judicial notice of the fact as
well that those who did request to
participate in the mediation if
they had a reasonable basis to do
so were generally invited into the
mediation, including for example
the NAACP.  The failure to
participate in mediation is not
something that should detract from
the settlement reached, as long as
classifications is fair and
rationale, in /STPHAOEUFPLT pea
body energy Corp. 933, such a
distinction between U.S. and
Canadian claimants has been
recognized by the third circuit.
And the 6th circuit.  See the class
5 divided claimants versus
/STPHAOEUFPLT downing Corp. 280F3
of 2012, WR grace and company,
3112013 where Canadian property
damage claims, including a claim by
the queen on behalf of Canada was
found to be properly and separately
classified because of the different
types of recovery, such claims
would be under applicable law close
analogy to the different regulatory
schemes that would apply here to
the no act trust again there was a
suggestion that the separate
classification was also not in good
faith, basically the same argument
that the Canadian /PHAOUPB

/STPHAOEUFPLT didn't have the same
treatment and classification as the
U.S. Governmental entities and
Native American tribes, the plan
was not in good faith or proposed
in good faith, but given the plans
rational basis for separate
classification.

Of a lack of any evidence to
show that the objecting creditors
were improperly silenced or
excluded from negotiations, I find
that the plan is proposed in good
faith as to that.

Besides raising the foregoing
objections, the Canadian creditors
object to the plans release of
third-party claims against the
Sackler shareholder release
parties.  To the extent they make
the same arguments as others do to
raise this point, I will address
them collectively later.  In
addition, however, the Canadian
objectors have contended that
because no money from the
shareholders settlement is being
specifically channelled to class
11, class 11 creditors should not
be enjoined under the plan from
pursuing whatever claims they have
against the Sacklers for the
Sackler release parties based on
their U.S. conduct, is this a valid
basis for a plan objection.  Here I
conclude that it is.  And as
released by the Canadian creditors,
the uncontested best interest
liquidation analysis in the
Delconte declaration shows class 11
creditors will receive no recovery
on their claims if as I believe is
the case upon their carveout from
the third-party release provisions.
The debtors would liquidate.  The
Sackler settlement in other words
class 11 recovery to exist.  It is
necessary for and tied to the plan.
And fair to the Canadian objectors
therefore to bind them to the lease
provisions of the plan.  I will
note in this regard that there's
been no indication that /ET Sam
remembers would be reliable to

them.  Based on their conduct
related to the U.S. debtors.
Indeed, this note of there's really
any indication that there's any
claim against the U.S. debtors in
the first place.

It is clear to me from the
liquidation analysis in the record
of this case, therefore, that the
payment to the class of unsecured
creditors, that is class 11 in
which these objectors reside is
fair taking into account not only
their rights against the debtors,
but also whatever rights they may
have against the Sacklers that
would be released under the plan.
And in fact that they would not
recover if they were carved out
from the release.  So I will
overrule that objection.  To the
third-party claims release and
injunction in the plan, they have
asserted first that the plan
violates section 1122 of the
Bankruptcy Code by classifying them
in class 4 with their political
subdivisions.  Given that
classification if one simply goes
by a creditor by creditor in that
class, the objecting states and
District of Columbia have a tiny
percentage of the no vote compared
to an enormous percentage from the
yes vote and /STPHAOEUFPLT by
representing their state as a
whole, that is the people in that
state.  I do not accept however
their blanket characterization that
because they are states, the other
public creditors political
subdivision municipalities and the
like that are in their class can be
silenced, indeed I accept that for
most states that is not the case
more importantly, states and
political subdivisions that is of
course of home rule laws and the
like, more importantly, there has
been no attempt by the objecting
states and the District of Columbia
to silence the other members of
their class by seeking to disallow
their vote or designate their vote

under section 1126 of the
Bankruptcy Code.  And in any event
it is a position taken only as to
some political subdivisions claims
as being precluded by the parents
rights of states as opposed to all
of them.

Importantly, the states
acknowledge and this was stated on
the record by their counsel, their
claims have the same rights to the
debtors assets as other general
unsecured creditors including the
political subdivisions that are in
their class.  That is the states
claims are not priority claims,
they're not secured claims, they're
general unsecured claims.

The law is clear that under
those circumstances, the states
claims are in fact properly
classified under section 1122A as I
previously read with the other
claims in their class.  As noted by
the third circuit in in re-WR grace
and company, third circuit 2013, to
determine whether claims are
substantially similar for purposes
of section 1122A, the proper focus
is on the legal character of the
claim as it relates to the assets
of the debtor.  In re-AOV
industries Inc. 7092 /STPHAOEUFPLT
11401150D have /STPHAOEUFPLT see
also in retribe union company 84
concluding that the phrase
substantially similar reflects
quote the legal attributes of the
claims, not who holds them.  And in
requick lie /STPHAOEUFPLT
bankruptcy 2007 claims are similar
if they have substantially similar
rights to the debtors assets.  See
also in re-Drexel better than and
lamb percent group Inc.  1992 and
bankruptcy paragraph 11.2.03
brackets three 16th edition 2021.

That is clearly the case
here.  And therefore the claims can
in fact and should in fact properly
be classed together which has
resulted in the unanimous agreement
by all the states, including these
objecting states as to the

allocation within the class, among
them and the other public creditors
that was reached during the lengthy
and difficult mediation conducted
by Messrs. Phillips and Feinberg.

It also should be noted on
ultimately this has little bearing
on the classification issue only
bearing on the plan release issue
that if the plan had separately
classified the states, although
again that would have unduly
complicated the universally agreed
public side allocation of value as
between the states on the one hand
and all the other public entities
on the other in class 4, the
accepting states, states accepting
the plan and the territories would
go from 95 percent as far as class
4 is concerned to 80 percent or
slightly below 80 percent.

In each case, well above the
75 percent supermajority threshold
and the analogous section of the
Bankruptcy Code 524G.  The
objecting states and District of
Columbia also have referenced the
alleged improprietary of
classifying their claims as well as
all other opioid related claims,
none of which have been liquidated
to a dollar amount and most of
which never will be liquidated to a
dollar amount, none of which at
least by the public entities will
be because of the plan and the
agreement by all of the states in
the plan to use the money to abate
opoids as opposed to paying them
cash.  They nevertheless content
that their claims should not have
been loud for billing purposes at
$1.

This objection should be
denied for the same reason that I
denied the same argument made bit
Canadian municipalities and first
nations.  There's been no effort by
any of these objectors to seek to
temporarily allow their claims for
voting purposes, there's an obvious
reason for that, if that request
had been made, every entity that

wanted to vote would have made the
same request and we would have been
engaged in I believe literally
years of litigation over
liquidating the claims which these
entities themselves by their own
choice as part of a mediation have
agreed needent be done because the
money will go to opioid abatement
instead of individual treasuries.
Under those circumstances, it's
perfectly appropriate to allow the
claims for rogue purposes of $1,
again see in re-Lloyd Mitchell Inc.
The same objecting states also
argue that they are being treated
unequally with the United States
which is in large measure carved
out of the third-party release in
the plan.  This however is not a
proper objection under section
1124A4 -- I'm sorry, 1123A4, which
says that plans shall provide the
same treatment for each claim or
interest of a particular class
unless the holders claim or
interest agrees to a less favorable
treatment because they're not in
the same class, they're in
different classes and as I noted
earlier, a plan proponent can
separately classify similar claims
in different classes if there's a
rational basis to do so.

        There clearly is a rational
basis to classify the U.S.
differently here, the U.S. has
different types of claims, it
actually has secured claims which
are treated as part of one of the
aspects of the plan settlement.
And it's unsecured claims are
different in particular with
respect to the Sacklers.  Unlike
the claimants in class 4 where the
objecting states and District of
Columbia are classified, the United
States has settled its civil claims
with the Sacklers.  For a specific
payment.  So clearly the different
rights of the United States and
different treatment of the United
States which include as another
part of the plan settlement, the

waiver of $1.7 billion of its
superpriority administrative
expense claim which otherwise would
be entitled to be paid ahead of any
other secured claim and any
administrative expense claim under
the abatement and NewCo provisions
of the plan.  Which is for the
benefit of class 4 and class 5 and
frankly all the creditors of the
estate.  So those different rights
and differing treatment clearly
set forth separate classification
without a doubt.  Nor is any unfair
discrimination argument available
under section 1129B /STPHAOEUFPLT
provision because the class has
accepted the plan and therefore the
cram down provisions don't apply.
The state of West Virginia has
filed a limited objection to the
plan.  It does not object to any
aspect of the plan other than the
allocation in class 4 and the no
act procedures of its share of the
funds to be used in the no act
trust to abate the opioid epidemic.
It raises this objection in to
legal context, first it contents
that the plan is not being proposed
in good faith because what it
contends is the unfair allocation
of the no act trust.  Under section
1129A3 of the Bankruptcy Code, the
court shall confer the plan only if
the plan proponent shows if it has
been proposed in good faith and not
by any means forbidden by law.  The
courts have /TPAEUPBL general
consensus to the meaning of good
faith in this provision.  All
courts recognize a procedural
interpretation, that is they look
only to the proposal of the plan,
not the terms of the plan to see if
the proposal itself was in good
faith or to the contrary infected
with improper conflicts of interest
or self-dealing or the like.
        See for example /TKPWAR
vanity V cook investments northwest
SPNWY, 9th circuit 2019 and as the
/STPHAOEUFPLT a contrary
interpretation has a broader

inquiry in general principles of
good faith, not only renders the
words has been proposed
meaningless, but makes other
provisions of section 1129A which
are specific and shouldn't be die
lieutenanted by a good faith
analysis redundant.  Diluted.  See
bankruptcy paragraph 11293A60th
edition 2021.  In addition to that
view however, other courts apply
more of a totality of the
circumstances analysis beyond the
manner in which a plan is proposed
and find that a plan is proposed in
good faith if there is a reasonable
likelihood that a plan will achieve
a result consistent with the tad
applied under the code, that is the
Bankruptcy Code, 2019.  Generally
second circuit has clearly followed
the first line, just focusing on
the proposal of the plan, see in
reboard of directors of telecom
Argentina SA /STPHAOEUFPLT 162174
/KA*EUPB Johns mansville 1998.  And
in re/KOEBL K-O-B-L-B-E, second
circuit 1984.  On the other hand,
courts in this district have at
times followed a more expansive
view, more of a totality of the
circumstances surrounding the
establishment of the plan and the
like.  Although even there they
focus largely on the proposal of
the plan and the process of plan
development.  See in rechem /TAOR
Corp. /STPHAOEUFPLT 5610608
bankruptcy SDNY2010.  In requickly
co-Inc. /STPHAOEUFPLT generosity
co-shipping and trading limited, in
rebright burn energy partners LP,
however courts in this district
also have considered whether the
plan quote will achieve a result
consistent with the standards
prescribed under the Bankruptcy
Code see in redie tech holding
Corp. 606BR and the cases cited
therein.  And and as recognized by
judge /TKPWAEURT in this case, that
policies or objective include
/STPHAOEUFPLT and maximizing profit
/STPHAOEUFPLT giving debtors a

fresh start in life, encouraging
debtors misconduct, the expeditious
liquidation of distribution of the
bankruptcy estate to its creditors
in achieving fundamental fairness
and justice.  Here I have ample
testimony by John guard primarily,
the representative of the State of
Florida that the allocation of the
no act was the result of good faith
arms length negotiations by the
various states during the mediation
process.  That testimony really is
unassailable as to good faith.  It
is also clear that without those
negotiations which were difficult
given the nature of the states, not
as weight of course but equally
reflecting concerns underlying the
compromise behind the constitution,
you have small states, large
states, you have states that have
been disproportionately effected by
the opioid crisis, etcetera.
Without that agreement, the goals
of the Bankruptcy Code would
actually have been jeopardized,
that agreement which in fact the
State of Washington recognizes
being remarkable.  And I to believe
is remarkable to get 48 states to
agree upon an allocation mechanism
for abatement procedures.  The
failure to do so would have
resulted in extensive litigation
and arguably a fall back on
distributing the value of the
debtors estates including their
claims against the Sacklers and
channelled third-party
contributions or payments by the
Sackler shareholder released
parties.  Not to /STPHAOEUFPLT
abatement purposes.  But rather
after extensive litigation cash
payments which I believe would be
substantially reduced by the
extensive litigation to individual
states for their general use in
their treasuries.  In large part.
        So I find that the no at
allocation was in fact derived in
good /PA*EUT by arms length and
fair negotiations among the

parties.

That testimony by Mr. Guard is highlighted or the /STPHAOEUFPLT of that testimony is highlighted or was highlighted by the cross examination of West Virginia's expert Dr. Charles Cowan. He acknowledged his prior publications, his publications written prior to his being retained by the state of West Virginia /URBLD the no act of the plan. He recognized in those publications that other methods of allocating money towards abatement could be fair and reasonable as well. And that there was no specific formula for allocating states recoveries to them.

It was clear from Mr. Guard's testimony that the proposal made by Mr. Cowan would not have been agreed to by any state other than West Virginia. It also is clear that that proposal or that methodology would have resulted in peculiar allocations of the no act trust money for abatement. Whereby for example states with substantially smaller populations like Kentucky would get substantially more of the funds than states with large populations like New York or Washington would get a larger recovery than Texas, or West Virginia would get a larger recovery than Virginia, albeit that they're neighboring states.

And /-L ab it that although certain states like Kentucky, like West Virginia are in fact ground zero in the abatement -- I'm sorry, in the opioid crisis. It is a national problem that requires the exercise of extensive resources by every state where population is a legitimate measure as well as the other factors taken into account in the no act allocation.

That allocation does in certain ways respect the rights of smaller states and take into account levels of intensity of harm, however, it also recognizes

that the states report in some ways
measures of intensity differently
and therefore those measures are
not necessarily accurate for
example the evidence reflects that
different states and their
subdivisions report deaths from
opioids differently than others.

Or record opioid disorders
differently.  Given that, I
conclude that the treatment of the
states in class 4 and through it
the, by means of the trust
procedures and allocations for the
no act, are being treated
substantially the same.  Pursuant
to a overall regime that was
negotiated at arms length.

As discussed again by the
third circuit in the WR grace and
company case that I previously
cited, quote although near the code
for nextive history precisely
defines the standards of equal
treatment, the courts interpret the
quote same treatment requirement to
mean that all claimants in the
class must have quote the same
opportunity for recovery.  See for
example in rebright burn energy
partners LP, and in re-Dan /TPHA
Corp., the WR grace court then goes
on to state or to cite in recentury
medical center Inc., bankruptcy ED
Missouri 1990 which concludes the
plan subjects are all members of
the same class and same process for
plan payment is sufficient to
satisfy the requirements of section
1123A4.

Finally as the WR grace court
states, what matters then is not
that claimants recover the same
amount that they have equal
opportunity to recover on their
claims.  That's at 729F third 327.
The court goes on to sate state,
the courts are also in agreement
that section 1123A4 does not
require precise equality, /SEPBL
/STPHAOEUFPLT inrequickly company
Inc.  See also in re:
M-U-L-T-I-U-T, bankruptcy Illinois
2011.  Multiut.

It went on to find that that
is the WR grace case found that the
consequences of how and when the
class members would be paid didn't
produce a substantive difference in
the /PHRAF's opportunity to recover
and were the result of among other
things a comprehensive mediation in
arms length negotiations.

I conclude the same here with
regard to West Virginia's 1129A4
argument.  I was not going to
conclude the same as to another
aspect of its argument, one of the
adjustments made for the benefit of
states with smaller populations,
like West Virginia, in the no act
procedures, was a separate fund so
called 1 percent fund which all the
states other than the small states
that would participate in the fund
were going to participate in with
the exception of California.  I did
not see sufficient evidence on the
record to justify California's
being accepted from that
contribution obligation if you will
to the 1 percent fund.  However,
California has agreed since the
discussion on the record during the
confirmation hearing to change its
view and to participate in the
1 percent fund.  Therefore, the one
aspect of West Virginia's objection
that I was going to grant has
effectively been granted by the
agreement of California that I just
described.

Mr. Guest made it clear that
all of the states recognized the
huge impact that the opioid crisis
has had on states like West
Virginia and had tried to take that
into account in negotiating the no
act allocation.  I to recognize
that impact.  But I believe that
given the arms length nature of the
negotiation and the acceptable
range of West Virginia's treatment,
even within the writings
acknowledged by professor Cowan, I
conclude that it's objection under
section 1129A4 should be denied.

The remaining objections to

the plan, other than the objections
based upon plans third-party
release and injunction provisions
and the planned settlement with the
Sacklers and their related entities
have been asserted by a number of
pro se parties, that is parties who
are not represented by counsel.

I will go through these which
I believe are properly viewed in
roughly 4 different categories.
First, Ms. Butler Frank, Ms. Ville
/TPHAOUF, V-I-L-N-E-V-U-V-E,
Mr. C-O-B-B, and Mr. Wright, have
Allstated in one form or another,
that the plan should not give the
Sackler family quote immunity from
criminal charges.

I completely agree, as does
the plan.  The plan does not
provide a release of criminal
conduct.  That is crystal clear in
the plan and always has been.

It is I think understandable
that a person who is not a lawyer
and looks at this case from afar
through one form of the media or
other, may have reached a different
conclusion.  In part that is
because either through ignorance or
choice, the plan has been described
as providing quote immunity to the
Sacklers.  Immunity suggests
clearly immunity from criminal
charges.

That's how one generally
thinks of the word immunity.  It
simply does not do that.  It
couldn't do it.  And it doesn't.
It's important for those who should
now know better whether they are
reporters, law professors or
members of Congress to be careful
how they use their words in this
context.

At a minimum, it reflects
that they do not understand this
case.  It also, if they really do
know better, is irresponsible and
frankly also cruel to those who
they mislead.

If anyone that is obtaining a
civil release under this plan has
engaged in criminal activity either

before or during this case, they
are not relieved of the
consequences of that.  If any
prosecutor wants to pursue such a
claim against the released parties,
they can.

Ms. Graham, Mr. Nor meal,
Mr. Boos, I hope I'm pronouncing
that right, Ms. Willis, Ms. He
canny, Mr. West, and Ms. Per /ERB
have all in one form or another
contended that it is improper or
unfair for the plan to provide only
the 700 to $750 million for
individual personal injury
claimants.  While the bulk of the
recovery goes to as one of the
objectors have stated, wealthy
states, hospitals, school
districts, rate payors, etcetera.

I have said more than once
during this case including to
Ms. Ecky who testified during the
confirmation hearing that one
cannot put a price on a human life,
or an injury such as opioid
addiction.  And yet that's what
courts do with respect to personal
injuries.  They take into account a
number of factors which are
relevant legally, including
potential defenses or dilution of
the claim and causation.  The
amount that courts reach is rarely
in terms of dollars sufficient
compensation.

That is particularly the case
where the wrongdoer is insolvent.

I did not have any specific
valuation of personal injury claims
in this case.  What I do have is a
lengthy and difficult arms length
mediation led by two of the best
mediators not only in the United
States, but in the world.  Messrs.
Feinberg and Phillips.  They are, I
believe, in no way beholden to any
type of claimant here or sympathy
tick undulily to /STPHAOEUFPLT type
of claimant here.  Mr. Feinberg,
for example, had the incredibly
difficult job of working out by
dealing with victims and their
families the proper allocation of

the 9/11 fund.

Both of them have dealt with personal injury claims extensively and I believe the reason they do that is because they are as sympathetic if not more so to individual victims as they are to states, hospitals and other entities.

The people representing the personal injury claimants in that mediation were some of the most effective personal injury lawyers again in the world.

And by effective, I include within that category aggressive.

I also have the declaration of Michael Atkinson on behalf /STPHAOEUFPLT which attaches the committee's letter in support of the plan and recognizes the committee's role in balancing the interests of personal injury creditors with the states that also assert claims and strongly supports confirmation of the plan as a balance of those interests.

The plan vote which is approximately 97 percent of the personally class and payroll plan strongly argues that the members of that class support the plan and the fairness, albeit only in this setting, where one allocates money from a limited pot base not on a nonlegal view to the valve a human life or a person's health, but based upon the likelihood of such claims recovering in a contested setting and a, I believe, successful resolution of that under the plan that provides for early moneys out to personal injury creditors, the head of the states and fair procedures that make it relatively easy though preserving the burden of proof to obtain a recovery.

The next set of objections were raised by Ms. /PH*BG who also was a witness at confirmation and Ms. V-O-M-S-A-A-L, both of these people had very legitimate concerns as do all of the objectors.

Although as I said before, I
believe the first group of
objectors have been misled and to
think the plan provides for release
of any criminal conduct.  May have
Ms. Mcguy hey and Ms. Vomsaal
questioned why NewCo under the plan
will continue to sell opoids in any
form.  Ms. /PH*BG also recommends
certain measures that could be
viewed as abatement measures such
as different disclosures regarding
long term opoids or the banning of
long term opioids.  Changes in
packaging and the like.
       I believe strongly that every
constituency in this case that is
had a say on this issue has wanted
to ensure that the lawful
production and sale of this
dangerous product be not only
lawful but conducted in a way that
is cautious, subject to layers of
oversight and informed by the
public interest at every step.
That is the purpose of the
provisions of the plan dealing with
NewCo.  The NewCo governance
covenants, the NewCo monitor, the
NewCo operating agreement and the
NewCo operating injunction.
       All of these things from the
start of this case were a primary
focus of the official unsecured
creditors committee Wes /KPROESed
of victims only, there are no
financial creditors in this case,
the committee consists entirely of
victims.  They have also been a
focus since the start of this case
of all states and political
subtuitions and I believe soon
after the start of this case like
the other institutional creditors
like hospitals.  The debtors have
not, since before the start of this
case, have the Sacklers play any
role whatsoever in their management
and so the debtors too have been
focused and volunteered at the
start of this case an injunction
pertaining to their sale legally of
these products.
          Those measures are described

in Mr. /HRO*UPB's declaration,
/SWALS the fact declaration of
Mr. Delconte, they also discussed
it in the Michael /STPHAOEUFPLT and
the attached letter from the
creditors committee and they're
reflected again in the provisions
of the plan that I just described.
        The Bankruptcy Code does not
require this, but in keeping with
the broad determination of the
1129A3 good faith requirement, the
parties and interest in this case
have required it and I have
encouraged them to do so.  So that
at this point I believe that the
measure that is I have just
described will set a standard not
only for this company, but for
other companies that manufacturer
and distribute these products which
are legal yet dangerous with these
well thought out provisions.  It is
hard to imagine how any other
company engaged in this business or
in the distribution of these
products wouldn't also believe that
it was not only the right thing to
do, but also in their interest to
imitate them.  They're not being
posed by a government, they're
being imposed by this plan.  With
the input of state government and
federal government, and again not
only should serve as a model, but a
warning to similar companies to
take extra care than is required by
the FDA or Congress or state law or
be held up against this model in
the future and be found lacking if
they did not at least take the
level of care set forth in this
model of governance.
        The abatement programs
themselves are the subject of
substantial again unrebuted
testimony including by
/STPHAOEUFPLT
G-O-W-R-I-S-A-N-K-R-I-N, Maureen --
I'm sorry, I apologize, I used the
wrong person there.  Raul Gupta,
Dr. Gupta, as well as as far as the
distribution procedures and
abatement activities /STPHAOEUFPLT

and Gail /TKPWOU within.  And of
course the abatement initiatives
have the heavy input of the states
in nonstate governmental entities.
To have reached an agreement on
this abatement metrics and
mechanisms again is an incredible
achievement.  Given the strong
views that various parties have as
to what is proper as far as
abatement is concerned.
Mr. /STPHAOEUFPLT his testimony
again is unrefuted and I believe
Cogent that there is a clear
multiplier effect of debt
indicating the /STPHAOEUFPLT
dedicate /STPHAOEUFPLT to the sack
/R*ERS to abatement programs as
opposed to individual payments to
be used perhaps for abatement but
not necessarily so.
            Foregoing testimony also
shows as do the abatement metrics
that the plan sets forth abatement
metrics and procedures that take
into account developments over time
and learning over time as to what
works and what doesn't.  Indeed
they encourage that learning
because one feature of the plan is
a requirement for periodic reports
as to the use of the funds for
abatement which can then be checked
to see what works and what doesn't.
And what can be reallocated to what
works.
            The abatement procedures and
metrics also include a consult
ative process that takes into
accounts of views of communities
and those within the community in a
reasonable and fair way.
            The objection that is I just
described really don't lay out and
I didn't expect them to layout
because again they're pro se
objectors a legal basis for the
objection.  I believe though that
the proper prism within which to
analyze the objection legally is
again the good faith test under
1129A3, given all that I have just
described, it is very clear to me
that the use of the bulk of the

debtors value for abatement
purposes is clearly in good faith
and in fact highly beneficial to
those who have individual claims
against the debtors as well as the
communities and states that also
have claims.

It is also clear to me that
those procedures both for abatement
and for the governance of NewCo are
facilitating not only the emphasis
of the Bankruptcy Code, but the
broader good.

To suggest otherwise, to
suggest that somehow this was an
ill cooked and cooked in secret
stew which I don't believe the two
objectors are contending, but it
has been suggested publicly by
those who I don't think have been
following this case or if they have
should know better.  It's simply
incorrect and dramatically so.
What this plan does within the
constraints of federal law,
including the regulations and
guidance from the FDA is go beyond
that law or that can be done to
ensure, a, the safety or safe use
of the debtors products, including
the development of products that
would assist those who are trying
to recover from opioid use disorder
and provide cheap and accessible at
least they have the shares that
would enable them to control the
debtors if that was not foregone by
the Sacklers.  The debtors plan is
in a sense is in a sense that is
the Sacklers plan, it is a plan for
the Sacklers benefit.  While I will
straightly exam that the cementment
for the slack certificates is fair,
one thing should be absolutely
clear and is clear, and anyone who
says to the contrary is again
simply misleading the public, this
is not the Sacklers plan.  The
debtors are not the Sacklers
company anymore.  The Sacklers only
the debtors but the debtors are not
run by the Sacklers in any way and
have not been since before the
start of this case.  There is

literally no evidence to the
contrary, none.  Although it was
not necessary because the record
was clear, the examiner appointed
in this case confirmed that.

More importantly, and as
recognized by the examiner and as
recognized by anyoning who paid any
attention to this case from the
start, this case was driven as much
by, if not more than, the official
unsecured creditors committee and
the other creditors in the case who
formed well represented ad hoc
committees.  Let primarily by the
48 states that have claims against
the debtors, two states having
previously settled those claims
before the start of the bankruptcy
case.

Led also by groups that had
within them very strong
representatives of public nonstate
governmental entities.  And Native
American tribes.  These creditors
are in essence the only creditors
of this debtor and from the start
of this case all of this debtors
assets were dedicated to them.
They wanted more than anything else
to obtain as much value not only
from the debtors and the process of
agreeing on a chapter 11 plan, but
also from the Sacklers who were
viewed by all as the other side,
the opposition, the potential
defendants, the payors.  And it is
crystal clear that the unsecured
creditors committee, the
/STPHAOEUFPLT and governmental
entities were completely, utterly
independent and focused on is that
goal.  They were facilitated in
achieving that goal by the two
incredibly experienced and
effective mediators that I've
already described.

And further, even after a
largely successful mediation of the
claims against the Sacklers, both
direct by the debtors and
third-party claims by others, which
resulted from the mediators own
proposal as to what would be a fair

settlement, which was accepted by
all except the all nonconsenting
state groups of the 24 states of
the District of Columbia.  I
directed another mediation with
another one of the best mediators,
not only in the U.S., but the
world, my colleague judge chapman.
Based on her mediation report, she
had over 140 contacts, discussions
and knowing judge chapman, I
believe they were in depth, serious
and well informed before the
mediation date set to see whether
the nonconsenting states could
reach agreement with the Sacklers.

That day turned into a
27-hour day.  Judge Chapman like
Messrs. Feinberg and former judge
Phillips is a successful mediator
because she does not brow beat
people, she could not brow beat
these states, that is crystal
clear.  She's a successful mediator
because she points out the risks
and rewards of not reaching a
settlement and reaching a
settlement.  Recognizing that the
process is always consensual and
not coercive.  15 of the states who
had previously fought the Sackler
settlement and the plan tooth and
nail agreed to a modified
settlement as a result of that
mediation.

I'm saying this not to
support or show my support for the
underlying settlement, but to
reflect again or to illustrate
again the arms length negotiation
here and the fact that this is not
a Sackler plan but a plan agreed to
by 80 percent of the states and
well over 95 percent of the
nonstate governments and actively
supported by the unsecured
creditors committee and
notwithstanding the incredible harm
that the debtors products have
inflicted on them.

Bitterness over the outcome
of this case is completely
understandable.  Where there has
been such pain inflicted, one

cannot help but be bitter.  But one
also has to look at the process and
the issues for their in light of
the alternatives.

And with a clear analysis of
the risks and rewards of continued
litigation versus the settlements
set forth in the plan.

And it's that process to
which I'll turn next.  As I noted,
the chapter 11 plan puts together
two settlements related to the
Sacklers.  It provides for the
settlement of the estates claims
and when I say the estates claims,
that means the debtors claims
against the Sacklers for the
benefit of their creditors.  And
the estates have substantial claims
against the Sacklers.  Indeed one
can argue that those claims are the
main claims against the Sacklers.
In addition, the plan provides for
a settlement of certain third-party
claims, claims by others that could
be asserted by others against the
Sacklers and the related parties,
i.e. the shareholder released
parties under the plan.

I will focus first on the
settlement of the estates claims.
But I will note before focusing in
on those claims and the settlement
proposed of them that the plan is
not just a plan that settles the
estates claims against the Sacklers
and third parties claims that are
related to those claims against the
Sacklers.  In fact, the plan
contains several interrelated
settlements, with those
settlements.  And would not be
achievable in any of those
settlements fell away.  They
include a settlement of the complex
allocation between on the one hand,
individual personal injury claims
and claims by governmental
entities.  The subject of months of
mediation which I already
discussed.

They also include a
settlement of the allocation of
value among the public creditors,

the states and nongovernmental
entities and Native American
tribes.  Remarkably, all of those
parties agreed to use the value
they would receive for abatement
purposes, the benefits of which
I've already described.  Other than
the personal injury claimants and
the NAS claimants, the other
private claimants have also agreed
remarkably to use the value they
will receive for abatement
purposes, not to go into their
private could havers for whatever
use they want to have such as
buying a new x-ray machine.

        In addition, during the case,
the debtors settled both civil and
criminal claims of the federal
government.  And the plan
encompasses those settlements
importantly including the agreement
by the federal government to
release 1.7 of its $2 billion
superpriority claim for the benefit
of the other public creditors and
abatement, if as is the case under
this plan, the plan meets the
requirements of the DOJ settlement
as far as setting up an abatement
structure and the corporate
governance and other public
purposes that I described for
NewCo.  All of those things hinge
on at least the amount of money
coming to the debtors from the
debtors and the third-party
settlements of the Sackler sames.
Without the $4.325 billion being
paid by the Sacklers, those other
settlements would not happen.  The
record testimony is clear on that.
The private public settlement would
fall apart and it's in my view
assured that the abatement
settlement would fall apart.  That
still begs the question, however,
is the $4.325 billion coupled with
the other agreements that the
Sacklers have made, including with
respect to the dedication of the
two charities worth approximately
$175 million for abatement
purposes, their agreement to a

resolution on naming rights, their
agreement not to engage in any
opioid related business with the
debtors or any business with NewCo
and their agreement to exit their
foreign companies within a
prescribed time.  Would not unravel
the settlements already described.
However at least that amount of
money is required.

The settlements is
compromises of a debtors claims is
claims assertible by the debtors
estate are a normal part of the
process of reorganization in
bankruptcy and are strongly favored
over litigation.  This is in part
for the obvious reason that in
bankruptcy I pie is not large
enough to feed everyone in full.
Therefore, the cost delay factor in
deciding whether to approve a
settlement or not is even greater
than it is in a nonbankruptcy
context.  However an assessment of
the merits or the claims that are
being settled has much the same
weight, the risks of losing a piece
of the pie where there's not enough
to go around are also greater in
the bankruptcy context.  In
determining whether to approve the
settlement -- I'm sorry, as far as
the pop significance that
settlements /STPHAOEUFPLT and
compromise are a normal part of the
process in chapter 11 or
reorganization, protective
committee for independent stock
holders /STPHAOEUFPLT FERRY Inc. R
Anderson in determine whethering to
approve a settlement and
compromise, the Bankruptcy Code
must make an informed independent
judgment that the settlement is
quote fair and equitible and in the
best interest of the estate Drexel
lamb better TMT trader ferry based
on the framework laid out in the
/STPHAOEUFPLT ferry case, courts in
this circuit have long considered
the following factors in evaluating
settlements one, the probability of
success should the issues be lit

gaited versus the /STPHAOEUFPLT
without the delay and expense of
litigation and subsequent appeals
two, being /STPHAOEUFPLT and
protect lit /TKPWA*EUGTS if the
settlement is not approved with its
intended expense and conconvenience
in delay including the difficulty
in collecting on the judgment.
Three, the interests of the
creditors including the degree to
which creditors support the
proposed settlement.  Four, whether
there are other interested parties
support the settlement.  5, the
competency and experience of
counsel supportive and experience
and knowledge of the court in
reviewing the settlement 6, the
nature and bred of theth
/STPHAOEUFPLT releases to be
obtained by officers and directors
or other insiders and 7, the extent
to which the settlement is the
product of arms length bargaining.
See general in gentlemen operating
LLC will often be the dispositive
factor.  That is unless the
remaining factors weigh /HEFL in
approving a settlement if the
settlement varies materially the
private scheme of the Bankruptcy
Code /-RB the court should normally
not approve it, that issue does not
apply here as I've noted in dealing
with the objections to
classification and treatment under
the plan, the plan does not vary,
the priority scheme of the
Bankruptcy Code or otherwise
violate the classification
requirements and treatment within a
class of the Bankruptcy Code.  I
will address these factors or these
elements of evaluating a settlement
in a different order than laid out
by the courts.  Following the
radium case.  I will note that they
are applied, nineteen context where
the part of the settlement involves
not the simple trade of money for
claim, but also performance
outcomes such as ceasing to be
involved with a product or the

agreement by the Sacklers to the
document depository and the like.
See for example in re: Global
vision products V.
T-R-U-E-S-D-E-L-L, 2009SDNY2009.

As I noted, this settlement
was clearly and unmistakably the
product of arms length bargaining
conducted in two separate
mediations by capable mediators
proceeded by the most extensive
discovery process not only I, but I
believe any court in bankruptcy has
ever seen.  Again the record is
unrefuted.  As to the incredible
extent of discovery taken not only
by the debtors through their
independent committee which again
truly was independent, but also the
official unsecured creditors
committee in consultation with the
nonconsenting states group and the
other states and governmental
entities.  In fact anyone who
wanted to sign the standard
nondisclosure agreement to permit
the discovery to proceed without
extensive discovery fights over
confidentiality.  From the very
first day of the case, I made it
clear, as recognized by, also by
then chief district judge McMahon
in affirments of the injunction
that I entered that the Sackler
parties and their owned and related
entities would have to provide
discovery far beyond the normal
fishing expedition discovery in
bankruptcy cases in order to have
the benefit of the temporary
injunction or any final stay and
that is exactly what happens.  I
did not have to decide one
discovery dispute on the record.  I
had numerous chambers conferences
with parties over discovery
disputes which led to I believe in
every instance additional
discovery.  There are approximately
10 million documents that have been
produced comprising almost, it's
just unfathomable the number of
pages.

Consistent with the next

factor, which is the competency and
experience of counsel supporting
the settlement, not only were the
debtors represented by extremely
capable counsel that assisted the
independent committee in reviewing
the debtors, in discovering the
debtors claims against the Sacklers
which are laid out in.
/STPHAOEUFPLT and then commented on
by John due bell on behalf of the
board special committee.  The
debtors identified over a billion
-- $11 billion of potentially
voidable transfers to various
Sackler individuals or entities.
The creditors committee did its own
discovery, including vetting that
extensive exercise.  They also
thoroughly investigated estate
claims that are not in the nature
of avoidance claims, avoiding
transfers, but claims for example
piercing the corporate veil and
breach of fiduciary duty which
would belong to the state.  Here I
believe because at least as far as
the record reflects, the basis for
such claims that would be a
generalized injury to the estate on
all creditors rather than to
individual creditors, see for
example saint Paul fire insurance
company V. Pepsi Co. Inc.
        And board of trustees of
teamsters local 683 pension fund V.
food town Inc.  So again any
statement that there has not been
transparency in this case, at least
to those who negotiated the
settlement, who again in essence
represented all of the people who
are creditors in this case, the
objecting states, the other
governmental entities, the
consenting states and the creditors
committee is simply incorrect.  And
particularly as far as an objecting
state is concerned, it's just a
lie, flat out, a lie.  They know
what they had access to.  They know
how extensive it was.  The only
argument they can make and I will
address it in the future is that

the public hasn't had access to it.
But of course if it had not been
conducted the way it was by the
public's representatives, including
the very states that make this
argument, there would not have been
that level of discovery.  Because
it is not the type of discovery
that the public would ever have
access to, including in a trial.
Or for example in an examiner's
examination.
          Factors three and four are
closely related to each over, the
interest of creditors /STPHAOEUFPLT
to support the proposed settlement
and four whether other interested
parties support the settlement, and
again I'm talking solely about the
settlement of the debtors estates
claims.  Given the plan vote, given
the support by creditors committee,
80 percent of the states,
95 percent plus of the other
governmental entities, and
apparently in this context the
United States, although one can't
really make heads or tails of the
U.S. trustees objection on this
point.  It is clear that the
creditor body by overwhelming
margin supports the settlement,
again after being fully informed in
making that decision or having
their representatives fully
informed in making that decision.
          The second issue or second
factor which now is next to last,
includes an assessment of cost
first by /STPHAOEUFPLT the
settlement is not approved.  Is
secondly, the difficulty in
collecting on a judgment.  I'll
focus on that latter point first,
i.e. the difficulty of collecting
on a judgment.
          As is often the case, parties
who support a settlement such as
hear the creditors committee,
consenting states, the
nonconsenting states who now
consent and the debtors are careful
not to lay out all of the reasons
that they support the settlement,

which usually go to assessment of
the merits, but generally cover
legal issues including legal
impediments to collection.  Because
they are legitimately worried that
either A the settlement won't be
approved in which case they're
actually going to have to run of
the risk of having given their
opponent a road map as to the
weaknesses in their case and the
strikes of the /POEPBTS case.  And
a road map as to their assessment
of the difficulty of collection.
And of course the settlement in
itself does not require because
then it would not be a settlement a
full litigation on the merits, or
collection.  I mean that's simply
not obviously the purpose of the
settlement.  Instead, the circuit
has directed the court to make an
informed judgment based on the
record before it taking into
account these factors.  At one
level, and again this is the level
that has been reported in the media
by some, one would think that this
factor clearly weighs against the
settlement.  The record I believe
is uncontroverted that the Sacklers
as a family are today worth, again
in the aggregate, approximately
$11 billion.  Clearly one could
collect even after the costs of
collection, the lawyers fees, the
tracing fees, etcetera, and the
discovery has largely been taken as
to where the assets are, and the
preliminary injunction precluded
the Sacklers from transferring
their assets further away, so one
would think that one could collect
something approaching significantly
more than $4.325 billion plus the
money the Sacklers /STPHAOEUFPLT
for settlement of civil claims,
plus the access to or the
dedication of $175 million worth of
charitable assets which adds up to
$4.5 billion plus the DOJ
settlement.
        On the other hand, the
Sacklers are not a simple set of

defendants.  They're a large family
divided into two sides, side A and
B with 8 pods or groups of family
members within those.  Most of the
scores of Sacklers never served on
Purdue's board.  I had testimony
from three who at one time or
another were officers of Purdue,
i.e. in management.

Their assets are widely
scattered and primarily held
offshore or by people who
themselves live outside of the
territorial jurisdiction of the
United States.

And might not have subjected
themselves sufficiently to the U.S.
for a U.S. court to get personal
jurisdiction over them.  I want to
be clear, I am not deciding that
issue, nor am I deciding whether
the trust or most of the Sackler
family wealth is held or helding
are in fact spend through a trust
to collect a judgment, throughing
in a possible bankruptcy case if
the beneficiary of that trust were
forced into bankruptcy by pursuit
of litigation by the debtors, or
frankly by a third-party.  The
beneficial interest and
/STPHAOEUFPL spent through the
trust may be excluded from a
bankers estate, which states a
restriction on the transfer of
beneficial interest of the debtor
and the trust that is enforceable
under applicable nonbankruptcy law
is enforceable in a case under the
Bankruptcy Code.  That section
forces one to look at applicable
nonbankruptcy law which may or may
not be the law of the United States
with regard to these foreign trusts
most of which are established under
the law of /-L baile /WHEUBG of
Jersey.  Michael Cushing an expert
in the law /STPHAOEUFPLT and the
enforceability of judgments, that
is U.S. judgments against trusts
organized under that law.  There is
a substantial issue in my mind as
to the collectability under that
law, even of a fraudulent transfer

claim.  Although it is clear to me
that under the law of various
jurisdictions in the U.S.,
including New York, that a transfer
that is fraudulent to creditors
into a trust is recoverable for the
benefit of creditors.  See
securities investor Bernard Madoff
investor securities LLC in addition
U.S. law does not rec any
self-centered /STPHAOEUFPLT that in
name only are U.S. trusts.  But
again most of the trusts here are
governed by Jersey, that is the
bailiwick of Jersey law, according
to Mr. Cushing's degree layerings,
which is unopposed on these points
electronically suggests that a
different result might apply when
one would go to enforce a judgment
obtained in the U.S. for a
fraudulent transfer or in personal
debt to the trust in the aisle,
bailiwick of Jersey.  Through the
vie count of Jersey and the Jersey
court.

        Again I'm not deciding those
issues but given the record before
me and given the agreement of
substantially all the parties in
this case to reach a settlement of
the estates claims with the
Sacklers and the due diligence
they've undertaken, which has not
been undertaken by the U.S.
trustee, one can infer that the
issue of collection is at least a
real one.  In addition, you're rid
yam factor number two, also takes
into account, or requires the court
to take into account the cost of
delay of continued litigation.  As
opposed to the benefits of a
settlement.  The cost and delay
here I believe are on an
uncontroverted based for not
approving the settlement would be
substantial.  Those /STPHAOEUFPLT
the discover for which has largely
occurred, but the litigation
pursuit, including at trial, would
have to take place, but in addition
to that, there is the cost
resulting from the unravelling of

the other settlements that I crust
described.  I believe that the
record here strongly reflects that
this settlement of the debtors
claims, the estates claims were not
approved, the parties would be back
essentially to square one on
allocating the value of the debtors
estate, including any ultimate
recovery on the states litigation
claims N. that record the
litigation analysis reflected in
Mr. Delconte's secretary
declaration which contains a
liquidation analysis is instructed
under the most realistic scenarios,
there would be literally no
recovery by unsecured creditors
from the estate in a chapter 7
liquidation, which is I believe the
most likely result if this
settlement were not approved.
Given the unravelling of the
heavily negotiated and inter-Rick
atly woven compromises in the plan.
One reason for that is that in a
liquidation scenario, the United
States agreement to forego
$1.7 billion of its $2 billion
superprior administrative claim for
the benefit of the abatement
program by the states would
disappear.  The United States would
be entitled to all of that money
first.

        This leaves the last factor,
which really in most settlements is
the most or depending on the
difficulty of collection, one of
the most important factors.  Mainly
a comparison of the results of
litigation as against the results
of the settlement.  As I noted as
with the issue of difficulty of
collection, the parties supporting
the settlement have been careful
not to lay out their views of the
defenses that the Sackler released
parties would have to the estates
claims.  And of course because it
is a settlement, there's been no
trial on the merits of those
claims.  On the other hand, I do
have reports as to the nature of

the transfers when they occurred,
what they were, and who they were
to.  And also some testimony as to
the involvement of some of the
Sacklers in the running of Purdue.
Which is relevant to the estates
claims suffered in apart from the
avoidance of transfers, name claims
for piercing the corporate veil,
alterego liability, breach of
fiduciary duty and the like.  I
also have an extensive submission
by both sides of the Sackler
family, or submissions by both
sides of the Sackler family that do
state the defenses they would
argue.  I heard the testimony of
four members of the Sackler family,
two from side A and two from side
B.  And that too is informed by
views on the merits here, although
that testimony primarily meant not
to fraudulent transfer claims, but
to other claims related to their
role in Purdue's governance.  And
the decisions made that have led to
trillions of dollars of claims
being filed against Purdue and a
criminal plea and settlement by
Purdue with the Department of
Justice from 2020.  Again I want to
be clear, I'm not making a decision
anywhere close to being on the
merits, this assessment has not
therefore in any way something that
can serve as collateral hes stomach
or just /STPHAOEUFPLT nor do I
particularly have any fondness for
the Sacklers or sympathy for them.
        I will note the following
however, the Sacklers family, 77 I
believe of them, received
comprehensive releases from almost
all of the states in 2007.  In
addition, 2007 is about as far back
under any theory that one could
look to avoid a fraudulent
transfer.  So one would vote for
estate claims and for third-party
claims be looking at primarily, if
not exclusively, actions by the
Sacklers or transfers to them that
took place after 2007, over
40 percent of those transfers went

to pay taxes, including in large
amounts to certain of the objecting
states or the states that continued
to object to the plan.  The fact
that they went to pay taxes did
obviously relieve the Sacklers of
an obligation.  I do however have
testimony from Jennifer
B-L-O-U-I-N, that if the
partnership structure of Purdue was
not in place with the taxes running
through the Sacklers, Purdue itself
would be liable for them.  And
therefore arguably received fair
consideration for the payment.  The
Sacklers would also argue that
after the 2007 settlement with the
federal government and the states,
the U.S. Department of Health and
human services entered into a
5-year corporate integrity
agreement with the company to
monitor its compliance with federal
healthcare law which took place
from July 31, 2007, to July 30,
2012.  And that agreement is
available as part of the record but
can also be obtained as a matter of
judicial notice.

        In 2015, after, well after
Purdue implemented an abuse and
diversion detection program, the
New York attorney general required
that program to be subject to
annual reviews from 2015 to 2018.
They would argue that that
compliance both with the LIG
monitor and those reviews detailed
no proper, by Purdue.  And
therefore, there couldn't be any
improper actions by the board.

        In addition they would argue
that solely as board members they
would not have a fiduciary duty for
actions of Purdue and its
management that were improper or
unlawful unless they were aware of
it.  Of course it would be a very
much a triable issue as to whether
in fact they were aware of them.
Those who are not on the board of
course would say that law didn't
even apply to them.  They would
also argue the applicability of

various statutes and limitations to
the fraudulent transfer claims that
would limit the reach back by the
/STAOEUT most of the claims.  The
states would be /STPHAOEUFPLT to
the contrary based on rights that
unique /STPHAOEUFPLT like the
federal government would have.  To
sort of a golden creditor under
section 544 of the Bankruptcy Code.
The Sacklers would also argue that
following the 2007 settlement, they
paid, meaning Purdue paid
manageable amounts in settlements
between 2008 and 2019 of litigation
claims related to opioid matters or
other litigations that would effect
the solvency of Purdue.  And that
as recently as 2016, Purdue is
receiving ratings from rating
agencies that indicated that it was
financially healthy.  And therefore
they would contend, except for the
last year or so before the
bankruptcy filing date where only a
very small amount, relatively
speaking of the roughly $11 billion
of transfers that the debtors
estate would contend are avoidable
took place.  Purdue was not
insolvent and one could not impute
intentional fraudulent transfer
liability to it.  Of course there
are statements of the record to
suggest that the Sacklers were very
aware of the risk of litigation, a
trial might well also establish as
some of the testimony that I heard
from the Sacklers.  That as a
closely held company Purdue was run
more than by a normal board, by its
board and shareholders.  I.e. the
Sacklers.
          And that notwithstanding the
denials by the Sacklers who
testified at least those who were
on the board and perhaps others who
with the votes of their family
members could control ultimately
the board, or aware of the harms of
Purdue's product and should plot
rested or taken comfort in either
of FDAs sign off on various labels
and marketing initiatives or the

reports by office the inspector
general or the auditor of the abuse
and diversion detection program.
          I believe that standing in a
vacuum on the merits, the claims
that would be achieved, the
ultimate judgment that would be
achieved on the estates claims and
related third partied claims that
it would be settled under the plan
would be higher than the amount
that the Sacklers are contributing.
But I do not believe that they
would be higher after taking into
account the catastrophic effect on
recoveries that would result from
pursuing those claims and
unravelling the plan's intricate
settlements.  And as I said at the
beginning of this analysis, there
is also the issue of problems that
would be faced in collection.  This
is a bitter result, B-I-T-T-E-R, it
is incredibly frustrating that the
law recognizes, albeit with some
exceptions, although fairly narrow,
the enforceability of trusts, it is
incredibly frustrating that people
can send their money off shore to
off shore trust that is may not
recognize U.S. law.  It is
incredibly frustrating that the
vast size of the claims against
Purdue and the vast number of
claimants the need for the interrat
plan settlements at least some of
the Sackler parties also have
liability for those claims.  But
those things are all facts that
anyone who was a fiduciary through
the creditor body would have to
recognize and that I recognize.  A
settlement is not evaluated in a
vacuum as a wish list, it takes an
agreement which means that it
generally improperly negotiated and
I believe that's clearly the case
here re/TPHREBLGTs the underlying
strengths and weaknesses of the
party's legal position and issues
of collection, not moral issues.
Or how someone might see moral
issues.  It's not enough to say we
need more.  Or I don't care whether

we don't get anything I would
rather see it all burned up.  One
has to freely focus on the
sequences of those two approaches.
I must say that when I approached
the middle stage of this case
before the mediation, I would have
expected a higher settlement.  And
frankly anyone with half a brain
would know that when I directed a
second immediate yeahs, briefly
undertaken by judge chapman, I
expected a higher settlement.
Nevertheless, extremely well
represented and dedicated parties
on the plaintiff's side knowing far
more than I have laid out today of
the strengths and weaknesses of the
case and collection and the like
agreed to this settlement.

        I am not prepared given all
the record before me to risk that
agreement.  I do not have the
ability to impose what I would like
on the parties.  The judge is not
given that power, can I only turn
down the request for approval of
it.  Given this record I'm not
prepared to do that.  As much as I
would like to impose a higher
recovery.

        I will note as far as the
bona fides of the settlement
concerned, notwithstanding my
reservations, 100 percent of this
formally closely held company that
is closely held by the Sacklers is
under this plan taken away from
them and devoted to abating opioids
ill effects in one way or another.
In addition, the amount being paid
is to my knowledge the highest
amount any shareholder group has
paid for these types of claims.
Throughout the history of
litigation involving Purdue, the
Sacklers themselves were not
targets except for the relatively
modest settlements that they
entered into with the states in
2007 until very recently.

        The entire negotiation
process in this context has
magazine for identification that

target on them.  Or that focus on
them.  While I would wish that the
amount would be higher as I believe
everyone on the other side in this
case, including the debtors does,
the settlement itself fairly
reflects the standards laid out by
the supreme court in the second
circuit in evaluating a settlement.
And clearly both it and the process
in arriving at it has not been in
any shape or form a free ride for
the Sacklers or enable them to
quote get away with it.

If what people mean by
getting away with it is getting
relieved of criminal liability,
that is obviously not the case.
And I believe given all the factors
that I've outlined, they are paying
a substantial and under the
circumstances of this case,
approvable amount as well as the
other aspects of the settlement
that they are agreeing to.  I will
note finally that as alluded to
this morning by the debtors
counsel, they have agreed also to
enforcement mechanism that is are
quite rigorous as part of the
settlement agreement so that the
collection problems that I had
addressed or the potential
collection problems are far
lessened by this settlement if they
don't live up to it.

Including as to the ability
to hide behind foreign spin trusts.
So to the extent that objectors
have object today the merits of the
settle of the of the debtors estate
claims, I will overrule those
objections.

That leaves the last issue
for determination, which is the
most complex issue.  A third-party
claims, including under a plan.
That was arguably rejected by the
circuit in a case that do
extensively cite in re: Johns
manville Corp. 517F third 52 second
circuit 2008.  Reverse travels
indemnity company V. baile 2009.
With the circuit in the left the

impression that the only source for
jurisdiction due to the course of
release of third-party claims and
an injunction to support it is
where the claim would be a
derivative, I'll come back to that
point in a moment.  The point was
somewhat cleared up in the next
manville case referred to as
manville four in the quickly
opinion appearing at 600F third at
152.  But the /KWEUGly case took it
head on in that case a party who
had brought a third-party claim
against an insurer, notwithstanding
the chapter 11 plans injection, of
claims against insurers, asserting
that the Bankruptcy Court did not
have jurisdiction to enjoin such a
claim because it alleged a
violation of an independent legal
duty owed by the defendant, the
third-party, rather than claims
that are quote derivative.  Circuit
disagreed that that was the
limitation on /STPHAOEUFPLT imposed
by it in manville three.  In the
/KAUP text of bankruptcy
jurisdiction liability, we discuss
the subject in some detail it then
goes on to state after analyzing
manville one, the McArthur company
V. Johns manville Corp. case at
837F second 89, that there was no
independent requirement of a
derivative claim for the exercise
of jurisdiction.  Rather the claim
was based upon the effect of the
third-party claim on the estate,
the circuit then went onto state
manville three did not work a
change in our juries prudence after
manville two as about of a
bankruptcy /STPHAOEUFPLT nondebtor
claims that directly effect the RES
of the bankruptcy estate, as
/TPHAOEUFPLT regard to the sail
/STPHAOEUFPLT inquiry as to whether
travels /STPHAOEUFPLT derivative of
rights and liabilities was that in
the facts and circumstances of
manville 3 cases alleging
derivative liability would effect
the rest of the bankruptcy estate.

Where as cases alleging
nonderivative liability would not.
However, it did not im/STPHAOEUFPLT
must both directly effect the state
and be /STPHAOEUFPLT for bankruptcy
jurisdiction or the action to
exist.  It then further discussed
the manville 4-case and then
stated, it thus appears that our
case from our case law that while
we have treated whether a suit
seeks to impose derivative
liability as a helpful way to
assess whether it has the potential
to effect the bankruptcy RES, the
touch stone for bankruptcy
jurisdiction remains whether its
outcome might have any conceivable
effect on the bankruptcy estate.
This test has been -- I'm
continuing now, this test has been
almost universally adopted by our
sister circuits siting the sell
/STPHAOEUFPLT Corp. that I
previously cited collecting cases
which in some instances have found
bankruptcy jurisdiction to exist
over nonderivative claims against
third parties see citing in restone
technologies, Inc., 4 /STPHAOEUFPLT
2 through 6 had and 267 and in
redog patch U.S.A. Inc.
/STPHAOEUFPLT 787, and then stating
quote a suit against /STPHAOEUFPLT
alleging liability not
/STPHAOEUFPLT but nevertheless
impose the direct impact on rest of
the /PWRUT estate /UFT impair the
Bankruptcy Court's ability to make
a fair distribution for the
bankrupts assets as a third-party
suit alleging derivative liability.
Accordingly we conclude that
litigation of the third-party suits
against the third-party would
almost certainly result in the
drawing down of insurance policies
that are part of the bankruptcy
estate of the debtor, the exercise
of the bankruptcy jurisdiction to
enjoin these suits was appropriate.
I conclude here based upon the
adverse effect of the third-party
claims that are covered by the

shareholder release as I will
further narrow it do effect the
rest of the estate, including
insurance rights and rights to
indemnification and the debtors
ability to pursue its own claims.
Certain of the objectors cite a
pre-Bankruptcy Code pre-28 section
34-case from the supreme court
Callaway V. Ben ton 336 U.S. 132,
1948 for the proposition that there
is no such jurisdiction.  Of course
section 1334 is broader than the
jurisdictional mandate that applied
at that time in that case.  It is
rather a dramatic change to the
jurisdictional scheme from the
bankruptcy laws administered before
that time.  And is meant to be
interpreted broadly as laid out by
the case law as well as
commentators, she Howard B bushman
the third power and proprietary
Bankruptcy Code intervention and
actions between non-debtors, 47
business lawyer 913, 914 through
19.  May 1992.  See also in redo
you corning corp 255V445, ED
Michigan 255BR455, 2002 vacated on
other grounds downing Corp.
280F3648, 6th circuit 2002.  One
example of the courts recognition
of the breadth of bankruptcy
jurisdiction, under the Bankruptcy
Code in 28 /STPHAOEUFPLT section
1334 although not directly on point
is United States V energy resources
company Inc. 1990, although again
the court must go through the
analysis gone through by quickly
and other courts defined the
necessary conceivable effect on the
debtors estate for there to be
subject matter jurisdiction.

        Although I have done that
here.  I will note that another
case the objectors rely on in
gentlemen /STPHAOEUFPLT pet rule
yes, ma'am network Inc. bankruptcy
SDNY2019.  Has questioning the
ability of the Bankruptcy Court to
ever impose a release of a
third-party claim as a
jurisdictional matter which case

cites the Callaway V Ben ton case
and does not cite the quickly case
because well I don't know why.
Maybe it wasn't raised to a judge.
Nevertheless acknowledges that
where there is quote a huge overlap
between claims that a debtor is
making against its parent company
and the various other parties were
making against that nondebtor
company or where there is a direct
connection between the asset or the
claims of the debtor and the
contributions that were being made
for both resolving those claims and
claims basically aligned with those
claims, those estate claims such a
release would be appropriate, at
727.  So I conclude that there is
depending on the nature of the
release jurisdiction to enter an
order enforcing a plan that has
such a third-party claim release in
it.  And that jurisdiction is based
upon the effect of the claims on
the estate rather than that the
claims are quote derivative.
Although if they are derivative,
that is a good sign that they
effect the estate.  Again see
quickly 667F3 at 52.  The objectors
have also raised the objection that
the release of third-party claims
is a violation of due process under
the constitution, there are really
two aspects to this objection, the
first is one that the courts in
this circuit do not accept as part
of a settlement of the claim that
channels the settling funds to the
estate.  See manville 89, 91
through 92, second circuit 1988.
And in re: Care one offices S. P.
A. R. lynch V. lap /TKEPL limited
592VR489504 through 505, see also
in remill em /STPHAOEUFPLT holding
II LLC 575273 bankruptcy Delaware
2017 affirmed 591VR, 559D Delaware
2018 affirmed 126 third circuit
2019 cert denied, 140 supreme court
20852020, a cord confirming a plan
with releases does not rule on the
merits of the state law claims or
in this case third-party claims

being released.

The other aspect of the due
process objection goes to the
notice that was provided with
respect to the release.  It is now
clear under the plan that only
holders of claims against the
debtor or debtors are being
released under the third-party
shareholder release.  And it is
clear from the factual record that
holders of claims received in my
view due process notice not only of
the bankruptcy case, but of the
plans intention to provide a broad
release of third-party claims
against the shareds and the related
entities related to the debtors as
a whole, indeed at that time with
that notice, including the simple
form notice that went out, the
release was far broader than it is
today to argue that because it was
more complicated than because it
was broader is somehow a violation
of due process is equally
incorrect.  Ultimately the issue of
what processes do requires a court
to ask whether in the connection
with the confirmation hearing,
notice was sent that was reasonably
calculated under all the
circumstances to apprise interested
parties of the pendency of the
request and afford them an
opportunity to present their
objections.  Lain be central
happenover /PWRUFS trust company
1950, see also /EL /STPHOEUFPLT in
remotors liquidation company says
829135158 second circuit 2016.  As
noted by the circuit in this case,
this requirement always
/STPHAOEUFPLT bankruptcy
proceedings and what is reasonably
known by the debtor of the party
who would be effected by the action
that the debtor is taking.  It
appears to me again based upon
Ms. Finnegan's testimony that
holders of claims receive
sufficient notice of the release
indeed the broader assumption I
believe fostered in the media is

that the release even included
criminal liability which it
doesn't.  In fact there were
multiple objections to the plan
based upon the third-party release
and I conclude that compliance with
the procedures laid out by Ms. Fin
began and with the dictates of
bankruptcy rule 3016 which requires
bolding of the release language is
in fact sufficient.  See for
example hospital Inc. 48 bankruptcy
D. New Mexico 2016 in reretail
group Inc. 2021WL2188929 bankruptcy
ED Virginia May 28, 2021.  And for
Nova capital Corp. V Larson
pharmaceutical Inc. 2003 U.S.
district Lexus 26681 affirmed for
Nova capital Corp. pharmacy Inc.
425F3129411 /STPHAOEUFPLT sir you
2005.  If someone can make the case
after the fact that they did not
receive the type of notice that
Mr. Fin began testified to or the
debtor could be said to be aware of
them tombly and therefore given the
approved notice they would have the
right to come back and argue that
as was the case in the motors
liquidation second circuit opinion
that I cited.  But as far as the
record before me is concerned
confirmation and request for
approval of the third-party release
satisfied due process.
        The next objection to the
third party release provision in
the plan pertaining to the
shareholder settlement is an
objection based on the power of the
Bankruptcy Court to issue a final
order confirming the plan it has
been addressed now at length in two
opinions that that I will simply
refer to that I believe the logic
of these opinions cannot be
improved upon as far as the
Bankruptcy Courts authority and the
context of a concededly core
proceeding, namely consideration of
whether a chapter 11 plan should be
confirmed or not, which is the
fundamentally central aspect of a
chapter 11-case is in fact core so

I will refer parties to those
opinions.  Lab holdings 2LLC
/STPHAOEUFPLT also applicable here
I believe directly on point is
lynch V. lap /TKEPL limited in
recare one offices S.A. R. L. 592V
/STPHAOEUFPLT DSNY twenty affirmed
holding limited curon offices S. P.
R. L. 2019 U.S.A. Lexus
/STPHAOEUFPLT second circuit 2019,
I will note that in that
affirmance, the circuit did not
reach the determination by former
chief judge McMahon that this was a
core, this type of an injunction is
a core proceeding within a core
proceeding, but I believe her logic
is correct.  And I believe that
that logic will distinguish her
statement in done way V. Purdue
pharma LP619BR318.  Where she was
dealing not with a chapter 11 plan,
but rather a request for a
preliminary injunction under 105 of
the Bankruptcy Code and in that
context concluded I believe
correctly although she was
reversing me on the point that in
that context the court had only
related to jurisdiction because it
was not a core matter like a plan.
At least that's how I read this.
That still leaves however the
merits of the application of the
court's jurisdiction and power to
enter a final order to the
third-party claim release and
injunction in the plan pertaining
to the shareholder release parties.
        Most of those -- let me take
a pause for a second.  Most of the
case law on this topic and there's
a lot of case law at the circuit
level as well as at the lower court
level does not deal with the
foregoing jurisdictional and
article three article 1 power
issues.  Now it deals with the
statutory source for the claimed
ability to enforce a coercive
release of a third-party claim and
the limited circumstances in which
that would occur.  Every circuit at
this point has an opinion on the

issue.  The clear majority of
circuits supports the issuance of
releases on a basis of third-party
claims under appropriate narrow
circumstances.  Life insurance
company V. Ropes & Gray first
circuit 1995.  Deutsche Bank AG
/TPAOEUB network Inc. /STPHAOEUFPLT
second circuit 2005 and the case is
cited therein from the second
circuit, including the manville
case that I previously cited.  As
well as the Drexel case I will cite
in a moment.  In/STPHAOEUFPLT mill
yes, ma'am /STPHAOEUFPLT LLC which
I just cited from the third circuit
national heritage foundation Inc.
V. high born 2015 and AHN Robins
company Inc. 1989.  In re-Dow
corpsing corp 280F third through 58
second circuit 2002.  In reerdine
A-R-I-D-I-G-M communications Inc.
/STPHAOEUFPLT 540655 through 58
second circuit 2008.  And in
reen/TKPWER /SOL Inc. second
circuit 2009, which held even that
those who hold who /TKHOEPBLTD
/STPHAOEUFPLT such a release under
appropriate circumstances.  In
reseaside engineering surveyance
Inc. 107627911th sir /STPHAOEUFPLT
2018 and in re-AOV industries Inc.
21401153D C circuit 1986.  Three
circuits are on record first
national bank and trust company
Tulsa (in re: Real estate fund
Inc.) 10th circuit 1990.  The
following can be said about those
3 cases or the line of cases from
those three courts, first, they are
based fundamentally on a view that
section 524E of the Bankruptcy Code
precludes the grant of such a
release, that section says quote
accept as provided in subsection A3
of this techs which is irrelevant
hear /STPHAOEUFPLT discharge of the
debtor does not effect the
liability of any other entity on
with the property of any other
entity for such debt.  I will note
in a moment that several of the
cases and I believe they employ the
right analysis including the second

circuits manville 1 case refute
that view as a statutory matter.  I
will note further that in the
Pacific lumber case, 59th circuit
noted quote nondebtor releases are
most appropriate as a method to
challenge mass claims toward a
specific pool of assets.  In a
context of quote global settlements
of mass claims against the debtors
and co-liable parties, close quote.
Citing a similar observation by the
5th circuit in fell able Corp. 62
if third /STPHAOEUFPLT 5th circuit
1995.  That's quote was from a 67F
third, I'm sorry, was from 584F
third 252 from the 5th circuit
specific lumber case.  I will note
further not are w standing /RET
likes /STPHAOEUFPLT as precluding
any release which the circuit had a
low /STPHAOEUFPLT such as American
hardwood 88 /STPHAOEUFPLT 9th
circuit 1989 equating with a
discharge.  The circuit, the 9th
circuit held that a release of a
third-party claim limited to
actions taken in or related to the
bankruptcy case could an
appropriate circumstances be
imposed in a plan.  Which undercuts
the 524E analysis since post
bankruptcy preconfirmation claims
would be subject to the discharge
as well.
        961F third 107 --
C-B-L-I-X-S-E-T-H Credit Suisse,
/STPHAOEUFPLT 10 /STPHAOEUFPLT
through 815, 9th circuit 2020.  I
will note further that the western
real estate fund case from the 10th
circuit from 1990 did recognize as
the American hard woods case also
recognized the proprietary of
imposing a temporary stay of
third-party claims to quote /TPAFL
rate the reorganization process one
wonders why if one is not bound by
the 524E argument such a temporary
stay could not become a permanent
stay if the reorganization process
would be appropriately facilitated
over the objections of a small
number of creditors who assert

third-party claims.  In any event,
that opinion has been interpreted
and I believe Cogently, although
fairly bravely, by a court in the
10th circuit, is not standing for
the proposition that 524E, the
Bankruptcy Code clearly precludes
all third-party releases and that
section 105A of the Bankruptcy Code
and other applicable bankruptcy law
might in appropriate circumstances
justify a release of third-party
claims.

    In re: Midway gold
575VR475505 bankruptcy D Colorado
2017.

    The argument upon which the
3 cases that I've just gone through
at some length from the 5th, 9 and
10th circuit which go against the
majority of cases dealing with
third-party releases.  Relies upon
a theory that section 524Es
language which I quoted precludes
to grant a release as part of a
settlement under a plan.  This view
I believe is appropriately
addressed and refuted by a number
of courts including the erdime
communications Inc. court, AIRIDIGM
communications Inc. 519F third.  At
I'm sorry 640 and the 6th circuit
in /STPHAOEUFPLT downing Corp.
280F36482006.  It's also
effectively refuted by the
distinction made in the manville
and lynch V. lap /TKEPL cases a
previously cited which distinguish
a discharge from a settlement of
claims.  It is also inconsistent
with section 524 itself, 524G of
the Bankruptcy Code specifically
provides for certain third-party
releases if certain conditions are
met in a plan that deals with
asbestos liabilities.  And a trust
set up for asbestos liabilities
including the affirm tiff vote of
the effective class in a
supermajority of 75 percent which
as I noted here has been well
exceeded.  But more importantly
section 524H of the Bankruptcy Code
recognizes that this provision,

524G does not mean that plans that
were confirmed before the enactment
of section 524G are in fact
unlawful.  And indeed the
legislative history to the
amendment makes that point.
Stating section at that .111, but
it became 524H rule of construction
to make clear that the special rule
being deviced for the asbestos
claim trust/injunction mechanism is
not intend today alter any
authority bankruptcy courts may
already have to issue injunctions
in connection with the plan of
reorganization.  Indeed John
manville and UNR firmly believe
that the court in their cases had
full authority to approve the
trusted judgment mechanism.  In
other debtors other his
/STPHAOEUFPLT error with similar
mechanisms.  The committee
expresses no opinion as to how much
authority the Bankruptcy Court may
generally have under traditional
equitable powers to issue an
enforceable injunction of this
kind.  The committee has decide
today provide explicit authority in
the asbestos mayor /STPHAOEUFPLT of
the claims involved.  How the new
statuty mechanism works in the
asbestos area may help the
committee judge whether the concept
should be extended into other
areas.
        140 Congressal record
appearing in 1994W L54573 October
41994.  Similar commentary appears
in Mr. -- /STPHAOEUFPLT remarks
appearing at 140 is Congress record
/STPHAOEUFPLT regarding the
bankruptcy reform act of 1994.
Where senator states finally,
Mr. President, with respect to the
senator's specific question, this
section applies to injunction and
in effect on or after the date of
enactment.  That what means any
injunction may have been issued
under court prior to effectment
such /STPHAOEUFPLT afforded statuty
from the day enacted forward

assuming it otherwise means the
following criteria described
earlier.

It appears clear to me
therefore the case law under the
code itself that 524E is not an
impediment to the court's statuty
impediment that is to the court's
issuance or enforcement of a
third-party claim release and
appropriate circumstances.  That
raises the issue however, what is
the court's statutory or other
source of power.  Which also has
been discussed ably I believe
establishing by position to comment
one way or the other as to whether
it's able or not, but it's been
discussed thoroughly I believe and
appropriately applied at the
appellate level.

Again see in reerdime
communications Inc. 519F third
648657, 7 /*EUT circuit 2008.
Where the circuit after determining
that section 524E is not a bar to
the grant of release states the
second related question dividing
the circuits is whether Congress
firm tiffly the /STPHAOEUFPLT from
a creditors claims without the
creditors consent.  Even if 524E
does not expressly conclude the
releases.  The Burt /STPHAOEUFPLT
and rules of he can quit
/STPHAOEUFPLT and his equitable
powers are traditionally broad,
resources Inc.  Section 105 of the
Bankruptcy Code codifies this
understanding of the Bankruptcy
Court's powers by giving it the
authority to effect any quote
necessary or appropriate order to
carry out the provisions of the
Bankruptcy Code.  And the
Bankruptcy Court is also able to
exercise these broad equitable
powers within the plans of
reorganizations themselves.
Section 1123B6 of the Bankruptcy
Code permits court to quote include
any other appropriate provision not
inconsistent with the applicable
provisions of this title.  In light

of these provisions we hold that
permits the Bankruptcy Court to
release third parties from
liability and to participate in
creditors if the release is quote
appropriate and is not inconsistent
with any provision of the
Bankruptcy Code.  See also class 5
Nevada claimants V do you corning
corp, in redo you /TKORPBG Corp.
      I will now turn to what types
of claims can in fact be released
under that power.  A topic that
again directs one back to the 7th
circuit questioningly case that I
repeatedly cited /STPHAOEUFPLT 45.
In that case the court extensively
discussed the relation of its use
of the term derivative claims both
the court's jurisdiction to impose
a mandatory release of third-party
claims and the court's power to do
so in appropriate circumstances.
The use of the term derivative
claim which really I believe began
in the manville 3-case which
appears at 517F third is an
unfortunate one.  There's a widely
accepted definition of the term
that is derivative claim.  It's
one, it's a claim that is asserting
injury to the corporate entity and
requesting relief that would go to
the corporate entity.  See Donohue
V. bull dog estimates general
partnership 696F3 second circuit
2012.  The circuit has spent an
enormous amount of time and
resources interpreting what I would
refer to as true derivative claims,
i.e. those that are really claims
asserted by third parties, but
properly existing in the bankrupt's
estate.  And belonging to the
estate.  Much of this analysis
occurred in the Madoff case where
various third parties tried to
pursue for their own benefit as
opposed to for the benefit of the
estate claims against third
parties.
      And the court determined
whether in fact those claims were
really claims of the third-party or

claims brought by the third-party
that would have to be, if there was
any recovery, part of the debtors
estate as opposed to collected only
by the third-party.

In these types of cases, the
court looks at whether the relief
sought by the third-party claimant
against the third-party defendants
are really secondary harms that
flow primarily to the estate.  See
Marshall W. pick /ARD /STPHAOEUFPLT
Madoff investment securities LLC
740F third 81 second circuit 2014.
And /STPHAOEUFPLT McGee Corp.
interest knocks Inc. 855F third 84
second circuit 2016.  They defend
the right, the strong bankruptcy
policy to a rateable recovery from
the debtors estate, which is a
requires that claims that purport
to be independent of a remedy for
the debtors estate, but are in fact
arising from harm to the debtor
before the debtors before and not
the third-parties benefit.  This is
the type of claim that is included
within the nonopioid release for
non-Sackler shareholder parties.

That release is defined in
the nonopioid excluded claim
definition, does not exclude, I'm
sorry does not include and instead
excludes any cause of action that
does not allege expressly or
impliedly any liability that is
derivative of any liability of any
debtor or any other estates.  If in
fact those types of claims were the
only claims to be released we would
not be talking about a third-party
claim release, we would be talking
about a release that clarifies and
protects the estate from back door
attacks through the assertion of
purportedly third-party claims.
That in fact are estate claims.
Instead third-party releases quite
often involve independent claims,
at least independent as a legal
basis, if not as a factual basis.
See for example in redirectionle
/STPHAOEUFPLT 960F second 2851992.
The claim asserted by the

California department of toxic
substances control against
third-parties in California
department of toxic substances
control, the EXIDE holdings Inc.
parentheses holdings Inc. 2021 U.S.
district Lexus 123D Delaware
July 26, 2021.

And in car leany V. card carp
can /STPHAOEUFPLT in recard Corp.
342BR45SDNY2006, the question is
what sorts of independent legal
claims are properly covered by a
third-party injunction.  On this
point as in so many others, the
circuits opinion in the quickly
case albeit in that it discusses
liability under section 524G
provides real guidance.  In that
case, the party relying upon a
third-party release insurance
company argued that because the
claim against it would not have
arisen but for the debtor, because
the debtor distributed its
products, it would be covered
properly by the release and the
third-party claimant said
otherwise.  And in this instance as
opposed to the jurisdictional
argument, the circuit agreed with
the claimant.

The court concluded that the
but for test creates too much of an
accidental Nexus to the bankruptcy
estate.  And that instead the
third-party claim to be subject to
the injunction must arise as a
legal consequence of the debtors
conduct or the claims asserted
against it such that that conduct
must be a legal cause or a legally
relevant factor to the
third-parties alleged liability.
676F third at page 59 through 50.
This is a consistent theme
throughout the case law.

An independent liability may
be enjoined if it is dependent on
the debtors liability through
conduct of the debtor.  Car in
re-WR grace company 900F third
126136.  As stated in the card
Corp. case which I previously

cited, if there is an identity of
interest between the debtors and
the nondebtor Lex with related
conduct which would not exist as a
liability to the third-party but
for the debtors conduct is the
proper subject of a third-party
injunction.  Similarly the court in
in refirst energy solutions Corp.
606VR720 bankruptcy ND Ohio
referred to an identity of interest
with the debtor and between the
debtor and the third-party claimant
where the debtor is primarily
reliable and one can view the
nondebtor parties as secondarily
liable is the relevant
consideration.  So in con/STRAOUG
the proprietary of the court's
exercise of its power to grant a,
or impose a nonconsensual
third-party release, that type of
relationship must underpin the
release.  Otherwise the release
would be too broad, it would
release for example claims based on
a guarantee which is a separate
factual premise than the debtors
conduct.  It would for example in
this instance release a claim if
one of the Sacklers negligently
prescribed an opioid to someone.
Which clearly under the case law is
guided by the quickly case would
not be the proper subject of a
third-party release.  So while a
firmly believe that I have
jurisdiction and power under
article 1/article 3 of the
dichotomy of the constitution, and
there is a sufficient source of
that power in the Bankruptcy Code
itself in sections 105 and 1123A6
as well as in the court's inherent
equitable power, which has been
recognized by bankruptcy scholars
in this area including as applying
to third-party injunctions and
claim injunctions and releases, see
for example Adam J. leave ton
article toward a federal common law
bankruptcy, judicial law making in
a statutory scheme 80 American
bankruptcy law journal 1, 2006, I

believe that they extent one is not
imposing a release of a truly
derivative claim, the claim needs
to be sufficiently bound up in the
debtors own actions, albeit that
it's a separate independent legal
claim that would be payable if
recoverable to the third-party as
opposed to the debtor.  For the
claim to be subject to the
injunction.  In that regard,
regardless of whether or not in
applying the standard, which I
still have not yet gotten to as to
whether third-party claim release
is appropriate or not, would
require that the shareholder
releases in paragraph 10.7B by the
releasing parties be further
qualified than they now are to
apply where again following the
guidance of the quickly case a
debtors conduct with the claims
asserted against it are a legal
cause or a legally relevant factor
to the cause of action against the
shareholder released party.
Otherwise the release would
improperly extend to for example
the prescription example that I
just gave.  On the other hand,
having read the objective states
complaints against the Sacklers,
which is noted not only by me, but
by chief district judge McMahon in
her Purdue opinion, essentially
dove tailed with the objecting
states objections to -- I'm sorry,
claims against the debtors.  Those
claims that is would be properly
covered by the shareholder
injunction.  As I said, that leaves
still the issue of whether under
the applicable standards and the
facts of this case, the third-party
releases should be imposed.  Those
standards vary among the circuits.
In the second circuit, in the in
remetro media fiber network Inc.
case, second circuit 2005, the
circuit went through a number of
circumstances where courts have
exercised their power including
under section 105 of the Bankruptcy

Code in furtherance of section
1123A6 and observed that courts
have approved nondebtor releases
when the state receives substantial
consideration, the enjoined claims
were channelled to a settlement
fund rather than extinguished, the
enjoined claims would indirectly
impact the debtors organization by
way of an indemnity consideration
and the plan otherwise
/STPHAOEUFPLT provided for a full
payment of the enjoined claims.
The court went onto state, however,
that this is not a matter of
factors or prongs and further that
no case has tolerated nondebtor
releases absent the findings of
circumstances that may be
characterized as unique.  Not
recognizing further that such
releases can be abused,
particularly if they are for
insiders.  And need to be supported
by sufficient findings by the
Bankruptcy Court.  The third
circuit has a similar but somewhat
different standard as laid out in
the ex /AO*EUD case where the court
states citing, with citations
omitted, but citing among other
cases continental airlines, to
grant nonconsensual releases a
court must assess fairness,
necessity to the reorganization,
and make specific actual findings
to support these conclusions.
These considerations might include
whether one the nonconsensual
release is necessary to the success
of the organization, the releasee
have provided a critical financial
contribution to the debtors plan,
the releasees financial
contribution is necessary to make
the plan feasible and the release
is fair to the nonconsenting
creditors.  I.e., whether the
noncun con/STPHAOEUFPLT in exchange
for the release.
        Other circuits, including the
fourth and 11th circuits and the
6th circuit have applied a multi
factor test as well that is in in

some ways /STPHAOEUFPLT similar,
usually an indemnity relationship
such that a suit against the
nondebtor in a/STPHAOEUFPLT or will
deplete the assets of the estate to
the nondebtor has contributed
substantial assets to the
reorganization, three, the
injunction is /SERL to
reorganization, namely the
reorganization hinges on the debtor
being free from indirect suits
against parties who would have
indemnity for contributions claims
against the debtor, four, the
impacted class or classes
overwhelmingly /STPHAOEUFPLT
provide the plans provide a member
/STPHAOEUFPLT pay for substantially
all of the class ors class effected
by the injunction.  6, the plan
provides an opportunity for those
claimants who choose not to settle
if x recover in full, and
/STPHAOEUFPLT made a record of
specific factual findings to
support his conclusion.
        The 7th circuit has a very
broad standard although noting the
potential for abuse whether it
needs to be a finding that the
release was an essential
/STPHAOEUFPLT fruit exchange of
good and valuable consideration.
        That will enable unsecured
creditors to realize distribution
in the case in re/STPHAOEUFPLT 526F
third 856, 7th circuit noun 9.
Again according to /STPHAOEUFPLT
none of these factors is
dispositive, but they do need to be
considered in relation to the
record and they do need to be in
the context of truly unique
circumstances where the release is
necessary to the plan.  Certainly
circumstances of this case are
unique, every chapter 11-case has
its own unique factors and
difficulties but I believe this
case is the most complex case given
the issues before the parties and
ultimately the court that I have
ever seen and that has come before

the courts under chapter 11.

At least that view is confirmed by the parties to this case. They were represented by extremely capable experienced counsel. It is also clear to me that for the reasons I already stated, that the monetary contributions by the Sacklers are absolutely critical to the confirmation of this chapter 11 plan. Without them I believe the plan would completely unravel including the complex interrelated settlements that depend upon the amount of consideration being supplied as well as the nonmonetary consideration. Now it is also the case that the plan has been overwhelmingly accepted including by the classes effected by the third-party release well above the 75 percent supermajority in section 524G and recognizing the proper classification scheme of the plan over 95 percent of the creditors in the classes where there are objections.

It is also clear to me that being paid by the Sackler released parties or shown to the release parties is in fact substantial as I noted earlier not only is it substantial in dollar terms, I believe it's the largest amount that shareholders have paid in such a context ever. It has been argued that either in light of the aggregate amount of the claims or the amount of the Sacklers wealth, it is not substantial. And I've considered that point carefully as I noted, I would wish the amount would be even higher. However as a raw matter, it is undoubtedly a substantial amount. Moreover, and this highlights the distinction from this case from one of the factors that I have cited which is that the plan quote provides a mechanism to pay for all or substantially all of the class or classes effected by the injunction.

Clearly that will not occur

here as I already found United
States's claim for example is
receiving only under 1 percent of
the recovery and it's fair to
assume that other claims that are
yet to be liquidated would come
nowhere close to being paid in
full.  On the other hand, there
have been a number of cases that
have held that a full recovery is
not necessary and indeed one would
question why you really need a
third-party release when you can
project a full recovery anyway.
See in refan steel family Corp.
2018 bankruptcy Lexus, bankruptcy
SD Iowa October 26, 2018, and
B-E-H-R-M-A-N-N V. national
heritage foundation Inc. 663F third
704, fourth circuit 2011.

        A more relevant consideration
I believe is whether the plan in
its third-party release provision
is in fact fair not just to the
estate generally and all the
creditors in the estate, but also
to those who are bearing the brunt
of the third-party release, which
is the view under the third circuit
standard and I believe a proper
one.

        The concept of Marshalling
from two different sources of
recovery from some cases, including
the Dow case that I cited has been
cited as an authority for imposing
a third-party release, Marshalling
does not require payment in full
generally, it only requires payment
in full from the sources of a
specific recovery.  Or rather the
full amount of the sources
available from their marshalled
claims.  And I have analyzed the
fairness of the settlement on the
third-party claimants from the
perspective of their recovery if
they were allowed to pursue their
third-party claims.  And it's in
that context, if at all, that the
rights of the third-parties and the
amount that they would recover is
relevant to the question of whether
there's a substantial contribution

to the reorganization.

It is without doubt the case
that without these releases, the
Sackler shareholder released
parties would not agree to the
payments under the plan.  And they
understandably I believe are
insisting on that because that is
their consideration in return for
the consideration they are
providing to the estate.  I've
already concluded that without the
releases the plan would unravel and
in all likelihood the debtors case
would convert to a case under
chapter 7 of the Bankruptcy Code.

In that context, I've already
found that from the debtors estate
unsecured creditors like the
objecting creditors would in all
likelihood recover nothing or at
most as set forth in the unrefuted
liquidation analysis by
Mr. Delconte /STPHOEUFPLT
$600 million which is a high case
scenario that I am skeptical about.
I've already gone through the
dilutive effect resulting from
conversion of the case to chapter
7.  The question is whether in that
scenario, the third parties could
pursue the Sackler released parties
to make up the amount that they
would have lost from the estate
distribution by pursuing their
third-party claims.

In large measure by analysis
of that reasonably projected
outcome is quite similar to my
analysis of the collectability and
merits of the estate claims against
the Sacklers.

Although I believe that the
fraudulent transfer claims against
certain of the Sacklers are
probably the strongest of the suite
of claims against them and they
would clearly be aggressively
pursued by a chapter 7 trustee, the
problem is that the senior claims
of the United States and the costs
and risks of pursuing them would
eat up most of the value.  As far
as the third-party claims are

concerned they do derive from the
same facts pertaining to the
debtors activities, operation and
marketing with respect to opioids,
but are further narrowed to claims
against the directors and
controlling shareholders related to
those activities.  Again we did not
have a full trial regarding the
merits of such claims, however, the
record before we /STPHAOEUFPLT
arguments I've gone through already
with respect to the /STPHAOEUFPLT
include rare piercing and breach of
fiduciary duty and the like which
all involve conduct by controlling
shareholders and directors.  And I
won't repeat them here because I
believe they equally apply to the
third-party claims.  In addition
the same issues pertaining to
collection apply, except that the
well recognized ability to break
through a trust if in fact this is
under U.S. law, if in fact it was a
recipient of a fraudulent transfer
would not apply to the third-party
claims which are not fraudulent
transfer claims, but rather direct
claims which would have to be
asserted against the Sacklers, all
of them, and/or their companies
which are held in trust in the
bankruptcy -- I'm sorry, the
bankruptcy, the structure testified
to by Mr. Cushing.  I'm not again
ruling that that structure could
not be breached, but I believe it
would be very difficult to do so.
Particularly aware0ed to was
undercut.  So it would appear to me
that the aggregate recovery by the
objecting third-parties in respect
of their claims against the debtor
and against the third-parties which
again I have narrowed to fit within
the claims of the rubric would
exceed materially the recovery if I
did not confirm the plan and they
pursued their third-party claims
separately as well as their claims
against the debtor in the
inevitable liquidation of the
debtor under chapter 7.

A related argument made by
the objectors is that contrary to
what I've just gone through, the
plan does not satisfy the best
interest test of section 1129A7 of
the Bankruptcy Code.  There is a
statutory response to that argument
that under the plain meaning of
section 1129A7 I believe is well
taken.  That section again provides
that with regard to a party that
has not accepted its treatment
under the plan, the such holder of
a claim will receive or retain
under the plan on account of such
claim and I went to emphasize that
/STPHAOEUFPLT on property of a
value as the effective date of the
plan that is not less than the
amount that such holder would so
reef and I'm emphasizing the word
so receive will retain if the
debtor were liquidated under
chapter 7 of this title.  It is
clear to me that as a matter of
grammar, the comparison is between
the amount that the objecting
creditor would receive under the
plan on account of its claim and
what it would so receive again on
account of its claim under chapter
7 and would not look to rights that
it would retain against third
parties.  I recognize that the
interpretation of section 1129A7 by
two of my colleagues who I greatly
respect in in re: Die tech holding
/STPHAOEUFPLT bankruptcy SDNY2019
and in requickly company 437BR102
bankruptcy SDNY2010, are to the
contrary that one should look if
one can make a reasonable
determination at one that rights
would have not in with respect of
one's claims, but in respect of
other claims, third-party claims in
a liquidation in comparison to the
rights that one would have based on
one's claim under the chapter 11
plan.  Neither of those cases
however addresses the plain meaning
argument that I've just gone
through and I believe the plain
meaning would rule here.

Importantly though I have not
limited my ruling to the plain
meaning interpretation that I just
gave.  I have instead assessed
based on the evidence before me in
this settlement hearing context
what I believe would be recovered
by the objecting creditors in a
chapter 7-case both on account of
their claims and on account of
their third-party claims.  And
based on that assessment, I
concluded they would recover more
or at least as much as that
recovery if I confirm the plan.
          If both the die tech and
quickly cases, the court's stated
that if the recovery from nondebtor
sources, i.e. the claims would be
released under the plan were
neither speculative nor capable of
estimation, or speculative and
hypothetical, then the analysis
could be done.  In both of those
cases, the courts determined in
1 case based on various admissions
by the debtor, that is the quickly
case as to the settlement history
over a 20-year period of such types
of claims and at least some
evidence which was the only
evidence offered by the planned
proponent which has a burden of
proof which showed that for at
least a relatively short period
January 2nd /STPHAOEUFPLT there
were payments on settlements that
could be owe vaulted and therefore
one could evaluate settlement
payments generally and therefore
the claims were capable of being
estimated, the planned components
/STPHAOEUFPLT the objecting states
have suggested that in similar
failure of proof existing here
given the absence of any expert
testimony to try to value the
claims of the objecting states
against the third parties, mainly
the Sacklers and the related
entities.  It is true there is no
such expert testimony but I believe
it would have to be expert fact
testimony, not an assessment of the

strengths and weaknesses of the
claims including the costs of
pursuing them, the risks of
collection and the die dilutive
effect of all of the other claims
that /STPHAOEUFPLT all the other
creditors in this case, including
all of the other states who
otherwise agreed to the plan
because it is perfectly obvious
that they would not agree to let
the objecting states alone pursue
the shareholder released parties on
the theories that would equally
apply under those other states
laws.  Collectively, the states and
territories of this case filed
proofs of claim aggregating in an
unliquidated amount at least 5
/STPHAOEUFPLT the objecting states
share that adds up to 482
/STPHAOEUFPLT or roughly 22 and a
half percent that comes down to 450
billion or less than 21 percent if
you exclude West Virginia which
really was not raising this issue.
If you factor in all of the other
claims some of which would clearly
have third-party claim rights that
you're talking about a largely
dilutive effect on the recovery on
top of the liability and claim
collection issues that I've already
described.

         I believe that given the /POS
/STPHAOEUFPLT of any settlement
history here with the exception of
the payment to the state of
Oklahoma by the Sacklers and their
payment to the United States in
respect of their civil claims, that
assessment which is fundamentally
an assessment by the court of the
legal risks and implementation
risks of pursuing a lawsuit is a
proper assessment and I conclude
again that the settlement is fair
to the objecting states after
having conducted that assessment
their claims of large measure were
dependent upon /STPHAOEUFPLT
debtors truly and therefore not
truly derivative claims would
depend largely on finding whether

any of the Sacklers was personally
responsible for the misconduct of
Purdue.  Such a trial might
actually show that.  I believe the
testimony before me was
inconclusionive on that point,
although clearly I accept that
there is substantial risk for the
Sacklers that that point would be
wrong by the objecting states so in
addition to that risk for the
reasons I've already stated, there
are substantial cost and collection
risks that I don't need to go
through again.  As far as the
/STPHAOEUFPLT proof that would need
to be shown I've not gone through
every state's applicable law on
this point, but I will note that
the main case they have cited in
their briefs, gray son in orderic
construction Inc. 1979 and state V.
/RAL /*FL /STPHAOEUFPLT 87
Washington second 2983221976, both
of which found individual
/HRAOEUBGT based on the controlling
shareholders personal actions for
many of the unlawful acts and
practices taken by that person's
corporation.
          The last argument made by the
objecting states is that the
nonconsensual third-party release
and injunction is a violation of
their sovereign entity and police
power.  There is no such bar in the
Bankruptcy Code itself.  The
Bankruptcy Code and traditional
code and certain carefully
prescribed instanceness recognize
the police power of states and
other governmental entities, but
only in limited context thus in
section 362B2, Congress provided an
exception to the automatic stay for
the liquidation of a claim in the
exercise of police power but stayed
its payment and such claims are in
fact as is well recognized not
exempt from chapter 11 debtors
discharge.  Similarly 28USE section
1452 preclude the removal to the
Bankruptcy Court which is generally
permitted under that section of a

pending cause of action, if it is
one that is asserting the police
power.  The scope of the police
power in those exceptions has not
been decided definitively by the
second circuit.  As noted in a
thorough discussion?  /STPHAOEUFPLT
switch litigation 2014, the
exception, the definition of police
power for purposes of these
exceptions has evolved over the
years from a focus on
distinguishing between actions to
enforce police power with respect
to conduct on the one hand and
actions to provide for financial
recovery on another.  After board
of governors of the Federal Reserve
systems V. M Corp. financial Inc.
502S32401991, the focus has turned
more to the from the subjective
merits of the government entities
exercise of its police power in a
given case.  Only to the purpose of
the law that the government is
attempting to enforce.  Even if
that purpose which is well
recognized may include the payment
of money.

        I accept that broader
definition of the police power.
The fact that a governmental entity
is looking to collect money I
believe is not enough to take it
out of the police power exception.
But again that exception is a
limited one in the Bankruptcy Code
and the judicial code.  It is well
recognized indeed the 10th circuit
states it is a matter of corn book
law that actions accepted from the
automatic stay including under the
police power may be subject to
specific injunctive relief under
section 105A in re: Western real
estate fund 922F second 922959,
10th circuit as a previously sited
and in recommonwealth companies
Inc. United States V. commonwealth
companies Inc.  Bankruptcy
paragraph 362.05.  And as that
discussion notes the legislative
history to the section which
recognizes the power to enjoin

notwithstanding that the injunction
is owed the police power.

H10950 November 12, 1997 and
HR rep 95595, 95th Congress first
session 1977, September 8th, 1977,
quote subsection B lists 5
exceptions to the automatic stay,
the effect of an exception is not
to make the action immune from
injunction, close quote.  As far as
the limitation on the power to
assert the police power, at least
as far as general assertion of
states rights over the power of the
Bankruptcy Code, see in repea body
energy Corp. 717, 8th circuit 2020.
And in fact plan injunctions at
least in one instance at a recent
one had been imposed without any
quams about the police
/STPHAOEUFPLT see California /TOBGS
/EUBGS substance control XV
holdings Inc. 2021 U.S. district
Lexus /STPHAOEUFPLT D Delaware
July 26, 2021.  At this point given
the states agreement including the
objecting states agreement to the
public private allocation and the
no act allocation under the plan
and the carveouts from the plan
release, the only thing that, of
tangible note that the states would
be obtaining here would be money.
Which they actually agreed to put
to use under the plan for abatement
purposes in which there not
disputing the validity of in fact
the markedly constructive nature of
such provisions the objecting
states nevertheless state that the
plan deprives them of establishing
a sufficient civil punishment for
the released claims and certainly
that is a valid aspect of the
police power namely the sending of
a message to others who might
similarly, if it is proven against
them, be shown to have improperly
engaged in conduct that would
subject them to the liability that
the states assert they would have
be able -- would be the ability to
impose here and that is being
released.  It is clear to me

however that the states cannot have
it both ways.  They cannot have the
results of the plan and have
further punishment and the plan
already provides.  They are nod
prepared to make that choice,
unlike 80 percent of their state
/PWREUTen and sisters but the
againsts of such /STPHAOEUFPLT
punishment would be to the
detriment of all of the states and
the creditors in this case.

        The element of punishment
besides the loss of all of Purdue
and the money that the Sacklers are
paying also includes I believe the
agreement by the Sacklers and the
debtors to provide the
comprehensive document depository
which is includes waivers by the
debtors of attorney/client
privilege for a future analysis by
the states and third parties.
Ms. Conroy who has been pursuing
Purdue and the Sacklers longer than
anyone and harder than anyone I
believe has noted that that feature
of the settlement is perhaps the
most important one, even more
important than the billions of
dollars being paid by Sackler
family members.

        It is especially important in
the public context leased by the
objecting states, it will provide
far more transparency to the
conduct of Purdue and those it did
business with and those who
regulated it.  Including some of
these varying objectors, including
the state where Purdue's main
offices are, Connecticut and the
federal government.

        Which of course also regulate
Purdue.  That record is extremely
important, not only for continuing
to pursue lawsuits against other
parties, but also to guide
legislatures and regulators to
address a company that has a legal
product, but is also incorrectly
dangerous.

        As I've noted, the other
aspects of the plan that deal with

NewCo also provide a model for
either future self-regulation or
regulation by regulatory bodies.

Each of the four members of
the Sackler family who testified
during the evidentiary hearing
before me was asked would they
apologize for their role and
conduct related to Purdue.  Their
reactions as perhaps is typical of
a family varied.  None would state
an explicit apology, which I
suppose is understandable given the
legal risks they face in making
such an apology before settlement
where there is an objection to the
settlement.  Although I will note
that in a somewhat similar context
that I have received an apology to
victims of misconduct.

One of the witnesses frankly
did not accept any level of
responsibility and the other three
with different degrees of emotion
did in terms of stating their
regret for what their company had
done.

A forced apology is not
really an apology.  So we will have
to live without one.  The writer
Stan doll wrote that most people do
not forgive, they just forget.
Given the nature of this
settlement, including the document
depository, forgetting will be
impossible.  To me those are
elements of the settlement that
more than justify the admittedly
serious implications even in a
context where the real relief now
being sought by the states has been
agreed by them in overriding their
assertion of their own independent
police power rights.  So assuming
that the change to section 10.07B
of the plan will be made and I will
not confirm the plan if it isn't
made that I outlined and assuming
one other change that I believe is
necessary, I will confirm the plan.

I do so agreeing with the
creditors committee and everyone
else on the other side of the
table, including the debtors from

the Sackler family that I wish the
plan had provided for more but I
will not jeopardize what the plan
does provide for by denying
confirmation.

The other change to the plan
that I believe is required is to
the provision found at paragraph
11.1B of the plan on page 146,
which directs to prosecute for a
nonopioid excluded claim, which is
truly a derivative claim in the
normal definition of the term.
Unless such person first obtains
leave from the Bankruptcy Code.
Consistent with my remarks to
counsel for the Canadian
municipalities, that provision
should be made clear that it
applies only to causes of action
that colorably is a nonopioid
excluded claim.  Ie, the cause of
action is for example for
fraudulent transfer claim brought
by Purdue Canada.  Or some other
claim it should not have to go
through the Bankruptcy Court.  So I
will confirm the plan only if the
following phrase is added after the
phrase nonopioid excluded claim in
the third line of 11.1E  "if such
cause of action colorably is a
nonopioid excluded claim.

That is different than the
stricken language which said the
claim must be colorable, this is
one that's colorably an excluded
claim.

So as I noted at the
beginning of this hearing, I have
an over one hundred page
confirmation order, I have not
reviewed it in detail, I've given
you a several hours long ruling for
which I apologize for the length
of.  I will go through the
confirmation order carefully, but I
will confirm the plan if it is
modified in the two ways that I've
noted during my ruling.

MR. HUEBNER:  Your Honor,
thank you very much.  With
tremendous apologies for even
needing to speak at all after a

six-and-a-half hour bench ruling
without a break, there are two
housekeeping matters with respect
to statutes of limitations and the
injunction, I'll ask Mr. /KEPL net
can I to turn to in a minute, those
will hopefully take 45 seconds, I
have one thing before that your
Honor I also raise with some
hesitation.  In the course of the
six-and-a-half hours, your Honor, I
believe we might have misheard, but
we might have heard you say that
the majority of the Sacklers assets
are in trust organized /OURPBD
/STPHAOEUFPLT for the record your
Honor, we think you may have
intended to refer to the Mortimer A
side of the family, according to
the testimony, including his report
at JX3092 docket 3488, the A side
of the family has substantial asits
in trusts under the bailiwick of
Jersey.  The documents also
reflects the B side, which is the
Raymond side, which is largely the
domestic side does not have equally
similar assets outside the United
States --
          THE COURT:  But they do
recommend in /STPHAOEUFPLT trusts.
          MR. HUEBNER:  Exactly, your
Honor, we were quite confident we
didn't /STPHAOEUFPLT mean to rely
on manual /REUT of overall assets
being in the Jersey trusts, but
rather in various trusts, the A
side has a lot of money in Jersey,
the B side does not, which is what
theed evidence shows and we want to
make sure that as you said that the
record accurately reflected sort of
what you --
          THE COURT:  As I said at the
beginning of my ruling, I will you
go through it and correct any
misstatements I made to that effect
although the ruling won't change.
The B side has most of its assets
in trust.
          MR. HUEBNER:  Thank you, we
all know /STPHAOEUFPLT let me now
put myself back on mute and ask
Mr. /STPHAOEUFPLT to handle two

quick housekeeping matters and I
agree there's nothing further
certainly from the debtors.

THE COURT:  Okay.

DAVIS POLK:  Your Honor,
Benning /STPHAOEUFPLT of Davis Polk
for the debtors, den with
apologies, you must be exhausted.
Two I hope administrative matters,
the first back to preliminary
injunction, the following the entry
of the court's bridge extension on
Monday docket number 286 in the
adversary proceeding numbered
19-08289, the preliminary
injunction is now set to expire
today.  As I mentioned on Friday,
there's a provision in the proposed
confirmation order that will ex
/TEPD the preliminary injunction
through the effective date, that is
paragraph 56A of the proposed
confirmation order, bankruptcy rule
3020E and paragraph 66 of the order
provide that the confirmation order
will be stayed until the expiration
of 14 days after the entry of the
order unless the court orders
otherwise.  There will therefore be
a small gap in the protection
afforded by the preliminary
injunction and the voluntary
injunction unless the court enters
a second bridge order.  So as I
for/STPHAOEUFPLT the debtors
requestfully request that the court
enter another bridge order
extending the preliminary
injunction through entry of the
confirmation order and the
expiration of the 14-day period
stay period we just described.

So that's, he guess I can go
on, but we spoke into the easy
/STPHAOEUFPLT and they support
this.  And given my colloquy with
the court on Friday about the
second bridge order today I assume
the nonsawn senting states are in a
position to confirm the voluntary
compliance with the extension
rather than to be formally bound by
it which is consistent with past
practices.  So if the

representatives of nonconsenting
states are on and could indicate
that on the record that would be
wonderful, I see Mr. Gold.
          MR. GOLD:  Your Honor,
Matthew gold from Kleinberg Kaplan
representing Washington, Oregon and
District of Columbia, although
maybe I should let Mr. Troop go
first, but can your Honor hear me.
          THE COURT:  I can, thanks.
          MR. GOLD:  I would defer to
Mr. Troop who speaks on behalf of
more states if he wish tos go first
otherwise I'm prepared to speak.
          MR. TROOP:  Your Honor,
Andrew troop nonconsenting state
group, I have not been received any
information or suggestion that the
members of the nonconsenting states
will not continue to /STPHAOEUFPLT
volume temporarily with the
injunction through an additional
extension, but we did not solicit
on that point specifically I will
never to any /STPHAOEUFPLT if they
think otherwise, but I don't think
there should be an issue your Honor
and I will take that --
          THE COURT:  Okay.
          MR. GOLD:  Your Honor, this
is Matthew gold again.  As
Mr. Troop said, we certainly have
not had any opportunity to discuss
with our clients this particular
request, I think it would have been
far preferable in the debtors in
soliciting the opinions of all the
other parties had spoken to us
first rather than making this
request in open court during a
hearing, but it is obviously too
late for that.
          The one question that I do
not -- one thing I do not
understand from the way Mr. Cam net
can I put it is that we have been
given to understand that the
effective date under the plan
occurs not 14 days after the entry
of the confirmation order, but at
least 82 days after the entry of
the confirmation order, so that
what Mr. Cam is requesting here is

not a 2-week extension of the
injunction, but a 3-month extension
of the injunction and I would at
least appreciate some clarification
from Mr. Cam on that point so we
can understand what's considered
brief or not in this con.

THE COURT:  Fair point, it
wouldn't be limited by time, right,
it's limited by definition.

DAVIS POLK:  I'm sorry, the
confirmation order extends the
proposed confirmation order extends
the preliminary injunction to the
effective date, the effective date
is still the effective date of the
plan, those are two different
things, the order would give us the
bridge to the effective date.

THE COURT:  So this is time
to get the order in and to have it
be --

DAVIS POLK:  That's it.

THE COURT:  So I think it is
14 days unless there's a stip A
pending appeal.

DAVIS POLK:  And your Honor
to say the obvious, I said this was
going to happen last Friday, this
is not a surprise at all.  So --

THE COURT:  It wasn't a
surprise to me.  So look I am
perfectly happy to have the states
continue to agree as opposed to
having /STPHAOEUFPLT there's value
to that that I understand.  But if
they were to agree in all
likelihood I would extend the
injunction through the entry of the
confirmation order.  And the order
becoming a final order.

DAVIS POLK:  Thank you your
Honor.  The second issue as your
Honor knows the shareholder
settlement agreement contains a
unique mechanism we called the snap
back in the event that certain
breaches of the shareholder
settlement agreement occur, the MDT
can trigger a snap back by filing a
notice with the court at which
point both the shareholder releases
and the shareholder injunction will
unwind with respect to any breaches

by the shareholder parties and the
MDT and the releasing parties can
then sue the breaching shareholder
parties under the released causes
of action.  To ensure that these
remedies are maximally effective,
it is necessary to preserve those
claims during the life of the
settlement agreement or until the
parties subject to the snap back
have fully performed their
obligations.  According so section
10.9 of the plan and paragraph 32A
of the con/TEURPLation order they
toll any statute of limitations
that apply to the shareholder
release claims.  However, we are
phrased with a potential very small
gap because those provisions of the
plan and confirmation order will
not take effect until the 14-day
stay of the confirmation order
expires.  And we're facing the end
of the tolling provisions in
section 108A2 and limitations in
546A1A because we're approaching
the second anniversary of our
filing.  So we have a proposed
order which is to make sure that
the tolling provisions provided by
section 10.9 of the plan is in
place as soon as possible and
before the 14-day stay runs.  So
the proposed order thus effectuated
only the tolling provision and plan
carp filmation /STPHAOEUFPLT start
now, the applicable statute of
limit aces for the shareholder
released claims and exactly the
same way as it's provided by the
plan and paragraph 32A of the
confirmation order and the tolling
orders remain effective until the
later of the date of the
confirmation order becomes final
and if the confirmation order is
have a /STPHAOEUFPLT 225 days after
the date when that occurred so
folks have plenty of time to file
their complaints.  This is not
controversial --
          THE COURT:  Sorry to /REUPBT
up /STPHAOEUFPLT is that I
stipulated order with the Sacklers.

THE COURT:  Both sides A and
B agree to this and I can't imagine
anyone would object given that is
just a way to maximally preserve
the claims if God forbid there's a
breach.

THE COURT:  You can submit
that to chambers.

DAVIS POLK:  Okay, perfect.

THE COURT:  When does that
period expire, I don't think it
expires tonight, right?

DAVIS POLK:  No, we have --

THE COURT:  Okay, it will get
entered tomorrow then.

DAVIS POLK:  We have until
September 15th or 16 depending on
how you count.

THE COURT:  Okay.

DAVIS POLK:  We'll get that
on file.

THE COURT:  Submit that to
chambers and it will get entered
tomorrow.  I expect the
confirmation order probably will
get entered tomorrow, I do have a
brief calendar in the morning but
I'll be able to go through it.

DAVIS POLK:  Thank you, your
Honor.

MR. HIGGINS:  Your Honor,
very briefly /STPHAOEUFPLT may I be
heard briefly, your Honor.

THE COURT:  Sure.

MR. HIGGINS:  Thank you.
Just on a procedural note now that
your Honor has ruled, the United
States districtee intends to file a
formal motion for a state pending
appeal, as part of that motion we
would be seeking an expedited
hearing, consistent with the case
management order, your Honor, we
have conferred with debtors counsel
/STPHAOEUFPLT on an expedited
briefing or hearing schedule but as
the case management order directs
your Honor we will reach outed to
counsel again tonight and if we're
unable to reach a /STPHAOEUFPLT we
would contact chambers as the case
management order requires.

THE COURT:  Okay.

MR. HIGGINS:  Thank you, your

Honor.

THE COURT:  That's fine.

MR. HUEBNER:  So your Honor just so that everybody is clear so we don't get a cascade of emergency pleadings like this, as I think Mr. Gold correctly referred to before, it is of record in this case and should be well-known to everybody if it's not they should become familiar with it that our DOJ settlement approved by this court after a /HULTy hour hearing as well expressly contemplates a settlement A sentencing hearing not earlier than 75 days after the entry of a confirmation order and emergence not earlier than 7 days after that which is why as your Honor has actually advised all the parties at multiple recent hearings, including the Kirk hearing, this company can't come out for several months and I think at this point, you know, to start burdening the docket with emergency motions, there's got to be a way to work this out more thoughtfully than unnecessary emergency motions when there cannot be an emergence for really rather quite a while. We don't /STPHAOEUFPLT we understand that, that's the thing we're trying to be in dialogue about, but we have a history /STPHAOEUFPLT and waiting for a thoughtful response and they never call back or email and file something that costs the estate a lot of resources as multiple parties all have to think about it and respond to it.  So what I saw on the very first day of the case at the very first hearing still holds 2 years later.  Please just call us and let's see if we can work something out that is efficient and not a waste of taxpayer resources and state resources that does nothing but drain money from abatement and saving lives.

THE COURT:  Well Ms. Lee is very good at keeping my calendar,

she nose better than I do
/STPHAOEUFPLT how long things were
l take, don't tell her that because
she's probably valuable to any
number of law firms if they knew
that.  She'll find time that makes
sense.  I don't think it is an
emergency, Mr. Higgins, I really
don't.  Which is something you
should take into account before
making such a motion.
           MR. HIGGINS:  Understood,
your Honor, and that's why we
reached out to Mr. Huebner twice
about this and we will continue to
talk with him for a schedule that
works for everybody.
           THE COURT:  Among other
things, I would hope someone would
actually be able to read the last
6 hours of what I was talking about
before we actually decided to do
something.
           MR. HIGGINS:  Of course, your
Honor.
           THE COURT:  Okay.
           MR. HUEBNER:  Thank you, your
Honor.
           THE COURT:  All right,
anything else?
           MR. HUEBNER:  None from the
debtors.
           THE COURT:  All right, thank
you all, thanks everyone.
           (Time noted:  4:48 p.m.)