Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   Tele/Video Proceedings

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   September 1, 2021

17                   10:06 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JUSTIN WALKER

Page 2

1    HEARING re Bench Ruling at 10:00 AM at Videoconference

2    (ZoomGov) (RDD).

3

4    Statement / Notice of Change of Listen-Only Dial in for

5    Hearing on Confirmation of Eleventh Amended Joint Chapter 11

6    Plan of Reorganization of Purdue Pharma L.P. and

7    its Affiliated Debtors

8

9    Notice of Agenda / [Updated] Third Amended Agenda for

10   Confirmation Hearing

11

12   Notice of Agenda / Third Amended Agenda for Confirmation

13   Hearing

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   DAVIS POLK WARDWELL LLP

4        Attorney for Debtors

5        450 Lexington Avenue

6        New York, NY 10017

7

8   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

9        BENJAMIN S. KAMINETZKY (TELEPHONICALLY)

10

11  SULLIVAN WORCESTER LLP

12        Post-conflicts counsel for the Debtors

13        1633 Broadway

14        New York, NY 10019

15

16  BY:  JEFFREY R. GLEIT (TELEPHONICALLY)

17

18  KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

19        Attorney for State of Washington

20        500 Fifth Avenue

21        New York, NY 10110

22

23  BY:  MATTHEW J. GOLD (TELEPHONICALLY)

24

25

1   UNITED STATES DEPARTMENT OF JUSTICE

2       Attorneys for the U.S. Trustee

3       201 Varick Street, Suite 1006

4       New York, NY 10014

5

6   BY:  BEN HIGGINS (TELEPHONICALLY)

7

8   PILLSBURY WINTHROP SHAW PITTMAN LLP

9       Attorneys for Ad Hoc Group of Non-Consenting States

10      31 West 52nd Street

11      New York, NY 10019

12

13  BY:  ANDREW M. TROOP (TELEPHONICALLY)

14

15  ALSO PRESENT TELEPHONICALLY:

16  ROXANA ALEALI

17  ANDREW VINCENT ALFANO

18  PHILIP D. ANKER

19  MICHAEL ATINSON

20  MITCHELL JAY AUSLANDER

21  PRIYA BARANPURIA

22  DAVID E. BLABEY

23  LOUIS BOGRAD

24  SARA BRAUNER

25  GARY BRESSLER

1   DAVID BROWN

2   GABE BRUNSWICK

3   AARON R CAHN

4   MARK CHALOS

5   GERARD CICERO

6   HAYDEN COLEMAN

7   DANIEL CONNOLLY

8   HAYDEN COLEMAN

9   DYLAN CONSLA

10   ABBY G. CUNNINGHAM

11   MARIO D'ANGELO

12   PETER C. D'APICE

13   STACY DASARO

14   JOSEPH G. DAVIS

15   MARK DEARMAN

16   CLINT DOCKEN

17   JOHN C. DOUGHERTY

18   JOHN DUBEL

19   STEPHANIE EBERHARDT

20   KENNETH H. ECKSTEIN

21   BERNARD ARDAVAN ESKANDARI

22   MATHEW FARRELL

23   LAURA FEMINO

24   ROBERT FINZI

25   MATTHEW FITZSIMMONS

Page 6

1   HEATHER FRAZIER

2   BRYCE L. FRIEDMAN

3   KATHERINE N. GALLE

4   CAROLINE GANGE

5   GILL GELDREICH

6   MELISSA GIBSON

7   MAGALI GIDDENS

8   SCOTT GILBERT

9   MICHAEL GOLDSTEIN

10   GEOFFREY S. GOODMAN

11   ISLEY MARKMAN GOSTIN

12   GARY GOTTO

13   JARED T. GREEN

14   JAMES S. GREEN, JR.

15   DEBORAH GREENSPAN

16   EMILY GRIM

17   JOHN GUARD

18   ADAM P. HABERKORN

19   CATHERINE BEIDERMAN HEITZENRATER

20   ANGELA K. HERRING

21   MICHELE HIRSHMAN

22   JENNA A. HUDSON

23   TIMOTHY J. HURLEY

24   MITCHELL HURLEY

25   ELISA HYDER

Page 7

1    LINDA IMES

2    MARK S. INDELICATO

3    SAMUEL ISSACHAROFF

4    EVAN JONES

5    EVAN M. JONES

6    GREGORY JOSEPH

7    ETHAN KAMINETZKY

8    NICKOLAS KARAVOLAS

9    NEIL FX KELLY

10   KAREN KENNEDY

11   MARC KESSELMAN

12   DARREN S. KLEIN

13   JEREMY C. KLEINMAN

14   LAWRENCE KOTLER

15   ANN KRAMER

16   ALEXANDER LEES

17   DANIEL LENNARD

18   MARA LEVENTHAL

19   DANIELLE J. LEVINE

20   JEFFREY LIESENMER

21   EDAN LISOVICZ

22   JOHN LONGMIRE

23   JOHN LOWNE

24   ROBERT MACKENZIE

25   KEVIN MACLAY

Page 8

1   ROBERT MARSTERS

2   BRIAN S. MASUMOTO

3   DOUGLAS KIRK MAYER

4   JAMES I. MCCLAMMY

5   LAURA MCCLOUD

6   HUGH M. MCDONALD

7   SHANNON M. MCNULTY

8   MICHELE MEISES

9   LIVY MEZEI

10  NATHANIEL MILLER

11  JONATHAN E. MITNICK

12  DAVID MOLTON

13  MAURA KATHLEEN MONAGHAN

14  AMANDA MORALES

15  ANDREW J. MUHA

16  AISLING MURRAY

17  EDWARD E. NEIGER

18  NATHALIE E. NIEVES

19  MICHAEL PATRICK O'NEIL

20  THOMAS ROBINSON O'NEILL

21  DAMIAN O'SULLIVAN

22  RACHEL R. OBALDO

23  JAMES FRANKLIN OZMENT

24  JENNIFER PEACOCK

25  MARK PLEVIN

Page 9

1   STEPHEN POHL

2   KATHERINE PORTER

3   ARIK PREIS

4   DOUGLASS PRESS

5   NICHOLAS PREY

6   MICHELE PULGGARI

7   KAMI QUINN

8   MARION QUIRK

9   CHRISTINA RICARTE

10   JOSEPH RICE

11   RACHAEL RINGER

12   CHRISTOPHER ROBERTSON

13   JEFFREY J. ROSEN

14   JORDAN ROSENBAUM

15   PAUL S. ROTHSTEIN

16   JASON RUBINSTEIN

17   MEGAN PARIS RUNDLET

18   WILLIAM T. RUSSELL

19   JEREMEY RYAN

20   JAMES SALWEN

21   DANIEL JOSEPH SAVAL

22   SETH SCHINFELD

23   ELIZABETH SCHLECKER

24   FREDERICK E. SCHMIDT

25   MICHAEL SHEPHERD

Page 10

1   RICHARD SHORE

2   J. CHRISTOPHER SHORE

3   RICHARD SILBERT

4   LIANNA SIMMONDS

5   PAUL SINGER

6   PAUL M. SINGER

7   MARC F. SKAPOF

8   ARTEM SKOROSTENSKY

9   D. RYAN SLAUGH

10   JOSEPH SORKIN

11   CLAUDIA Z. SPRINGER

12   CATHERINE STEEGE

13   HOWARD STEEL

14   ERIC STODOLA

15   ADAM SWINGLE

16   JEROME TAPLEY

17   PAMELA THURMOND

18   MARC J. TOBAK

19   SARA E. TONNESEN

20   ALICE TSIER

21   JOSEPH TURNER

22   ALLEN J. UNDERWOOD

23   MELISSA L. VAN ECK

24   MICHAEL J. VENDITTO

25   JOYCE M. VILLNAVE

Page 11

1  JONATHAN WAGNER

2  RYAN A. WAGNER

3  JORDAN A. WEBER

4  WENDY WEINBERG

5  SHIRA WEINER

6  WILLIAM P. WEINTRAUB

7  MARTIN WEIS

8  MARTIN JAMES WEIS

9  ALLISON H. WEISS

10  THEODORE WELLS, JR.

11  DANIEL WOLF

12  LAUREN S. ZABEL

13  DAVID ZYLBERBERG

14  LAUREN DEL VALLE

15

16

17

18

19

20

21

22

23

24

25

Page 12

1              P R O C E E D I N G S

2              THE COURT:  Okay.  Good morning.  This is Judge

3    Drain.  We're here in In re Purdue Pharma, LP, et al.  This

4    morning's hearing was scheduled for me to give my bench

5    ruling on the Debtors' request for confirmation of their

6    amended Chapter 11 plan.  I received a blacklined version of

7    certain important but still relatively minor changes to the

8    Debtors' tenth amended joint Chapter 11 plan yesterday which

9    is now, in light of those changes, the eleventh amended

10   joint Chapter 11 plan.

11             I also received a revised proposed confirmation

12   order including proposed findings of fact and conclusions of

13   law which is over 100 pages long.  I have not gone through

14   it in detail.  My ruling will be detailed, and if I'm

15   comfortable with the proposed findings and conclusions, I'll

16   keep them.  I may add to them.  And my ruling will be part

17   of the record as far as the proposed findings and

18   conclusions are concerned.

19             But I understand that the Debtors wanted to

20   address the Court briefly regarding the changes to the plan

21   and the resolution of at least one objection.  And I'm happy

22   to hear that.

23             MR. HUEBNER:  Thank you very much, Your Honor.

24   Can you see and hear me clearly?

25             THE COURT:  Yes.

Page 13

1          MR. HUEBNER:  Okay.  Your Honor, for the record,

2     Marshall Huebner on behalf of the Debtors and Debtors In

3     Possession.  A couple of quick updates which I think are

4     hopefully positive.

5          Number one, you know, since the Court's direction

6     at several of the hearings including both Wednesday and

7     Friday, various documents have been amended in a way that we

8     hope now comports with the Court's vision.  The primary

9     changes to the plan that we are not going to walk through

10    unless the Court has questions are to finalize what I would

11    call the material or maybe even radical narrowing of the

12    Sackler releases, which is really on three different axes:

13         Number one, which parties are covered and get the

14    benefit of the releases and those changes I believe are now

15    in;

16         Number two, what is the scope of the releases.

17    And, of course, the Court gave a clear direction that they

18    should be limited very substantially as to scope compared to

19    the original set of agreements reached and filed by the

20    parties;

21         And then, number three, I guess who is bound by

22    the releases.  This is the sort of "any other person to

23    holders of claims and causes of action" to just "holders of

24    claims."  And I believe that hopefully we got it right after

25    several tries and the Court's continuing clear interim

Page 14

1   rulings or directions to narrow the releases.

2          The second item, Your Honor, just for the benefit

3   of everyone's knowledge is the operating injunction for

4   NewCo.  That is one of the many documents along with many

5   other structures in the plan including a brand new board of

6   directors and other things selected by governmental entities

7   to ensure that NewCo does only the things that everybody

8   would want it to be doing and doesn't do any of the things

9   that people would not want it to be doing.  And that's

10  obviously I think part of the sacred mission of many of the

11  parties who have worked on this case.

12         That operating injunction was negotiated by the

13  Department of Justice by the Ad Hoc Committee which of

14  course includes a huge number of AGs, by the NCSG which

15  includes all the rest of the AGs getting us up to 48, and

16  the MSG, as well.  That has now in fully-agreed form, and

17  it's final and was filed as Exhibit C like Charlie to the

18  confirmation order.  That's a critically important document,

19  frankly, as part of ensuring that on a go-forward basis, you

20  know, everybody can hopefully take comfort in the credible

21  involvement of governmental entities and, of course, the UCC

22  as well who I, of course, need to mention as the official

23  appointee of the Department of Justice to oversee and assist

24  all unsecured creditors in the case.

25         Next, Your Honor, also filed I believe yesterday

Page 15

1    is the final Sackler settlement agreement which has been a

2    very long time coming.  Just so the record is clear, that

3    document was negotiated by the Official Committee of

4    Unsecured Creditors appointed by the Department of Justice,

5    by the AHC, by the MDL PACA members who are part of the AD

6    Hoc Committee which includes obviously several dozen

7    attorneys general and, of course, lastly really by the

8    Special Committee of Board which, of course, as everybody

9    knows after an examination was likewise found to be

10   fulfilling its fiduciary responsibilities with complete and

11   total independence.

12           So that document is now done, as well.  It

13   contains very important things because this is a deal in

14   which the Sacklers are paying over time and frankly

15   something that sounds lawyerly and technical, which are the

16   collateral and the credit support annexes frankly involve

17   some of the most brutal negotiations that actually took

18   months because all of the fiduciaries on our side of the V

19   who represent the Plaintiffs in the case and, you know,

20   frankly, the states and the cities and the victims and the

21   like, you know, need to ensure that the Sacklers are going

22   to pay.

23           And, obviously, credit and collateral and

24   covenants and promises and oversight rights and the like are

25   quite critical to that, and those have now been, we believe,

1    negotiated to a place that we can live with.  As the Court

2    has heard me say many times, you know, this is not a perfect

3    deal.  We would have liked more and earlier, but this was

4    the deal that everybody was ultimately willing to agree to

5    under very very complex circumstances.

6           Finally, Your Honor, it just goes without saying

7    that I believe we incorporated everything the Court said.

8    One of the things that the Court will see is paragraph 7A of

9    the proposed confirmation order now further clarifies that

10   no material or substantive changes can be made to the

11   settlement agreement, essentially, and that it's not -- this

12   is the deal.  The deal is done, and there will not be, you

13   know, any further material certainly concessions to the

14   Defendants in this case subsequent to the order being

15   entered and the documents having gone final.

16          Number four, Your Honor, there was a filing we

17   found a little bit puzzling by the U.S. Trustee yesterday.

18   They called us yesterday and raised a question about

19   language in our proposed confirmation order that they

20   believe could be read ambiguously as somehow being -- I

21   think the theory was like a ruling by this Court that this

22   and other courts can't grant future stays.  We didn't

23   remotely read it that way.  It certainly was nobody's intent

24   and, frankly, it's completely standard language that's in

25   dozens of confirmation orders.

Page 17

1          We said, absolutely, let's clarify it.  We thought

2     they were sending language; they didn't.  Instead, they just

3     filed a pleading on the docket expressing their concern

4     about the ambiguity.  I guess that's fine.  And we jumped

5     right on it and instantly drafted language that we think

6     makes it clear beyond perventure that there's no possible

7     argument since of course this Court never would, never

8     could, and no one would ever ask it to, you know, try to

9     issue something about future stays.

10          The point is just we took out the Rule 3020(E)

11     waiver of the 14-day stay so this case does have the 14-day

12     stay under Rule 3020(E).  And all the language says is that

13     other than that stay, no other stays are currently in place.

14     Obviously, if somebody moves for a stay and they get a stay,

15     we'll all deal with that at the time and, obviously, we'll

16     be ready to discuss that since many parties in this case

17     certainly have strong views.  So that has been addressed.

18          They did make a point about 1127.  I just want to

19     be clear.  I think all of the many fiduciaries in this case

20     are extraordinarily comfortable beyond a shadow of a doubt,

21     frankly, that the changes to the plan have just made it

22     better and better for the estate as, for example, to give

23     the primary example, we have continued to narrow the scope

24     of the releases in draft after draft while getting the same

25     amount of consideration from the Defendants.

Page 18

 1            So there's no limitation on the number of times

 2    you could amend the plan.  The law is very clear which is

 3    you can't adversely affect creditors and stakeholders at a

 4    juncture like this.  The U.S. Trustee is not suggesting we

 5    have.  It almost seems more like amusing to me, but I do

 6    want to be very clear we believe that all of the changes in

 7    this plan  that have happened really since it was originally

 8    filed in March and certainly collectively but even

 9    individually have done nothing but improve it further and

10    further and further for the stakeholders for whom many of us

11    serve as fiduciaries.

12            Obviously, they also indicate that they stand on

13    their objection as to both legal fees and the legality of

14    third-party releases.  We certainly understand that.  No one

15    else refiled their objection to make clear that it's still

16    standing.  We understand.  We don't pretend that all

17    objections are resolved, but certainly things have been

18    narrowed and many items have been resolved.

19            Finally, Your Honor, the last I think good-news

20    announcement and I'll turn over the podium in a minute to

21    Mr. Gleit is that I believe that there is now agreed

22    language to effectuate the Court's in essence ruling on

23    Friday about what the Court was and was not willing to do

24    with respect to the DMPs based both on the pleadings and the

25    factual record of the case.  And so, you know, while that's

Page 19

1    not a settlement, it is simply language that we believe

2    effectuates the Court's ruling.  You know, I'm hoping that

3    that issue is now behind us, as well.

4            And so, Your Honor, with all of those updates, I

5    think it's fair to say that I should stop talking except to

6    note that I think we're now down to at the end, you know, a

7    very small number of the core objections about which we

8    heard both extensive trial testimony and argument.  And so I

9    have no further updates I can announce because that's not

10   where we are.

11           But, you know, the final, you know, ten or so sort

12   of meta-objections have been resolved.  We still continue to

13   work with all parties and hope that we can come to a

14   resolution.  But it's just not where we are this morning.

15           So, Your Honor, unless the Court has questions for

16   me, I think that that actually sort of updates the Court and

17   all parties on what's been filed, why it was filed, which

18   things are now in the "done" pile, obviously, but for Your

19   Honor's comments, it goes without saying.  and I have

20   proposed to turn my mic off and as Mr. Gleit to quickly

21   summarize the documentation on the DMP issue that Your Honor

22   gave guidance on.  And I think we have nothing further to

23   say from the Debtors.

24           THE COURT:  Okay.  Thank you.

25           MR. GLEIT:  Good morning, Your Honor.  Jeffrey

Page 20

1    Gleit, post conflicts counsel for the Debtors.

2            THE COURT:  Good morning.

3            MR. GLEIT:  Good morning.  Your Honor, we heard

4    you loud and clear last Friday.  And over the weekend and

5    the beginning of this week, we worked with the DMPs and the

6    AHC to work on language which I'm just going to briefly now

7    put in the record a brief statement which says:

8            "The Debtors and the DMPs have agreed that the

9    language inserted into 10.10(B) of the eleventh plan

10   reflects the Court's statements made in connection with the

11   DMPs' reserved objection.  In addition, the parties agree

12   that the Debtors would state on the record" -- which I'm

13   doing now -- "Section 8.8(B) of the plan does not apply to

14   the settling Co-Defendants."

15           And, lastly, a provision was added to the

16   confirmation order which is going to make clear that any MDT

17   insurance settlements going forward are going to be upon

18   notice and in accordance with Bankruptcy Rule 9019.

19           So unless Your Honor has any questions, I think

20   the issue is now resolved.

21           THE COURT:  Okay.  All right.  Ms.

22   (Indiscernible), is that correct?  Does that language in the

23   plan and the statement that Mr. Gleit just made resolve the

24   remaining objection by the MDP parties or sometimes referred

25   to as the Co-Defendants?

Page 21

1              WOMAN:  Yes, Your Honor; it does.  Thank you.

2              THE COURT:  Okay.  And I just want to be clear.

3      As I understand it, it leaves open the issues that I said

4      should be left open, which includes potentially as a defense

5      whether the rights to coverage under a policy were released

6      under the agreement between the parties.  But if in fact

7      those rights are direct and established, then as I read the

8      plan, it gives the -- that party that has that, those rights

9      access.  They're not enjoined by the insurance injunction.

10             WOMAN:  That's our understanding, Your Honor.

11     Thank you.

12             THE COURT:  Okay.  Very well.  I appreciate the

13     parties' work on that.

14             All right.  I think that concludes the first part

15     of this hearing which really just went to clarify as noted

16     the recent changes to the plan and updated me on the status

17     of the settlement agreement with the Sackler parties.  So

18     I'll give you my bench ruling now on the Debtors' request

19     for confirmation of the eleventh amended joint Chapter 11

20     plan.

21             It is clear that the wrongful use including

22     marketing of opioid products has contributed to a massive

23     public health crisis in this country and elsewhere.  The

24     role of these Debtors and their owners, and this is a

25     closely-held set of Debtors, to that crisis makes the

Page 22

1   bankruptcy cases before me highly unusual and complex.

2          This is so primarily because of the nature of the

3   creditor body given the extraordinarily harmful effects of

4   the Debtors' primary product, OxyContin, and other opioids

5   on ordinary people as well as on the local governments,

6   Indian tribes, hospitals and other first responders, states

7   and territories, and the United States who must address

8   these effects on a daily basis.  In a very real sense, every

9   person in the range of the Debtors' sell of opioid products

10  is a potential creditor.

11         Bankruptcy cases present a unique and perhaps the

12  only means to resolve the collective problem presented by an

13  insolvent debtor and a large body of creditors competing for

14  its insufficient assets, including especially when dealing

15  with mass claims premised on a harmful product that, as is

16  the case here, causes massive harms or mass harms.

17         Bankruptcy cases focus the solution away from

18  individual litigation to a fair collective result subject to

19  the unique ability under the bankruptcy laws to, under

20  generally well-defined and rare circumstances, bind holdouts

21  who could not otherwise be bound under applicable able.

22         Over the years, courts and the parties to

23  bankruptcy cases have refined and improved on these

24  solutions.  They clearly have been brought to bear here in

25  these cases involving in all likelihood the largest creditor

Page 23

1    body ever.  And I'm not speaking solely of the roughly

2    614,000 claims that were filed, although I believe that is a

3    record, but also as I noted before the people who could

4    arguably be said to be represented by their local

5    governments and their state governments as well as by the

6    United States.

7            Here, too, the parties have worked in unique and

8    trailblazing ways to address the public health catastrophe

9    that underlies those claims.  These cases are complex, too,

10   because the Debtors' assets include enormous claims against

11   their controlling shareholders and in some instances

12   directors and officers who are members of the Sackler family

13   whose aggregate net worth, through greater than the Debtors,

14   also may well be insufficient to satisfy such claims and

15   other very closely-related claims against them that are

16   asserted by third-parties who also are creditors of the

17   Debtors, that is have claims against the Debtors.

18           The questions then are how can such claims be

19   resolved to best effect for the claimants and is such

20   resolution authorized under the Bankruptcy Code and law.

21   The primary questions for me in this case focusing on the

22   Chapter 11 plan that is before the Court for confirmation is

23   can these issues be resolved by the Court by approval of the

24   plan and should they.  It is clear to me after a lengthy

25   trial that there is now no other reasonably conceivable

Page 24

1   means to achieve this result.

2           I believe it is also clear under well-established

3   precedent that with a sufficient factual record, Congress in

4   the Bankruptcy Code and the courts interpreting it provide

5   the authority for such a resolution.  That leaves the

6   question should this resolution be implemented.  This ruling

7   explains my findings and conclusions with respect to all of

8   those issues informed by the record of these cases, the

9   parties' votes on the plan, the parties' briefing, and the

10  record of a six-day trial involving 41 witnesses in a

11  courtroom full of exhibits and two full days of oral

12  argument.

13          I will note before I proceed that I am giving this

14  ruling as an oral bench ruling as opposed to writing a

15  written opinion because I believe it is of critical

16  importance that the parties to these cases learn the result

17  of my analysis as promptly as practicable.

18          As I often do with lengthy bench rulings, I will

19  go over the transcript of my ruling.  And if I feel that I

20  have said something inartfully or left something out that I

21  should have said and, of course, in addition to correcting

22  any typos or missed citations or citations in improper form,

23  I will modify my bench ruling and file it as a modified

24  bench ruling, not obviously as a transcript.

25          But, again, as with any case of this size and

Page 25

1    particularly given this case where the parties I think

2    universally have made it clear, and I fully understand them,

3    that it is important to devote the Debtors' resources as

4    soon as possible to paying victims' claims and otherwise

5    abating the opioid crisis, that there should not be any

6    further delay in my delivering this ruling.

7            The notice of the Debtors' request for

8    confirmation of the plan was set forth by Jeanne Finegan in

9    her declaration and testimony, primarily her third

10   supplemental declaration which served as her direct

11   testimony but also referred to prior declarations that she

12   had provided with respect to the noticing of claimants and

13   potential claimants in these cases.

14           It is clear from her testimony that the notice of,

15   A, these bases; B, the right to assert a claim against these

16   Debtors; C, the request for confirmation of the plan; and D,

17   the proposed broad release of third-parties' claims against

18   the released parties in the plan which is primarily of the

19   Sacklers and their related entities, was unprecedentedly

20   broad with only one caveat.

21           Ms. Finegan's testimony was undisputed that the

22   Debtors' noticing program as implemented under Ms. Finegan's

23   supervision reached roughly 98 percent of the population of

24   the United States and a only marginally smaller number or

25   percentage of the population in Canada and also was

Page 26

1    extensive throughout the world where the Debtors' own

2    products might have caused harm.

3         The program was carefully tailored to reach known

4    creditors but also to reach the population at large

5    including through various types of media aimed at people who

6    may have been harmed by the Debtors' products.  Ms.

7    Finegan's calculations reflect literally billions of hits on

8    the social media and internet notices as well as, of course,

9    reliable studies of the reach of the other means of notice.

10        The caveat that I would have is that the notice to

11   those in prison was in part effective, I believe, in

12   providing notices to prisons and to groups working with or

13   known to work with people who are in prison and suffering

14   from opioid use disorder or other adverse effects of

15   opioids.  But it is certainly within my contemplation that

16   given prison regulations and at times lack of access to TV

17   and radio and other media, prisoners may not have gotten the

18   same high level, and I'm talking again about approximately

19   98 percent of the entire U.S. population, of notice of the

20   case, the bar date, the confirmation request, and the

21   releases in the plan.

22        On the other hand, the Debtors and the plan

23   including the personal injury trust procedures have made it

24   clear that they are flexible with regard to late claims

25   against the personal injury trust and the assertion of

Page 27

1    evidence to the trust by prisoners in light of prisoners'

2    unique circumstances.

3            United States Trustee also suggested that

4    references to the plan in the notice would have sent a party

5    to a lengthy and complex set of release provisions.  This is

6    true, and it clearly does take a lawyer to parse through

7    those provisions.  And even then, as reflected by the record

8    of the parties' responses to my comments, those provisions

9    were subject to some potential for differing interpretation,

10   although I believe that is not the case now that they have

11   been narrowed.

12           However, the notice that was most widespread was a

13   very simple one that made it quite clear that the plan

14   contemplated a broad civil release of the Debtors'

15   shareholders, the Sacklers, and their related entities.  In

16   addition, the extensive media coverage of this case also

17   made that point crystal clear.  And it is that aspect of the

18   release rather than parsing through it that is the basis for

19   the objections that have been filed and, therefore, that

20   could have been filed, i.e., that it is too broad and not

21   authorized under applicable law, which I believe was

22   pervasively spread throughout the country and in Canada.

23           So I conclude that the Debtors' notice of the

24   confirmation hearing and the proposed releases in the plan

25   was sufficient and, again, unprecedentedly broad.

Page 28

1           Next, I should note the vote on the plan by the

2   classes entitled to vote.  It is important to address this

3   issue up-front because if a plan is not accepted by an

4   impaired class in its vote, the plan proponent must proceed

5   under the so-called cramdown provision of the Bankruptcy

6   Code, Section 1129(b).  On the other hand, if all of the

7   impaired classes have voted in favor of confirmation of the

8   plan, the Court analyzes only Section 1129(a)'s requirements

9   for confirmation and the incorporated provisions of the

10  Bankruptcy Code related to it such as Section 1122 and 1123

11  of the Code.

12          Based on the ballot declaration and testimony of

13  Christina Pullo, this plan received I believe also an

14  unprecedented number of votes cast.  And of the votes cast,

15  the plan was in fact accepted by every voting class, thus,

16  obviating the need to proceed with the cramdown provisions

17  of the Bankruptcy Code.

18          In addition, and significantly, each voting class

19  voted overwhelmingly in favor of confirmation of the plan.

20  On average, the vote was over 95 percent in favor of

21  confirmation of the plan.  That, too, is a remarkable result

22  given the very large number of people who got notice, who

23  were entitled to vote, and who actually voted.  And the

24  unprecedentedly large number applies to each of those

25  categories.

1          On the personal-injury claim side, the vote was

2    roughly 97 percent.  In all cases, it was above 95 percent

3    except with regard to the hospital class which was just

4    under 90 percent, which however -- no member of which,

5    however, has actually objected or has an extant objection to

6    the plan.

7          I will address separately two objections that

8    allege that the votes should be looked at differently,

9    first, that the plan improperly classified certain claims

10   with other claims and that if they had been classified

11   differently in a separate class, the vote would not have

12   been as overwhelming, although it's acknowledged by those

13   objectors that it would still have been over 75 percent as

14   far as the super majority voting in the class, which is the

15   figure that Congress provided for in Section 524(g) of the

16   Bankruptcy Code when setting a higher bar for the release or

17   channeling of third-party claims in cases where the claims

18   are asbestos liability-related.  Again, I will address those

19   classification points separately.

20         In addition, and frankly baffling to me, the

21   United States Trustee has argued that I shouldn't just look

22   at the votes cast but at the votes that were not cast in

23   determining whether the plan was overwhelmingly accepted.

24   That, of course, is not how elections are conducted.  There

25   is no conceivable way to determine the preferences of those

1    who didn't vote other than that they didn't object and they

2    took no position in a "no" vote.

3            But where a vote is as extensive as this with

4    hundred -- well over 100,000 people voting, under any

5    measure, this plan has been overwhelmingly accepted.  And,

6    of course, it is the vote that counts under Section 1126 of

7    the Bankruptcy Code and in every election, not a statement

8    by a bureaucrat or his or her sense of where the wind is

9    blowing.  That's why we have elections.

10           A plan proponent has the burden of proof on all of

11    the applicable elements of Section 1129(a) that must be

12    satisfied for a plan to be confirmed.  That burden of proof

13    is satisfied by a showing that the applicable provision has

14    been met by a preponderance of the evidence.  In Re Ditech

15    Holding Corp, 606 B.R. 544,554 (Bankr. S.D.N.Y. 2019) and

16    the cases cited therein.

17           Many of the provisions of Section 1129(a) that are

18    applicable to this plan are uncontested.  And based on my

19    review of the relevant witness declarations, including the

20    declaration of Jon Lowne, John Dubel, and Jesse DelConte, I

21    conclude that the uncontested -- that with respect to the

22    uncontested provisions of Section 1129(a), the Debtors have

23    carried their burden of proof.

24           The provisions of Section 1129(a) that have been

25    contested by the remaining objections are Section 1129(a)(1)

Page 31

1    which states that the plan must comply with the applicable

2    provisions of this title, i.e., the Bankruptcy Code, which

3    incorporates for purposes of the objections that were filed

4    Sections 1122 and 1123(a)(4) of the Bankruptcy Code.

5            In addition, certain objectants have contested

6    that the Debtors have not satisfied their burden to show

7    under Section 1129(a)(3) that the plan has been proposed in

8    good faith and not by any means forbidden by law.

9            The United States Trustee has objected that the

10   payment of certain fees, that is legal fees and expenses,

11   under paragraph 5.8 of the plan, violates Section 1129(a)(4)

12   of the Code which states that it is a requirement for

13   confirmation that any payment made or to be made by the

14   proponent, by the debtor, or by a person issuing securities

15   or acquiring property under the plan for services or for

16   costs and expenses in or in connection with the case or in

17   connection with the plan and incident to the case has been

18   approved by or is subject to the approval of the Court as

19   reasonable.

20           Certain objectors have also contended that the

21   plan proponent has not satisfied the so-called "best

22   interests test" of Section 1129(a)(7) of the Bankruptcy Code

23   which requires a showing that with respect to each impaired

24   class of claims or interests, each holder of a claim or

25   interest of such class has accepted the plan or, that is for

Page 32

1    those who have not accepted the plan, will receive or retain

2    under the plan on account of such claim or interest property

3    of a value as of the effective date of the plan that is not

4    less than the amount, excuse me, that such holder would so

5    receive or retain if the debtor were liquidated under

6    Chapter 7 of this title on such date.

7         The objectors who have raised this provision

8    contend that because they're third-party claims against the

9    released parties, the shareholder released parties, are

10   being channeled to the plan trust or otherwise precluded

11   because of the distribution that they would be receiving

12   under the plan, whereas they will not be in a Chapter 7

13   liquidation, the plan fails the so-called "best interests

14   test" comparing that liquidation recovery to the recovery

15   under the plan.

16        Finally, there has been a suggestion, although of

17   the faintest kind, that the plan does not satisfy Section

18   1129(a)(11) of the plan, the so-called "feasibility test"

19   Which states that confirmation of the plan is not likely to

20   be followed by the liquidation or the need for further

21   financial reorganization of the debtor or any successor to

22   the debtor under the plan unless such liquidation or

23   reorganization is proposed in the plan.  I will address each

24   of those individual objections shortly.

25        Although I can find at this point that the plan

Page 33

1   does satisfy the so-called "feasibility test" under Section

2   1129(a)(11), as set forth in the uncontested fact

3   declaration of Mr. DelConte showing projections and the

4   assignability of the Debtors' insurance, the only -- and I

5   would say this again -- nebulous objection on this point was

6   by the holders of certain claims asserted by certain

7   Canadian municipalities and First Nations which contended,

8   albeit I think only at oral argument, that the treatment of

9   those creditors under the plan would be sufficiently

10  disagreeable to the Canadian court presiding over the

11  ancillary CCAA proceeding in Canada when the Debtors request

12  recognition of the plan.

13          First, based on my understanding of the model law

14  on cross-border insolvencies, which forms the basis of

15  Chapter 15 of the Bankruptcy Code as well as the CCAA

16  provisions providing for recognition, I am reasonably

17  comfortable that the Canadian court will recognize the plan,

18  although of course that is the decision for the Canadian

19  court, and not view the plan as unduly discriminatory

20  against Canadian creditors of the Debtor or Debtors in light

21  of what they would reasonable recover from the Debtors if

22  this plan were not confirmed and the different nature of the

23  regulatory regime that governs the Canadian creditors than

24  their U.S. counterparts, i.e., Native American tribes and

25  municipalities in the U.S.

Page 34

1            It is also my belief that the public policy

2    exception to recognition under the model law on cross-border

3    insolvencies would not be applied by the Canadian court

4    given the narrow nature of that public policy exception,

5    although again, of course, that decision is one to be made

6    by the Canadian court.

7            Further, it appears to me, again, based upon Mr.

8    DelConte's declaration that while recognition is important

9    and would bring clarity and finality to the claims of

10   Canadian creditors against these Debtors, the absence of

11   recognition is not critical to the survival of NewCo under

12   the plan and, therefore, that in any event the feasibility

13   test would be met.

14           I will note further that the plan makes it clear

15   that with respect to any Canadian creditor that has a claim

16   against Purdue Canada which is not a debtor here or a claim

17   against any of the shareholder-released parties that is

18   unrelated to a claim against the Debtors here, i.e., for

19   example, a claim against them because of their role in

20   Purdue Canada, those rights are expressly preserved under

21   the plan.

22           Most of the objections to confirmation of the plan

23   are based on the objectants' contention that the settlements

24   provided for in the plan either are not warranted under

25   applicable bankruptcy law or are beyond the Court's power,

Page 35

1    even if warranted under bankruptcy law, to approve and

2    impose.  Before addressing those issue, however, I will

3    address the other remaining objections to the plan's

4    confirmation.

5           The first set of objections that I will address

6    have been raised by certain insurers, Navigators Specialty

7    Insurance Company, American Guaranty and Liability Insurance

8    Company, and Steadfast Insurers and joined in by National

9    Union Insurance Company.  I will note that another insurer

10   objection made by the Chubb Insurance USA Group has been

11   withdrawn.

12          The Debtors seek certain findings in the

13   confirmation order regarding the effectiveness of the

14   transfer of the Debtors' insurance or insurance rights to

15   the trust established under the plan to fund and make

16   distributions to creditors.  They also seek findings

17   regarding the plan's settlement of opioid claims, namely

18   that the treatment of opioid claims under the plan or

19   insured claims under the plan or arguably insured claims

20   does not have the effect of impairing any applicable

21   insurance coverage as a bona fide fear of settlement on due

22   notice to the objecting insurers as well as the other

23   insurers who did not object.

24          The plan does not seek extensive findings as to

25   the Debtors' insurance.  It, for example, does not seek a

Page 36

1  declaration that any insurance coverage or insurance rights

2  actually apply.  That is the subject of a separate

3  litigation that will take its own course.  Rather, the

4  findings that the Debtors seek are integral simply to the

5  effectuation of the transfer of insurance and insurance

6  rights to the trust from the Debtors and to obviate a

7  defense that the plan itself in providing for a means to pay

8  opioid-related claims somehow derogates the insurers' rights

9  to review and consent to the payment of an insured claim.

10         The objectors contend that the plan and

11  confirmation order should be "insurance neutral, i.e.,

12  postponed for another day the need for even these findings."

13  There is no such concept or requirement that a plan be

14  insurance neutral.  And where a plan provides for as an

15  element of the plan the transfer of the Debtors' insurance

16  or insurance rights to a trust, the issue has been joined in

17  the confirmation hearing.  And the Court is properly

18  situated to decide it.

19         This is in contrast to, again, general coverage

20  issues, i.e., whether any particular claim against the

21  insurance is excluded because of a coverage exclusion, which

22  is not an element that the plan request a determination of

23  or hinges upon and where the plan is clear in the

24  reservation of rights by the insurance -- by the trustees of

25  the trust that will hold the insurance and insurance rights

Page 37

1    on the one hand and the insurers on the other.

2         The insurance-neutral argument that the objecting

3    insurance companies make, therefore, is not grounded on an

4    underlying principle of bankruptcy law but rather only on a

5    due process concern.  They contend that as originally filed,

6    the plan was arguably completely insurance neutral and did

7    not seek these types of determinations.  However, I believe

8    that the record is clear that the objecting insurers and all

9    other insurers have had sufficient notice for months now

10   that the Debtors were going to seek these limited findings

11   in the confirmation order.

12        The insurers are extremely well represented,

13   highly sophisticated, as evidenced by the negotiations over

14   the plan provisions relating to them and the proposed

15   confirmation order.  And they had a full opportunity to

16   challenge the findings that I've just outlined that are

17   being sought by the Debtors and their allies, the parties

18   that is, who would receive the benefits of the insurance

19   under the plan, namely the creditors.

20        That notice has really been made to them, at least

21   since May of 2021 and for the statutory and Bankruptcy Rules

22   notice period for the confirmation hearing, as well.

23        The plan also resolves the remaining due process

24   issue that the insurers had raised which is, as originally

25   drafted, it left open the possibility that additional

Page 38

1    findings could be sought or documents could be filed that

2    the insurers would not have notice of and that might

3    nevertheless be bindings on them.  The plan has been amended

4    to make it clear that that is not going to happen.

5            As far as the finding as to the plan's resolution

6    of arguably insured claims by providing for the distribution

7    of 100 percent of the value of the Debtors on account of the

8    claims asserted against them in the form of payments between

9    700 and $750 million through personal injury trusts and

10   remaining amounts of at least 5 billion to abate the opioid

11   crisis in various forms, it is almost impossible to see how

12   -- in fact, I believe impossible to see how an insurer could

13   claim that its consent rights were somehow violated by

14   notice of the plan and the implementation of it.

15           As far as the filed claims are concerned, the

16   claims assert roughly $40 trillion excluding a sole $100-

17   trillion claim that was filed by an individual, and that is

18   only roughly 10 percent of the claims, the others asserting

19   unliquidated amounts or unasserted amounts as set forth in

20   the declaration of Jessica B. Horewitz, Ph.D., which is an

21   expert declaration.  She calculated that the actual fixed

22   claim of the Department of Justice under the settlement

23   agreement entered into by the Debtors during the course of

24   this case provides for less than a one-percent recovery on

25   the asserted claim.

1        Under those circumstances, given the wide notice

2   and the absolute lack of any objection to the plan's

3   allocation of value either to opioid victims or to abate the

4   opioid crisis and the fact that insurers' consent rights

5   just like any other contract parties' consent rights are

6   circumscribed by the Bankruptcy Code's own separate notice

7   and hearing process.  The Debtors' request for a finding as

8   to applicable consent provisions is justified and

9   appropriate.

10        In addition, ample case law establishes the

11   authority under Sections 1123(a)(5)(B) and (b)(2) and (6) to

12   transfer as part of a plan and in furtherance of a plan

13   insurance rights and insurance policies to a trust to pay

14   mass claims as exist in this case, the analysis set forth by

15   the Third Circuit in In re Federal-Mogul Global Inc., 684

16   F.3d 355 (3d. Cir. 2012), I believe cannot be improved on in

17   this context.

18        I will note that although that was a case driven

19   by asbestos claims, the logic behind the Court's analysis

20   was based on Section 1123(a)(5) and 1141, not Section 524(g)

21   of the Code and, therefore, it would apply here.  See also

22   In re W.R. Grace and Company, 475 BR 34, 139 *189 (D. Del.

23   2012), affirmed 729 F.3d 311 (3d Cir. 2013) and the cases

24   cited therein which show the vast, and I think perhaps

25   unanimous, authority for the finding and conclusion that the

Page 40

1    Debtors seek here that notwithstanding any anti-assignment

2    provision and any applicable insurance under the plan, the

3    insurance policies or the insurance coverage rights, or the

4    rights to the proceeds could be assigned to the MDT, the

5    Master Distribution Trust.

6            I will note that both of these findings are also

7    warranted given that it appears that at least at this point

8    the insurers who have objected have either disclaimed

9    coverage or indicated that they were reserving their rights

10   to do so.  See JP Morgan Security Inc. v. Vigilant Insurance

11   Company, 58 NYS 3d. 38 (1st Dep't 2017) and the cases cited

12   therein.

13           So I will overrule the remaining portions of the

14   insurers' objection to the extent they actually do remain.

15   And I will note that in light of the colloquy during oral

16   argument with the insurers' counsel and counsel handling

17   insurance issues in this case, Reed Smith, it appeared to me

18   that most if not all of the objections actually had been

19   resolved by the changes to the plan that I've already

20   described.

21           The next objection that I want to address is an

22   objection by the United States Trustee not to the plan

23   settlement and release provisions pertaining to the

24   shareholder release parties, i.e., the Sacklers and their

25   related entities, but rather a separate objection which is

Page 41

1    to Section 5.8 of the plan.

2            The plan provides for compensation of a defined

3    term "professionals" which are estate-retained professionals

4    or professionals such as counsel for Official Committee of

5    Unsecured Creditors who are retained pursuant an order of

6    the Court and paid out of the estate's assets for their

7    post-petition, that is post-bankruptcy filing, work.  Two

8    other groups of professionals are also covered by orders of

9    the Court previously entered in the case and will continue

10   to be so with respect to their fees through the effective

11   date or the confirmation date of the plan under those

12   orders, namely the AHC and the multi-state governmental

13   entities group.

14           Section 5.8 of the plan sets forth the treatment

15   of fee claims for other counsel, not counsel formally

16   retained by and whose retention was approved by an order of

17   the Court or was approved by order of the Court even if

18   retained separately.  That section lays out the settlement

19   regarding the payment of these counsel, namely funds from

20   the so-called No Act and Tribal Abatement Fund Trusts for

21   political subdivisions and tribes' counsel.

22           In addition, it lays out payment of attorneys

23   involved in the pursuit by hospitals of their claims, the

24   so-called NAS monitoring claimant costs, that is the counsel

25   for NAS victims, payment for rate-payer costs and expenses,

Page 42

1    payment for personal injury claimants' costs and expenses,

2    payment for the public schools' costs and expenses.

3            The U.S. Trustee contends that the only way that

4    the plan can provide for such payments is pursuant to

5    Section 503(b)(3) or (4) of the Bankruptcy Code which

6    provides that after notice and a hearing, there should be

7    allowed administrative expenses, that is expenses against

8    the estate for post-petition claims, including the actual

9    necessary expenses comprising reasonable compensation for

10   professional services rendered by an attorney or an

11   accountant of an entity whose expense is allowable under

12   (a), (b), (c), (d), or (e) of paragraph 3 based on the time,

13   the nature of the extent, and the value of such services and

14   the cost of comparable services other than the case under

15   this title and reimbursement of actual necessary expenses

16   incurred by such attorney or accountant.

17           That section takes you back to Section 503(b)(3)

18   which requires that a creditor show that it made a

19   "substantial contribution in a case under Chapter 11 of the

20   Bankruptcy Code."  This contention by the U.S. Trustee is

21   wrong in two critical respects.  First, the bulk of the fees

22   that it is objecting to are not for post-petition work but

23   rather for pre-petition work in bringing and pursuing claims

24   against Purdue and to some extent the Sacklers before the

25   commencement of the bankruptcy case including in the multi-

Page 43

1    district litigation that was pending before the start of the

2    case.

3              Unsecured creditors' claims for collection of

4    costs including attorneys' fees are based in contract

5    ultimately as well as rights under applicable non-bankruptcy

6    law and enforceable in bankruptcy without the necessity to

7    comply with Section 503(b)(3) and (4) which applies only to

8    post-petition services or services leading up to a plan if

9    one seeks an administrative expense.  See In re United

10   Merchants and Manufacturers, Inc., 674 F.2d 134, 138 (2d

11   Cir. 1982).

12             The U.S. Trustee is wrong on this point also

13   because the remaining fees to be sought again are not being

14   sought as an administrative expense but rather as part of a

15   highly-negotiated compromise of those fees and their

16   clients' obligation to pay those fees reached during the

17   mediation in this case conducted by Messrs. Feinberg and

18   Phillips.

19             The settlements laid out in Section 5.8 that

20   resulted from that mediation are subject to court review

21   both under Bankruptcy Rule 9019 and I believe, although

22   there are arguments to the contrary, under Section

23   1129(a)(4) of the Bankruptcy Code, which I previously read,

24   and have been so recognized in this district.  See In re

25   Sterns Holding LLC, 607 BR 781, 793 (Bankr. SDNY 2019) and

1    In re Sabine Oil & Gas Corp., 555 BR 180, 258 (Bankr. SDNY

2    2016).

3          The U.S. Trustee relies upon a case that is

4    eminently distinguishable, In re Lehman Brothers, Inc., 508

5    BR 283 (SDNY 2014).  In that case, the district court noted

6    that Congress had specifically precluded recovery by

7    creditors' committee members of their post-bankruptcy fees

8    and expenses.  Therefore, any settlement of those expenses

9    would be improper as controverted by that provision.  See.

10   In contrast, In re AMR Corp. 497 BR 690, 695 (Bankr. SDNY

11   2013).

12         The mediator's report has made it clear and there

13   is unrefuted testimony in the record in addition to the

14   mediator's report on the docket by Gary A. Gotto, Peter

15   Weinberger, and Jayne Conroy as to, not only the

16   reasonableness of the contingency fees provided for in

17   Section 5.8, again, almost all of which were pre-petition or

18   for services rendered pre-petition but also the significant

19   compromise of those fees as set forth in Section 5.8

20   compromising down from a range of generally 20 to 40 percent

21   to the ranges set forth in Section 5.8.

22         As stated in the mediator's report, the

23   contingency fee resolutions as well as the common benefit

24   assessments reached in this mediation are consistent with

25   fee awards or arrangements of assessments agreed upon in

Page 45

1    other similar mass-tort situations.  See also the

2    declaration of AG Guard at paragraphs 57 through 60, 73, and

3    77 through 78; the Weinberger declaration at paragraphs 20

4    through 27 and 31 through 32; and the Conroy declaration at

5    11 through 15.

6            I do believe given Congress's concern that the

7    court be the ultimate say on the reasonableness of

8    attorneys' fees paid through a Chapter 11 plan, albeit that

9    here they're not being paid by the Debtor but rather they're

10   being paid by the clients and the trusts that the clients

11   have agreed to set up as part of the clients' recovery.

12   Congress did that, however, in Section 1129(a)(4), not

13   503(b)(3) and (4), which requires only that the fees be

14   founds to be reasonable.

15           That inquiry should not be turned into a mandate

16   for an expensive or unnecessary review.  In re Journal

17   Register Company, 407 BR 520, 537-538 (Bankr. SDNY 2009)

18   quoting maybe the Southwestern Electric Power Company (In re

19   Cajun Electric Power Co-op Inc., 150 F.3d 503, 517 (5th Cir.

20   1998) based upon the uncontested representations.  And I

21   note that the U.S. Trustee has made absolutely no effort

22   whatsoever to contest them but, nevertheless, somehow

23   contended that the fees were improper in the Guard-Conroy-

24   Weinberger declarations and the mediator's report.

25           I find that the contingency fees provided for in

1   the plan paragraph 5.08 and the mechanism for allocating

2   them among counsel are reasonable and, in fact, to the

3   benefit of the estate by a reduction of the attorneys'

4   claims.  Sometimes being a watchdog that has no regulatory

5   power requires backing off when the facts show that a

6   provision is reasonable and for the benefit of the estate,

7   not its detriment.  This is one of those instances.

8           There are two sets of fees that I cannot on this

9   record make a reasonableness finding on.  I noted them

10  during oral argument on this issue.  They are fees that are

11  based on not contingencies that the parties have analyzed,

12  contingency fee mechanisms, that is, that the parties have

13  analyzed and the mediators have analyzed and that I have

14  analyzed and that have not been controverted but rather on

15  hourly rates.  I have not seen any time records as to the

16  amount of time spent or the rates, and so I believe I need

17  to make a reasonableness finding as to those counsel which

18  are the counsel to the PI Ad Hoc Committee and the School

19  Districts Committee.

20          The plan has been amended to reflect that opinion

21  that voiced during oral argument with one wrinkle.  It

22  contemplated or it reflects that one portion of the school

23  districts' claim may actually be a contingency fee claim.

24  And it suggests that the Court will not review it if it is

25  determined by one of the mediators, Mr. Feinberg, to be

Page 47

1    reasonable.  I'm not prepared to accept that mechanism.  I

2    will certainly take into account as I have with regard to

3    the other contingency fee compromises that are set forth in

4    paragraph 5.8 Mr. Feinberg's views, but I believe I

5    ultimately have to make the reasonableness determination on

6    notice to parties in interest including the U.S. Trustee.

7            I recognize that this is a compromise or that the

8    contingency fee amount is a compromise.  But given that I

9    don't have evidence in this record to show that it was a

10   reasonable compromise, I need to under Section 1129(a)(4)

11   have the last say on it.

12           But I want to be clear that is a say that I will

13   exercise based on my review of the reasonableness of

14   contingency fee taking into account the evidence presented

15   before me which I anticipate will be some statement by Mr.

16   Feinberg and any other statement that would support that

17   level of contingency fee.  So the U.S. Trustee's objection

18   on this point is overruled.

19           And just to be clear, because insinuations really

20   shouldn't go unanswered, there is absolutely no evidence for

21   any insinuation in the U.S. Trustee's filings that the fees

22   provided for in paragraph 5.8 are somehow improper.  In

23   fact, to the contrary, they are settlements of claims that

24   could be substantially higher and were settled as part of a

25   mediation resolving the allocation of claims between public

Page 48

1    and private creditors and the amount that creditors were

2    willing to accept coming from the Sacklers.  The record is

3    crystal clear on that.  Again, the settlements are to the

4    benefit of the creditors, not their detriment.

5          The next objections are by individuals, Creighton

6    Bloyd, Stacey Bridges, and Charles Fitch in their individual

7    capacities.  They object contending that there was

8    insufficient notice of the bar date to those incarcerated in

9    prison, notwithstanding as I had noted above or earlier the

10   extensive notice as testified to by Ms. Finegan.

11         There's a fundamental problem with this objection.

12   All three of the objectors have actually filed a proof of

13   claim timely, i.e., before the bar date.  They, therefore,

14   lack standing under Article III of the Constitution, and

15   this Court lacks the power to decide their objection because

16   as to them, and again, they're proceeding in their

17   individual capacity, there is no remedy that the Court can

18   grant.  Again, they have filed timely proofs of claim in

19   this case.

20         As recently stated by the Supreme Court in

21   TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2202-2203

22   (2021), to have standing and for there to be a case in

23   controversy, the party raising a matter with the federal

24   court must have a personal stake in fact and if they don't,

25   there is no case or controversy which precludes

Page 49

1   determination of the objection under Article III of the

2   Constitution.

3           See also Kane v. Johns Manville, Corp., 843 F.3d

4   636, 642-646 (2d.Cir 1988) which dealt with almost the same

5   issue.

6           Mr. Bloyd also filed a second individual objection

7   based on what he believes might be the consequences of the

8   Debtors' criminal plea in their 2021 settlement with the

9   Department of Justice.  Mr. Bloyd's counsel acknowledged at

10  oral argument that this issue is properly raised not here

11  but at the Debtors' sentencing before the New Jersey

12  District Court in which it can be argued that persons such

13  as Mr. Bloyd might have an individual right to the proceeds

14  to be paid by the Debtors under the DOJ settlement.

15          Even if that wasn't conceded, I rule that that

16  issue is not a plan confirmation issue but rather an issue

17  as to the allocation of the DOJ payment after the Debtor

18  makes it.  I don't believe it affects the feasibility of the

19  plan.  Moreover, based on my review of the discretion that

20  the District Court would have under the applicable act that

21  Mr. Bloyd is going to rely on where there is such a large

22  number of potential victims for which the DOJ could be said

23  to be acting, individual rights in a restitution fund can be

24  foregone.

25          There's arguably a suggestion by Mr. Bloyd that

Page 50

1    somehow the Debtors and the Department of Justice colluded

2    in agreeing to the settlement agreement and, therefore -- in

3    that they did not provide for individual rights of

4    restitution from the payments or the rights of the DOJ under

5    the settlement agreement.  This is not supported by the

6    record.

7           The Debtors have established that, as far as the

8    plan's treatment of the Department of Justice, the plan has

9    been proposed in good faith under Section 1129(a)(3).

10   There's no evidence of any attempt to improperly cut off

11   rights that individual victims would have under the DOJ

12   settlement and, indeed, the personal injury class was

13   actively and well represented in the mediations in this case

14   which came up with the funding of the personal injury

15   trusts.

16          It's well established in the Second Circuit,

17   including in the Drexel case that I'll be citing in a

18   moment, that the fact that some creditors did not

19   participate in a mediation does not render the results of a

20   mediation improper or not in good faith.  The extent of the

21   vote of the personal injury class, 97 percent in favor of

22   the plan, also argues for the good faith treatment of the

23   personal injury creditors here vis-à-vis the DOJ settlement.

24          And again, I've noted the flexibility in the

25   settlement and the applicable statute that would govern

Page 51

1    restitution rights, which of course, the district court in

2    New Jersey will consider at the appropriate time.

3            So I will overrule Mr. Bloyd's second objection to

4    the plan.

5            I had mentioned earlier that certain Canadian

6    Municipalities and First Nations had filed an objection to

7    the plan.  I've reviewed the proofs of claim that they have

8    filed in these cases against these Debtors.  It is not clear

9    from those claims, which essentially attach complaints

10   against both non-debtor Purdue Canada and other non-debtors

11   and these Debtors, whether the claims really are against the

12   Debtors.

13           To the extent they are against Purdue Canada or

14   other foreign non-debtors, those recoveries are fully

15   preserved.  They're not affected by the plan and claims

16   against third-parties, including the Sacklers related to

17   those types of claims, as opposed to claims against these

18   Debtors, are not enjoined.

19           The gist of the objection is that rather than be

20   treated as general unsecured creditors in Class 11, the

21   Canadian Municipalities and First Nation objectors must be

22   classified with the U.S. Public and Native American Tribes

23   in Classes 4 and 5 respectively and participate in the

24   abatement trusts created under the plan for those creditors.

25           It should be noted that these objectors have made

Page 52

1    no contention that the value to be paid to them as a Class

2    11 creditor is unfairly different than the value to them if

3    they participated in the NOAT and Native American Tribes

4    Abatement Trusts.  But in any event, it is conceded by these

5    objectors that if their vote were counted in Class 11, as

6    opposed to in Classes 4 and 5, Class 11 would still have

7    overwhelmingly accepted the plan.

8           Thus, the provision is Section 1129(b)'s cramdown

9    requirement that there be no unfair discrimination among

10   similarly situated creditors in different classes does not

11   apply.  Instead, the objection is, if at all, properly

12   couched under different provisions of the Bankruptcy Code.

13          I will note that there was some suggestion during

14   oral argument and one sentence in the objection that stated

15   that the claims of the Canadian Municipalities and First

16   Nations should not be allowed for voting purposes at $1.00,

17   as provided for in the Court's confirmation/disclosure

18   statement order.  However, there's been no request to

19   estimate these claims for voting purposes under Section

20   502(c) of the Bankruptcy Code or Rule 3018.

21          And further, such treatment, i.e., temporary

22   allowance for what would otherwise be a disputed and

23   unliquidated claim arguably not even against these Debtors

24   for mass tort liability, is well recognized as being fair --

25   see the discussion in In re Lloyd E. Mitchell, Inc., 373

1   B.R. 416, 428 (Bankr. D. Md. 2007) and the cases cited

2   therein -- given the vast number of claims asserted that are

3   unliquidated like these and subject to dispute.  To subject

4   the process to fixing the amounts of such claims would

5   defeat the whole conduct of the bankruptcy case.

6           Given that Section 1129(b) doesn't apply to this

7   issue because of the class vote, the issue is whether the

8   plan's separate classification of these objecting creditors

9   in Class 11, as opposed to the class that they want to be

10  in, is proper.

11          Separate classification of similar claims is a

12  right that a plan proponent has under the Bankruptcy Code if

13  there's a reasonable basis to classify the claims

14  separately.  See generally 7 Collier on Bankruptcy,

15  Paragraph 1122.03[1][c] 16th Edition 2021; In re

16  Lightsquared, Inc., 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014),

17  and In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723,

18  759 (Bankr. S.D.N.Y. 1992).

19          Section 1122 of the Bankruptcy Code, which again

20  is incorporated into Section 1129(a)(1) states nearly that

21  notwithstanding any otherwise applicable non-bankruptcy law,

22  the plan shall -- I'm sorry, I'm focusing on Section 1129 --

23  designate, subject to Section 1122 of this title, classes of

24  claims.

25          Section 1122 says, except as provided in

Page 54

1   subsection (b) of this section, which is inapplicable here,

2   a plan may place a claim -- that is may place a claim -- in

3   a particular class only if such claim or interest is

4   substantially similar to other claims or interests in such

5   class.  It doesn't require all substantially similar claims

6   to be placed in the same class, only that if you are putting

7   claims in a class, they need to be substantially similar.

8           Here, there is clearly a rational basis for

9   separately classifying these objectors' claims from the U.S.

10  public creditors and Native American Tribes, based upon the

11  different regulatory regimes that the objectors operate

12  under with regard to opioids and abatement, as well as the

13  fact that the allocation mediation, which I'll be discussing

14  at length later, which allocated the Debtors' assets and

15  third-party claim assets among private and public claimants

16  and then separately among the public claimants involved U.S.

17  public claimants and their own regulatory interests and

18  features.

19          The record reflects that there was no request by

20  any of the objecting creditors to participate in that

21  mediation.  The record is also clear, and I can take

22  judicial notice of the fact as well, that those who did

23  request to participate in the mediation, if they had a

24  reasonable basis to do so, were generally invited into the

25  mediation, including for example, the NAACP.

1           The failure to participate in mediation is not

2    something that should detract from the settlement reached,

3    as long as the classification scheme is fair and rational.

4    See In re Peabody Energy Corp., 933 F.3d 918, 927-8 (8th

5    Cir. 2019).

6           Such a distinction between U.S. and Canadian

7    claimants has been recognized by the Third Circuit and the

8    Sixth Circuit.  See Class 5 Nevada Claimants v. Dow Corning

9    Corp. (In re Dow Corning Corp.), 280 F.3d 648, 942 (6th Cir.

10   2012).  See also, In re W.R. Grace & Co., 729 F.3d 311, 329-

11   30 (2013), where Canadian property damage claims, including

12   a claim by the Queen on behalf of Canada, was found to be

13   properly separately classified because of the different

14   types of recovery such claims would have under applicable

15   law, a close analogy to the different regulatory schemes

16   that would apply here to the NOAT Trust.

17          Again, there was a suggestion that the separate

18   classification was also not in good faith, asserting

19   basically the same argument that because the Canadian

20   Municipalities and First Nations didn't have the same

21   treatment and classification as the U.S. governmental

22   entities and Native American Tribes, the plan was not in

23   good faith or proposed in good faith.

24          But given the plan's rational basis for separate

25   classification and the lack of any evidence to show that the

Page 56

1    objecting creditors were improperly silenced or excluded

2    from negotiations, I find that the plan is proposed in good

3    faith as to them.

4            Besides raising the foregoing objections, the

5    Canadian creditors object to the plan's release of third-

6    party claims against the Sackler shareholder released

7    parties.  To the extent they make the same arguments as

8    others do who raised this point, I will address them

9    collectively later.

10            In addition, however, the Canadian objectors have

11    contended that because no money from the shareholder

12    settlement is being specifically channeled to Class 11,

13    Class 11 creditors should not be enjoined under the plan

14    from pursuing whatever claims they have against the Sacklers

15    or the Sackler released parties based on their U.S. conduct.

16    Is this a valid basis for the plan objection?

17            Here, I conclude that it is as, at least by the

18    Canadian creditors, the uncontested best interest

19    liquidation analysis in the DelConte declaration shows Class

20    11 creditors would receive no recovery on their claims if,

21    as I believe is the case, upon their carveout from the

22    third-party release provisions, the Debtors would liquidate

23    the Sackler settlement, in other words, enables the Class 11

24    recovery to exist.  It is necessary for and inextricably

25    tied to the plan and fair to the Canadian objectors,

Page 57

1    therefore, to bind them to the release provisions in the

2    plan.

3              I will note in this regard that there's been no

4    indication in any claim by the Class 11 creditors that the

5    Sacklers would be liable to them based on their conduct

6    related to the U.S. Debtors.  Indeed, as noted, there's

7    really little indication that there's any claim against the

8    U.S. Debtors in the first place.

9              It is clear to me from the liquidation analysis

10   and the record of this case, therefore, that the payment to

11   the class of unsecured creditors, that is Class 11 in which

12   these objectors reside, is fair taking into account not only

13   their rights against the Debtors, but also whatever rights

14   they may have against the Sacklers that would be released

15   under the plan, and, in fact, that they would not recover if

16   they were carved out from the release, so I will overrule

17   that objection.

18             Certain of the objecting states and the District

19   of Columbia have raised another objection to confirmation

20   than their objection to the third-party claims release and

21   injunction in the plan.  They have asserted, first, that the

22   plan violates Section 1122 of the Bankruptcy Code by

23   classifying them in Class 4 with their political

24   subdivisions.

25             Given that classification, if one simply goes by a

Page 58

1    creditor term by creditor vote in that class, the objecting

2    states and District of Columbia have a tiny percentage of

3    the no vote, compared to an enormous percentage of the yes

4    vote.  They obviously do not like being portrayed that way,

5    and I do view them as representing their state as a whole,

6    that is the people in that state.

7            I do not accept, however, their blanket

8    characterization that because they are states, the other

9    public creditors, political subdivisions, municipalities and

10   the like that are in their class, can be silenced.  I accept

11   that for most states that is not the case.  More

12   importantly, states have political subdivisions that is

13   because of home rule laws and the like.

14           More importantly, there has been no attempt by the

15   objecting states and the District of Columbia to silence the

16   other members of their class by seeking to disallow their

17   vote or designate their vote under Section 1126 of the

18   Bankruptcy Code.  And in any event, it is a position taken

19   only as to some political subdivisions' claims as being

20   precluded by the parens patriae rights of a state, as

21   opposed to all of them.

22           Importantly, the states acknowledge -- and this

23   was stated on the record by their counsel -- their claims

24   have the same rights to the Debtors' assets as other general

25   unsecured creditors, including the political subdivisions

Page 59

1    that are in their class.  That is, the states' claims are

2    not priority claims, they're not secured claims; they're

3    general unsecured claims.

4          The law is clear that under those circumstances,

5    the states' claims are, in fact, properly classified under

6    Section 1122(a), as I previously read, with the other claims

7    in their class.  As noted by the Third Circuit in In re W.R.

8    Grace & Co., 729 F.3d 311, 326 (3d Circ. 2013), to determine

9    whether claims are substantially similar for purposes of

10   Section 1122(a), "The proper focus is on the legal character

11   of the claim as it relates to the assets of the debtor."  In

12   re AOV Industries, Inc., 792 F.2d, 1140, 1150, (DC Cir.

13   1986).  See also, In re Tribune Company, 476 B.R. 843, 855

14   (Bankr. D. Del 2021), (concluding that the phrase

15   substantially similar reflects, "The legal attributes of the

16   claims, not who holds them), and In re Quigley, 377 B.R.

17   110, 116 (Bank. S.D.N.Y. 2007), "Claims are similar if they

18   have substantially similar rights to the Debtors' assets."

19   See also, In re Drexel Burnham Lambert Group, Inc., 138 B.R.

20   723, 757 (Bankr. S.D.N.Y. 1992) and 7 Collier on Bankruptcy,

21   Paragraph 1122.03[3] 16th Edition 2021.

22         That is clearly the case here and, therefore, the

23   claims can in fact and should in fact properly be classed

24   together, which has resulted in the unanimous agreement by

25   all of the states, including these objecting states as to

Page 60

1    the allocation within the class among them and the other

2    public creditors that was reached during the lengthy and

3    difficult mediation conducted by Messrs. Phillips and

4    Feinberg.

5         It also should be noted, although ultimately this

6    has little bearing on the classification issue, only bearing

7    on the plan release issue, that if the plan had separately

8    classified the states, although again that would have unduly

9    complicated the universally agreed public side allocation of

10   value as between the states on the one hand and all of the

11   other public entities on the other in Class 4, the accepting

12   states, the states accepting the plan, and the territories

13   would go from 95 percent as far as Class 4 is concerned to

14   80 percent or slightly below 80 percent, in each case, well

15   above the 75 percent supermajority threshold in the

16   analogous section of the Bankruptcy Code 524(g).

17        The objecting states and District of Columbia also

18   have referenced the alleged impropriety of classifying their

19   claims as well as all other opioid-related claims, none of

20   which have been liquidated to a dollar amount and most of

21   which never will be liquidated to a dollar amount, none of

22   which at least by the public entities will be because of the

23   plan and the agreement by all of the states in the plan to

24   use the money to abate opioids as opposed to paying them

25   cash.  They nevertheless contend that their claims should

Page 61

1    not have been allowed for voting purposes at $1.00.

2             This objection should be denied for the same

3    reason that I denied the same argument made by the Canadian

4    Municipalities and First Nations: there's been no effort by

5    any of these objectors to seek to temporarily allow their

6    claims for voting purposes.  There's an obvious reason for

7    that.

8             If that request had been made, every entity that

9    wanted to vote would have made the same request and we would

10   have been engaged in, I believe, literally years of

11   litigation over liquidating the claims, which these entities

12   themselves by their own choice as part of a mediation have

13   agreed needn't be done because the money will go to opioid

14   abatement instead of into their individual treasuries.

15            Under those circumstances, it's perfectly

16   appropriate to allow the claims for voting purposes for

17   $1.00.  Again, it's the In re Lloyd E. Mitchell, Inc., 373

18   B.R. at 428.

19            The same objecting states also argue that they are

20   being treated unequally with the United States, which is in

21   large measure carved out of the third-party release in the

22   plan.  This, however, is not a proper objection under

23   Section 1124 -- excuse me -- 1123(a)(4), which says that a

24   plan shall provide the same treatment for each claim or

25   interest of a particular class unless the holder of a claim

Page 62

1   or interest agrees to a less favorable treatment because

2   they're not in the same class; they're in different classes,

3   and as I noted earlier, a plan proponent can separately

4   classify similar claims in different classes if there's a

5   rational basis to do so.

6         There clearly is a rational basis to classify the

7   U.S. differently here.  The U.S. has different types of

8   claims.  It actually has secured claims, which are treated

9   as part of one of the aspects of the plan settlement, and

10  it's unsecured claims are different in particular with

11  respect to the Sacklers.  Unlike the claimants in Class 4,

12  where the objecting states and the District of Columbia are

13  classified, the United States has settled its civil claims

14  with the Sacklers for a specific payment.

15        So clearly, the different rights of the United

16  States and different treatment of the United States, which

17  include as another part of the plan settlement, the waiver

18  of $1.7 billion of its super-priority administrative expense

19  claim, which otherwise would be entitled to be paid ahead of

20  any unsecured claim and any administrative expense claim

21  under the abatement and NewCo provisions of the plan, which

22  is for the benefit of Class 4 and Class 5 and, frankly, all

23  of the creditors of the estate.

24        So those different rights and different treatment

25  clearly support separation classification, without a doubt,

Page 63

1    nor is any unfair discrimination argument available under

2    Section 1129(b), the cramdown provision, because the class

3    has accepted the plan and, therefore, the cramdown

4    provisions don't apply.

5            The State of West Virginia has filed a limited

6    objection to the plan.  It does not object to any aspect of

7    the plan other than the allocation in Class 4 and the NOAT

8    procedures of its share of the funds to be used in the NOAT

9    Trust to abate the opioid epidemic.  It raises this

10   objection in two legal contexts.  First, it contends that

11   the plan is not being proposed in good faith because what it

12   contends is the unfair allocations of the NOAT Trust.

13           Under Section 1129(a)(3) of the Bankruptcy Code,

14   the Court shall confirm a plan only if the plan proponent

15   shows that it has, "Has been proposed in good faith and not

16   by any means forbidden by law."  The courts have fairly

17   general consensus as to the meaning of proposed in good

18   faith in this provision.

19           All courts recognize a procedural interpretation;

20   that is they look only to the proposal of the plan, not the

21   terms of the plan, to see if the proposal itself was in good

22   faith or, to the contrary, infected with improper conflicts

23   of interest or self-dealing or the like.  See, for example,

24   Garvin v. Cook Investments NW, SPNWY, LLC, 922 1031, 1035

25   (9th Cir. 2019).

Page 64

1            As the Circuit Court noted there, a contrary

2     interpretation that has a broader inquiry into general

3     principles of good faith not only renders the words has been

4     proposed meaningless, but makes other provisions of Section

5     1129(a), which are specific and shouldn't be diluted by a

6     good faith analysis, redundant.  See 7 Collier on

7     Bankruptcy, Paragraph 1129.02[3][a] 16th Edition 2021.

8            In addition to that view, however, other courts

9     apply more of a totality of the circumstances analysis

10    beyond the manner in which a plan is proposed and find that

11    a plan is proposed in good faith if there is a reasonable

12    likelihood that a plan will achieve a result consistent with

13    the standards prescribed under the Code, that is the

14    Bankruptcy Code.  In re Peabody Energy Corp., 923 F.3d 918,

15    927 (8th Cir. 2019).

16            Generally, the Second Circuit has clearly followed

17    the first line, just focusing on the proposal of the plan.

18    See In re Board of Directors of Telecom Argentina, S.A., 528

19    F.3d 162, 174 (2d Cir. 2008) and Kane v. Johns-Manville

20    Corp., 843 F.2d 636, 649 (2d Cir. 1998), and In re Koelbl

21    751 F.2d 137, 139 (2d Cir. 1984).

22            On the other hand, courts in this district have,

23    at times, followed a more expansive view, more of a totality

24    of the circumstances surrounding the establishment of the

25    plan and the like.  Although even there, they focused

Page 65

1    largely on the proposal of the plan and the process of plan

2    development.  See In re Chemtura Corp., 439 B.R. 561, 608

3    (Bankr. S.D.N.Y. 2010), In re Quigley Co., Inc., 437 B.R.

4    102, 125 (Bankr. S.D.N.Y. 2010), In re Genco Shipping &

5    Trading Limited, 513 B.R. 233, 261 (Bankr. S.D.N.Y.), and In

6    re Breitburn Energy Partners LP, 582 B.R. 321, 352 (Bankr.

7    S.D.N.Y. 2018).

8              However, courts in this district also have

9    considered whether the plan, "... will achieve a result

10   consistent with the standards prescribed under the

11   Bankruptcy Code."  See In re Ditech Holding Corp., 606 B.R.

12   544, 578 (Bankr. S.D.N.Y. 2019) and the cases cited therein.

13   And as recognized by Judge Garrity in that case, those

14   policies or objectives include preserving going concerns and

15   maximizing property available to satisfy creditors, giving

16   debtors a fresh start in life, discouraging debtor

17   misconduct, the expeditious liquidation of distribution of

18   the bankruptcy estate to its creditors and achieving

19   fundamental fairness and justice.  Id.

20             Here, I have ample testimony by John Guard

21   primarily and the representative of the State of Florida,

22   that the allocation of the NOAT was the result of good faith

23   arms' length negotiations by the various states during the

24   mediation process.  That testimony really is unassailable as

25   to good faith.  It is also clear that without no

Page 66

1   negotiations, which were difficult given the nature of the

2   states, not as weighty of course, but equally reflecting

3   concerns underlying the compromise behind the constitution;

4   you have small states, you have large states, you have

5   states that have been disproportionately affected by the

6   opioid crisis, et cetera.

7            Without that agreement, the goals of the

8   Bankruptcy Code would actually have been jeopardized that

9   agreement, which in fact, the State of Washington recognizes

10  being remarkable, and I too believe is remarkable to get 48

11  states to agree upon an allocation mechanism for abatement

12  procedures.

13           The failure to do so would have resulted in

14  extensive litigation and arguably a fallback on distributing

15  the value of the Debtors' estates, including their claims

16  against the Sacklers and channeled third-party contributions

17  or payments by the Sackler shareholder release parties, not

18  to serve abatement purpose, but rather after extensive

19  litigation cash payments, which I believe would be

20  substantially reduced by the extensive litigation, to

21  individual states for their general use in their treasuries

22  in large part.

23           So I find that the NOAT allocation was, in fact,

24  derived in good faith by arms' length and fair negotiations

25  among the parties.

Page 67

1          That testimony by Mr. Guard is highlighted or the

2    cogency of that testimony is highlighted or was highlighted

3    by the cross-examination of West Virginia's expert, Dr.

4    Charles Cowan.  He acknowledged his prior publications, that

5    is publications written prior to his being retained by the

6    State of West Virginia for the purpose of showing why West

7    Virginia should receive a larger allocation of the NOAT

8    under the plan.  He recognized in those publications that

9    other methods of allocating money towards abatement could be

10   fair and reasonable as well, and that there was no specific

11   formula for allocating states' recoveries to them.

12          It was clear from Mr. Guard's testimony that the

13   proposal made by Mr. Cowan would not have been agreed to by

14   any state other than West Virginia.  It also is clear that

15   that proposal or that methodology would have resulted in

16   peculiar allocations of the NOAT Trust money for abatement;

17   whereby, for example, states with substantially smaller

18   populations, like Kentucky, would get substantially more of

19   the funds than states with large populations like New York,

20   or Washington would get a larger recovery than Texas, or

21   West Virginia would get a larger recovery than Virginia,

22   albeit that they're neighboring states.

23          And albeit that although certain states like

24   Kentucky, like West Virginia are, in fact, ground zero in

25   the opioid crisis, it is a national problem that requires

Page 68

1     the exercise of extensive resources by every state where

2     population is a legitimate measure, as well as the other

3     factors taken into account in the NOAT allocation.

4            That allocation does, in certain ways, respect the

5     rights of smaller states and take into account levels of

6     intensity of harm.  However, it also recognizes that the

7     states report in some ways measures of intensity differently

8     and, therefore, those measures are not necessarily accurate.

9     For example, the evidence reflects that different states and

10    their subdivisions report deaths from opioids differently

11    than others, or record opioid disorders differently.

12           Given that, I conclude that the treatment of the

13    states in Class 4, and through it by means of the trust

14    procedures and allocations for the NOAT, are being treated

15    substantially the same pursuant to an overall regime that

16    has been negotiated at arms' length.

17           As discussed again by the Third Circuit in the

18    W.R. Grace & Co. case that I previously cited, "Although

19    neither the code nor the legislative history precisely

20    defines the standards of equal treatment, courts have

21    interpreted the 'same treatment requirement' to mean that

22    all claimants in a class must have 'the same opportunity for

23    recovery.'"  See, for example, In re Breitburn Energy

24    Partners, LP, 582 B.R. 358, 321 (Bankr. S.D.N.Y. 2018) and

25    In re Dana Corp., 412 B.R. 5362 (S.D.N.Y. 2008).

1          The W.R. Grace court then goes on to state or to

2     cite In re Central Medical Center, Inc., 122 B.R. 568, 575

3     (Bankr. E.D. Mo. 1990), which concludes that a plan that

4     subjects all members of the same class to the same process

5     for claim payment is sufficient to satisfy the requirements

6     of Section 1123(a)(4).

7          Finally, as the W.R. Grace court states, what

8     matters then is not that claimants recover the same amount

9     or that they have equal opportunity to recover on their

10    claims; that's at 729 F.3d 327.

11         The court goes on to state, courts are also in

12    agreement that Section 1123(a)(4), "... does not require

13    precise equality, only approximately equality," citing In re

14    Quigley Company, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007).

15    See also In re Multiut Corp., 449 B.R. 334 (Bankr. N.D.

16    Illinois, 2011).

17         It went on to find that -- that is the W.R. Grace

18    case -- found that the consequences of how and when the

19    class members would be paid didn't produce a substantive

20    difference in a claimant's opportunity to recover and were

21    the result of, among other things, a comprehensive mediation

22    and arms' length negotiations.

23         I conclude the same here with regard to West

24    Virginia's 1129(a)(4) arguments.  I was not going to

25    conclude the same as to another aspect of its argument.  One

Page 70

1    of the adjustments made for the benefit of states with

2    smaller populations like West Virginia in the NOAT

3    procedures was a separate fund, so-called 1 percent fund,

4    which all the states, other than the small states that would

5    participate in the fund, were going to participate in, with

6    the exception of California.

7         I did not see sufficient evidence on the record to

8    justify California's being excepted from that contribution

9    obligation, if you will, to the 1 percent fund.  However,

10   California has agreed, since the discussion on the record

11   during the confirmation hearing, to change its view and to

12   participate in the 1 percent fund.  Therefore, the one

13   aspect of West Virginia's objection that I was going to

14   grant has effectively been granted by the agreement of

15   California that I've just described.

16        Mr. Guest made it clear that all of the states

17   recognized the huge impact that the opioid crisis has had on

18   states like West Virginia and had tried to take that into

19   account in negotiating the NOAT allocation.  I too recognize

20   that impact, but I believe that given the arms' length

21   nature of the negotiation and the acceptable range of West

22   Virginia's treatment even within the writings acknowledged

23   by Professor Cowan, I conclude that its objection under

24   Section 1129(a)(4) should be denied.

25        The remaining objections to the plan, other than

Page 71

1    the objections based upon the plan's third-party release and

2    injunction provisions and the plan settlement with the

3    Sacklers and their related entities, have been asserted by a

4    number of pro se parties, that is parties who were not

5    represented by counsel.

6              I will go through these, which I believe are

7    properly viewed in roughly four different categories.

8    First, Ms. Butler Frank, Ms. Villeneuve, Mr. Cobb, and Mr.

9    Wright have all stated in one form or another that the plan

10   should not give the Sackler family, "... immunity from

11   criminal charges."  I completely agree, as does the plan.

12   The plan does not provide a release of criminal conduct.

13   That is crystal clear in the plan and always has been.

14             It is I think understandable that a person who is

15   not a lawyer and looks at this case from afar through one

16   form of the media or other may have reached a different

17   conclusion; in part, that is because either through

18   ignorance or choice, the plan has been described as

19   providing "immunity" to the Sacklers.  Immunity suggests

20   clearly immunity from criminal charges; that's how one

21   generally thinks of the word immunity.  It simply does not

22   do that.  It couldn't do it and it doesn't.

23             It's important for those who should now know

24   better, whether they are reporters, law professors, or

25   members of congress, to be careful how they use their words

Page 72

1    in this context.  At a minimum, it reflects that they do not

2    understand this case.  It also, if they really do know

3    better, is irresponsible and, frankly, also cruel to those

4    whom they mislead.

5            If anyone that is obtaining a civil release under

6    this plan has engaged in criminal activity, either before or

7    during this case, they are not relieved of the consequences

8    of that.  If any prosecutor wants to pursue such a claim

9    against the release parties, they can.

10           Ms. Graham, Mr. Normile,  Mr. Beois (ph), I hope

11   I'm pronouncing that right, Ms. Willis, Ms. Ecke, Mr. West,

12   and Ms. Farash have all in one form or another contended

13   that it is improper or unfair for the plan to provide only

14   the $700 to $750 million for individual personal injury

15   claimants, while the bulk of the recovery goes to, as one of

16   the objectors stated, wealthy states, hospitals, school

17   districts, ratepayers, et cetera.

18           I have said more than once during this case,

19   including to Ms. Ecke who testified during the confirmation

20   hearing, that one cannot put a price on a human life or an

21   injury such as opioid addiction, and yet, that's what courts

22   do with respect to personal injuries.  They take into

23   account a number of factors, which are relevant legally,

24   including potential defenses or dilution of the claim and

25   causation.  The amount that courts reach is rarely, in terms

Page 73

1    of dollars, sufficient compensation.  That is particularly

2    the case where the wrongdoer is insolvent.

3            I did not have any specific valuation of personal

4    injury claims in this case.  What I do have is a lengthy and

5    difficult arms' length mediation, led by two of the best

6    mediators not only in the United States but in the world,

7    Messrs. Feinberg and Phillips.  They are, I believe, in no

8    way beholden to any type of claimant here or sympathetic

9    unduly or disproportionately to any type of claimant here.

10           Mr. Feinberg, for example, has the incredibly

11   difficult job of working out by dealing with victims and

12   their families the proper allocation of the 9/11 fund.  Both

13   of them have dealt with personal injury claims extensively,

14   and I believe the reason they do that is because they are as

15   sympathetic, if not more so, to individual victims as they

16   are to states, hospitals, and other entities.

17           The people representing the personal injury

18   claimants in that mediation were some of the most effective

19   personal injury lawyers, again, in the world, and by

20   effective, I include within that category aggressive.  I

21   believe that, as set forth in the mediators' report, their

22   negotiations were at arms' length and in good faith.

23           I also recognize from the declaration by Jayne

24   Conroy, who is one of those personal injury lawyers and, in

25   fact, with her colleagues probably the main lawyer to, over

Page 74

1    the last more than decade, pursue Purdue and the Sacklers on

2    behalf of personal injury claimants.  Because of that dogged

3    pursuit, she obtained a settlement for her clients, roughly

4    1,100 personal injury claimants, albeit many years ago.

5           She described them in her declaration as those who

6    could tie their injury to a prescription, and I took away

7    from it probably the holders who had the most likely chance

8    in a litigation of obtaining a recovery, notwithstanding all

9    of the arguments that the defendants would throw back at

10   them.

11          After deducting a reasonable contingency fee from

12   that settlement, I believe on average the recovery -- and I

13   don't know how the recovery was divided, but just doing the

14   math from the aggregate amount minus a reasonable

15   contingency fee -- was approximately $13,500 per person.

16          I have the declarations of Deborah Greenspan,

17   Peter Weinberger, Gary Gotto, and Ms. Conroy all laying out

18   what they believe was the hard-fought litigation process and

19   negotiation process for the settlement embodied in the plan

20   for personal injury claimants.

21          Ms. Greenspan also details the procedures under

22   the personal injury trust for efficiently, but consistent

23   with the burden to show a claim, to fix the amount of

24   personal injury claims and obtain a distribution.  Her

25   declaration was uncontroverted and is eloquent in describing

Page 75

1    a trust procedure mechanism that minimizes the difficulty

2    and cost of presenting a claim for personal injury, while

3    maintaining a sufficient degree of rigor over the burden of

4    proof to ensure as much of that money can go directly to

5    personal injury creditors instead of further to lawyers.

6          I also have the declaration of Michael Atkinson on

7    behalf of the Official Unsecured Creditors' Committee, which

8    attaches the committee's letter in support of the plan and

9    recognizes the committees role in balancing the interests of

10   personal injury creditors with the states that also assert

11   claims, and strongly supports confirmation of the plan as a

12   balance of those interests.

13         The plan vote, which was approximately 97 percent

14   of the personal injury class in favor of the plan, strongly

15   argues that the members of that class support the plan and

16   the fairness, albeit only in this setting where one

17   allocates money from a limited pot based not on a non-legal

18   view of the value of a human life or a person's health, but

19   based upon the likelihood of such claims recovering in a

20   contested setting and a, I believe, successful resolution of

21   that under the plan that provides for early monies out to

22   personal injury creditors ahead of the states and fair

23   procedures that make it relatively easy, though preserving

24   the burden of proof, to obtain a recovery.

25         The next set of objections were raised by Ms.

Page 76

1    McGaha, who also was a witness at confirmation, and Ms.

2    VomSaal.  Both of these people have very legitimate

3    concerns, as do all of the objectors, although as I said

4    before, I believe the first group of objectors have been

5    misled into thinking that the plan provides for release of

6    any criminal conduct.

7            Ms. McGaha and Ms. VomSaal question why NewCo

8    under the plan will continue to sell opioids in any form.

9    Ms. McGaha also recommends certain measures that could be

10   viewed as abatement measures, such as different disclosures

11   regarding long-term opioids or the banning of long-term

12   opioids, changes in packaging and the like.

13           I believe strongly that every constituency in this

14   case that has had a say on this issue has wanted to ensure

15   that the lawful production and sale of this dangerous

16   product be not only lawful, but conducted in a way that is

17   cautious, subject to layers of oversight, and informed by

18   the public interest at every step.  That is the purpose of

19   the provisions of the plan dealing with NewCo.  The NewCo

20   governance covenants, the NewCo monitor, the NewCo operating

21   agreement and the NewCo operating injunction.  All of these

22   things, from the start of this case, were a primary focus of

23   the Official Unsecured Creditors Committee, which is

24   composed of victims only.  There are no financial creditors

25   in this case.  The Committee consists entirely of victims.

1      They have also been a focus, since the start of

2 this case, of all of the states and political subdivisions,

3 and I believe soon after the start of this case, of the

4 other institutional creditors like hospitals.

5      The Debtors have not, since before the start of

6 this case, had the Sacklers play any role whatsoever in

7 their management.  And so the Debtors, too, have been

8 focused and volunteered, at the start of this case, an

9 injunction pertaining to their sale legally of these

10 products.

11      Those measures are described in Mr. Lowne's

12 declaration as well as the fact declaration of Mr. DelConte.

13 They were also discussed in the Michael Atkinson declaration

14 and the attached letter from the Creditors Committee, and

15 they are reflected again in the provisions of the plan that

16 I've just described.

17      The Bankruptcy Code does not require this but, in

18 keeping with the broad determination of 1129(a)(3) good

19 faith requirement, the parties in interest in this case have

20 required it, and I have encouraged them to do so.  So that

21 at this point, I believe that the measures that I have just

22 described will set a standard not only for this company but

23 for other companies that manufacture and distribution these

24 products which are legal yet dangerous.

25      With these well-thought out provisions, it is hard

Page 78

1    to imagine how any other company that engaged in this

2    business or in the distribution of these products wouldn't

3    also believe that it was not only the right thing to do but

4    also in their interest to imitate them.  They're not being

5    imposed by a government; they're being imposed by this plan

6    with the input of state governments and the federal

7    government and, again, not only should serve as a model but

8    a warning to similar companies to take extra care than is

9    required by the FDA or Congress or state law or be held up

10   against this model in the future and be found lacking if

11   they did not at least take the level of care set forth in

12   this model of governance.

13            The abatement programs themselves are the subject

14   of substantial, again, unrebutted testimony, including by

15   Gautam Gowrisankaran, Dr. Rahul Gupta, as well as, as far as

16   the distribution procedures and abatement activities,

17   William Legier and Gayle Galan and, of course, the abatement

18   initiatives have the heavy input of the states and non-state

19   governmental entities.  To have reached agreement on these

20   abatement metrics and mechanisms, again, is an incredible

21   achievement given the strong views that various parties have

22   as to what is proper as far as abatement is concerned.

23            Mr. Gowrisankaran's testimony, again, is unrefuted

24   and I believe cogent that there is a clear multiplier effect

25   of dedicating the bulk of the Debtor's value, including

Page 79

1    their recovery from the Sackler, to abatement programs as

2    opposed to individual payments to be used perhaps for

3    abatement but not necessarily so.

4           The foregoing testimony also shows, as do the

5    abatement metrics, that the plan sets forth abatement

6    metrics and procedures that take into account developments

7    over time and learning over time as to what works and what

8    doesn't.  Indeed, they encourage that learning because one

9    feature of the plan is the requirement for periodic reports

10   as to the use of the funds for abatement, which can then be

11   checked to see what works and what doesn't, and what can be

12   reallocated to what works.

13          The abatement procedures and metrics also include

14   a consultative process that takes into account the views of

15   communities and those within the community in a reasonable

16   and fair way.

17          The objections that I just described really don't

18   lay out, and I didn't expect them to lay out because, again,

19   they're pro se objectors, a legal basis for the objection.

20   I believe, though, that the proper prism within which to

21   analyze the objection legally is, again, the good faith test

22   under 1129(a)(3).

23          Given all that I've just described, it is very

24   clear to me that the use of the bulk of the Debtors' value

25   for abatement purposes is clearly in good faith and, in

Page 80

1   fact, highly beneficial to those who have individual claims

2   against the Debtors as well as the communities and states

3   that also have claims.

4           It is also clear to me that those procedures, both

5   for abatement and for the governance of NewCo, are

6   facilitating not only the purposes of the Bankruptcy Code,

7   but the broader good.  To suggest otherwise, to suggest that

8   somehow this was an ill-cooked and cooked in secret stew,

9   which I don't believe the two objectors are contending but

10  it has been suggested publicly by those who I don't think

11  have been following this case, or if they have, should know

12  better, is simply incorrect and dramatically so.

13          What this plan does within the constraints of

14  federal law, including the regulations and guidance from the

15  FDA is go beyond that law where that can be done to ensure,

16  A, the safety or the safe use of the Debtors' products,

17  including the development of products that would assist

18  those who are trying to recover from opioid use disorder and

19  provide cheap and accessible prevention mechanisms for

20  overdoses, and to provide for well-thought through,

21  consensually agreed upon by a wide spectrum of parties and

22  appropriately flexible abatement measures.  Frankly, it

23  would be worse than embarrassing, it would again be

24  irresponsible and cruel to suggest otherwise.

25          The last objection by certain of the pro se

Page 81

1    objectors that I've already named have contended that the

2    monetary civil settlement under the plan with the Sackler

3    shareholder parties and their related entities is unfair and

4    should not be approved.  Of course, in this plan there is a

5    civil settlement with the shareholder parties and their

6    related entities.  That is a true statement.  That

7    settlement would resolve the Debtors' claims against those

8    parties, i.e., a Debtor settlement of Debtor claims, and

9    would resolve certain related third-party claims based

10   largely on the same conduct behind the Debtor claims or

11   certain of the Debtor claims.

12          It is extremely important and my main task,

13   notwithstanding that we're now at 1 p.m., to consider

14   whether that settlement is proper under the Bankruptcy Code,

15   both of the Debtors' claims and the related settlement and

16   third-party release and injunction of claims against the

17   settling parties.

18          One point should be addressed first with regard to

19   this inquiry, and I'm addressing it first in part because it

20   has been raised by the pro se objectors and I believe raised

21   because of what they have read or heard in the media and

22   perhaps from others.

23          Some of them assert that this Chapter 11 plan and

24   the settlement in it is the Sacklers' plan, or perhaps

25   artfully, some may mislead them by suggesting that, as it is

1   proposed by the Debtors and the Debtors are the controlling

2   shareholders -- at least they have the shares that would

3   enable them to control the Debtors if that was not foregone

4   by the Sacklers -- the Debtors' plan is, in a sense, the

5   Sacklers' plan, i.e., a plan for the Sacklers' benefit.

6           While I will separately examine whether the

7   settlement with the Sacklers is fair, one thing should be

8   absolutely clear and is clear, and anyone who says to the

9   contrary is, again, simply misleading the public, this is

10  not the Sacklers' plan.  The Debtors are not the Sacklers'

11  company anymore.  The Sacklers own the Debtors, but the

12  Debtors are not run by the Sacklers in any way and have not

13  been since before the start of this case.  There is,

14  literally, no evidence to the contrary -- none.  Although it

15  was not necessary, because the record was clear, the

16  examiner appointed in this case confirmed that.

17          More importantly, and as recognized by the

18  examiner and as recognized by anyone who paid any attention

19  to this case from its start, this case was driven as much

20  by, if not more than, the Official Unsecured Creditors

21  Committee and the other creditors in the case who formed

22  well-represented ad hoc committees led primarily by the 48

23  states that have claims against the Debtors, two states

24  having previously settled those claims before the start of

25  the bankruptcy case; led also by groups that had within them

Page 83

1   very strong representatives of public non-state governmental

2   entities and Native American tribes.

3           These creditors are, in essence, the only

4   creditors of this Debtor.  And from the start of this case,

5   all of this Debtor's assets were dedicated to them.  They

6   wanted more than anything else to obtain as much value, not

7   only from the Debtors and the process of agreeing on a

8   Chapter 11 plan, but also from the Sacklers, who were viewed

9   by all as the other side, the opposition, the potential

10  defendants, the payors.  And it is crystal clear that the

11  Unsecured Creditors Committee, the 48 states and territories

12  and the governmental entities were completely, utterly

13  independent and focused on that goal.  They were facilitated

14  in achieving that goal by the two incredibly experienced and

15  effective mediators that I've already described.

16          And further, even after a largely successful

17  mediation of the claims against the Sacklers, both direct by

18  the Debtors and third-party claims by others, which resulted

19  from the mediators' own proposal as to what would be a fair

20  settlement, which was accepted by all except the so-called

21  nonconsenting state group of 24 states and the District of

22  Columbia.

23          I directed another mediation with another one of

24  the best mediators, not only in the U.S. but the world, my

25  colleague Judge Chapman.  Based on her mediation report, she

1   had over 140 contacts discussions -- and knowing Judge

2   Chapman, I believe they were in depth, serious and well-

3   informed -- before the mediation date set to see whether the

4   nonconsenting states could reach agreement with the

5   Sacklers.

6         That day turned into a 27-hour day.  Judge

7   Chapman, like Mr. Feinberg and former Judge Phillips, is a

8   successful mediator because she does not browbeat people.

9   She could not browbeat these states.  That is crystal clear.

10        She's a successful mediator because she points out

11   the risks and rewards of not reaching a settlement and

12   reaching a settlement, recognizing that the process is

13   always consensual and not coercive.  15 of the states who

14   had previously fought the Sackler settlement and the plan

15   tooth and nail agreed to a modified settlement as a result

16   of that mediation.

17        I'm saying this not to support or show my support

18   for the underlying settlement but to reflect again or to

19   illustrate again the arm's length negotiation here and the

20   fact that this is not a Sackler plan but a plan agreed to by

21   80 percent of the states and well over 95 percent of the

22   non-state governments, and actively supported by the

23   Unsecured Creditors Committee, notwithstanding the

24   incredible harm that the Debtors' products have inflicted on

25   them.

Page 85

1            Bitterness over the outcome of this case is

2     completely understandable.  Where there has been such pain

3     inflected, one cannot help but be bitter.  But one also has

4     to look at the process and the issues for their -- in light

5     of the alternatives and with a clear analysis of the risks

6     and rewards of continued litigation versus the settlement

7     set forth in the plan.  And it's that process to which I'll

8     turn next.

9            As I noted, the Chapter 11 plan puts together two

10    settlements related to the Sacklers.  It provides for the

11    settlement of the estate's claims -- and when I say the

12    estate's claims, that means the Debtors' claims against the

13    Sacklers for the benefit of their creditors -- and the

14    estates have substantial claims against the Sacklers.

15    Indeed, one can argue that those claims are the main claims

16    against the Sacklers.

17            In addition, the plan provides for a settlement of

18    certain third-party claims, claims by others or that could

19    be asserted by others, against the Sacklers and their

20    related parties, i.e., the shareholder released parties

21    under the plan.

22            I will focus first on the settlement of the

23    estate's claims, but I will note before focusing on those

24    claims and the settlement proposed of them that the plan is

25    not just a plan that settles the estate's claims against the

Page 86

1    Sacklers and third-parties' claims that are related to those

2    claims against the Sacklers.  In fact, the plan contains

3    several interrelated settlements with those settlements and

4    would not be achievable if any of those settlements fell

5    away.

6              They include a settlement of the complex

7    allocation between, on the one hand, individual personal

8    injury claims and claims by governmental entities, a subject

9    of months of mediation that I've already discussed.  They

10   also include a settlement of the allocation of value among

11   the public creditors, the states, and nongovernmental

12   entities and Native American tribes.

13             Remarkably, all of those parties agreed to use the

14   value they would receive for abatement purposes, the

15   benefits of which I've already described.  Other than the

16   personal injury claimants and the NAS claimants, the other

17   private claimants have also agreed, remarkably, to use the

18   value they will receive for abatement purposes, not to go

19   into their private coffers for whatever use they want to

20   have, such as, for example, buying a new x-ray machine.

21             In addition, during the case, the Debtors settled

22   both civil and criminal claims of the federal government and

23   the plan encompasses those settlements.  Importantly,

24   including the agreement by the federal government to release

25   $1.7 of its $2 billion super-priority claim for the benefit

Page 87

1    of the other public creditors and abatements if, as is the

2    case under this plan, the plan meets the requirements of the

3    DOJ settlement as far as setting up an abatement structure

4    and the corporate governance and other public purposes that

5    I described for NewCo.

6           All of those things hinge on at least the amount

7    of money coming to the Debtors from the Debtors and the

8    third-party settlements of the Sackler claims.  Without the

9    $4.325 billion being paid by the Sacklers, those other

10   settlements would not happen.  The record testimony is clear

11   on that.  The private public settlement would fall apart and

12   it's in my view assured that the abatement settlement would

13   fall apart.

14          That still begs the question, however, is the

15   $4.325 billion, coupled with the other agreements that the

16   Sacklers have made, including with respect to the dedication

17   of the two charities worth approximately $175 million for

18   abatement purposes, their agreement to a resolution on

19   naming rights, their agreement not to engage in any opioid-

20   related business with the Debtors, or any business with

21   NewCo, and their agreement to exit their foreign companies

22   within a prescribed time sufficient?  Obviously, more money

23   from the Sacklers would not unravel the settlements that

24   I've already described.  However, at least that amount of

25   money is required.

1           Settlements and compromises of Debtors' claims,

2    these claims asserted or assertable by the Debtors' estates,

3    are a normal part of the process of reorganization in

4    bankruptcy and are strongly favored over litigation.  This

5    is in part for the obvious reason that in bankruptcy, the

6    pie is not large enough to feed everyone in full.

7    Therefore, the cost delay factor in deciding whether to

8    approve a settlement or not is even greater than it is in a

9    non-bankruptcy context.  While, obviously, an assessment of

10   the merits of the claims that are being settled has much the

11   same weight, the risks of losing a piece of the pie where

12   there's not enough to go around are also greater in a

13   bankruptcy context.

14           As far as the proposition that such settlements in

15   compromise are a normal part of the process in Chapter 11 or

16   in reorganization, see Protective Committee for Independent

17   Stockholders of TMT Trailer Ferry, F-E-R-R-Y, Inc. v.

18   Anderson, 390 U.S. 414-424 (1968).  In determining whether

19   to approve a settlement in compromise, a Bankruptcy Court

20   must make an informed independent judgment that the

21   settlement is "fair and equitable" and "in the best

22   interests of the estate."  In re Drexel Burnham Lambert

23   Group, Inc., 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991),

24   quoting TMT Trailer Ferry, 390 U.S., 424.

25           Based on the framework laid out in the TMT Trailer

Page 89

1    Ferry Case, courts in this circuit have long considered the

2    following factors in evaluating settlements:

3              (1) The probability of success, should the issues

4    be litigated, versus the present and future benefits of the

5    settlement, without the delay and expense of litigation and

6    subsequent appeals;

7              (2) the likelihood of complex and protracted

8    litigation if the settlement is not approved, with its

9    attended expense, inconvenience and delay, including the

10   difficulty on collecting on the judgment;

11             (3) the interests of the creditors, including the

12   degree to which creditors support the proposed settlement;

13             (4) whether other interested parties support the

14   settlement;

15             (5) the competency and experience of counsel

16   supporting, and the experience and knowledge of the court in

17   reviewing the settlement;

18             (6) the nature and breadth of the releases to be

19   obtained by officers and directors or other insiders; and

20   (7) the extent to which the settlement is the product of

21   arms-length bargaining.  See generally, In re Iridium

22   Operating LLC, 478 F.3d 452, 464-466 (2d Cir. 2007).

23             That case also noted that whether a settlement's

24   distribution plan complies with the Bankruptcy Code's

25   priority scheme will often be the dispositive factor.  That

Page 90

1    is, unless the remaining factors weigh heavily in favor of

2    approving a settlement, if the settlement varies materially,

3    the priority scheme of the Bankruptcy Code, a court should

4    normally not approve it.  That issue does not apply here.

5              As I have noted in dealing with the objections to

6    classification and treatment under the plan, the plan does

7    not vary the priority scheme of the Bankruptcy Code or

8    otherwise violate the classification requirements and

9    treatment within a class of the Bankruptcy Code.

10             I will address these factors, or these elements of

11   evaluating a settlement in a different order than laid out

12   by the courts following the Iridium case.  I will note that

13   they are applied even in context where part of the

14   settlement involves not the simple trade of money for a

15   claim, but also performance outcomes, such as ceasing to be

16   involved with a product or the agreement by the Sacklers to

17   the document depository and the like.  See, for example,

18   Global Vision Products v. Truesdell, 2009 WL 2170253

19   (S.D.N.Y. 2009).

20             As I've noted, this settlement was clearly and

21   unmistakably the product of arm's-length bargaining

22   conducted in two separate mediations by capable mediators,

23   preceded by the most extensive discovery process, not only

24   I, but I believe any court in bankruptcy has ever seen.

25             Again, the record is unrefuted as to the

Page 91

1    incredible extent of discovery taken, not only by the

2    Debtors through their Independent Committee, which again,

3    truly was independent, but also the Official Unsecured

4    Creditors Committee in consultation with the non-consenting

5    states group and the other states and governmental entities,

6    in fact anyone who wanted to sign the standard nondisclosure

7    agreement to permit the discovery to proceed without

8    extensive discovery fights over confidentiality.

9         From the very first day of the case, I made it

10   clear, as recognized also by Chief Justice Judge McMahon in

11   her affirmance of the injunction that I entered, that the

12   Sackler parties and their owned and related entities would

13   have to provide discovery far beyond the normal fishing

14   expedition discovery in bankruptcy cases in order to have

15   the benefit of the temporary injunction or any final stay,

16   and that is exactly what happened.

17        I did not have to decide one discovery dispute on

18   the record.  I had numerous chambers conferences with

19   parties over discovery disputes, which led to, I believe in

20   every instance, additional discovery.  There are

21   approximately 10 million documents that have been produced,

22   comprising almost -- well, it's just unfathomable the number

23   of pages.

24        Consistent with the next factor, which is the

25   competency and experience of counsel supporting the

Page 92

1    settlement, not only were the Debtors represented by

2    extremely capable counsel that assisted the Independent

3    Committee in discovering the Debtors' claims against the

4    Sacklers, which are laid out in the uncontroverted

5    declarations of Richard Collura and Mark Rule, and then

6    commented on by John Dubel on behalf of the Board of Special

7    Committee, the Debtors identified over $11 billion of

8    potentially avoidable transfers to various Sackler

9    individuals or entities.

10           The Creditors Committee did its own discovery,

11   including vetting that extensive exercise.  They also

12   thoroughly investigated estate claims that are not in the

13   nature of avoidance claims avoiding transfers, but claims,

14   for example, piercing the corporate veil and breach of

15   fiduciary duty, which would belong to the estate, here,

16   I believe, because at least as far as the record reflects,

17   the basis for such claims would be a generalized injury to

18   the estate and all creditors, rather than to individual

19   creditors.  See, for example, St. Paul Fire and Marine

20   Insurance Company v. PepsiCo, Inc., 884 F.2d 688, 704-705

21   (2d Cir. 1989), and Board of Trustees of Teamsters Local 683

22   Pension Fund v. Foodtown Inc., 296 F.3d 164, 169 (3d Cir.

23   2002).

24           So, again, any statement that there has not been

25   transparency in this case, at least to those who negotiated

Page 93

1   the settlement, who again in essence represented all of the

2   people who are creditors in this case, the objecting states,

3   the other governmental entities, the consenting states and

4   the Creditors Committee, is simply incorrect, and

5   particularly as far as an Objecting State is concerned, it's

6   just a lie, flat-out a lie.  They know what they had access

7   to.  They know how extensive it was.

8           The only argument they can make -- and I will

9   address that in the future -- is that the public hasn't had

10  access to it.  But, of course, if it had not been conducted

11  the way it was by the public's representatives, including

12  the very states that make this argument, there would not

13  have been that level of discovery, because it is not the

14  type of discovery that the public would ever have access to,

15  including in a trial or in, for example, an examiner's

16  examination.

17          Factors 3 and 4 are closely related to each other,

18  the interests of creditors, including the degree to which

19  creditors support the proposed settlement, and four, whether

20  other interested parties support the settlement.  And again,

21  I'm talking solely about the settlement of the Debtors

22  estate's claims.

23          Given the plan vote, given the support by the

24  Official Unsecured Creditors Committee, 80 percent of the

25  states, 95 percent-plus of the other governmental entities,

Page 94

1    and apparently in this context, the United States --

2    although one can't really make heads or tails of the U.S.

3    Trustee's objection on this point -- it is clear that the

4    creditor body by an overwhelming margin supports the

5    settlement, again, after being fully informed in making that

6    decision, or having their representatives be fully informed

7    in making that decision.

8            The second issue, or the second factor, which now

9    is next to last, includes an assessment of cost first, i.e.,

10   the likelihood of complex and contracted litigation if the

11   settlement is not approved, and secondly, the difficulty in

12   collecting on a judgment.  I'll focus on that latter point

13   first, I'll focus on that latter part first, i.e., the

14   difficulty of collecting on a judgment.

15           As is often the case, parties who support a

16   settlement, such as here, the Creditors Committee, the

17   consenting states, the non-consenting states who now

18   consent, and the Debtors are careful not to lay out all of

19   the reasons that they support the settlement, which usually

20   go to an assessment of the merits, but generally cover legal

21   issues, including legal entitlements to collection, because

22   they are legitimately worried that either, A, the settlement

23   won't be approved, in which case they're actually going to

24   have to run the risk of having given their opponent a

25   roadmap as to the weaknesses in their case and the strengths

Page 95

1    in the opponents' case, and a roadmap as to their assessment

2    of the difficulty of collection.

3         And of course, the settlement in itself does not

4    require -- because then it would not be a settlement -- a

5    full litigation on the merits or collection.  I mean, that's

6    simply not, obviously, the purpose of a settlement.

7    Instead, the circuit has directed the Court to make an

8    informed judgment based on the record before it, taking into

9    account these factors.

10        At one level -- and again, it is the level that

11   has been reported in the media by some -- one would think

12   that this factor clearly weighs against the settlement.  The

13   record, I believe, is uncontroverted that the Sacklers, as a

14   family, are today worth -- again, in the aggregate --

15   approximately $11 billion.  Clearly, one could collect, even

16   after the cost of collection, the lawyers' fees, the tracing

17   fees, et cetera, and the discovery has largely been taken as

18   to where the assets are.  And the preliminary injunction

19   precluded the Sacklers from transferring their assets

20   further away.  So, one would think that one could collect

21   something approaching significantly more than $4.325

22   billion, plus the money that the Sacklers are paying under

23   their own settlement to the DOJ for settlement of civil

24   claims, plus the access to, or the dedication of, the $175

25   million worth of charitable assets, which adds up to

Page 96

1    something north of $4.5 billion, plus the DOJ settlement.

2          On the other hand, the Sacklers are not a simple

3    set of defendants.  They are a large family, divided into

4    two sides, Side A and B, with eight pods or groups of family

5    members within those sides or divisions.  Most of the scores

6    of Sacklers never served on Purdue's Board.

7          I had testimony from three who at one time or

8    another were officers of Purdue, i.e., in management.  Their

9    assets are widely scattered and primarily held offshore, or

10   by people who themselves live outside of the territorial

11   jurisdiction of the United States and might not have

12   subjected themselves sufficiently to the U.S. for a U.S.

13   court to get personal jurisdiction over them.

14         I want to be clear.  I am not deciding that issue.

15   Nor am I deciding whether the trusts that most of the

16   Sackler Family wealth are held in are in fact spendthrift

17   trusts that could not be invaded to collect a judgment,

18   including in a possible bankruptcy case, if the beneficiary

19   of that trust were forced into bankruptcy by a pursuit of

20   litigation by the Debtors or, frankly, by a third-party.

21         A beneficial interest in a valid spendthrift trust

22   may be excluded from a debtor's bankruptcy estate.

23   Patterson v. Shumate, 504 U.S. 753, 757 (1992); 11 U.S.C.,

24   Section 541(c)(2), which states, a restriction on the

25   transfer of beneficial interests of the debt in a trust that

Page 97

1   is enforceable under applicable non-bankruptcy law is

2   enforceable in a case under the Bankruptcy Code.  That

3   section forces one to look at applicable non-bankruptcy law,

4   which may or not be the law of the United States with regard

5   to these foreign trusts, most of which are established under

6   the law of the Bailiwick of Jersey.

7          I have the expert declaration of Michael Cushing,

8   an expert in the law of the Bailiwick of Jersey and the

9   enforceability of judgments, that is, U.S. judgments,

10   against trusts organized under that law.  There is a

11   substantial issue in my mind as to the collectability under

12   that law, even of a fraudulent transfer claim, although, it

13   is clear to me that under the law of various jurisdictions

14   in the U.S., including New York, that a transfer that is

15   fraudulent to creditors into a spendthrift trust is

16   recoverable for the benefit of creditors.  See Securities

17   Investor Protection Corp. v. Bernard L. Madoff Investment

18   Securities LLC, 2021 WL 787604, at *10 (S.D.N.Y. 2021), and

19   In re BLMIS, 476 B.R. 715, 728, n.3 (S.D.N.Y. 2012).

20          In addition, U.S. law does not recognize self-

21   settled trusts that in name only are spendthrift trusts.

22   But again, most of the trusts here are governed by Jersey,

23   that is the Bailiwick of Jersey, law, which according to Mr.

24   Cushing's declaration, which is unopposed on these points,

25   strongly suggests that a different result might apply when

Page 98

1    one would go to enforce a judgment obtained in the U.S. for

2    a fraudulent transfer, or on an in personam debt to the

3    trust in the Bailiwick of Jersey, through the Viscount of

4    Jersey and the Jersey court.

5          Again, I'm not deciding those issues, but given

6    the record before me, and given the agreement of

7    substantially all of the parties in this case to reach a

8    settlement of the estate's claims with the Sacklers, and the

9    due diligence which they have undertaken, which has not been

10   undertaken by the U.S. Trustee, one could infer that the

11   issue of collection is at least a real one.

12         In addition, Iridium factor number two also takes

13   into account, or requires the Court to take into account,

14   the cost and delay of continued litigation, as opposed to

15   the benefits of a settlement.  The cost and delay here, I

16   believe, on an uncontroverted basis for not approving the

17   settlement would be substantial.  Those costs are not just

18   the direct costs of pursuing the litigation, the discovery

19   for which has largely occurred, but the litigation pursuit,

20   including a trial, would have to take place.

21         But in addition to that, there is the cost

22   resulting from the unraveling of the other settlements that

23   I have just described.  And I believe that the record here

24   strongly reflects that if the settlement of the Debtors'

25   claims, the estate's claims, were not approved, the parties

Page 99

1    would be back essentially to square one on allocating the

2    value of the Debtors' estate, including any ultimate

3    recovery on the estate's litigation claims.

4         In that regard, the litigation analysis reflected

5    in Mr. DelConte's second declaration, which contains a

6    liquidation analysis, is instructive.  Under the most

7    realistic scenarios, there would be literally no recovery by

8    unsecured creditors from the estate in a Chapter 7

9    liquidation, which is, I believe, the most likely result if

10   this settlement were not approved, given the unraveling of

11   the heavily negotiated and intricately woven compromises in

12   the plan.

13        One reason for that is that in a liquidation

14   scenario, the United States' agreement to forego $1.7

15   billion of its $2 billion superpriority administrative claim

16   for the benefit of the abatement program by the states would

17   disappear.  The United States would be entitled to all of

18   that money first.

19        That leaves the last factor, which really in most

20   settlements is the most, or depending on the difficulty of

21   collection, one of the most important factors, namely a

22   comparison of the results of litigation as against the

23   results of a settlement.

24        As I noted, as with the issue of difficulty of

25   collection, the parties supporting the settlement have been

Page 100

1    careful not to lay out their views of the defenses that the

2    Sacklers released parties would have to the estate's claims.

3    And of course, because it is a settlement, there's been no

4    trial on the merits of those claims.

5           On the other hand, I do have reports as to the

6    nature of the transfers, when they occurred, what they were,

7    and who they were to, and also some testimony as to the

8    involvement of some of the Sacklers in the running of

9    Purdue, which is relevant to the estate's claims, separate

10   and apart from avoidance of fraudulent transfers, namely

11   claims for piercing the corporate veil, alter-ego liability,

12   breach of fiduciary duty, and the like.

13          I also have an extensive submission by both sides

14   of the Sackler Family, or submissions by both sides of the

15   Sackler Family, that do state the defenses they would argue.

16   I heard the testimony of four members of the Sackler Family,

17   two from Side A and two from Side B, and that too is

18   informed by views on the merits here, although that

19   testimony primarily went not to fraudulent transfer claims

20   but to other claims related to their role in Purdue's

21   governance, and the decisions made that have led to

22   trillions of dollars of claims being filed against Purdue

23   and a criminal plea and settlement by Purdue with the

24   Department of Justice from 2020.

25          Again, I want to be clear, I'm not making a

Page 101

1    decision anywhere close to being on the merits.  This

2    assessment is not, therefore, in any way something that

3    could serve as collateral estoppel or res judicata.  Nor do

4    I particularly have any fondness for the Sacklers or

5    sympathy for them.

6           I will note the following, however.  The Sackler

7    Family, 77, I believe, of them, received comprehensive

8    releases from almost all of the states in 2007.  In

9    addition, 2007 is about as far back under any theory that

10   one could look to avoid a fraudulent transfer.

11          So one would, both for estate claims and for

12   third-party claims, be looking at primarily, if not

13   exclusively, actions by the Sacklers or transfers that took

14   place after 2007.  Over 40 percent of those transfers went

15   to pay taxes, including in large amounts to certain of the

16   objecting states or the states that continue to object to

17   the plan.  The fact that it went to pay taxes did obviously

18   relieve the Sacklers of an obligation.

19          I do, however, have testimony from Jennifer

20   Blouin, that if the partnership structure of Purdue was not

21   in place with the taxes running through the Sacklers, Purdue

22   itself would be liable for them and, therefore, arguably

23   received fair consideration for the payment.

24          The Sacklers would also argue that after the 2007

25   settlement with the federal government and the states, the

Page 102

1    U.S. Department of Health and Human Services entered into a

2    five-year corporate integrity agreement with the company to

3    monitor its compliance with federal healthcare law, which

4    took place from July 31, 2007 to July 30, 2012.  And that

5    agreement is available as part of the record, but it can

6    also be obtained as a matter of judicial notice.

7              In 2015, well after Purdue implemented a "Abuse

8    and Diversion Detection program", the New York Attorney

9    General required that program to be subject to annual

10   reviews from 2015 to 2018.  They would argue that that

11   compliance, both with the OIG monitor and those reviews,

12   detailed no improper actions by Purdue, and therefore, there

13   couldn't be any improper actions by the Board.

14             In addition, they would argue that solely as Board

15   members, they would not have a fiduciary duty for actions of

16   Purdue and its management that were improper or unlawful,

17   unless they were aware of them.  Of course, it would be very

18   much a triable issue as to whether they were in fact aware

19   of them.  Those who were not on the Board, of course, would

20   say that law didn't even apply to them.

21             They would also argue the applicability of various

22   statutes of limitations to the fraudulent transfer claims

23   that would limit the reach-back by the estate to most of the

24   claims.  The estate would have arguments to the contrary,

25   based on rights that unique creditors like the federal

Page 103

1    government would have to serve as a "Golden Creditor" under

2    Section 544 of the Bankruptcy Code.

3           The Sacklers would also argue that following the

4    2007 settlement, Purdue paid manageable amounts in

5    settlements between 2008 and 2019 of litigation claims

6    related to opioid matters or other litigations that would

7    affect the solvency of Purdue, and that as recently as 2016,

8    Purdue was receiving ratings from rating agencies that

9    indicated that it was financially healthy, and therefore,

10   they would contend, except for the last year or so before

11   the bankruptcy filing date, were only a very small amount,

12   relatively speaking, of the roughly $11 billion of transfers

13   that the Debtors' estate would contend are avoidable took

14   place.  Purdue was not insolvent, and one could not impute

15   intentional fraudulent transfer liability to it.

16          Of course, there are statements in the record to

17   suggest that the Sacklers were very aware of the risk of

18   litigation.  A trial might well also establish, as some of

19   the testimony that I heard from the Sacklers that as a

20   closely held company, Purdue was run more than by a normal

21   board, by its Board and shareholders, i.e., the Sacklers,

22   and that notwithstanding the denials by the Sacklers who

23   testified, at least those who were on the Board, and perhaps

24   others who with the votes of their family members could

25   control ultimately the Board, were aware of the harms of

Page 104

1   Purdue's product and should not have rested or taken comfort

2   in either of the FDA's sign-off on various labels and

3   marketing initiatives or the reports by the Office of the

4   Inspector General or the auditor of the Abuse and Diversion

5   Detection program.

6           I believe that standing in a vacuum on the merits,

7   the claims that would be achieved, the ultimate judgment

8   that would be achieved on the estate's claims and related

9   third-party claims that are being settled under the plan,

10  would be higher than the amount that the Sacklers are

11  contributing.  But I do not believe that they would be

12  higher after taking into account the catastrophic effect on

13  recoveries that would result from pursuing those claims and

14  unravelling the plan's intricate settlements.  And as I said

15  at the beginning of this analysis, there is also the issue

16  of problems that would be faced in collection.

17          This is a bitter result.  B-I-T-T-E-R.  It is

18  incredibly frustrating that the law recognizes, albeit with

19  some exceptions, although fairly narrow, the enforceability

20  of spendthrift trusts.  It is incredibly frustrating that

21  people can send their money offshore to offshore spendthrift

22  trusts that may not recognize U.S. law.

23          It is incredibly frustrating that the vast size of

24  the claims against Purdue and the vast number of claimants

25  creates the need for the intricate plan settlements, since

Page 105

1   at least in some measure I believe that at least some of the

2   Sackler parties also have liability for those claims.  But

3   those things are all facts that anyone who is a fiduciary

4   for the creditor body would have to recognize, and that I

5   recognize.

6           A settlement is not evaluated in a vacuum as a

7   wish list.  It takes an agreement, which means that it

8   generally, if properly negotiated -- and I believe that's

9   clearly the case here -- reflects the underlying strengths

10  and weaknesses of the parties' legal position and issues of

11  collection; not moral issues, or how someone might see moral

12  issues.

13          It's not enough to say we need more, or I don't

14  care whether we don't get anything; I'd rather see it all

15  burned up.  One has to really focus on the consequences of

16  those two approaches.

17          I must say that when I approached the middle stage

18  of this case before the mediation, I would have expected a

19  higher settlement.  And frankly, anyone with half a brain

20  would know that when I directed a second mediation,

21  courageously undertaken by Judge Chapman, I expected a

22  higher settlement.  Nevertheless, extremely well-represented

23  and dedicated parties on the Plaintiffs' side, knowing far

24  more than I have laid out today of the strengths and

25  weaknesses of the case and collection and the like, agreed

Page 106

1    to this settlement.

2           I am not prepared, given all of the record before

3    me, to risk that agreement.  I do not have the ability to

4    impose what I would like on the parties.  The Judge is not

5    given that power.  I can only turn down the request for

6    approval of it.  Given this record, I'm not prepared to do

7    that, as much as I would like to impose a higher recovery.

8           I will note, as far as the bona fides of the

9    settlement is concerned, and notwithstanding my

10   reservations, 100 percent of this formerly closely-held

11   company -- that is, closely held by the Sacklers -- is under

12   this plan taken away from them and devoted to abating

13   opioids' ill effects in one way or another.

14          In addition, the amount being paid is to my

15   knowledge the highest amount any shareholder group has paid

16   for these types of claims.  Throughout the history of

17   litigation involving Purdue, the Sacklers themselves were

18   not targets, except for the relatively modest settlements

19   that they entered into with the states in 2007 until very

20   recently.  The entire negotiation process in this context

21   has magnified that target on them, on that focus on them.

22          While I would wish that the amount would be

23   higher, as I believe everyone on the other side in this

24   case, including the Debtors does, the settlement itself

25   fairly reflects the standards laid out by the Supreme Court

Page 107

1    in the Second Circuit in evaluating a settlement.  And

2    clearly, both it and the process in arriving at it has not

3    been in any shape or form a free ride for the Sacklers or

4    enabled them to "get away with it."

5             If what people mean by getting away with it is

6    getting relieved of criminal liability, that is obviously

7    not the case.  And I believe, given all of the factors that

8    I've outlined, they are paying a substantial, and under the

9    circumstances of this case, approvable amount, as well as

10   the other aspects of the settlement that they are agreeing

11   to.

12            I will note, finally, that as alluded to this

13   morning by the Debtors' counsel, they have agreed also to

14   enforcement mechanisms that are quite rigorous as part of

15   the settlement agreement, so that the collection problems

16   that I had addressed, or the potential collection problems,

17   are far lessened by the settlement if they don't live up to

18   it, including as to the ability to hide behind foreign

19   spendthrift trusts.

20            So, to the extent that objectors have objected to

21   the merits of the settlement of the Debtors' estate's

22   claims, I will overrule those objections.

23            That leaves the last issue for determination,

24   which is the most complex issue.  It is in large measure

25   informed by the analysis that I've just gone through, which

Page 108

1    as I'm sure you'll note, included not just an assessment of

2    the estate's claims, when considering the alternative to the

3    estate settlement, but also the merits of third-party claims

4    closely related to the estate's claims, and particularly

5    focused on claims beyond fraudulent transfer avoidance.

6            There are multiple grounds for the objecting

7    parties' objection to the non-consensual release under the

8    plan and injunction of their third-party claims against the

9    shareholder settling parties.

10           I will note that certain of those objections went

11   to issues that I agreed with the objectors over, namely the

12   breadth of the releases in the plan.  The current form of

13   the plan has substantially narrowed those releases.  The

14   settling shareholder parties, unless, of course, they

15   default on the settlement, are now being released only of

16   opioid-related claims of third-parties, and I will go into

17   in detail what that release involves.

18           Other released parties are released as well under

19   the plan, but it is clear, given the revised definitions,

20   including those that came in overnight, that those releases

21   deal with a release of claims that are truly derivative of

22   the Debtors and simply prevent third-parties from going

23   after those parties through the back door, only to later

24   learn that those claims had been released by the Debtors

25   under the plan.

Page 109

```
 1              The first objection to the third-party release of
 2    the Sacklers is a jurisdictional one, i.e., the contention
 3    that the Court lacks jurisdiction -- subject matter
 4    jurisdiction, to impose the release of the shareholder
 5    released parties on those who do not consent to it and who
 6    have, in fact, objected to it.
 7              It's axiomatic that federal courts, including the
 8    bankruptcy courts, have only the jurisdiction given to them
 9    and no more.  Under 28 U.S.C. Section 1334(b), however, the
10    bankruptcy courts, through the reference from the district
11    courts in 28 U.S.C. 157, do have broad jurisdiction with
12    respect to matters that are related to the Debtors' property
13    and case.
14              This includes the power to enjoin claims of third-
15    parties that have a conceivable effect on the Debtors'
16    estate.  As noted by the Supreme Court in Celotex Corp. v.
17    Edwards, which involved a preliminary injunction of a third-
18    party's right to pursue a third-party claim, 15 U.S. 300,
19    307-308 (1995).  "Congress did not delineate the scope of
20    'related to' jurisdiction, but its choice of words suggests
21    a grant of some breadth."
22              In this circuit, "A civil proceeding is related to
23    Title XI case if the action's outcome might have any
24    conceivable effect on the bankrupt estate."  See SPV OSUS,
25    Limited v. UBS AG, 882 F.3d 333, 339-40, citing Parmalat
```

Page 110

1    Capital Finance, Limited v. Bank of America Corp., 639 F.3d

2    572, 579 (2d Cir. 2001).

3              That jurisdiction is not limitless, id., but it

4    does extend to where there is a legal effect, even through

5    an indemnification agreement or contribution rights,

6    including by, as set forth in the SPV OSUS case, someone who

7    has not, despite those rights, filed a proof of claim in the

8    case.  The Second Circuit has extensively dealt with this

9    issue in the context of this Court's jurisdiction over

10   actions to stay or prevent the assertion of third-party

11   claims in bankruptcy cases, the most recent version of

12   which, which the objectors largely ignored, if not entirely

13   ignored, is the Second Circuit's decision in In re Quigley

14   Company, 676 F.3d 45 (2d Cir. 2012).

15             The court there went through a lengthy analysis of

16   its jurisdiction -- bankruptcy jurisdiction, that is -- to

17   preclude the pursuit of a third-party claim, including an

18   analysis of Section 1334 of the Judicial Code which provides

19   for original jurisdiction in the district courts, which is

20   then referred under section -- 28 U.S.C. Section 157 for,

21   "all cases under Title XI," and "all civil proceedings

22   arising under Title XI or arising in or related to cases

23   under Title XI."

24             The dispute in Quigley reflected some arguable

25   confusion in the Second Circuit over the extent of this

Page 111

1    jurisdiction when dealing with an injunction of third-party

2    claims, including under a plan, that was arguably injected

3    by the circuit in a case that the objectors do extensively

4    cite, In re Johns-Manville Corp., 517 F.3d 52 (2d Cir.

5    2008), reversed sub nom Travelers Indemnity Company v.

6    Bailey, 557 U.S. 137 (2009), which the Circuit in the

7    Quigley case refers to as Manville III.

8            In that case, the Circuit had left the impression

9    that the only source for jurisdiction to enter a course of

10   release of third-party claims and an injunction to support

11   it is where the claim would be a derivative claim.  I'll

12   come back to that point in a moment.

13           The point was somewhat cleared up in the next

14   Manville case, referred to as Manville IV in the Quigley

15   opinion, appearing at 600 F.3d 152.  But the Quigley case

16   took it head on.  In that case, a party who had brought a

17   third-party claim against an insurer, notwithstanding the

18   Manville Chapter 11 plan's injunction of claims against

19   insurers, asserting that the bankruptcy court did not have

20   jurisdiction to enjoin such a claim because it alleged a

21   violation of an independent legal duty owed by the

22   defendant, a third-party, rather than claims that are

23   "derivative."

24           The Circuit disagreed that that was the limitation

25   on jurisdiction imposed by it in Manville III, 676 F.3d at

Page 112

54.   The Circuit went on to say, because the third-party's

mistake as to the nature of the jurisdictional inquiry under

28 U.S.C. 1534(b) stems from a misunderstanding of our

caselaw's treatment of derivative liability in the context

of bankruptcy jurisdiction, we discuss our previous cases

addressing this subject in some detail.

It then goes on to state, "After analyzing

Manville I, the MacArthur Company v. Johns-Manville Corp.

case at 837 F.2d 89, that there was no independent

requirement of a derivative claims for the exercise of

jurisdiction.  Rather, the claim was based upon the effect

of the third-party claim on the estate."

The Circuit then went on to state, "Manville III

did not work a change in our jurisprudence.  After Manville

II, as before, a bankruptcy court has jurisdiction to enjoin

third-party non-Debtor claims that directly affect the res

of the bankruptcy estate.

"As in MacArthur, the salience of Manville III's

inquiry as to whether Travelers' ability was derivative of

the Debtor's rights and liabilities was that, in the facts

and circumstances of Manville III, cases alleging derivative

liability would affect the res of the bankruptcy estate,

whereas, cases alleging non-derivative liability would not.

"However, it did not impose a requirement that an

action must both directly affect the estate and be

Page 113

1    derivative of the Debtors' rights and liabilities for

2    bankruptcy jurisdiction over the action to exist."  676 at

3    56 through 57.

4            It then further discussed the Manville IV case and

5    then stated, "It thus appears that our case, from our

6    caselaw, that while we have treated whether a suit seeks to

7    impose derivative liability as a helpful way to assess

8    whether it has the potential to affect the bankruptcy res,

9    the touchstone for bankruptcy jurisdiction remains 'whether

10   its outcome might have any conceivable effect on the

11   bankruptcy estate.'"

12           This test has been -- I'm continuing now, because

13   I'm omitting the citation.  "This test has been almost

14   universally adopted by our sister circuit," citing the

15   Celotex Corp. that I previously cited, collected case,

16   "which in some instances have found bankruptcy jurisdiction

17   to exist over non-derivative claims against third-parties.

18   See -- citing In re Stonebridge Technologies, Inc., 430 F.3d

19   260, 263-64 and 267 (5th Cir. 2005) and In re Dogpatch USA,

20   Inc., 810 F.2d 782, 786 (8th Cir. 1987).

21           And then stating, "A suit against a third-party

22   alleging liability not derivative of the Debtors' conduct

23   but that nevertheless poses the specter of direct impact on

24   the res of the bankrupt estate may just as surely impair the

25   bankruptcy court's ability to make a fair distribution of

Page 114

1    the bankrupt's assets as a third-party suit alleging

2    derivative liability.

3            "Accordingly, we conclude that where litigation of

4    the third-party suits against the third-party would almost

5    certainly result in the drawing down of insurance policies

6    that are part of the bankruptcy estate of the Debtor, the

7    exercise of bankruptcy jurisdiction to enjoin these suits

8    was appropriate."

9            I conclude here, based upon the adverse effect of

10   the third-party claims that are covered by the shareholder

11   release, as I will further narrow it, do affect the res of

12   the estate, including insurance rights, and rights to

13   indemnification and the Debtors' ability to pursue its own

14   claims.

15           Certain of the objectors cite a pre-Bankruptcy

16   Code, pre-28 U.S.C. Section 1334 case from the Supreme

17   Court, Callaway v. Benton, 336 U.S. 132 (1948), for the

18   proposition that there is no such jurisdiction.  Of course,

19   Section 1334 is broader than the jurisdictional mandate that

20   applied at that time in that case.

21           "It is rather a dramatic change to the

22   jurisdictional scheme from the bankruptcy laws administered

23   before that time and is meant to be interpreted broadly, as

24   laid out by the caselaw, as well as commentators.  See

25   Howard C. Buschman, III and Sean P. Madden, "Power and

Page 115

1    Propriety of Bankruptcy Court Intervention and Actions

2    Between Non-debtors," 47 Business Lawyer 913, 914-19, May

3    1992.  See also In re Dow Corning Corp., 255 B.R. 445 (E.D.

4    Mich. 2002), vacated on other grounds, Class Five Nevada

5    Claimants V. Dow Corning Corp. (In re Dow Corning Corp.) 280

6    F.3d 848 (6th Cir. 2002).

7            One example of the Court's recognition of the

8    breadth of bankruptcy jurisdiction under the Bankruptcy Code

9    in 28 U.S.C. Section 1334, although not directly on point,

10   is United States v. Energy Resources Company in 495 U.S. 545

11   (1990).  Although, again, the Court must go through the

12   analysis gone through by Quigley and other courts to find

13   the necessary conceivable effect on the Debtors' estate for

14   there to be subject matter jurisdiction, although I have

15   done that here.

16           I will note that another case that the objectors

17   rely on, In re Aegean Marine Petroleum Network, Inc., 599

18   B.R. 717 (Bankr. SDNY 2019) as questioning the ability of

19   the bankruptcy court to ever impose a release of a third-

20   party claim as a jurisdictional matter, which case cites the

21   Callaway v. Benton case, and does not cite the Quigley case

22   because -- well, I don't know why, maybe it wasn't raised to

23   a judge -- nevertheless acknowledges that where there is "a

24   huge overlap between claims that a debtor is making against

25   its parent company and various other parties were making

Page 116

1    against that non-debtor company or where there is a direct

2    connection between the asset or the claims of the debtor and

3    the contributions that were being made for both resolving

4    those claims and claims basically aligned with those claims,

5    those estate claims, such a release would be appropriate,"

6    id. at 727.

7            So, I conclude that there is, depending on the

8    nature of the release, jurisdiction to enter an order

9    enforcing a plan that has such a third-party claim release

10   in it and that that jurisdiction is based upon the effect of

11   the claims on the estate, rather than that the claims are

12   "derivative."  Although, if they are derivative, that is a

13   good sign that they affect the estate.  Again, see Quigley,

14   676 F.3d at 52.

15           The objectors have also raised the objection that

16   the release of third-party claims is a violation of due

17   process under the Constitution.  There are really two

18   aspects to this objection.  The first is one that the courts

19   in this circuit do not accept, which is that such a release

20   is an adjudication of the claim.  It is not.  It is part of

21   the settlement of the claim that channels the settlement

22   funds to the estate.  See Manville I, 837 F.2d 89, 91-92 (2d

23   Cir. 1988) and In re Kirwan Offices, S.a.R.L., Lynch v.

24   Lapidem, Limited, 592 B.R. 489, 504-505.

25           See also In re Millennium Lab Holdings, II, LLC,

Page 117

1     575 B.R. 252, 273 (Bankr. D. Del. 2017), affirmed 591 B.R.

2     559 (D. Del. 2018), affirmed 945 F.3d 126 (3d Cir. 2019),

3     cert. denied, 140 S. Ct. 2085 (2020).  "An order confirming

4     the plan with releases does not rule on the merits of the

5     state law claims" -- or in this case, third-party claims --

6     "being released."

7            The other aspect of the due process objection goes

8     to the notice that was provided with respect to the release.

9     It is now clear, under the plan, that only holders of claims

10    against the Debtor or Debtors are being released under the

11    third-party shareholder release, and it is clear from the

12    factual record that holders of claims received, in my view,

13    due process notice, not only of the bankruptcy case, but of

14    the plan's intention to provide a broad release of third-

15    party claims against the shareholders and their related

16    entities related to the Debtors as a whole.

17           Indeed, at that time, with that notice, including

18    the simple form notice that went out, the release was far

19    broader than it is today.  To argue that because it was more

20    complicated then, because it was broader, is somehow a

21    violation of due process, is equally incorrect.  Ultimately,

22    the issue of what process is due requires a court to ask

23    whether in the connection with the confirmation hearing

24    notice was sent that was reasonably calculated under all the

25    circumstances to apprise interested parties of the pendency

Page 118

1    of the request and afford them an opportunity to present

2    their objections.  Mullane v. Central Hanover Bank and Trust

3    Company, 339 U.S. 306, 314 (1950).

4            See also Elliot v. GM, LLC (In re Motors

5    Liquidation Company), 829 F.3d 135, 158 (2d Cir. 2016).  As

6    noted by the Circuit in that case, this requirement

7    obviously applies to bankruptcy proceedings and there,

8    notice turns upon what is reasonably known by the Debtor of

9    the party who would be affected by the action that the

10    Debtor is taking.

11            It appears, to me, again, based upon Ms. Finegan's

12    testimony, that holders of claims received sufficient notice

13    of the release.  Indeed, the broader assumption, I believe,

14    fostered in the media is that the release even included

15    criminal liability, which it doesn't.  In fact, there were

16    multiple objections to the plan, based upon the third-party

17    release, and I conclude that compliance with the procedures

18    laid out by Ms. Finegan and with the dictates of Bankruptcy

19    Rule 3016, which requires bolding of the release language,

20    is, in fact, sufficient.

21            See, for example, In re Otero County Hospital

22    Association, Inc., 551 B.R. 463, 471-2 and 478-79 (Bankr.

23    D.N.M. 2016), In re Retail Group, Inc., 2021 WL 2188929

24    (Bankr. E.D. Va. May 28, 2021), and Finova Capital Corp. v.

25    Larson Pharmaceutical Inc., 2003 U.S. Dist. LEXIS 26681,

Page 119

1    affirmed Finova Capital Corp. v. Larson Pharmacy, Inc. 425

2    F. 3d, 1294 (11th Cir. 2005).

3            If someone can make the case after the fact that

4    they did not receive the type of notice that Ms. Finegan

5    testified to or the Debtor could be said to be aware of them

6    actually, and therefore, given them improved notice, they

7    would have the right to come back and argue that, as was the

8    case in the Motors Liquidation Second Circuit opinion that

9    I've cited.

10            But as far as the record before me is concerned, I

11    find that the notice of the plan, confirmation hearing and

12    request for approval of the third-party release satisfied

13    due process.

14            The next objection to the third-party release

15    provision in the plan pertaining to the shareholder

16    settlement is an objection based on the power of the

17    bankruptcy court to issue a final order confirming the plan

18    as opposed to the bankruptcy court's jurisdiction to approve

19    confirmation of the plan as it related to jurisdictional

20    matter under 1334(b) and (a).

21            This issue was not addressed until fairly

22    recently, but it has been addressed now at length in two

23    opinions that I will simply refer to, because I believe the

24    logic of these opinions cannot be improved upon as far as

25    the bankruptcy court's authority in the context of a

Page 120

1    concededly core proceeding, namely consideration of whether

2    a Chapter 11 plan should be confirmed or not, which is the

3    fundamentally central aspect of a Chapter 11 case, is, in

4    fact, core, not only under 28 U.S.C. 157(b) but also core as

5    a constitutional matter, being within the power

6    traditionally exercised by bankruptcy courts to confirm

7    plans and provide for the allocation of property of the

8    estate.

9            So, I will refer parties to those opinions.  See

10   In re Millennium Lab Holdings II, LLC, 945 F.3d 126, cert.

11   denied, Loan Trust v. Millennium Lab Holdings, 2020 U.S.

12   LEXIS 2850 (May 26, 2020).  I'd also commend, as did that

13   court, the lower court opinions in that case, Opt-Out

14   Lenders v. Millennium Lab Holdings II, LLC, 591 B.R. 559 (D.

15   Del. 2018) and In re Millennium Lab Holdings II, LLC, 575

16   B.R. 252 (Bankr. D. Del. 2017).

17           Also applicable here, I believe, directly on point

18   is Lynch v. Lapidem Limited, In re Kirwan Offices, S.a.R.L.,

19   492 B.R. 489 (SDNY 2018), affirmed Lynch v. Mascini

20   Holdings, Limited, In re Kirwan Office, S.R.L. 2019 U.S.

21   App. LEXIS 38068 (2d Cir. 2019).

22           I will note that in that affirmance, the Circuit

23   did not reach the determination by former Chief Judge

24   McMahon that this was a core -- this type of injunction is a

25   core proceeding within a core proceeding, but I believe her

1    logic is correct and I believe that that logic would

2    distinguish her statement in Dunaway v. Purdue Pharma, LP,

3    619 B.R. 318, where she was dealing not with a Chapter 11

4    plan, but rather a request for a preliminary injunction

5    under 105 of the Bankruptcy Code, and in that context,

6    concluded, I believe correctly, although she was reversing

7    me on the point, that in that context, the court had only

8    related-to jurisdiction because it was not a core matter

9    like a plan.  At least, that's how I read the decision.

10           That still leaves, however, the merits of the

11   application of the court's jurisdiction and power to enter a

12   final order to the third-party claim release an injunction

13   in the plan pertaining to the shareholder release parties.

14           Most of the caselaw on this topic -- and there is

15   a lot of caselaw at the circuit level as well as at the

16   lower court level -- does not deal with the foregoing

17   jurisdictional and Article III, Article I power issues.  It

18   deals with the statutory source for the claimed ability to

19   enforce a coercive release of a third-party claim and the

20   limited circumstances in which that would occur.

21           Every circuit at this point has an opinion on the

22   issue.  The clear majority of circuits supports the issuance

23   of releases on a coercive basis of third-party claims under

24   appropriate, narrow circumstances.  Monarch Life Insurance

25   Company v. Ropes and Gray, 65 F.3d 973, 984-85 (1st Cir.

Page 122

1    1995), Deutsche Bank A.G. v. Metromedia Fiber Network, Inc.

2    (In re Metromedia Fiber Network, Inc.) 416 F.3d 136, 141

3    (2d. Cir. 2005) and the cases cited therein from the Second

4    Circuit, including the Manville case that I previously cited

5    as well as the Drexel case which I'll cite in a moment.

6          In re Millennium Lab Holdings II, LLC, which I've

7    just cited from the Third Circuit, 945 F.3d 126, 133-40.

8    National Heritage Foundation, Inc. v. Highbourne Foundation,

9    Inc., 760 F.3d 344, 350 (4th Cir. 2014), cert. denied, 135

10   S. Ct. 961 (2015) and In re A.H. Robins Company, Inc., 880

11   F.2d 694, 700-02 (4th Cir. 1989), In re Dow Corning Corp.,

12   280 F.3d 648, 656-58 (2nd Cir. 2002), In re Airadigm

13   Communications, Inc., 519 F.3d 640, 655-59 (7th Cir. 2008),

14   and In re Ingersoll, Inc., 562 F.3d 856 (7th Cir. 2009),

15   which held even that those who hold -- who don't hold a

16   claim against the Debtors' estate can be bound by such a

17   release under appropriate circumstances.

18          In re Seaside Engineering and Surveying, Inc., 780

19   F.3d 1070, 1076-79 (11th Cir. 2015) and In re AOV

20   Industries, Inc., 792 F.2d 1140, 1153 (D.C. Cir. 1986).

21          Three circuits are on record as holding that

22   third-party releases are improper for a bankruptcy court or

23   a court exercising bankruptcy jurisdiction to compel on a

24   third-party.  See Bank of New York Trust Company v. Official

25   Unsecured Creditors Committee (In re Pacific Lumber

Page 123

1     Company), 584 F.3d 229, 252 (5th Cir. 2009), Resorts

2     International v. Lowenschuss (In re Lowenschuss), 67 F.3d

3     1394, 1401-02 (9th Cir. 1995) and Lansing Diversified

4     Properties-II v. First National Bank and Trust Company of

5     Tulsa (In re Real Estate Fund, Inc.) 922 F.2d 592, 600 (10th

6     Cir. 1990).

7             The following can be said about those three cases

8     or the line of cases from those three courts.  First, they

9     are based fundamentally on a view that Section 524(e) of the

10    Bankruptcy Code precludes the grant of such a release.  That

11    section says, "Except as provided in Subsection A3 of this

12    Section" -- which is irrelevant here -- "discharge of a debt

13    of the debtor does not affect the liability of any other

14    entity on or the property of any other entity for such

15    debt."

16            I will note in a moment that several of the cases,

17    and I believe they employ the right analysis, including the

18    Second Circuit's Manville I case, refute that view as a

19    statutory matter.  I will note further that in the Pacific

20    Lumber case, the Fifth Circuit noted, "Non-debtor releases

21    are most appropriate as a method to channel mass claims

22    toward a specific pool of assets in a context of 'global

23    settlements' of mass claims against the Debtors and co-

24    liable parties," citing a similar observation by the Fifth

25    circuit in Feld v. Zale Corp., 62 F.3d 746, 760-61 (5th Cir.

Page 124

1    1995).

2            That quote was from 584 F.3d 252 from the Fifth

3    Circuit's Pacific Lumber case.  I will note further, that

4    notwithstanding its reliance on Section 524(e) as precluding

5    any release which the Circuit had in Lowenschuss and prior

6    case such as In re American Hardwood, 885 F.2d 621 (9th Cir.

7    1989), equated with a discharge.  The circuit -- the Ninth

8    Circuit held that a release of a third-party claim limited

9    to actions taken in or related to the bankruptcy case could,

10   in appropriate circumstances, be imposed in a plan, which

11   undercuts the 524(e) analysis, since post-bankruptcy, pre-

12   confirmation claims would be subject to the discharge as

13   well.  961 F.3d 107 -- I'm sorry.

14           See Blixseth v. Credit Suisse, 961 F.3d 1074,

15   1081-85 (9th Cir. 2020).  I will note further that the

16   Western Real Estate Fund case from the Tenth Circuit from

17   1990 did recognize, as the American Hardwoods case also

18   recognized, the propriety of imposing a temporary stay of

19   third-party claims to "facilitate the reorganization

20   process," one wonders why, if one is not bound by the 524(e)

21   arguments, such a temporary stay could not become a

22   permanent stay if the reorganization process would be

23   appropriately facilitated over the objections of a small

24   number of creditors who assert third-party claims.

25           In any event, that opinion, has been interpreted,

Page 125

1    and, I believe, cogently, although fairly bravely, by a

2    court in the Tenth Circuit as not standing for the

3    proposition that 524(e) of the Bankruptcy Code clearly

4    precludes all third-party releases and that Section 105(a)

5    of the Bankruptcy Code and other applicable bankruptcy law

6    might, in appropriate circumstances, justify a release of

7    third-party claims.  In re Midway Gold, 575 B.R. 475, 505

8    (Bankr. D. Colo. 2017).

9         The argument upon which the three cases that I've

10   just gone through at some length from the Fifth, Ninth, and

11   Tenth Circuit, which go against the majority of cases

12   dealing with third-party releases, relies upon a theory that

13   Section 524(e)'s language, which I've quoted, precludes to

14   grant a release as part of a settlement under a plan.

15        This view, I believe, is appropriately addressed

16   and refuted by a number of courts, including the Airadigm

17   Communications, Inc., 519 F.3d 640, and the Sixth Circuit in

18   In re Dow Corning Corp., 280 F.3d 648 (2006).

19        It's also effectively refuted by the distinction

20   made in the Manville and Lynch v. Lapidem cases that I

21   previously cited, which distinguish a discharge from a

22   settlement of claims.

23        It is also inconsistent with Section 524 itself;

24   524(g) of the Bankruptcy Code specifically provides for

25   certain third-party releases, if certain conditions are met

1    in a plan that deals with asbestos liabilities and a trust

2    set up for asbestos liabilities, including the affirmative

3    vote of the affected class in a super-majority of 75

4    percent, which, as I've noted here, has been well exceeded.

5             But more importantly, Section 524(h) of the

6    Bankruptcy Code recognizes that this provision, 524(g), does

7    not mean that plans that were confirmed before the enactment

8    of Section 524(g) are, in fact, unlawful.  And indeed, the

9    legislative history to the amendment makes that point,

10   stating Section, at that point 111, but it became 524(h).

11            "Makes a rule of construction to make clear that

12   the special rule being devised for the asbestos claim

13   trust/injunction mechanism is not intended to alter any

14   authority bankruptcy courts may already have to issue

15   injunctions in connection with a plan of reorganization.

16   Indeed, Johns-Manville and UNR firmly believe that the court

17   in their cases had full authority to approve the trust

18   injunction mechanism, and other debtors in other industries

19   are reportedly beginning to experiment with similar

20   mechanisms.

21            "The Committee expresses no opinion as to how much

22   authority a bankruptcy court may generally have under its

23   traditional equitable powers to issue an enforceable

24   injunction of this kind.  The Committee has decided to

25   provide explicit authority in the asbestos area because of

Page 127

1    the singular, cumulative magnitude of the claims involved.

2    How the new statutory mechanism works in the asbestos area

3    may help the Committee judge whether the concept should be

4    extended into other areas."  140 Cong. Rec. H-10752-01,

5    appearing in 1994 WL 54573, (October 4, 1994).

6              Similar commentary appears in Senator Heflin's

7    remarks appearing at 140 Cong. Rec. S14461-01, 1994 WL

8    553390 at S14461 regarding the Bankruptcy Reform Act of

9    1994, where Senator Heflin states, "Finally, Mr. President,

10   with respect to the senator's specific question, this

11   section applies to injunction in effect on or after the date

12   of enactment."

13             What that means is, for any injunction that may

14   have been issued under a court's authority under the code

15   prior to enactment, such an injunction is afforded statutory

16   permanence from the date of enactment forward, assuming that

17   it otherwise meets the qualifying criteria described

18   earlier.

19             It appears clear to me, therefore, under well-

20   reasoned caselaw as well as the code itself that 524(e) is

21   not an impediment to the court's -- statutory impediment,

22   that is, to the court's issuance or enforcement of a third-

23   party claim release in appropriate circumstances.

24             That raises the issue, however, what is the

25   court's statutory or other source of power, which also has

Page 128

1    been discussed ably, I believe -- it's not really my

2    position to comment one way or the other as to whether it's

3    able or not, but it's been discussed thoroughly, I believe,

4    and appropriately applied at the appellate level.

5             Again, see In re Airadigm Communications, Inc.,

6    519 F.3d 640, 657 (7th Cir. 2008), where the Circuit after

7    determining that Section 524(e) is not a bar to the grant of

8    release, states, "The second related question dividing the

9    circuits is whether Congress affirmatively gave the

10   bankruptcy court the power to release third-parties from a

11   creditor's claims without the creditor's consent, even if

12   524(e) does not expressly preclude the releases."

13            "The bankruptcy applies the principle and rules of

14   equity jurisprudence," Pepper v. Litton, 308 U.S. 295, 304

15   (1939), and its equitable powers are traditionally broad,

16   citing United States v. Energy Resources Company, Inc., 495

17   U.S. 545, 549 (1990).

18            "Section 105 of the Bankruptcy Code codifies this

19   understanding of the bankruptcy court's powers by giving it

20   the authority to effect any 'necessary or appropriate order

21   to carry out the provisions of the Bankruptcy Code, and a

22   bankruptcy court is also able to exercise these broad

23   equitable powers within the plans of reorganizations

24   themselves.'

25            "Section 1123(b)(6) of the Bankruptcy Code permits

Page 129

1     a court to 'include any other appropriate provision not

2     inconsistent with the applicable provisions of this title.'

3     In light of these provisions, we hold that this 'residual

4     authority' permits the bankruptcy court to release third-

5     parties from liability to participating creditors if the

6     release is 'appropriate' and is not inconsistent with any

7     provision of the Bankruptcy Code."

8              See also Class Five Nevada Claimants v. Dow

9     Corning Corp. (In re Dow Corning Corp.) 280 F.3d 648, 656 -

10    658.

11             I'll now turn to what types of claims can, in

12    fact, be released under that power, a topic that, again,

13    directs one back to the Second Circuit's Quigley case that I

14    repeatedly cited, 676 F.3d 45.

15             In that case, the court extensively discussed the

16    relation of its use of the term derivative claims to both

17    the court's jurisdiction to impose a mandatory release of

18    third-party claims and the court's power to do so, in

19    appropriate circumstances.

20             The use of the term derivative claim which really,

21    I believe began in the Manville III case, which appears at

22    517 F.3d 56, is an unfortunate one.  There is a widely

23    accepted definition of the term, that is derivative claim,

24    it's a claim that is asserting injury to the corporate

25    entity and requesting relief that would go to the corporate

Page 130

1    entity.  See Donahue v. Bulldog Investments, Gen. P'ship,

2    696 F.3d 170, 176 (2nd Cir. 2012).

3            The Circuit has spent an enormous amount of time

4    and resources interpreting what I would refer to as true

5    derivative claims, i.e. those that are really claims

6    asserted by third-parties, but properly existing in the

7    bankrupt's estate, and belonging to the estate.  Much of

8    this analysis occurred in the Madoff Case where various

9    third-parties tried to pursue for their own benefit as

10   opposed to for the benefit of the estate, claims against

11   third-parties and the court determined whether, in fact,

12   those claims were really claims of the third-party or claims

13   brought by the third-party, that would have to be, if there

14   was any recovery, part of the debtor's estate as opposed to

15   collected only by the third-party.

16           In these types of cases, the court looks at

17   whether the relief sought by the third-party claimant

18   against the third-party defendant, are really secondary

19   harms that flow primarily to the estate.  See Marshall v

20   Picard, (In re Bernard L. Madoff Investment Securities LLC,

21   740 F.3d 81 (2nd Cir. 2014) and Tronox Inc. v. Kerr McGee

22   Corp, (In re Tronox Inc.) 855 F.3d 84 (2nd Cir. 2016).  They

23   defend the right -- the strong bankruptcy policy to a

24   weighable recovery from the debtor's estate, which is a

25   concomitant requires that claims that purport to be

Page 131

1    independent of the remedy for the debtor's estate, but are,

2    in fact, arising from harm to the debtor, be for the

3    debtor's benefit, and not the third-party's benefit.

4            This is the type of claim that is included within

5    the non-opioid release for non-Sackler shareholder parties.

6    That release, as defined in the non-opioid excluded claim

7    definition, does not include, instead it excludes any cause

8    of action that does not alleged, expressly or impliedly any

9    liability that is derivative of any liability of any debtor

10   or any other estates.

11           If, in fact, those types of claims were the only

12   claims to be released, we would not be talking about a

13   third-party claim release.  We would be talking about a

14   release that clarifies and protects the estate from backdoor

15   attacks, through the assertion of purportedly third-party

16   claims, that, in fact, are estate claims.

17           Instead, third-party releases, quite often,

18   involve independent claims, at least independent as a legal

19   basis, if not as a factual basis.  See, for example In re

20   Drexel Burnham Lambert Group, 960 F.2d 285 (1992).  The

21   claim asserted by the California Department of Toxic

22   Substances Control against third-parties in California

23   Department of Toxic Substances Control v. Exide Holdings,

24   Inc. (In re Exide Holdings, Inc.) 2021 U.S. District LEXIS

25   138478 (D. Del. July 26, 2021) and in Cartalemi v. Karta

Page 132

1      Corp. (In Re Karta Corp) 342 B.R. 45 (S.D.N.Y. 2006).

2              The question is what sorts of independent legal

3      claims are properly covered by a third-party injunction.  On

4      this point, as in so many others, the Circuits' opinion in

5      the Quigley case, albeit in that it discusses liability

6      under Section 524(g), provides real guidance.

7              In that case, the party relying upon a third-party

8      release, an insurance company, argued that because the claim

9      against it would not have arisen but for the debtor because

10     the debtor distributed its products, it would be covered

11     properly by the release.  That third-party claimant said

12     otherwise and in this instance, as opposed to in the

13     jurisdictional argument, the Circuit agreed with the

14     claimant.

15             The court concluded that the but/for test creates

16     too much of an accidental nexus to the bankruptcy estate and

17     that instead the third-party claim to be subject to the

18     injunction must arise as a legal consequence of the debtors'

19     conduct or the claims asserted against it such that that

20     conduct must be a legal cause or a legally relevant factor

21     to the third-party's alleged liability, 676 F.3d 45, 59-60.

22             This is a consistent theme throughout the case

23     law, independent liability may be enjoined if it is

24     dependent on the debtor's liability through conduct of the

25     debtor.  See Continental Casualty Company v. Carr, (In re WR

1   Grace and Company), 900 F.3d 126, 136.

2          As stated in the Kardi Corp. case, which I've

3   previously cited, if there is an identity of interest in

4   between the debtors and the non-debtor really sees with

5   regard to the related conduct, which would not exist as a

6   liability to the third-party, but for the debtor's conduct

7   is the proper subject of a third-party injunction.

8          Similarly, the court in In re FirstEnergy

9   Solutions Corp, 606 BR 720 (Bankr. N.D. Ohio), referred to

10  an identity of interest with the debtor, and between the

11  debtor and the third-party claimant, where the debtor is

12  primarily liable and one can view the non-debtor parties as

13  secondarily liable, is the relevant consideration.

14         So in construing the propriety of the Court's

15  exercise of its power to impose a non-consensual third-party

16  release, that type of relationship must underpin the

17  release, otherwise the release would be too broad.  It would

18  release, for example, the claims based on a guarantee, which

19  is a separate factual premise than the debtor's conduct.  It

20  would, for example, in this instance release a claim if one

21  of the Sackler's negligently prescribed an opioid to

22  someone, which clearly under the case law is guided by the

23  Quigley case, would not be the proper subject of a third-

24  party release.

25         So while I firmly believe that I have jurisdiction

Page 134

1    and power under Article 1 and slash Article 3 of the

2    dichotomy of the Constitution, and there is a sufficient

3    source of that power in the Bankruptcy Code itself, in

4    Sections 105 and 1123(a)(6), as well as in the Court's

5    inherent equitable power, which has been recognized by

6    bankruptcy scholars in this area, including and applying to

7    third-party injunctions, claim injunctions and releases.

8    See, for example Adam J. Levitin's article "Toward A Federal

9    Common Law of Bankruptcy: Judicial Lawmaking in a Statutory

10   Regime", 80 Am. Bankr. L.J. 1 (2006).

11           I believe that they, to the extent that one is not

12   imposing a release of a truly derivative claim, the claim

13   needs to be sufficiently bound up in the debtor's own

14   actions, albeit that it's a separate independent legal claim

15   that would be payable, if recoverable, to the third-party,

16   as opposed to the debtor for the claim to be subject to the

17   injunction.

18           In that regard, regardless whether I, in applying

19   the standard, which I still have not yet gotten to, as to

20   whether the third-party claim release is appropriate or not,

21   would require that the shareholder releases in paragraph

22   10.7(b), by the releasing parties, be further qualified than

23   they now are.  To apply where, again, following the guidance

24   of the Quigley case, a debtor's conduct or the claims

25   asserted against it or a legal cause or a legally relevant

Page 135

1    factor to the cause of action against the shareholder

2    released party, otherwise the release would improperly

3    extend to, for example, the prescription example that I just

4    gave.

5          On the other hand, having read the objecting

6    states complaints against the Sacklers, which is noted not

7    only by me, but by former Chief District Judge McMann in her

8    Purdue opinion, essentially dovetailed with the objecting

9    states' claims against the debtors.  Those claims, that is,

10   would be properly covered by the shareholder injunction.

11         As I said, that leaves still the issue of whether

12   under the applicable standards and the facts of this case,

13   the third-party releases should be imposed.  Those standards

14   vary among the circuits.  In the Second Circuit, in the In

15   Re Metromedia Fiber Network, Inc. case, 416 F.3d 136, (2d

16   Cir. 2005), the circuit went through a number of

17   circumstances where courts have exercised their power,

18   including under Section 105 of the Bankruptcy Code, in

19   furtherance of Section 1123(a)(6) and observed that courts

20   have approved non-debtor releases when the estate receives

21   substantial consideration, the enjoined claims would channel

22   to a settlement fund, rather than extinguished.  The

23   enjoined claims would indirectly impact the debtors'

24   reorganization by way of indemnity or contribution and the

25   plan otherwise provided for the full payment of the enjoined

Page 136

1    claims.

2         The court went on to state, however, that this is

3    not a matter of factors or prongs and further that no case

4    has tolerated non-debtor releases absent the finding of

5    circumstances that may be characterized as unique.

6    Recognizing further that such releases can be abused,

7    particularly if they are for insiders, and need to be

8    supported by sufficient findings by the Bankruptcy Court.

9         The Third Circuit has a similar, but somewhat

10   different, standard as laid out in the Exide case, where the

11   court, with the citations omitted, but citing among other

12   cases In re Continental Airlines, 203 F.3d 203 (3d Cir.

13   2000), "To grant non-consensual releases a court must assess

14   fairness, necessity to the reorganization and make specific

15   actual findings to support these conclusions.  These

16   considerations might include whether 1) the non-consensual

17   release is necessary to the success of the reorganization;

18   the releasees have provided a critical financial

19   contribution to the debtor's plan; the releasees' financial

20   contribution is necessary to make the plan feasible and the

21   release is fair to the non-consenting creditors, i.e.

22   whether the non-consenting creditors received reasonable

23   compensation in exchange for the release."

24        Other circuits, including the Fourth and Eleventh

25   Circuits and the Sixth Circuit have applied a multifactor

Page 137

1    test as well that is in some ways similar;  1) There is an

2    identity of interests between the debtor and the third-

3    party, usually an indemnity relationship, such that a suit

4    against the non-debtor is, in essence, a suit against the

5    debtor or will deplete assets of the debtor's estate;

6           The non-debtor has contributed substantial assets

7    to the reorganization;

8           The injunction is essential to reorganization —

9    namely, the reorganization hinges on the debtor being free

10   from indirect suits against parties who would have indemnity

11   or contribution claims against the debtor;

12          The affected class or classes have voted

13   overwhelmingly to accept the plan;

14          The plan provides a mechanism to pay for all, or

15   substantially all, of the claims in the class or classes

16   affected by the injunction;

17          The plan provides an opportunity for those

18   claimants who choose not to settle to recover in full; and

19          The bankruptcy court made a record of specific

20   factual findings that support its conclusions.

21          The Seventh Circuit has a very broad standard,

22   although noting the -- the potential for abuse, whether it

23   needs to be a finding that the release was an essential

24   component of the plan, the fruit of long-term negotiations,

25   and achieved by the exchange of good and valuable

Page 138

1    consideration that will enable unsecured creditors to

2    realize distribution in the case.  In re Ingersoll, Inc.,

3    562 F.3d 856  (7th Cir. 2009).  Again, according to the

4    Second Circuit, none of these factors is dispositive, but

5    they do need to be considered I relation to the record, and

6    they do need to be in the context of truly unique

7    circumstances, where the release is necessary to the plan.

8          And certainly, the circumstances of this case are

9    unique.  Every Chapter 11 case has its own unique factors

10   and difficulties, but I believe this case is the most

11   complex case given the issues before the parties and

12   ultimately the Court that I have ever seen and that has come

13   before the courts under Chapter 11.  At least, that view is

14   confirmed by the parties to this case who were represented

15   by extremely capable and experienced counsel.

16         It is also clear to me that, for the reasons I've

17   already stated, the monetary contributions by the Sacklers

18   are absolutely critical to the confirmation of this Chapter

19   11 plan.  Without them, I believe the plan would completely

20   unravel, including the complex interrelated settlements that

21   depend upon the amount of consideration being supplied, as

22   well as the non-monetary consideration.

23         There's also the case that the plan has been

24   overwhelmingly accepted, including by the classes affected

25   by the third-party release, well above the 75 percent

1       supermajority in Section 524(g), and recognizing the proper

2       classification scheme of the plan, over 95 percent of the

3       creditors in classes where there are objections.

4               It is also clear to me that the amount being paid

5       by the Sackler released parties or the shareholder released

6       parties is, in fact, substantial.  As I noted earlier, not

7       only is it substantial in dollar terms, I believe it's the

8       largest amount that shareholders have paid in such a context

9       ever.

10              It has been argued that either in light of the

11      aggregate amount of the claims or the amount of the

12      Sacklers' wealth is not substantial.  And I've considered

13      that point carefully.  As I noted, I would wish the amount

14      would be even higher, however as a raw matter, it is

15      undoubtedly a substantial amount.  Moreover, and this

16      highlights the distinction from this case, from one of the

17      factors that I've cited, which is that the plan, "provides a

18      mechanism to pay for all or substantially all of the class

19      or classes affected by the injunction."

20              Clearly, that will not occur here as I've already

21      found the United States' claim, for example, is receiving

22      only under one percent of a recovery and it's fair to assume

23      that other claims that have yet to be liquidated would come

24      nowhere close to being paid in full.

25              On the other hand, there have been a number of

1    cases that have held that a full recovery is not necessary,

2    and indeed, one would question why you really need a third-

3    party release when you can project a full recovery anyway.

4    See In re Fansteel Foundry Corp., 2018 Bankr. LEXIS 3309,

5    (Bankr. S.D. Iowa Oct. 26, 2018) and Behrmann v. National

6    Heritage Foundation Inc. 663 F.3rd 704 (4th Cir. 2011).

7                    A more relevant consideration, I believe, is

8    whether the plan in its third-party release provision is, in

9    fact, fair, not just to the estate generally and all of the

10   creditors in the estate, but also to those who are bearing

11   the brunt of the third-party release, which is the view

12   under the Third Circuit standard, and I believe a proper

13   one.  The concept of marshalling from two different sources

14   of recovery, in some cases, including the Dow case that I've

15   frequently cited, has been cited as an authority for

16   imposing a third-party release.  Marshaling does not require

17   a payment in full, generally.  It only requires payment in

18   full from the sources of specific recovery, rather, the full

19   amount of the sources available from the marshaled claims.

20   And I have analyzed the fairness of the settlement on the

21   third-party claimants from the perspective of their recovery

22   if they were allowed to pursue their third-party claims.

23   And it's in that context, if at all, that the rights of the

24   third-parties in the amount that they would recover is

25   relevant to the question of whether there's a substantial

Page 141

1    contribution to the reorganization.

2           It is, without doubt, the case that without these

3    releases the Sackler shareholder released parties would not

4    agree to the payments under the plan, and they,

5    understandably I believe, are insisting on that because that

6    is their consideration in return for the consideration they

7    are providing to the estate.  I've already concluded that

8    without the releases the plan would unravel and in all

9    likelihood, the Debtors case would convert to a case under

10   Chapter 7 of the Bankruptcy Code.

11          In that context, I've already found that from the

12   Debtor's estate unsecured creditors like the objecting

13   creditors would in all likelihood recover nothing or at

14   most, as set forth in the unrefuted liquidation analysis by

15   Mr. Delaconte, no more than their pro rata share of $600

16   million which is a high-case scenario that I am skeptical

17   about.

18          I've already gone through the dilutive effect

19   resulting from conversion of the case to Chapter 7.  The

20   question is whether in that scenario the third-parties could

21   pursue the Sackler released parties to make up the amount

22   that they would have lost from the estate distribution by

23   pursuing their third-party claims.

24          In large measure, my analysis of that reasonably

25   projected outcome is quite similar to my analysis of the

Page 142

1     collectability and merits of the estate claims against the

2     Sacklers.  Although I believe that the fraudulent transfer

3     claims against certain of the Sacklers are possibly the

4     strongest of its suite of claims against them and they would

5     clearly be aggressively pursued by a Chapter 7 trustee.  The

6     problem is that the senior claims of the United States and

7     the costs and risks of pursuing them would eat up most of

8     the value.

9           As far as the third-party claims are concerned,

10    they do derive from the same facts pertaining to the

11    Debtor's activities, operation, and marketing with respect

12    to opioids, but are further narrowed to claims against the

13    directors and controlling shareholders related to those

14    activities.  Again, we did not have a full trial regarding

15    the merits of such claims; however, the record before me

16    included the same types of arguments that I'm gone through

17    already with respect to the Sacklers' defenses to the estate

18    claims, which would include veil-piercing and breach of

19    fiduciary duty and the like which all involve conduct by

20    controlling shareholders and directors, and I won't repeat

21    them here because I believe they equally apply to the third-

22    party claims.

23          In addition, the same issues pertaining to

24    collection apply, except that the well-recognized ability to

25    break through a spendthrift trust, if in fact -- this is

1    under U.S. law -- if, in fact, it was the recipient of a

2    fraudulent transfer would not apply to the third-party

3    claims which are not fraudulent transfer claims but rather

4    direct claims which would have to be asserted against the

5    Sacklers -- all of them -- and/or their companies which are

6    held in trust in the bankruptcy-proof trust structure

7    testified to by Mr. Cushing.  I'm not, again, ruling that

8    that structure could not be breached, but I believe it would

9    be very difficult to do so, particularly where the

10   settlement which the trust and the trustees have agreed --

11   or prepared to agree to was undercut.

12           So it would appear to me that the aggregate

13   recovery by the objecting third-parties in respect of their

14   claims against the Debtor and against the third-parties --

15   which, again, I have narrowed to claims that fit within the

16   Quigley rubric -- would exceed materially their recovery if

17   I did not confirm the plan and they pursued their third-

18   party claims separately as well as their claims against the

19   Debtor in the inevitable liquidation of the Debtor under

20   Chapter 7.

21           A related argument made by the objectors is that,

22   contrary to what I've just gone through, the plan does not

23   satisfy the best interest test of Section 1129(a)(7) of the

24   Bankruptcy Code.  There is a statutory response to that

25   argument that under the plain meaning of Section 1129(a)(7)

Page 144

1      I believe is well taken.

2              That section, again, provides that with regard to

3      a party that has accepted its treatment under the plan, such

4      holder of the claim will receive or retain under the plan on

5      account of such claim -- and I want to emphasize that phrase

6      -- on account of such claim property of a value as of the

7      effective date of the plan that is not less than the amount

8      that such holder would so receive -- and I'm emphasizing the

9      words "so receive" -- or retain in the Debtor were

10     liquidated under Chapter 7 of this title.  It is clear to me

11     that as a matter of grammar, the comparison is between the

12     amount that the objecting creditor would receive under the

13     plan on account of its claim and what it would so receive,

14     again, on account of its claim, under Chapter 7 and would

15     not look to rights that it would retain against third-

16     parties.

17             I recognize that the interpretation of Section

18     1129(a)(7) by two of my colleagues who I greatly respect in

19     In re Ditech Holding Corporation, 606 BR 544 (Bankr. SDNY

20     2019) and In re Quigley Company, 437 BR 102 (Bankr. SDNY

21     2010), are to the contrary, that one should look, if one can

22     make a reasoned determination, at the rights that one would

23     have, not in respect of one's claim, but in respect of other

24     third-party claims in a liquidation in comparison to the

25     rights that one would have based on one's claim under the

Page 145

1    Chapter 11 plan.  Neither of those cases, however, addresses

2    the plain meaning argument that I've just gone through, and

3    I believe the plain meaning would rule here.

4              Importantly though, I have not limited my ruling

5    to the plain meaning interpretation that I just gave.  I

6    have instead assessed, based on the evidence before me in

7    this settlement hearing context, albeit what I believe would

8    be recovered by the objecting creditors in a Chapter 7 case,

9    both on account of their claims and on account of the third-

10   party claims.  And based on that assessment, I have

11   concluded that they would recover more, or at least as much

12   as, that recovery if confirm with the plan.

13             In both of the Ditech and Quigley cases, the

14   courts stated that if the recovery from non-debtor sources,

15   i.e., the claims that would be released under the plan, were

16   neither speculative nor incapable of estimation or

17   speculative an hypothetical, then the analysis could be

18   done.  In both of those cases, the courts determined -- in

19   one case, based on various admissions by the debtor, that is

20   the Quigley case -- as to the settlement history over a 20-

21   year period of such types of claims and at least some

22   evidence, which was the only evidence offered by the plan

23   proponent, which, again, has the burden of proof, which

24   showed that at least for a relatively short period --

25   January 1 through June 30, 2019 -- there were payments on

1    settlements that could be evaluated, and, therefore, one

2    could evaluate settlement payments generally, and,

3    therefore, the claims were capable of being estimated, the

4    plan proponents hadn't carried their burden of proof.  The

5    objecting states have suggested that a similar failure of

6    proof exists here given the absence of any expert testimony

7    to try to value the claims of the objecting states against

8    third-parties, namely, the Sacklers and their related

9    entities.

10           It is true there is no such expert testimony, but

11   I believe it would have to be expert fact testimony, not an

12   assessment of the strengths and weaknesses of the claims,

13   including the cost of pursuing them, the risks of

14   collection, and the dilutive effect of all of the other

15   claims that would be pursued by all of the other creditors

16   in this case, including all of the other states who are

17   otherwise agreeing to the plan because it is perfectly

18   obvious that they would not agree to let the objecting

19   states alone pursue the shareholder released parties on the

20   theories that would equally apply under those states' laws.

21           Collectively, the states and territories in this

22   case filed proof of claims aggregating in an unliquidated

23   amount at least $2.156 trillion.  The objecting states share

24   of that adds up to $482,947,000 or roughly 22.5 percent of

25   all of the filed claims by the states and territories.  That

Page 147

1    comes down to 450 billion or less than 21 percent if you

2    exclude West Virginia which was not raising this issue.  If

3    you factor in all of the other claims, some of which would

4    clearly have third-party claim rights, you're talking about

5    a largely dilutive effect on the recovery on top of the

6    liability and claim collection issues that I've already

7    described.

8            I believe that given the paucity of any settlement

9    history here with the exception of the payment to the state

10   of Oklahoma by the Sacklers and their payment to the United

11   States in respect of their civil claims, that assessment,

12   which is fundamentally an assessment by the court of the

13   legal risks and implementation risks of pursuing a lawsuit

14   is a proper assessment, and I conclude again that the

15   settlement is fair to the objecting states after having

16   conducted that assessment.  Their claims in large measure

17   would depend upon, to the extent they are independent of the

18   Debtors truly -- and, therefore, not truly derivative claims

19   -- would depend largely on finding whether any of the

20   Sacklers was personally responsible for the misconduct of

21   Purdue.  Such a trial might actually show that.  I believe

22   the testimony before me was inconclusive on that point,

23   although, clearly, I accept that there is substantial risks

24   for the Sacklers, that point would be won by the objecting

25   states.  So in addition to that risk for the reason I've

Page 148

1    already stated, there are substantial cost and collection

2    risks that I don't need to go through again.

3           As far as the gravamen or the proof that would

4    need to be shown, I've not gone through every state's

5    applicable law on this point, but I will note that the main

6    case that they have cited in their briefs -- Grayson v.

7    Nordic Construction, Inc., 92 Wn.2d 548 (1979) and State v.

8    Ralph Williams, North West Chrysler Plymouth, Inc., 87 Wn.2d

9    298, 322 (1976) -- both of which found individual liability

10   based upon the controlling shareholders personal actions for

11   many of the unlawful acts and practices taken by that

12   person's corporation.

13          The last argument made by the objecting states is

14   that the nonconsensual third-party release and injunction is

15   a violation of their sovereignty and police power.  There is

16   no such bar in the Bankruptcy Code itself.

17          The Bankruptcy Code and the judicial code, in

18   certain carefully prescribed instances, recognize the police

19   power of states and other governmental entities but only in

20   limited contexts.  Thus, in Section 362(b)(2), Congress

21   provided an exception to the automatic stay for the

22   liquidation of a claim in the exercise of police power but

23   stayed its payment, and such claims are, in fact, as is well

24   recognized, not exempt from Chapter 11 debtor's discharge.

25          Similarly, 28 U.S.C. Section 1452 precludes the

Page 149

1   removal to the bankruptcy court, which is generally

2   permitted under that section, of a pending cause of action

3   if it is one that is asserting the police power.  The scope

4   of the police power in those exceptions has not been decided

5   definitively by the second circuit.  As noted in a thorough

6   discussion in In re General Motors, LLC, Ignition Switch

7   Litigation, 69 F.Supp.3d 404 (SDNY 2014), the exception --

8   the definition of police power, for purposes of these

9   exceptions, has evolved over the years from a focus on

10  distinguishing between actions to enforce the police with

11  respect to conduct on the one hand and actions to provide

12  for financial recovery on another.

13          After Board of Governors of the Federal Reserve

14  systems, the MCorp. Financial, Inc., 502 U.S. 32, 40 (1991),

15  the focus has turned more from the subjective merits of the

16  government entities exercise of its police power in a given

17  case only to the purpose of the law that the governmental

18  unit is attempting to enforce, even if that purpose, as is

19  well recognized, may include the payment of money.  I accept

20  that broader definition of the police power.  The fact that

21  a governmental entity is looking to collect money, I believe

22  is not enough to take it out of the police power exception.

23          But, again, that exception is a limited one in the

24  Bankruptcy Code and the judicial code.  It is well

25  recognized, indeed the 10th Circuit states that it is a

Page 150

1    matter of Hornbook law that actions excepted from the

2    automatic stay, including under the police power, may be

3    subject to specific injunctive relief under Section 105(a),

4    In re Western Real Estate Fund, 922 F.2d 592, 599 (10th

5    Cir.) as I previously cited and In re Commonwealth

6    Companies, Inc., United States v. Commonwealth Companies,

7    Inc., 913 F.2d 518 (8th Cir. 1990).  See also 3 Collier on

8    Bankruptcy P 362.05 and, as that discussion notes, the

9    legislative history to the section which recognizes the

10   power to enjoin, notwithstanding that the injunction is of

11   the police power, 143 Cong.Rec. H109 50-03, 1997 WL 712488

12   H109 50, (November 12, 1997) and H.Rept 95-595 95th Congress

13   1st Session (September 8, 1977), "Subsection B lists five

14   exceptions to the automatic stay.  The effect of an

15   exception is not to make the action immune from injunction."

16        As far as the limitation on the power to assert

17   the police power, as least as far as a general assertion of

18   states' rights over the power of the Bankruptcy Code, see In

19   re Peabody Energy Corp., 958 F.3d 717 (8th Cir. 2020).  And

20   in fact, plan injunctions, at least in one instance and a

21   recent one, have been imposed without any qualms about the

22   police power authority.  See California Department of Toxic

23   Substances Control v Exide Holdings, Inc., 2021 U.S. Dist.

24   LEXIS 138478 (D. Del. July 26, 2021).

25        At this point, given the states' agreement,

Page 151

1    including the objecting states' agreement, to the public

2    private allocation and the NOAT allocation under the plan

3    and the carve outs from the plan release, the only thing of

4    tangible note that the states would be obtaining here would

5    be money which they've actually agreed to put to use under

6    the plan for abatement purposes and which they're not

7    disputing the validity of -- in fact, the remarkable

8    reconstructive nature of such provisions.

9              The objecting states nevertheless state that the

10   plan deprives them of establishing a sufficient civil

11   punishment for the released claims, and certainly, that is a

12   valid aspect of the police power, namely, the sending of a

13   message to others who might similarly, if it is proven

14   against them, be shown to have improperly engaged in conduct

15   that would subject them to the liability that the states

16   assert they would have the ability to impose here and that

17   is being released.

18             It is clear to me, however, that the states cannot

19   have it both ways.  They cannot have the results of the plan

20   and have further punishment than the plan already provides.

21   They are not (indiscernible) to make that choice, unlike 80

22   percent of their state brethren and sisters, but the

23   consequences of such additional punishment would be to the

24   detriment of all of the states and the creditors in this

25   case.

Page 152

1          The element of punishment, besides the loss of all

2     of Purdue and the money the Sacklers are paying, also

3     includes, I believe, the agreement by the Sacklers and the

4     Debtors to provide the comprehensive document depository

5     which includes waivers by the Debtors of attorney-client

6     privilege for future analysis by the States and third-

7     parties.

8          Ms. Conroy, who has been pursuing Purdue and the

9     Sacklers longer than anyone and harder than anyone, I

10    believe, has noted that that feature of the settlement is

11    perhaps the most important one -- even more important than

12    the billions of dollars being paid by Sackler family

13    members.

14         It is especially important in the public context

15    raised by the objecting states.  It will provide far more

16    transparency to the conduct of Purdue and those it did

17    business with and those who regulated it, including some of

18    these very objectors, including the state where Purdue's

19    main offices are, Connecticut, and the federal government,

20    which of course also regulated Purdue.

21         That record is extremely important, not only for

22    continuing to pursue lawsuits against other parties, but

23    also to guide legislatures and regulators as to how better

24    to address a company that has a legal product that is also

25    incredibly dangerous.

Page 153

1          As I've noted the other aspects of the plan that

2     deal with NewCo, also provide a model for either further

3     self-regulation or regulation by regulatory bodies.

4          Each of the four members of the Sackler family who

5     testified during the evidentiary hearing before me was asked

6     would they apologize for their role and conduct related to

7     Purdue.  Their reactions, as perhaps is typical of a family,

8     varied.  None would state an explicit apology, which I

9     suppose is understandable given the legal risks they face in

10    making such an apology before a settlement, whether there's

11    an objection to the settlement, although I will note that in

12    a somewhat similar context, I have received an apology to

13    victims of misconduct.

14         One of the witnesses, frankly, did not accept any

15    level of responsibility.  The other three with differing

16    degrees of emotion did in terms of stating their regret for

17    what their company had done.  A forced apology is not really

18    an apology.  So we will have to live without one.

19         The writer Standahl wrote that most people do not

20    forgive, they just forget.  Given the nature of this

21    settlement, including the document depository, forgetting

22    will be impossible.  To me, those elements of the settlement

23    more than justify the admittedly serious implications, even

24    in a context where the real relief now being sought by the

25    states has been agreed by them in overriding their assertion

Page 154

1    of their own independent police power rights.

2         So assuming that the change to Section 10.07(b) of

3    the plan will be made, and I will not confirm the plan if it

4    isn't made that I outlined, and assuming one other change

5    that I believe is necessary, I will confirm the plan.  I do

6    so agreeing with the Creditors Committee and everyone else

7    on the other side of the table, including the Debtors from

8    the Sackler family, that I wish the plan had provided for

9    more, but I will not jeopardize what the plan does provide

10   for by denying the confirmation.

11        The other change to the plan that I believe is

12   required is to the provision found at Paragraph 11.1(e) of

13   the plan on Page 146, which directs people who prosecute a

14   cause of action for a nonopioid-excluded claim, which is

15   truly a derivative claim in the normal definition of the

16   term, unless such person first obtains leave from the

17   bankruptcy court.

18        Consistent with my remarks to counsel for the

19   Canadian Municipalities, that provision should be made clear

20   that it provides only to causes of action that colorably is

21   a non-opioid-excluded claim, i.e. if the cause of action is,

22   for example, for a fraudulent transfer claim brought by

23   Purdue Canada or some other claim, it should not have to go

24   through the bankruptcy court.

25        So I will confirm the plan only if the following

Page 155

1    phrase is added after the phrase "non-opioid-excluded claim"

2    in the third line of 11.1(e) "if such cause of action

3    colorably is a non-opioid-excluded claim."  That is

4    different than the stricken language which said the claim

5    must be colorable.  This is one that is colorably an

6    excluded claim.

7          So as I noted at the beginning of this hearing, I

8    have an over one-hundred-page confirmation order I have not

9    reviewed in detail.  I've given you a several hours' long

10   ruling, for which I apologize for the length of.  I will go

11   through the confirmation order carefully, but I will confirm

12   the plan if it is modified in the two ways that I've noted

13   during my ruling.

14         MR. HUEBNER:  Your Honor, thank you very much with

15   tremendous apologies for even needing to speak at all after

16   a six-and-a-half-hour bench ruling without a break.  There

17   are two housekeeping matters with respect to statutes of

18   limitations and the injunction, which I will ask Mr.

19   Kamenetzky to in a minute.  Those will hopefully only take

20   45 seconds.  I have one thing before that, Your Honor, that

21   I also raise with some hesitation.

22         During the course of the six and a half hours,

23   Your Honor, I believe, we might have misheard, but we might

24   have heard you say that the majority of the Sacklers' assets

25   are in trusts organized under the bailiwick of Jersey.  For

1    the record, Your Honor, we think you may have intended to

2    refer to the Mortimer A side of the family.

3            According to the testimony, including his report

4    at JX3092 at Docket 3488, the A side of the family has

5    substantial assets in trust under bailiwick of Jersey.  The

6    documents also reflect that the B side, which is the Raymond

7    side, which is largely the domestic side, does not have

8    equally significant assets outside the United States.  They

9    do have put in record evidence --

10            THE COURT:  They do have them in spendthrift

11   trust.

12            MR. HUEBNER:  Exactly, Your Honor.  We were quite

13   confident that you didn't mean to rely on the majority of

14   their overall assets being in Jersey trusts, but rather in

15   various trusts.  The A side has a lot of money in Jersey.

16   The B side does not, which is what the evidence shows.  And

17   we just wanted to make sure that, as you said, the record

18   accurately reflected what you found in that respect.

19            THE COURT:  As I said in the beginning of my

20   ruling, I will go through it and correct any misstatements

21   that I made to that effect, although the ruling won't

22   change.

23            MR. HUEBNER:  Perfect, Your Honor.

24            THE COURT:  The B side has most of its assets in

25   spendthrift trusts.

Page 157

1            MR. HUEBNER:  Thank you, Your Honor.  I think we

2     all know what the facts are.  They are uncontroverted.  That

3     was the only point.  Let me now put myself back on mute and

4     ask Mr. Kaminetzky to handle two quick housekeeping matters.

5     And I believe there is nothing further, certainly, from the

6     Debtors.

7            THE COURT:  Okay.

8            MR. KAMINETZKY:  Your Honor, Benjamin Kaminetzky

9     of Davis Polk.  For the Debtors, again, with apologizes.

10    You must be exhausted.  Two, I hope, administrative matters.

11    The first back to the preliminary injunction.

12            Following the entry of the Court's bridge

13    extension on Monday, which is Docket No. 286 in the

14    Adversary proceeding No. 19-08289, the preliminary

15    injunction is now set to expire today.

16            As I mentioned on Friday, there is a provision in

17    the proposed confirmation order that will extend the

18    preliminary injection through the effective date, that is

19    Paragraph 56(a) of the proposed confirmation order.

20    Bankruptcy Rule 3020(e) in Paragraph 66 of the order provide

21    that the confirmation order be stayed until the expiration

22    of 14 days after the entry of the order unless the Court

23    orders otherwise.

24            There will therefore be a small gap in the

25    protection afforded by the preliminary injunction and the

Page 158

1    voluntary injunction unless the Court enters a second bridge

2    order.

3            So as I foreshadowed last Friday, the Debtors

4    respectfully request that the Court enter another bridge

5    order extending the preliminary injunction to entry of the

6    confirmation order and the expiration of the 14-day period,

7    stay period we just described.  So I guess I could go on,

8    but we've spoken to the UCC, the AHC and MSGE and they

9    support this.  And given my colloquy with the Court on

10   Friday about the Debtor's intention to seek the second

11   bridge order today, I assume the nonconsenting states are in

12   a position to affirm their voluntary compliance with the

13   extension rather than to be formally bound by it, which is

14   consistent with past practices.

15           So if the representatives of nonconsenting states

16   are on, and could indicate that on the record, that would be

17   wonderful.  I see Mr. Gold.

18           MR. GOLD:  Your Honor, Matthew Gold from Kleinberg

19   Kaplan representing Washington, Oregon, and District of

20   Columbia, although maybe I should let Mr. Troop go first,

21   but can Your Honor hear me?

22           THE COURT:  Yes, I can, thanks.

23           MR. GOLD:  I would defer to Mr. Troop who speaks

24   on behalf of more states, if he wishes to go first.

25   Otherwise, I'm prepared to speak.

1          MR. TROOP:  Your Honor, Andrew Troop on behalf of

2     the nonconsenting states.  I have not received any

3     information or suggestion that the members of the

4     nonconsenting states will not continue to abide voluntarily

5     with the preliminary injunction or its extension.  We did

6     not solicit on that point.  Specifically, I will defer to

7     any law on phone if they think otherwise, but I don't think

8     there should be an issue, Your Honor.

9          THE COURT:  Okay.

10          MR. GOLD:  Thank you, Your Honor.  This is Matthew

11     Gold again.  As Mr. Troop said, we certainly have not had

12     any opportunity to discuss with our clients this particular

13     request.  I think it would have been far preferrable if the

14     Debtors, in soliciting the opinions of all those other

15     parties, had spoken to us first rather than making us

16     request in open court during the hearing, but it is

17     obviously too late for that.

18          The one question that I do not understand from the

19     way Mr. Kaminetzky put it, is that we have been given to

20     understand that that the effective date under the plan

21     occurs not 14 days after the entry of the confirmation

22     order, but at least 82 days after the entry of the

23     confirmation order.

24          So what Mr. Kaminetzky is requesting here is not a

25     two-week extension of the injunction, but a three-month

Page 160

1    extension of the injunction.  And I would at least

2    appreciate some clarification from Mr. Kaminetzky on that

3    point so that we can understand what is considered brief or

4    not in this context.

5              THE COURT:  Fair point.  I think it wouldn't be

6    limited by time, right?  It's limited by definition?

7              MR. KAMINETZKY:  I'm sorry.  The confirmation

8    order extends the, the proposed confirmation order extends

9    the preliminary injunction to the effective date.  The

10   effective date is still the effective date of the plan.

11   Those are two different things.

12             THE COURT:  Right.

13             MR. KAMINETZKY:  So the order would give us the

14   bridge to the effective date.

15             THE COURT:  So this is time to get the order in

16   and to have it be an effective order.

17             MR. KAMINETZKY:  Yes.

18             THE COURT:  So I think it is 14 days unless

19   there's a stay pending appeal.

20             MR. KAMINETZKY:  That's correct.  And Your Honor,

21   just on the point -- I said this was going to happen last

22   Friday.  This is not a surprise at all.

23             THE COURT:  It wasn't a surprise to me.  Look, I

24   am perfectly happy to have the states continue to agree as

25   opposed to having it imposed on them.  There's precedential

Page 161

1    value to that that I understand.  But if they weren't to

2    agree, in all likelihood, I would extend the injunction

3    through the entry of the confirmation order and the order

4    being a final order.

5         MR. KAMINETZKY:  Thank you, Your Honor.  The

6    second issue, as Your Honor knows, the shareholders

7    settlement agreement contains a unique enforcement mechanism

8    which we call the snapback in the event that certain

9    breaches of the shareholder settlement agreement occur, the

10   MDT can trigger a snapback by filing a notice with the

11   Court, at which point, both the shareholder releases and the

12   shareholder injunction will unwind with respect to any

13   breaches by the shareholder parties and the MDT, and the

14   releasing parties could then sue the breaching shareholder

15   parties under the release causes of action.

16        To ensure that these remedies are maximally

17   effective, it is necessary to preserve those claims during

18   the life of the settlement agreement or until the parties

19   subject to the snapback have fully performed their

20   obligations.  According to Section 10.9 of the plan and

21   Paragraph 32(a) of the confirmation order, they toll any

22   statue of limitations that apply to the shareholder release

23   claims.

24        However, we are faced with a potential very small

25   gap because those provisions of the plan and confirmation

Page 162

1    order will not take effect until the 14-day stay of the

2    confirmation order expires.  And we're facing the end of the

3    tolling provisions in Section 108(a)(2) and the limitations

4    in 546(a)(1)(A) because we're approaching the second

5    anniversary of our filing.

6         So we have a proposed order which is to make sure

7    that the tolling provisions provided by Section 10.9 of the

8    plan is in place as soon as possible and before the 14-day

9    stay runs.

10        So the proposed order does effectuate only that

11   tolling provision to the plan and confirmation order.  It

12   will start now.  It tolls the applicable statute of

13   limitations for the shareholder release claims in exactly

14   the same way as it's provided by the plan in Paragraph 32(a)

15   of the confirmation order.  The tolling order is to remain

16   effective until the later of the date of the confirmation

17   order becomes final and if the confirmation order is vacated

18   or reversed, 225 days after the date when that occurs so

19   folks have plenty of time to file their complaints.

20        This is not controversial --

21        THE COURT:  Is this -- sorry to interrupt you, Mr.

22   Kaminetzky.  Is this a stipulated order with the Sacklers?

23   So they're agreeing to this?

24        MR. KAMINETZKY:  Yeah.  Both sides, A and B, agree

25   to this and I can't imagine anyone would object --

Page 163

1                THE COURT:  Okay.

2                MR. KAMINETZKY:  -- given that this is just a way

3    to maximally preserve the claims if, God forbid, there's a

4    breach.  We can provide that to Your Honor.

5                THE COURT:  You can submit that to chambers.

6                MR. KAMINETZKY:  Okay.  Perfect.

7                THE COURT:  When does that period expire?  I mean

8    I don't think it expires tonight, right?

9                MR. KAMINETZKY:  No.  We have --

10               THE COURT:  It will get entered tomorrow then.

11               MR. KAMINETZKY:  Yeah.  We have September 15th or

12   16th depending on how you count.  So we'll get that on file.

13               THE COURT:  Okay.  So you can submit that to

14   chambers and it will get entered tomorrow.  I expect the

15   confirmation order probably will get entered tomorrow.  I do

16   have a brief calendar in the morning, but I'll be able to go

17   through it.

18               MR. KAMINETZKY:  Okay.  Thank you, Your Honor.

19               MR. HIGGINS:  Your Honor, very briefly, Ben

20   Higgins for the United States Trustee.  May I be heard

21   briefly, Your Honor?

22               THE COURT:  Sure.

23               MR. HIGGINS:  Thank you, Your Honor.  Just on a

24   procedural note now that Your Honor has ruled.  The United

25   States Trustee intends to file a formal motion for a stay

Page 164

1   pending appeal.  As part of that motion, we would be seeking

2   an expedited hearing.

3           Consistent with the case management order, Your

4   Honor, we have conferred with Debtors' counsel.  We have not

5   yet reached an agreement on an expedited briefing or hearing

6   schedule, but as the case management order directs, Your

7   Honor, we'll reach out to counsel again tonight and if we're

8   unable to reach an agreement regarding scheduling, we know

9   to contact chambers as the case management order requires.

10          THE COURT:  Okay.  That's fine.

11          MR. HUEBNER:  Your Honor, just so everybody is

12  clear, so we don't get a cascade of emergency pleadings like

13  this, I think Mr. Gold correctly referred to before, it is

14  of record in this case and should be well known to everybody

15  and if it's not, they should be come familiar with it, but

16  our DOJ settlement approved by this Court after a multi-hour

17  hearing as well, expressly contemplates a settlement -- a

18  sentencing hearing not earlier than 75 days after the entry

19  of the confirmation order.  And emergence not earlier than

20  eight days -- then seven days after that, which is why, as

21  Your Honor has actually advised all parties at multiple

22  recent hearings, including the KERP hearing, this company

23  can't come out for several months and I think at this point,

24  you know, to start burdening the docket with emergency

25  motions, there's got to be a way to work this out more

Page 165

1    thoughtfully than unnecessary emergency motions when there

2    cannot be an emergence for really rather quite a while.

3            We don't want anybody to be prejudiced, we

4    understand that.  That's the kind of thing we're trying to

5    be in dialog about, but we have a history here where we're

6    in dialog with people and we're waiting for a thoughtful

7    response and then they just never call back or email and

8    file something that costs the Estate a lot of resources as

9    multiple parties all have to think about it and respond to

10   it.

11           So what I said on the very first day of this case,

12   at the very first hearing, still holds two years later.

13   Please just call us and let's see if we can work something

14   out that is efficient and not a waste of taxpayer resources

15   and Estate resources that does nothing but drain money from

16   abatement and saving lives.

17           THE COURT:  Ms. Lee is very good in keeping my

18   calendar.  She knows better than I do how long things will

19   take.  Don't tell her that because she's probably valuable

20   to any number of law firms if they knew that.  She'll find

21   time that makes sense.  I don't think it is an emergency,

22   Mr. Higgins.  I really don't, which is something you should

23   take into account before making such a motion.

24           MR. HIGGINS:  Understood, Your Honor.  That's why

25   we reached out Mr. Huebner twice about this and we will

Page 166

1  continue to talk with him to work on a schedule that works

2  for everybody, Your Honor.

3          THE COURT:  Among other things, I would hope that

4  someone would actually be able to read the last six hours of

5  what I was talking about before they actually decided to do

6  something.

7          MR. HIGGINS:  Of course, Your Honor.

8          THE COURT:  Okay.  Anything else?

9          MR. KAMINETZKY:  Nothing from the Debtor.

10          THE COURT:  Thank you all.  Thanks, everyone.

11

12          (Whereupon, these proceedings were concluded at

13  4:49 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 167

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 1, 2021