DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OBJECTION TO ELLEN ISAACS' EMERGENCY REQUEST
FOR IMMEDIATE INJUNCTION AND HEARING FOR DUE PROCESS,
PRODUCTION FOR EVIDENTIARY DOCUMENTS & OTHER RELIEF**

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**," or "**Purdue**") respectfully represent as follows in opposition to the *Emergency Request for Immediate Injunction and*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Hearing for Due Process, Production for Evidentiary Documents & Other Relief* [Dkt. No. 3582] (the "**Motion**") filed by Ellen Isaacs ("**Ms. Isaacs**"):

1.  In the Motion, Ms. Isaacs asserts that "[t]he process of the [b]ankuptcy proceedings are in violation of [t]he U.S. Constitution's 14th Amendment" right to due process because "family members are deceased and have been deprived of life, dying every single day . . . or still struggling with their afflictions." (Mot. ¶¶ 2-4, 26.) Ms. Isaacs also alleges insufficient notice of the bar date (although Ms. Isaacs was able to file a timely proof of claim)[2] (*id.* ¶ 16); confusion over voting on and solicitation of the Plan, including because of the number of creditors who actually voted versus those who filed proofs of claim (*id.* ¶¶ 19-21); and lack of access to discovery documents and the confirmation hearing (*id.* ¶¶ 13, 28).

2.  Ms. Isaacs seeks various forms of relief, including (i) "[a]n immediate injunction stopping the . . . [b]ankruptcy proceedings" and for the U.S. Attorney General and the U.N. to oversee the "[b]ankruptcy proceedings and [c]riminal [p]rosecution," (ii) new notice to "surviving family members" based on information from "[a]ll medical examiner reports collected by a third party for every accidental overdose and homicide by drugs since the first prescription of Oxy[C]ontin" followed by the establishment of a recovery fund like that established for families after 9/11, (iii) additional time for and information regarding voting, including a recount of all votes for each state, (iv) investigations into non-Purdue products and the DEA's approval of OxyContin, (v) release of discovery documents to the general public, and

---

[2] Ms. Isaacs filed a proof of claim on July 23, 2020. Pursuant to paragraph 5 of the Court's initial order establishing the deadline to file proofs of claim in these cases [Dkt. No. 800], Ms. Isaacs' proof of claim is not available on the public docket maintained on Prime Clerk LLC's restructuring website for these cases.

(vi) seizure of all of Purdue's and the Sackler's assets and holdings, including Mundipharma. (*Id*. at 6.)

3.  Although the Debtors remain sympathetic to all of those affected by the opioid crisis, including Ms. Isaacs and other individual victims and their families, the Debtors must object to the Motion. First, to the extent that Ms. Isaacs' Motion is an objection to confirmation of the Debtors' *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Dkt. No. 3726] (the "**Plan**"),[3] Ms. Isaacs' objection is untimely. On September 1, 2021, the Court issued a bench ruling confirming the Plan. Second, to the extent relevant to Plan confirmation, most of the arguments raised in the Motion already have been considered by this Court and ultimately overruled. Accordingly, in addition to being an untimely objection to the Plan, Ms. Isaacs' Motion should be denied for the same reasons set forth in the Court's bench ruling.

4.  *First*, the Court repeatedly emphasized that these cases and the Plan do not purport to (nor could they) resolve any potential <u>criminal</u> liability against the Debtors' shareholders, the Sackler Families.[4] (Sept. 1, 2021 Conf. Hr'g Tr. 71:8-13 (explaining that it is "crystal clear in the plan and always has been" that it does not provide "the Sacklers [Families]. . . immunity from criminal charges"); 71:14-72:4 ("[T]he plan has been described as providing . . . "immunity to the Sacklers . . . [which] suggests clearly immunity from criminal charges. That's

---

[3] Terms used herein but not defined shall have the meanings ascribed to them in the Plan.

[4] The Debtors pled guilty to criminal charges pursuant to a resolution reached with the Department of Justice (the "**DOJ**") approved by the Court, *Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [Dkt. No. 2004], and the satisfaction of the terms of such resolution, including a criminal sentencing hearing before a federal district court, are a condition precedent to the effective date of the Plan. (Plan § 9.1(c); *see also* Sept. 1, 2021 Conf. Hr'g Tr. 86:21-87:5 (explaining that "the [P]lan meets the requirements of the DOJ settlement as far as setting up an abatement structure and the corporate governance and other public purposes . . . for NewCo").)

3

how one generally thinks of the word immunity [but] [i]t simply does not do that."); 75:25-76:6 (noting that certain objectors "ha[d] been misled into thinking that the [P]lan provides for release of any criminal conduct").)  Indeed, applicable prosecutorial authorities are free to pursue criminal investigations or charges against the Sackler Families or other released parties.  (*Id*. at 72:5-9 ("If anyone that is obtaining a civil release under this plan has engaged in criminal activity either before or during this case, they are not relieved of the consequences of that.  If any prosecutor wants to pursue such a claim against the released parties, they can.").)

5.      *Second*, at the outset of its bench ruling, the Court found that the Debtors' "notice of . . . these [c]ases; . . . the right to assert a claim against these Debtors; . . . the request for confirmation of the plan; and . . . the proposed broad release of third-parties' claims against the Sacklers . . . was unprecedentedly broad" and "sufficient."  (*Id.* at 25:7-20.)  In particular, the Court noted that "[t]he program was carefully tailored to reach known creditors but also to reach the population at large, including through various types of media aimed at people who may have been harmed by the Debtors' products," such as Ms. Isaacs and other families of victims of the opioid crisis.  (*Id.* at 26:3-9.)

6.      *Third*, the solicitation and tabulation of votes on the Plan was entirely appropriate.  In overruling the U.S. Trustee's objection to the Plan, the Court explained that, while "[t]here is no conceivable way to determine the preferences of those who did[] [not] vote other than that they did[] [not] object and they took no position in a 'no' vote . . . where a vote is as extensive as this with . . . well over 100,000 people voting, under any measure, this [P]lan has been overwhelmingly accepted."  (*Id*. at 29:20-30:9.)  Indeed, it is for this reason that, under the Bankruptcy Code (and in every election), acceptance is measured by those that vote.  (*Id*.)  Accordingly, to the extent that the Motion purports to identify a defect in solicitation based on

4

the voting results, there is none, particularly given the extensive and unprecedented notice provided of the confirmation hearing (as just discussed) and the record-setting number of voting creditors who have overwhelmingly accepted the Plan.[5]

7.   *Fourth*, discovery in these cases has been the "most extensive . . . any court in bankruptcy has ever seen." (Sept. 1, 2021 Conf. Hr'g Tr. 90:23-24.) In particular, those who negotiated the settlements among the Debtors' creditors and with the Sackler Families, including the few remaining objecting States—all of "who[m] . . . in essence represented all of the people who are creditors in this case"—benefited from broad transparency in these cases, which facilitated the "extensive" investigation conducted by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), in parallel with the investigation by the Debtors' Special Committee, including with respect to estate claims against the Sackler Families. (*Id.* at 91:24-93:7.) Notably, the discovery in these cases "is not the type of discovery that the public would ever have access to, including in a trial." (*Id.* at 93:8-16.) Nonetheless, and critically, the Plan provides for the establishment of a comprehensive Public Document Repository of millions of documents, including the Debtors' attorney-client privileged documents—all of which will be available to the public and provide information that would not otherwise be available. (*Id.* at 152:1-25 (noting that the "record" provided by the Public Document Repository is "extremely important" and "perhaps the most important [feature of the settlement] . . . even more important than the billions of dollars being paid by the Sackler family members" because it will help "to

---

[5] Contrary to Ms. Isaacs' assertions (Mot. ¶¶ 14-15), thirty-eight States voted to accept the Plan, and ten States rejected the Plan. (*See* Final Decl. of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes & Tabulation of Ballots Case on the Fifth Am. Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. & Its Affiliated Debtors, Ex. B (Aug. 2, 2021), Dkt. No. 3372.)

guide legislatures and regulators as to how better to address a company that has a legal product that is also incredibly dangerous"); Plan § 5.12.)

8. *Fifth*, and relatedly, although OxyContin, as an FDA-approved Schedule II drug, is no doubt a "dangerous product," the Plan includes specific provisions designed "to ensure . . . the lawful production and sale of this dangerous product . . . in a way that is cautious, subject to layers of oversight and informed by the public interest at every step." (Sept. 1, 2021 Conf. Hr'g Tr. 76:7-77:5.) Indeed, since the start of these cases, "the Debtors . . . focused [on] and volunteered . . . [to abide by] an injunction pertaining to their sale legally of these products." (*Id.* at 77:5-10.) And, these measures "were a primary focus of the [Creditors' Committee]" and "all of the states and political subdivisions" and, although not required by the Bankruptcy Code, "in keeping with the broad determination of [the] 1129(a)(3) good faith requirement, the parties in interest in th[ese] case have required [them] and [the Court] encouraged them to do so." (*Id.* at 76:13-77:24.)

9. *Sixth*, under the Plan, the Debtors are giving up the <u>entirety</u> of their assets to and for the benefit of their many creditors and the American public. Although the Debtors (and the Court) do not have authority to force the Sackler Families to provide additional funds, including through the invasion of domestic or foreign trusts held for the benefit of the Sackler Families, the settlement embodied under the Plan provides substantial additional funds to distribute to the Debtors' creditors than would otherwise be available. (*Id.* at 154:2-10 (explaining that the Court would confirm the Plan although "agreeing with the Creditors['] Committee and everyone else on the other side of the table, including the Debtors[,] from the Sackler [Families], that [it] wish[ed] the [P]lan had provided for more" but that "[it] w[ould] not jeopardize what the Plan does provide for by denying the confirmation").)

6

10.    *Seventh*, and finally, under the Plan, substantial funds—$700 to $750 million—will be dedicated to compensating individual victims through the establishment of a personal injury trust with a fair and equitable mechanism for evaluating personal injury claims, including Ms. Isaacs'. (*Id.* at 72:10-17; Plan § 5.7(e).) As the Court emphasized, although no amount of money could compensate victims or families for losses suffered as a result of the opioid crisis, the personal injury trust is the result of the agreement reached as part of the intensely-negotiated mediation conducted in these cases before two of the most highly regarded mediators in the world—the Honorable Layn Phillips and Mr. Kenneth Feinberg (who administered the 9/11 fund). (Sept. 1, 2021 Conf. Hr'g Tr. 72:19-73:22, 74:16-75:5; *see also id.* at 73:17-22 (finding that negotiations in the mediation were "arms' length and in good faith" in part because "[t]he people representing the personal injury claimants in that mediation were some of the most effective personal injury lawyers . . . in the world," including because they were "aggressive").) In addition, the bulk of the Plan's remaining distributions will be dedicated to funding abatement programs that also will benefit personal injury victims. (*Id.* at 86:13-20 ("Remarkably, all of th[e] [governmental and nongovernmental] parties agreed to use the value they would receive for abatement purposes."); Plan § 5.7.)

11.    As set forth above, the Debtors have tremendous sympathy for those that have been injured by the Debtors' products, and readily agree with the Court that no amount of money can ever bring back lives lost or undo suffering. But the Debtors—like almost all of their creditors—agree that the time has come to exit these cases, get to work abating the opioid epidemic, and compensate victims in accordance with the confirmed Plan. Accordingly, and for the reasons set forth above, the Debtors respectfully request that the Court deny the Motion without prejudice to any rights Ms. Isaacs may have under the Plan with regard to her proof of

claim. The Debtors have consulted with the advisors to the Creditors' Committee, who agree that the Motion should be denied.

Dated: September 6, 2021
      New York, New York

                    */s/ James I. McClammy*
                    DAVIS POLK & WARDWELL LLP
                    450 Lexington Avenue
                    New York, New York 10017
                    Telephone: (212) 450-4000
                    Facsimile: (212) 701-5800
                    Marshall S. Huebner
                    Benjamin S. Kaminetzky
                    James I. McClammy
                    Eli J. Vonnegut

                    *Counsel to the Debtors*
                    *and Debtors in Possession*