DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
Darren S. Klein
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**DEBTORS' SUPPLEMENTAL OMNIBUS REPLY IN SUPPORT OF
MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE PLAN
AND 2021 KEY EMPLOYEE RETENTION PLAN**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

P<small>AGE</small>

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

THE AGREED MODIFICATIONS TO THE 2021 KEIP .............................................6

ARGUMENT .......................................................................................................................7

      I.      Legal Standard ..........................................................................................7

      II.     The Washington and NCSG Objections Are Without Merit ...................................8

      III.    The 2021 Performance Metrics Ensure That the 2021 KEIP Is Incentivizing ......13

      IV.    Further Delaying the 2021 KEIP Is Inappropriate .................................................19

# TABLE OF AUTHORITIES

### CASE(S)

PAGE(S)

*In re Borders Grp., Inc.*,
   453 B.R. 459 (Bankr. S.D.N.Y. 2011) .......................................................................7

*In re Dana Corp.*,
   358 B.R. 567 (Bankr. S.D.N.Y. 2006) .......................................................................8

*In re Mesa Air Grp., Inc.*,
   No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ...........................7

*In re Residential Capital, LLC*,
   478 B.R. 154 (Bankr. S.D.N.Y. 2012) .......................................................................7

*UMW 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*,
   553 B.R. 556 (E.D. Va. 2016) .................................................................................7

*In re Velo Holdings Inc.*,
   472 B.R. 201 (Bankr. S.D.N.Y. 2012) .......................................................................7

### STATUTES & RULES

Fed. R. Bankr. P. 9011(b)(3)...................................................................................... 1–2

11 U.S.C. § 503(c) ..................................................................................................7

Purdue Pharma L.P. ("**Purdue**") and its affiliate debtors (collectively, the "**Debtors**" or the "**Company**") submit this supplemental omnibus reply in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077] (the "**Motion**" or "**Mot.**")[2] as it pertains to the 2021 KEIP and in response to the objections filed by the United States Trustee (the "**U.S. Trustee**") [ECF No. 3137] (the "**UST Obj.**"), the Ad Hoc Group of Non-Consenting States (the "**NCSG**") [ECF No. 3625] (the "**NCSG Obj.**") and the State of Washington ("**Washington**") [ECF No. 3624] (the "**Washington Objection**" or "**Wash. Obj.**").  In further support of the Motion, the Debtors rely on the *Second Supplemental Declaration of Jon Lowne in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Second Suppl. Lowne Decl.**"), attached as **Exhibit B**.

## PRELIMINARY STATEMENT

1.      This Court recently approved the 2021 KERP, subject to modifications agreed to in negotiations with the AHC, MSGE and UCC and ordered by this Court.  The Debtors are pleased to report that the AHC, MSGE and UCC similarly do not object to the modified 2021 KEIP.

2.      The 2021 KEIP as to all five participants is opposed only by Washington and the U.S. Trustee, while the NCSG objects only to payments contemplated to be made to Dr. Landau.

3.      Washington's objection is the third pleading in a row in which it has made false factual statements to this Court.  Signatories to pleadings "certify[] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support."  Fed. R. Bankr.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

P. 9011(b)(3).  That standard has again not been met.  This is also the second pleading in a row by this objector that is untimely under the Case Management Order [ECF No. 498].[3]

4.      It is, for example, flatly untrue that all five of the 2021 KEIP Participants "helped to craft and have pressed for [the Plan's] implementation."  Wash. Obj. ¶ 2.  Of these five, one is Purdue's chief technical operations officer, who worked at Rhodes Technologies ("**Rhodes Tech**") and Rhodes Pharmaceuticals L.P. ("**Rhodes Pharma**")—not Purdue—until January of last year, and works in technical operations and manufacturing; one is the president of Rhodes Pharma (which operates the Debtors' generic prescription pharmaceutical business), lives and works in Rhode Island and has never worked at Purdue; and one is Purdue's CFO.  In other words, two of the five are in technical operations and have nothing to do with the Plan (beyond perhaps dealing with a few executory contract issues).  While Mr. Lowne, Purdue's CFO, provided financial facts and analysis with respect to the Plan and has reviewed various drafts, his role is not to advocate for its approval.  Dr. Landau, Purdue's CEO, testified on one occasion before a Congressional committee and supported the objectives served by the Plan, but his primary responsibility has been to position the Company to deliver on its promise of preserving the value of the estates for the benefit of all stakeholders, appropriately leaving the crafting of and advocacy for the Plan to others.  Mr. Kesselman, Purdue's general counsel, has been actively involved in creating and advocating for approval of a Plan that is profoundly in the public interest, supported by virtually all stakeholders and now confirmed by this Court.

5.      The Washington Objection also falsely represents that Mr. Kesselman "bear[s] at least some modicum of responsibility for directing the actions and setting the culture of a company

---

[3] Pursuant to the Case Management Order, the deadline to object to the Debtors' Motion was July 12, 2021.  The Debtors extended this deadline for the NCSG to allow for productive engagement and resolution if possible, and the NCSG filed a timely limited objection.  No individual state requested, and the Debtors did not grant, an extension with respect to any individual member of the NCSG.

that has caused untold destruction and immiseration−a company that, by its own admission, engaged in a decades-long series of felonies." Wash. Obj. ¶ 5. As is well known by every major party in this case, Mr. Kesselman joined Purdue in July 2018 from a distinguished career in public service and at leading American companies. He arrived after all the conduct at issue had occurred, all detailing and all promoting of opioid products by Purdue had ended and the entire opioid sales organization had been eliminated, with the Company having decreased in headcount by approximately 75% since 2017. DS at 58. Counsel for Washington should formally retract the outrageous canard that Mr. Kesselman bears "responsibility for directing the actions and setting [a] culture" of wrongdoing at the Company—conduct that took place before Mr. Kesselman arrived. This flatly and knowingly false accusation is inconsistent with the ethical standards owed to this Court and all parties.

6.      Washington makes the same allegations as to Dr. Landau, but all of the conduct that Purdue admitted to as part of its guilty plea (memorialized in Schedule A to Purdue's plea agreement) took place before Dr. Landau became Purdue's CEO on June 22, 2017. Between mid-2013 and mid-2017, Dr. Landau was not even part of the Purdue U.S. organization; in those four years, he was employed by Purdue Pharma (Canada), a separate company. DS at 55.

7.      Under Dr. Landau's stewardship as CEO, Purdue has taken a series of decisive steps, including voluntarily stopping the promotion of opioids to prescribers through sales representatives and via other channels (such as in medical journals); eliminating the Company's opioid sales force; discontinuing the last of the Company's speaker programs relating to opioids; ceasing the Company's sponsorship of all outside pain groups; and taking meaningful action to address the opioid crisis through research and development as well as through multiple partnerships and other initiatives organized under the Company's office of Corporate Social

Responsibility.  DS at 55; Dr. Craig Landau, *Testimony Before the U.S. House of Representatives Comm. on Oversight & Reform* (Dec. 17, 2020) at 3; *Declaration of Jon Lowne* [ECF No. 3440] (the "**Lowne Confirmation Decl.**") ¶ 22.[4]

8.    The NCSG objects to the 2021 KEIP only with respect to Dr. Landau, alleging that he improperly failed to discipline wrongdoers or demand investigations.  The NCSG argues that Dr. Landau should not be provided with indisputably market compensation for 2021 because he did not personally involve himself in investigations of employee misconduct.  It is a matter of public record that the Company timely retained prominent outside law firms with deep and broad relevant expertise, which worked closely with the Company's general counsel and, when applicable, the Special Committee in connection with investigations of the Company by the U.S. Department of Justice as well as the attorneys general of many states.  *See* Debtors' Reply in Supp. of 2021 KERP [ECF No. 3334] ¶ 5; DS at 67–69 (citing retention applications detailing counsels' past work).  The notion that, in such a situation, Dr. Landau should be faulted for not inserting himself into these matters is sorely misguided.  Dr. Landau was named as a defendant in two state Attorney General actions (brought by Massachusetts and Colorado, both of which ultimately supported the Plan) and several other civil lawsuits.  Although Dr. Landau has always vigorously disputed the allegations therein, any involvement in such matters surely would have prompted objections.  The Board, the Special Committee and Dr. Landau clearly took the more prudent course.

---

[4] Dr. Landau joined Purdue as an associate medical director within the Company's research and development ("**R&D**") group and thereafter held roles of increasing responsibility within the R&D organization. DS at 55.  He was appointed as CEO of Purdue after four years at Purdue Pharma (Canada), a separate entity. *Id*.

   Dr. Landau's written testimony before Congress is available at https://docs.house.gov/meetings/GO/GO00/20201217/111120/HHRG-116-GO00-Wstate-LandauC-20201217.pdf (last visited Sept. 9, 2021).

9.      Finally, the U.S. Trustee has lodged yet another full-spectrum challenge to the performance metrics—disregarding this Court's rulings on highly similar metrics for both 2019 and 2020 and claiming that the 2021 Performance Metrics are insufficiently incentivizing.  They are not.  To the contrary, unrebutted testimony demonstrates that the metrics push the Debtors to achieve demanding, critically important corporate goals.  Moreover, the Debtors developed and approved the 2021 Performance Metrics early in 2021 using the same process that has long yielded incentivizing performance targets at Purdue—a process that this Court found, in both 2019 and 2020, to produce incentivizing metrics.  No different result is warranted now.

10.     The U.S. Trustee also claims that the Debtors' post-confirmation Board should approve the 2021 KEIP.  The Court recently rejected this very argument with respect to the 2021 KERP and should do so again here.  The Debtors delayed the 2021 KEIP to win broader creditor support for it.  Further delay would be inappropriate, and properly incentivizing these executives to reach critical corporate targets is essential to maximizing the value of the Debtors' estates.  Moreover, it is the current Board (and not some future board, which would be unable to weigh in for a few months at the earliest, and likely longer) that should determine compensation for 2021 performance—a period they were and are charged with overseeing.

11.     The 2021 KEIP is amply justified by the relevant facts and circumstances.  Just as this Court recently observed with respect to the 2021 KERP, without the 2021 KEIP "these employees would not be compensated at market."  Hr'g Tr., 51:4–5, July 29, 2021.  Providing appropriate, market compensation is mission critical to maximizing the value of the Debtors' estates—value that, upon emergence, will inure to the benefit of the American people.

5

## THE AGREED MODIFICATIONS TO THE 2021 KEIP

12.    The Debtors have agreed with the AHC, MSGE and UCC to the following modifications[5] to the terms of the proposed 2021 KEIP:[6]

- The 2021 KEIP Annual Award will be paid on June 30, 2022, subject to achievement of the 2021 Performance Metrics at least at threshold level.  The 2021 KEIP Annual Award will not be subject to acceleration upon emergence.

- The 2021 KEIP Long-Term Award will be paid on June 30, 2022, subject to achievement of the 2021 Performance Metrics at least at threshold level.  The 2021 KEIP Long-Term Award will not be subject to acceleration at emergence, and amounts paid thereunder will be subject to clawback through March 15, 2024 if a recipient resigns or is terminated for any reason other than by the Debtors without cause.

- The Debtors will not seek to assume the employment contracts of any 2021 KEIP Participants.

- The Debtors will consult with the Ad Hoc Committee, MSGE Group and UCC with respect to measuring corporate performance against the 2021 Performance Metrics, which shall not be completed prior to February 28, 2022, and developing performance metrics for calendar year 2022, which shall not be completed prior to January 31, 2022, in either case, unless the Effective Date occurs prior thereto.

13.    A revised proposed order (the "**Revised Proposed 2021 KEIP Order**") is attached as **Exhibit A** and includes the provision recently implemented with respect to the 2021 KERP: that payments may not be made to any 2021 KEIP Participant that the Company believes, based on reasonable inquiry (including inquiry of its attorneys and advisors), to have violated the standard set forth in paragraph 8 of the Revised Proposed 2021 KEIP Order.

---

[5] The terms of the proposed 2021 KEIP are otherwise as set forth in the Motion.

[6] For administrative convenience, all payments with respect to the 2021 KEIP may be made on the regular payroll dates falling immediately prior to or immediately after the dates described herein.

## ARGUMENT

### I.    Legal Standard

14.    Section 503(c)(1), which generally prohibits a transfer to an insider "for the purpose of inducing such person to remain with the debtor's business," is inapplicable.  An incentive-based plan that compensates insiders for achieving financial metrics or other targets is permitted if it "is primarily incentivizing and not primarily retentive."  *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).

15.    Courts have differentiated primarily incentivizing compensation plans from those that are primarily retentive by looking to whether "the goals [are] almost certain to be met regardless of the [relevant] participants' actions."  *United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*, 553 B.R. 556, 563 (E.D. Va. 2016); *see also Residential Capital*, 478 B.R. at 171 ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1).").  Under this metric, courts have rejected compensation plans that are conditioned solely on the occurrence of a transaction or emergence.  *See, e.g.*, *Residential Capital*, 478 B.R. at 171–72.  By contrast, courts routinely approve compensation plans that are "tied . . . to the achievement of particular financial milestones," *In re Borders Grp., Inc.*, 453 B.R. 459, 471–72 (Bankr. S.D.N.Y. 2011), and that are consistent with past practice, *see, e.g.*, *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010).

16.    Incentive plans for insiders are subject to the "facts and circumstances test" of section 503(c)(3).  As the court in *In re Velo Holdings Inc*. observed, "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."  472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012).  In the Motion, the Debtors set

forth in extensive detail how the 2021 KEIP satisfies the *Dana II* Factors used to evaluate the reasonableness of compensation plans. *See* Mot. ¶¶ 72–86; *see also In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006).

## II.    The Washington and NCSG Objections Are Without Merit

17.    This Court has repeatedly recognized that the Debtors' longstanding compensation plans, as continued in 2019 with the authorization of this Court (subject to certain modifications) and then essentially renewed by first the 2020 KEIP and 2020 KERP and now the 2021 KEIP and 2021 KERP, are necessary to compensate employees at market levels.    As this Court has recognized, these compensation plans are not rightly thought of as bonuses "[b]ecause [they are] essentially salary with some modifications or risks on either side, depending on how you perform and the company performs." Hr'g Tr., 113:17–18, Dec. 4, 2019; *see also* Hr'g Tr., 50:22–23, July 29, 2021 ("I do not view this program, therefore, as one would, as a lay person, typically view a bonus program.").    In fact, the 2021 KEIP Participants, other than the General Counsel,[7] would all receive less than 60% of median market compensation absent the 2021 KEIP, with the CEO receiving only 45% of median market compensation, as set forth in the table below (as included by Ms. Gartrell in her declaration in support of the Motion).[8]

---

[7] The Company determined that it required significantly greater expertise and experience in a general counsel than would an ordinary peer pharmaceutical company, and this Court has repeatedly authorized compensation corresponding to these qualifications.    In so doing, the Court has stated that "[w]ith regard to the Debtor's general counsel, . . . [t]hat person's job description it appears clear to me is not comparable to other general counsel in this industry, requires more expertise and more work, frankly, and I think the parties in interest have recognized that as well in not objecting to the general counsel's proposed compensation package as set forth in the agreed revisions here which is over market for general counsels generally in this industry, but reflects the added duties and expertise that a general counsel has."  Hr'g Tr., 24:18–25:5, Oct. 28, 2020.

[8] *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* [ECF No. 3077] ¶ 26.

| Title | Variance to Market Target TDC: Base Salary Only | | |
|---|---|---|---|
| | P25 | P50 | P75 |
| President & CEO | -38% | -55% | -67% |
| Chief Financial Officer | -28% | -44% | -57% |
| General Counsel | 94% | 42% | 3% |
| Chief Technical Operations Officer | -22% | -42% | -57% |
| President, Rhodes Pharmaceuticals | -20% | -42% | -67% |
| **Average (excl. General Counsel)** | **-27%** | **-46%** | **-62%** |

18.    This Court has recognized that it is appropriate for the Company, subject to its current stringent safeguards, to continue to operate its business, which requires providing market-based pay to its employees, and that it is not an appropriate exercise of business judgment to attempt to pay employees less for work they are performing now because of wrongdoing by others in the past. Hr'g Tr., 141:8–24, Sept. 30, 2020 ("The Debtors have substantial checks and balances in place to ensure that that continues.  In addition, at my request at the beginning of the case, the Debtors have negotiated with the key parties of interest, and agreed upon the appointment of Mr. Vilsack as their monitor, over and above the regulations that they are under.  I do not believe it is a [proper] exercise of business judgment to pay employees of these companies below market compensation, because of past events, pre-petition events.").  This Court has previously recognized that "people don't work, generally speaking, for less than market."  Hr'g Tr., 110:18–20, Jan. 24, 2020.  When people are not compensated properly, value is destroyed.  *See* Hr'g Tr., 113:5–7, Dec. 4, 2019 (explaining that the Company should have "a proper compensation structure," because "otherwise what they own is going to deteriorate").

19.    The Court also previously addressed Dr. Landau, stating that "it would be wholly inappropriate to . . . send a Debtor into material risk of not having a chief executive officer merely because a complaint has been filed against him."  Hr'g Tr., 115:9–12, Jan. 24, 2020; *see also id.* at 113:17–24 ("I, frankly, did not want there to be a question mark hanging over Dr. Landau's

head as to whether he was being given a sweetheart deal or an overly-generous compensation package. I don't believe that question mark exists today. On the other hand, I didn't want there to be an unresolved question that he was receiving too much. And again, the record reflects that that's not the case.").

20.    Washington first reasons that these employees should be compensated at dramatically below-market rates for 2021 because of market-based compensation previously paid to them. *See* Wash. Obj. ¶ 2 (arguing that "the Insiders have been paid enough"). The fact that an employee has received market compensation in the past does not justify requiring them to work at approximately half-off at present. The Washington Objection also suggests that these employees' compensation should be dramatically cut "[i]f Purdue is no longer to be a private, for-profit enterprise," which oddly suggests that non-profit enterprises should not appropriately compensate their employees. *Id.* ¶ 7. The Washington Objection inappositely cites compensation paid to the Board during the two years of these cases, as if compensating an exceptionally well-qualified board of directors is somehow a reason not to pay management market compensation. *See id.* ¶ 4. In addition, characterizing payments to members of the Board as continuing "the Debtors' practice of rewarding its insiders" is highly misleading when four of the seven members constitute the highly qualified and independent Special Committee who joined the Company under unprecedented circumstances and have guided the Debtors through one of the most complex restructurings in history. The Disclosure Statement at pages 136 through 153 lays out their extraordinary efforts. Moreover, all seven directors bring specific experience that has helped steward the Debtors through these challenging times. The Washington Objection also absurdly suggests that helping craft a virtually completely consensual plan of reorganization—a core

function and vital goal—justifies dramatically slashing the current compensation of the employees who assisted with that important task. *See* Wash. Obj. ¶ 2.

21.    As noted above, the Washington Objection misrepresents the roles of most of the 2021 KEIP Participants. Only one of the five 2021 KEIP Participants was actively involved in both crafting the Plan and advocating for its approval.

22.    Vincent Mancinelli has been president of Rhodes Pharma since November 2010. DS at 57–58. He lives and works in Rhode Island and has never held a role at Purdue. Second Suppl. Lowne Decl. ¶ 6.    Rhodes Pharma operates the Debtors' generic prescription pharmaceutical business and does not—nor has it ever—promoted or marketed opioid drugs to prescribers or patients. DS at 51. Until May 2019, Rhodes Pharma and Rhodes Tech were separately managed from Purdue, with different boards of directors. *Id.*

23.    David Lundie has served as Purdue's chief technical operations officer since January 2020. *Id.* at 57. He lives in North Carolina and works primarily in North Carolina and Rhode Island. Second Suppl. Lowne Decl. ¶ 7. In his current role, Mr. Lundie is responsible for all U.S. manufacturing and supply chain activities, including oversight of the Company's operations at its Wilson, North Carolina facility. DS at 57. Mr. Lundie previously served as chief operating officer of Rhodes Tech and Rhodes Pharma from December 2018 to January 2020. *Id.* Rhodes Tech manufactured active pharmaceutical ingredients and operated the Debtors' manufacturing facility in Coventry, Rhode Island.[9] *See id.* at 51. Mr. Mancinelli and Mr. Lundie have not attended any meetings of the Board regarding the Plan or any meetings of the Special Committee at all. Second Suppl. Lowne Decl. ¶ 5.

---

[9] On October 1, 2020, the Court entered an order approving the sale of Rhodes Tech's assets to Noramco Coventry LLC and the Debtors' entry into a supply agreement with Noramco LLC. [ECF No. 1765]

24.     Jon Lowne, Purdue's chief financial officer, has spent the entirety of his tenure at the Company in its finance department, working his way up from senior internal auditor to controller to acting CFO, before assuming the role of CFO on a permanent basis in March 2018. DS at 56.  He has been a critical witness at multiple hearings and repeatedly found credible by this Court.  Although he provided financial facts and analysis with respect to the Plan and has reviewed various drafts and revised versions of the Plan, his role was not to "press for its implementation."

25.     Dr. Landau was appointed as CEO of Purdue in June 2017.  All of the conduct that Purdue admitted to as part of its guilty plea (memorialized in Schedule A to Purdue's plea agreement) took place before Dr. Landau became Purdue's CEO on June 22, 2017.  Following his appointment as CEO of Purdue, Dr. Landau eliminated, after procuring Board approval, Purdue's entire opioid sales force.  DS at 55.  He also voluntarily stopped, again after procuring Board approval, Purdue's promotion of opioids to prescribers through sales representatives and via other channels, such as in medical journals.  *Id.*; Lowne Confirmation Decl. ¶ 22.

26.     Mr. Kesselman joined Purdue in <u>July 2018</u> and was retained precisely because of his extraordinary qualifications, including years of public service, that the Company determined were necessary.  *See* Lowne Decl. ¶ 33; DS at 56–57.  The idea that an eminently qualified individual should not join a company where misconduct has occurred in the past and a reorganization is imminent—and is being attacked for efforts to appropriately address the massive challenges inherent in taking on such a task—is antithetical to the very purpose and ethos underlying chapter 11.

27.     In short, out of these five employees, only the General Counsel, Mr. Kesselman, has had any significant involvement in both crafting the Plan and advocating for its approval.  The CEO had little involvement in crafting the Plan or pressing any party for its implementation, while

the remaining 2021 KEIP Participants (other than Mr. Lowne, in an appropriate finance role) have not been materially involved (and not involved at all in pressing for the Plan's implementation). *See* Second Suppl. Lowne Decl. ¶¶ 4–9.

28.     The NCSG criticizes Dr. Landau (and posits that he should work for only 45% of market compensation) for not inserting himself into investigations of misconduct.  However, Dr. Landau was and is, of course, fully aware of the existence of ongoing investigations by multiple governmental agencies (including the DOJ and the attorneys general of many states).  These investigations and the unprecedented chapter 11 discovery process were all handled with the assistance of eminently qualified outside counsel, working with the Company's general counsel and the Board.  *See Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [ECF No. 1828] ¶ 44.  In such a situation, particularly where the CEO is himself a named defendant in certain litigation, a decision not to insert himself into these matters was entirely reasonable and proper.  Certainly, it does not provide the basis for paying him 45% of median market compensation, especially during a difficult transitional period when his services are and have been particularly crucial to holding the Company together and managing a value-maximizing exit from chapter 11.

29.     Dr. Landau has served, and continues to serve, a critical function at the Company. As the Court noted previously in this case, "[y]ou can't leave a company without a chief executive officer.  And the universe of replacements, particularly in a situation like this in a complicated, difficult bankruptcy that raises unique issues that requires more than a fair amount of not only general business expertise, but knowledge about the industry and the like, you need someone to

run the company.  And people don't work, generally speaking, for less than market."  Hr'g Tr.,
110:11–18, Jan. 24, 2020.

## III.    **The 2021 Performance Metrics Ensure That the 2021 KEIP Is Incentivizing**

30.    The U.S. Trustee takes issue—for the third time—with the Debtors' longstanding
process for setting corporate performance metrics.  It asserts—with no evidence—that the 2021
KEIP is not an incentive plan because the 2021 Performance Metrics do not "present difficult
targets that will incentivize future performance."  UST Obj. at 12.  The Debtors, however, set the
2021 Performance Metrics using the same rigorous process that generated the performance metrics
with respect to their AIP payments for the 2019 performance year, which the Court approved in
2019, and the 2020 Performance Metrics with respect to the 2020 KEIP, which the Court approved
in 2020.[10]  Indeed, the U.S. Trustee has recycled verbatim the arguments it raised last year,
disregarding the Court's rejection of them.  For example, in 2020, the U.S. Trustee argued that:

> No information, including historical financial information, regarding these
> metrics is provided to allow creditors, the Court and the US Trustee to
> compare the current targets with past results. Without such information it is
> impossible to determine if these are truly difficult targets or rather "lay-ups"
> rewarding participants for merely staying with the Debtor.

This year, the U.S. Trustee argues that:

> No information, including historical financial information, regarding these
> metrics is provided to allow creditors, the Court and the United States
> Trustee to compare the current targets with past results. Without such
> information it is impossible to determine if these are truly difficult targets
> or rather "lay-ups" rewarding participants for merely staying with the
> Debtors.

---

[10] *See Final Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other
Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations,
(II) Employees and Retirees to Proceed With Outstanding Workers' Compensation Claims; and (III) Financial
Institutions to Honor and Process Related Checks and Transfers* [ECF No. 309]; Supplemental Final Wages Order;
*Second Supplemental Final Order Authorizing (I) Debtors to (A) Pay Certain Prepetition Wages, Salaries, Employee
Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative
Obligations, (II) Employees and Retirees to Proceed With Outstanding Workers' Compensation Claims and
(III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 783]; 2020 KEIP Order;
Supplemental 2020 KEIP Order.

*Compare Objection of the United States Trustee to Motion of Debtors for Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF No. 1708] (the "**2020 UST Obj.**") at 13−14, *with* UST Obj. at 13.  This is now the third time the U.S. Trustee has lodged an unchanging, unsupported challenge to the Debtors' performance metrics.  The Court has been unpersuaded thus far and should remain so now.

31.    As explained in the Motion, Lowne Declaration and Second Supplemental Lowne Declaration, the metrics were set early in the applicable performance period in a manner consistent with the Debtors' longstanding practice.  Second Suppl. Lowne Decl. ¶ 10.  The 2021 Performance Metrics also include the same high-level categories (value creation, innovation and efficiency, and people and culture) as the 2020 Performance Metrics and the performance metrics with respect to the AIP for the 2019 performance period, with similar weighting and with performance goals of a similar nature within each category.  Lowne Decl. ¶ 27.

32.    In 2019, this Court examined whether the Debtors' practices were sufficiently rigorous.  It elicited testimony that the performance metrics are set based on the Board-approved budget and heard how the Company ensures that the metrics "truly are stretch objectives" before approving the applicable payments.  *See, e.g.*, Hr'g Tr., 72:3−75:3, Dec. 4, 2019 ("THE COURT: So are there times when you ask them for more results than they proposed?  [MR. LOWNE]: Significantly more.").  In 2020, this Court approved the 2020 Performance Metrics that were set using the same process, as described in unrebutted testimony from Mr. Lowne and Ms. Gartrell.  Both declarants have testified again this year in support of the 2021 KEIP.

33.    The Debtors have provided similar evidence demonstrating that the 2021 Performance Metrics incentivize the participants to meet challenging and important corporate objectives.  As Mr. Lowne testified, the 2021 Performance Metrics "are ambitious, having

threshold targets that are difficult to achieve both individually and when considered in combination." Lowne Decl. ¶ 27. Achievement of the 2021 Performance Metrics "will require the 2021 KEIP Participants' diligent and committed efforts." *Id.* At the time of their approval by the Board, the 2021 Performance Metrics "were challenging, required extensive achievement and presented a meaningful risk of not being met" at even the "threshold level required for payment." *Id.* They remain similarly demanding today: Mr. Lowne explained that, "while certain of the target metrics have been met, others remain in progress, and still others the Company will be unable to satisfy." *Id.* Ms. Gartrell testified to the same effect, noting that the 2021 KEIP is "purely incentive-based." Willis Towers Decl. ¶ 21. The 2021 Performance Metrics, Ms. Gartrell explained, ensure that the participants are "properly incentivized to work toward a value-maximizing restructuring of the Debtors' estates during this critical stage of these Chapter 11 Cases." *Id.* This testimony is uncontroverted.

34.     Unsurprisingly, it has already become clear that certain 2021 Performance Metrics will not or are highly unlikely to be achieved despite diligent efforts. Second Suppl. Lowne Decl. ¶ 11. The tables in paragraph 11 of the Second Supplemental Lowne Declaration identify performance to date measured against the value creation and innovation and efficiency performance metrics and describe how the status of individual metrics covers the full range from ahead of schedule or on track to behind schedule or certain not to be achieved. *Id.*

35.     The Company anticipates that it will satisfy both of its people and culture performance metrics: (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a diversity, equity and inclusion roadmap. *Id.* ¶ 12. These metrics capture important priorities as the Company approaches the completion of its restructuring. *Id.* Based on performance year-to-date, the Debtors expect to achieve their

corporate objectives at a modestly below-target level in the aggregate, *id.*, demonstrating yet again that these metrics do, in fact, incentivize effectively and cannot be fairly characterized as mere "lay-ups."

36.    The U.S. Trustee's objection also observes that "three of the four" innovation and efficiency metrics "are now lower" than in 2020.  UST Obj. at 13.  This ignores a basic corporate reality: budgets and projections change every year in response to changing business conditions, and reflect strategic priorities for the year ahead.  Second Suppl. Lowne Decl. ¶ 13.  Changes in budgets and forecasts from one year to another are considered when setting metrics, so the level of each typically changes yearly.  *Id.*  The fact that two (not three) financial performance metrics, Consolidated total business Operating Profit and Adhansia XR Net Sales, were set at nominally lower targets than last year's targets reflects changes in the Company's circumstances, not an attempt to make metrics less difficult to achieve.  *Id.*  By contrast, the financial performance metric of Avrio Net Sales was set at a <u>higher</u> target based on an anticipated increase in sales over the prior year.  *Id.*  Moreover, as explained in the Second Supplemental Lowne Declaration, the Company changed its Rhodes (RALP) metric from a profit target to a cash target with a goal of boosting cost-saving and working capital improvement initiatives at the Rhodes (RALP) business.  *Id.*

37.    The U.S. Trustee also asserts that the Debtors omitted two of last year's innovation and efficiency metrics from the 2021 Performance Metrics.  This change, however, is better described as the consolidation of three profit objectives for individual businesses into a single metric.  *Id.* ¶ 15.  Specifically, the Debtors combined the Purdue Branded Business Operating Profit, Adhansia XR Operating Loss and Avrio Operating Profit metrics from 2020 into a single Consolidated total business Operating Profit metric for 2021.  *Id.*  The Debtors determined that a more focused, simplified list of performance metrics that continued to emphasize Avrio and

Adhansia XR sales growth would better incentivize innovation and efficiency and would be more consistent with the number of performance metrics at the Debtors' peer companies. *Id.* The Debtors' ongoing efforts to improve and refine their performance metrics actually provide further support for the fact that the 2021 Performance Metrics are incentivizing.

38.    Finally, the U.S. Trustee's objection to the people and culture portion of the 2021 Performance Metrics returns—verbatim—to an argument this Court has already rejected. Last year, the U.S. Trustee said that the people and culture metric "is at best vague and it is difficult to objectively determine if it has been achieved." 2020 UST Obj. at 14. It does so again verbatim. UST Obj. at 14. The Debtors disagree. The Motion and the Second Supplemental Lowne Declaration explain that the people and culture metric includes the critical activities of (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a DE&I roadmap, both of which are important strategic priorities for the Company. Second Suppl. Lowne Decl. ¶ 12.

39.    The 2021 Performance Metrics are very similar to the 2020 Performance Metrics approved last year, both in their composition and in the process by which they were established, with appropriate modifications reflecting changes in the Debtors' circumstances and efforts to improve the metrics. As always, the 2021 KEIP Participants remain unable to set their own compensation, a task completed instead by the Debtors' Compensation Committee and Board, as applicable. Hr'g Tr., 40:18–41:18, Nov. 17, 2020 (testimony from Jon Lowne explaining that "the compensation committee ultimately determines the payout percentages"); Hr'g Tr., 66:14–18, Dec. 4, 2019 (testimony from Jon Lowne explaining that "ultimately the compensation committee and then the board approves [Purdue's CEO's] compensation"); Second Suppl. Lowne Decl. ¶ 14;

Mot. ¶ 47 n.12. The incentivizing nature of the 2021 Performance Metrics is supported by detailed, unrebutted testimony.

**IV.    Further Delaying the 2021 KEIP Is Inappropriate**

40.    This Court recently rejected the U.S. Trustee's contention that consideration of the 2021 Compensation Plans should be delayed with respect to the 2021 KERP. The same logic applies to the 2021 KEIP. Less than two months ago, the Court determined that the 2021 KERP should not be delayed on the grounds that the confirmation hearing was scheduled to commence shortly because the 2021 KERP governed pay for 2021 work and a new Board was not likely to be installed for a significant period post-confirmation. *See* Hr'g Tr., 57:20–24, July 29, 2021. Moreover, the post-emergence Board will "not have the experience with regard to this company for 2021, when they were not serving as a Board" and thus will be ill-suited to review compensation for work performed in 2021. *Id.* at 57:22–24. The same is true of the 2021 KEIP. The Debtors consented to delaying consideration of the 2021 KEIP until near the anticipated close of the confirmation hearing in order to secure broader creditor support for the 2021 Compensation Plans. No further delay is prudent or warranted.

41.    Nor did the Court give any credence to the U.S. Trustee's complaint that the Debtors filed the Motion "well over two months earlier than they have done in the past." UST Obj. at 16. Here, the Court found that it was "understandable . . . that the hearing on this matter is coming on earlier than it did with regard to the [Debtors' 2019 and 2020 compensation] programs." Hr'g Tr., 56:19–21, July 29, 2021. The Debtors have in fact sought approval of the 2021 Compensation Plans <u>later</u> than is customary; the Company typically finalizes and announces its annual compensation programs in the first quarter of each year. First Suppl. Lowne Decl. ¶ 5. The Court has acknowledged that the Debtors appropriately delayed seeking approval of their 2019

and 2020 compensation programs and found that such a delay was not warranted this year. *See* Hr'g Tr., 56:24–57:2, July 29, 2021 ("So, I don't view the timing here [as] somehow trying to rush a determination prematurely simply based on the economics and the timing of the program and the past history.").

42.     The Court's recent rulings on these points with respect to the 2021 KERP apply here as well. The Debtors made a reasonable business judgment that they needed to seek approval of the 2021 KEIP now, and not later, to maximize the value of the Debtors' business. And the timing is much later in the year than is their (or any company's) standard practice. Waiting for months until the installation of a post-emergence Board is illogical, including because that Board will be in no position to evaluate the appropriateness of compensation for 2021 performance.

*[Remainder of Page Intentionally Left Blank]*

Dated:      September 9, 2021
            New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Marshall S. Huebner*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Darren S. Klein
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors
and Debtors in Possession*