Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9          Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                   United States Bankruptcy Court

12                   Tele/Video Proceedings

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   September 13, 2021

17                   10:13 AM

18

19

20

21    B E F O R E :

22    HON ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: ART

Page 2

1   HEARING re Notice of Agenda / Agenda for September 13, 2021

2   Hearing (ECF #3750)

3

4   HEARING re Motion to Shorten Time / The Ad Hoc Group of

5   Individual Victims' Ex Parte Motion for Entry of an Order

6   Shortening Notice with Respect to the Motion of the Ad Hoc

7   Group of Individual Victims for Entry of a HIPAA-Qualified

8   Protective Order (related document(s)3486) filed by J.

9   Christopher Shore on behalf of Ad Hoc Group of Individual

10  Victims of Pharma L.P. (ECF #3487)

11

12  HEARING re Daniel L. Carpenter Late Claim Motion / Motion to

13  File Proof of Claim After Claims Bar Date (ECF #3526)

14

15  HEARING re Application for Final Professional Compensation

16  for The Examiner, Other Professional, period: 6/24/2021 to

17  7/19/2021, fee:$197,423.16, expenses: $2,576.84 (ECF #3753)

18

19  HEARING re Motion to Authorize I Debtors Motion Pursuant to

20  11 U.S.C. 105(a) and 363(b) for  Entry of an Order (I)

21  Authorizing the Debtors to Fund Establishment of the

22  Creditor  Trusts, the Master Disbursement Trust and Topco,

23  (II) Directing Prime Clerk LLC to  Release Certain Protected

24  Information, and (III) Granting Other Related Relief

25  (ECF #3484)

Page 3

1    HEARING re Objection to Motion for Entry of an Order

2    Shortening Notice With Respect to the  Debtors Motion

3    Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an

4    Order (I)  Authorizing the Debtors to Fund Establishment of

5    the Creditor Trusts, the Master 1  Disbursement Trust, and

6    Topco, (II) Directing Prime Clerk LLC to Release Certain

7    Protected Information, and (III) Granting Other Related

8    Relief (related document(s)3485) filed by Brian Edmunds on

9    behalf of State Of Maryland. (ECF #3493)

10

11   HEARING re Objection to Motion /Objection of the United

12   States Trustee to Debtors Ex Parte  Motion for Entry of an

13   Order Shortening Notice with Respect to the Debtors Motion

14   Pursuant to 11 U.S.C. 105(a) and 363(b) for Entry of an

15   Order (I) Authorizing the  Debtors to Fund Establishment of

16   the Creditor Trusts, the Master Disbursement Trust

17   and TopCo, (II) Directing Prime Clerk LLC to Release Certain

18   Protected Information, and (III) Granting Other Related

19   Relief (related document(s)3484, 3485)(ECF #3555)

20

21   HEARING re Objection Joinder of Canadian Municipality

22   Creditors and Canadian First Nations to  the Objecting

23   States and Office of the U.S. Trustee Objection to Debtors'

24   Motion  Pursuant to 11 U.S.C. Sections 105(A) and 363(B) for

25   Entry of An Order (I)  Authorizing The Debtors to Fund

Page 4

1   Establishment of the Creditor Trusts, The Master

2   Disbursement Trust and Topco, (II) Directing Prime Clerk LLC

3   to Release Certain Protected Information (related

4   document(s)3555, 3493) filed by Allen J. Underwood on

5   behalf of Certain Canadian Municipality Creditors and

6   Canadian First Nation Creditors.  (ECF #2463)

7

8   HEARING re Reply to Motion/ Debtors Reply to the Objections

9   of the Objecting States, the United States Trustee, and the

10  Canadian Municipality Creditors and Canadian First Nations

11  Creditors to the Debtors Motion Pursuant to 11 U.S.C. §§

12  105(A) and 363(B) for Entry of an Order (I) Authorizing the

13  Debtors to Fund Establishment of the Creditor Trusts,

14  the Master Disbursement Trust and Topco, (II) Directing

15  Prime Clerk LLC to Release Certain Protected Information,

16  and (III) Granting Other Related Relief (related

17  document(s)3484) filed by Eli J. Vonnegut on behalf of

18  Purdue Pharma L.P. (ECF #3743)

19

20  HEARING re Debtors' KEIP/KERP Motion, Solely Respect to the

21  2021 KEIP - Motion of Debtors for Entry of an Order

22  Authorizing Implementation of 2021 Key Employee Incentive

23  Plan and 2021 Key Employee Retention Plan filed by Eli J.

24  Vonnegut on behalf of Purdue Pharma L.P. (ECF #3077)

25

Page 5

1    HEARING re Objection to Motion of Debtors for Entry of an

2    Order Authorizing Implementation of 2021 Key Employee

3    Incentive Plan and 2021 Key Employee Retention Plan (related

4    document(s)3077) filed by Paul Kenan Schwartzberg on behalf

5    of United States Trustee (ECF #3137)

6

7    HEARING re Objection to Motion/ THE NON-CONSENTING STATES'

8    OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER

9    AUTHORIZING IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE

10   PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN (related

11   document(s)3077) filed by Andrew M. Troop on behalf of Ad

12   Hoc Group of Non-Consenting States.(ECF #3320)

13

14   HEARING re Objection to Motion of Debtors for Entry of an

15   Order Authorizing Implementation of 2021 Key Employee

16   Incentive Plan filed by Matthew J. Gold on behalf of State

17   of Washington. (ECF #3624)

18

19   HEARING re Objection to Motion/ The Non-Consenting States'

20   Limited Objection to Motion of Debtors for Entry of an Order

21   Authorizing Implementation of 2021 Key Employee Incentive

22   Plan (related document(s)3077) filed by Andrew M. Troop on

23   behalf of Ad Hoc Group of Non-Consenting States. (ECF #5625)

24   Reply to Motion / Debtors' Omnibus Reply in Support of

25   Motion of Debtors for Entry of an order Authorizing

1   Implementation of 2021 Key Employee Incentive Plan arid 2021

2   Key Employee Retention Plan (related document(s)3077) filed

3   by Eli J. Vonnegut on behalf of Purdue Pharma L.P.

4   (ECF #3334)

5

6   HEARING re Reply to Motion / Debtors Supplemental Omnibus

7   Reply in Support of Motion of Debtors for Entry of an Order

8   Authorizing Implementation of 2021 Key Employee Incentive

9   Plan and 2021 Key Employee Retention Plan (related

10  document(s)3077) filed by Marshall Scott Huebner on behalf

11  of Purdue Pharma L.P. (ECF #3744)

12  Ellen Isaacs's Request for Immediate Injunction and Due

13  Process. Request for Immediate Injunction and Hearing for

14  Due Process, Production for Evidentiary Documents & Other

15  Relief (ECF #3582)

16

17  Objection to Motion/ Debtors Objection to Ellen Isaacs

18  Emergency Request for Immediate Injunction and Hearing for

19  Due Process, Production for Evidentiary Documents & Other

20  Relief (related document(s)3582) filed by James I. McClammy

21  on behalf of Purdue Pharma L.P. (ECF #3734)

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 7

1    A P P E A R A N C E S :

2

3    DAVIS POLK WARDWELL LLP

4         Attorney for Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

9         KATHRYN BENEDICT (TELEPHONICALLY)

10        ELI VONNEGUT (TELEPHONICALLY)

11

12   WHITE & CASE LLP

13        Attorneys Ad Hoc Group of Individual Victims

14        1221 Avenue of the Americas

15        New York, NY 10020

16

17   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

18

19   QUIRE PATTON BOGGS

20        Attorneys for The Examiner

21        201 E. Fourth Street, Suite 1900

22        Cincinnati, OH 45202

23

24   BY:  STEPHEN LERNER (TELEPHONICALLY)

25

Page 8

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         201 Varick Street, Suite 1006

4         New York, NY 10014

5

6    BY:  BEN HIGGINS (TELEPHONICALLY)

7

8    LITE DEPALMA GREENBERG & AFANADOR, LLC

9         Attorneys for Certain Canadian Municipality Creditors

10        and Canadian First Nation Creditors

11        570 Broad Street, Suite 1201

12        Newark, New Jersey 07102

13

14   BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

15

16   KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

17        Attorney for State of Washington

18        500 Fifth Avenue

19        New York, NY 10110

20

21   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

22

23

24

25

Page 9

1    PULLMAN & COMLEY, LLC

2         Attorneys for the State of Connecticut

3         850 Main Street, P.O. Box 7006

4         Bridgeport, CT 06601

5

6    BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

7

8    PILLSBURY WINTHROP SHAW PITTMAN LLP

9         Attorneys for Ad Hoc Group of Non-Consenting States

10        31 West 52nd Street

11        New York, NY 10019

12

13   BY:  ANDREW M. TROOP (TELEPHONICALLY)

14

15   KRAMER LEVIN NAFTALIS & FRANKEL LLP

16        Attorneys for Ad Hoc Committee of Governmental and

17        Other Contingent Litigation Claimants

18        1177 Avenue of the Americas

19        New York, NY 10036

20

21   BY: KENNETH H. ECKSTEIN (TELEPHONICALLY)

22

23

24

25

1   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

2        Attorney for State of Maryland

3        200 Saint Paul Place

4        Baltimore, MD 20852

5

6   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

7

8   AKIN GUMP STRAUSS HAUER & FELD LLP

9        Attorneys for The Official Committee of Unsecured

10       Creditors

11       One Bryant Park

12       New York, NY 10036

13

14  BY:  ARIK PREIS (TELEPHONICALLY)

15

16  UNITED STATES DEPARTMENT OF JUSTICE

17       Attorneys for the U.S. Trustee

18       201 Varick Street, Suite 1006

19       New York, NY 10014

20

21  BY:  PAUL SCHWARTZBERG (TELEPHONICALLY)

22

23

24

25

1   LINDA IMES, Pro Se (TELEPHONICALLY)

2   ELLEN ISAACS, Pro Se (TELEPHONICALLY)

3

4   WITNESSES:

5   JOSEPHINE GARTRELL (TELEPHONICALLY)

6   JONATHAN LOWNE (TELEPHONICALLY)

7

8   ALSO PRESENT TELEPHONICALLY:

9   ROXANA ALEALI

10  ANDREW VINCENT ALFANO

11  ANNE ANDREWS

12  MICHAEL ATINSON

13  JASMINE BALL

14  BROOKS BARKER

15  SCOTT R. BICKFORD

16  DAVID E. BLABEY

17  SARA BRAUNER

18  GERARD CICERO

19  DYLAN CONSALA

20  MARIO D'ANGELO

21  PETER C. D'APICE

22  CLINT DOCKEN

23  BERNARD ARDAVAN ESKANDARI

24  MATHEW FARRELL

25  LAURA FEMINO

1   MATTHEW FITZSIMMONS

2   LAWRENCE FOGELMAN

3   CAROLINE GANGE

4   EDGAR C. GENTLE, III

5   JEFFREY R. GLEIT

6   GEOFFREY S. GOODMAN

7   ISLEY MARKMAN GOSTIN

8   JAMES S. GREEN, JR.

9   ADAM P. HABERKORN

10  SEAN T. HIGGINS

11  MITCHELL HURLEY

12  ELISA HYDER

13  HAROLD D. ISRAEL

14  EVAN M. JONES

15  GREGORY JOSEPH

16  ETHAN KAMINETZKY

17  SCOTT A. KANE

18  MARC KESSELMAN

19  ALEXANDER LEES

20  STEPHEN D. LERNER

21  MARA LEVENTHAL

22  DANIELLE J. LEVINE

23  JEFFREY LIESENMER

24  KEVIN MACLAY

25  BRIAN S. MASUMOTO

1    PATRICK C. MAXCY

2    GERARD MCCARTHY

3    JAMES I. MCCLAMMY

4    HUGH M. MCDONALD

5    SHANNON M. MCNULTY

6    MICHELE MEISES

7    LIVY MEZEI

8    NATHANIEL MILLER

9    DAVID MOLTON

10   MAURA KATHLEEN MONAGHAN

11   AMANDA MORALES

12   AISLING MURRAY

13   EDWARD E. NEIGER

14   NATHALIE E. NIEVES

15   SUSAN OUSTERMAN

16   STEPHEN POHL

17   RACHAEL RINGER

18   CHRISTOPHER ROBERTSON

19   JEFFREY J. ROSEN

20   PAUL S. ROTHSTEIN

21   JEREMEY RYAN

22   MICHAEL SHEPHERD

23   MARC F. SKAPOF

24   CLAUDIA Z. SPRINGER

25   ERIC STODOLA

Page 14

1    JEROME TAPLEY

2    MARC J. TOBAK

3    ALICE TSIER

4    GERARD UZZI

5    MELISSA L. VAN ECK

6    JORDAN A. WEBER

7    ALLISON H. WEISS

8    THEODORE WELLS, JR.

9    LAUREN S. ZABEL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  This is Judge Drain and

3    we are here in In re Purdue Pharma L.P. et al.  I have the

4    proposed agenda for today's hearing, and I'm happy to go

5    down that agenda in order unless someone believes they need

6    to make an introductory remark on something else.

7            MR. HUEBNER:  Your Honor, nothing from this end.

8    Good morning.  For the record, Marshall Huebner.  That was

9    exactly our vision.  We have three uncontested matters and

10   three contested matters.  And I guess we will just go down

11   the order, which is what I was going to recommend.

12           The first motion is actually going to be presented

13   by White & Case.  That is the Ad Hoc Group of Individual

14   Victims' Protective Order Motion.  So with the Court's

15   permission, I will turn the virtual podium over to them on

16   behalf of the personal injury claimants.

17           THE COURT:  Okay, that's fine.  Thank you.

18           MR. SHORE:  Good morning, Your Honor. Chris Shore

19   from White & Case.

20           THE COURT:  Good morning.

21           MR. SHORE:  Does Your Honor have any questions?

22           THE COURT:  I have reviewed the motion and I think

23   it's clear as to its purpose, which is to authorize the

24   initial work to be done on behalf of the PI trust pending

25   the effective date of the plan.  And tied into that is,

1   subject to the terms of the protective order and this order,

2   the access of certain people who will be working on behalf

3   of the trust to information that constitutes, "protected

4   health information" under 45 CFR § 160.103.

5           So this appears to me to be reasonable relief

6   under the circumstances.  One of the goals of the Ad Hoc

7   Group of Individual Victims and other personal injury

8   claimants is to expedite the treatment of their claims and

9   distributions on allowed claims from the trust to be set up

10  under the plan, and a considerable amount of work needs to

11  be done to facilitate that.  So it seems clear to me.

12          I don't know if you have anything more to say on

13  it, Mr. Shore, or are you going to rely on the motion?

14          MR. SHORE:  I will rely on the motion, and I will

15  when we get to the contested matter address the issue of the

16  importance, if it's necessary to do so, the importance of

17  getting this process started so that when we get to an

18  effective date, we could be up and running with the trust.

19          THE COURT:  Okay.  So I understand that the motion

20  is unopposed.  It was originally sought on an expedited

21  basis when it was filed, but that was on August 6th.  Now

22  it's September 13th.  There's been plenty of time for

23  regular notice of the motion.  And given that time, there

24  are no objections to it.  So unless anyone has anything

25  further to say on it, I will grant the motion.

1          MR. SHORE:  Thank you, Your Honor.

2          THE COURT:  Okay.  Hearing no one, I will grant

3    the motion.  Mr. Shore, you can email the order to chambers.

4          MR. SHORE:  We'll do that.

5          THE COURT:  Okay.

6          MR. SHORE:  Thank you, Your Honor.

7          Your Honor, the second motion is a motion by

8    Daniel Carpenter that will be handled by Ms. Kathryn

9    Benedict of Davis Polk.

10          THE COURT:  Okay.

11          MS. BENEDICT:  Good morning, Your Honor.  For the

12    record, Kathryn Benedict of Davis Polk & Wardwell LLP on

13    behalf of the debtors.  Can you hear me clearly?

14          THE COURT:  Yes, I can hear you and see you fine.

15    Thanks.

16          MS. BENEDICT:  Thank you.  Mr. Carpenter's late

17    claim motion is at Docket Number 3526.  Based on the

18    individualized assertions in Mr. Carpenter's motion, the

19    Debtors believe there is a colorable basis for granting Mr.

20    Carpenter's request.

21          In addition, the Debtors consulted with the

22    Creditors' Committee and the Ad Hoc Group of Individual

23    Victims regarding the individualized circumstances

24    surrounding Mr. Carpenter's request, and each has consented

25    to the relief requested.

Page 18

```
 1              Accordingly, the Debtor's request that the

 2    proposed order submitted at Docket Number 3733 be entered.

 3    I am happy to answer any questions Your Honor may have.

 4              THE COURT:  Okay.  I don't have any questions.  I

 5    have reviewed Mr. Carpenter's motion.  Let me just ask, does

 6    anyone have anything further to say on his motion?  Okay.

 7              I will grant the motion.  I agree with the

 8    Debtor's decision not to oppose it.  Mr. Carpenter's motion

 9    lays out clearly that having contracted COVID and having

10    been incarcerated during most of the COVID period as a

11    result without access to information regarding the bar date,

12    he has shown excusable neglect for purposes of Bankruptcy

13    Rule 9006 in the Supreme Court's Pioneer case.

14              So you can email the proposed order to chambers

15    and it will be entered shortly.

16              MS. BENEDICT:  Thank you, Your Honor.  With that,

17    I'll turn over the podium to Mr. Lerner at Squire Patton

18    Boggs.

19              THE COURT:  Okay.

20              MR. LERNER:  Good morning, Your Honor.  Stephen

21    Lerner of Squire Patton Boggs.  Can you hear me okay?

22              THE COURT:  Yes.  I can hear you and see you fine.

23    Thanks.

24              MR. LERNER:  Thank you, Your Honor.  We, as you

25    know, obviously I served as an examiner in the case for
```

Page 19

1    roughly three to four weeks.  We filed our fee application

2    consistent with the order approving my appointment, limiting

3    the fees to the $200,000 amount.  And we have received no

4    objections and response of any kind and filed a certificate

5    to that effect on Friday.  And unless the Court has specific

6    questions of me, I'll stand on the application.

7              THE COURT:  Okay.  I don't have any questions.  I

8    have reviewed the application, including the time and

9    expense records.  Obviously there was a lot of work done in

10   a short period, and the time here is reasonable.  Indeed,

11   you're taking somewhat of a discount because of the cap that

12   I placed on the fees.

13             So I will grant the application.  I believe you or

14   someone from your firm already emailed the proposed order

15   and schedules A and B to chambers.  So those will be entered

16   shortly.

17             MR. LERNER:  Thank you, Your Honor.

18             THE COURT:  And I want to thank you for

19   undertaking this task and completing it within the timeframe

20   set.

21             MR. LERNER:  Thank you, Your Honor.

22             MR. HUEBNER:  Your Honor, I think that brings us

23   to the contested part of the hearing.  The first motion I

24   will turn the podium over to Mr. Vonnegut.

25             MR. VONNEGUT:  Thank you.  Good morning, Your

1    Honor.  For the record, Eli Vonnegut of Davis Polk &

2    Wardwell on behalf of the Debtors.  Can you hear me, Your

3    Honor?

4            THE COURT:  Yes, I can hear you fine.  Thanks.

5            MR. VONNEGUT:  Thank you.  I will be brief on the

6    Trust Authorization Motion, Your Honor, because I think our

7    papers mostly speak for themselves.  But I believe some

8    basic (indiscernible) will be helpful.

9            The plan has a lot of infrastructure in it that

10   needs to be established in order to reconcile all of the

11   claims and actually get money out the door and into the

12   hands of personal injury claimants and the abatement

13   initiative (indiscernible) that the plan distributes

14   (indiscernible) funds.  There is a network of five abatement

15   trusts, the PI Trust, which has sub-comments for NAS and

16   non-NAS personal injury claims, as well as the Master

17   Disbursement Trust and Topco, which will both help direct

18   distributions to all of these different trusts.

19           I think the most salient example is the Personal

20   Injury Trust, which before it's going to be able to get

21   distributions out to claimants will need to establish a

22   claims database, a web portal, online forms, and test all of

23   that to make sure that it works so that the PI Trust will be

24   able to reconcile approximately 140,000 filed claims as it's

25   required to do under the plan.

Page 21

```
 1              So in other words, this isn't a simple case in
 2     which emergence comes, we press a button, we send a couple
 3     wires and we call it a day.  There's a lot more work
 4     necessary to actually get money into the hands of creditors.
 5              If we waited until emergency to do all of that
 6     work, the trusts would receive their distributions on the
 7     effective date of the plan, but then they would have to sit
 8     on the cash for several months while they built the
 9     infrastructure necessary to process the claims and get
10     distributions out.
11              And so knowing that we would have at least a
12     couple of months of lag time between confirmation and
13     emergency for regulatory processes and the DOJ settlement,
14     several months ago the Ad Hoc Group of Individual Victims
15     reached out to us and suggested that an advanced
16     distribution to the PI trust following confirmation would
17     help reduce that lag time and enable the trust to be much
18     more ready on the emergency date to start actually sending
19     money out.
20              That struck the Debtor as a great idea.  We
21     thought other creditor groups might likewise appreciate
22     having a bit of lead time in order to get their legal
23     vehicles ready.  So we coordinated with all of our
24     creditors, compiled proposed budgets.  That's what led to
25     the comprehensive proposal reflected in the motion.
```

1          We got a limited number of objections filed by a

2     subset of the states that are still opposing the plan,

3     Maryland, Connecticut, Oregon, and Washington, as well as

4     the U.S. Trustee.  And then a very brief joinder filed by

5     the Canadian municipal claimants.

6          All of the objectors effectively have variations

7     on the theme that they believe these payments are in one way

8     or another really an effort to equitably move appeals of the

9     confirmation of the plan before we've actually been able to

10    emerge.  So I just want to address those concerns briefly.

11         The total amount that we are seeking authority to

12    spend under this motion is $6.855 million.  None of those

13    funds are going to creditors.  It's all just being used to

14    build plan infrastructure.  None of the money is coming from

15    the Sacklers.  This is all estate cash on hand.

16         I think a helpful reference point in terms of size

17    here is that the estate has spent an average of $8.7 million

18    per month to date on creditor professional fees.  We,

19    frankly, don't really view these expenditures as any

20    different, and we think it would be ridiculous for us to

21    argue that these payments would somehow moot appeals of

22    confirmation of a plan and a settlement before the plan and

23    the settlement before the plan and the settlement are

24    consummated.

25         We didn't hear from the objectors before they

Page 23

1    filed their pleadings.  But as soon as we saw them, we

2    reached out to make very clear to them that we were not

3    attempting to moot appeals, that we were not trying to treat

4    consummation of the plan as a foregone conclusion, and

5    offered to stipulate on the point to try to resolve the

6    objection.

7           The concern that we heard in response was, well,

8    what about the Sacklers?  What about other creditors?  How

9    do I know that they won't make these arguments?  That's a

10   fair point.  So we reached out to every organized creditor

11   group that we have and we confirmed that they all agree with

12   the Debtors, that these payments pre-emergence would not

13   have the effect of mooting appeals during the pre-emergence

14   window.

15          So we took that back to the objectors, and we've

16   heard two different things in response.  One is a concern

17   that even if we, the Debtors, and all the creditors agree to

18   this language in the order, that some other parties might

19   not be bound by it or that an appellate court might conclude

20   sua sponte that somehow these payments do moot appeals of

21   the plan.

22          The four states that are objecting suggested that

23   the stipulation that these payments wouldn't equitably moot

24   appeals of confirmation doesn't go far enough, but that

25   instead we and all the creditors should stipulate that full

Page 24

1    consummation of the plan and the settlement also would not

2    moot appeals.  So we took that suggestion to the creditors.

3    We discussed it with them.  We all just don't think that's

4    correct substantively.  We don't think it's right to hold up

5    this motion over an unrelated issue.  And the suggestions

6    that were made as to how the settlement and the plan might

7    be adjusted to make that work we just didn't think were

8    practical.

9          So where that leaves us, Your Honor, is the

10   Debtors and the overwhelming majority of all of the

11   creditors in the case are just trying to do what we think is

12   a good and simple thing; we are trying to get creditors

13   their money faster.  We think that we've addressed all of

14   the objectors' concerns, and we don't think that asking

15   creditors to accept more delay over a theoretical concern

16   that somebody might make an argument that we all think is

17   crazy is the right way to be arranging our priorities in

18   this case.

19          I continue to believe that the creditors'

20   preferences are much more important than the Debtor's

21   preferences in this case, and I know they feel very strongly

22   about this.  But if it's okay with Your Honor, how we would

23   propose to proceed is to ask the objectors to speak for

24   themselves as to what their remaining concerns are.  And

25   then I know Mr. Preis would like to address this matter, as

Page 25

1   well as Mr. Eckstein and potentially others.

2            THE COURT:  Okay.

3            MR. VONNEGUT:  Thank you, Your Honor.

4            MR. HIGGINS:  Your Honor, Ben Higgins for the U.S.

5   Trustee.  I can start for the objecting side if that's

6   acceptable to Your Honor.

7            THE COURT:  Okay.

8            MR. HIGGINS:  Thank you, Your Honor.  I agree with

9   Mr. Vonnegut that we are concerned with preserving the

10  status quo so that there can be an appellate review of the

11  merits of the Court's decision approving the plan.

12            And to be clear, we do appreciate the efforts of

13  the Debtors to craft language providing that the proposed

14  funding won't support an equitable mootness argument.  And

15  we also appreciate the reference to get a consent among the

16  various parties for this principle.  But we don't know for

17  certain that such an order would be binding on an appellate

18  court or binding on all the parties to this case.

19            And there is ample caselaw in the Second Circuit

20  that shows that an appellant that does not diligently

21  attempt to preserve the status quo runs the risk of having

22  its appeal dismissed as equitably moot.  And just to

23  illustrate that concern, at the last hearing on the KERP

24  motion back in July, Your Honor referenced a recent district

25  court decision in Harrington v. LSC Communications.  And in

Page 26

1    that case, the debtor appellees argue that bonus payments to

2    six officer which totaled less than a million dollars

3    rendered the U.S. Trustee's appeal as equitably moot because

4    the payments constituted a change in circumstances.

5            And now the district court ruled in the U.S.

6    Trustee's favor on that point and decided that we could

7    reach the merits, but the district court didn't say the

8    appellee's argument was frivolous or crazy, as Mr. Vonnegut

9    suggests, and it did warn that an appellant's failure to

10   obtain a stay in the context of plan confirmation would be

11   dire.  And the purpose of the current motion is to perform

12   work necessary to implement the plan.  And we are highly

13   concerned, and I think justifiably so based on Second

14   Circuit law, that any steps taken to implement the plan

15   could constitute grounds for an appellate court to dismiss

16   an appeal as equitably moot.

17           And to be clear, we do intend to move

18   expeditiously with any appellate practice.  And the question

19   of the stay of the confirmation order is not yet before the

20   Court, but we are also concerned about whether there are

21   actions that the Debtors could undertake even before the

22   effective date under the Confirmation Order or the

23   Restructuring Steps Memorandum that could have the effect of

24   scrambling the eggs or ringing the bell that can't be

25   unrung, or choose whatever metaphor you want, Your Honor.

Page 27

1    But the Second Circuit law was clear that if we just sit on

2    our hands, we allow comprehensive change in circumstances to

3    take place, then we do run the risk that an appellate court

4    will never hear the merits of an appeal.

5            And it's also worth noting that the Debtors have

6    bound themselves under the shareholder agreement at Section

7    2.09 to oppose any request for a stay pending appeal.  And

8    if no stay is granted and the plan is consummated, or even

9    if before consummation there are sufficient changes in

10   circumstances, there is a real danger that an appeals court

11   will never reach the merits.

12           And from our perspective, that is a problem.  And

13   frankly, regardless of the outcome of an appeal on this

14   case, we believe the integrity of the bankruptcy system is

15   best served by an appeals court deciding that appeal on the

16   merits.

17           And so we would request that just hold this motion

18   in abeyance pending the outcome of (indiscernible).

19           THE COURT:  Okay.

20           MR. HIGGINS:  Thank you.

21           MR. GOLD:  Good morning, Your Honor.  Matthew

22   Gold, Kleinberg, Kaplan, Wolff & Cohen for the State of

23   Washington.  Can you hear me, Your Honor?

24           THE COURT:  Yes.  I can hear you fine.

25           MR. GOLD:  Okay, thank you.  Your Honor, we

1    support what the United States Trustee's office has said.  I

2    don't have any feeling I need to repeat that.

3         I would just add that, as Mr. Higgins alluded to,

4    we are expecting that sometime soon there will be an order

5    confirming the plan and that then there will be motions for

6    a stay pending appeal.  And we suggest that at a minimum,

7    this motion is premature until a stay pending appeal as to

8    (indiscernible) granted, then this would be a preparation

9    for something that may not occur.  And simply put, it would

10   be more efficient to (indiscernible) --

11        THE COURT:  You froze.  But you were about to say

12   that this would be more efficiently dealt with as part of a

13   stay pending appeal motion.  Is that what you were about --

14   you broke up right when you --

15        MR. GOLD:  Yes, Your Honor.  That is correct.

16        THE COURT:  Okay.

17        MR. GOLD:  Your Honor, I have nothing to add.

18        THE COURT:  All right.

19        MR. UNDERWOOD:  Your Honor, this is Allen

20   Underwood on behalf of the Canadian Municipal Creditors and

21   First Nations Creditors.  I just wanted to indicate --

22   obviously we filed a joinder pleading.  But I think we went

23   further, and we completely agree with statements made by the

24   U.S. Trustee and the non-consenting states.  We went a step

25   further even to say that this is a case where we have the

Page 29

1    ability to case management, a likely appellate process, have

2    a global consent order that might give all a path and some

3    level of confidence.  Expedition, cost production in terms

4    of where this is going so that there can be a relatively

5    defined and short appellate process as necessary here if

6    that's where this all ends up going.  I know that's beyond

7    the scope of the motion, but I wanted to make it clear that

8    that's something that the Canadian Municipalities and First

9    Nations are more than happy to negotiate and assist them

10   with --

11             THE COURT:  As far as I'm concerned, there is no

12   need for negotiation there.  Every appellant should be

13   moving for expedited review, and I assume they'll get it.

14             We just lost the picture.  It came back.

15             MR. GOLDMAN:  Your Honor, good morning.

16             THE COURT:  Good morning.

17             MR. GOLDMAN:  Irve Goldman, Pullman & Comley, for

18   the State of Connecticut.  I just wanted to put our support

19   for the position of the U.S. Trustee and the State of

20   Washington on record.

21             It does seem anomalous, if you will, that this

22   amount of money would go out the door until a Court rules on

23   a stay.  And of course there is the potential for reversal.

24   So this money could be retrievable.

25             THE COURT:  Could I -- maybe I am operating under

1    a misimpression here.  As I read the proposed order,

2    Paragraph 11 provides that if the Debtors are unable to

3    consummate the plan after some or all of the proposed

4    advances have been issued.  Any unused portion will be

5    required to be returned to the Debtors.  And then it

6    provides further the Debtors shall be required to prenotice

7    the motion, and absent further authorization from the Court,

8    payment of the proposed advances to the PI Trust, the NAS

9    Monitoring Trust, the Third Party Payor Trust, TAFT, the

10   Hospital Trust, and NOAT shall be recharacterized and/or

11   reallocated pursuant to Sections 502 or 506(b) of the

12   Bankruptcy Code as payments on account of the claims

13   asserted by the holders of the applicable claims, and

14   payment of the Topco advance shall be recharacterized and/or

15   reallocated pursuant to Sections 502 and 506(b) of the

16   Bankruptcy Code.

17          So how is this going out the door?

18          MR. GOLDMAN:  Well, actually if the money was

19   recharacterized in that manner, it wouldn't actually be in

20   the pockets of any creditors.

21          THE COURT:  Right.  It doesn't go out the door.

22   It's recharacterized.

23          MR. GOLDMAN:  To the extent it's unused.  But by

24   the time a ruling comes down on a stay motion, and certainly

25   if we can make it through the appellate process, a ruling on

1    appeal, I would say there is a substantial likelihood that

2    all of the money would be spent at that point.  So that is

3    my point.  I did notice the provision that Your Honor just

4    quoted, but that was my thinking on it.

5              THE COURT:  Okay.

6              MR. GOLDMAN:  I would also -- if Your Honor is

7    inclined to grant the motion, I would just ask that there be

8    an express finding in the order that this money spent and

9    the preparatory actions taken wouldn't constitute

10   substantial consummation.

11             THE COURT:  Well, I'm perfectly happy to make that

12   finding as well as state that the appellee in any appeal,

13   which would be the Debtors only since they are the proponent

14   of the plan, has waived the right to argue equitable

15   mootness.

16             MR. VONNEGUT:  Your Honor, we're fine with all of

17   that.  And just to briefly respond to a few things that --

18             THE COURT:  No, you don't need to respond.  This

19   is just an absurd opposition.  It truly is.  It truly is.  I

20   understand why you would make it so you could get it on the

21   record.  But now that it's on the record, it's entirely

22   clear.  No court, given what I've just laid out, would find

23   that these payments to expedite distributions to creditors

24   represents an argument for equitable mootness, let alone

25   would justify equitable mootness.  And the Debtors have

Page 32

1    waived the argument.  I don't know what more one could want.

2             Now, I understand you want to have that on the

3    record.  That's fine.  But I don't see why we should be

4    prolonging this.

5             MR. EDMUNDS:  Your Honor, if I may, Brian Edmunds

6    for Maryland.  I don't want to prolong this.  I have nothing

7    to add, but just for the record.  Thank you.

8             THE COURT:  Okay, very well.

9             So, look, everyone in this case is, rightly so,

10   being a careful lawyer.  So I'm not faulting people for

11   making the objection.  But I think the record is clear under

12   these circumstances that the concern that the U.S. Trustee

13   and the others have raised is simply not a legitimate

14   concern with respect to this motion somehow creating a basis

15   for equitable mootness with respect to an appeal of a plan.

16            Mr. Preis, I gather you wanted to say something.

17            MR. PREIS:  For the record, Your Honor, Arik

18   Preis, Akin Gump Strauss Hauer & Feld.  I was going to say

19   what you said.

20            THE COURT:  Okay.

21            MR. PREIS:  I was going to do it a lot more

22   colorfully.  So if that's the way Your Honor is going to

23   rule (indiscernible).

24            THE COURT:  Okay.  All right.  Does anyone else

25   have anything more to say on this motion?

1           MR. TROOP:  Your Honor, Andrew Troop for the non-

2      consenting state group.  Just a cleanup matter, I think Mr.

3      Underwood referred to the objecting parties in this motion

4      with the non-consenting state group.  The non-consenting

5      state group has not objected to this motion.

6           THE COURT:  Right.

7           MR. TROOP:  Just so the record is clear.  Thank

8      you, Your Honor.

9           THE COURT:  Okay.  Thank you.

10          MR. ECKSTEIN:  Your Honor, this is Kenneth

11     Eckstein of Kramer Levin.  We support the motion and its

12     entry.  I have nothing further to add.  Thank you.

13          THE COURT:  Okay.  All right.  I will grant the

14     motion.  This motion seeks authorization to use up to --

15     slightly over -- well, $6.8 million in cash to establish the

16     various trusts under the plan as far as the advance work to

17     be done on them, including creating website and other

18     mechanisms to expedite distributions to the beneficiaries of

19     the trust under the plan.

20          The parties in these cases, including those who

21     have objected to this motion, as well as those who support

22     it, have all recognized that given the number of deaths on a

23     daily basis because of the effects of opioids, there is a

24     clear purpose, both as a public health matter as well as a

25     bankruptcy matter, to expedite the distribution of funds to

Page 34

1   abate the effects of opioids.  These measures provided for

2   in this order would do that, I believe, by a number of

3   months, which translates into real lives being saved because

4   of that.

5           The motion has appropriate safeguards in it, as

6   just quoted from paragraph 11 of the proposed order as far

7   as any reallocation and/or return of the funds if for some

8   reason the plan does not go forward to the effective date.

9   Further, the Debtors have agreed to waive the argument of

10  equitable mootness on appeal insofar as it could be argued

11  with respect to the grant of this motion and the expenditure

12  of these funds.  They are the only appellees on the appeal

13  given that they are the only proponents of the plan.  Of

14  course many other groups in these cases would support them

15  on that appeal, but it is their right to argue equitable

16  mootness.  They are fully within their rights to preserve

17  that argument generally, but they recognize that they are

18  not really giving up anything meaningful to waive equitable

19  mootness based on the grant of this motion given the fact

20  that it is almost inconceivable to believe that any court

21  would conclude that the grant of this motion and its

22  implementation would render the plan equitably moot.

23          So I will grant the motion.  You should add the

24  waiver point, Mr. Vonnegut, to the order. And then you can

25  email it to chambers.

1          MR. VONNEGUT:  Thank you very much, Your Honor.

2    We'll do that.

3          THE COURT:  Okay.  Thanks.

4          MR. HUEBNER:  Your Honor, for the record, I think

5    that brings us to the second contested matter, Item 5 on the

6    agenda, which is the 2021 KEIP which is, of course as the

7    Court knows, split off from the KERP that was approved at

8    the end of July.  So if I can be heard clearly, for the

9    record, Marshall Huebner.  I will be presenting this motion

10   for the Debtors.

11         THE COURT:  Okay, very well.

12         MR. HUEBNER:  So, Your Honor, first to set the

13   stage.  On this matter, as on so many other matters, we

14   adjourned consideration of this motion because, as always,

15   we went to our creditors and engaged in extensive

16   negotiation with key stakeholders.  And as the motion papers

17   lay out, we made a bunch of modifications, which I'll get to

18   in a few minutes, that led to the Ad Hoc Committee, the MSGE

19   Group, and of course the UCC itself not having any remaining

20   objections to the substantially amended 2021 KEIP plan.

21         Your Honor, of course much of the program is going

22   to be quite familiar to the Court, as it is in fact nearly

23   identical to the incentive plan approved by this Court last

24   year and quite similar to the one approved by the Court the

25   year before that.  This is an annual plan, and we'll talk in

Page 36

1    a few minutes about timing and the U.S. Trustee's kind of

2    alleged concerns about timing and the like.

3            Your Honor, with respect to the evidence, once

4    again, it is all on our side and it's quite substantial.

5    There are two supporting declarations.  There were

6    originally two supporting declarations from Jon Lowne, the

7    Debtor's CFO.  I have one from Josephine Gartrell, a senior

8    director at Willis Tower Watson, who was the independent

9    compensation consultant who advised the Comp Committee.

10           Your Honor, you already entered those declarations

11   into evidence in July at the KERP hearing.  There is a

12   supplemental further declaration from Mr. Lowne, the second

13   supplemental declaration, which is Docket Number 3744 that

14   addresses the modifications that were done subsequent to his

15   original declarations and some of the issues raised in the

16   objections.  We would ask that the Court enter the

17   declaration into evidence at this time.

18           I would note that we have communicated with the

19   parties and as we understand it, Mr. Schwartzberg will have

20   a few questions for Mr. Lowne.  I don't think anyone has

21   questions for Ms. Gartrell.  And then the other parties, the

22   other two objectors, which we'll get to, either don't intend

23   to cross-examine, or I think Mr. Troop reserved his rights

24   in case something comes up and they want to ask a question

25   or two.  But I think that's probably the evidentiary lineup

Page 37

1    for today.

2           So I would like to move formally to have Docket

3    Number 3744 entered into evidence as another declaration in

4    support of the motion.

5           THE COURT:  Well, let me -- were you going to

6    present Ms. Gartrell first and then Mr. Lowne?

7           MR. HUEBNER:  So, Your Honor, there is no -- I

8    wasn't going to present Ms. Gartrell because nobody wants to

9    cross-examine her and her declaration is already admitted

10   into evidence as of July.  And so I think that's just in and

11   done.  I was going to present the motion first.  And I

12   assume Mr. Schwartzberg would cross-examine Mr. Lowne.  He

13   said he had a few questions for him, which of course he is

14   well within his rights to want to ask.

15          THE COURT:  Okay.  I did admit Ms. Gartrell's

16   declaration in the hearing in July, which was on the KERP.

17   But let me ask Ms. Gartrell to go under oath with respect to

18   the declaration regarding the KEIP.

19          Ms. Gartrell, would you raise your right hand,

20   please?  Do you swear or affirm to tell the truth, the whole

21   truth, and nothing but the truth, so help you God?

22          MS. GARTRELL:  I do.

23          THE COURT:  So, Ms. Gartrell, in a declaration

24   dated June 28th, 2021, you submitted your testimony in

25   support of the Debtor's motion, which sought both approval

Page 38

1   of the 2021 KERP and the 2021 KEIP.  We are here today on

2   the Debtor's request for approval of the 2021 KEIP, which

3   request had been adjourned pending the conclusion of the

4   confirmation hearing.

5           Sitting here today, September 13th, and knowing

6   that the Debtor's motion itself as supplemented in its reply

7   and by Mr. Lowne's second supplemental declaration updates,

8   the Court, on changes to the KEIP that have since negotiated

9   and the like.  Is there anything that you would wish to

10  change in your June 28th declaration?

11          MS. GARTRELL:  Your Honor, nothing more than

12  what's in the motion and the reply.  So the payments of the

13  KEIP have changed, and the fact that there is no

14  acceleration upon emergence has changed.  So that is

15  different from what's in my declaration.  But I don't have

16  anything else to add.

17          THE COURT:  Okay.  So does anyone want to cross-

18  examine Ms. Gartrell on her declaration?

19          All right.  I will admit it for purposes of this

20  motion, this aspect of the motion, that is.

21          Okay, so you can go ahead, Mr. Huebner, to Mr.

22  Lowne's declaration.  And again, there are two of those.  I

23  would propose to swear him in now and then we can have

24  argument after his testimony.

25          Mr. Lowne, would you raise your right hand,

1   please?  Do you swear or affirm to tell the truth, the whole

2   truth, and nothing but the truth, so help you God?

3          MR. LOWNE:  I do.

4          THE COURT:  Okay.  Mr. Lowne, you submitted an

5   initial declaration in support of the Debtor's motion for

6   approval of a KERP and a KEIP for 2021.  It was dated June

7   28th, 2021.  Recognizing that you have since submitted a

8   second declaration in support of that portion of the motion

9   seeking approval of the KEIP that's dated September 9th,

10  2021, which I'll refer to as your second declaration, is

11  there anything in your first declaration, the one from June,

12  that you wish to change?

13         MR. LOWNE:  No, other than the updates that were

14  made in the second declaration, which included for example

15  an update in the performance of the scorecard metrics,

16  nothing else that I would want to change.

17         THE COURT:  Okay.  And let me ask you the same

18  question regarding your second declaration.  It's only been

19  a few days, but is there anything that you would wish to

20  update in that one, knowing that it would constitute your

21  direct testimony for this aspect of the motion?

22         MR. LOWNE:  Nothing to update, no.

23         MR. HUEBNER:   Okay . Does anyone want to cross-

24  examine Mr. Lowne on either of his declarations?

25         MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

Page 40

1   for the U.S. Trustee's Office.  I do have a limited cross of

2   Mr. Lowne.

3           THE COURT:  Sure.  You can go ahead.

4           MR. SCHWARTZBERG:  Thank you, Your Honor.

5               CROSS-EXAMINATION OF JONATHAN LOWNE

6   BY MR. SCHWARTZBERG:

7   Q    Mr. Lowne, can you hear me okay?

8   A    I can.

9   Q    Great.  Just initially, Mr. Lowne, it is a pleasure to

10  see you again.  We haven't spoken in quite some time.

11  A    Likewise.

12  Q    I wanted to first examine the innovation and efficiency

13  metrics that you list.

14  A    Sure.

15  Q    The payment is contingent upon the Debtor achieving

16  certain performance metrics, correct?

17  A    Correct.

18  Q    And there is a threshold level that needs to be met

19  before an award can be paid for that metric, correct?

20  A    Correct.

21  Q    And I believe it's 75 percent of the award is earned

22  when the threshold level is met, correct?

23  A    That is the threshold, correct.

24  Q    Please turn to -- I'm going to reference your initial

25  declaration.  It's Paragraph 29, which I believe is Page 71

Page 41

1    of 107 of the PDF.  And there is a Table 4.

2    A    Yes, I've got it.  Thank you.

3    Q    All right, excellent.  That table lists the target

4    metrics that need to be met for the innovation and

5    efficiency performance metric, correct?

6    A    That's correct.

7    Q    And the target level metric needs to be met for the

8    full award for each metric to be paid, correct?

9    A    That is correct.

10   Q    Table 4 does not list the threshold metric that needs

11   to be met for the 75 percent award.  Is that correct?

12   A    Correct.  The 75 metric is an aggregate across every

13   single metric.  But we do have the scales that are in effect

14   for each of these financial metrics in Table 4 that would

15   determine the payouts upon achieving or exceeding or not

16   achieving each of these financial metrics you refer to.

17   Q    I want to go through these and figure out what the

18   threshold metric is for each.

19   A    Yes.

20   Q    If you look at the first one, the consolidated total

21   business operating profit, it's a target of $69 million.

22   What is the threshold metric for that performance award?

23   A    You know, I don't have the numbers in front of me.

24   It's a scale that goes from -- all the way from zero to

25   above a hundred percent, from my recollection.  And there's

Page 42

1  different dollar amounts that would determine the payout.

2  So, again, the 75 percent is across the totality of all of

3  the metrics that are in the scorecard.

4  Q    So are you saying if I took 25 percent off of $69

5  million, that would give me the threshold metric?

6  A    No.  The scale wasn't a perfectly linear scale from my

7  recollection.  So 25 percent more doesn't mean 25 percent

8  more for this individual objective.  And equally, 25 percent

9  less doesn't equal 25 percent less on this individual

10 metric.  We had a non-linear scale to the best of my

11 recollection that determined the payout for each of these

12 financial metrics.

13 Q    So just to be clear, as you're sitting here today, you

14 cannot give me the dollar amount for the threshold metric

15 for the consolidated total business operating profit?

16 A    I apologize.  I haven't committed the entire scale to

17 memory, but about six months ago I presented it, or it was

18 presented.

19 Q    I understand.  Just to save time, I assume that would

20 be the same answer for the Adhansia XR net sales, the Avrio

21 net sales, and the Rhodes reduced funding metric as well.

22 You couldn't give me the dollar amount for the threshold for

23 those?

24 A    Yeah, exactly.  I can't give you the scale for

25 exceeding or not achieving each of the financial metrics

1   Correct.

2   Q    Okay.  Thank you.  I am going to stay at that table and

3   I have a few other questions regarding historical financial

4   information.

5   A    Sure.

6   Q    The Debtor's 2020 performance metrics -- this is on

7   Table 4 -- the 2020 performance, or the results of the 2020

8   are not included in Table 4 or your declaration.  Is that

9   correct?

10  A    That's correct.

11  Q    Okay.  So let me look at the first one, the

12  consolidated total business operating profit metric.

13  According to the supplement you filed on Paragraph 15, that

14  metric was not part of the 2020 incentive plan.  Is that

15  correct?

16  A    Correct.

17  Q    And in fact it's a combination of three metrics that

18  were used in the 2020 KEIP plan.

19  A    That is correct.

20  Q    And just so we could be more specific, it deals with

21  the combination of three older metrics, or the Purdue

22  Branded Operating Profit Metric from 2020, the Adhansia XR

23  Operating Loss Metric, and the Avrio Operating Profit

24  Metric, all from 2020.  Is that correct?

25  A    That is correct.  They would be three components of the

1    total consolidated business profit.  Correct.

2    Q    Okay.  I'm just going to see if you know these numbers.

3    Do you know what the 2020 Purdue Branded Business Operating

4    Profit was?

5    A    I don't recall the exact number.  I don't have that in

6    front of me, no.

7    Q    Whether that -- I'm sorry, I apologize.

8    A    No, that's really all I was going to say.

9    Q    Okay.  What about the 2020 Adhansia XR Operating Loss?

10   Do you have the 2020 results from that?

11   A    I don't have it in front of me, no.

12   Q    And just the last one, the 2020 Avrio Operating Profit,

13   if I'm pronouncing that correctly.

14   A    Again, I don't have that in front of me, no.

15   Q    Okay.  Let me go to the next innovation and efficiency

16   performance metric, the Adhansia XR Net Sales.  Do you know

17   what the 2020 results were for the Adhansia XR Net Sales?

18   A    Again, I'm going on memory, but I believe it was about

19   $4 million, in that vicinity.

20   Q    I'm sorry, did you say 40 or four?

21   A    Four.

22   Q    And the Avrio net sales?

23   A    The Avrio net sales was in the vicinity of about $94

24   million.  Again, that's out of memory without having the

25   number in front of me.

Page 45

1   Q    And then that fourth metric, the reduced Rhodes

2   (indiscernible) 2021.

3   A    Yeah.

4   Q    That was not -- that's a new metric, correct?

5   A    It's a newly-worded metric, yes.

6   Q    And the old metric was an operating loss, a Rhodes

7   operating loss at $35 million, correct?

8   A    The 2020 metric was worded that way, yes.

9   Q    Okay.  And what was the 2020 Rhodes operating loss?

10  A    The 2020 operating loss I think was in the region of

11  about $35 million.

12  Q    So to your recollection when figuring out the 2020 KEIP

13  payments, did they make the target or did they not make the

14  target?  Because they are about the same number, and it's

15  hard to say from your testimony which occurred.

16  Q    From my memory, I think they were directionally very

17  close to that target, but I'd have to go back and look and

18  compare for the Rhodes business the actual loss versus the

19  target.

20  Q    Okay.  Now, just turning back to consolidated total

21  business operating profit.  That metric is $69 million,

22  correct?

23  A    That's correct.

24  Q    And that $69 million is less than the aggregate of the

25  three metrics used in 2020 to make up the consolidated total

Page 46

1    business operating profit.  Is that correct?

2    A    That is correct.

3    Q    And if my math is correct, the three 2020 metrics that

4    make up the consolidated total business operating profit

5    added up to $79.6 million?

6    A    I trust your math for those three metrics, yes.

7    Q    Just your 2020 declaration in support of the 2020 KEIP,

8    which you probably don't have in front of you.  That's ECF

9    1674.  There was a table that you may recall that listed the

10   metrics.  I've reviewed that, and I'll tell you my math came

11   out that those were $79.6 million.  You have no reason to

12   disagree with me, do you?

13   A    I have no reason to disagree with you, and I don't have

14   it in front of me.

15   Q    So assuming my math is correct, the $69 million

16   consolidated -- 2021 consolidated total business operating

17   profit metric is approximately $10.6 million less than the

18   2020 metric for the three that are consolidated into the

19   current metric.

20   A    I don't disagree with your math and your statement,

21   correct.

22   Q    I just want to go down one, the next one.  The Adhansia

23   XR net sales.  The 2021 Adhansia XR net sales target metric

24   was $14 million, correct?

25   A    That's correct.

Page 47

1    Q    And that's less than the 2020 Adhansia XR net sales --

2    or less than the 2020 Adhansia XR net sales target.  Is that

3    correct?

4    A    It's correct, with the comment that the actual sales in

5    2020 were $4 million.  So this target of $14 million was

6    pretty significant growth over the 2020 actual.  And that

7    reflects the challenges of launching any new product in a

8    COVID environment when a salesforce have more limited access

9    to calling upon healthcare providers.

10   Q    And just to close the loop, the 2020 target for that

11   was $18 million, correct?

12   A    That's correct, which we didn't achieve.

13   Q    I want to turn to -- I guess it's Paragraph 30 of your

14   declaration.  It's Page 71 of 107.  It's right below Table

15   4.

16   A    Yes.

17   Q    That's the People and Culture Metric, correct?

18   A    Correct.

19   Q    And that requires the Debtor to conduct readiness

20   activities to prepare for emergence from bankruptcy as well

21   as establish and support implementation of a diversity,

22   equity, and inclusion roadmap through the end of 2021,

23   correct?

24   A    That's correct.

25   Q    Could you give an example of a readiness activity to

Page 48

1   prepare for an emergency from bankruptcy?

2   A    Yeah, there's many.  I mean, it involves many, many

3   people from our company working on that.  I'll speak just to

4   the groups that report to me.  I mean, we have significant

5   IT implementation going on in our SAP financial systems to

6   set up (indiscernible) Pharma as the new entity that will be

7   transacting the entirety of our business.  As many of the

8   creditor groups know because we presented to them many

9   times, the significant amount of work with our insurance

10  companies to provide the new director and officer insurance

11  and also renew every single line of our insurance policies

12  under (indiscernible) Pharma.  We've got new bank accounts

13  to set up.  We've got to configure our treasury workstation

14  for the cash movements between the new company and the

15  existing companies.  We have work going on to get all of the

16  required state licensures for us to do business in all of

17  the different states.  That's just some examples of the

18  workstreams that are going on.  But they are significant.

19  Q    And how do you determine if a particular workstream

20  actually is successful and meets the requirement for an

21  award?

22  A    So like all of the objectives in our scorecard,

23  ultimately a decision related to meeting an objective is

24  based upon the decision of our compensation committee.

25       So in approximately late January or February of next

Page 49

1    year, there will be  a presentation to the compensation

2    committee on all of the activities that have gone into the

3    People and Culture Objectives that we're talking about now,

4    which represent ten percent of our scorecard.  All of the

5    other objectives in our scorecard, other than People and

6    Culture are point-based objectives.  You either achieve them

7    or you don't.  These People and Culture objectives that

8    we're now discussing will be based upon a presentation from

9    management in terms of all of the activities that have been

10   performed.  And then ultimately the payout percentage will

11   be based upon the judgement of the compensation committee

12   based upon the number of initiatives and their perceived

13   performance against those objectives.

14   Q    And when would that presentation to management

15   regarding whether they accomplished or did not accomplish a

16   task, when would that take place?

17   A    I think the timing of that is typically in February

18   because we close our books for the -- our financial records

19   for the year in late January.  So it's typically February

20   where the compensation committee is presented with the

21   results against the scorecard.

22   Q    And I want to turn to the next metric within the People

23   and Culture Metric.  Did you disappear, Mr. Lowne?

24   A    Sorry.  If I don't move, my lights go off.  Sorry.

25   Q    I understand that.  Do the Debtors have a Diversity and

1  Inclusion employee or officer?

2  A    We have a team of people that are involved in the

3  diversity, equity, and inclusion initiatives for our

4  company.

5  Q    So there's not one point person?

6  A    Well, there's an individual that is leading that team,

7  but I don't believe that they've had any titling that

8  reflects that they're leading that team, similar to we have

9  a COVID task force that is setting the policies for our

10  company.  We have a lead person for that team.  I don't

11  believe they have that reflected in their titles.

12  Q    Could you give an example of an activity that would

13  accomplish this task?

14  A    Sure.  So we have sub-teams.  One of our sub-teams is

15  headed up by our head of HR.  And as you can imagine,

16  there's members on that sub-team.  And what they're looking

17  to do is ensure that diversity and equity considerations are

18  built into our hiring processes, how we retain employees,

19  and how we look to provide opportunities for people to grow

20  within the company considering diversity and equity.  So

21  that's one example of an initiative that's ongoing at the

22  moment.

23  Q    And similar to your other People and Culture metric,

24  that's presented in February of 2020 to management?

25  A    February of 2021, yeah.

1          THE COURT:  I'm sorry, 2022, wouldn't it be?

2          THE WITNESS:  Oh, 2022.

3          THE COURT:  Yeah.  Okay

4          THE WITNESS:  Thank you.

5          MR. SCHWARTZBERG:  Thank you, Your Honor.

6    BY MR. SCHWARTZBERG:

7    Q    I want to turn to the Value Creation Metric, which I

8    believe -- if we could go to -- I guess it's Paragraph 11,

9    Page 4 of your supplemental application.  And do you see

10   there is a table that starts at the bottom of Page 4 that

11   spills over to Page 5 and 6?

12   A    Yes.

13   Q    Do you see the first -- it's under Public Health

14   Initiatives, "Provides support to HRT to allow an NDA filing

15   for OTC intranasal Naloxone"?

16   A    Yes.

17   Q    Now, it seemed to indicate that that metric needs to be

18   met by Q3 and it's behind schedule, correct?

19   A    Yes.

20   Q    If that metric gets met in Q4, will there still be an

21   award paid?  Or once Q3 is done, there can't be an award on

22   that?

23   A    So, similar to the financial metrics that I describe,

24   for each quarter that a metric is behind schedule, there is

25   a reduced payout percentage.  And for each quarter that a

Page 52

```
 1    metric is ahead of schedule, there is a percentage payout

 2    above target or above the hundred percent.  I can't remember

 3    that exact scale.  I don't have that in front of me.  But

 4    it's the same concept.  So that was how I came up -- why I

 5    made the comment earlier that the 75 percent threshold or

 6    how we measure the scorecard is an aggregate rollup of the

 7    map of every single objective using those tiered scales.

 8    Q    So if they complete this in Q3 -- Q4, I apologize,

 9    there is a bonus -- I'm sorry, an award above compensation

10    paid, but not the full amount.

11    A    Well, no.  If it's in Q4, it would be one quarter

12    behind schedule, so it would be something south of 11

13    percent -- a hundred percent.

14    Q    And if it was in Q1 of 2022, something could be

15    awarded.  But, once again, even further south.

16    A    That's exactly right.  Yeah.  Yeah.

17    Q    I want to flip to the next page.  And I guess sort of

18    towards the bottom under the (indiscernible) and

19    progressing, the generic pipeline.  Do you see that box?

20    A    I do.

21    Q    And I reference you to that box because, I apologize,

22    I'm going to have a little difficulty with the third sub-box

23    down, Dihydroergotamine nasal spray?

24    A    Yes.

25    Q    My first question is can you please pronounce that?
```

1    A    Um...

2    Q    Okay, then it's not just me.  Okay, that's fine.

3    A    Yeah.  I wouldn't pronounce it any different from you.

4    You do a better job.

5    Q    Okay.  Now, that indicates that it's not achieved by

6    the target date, but it's due on Q3.  Is that correct?

7    A    That's correct.

8    Q    So even though it's Q3, which is behind the target

9    date, an award will be paid, yet south of what would be paid

10   if they did it on Q2.  Is that correct?

11   A    That's correct.

12   Q    And the same question with the last sub-box, the

13   Varenicline tablets.  Once again, if it's done by Q4,

14   although its's beyond the Q3 target, something less would be

15   paid.  Is that correct?

16   A    That's correct.

17   Q    And I want to go down to the next sub-box, Innovation

18   and Efficiency Performance Metrics.

19   A    Yes.

20   Q    Do you see the Adhansia XR Net Sales, on track to fall

21   short?

22   A    I do.

23   Q    Is that on track to fall short the target or the

24   threshold?

25   A    I think at this stage of the year it is borderline

Page 54

1    whether it will hit the threshold 75 percent based upon the

2    scale, which I can't remember the details of.  But Adhansia

3    is performing quite a bit below the $14 million target.  So

4    I think the payout percentage will be less than the

5    threshold in this example.

6    Q    I just have one last question.  And this was from the

7    supplement, so it's not from your declaration.  But I just

8    want to be clear on the record.  Maybe Mr. Huebner would

9    talk to it.  But the KEIP awards now that -- the timeline

10   for payment has been changed.  So nothing is going to be

11   paid until June 30th, 2022?

12   A    That's correct.

13            MR. SCHWARTZBERG:  Your Honor, I don't have any

14   more questions.

15            And I thank you for your time, Mr. Lowne.

16            THE COURT:  Okay.

17            THE WITNESS:  No problem.

18            THE COURT:  Does anyone else want to cross-examine

19   Mr. Lowne?

20            Okay.  Do the Debtors have any redirect?

21            MR. HUEBNER:  Your Honor, Mr. Kaminetzky and I are

22   in two different locations, so I'm going to ask Ms. Benedict

23   to answer that question for us.

24            THE COURT:  Okay.

25            MS. BENEDICT:   No, Your Honor.  No redirect.

Page 55

```
1              THE COURT:  All right.  So I did have a couple of

2     questions, Mr. Lowne.  And this may lead to redirect.

3              Mr. Schwartzberg took you through the chart that

4     is in Paragraph 11 of your supplemental declaration.  And I

5     think with the exception perhaps of Adhansia where that

6     chart shows that some metric is behind schedule or not to be

7     achieved, your answer was that it still might well warrant

8     payment above the threshold, albeit below the target.  Do

9     you recall that testimony?

10             THE WITNESS:  Yes.  And if I wasn't clear, my

11    recollection based upon our midyear review is that for this

12    individual metric, the payout may actually be less than the

13    75 percent threshold.

14             THE COURT:  Right.  That's for Adhansia.  But for

15    the other ones on the chart, my understanding was that where

16    your chart had said not achieved by target date, behind

17    schedule in a number of places.  With the exception of

18    Adhansia, the measurement might still lead to a payment

19    under the KEIP, albeit one that is below the target, but

20    still above the threshold?

21             THE WITNESS:  That's correct.  Yeah.

22             THE COURT:  Okay.

23             THE WITNESS:  If it's helpful, Your Honor, we did

24    do a midyear review in the aggregate across all of the

25    metrics, some of which are overperforming, some of which are
```

Page 56

1    underperforming, and some are on track.  We estimated then

2    that the payout would be something around 95 percent.  So

3    that's the aggregate.

4           THE COURT:  So let me ask you, what is the

5    rationale for having a payment above the threshold, albeit

6    below the target, if the target is not met?

7           THE WITNESS:  Well, I think the two parts to my

8    answer -- I mean, we do look at the scorecard in aggregate,

9    which -- so we look at all of the metrics, add up the scores

10   of all of them, and that was the 95 percent that I came up

11   with.  But I think the rationale for coming up with a 75

12   percent threshold as opposed to -- I think what your

13   question is, if all of the individual metrics added up in

14   aggregate to 70 percent, why wouldn't you pay 70 percent

15   versus 75 percent.  I think the answer is that as we were

16   considering the KEIP program, we wanted to be incentivizing

17   enough given the uncertainty of the situation to our

18   insiders.  And similarly when we presented the KERP, to have

19   some minimum level that would -- the insiders would

20   understand given that uncertainty and given the fact that

21   these payments are now not going to happen until June 30th

22   of next year.

23          THE COURT:  Okay.  So is achieving -- or when

24   these metrics were set -- and I gather they were set -- even

25   though you're seeking approval for them now, they were set

Page 57

1   many months ago.  In achieving these metrics, is it hard to

2   achieve the threshold?

3          THE WITNESS:  I think we set the objectives, they

4   were finalized in early February.  We presented to all of

5   the employees in early February.  And there was certainly no

6   certainty that we could achieve all of the metrics.  As you

7   can see, some of them are overperforming and

8   underperforming.  So achieving 75 percent as a threshold,

9   there was no guarantee.  But obviously I now have the

10  benefit of hindsight with being nine-and-a-half months into

11  the year.  And it certainly appears that we are going to be

12  above the threshold.  And if you ask me my best guess now in

13  the aggregate, it would probably be in the mid-ninety

14  percent.

15         THE COURT:  Okay.  What was the basis, if this was

16  the case, for thinking back last February that the threshold

17  would be difficult to achieve?

18         THE WITNESS:  So to the best of my recollection,

19  the concept of the threshold was not discussed back in

20  February of last year to the best of my recollection.  I

21  think this was something that we discussed in light of the

22  fact that we couldn't confirm to our insiders the incentive

23  plan.  It was something that was discussed at approximately

24  the time of filing the various declarations to the Court.

25  That's my memory, and any of the lawyers can correct my

Page 58

1   memory if that's incorrect.

2           THE COURT:  Let me make sure I understand that.

3   So the metrics were set in February, but the threshold was

4   set later?

5           THE WITNESS:  To the best of my memory.  I don't

6   recall what we presented to the compensation committee back

7   in February the 75 percent threshold.  But I think when we

8   updated the compensation committee on the plan, that was

9   when the 75 percent was discussed.

10          THE COURT:  And the rationale for the 75 percent

11  was what again?  If I heard you right, I think I heard that

12  it was the delay in implementing the incentive plan.  Was

13  that the rationale behind it?

14          THE WITNESS:  A combination of the delay in

15  implementing the plan, the delay of the payout until June

16  30th, the agreement to pay a reduced amount for the long-

17  term incentive.  They were all factors in having the 75

18  percent threshold added.

19          THE COURT:  Okay.  All right.  Okay.  Any

20  questions on that set of questions by me from either Mr.

21  Schwartzberg or the Debtors?

22          MR. SCHWARTZBERG:  Not from me, Your Honor, thank

23  you.

24          THE COURT:  Okay.  Any redirect on that by the

25  Debtors?

1          MR. KAMINETZKY:  No, Your Honor.  Ben Kaminetzky,

2     Davis Polk.

3          THE COURT:  All right.

4          MR. HUEBNER:  Your Honor, one just note from me if

5     I may.  You know, a lot of the Court's questions relate to

6     the fundamental structuring of the plan.  And obviously Mr.

7     Lowne is not our expert witness on that topic.  He is the

8     CFO of the company.  Ms. Gartrell did obviously put in a

9     declaration that I think is pretty complete and quite

10    detailed about the fact that Willis Towers Watson was

11    actually the group that worked with the compensation

12    committee on structing of the plan.  And I believe that her

13    testimony is that both as to structure and content, the plan

14    is typical, appropriate, and reasonable.

15          Your Honor was essentially asking questions about

16    kind of is there a cliff, sort of reverse cliff vesting.

17    And my general understanding -- I'm obviously not the

18    witness -- is that that type of structuring is actually

19    quite typical.  And I actually believe the Gartrell

20    declaration covers the topics that Your Honor asked Mr.

21    Lowne about.  To his credit, he does many things for the

22    company, he is not our compensation expert.  He is the CFO.

23    And I just want to point that out so the record is clear

24    that, you know, we do have someone whose job it was to

25    ensure that the design of the plan was appropriate, industry

Page 60

1    standard, typical, and incentivizing.

2            THE COURT:  Well, is she still available?

3            MS. GARTRELL:  I am here.

4            THE COURT:  Okay.  Ms. Gartrell, I want to ask you

5    I guess then the same questions I asked Mr. Lowne.

6            MS. GARTRELL:  Sure.

7            THE COURT:  So you are still under oath.  My focus

8    was really on the rationale for a threshold award that is

9    below the performance targets.

10           MS. GARTRELL:  Yes.

11           THE COURT:  And what is your understanding as to

12   when the threshold award aspect of the KEIP was adopted?

13           MS. GARTRELL:  My understanding was that it's a

14   historical measurement.  So in the 2020 KEIP as well as the

15   2021 KEIP, there was the concept of having a threshold

16   performance metric at 75 percent of target and then a

17   target/max at 100 percent.  A typical plan, and Purdue's

18   plan prior to entering bankruptcy, was to have a 150 percent

19   upside in their program as well, which is typical in the

20   pharmaceutical industry.  But due to the circumstances,

21   there is no upside in this plan.  So there is only the

22   downside.  And so if they hit the 75 percent threshold, then

23   on a sliding scale go up to a hundred percent is the maximum

24   that can be achieved under this plan.

25           THE COURT:  Okay.  And what is the rationale in an

Page 61

1   incentive plan to have the plan provide for a threshold

2   amount even if the target is not met by 25 percent or less?

3           MS. GARTRELL:  So if you don't hit the threshold,

4   there is no payment.  But companies typically want to have

5   some performance sensitivity and still incentivize their

6   senior leadership team to continue to try to achieve target,

7   but recognize that they still need to have skin in the game

8   and that it's not just a make or miss target.  You don't

9   just get your target bonus at a make or miss level, but

10  there is some sliding scale at a threshold level up to

11  target.

12          THE COURT:  And is that a common feature for

13  incentive plans?

14          MS. GARTRELL:  Yes, it is.

15          THE COURT:  Were you or your team involved in

16  setting the targets, or was that a management function?

17          MS. GARTRELL:  It's typically a management

18  function.  My team was involve in helping set the 75 percent

19  threshold, the 100 percent target, and suggesting that there

20  be no maximum or upside for exceeding target.

21          THE COURT:  So then you and our team were involved

22  in setting the 75 percent threshold I gather from your

23  answer.

24          MS. GARTRELL:  Yes.

25          THE COURT:  And the rationale for that was -- I'm

1   taking from your answer, tell me if I'm wrong, two things.

2   One, there was no -- the upside under the prior compensation

3   arrangement has been removed.  And why particularly that it

4   was a 75 percent threshold met as opposed to say 90 percent

5   or 65 percent?

6           MS. GARTRELL:  Typically, Your Honor, the

7   threshold is set somewhere either at 50 percent or 75

8   percent.  And then targets at a hundred percent.  And the

9   upside maximum can be somewhere between 150 to 200 percent.

10  And so 75 percent seemed like a conservative and reasonable

11  threshold performance metric.

12          THE COURT:  Did it have anything to do with the

13  market assessment of base compensation for these five

14  people?

15          MS. GARTRELL:  No.  It's purely a design feature.

16          THE COURT:  Well, maybe I wasn't clear.  The

17  declaration states that for four of the executives, their

18  base level of compensation is between 45 percent and 60

19  percent of executives that perform similar functions in the

20  industry.  The one exception being the general counsel.  Are

21  you saying to me that the -- saying a below target threshold

22  for an incentive plan really had nothing to do with that

23  factor or that fact?

24          MS. GARTRELL:  So my answer is two parts.  So the

25  bonus opportunities are set typically as a percentage of

Page 63

1    base salary.  In this case -- so it does have -- so the

2    actual amount that you would receive as a bonus is generally

3    set at the percentage of base salary.  So from that

4    perspective, it is relevant.  But here, the KEIP pays out at

5    75 percent of threshold.  That's how the bonus is

6    determined.  And then a hundred percent at target.

7              THE COURT:  Okay.  So really it's more -- the

8    choice of the 75 percent threshold was simply more focused

9    on what a threshold structure is generally in the industry?

10             MS. GARTRELL:  Yes, it is, Your Honor.  It's

11   whether you have hit 75 percent of your target from a

12   performance perspective then determines the payout.  And

13   it's actually a conservative number because it's typically

14   50 percent.

15             THE COURT:  Okay.  All right.  Does anyone have

16   any questions of Ms. Gartrell related to that discussion?

17             MR. HUEBNER:  Your Honor, just to clear my own

18   mind, I'm going to have about 35 seconds of redirect for her

19   if that's okay.

20             THE COURT:  Okay.

21             REDIRECT EXAMINATION OF JOSEPHINE GARTRELL

22   BY MR. HUEBNER:

23   Q    So, Ms. Gartrell, just to make sure I'm following,

24   because frankly I was not expecting to get into all this

25   detail, and I thank you for -- and you are under oath.  You

Page 64

1   have been recalled to the witness stand.  So just to be

2   clear, you testified that there is typically 150 to 200

3   percent upside opportunity if target is exceeded.

4   A    Correct.

5   Q    And here we don't have that at all?

6   A    That's correct.

7   Q    Okay.  And that the threshold that begins the sliding

8   scale, the concept of the threshold and the concept of the

9   sliding scale is absolutely typical?

10  A    Yes, that's correct.

11  Q    And the threshold normally starts at 50 percent, but

12  here, to use your words, it's 75 percent.  So it's actually

13  also conservative or less compensatory than industry norms

14  would be.

15  A    Correct.

16  Q    Okay.  And then the Judge asked you a few minutes ago

17  about sort of overall compensation numbers.  I think you

18  said that's a little bit different than the structural

19  design of plans.  Do you remember that testimony?

20  A    Correct, yes.

21  Q    Okay.  But to be clear, your testimony, if I have it

22  right -- and if you need to turn to your declaration, please

23  do -- is that the KEIP group, leaving out the GC for a

24  minute, without the KEIP would be 27 percent below the 25th

25  percentile of industry compensation.  Is that correct?

Page 65

1    A    That's correct.

2    Q    And even -- and that they would be 46 percent below the

3    50th percentile.  So they would be making 46 percent less

4    than median compensation without the KEIP.  Is that correct?

5    A    Correct.

6    Q    Okay.  And while it's not related to the structure of

7    the KEIP, I assume the fact that the KEIP puts the

8    participants according to your declaration --

9         MR. SCHWARTZBERG:  Your Honor, I object.  These

10   are leading questions.

11        THE COURT:  It's true.  You shouldn't be leading,

12   Mr. Huebner.

13        MR. HUEBNER:  Okay.  I apologize.  These are just

14   facts in the declaration.  But let me rephrase it.

15        Mr. Schwartzberg, you're right.  I apologize.  As

16   I said, I didn't know we were going to this level of detail.

17   So let me ask my last couple of questions a different way.

18   BY MR. HUEBNER:

19   Q    Ms. Gartrell, can you -- do you remember what

20   percentile of overall compensation the insiders, leaving

21   aside the general counsel, are at assuming the KEIP payments

22   are made?

23   A    Yes.  They're right at median in the aggregate.

24   Q    And when you say median, can you explain what you mean?

25   A    It's the 50th percentile compared to market.  So we

Page 66

1   compare the total direct compensation, which is represented

2   in our pharmaceutical survey in 2020, to the total amounts

3   under the KEIP plus base salary to figure out how they

4   compared to market in the pharmaceutical industry.  And they

5   are right in the middle.

6   Q    Okay.  And did that go into your ultimate determination

7   about the overall reasonableness of the plan?

8   A    It did, yes.

9   Q    Okay.

10  A    It's a reasonable -- I mean, they have to be paid

11  competitive to market.  And they're right at median.  So

12  they are not overly paid under our market competitive

13  analysis.

14  Q    Okay.

15         MR. HUEBNER:  Your Honor, I'll leave it at that.

16  Because, again, I think the declaration is quite detailed

17  and speaks for itself.  But I just think it's important

18  context for some of the questions that the Court had.

19         THE COURT:  Okay.  All right.  Let me ask again,

20  does anyone else have any questions for either Mr. Gartrell

21  or Mr. Lowne on this last set of questions?

22         MR. SCHWARTZBERG:  Your Honor, just two quick

23  questions, I believe.

24         RECROSS EXAMINATION OF JOSEPHINE GARTRELL

25  BY MR. SCHWARTZBERG:

Page 67

1    Q    Ms. Gartrell?

2    A    Mm-hmm.

3    Q    Can you hear me?

4    A    I can.

5    Q    My name is Paul Schwartzberg.  I am an attorney with

6    the U.S. Trustee's Office.  I just wanted to confirm, you

7    had indicated that it's management that sets the threshold

8    and target dollar amounts.

9    A    They set the actual goals, yes.

10   Q    And is it correct that management did not, as Mr. Lowne

11   said, did not determine the thresholds until they filed the

12   motion, or the declarations as he indicated?

13   A    I don't know the answer to that question.  The

14   threshold number, the 75 percent, is a historical

15   percentage.  That was the same as the 2020 design.  And so

16   it just carries over to 2021.  But I don't know when they

17   actually set the metrics.

18   Q    Okay.  Thank you.

19        THE COURT:  Ms. Gartrell, I want to just follow up

20   on one point from Mr. Schwartzberg.  When you said

21   management set these goals, were these goals then reviewed

22   by the compensation committee and the Board?

23        MS. GARTRELL:  Yes.  So the typical process is

24   that management sets the goals and they can change year over

25   year.  And it's my understanding that they've had some

Page 68

1   moderate changes this year as well based on business

2   circumstances.  And so the management typically sets the

3   goals in the beginning of the year, and then they assess the

4   achievement of those goals toward the end of the year.  And

5   it's my understanding that they will assess the achievement

6   of those goals at the beginning of 2022.

7            THE COURT:  And what is the role of the Board and

8   the Compensation Committee in setting the goals?

9            MS. GARTRELL:  Management presents the goals to

10  the compensation committee based on various operational,

11  financial, and individual achievements.  And the

12  Compensation Committee approves those and recommends them to

13  the Board.

14           THE COURT:  Okay.

15           MR. HUEBNER:  Your Honor, I have just a couple of

16  redirect questions on that exact point.

17      FURTHER REDIRECT EXAMINATION OF JOSEPHINE GARTRELL

18  BY MR. HUEBNER:

19  Q   Ms. Gartrell, the distinction is actually quite

20  important.  And so I'm going to actually have to pause you

21  on that.  I think in your initial testimony, you said the

22  company.  And then Mr. Schwartzberg, I'm not sure

23  intentionally or not, introduced the kind of management.

24  And you responded.  And I just -- we need to stop on that.

25  Who actually approves the goals and the metrics in the

Page 69

1   compensation plan?  Is it the compensation committee or is

2   it management?  Who has the ultimate --

3   A    The Compensation Committee has the ultimate

4   responsibility for approving that, and they would recommend

5   those to the Board.

6   Q    Okay.  And to your knowledge, is that what happened

7   here?

8   A    Yes.

9   Q    Okay, thank you.  I think that clarification is quite

10  important, and I think we may have gone by too quickly.

11  A    Sorry about that.

12          THE COURT:  Okay.  All right.  I don't recall

13  whether I told you you could sign off, Mr. Lowne, but you

14  can sign off at this point.

15          And, Ms. Gartrell, you can as well.

16          MS. GARTRELL:  Thank you.

17          MR. HUEBNER:  Your Honor, is it okay to proceed

18  with argument now?

19          THE COURT:  Yes.  It's my understanding that no

20  one else had any evidence.  So hearing no one, yes, we

21  should go ahead with oral argument.

22          MR. HUEBNER:  Okay.  Thank you, Your Honor.

23          So, Your Honor, the 2021 KEIP, like the KERP, was

24  designed to parallel last year's program that was approved

25  by this Court after substantial negotiation with multiple

Page 70

1    creditor groups and the, you know, not particularly

2    contested, but somewhat contested hearing.

3            The adjustments and concessions that were

4    negotiated last year were actually put in, and in many ways

5    deepened even further this year, which I'll talk bout in a

6    few minutes.  And so it is important to note that like the

7    2021 KERP approved in July, the 2021 KEIP is essentially a

8    renewal of the program.

9            And, Your Honor, it's a renewable program, but as

10   we have now been discussing at hearings for over three

11   years, programs that are 20 and 30 years old.  These are not

12   special bankruptcy bonuses, nothing of the kind.  In fact,

13   this is a degradation of the components of annual

14   compensation that have been at this company, and frankly

15   other companies in their industry, because the programs are

16   entirely typical, for literally decades, except that they

17   have been adjusted not in the executives' favor in the

18   context of these Chapter 11 cases for various reasons.

19   Right?  We've already heard testimony about how the overall

20   levels were reduced, the percentiles, the payout timing.

21   And in fact, it's even lower market positioning than last

22   year's programs that were approved.  And that's the evidence

23   in the record that was uncontroverted.  This is a lower

24   market position for these participants than what the Court

25   approved last year after extensive negotiation with

Page 71

1    creditors that got virtually everyone from the entire case

2    on board or in a no objection situation.

3              Your Honor, it should be noted that, as I

4    sometimes point out, it's easy to think of Purdue merely as

5    a debtor or merely as a defendant.  But Purdue is actually

6    23 complicated operating pharmaceutical companies.  And the

7    challenges of 2021 are almost unthinkable, running a

8    pharmaceutical company making complex, and frankly dangerous

9    products in COVID with quarantines and outages and on-site

10   testing and supply chain disruptions and tremendous

11   dislocation in the world.

12             And as Your Honor knows, very often the cash

13   balance and the value of debtors dwindles by hundreds of

14   millions or billions of dollars during the bankruptcy case.

15   And one thing that I think gets lost in the maelstrom of

16   litigation about the proper end of these cases and which

17   creditors get what and all of that, is that the actual

18   maintenance of the value of these enterprises, all of which

19   is going to their victims, is due to actual human beings who

20   come to work all day, every day, in circumstances that are

21   very, very challenging to say the least.

22             Your Honor, let's now look at the numbers for a

23   minute.  The 2021 KEIP all in is $5.39 million for all five

24   participants.  That's what we're talking about.  That's the

25   annual award.  And that's basically the same except for very

Page 72

1    small annual salary increases in COLA and the like of the

2    $5.21 million approved by this Court last year.

3            The 2021 long-term award is $1.71 million for all

4    five, which is the same exact amount as last year.  So in

5    terms of COLA and purchasing power, it's actually, you know,

6    in consistent dollars, it's actually less than last year.

7    And all of the payments under the KEIP are subject to the

8    metrics which I'll talk about in a few minutes.

9            It's important to note that the changes that were

10   made in weeks of negotiations with the UCC, the AHC, and the

11   MSGE are very material, and frankly, very much serve the

12   goals that many of us are working to accomplish in these

13   Chapter Elevens.

14           First of all, the payments are now not being paid

15   until June 30, 2022.  None of them.  Not part of it in

16   October and part of it in March.  And for the last many

17   decades, as you've been hearing for years as is typically in

18   pretty much every company that has any sort of deferred

19   compensation, it's often paid in February or March of the

20   following year once you can sort of validate that the goals

21   were met and the comp committee goes through it in detail.

22   You know, the creditors ask that we essentially turn it into

23   an extra duty plan to also hold people in connection with

24   the transition into a new situation.  And that was agreed

25   to.  And so that's not a small change at all.

Page 73

1          Second, Your Honor, the long-term award, which I

2    think was also quite typical, originally had a clawback only

3    until 2022.  Again, at the request of creditors, that was

4    extended to March 15th, 2024.  So, again, this plan is now

5    doing sort of unheard of double duty as a sort of multi-year

6    retentive element that is quite atypical in some

7    circumstances and is unusual here.

8          Three, the Debtors agreed, and of course everybody

9    saw it -- we always keep our (indiscernible), that goes

10   without saying -- not to seek to assume the employment

11   contracts of any KEIP participants.  Right?  What often

12   happens at the end of Chapter 11 is that, you know,

13   management that has stayed on through the case doesn't have

14   their contracts rejected.  They have their contracts

15   assumed.  Not all the time.  Sometimes they are

16   renegotiated.  But we all know what this really means,

17   right?  Which is that if the creditors make the decision to

18   release any of the participants post-emergence, they

19   essentially are leaving not only with no severance during

20   the case, which is a 503 issue, but no severance even for

21   staying post-emergence to continue to assist with the

22   transition.  And certainly I think at least until June, if

23   not far beyond given the structure of the timing.

24          And then we gave consultation rights to the AHC,

25   MSGE, and the UCC with respect to measuring the performance

Page 74

1    against the 2021 metrics and developing the metrics for

2    calendar year 2022.  And so, again, quite unusual.  We are

3    inviting sort of multiple large creditor group to

4    collectively speak for pretty much all of, a huge

5    (indiscernible) of the creditors in this case to help ensure

6    that this is implemented correctly and to be involved in

7    2022.

8              And of course the revised order, Your Honor, goes

9    without saying, includes the language that we all ended up

10   coming up with in connection with Your Honor's ruling at the

11   July 2021 KERP hearing, which essentially just makes

12   somewhat more concrete and adds more procedure to the

13   standard that we agreed to six hearings ago in early 2020

14   with respect to ensuring sort of (indiscernible).

15             So, Your Honor, we already discussed the

16   percentiles, and so I'm not going to repeat that.  But to

17   say that this KEIP shouldn't be approved is essentially to

18   ask five senior executives who work for 27 below the 25th

19   percentile of compensation for their industry peers, which

20   is probably something like 75 percent less than market comp

21   or something like that.  And I'm not even talking about --

22   which nobody contests the very material attrition laid out

23   in the documents, the unfilled positions, the length of time

24   to fill the positions, and the fact that we are now down to

25   five insiders as opposed to eight and we have to keep

Page 75

1    consolidating further work in the hands of fewer people

2    because people leave and we can't replace them or choose not

3    to replace them as part of cost saving and running this

4    estate as efficiently as possible.  And so fewer people are

5    doing the work or more people, which frankly is another kind

6    of totally unrecognized but very important structural

7    feature of where we are.

8          So, Your Honor, the good news is there were only

9    three objections, and some of them were -- at least one of

10   them was pretty surgical.  So let me turn to those now, Your

11   Honor.

12         WE have objections from the State of Washington,

13   from the NCSG, the so-called NCSG.  Of course, 62 percent of

14   whose members support the plan.  And so I continue to find

15   that name bewildering and not helpful at all.  And of course

16   the U.S. Trustee.

17         Let's start with Washington.  Your Honor, the

18   Washington objection, to say the least, much like the

19   pleading they filed in the middle of the confirmation

20   hearing that literally was a mid-hearing unauthorized brief

21   in support of their objections, continues -- and we say this

22   very rarely -- to be in our mind outside the scope of what

23   we believe to be acceptable legal practice.  Once again,

24   they just put a whole bunch of facts in their pleading that

25   if they were in a declaration, I would sure love to cross-

1   examine the witness.  Because they just say many things that

2   are untrue.  They are flatly false.  And there is no simpler

3   way to say it, and I'm not going to sugarcoat it.  So let's

4   just talk about it.

5         First, they argue that because we have paid market

6   compensation in the past and each year we've had a hearing,

7   in which they did not directly participate.  And we put on

8   substantial evidence and the Court found that the

9   compensation was market and appropriate and necessary.  But

10  somehow, they just say that because people got market

11  compensation in the past, they should work for half off or

12  two-thirds off at present, not because they were overpaid in

13  the past, but because they were paid what was found to be

14  reasonable and appropriate.

15        Second, Your Honor, Washington argues that because

16  Purdue is going to become essentially a public benefit

17  oriented company that in 2021, employees should work for

18  substantially below market compensation.  I mean, we

19  disagree.  I don't even understand the theory, and I think

20  that it is not appropriate at all, including the fact that

21  whatever guise this company is in, it is a very complex,

22  multi-billion-dollar pharma company, among other things,

23  making Class 2 narcotics.  And it needs talented,

24  appropriate executives.  And the irony of course, and we'll

25  talk about it in a few minutes, is that two of these

Page 77

1    executives are purely technical folks.  And this is exactly

2    the kind of people we need the highest quality of to ensure

3    the safety and efficacy and propriety of our products in our

4    supply chain, including to continue to protect the American

5    public with respect to products that are not simple, to say

6    the least.

7            Third, Washington points to the compensation paid

8    to the board of directors and in a really inappropriate

9    sleight of hand attacks as a continuing practice of

10   enriching insiders.

11           As Washington knows perfectly well, the majority

12   of the Board was brought in new and clean, as we discussed

13   at many, many hearings now, in 2018 to undertake one of the

14   most difficult board assignments I think any of us has ever

15   seen.  And you need look no further than the (indiscernible)

16   statement for the dozens and dozens of formal meetings which

17   also obviously involve the less-formal thousands of phone

18   calls, email communications and the like to bring the

19   Debtors to where they are today.  So the notion that board

20   compensation even has relevance is challenging, to say the

21   least.  The notion that appropriate board compensation for a

22   majority -- for a board, the majority of which is brand new

23   and has worked, you know, basically as hard as any board any

24   of us have probably ever seen in our careers I think has no

25   relevance whatsoever.

Page 78

1          Then, just to double down, quite astonishingly,

2     with no facts, Washington says that the key participants are

3     all released parties who aren't paying anything and they,

4     "helped to craft and have pressed for the plan's

5     implementation," and that's why they should work for less

6     than half of market compensation.  This is a flatly untrue

7     statement that they had no basis making.  It's just

8     inappropriate in the extreme.

9          First of all, the notion that an employee of a

10    debtor who takes on, even if were true, takes on part of the

11    task of crafting and advocating for a plan that is

12    profoundly in the public interest, supported by virtually

13    all stakeholders and confirmed by the Court, should

14    essentially be penalized for doing so.  It is to say the

15    least a proportion to which I think very few people would

16    agree.  But more importantly, it's just factually flatly

17    false.

18         So as we laid out in our declarations and in our

19    reply brief, with the sole exception of Mr. Kesselman, none

20    of the five participants pressed for the plan's

21    implementation.  Just not true.  And Mr. Kesselman, as we'll

22    talk about in a few minutes, arrived in 2018.  And this was

23    exactly his job, which was to try to get control of one of

24    the most complicated, litigious situations probably ever in

25    U.S. history and help everyone get to the best possible

Page 79

1   outcome.  The notion that because he helped bring this plan

2   together, you know, he should be economically penalized is

3   just ridiculous.

4          And, Your Honor, if you look at the Lowne Second

5   Supplemental Declaration at Paragraph 9, after going through

6   in prior paragraphs the roles of Mr. Mancinelli and Mr.

7   Lundie, who don't even live in or near New York and work

8   down in operations, who obviously had basically nothing at

9   all to do with the plan.  Paragraph 9 also confirms that

10  even Dr. Landau has never attended a single meeting with

11  stakeholders to advocate for implementation of the plan.

12         So this canard of Washington that these five have

13  been running around trying to get themselves releases and

14  that there's something untoward going on here, he, frankly,

15  owes an apology to people.

16         Next, Your Honor, as if this wasn't bad enough,

17  Washington then claims as to both Mr. Kesselman and Dr.

18  Landau, and I quote, "Even if they themselves did not

19  participate in wrongdoing, they bear at least some modicum

20  of responsibility for directing the actions and setting the

21  culture of a company that has caused untold destruction and

22  immiseration, a company that by its own admission engaged in

23  a decades-long series of felonies."

24         As every party in this Court, including

25  Washington, which has been involved from the first moments

Page 80

1    of these cases, is perfectly well aware, Marc Kesselman

2    joined this company in July 2018, after all the conduct at

3    issue had occurred, after the entire opioid salesforce had

4    been eliminated, after all detailing to prescribers and the

5    like had stopped.  He joined from a distinguished career in

6    both public service at very high levels and in the private

7    sector leading American companies, and was hired precisely

8    because of extraordinary qualifications.  To say that he had

9    a role in setting a culture of wrongdoing for decades, it's

10   just so irresponsible that it's just shocking to me that

11   somebody felt comfortable even signing a pleading that says

12   that.

13           As to Dr. Landau, Your Honor, just to be clear --

14   because this is stuff the Court knows, but somehow

15   Washington's counsel maybe just forgot -- Dr. Landau was

16   appointed in June '17 as CEO, after four years at a

17   different company in Canada, a separate company.  All of the

18   conduct which Purdue admitted as part of the guilty please

19   took place before Dr. Landau became the CEO.  What Dr.

20   Landau actually did as CEO quite soon after arriving was

21   voluntarily stopping all use of sales representatives to

22   promote opioids to prescribers.  He supported and went to

23   the Board and got them to agree to eliminate entirely the

24   opioid salesforce.  They discontinued the last of the

25   speaker programs relating to opioids and ceased all

Page 81

1   sponsorship of outside pain groups.  Those are the facts in

2   the record, and they have been in the record for over two

3   years.

4           Now, the NCSG, to their credit, filed a much more

5   limited objection and take issue with what Dr. Landau both

6   did and did not do in 2021.  And there are fair questions,

7   but the answers are better than the questions.

8           The NCSG essentially says that Dr. Landau should

9   work for a fraction of market comp because he did not insert

10  himself into investigations of misconduct.  We strongly

11  disagree.  In fact, Dr. Landau, having no involvement in the

12  investigations, was in fact the most appropriate way to

13  approach the situation.  Dr. Landau was named as a defendant

14  by two states and in several other civil lawsuits and has

15  been the subject of personal attack in several KEIP hearings

16  during this case.

17          While he vigorously denies the allegations against

18  him, I think it would have been entirely inappropriate had

19  DR. Landau involved himself to investigation when he was,

20  stated simply, not disinterested.  This is why companies

21  have special committees and general counsels and outside law

22  firms and boards of directors where people recuse themselves

23  when they have a potential connection to the issues under

24  consideration.

25          And as the Court knows perfectly well, and so do

Page 82

1    the objectors, Purdue has been investigated exhaustedly by

2    the Department of Justice and also by the attorneys general

3    of many states.  We're not going to repeat for the nth time

4    at this hearing the scope of the information provision and

5    the hundreds of millions of pages and the 400 parties to the

6    protective order, including I believe all the states.

7              THE COURT:  So could I interrupt you on this

8    point?  What is being done and by whom to determine whether

9    there are current employees who should not be employees

10   because of their role in the conduct to which Purdue pled

11   guilty in November of 2020?

12             MR. HUEBNER:  Your Honor, I need to choose my

13   words very carefully, because this is really primarily a

14   Skadden Arps, you know, civil and criminal sort of experts

15   thing.  But I'll say it like this, and I guess I will ask

16   somebody from Skadden to please correct me if I misspeak.

17             First of all, all of the company's lawyers have

18   been directed from inception to keep their eyes and ears

19   open as they work on and review and produce tens and

20   hundreds of millions of pages of documents so that if there

21   are issues of wrongdoing of any remaining employees that

22   come to light, those are to be immediately brought to the

23   attention of the Special Committee.

24             Secondly,  Your Honor, we, and I personally, have

25   told and advised and requested of all of our creditor groups

Page 83

1    -- who, as the Court knows, have done extremely, extremely

2    extensive discovery of their own -- that if comes to their

3    attention that they believe that in their reviews, which

4    collectively the estate has paid probably well over a

5    hundred million dollars for, that if anyone comes to their

6    attention as being likely or potential wrongdoer, that that

7    also must immediately be brought to the Special Committee.

8             Third, Your Honor, in connection with the KERP

9    motion of course, a yet additional layer of review is now

10   being done.  And we always had in there from the beginning,

11   we actually -- it was consensual from the start, the

12   standard in all of the compensation motions that if it came

13   to light that any employee triggered either of the two

14   prongs of the standard -- which I don't want to state from

15   memory because I would get it slightly wrong.  But obviously

16   there is a disgorgement obligation.  That has been now sort

17   of furthered at the Court's direction into kind of -- there

18   is an entire process going on.  In fact, there's a multi-

19   hour -- I shouldn't say this, but there's actually a multi-

20   hour Special Committee meeting later today on exactly this

21   topic and on the work plan and the structure and the

22   approach to continue to work on all of these issues.

23            So, Your Honor, the short answer is quite a lot is

24   being done.  And I would venture a guess to say that as the

25   Court probably knows, Purdue has been downsized in terms of

Page 84

1    reductions in force by something like 80 percent since 2017

2    when the company had a salesforce and was detailing.  So,

3    you know, the people who led all of this activity of the

4    sales and marketing side by and large have been gone for

5    years, as have all of the opioid salesforce people, perhaps

6    with very limited exceptions.  So there are reasons why it

7    may not be such a surprise this Purdue and the few hundred

8    remaining employees is just a radically different company

9    than the Purdue of several thousand employees that detailed

10   opioids in the period prior to March 2018.

11        So, Your Honor, let me ask my colleagues from

12   Skadden.  I'm not sure they were expecting to speak at a

13   bankruptcy hearing.  But if I have misstated anything about

14   the way in which the multiple law firms have gone about

15   their sort of involvement in this topic, I would ask someone

16   to correct me.  Because this is a very important issue.  And

17   I am, frankly, just a bankruptcy lawyer.  And so I want to

18   make sure that I'm not getting it wrong.

19        Okay.  So, Your Honor, that I think is the

20   response.  I do want to reiterate something that I can speak

21   to very directly.  I have said to probably every major

22   stakeholder group in this case, if you bring to our

23   attention that you believe that somebody was specifically

24   involved in wrongdoing and that turned out to be correct,

25   they will be exited from this company faster than you can

Page 85

1   snap your fingers.  And that's always been our position.

2   There is no safe haven for wrongdoers at this company, god

3   forbid.

4            Your Honor, I see Mr. Troop has turned on his

5   video.  I'm assuming that it's not inadvertent, even though

6   I guess I'm in the middle of argument, I guess I would see

7   what he would like to add on this point.

8            MR. TROOP:  Your Honor, if you don't mind, since

9   Mr. Huebner just testified, I thought it might be a good

10  time to (indiscernible).  You reported facts.  And

11  therefore, you are the only person that I can ask the

12  question of, and I'd like to ask it now so that I can think

13  about it before I actually (indiscernible).  And that is if

14  any lawyer who is so tasked with identifying anyone with any

15  misconduct, report anyone to the special committee

16  (indiscernible).

17           MR. HUEBNER:  Your Honor, obviously I don't have a

18  choice but to, nor would I refuse to answer questions from

19  the Court -- and, frankly, you know, since lawyers are not

20  supposed to testify, I don't actually think that answering

21  the Court's question is sort of, you know, a lawyer

22  testifying.  I don't actually think that expanding this into

23  cross-examining me by other parties --

24           THE COURT:  No, but I would ask the question as to

25  whether there has been a report of anyone to the Special

Page 86

1   Committee.

2           MR. HUEBNER:  And, Your Honor, with apologies.

3   Because I need to get this right.  Report of anyone in

4   connection with what?

5           THE COURT:  Well, that had been identified either

6   by counsel within -- an employee of the company or by a

7   constituent in the case as being still an employee and

8   having grounds for being fired because of misconduct related

9   to the company's past practices.

10          MR. HUEBNER:  Your Honor, I can tell you what I

11  know, which is the best I can do.  I do not know of any

12  creditor having brought to our attention at all an employee

13  and having them say this is someone we think should be

14  terminated based on things we know.  I don't even think that

15  example was brought to us.

16          As the Court remembers because it was all public,

17  in connection with last year's KERP hearing -- sorry, I'm

18  going to actually amend -- I will amend my testimony, Your

19  Honor.  In connection with last year's KERP hearing, in

20  fact, the UCC and the NCSG did raise questions about eight

21  individuals.  And we deferred the payment of the KERP to

22  these eight individuals and further kind of investigation

23  was done.  Investigation may not be the right word, because

24  Skadden hates it when I use the word investigation because I

25  guess it's a technical thing.  Substantial further work was

Page 87

1   done.  Detailed presentations were made, including after we

2   got a document set from the UCC and the NCSG as to those

3   eight.  And ultimately, everybody got comfortable that the

4   KERP payments could be made to those eight people.

5          So I guess the answer is yes, which is last year

6   certain of our individual creditor groups brought eight

7   individuals to our attention.  We went and did the work.  We

8   had multi-hour calls with them on the eight individuals,

9   presented our sort of findings on what we found and why we

10  thought that some documents that they had brought to our

11  attention in fact did not suggest or support potential

12  misconduct.  And everybody to my knowledge was satisfied,

13  and they agree to have those final eight people get their

14  KERP payments.

15         That's the only example I know of, Your Honor,

16  where individual creditors brought people to our attention.

17  We jumped on it immediately and ultimately got everybody

18  comfortable.  And had there been others, I assume the same

19  progress would have obtained.

20         THE COURT:  And are you aware of examples where

21  outside counsel to the company or in-house counsel to the

22  company raised similar types of issues with employees and

23  whether they were looked into?

24         MR. HUEBNER:  I think the answer is no, Your

25  Honor.  But again, I am a bankruptcy lawyer, and I was not

Page 88

1   running the workstreams --

2          THE COURT:  I understand.  Even though you're the

3   lead counsel in the bankruptcy case, you don't have the

4   perspective on the whole case.  I'm just asking you as to

5   what you're aware of.

6          MR. HUEBNER:  Yeah.  I think the answer is no.  I

7   don't believe that -- primarily it would be Skadden and

8   (indiscernible), who were the Special Committee counsel,

9   brought to the Special Committee's attention people who were

10  involved in the detailing of opioids in the pre-2018 era who

11  were still employed with the company, where they believed

12  that the conduct was problematic.  Because, remember, under

13  the KERP orders, Your Honor, we could not allow someone to

14  get or keep their 2019 and 2020 KERPs, which it came to our

15  attention that we believed that they violated the standard.

16  And so people were all made aware of that in blazing

17  technicolor.  And I do not believe that anybody was brought

18  to the Special Committee's attention.

19          We also, with respect to indemnification, Your

20  Honor, have a similar process where before the Special

21  Committee agrees to permit the indemnification of any

22  present or former employees' legal fees, they first review

23  it and form a view that they believe that they are, you

24  know, likely to satisfy the standard for indemnification.

25          So there are a whole bunch of checks and balances

1    in place on the Special Committee side that I believe the

2    Special Committee counsel and the Skadden folks and the like

3    feel are appropriate.

4              THE COURT:  Okay.  I kind of interrupted you, Mr.

5    Troop.  I don't know if you had anything more to say on this

6    point.

7              MR. TROOP:  No, Your Honor.  You covered the

8    (indiscernible).

9              THE COURT:  Okay.  So why don't you go ahead, Mr.

10   Huebner?

11             MR. HUEBNER:  Just to finish up Dr. Landau for a

12   minute.  The numbers are that without the KEIP payments

13   which bring him in fact to below 50th percentile even with

14   the payments.  But without them, he would be 55 percent

15   below median compensation.  He would be working for 45

16   percent of median compensation.  And here, again, the only

17   objection that we really see is that he didn't personally

18   deal with investigations with potential consequences of

19   those.  And that's just not the role of a CEO in this fact

20   pattern where the CEO himself is just simply not

21   disinterested.  In fact, if I were on the other side, I

22   would be, you know, howling if I found out he was involved

23   at all.  He has no place in the room when these decisions

24   and conversations and issues I think are being raised.

25             And, Your Honor, you've expressed several times

Page 90

1    that the NCSG over the last couple of years has sort of

2    shifted its theory as to why Dr. Landau should not be paid

3    market compensation.  And, frankly, each time you say, you

4    know, you need someone to run the company, you need people

5    here to sort of stay and maximize value.  And, frankly, the

6    judgment of the Compensation Committee and the Board was

7    paying the CEO somewhat below median market compensation.

8    And of course it's really much more below median when you

9    consider the payment terms now, which are highly unfavorable

10   and highly atypical and also turn into sort of a multi-month

11   retention plan and a multi-year retention plan with the

12   2024.  And so I know there is no way to work that into the

13   math, but I think that these are actually well below the

14   median when you consider that they're actually doing the job

15   of multiple plans, but they are only one plan.

16          Your Honor, that brings us to the U.S. Trustee.

17   So the U.S. Trustee again presents no evidence at all -- I

18   know it's our burden and I'm not saying they had to present

19   evidence, but they chose not to put on their own experts

20   with their own testimony.  They didn't depose anybody to my

21   knowledge.  They did ask a few questions of Mr. Lowne.  And,

22   frankly, I thought his answers were quite helpful in showing

23   exactly what types of things were done to ensure that these

24   were incentivizing.

25          So let me just quickly scan what is in the record

1   on this, as it is very important I think for all parties.

2   All parties deserve comfort that people are being paid to do

3   their jobs and do them appropriately in a way that hopefully

4   pays for itself many times over and maximizes value.

5           So Mr. Lowne's sworn testimony is that the metrics

6   are "ambitious, having threshold hard targets that are

7   difficult to achieve both individually and when considered

8   in combination".  It's just uncontested testimony.  Right?

9   He testified that achieving the metrics requires "Diligent

10  and committed efforts" and that at the time of their

11  approval by the Board, the metrics were "Challenging,

12  require extensive achievement, and presented a meaningful

13  risk of not being met," even at the threshold.  And it's

14  actually not surprising at all that as we sit here much

15  farther into the year, as the evidence also makes clear,

16  some are not being met.  Some are barely being met.  Some

17  are being met.  Which is exactly what we would expect if

18  metrics were properly set.  Obviously if it was just target,

19  target, target, target, target, that would suggest that the

20  targets would have been set too low, which is not where we

21  are.  Which is why I think the updated declarations serve as

22  the proof.

23          You know, the U.S. Trustee again, just kind of

24  xeroxing its pleadings from prior years, again, just sort of

25  calls the targets lay-ups.  And it's just not what the

Page 92

1    evidence shows.  It's just not.

2              Your Honor, strangely enough, the U.S. Trustee in

3    part attacks the metrics because the numbers are somewhat

4    different than last year.  But that's the way the world

5    works.  Every year, every time, in every company.  The

6    cashflows are different, the budges are different, the

7    volumes are different, the profitability is different, the

8    costs are different.  The job of a board of directors is in

9    fact to reset and customize the metrics for every single

10   year.  And among other things, Purdue is getting smaller,

11   which is one of the reasons that some of the numbers are

12   getting lower.

13             But other metrics are getting higher.  You know,

14   where products or companies or divisions are (indiscernible)

15   better than expected, those metrics are higher than last

16   year.

17             Similarly, Your Honor, I think Mr. Lowne already

18   sort of testified about this both in response to Mr.

19   Schwartzberg's questions and his declaration.  We didn't

20   drop any of last year's metrics.  In order to make the plan

21   -- and this is what the evidence is -- more industry-

22   standard and have somewhat fewer metrics rather than

23   industries with smaller metrics, they combined three of last

24   year's metrics, Purdue Branded Business Operating Profit,

25   Adhansia XR Operating Loss and Avrio Operating Profit, into

Page 93

1    a single, consolidated operating profit metric.  This was

2    done for the salutary and entirely typical reasons set forth

3    in the declarations.

4            So all these changes just show that we keep

5    refining the plan as the years go by to best match the

6    better business reality.

7            The last issue, Your Honor, is the question of

8    timing of approval, which it's sort of like déjà vu all over

9    again.  We just keep having the same argument and the Court

10   keeps ruling, and then we just keep seeing that argument

11   again in the next pleading.  And I just -- I just don't

12   really understand it.

13           The notion that the post-emergence board should

14   deal with the 2021 compensation plan is just completely

15   misguided.  In fact, if I were a board member that came onto

16   a company in 2022, I would refuse to do that.  I wasn't

17   there, I didn't set the goals, I didn't measure them, I

18   couldn't assess the people.  For all we know, none of those

19   people might even be there by the time a new board is

20   seated.  So to say that a new board should responsibly or

21   could responsibly even accept that obligation I think

22   misunderstands what a serious board would and would not

23   agree to do.

24           And with respect to timing, Your Honor, we've now

25   talked about it, I think, seven hearings.  You know, it is

Page 94

1   typical in this company and all companies for the metrics

2   and the plan to be baked and done near the end of the first

3   quarter of the calendar year.  You need to sort of finish up

4   the prior year and get an assessment of how things turned

5   out and what the final numbers are, audited or not, and then

6   early enough in the year to incentivize people and know what

7   the right numbers are, you announce that calendar year's

8   plan.

9          You know, we filed this rather late in the year

10  and we adjourned it multiple times specifically to get

11  broader creditor support and to give us time to negotiate

12  and make the multiple very material concessions that I

13  described before that were done at the request of creditors.

14  And more importantly, Your Honor, I only need to ask the

15  Court to look at Pages 55-58 of the Court's own ruling from

16  the July 29, 2021 KERP Hearing, because this exact argument

17  verbatim was made six weeks ago and for the, I think, sixth

18  time or so, the Court ruled on it and found that the timing

19  of the motions, which actually came very late in the year,

20  and then their actual hearing, which was held even far later

21  yet in the year, precisely to allow for appropriate

22  commercial negotiations and concessions in no way detracted

23  from the propriety of the programs or their timing but, in

24  fact, supported them.  I think Your Honor ruled for about

25  four pages on this topic, and I have to say, and it's a

Page 95

1   little bit frustrating that we're discussing it yet again,

2   given that I think we already have a ruling from the Court.

3          So, Your Honor, I'll leave it at that.  Obviously,

4   our initial motion had a lot in it.  Our reply brief on the

5   KEIP had a lot in it.  We have multiple declarations.  And

6   there are only three objections.  I think the primary

7   creditor groups, of which Your Honor knows there's something

8   like 11, have no objection.  We negotiated this thing and

9   made very material changes at the request of the UCC, AHC

10  and MSGE.  And we're at or below median, even with the full

11  program, and we ask that it be approved.  Your Honor, I'll

12  hopefully have little to no rebuttal but I'd like to save a

13  little bit of time based on what the objectors argue.  And,

14  of course, I'm happy to answer any questions from the Court.

15         THE COURT:  Okay.  Well, why don't I hear from the

16  objectors?

17         MR. SCHWARTZBERG:  Hi, Your Honor, Paul

18  Schwartzberg from the U.S. Trustee's Office.  Is it okay if

19  I go first?

20         THE COURT:  Sure.

21         MR. SCHWARTZBERG:  Thank you, Your Honor.  Your

22  Honor, this is the third motion by which the Debtors seek

23  authority to pay compensation above base salary.  And in

24  this particular motion, the Debtors seek to pay, I believe,

25  up to 7.5 million to five insiders pursuant to a Key

Page 96

1    Employee Incentive Plan.  However, before additional

2    compensation could be paid, the Debtors must pass a

3    threshold test to demonstrate that the payments do not

4    violate Section 503(c)(1).  That the payments are not

5    (indiscernible).  Only if this is passed can the Debtors

6    turn to demonstrate the facts -- demonstrate the payments

7    are justified by the facts and circumstances of the case

8    such as what is market compensation?  And as Mr. Huebner

9    said, the burden is on the Debtor to demonstrate that this

10   plan is not a retention plan.

11          Now, I know Mr. Huebner had indicated that this is

12   a removal of past programs but the numbers chance in each

13   program and we're here testing the numbers to make sure that

14   it is a true incentive plan and not a retention plan.  And

15   the Debtors set three metrics to be met for awards to be

16   paid:  The value creating metric, the innovation and

17   efficiency metric and the people and culture metric.

18          First, Your Honor, for the innovation and

19   efficiency metric, the threshold level for the award

20   (indiscernible) is not disclosed.  Only the target level is

21   disclosed.  Therefore, it's impossible to determine if the

22   minimum metric that needs to be met before payments are

23   made...  In fact, 75 percent of the payments are being made

24   at this threshold level, which is not disclosed.

25          Second, initially, no historical information --

Page 97

1   financial information is provided to compare the metrics

2   with the past results.  Mr. Huebner had indicated that Mr.

3   Lowne had testified that these are actually hard metrics to

4   achieve, but those are conclusions.  We need to see the

5   numbers to make informed decisions.

6              And, in fact, for example, for the consolidated

7   total business operating profit, I believe that's the

8   largest metric in the innovation in the performance metric -

9   - we're not providing the historical information to

10  determine if the $69 million target is, in fact, an

11  incentivized target.

12             THE COURT:  Can I interrupt you on this point?

13             MR. SCHWARTZBERG:  Yes, Your Honor.

14             THE COURT:  Section 503(c)(1) addresses, in a way

15  that makes it essentially impossible, a transfer to an

16  inside for the purpose of inducing such person to remain

17  with the Debtor's business.  Right?

18             MR. SCHWARTZBERG:  Yes, Your Honor.

19             THE COURT:  And then says in (c)(3), which is the

20  basis that the Debtor is moving under, that other transfers

21  or obligations that are outside the ordinary course of

22  business and not justified by the facts and circumstances

23  also cannot be made.

24             So, I guess my question is -- you referred to

25  "base salary", right?

1             MR. SCHWARTZBERG:  Yes, Your Honor.

2             THE COURT:  So, you agree, I guess, that "base

3      salary" is not a transfer to induce someone to remain with

4      the Debtor's business, right?

5             MR. SCHWARTZBERG:  Yes, Your Honor, it's very

6      complicated.

7             THE COURT:  Because if you're not paid a salary,

8      obviously you will leave because you're not being paid.  But

9      that's not what Congress had in mind, right?

10            MR. SCHWARTZBERG:  I believe what they had in mind

11     was, as we indicated, bonuses, awards, things above a

12     person's base salary.

13            THE COURT:  Well, that's two different things,

14     right?  Because a bonus -- and this is what Congress, I

15     think, really was focusing on -- can be a bonus to stay,

16     i.e., the practice that developed now many years ago where

17     debtors sought stay bonuses for executives simply, you know,

18     that they hadn't awarded before -- bonuses had not gotten --

19     executives had not gotten such payments before the

20     bankruptcy, and the rationale for the bonus was that it was

21     hard to work in a bankruptcy environment and so, therefore,

22     they should have this increase.

23            But the evidence is really quite clear in this

24     matter, as it has been when compensation levels for 2019-

25     2020 were sought, that the actual compensation for

1    executives of these companies for decades included a

2    contingent payment as well as a "base salary".  And it was

3    only when you have both of those together, as the evidence

4    shows, that you actually are in the median for your

5    competitors.

6             To me, that doesn't seem like the type of bonus,

7    retention bonus, that Congress is addressing in 503(c)(1).

8    To me, it seems like a payment that is, yes, it's required

9    by people to be competitive and not to go somewhere else but

10   it's essentially part of their salary.

11            MR. SCHWARTZBERG:  Your Honor --

12            THE COURT:  Do you have any cases or legislative

13   history to support otherwise?  That in a context like this,

14   as opposed to where someone gets something that they had

15   never gotten before and it was tied to just staying in place

16   in the bankruptcy case -- but, rather, an element of

17   compensation that had always been there and is necessary to

18   make you in the median for people in your industry.  That's

19   somehow a bonus, as opposed to a risk you're taking that you

20   won't get enough to be in the median?

21            MR. SCHWARTZBERG:  Well, Your Honor, I'm looking

22   at the section -- or the statute and it says transfers.  So,

23   we believe this is a transfer.  And that's where we've come

24   up with that.

25            THE COURT:  But so is a base salary.  So is base

Page 100

1   salary.  And if you need both to be in the middle and you're

2   actually running the risk with the portion of the

3   compensation to get to the middle, i.e., that you don't meet

4   the targets, to me that doesn't seem like getting a leg up.

5   It seems like staying in the middle or even risking being

6   before the middle.

7        MR. SCHWARTZBERG:  Well, Your Honor, we believe

8   you don't get to (c)(3) until you've passed the (c)(1) test.

9        THE COURT:  I understand.  But how is the (c)(1)

10  test applicable to these facts?  I understand clearly that

11  if someone is getting what I would view as a true bonus just

12  to hang around or just to do their job, that they haven't

13  gotten in the past but they're getting it now in a

14  bankruptcy case -- because, as courts were told in the '90s,

15  before this statute was enacted, you've got to incentivize

16  them, Judge, because it's really hard on the bankruptcy case

17  -- I understand your point completely.  I think that's what

18  the statute addresses.

19        I'm having a very hard time seeing how it

20  addresses a situation where the evidence shows that this is

21  -- this is actually necessary to get them to the middle of

22  compensation and that the so-called base salary is way below

23  the middle.

24        MR. SCHWARTZBERG:  Your Honor, two responses:

25  One, I guess I'll harken back to what Mr. Huebner has said.

Page 101

1   The timing of the payments was put out to now June 30th to

2   ensure that they get or stick around until post-emergence.

3   So, that --

4            THE COURT:  Well, clearly, that's something that

5   people want, is that they'll stick around.  Yes, that's

6   true.  That is true.  That's fair.  But that just puts

7   another risk, another burden on the employee, right?

8            MR. SCHWARTZBERG:  Well, I think the fact that

9   they're being timed that way because they stick around is

10  another evidence or demonstration that they are retention

11  payments.

12           And, second, Your Honor, we're turning to the

13  chart that I went over with Mr. Lowne -- it appears they're

14  going to get a bonus for everything except for one, or an

15  award for everything.  And, in fact, he testified are the

16  ones that they're not going to meet.  If they meet them

17  later, after the target, they still get an award.  So, it

18  seems like these are less incentivizing and more guarantee

19  paid.

20           THE COURT:  I agree with you to some extent.  I

21  think that the targets are incentivizing, but the threshold,

22  notwithstanding Ms. Gartrell's testimony that this is also

23  common in the industry -- in fact, usually the threshold can

24  be lower -- is more akin to, you know, not as hard an

25  achievement.

1           But, again, if the -- if the outcome is that you

2       get paid what is the median in the industry, with a risk

3       that you don't get that even because you're below the target

4       and perhaps even below the threshold, I have a really hard

5       time seeing that that is a bonus.  It's a bonus in the sense

6       that you get more than your base salary but it's not a bonus

7       over the people who are working as the head of the

8       equivalent of Rhodes Pharma for some other pharmaceutical

9       company or the CEO of that company.  It's just -- it doesn't

10      really seem like a bonus to me.  It's a bonus in the sense

11      that you have some risk that if you don't get it, you'll get

12      paid less.  But it doesn't really -- it seems like

13      compensation.

14              MR. SCHWARTZBERG:  Your Honor, we believe it's a

15      transfer.  And we --

16              THE COURT:  Well, so is salary.  Salary is a

17      transfer, too.

18              MR. SCHWARTZBERG:  But that would make the statute

19      -- some have said nonsensical if it included salary, base

20      salary.  I think they're talking about transfers above base

21      salary.  You can call them bonuses, you can call them awards

22      --

23              THE COURT:  It doesn't say transfers above base

24      salary.  In fact, the language could actually apply to

25      transfers that include base salary.  I don't think Congress

Page 103

1    meant it that way but if you take that meaning of a

2    transfer, clearly every dollar that you receive is "for the

3    purpose of inducing such person to remain with the Debtor's

4    business" -- otherwise you wouldn't have an HR Department.

5    You wouldn't have a business.

6            So, it -- I -- look, I just -- it's -- it's easy,

7    too easy, in fact, to say that an incentive program is

8    always a bonus.  It actually could be a risk and not a

9    bonus.  It's a risk in that -- or if, A, at most, if you

10   achieve the targets, you get paid market compensation

11   because you may not achieve the targets.  You never have a

12   chance of getting above market.  At best, you can get two

13   market.

14           I mean, it's just -- I think -- there's a lot of

15   rhetoric around these types of programs and I guess, to some

16   extent, rightly so.  It really was pretty outrageous that

17   before this statute was enacted, firms would say to their

18   managers, you know, you can actually make more in a

19   bankruptcy.  We'll call it a stay bonus and we'll pay you

20   more.  Congress dealt with that.

21           But if someone's being paid on essentially a

22   combination of flat salary and if you get the metrics,

23   median compensation, it's hard for me to see that that

24   outrage that Congress reflected in (c)(1) really would

25   apply.

1          MR. SCHWARTZBERG:  Your Honor, I see where you're

2     going so I just would like to get on the record just that

3     our concern is that the thresholds were not disclosed, in

4     fact, even today.  The historic information to compare it,

5     rather than the conclusions by Mr. Lowne were not -- were

6     not set forth.  And then, as he indicated, it appears

7     everything that's in his table on Page 4 of his declaration,

8     even if they miss the target that's listed (indiscernible) -

9     -

10         THE COURT:  No, I actually don't think he said

11    that.  I think he said that the -- let me turn to his thing

12    -- the Adhansia 10 percent wouldn't be met and that overall,

13    however -- and I do agree with you on this point -- it's

14    above 90 percent of what the target would provide.

15         MR. SCHWARTZBERG:  Yes, Your Honor, everything but

16    Adhansia was going to be met, even if it didn't hit the

17    target.

18         THE COURT:  Well, at a threshold but not the whole

19    -- not the whole target.

20         MR. SCHWARTZBERG:  Yes.  But we don't know what

21    that threshold is, Your Honor.

22         THE COURT:  Right.  Okay.

23         MR. SCHWARTZBERG:  Thank you, Your Honor.

24         THE COURT:  Okay.  All right.

25         MR. SCHWARTZBERG:  I'll defer to Mr. Gold, Your

Page 105

1    Honor, for the last (indiscernible) --

2              THE COURT:  Okay.  All right.

3              MR. GOLD:  Thank you, Your Honor.  Matthew Gold,

4    Kleinberg Kaplan.  Can you hear me?

5              THE COURT:  Yes and I can see you fine, too.

6              MR. GOLD:  Okay, thank you, Your Honor, and I

7    apologize for the unstable interface.  Simply I have nothing

8    --

9              THE COURT:  It just looks like a 1970s Italian

10   movie, it's fine.  It's like Vittorio De Sica.

11             MR. GOLD:  I would be honored to be put in that

12   presence, Your Honor.  In any event, I have nothing to add

13   to our papers on this matter and we rest on that.

14             THE COURT:  Okay.  Okay.

15             MR. TROOP:  Thank you, Your Honor.  Andrew Troop

16   for the Nonconsenting State Group.  Your Honor, we are left

17   with the compensation program the way it was presented to

18   us, with base salary and the consented compensation.  And

19   we're here today to object because a significant portion, as

20   we set forth in our statements -- this company's

21   (indiscernible) --

22             THE COURT:  I'm sorry, you're cutting in and out,

23   I'm afraid, Mr. Troop.

24             MR. TROOP:  I'm sorry, hold on one second, Your

25   Honor.  See if that's better.  We're having some air

Page 106

1    conditioning issues today so I thought it as better

2    (indiscernible)...  Your Honor, as I was saying, we've heard

3    from the beginning of the (indiscernible) again today that

4    the fundamental purpose of this Chapter 11 was an evolution,

5    an evolution of this company and its culture, and its

6    culture with respect to its practices.

7            There is responsibility for that culture.  That

8    culture, as we established, at the KERP hearing in July

9    includes ensuring that participants in this case, the

10   retention plan -- in that case, the retention plan -- did

11   not, through their own inaction or misconduct advance the

12   wrongdoing of this company over time or during the course of

13   business.  You made that clear in 2019 as well.

14           But we've learned that notwithstanding that

15   instruction from 2019, the special committee is meeting just

16   today to take on the responsibility of ensuring that

17   bonuses, however described, are not paid out and really to

18   evaluate the workforce in light of this company

19   (indiscernible) misconduct.  It's not a defense by the

20   Debtors to argue that the criminal investigations into the

21   company took the place of the company's own responsibility

22   to ensure the integrity of its workforce against this

23   culture.  And it is no defense for Dr. Landau to say that

24   parties would have complained had he inserted himself into -

25   - I believe the word that Mr. Huebner used was

Page 107

1    investigations of misconduct -- the words.  And accepting

2    that as true, as the CEO, Dr. Landau still had

3    responsibility to make sure that the process was in place.

4            Dr. Landau could not rely, should not have relied,

5    solely on (indiscernible).

6            THE COURT:  I'm sorry -- I'm sorry, should not

7    have relied on?

8            MR. TROOP:  On legal counsel being engaged in

9    criminal investigative conduct, their own counsel, to

10   substitute for the company's own responsibilities.  And at

11   the end of the day, they were his responsibilities as CEO.

12           In some ways the objection by the Debtor is that

13   we were too surgical, we were too surgical in focusing on

14   Dr. Landau.  But at the end of the day, as I said, he is the

15   CEO and he could've directed the appropriate conduct

16   undertaken by this company in response to what I understood

17   their directives from Ms. Wood back in October of 2019, and

18   which we learned from his own testimony during the 2004 --

19   the 2004 depositions in this case, that the company did not,

20   in fact, undertake any (indiscernible)...

21           They said they didn't do it, notwithstanding the

22   Practice Fusion deferred compensation program, which

23   (indiscernible) identified participation by people at

24   Purdue.  They did not --

25           THE COURT:  Well, can I interrupt you?  Because I

Page 108

1    guess, given the seriousness of what your objection

2    asserted, I would've expected more a cross-examination of

3    more of an analysis here of who did what.  But, to your

4    understanding, is there anyone at the company who was

5    identified with the Practice Fusion admissions or

6    activities?

7              MR. TROOP:  If we're going to use Practice Fusion,

8    Your Honor, I believe an unnamed Purdue employee identified

9    as a brand manager was identified.  And if we'd matched up

10   that person correctly, that person is still at the company.

11             THE COURT:  And is that one of the eight or is

12   that someone else?

13             MR. TROOP:  That was one of the eight.  But if you

14   recall at the time, Your Honor, we were instructed -- in

15   fact, in part, I will give Mr. Huebner credit.  Yes, our

16   arguments have modified over time in response to what's

17   happened in the case and in response to your focus on these

18   hearings.  But at the time, you may recall, Your Honor, it

19   was that if someone committed -- if someone did something

20   criminal, right, that's what we should be focused on.  And

21   we worked on that claw-back language, which really focused

22   on criminal more than anything else.

23             We continued to raise our objections that the

24   company had an independent obligation.  And as time has

25   passed where practice (indiscernible) practice

1   (indiscernible) agreement (indiscernible) by the company's

2   own (indiscernible) -- and, Your Honor, there's another

3   guilty plea in Practice Fusion by an individual but it's not

4   in front of you, which also talks about for the -- which

5   suggests that there was a process that should have been

6   undertaken by the company to do what it obviously wanted to

7   do.

8          And at some level, Your Honor, regardless of the

9   level of the investigation that the parties were able to do,

10  there were whole swaths of documents (indiscernible) that

11  did not...  There was a level of investigation allegedly

12  undertaken by the (indiscernible) there was an investigation

13  undertaken by the Special Committee where we did not receive

14  a fair analysis, we did not receive (indiscernible) and it

15  seems that the responsibility -- if we went outside of

16  bankruptcy, Your Honor, this responsibility would clearly

17  have been on the company and there'd be no defense that

18  would've said creditors can do investigations.  Creditors

19  had access to 2004 examinations.

20          THE COURT:  Can I -- again, I didn't hear you

21  clearly.  I am having kind of a hard time hearing you.  I

22  don't know if other people are, too.  But I think you said

23  that there was some separate work on this issue by the

24  Special Committee that --

25          MR. TROOP:  No, Your Honor.  What I was saying is

Page 110

1    that there's been a lot of talk about the access to

2    information which creditor constituencies (indiscernible).

3             THE COURT:  Right.

4             MR. TROOP:  I think that it continues to pale in

5    comparison to what was available to the Special Committee,

6    including, Your Honor, information that we know was produced

7    to the Department of Justice, which was not produced to us

8    under -- because the Department of Justice, among other

9    things, objected.

10            Your Honor, at the end of the day, the question is

11   whether or not you establish the culture of a company with a

12   responsibility that it's (indiscernible) based.  And for us,

13   that is -- that is the fundamental issue here.  I think that

14   our pleading was clear about that, I hope that it's clear to

15   the Court about that, and otherwise we will rest on our

16   papers --

17            THE COURT:  Well, I think the issue that the

18   Debtors have raised with your contention, which I don't

19   think they disagree with the underlying premise, which is

20   that Purdue's culture that existed, you know, through some

21   period in 2017 needed to change -- is whether and what role

22   Dr. Landau should play in that.  The Debtors say that,

23   particularly given the Special Committee and the role played

24   by outside counsel in the criminal investigation and Dr.

25   Landau's own inherent conflict, given that he was named in

1   some complaints, meant that Dr. Landau, although the CEO, is

2   not the person to take the lead on this point but, rather,

3   it would ultimately depend upon the board as advised by

4   counsel.  What is your response on that point?

5          MR. TROOP:  As I said, Your Honor, perhaps we were

6   too narrow.

7          THE COURT:  Well, but the issue before me is his

8   compensation where there is, again, a carve-out.  So, you

9   may have been too narrow but I'm just focusing on him at

10  this point.

11         MR. TROOP:  Understood, Your Honor.  So, Your

12  Honor, what's the best analogy?  Your Honor, there is a

13  distinction between being involved in an -- I'm going to use

14  the word investigation or a review (indiscernible) and

15  making clear that that review has to be undertaking, even if

16  you can't do it yourself for all the reasons the Debtors

17  have articulated, but accepting them as truth for these

18  purposes, it's still the CEO's responsibility to say we need

19  to make sure -- we need to make sure that we are reviewing

20  (indiscernible) in plans and reviewing --

21         THE COURT:  Okay, no, I understand that point.

22  But I guess what is -- what is your basis for saying that

23  that isn't -- or hasn't been properly addressed?

24         MR. TROOP:  The basis, Your Honor, includes the

25  deposition transcript that was attached to our KERP

1    objection, for one.

2            THE COURT:  No, that says that he doesn't know

3    about it.  And that's the first part of my question, and you

4    answered that.  But I'm trying to figure out whether it

5    hasn't been done.

6            Clearly, Dr. Landau has not been involved in it

7    and I don't think there's any testimony that he directed

8    some sort of inquiry.  But the issue is, I guess,

9    ultimately, whether there has been a failure to do it.

10           MR. TROOP:  Well, Your Honor, I can only look at

11   some facts, right, that we have, and those facts are that,

12   to my knowledge, no one's been disciplined.  Part of his

13   testimony was that no one was disciplined and no one was

14   fired.  The second part is that they were -- if I understood

15   Mr. Huebner earlier, I understand that for the first time

16   the Special Committee is leading the institute process.  And

17   if I misunderstood Mr. Huebner, I'm sure he'll correct me.

18           But it is -- we are unaware...  For example, Your

19   Honor, when we raised this objection (indiscernible) no one

20   advised us that there was process underway or in place that

21   undertook a review.  No evidence was presented in connection

22   with the KERP, to my memory, that, in fact, any such process

23   was employed.  What we heard then as we heard today was that

24   well, there were criminal investigations going on and people

25   were looking -- and outside lawyers were looking at lots of

1    documents.  And that, Your Honor, doesn't mitigate the

2    company's internal responsibilities with respect to its

3    culture and its future, which doesn't line up with the

4    criminal law.  It doesn't line up with the...  So, Your

5    Honor, I don't --

6              THE COURT:  Well, I mean, the Debtors have

7    identified many steps that I think were quite far-reaching

8    that Dr. Landau took to change the culture, right?  So --

9              MR. TROOP:  So, Your Honor --

10             THE COURT:  I guess -- I --

11             MR. TROOP:  Your Honor, let me use this as not a

12   perfect example, okay?  In the last monitor report, the

13   monitor reports on the fact that in Customer Service,

14   someone -- someone reached out directly to (indiscernible)

15   rather than referring.  And the Debtors jumped all over

16   that.  I don't want to take anything away from the Debtors

17   when they learned about it.

18             But it reflects a cultural question.  It's a

19   cultural question.  How do you -- how do you make sure the

20   (indiscernible) that these (indiscernible) are more than

21   second nature to everyone within the organization?  And,

22   Your Honor, this was the vehicle in which this issue came

23   up.  And, as I said, at the end of the day, when you're the

24   head of the organization, it is your responsibility.  If you

25   can't do it yourself, then make it very clear that

1    (indiscernible).

2              THE COURT:  Okay.

3              MR. TROOP:  Thank you, Your Honor.

4              THE COURT:  Okay.

5              MS. IMES:  Your Honor, may I be heard?  Linda

6    Imes, for Dr. Landau?

7              THE COURT:  Okay.

8              MS. IMES:  Thank you for hearing me, Your Honor.

9    I appreciate that this is the Debtor's motion, not Dr.

10   Landau's, but the objectors have challenged both his

11   leadership of Purdue and his integrity.  And Dr. Landau is a

12   highly principled man who has always been committed to doing

13   the right thing at Purdue, and we just can't sit by while

14   they make unfounded smears against him, Your Honor.  So,

15   with your indulgence I'd like to address two main points,

16   one of which Mr. Huebner touched upon.

17              First of all, there's no evidence whatsoever to

18   what Mr. Troop just alluded to that somehow his inept or

19   misconduct advanced any wrongdoing.  There's not a shred of

20   evidence to support that.  Similarly, Washington is trying

21   to link Dr. Landau to the misconduct to which Purdue pled

22   guilty by saying that he bears responsibility for directing

23   actions and setting a culture that resulted in a decades'

24   long series of felonies.

25              Yet, number one, Dr. Landau has testified under

Page 115

1    oath twice, once at his 2004 deposition where anyone

2    could've asked him any question they wanted to in this case,

3    and once before Congress that he did not participate in and

4    was not aware of that criminal activity.  And this is --

5    Your Honor, it's in the testimony that's attached to the

6    Nonconsenting State group's motion at Page 85, 87 and 91.

7           Secondly, the timeframe for the criminal conduct

8    that Purdue admitted to in its 2020 guilty plea preceded Dr.

9    Landau's onboarding as CEO of Purdue.  The long and short of

10   it, Your Honor, is that he was not CEO during the period of

11   (indiscernible) conduct.  And for four years of that period

12   of time, he worked at a separate company, Purdue Canada in

13   Canada.

14          So, there's not a single action that he directed

15   that resulted in the committing of felonies.  Also, since

16   they've alluded to a decades' long series of felonies, I

17   gather they're referring that to the 2007 plea.  What Your

18   Honor should know about that is that Dr. Landau had no

19   responsibility for the sales and marketing functions at this

20   time, and he had no involvement with any of the conduct at

21   issue in the 2007 criminal plea.  That conduct that was

22   alleged occurred before July 2001, when he had been working

23   as a junior employee in the R&D for less than two years.

24   So, there's just no truth at all to the aspersions they're

25   trying to cast upon Dr. Landau.

Page 116

```
 1              The second point I wanted to address, Your Honor,

 2     was the one that you raised about the culture needing to

 3     change.  One of the things Washington talked about in its

 4     allegations was that somehow Dr. Landau set the culture of

 5     the company that enabled this criminal activity.  And,

 6     again, that's just completely false.  And, in fact, what Dr.

 7     Landau has done is he's been a problem-solver and a change

 8     agent.  And I'd like to just run through some of the things

 9     that he has done to change the culture and business of

10     Purdue.

11              Your Honor, much of this is set out in the written

12     statement that Dr. Landau presented to Congress in December

13     of 2020 at Page 2-3 and 4-5, and there's a link to that

14     referenced in Mr. Huebner's brief.  But among the many

15     things he's done for the company since becoming CEO in June

16     of 2017 are the following things:

17              First, he ended the company's promotion of opioids

18     by sales reps to prescribers, and he did this without being

19     asked to do so or directed by anyone, including regulators.

20              Two, he eliminated the company's entire opioid

21     salesforce.  He discontinued the last of the company's

22     opioid-related speakers programs.  He ceased the company's

23     sponsorship of all outside pain groups.  He assembled a new

24     management team.  He renewed the company's focus on R&D.  He

25     prioritized the advancement of three programs intended to
```

Page 117

1    address specific elements of the opioid crisis, namely, the

2    approval and availability of buprenorphine and naloxone; the

3    development of an over-the-counter version of intranasal

4    naloxone, and the development of injectable minalfene.

5    These are obviously all important to NewCo as well.

6            And since September 2019, he's paid a crucial role

7    in driving workforce productivity, maintaining employee

8    morale, limiting attrition as much as possible, and even

9    recruiting new talent.

10           So, Your Honor, there's just absolutely no truth

11   to the notion -- and it is merely someone's notion -- that

12   somehow Dr. Landau was part of or contributed to a corrupt

13   culture that promoted wrongdoing.  It's just not so.

14           And one final point, Your Honor, is that --

15   unrelated to what I was just talking about -- is that -- and

16   this follows up on a conversa -- question you were asking

17   Dr. Lowne about diversity and so on.  It's my understanding

18   that Dr. Landau created the Presidential Committee on

19   Diversity, Equity & Inclusion at the company over a year

20   ago, and that he communicated that as a high priority for

21   the company.

22           As for the alleged failure for Dr. Landau to

23   conduct an investigation, I think Mr. Huebner addressed that

24   and made the critical points and I gather that Your Honor

25   has followed up on those observations.  Unless you have any

1    questions, Your Honor, I have nothing else.

2              THE COURT:  No, that's fine.  Thank you.

3              MR. HUEBNER:  Your Honor, a few quick things from

4    my end, and I will be pretty brief.  Your Honor, first with

5    respect to the United States Trustee, candidly, if Mr.

6    Schwartzberg believed that the many conclusion in our four

7    declarations were not sufficiently supported or granular,

8    then he probably should have asked for a deposition because

9    that's what someone does when they think that a witness can

10   be sort of like, knocked over by incisive questioning.

11             The fact that he asked Mr. Lowne to recite a

12   series of highly specific numbers from memory with no prior

13   notice in open court I really don't think provides any

14   support whatsoever to any sort of argument that these -- the

15   conclusions that these are ambitious, challenging, real

16   targets gets trammeled in any way whatsoever.

17             The second, Your Honor, and you said it now at

18   about five hearings.  There was a very tawdry world, in

19   which I'm glad to say I don't think I ever participated,

20   where people got big extra bonuses in Chapter 11.  That is

21   not this and has never been this.  This is regular annual

22   compensation that's been going on for 30 years, split into a

23   part paid biweekly as base salary and a part that is

24   essentially deferred and put at risk to get them to median

25   comp if it goes as expected.  It's not extra, it's not new,

Page 119

1   it's not bonuses, it's not retention, except for one thing.

2   And you want to talk about returning bad -- good for bad --

3   it's just completely unbelievable that we were originally

4   going to make these payments essentially, you know, in March

5   of 2022, as has been done for decades.  And three of our

6   creditor groups said, no.  We don't want you to pay it until

7   June because we want buy one, get one free.  We also want to

8   have to hold them until July 1st.

9          And now the Trustee is saying because we agreed to

10  accommodate the needs of our priority economic stakeholders,

11  this is now an illegal retention plan?  You know what, Your

12  Honor?  I'll make the offer right now.  If people would like

13  us to go back to paying it in March exactly as we proposed,

14  we would be delighted to.  But to say that it's been made

15  unlawful because we made a concession to creditors to

16  benefit the estate and increase its value, I mean, it's just

17  -- you can't even make this stuff up.

18          Your Honor, with respect to Mr. Troop's comments,

19  I just -- I found myself bewildered as he was talking.

20  Because, essentially, he actually did testify incorrectly at

21  great length about what Purdue, and the board, and the

22  Special Committee has done and not done, which was not in

23  his two-page objection that said one thing only, which is

24  Dr. Landau did not oversee investigations or personally fire

25  or discipline people.  And somehow out of the blue we're in

Page 120

1    a referendum on whether the culture of Purdue has

2    sufficiently turned over.

3            So, let me be very clear because this is actually

4    -- while inappropriately raised, is actually quite central

5    to everything some of us are trying to accomplish.  First of

6    all, the notion that one person in Customer Service appears

7    to have made one phone call that may not have been okay and

8    that everyone agrees that the company, and the monitor, and

9    the compliance function jumped on instantly, and this is

10   somehow evidence that something is still not right?  I mean,

11   please.  Seriously.

12           Like, to even suggest that in the case of this

13   publicity as evidence of impropriety or a not completely

14   clean culture as opposed to the opposite -- you know, I

15   invite anyone who wants to read every single monitor report,

16   which have been filed exactly on scale, about the

17   extraordinary compliance, and the extraordinary change in

18   culture, and the extraordinary safety ad propriety in so

19   many areas.

20           Second, Mr. Troop has grossly misheard me and

21   misunderstood me, and he repeated it multiple times.  I did

22   not say they're meeting just today or today for the first

23   time.  I said, ironically, there is also a multi-hour

24   meeting later today on this exact topic.  This is not the

25   first meeting, it's not the second meeting, it's not the Nth

Page 121

1    meeting -- well, I guess it is the Nth meeting because that

2    can be any number.  The Special Meeting has been on these

3    issues for years, and I already described at some length,

4    because we ended up going very far afield from one objection

5    on one person on one part of their compensation, in

6    connection with things like indemnity, the Special Committee

7    demanded voluminous information from the Debtor's primary

8    law firms to be comfortable that before anybody got

9    indemnified, who was likely to be appropriate.

10           I described to Your Honor, again, impromptu and

11   with some trepidation, the many implicit layers of netting

12   and review that had been in place for a long time.  We

13   didn't put the onus in creditors.  We said, and in addition

14   to all the things we're doing, if you see anything, then

15   your hundreds of million -- hundred million dollars of legal

16   fees' worth of review that suggest that a wrongdoer is still

17   at the company, bring it to our attention and we will jump

18   on it right away.  It's an additional layer of care for

19   people who are highly adversarial to the old Purdue and with

20   very good reason, and had every incentive in the world to

21   help us all ensure that no wrongdoers remain at the company.

22           Your Honor, with respect to Practice Fusion, to be

23   clear, Mr. Troop I assume is right in matching up that one

24   person who was mentioned in a document is still at the

25   company.  That doesn't mean that that person was a wrongdoer

Page 122

1    or satisfied the original standards under the KERP.  Those

2    are all things that the Skadden folks and the Special

3    Committee had been looking at consistently, and there

4    obviously a tremendous amount of discussion about Practice

5    Fusion both when the information statement or whatever it

6    was, indictment or plea agreement with Practice Fusion

7    itself came out.  And then obviously in connection with the

8    negotiation of Purdue's own guilty plea.

9            Your Honor, at the end of the day, the NCSG,

10   again, very inaptly named, is really the only objector that

11   is making these, I think, really dangerous and unfounded,

12   unexpected claims that somehow the culture of the company

13   has not been sufficiently changed.  We have a UCC, we have

14   an AHC, we have an MSGE, we have a huge group of PIs, we

15   have a group of tribes, we have a group of hospitals, we

16   have the MAS babies, we have the MAS baby monitorings, we

17   have Main Justice.  No one is joining Mr. Troop in his

18   extensive musings to this Court that maybe things aren't

19   fully corrected yet, because it's not true and it's not

20   fair.  And to pull out of the blue this one person in

21   Customer Service dialed a phone number and maybe that should

22   be looked into, it only proves the opposite, which is there

23   are microscopes, and magnifying glasses, and multiple

24   processes going on to ensure that this company is all the

25   things that the Debtors and, frankly, the employees

Page 123

1    drastically reduced the number from the company this once

2    was are working so hard to deliver to the American people.

3              What's actually up for today, and with this I'll

4    close, is a compensation motion for five people, two of whom

5    are in Technical Operations, one of whom is a finance

6    executive, one of whom is a brand new general counsel, who

7    is basically Mr. Clean with years of government service at

8    the Department of Justice as the general counsel of the

9    Department of Agriculture and other august positions, who

10   was brought in to help figure this out and make it right;

11   and a CEO who is doing his job.  He is where he is supposed

12   to be and he's not where he's not supposed to be.

13             And we have nothing that I think -- you know,

14   what's presented today that comes close to suggesting that

15   paying basically below median compensation for the five

16   people who have worked so hard to preserve the actual value

17   with the cash balance of a billion dollars should not be

18   approved.  That's all I have, Your Honor.

19             THE COURT:  Okay, thank you.

20             MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg.

21   Could I make two quick points, Your Honor?

22             THE COURT:  Okay.

23             MR. SCHWARTZBERG:  The first, Your Honor, you had

24   some questions regarding salary and 503(c).  I just wanted

25   to point out, Your Honor, that salary is referenced in

Page 124

1       503(b) and then 503(c) the indicates, notwithstanding

2       Subsection B.  So, I wanted to point that out, Your Honor.

3              And, second, Mr. Huebner had asserted that we did

4       not provide any evidence, but I just wanted to also point

5       out that we did file an objection that indicated for, among

6       other things, there was no historical information.  And the

7       Debtors filed a response and it didn't include it.  And

8       that's why we had to cross Mr. Lowne today, Your Honor.

9              THE COURT:  All right.  Well, the Debtors do have

10      the burden of proof but notwithstanding the resources of

11      your office, there are such things as depositions.

12             Okay, I'm assuming that that closes oral argument.

13      I have before me a motion by the Debtors to obtain approval

14      of their 2021 Key Employee Incentive Plan, which would apply

15      to five current employees of the Debtors that would qualify

16      as insiders under the Bankruptcy Code.  The Bankruptcy Code

17      in Section 503(c)(1) establishes an extraordinarily

18      difficult, if not de facto, impossible standard that must be

19      met before a Debtor may make a transfer to or incur an

20      obligation for the benefit of an insider of the Debtor for

21      the purpose of inducing such person to remain with the

22      Debtor's business.  11 USC, Section 503(c)(1).

23             That subsection is premised by the phrase:

24      Notwithstanding Subsection B, there shall neither be allowed

25      nor paid -- and then the language that I just quoted.  Mr.

Page 125

1    Schwartzberg for the U.S. Trustee is correct that 503(b)(1)

2    includes as an administrative expense wages, salaries and

3    commissions for services rendered after the commencement of

4    the case.  But, again, 503(c) is introduced by

5    notwithstanding Section B, which would seem to indicate that

6    if one read the provision as broadly as I think the U.S.

7    Trustee might be trying to, it would not even -- it would

8    apply even to and notwithstanding the allowance of wages,

9    salaries and commissions if they fit into a transfer made

10   for the purpose of inducing a person who was an insider to

11   remain with the Debtor's business.

12        The courts have not adopted that interpretation of

13   Section 503(c)(1), largely because it makes no sense, but

14   also because they have recognized almost since the enactment

15   of 503(c)(1) that all payments to employees and executives

16   included within that definition have some retentive effect.

17   Obviously, if you don't receive wages, salaries and

18   commissions or if you're not paid market rates, then

19   generally you will, as soon as you can, leave the employ of

20   your employer and find a better paying job or a more

21   satisfying job elsewhere.  In re Dana Corp, 358 B.R. 567

22   671, (Bankr. S.D.N.Y. 2006).

23        The Debtors acknowledge that the five people that

24   are covered by the Key Employee Incentive Plan are insiders

25   under the Bankruptcy Code definition, found at 11 USC

1    Section 101(31).  And therefore they seek allowance or

2    approvals, rather, of the KEIP under 503(c)(3), which

3    applies to other transfers or obligations that are outside

4    the ordinary course of business, and does not permit them if

5    they are not justified by the facts and circumstances of the

6    case.  11 USC Section 503(c)(3).

7           Otherwise, because they would be out of the

8    ordinary course of business, the Court applies the general

9    standard applied under Section 363(b) of the Bankruptcy

10   Code, i.e., whether the proposed transfer or obligation is a

11   proper exercise of business judgment.  In re Velo Holdings,

12   Inc., 472 B.R. 201 (2012) (Bankr. S.D.N.Y. 2012), and In re

13   Borders Group, Inc., 453 B.R., 459473 (Bankr. S.D.N.Y 2011),

14   and In re Dana Corp., 358 B.R. at 576-77.

15          In that case, tying his analysis to the particular

16   facts and circumstances of a key incentive employee program,

17   Judge Lifland asked whether the program sufficiently

18   answered the following questions in deciding whether it made

19   good business sense to approve it:

20          First.  Is there a reasonable relationship between

21   the plan proposed and the results to be obtained -- i.e.,

22   will the employee be properly incentivized?  Is the plan

23   calculated to achieve the desired performance?

24          Second.  Is the cost of the plan reasonable in the

25   context of the Debtor's assets, liabilities and earning

1    potential?

2           Third.  Is the scope of the plan fair and

3    reasonable?  Does it apply to all employees?  Does it

4    discriminate unfairly?

5           Fourth.  Is the plan proposal consistent with

6    industry standards?

7           Five.  What were the due diligence efforts of the

8    Debtor in investigating the need for a plan, analyzing which

9    key employees need to be incentivized?  What is available?

10   What is generally applicable in the particular industry?

11          And, last, did the Debtor receive independent

12   counsel in performing due diligence and in creating and

13   authorizing the incentive compensation.  Id.  It is very

14   much a fact-based inquiry based upon the Debtor's resources,

15   the stage in the case, where the relief is being sought, the

16   nature of the compensation to the executives who would be

17   covered by the plan, how other employees are being treated,

18   the cost of the plan and the like.

19          Ultimately, I believe that Congress clearly enough

20   set forth the determination to be made by the Court as to

21   whether the plan is, in fact, proper compensation with an

22   incentive element to it.  Or, instead, tantamount to

23   improper favoritism to an insider based upon their insider

24   relationship and their being benefitted beyond good business

25   practice merely to report to work.  See, for example, again,

1    In re Residential Capital, LLC, 478 B.R. at 170; In re

2    Hawker Beechcraft, Inc., 479 B.R. 308-313 (Bankr. S.D.N.Y

3    2012), and In re Velo Holdings, Inc., 472 B.R. 201 at 207.

4    See also In re PG&E Corp., 2019 WL, 468 67 65 at Page 3

5    (Bankr. N.D. Cal. August 30, 2019)

6          The Debtor/Movant has the burden of proof to

7    establish both that 503(c)(1) does not apply to the plan and

8    that 503(c)(3)'s facts and circumstances test for an out of

9    the ordinary course action is also satisfied.

10          I have three objections to the proposed Key

11   Employee Incentive Plan, one of which is a limited objection

12   applying to only the Debtor's CEO, Dr. Landau.  The first

13   objection is by the state of Washington, the second is by

14   the United States Trustee, and the third is by the so-called

15   Nonconsenting States Group, which as a group still acts

16   under common counsel, although it is now made up of states

17   that both consent to confirmation of the plan and those that

18   have objected to the confirmation of the plan.

19          The motion clearly has a context that could be, in

20   many respects, viewed as law of the case, although they

21   filed their petitions late in 2019 and the metrics for a Kay

22   Employee Incentive Program would generally be set in the

23   early part of the year, i.e., in early 2019. The Debtors in

24   2019, after their petition date, sought approval of the 2019

25   program which would largely apply retroactively since by

1   that point, we were in the fall of 2019.  These plans are

2   updated and addressed on a yearly basis to reflect the

3   Debtor's circumstances as they evolve each year and,

4   therefore, in 2020, the Debtors also sought approval of the

5   2020 KEIP program and did so again in the fall of that year.

6   They have done so again for the 2021 program seeking

7   approval at the end of September, even though the company

8   developed the metrics for the program in early 2021 for 2021

9   performance.

10          The program has been modified in light of

11   negotiations with most of the creditor groups in these cases

12   in material ways that are detrimental to the executives

13   covered by the program.  First, the Debtors have agreed that

14   the annual award and the long-term award for 2021 will not

15   be subject to acceleration upon the effective date of the

16   Chapter 11 plan.  Instead, they have further agreed that the

17   entire 2021 KEIP annual award will be paid on June 30, 2022

18   as opposed to having a substantial portion of it paid in

19   calendar year 2021, as was the case with the prior awards

20   for the year in which they were earned.

21          Similarly, the potential claw-back from the 2021

22   long-term award has been extended through March 15, 2024 if

23   a recipient resigns or is terminated for any reason other

24   than by the Debtors without cause -- roughly, a two-year

25   extension.  The Debtors have agreed not to seek to assume

Page 130

1   any of the employment contracts of any of the 2021 KEIP

2   participants, therefore, not locking in those contracts as

3   part of the plan process.

4            And, lastly, Debtors have agreed to consult with

5   the Ad Hoc Committee of States and Other Governmental

6   Entities, the Multistate Governmental Group and the

7   Unsecured Creditors Committee with respect to measuring

8   corporate performance against the 2021 corporate metrics, a

9   function that would normally be performed solely by the

10  Compensation Committee and ultimately the board based on

11  presentations by management as to compliance or performance

12  compliance with the metrics.

13           And, further, have agreed that those committees

14  will consult with the Debtors in developing performance

15  metrics for calendar year 2022, although the normal time

16  when one would do that in February of 2022 may not come

17  before the effective date of the Chapter 11 plan.

18           All of those measures, as I said, are to the

19  detriment of the executives in that they delay their payment

20  and make their right to access to the long-term payment

21  subject to a more lengthy claw-back period.  The plan

22  amounts are also premised upon the reductions in the prior

23  years' KEIP programs, which aggregate approximately $4.8

24  million of reductions across the board.

25           The Court heard testimony by two parties, two

Page 131

1   witnesses, rather, in support of the KEIP:  Josephine

2   Gartrell and Mr. Lowne, who submitted two declarations in

3   support of the motion.  Both of them had also previously

4   testified at the two earlier hearings on the 2019 and 2020

5   KEIP program, where the United States Trustee made almost

6   exactly the same objection.

7           Based on my review of that testimony and

8   especially the testimony in the current witness declarations

9   as well as the live testimony today by Ms. Gartrell and Mr.

10  Lowne, it appears to me that the Debtors have carried their

11  burden of proof to show, first, that the proposed KEIP is

12  not the type of retentive bonus program that Congress had in

13  mind in 503(c)(1) and that the KEIP was designed to be

14  consistent with, although provide materially less

15  compensation than, the roughly three decades of compensation

16  history that these Debtors provided to their executives.

17  And, more importantly, was designed to enable these five

18  employees to be compensated on an aggregate basis, including

19  the KEIP, at median compensation rates compared to their

20  company's competitors or the Debtor's competitors.

21          That testimony by Ms. Gartrell was unchallenged

22  and credible.  The record is clear that when one looks at

23  the base salary of four of the five people covered by the

24  KEIP, that base salary is well-below, dramatically below in

25  fact, median compensation in the Debtor's industry.  25

Page 132

1    percent below the 25th percentile.

2         With the KEIP, if the target metrics are met, the

3    compensation for those four executives, including the fifth

4    one, the company's general counsel, will be at median.  The

5    company's general counsel is being paid well in excess of

6    media compensation, but no one has challenged his

7    compensation, and I believe rightly so given the evidence

8    before me and the evidence from the prior hearings in 2019

9    and 2020, which reflect the fact which is throughout these

10   cases -- I believe an obvious one, that his role as general

11   counsel is far more complex and difficult than general

12   counsel of a competitor in this industry, given the myriad

13   complex legal issues that, as general counsel, he needs to

14   deal with.

15        These payments, again, if the target is met, will

16   lead to median compensation in the industry.  There is no

17   ability under the KEIP to get more than the targeted

18   payment, notwithstanding the fact, as Ms. Gartrell has

19   testified, that it is common practice in the industry to

20   have such an ability going up to payment of 150 percent of

21   the target.  Here, the target is the limit and can be

22   reduced based on a right to get some payment between 75 and

23   100 percent for meeting metrics in part but not in whole,

24   and below the failure to meet the metrics there would be no

25   payment of the KEIP.  So, ultimately, what the KEIP enables

Page 133

1   is the opportunity to bring aggregate compensation for these

2   five individuals up to the median in their industry.

3          No doubt my ruling will be construed by some as

4   authorizing large bonuses to executives.  I do not believe

5   that that is, in fact, the case here.  A bonus is something

6   that you get over and above median compensation.  What

7   Congress addressed in 503(c)(1) was, in essence, an unearned

8   bonus for simply staying and working at the company; not

9   something, as is the case here, to bring compensation up to

10  a competitive level if one meets the metrics that are set on

11  a yearly basis or a somewhat lesser amount if those metrics

12  are not completely met up to a 75 percent threshold.

13         That structure of a KEIP Ms. Gartrell testified

14  to, again without any cross or contravention, is a typical

15  structure in the industry.  Indeed, the threshold, according

16  to her testimony, often goes all the way down to 50 percent

17  compensation for lesser performance than the target, as

18  opposed to the higher requirement of the present KEIP which

19  cuts off compensation at the level provided for here.

20         The state of Washington has objected to the KEIP

21  in a way that has been entirely refuted by Mr. Lowne's

22  second supplemental declaration.  The state of Washington

23  contended that Dr. Landau and Mr. Kesselman, the CEO and

24  general counsel, "bear at least some modicum of

25  responsibility for directing the actions and setting the

1   culture of a company that has caused untold destruction and

2   immiseration.  A company that by its own admission engaged

3   in a decades-long series of felonies."

4        What the state of Washington got wrong and,

5   indeed, its assertion is scurrilous in light of its failure

6   to get it right, is that Mr. Kesselman arrived at Purdue in

7   2018, well after the conduct that it rightly complains of.

8   Similarly, Dr. Landau became CEO of Purdue in June of 2017,

9   well after the conduct that is the subject or was the

10  subject of a DOJ investigation and the decades of misconduct

11  referred to in the objection.  Why would anyone having the

12  role of an attorney general of a state make such allegations

13  is perhaps better left for the voters.

14       The state of Washington and the United States

15  Trustee also argued, in their pleadings at least, not at the

16  oral argument, that the decision as to the 2021 KEIP should

17  be left to the post-effective date board of these Debtors.

18  We're talking about this year, performance and compensation

19  for 2021, where we're already at September 13th.  There will

20  not be a new board for this company in all likelihood until

21  2022.  There is, literally, no way that they should be

22  setting the compensation for 2021.

23       Indeed, in a recent and cogent article, the

24  deferral of that type of analysis has been highlighted as

25  something that shouldn't be done.  Similarly, the Debtors'

Page 135

1   waiting to set a KEIP after the petition date as opposed to

2   issuing the payments in 2019 before the petition date is

3   lauded as a best practice in the article.  Similarly, the

4   Debtor's agreement not only not to include the KEIP as part

5   of a plan but also to eschew assumption of the employment

6   agreements is lauded as a best practice.  Arguments to the

7   contrary are just boneheaded.  See Jared A. Ellias,

8   Regulating Bankruptcy Bonuses, 92 Southern California Law

9   Review 653, 695 (March 2019).

10          What the Debtors have done which is laudable is

11  agreed to include a wide swath of creditor groups in

12  advising their current Compensation Committee and board on

13  compliance with the metrics for 2021 and in helping to set

14  the metrics for 2022.

15          The U.S. Trustee has also argued that because

16  certain of the metrics are reduced in light of the company's

17  performance, there is something wrong with them.  Based on

18  Mr. Lowne's testimony including cross-examination, I

19  conclude to the contrary that the metrics -- the target

20  metrics, that is, were established or recommended by

21  management to the Compensation Committee and established by

22  the board to reflect the current condition of Purdue and, in

23  fact, in some respect, reflect better performance than last

24  year.  And in one respect, which covers two categories,

25  reflect understandably worse performance than last year, a

Page 136

1    $10 million shortfall as far as the performance target for

2    Adhansia XR net sales, which is also reflected in a roughly

3    $10 million drop in the performance target for consolidated

4    total business operating profit, as testified by Mr. Lowne;

5    Adhansia being a new product was run out in a COVID

6    environment that made it difficult to actually engage in

7    sales of that non-opioid product.

8              The declaration and testimony by Mr. Lowne also

9    addressed the U.S. Trustee's assertion that the people and

10   culture metric was vague and difficult to objectively

11   determine without further information.  Mr. Lowne detailed

12   numerous additional activities required of the Debtors to

13   prepare for emergence from Chapter 11 that are unique one-

14   year tasks, and also reflected what I believe is a proper

15   focus on establishing and supporting implementation of a

16   diversity, equity and inclusion roadmap through the end of

17   2021.  One would question how one could be more specific on

18   that than as described by Mr. Lowne, including as described

19   in the policies of the U.S. courts and the U.S. Trustee.

20   The objections of the U.S. Trustee therefore are overruled,

21   as are the objections of the state of Washington.  That

22   leaves the more limited objection by the Nonconsenting

23   States Group, which again was an objection only to the KEIP

24   for the Debtor's CEO, Dr. Landau.

25             And before I get to that, I guess I should mention

1      an objection by both the U.S. Trustee and the State of

2      Washington, although it hardly deserves being addressed.

3      Both of them have contended that because the Debtors

4      implemented and the Court approved a keep for 2019 and a

5      keep for 2021.  In essence, that's enough, they shouldn't

6      have to do it, or they shouldn't be allowed to do it for

7      2021 and presumably thereafter.  The reason for that is

8      really not at all articulated.

9              As I noted, each year is part of the normal

10     compensation for key employees of this company.  This

11     company has proposed this type of compensation and will

12     continue to do so.  To contend that the annual review of

13     that compensation should simply stop for some reason really

14     makes no sense.  It appears to me to the contrary, that the

15     reason the argument is made is simply to inflame people who

16     do not listen to the hearing and to the Court's ruling into

17     thinking that the Debtors are constantly seeking bonuses and

18     piling them on year after year, as opposed to proposing an

19     element of market compensation that puts the senior

20     executives at risk of not being paid at market, and does not

21     pay them above market.

22             So, again, returning to the last objection, which

23     is the limited one by the Nonconsenting States, in some

24     respects that objection raises important issues.  Clearly,

25     and I say this based in part upon the record of the

Page 138

1    confirmation hearing that I just conducted, and in part as

2    brought out thoroughly in that record, although I was well

3    aware of it beforehand, given the Court's approval of the

4    Debtors' November 2020 civil and criminal settlement with

5    the United States, that the culture, the corporate culture

6    of Purdue was sick, was in -- simply not the type of

7    corporate culture that a corporation should have.

8              It is important, obviously, to change that

9    culture, and there is considerable evidence in the record

10   that, in fact, under Dr. Landau's leadership such changes

11   have taken place, including the pre-petition termination of

12   the opioid sales force, the end of detailing, and the like.

13   The Debtors' Board was also substantially changed with the

14   appointment of an independent Special Committee that had

15   extraordinary power, and the appointment post-petition of a

16   monitor.

17             The Nonconsenting States have argued in their

18   four-page objection that Dr. Landau did not do enough to

19   change the corporate culture.  They have not identified what

20   in addition needs to be done.  But they have stated, and

21   there is some cogency to this, that Dr. Landau should have

22   at least directed those who were in a position to change the

23   corporate culture as to employees for past alleged

24   misconduct, to do so.  The Nonconsenting States have pointed

25   out that Dr. Landau does not appear to have been directly

Page 139

1    involved in either determining or recommending to others

2    that they determine whether any current employees should be

3    terminated because of their improper conduct in the period

4    before he became CEO, or even thereafter; although, they

5    have not really identified any improper conduct of any

6    employee that arose thereafter.

7         The Debtors have quite cogently pointed out that

8    because Dr. Landau was himself named as a defendant in some

9    complaints against Purdue and the Sacklers, pre-petition,

10   albeit that he strongly denies the claims that were asserted

11   against him in that litigation, it would have been improper

12   for him to inject himself into the process of determining

13   who acted properly or improperly at Purdue, who was still an

14   employee there.  I agree with that argument.  That role

15   really needs to have been assumed by other parties, whether

16   that would be the Special Committee or outside counsel, as

17   opposed to by Dr. Landau.

18        There is no evidence before me to show that any

19   current employee does deserve to be fired or any evidence

20   that the Debtors have turned a blind eye to any improper

21   past conduct.  Indeed, it appears the Debtors have been very

22   attentive and responsive to allegations of specific --

23   regarding specific current employees' alleged past improper

24   conduct, as well as to any allegations of current improper

25   conduct.

Page 140

1          Ultimately, of this record, I do not believe that

2    therefore is sufficient evidence to deny the Debtors' motion

3    as to Dr. Landau.  On the other hand, I will note that since

4    the first order granting a keep motion, and this will be the

5    case for this order, I have provided for disgorgement if it

6    turns out later that any recipient of a payment has engaged

7    in misconduct.  And the current language was further beefed

8    up in my order approving the KERP motion, and will be in

9    this order as well.

10          If any party believes that these Debtors are

11   continuing to employee people who should not be employed

12   because of their role in prior misconduct, that issue should

13   be addressed with a proper evidentiary record and not by

14   insinuation or innuendo or request to prove a negative.

15          It's a serious issue and should be addressed with

16   the seriousness that it warrants, i.e., with a proper and

17   full record, not a four-page objection, and in essence,

18   requests to approve -- I'm sorry, to deny the relief based

19   on the failure to prove a negative.

20          So, I will grant the motion as it has been revised

21   based on this ruling.  And so, the Debtors can email the

22   proposed order to chambers doing that.

23          MR. HUEBNER:  Thank you, Your Honor.  I believe

24   that brings us to the last item on the agenda for today.

25          THE COURT:  Right.

1          MR. HUEBNER:  Which I believe is also being

2     handled by Ms. Benedict of our office.  If I could ask her

3     to take over the podium, I'd be appreciative.

4          THE COURT:  Okay.

5          MS. BENEDICT:  Thank you, Mr. Huebner.  Thank you,

6     Your Honor.  Once again, this is Kathryn Benedict, of Davis

7     Polk & Wardwell LLP on behalf the Debtors.  Can you hear me?

8          THE COURT:  Yes, I hear you fine.

9          MS. BENEDICT:  Thank you.  The last item on the

10    agenda is Ms. Isaacs's motion, and I believe we've seen Ms.

11    Isaacs, so I'd ask her to turn on her video if she'd like to

12    be heard.  Thank you.  And as Ms. Isaacs is movant, we will

13    turn the podium over to her.

14          THE COURT:  Okay.  Good afternoon, Ms. Isaacs.

15    And I can tell you I've reviewed the motion.  I've read it

16    and read the Debtors' objection, but I'm happy to hear for

17    you.

18          MS. ISAACS:  Thank you, Your Honor.  All right.

19    This is going to be really hard to do, Your Honor, so please

20    bear with me.  All right.  My name is Ellen Isaacs.  I'm

21    here representing my beloved son, Ryan, myself, many unborn

22    fetus's that were born -- never born, due to mothers that

23    were prescribed OxyContin, the over 500,000 who have died,

24    for those that are currently addicted to opioids, to give

25    voice to those who under the Fourteenth Amendment of the

Page 142

1    Constitution, have been denied their rights to be heard, for

2    the millions of families, friends, and associates with

3    mental health disorders caused by those suffering substance

4    use disorder, and to give warning and notice to the rest of

5    the world as these proceedings only have standing in the

6    United States of America.

7            Your Honor, thank you for allowing me to take the

8    Court's time and energy by allowing me to bring forth this

9    motion on behalf of myself and the American people.

10   Although I was never personally notified, I read the

11   Debtors' objection and understand as part of our legal

12   procedures, I can't say that Debtors made a full search and

13   not all the creditors agree.  If that were the case, I would

14   not have received a call from my former counsel telling me

15   they liked my motion, the very attorney's office that is

16   representing some of the people's claims.  These

17   incongruencies are exactly why I'm here today.

18           The attorneys are playing games on paper and

19   humans are dying.  Mr. Huebner, in a prior motion, talked

20   about howling.  I am here for my family and the families

21   across the nation howling.  We are outraged, as you have

22   verbally confirmed bankruptcy prior to hear this emergency

23   motion that was previously on the calendar and filed well

24   prior to Confirmation, and reviewing the objection in this

25   matter, it now falls under due process and other relief.

Page 143

1         The broken legal justice system is part of the

2    problem contributing to all the death, dismemberment, and

3    personal injury that in the people's nation is now a full-

4    blown mental health pandemic.

5         The opioid pandemic that was permitted to develop

6    due to Purdue Pharma and the FDAs nonadherence to their

7    responsibilities as business owners and government employees

8    has been ineffectively addressed by the government for more

9    than two decades.

10        As this case has progressed, I have read,

11   observed, and heard the most outrageous rationalizations,

12   excuses and justifications by most everyone, including my

13   prior counsel, Andrew & Thornton and ASK, LLC, and had many

14   epiphanies.  Because of this, here is where I began to

15   follow many of the moving pieces in this case to put my

16   boots on the ground to uncover many truths.

17        Over the years, I've spoken to many people in

18   recovery, recovery professionals, homeless, afflicted,

19   grieving parents, policy makers, legal professionals,

20   business owners, nonprofits, college students, pharmacists,

21   physicians, medical examiners, law enforcement personnel,

22   press, advocates, activists, and many more in between.  For

23   clarification, Your Honor, the Sacklers are Purdue Pharma.

24   The family is the controlling members of Purdue Pharma.

25        A corporation, a legal entity does not take any

Page 144

1    action on its own.  A corporation does not create,

2    manufacture, distribute, or sell a product without the

3    individuals to be the decisionmakers.  We are in the midst

4    of the largest fraud ever perpetrated in the United States

5    and the world, and I intend to show how this began and still

6    exists today.

7            Our bankruptcy system is for corporations and

8    individuals that are insolvent.  It is not to be utilized by

9    the wealthy for manipulation to be self-serving.

10   Manipulation is highly referred to in the Securities Act in

11   1933, and the Securities Fraud Enforcement Act of 1988.  The

12   Securities Fraud Act was developed due to securities fraud

13   schemes.  Here in the 21st century, we now have bankruptcy

14   and corporation fraud that is surfaced behind decades of

15   death, dismemberment, personal injury, pain, and sorrow.

16           The Webster's Dictionary's definition of

17   manipulation is (1) to manage skillfully and especially with

18   intent to deceive, and (2) the candidates try to manipulate

19   the public.  The definition of fraud is wrongful or criminal

20   deception intended to result in financial or personal gain.

21           The Sackler Family is hiding behind the

22   corporation named Purdue Pharma.  The Sacklers have been

23   continually and systematically using the already broken

24   justice system through their attorneys with perpetual

25   manipulation fraud for decades.  They've used these tactics

Page 145

1    at the minimum since the inception of OxyContin.

2           I could go back to Purdue's launch of Valium and

3    Librium in the 1960s and all those harmed, but that is not

4    why we're here today.  All of the senseless deaths,

5    dismemberment, personal injury, and trauma imposed on the

6    families across the nation were created by the Sacklers'

7    manipulation and fraud towards the U.S. people and the U.S.

8    government.

9           In October 2020, they admitted defrauding

10   regulators and paying illegal kickback to doctors.  The DOJ

11   also reported the Sacklers, "criminal guilty pleas, a

12   federal settlement of more than $8 billion, and a

13   dissolution of a company, and repurposing it assets."

14          Then we have their admitting to wrongdoing back in

15   2007 with the misleading labeling in their marketing

16   materials.  Back then, according to the Justice Department,

17   "Purdue Pharma pled guilty to violating federal requirements

18   to monitor promotion and sales of OxyContin, and making

19   false claims to Medicare and Medicaid" and "the company,

20   which manufactured millions of OxyContin pills during the

21   height of the opioid pandemic, was accused of marketing and

22   offering kickbacks to doctors in violation of federal

23   statute."

24          They are guilty.  2007 was the first wave of

25   deception unto the government by the Sacklers following a

1    spike in opioid related deaths.  They got a slap on the

2    wrist and paid a fine.  They did a reset and began their

3    marketing antics all over again, and the sales

4    representatives became more aggressive.  The Sacklers have

5    one motive, money.  They will use any means, including

6    manipulation and fraud to achieve their end goal, which is

7    keeping their wealth intact and creating more wealth.

8         The blood money of my son, current injury to

9    myself, and millions around the globe with very similar

10   circumstances behind the decades of the Sacklers clear

11   intentions and actions that harm millions.  This has all

12   been laid out by the Senate Oversight Committee, the DOJ,

13   the FBI, and multitude of governmental agencies across the

14   nation, and these proceedings because it has been, and

15   continuously profits over the health and safety of the

16   American people.  Even the attorneys are putting profits

17   over the health of the families and the grassroots of our

18   communities.

19        Much of the timeline of the facts have been laid

20   in a plethora of documents filed with this Court.  It is all

21   so confusing unless you have your docket numbers, the

22   keywords of exactly what you're looking for.  It's very

23   difficult to field through the myriad of discovery.  For a

24   layperson who cannot afford an attorney, and not have the

25   knowledge to seek such information, and these proceedings

Page 147

1   are not fair and impartial.  For those here in the know, I

2   will not waste everyone's time that's here and reverberate

3   the timeline the Sacklers domestic genocide that has taken

4   over 500,000 loving humans from us, with the death toll

5   inflicted climbing.

6          The Sacklers are not bankrupt, nor is their shield

7   of Purdue Pharma.  Purdue Pharma is now selling another

8   habitual extended-release stimulant drug, Adhansia, XR.

9   Let's be fully transparent.  This drug is much like

10  methamphetamine, approved for children six and over -- an

11  extended-release stimulant for children.

12         They also purchased a $6.8 million office building

13  in West Palm Beach, Florida.  I have many more examples of

14  how the Sacklers or the shield of Purdue Pharma are not

15  insolvent.  They are operating just fine and are

16  fraudulently abusing the legal justice system and costing

17  our government endless amounts of money to hold these

18  proceedings.

19         The Sacklers, by way of their attorneys, who are

20  trained find loopholes in our legal justice system, are

21  continuing to systematically manipulate the bankruptcy laws

22  and Your Honor to evade justice and protect their own money,

23  alongside shielding more than 1,000-plus others they

24  clearly, and on the record, have been in collusion with.

25  The Sacklers are withholding 30 million internal documents

Page 148

1    from the public.  It's all fraud, and it's been decades of

2    death, dismemberment, and permanent personal injury,

3    physical, and emotional trauma, and a (indiscernible) by the

4    Sackler Family.

5         How we are all sitting here today with David

6    Sackler threatening this very Court to pull the settlement

7    if the Court does not agree to the family's terms is very

8    alarming.  If one person murdered one person, they are

9    looking at life in jail or death row.  Here, we are

10   listening to one entire family manipulate the legal justice

11   system over and over again with little to no consequences

12   for the public health and safety emergency they created with

13   over 500,000 deaths.

14        Why?  I would argue because they can afford to do

15   so.  The laypeople collectively do not have the wealth to go

16   up against Purdue Pharma.  I do not have the wealth, but I

17   have the wherewithal, perseverance, and moral compass to

18   stand up for myself and the American people.

19        It's unconscionable for the governing members of

20   Purdue Pharma, the Sackler Family, to believe that $4.3

21   billion over nine years is going to be adequate compensation

22   to relieve the pressure valve and the mental health pandemic

23   that is rippling like a pebble in a pond across the entire

24   nation.  No one should forget that from 2016 to 2018, the

25   government paid out over $650 billion for services, and

1    there has been little to no relief with the numbers of

2    deaths and hospital admissions soaring.

3            This does not include the (indiscernible)

4    financial impact of the mental health services paid by the

5    government for the family members that sought and continue

6    to seek mental health services behind the death,

7    dismemberment, personal injury, and those family members'

8    mental anguish, trying to keep those afflicted alive.

9            This brings me to millions of people that have

10   viable claims against Purdue Pharma and were not effectively

11   notified.  There were millions of OxyContin prescriptions

12   written since the very first prescription and

13   administrations during trial studies.  I personally would

14   have never known this lawsuit was going on had I not been on

15   a social networking platform in a bereaved parents' group.

16   This is where the law firm set their traffic on the web,

17   using keywords to send clients to advertising.

18            (Indiscernible) reports show approximately 21

19   million to 23 million are currently afflicted with substance

20   use disorder.  Many of the 21 million to 23 million

21   afflicted, and many of which are viable claimants, they

22   aren't sitting on social networking seeking comfort from

23   another grieving, nor are they watching television to see

24   infomercials about possible lawsuits when they've been

25   taken.  Many are just looking for help to get off of the

Page 150

1   poisonous drugs, or out seeking more drugs so they're not

2   physically sick from withdrawal.

3           In my travels, many have asked how they can

4   participate in this legal action, and it was passed the

5   filing deadline.  These people had no idea these proceedings

6   were happening.  There were millions of loving humans that

7   have not received their due process to file claims in this

8   very proceeding.

9           U.S. Attorney of this New York Southern District

10  recently quoted, "the Plan violated the constitutional

11  rights to due process for those with potential opioid

12  claims."  Here is where we can get into the constitution.

13          My son's life has been taken.  My life has been

14  forever altered.  I do not have the liberty or free rein to

15  do what I want to do with the physical harm inflicted on me

16  by the Sacklers.  I spend my days trying to survive and

17  navigating the physicians and the insurance company.  My

18  property is all but gone and I cannot get my attorneys to do

19  anything I ask them to do.

20          Myself and the people of this nation have had no

21  say in these proceedings.  As these tedious, time-consuming,

22  keystroke-slamming, paper-shuffling, thumb-drive jamming,

23  mincing words proceedings are going on, the CDC reports

24  approximately 200,000 more loving humans have died from

25  opioid related deaths.  Many of these aggrieved families

Page 151

1    that had a love one pass on that was precipitated by

2    OxyContin, also should be able to file claims against the

3    Sacklers.  There should never be a deadline on protection

4    for taking of a human life financially.

5           The latest statistics from President Biden of over

6    93,000 drug-related deaths in 2020, reduces it to a death

7    every five minutes.  This number does not include drug-

8    related suicides and murders, nor does this number

9    demonstrate all the drug-related nonfatal overdoses pouring

10   into medical facilities and inundating the healthcare

11   system, or the overdoses that civilians revive people from

12   in their homes and on the streets around the nation daily.

13          Here is just one example of the severity of the

14   rise in nonfatal overdoses from one medical facility in our

15   nation.  Using data from a single emergency department in

16   Richmond, Virginia, researchers compared unintentional

17   nonfatal opioid overdoses between March 1st and June 30th,

18   2020, with the same time period in 2019.  There were more

19   than twice as many visits for nonfatal opioid overdoses in

20   2020.  The number was 227 in 2020, compared with 2019 of

21   102, despite roughly 10,000 fewer emergency department

22   visits in 2020.  Black patients accounted for the highest

23   number of overdoses in both years, and the proportion was 17

24   percent higher in 2020 than in 2019.

25          We are all wise to the non-debtor loopholes, Your

1    Honor, which is why we are in your particular court with

2    you.  Your Honor, for this Court to permit such wide-

3    reaching third-party relief is creating a precedent for

4    every big pharma corporation to do the same as the Sacklers,

5    who are manipulating and defrauding our government at the

6    expense of the life, liberty, property, and due process of

7    the American people.  It will also permit every single

8    corporation to do the same, anyone will be permitted to tell

9    the corporation, behave unscrupulously, harm the public, and

10   walk away by declaring bankruptcy.

11            Bankruptcy was never created to protect a

12   corporation or family to keep their wealth over that of a

13   human life.  The unraveling of this case and the precedent

14   being set will be an undertaking that will cost our

15   government billions.  The cost of appeals will be in the

16   billions for the Sacklers and the claimants, and the only

17   ones that will profit is the attorneys, attorneys that were

18   to represent the people.

19            How many more claimants beside myself requested

20   their attorneys to file motions that were met with

21   resistance, yet the attorneys was 33 percent of the fund for

22   partaking in this charade.  Only 7.5 percent of this

23   settlement is being allocated for the victims.  What?  And

24   approximately $250 million of that will be paid to the

25   claimants' attorneys, leaving only $500 million of the $4.3

Page 153

1    billion settlement of the 130,000 victims that filed claims.

2    This makes no sense.

3            The victims are getting the least compensation in

4    this agreement.  The claimants' voices were not permitted to

5    be heard in these proceedings, and I have an overwhelming

6    objection -- because the people were not heard, I have an

7    overwhelming objection to the payment to the attorneys.

8            Your Honor, I have looked into your history on the

9    bench as a bankruptcy judge, and found that you've done a

10   lot of great things over the years.  No disrespect, Your

11   Honor, as an outsider looking in, it is very apparent that

12   the Sacklers via their counsel, used you to get to the ends

13   of their means.

14           It's so sad.  I'm sure this is not shocking for

15   anyone to hear as it's been all over the news and the

16   Internet.  It's a well-known fact that the Sacklers hand-

17   picked White Plains to file their bankruptcy proceedings

18   because of your well-known history of providing widespread

19   third-party releases.  You are the only bankruptcy judge in

20   this District that the Sacklers preyed upon you like they

21   have the American people.  They will stop at nothing, not

22   even creating a public health and safety emergency to create

23   and retain their wealth.

24           Again, no disrespect to you, Your Honor.  However,

25   you need to know the facts.  I asked my counsel to request

Page 154

1    for you to be recused from this case for your protection for

2    a fair and impartial outcome for the people.  My attorney's

3    office advised me they would not file the motion because you

4    "are too liked by all of your peers."  This statement made

5    me pause and engage with Sean Higgins, the once highly

6    hopeful attorney and in the end of all was no longer

7    exhibiting hope.  It was clear, reading between the lines,

8    an exit strategy in these proceedings was underway.  The

9    attorneys were not in a financial position to stay in the

10   fight, and now wanted the abatement to start.

11          Despite it all being unfair and unjust to the

12   victims, I was left scratching my head and wondering, who do

13   the attorneys work for, and does anyone in these proceedings

14   have a moral compass or has everyone got a tie in to save

15   their jobs, companies, or elected seats.  I'll show you how

16   in my travels, the Sacklers are terrorists.  If this had

17   been a terrorist attack like that of 9/11, the military

18   would be called in.

19          Here, we have over 500,000 deceased by one family

20   and our government is idly standing by watching the mental

21   health statistics of the American people per the latest

22   (indiscernible) report soared over 52 percent.

23          The Sacklers are (indiscernible) to a power to

24   because powers and racketeers, they are addicted to money.

25   Their fraud comes in many forms and it's mostly all part of

Page 155

1    the record.  Lack of due process of the citizens and far-

2    reaching, widespread, third-party releases, extremely

3    disturbing Board Room conversations, hideous emails, texts,

4    and messaging to push OxyContin sales, thwart any

5    wrongdoing, to retain their personal wealth.

6          Then we have deception in these proceedings by

7    (indiscernible) Perkin, ASK, LLC, prompting the claimants to

8    vote in favor of the Bankruptcy Plan with no explanation.

9    My ballot came through that said that I wanted to vote yes.

10   That's coercion.

11         The filing of the affidavit for the Court that

12   depicts this unscrupulous act by Prime Clerk and it was

13   never addressed.  The Attorney General's filing suit against

14   Purdue Pharma and then reversing course under duress by the

15   Sacklers and their attorneys despite this case having the

16   most overwhelming amount of hours of discovery,

17   interrogatories, depositions, filthy pleas, and the DOJ

18   evidence of fraud.  There are conditions in the Settlement

19   Agreement that prohibit funds for those government entities

20   that did not agree to the Settlement Agreement, and that is

21   coercion.

22         Although Kathe Sackler would like to confuse the

23   Court by reminding everyone on camera, the company pled

24   guilty, and not the individuals.  I would like to remind

25   this Court that the Sacklers are Purdue Pharma.  They are

Page 156

1    one in the same.  The corporation is a piece of paper.  The

2    corporation does not have hundreds of investors to attack.

3    It is one family, and one family alone.  And it has had

4    controlling interest, deceived the public and our government

5    to create a mental health crisis of pandemic proportions.

6    They were the decisionmakers that created the wave of death,

7    dismemberment, and personal injury, and mental anguish to

8    millions.

9            Here is the most egregious fact.  The real part is

10   the Sacklers are not giving up anything to the American

11   people.  They have used smoke and mirrors to fool our

12   government and American people for decades.

13           Please follow along, Your Honor.  In 2018, it was

14   reported that Purdue Pharma's net profits since the

15   inception of OxyContin was $31 billion.  In 2019, one year

16   later, Purdue Pharma's net profits increased to $36 billion,

17   a $5 billion increase in profits in that one year.  In that

18   same year of record, the Sacklers were aggressively moving

19   money around to off-shore accounts, and there are accounts

20   still unaccounted for in excess of $4.3 billion.

21           The Sacklers' wealth is shielded in a web of

22   companies and trusts, some registered off-shore tax havens.

23   In one example, the Board instructed that the money pass

24   through three layers of holding companies and split equally

25   between (indiscernible) Company and Rosebay Medical Company,

1     the other ultimate parent company of Purdue.  Both are

2     controlled by Sackler Trusts.

3            An examination of Sacklers' web shows striking

4     complexity and desire for secrecy while pursuing lengths

5     between (indiscernible) Holdings.  The family has worked

6     with (indiscernible) to move money out of Purdue to insulate

7     their fortune.

8            The fact remains, the money they're reported to be

9     paying is coming from the parties that paid for their

10    prescriptions to start with, the victims, the insurance

11    companies, Medicare, and Medicaid.  It's not their money.

12           Then to add insult to injury, they wish to deceive

13    the American people with two heart-wrenching presents, a

14    cancerous corporation has been determined to have killed

15    over 500,000 loving humans at this juncture, and a

16    nationwide public and health and safety emergency.  Note, a

17    corporation is a trigger to every family member or friend

18    that has been -- had a love one pass on or to those

19    afflicted and are in recovery as a result of domestic

20    genocide fueled by the Sacklers.

21           Also, analysts have calculated the Sacklers' $11

22    billion disclosed wealth they should be walking away with

23    has the potential to earn $4.3 billion, they're offering in

24    exchange for any future liability of Purdue Pharma or the

25    Sacklers personally by 2024.

Page 158

1        I'd like to go back a moment to the public

2   corporation.  Why would I or anyone else ever agree to

3   taking this corporation is beyond comprehension?  To hear

4   the revenue of the corporation, including OxyContin sales,

5   is going to be used to rehabilitate the communities and

6   mitigation the opioid epidemic is absolutely startling.  The

7   mere suggestion to the public, but really the government

8   will run the entity, will be selling deadly opioids and

9   benzodiazepines that are causing death, dismemberment,

10  personal injury, mental, and physical disease to our

11  citizens, and ripping families apart, virtually causing

12  everyone harm, and then turn around and use the revenues

13  obtained as the citizens continue to be harmed, and then try

14  to rehabilitate them.  This makes absolutely no sense.

15  There isn't more illogical.

16        To expand on how illogical it all is, the FBI will

17  be in control of the public corporation.  The FBI, who has

18  investigated the Sacklers for criminal misconduct in

19  deceptive opioid marketing and sales, will be the nation's

20  new drug dealer.

21        The Sacklers are also Purdue Pharma -- or

22  Mundipharma of Frankfurt, Germany.  And as of May 2021, has

23  a presence in over 120 countries, along with a multitude of

24  corporations the Sacklers own.  They have layered these

25  companies and moved money around between the companies,

Page 159

1    confusing investigations to shield their wealth.  Why the UN

2    is not involved is baffling.  Why a world court is not

3    overseeing this case is also baffling.

4          The Sacklers have invited a worldwide

5    investigation into the domestic genocide by their own

6    unscrupulous actions.  In 1991, the Sacklers claimed to be

7    "pioneering developing medications for reducing pain, a

8    principal cause of human suffering."  That is the furthest

9    statement from the truth.  The truth is, they were and

10   continue to be the pioneers of creating the worst public

11   health and safety emergency in American history.  The human

12   suffering they created, will carry forward into generations

13   to come with all the grieving family members and

14   insurmountable amount of emotional and physical pain.

15         Then there are the parentless children.  What

16   about the children?  Like many of the children that are

17   victims, my granddaughter will never know her father.  Her

18   mental health is at risk and she's predisposed for substance

19   use disorder.  The irreparable damage the Sacklers have

20   caused my family and millions of families around the globe

21   is reprehensible.

22         Your Honor, the temperature is rising and humans

23   with feelings and emotions are getting angrier.  It was once

24   said it was hard to navigate the system.  I say you can't

25   navigate through a locked channel, or in this case, a broken

Page 160

1    system.  There are people like Susan Ousterman, who's here,

2    Your Honor, I'd like her to speak after me, myself and more,

3    that care with compassion, empathy, and love, with no

4    financial vested interest in these proceedings, that will

5    continue to help humanity and ensure the next right thing

6    gets done by the people for the people.

7            The Sacklers continuing systematically undermine

8    the very institution of our Founding Forefathers, and this

9    very Bankruptcy Court to keep the harm from their wealth.

10   Drug dealers do not get to keep their assets.  All assets

11   and property are seized and they go directly to jail.

12           Please refer this case to the Justice Department

13   for criminal prosecution, overrule the corporate and

14   bankruptcy laws, and escalation to a world court to stop the

15   Sacklers from conducting business in the pharmaceutical

16   industry worldwide.

17           Based on the facts of fraud, I respectfully

18   request on behalf of myself and the American people, that

19   Your Honor reverse course and reconsider the bench ruling

20   for confirmation and enter an order denying this Settlement

21   Agreement in its entirety, along with an order for an

22   immediate investigation by a third-party into the entire

23   bankruptcy proceedings so this never happens again.  Then

24   please recuse yourself from this case.

25           I have a few last things.  One, Your Honor, it's

Page 161

1   your choice.  I believe that you do not want to go home at

2   night worried and saying to yourself, I should have done

3   more, I should have done something differently.  Nor do I

4   want this stress of this particular case to make you sick

5   like it has many and many across our nation.  Please stand

6   up and make the right decisions and the best intention of

7   not only the people here in the United States, but for

8   everyone around the globe, and the 120 countries that the

9   Sacklers are currently conducting business in under

10  Mundipharma, Mundipharma International, all the corporations

11  the Sacklers own under the guise of trust.

12          Two, Your Honor, I'm not an attorney.  I'm a

13  grieving mother seeking to save humanity from the physical

14  and emotional pain rippling around the globe.  I will

15  continue to be here to represent the people unless Alan

16  Dershowitz or Ryan Zant comes out of retirement, or possibly

17  some nonvested person in the outcome alone comes along to

18  represent the people.

19          Three, you've had many letters submitted to your

20  office by the bereaved family members for your review.  And

21  out of the parties involved, I have yet to submit my letter

22  on this matter.  And up until the last few months, I still

23  wanted to believe my former attorney had my family's best

24  interests at heart, but it's just false.  Everybody's about

25  the money.  So, I will share this letter with you now.

Page 162

1          Dear Judge Drain, I am the bereaved mother of

2    Patrick "Ryan" Wroblewski.  Ryan's happy-go-luck -- Ryan was

3    a happy-go-lucky child with a zest and zeal for life.  He

4    had a spirit and energy about him that I had never

5    experienced before.  He was smart.  He could do a

6    complicated math problem in the millions without a

7    calculator.

8          He loved to be outdoors at the beach, playing

9    paintball, going on adventures, camping, working, listening

10   to music, playing video games, board games, and playing

11   cards, but most of all enjoying time with his brothers and

12   friends.  When he laughed, it was contagious.  He was very

13   crafty with his hands and loved being a master carpenter.

14   Very rarely did he need directions to put anything together.

15         Ryan would light up the room when he walked in.

16   Ryan had a magical charm about him.  He was a human being

17   that had real feelings and emotions for others in humanity.

18         On the flip side to all of his attributes, Ryan

19   experienced a 17-year slow and emotionally and physically

20   painful cancerous death behind OxyContin.  In 1999, when

21   Ryan was about 16 years old, he had an injury to his spine.

22   The physicians placed him on OxyContin.  Yes, a 16-year-old

23   was prescribed 40 mg of OxyContin every eight hours.  As the

24   parent, I was told by the physician this new drug was less

25   harmful than the other drugs on the market and there was to

Page 163

1    be less potential for abuse.  This was far from true, as we

2    all know.  When the physician decided that Ryan no longer

3    needed the medication, he became physically sick and no one

4    could explain how to stop or alleviate the withdrawal

5    symptoms.  This was when he began seeking other avenues to

6    obtain OxyContin.

7           He and a few of his friends that had now also

8    found their way to this drug, began a laborious process of

9    physician shopping to not be sick.  They would share their

10   medication between each other and look out for one another.

11          Ryan went through 17 years of physical and

12   emotional torture.  The angst that he internalized was

13   severe.  When Ryan became 18, I could no longer help him.

14   The HIPAA laws would not permit me to gain access to his

15   records to get him the help he needed.  As a parent, I felt

16   helpless.  The government was prohibiting me from helping my

17   child.

18          By 21, the cravings for OxyContin were so severe

19   that some of his decision-making processes became

20   questionable.  The craving for the drug superseded any

21   rational thought because that is what the opiates do to the

22   human brain.

23          By 24, 25, everything in his world as he knew it

24   spun out of control and he lost nearly everything.  He lost

25   his girlfriend of eight years, his housing, his job, and two

Page 164

1    of his brothers turned the other cheek, along with nearly

2    the entire extended family.  The once family-oriented child

3    told me he felt like an adult child of a single mom.  Yet,

4    he physically had a biological father and three brothers.

5    OxyContin tore our family to shreds.

6              Also, at this time the pill mills spawned and they

7    could all pick a doctor on the same block.  Then when the

8    raids came on the pill mills, to not be physically sick,

9    Ryan slowly disintegrated into heroin.  During the next 10

10   years his heroin use became more extensive.  I would suggest

11   that he go to treatment, and I was met with resistance.

12   Ryan believed he had to work to sustain a life, and if he

13   was in treatment there would be no income to provide basic

14   essentials.  His mind was caught in a trap.  Like with

15   OxyContin and all pain medication, the human body builds a

16   tolerance to the medication and the dose needs to be

17   increased to reduce pain or increase euphoria.  It also

18   takes away your ability to think clearly.  Either way, it's

19   a lose-lose situation because coming off higher doses of

20   pain medication and heroin is much more difficult and

21   dangerous.

22              He also began to experience weeks of homelessness

23   as he became a recluse out of shame and stigma.  One of his

24   dear friends told me that Ryan told him, "I am a huge

25   disappointment to my mother."  No, the government is a huge

Page 165

1    disappointment to me.  The very people that are supposed to

2    protect and serve the people, the Sacklers, and the

3    physicians, the pharmacists, killed Ryan.

4           In those 10 years, no matter what was going on

5    with him, Ryan always showed up for me and wanted nothing

6    more than to have a cohesive family unit with his brothers.

7           He has also had a lot of emotional ups and downs

8    behind his feelings and yearning for the family unit.  He

9    would describe the feelings of abandonment, worthlessness,

10   unloved, disrespected, mistreated, inferior, lonely, and so

11   on.  One evening he explained to me that when he is on

12   opioids all of his emotions go away and he feels free from

13   society ridiculing him and labeling him.

14          At the latter part of the 10 years, Ryan called to

15   say he was having a child.  The day I got this call, was the

16   happiest I had heard from him since before the physician

17   first prescribed him OxyContin at 16 years old.

18          Also, during this 10 years, I received a

19   disturbing call from my grandmother, Ryan's great-

20   grandmother.  Ryan was on the living room floor curled up in

21   a ball saying he wanted to die and crying.  I was devastated

22   for the two of them, and sent in the troops to go get him

23   and bring him to me again.  This was one of the many times a

24   core group of us would go get one of the many afflicted.

25   This was one of multiple times it was my son.  I am truly

1    grateful for these persons and they know who they are.

2            When the Medicated-Assisted Treatment drugs

3    Suboxone and Subutex came out, he thought he had found the

4    answer to not being sick and tapering off of the opioids.

5    No, that was not the answer.  Suboxone and Subutex are also

6    being abused by individuals in the grassroots of our

7    communities.  These prescribing physicians have taken

8    advantage of what was to be a short-use drug to get people

9    off of the opioids and are also further harming the public

10   for profits and providing these drugs long-term which is

11   adding to the public health and safety emergency.  These

12   unscrupulous doctors are taking cash only just like the pill

13   mills did.  It's all about the money.

14           Ryan changed geographic locations and ended up on

15   heroin with methamphetamine.  In a panic from the

16   methamphetamine, he returned home and started seeking out

17   help.  He would spend night after night outside the local

18   state-funded facility for a bed.  He would ask me why do I

19   have to get high each night to get a bed in treatment when I

20   am trying to get off the drugs.  None of what was going on

21   at this state-funded facility made any sense.  I could not

22   explain to him that they get paid for every intake whether

23   they have a bed or not, and it's all a game of government

24   monopoly.  This was his life he was fighting for and I was

25   trying to give him a lot of hope and love.

1              He eventually heard from another client about the

2      money scheme and decided he was not going back there to be

3      shuffled around so they could get a check at his personal

4      expense.  He had integrity.

5              Then he was approached by a gentleman who says he

6      can get him into treatment.  Ryan goes to treatment and

7      there -- while there learns that the fellow was an insurance

8      broker that got paid by someone else to refer him and the

9      center paid for his insurance.  I then get another call; he

10     doesn't know what to do.  He wants to stay because he

11     believes this is the best chance, he has to get clean, yet

12     is conflicted and wants to leave because he does not want to

13     get in trouble.  He decided the benefit of himself getting

14     better over the next few weeks outweighed the risk of

15     getting in trouble and reverting back to a life he no longer

16     wanted to live.

17             Shortly after Ryan's graduation, the center was

18     shut down.  Ryan stayed off opioids for about a year.

19     During this period of time he was gainfully employed,

20     playing cards, video games, enjoying the beach, laughing

21     with his youngest brother and friends.  Then he had an

22     epiphany.  I already said he was smart.  He began recalling

23     the timeline of events that occurred from his childhood in

24     his moment of clarity.  Ryan called furious and just know,

25     it took a lot to get him mad.  He realized that the

Page 168

1    physician that put him on OxyContin when his life -- was

2    when his life went tilt.  He was livid.

3          Ryan wanted to talk about this and offered to take

4    me out to dinner.  At dinner, he expressed he could not

5    shake off the internal rage towards the physicians,

6    hospitals, and the government for playing Russian roulette

7    with his life.

8          Just before our last holidays together, Ryan

9    shocked me.  He brought me home to a completely decorated

10   house, inside and out; although, this was Ryan, tender,

11   loving, kind, thoughtful, and caring.  However, we did not

12   get through the 2017 holidays without another wave of

13   emotions that turned him back to the drugs.

14         At this time, Ryan was dealing with the grief of

15   the loss of a friend from a tragic overdose and he had a lot

16   of fear surrounding a loved one.  Unfortunately, these

17   personal matters and the holidays without his daughter in

18   his life became really intense and became too much for him

19   to bear.  Many things were going on, but the worst thing

20   always nagging at his emotions and heartstrings was the

21   yearning to hear his daughter's voice.  She was the

22   motivator and driving force when he started to turn his life

23   around.  The more he would try to engage with no positive

24   results, the more upset he would get.  Then he wouldn't call

25   because the pain of rejection was too great.  The

Page 169

1    combination of everything was a perfect storm brewing.

2            This was also the first time he was shunned by my

3    landlord and requested to leave the property.  I was

4    threatened with eviction if he returned.  Due to the stigma

5    and fear, the landlord had no compassion and empathy for

6    Ryan.  He was once again homeless.  In the past he would

7    have a few weeks of homelessness and rebound.  This time it

8    went on for months.  Once again, he reluctantly turned to

9    the state-funded facility for help.  Again, I was sitting

10   with him night after night to keep him safe while he

11   injected, smoked, or snorted drugs to produce a positive

12   drug screen so they could get a check at his personal

13   expense.

14           It was complete lunacy what I was witnessing at

15   the treatment center and the hospital's facilities.  One

16   night he overdosed inside of a hospital's locked-down detox

17   after just being revived from an overdose.  They had not

18   done his intake properly and never removed the drugs from

19   him.

20           Around this time is also when the arrests started.

21   He was trying to get clean, appear in court, and look for a

22   job all at the same time.  He became so overwhelmed.  The

23   background check continued to prohibit him from his gainful

24   employment, this kept him on the street, he had no

25   transportation to freely get around at his liberty, his

Page 170

1    property was all gone except for what he had in his

2    backpack, and he was getting tossed around the government's

3    broken systems penniless.

4            The Sackler's stripped him of all of his self-

5    worth, his life, liberty, property, and due process.

6            Over the 17 long years, I spent many hours with

7    Ryan crying in my arms.  He would ask me questions like,

8    what is wrong with my brain, why is there no help, why

9    doesn't anyone care, what is wrong with me.  He also began

10   to make statements like, I'm going to die before I'm 30, the

11   government doesn't care enough to help someone like me, and

12   when I die, please donate my brain to science.  That's all a

13   mother needs to hear.

14           That last statement threw me into high gear after

15   years of trying to get him help in our local community.  The

16   most families across -- like most families across the

17   nation, we could not afford attorneys.  Since the local

18   state-funded facility was forced to take court ordered

19   patients, I filed for a Marchman Act on Ryan to get him into

20   treatment by court order.

21           The order was obtained but the place for him to go

22   to treatment was not around the corner.  Just when I thought

23   we had finally got him a bed, and things went awry.  The

24   county legal justice system is just as broken as this

25   bankruptcy court and the DOJ.

1          Before Ryan passed on, we had one last mini-

2     vacation together Labor Day weekend 2018.  Ryan was so

3     happy.  He was dancing, and for Ryan that was huge.  Anyone

4     that knew Ryan, knew he did not dance.  He was smiling and

5     laughing for the first time in 10 months.  I could see a ray

6     of sunshine in his eyes.  I had hope for him.  So much so

7     that when he asked me if we could move to another state to

8     be near his brother -- youngest brother and get treatment

9     services there, I agreed.

10          Although, sadly, we never got there.  Ryan went

11    down again, but not before there was one last act of

12    goodwill.  You see, the previous day, Ryan took his food and

13    gave it to another family to feed their grandchildren who

14    had no food.  He always made sure children and animals had

15    their needs met before that of his own.

16          At this point, I had lost track of how many times

17    I had received calls about another overdose.  However, this

18    time I was in the next room and there was no need for a

19    phone call, just a huge crash against the wall and the

20    floor.  And what I witnessed next was the four of the most

21    traumatic experiences of my life.  The first being my son's

22    lifeless body on the floor.  The second was sitting with him

23    for nine days, hooked up to life support and a plethora of

24    machines and wires.  The third was watching the medical

25    staff take him off of life support to move him to hospice.

Page 172

1    And the fourth was physically crossing him over myself and

2    tucking him in and kissing him on the forehead to say

3    goodbye for the last time when there was nothing else that

4    the doctors could do.

5            Ryan didn't choose to live his life this way.  The

6    Sacklers poisoned my son's mind as a child with harmful

7    chemicals that changed the chemistry in his brain.  The

8    Sacklers used their marketing team and physicians to

9    administer synthetic heroin to my son.  The Sacklers planted

10   the cancerous opioids in my son's body that slowly killed

11   his soul over 17 years.

12           OxyContin fractured the entire family unit.

13   Everyone in our family is suffering a form of trauma,

14   conscious or unconscious, from the Sacklers' manufacturing

15   and sales of OxyContin and the absence of Ryan's physical

16   presence.

17           At 33, Ryan's pain and suffering stopped when he

18   took his last breath.  The pain and suffering to myself and

19   my family, physically and emotionally, continues daily, in

20   part because we miss Ryan.  The largest part is due to our

21   government's ineffective dealing with the Sacklers and the

22   public health and safety emergency they all created, along

23   with living in the devastation of our communities with

24   little to no resources.

25           At this point, the effective resources are coming

1    from the people, for the people.  The people are the real

2    humanitarians, cleaning up behind the Sacklers and our

3    government's wave of public devastation.

4            As I walked out the hospital, I threw my hands in

5    the air and said, enough is enough, and I meant it.  And

6    that's why I'm here today, Your Honor.

7            Your Honor, since your bench ruling, all I hear is

8    the Sacklers really got away with murder.  That's what

9    people say when they call me on my phone.  The Sacklers

10   really got away with murder.  If this is not revoked, yes,

11   indeed, the Sacklers will not only have gotten away with

12   murder, they will continue to murder through Mundipharma,

13   and they will have defrauded the people and American

14   government again.

15           This is the worst crime against humanity since

16   Adolf Hitler, that is being swept under, aside, and paper-

17   pushing and high paid attorneys.  The case is in the wrong

18   court.

19           Lastly, through all of my travels and speaking to

20   various people and visiting with different organizations and

21   groups and processing the volumes of information, I have

22   hope, the destruction to our families in the grassroots in

23   our communities can be stopped and remedies can begin to

24   heal the nation and the world.  Several key activists have

25   solutions that would benefit the families, the Court, the

Page 174

1    Justice Department, the Sacklers, and the afflicted, who

2    would like to speak to the Sacklers.

3           With the new information and perspective, please

4    take the proper legal and humanitarian action now.  Please

5    stop the biggest fraud ever perpetrated on the American

6    people.

7           Your Honor, I didn't do a second letter about

8    myself.  That could be just as cumbersome and grossly -- the

9    overdosing and what they did to me in the hospitals, by

10   doctors, that went on -- I could go through all kinds of

11   stories and people that I've seen along my journey, but I

12   would like to please let you listen to Susan Ousterman.

13          And I want to thank you for your time.  And I

14   appreciate everybody for being here.  I know this is a very

15   difficult situation for everybody, but we have to do the

16   right thing for our citizens, for the love of the people.

17   This is not about the Sacklers and their wealth.  This is

18   about the people getting the help that they need in the

19   grassroots of their communities.

20          Keeping this corporation going is not helping the

21   people.

22          THE COURT:  Okay.

23          MS. ISAACS:  Your Honor, thank you.

24          THE COURT:  Thank you, Ms. Isaacs.  This is

25   actually in a legal setting where I'm dealing with Ms.

Page 175

1   Isaacs's motion.  So, I'm going to hear from the Debtors and

2   then give you my ruling.

3          MS. BENEDICT:  Thank you, Your Honor.  Your Honor,

4   the Debtors will rest on our papers, unless you have any

5   questions for us.

6          THE COURT:  All right.  That's fine.  All right.

7   I have an -- I mean, the title of the document, an emergency

8   "Request for Immediate Injunction and Hearing for Due

9   Process, Production for Evidentiary Documents and Other

10  Relief."  It was filed by Ms. Isaacs in this case shortly

11  before the start of the -- actually, during the Confirmation

12  Hearing of this -- of the -- after the 11th --

13         MS. ISAACS:  No.

14         THE COURT:  -- or shortly before, on August 16th.

15  And I've heard Ms. Isaacs at length at this point.  And I

16  would just ask you, ma'am, to listen to me as carefully as I

17  listened to you.

18         First, it is crystal clear to me and has been

19  since the start of these cases that the products, primarily

20  OxyContin, that these Debtors produced, has caused

21  unimaginable harm to people like yourself, ordinary, good

22  people.

23         It's also clear to me that from the very start of

24  these cases, everyone in these cases, including the Debtors,

25  was opposed to the Sackler Family.  The Sackler Family did

Page 176

1   not run these Debtors when they filed, and has nothing to do

2   with these Debtors, other than be a target during these

3   cases.

4           I have ruled at length, and I will file shortly a

5   modified bench ruling that lays out, I hope, even more

6   clearly my assessment of the Plan in these cases, which was

7   prepared and negotiated to resolve as best as a bankruptcy

8   case can, the civil claims against these Debtors and the

9   very closely related claims against the Sacklers.  It was

10  negotiated on one side of the table by states, governmental

11  entities, Indian Tribes, representatives of personal injury

12  claimants, and NAS Babies, and their parents and

13  grandparents, and the Official Unsecured Creditors

14  Committee.

15          Those negotiations were fierce, both among the

16  creditors and against the Sacklers.  They were fierce among

17  the creditors because each creditor believed that its

18  particular group was entitled to most of the value.

19          I have heard six days of testimony and had two

20  days of oral argument on that Plan, and I've evaluated it

21  very carefully and concluded that although it's not perfect,

22  it is worthy of Confirmation, and I've approved

23  Confirmation.

24          I want to be clear because you have said today as

25  well as in your pleading, which preceded my ruling, that the

Page 177

1    Plan enables the Sacklers to get away with criminal conduct

2    and that this case should be somehow moved to a criminal

3    proceeding.  The Plan does not release anyone of any

4    criminal conduct.  Throughout these cases and after the

5    Plan's Confirmation, any governmental entity with the

6    criminal power can exercise that power.

7         What the Plan does is resolve civil claims, claims

8    for money in the way that has been not only extensively

9    negotiated, but I think thoughtfully negotiated, in large

10   measure to try to dedicate the money to abatement.  The

11   abatement procedures are intentionally open to people like

12   yourself and other representatives who live this for input

13   as to what works or doesn't work.

14        Importantly, and this is something only a

15   bankruptcy order can do, the money can be used only for

16   abatement.  It can't be spent for some other purpose, which

17   is what happened for example with the cigarette settlements.

18   And equally importantly I think, there's reporting often to

19   the Court about the use of the money for abatement, so that

20   people like yourself can read it and say, well, this doesn't

21   work.  For example, you know, the system of treatment isn't

22   working, as you described it.  It gives people like yourself

23   that input to try to help people, unfortunately not your

24   son, but like your son, who are still going through that

25   hell.

Page 178

1            So, I've heard you and others a lot.  Believe me.

2    And I certainly have no love loss for the Sacklers.  And I

3    can tell you, that I do not feel manipulated by anyone in

4    these cases, nor do I believe that the attorneys general

5    were manipulated.  They're beyond manipulation.  Or the

6    Creditors Committee.

7            We do live under a system of laws in this country.

8    Every person has the right to try to change those laws, but

9    the precedent in the Second Circuit, and the majority of the

10   precedent throughout the country supports this Plan.

11           I did not become a judge to get things wrong.

12   I've tried as hard as I can throughout my 20-year career to

13   get things right.  I could have stayed in private practice

14   and made in one year the amount of money that I made in that

15   20 years.  That's not my -- that's not what I wanted to do.

16   I became a judge to try to get things right, and that's what

17   I've tried to do here.

18           People are certainly free to disagree with it.

19   But I do urge you to read my ruling and see where a lot of

20   people in this case have tried to do the right thing in a

21   very difficult situation.

22           So, I'm not going to reconsider my ruling, which I

23   think is the proper context at this point given the evidence

24   that I've heard and the basis for that ruling.

25           And I wish with all my heart that some of the

Page 179

1    value in this case goes to you personally, but more

2    importantly, to help abate the opioid crisis, which is

3    coming not from the government, it's coming from the

4    judicial system.  And it's setting a precedent for how the

5    states and the public deal with these settlements from other

6    parties who are being sued around the country for enormous

7    amounts of liability.

8              So, I thank you for sharing with us what is truly

9    difficult, even after all these years, a difficult account.

10   And I thank you for that.

11             So, I will ask the Debtors to submit the order

12   denying the motion, which at this point I will treat as a

13   motion for reconsideration.

14             Thank you, ma'am.

15             MS. ISAACS:  Thank you, Your Honor.

16             THE COURT:  Okay.  I think that concludes today's

17   hearing.

18             MS. BENEDICT:  Thank you, Your Honor.

19             (Whereupon these proceedings were concluded at

20   2:50 PM)

21

22

23

24

25

Page 180

1                              I N D E X

2

3                              RULINGS

4                                                Page        Line

5   Personal injury claimants motion granted     16          25

6   Carpenter motion granted                     18          7

7   Squire Patton Boggs fee application granted  19          13

8   Trust authorization motion granted           34          23

9   Debtors' KEIP/KERP Motion granted            140         20

10  Motion to reconsider ruling denied           179         12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 181

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 15, 2021