Brian E. Frosh, Attorney General
Brian T. Edmunds, Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202
bedmunds@oag.state.md.us
(410) 567-6578

*Attorneys for the State of Maryland*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **PURDUE PHARMA, L.P., *et al.*,** | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**STATE OF MARYLAND'S MOTION FOR STAY OF CONFIRMATION ORDERS
[3786, 3787] AND TRUST ADVANCES ORDER [3773] PENDING APPEAL**

**PRELIMINARY STATEMENT**

The Court has recognized that these cases are among the most complex Chapter 11 cases ever brought and has commented that they are "certainly" the most complex cases over which the Court has presided. Tr., Aug. 19, 2021, at 223:2-7; Modified Bench Ruling on Confirmation of Eleventh Amended Joint Chapter 11 Plan (Sept. 17, 2021) [3786] ("MBR") at 135 ("Every Chapter 11 case has its own difficulties, but I believe these cases are the most complex, given the issues before the parties and ultimately the Court, that I have handled, and frankly that the courts under Chapter 11 have handled. At least that view is shared by the parties to these cases, who were represented by very capable and experienced counsel."). There is no question of the "very difficult choices" that these cases present. Tr., Aug. 19, 2021, at 223:2-7. Earlier in the case, the Court suggested that Debtors and other parties favoring non-debtor releases should file briefs as *amici curiae* in cases raising those issues because "these issues are bubbling up in other cases" and it

would be "easy [for an appellate court] to make a mistake." *See* Tr., Feb. 21, 2020, at 39:10-41:16. And this Court and the parties have correctly observed the complexity and overarching importance to the public health and welfare of the resolution of these proceedings, in which federal, tribal, state, territorial, and local governments have participated on an unprecedented scale. *See, e.g.,* MBR at 1-2.

The Twelfth Amended Joint Plan of Reorganization (the "Plan") that the Court has now confirmed purports to address a national public health crisis that continues to addict millions and adds approximately 1,000 Americans lives each week to the more than 600,000 lives opioids overdoses have already taken. *See* U.S. Centers for Disease Control, Drug Overdose Deaths, at https://www.cdc.gov/drugoverdose/deaths/index.html (last visited Sept. 29, 2021). The Plan would create sweeping injunctions, shield numerous non-debtors who acted wrongly from government unit police power litigation, and impose other requirements that supersede the usual processes by which state governments work, constitutionally independent of federal mandates, to maintain the public health, safety, and welfare.

There is no question of the Plan's novelty. Its approval significantly extends the holdings on one side of an unresolved circuit split, and it is important to pending and future bankruptcies, to the public health, safety, and welfare in other factual settings that may come before bankruptcy courts, and as a precedent that will affect the complex relationships between federal courts and state governments, as arms of those governments work concurrently under the Constitution to protect members of the public against those who act unlawfully to secure private gain. *See*, e.g., S. Ct. R. 10 (providing that the presence of circuit splits and important legal issues may make cases appropriate for review by certiorari).

Especially under the dire circumstances of the *worsening* nationwide opioid crisis, there is a clear need to ensure that these cases are correctly resolved by subjecting the Plan and related orders to appellate scrutiny before they are permitted to take effect. The Court seems to have recognized, or at least believed that the appellate courts would recognize, the significant need for expeditious appellate review. It stated, for example, that it fully expects that "every appellant should be moving for expedited review" and that it "assume[s]" they will receive it. Tr., Sept. 13, 2021, at 29:11-13. The subject-matter of these proceedings touches every community in the United States – and possibly in some way nearly every individual. Because there can no room for committing error in this highly significant subpart of the national governmental response to the opioid crisis, this Court's Orders that make "very difficult choices" should be stayed until the Plan is tested through expedited appeals that will likely be expedited.

The Court's own findings and expressed concerns, to say nothing of the stated concerns of Debtors and many other parties, establish the grounds for and the necessity of a stay of the Confirmation and Trust Advances Orders (together, the "Appealed Orders") pending the conclusion of appellate review. Beyond these concerns, as set forth below, ample additional reasons exist that establish the appellants' substantial probability of success on the merits and a significant likelihood of irreparable harm to the parties and the public that warrant a stay of the Appealed Orders during likely expedited appellate proceedings that resolve the Plan's legality before it becomes effective.

Accordingly, the Court should grant a stay of its Confirmation and Trust Advances Orders pending the exhaustion of the appellate process.

## BACKGROUND

The Court is already familiar with the facts, which need not be repeated in detail.

3

In March 2018, while seven Sackler family members continued to direct Purdue and other Debtors, Decl. of John S. Dubel (Aug. 5, 2021) [3433] ¶ 7l ("Dubel Decl."); Decl. of Richard S. Collura (Aug. 5, 2021) [3410-3] at 324, Appx. B ("Collura Decl."), Debtors hired outside bankruptcy counsel and set in motion the work that ultimately culminated in the Plan. *See* Tr., Aug. 25, 2021 at 64:23-34 (stating that Debtors' counsel "arrived" in March 2018). Beginning in late July 2018, the Sackler family members ultimately resigned successively from board. *See* Collura Decl. at 324, Appx. B. The last Sackler family board member, Mortimer D.A. Sackler, resigned from the board in January 2019. *See id.* An independent "Special Committee" was created in May 2019 and later given "more independence" through changes in the months before Debtors filed their petition. *See* Dubel Decl. ¶¶6-11.

Debtors filed their Chapter 11 petitions in this Court on September 15, 2019. For now more than two years, Debtors steadfastly have pursued a resolution designed to release their owners, the Sacklers, from liability for their own conduct in marketing and selling opioids and establish a public benefit corporation to continue to sell Purdue's opioids, which Sackler-controlled businesses continue to market abroad under existing licenses or similar arrangements that Debtors or related entities conferred upon the Sackler Family's international affiliated companies ("IACs"), and from which they will derive ongoing profit at least for several years. The Sacklers ultimately must sell the IACs. Debtors obtained an injunction or the "voluntary commitment" restraining state and local governments from investigating conduct and pursuing police power actions against Debtors *and* the Sacklers and then spent nearly two years, among other activities, negotiating with the enjoined creditors to secure agreement of the ultimate Plan. *See, e.g.,* Twenty-Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for

4

Preliminary Injunction [Adv. Docket 291] (lidentifying the 22 successive preliminary injunctions against government entities beginning first entered on October 11, 2019).

Ultimately, Debtors failed to secure universal agreement to a settlement containing a $4.3 billion Sackler contribution that the Court has suggested is below what the Court expected. *See* Mediator's Rept. ¶ 4 (July 7, 2021) (Chapman, J) [3119]. Indeed, Richard Sackler's testimony, to say nothing of others, squarely describes conduct that may make him subject to summary judgment under state unfair and deceptive trade practices laws and that provides substantial evidence against other Sackler family members who served with him on Purdue's board. *See, e.g.,* Tr., Aug. 18, 2019 at 94-97 (admitting that he and other board members, including other family members, participated in some of the conduct that is the subject of Purdue's 2020 guilty pleas). The Court indicated at the conclusion of the confirmation hearing that "it is obviously very conceivable to me that [members of the Sackler Family face] substantial potential liability here," though the Court did not make an ultimate finding. Tr., Aug. 23, 2021, at 177:21-178:3. The Court also believed that it would be possible to achieve "higher" "ultimate judgments" "in a vacuum," though it noted that those would be diminished by the effects of unraveling intra-creditor agreements and by "serious" collection problems. MBR at 99 ("I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims (and the closely related third-party claims that are being settled under the plan) might well be higher than the amount that the Sacklers are contributing. But I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effect on recoveries that would result from pursuing those claims and unravelling the plan's intricate settlements. And as I said at the beginning of this analysis, there is also the serious issue of problems that would be faced in collection that the plan settlements materially reduce."). It expressed "reservations" and "frustrat[ion]" and commented that it had

5

"expected a higher settlement," but relied upon views and efforts of experienced counsel among the parties that have agreed to the settlement and the legal obstacles that it could not remove. *Id.* at 99-103.

Maryland objected to the proposed plan, as did the U.S. Trustee, other states, and other creditors. Maryland filed two objections, one with Connecticut and the District of Columbia ("the District" or "D.C."), and one on its own (in which it also incorporated by reference all but five paragraphs of the objection filed by the State of Washington). *See* Joint Objection of the State of Connecticut, the State of Maryland, and the District of Columbia to Confirmation of Debtors' Sixth Amended Plan of Reorganization (July 19, 2021) [3270] ("Conn. Obj."); State of Maryland's Separate Objection and Joinder to the Objections of Connecticut and Washington to Confirmation of the Debtor's Proposed Sixth Amended Joint Plan of Reorganization (July 19, 2021) [3278] ("Md. Obj."). The Court held a confirmation hearing during August 2021, at which it received evidence and legal argument concerning the Plan and the objections.

On September 17, 2021, the Court confirmed the Twelfth Amended Joint Chapter 11 Plan over the various objections by issuing a revised transcript of the bench ruling it had previously provided on September 1, 2021, as well as voluminous written findings of fact and conclusions of law confirming the Plan. *See* Findings of Fact, Conclusions of Law, and Order Confirming Twelfth Amended Joint Chapter 11 Plan of Reorganization (Sept. 17, 2021) [3787] ("Confirmation Order"); MBR. The Plan approved by these Orders provides, *inter alia*, for a release of State police power claims against the Sacklers and many others who have contributed too little, or have contributed nothing at all, to the bankruptcy. *See* Plan §§ 10.6, 10.7. The Plan also enjoins States and other government units from commencing or continuing police power litigation against the released parties. *Id.* § 10.8; Confirmation Order ¶31. Finally, the Plan subjects government units

6

wishing to prosecute claims against Shareholder Related Parties to the need for leave from this Court. *See* Plan § 11.1(e).

The United States Trustee, the District of Columbia, the States of California, Connecticut, Maryland, and Washington, as well as other parties, have timely appealed.

## ARGUMENT

As the Court's statements have seemed to recognize from the beginning, *see* supra at 1-2, this highly complex bankruptcy, which raises complex issues critical to the public health and States' police powers to protect the public, is of substantial consequence in the governmental response to an ongoing public health emergency of horrific magnitude. In this context, the appellants' requests for stays easily meet the familiar standards governing the grant of a stay on appeal:

1. Appellants have a substantial likelihood of success on the merits of the appeal;

2. Appellants and the public they represent will suffer irreparable harm in the absence of a stay;

3. Other parties would not suffer significant irreparable harm from the temporary maintenance of the status quo. (Indeed, appellees and other creditors may avoid irreparable harm because of the stay); and

4. There is a strong public interest in resolving the legality of the plan before it is permitted to become effective.

*See, e.g., In re Anderson*, 560 B.R. 84, 88-89 (S.D.N.Y. 2016) (Román, J.) ("In exercising this discretion [under Fed. R. Bankr. P. 8007)] courts consider four factors: (1) the likelihood that the party seeking the stay will prevail on the merits on appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay."); Fed. R. Bankr. P. 8007.

This is not a borderline or case for a stay pending appeal. To the contrary, it is a textbook example of a case that calls for one.

I. **Appellants Are *Overwhelmingly* Likely To Succeed On The Merits Of Their Appeals**

There is no question that the appellants have a sufficiently strong likelihood of success on the merits to warrant a stay pending appeal. To obtain a stay, moving parties are required to show a "substantial possibility of success," but are not required to show a "probability" of success or that success is more likely than not. *See Andreson*, 560 B.R. at 90; *see also Mohammed v. Reno*, 309 F.3d 95, 101-102 (2d Cir. 2002). The Second Circuit:

> has long recognized that the "likelihood of success on the merits" that is required for both a preliminary injunction and a stay can be satisfied if there are "serious questions" going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips *decidedly* in its favor. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). "The 'serious questions' standard permits a district court to grant a preliminary injunction [or stay] in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction [or stay]." *Id.*

*In re A2P SMS Antitrust Litig.*, 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014) (alterations in original); *see also Mohammed*, 309 F.3d at 100-102. The appellants here have strong arguments that the Court recognized could prevail on appeal in encouraging Debtors and other counsel to file amicus briefs in similar cases that are "bubbling up." *See supra* at 1. There can be no doubt that there is ample support in the law for the appellants' arguments.

One of the obvious signs indicating a likelihood of success on the merits here is the presence of a circuit split that has yet to be resolved by the Supreme Court, *see* S. Ct. R. 10, over whether and under what circumstances a bankruptcy court may ever grant the release of third-party direct claims against non-debtors. *See, e.g., California v. Am. Stores Co.*, 492 U.S. 1301, 1305

(1989) (O'Connor, J., in chambers) (granting application for stay pending certiorari review because "the issue presented appears to be an important question of federal law over which the Circuits are in conflict"); *Bricklayers Loc. 21 of Illinois Apprenticeship and Training Program v. Banner Restoration, Inc.,* 384 F.3d 911, 912 (7th Cir. 2004) (denying stay of Court of Appeals' mandate because, *inter alia*, movant "cannot show a split between the circuits that would favorably indicate success for a petition for a writ of certiorari" as would warrant a stay pending certiorari proceedings). As the U.S. Trustee observes, the Fifth, Ninth, and Tenth Circuits have held that 11 U.S.C. § 524(e), among other reasons, prohibits the Court from granting releases to non-debtors by stating that "a discharge of the debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *In re W. Real Estate Fund Inc.*, 922 F3d 592, 600 (10th Cir. 1990); U.S. Trustee Am. Mem. at 16-18. For all the reasons stated by the Trustee, these decisions are correct and by themselves satisfy the standard for demonstrating a substantial likelihood of success on the merits.

But even in the absence of a significant circuit split, the legal foundations of the appeals would remain strong for many reasons.

*First*, neither the Bankruptcy Clause nor the Bankruptcy Code extend this Court's subject-matter jurisdiction to third-party direct claims against non-debtors. *See* U.S. Const. Art. 1, Sect. 8, Cl. 4; 28 U.S.C. § 1334. Fundamental principles of federalism act in this case to make clear that the "subject of bankruptcies," *See* U.S. CONST. ART. 1, SECT. 8, CL. 4, cannot include wholly independent third-party claims by government entities against non-debtors. *See, e.g.,* U.S. CONST. AMEND. X; *New York v. United States*, 505 U.S. 144, 166 (1992) (holding that Congress may not, under its enumerated powers, direct states to take title to hazardous waste: "We have always

understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."); *Prtintz v. United States*, 521 U.S. 898, 918-19 (1997) (Congress cannot, pursuant to its enumerated powers, direct local chief law enforcement officers to implement federal policy choices); *see also Nat'l Federation Indep. Bus. v. Sebellius*, 567 U.S. 519, 535-36 (2012).

Moreover, the Second Circuit has already held that this Court's statutory jurisdiction similarly does not encompass third-party direct claims against non-debtors.  In *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *vacated on other grounds*, 557 U.S. 137 (2009), the Second Circuit held that "[i]t was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate." 517 F.3d at 66.  The Court reasoned that "[i]f that were possible, a debtor could create subject-matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party [non-debtor] contributions."  Although the Supreme Court ultimately vacated the Second Circuit's 2008 *Manville III* opinion on the ground that the injunction could not be collaterally attacked years later, the Second Circuit reimposed its jurisdictional ruling on remand in 2010.  *See In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010) (Wesley, J.) ("*Manville IV*") ("[The third-party claimant] is therefore not bound by the terms of the 1986 Orders [imposing the injunction]. Consequently, it may attack the Orders collaterally as jurisdictionally void.  And, as we held in *Manville III,* that attack is meritorious.").  If bankruptcy court jurisdiction does not encompass the claims at issue between private parties in *Manville III* and *Manville IV*, it cannot encompass the states' claims against non-debtors here. Indeed, the Bankruptcy Code otherwise makes clear Congress' intent that bankruptcy courts respect principles of federalism and allow state police power claims to go forward against, at the

10

very least, non-debtors. *See, e.g,* 11 U.S.C. § 362(b)(4) (providing exception to automatic stay); *id.* § 523(a)(2) (preventing discharge of claims for false pretenses, false representations, or actual fraud, including governmental claims for disgorgement and restitution); [1] *id.* § 523(a)(7) (preventing the discharge of claims against individuals for governmental fines, penalties, and forfeitures); 28 U.S.C. § 959 (debtors in possession must operate "according to the requirements of the valid laws of the State in which [the] property is situated"); *see also id.* § 1334(c) (mandatory and permissive abstention from jurisdiction).[2]  And the Supreme Court and other courts have held repeatedly that amorphous language of 11 U.S.C. § 105(a) cannot be read to expand powers that the law otherwise withholds from the bankruptcy courts. *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code' . . . Section 105(a) confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits . . . . We have long held that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.") (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013)) (some internal quotation

---

[1] *See, e..g., In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998) (SEC disgorgement judgment not dischargeable because "[w]e agree with the district court that [the debtor's] debt is one for money, and that the disgorgement judgment was designed to remedy fraudulent behavior.")

[2] Moreover, the Plan unconstitutionally requires state governments to obtain prior leave from the Court for even some unreleased claims. Plan § 11.1(e). Reasons are legion (including privacy, the need to investigate non-adversarially, maintaining the independence of the Executive Branch, and the sheer inconvenience of seeking prior approval from a non-Article III federal court in a distant state to initiate a police power lawsuit) why the prosecutorial function of pursuing enforcement action should not and cannot constitutionally be subjected to prior adversarial adjudication.

marks and citations omitted); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (section 105(a) does not supply a general basis for granting non-debtor releases).

*Second,* even assuming the Court had the authority to settle a State's direct police power claims against non-debtors without the State's consent, existing Second Circuit law governing the release of even private party claims against non-debtors bars the releases here. In *Metromedia*, although it suggested that non-debtor releases could be viable in "rare cases" under "circumstances that may be characterized as unique" and that are "truly unusual circumstances," the Second Circuit held that non-debtor releases were subject to "potential for abuse," should be granted only with "reluctance," and were improper in the case before it because they were not "necessary" to the reorganization. *Id.* at 142-43. *Metromedia's* dictum recognizes the possibility only of a narrow exception that permits a non-debtor release when – apart from any contribution to the estate made by the released party – the release "[is] *itself* important to the Plan." *Id.* at 143. The releases, and their scope, must be necessary to carry out a reorganization of the debtor. *See id.* That circumstance is not satisfied here. There is no question that Debtors would be able to successfully reorganize here without the Sackler contribution and in the absence of providing the Sackler family members and those who have made no contribution, *see id..*, releases from their *independent* liability to the States. Even without the Sacklers' contribution, the essential purpose of Chapter 11 to enable Debtors to reorganize can clearly be achieved. Creditors do not stand to suffer here from the released parties' exclusion; they will retain and be able to pursue their valuable claims, quite possibly without litigation abroad. MBR at 99-103. As the Second Circuit foresaw in warning against non-debtor releases in *Metromedia* and articulating substantial limitations upon their availability, the potential for the permissive grant of non-debtor releases has driven members of the Sackler family and other non-debtors to seek such releases from the Court here because it

12

may offer temporary shelter and the potential for a better for opportunity for *them* than the alternative of actually facing the claims that their misconduct has created. *See id.* at 142 ("[A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."). For good reason, the Bankruptcy Code makes that opportunity available to debtors, who become fully subject to the protections that the Code affords to creditors. These protections do not apply to non-debtors.

*Finally*, even if the releases could otherwise be imposed – which they cannot – the settlement itself is inadequate to warrant their imposition in this case. *See In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007). The settlement here offers less than the Court expected throughout the proceedings based on what it saw and heard. MBR at 99-103. And numerous released parties have made no contribution whatsoever to the plan. The Court's rationale for accepting and imposing the Plan's lower-than-expected resolution – the loss of negotiated agreements and prevalent creditor support for the plan – is not supported by *Iridium*. There is not an *Iridium* factor that covers the loss of a plan that is legally impermissible and materially insufficient, especially when a preliminary injunction has dramatically altered the circumstances that would exist for non-debtors out of bankruptcy without imposing the circumstances that they would face if they were to themselves to become debtors. It is well accepted that settlement negotiations proceed in the "shadow of the law." *In re The City of New York*, 607 F.3d 923, 942 (2d Cir. 2010) (recognizing that a "potential litigant organizing his affairs in the shadow of the law may make incorrect decisions when faced with uncertainty in the application of the law.") Here, however, the shadow cast is not the one that would loom over the parties in state court proceedings on the merits. Nor is it the shadow that would be cast if the Sackler family members and other

non-debtors were in fact debtors in bankruptcy proceedings. The modified reality under which the Plan was negotiated inherently fails to satisfy scrutiny under *Iridium*.

For these myriad reasons, any one of which is sufficient, and for the additional reasons stated in Maryland's objections, the circumstances here easily surpass the requirement that appellants demonstrate a substantial likelihood success on the merits of their appeal.

## II. Absent A Stay, Appellants And The Public Will Suffer Irreparable Harm

It is also beyond question that appellants and the public they serve will suffer irreparable harm in the absence of a stay. As Maryland suggested at closing argument, the Plan will imposes negative consequences for the States' protections of the public health and also diminishes the amount of recovery that States could ultimately receive from the Sacklers who have violated state law and imposed tragic consequences upon the public. Tr., Aug. 23, 2021, at 228:25-248:4.

Courts have across the country repeatedly have held that a State suffers irreparable harm when there is interference with the proper workings of federalism or at "[a]ny time" the State is prevented from enforcing its duly enacted statutes. *See, e.g., Our Wicked Lady LLC v. Cuomo*, 21CV0165 (DLC), 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury[,]" particularly where there would be "an ongoing and concrete harm to . . . public safety interests." Amid an ongoing public health crisis that continues to kill more than 100 Americans per day, *see supra* at 2, including on average nearly seven in Maryland, the Court's Order enjoins States from freely investigating and engaging in civil enforcement actions against the Sacklers, shareholder released parties, and certain debtor related parties against whom there is strong suspicion, and in many instances concrete evidence, of engagement in violations of state, federal, and local law that contributed to the opioid crisis. The question of the propriety of such

14

injunctions against litigation against non-debtors will be one of the central questions on appeal on which there is more than a substantial chance that appellants – sovereign governments responsible for more than 20 percent of the U.S. population – will prevail.

Under these circumstances, as Chief Justice Roberts stated in granting the State of Maryland's application for a stay in an earlier case raising similar issues:

> [The] decision below subjects Maryland to ongoing irreparable harm. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Here there is, in addition, an ongoing and concrete harm to Maryland's law enforcement and public safety interests. . . . . That Maryland may not employ a duly enacted statute to help prevent [serious] injuries constitutes irreparable harm.

*Maryland v. King*, 567 U.S 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *see also, e.g., Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) ("When the State is seeking to stay a preliminary injunction, it's generally enough to say '[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *King*); *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") *cert. denied*, 209 L. Ed. 2d 547 (Apr. 19, 2021).

The objecting States have argued that the Plan fails to sufficiently provide for the vindication of their conduct-regulating laws, and that it is insufficient to provide either enough abatement money or exact sufficient deterrence and retribution to secure a public placed at grave risk by the opioid crisis and subjected to the damages that have resulted from it. Implementing the Plan over the public policy choices of the States made in pursuit of the constitutional police

powers assigned to their executive and legislative branches will frustrate the response to the opioid crisis and the achievement of, for example, the "strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland" that the Maryland Legislature has directed the Attorney General of Maryland to take in order to "maintain the health and welfare of the citizens of the State." Md. Code Ann., Com. Law § 13-102. In the absence of a stay, especially during a crisis which takes on average almost seven Maryland lives a day, implementing the Plan during appeal interferes with Maryland's constitutionally reserved sovereignty and impedes its protection of the public health. It also diverts the focus of public officials to a Plan that may change substantially.

Furthermore, the cavalier implementation of the Plan before it has been tested on appeal is not without potentially harmful financial consequences for the objecting States and all creditors. As Debtors' Trust Advances motion and this Court's Order granting it demonstrate, even though debtors and others have potentially waived the application of equitable mootness, the Estate will pay at least some amounts to cover transaction costs that may not be fully recoverable after the Appealed Orders are reversed. Although $6.8 million for trust advances and other likely early expenditures from the Estate are insubstantial compared with the total amount that will later be distributed, this money would be better put to use for abatement once a Plan has survived appellate review, rather than treated later as additional claims against the Estate.

Moreover, failing to maintain the status quo may prevent the application of protections that would exist either in bankruptcy or state proceedings to prevent the secretion or dissipation of the Sacklers' and others' additional assets. The Sacklers retain billions of dollars of ill-gotten gains, even after committing $4.3 billion to the Plan. Although we understand that there will ultimately

16

be protections to secure the Sacklers' required contributions under the Plan, we do not believe that sufficient security will be provided for the Sacklers' remaining ill-gotten gains once the plan takes effect.

Finally, the Plan does not resolve whether the additional non-Sackler released parties have engaged in misconduct and does deter these other released parties from engaging in further misconduct. And even the Plan's requirements of the Sacklers are not as broad as States would be permitted to seek in proceedings under State law. Conduct by wrongdoers should be fully addressed, restrained, and deterred in exchange for releases of police power claims, as it would be in a state judicial or administrative proceeding.

### III. Entering A Stay Will Also *Prevent* Irreparable Harm To Debtors And Other Creditors

Instead of imposing irreparable harm on Debtors and other creditors, entering a stay pending appeal will in fact prevent harm to these parties. Putting the cart before the horse and allowing the Plan to become effective before it is tested on appeal poses the same risk to Debtors and other creditors as to appellants of wasting the estate when the Plan has yet to be approved on appeal to Article III courts. As already discussed, the amount available for the estate will be to some degree smaller if the plan is reversed after it is allowed to take effect.

Beyond that, it is perilous in a very concrete sense to begin to implement a plan of this magnitude that has not been affirmed on appeal. It is unstable. During possibly as many as three levels of appeal, the reorganized entity and all creditors will be forced to implement a plan while they and the public are in doubt as to the outcome at each potential successive stage of the appeals. The reorganized entity, established under these circumstances, may face significant barriers to its operations if it is required to operate before it is perceived to be stable. The uncertainty will also affect state policy makers and potential grant recipients, among others. Counterparties and

19-23649-rdd    Doc 3845    Filed 09/29/21    Entered 09/29/21 22:36:25    Main Document
Pg 18 of 20

potential creditors, among others, may be less likely to contract with the reorganized business and other structures erected by the Plan, and if they do engage they may demand more security and present more onerous terms if, as is inevitable, *see supra* at 1-2, 7-13, they perceive a substantial likelihood that the Plan could be unwound. It may be difficult to maintain employees and other agents as a result of the instability that the structures created face. For these reasons, it would be harmful to debtors, all creditors, and to the reorganization itself if an undertaking of the magnitude of the Plan proceeded on its currently unstable foundation.

And contrary to what has previously been asserted, a short delay in implementing the Plan during what all expect to be an expedited appeal. *See, e.g., In re Skinner*, 202 B.R. 867, 869 (W.D. Va. 1996) ("The case law signals a preference in favor of maintaining the status quo" in determining whether to grant a stay pending appeal). The federal, state, and local governments are already spending roughly the same amount in a month as the Plan will provide them for abatement over all ten years, at present value. While more money is clearly necessary, staying the effective date of the Plan pending a likely-to-be expedited appeal will prevent any waste of that money and will not delay the substantial abatement monies and other voluntary efforts that governments in the United States already contribute to abatement.

Additionally, the appeal may provide an upside to all creditors, the expected value of which precludes any costs. Again, the Court itself expected more from the Sacklers and has suggested also that the parties continue to engage in efforts toward resolution. There are other ways to resolve claims against non-debtors that would not lead to litigation abroad. A stay will provide the parties with further opportunity to pursue alternatives that achieve critical policy objectives.

Again, in balancing harms it is significant that any claim of potential harm raised by Debtors or other creditors would amount to speculation that seeks to *alter* the status quo prior to

the resolution of this case by any Article III court. *See*, *e.g.*, *Skinner*, 202 B.R. at 869. And arguments raised concerning delay should be suspect; Debtors and other parties were fine delaying relief to the public for more than two years in the pursuit of the relief that fulfills their interests. It is now unfair to seek to rapidly carry into effect a cramdown of dubious legality to serve private interests. Doing so elevates these interests over those of the public and the victims themselves in obtaining something closer to adequate compensation, retribution, and effective deterrence.

Accordingly, staying the Plan will not significantly harm the interests of others, and may in fact advance those interests and the reorganization itself.

### IV. The Public Interest Warrants A Stay

As noted above, the public interest supports a stay because the public will suffer irreparable harm if a stay is not granted. The public also has additional interests in this case.

As the Court recognizes, at least in terms of its potential effect on the ability to secure the public health, these may be the most important cases ever brought under Chapter 11. Hundreds of thousands have died with roughly another thousand added every week. Millions more have become addicted and remain addicted and at risk, and the total cost to society increases by billions of dollars each year. The public has an interest in getting it right. It has an interest in preventing private parties from tinkering prematurely with (and securing injunctions against) the public response to the opioid crisis  The notion that the plan should rollout untested by even a single Article III judge in this context inherently disserves the public interest. Opioids policy should be certain; it should not be directed prematurely after adjudication before a single specialized court, without the benefit of the substantial executive and legislative policy-making tools that these branches of government have at their disposal. State governments were not meant to be subordinated to private parties' interests and pervasive interference with the exercise of their police

powers while they address\ a public health crisis created through illegal conduct.  These matters at a minimum should be first tested on appeal by other judges.

The public also has an interest in the avoidance of confusion, which clearly will occur if the plan is rolled out only to be recalled.  This Court has on several occasions commented that the public, including relatives and victims, have been confused by conflicting reports and statements about this case.  But members of public will doubtless become even more confused if the Plan takes effect only to be reversed shortly on appeal.

## CONCLUSION

For the foregoing reasons, the appellants are substantially likely to succeed on the merits and the balance of harms and public interest weigh decidedly in their favor.  The Appealed Orders should be stayed pending appeal.

September 29, 2021
Baltimore, Maryland

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Brian T. Edmunds
BRIAN T. EDMUNDS
Assistant Attorney General

Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202
bedmunds@oag.state.md.us
(410) 576-6578

*Attorneys for the State of Maryland*