# Exhibit B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE TWELFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

The Debtors[2] having:

a. filed the *Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated March 15, 2021 [D.I. 2487], which the Debtors revised on April 23, 2021 [D.I. 2731], on May 7, 2021 [D.I. 2823], on May 24, 2021 [D.I. 2904], on May 26, 2021 [D.I. 2935], on June 2, 2021 [D.I. 2967], and on June 3, 2021 [D.I. 2982] (as so revised and supplemented, the "**Solicitation Plan**" and, as revised pursuant to the Sixth Amended Plan, the Seventh Amended Plan, the Eighth Amended Plan, the Ninth Amended Plan and the Tenth Amended Plan (each, as defined herein) and as may be further amended, supplemented, or modified in accordance with the terms thereof, the "**Plan**"); and

b. filed the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated March 15, 2021 [D.I. 2488], which the Debtors revised on April 24, 2021 [D.I. 2734], on April 30, 2021 [D.I. 2788], on May 8, 2021 [D.I. 2825], on May 24, 2021 [D.I. 2907], on May 26, 2021 [D.I. 2937], on June 2,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, or Solicitation Order (each as defined herein), as applicable. The rules of interpretation set forth in Section 1.2 of the Plan shall apply to this Order.

2021 [D.I. 2969], and on June 3, 2021 [D.I. 2983] (as so revised, the "**Disclosure Statement**");

the United States Bankruptcy Court for the Southern District of New York (the "**Court**") having:

a. entered the *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto,* dated June 3, 2021 [D.I. 2988] (the "**Solicitation Order**");

b. approved, pursuant to the Solicitation Order, among other things, (i) the Disclosure Statement and (ii) the transmission to Holders of Claims against the Debtors' Estates of the Solicitation Plan, the Disclosure Statement, and the associated Ballots and notices in compliance with title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"); and

c. set, pursuant to the *Third Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [D.I. 3347], August 12, 2021 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the hearing to consider Confirmation of the Plan (the "**Confirmation Hearing**");

the Debtors having:

a. timely and properly solicited the Plan and Disclosure Statement and provided due notice of the Confirmation Hearing, all in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials*, dated July 25, 2021 [D.I. 3319] (the "**Solicitation Affidavit**");

b. timely and properly filed and served, on April 23, 2021 [D.I. 2732], April 25, 2021 [D.I. 2737], May 15, 2021 [D.I. 2867], May 17, 2021 [D.I. 2868], May 26, 2021 [D.I. 2938], June 2, 2021 [D.I. 2977], June 30, 2021 [D.I. 3098], July 7, 2021 [D.I. 3121], July 15, 2021 [D.I. 3187], July 15, 2021 [D.I. 3232], July 16, 2021 [D.I. 3246], July 19, 2021 [D.I. 3283], and August 10, 2021 [D.I. 3528], notices of filing of Plan Supplement documents (such Plan Supplement documents, collectively, as may be amended or supplemented from time to time, the "**Plan Supplement**");

c. filed, (i) on July 14, 2021, the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3185] (the "**Sixth Amended Plan**"), (ii) on August 12, 2021, the *Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3545] (the "**Seventh Amended Plan**"), (iii) on August 23, 2021, the *Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3632] (the "**Eighth Amended Plan**"), (iv) on August 25, 2021, the *Ninth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3652] (the "**Ninth Amended Plan**"), (v) on August 26, 2021, the *Tenth Amended Joint Chapter 11*

*Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3682] (the "**Tenth Amended Plan**"), (vi) on August 31, 2021, the *Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3706] (the "**Eleventh Amended Plan**"), and (vii); on September 2, 2021, the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3726] (the "**Twelfth Amended Plan**");

d. filed, on August 5, 2021, the *Declaration of Lianna E. Simmonds* [D.I. 3432] (the "**Simmonds Declaration**"), the *Third Supplemental Declaration of Jeanne C. Finegan* [D.I. 3403] (the "**Third Supplemental Finegan Declaration**"), the *Declaration of Deborah E. Greenspan* [D.I. 3412] (the "**Greenspan Declaration**"), the *Declaration of Jesse DelConte* [D.I. 3411] (the "**First DelConte Declaration**"), the *Declaration of Richard A. Collura* [D.I. 3410] (the "**Collura Declaration**"), the *Declaration of Gautam Gowrisankaran* [D.I. 3414] (the "**Gowrisankaran Declaration**"), the *Declaration of Mark F. Rule* [D.I. 3424] (the "**Rule Declaration**"), the *Declaration of Davis W. DeRamus* [D.I. 3428] (the "**DeRamus Declaration**"), the *Declaration of John S. Dubel* [D.I. 3433] (the "**Dubel Declaration**"), the *Declaration of Joseph L. Turner* [D.I. 3431] (the "**Turner Declaration**"), the *Declaration of Jon Lowne* [D.I. 3440] (the "**Lowne Declaration**"), and the *Declaration of Jesse DelConte* [D.I. 3456] (the "**Second DelConte Declaration**");

e. submitted, on August 2, 2021, the *Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3372] (the "**Tabulation Declaration**"), describing the methodology used for the tabulation of votes and the results of voting with respect to the Plan; and

f. filed, on August 5, 2021, the *Debtors' Memorandum of Law in Support of Confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3461] (the "**Confirmation Brief**");

the Court having:

a. found that the notice provided regarding the Confirmation Hearing, and the opportunity for any party in interest (including, without limitation, any Releasing Party) to object to Confirmation of the Plan and the releases and injunctions therein, have been adequate and appropriate under the circumstances and no further notice is required;

b. considered, and having taken judicial notice of, the entire record of the Chapter 11 Cases;

c. held the Confirmation Hearing;

d. considered the entire record of the Confirmation Hearing, including, but not limited to,

    i. the Plan (including, without limitation, the Plan Documents), the Disclosure Statement, and the Solicitation Order,

ii.   the Solicitation Affidavit and Tabulation Declaration,

iii.  the objections, reservations of rights, and other responses submitted with
      respect to the Plan (collectively, the "**Objections**"), including the
      following: [D.I. 3256], [D.I. 3257], [D.I. 3262], [D.I. 3263], [D.I. 3264],
      [D.I. 3265], [D.I. 3268], [D.I. 3270], [D.I. 3271], [D.I. 3272], [D.I. 3273],
      [D.I. 3274], [D.I. 3275], [D.I. 3276], [D.I. 3277], [D.I. 3278], [D.I. 3279],
      [D.I. 3280], [D.I. 3288], [D.I. 3292], [D.I. 3293], [D.I. 3298], [D.I. 3299],
      [D.I. 3301], [D.I. 3304], [D.I. 3306], [D.I. 3323], [D.I. 3335], [D.I. 3357],
      [D.I. 3359], [D.I. 3368], and [D.I. 3404],

iv.   the Simmonds Declaration, the Third Supplemental Finegan Declaration,
      the Greenspan Declaration, the First DelConte Declaration, the Collura
      Declaration, the Gowrisankaran Declaration, the Rule Declaration, the
      DeRamus Declaration, the Dubel Declaration, the Turner Declaration, the
      Lowne Declaration, the Second DelConte Declaration, the *Preliminary
      Declaration of Christina Pullo of Prime Clerk LLC Regarding the
      Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended
      Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its
      Affiliated Debtors* [ECF No. 3327], the Tabulation Declaration, the
      *Declaration of Scott R. Bickford, Esq. In Support of The Ad Hoc Committee
      of NAS Children's Reply To The United States Trustee's Objection To The
      Fee Settlements Included In The Sixth Amended Joint Chapter 11 Plan of
      Reorganization of Purdue Pharma L.P. And Its Affiliated Debtors* [ECF
      No. 3398], the *Declaration of Rahul Gupta, MD, MPH, MBA, FACP Filed
      by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals* [ECF
      No. 3565 and JX-3270], the *Declaration of Gayle A. Galan, M.D. FACEP
      Filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals*
      [ECF No. 3565 and JX-3270], the *Declaration of William Legier Filed by
      Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals* [ECF No.
      3567 and JX-3272], the *Declaration of Carl J. Trompetta filed by Gerard
      Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3415], the
      *Declaration of Garrett Lynam filed by Gerard Uzzi on behalf of The
      Raymond Sackler Family* [ECF No. 3416], the *Declaration of Stephen A.
      Ives filed by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF
      No. 3417], the *Declaration of David Sackler filed by Gerard Uzzi on behalf
      of The Raymond Sackler Family* [ECF No. 3418], the *Supplemental
      Declaration of Jennifer L. Blouin filed by Gerard Uzzi on behalf of The
      Raymond Sackler Family* [ECF No. 3419], the *Declaration of Maureen M.
      Chakraborty filed by Gerard Uzzi on behalf of The Raymond Sackler
      Family* [ECF No. 3420], the *Declaration of Lawrence A. Hamermesh filed
      by Gerard Uzzi on behalf of The Raymond Sackler Family* [ECF No. 3421],
      the *Declaration of Timothy J. Martin filed by Gerard Uzzi on behalf of The
      Raymond Sackler Family* [ECF No. 3422], the *Declaration of Gary A.
      Gotto in Support of Ad Hoc Committee's Reply to Plan Objections and in
      Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad
      Hoc Committee of Governmental and Other Contingent Litigation*

*Claimants* [ECF No. 3443], the *Declaration of John M. Guard in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3446] (the "**Guard Declaration**"), the *Declaration of Jayne Conroy in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3447], the *Declaration of Timothy J. Martin filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3448], the *Declaration of Peter H. Weinberger in Support of Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3449], the *Declaration of Jessica B. Horewitz, Ph.D in Support of the Ad Hoc Committee's Reply to Plan Objections and in Support of Plan Confirmation filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3450], the *Declaration of Jonathan Greville White filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3451], the *Declaration of Alexa M. Saunders filed by Jasmine Ball on behalf of Beacon Company* [ECF No. 3452], and the *Redacted Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3460],

    v.   the Confirmation Brief, the *Debtors' Reply to Joint Objection of Certain Distributors, Manufacturers, and Pharmacies to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma and its Affiliated Debtors* [ECF No. 3506], the *Ad Hoc Committee's Reply to Plan Objections filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [ECF No. 3465], the *Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3459], the *Multi-State Governmental Entities Group's Statement in Support of and Response to Certain Objections to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3430] and the *Ad Hoc Group of Individual Victims' Limited Reply in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization* [ECF No. 3427] and

    vi.   arguments of counsel and the evidence proffered, adduced, and/or presented at the Confirmation Hearing; and

e.  filed its Modified Bench Ruling on Request for Confirmation of the Plan, dated September 17, 2021 (the "**Modified Bench Ruling**"); and

    f. overruled any and all Objections to the Plan and to Confirmation, as well as all statements and reservations of rights not consensually resolved or withdrawn, except as otherwise expressly provided herein; and

after due deliberation thereon and good cause appearing therefor, including for the reasons stated in the Modified Bench Ruling, it is hereby **FOUND, ORDERED, and ADJUDGED that:**

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

A.    The findings and conclusions set forth herein and in the Modified Bench Ruling constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334*b( and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O), and the Court may enter a Final Order with respect thereto in accordance with Article III of the United States Constitution. Each of the Debtors was an eligible debtor under section 109 of the Bankruptcy Code. Venue was proper in the Southern District of New York as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Commencement and Joint Administration of Chapter 11 Cases</u>.  On September 15, 2019 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By order of the Court [D.I. 59], the Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015. The Debtors have continued in possession of their property and have continued to operate and manage their

businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code. On September 27, 2019, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "**Creditors' Committee**"). *See Notice of Appointment*

*of Committee of Unsecured Creditors* [D.I. 131].

   D. <u>Judicial Notice</u>. The Court takes judicial notice of the docket of the Chapter 11

Cases maintained by the Clerk of the Court, including, but not limited to, all pleadings and other

documents filed, all orders entered, and all evidence and arguments made, proffered, adduced,

and/or presented at the various hearings held before the Court during the pendency of the

Chapter 11 Cases.

   E. <u>Solicitation Order, Solicitation, and Notice</u>.

   (a) On June 3, 2021, the Court entered the Solicitation Order.

   (b) The Disclosure Statement as transmitted pursuant to the Solicitation Order

(i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all

applicable non-bankruptcy laws and (ii) contains "adequate information" (as such term is defined

in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the

Debtors, the Plan, the Shareholder Settlement, and the transactions contemplated therein.

   (c) The Disclosure Statement (including all applicable exhibits thereto and the

notices provided for therein) provided holders of Claims, holders of Interests and all Persons that

have held or asserted, that hold or assert or that may in the future hold or assert any Channeled

Claim or any Shareholder Released Claim with sufficient notice of the releases, exculpatory

provisions, and injunctions, including the Channeling Injunction and Releases by Holders of

Claims and Interests, set forth in <u>Sections 10.6</u>, <u>10.7</u>, <u>10.8</u>, <u>10.9</u>, <u>10.10</u>, <u>10.11</u>, <u>10.12</u>, and <u>10.13</u>

of the Plan, as well as in the Shareholder Settlement, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

(d)      Promptly following entry of the Solicitation Order, in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order, and as evidenced by the Solicitation Affidavit, the Claims and Solicitation Agent effectuated:

(i)      filing and service on all parties in interest of a notice concerning the Disclosure Statement and the Plan, and deadlines and hearing dates with respect thereto, including, but not limited to, setting forth the proposed release, exculpation, and injunction provisions in the Plan, the dates applicable to, and procedures regarding, the solicitation of votes on the Plan, the date of the Confirmation Hearing, and the procedures for objecting to Confirmation of the Plan;

(ii)      service of the appropriate solicitation materials (collectively, the "**Solicitation Materials**") on (A) each Holder of Claims entitled to vote on the Plan (i.e., Class 3 (Federal Government Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), and Class 11(c) (Other General Unsecured Claims)) (the Classes of Claims entitled to vote to accept or reject the Plan, the "**Voting Classes**"), including, but not limited to, (I) the Disclosure Statement, (II) the Plan, (III) the Solicitation Order, (IV) the Confirmation Hearing Notice, (V) an appropriate number of Ballots (with voting instructions with respect thereto), and (VI) the Cover Letters, and (B) each Holder of Claims or Interests in a Class not entitled to vote on the Plan (i.e., Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured

Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests), and Class 17 (PPI Interests)), including (I) the Confirmation Hearing Notice and (II) the applicable Notice of Non-Voting Status; and

(iii)    the Supplemental Confirmation Hearing Notice Plan (as defined in the Solicitation Order), including providing supplemental notice by means of (A) direct mailings to certain additional individuals and entities, (B) print media, (C) online display, (D) internet search terms, (E) social media campaigns, and (F) earned media, which collectively served over 3.7 billion impressions.

(e)    The Debtors were not required to solicit votes from the Holders of Claims and Interests in Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests) as each such Class either (i) will receive no distribution under the Plan and is deemed to reject the Plan or (ii) will be Unimpaired and is presumed to accept the Plan. Further, the Debtors did not send Holders of Claims and Interests in each such Class a Confirmation Hearing Notice or Notice of Non-Voting Status as such Holders are Debtors.

(f)    As described in the Solicitation Order and as evidenced by the Solicitation Affidavit, service of the Solicitation Materials was adequate and sufficient under the circumstances of the Chapter 11 Cases, and adequate and sufficient notice of the Confirmation Hearing and other requirements, deadlines, hearings, and matters described in the Solicitation Order (i) was timely and properly provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Order and (ii) provided due process, and an opportunity to appear and to be heard, to all parties in interest, all holders of Claims, all holders of Interests, and all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any Channeled Claim or any Shareholder Released Claim.

(g)     Because the foregoing transmittals, notices, and service set forth above were adequate and sufficient, no other or further notice is necessary or shall be required.

(h)     All parties in interest, including, without limitation, the Debtors' insurers, had notice of the Purdue bankruptcy proceedings and an opportunity to participate in them and were on notice that Debtors' opioid-related liabilities were being mediated, negotiated, and resolved.

F.     <u>Voting and Solicitation</u>.     Votes on the Plan were solicited, including, where applicable, by Master Ballot Solicitation Method and by Direct Solicitation Method, after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code.  As evidenced by the Solicitation Affidavit and Tabulation Declaration, votes to accept the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Neither the Raymond Sackler family making publicly available the website www.JudgeforYourselves.info, nor the many postings, press releases, statements, and news conferences of various parties, constituted improper solicitations of the Plan under section 1125 of the Bankruptcy Code.

G.     <u>Plan Supplement</u>.  The filing and notice of the Plan Supplement (and any and all subsequent amendments, modifications, and supplements thereto filed with the Court) were proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Orders, and no other or further notice is or shall be required.

H.     <u>Plan Modifications</u>.  Any modifications to the Plan since the commencement of solicitation described or set forth herein following entry of the Solicitation Order comply with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.  Such modifications constitute immaterial modifications and/or do not adversely affect or change the

treatment of any Claims or Interests of any Holders that have not accepted such modifications. Pursuant to Bankruptcy Rule 3019, the modifications do not require either (a) any additional disclosure under section 1125 of the Bankruptcy Code and/or the re-solicitation of votes under section 1126 of the Bankruptcy Code or (b) that the Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

I.    <u>Burden of Proof</u>. The Debtors, as proponents of the Plan, have met their burden of proving the satisfaction of the applicable requirements for Confirmation of the Plan set forth in section 1129 of the Bankruptcy Code by a preponderance of the evidence, which is the applicable standard. Further, but subject in all instances to paragraph 42 of this Order, each witness who testified (by declaration or otherwise) at or in connection with the Confirmation Hearing in support of the Plan was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

J.    <u>Tabulation</u>. As described in and evidenced by the Voting Report, Claims in Class 3 (Federal Governmental Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), and Class 11(c) (Other General Unsecured Claims) are Impaired under the Plan. With the exception of Class 3 (Federal Governmental Unsecured Claims), which did not vote to accept or reject the Plan and is therefore presumed to accept the Plan pursuant to <u>Section 3.3</u> of the Plan, each of the foregoing Classes has voted to accept the Plan by the numbers and amounts of Claims required by section 1126 of the Bankruptcy Code. The miscounting of the votes of the objecting Canadian municipalities and First Nations in Classes 4 and 5, respectively, instead of in the correct Class, Class 11(c), is

immaterial given that each such Class accepted the Plan if such votes were properly counted in Class 11(c). No Class that was entitled to vote on the Plan voted to reject the Plan.

K.     <u>Bankruptcy Rule 3016</u>.  The Plan is dated and identifies the Debtors as the entities submitting the Plan, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

## **COMPLIANCE WITH SECTION 1129 OF BANKRUPTCY CODE**

L.     <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  As further detailed below, the Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(a)     *Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))*.  <u>Article III</u> of the Plan designates all Claims and Interests, other than the Claims of the type described in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code, into 21 Classes.  The Claims or Interests in each designated Class have the same or substantially similar rights as the other Claims or Interests in such Class and such classification is appropriate under the circumstances of these Chapter 11 Cases.  Valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan.  Had the States' Claims been separately classified from other Non-Federal Domestic Governmental Claims, both (i) such class and (ii) the class comprised of the remaining Non-Federal Domestic Governmental Claims would still have voted to accept the Plan.  The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)     *Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))*.  The Plan specifies that Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), and Class 11(b) (Adlon General Unsecured Claims) are Unimpaired Classes and Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests) are

potentially Unimpaired Classes under the Plan, each within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)     *Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).*   The Plan specifies that Class 3 (Federal Government Unsecured Claims), Class 4 (Non-Federal Domestic Governmental Claims), Class 5 (Tribe Claims), Class 6 (Hospital Claims), Class 7 (Third-Party Payor Claims), Class 8 (Ratepayer Claims), Class 9 (NAS Monitoring Claims), Class 10(a) (NAS PI Claims), Class 10(b) (Non-NAS PI Claims), Class 11(c) (Other General Unsecured Claims), Class 13 (Shareholder Claims), Class 14 (Co-Defendant Claims), Class 15 (Other Subordinated Claims), Class 16 (PPLP Interests), and Class 17 (PPI Interests) are Impaired Classes under the Plan and Class 12 (Intercompany Claims) and Class 18 (Intercompany Interests) are potentially Impaired Classes under the Plan, each within the meaning of section 1124 of the Bankruptcy Code, and specifies the treatment of each such Class, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(d)     *No Disparate Treatment (11 U.S.C. § 1123(a)(4)).*   The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)     *Implementation of Plan (11 U.S.C. § 1123(a)(5)).*   <u>Article V</u> of the Plan and the other provisions of the Plan, the various documents included in the Plan Supplement, and the terms of this order (this "**Order**") provide adequate and proper means for the implementation of the Plan, including, but not limited to, authorization for the Debtors to consummate the Restructuring Transactions and to take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary

to effectuate the Restructuring Transactions under and in connection with the Plan. The Bankruptcy Code authorizes (a) the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law and (b) authorizes the transfer and vesting of the NewCo Transferred Assets to NewCo. No insurers that issued the Purdue Insurance Policies have objected to the transfer and vesting of the MDT Transferred Assets.

(f)     *Voting Power of Equity Securities (11 U.S.C. 1123(a)(6))*.  The NewCo Operating Agreement will prohibit the issuance of non-voting securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(g)     *Designation of Directors, Officers, and Trustees (11 U.S.C. § 1123(a)(7))*. The Plan and the Plan Supplement are consistent with the interests of Holders of Claims and with public policy with respect to the manner of selection of the NewCo Manager, the TopCo Managers, the Plan Administration Trustee, the MDT Trustees, the MDT Executive Director, the Creditor Trustees, and the Creditor Trust Overseers.  Thus, section 1123(a)(7) of the Bankruptcy Code is satisfied.

(h)     *Inapplicable Provisions (11 U.S.C. §§ 1123(a)(8))*.  None of the Debtors is an individual, as such term is used in the Bankruptcy Code.  Accordingly, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

(i)     *Additional Plan Provisions (11 U.S.C. § 1123(b))*.  As set forth below, the discretionary provisions of the Plan comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b) of the Bankruptcy Code is satisfied.

(i)     *Impairment/Unimpairment of Classes (11 U.S.C. § 1123(b)(1))*.   In accordance with section 1123(b)(1) of the Bankruptcy Code, (A) Classes 1, 2, 11(a), and 11(b) are Unimpaired, (B) Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b), 11(c), 13, 14, 15, 16 and 17 are Impaired, and (C) Classes 12 and 18 are Unimpaired or Impaired under the Plan.

(ii)    *Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))*.   In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VIII of the Plan provides that each executory contract and unexpired lease to which any Debtor is a party, subject to Section 8.4 of the Plan, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except if it (A) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (B) is specifically identified on the Schedule of Rejected Contracts, (C) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (D) is the subject of a pending Contract Dispute, or (E) is being otherwise treated pursuant to the Plan. The Debtors have exercised reasonable business judgment in determining whether to reject, assume, or assume and assign each of their executory contracts and unexpired leases under the terms of the Plan. Accordingly, the Debtors' assumption, assumption and assignment, or rejection of each executory contract and unexpired lease under the Plan satisfies the requirements of section 365(b) of the Bankruptcy Code and, therefore, the requirements of section 1123(b)(2) of the Bankruptcy Code.

(iii)   *Settlement, Releases, Exculpation, and Injunction of Claims (11 U.S.C. § 1123(b)(3)(A))*.   In accordance with sections 1123(b)(3)(A) and (b)(6) of the

Bankruptcy Code, the Plan contains appropriate settlement, releases, exculpation and injunction provisions as described in more detail in Paragraph II.

(iv)     *Preservation of Claims and Retention of Claims (11 U.S.C. § 1123(b)(3)(B))*.  In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Master Disbursement Trust, the Plan Administration Trust, the Creditor Trusts, and NewCo shall have rights to prosecute Retained Causes of Action as and to the extent set forth in the Plan, as of the Effective Date, and all such Retained Causes of Action shall be absolutely transferred and assigned to the Master Disbursement Trust, the Plan Administration Trust, the Creditor Trusts, and NewCo, as applicable, on the Effective Date.

(v)     *Additional Plan Provisions (11 U.S.C. § 1123(b)(6))*.  The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, but not limited to, provisions for (A) distributions to Holders of Claims, (B) resolution of Disputed Claims, (C) allowance of certain Claims, (D) indemnification obligations, (E) releases by the Debtors of certain parties, (F) releases by certain parties of certain claims against third parties, (G) exculpations of certain parties, (H) injunctions from certain actions, including actions against certain third parties, and (I) retention of the Court's jurisdiction, thereby satisfying the requirements of section 1123(b)(6) of the Bankruptcy Code.

M.     The Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  As further detailed below, the Debtors as proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically:

(a)     Each of the Debtor entities is a proper debtor under section 109 of the Bankruptcy Code.

(b)     The Debtors have complied with all applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

(c)     The Debtors have complied with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code, in (i) transmitting the Solicitation Materials and related documents and (ii) soliciting and tabulating votes with respect to the Plan.

(d)     Good, sufficient, and timely notice of the Confirmation Hearing has been provided as further described in Paragraph E above.

N.     Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). The Plan is the product of the good faith process through which the Debtors have conducted the Chapter 11 Cases and reflects extensive, good faith, arm's-length negotiations among the Debtors, the Creditors' Committee, and the Debtors' key stakeholders, including each of the Supporting Claimants, and their respective professionals, including in arms-length good faith mediations.   The Plan Documents are the product of good faith efforts of the Debtors and applicable non-Debtor parties who assisted in the drafting of the Plan Documents.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims.  Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and providing for fair and reasonable distributions to creditors.  Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code.  Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the hearing with

respect to the Disclosure Statement, the Confirmation Hearing, the Simmonds Declaration, the Third Supplemental Finegan Declaration, the Greenspan Declaration, the First DelConte Declaration, the Collura Declaration, the Gowrisankaran Declaration, the Rule Declaration, the DeRamus Declaration, the Dubel Declaration, the Turner Declaration, the Lowne Declaration, the Second DelConte Declaration and the Guard Declaration, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

O.     _Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))._     All payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are subject to the approval of the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.    With respect to payments being made to stakeholder professionals out of distributions to creditors under the several private creditor trusts under Section 5.8 of the Plan and otherwise, such payments are not within the scope of section 1129(a)(4); alternatively, to the extent any such payments are within the scope of section 1129(a)(4), based upon the record, the Court finds that such fees and costs are reasonable or are, as set forth in the Modified Bench ruling and Section 5.8 of the Plan, subject to approval of the Court as reasonable .

P.     _Service of Certain Individuals (11 U.S.C. § 1129(a)(5))._     To the extent not disclosed in the Plan Supplement, the identities and affiliations of the MDT Trustees, the MDT Executive Director, the NewCo Managers, the TopCo Managers, the Plan Administration Trustee and PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers shall be determined in accordance with Article V of the Plan.    The appointment of such individuals to

such positions, or the process by which such individuals have been or will be identified or appointed, is consistent with the interests of Holders of Claims and public policy. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

Q.      Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction, and, accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

R.      Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).

(a)      The Plan satisfies section 1129(a)(7) of the Bankruptcy Code because each Holder of a Claim or Interest (i) has voted to accept or is presumed to have accepted the Plan, (ii) is Unimpaired and deemed to have accepted the Plan, or (iii) shall receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on such date.

(b)      In addition, the liquidation analysis attached as Appendix B to the solicitation version of the Disclosure Statement (the "**Liquidation Analysis**"), as well as the other evidence related thereto in support of the Plan that was proffered or adduced at, prior to, or in affidavits and declarations in connection with the Confirmation Hearing, (i) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was proffered, adduced, and/or presented, (ii) utilize reasonable and appropriate methodologies and assumptions, (iii) have not been controverted by other evidence, and (iv) establish that, with respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or Interest in such Class shall receive under the Plan on account of such Allowed Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would

so receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(7) of the Bankruptcy Code.

S. Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).

(a) Holders of Claims in Class 1 (Secured Claims), Class 2 (Other Priority Claims), Class 11(a) (Avrio General Unsecured Claims), Class 11(b) (Adlon General Unsecured Claims), Class 12 (Intercompany Claims), and Class 18 (Intercompany Interests) are Unimpaired or potentially Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan, thus meeting the requirements of section 1128(a)(8) of the Bankruptcy Code.

(b) As reflected in the Tabulation Declaration, each Impaired Voting Class affirmatively voted to accept the Plan or is presumed to have accepted the Plan. Class 4 (Non-Federal Domestic Governmental Claims) voted, in the aggregate, 96.87% in number and 96.87% in amount to accept the Plan; Class 5 (Tribe Claims) voted, in the aggregate, 96.17% in number and 96.17% in amount to accept the Plan; Class 6 (Hospital Claims) voted, in the aggregate, 88.26% in number and 88.26% in amount to accept the Plan; Class 7 (Third-Party Payor Claims) voted, in the aggregate, 93.54% in number and 93.54% in amount to accept the Plan; Class 8 (Ratepayer Claims) voted, in the aggregate, 100% in number and 100% in amount to accept the Plan; Class 9 (NAS Monitoring Claims) voted, in the aggregate, 99.78% in number and 99.78% in amount to accept the Plan; Class 10(a) (NAS PI Claims) voted, in the aggregate, 98.08% in number and 98.08% in amount to accept the Plan; Class 10(b) (Non-NAS PI Claims) voted, in the aggregate, 95.72% in number and 95.72% in amount to accept the Plan; and Class 11(c) (Other General Unsecured Claims) voted, in the aggregate, 93.28% in number and 96.44% in

amount to accept the Plan. Class 3 (Federal Governmental Unsecured Claims), did not submit votes to accept or reject the Plan; accordingly, pursuant to <u>Section 3.3</u> of the Plan, Class 3 (Federal Governmental Unsecured Claims) is presumed to have accepted the Plan.

(c)     Accordingly, the Debtors have satisfied the requirements of section 1129(a)(8) of the Bankruptcy Code with respect to such Impaired Voting Classes of Claims.

T.     <u>Treatment of Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9))</u>.     The treatment of Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims under <u>Articles II</u> and <u>III</u> of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

U.     <u>Acceptance by Impaired Class of Claims (11 U.S.C. § 1129(a)(10))</u>.     The Voting Classes are Impaired Classes, and each Voting Class has voted to or is presumed to have accepted the Plan. Accordingly, at least one Class of Claims against the Debtors that is Impaired under the Plan has voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by any insider, thus satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

V.     <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.     The information in the Disclosure Statement, including financial projections attached as Appendix D to the Disclosure Statement and the evidence that was proffered or adduced at or prior to the Confirmation Hearing by the Debtors: (a) are reasonable, persuasive, and credible; (b) have not been controverted by other evidence; (c) utilize reasonable and appropriate methodologies and assumptions; (d) establish that the Plan is feasible and that there is a reasonable prospect of NewCo being able to meet its financial obligations under the Plan and in the ordinary course of business, and that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization of, NewCo or any other successor to the Debtor under the Plan; and (e) establish that NewCo will have sufficient funds available to meet its obligations under the Plan. Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

W.      Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under section 1930 of title 28 of the United States Code and statutory interest thereon shall be paid in accordance with Section 12.5 of the Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

X.      Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  The Debtors do not maintain retirement plans or other benefits obligations.  Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

Y.      Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation and, accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan.

Z.      Plan of an Individual Debtor (11 U.S.C. § 1129(a)(15)).  None of the Debtors is an individual and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

AA.      Transfers in Accordance with Non-Bankruptcy Law (11 U.S.C. § 1129(a)(16)).  None of the Debtor entities is a nonprofit entity and, accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable to the Plan.

BB.      No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).  Each Voting Class has voted to or is deemed to have accepted the Plan.  Therefore, section 1129(b) of the Bankruptcy Code is inapplicable to the Voting Classes in the Chapter 11 Cases.  The Plan does not "discriminate unfairly" with respect to the Classes that are Impaired and deemed to

have rejected the Plan, because the Debtors have a valid rationale for the Plan's classification scheme, the Plan does not discriminate unfairly with respect to such Classes, and the Plan is "fair and equitable" with respect to the Classes that are Impaired and deemed to have rejected the Plan because no Class senior to any rejecting Class is being paid more than in full and the Plan does not provide a recovery on account of any Claim or Interest that is junior to such rejecting Classes. Thus, the Debtors have demonstrated that the Plan satisfies section 1129(b) of the Bankruptcy Code to the extent such provision is applicable.

CC. <u>Only One Plan (11 U.S.C. § 1129(c))</u>. The Plan is the only plan that has been filed in the Chapter 11 Cases and meets the requirements of sections 1129(a) and (b) of the Bankruptcy Code, thereby satisfying the requirements of section 1129(c) of the Bankruptcy Code.

DD. <u>Principal Purpose of Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, thereby satisfying the requirements of section 1129(d) of the Bankruptcy Code.

EE. <u>Not Small Business Cases (11 U.S.C. § 1129(e))</u>. The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

FF. <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>. Based on the record of the Chapter 11 Cases, including, but not limited to, the evidence proffered, adduced, and/or presented at the Confirmation Hearing by the Debtors and the Supporting Claimants, which is reasonable, persuasive, and credible, utilizes reasonable and appropriate methodologies and assumptions, and has not been controverted by other evidence, the Debtors and each of their successors, predecessors, control persons, members, agents, employees, officers, directors,

financial advisors, investment bankers, attorneys, accountants, consultants, and other professionals have solicited acceptances of the Plan in good faith, and the law firms that utilized the Master Ballot Solicitation Procedures have collected votes on the Plan in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, including, but not limited to, section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and, therefore, (a) are not liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan and (b) are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article X of the Plan. In addition, the Debtors have acted and entered into the documents effectuating the Debtors' reorganization pursuant to the Plan in good faith and shall be deemed to continue to act in good faith if they (x) proceed to consummate the Plan and transactions contemplated thereby pursuant thereto and (y) take the actions authorized and directed by this Order. The Debtors negotiated the transactions effectuating the Debtors' reorganization pursuant to the Plan in good faith and the resulting terms of the agreements effectuating the Debtors' reorganization are in the best interests of the Debtors and the Estates.

GG.    Satisfaction of Confirmation Requirements. Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Confirmation Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## **ADDITIONAL FINDINGS REGARDING CHAPTER 11 CASES AND PLAN**

HH.    Implementation. All documents and agreements necessary to implement the Plan, including, but not limited to, any Plan Document, are essential elements of the Plan and have

been negotiated in good faith and at arm's length by the Debtors and the other parties thereto, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and the Holders of Claims, and each such document and agreement shall, upon completion of documentation and execution, be valid, binding, and enforceable and not be in conflict with any federal, state, or local law. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.

II.     Injunction, Exculpation, and Releases.

(a)     The Court has jurisdiction under section 1334 of title 28 of the United States Code to approve the injunctions, releases, and exculpation set forth in Article X of the Plan, including, but not limited to, jurisdiction to release claims against the Shareholder Released Parties. Sections 105(a) and 1123(b)(3) and (6) of the Bankruptcy Code and the Court's inherent equitable power permits issuance of the injunction and approval of the releases and exculpations set forth in Article X of the Plan. With respect to the Third-Party Releases (defined below), as has been established based upon the record in the Chapter 11 Cases and the evidence presented at the Confirmation Hearing, the Court has subject matter jurisdiction to approve the Third-Party Releases because (i) confirmation of a plan of reorganization is a core proceeding and the Third-Party Releases are integral to confirmation of the Plan and the failure to approve these injunctions, exculpations, and releases would render the Debtors unable to confirm and implement the Plan, and (ii) the Released Claims and Shareholder Released Claims that are the subject of the Third-Party Releases could have a conceivable effect on the Debtors' Estates. Released Claims and Shareholder Released Claims have factual and legal issues in common with actual or potential claims or causes of action against the Debtors and actual or potential claims or

causes of action of the Estates against third parties, including the Shareholder Released Parties. The litigation of the Released Claims and the Shareholder Released Claims would have conceivable effects on the *res* of the Estates. Litigation of such claims could deplete the value of certain insurance policies, could lead to the assertion of indemnification and contribution claims against the Estates, and could prejudice the Estates or the Master Distribution Trust (and therefore reduce the value available for distribution to the Creditor Trusts) in future litigation of such claims or causes of action. Litigation over a disputed indemnification or contribution claim is itself an effect upon the Estates. Moreover, the Court has the power to render a final decision confirming the Plan, including such provisions, under the United States Constitution.

(b)      The injunctions, releases, and exculpations set forth in Article X of the Plan, including the Debtor Releases (defined below), the Third-Party Releases and the Channeling Injunction, were adequately disclosed and explained in the Disclosure Statement, on the Ballots, through the Supplemental Confirmation Hearing Notice Plan, in the Notices of Non-Voting Status and in the Plan.

(c)      The releases granted by the Debtors and their Estates pursuant to Sections 10.6 and 10.7 of the Plan (the "**Debtor Releases**") represent a valid exercise of the Debtors' business judgment. For the reasons set forth in the Modified Bench Ruling, the Disclosure Statement and the Confirmation Brief and based on the evidence proffered or adduced at the Confirmation Hearing, the Debtor Releases are (i) an integral and necessary part of the Plan, (ii) a good faith settlement and compromise of the claims and Causes of Action released, (iii) given in exchange for good and valuable consideration, (iv) appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and (v) given after due notice and opportunity for objection. The Debtor Releases shall constitute a bar to the Debtors, the Liquidating Debtors, the

Transferred Debtors, the Estates, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo, any other newly formed Persons that shall be continuing the Debtors' businesses after the Effective Date, or any party purporting to claim through any of the foregoing, from asserting any Released Claim or Shareholder Released Claim released pursuant to Section 10.6 or 10.7 of the Plan, except as otherwise set forth in the Plan. The Debtor Releases were negotiated by sophisticated parties represented by able counsel and financial advisors and are the result of an arm's-length, mediated negotiation process. The Debtors' pursuit of any Released Claims or Shareholder Released Claims against the Released Parties or the Shareholder Released Parties would not be in the interests of the Estates' various constituencies because the benefits to the Estates obtained in exchange for granting the releases, including the benefit to the Estate's creditors by virtue of the various intercreditor allocation agreements and settlements reached in Mediation, likely outweigh any potential benefit from pursuing such claims considering the costs and uncertainty involved therein, and the fact that all of the intercreditor allocation agreements and settlements reached in Mediation were conditioned upon the Shareholder Settlement. In light of, among other things, the concessions and contributions provided to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan, the Debtor Releases are fair and reasonable, in the best interests of the Estates and creditors, and appropriate.

(d) The non-Debtor releases set forth in Sections 10.6 and 10.7 of the Plan (the "**Third-Party Releases**") are appropriate. The Third-Party Releases satisfy the applicable standard for approval of nonconsensual third-party releases set forth in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d

Cir. 2005) ("**Metromedia**") and other applicable law. The record of the Confirmation Hearing demonstrates the following:

(i)     The Third-Party Releases set forth in the Plan and implemented by this Order are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates and the releasing parties, including as a result of their relationship to the intercreditor allocation agreements and settlements. An overwhelming number of creditors support the Plan, with 96.01% in number of Holders of Claims in Voting Classes that voted having voted to accept the Plan as reflected in the Tabulation Declaration. The Third-Party Releases are consensual, and not involuntary, as to those creditors who voted in favor of the Plan, including the Consenting States and Newly Consenting States. Of the over 600,000 claimants that filed proofs of claim in this case, which include the Federal Government, most of the States, thousands of political subdivisions, hundreds of Native American Tribes, more than 130,000 personal injury victims, and numerous hospitals, third party payors, ratepayers, public schools, and others, the following claimants filed objections and continue to press such objections to the shareholder releases: nine States (including the District of Columbia), the U.S. Trustee (who is not a claimant), the City of Seattle, four Canadian municipalities, two Canadian First Nations and three pro se objectors.[3]

(ii)     The complexity of the litigation against the Debtors and potential claims among the Debtors and co-defendants in that litigation or against the Shareholder Released Parties make these chapter 11 cases both "rare" and "unusual." As of the Petition Date, the Debtors faced over 2,600 lawsuits arising from the Debtors' marketing of opioid medications. Many of these suits sought to hold the Debtors and other parties jointly and severally liable for injuries related to opioid use. Many of these suits also name certain of the

---

[3] The Department of Justice also filed a statement regarding the Shareholder Releases.

Debtors' officers, directors, and shareholders, including members of the Sackler Families, as defendants. In addition, the claims that are the subject of the Shareholder Settlement are, in part, premised upon the alleged liability or conduct of the Debtors and assert trillions of dollars in damages.

        (iii)    The Third-Party Releases are an integral and necessary part of the Plan. The Plan, and the global resolution embodied in the Plan and Plan Settlements, would not be possible without the Third-Party Releases. The Shareholder Settlement would not be possible without the Shareholder Releases because the Sackler Families would not enter into the Shareholder Settlement, and cause the payments and other concessions contemplated therein, without the Shareholder Releases and Channeling Injunction. The Plan Settlements, including the intercreditor allocation agreements and settlements reached in Mediation, are premised upon the consideration under the Shareholder Settlement Agreement, and the term sheets agreed to by the private claimants in Mediation were conditioned on the participation of the Sackler Families in the Plan. In the absence of the Plan Settlements, the Debtors would not be able to take advantage of the DOJ Forfeiture Judgment Credit provided for in the DOJ Resolution. The Third-Party Releases, by way of the consideration under the Shareholder Settlement Agreement, also preserve the agreed allocations among creditors that underlie the Plan Settlements. Without the Third-Party Releases, and therefore without the consideration under the Shareholder Settlement Agreement, there could be no certainty that such agreed upon allocations would not be undermined by collateral litigation. Absent the consideration provided to the Debtors' Estates under the Shareholder Settlement, the Plan would not have been feasible. In the absence of the Plan Settlement, of which the Third-Party Releases are a key and inextricable element, the litigation of thousands of pending actions to judgment and through appeals in the civil court

system would likely result in the destruction of the significant value that would otherwise have been distributed to opioid abatement efforts and personal injury claimants. The resumption of litigation that would otherwise be the subject of the Shareholder Settlement would implicate NewCo and could have an impact on the operations of NewCo and NewCo's ability to support abatement. The Restructuring Transactions contemplated by the Plan, the Plan Supplement, and other instruments, releases, and other agreements related to the Plan would not be possible absent the Shareholder Settlement and the consideration received by the Debtors' Estates thereunder. As such, the Chapter 11 Cases present unique and extraordinary circumstances where release of non-Debtors as provided in the Plan is proper and appropriate.

(iv)    The consideration under the Shareholder Settlement Agreement described in the Disclosure Statement (including in Article 11.2 thereof), including $4.275 billion in cash and 100% of the equity interests in Purdue Pharma L.P., which does not include the enhancements described in the Mediators Report [D.I. 3119] that have since been added to the settlement consideration, constitutes a substantial contribution to the Estates. The consideration under the Shareholder Settlement Agreement includes payments totaling $4.325 billion to estates over nine or ten years. Such payments total at least twice the value of the Debtors as a going concern. Such payments also allow the Debtors to make the payments required under the DOJ Resolution and the Plan Settlements.

(v)    The Plan provides for channeling of the Released Claims and Shareholder Released Claims. Applicable Channeled Claims are eligible for treatment by the Creditor Trusts.

(vi)    The Released Claims and Shareholder Released Claims directly impact the Debtors' reorganization. The appropriate resolution of these claims has been the

-30-

subject of significant discovery, litigation and mediation in these cases by sophisticated parties from multiple creditor constituencies that were represented by able counsel and financial advisors.

(e)     The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction: (i) are essential to the Plan; (ii) are necessary to preserve and enforce the discharge and releases set forth in <u>Sections 10.2</u>, <u>10.6</u>, and <u>10.7</u> of the Plan, the exculpation provisions in <u>Section 10.12</u> of the Plan, and the compromises and settlements implemented under the Plan; (iii) are appropriately tailored to achieve that purpose; (iv) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (v) are an essential means of implementing the Plan pursuant to section 1123(a)(5) and (b)(6) of the Bankruptcy Code; (vi) are an integral element of the transactions incorporated into the Plan; (vii) confer material benefits on, and are in the best interests of, the Debtors and their Estates, creditors, and other stakeholders; (viii) are critical to the overall objectives of the Plan; and (ix) are consistent with sections 105, 524(e), 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The injunction provisions set forth in <u>Article X</u> of the Plan, including, without limitation, the Channeling Injunction, were adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in <u>Article X</u> of the Plan.

(f)     The Creditors' Committee, the Ad Hoc Committee, the MSGE Group, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, the Public School District Claimants, and the NAS Committee affirmatively support the Plan, which includes the

release and injunction provisions in favor of the Released Parties, the Shareholder Released Parties, and the Protected Parties (as applicable). The Newly Consenting States[4] do not object to approval of the Plan.

(g) The Exculpated Parties made significant contributions to the Chapter 11 Cases and played an integral role in working towards the resolution of the Chapter 11 Cases, and the Court has found that resolution to have been in good faith after due notice. Accordingly, the exculpations contemplated by Section 10.12 of the Plan are part of a fair and valid exercise of the Debtors' business judgment and are fair, reasonable, and appropriate under the circumstances of the Chapter 11 Cases.

(h) The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunctions, releases, and exculpations set forth in Article X of the Plan. Based on the record of the Chapter 11 Cases, the representations of the parties, and the evidence proffered, adduced, and presented at the Confirmation Hearing, this Court finds that the injunctions, releases, and exculpations set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement such provisions would render the Debtors unable to confirm and consummate the Plan.

JJ.     Compromise of Controversies.

(a) Pursuant to the Bankruptcy Code, including section 1123 of the Bankruptcy Code, and Bankruptcy Rule 9019, the Debtors have authority to propose and negotiate a resolution of their opioid-related liabilities and, with approval of the Court, enter into a resolution of their opioid-related liabilities through the Plan. The settlements reached between

---

[4] Newly Consenting States include the members of the Ad Hoc Group of Non-Consenting States that agreed to support the Plan on the terms set forth in the *Mediator's Report* filed with the Bankruptcy Court on July 7, 2021 [D.I. 3119].

the Debtors and the opioid-related claimants, as embodied in the Plan, are fair, equitable and reasonable and were entered into in good faith based on arm's-length negotiations. The various intercreditor allocation agreements and settlements, including, without limitation, the NOAT Allocation Formula, are fair, equitable, and reasonable. Such negotiation, settlement, and resolution of liabilities shall not operate to excuse any insurer from its obligations under any insurance policy, notwithstanding any terms of such insurance policy (including any consent-to-settle or pay-first provisions) or provisions of non-bankruptcy law. The Plan Settlement is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests and is fair, equitable, and reasonable. The Plan Settlement is necessary and integral to the Plan and the Plan Documents and the success of the Chapter 11 Cases. Any reasonable estimate, projection, or valuation of their total liability and obligation to pay for Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), and 10(b), if the Debtors had the ability to pay those Claims and that liability outside of the Chapter 11 Cases, exceeds by many multiples the total value of all assets of the Debtors' Estates, including but not limited to the value of the Debtors' business, contributions from third parties and the full face value of all of Purdue's insurance.

KK.    <u>Shareholder Settlement</u>.[5]

(a)    The Debtors' Special Committee was vested with exclusive authority to provide approval on behalf of the Debtors with respect to all transactions between Purdue and members of the Sackler Families and the prosecution, defense, and settlement of any causes of action against the Debtors' shareholders and members of the Sackler Families and their affiliates. The members of the Special Committee were well qualified, independent, and acted

---

[5] Capitalized terms used solely in this paragraph KK but not otherwise defined herein or in the Plan, Disclosure Statement, or Solicitation Order shall have the meanings ascribed to such terms in the Shareholder Settlement Agreement.

independently and not under the direction or influence of the Sackler Families, including with respect to the negotiation and approval of the Shareholder Settlement, as evidenced by the record of the Chapter 11 Cases, including, without limitation, by the *Report of Stephen D. Lender, Examiner* [D.I. 3285].   The Special Committee conducted a comprehensive and thorough investigation into potential claims against the Sackler Families and associated entities.   The Debtors have exercised reasonable business judgment in determining to enter into the Shareholder Settlement Agreement, Collateral Documents, and other Definitive Documents.

(b)   The Official Committee, Ad Hoc Committee, the Newly Consenting States and the MSGE Group, through their respective experienced and well-qualified advisors and/or members, as applicable, each also separately conducted their own comprehensive and thorough investigation into potential claims against the Sackler Families and their associated entities.   Based on such investigations, as well as all of the facts and circumstances of these Chapter 11 Cases, the Official Committee, Ad Hoc Committee, and MSGE Group each made its own independent judgment—free of influence or coercion from any party in the case, and acting solely on behalf of, and in the best interests of, its constituents, in each case—to support the Plan, including all of its component parts and the Newly Consenting States agreed not to object to the Plan.

(c)   The Shareholder Settlement is necessary and integral to the Plan and the success of the Chapter 11 Cases, is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, is fair, equitable, and reasonable, and satisfies the standard for approval set forth in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

(i)   The balance between the litigation's possibility of success (including, specifically, issues regarding collectibility) and the Shareholder Settlement's future

benefits—when considered in light of all of the facts and circumstances of these Chapter 11 Cases—weigh in favor of approving the Shareholder Settlement. There are many benefits of the Shareholder Settlement, including the consideration under the Shareholder Settlement Agreement, the ability to implement the intercreditor allocation agreements and settlements reached in Mediation and the DOJ Resolution, and avoiding costly, lengthy, value-destructive litigation and likely delay in stakeholder recovery. The quantum and timing of success in, and collection with respect to, litigation against the Sackler Families is not certain and could require resolution of numerous complex and disputed legal and factual issues, including—depending upon the theory of liability and which party is the defendant—jurisdiction, statute of limitations, prejudgment interest, solvency, reasonably equivalent value, intent to hinder, delay, or defraud creditors, and fiduciary duties.

(ii)     Litigation of the claims resolved in the Shareholder Settlement would be complex, protracted, and expensive and delay resolution of these Chapter 11 Cases. Fraudulent transfer litigation is often lengthy and expensive, all the more so when dozens of defendants in multiple jurisdictions are involved. Before the Petition Date, the Debtors were incurring professional fees at an average rate of over $2 million per week directly related to the Pending Actions. Representatives of the Sackler Families have stated that if the Shareholder Settlement, the Shareholder Releases, and the channeling injunction are not approved, the Sackler Families will vigorously defend any litigation against them. The Sackler Families have also asserted that recoveries would be limited by the amount of assets held by individual members of the Sackler Families and by obstacles in recovering against trusts held for the benefit of members of the Sackler Families. The Sackler Families have stated that, absent settlement, they would vigorously assert various defenses to the claims against them (both claims held by

the Estates and by third parties), assert that substantial evidence supports their defenses, and argue that the Estates and third parties would face obstacles to their ability to collect on any judgments against members of the Sackler Families and trusts of which they are beneficiaries.

(iii)     The Shareholder Settlement is in the best interests of creditors. The Shareholder Settlement confers substantial benefit on the Debtors' creditors. The consideration under the Shareholder Settlement Agreement includes payments to the Debtors' Estates totaling at least $4.325 billion. The Shareholder Settlement also avoids value-destructive litigation on many fronts.

(iv)     The Shareholder Settlement is an integral part of the Plan. The Plan has overwhelming support. The Tabulation Report establishes that 96.01% in number of Holders of Claims in Voting Classes having voted to accept the Plan.

(v)     Counsel to the multiple parties to the Shareholder Settlement are experienced and competent.

(vi)     As described above, the breadth of the Releases and Shareholder Releases are appropriate under the facts and circumstances of these cases and satisfy the standard for granting such releases articulated in *Metromedia* and other applicable law.

(vii)     The Shareholder Settlement is the product of arm's-length bargaining. The parties have engaged in extraordinarily broad discovery at a significant expense to the Estates and the Sackler families. The discovery exchanged has exceeded the scope of discovery that would be obtainable before judgment in civil litigation. The Shareholder Settlement is the product of mediation by court-appointed mediators the Honorable Layn Phillips (ret.), Kenneth Feinberg, and the Honorable Shelley C. Chapman.

(d)     All documents and agreements necessary to implement the Shareholder Settlement, including, but not limited to, the Shareholder Settlement Agreement, Collateral Documents, and other Definitive Documents, are essential elements of the Plan and have been negotiated in good faith, at arm's length, and without collusion or fraud, and entry into and consummation of the transactions contemplated by each such document and agreement is in the best interests of the Debtors, the Estates, and the Holders of Claims and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal, state, or local law.

LL.     Foundations.

(a)     At a March 24, 2021 hearing concerning, among other things, the adequacy of the disclosures to the Plan, the Court, in suggesting that parties should continue to pursue additional support for the Plan, observed that: "historically the Sacklers have given lots of money to charity . . . [and] there's absolutely nothing preventing the Sacklers from making an additional charitable contribution in a meaningful way . . . ." Tr. at 107:4–10, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. Mar. 24, 2021).

(b)     On May 7, 2021, the Court appointed Bankruptcy Judge Shelley C. Chapman to mediate between the nonconsenting states, the Initial Covered Sackler Persons and the Additional Covered Sackler Persons (each as defined in the Mediator's Report) (the "**Sackler Mediation Parties**"), with the Debtors also party to the mediation. *See Order Appointing the Honorable Shelley C. Chapman as Mediator* [D.I. 2820]; *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman* [D.I. 2879] (the "**Appointment Order**"). As described in Judge Chapman's Mediator's Report, in the ensuing

weeks, Judge Chapman conducted an in-person mediation among certain parties. *Mediator's Report* [D.I. 3119] (the "**Mediator's Report**").

(c)  Following the mediation, Judge Chapman issued the Mediator's Report outlining the terms of a proposal made by Judge Chapman and accepted by a majority of the Ad Hoc Group of Non-Consenting States (consisting of the following 15 states: Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin), the Sacklers Mediation Parties and the Debtors. *Id.* at 2.

(d)  The terms of Judge Chapman's proposal included, among other things:  (i) "[e]nhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments . . . as well as acceleration of $50 million in previously agreed settlement payments"; (ii) "[a] material expansion of the scope of the public document repository to be established" pursuant to the Plan, including "tens of millions of documents and approximately 13 categories of attorney-client privileged documents"; (iii) "[a] prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses that engage in the manufacturing or sale of opioids"; and (iv) modification of certain aspects of the Plan concerning the sale of assets of the new company that will be formed to continue Purdue's businesses, and concerning the distribution of funds from the National Opioid Abatement Trust ("**NOAT**").  *Id.* at 2–3.

(e)  Judge Chapman's proposal also provided that:  (i) "the individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond

and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences, which shall have an aggregate value of at least $175 million and will be required to limit the purposes of the Foundations to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis." *Id.* at 4.

(f)     The Raymond and Beverly Sackler Foundation (the "**Foundation**") is a New York not-for-profit corporation. *See* Certificate of Incorporation of the Raymond and Beverly Sackler Foundation, Inc., dated November 28, 1967 at Art. 2. Pursuant to its Certificate of Incorporation, the Foundation's purposes are to be "a charitable fund" to which donations may be made, and invested and reinvested, and whose directors are authorized to (i) "mak[e] and establish[] scholarships, awards, grants, endowments, gifts, loans, prizes, and/or contests for educational, cultural, scientific, and/or research purposes" and also (ii) "devote [its assets]. . . to any other charitable, scientific, literary, artistic, benevolent, social and/or educational use," in each case in a manner that is not inconsistent with other provisions of its Certificate of Incorporation or applicable law. *Id*. at Art. 2.

(g)     The Raymond and Beverly Sackler Fund for the Arts and Sciences (the "**Fund**") is a Delaware not-for-profit corporation. *See* Certificate of Incorporation of the Raymond and Beverly Sackler Fund for the Arts and Sciences, dated October 13, 1999 at 1. Pursuant to its Certificate of Incorporation, the Fund was "formed exclusively for charitable, scientific, medical and educational purposes," including making distributions to organizations described in Section 501(c)(3) of the Internal Revenue Code. *Id.* at Art. 3.

(h)     In agreeing to step down from their positions as members of the Foundation and the Fund in accordance with the proposal outlined in the Mediator's Report, the current members of the Foundation and the Fund will be voluntarily relinquishing control of the

Foundation and the Fund to new members (the "**Continuing Foundation Members**"). The Continuing Foundation Members will be the Persons appointed to serve as members of the Foundations in accordance with Section 5.7(l) of the Plan, which Persons shall be (i) the individuals appointed to serve as Creditor Trustees of NOAT; and/or (ii) as otherwise agreed to by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States.

(i)     The assets of the Foundation and the Fund will not be transferred to NOAT or to the Tribe Trust. Consistent with the governing documents of the Foundation and the Fund, and in accordance with Section 5.7(l) of the Plan, unless otherwise agreed by the Debtors, the Governmental Consent Parties and counsel to the Newly Consenting States, the Continuing Foundation Members are to file certificates of amendment of their respective certificates of incorporation under applicable New York or Delaware law (in accordance with the rules of the respective states of incorporation and which, in the case of the Foundation, requires the approval of either (I) the Attorney General of the State of New York or (II) a justice of the Supreme Court of the New York judicial district in which the office of the Foundation is located) limiting "the purposes of the Foundation [and the Fund] set forth in the certificates of incorporation of the Foundation [and the Fund] . . . to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis." *See* Twelfth Amended Plan. By virtue of the amended certificates of incorporation, the Foundation and the Fund will be required to use such assets for charitable purposes in a manner consistent with Section 5.7(l) of the Plan, and the Plan also recognizes that Foundation and Fund members and directors will remain subject to all relevant fiduciary duties in the administration of the Foundation and the Fund. *Id.*

(j)     Consistent with the proposal outlined in the Mediator's Report and Section 5.7(l) of the Plan, (i) the members of the Foundation and the Fund are to relinquish control of the

Foundation and the Fund on or before the Effective Date of the Plan, and (ii) consequently, the current members will no longer be entitled to make further decisions concerning the governance or operations of the Foundation and the Fund, including the use of the corporations' assets.

(k)    Deployment of the assets of the Foundation and the Fund by the Continuing Foundation Members for opioid abatement would be consistent with the broad charitable purposes of the corporations as set forth in their current certificates of incorporation.

(l)    The Shareholder Settlement Amount is sufficient consideration for the Shareholder Releases under the facts and circumstances of these chapter 11 cases, the accepting votes of the Newly Consenting States were not necessary for acceptance of the Plan by Class 4, and the Plan's treatment of Claims satisfies the requirements for confirmation of the Plan; therefore, relinquishment of control of the Foundation and the Fund is not required to justify the Shareholder Releases or confirm the Plan.

(m)    The actions taken pursuant to Section 5.7(l) of the Plan with respect to the relinquishment of control of the Foundation and the Fund constitute conduct relating to the Plan for purposes of Section 10.7(b) thereof.

MM.    Additional Findings Related to Section 1129(a)(7).    The Plan provides for recoveries that are no less than, and in many cases greater than, what creditors might receive in a hypothetical chapter 7 liquidation with specific regard to creditors in Classes 4 through 10(b). The testimony of the Debtors' witness, Jesse DelConte, evidenced that the creditors in such classes in the aggregate would recover zero in the low case and mid-case scenarios and would recover in the aggregate $699.1 million in the less likely high case scenario.  Under the Plan, an estimated at least $5.5 billion will be distributed on account of contingent liability claims.  The majority of that $5.5 billion will be provided to the Creditor Trusts.  The evidence at the

Confirmation Hearing established that the value of claims against the Sackler Families that any individual creditor would retain or recover in a hypothetical chapter 7 liquidation is speculative and not readily capable of estimation but, in any event would, along with such creditor's recovery from the Estates not exceed its recovery under the Plan. No party put forth an estimate of the value of such claims or directed the court to evidence in the record from which such an estimate could be made. Representatives of the Sackler Families have testified that they would vigorously litigate any claims brought against them relating to the Debtors. The outcome of such litigation is not certain. The Sackler Families have asserted that claimants would face uncertainty in collection, including because a substantial portion of the Sackler Families' assets are held in trusts, the contents of which they assert cannot be used to satisfy the personal liabilities of beneficiaries. An overwhelming majority of the voting creditors, including 38 out of 48 voting U.S. States, voted to accept the Plan. The Plan provides for the release of such creditors' potential third party claims against the Sackler Families. This support further supports the Court's finding and conclusion that recoveries under the Plan are not less than the recoveries they would obtain in hypothetical chapter 7 liquidation, including recoveries on account of such third-party claims.

NN.    <u>Scope of Discharge</u>.  Except as expressly provided in this Order or the Plan, the discharge or release of the Debtors through the Plan will not operate to relieve any other entity, including Insurance Companies, of their obligation to pay the Debtors' opioid-related liabilities, without regard to (i) whether the Debtors would be able to pay such liabilities in the first instance outside of bankruptcy, and (ii) whether the Debtors or a post-bankruptcy trust can or do pay those liabilities in full, in both instances notwithstanding any terms of the Purdue Insurance

Policies or provisions of non-bankruptcy law.  The Plan discharges or releases Debtors for their opioid-related liabilities.

OO.    <u>Attorney Fees and Costs</u>.  The Attorney Fees and Costs provisions set forth in <u>Section 5.8</u> of the Plan are fair, appropriate, and constitute an integral part of the resolution of the Chapter 11 Cases.  Such provisions, except as provided in <u>Section 5.8</u> of the Plan as set forth in the Modified Bench Decision, embody negotiated settlements as described in the *Mediator's Report* filed by Kenneth R. Feinberg on July 28, 2021. The *Mediator's Report* is persuasive and credible.  Such Attorney Fees and Costs provisions set forth in <u>Section 5.8</u> of the Plan (i) were the product of good-faith, hard fought arm's-length discussions and mediations that spanned many months; (ii) with respect to the contingency fee resolutions with respect to the payment of (a) Local Government and Tribe Costs and Expenses Fund, (b) State Costs and Expenses Fund, (c) Ratepayer Costs and Expenses, and (d) PI Claimant Costs and Expenses, as well as the funding of the Common Benefit Fund Escrow (items (a)-(e) and the Common Benefit Escrow shall be referred to as the "Public/Private Fee and Expense Settlement") are consistent with fee awards, arrangements, and assessments agreed upon in other similar mass tort cases; (iii) with respect to the fee settlements reached between the Debtors, the Ad Hoc Group of Hospitals and the Public Side Claimants, as well as the Ad Hoc Group of NAS Children and the Public Side Claimants (collectively, the "Hospital/NAS/Public Fee Settlement"), are consistent with fee awards, arrangements, and assessments in similar mass tort situations; (iv) with respect to such percentages agreed upon in <u>Section 5.8</u> of the Plan are well within the range of reasonableness; (v) with respect to the Common Benefit Fund assessments were the reasonable result of the work of the public creditor contingency fee counsel that has benefited all other opioid claimant constituents;  and (vi) as evidenced by the Public/Private Fee and Expense Settlement and

Hospital/NAS/Public Fee Settlement are necessary and integral to the Plan and the success of the Chapter 11 Cases, are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, are fair, equitable, and reasonable and meet the standard for approval under Bankruptcy Rule 9019 and *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) for the foregoing reasons as they (w) will avoid costly, protracted litigation over Confirmation of the Plan; (x) are far above the lowest range of reasonableness; (y) were heavily negotiated and extensively disclosed in the Disclosure Statement; and (z) were approved overwhelmingly by creditors voting on the Plan.

PP.     Value Distributed in Respect of Non-Federal Domestic Governmental Claims and Tribe Claims. The aggregate amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims under the Plan exceeds $1.775 billion.

QQ.     Disputed Claims Reserve and Effective Date Distributions. Based on the evidence proffered, adduced, and/or presented by the Debtors at the Confirmation Hearing, the procedures for establishing Disputed Claims Reserves, as set forth more fully in Article VII of the Plan, are adequate to ensure that each Holder of a Claim that is Disputed on any particular distribution date but Allowed thereafter shall receive distributions equal to the Distributions such Disputed Claim would be entitled to on the applicable distribution date if such Disputed Claim were Allowed in its full amount on the Effective Date.

RR.     Notice and Future Claims Issues.

(a)     The uncontroverted testimony set forth in the Declaration of Jeanne C. Finegan [D.I. 719], the Supplemental Declaration of Jeanne C. Finegan [D.I. 1179], and the Third Supplemental Declaration of Jeanne C. Finegan [D.I. 3403], confirms that the Bar Date

Notice Plan approved by this Court was incredibly extensive in its reach, having reached an estimated 98% of all adults 18 years and older in the United States with an average frequency of message exposure of eight times, and an estimated 86% of all adults 18 years and older in Canada, with an average frequency of message exposure of four times, through (i) direct mailings to certain individuals and entities, (ii) network broadcast, cable, and streaming television, (iii) terrestrial and streaming radio, (iv) print media (e.g., magazines and newspapers), (v) out-of-home advertising (e.g., billboards), (vi) online display (e.g., banner advertising on websites), (vii) internet search terms (e.g., Google and Bing), (viii) digital video and social media campaigns (e.g., Facebook, Instagram, LinkedIn, Twitter, and YouTube), and (ix) earned media (e.g., press releases). Print media served approximately 143 million impressions, television advertisements served over 1.1 billion impressions, and the digital campaign served over 1.6 billion impressions. As a result, this Court determines that the Notice of the General Bar Date provided, in part, through the Bar Date Notice Plan, was reasonable and appropriate, and provided due, proper, adequate, timely, and sufficient notice of the General Bar Date and the procedures for filing proofs of claim such that both known and unknown Holders of Claims and/or Channeled Claims are bound by the terms of the Plan, including the Shareholder Settlement. The court also finds that notice was reasonably calculated, under all the circumstances, to apprise interested parties of the chapter 11 cases and the confirmation hearing, and afford them an opportunity to present their objections as set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).

(b)    Similarly, according to the uncontroverted testimony set forth in the Second Supplemental Declaration of Jeanne C. Finegan [D.I. 2917] and the Third Supplemental Finegan Declaration, the Supplemental Confirmation Hearing Notice Plan reached an estimated

87% of adults 18 years and older in the U.S., with an average frequency of message exposure of five times, 82% of all adults 18 years and older in Canada, with an average frequency of message exposure of six times, and served over 2.6 billion digital media impressions in 39 other countries, through (i) direct mailings to certain individuals and entities, (ii) print media (e.g., magazines and newspapers), (iii) online display (e.g., banner advertising on websites), (iv) internet search terms (e.g., Google); (v) social media campaigns (e.g., Facebook, Instagram, LinkedIn, Twitter, and YouTube), and (vi) earned media (e.g., press releases). The Supplemental Confirmation Hearing Notice Plan was conducted in 27 different languages and served over 3.6 billion online and social media impressions. As a result, this Court determines that notice of the Confirmation Hearing (which included notice of the settlement of potential claims and Causes of Action against the Shareholder Released Parties) provided, in part, through the Supplemental Confirmation Hearing Notice Plan, was reasonable and appropriate, and provided due, proper, adequate, timely, and sufficient notice of the Confirmation Hearing, the releases, the exculpatory provisions, and the injunctions set forth in Article X of the Plan, including the Channeling Injunction, the Releases and the Shareholder Releases, as well as the Shareholder Settlement in satisfaction of the requirements of Bankruptcy Rule 3016(c), to both known and unknown Holders of Claims and/or Channeled Claims, as well as Persons that may in the future assert any Claim and/or Channeled Claim or otherwise be bound by the Plan and this Order, and that such parties have had an opportunity to appear and be heard with respect thereto.

(c)      The Court also finds, based upon the facts and legal argument presented, that the appointment of a future claims representative in these cases (which no party requested of this Court at any time in these Chapter 11 Cases) was not warranted, including because (i) the Debtors ceased all promotional activities, including the promotion of opioid medications through

a sales force, advertisements in printed journals and electronic media, and speaker programs, by February 2018, (ii) the Sackler Families ended their tenure as directors on Purdue's board and relinquished all direct control over Purdue by January 2019, (iii) the Debtors and the Sackler Families have been subject to, and in compliance with, a voluntary injunction preventing the Debtors from promoting opioids or opioid products and prohibiting the Sackler Families from actively engaging in the opioid business in the United States since October 11, 2019 and November 6, 2019, respectively, and (iv) in light of these facts and the facts presented and arguments made in the Debtors' Confirmation Brief, the Court believes there are no viable future claims. To the extent a Person attempts to bring a Future PI Channeled Claim against the Debtors, the other Released Parties, the Sackler Families, and/or the Shareholder Released Parties, such claimants are provided for in the Plan, which, in order to preserve the bargained for consideration of the Shareholder Settlement, properly sets forth a procedure for the assertion of such a claim or Cause of Action pursuant to Section 6.21 of the Plan, establishes the PI Futures Trust to litigate Future PI Channeled Claims, and—to the extent any Future PI Channeled Claim is found by a court to be viable—provides procedures for recovery that is consistent with that afforded to Holders of PI Claims. No such claims shall be asserted against any of the Protected Parties (other than the PI Futures Trust).

(d)     The $5 million set aside for the PI Futures Trust under the Plan is fair and reasonable in light of the purpose of the trust, which is to defend against such claims, and in the unlikely event that any such claim is found by a court to be viable, compensate the holder of any such claim in a manner consistent with Non-NAS PI Claims or NAS PI Claims.

SS.     Public Document Repository. The Public Document Repository is an appropriate method of ensuring that the public is granted access to the Debtors' and Sackler Family

Members' documents relevant to understanding the facts and circumstances underlying the Pending Opioid Actions, and the settlement related thereto reached with the Newly Consenting States in the third and final phase of mediation before the Honorable Shelley Chapman is in the public interest.[6]

TT.    <u>Retention of Jurisdiction</u>.  The Court may properly retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, *provided* that the resolution of Channeled Claims and the forum in which such resolution shall be determined shall be governed by, and in accordance with, <u>Section 6.21</u> of the Plan, the Master TDP and the Creditor Trust TDPs, as applicable.

UU.    <u>Likelihood of Satisfaction of Conditions Precedent</u>.    Each of the conditions precedent to the Effective Date, as set forth in <u>Article IX</u> of the Plan, is reasonably likely to be satisfied or waived in accordance with the provisions of the Plan.

VV.    <u>Good Faith</u>.  The Exculpated Parties have been and will be acting in good faith if they proceed to (a) consummate the Plan and the agreements, transactions, and transfers contemplated thereby and (b) take the actions authorized by this Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

2.    <u>Confirmation</u>.  All requirements for the Confirmation of the Plan have been satisfied.  Accordingly, the Plan, in its entirety, is CONFIRMED pursuant to section 1129 of the

---

[6] The members of the Ad Hoc Group of Non-Consenting States other than the Newly Consenting States also endorse the Public Document Repository.

Bankruptcy Code. Each of the terms and conditions of the Plan and the exhibits and schedules thereto, including, but not limited to, the Plan Documents, and any amendments, modifications, and supplements thereto, are an integral part of the Plan and are incorporated by reference into this Order. Any failure to specifically describe or include a particular provision of the Plan (or any Plan Document) in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan (including all Plan Documents) be approved and confirmed in its entirety. The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. A copy of the confirmed Plan is attached hereto as <u>Exhibit A</u>. Once finalized and executed, the documents comprising the Plan Documents and all other documents contemplated by the Plan shall, as applicable, constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and the terms of the Plan and this Order. All persons who hold or may in the future hold or assert any Shareholder Released Claim have received adequate notice that complies with due process and are bound by the releases in the Plan and Shareholder Settlement.

3.      <u>Objections</u>. All parties have had a fair opportunity to litigate all issues raised by Objections, or which might have been raised, and the Objections have been fully and fairly litigated. All Objections, responses, statements, reservation of rights, and comments in opposition to the Plan, other than those withdrawn with prejudice in their entirety, waived, settled, or resolved prior to the Confirmation Hearing, or otherwise resolved on the record of the Confirmation Hearing and/or herein, are hereby overruled. To the extent set forth on the record at the Confirmation Hearing on August 23, 2021, the reservation of rights of the Settling Co-

Defendants with respect to proceedings in Canada is preserved. The record of the Confirmation Hearing was closed before the issuance of the Court's bench ruling on September 1, 2021.

4.      Solicitation and Notice. Notice of the Confirmation Hearing and the Plan, and all related documents, the solicitation of votes on the Plan, and the Solicitation Materials (a) complied with the solicitation procedures in the Solicitation Order, (b) were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and (c) were in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

5.      Plan Classification. The categories listed in Article III of the Plan classify Claims against, and Interests in, each of the Debtors, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, for all purposes, including, but not limited to, voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling. The Court hereby holds that (a) the classifications of Claims and Interests under the Plan (i) are fair, reasonable, and appropriate and (ii) were not done for any improper purpose, (b) valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan, and (c) the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

6.      Compromise of Controversies.

(a)      The provisions of the Plan (including the applicable provisions contained in Section 5.8 of the Plan and the release and injunctive provisions contained in Article X of the Plan) and the other Plan Documents constitute a good faith compromise and settlement of Claims and controversies among the Debtors, the Supporting Claimants, the Shareholder Payment Parties, certain other participants in the Mediation and other parties in interest reached in connection with the Mediation and otherwise. The Debtors are hereby authorized and directed to

enter into the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The Plan, the Plan Settlement, the Plan Documents and this Order constitute a good faith, full and final comprehensive compromise and settlement of all Claims, Interests and controversies described in the Plan based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that (a) none of the foregoing documents (including the provisions contained in Section 5.8 of the Plan), nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and (b) any obligation by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and this Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors or any other Protected Party is a party; *provided* that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents or this Order. Any Person's support of, or position or action taken in connection with, the Plan, the

Plan Settlement, the Plan Documents and this Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, the Plan Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation, or litigation.

(b)  Professionals that are required to seek payment or reimbursement under Section 5.8(g) or (h) of the Plan of their compensation, costs and/or fees shall file with the Bankruptcy Court an application for approval of such compensation, costs and/or fees as "reasonable" under section 1129(a)(4) of the Bankruptcy Code (A) *first*, not later than thirty (30) days following the Confirmation Date, with respect to compensation, costs and/or fees incurred during the period prior to August 12, 2021 (the first day of the Confirmation Hearing), and (B) *second*, not later than thirty (30) days following the Effective Date, with respect to compensation, costs and/or fees incurred during the period of August 12, 2021 through and including the Effective Date. Such applications shall not be deemed an application for reasonable compensation for actual, necessary services by such professionals or reimbursement for actual, necessary expenses to be paid from the Estates, and neither section 330 of the Bankruptcy Code nor any of the Bankruptcy Rules, guidelines from the office of the U.S. Trustee, or other rules or guidelines applicable to fee applications shall apply.  Each such application shall set forth the amount of compensation, costs and/or fees sought, provide a narrative basis for such compensation, costs and/or fees, and attach, as applicable, supporting documentation.  A single application may cover one or more professionals that represented or advised an ad hoc group. Each such application shall be set for hearing on not less than fourteen (14) days' notice and

served upon counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee. If no objection is filed by any of such parties by the date that is three (3) days prior to such hearing, the Bankruptcy Court may enter an order approving such application without a hearing. With respect to applications filed by professionals that represented or advised the Ad Hoc Group of Individual Victims or the NAS Committee under Section 5.8(g) of the Plan, the Supporting Claimants have agreed and acknowledged that they shall not file any objections to, and shall support, such applications. Any such application made is without prejudice to any applications by the Ad Hoc Group of Individual Victims, the NAS Committee, the Public School District Claimants or professionals that represented or advised any of the foregoing for allowance and payment of compensation, costs or fees under section 503(b) of the Bankruptcy Code.

7.      Shareholder Settlement Agreement.[7]

(a)      The Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors or the Master Disbursement Trust, as applicable, in connection therewith, are hereby approved. The Shareholder Settlement Agreement is approved in the form most recently filed by the Debtors with the Plan Supplement as of the date hereof, subject only to non-substantive or immaterial changes including changes to correct typographical and grammatical errors, and any amendments thereafter (including, for the avoidance of doubt, any purported amendment to Exhibits S and X

---

[7] Capitalized terms used solely in this paragraph 7 but not otherwise defined herein or in the Plan, Disclosure Statement, or Solicitation Order shall have the meanings ascribed to such terms in the Shareholder Settlement Agreement.

thereto) are not approved, notwithstanding anything to the contrary in the Shareholder Settlement Agreement, the Plan or this Order.

(b)     The Debtors and the Master Disbursement Trust, as applicable, are authorized in all respects, without further approval of the Bankruptcy Court, act or action under applicable law, regulation, order, rule or vote, or the consent, authorization or approval of any Person except as otherwise required by the Shareholder Settlement Agreement, the Collateral Documents or any of the other Definitive Documents, to (i) execute and deliver, or cause to be executed and delivered the Shareholder Settlement Agreement, the Collateral Documents and all other Definitive Documents and to perform their obligations thereunder, except as otherwise required by the Shareholder Settlement Agreement, any of the Collateral Documents or any of the other Definitive Documents and (ii) perform all obligations under the Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents, in each case consistent with the terms of the Shareholder Settlement Agreement, Collateral Documents and other Definitive Documents.

(c)     Subject to the terms and conditions of the Shareholder Settlement Agreement, Purdue Pharma Inc. shall surrender, cancel and/or redeem its de minimis interests in Pharmaceutical Research Associates L.P.

(d)     Each party to the Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents (as defined in the Settlement Agreement) shall comply in good faith with the applicable terms of such agreements to which they are a party. Each provision of the Shareholder Settlement Agreement, the Collateral Documents, and the other Definitive Documents shall have the full force and effect of a binding Court order as of

the Agreement Effective Date (as defined in the Shareholder Settlement Agreement).  The Plan and this Order shall be binding upon each of the Shareholder Released Parties.

> (e)  Pursuant to the Shareholder Settlement Agreement, each party to the Shareholder Settlement Agreement will (i) submit to the jurisdiction of the Court, (ii) consent to the authority of the Court to enter Final Orders or judgments, and (iii) waive and not advance any argument that any Proceeding (as defined in the Shareholder Settlement Agreement) arising under, related to, or in connection with the Shareholder Settlement Agreement is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Court is an improper or inconvenient forum or venue.

8.  Plan Transactions.  All of the transactions contemplated by the Plan are hereby approved.  The Debtors are authorized to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  All implementing actions required or contemplated by the Plan, including, but not limited to, (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions and (e) any transactions described in the Restructuring Steps Memorandum, are hereby authorized and approved in all respects.

9.  Establishment and Purpose of the Trusts. Each of the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts shall be established as a trust (or, in the case of Tribe Opioid Abatement Fund LLC, a limited liability company) under applicable state law for the purposes described in the Plan and the applicable Plan Documents, and shall be funded as and to the extent provided for in the Plan. Each of the Master Disbursement Trust and the Creditor Trusts is being established to resolve or satisfy Claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to Claims asserting liability arising out of a tort, breach of contract or violation of law.

10.  Beneficiaries. Beneficiaries of the Plan Administration Trust, the Master Disbursement Trust and each of the Creditor Trusts shall have only such rights and interests in and with respect to the applicable trust assets as set forth in the Plan and the applicable Plan Documents. Each of the Plan Administration Trustee, the MDT Trustees and the Creditor Trustees shall be entitled to take the actions set forth in, and in each case in accordance with, the Plan and the applicable Plan Documents. The Creditor Trusts shall be subject to the continuing jurisdiction of the Bankruptcy Court.

11.  U.S. Federal Income Tax Matters.

(a)  U.S. Federal Income Tax Matters Relating to Plan Administration Trust. The Plan Administration Trust shall be structured to qualify as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan

Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this paragraph shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(b)     U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust. The Master Disbursement Trust shall be structured to qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing. An MDT Trustee or the MDT Executive Director, as determined in accordance with the MDT Agreement, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust.

(c)     U.S. Federal Income Tax Matters Relating to the Creditor Trusts.   Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust)

-57-

shall be structured to qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust.

(d)     U.S. Federal Income Tax Matters Relating to the Appeals Account.  The Appeals Account (as defined in the Shareholder Settlement Agreement) shall be structured to qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable.  All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes.  The person designated as escrow agent for the Appeals Account shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the Appeals Account.  The administrator of the Appeals Account shall be responsible for filing all

tax returns of the Appeals Account and the payment, out of the assets of the Appeals Account, of any taxes due by or imposed on the Appeals Account. The escrow agent for the Appeals Account may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Appeals Account for all taxable periods through the close of the Appeals Account.

(e)     Nothing in the Plan or this Order, including without limitation this Paragraph 11, shall be deemed to (A) determine the United States federal tax liability of any Person, including but not limited to the Debtors, (B) have determined the United States federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or this Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to United States federal tax liability and United States federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

12.     Approval of the Master TDP and the Creditor Trust TDPs. The Master TDP and the Creditor Trust TDPs, copies of which are attached hereto in **Exhibit B**, are hereby approved. The sole recourse and source of Distribution under the Plan of any State on account of any Non-Federal Domestic Governmental Channeled Claim shall be a beneficial interest in NOAT as and to the extent provided in the NOAT TDP.

13.     Appointment of Managers, Trustees, Etc. The appointment of the MDT Trustees, the MDT Executive Director, the NewCo Managers, the TopCo Managers, the Plan Administration Trustee, the PPLP Liquidator, the Creditor Trustees, and the Creditor Trust Overseers in accordance with Article V of the Plan and the exculpation thereof pursuant to Article V of the Plan, and the appointment of the PI Claims Administrator pursuant to Section 2.3 of the PI Trust Agreement, is hereby approved.

14.     <u>Corporate Action</u>.  Prior to or after the Effective Date, all actions contemplated under the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, and any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Plan Supplement.

15.     Preservation of Causes of Action and Reservation of Rights.  As of the Effective Date, all Retained Causes of Action shall vest in the Master Disbursement Trust, the Plan Administration Trust, each Creditor Trust or NewCo, as applicable, and the Master Disbursement Trust, the Plan Administration Trust, each Creditor Trust and NewCo shall have the right to prosecute Retained Causes of Action as and to the extent set forth in the Plan and/or Plan Supplement.

16.     <u>Executory Contracts and Unexpired Leases</u>.  Entry of this Order shall constitute approval of all amendments, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases provided for under the Plan pursuant to section 365 of the Bankruptcy Code. Amendments, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law.  Any motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date, entry of which shall result in such assumption, assumption and assignment, or rejection becoming effective without need for any further action that may otherwise be required under applicable non-bankruptcy law.

17.     _Cigna Health and Life Insurance Objection to Assumption and Assignment of Executory Contracts_. Cigna Health and Life Insurance Company reserves its rights to renew _Cigna Health and Life Insurance Company's Limited Objection to Assumption and Assignment of Executory Contracts_ [D.I. 3358] ("**Cigna's Assumption and Assignment Objection**") to the extent of a future default under the Employee Benefits Agreement (as defined in Cigna's Assumption and Assignment Objection) occurring prior to the Effective Date.

18.     _Disputed Claims_.  The provisions of _Article VII_ of the Plan, including, but not limited to, the provisions governing procedures for resolving certain Disputed Claims, are fair and reasonable and are approved.

19.     _No Post-Petition or Post-Effective Date Interest on Claims_.  Unless otherwise specifically provided for in the Plan or this Order, or required by applicable bankruptcy law, post-petition and post-Effective Date interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

20.     _Full and Final Satisfaction of Claims_.  Unless otherwise provided in the Plan, the Distributions and deliveries to be made on account of Allowed Claims under the Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims under the Plan shall additionally be in consideration of the release and discharge of any and all Released Claims and Shareholder Released Claims related to or arising from such Claims.

21.     _Release of Liens_.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the

Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Liquidating Debtors and their successors and assigns. The Liquidating Debtors are authorized to File any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests.

22. <u>Approval of Releases, Injunctions, and Exculpations</u>. The record in the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the approval of each of the releases, injunctions, and exculpations provided in the Plan, including those, without limitation, set forth in Article X thereof. Accordingly, based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation Hearing, the releases, settlements, injunctions, and exculpations set forth in the Plan, including those set forth in Article X thereof, are (i) appropriate and consistent with the Bankruptcy Code and applicable law, (ii) incorporated herein in their entirety, (iii) are hereby approved and authorized in all respects, and (iv) shall be immediately effective and binding on all Persons and Entities on the Effective Date, to the extent provided in the Plan, without further order or action on the part of this Court or any other party.

23. <u>Injunction Against Interference with Plan</u>. In accordance with <u>Section 10.4</u> of the Plan, subject to <u>Section 12.4</u> of the Plan, upon entry of this Order, all Holders of Claims against or Interests in the Debtors, Holders of Channeled Claims, Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents.

24. <u>Injunction Regarding Post-Confirmation Claims</u>. In accordance with <u>Section 6.21</u> of the Plan, except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Channeled Claim that is or was channeled to a Creditor Trust under the Master TDP and grants such Person leave to assert such Channeled Claim against such Creditor Trust. If such leave is granted, such Person shall be entitled to seek to recover on such Channeled Claim solely from the Creditor Trust to which such Channeled Claim is or was channeled pursuant to the Master TDP, as determined by the Bankruptcy Court, and any such recovery shall be solely in accordance with and to the extent provided in the Creditor Trust TDP for such Creditor Trust. After the Effective Date, in addition to the Person seeking to assert such Channeled Claim and any Person against which such Channeled Claim is purportedly asserted, only the MDT Trustees, the Creditor Trustees and NewCo shall have standing to participate in any action before the Bankruptcy Court in respect of the foregoing. For

the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify or amend the terms and conditions of any Creditor Trust TDP or the Master TDP or the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

25.     <u>Releases by Debtors</u>.[8]

(a)     **As set forth in <u>Section 10.6(a)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in this Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or**

---

[8] For the avoidance of doubt, paragraphs 25 through 33 hereof do not override the corresponding sections of the Plan and, in the event of any inconsistency between such paragraphs and the corresponding sections of the Plan, such corresponding sections of the Plan govern.

hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this subparagraph and <u>Section 10.6(a)</u> of the Plan.

(b)     Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim and (y) nothing in this Order or <u>Section 10.6(a)</u> of the Plan shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions; *provided* that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided, however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) be construed to impair in any way the Effective Date or post-Effective Date rights and

obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement, or (D) release any Claim or right to disgorge, recoup or recover compensation under the orders authorizing the Key Employee Plans or the orders with respect to the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* **[D.I. 6]**.

26.    <u>Releases by Releasing Parties</u>.

(a)    **As set forth in <u>Section 10.6(b)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in this Order, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction**

that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, (x) based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases and (y) as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor.

(b)      For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

(c)      Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim; (y) Co-Defendants shall not be Released Parties for purposes of this subparagraph or Section 10.6(b) of the Plan; and (z) nothing in this Order or Section 10.6(b) of the Plan shall (A) release any Non-Opioid Excluded Claims, (B) release any Estate Cause of Action against a Holder of a

Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, provided, however, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, or **(C)** be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

(d)    Notwithstanding anything herein or in the Plan to the contrary, but subject to the MDT Insurer Injunction and the Settling MDT Insurer Injunction, the Debtors shall not be released from liability for any Claim (other than any Co-Defendant Claim) that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies.  The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

27.    <u>Releases by Debtors of Holders of Claims</u>.

(a)     As set forth in <u>Section 10.6(c)</u> of the Plan, as of the Effective Date, all Holders of Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing or (ii) such Holder's participation in the Pending Opioid Actions.  The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this paragraph and <u>Section 10.6(c)</u> of the Plan.

(b)     As of the Effective Date, all Holders of PI Channeled Claims and Holders of NAS Monitoring Channeled Claims (excluding, in all respects, any Excluded Party, Shareholder Release Snapback Party or MDT Insurer) are hereby released by the Debtors and their Estates from any and all Causes of Action for any Claim in connection with, or arising out of, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products,

and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases, including, in each case, without limitation, any act, conduct, omission, event, transaction, occurrence, injury, damage, or continuing condition in any way relating to the foregoing.

(c)     Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim and (y) nothing in this Order or <u>Section 10.6(c)</u> of the Plan shall (A) release any contractual Estate Cause of Action or any Estate Cause of Action that is commercial in nature and, in each case, unrelated to either the Chapter 11 Cases or the subject matter of the Pending Opioid Actions, provided that, with respect to the Settling Co-Defendants, only Estate Surviving Pre-Effective Date Claims shall be retained and not released, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, *provided*, *however*, that the foregoing shall not apply to any Holder of a Co-Defendant Claim solely with respect to such Co-Defendant Claim, (C) release any claim or right arising in the ordinary course of the Debtors' or NewCo's business, including, without limitation, any such claim with respect to taxes or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

28.     <u>Shareholder Releases by Debtors</u>.

(a)      As set forth in <u>Section 10.7(a)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of <u>Section 10.7(a)</u> of the Plan, by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors'

businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in Section 10.7(a) of the Plan.

(b)     Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this Order or Section 10.7(a) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in paragraph 28(a) of this Order and Section 10.7(a) of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, and (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of paragraph 28(a) of this Order and Section 10.7(a) of the Plan had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt,

notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

29. <u>Shareholder Releases by Releasing Parties</u>.

(a) **As set forth in <u>Section 10.7(b)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Shareholder Released Parties, other than any Shareholder Released Parties identified in clause (vii)(C) of the definition of Shareholder Released Parties (and in no other clause of such definition), shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of <u>Section 10.7(b)</u> of the Plan, by the Releasing Parties from any and all Causes of Action, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with**

regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases. In addition, as of the Effective Date, notwithstanding anything to the contrary herein, each Shareholder Released Party shall be released by any Person (regardless of whether such Person otherwise is a Releasing Party) that is a Shareholder Released Party's current or former officer, director, principal, member, employee, financial advisor, attorney (including, without limitation, any attorney retained by any director, in his or her capacity as such), accountant, investment banker (including, without limitation, investment banker retained by any director, in his or her capacity as such), consultant, expert or other professional, from any Cause of Action for indemnification, contribution or any similar liability-sharing theory based on or relating to, or in any manner arising from, in whole or in part, the subject matter of the preceding paragraph.

(b)    For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

(c)    Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this

Order or <u>Section 10.7(b)</u> of the Plan shall (A) release any Non-Opioid Excluded Claims or (B) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in this Order and <u>Section 10.7(b)</u> of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

30.     <u>Releases by Shareholder Released Parties</u>.

(a)     As set forth in <u>Section 10.7(c)</u> of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in this Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of <u>Section 10.7(c)</u> of the Plan, by the Shareholder Released Parties from any and all Causes of Action, including any

derivative claims asserted or assertible by or on behalf of the Debtors or their Estates and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether existing or hereinafter arising, in each case, based on or relating to, or in any manner arising from, in whole or in part, (i) the Debtors, as such Entities existed prior to or after the Petition Date (including the Debtors' Opioid-Related Activities, manufacture, marketing and sale of Products, interaction with regulators concerning Opioid-Related Activities or Products, and involvement in the subject matter of the Pending Opioid Actions, and the past, present or future use or misuse of any opioid by a Releasing Party), (ii) the Estates or (iii) the Chapter 11 Cases.

(b)     Notwithstanding anything herein or in the Plan to the contrary, (x) nothing in this Order or the Plan shall release any Excluded Claim; (y) nothing in this Order or Section 10.7(c) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, this Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements, and including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any Claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the

commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in this Order and <u>Section 10.7(c)</u> of the Plan of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in paragraph 30(a) of this Order and <u>Section 10.7(c)</u> of the Plan shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

31.     <u>Channeling Injunction</u>.

(a)     **As of the Effective Date, in order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in <u>Sections 10.5, 10.6, and 10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the**

Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:

(i)     commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;

(iii)   creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any Protected Party or against the property of any Protected Party with respect to any Channeled Claims; and

(v)     taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any Channeled Claims.

(b)     Notwithstanding anything to the contrary in <u>Section 10.8</u> of the Plan or this Order, this Channeling Injunction shall not stay, restrain, bar or enjoin:

(i)     the rights of Holders of Channeled Claims to the treatment afforded them under the Plan and the Plan Documents, including the rights of Holders of Channeled Claims to assert

such Channeled Claims solely in accordance with Section 6.21 of the Plan, the Master TDP and the Creditor Trust TDPs, in each case whether or not there are funds to make Distributions in respect of such Channeled Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

(ii) the rights of Persons to assert any claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;

(iii) the rights of Persons to assert any claim, debt or litigation against any Excluded Party;

(iv) the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;

(v) the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;

(vi) the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Documents;

(vii) the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or

(viii) NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.

(c) Upon the filing of a Notice of Shareholder Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought against any member of the Breaching Shareholder Family Group or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by paragraph 32(a) of this Order and Section 10.9(a) of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to this paragraph and Section 10.8(c) of

the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(d)     Except as expressly set forth in paragraph 31(c) above and paragraph (c) of <u>Section 10.8</u> of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(e)     Except as expressly set forth in paragraphs (b) and (c) of this Order and paragraphs (b) and (c) of <u>Section 10.8</u> of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(f)     The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

32.     <u>Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction</u>.

(a)     *Tolling of Shareholder Released Claims*.  If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the latest of (i) the end of such period; (ii) with respect to the applicable

Shareholder Family Group and any Designated Shareholder Released Party, two hundred twenty-five (225) days after the filing of a Notice of Shareholder Release Snapback with respect to such Shareholder Family Group; (iii) with respect to the applicable Shareholder Family Group and any Designated Shareholder Released Party, when such Shareholder Family Group fulfills its payment obligations under the Shareholder Settlement Agreement; and (iv) with respect to the applicable Shareholder Released Party that is a Subsidiary (as defined in the Shareholder Settlement Agreement) of a Shareholder Payment Party, two hundred twenty-five (225) days after the reinstatement of any Estate Cause of Action against such Shareholder Released Party pursuant to Section 10.20 of the Plan.

(b)     *Violations of Shareholder Releases and Channeling Injunction*. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, (i) disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); (ii) the termination of any rights of the violating Person to receive any

funds, assets or other value pursuant to the Plan or Plan Documents; (iii) the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreement to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); (iv) an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; (v) a fine or penalty paid into the Bankruptcy Court; (vi) a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; (vii) an appropriate sanction on any attorney or law firm responsible for the violation; (viii) injunctive relief to prevent future violations by the Person or its counsel; and (ix) attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

33.    <u>Special Provisions for United States</u>.

(a)    As set forth in <u>Section 10.21</u> of the Plan, as to the United States, notwithstanding anything contained in the Plan or this Order to the contrary (except <u>Section 5.2(h)</u> of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement), including but not limited to <u>Article X</u> of the Plan, nothing in the Plan or this Order (except <u>Section 5.2(h)</u> of the Plan and in respect of the United States-PI Claimant Medical Expense Claim Settlement) shall:

(i)    limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and this Order are not intended and shall not be construed to bar the United

States from, subsequent to this Order, pursuing any police or regulatory action, or any criminal action;

(ii)    discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; *provided*, *however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

(iii)    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided*, *however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A)–(D) in clause (ii) are likewise fully preserved;

(iv)    affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided*, *however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or this Order that may extinguish setoff or recoupment rights);

(v)    divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Order, the Plan or the Bankruptcy Code; *provided*, *however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)    be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or this Order, or (C)

expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in paragraph 31 of this Order or Section 10.8 of the Plan does not apply to the rights and causes of action protected by this paragraph or Section 10.21 of the Plan.

(b)     Notwithstanding anything to the contrary herein, nothing in the Plan, this Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, this Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall limit the releases contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(c)     Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

> (i)     The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-l14A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. The Centers for Medicare & Medicaid Services requires that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with the Centers for Medicare & Medicaid Services

with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)     The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912);

(iii)    Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912); and

(iv)     The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or this Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new

owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

(d)  Notwithstanding anything to the contrary herein, nothing in the Plan, this Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "**Medicaid Program**") or in section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

34.  MDT Insurer Injunction.

(a)  **In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

(i) commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(ii) enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iii) creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(b) The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, or any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. This MDT Insurer Injunction

shall not enjoin, impair or affect (i) any claims between or among MDT Insurers that are not Settling MDT Insurers; (ii) the rights of current and former directors, officers, employees and authorized agents of the Debtors that are not Sackler Family Members that are preserved under the Plan; or (iii) the terms of the Shareholder Settlement Agreement with respect to the MDT Shareholder Insurance Rights. For the avoidance of doubt, with respect to a Person that purports to be insured under any MDT Insurance Policy, the MDT Insurer Injunction shall enjoin only derivative claims and rights. Nothing in this Order or the Plan shall determine whether any Claim or right under any MDT Insurance Policy is either derivative or direct, or otherwise would be disallowed or subordinated under the Bankruptcy Code, which determination shall be made, as necessary, to the extent such Claim or right is not otherwise released under the Plan, in accordance with applicable law.

(c)     To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that (i) any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply in the same manner to all beneficiaries of the Creditor Trusts that are MDT Beneficiaries and (B) shall comply with any procedures set forth in the MDT Agreement and (ii) the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(d)     Except as set forth in this Order and paragraphs (b) and (c) of <u>Section 10.10</u> of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

35.     <u>Settling MDT Insurer Injunction</u>.

(a)     **In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:**

> (i)     **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

> (ii)     **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

> (iii)     **creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the**

-89-

      property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)    Any right, Claim or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim or cause of action.

(c)    There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)    Except as set forth in this Order and paragraphs (b) and (c) of Section 10.11 of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents

shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

36.    Exculpation.    To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Cause of Action for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this paragraph and Section 10.12 of the Plan shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Causes of Action that may be asserted against any Excluded Party.

37.     <u>Injunction Related to Releases and Exculpation</u>.  To the maximum extent permitted under applicable law, this Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to the Plan, including, without limitation, the Causes of Action released or exculpated in the Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in <u>Section 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan (but, for the avoidance of doubt, excluding any Excluded Claims).

38.     <u>Channeling of Future PI Channeled Claims and Injunction in Support of PI Futures Trust</u>. As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Future PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Futures Trust. Each Future PI Channeled Claim shall be asserted exclusively against the PI Futures Trust and resolved solely in accordance with the terms, provisions and procedures of the PI Futures TDP. The sole recourse of any Person on account of any Future PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the PI Futures Trust as and to the extent provided in the PI Futures TDP. Holders of Future PI Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Future PI Channeled Claims exclusively against the PI Futures Trust, solely as and to the extent provided in the PI Futures TDP.

39.     <u>Operating Injunction and Governance Covenants</u>. The operating injunction set forth in **<u>Exhibit C</u>** hereto and the governance covenants set forth in **<u>Exhibit D</u>** hereto shall bind NewCo and any successor owner of NewCo's opioid business to the extent set forth therein.

40.     <u>Plan Modifications</u>.  The Plan may not be modified except in accordance with <u>Section 12.3</u> of the Plan.  The Debtors are authorized to make modifications to the Plan as and to the extent provided under <u>Section 12.3</u> of the Plan.

41.     <u>Co-Defendant Defensive Rights</u>.[9]  Except as provided in the MDT Insurer Injunction, the Settling MDT Insurer Injunction or clause (ii) of the penultimate sentence of <u>Section 10.18</u> of the Plan, notwithstanding anything to the contrary in <u>Article X</u> of the Plan or in the Plan as it currently exists or as it might be further amended, this Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including, without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Holder of a Co-Defendant Claim or Excluded Party as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in this Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim or Excluded Party from

---

[9] For the avoidance of doubt, paragraph 41 hereof does not override Section 10.18 of the Plan and, in the event of any inconsistency between such paragraph and the corresponding sections of the Plan, <u>Section 10.18</u> of the Plan governs.

asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have

under applicable law. Nothing in the Plan, any of the Plan Documents or this Order shall be

deemed to waive any Co-Defendant Defensive Rights, and nothing in the Chapter 11 Cases, the

Plan, any of the Plan Documents or this Order may be used as evidence of any determination

regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be

permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response

to the assertion of any Co-Defendant Defensive Rights. Co-Defendant Defensive Rights (i) may

be used to offset, set-off, recoup, allocate or apportion fault, liability, or damages, or seek

judgment reduction or otherwise defend against any Cause of Action brought by any Person

against the Holder of any Co-Defendant Claim or the Excluded Party based in whole or in part

on Opioid-Related Activities and (ii) shall in no case be used to seek or obtain any affirmative

monetary recovery from any Protected Party or any Asset of any Protected Party (including from

any Purdue Insurance Policy or any other insurance policy of a Protected Party) on account of

any Released Claim or Shareholder Released Claim. The foregoing does not constitute a release

of any Co-Defendant's Class 14 Claim or any other Excluded Party's Class 11(c) Claim.

    42.    <u>Evidentiary Stipulations</u>.

    (a)    This Order shall incorporate, as if set forth fully herein, the terms of the

so-ordered Stipulation Between and Among the Raymond Sackler Family, the Mortimer Sackler

Family, the States of Connecticut, Oregon, Washington, and the District of Columbia [ECF No.

3601], the Joint Stipulation of Facts Between and Among the Mortimer-side Initial Covered

Sackler Persons and the State of Washington, State of Oregon, State of Connecticut, and the

District of Columbia [ECF No. 3631], the Joint Stipulation as to Facts Between and Among the

Mortimer-side Initial Covered Sackler Persons and the State of Maryland [ECF No. 3642], the

Stipulation by the Debtors and Certain Insurers Regarding Certain Insurers Motion in Limine to Exclude Certain Evidence Related Solely to Insurance Coverage and to Strike Insurance-Related Testimony in Debtors Declarations [ECF No. 3588], the Stipulation Regarding the Objection Filed by Gulf Underwriters Insurance Company and St. Paul Fire and Marine Insurance Company [ECF No. 3589] and the Stipulations Between Certain Distributors, Manufacturers, and Pharmacies and the Debtors Regarding Documentary Evidence Pertaining to the Confirmation Hearing [ECF 3612].

(b)　　The following stipulation, which was read into the record at the Confirmation Hearing and further confirmed during oral argument, is hereby approved and so-ordered as set forth herein: In the event there is litigation against a Shareholder Released Party as a result of a Notice of Shareholder Release Snapback, as defined in the Plan, no party (a "**Non-Prejudiced Party**") and no party formed as a result of the Plan (a "**Future Party**") shall be prejudiced in any way in connection with such snapback litigation by its decision to (i) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forego or not participate in any argument regarding such evidence during oral argument, in each case in connection with the confirmation of the Plan (including at the Confirmation Hearing). If Plan confirmation is reversed on appeal, no Non-Prejudiced Party nor Future Party shall be prejudiced in any way in connection with any future proceeding based on its decision to (a) limit or forgo the presentation of evidence (or forgo cross examination of any witness) or (ii) forego or not participate in any argument regarding such evidence during oral argument, in each case in connection with the confirmation of the Plan (including at the Confirmation Hearing). Nothing that occurs at the Confirmation Hearing (or related thereto) shall constitute or be deemed agreement or disagreement in any future proceeding or snapback litigation by any

Non-Prejudiced Party or Future Party with any position taken or evidence offered or argument made (at oral argument) by any other party at the Confirmation Hearing, provided that nothing herein shall operate to limit or reduce the binding nature of the Plan, this Order, and any related findings on any party. For the avoidance of doubt, all parties agree and acknowledge that the Debtors, the UCC, any Public or Private Claimant that is not objecting to the Plan, any Shareholder Released Party subject to snapback litigation, and any Future Party is intended to be a "Non-Prejudiced Party."

43. <u>Timney and Stewart Stipulation</u>. The *Stipulation in Connection with the Debtors' Chapter 11 Plan of Reorganization* [ECF No. 3543] between the Debtors, Mark Timney, a former officer of Purdue, and John H. Stewart, a former officer of Purdue, and acknowledged and agreed to by the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Multi-State Governmental Entities Group and the Ad Hoc Group of Non-Consenting States, was entered into as of August 11, 2021, and is hereby approved and so ordered.

44. <u>West Boca Medical Center</u>. Notwithstanding anything in the Plan, the Plan Supplement or elsewhere in this Order to the contrary, West Boca Medical Center, its ultimate parent Tenet Healthcare Corporation, and their respective affiliates (together with the Related Parties of each of the foregoing, including any affiliated medical practices, the "West Boca Parties") shall retain any Co-Defendant Defensive Rights they may have regardless of whether the West Boca Parties are or are not each a Co-Defendant under the Plan.

45. <u>Revocation or Withdrawal of Plan</u>. The Debtors shall have the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors in accordance with the terms of the Plan. If, with respect to a Debtor, the Plan has been revoked or withdrawn

prior to the Effective Date, or if the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreement that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

46.     <u>Retention of Jurisdiction</u>.  Except as provided in <u>Section 11.1</u> of the Plan, notwithstanding the entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for the purposes set forth in <u>Section 11.1</u> of the Plan.

47.     <u>Successors and Assigns</u>.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

48.     <u>Further Assurances</u>.  The Holders of Claims and Channeled Claims receiving Distributions under the Plan and all other parties in interest shall, from time to time, prepare,

execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

49.     Service of Documents.  Any pleading, notice, or other document required by the Plan to be served on the Debtors shall be served pursuant to the terms of Section 12.13 of the Plan.

50.     Effectiveness of All Actions.  All actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to this Order, as applicable, without further notice to, or action, order, or approval of, the Court or further action by the respective shareholders, affiliates, subsidiaries, members (including, but not limited to, ex-officio members), officers, directors, principals, managers, trustees, employees, partners, agents, or representatives of the Debtors and with the effect that such actions had been taken by unanimous action of such shareholders, affiliates, subsidiaries, members (including, but not limited to, ex-officio members), officers, directors, principals, managers, trustees, employees, partners, agents, or representatives.

51.     Notice of Confirmation Date and Effective Date; Substantial Consummation of Plan.  The Claims and Solicitation Agent may serve notice of the entry of this Order on (a) all Holders of Claims and (b) those other parties on whom the Plan, Disclosure Statement, and related documents were served.  Such service constitutes good and sufficient notice pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c).  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall file with the Court a "Notice of Effective Date" (the "**Notice of Effective Date**") and shall mail or cause to be mailed by first-class mail to Holders of Claims or Interests a copy of the Notice of Effective Date; *provided*, *however*, that the Debtors shall not be required to transmit the Notice of Effective Date to Holders of Claims or

Interests in Classes 12 and 18 or to any Holders of Claims or Interest for which applicable Solicitation Materials were returned to the Debtors' Claims and Solicitation Agent as undeliverable.  Upon the Effective Date, the Plan shall be deemed substantially consummated as to each Debtor, consistent with the definition of "substantial consummation" in section 1101(2) of the Bankruptcy Code.

52.     <u>Transactions on Business Days</u>.  If any payment, distribution, act, or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

53.     <u>General Authorizations</u>.  Pursuant to section 1142 of the Bankruptcy Code, Section 303 of the Delaware General Corporation Law, and any comparable provisions of the business corporation or similar law of any applicable state, the Debtors and any other necessary parties are authorized and empowered on, prior to, or after the Effective Date pursuant to this Order, as applicable, without further corporate action or action by the Debtors' directors, members, partners, shareholders, or any other person to (a) execute and deliver any instrument, agreement, or document, (b) adopt amendments to by-laws or similar governing documents, (c) appoint the PPLP Liquidator to serve as the sole officer, director, or manager of each of the Liquidating Debtors, and (d) perform any act that is necessary, desirable, or required to comply with the terms and conditions of the Plan and this Order and consummation of the Plan, and are authorized and empowered, without limitation, to take all actions necessary or appropriate to enter into, implement, perform under, and consummate the contracts, instruments, and other

agreements or documents created in connection with the Plan, including, without limitation, entering into the Plan Documents.

54.     <u>Administrative Claim Bar Date</u>.  All requests for payment of Administrative Claims that accrued on or before the Effective Date must be Filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating Debtors, counsel for the Creditors' Committee, the Plan Administration Trustee and the PPLP Liquidator by (a) 30 days after notice of the Confirmation Date with respect to Claims that arose before the Confirmation Date and (b) 30 days after notice of the Effective Date with respect to Claims that arose on or after the Confirmation Date (the "**Administrative Claim Bar Date**").  <u>Any requests for payment of Administrative Claims pursuant to Article II of the Plan that are not properly Filed and served by the Administrative Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtors or any action by the Court</u>.

55.     <u>Payment of Statutory Fees</u>.  All fees payable under section 1930 of chapter 123 of title 28 of the United States Code and any statutory interest thereon shall be paid pursuant to <u>Section 12.5</u> of the Plan.

56.     <u>Term of Injunctions or Stays and Case Stipulation</u>.

(a)     Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(b)     Notwithstanding the foregoing paragraph 56(a), on the Effective Date, without further action by or order of the Bankruptcy Court: (i) any and all obligations of the

Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be withdrawn, vacated and superseded by this Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan; (ii) any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by this Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and (iii) any and all obligations of any Person arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of and Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately*

*Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(c)     Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph 56(b), including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly.

(d)     Except as provided in the PI TDP or the PI Futures TDP, nothing in the Plan shall either (i) excuse any Person from compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation; or (ii) limit any right of any Person with respect to compliance with any legislative, judicial or administrative subpoena, any civil investigative demand or any request for information made in the course of a government investigation.

57. <u>Plan Supplement</u>. All materials included in the Plan Supplement (as may be amended in accordance with the terms of the Plan or this Order) are integral to, part of, and incorporated by reference into the Plan. The Plan Supplement (as may be altered, modified, or amended in accordance with the terms of the Plan or this Order) and all related documents are hereby approved, including, but not limited to, the Shareholder Settlement Agreement, the MDT Documents, the NewCo Transfer Agreement, the NewCo Operating Agreement, the TopCo Operating Agreement, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the PI Futures Trust Documents, the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents, the Tribe Trust Documents and the NewCo Credit Support Agreement.

58. <u>Rhodes Debtors</u>. Rhodes Debtors shall mean Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries.

59. <u>Purdue Pension Plan</u>. Notwithstanding any provision in this Order to the contrary, no provision contained in this Order, the Plan, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. The PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of this Order, the Plan, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases.

60. <u>Independent Emergency Room Physician Payment.</u> On the Effective Date, the Debtors shall make a payment of $375,000 from Effective Date Cash (the "**Independent**

**Emergency Room Physician Payment**") to independent emergency room physician Dr. Michael Masiowski ("**Masiowski**"). In consideration for the Independent Emergency Room Physician Payment, Masiowksi and his advisors and representatives, including his counsel in these Chapter 11 Cases, have withdrawn all of their objections to confirmation of the Plan and have agreed that any and all Claims or Causes of Action against, and/or any other purported right to payment from, any Protected Party, including without limitation any Claim set forth in Proof of Claim No. 29085, shall be deemed released and extinguished without any further payment or distribution and without any further action by or order of the Bankruptcy Court, and such Proof of Claim shall be expunged and shall be of no further force or effect.

61.     **Westchester Fire Insurance Company**.

(a)     Notwithstanding anything to the contrary in the Plan Documents, the Disclosure Statement, or this Order, or any agreements or documents relating to the foregoing, including, without limitation, any transition agreements and trust agreements (for purposes of this section, the "**Plan Documents**"), nothing in the Plan Documents shall in any way prime, discharge, impair, modify, subordinate or affect the rights of Westchester Fire Insurance Company and/or its past, present or future U.S.-based affiliated sureties (each as surety in its role as an issuer of bonds, individually and collectively referred to herein as "**Westchester**" or "**Surety**") as to:

(i)     any indemnity or collateral obligations or agreements relating to bonds or related instruments issued and/or executed by Surety and assumed by the Debtors and/or NewCo (each such bond or related instrument, a "**Bond**", and, collectively, the "**Bonds**");

(ii)    any collateral or letter of credit related to any Bond; or

(iii)   any indemnity agreement related to any of the Bonds (collectively, the "**Indemnity Agreements**"), which include, without limitation, the General Agreement of Indemnity dated December 13, 2016 and

-104-

the General Agreement of Indemnity dated August 2, 2017 which are hereby assumed and assigned to NewCo.

(b)     Notwithstanding any provision in the Plan Documents to the contrary, including, without limitation, the third-party releases in the Plan,

(i)     any and all collateral, including cash collateral and letters of credit, held by Surety and/or on Surety's behalf in connection with the Bonds shall be retained by Surety and/or on Surety's behalf to secure the obligations of the Debtors and/or NewCo under such Bonds;

(ii)    Surety has no obligation to issue or execute any new bond or related indemnity agreement on behalf of any entity, and Surety has no obligation to extend, modify and/or increase the amount of any Bond or related indemnity agreement;

(iii)   any rights, remedies and/or defenses Surety may now or in the future have with respect to the Bonds are preserved;

(iv)    any current or future setoff, recoupment rights, lien rights, trust fund claims of Surety or any party to whose rights the Surety has or may be subrogated, and/or any existing or future subrogation or other common law rights of the Surety are preserved;

(v)     It shall not be necessary for Surety to file an administrative proof of claim, file a request for payment, and/or file a fee application to protect any of its claims related to the Indemnity Agreements and Bonds;

(vi)    Sections 6.13 and 6.18 of the Plan shall not have the effect of disallowing Surety's claims related to the Bonds and Indemnity Agreements and/or the claims that Surety may assert via subrogation, and Section 7.5 of the Plan shall not apply to such claims; and

(vii)   Surety shall have access to any and all books and records held by the Debtors and/or NewCo relating to the Bonds and Indemnity Agreements and Surety shall receive no less than thirty (30) days written notice by the entity holding such books and records prior to destruction or abandonment of any such books and records. Without limitation to any other rights of the Surety, if a claim or claims is or are asserted against any Bonds and/or related instruments, then the Surety shall be granted access to, and may make copies of, any books and records related to such Bonds upon Surety's request.

-105-

62.     <u>Gulf Underwriters Insurance Company</u>.   Purdue Pharma L.P., The Purdue
Frederick Company Inc. d/b/a The Purdue Frederick Company, Purdue Pharma Inc., Purdue
Pharmaceuticals L.P., The P.F. Laboratories, Inc., and PRA Holdings, Inc. (collectively, the
"**Purdue Entities**"), on the one hand and Gulf Underwriters Insurance Company ("**Gulf**") and
certain other insurers on the other hand, entered into a Settlement Agreement and Release,
effective as of May 4, 2006 (the "**Settlement Agreement**").   Pursuant to the Settlement
Agreement, certain claims under Gulf policy number GU6078280 (the "**Policy**"), were released,
and with regard to such claims, the Purdue Entities undertook certain defense and
indemnification obligations for the benefit of Gulf, as provided for, and subject to all terms and
limitations, in the Settlement Agreement (the "**Gulf Indemnification Obligation**").   Gulf
contends that claims under the Policy by the Plaintiffs in Adv. Proc. No. 21-07005 (RDD), prior
to the Effective Date, and by the Master Disbursement Trust, after the Effective Date ("**Debtor
Policy Claims**"), that were released in the Settlement Agreement would be subject to the Gulf
Indemnification Obligation.   The Purdue Entities, Debtors, and the Plaintiffs in Adv. Proc. No.
21-07005 (RDD) disagree.   Prior to the Effective Date, all Claims under the Policy other than
Claims by the Plaintiffs in Adv. Proc. No. 21-07005 (RDD) are enjoined.   Under the Plan, from
and after the Effective Date, (1) all Persons are subject to the MDT Insurer Injunction under and
subject to all terms of Section 10.10 of the Plan; (2) all Purdue Entities are released from the
Gulf Indemnification Obligation; and (3) any and all Claims against the Purdue Entities in
respect of the Gulf Indemnification Obligation, including Claims under Proof of Claim No.
116704, held by Gulf, Travelers, or otherwise, shall be deemed Disallowed and expunged;
provided that (i) nothing in the Plan or this Confirmation Order shall preclude Gulf (as defined in
the Settlement Agreement) from seeking a ruling by a court that a Debtor Policy Claim or any

other claim against Gulf (as defined in the Settlement Agreement) (an "**Enjoined Claim**") is subject to the Gulf Indemnification Obligation; (ii) with regard to a Debtor Policy Claim, to the extent that a court rules that a Debtor Policy Claim is subject to the Gulf Indemnification Obligation and such ruling becomes a final order not subject to appeal, NewCo shall be liable solely for reasonable amounts subject to the Gulf Indemnification Obligation under such final unappealable ruling; (iii) with regard to an Enjoined Claim, to the extent an Enjoined Claim triggers the Gulf Indemnification Obligation, NewCo shall be liable solely for reasonable amounts subject to the Gulf Indemnification Obligation and at NewCo's option, after consultation with the Master Disbursement Trust, NewCo either will defend the Enjoined Claim or pay Gulf's (as defined in the Settlement Agreement) reasonable amounts incurred in the defense of the Enjoined Claim solely to the extent subject to the Gulf Indemnification Obligation, with Gulf's (as defined in the Settlement Agreement) consent, such consent not to be unreasonably withheld. Nothing herein shall limit Gulf's (as defined in the Settlement Agreement) rights or ability to assert any defense to insurance coverage under any insurance policy or the Settlement Agreement, except as specifically stated herein; *provided* that the obligations of NewCo and the Master Disbursement Trust with respect to the Gulf Indemnification Obligation are limited to those specifically stated herein. Gulf (as defined in the Settlement Agreement), NewCo, and the Master Disbursement Trust shall reasonably cooperate with each other, each at its own expense except as otherwise provided herein, to the extent necessary to implement the obligations herein.

63.  <u>MDT Insurance Settlements</u>. Any MDT Insurance Settlement for which Court approval is sought shall be sent out on notice pursuant to Bankruptcy Rule 9019.

64.     <u>Headings</u>.   The headings contained within this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.

65.     <u>Severability</u>.  Notwithstanding anything else contained in the Plan,  but solely to the extent provided in the Shareholder Settlement Agreement, each of the provisions of the Shareholder Settlement, including, without limitation, the Shareholder Releases and the Channeling Injunction, is (a) integrated with and integral to all other provisions of the Shareholder Settlement and the remainder of the Plan and the Plan Documents, and shall not be severable from the remainder of the Shareholder Settlement, the Plan or the Plan Documents, (b) is valid and enforceable pursuant to its terms, integral to both the entirety of the Shareholder Settlement and the Plan and may not be excised or modified other than in accordance with the Shareholder Settlement Agreement, and (c) nonseverable from and mutually dependent on each other term in the Shareholder Settlement and the Plan.   In the event that any one or more provisions of the Shareholder Settlement are deemed null, void, illegal or unenforceable, the Shareholder Settlement, the Plan, this Order and the Plan Documents shall be null and void, solely to the extent set forth in the Shareholder Settlement Agreement.

66.     <u>Final Order</u>.  This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

67.     <u>Binding Effect; Bankruptcy Rules 3020(e), 6004(h), and 7062; Waiver of Any Other Stays</u>.  Pursuant to Bankruptcy Rules 3020(e), 6004(h), and 7062, this Order shall be stayed until the expiration of 14 days after the entry of this Order.  Unless stayed by this Court or another court under Bankruptcy Rule 8007 or otherwise, (i) notwithstanding any Bankruptcy Rules, nonbankruptcy law, or otherwise, this Order shall be immediately effective and enforceable after the expiration of 14 days after the entry of this Order and (ii) except as

otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence

of the Effective Date, the provisions of the Plan, the Plan Documents, and this Order shall bind

the Debtors, the other Protected Parties, all Releasing Parties, all Holders of Claims against or

Interests in any Debtors, all Holders of Channeled Claims, all parties to executory contracts and

unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases,

including the Debtors' insurers, and each of their respective heirs, executors, administrators,

estates, successors and assigns.

      68.    <u>Conflicts with This Order; Controlling Document</u>.  The provisions of the Plan

and this Order shall be construed in a manner consistent with each other so as to effectuate the

purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between

any provision of the Plan and any provision of this Order that cannot be reconciled, then, (a) with

regard to paragraphs 25 through 33 and paragraph 41 of this Order, the Plan shall govern and (b)

with regard to all other paragraphs of this Order, the provisions of this Order shall govern, and

any such provisions of this Order shall be deemed a modification of the Plan solely to the extent

of such inconsistency.  In the event of an inconsistency between <u>Articles I</u> through <u>XII</u> of the

Plan and the Plan Supplement, the terms of <u>Articles I</u> through <u>XII</u> of the Plan shall control,

except that in the event of an inconsistency between <u>Articles I</u> through <u>XII</u> of the Plan and the

Shareholder Settlement Agreement (or any agreements ancillary to the Shareholder Settlement

Agreement), the Shareholder Settlement Agreement (or such ancillary agreement) shall control.

In the event of an inconsistency between the Plan and any other instrument or document created

or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.

Dated: September 17, 2021
         White Plains, New York

                                        /s/Robert D. Drain
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**Plan of Reorganization**

[Filed at ECF No. 3726]

# EXHIBIT B

**Master TDP and the Creditor Trust TDPs**

# EXHIBIT C

**Operating Injunction**

# EXHIBIT D

## Governance Covenants

**Hospital TDP**

## HOSPITAL TRUST
## DISTRIBUTION PROCEDURES[1]

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Hospital Channeled Claims") shall be channeled to and liability therefor shall be assumed by the Hospital Trust as of the Effective Date: (i) all Hospital Claims,[3] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities.   Hospital Channeled Claims shall be administered, liquidated and discharged pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in these distribution procedures (this "Hospital TDP"). This Hospital TDP sets forth the manner in which the Hospital Trust shall make Abatement Distributions to Holders of Hospital Channeled Claims (such Abatement Distributions, "Hospital Abatement Distributions") that satisfy the eligibility criteria for Authorized Recipients set forth herein.   Hospital Channeled Claims shall be fully discharged pursuant to this Hospital TDP.

Hospital Authorized Recipients (as defined below) are required to use all funds distributed to them from the Hospital Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth in § 7 or (ii) the payment of attorneys' fees and costs of Holders of Hospital Channeled Claims (including counsel to the Ad Hoc Group of Hospitals) (such Authorized Abatement Purposes, collectively, "Hospital Authorized Abatement Purposes").

## § 2.    CLAIMS ADMINISTRATION.

The Plan contemplates that the Hospital Trust will receive a total of $250 million over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date (the "Initial Hospital Trust Distribution") and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022, (ii) $45 million on July 31, 2023, (iii) $45 million on July 31, 2024, (iv) $50 million on July 31, 2025, and (v) $50 million on July 31, 2026.[4]   So long as he is able to serve as of the Effective Date, the presumptive trustee of the Hospital Trust is Hon. Thomas Hogan (Ret.) (the "Trustee").   If Judge Hogan is not

---

[1]    These procedures are qualified by the terms of the Plan. Holders of Hospital Channeled Claims are strongly advised to review the Plan as well as all of the Hospital Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Hospital Channeled Claims.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, (i) the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers and (ii) Claims against the Debtors held by Non-Federal Acute Care Hospitals.

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

able to serve, then a new Trustee will be selected in accordance with the Plan in advance of the Effective Date by the Ad Hoc Group of Hospitals with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).[5]   The Ad Hoc Group of Hospitals is a group of certain Holders of Hospital Channeled Claims consisting of the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

The Trustee shall have the power and authority to perform all functions on behalf of the Hospital Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the Hospital Trust Documents.[6]   The Trustee shall be responsible for all decisions and duties with respect to the Hospital Trust.[7]

The Trustee shall have the authority to determine the eligibility of Hospital Authorized Recipients and the amount of Hospital Abatement Distributions made by the Hospital Trust.  In order to qualify as a Hospital Authorized Recipient and be eligible to receive a Hospital Abatement Distribution, Holders of Hospital Channeled Claims must comply with the terms, provisions and procedures set forth herein, including the Hospital Abatement Distribution Form Deadline and the timely submission of all forms required pursuant hereto.  The Trustee may investigate any Hospital Channeled Claim, and may request information from any Holder of a Hospital Channeled Claim to ensure compliance with the terms set forth in this Hospital TDP, the other Hospital Trust Documents and the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the Trustee shall be and is appointed as the successor-in-interest to, and the representative of, the

---

[5]   The Hospital Trust Agreement shall provide that, in the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the Hospital Trust Advisory Committee (the "TAC"); in the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

[6]   The Hospital Trust Agreement shall provide that the Trustee shall have the power to appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Hospital Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deem advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation the Delaware Trustee, and any third-party claims or noticing agent deemed necessary or convenient by the Trustee, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities).

[7]   The Hospital Trust Agreement shall provide that: (i) the Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually; (ii) hourly time shall first be billed and applied to the annual retainer; (iii) hourly time in excess of the annual retainer shall be paid by the Hospital Trust; (iv) for all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $525 per hour; (v) for all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour; (vi) all time shall be computed on a decimal (1/10th) hour basis; and (vii) the Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Hospital Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Hospital Claims on the Effective Date, and shall be entitled to make reasonable requests to NewCo for additional information and documents reasonably necessary for the administration of the Hospital Trust, which may include those medical, prescription or business records of the Debtors related to the Hospital Channeled Claims, which records shall be transferred to NewCo on the Effective Date.

## § 3.  QUALIFYING CERTIFICATION.

To qualify as a Hospital Authorized Recipient, a Holder of a Hospital Channeled Claim must certify in its Hospital Abatement Distribution Form (as defined below) that:

    (a)    It adheres to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment; and

    (b)    It provides discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

A Holder of a Hospital Channeled Claim must demonstrate through the Requisite Hospital Claims data that it has been damaged in the past and reasonably anticipates incurring additional abatement expenses in the future arising from patients suffering from OUD; if it does not do so, then it will not receive any Hospital Abatement Distribution.

## § 4.  ELIGIBILITY FOR HOSPITAL ABATEMENT DISTRIBUTIONS; NOTICES.

    (a)    Eligibility for Hospital Abatement Distributions

To qualify as a Hospital Authorized Recipient eligible to receive Hospital Abatement Distributions from the Hospital Trust, each applicable Holder of a Hospital Channeled Claim must:

    (i)    Have timely filed a Proof of Claim in the Debtors' Chapter 11 case (that is, on or before July 30, 2020); provided, that this requirement shall not apply to a Holder of a Hospital Channeled Claim that (a) is listed on the national registry of hospitals maintained by the American Hospital Directory®, as in effect on the Effective Date and (b) is a Non-Federal Acute Care Hospital;

    (ii)    Timely submit the form attached hereto as Exhibit A (the "Hospital Abatement Distribution Form") containing:

        A.    the certification set forth in § 3;

B.   a certification signed by the Holder of a Hospital Channeled Claim or its attorney attesting to the accuracy and truthfulness of the Holder of a Hospital Channeled Claim's submission.   Such certification must include an attestation that no data required for claims processing and distribution valuation, and no records or information that would reasonably be relevant to the valuation of the distribution, have been misrepresented or withheld; and

C.   the certification that the Holder of a Hospital Channeled Claim will comply with § 7 in its use of any funds distributed to it; and

(iii)   Provided all of the requisite claims data (as described in § 5 the "Requisite Claims Data") as part of a timely filed Proof of Claim or in connection with submitting a Hospital Abatement Distribution Form.

Any Holder of a Hospital Channeled Claim who meets all of the above criteria (i)-(iii) (each, a "Hospital Authorized Recipient") shall qualify for Hospital Abatement Distributions, subject to the limitations otherwise set forth herein; however, if such Holder does not meet such criteria, then it will not qualify as a Hospital Authorized Recipient and will not receive any Hospital Abatement Distributions.   Any discrepancy as to whether a Holder of a Hospital Channeled Claim qualifies as a Hospital Authorized Recipient pursuant to the criteria as set forth in this § 4(a) will be resolved by the Trustee.

Those Hospital Claims that are evidenced by timely filed Proofs of Claim in the Debtors' Chapter 11 Cases (that is, for which Proofs of Claim were filed prior to or on the General Bar Date of July 30, 2020, i.e., D.I. 1536) that contained all of the Requisite Claims Data for such Hospital Claims have satisfied the requirements of §§ 4(a)(i) and 4(a)(iii), and shall be required to submit only a Hospital Abatement Distribution Form that provides the certifications set forth in § 4(a)(ii) to qualify for Hospital Abatement Distributions.[8]

FOR AVOIDANCE OF DOUBT, FOR A HOLDER OF A HOSPITAL CHANNELED CLAIM TO QUALIFY AS A HOSPITAL AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A HOSPITAL ABATEMENT DISTRIBUTION, SUCH HOLDER OF A HOSPITAL CHANNELED CLAIM MUST TIMELY SUBMIT A FULLY COMPLETED HOSPITAL ABATEMENT DISTRIBUTION FORM BY OR BEFORE THE HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE (THAT IS, FORTY-FIVE (45) DAYS AFTER THE DATE OF THE APPLICABLE HOSPITAL ABATEMENT DISTRIBUTION DEADLINE NOTICE, AS SET FORTH HEREIN).

(b)   Notices

---

[8]   There are approximately 1,180 Hospital Claims believed to satisfy the requirements of §§ 4(a)(i) and 4(a)(iii), comprising approximately 1,030 Proofs of Claim filed by hospitals and 150 Proofs of Claim filed by other treatment providers; this Hospital TDP does not constitute an admission by the Trustee that such Proofs of Claim in fact contained all applicable Requisite Claims Data, and the Trustee reserves the right to request additional information from any Holder of a Hospital Channeled Claim before such Holder of a Hospital Channeled Claim is determined to be a Hospital Authorized Recipient.

(i)     As soon as reasonably practicable after the Effective Date of the Plan, the Trustee or the Claims Administrator, as applicable, shall cause a notice to be served on each Holder of a Hospital Channeled Claim that (i) is listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date *and* (ii) is a Non-Federal Acute Care Hospital.  Such notice shall contain, among other things that the Trustee deems reasonable and appropriate under the circumstances, (i) this Hospital TDP, including the Hospital Abatement Distribution Form attached hereto, (ii) the URL for the Debtors' claims and noticing website where such Hospitals can locate the Plan (https://restructuring.primeclerk.com/purduepharma), and (iii) clear instructions for submitting a Hospital Abatement Distribution Form to the Trustee, the deadline set forth in each such Hospital Abatement Distribution Form for submitting the Hospital Abatement Distribution Form being 45 days after the date of such notice.

(ii)    Also as soon as reasonably practicable after the Effective Date, the Trustee or the Claims Administrator, as applicable, shall cause a notice (each such notice, and each notice delivered pursuant to § 4(b)(i) above, a "<u>Hospital Abatement Distribution Deadline Notice</u>") to be served on each of the Holders of the approximately 1,180 Hospital Claims for which there are timely filed Proofs of Claim, indicating whether such Proof of Claim contained the Requisite Claims Data for such Hospital Claim, and providing each such Holder of a Hospital Channeled Claim with 45 days from the date of such notice to submit a Hospital Abatement Distribution Form that complies with this § 4.  Such notice shall make clear whether the applicable Proof of Claim (i) contained the Requisite Claims Data (and therefore such Holder of a Hospital Channeled Claim is required to provide only the certifications set forth in § 4(a)(ii)) or (ii) did <u>not</u> contain the Requisite Claims Data in its Proof of Claim (and therefore such Holder of a Hospital Channeled Claim is required to satisfy both §§ 4(a)(ii) and 4(a)(iii) hereof when it submits its Hospital Abatement Distribution Form).

(iii)   For any Holder of a Hospital Channeled Claim that receives a Hospital Abatement Distribution Deadline Notice pursuant to §§ 4(b)(i) or 4(b)(ii) hereof and submits a Hospital Abatement Distribution Form, and all of its parts, by the applicable deadline (with respect to each such notice, the "<u>Hospital Abatement Distribution Form Deadline</u>") and whose Hospital Abatement Distribution Form is substantially complete but otherwise defective in such a manner as to render such Holder of a Hospital Channeled Claim ineligible to receive Hospital Abatement Distributions, and to the extent such defect is determined by the Trustee to be curable, the Trustee, as applicable, shall provide such Holder of a Hospital Channeled Claim with notice of the defect and a reasonable period of time following delivery of such notice for such Holder of a Hospital Channeled Claim to cure such defective Hospital Abatement Distribution Form. The Trustee shall exercise discretion in determining defect, curability and the period of time in which

a defect may be cured.  Under no circumstance is the Trustee obligated to send a notice of defect for Hospital Abatement Distribution Forms that do not provide responses to the requirements set forth under §§ 4(a)(ii) and 4(a)(iii).

(iv)    Other than pursuant to the cure procedures set forth herein, any Holder of a Hospital Channeled Claim that does not submit a Hospital Abatement Distribution Form shall not qualify as a Hospital Authorized Recipient, and any Holder of a Hospital Channeled Claim that submits a Hospital Abatement Distribution Form after the Hospital Abatement Distribution Form Deadline shall not qualify as a Hospital Authorized Recipient.  No Hospital Abatement Distribution Form shall be accepted after the Hospital Abatement Distribution Form Deadline.

## § 5.    EVIDENCE FOR DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTIONS.

(a)    To permit the Trustee to evaluate the amount each Hospital Authorized Recipient is to receive as a Hospital Abatement Distribution, and to the extent not already submitted in connection with its Proof of Claim, a Holder of a Hospital Channeled Claim must submit all of the following, non-exhaustive, data and types of documents, unless otherwise determined in the discretion of the Trustee in consultation with the TAC and consistent with § 4(b)(iii):

(i)    A properly and fully completed Hospital Abatement Distribution Form, with all its parts and requisite submissions, as established by the Trustee, consistent with the requirements set forth in § 4; and

(ii)    copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that a Holder of a Hospital Channeled Claim submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to such Holder of a Hospital Channeled Claim's OUD program or related to any of the injuries that underlie that claim presented to the Trustee.

The Trustee may request additional information as reasonably necessary in the opinion of the Trustee to determine the amount to be distributed to a Hospital Authorized Recipient.  The Trustee shall establish a reasonable timeframe in which a Hospital Authorized Recipient must provide any requested information.

## § 6.    DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTION AMOUNTS.

(a)    The Trustee (or its agents or representatives) shall review the timely submitted Hospital Abatement Distribution Forms.

(b)    The Trustee shall utilize (but shall have no rights in or to the intellectual property contained in) the proprietary Legier Model and Algorithm (the "Model"), prepared

and operated by Legier & Company, apac, for determining the amount of each Hospital Abatement Distribution. The amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient shall be determined within 120 days after the applicable Hospital Abatement Distribution Form Deadline or in a period of time determined by the Trustee to be most practicable.

(c)    The Model shall determine the amount distributable to each Hospital Authorized Recipient based on (1) the diagnostic codes associated with operational charges incurred by the Hospital Authorized Recipient in connection with the treatment of Opioid Use Disorder, (2) the portion of such charges that were not reimbursed, and (3) the following distribution determination factors and weights:[9]

(i)    Units of morphine milligram equivalents (MME) dispensed in the Hospital Authorized Recipient's service area ("Service Area") during the period January 1, 2006-December 31, 2014 (the "Measurement Period") (to be weighted at 10%);

(ii)    Opioid use disorder rates at the State level, pro-rated for each Hospital Authorized Recipient (to be weighted at 10%);

(iii)    Opioid overdose deaths in the Hospital Authorized Recipient's Service Area (to be weighted at 8.75%)

(iv)    Operational impact calculated using the Model, to include opioid diagnoses, and charge and reimbursement data (to be weighted at 35%);

(v)    Hospital Authorized Recipient's opioid related patients as a percentage of its total patients (to be weighted at 18.75%);

(vi)    17.5% for either

A.    such Hospital Authorized Recipient having filed a timely Proof of Claim in the Purdue Pharma bankruptcy claim filing process, or

B.    such Hospital Authorized Recipient having been designated as a "Safety Net Hospital"[10] on the Effective Date.

---

[9]    The Model calculates a Hospital Authorized Recipient's loss resulting from its treatment of patients with OUD and other opioid diagnoses, considering the total charges and collections for each, among other things, including a causation algorithm applied to each patient encounter.

[10]    A "Safety Net Hospital" has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

## § 7.   HOSPITAL AUTHORIZED ABATEMENT PURPOSES.

(a)   All net funds (after the deduction of all legal fees and litigation expenses, as described herein, and in the Hospital Trust Agreement) distributed to Hospital Authorized Recipients shall be used solely and exclusively for Opioid Use Disorder ("OUD") abatement programs, whether currently existing or newly initiated. As a condition of receiving a Hospital Abatement Distribution, each Hospital Authorized Recipient must submit to the Trustee on its Hospital Abatement Distribution Form a written statement that all funds will be spent only in the Authorized Recipient's Service Area for one or more of the following Hospital Authorized Abatement Purposes:

  (i)   Providing transportation to treatment facilities for patients with OUD.

  (ii)   Providing continuing professional education in addiction medicine, including addressing programs addressing stigma.

  (iii)   Counteracting diversion of prescribed medication in ED or practice, consistent with the following goal: reducing opioid misuse, OUD, overdose deaths, and related health consequences throughout the hospital Service Area (county or region).

  (iv)   Participating in community efforts to provide OUD treatment to others in the community, such as those in jails, prisons, or other detention facilities.

  (v)   Providing community education events on opioids and OUD.

  (vi)   Providing Naloxone kits and instruction to patients upon discharge.

  (vii)   Implementing needle exchange in hospital or adjacent clinic and providing on-site MAT services if possible.

  (viii)   Prospectively providing otherwise unreimbursed or under-reimbursed future medical services for patients with OUD or other opioid related diagnoses.

  (ix)   Building or leasing space to add half-way house beds.

  (x)   Participating in research regarding development of innovative OUD treatment practices.

  (xi)   Directing moneys to any other public or private Authorized Recipient of funds concerning the treatment of persons with OUD or other opioid-related diagnoses; provided that such recipient's use of such funds would otherwise constitute an Authorized Abatement Purpose.

  (xii)   Medication-Assisted Treatment ("MAT") Programs: an aggregate of $50 million may be earmarked for Holders of Hospital Channeled Claims to

8

establish and implement a MAT program or to continue, complete and/or implement an existing MAT program already under development.[11]

    (xiii)   Engaging in any other abatement activity with the express permission of the Court, at the request of the Trustee.

(b)    In addition, the Hospital Trust shall, in accordance with the Plan, the Confirmation Order and the Hospital Trust Documents, make Hospital Abatement Distributions to Hospital Authorized Recipients exclusively for Hospital Abatement Purposes within each Hospital Authorized Recipients' respective Service Area identified in the claim. Decisions concerning Hospital Abatement Distributions made by the Hospital Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(c)    To the extent any Holder of a Hospital Channeled Claim that is otherwise a Hospital Authorized Recipient does not comply with this § 7, such Holder of a Hospital Channeled Claim shall not be a Hospital Authorized Recipient and shall be disqualified from receiving Hospital Abatement Distributions, notwithstanding any other eligibility determination pursuant to other sections or procedures set forth herein or in the other Hospital Trust Documents.

## § 8. HOSPITAL ABATEMENT DISTRIBUTIONS BY HOSPITAL TRUST.

(a)    Once the Trustee has calculated the amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient, and also calculated each Hospital Authorized Recipient's *pro rata* share of the total sum of all Hospital Abatement Distributions to be paid to all Hospital Authorized Recipients, then the Trustee shall make interim Hospital Abatement Distributions, from time to time in its judgment, to those Hospital Authorized Recipients that have complied with all of the criteria and procedures described herein. Unless otherwise determined by the Trustee, such Hospital Authorized Recipients may receive one interim, and one final, distribution.

(b)    All payments made for one or more of said Hospital Authorized Abatement Purposes shall be subject to audit by the Trustee of the Hospital Trust and shall be repaid with a ten percent (10%) penalty added for any funds found by audit to have been spent for an unauthorized purpose. Such audit may occur any time prior to the wind-down of the Trust.

(c)    Hospital Abatement Distributions will be subject to a common benefit assessment and may be subject to certain additional assessments for payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals in accordance with Section 5.8 of the Plan.

---

[11]   The Hospital Abatement Distribution Form will provide an opportunity to indicate the proportion and amount of Hospital Abatement Distributions that the Hospital Authorized Recipient intends to apply to MAT programs.

## § 9.    REPORTING BY HOSPITAL AUTHORIZED RECIPIENTS.

(a)    Within ninety (90) days after the end of a distribution period (that being the twelve (12) month period following each annual distribution date), each Hospital Authorized Recipient that received a distribution must submit to the Hospital Trust a certification regarding its satisfaction of the minimum spending requirements on Hospital Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its distribution.

(b)    If the Hospital Authorized Recipient has not met the requirements during that period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the Hospital Authorized Recipient meets the relevant spending requirements for Hospital Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the Hospital Authorized Recipient meets the relevant spending requirements. A Hospital Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its Hospital Abatement Distribution during a given distribution period.

(c)    The Hospital Trust shall have the right to audit a claimant to determine whether the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements set forth in the Hospital Trust Documents.

(d)    Each Hospital Authorized Recipient, if and when requested by the Hospital Trustee (or its agents or representatives), shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements of the Hospital Trust Documents. All Proofs of Claim, Hospital Abatement Distribution Forms and certifications filed or submitted by Holders of Hospital Channeled Claims are subject to audit by the Hospital Trustee (or its agents or representatives). If the Hospital Trustee finds a material misstatement in a Holder of a Hospital Channeled Claim's Proof of Claim, Hospital Abatement Distribution Form or certification, the Hospital Trustee may allow that Holder of a Hospital Channeled Claim up to 30 days to resubmit its Proof of Claim, Hospital Abatement Distribution Form or certification with supporting documentation or revisions. Failure of the Holder of a Hospital Channeled Claim to timely correct its misstatement in a manner acceptable to the Hospital Trustee may result in forfeiture of all or part of the Holder of a Hospital Channeled Claim's qualification as a Hospital Authorized Recipient or right to receive Hospital Abatement Distributions.

(e)    The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of Hospital Trust. The Hospital Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this Hospital TDP.

## § 10.   REPORTING BY THE HOSPITAL TRUST.

The Hospital Trust shall file an annual report with the Bankruptcy Court after each year that the Hospital Trust is in existence, summarizing the distributions made from the Hospital Trust and detailing the status of any Hospital Authorized Recipient audits, and any recommendations made by the Trustee relating to such audits.

## EXHIBIT A
## HOSPITAL ABATEMENT DISTRIBUTION FORM

# HOSPITAL ABATEMENT DISTRIBUTION FORM

**HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE: [_____]**
Please read the instructions carefully before filling out this Hospital Abatement Distribution Form
(this "Form"). Capitalized terms used herein and not otherwise defined, shall have the meanings
ascribed to them in the *Twelfth Amended Joint Plan of Reorganization of Purdue Pharma L.P. and
its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan")
[Docket No. 3726] or the Hospital Trust Distribution Procedures (as modified, amended or
supplemented from time to time, the "Hospital TDP")," dated August 10, 2021 [Docket No. 3528].

Each Holder of a Hospital Channeled Claim, which includes (i) all Hospital Claims,[12] which
include all Claims against the Debtors held by providers of healthcare treatment services or any
social services, in their capacity as such, that are not Domestic Governmental Entities and (ii) all
Released Claims and Shareholder Released Claims held by providers of healthcare treatment
services or any social services, in their capacity as such, that are not Domestic Governmental
Entities, is required to complete and submit this Form in order to be eligible to receive Hospital
Abatement Distributions from the Hospital Trust.

In this proceeding, "Purdue Opioid" means all natural, semi-synthetic or synthetic chemicals that
interact with opioid receptors on nerve cells in the body and brain, and that are approved by the
U.S. Food & Drug Administration  and listed by the U.S. Drug Enforcement Administration  as
Schedule II or III drugs pursuant to the federal Controlled Substances Act, 21 U.S.C. § 801 et seq.
produced, marketed, or sold by the Debtors as: (i) the following Brand Name Medications:
OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®,
DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone
extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release
tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-
release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets
(generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).
The submission of the completed Form by the Hospital Abatement Distribution Form Deadline set
forth above is a prerequisite to eligibility for a Hospital Abatement Distribution, but does not
guarantee a Holder of a Hospital Channeled Claim will be deemed eligible for a Hospital
Abatement Distribution. If a Holder of a Hospital Channeled Claim is deemed eligible by the
Hospital Trustee pursuant to the Hospital TDP to receive Hospital Abatement Distributions, the
information provided in this Form will be used to determine each such Hospital Authorized
Recipient's Hospital Abatement Distribution from the Hospital Trust (as defined in the Plan, the
"Hospital Trust"). Holders of Hospital Channeled Claims may redact information on this Form or
any attached documents, as they deem necessary. A Holder of a Hospital Channeled Claim shall
only attach *copies* of any documents that support a claim, and shall not submit original documents;
**documents submitted may be destroyed after scanning and will not be returned to the Holder
of a Hospital Channeled Claim**. A person who files a fraudulent claim on behalf of a Holder of
a Hospital Channeled Claim may, at a minimum, be fined up to $500,000.00, imprisoned for up to

---

[12] For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, the Claims set
forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers.

5 years, or both.  18 U.S.C. §§ 152,157.  Holders of Hospital Channeled Claims shall provide the information requested that is, to the best of their knowledge, current and valid as of the date this Form is completed and delivered to the Hospital Trustee by such a Holder of a Hospital Channeled Claim:

> **Please provide the following information to the Hospital Trustee by delivering this completed Hospital Abatement Distribution Form by email, online or mail at the addresses reflected online at www.purduehospitalsettlement.com prior to the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form.**
> **Failure to submit a completed copy of this Form and requisite claims data (as described in #23 herein) by the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form may disqualify you from receiving a Hospital Abatement Distribution. Additionally, failure to complete any portion of the Form may result in a reduced Hospital Abatement Distribution or disqualification from receiving a Hospital Abatement Distribution.**

The name, address, and the Federal Employer Tax Identification Number ("EIN") of the entity claiming to be a Holder of a Hospital Channeled Claim OR the name, address, and Social Security Number if the Holder of a Hospital Channeled Claim is a natural person:

_____
_____
_____

The contact name, address, phone number *and email address* for where notices and Hospital Abatement Distribution(s) should be sent:

_____
_____
_____

By filling out this Form, you are deemed to consent to receipt of notice by email.  If you do not consent to receipt of notice by email, **please check this box:** ☐

The name, address and duration of your ownership of each facility owned and/or operated by the above referenced entity OR the name and address of the facility at which the Holder of a Hospital Channeled Claim provides healthcare treatment services or any social services and the duration of that Holder of a Hospital Channeled Claim's provision of such services at such facility for which this claim is filed. (Please list on Exhibit A)

_____

1.  Did you file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020 that
    a.  Included a dollar amount of financial losses in the Purdue bankruptcy?
        ___ Yes ___ No
    b.  As of the date of this Form, provided to the Ad Hoc Group of Hospitals or its agent substantially all of the requisite claims data (as described in #23 herein) for any facility to the best of your knowledge   ___ Yes ___ No

If yes to both (a) and (b) then proceed to final page of Form to complete and sign.

2. Are you listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are a Non-Federal Acute Care Hospital and did not timely file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020? ___ Yes ___ No

3. Are you a named Plaintiff in any active cause of action against opioids manufacturers, distributors, or pharmacies? ___ Yes ___ No
   a. If yes, please provide whether the active cause of action is filed (check one):
      i. in the MDL: _____
      ii. in state court: _____
   b. Attach a copy of the most recently filed Complaint.

4. Service Area.  Please list on Exhibit B the counties that each of the above-described facilities serve, the population of those counties and the percentage of the total population of those counties served by the facility.  Attach any supporting documents that you deem to be helpful.

5. For each of the facilities listed on Exhibit A, please provide the payor mix (% of payor payments to total of all payor payments) on Exhibit C:
   a. % Medicare;
   b. % Medicaid;
   c. % TRICARE;
   d. % Commercial, e.g., Blue Cross Blue Shield, other non-governmental payors;
   e. % Self-pay;
   f. % All Other Payors;
   g. Describe the name of each payor that comprises "All Other Payors";

6. Please provide on Exhibit D the amounts of funding, if any, received by you and/or for each facility listed on Exhibit A for the period of January 1, 2009 through September 15, 2019 in each of the following:
   a. Grants;
   b. Taxing authorities;
   c. Health-care authorities;
   d. State funded programs for indigent care;

e.  "Disproportionate Share"[13];

f.  Foundations/charities;

g.  Others;

7.  Unless a filed Complaint is attached to the Form, describe on Exhibit E, the opioid problem that has impacted each of the facilities listed on Exhibit A, and include with particularity, data reflecting overdose and deaths from overdoses in your respective service area(s), for the period of time ranging from January 1, 2009 through September 15, 2019.

8.  List and describe with particularity on Exhibit F, all Hospital Authorized Abatement Purposes instituted by you at and/or in each facility listed on Exhibit A that are intended to treat, reduce, abate and prevent opioid addiction. Include in your description the year(s) such program(s) began; whether they presently remain operational; and, the prospective end date for the program(s), if any. In addition, please provide the extent that any funding received, as described in No. 6 above, was used to pay for the abatement programs described herein.

9.  Prescribing practices:
    a.  For you and/or for each of the facilities listed on Exhibit A, please provide on Exhibit G the national ranking for prescribing the following opioids: (i) Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®);
    b.  Did you and/or any or all of the facilities listed on Exhibit A provide pain management care in a pain management clinic during the period of January 1, 2009 through September 15, 2019? ___ Yes ___No. If yes, please provide the dates for which each of your pain management clinic were in operation on Exhibit G.

10. Are any of the facilities listed on Exhibit A a "safety net" hospital as defined in the CARES ACT?[14] ___ Yes ___No. If yes, please indicate this "safety net" designation next to each applicable facility on Exhibit A and provide proof of each such designation, therein.

---

[13] Disproportionate Share Hospitals serve a significantly disproportionate number of low-income patients and receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients.

[14] A "safety net" hospital has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

11. Are any of the facilities listed on Exhibit A a tertiary referral center?  (A hospital provides tertiary healthcare if it provides "care of a highly technical and specialized nature, in a medical center, usually one affiliated with a university, for patients with unusually severe, complex, or uncommon health problems."  See Flegel, Ken, Tertiary Hospitals Must Provide General Care (March 3, 2015), Nat'l Ctr. for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347764).

___ Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

12. Do you and/or any of the facilities listed on Exhibit A perform "Screening Brief Intervention Referral to Treatment" ("SBIRT") in the emergency department? _____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

13. Do any of the facilities listed on Exhibit A equip emergency departments to treat acute withdrawal and initiate treatment for Opioid Use Disorder ("OUD") with medications, including buprenorphine, suboxone, and subutex, etc.? ___Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

14. To qualify for distributions from the Hospital Trust, a Holder of a Hospital Channeled Claim must certify that:
    a. You and/or it adhere to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment, AND

    b. You and/or it provide discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

    Do you and/or each of the facilities listed on Exhibit A satisfy A? ___ Yes ___No;

    Do you and/or each of the facilities listed on Exhibit A satisfy B? ___ Yes ___No.

15. Do you and/or any of the facilities listed on Exhibit A make discharge planning and post-discharge care coordination mandatory for patients with OUD? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

16. Do you and/or any of the facilities listed on Exhibit A provide bridge programs to encourage access to treatment for patients with OUD? ___ Yes ___ No. If yes, please

provide this designation and describe the bridge program next to each applicable facility on Exhibit A.

17. Do you and/or any of the facilities listed on Exhibit A participate in community efforts to provide OUD treatment to others in the community, such as those in jails, or other detention facilities? ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

18. Do you and/or any of the facilities listed on Exhibit A provide transportation to OUD treatment facilities? __Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

19. Do you and/or any of the facilities listed on Exhibit A implement needle exchange in the hospital or an adjacent clinic and/or provide on-site medication-assisted treatment ("MAT") services? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

20. Do you and/or any of the facilities listed on Exhibit A use telemedicine, telehealth, and/or teleconsulting to support treatment and to support "spoke" entities? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

21. Do you and/or any of the facilities listed on Exhibit A perform heart valve replacements? ___ Yes ___ No. If yes, please provide this designation and the percentage of all heart valve replacements performed that are secondary to opioid addiction next to each applicable facility on Exhibit A.

22. Do any of the facilities listed on Exhibit A have a Neonatal Intensive Care Unit ("NICU") that treats babies with Neonatal Abstinence Syndrome ("NAS")? ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A for #22 and 22(a) and 22(b) below:

    a. Do any of the facilities have a dedicated NAS NICU? ___ Yes ___ No

    b. Do you and/or any of the facilities provide obstetric and perinatal services to treat mothers with OUD? ____Yes ___ No

23. For all inpatient and outpatient discharges during the period January 1, 2009, to September 15, 2019, from you and/or each qualifying facility operated by you, please provide the following data in CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File to be used in connection with the calculation of each of your financial damages. **An example of the data formatting is set forth in Exhibit H. This data should be in a**

**separate CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File for each Holder of a Hospital Channeled Claim.** Physician office visits and non-acute care visits should **NOT** be included in data provided.

For the CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File, please include in the file name the name of the Holder of a Hospital Channeled Claim, City and State where located and Date Range of Data Provided, for example, PhoenixGeneral-Phoenix-AZ-Jan09-Dec12.csv. If more than one file is provided due to size limitation, each file name will be the same with only the date range of the data provided changing e.g. PhoenixGeneral-Phoenix-AZ-Jan13-Dec20.csv

It is important to note, and as further described below, that the following data (except for ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority) for each visit/discharge will need to be repeated on each row corresponding to each different ICD diagnosis code.  The data for the ICD diagnosis codes, ICD diagnosis code descriptions and ICD diagnosis code priority for each visit/discharge will therefore be unique to each row.  For example, if a visit has 18 ICD diagnosis codes, there would be 18 rows/lines for that visit/discharge with each line containing a different ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority. For all other data fields such as Patient Medical Record Number, Date of Discharge, etc. this data will be the same, and thus repeated, on all 18 rows/lines for that visit/discharge.

Once the CSV (Comma Delimited) or Pipe Delimited Text File is prepared, please review to confirm the data in each column contains the applicable data for that respective columns data field description. **After submission of this completed Form and execution of the Business Associate Agreement (as described in #25 herein), each claimant will be provided a secure portal by the Hospital Trustee to upload this requisite claims data.**

| Column | Data Fields | Definitions and Clarifications |
|---|---|---|
| a. | **Name** | Name of facility for which data is provided. |
| b. | **Address** | Address of facility for which data is provided. |
| c. | **City** | City of facility for which data is provided. |
| d. | **State** | State of facility for which data is provided. |
| e. | **Zip** | Zip of facility for which data is provided. |
| f. | **CMS Certification Number** | Center for Medicare & Medicaid Services – Formerly known as the Medicare Provider Number.  This should |

| | | |
|---|---|---|
| | | be a six-digit Medicare certification number for a facility. |
| g. | **Patient Medical Record #** | |
| h. | **Patient Account #** | |
| i. | **Payor Financial Class Description** | e.g., Blue Cross, Medicaid, Private Pay, etc. |
| j. | **Patient Type** | e.g., Inpatient or Outpatient. Hospital related clinics or physician office visits should NOT be included in data provided. |
| k. | **Custom Patient Type** | e.g., Inpatient Psych, Outpatient Single Visit, Surgery, Lab, etc. Hospital related clinics or physician office visits should NOT be included in data provided. |
| l. | **Date of Admission** | |
| m. | **Date of Discharge** | |
| n. | **Length of Stay (days)** | |
| o. | **Admission Type Description** | e.g., Emergency, Reservation, Reference Lab, etc. |
| p. | **Discharge Disposition Description** | e.g., Discharge Home, Nursing Home, Expired, etc. |
| q. | **Patient Date of Birth** | |
| r. | **Patient Age at Discharge** | |
| s. | **Patient Gender** | |
| t. | **Patient Race** | |
| u. | **Patient City** | |
| v. | **Patient State** | |

| w. | **Patient Zip Code** | |
| x. | **Attending Physician Name** | |
| y. | **Total Charges** | |
| z. | **Total Payments** | Total Payments should only contain actual payments received (e.g. insurance/self-pay). It should NOT include adjustments, bad debt, write-offs or contractual adjustments. |
| aa. | **DRG Code** | Provide Diagnosis Related Group (DRG) code for each inpatient visit/discharge. |
| ab. | **DRG Code Description** | Provide DRG description for the above DRG code. |
| ac. | **All ICD Diagnosis Code** | For each visit/discharge, provide all International Classification of Disease (ICD) diagnosis codes (ICD-9 or ICD-10, as applicable) associated with each patient visit/discharge. Each of these ICD Diagnosis Codes related to each patient's visit should NOT be listed in multiple columns but rather each ICD Code should be listed in the same single column with each ICD Code shown on separate rows within the same single column. See Exhibit H. |
| ad. | **ICD Diagnosis Code Descriptions** | Provide ICD Diagnosis description for the above ICD Diagnosis Code. |
| ae. | **ICD Diagnosis Code Priority** | Provide whether each ICD Diagnosis Code is a Primary, Secondary, Tertiary, etc. diagnosis. These categories must be expressed in terms of a numerical code such as 1=Primary, 2=Secondary, 3=Tertiary, etc. |
| af. | **Mom's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit. If this visit/charge is for a birth mother, then this field should be blank as it would be the same MRN as the patient reported in #g above. However, if this visit/charge pertains to a baby, then this field should contain the mother's MRN so that there can be a mother/baby link associated therewith. |

| ag. | **Baby's MRN  - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit.  If this visit/charge is for a baby, then this field should be blank as it would be the same MRN as the patient reported in #g above.  However, if this visit/charge pertains to a birth mother, then this field should contain the Baby's MRN so that there can be a mother/baby link associated therewith. |

24. Please attach your "charge master"[15] for the calendar years 2009 through 2019 for yourself and/or each of the facilities listed on Exhibit A.

25. Please execute the Business Associates Agreement attached as Exhibit J and return with the Form for each facility listed on Exhibit A.

26. Funds received from the Hospital Trust may only be used for specific abatement purposes as set forth in Section 7 of the Hospital TDP. If the Holder of a Hospital Channeled Claim on whose behalf this claim has been prepared is allocated a Hospital Abatement Distribution from the Hospital Trust, as a condition of receiving the funds, then it will use the funds for one or more specific uses as listed on Exhibit I.

27. Please complete the W-9 attached hereto for each entity OR the natural person claiming to be a Holder of a Hospital Channeled Claim and return the W-9 with this Form.

---

[15] The "charge master" is a list of all the billable services and items billed to a patient or a patient's health insurance provider. The charge master captures the costs of each procedure, service, supply, prescription drug, and diagnostic test provided at the hospital to a patient, as well as any fees associated with such services, such as equipment fees and room charges.

> I certify that I am authorized to sign this Hospital Abatement Distribution Form and I understand that an authorized signature on this Form serves as an acknowledgement that I have a reasonable belief that the information is true and correct.
>
> I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: _____

Executed on date: (MM/DD/YYYY) _____

Print the name of the person who is completing and signing this claim.

Name (First, Middle, Last):    _____

Title:                        _____

Hospital:                     _____

Address:                      _____
                              _____

Contact phone:                _____

Email:                        _____

**NAS Monitoring TDP**

## NAS MONITORING TRUST DISTRIBUTION PROCEDURES

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[1] and the Master TDP, the following claims ("NAS Monitoring Channeled Claims") shall be channeled to and liability therefor shall be assumed by the NAS Monitoring Trust as of the Effective Date: (i) all NAS Monitoring Claims, which include all Claims against any Debtor held on account of an NAS Child (with respect to such Claims, an "NAS Monitoring Claimant") that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief,[2] and (ii) all Released Claims and Shareholder Released Claims that are held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and are not for alleged personal injuries suffered by an NAS Child.  NAS Monitoring Channeled Claims shall be administered, liquidated and discharged pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in these distribution procedures (this "NAS Monitoring TDP").  This NAS Monitoring TDP sets forth the manner in which the NAS Monitoring Trust shall make Abatement Distributions to Authorized Recipients (such Abatement Distributions, "NAS Monitoring Grants")[3] that satisfy the eligibility criteria for Authorized Recipients set forth herein.  All Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of (i) NAS Monitoring Grants to be used exclusively for the Authorized Abatement Purposes set forth Section 2(h), or (ii) the payment of the attorneys' fees and costs of counsel constituting the NAS Committee (such Authorized Abatement Purposes, collectively, "NAS Monitoring Authorized Abatement Purposes").  No Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with this NAS Monitoring TDP.

### § 2.    ADMINISTRATION BY TRUSTEE; ELIGIBILITY.

(a)    The trustee of the NAS Monitoring Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by [____] with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(b)    The Trustee shall have the power and authority to perform all functions on behalf of the NAS Monitoring Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the NAS Monitoring Trust

---

[1]    Capitalized terms used but not defined herein or in the other NAS Monitoring Trust Documents shall have the meaning ascribed to them in the Plan.

[2]    For the avoidance of doubt, NAS Monitoring Claims do not include any Claim that is for an alleged personal injury suffered by an NAS Child.

[3]    As used herein, NAS Monitoring Grants may refer to Abatement Distributions, either in part or in whole, as the context requires, that the NAS Monitoring Trust has Awarded to an Authorized Recipient.

Documents. The Trustee shall be responsible for all decisions and duties with respect to the NAS Monitoring Trust.

(c)     The Trustee (in consultation with the members of the Trust Advisory Committee (the "<u>TAC</u>")) shall have the authority to determine the eligibility of NAS Authorized Recipients (as defined below) and the amount of NAS Monitoring Grants made by the NAS Monitoring Trust.

(d)     A potential Grant Recipient or Grantee, in order to qualify as an Authorized Recipient and be eligible to receive an NAS Monitoring Grant, a potential Grant Recipient must:

     (i)     Submit a Grant Proposal Form (as defined below) that complies with the requirements set forth in Section 3 hereof;

     (ii)     Execute a Grant Agreement (as defined below) that complies with the requirements set forth in Section 6 hereof; and

     (iii)     Agree to comply with and be bound by the reporting obligations set forth in Section 7 hereof.

(e)     Only a potential Grant Recipient or Grantee[4] who is Awarded[5] an NAS Monitoring Grant by the NAS Monitoring Trust and complies with the foregoing requirements set forth in this Section 2 shall be an Authorized Recipient and eligible to receive Abatement Distributions in the form of an NAS Monitoring Grant from the NAS Monitoring Trust (each such eligible Grant Recipient or Grantee, an "<u>NAS Authorized Recipient</u>").

(f)     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the NAS Monitoring Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the NAS Monitoring Channeled Claims.

(g)     Pursuant to that authority, the Trustee (in consultation with the TAC) may evaluate any Grant Proposal (as defined below), and the member of the TAC which undertakes such review and consideration of a Grant Proposal may request information from the potential Grant Recipient or Grantee to ensure compliance with the NAS Monitoring Trust Documents.

---

[4]   "Grant Recipient" or "Grantee" means the recipient of an NAS Monitoring Grant from the NAS Monitoring Trust who, prior to receipt of such NAS Monitoring Grant, shall agree to abide by and perform all conditions and requirements which may be established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant.

[5]   "Award" or "Awarded" or "Awarding" means a determination by the NAS Monitoring Trust to award an NAS Monitoring Grant for the purpose of funding an NAS Abatement Program sponsored by a Grant Recipient or Grantee.

(h)    All NAS Monitoring Grants to NAS Authorized Recipients shall be received subject to the obligation of such NAS Authorized Recipient to any NAS Monitoring Grant funds solely for a program relating to neonatal abstinence syndrome sponsored by a Grant Recipient or Grantee, which advances all or any of the following goals: (1) preparing children with a history of NAS to be ready to enter or to succeed in school; (2) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (3) enhancing the Mother-Child Dyad (any program relating to any of the NAS Monitoring Authorized Abatement Purposes, an "NAS Abatement Program").

(i)    NAS Monitoring Grants will be subject to a common benefit assessment and certain additional assessments for payment of attorneys' fees and costs of the NAS Committee in accordance with Section 5.8 of the Plan.

## § 3.    FORM OF GRANT PROPOSALS.[6]

(a)    Prior to the Effective Date of the Plan, the Trustee, in consultation with the TAC, shall devise a Grant Proposal form (the "Grant Proposal Form") which shall include, at a minimum, the following necessary information for the evaluation of Grant Proposals:

(i)    a historical chronology of the establishment, function, and region of operation of the proposed NAS Abatement Program;

(ii)    a description of the mission, purpose, and methods of the proposed NAS Abatement Program;

(iii)    identification of the States or territories of the United States, or the regions thereof, in which the program is located and operates;

(iv)    a description of the population served by the proposed NAS Abatement Program, including the approximate number of such population and a statement of the specific needs of the population that the program is designed to serve;

(v)    evidence of the efficacy of the program in addressing its mission or purpose;

(vi)    the requested monetary amount of the NAS Monitoring Grant sought by the proposed NAS Abatement Program from the NAS Monitoring Trust;

---

[6]    "Grant Proposal" means a proposal for the Awarding of an NAS Monitoring Grant for funding of an NAS Abatement Program sponsored by a potential Grant Recipient or Grantee, which proposal shall comply with all requirements for Grant Proposals established by this Agreement.

(vii)     a statement of the intended uses of any NAS Monitoring Grant Awarded and NAS Abatement Distribution by the NAS Monitoring Trust to the potential Grant Recipient;

(viii)    the projected time period over which any Awarded NAS Monitoring Abatement Distribution will be utilized or expended;

(ix)      a projected budget for the proposed NAS Abatement Program, including line items identifying the purpose(s) of the proposed expenditures and a schedule for such expenditures;

(x)       identification by the program of its financial or internal documents which will be utilized to account for and track the proposed expenditures, including an agreement of the Grant Recipient or Grantee to provide the same to the NAS Monitoring Trust for the purpose of monitoring the expenditures made from any Awarded NAS Monitoring Grant;

(xi)      a pledge and agreement by the potential Grant Recipient or Grantee to regularly report, on a quarterly basis, the expenditures that are made from any Awarded Abatement Distribution, and to produce for review and monitoring by the NAS Monitoring Trust, on a quarterly basis, the identified financial or internal documents which verify, account for and track such expenditures; and

(xii)     *an acknowledgement and agreement by the potential Grant Recipient or Grantee that the Award of an NAS Monitoring Grant does not constitute a contractual agreement between the Grant Recipient or Grantee and the NAS Monitoring Trust; that the amount of any Abatement Distribution of an Award will be made from a Fund[7] established for such purpose by the NAS Monitoring Trust, and that such Grant Recipient or Grantee's sole recourse is to such Fund, rather than to the Trust, its Corpus or any other Fund established by the Trust; that receipt by the Grant Recipient or Grantee of an Abatement Distribution is conditioned upon execution and return by the Grant Recipient or Grantee of a "Grant Agreement" which shall contain, inter alia, the Trust's requirements for receipt and use of the Abatement Distribution; and that no binding agreement shall arise as between the NAS Monitoring Trust and the Grant Recipient or Grantee until such time as the Abatement Distribution is received by the Grant Recipient or Grantee, at which time the Grant Agreement shall become effective*

---

[7]   Fund shall have the meaning ascribed to such term in the Delaware Statutory Trust Act, Chapter 38 of title 12 of the Delaware Code, 12 Del. C. §§3801 et seq.

## § 4.    REVIEW AND CONSIDERATION OF GRANT PROPOSALS.

(a)    Upon receipt by the Trust, a Grant Proposal in proper form shall be tendered to a member of the TAC for review and investigation.  In the exercise of his or her office, the TAC member undertaking such review and investigation is encouraged to communicate directly with the potential Grant Recipient or Grantee, or its representatives, and may request therefrom any additional documents or information which such member of the TAC believes necessary for his or her review and consideration of the Grant Proposal.

(b)    The member of the TAC which undertakes such review and consideration of the Grant Proposal shall prepare a written report, to be distributed to the Trustee and all other members of the TAC, which summarizes the Grant Proposal and the results of the review and investigation of the Grant Proposal.

(c)    After distribution of such written report, and at the next regularly occurring meeting or special meeting of the Trustee and the TAC, the Grant Proposal shall be presented for discussion and deliberation.  The TAC may, but is not required to, vote on Awarding an NAS Monitoring Grant to the potential Grant Recipient or Grantee with respect to such Grant Proposal and/or vote as to the amount of such Abatement Distribution from a Fund to be established by the Trust, if the NAS Monitoring Grant is Awarded.  At any subsequent meeting of the Trustee and the TAC, the TAC may take up, consider, discuss, and vote upon any pending Grant Proposal.

(d)    In the event of a vote of a majority of the members of the TAC to Award any NAS Monitoring Grant for the funding of an NAS Abatement Program sponsored by any Grant Recipient or Grantee, the Trustee shall inform the Grant Recipient or Grantee of the Award and of the amount of the Abatement Distribution to be made by the NAS Monitoring Trust to the Grant Recipient or Grantee, provided that no binding agreement for the Award of the NAS Monitoring Grant or the Abatement Distribution shall exist until execution and return of the Grant Agreement by the Grant Recipient or Grantee and the receipt of the Abatement Distribution by the Grant Recipient or Grantee.

(e)    Review of Grant Proposals shall occur at regularly scheduled intervals in accordance with the below:

| Application Due Dates | | | Review and Award Cycles | | |
|---|---|---|---|---|---|
| New | Renewal / Resubmission / Revision (as allowed) | AIDS | Scientific Merit Review | Advisory Council Review | Earliest Start Date |
| March 08, 2022 | March 08, 2022 | March 08, 2022 | May 2022 | July 2022 | October 2022 |
| June 10, 2022 | June 10, 2022 | June 17, 2022 | September 2022 | November 2022 | January 2023 |
| March 08, 2023 | March 08, 2023 | March 08, 2023 | May 2023 | July 2023 | October 2023 |
| June 10, 2023 | June 10, 2023 | June 10, 2023 | September 2023 | November 2023 | January 2024 |
| March 08, 2024 | March 08, 2024 | March 08, 2024 | May 2024 | July 2024 | October 2024 |
| June 10, 2024 | June 10, 2024 | June 10, 2024 | September 2024 | November 2024 | January 2025 |

## § 5.    REQUIREMENTS, CONSIDERATIONS AND PREFERENCES FOR AWARDING OF NAS MONITORING GRANTS.

(a)    Requirements for Awarding NAS Monitoring Grants:

(i)    All NAS Monitoring Grants Awarded by the NAS Monitoring Trust shall relate to NAS and shall advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the Standard of Care for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6) (the "Identified Group"); and/or (iii) enhancing the Mother-Child Dyad.

(ii)    For all NAS Abatement Programs which propose to span an operational period of three years and which have a goal of either preparing children in the Identified Group to be ready to enter or succeed in school or of enhancing the Mother-Child Dyad ("Eligible Programs"), NAS Monitoring Grants should be made (i) to entities operating or planning to operate evidence-based programs such as, by way of example only, The Child First Program (https://www.childfirst.org), and (ii) NAS Monitoring Grants should be prioritized to Grant Recipients or Grantees which service populations in States, Reservations, Counties or Cities with excessive rates of NAS births and otherwise underserved communities.  No less than eighty-nine percent (89%) of the Net-Assets or Corpus shall be used for the NAS Monitoring Grants referenced in this Section 5(a)(ii).

(iii)    Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may, if approved by a vote of the majority of the TAC and as necessary to address a

demonstrated need in significant parts of the country, Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed one percent (1%) of the Net-Assets or Corpus of the Trust, for the development of a scalable program serving the families of the Identified Group, for the purposes of (i) providing clinical and in-home assessment of latent medical and developmental conditions; (ii) identifying and providing access to necessary services for the individual families of the Identified Group; and/or (iii) maintaining accountable reporting of program metrics.

(iv)   Without delaying the identification and funding of Eligible Programs under Section 5(a)(ii), the NAS Monitoring Trust may Award an NAS Monitoring Grant or Grants, in an aggregate amount not to exceed five percent (5%) of the Net-Assets or Corpus of the Trust, to research institution(s) to conduct and publish the results of research into the approaches for helping children and families harmed, impacted or at risk of fetal opioid exposure.  Grant Recipients or Grantees under this Section 5(a)(iv) will receive access to the de-identified health outcome metrics provided by other Grant Recipients and to the scientific documents of Purdue, the Purdue Debtors, and the IAC to the extent such scientific documents are part of a public record or in the public domain, including documents relating to preclinical toxicology.

(v)   The NAS Monitoring Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Monitoring Trust Documents, make Abatement Distributions to Grant Recipients or Grantees exclusively for Authorized Abatement Purposes.  Decisions concerning Abatement Distributions made by the NAS Monitoring Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(b)   Preference:  For purposes of the Awarding of NAS Monitoring Grants, an existing and operational NAS Abatement Program with an evidence-based record of efficacy shall be preferred over a new or start-up NAS Abatement Program which has yet to begin operation.

(c)   Additional Considerations:   In Awarding NAS Monitoring Grants and determining the amount thereof, the Trustee and the TAC shall consider the following non-exhaustive factors pertinent to NAS Abatement Program(s) (each, a "Program") proposed by potential Grant Recipients or Grantees:

(i)   Whether the proposed Program serves a region of the United States which has been greatly impacted by opioid use disorder and the occurrence of Neonatal Abstinence Syndrome in infants born in such region;

(ii)   Whether the proposed Program will benefit an underserved population of NAS Children and their families;

7

(iii)    Whether the proposed Program places a focus on early intervention to improve the outcomes for the Mother-Child Dyad with respect to NAS;

(iv)    Whether the proposed Program offers a comprehensive assessment of children and/or families impacted by NAS;

(v)    Whether the proposed Program offers or provides medical care access or medical care coordination to children and families impacted by NAS;

(vi)    Whether the proposed Program offers counseling, individually or in group sessions, to Birth Mothers and/or Guardians with regard to best practices in caring for an NAS Child or NAS Children;

(vii)    Whether the proposed Program addresses emotional, behavioral, developmental, or learning problems experienced by NAS Children and provides educational, counseling, treatment or care coordination options with regard to the same;

(viii)    Whether the proposed Program involves any data collection, data analysis, or data reporting components, including without limitation, reporting of data to the NAS Monitoring Trust or to state or federal governmental offices or agencies, such as the Center for Disease Control's National Center on Birth Defects and Developmental Disabilities;

(ix)    Whether the proposed Program is designed to compare health outcomes across opioid use disorder treatment regimens to inform with regard to best practice guidelines for pregnant Birth Mothers with respect to mitigating or preventing the occurrence of NAS in infants;

(x)    Whether the proposed Program involves the education of Birth Mothers and potential Birth Mothers with regard to the risks and danger of opioid use during pregnancy and/or is designed to reduce the usage of opioids during pregnancy by Birth Mothers and potential Birth Mothers;

(xi)    Whether the proposed Program is designed to connect pregnant Birth Mothers with prenatal care, substance abuse treatment, or necessary multi-specialty services; and

(xii)    Whether the proposed Program provides medical or other care coordination for children who were diagnosed with NAS or who experienced intrauterine opioid exposure.

## § 6.   THE GRANT AGREEMENT.

(a)    All Grant Recipients or Grantees which are Awarded an NAS Monitoring Grant for funding of an NAS Abatement Program shall execute a Grant Agreement prior to receipt of any Abatement Distribution from any Fund of the NAS Monitoring Trust.

(b)     The Grant Agreement shall contain, at a minimum, an acknowledgement by the Grant Recipient or Grantee that:

(i)     the sole recourse of the Grant Recipient or Grantee is to the Fund established by the NAS Monitoring Trust pertinent to such NAS Monitoring Grant;

(ii)    the Grant Agreement shall not be effective and binding until the Grant Recipient or Grantee's receipt of an Abatement Distribution and that the NAS Monitoring Trust reserves the right to make or pay such Abatement Distribution(s) in installments;

(iii)   the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals shall have no responsibility or liability for administration or operation of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(iv)    the Grant Recipient or Grantee agrees to indemnify and hold harmless the NAS Monitoring Trust, including its Trustee, the members of its TAC, and its employees, contractors and professionals from any and all claims arising out of operation or administration of the Awarded NAS Abatement Program sponsored by the Grant Recipient or Grantee;

(v)     the Grant Recipient or Grantee agrees that monies yet to be distributed to the Grant Recipient or Grantee by the NAS Monitoring Trust for an Awarded NAS Abatement Program may be withheld or withdrawn by the NAS Monitoring Trust in the event of the financial inability of the NAS Monitoring Trust to pay Abatement Distribution(s), or in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Grant.  The Grant Recipient or Grantee agrees and acknowledges that the NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of the NAS Monitoring Grant; and

(vi)    the Grant Recipient or Grantee agrees to make financial and other disclosures, on at least an annual basis, to the NAS Monitoring Trust relating to the implementation and operation of the Awarded NAS Abatement Program, including but not limited to data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program, provided that the disclosure of personal identifying information of the individual(s) or population(s) served by the program shall not be required.

(c)     In addition, each Grant Agreement shall contain the NAS Monitoring Trust's requirements of the Grant Recipient or Grantee in the operation and administration of the Awarded NAS Abatement Program, which requirements shall be program specific and are to be determined by the members of the TAC,

utilizing and drawing upon their independent and collective medical, scientific, technical or other expertise.

## § 7. MONITORING OF AWARDED NAS MONITORING GRANTS AND ABATEMENT DISTRIBUTIONS.

(a)     In addition to the quarterly reports on expenditures set forth in Section 3(a)(xi), Grant Recipients and Grantees which received Abatement Distributions for the funding of NAS Abatement Programs shall be required to report annually to the NAS Monitoring Trust. Such reports and supporting documentation submitted by the Grant Recipient or Grantee shall contain information sufficient for the Trustee and TAC to monitor whether:

    (i)     Awards and Abatement Distributions are being used by the Grant Recipient or Grantee as intended by the NAS Monitoring Trust and within the scope of the NAS Abatement Program for which the Award and Abatement Distribution was made;

    (ii)    The Grant Recipient or Grantee is complying with the projected budget for the NAS Abatement Program sponsored by the Grant Recipient or Grantee;

    (iii)   The status of the Grant Recipient or Grantee's achievement of the milestones, efficacies, or benefits for which the NAS Abatement Program was designed or is being operated; and

    (iv)    Data relating to NAS which the Grant Recipient or Grantee receives or derives from operation of the NAS Abatement Program.

(b)     The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of NAS Monitoring Trust. The NAS Monitoring Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this NAS Monitoring TDP.

**TPP TDP**

# TPP TRUST DISTRIBUTION PROCEDURES[1]

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Third-Party Payor Channeled Claims") shall be channeled to and liability therefor shall be assumed by the TPP Trust as of the Effective Date: (i) all Third-Party Payor Claims, which include all Claims against the Debtors held by Third-Party Payors that are not Domestic Governmental Entities ("TPP Claimants"),[3] and (ii) all Released Claims and Shareholder Released Claims held by Third-Party Payors that are not Domestic Governmental Entities. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in these trust distribution procedures (this "TPP TDP"). This TPP TDP sets forth the manner in which the TPP Trust shall make Abatement Distributions to TPP Claimants that satisfy the eligibility criteria for TPP Authorized Recipients set forth herein, including the timely filing of a TPP Abatement Claim Form, as defined in Section 4 herein (such Abatement Distributions, "TPP Abatement Distributions"). Third-Party Payor Channeled Claims shall be fully discharged pursuant to this TPP TDP. All Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of TPP Abatement Distributions, shall be based upon the Purdue-Related Opioid Spend, as defined herein, set forth in the TPP Abatement Claim Form and the TPP Trust's determination with respect to that asserted TPP Abatement Claim, and may be used exclusively for the Authorized Abatement Purposes set forth herein.

## § 2.    RECEIPT AND USE OF FUNDS BY THE TPP TRUST.

The Plan contemplates that the TPP Trust will receive a total of $365 million over time, with an initial payment of $5 million to the TPP Trust on the Effective Date (the "Initial TPP Trust Distribution") and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $120 million on July 31, 2022, (ii) $120 million on July 31,

---

[1]    These procedures are qualified by the terms of the Plan. TPP Claimants are strongly advised to review the Plan as well as all of the TPP Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Third-Party Payor Channeled Claims. In addition, you are advised to review the LRP Agreement, which describes lien resolution procedures with respect to claims that Third-Party Payors may have in connection with Distributions to Holders of PI Claims against the Debtors. Although the LRP Agreement is a PI Trust Document, it has been attached to this TPP TDP as Exhibit 1 purely for ease of reference for TPP Claimants and potential TPP Authorized Recipients.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Third-Party Payor Claims" include any Claims against any Debtor that are held by Third-Party Payors (including any Claims based on the subrogation rights of the Holder thereof that are not Other Subordinated Claims) that are not Domestic Governmental Entities; provided that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." Claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims." The claims of Third-Party Payors against Holders of PI Claims and Distributions payable to Holders of PI Claims are addressed in the LRP Agreement, as noted in Section 2 hereof and in Exhibit 1. See supra n.1.

2023 and (iii) $120 million on July 31, 2024.[4] The funds paid to the TPP Trust shall be used for the administration (including the payment of expenses) of the TPP Trust, and to make the TPP Abatement Distributions to TPP Claimants that qualify as TPP Authorized Recipients (as defined below), subject to the assessments payable to the Common Benefit Escrow (and, later, the Common Benefit Fund) pursuant to Section 5.8 of the Plan. On the Effective Date, a Common Benefit Escrow shall be established and funded by assessments of 5% of each TPP Abatement Distribution made by the TPP Trust. Such assessments will be paid by the TPP Trust in respect of TPP Abatement Distributions made by the TPP Trust to the Common Benefit Escrow and then, upon its establishment, directly to the Common Benefit Fund established by the MDL Court, on periodic schedules acceptable to the Third-Party Payor Group, The amounts in the Common Benefit Escrow shall be held in escrow until an order is entered by the MDL Court establishing a Common Benefit Fund, at which time the amounts held by the Common Benefit Escrow and all subsequent assessments of 5% of each TPP Abatement Distribution made by the TPP Trust shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund.

TPP Authorized Recipients are required to use all funds distributed to them from the TPP Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth herein in Section 8 and Appendices C and D or (ii) the payment of attorneys' fees and costs of TPP Authorized Recipients (including counsel to the Third-Party Payor Group) (collectively, the "TPP Authorized Abatement Purposes"); provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

CLAIMS THAT THIRD-PARTY PAYORS MAY HAVE AGAINST DISTRIBUTIONS PAYABLE TO HOLDERS OF PI CLAIMS (SUCH AS REIMBURSEMENT AND LIEN CLAIMS) ARE NOT BEING ADMINISTERED BY THE TPP TRUST AND ARE NOT SUBJECT TO THE PROCEDURES SET FORTH HEREIN. THIRD-PARTY PAYORS MAY ELECT TO RESOLVE SUCH CLAIMS THROUGH THE LIEN RESOLUTION PROCEDURES UNDER THE LRP AGREEMENT, WHICH SHALL BE ATTACHED AS EXHIBIT D TO THE PI TRUST AGREEMENT (AND IS ATTACHED HEREIN AS EXHIBIT 1 FOR EASE OF REFERENCE), AND WHICH SHALL BE FILED WITH THE PLAN SUPPLEMENT. THE PLAN SUPPLEMENT (INCLUDING THE LRP AGREEMENT) MAY BE OBTAINED FREE OF CHARGE AT HTTPS://RESTRUCTURING.PRIMECLERK.COM/PURDUEPHARMA.

DISTRIBUTIONS TO PARTICIPATING THIRD-PARTY PAYORS UNDER THE LRP AGREEMENT WILL BE MADE BY THE PI TRUSTEE FROM FUNDS HELD BY THE PI TRUST.

---

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## § 3.    ADMINISTRATION BY TRUSTEE.

The trustee of the TPP Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by the Third-Party Payor Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed, or denied.).[5] Alan D. Halperin has been selected and approved to serve as the Trustee.

The Trustee shall have the power and authority to perform all functions on behalf of the TPP Trust, and shall undertake all administrative responsibilities of the TPP Trust (whether directly or through professionals and agents engaged by the TPP Trust, including a claims administrator) as are provided in the Plan and the TPP Trust Documents.[6] The Trustee shall be responsible for all decisions and duties with respect to the TPP Trust, as more fully set forth in the TPP Trust Agreement.[7]

The Trustee shall have the exclusive authority to determine the eligibility of TPP Claimants to be TPP Authorized Recipients and the amount of TPP Abatement Distributions to be made by the TPP Trust. In order to qualify as a TPP Authorized Recipient and be eligible to receive a TPP Abatement Distribution, TPP Claimants must comply with the terms, provisions and procedures set forth herein, including the TPP Abatement Claim Deadline (defined below) and the timely submission of all forms required pursuant hereto (which shall be in addition to, and not in substitution of, Proofs of Claim filed in the Chapter 11 Cases). The Trustee may investigate any Third-Party Payor Channeled Claim, may request information from any TPP Claimant to ensure compliance with the terms set forth in this TPP TDP, the other TPP Trust Documents and the Plan, and make determinations about the TPP Abatement Distribution amounts to be made to TPP Authorized Recipients.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the TPP Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Third-Party Payor Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Third-Party Payor Channeled Claims on the Effective Date, and shall be entitled

---

[5]    The TPP Trust Agreement will be filed on or prior to the Plan Supplement Deadline.

[6]    The TPP Trust Agreement shall provide that the Trustee shall have the authority to, in his/her discretion, consult with and retain attorneys, financial advisors, accountants, or other professionals and employees, including any third-party claims administrators or claims and noticing agent, as the Trustee deems appropriate in the reasonable exercise of his/her discretion, and who the Trustee reasonably determines to have qualifications necessary to assist the Trustee in the proper administration of the TPP Trust. The TPP Trust Agreement defines such parties as Trust Professionals. The Trustee may pay the reasonable fees, costs and expenses of such persons (including to him/herself and his/her firm) out of the assets of the TPP Trust in the ordinary course of business, pursuant to the terms of the TPP Trust Agreement. There will also be a Trust Advisory Committee, comprised of representatives of five Third-Party Payors, and the members of that committee will have certain oversight and advisory rights, which are described in the TPP Trust Agreement.

[7]    The TPP Trust Agreement shall provide for the compensation of the Trustee. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

to reasonably request and receive from NewCo such additional information and documents as reasonably necessary for the administration of the TPP Trust, which may include those medical, prescription or business records of the Debtors related to the Third-Party Payor Channeled Claims, which records shall be transferred from the Debtors to NewCo on the Effective Date.

## § 4.   ELIGIBILITY FOR TPP ABATEMENT DISTRIBUTIONS.

To qualify as a TPP Authorized Recipient and be entitled to receive TPP Abatement Distributions from the TPP Trust, each TPP Claimant must:

    a.  Have timely filed a Proof of Claim in the Debtors' Chapter 11 Cases (that is, on or before July 30, 2020) and checked the box identifying itself as a Third-Party Payor, or have timely filed a Proof of Claim and amended that Proof of Claim prior to the Effective Date of the Plan to properly identify itself as a Third-Party Payor;

    b.  **Timely submit an additional, completed form (the "TPP Abatement Claim Form," available at Appendix A) to the TPP Trust by the TPP Abatement Claim Deadline, which shall be no later than sixty (60) days after the Effective Date of the Plan[8] (the "TPP Abatement Claim Deadline")** in accordance with the instructions provided with the TPP Abatement Claim Form; and

    c.  Have provided in connection with such TPP Abatement Claim Form, by or before the TPP Abatement Claim Deadline, a calculation of its Purdue-Related Opioid Spend (as defined in Appendix B), utilizing the Maximum Eligible Amount Calculation Methodology (for each TPP Claimant, its "TPP Abatement Claim").[9]

Any TPP Claimant who meets all of the above criteria (a)-(c) (each such TPP Claimant, a "TPP Authorized Recipient") shall qualify for TPP Abatement Distributions, subject to the limitations otherwise set forth herein. **To receive a TPP Abatement Distribution from the TPP Trust, a TPP Authorized Recipient must also complete and return to the TPP Trust an IRS form W-9 or an IRS form W-8, as applicable. Copies of such forms are available at Exhibit 2 to this document.**

FOR AVOIDANCE OF DOUBT, FOR A TPP CLAIMANT TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A TPP ABATEMENT DISTRIBUTION, SUCH TPP CLAIMANT MUST HAVE (i) TIMELY FILED A PROOF OF CLAIM IDENTIFYING ITSELF AS A THIRD-PARTY PAYOR BY OR BEFORE THE GENERAL BAR DATE, (ii) MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE (THAT IS, SIXTY (60) DAYS AFTER THE EFFECTIVE DATE OF THE PLAN, AS SET FORTH BELOW), USING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY, AND (iii) MUST

---

[8]  In the event that the deadline (i.e., the sixtieth day after the Effective Date) falls on a date that is not a Business Day, then the deadline shall be the next succeeding Business Day,

[9]  The Maximum Eligible Amount Calculation Methodology is attached as Appendix B.

PROVIDE A COMPLETED IRS FORM W-9 OR W-8 TO THE TPP TRUST. MORE DETAIL ABOUT EACH OF THESE POINTS IS PROVIDED BELOW.

(a)      **Initial Proof of Claim**

All TPP Claimants were required, in order to preserve their claims against the Debtors, to file Proofs of Claim by the General Bar Date (that is, July 30, 2020) established by the Bankruptcy Court. More than 467,108 such Proofs of Claim were filed (some as part of consolidated Proofs of Claim filed on behalf of numerous TPP Claimants). Many, though not all, were filed using estimated or unliquidated amounts.

Any TPP Claimant that did not timely file a Proof of Claim and check the box on the Proof of Claim form identifying itself as a Third-Party Payor or that did not timely file a Proof of Claim and amend that claim before the Effective Date to properly identify itself as a Third-Party Payor is barred from asserting or seeking to enforce its Third-Party Payor Channeled Claim, pursuant to the Bar Date Order, and shall not be a TPP Authorized Recipient or eligible to receive a TPP Abatement Distribution from the TPP Trust.

(b)      **TPP Abatement Claim Deadline**

All TPP Claimants that timely filed a Proof of Claim on or before July 30, 2020 shall be required to submit a TPP Abatement Claim Form by the TPP Abatement Claim Deadline. Any TPP Claimant that does not submit a TPP Abatement Claim Form shall not qualify as a TPP Authorized Recipient, and any TPP Claimant that submits a TPP Abatement Claim Form after the TPP Abatement Claim Deadline shall not qualify as a TPP Authorized Recipient, and shall have no right to any distribution from the TPP Trust. No TPP Abatement Claim Form shall be accepted after the TPP Abatement Claim Deadline, unless that TPP Claimant has made a written request for an extension to the Trustee prior to the TPP Abatement Claim Deadline, and that request has been granted by the Trustee in writing. Requests for extension must be **actually received** by the Trustee prior to the TPP Abatement Claim Deadline, and the determination as to whether to grant any requested extension is wholly within the discretion of the Trustee.

The TPP Abatement Claim Form requires all TPP Claimants to use the Maximum Eligible Amount Calculation Methodology to determine the amount of their Purdue-Related Opioid Spend, which shall be used to determine the maximum amount they are eligible to receive as a TPP Abatement Distribution. However, the actual amount of the TPP Abatement Distribution to a TPP Authorized Recipient will depend on the total dollar amounts of (i) the TPP Abatement Distribution to all TPP Authorized Recipients and (ii) the Purdue-Related Opioid Spend of all TPP Authorized Recipients.

The TPP Abatement Claim Form (including instructions for the required calculations and the deadlines and instructions for the submission of such TPP Abatement Claim Form on the website to be maintained by the TPP Trust) will be distributed by the Trustee (or an agent thereof) to each TPP Claimant that timely filed a Proof of Claim promptly after the Effective Date and in no event more than three business days after the Effective Date (such notice, the "TPP Abatement Claim Form Notice"). The TPP Abatement Claim Form Notice will make it clear that after the TPP Abatement Claim Forms are reviewed by the Trustee, the TPP website will be the sole form of notice of the TPP Trust's determination of the TPP Abatement Distribution amount each TPP

Authorized Recipient is to receive. The deadline for the posting of such determinations on the website is described in Section 5(a) herein.

As set forth in more detail in the instructions attached to the TPP Abatement Claim Form, for those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach a chart or spreadsheet containing such aggregate information. For each TPP Claimant included in the consolidated TPP Abatement Claim Form, the chart or spreadsheet shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii)  the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) the responses to each of questions 1 through 6 in the instructions accompanying the TPP Abatement Claim Form (described as the Maximum Eligible Amount Calculation Methodology) for that TPP Claimant, (iv) the dollar amount of that TPP Claimant's Purdue-Related Opioid Spend, as calculated pursuant to the instructions set forth in this TDP, and (v) the claim number of the previously filed Proof of Claim.

A TPP Claimant (or its attorney) must deliver, as part of the TPP Abatement Claim Form, a certification signed by the TPP Claimant or its attorney attesting to the accuracy and truthfulness of the TPP Claimant's submission. Such certification must include an attestation that the TPP Claimant utilized the Maximum Eligible Amount Calculation Methodology to determine the Purdue-Related Opioid Spend of its TPP Abatement Claim and that no data required for claims processing and valuation, and no records or information that would reasonably be relevant to the valuation of the TPP Abatement Claim, have been misrepresented or omitted.

A TPP CLAIMANT THAT FILED AN INITIAL PROOF OF CLAIM MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM IN ORDER TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND TO BE ELIGIBLE FOR TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST SHALL BE THE SOLE SOURCE OF RECOVERY IN RESPECT OF THIRD-PARTY PAYOR CHANNELED CLAIMS, AND NO TPP CLAIMANT SHALL HAVE ANY OTHER OR FURTHER RECOURSE TO THE DEBTORS OR THEIR ESTATES, THE TPP TRUST OR ANY OTHER RELEASED PARTY OR SHAREHOLDER RELEASED PARTY IN RESPECT OF ITS THIRD-PARTY PAYOR CHANNELED CLAIMS.

(c)     **Use of Maximum Eligible Amount Calculation Methodology to Determine Purdue-Related Opioid Spend**

In addition to the requirements set forth above, each TPP Claimant must use the Maximum Eligible Amount Calculation Methodology to identify its Purdue-Related Opioid Spend on a TPP Abatement Claim Form in order to qualify as a TPP Authorized Recipient and to be eligible to receive a TPP Abatement Distribution hereunder. On the TPP Abatement Claim Form, each TPP Claimant must set forth, inter alia, the total amount of its Purdue-Related Opioid Spend, certifying that it used the Maximum Eligible Amount Calculation Methodology, as set forth on Appendix B attached hereto, to calculate its Maximum Eligible Amount (as defined below).

TPP Claimants shall not be required to submit the data underlying the amount of their Purdue-Related Opioid Spend with the TPP Abatement Claim Form but shall promptly provide supporting documentation and data, if and when requested by the Trustee, sufficient to enable confirmation of the amounts.

### (d)    The Submission of IRS Form W-9 or IRS Form W-8 to the TPP Trust

Each TPP Claimant must also furnish to the Trustee in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and a completed IRS Form W-9 or, if applicable, IRS Form W-8. Such form may be submitted with the TPP Abatement Claim Form or may be sent separately via email to [●]. **If such completed form is not received by the Trustee within three hundred sixty-five days (365) days of the TPP Abatement Claim Form Notice, which shall include notice of the deadline for submitting a completed IRS Form W-9 or W-8, each such TPP Claimant shall be deemed to have forfeited his/her/its entire interest in the TPP Trust, any and all claims to the TPP Trust Assets, and all rights to any TPP Abatement Distribution under the TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and such forfeited amounts shall re-vest in the TPP Trust to be distributed to other TPP Authorized Recipients.**

### § 5.    DETERMINATION OF TPP ABATEMENT DISTRIBUTIONS.

### (a)    Claims Review and Reconciliation

The Trustee shall review the timely submitted TPP Abatement Claim Forms.

As part of this review and aggregation process, the Trustee and Trust Professional(s) shall identify and eliminate duplicative TPP Abatement Claims, if any, submitted by more than one TPP Authorized Recipient (e.g., by a Self-Funded Health Plan[10] independently and as an ASO[11] included in a consolidated TPP Abatement Claim Form) to ensure a TPP Authorized Recipient does not receive multiple TPP Abatement Distributions in connection with the same Purdue-Related Opioid Spend. In the event that the Trustee identifies TPP Abatement Claims as duplicative, the Trustee (or Trust Professionals acting on behalf of the Trustee) shall notify the submitting parties via email of the duplication and request joint written instructions or alternatively, instruction from the Self-Funded Health Plan that submitted on its own behalf within thirty (30) days of the date of the email, as to which TPP Abatement Claim should be deemed withdrawn. Absent such timely instructions, the Trustee shall treat the TPP Abatement Claim Form submitted earlier in time as the TPP Abatement Claim Form for notice and distribution purposes, and the other TPP Abatement Claims shall be deemed disqualified.

---

[10]   The term Self-Funded Health Plan ("SFHP") means a health or disability benefits plan provided by an employer, association, union, or other such entity (the "entity") to its employees, members, or other such beneficiaries entitled to receive benefits under the plan, using the entity's own funds, whereby the entity assumes most of the financial risk relating to health insurance. A SFHP may secure stop-loss coverage from an insurer only to cover unexpectedly large or catastrophic claims.

[11]   Self-Funded Health Plans for which a Third-Party Payor performs administrative services only are referred to herein as Administrative Services Only customers or "ASO" or "ASO customers."

No later than 270 days after the TPP Abatement Claim Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients (with respect to each TPP Authorized Recipient, its "Maximum Eligible Amount") and initial percentage of total TPP Abatement Distributions represented by such Maximum Eligible Amount (with respect to each TPP Authorized Recipient, its "Initial Allocation Percentage"). This will require that the TPP Trust match the TPP Abatement Claim Forms to the Proofs of Claim that were timely filed as Third-Party Payor Channeled Claims in connection with the General Bar Date,  review the TPP Abatement Claim Forms and any supporting documentation and data, make determinations about the amount and validity of the TPP Abatement Claims submitted by TPP Authorized Recipients, and eliminate any duplicative TPP Abatement Claims or TPP Abatement Claim Forms that request TPP Abatement Distributions for the same Purdue-Related Opioid Spend. The Maximum Eligible Amount may be shown as zero dollars ($0) and the TPP Abatement Claim disqualified in its entirety, or may be an amount different from that asserted on the TPP Abatement Claim Form, as appropriate, if no Proof of Claim was timely filed in connection with the General Bar Date, if no TPP Abatement Claim Form was timely submitted by the TPP Abatement Claim Deadline, if the TPP Claimant did not fully comply with the requirements of the TPP Abatement Claim Form and instructions, if the TPP Claimant was directed to provide the TPP Trust with documentation or data and did not promptly do so, or on any other basis. The Trustee's determination as to the Maximum Eligible Amount of each TPP Abatement Claim shall be the amount reflected on the updated website.

Each TPP Authorized Recipient's Initial Allocation Percentage will be calculated by dividing (i) the final dollar amount of such TPP Authorized Recipient's Maximum Eligible Amount by (ii) the total dollar amount of all TPP Authorized Recipients' Maximum Eligible Amounts plus the disputed, unresolved TPP Abatement Claims for which funds must be reserved (see below).

Within five business days of updating the website to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients, the Trustee will, via email, notify each TPP Claimant that has submitted or is included in a TPP Abatement Claim Form (via notice to the representative identified as the notice party on the TPP Abatement Claim Form) that the website has been updated. For avoidance of doubt, with respect to consolidated TPP Abatement Claims included in one TPP Abatement Claim Form, email notice will be sent only to the notice party identified on the TPP Abatement Claim Form.

(b)      **Challenges to Determinations by the TPP Trust**

TPP Authorized Recipients will have thirty (30) days from the date that the Trustee emails notice of the updating of the TPP Trust website as set forth in Section 5(a) hereof, to submit a letter or letters to the TPP Trust, by submitting such letter or letters on the TPP Trust website, challenging the TPP Trust's determination regarding its Maximum Eligible Amount or Initial Allocation Percentages and/or the Maximum Eligible Amounts or Initial Allocation Percentages of any other TPP Authorized Recipient (the "Challenge Deadline"). A separate letter must be submitted for each challenged Maximum Eligible Amounts and/or Initial Allocation Percentages.

A TPP Authorized Recipient may challenge the Maximum Eligible Amounts and/or Initial Allocation Percentages of as many other TPP Authorized Recipients as it wishes, though each

challenge must be made separately by one TPP Authorized Recipient against a single other TPP Authorized Recipient, made on a good faith basis, and accompanied by a detailed letter identifying the basis or bases for the challenge. A TPP Claimant that did not timely file a Proof of Claim and does not timely submit a TPP Abatement Claim Form shall not have the right to challenge the amount of any other TPP Authorized Recipient's Maximum Eligible Amounts and/or Initial Allocation Percentages.

The TPP Trust will have up to forty-five (45) days after the Challenge Deadline to resolve challenges (the "Resolution Deadline"). If a TPP Abatement Claim has been timely challenged and no agreement can be reached between the TPP Trust and the TPP Authorized Recipient or TPP Authorized Recipients (i.e., the TPP Authorized Recipient challenging the determination of the TPP Trust, and in the event that the challenge relates to the Maximum Eligible Amount and/or Initial Allocation Percentage of a different TPP Authorized Recipient, that TPP Authorized Recipient), the TPP Authorized Recipient that brought the challenge has the right to file a motion with respect to such challenge with the Bankruptcy Court, within thirty (30) days from the Resolution Deadline (the "Motion Deadline").

**If there is a timely challenge, the amount of the challenged Maximum Eligible Amount and/or Initial Allocation Percentage shall be determined by negotiated resolution if possible, or, in the absence of agreement, the TPP Trust's determination of the Maximum Eligible Amount and/or Initial Allocation Percentage will control, if no motion is filed with the Bankruptcy Court by or before the Motion Deadline. If a motion is timely filed, the amount of the Maximum Eligible Amount and/or Initial Allocation Percentage will be determined by the Bankruptcy Court.**

If appropriate due to a successful challenge, the Trustee shall modify one or more amounts of Maximum Eligible Amounts and/or Initial Allocation Percentages accordingly.

Challenges that do not result in a change to the amount of any Maximum Eligible Amount and/or Initial Allocation Percentages shall be deemed unsuccessful and the challenging TPP Authorized Recipient shall be charged for all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated TPP Trust professionals; such fees and expenses shall be subtracted from the challenging TPP Authorized Recipient's TPP Abatement Distribution payment. To the extent that the challenging TPP Authorized Recipient's TPP Abatement Distribution payment is insufficient to fully reimburse such expenses, the challenging TPP Authorized Recipient and the challenging TPP Authorized Recipient's professionals that filed the unsuccessful challenge shall be liable for payment of all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated Trust Professionals.

If no challenge is timely received, the TPP Trust's determination shall become a final determination as to the amount of that Maximum Eligible Amount and/or Initial Allocation Percentage (with the allocation percentage being subject to adjustment based on the outcome of other challenges).

Promptly following the Motion Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the final determination of each TPP Authorized

Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, which shall become such TPP Authorized Recipient's "Final Allocation Percentage." The website shall also reflect which, if any, TPP Abatement Claims continue to be subject to dispute as a result of timely filed motions.

## § 6.   TPP ABATEMENT DISTRIBUTIONS BY TPP TRUST.

### (a)   **Timing and Manner of Distributions**.

There will be three annual distributions by the TPP Trust, and the TPP Trust will provide a distribution report on the TPP Trust website in advance of each of the distributions.

The first distribution report will be due on or before February 15, 2023 (or, if February 15, 2023 is not a Business Day, the next Business Day), provided that February 15, 2023 is at least fifteen (15) months after the Effective Date. If it is not, the first distribution report will be due on the date that is fifteen (15) months after the Effective Date. The second and third distribution reports will be due on or before one year and two years, respectively, after the date of the filing of the first distribution report.

**Distributions to TPP Authorized Recipients will begin thirty (30) days after the filing of each distribution report, with the date on which that distribution begins being a "Distribution Date."**

The maximum amount each TPP Authorized Recipient shall be allowed to receive from a distribution shall be equal to the total gross distributable amount for all TPP Authorized Recipients eligible to receive TPP Abatement Distributions, multiplied by each TPP Authorized Recipient's Final Allocation Percentage, all subject to any amounts reserved on account of disputed Third-Party Payor Channeled Claims, consistent with Section 7. The existence of a Final Allocation Percentage for a particular TPP Authorized Recipient does not entitle that TPP Authorized Recipient to receive any funds, however, unless it has also complied with the terms of the TPP Trust and the funding of delineated opioid abatement initiatives therein.

At the option of the Trustee, any Cash payment may be made by a check or wire transfer or as otherwise required or provided in the TPP Trust Agreement.

### (b)   *De Minimis* Distributions

The Trustee shall not be required to make any TPP Abatement Distributions of Cash in an amount less than $100, or such lower amount as determined by the Trustee in accordance with the TPP Trust Agreement to any TPP Authorized Recipient; provided, however, that if any TPP Abatement Distribution is not made pursuant to this Section, such TPP Abatement Distribution shall be added to any subsequent TPP Abatement Distribution to be made to such TPP Authorized Recipient. The Trustee shall not be required to make any final distribution of Cash in an amount less than $100 to any TPP Authorized Recipient. If the amount of any final TPP Abatement Distribution to any TPP Authorized Recipient would be $100 or less, then such distribution shall be made available for distribution to all TPP Authorized Recipients receiving final distributions of at least $100.

In the event that following all distributions and upon completion of the TPP Trust's tasks, the TPP Trust is left with *de minimis* funds, the Trustee may donate such *de minimis* funds to an IRS accredited charity.

### (c)    Undeliverable Distributions; Uncashed Checks

In the event that any TPP Abatement Distribution is returned as undeliverable, no TPP Abatement Distribution shall be made to such TPP Authorized Recipient (or its designated agent) unless and until the Trustee is notified in writing of such TPP Authorized Recipient's (or its authorized representative's) then-current address, at which time or as reasonably practicable thereafter, such TPP Abatement Distribution shall be made without interest, subject to the limitations of the following paragraph. The Trustee may, in his or her sole discretion, attempt to determine a TPP Authorized Recipient's current address or otherwise locate a TPP Authorized Recipient but nothing in this TPP TDP, the TPP Trust Agreement or the Plan shall require the Trustee to do so.

In the event that a TPP Abatement Distribution is returned as undeliverable or otherwise unclaimed for a period of six (6) months after the Distribution Date, and no updated address information is provided during that time, such Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to or for the benefit of such TPP Authorized Recipient, the TPP Abatement Claim(s) of such TPP Authorized Recipient shall be discharged and forever barred from receiving Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and shall be redistributed in accordance with the Plan, the TPP Trust Agreement, and this TPP TDP.

Likewise, in the event any check in respect of a TPP Abatement Distribution to a TPP Authorized Recipient or its authorized representative has not been cashed or otherwise negotiated within six (6) months of the date of such TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution(s) shall be made to such TPP Authorized Recipient or representative on account of such TPP Abatement Claim, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, and the Third-Party Payor Channeled Claims of the TPP Authorized Recipient shall be discharged and forever barred from receiving TPP Abatement Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the TPP Trust, and shall be redistributed in accordance with the Plan, the TPP Trust Agreement and this TPP TDP.

## § 7.    TREATMENT OF DISPUTED TPP ABATEMENT CLAIMS.

If thirty (30) days prior to the due date of a distribution report, the Maximum Eligible Amount and/or Initial Allocation Percentage of a TPP Abatement Claim remains disputed, funds shall be reserved on account of that Maximum Eligible Amount and/or Initial Allocation Percentage. Once the Trustee or the Bankruptcy Court, as applicable, makes a determination as to the amount of the TPP Authorized Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, that TPP Authorized Recipient may be entitled to a "catch-up" payment in connection with the next distribution report and Distribution Date, consistent with the determination.

**THE TPP TRUST SHALL NOT BE REQUIRED TO RESERVE FUNDS FOR A DISPUTED TPP ABATEMENT CLAIM UNLESS A TPP CLAIMANT TIMELY SATISFIED THE REQUIREMENTS OF SECTIONS 3 AND 5 HEREIN, INCLUDING BUT NOT LIMITED TO HAVING FILED (I) A PROOF OF CLAIM BY OR BEFORE THE GENERAL BAR DATE AND (II) A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY. A TPP CLAIMANT THAT FAILED TO TIMELY FILE A PROOF OF CLAIM OR TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY SHALL HAVE NO CLAIM AGAINST THE TPP TRUST AND NO RIGHT TO ANY TPP ABATEMENT DISTRIBUTION FROM THE TPP TRUST.**

## § 8.    USE OF TPP ABATEMENT DISTRIBUTIONS.

TPP Authorized Recipients are required to use all net funds distributed to them from the TPP Trust solely and exclusively for TPP Authorized Abatement Purposes which consist of (i) Approved MAT Expenses and Approved Uses/Programs[12] and (ii) the payment of attorneys' fees and costs; provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

A TPP Authorized Recipient that receives a TPP Abatement Distribution from the TPP Trust must certify, pursuant to Section 9, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, and affiliate companies), an aggregate amount equal to or exceeding its share of the annual TPP Abatement Distribution for TPP Authorized Abatement Purposes, and that it has complied with this Section, during the Distribution Period.[13] A TPP Authorized Recipient that submitted an aggregate Proof of Claim on behalf of ASO customers may distribute amounts received to ASO customers; provided that the TPP Authorized Recipient certify, pursuant to Section 9 herein, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount equal to or exceeding its TPP Abatement Distribution for TPP Authorized Abatement

---

[12]   See Appendices C and D hereto.

[13]   The Distribution Period is defined as the twelve (12) month period following each annual Distribution Date.

Purposes, and that it has complied with this Section 8, during the Distribution Period. An ASO customer included in an aggregate Proof of Claim will not be subject to independent certification or usage requirements relating to the ASO's share of the TPP Abatement Distribution.

The TPP Trust shall, in accordance with the Plan, the Confirmation Order and the applicable TPP Trust Documents, make TPP Abatement Distributions to TPP Authorized Recipients exclusively for TPP Authorized Abatement Purposes. Decisions made by the TPP Trust concerning Abatement Distributions will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(a)      **Approved MAT Expenses and Approved Uses/Programs**

TPP Authorized Abatement Purposes include Approved MAT Expenses and Approved Uses/Programs.

Approved MAT Expenses shall include all or part of the costs paid by TPP Authorized Recipients for Allowed MAT Therapy as defined in Appendix C attached hereto.

Approved Uses/Programs focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") and are defined in Appendix D attached hereto.[14]

(b)      **Requirements for Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient that qualifies as a Self-Funded Health Plan: i) must have spent an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent an aggregate amount at least equal to, or exceeding, 50% of the Self-Funded Health Plan's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto. This provision does not apply to the extent a Self-Funded Health Plan is an ASO included in an aggregate Proof of Claim.

(c)      **Requirements for all TPPs other than Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient (including a TPP Authorized Recipient that filed an aggregate Proof of Claim on behalf of ASOs), other than a Self-Funded Health Plan that independently filed a Proof of Claim: i) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, 50%

---

[14]   As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

of the TPP Authorized Recipient's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto.

## § 9.   REPORTING BY TPP AUTHORIZED RECIPIENTS.

Within ninety (90) days after the end of a Distribution Period, each TPP Authorized Recipient that received a TPP Abatement Distribution, other than an ASO included in an aggregate Proof of Claim, must submit to the TPP Trust a certification regarding its satisfaction of the minimum spending requirements on TPP Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its TPP Abatement Distribution.

If a TPP Authorized Recipient that received a TPP Abatement Distribution is unable to meet or has not met the minimum spending requirements set forth in Section 8 above during the Distribution Period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the TPP Authorized Recipient meets the relevant spending requirements for TPP Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the TPP Authorized Recipient meets the relevant spending requirements. A TPP Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its TPP Abatement Distribution during a given Distribution Period.

The TPP Trust shall have the right to audit a TPP Authorized Recipient to determine whether the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements set forth in the TPP Trust Documents.

Each TPP Authorized Recipient, other than an ASO included in an aggregate Proof of Claim, if and when requested by the Trustee, shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements of the TPP Trust Documents. All Proofs of Claim, TPP Abatement Claim Forms and certifications filed or submitted by TPP Claimants are subject to audit by the Trustee, at the Trustee's discretion. If the Trustee finds a material misstatement in a TPP Claimant's Proof of Claim, TPP Abatement Claim Form or certification, the Trustee may allow that TPP Claimant up to 30 days to resubmit its Proof of Claim, TPP Abatement Claim Form or certification with supporting documentation or revisions. Failure of the TPP Claimant to timely correct its misstatement in a manner acceptable to the Trustee may result in forfeiture of all or part of the TPP Claimant's qualification as a TPP Authorized Recipient or right to receive TPP Abatement Distributions.

The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of TPP Trust. The TPP Trust retains the right to seek return by legal means of any expenditures that fail to comply with the requirements of this TPP TDP.

## § 10.   ADDITIONAL REPORTING BY THE TPP TRUST.

The TPP Trust shall (i) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes

set forth in the applicable TPP Trust Documents, and (ii) prepare and file with the Bankruptcy Court and on the TPP website, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the TPP Trust after each year that the TPP Trust is in existence. The annual report will contain, among other things, a summary regarding the number of claims resolved during the period covered by the financial statements, the status of any audits of TPP Authorized Recipients and any recommendations made by the Trustee relating to such audits.

*[Remainder of Page Intentionally Left Blank]*

## APPENDICES AND EXHIBITS

**APPENDIX A: TPP Abatement Claim Form**

**APPENDIX B: Maximum Eligible Amount Calculation Methodology**

**APPENDIX C: Approved MAT Expenses**

**APPENDIX D: Approved Uses/Programs**


**EXHIBIT 1:  LRP Agreement**

**EXHIBIT 2:   IRS forms W-9 and W-8**

**APPENDIX A: TPP Abatement Claim Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors. | **(Jointly Administered)** |

# Third-Party Payor Abatement Claim Form

This form (this "**TPP Abatement Claim Form**") is only for Holders of Third-Party Payor Channeled Claims, as defined in the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] that timely filed a Proof of Claim by the General Bar Date (July 30, 2020) established by the Bankruptcy Court (each, a "**TPP Claimant**").

If you are a TPP Claimant and want to have your TPP Abatement Claim reviewed by the TPP Trust that will come into existence upon the Effective Date of the Plan, you or your authorized representative must complete and submit this TPP Abatement Claim Form so that it received on or before [●], 2021 (the "**TPP Abatement Claim Deadline**"). You may file your TPP Abatement Claim Form using any of the following methods:

| If by E-Submission: | If by standard or overnight | If by hand delivery: |
|---|---|---|
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit Third-Party Payor Channeled Claim Form" link | Purdue Pharma TPP Supplemental Claims c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165 | Purdue Pharma TPP Supplemental Claims c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165

If you plan to hand deliver your TPP Abatement Claim Form to Prime Clerk's office, please email _____@primeclerk.com at least one business day in advance to arrange delivery. |

**Instructions regarding how to calculate your claim are attached to this TPP Abatement Claim Form.**

**For questions regarding this TPP Abatement Claim Form, please call [_____] or visit [WEBSITE].**

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan or the TPP TDP.

*Notwithstanding a previously filed Proof of Claim in In re Purdue Pharma L.P., et al., Case No. 19-23649 (RDD), failure to submit this TPP Abatement Claim Form by the TPP Abatement Claim Deadline ([●], 2021) will result in disqualification of your Proof of Claim and will mean that you are not entitled to any distribution from the TPP Trust.*

**PURSUANT TO THE PLAN, ALL THIRD-PARTY PAYOR CHANNELED CLAIMS AGAINST THE DEBTORS IN THESE CHAPTER 11 CASES WILL BE CHANNELED TO THE TPP TRUST UPON THE EFFECTIVE DATE, AND THE ONLY POTENTIAL SOURCE OF DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS WILL BE TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. AS SET FORTH IN THE PLAN, TPP ABATEMENT DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS BY THE TPP TRUST MUST BE USED FOR TPP AUTHORIZED ABATEMENT PURPOSES.**

**IN ORDER TO HAVE THE TPP TRUST REVIEW AND MAKE A DETERMINATION OF YOUR MAXIMUM ELIGIBLE AMOUNT, IF ANY, OF YOUR TPP ABATEMENT CLAIM, YOU MUST HAVE TIMELY FILED A PROOF OF CLAIM BY THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES <u>AND</u> YOU MUST TIMELY FILE THIS TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE SET FORTH ABOVE.**

| Part 1: | Identify the Proof of Claim |
|---|---|
| **1. Who is the current creditor?** | _____<br>Name of the entity to be paid for this claim (including other names the creditor used with the debtor, including d/b/a) |
| **2. What is the claim number of your previously filed Proof of Claim?** | Claim Number: _____ |
| **3. Has anyone else filed a claim on behalf of this creditor?** | _____<br>If yes, please provide the filer and the claim number<br><br>_____ |
| **4. Last 4 digits of creditor's federal tax identification number (FEIN)?** | FEIN:____ _____ |

| Part 2: | Notices and Distributions |
|---|---|

| **1. Who should receive notice?** | Name: _____<br>First name        Middle name        Last name<br><br>Title: _____<br><br>Company: _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____<br>Number        Street<br><br>_____<br>City        State        Zip code<br><br>Phone Number: _____<br><br>E-mail Address: _____ (required) |
|---|---|
| **2. Where should TPP Abatement Distributions be sent?** | Name: _____<br>First name        Middle name        Last name<br><br>Title: _____<br><br>Company: _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____<br>Number        Street<br><br>_____<br>City        State        Zip code |

| Part 3: | Amount of TPP Abatement Claim |
|---|---|

| **1. Total amount of the TPP Abatement Claim, as calculated by the methodology set forth in the instructions that begin on page 5 herein.** | Claim Amount: $_____ |
|---|---|
| **2. Components of TPP Abatement Claim, per instructions for calculation.** | 1. Number of creditor's plan members, subscribers, or covered dependents prescribed drugs identified on NDC List on Appendix A between 1/1/2008 and 12/31/2019.(Note: Count each member only once regardless of the number of prescriptions they had): _____ |

2.  Number of prescriptions paid by creditor for drugs in item 1: _____

3.  Total dollars paid by creditor for such prescriptions:_____

4.  Number of plan members in item 1 who were diagnosed with Opioid Use Disorder (Appendix B):_____

5.  For members in item 4, dollar amount of medical claims with ICD, CPT or HCPS codes (Appendix C):_____

6.  The total number of members, subscribers, and covered dependents covered by your plan or administered by your plan as of January 1, 2020:_____

| Part 4: | Sign Below |
| --- | --- |

**The person completing this TPP Abatement Claim must sign and date it.**

**If you file this claim electronically, FRBP 5005(a)(2) establishes a local rule specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*
☐ I am the creditor
☐ I am the creditor's attorney or authorized agent

I understand that an authorized signature on this *TPP Abatement Claim Form* serves as an acknowledgement and certification that when calculating the amount of the TPP Abatement Claim, the Third-Party Payor on whose behalf the form is submitted has complied with the Maximum Eligible Amount Calculation Methodology set forth in the Instructions.

I have examined the information in this *TPP Abatement Claim Form* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

**Print the name of the person who is completing and signing this form**

Name: _____
        First name        Middle name        Last name

Title: _____

Company: _____
        Identify the corporate servicer as the company if the authorized agent is a servicer

Address: _____
        Number            Street

_____
        City              State            Zip code

# INSTRUCTIONS FOR TPP ABATEMENT CLAIM FORM

## How to Calculate Your TPP Abatement Claim

Each TPP Claimant (also referred to as "You" or "Your" throughout) shall provide information responsive to the questions set forth below, which shall set forth, *inter alia*, the total amount of Your Purdue-Related Opioid Spend, certifying that You used the Maximum Eligible Amount Calculation Methodology, as set forth below, to arrive at the amount. Each TPP Claimant, if and when requested by the TPP Trust Trustee, shall provide supporting documentation and data, in the requested format, underlying the TPP Claimant's calculation of its Purdue-Related Opioid Spend, sufficient to enable confirmation of the amount.

## Consolidated TPP Abatement Claims

For those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach to the completed TPP Abatement Claim Form a chart identifying the TPP Claimants included in the consolidated TPP Abatement Claim. For each TPP Claimant included in the consolidated TPP Abatement Claim, the chart shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii) the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) responses to each of questions 1 through 6 in these instructions; (iv) the amount of that TPP Claimant's TPP Abatement Claim, as calculated pursuant to the instructions below; and (v) the claim number of the previously filed Proof of Claim.

Filers of consolidated TPP Abatement Claims that provide unique identifiers rather than the names of the TPP Claimants in the charts that accompany their TPP Abatement Claims are required to submit charts with the names of the TPP Claimants that correspond to the unique identifiers directly to the TPP Trust by emailing such charts to [_____]. The names of such TPP Claimants shall not appear on the TPP website.

For avoidance of doubt: Filers of consolidated TPP Abatement Claims that used unique identifiers rather than the names of the TPP Claimants in connection with the Proofs of Claim filed by or before the General Bar Date shall use the same unique identifiers in connection with the filing of this TPP Abatement Claim Form, but are required to concurrently provide the TPP Trust with a chart that provides the unique identifier, the name of the TPP Claimant that corresponds to that identifier, the information required for each claimant under the TPP Claim Calculation Methodology below, the claim number of the previously filed Proof of Claim, and the amount of that TPP Claimant's TPP Abatement Claim.

## Maximum Eligible Amount Calculation Methodology

For the period of January 1, 2008 through December 31, 2019, You must provide the following:

1.  The number of unique members who were prescribed one or more of the drugs identified on the NDC List, attached as Appendix A. Count each member only once regardless of the number of prescriptions they had.
2.  The number of unique prescriptions paid, all or in part, by Your plan for the drugs identified on the NDC List, attached as Appendix A.
3.  The total final dollars paid by Your plan for the prescriptions for the drugs identified in 2 above.
4.  The number of unique members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 9 and 10 List, attached as Appendix B.

5. For the members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, attached as Appendix C, paid for those members.

6. The total number of members, subscribers and covered dependents covered by your plan or administered by your plan as of January 1, 2020.

**The amount of Your TPP Abatement Claim (Part 3, question 1 of the TPP Abatement Claim Form) should be calculated by adding the answers to questions 3 and 5 of Part 3 of the TPP Abatement Claim Form.**

You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your TPP Abatement Claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect. You may append one or more pages to provide or supplement your responses hereto.

*You must leave out or redact* information that is entitled to privacy on this form or on any attached documents.

The documents that support your calculations need not be submitted with this TPP Abatement Claim Form. However, the TPP Trustee shall have the right to require that you provide such

documentation promptly upon request.

**Confirmation that the TPP Abatement Claim Form has been filed**

To receive confirmation that the TPP Abatement Claim has been filed, enclose a stamped self-addressed envelope and a copy of this completed form. You may also view a list of filed TPP Abatement Claims by visiting the Claims and Noticing Agent's website at [PurduePharmaClaims.com/_____]

*Information that is entitled to privacy.* The TPP Abatement Claim Form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the TPP Trustee so requests or someone else objects to the TPP Abatement Claim.

*Redaction of information.* Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to privacy on the TPP Abatement Claim Form and any attached documents.

**APPENDIX A: NDC LIST**

| NDC | DRUG NAME |
|---|---|
| 42858000101 | oxyCODONE HCl |
| 42858000110 | oxyCODONE HCl |
| 42858000201 | oxyCODONE HCl |
| 42858000210 | oxyCODONE HCl |
| 42858000301 | oxyCODONE HCl |
| 42858000401 | oxyCODONE HCl |
| 42858000501 | oxyCODONE HCl |
| 42858004001 | HYDROcodone-Acetaminophen |
| 42858010201 | oxyCODONE-Acetaminophen |
| 42858010250 | oxyCODONE-Acetaminophen |
| 42858010301 | oxyCODONE-Acetaminophen |
| 42858010350 | oxyCODONE-Acetaminophen |
| 42858010401 | oxyCODONE-Acetaminophen |
| 42858010450 | oxyCODONE-Acetaminophen |
| 42858012201 | Dilaudid |
| 42858013901 | HYDROcodone-Acetaminophen |
| 42858020101 | HYDROcodone-Acetaminophen |
| 42858020150 | HYDROcodone-Acetaminophen |
| 42858020201 | HYDROcodone-Acetaminophen |
| 42858020301 | HYDROcodone-Acetaminophen |
| 42858020350 | HYDROcodone-Acetaminophen |
| 42858023401 | Dilaudid |
| 42858023450 | Dilaudid |
| 42858023801 | HYDROcodone-Acetaminophen |
| 42858030101 | HYDROmorphone HCl |
| 42858030125 | HYDROmorphone HCl |
| 42858030201 | HYDROmorphone HCl |
| 42858030225 | HYDROmorphone HCl |
| 42858030250 | HYDROmorphone HCl |
| 42858030301 | HYDROmorphone HCl |
| 42858030416 | HYDROmorphone HCl |
| 42858033801 | Dilaudid |
| 42858035340 | Buprenorphine |

| NDC | DRUG NAME |
|---|---|
| 42858041616 | Dilaudid |
| 42858049340 | Buprenorphine |
| 42858050103 | Buprenorphine HCl |
| 42858050203 | Buprenorphine HCl |
| 42858051501 | MS Contin |
| 42858058640 | Buprenorphine |
| 42858063101 | MS Contin |
| 42858075040 | Buprenorphine |
| 42858076001 | MS Contin |
| 42858079901 | MS Contin |
| 42858080101 | Morphine Sulfate ER |
| 42858080201 | Morphine Sulfate ER |
| 42858080301 | Morphine Sulfate ER |
| 42858080401 | Morphine Sulfate ER |
| 42858080501 | Morphine Sulfate ER |
| 42858083940 | Buprenorphine |
| 42858090001 | MS Contin |
| 42858090103 | TRAMADOL HCL ER |
| 42858090203 | TRAMADOL HCL ER |
| 42858090303 | TRAMADOL HCL ER |
| 59011010010 | OXYCONTIN |
| 59011010020 | OXYCONTIN |
| 59011010025 | OXYCONTIN |
| 59011010310 | OXYCONTIN |
| 59011010320 | OXYCONTIN |
| 59011010325 | OXYCONTIN |
| 59011010510 | OXYCONTIN |
| 59011010520 | OXYCONTIN |
| 59011010525 | OXYCONTIN |
| 59011010610 | NULL |
| 59011010710 | OXYCONTIN |
| 59011010720 | OXYCONTIN |
| 59011010725 | OXYCONTIN |

| NDC | DRUG NAME |
|-----|-----------|
| 59011010910 | OXYCONTIN |
| 59011010925 | OXYCONTIN |
| 59011020110 | OXYIR |
| 59011022520 | OXYFAST |
| 59011026005 | MS CONTIN |
| 59011026010 | MS Contin |
| 59011026105 | MS CONTIN |
| 59011026125 | MS Contin |
| 59011026205 | MS CONTIN |
| 59011026210 | MS Contin |
| 59011026305 | MS CONTIN |
| 59011026310 | MS Contin |
| 59011026410 | MS Contin |
| 59011027160 | Hysingla ER |
| 59011027260 | Hysingla ER |
| 59011027360 | Hysingla ER |
| 59011027460 | Hysingla ER |
| 59011027560 | Hysingla ER |
| 59011027660 | Hysingla ER |
| 59011027760 | Hysingla ER |
| 59011031220 | PALLADONE |
| 59011031260 | PALLADONE |
| 59011031320 | PALLADONE |
| 59011031360 | PALLADONE |
| 59011031420 | PALLADONE |
| 59011031460 | PALLADONE |
| 59011031520 | PALLADONE |
| 59011031560 | PALLADONE |
| 59011033430 | RYZOLT |
| 59011033530 | RYZOLT |
| 59011033630 | RYZOLT |
| 59011041010 | OxyCONTIN |
| 59011041020 | OxyCONTIN |
| 59011041510 | OxyCONTIN |

| NDC | DRUG NAME |
|-----|-----------|
| 59011041520 | OxyCONTIN |
| 59011042010 | OxyCONTIN |
| 59011042020 | OxyCONTIN |
| 59011043010 | OxyCONTIN |
| 59011043020 | OxyCONTIN |
| 59011044010 | OxyCONTIN |
| 59011044020 | OxyCONTIN |
| 59011044110 | DILAUDID |
| 59011044210 | DILAUDID |
| 59011044225 | Dilaudid |
| 59011044410 | Dilaudid |
| 59011044501 | Dilaudid-HP |
| 59011044505 | Dilaudid-HP |
| 59011044550 | DILAUDID-HP |
| 59011044625 | DILAUDID-HP |
| 59011045101 | Dilaudid |
| 59011045201 | Dilaudid |
| 59011045210 | Dilaudid |
| 59011045401 | Dilaudid |
| 59011045405 | Dilaudid |
| 59011045410 | Dilaudid |
| 59011045810 | Dilaudid |
| 59011046010 | OxyCONTIN |
| 59011046020 | OxyCONTIN |
| 59011048010 | OxyCONTIN |
| 59011048020 | OxyCONTIN |
| 59011075004 | Butrans |
| 59011075104 | Butrans |
| 59011075204 | Butrans |
| 59011075704 | Butrans |
| 59011075804 | Butrans |
| 59011081510 | OXYCONTIN |
| 59011083010 | OXYCONTIN |
| 59011086010 | OXYCONTIN |

# APPENDIX B: OUD ICD 9 AND 10 LIST

**ICD 9 Codes for OUD**:
304.00   OPIOID DEPENDENCE-UNSPECIFIED
304.01   OPIOID DEPENDENCE-CONTINUOUS
304.02   OPIOID DEPENDENCE-EPISODIC
304.03   OPIOID DEPENDENCE, IN REMISSION
304.70   OPIOID OTHER DEP-UNSPECIFIED
304.71   OPIOID OTHER DEP-CONTINUOUS
304.72   OPIOID OTHER DEP-EPISODIC
304.73   OPIOID OTHER DEP-IN REMISSION
305.50   OPIOID ABUSE-UNSPECIFIED
305.51   OPIOID ABUSE-CONTINUOUS
305.52   OPIOID ABUSE-EPISODIC
305.53   OPIOID ABUSE-IN REMISSION

**ICD 10 Codes for OUD**:
F11.1       Opioid abuse
F11.10     Opioid abuse, uncomplicated
F11.11     Opioid abuse, in remission
F11.12     Opioid abuse with intoxication
F11.120   Opioid abuse with intoxication, uncomplicated
F11.121   Opioid abuse with intoxication delirium
F11.122   Opioid abuse with intoxication with perceptual disturbance
F11.129   Opioid abuse with intoxication, unspecified
F11.13     Opioid abuse with withdrawal
F11.14     Opioid abuse with opioid-induced mood disorder
F11.15     Opioid abuse with opioid-induced psychotic disorder
F11.150   Opioid abuse with opioid-induced psychotic disorder with delusions
F11.151   Opioid abuse with opioid-induced psychotic disorder with hallucinations
F11.159   Opioid abuse with opioid-induced psychotic disorder, unspecified
F11.18     Opioid abuse with other opioid-induced disorder
F11.181    Opioid abuse with opioid-induced sexual dysfunction
F11.182   Opioid abuse with opioid-induced sleep disorder
F11.188   Opioid abuse with other opioid-induced disorder
F11.19     Opioid abuse with unspecified opioid-induced disorder
F11.20     Opioid Dependence uncomplicated
F11.21     Opioid Dependence in remission
F11.22     Opioid dependence with intoxication
F11.220   Opioid Dependence uncomplicated
F11.221   Opioid Dependence delirium
F11.222   Opioid dependence w intoxication with perceptual disturbance
F11.229   Opioid Dependence unspecified
F11.23     Opioid Dependence with withdrawal
F11.24     Opioid Dependence with opioid-induced mood disorder
F11.25     Opioid Dependence with opioid-induced psychotic disorder
F11.250   Opioid Dependence with delusions
F11.251   Opioid Dependence with hallucinations
F11.259   Opioid Dependence unspecified
F11.28     Opioid Dependence with other opioid-induced disorder
F11.281   Opioid Dependence with opioid-induced sexual dysfunction
F11.282   Opioid Dependence with opioid-induced sleep disorder
F11.288   Opioid Dependence with other opioid-induced disorder

## APPENDIX C: OUD MEDICAL CLAIMS CODES LIST

1.   Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2.   Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3.   New Patient: code 99205, 99201

4.   Established Patient: code 9921199215

5.   Visit type: MAT medication induction.

6.   Established Patient E/M: 99211–99215

7.   Patient Consult: 99241-45(*)[2]

8.   Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9.   Prolonged visits codes (99354, 99355) (*)

10.   30-74 minutes: 99354(*)

11.   75-104 minutes: 99355(*)

12.   105+ minutes: 99354+99355x2(*)

13.   Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14.   Established Patient: 99212-15

15.   SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16.   CPT/Prof   HCPC/FAC

17.   99214 – E/M office visit/G0480 – UDT definitive

18.   99213 – E/M office visit/H0015 - IOP

19.   99285 – E/M ER visit/H2035 – drug treatment program per hour

20.   99215 – E/M office visit/G0481 – UDT definitive

21.   80307 – UDT presumptive/H0010 – acute/subacute detox

22.   99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23.   99233 – E/M inpatient visit/G0463 – outpatient clinic visit

24.   99223 – E/M inpatient visit/H0011 - acute/subacute detox

25.   99284 – E/M ER visit/H0007 outpatient crisis intervention

26.   99204 – E/M office visit/G0482 – UDT definitive

27.   99231 – E/M inpatient visit/G0483 – UDT definitive

28.   99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29.   99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30.   99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

---

[2] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

31. 99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32. 99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33. 96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34. J2315 - Injection, naltrexone, depot form, 1 mg

35. 3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36. 96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37. Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38. Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39. G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40. G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41. G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42. G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43. G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44. G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45. G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46. G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47. G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48. G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program

physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49.   G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50.   G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51.   G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52.   G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53.   G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54.   G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55.   G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56.   G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57.   G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58.   G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

      G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.

60.   11981 – Insertion of single non-biodegradable implant

61.   11982 – Removal of single non-biodegradable implant

62.   11983 – Removal and re-insertion of single nonbiodegradable implant

63.   17999 – unlisted   procedure, skin, mucous mem

64.   S9475 –Ambulatory setting substance abuse treatment or detoxification services

65.   H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66.   H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67.   J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68.   J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69.   J0571 BUPRENORPHINE ORAL 1 MG

70.   J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71.   J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

| 72. | J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN |
|-----|--------------------------------------------------------|
| 73. | J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE |
| 74. | J1230 Methadone |
| 75. | J2315 INJECTION NALTREXONE DEPOT FORM 1 MG |
| 76. | S0109 METHADONE ORAL 5MG |
| 77. | Rev Code 900 + H0020 (methadone) |
| 78. | Rev Code 900 + H0001 or H0004 or H0005 or H0006 |
| 79. | Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone] |
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |

| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |
| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |

| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |
| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |

| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |
| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |

| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |
| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |

| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |
| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |

| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |

| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |
| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |

| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

*[Remainder of Page Intentionally Left Blank]*

*[Page Intentionally Left Blank]*

## **APPENDIX B: Maximum Eligible Amount Calculation Methodology**

TPP Claimants shall use the following methodology for calculating the Maximum Eligible Amount distributable to them:

For the period of January 1, 2008 through December 31, 2019, provide the following:

1. The number of subscribers or dependents covered under the TPP Claimant's plan during some or all of the period from January 1, 2008 through December 31, 2019 (each, a "Unique Member") who were prescribed one or more of the drugs identified on the NDC List.

2. The number of unique prescriptions paid, all or in part, by your plan for the drugs identified on the NDC List.

3. The total final dollars paid by your plan for the prescriptions for the drugs identified in 2 above.

4. The number of Unique Members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 10 List.

5. For the Unique Members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, paid for those Unique Members.

The NDC List, OUD ICD 10 List, and OUD Medical Claims Codes List will be attached to and included with the TPP Abatement Claim Form.

## APPENDIX C: Approved MAT Expenses

*Approved MAT Expenses.* All or part of the expenses incurred by TPP Authorized Recipients for Allowed MAT Therapy, defined as claims paid for the following therapies or under the following ICD/CPT/HCPS codes:

1. Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2. Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3. New Patient: code 99205, 99201

4. Established Patient: code 99211-99215

5. Visit type: MAT medication induction.

6. Established Patient E/M: 99211–99215

7. Patient Consult: 99241-45(*)[15]

8. Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9. Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof    HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23. 99233 – E/M inpatient visit/G0463 – outpatient clinic visit

---

[15] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

24.    99223 – E/M inpatient visit/H0011 - acute/subacute detox

25.    99284 – E/M ER visit/H0007 outpatient crisis intervention

26.    99204 – E/M office visit/G0482 – UDT definitive

27.    99231 – E/M inpatient visit/G0483 – UDT definitive

28.    99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29.    99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30.    99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

31.    99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32.    99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33.    96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34.    J2315 - Injection, naltrexone, depot form, 1 mg

35.    3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36.    96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37.    Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38.    Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.    G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40.    G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41.    G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42.    G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and

group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.   G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.   G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.   G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.   G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.   G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.   G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49.   G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50.   G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51.   G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52.   G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

21

53.  G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54.  G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55.  G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56.  G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57.  G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58.  G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.  G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

60.  11981 – Insertion of single non-biodegradable implant

61.  11982 – Removal of single non-biodegradable implant

62.  11983 – Removal and re-insertion of single nonbiodegradable implant

63.  17999 – unlisted   procedure, skin, mucous mem

64.  S9475 –Ambulatory setting substance abuse treatment or detoxification services

65.  H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66.  H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67.  J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68.  J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69.  J0571 BUPRENORPHINE ORAL 1 MG

70.  J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71.  J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.  J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.  J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.  J1230 Methadone

75.  J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.  S0109 METHADONE ORAL 5MG

77.  Rev Code 900 + H0020 (methadone)

78.  Rev Code 900 + H0001 or H0004 or H0005 or H0006

79.   Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone

| | | |
|---|---|---|
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |
| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |

| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |

| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |
| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |

25

| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |
| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |

| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
|------|---------|---------------------------------------------------|
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |
| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |

| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |
| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |

| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |

| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |

| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |
| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |

| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |
| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |

| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX D: Approved Uses/Programs

*Approved Uses/Programs.* Approved Uses/Programs are those that satisfy the following criteria (the "Approved Uses/Programs Criteria"): they (a) focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") conditions, and/or grants to organizations focused on providing treatment of OUD and/or any SUD/MH conditions, (b) employ evidence-based or evidence-informed strategies, and (c) do not include reimbursements to health care providers or payments to covered persons under the plan of a TPP Authorized Recipient (or ASO, if applicable). Approved Uses/Programs follow:[16]

1) Support programs that increase the availability or quality of treatment for OUD and/or any SUD/MH conditions or are designed to prevent OUD, including, but not limited to:

   a) Expand telehealth networks and availability to increase access to treatment for OUD and/or any SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

   b) Support mobile, community-based crisis intervention services, including outpatient hospitals, community health centers, mental health centers and other clinics delivering mobile crisis intervention by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and/or any SUD/MH conditions and for persons who have experienced an opioid overdose. All supported services should make medications for opioid use disorder available through the mobile interventions.

   c) Train health care personnel to identify and treat trauma of individuals with OUD and/or SUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), including training of health care personnel supporting residential treatment, partial hospitalization, and intensive outpatient services.

   d) Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("DATA 2000") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

   e) Support academic-led training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including tele-mentoring to assist community-based providers in rural or underserved areas.

   f) Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment and peer recovery and support specialists. These efforts should be based on research evidence of what works for stigma reduction and include an evaluation of efforts.

---

[16] As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

g) Support programs offering physical health and behavioral health services for members with OUD and/or any SUD/MH conditions, including but not limited to care management.

h) Support utilization management programs designed to prevent OUD.

i) Fund programs providing locations for safe and free disposal of opioids and other controlled substances.

j) Fund programs tailored to support patient adherence to MAT treatment.

k) Support educational programs on correct coding for OUD.

l) Fund programs to develop predictive modeling for earlier identification of OUD and SUD.

m) Support hospitals to deliver provision of MAT to patients.

2) Support programs that decrease the cost to the patient of treatment for OUD and/or any SUD/MH conditions.

a) Waive co-payments and other non-covered (or unreimbursed) patient costs for treatment for opioid use disorder with buprenorphine and methadone.

b) Provide or support transportation to treatment or recovery programs or services for persons with OUD and/or any SUD/MH conditions.

c) Provide community support services, including social and legal services, to assist in the living conditions of persons with OUD and/or any SUD/MH conditions.

d) Provide employment training or educational services for persons in treatment for or recovery from OUD and/or any SUD/MH conditions.

3) Grants to organizations whose mission is to provide, expand access to and/or improve the delivery of treatment for OUD and/or any SUD/MH conditions through evidence-based or evidence-informed strategies.

Examples include:

   Liberation Programs Inc. (CT)

   Boston Medical Center (Grayken Center) (MA)

   Institutes for Behavioral Resources - Reach Health Services (MD)

   Montefiore Medical Center (opioid treatment programs) (NY)

   Pennsylvania Psychiatric Institute: Advancement in Recovery (PA)

   Evergreen Treatment Services (WA)

   Shatterproof

   The Alliance for Addiction Payment Reform

   National Council for Behavioral Health

35

Faces and Voices of Recovery

National Alliance for Recovery Residences

Supportive Housing

National Association for Mental Illness

Mental Health of America

The Trustee can add to the list of Approved Uses/Programs in this Appendix D programs that satisfy the Approved Uses/Programs Criteria; provided that the Trustee provides each State Attorney General at least forty-five (45) days advance written notice that both identifies the program or programs to be added to this Appendix D and explains how the program or programs to be added satisfy the Approved Uses/Programs Criteria.

**EXHIBIT 1: LRP Agreement**

# MASTER AGREEMENT GOVERNING THE

# OPIOIDS PRIVATE LIEN RESOLUTION PROGRAM

## PREAMBLE

This agreement (the "LRP Agreement")[1] is made and entered into as of the Effective Date, by and between the following parties (the "Parties"):

- Each Holder of a Third Party Payor Claim authorized to participate in the TPP Trust and signatory hereto (each such Holder individually, a "Participating TPP," and collectively, the "Participating TPPs");

- Each Holder of an Allowed PI Claim (each such Holder referred to herein as a "Participating Claimant") upon and by virtue of the submission of a Claim Form to the PI Trust;

- Each Claimant's Counsel signatory hereto, in its capacity as counsel to one or more Participating Claimants;

- MASSIVE: Medical and Subrogation Specialists ("MASSIVE"), as the third-party lien resolution administrator ("PI LRP Administrator") as designated under the PI Trust Agreement;

- The administrator(s) (each, a "TPP Administrator") designated by the undersigned counsel to the Participating TPPs in accordance with the provisions hereof;

- Ed Gentle of Gentle, Turner, Sexton & Harbison, LLC, in his capacity as the claim administrator for the PI Trust ("PI Claim Administrator"); and

- The Creditor Trustee for the TPP Trust ("TPP Trustee"), exclusively for the limited purposes of monitoring and enforcement as set forth in Section V(B)(3) hereof.

WHEREAS, the Parties to this LRP Agreement desire to create a fair, swift, and cost-effective program (the "Private Lien Resolution Program") under which a Participating Claimant shall be provided an expedited resolution process on favorable terms used for resolution of liens asserted or that may be asserted by Participating TPPs against recoveries of Participating Claimants under the Plan;

WHEREAS, upon conclusion of the matching and reimbursement processes and receipt of funds by the Participating TPPs as provided herein, any and all claims of the Participating TPPs against the Participating Claimants' recoveries under the Plan shall be resolved and discharged, and all liens of the Participating TPPs on Participating Claimants' recoveries under the Plan shall be released. Participating TPPs are entitled to receive only the reimbursements described below as against the Participating Claimants or from the PI Trust. Participating TPPs are not releasing any subrogation or reimbursement rights, liens, or claims they may have against recoveries other than recoveries under the Plan, including any rights or claims against recoveries other than Plan

---

[1] Capitalized terms used herein that are not defined in the body of this LRP Agreement, the Declarations Page, or Appendix A: Definitions have the meanings ascribed to them in the Plan or the PI Trust Documents, as applicable.

recoveries that are received on account of the conduct of entities that are not affiliated with the Debtors.

WHEREAS, the following sets forth the agreement between and among the Parties concerning their respective obligations;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is stipulated and agreed by and between the Parties as follows:

## I.    ESTABLISHING THE PRIVATE LIEN RESOLUTION PROGRAM

### A.    Participating Claimant Obligations.

Within twenty (20) days after Effective Date, the PI LRP Administrator shall provide to each TPP Administrator in electronic form and in the manner established by the PI Claim Administrator and the members of the Third-Party Payor Group, the following information about each Participating Claimant: (a) First name; (b) Middle name or initial; (c) Last name; (d) Residential address; (e) Full social security number; (f) Date of birth; (g) Date of first qualifying opioid ingestion; and (h) Injury relating to any Allowed PI Claim. The PI LRP Administrator shall supplement this information and provide the new information to each TPP Administrator every thirty days, to add information about PI Claimants who become Participating Claimants upon allowance of their claims in whole or in part.

Participating TPPs shall make their best effort to locate Participating Claimants in limited circumstances where a full social security number is not available.

### B.    Participating TPP Obligations

Within ten (10) days after the Effective Date, each Participating TPP shall designate the individual or entity which shall serve as its TPP Administrator. Such designation shall be made by sending written notice of that election to undersigned TPP counsel, the PI LRP Administrator and the PI Claim Administrator, it being agreed that a Participating TPP that provides such designation on the consent form/signature page evidencing its participation in this agreement shall have satisfied the notice requirement. If any Participating TPP fails to timely make such a designation, such Participating TPP shall be considered to have designated the creditor identified in Part 1, Question 1, of its Proof of Claim as its TPP Administrator, and any notice required under this LRP shall be sent to the address indicated in Part 1, Question 4, of its Proof of Claim.[2]

## II.    DETERMINING THE INITIAL LIEN AMOUNT

### A.    The Participating Claimant List

Within twenty (20) days after the Effective Date, or as soon thereafter as practicable, the PI LRP Administrator shall provide each TPP Administrator with the Participating Claimant List, in the

---

[2] A Participating TPP who elects to administer its own liens is encompassed within term "TPP Administrator" as used throughout this LRP Agreement.

form of an electronic file in a format mutually agreed to by the majority of TPPs. The date on which the PI LRP Administrator provides the Participating Claimant List to the TPP Administrator(s) shall be considered the "Notice Date" as to each Participating Claimant identified therein. The PI LRP Administrator shall supplement this list as set forth in Section I(A) hereof.

If a TPP Administrator identifies a Participating Claimant with any missing, incomplete, or invalid data, that TPP Administrator shall, no later than forty five (45) days after the Notice Date, notify the PI LRP Administrator of the missing, incomplete, or invalid data, and the Notice Date for such Participating Claimant shall not occur as to any Participating TPP(s) represented by that TPP Administrator until such data is complete and provided to that TPP Administrator in the form of a supplemental Participating Claimants List.

Any Participating Claimant determined to have missing, incomplete, or invalid data shall be excluded from the below-noted timeframes. Participating Claimants identified with missing or incomplete data shall be resubmitted with complete data by the PI LRP Administrator to the TPP Administrator which notified the PI LRP Administrator of the incomplete data. The first day which is the 15th of the month following the day on which the PI LRP Administrator provides complete data to the TPP Administrator(s) shall be considered the "Notice Date" as to each Participating Claimant previously identified to have had missing, incomplete, or invalid data. The Notice Date in respect of Participating Claimants with complete data shall not be delayed due to other Participating Claimants with missing, incomplete, or invalid data. Those Participating Claimants with complete data shall be addressed under the below-noted timeframes.

The Participating Claimant List shall be provided by the PI LRP Administrator to TPP Administrators only, shall not be provided by any Party to any other Person, including any Non-Participating TPPs, and shall not be used for any purpose other than those provided for in this LRP Agreement. For example, the Participating Claimant List shall not be used for identification of reimbursement claims of any Non-Participating TPPs, or for identification of any claims against recoveries outside of these Chapter 11 Cases. Furthermore, in the event a Participating Claimant List is provided to counsel for any Participating TPP prior to the Effective Date of the Plan, that Participating Claimant List shall not be shared with any Participating TPP until such time as that Participating TPP or its agent has confirmed in writing that each such Participating TPP agrees to be bound by the terms of this LRP Agreement. In the event of termination of this LRP Agreement with respect to a Participating Claimant pursuant to Section V(C) hereof, the information provided under this LRP Agreement with respect to such Participating Claimant shall not be used to enforce liens against such Participating Claimant.

Each original or later-provided Participating Claimant List shall be treated as an individual Participating Claimant List with its own timeline for purposes of this LRP Agreement. The Notice Date for a Participating Claimant submitted on multiple Participating Claimant Lists shall be the latest-submitted Participating Claimant List on which that Participating Claimant appears.

## B.    Identifying Matched and Unmatched Claimants

Within three (3) months of the 15th day of the month immediately following the Notice Date, each TPP Administrator shall provide the PI LRP Administrator with an itemized claims history ("Initial Claims History") for the Matched Claimants of the Participating TPPs represented by such TPP

Administrator.  Once the Initial Claims History for a Matched Claimant is delivered to the PI LRP Administrator, it may be amended before an Audited Lien Amount for such Matched Claimant is returned or by agreement of the PI LRP Administrator.

Within ninety days of the 15th day of the month immediately following the Notice Date, the PI LRP Administrator shall identify any Matched Claimant for whom multiple Initial Lien Amounts have been received and notify TPP Administrators who have matched such Participating Claimant.

Any Participating Claimant for whom no Initial Claims History is provided by or on behalf of any Participating TPPs following the Claimant Matching Period shall be deemed an "Unmatched Claimant."

### C.       Treatment of Unmatched Claimants

Participating TPPs shall receive no recovery from any distributions to Unmatched Claimant(s) on account of Allowed PI Claims.

### D.       Waiver of liens as to certain recoveries

Notwithstanding anything else in this LRP Agreement, each Participating TPP expressly waives any and all claims and liens against the recoveries of Participating Claimants' PI Claims under the Plan with respect to any Participating Claimant whose total Gross Recovery does not exceed $3,500.00 (the "Waived Recovery Amount").

## III.      DETERMINING THE FINAL LIEN AMOUNT

### A.       Determination of Approved Lien Amount

The PI LRP Administrator shall have sixty (60) calendar days from the date on which it receives each Participating Claimant's Initial Lien Amount from a TPP Administrator representing a Participating TPP, or a reasonable agreed extension, to provide that TPP Administrator for that Participating TPP with an Audited Lien Amount for that Participating Claimant.  To determine the Audited Lien Amount, and in strict accordance with the Claims Audit Protocol, the PI LRP Administrator shall confirm that all the claims secured by the lien are related to the Participating Claimant's opioid use.

The lien amounts produced in accordance with the Claims Audit Protocol may only be disputed based on the following: (1) whether the claimed lien expense was actually incurred by the Participating Claimant; or (2) whether one or more of the claimed lien expenses was actually related to a Compensable Injury.  No other grounds for protest will be considered.  The party protesting the lien must identify the specific claims being challenged.

If the PI LRP Administrator does not submit an Audited Lien Amount within sixty (60) calendar days (subject to reasonable agreed extension) following the receipt by the PI LRP Administrator of the Initial Lien Amount, or if the PI LRP Administrator gives notice to a Participating TPP that it does not object to the Initial Lien Amount, the Initial Lien Amount provided on behalf of the Participating TPP shall become the approved lien amount hereunder (the "Approved Lien Amount") and be non-appealable by any Party; provided, however, that for any PI Claim that has

not yet been Allowed or Disallowed by the PI Trust or PI Claim Administrator, the PI LRP Administrator will within sixty (60) calendar days from the date on which it receives the Initial Lien Amount on behalf of a Participating TPP, notify that Participating TPP that such PI Claim has yet to be Allowed or Disallowed under the trust distribution procedure for the PI Trust (the "PI TDP").

If an audit cannot be completed by the PI LRP Administrator because of extenuating circumstances, the PI LRP Administrator shall provide ten (10) business days' notice to the appropriate TPP Administrator(s) prior to the expiration of the sixty (60) day period and confer with the same in good faith as to whether a reasonable extension of deadlines may be warranted.

Within thirty (30) calendar days (subject to reasonable agreed extension) of receiving an Audited Lien Amount, the TPP Administrator shall review the Audited Lien Amounts and provide written notice to the PI LRP Administrator of any Protest thereof. If the TPP Administrator does not submit a Protest within this time period, the Audited Lien Amount shall become the Approved Lien Amount and shall be non-appealable by the Participating TPP.

If the TPP Administrator or PI LRP Administrator submits a Protest within the applicable time period and the TPP Administrator and PI LRP Administrator cannot agree on whether a given treatment is related, they shall initially work in good faith to resolve the issue.

If the issue cannot be resolved by good faith negotiations, the TPP Administrator and PI LRP Administrator will submit the dispute to the lien resolution officer ("LRO"), to be appointed by the PI Claim Administrator, PI LRP Administrator and the TPP Administrator by unanimous consent. The LRO shall be experienced in lien resolution and cannot be terminated and replaced except by unanimous consent of such parties, or for good cause cited by one or more of such parties, brought to the attention of all such parties, and failing to be cured. The TPP Administrator and PI LRP Administrator shall initially seek the opinion of the LRO as to resolution of their dispute. If this does not result in an agreed resolution, the TPP Administrator and PI LRP Administrator shall then engage in non-binding mediation with the LRO.

If such mediation fails, the LRO will make a mediator's final recommendation that shall be a final and binding determination of the Approved Lien Amount, unless either the TPP Administrator or the PI LRP Administrator requests that the matter be decided by binding arbitration of the LRO. The procedure to be followed will be informal in nature to the extent practicable. The LRO's arbitration decision shall be final and binding.

The costs of the LRO for all functions other than binding arbitration will be split by the Participating TPP and the PI Trust, with the LRO providing a budget agreed to by the parties to each Protest before the LRO is engaged in each individual lien dispute. Arbitration costs shall be paid by the Party who seeks arbitration.

### B.    Determination of the Proposed Payable Lien Amount

The Participating TPPs agree to offset and/or cap each Participating TPP's lien with respect to the PI Claims of the Participating Claimants as follows:

The applicable "Lien Cap" shall be:

1) For any statutory lien (*i.e.* MA, MCOs, FEHBA, etc.): 25%.

2) For all preemptive liens (*i.e.* ERISA self-funded, etc.): 25%.

3) For all non-preemptive liens in an Anti-Subrogation State: Liens are waived.

4) For all non-preemptive liens in a Non-Equity State without contractual recovery rights: Liens are waived.

5) For all non-preemptive liens not waived pursuant to (3) or (4) of this Section (B) or otherwise:

   a) Gross Recovery above $50,000: 19.5%.
   b) Gross Recovery between $25,000 and $50,000: 18%.
   c) Gross Recovery below $25,000: 15%.

The "Lien Offset" shall be 30%.

Any Participating Claimant whose Gross Recovery is subject to one or more reimbursable Participating TPP liens shall not have its applicable Lien Caps, Lien Offset, or Holdback Percentage increased by virtue of those multiple liens (i.e., multiple Participating TPPs share a single Lien Cap, Lien Offset, and Holdback Percentage and may not aggregate these limits).

If, in addition to one or more Participating TPP lien(s), a Participating Claimant's Gross Recovery is also subject to one or more reimbursable Governmental Liens, and all of the governmental entities holding such Governmental Liens agree to share in the Lien Cap and Lien Offset with respect to such Participating Claimant, then

   i. each of the Holdback Percentage and Lien Cap with respect to such Participating Claimant shall be increased by 2.5%;

   ii. the Participating TPP(s) and the holder(s) of the Governmental Lien(s) shall share in a single Lien Cap, Holdback Percentage, and Lien Offset with respect to such Participating Claimant; and

   iii. such Participating TPP(s) and such holder(s) of the Governmental Lien(s) shall be reimbursed from such Participating Claimant's total Holdback in an amount pro rata to each lienholder's total reimbursable lien.

If, in addition to one or more Participating TPP lien(s), a Participating Claimant's Gross Recovery is also subject to one or more reimbursable Governmental Liens, and one or more of the governmental entities holding such Governmental Liens do <u>not</u> agree to share in the Lien Cap and Lien Offset with respect to such Participating Claimant, then such Participating Claimant's Lien Cap and Lien Offset shall be reduced by a percentage number equal to half the total lien percentage number claimed by the holder(s) of the Governmental Lien(s).  For example, if there is only one holder of a Governmental Lien and such holder takes 30% of a Participating Claimant's Gross Recovery, then the Lien Cap and Lien Offset for a Participating TPP claiming against the same

Participating Claimant would be reduced by 15%. Notwithstanding the foregoing, this paragraph shall not be used to reduce the Lien Cap for a Participating TPP below 5% with respect to any given Participating Claimant.

The PI LRP Administrator shall calculate the "Proposed Payable Lien Amount" as the *lesser* of:

    i.   The aggregate of each Approved Lien Amount multiplied by the applicable Lien Offset; and

    ii.  A Participating Claimant's Gross Recovery multiplied by the applicable Lien Cap (the "Capped Lien Amount");

provided, however, that a given Proposed Payable Lien Amount shall not be calculated until the following conditions are met:

    i.   The three (3) month Claimant Matching Period related to such Participating Claimant as defined in Section II(B) has expired as to all Participating TPPs with claims and liens against such Participating Claimant; and

    ii.  An Approved Lien Amount for each of the Participating Claimant's liens has been identified from the Claimant Matching Period.

Within ten (10) calendar days after a given Proposed Payable Lien Amount is calculated, the PI LRP Administrator shall provide the Claimant's Counsel (or the Participating Claimant, if not represented) and the TPP Administrator with notice of such Proposed Payable Lien Amount.

### C.   Determination of the Final Lien Amount

Within the ten (10) calendar days following receipt of the notice of a Proposed Payable Lien Amount, the TPP Administrator may object to the Proposed Payable Lien Amount only on the grounds that the Proposed Payable Lien Amount was improperly calculated pursuant to the formula set forth above. If the TPP Administrator does not raise such objection, or following resolution of such objection, the Proposed Payable Lien Amount shall become final (the "Final Lien Amount").

## IV.   RESOLUTION OF LIENS, PAYMENTS MADE, AND RELEASES EXCHANGED

### A.   Holdback

The Parties agree that an amount equal to the Holdback Percentage of each individual Distribution to a Holder of an Allowed PI Claim in accordance with the Plan and the PI Trust Documents shall be held in escrow by [_____] (the "TPP LRP Escrow Agent") and used to satisfy all liens of Participating TPPs resolved under this Private Lien Resolution Program. The escrow shall be funded from funds received by the PI Trust pursuant to the Plan, and the TPP LRP Escrow Agent shall be Ed Gentle of Gentle, Turner, Sexton & Harbison, LLC, in his capacity as the Creditor Trustee of the PI Trust (the "PI Trustee"), or an authorized agent of the PI Trustee.

Non-Participating TPPs' reimbursement interests are not limited by the amount of the Holdback, and the Participating TPPs' recoveries under this LRP Agreement shall not be affected by any Non-Participating TPP's reimbursement interests.

Upon a Participating Claimant becoming a Matched Claimant, or upon determination that there is no match for such Participating Claimant, the Holdback shall be reduced to the Final Lien Amount (if lower) or reduced to $0 if the Participating Claimant's Gross Recovery is less than or equal to the Waived Recovery Amount, that is, $3,500.

### B.      Final payment for Participating Claimants

#### *1.      Matched Claimants*

Within thirty (30) calendar days after establishing the Final Lien Amount with respect to a Participating Claimant, the PI LRP Administrator shall send notice of the Final Lien Amount with respect to such Claimant to the TPP LRP Escrow Agent (with a copy sent to the Participating TPP). Upon receipt of such notice and pursuant to the time periods set forth below, the TPP LRP Escrow Agent shall make the following payments:

  i.   To the Participating TPP or its designated agent: No later than twenty (20) business days after receiving notice of the Final Lien Amount, payment in the amount of the Final Lien Amount.  Each Participating TPP shall be responsible for paying to its TPP Administrator any fee charged by such TPP Administrator out of its recovery under this LRP.

  ii.  To Claimant's Counsel or its designee for the benefit of the Participating Claimant (or to the Participating Claimant, if not represented): Within ten (10) business days following completion of the payments in clause (i) of this Section IV(B)(1), payment of the remainder, if any, of the Holdback.

#### *2.      Unmatched Claimants*

Beginning seven (7) days after a Participating Claimant is determined to be an Unmatched Claimant as to all Participating TPPs, the PI Claim Administrator or TPP LRP Escrow Agent shall be authorized to make payment of the entire Holdback associated with that particular Unmatched Claimant to the Claimant's Counsel or its designee for the benefit of that particular Unmatched Claimant (or to the Participating Claimant, if not represented).

### C.      Releases

A Participating Claimant shall be entitled to a release of all claims and liens of a Participating TPP against him/her and his/her recovery under the Plan in connection with his/her PI Claim, in the form attached hereto as Exhibit [  ], upon the occurrence of any of the following under the terms of this LRP Agreement:

  (a) Such Participating TPP's receipt of final payment for the Participating Claimant's Final Lien Amount; or

  (b) the determination that the total Final Lien Amount for the Participating Claimant is $0.00; or

(c) the determination that the Participating Claimant's total Gross Recovery under the Plan does not exceed the $3,500.00 Waived Recovery Amount.

**D.      Claimants not subject to release**

No release will be given to Non-Participating Claimants.

## V.      MISCELLANEOUS

**A.      HIPAA**

The Parties shall take all reasonable actions (including entering into all necessary agreements) reasonably necessary to ensure compliance with federal requirements of confidentiality, including (a) the Health Insurance Portability and Accountability Act (HIPAA) and (b) section 543 of the Public Health Service Act, 42 U.S.C. 290dd-2, and its implementing regulation, 42 CFR Part 2 (together, "Part 2").   All Participating Claimants shall be deemed to have consented to the disclosure and sharing (solely to the extent agreed pursuant to the terms hereof) of their information for the purpose of resolving the liens under this LRP Agreement.

**B.      Governing Law and Adjudication of Disputes**

*1.      Governing Law*

This LRP Agreement shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without regard to conflict of laws principles, except with respect to the anti-subrogation statutes of Anti-Subrogation States and the non-equity laws and rules of Non-Equity States as referenced herein.

*2.      Adjudication of Disputes*

Subject only to the terms of the following paragraph (3), all actions, disputes, claims, and controversies under common law, statutory law, or in equity of any type or nature whatsoever relating to this LRP Agreement will be subject to and resolved by binding arbitration in Washington, D.C. under the rules of the American Arbitration Association.   Any award or order rendered therein may be confirmed as a judgment or order in any state or federal court of competent jurisdiction within the federal judicial district in which the party against whom such award or order was entered resides.

*3.      Jurisdiction of Bankruptcy Court and Rights of TPP Trust*

The TPP Trustee shall have the right (i) to inquire periodically with the PI Trustee, the PI Claim Administrator and the escrow agent for the TPP LRP Escrow Account as to whether the TPP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under this LRP Agreement, and to request evidence of the same and (ii) to seek entry of an order by the Bankruptcy Court enforcing this LRP Agreement, including the obligations to provide such information and evidence, in the event the TPP Trustee reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by this LRP Agreement, payments have not been made to LRP Participating TPPs as required by this LRP

Agreement, and/or any of the PI Trustee, the PI Claim Administrator and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the TPP Trustee for such information and evidence.

Notwithstanding the foregoing, the TPP Trustee shall have such monitoring and enforcement rights only as to the PI Trust's *general compliance* with the funding and payment terms of this LRP Agreement, and shall not monitor or enforce individual payments owed to particular Participating TPPs at the single entity level.

### C.    Severability and Termination

If any provision is construed to be invalid, illegal, or unenforceable, the remaining provisions shall not be affected thereby; provided, however, that any determination that the Lien Offset or Lien Cap are unenforceable by the Participating Claimant shall give to such Participating Claimant or Participating TPP a right to terminate this LRP Agreement with respect to such Participating Claimant only.

### D.    Amendment only in writing

This LRP Agreement may be amended in writing, in whole or in part, only with the written consent of Claimant's Counsel representing more than 50% of the Participating Claimants and counsel representing more than 50% of the Participating TPPs; provided, however, that this LRP Agreement may not be amended in a way that imposes upon one or more Participating Claimants or Participating TPPs worse treatment than that afforded to one or more other Participating Claimants or Participating TPPs without the consent of the Participating Claimants or Participating TPPs negatively impacted. Upon the successful amendment of this LRP Agreement, the PI LRP Administrator shall cause a copy of the amended LRP Agreement to either be filed on the Bankruptcy Court docket for *In re Purdue Pharma L.P. et al.*, Case No. 19-23649, or posted to an easily accessible website.

### E.    No admission of liability

Participation in the Private Lien Resolution Program will not constitute any admission of fact, law, liability, or strength or weakness of any claim or defense for any Participating Claimant or Participating TPP.

### F.    Best efforts

The Parties shall exercise reasonable best efforts to engage in ongoing cooperation to make the Private Lien Resolution Program successful. The Parties recognize that a Holder of a PI Claim may choose to participate even if their health plan is not then a Participating TPP.

### G.    Counterparts

This LRP Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any Party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

## APPENDIX A: DEFINITIONS

"*Anti-Subrogation Laws*" shall mean statutes, rules or regulations enacted in any of the Anti-Subrogation States which eliminate a Participating Claimant's obligation to repay liens.

The "*Anti-Subrogation States*" shall mean Arizona, Connecticut, Kansas, Missouri, North Carolina, New Jersey, New York and Virginia.

The "*Appeals Masters*" shall be [          ].

"*Audited Lien Amount*" shall mean that portion of the Initial Lien Amount that is determined by the PI LRP Administrator to be related to medical care for the Compensable Injury.

"*Claim Form*" means the Claim Form attached as Exhibit B to the TDP.

"*Claimant's Counsel*" shall be the law firm or other legal counsel representing a particular Participating Claimant or group of Participating Claimants in connection with the Participating Claimants' PI Claims.

"*Claims Audit Protocol*" shall mean the protocols agreed to by counsel representing more than 50% of the Participating TPPs and the PI LRP Claim Administrator, and applied by the PI LRP Claim Administrator for auditing liens under the Private Lien Resolution Program governed by this LRP Agreement. The Claims Audit Protocol may be amended and updated from time to time by agreement of the PI Claim Administrator and counsel representing more than 50% of the TPPs, shall be considered highly confidential, and may only be distributed or shown on a confidential basis to the Participating TPPs, Claimant's Counsel, the PI LRP Claim Administrator and/or Participating Claimants (upon request of such Participating Claimant to the PI LRP Administrator).

"*Compensable Injuries*" are those set forth in Attachment A. Compensable Injuries shall not include loss of consortium claims, and Participating TPPs shall not assert liens for loss of consortium claims.

"*Debtors*" shall mean Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).

"*Governmental Lien*" shall mean a related lien asserted by, or on behalf of a healthcare-related governmental entity, including but not limited to, liens asserted under Medicare Part A, Medicare Part B, Medicaid, Tricare, Champus, Indian Benefit Services and/or the Veteran's Administration.

"*Gross Recovery*" shall mean the total Distributions issued to any Holder of an Allowed PI Claim in accordance with the Plan and the PI Trust Documents on account of such PI Claim, before the deduction of any fees.

"*Holdback*" shall mean that portion of each Claimant's Settlement which the Parties have agreed will be held back and placed in the TPP LRP Escrow Account to satisfy the liens being resolved under this LRP Agreement. The amount of the Holdback shall be determined by multiplying the Gross Recovery times the Holdback Percentage.

The "*Holdback Percentage*" shall be 27.5%.

"*Initial Lien Amount*" shall mean the amount of medical care expended on a Participating Claimant's behalf by a Participating TPP related to the Compensable Injury, as determined by the Participating TPP *prior* to any auditing and *prior* to the application of any Lien Cap or Lien Offset.

"*Law Firm*" shall mean any law firm who represents Participating Claimants in connection with the pursuit of PI Claims.

"*Matched Claimant*" shall mean a Participating Claimant whose name has been provided to a Participating TPP, run against the Plan's data, and determined to be a "match" (that is, the Participating Claimant is, or was at the time of treatment, insured by the Participating TPP).

"*Non-Equity Laws*" shall mean any statutes, rules or regulations enacted in any of the Non-Equity States which require a Participating Claimant's obligation to repay healthcare liens to be contractual.

The "*Non-Equity States*" shall mean Illinois, Louisiana, Maine, Michigan, New Hampshire, Ohio and South Carolina.

"*Non-Participating Claimant*" shall mean a Holder of a PI Claim who has not elected to participate in this Private Lien Resolution Program and is not receiving a recovery on account of its PI Claim under the Plan.

"*Non-Participating TPP*" shall mean a private third-party payor who is not participating in this Private Lien Resolution Program. The terms of this Lien Resolution Program will not impact the liens, if any, asserted by a Non-Participating TPP.

"*Participating Claimant List*" shall mean the list compiled periodically by the PI LRP Administrator and sent to the TPP Administrators identifying all new Participating Claimants (*i.e.,* those who have been identified since the prior list was sent). The Participating Claimant information contained on each such list shall be sufficient to allow Participating TPPs to determine if a Claimant "matches" any of its insureds and shall, at a minimum, include (a) First name; (b) Middle name or initial; (c) Last name; (d) Residential address; (e) Full social security number; (f) Date of birth; (g) Date of first qualifying opioid ingestion; and (h) Injury relating to any Allowed PI Claim. The Participating Claimant information contained on this list shall relate to the individual who actually suffered the Compensable Injury (and not to any person representing that Participating Claimant in a representative capacity).

"*Protest*" shall mean a written protest of the Audited Lien Amount.  The sole bases for any Protest shall be (i) the relatedness of medical care to the Compensable Injury and/or (ii) whether a claimed lien expense was actually incurred by the Participating Claimant for treatment received by the Participating Claimant.

"*TPP LRP Escrow Account*" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds, the aggregate Holdback, received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of this LRP Agreement.

"*Unmatched Claimant*" shall mean a Participating Claimant whose name has been provided to each Participating TPP Administrator and has been run against the plan's data and determined not to "match" (that is, the Participating Claimant was not covered with respect to its Compensable Injury(ies) by any Participating TPP).

## ATTACHMENT A: COMPENSABLE INJURIES

[Attachment pending]

In no event may a prescription for any opioid, other than Medication-Assisted Treatment (MAT) such as Methadone, Suboxone, buprenorphine, be deemed related medical care to a Compensable Injury or otherwise be recoverable under this Private Lien Resolution Program.

**NOAT TDP**

# NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| 1. **APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by NOAT under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**")[2] in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in respect of the Public Creditor Trust Distributions (including the Initial Public Creditor Trust Distribution and all amounts distributed in respect of the TopCo Interests and the MDT Interests), which shall be distributed among (i) the states, territories and the District of Columbia (each a "**State**" as defined in the Plan), and (ii) each county, city, town, parish, village, and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Claim that is otherwise not a "State" as defined in the Plan (collectively, the "**Local Governments**"), whose Claims in Class 4 (Non-Federal Domestic Governmental Claims), along with all other Non-Federal Domestic Governmental Channeled Claims, are channeled to the National Opioid Abatement Trust ("**NOAT**") under the Plan and the Master TDP. To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, the trust |

---

[1] Oklahoma local governments set forth in **Schedule D** (the "**Oklahoma Local Governments**") will receive the equivalent of the Regional Apportionment portion of the allocation for Oklahoma less the $12.5 million designated for the Oklahoma political subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and the Sacklers (the "**Purdue Oklahoma Political Subdivision Fund**"). The release requirement contained in the State of Oklahoma settlement with the Debtors and the Sacklers for a political subdivision to participate in the Purdue Oklahoma Political Subdivision Fund, as defined in that agreement, shall be waived by the Debtors and any other party to that agreement as part of the documentation related to their Plan of Reorganization such that Oklahoma Local Governments may participate in both the Purdue Oklahoma Political Subdivision Fund and receive distributions from the National Opioid Abatement Trust. Debtors and the Sacklers also waive any requirement in the State of Oklahoma pre-petition settlement that funds not distributed by the Purdue Oklahoma Political Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment created by the State of Oklahoma's pre-petition settlement, and acknowledges that the entire Purdue Oklahoma Political Subdivision Fund shall be distributed to Oklahoma political subdivisions. Each of the Oklahoma Local Governments will be treated as a Qualifying Block Grantee, as that term is utilized in these National Opioid Abatement Trust Distribution Procedures, regardless of their population or other qualifications. Distributions from NOAT to Oklahoma Local Governments shall be in accordance with the ratios set forth in **Schedule E**. The Oklahoma Local Governments shall either hire an administrator for the funds from NOAT or receive the funds directly from NOAT. Funds distributed to Oklahoma Local Governments shall only be used for Approved Uses, as that term is defined in these National Opioid Abatement Trust Distribution Procedures, and Oklahoma Local Governments shall be required to publish and submit documentation of the use of funds to an administrator for the purpose of reporting to NOAT as is required for a Qualifying Block Grantee under these National Opioid Abatement Trust Distribution Procedures. The administrator may be reasonably compensated to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Local Governments by NOAT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Chapter 11 Plan or NOAT Agreement, as applicable.

| Issue | Description |
|-------|-------------|
| | agreement for the National Opioid Abatement Trust (the **"NOAT Agreement"**) and the NOAT Documents, as applicable.<br><br>These terms set forth the manner in which NOAT shall make Abatement Distributions to States and Local Governments (such entities, **"Authorized Recipients"**), which may be used exclusively on the parameters set forth herein.[3] |
| **2.  PURPOSE** | Virtually all creditors and the Court itself in the Purdue Chapter 11 Cases recognize the need for and value in developing a comprehensive abatement strategy to address the opioid crisis as the most effective use of the funds that can be derived from the Purdue estate (including without limitation insurance proceeds and, if included in the Chapter 11 Plan, payments by third parties seeking releases).  Because of the unique impact the crisis has had throughout all regions of the United States, and as repeatedly recognized by the Bankruptcy Court, distribution of a substantial portion of the estates should occur through an established governmental structure, with the use of such funds strictly limited to abatement purposes as provided herein.[4]  This approach recognizes that funding abatement efforts – which would benefit most creditors and the public by reducing future effects of the crisis through treatment and other programs – is a much more efficient use of limited funds than dividing thin slices among all creditors with no obligation to use it to abate the opioid crisis.  Because maximizing abatement of the opioid crisis requires coordination of efforts by all levels of government, particularly when the abatement needs far exceed the |

---

[3] Subject to the approved settlement between the United States Department of Justice and the Debtors, resolution of States' and Local Governments' claims under this model presumes reaching satisfactory agreement regarding all claims asserted by the federal government in the Chapter 11 Cases.

[4] *See, e.g.,* Hrg. Tr at 149:22-150:5 (Oct. 11, 2019) ("I would hope that those public health steps, once the difficult allocation issues that the parties have addressed here, can be largely left up to the states and municipalities so that they can use their own unique knowledge about their own citizens and how to address them. It may be that some states think it's more of a law enforcement issue, i.e. interdicting illegal opioids at this point. Others may think education is more important. Others may think treatment is more important."); *id.* At 175:24-176:6 ("I also think, and again, I didn't say this lightly, that my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that[,] subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance from the states primarily."); Hr'g Tr. At 165:3-165:14 (Nov. 19, 2019) ("I continue to believe that the states play a major role in [the allocation] process. The role I'm envisioning for them is not one where they say we get everything. I think that should be clear and I think it is clear to them. But, rather, where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."); Hr'g Tr. at 75:19-76:1 (Jan. 24, 2020) ("Even if there ultimately is an allocation here – and there's not a deal now, obviously, at this point on a plan. But if there is an allocation that leaves a substantial amount of the Debtors' value to the states and territories, one of the primary benefits of a bankruptcy case is that the plan can lock in, perhaps only in general ways, but perhaps in more specific ways, how the states use that money . . . .").

| Issue | Description |
|-------|-------------|
|  | available funds, this structure requires a collaborative process between each State and its Local Governments.

These distribution procedures (these "**National Opioid Abatement Trust Distribution Procedures**") are intended to establish the mechanisms for the distribution and allocation of funds distributed by NOAT to the States and Local Governments. All funds described in the foregoing sentence are referred to herein as "**NOAT Funds**." 100% of the **NOAT Funds** distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. Specifically, (i) no less than ninety five percent (95%) of the **NOAT Funds** distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in <u>Schedule B</u> (the "**Approved Opioid Abatement Uses**"); (ii) priority should be given to the core abatement strategies ("**Core Strategies**") as identified on <u>Schedule A</u>; and (iii) no more than five percent (5%) of the **NOAT Funds** may be used to fund expenses incurred in administering the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of **NOAT Funds** for implementing those programs and in connection with the Government Participation Mechanism[5] ("**Approved Administrative Expenses**") and together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**".

Each State and Qualifying Block Grantee shall agree that **NOAT Funds** received by it are to be used only in compliance with the requirements for Approved Opioid Abatement Uses and Approved Administrative Expenses set forth herein. Each State and Qualifying Block Grantee shall use best efforts to create a separate account or subaccount to hold **NOAT Funds** apart from such party's general funds pending use of such funds consistent with this NOAT TDP, and if such segregation of **NOAT Funds** by such party is impracticable notwithstanding use of best efforts or impermissible as a matter of law, such party shall nevertheless be required to report to the NOAT Trustees that **NOAT Funds** have been used solely for Approved Opioid Abatement Uses and Approved Administrative Expenses.

NOAT shall, in accordance with the Plan, the Confirmation Order and the NOAT Documents, distribute **NOAT Funds** to States and Local Governments exclusively for Approved Uses. Decisions concerning NOAT Funds made by NOAT will consider the need to ensure that |

---

[5] Capitalized terms not defined where first used shall have the meanings later ascribed to them in these National Opioid Abatement Trust Distribution Procedures.

| Issue | Description |
|---|---|
| | underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these National Opioid Abatement Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute **Approved Opioid Abatement Uses** may be provided by States, State agencies, Local Governments, Local Government agencies or nongovernmental parties and funded from **NOAT Funds**. |
| **3.  DISBURSEMENT OF FUNDS** | The Chapter 11 Plan shall provide for the establishment of NOAT and the appointment of NOAT Trustees.[6] The NOAT Trustees shall distribute the **NOAT Funds** consistent with the allocation attached as **Schedule C** and in accordance with the NOAT Agreement. |
| **4.  ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5.  DIVISION OF NOAT FUNDS** | **NOAT Funds** shall be allocated among the States, the District of Columbia, and Territories in the percentages set forth on **Schedule C**.<br><br>A.  Except as set forth below in Section 5(B) for the District of Columbia and Territories, each State's Schedule C share shall then be allocated within the State in accordance with the following:<br><br>1.  **Default Allocation Mechanism (excluding Territories and DC addressed below).**  The **NOAT Funds** allocable to a State that is |

[6] Pursuant to the Plan, the NOAT Trustees shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The NOAT Agreement shall provide that: (i) the Trustees shall receive compensation from NOAT for their services as Trustees; (ii) the amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report; (iii) the Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court; (iv) the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and (v) the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.

| Issue | Description |
|---|---|
| | not party to a **Statewide Abatement Agreement** as defined in Section 5(A)(2) below (each a "**Non-SAA State**") shall be allocated as between the State and its Local Governments to be used only for **Approved Uses**, in accordance with this Section 5(A)(1) (the "**Default Allocation Mechanism**"). <br><br> i.  **Regions.**  Except as provided in the final sentence of this paragraph, each **Non-SAA State** shall be divided into "**Regions**" as follows: (a) each **Qualifying Block Grantee** (as defined below) shall constitute a **Region**; and (b) the balance of the State shall be divided into **Regions** (such **Regions** to be designated by the State agency with primary responsibility (referred to herein as a "**lead agency**")[7] for opioid use disorder services employing, to the maximum extent practical, existing regions established in that State for opioid use disorder treatment or similar public health purposes); such non-**Qualifying Block Grantee Regions** are referred to herein as "**Standard Regions**".  The **Non-SAA States** which have populations under four (4) million and do not have existing regions described in the foregoing clause (b) shall not be required to establish **Regions**;[8] such a State that does not establish **Regions** but which does contain one or more **Qualifying Block Grantees** shall be deemed to consist of one **Region** for each **Qualifying Block Grantee** and one **Standard Region** for the balance of the State. <br><br> ii. **Regional Apportionment.  NOAT Funds** shall be allocated to each **Non-SAA State** as (a) a **Regional Apportionment** or (b) a **Non-Regional Apportionment** based on the amount of **NOAT Funds** dispersed under a confirmed Chapter 11 Plan as follows: <br><br> A.  **First $1 billion** – 70% Regional Apportionment /30% Non-Regional Apportionment <br><br> B.  **$1-$2.5 billion** – 64% Regional Apportionment /36% Non-Regional Apportionment |

---

[7] A list of lead agencies will be made available on the NOAT website.

[8] To the extent they are not parties to a Statewide Abatement Agreement, the following States will qualify as a Non-SAA State that does not have to establish Regions: Connecticut, Delaware, Hawai'i, Iowa, Maine, Nevada, New Hampshire, New Mexico, Rhode Island, Vermont.

| Issue | Description |
|-------|-------------|
|  | **C. $2.5-$3.5 billion** – 60% Regional Apportionment /40% Non-Regional Apportionment |
|  | **D. Above $3.5 billion** – 50% Regional Apportionment /50% Non-Regional Apportionment |
|  | iii. **Qualifying Block Grantee.** A "**Qualifying Local Government**" means a county or parish (or in the cases of States that do not have counties or parishes that function as political subdivisions, a city), that (a) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more and (b) has funded or otherwise manages an established, health care and/or treatment infrastructure (e.g., health department or similar agency) to evaluate, award, manage and administer a Local Government Block Grant.[9] A **Qualifying Local Government** that is eligible and wishes to receive **NOAT Funds** through Local Government Block Grants shall elect to receive funds in such manner no later than (90) ninety days following the Agreement Date. A **Qualifying Local Government** that elects to receive **NOAT Funds** through Local Government Block Grants is referred to herein as a **Qualifying Block Grantee**. |
|  | iv. **Proportionate Shares of Regional Apportionment.** As used herein, the "**Proportionate Share**" of each **Region** in each **Non-SAA State** shall be (a) for States in which counties or parishes function as Local Governments, the aggregate shares of the counties or parishes located in such **Region** under the applicable allocation model employed in connection with the Purdue Chapter 11 Cases (the "**Allocation Model**"),[10] divided by the aggregate shares for all counties or parishes in the State under that **Allocation Model**; and (b) for all other States, the aggregate shares of the cities and towns in that **Region** under that **Allocation Model's** intra-county allocation formula, |

---

[9] As noted in footnote 11, the population for each State shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[10] The Allocation Model shall be the allocation model available at www.opioidnegotiationclass.info implemented in In re: National Prescription Opiates Litigation, MDL No. 2804 (N.D. Ohio) (the "**Negotiation Class Allocation Model**"), provided, however, that notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), available at _____.

| Issue | Description |
|-------|-------------|
| | divided by the aggregate shares for all cities and towns in the State under that **Allocation Model**.<br><br>v.  **Expenditure or Disbursement of Regional Apportionment.** Subject to Section 5(A)(1)(ix) below regarding **Approved Administrative Expenses**, all **Regional Apportionments** shall be disbursed or expended in the form of **Local Government Block Grants** or otherwise for **Approved Opioid Abatement Uses** in the **Standard Regions** of each **Non-SAA State**.<br><br>vi.  **Qualifying Block Grantees.** Each **Qualifying Block Grantee** shall receive its **Regional Apportionment** as a block grant (a "**Local Government Block Grant**").<br><br>**Local Government Block Grants** shall be used only for **Approved Opioid Abatement Uses** by the **Qualifying Block Grantee** or for grants to organizations within its jurisdiction for **Approved Opioid Abatement Uses** and for **Approved Administrative Expenses** in accordance with Section 5(A)(1)(ix) below. Where a municipality located wholly within a **Qualifying Block Grantee** would independently qualify as a block grant recipient (an "**Independently Qualifying Municipality**"), the **Qualifying Block Grantee** and **Independently Qualifying Municipality** must make a substantial and good faith effort to reach agreement on use of **NOAT Funds** as between the qualifying jurisdictions. If the **Independently Qualifying Municipality** and the **Qualifying Block Grantee** cannot reach such an agreement on or before the Effective Date of the Chapter 11 Plan, the **Qualifying Block Grantee** will receive the **Local Government Block Grant** for its full **Proportionate Share** and commit programming expenditures to the benefit of the **Independently Qualifying Municipality** in general proportion to **Proportionate Shares** (determined as provided in Section 5(A)(2)(iv) above) of the municipalities within the **Qualifying Block Grantee**. Notwithstanding the allocation of the **Proportionate Share** of each **Regional Apportionment** to the **Qualifying Block Grantee**, a **Qualifying Block Grantee** may choose to contribute a portion of its **Proportionate Share** towards a statewide program.<br><br>vii. **Standard Regions.** The portions of each **Regional Apportionment** not disbursed in the form of **Local Government Block Grants** shall be expended throughout the **Standard Regions** of each **Non-SAA State** in accordance with 95%-105% of the respective **Proportionate Shares** of such |

| Issue | Description |
|-------|-------------|
|  | **Standard Regions**.  Such expenditures will be in a manner that will best address opioid abatement within the State as determined by the State with the input, advice and recommendations of the **Government Participation Mechanism** described in Section 6 below.  This regional spending requirement may be met by delivering **Approved Opioid Abatement Use** services or programs to a **Standard Region** or its residents.  Delivery of such services or programs can be accomplished directly or indirectly through many different infrastructures and approaches, including without limitation the following:<br><br>A.  State agencies, including local offices;<br><br>B.  Local governments, including local government health departments;<br><br>C.  State public hospital or health systems;<br><br>D.  Health care delivery districts;<br><br>E.  Contracting with abatement service providers, including nonprofit and commercial entities; or<br><br>F.  Awarding grants to local programs.<br><br>viii.    **Expenditure or Disbursement of NOAT Funds Other Than Regional Apportionment.** All **NOAT Funds** allocable to a **Non-SAA State** that are not included in the State's **Regional Apportionment** shall be expended only on **Approved Uses**.  The expenditure of such funds shall be at the direction of the State's lead agency (or other point of contact designated by the State) and may be expended on a statewide and/or localized manner, including in the manners described herein.    **Qualifying Block Grantees** will be eligible to participate in or receive the benefits of any such expenditures on the same basis as other **Regions**.<br><br>ix.  **Approved Administrative Expenses.**  States may use up to five percent (5%) of their **Non-Regional Apportionments** plus five percent (5%) of the **Regional Apportionment** not used to fund **Local Government Block Grants**, for **Approved Administrative Expenses**.  **Qualifying Block Grantees** may use up to five percent (5%) of their **Local Government Block Grants** to fund their **Approved Administrative Expenses**. |

| Issue | Description |
|-------|-------------|
|  | 2. **Statewide Abatement Agreement.**  Each State and its Local Governments will have until fourteen (14) days after the Effective Date of the Chapter 11 Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the **NOAT Funds** for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").  Any State and its Local Governments that have reached agreement before the Agreement Date of the Chapter 11 Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available; no SAA shall become effective without such filing.  Any dispute regarding allocation within a State that has adopted a **Statewide Abatement Agreement** will be resolved as provided by that **Statewide Abatement Agreement**; *provided* that no **Statewide Abatement Agreement** may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement and Sections 5(A)(3) and 7 hereof.<br><br>A **Statewide Abatement Agreement** shall be agreed when it has been approved by the State and either (a) representatives[11] of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent fifteen percent (15%) or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, fifteen percent (15%) of or more of the State's incorporated cities or towns), by number.[12]<br><br>Population Percentages shall be determined as follows: |

---

[11] An authorized "representative" of local, or even State, government can differ in these National Opioid Abatement Trust Distribution Procedures depending on the context.

[12] All references to population in these National Opioid Abatement Trust Distribution Procedures shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

| Issue | Description |
|-------|-------------|
|  | For States with counties or parishes that function as Local Governments,[13] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality.  The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population.  For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.<br><br>The **Statewide Abatement Agreement** will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>A State and its Local Governments may revise, supplement, or refine a **Statewide Abatement Agreement** by filing an amended **Statewide Abatement Agreement** that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>3. **Records.**  The States shall maintain records of abatement expenditures and their required reporting, as set forth in further detail in Section 7, will include data on regional expenditures so it can be verified that the **Regional Distribution** mechanism guarantees are being met.  **Qualifying Block Grantees** shall |

---

[13] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont.  All other States have counties or parishes that function as Local Governments.

| Issue | Description |
|---|---|
| | maintain records of abatement expenditures and shall provide those records periodically to their State for inclusion in their State's required periodic reporting. |
| | B. **Allocation for Territories and the District of Columbia Only.** The allocation of **NOAT Funds** within a Territory or the District of Columbia will be determined by its local legislative body within one year of the Effective Date, unless that legislative body is not in session, in which case, the allocation of **NOAT Funds** shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its Government Participation Mechanism. |
| **6. GOVERNMENT PARTICIPATION MECHANISM** | In each **Non-SAA State**, as defined in Section 5(A)(1) above, there shall be a process, preferably pre-existing, whereby the State shall allocate funds under the **Regional Distribution** mechanism only after meaningfully consulting with its respective Local Governments. Each such State shall identify its mechanism (whether be it a council, board, committee, commission, taskforce, or other efficient and transparent structure) for consulting with its respective Local Governments (the "**Government Participation Mechanism**" or "**GPM**") in a notice filed with the Bankruptcy Court identifying what **GPM** has been formed and describing the participation of its Local Governments in connection therewith. States may combine these notices into one or more notices for filing with the Bankruptcy Court. These notices are reviewable by the Bankruptcy Court upon the motion of any Local Government in that State asserting that no **GPM** has been formed. |
| | **Government Participation Mechanisms** shall conform to the following: |
| | A. *Composition*. For each State, |
| |     1. the State, on the one hand, and State's Local Governments, on the other hand, shall have equal representation on a **GPM**; |
| |     2. Local Government representation on a **GPM** shall be weighted in favor of the **Standard Regions** but can include representation from the State's **Qualifying Block Grantees**; |
| |     3. the **GPM** will be chaired by a non-voting chairperson appointed by the State; |
| |     4. Groups formed by the States' executive or legislature may be used as a **GPM**, provided that the group has equal representation by the State and the State's Local Governments. |

| Issue | Description |
|-------|-------------|
| | A **GPM** should have appointees such that as a group they possess experience, expertise and education with respect to one or more of the following: public health, substance abuse, healthcare equity and other related topics as is necessary to assure the effective functioning of the **GPM**.<br><br>B. *Consensus*. Members of the **GPMs** should attempt to reach consensus with respect to **GPM Recommendations** and other actions of the **GPM**. Consensus is defined in this process as a general agreement achieved by the members that reflects, from as many members as possible, their active support, support with reservations, or willingness to abide by the decision of the other members. Consensus does not require unanimity or other set threshold and may include objectors. In all events, however, actions of a **GPM** shall be effective if supported by at least a majority of its members. **GPM Recommendations** and other actions shall note the existence and summarize the substance of objections where requested by the objector(s).<br><br>C. *Proceedings*. Each **GPM** shall hold no fewer than four (4) public meetings annually, to be publicized and located in a manner reasonably designed to facilitate attendance by residents throughout the State. Each **GPM** shall function in a manner consistent with its State's open meeting, open government or similar laws, and with the Americans with Disabilities Act. **GPM** members shall be subject to State conflict of interest and similar ethics in government laws.<br><br>D. *Consultation and Discretion*. The **GPM** shall be a mechanism by which the State consults with community stakeholders, including Local Governments (including those not a part of the **GPM**), state and local public health officials and public health advocates, in connection with opioid abatement priorities and expenditure decisions for the use of **NOAT Funds** on **Approved Opioid Abatement Uses**.<br><br>The **GPM** is authorized to identify and recommend that non-**Qualifying Local Government(s)** (individually or in combination) should be considered for a block grant to be funded from an applicable **Regional Apportionment**. "**Non-Qualifying Local Government(s)**" individually or in combination are Local Governments that are not **Qualifying Local Governments** but they fund or otherwise manage an established, health care and/or treatment infrastructure (*e.g.*, health department or similar agency) to evaluate, award, manage and administer a block grant for programs constituting **Approved Uses**.<br><br>E. *Recommendations*. A **GPM** shall make recommendations regarding specific opioid abatement priorities and expenditures for the use of **NOAT Funds** on **Approved Opioid Abatement Uses** to the State or the agency designated by a State for this purpose ("**GPM** |

| Issue | Description |
|-------|-------------|
|  | Recommendations"). In carrying out its obligations to provide **GPM Recommendations,** a **GPM** may consider local, state and federal initiatives and activities related to education, prevention, treatment and services for individuals and families experiencing and affected by opioid use disorder; recommend priorities to address the State's opioid epidemic, which recommendations may be Statewide or specific to **Regions**; recommend Statewide or **Regional** funding with respect to specific programs or initiatives; recommend measurable outcomes to determine the effectiveness of funds expended for **Approved Opioid Abatement Uses**; and monitor the level of **Approved Administrative Expenses** expended from **NOAT Funds**.<br><br>The goal is for a process that produces **GPM Recommendations** that are recognized as being an efficient, evidence-based approach to abatement that addresses the State's greatest needs while also including programs reflecting particularized needs in local communities. It is anticipated that such a process, particularly given the active participation of state representatives, will inform and assist the state in making decisions about the spending of the **NOAT Funds**. To the extent a State chooses not to follow a **GPM Recommendation**, it will make publicly available within fourteen (14) days after the decision is made a written explanation of the reasons for its decision, and allow seven (7) days for the **GPM** to respond.<br><br>F.  **Non-SAA States Review**. In Non-SAA States, Local Governments and States may object to any apportionment, allocation, use or expenditure of **NOAT Funds** (an "**Allocation**") solely on the basis that: the Allocation at issue (i) is inconsistent with the provisions of Section 5(A)(1)(ii) hereof with respect to the levels of **Regional Apportionments** and **Non-Regional Apportionments**, (ii) is inconsistent with the provisions of Section 5(A)(1) hereof with respect to the amounts of **Local Government Block Grants** or **Regional Apportionment** expenditures, (iii) is not for an **Approved Use** or (iv) violates the limitations set forth herein with respect to **Approved Administrative Expenses**. The objector shall have the right to bring that objection to either (a) a state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed (each an "**Objection**"). If an **Objection** is filed within fourteen (14) days of approval of an **Allocation**, then no funds shall be distributed on account of the aspect of the **Allocation** that is the subject of the **Objection** until the **Objection** is resolved or decided by the Bankruptcy Court or **State Court**, as applicable. There shall be no other basis for bringing an **Objection** to the approval of an **Allocation**. |

| Issue | Description |
|-------|-------------|
| **7. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. At least annually, each State shall publish on its lead agency's website and/or on its Attorney General's website and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **NOAT Funds** received, (ii) the allocation awards approved (indicating the recipient, the amount of the allocation, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations, to **Qualifying Local Governments** for **Local Government Block Grants** and **Approved Administrative Expenses**. |
| | 2. At least annually, each **Qualifying Block Grantee** which has elected to take a **Local Government Block Grant** shall publish on its lead agency's or Local Government's website, and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **Local Government Block Grants** received, (ii) the allocation awards approved (indicating the recipient, the amount of the grant, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations. |
| | 3. As applicable, each State or Local Government shall impose reporting requirements on each recipient to ensure that **NOAT Funds** are only being used for **Approved Uses**, in accordance with the terms of the allocation. |
| | 4. NOAT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the NOAT Agreement, which audited **Annual Report** shall be filed annually with the Bankruptcy Court, and the States and **Qualifying Block Grantees** shall provide NOAT with any information reasonably required regarding the expenditure and disbursement of **NOAT Funds** to satisfy the requirements of such an audited **Annual Report** of NOAT. |
| | 5.  (a) A state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed shall have jurisdiction to enforce the terms of these National Opioid Abatement Trust Distribution Procedures, and as applicable, a **Statewide Abatement Agreement** or default mechanism; *provided* that nothing herein is intended to expand the scope of the Bankruptcy Court's post-confirmation jurisdiction.  For the avoidance of doubt, the Bankruptcy Court shall have continuing jurisdiction over NOAT, *provided*, *however*, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT, *provided further*, that the foregoing shall not preclude **State Court** jurisdiction in any State with respect to any matter arising under the National Opioid Abatement Trust Distribution |

14

| Issue | Description |
|-------|-------------|
|       | Procedures involving that State and one or more of its political subdivisions or agencies. |
|       | 6.  The NOAT Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of NOAT, including the requirement that 100% of the NOAT Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**").[1]

A.    **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

　　　1.    Expand training for first responders, schools, community support groups and families; and

　　　2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B.    **MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

　　　1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

　　　2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

　　　3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

　　　4.    Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

C.    **PREGNANT & POSTPARTUM WOMEN**

　　　1.    Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

　　　2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

3.    Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D.    **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.    Expand comprehensive evidence-based and recovery support for NAS babies;

2.    Expand services for better continuum of care with infant-need dyad; and

3.    Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.    **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.    Expand warm hand-off services to transition to recovery services;

3.    Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.    Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.    Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.    **TREATMENT FOR INCARCERATED POPULATION**

1.    Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.    Increase funding for jails to provide treatment to inmates with OUD.

G.    **PREVENTION PROGRAMS**

1.    Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.    Funding for evidence-based prevention programs in schools.;

3.    Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.    Funding for community drug disposal programs; and

5. Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H. **EXPANDING SYRINGE SERVICE PROGRAMS**

1. Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I. **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

8.     Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.     Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.    Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.    Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.    Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.     Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

20

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.     Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.     Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.     Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.     Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.     Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.      Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.      Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.      Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.      Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.      Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.      Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.      Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.      Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.      Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.      Expand warm hand-off services to transition to recovery services.

12.      Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.      Develop and support best practices on addressing OUD in the workplace.

14.      Support assistance programs for health care providers with OUD.

15.      Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.     ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.   Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.   Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.   Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.   Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.   Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.   Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.   Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1. Increase the number of prescribers using PDMPs;

   2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.  **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

26

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.  <u>PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)</u>

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

## I.     I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.     Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.     LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

## K.     TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.   Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.   **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.   Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.   Research non-opioid treatment of chronic pain.

3.   Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.   Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.   Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.   Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.   Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.   Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.   Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
### State Allocation Percentages

| State | Final Percentage Division of Funds |
|---|---|
| Alabama | 1.6579015983% |
| Alaska | 0.2681241169% |
| American Samoa* | 0.0175102976% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9779907816% |
| California | 9.8347649255% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3562609766% |
| Delaware | 0.5131270783% |
| District of Columbia | 0.2129072934% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0518835714% |
| Hawaii | 0.3476670198% |
| Idaho | 0.5364838684% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7639415424% |
| Kansas | 0.8114241462% |
| Kentucky | 1.6059653429% |
| Louisiana | 1.5326855153% |
| Maine | 0.5786741854% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8994318052% |
| Missouri | 2.0056475170% |
| Montana | 0.3517745904% |
| N. Mariana Islands* | 0.0191942445% |
| Nebraska | 0.4335719578% |
| Nevada | 1.2723862145% |
| New Hampshire | 0.6489060374% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8817467856% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1910712849% |
| Ohio | 4.3567051408% |
| Oklahoma | 0.6152210532% |
| Oregon | 1.4405383452% |
| Pennsylvania | 4.5882419559% |
| Puerto Rico** | 0.7324076274% |
| Rhode Island | 0.5103269014% |

| | |
|---|---|
| South Carolina | 1.5989037696% |
| South Dakota | 0.2231552882% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.2108633719% |
| Vermont | 0.2998736439% |
| Virgin Islands* | 0.0348486384% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.1707900483% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.2046300910% |

\* Allocations for American Samoa, Guam, N. Mariana Islands, and Virgin Islands are 100% based on population because of lack of available information for the other metrics.

\*\* Allocations for Puerto Rico are 25% based on MMEs and 75% based on population because of lack of available information for the other metrics.

The metrics noted above are calculated as follows:

A.       Amount of Prescription Opioids Sold as Measured by MME

The MME metric reflects the intensity of prescription opioid sales by state over a nine-year period from 2006 to 2014. This measure accounts for the flow of prescription opioids from manufacturers to distributors to pharmacies. The MME metric uses sales data for 12 categories of prescription opioids and was collected in a standardized manner by the Drug Enforcement Administration (DEA) in its Automation of Reports and Consolidated Orders System (ARCOS) database. As part of the National Prescription Opiate Litigation Multi-District Litigation, Case No. 1:17-MD-2804 (N.D. Ohio) (Opioid MDL), the DEA agreed to produce the nine years of data from 2006-2014, which encompassed the peak years of opioid sales in most states. The ARCOS data is standardized by converting data from varying products and prescription strengths into uniform MME totals to accurately reflect higher doses and stronger drugs in the data.

B.       Pain Reliever Use Disorder

This metric consists of the number of people in each state with pain reliever use disorder, as identified by the annual National Survey on Drug Use and Health conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA survey is widely used by federal and other agencies. This metric included all three prior years in which pain reliever use disorder was broken down by state, 2015-2017, and included both people receiving treatment and those who are not.

C.       Overdose Deaths

The overdose death metric includes two measures: (1) overdose deaths caused by opioids and (2) overdose deaths caused by all drugs. The overdose death figures used for the metric are from the years 2007-2017, with data drawn from a database compiled by the Centers for Disease Control and Prevention ("**CDC**"). The CDC database does not adjust for local reporting problems that differ from state to state and over time. To mitigate this data collection issue, figures for all

drug overdose deaths, which captures some unidentified opioid overdoses as well as overdoses unrelated to opioids.

### D.    Population

Population is measured by the 2018 U.S. Census estimate.

### E.    Negotiation Class Metrics

The Opioid MDL Plaintiffs' proposed "negotiation class" metrics weighting factor consists of the Negotiating Class Allocation Model (defined below) applied at the state level.

### ii.    Intrastate Allocation of NOAT Abatement Funds

Each State and its Local Governments will have until (14) fourteen days after the Effective Date of the Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the NOAT Funds for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").   Any State and its Local Governments that have reached agreement before the Effective Date of the Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available for the SAA to be effective for the Purdue Bankruptcy. Any dispute regarding allocation within a State will be resolved as provided by the Statewide Abatement Agreement; *provided* that no Statewide Abatement Agreement may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement.

A Statewide Abatement Agreement shall be agreed when it has been approved by the State and either (a) representatives of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent 15% or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, 15% of or more of the State's incorporated cities or towns), by number.

Population Percentages shall be determined as follows: For States with counties or parishes that function as Local Governments,[1] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population.  A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality.  The

---

[1] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont.  All other States have counties or parishes that function as Local Governments.

Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population. For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.

The Statewide Abatement Agreement will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

A State and its Local Governments may revise, supplement, or refine a Statewide Abatement Agreement by filing an amended Statewide Abatement Agreement that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court

Under the Plan, NOAT Funds allocated to each Non-SAA State are allocated between a "**Regional Apportionment**" and a "**Non-Regional Apportionment.**" The Proportionate Share of the Regional Apportionment for each Region in a Non-SAA State is determined by reference to the aggregate shares of counties (as used herein, the term county includes parishes), and cities or towns in the cases of a Non-SAA States in which counties do not function as Local Governments, in the Region either (i) under the allocation model available at www.opioidnegotiationclass.info that was developed as part of the establishment of a negotiation class procedure implemented in *In re: National Prescription Opiates Litigation*, MDL No. 2804 (N.D. Ohio) (the "**Negotiating Class Allocation Model**"), or (ii) the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), attached hereto as Exhibit 1, (collectively with the Negotiating Class Allocation Model, the "**Allocation Models.**").

a.    The Negotiating Class Allocation Model

The Negotiating Class Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties. The three factors are:

A.    Opioid Use Disorder ("**OUD**"). Under this factor, each county is assigned a percentage derived by dividing the number of people in the county with OUD by the total number of people nationwide with OUD. The Model uses data reported in the National Survey on Drug Use and Health ("**NSDUH**") for 2017. The data is accessible at https://bit.ly/2HqF554.

B.    Overdose Deaths. This factor assigns to each county a percentage of the nation's opioid overdose deaths. The percentage is based on Multiple Causes of Death ("**MCOD**") data reported by the

National Center for Health Statistics ("**NCHS**"), the Centers for Disease Control ("**CDC**") and the Department of Health and Human Services ("**DHHS**"). The data so reported is adjusted using a standard, accepted method (the "**Ruhm Adjustment**") designed to address the well-established under-reporting of deaths by opioids overdose.

C.    Amount of Opioids. This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome. This percentage is based on data reported by the U.S. Drug Enforcement Agency ("**DEA**") in its ARCOS (Automation of Reports and Consolidated Orders System) database. Each county's share of national shipments is multiplied by the higher of two ratios: (1) the ratio of the percentage of people in the county with OUD to the percentage of people nationwide with OUD; or (2) the ratio of the percentage of people in the county who died of an opioids overdose between 2006-2016 to the national percentages of opioids overdose deaths during that time.

The Negotiating Class Allocation Model gives equal weight to each of these factors. Thus, a hypothetical county with an OUD percentage of .3%, and overdose deaths percentage of .2% and an amounts of opioids percentage of .16% would receive an overall allocation of .22%.

Where a county and its cities and towns are unable to reach agreement regarding the sharing of the county's overall allocation, the Negotiating Class Allocation Model provides for such sharing based on how the county and its cities and towns have historically split funding for opioids abatement. This historical analysis employs data reported by the U.S. Census Bureau on local government spending by certain functions. The Negotiating Class Allocation Model assigns to each incorporated city and town a portion of the county's overall allocation based on this historical data.

b.    The Ruhm Allocation Model

The Ruhm Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties. The three factors are:

A.    Number of Persons with Opioid Use Disorder ("**OUD**"). **NSDUH** data from 2007-2016 is used to estimate the number of persons in the state with OUD. The county share of OUD cases was assumed to be the same as its share of opioid-involved overdose deaths, calculated as described in (B) below.

B.    Opioid-Related Overdose Deaths. This factor assigns to each county a percentage of the nation's opioid overdose deaths. The percentage is based on **MCOD** data reported by the **NCHS**, **CDC** and **DHHS**. The data so reported is adjusted using the **Ruhm**

34

**Adjustment** designed to address the well-established under-reporting of deaths by opioids overdose.

C.     Opioid Shipments. This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome. This percentage is based on data reported by the **DEA** in its ARCOS. No additional adjustments are used.

Under the Plan, the Allocation Models' shares of each county in a Region are aggregated. Those aggregate Allocation Model shares are then divided by the total Allocation Model shares for all Regions in the State to determine the subject Region's Proportionate Share. For Non-SAA States in which counties do not function as Local Governments, the Allocation Model shares for each city and town in a Region are aggregated, and the aggregate is divided by the total Allocation Model shares for all cities and towns in the State to determine the Region's Proportionate Share.

On September 30, 2020, the Bankruptcy Court entered the *Order Expanding Scope of Mediation* [D.I. 1756] (the "**Supplemental Mediation Order**"), which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Mediators' Report, as well as to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in Phase 2 of Mediation.

<u>Schedule D</u>

**Oklahoma Local Governments**

| | |
|---|---|
| City of Ada | City of Lawton |
| City of Altus | Le Flore County |
| City of Anadarko | Lincoln County |
| Town of Asher | Logan County |
| Atoka County | Love County |
| Town of Avant | Major County |
| Beckham County | Mayes County |
| City of Bethany | McClain County |
| City of Broken Arrow | Town of McCurtain |
| Caddo County | McCurtain County |
| Choctaw County | City of McLoud |
| Cimarron County | City of Midwest City |
| Town of Clayton | City of Muskogee |
| Cleveland County | Muskogee County |
| Coal County | City of Mustang |
| Town of Colbert | Noble County |
| City of Collinsville | City of Nowata |
| Comanche County | Nowata County |
| Town of Copan | Okfuskee County |
| Craig County | City of Oklahoma City |
| Creek County | Oklahoma County |
| Custer County | Okmulgee County |
| Delaware County | Town of Oologah |
| Dewey County | Osage County |
| Town of Dover | Ottawa County |
| City of Duncan | City of Owasso |
| City of Edmond | Pawnee County |
| City of El Reno | Payne County |
| City of Elk City | Pittsburg County |

City of Enid

City of Garber

Garvin County

Grady County

Greer County

City of Guthrie

Harmon County

Harper County

Town of Haskell

Haskell County

City of Holdenville

Hughes County

Jackson County

Jefferson County

City of Jenks

Johnston County

Kay County

Town of Kingston

Town of Kiowa

Kiowa County

City of Krebs

Latimer County

City of Ponca City

Pottawatomie County

Roger Mills County

Rogers County

City of Savanna

City of Seminole

Seminole County

City of Shawnee

City of Skiatook

Town of Sperry

Stephens County

City of Stillwater

City of Tecumseh

Texas County

Tillman County

City of Tulsa

Tulsa County

Washington County

Town of Welch

Woods County

Woodward County

City of Yukon

**Schedule E**
**Oklahoma Local Government Allocation Percentages**

Table 1: Opioid Settlement Allocation Shares to Oklahoma Counties, Cities and Towns

| Municipal Area | Area % of Total | Municipal Area | Area % of Total |
|---|---|---|---|
| City of Ada | 1.063% | City of Lawton | 0.459% |
| City of Altus | 0.084% | Le Flore County | 1.049% |
| City of Anadarko | 0.296% | Lincoln County | 0.331% |
| Town of Asher | 0.022% | Logan County | 0.702% |
| Atoka County | 0.262% | Love County | 0.133% |
| Town of Avant | 0.003% | Major County | 0.015% |
| Beckham County | 0.233% | Mayes County | 0.617% |
| City of Bethany | 0.322% | McClain County | 0.263% |
| City of Broken Arrow | 2.616% | Town of McCurtain | 0.010% |
| Caddo County | 0.395% | McCurtain County | 0.577% |
| Choctaw County | 0.272% | City of McLoud | 0.088% |
| Cimarron County | 0.043% | City of Midwest City | 1.772% |
| Town of Clayton | 0.019% | City of Muskogee | 2.750% |
| Cleveland County | 0.344% | Muskogee County | 0.141% |
| Coal County | 0.133% | City of Mustang | 0.207% |
| Town of Colbert | 0.066% | Noble County | 0.037% |
| City of Collinsville | 0.160% | City of Nowata | 0.115% |
| Comanche County | 2.865% | Nowata County | 0.101% |
| Town of Copan | 0.001% | Okfuskee County | 0.189% |
| Craig County | 0.133% | City of Oklahoma City | 18.654% |
| Creek County | 1.050% | Oklahoma County | 3.716% |
| Custer County | 0.257% | Okmulgee County | 0.282% |
| Delaware County | 0.310% | Town of Oologah | 0.028% |
| Dewey County | 0.016% | Osage County | 0.598% |
| Town of Dover | 0.000% | Ottawa County | 0.238% |
| City of Duncan | 0.959% | City of Owasso | 0.955% |
| City of Edmond | 1.896% | Pawnee County | 0.292% |
| City of El Reno | 0.257% | Payne County | 0.474% |
| City of Elk City | 0.414% | Pittsburg County | 0.129% |

| | | | |
|---|---|---|---|
| City of Enid | 0.963% | City of Ponca City | 0.578% |
| City of Garber | 0.003% | Pottawatomie County | 0.651% |
| Garvin County | 0.106% | Roger Mills County | 0.074% |
| Grady County | 1.310% | Rogers County | 1.169% |
| Greer County | 0.055% | City of Savanna | 0.002% |
| City of Guthrie | 0.275% | City of Seminole | 0.317% |
| Harmon County | 0.039% | Seminole County | 0.400% |
| Harper County | 0.053% | City of Shawnee | 1.480% |
| Town of Haskell | 0.012% | City of Skiatook | 0.221% |
| Haskell County | 0.207% | Town of Sperry | 0.012% |
| City of Holdenville | 0.111% | Stephens County | 0.554% |
| Hughes County | 0.159% | City of Stillwater | 1.149% |
| Jackson County | 0.643% | City of Tecumseh | 0.103% |
| Jefferson County | 0.175% | Texas County | 0.414% |
| City of Jenks | 0.230% | Tillman County | 0.122% |
| Johnston County | 0.210% | City of Tulsa | 15.192% |
| Kay County | 0.404% | Tulsa County | 6.580% |
| Town of Kingston | 0.043% | Washington County | 0.471% |
| Town of Kiowa | 0.009% | Town of Welch | 0.006% |
| Kiowa County | 0.143% | Woods County | 0.038% |
| City of Krebs | 0.002% | Woodward County | 0.183% |
| Latimer County | 0.330% | City of Yukon | 0.389% |

Note: Fifteen Percent (15%) of each distribution received from NOAT will be held by the Administrator.  Ten Percent (10%) will be maintained as a reserve fund for cities, counties and towns to appeal the amount they are distributed under the model.  All appeals will be decided by a Special Master hired by the Administrator.  Any money not distributed from the 10% reserve fund within a year of a receipt of NOAT shall be distributed pro rata in accordance with the schedule below for "Prorata Distribution for Cities, Towns and Counties of Unused Appeal Funds."  The remaining five percent (5%) shall be paid to the Administrator for expenses incurred and work performed in the distribution of funds, the reporting of the use of funds to NOAT for Approved Opioid Abatement Uses, and to pay the Special Master in connection with the appeals process.

Table 2: Prorata Distribution for Counties, Cities and Towns of Unused Appeal Funds

| Municipal Area | Area % of Total | Municipal Area | Area % of Total |
|---|---|---|---|
| City of Ada | 1.251% | City of Lawton | 0.540% |
| City of Altus | 0.098% | Le Flore County | 1.234% |
| City of Anadarko | 0.348% | Lincoln County | 0.389% |
| Town of Asher | 0.026% | Logan County | 0.826% |
| Atoka County | 0.308% | Love County | 0.156% |
| Town of Avant | 0.003% | Major County | 0.018% |
| Beckham County | 0.274% | Mayes County | 0.726% |
| City of Bethany | 0.379% | McClain County | 0.309% |
| City of Broken Arrow | 3.078% | Town of McCurtain | 0.011% |
| Caddo County | 0.465% | McCurtain County | 0.679% |
| Choctaw County | 0.321% | City of McLoud | 0.104% |
| Cimarron County | 0.050% | City of Midwest City | 2.084% |
| Town of Clayton | 0.022% | City of Muskogee | 3.236% |
| Cleveland County | 0.404% | Muskogee County | 0.166% |
| Coal County | 0.157% | City of Mustang | 0.244% |
| Town of Colbert | 0.078% | Noble County | 0.044% |
| City of Collinsville | 0.188% | City of Nowata | 0.135% |
| Comanche County | 3.371% | Nowata County | 0.118% |
| Town of Copan | 0.001% | Okfuskee County | 0.222% |
| Craig County | 0.157% | City of Oklahoma City | 21.946% |
| Creek County | 1.236% | Oklahoma County | 4.372% |
| Custer County | 0.302% | Okmulgee County | 0.331% |
| Delaware County | 0.365% | Town of Oologah | 0.032% |
| Dewey County | 0.018% | Osage County | 0.704% |
| Town of Dover | 0.000% | Ottawa County | 0.280% |
| City of Duncan | 1.128% | City of Owasso | 1.124% |
| City of Edmond | 2.230% | Pawnee County | 0.343% |
| City of El Reno | 0.303% | Payne County | 0.558% |
| City of Elk City | 0.487% | Pittsburg County | 0.152% |

| | | | |
|---|---|---|---|
| City of Enid | 1.133% | City of Ponca City | 0.680% |
| City of Garber | 0.004% | Pottawatomie County | 0.766% |
| Garvin County | 0.124% | Roger Mills County | 0.087% |
| Grady County | 1.541% | Rogers County | 1.376% |
| Greer County | 0.064% | City of Savanna | 0.002% |
| City of Guthrie | 0.324% | City of Seminole | 0.373% |
| Harmon County | 0.045% | Seminole County | 0.471% |
| Harper County | 0.062% | City of Shawnee | 1.741% |
| Town of Haskell | 0.015% | City of Skiatook | 0.259% |
| Haskell County | 0.244% | Town of Sperry | 0.014% |
| City of Holdenville | 0.131% | Stephens County | 0.652% |
| Hughes County | 0.187% | City of Stillwater | 1.352% |
| Jackson County | 0.756% | City of Tecumseh | 0.122% |
| Jefferson County | 0.205% | Texas County | 0.487% |
| City of Jenks | 0.271% | Tillman County | 0.144% |
| Johnston County | 0.247% | City of Tulsa | 17.873% |
| Kay County | 0.476% | Tulsa County | 7.741% |
| Town of Kingston | 0.050% | Washington County | 0.554% |
| Town of Kiowa | 0.010% | Town of Welch | 0.007% |
| Kiowa County | 0.169% | Woods County | 0.045% |
| City of Krebs | 0.002% | Woodward County | 0.215% |
| Latimer County | 0.388% | City of Yukon | 0.458% |

**Tribe TDP**

# PURDUE PHARMA L.P.

## TRIBE TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the Tribal Abatement Fund Trust ("**TAFT**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in § 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
| | Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe.  The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures. |
| | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for TAFT (the "**TAFT Agreement**"), as applicable. |
| | These terms set forth the manner in which TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the TAFT Agreement.

| Issue | Description |
|---|---|
| **2. PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by TAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the TAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**").

For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

TAFT shall, in accordance with the Plan, the Confirmation Order and the TAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions of Abatement Funds to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set |

| Issue | Description |
|---|---|
| | forth on **Schedule C**, which will immediately contribute such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| 4. **DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Chapter 11 Plan shall provide for the establishment of TAFT and the appointment of Tribe Trustees. The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| 5. **ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| 6. **TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents. <br><br> 2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. <br><br> 3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| 7. **COMPLIANCE, REPORTING,** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved |

| Issue | Description |
|-------|-------------|
| **AUDIT AND ACCOUNTABILITY** | Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level. |
| | 2. TAFT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the TAFT Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court. |
| | 3. The Bankruptcy Court shall have continuing jurisdiction over TAFT, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT. |
| | 4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## Schedule A

(Reserved)

<u>**Schedule B**</u>
<u>**Approved Uses**</u>

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

PART ONE: TREATMENT

---

**A.**    <u>**TREAT OPIOID USE DISORDER (OUD)**</u>

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

8.    Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.    Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.   Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.   Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.   Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.   Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.   Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.    <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.    Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.   Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.   ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.   Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    2.   Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    3.   "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.   Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    5.   Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.   Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.   Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.   Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.   Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.   Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.  Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.  Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.  Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.  Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.  Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.  Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.   PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1. Increase the number of prescribers using PDMPs;

   2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

## G. <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Fund community anti-drug coalitions that engage in drug prevention efforts.

6. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.   Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.   PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.   Public health entities providing free naloxone to anyone in the community.

3.   Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.   Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.   Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.   Public education relating to emergency responses to overdoses.

7.   Public education relating to immunity and Good Samaritan laws.

8.   Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.   Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.   Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.   Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.   Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

## I.      I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.      LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.      A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.      Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.      Provide resources to staff government oversight and management of opioid abatement programs.

## K.      TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.  Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.  Research non-opioid treatment of chronic pain.

3.  Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.  Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.  Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.  Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.  Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.  Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.  Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule C**
**Tribe Beneficiaries and Tribal Allocation Percentages**

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1) PowerPoint summary of the intertribal allocation model

2) One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3) Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011


By:    _____
            Layn R. Phillips

## Allocation of Settlement Among Tribes

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguen̄o Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a

model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.      **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources

and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

> Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

> Example: Part of the Swinomish Tribe's Didgʷáličʼ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population.  15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

**TRIBE OPIOID LLC DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. § 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan.<br><br>To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable.<br><br>These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| **2. PURPOSE** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or |

| Issue | Description |
|---|---|
| | ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| 3. **DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| 4. **ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| 5. **TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, |

- 28 -

| Issue | Description |
|---|---|
| | practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. |
| | 3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level. |
| | 2. The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court. |
| | 3. The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company. |
| | 4. The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

**Schedule A**

(Intentionally Omitted)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
|---|

**A.      TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[6]:

1.      Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.      Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.      Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.      Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.      Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.      Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[6] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.     **<u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.  Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.  Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.  **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.   **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.    PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

     1.      Increase the number of prescribers using PDMPs;

     2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

     3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

**G.      PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic

Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

**H.   PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

## I.      I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.      Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.      LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention

services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.      A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.      Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.      Provide resources to staff government oversight and management of opioid abatement programs.

## K.    TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.      Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.     Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.     Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.     Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.     Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.     Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.     Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule C**
**Tribe Beneficiaries and Tribal Allocation Percentages**

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)  PowerPoint summary of the intertribal allocation model

2)  One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)  Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011

By:  _____
        Layn R. Phillips

**Allocation of Settlement Among Tribes**

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguено Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

### 1.    Traditional Activities Associated with Cultural Identity and Healing

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

> Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

> Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

### 2.    Culturally Competent Integrated Treatment Models

> Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use

disorder (OUD). Didgʷáličʔ provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.      **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for

Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷáličʼ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points:  MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis.  In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together.  85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population.  15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation.  Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census).  In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

**Non-NAS PI TDP**

## INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related Causes of Action against any Debtor, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury or that are similar opioid-related Causes of Action, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered and resolved pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726] in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]    If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]    Submission instructions to be added after solicitation.

**ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**

**A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases
prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more
Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form
attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system
rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI
TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out
Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her
own expense, as set forth in more detail in Exhibit B hereto, and shall forfeit all rights to
liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims
regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under
the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right
to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is
available only with respect to Claims that meet the definition of "PI Claim" set forth in the
Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF
CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND
TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST.
FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL
CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS
LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

**§ 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.**

    (a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS
    Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750
million (minus amounts distributed directly to the United States under the United States-PI
Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300
million on the Effective Date of the Plan and subsequent installments, in each case subject to the
United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a
fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS
PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it
receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate
maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case
subject to applicable PI Trust Deductions and Holdbacks.

    (b)    Claims Administrator.

        (i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1)
        assume all liability for the PI Channeled Claims, (2) hold the MDT PI
        Claim and collect the Initial PI Trust Distribution and payments due under

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer and resolve PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "<u>Trustee</u>"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "<u>Claims Administrator</u>") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)     The Trustee and the Claims Administrator[5] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this Non-NAS PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.   INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant <u>must, with respect to that Non-NAS PI Channeled Claim</u>:

(a)     <u>Hold such Non-NAS PI Channeled Claim against one or more Debtors;</u>

(b)     <u>Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")</u>

(i)     Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying

---

[5]     As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)   Have already timely[6] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)   Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[7] by the date that is 90 days[8] after the Non-NAS PI Claim Form is disseminated[9] to Non-NAS PI Claimants;[10]

(e)   Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)   If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[11]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

---

[6]   If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[7]   In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[8]   Subject to extension in the discretion of the Claims Administrator.

[9]   Within 60 days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[10]  If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[11]  Exhibit F hereto contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[12] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4.   DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

    (a)    A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

    (b)    In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

        (i)    The product's corresponding NDC number, which is set forth in Exhibit E;[13] or

        (ii)    A notation in the record submitted that the product is manufactured or sold by Rhodes or Purdue.

    (c)    A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

        (i)    Oxycodone CR (or controlled release); or

        (ii)    Oxycodone ER (or extended release).

## § 5.   TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence (a)-(e):[14]

---

[12]   Subject to extensions which the Claims Administrator may give in his discretion.

[13]   Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

(a)   Pharmacy prescription records;

(b)   Prescription records, including without limitation:

   (i)   A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

   (ii)   A signed prescription from a doctor for one of the Qualifying Opioids;

(c)   A historical reference to one of the Qualifying Opioids, including but not limited to:[15]

   (i)   A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

   (ii)   A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

   (iii)   A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

   (iv)   A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)   A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

(e)   A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)   If a Non-NAS PI Claimant holds a Non-NAS PI Channeled Claim based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and cannot meet the evidentiary requirements of § 5(a)-(e) above,[16] s/he may still qualify if s/he can demonstrate both of the following:[17]

---

[14]   Subject to the exceptions set forth in provisions (f) and (g) of this Section 5.

[15]   The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

[16]   Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as

(i)     By a declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(ii)    By an *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)     In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates <u>all</u> of the following:

(i)     That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, <u>and</u> all known insurance explanations of benefits. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains required evidence and the basis for that assessment of probability); and

(ii)    By a declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a

---

a minor. In the absence of that historical reference in the medical records, this declaration requirement can be used under the conditions set forth in this subsection.

[17]    Sample affidavits will be made available on the PI Trust website.

third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)   By a supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)   The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)   In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)   Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)   The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

## § 6.    ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" *or* a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)    Easy Payment of $3,500 per qualifying Non-NAS PI Claimant[18] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)    Base Payments and Level Awards to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of Awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.    ADDITIONAL AWARD DETERMINATION.

(a)    Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[19] as follows:

(i)    **Tier 1A**:

A.    Base Payment:

---

[18]    If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

[19]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

1. For a Non-NAS PI Claimant who demonstrates that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

2. Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

    aa. However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

        a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any licensed medical professional;

        b. treatment in a rehabilitation center for opioid use disorder;

        c. overdose, withdrawal, or detox from an opioid;

        d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

        e. use of illegal opioids; or

        f. use of medication-assisted treatment ("MAT") like methadone.

B. Level Awards: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

    1. *Level A*:

        aa. For Non-NAS PI Claimants who demonstrate one or more of the following:

a. Opioid Use Disorder ("OUD");[20]

b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

c. Administration of Narcan, Evzio or Naloxone.

2. *Level B*:

aa.    For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C.    <u>Additional Evidence for Level Awards</u>:

1. If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2. If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3. If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No declarations may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii)    **Tier 1B:** Claims based on opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin qualifies under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim

---

[20]    The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii)   **Tier 2:** Non-NAS PI Claimants must demonstrate use of a qualifying product for 6 months or more; however, the usage does not have to be consecutive.

    A.    Base Payment: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

    B.    Level Awards: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

        1.  *Level A*:

            aa.    For Non-NAS PI Claimants who demonstrate one or more of the following:

                a. Opioid Use Disorder (OUD);

                b. MAT $\geqslant$ 6 months days; or

                c. Administration of Narcan, Evzio or Naloxone.

        2.  *Level B*:

            aa.    For Non-NAS PI Claimants who demonstrate death caused by an opioid.

    C.    Additional Evidence for Level Awards:

        1.  If making a claim for a Tier 2 Level Award based on OUD diagnosis, then medical records—including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a licensed medical or health professional—can serve as additional evidence. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

13

2.  If making a claim for a for a Tier 2 Level Award based on MAT or on Narcan, Evzio or Naloxone use, then pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone can serve as additional evidence. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No declarations may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

3.  If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports can serve as additional evidence. The records do not have to coincide in time with the qualifying product use. No affidavits may be used to meet this requirement.

(iv)   **Tier 3:** Claims based on the use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claims. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.   BASE PAYMENTS AND LEVEL AWARDS.

(a)   Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

(b)   Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

14

|  | Tier 1A

Addiction from Purdue Opioids | Tier 1B

Death on OxyContin | Tier 2

Purdue Opioids Use ≥6 months | Tier 3

No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[21] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[22]** |  |  |  |  |
| **A** | 10,000 pts

OUD Diagnosis, OR MAT for ≥6 months | N/A | 3,000 pts

OUD Diagnosis, OR MAT for ≥6 months | N/A |
| **B** | 20,000 pts

Death from an Opioid | N/A | 20,000 pts

Death from an Opioid | N/A |

## § 9.   ADDITIONAL CLAIM FACTORS AND VALUATION.

(a)   To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

(b)   This grid is based in part on other scoring grids developed in comparable cases with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

(c)   Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

(d)   Only reported injuries are to be scored.

(e)   In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)   Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

---

[21]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[22]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

## § 10.    BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.    CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.    APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

## EXHIBIT A

## SAMPLE CLAIM FORM FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
## PROCEDURE FOR NON-NAS PI CLAIMS

# PURDUE PHARMA PI TDP
# NON-NAS CLAIM FORM
# INSTRUCTIONS PAGE

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed by each Non-NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on its Non-NAS PI Channeled Claim(s).[1]  IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NON-NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NON-NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NON-NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you hold multiple Non-NAS PI Claims against the Debtors on account of injuries to *more than one* person who used opioids, then fill out one Claim Form for each of those Non-NAS PI Claims. If you hold multiple Non-NAS PI Claims on account of multiple injuries to *the same* person who used opioids, then fill out only one Claim Form. One Claim Form submitted for a Non-NAS PI Claim shall be deemed to be a Claim Form in respect of that Non-NAS PI Claim and also any Non-NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that Non-NAS PI Claim.

**Follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. If any section does not pertain to your claim, leave it blank. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth in the Non-NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the Non-NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited Non-NAS PI TDP liquidation process with respect to any Non-NAS PI Claim against one or more of the Debtors, and instead pursue that Non-NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense. You may litigate in court only with respect to a Non-NAS PI Claim held against one or more Debtors, and may not litigate other Non-NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive the Easy Payment or any "Base Payment" or "Level Award." Furthermore, you will not be allowed to opt back in to the Non-NAS PI TDP if your lawsuit is unsuccessful in the tort system. Any final judgment you obtain in the tort system against the Non-NAS PI Trust will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the Non-NAS PI TDP.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out," this Claim Form requires you to choose between receiving an "Easy Payment" of $3,500 or seeking a "Base Payment" and "Level Award." If your Non-NAS PI Claim is eligible for

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Non-NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

payment, then the "Easy Payment" choice will get you money faster, but may not pay as much as a "Base Payment" or "Level Award" would ultimately pay.

By submitting this Claim Form and choosing to liquidate your Claim under the Non-NAS TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the Non-NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [   ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at ███████, or by mailing back the completed Claim Form to ███████

## PURDUE PHARMA PI TDP
## NON-NAS CLAIM FORM

### PART ONE: PERSONAL INFORMATION OF NON-NAS PI CLAIMANT

What is the Claim Number assigned to your claim by Prime Clerk? ███████████████

Please only fill out **one** of the following sections (Section 1.A or 1.B).

- If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), fill out Section 1A.

- If you hold a PI Claim due to use of opioids by a deceased person (or you are completing this form on behalf of such a holder as his/her representative), fill out Section 1.B.

**Section 1.A: If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), then the term "Claimant" in this Claim Form refers to the person who used opioids, whether that is you or the person you represent.  Please fill out the information below:**

Claimant's Name**:** ████████████████████████████

Claimant's Date of Birth: ████████████████████████

Claimant's Address: █████████████████████████████

Claimant's Social Security Number (or Taxpayer ID): ███████████████

**Representative Name (if applicable):** ██████████████████

**Legal Authority for Representative (if applicable):** █████████████
 **(e.g., POA, Legal Guardian, Conservator):**

**Section 1.B: If you are filing a PI Claim due to another's death from use of opioids, or you are completing this form as the representative of an individual with a claim due to another's death from use of opioids, please fill out the information below.**

Name of Deceased Person Who Used Opioids: ████████████████

Address at Time of Death of Deceased
Person Who Used Opioids : ████████████████████████

Date of Birth of Deceased Person Who Used Opioids: ██████████████

Date of Death: ████████████████████████████████

Cause of Death: █████████████████████████████████

Social Security Number (or Taxpayer ID) of Person Who Used Opioids: ██████████

Name of Claimant Filing Claim
on behalf of the Person Who Used Opioids: ████████████████████

Claimant's Address: ████████████████████

Claimant's Relationship to Person Who Used Opioids: ████████████
(i.e., parent, sibling, child, spouse, etc.)

**Representative Name (if applicable):** ████████████████

**Legal Authority for Representative (if applicable):** ████████████
 **(e.g., POA, Legal Guardian, Conservator):**

If a Court has appointed you as Executor, Administrator or Personal Representative of the deceased person's estate, then submit the court order so appointing you along with your Claim Form. If a Court has not appointed you as Executor, Administrator, or Personal Representative of the deceased person's estate, then also execute and submit the appropriate Heirship Declaration attached.

---

## PART TWO: "OPT OUT" OF THE NON-NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have your Non-NAS PI Channeled Claim(s) liquidated under the Non-NAS PI TDP and instead to pursue your Non-NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box. If you "opt out," you will not be eligible to receive an "Easy Payment," "Base Payment," or "Level Award" from the PI Trust.

Mark the following box **only if** you **elect to "opt out" of the Non-NAS PI TDP liquidation process and instead pursue your Non-NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense**:                    ☐

---

## PART THREE: EASY PAYMENT ELECTION (If you selected "Opt Out," then skip this Part Three)

**Section 3.A:** You may elect to receive an "Easy Payment" in lieu of other compensation. If you elect to receive an Easy Payment, you will receive a one-time payment of $3,500 within a reasonably short amount of time after receipt of your Claims Package by the Claims Administrator and resolution of any healthcare liens. The Easy Payment is expected to be free of many but not all types of health care liens. Even if you select the Easy Payment option, you must comply with the requirements of the Non-NAS PI TDP. **WARNING: If you elect to receive an Easy Payment, you are not eligible to receive any additional Awards for your Non-NAS PI Channeled Claims. On the other hand, declining the Easy Payment election and seeking a "Base Payment" and "Level Award" may result in receiving payment at a later date and through installments.**

Mark the following box **only if** you **elect to receive the Easy Payment** and **waive all additional Awards** or compensation:                    ☐

---

**PART FOUR: TIERING AND LEVEL DESIGNATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Four)**

**Section 4.A:** In this section, please mark the tier that applies to your Non-NAS PI Claim. IF MULTIPLE TIERS APPLY, CHECK THE HIGHEST TIER THAT APPLIES TO YOUR CLAIM. Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria.

Highest

**Tier 1B (highest tier):**

☐  You can demonstrate opioid-related death (such as overdose or withdrawal) while on Oxycontin.

**Tier 1A:**

☐  You can demonstrate that addiction, dependence, or substance abuse began while using one of the qualifying opioids.

**Tier 2:**

☐  You can demonstrate use of a qualifying product for 6 months or more (does not have to be consecutive use).

**Tier 3 (lowest tier):**

☐  You can demonstrate use of a qualifying product for less than 6 months and otherwise do not meet the criteria of any of the above tiers.

Lowest

**Section 4.B:** If you selected <u>Tier 1A</u> or <u>Tier 2</u> above, please mark the level designation that applies to your Non-NAS PI Claim. IF BOTH LEVEL B AND LEVEL A APPLY TO YOU, CHOOSE LEVEL B. Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria. (If you checked a Tier 1B or Tier 3 Claim above, SKIP this section.)

Highest

**Level B (highest level):**

☐  You can demonstrate death caused by an opioid (e.g., death caused by overdose or withdrawal).

**Level A (lowest level):**

☐  You can demonstrate (1) a diagnosis of Opioid Use Disorder (OUD), (2) MAT usage of 6 months or more, or (3) administration of Narcan, Evzio, or Naloxone.

Lowest

**PART FIVE: PRESCRIBED MEDICATIONS** (If you selected "Opt Out," SKIP this Part Five)

**Section 5.A:** Identify any of the following Purdue-brand opioids that the person whose opioid use is the subject of your Non-NAS PI Claim was **prescribed.** *Include evidence of the prescriptions when submitting this Claim Form. (A claim may qualify without prescription if the person who used opioids was a minor at the time the use began.)*

|  | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| OxyContin ☐ |  |  |  |
| MSContin ☐ |  |  |  |
| Dilaudid ☐ |  |  |  |
| Butrans ☐ |  |  |  |
| Hysingla ☐ |  |  |  |
| DHC Plus ☐ |  |  |  |
| MSIR ☐ |  |  |  |
| OxyFast ☐ |  |  |  |
| Oxy IR ☐ |  |  |  |
| Palladone ☐ |  |  |  |
| Ryzolt ☐ |  |  |  |
| Rhodes Generic (name) _____ ☐ |  |  |  |

**Section 5.B:** Identify any of the following Medication Assistance Treatment (MAT) drugs prescribed to the person whose opioid use is the subject of your Non-NAS PI Claim. *Include evidence of the prescriptions when submitting this Claim Form.*(If you selected Easy Payment, SKIP this Section.)

|  | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| Buprenorphine: ☐ |  |  |  |
| Butrans: ☐ |  |  |  |
| Methadone: ☐ |  |  |  |
| Suboxone ☐ |  |  |  |
| Zubsoly: ☐ |  |  |  |
| Naltrexone: ☐ |  |  |  |

**Section 5.C:** Identify any of the following medications provided to the person whose opioid use is the subject of your Non-NAS PI Claim during or after an opioid overdose. *Include evidence of the prescriptions or administration when submitting this Claim Form.* **(If you selected Easy Payment, SKIP this Section.)**

| | | Date administered: |
|---|---|---|
| Narcan: | ☐ | |
| Evzio: | ☐ | |
| Naloxone: | ☐ | |

---

**PART SIX: INJURIES SUFFERED BY THE PERSON WHO USED OPIOIDS (If you selected "Opt Out," SKIP this Part Six)**

**WARNING: IF YOU DO NOT CHECK ANY INJURIES ON THIS LIST, THEN YOUR NON-NAS PI CHANNELED CLAIMS WILL BE DISALLOWED AND YOU WILL RECEIVE NO RECOVERY**

**Section 6.A:**

**Please mark all that are applicable to your claim.**

_____ ADDICTION

      Date addiction began: _____

      Opioid that started the addiction: _____

      Diagnosis and Date of Opioid Use Disorder: _____

_____ WITHDRAWALS

      Date(s) withdrawal(s) occurred: _____

_____ OVERDOSE

      Date(s) overdose(s) occurred: _____

_____ JAIL

      Date(s) jail sentence(s) began/ended: _____

      The charge(s): _____

_____ REHAB

      Dates of inpatient or outpatient rehabilitation: _____

## PART SEVEN: MEDICAL PROVIDER INFORMATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Seven)

**Section 7.A:** In this section, please identify information for the medical providers (prescribing doctors and pharmacies) who prescribed opioids to the person whose opioid use is the subject of your Non-NAS PI Claim:

| Name of Prescriber/Pharmacy | Address | City | State | Zip | Date Range From | Date Range To |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

## PART EIGHT: MEDICAL LIENS (If you selected "Opt Out," SKIP this Part Eight)

**Section 8.A:** Did any insurance company pay for medical treatment for the opioid-related injuries that gave rise to your Non-NAS PI Claim?

Yes: ☐

No: ☐

**Section 8.B:** In the last 20 years, was the person whose opioid use is the subject of your Non-NAS PI Claim eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs?  Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the person who used opioids is not listed below, please write in that carrier's name and information at the bottom of the chart.

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare |  |  |  |  |  |  |
| Medicaid |  |  |  |  |  |  |
| Tricare |  |  |  |  |  |  |
| VA |  |  |  |  |  |  |
| Champus |  |  |  |  |  |  |
| Private (Name Below): |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**PART NINE:** **SIGNATURE (You must complete this Part Nine regardless of your elections above)**

**Section 9.A:** **Please sign this section when you have completed this Claim Form.**

Name of person who is signing this form: _____

E-mail address of person who is signing this form: _____

Phone Number of person who is signing this form: _____

I am including the evidence requested above in my submission of this form: ☐

*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

_____

*Signature of Non-NAS PI Claimant (or signature of Representative Completing this Form for a Non-NAS PI Claimant)*

## EXHIBIT B

## PROCEDURES FOR NON-NAS PI CLAIMANTS WHO OPT TO LIQUIDATE THEIR NON-NAS PI CLAIMS IN THE TORT SYSTEM RATHER THAN UNDER THE INDIVIDUAL PURDUE PHARMA L.P. NON-NAS TRUST DISTRIBUTION PROCEDURE

The following procedures shall apply in the case of a Non-NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her Non-NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her Non-NAS PI Claim Form. By so electing, such Non-NAS PI Claimant forfeits any right to have his or her Non-NAS PI Claim liquidated under sections 6 through 9 (inclusive) of the Non-NAS PI TDP, and instead shall have the right to liquidate his or her Non-NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "Non-NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of a Non-NAS PI Claim in the tort system shall be deemed to be an adjudication of that Non-NAS PI Claim and any associated Non-NAS PI Channeled Claims of the Non-NAS PI Claimant regarding the same injuries that are the subject of his or her Non-NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such Non-NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such Non-NAS PI Claim and such associated Non-NAS PI Channeled Claims.

## § 1.    SUITS IN THE TORT SYSTEM.

If a Non-NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her Non-NAS PI Claim, then he or she may elect to liquidate such Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP by checking the box so indicating on his or her Non-NAS PI Claim Form, which Non-NAS PI Claim Form must be filed by the date that is ninety (90) days[2] after the applicable Non-NAS PI Claim Form is disseminated to him/her.[3] If the Non-NAS PI Claimant makes such election, then the Non-NAS PI Claimant may file a lawsuit regarding only his or her Non-NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Non-NAS PI TDP or, if not defined in the Non-NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]    Within sixty (60) days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if the Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, each Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[3]    The filing of a Non-NAS PI Claim Form indicating that a Non-NAS PI Claimant has elected to liquidate his or her Non-NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the Non-NAS PI Claims asserted by such Non-NAS PI Claimant.

[4]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

§ 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the Non-NAS PI Claim arose.

Any such lawsuit shall be filed by the Non-NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of a Non-NAS PI Claim Form so indicating that a Non-NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such Non-NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Non-NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such Non-NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Non-NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If a Non-NAS PI Claimant obtains a judgment on his or her Non-NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the Non-NAS Payment Percentage and Non-

---

[5]   The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6]   Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of a Non-NAS PI Claimant's lawsuit is not a "Non-NAS PI Claim" within the meaning of the Plan.

[7]   In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

NAS Maximum Value (each as defined below), as provided in <u>Section 6</u> below, the deductions as set forth in <u>Section 6</u> below, and the resolution of healthcare liens, as provided in <u>Section 7</u> below.

## § 2.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Non-NAS PI Claim litigated against the PI Trust in the tort system.

## § 3.    NON-NAS MAXIMUM VALUE.

Payment on a Final Judgment for a Non-NAS PI Claim shall not exceed the dollar-equivalent of 120,000 points (the "<u>Non-NAS Maximum Value</u>"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the conversion set forth in section 8 of the Non-NAS PI TDP. As set forth in more detail in the Non-NAS PI TDP, the dollar amount ultimately awarded per point will be determined with reference to the funds remaining in the PI Trust and to the pool of claims remaining against the PI Trust. It will vary depending on how many people choose to opt out their claims and how expensive it is for the PI Trust to defend those claims in the tort system. It will also depend on the payment elections made by those who are liquidating their claims under sections 6 through 9 (inclusive) of the Non-NAS PI TDP. At this time, it is estimated that the dollar award amount per point will be between $0.80 and $1.20.

## § 4.    NON-NAS PAYMENT PERCENTAGE.

A Final Judgment on a Non-NAS Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that Non-NAS PI Claims liquidated under the Non-NAS PI TDP are reduced prior to payment. In other words, a Non-NAS PI Claimant who elects to liquidate his or her Non-NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all Non-NAS PI Channeled Claims entitled to a recovery pursuant to the Non-NAS PI TDP. Based upon the work of the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject-matter experts for the Ad Hoc Group of Individual Victims and other Holders of PI Claims, review of judgments obtained in lawsuits, settlement history, and collaborative discussions with stakeholders, the Base Payments and Level Awards described in the Non-NAS PI TDP represent an estimated pro-rata percentage recovery by PI Claimants holding Allowed PI Channeled Claims of approximately 2.0% (such pro-rata percentage recovery as may be altered over time, the "<u>Non-NAS Payment Percentage</u>"). Accordingly, the initial Non-NAS Payment Percentage is 2.0%.

No Holder of a Non-NAS PI Claim who elects to liquidate his or her Non-NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her Non-NAS PI Claim multiplied by the Non-NAS Payment Percentage in effect at the time of payment (such value so reduced, the "<u>Non-NAS Percentage-Reduced Claim</u>"); *provided, however*, that if there is

a reduction in the Non-NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the Non-NAS PI Trust to pay a Non-NAS PI Claim based on the Non-NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such Non-NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new Non-NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such Non-NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the Non-NAS PI Claimant or the Claimant's Counsel (as applicable).

## § 5.   ADJUSTMENT OF THE NON-NAS PAYMENT PERCENTAGE.

The Non-NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable Non-NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and with the consent of the Oversight Committee, change the Non-NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable Non-NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the Non-NAS Payment Percentage on current estimates of the number, types, and values of Non-NAS PI Channeled Claims, the value of the assets of the PI Trust Non-NAS Fund available for the payment of Allowed Non-NAS PI Channeled Claims pursuant to the Non-NAS PI TDP and amounts due and estimated to become due pursuant to the Non-NAS PI TDP in respect of Final Judgments obtained by Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed Non-NAS PI Channeled Claims and (ii) the Non-NAS Maximum Value to Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the Non-NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the Non-NAS Payment Percentage has not yet been adopted by the Oversight Committee, a Non-NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current Non-NAS Payment Percentage and the proposed Non-NAS Payment Percentage. However, if the proposed Non-NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the Non-NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Non-NAS Payment Percentage is the higher amount and subsequent adopted, the Non-NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the Non-NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the Non-NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the Non-NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust Non-NAS Fund, the Claims Administrator shall make supplemental payments to all Non-NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower Non-NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the Non-NAS PI Channeled Claim in question multiplied by the newly-adjusted Non-NAS Payment Percentage, less all amounts paid previously to the Non-NAS PI Claimant in respect of such Non-NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to a Non-NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such Non-NAS PI Claimant, at such time that the total exceeds $100.00.

## § 6.    PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

A Non-NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust Non-NAS Fund in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the Non-NAS Percentage-Reduced Claim and (ii) the Non-NAS Maximum Value, in each case as then in effect (as described next) (such lesser amount, the "Non-NAS Gross Amount"). A Non-NAS PI Claimant's Non-NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases as and to the extent provided in the PI Trust Agreement, subject to Section 5.8(g) of the Plan, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, which deduction shall be taken by such individual attorney and reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan. The resulting net amount shall be paid to the Non-NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the Non-NAS Percentage-Reduced Claim, the Non-NAS Maximum Value, the Non-NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.   RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.   APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

The special procedures set forth in Exhibit G to the Non-NAS PI TDP shall apply to all Non-NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their Non-NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the Non-NAS PI TDP as Exhibit F.[8]

---

[8]   Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

6

1

## EXHIBIT C

### PROCEDURE FOR DEFICIENCIES AND APPEALS FOR
### THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE
### FOR NON-NAS PI CLAIMS

These procedures apply only to PI Channeled Claims liquidated under sections 6 through 9 (inclusive) of the PI Trust Distribution Procedure for Non-NAS Claims (the "Non-NAS PI TDP"), and are not available for NAS PI Claims or for any PI Claims liquated in the tort system.

**1.01    Curing Deficiencies.**    If the Claims Administrator[1] determines that a claim submitted pursuant to the Non-NAS PI TDP is incomplete, (s)he will notify the PI Claimant and afford a 14-day period to cure any such deficiency.    Such deficiencies include, but are not limited to, failure to sign the Claim Form (Exhibit A to the Non-NAS PI TDP), failure to complete the Claim Form, failure to execute a HIPAA authorization (Exhibit D to the Non-NAS PI TDP), or submission of a declaration that fails to meet the requirements of § 5 of the Non-NAS PI TDP.    If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying Claim.    If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the Non-NAS PI Claimant from receiving all or part of any award (s)he would otherwise be entitled to.

**1.02    Appeals to the Claims Administrator.**    If a Non-NAS PI Claimant is dissatisfied with his/her award determination pursuant to the Non-NAS PI TDP or a determination by the Claims Administrator thereunder to limit or prohibit an award pursuant to the deficiency process described in Section 1.01 above or any other determination made by the Claims Administrator under the Non-NAS PI TDP, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the Non-NAS PI Claimant should identify the determination with which the Non-NAS PI Claimant disagrees and state the reasons for the disagreement. The Non-NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.    Only one appeal is permitted per Proof of Claim.    The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the Non-NAS PI Claimant and/or his/her counsel, as applicable.    In the event that the Claims Office determines that the records submitted in support of the Non-NAS PI Claimant's claim are unreliable, the notification of status shall advise the Non-NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.    The Claims Administrator shall not change the Non-NAS PI TDP allowance criteria.    The Non-NAS PI Claimant shall have the right to appeal any such determination to the Appeals Master as set forth in Section 1.03 herein.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Non-NAS PI TDP.

2

**1.03**    **Appeals to Appeals Master.**    Non-NAS PI Claimants who disagree with the ruling of the Claims Administrator may appeal to the Appeals Master within fourteen (14) days of notice of such ruling by submitting a written statement outlining the Non-NAS PI Claimant's position and why he/she believes the Claims Administrator has erred.    An appeal fee of $1,000 shall be assessed against the Non-NAS PI Claimant's recovery from the PI Trust regardless of the outcome of the appeal.    The Appeals Master shall review only the appeal record and claim file in deciding the appeal.    The Appeals Master shall apply the guidelines and procedures established in the Non-NAS PI TDP, and the appeals process shall not result in any modification of substantive eligibility criteria.    The Appeals Master shall issue a determination on the appeal in writing, which shall be served on the Non-NAS PI Claimant (and his/her counsel, where applicable) and the Claims Administrator.    Decisions of the Appeals Master pursuant hereto are final and binding, and Non-NAS PI Claimants have no further appeal rights beyond those set forth herein.

**EXHIBIT D**

**HIPAA FORMS FOR
THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
PROCEDURE FOR NON-NAS CLAIMS**

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE**

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: █████████████   Date: █████████████

Date of Birth: █████████████   SSN: █████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774     (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time.  I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization.  I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.   Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility  for benefits on my signing of this authorization.  I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524.  I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA.  If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                        Date

Relationship to Patient (If signed by Legal Representative)

<span style="color:red">**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE**</span>

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ███████████████        Date: ███████████████

Date of Birth: ███████████████        SSN: ███████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  <u>If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties</u>):**

    _____

2. The type and amount of information to be used or disclosed as follows:

    The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. <u>If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges</u>).**

    Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**(p) 205-716-3000    (f) 205-716-2364**

5. I understand I have the right to revoke this authorization at any time.  I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization.  I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.   Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility  for benefits on my signing of this authorization.  I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524.  I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA.  If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                    Date

Relationship to Patient (If signed by Legal Representative)

**EXHIBIT E**

**QUALIFYING OPIOIDS FOR**
**THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE**
**FOR NON-NAS PI CLAIMS**

| **Drug Name** | **NDC Labeler and Drug Prefix** |
|---|---|
| OxyContin | 59011-410-[1] |
| OxyContin | 59011-415- |
| OxyContin | 59011-420- |
| OxyContin | 59011-430- |
| OxyContin | 59011-440- |
| OxyContin | 59011-460- |
| OxyContin | 59011-480- |
| OxyContin | 59011-0100- |
| OxyContin | 59011-0103- |
| OxyContin | 59011-0105- |
| OxyContin | 59011-0107- |
| OxyContin | 59011-0109- |
| OxyContin | 43063-0244- |
| OxyContin | 43063-0245- |
| OxyContin | 43063-0246- |
| OxyContin | 43063-0354- |
| Butrans | 59011-750- |
| Butrans | 59011-751- |
| Butrans | 59011-752- |
| Butrans | 59011-757- |
| Butrans | 59011-758- |
| Hysingla ER | 59011-271- |
| Hysingla ER | 59011-272- |
| Hysingla ER | 59011-273- |
| Hysingla ER | 59011-274- |
| Hysingla ER | 59011-275- |
| Hysingla ER | 59011-276- |
| Hysingla ER | 59011-277- |
| MS Contin | 42858-515- |
| MS Contin | 42858-631- |
| MS Contin | 42858-760- |
| MS Contin | 42858-799- |
| MS Contin | 42858-900- |
| MS Contin | 00034-0513- |
| MS Contin | 00034-0514- |
| MS Contin | 00034-0515- |

---

[1] Pharmacies may include an additional "0" in the second segment of NDC Labeler and Drug Prefixes, such that, in respect of eight digit NDC Labeler and Drug Prefixes listed herein (for example, 59011-410-), a pharmacy record may include a "0" as a ninth digit (for example, 59011-0410).

| MS Contin | 00034-0516- |
| MS Contin | 00034-0517- |
| MS Contin | 16590-884- |
| Dilaudid | 42858-122- |
| Dilaudid | 42858-234- |
| Dilaudid | 42858-338- |
| Dilaudid | 42858-416- |
| Dilaudid | 76045-009- |
| Dilaudid | 76045-010- |
| Dilaudid | 0074-2414- |
| Dilaudid | 0074-2415- |
| Dilaudid | 0074-2416- |
| Dilaudid | 0074-2426- |
| Dilaudid | 0074-2451- |
| Dilaudid | 0074-2452- |
| OxyIR | 59011-0201- |
| OxyFast | 59011-0225- |
| MSIR | 00034-0518- |
| MSIR | 00034-0519- |
| MSIR | 00034-0521- |
| MSIR | 00034-0522- |
| MSIR | 00034-0523- |
| Palladone | 59011-0312- |
| Palladone | 59011-0313- |
| Palladone | 59011-0314- |
| Palladone | 59011-0315- |
| Buprenorphine | 42858-353- |
| Buprenorphine | 42858-493- |
| Buprenorphine | 42858-501- |
| Buprenorphine | 42858-502- |
| Buprenorphine | 42858-586- |
| Buprenorphine | 42858-750- |
| Buprenorphine | 42858-839- |
| Hydromorphone Hydrochloride | 42858-301- |
| Hydromorphone Hydrochloride | 42858-302- |
| Hydromorphone Hydrochloride | 42858-303- |
| Hydromorphone Hydrochloride | 42858-304- |
| Morphine Sulfate | 42858-801- |
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-804- |
| Morphine Sulfate | 42858-805- |
| Morphine Sulfate | 0904-6557- |
| Morphine Sulfate | 0904-6558- |
| Morphine Sulfate | 0904-6559- |
| Morphine Sulfate | 35356-833- |
| Morphine Sulfate | 35356-836- |
| Morphine Sulfate | 35356-838- |
| Morphine Sulfate | 42858-801- |

| | |
|---|---|
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-810- |
| Morphine Sulfate | 42858-811- |
| Morphine Sulfate | 42858-812- |
| Morphine Sulfate | 61919-966- |
| Morphine Sulfate | 67296-1561- |
| Morphine Sulfate | 68084-157- |
| Morphine Sulfate | 68084-158- |
| Morphine Sulfate | 16590-966- |
| Oxycodone Hydrochloride | 0406-0595- |
| Oxycodone Hydrochloride | 0093-0031- |
| Oxycodone Hydrochloride | 0093-0032- |
| Oxycodone Hydrochloride | 0093-0033- |
| Oxycodone Hydrochloride | 0093-5731- |
| Oxycodone Hydrochloride | 0093-5732- |
| Oxycodone Hydrochloride | 0093-5733- |
| Oxycodone Hydrochloride | 0093-5734- |
| Oxycodone Hydrochloride | 0115-1556- |
| Oxycodone Hydrochloride | 0115-1557- |
| Oxycodone Hydrochloride | 0115-1558- |
| Oxycodone Hydrochloride | 0115-1559- |
| Oxycodone Hydrochloride | 0115-1560- |
| Oxycodone Hydrochloride | 0115-1561- |
| Oxycodone Hydrochloride | 0115-1562- |
| Oxycodone Hydrochloride | 0591-2693- |
| Oxycodone Hydrochloride | 0591-2708- |
| Oxycodone Hydrochloride | 0591-3503- |
| Oxycodone Hydrochloride | 0781-5703- |
| Oxycodone Hydrochloride | 0781-5726- |
| Oxycodone Hydrochloride | 0781-5767- |
| Oxycodone Hydrochloride | 0781-5785- |
| Oxycodone Hydrochloride | 10702-801- |
| Oxycodone Hydrochloride | 10702-803- |
| Oxycodone Hydrochloride | 42858-001- |
| Oxycodone Hydrochloride | 42858-002- |
| Oxycodone Hydrochloride | 42858-003- |
| Oxycodone Hydrochloride | 42858-004- |
| Oxycodone Hydrochloride | 42858-005- |
| Oxycodone Hydrochloride | 49884-136- |
| Oxycodone Hydrochloride | 49884-137- |
| Oxycodone Hydrochloride | 49884-138- |
| Oxycodone Hydrochloride | 49884-197- |
| Oxycodone Hydrochloride | 60505-3537- |
| Oxycodone Hydrochloride | 60505-3538- |
| Oxycodone Hydrochloride | 60505-3539- |
| Oxycodone Hydrochloride | 60505-3540- |
| Oxycodone Hydrochloride | 60951-0702- |
| Oxycodone Hydrochloride | 60951-0703- |

| | |
|---|---|
| Oxycodone Hydrochloride | 60951-0705- |
| Oxycodone Hydrochloride | 60951-0710- |
| Oxycodone Hydrochloride | 63304-400- |
| Oxycodone Hydrochloride | 63304-401- |
| Oxycodone Hydrochloride | 67296-1376- |
| Oxycodone Hydrochloride | 67296-1560- |
| Oxycodone Hydrochloride | 68774-0161- |
| Oxycodone Hydrochloride | 68774-0162- |
| Oxycodone Hydrochloride | 68774-0163- |
| Oxycodone Hydrochloride | 68774-0164- |
| Oxycodone Hydrochloride | 00093-0024- |
| Oxycodone Hydrochloride | 00093-0031- |
| Oxycodone Hydrochloride | 00093-0032- |
| Oxycodone Hydrochloride | 00093-0033- |
| Oxycodone Hydrochloride | 00115-1644- |
| Oxycodone Hydrochloride | 00172-6354- |
| Oxycodone Hydrochloride | 00172-6355- |
| Oxycodone Hydrochloride | 00172-6356- |
| Oxycodone Hydrochloride | 00172-6357- |
| Oxycodone Hydrochloride | 00591-3501- |
| Oxycodone Hydrochloride | 00591-3502- |
| Oxycodone Hydrochloride | 00591-3503- |
| Oxycodone Hydrochloride | 00591-3504- |
| Oxycodone Hydrochloride | 52152-0408- |
| Oxycodone Hydrochloride | 52152-0409- |
| Oxycodone Hydrochloride | 52152-0410- |
| Oxycodone Hydrochloride | 52152-0411- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-040- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-139- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-201- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-202- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-203- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-238- |
| Oxycodone/Acetaminophen | 42858-102- |
| Oxycodone/Acetaminophen | 42858-103- |
| Oxycodone/Acetaminophen | 42858-104- |

**EXHIBIT F**

**HEIRSHIP DECLARATION FOR
THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
PROCEDURE FOR NON-NAS PI CLAIMS**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| **SD-1** | **SWORN DECLARATION:** <br> SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "<u>PI Claimant</u>") regarding the opioid-related death of another person (the "<u>Decedent</u>"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|
| | | | | |
| **Social Security Number** | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | **Date of Death** | ___/___/___ <br> (Month/Day/Year) |
| **Residence/Legal Domicile Address at Time of Death** | Street | | | |
| | City | | State | Zip Code |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|
| **Your Social Security Number** | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | |
| **Prime Clerk POC Number assigned to your PI Claim** | | | | |
| **Your Address** | Street | | | |
| | City | | State | Zip Code |
| **Your Relationship to Decedent** | | | | |
| **Basis of Your Authority to Act for the Decedent** | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

## HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | | III.   HEIRS AND BENEFICIARIES OF DECENDENT (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | |
|---|---|---|---|

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

|   | Name | Information | | |
|---|------|-------------|---|---|
| **4.** |  | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** |  | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

## IV.  PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e) No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g) I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids. The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct. I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** | ____/____/____ <br>(Month/Day/Year) |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I.    DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | Date of Death | ____/____/____ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II.    PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

1

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECEDENT <br> (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | |
|---|---|---|
|  | Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified. |
| | **Name** | **Information** |

| | Name | | Information |
|---|---|---|---|
| **1.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |
| **2.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |
| **3.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |

3

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

## IV.    PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)   I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)   No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)   I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)   I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

|  | V.   PI CLAIMANT SIGNATURE | | |
|---|---|---|---|
| **Signature** | | **Date** | _____/_____/_____ <br> (Month/Day/Year) |

## EXHIBIT G

## DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to Section 2 below. The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP. The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by Section 5 below). These actions include, where

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI Claimant, making

a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to

the PI Trust on behalf of a Minor Claimant shall include along with such submission

documentation of his/her authority to act on behalf of the Minor Claimant, consisting of

the following:

a. If the purported Proxy is the Guardian of the Minor Claimant, then the court order

appointing that Proxy as Guardian, or other documents reasonably acceptable to the

Claims Administrator as sufficient under applicable law to evidence the

guardianship.

b. If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn

statement that such Proxy is the custodial parent of the Minor Claimant.

c. If the purported Proxy is neither the Guardian nor custodial parent of the Minor

Claimant, then a sworn statement by the purported Proxy that he/she is providing

custody and care to the Minor Claimant, stating for how long he/she has been

providing such care and custody, explaining his/her relationship to the Minor

Claimant and the circumstances around the provision of care and custody, as well

as a statement and/or records from one or more of the following in support of his/her

sworn statement:

1. Minor Claimant's school

2. Purported Proxy's landlord or property manager

3. Minor Claimant's health provider

4. Minor Claimant's child care provider

5.  Purported Proxy's placement agency

6.  Governmental social services agency

7.  Indian tribe officials

8.  Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

3.  **Distributions to Minor Claimants.**    When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known).  Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined.  Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

4.  **Payments of attorneys' fees.**

Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery.  It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses.  Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5.  **Early Distributions.**  Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**NAS PI TDP**

**INDIVIDUAL PURDUE PHARMA L.P.**
**PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS**

## § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related Causes of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related Causes of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726] in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

1

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "NAS Opt-Out Claimant"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

## § 2.   ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]   If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]   Submission instructions to be added after solicitation.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)    The Trustee and the Claims Administrator[4] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as

---

[4]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.    INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)    Hold such NAS PI Channeled Claim against one or more Debtors;

(b)    Have already timely[5] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)    Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("NAS"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)    Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[6] after the NAS PI Claim Form is disseminated[7] to NAS PI Claimants;[8]

---

[5]    If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("WV NAS Claimants") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

[6]    Subject to extension in the discretion of the Claims Administrator.

[7]    Within 60 days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

4

      (e)      Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

      (f)      If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[9]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[10] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

      (a)      To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

          (i)      A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

          (ii)     A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

          (iii)    Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid

---

[8]    If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[9]    Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[10]   Subject to extension in the discretion of the Claims Administrator.

exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

(b)    The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[11] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)    The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)    If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.   AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a

---

[11]    Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

### § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

### § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

### § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

### § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are

deemed unreliable.  In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.

## EXHIBIT A

## SAMPLE CLAIM FORM FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST
## DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS

# PURDUE PHARMA PI TDP
# NAS CLAIM FORM
# INSTRUCTIONS PAGE

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed for each NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (the "PI Trust") on its NAS PI Channeled Claim(s).[1]  IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you represent the interests of an NAS Child and are seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on account of an that NAS Child's NAS PI Channeled Claim(s), you must complete this Claim Form (the "Claim Form") and return the form as instructed below.  If you do not complete the form, you will NOT qualify to receive funds on behalf of the child you represent.

If you believe that the NAS Child you represent holds multiple NAS PI Claims against the Debtors on account of multiple injuries, you should still submit only one Claim Form. One Claim Form submitted for a NAS PI Claim shall be deemed to be a Claim Form in respect of that NAS PI Claim and also any NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that NAS PI Claim.

If you represent the interests of more than one NAS Child, you must file a Claim Form on behalf of each individual NAS Child.  YOU CANNOT file one Claim Form on behalf of multiple children.

**Please follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth on this Claim Form and further detailed in the NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited NAS PI TDP liquidation process with respect to any NAS PI Claim against one or more of the Debtors, and instead pursue that NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense.  You may litigate in court only with respect to a NAS PI Claim held against one or more Debtors, and may not litigate any other NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive any distribution under the streamlined liquidation procedures of the NAS PI TDP. Furthermore, you will not be allowed to opt back in to the liquidation provisions of the NAS PI TDP if your lawsuit is unsuccessful in the tort system. In other words, if you lose your lawsuit, you cannot return to the NAS PI Trust and ask for money.  And importantly, if you do

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

obtain a judgment in a court against the PI Trust, that award will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the NAS PI TDP.  See the procedures set forth in Exhibit B to the NAS PI TDP for more detail.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out:" If your claim is Allowed by the Claims Administrator of the PI Trust, your claim will be liquidated and paid according to the NAS PI TDP.  If your claim is Disallowed by the Claims Administrator, you will not receive a distribution from the PI Trust.  All claimants whose NAS PI Channeled Claims are Allowed by the Claims Administrator shall receive an equal distribution from the PI Trust NAS Fund, subject to the deductions described in the NAS PI TDP.

By submitting this Claim Form and choosing to liquidate your NAS PI Claim under the NAS PI TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [  ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at ███████████, or by mailing back the completed Claim Form to ████████████

# PURDUE PHARMA PI TDP
# NAS CLAIM FORM

**PART ONE: PERSONAL INFORMATION OF NAS PI CLAIMANT AND HIS/HER REPRESENTATIVE**

What is the Claim Number assigned to the NAS Child's claim by Prime Clerk? ██████████

**Section 1.A: Fill out the information of the NAS Child below:**

NAS Child's Name**:** ████████████████████

NAS Child's Date of Birth: ████████████████████

NAS Child's Address: ████████████████████

NAS Child's Social Security Number (or taxpayer ID): ████████████████

**Section 1.B: Fill out your own information below:**

Your Name: ████████████████████

Your Date of Birth: ████████████████████

Your Address: ████████████████████

Your Social Security Number: ████████████████████

Your Phone Number: ████████████████████

State whether you are the "natural parent," "legal guardian," or "other custodian" of the NAS Child: ████████████████████

- 3 -

## PART TWO: "OPT OUT" OF LIQUIDATION UNDER THE NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have the NAS PI Claimant's NAS PI Channeled Claim(s) liquidated under the NAS PI TDP and instead pursue the NAS PI Claimant's NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box and provide the additional information sought in this PART TWO.  **WARNING:** Mark the box in this paragraph of PART TWO **only if** you **elect to "opt out" of the NAS PI TDP liquidation process and instead pursue your NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense.**

☐    **I have checked this box to opt out of the liquidation procedures of the NAS PI TDP and the PI Trust NAS Fund.**

## PART THREE: MEDICAL PROVIDER INFORMATION  (skip this section if you elected to "opt out")

**Section 3.A:** This section concerns licensed medical providers who have diagnosed the NAS Child with any medical, physical, cognitive or emotional condition resulting from his/her intrauterine exposure to opioids or opioid replacement or treatment medication(s).  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").   Fill out and provide the following information, if known:

| Name of Licensed Medical Provider | Address | City | State | Zip | Date of Diagnosis | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Section 3.B:**  Even if you do not know the information sought in Section 3.A, **please include with your submission of this Claim Form Competent Evidence that a licensed medical provider has diagnosed the NAS PI Claimant with any medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication(s).**  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").  The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselors or therapists, or professionals at a rehabilitation center.  Evidence can include, among other things, medical records evidencing that the NAS Child had a NAS diagnosis, including post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

**Section 3.C:** **Was the NAS Child born in a medical facility? If so:**

Name of the Facility where
the NAS Child was born:        ████████████████████

Location (city and state)
where the NAS Child was born:  ████████████████████

---

**PART FOUR: MEDICAL LIENS** (skip this section if you elected to "opt out")

**Section 4.A:** **Did any insurance company pay for medical treatment for the NAS Child's opioid-related injuries?**

Yes:   ☐

No:    ☐

**Section 4.B:** **In the last 20 years, was the NAS Child eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs?  Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the NAS Child is not identified, please fill in that carrier's name and information at the bottom of the chart.**

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare | | | | | | |
| Medicaid | | | | | | |
| Tricare | | | | | | |
| VA | | | | | | |
| Champus | | | | | | |
| Private   (Name Below): | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**PART FIVE: SIGNATURE (You must complete this Part Five regardless of your elections above)**

**Please fill out and sign this section when you have completed this Claim Form.**

NAS Child's Name:            _____

NAS Child's E-mail (if any):  _____

NAS Child's Phone Number (if any):  _____

Your Name: _____

Your E-mail: _____

Your Phone Number: _____


I am including the evidence requested in Section 3.B above in my submission of this form: ☐


*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

_____

*Signature of NAS PI Claimant or individual acting on behalf of the NAS PI Claimant*

## EXHIBIT B

## PROCEDURES FOR NAS PI CLAIMANTS WHO OPT TO LIQUIDATE THEIR NAS PI CLAIMS IN THE TORT SYSTEM RATHER THAN UNDER THE INDIVIDUAL PURDUE PHARMA L.P. NAS TRUST DISTRIBUTION PROCEDURE

The following procedures shall apply in the case of an NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her NAS PI Claim Form. By so electing, such NAS PI Claimant forfeits any right to have his or her NAS PI Claim liquidated under the liquidation provisions of the NAS PI TDP, and instead shall have the right to liquidate his or her NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of an NAS PI Claim in the tort system shall be deemed to be an adjudication of that NAS PI Claim and any associated NAS PI Channeled Claims of the NAS PI Claimant regarding the same injuries that are the subject of his or her NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such NAS PI Claim and such associated NAS PI Channeled Claims.

## § 1.   SUITS IN THE TORT SYSTEM.

If an NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her NAS PI Claim, then he or she may elect to liquidate such NAS PI Claim in the tort system rather than under the NAS PI TDP by checking the box so indicating on his or her NAS PI Claim Form, which NAS PI Claim Form must be filed by the date that is one hundred and fifty (150) days[2] after the applicable NAS PI Claim Form is disseminated to him/her.[3] If the NAS PI Claimant makes such election, then the NAS PI Claimant may file a lawsuit regarding only his or her NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the NAS PI Claim arose.

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the NAS PI TDP or, if not defined in the NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]   Within sixty (60) days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if the NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, each NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

[3]   The filing of an NAS PI Claim Form indicating that an NAS PI Claimant has elected to liquidate his or her NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the NAS PI Claims asserted by such NAS PI Claimant.

[4]   The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

Any such lawsuit shall be filed by the NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of an NAS PI Claim Form so indicating that an NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If an NAS PI Claimant obtains a judgment on his or her NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the applicable NAS Payment Percentage and NAS Maximum Value (each as defined below), as provided in Section 6 below, the deductions as set forth in Section 6 below, and the resolution of healthcare liens, as provided in Section 7 below.

---

[5]   The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6]   Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of an NAS PI Claimant's lawsuit is not an "NAS PI Claim" within the meaning of the Plan.

[7]   In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

## § 2. LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any NAS PI Claim litigated against the PI Trust in the tort system.

## § 3. NAS MAXIMUM VALUE.

Payment on a Final Judgment for an NAS Child shall not exceed $21,000 (the "NAS Maximum Value") which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for a given NAS PI Claim.

## § 4. NAS PAYMENT PERCENTAGE.

A Final Judgment on an NAS PI Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that NAS PI Claims liquidated under the NAS PI TDP are reduced prior to payment. In other words, an NAS PI Claimant who elects to liquidate his or her NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all NAS PI Channeled Claims entitled to a recovery pursuant to the NAS PI TDP. Subject to Section 5.2(c) of the Plan, the estimated awards for NAS PI Claims liquidated under the NAS PI TDP represent an estimated pro-rata percentage recovery by NAS PI Claimants holding Allowed NAS PI Channeled Claims of approximately 2% (such pro-rata percentage recovery as may be altered over time, the "NAS Payment Percentage"). The initial NAS Payment Percentage is 2%.

No Holder of an NAS PI Claim who elects to liquidate his or her NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her NAS PI Claim multiplied by the NAS Payment Percentage in effect at the time of payment (such value so reduced, the "NAS Percentage-Reduced Claim"); provided, however, that if there is a reduction in the NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the NAS PI Trust Fund to pay an NAS PI Claim based on the NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the NAS PI Claimant or the NAS PI Claimant's Counsel (as applicable).

## § 5. ADJUSTMENT OF THE NAS PAYMENT PERCENTAGE.

The NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and

with the consent of the Oversight Committee, change the NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the NAS Payment Percentage on current estimates of the number of NAS PI Channeled Claims, the value of the assets of the PI Trust NAS Fund available for the payment of Allowed NAS PI Channeled Claims pursuant to the NAS PI TDP and amounts due and estimated to become due pursuant to the NAS PI TDP in respect of Final Judgments obtained by NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed NAS PI Channeled Claims and (ii) the NAS Maximum Value to NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the NAS Payment Percentage has not yet been adopted by the Oversight Committee, a NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current NAS Payment Percentage and the proposed NAS Payment Percentage. However, if the proposed NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed NAS Payment Percentage is the higher amount and subsequent adopted, the NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust NAS Fund, the Claims Administrator shall make supplemental payments to all NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the NAS PI Channeled Claim in question multiplied by the newly-adjusted NAS Payment Percentage, less all amounts paid previously to the NAS PI Claimant in respect of such NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to an NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such NAS PI Claimant, at such time that the total exceeds $100.00.

## § 6.  PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

An NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust NAS Fund, in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the NAS Percentage-Reduced Claim (using the NAS Payment Percentage then in effect) and (ii) the NAS Maximum Value (such lesser amount, the "NAS Gross Amount"). A NAS PI Claimant's NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan and the Trust Agreement, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[8] The resulting net amount shall be paid to the NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the NAS Percentage-Reduced Claim, the NAS Maximum Value, the NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.  RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.  APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

The special procedures set forth in Exhibit E to the NAS PI TDP shall apply to all NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the NAS PI TDP as Exhibit D.[9]

---

[8]  Your individual attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from the award.

[9]  Exhibit D contains two declaration forms. One applies if the NAS-Decedent named the NAS PI Claimant as executor in his/her will; the other applies if the NAS Decedent had no will.

**EXHIBIT C**

**SAMPLE HIPAA FORMS FOR
THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST
DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS**

**<span style="color:red">SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE</span>**

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ██████████████     Date: ████████████████

Date of Birth: ██████████████     SSN: ████████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  <u>If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties</u>):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. <u>If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges</u>).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774    (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                    Date

Relationship to Patient (If signed by Legal Representative)

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE**

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ███████████      Date: ████████████

Date of Birth: ██████████████      SSN: ██████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
501 Riverchase Parkway East, Suite 100
Hoover, Alabama 35244
(p) 205-716-3000   (f) 205-716-2364

5. I understand I have the right to revoke this authorization at any time.  I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization.  I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.  Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures.  I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization.  I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524.  I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA.  If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                        Date

Relationship to Patient (If signed by Legal Representative)

## EXHIBIT D

## SAMPLE HEIRSHIP DECLARATIONS FOR
## THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST
## DISTRIBUTION PROCEDURE FOR NAS PI CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-1 | SWORN DECLARATION:<br>SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I.   DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | Date of Death | ___/___/___<br>(Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II.   PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

1

## HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | | III.    HEIRS AND BENEFICIARIES OF DECEDENT (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |
|---|---|---|

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | |
|---|---|---|---|
| **4.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |
| **5.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

## IV.  PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a)  I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b)  I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c)  No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d)  The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e)  No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f)  I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g) I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.    PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** | ____/____/____ <br> (Month/Day/Year) |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-2 | SWORN DECLARATION:<br>DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I.    DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| **Social Security Number** | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | **Date of Death** | ____/____/____ <br>(Month/Day/Year) | |
| **Residence/Legal Domicile Address at Time of Death** | Street | | | | |
| | City | | State | Zip Code | |

## II.    PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| **Your Social Security Number** | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | | | |
| **Prime Clerk POC Number assigned to your PI Claim** | | | | | |
| **Your Address** | Street | | | | |
| | City | | State | Zip Code | |
| **Your Relationship to Decedent** | | | | | |
| **Basis of Your Authority to Act for the Decedent** | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.
[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

1

Exhibit B

## HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECENT |
|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **2.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| **3.** | | Address | |
| | | Relationship to Decedent | |
| | | Notified of Settlement? | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |

## HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | |
|---|---|---|---|
| **4.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |
| **5.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |

| **IV.  PI CLAIMANT CERTIFICATION** |
|---|

This Sworn Declaration is an official document for submission to the PI Trust.  By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)  I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

|  | V.   PI CLAIMANT SIGNATURE | | |
| --- | --- | --- | --- |
| **Signature** | | **Date** | ____/____/____ <br> (Month/Day/Year) |

**EXHIBIT E**

**DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]**

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to paragraph 2 below. The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP. The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by paragraph 5 below). These actions include, where permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

Claimant, making a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to the PI Trust on behalf of a Minor Claimant shall include along with such submission documentation of his/her authority to act on behalf of the Minor Claimant, consisting of the following:

   a. If the purported Proxy is the Guardian of the Minor Claimant, then the court order appointing that Proxy as Guardian, or other documents reasonably acceptable to the Claims Administrator as sufficient under applicable law to evidence the guardianship.

   b. If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn statement that such Proxy is the custodial parent of the Minor Claimant.

   c. If the purported Proxy is neither the Guardian nor custodial parent of the Minor Claimant, then a sworn statement by the purported Proxy that he/she is providing custody and care to the Minor Claimant, stating for how long he/she has been providing such care and custody, explaining his/her relationship to the Minor Claimant and the circumstances around the provision of care and custody, as well as a statement and/or records from one or more of the following in support of his/her sworn statement:

      1. Minor Claimant's school

      2. Purported Proxy's landlord or property manager

      3. Minor Claimant's health provider

      4. Minor Claimant's child care provider

5. Purported Proxy's placement agency

6. Governmental social services agency

7. Indian tribe officials

8. Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

3. **Distributions to Minor Claimants.**   When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known).   Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined.   Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

4. **Payments of attorneys' fees.**

Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery. It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses. Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5. **Early Distributions.** Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**PI Futures TDP**

## PURDUE PHARMA L.P.
## TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS

### § 1.    APPLICABILITY AND PURPOSE.

This trust distribution procedure for Future PI Channeled Claims (as defined below) (the "PI Futures TDP") sets forth the manner in which Future PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Futures Trust.[1] Distributions in respect of Future PI Channeled Claims shall be exclusively in the form of Distributions from the PI Futures Trust to Holders of Allowed Future PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Future PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Futures Trust as of the Effective Date of the Plan: any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the subject matter described in subclause (i) of Sections 10.6(b) and 10.7(b) of the Plan), the Estates or the Chapter 11 Cases, and that is not (i) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (ii) held by a Domestic Governmental Entity or (iii) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business. Pursuant to section 6.21 of the Plan, in the event a Holder of a Future PI Channeled Claim seeks payment at any time on account of such Claim as to which no Proof of Claim was filed before the General Bar Date and/or for which no motion seeking leave or order granting leave to file a late Proof of Claim was filed or entered before the Confirmation Date, or as to which no Proof of Claim was required to be filed, such Person shall not be entitled to any payment or distribution on account of such Future PI Channeled Claim unless the Bankruptcy Court, by Final Order, first determines that such Person has a Future PI Channeled Claim that is or was channeled to the PI Futures Trust under the Master TDP and grants such Holder leave to assert such Future PI Channeled Claim against such the PI Futures Trust.

Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from the PI Futures Trust. Holders of Future PI Channeled Claims are referred to herein as "Future PI Claimants."

### § 2.    PI FUTURES TRUST AND TRUSTEE.

### a)    Allocations of Funds to the PI Futures Trust.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726] in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Under the Plan, the PI Futures Trust will receive a distribution of $5 million (the "PI Futures Trust Distribution").

**b) PI Futures Trust.**

The PI Futures Trust shall be established in accordance with section 5.7 of the Plan to (i) assume all liability for the Future PI Channeled Claims, (ii) collect the PI Futures Trust Distribution in accordance with the PI Futures Trust Documents, (iii) administer Future PI Channeled Claims, (iv) make Distributions on account of Allowed Future PI Channeled Claims in accordance with the PI Futures Trust Documents, and (v) carry out such other matters as are set forth in the PI Futures Trust Documents. The trustee of the PI Futures Trust (the "Trustee") is Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, and he will carry out the duties of the Trustee as set forth in the Plan and PI Futures Trust Documents.

## § 3.    SUITS IN THE TORT SYSTEM.

Subject to satisfaction of section 6.21 of the Plan, Future PI Claimants have the right to commence a lawsuit in the tort system against the PI Futures Trust with respect to any Future PI Channeled Claim which, prior to channeling, was held against a Debtor or would have been held against a Debtor but for the Releases and Channeling Injunction pursuant to the Plan. Such lawsuit may be commenced against only the PI Futures Trust (and including no other parties as defendants[2]) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[3] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which such Future PI Channeled Claim arose.

Any such lawsuit must be filed by the applicable Future PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[4] All defenses (including, with respect to the PI Futures Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[5]

A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim formerly held or that would have been held against a non-Debtor party.

---

[2]    For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the Assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to, or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Futures Trust or at any other time.

[3]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Future PI Claimants against the PI Futures Trust must be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[4]    The Trustee shall be empowered (i) to bring one or more consolidated actions against multiple Future PI Claimants and (ii) to seek to consolidate multiple lawsuits commenced by individual Future PI Claimants.

[5]    Among other things, the PI Futures Trust shall be empowered to assert that the claim that is the subject of a Future PI Claimant's lawsuit is not a "Future PI Channeled Claim" within the meaning of the Plan.

However, any Distribution to a Future PI Claimant on a Final Judgment (as defined below) in respect of his or her Future PI Channeled Claim formerly held or that would have been held (but for the Releases and Channeling Injunction pursuant to the Plan) against a Debtor is deemed to be a distribution in satisfaction of all Future PI Channeled Claims held by such Future PI Claimant with respect to the injuries that are the subject of his or her Future PI Channeled Claim against a Debtor.

Subject to the commencement of a lawsuit in the tort system against the PI Futures Trust by a Future PI Claimant that is not barred by section 6.21 of the Plan, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit(s) as discovery material. Any Future PI Claimant that has commenced such a lawsuit will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Future PI Claimant who propounds on the PI Futures Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such Future PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Future PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Futures Trust shall not be liable for any costs incurred by parties other than the PI Futures Trust in connection with third-party discovery propounded by any party other than the PI Futures Trust.[6]

If Future PI Claimant obtains a judgment against the PI Futures Trust on his or her Future PI Channeled Claim in the tort system and such judgment becomes a Final Order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Futures Trust, subject to the applicable limitations of Sections 4 through 10, inclusive, of this PI Futures TDP. No other Future PI Channeled Claims shall be Allowed.

## § 4.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Future PI Channeled Claim litigated against the PI Futures Trust in the tort system.

---

[6]    In order to minimize costs incurred by the PI Futures Trust in connection with third-party discovery, the Trustee shall be empowered to seek to consolidate discovery propounded by Future PI Claimants or the PI Futures Trust in multiple lawsuits.

## § 5. NAS FUTURE PI CHANNELED CLAIMS AND NON-NAS FUTURE PI CHANNELED CLAIMS

If a Future PI Claimant obtains a Final Judgment on his or her Future PI Channeled Claim, the Trustee shall determine, in his or her sole discretion and in accordance with the definitions set forth herein, whether such Future PI Channeled Claim is a "NAS Future PI Channeled Claim" or a "Non-NAS Future PI Channeled Claim," defined as follows:

- A "NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child.

- A "Non-NAS Future PI Channeled Claim" is a Future PI Channeled Claim that is not an NAS Future PI Channeled Claim.

## § 6. NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 6 only applies to NAS Future PI Channeled Claims.

### a) NAS Maximum Value.

Payment on a Final Judgment issued in respect of an NAS Future PI Channeled Claim shall not exceed $21,000 (the "NAS Maximum Value"), which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for an NAS PI Claim that is Allowed under the NAS PI TDP.

### b) NAS Payment Percentage.

A Final Judgment issued in respect of an NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the NAS Payment Percentage, as defined in Exhibit B to the NAS PI TDP. As discussed in Exhibit B to the NAS PI TDP, the initial NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of an NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her NAS Future PI Channeled Claim multiplied by the NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced NAS Future PI Channeled Claim").

### c) NAS Future Award

A Future PI Claimant who obtains a Final Judgment on an NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the NAS Maximum Value, and (ii) the Percentage-Reduced NAS Future PI Channeled Claim (the "NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

4

An NAS Future Award is payable by the PI Futures Trust in a single lump sum, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced NAS Future PI Channeled Claim, the NAS Maximum Value, or the NAS Future Award is subject to any appeal or reconsideration.

## § 7.    NON-NAS MAXIMUM VALUE, PAYMENT PERCENTAGE AND AWARD

This Section 7 applies only to Non-NAS Future PI Channeled Claims.

### a)   Non-NAS Maximum Value.

Payment on a Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim shall not exceed the dollar-equivalent of 120,000 points (the "Non-NAS Maximum Value"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the dollar-award-per-point then in effect as set forth in Section 8 of the Non-NAS PI TDP.

### b)   Non-NAS Payment Percentage.

A Final Judgment issued in respect of a Non-NAS Future PI Channeled Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the Non-NAS Payment Percentage, as defined in Exhibit B to the Non-NAS PI TDP. As discussed in Exhibit B to the Non-NAS PI TDP, the initial Non-NAS Payment Percentage is 2.0% and is subject to change as set forth therein.

No Holder of a Non-NAS Future PI Channeled Claim shall receive a payment that exceeds the liquidated value of his or her Non-NAS Future PI Channeled Claim multiplied by the Non-NAS Payment Percentage then in effect (such value so reduced, the "Percentage-Reduced Non-NAS Future PI Channeled Claim").

### c)   Non-NAS Future Award.

A Future PI Claimant who obtains a Final Judgment on a Non-NAS Future PI Channeled Claim shall be entitled to receive from the PI Futures Trust, in full and final satisfaction of that Final Judgment, an amount equal to the *lesser* of (i) the Non-NAS Maximum Value then in effect and (ii) the Percentage-Reduced Non-NAS Future PI Channeled Claim (the "Non-NAS Future Award"), subject to any reductions or reserves taken in accordance with Section 8 hereof.

A Non-NAS Future Award is payable by the PI Futures Trust in a single lump sum payment, subject to Sections 8, 9 and 10 below. The PI Futures Trust shall pay such Non-NAS Future Award reasonably promptly following a judgment becoming a Final Judgment and the Trustee's

reasonable satisfaction that any applicable healthcare liens have been satisfied pursuant to Section 9 below. In no event shall the PI Futures Trust pay interest in respect of any judgment obtained in the tort system.

None of the Percentage-Reduced Non-NAS Future PI Channeled Claim, the Non-NAS Maximum Value, or the Non-NAS Future Award is subject to any appeal or reconsideration.

## § 8.   PI FUTURES TRUST OPERATING EXPENSES

The Creditor Trust Operating Expenses of the PI Futures Trust shall be paid solely from the PI Futures Trust. Creditor Trust Operating Expenses of the PI Futures Trust, including any amounts due to the Trustee in respect of indemnification and reimbursement as described in Section 5.7(m) of the Plan, shall be paid on an ongoing basis with first priority before any payments hereunder are made on Allowed Future PI Channeled Claims. The Trustee shall also be entitled to reserve a reasonable amount of funds needed to wind down the PI Futures Trust, indemnify the Trustee for claims that may be brought against the Trustee in the future, and any other reserves for future costs or expenses that the Trustee reasonably believes are necessary before making payments hereunder on any Allowed Future PI Channeled Claim.

If insufficient funds remain in the PI Futures Trust to pay one or more outstanding Non-NAS Future Awards and/or NAS Future Awards that are otherwise ripe for payment hereunder, the Trustee shall, after reserving funds as necessary pursuant to the preceding paragraph, use any remaining funds to pay all such outstanding awards a pro-rata portion of their face value, in full and final satisfaction of such Final Judgments.

## § 9.   RESOLUTION OF HEALTH CARE LIENS.

The PI Futures Trust shall not issue any payment on a Non-NAS Future Award or NAS Future Award until the Trustee has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 10.   APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

If a Future PI Claimant is a minor under applicable law at the time amounts are payable by the PI Futures Trust to such Future PI Claimant under this PI Futures TDP, any such amounts shall be paid at such time, to such recipient, and in such manner as ordered by the court that issued the Final Judgment, by a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or by the United States Bankruptcy Court for the Southern District of New York.  Anyone seeking a Distribution from the PI Futures Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached hereto as Exhibit A.[7]

---

[7]   Exhibit A contains two declaration forms. One applies if the Decedent named the Future PI Claimant as executor in his or her will; the other applies if the Decedent had no will.

## EXHIBIT A

## SAMPLE HEIRSHIP DECLARATIONS FOR THE PURDUE PHARMA L.P. TRUST DISTRIBUTION PROCEDURE FOR FUTURE PI CHANNELED CLAIMS

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME.  ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| **SD-1** | **SWORN DECLARATION:** **Signatory is Executor Under Decedent's Last Will and Testament** |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "Future PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last Will and Testament of the Decedent.

## I.    DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|
| | | | | |

| Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| | Date of Death | ___ / ___ / ___ (Month/Day/Year) |
|---|---|---|---|

| Residence/Legal Domicile Address at Time of Death | Street | | |
|---|---|---|---|
| | City | State | Zip Code |

## II.    FUTURE PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|

| Your Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| |
|---|---|

| Prime Clerk POC Number assigned to your PI Claim | |
|---|---|

| Your Address | Street | | |
|---|---|---|---|
| | City | State | Zip Code |

| Your Relationship to Decedent | |
|---|---|
| Basis of Your Authority to Act for the Decedent | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. |
|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | III.    HEIRS AND BENEFICIARIES OF DECEDENT | |
|---|---|---|
| | **(ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED)** | |
| | Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified. | |
| | **Name** | **Information** |
| **1.** | | **Address** |
| | | **Relationship to Decedent** |
| | | **Notified of distribution?** ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |
| **2.** | | **Address** |
| | | **Relationship to Decedent** |
| | | **Notified of distribution?** ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |
| **3.** | | **Address** |
| | | **Relationship to Decedent** |
| | | **Notified of distribution?** ☐ Yes. How Notified: _____ ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| IV. FUTURE PI CLAIMANT CERTIFICATION |
|---|

This Sworn Declaration is an official document for submission to the PI Futures Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e) No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f) I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(g)  I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h)  No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust in respect of the injuries of the Decedent.

(i)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j)  I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

## V.    FUTURE PI CLAIMANT SIGNATURE

| Signature | | Date | ____/____/____ (Month/Day/Year) |
|---|---|---|---|

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

**THIS IS A SAMPLE DECLARATION FORM. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PURDUE PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, A FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI FUTURES TRUST.[1]**

| SD-2 | SWORN DECLARATION:<br>DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a Future PI Channeled Claim[2] (and thus are a "Future PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

### I.  DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | Date of Death | ____/____/____ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

### II.  FUTURE PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|_\|_\|_\| - \|_\|_\| - \|_\|_\|_\|_\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.
[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (as modified, amended or supplemented from time to time, the "Plan") [ECF No. 3726].

1

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death. |
|---|---|
|  |  |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | | | |
|---|---|---|---|
| **III.   HEIRS AND BENEFICIARIES OF DECENT** | | | |
| **(ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED)** | | | |

Use the space below to identify the name and address of all persons who may have a legal right to share in any distributions from the PI Futures Trust on account of injuries of the Decedent. Also state if and how you notified these persons of such expected distribution, or the reason they cannot be notified.

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ |
| | | | ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ |
| | | | ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ |
| | | | ☐ No. Why Not: _____ |

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of distribution?** | ☐ Yes. How Notified: _____ | |
| | | | ☐ No. Why Not: _____ | |

## IV.    FUTURE PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Futures Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI Futures TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the trustee of the PI Futures Trust (the "PI Futures Trustee") immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

# HEIRSHIP DECLARATION FOR PURDUE PI FUTURES TDP

(f) I am not aware of any objections to my appointment and service as the Future PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g) No person notified under Section III objects to my serving as the Future PI Claimant and taking such steps as required by the PI Futures TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids. The persons named in Section III are all of the persons who may have a legal right to share in any distributions issued by the PI Futures Trust on account of the injuries of the Decedent.

(h) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of distributions in respect of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i) I will indemnify and hold harmless the PI Futures Trust, the PI Futures Trustee, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI Futures Trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct. I understand that the PI Futures Trustee and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| **V. FUTURE PI CLAIMANT SIGNATURE** | | |
|---|---|---|
| **Signature** _____ | **Date** | _____/_____/_____ <br> (Month/Day/Year) |

**Master TDP**

**MASTER DISBURSEMENT TRUST**
**MASTER TRUST DISTRIBUTION PROCEDURES**

SECTION 1.    APPLICABILITY.

Pursuant to the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "Master TDP"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2.    PROCEDURES GENERALLY.

This Master TDP provides procedures pursuant to which (a) each Channeled Claim shall automatically be further channeled to and assumed exclusively by a Creditor Trust in accordance with Sections 3 through 9 of this Master TDP or shall otherwise be Disallowed and released in full pursuant to Section 12 of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions (other than the Public Schools' Special Education Initiative Contribution) and distribute the TopCo Interests to the National Opioid Abatement Trust ("NOAT") and the Tribal Abatement Fund Trust ("TAFT"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered and resolved pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to any Protected Party, including from the Master Disbursement Trust.

SECTION 3.    NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1    Non-Federal Domestic Governmental Channeled Claims Defined.

A Non-Federal Domestic Governmental Channeled Claim is (a) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

3.2     Channeling of Non-Federal Domestic Governmental Channeled Claims to NOAT.

On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered and resolved solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3     Effective Date Distributions to NOAT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution (*less* the Public Schools' Special Education Initiative Contribution) to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4.    TRIBE CHANNELED CLAIMS.

4.1     Tribe Channeled Claims Defined.

A Tribe Channeled Claim is (a) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim ("Tribe Claim"), or (b) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2     Channeling of Tribe Channeled Claims to TAFT.

On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered and resolved solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

4.3     Effective Date Distributions to TAFT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC

("Tribe Opioid LLC") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

SECTION 5.   HOSPITAL CHANNELED CLAIMS.

5.1   Hospital Channeled Claims Defined.

A Hospital Channeled Claim is (a) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (b) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2   Channeling of Hospital Channeled Claims to the Hospital Trust.

On the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered and resolved solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3   Effective Date Distributions to the Hospital Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

SECTION 6.   THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1   Third-Party Payor Channeled Claims Defined.

A Third-Party Payor Channeled Claim is (a) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims include Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors, but do not include (i) Federal Government Unsecured Claims, or (ii) claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2  <u>Channeling of Third-Party Payor Channeled Claims to the TPP Trust</u>.

On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered and resolved solely pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3  <u>Effective Date Distribution to the TPP Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7.   NAS MONITORING CHANNELED CLAIMS.

7.1  <u>NAS Monitoring Channeled Claims Defined</u>.

An NAS Monitoring Channeled Claim is (a) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (b) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2  <u>Channeling of NAS Monitoring Claims to the NAS Monitoring Trust</u>.

On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered and resolved solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3  <u>Effective Date Distribution to the NAS Monitoring Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8.   PI CHANNELED CLAIMS.

8.1  <u>NAS PI Channeled Claims Defined</u>.

An NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related Cause of Action

4

against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2   <u>Channeling of NAS PI Channeled Claims to the PI Trust</u>.

On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

8.3   <u>Non-NAS PI Channeled Claims Defined</u>.

A Non-NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4   <u>Channeling of Non-NAS PI Channeled Claims to the PI Trust</u>.

On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered and resolved solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5   <u>Effective Date Distribution to the PI Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9.   FUTURE PI CHANNELED CLAIMS.

9.1   Future PI Channeled Claims Defined.

A Future PI Channeled Claim is any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date) (including but not limited to the subject matter described in subclauses (i) through (vi) of Sections 10.6(b) and 10.7(b) of the Plan), and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim, a Hospital Channeled Claim or an Administrative Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2   Channeling of Future PI Channeled Claims to the PI Futures Trust.

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered and resolved solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3   Effective Date Distribution to the PI Futures Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

SECTION 11. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION 12. DETERMINATION BY THE BANKRUPTCY COURT.

In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.

## DEBTORS/NEWCO OPERATING INJUNCTION

## I.    DEFINITIONS

A.    "Bankruptcy Court" or "Court" shall mean the court presiding over the chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (Bankr. S.D.N.Y.).

B.    "CDC Guideline Recommendations" shall mean the 12 enumerated Recommendations published by the U.S. Centers for Disease Control and Prevention (CDC) for the prescribing of opioid pain medication for patients 18 and older in primary care settings as part of its 2016 Guideline for Prescribing Opioids for Chronic Pain (CDC Guidelines), as updated or amended by the CDC.

C.    "Chapter 11 Plan of Reorganization" or "Plan of Reorganization" or "Plan" shall mean the Eleventh Amended Plan filed on August 31, 2021 as may be further amended in *In re Purdue Pharma L.P.*.

D.    "Company" shall mean the Debtors as defined in these chapter 11 proceedings *In re Purdue Pharma L.P. et al.*, Case No. 19-23649-RDD (S.D.N.Y.).  Following the Effective Date, "Company" shall mean "NewCo," a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

E.    "Confirmation Order" shall mean the order of the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan.

F.    "Downstream Customer Data" shall mean transaction information that the Company collects relating to the Company's direct customers' sales to downstream customers, including but not limited to chargeback data tied to the Company providing certain discounts, "867 data," and IQVIA data.

G.    "Effective Date" means the date on which the Plan of Reorganization becomes effective.

H.    "Governance Covenants" shall have the meaning set forth in NewCo's Operating Agreement.

I.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, medical practice, hospital, clinic or pharmacy.

J.    "Including but not limited to," when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

K.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

L.      "Lobby" shall mean to engage in "lobbying activities" or "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq*., and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this injunction, "Lobby" includes Lobbying directly or indirectly, through grantees or Third Parties.

M.      "NewCo Disposition Event" shall have the meaning assigned to the term "Disposition Event" as set forth in the NewCo Operating Agreement.

N.      "NewCo Operating Agreement" shall have the meaning set forth in the Plan of Reorganization.

O.      "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium.  For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone and nalmefene.

P.      "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the Drug Enforcement Administration (DEA) as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act, including but not limited to codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, oxymorphone, tapentadol, and tramadol.

Q.      "OUD" shall mean opioid use disorder defined in the *Diagnostic and* Statistical *Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

R.      "PHI Product(s)" shall have the meaning set forth in the NewCo Operating Agreement, which for the avoidance of doubt includes, buprenorphine-naloxone combination tablets, over-the-counter naloxone nasal spray, injectable nalmefene, and any other medicines as determined by NewCo's Board provided that such medicines must be approved by the FDA for treatment of opioid addiction and/or reversing opioid overdoses, but for purposes of this injunction does not include methadone and generic versions of Subutex® sublingual buprenorphine tablets.

S.      "Promote," "Promoting," and "Promotion" shall mean dissemination of information or other practices intended or that could be reasonably anticipated to influence prescribing practices in a manner that increases sales, prescriptions, or the utilization of prescription products.

T.      "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

U.      "Section" shall mean, unless the context requires otherwise, a Section of this injunction.

V.      "Shareholder Released Parties" shall mean the Estate of Beverly Sackler, David A. Sackler, Ilene Sackler, the Estate of Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are

beneficiaries, and the trustees thereof (solely in their capacities as such), each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors, and in the event of the death of a Shareholder Released Party who is a natural person, other than a natural person who is a Shareholder Released Party solely in the capacity as a trustee, the estate of such person.

W.      "State Monitor Committee" shall mean a bipartisan, volunteer committee comprising representatives from 5-7 States.

X.      "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder, final DEA administrative decisions that are published in the Federal Register, and analogous state laws and regulations.

Y.      "Third Party" shall mean any person or entity other than the Company or a government entity.

Z.      "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

## II.    SCOPE AND ENFORCEMENT

A.      This injunction shall apply to and be binding on NewCo on the Effective Date; and on any transferee or successor to, or subsequent operator of, all or any portion of NewCo's Opioid business (a "Transferee/Successor") as set forth below.

B.      The Debtors and NewCo consent to the entry of a final judgment or consent order, substantially in the form of this injunction, imposing all of the provisions of this injunction in each state and territorial court on the Debtors, NewCo and any Transferee/Successor, at any time after the Effective Date (the "Consent Judgment"), as well as to the jurisdiction of those state and territorial courts with respect to a Consent Judgment. A Consent Judgment shall apply to and be binding on NewCo after the Effective Date; and on any Transferee/Successor.

C.      Until this injunction is effective, the Voluntary Injunction initially entered on November 6, 2019 in *Purdue Pharma L.P. v. Massachusetts*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y) as Exhibit 1 to the Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction and re-entered thereafter, shall remain in full force and effect on the Company and NewCo.

D.      Without limiting the foregoing:

1.      NewCo shall be required to obtain the consent of any Transferee/Successor to be bound by this injunction and to submit to the jurisdiction of this Court and each state and territorial court for enforcement of the terms of this injunction as a condition to a transfer of all or any portion of NewCo's Opioid business.

2.    Nothing in this injunction applies to the operation of a Transferee/Successor's pre-existing Opioid business. Any Transferee/Successor shall be subject only to Sections III.A-C and III.E-H.

3.    Nothing requires that this injunction be enforced exclusively in this Court or limits the jurisdiction of any state or territorial court to enforce the terms of this injunction.

## III.    INJUNCTIVE RELIEF

**A.    Ban on Promotion**

1.    The Company shall not engage in the Promotion of Opioids or Opioid Products, including but not limited to, by:

   a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients.

   b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products.

   c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that include references to Opioids or Opioid Products.

   d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products.

   e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides.

   f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

   g.    Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products, including by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

   h.    Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

2.     Notwithstanding Sections III.A.1 and III.C, the Company may:

a.     Maintain corporate websites.

b.     Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider; Risk Evaluation and Mitigation Strategy (REMS) materials; and contact information to report an adverse event or product complaint.

c.     Provide information or support the provision of information as expressly required by law, settlement, court order or any state or federal government agency, including providing all information necessary in order for the Company to comply with its regulatory obligations pursuant to the Federal Food, Drug, and Cosmetic Act or the Controlled Substances Act, and/or provide information about legal proceedings involving the Company.

d.     Engage and compensate Health Care Providers or other Third Parties to assist the Company in responding to, preparing for and participating in any of the following activities held by any state or federal government or state or federal agencies or regulators, including the FDA: advisory committees, working groups, meetings and or/hearings.

e.     Provide the following by mail, electronic mail, on or though the Company's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, REMS materials or other prescribing information for Opioid Products that are published by a state or federal government agency. State materials may be provided only within the applicable state.

f.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider concerning Opioid Products consistent with the  recommendations set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011, as updated or amended by the FDA) and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009, as updated or amended by the FDA). Such responses should be handled by medical or scientific personnel at the Company who are independent from the sales or marketing departments.

g.     Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling and to the extent that the question cannot be answered solely by reference

5

to a specific provision of the FDA-approved labeling, providing a response that is truthful, balanced, non-misleading and fully consistent with the FDA-approved labeling or recommending the patient or caregiver speak with a licensed Health Care Provider without naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product.

h.      Provide information to a payor, formulary committee, distributor, or other similar entity with knowledge and expertise in the area of health care economics concerning the cost or availability of a Company Opioid Product, including the costs compared to the cost of an Opioid Product manufactured or distributed by another company.  Such information may include information about the stocking of the Opioid Product as described in the FDA-approved labeling; tier status; applicable prescribing guidelines that are consistent with the FDA-approved labeling; step-edits for Opioid Products; restrictions; and/or prior authorization status concerning an Opioid Product.  Provided further that information provided pursuant to this subparagraph shall also be posted on the website permitted by Section III.A.2.b, except for information that is commercially sensitive or otherwise confidential, which instead shall be provided to the Monitor and the State Monitor Committee.

i.      Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation in accordance with applicable requirements, settlement with a governmental entity, or court order, through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of the Company.

j.      Provide rebates, discounts, fees and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, Managed Care Plans and Pharmacy Benefit Managers, except as prohibited by Section III.E.

k.      Promote PHI Products, and provide information about, discuss, or comment on, issues regarding mechanisms for preventing opioid abuse and misuse, including the prevention, education and treatment of opioid overdose. Except that the Company shall not:

(i) Employ or contract with sales representatives to detail PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs) who are compensated based on sales or volume of PHI Products. The Company will document interactions related to PHI Products between Company sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications; and/or

6

(ii) In addition to Section III.A.2.k.i, with regard to PHI Products that are Opioid Products indicated for the treatment of substance abuse disorders, employ or contract with sales representatives to detail such PHI Products (i.e., through direct interaction, whether in-person or virtual, with individual prescribing or dispensing health care professionals or their staffs). Nothing in this Section III.A.2.k.ii shall be construed to prohibit personal contact between non-sales representatives of the Company and health care professionals or their staffs regarding PHI Products that are Opioids. The Company will document interactions regarding PHI Products that are Opioids between Company non-sales representatives and health care professionals or their staffs and will retain documents and information relating to those communications.

(iii) Any and all documents and information relating to communications related to the activities described in Subsections (i) and (ii) of this Section III.A.2.k shall be provided to the Monitor at his request for his review.

(iv) Nothing in this section shall be construed to permit the Promotion of methadone or generic versions of Subutex® sublingual buprenorphine tablets except pursuant to Sections III.A.2.a-j.

3.   The Company shall not engage in the following specific Promotional activity relating to any products for the treatment of Opioid-induced side effects except as permitted by Section III.A.2.k, above:

   a.   Employing or contracting with sales representatives or other persons to Promote products for the treatment of Opioid-induced side effects to Health Care Providers or patients.

   b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of products for the treatment of Opioid-induced side effects.

   c.   Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to products for the treatment of Opioid-induced side effects except as required by REMs, court orders or settlements.

   d.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

   e.   Engaging in any other Promotion of products for the treatment of Opioid-induced side effects in a manner that encourages the utilization of Opioids or Opioid Products or normalizes the use of Opioids or Opioid Products for chronic pain.

7

    f.    Utilizing electronic health records software or other digital health platforms to create alerts, workflows, or disseminate information known or reasonably expected to increase utilization of Opioids or Opioid Products.

4.    Notwithstanding Section III.A.3, the Company may Promote Senokot® and Colace® or other non-prescription products to treat constipation so long as such Promotion does not explicitly or implicitly associate the product with Opioids or Opioid Products except for linking to the FDA label associated with that product.

5.    Treatment of Pain

    a.    The Company shall not, either through the Company or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

    b.    The Company shall not, either through the Company or through Third Parties, Promote the concept that pain is undertreated in a manner that directly or indirectly encourages the use of Opioids or Opioid Products.

6.    To the extent that the Company engages in conduct permitted by Section III.A.2, the Company shall do so in a manner that is:

    a.    Consistent with the CDC Guideline Recommendations, as applicable.

    b.    Truthful, not misleading, accurate, and not deceptive.

7.    For the avoidance of doubt, nothing in this injunction shall be construed or used to prohibit the Company from taking legal or factual positions in litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal or administrative proceedings or prohibit or limit the Company's right to make public statements or respond to media reports or inquiries relating to any litigation, bankruptcy proceedings, investigations, regulatory actions, or other legal, administrative, or legislative proceedings.

## B.    No Reward or Discipline Based on Volume of Opioid Sales

1.    The Company shall not provide financial or non-financial incentives to its employees or discipline its employees based upon sales volume or sales quotas for Opioid Products.

2.    The Company shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or through a Third Party, to or from any person in return for the prescribing, sale, use or distribution of an Opioid Product. For the avoidance of doubt, this subparagraph shall not prohibit the provision of rebates and/or chargebacks to the extent permitted by Section III.A.2.j.

3.    The Company's compensation policies and procedures shall be designed to ensure compliance with this injunction and other legal requirements.

8

## C.    Ban on Funding/Grants to Third Parties

Except with respect to PHI Products:

1.      The Company shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for the purpose of Promoting Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, including educational programs or websites that Promote Opioids, Opioids Products, the Treatment of Pain or products intended to treat Opioid-related side effects, but excluding financial support otherwise allowed by this injunction, including REMS, settlements, and court orders or as required by a federal or state agency.

2.      The Company shall not operate, control, create, sponsor, provide financial support or In-Kind Support to any medical society or patient advocacy group relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects, except with regard to REMS or to comply with settlements, court orders, or federal or state law.

3.      The Company shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects.

4.      The Company shall not use or pay any Third Party to engage in any activity that the Company itself would be prohibited from engaging in pursuant to the injunction.

5.      The Company shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or likely effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      The Company shall not compensate or provide In-Kind Support to Health Care Providers or organizations to advocate for formulary access or treatment guideline changes that would have the effect of increasing access to any Opioid Product by third-party payors, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. For the avoidance of doubt, nothing herein shall prohibit the Company from compensating Third Parties for engaging in conduct otherwise permitted under this injunction

7.      No current director, officer, or management-level employee of the Company may serve as a director, board member, employee, agent, or officer of any entity that engages in Promotion relating to Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except insofar as such service would be consistent with Section III.A.2. or III.A.4, or except for services relating to (i) the treatment of OUD, (ii) the prevention, education or treatment of

opioid abuse, addiction or overdose, including medication-assisted treatment for opioid addiction and/or (iii) rescue medication for opioid overdose.

8. The Company shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that principally engages in Promotion relating to any Opioids, Opioid Products, the Treatment of Pain, or products intended to treat Opioid-related side effects except as otherwise permissible under Section III.A.4.

9. The Company shall ensure that any employee serving on the board of any organization that engages in lobbying or educating state and federal officials on policies and regulations, the impact of which would be to more easily enable or Promote the use of Opioids or Opioid Products, recuse himself/herself from any board discussion or decisions relating to Opioids, including any determinations the organization may make related to lobbying efforts with respect to opioids. Further, the Company shall ensure that any such employees will refrain from participation in any working group of such organization that focus on the Promotion of Opioids or Opioid Products or which focus on issues that would otherwise not be permitted under this injunction.

10. For the avoidance of doubt, nothing in Section III.C shall be construed or used to prohibit the Company from providing financial or In-Kind Support to:

    a. medical societies and patient advocate groups, who are principally involved in issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

    b. universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (i) the treatment of OUD; (ii) the prevention, education, and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (iii) rescue medications for opioid overdose.

## D. Lobbying Restrictions

1. The Company shall not Lobby for or against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that:

    a. Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

    b. Would have the effect of limiting access to any non-Opioid alternative pain treatments;

    c. Pertains to the prohibitions against misbranding or adulteration in the Federal Food, Drug, and Cosmetic Act; or

10

d.     Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.    The Company shall not directly, or by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation that supports:

a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid therapy, including but not limited to Third Party payment or reimbursement for such therapies;

b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid therapy is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions;

c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to Third Party reimbursement or payment for such prescription;

d.     The limitation of initial prescriptions of Opioids to treat acute pain;

e.     The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone;

f.     The use of urine testing before starting Opioid therapy and annual urine testing when Opioids are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.     Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for Opioid Use Disorder, including but not limited to third party reimbursement or payment for such treatment; or

h.     The implementation or use of Opioid drug disposal systems that have proven efficacy for the Company's Opioid Products.

i.     The Company shall not directly, or indirectly by employing or controlling a Third Party, Lobby against the enactment of any federal, state or local legislation or promulgation of any rule or regulation limiting the operation or use of prescription drug monitoring programs ("PDMPs"), including, but not limited to, provisions requiring Health Care Providers to review PDMPs when Opioid therapy is initiated and with every prescription thereafter.

j.     The Company shall not establish any Political Action Committees or make campaign contributions to candidates for political office at any time prior to the NewCo Disposition Event.

11

3.    Provided, however, that nothing in Section III.D of this injunction limits the Company from:

   a.    Challenging the enforcement of, or suing to stop the enactment of, or for declaratory or injunctive relief with respect to any legislation, rules or regulations;

   b.    Responding to a statute, rule, regulation, or order requiring such communication;

   c.    Appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order, or subpoena commanding that person to testify;

   d.    Responding, in a manner consistent with this injunction, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to the Company from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

   e.    Responding to unsolicited requests from the DEA, the FDA, or any other Federal or state agency and/or participating in FDA or other agency panels at the request of the agency;

   f.    Communicating with governmental officials regarding access to, availability of, procurement of, or use of PHI Products.

   g.    Monitoring any pending or proposed legislation, rule or regulation relating to its business, including directly or indirectly through grantees or Third Parties.

4.    The Company shall not Lobby by affirmatively advocating either for or against the enactment of any federal, state, or local legislation or promulgation of any rule or regulation or the appointment of any individual to public office, unless NewCo's Board shall have determined that the request comports with the Company's Purpose (as defined in the NewCo Operating Agreement). If NewCo's Board so determines, then the Company shall provide advance notice to the Monitor of its intention to Lobby on the issue. The Monitor shall then have the sole and absolute discretion to direct that the activity not take place if the Monitor exercises such discretion and determines that the request approved by the NewCo Board (a) is expressly prohibited by the terms of this injunction, or (b) does not reasonably comport with the Company's Purpose (as defined in the NewCo Operating Agreement). Nothing in Section III.D.4 shall permit advocacy that is otherwise prohibited under Section III.D.

5.    The Company shall require all of its officers, employees, and agents engaged in conduct described in Section III.D to certify annually in writing or by appropriate electronic means to the Company that they are aware of and will fully comply with

the provisions of this injunction with respect to Lobbying on behalf of the Company.

6.    On a quarterly basis, NewCo will report its Lobbying activities to the Monitor and the Board. The requirements of Section III.D shall remain in effect until the NewCo Disposition Event.

## E.    Ban on Prescription Savings Cards

1.    The Company shall not directly or through a Third Party offer prescription savings cards or coupons for its Opioid Products (other than PHI Products) except to existing, commercially insured, non-cash paying patients.  Nothing in this paragraph shall prohibit the Company from utilizing unsolicited electronic point-of-dispense programs for the benefit of commercially-insured, non-cash paying patients.

2.    The Company shall not directly or indirectly assist patients, Health Care Providers, or pharmacies regarding the claims and/or prior authorization process required for third-party payors to approve claims involving any Opioid Product.

## F.    Monitoring and Reporting of Direct and Downstream Customers

1.    The Company shall operate an effective monitoring and reporting system in compliance with 21 C.F.R. § 1301.71(a), 21 C.F.R. §1301.74(b), 21 U.S.C. § 823(d) and Section 3292 of the SUPPORT for Patients and Communities Act and final DEA administrative decisions that are published in the Federal Register.

2.    The monitoring and reporting system shall include processes and procedures pertaining to Opioid Products that:

a.    Utilize all reasonably available information and conduct appropriate due diligence to identify a Suspicious Order of an Opioid Product by a direct customer, including, but not limited to, utilizing appropriate algorithms to identify orders of unusual size, unusual frequency and/or that deviate from a normal pattern.

b.    Review all Suspicious Orders to determine whether circumstances warrant permitting a Suspicious Order to be cleared for shipment.  As part of this review, the Company shall conduct appropriate due diligence including, but not limited to, collecting additional information and documentation from direct customers that explain whether the order is legitimate, and conducting a site visit if warranted.  No Suspicious Order may be cleared absent adequate, documented justification.

c.    In addition to the review above, each month the Company shall make a selection of previously cleared orders for further review.  Such additional review will include, but not be limited to gathering information pertaining to the legitimacy of the customer's orders and investigating whether there

13

are indicators that a direct or downstream customer poses a risk of diversion. The Company shall document its review and findings.

d.    Require all direct customers to annually complete a Wholesaler Due Diligence Questionnaire ("Questionnaire"), utilize all information that the Company receives through such Questionnaire, and require any direct customer that provides incomplete, unsigned, or unresponsive responses, or fails to provide referenced accompanying information to correct the deficiency.  The Company will conduct site visits to corroborate the information obtained from its customers.  Once the Questionnaire review process is complete, any Questionnaire that is incomplete, unsigned or unresolved shall result in denial of clearance for shipment.

e.    Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product, including, but not limited to: a monthly review of Downstream Customer Data; review of Downstream Customer Data to identify downstream customers that consistently have a large volume of chargebacks meriting further investigation; the establishment of objective methods for identifying chargeback units that merit further review; and the review of chargeback reports to identify downstream customers that have higher chargebacks on a repeat basis.  If chargeback data reveals suspicious indicia (e.g. the number or frequency of chargebacks), the Company shall investigate further.  To the extent the inquiry does not resolve the concern, the Company shall report the identity of the downstream customer to DEA and to the relevant direct customers.

f.    Utilize all reasonably available information that the Company receives that indicates an unreasonable risk of a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by the Company's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media.

g.    Upon request (unless otherwise required by law), report to any requesting State Attorney General or State controlled substances regulatory agency or Department of Justice component any direct customer or downstream customer in such requesting State Attorney General's or agency's State identified as part of the monitoring required by Sections III.F.2(a)-(f), and any customer relationship in such State terminated by the Company relating to diversion or potential for diversion.   DEA will be notified of all Suspicious Orders.  Additionally, rejected order information will be shared with DEA in compliance with governing statutes and regulations.  These reports shall include the following information, to the extent known to the Company:

    i.    The identity of the downstream customer and the direct customer(s) engaged in the controlled substance transaction(s), to include each

14

registrant's name, address, business type, and DEA registration number.

ii.    The dates of reported distribution of controlled substances by direct customers to the downstream customer during the relevant time period.

iii.    The drug name, drug family or NDC and dosage amounts reportedly distributed.

iv.    The transaction or order number of the reported distribution.

v.    A brief narrative providing a description of the circumstances leading to the Company's suspicion that there is a risk of diversion.

h.    The Company will retain record copies of documentation associated with Sections III.F.2(a)-(g), and make such documentation available to any federal, state, or local law enforcement agency upon request.

3.    The Company shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless the Company investigates and finds that the identified order is not suspicious. The Company may not find an identified order is not suspicious solely based on a threshold review. Where the Company has reviewed an order identified as a Suspicious Order and determined that the identified order is not suspicious, the Company must document the basis for its determination, and provide such documentation to the Monitor. The Company will retain record copies of documents provided to the Monitor, and make such documentation available to any federal, state, or local law enforcement agency upon request.

4.    The Company shall promptly notify the DEA of findings by the Monitor related to the Company's suspicious order monitoring program.

5.    The Company shall employ sufficient staff so that the suspicious order monitoring can be robust, the review of customer provided Questionnaires can be thorough, and the documentation of all decisions related to Suspicious Orders can be thorough and complete.

6.    Upon request, the Company shall provide full cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices. For the avoidance of doubt, the Company must provide full cooperation to DEA and any component of the Department of Justice.

7.    The Company will refrain from providing an Opioid Product (other than a PHI Product) directly to a retail pharmacy location or Health Care Provider or otherwise engaging in activity that requires it to be registered as a distributor under the

Controlled Substances Act. Nothing in this provision, however, prevents the Company from acting as a distributor of PHI Products consistent with applicable law.

## G.   General Terms

1.   To the extent that a provision in this injunction conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in the injunction is in conflict with federal or relevant state law such that the Company cannot comply with both the statute or regulation and a provision of this injunction, the Company may comply with such statute or regulation. To the extent that the Company makes any such determination, it will disclose the conflict and its determination to the affected State Attorney(s) General, the Director, Consumer Protection Branch, Department of Justice, and the Monitor as soon as reasonably practicable and in advance of any change to the Company's policies or practices.

2.   The Company shall not make any written or oral statement about Opioids, Opioid Products or PHI Products that is unfair, false, misleading or deceptive, or unconscionable.

3.   The Company shall not represent that Opioids, Opioid Products or PHI Products have approvals, characteristics, uses, benefits, or qualities that they do not have or are inconsistent with the products' FDA-approved labeling.

4.   For the avoidance of doubt, nothing in this injunction is intended to or shall be construed to prohibit the Company in any way whatsoever from taking legal or factual positions with regard to its Opioid Product(s) in defense of litigation or other legal proceedings or investigations.

5.   Upon the request of any State Attorney General or federal component, the Company shall provide the requesting State Attorney General or federal component with the following, within 30 days of the request:

   a.   Notification as to whether the Company has received any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to the Company's Opioid Product(s), as well as the identity of the state or federal component(s) that issued any such subpoenas or Civil Investigative Demands.

   b.   Copies of warning or untitled letters issued by the FDA regarding the Company's Opioid Product(s) and all non-confidential correspondence between the Company and the FDA related to such letters.

6.   Whenever possible, each provision of this injunction shall be interpreted in such manner as to be effective and valid under applicable law and regulation, but if any provision of this injunction is held to be prohibited by or invalid under applicable

law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this injunction.

**H.    Compliance with All Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.    The Company shall comply with all laws and regulations that relate to the sale, Promotion, distribution, and disposal of any Opioid Product or PHI Product including but not limited to:

   a.    State controlled substances acts.

   b.    The Federal Controlled Substance Act and any regulation promulgated thereunder.

   c.    The Federal Food, Drug and Cosmetic Act, or any regulation promulgated thereunder.

   d.    Federal health care offenses, as defined in 18 U.S.C. § 24.

   e.    State consumer protection and unfair trade practices acts.

   f.    State laws and regulations related to prescribing, distribution and disposal of Opioid Products.

   g.    Bribery, Foreign Corrupt Practices Act, Anti-Kickback, and Stark laws and regulations.

**I.    Compliance Deadlines**

1.    As of 90 days after the Effective Date, the Company must be in full compliance with the provisions included in this injunction.

**J.    Training**

1.    The Company shall provide regular training, at least once per year, to relevant employees on their obligations imposed by this injunction.  The Company shall provide training to any new employees at the time of their onboarding.

## IV.    CLINICAL DATA TRANSPARENCY

**A.    Data to Be Shared**

1.    The Company shall share the following clinical data to the extent and in a manner permitted by applicable law and contracts, including data privacy laws, informed consent forms and clinical trial protocols through a third-party data archive that conforms to the requirements defined below to increase the transparency of its clinical research.

17

a. The Company shall make available all clinical data and/or information it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets previously disclosed to the FDA.

b. The Company shall make available all previously unreleased, clinical data it possesses in electronic form that can be located following a reasonably diligent search, regarding OxyContin® Tablets, Butrans® Transdermal System and Hysingla® Tablets, for both approved and unapproved indications, including:

   i. Full analyzable data set(s) (including individual participant-level data de-identified by an independent biostatistician);

   ii. The clinical study report(s) redacted for commercial or personal identifying information;

   iii. The full protocol(s) (including the initial version, final version, and all amendments); and

   iv. Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

## B.    Third-Party Data Archive

1. The Company shall share the clinical data and information described in Section IV.A.1 via a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal.

2. The Company shall begin sharing information identifying the clinical data and information described in Section IV.A.1.a and b with the vendor no later than 30 days following entry of the Confirmation Order and shall complete that process of identifying the clinical data and information described in Section IV.A.1.a and b no later than 90 days following entry of the Confirmation Order.

3. The data archive shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

4. The panel may exclude research proposals with a commercial interest.

## C.    Non-Interference

1. The Company shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

18

2.   Unless expressly stated herein, the Company shall have no communications directly or indirectly with a Qualified Researcher, including with regard to the data added to the third party archive.

**D.   Data Use Agreement**

1.   Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for the Company's pharmacovigilance staff.   Every agreement shall require the lead qualified researcher to inform the Company's pharmacovigilance staff within 24 hours of any determination that research findings could detrimentally impact the risk-benefit assessment regarding the product.   The Company's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying regulatory authorities or the public.  The lead Qualified Researcher may also inform regulatory authorities of the safety signal impacting the risk-benefit assessment as well as provide reasonable notice to the Company.

**E.   Cost**

1.   The Company shall bear all costs for making data and/or information until the NewCo Disposition Event.

## V.   DISPUTE RESOLUTION

A.   For the purposes of resolving disputes with respect to compliance with this injunction, should any State Attorney General or federal agency have reason to believe that the Company has violated a provision of this injunction subsequent to the Effective Date, then such Attorney General or federal agency shall notify the Company in writing of the specific objection, identify with particularity the provisions of this injunction that the practice appears to violate, and give the Company 30 days to respond to the notification.

B.   Upon 30 days of receipt of written notice from such State Attorney General or federal agency, the Company shall provide a written response, containing either a statement explaining why the Company believes it is in compliance with this injunction or a detailed explanation of how the alleged violation occurred and a statement explaining how and when the Company intends to remedy or has remedied the alleged violation.

C.   Such State Attorney General may not take any action concerning the alleged violation of this injunction during the 30-day response period.   Nothing shall prevent such State Attorney General from agreeing in writing to provide the Company with additional time beyond the 30 days to respond to the notice.  However, such State Attorney General may take any action, including, but not limited to legal action to enforce compliance with the [Confirmation Order/consent judgment specified by Section II.B], without delay if such State Attorney General believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

D.  Such State Attorney General may bring an action against the Company to enforce the terms of the [Confirmation Order/consent judgment specified by Section II.B], but only after providing the Company an opportunity to respond to the notification as described above or within any other period as agreed to by the Company and such State Attorney General.

E.  Nothing in this injunction shall be interpreted to limit any State Attorney General's Civil Investigative Demand ("CID") or investigative subpoena authority and any federal agency's subpoena or investigative authority, to the extent such authority exists under applicable state or federal law. The Company agrees to comply with such CID, subpoenas, or other demands or requests issued pursuant to such authority.

F.  Nothing herein shall be construed to exonerate any failure to comply with any provision of this injunction after the Effective Date, or to compromise the authority of any State Attorney General to take action for any failure to comply with this injunction.

## VI.    INDEPENDENT MONITOR

### A.    Monitor Selection and Engagement

1.  The Company shall engage a Monitor to review its compliance with this injunction.

2.  Steven Bullock, the Monitor approved by the Bankruptcy Court on March 1, 2021 to oversee compliance with the Voluntary Injunction, shall continue to serve as Monitor with respect to this injunction after the Effective Date.

3.  If a new Monitor must be appointed due to the Monitor resigning or otherwise becoming unable to perform the specified tasks, the TopCo Managers shall select a new Monitor, who must be approved by the State Monitor Committee which approval shall not be unreasonably withheld and approved by the Court. The selected Monitor approved by the State Monitoring Committee may serve while Court approval is pending.

4.  The Monitor may employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the manufacture, marketing and sale of pharmaceuticals and controlled substances and the applicable requirements of federal and state law. The Monitor may also retain the services of additional third-parties to the extent that additional expertise is required for the engagement. The Monitor may consult with and seek input from the Company and the State Monitor Committee prior to finalizing the retentions described in this paragraph.

### B.    Term

1.  The Company shall retain a Monitor until the NewCo Disposition Event(s).

2.  As required under Section II.A, any person or entity that acquires some or all of the Company's Opioid Products, including through the NewCo Disposition Event,

shall retain the Monitor for at least one (1) year after the effective date of the transaction.

**C.      Monitor's Scope of Work**

1.      The Monitor shall review the Company's ongoing compliance with the requirements of this injunction.

2.      The Monitor will report his or her findings as provided in Section VI.F.

3.      In the event that in the course of reviewing the Company's compliance with the requirements of this injunction the Monitor becomes aware of action or conduct by the Company that the Monitor believes may pose a threat to the health or safety of the public or otherwise requires prompt action, the Monitor may in his or her sole discretion, notify the Company and the States of such action or conduct without following the procedures provided in Section VI.F below.

4.      Within thirty (30) calendar days after the Effective Date, the State Monitor Committee and the Company shall confer with the Monitor on a work plan and contract.  In the event a new Monitor is appointed within thirty (30) days prior to the Effective Date, the State Monitor Committee and the Company shall have sixty (60) days from the Effective Date to confer with the Monitor on a work plan and contract.   The work plan shall set forth the substance of the Monitor's review and the manner in which the Monitor will carry out his or her review of the Company's compliance with this injunction, including the general scope of information that the Monitor will seek to review.  The Monitor shall have final authority to determine the content and substance of the work plan. The Monitor may select the period of time covered by the work plan, not to exceed one year. Any work plan and contract in place before the Effective Date may continue to be used upon agreement of the State Monitor Committee, the Company, and the Monitor.

5.      At least annually, and more frequently if appropriate, the Company and the State Monitor Committee will meet in person or virtually to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the State Monitor Committee, unless the Company and the State Monitor Committee believe such a meeting is unnecessary.

**D.      Monitor Access to Information**

1.      In connection with its review of the Company's compliance with this injunction, the Monitor shall be vested with broad discretion to review the Company's operations, including access to documents and the right to interview employees, as the Monitor determines is reasonably necessary to fulfill its duties under this injunction, with reasonable notice to the Company and without unreasonable interference in the Company's or its employees' ability to perform day-to-day operations. The Monitor shall have all powers reasonable and necessary to efficiently and effectively discharge its responsibilities subject to appropriate confidentiality.

2.  The Company's General Counsel or his designee shall serve as the primary point of contact for the Monitor to facilitate the Monitor's reasonable access to documents, materials, or employees necessary to review for compliance with this injunction. The Monitor shall have unfettered access to the Chief Compliance Officer. The Monitor shall make a good faith effort to leverage the Company's existing compliance mechanisms when reviewing the Company's compliance with this injunction. The Monitor shall communicate any request for documents, materials, or access to employees to the [General Counsel or his designee], but, subject to the terms hereof, is not prohibited from speaking with any other current or former employees of the Company.

3.  The Company shall not intimidate, harass, threaten, or penalize any employee or former employee for his or her cooperation with or assistance to the Monitor.

4.  If at any time the Monitor reasonably believes that there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee deemed necessary by the Monitor to implement or review compliance by the Company with this injunction, the Monitor may meet and confer with the Company's [General Counsel or his designee]. If the Monitor cannot resolve such limitation or denial, it shall be immediately reported to the Board of NewCo. If the issue remains unresolved after consultation with the Board of NewCo, the Monitor shall report the issue to the State Monitor Committee.

**E.    Access to Monitor**

1.  There shall be no limitation on the ability of the Monitor to communicate at any time with States and the United States, including any agency or component of the United States, regarding the Company's conduct.

**F.    Monitor Reports**

1.  Observations and Recommendations

    a.  If the Monitor notes any areas for potential improvement regarding the Company's compliance with this injunction during the course of his or her reviews, the Monitor shall include any such recommendations in the Final Report described below.

    b.  Collectively, any such questions, concerns or recommendations will be referred to as "Observations and Recommendations."

2.  Draft and Final Reports

    a.  For purposes of the reporting described below, the Monitor's work will be divided into three-month periods ("Reporting Periods").

    b.  No later than ten (10) calendar days after the close of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the

Monitor shall provide the Company and the State Monitor Committee with a draft report identifying and detailing any Observations and Recommendations and Potential Violations and the bases therefore (the "Draft Report"). Potential Violations shall mean the Company's failure to comply with the provisions of this injunction, as reasonably determined by the Monitor. The Company shall have the right to cure any Potential Violation, in accordance with the below provisions. The Draft Report will also contain detailed descriptions of any Observations and Recommendations for Improvement.

c.    Within seven (7) calendar days of its receipt of the Draft Report, the Company will provide comments to the Draft Report. The Company may also:

i.    Respond to each Potential Violation, including, where appropriate, explaining why no violation occurred, or describing any corrective action taken (or to be taken) as a result of the findings made by the Monitor, including, where appropriate, providing documentation supporting a relevant decision or additional context explaining the Potential Violation and why it occurred.

ii.    Respond to each Observation and Recommendation for Improvement.

d.    After receipt of the Company's comments and responses and the State Monitor Committee's comments, if any, the Monitor will provide a final report (the "Final Report") simultaneously to the State Monitor Committee and the Company.

e.    The Final Report shall set forth:

i.    The Monitor's evaluation of the Company's compliance with this injunction and the factual basis for the Monitor's conclusions, including whether a Potential Violation has occurred and an explanation of the nature of the Potential Violation.

ii.    The Monitor's conclusion as to whether the Company has cured any Potential Violations.

iii.    The Final Report shall include a listing of the Observations and Recommendations for Improvement made by the Monitor and responses of the Company. Recommendations shall not be deemed to be incorporated into the terms of this injunction.

iv.    The Monitor shall create a public version of each Final Report. The public version of each Final Report shall exclude all information that the Monitor determines, in consultation with the Company, to be

23

trade secret or otherwise commercially sensitive and shall be posted on the Company's website.

## VII.    SHAREHOLDER RELEASED PARTIES

A.    The Shareholder Released Parties shall not take any action that would interfere with the Company's compliance with its obligations under this injunction.

## NEWCO GOVERNANCE COVENANTS

These Governance Covenants will bind NewCo (the "**Company**") and the Company's Subsidiaries to operating requirements and controls that ensure that the Company and the Company's Subsidiaries (i) develop, manufacture, distribute and sell all of their products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) comply with their respective obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursue and implement Public Health Initiatives, (iv) comply with the Operating Injunction and (v) otherwise operate in accordance with the Company's Purpose and take into account long-term public health interests relating to the opioid crisis and responsible, transparent and sustainable practices in the management of a pharmaceutical business.

| Category | Covenant |
|---|---|
| Governance | **Purpose and Principles**<br><br>• In accordance with Section 2.3(a) of the Limited Liability Company Operating Agreement of the Company (the "**Operating Agreement**"), the purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the Company Transferred Assets and any other assets of the Company or any of its Subsidiaries (i) in accordance with the terms of the Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and these Governance Covenants, and (iii) in a responsible, transparent and sustainable manner, taking into account the public interest in transparency regarding the Company and balancing: (x) the best interests of its stakeholders (including the direct and indirect holders of Interests in the Member), to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the best interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").<br><br>• In accordance with Section 2.3(b) of the Operating Agreement, the Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but rather shall take all elements of the Company's Purpose into account. In balancing the interests of the Member prior to implementation of the Company Disposition Event, the Board shall give priority to the Company's obligation to fund the Minimum TopCo Distribution for the purpose of devoting funds to opioid abatement programs.<br><br>**Effectuation of the Company's Purpose**<br><br>• In accordance with Section 2.3 of the Operating Agreement, the Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in accordance with the Company's Purpose and in a manner that complies with these Governance Covenants in order to ensure that each of the Company and the Company's Subsidiaries, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise takes into account long-term public health interests relating to |

1

the national opioid crisis and responsible, transparent and sustainable practices in management of a pharmaceutical business.

- The Company shall integrate the Company's Purpose into material business activities and systems by:

  - o providing relevant employees with at least annual training on the Purpose, the Injunction and these Governance Covenants. The Company shall provide appropriate, relevant training to new employees at the time of their onboarding.
  - o incorporating, under the oversight of the Board, to the extent relevant, the Company's Purpose, the Injunction and these Governance Covenants into the Company's controls, performance management programs, management and leadership oversight, and executive compensation schemes.
  - o vesting the appropriate committee of the Company Board with the responsibility for oversight of policy-setting and monitoring with respect to the Company fulfilling its Purpose; compensating and managing its workforce; maintaining legal compliance and otherwise fulfilling its obligations under these Governance Covenants.
  - o authorizing the Board and Board committees with the ability and the funding to retain external subject matter experts who may provide insight, recommendations and review of the Company's strategic plans and programs for implementing these Covenants.
  - o subject to the Company's obligation to distribute Excess Cash in accordance with Section 6.5(a) of the Operating Agreement, using reasonable efforts to ensure, in consultation with the Board, that the amount of unrestricted Cash and cash equivalents held by the Company and the Company's Subsidiaries (other than MDT Distributable Sale Proceeds), as reflected on the consolidated balance sheet of the Company and the Company's Subsidiaries, is adequate for purposes of ensuring the Company's ability to comply with its obligation to fund Operating Expenses consistent with the Company's Purpose and these Governance Covenants.
  - o taking, as determined by the Company Board, steps as needed to ensure that these Governance Covenants are integrated into the Company's strategic plans, management controls and day to day operations.

- The Company will maintain programs and controls reasonably designed to manage risk and protect and strengthen its resilience and capacity to anticipate and manage business threats and disruptions. This shall include plans and programs relating to: (i) business continuity, (ii) crisis management; (iii) physical security; (iv) emergency management and response; and (v) IT disaster recovery. The Board (or an authorized committee thereof) shall review Purdue's Business Continuity Plan dated May 2020 and may decide to have it apply to the Company or whether

| | another business continuity plan should be adopted in a manner consistent with the Company's Purpose. The Board (or an authorized committee thereof) will review its business continuity plan from time to time and amend it if appropriate, in a manner consistent with the Company's Purpose.<br><br>**Transparency & Reporting**<br><br>• The Board shall cause the Company to prepare (i) in accordance with Section 8.3(c) of the Operating Agreement, semi-annual public benefit reports to be published publicly, which shall describe the effectuation of the Company's Purpose, the short-term and long-term value being created by the Company, and the public benefits being achieved consistent with the Company's Purpose ("**Public Benefit Reports**"), and (ii) in accordance with Section 8.3(b) of the Operating Agreement semi-annual financial and operating reports to be delivered to TopCo and NOAT.<br><br>• The Board shall cause the Company to, from time to time, solicit and consider feedback from those stakeholders that the Board determines to be appropriate, in identifying material threats, opportunities, megatrends and material topics to the company to inform the Public Benefit Reports. |
|---|---|
| **Access to Medicine - Public Health Initiatives** | **PHI Funding and Implementation**<br><br>• Subject to the parameters set forth in Section 6.2 of the Operating Agreement, including the PHI Budget Amount, the Company will pursue and implement the Public Health Initiatives, as defined in the Plan, by developing and distributing medicines to treat opioid addiction and reverse opioid overdoses in a manner consistent with the plans outlined in the PHI program plan, provided that such PHI program plan may be reviewed and amended from time to time by the Board (or an authorized committee thereof) in a manner consistent with the Company's Purpose. |
| **Product Diversion and Security** | • The Company will maintain product security and diversion controls reasonably designed to ensure that the Company's Products are sold and distributed in a manner that is safe, compliant and minimizes the risk of diversion and that is otherwise compliant with:<br><br>    ○ The Operating Injunction.<br>    ○ applicable Drug Enforcement Administration regulations.<br>    ○ relevant Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies including, without limitation, those governing the receipt, destruction, procurement, and handling of controlled substances, provided that such procedures may be reviewed and amended from time to time by the Board (or an authorized committee thereof). |

| | |
|---|---|
| | • The Company shall operate a robust supply chain security program.  The Board (or an authorized committee thereof) shall review Purdue's current applicable policies and program and decide whether to have them apply to the Company, or whether another program should be implemented, consistent with the Operating Injunction after taking into account the Company's Purpose.  The Board (or an authorized committee thereof) will review the supply chain security program from time to time and amend the program if appropriate, in a manner consistent with the Company's Purpose. |
| **Compliance and Ethics** | **Compliance and Regulatory Programs**<br><br>The Company will implement a comprehensive internal compliance management and assurance program that:<br><br>    o  is designed to ensure adherence to the Operating Injunction and these Governance Covenants in accordance with Section 6.7 of the Operating Agreement.<br>    o  is designed to ensure compliance with all applicable laws and regulations.<br>    o  is consistent with: (i) the Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers; (ii) the US Department of Justice Guidance on the Evaluation of Corporate Compliance Programs; and (iii) the PhRMA Code on Interactions with Healthcare Professionals.<br>    o  is reasonably designed to mitigate compliance risks applicable to a pharmaceutical business including, without limitation, those relating to: bribery and corruption; conflicts of interest; physical and product security; bioethics; clinical trial transparency and patient safety; provided that such Code of Ethics and policies may be reviewed and amended from time to time by the Board (or an authorized committee thereof) in a manner consistent with the Company's Purpose, and implemented through a Code of Ethics and the adoption of procedures, standards and other controls. |
| **Environmental, Health, & Safety** | **Environmental, Workplace Health & Safety**<br><br>• The Company will maintain environment, workplace health and safety policies, programs and controls that:<br><br>    o  are reasonably likely to ensure compliance with applicable laws and regulations.<br>    o  are reasonably designed to minimize any adverse impacts on the environment associated with the Company's operations or products, whether in use or at the end of their useful life.<br>    o  are reasonably designed to educate and enable Company employees and contractors to work in a safe, healthy and environmentally responsible manner. |

| | |
|---|---|
| | <ul><li>reflect and embed leadership commitment to maintaining a safe, "zero injury" workplace.</li><li>are reasonably designed to proactively identify and manage workplace hazards to employees and third parties.</li><li>are reasonably designed to embed a culture of safety and wellbeing throughout the Company.</li><li>are reasonably designed to continuously improve performance.</li><li>enable the Company to transparently communicate performance to stakeholders through the Public Benefit Reports.</li></ul> |
| **Diversity, Equity & Inclusion** | • The Company shall use reasonable efforts to strengthen its workforce, support local communities, and advance its Purpose through implementation of policies, programs and improvement targets that promote workplace diversity, foster equity, and advance a culture of inclusion throughout the organization (collectively, "Inclusion Programs"). The Board (or an authorized committee thereof) shall review Purdue's current Inclusion Programs and may decide to have them apply to the Company or whether other Inclusion Programs should be adopted in a manner consistent with the Company's Purpose. The Board (or an authorized committee thereof) will review its Inclusion Programs from time to time and amend them if appropriate, in a manner consistent with the Company's Purpose. |
| **Oversight** | • On an annual basis, the CEO of the Company shall certify, solely in his or her capacity as an officer of the Company, that, after reasonable inquiry and based on his or her knowledge, the Company is in material compliance with these Covenants. The certification shall be provided to the Board, the State Monitor Committee (as defined in the Operating Injunction) and upon request, any State Attorney General.<br><br>• In accordance with the Operating Agreement, under the oversight of the Board, the Company and its representatives shall cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan, the Confirmation Order and the Operating Injunction, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The reasonable compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor shall be paid by the Company.<br><br>• The Company will not amend the Operating Agreement, including by merger, consolidation, division or otherwise, (i) in any manner that is inconsistent with the Plan or the Confirmation Order without (I) an order of the Bankruptcy Court approving such modification, and (II) to the extent such proposed amendment adversely affects the Master Disbursement Trust, the unanimous consent of the MDT Trustees. The Company will |

| | give the Monitor 7 business days' written notice of any amendment to the Operating Agreement and will reasonably consider comments of the Monitor solely to the extent that the contemplated amendment would or would potentially alter, undermine or limit or interfere with the effectiveness or the implementation of the Operating Injunction. The Monitor shall promptly deliver such notice to the State Monitor Committee (as defined in the Operating Injunction). |
|---|---|
| **Successors** | • Any successor owner (whether through one transaction or a series of related transactions) of the Opioid Business, shall be obligated to comply with the provisions of these Governance Covenants that are specifically enumerated under the category "Product Diversion and Security" and the matters described in clauses (i) and (iv) of Section 2.3(c) of the Operating Agreement; provided (x) that the obligations of any successor to comply with the Operating Injunction shall be as set forth in the Operating Injunction and (y) as long as a successor maintains internal standard operating procedures similar to the Standard Operating Procedures for Purdue Pharma L.P. and Associated US Companies, as may be amended from time to time by the Board, as appropriate and reasonable for such successor, taking into account such successor's size and resources, such successor shall not be obligated to adopt the Company's standard operating procedures. |