UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

In re:                                    Chapter 11

PURDUE PHARMA L.P., <u>et al.</u>,              Case No. 19-23649 (RDD)

                                          (Jointly Administered)

        Debtors.

- - - - - - - - - - - - - - - - x

MODIFIED BENCH RULING ON REQUEST FOR CONFIRMATION OF
ELEVENTH AMENDED JOINT CHAPTER 11 PLAN[1]

Hon. Robert D. Drain, United States Bankruptcy Judge

        The wrongful use, including marketing and

distribution, of opioid products has contributed to a

massive public health crisis in this country.  The role of

the debtors before me (the "Debtors" or "Purdue") and their

owners in that crisis makes these bankruptcy cases highly

unusual and complex.

        This is so primarily because of the nature of the

creditor body, given the extraordinarily harmful effects of

the Debtors' primary product, the prescription drug

---

[1] Because of the importance of promptly delivering a ruling on
confirmation of the amended joint chapter 11 plan in these cases, I gave
a lengthy bench ruling rather than reading from and issuing a written
decision.  I informed the parties, however, that after reviewing the
transcript of that ruling I might modify it to make it clearer, add
information that I inadvertently omitted, and of course correct
typographical errors in the transcript.  This Modified Bench Ruling,
while still more colloquial than a written decision, attempts to do that
and is being filed separately from the transcript of my bench ruling.

OxyContin, and other synthetic opioids on ordinary people as
well as on the local governments, Indian tribes, hospitals
and other first responders, states and territories, and the
United States that confront these effects every day.  In a
very real sense, every person in the range of the Debtors'
opioid products, sold throughout the United States, was a
potential creditor.

Bankruptcy cases present a unique and perhaps the
only means to resolve the collective problem presented by an
insolvent debtor and a large body of creditors competing for
its insufficient assets, including especially when there are
mass claims premised on products to which, as here, massive
harm is attributed.

Bankruptcy cases focus the solution away from
individual litigations to a fair collective result subject
to the unique ability under bankruptcy law to bind holdouts
under well-defined circumstances who could not otherwise be
bound under non-bankruptcy law.

Over the years courts and the parties to
bankruptcy cases have refined and improved on such
solutions, which clearly have been brought to bear in these
cases involving likely the largest creditor body ever.  And
I'm not speaking solely of the roughly 618,000 claims that
were filed, although I believe that is a record, but also,

2

as noted, the people who could arguably be said to be represented by their local and state governments and by the United States.

Here, too, the parties have worked in unique and trailblazing ways to address the public health catastrophe that underlies those claims.

These cases are complex also because the Debtors' assets include enormous claims against their controlling shareholders, and in some instances directors and officers, who are members of the Sackler family, whose aggregate net worth, though greater than the Debtors', also may well be insufficient to satisfy the Debtors' claims against them and other very closely related claims that are separately asserted by third parties who are also creditors of the Debtors.

Since the start, then, key issues for these cases have been (a) how can such claims be resolved to best effect for the claimants and (b) is such a resolution authorized under the Bankruptcy Code and law? The primary questions for me now, focusing on the Chapter 11 plan before the Court, are can these issues be resolved by confirmation of the plan, and should they?

It is clear after a lengthy evidentiary hearing that there is now no other reasonably conceivable means to

achieve the result that would be accomplished by the Chapter 11 plan in addressing the problems presented by the Debtors' Chapter 11 cases. I believe it is also clear under well-established precedent that, with a sufficient factual record, Congress in the Bankruptcy Code and the courts interpreting it provide the authority for such a resolution. That leaves the question whether the proposed resolution should be implemented.

This ruling explains my findings and conclusions regarding these issues, informed by the record of these cases, the parties' votes on the plan, the parties' briefing, and the record of a six-day trial involving 41 witnesses and a courtroom full of exhibits and two full days of oral argument.

**Notice**. The notice of the Debtors' request for confirmation of the plan was described by Jeanne C. Finegan in her declarations and live testimony, primarily in her third supplemental declaration, which, under my order setting procedures for the confirmation hearing, served as her direct testimony but also referred to prior declarations that she had provided in these cases regarding the notice to claimants and potential claimants.

As established by her testimony, the Debtors' notice of (a) these cases, (b) the right to assert a claim

4

against the Debtors, (c) the Debtors' request for
confirmation of the plan, and (d) the proposed release of
third parties' claims against the released parties in the
plan, primarily of such claims against the Sacklers and
their related entities (the "shareholder released parties"),
was unprecedentedly broad.

Ms. Finegan's testimony was uncontroverted and
credible that the Debtors' noticing program as implemented
under her supervision reached roughly 98 percent of the
adult population of the United States and approximately 86
percent of Canadian adults, with an average frequency of
message exposure in each case of four times, and also was
extended extensively throughout the world where the Debtors'
products might have caused harm.  As testified to by Ms.
Finegan, the supplemental confirmation hearing notice plan
reached an estimated 87 percent of all U.S. adults, with an
average message frequency of five times, and an estimated 82
percent of all Canadian adults, with an average message
frequency of six times. It also was expanded to 39 countries
not included in the bar date notice, served over 3.6 billion
online and social impressions, and resulted in over 3,400
news mentions around the world.

The program was carefully tailored to reach not
only known creditors but also the population at large,

including through various types of media aimed especially at
people who may have been harmed by the Debtors' products.
Ms. Finegan's calculations reflect literally billions of
hits on the internet and social media as well as reliable
estimates of the very wide extent of the other means of
notice by TV, radio, various types of publications,
billboards, and outreach to victims' advocates and
abatement-centered groups.

          The only caveat that I have to the extraordinarily
broad scope of the notice of the Debtors' request for
confirmation of the plan pertains to notice to those in
prison.  The notice program was in large part effective in
reaching prisons and groups known to work with people who
are in prison and suffering from opioid use disorder or
other adverse effects of opioids.  But it is possible that
because of prison regulations and at times the lack of
access to TV, radio and other media, prisoners may not have
received the same high level of notice of these cases, the
bar date, and the Debtors' request to confirm the plan,
including of the proposed third-party claim releases in the
plan.

          On the other hand, the Debtors, including in the
plan's personal injury trust procedures, have shown a
willingness to consider requests to assert and prove claims

                              6

late based on evidence of prisoners' unique circumstances that may have restricted notice to them.

The United States Trustee has suggested that references in notices to the plan would have sent people to a lengthy and complex set of release provisions.  This is true, as is the observation that it helps to have legal training to parse those provisions, although during the confirmation hearing they have been narrowed and simplified. And as reflected by the record of the parties' responses to my comments during the hearing, those provisions were subject to some potential for differing interpretations, although I believe that is not the case now that they have been revised.

Nevertheless, the most widespread notices of the plan's proposed third-party claims release were simple, in plain English that the plan contemplated a broad release of the Sacklers and their related entities of civil claims pertaining to the Debtors, including claims against them held by third parties. Finegan Decl. at paragraphs 19-22 (describing various ways this notice was disseminated). In addition, extensive media coverage of these cases also hammered home that point.  Indeed, wide media coverage exaggerated the extent of the plan's proposed releases of claims against the Sacklers and further noted controversy

over its basis in applicable law.  And it is these aspects
of the plan's third-party claims release -- that it is too
broad and unfair and that it is not authorized under
applicable law -- that primarily underly the objections to
confirmation of the plan that have been filed, including by
the U.S. Trustee, not that the releases are hard to read.

I therefore conclude that the Debtors' notice of
the confirmation hearing and the proposed releases in the
plan was sufficient and indeed unprecedentedly broad.

**Voting on the Plan**.  I should next note the vote on
the plan by the classes of claimants entitled to vote.  It
is important to address this issue up front because if a
plan is not accepted by the vote of an impaired class, the
plan proponent must proceed with respect to that class under
the so-called cramdown provision of the Bankruptcy Code,
section 1129(b).  On the other hand, if the impaired classes
have voted in favor of the plan's confirmation, the Court
analyzes only section 1129(a)'s requirements for
confirmation and the incorporated provisions of the
Bankruptcy Code related to it, such as sections 1122 and
1123 of the Code.

Based on the ballot declaration and testimony of
Christina Pullo, an unprecedented number of votes were cast
on the plan, over 120,000.  In contrast, votes on most

8

Chapter 11 plans, even in large cases, number between a few
and a few thousand.

And of the votes cast, the plan was in fact
accepted by every voting class, thus obviating the need to
proceed with the "cramdown" provisions of the Bankruptcy
Code except as to insider classes where the plan has
satisfied section 1129(b).

In addition, and significantly, each voting class
voted in favor of confirmation of the plan overwhelmingly.
In the aggregate, the vote was over 95 percent in favor of
confirmation.  That, too, is a remarkable result given the
very large number of people who got notice, who were
entitled to vote, and who voted.

For the personal-injury claims classes, the vote
was 95.7 percent (Class 10(b)) to over 98 percent (Class
10(a)).  In each class the percent voting in favor of the
plan was above 93 percent with the exception of the class of
hospital claims, which was over 88 percent (and no member of
that class is pursuing an objection to the plan).

I will address later two objections that allege
that this overwhelming acceptance of the plan should be
looked at differently.  They allege that the plan improperly
classified certain claims together with other claims, which,
if classified in a separate class, would not have accepted

9

the plan as overwhelmingly. These objectors acknowledge,
though, that such a hypothetical class would still have
voted in favor of confirmation by well over the 75 percent
supermajority threshold that Congress provided for in
section 524(g) of the Bankruptcy Code when setting a bar for
the release of third-party claims in Chapter 11 plans
addressing asbestos liability.  Again, I will discuss such
classification objections separately.

In addition, and frankly baffling to me, the
United States Trustee has argued that I should not look at
the votes cast but at the votes that were not cast in
determining whether the plan was overwhelmingly accepted.
That, of course, is not how elections are conducted.  There
is no conceivable way to determine the preferences of those
who didn't vote other than that they didn't object to
confirmation.

But where a vote is as extensive as occurred here,
under any measure this plan has been overwhelmingly
accepted.  And of course it is the actual vote that counts
under section 1126 of the Bankruptcy Code, as it does in
every election, not a statement by a bureaucrat or his or
her sense of where the wind is blowing.  That's why we have
elections.

### Burden of Proof, Uncontested Subsections of 11

**U.S.C. § 1129(a), and Statutory Bases for the Objections to
Confirmation of the Plan**.  A plan's proponent has the burden
of proof on the applicable elements of Bankruptcy Code
section 1129(a) that must be met for a plan to be confirmed.
That burden of proof is satisfied by showing that the test
in the applicable subsection of section 1129(a) has been met
by a preponderance of the evidence.  In re Ditech Holding
Corp., 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019), and the
cases cited therein.

Many of the subsections of section 1129(a) that
are applicable to this plan are uncontested.  And based on
my review of the relevant witness declarations, including
those of Jon Lowne, John S. Dubel, and Jesse DelConte, I
conclude that with respect to the applicable uncontested
subsections of section 1129(a), the Debtors have carried
their burden of proof.

The subsections of section 1129(a) that have been
contested in objections to the plan include section
1129(a)(1), which states that the plan "must comply with the
applicable provisions of this title," i.e., the Bankruptcy
Code, and thus incorporates for purposes of these objections
sections 1122 and 1123(a)(1) and (4) of the Bankruptcy Code
pertaining to the classification and treatment of claims.

In addition, certain objections contend that the

11

Debtors have not satisfied their burden to show under
Bankruptcy Code section 1129(a)(3) that the plan has been
proposed in good faith and not by any means forbidden by
law, including not only as to the proposed settlement of
claims against the shareholder released parties but also as
to other plan provisions or related acts that, objectors
contend, violate other provisions of the Code or were not in
good faith.

    The United States Trustee has objected that the
payment of certain legal fees and expenses under section 5.8
of the plan (x) violates section 1129(a)(4) of the Code,
which states that it is a requirement for confirmation that
"[a]ny payment made or to be made by the proponent, or by
the debtor, or by a person issuing securities or acquiring
property under the plan, for services or for costs and
expenses in or in connection with the case, or in connection
with the plan and incident to the case, has been approved
by, or is subject to the approval of, the court as
reasonable," 11 U.S.C. § 1129(a)(4); and (y) can be allowed
only if sought and granted under the standard set forth in
sections 503(b)(3) and (4) of the Code, which the plan does
not propose to meet.

    One set of objectors has suggested that the plan
does not satisfy section 1129(a)(11) of the Bankruptcy

Code's so-called feasibility test, which requires a showing

that "[c]onfirmation of the plan is not likely to be

followed by the liquidation, or the need for further

financial reorganization, of the debtor or any successor to

the debtor under the plan, unless such liquidation or

reorganization is proposed in the plan."  11 U.S.C. §

1129(a)(11).

The remaining objections to the plan contend that

the proposed settlement of the Debtors' and third parties'

claims against the shareholder released parties are not

sustainable on various theories challenging (x) the merits

of the settlement of the Debtors' claims under section

1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule

9019, (y) the Court's jurisdiction and power to approve the

plan's third-party claims' release under 28 U.S.C. §§

157(a)-(b) and 1334(b), Article III of the U.S.

Constitution, sections 105(a) and 1123(a)(5) and (b)(6) of

the Bankruptcy Code, and (z) the merits of the shareholder

released parties settlement and third-party claims release

under applicable case law.

In addition, these objections contend that the

Debtors have not satisfied the so-called best interests test

of section 1129(a)(7) of the Bankruptcy Code, which requires

a showing that "[w]ith respect to each impaired class of

13

claims or interests, each holder of a claim or interest of
such class has (i) accepted the plan or (ii) will receive or
retain under the plan on account of such claim or interest
property of a value as of the effective date of the plan,
that is not less than the amount that such holder would so
receive or retain if the debtor were liquidated under
Chapter 7 of this title on such date."  11 U.S.C. §
1129(a)(7).

The objectors who have argued that the Debtors
have not satisfied section 1129(a)(7) argue that because
their third-party claims against the shareholder released
parties are being channeled to the plan trusts or otherwise
precluded in return for their distributions under the plan,
whereas they would not be so channeled and precluded in a
Chapter 7 liquidation, the plan fails the "best interests "
comparison of their liquidation recovery to their recovery
under the plan.

Each of these objections will be addressed below.

**Insurers' Objections**. Navigators Specialty
Insurance Company, American Guaranty and Liability Insurance
Company, and Steadfast Insurance Company have pursued a
limited objection to confirmation of the plan, joined in by
National Union Fire Insurance Company.  (Another objection,
by the Chubb Insurance USA has been withdrawn.)

14

The Debtors seek certain findings in the proposed confirmation order regarding the effectiveness of the transfer of the Debtors' insurance or insurance rights to the trusts established under the plan to fund and make distributions to creditors or to NewCo, the public benefit company to be established under the plan to fund distributions and develop and sell at or near cost drugs to combat opioid addiction and overdoses.  They also seek a finding regarding the plan's settlement of claims against the Debtors that potentially are covered by such insurance: that the treatment of such claims under the plan does not violate consent rights under any applicable insurance coverage because it is a bona fide settlement on due notice to the objecting insurers, as well as to the other insurers who did not object.

The plan does not otherwise seek findings as to the Debtors' insurance.  For example, it does not seek a declaration that any insurance coverage or insurance rights apply to claims that have been asserted to such coverage (this issue is the subject of a separate litigation that will take its own course).  Rather, the findings that the Debtors seek are integral to the effectuation of the transfer by the Debtors of insurance and insurance rights to the plan trusts or NewCo, notwithstanding any "anti-

15

assignment" provisions in the applicable policies, and to
obviate a defense that the plan itself in providing for a
means to pay creditors' claims somehow derogates the
insurers' rights to review and consent to the payment of
insured claims.

The objectors contend that the plan and
confirmation order should not just be largely "insurance
neutral," however, but that it be completely so -- that is,
that even these findings should be postponed for another
day.

But there is no requirement that a Chapter 11 plan
be "insurance neutral" in any respect.  And where a plan
provides for the transfer of a debtor's insurance or
insurance rights to a trust or successor, as here, the issue
of transferability has been joined in the context of the
confirmation hearing and can and should be resolved then.
Similarly, the plan's settlement of claims that might be
covered by insurance is integral to the plan -- indeed, it
is a fundamental purpose of a plan -- and therefore the bona
fides of that settlement are ripe for determination at
confirmation.  The Court is properly situated to decide
those issues without a subset relating to the insurers'
consent rights being carved out for a separate, second
litigation.

16

This contrasts with, again, general coverage
issues, such as whether any claim against the insurance is
subject to a coverage exclusion, which is not something that
is inherently raised in the request to confirm the plan and
where the plan clearly reserves such rights assertable by
the trustees of the trusts that will hold the insurance and
insurance rights, on the one hand, and the insurers on the
other.

The "insurance-neutral" argument of the objecting
insurance companies therefore is not grounded on an
underlying principle of bankruptcy law but rather only on a
due process concern.  The insurers contend that as
originally filed the plan was arguably completely "insurance
neutral" and did not seek even the foregoing limited
determinations in connection with confirmation.

I find, however, that the objecting insurers and
all other insurers have had sufficient notice for months
that the Debtors were going to seek these limited findings
in the confirmation order.  The insurers were well
represented and are highly sophisticated, as evidenced by
their negotiations over the plan's provisions and the
proposed confirmation order relating to them.  They had a
full opportunity to challenge the findings that I've just
outlined, first disclosed to them in May 2021, which more

17

than subsumes the applicable notice period under Bankruptcy Rule 2002(b) for the plan and confirmation hearing.

The plan as amended during the confirmation hearing also resolves the remaining due process issue that the insurers had originally raised -- that, as originally drafted, the plan left open the possibility that additional findings could be sought or documents filed that the insurers would not have notice of and might nevertheless be binding on them.  As the plan has been amended, this is not going to happen.

As far as the requested finding regarding the bona fides of the plan's resolution of arguably insured claims by providing for the distribution of 100 percent of the value of the Debtors on account of the claims asserted against them in the form of payments between 700 and $750 million through personal injury trusts and at least 5 billion more to abate the opioid crisis in various forms, it is almost impossible to see how an insurer could claim that its consent rights were violated, and in fact the insurers do not give any examples of how those rights might have been violated.

The claims filed in these cases assert at least roughly $40 trillion of liability (excluding a $100 trillion claim that was filed by an individual), which, moreover,

18

covers only roughly 10 percent of the claims filed, the rest
asserting wholly unliquidated amounts.  As stated in the
expert trial declaration of Jessica B. Horewitz, Ph.D., the
allowed, fixed claim of the United States under the November
2020 civil and criminal settlement between the Debtors and
the Department of Justice will receive less than a one-
percent recovery.

Under those circumstances, given the plan's wide
notice, the lack of any objection to the plan's allocation
of value either to personal injury claimants or to abate the
opioid crisis, and the fact that insurers' consent rights,
like any other contract party's consent rights, are
circumscribed by the Bankruptcy Code's separate notice and
hearing process, the Debtors' request for a finding that the
plan does not violate the policies' applicable consent
provisions is justified and appropriate.

In addition, ample case law establishes the
authority under sections 1123(a)(5)(B) and (b)(2) and (6) of
the Bankruptcy Code to transfer insurance rights and
insurance policies as part and in furtherance of a plan to
pay mass claims, such as in these cases.

The analysis of this issue in In re Federal—Mogul
Global, 684 F.3d 355 (3d. Cir. 2012), cannot be improved on.
I will note, though, that although that case was driven by

19

asbestos claims, the logic behind it was based on Bankruptcy
Code sections 1123(a)(5) and 1141, not section 524(g) of the
Code and, therefore, would apply here.  See also In re W.R.
Grace & Co., 475 B.R. 34, 139 n.189 (D. Del. 2012), aff'd
729 F.3d 311 (3d Cir. 2013), and the cases cited therein,
which show the extensive, and perhaps unanimous, authority
for the finding and conclusion that the Debtors seek here
that notwithstanding any anti-assignment provision in any
applicable insurance policy, under the plan the insurance
policies, insurance rights, or rights to insurance proceeds
can be lawfully assigned to the trusts created under the
plan or NewCo for administration and distribution under the
plan.

        I will note that both requested findings are also
warranted because it appears that at least at this stage the
objecting insurers have either disclaimed coverage or
indicated that they are reserving their rights to do so.
See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 151 A.D.3d
632, 58 N.Y.S.3d 38 (1st Dep't 2017), and the cases cited
therein.

        I therefore will overrule the insurers'
confirmation objection. (And I will note that after the
colloquy during oral argument with the insurers' counsel and
counsel handling insurance issues in this case for the

Debtors, it appeared that most, if not all, of the insurers'
objections may have been resolved in any event by the
changes to the plan that I've already described.)

**U.S. Trustee's Objection to Plan's Treatment of
Certain Attorneys Fees and Expenses**. In addition to its
objection to the plan's settlement of the Debtors' and third
parties' claims against the shareholder released parties, to
be discussed later, the United States Trustee has objected
to section 5.8 of the plan's treatment of certain attorneys
fees and expenses.

Section 5.8 of the plan provides for compensation and
reimbursement of "professionals," a defined term comprising
professionals for the Debtors and the Official Unsecured
Creditors Committee who are retained pursuant an order of
the Court and paid out of the estates' assets for their
postpetition work under section 330 of the Bankruptcy Code.
The compensation and reimbursement of two other groups of
professionals -- representing the ad hoc committee of
government and other contingent litigation claimants (the
"AHC") and the multi-state governmental entities group (the
"MSGE") -- are also covered by orders of the Court that
subject the estates' payments to them to notice and Court
review.

Section 5.8 of the plan sets forth the treatment

21

of fee claims by other counsel, not counsel whose
compensation is separately subject to approval by prior
order of the Court.   Section 5.8 effectuates a settlement
regarding the payment from the National Opioid Abatement
Trust (the "NOAT") and Tribal Abatement Fund Trust to be
established under the Plan of counsel to beneficiaries of
those trusts. In addition, section 5.8 provides for the
payment of attorneys involved in the pursuit by hospitals of
their claims; of the so-called NAS monitoring claimants'
attorneys fees and expenses; of rate-payer attorneys' fees
and expenses; of personal injury claimants' attorneys fees
and expenses; and of payment for the public schools'
attorneys fees and expenses.

The U.S. Trustee contends that the only way that
the plan can provide for such payments is under section
503(b)(3) and (4) of the Bankruptcy Code.   Section 503(b)(4)
provides that "[a]fter notice and a hearing, there shall be
allowed administrative expenses . . . [that is, expenses
against the estate for postpetition claims], including the
actual necessary expenses . . . [comprising] reasonable
compensation for professional services rendered by an
attorney or an accountant of an entity whose expense is
allowable under subparagraph (A), (B), (C), (D), or (E) of
paragraph 3 of this subsection based on the time, the

22

nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement of actual necessary expenses incurred by such attorney or accountant." 11 U.S.C. § 503(b)(4). That section refers one back to section 503(b)(3) of the Code, which requires that a creditor show that it made a "substantial contribution in a case under Chapter 11 of the Bankruptcy Code" to be entitled to the administrative expense.

The U.S. Trustee's objection is misplaced in two respects. First, the bulk of the fees covered by section 5.8 are not for postpetition work (and therefore not an "administrative expense" covered by section 503(b)(3) and (4)) but rather for prepetition work in raising and pursuing claims against the Debtors and to some extent the Sacklers, including in the multi-district litigation that was pending prepetition in the United States District Court for the Northern District of Ohio. Unsecured creditors' claims for collection of their prepetition costs, including of attorneys' fees and expenses, as well as rights under applicable non-bankruptcy law, such as on a "common benefit" basis, are enforceable in bankruptcy without the need to comply with subsections 503(b)(3) and (4) of the Bankruptcy Code, which, again, apply only to administrative expenses.

23

In re United Merchs. & Mfrs., Inc., 674 F.2d 134, 138 (2d
Cir. 1982).

The U.S. Trustee's objection also is misplaced
because the remaining fees to be paid under section 5.8 also
are not being sought as an administrative expense payable on
the plan's effective date (as would be required under
section 1129(a)(9)(A) of the Bankruptcy Code if they were
being sought as administrative expenses) but rather as part
of a heavily negotiated compromise of those fees and the
clients' obligation to pay them reached during the mediation
in this case conducted by Kenneth R. Feinberg and Hon. Layn
R. Phillips (ret.).

The settlements provided for in section 5.8 that
resulted from the mediation are subject to this Court's
review both under Bankruptcy Rule 9019 and, I believe --
although there are arguments to the contrary -- under
section 1129(a)(4) of the Bankruptcy Code, as has been so
recognized in this district. See In re Stearns Holdings,
LLC, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019); In re Sabine
Oil & Gas Corp., 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016).

The U.S. Trustee relies upon a case that is
clearly distinguishable, Davis v. Elliot Mgmt. Corp. (In re
Lehman Bros. Holdings, Inc.), 508 B.R. 283 (S.D.N.Y. 2014),
in which the district court noted that Congress specifically

precluded in Bankruptcy Code section 503(b)(3)(D) recovery by official creditors' committee members of their postpetition fees and expenses, and therefore any settlement of those expenses would have been an improper workaround of that provision.  Id. at 288-91.

Mr. Feinberg's mediator's report [Dkt. No. 3339] makes it clear (and there is, in addition, unrefuted supporting testimony by Gary Gotto, John Guard, Peter Weinberger, and Jayne Conroy) that the compromised contingency fees provided for in section 5.8 -- again, almost all of which are for services rendered prepetition -- are reasonable and indeed significantly reduced from a non-bankruptcy range of generally 20 to 40 percent to the ranges set forth in Section 5.8.

As stated at paragraphs 23-25 of the mediator's report, the contingency fee resolutions as well as the common benefit assessments reached in the mediation are consistent with fee arrangements or assessments agreed upon in other similar mass-tort contexts and are reasonable.  See also the trial declaration of Gary Gotto at paragraphs 18(g) and 25(g); the John Guard declaration at paragraphs 57 through 60, 73, and 77 through 78; the Weinberger declaration at paragraphs 20 through 27 and 31 through 32; and the Conroy declaration at paragraphs 11 through 15.

25

It has been argued that because these section 5.8 fees and expenses are not being paid by the Debtors but by the clients through the trusts that the clients have agreed will be the source of their recovery, they are not subject to this Court's review for reasonableness under the plain terms of Bankruptcy Code section 1129(a)(4) but are, rather, like the fees any claimant would pay its counsel. I conclude, however, that the thrust of section 1129(a)(4), evidencing Congress' desire that unreasonable fees and expenses not be allowed under the pressure of plan confirmation, is that the Court have the ultimate say on the reasonableness of these fees under section 1129(a)(4).

That reasonableness inquiry does not require an extensive review, however, if reasonableness can be otherwise established.  In re Journal Register Co., 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009), citing Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.), 150 F.3d 503, 517 (5th Cir. 1998).  Based on the uncontested declarations and mediator's report that I've previously cited -- and I note that the U.S. Trustee has made no effort to contest these, despite at least implicitly contending that the fees and expenses are improper or unreasonable -- I find that all but one of the contingency fees provided for in section 5.8 of the plan and the

26

mechanism for allocating them among counsel are reasonable.
Indeed, the mediated settlement set forth in section 5.8
benefits the estates and creditors by materially reducing
the fees and expenses that might otherwise be claimed from
the clients and therefore indirectly reduces the claims
against the estates.

There are, however, two sets of fees covered by
section 5.8 that I cannot on this record make a
reasonableness finding on, those of counsel to the personal
injury ad hoc committee and of counsel to the school
districts' ad hoc committee.  I noted this issue during oral
argument.  These fees are not the reduced contingency fees
that the parties and Mr. Feinberg as mediator negotiated and
that I have analyzed based on the uncontroverted evidence as
being reasonable but, rather, are based on counsels' hourly
rates and perhaps in one instance a contingency fee that was
not negotiated.  I have not seen any time records or hourly
rates charged by counsel billing at an hourly rate, nor have
I seen the time spent relative to the contingency fee, nor
do I have any testimony as to the reasonableness of the
contingency fee, so I believe that I will need to make a
reasonableness finding as to those counsel fees and expenses
in the future under section 1129(a)(4).

The plan has already been amended to reflect this

conclusion raised during oral argument, with one wrinkle.
It contemplates that the contingency fee portion of counsel
for the school districts' fees will not be reviewed by the
Court but, rather, by Mr. Feinberg. I'm not prepared to
accept that mechanism. I will certainly consider Mr.
Feinberg's views, as I have regarding the contingency fee
compromises that I have approved, but I ultimately must make
the reasonableness determination on notice to parties in
interest, including to the U.S. Trustee, under section
1129(a)(4).

**Objections by Creighton Bloyd, Stacey Bridges, and
Charles Fitch**. Creighton Bloyd, Stacey Bridges, and Charles
Fitch in their individual capacities object that there was
insufficient notice to those incarcerated in prison of the
bar date for filing claims, notwithstanding the extensive
notice testified to by Ms. Finegan.

There is a fundamental problem with these
objections, however, in that all three of the objectors have
filed a timely proof of claim in these cases and a timely
confirmation objection. They therefore lack standing under
Article III of the Constitution to pursue, and this Court
lacks the power to decide, their objections because there is
no remedy that the Court can grant for their complained-of
wrong.

As stated in TransUnion LLC v. Ramirez, 141 S. Ct.
2190, 2202-03 (2021), to have standing, and for there to be
a case and controversy, the party raising a matter with a
federal court must have a personal stake in fact in
obtaining a remedy, which clearly is lacking here. See also
Kane v. Johns-Manville, Corp., 843 F.2d 636, 642-46 (2d Cir.
1988), which dealt with almost the same issue as raised by
these objections, with the same result.

Mr. Bloyd also filed a second confirmation
objection based on what he believes might be the
consequences of the Debtors' guilty plea in their October
2020 criminal and civil settlement with the Department of
Justice.  Mr. Bloyd contends that people like him might have
an individual right under the Mandatory Victims Restitution
Act, 18 U.S.C. § 36633A, to proceeds to be paid by the
Debtors to the United States under the DOJ settlement.

His counsel acknowledged at oral argument, though,
that this issue is properly raised not here but at the
Debtors' sentencing before the New Jersey District Court as
contemplated by the settlement.

Even if that wasn't conceded, I conclude that any
entitlement of Mr. Bloyd to a portion of the DOJ settlement
proceeds arises not in the context of plan confirmation but,
rather, properly after the Debtors make the DOJ settlement

payment.  I also do not believe the issue affects the
feasibility of the plan and note, finally, that the
discretion of the district court under the MVRA to require a
specific restitution fund is likely to be informed by the
very large number of potential victims for whom the DOJ
could be said to be acting, as well as based on the
complexity of determining the number and amount of the
victims' claims and the allocation to them of the settlement
proceeds.

Mr. Bloyd also arguably has suggested that somehow
the Debtors and the Department of Justice colluded in
agreeing to the October 2020 settlement agreement by not
specifically providing for a restitution fund under the
MVRA, but this contention is not supported by the record.

Regarding the plan's treatment of the United
States, the Debtors have established that the plan was
proposed in good faith under section 1129(a)(3) of the
Bankruptcy Code.  There is no evidence of any attempt to
improperly cut off rights that individual victims would have
under the DOJ settlement and, indeed, the personal injury
class was well and actively represented in the mediation in
these cases conducted by Messrs. Feinberg and Phillips that
resulted in the plan's allocation of value among public and
private creditors, including the agreement to fund the

30

personal injury trusts.

It is well established in the Second Circuit that
some creditors' failure to participate in a mediation does
not render the results of a mediation improper or not in
good faith if there was no conflict of interest.  In re
Drexel Burnham Lambert Group, 960 F.2d 285, 293 (2d Cir.
1992).  The mediation between personal injury and other
private claimants, on the one hand, and governmental
claimants on the other over the allocation of funds to the
personal injury trusts was in good faith, as shown by, among
other things, the mediators' report and the ad hoc personal
injury committee's alignment with all personal injury
creditors.  The extent of the vote of the non-NAS personal
injury claimants' class, 95.7 percent in favor of the plan,
also argues in favor of the good faith treatment of the
personal injury creditors under the Plan in relation to the
United States' and other types of creditors' recoveries. I
therefore will overrule Mr. Bloyd's second objection to
confirmation of the plan.

**Certain Canadian Creditors' Objections**. Certain
Canadian municipalities and First Nations have objected to
the plan on various grounds, all premised ultimately on
their view that rather than be treated as general unsecured
creditors in Class 11(c) of the plan, they must be

classified with the U.S. non-federal governmental creditors
and Native American Tribes in Classes 4 and 5, respectively,
and thus participate in the opioid abatement trusts created
under the plan for those classes instead of receiving their
pro rata share of the cash payment to Class 11(c).

It should be noted that these objectors have not
contended that the value to be paid to them under the plan
differs unfairly in value from that to Classes 4 and 5.
But, in any event, they concede that if their votes were
counted in Class 11(c), as opposed to in Classes 4 and 5,
Class 11(c) would still have overwhelmingly accepted the
plan. Thus the provision in section 1129(b)'s cramdown
requirement that there be no unfair discrimination among
similarly situated creditors in different classes does not
apply. Instead, the objection is, if at all, properly
couched under different provisions of the Bankruptcy Code.

In that regard, there was some suggestion during
oral argument and in one sentence in the objection that the
claims of the Canadian municipalities and First Nations
should not have been allowed for voting purposes at $1.00,
as provided in the Court's confirmation procedures order,
along with all other contingent unliquidated claims, the
objectors' implication being that if their claims had been
liquidated they might have carried Class 11(c)'s vote. They

32

have made no request, however, to estimate their claims for
voting purposes under section 502(c) of the Bankruptcy Code
or to temporarily allow them in a different amount than $1
under Bankruptcy Rule 3018(a).[2]

Further, such temporary allowance in a uniform
amount of mass tort claims such as those here in the sum of
$1 for voting purposes is well recognized as fair. See In re
Lloyd E. Mitchell, Inc., 373 B.R. 416, 428 (Bankr. D. Md.
2007), and the cases cited therein.  The alternative, fixing
the amount of hundreds of thousands of unliquidated disputed
claims before voting on a plan (because of course once the
claims liquidation process started, most, if not all, of the
claimants would insist on their claims being liquidated)
would take years, defeating the conduct and purpose of the
bankruptcy case.  Kane v. Johns-Manville Corp., 843 at 647-
48.

Given that section 1129(b) doesn't apply to the

---

[2] Indeed, based on my review of these Canadian
municipalities and First Nations' proofs of claim, which
rely on attached complaints against both non-Debtor Purdue
Canada and other non-Debtors and against the Debtors that do
not distinguish between the conduct of the Debtors and the
non-Debtors, it is far from clear that the claims really are
against the Debtors. To the extent they are against Purdue
Canada or other non-Debtors, those claims are fully
preserved under the plan.  Nor are claims that are based on
the shareholder released parties' conduct related to non-
Debtors released or enjoined under the plan.

objecting Canadian claimants because of the class vote, the
only remaining issue is whether the plan's separate
classification of them in Class 11(c), rather than in the
classes where they want to be classified, is proper.

A plan proponent has the right under the
Bankruptcy Code to classify similar claims in separate
classes if there is a reasonable basis to do so.  See
generally 7 Collier on Bankruptcy ¶ 1122.03[1][c] (16th Ed.
2021); see also In re LightSquared, Inc., 513 B.R. 56, 83
(Bankr. S.D.N.Y. 2014); In re Drexel Burnham Lambert Group,
Inc., 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

Section 1123(a)(1) of the Bankruptcy Code, which
is incorporated into section 1129(a)(1), states that
"[n]otwithstanding any otherwise applicable non-bankruptcy
law, the plan shall designate, subject to section 1122 of
this title, classes of claims."  11 U.S.C. § 1123(a)(1).
Section 1122 provides only that, "except as provided in
subsection (b) of this section [which is inapplicable here],
a plan may place a claim in a particular class only if such
claim or interest is substantially similar to other claims
or interests in such class."  11 U.S.C. § 1122.  It does not
require all substantially similar claims be placed in the
same class.

Here, there are reasonable bases for separately

classifying these objectors' claims from the U.S. public creditors and Native American Tribes: (x) the different regulatory regimes that the objectors operate under with regard to opioids and abatement, as well as (y) the fact that the allocation mediation conducted by Messrs. Feinberg and Phillips that resulted in the plan's division of the Debtors' assets and third-party claims among private and public claimants and then separately the public claimants' allocation of their share among themselves involved only U.S.-based public claimants with their own regulatory interests and characteristics.

There was no request by any of the objecting Canadian creditors to participate in that mediation.  The record is also clear, and I can take judicial notice of the fact, as well, that those who did request to participate in the mediation, if they had a reasonable basis to do so, were generally invited into it, including, for example, the NAACP.  One's failure to participate in a mediation should not detract from the settlement reached if the classification scheme is fair and rational.  See Ad Hoc. Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.), 933 F.3d 918, 927-28 (8th Cir. 2019).

This is not the first time that U.S. and Canadian

creditors have been found to be properly classified

separately.  See Class Five Nev. Claimants v. Dow Corning

Corp. (In re Dow Corning Corp.), 280 F.3d 648, 661 (6th Cir.

2012, and In re W.R. Grace & Co., 729 F.3d 311, 329-30 (3d

Cir. 2013), where Canadian claimants, including the Queen on

behalf of Canada, were found to be separately classified

properly because of the different types of recovery their

claims would have under applicable law, a close analogy to

the different regulatory schemes that would apply here to

the NOAT and Native American Tribes Trust.  The plan's

classification scheme therefore is proper as it pertains to

the objecting Canadian municipalities and First Nations.

These objectors also suggested that the plan was

not proposed in good faith for purposes of section

1129(a)(3) of the Bankruptcy Code.  But that objection is

premised on the same classification argument overruled

above.  Again, given the plan's rational basis for separate

classification and the lack of any evidence to show that the

objecting creditors were improperly silenced or excluded

from negotiations, I find that the plan has been proposed in

good faith as to them.

These objectors also suggested that the Debtors

have not satisfied the "feasibility" test under section

1129(a)(11) of the Bankruptcy Code.  The uncontested

declaration of Mr. DelConte establishes, however, by showing

projections for NewCo and discussing the assignability of

the Debtors' insurance and insurance rights, that the plan

satisfies section 1129(a)(11).  The objecting Canadian

municipalities and First Nations do not dispute this

generally but contended at the confirmation hearing that

their treatment under the plan would be sufficiently

objectionable to the court presiding over the Canadian

Companies Arrangement Act proceeding in Canada ancillary to

those cases that it might not grant recognition of or

enforce the plan in Canada.

Based on my understanding of the Model Law on

Cross-Border Insolvencies, which is in effect in Canada as

well as forming the basis of Chapter 15 of the Bankruptcy

Code, I am reasonably comfortable, however, that the

Canadian court will recognize and enforce the plan, although

of course that is a decision for the Canadian court to make,

and not view the plan as unduly discriminatory against

Canadian creditors in the light of what they would

reasonably recover from the Debtors if the plan were not

confirmed, as well as the difference between the non-

bankruptcy regulatory regime that governs the Canadian

creditors from that applying to U.S. governmental units and

Native American tribes.

I also believe that the "public policy" exception to recognition under the Model Law on Cross-Border Insolvencies would not be applied by the Canadian court given the narrow nature of that exception, although again, of course, that decision is left to the Canadian court.

Further, it appears based upon Mr. DelConte's declaration that while recognition in Canada is important and would bring clarity and finality to the claims of Canadian creditors against these Debtors, the absence of the Canadian CCAA court's recognition is not critical to the survival of NewCo under the plan and the Chapter 11 feasibility test therefore is satisfied in any event.

Besides raising the foregoing objections, the Canadian creditors object to the plan's release of third-party claims against the shareholder released parties.  To the extent that they make the same arguments as others who raised this issue, I will address them collectively later.

In addition, however, the Canadian objectors have contended that because no money from the shareholder settlement is being specifically channeled to Class 11(c), Class 11(c) creditors like them should not be enjoined under the plan from pursuing whatever claims they may have against the shareholder released parties based on their U.S. conduct.

Upon the record before me, though, I conclude that
the lack of specific channeling of any of the third-party
claims settlement proceeds to Class 11(c) does not justify
this objection.  It is uncontested by the Canadian creditors
that under the "best interests" liquidation analysis in the
DelConte declaration, Class 11(c) would receive no recovery
on their claims against the Debtors if, as I believe would
occur, upon their carveout from the plan's third-party
release provisions that are an essential quid pro quo to the
shareholder released parties' settlement, the Debtors would
liquidate.  That settlement, in other words, enables Class
11(c)'s recovery to exist.

Further, there has been no indication by these
claimants that the shareholder released parties would be
liable to them based on their conduct related to the U.S.
Debtors.[3]  Indeed, as noted above, there is little indication
that these creditors have any claims against the U.S.
Debtors in the first place, let alone claims against the
Sacklers covered by the release.  The Sacklers' defenses to
such claims, as well as the costs and impediments to
collecting on any eventual judgment against them, will be
discussed later in the context of a general analysis of the

_____

[3] Again, the third-party claims release does not cover claims based on
the shareholder released parties' conduct related to non-Debtors.

plan's third-party claims release. Suffice it for now that

that any recovery by these Canadian objectors under the plan

is inextricably tied to the plan's release of the

shareholder released parties and their payment of the

settlement amount that enables the recovery to Class 11(c)

creditors, a recovery they would not receive in a Chapter 7

liquidation from the Debtors' estates and the shareholder

released parties combined.  Thus even without those proceeds

being specifically channeled to Class 11(c), it is fair to

the Canadian objectors to bind them to the release

provisions in the plan.

**Certain States' Classification Objection**.  Certain

of the objecting states and the District of Columbia have

also raised objections to confirmation besides their

objection to the third-party claims release and injunction

in the plan.

They have asserted, first, that the plan violates

section 1122 of the Bankruptcy Code by classifying them in

Class 4 along with their political subdivisions.

Given that classification, the objecting states

and the District of Columbia are a small percentage of Class

4's 3.13% rejecting vote, compared to the class' 96.87% vote

in favor of the plan.  These objecting states and the

District of Columbia obviously do not like being portrayed

in that way, and I do view them to some extent as
representing their populations as a whole (although various
political subdivisions of these objecting states actively
support the plan, raising the question, which political
entity is closer to its constituents?).

I do not accept, however, their blanket
characterization that because they are states, the other
public creditors, political subdivisions, and municipalities
that are in Class 4 can be silenced as a matter of non-
bankruptcy law based, as the objectors argue, on the <u>parens
patriae</u> doctrine or "<u>Dillon</u> rule" with respect to some of
the subdivisions' claims.  As briefed by the AHC and MSGE,
the vast majority of states have enacted "home rule" laws
that override those doctrines.

As importantly, the objecting states and the
District of Columbia have made no attempt to silence the
other members of Class 4 by seeking to disallow their claims
for lack of standing or to designate their votes under
section 1126(e) of the Bankruptcy Code so that they wouldn't
be counted.

The objectors acknowledge, moreover -- as stated
on the record by their counsel -- that their claims have the
same rights to the Debtors' assets as other general
unsecured creditors, including the political subdivisions

that are in their class.  That is, the states' claims are not priority claims, they are not secured claims, they are simply general unsecured claims like their political subdivisions'.

And under those circumstances, the states' claims are properly classified under Bankruptcy Code section 1122(a) with the other governmental entity claims in Class 4.  As noted by the Third Circuit in In re W.R. Grace & Co., 729 F.3d at 326, which upheld a chapter 11 plan's classification of the State of Montana with private claimants also holding personal injury claims,

> "[t]o determine whether claims are 'substantially similar' [for purposes of section 1122(a)], 'the proper focus is on the legal character of the claim as it relates to the assets of the debtor.' In re AOV Indus., Inc., 792 F.2d, 1140, 1150 (D.C. Cir. 1986); see also In re Tribune Co., 476 B.R. 843, 855 (Bankr. D. Del 2012) (concluding that the phrase 'substantially similar' reflects 'the legal attributes of the claims, not who holds them') (internal quotation marks omitted); In re Quigley, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ('Claims are similar if they have substantially similar rights to the debtor's' assets.') (emphasis and internal quotation marks omitted)."

See also In re Drexel Burnham Lambert Group, Inc., 138 B.R. at 757; 7 Collier on Bankruptcy ¶ 1122.03[3].

That is clearly the case here and, therefore, the claims can and should properly be classified together given the agreement by all of the states (with the exception of West Virginia) and territories along with the other members

42

of Class 4 to the allocation of distributions within Class 4 among themselves, as well to as the allocation of distributions to the public creditors, on the one hand, and the private creditors on the other, that was reached during the mediation conducted by Messrs. Phillips and Feinberg.

(It also is worth noting, although it has no bearing on the classification issue, that if the plan had separately classified the states and territories from the other public creditors (although that would have unduly complicated the universally agreed allocation of value as between the states and all of the other public entities in Class 4 and the public/private allocation under the plan), the percentage of states and territories accepting the plan would go to over 79 percent, still well above the 75 percent supermajority threshold in the analogous provision of Bankruptcy Code section 524(g).)

The objecting states and the District of Columbia also contend that the Court's order establishing confirmation procedures improperly allowed their claims for voting purposes at $1 (as it allowed all other opioid-related claims for voting purposes, which similarly have not been liquidated and would be disputed). Notwithstanding that the objectors have agreed to the allocation formula under the NOAT, and thus that their claims will never need to be

43

liquidated for the plan's distributions to be made on their
claims, they contend that their claims must be liquidated
before their votes can be counted.

But this objection should be denied for the same
reasons as the similar objection made by the Canadian
municipalities and First Nations objectors.  These objectors
have made no attempt to seek to estimate their claims or
temporarily allow them for voting purposes in a different
amount under section 502(c) of the Bankruptcy Code or
Bankruptcy Rule 3018(a).  And there is an obvious reason why
they haven't. If such a request had been made, almost all,
if not all, of the other claimants with unliquidated claims
would have made a similar request, leading to lengthy,
expensive, and, as shown by the parties' agreement to their
treatment in Class 4 solely for opioid abatement under an
agreed formula, unnecessary litigation over the amount of
their claims.  Under such circumstances, it is entirely
appropriate to allow the claims for voting purposes in the
sum of $1.00.  Kane v. Johns-Manville Corp., 843 F.2d at
647-48; In re Lloyd E. Mitchell, Inc., 373 B.R. at 428.

The objectors also argue that they are being
treated unfairly under the plan in relation to the United
States, which, unlike them, is in large measure carved out
of the plan's third-party claims release.  This is not a

44

proper objection, however, under section 1123(a)(4) of the
Bankruptcy Code, cited by the objectors, which states that a
plan shall "provide the same treatment for each claim or
interest of a particular class unless the holder of a claim
or interest agrees to a less favorable treatment," 11 U.S.C.
§ 1123(a)(4), because the plan classifies the United States
in different classes than the objectors.

        Clearly also, that separate classification is
appropriate.  As discussed earlier, the Bankruptcy Code
gives plan proponents the ability to classify similar claims
in different classes if there is a reasonable basis to do
so. 7 Collier on Bankruptcy ¶ 1122.03[1][a]. Here, there
clearly is a rational basis to classify the United States
separately from the other public creditors.  Indeed, the
United States has qualitatively different claims to the
Debtors' assets in some respects, mandating its multiple
separate classifications from general unsecured creditors.
In addition to its general unsecured claims in Class 3, it
has secured claims, which are treated as part of one of the
aspects of the plan's settlements, it has a superpriority
administrative expense claim under the October 2020 DOJ
settlement, and it has priority claims.  And, unlike the
claimants in Class 4, the United States has already settled
civil claims against the Sacklers for a specific payment

45

under its separate postpetition DOJ settlement agreement

with the Sacklers.  Finally, the United States' treatment

under the plan is different than the treatment of the Class

4 claims; unlike them, it is not required to use its plan

distributions for abatement, although it has agreed under

the DOJ settlement to forego $1.775 billion of its

superpriority claim if, as the plan provides, NewCo is

established on the effective date to operate for the public

benefit and the states and other public claimants in Class 4

agree to use their distributions for abatement.

Clearly, then, the United States' different rights

and different treatment support its separate classifications

from Class 4, nor is an unfair discrimination argument

available under section 1129(b) of the Bankruptcy Code given

that Class 4 has accepted the plan, thus negating the need

for the Code's cramdown provision to apply.

**West Virginia's Limited Objection to the NOAT**

**Allocation Formula**. The State of West Virginia does not

object to any aspect of the plan other than its allocation

in Class 4 and under the NOAT distribution procedures of the

funds to be distributed to it for abatement of the opioid

epidemic.

First, it contends that the plan has not been

proposed in good faith for purposes of section 1129(a)(3) of

46

the Bankruptcy Code because of the NOAT's assertedly unfair
allocation formula for the states.  Under section
1129(a)(3), the Court shall confirm a plan only if the
proponent shows that "the plan has been proposed in good
faith and not by any means forbidden by law."  11 U.S.C. §
1129(a)(3).  The Code does not define "good faith," but the
courts have a fair consensus on its meaning in section
1129(a)(3).  All courts emphasize, based on the section's
plain terms, that the inquiry should primarily focus on
whether the proposal of the plan was in good faith, not on
whether the plan generally is in good faith or undertake an
even more free ranging inquiry into fairness and equity.
Many courts go further, to limit the section's application
to whether the proposal of the plan was in good faith or
instead infected with improper conflicts of interest or
self-dealing.  See, e.g., Garvin v. Cook Invs. NW, SPNWY,
LLC, 922 F.3d 1031, 1035 (9th Cir. 2019) ("A contrary
interpretation not only renders the words 'has been
proposed' meaningless, but makes other provisions of §
1129(a) redundant."); see also 7 Collier on Bankruptcy ¶
1129.02[3][a].

Generally, the Second Circuit has focused on the
proposal of the plan.  See Argo Fund Ltd. v. Bd. Of Dirs. of
Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg.,

S.A.), 528 F.3d 162, 174 (2d Cir. 2008); Kane v. Johns-
Manville Corp., 843 F.2d at 649; In re Koelbl, 751 F.2d 137,
139 (2d Cir. 1984).  On the other hand, courts in this
district, while focusing largely on the proposal of the
plan, including on the process of plan development, have
also considered whether the plan, "... will achieve a result
consistent with the standards prescribed under the
Bankruptcy Code." In re Ditech Holding Corp., 606 B.R. at
578, and the cases cited therein.  See also In re Chemtura
Corp., 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); In re
Quigley Co., Inc., 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010);
In re Genco Shipping & Trading Ltd, 513 B.R. 233, 261
(Bankr. S.D.N.Y.); In re Breitburn Energy Partners LP, 582
B.R. 321, 352 (Bankr. S.D.N.Y. 2018).

     As recognized by Judge Garrity in Ditech, those
policies or objectives include preserving going concerns,
maximizing property available to satisfy creditors, giving
debtors a fresh start, discouraging debtor misconduct, the
expeditious liquidation of claims and distribution of the
bankruptcy estate to creditors and, where warranted,
interest holders, and achieving fundamental fairness in the
collective context of a bankruptcy case.  606 B.R. at 578.

     Here, I have ample testimony by John Guard, from
the office of the Attorney General of the State of Florida,

48

that the allocation of the NOAT among the states under the
plan and the NOAT distribution procedures derived from good
faith, arms' length negotiations by the states preceding the
mediation by Messrs. Phillips and Feinberg and then
continuing to completion during it.  That testimony really
is unassailable as to the plan's good faith on this issue.
It highlighted that these difficult but ultimately nearly
comprehensively successful negotiations (with the exception
of West Virginia's disagreement) took into account the
differing interests of the various states, which if not as
weighty as those underlying the compromises at the
Constitutional Convention, were similar: for example, the
interests of states with small populations, though heavily
impacted by opioids; the interests of states with large
populations and therefore more people affected by opioids;
the interest of states with different health and law
enforcement resources; and the interests of states with
different ways of reporting opioid-related deaths and other
conditions of opioids' impact.

        Mr. Guard testified credibly that while the
negotiations were difficult, the states recognized and tried
to address these differing interests in an overall
allocation formula. He also testified credibly that no state
was prepared to come even close to accepting the alternate

allocation proposal put forth by West Virginia but that
states with characteristics similar to West Virginia agreed
that the plan's allocation formula adequately addressed
their concerns.

The states' unanimous agreement to accept their
recovery in the form of money solely devoted to opioid
abatement, and their nearly unanimous agreement on the
allocation of that distribution among them is truly
remarkable, and, as noted during the confirmation hearing by
the Attorney General of West Virginia, likely will serve as
a model for the allocation of future settlement proceeds
from other opioid manufacturers and distributors among the
states.  Without that agreement, the goals of the Bankruptcy
Code would have been jeopardized. Such a failure would have
resulted in extensive litigation over the various states'
claims, a lengthy delay in making distributions to abate the
opioid crisis, and arguably a fallback to distributing the
value under the plan not for abatement purposes but, rather,
for general use by states and other public creditors.

Mr. Guard's testimony was supported by the cross-
examination of West Virginia's expert, Charles Cowan, Ph.D.
Mr. Cowan acknowledged that in publications that he wrote
before being retained by the State of West Virginia for the
purpose of showing why it should receive a larger allocation

of the NOAT distributions, he recognized that other methods
of allocating money towards abatement could be fair and
reasonable, as well, and that there was no specific "best"
formula for allocating settlement funds to public creditors.
He also acknowledged that the plan's allocation formula was
an acceptable choice if West Virginia's proposal was not
adopted by the Court. He acknowledged that his proposed
allocation to West Virginia was outside the range of
allocations under formulas that he earlier had written were
reasonable, whereas West Virginia's allocation of
distributions to the NOAT was within those ranges.

It was clear that the allocation formula proposed
by Mr. Cowan also would lead to peculiar allocations of the
NOAT funds for abatement, for example that states with
substantially smaller populations would get substantially
more funds than states with large populations.  Thus the
State of Washington would have a larger recovery than Texas,
and West Virginia would have a larger recovery than
Virginia, although they are neighboring states and West
Virginia is losing population and Virginia's is growing.

Mr. Guard and Mr. Cowan agreed that West Virginia
and certain other states have been disproportionately harmed
by the opioid crisis, but their testimony also reflected
that a state's population is an important element of any

51

allocation formula because it reflects the resources that a
state will need to bring to bear for abatement.  Their
testimony established, moreover, that different states
report opioid deaths and opioid disorders differently from
each other, casting some doubt on the reliability of an
"intensity" emphasis for an abatement allocation formula.

Lastly, the NOAT allocation formula does in
certain ways recognize the interests of smaller states,
including levels of intensity of harm.

I therefore find and conclude that the NOAT
allocation was derived in good faith by arms' length and
fair negotiations among the parties and satisfied Bankruptcy
Code section 1129(a)(3).

I also find and conclude that the treatment of the
states in Class 4, and through it by means of the good
faith, fair, and uniform trust procedures and allocation
formula for the NOAT, provides for the same treatment of
each claim in Class 4 for purposes of section 1123(a)(4) of
the Bankruptcy Code.  As discussed in In re W.R. Grace &
Co., "[a]lthough neither the Code nor the legislative
history precisely defines the standards of equal treatment,
courts have interpreted the 'same treatment requirement' [of
section 1123(a)(4)] to mean that all claimants in a class
must have the same opportunity for recovery."  729 F.3d at

52

327 (internal quotations and citation omitted). See also In re Cent. Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990), which W.R. Grace cites for the proposition that "a plan that subjects all members of the same class to the same process for claim payment is sufficient to satisfy the requirements of Section 1123(a)(4)." 720 F.3d at 327.

The W.R. Grace court goes on to state, "Courts are also in agreement that § 1123(a)(4) does not require precise equality, only approximately equality," id., citing In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007), and In re Multiut Corp., 449 B.R. 323, 334 (Bankr. N.D. Ill. 2011). The consequences of how and when the class members would be paid under W.R. Grace's plan did not produce a substantive difference in a claimant's opportunity to recover and were the result of, among other things, a comprehensive mediation and arms' length negotiations, and thus the plan satisfied section 1123(a)(4). In re W.R. Grace & Co., 729 F.3d at 328. The same analysis applies to the treatment of the NOAT allocation among the states in Class 4.

I was not going to reach the same conclusion with respect to a former element of the NOAT allocation and distribution procedures. One of the adjustments made for the benefit of states with smaller populations like West

53

Virginia in the NOAT allocation was a separate, so-called 1
percent fund, which all of the states, other than the small
states that would participate in the fund, were going to
contribute to, with, however, the exception of California.

I did not see sufficient evidence to justify
California's being excepted from that contribution
obligation to the 1 percent fund.  However, since the
discussion on the record during the confirmation hearing,
California has agreed to contribute to the 1 percent fund.
The one aspect of West Virginia's objection that I was going
to grant has effectively been granted, therefore, by this
agreement of the State of California.

Mr. Guard made it clear that all of the states
recognized the huge impact that the opioid crisis has had on
states like West Virginia and had tried to take that into
account in negotiating the NOAT allocation.  I too recognize
that impact, but I believe that given the arms' length
nature of the negotiation and the acceptable range of West
Virginia's treatment even within the writings acknowledged
by Mr. Cowan, its objection under Section 1129(a)(4) should
be denied.

**Pro se Objections/Good Faith**. The remaining
objections to the plan, other than objections based upon the
plan's third-party release and injunction provisions and the

plan settlement with the Sacklers and their related

entities, have been asserted by several parties who were not

represented by counsel.

These objections are properly viewed in roughly

four different categories.  First, Ms. Butler-Fink, Ms.

Villnave, Mr. Cobb, and Mr. Wright have stated in one form

or another that the plan should not give the Sackler family

"... immunity from criminal charges."

I completely agree, as does the plan.  The plan

does not contain a release of criminal conduct.  That is

crystal clear in the plan and always has been in these

cases.

It is understandable that a person who is not a

lawyer and looks at these cases from afar through one form

of the media or another may have reached a different

conclusion.  In part that is because either through

ignorance or choice, the plan has been described in the

media and online as providing "immunity" to the Sacklers for

crimes, including murder and illegal drug dealing.

"Immunity" clearly suggests immunity from criminal charges;

that's how one generally thinks of the word.  But the plan

simply does not grant such a release.  It couldn't do it,

and it doesn't.

Those who should know better, whether they are

55

reporters, law professors, or politicians, should not
suggest otherwise.  At best, suggestions that the plan would
relieve the Sacklers of potential criminal liability reflect
a lack of understanding about these cases; at worst, such
suggestions are irresponsible and, frankly, cruel to those
whom they mislead.

If anyone has engaged in criminal activity either
before or during these cases, they are not relieved of the
consequences of that liability under the plan.  If any
prosecutor wants to pursue such a claim against the released
parties, they can.

Ms. Graham, Mr. Normile III, Mr. Burris, Ms.
Willis, Ms. Ecke, Mr. West, and Ms. Farash have in one form
or another contended that it is improper or unfair for the
plan to provide only $700 million to $750 million in the
aggregate for distribution on account of non-NAS personal
injury claims, while the bulk of the recovery goes to, as
one of the objectors stated, "the government, politicians
and big businesses."

I have said more than once during these cases,
including to Ms. Ecke, who testified during the confirmation
hearing, that one cannot put a price on a human life or an
injury such as opioid addiction, and yet that's what courts
do with respect to personal injuries.  They take into

account a number of factors that are relevant legally,
including potential defenses and intervening circumstances
that defeat or dilute the claim, and ultimately the claimant
must meet the burden of showing proximate cause.  The dollar
amount that courts reach if they find a claim for personal
injury often does not seem like sufficient compensation.
That is particularly the case where the wrongdoer is
insolvent.

I did not have any specific valuation of personal
injury claims in this case.  What I do have is a lengthy and
difficult arms-length mediation led by two of the best
mediators not only in the United States but in the world,
Messrs. Feinberg and Phillips.  They are, I believe, in no
way beholden to any type of claimant or unduly sympathetic
to any type of claimant or any other party.

Mr. Feinberg, for example, had the incredibly
difficult job of working out, by dealing with victims and
their families, the proper allocation of the 9/11 fund.
Both mediators have extensively dealt with personal injury
claims over the course of their careers, and I believe they
have been so successful because they are as sympathetic, if
not more so, to individual victims as they are to states,
hospitals, and other corporate entities.

The people representing the personal injury

claimants in the mediation were some of the most effective
personal injury lawyers in the world, which means that they
are aggressive, creative, knowledgeable and responsible in
the pursuit of their clients' claims.  I believe that, as
set forth in the mediators' report, their negotiations with
the other classes of creditors were at arms-length and in
good faith. Dkt. No. 2548. I also do not see any conflict
between their representation of their tens of thousands of
clients in the mediation and the other tens of thousands of
personal injury claimants in these cases, who collectively
will receive the same type of treatment under the plan and
the personal injury trust claims and distribution
procedures.

I also carefully considered the trial declaration
of Jayne Conroy, who is one of those personal injury lawyers
and in fact with her colleagues was probably the main lawyer
to pursue Purdue and the Sacklers over more than a decade on
behalf of personal injury claimants.  Because of that dogged
work, she obtained a settlement for roughly 1,100 personal
injury claimants, albeit many years ago.  She described
those clients in her declaration as those who could tie
their injury to a prescription of one of Purdue's products,
from which I inferred that they probably were among those
most likely to obtain a recovery in a litigation,

notwithstanding all of the arguments that the defendants
would throw back at them.

After deducting a reasonable contingency fee from
that settlement, I believe on average the recovery under
that settlement -- and because I don't know how the recovery
was divided among the clients, I simply allocate it evenly
to each client -- was approximately $13,500 per person,
which is well within the anticipated range under the plan
for allowed personal injury claims.

The uncontroverted declarations of Peter H.
Weinberger, Gary A. Gotto, and Ms. Conroy describe the hard-
fought litigation and negotiation process leading to the
settlement contained in the plan for personal injury
claimants, a settlement they support and one which Ms.
Conroy testified reflects a "settlement premium" paid to
obtain a comprehensive result.

The uncontroverted trial declaration of Deborah E.
Granspan details the procedures under the personal injury
trust for efficiently -- though consistently with the burden
to prove one's claim -- establishing the amount of one's
personal injury claim and obtaining a distribution.  Her
declaration was uncontroverted in describing a trust
procedures mechanism that minimizes the difficulty and cost
of presenting a claim for personal injury while maintaining

59

a sufficient degree of rigor over the burden of proof to
ensure that as much of the money allocated to personal
injury claimants can go promptly and directly to them
instead of to lawyers.

I also have reviewed the declaration of Michael
Atkinson on behalf of the Official Unsecured Creditors
Committee, which attaches the Committee's letter in support
of the plan and recognizes the Committee's role in balancing
the interests of personal injury creditors with those of the
states and other entities that also assert claims, and
strongly supports confirmation of the plan as a fair balance
of those interests.

The plan vote of approximately 95.7 percent of the
non-NAS personal injury class in favor of the plan strongly
argues that the members of that class support the plan and
the fairness -- although only in this setting where one
allocates money from a limited pot based not on a moral view
of the value of a human life or a person's health but,
rather, upon the likelihood of such claims recovering in a
litigation -- of the plan's allocation of value among
personal injury claimants and other creditors.  Under the
plan that settlement provides for funds to be paid early to
personal injury creditors, ahead of the states and other
governmental entities, and fair procedures that make it

60

relatively easy, though preserving the burden of proof, to
obtain a recovery.

As I will discuss later, the plan's allocation of
value to all other creditors to be devoted solely to
abatement purposes will also provide value, though
indirectly, to all surviving personal injury claimants.

In sum, then, the plan's treatment of personal
injury claimants is a fair, mediated resolution of extremely
difficult private/public allocation issues.

The next set of objections was made by Ms.
McGaha, who also was a witness at confirmation, and Ms.
VomSaal.  Both raise legitimate concerns, as do all the
objectors, although, as I said before, I believe the first
group of objectors has been misled into thinking that the
plan provides for a release of criminal conduct.

Ms. McGaha and Ms. VomSaal question why after the
plan's effective date NewCo will continue to manufacture and
sell opioids in any form, even though such sales would be
lawful.  Ms. McGaha also makes certain recommendations that
could be viewed as abatement measures but are not
necessarily included in the abatement policies and
guidelines under the plan, such as the banning of long-term
opioids or at least making different disclosures regarding
them, changes in packaging, and the promotion of non-opioid

61

treatments for chronic pain and alternative, non-opioid
therapies for pain.

I believe strongly that every constituency in
these cases -- including the Official Unsecured Creditors
Committee, the Debtors themselves, the United States, the
states, the other governmental entities, the Native American
tribes group, the ad hoc group of hospitals, the ratepayer
and third-party payors groups, the NAS committees, and the
ad hoc committee of personal injury claimants -- has wanted
to ensure that the production and sale of this dangerous
product be not only lawful but also conducted in a way that
is cautious, subject to layers of oversight, and informed by
the public interest at every step.  That is the purpose of
the plan's provisions dealing with NewCo:  the NewCo
governance covenants, the NewCo monitor, the NewCo operating
agreement, and the NewCo operating injunction.

From the start of these cases, this was a primary
focus of the Official Unsecured Creditors Committee. This
has also been a focus since the start of the states and
political subdivisions and I believe soon after the start of
these cases of the other institutional creditors, such as
hospitals and school districts. That is why with the
exception of personal injury creditors all claimants in
these cases have agreed to take their distributions in the

form of payments to be devoted solely to abatement of the
opioid crisis.

The Debtors, too, have been focused on these
goals, for example at the start of these cases volunteering
a self-injunction pertaining to their legal manufacture and
sale of these products, agreeing to the appointment of a
monitor, and re-focusing their business in part to
developing overdose and addiction treatments to be sold at
or near cost.  Those measures are described in Mr. Lowne's
trial declaration, as well as the fact declaration of Mr.
DelConte.  They also were discussed in Mr. Atkinson
declaration and the attached letter from the Creditors
Committee, and they are reflected in the provisions of the
plan that I've just described.

Since before the start of these cases, this focus
has not involved any input from the Sackler family or their
related entities, because since before the bankruptcy
petition date the Sacklers have not taken any role
whatsoever on the Debtors' Board or otherwise regarding the
Debtors' management.

The Bankruptcy Code does not require this focus,
but in keeping with the broader view of section 1129(a)(3)'s
good faith requirement, the parties in interest have
required it, and I have encouraged them, so that at this

point I believe the measures that I have just described will set a standard not only for this company but for other companies that manufacture and distribute products like the Debtors' that are legal yet dangerous.

It is hard to imagine how any other company that engaged in this business or in the distribution of these types of products wouldn't also conclude that it was not only the right thing to do but also was in their interest to imitate these governance and operating constraints.  They're not being imposed by a government; they're being imposed by this plan with the input of state and local representatives and the federal government and, importantly, representatives of the victims of Purdue's prior conduct.  Again, these governance and operating constraints should serve as a model to similar companies as well as an implicit warning that if such companies do not take such care, if they rely instead only on the minimum that the F.D.A. or other federal or state law or regulations require, they may nevertheless, like Purdue, be found lacking if their products cause harm.

The plan's abatement programs themselves are the subject of substantial unchallenged testimony, including by Dr. Gautam Gowrisankaran and Dr. Rahul Gupta, and, with respect to the hospital class, William Legier and Dr. Gayle Galan.  And the abatement initiatives reflect heavy input by

64

all of the states and non-state governmental entities.
Again, to have reached agreement on these abatement metrics
and mechanisms is an incredible achievement given the strong
views that various parties have about what types of
abatement are proper.

Dr. Gowrisankaran's unchallenged testimony
described the clear multiplier effect of dedicating the bulk
of the value to be distributed under the plan, including
from the shareholder released parties, to abatement programs
as opposed to individual payments that perhaps could be used
for abatement but, as with prior national settlements such
as the settlements with tobacco companies, also could be
used for miscellaneous governmental purposes.

The foregoing testimony also shows, as do the
abatement metrics themselves, that the plan contemplates
abatement procedures that will take into account
developments and lessons learned over time about what works
and what doesn't.  That incremental development is furthered
by the plan's requirement for periodic reports on the use of
the abatement funds, which then can be checked to see what
succeeds and what doesn't and therefore how future NOAT
distributions might best be reallocated.

The abatement procedures and metrics also include
a consultation process taking into account the views of

65

local governments and people within local communities in a
reasonable and fair way; that is, they are not simply
imposed from the top down by the respective states.

Ms. McGaha and Ms. VomSaal don't identify a
specific legal basis for their objections (which is
understandable given that they are not represented by
counsel).  I have addressed them, however, in the light of
Bankruptcy Code section 1129(a)(3)'s good faith requirement.
Given all that I've just described, it is clear that the use
of most of the value to be distributed under the plan for
abatement purposes as specified is in good faith and, in
fact, beneficial to those who have individual claims against
the Debtors as well as the communities and states that also
have claims.  It is also clear that the plan's provisions
for the governance and operations of NewCo, facilitate not
only the purposes of the Bankruptcy Code but also the
broader good.  Within the constraints of federal law,
including regulations and guidance from the F.D.A, the NewCo
governance provisions go beyond that law where possible to
ensure the safety or the safe use of the Debtors' products,
including the development of products that would assist
those who are trying to recover from opioid use disorder and
provide cheap and accessible prevention mechanisms for
overdoses.

To suggest otherwise, to suggest that somehow this was an ill-cooked and cooked-in-secret stew (which I don't believe the two objectors are contending but has been suggested publicly by those who I don't think have been following these cases, or if they have been following them should know better), is incorrect and dramatically so.

The last objection by certain of the pro se objectors whom I've already named contends that the civil settlement under the plan with the shareholder released parties -- the Sacklers and their related entities -- is unfair and should not be approved.  That settlement would resolve the claims of (x) the Debtors' estates against those parties and (y) certain claims against the shareholder released parties based in large measure on the same conduct underlying certain of the Debtors' claims against the shareholder released parties and the third parties' claims against the Debtors.

It is my main task, notwithstanding the length of this ruling already, to consider whether that settlement of the Debtors' claims and related third-party claims against the shareholder released parties is proper under the Bankruptcy Code.

One point should be addressed first regarding this inquiry, and I discuss it now in part because it has been

67

raised by the pro se objectors, perhaps because of what they have read or heard in the media or from others.

Some assert that this Chapter 11 plan and the settlement in it is "the Sacklers' plan," or perhaps, artfully, it has been suggested that because it is proposed by the Debtors, and the Sacklers own the Debtors, the Debtors' plan is "the Sacklers' plan."

While I will separately examine whether the settlements with the Sacklers under the plan are fair, one thing is crystal clear, and anyone who contends to the contrary is, again, simply misleading the public: this is not the Sacklers' plan.  The Debtors are not the Sacklers' company anymore.  The Sacklers own the Debtors, but the Debtors are not run by the Sacklers in any way and have not been since before the start of these cases.  There is literally no evidence to the contrary -- none.  Although it was not necessary, because the record was clear, the examiner appointed in these cases confirmed it in his report. Dkt. No. 3285.

More importantly, and as recognized by the examiner, these cases were driven as much, if not more, by the Official Unsecured Creditors Committee and the other creditors in these cases who formed well-represented ad hoc committees, including committees of the 48 states and

68

territories that have claims against the Debtors (two states
having settled those claims before the start of the
bankruptcy cases) and strong representatives of non-state
governmental entities and Native American tribes; personal
injury claimants; victims of neonatal abstinence syndrome or
their guardians, hospitals, ratepayers and third-party
payors, and school districts.

These creditors essentially have represented the
interests of all creditors of these Debtors, although of
course other creditors were free as parties in interest to
appear and be heard.  And from the start of these cases, all
of the Debtors' assets were dedicated to them.  These
creditor groups wanted more than anything to obtain as much
value not only from the Debtors but also from the Sacklers,
who were viewed by all as the opposition, the other side,
the potential defendants, the payors.  And it is clear that
the Official Unsecured Creditors Committee, the states and
territories, the other governmental entities and tribes, and
the other ad hoc groups were completely independent from the
Sacklers in their focus on that goal.

They were facilitated in achieving that goal by
the two incredibly experienced and effective mediators I've
already discussed, Messrs. Philips and Feinberg. And,
further, even after a largely successful mediation of the

claims against the Sacklers -- claims by the Debtors'
estates and claims assertable by others -- which ultimately
resulted from the mediators' own proposal as to what would
be a fair settlement that was accepted by all of the
foregoing groups with the exception of the so-called
nonconsenting state group of 24 states and the District of
Columbia, I directed <u>another</u> mediation with another of the
best mediators in the world, my colleague Judge Shelly
Chapman.  Based on her mediation report [Dkt. No. 3119],
Judge Chapman held over 140 discussions before the mediation
day set aside to see whether the remaining nonconsenting
states could reach agreement with the Sacklers.  That "day"
lasted 27 hours. Id.

       Judge Chapman, like Mr. Feinberg and former Judge
Phillips, is a successful mediator because she does not
browbeat people, although even if she wanted to, she could
not browbeat the nonconsenting states' representatives.
She, like Messrs. Feinberg and Phillips, is a successful
mediator because she points out the risks and rewards of not
reaching a settlement and of reaching a settlement. At the
end of her mediation, fifteen of the states that had
previously fought the Sackler settlement tooth and nail
agreed to the modified settlement in the amended plan.

       I'm saying this not to show my support for the

70

underlying settlement but to highlight again the arms-length

negotiation of the plan and the fact that it is not a

"Sackler plan" but a plan agreed to by 79 percent of the

states and territories and well over 96 percent of the non-

state governments, and actively supported by the Official

Unsecured Creditors Committee and the other ad hoc

committees, notwithstanding the incredible harm that the

Debtors' products have caused their constituents.

Bitterness over the outcome of these cases is

completely understandable.  Where there has been such pain

inflected, one cannot help but be bitter.  But one also must

look at the process and the issues in the light of the

alternatives and with a clear understanding of the risks and

rewards of continued litigation versus the settlements set

forth in the plan.  And it's that process to which I'll turn

next.

**Analysis of the Settlements with the Shareholder**

**Released Parties**.  As I noted, the plan includes two

settlements with the Sacklers and their related entities.

It provides for the settlement of the Debtors' estates'

claims -- that is, the Debtors' claims against the Sacklers

and related entities for the benefit of the Debtors'

creditors.  (And the estates have substantial claims against

the Sacklers.  Indeed, one can argue that those claims are

the main claims against them.)   Second, the plan provides

for the settlement of certain third-party claims -- that is,

claims that could be asserted by others -- against the

Sacklers and their related parties, the "shareholder

released parties" under the plan.

I will focus first on the settlement of the

Debtors' estates' claims, but I will note before doing so

that the plan is not just a plan that settles the estates'

claims and certain third-party claims against the Sacklers

related to those claims and the third parties' claims

against the Debtors.   In fact, the plan contains several

other settlements interrelated to those settlements that

would not be achievable if either of the settlements with

the Sacklers fell away.

These include a settlement of the complex

allocation between personal injury claimants, NAS-personal

injury claimants and non-governmental entities, on the one

hand, and claims by public, governmental entities on the

other, a subject of months of mediation that I've already

discussed.   They also include a settlement of the allocation

of value among the public creditors -- the states and

nongovernmental entities and Native American tribes.

Remarkably, all parties with the exception of the

personal injury claimants agreed in the mediation to use the

value that they would receive solely for abatement purposes,
the multiplier-effect benefits of which I've already
described.  This includes the private, corporate entity
claimants as well as the non-federal governmental claimants.

In addition, during these cases, the Debtors
settled both civil and criminal claims of the federal
government, and the plan encompasses those settlements,
importantly including the United States' agreement to
release $1.775 billion of its $2 billion superpriority
administrative expense claim for the benefit of the other
public creditors if, as is the case here, the plan meets the
requirements of the DOJ settlement to establish an abatement
structure and the corporate governance and other public
purposes for NewCo that I have previously described.

Each of those settlements hinges on at least the
amount of money to be distributed under the plan coming from
the Sacklers and their related entities in return for (x)
the Debtors' settlement and (y) the third-party claims
settlement.  Without the $4.325 billion being paid by the
Sacklers under the plan and the other elements of the
Sackler settlements, those other elements of the plan would
not happen.  The record is clear on that.  The
private/public settlement would fall apart and the abatement
settlements likely would fall apart for lack of funding and

the inevitable fighting over a far smaller and less certain

recovery with its renewed focus on pursuing individual

claims and races to collection.

That still begs the question, though, is the

$4.325 billion, coupled with the Sackler's other agreements,

including the dedication of the two charities worth at least

$175 million for abatement purposes, the Sacklers' agreement

to a resolution on naming rights, their agreement not to

engage in any business with NewCo, their agreement to exit

their foreign companies within a prescribed time, their

agreement to various "snap back" protections to ensure the

collectability of their settlement payments, and their

agreement to an unprecedented extensive document depository

accessible to the public that will archive in a

comprehensive way the Debtors' history, including as it

relates to the development, production, and sale of opioids,

sufficient?  Obviously, more money from the Sacklers, if

such were obtainable, would not unravel the settlements that

I've already described.

Settlements and compromises of asserted or

assertable claims by debtors' estates are a normal part of

the process of reorganization in bankruptcy and are strongly

favored over litigation.  Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390

U.S. 414, 424 (1968).  This is in part for the obvious
reason that in bankruptcy the pie is not large enough to
feed everyone.  In bankruptcy the cost and delay factors in
deciding whether to approve a settlement are more
significant than in a non-bankruptcy context, as is an
assessment of the merits of the claims that are being
settled: the risks of losing a piece of the pie or having it
go stale are magnified if from the start there is not enough
to go around.

In determining whether to approve a settlement of
a debtor's estate's claims, a bankruptcy court must make an
informed independent judgment that the settlement is "fair
and equitable" and "in the best interests of the estate."
TMT Trailer Ferry, 390 U.S. at 424; In re Drexel Burnham
Lambert Group, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).
"In undertaking an examination of the settlement . . . this
responsibility of the bankruptcy judge . . . is not to
decide the numerous questions of law and fact raised . . .
but rather to canvas the issues and see whether the
settlement falls below the lowest point in the range of
reasonableness."  Nuevo Pueblo, LLC v. Napolitano (In re
Nuevo Pueblo, LLC), 608 Fed. Appx. 40, 42 (2d Cir. 2015),
quoting In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.
1983); see also Weinberger v. Kendrick, 698 F.2d 61, 74 (2d

75

Cir. 1982) ("The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one."); E. 44th Realty, LLC v. Kittay, 2008 U.S. Dist. LEXIS 7337, at *22 (S.D.N.Y. Jan. 23, 2008).  Nevertheless, a request to approve a settlement, including of course a major settlement like this in the context of a Chapter 11 plan, requires careful consideration and the right to an evidentiary hearing, and here warranted a six-day trial involving 41 witnesses.

Based on the framework laid out in TMT Trailer Ferry, courts in this Circuit have long considered the following factors in evaluating proposed settlements:

(1) The probability of success, should the issues be litigated, versus the present and future benefits of the settlement;

(2) the likelihood of complex and protracted litigation if the settlement is not approved, with its attendant expense, inconvenience and delay, including the difficulty of collecting on a judgment;

(3) the interests of the creditors, including the degree to which creditors support the proposed settlement;

(4) whether other interested parties support the settlement;

(5) the competence and experience of counsel

76

supporting, and the experience and knowledge of the court in reviewing, the settlement;

(6) the nature and breadth of the releases to be obtained by officers and directors or other insiders; and

(7) the extent to which the settlement is the product of arms-length bargaining.  See generally, Motorola, Inc. v. Off. Comm. of Unsecured Creditors & JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 464-66 (2d Cir. 2007).

The Iridium court also noted that how a settlement's distribution plan complies with the Bankruptcy Code's priority scheme may be the dispositive factor.  That is, unless the remaining factors weigh heavily in favor of approving a settlement, if the settlement materially varies the Bankruptcy Code's priority scheme, the court should normally not approve it.  That concern does not apply here, however.  As I have noted regarding objections to classification and treatment under the plan, the plan does not vary the Bankruptcy Code's priority scheme or otherwise violate the Code's requirements for classification and treatment within a class.

I will address the elements of evaluating a settlement in a different order than listed by the Iridium court, noting first, however, that they are applied even

where part of the settlement involves not just the simple
trade of money for a claim but, as here, also performance,
such as ceasing to be involved with Purdue or agreement to
the public document depository.  See, e.g., DeBenedictis v.
Truesdell (In re Global Vision Prods.), 2009 U.S. Dist.
LEXIS 64213 (S.D.N.Y. July 13, 2009).

As discussed, the Sackler settlement was clearly
and unmistakably the product of arm's-length bargaining
conducted in two separate mediations by three outstanding
mediators.  It was preceded, moreover, by the most extensive
discovery process that not only I have seen after practicing
bankruptcy law since 1984 and being on the bench since 2002,
but I believe any court in bankruptcy has ever seen.

The record is unrefuted regarding the incredible
extent of discovery taken not only by the Debtors through
their Special Committee and counsel, but also the Official
Unsecured Creditors Committee in consultation with the non-
consenting states group and the other states and
governmental entities, in fact anyone who wanted to sign a
standard nondisclosure agreement to permit discovery to
proceed without extensive fights over confidentiality.

From the first hearing in these cases, I made it
clear -- as was also recognized by Judge McMahon in Dunaway
v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.), 619 B.R.

38, 58-59 (S.D.N.Y. 2020), in affirming the preliminary

injunction that I entered -- that the Sacklers and their

related entities must provide discovery beyond even the

normally extensive discovery in bankruptcy cases as a

condition to retaining the continued benefit of the

injunction.  And that discovery occurred.

I did not have to decide one discovery dispute on

the record.  Each of the chambers conferences with parties

over discovery disputes led to the production of additional

discovery.  As a result of that process, approximately ten

million documents were produced, comprising almost 100

million pages, an almost unfathomable record that

nevertheless teams of lawyers for the creditor groups have

pored through to find anything suggesting a claim against

the shareholder released parties.

Thus any assertion that there has not been

"transparency" in these cases, at least to those who

negotiated the plan's settlements, who again in essence

represented all of the creditors in these cases, is simply

incorrect, and is particularly galling when asserted by any

of the states that continue to object to the plan on this

basis.  They know what they had access to.  They know how

unprecedentedly extensive that information was.

The only argument that they can make is that the

79

public hasn't had access to such information.  But of course
if the discovery and information-sharing process had not
been conducted as it was by the public's representatives,
including the very states that make this argument, far less
information would have been produced, most of which the
public would never have had access to in any event,
including if the settled claims instead went to trial or an
examiner issued an examiner's report.  Further, the
objectors had the ability to probe the merits of the
proposed settled claims, including their own claims, during
the confirmation hearing, and objecting states took
advantage of it to, among other things, extensively examine
four members of the Sackler family and present the
deposition testimony of a fifth.

The discovery record armed the parties in their
negotiations in the mediations, and the mediations further
fostered the arms-length bargaining in these cases.

The clearly arms-length nature of the negotiations
also establishes that conflicts of interest or self-dealing
do not taint the nature and breadth of the plan's proposed
release of the shareholder released parties, who certainly
once were "insiders," one element of the analysis of the
Iridium factor focusing on such releases that otherwise will
be discussed later when focusing on the plan's proposed

80

release of third-party claims.

Applying the next Iridium factor -- the competency and experience of counsel supporting the settlement -- the Debtors were represented by very capable counsel and forensic and financial advisors that assisted the Debtors' Special Committee in discovering most of the the Debtors' claims against the Sacklers and their related entities. These claims, for over $11 billon of assertedly avoidable transfers, are described in the trial declarations of Richard Collura, Mark Rule, and David DeRamus, Ph.D and commented on by John Dubel in his trial declaration, as well as set forth in even greater detail in the report filed by the Debtors before the start of the mediation.  Dkt. No. 654.

The Official Unsecured Creditors Committee also had very experienced and capable counsel and financial advisors, who led the Committee's own extensive analysis of potential estate claims, including vetting the Debtors' analysis of avoidable transfer claims.  The Committee also thoroughly investigated the estates' claims against the Sacklers that are not in the nature of avoidable transfer causes of action but, rather, claims based on theories of alter ego, piercing the corporate veil, and breach of fiduciary duty/failure to supervise.  Here it appears clear

that such claims would belong to the Debtors' estates, not

individual creditors, because at least as far as the

confirmation hearing record reflects, such claims would be

based on a generalized injury to the estates and creditors

rather than conduct directed only at certain creditors.

See, e.g., St. Paul Fire and Marine Insur. Co. v. PepsiCo,

Inc., 884 F.2d 688, 704-705 (2d Cir. 1989); Bd. of Trs. Of

Teamster Local 863 Pension Fund v. Foodtown Inc., 296 F.3d

164, 169 (3d Cir. 2002).

Similarly, the counsel and advisors for the states

and other governmental entities, all of whom were on the

other side of the table from the Sacklers, were every match

for the Sacklers' own able counsel.  In many cases, in

addition to their outside counsel, states' own attorneys

general played an active role in the negotiations, such as,

for example the AGs for Massachusetts and New York who after

the second mediation, led by Judge Chapman, agreed to the

modified settlement.

The next two Iridium factors are closely related:

the interests of creditors, including the degree to which

creditors support the proposed settlement, and whether other

interested parties support the settlement.

Given the over 95 percent aggregate vote in favor

of the plan; given the support by the Official Unsecured

Creditors Committee, over 79 percent of the states and
territories, over 96 percent of the other governmental
entities and Native American tribes, apparently in this
context the United States -- although one can't really make
heads or tails of the U.S. Trustee's objection, which is not
based on participation in the cases' discovery process,[4]
regarding the merits of the Debtors' settlement with the
shareholder released parties –- approximately 96% of the
personal injury and NAS personal injury claimants, and a
supermajority of the other claimants; and given the paucity
of objections to the plan's confirmation notwithstanding the
size of the creditor body, it is clear that by an
overwhelming margin the creditors support the settlements.
They do so, again, after being fully informed in making that
decision, or with their representatives being fully
informed.

        The next _Iridium_ factor requires analysis of the
likelihood of complex and protracted litigation if the
settlement is not approved, with its attendant cost and
delay, and, relatedly, the difficulty in collecting on a

---

[4] The U.S. Trustee did not participate in that discovery process and
apparently took no independent discovery before the confirmation hearing
to explore the merits of its factual objections to the plan.  It also
has offered no evidence for any of its fact-based objections to the
plan, instead apparently assuming that it can nevertheless act credibly
as an outside commentator on others' analysis of the settlements (which
it mostly did not seek to challenge by cross examination).

judgment.  I'll focus first on the difficulty of collecting
on a judgment absent the settlement.

     As often happens, parties who support a
settlement, such as here the Official Unsecured Creditors
Committee, the consenting states and other governmental
entities, and the Debtors are careful not to describe in
detail the reasons for their support that would show the
potential weaknesses of their underlying claims or their
views on how difficult it would be to collect on a judgment.
They are legitimately concerned that the settlement won't be
approved, in which case they would have given their
opponents a regretted roadmap.  This leaves the Court to
draw reasonable inferences from the record, as well as its
knowledge and experience regarding the legal issues bearing
on the merits and collection.  Here, that record is fairly
extensive in the light of submissions by the Sacklers and
those overseeing their wealth.

     One might think at first that the issue of
collectability weighs against the settlement.  The record is
uncontroverted that the Sacklers, as a family, are worth --
again, in the aggregate -- approximately $11 billion,
reduced perhaps by $225 million agreed to be paid under the
Sacklers' own postpetition civil settlement with the United
States.  The discovery process that I have described has

largely identified their assets and where and how they are held.  And the preliminary injunction in these cases precluded the further transfer of their assets.  So, assuming the entry of judgments against them instead of the settlement, one might reasonably believe that collecting significantly more than $4.325 billion, plus access to, or the dedication of, at least $175 million of charitable assets under the settlement, is readily achievable

The Sacklers are not a simple group of a few defendants, however.  They are a large family divided into two sides, Side A and Side B, with eight pods or groups of family members within those divisions that have their own unique sources and holdings of wealth.  As described in the trial declarations of Timothy Martin and Steven Ives, their assets are in fact widely scattered and primarily held (x) in purportedly spendthrift offshore trusts, (y) in purportedly spendthrift U.S. trusts, and/or (z) by people who themselves live outside of the territorial jurisdiction of the United States and might not have subjected themselves sufficiently to the U.S. for a U.S. court to get personal jurisdiction over them.

I want to be clear that I am not deciding that jurisdictional issue, nor whether the trusts where most of the Sackler family's wealth is held are in fact spendthrift

trusts that could not be invaded to collect a judgment,
including in a possible bankruptcy case of a beneficiary of
such a trust forced into bankruptcy by the pursuit of
litigation.

A beneficial interest in a valid spendthrift trust
may be excluded from a debtor's bankruptcy estate.
Patterson v. Shumate, 504 U.S. 753, 757 (1992). As provided
in Bankruptcy Code section 541(c)(2), "A restriction on the
transfer of a beneficial interest of the debtor in a trust
that is enforceable under applicable non-bankruptcy law is
enforceable in a case under [the Bankruptcy Code]."  11
U.S.C. § 541(c)(2).  That section directs one to applicable
non-bankruptcy law, which may or may not be the law of the
United States with regard to the Sacklers' foreign trusts,
almost all of which are established under the law of the
Bailiwick of Jersey.

Based on the trial declaration and examination of
Michael Cushing, an expert in the law of the Bailiwick of
Jersey and the enforceability of judgments against trusts
organized under that law, there is a substantial question
regarding the collectability from such a trust of even a
U.S. fraudulent transfer judgment against the trust, let
alone a judgment against a trust beneficiary, including for
his or her conduct such as the beneficiary being an alter

ego of another entity, like Purdue, or otherwise legally
responsible for Purdue's conduct.

For U.S. spendthrift trusts, on the other hand,
generally applicable non-bankruptcy law provides that a
transfer into such a trust that is fraudulent to creditors
is recoverable for the benefit of creditors.  See, e.g.,
Sec. Investor Prot. Corp. v. Bernard L. Madoff Sec. LLC (In
re BLMS), 2021 Bankr. LEXIS 1769, at 13-19 (Bankr. S.D.N.Y.
July 2, 2021); see also In re BLMIS, 476 B.R. 715, 728, n.3
(S.D.N.Y. 2012).

U.S. law also generally does not recognize self-
settled trusts that in name only are spendthrift trusts.
But again, many of the trusts here might well be governed by
the law of the Bailiwick of Jersey, which according to Mr.
Cushing's declaration -- which was not meaningfully
controverted on these points -- strongly suggests that a
different result might apply when enforcing a judgment
against a beneficiary of such a trust.  And none of the
evidence at the confirmation hearing clearly showed that any
of the trusts was self-settled.

Lastly, the summaries of the Sackler family's
wealth reveal that much of it is not held in readily
liquidated assets but rather in the shares of closely held
businesses, including the foreign businesses they are

required to sell within seven years under the settlement.

Once more, I'm not deciding any legal issues that would affect the collectability of judgments against Sackler family members or their entities, but, given the record before me, as well as the agreement of substantially all of the parties in these cases to a settlement of the estates' claims against the Sacklers and their related entities after the due diligence that they have undertaken, I make the reasonable inference that the issue of collection if the settlement were not approved is in fact a significant concern.

Under the settlement, on the other hand, although the shareholder released parties are given several years to make their payments (in at least partial recognition, one infers, of the illiquid nature of many of their assets), (x) the shareholder settling parties have agreed to "snap back" provisions that enhance collectability upon a default and (y) the trustees and asset managers for the foreign trusts have agreed to seek, and believe they will obtain, the approval of the Jersey court to comply with the settlement.

As noted, _Iridium_ also requires the Court to consider the cost and delay of continued litigation in comparison to the benefits of the proposed settlement.  If the estate's claims against the Sacklers and their related

88

entities were not settled as provided in the plan, the cost

and delay to the estates clearly would be substantial.  That

cost and delay would not be limited to the cost and delay of

pursuing litigation claims against the family members and

their related entities and collecting any ensuing judgments,

which primarily would involve preparation for trials against

multiple defendants (the discovery for which has mostly

occurred) and the trials themselves, as well as judgment

enforcement litigation and other collection costs in

multiple jurisdictions.  That cost and delay alone would be

substantial, as it is reasonable to infer that the hundreds

of prepetition lawsuits naming the Sacklers would resume and

proceed alongside prosecution of the estates' claims against

the Sacklers and related entities.[5]

Besides that cost and delay, moreover, is the cost

and delay that would ensue from the unraveling of the other

plan settlements that I have described.  The confirmation

hearing record strongly reflects that if the settlement of

the Debtors' claims against the shareholder released parties

were not approved, the creditor parties would be back

---

[5] The preliminary injunction in these cases enjoined over 2,600 pending
prepetition lawsuits against Purdue by governmental entities, hundreds
of which named one or more Sackler family members as a co-defendant, and
presumably most of the other actions would be amended to add Sackler
family members as defendants, and other third parties also would attempt
to pursue such claims, as well.

essentially to square one on allocating the value of the
Debtors' estates, including any ultimate recovery on the
estates' litigation claims.  And the creditors would be
litigating against each other over the merits of their
respective claims against the Debtors.

In that regard, the analysis in Mr. DelConte's
second declaration, which contains the Debtors' section
1129(a)(7) "best interests" liquidation analysis, is
instructive.  Under the most realistic scenarios described
in that analysis, there would literally be no recovery by
unsecured creditors from the estates in a Chapter 7
liquidation, which is, I believe, the most likely result if
the settlements with the shareholder released parties were
not approved, given the likely unraveling of the heavily
negotiated and intricately woven compromises in the plan and
the ensuing litigation chaos.

That projected outcome also reflects that in a
liquidation scenario the United States' agreement in the
DOJ's October 2020 settlement with Purdue to forego $1.775
billion of its $2 billion superpriority administrative
expense claim for the benefit of the plan's abatement
program would disappear.  The United States would be
entitled to all of that recovery first from the Debtors'
estates.  And no one has controverted the trial declaration

of Joseph Turner, the Debtors' investment banker in which he
gives a midpoint valuation of the Debtors' businesses as
going concerns at $1.8 billion.  Thus the estates would be
litigating their own claims against the Sacklers and their
related entities in that highly contested environment on a
severely reduced budget with no assurance of administrative
solvency.

That leaves the last Iridium factor, a comparison
of the legal risks posed by continued litigation against the
results of the settlement.

As with the issue of the difficulty of collection,
the parties supporting the settlement have been careful not
to bare their views of the defenses that the shareholder
released parties would have to the estates' claims against
them.  However, I do have an extensive report and trial
declarations as to the nature of the assertedly over $11
billion of avoidable transfers, when they occurred, what
they comprised, and who they were made to.  Those objecting
to the settlement also had the opportunity to examine at
length four members of the Sackler family at the
confirmation hearing -- David Sackler, Richard Sackler,
Mortimer Sackler, and Kathe Sackler -- and in addition
submitted the deposition of Irene Sackler, including to
attempt to show the strength of the estates' and third-

parties' claims against them based on their actions in their
capacities as shareholders and members of Purdue's Board
and, in three instances, in Purdue's management.  Finally, I
have extensive submissions by both sides of the Sackler
family regarding the defenses that they would argue in the
absence of the settlement in response to the claims asserted
against them and their related entities.

          In evaluating that evidence and those arguments I
want to be clear again that I am not deciding anything close
to the merits of those claims.  This assessment could not,
therefore, serve as collateral estoppel or res judicata.
Nor do I particularly have any fondness or sympathy for the
Sacklers.

          I will note the following, however.  The Sackler
family -- or rather 77, I believe, of them -- received
releases from most of the states in 2007.  In addition, 2007
is about as far back under any theory that one could look to
avoid a fraudulent transfer to the Sacklers or any of their
related entities under U.S. law.  Thus one would, both for
estate claims and for third-party claims, be looking at
primarily, if not exclusively, potentially wrongful actions
by the Sacklers or their related entities or potentially
avoidable transfers to them that took place only after 2007.
This would limit claims against them, for example, based on

92

OxyContin's role since its introduction in 1999 to 2007 in
dramatically increasing the use of opioids and related
addictions and opioid use disorders.

Avoidable Transfers.  As described in the trial
declaration of Carl Trompetta and as generally acknowledged,
over 40 percent of the asserted avoidable transfers to the
Sacklers or their related entities went to pay taxes
associated with Purdue, including large amounts to the IRS
and the states that continue to object to the plan and, of
course, intend to keep the tax payments.  The fact that
these payments went to pay taxes obviously relieved the
Sacklers of an obligation.  I do, however, have
uncontroverted testimony from Jennifer Blouin that if the
partnership structure of Purdue, with the taxes running
through the Sacklers, was not in place, Purdue itself would
have been liable for taxes in almost all of the amount of
the tax payments to or for the benefit of the Sacklers and,
therefore, arguably received fair consideration for those
tax payments.

The Sacklers also would argue the applicability
of various statutes of limitation to the fraudulent transfer
claims that would limit the reach-back by the estates to
most of the claims.  The estates would have arguments to the
contrary, based on rights that unique creditors like the

federal government would have to serve as a "golden
creditor" under section 544(b) of the Bankruptcy Code, which
provides that the Debtors "may avoid any transfer of an
interest of the debtor in property . . . that is voidable
under applicable law by a creditor holding an unsecured
claim that is allowable under section 502 of this title," 11
U.S.C. § 544(b), although the Sacklers would argue that the
purportedly "golden creditor's" current claims against the
Debtors are not the claim it would have had when many of the
transfers were made that would have enabled the creditor to
avoid them.

The Sacklers would also argue that after the 2007
settlement between Purdue and the United States, Purdue paid
manageable amounts in settlements of litigation claims
related to opioid matters or of other litigation claims
between 2008 and 2019 and that as recently as 2016 Purdue
was receiving ratings from rating agencies that indicated it
was financially healthy. They would contend, therefore,
that except for the last year or so before the bankruptcy
filing date, when only a small fraction of the roughly $11
billion of transfers occurred, Purdue was not insolvent,
unable to pay its debts when they came due, or left with
unreasonably small capital -- requirements to prove
constructive fraudulent transfers. Finally, they would argue

94

that for these same reasons, and bolstered by at least some
of the Sacklers' willingness to continue to invest large
amounts of capital in Purdue in years after 2007, the
Debtors would not be able to prove that most, if not all, of
the transfers were intentionally fraudulent, either.

There are, on the other hand, statements in the
record suggesting that at least some of the Sacklers were
very aware of the risk of opioid-related litigation claims
against Purdue and sought to shield themselves from the
economic effect of such claims by causing Purdue to make
billions of dollars of transfers to them and to shield their
own assets, as well, from collection.  Further, the estates
would argue that the potential sheer size of opioid-related
claims against Purdue was obvious several years before the
second onslaught of litigation claims against it.

Alter Ego, Veil Piercing, and Breach of Fiduciary
Duty/Failure to Supervise Claims.  As discussed earlier,
claims based on alter ego, piercing the corporate veil, and
breach of fiduciary duty/failure to supervise theories would
appear to stem from allegations against Sackler family
members that they caused harm to the creditor body
generally, or to the Debtors, in exercising their control of
the Debtors and, therefore, would belong to the Debtors'
estates rather than to individual creditors.  As discussed

95

later, very closely related, indeed usually the same,
factual allegations also underly the objecting states'
third-party claims against Sackler family members.

In response to such claims, most Sackler family
members would argue that they did not serve on Purdue's
Board or in management during the relevant period and that
no actions by them in their capacity as a shareholder of
Purdue have been identified that would show liability for
such claims. In response, the Debtors and others would
contend that notwithstanding the large size of the Sackler
family, the Sacklers acted in a coordinated way over
investment and business strategies involving Purdue, with
regular meetings of authorized family representatives. The
Sacklers would argue, supported by the trial declaration of
Lawrence A. Hamermesh that generally the ability to control
a corporate entity and such actions as were identified at
the confirmation hearing do not give rise to such liability,
however.  In response, the Debtors' estates would argue, as
did the objecting states at the confirmation hearing, that
Mr. Hamermesh's declaration speaks only in generalities
regarding the law of corporate fiduciaries and does not
address the actual actions of Sackler family members in
controlling Purdue.

The Sacklers would also point out that after the

96

2007 settlements with the federal government and the states,
the U.S. Department of Health and Human Services entered
into a five-year corporate integrity agreement with Purdue
to monitor its compliance with federal healthcare law, which
was in effect from July 31, 2007 to July 30, 2012.  That
agreement is available as part of the record but also is
public and a matter for judicial notice.  In addition, in
2015, after Purdue implemented an "Abuse and Diversion
Detection" program, the New York Attorney General required
the program be subjected to annual reviews, which occurred
from 2015 to 2018.  The Sackers would argue that both the
H.H.S.'s OIG monitor and those ADD reviews identified no
improper actions by Purdue and therefore that as controlling
shareholders or Board members they should not be liable for
Purdue's improper actions to the extent they were
inconsistent with those reviews.  More generally they would
argue that as Board members they would not have a fiduciary
duty for actions by Purdue's management that were improper
or unlawful unless they were aware of them or blindfolded
themselves to them. Those who were not on the Board and did
not individually control ownership of Purdue would argue
that they were yet another step removed from such a duty.
They would also point out the difficulty under applicable
state law of piercing the corporate veil between a corporate

entity and its owners.

Of course trials on the merits might well
establish, as some of the testimony that I heard from the
Sacklers tended to show, that as a closely held company
Purdue was run differently than a public company and that
its Board and shareholders took a major role in corporate
decision-making, including Purdue's practices regarding its
opioid products that was more akin to the role of senior
management.

Moreover, strong arguments could be made that the
Sackler Board members and the shareholders as a whole not
only understood the highly addictive nature of Purdue's
opioid products -- which the Sackler witnesses acknowledged
-- but also that F.D.A.-approved warning labels and
modifications to the product and how it was sold that
allegedly made it less likely to be abused were not
preventing massive harm.  The Sackler witnesses testified
that their aim, especially after 2007, was to avoid Purdue's
causing more harm from the sale of highly addictive
products.  But a jury might well conclude to the contrary
that the Sacklers' evident desire to continue to drive
profits from the products' sale blinded them to evidence of
the fraud, kickbacks and other crimes to which Purdue pled
guilty in the October 2020 DOJ settlement or that the pain-

relieving benefits of those products was still horribly out of balance with the harm caused, so that they could be held liable for such harm.

I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims (and the closely related third-party claims that are being settled under the plan) might well be higher than the amount that the Sacklers are contributing. But I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effect on recoveries that would result from pursuing those claims and unravelling the plan's intricate settlements. And as I said at the beginning of this analysis, there is also the serious issue of problems that would be faced in collection that the plan settlements materially reduce.

This is a bitter result. B-I-T-T-E-R. It is incredibly frustrating that the law recognizes, albeit with some exceptions, although fairly narrow ones, the enforceability of spendthrift trusts. It is incredibly frustrating that people can send their money offshore in a way that might frustrate U.S. law. It is frustrating, although a long-established principle of U.S. law, that it is so difficult to hold board members and controlling shareholders liable for their corporation's conduct.

It is incredibly frustrating that the vast size of the claims against the Debtors and the vast number of claimants creates the need for the plan's intricate settlements.  But those things are all facts that anyone who is a fiduciary for the creditor body would have to recognize, and that I recognize.

A settlement is not evaluated in a vacuum, as a wish list.  It takes an agreement, which means that if properly negotiated -- and I believe that's clearly the case here -- it generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection, not moral issues or how someone might see moral issues.

It is not enough simply to say "we need more," or "I don't care whether we don't get anything; I'd rather see it all burned up before the Sacklers keep anything."  One must focus on the foreseeable consequences of litigation versus settlement.

I must say that at the middle stage of these cases, before the mediation, I would have expected a higher settlement.  And frankly anyone with half a brain would know that when I directed a second mediation, bravely undertaken by Judge Chapman, I expected a higher settlement, perhaps higher than the materially improved settlement that resulted

from that mediation.  Nevertheless, extremely well-
represented and dedicated parties on the prospective
plaintiffs' side, knowing far more than I have laid out
today about the strengths and weaknesses of the claims,
costs, delay, and collection issues, agreed to this
settlement as modified as a result of that second mediation.

Are the Sacklers paying a "settlement premium" in
their settlements than they would pay in litigation, as Ms.
Conroy suggested?  Perhaps.  As noted, Ms. Conroy as much as
anyone has dedicated much of her professional career to
pursuing Purdue and the Sacklers and has no reason to pull
her punches now.  In any event, I am not prepared, given the
record before me, to risk that agreement.  I do not have the
ability to impose what I would like on the parties.
Thankfully, no judge in our system is given that power.  I
can only turn down a request for approval of it and deny
confirmation of the plan.  Given this record, I'm not
prepared to do that.

I will note, as far as the bona fides of the
settlement are concerned, and notwithstanding my
reservations, under this plan 100 percent of these Debtors,
closely held by the Sacklers, is taken away from them and
devoted to abating opioids' ill effects in one way or
another.

In addition, the amount being paid is to my
knowledge the highest amount that any shareholder group has
paid for these types of claims.  Throughout the history of
litigation involving Purdue, the Sacklers themselves were
not targets, except leading up to the relatively modest
settlement payments by Purdue on their behalf to a number of
states in 2007,[6] until roughly three years before the
bankruptcy petition date.  The entire negotiation process in
these cases has magnified that focus on them and will be
remembered for doing so.

       While I wish that the amount were higher, as I
believe everyone on the other side of the Sacklers does, the
settlement is reasonable in the light of the standards laid
out by the Supreme Court and the Second Circuit. And clearly
both it and the process of arriving at it have not been in
any shape or form a free ride for the Sacklers or enabled
them to "get away with it."

       If what people mean by "getting away with it" is
being relieved of criminal liability, that obviously is not

---

[6] The 2007 settlement between 26 states and the District of Columbia, on
one side, and Purdue on the other called for a $19.5 million multi-state
payment by Purdue to the states. Consent Judgement, Washington v. Purdue
Pharma L.P., Cause No. 07-2-00917-2 (Sup. Ct. Wash. Thurston Cnty. May
3, 2007), http://www.atg.wa.gov/news/news-releases/washington-receive-
share-195-million-settlement-oxycontin-
maker#:~:text=FOR%20IMMEDIATE%20RELEASE%3A%20May%208%202007%20SEATTLE%20
%E2%80%93,to%20doctors%20while%20downplaying%20the%20risk%20of%20addicti
on.

the case.  And I believe, given all the factors that I've

outlined, the Sacklers are paying a substantial and, under

the circumstances of this case, justifiable amount, as well

as agreeing to the other material aspects of the settlement

that I have described.

I will note, finally, that as alluded to this

morning by the Debtors' counsel, they have agreed to

enforcement mechanisms that are quite rigorous as part of

the settlement, so that the potential collection problems

that I addressed are far lessened by the settlement if any

released party doesn't live up to it, including as to the

ability to hide behind spendthrift trusts.

So, I will overrule the objections to the merits

of the settlement of the Debtors' estates' claims against

the shareholder released parties.

**Analysis of Plan's Release and Injunction of**

**Third-Party Claims**. That leaves the last issue for

determination, which is the most complex issue legally:  the

propriety of the plan's release and injunction of certain

third-party claims against the shareholder released parties.

The third-party claims that the plan would release and

enjoin are very closely related on the facts to the estates'

claims for alter ego, veil piercing, and breach of fiduciary

duty/failure to supervise settled under the plan. See

Dunaway v. Purdue Pharm. L.P., 619 B.R. at 50 (noting
virtually identical allegations against Purdue and third-
party claims against Richard Sackler, each stemming from
conduct by Purdue allegedly under his control).  My analysis
of the merits of the plan's treatment of such third-party
claims thus is in large measure informed by my analysis of
the alternatives to the settlement of the estates' claims
against the shareholder released parties that I've just
finished.  Before turning to the merits, however, multiple
other grounds for the objections to the plan's nonconsensual
release and injunction of third-party claims against the
shareholder settling parties must be addressed.

        I will note first that I have agreed with certain
of those objections, namely as to the over-breadth of the
releases in the plan as initially proposed.  In the light of
colloquy during the confirmation hearing, the current form
of the plan has substantially narrowed those releases.  As
discussed in more detail later, the settling shareholder
parties are now being released of true third-party claims
only if they are opioid-related and then only for such
claims where Purdue's conduct is at least in material part a
legal element of the third-party claim.

        Other released parties, including the Sacklers,
are released from certain other third-party claims, as well

under the plan, but it is clear, given the plan's revised
definitions, that those releases cover claims that are truly
derivative of the Debtors' claims such that the releases
simply prevent third parties from going after released
parties through the back door when the Debtors have resolved
the claims, or, to change the metaphor, from improperly
adding a second fork with which to eat their share of the
pie.

The first objection to the release of third-party
claims against the shareholder released parties is premised
on the Court's asserted lack of subject matter jurisdiction
to impose the release on those who do not consent to it.

It is axiomatic that federal courts, including
bankruptcy courts, have only the jurisdiction given to them
by the Constitution or Congress.  Purdue Pharma L.P. v.
Kentucky, 704 F.3d 208, 213 (2d Cir. 2013).  Under 28 U.S.C.
§ 1334(b), however, this Court has broad jurisdiction over
matters that are related to the Debtors' property and cases.
Section 1334 of the Judicial Code provides that district
courts have original jurisdiction (which is referred by
standing orders to the bankruptcy courts under 28 U.S.C. §
157(a)-(a)) over "all cases under title 11" 28 U.S.C. §
1334(a), and "all civil proceedings arising under title 11
or arising in or related to cases under title 11."  28

105

U.S.C. § 1334(b).

This includes the power to enjoin claims of third
parties that have a conceivable effect on the Debtors'
estates.  As noted by the Supreme Court in Celotex Corp. v.
Edwards, 514 U.S. 300, 307-08 (1995), which involved a
preliminary injunction of a third-party's right to pursue a
third-party claim, "Congress did not delineate the scope of
'related to' jurisdiction, but its choice of words suggests
a grant of some breadth."  The Court found bankruptcy
jurisdiction because the third-party's pursuit of the
enjoined claim would affect or impede the debtor's
reorganization.  Id. at 312.

In this Circuit, "a civil proceeding is related to
a title 11 case if the action's outcome might have any
conceivable effect on the bankrupt estate.  If that question
is answered affirmatively, it falls within the 'related to'
jurisdiction of the bankruptcy court.  Congress intended to
grant comprehensive jurisdiction to the bankruptcy courts so
that they might deal efficiently and expeditiously with all
matters connected with the bankruptcy estate.  While
'related to' jurisdiction is not limitless, it is fairly
capacious and includes suits between third parties that have
an effect on the bankruptcy estate.  An action is related to
bankruptcy if the outcome could alter the debtor's rights,

106

liabilities, options, or freedom of action (either
positively or negatively) and which in any way impacts upon
the handling and administration of the bankrupt's estate."
SPV OSUS, Ltd. v. UBS AG, 882 F.3d 333, 339-40 (2d Cir.
2017) (internal quotations omitted), citing Celotex Corp. v.
Edwards, 514 U.S. at 307-08; Parmalat Cap. Fin. Ltd. v. Bank
of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2001); In re
Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992).

In SPV OSUS, the court found bankruptcy
jurisdiction over third-party claims based on the
conceivable possible legal effect of an indemnification or
contribution right against the debtor, although the party
that might assert those rights had not filed a proof of
claim in the case. 882 F.3d at 340-42. That decision is not
alone. The Second Circuit has extensively dealt with
bankruptcy jurisdiction over actions to stay or prevent the
assertion of third-party claims in bankruptcy cases, the
most informative of which for present purposes is In re
Quigley Co., 676 F.3d 45 (2d Cir. 2012).

In Quigley the court undertook a lengthy analysis
of bankruptcy jurisdiction over the preclusion of third-
party claims.  It did so because of the parties' confusion
over the extent of such jurisdiction arguably injected by
Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-

Manville Corp.), 517 F.3d 52 (2d Cir. 2008), rev'd sub nom.
Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009), which
Quigley refers to as Manville III.  Manville III left the
impression, at least with the third-party claimant in
Quigley, that the only source for jurisdiction to enter a
coercive release of third-party claims and an injunction to
support it was if the claim was "derivative" -- that is,
derivative of the debtor's rights and therefore affecting
the res of the debtor's estate. 676 F.3d at 53-54.

    The point was somewhat cleared up in the Circuit's
next Manville case, Johns-Manville Corp. v. Chubb Indem.
Ins. Co. (In re Johns-Manville Corp.), 600 F.3d 135 (2d Cir.
2010), referred to as Manville IV in the Quigley opinion,
but Quigley addressed the asserted limitation head on.

    In Manville III, a party that had brought a third-
party claim against an insurer, notwithstanding the Manville
Chapter 11 plan's injunction of claims against the insurer,
asserted that the bankruptcy court did not have jurisdiction
to enjoin the claim because it alleged a violation of an
independent legal duty owed by the defendant, rather than a
claim that was derivative of the debtor's claim. Quigley,
676 F.3d at 54.  The Circuit disagreed that Manville III
imposed this imitation on jurisdiction. Id. at 54-55,
adding, "because [the third-party's] mistake as to the

108

nature of the jurisdictional inquiry under 28 U.S.C. §
1334(a) and (b) stems from a misunderstanding of our case
law's treatment of derivative liability in the context of
bankruptcy jurisdiction, we discuss our previous cases
addressing this subject in some detail."  Id. at 55.

After analyzing MacArthur Co. v. Johns-Manville
Corp., 837 F.2d 89 (2d Cir. 1988), the court held that there
was no independent jurisdictional requirement that to be
barred by a plan a third-party claim must be derivative of
the estate's rights. Id.  Rather, the claim must affect the
debtor's estate, id. at 56, and "Manville III did not work a
change in our jurisprudence.  After Manville III, as before
it, a bankruptcy court has jurisdiction to enjoin third-
party non-Debtor claims that directly affect the res of the
bankruptcy estate: As in Macarthur, the salience of Manville
III's inquiry as to whether [the third party's] liability
was derivative of the debtor's rights and liabilities was
that, in the facts and circumstances of Manville III, cases
alleging derivative liability would affect the res of the
bankruptcy estate, whereas cases alleging non-derivative
liability would not." Id. (internal quotations and citations
omitted).  However, "Manville III did not impose a
requirement that an action must both directly affect the
estate and be derivative of the debtor's rights and

109

liabilities for bankruptcy jurisdiction over the action to
exist." Id. at 57 (emphasis in the original).

After noting that Manville IV was consistent with
this view, the court summed up: "It thus appears from our
case law that, while we have treated whether a suit seeks to
impose derivative liability as a helpful way to assess
whether it has the potential to affect the bankruptcy res,
the touchstone for bankruptcy jurisdiction remains 'whether
its outcome might have any conceivable effect on the
bankruptcy estate.' Cuyahoga, 980 F.2d at 114. This test has
been almost universally adopted by our sister circuits, see
Celotex Corp. v. Edwards, 514 U.S. 308 n.6 . . . (1995)
(collecting cases), which is some instances have found
bankruptcy jurisdiction to exist over non-derivative claims
against third-parties." Id., citing EOP-Colonnade v.
Faulkner (In re Stonebridge Techs., Inc.), 430 F.3d 260,
263-64, 267 (5th Cir. 2005); Dogpatch Props., Inc. v.
Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.), 810
F.2d 782, 786 (8th Cir. 1987).

Thus, "[a] suit against a third party alleging
liability not derivative of the debtor's conduct but that
nevertheless poses the specter of direct impact on the res
of the bankrupt estate may just as surely impair the
bankruptcy court's ability to make a fair distribution of

the bankrupt's assets as a third-party suit alleging derivative liability.  Accordingly, we conclude that where litigation of [the claimant's] suits against [the third party] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate . . . the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."  Id. at 58.

I conclude that the third-party claims that are covered by the shareholder release under the plan, as I will further narrow that release in this ruling, directly affect the res of the Debtors' estates, including insurance rights, the shareholder released parties' rights to indemnification and contribution, and the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims, and thus that bankruptcy subject matter jurisdiction to impose a third-party claims release and injunction under the plan exists.

Certain of the objectors cite Callaway v. Benton, 336 U.S. 132 (1949), for the proposition that there is no such jurisdiction.  That decision, however, preceded 28 U.S.C. § 1334(b)'s jurisdictional grant, which, as discussed in Celotex, SPV OSUS, and Quigley, significantly broadened the jurisdictional scheme that existed before the Bankruptcy Code's enactment.  In re Dow Corning Corp., 255 B.R. 445,

486-87 (E.D. Mich. 2001) (distinguishing Callaway on this

basis), vacated on other grounds, In re Dow Corning Corp.,

280 F.3d at 648.  See also Howard C. Buschman, III & Sean P.

Madden, "Power and Propriety of Bankruptcy Court

Intervention in Actions Between Non-debtors," 47 Bus. Lawyer

913, 914-19 (May 1992).[7]  See generally, Lynch v. Lapidem

Ltd. (In re Kirwan Offices S.A.R.L.), 592 B.R. 489, 504-07

(S.D.N.Y. 2018), aff'd Lynch v. Mascini Hldgs. Ltd. (In re

Kirwan Offices S.A.R.L.), 792 Fed. Appx. 99 (2d Cir. 2019).

     Depending on the kinds of third-party claims

covered by a plan's release and injunction of such claims, I

conclude, therefore, that the Court has jurisdiction to

impose such relief, based upon the effect of the claims on

the estate rather than on whether the claims are

"derivative," although if they are derivative that is a good

sign that they affect the estate.  Quigley, 676 F.3d at 52.

     The objectors have also contested that the release

of third-party claims under a plan violates the third-party

---

     [7] I will note that another case that the objectors rely on,
In re Aegean Marine Petroleum Network, Inc., 599 B.R. 717 (Bankr.
S.D.N.Y. 2019), in questioning the Court's jurisdiction to impose the
release of a third-party claim, which cites Callaway v. Benton but
discusses neither SPV OSUS nor Quigley, nevertheless acknowledges that
where there is "a huge overlap between claims that [a debtor] is making
against the parent . . . [and] the parent did not want to settle the
claims made by [the debtor] unless the overlapping third-party claims
were also barred," a third-party release was justified. Id. at 727.

claimants' rights to due process.  There are two aspects to
this objection.  The first is not accepted by courts in this
Circuit, which is that such a release is an adjudication of
the claim.  It is not.  It is part of the settlement of the
claim that channels the settlement funds to the estate.  See
Macarthur Co. v. Johns-Manville Corp., 837 F.2d at 91-92;
Lynch v. Lapidem, 592 B.R. at 504-05; see also In re
Millennium Lab Holdings II, LLC, 575 B.R. 252, 273 (Bankr.
D. Del. 2017) ("An order confirming the plan with releases
does not rule on the merits of the state law claims being
released."), aff'd 591 B.R. 559 (D. Del. 2018), aff'd 945
F.3d 126 (3d Cir. 2019), cert. denied, Loan Tr. v.
Millennium Lab Holdings, 140 S. Ct. 2085 (2020).

        The other aspect of the due process objection goes
to the extent and quality of notice provided regarding the
proposed release.  Under the amended plan, it is now clear,
however, that only holders of claims against the Debtors are
being deemed to grant the shareholder release, and it is
equally clear, as discussed earlier, that holders of such
claims received due process notice of the plan's intention
to provide a broad release of third-party claims against the
shareholders and their related entities related to the
Debtors.

        As set forth in that widespread notice, including

the press releases, short form publication notices, and
short form notices sent, the proposed release was far
broader than it is today in the amended plan.  To argue that
because it was more complicated then it somehow violated due
process is equally incorrect.

        The issue of what process is due requires a court
to ask whether the notice was reasonably calculated under
the circumstances to apprise interested parties of the
pendency of the plan's proposed release and afford them an
opportunity to present their objections.  Mullane v. Cent.
Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  See
also Elliott v. GM, LLC (In re Motors Liquidation Co.), 829
F.3d 135, 158 (2d Cir. 2016).  As noted in Motors
Liquidation, this requirement equally applies in bankruptcy
proceedings, where whether notice satisfies due process
turns upon what is reasonably known by the debtor of the
party who would be affected by the action for which the
debtor is seeking permission.

        Based upon Ms. Finegan's testimony, holders of
claims received sufficient notice of the proposed release.
(Indeed, the media separately fostered the assumption,
though incorrect, that the release was even broader,
including of criminal liability.)  And in fact there were
multiple objections to the plan based upon its proposed

114

third-party release.  The Debtors' compliance with the
procedures described by Ms. Finegan, which also were well
within the dictates of Bankruptcy Rule 3016 (which requires
the prominent display of such release language in a proposed
plan) was more than sufficient for due process purposes.
See, e.g., Macarthur Co. v. Johns-Manville Corp., 837 F.2d
at 94; Finova Cap. Corp. v. Larson Pharma., Inc., 2003 U.S.
Dist. LEXIS 26681, at *26-27 (M.D. Fla. Oct. 6, 2003), aff'd
Finova Capital Corp. v. Larson Pharma., Inc., 425 F.3d 1294
(11th Cir. 2005); In re Retail Grp., Inc., 2021 Bankr. LEXIS
547, at *51-57 (Bankr. E.D. Va. May 28, 2021); In re Otero
Cty. Hosp. Ass'n, Inc., 551 B.R. 463, 471-72 and 478-79
(Bankr. D.N.M. 2016).

        If someone can make the case after the fact that
the notice that Ms. Finegan testified to was in fact not
provided, or that they did not receive actual notice of the
confirmation hearing and proposed release although the
Debtors were aware of their specific claim, they would have
the right to return and argue that they did not receive due
process, as in Motors Liquidation, 829 F.3d at 135, but as
far as the record before me is concerned, notice of the
confirmation hearing and the plan's proposed third-party

claims release satisfied due process.[8]

The next objection is based on a bankruptcy
court's alleged lack of constitutional power to issue a
final order confirming a plan that contains a third-party
claims release, as opposed to an alleged lack of bankruptcy
jurisdiction to approve confirmation of such a plan under
section 1334(b) of the Judiciary Code.

This issue was not addressed by the courts until
fairly recently, but it has been resolved at length in two
opinions that I will simply cite because their logic cannot
be improved upon to establish that a proceeding to determine
whether a Chapter 11 plan that contains such a release
should be confirmed not only is a core proceeding under 28
U.S.C. § 157(b), but also is a fundamentally central aspect
of a Chapter 11 case's adjustment of the debtor/creditor
relationship and, therefore, "constitutionally core" under
Stern v. Marshall, 564 U.S. 462 (2011), and its progeny. See
In re Millennium Lab Holdings II, LLC, 945 F.3d 126, as well
as the lower court opinions in that case, Opt-Out Lenders v.

_____

[8] On a somewhat related point, certain objecting states asserted that the
creation by some of the Sacklers of a website that described their
defenses to liability constituted an improper solicitation.  The
objectors ignore, though, that throughout the solicitation period they
publicly proselytized their objections to the plan's release, which was
widely described in the media. Neither activity violated my order
approving the disclosure statement for the plan and confirmation
procedures.

Millennium Lab Holdings II, LLC, 591 B.R. at 559; In re

Millennium Lab Holdings II, LLC, 575 B.R. at 252.

Also on point is Lynch v. Lapidem, 592 B.R. 506,

509-12.  See also In re Quigley Co., 676 F.3d at 51-52.

In its affirmance of Lynch v. Lapidem, the Circuit

did not reach Judge McMahon's determinations regarding the

existence of bankruptcy subject matter jurisdiction and the

bankruptcy court's power to issue a final order under

Article III of the Constitution with respect to this type of

injunction.  Lynch v. Mascini Holdings, Ltd., 792 Fed. Appx.

at 102-04.  Her logic was impeccable, however, in the

context of, as here, a request for confirmation of a Chapter

11 plan, which is a proceeding central to the bankruptcy

court's adjustment of the debtor/creditor relationship and

"arising in" a case (as it would "have no existence outside

of the bankruptcy," In re Motors Liquidation Co., 829 F.3d

at 151), and "under" the Bankruptcy Code (11 U.S.C. §§ 1129

and 1123) for purposes of 28 U.S.C. § 1334(b). That

traditional context is to be distinguished from a request

under Fed. R. Bankr. P. 7065, incorporating Fed. R. Civ. P.

65, for a preliminary injunction of third-party claims,

which Judge McMahon found in Dunaway v. Purdue Pharm. L.P.,

619 B.R. at 55-57, to be based on only 'related to'

jurisdiction under 28 U.S.C. § 1334(b).

117

Having addressed the jurisdictional, due process,
and Stern v. Marshall objections, one still must decide,
though, whether the Court has statutory or other power to
confirm a plan with a third-party claim release and
injunction pertaining to the shareholder released parties,
as well as the merits of the settlement that is the quid pro
quo for that release and injunction.

Almost every circuit has addressed those issues.
The clear majority (the First, Second, Third, Fourth, Sixth,
Seventh, Eleventh, and D.C. Circuits) have determined that
such releases and injunctions under a plan are authorized in
appropriate, narrow circumstances. See Monarch Life Ins.
Co. v. Ropes & Gray, 65 F.3d 973, 984-85 (1st Cir. 1995);
Deutsche Bank A.G. v. Metromedia Fiber Network, Inc. (In re
Metromedia Fiber Network, Inc.), 416 F.3d 136, 141 (2d. Cir.
2005), and the cases cited therein from the Second Circuit,
including the Macarthur Co. v. Johns-Manville Corp., 837
F.2d at 93-94, and In re Drexel Burnham Lambert Group, 960
F.2d at 293; In re Millennium Lab Holdings II, LLC, 945 F.3d
at 133-40; Nat'l Heritage Found., Inc. v. Highbourne Found.,
Inc., 760 F.3d 344, 350 (4th Cir. 2014), cert. denied, 135
S. Ct. 961 (2015), and Menard-Sanford v. Mabey (In re A.H.
Robins Co.), 880 F.2d 694, 700-02 (4th Cir. 1989); In re Dow
Corning Corp., 280 F.3d at 656-58; Airadigm Communs. v. FCC

118

(In re Airadigm Communs., Inc.), 519 F.3d 640, 655-59 (7th
Cir. 2008), and In re Ingersoll, Inc., 562 F.3d 856 (7th
Cir. 2009); SE Prop. Holdings, LLC v. Seaside Eng'g &
Surveying (In re Seaside Eng'g & Surveying), 780 F.3d 1070,
1076-79 (11th Cir. 2015), cert. denied, Vision-Park Props.
V. Seaside Eng'g & Surveying, 577 U.S. 823 (2015); and In re
AOV Indus., Inc., 792 F.2d 1140, 1153 (D.C. Cir. 1986).

Three circuits are on record that third-party
claims releases are improper for a court exercising
bankruptcy jurisdiction to approve.  See Bank of New York
Tr. Co., NA v. Off. Unsecured Creditors' Comm. (In re
Pacific Lumber Co.), 584 F.3d 229, 252 (5th Cir. 2009);
Resorts Int'l v. Lowenschuss (In re Lowenschuss), 67 F.3d
1394, 1401-02 (9th Cir. 1995); In re W. Real Estate Fund,
922 F.2d 592, 600 (10th Cir. 1990).

The following can be said about them, or the line
of cases from those three courts, however.  First, they are
fundamentally based on the view that section 524(e) of the
Bankruptcy Code precludes the grant of such a release.  That
section provides in relevant part, "[D]ischarge of a debt of
the debtor does not affect the liability of any other entity
on, or the property of any other entity, for such debt."  11
U.S.C. § 524(e).  This statutory reading has been
effectively refuted, however. See, e.g., In re Airadigm

119

Communs.: ("If Congress meant to include such a limit [in
section 524(e)], it would have used the mandatory terms
'shall' or 'will' rather than the definitional term 'does.'
And it would have omitted the prepositional phrase 'on, or
for, . . . such debt,' ensuring that 'the discharge of the
debt of a debtor *shall* not affect the liability of another
entity' -- whether a debtor or not.  See 11 U.S.C. § 34
(repealed Oct. 1, 1979) ('The liability of a person who is a
co-debtor with, or guarantor or in any manner a surety for,
a bankruptcy shall not be altered by the discharge of such
bankruptcy.') (prior version of § 524(e)).  Also, where
Congress has limited the powers of the bankruptcy court, it
has done so clearly.") 519 F.3d at 656; In re Dow Corning
Corp., 280 F.3d at 657 (section 524(e) "explains the effect
of a debtor's discharge.  It does not prohibit the release
of a non-debtor").  See also Macarthur Co. v. Johns-Manville
Co., 837 F.2d at 91, and Lynch v. Lapidem, 592 B.R. at 504-
05, which distinguish a bankruptcy discharge or a final
determination on the merits from a settlement of claims.

Second, the Fifth Circuit observed in Pacific
Lumber that "non-debtor releases are most appropriate as a
method to channel mass claims toward a specific pool of
assets" in cases concerning "global settlements of mass
claims against the debtors and co-liable parties," 584 F.3d

120

at 252, citing a similar observation by the Fifth Circuit in
Feld v. Zale Corp., 62 F.3d 746, 760-61 (5th Cir. 1995),
thus suggesting that in a context like the plan before this
Court, the Fifth  Circuit might reach a different result.

I will note, further, that notwithstanding its
reliance on Bankruptcy Code section 524(e) as precluding any
third-party claim release, which the Ninth Circuit in
Lowenschuss, 67 F.3d at 1401-02, and In re Am. Hardwoods,
885 F.2d 621, 623 (9th Cir. 1989), equated with a discharge,
the Ninth Circuit has more recently held that a release of
third-party claims based on actions taken in or related to
the bankruptcy case could, in appropriate circumstances, be
imposed in a plan, although such post-bankruptcy, pre-
confirmation claims would be subject to the discharge, as
well.  Blixseth v. Credit Suisse, 961 F.3d 1074, 1081-85
(9th Cir. 2020).

Fourth, both Am. Hardwoods, 885 F.2d at 624-25,
and W. Real Estate Fund, 922 F.2d at 599, recognized the
propriety of imposing a preliminary injunction of third-
party claims to "facilitate the reorganization process,"
leading one to ask why couldn't such a stay become permanent
if it was crucial to a reorganization process involving
massive numbers of overlapping estate and third-party
claims, in contrast to the peripheral third-party claims in

121

those two decisions, simply because it was opposed by a small number of objecting creditors, or just one?

In any event, W. Real Estate Fund, has been interpreted by a court in the Tenth Circuit as not standing for the proposition that section 524(e) of the Bankruptcy Code precludes all third-party releases but rather that section 105(a) of the Bankruptcy Code and other applicable bankruptcy law might, in appropriate circumstances, justify a release of third-party claims under different circumstances.  In re Midway Gold, 575 B.R. 475, 505 (Bankr. D. Colo. 2017).

The minority circuits' reliance on Bankruptcy Code section 524(e) to preclude third-party claims releases under a plan, is also inconsistent with section 524 as a whole. Section 524(g) of the Bankruptcy Code specifically provides for certain third-party releases if certain conditions are met in a plan that addresses asbestos liabilities, including the affirmative vote of the affected class by a super-majority of 75 percent of those voting.

But more importantly, section 524(h)(1) of the Bankruptcy Code expressly provides that section 524(g) does not mean that plans that were confirmed before the enactment of that section that are generally in conformity with it are unlawful. 11 U.S.C. § 524(h)(1).  The legislative history to

122

the amendment makes the same point:

> "[S]ection [524(h)] contains a rule of
> construction to make clear that the special rule
> being devised for the asbestos claim
> trust/injunction mechanism is not intended to
> alter any authority bankruptcy courts may already
> have to issue injunctions in connection with a
> plan of reorganization.  Indeed, Johns-Manville
> and UNR firmly believe that the court in their
> cases had full authority to approve the trust
> injunction mechanism.  And other debtors in other
> industries are reportedly beginning to experiment
> with similar mechanisms.  The Committee expresses
> no opinion as to how much authority a bankruptcy
> court may generally have under its traditional
> equitable powers to issue an enforceable
> injunction of this kind.  The Committee has
> decided to provide explicit authority in the
> asbestos area because of the singular and
> cumulative magnitude of the claims involved.  How
> the new statutory mechanism works in the asbestos
> area may help the Committee judge whether the
> concept should be extended into other areas."

H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec.

H10765 (Oct. 4, 1994).

A similar floor statement by Senator Heflin at 140

Cong. Rec. S14461-01 (Oct. 6, 1994) reads, "Finally, Mr.

President, with respect to the senator's specific question,

this Section applies to injunctions in effect on or after

the date of enactment. What that means is, for any

injunction that may have been issued under a court's

authority under the Code prior to enactment, such an

injunction is afforded statutory permanence from the date of

enactment forward, assuming that it otherwise meets the

qualifying criteria described earlier."

It appears clear, therefore, under well-reasoned caselaw as well as the Code itself that section 524(e) is not a statutory impediment to the issuance or enforcement of a third-party claim release under a plan in appropriate circumstances.

That raises the issue, however, what _is_ the statutory or other source of power for such a release?  This issue also has been addressed at the appellate level. See In re Airadigm Communs., Inc., where after determining that section 524(e) does not bar a third-party claims release, the Seventh Circuit stated,

> "The second related question dividing the circuits is whether Congress affirmatively gave the bankruptcy court the power to release third parties from a creditor's claims without the creditor's consent, even if 524(e) does not expressly preclude the releases.  A bankruptcy court 'appl[ies] the principles and rules of equity jurisprudence,' Pepper v. Litton, 308 U.S. 295, 304 (1939), and its equitable powers are traditionally broad. United States v. Energy Resources Co, Inc., 495 U.S. 545, 549 (1990). Section 105(a) [of the Bankruptcy Code] codifies this understanding of the bankruptcy court's powers by giving it the authority to effect any 'necessary or appropriate' order to carry out the provisions of the bankruptcy code.  Id. at 549; 11 U.S.C. § 105(a).  And a bankruptcy court is also able to exercise these broad equitable powers within the plans of reorganizations themselves. Section 1123(b)(6) [of the Bankruptcy Code] permits a court to 'include any other appropriate provision not inconsistent with the applicable provisions of this title.'  11 U.S.C. § 1123(b)(6). In light of these provisions, we hold that this 'residual authority' permits the bankruptcy court to release third parties from

124

> liability to participating creditors if the
> release is 'appropriate' and is not inconsistent
> with any provision of the Bankruptcy Code."

519 F.3d at 657.  See also In re Dow Corning Corp., 280 F.3d

at 656-58; Lynch v. Lapidem, 592 B.R. at 511 ("[T]hird-party

releases contained in a confirmed plan are subject to 11

U.S.C. §§ 1129(a)(1), 1123(a)(5) & (b)(6), 105, and 524(e).

In other words, those releases flow from a federal statutory

scheme. This statutory scheme reflects Congress's exercise

of its preemption powers, which permit the abolition of

[rights] to attain a permissible legislative object.

Congress possesses exceedingly broad power [t]o establish

uniform laws on the subject of [b]ankruptcies throughout the

United States.  By way of the Bankruptcy Code, Congress

authorized wholesale preemption of state laws regarding

creditors' rights and has delegated this preemptive power to

the bankruptcy courts."); Adam J. Levitin, "Toward A Federal

Common Law of Bankruptcy: Judicial Lawmaking in a Statutory

Regime", 80 Am. Bankr. L.J. 1, 79-80, 83-84 (2006) (finding

source for third-party releases and injunctions under a plan

in federal common law as much as, if not more, than under

section 105(a) of the Bankruptcy Code coupled with sections

1123(a)(5) and (b)(6)).

All courts considering whether to approve a third-

party claims release under a plan have noted that such power

125

is subject to considerable scrutiny and may be exercised
only in limited, rare cases.  See, e.g., In re Metromedia
Fiber Network, Inc., 416 F.3d at 143, and the cases cited
therein.  In deciding whether this Chapter 11 plan presents
such a case, it is worthwhile to look first at the types of
claims that courts find are properly subject to such a
release.  In re Quigley Co., 676 F.3d 45, again provides
guidance, because it extensively addressed "derivative"
claims not only in the context of subject matter
jurisdiction, discussed earlier, but also when considering
the types of third-party claims that can properly be
released and enjoined under a plan, albeit in interpreting
Bankruptcy Code section 524(g).

     "Derivative claims" are widely understood to be
claims by a third party that asserts injury to the corporate
entity and requests relief that if granted would go to the
corporate entity.  See Donahue v. Bulldog Invs. Gen. P'ship,
696 F.3d 170, 176 (2d Cir. 2012).

     The Second Circuit has spent substantial time
interpreting what constitutes a true derivative claim, one
that, though asserted by a third party, properly belongs to
the debtor's estate, as opposed to being recoverable by the
third party. In such disputes, the courts generally ask
whether the relief sought by the third party would really

126

address only a secondary harm to that which flows primarily to the estate.  See Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC), 740 F.3d 81 (2nd Cir. 2014); Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.) 855 F.3d 84 (2nd Cir. 2017).  This inquiry supports the strong bankruptcy policy in favor of the ratable recovery by all similarly situated creditors from the debtor's estate, which as a concomitant principle requires that claims that purport to be independent of a remedy held by the debtor's estate but in fact arise from harm to the debtor be reserved only for the estate's benefit.

       This is the type of claim that is included within the non-opioid third-party claims release under the plan.  That release, as defined in the plan's "non-opioid excluded claim" definition, excludes "any cause of action that does not allege (expressly or impliedly) any liability . . . that is derivative of any liability of any Debtor or any of their Estates."

       If, in fact, those types of claims were the only claims to be released, we would not be talking about a "third-party claims" release of the shareholder released parties.  We would be talking about a release that clarifies and protects the estates from backdoor attacks through the assertion of purported third-party claims, that, in fact,

127

are estate claims to be shared ratably with the estate's
creditors.

Instead, true third-party releases involve claims
that are independent of the debtor's estate's claims at
least on a legal basis, if not as a factual basis.  See,
e.g., In re Drexel Burnham Lambert Group, 960 F.2d at 288,
293 (release of securities laws claims against officers and
directors proper); Macarthur Co. v. Johns-Manville Corp.,
837 F.2d at 90-92 (claims of co-insured and direct claims of
personal injury claimants against debtor's insurance
properly enjoined as part of plan's resolution of claims
against insurers); Cal. Dep't of Toxic Substances Control v.
Exide Holdings, Inc. (In re Exide Holdings, Inc.) 2021 U.S.
District LEXIS  138478 (D. Del. July 26, 2021) (claims
against plan funders as potentially responsible parties
properly enjoined as part of resolution of debtor's cleanup
obligations); Cartalemi v. Karta Corp. (In re Karta Corp.)
342 B.R. 45, 50, 56-57 (S.D.N.Y. 2006) (claims against non-
debtor affiliates and their fiduciaries).

But obviously not all independent legal claims are
properly covered by such a release if based on simply having
some relationship to the debtor, a clear example being a
third party's guaranty of a debtor's obligation.  Quigley
helps to sort out the degree of the necessary relationship.

128

There, the party relying upon a plan's third-party claims release argued that because the claim against it would not have arisen but for the debtor, because the debtor distributed its products, it should be covered by the release.  676 F.3d at 59-60.  The claimant argued otherwise, and the Circuit agreed with it.  Id. at 60-61.

The court concluded that a "but for" test creates too much of an "accidental nexus" to the bankruptcy estate and that instead the third-party claim, to be subject to the plan's release and injunction, must arise "as a legal consequence" of the debtor's "conduct or the claims asserted against it must be a legal cause of or a legally relevant factor to the third party's alleged liability." Id. at 60; see also id. at 61 (channeling authority limited "to situations in which the third party's relationship with the debtor is legally relevant to its purported liability [to the claimant]").  See also Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.), 900 F.3d 126, 136-37 (3d Cir. 2018) (claim need not be directly derivative of the debtor's rights; instead, "[t]he proper inquiry is . . . to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it").

Again, the discussion in Quigley, as well as in W.R. Grace, came in the context of interpreting the limits

of Bankruptcy Code section 524(g)'s release and injunction
of third-party claims; however, the need to limit third-
party claims releases and injunctions generally to such
closely related, though independent, claims is a consistent
theme throughout the case law, and it is reasonable
therefore to be guided by the section 524(g) cases.  See,
e.g., In re Karta Corp., 342 B.R. at 55-57 (relying on
identity of interest between debtors and non-debtor released
parties); In re Dow Corning Corp., 280 F.3d at 658 (noting
identity of interest between the debtor and third-party
claimants).

        To properly be subject to a third-party claims
release under a plan, therefore, the third-party claim
should be premised as a legal matter on a meaningful overlap
with the debtor's conduct. Otherwise, the release would be
too broad and would cover, for example, a claim against one
of the Sacklers, some of whom are doctors, for negligently
prescribing OxyContin to a patient.  On the other hand,
given a causal legal dependence on the Debtor's conduct, or
a legally meaningful relationship with the debtor's conduct,
a third-party claim is sufficiently close to the claims
against the debtor to be subject to settlement under the
debtor's plan if enough other considerations support the
settlement.

So, while I firmly believe that I have subject matter jurisdiction, that the Debtors have satisfied due process, that I have the power to issue a final confirmation order under Article III of the Constitution, and that there is a sufficient source of power in the Bankruptcy Code itself, in sections 105(a) and 1123(a)(5) and (b)(6), as well as in the Court's inherent equitable power, I will require section 10.7(b) of the plan, which provides for the release of third-party claims against the shareholder released parties, to be further modified to state that a Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party, for the third-party claim to be subject to the release.

On the other hand, having read the objecting states' complaints against the Sacklers, which, as noted not only by me but also by Judge McMahon in Dunaway v. Purdue Pharm. L.P., 619 B.R. at 50, essentially dovetail with the facts of the claimants' third-party claims against the Debtors, such third-party claims would be properly covered by such a revised release and injunction.

This still leaves whether under the remaining applicable standards and the facts of these cases the plan's

131

third-party claims release in favor of the shareholder

released parties should be imposed.  Those standards vary

among the circuits.  In In re Metromedia Fiber Network,

Inc., the Second Circuit listed a number of circumstances in

which courts have exercised their power to impose such a

release under section 105(a) of the Bankruptcy Code,

observing that non-debtor releases have been approved when

the release is "important" to the plan, the estate receives

substantial consideration in return, the enjoined claims

would be channeled to a settlement fund rather than

extinguished, the released claims would otherwise indirectly

impact the debtors' reorganization by way of indemnity or

contribution, and the plan otherwise provided for the full

payment of the enjoined claims. 416 F.3d at 141-42.

        The court went on to state, however, that "this is

not a matter of factors or prongs" and further that "[n]o

case has tolerated nondebtor releases absent the finding of

circumstances that may be characterized as unique."  Id. at

142.  It also cautioned that such releases can be abused,

especially if they are for insiders, and need to be

supported by sufficient findings by the bankruptcy court.

Id.

        The Third Circuit has used a similar set of

factors with perhaps one important difference.  As

summarized in In re Exide Holdings, Inc., 2021 U.S. Dist. LEXIS 138478, at *44-45: "To grant non-consensual releases a court must assess 'fairness, necessity to the reorganization' and [make] specific actual findings to support these conclusions.  Cont'l Airlines, 203 F.3d at 214.  These considerations might include whether: '(i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e. whether the non-consenting creditors received reasonable compensation in exchange for the release.'  In re Spansion, Inc., 426 B.R. 114, 144 (Bankr. D. Del. 2010)."

The Fourth, Sixth, and Eleventh Circuits have applied a similar multifactor test: there is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the debtor's estate; the non-debtor has contributed substantial assets to the reorganization; the injunction is essential to the reorganization -- namely, the reorganization hinges on the debtor being free from indirect

suits against parties who would have indemnity or
contribution claims against the debtor; the affected class
or classes have voted overwhelmingly to accept the plan; the
plan provides a mechanism to pay for all, or substantially
all, of the claims in the class or classes affected by the
injunction; the plan provides an opportunity for those
claimants who choose not to settle to recover in full; and
the bankruptcy court made a record of specific factual
findings that support its conclusions.  Behrmann v. Nat'l
Heritage Found., Inc., 663 F.3d 704, 712 (4th Cir. 2011)
(noting, however, that not all factors are required in each
case); In re Dow Corning Corp., 280 F.3d at 658; In re
Seaside Eng'g & Surveying, 780 F.3d at 1079.

     The Seventh Circuit has used a broader standard,
although also noting the potential for abuse, as well as the
fact-based nature of the inquiry:  whether the release is
narrowly tailored, not blanket, whether there has been a
finding that the release was an essential component of the
plan, whether it was the fruit of long-term negotiations,
and whether it was achieved by the exchange of good and
valuable consideration that will enable unsecured creditors
to realize distributions in the case.  In re Ingersoll,
Inc., 562 F.3d at 865.

     Again, according to Metromedia Fiber, none of

these factors is dispositive, but they do need to be
considered, the release must be supported by factual
findings in the record, and the release must be requested in
the context of unique circumstances and necessary to the
plan.

          Certainly the circumstances of these cases are
unique.  Every Chapter 11 case has its own difficulties, but
I believe these cases are the most complex, given the issues
before the parties and ultimately the Court, that I have
handled, and frankly that the courts under Chapter 11 have
handled.  At least that view is shared by the parties to
these cases, who were represented by very capable and
experienced counsel.

          The release of the shareholder released parties
under the plan as amended also is narrowly tailored and as
discussed above will need to be further narrowed.

          Again for reasons that I've already stated, it is
also clear that the monetary contributions by the Sacklers
and their related entities are critical to confirmation of
the plan.  Without the settlement payments, I find that the
plan would unravel, including the complex interrelated
settlements that depend upon the payments being supplied
under the settlement in addition to the non-monetary
consideration under it.

Not every shareholder released party is
necessarily going to make a specific payment under the plan,
but the Sackler family members are obligated to cause the
payments to be made, and the relationships among the
shareholder released parties are sufficiently close to lead
to the conclusion that the aggregate settlement payment
hinges on each being released.  Understandably the
shareholder released parties are not going to agree to
provide the consideration under the settlement without
receiving the shareholder release in return.

The plan also has been overwhelmingly accepted,
including by the classes affected by the third-party claims
release, by well above the 75 percent supermajority in
section 524(g) of the Bankruptcy Code. Indeed, over 95
percent of the large number of creditors voting have
accepted the plan, including in the objectors' classes.

It is also clear that the amount being paid under
the settlement is substantial.  As I noted earlier, not only
is it substantial in dollar terms, I believe that it is the
largest amount that shareholders have ever paid in such a
context of these types of third party claims and closely
related claims for piercing the corporate veil, alter ego,
and breach of fiduciary duty/failure to supervise.
Moreover, the non-monetary consideration under the

136

settlement also is substantial, including the agreement to
allocation by charities to opioid abatement valued at least
at $175 million, resolution of naming rights, and the public
document depository.

Objectors have argued that in the light of either
the aggregate amount of claims asserted against Sacklers or
the aggregate amount of their wealth, the settlement sum is
not substantial.  I've considered those points carefully.
The Sackler settlement does not provide anything close to
enough to pay for all or substantially all of the asserted
claims of the classes affected by the third-party claims
release.  The United States' claim alone, for example, will
recover only a small fraction of its allowed claim, and it
is fair to assume that if the other claims were liquidated
they, too, would not be paid in full.  In addition, the
settlement, although clearly substantial in dollars, leaves
the Sackler family members in the aggregate with substantial
wealth.

On the other hand, neither a defendant's wealth
nor the amount of claims asserted against it should dictate
the fairness of a settlement without considering the claims'
merits, the costs and delay of continued litigation, and
risks relating to the collectability of any eventual
judgments.

More relevant than the prospect of full payment,
therefore, is the Third Circuit's focus on the fairness of
the settlement to the third-party claimants. In re Exide
Holdings, Inc., 2021 U.S Dist. LEXIS 138478, at *44-45.[9]
That issue can be assessed in two ways:  first, the Court's
analysis, based on the evidence, of the factors for and
against the settlement and, second, based on the process
leading to the settlement -- that is, whether it was
conducted at arms-length by well-informed and well-
represented parties whose interests were aligned with the
third parties whose claims would be released, as well as
whether those parties and the overwhelming number of parties
affected by the settlement, support it.

I therefore have analyzed the fairness of the
settlement from the perspective of the third-party claimants
in comparison to the likely result if they were instead able
to separately pursue their third-party claims.

This analysis in large measure overlaps the

---

[9] Courts have analogized the power to compel a third-party claims release
under a plan to the equitable doctrine of marshalling.  In re Dow
Corning Corp., 280 F.3d at 656; In re A.H. Robbins Co., 880 F.2d at 701
("A creditor has no right to choose which of two funds will pay his
claim.  The bankruptcy court has the power to order a creditor who has
two funds to satisfy his debt to resort to the fund that will not defeat
other creditors.").  This approach similarly focuses the Court on the
value of the third-party claim, taking into account all relevant
factors, not just the size of the asserted claim or the target's net
worth in a vacuum.

analysis of the merits of the Debtors' estates' settlement
of certain of their claims against the shareholder released
parties.  This is because, as noted, the third-party claims
being released under the settlement are based on essentially
the same facts as the Debtors' veil piercing, alter ego, and
breach of fiduciary duty/failure to supervise claims.

Having considered the complaints filed against the
Debtors and certain of the Sacklers by the objecting states,
their claims ultimately derive from the Debtors' conduct to
the extent that as a legal matter one or more of the
Sacklers can be said to have directed it or have had the
knowledge and power to have directed it but failed to do so.
As far as the gravamen or the proof that would need to be
shown, I've not gone through every state's applicable law on
this point, but I will note that the main cases that they
have cited -- Grayson v. Nordic Const., Co., 599 P.2d 1271
(Wash. 1979), and State v. Ralph Williams, N. W. Chrysler
Plymouth, Inc., 553 P.2d 423, 439 (Wash. 976) -- found
individual liability based upon the controlling
shareholder's personal direction, including fraud committed
by the corporation through the shareholder, of many of the
unlawful acts and practices taken by the corporation.

The Sacklers therefore would raise the same
defenses to these claims (to the extent that they would

139

belong to the third party claimants instead of to the
Debtors) as they would to the estates' closely similar
claims:  all would argue that many of the claims pre-date
2007 and are barred by prior settlements or statutes of
limitations; most of the shareholder released parties would
argue that they never served on Purdue's Board, did not
otherwise engage in decision-making for Purdue, and that
their ability to control Purdue, if they exercised their
shares along with their family members, does not, standing
alone, suffice to ascribe liability; and the Sacklers who
were on Purdue's Board would argue that the evidence does
not show their involvement sufficiently in Purdue's wrongful
conduct, such as the conduct admitted by it in the October
2020 DOJ settlement, and would point in support to the OIG
and ADD certifications, although as I've discussed, they
still face substantial legal risk on such claims.

As I've also discussed, moreover, there are
serious collection issues pertaining to any judgment against
shareholder released parties.  These issues are exacerbated
by the inevitable competition not only among all of those
who assert third-party claims against the shareholder
released parties (and it is noteworthy that none of these
claims has been identified as being based on wrongful
conduct specifically aimed at the claimant, as opposed to at

all claimants), but also from the estates' claims.  Indeed,
as noted, the estates' fraudulent transfer avoidance claims,
which the third-party claimants clearly would not be able to
pursue on their own behalf, probably would have the best
chance of material success among all of the claims against
the shareholder released parties.

The issue of collection is two-fold.  First,
because of the dispersal of the Sacklers' wealth, including
(x) among many different people or family groups, including
outside of the U.S. and (y) in allegedly spendthrift trusts,
including, again, outside of the U.S., recovery on judgments
would be difficult, especially since the generally well-
recognized fraudulent transfer exception to the integrity of
U.S. spendthrift trusts would not be available to creditors
that would not have standing to pursue fraudulent transfers
for themselves because they would be pursued by the estates
for the benefit of all creditors.

Second, as I've discussed, without the releases
the plan would unravel and the Debtors' cases would likely
convert to cases under Chapter 7 of the Bankruptcy Code.
I've already found that in a liquidation, unsecured
creditors would probably recover nothing from the Debtor's
estates, as set forth in the unrefuted liquidation analysis
by Mr. DelConte.  Under that analysis, even in the less

141

likely "best case" scenario, they would receive no more than their pro rata share of $699 million, which would be small.

I've already gone through the dilutive effect resulting from conversion of these cases to Chapter 7. Claims that under the plan are to be resolved by agreed multi-billion-dollar payments for abatement, and thus do not require being determined on the merits, would then be contested, as would the personal injury claims.  The contests would be extraordinarily expensive and time-consuming, and, after being determined, the resulting claims would likely not only receive zero from the Debtors' estates but also, because of their collective size, only a small pro rata share of any recovery from the shareholder released parties.

Collectively, the states and territories filed proofs of claims in these cases aggregating at least $2.156 trillion.  The share of that sum for the objectors who have attacked the plan's third-party claims release is roughly 450 billion, or less than 21 percent.  If you factor in the other, non-state claimants, many of which, like the City of Seattle, would clearly assert third-party claims, too, as well as the Debtors' estates' claims against the Sacklers and their related entities, the dilutive effect upon any individual third-party claimant's recovery from the

142

shareholder released parties is clear.  And I have no doubt

that a Chapter 7 trustee and at least the other governmental

entities would pursue similar claims against the shareholder

released parties (in addition to a Chapter 7 trustee's

pursuit of the estates' avoidance claims).  They would never

permit the objecting states, which are similarly situated to

them, to win a litigation race.

I therefore conclude that if I denied confirmation

of the plan, the objectors' aggregate net recovery on their

claims against the Debtors and the shareholder released

parties would be materially less than their recovery under

the plan.

This conclusion is strongly supported by the

second, process-related inquiry into the fairness of the

settlement from the third-party claimants' perspective that

I have identified.  As discussed earlier, the negotiations

of the Sackler settlement were clearly arms-length.  The

Sacklers were on one side, and everyone else was on the

other.  The Sacklers and their related entities were

required to provide extraordinary disclosure regarding (x)

their conduct related to Purdue and (y) their assets and

liabilities, at least as much, and often more, than would be

reasonably expected if they themselves sought bankruptcy

relief (which for many of the Sacklers and most of their

related entities would not be under the U.S. Bankruptcy

Code).  The parties investigating and negotiating against

the Sacklers were very well represented and aligned with the

objectors; indeed, in addition to the Official Unsecured

Creditors Committee, those parties were fellow state

attorneys general and other governmental representatives,

many of whom have been in the forefront pursuing Purdue and

its shareholders for years.  Lastly, the settlement was

negotiated in not one but two mediations conducted by superb

mediators.

Arguably the "best interests" analysis under

section 1129(a)(7) of the Bankruptcy Code overlaps with the

foregoing assessment of the fairness of the plan's third-

party claims release to the objectors.  The objectors have

argued that the plan does not satisfy section 1129(a)(7) of

the Code because in a Chapter 7 liquidation of the Debtors

they would have two sources of recovery -- from the Debtors'

estates and separately from the shareholder released

parties.

I have said that section 1129(a)7) "arguably"

applies to this objection because the section's plain

meaning may well not contemplate it.  As previously quoted,

section 1129(a)(7) provides that for the holder of a claim

that has not accepted its treatment under a plan, such

144

holder must be projected to "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7) (emphasis added).  As a matter of grammar, therefore, the comparison required by section 1129(a)(7) apparently is between the amount that the objecting creditor would receive under the plan on account of its claim and what it would "so" receive -- that is, also on account of its claim -- if the debtor were liquidated under chapter 7.  It would not, therefore, require analysis of the claimant's rights against third parties.

I recognize that the interpretation of section 1129(a)(7) by two of my colleagues, whom I greatly respect, was to the contrary in In re Ditech Holding Corp., 606 B.R. at 610-14, and In re Quigley Co., 437 B.R. at 145.  In deciding, however, that when conducting the "best interests" test the court should take into account a claimant's recovery from a third-party source that is precluded by the plan if one can make a reasoned determination of the recovery on that third-party claim, neither of those decisions addresses the plain meaning argument that I've just described (and, moreover, the applicability of section

145

363(o) of the Bankruptcy Code in a Chapter 7 liquidation
when it was found inapplicable under the plan[10] in the _Ditech_
case would have placed the focus on third-party claims in a
way absent here).

I have not limited my ruling, though, to the
foregoing plain meaning interpretation.  I have instead
assessed, based on the record of the confirmation hearing,
what I believe would be recovered by the objectors if the
Debtors were liquidated in Chapter 7, both on account of
their claims against the Debtors _and_ on account of their
third-party claims.  And based on that assessment, I have
concluded that under the plan they would recover at least as
much as their recovery in a hypothetical Chapter 7 case,
indeed materially more.

In _Quigley_, 437 B.R. at 145, and _Ditech_, 606 B.R.
at 615, the courts stated that the hypothetical recovery
from non-debtor sources should be included in the "best
interests" analysis if it was neither speculative nor
incapable of estimation.  The Debtors have argued that here
such a recovery would be too speculative.

In _Quigley_ the court relied on various admissions

---

[10] Section 363(o) of the Code, which _Ditech_ found did not apply in a
Chapter 11 plan context though it would in Chapter 7, _id._ at 595,
expressly preserves the types of third-party claims that the plan would
have released.  11 U.S.C. § 363(o).

by the debtor regarding an over 20-year history of
settlements of similar claims that such a recovery, which
would be barred by the plan, was not speculative.  437 B.R.
at 146.  In Ditech, the court concluded that the debtors had
not carried their burden to show that the claims that would
be barred under the plan in return for a small pro rata
distribution from a settlement fund could not be estimated
or that the fund was a reasonable settlement, in part
because the limited evidence offered by the debtors
suggested to the contrary. 606 B.R. at 620-21.  The
objecting states have suggested that a similar failure of
proof exists here given the absence of expert testimony
regarding the value of the third-party claims against the
shareholder released parties.

It is true that there was no such expert
testimony, but given the evidence regarding the strengths
and weaknesses of the claims, including the cost of pursuing
them, the risks of collection, and the dilutive effect of
all of the other litigation that would be pursued by all of
the other creditors in these cases, including all of the
other states and governmental entities who are otherwise
agreeing to the plan that would have the same types of
third-party claims, as well as the Chapter 7 trustee on
behalf of the estate, I conclude that no additional evidence

147

is required.

Unlike in _Quigley_, there is a paucity of any post-
2007 settlement history here of third-party claims against
the Sacklers and their related entities, with the exception
of the Sacklers' postpetition payment of $225 million to the
United States in respect of the civil claims that were the
subject of their postpetition settlement with the DOJ; the
Sacklers' settlement shortly before the bankruptcy petition
date with the State of Oklahoma for $75 million;[11] and the
fact that the Sacklers paid nothing to the Sate of Kentucky
but obtained a release under Purdue's $24 million December
2016 settlement with the State of Kentucky,[12] which amounts
reasonably compare to the proposed recoveries of the
objecting states under the plan.  And unlike in _Ditech_, no
one has tried to hide the Sacklers' settlement history.

In this context, the merits of the plan's
settlement of the third-party claims can properly be
undertaken by the Court not only in the light of that
history but also the other evidence that I have already

---

[11] _Attorney General Hunter Announces Historic $270 Million Settlement
with Purdue Pharma_, Office of the Oklahoma Attorney General (May 28,
2019), http://oag.ok.gov/articles/attorney-general-hunter-announces-
hitoric-270 -million-settlement-purdue-pharma-200-million.
[12] Settlement Agreement and General Release, _Commonwealth of Kentucky, ex
rel. Jack Conway, Attorney General, and Pike County, Kentucky v. Purdue
Pharma, L.P., et al._, Civil Action No. 07-Cl-013303 (Ky. Ct. App. Dec.
22, 2015) (NO. 1606).

discussed at length.[13]  Accordingly, for the same reasons
that that the plan's settlement/third-party claims release
of the shareholder released parties is fair to the
objectors, the plan also meets Bankruptcy Code section
1129(a)(7)'s "best interests" test under a broad
construction of that test.  Having a second fork in the pie
does not help, it hurts because of the resulting "battle of
the century" among the creditor parties, as well as the
Chapter 7 trustee.

The last argument made by the objecting states, as
well as the City of Seattle, is that the plan's
nonconsensual third-party release and injunction violates
their sovereignty and police power.

There is, however, no such bar or exception under
the Bankruptcy Code.

In certain carefully delineated instances, the
Bankruptcy Code and the Judicial Code recognize the police
power of states and other governmental units, but only in
those limited contexts.  Thus, in section 362(b)(4) of the
Code, Congress provided a limited exception to the automatic

---

[13] It is worth noting that, unlike here, both Quigley, 437 B.R. at 126-
29, and Ditech, 606 B.R. at 624-25, found that the proposed settlements
of the third-party claims at issue were not negotiated by those whose
interests were aligned with the third-party claimants and that this flaw
meant that the plan either was not in good faith for purposes of section
1129(a)(3) of the Bankruptcy Code or that the settlement was not fair
and reasonable.

stay under section 362(a) "of the commencement or
continuation of an action or proceeding by a governmental
unit . . . to enforce such governmental unit's . . . police
or regulatory power, including enforcement of a judgment
other than a monetary judgment, obtained in an action or
proceeding by the governmental unit to enforce such
governmental unit's . . . police or regulatory power."  11
U.S.C. § 362(b)(4).  By its own terms, however, section
362(b)(4) does not except governmental units' actions to
enforce a monetary judgment from the automatic stay under
section 362(a); nor does the exception apply to governmental
units' actions to obtain or enforce a lien against the
estate.  See Ohio v. Kovacs, 469 U.S. 274, 283 n.11 (1985);
SEC v. Brennan, 230 F.3d 65, 71-72 (2d Cir. 2000); 3 Collier
on Bankruptcy ¶ 362.05[5][b].

Similarly, 28 U.S.C. § 1452(a) precludes the
removal, which is generally permitted under that section
when the district court has bankruptcy jurisdiction under 28
U.S.C. § 1334, of a claim or cause of action in a civil
proceeding to enforce a governmental unit's police or
regulatory power.

The scope of the "police or regulatory power" in
those exceptions has not been decided definitively by the
Second Circuit.  As noted in the thorough discussion in

150

People of Cal. V. GM L.L.C. (In re GM L.L.C. Ignition Switch
Litig.) 69 F.Supp.3d 404 (S.D.N.Y. 2014), the definition of
police power for purposes of these exceptions has always
recognized a distinction between "whether the governmental
action relates primarily to the government's pecuniary
interest in the debtor's property or to matters of public
health and welfare."  Id. at 410 (internal quotation and
citation omitted).  After Bd. of Governors of Fed. Reserve
Sys. v. MCorp. Fin., Inc., 502 U.S. 32, 40 (1991), courts'
focus turned from assessing whether the governmental unit
was truly intending to deter harmful conduct rather than
seeking to benefit the government financially, to an
objective inquiry into the purpose of the law that the
governmental unit was attempting to enforce. In re GM L.L.C.
Ignition Switch Litig., 69 F. Supp. 3d at 410-12.  Thus the
fact that a governmental unit seeks a money judgment is not
enough to take its claim out of the police power exception,
and at least for many of the governmental objectors' causes
of action against shareholder released parties, therefore,
the "police power exception" would apply.

        But, again, that exception is a limited one.  It
is well recognized -- indeed the 10th Circuit states that it
is a matter of hornbook law -- that actions excepted from
the automatic stay, including under the police or regulatory

power, may be subject to injunctive relief under section
105(a) of the Bankruptcy Code. In re W. Real Estate Fund,
922 F.2d at 599; In re Commonwealth Cos., Inc., 913 F.2d
518, 527 (8th Cir. 1990).  See also 3 Collier on Bankruptcy
¶ 362.05[5][d]; H.R. Rep. 95-595 95th Congress 1st Sess.
(September 8, 1977) ("Subsection (b) lists five exceptions
to the automatic stay.  The effect of an exception is not to
make the action immune from injunction.").

        And where police and regulatory power or state
sovereignty generally is not specifically recognized in the
Bankruptcy Code, Congress' power under Art. I cl. 8 of the
Constitution to enact uniform bankruptcy laws overrides it.
See, e.g., Cty. of San Mateo v. Peabody Energy Corp. (In re
Peabody Energy Corp.), 958 F.3d 717, 724-25 (8th Cir. 2020)
(chapter 11 plan discharges governmental units' public
nuisance claim); see also In re Fed'l-Mogul Global, 684 F.3d
at 364-65, 367-70; In re Airadigm Communs., Inc., 519 F.3d
at 653-54. Plan injunctions have previously been imposed
over governmental units' police or regulatory power.  See,
e.g., In re Exide Holdings, Inc., 2021 U.S. Dist. LEXIS
138478, at *51 (California Department of Toxic Substances
Control enjoined from pursuing claims against plan funder);
see also In re Airadigm Communs., Inc., 519 F.3d at 557
(third-party claims release of plan funder applied to

F.C.C.); cf. In re Dow Corning Corp., 280 F.3d at 648

(plan's third-party claims release could be applied to

United States as claimant under Medicare Secondary Payer

Program and Federal Medicare Recovery Act; remanded for

findings in accordance with opinion).  Such an injunction is

most clearly within the ambit of traditional bankruptcy

power when it pertains primarily to the collection of money

on claims that overlap claims against a debtor's estate, not

to enforcement of states' rights otherwise to regulate

conduct.

The objecting states' and Seattle's police power

and parens patriae arguments therefore should be considered

only in evaluating the fairness of the settlement to them as

governmental units, not as a bar to the settlement.  Given

the limited scope of the plan's release of the shareholder

released parties and those parties' agreement to no longer

be involved with the Debtors or NewCo except to perform the

settlement, as a practical matter the plan only limits the

objecting states' remedies against the shareholder released

parties to collect money on account of their past conduct.

As to that limitation, moreover, all of the states,

including the objecting states, have agreed to the

public/private allocation and the NOAT allocation under the

plan for abatement purposes.  Indeed, during the

confirmation hearing, counsel for the objecting State of Washington lauded the constructive nature of the NOAT allocation and the plan's proposed abatement procedures guidelines. Further, I have found that if the objecting governmental units were carved out of the release, the plan would fail, the Debtors would likely liquidate, and the objectors would collect materially less money from the Debtors and the shareholder released parties in the aggregate, as would the other states and governmental entities and non-public unsecured creditors who support the plan's confirmation.

The objecting states and Seattle nevertheless contend that the plan deprives them of establishing a sufficient civil remedy for the released claims.  And sending a message to others who might similarly be shown to have improperly engaged in conduct that would subject them to liability certainly can be a valid aspect of the police power.

Should that interest, though, defeat a plan that 79 percent of their sister states support, more than 96 percent of the other governmental entities and Native American Tribes support, and more than 95 percent of the other claimants support?  Should that interest deprive the other creditors of their assessment of the merits of the

154

settlement, with which this Court's analysis agrees?

As noted earlier, moreover, the plan does not just
address claims against the Debtors and the Sacklers for
money.  It not only deprives the Sacklers of all their
interest in the Debtors and requires them to cause the
delivery of $4.5 billion to the creditors, primarily for
abatement purposes.  It not only has been negotiated in a
context that has subjected them to national opprobrium. It
also addresses their naming rights and includes the Sacklers
and the Debtors' agreement to provide the comprehensive
public document depository, including waivers of the
attorney-client privilege, for future analysis by the
federal government, states, and others.

Ms. Conroy, who has been pursuing Purdue and the
Sacklers for as long and as diligently as anyone, in fact
testified that the document depository is perhaps the most
important aspect of the settlement, even more important than
the billions of dollars being paid by the shareholder
released parties. It is especially important given the
public interest raised by the objecting states.  It will
provide far more transparency to the conduct of Purdue and
those it did business with and those who regulated it,
including perhaps some of these very objectors, including
the state of Connecticut where Purdue's headquarters is

155

located, as well as, of course, the federal government, than would renewed litigation and any eventual trials against various members of the Sackler family.

The record to be established by the public document depository is important for the continued pursuit of lawsuits against other parties in this industry, and it will guide legislatures and regulators about how to better address other companies with lawful products that also are incredibly dangerous.

Similarly, the plan's mandated use of most of its anticipated distributions for abatement purposes, the parties' agreement on parameters for abatement, and the required periodic reporting on those efforts should guide the public's consideration of the efficacy of abatement measures going forward.

The aspects of the plan that regulate NewCo's future governance and conduct also, as I've noted, should provide a model for further self-regulation of similar companies or regulation by governmental entities.

I conclude therefore that the objectors' expressed public interests in opposing the settlement are outweighed by the foregoing considerations.

Each of the four members of the Sackler family who testified during the evidentiary hearing was asked if they

would apologize for their role and conduct related to
Purdue.  Their reactions, typically for an unhappy family,
varied.  None would give an explicit apology, which I
suppose is understandable given the legal risks faced,
although I will note that in a somewhat similar context I
have received a profound apology to victims of misconduct.

One of the witnesses, Richard Sackler, did not
accept any level of responsibility.  The other three with
differing degrees of emotion stated their regret for what
their companies had done.  A forced apology is not really an
apology.  So we will have to live without one unless
apologies follow the plan's confirmation.

The writer Stendahl wrote that most people do not
forgive, they just forget.  But given the nature of this
settlement, including the document depository, forgetting
should be impossible unless by choice.  To me, the elements
of the settlement, taken together, more than justify the
admittedly serious implications of overriding the objecting
states' and Seattle's rights.

So, assuming that the changes to sections 5.8 and
10.07(b) of the plan that I outlined will be made, as well
as one other change that I will address in a moment, I will
confirm the plan.  I do so agreeing with the Official
Unsecured Creditors Committee and everyone else on the other

side of the table from the Sackler family, including the Debtors, that I wish the plan had provided for more, but I will not jeopardize what the plan does provide by denying its confirmation.

The other change to the plan that I believe is required involves section 11.1(e), which provides that those who would prosecute a cause of action against released parties based on its being a "non-opioid excluded claim," which by definition truly is not a derivative claim, nevertheless must obtain leave from the bankruptcy court to do so. The provision is intended to protect the estates and released parties from having to go to other courts to litigate whether someone is usurping the estates' claims and thus violating the release.

Consistent with my remarks to counsel for certain Canadian municipalities and First Nations during the confirmation hearing, that provision should be clarified to apply only to a causes of action that colorably are derivative and therefore would belong to the Debtors' estates. Thus, for example, if a cause of action seeks to avoid a fraudulent transfer made by a non-Debtor, the plaintiff should not have to obtain permission under section 11.1(e) from the bankruptcy court to bring it.

I will enter an order confirming the plan if it is

158

amended as required hereby, which order can generally be in

the form of proposed confirmation order previously

circulated to the parties and provided to chambers.

Dated:  White Plains, New York
        September 17, 2021


                              /s/Robert D. Drain
                              United States Bankruptcy Judge