Ellen Isaacs, Pro Se
ryansopc@gmail.com
Tel: (561) 860-0770

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In re: PURDUE PHARMA L.P., et al.,          Chapter 11 Case No. 19-23649 (RDD)

Debtor(s).

                                             (Jointly Administered)

_____


## <u>MOTION OF ELLEN ISAACS, DECEASED PATRICK RYAN WROBLEWSKI & THE AMERICAN PEOPLE FOR A STAY PENDING APPEAL</u>

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................. 1

**FACTUAL AND PROCEDURAL BACKGROUND** ......................................... 4

    A.  The Opioid Epidemic ..................................................................................4

    B.  The Sackler Family's Role in the Opioid Epidemic ...................................5

    C.  The State Police Power Actions..................................................................7

    D.  Purdue Files for Bankruptcy and Obtains a Stay of Police Power Actions Against the Sacklers...................................................................................9

    E.  The Plan and the Sackler Releases............................................................10

    F.  Attempts to Engineer Equitable Mootness ...............................................16

**LEGAL STANDARD** ........................................................................................ 16

**ARGUMENT** ...................................................................................................... 17

    I.  THE CONFIRMATION ORDER SHOULD BE STAYED PENDING APPEAL...........17

    A.  A Stay is Necessary to Prevent Irreparable Injury to the States. ................17

    B.  A Stay is Unlikely to Cause Substantial Harm. .........................................18

    C.  The States Have at a Minimum a Substantial Possibility of Succeeding on Appeal.......................................................................................................21

        (i)    The Non-Consensual Third-Party Releases Are Improper ............... 21

        (ii)   Deference to Police Powers ...................................................... 23

        (iii)  Unclean Hands and Non-Dischargeability.............................. 29

        (iv)  Other Substantial Issues On Appeal .............................................. 32

    D.  A Stay Is In the Public Interest. ...............................................................37

    II.  THE CONFIRMATION ORDER SHOULD BE STAYED WITHOUT ANY REQUIREMENT THAT A BOND BE POSTED...........................................................38

**CONCLUSION** .................................................................................................. 40

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 473 W. End Realty Corp.,*
507 B.R. 496 (Bankr. S.D.N.Y. 2014) ................................................................................17

*ACC Bondholder Grp. v. Adelphia Communications Corp. (In re Adelphia*
*Communications Corp.),*
361 B.R. 337 (S.D.N.Y. 2007) ...........................................................................................17

*In re Airadigm Communications, Inc.,*
519 F.3d 640 (7th Cir. 2008) ......................................................................................27, 28

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
458 U.S. 592 (1982) ...........................................................................................................38

*In re Asher,*
488 B.R. 58 (Bankr. E.D.N.Y. 2013) .................................................................................35

*In re Avaya Inc.,*
573 B.R. 93 (Bankr. S.D.N.Y. 2017) .................................................................................35

*Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.),*
504 B.R. 754 (S.D.N.Y. 2014) ...........................................................................................17

*Brown v. Am. Sur. Co. of New York,*
110 Okla. 253 (1925) .........................................................................................................39

*California Department of Toxic Substances Control v. Exide Holdings, Inc. (In re*
*Exide Holdings, Inc.),*
Case No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021) ...............................27

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),*
280 F.3d 648 (6th Cir. 2002) ......................................................................................28, 29

*In re Commonwealth Companies, Inc.,*
913 F.3d 518 (8th Cir. 1990) ......................................................................................23, 25

*Commonwealth of Massachusetts v. Bartel (In re Bartel),*
403 B.R. 173 (Bankr. D. Mass. 2009) ...............................................................................30

*Consumer Protection Div. v. Morgan,*
874 A.2d 919 (Md. 2005) ...................................................................................................36

*Country Squire Assoc. of Carle Place, L.P. v. Rochester Comm. Sav. Bank (In re Country Squire Assocs. of Carle Place, LP),*
203 B.R. 182 (B.A.P. 2d Cir. 1996)................................................................17, 21

*Credit One Bank, N.A. v. Anderson (In re Anderson),*
560 B.R. 84 (S.D.N.Y. 2016)..........................................................................21, 37

*Czyzewski v. Jevic Holding Corp.,*
137 S. Ct. 973 (2017)............................................................................................23

*In re Daebo International Shipping Co.,*
No. 15-10616, 2016 BL 31731 (Bankr. S.D.N.Y. Feb. 4, 2016)..........................17

*In re Degennaro,*
No. 20-cv-7958, 2020 WL 6827936 (S.D.N.Y. Oct. 2, 2020)..............................17

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),*
416 F.3d 136 (2d Cir. 2005).........................................................................*passim*

*In re Ditech Holding Corp.,*
606 B.R. 544 (Bankr. S.D.N.Y. 2019)..........................................................34, 35

*In re Dow Corning Corp.,*
287 B.R. 396 (E.D. Mich. 2002)...........................................................................28

*Dunaway v. Purdue Pharmaceuticals L.P. (In re Purdue Pharmaceuticals L.P.),*
619 B.R. 38 (S.D.N.Y. 2020)................................................................................10

*In re Federal-Mogul Global, Inc.,*
684 F.3d 355 (3d Cir. 2012).................................................................................26

*FishDish, LLP v. VeroBlue Farms USA, Inc. (In re VeroBlue Farms USA, Inc.),*
No. 19-3413, 2021 US App Lexis 23164 (8th Cir. Aug. 5, 2021).........................20

*FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.),*
264 B.R. 634 (C.D. Cal. 2001) .............................................................................24

*In re Fucilo,*
No. 00-36261, 2002 WL 1008935 (Bankr. S.D.N.Y. Jan. 24, 2002) ...................30

*Gibbons v. Ogden,*
22 U.S. 1 (1824)......................................................................................................3

*GLM DFW, Inc. v. Windstream Holdings Inc. (In re Windstream Holdings Inc.),*
838 Fed. App'x 634 (2d Cir. 2021).................................................................18, 20

iii

*Hargreaves v. Nuverra Environmental Solutions, Inc. (In re Nuverra Environmental Solutions, Inc.)*,
834 Fed. App'x 729 (3d Cir. Feb. 2, 2021)........................................................20

*Harrington v. LSC Communications, Inc. (In re LSC Communications, Inc.)*,
No. 20-cv-5006, 2021 US Dist. Lexis 128403 (S.D.N.Y. July 9, 2021) .......................18

*Hessler v. State of Maryland Consumer Protection Division (In re Hessler)*,
No. 09-13371-JS, 2013 WL 5429868 (Bankr. D. Md. Sept. 30, 2013)...........................30

*Hirschfield v. Board of Elections*,
984 F.2d 35 (2d Cir. 1993)........................................................................21

*In re Hologenix, LLC*,
No. 20-cv-10109, 2020 WL 8457487 (C.D. Cal. Dec. 21, 2020)...............................17

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905)....................................................................................3

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
517 F.3d 52 (2d Cir. 2008).....................................................................22, 32

*Joseph General Contracting v. Couto*,
317 Conn. 565 (2015)................................................................................36

*Lutin v. U.S. Bankr. Ct. for the S.D.N.Y. (In re Advanced Mining Sys., Inc.)*,
173 B.R. 467 (S.D.N.Y. 1994).....................................................................17

*Mata v. Lynch*,
576 U.S. 143 (2015).................................................................................37

*Mohammed v. Reno*,
309 F.3d 95 (2d Cir. 2002)....................................................................21, 37

*In re One2One Communications, LLC*,
805 F.3d 428 (3d Cir. 2015)......................................................................20

*In re Pacific Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ....................................................................38

*In re Peabody Energy Corp.*,
958 F.3d 717 (8th Cir. 2020) ....................................................................26

*Pfizer, Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*,
676 F. 3d 45 (2d Cir. 2012)...................................................................33, 35

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010).......................................................34, 35

iv

*Souratgar v. Fair*,
818 F.3d 72 (2d Cir. 2016) ............................................................... 29

*State of Connecticut v. Moody's Corp.*,
No. 10-cv-546, 2011 WL 63905 (D. Conn. Jan. 5, 2011) ....................... 9

*State of New York v. DeFelice (In re DeFelice)*,
77 B.R. 376 (Bankr. D. Conn. 1987) .................................................... 31

*State of Texas v. Garner (In re Garner)*,
515 B.R. 643 (Bankr. M.D. Fla. 2014) .................................................. 31

*State v. $2,000,000.00 in U.S. Currency*,
822 S.W.2d 721 (Tex. App.-Houston 1991) ........................................... 39

*State v. Macko*,
No. 12-cv-6031858S, 2016 WL 4268383 (Conn. Super. Ct. Aug. 1, 2016) ........... 8

*State v. Ralph Williams North West Chrysler Plymouth*,
87 Wash.2d 298 (1976) .................................................................... 36

*State v. Steadman*,
149 Vt. 594 (1988) ......................................................................... 36

*United States v. Commonwealth Companies, Inc. (In re Commonwealth
Companies, Inc.)*,
913 F.2s 518 (8th Cir. 1990) ............................................................. 24

*In re W.R. Grace & Co.*,
384 B.R. 678 (Bankr. D. Del. 2008) .................................................... 26

*In re Western Real Estate Fund*,
922 F.2d 592 (10th Cir. 1990) ........................................................ 24, 25

**Statutes**

28 U.S.C. § 1452(a) ......................................................................... 23

11 U.S.C. § 349(b) .......................................................................... 23

11 U.S.C. § 362 ......................................................................... 9, 23, 25, 26

11 U.S.C. § 1129 ........................................................................ 12, 27, 34, 35

Conn. Gen. Stat. § 42-110m(a) ........................................................... 8

NY Business Corp. Law § 722(a) ........................................................ 33

Washington Consumer Protection Act, RCW 19.86 ................................. 8

v

## PRELIMINARY STATEMENT

1.      This is no ordinary bankruptcy. Purdue, under the close control of the Sackler family, helped create the opioid crisis, causing the deaths of tens of thousands of Americans, destroying the lives of countless others, and inflicting massive harms on state and local governments. While the Sacklers refused to subject themselves, personally, to individual bankruptcy cases, they seek to piggyback on this corporate bankruptcy to shield themselves from any future liability for their role in the opioid crisis while holding onto billions in ill-gotten gains. This Court reluctantly approved this "bitter" arrangement, but the difficult legal issues involved and the stakes of this case require that its decision receive meaningful appellate review. Several federal Circuit Courts of Appeals have held that bankruptcy proceedings cannot be used to release claims against non-debtors like the Sacklers, and even in circuits that occasionally allow such releases, including the Second Circuit, such releases are supposed to be "rare," both because they are not specifically authorized by the Bankruptcy Code and because "a nondebtor release is a device that lends itself to abuse." *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005)).

2.      Here, the Second Circuit and ultimately the Supreme Court should have the opportunity to decide whether the Bankruptcy Code actually allows non-debtor releases despite the lack of any textual basis for such releases, and even if it does, whether such a release is appropriate here. The States of Washington and Connecticut (the "States"), therefore respectfully submit this Motion for a Stay Pending Appeal of this Court's Order dated September 17, 2021 (the "Confirmation Order"), dkt. # 3787, confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization, dkt. # 3726, of Purdue Pharma L.P. (collectively, with its affiliated debtors, "Purdue"), based on the Court's September 1, 2021 oral decision confirming the Plan (the "Initial Decision"), and its subsequent Modified Bench Ruling, dkt. # 3786 (the "Decision").

1

3.      As much as the appealing States disagree with the Court's decision to impose non-consensual releases upon them, wiping out their ability to exercise their police powers as they see fit for purposes of deterrence and otherwise, we respect the time and thoughtfulness that went into the ruling. Nonetheless, the decision of one single bankruptcy judge, on issues of this magnitude, should not be rendered potentially unappealable.

4.      It would be particularly inappropriate for the very Court that issued the ruling under appeal to act in a manner that could have the effect of insulating its own ruling from appellate scrutiny. By declining to issue a stay, this Court would thereby enable Purdue to cry "equitable mootness" and seek to preclude effective appellate review. Ensuring such review is the sole purpose of this motion.

5.      Made over the States' vigorous objections, this Court's ruling would extinguish permanently a central component of the States' efforts to protect their citizens from the ongoing opioid epidemic — the defining public health crisis facing Americans of the past generation (excepting only the Covid-19 pandemic) — through a resolution that will allow the non-debtor Sacklers, among the principal perpetrators of this calamity, to walk away from the enormous harms they have wrought without the States being allowed to hold them to account. The Court's ruling would hand the Sacklers broad releases from opioid liability in exchange for backloaded payments over ten years that would likely leave them wealthier after those payments than they are now. Whether, in a case of first impression, state police powers asserted against non-debtors can be so overridden by a federal bankruptcy judge urgently cries out for meaningful appellate consideration.

6.      The right of the States to protect their citizens through the exercise of the States' police powers is a cornerstone of the Constitutional order. As the Supreme Court explained over a century ago, the States' ability to "protect the public health and the public safety" is among the

2

sovereign prerogatives that the States retained — and "did not surrender [—] when becoming … member[s] of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24-25 (1905); *see also Gibbons v. Ogden*, 22 U.S. 1, 203 (1824) ("Inspection laws, quarantine laws, health laws of every description … are component parts" of the "immense mass of legislation, which embraces everything within the territory of a state, not surrendered to the general government" and "which can be most advantageously exercised by the states themselves.").

7.      Never before in the history of this country has a State had its police powers non-consensually stripped from it in the manner effected by this Court's order. By refusing to consent to a stay pending appeal beyond the 14-day stay provided by Bankruptcy Rule 3020(e), Purdue, acting as directed under its agreement with the Sacklers, its former principals, is seeking to prevent appellate review of the decision of a solitary bankruptcy judge on the merits of these momentous issues.

8.      The States respectfully submit that the Court's Decision and the Confirmation Order were wrongly decided, and Washington and Connecticut already have noticed their appeals (Dkt. ## 3724 & 3784). For the reasons set forth in the Objections of the State of Washington, the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization (Dkt. # 3276) (the "Washington Objection") and the Joint Objection of the State of Connecticut, the State of Maryland and the District of Columbia to Confirmation of the Debtors' Sixth Amended Plan of Reorganization (Dkt. # 3270) (the "Connecticut Objection"), the contents of which are incorporated in full by reference herein, and as further detailed below, the Plan's unprecedented and sweeping release of the non-debtor Sacklers is inconsistent with the Bankruptcy Code, improperly infringes on the States' police power claims against the Sacklers, and is improper under the Second Circuit's opinion in *Metromedia*.

9.      At a minimum, the States' appeal of the Decision presents consequential and unresolved issues concerning the Bankruptcy Court's ability to effect non-consensual releases of state police power claims in favor of parties who not only have not themselves sought the protections of the Bankruptcy Code, but who in this case have the most unclean hands conceivable. These issues, which can only be expected to recur, should not be shielded from substantive appellate review.

10.      The Sacklers and Purdue should not be given the opportunity to claim that such substantive review is precluded due to equitable mootness. Only staying the effectiveness of the Confirmation Order pending appeal will ensure that they cannot engineer such a hurdle to appellate review. The weighty issues of state sovereignty and the public interest implicated by the Plan deserve nothing less. This Court should avoid even the appearance of impropriety that could result were it to deny a stay to permit review of its own order.

11.      Accordingly, for the reasons set forth herein, the motion should be granted, and effectiveness of the Confirmation Order should be stayed pending appeal.

12.      In addition, the States request that the Trust Advance Order (as defined below) be stayed for the same reasons. The Trust Advance Order is based on the assumption that this motion will be denied and that the Plan Effective Date will occur. Should the requested stay of the Confirmation Order be granted the purpose of the Trust Advance Order will be vitiated.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Opioid Epidemic

13.      Year after year, tens of thousands of Americans have fallen victim to dependency, addiction and even death caused by prescription opioids. (*See, e.g.,* JX-2980, at 1 (tracing increase in opioid overdose deaths).) Viewed from any lens, the costs of the opioid epidemic are staggering. From a financial perspective, the toll has been reckoned in the tens of billions of dollars annually.

4

(id.) Measured in terms of human loss and suffering, the costs are incalculable. (*See, e.g.,* https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html ("Nearly 247,000 Americans have lost their lives to overdoses involving prescription opioids from 1999-2019.").) For all of the desperately needed attention that has been paid to opioid abuse in recent years, the crisis remains acute—in 2019 alone, nearly 50,000 Americans overdosed on opioids and died as a result. (https://www.cdc.gov/drugoverdose/deaths/index.html.)

### B. The Sackler Family's Role in the Opioid Epidemic

14.　　There is perhaps no brand name more closely associated with the opioid epidemic than that of Purdue's signature product, the now-infamous OxyContin. OxyContin is a controlled-release prescription opioid that is classified as a Schedule II controlled substance and has "an abuse liability similar to morphine." (JX-1895, at ¶ 2.) Standing alone, OxyContin has caused thousands upon thousands of deaths and many trillions of dollars in damages stemming from — in addition to the value of the lives lost — the costs of treatment, incarceration and what has euphemistically been referred to as "lost productivity." (JX-2970 (identifying over 1,000 deaths and $7 billion in damages in the year 2006 alone).)

15.　　The enormous harms that OxyContin and other Purdue branded opioid products have wrought on citizens of this country are no accident of nature. They are the product of decisions by human beings—decisions made in and organized around the pursuit of profit. The evidence presented in this case and at the confirmation hearing leaves little doubt about the culpability of at least one group of such decision-makers: the Sacklers.

16.　　The evidence renders untenable the Sacklers' consistent position that they were passive bystanders while Purdue, acting as a presumed automaton, committed repeated serial federal crimes. For many years Sackler family members "micromanage[d Purdue] beyond belief." (JX-2938.) As Purdue's then-CEO observed as far back as 2003 — four years before both he and

5

Purdue would be pleading guilty to federal crimes in connection with Purdue's sales and marketing of OxyContin — members of the Sackler family persistently "engage[d] subordinates in lengthy conversations and chains of correspondence … that amount[ed] to substantial direction." (JX-2940.) The Sacklers continued to be "deeply involved in the business" and "unwilling to delegate authority over many matters that would be left to management of a public company" in 2010 (JX-2939), and as recently as 2015 were "bombarding execs with … ideas and trying to influence them" (JX-2947). As of 2017, Purdue's CEO identified Sackler intervention in the management of Purdue as among the primary "issues facing [the] business." (JX-2943.) The Sacklers devoted enormous time and energy into the management of Purdue (*see* JX-2937, JX-2948 & JX-3011), with Mortimer Jr., for example, expending so much of his time on Purdue's operations that he regarded his $2.5 million in annual compensation as grossly inadequate recompense (JX-2938). Throughout this period of time, the Sacklers intimately involved themselves in Purdue's efforts to market and sell prescription opioids, including a specific intervention to promote and approve a program to "Turbocharge the Sales Engine." (*See, e.g.*, JX-2944, JX-2945, JX-2952, JX-3013, JX-3014 & JX-1652, at ¶¶ 103-04.) As the Court noted, "I believe that at least some of the Sackler parties also have liability for [claims against Purdue]." Initial Decision Tr. at 105.

17.     The actions that Purdue undertook under the Sackler leadership led Purdue to plead guilty to two sets of federal crimes.

18.     In the first of the two sets of guilty pleas, in 2007 Purdue admitted to one count of misbranding a drug — OxyContin — with the intent to defraud or mislead in violation of U.S. law. As part of that plea agreement, Purdue conceded its responsibility for falsely marketing and promoting OxyContin as "less addictive, less subject to abuse and diversion, and less likely to

6

cause tolerance and withdrawal than other pain medications," when in fact Purdue knew that the truth was otherwise. (JX-1895, at ¶ 20.)

19.     Although Purdue was required to disgorge hundreds of millions of dollars in connection with the 2007 OxyContin settlement (JX-1897, at 5-6), the settlement appears to have had little effect on Purdue's lawfulness, as it again pled guilty to multiple federal crimes that began almost immediately after the 2007 settlement. In particular, in November 2020, Purdue pled guilty to a three-count information based upon conduct covering the period 2007 up until 2017. (JX-1651.) In the 2020 guilty plea, Purdue admitted to

- knowingly and intentionally conspiring to aid and abet health care providers' dispensing prescription drugs without a legitimate medical purpose and outside the usual course of professional practice (and thus without a valid prescription) (*id.*, at 17);

- knowingly and willfully offering payments in the form of speakers fees and other payments (e.g., travel, lodging, consulting fees) to health care providers to induce them to write more prescriptions of Purdue opioid products (*id.*, at 17); and

- paying kickbacks to Practice Fusion, a cloud-based electronic health records platform to increase sales of Purdue products (*id.*, at 17-18).

20.     During the same period the Sacklers, who were aware (although the public was not) that Purdue faced massive uncapped liabilities (JX-1660), turbocharged their withdrawals of funds from Purdue, receiving over $10 billion over the years Purdue was engaged in its crimes (JX-434).

### C.  The State Police Power Actions

21.     As part of their broader response to the opioid crisis, States across the country asserted police power claims against Purdue in state court. In a plethora of actions, the States of California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia and Wisconsin, among others, sought to protect their respective citizens by asserting police power claims against a group

of defendants including both Purdue and the Sacklers. *See* https://www.mass.gov/lists/state-lawsuits-against-purdue-pharma (collecting complaints).

22.    For its part, Washington sued Purdue for violating Washington's Consumer Protection Act, RCW 19.86, causing a public nuisance, and breaching Washington's common law of negligence. (*See* First Am. Compl., *State of Washington v. Purdue Pharma L.P., et al.*, No. 17-2-25505-0 (Sup. Ct., King Cnty., filed May 4, 2018), *available at* https://www.mass.gov/doc/washington-0/download.) Through this police power action, Washington sought to protect its citizens by enjoining further violations of state law, abating the public nuisance that Purdue caused, and setting a precedent to deter future wrongdoers and protect the next generation of Washingtonians. (*See id.*, §§ V-VIII.)

23.    The Connecticut Attorney General sued Purdue and certain Sackler family members[1] (JX-0840) (the "CT Complaint") under Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*, and in particular under Conn. Gen. Stat. § 42-110m(a), which provides, in pertinent part, for "the Attorney General to apply in the name of the state of Connecticut" to enjoin an alleged violation of CUTPA and to seek "an order directing restitution … and such other relief as may be granted in equity." *Id.* Disgorgement of the profits the Sackler Defendants received as a result of the unfair acts and practices which they committed was among the requested relief, which has been recognized "as a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions'." *State v. Macko*, No. 12-cv-6031858S, 2016 WL 4268383, at *9 (Conn. Super. Ct. Aug. 1, 2016) (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011)). When Connecticut

---

[1] The Sacklers who are named defendants in Connecticut's action are Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, and Ilene Sackler Lefcourt (the "Sackler Defendants").

brings an action under CUTPA, it does so in furtherance of its sovereign interest in enforcing its own

laws and its statutory interest "'to protect the public from unfair practices in the conduct of any trade

or business'." *State of Connecticut v. Moody's Corp.*, No. 10-cv-546, 2011 WL 63905, at *3 (D.

Conn. Jan. 5, 2011) (quoting *Eder Bros., Inc. v. Wine Merchants of Connecticut, Inc.*, 275 Conn.

363, 380 (2005)).

### D. Purdue Files for Bankruptcy and Obtains a Stay of Police Power Actions Against the Sacklers.

24.     On September 15, 2019, Purdue filed voluntary chapter 11 petitions. (*See* JX-0534,

at 1.) The automatic stay of Bankruptcy Code section 362(a) stayed the vast majority of the

pending lawsuits against Purdue, but the police power actions brought by Washington, Connecticut

and the other States against Purdue were exempt from the automatic stay under section 362(b)(4),

and actions against the Sacklers were outside of the scope of the automatic stay. Purdue sought

and obtained a discretionary injunction preventing the continuation or prosecution of police power

actions against Purdue and of all actions against the Sacklers by order dated November 6, 2019

(Adv. Dkt. # 105) (the "Sackler Action Injunction"). In granting the Sackler Action Injunction,

this Court stated that the endgame of the process initiated by Purdue would be a plan of

reorganization that contained nonconsensual third party releases based on *Metromedia*. (Oct. 11,

2019 Tr., at 265.)

25.     The Sackler Action Injunction has been extended by this Court repeatedly over the

past 22 months, most recently by this Court's Twenty-First Amended Order dated September 2,

2021 (adv. dkt. # 287), and has prevented Washington, Connecticut and other states from

continuing or commencing proceedings against the non-debtor Sacklers. (*See* Sackler Action

Injunction.) As a result these sovereign States have been stymied — for a period now approaching

two years — from prosecuting police power actions directly against the Sacklers (who have twisted

12095185.17 - 09/19/21

this into a disingenuous argument that relatively few of them have been named in lawsuits and only by a few states (Dkt. # 3442, at ¶ 45)).

26.    The Sackler Action Injunction was affirmed by the District Court on August 11, 2020. *Dunaway v. Purdue Pharmaceuticals L.P. (In re Purdue Pharmaceuticals L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020). The District Court reasoned that the injunction could help keep Purdue from being "embarrass[ed] [were] one of its largest shareholders and former leaders to be found culpable for the opioid epidemic." It further justified the injunction as affording the parties an adequate opportunity to reach a *consensual* resolution of the claims asserted by the States and others. (*See Dunaway*, 619 B.R. at 59, *citing In re OMC, Inc.*, No. 10-14864 MC, 2010 Bankr. Lexis 3600, 2010 WL 4026097, at *4 (Bankr. S.D.N.Y. Oct. 13, 2010)). However, as described below, no consensus has been reached. Nonetheless Purdue proceeded to propose a plan of reorganization in the absence of consensus.

### E.  The Plan and the Sackler Releases

27.    Following the Sackler Action Injunction, Purdue orchestrated a series of negotiations premised on the construct that the final settlement would include broad and blanket releases of the Sacklers in return for a fixed payment of cash. In the now-confirmed Plan, the Sacklers have received just that. In particular, Section 10.7(b) of the Plan "conclusively, absolutely, unconditionally, irrevocable, fully, finally, forever and permanently" bars all civil claims of any kind held by all claimants, including the States, against the non-debtor Sacklers, and Section 10.8 backs the "releases" with an injunction. These "releases" are bestowed without the States' consent and over their objections, and without any opportunity for the States to opt out.

28.    In exchange for these unprecedented non-debtor releases of State police power actions, the Sacklers agreed to pay $4.3 billion, to be paid out over the extended period of ten years, with most of the payments to be made during the later years of the ten-year period. (*See* Dkt.

# 3711, Exhibit AA ("Sackler Settlement Agreement"), at § 2.01(b).) The initial payments are $300 million on the Plan Effective Date and $350 million on June 30, 2022 (subject to adjustment). *Id.* Those amounts are to be paid directly to the Master Disbursement Trust ("MDT"), which then, under the Plan, distributes those funds to the various plan trusts. (*Id.*, at § 2.08(a)(i) and (ii); Plan, at § 5.6.) Subsequent Sackler payments are paid to an appeal account and held pending the result of any pending appeal. If there is a stay pending appeal the Plan Effective Date will not yet occur, (Plan, at § 9.1(a)), and the payments and distributions to the various plan trusts will not be made because the authority and obligation to make them depends upon the occurrence of the Plan Effective Date (Plan §§ 5.2(d), (e)).

29.     If the Plan is overturned on appeal by a final order (i) the agreement is rescinded; (ii) the parties' rights arising from such recission, including any entitlement by the Sackler Parties to restitution of amounts paid to the MDT) shall be preserved (Sackler Restitution Right); and (iii) the Sackler Parties shall be entitled to credit (without duplication) any payments that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Sackler Releases (Sackler Credit Right). (Sackler Settlement Agreement, at § 2.08(c).)

30.     The total amount to be paid represents a fraction of the Sacklers' family wealth, derived almost entirely from the profits realized from the abusive promotion and sale of branded opioid products. (JX-0434.) By the time the Sacklers make their last payment, there is every reason to believe that they will be richer than they are today. (JX-0483.)

31.     Washington, Connecticut and numerous other states objected vigorously to the Plan and to the release of the non-debtor Sacklers in the Plan. (*See* Washington Objection and

Connecticut Objection.) In this they were joined by the United States Trustee (Dkt. # 3256) and

the United States itself (Dkt. # 3268). The States objected that:

- The nonconsensual third party releases of the Sacklers were contrary to the principles discussed in *Metromedia*;

- There was no precedent in the Second Circuit or elsewhere for nonconsensual third party releases to bar the exercise of police powers against non-debtors by sovereign States, acting *in parens patriae*, to protect their entire citizenry against the clear and present danger of the ongoing opioid abuse epidemic and to deter future would-be wrongdoers from violating the law;

- The release of the Sacklers was especially pernicious because the Sacklers had repeatedly demonstrated their unclean hands through their domination of the Purdue board, their unprecedented, calculated scheme to subvert the safeguards built into the American medical system in order to sell massive amounts of opioids, and their brazen scheme to place their massive profits beyond the reach of creditors;

- The legitimacy of the *Metromedia dicta* itself is questionable as other circuit courts have held that nonconsensual third party releases are not permitted under the Bankruptcy Code (outside of the asbestos context, where they are permitted by an express statutory amendment);

- The nonconsensual third party releases of direct State claims against the Sacklers exceeds the jurisdiction of the Bankruptcy Court;

- Purdue failed to satisfy its burden of proof necessary to confirm a plan of reorganization by failing to prove that it had satisfied the "best interest of creditors" requirement of Bankruptcy Code section 1129(a)(7); that is, that the amounts the States are projected to receive under the Plan exceeds the amounts the States would receive in the actions against the Sacklers that the Plan releases;

- The Plan improperly classified the claims of States with their subdivisions, and arbitrarily assigned to each State and subdivision the same nominal $1 claim (when it was obvious that the State claims were necessarily many orders of magnitude larger than the subdivision claims), in order to be able to argue that the Plan received "overwhelming" support.

32.    The United States stated that the Sackler release violates due process under the

United States Constitution, is impermissible under the Bankruptcy Code, and is beyond the

jurisdiction of this Court to enter. (Dkt. # 3268.) The United States Trustee objected that the

Sackler release "is nothing less than an illegal, court-ordered discharge of a potentially limitless

12

group of non-debtors" that suffers from numerous fundamental defects that render the Plan unconfirmable. (Dkt. # 3256, at 2.)

33.      While the Purdue plan was being litigated, on July 21, 2021, the National Prescription Opiate Litigation MDL Plaintiffs' Executive Committee, several State Attorneys General, and four major defendants announced agreement on terms of proposed nationwide settlements to resolve all opioids litigation brought by states and local political subdivisions against the three largest pharmaceutical distributors: McKesson, Cardinal Health and AmerisourceBergen, and manufacturer Janssen Pharmaceuticals, Inc. and its parent company Johnson & Johnson. These settlements, if agreed and adopted, are intended to provide substantial funds to states and subdivisions for abatement of the opioids epidemic across the country and will impose transformative changes in the way the settling defendants conduct their business.[2] Notably, this settlement was achieved outside of bankruptcy and without the need for nonconsensual third party releases to bind holdouts. Further, the dollars involved dwarf the payments contemplated under the Purdue plan.

34.      Notwithstanding the objections, this Court on September 1, 2021 issued the Initial Decision, including the release of the non-debtor Sacklers. In so doing the Court admitted that the premises supporting the Sackler Action Injunction and the subsequent negotiations had proven hollow. The strategy of basing the negotiations upon sparing Purdue and the Sacklers from embarrassment and conceding that a blanket civil release of the Sacklers for opioid-related claims would be included in the settlement — in essence granting to the Sacklers their most important priority at the outset of negotiations — produced a return to creditors that this Court conceded was

---

[2] The settlement is described in detail at https:/nationalopioidsettlement.com , of which the Court can take judicial notice.

disappointingly low. (Decision at 100.) Furthermore, no consensus had been reached, as the "settlement" is still rejected by States representing one fifth of the country.

35.    Curiously, in its Initial Decision the Court warned that "the states cannot have it both ways" (Sept. 1, 2021 Tr. at 151:18-19), notwithstanding that the States had not been offered a choice, and instead had Purdue's choice forced upon them. The Plan does not give the States an opt-out right, which would indeed force the States to choose whether to take the Plan with its benefits or seek redress against the Sacklers.

36.    Accordingly, unless and until an appellate court determines otherwise, the States' abilities to protect their citizens through the exercise of their sovereign police powers by prosecuting claims against the Sacklers is set to be extinguished permanently.

37.    Washington noticed its appeal of the Initial Decision on September 1, 2021 (Dkt. # 3724).

38.    On September 15, 2021, the Court, overruling objections from the States and the United States Trustee, entered an order (Dkt. # 3773) permitting Purdue to incur certain expenses in anticipation of the Plan Effective Date (the "Trust Advance Order"). The Trust Advance Order provides that "[t]he terms and conditions of this Order shall be immediately effective and enforceable upon its entry," *id.* at 6, despite the fact that the Confirmation Order has not yet been entered.

39.    Connecticut noticed its appeal on September 17, 2021 (Dkt. # 3784).

40.    The United States Trustee filed a motion seeking a stay pending appeal on September 15, 2021 (Dkt. # 3778) (the "US Trustee Motion"). In it, the United States Trustee argues that the "Confirmation Order harms both the public and countless individuals by extinguishing the rights that opioid victims hold against possibly thousands of Sackler Family

14

members and associated parties, all of whom will be released without a full accounting of their role in and liability for the opioid disaster in a court of law in which their victims are entitled to be heard," and that, absent a stay, there is a substantial risk that an appeal of the Confirmation Order will be deemed equitably moot. (US Trustee Motion, at 3.) As the United States Trustee argues further, the Sackler release set forth in the Plan is inconsistent with the Bankruptcy Code, violative of the Due Process Clause of the United States Constitution, and beyond the jurisdiction of this Court to enter (*id.*, at 15-31), and that an appellate court reviewing these issues *de novo* is likely to reverse the Confirmation Order (*id.*, at 15).

41.    On September 17, 2021 the Court set a chambers conference on September 30, 2021 to determine a hearing date for the US Trustee Motion. The States respectfully submit that this motion should be heard concurrently with the US Trustee Motion.

42.    The Confirmation Order was entered on September 17, 2021. On that date the Court also entered the Decision.

43.    The States have proposed to Purdue a reasonable process that would permit the Purdue Plan to be consummated while protecting the States' appeal rights. Under this proposal the Sacklers would agree to waive any Sackler Rescission Right, at least for the first two payment dates. The payments and distributions contemplated for the first two payment dates would take place as contemplated notwithstanding the pendency of an appeal. The Court would enter an order providing that "The [making of the first two Sackler payments and the distribution thereof by the MDT and plan trusts] shall not prejudice any appeals of the confirmation of the Plan and the fact of such [payments and distributions] having been made shall not support any argument that any such appeals are equitably moot."

12095185.17 - 09 19 21

### F. Attempts to Engineer Equitable Mootness

44.     Under Plan Section 9.1(c), the Effective Date of the Plan cannot occur until 82 days following the entry of the Confirmation Order. On the Effective Date of the Plan the Sacklers are obligated to make their initial payment of $300 million, and the Plan's Master Distribution Trust will allocate those funds among several trusts.

45.     Even before the Plan was confirmed, the Sacklers unmistakably signaled their intention to engineer a condition of equitable mootness to forestall appellate review of the Plan. In the Sackler Settlement Agreement, annexed and incorporated into the Plan, they bound the Master Distribution Trust, Purdue's post-confirmation successor, to oppose any request for a stay pending appeal: "The MDT shall challenge and object to (in the appropriate court) any motion by an applicable appellant for a stay of the Confirmation Order." (Sackler Settlement Agreement, § 2.09(c).) The purpose of this provision was to enhance the possibility of a determination of equitable mootness. (*Id.*, at § 2.08(c).)

46.     For its part, in its initial version of its proposed Confirmation Order, Purdue proposed, without explanation or justification, a waiver of even the 14-day automatic stay of effectiveness of Confirmation Orders set forth in Rule 3020(e). (Dkt. # 3552 Ex. A at 100.) Only when a group of States including Washington and Connecticut objected to the inclusion of this putative waiver (Dkt. # 3594) did Purdue agree to withdraw it (Dkt. # 3626).

### LEGAL STANDARD

47.     Motions for stays pending appeals of confirmation orders are governed by Bankruptcy Rule 8007. In deciding whether to grant a stay pending appeal under this Rule, courts in this circuit consider the following four factors: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success

16

on appeal, and (4) the public interests that may be affected." *ACC Bondholder Grp. v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007) (quotation marks and citation omitted). "[T]he Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed," rather than a rigid examination of each of the factors in isolation. *In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) (quotation marks and citation omitted).

## ARGUMENT

### I.    THE CONFIRMATION ORDER SHOULD BE STAYED PENDING APPEAL.

#### A.    A Stay is Necessary to Prevent Irreparable Injury to the States.

48.    "[T]he fact is that loss of appellate rights is a 'quintessential form of prejudice.' Thus, where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied." *Adelphia*, 361 B.R. at 347-48 (emphasis in original; citation omitted); *see also, e.g., Country Squire Assoc. of Carle Place, L.P. v. Rochester Comm. Sav. Bank (In re Country Squire Assocs. of Carle Place, LP)*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) ("Obviously, that result [of an appeal being rendered equitably moot] would be the 'quintessential form of prejudice' to [the appellant]."); *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*, 504 B.R. 754 (S.D.N.Y. 2014) (same); *Lutin v. U.S. Bankr. Ct. for the S.D.N.Y. (In re Advanced Mining Sys., Inc.)*, 173 B.R. 467 (S.D.N.Y. 1994) (same); *In re Degennaro*, No. 20-cv-7958, 2020 WL 6827936 (S.D.N.Y. Oct. 2, 2020) (granting stay where "failure to grant the stay would moot the appeal"); *In re Hologenix, LLC*, No. 20-cv-10109, 2020 WL 8457487 (C.D. Cal. Dec. 21, 2020) (irreparable harm due to the threat of equitable mootness). Indeed, at least one court has held that the possible loss of appellate rights due to equitable mootness is so prejudicial as to warrant a stay regardless of an appellant's likelihood of success on the merits. *In re Daebo*

17

*International Shipping Co.*, No. 15-10616, 2016 BL 31731, at **3-4 (Bankr. S.D.N.Y. Feb. 4, 2016).

49.     Here, there is a substantial risk that the States' appeal may be rendered moot by implementation of the Plan during the period in which the appeal is pending. Clearly the Sackler Settlement Agreement contemplates an appellate strategy based on that argument. On the Effective Date of the Plan, which can occur as early as 82 days after the Confirmation Order is entered, as noted above the Sacklers are obligated to make their initial payment of $300 million, and the Plan's Master Distribution Trust will allocate those funds among several trusts. Such acts may constitute substantial consummation of the Plan, such that an appellate court may refrain from considering the States' substantive and weighty objections to the Plan on the merits. *See, e.g., Harrington v. LSC Communications, Inc. (In re LSC Communications, Inc.)*, No. 20-cv-5006, 2021 US Dist. Lexis 128403, 2021 BL 258017, at *3 (S.D.N.Y. July 9, 2021); *see also, e.g., GLM DFW, Inc. v. Windstream Holdings Inc. (In re Windstream Holdings Inc.)*, 838 Fed. App'x 634, 636 (2d Cir. 2021).

50.     Consequently, in the absence of a stay the States are threatened with the potential irreparable injury of a complete abrogation of their appellate rights. Given the States' unique constitutional role, and the fact of their exercise of a core facet of their sovereign prerogatives, the States should not face the substantial possibility of being stripped of their right to prosecute their police power actions and their ability to pursue the Sacklers under applicable consumer protection laws without so much as being heard on a substantive appeal.

**B.     A Stay is Unlikely to Cause Substantial Harm.**

51.     Conversely, a stay of the Confirmation Order is unlikely to cause substantial harm. For one thing, while Purdue is contractually obligated to argue that *the Sacklers* will be harmed by a stay, see Sackler Settlement Agreement § 2.09(c) ("[Purdue] also shall request in the appropriate

18

court that … any stay of the Confirmation Order be conditioned on a bond or equivalent security sufficient to pay the costs and damages sustained or potentially to be sustained by all parties (*including, for the avoidance of doubt, the Sackler Parties*) that would or could be harmed as a result of such stay." (emphasis added), the Sacklers will suffer no harm from a stay because a stay will simply postpone their obligation to pay money.

52.     Likewise, Purdue should suffer little or no harm from a stay. The company can continue to operate as it has been. Any legal fees Purdue will incur will be minor in comparison to the legal fees it has generated throughout the case. Indeed, during the case Purdue's business has generated sufficient cash to permit Purdue to operate without financing, even while paying the significant legal costs of a chapter 11 debtor-in-possession, including the legal costs of multiple creditor constituencies. (Dkt. # 3640, at 2, 17.) Indeed, beyond those costs, Purdue has been able to accumulate sufficient cash to pay $6.8 million in advances for preparatory work in setting up the various plan trusts (Dkt. # 3484, ¶1) without affecting its liquidity.

53.     Finally, while a stay may delay the implementation of the remediation and abatement programs established under the Plan, such a delay does not qualify as "substantial injury." The initial payment to be made on the 82nd day following entry of the Confirmation Order is less than 8% of the total to be paid over ten years. There is nothing in the record to establish that those initial payments are necessary to avoid irreparable harm to any party or the public. The States are prepared to minimize any harm through an expedited appeal as well as a direct appeal to the circuit court, both of which Purdue is contractually obligated to request. (Sackler Settlement Agreement, § 2.09(a), (b).) The States also have commenced a negotiation with Purdue to permit payments to be made to the trusts without mooting an appeal. Aid to victims of Purdue should not be held hostage to the Sacklers' cynical appellate strategy.

54.     Furthermore, the States are already engaged in providing abatement and remediation programs to their citizens, and the impending National Opioid Settlement holds the promise of providing larger and faster funding for such programs. This Court can take judicial notice of the fact that many of Purdue's victims are set to receive substantial benefits from a recent settlement among the National Prescription Opiate Litigation MDL Plaintiffs' Executive Committee, several State Attorneys General, and the pharmaceutical distributors McKesson, Cardinal Health and AmerisourceBergen, manufacturer Janssen Pharmaceuticals, Inc. and Janssen's parent company Johnson & Johnson. *See* https://nationalopioidsettlement.com/.

55.     Although the doctrine of equitable mootness has been the subject of increasingly intense criticism, *see, e.g., FishDish, LLP v. VeroBlue Farms USA, Inc. (In re VeroBlue Farms USA, Inc.)*, No. 19-3413, 2021 US App Lexis 23164, 2021 BL 294741, at **7-8 (8th Cir. Aug. 5, 2021); *In re One2One Communications, LLC*, 805 F.3d 428, 439-54 (3d Cir. 2015) (Krause, J., concurring),[3] it has yet to be rejected in the Second Circuit. But the fact that an appeal may become equitably moot absent a stay does not mean that this Court should facilitate such a result. By staying the effectiveness of the Confirmation Order pending appeal and thus preserving the States' appellate rights, this Court would promote public confidence in its determinations and avoid the skepticism and critical backlash that would be sure to follow if Purdue and the Sacklers are able to evade appellate review through a doctrine whose legitimacy has increasingly come under attack. Particularly given the consequential and unresolved issues to be implicated by the States' appeals,

---

[3] It is noteworthy that two petitions for *certiorari* are currently pending in the U.S. Supreme Court asking it to rule on whether the judge-made doctrine of equitable mootness allows federal appellate courts to refuse to review the merits of orders confirming chapter 11 plans. *GLM DFW, Inc. v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.)*, 838 Fed. Appx. 634 (2d Cir. Feb. 18, 2021), cert. petition filed, No. 21-78 (July 16, 2021); *Hargreaves v. Nuverra Environmental Solutions, Inc. (In re Nuverra Environmental Solutions, Inc.)*, 834 Fed. App'x 729 (3d Cir. Feb. 2, 2021), cert. petition filed, No. 21-17 (July 6, 2021).

12095185.17 - 09 19 21

Washington. Connecticut and the millions of citizens on whose behalf they are acting should be assured of their day in an appeals court.

**C.     The States Have at a Minimum a Substantial Possibility of Succeeding on Appeal.**

56.     As this is a case of first impression, it would be disingenuous to claim that the result of an appeal is foreordained. For the reasons set forth in the Washington Objection, the Connecticut Objection and the objections of the United States Trustee and the United States, and as detailed below, the States easily satisfy the standard of "substantial possibility" of success on the merits set by the Second Circuit in *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002), the purpose of which is simply to "eliminate frivolous appeals" and does not even require that success on appeal be "probable." *See, e.g., Credit One Bank, N.A. v. Anderson (In re Anderson)*, 560 B.R. 84, 90 (S.D.N.Y. 2016); *see also Country Squire Associates of Carle Place, L.P. v. Rochester Community Savings Bank (In re Country Squire Associates of Carle Place, L.P.)*, 203 B.R. 182, 184 (2d Cir. BAP 1996) (the Second Circuit's decision in *Hirschfield v. Board of Elections*, 984 F.2d 35 (2d Cir. 1993), "prescribes an intermediate level between possible and probable which is intended to eliminate frivolous appeals").

*(i)     The Non-Consensual Third-Party Releases Are Improper*

57.     Primarily at issue on the appeal of this Court's Decision and Confirmation Order will be nothing less than the question of whether the right of the States to protect their citizens through the exercise of their constitutionally enshrined police powers may be non-consensually stripped from them, in order to provide the non-debtor Sacklers with a blanket release from further opioid-related civil liability stemming from the criminal conduct of the company they owned and ran and the devastating damage inflicted upon the States (and the entire United States) as a result. Indeed, it is the position of the United States (as well as the States) that such "releases" are

21

impermissible and unconstitutional in all circumstances and that the Court in *Metromedia* was wrong to indicate that there are circumstances in which they are ever permissible. (Dkt. # 3268, at 2 & n.4.)

58.    Even within the parameters of what the *Metromedia* Court hypothesized, the Plan's injunction in favor of the non-debtor Sacklers fall well short. *Metromedia* warned that "a nondebtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity." *Metromedia*, 416 F.3d at 142.

59.    The Second Circuit reiterated its concerns in *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), which concerned a proposed global settlement in which non-debtor insurance companies would contribute money to a settlement fund and receive third party releases. The circuit court cautioned that non-debtor releases are not justified by the mere contribution of funds:

> It was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate. If that were possible, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions."

*Manville*, 517 F.3d at 66 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004)).

60.    The non-debtor release of the Sacklers is particularly inappropriate based upon two highly relevant factors that were not addressed in *Metromedia*: (1) the releases improperly bar the States' exercise of police powers *in parens patriae* against non-debtors to protect their entire

citizenry against the clear and present danger of the ongoing opioid abuse epidemic,[4] and (2) the beneficiaries of the release, the Sacklers, have the most unclean hands imaginable and would be susceptible to claims of nondischargeability if they were forced to file their own bankruptcy cases and attempt to receive bankruptcy discharges the old-fashioned way.

*(ii)   Deference to Police Powers*

61.    The Supreme Court has held that a bankruptcy court's equitable powers may not be used in a manner that is inconsistent with the specific provisions of the Bankruptcy Code. For example, in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Court rejected the argument that a bankruptcy court has the authority to approve a structured dismissal of a bankruptcy case based solely on the vague provision of Bankruptcy Code section 349(b) that a bankruptcy judge may, "for cause, orde[r] otherwise." *Id.*, at 984. It noted that nothing else in the Bankruptcy Code authorized such an order, and concluded "[t]hat being so, the word 'cause' is too weak a reed upon which to rest so weighty a power." *Id.* at 984-85.

62.    It is clear that the drafters of the Bankruptcy Code considered police power actions to be a special category of claims that were to be accorded deferential treatment. For example, 28 U.S.C. § 1452(a) expressly prohibits removal of state police power actions to any federal court pursuant to its bankruptcy authority: "A party may remove any claim or cause of action in a civil action *other than ... a civil action by a governmental unit to enforce such governmental unit's police or regulatory power ....*") (emphasis added). Likewise, Bankruptcy Code section 362(b)(4) excepts police power actions from the automatic stay.

---

[4] In its Decision, this Court conceded that the States' enjoined actions are police power claims notwithstanding that those actions seek, in part, monetary damages. (Decision at 151.) Indeed, in one of the decisions cited by the Court, *In re Commonwealth Companies, Inc.*, 913 F.3d 518 (8th Cir. 1990), the Eighth Circuit specifically held that because monetary damages such as restitution under the False Claims Act were "to both make the government whole ... and to deter fraud against the government," the government's claims under the Act based on bid rigging were police power claims within the meaning of the section 362(b)(4) exception to the automatic stay. *Id.* at 526.

63.     While this case does not directly implicate either of these provisions, they nonetheless demonstrate that Congress considered it important to provide for special consideration when a bankruptcy court's powers intrude on the exercise of police powers. It stands to reason that police power claims should be accorded special consideration in the context of nonconsensual releases against non-debtors as well.

64.     To be sure, the Bankruptcy Code does not expressly provide that nonconsensual third party releases may not be imposed on police power claims. However, the Bankruptcy Code does not expressly provide for nonconsensual third party releases at all (other than in sections 524(g) and (h), which are inapplicable as they apply only to asbestos cases). Congress can scarcely be faulted for failing to legislate an exception to a rule it never provided in the first place. Indeed, the express exclusion for asbestos cases may give rise to a negative inference as to non-asbestos cases, as to which Congress has chosen not to act in this regard.

65.     The policy justifications for the automatic stay exception provided in *FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.)*, 264 B.R. 634, 659 (C.D. Cal. 2001), are even more compelling in the context of the permanent injunction provided under the Plan: "it is the governmental units charged with enforcing consumer protection laws, governmental units that are responsible to the political will of the people, that should be the ones to make the choice [about how State police powers should be exercised], not the bankruptcy court."

66.     The decisions and other authority cited by the Court to justify the *permanent* bar of the States' police power claims against the Sacklers do not support that relief. In particular, the Court cited *In re Western Real Estate Fund*, 922 F.2d 592 (10th Cir. 1990) and *United States v. Commonwealth Companies, Inc. (In re Commonwealth Companies, Inc.)*, 913 F.2s 518 (8th Cir. 1990), as well as the *Collier* treatise, for the proposition that "it is a matter of hornbook law -- that

24

actions excepted under the police or regulatory power, may be subject to injunctive relief under section 105(a)." (Decision at 151-52.) Those authorities, however, analyze police power claims against a *debtor* in the *debtor's* bankruptcy case that are excepted from the automatic stay, but that might be subject to injunction under Section 105(a). In the instant case, however, the permanent injunction at issue was imposed with respect to the States' police power claims against the non-debtor Sacklers, who, unlike the debtors in *Western Real Estate Fund* and *Commonwealth Companies*, did not file bankruptcy cases that imposed the automatic stay. Therefore, while those authorities support the injunction in favor of Purdue (which the States are not contesting), they are inapposite to the release of the Sacklers.

67.    Indeed, while *dicta* in *Western Real Estate Fund* supports temporary section 105 injunctions of actions excepted from the automatic stay, the case specifically held that even non-governmental claims may not be permanently enjoined to preclude a private party's attempt to recover from a third party. *Western Real Estate Fund*, 922 F.2d at 600 ("[W]e hold that such a permanent injunction precluding Abel's attempt to recover any unpaid portion of his fee from [Public Service Company of Oklahoma] to be improper, regardless of who has agreed to indemnify PSO").[5]

68.    The cited portion of *Collier* likewise does not support a permanent bar of the States' claims against non-debtors, as it concerns only temporary stays of actions, and only insofar as such temporary stays protect a debtor's estate. *See* 3 *Collier on Bankruptcy* ¶ 362.05[5][d], at 362-72 (Richard Levin & Henry Sommer eds., 16th ed. 2021), citing *Commonwealth Companies*,

---

[5] The decision in *Commonwealth Companies* is also not supportive of the permanent release of the States' police power claims against the Sacklers, because that case dealt only with the applicability of the section 362(b)(4) automatic stay exception to the government's claims under the False Claims Act, and simply mentioned in passing the legislative history suggesting that an exception to the automatic stay is not immune from injunction. *Commonwealth Companies*, 913 F.2d at 522 n.5.

discussed above, and *In re W.R. Grace & Co.*, 384 B.R. 678, 680 (Bankr. D. Del. 2008) (dealing only with the propriety of a preliminary injunction). It is clear, therefore, that *Collier* was stating the rule that police power claims excepted from the automatic stay might be subject to a preliminary, not permanent, injunction under section 105(a), and only in the case of a debtor that has filed a bankruptcy case and thereby has a reorganization or rehabilitative effort to protect. It is obvious that the Sacklers are not such debtors and have no "reorganization or rehabilitative effort" of their own to protect.

69.     The other decisions cited by the Court for the proposition that the Bankruptcy Code can override police and regulatory power or state sovereignty (Decision at 152) also do not support the third party releases of the States' police power claims against the non-debtor Sacklers. *In re Peabody Energy Corp.*, 958 F.3d 717 (8th Cir. 2020), merely construed two provisions of the Peabody Energy confirmed plan rather than the Bankruptcy Code. *Id.* at 723. Furthermore, the *Peabody Energy's dicta* regarding the section 362(b)(4) police power exception (as an analogy to aid in the construction of a plan provision) did no more than note that "when the government actions would result in an economic advantage to the government or its citizens over third parties *in relation to the debtor's estate*, then the government is not exercising its police or regulatory power." *Id.* at 723 (emphasis added). Here, there is no dispute that the States' claims against the Sacklers are police power claims, and unlike in *Peabody Energy*, those claims are against non-debtors who do not have a bankruptcy estate.

70.     *In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 364-65 (3d Cir. 2012) is completely inapposite because it did not deal at all with a state's police power claims against non-debtors or state sovereignty, but rather, whether state law prohibiting the assignment of a private insurance contract should be given effect in a reorganization case. *Id.*

71.     Nor does *In re Airadigm Communications, Inc.*, 519 F.3d 640, 653-54 (7th Cir. 2008) support the proposition advanced by the Court. In *Airadigm*, the FCC did not even argue that the Bankruptcy Code was improperly overriding its police or regulatory power over non-debtors, and indeed the court held that "the bankruptcy plan does not purport to affect the FCC's powers to regulate outside of bankruptcy." *Id.* at 655. The portion of *Airadigm* cited by the Court dealt with the plan's treatment of the FCC's claimed liens against the debtor's FCC licenses and whether, as a matter of statutory interpretation, a "due-on-sale" regulation was within the scope of such liens, which the plan proposed to "retain" under Bankruptcy Code section 1129(b)(2)(A)(i)(I). *Id.* at 653-65.

72.     The decisions cited by the Court for the proposition that "[p]lan injunctions have previously been imposed over governmental units' police or regulatory power" (Decision at 152), do not support the injunction imposed in favor of the Sacklers, which permanently enjoins the states' police power claims against them. In *California Department of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*, Case No. 20-11157-CSS, Civil No. 20-1402-RGA, 2021 WL 3145612, 2021 US Dist. Lexis 138478 (D. Del. July 26, 2021) ), the objecting creditor had not raised the police power argument at all, so that court had no occasion to consider whether it was proper to enjoin a police power claim. In any event, *Exide* is readily distinguishable. The state agency in question had voluntarily issued a third party release such that there was no live case or controversy (*id.*, at **9-10). The court noted that the third party releasees were but a subset of the parties released by the debtors, such that the objecting creditor retained the right to bring claims against many relevant parties (*id.* at **17-18). In addition the third party releasees did not appear in any way responsible for the environmental violations that were at issue in the case, and could only have been liable as innocent transferees. Thus, *Exide* (in which the releases were only

27

alternative relief in any event) can hardly stand as authority supporting non-consensual releases in a case where the police power argument has been asserted vigorously, and where there is extensive evidence of independent and egregious culpable conduct by the third party releasees, the Sacklers.

73.      Likewise, in *Airadigm, supra*, the court's reasoning regarding nonconsensual third party releases had nothing to do with the FCC's regulatory powers or anything about any FCC claim against the releasee. 519 F.3d at 655-658.

74.      *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002), likewise provides no support to the Decision. The proposed plan contained releases of claims of governmental entities against Dow's insurers and shareholders. Unlike the claims in this case, the government claims in *Dow Corning* did not implicate police powers. Instead, the relevant claims related to reimbursement of amounts paid under a federal health benefit program such as Medicare. Even so, *Dow Corning* did not approve the proposed releases of the claims of governmental units. Instead, the court noted that the plan would have to be amended to ensure that the United States would receive full payment. *Id.* at 659-61. The United States subsequently negotiated a settlement under which, among other things, the United States' claims against the settling insurers were not released, so the final confirmed plan did not include a non-consensual release of government claims. *See In re Dow Corning Corp.*, 287 B.R. 396, 399, 403 & n. 6 (E.D. Mich. 2002).

75.      Turning to *Metromedia*, it is abundantly clear that the court did not consider the issue of compulsory releases of *police power actions* against non-debtors. Indeed, none of the lower court decisions in this circuit that construe *Metromedia* involve compulsory releases of police power actions. However, cases in other circuits show that it is appropriate to grant special deference to claims of governmental units in considering nonconsensual third party releases. *See,*

*e.g., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 651-61 (6th Cir. 2002) (claims of United States to be excepted from nonconsensual third party releases in the context of breast implant litigation).

### *(iii)   Unclean Hands and Non-Dischargeability*

76.     The Sackler liabilities that the Plan seeks to protect stem from among the most sordid crimes in recent American history, a context not at all contemplated in *Metromedia*. Across the country the opioid epidemic continues to rage unabated, to devastating and heart-rending effect. Thousands of persons have died of opioid overdoses, and many thousands more are actively struggling with the devastating effects of dependency and addiction on an ongoing basis. Purdue has now pled guilty — twice, over a decade apart — to federal crimes based upon its and its principals' role in the opioid epidemic. The Plan's release of the Sacklers allows them to walk away from the devastation they have caused with "global peace" and with the bulk of their enormous fortune intact — in so doing, the release strips the States of their ability to protect their citizens as they see fit and compels them to accept this Court's assessment of the appropriate tradeoffs.

77.     As discussed above, the Sacklers micromanaged Purdue at a time when its aggressive pursuit of profits both subverted the safeguards put in place after the 2007 Plea Agreement and, more broadly, subverted the safeguards built into the American medical system, all while aggressively siphoning Purdue's profits and scheming to place the blood money beyond the reach of victims. In short, not only do the Sacklers not have the "clean hands" required of the beneficiary of a court's equitable powers — *see Souratgar v. Fair*, 818 F.3d 72, 79 (2d Cir. 2016) ("The American legal system rightfully closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.") — their hands are so

29

dirty that they are the last people a court of equity should protect through a release that bars the States' exercise of their police power.

78.     *Metromedia*'s warning that a non-debtor release can be abused by operating as a bankruptcy discharge arranged without a filing and without the safeguards of the Bankruptcy Code is particularly applicable in this case. Although in its Decision the Court did not address the potential non-dischargeability of the States' claims against the Sacklers in Sackler bankruptcy cases, it is likely such claims would be nondischargeable against the Sackler Defendants. *See, e.g.*, *Hessler v. State of Maryland Consumer Protection Division* (*In re Hessler*), Bankruptcy No. 09-13371-JS, Adversary No. 11-0092-JS, 2013 WL 5429868, at *3 (Bankr. D. Md. Sept. 30, 2013) (State's claims for restitution against a debtor under its Consumer Protection Act are nondischargeable under § 523(a)(7) because "*as long as the government's interest in enforcing a debt is penal in nature, it is immaterial that injured persons may receive compensation for pecuniary loss*") (emphasis original); *In re Fucilo*, No. 00-36261, 2002 WL 1008935, at *2-6 (Bankr. S.D.N.Y. Jan. 24, 2002) (New York Attorney General's claims under Martin Act, which is intended to protect individual investors from misleading or fraudulent practices in connection with the promotion or sale of securities, and claims under New York Executive Law § 63(12), which prohibits any person from engaging in repeated fraudulent or illegal acts in carrying on a business activity, which claims sought restitution and damages, "would probably not have been subject to discharge under § 523(a)(7)"); *Commonwealth of Massachusetts v. Bartel* (*In re Bartel*), 403 B.R. 173, 174-76 (Bankr. D. Mass. 2009) (State Attorney General had standing to pursue non-dischargeability action against debtor under §§ 523(a)(2)(A), (a)(6) and/or (a)(7) seeking to except from discharge claims of "restitution for injured consumers" and civil penalties based on violations of Massachusetts Unfair Trade Practices Act in furtherance of the Commonwealth's "quasi-

sovereign interest in the well-being of its citizens, including their economic well-being") (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)); *State of New York v. DeFelice (In re DeFelice)*, 77 B.R. 376, 378-80 (Bankr. D. Conn. 1987) (State Attorney General had standing to challenge the dischargeability of a restitution debt ordered under New York Executive Law § 63(12), which is a "codification of that state's public policy of prohibiting deceptive business practices and protecting vulnerable consumers," as a debt falling under § 523(a)(2)(A)). *See also State of Texas v. Garner (In re Garner)*, 515 B.R. 643, 649 (Bankr. M.D. Fla. 2014) ("Restitution awarded under state consumer protection statutes often is deemed nondischargeable under section 523(a)(2)(A) because those statutes aim to recoup consumer losses resulting from misrepresentation and deceptive practices").

79.     Thus, the Sacklers are, in effect, receiving a super-discharge under the Plan that they would not receive if they were forced to proceed themselves as debtors under the Bankruptcy Code. This is precisely the type of abusive result that the Second Circuit strongly cautioned against in *Metromedia*. It also constitutes an additional way that the Plan injunctions are contrary to Bankruptcy Code provisions.

80.     If allowed to stand on appeal, the non-debtor release of the Sacklers will create an enormous moral hazard. The Sackler release will set a precedent for billionaires to buy themselves out of trillions of dollars in potential exposure — indeed to immunize themselves even from State police power actions — by having their companies (but not themselves) file for bankruptcy and then arrange to "buy" releases for a fraction of (i) the value of the claims that have been made against them, and (ii) the profits they have extracted over time. Perversely, such billionaires will find themselves most emboldened in those cases, such as this one, in which the harms they have

31

wrought are most acute, as the pressure to accept such terms as they may decide to offer will be practically irresistible.

81.    Indeed, the lesson of this Plan, if sustained on appeal, and especially if an appeal is mooted, is that if one causes harm sufficient to garner gargantuan enough profits, one can spend tens of millions of dollars on lawyers who will get one immunity from the consequences of the illicit activity.[6] Nine states and the District of Columbia found that an unacceptable message. At any rate, one bankruptcy judge should not be able to divest sovereign States of their police powers to pursue these non-debtor wrongdoers without that ruling being scrutinized and approved on appeal.

*(iv)    Other Substantial Issues On Appeal*

82.    An independent objection to the release of the States' direct claims against the Sacklers is that the Court lacked jurisdiction to do so under the ruling in *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 68 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), in which the Second Circuit ruled that the bankruptcy court lacked jurisdiction to enjoin the release of direct claims against the debtor's insurers based on the insurers' own alleged misconduct. Here, the sweeping releases of the Sacklers encompass police power claims that are predicated upon the Sacklers' own, independent wrongdoing, and do not seek to collect from any asset of Purdue's estate. The Sacklers' contribution to Purdue's estate, conditional on receiving the benefit of the Plan's releases, does not transform the claims into ones directly affecting the *res* of the bankruptcy estate. *See Manville*, 517 F.3d at 66.

---

[6] It is irrelevant that the Plan carves out criminal charges from the releases. (Decision at 102-03, 107:5-7.) A State's police powers extend far beyond the criminal law. Indeed, a release from non-criminal police powers is valuable enough that the Sacklers are willing to spend billions of dollars to obtain one.

12095185.17 - 09 19 21

83.    Accordingly, the Court is without subject matter jurisdiction to enter the Sackler release and corresponding injunction.

84.    *Pfizer, Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.)*, 676 F. 3d 45 (2d Cir. 2012), *cert. den.*, 570 U.S. 917 (2013), is not to the contrary. *Quigley* found *Manville* inapplicable because the third party claims in question in *Quigley* directly affected the *res* of Quigley's bankruptcy estate. Here, no such direct effect exists. *Quigley* concerned lawsuits filed against Pfizer regarding asbestos exposure to certain products that had been manufactured by Quigley but labelled and advertised by Pfizer as its products. Collection was sought from insurance policies that were the joint property of Pfizer and of Quigley's estate. *Id.* at 53 and, as noted in the Decision, the lawsuits against Pfizer "'would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate'" (Decision at 111) (quoting *Quigley*, 676 F.3d at 58). Accordingly, the near certainty that insurance coverage would be depleted constituted an effect on the Quigley estate and was the linchpin to the bankruptcy court's "related to" jurisdiction.

85.    In this case, there is no such certainty that the States' direct claims against the Sacklers would affect the assets of the Purdue estate. Purdue's primary D&O insurance policy contains an exclusion for a "deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law." (JX-1305.0021.)[7] Likewise, Purdue's most recent limited partnership agreement (JX-0872.0022) and Purdue Pharm. Inc.'s bylaws (JX-1222) require a showing of good faith for an indemnification claim. Under NY Business Corp. Law § 722(a), a corporation may

---

[7] Jesse DelConte's declaration (dkt. # 3456, at ¶43) lists D&O polices for the policy periods 2003 to 2004 and 2016 to 2018. It appears that the primary policy is the National Union policy (JX-1305) and the rest are "follow the form" policies providing excess coverage above the primary insurance policy limits and incorporating the same terms, conditions and limitations of the primary policy.

12095185.17 - 09 19 21

indemnify its directors and officers but only if they "acted, in good faith, for a purpose which [was] reasonably believed to be in … the best interests of the corporation." In short, the Sacklers' bad acts would render them ineligible to assert claims against Purdue.[8]

86.     Another independent failing of the Plan is that Purdue failed to satisfy its burden of proof under Bankruptcy Code section 1129(a)(7), the best interests of creditors test, which requires that the plan proponent demonstrate that each objecting creditor "will receive or retain under the plan on account of such claim … property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." Based on the plain language of the statute, the analysis here must include not only what an objecting State would *receive* from the estate in a hypothetical chapter 7 liquidation, but also the value of what the objecting State would *retain*: that is, its claims against the Sacklers. *In re Quigley Co., Inc.*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 614-15 (Bankr. S.D.N.Y. 2019).

87.     In this respect, Purdue addressed only half of its task. It analyzed what an objecting State would *receive* in a hypothetical chapter 7 but simply failed to put on any evidence regarding the value of the claims the Plan strips from the States, ostensibly because such a valuation was too speculative or difficult. (*See* Aug. 13, 2021 Hearing Tr. (testimony of J. DelConte) at 58, 61; Disclosure Statement, Dkt. # 2983, at 174-175.) Purdue's argument is implausible given that Purdue was able to retain experts to estimate the value of the estate claims against the Sacklers, which would be just as speculative as the States' claims. (Aug. 13, 2021 Hearing Tr. (testimony of J. DelConte) at 58-59.) In any event, by not putting on proof Purdue failed to meet its burden.

---

[8] It is noteworthy that the Court's principal reasons for discounting claims against the Sacklers were not that the Sacklers had demonstrated strong defenses of their conduct and liability, but rather that there are significant barriers to collection. (Decision at 85-88.) This analysis strongly supports the conclusion that the Sacklers' conduct would disqualify them from asserting insurance, contribution or indemnity claims.

12095185.17 - 09 19 21

The Court's generalized thoughts regarding the possible difficulties the States might face in pursuing the Sacklers (Decision at 147-49), do not constitute the particularized findings the statute requires.

88.      The Court acknowledged the *Quigley* and *Ditech* decisions but argued that those courts had not undertaken a "plain meaning" analysis that supposedly supported the Court's analysis. (Decision at 144-45). It is clear that the *Quigley* and *Ditech* expressly state that they are based on a "plain meaning analysis." *See Quigley*, 437 B.R. at 144-145 ("The express language of § 1129(a)(7) also requires me to consider the value of the property that each dissenting creditor will *retain* under the plan and in the hypothetical chapter 7.") (emphasis in original); *Ditech*, 606 B.R. at 613 ("Judge Bernstein [in *Quigley*] reasoned that by the plain terms of the statue, in conducting the best interest analysis, the court must consider both the distributions under the plan and in a hypothetical chapter 7 case, and the 'value of the property that each dissenting creditor will retain under the plan and in the hypothetical chapter 7.'"). Furthermore, this Court's "plain language" analysis did not give proper effect to the "or retain" portion of section 1129(a)(7). The States respectfully submit that the Court's analysis was mistaken and that the "plain meaning" of the statute supports the *Quigley* and *Ditech* holdings.[9]

89.      In conducting its best interests test analysis the Court operated under the misapprehension that the States' claims would be essentially the same as the estates' veil piercing.

---

[9] In any event this Court's "plain language" analysis should not stand. "'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole'." *In re Avaya Inc.*, 573 B.R. 93, 99 (Bankr. S.D.N.Y. 2017) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Furthermore, if the plain meaning of the statute were construed as the Court did, that interpretation would trigger the plain meaning rule's exceptions, which apply if a "plain reading … would clearly defeat the statute's obvious purposes … or lead to absurd results." *In re Asher*, 488 B.R. 58, 65 (Bankr. E.D.N.Y. 2013) (internal citations omitted). Here, where a plan of reorganization relies for its distributions to creditors on financial contributions from a non-debtor in exchange for a third party release, the Court's interpretation would defeat the statute's obvious purpose and lead to the absurd result — inconsistent with the statute as a whole — that in applying the best interests test, a bankruptcy court could not consider the value of the claims that a dissenting creditor would retain against the non-debtor being released under the plan.

12005185.17 - 09/19/21

alter ego, and breach of fiduciary duty/failure to supervise claims (Decision at 139). That is simply not the case, however. An individual's liability for a corporation's misconduct under the consumer protection laws of some States, such as the laws of Connecticut, Maryland, Vermont and Washington, can be established simply by "authority to control" the acts of the corporation or lesser standards than actual participation. *See, e.g., Joseph General Contracting v. Couto*, 317 Conn. 565, 589 (2015) (individual can be liable for the unfair or deceptive acts or practices of a business if "the individual either participated directly in the entity's deceptive or unfair acts or practices" or "had the authority to control them"); *Consumer Protection Div. v. Morgan*, 874 A.2d 919, 948-49 (Md. 2005) (individuals liable for corporate acts under Consumer Protection Act if they have "authority to control," even though they do not participate directly); *State v. Steadman*, 149 Vt. 594, 598 (1988) (suggesting that an individual can be liable under consumer protection law if he or she directly participates in the acts or gives direct aid to the corporate actor, or there exists a principal/agent relationship); *State v. Ralph Williams North West Chrysler Plymouth*, 87 Wash.2d 298, 332 (1976) (under Washington's consumer protection act, an individual can be liable for corporate wrongdoing if he or she participates in the wrongful conduct or with knowledge approves of the conduct).[10]

90.     Finally, the Plan improperly classifies states together with political subdivisions in a manner that ignores fundamental differences between the *parens patriae* claims asserted by the States and the claims asserted by the subdivisions, which could not include *parens patriae* claims. *See* Washington Objection at paragraphs 81 through 95. As a result of the fundamentally different claims that could be asserted (although there was some overlap), the State claims were necessarily

---

[10] Thus, given these less exacting requirements for imposing Sackler liability for unfair trade practices claims, the Court's determination that the estate claims are stronger that the States' direct claims (Sept. 1, 2021 Tr. at 142) is at best questionable and unsupported.

36

many orders of magnitude larger than the subdivision claims. The arbitrary assignment to each State and subdivision the same nominal $1 claim — when it was obvious that the State claims were necessarily many orders of magnitude larger — had no basis other than to demonstrate to the States (while the nonconsenting States bloc still numbered 25) that they would be hopelessly outvoted in plan balloting, and to permit Purdue to subsequently argue that the Plan received "overwhelming" support.

91.    In sum, the States have a significant possibility of succeeding on appeal — a likelihood well beyond the mere "substantial possibility" required by *Reno*. But as set forth in Section A above, the States would be so harmed by the absence of a stay (and the other parties would be so relatively unharmed) that a stay is strongly warranted; accordingly the States have well exceeded the necessary showing on possibility of success per the Second Circuit in *Reno*, 309 F.3d at 101): "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [a party] will suffer absent the stay. Simply stated, more of one excuses less of the other" (quotation marks and citation omitted). Clearly, at a minimum, this is not the type of "frivolous" appeal that should be "eliminated." *Credit One*, 560 B.R. at 90.

**D.    A Stay Is In the Public Interest.**

92.    All of the appellants in this case are governmental entities, representing millions of citizens (and in the case of the United States, the entire country). The norm in our judicial system is that decisions of judges in the first instance are subject to appellate review. *See generally Mata v. Lynch*, 576 U.S. 143, 150 (2015) (when a federal court has jurisdiction, it also has a "'virtually unflagging obligation to exercise'" that authority) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The States do not say that there might never be compelling circumstances justifying a deviation from that norm, but given the stakes of this case

37

and the legal issues involved, this is not such a case, and a stay pending appeal to preserve the States' appellate rights—win or lose—is certainly in the public interest.

93.     If no appeal is permitted, the Purdue bankruptcy will present a terrible and perverse lesson to the public: that the family that ran a company that pled guilty to multiple federal crimes and that pocketed the immense profits from those crimes would be able to parlay those profits into immunity from state police powers while retaining the lion's share of those profits.

94.     The States' elected Attorneys General should be allowed to fulfill their role by making this choice on behalf of their citizens. *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-08 (1982) (state acting in role of *parens patriae*).

95.     Furthermore, equitable mootness should not be allowed to be used to preclude review of important legal issues related to the bankruptcy process, such as whether or when non-debtor releases are appropriate. *See, e.g., In re Pacific Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) ("[E]quity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process.") (quoting *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008)).

96.     In a case of this public prominence and importance, it is all the more important that a controversial decision by a bankruptcy court be rigorously tested by appellate courts. Conversely, it would be inappropriate for this Court to place significant roadblocks in the way of an appeal of its own decision and order by denying a stay.

## II.     THE CONFIRMATION ORDER SHOULD BE STAYED WITHOUT ANY REQUIREMENT THAT A BOND BE POSTED.

97.     Bankruptcy Rule 8007(d) provides that "A bond or other security is not required when an appeal is taken by the United States, its officer, or its agency or by direction of any department of the federal government." As the United States Trustee has sought a stay, no bond is required.

12095185.17 - 09 19 21

98.    Furthermore, a bond should not be required in any event because the harms from a stay are limited and can be further mitigated through good faith efforts of the parties.

99.    And regardless of whether a bond might be warranted in other circumstances involving private parties, due consideration should be given to the sovereign nature of the appellants. *See generally State v. $2,000,000.00 in U.S. Currency*, 822 S.W.2d 721, 725 n.1 (Tex. App.-Houston 1991) ("As a sovereign, the State was not required to file an appeal bond …."); *Brown v. Am. Sur. Co. of New York*, 110 Okla. 253, 255 (1925) ("[T]he state … as a sovereign plaintiff, was entitled to the benefit of court process without price and without bond."). Accordingly, any doubts regarding a bond requirement should be resolved in favor of the States as sovereigns being able to pursue the best interests of their citizens.

12095185.17 - 09-19-21

## CONCLUSION

100. For the foregoing reasons, the States respectfully request that the Motion be granted and that the effectiveness of the Confirmation Order and the Trust Advances Order be stayed for the pendency of the States' appeal, and that the Court grant such other relief as is just and proper.

Dated: October 1, 2021

Respectfully submitted,

*Ellen Isaacs*

Ellen Isaacs, Pro Se
On behalf of Deceased Patrick Ryan Wroblewski
Ellen Isaacs
The American People

## CERTIFICATE OF SERVICE

I, Ellen Isaacs, hereby certify that, on October 1, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to consented to the electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect to these Chapter 11 cases and; (iii) by email upon the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

Dated: October 1, 2021

*Ellen Isaacs*

Ellen Isaacs, Pro Se
Representing Self,
Patrick Ryan Wroblewski
The American People

## NOTARY PUBLIC

Sworn to and subscribed before me this 1st day of October, 2021.

*Pooja Patel*

NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
POOJA PATEL - Notary Public
Bucks County
My Commission Expires July 16, 2024
Commission Number 1373150