

# Connecticut's Tobacco Windfall:
# A Billion Dollars Up In Smoke
By
Tamara Tragakiss

P.O. Box 260660 Hartford CT 06126-0660 * Phone (860) 297-4271 * Fax (860) 987-6218 *
www.yankeeinstitute.org

## About the Yankee Institute

The Yankee Institute for Public Policy, Inc. is a nonpartisan educational and research organization founded more than two decades ago. Today, the Yankee Institute's mission is to "promote economic opportunity through lower taxes and new ideas for better government in Connecticut." The Yankee Institute for Public Policy, Inc. is classified by the Internal Revenue Service as a 501 (c) (3) public charity.

> *"There is a danger to the euphoria that surrounds an unexpected source of revenue. This is the first session since I have been here [in 1992] that there seems to be so little concern with the overall increases in spending, and I think the tobacco settlement is part of that. It's a problem. Legislators have proposals to spend it five times over, and we don't have it once."*
> — Connecticut State Senator Robert Genuario, on the eve of receiving the first infusion from the 1998 Tobacco Settlement.[1]

> *"My greatest achievement was going after the tobacco companies. But my biggest disappointment is not being able to determine how the nearly $5 billion in settlement money allocated to Connecticut has been spent."*
> —Connecticut Attorney General Richard Blumenthal, one of the top five lead attorneys in the 1998 Tobacco Settlement, ten years later.[2]

## Executive Summary

In 1998, Connecticut became one of 46 beneficiaries of the multi-state, $246 billion Tobacco Settlement, a deal hammered out in backrooms between Attorneys General and the four major tobacco companies. For Connecticut, the settlement amounts to between $3.6 and $5 billion over the first 25 years of the in-perpetuity agreement. At the time, public health advocates and state Attorney General Richard Blumenthal, who represented Connecticut in the lawsuit, expected that tobacco prevention and treatment programs would receive much of these funds. Ten years later Blumenthal was calling the state's handling of the tobacco revenue "a moral and social failure."[3] Key findings of this report:

- Connecticut has received nearly $1.29 billion from the settlement since distributions began in Fiscal Year 2000.
- Of that, only $23 million, or less than 2% of the total Tobacco Settlement Funds, have been used on programs specific to reducing the number of smokers or anti-tobacco efforts.
- 86% of Tobacco Settlement funds, $1.1 billion, ended up in the General Fund for unrestricted spending.
- The Tobacco Health and Trust Fund, set up to fund tobacco prevention, cessation and health programs, received only $134 million from the Tobacco Settlement over time.
- Raids on that Trust Fund by the General Assembly have resulting in just $9.2 million in spending and a projected balance of just $11.1 million.

2

- The terms of the agreement allowed the tobacco companies to shift the cost of the settlement to consumers without fear of losing market share.
- Connecticut collected an additional $2 billion in cigarette tax revenue since settlement funds started flowing to the state, bringing the state's total cigarette-related revenue to more than $3 billion during these nine years.
- In 2008, smokers paid the state of Connecticut nearly half a billion dollars in combined cigarette taxes and settlement money.
- Despite all the revenue the state takes in from smokers, Connecticut was ranked 51st in the nation by the Campaign for Tobacco-Free Kids in 2008 for failing to spend enough on tobacco prevention. That year Connecticut spent just $1.19 million on tobacco prevention. For comparison, the Centers for Disease Control recommended $43.9 million.

## Taking A Cut: A Brief History of the Tobacco Settlement

In the 1990s, public health advocates achieved what was thought to be a climactic victory in their decades-long fight against Big Tobacco. The anti-smoking advocates believed they had found the "smoking gun:" documents which purported to show that the major tobacco companies had known all along about the health risks associated with smoking and had lied about it.[4] It was not just trial lawyers who took notice. In 1994, Florida became the first state to file suit against tobacco companies to collect damages. This filing was the shotgun that started a race among the states to get their share of any possible deal. Attorneys General across the United States initiated legal actions; Connecticut's Richard Blumenthal took a lead role. By 1998, four states had reached settlements with the major tobacco companies, and the remaining 46 coalesced around a Master Settlement Agreement (MSA).[5]

The states' legal argument focused on smoking-related Medicaid expenses bourn by the states, though their case may have benefited from popular sentiment against the tobacco companies due to the high human costs of tobacco use. These include increased health risks for a wide range of illnesses such as lung cancer, emphysema, and heart disease.[6] In March of 1998, as negotiations for the settlement were underway, the University of California at Berkeley's School of Social Welfare released a report claiming that nationwide, 14.4% of all Medicaid expenses could be attributed to smoking (the report used 1993 data). In Connecticut, the report said, $181.8 million, or 12.56% of the annual Medicaid expenditures, were caused by tobacco use.[7]

3

In November 1998, four major tobacco companies, R. J. Reynolds, Philip Morris USA, Brown & Williamson Tobacco Corp., and Lorillard, settled with the states. The Master Settlement Agreement, the enforcing document of the tobacco settlement, includes the following major components:

- **Annual Payouts for States.** Beginning in FY2000, states began receiving annual, in-perpetuity payouts estimated to reach $246 billion in the first 25 years, according to the advocacy group Campaign for Tobacco Free Kids.[8]

- **Restrictions on Marketing, Advertising and Lobbying.** The MSA eliminated many types of advertising including billboards and the use of cartoon characters. It restricts the use of tobacco brand names in merchandising and sponsorship of certain types of events, and it prohibits lobbying against certain types of legislation and administrative rules.[9]

- **Protection for Tobacco Companies.** Due to the MSA's protections, the signing companies have been able to pass on the cost of the agreement to consumers without fear of losing market share. The MSA also grants the tobacco companies immunity from most kinds of legal action taken by the states. The agreement drafted by the Attorneys General and the four major tobacco companies includes a monetary incentive for state legislatures to go after non-settling tobacco manufacturers. If a legislature passed a "qualifying statute," that is, one that levied fines on the non-settling companies, the state would be rewarded with the possibility of higher payments over the long-term. All states have passed such legislation. According to Thomas C. O'Brien of the libertarian CATO Institute, the agreement thus allows the settling companies to "engage in a program of price fixing and monopolization." Between 1998 and 2000 the major tobacco companies raised the price for cigarettes by $1.10 per pack, more than covering the expense of the annual payments, the Campaign for Tobacco Free Kids alleges. Since 1998, an additional 40 tobacco companies have joined the MSA.[10]

**Expectations Notwithstanding**
During the four years of negotiations between the states and the tobacco companies, the public health benefits of the potential agreement were never

4

far from the talking points of its advocates. In 1997, when states had reached an agreement on a similar plan (which later fell through), *Time* magazine hailed it as the next best thing to a cure for cancer. The Attorneys General were only slightly less effusive. It's "the most historic public-health achievement in history," said Mississippi's Michael Moore. Massachusetts AG Scott Harshbarger, then president of the National Association of Attorneys General, compared it to the discovery of major vaccines.[11] Clearly, the expectation was that the funds would be used to reduce smoking and help tobacco's "victims." The spirit of the agreement comes through in the whereas clauses, including:

> "WHEREAS, the Settling States that have commenced litigation … [and] have agreed to settle their respective lawsuits and potential claims pursuant to terms which will achieve for the Settling States and their citizens significant funding for the advancement of public health, the implementation of important tobacco-related public health measures, including the enforcement of the mandates and restrictions related to such measures …"[12]

But has the state of Connecticut used these funds to *significantly* advance public health and implement *important* tobacco-related health measures?

**Let the Spending Begin**
Almost as soon as the ink was dry on the Master Settlement Agreement, disagreements surfaced about how best to spend the incoming proceeds. Politicians, anti-tobacco groups, and public health advocates all had their own prescriptions.

In 1999 then-Governor John Rowland proposed using most of that year's settlement money for tax rebates, property tax relief and increasing funding to schools. Anti-tobacco advocates had other priorities. They demanded significant spending on tobacco-related youth prevention programs and media campaigns, smoking cessation and other health programs. Attorney General Blumenthal agreed. Democrats in the legislature suggested the establishment of two Trust Funds, each to allocate 50% of the settlement funds. The first Trust Fund would be for tobacco education and the second to help cities pay for schools.[13] A Republican state senator, Robert Genuario— now Secretary of the state Office of Policy and Management—reflected on the situation with sober and prescient words:

> "There is a danger to the euphoria that surrounds an unexpected source of revenue. This is the first session since I have been here [in 1992] that there seems to be so little concern with the overall

5

increases in spending, and I think the tobacco settlement is part of that. It's a problem. Legislators have proposals to spend it five times over, and we don't have it once."[14]

The first payment to the state arrived in April of fiscal year 2000 via a national escrow fund. The escrow receives payments from all the signing tobacco companies and disburses them to each state. Connecticut's portion goes directly to the State Treasurer, who deposits it into the state Tobacco Settlement Fund. From there, the funds are initially disbursed, annually, according to state law:[15]

1. $12 million to the **Tobacco and Health Trust Fund**, an independent recommending body established in 2000.
2. $4 million to the **Biomedical Research Trust Fund**, a granting body under the aegis of the Department of Public Health, established in Fiscal Year 2002.
3. $10 million to the **Stem Cell Research Fund**, a granting body also run by the DPH, with disbursements to run from FY2008 through FY2015.
4. $100,000 and $25,000, respectively, directly to the **Attorney General's Office** and the **Department of Revenue Services**.
5. Any amount to the **General Fund** as requested by The General Assembly, for use as unrestricted funds. Unrequested amounts will be deposited in the Tobacco and Health Trust Fund.

But the statute does not tell the whole story.

Over the years the General Fund has absorbed $1.12 billion of the $1.3 billion Tobacco Settlement funds received by Connecticut. Because these monies are unrestricted, they are fungible: The tobacco money may have been spent on roads or education; it may have contributed to tax relief, or it may have given life to any number of legislative pet projects.

| Tobacco Settlement Funds Net Distribution FY2000-2009 | | |
|---|---:|---:|
| FUND OR AGENCY | Net Distribution (rounded) | % of total |
| General Fund | $1,117,000,000 | 86.3% |
| Tobacco and Health Trust Fund | $122,000,000 | 9.5% |
| Biomedical Research Trust Fund | $24,000,000 | 1.9% |
| Stem Cell Research Trust Fund | $20,000,000 | 1.6% |
| Attorney General/Dept. of Revenue Services | $6,000,000 | 0.5% |
| Tobacco Grant Account | $5,000,000 | 0.4 % |
| Department of Mental Health and Addiction Services | $500,000 | >0.1% |
| TOTAL | $1,294,500,000 | 100.0% |

6



(Figures for both charts based on data from the Office of Fiscal Analysis, 2008 and recent updates provided by OFA and the Office of Policy and Management.[16])

## Tobacco-Related Spending: $23 Million Over 10 Years

Tobacco-related spending, for the purposes of this paper, is defined as Tobacco Settlement funds spent on any one or combination of the following: smoking cessation programs; marketing of anti-tobacco messages; education and prevention programs for youth and adults; tobacco enforcement; administration related to crafting a tobacco control plan; and medical research that is at least arguably related to diseases for which tobacco-users are at higher risk.[17]

About $23 million dollars of the Tobacco Settlement Funds have been spent on tobacco-related programs as follows:

1. The Tobacco and Health Trust Fund: $12.8 million

7

- Board Recommendations, $9.2 million.
- Other state agencies (through statutory transfers), $3.6 million.[18]

2. The Biomedical Research Trust Fund: $5.9 million spent on 20 grants awarded to two institutions—Yale University and the University of Connecticut.[19]

3. The Tobacco Grant Account (Office of Policy Management): $4.2 million for an anti-smoking media campaign, tobacco enforcement efforts and various tobacco education activities. This account is no longer operative.[20]

Please see the Appendix, Attachments B-F, for itemized breakdowns of these and other expenditures of the Tobacco Settlement Funds.



8

(Summarizes tobacco-related spending of Tobacco Settlement Funds across various agencies and trust funds. Figures extrapolated from data provided by the Office of Fiscal Analysis and the Fiscal Year 2009 Report of the Tobacco and Health Trust Fund.[21])

## Raiding The Tobacco and Health Trust Fund

The Tobacco and Health Trust Fund[22] is the "face" of the tobacco settlement in Connecticut and is by far its largest recipient after the General Fund. Its obligation is to make recommendations to the legislature's Appropriations and Public Health Committees for how these tobacco funds are used. The Trust Fund's stated objectives include the creation of "a continuing source of funds." These funds are to be used on programs that reduce tobacco abuse through prevention, education and cessation programs; that reduce substance abuse; and that "meet the unmet physical and mental health needs in the states."[24]

The trust has received an aggregate total of $134 million in the years since the settlement, beginning with initial grants of $20 million in each of Fiscal Years 2000 and 2001, and $17 million in 2002. By law, at least $12 million from the Tobacco Settlement Fund goes to the Trust.

To help the Trust Fund build an endowment, the legislature imposed restrictions on how much the Trustees could recommend for disbursement—just up to half of the net earnings of the Trust Fund and none of the principal.[25]  As a result, the Trust Fund was able to recommend less than $3 million in spending over its first eight years.

In 2008, with prodding from the Governor's office, the legislature increased the amount the Trustees may recommend. The Trustees now have access to the principal itself—one-half of the previous year's annual disbursement or $6 million, whichever is less—plus 100% of the net earnings of the previous year.[26]

With more breathing room, the Board of Trustees recommended the maximum, $6.8 million, for disbursements in FY2009.[27]  The recommendations, which were approved by the legislature and detailed in the Trustee's 2009 and subsequent updates (see Appendix A-C) include:

- $2 million to fund an existing tobacco cessation telephone service (information, counseling and pharmacotherapy) known as the Quitline

9

- $2 million for counter marketing (mass media campaigns to reduce tobacco use)
- $1.2 million for cessation programs for mentally ill individuals
- $500,000 to monitor "program accountability, including progress in achieving outcome objectives."
- $412,456 for "community-based" cessation programs
- $500,000 for 10-20 school districts to support prevention and cessation programs
- $250,000 to create a "Lung Cancer Research Tissue Repository and Database"

But the vast majority of the funds sent to the Trust Fund have been raided by the legislature. Despite having received over $134 million from the Tobacco Settlement over time, the Trust Fund has recommended just $9.2 million in spending and the June 30, 2009 projected balance of the Tobacco and Health Trust Fund stands at just $11.1 million.[28]

For example, in FY2009, statutory transfers bled $14 million from the Trust Fund's balance sheet, including $11 million to the Department of Social Services' Charter Oak Health Plan. The General Fund requested $21.6 million more during its FY2009 budget adjustments.

**Tobacco and Health Trust Fund Expenditures: FY2000 – FY2009**



(Figures based on data from the Tobacco and Health Trust Fund Fiscal Year 2009 Report, inclusive of estimates for FY2009 as of June 12, 2009.[29])

10

**Stem Cell Research Fund**
More tobacco settlement revenue has been spent in one year on controversial stem cell research than the Trustees of the Tobacco and Health Trust Fund have been able to recommend for disbursement over its entire 10-year existence.

While the Trustees of the Tobacco and Health Trust Fund were able to disburse $9.2 million from 2000 to 2009, the Stem Cell Research Trust Fund, which received its first annual Tobacco Settlement infusion of $10 million in FY2008, has already doled out most of that, or $9.8 million. The Research Fund will continue to receive $10 million dollars annually from the Tobacco Settlement through FY2015.[33] (See Appendix, Attachment A, for additional information.)

**Outrage from Some Quarters**
Connecticut's spending priorities for its share of the Tobacco Settlement funds has not gone unnoticed. In 2008, the Campaign for Tobacco Free-Kids ranked Connecticut dead last among all 50 states and the District of Columbia for spending on smoking prevention programs. In that year, Connecticut spent $1.19 million of federal grant funds on tobacco prevention, but zero of its own. The annual list looks at a state's entire spending across all revenue streams and compares a state's anti-tobacco spending to the Centers for Disease Control's recommended spending levels. In 2009, Connecticut rose to 29th place by spending $8.3 million on tobacco prevention, in large part due to the recommendations by The Tobacco and Health Trust Fund. Yet the CDC recommends Connecticut spend $43.9 million annually, or roughly five times what it does.[34]

In a *New York Times* piece covering the 2008 Tobacco-Free Kids ranking, reporter Alison Leigh Cowan noted that "Connecticut has never spent more than a few million dollars on tobacco prevention or smoking cessation, though it has drawn praise from the group for imposing stiff cigarette taxes and banning smoking in public places."  In that same article, Attorney General Blumenthal noted ruefully that "Connecticut has essentially failed in its obligation and opportunity to use money from the tobacco settlement to fight tobacco … We should be embarrassed and outraged by this evidence of our moral and social failure."[35]

The Campaign for Tobacco Free-Kids considers only spending on tobacco prevention, and does not factor in spending for other tobacco-related causes such as cessation programs and disease research.

11

## What of Those Cigarette Tax Monies?

Focusing on the settlement money actually understates the extent to which Connecticut is dependent on tobacco for revenue. Far greater than the money Connecticut receives through its share of the Tobacco Settlement is what the state takes in by direct taxation of tobacco products. In 2008, that figure was $306 million[36] (compared to $141 in Settlement Funds[37]).

The first state cigarette tax was enacted in 1935. Back then, smokers paid the state three cents for a pack of cigarettes. Today, the tax has risen to $2 a pack – or ten cents per cigarette. Cigarette taxes are a reliable revenue stream for states, with few apparent political drawbacks.

### History of Cigarette Tax Increases in Connecticut

| Fiscal Year Ending June 30th | Rate of Tax per Pack at Date of Change | Gross State Cigarette Taxes Not adjusted for inflation. |
|---|---|---|
| 1935 | $0.03 | n/a |
| 1961* | $0.05 | $12,680, 000 |
| 1963 | $0.06 | $20,575, 000 |
| 1965 | $0.08 | $24,953,000 |
| 1969 | $0.16 | $35,335,000 |
| 1971* | $0.26 | $57,202,000 |
| 1989 | $0.40 | $97,623,000 |
| 1991 | $0.45 | $114,506,000 |
| 1993 | $0.47 | $117,495,000 |
| 1994 | $0.50 | $119,272,000 |
| 2002 | $1.11 | $151,324,000 |
| 2003 | $1.51 | $251,979,000 |
| 2007 | $2.00 | $264,020,000 |

**Note**: n/a means not available. In 1956, the tax was raised to four cents and then lowered back to three. In 1971, the tax was raised twice: first to 21 and then to 26 cents. Data is taken from "The Tax Burden on Tobacco," published in 2007 by Orzechowski and Walker.[38]

The gap between tobacco-related revenue to the state and money spent on fighting smoking underscores what some see as an inherent conflict of interest. In FY 2009, Connecticut spent only $8.9 million on tobacco prevention, including use of Tobacco Settlement Funds, and spent none of

12

its own revenue to fight smoking the year before that.[39] In these two years, the state received approximately $940 million in tobacco-related revenue.

The $2 per-pack tax along with a $1.01 federal excise tax (includes a $0.62 increase that went into effect in April of 2009) represents 40% of the retail price of cigarettes in Connecticut.[40]

A 2009 effort to raise the state tax to $2.50 per pack failed in the legislature.[41] That idea may yet resurface.

In 2008, Connecticut received $470 million in combined tobacco revenues: $329 million from cigarette taxes and $141 million in settlement funds.

**Total Tobacco-Related Revenue Compared to Tobacco Prevention Spending in Connecticut 2000-2009**

| Fiscal Year | Cigarette Tax Revenue | Tobacco Settlement Revenue | Total Tobacco Revenue | Tobacco Prevention Spending | Percent of CDC Min. |
|---|---|---|---|---|---|
| 2000 | $117,425,635 | $150,000,000 | $267,425,635 | $4,000,000 | 18.80% |
| 2001 | $114,847,459 | $112,500,000 | $227,347,459 | $1,000,000 | 4.70% |
| 2002 | $156,485,164 | $140,000,000 | $296,485,164 | $600,000 | 2.70% |
| 2003 | $251,495,142 | $137,900,000 | $389,395,142 | $600,000 | 2.70% |
| 2004 | $275,908,244 | $116,600,000 | $392,508,244 | $500,000 | 2.40% |
| 2005 | $270,322,117 | $118,300,000 | $388,622,117 | $100,000 | 0.30% |
| 2006 | $267,809,756 | $108,600,000 | $376,409,756 | >$100,000 | 0.20% |
| 2007 | $264,155,137 | $113,700,000 | $377,855,137 | $2,000,000 | 9.40% |
| 2008 | $329,499,570 | $141,300,000 | $470,799,570 | $1,200,000 | 5.60% |
| 2009 | $315,000,000* | $153,800,000 | $468,800,000 | $8,300,000 | 18.90% |
| FY00-0 | $2,362,948,224 | $1,292,700,000 | $3,655,648,224 | $18,300,000 | 6.57% |

Note: Cigarette Tax Revenue data is taken from the State of Connecticut Annual Report 2007-2008; Tobacco Settlement Revenue is taken from the Connecticut Office of Fiscal Analysis; and Tobacco Prevention Spending figures are from the Campaign for Tobacco-Free Kids. *FY09 Cigarette Tax Revenue is the June 20, 2009, estimate by the Office of Policy and Management in its consensus letter to the Office of Fiscal Analysis.

## Conclusion: Smoking Profits More than Just Tobacco Companies

15.5% of Connecticut's adult population, and 21.1% of its high school age youth, smoke.[42] It is from their pockets that nearly a half a billion dollars goes into Connecticut's coffers each year, nearly none of which goes toward tobacco prevention. Of the more than $1 billion dollars smokers have paid in increased cigarette costs occasioned by the Tobacco Settlement, just $23

13

million has been spent to prevent smoking, help smokers quit or treat those who suffer from its deadly side effects.

[1] "Tobacco Funds Already a Habit/Everyone Has Ideas About How to Use Big Budget Windfall" by Christopher Keating, *Hartford Courant*, March 16, 1999. Pg. A.1

[2] "Blumenthal Talks Law" by Zeke Miller, Yale Daily News, April 21, 2009,

[3] "Connecticut Is Criticized on Spending on Smoking" by Alison Leigh Cowan. *The New York Times* 157.54176 (Jan. 1, 2008): pB1(L).

[4] See "Big Tobacco Grew Long Noses, but It's Not a Crime" by Marc Lacey. *New York Times*. New York, N.Y.: Sep 26, 1999. pg. 4.3; "Tobacco Executive Grilled on Company Smoking Memos" by Myron Levin. *Los Angeles Times*. Los Angeles, Calif.: Mar 4, 1998. pg. D3; "Big Tobacco Threatened by New Disclosures" by Henry Weinstein. *Los Angeles Times*. Los Angeles, Calif.: Aug 3, 1997. pg. 1.

[5] See "A Decade of Broken Promises: The 1998 Tobacco Settlement Ten Years Later," Campaign for Tobacco-Free Kids.

[6] Many news accounts leading up to the settlement in November 2008 cited the desire of the states to recover Medicaid expenses related to tobacco use. There was also debate and discussion about whether the federal government would be entitled to its share of Medicaid. See "Tobacco Suit Study Backs U.S.; Litigation: Government is entitled to some funds states win in suits to recover smoking-related Medicaid costs, public-interest center's report says," by Henry Weinstein, *Los Angeles Times*. Los Angeles, Calif.: Dec 6, 1997.  pg. 3. For an in-depth, contemporaneous look at the rational behind the legal arguments, see "Burning issues in the tobacco settlement payments: an economic perspective," by Jane G. Gravelle (Symposium: What Do We Mean by "Taxpayer Relief"?), *National Tax Journal* 51.n3 (Sept 1998): p437-451.

[7] Estimates of smoking-attributable health costs spending vary considerably. See "State estimates of Medicaid expenditures attributable to cigarette smoking, fiscal year 1993," by L. S. Miller, X. Zhang, T. Novotny, D. P. Rice, and W. Max, Public Health Report, March, 1998 (School of Social Welfare, Univ. of California, Berkeley 94720-7400, USA); Miller et. al estimated that 14.4% of all Medicaid expenses could be traced to smoking. The authors listed Connecticut's tobacco/Medicaid burden at 12.56%, or $181.8 million (in 1993). More recently, a 2009 report issued by the CDC, using slightly different nomenclature, put the tobacco-related expense at 7% of all adult Medicaid expenditures, an amount equal to $249 million of Connecticut Medicaid expenses, pre-federal reimbursements, in 2004 (See "State-level Medicaid expenditures attributable to smoking," by Armour BS, Finkelstein EA, Fiebelkorn IC. Prev. Chronic. Dis. 2009; 6(3). States are federally reimbursed for a portion of their Medicaid expense based on per capita income figures. According to the U.S. Department of Health and Human Services, the Federal Medical Assistance Percentages and Enhanced Federal Medical Assistance Percentages for Fiscal Year 2010 are set at 50% and 65% , respectively, in Connecticut. The latter percentage is used to calculate reimbursements for the State Children's Health Insurance Program under title XXI, and certain other children-related expenditures in the Medicaid program. See Federal Register: November 26, 2008 (Volume 73, Number 229) [Page 72051-72053].

[8] "A Decade of Broken Promises," Campaign for Tobacco-Free Kids. Payments vary by state and, significantly, by year, thanks to a hornet's nest of terms and conditions: bases, formulas, adjustments, bonuses and incentives embedded in the Master Settlement Agreement. Connecticut receives 1.86% as its "allocable share" of an annual payment that by the terms of the MSA is currently set at a "base" of  $8.139 billion. From 2008-2017 states will receive bonus payments

15

from the "Strategic Fund," a base worth an annual $816 million. These bonus payments are given to states according to their leadership role in the negotiations; in 2008, Connecticut's bonus of $27 million was the 5th highest of all states. (See "Use Tobacco Settlement Wisely," Editorial, *Hartford Courant*, Hartford, CT, May 27, 2007)). State-specific shares for both the annual payment and the Strategic Fund base payments were determined by the Attorneys General—percentages, but not the formulas used to craft them, are contained in the agreement. Both the annual and the Strategic Fund base payments are themselves subject to certain adjustments, including an annual increase that is the greater of 3% or the annual rate of inflation, and Volume Adjustments, a downward calculation based on a decline in sales over 1997 levels and other market share factors. The agreement also provided short-term funding for a National Foundation for Tobacco-Related Research ($250 million, from 1999 to 2008), a National Public Education Fund to reduce tobacco use among youth ($1.45 billion, 1999-2003), National Association of Attorneys General Administration ($1.5 billion, 1998 to 2007) and AG Enforcement ($50 million in 1999). Most of the information in this endnote relies on summaries of the MSA provided by the Campaign For Tobacco-Free Kids; or see The Master Settlement Agreement (MSA), the legal document in its entirety.

[9] "Summary of the Multistate Settlement Agreement (MSA)," Campaign for Tobacco-Free Kids, July 9, 2003.

[10] Legal immunity applies to all actions taken by the signing tobacco companies prior to the settlement, as well as certain types of future actions. This immunity does not extend to litigation taken by private citizens, or class action suits. The agreement allows states that pass a "qualifying statute"— legislation that penalizes non-signers of the agreement—to opt out of some of the provisions of the Volume Adjustments. See the Campaign for Tobacco-Free Kids' "Summary of the Multistate Settlement Agreement (MSA)" and its 2008 report, "A Decade of Broken Promises." For a scathing report and commentary on the MSA's legal framework, read Cato Policy Analysis No. 371, "Constitutional and Antitrust Violations of the Multistate Tobacco Settlement," by Thomas C. O'Brien. May 18, 2000.

[11] In 1997 states had reached an earlier agreement, a $365 billion "accord" with the tobacco companies that would been implemented through legislation by the United States Congress; the deal fell apart when Congress balked at accepting a "prepackaged" legislative proposal, among other reasons. See "Tobacco Accord, Once Applauded, Is All But Buried," by John M. Broder with Barry Meier. *New York Times*. New York, N.Y.: Sep 14, 1997. pg. 1.1. Meanwhile, much media coverage was expended on this first, failed attempt, and a *Time* magazine cover story adequately captured the high expectations of the states' lawsuit: "Sorry, Pardner"(settlement between tobacco industry and state attorneys general, Cover Story) by Jill Smolowe, *Time*. 149.n26 (June 30, 1997):pp24(6).

[12] The MSA includes more on the tobacco and health-related goals in its "Whereas" clauses: "WHEREAS, the Settling States that have commenced litigation … in order to further the Settling States' policies regarding public health, including policies adopted to achieve a significant reduction in smoking by Youth … [and] are committed to reducing underage tobacco use by discouraging such use and by preventing Youth access to Tobacco Products …"

[13] See "Tobacco Funds Burning a Hole in State's Pocket," by Michele Jacklin, *Hartford Courant*, Hartford, CT: Feb. 23, 2005. Pg A.9. ; "More Anti-Smoking Spending Urged/Advocates Want Greater Share of Settlement Money" by Christopher Keating et. al,

*Hartford Courant*, Mar. 17, 1999. Pg. A.3.; "Don't Blow Off Tobacco Money," Editorial, *Hartford Courant*, Feb. 24, 1999. Pg. A.14.

[14] Keating, Mar. 16, 1999 *Hartford Courant*.

[15] Chapter 47, Sec. 4-28 e. Prior to the establishment of this statute, the legislature passed laws which included a one-time payment of $5 million to a Tobacco Grant Account. See Soulsby/2008 memo. Also see Endnote 22.

[16] Soulsby/2008 memo. Both the table and the pie chart use data from the Office of Fiscal Analysis, through FY2008. OFA's projections for FY2009 from that memo were replaced in this report with the actual figures, provided in email correspondence by Ms. Soulsby (the state received an unexpected payment of $10,037,326 from the Tobacco Settlement Fund).

[17] The method used to calculate the total amount spent on tobacco-related programs and grants relied on the reported expenditures from the Office of Fiscal Analysis and the Office of Policy and Management (itemized lists in Appendix). From the Tobacco and Health Trust Fund, all "Board Recommended" expenditures were included. Also from the Tobacco and Health Trust Fund, the following "statutory transfers" were considered tobacco-related: (FY02) $375,000 to Dept. of Mental Health and Addiction Services (DMHAS), for grants to Regional Action Councils for tobacco related health, education, and prevention; $450,000 to DMHAS for SYNAR tobacco enforcement activities; and $221,550 to Dept. of Revenue Services (DRS) to implement the provisions of the tobacco settlement agreement escrow funds; (FY03) $375,000 to DMHAS for grants to Regional Action Councils for tobacco related health, education, and prevention; $472,000 to DMHAS for SYNAR tobacco enforcement activities; and $118,531 to DRS, to implement the provisions of the tobacco settlement agreement escrow funds; (FY05) $15,000 to Dept. of Public Health (DPH) for the QuitLine; (FY07) $1,300,000 to DPH for QUITLINE; and (FY08) $300,000 to DMHAS, for tobacco education programs. All grants made by the Bioresearch Trust Fund (see Attachment F) and the expenditures of the Tobacco Grant Account (detailed in Endnote 22) were also included as "tobacco-related" spending.

[18] Ibid.

[19] The Biomedical Research Trust Fund, under the auspices of the Department of Public Health, makes grants for biomedical research related to heart disease, cancer and other tobacco-related diseases. Of the $24 million transferred to it from the Tobacco Settlement since FY 02, at least $8 million has been transferred to the General Fund ($4 million in FY03, and $2 million in each of FY 04 and FY 05). Soulsby/Memo 2008. See Attachment F.

[20] The Tobacco Grant Account was set up as a one-time receiver of Tobacco Settlement funds, given $5 million earmarked for prevention, education, cessation, treatment, enforcement and health needs programs related to tobacco abuse. The Office of Policy and Management handled this account until the funds had been expended. $550,000 was used for a collaboration between the Department of Public Health and the Department of Mental Health and Addiction Services for a long-term Tobacco Prevention and Control Plan. Awards were made in FY01 as follows: a media campaign included awards of $132,000 to Alden Event Productions for media plan, $1.46 million to CT Radio Network for media buys, $1.24 million to Training Solutions Interactive for curricula development, distribution of curriculum kits, teacher training, and website development and maintenance, and $161,000 to North Castle Partners for an evaluation component. Not used for its earmarked purpose was $614,880 (transferred to the DMHAS and DRS in FY 01), and $843,136 transferred to the General Fund in 2002 and 2003. Soulsby/Memo 2008.

[21] See Endnote 19.

[22] A 17-member Board of Trustees administers the Tobacco and Health Trust Fund. Chaired by an ex-officio representative from the Office of Policy and Management, Anne Foley, the Board meets regularly to prepare recommendations for disbursements to the Appropriations Committee. The remaining Trustees are appointed for two-year terms by the Governor (4) and the legislative leaders (2 each). See Tobacco and Health Trust Fund 2009 Report.

[24] Public Act No. 08-145.

[25] The General Assembly transferred away—to its General Fund and to other state agencies—all but $600,000 of the Trust Fund's balance by Fiscal Year 2004. The board's operations were statutorily suspended for that year as well as for Fiscal Year 2005. See Tobacco and Health Trust Fund Report 2009.

[26] Soulsby/2008 memo.

[27] Please see Attachments A & B in the Appendix.

[28] The OFA's 2008 memo (Soulsby) shows a projected $12.5 million in Tobacco Settlement transfers to the Tobacco and Health Trust Fund for FY2009, and no transfers to the General Fund. However, preliminary figures received from the Office of Policy and Management show, as of June 12, 2009, a transfer of $23.8 million from the Tobacco Settlement Fund to the Tobacco and Health Trust Fund and a transfer to the General Fund from the Tobacco and Health Trust Fund of $21.6. It also projects a balance of $11.1 million on June 30, 2009. See Attachment A.

[29] Combining figures from the Soulsby/2008 Memo, the 2009 Report of the Tobacco and Health Trust Fund, and documents received by email from the Department of Office and Policy Management (see Attachments A & B, in the Appendix).

[33] Souslby/2008 memo. Pursuant to PA 05-149, "An Act Permitting Stem Cell Research and Banning the Cloning of Human Beings," the Stem Cell Research Fund received $20 million from the General Fund in the first two years of its ten-year initiative to support embryonic and human adult stem cell research. But, beginning in Fiscal Year 2008 and inclusive of FY2015, the Tobacco Settlement Fund will support its activities with a $10 million annual infusion. The Department of Public Health oversees the fund and makes grants. In April 2008 (FY09), it awarded $9,840,146 for 22 research projects at 3 institutions: Yale University Stem Cell Center and School of Medicine, the University of Connecticut Health Center, and Evergen Biotechnolgies ($900,000 to Establish a "Connecticut Therapeutic Cloning Core Facility"). For details, see Attachment D in the Appendix.

[34] "A Decade of Broken Promises," Campaign for Tobacco-Free Kids.

[35] Leigh Cowan, Jan. 1, 2008. *The New York Times*.

[36] "State Tobacco-Related Costs and Revenues," the Campaign for Tobacco Free Kids.

[37] Soulsby/Memo 2008.

[38] "The Tax Burden on Tobacco Historical Compilation 2007," published by the consulting firm Orzechowski and Walker (with financial support from tobacco companies): page 276.

[39] Campaign for Tobacco-Free Kids, State Rankings, 2008 & 2009.

[40] Orzechowski and Walker.

[41] SB 932: §§ 8-10 – CIGARETTE TAX.

[42] "2008 Tobacco Control Highlights," Center for Disease Control.