AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Z.W. Julius Chen
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
chenj@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of
Unsecured Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO MOTIONS TO CERTIFY DIRECT APPEAL**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................2

ARGUMENT ..........................................................................................................................4

I.    *Metromedia* Is Controlling Precedent In These Fact-Intensive Appeals ............................4

    A.    Appellants' Attempts To Avoid *Metromedia* Fail ...................................................4

    B.    Applying Longstanding Precedent To The Circumstances Of These Cases
Is Not A Matter Of Public Importance....................................................................9

II.   Courts' Applications Of The *Metromedia* Standard Have Not Resulted In
Conflicting Decisions Of Law In This Circuit.................................................................12

III.  A Direct Appeal Would Not Materially Advance The Progress Of The Case ...................14

CONCLUSION....................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ................................................................................13

*In re Bernard L. Madoff Inv. Sec. LLC*,
  740 F.3d 81 (2d Cir. 2014) ...................................................................................................6

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..................................................................................5

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992) ...........................................................................................5, 12

*In re General Motors Corp.*,
  409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...............................................................................9, 11

*In re Goody's Fam. Clothing, Inc.*,
  No. 09-cv-409, 2009 WL 2355705 (D. Del. July 30, 2009) ...................................................8

*In re Johns-Manville Corp.*,
  449 B.R. 31 (S.D.N.Y. 2011) ................................................................................10, 14, 15

*In re Karta Corp.*,
  342 B.R. 45 (S.D.N.Y. 2006) .........................................................................................5, 8, 14

*In re Kirwan Offices S.à.r.l.*,
  592 B.R. 489 (S.D.N.Y. 2018) ..........................................................................................5, 7

*In re Ladder 3 Corp.*,
  No. 17-cv-4733, 2018 WL 2298349 (E.D.N.Y. Mar. 28, 2018) .............................................8

*In re Lehman Bros. Inc.*,
  No. 13-cv-5381, 2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013) .............................................1

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 146 (2d Cir. 2005) ....................................................................................... *passim*

*In re Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016) ...................................................................................................7

*In re Nortel Networks Corp.*,
  No. 09-10138, 2010 WL 1172642 (Bankr. D. Del. Mar. 18, 2010) ........................................11

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006) ....................................................................5

*In re Residential Cap., LLC*,
   512 B.R. 179 (Bankr. S.D.N.Y. 2014) ..................................................................5

*In re Sabine Oil & Gas Corp.*,
   551 B.R. 132 (Bankr. S.D.N.Y. 2016) .........................................................8, 9, 10

*In re Springfield Hosp., Inc.*,
   618 B.R. 109 (Bankr. D. Vt. 2020) .....................................................................10

*Stern v. Marshall*,
   564 U.S. 462 (2011) ......................................................................................7, 15

*In re SunEdison*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017) ................................................................13

*Weber v. U.S. Trustee*,
   484 F.3d 154 (2d Cir. 2007) ..................................................................... *passim*

*Wortley v. Bakst*,
   844 F.3d 1313 (11th Cir. 2017) ..........................................................................16

**Statutes**

28 U.S.C.
   § 158(d) ................................................................................................................1
   § 158(d)(2)(A) ............................................................................................ *passim*
   § 158(d)(2)(A)(i) ..........................................................................................5, 9, 10
   § 158(d)(2)(A)(ii) .......................................................................................11, 12, 14
   § 158(d)(2)(A)(iii) ...............................................................................................14

**Other Authorities**

1 COLLIER ON BANKRUPTCY ¶ 5.06 ............................................................................12

The Official Committee of Unsecured Creditors (the "Official Committee")[2] appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Purdue"), by and through its undersigned counsel, hereby submits this opposition (the "Opposition") to: (i) *United States Trustee's Memorandum of Law in Support of Motion to Certify Direct Appeal to the Court of Appeals Under 28 U.S.C. § 158(d)* [ECF No. 3868] (the "UST Motion"); (ii) *The Appealing States' Motion for Certification Pursuant to 28 U.S.C. § 158(d)(2)(A)* [ECF No. 3871] ("State AGs Motion"); (iii) *California's Request for Certification of Direct Appeal to the Court of Appeals and Joinder to the Appealing States' Motion for Certification Under 28 U.S.C. § 158(d)(2)(A)* [ECF No. 3874] (the "Cal. AG Motion"); and (iv) *Joinder of Certain Municipality and First Nations Creditors and Appellants, in Support of the Motions by the Office of the United States Trustee and the Appealing States for Certification of a Consolidated and Expedited Direct Appeal to the Court of Appeals for the Second Circuit* [ECF No. 3913] (together with the UST Motion, the State AGs Motion, the Cal. AG Motion, the "Certification Motions"). By the Certification Motions, the U.S. Trustee, with the authorization of the Solicitor General[3] (the "UST"); the Attorneys General from California,

---

[2] The Official Committee was appointed by the United States Trustee at the beginning of these Chapter 11 Cases to serve as a fiduciary for the interests of all unsecured creditors, and currently comprises the following eight members: (i) The Blue Cross and Blue Shield Association (chair); (ii) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C.; (iii) Cheryl Juaire, (iv) Kara Trainor; (v) LTS Lohmann Therapy Systems Corporation; (vi) Pension Benefit Guaranty Corporation; (vii) Walter Lee Salmons; and (viii) West Boca Medical Center, plus three *ex officio* members: (a) Cameron County, Texas, on behalf of the Multi-State Governmental Entities Group; (b) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors; and (c) Thornton Township High School District 205, on behalf of certain public school districts.

[3] For nearly two years in these Chapter 11 Cases, the UST has appeared in these Cases as the UST. Over the past few months, however, the identity of the interests that the UST is representing has become unclear. During the September 30, 2021 hearing, the UST stated that it "received a notice of approval from the Solicitor General" to bring a direct certification of motion. *See* Sept. 30, 2021 Hr'g Tr. at 15:20-22. This was obviously the first time that the UST had noted that it was taking instruction from the Solicitor General. Additionally, in the District Court, the UST has decided to refer to itself as "the Government," without explaining exactly what part of "the Government" it represents, other than the Office of the UST. *See Memorandum of Law in Support of Emergency Motion by Appellant William K. Harrington, United States Trustee, for a Stay Pending Appeal*, No. 7:21-cv-7969 (S.D.N.Y.) [ECF No. 19], at 1. When the Ad Hoc Group of Personal Injury Victims sought a deposition from the Office of the UST, to which the Office of the UST objected, the UST stated that it is "seeking to protect the constitutional rights of small stakeholders and the

1

Connecticut, Delaware, the District of Columbia, Maryland, Oregon, Rhode Island, Vermont, and Washington (the "State AGs"); and certain Canadian Municipality and First Nations Creditors (collectively, the "Appellants") seek certification of a direct appeal of: (i) *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [No. 3787] (the "Confirmation Order"), which approves the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3726] (the "Plan")[4]; and (ii) *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* [ECF No. 3773]. In support of this Opposition, the Official Committee respectfully states as follows.[5]

## PRELIMINARY STATEMENT

1.      Despite all parties agreeing to an expedited schedule for resolving these appeals in the district court, and the district court *just yesterday* setting an expedited briefing schedule that will conclude in mid-November and signaling its clear intention to issue a ruling in this matter as soon as practicable after a November 30, 2021 argument, Appellants seek to displace the district court's swift decisionmaking with a typically months-long process of certifying and requesting a discretionary direct appeal to the Second Circuit—a process that may ultimately end in (delayed) district court review. There is no basis under 28 U.S.C. § 158(d)(2)(A) for setting these appeals on that path.

---

public interest" and it does not represent the interests of the United States as a creditor. *See Letter to Judge Drain for Pre-Motion Conference in Advance of Motion to Quash Deposition Notice* [ECF No. 3921]. The UCC hopes that the discovery requested by the Ad Hoc Group of Personal Injury Victims sheds light on these and other questions regarding the UST's involvement, and positions taken, in these Chapter 11 Cases.

[4] Capitalized terms used and not defined herein have the terms ascribed to them in the Plan.

[5] The NAS Committee has informed the Official Committee that it joins in these arguments.

2.     At bottom, these appeals concern whether this Court correctly applied the existing

and accepted standard for approving non-debtor releases set forth in *In re Metromedia Fiber*

*Network, Inc.*, 416 F.3d 146 (2d Cir. 2005), to the facts and circumstances of these Chapter 11

Cases.    None of Appellants' attempts to avoid *Metromedia*—novel or otherwise—makes that

precedent any less controlling, or their appeals any less dependent on their particular facts.    Nor is

the application of *Metromedia* to these cases a matter of public importance within the meaning of

the direct appeal statute, even though the number of creditors whose interests are represented by

the Official Committee and numerous ad hoc groups is extensive and includes governmental

entities (including states, political subdivisions, and indeed, the federal government).    That courts

in the Second Circuit have disapproved of particular non-debtor releases is not evidence of

confusion over any purely legal question; rather, it highlights the fact-intensive nature of the

*Metromedia* inquiry.    And in this specific instance, allowing the district court to resolve these

appeals—which also raise a host of additional fact-intensive issues that would benefit from

percolation through the district court—provides the best opportunity to facilitate the Article III

appellate review that Appellants insist must occur prior to distribution of funds for opioid

abatement and victim compensation under the Plan.

3.     In the end, when conducting the certification analysis under any of the section

158(d)(2)(A) prongs, this Court must not lose sight of the unfortunate but unmistakable reality that

lives will be lost to the opioid crisis each day Plan implementation is delayed.[6]    Since confirmation,

Appellants have made much of the idea that an Article III court must pass upon the Plan before it

---

[6] As one state Attorney General that supported the Plan put it, the number of people dying per day is "like a plane going down every day of every week of every month of every year."  *Mo. Attorney General discusses advances on $500 million opioid settlement, plus steps still needed to secure funding*, KY3.COM (updated Sept. 24, 2021), *available at*, https://www.ky3.com/2021/09/25/ky3-exclusive-mo-attorney-general-discusses-advances-500-million-opioid-settlement-plus-steps-still-needed-secure-funding.

goes effective.  The Official Committee, the Debtors, the various ad hoc groups, and even the

Appellants have facilitated that review by readily agreeing to expedited proceedings that the

district court has now ordered.  Appellants should not be permitted to demand that the parties

attempt to obtain discretionary Second Circuit review that could take months, on the view that

district court review would provide insufficient affirmation of this Court's considered

determination that the Plan comports with the law.

4.     Accordingly, this Court should deny the Certification Motions.

## ARGUMENT

5.     Certification of a direct appeal is appropriate only in "compelling" circumstances,

*Weber v. U.S. Trustee*, 484 F.3d 154, 162 (2d Cir. 2007), that satisfy the standards set forth by

Congress:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken . . . .

28 U.S.C. § 158(d)(2)(A)(i)-(iii).

6.     In these cases, Appellants can satisfy none of the standards for certification of a

direct appeal.

## I.  *Metromedia* Is Controlling Precedent In These Fact-Intensive Appeals

### A.  Appellants' Attempts To Avoid *Metromedia* Fail

7.     Section 158(d)(2)(A) first provides for certification of a direct appeal of an order

"involv[ing] a question of law as to which there is no controlling decision of the court of appeals

for the circuit or of the Supreme Court of the United States." 28 U.S.C. § 158(d)(2)(A)(i). That is not the case here.

8.      For nearly three decades, it has been the law of the Second Circuit that "a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtors' reorganization plan." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992). Surveying its own and other circuits' case law a dozen years later, the Second Circuit in *Metromedia* recognized that courts have approved nondebtor releases when, among other things, the estate received substantial consideration, the enjoined claims were channeled to a settlement fund rather than extinguished, or the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution. 416 F.3d at 142.

9.      It is no surprise that courts, taking the Second Circuit at its word, have deemed these Second Circuit precedents "controlling authority" that resolve "argument[s] that the release and exculpation provisions . . . in [a] Plan are invalid." *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006). As courts have made clear time and again, non-debtor releases are governed by "applicable Second Circuit authority," *id.*, and are permissible in a range of circumstances that align with the Second Circuit's guidance, *see, e.g.*, *In re Kirwan Offices S.à.r.l.*, 592 B.R. 489, 503-12 (S.D.N.Y. 2018) (affirming approval of non-debtor releases in confirmation order because Second Circuit "permit[s] them" and requirements were met); *In re Residential Cap., LLC*, 512 B.R. 179, 188 (Bankr. S.D.N.Y. 2014) ("In the Second Circuit, non-debtor releases are permissible under certain circumstances."); *In re Charter Commc'ns*, 419 B.R. 221, 257-58 (Bankr. S.D.N.Y. 2009) ("The Third Party Releases, under the circumstances presented, satisfy the requirements for such releases in the Second Circuit, and are accordingly approved."); *In re Karta Corp.*, 342 B.R.

45, 54 (S.D.N.Y. 2006) (describing circumstances under which "[n]on-debtor releases have been approved by courts in this Circuit").

10.    In the face of this authority, it is patently false for the State AGs to characterize the Second Circuit as merely "indicat[ing] in *dicta* that non-debtor releases might ever be appropriate." State AGs Mot. at 3.  The Second Circuit has expressly held otherwise:  "In *In re Metromedia Fiber Network, Inc.*, we *held* that a bankruptcy court could permit the nonconsensual release of creditors' claims against third parties upon a finding of 'truly unusual circumstances' that 'render the release terms important to [the] success of the [underlying bankruptcy reorganization plan].'" *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 93 n.12 (2d Cir. 2014) (emphasis added).  As such, it is likewise false for the State AGs to claim that Second Circuit precedent "suggest[s] that this Court may have lacked jurisdiction to enjoin direct third-party claims against debtors."  State AGs Mot. at 3.[7]

11.    The UST tries a slightly different tack, arguing that "[n]one of the[] [Second Circuit's] cases stand for the proposition that a bankruptcy court has authority to extinguish non-debtors' direct claims against other non-debtors that are independent of the debtor's own claims and property to further a debtor's reorganization."  UST Mot. at 20.  But that is irrelevant, for this Court did *not* approve the release of claims "independent of the debtor's own claims and property." *Id.*  Quite the opposite, this Court stated:

> I conclude that the third-party claims that are covered by the shareholder release under the plan . . . directly affect the *res* of the Debtors' estates, including insurance rights, . . . rights to indemnification and contribution, and the Debtors' ability to pursue the states' own closely related, indeed fundamentally overlapping, claims.

---

[7] The State AGs even take the view that this Court recognized a lack of controlling precedent during the confirmation hearing oral argument.  *See* State AGs Mot. at 4-5.  But in the cited colloquy, which the State AGs tellingly do not quote, this Court remarked only that "there's really not a whole lot of on-point, directly on-point, precedent on th[e] issue" of the State AGs' "belie[f] [that] every state needs to agree to [the releases], and perhaps every governmental entity."  Aug. 23, 2021 Hr'g Tr. at 217.

Bench Ruling at 111; *id.* at 104-05 (holding that certain "releases cover claims that are truly derivative of the Debtors' claims"). The UST agrees that Second Circuit precedent permits non-debtor releases of, among other categories, "claims that are duplicative or derivative of claims belonging to the debtor." UST Mot. at 19-20. Accordingly, the UST's attempt to distinguish the many Second Circuit decisions recognizing this Court's authority to approve non-debtor releases collapses into a fact-bound dispute over the nature of the claims at issue.[8]

12.    Equally unavailing is the UST's assertion that "[n]either the Supreme Court nor the Second Circuit has held that the Due Process Clause permits a bankruptcy court to non-consensually and permanently extinguish non-debtors' direct causes of action against other non-debtors without compensation or consent and without a hearing on their claims." UST Mot. at 16. "The issue of what process is due requires a court to ask whether the notice was reasonably calculated *under the circumstances* to apprise interested parties of the pendency of the plan's proposed release and afford them an opportunity to present their objections." Bench Ruling at 114 (emphasis added). Setting aside the extraordinary and widespread notice provided in these cases, as well as the "multiple objections" to the Plan's proposed third-party releases, *id.* at 113-15, what process is due is governed by a well-settled legal standard and "heavily dependent on the particular facts of a case." *Weber*, 484 F.3d at 158; *see, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 159-61 (2d Cir. 2016) (reviewing question of "whether [plaintiffs] were entitled to more" than publication notice and affirming by "find[ing] no clear error in th[e] [bankruptcy court's] factual finding").

---

[8] The same erroneous predicate underlies the UST's argument that it is an open question whether this Court "can constitutionally extinguish *independent* claims." UST Mot. at 17-18 (emphasis added). This Court has not purported to extinguish any "independent" claims. Existing precedent therefore already controls—and forecloses—the UST's constitutional challenges where, as here, the releases are "integral to the restructuring of the debtor-creditor relationship." *Stern v. Marshall*, 564 U.S. 462, 495-99 (2011); *see, e.g.*, *In re Kirwan Offices*, 592 B.R. at 509-12.

13.     That leaves the State AGs' contention that so-called "police power claims" should not be subject to non-debtor releases.  Yet in claiming an absence of authority on the issue, the State AGs merely invoke *Metromedia*'s rule that non-debtor releases must be subject to limitations, and rely on the assertion that the Second Circuit has not approved of non-debtor releases "in circumstances such as these."  State AGs Mot. at 3-4.  Again, determining whether these particular cases fall on the permissible or impermissible side of the *Metromedia* line requires a court to "parse the facts of the case before it to see whether a significant non-debtor financial contribution plus other unusual factors render a situation so 'unique' that non-debtor releases are appropriate."  *In re Karta*, 342 B.R. at 55.

14.     It follows that this Court's application of the *Metromedia* standard to the circumstances of these cases—including with respect to "the objectors' expressed public interest," Bench Ruling at 156—does not involve a question of law as to which there is no controlling decision.  *See In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 138-39 (Bankr. S.D.N.Y. 2016) (denying certification of supposedly "novel questions" of "first impression" because "business judgment standard and its application to a decision to reject pursuant to section 365 of the Bankruptcy Code involve well-established principles of law, have been addressed in countless decisions in this Circuit, and do not 'involve[] a question of law as to which there is no controlling decision'" (alteration in original)).  Reinforcing the point, even if viewed through a legal lens, novel arguments do not make controlling precedent any less so.  *See In re Goody's Fam. Clothing, Inc.*, No. 09-cv-409, 2009 WL 2355705, at *2 (D. Del. July 30, 2009) ("The Court need not conclude that this case presents a question of first impression merely because Debtor-Appellants have innovated a novel argument based upon the Third Circuit's decision . . . , which applied principles of statutory interpretation to a *different* provision of the bankruptcy code."); *In re*

*Ladder 3 Corp.*, No. 17-cv-4733, 2018 WL 2298349, at *3 (E.D.N.Y. Mar. 28, 2018) (declining to "artificially transform a simple application of" a federal rule "into a novel legal question" where there was "no controlling decision addressing the precise question . . . not because the legal question [was] open, but because no one ha[d] made such an obviously flawed argument").

### B. Applying Longstanding Precedent To The Circumstances Of These Cases Is Not A Matter Of Public Importance

15.    Certification is also not warranted under the "matter of public importance" clause of section 158(d)(2)(A)(i). 28 U.S.C. § 158(d)(2)(A)(i).  As recently explained in *In re Sabine Oil*, the application of an agreed-upon, broad standard to the specific facts of a case falls outside this statutory criterion.  *See* 551 B.R. at 141 ("While 'Nordheim tries desperately . . . to re-cast the Court's decision about the reasonableness of Sabine's actions concerning its contracts as a referendum on Texas property law and all contracts of similarly-situated parties in the oil and gas industry,' the Debtors are correct in their assertion that the Court's fact-specific holdings did not extend beyond the circumstances and contracts in this case." (ellipsis in original) (footnote omitted)).  For the reasons discussed in the preceding section, that is the situation here.  *See In re General Motors Corp.*, 409 B.R. 24, 28 (Bankr. S.D.N.Y. 2009) ("[I]t's already been decided by the Circuit; deciding it again is not a matter of public importance.").

16.    Resisting this conclusion, Appellants mainly recount the history of the opioid epidemic, the Sacklers' role in the ongoing crisis, and media coverage of these cases.  UST Mot. at 20-22; State AGs Mot. at 2-3.[9]  The Official Committee is all too familiar with the backdrop of these appeals:  since its formation, the Official Committee has advocated *on behalf of all unsecured creditors* for an outcome that not only maximizes value for those harmed by the conduct of the

---

[9] It is sad and tragic that the Appellants are attempting to utilize the horrors of the opioid epidemic to their advantage in an attempt to *undo* the numerous and complicated settlements and underlying Plan that 97% of the voting claimants approved, and *every single ad hoc group in these Cases* supports.

Debtors and the members of the Sackler family, but also allocates such value fairly among numerous creditor constituencies. Those constituencies include personal injury victims (such as children diagnosed upon birth with neonatal abstinence syndrome), hospitals, insurance ratepayers, third-party payors (such as employer and government-sponsored health insurance plans administered by these companies), states, municipalities, Native American Tribes, public schools and the federal government.

17. To be clear, the success and implementation of the Plan, which represents the best available option for creditors despite its imperfections, is of paramount importance. But whether a "dispute has received substantial news coverage" is not the barometer for a "matter of public importance" as that term is used in section 158(d)(2)(A)(i). *In re Sabine Oil*, 551 B.R. at 141. "Simply because a matter is important to certain members of the public does not render it a matter of 'public importance' that meets the standard for direct certification." *Id.* Instead, "the matter on appeal must 'transcend' the litigants and involve 'a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case.'" *Id.*[10]

18. Here, there are undoubtedly a massive number of creditors that care deeply about whether the UST and the State AGs succeed in scuttling the non-debtor releases at the heart of the Plan. Should that occur, the Plan will implode, jumpstarting a race to the courthouse with the State AGs best positioned (based on the progress of their cases during the pre-petition period) to get there first, and personal injury victims—who would benefit from abatement and compensation under the Plan—certain to lag behind. The State AGs' desire to run that race does not warrant

---

[10] Appellants' primary authority, *In re Springfield Hosp., Inc.*, 618 B.R. 109 (Bankr. D. Vt. 2020), arises in a markedly different legal and factual circumstance. At any rate, to the extent the case understands the "public importance" inquiry to turn on the impact of a case on a community, "that basis [for certification] appears to be in tension with *Weber*'s conclusion that section 158(d)(2)(A) was intended to facilitate the decision of pure questions of law." *In re Johns-Manville Corp.*, 449 B.R. 31, 34 n.3 (S.D.N.Y. 2011).

certification. *See In re General Motors*, 409 B.R. at 28 (denying certification over "[w]hether successor liability can be imposed in section 363 sales," even though "it's important to the individual litigants concerned, who understandably wish to proceed against as many parties as they can to recover on their claims"). Nor does the fact that the creditor body in these appeals eclipses that of a typical bankruptcy. *See In re Lehman Bros. Inc.*, No. 13-cv-5381, 2013 WL 5272937, at *3-5 (S.D.N.Y. Sept. 18, 2013) (denying certification despite argument that decision will "affect[] the enforcement remedies available to parties" and "will have an impact on the 'repo and larger securities market' in the United States").

19.     If anything, those considerations point decidedly in the opposite direction. Even where an appellant argues in favor of a "'police-regulatory' exception," courts have held that "the 'public importance' analysis weighs heavily against certification" because the analysis "mandates that the Court not permit creditors seeking to achieve their own agenda" to endanger diligent and good-faith work that has "resolve[d] critical issues in an efficient manner." *In re Nortel Networks Corp.*, No. 09-10138, 2010 WL 1172642, at *2 (Bankr. D. Del. Mar. 18, 2010). Here, the UST's and the small minority of dissenting State AGs' agendas are not a "matter of public importance" within the meaning of section 158(d)(2)(A)(ii). Any public importance lies in preventing their appeals from derailing years of negotiation and work on behalf of hundreds of thousands of individual creditor-victims represented by the Official Committee and ad hoc groups—not to mention vast numbers of states, cities, towns, counties, and Native American Tribes—to secure the Sackler Releases and bring the Plan to fruition.[11]

---

[11] Indeed, one could easily argue that the importance to the public of the Plan being confirmed—resulting in funds for abatement and victim compensation, as well as funding of medication assisted treatment, harm reduction organizations, peer counseling, programs for children born with NAS, hospitals, and schools with special programs (just to name a few)—should be the focus of the Appellants.

## II. Courts' Applications Of The *Metromedia* Standard Have Not Resulted In Conflicting Decisions Of Law In This Circuit

20.     The UST and the California AG also assert that certification is warranted under the second "conflicting decisions" prong of section 158(d)(2)(A).  UST Mot. at 24-25; Cal. AG Mot. at 2.  The other State AGs offer only a halfhearted endorsement, all but conceding that this ground for certification is not applicable.  State AGs Mot. at 2 n.1.  Those State AGs are correct not to overreach because the requisite legal uncertainty over non-debtor releases does not exist in the Second Circuit.

21.     It is hornbook law that any "'conflicting decisions' must exist . . . within [a] particular circuit" and that "[a] split among the circuits is not sufficient to warrant certification." 1 COLLIER ON BANKRUPTCY ¶ 5.06[4][c] & n.37; *see also Weber*, 484 F.3d at 161 ("We do not perceive a conflict of such a nature that creates uncertainty in the bankruptcy courts, as all three of the courts within this circuit to have considered the question have held that New York's homestead exemption applies retroactively.").  In addition, the statute by its terms requires that the decisions present a conflict over "a question of law."  28 U.S.C. § 158(d)(2)(A)(ii).

22.     In the Second Circuit, there are numerous examples of lower courts approving, and appellate courts upholding, non-debtor releases against a variety of challenges.  *See* p. 5, *supra*. These courts do so by *uniformly* applying the longstanding and explicit rule that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."  *In re Metromedia*, 416 F.3d at 141 (quoting *In re Drexel Burnham Lambert Grp.*, 960 F.2d at 293).  This Court followed that rule.  *See* Bench Rule at 131-32 (analyzing under *Metromedia* "whether under the remaining applicable standards and the facts of these cases the plan's third-party claims release in favor of the shareholder released parties should be imposed").

23.     The UST and the California AG nonetheless insist that there is a certifiable intra-circuit conflict here, pointing to *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019).  But those parties mischaracterize *Aegean Marine* as rejecting non-debtor releases writ large and as a matter of law.  To the contrary, for all its criticisms of such releases, *Aegean Marine* recognizes—as it must—the "command[] by the Second Circuit in *Metromedia*" that a court may approve a non-debtor release "where a *particular* release is essential and integral to the reorganization itself."   599 B.R. at 726-27 (emphasis added).  The court went on to disapprove of the "particular releases" at issue only because "no particular third-party claims have been identified that, if pursued, would undermine the restructuring and the deals that are part of that restructuring." *Id.* at 727-30.

24.     The same is true of the UST's other authority.  *See In re SunEdison*, 576 B.R. 453, 461-64 (Bankr. S.D.N.Y. 2017) (holding that "the Debtors have failed to demonstrate that the third party releases are appropriate under *Metromedia*" because, *inter alia*, "the Debtors have not identified which third party claims will directly impact their reorganization").  Indeed, despite disapproving a proposed non-debtor release, the court in *SunEdison* explained that "some form of a third party release may appropriately bind the Non-Voting Releasors" and "granted leave to propose a modified form of release that will bind the Non-Voting Releasors." *Id.* at 463-64.[12]

25.     All of this makes readily apparent that the UST and the California AG mistake the fact-specific application of the *Metromedia* standard for a (non-existent) intra-circuit dispute over the legal standard to be applied.  It is entirely unsurprising that, as noted above, courts "pars[ing] the facts of the case before it to see whether a significant non-debtor financial contribution plus

---

[12] In a footnote, the UST makes the passing suggestion that there is a divide in the Southern District of New York "on what constitutes consent for third-party releases."  UST Mot. at 25 n.13.  But this Court did not rely on any consent theory in approving the Plan.  *See* Bench Ruling at 105.  As *SunEdison* makes clear in separately analyzing the question of consent, that issue is distinct.  *See* 576 B.R. at 458-61.

other unusual factors render a situation so 'unique' that non-debtor releases are appropriate" might

come to a range of conclusions.  *In re Karta*, 342 B.R. at 55.  That range of conclusions does not

mean the Confirmation Order "involves a question of law requiring resolution of conflicting

decisions."  28 U.S.C. § 158(d)(2)(A)(ii).

### III. A Direct Appeal Would Not Materially Advance The Progress Of The Case

26.    Finally, Appellants assert that a direct appeal would "materially advance the

progress of the case."  28 U.S.C. § 158(d)(2)(A)(iii); *see* U.S. Trustee Mot. at 25-27; State AGs

Mot. at 5.  That assertion, however, is based on the garden-variety assumption that skipping the

district court would be faster than not.  That is insufficient to justify certification of a direct appeal:

> [T]he only argument for expedition is that the appeal will be quicker because it need
> only be heard by one court—the Court of Appeals.  That argument can be made in
> every case where there is an appeal involving a final judgment of the Bankruptcy
> Court.  If valid, the argument would eliminate appeals to the District Court, contrary
> to the statement by the Court of Appeals that the normal appellate process should
> proceed so that the Court of Appeals is provided with the views of the District Court
> to aid in the fair decision of the appeal.

*In re Johns-Manville*, 449 B.R. at 34; *see also Weber*, 484 F.3d at 160 (noting that "Congress was

aware of the dangers of leapfrogging the district court in the appeals process").

27.    In any event, Appellants are wrong.  All of the parties are prepared to move with

alacrity in the district court.   Indeed, at the September 30, 2021 status conference, counsel for the

UST stated that, although he had just received approval from the Solicitor General to seek a direct

appeal, the intention was still to "go on a dual track and try to deal with the appeal on the merits

in the district court on an expedited basis," with argument "hopefully before . . . November 14th."

Sept. 30, 2021 Hr'g Tr. at 15-16; *see also In re Johns-Manville*, 449 B.R. at 34 (declining

certification because '[t]he appeals will soon be fully briefed"); *In re Karta*, 342 B.R. at 46-47

(resolving appeal of non-debtor releases within one month of entry of confirmation order and

weeks after granting expedited appeal).  This Court then confirmed the other Appellants' support

for expedition, with some specifically stating support for "the expedited briefing schedules that's been discussed." Sept. 30, 2021 Hr'g Tr. at 17-19.

28.     Since then, the district court at an October 12, 2021 status conference ordered expedited briefing that will conclude on November 19, 2021, with oral argument to follow on November 30, 2021. In short, there will be oral argument on the appeal issues in six short weeks. How would certification of a direct appeal advance these Cases any more quickly?

29.     In contrast to that fast-paced schedule, it could take months for the Second Circuit to determine whether it will accept a direct appeal—not to mention to resolve the appeal on the merits. *See Weber*, 484 F.3d at 160 ("[D]istrict courts tend to resolve bankruptcy appeals faster than the courts of appeals . . . ."). Indeed, there is a good chance that the expedited proceedings the district court has already ordered would not alter the timing of Second Circuit review at all. And in the event the Second Circuit in its discretion *declines* to accept the direct appeal, "the certification process would have lengthened the appellate process rather than advanced it." *In re Johns-Manville*, 449 B.R. at 34.

30.     Appellants also incorrectly contend that there are no "salutary effects of allowing [these] cases to percolate through the normal channels." *Weber*, 484 F.3d at 160. The district court could aid the Second Circuit's review of numerous "fact-intensive" issues—extending well beyond whether the circumstances of these cases satisfy *Metromedia*—that Appellants intend to raise on appeal. *Id.* at 158. Those issues include the adequacy of the Plan disclosure statement and solicitation materials, best interest of creditors under Bankruptcy Code section 1129(a)(7), improper classification of claims, and admission of certain evidence at the confirmation hearing.

31.     In addition, Appellants intend to challenge this Court's Article I jurisdiction to approve non-debtor releases under *Stern v. Marshall*, 564 U.S. 462 (2011). Should the Second

Circuit agree on direct appeal that such approval must come from an Article III court, the appeals would most likely boomerang to the district court—creating even more delay. *See, e.g.*, *Wortley v. Bakst*, 844 F.3d 1313, 1322 (11th Cir. 2017) (finding no appellate jurisdiction but ordering bankruptcy court's final order transferred to district court for review). A district court appeal, by contrast, could remove that issue from the appeal altogether. *See Amended Standing Order of Reference M10-468* (S.D.N.Y. 2012) ("[T]he district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy court could not have entered a final order or judgment consistent with Article III of the United States Constitution.").

32.     For all of these reasons, a district court appeal also provides the best chance to allow the Plan to go effective following issuance of an appellate decision, either on or shortly after the earliest possible date (*i.e.*, December 8, 2021). Prompt implementation of the Plan is critical, as each day the Plan is not effective is another day funds for opioid abatement and victim compensation do not reach those desperately in need. That is "prejudice" by any measure. UST Mot. at 27. It is unclear why Appellants would risk delaying the Effective Date of the Plan through a direct appeal to the Second Circuit, when a district court appeal proceeding under the expedited schedule announced yesterday is the quickest form of Article III review that they demand prior to Plan implementation and thus most directly serves "the mission of these cases" to "provide remedies for those harmed by the opioid crisis." *Id.* at 26.

## CONCLUSION

33.     For the reasons set forth herein, the Official Committee respectfully requests that the Court deny the Certification Motions.

Dated:  New York, New York
       October 13, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Arik Preis*

Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Z.W. Julius Chen
Sara L. Brauner
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
chenj@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*