UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                           :
In re                         :         Chapter 11
                           :
PURDUE PHARMA L.P., *et al.*,     :         Case No. 19-23649 (RDD)
                           :
                  Debtors. :         Jointly Administered
                           :
------------------------------------------------------- x

**SECOND AMENDED MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES TRUSTEE'S AMENDED EXPEDITED MOTION FOR A STAY OF CONFIRMATION ORDER AND RELATED ORDERS PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007**

RAMONA D. ELLIOTT                   WILLIAM K. HARRINGTON
Deputy Director/General Counsel      United States Trustee, Region 2
P. MATTHEW SUTKO              LINDA A. RIFFKIN
Associate General Counsel            Assistant United States Trustee
BETH A. LEVENE                     PAUL K. SCHWARTZBERG
SUMI K. SAKATA                     BENJAMIN J. HIGGINS
Trial Attorneys                       Trial Attorneys

Department of Justice                Department of Justice
Executive Office for United States     Office of the United States Trustee
  Trustees                               201 Varick Street, Room 1006
441 G Street, N.W., Suite 6150        New York, NY 10014
Washington, DC 20530             (212) 510-0500
(202) 307-1399                      Fax: (212) 668-2361
Fax: (202) 307-2397

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND .................................................................................................................. 5

I.     The Confirmation Proceedings. .................................................................................. 5

II.    The Advance Motion ................................................................................................ 10

LEGAL STANDARD.......................................................................................................... 14

ARGUMENT ...................................................................................................................... 15

I.     The Court Should Stay the Confirmation Order. ..................................................... 15

     A.     The United States Trustee Has a Likelihood of Success on the Merits. ............... 15

          1.     The Non-Debtor Releases Violate the Bankruptcy Code........................... 16

          2.     The Extinguishment of the Releasing Parties' Causes of Action Against the Sackler Family and Other Non-Debtors Is Unconstitutional for Several Independent Reasons. ................................................................... 18

               a.     The Non-Debtor releases violate the Due Process Clause............ 18

                    i.     The Plan provisions extinguishing, without compensation, non-debtors' causes of action against the Sackler Family and other non-debtors are expansive yet unintelligible. ......... 18

                    ii.    The Plan violates the victims' rights under the Due Process Clause for several reasons....................................................... 22

               b.     The releases are beyond the scope of the Bankruptcy Clause. ..... 26

               c.     This Court lacks constitutional authority to involuntarily release non-debtors' state-law claims against other non-debtors.............. 28

          3.     Second Circuit Precedent Does Not Authorize These Releases................. 29

     B.     The Balance of Harms Weighs in Favor of a Stay................................................ 32

II.    The Court Should Also Stay the Advance Order............................................................. 37

CONCLUSION.................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACC Bondholder Grp. v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007)...................................................................................15, 25, 35

*Adams v. Zarnel (In re Zarnel)*,
    691 F.3d 156 (2d Cir. 2010)...................................................................................................32

*In re Aegean Marine Petroleum Network Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019).....................................................................................31

*Bank of NY Trust Co., NA v. Official Unsecured Creditors Comm. (In re The
    Pacific Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ..................................................................................................34

*Blixseth v. Credit Suisse*,
    961 F.3d 1074 (9th Cir. 2020) ................................................................................................17

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995).................................................................................................................28

*Central Va. Cmty. Coll. v. Katz*,
    546 U.S. 356 (2006).................................................................................................................27

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)......................................................................................................15

*In re City of Detroit, Michigan*,
    838 F.3d 792 (6th Cir. 2016) ..................................................................................................30

*In re Continental Airlines*,
    91 F.3d 553 (3d Cir. 1996) (en banc)......................................................................................30

*Czyzewski v. Jevic Holdings Corp.*,
    137 S. Ct. 973 (2017)......................................................................................................3, 17, 30

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
    Network, Inc.)*,
    416 F.3d 136 (2d Cir. 2005)........................................................................................ *passim*

*Elliott v. General Motors LLC (In re Motors Liquidation Co.)*,
    829 F.2d 135 (2d Cir. 2016)............................................................................................23, 36

*Giaimo v. DeTrano (In re DeTrano)*,
   326 F.3d 319 (2d Cir. 2003)...........................................................15

*In re Johns-Manville Corp.*,
   551 B.R. 104 (S.D.N.Y. 2016)........................................................23

*Kelly v. Honeywell Int'l, Inc.*,
   933 F.3d 173 (2d Cir. 2019)...........................................................15

*Law v. Siegel*,
   571 U.S. 415 (2014)..........................................................3, 17, 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)........................................................................30

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
   478 U.S. 501 (1986)........................................................................25

*Logan v. Zimmerman Brush Co.*,
   455 U.S. 422 (1982)........................................................................22

*In re Lowenschuss*,
   67 F.3d 1394 (9th Cir. 1995)..........................................................17

*Martinez v. State of Cal.*,
   444 U.S. 277 (1980)........................................................................23

*Mohamed v. Reno*,
   309 F.3d 95 (2d Cir. 2002).............................................................15

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................14, 32

*In re One2One Communications, LLC*,
   805 F.3d 428 (3d Cir. 2015)...........................................................30

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)..................................................................24, 25

*In re Quigley Co.*,
   676 F.3d 45 (2d Cir. 2012).............................................................17

*Railway Lab. Executives' Ass'n v. Gibbons*,
   455 U.S. 457 (1982)........................................................................26

*Société Internationale v. Rogers*,
   357 U.S. 197 (1958)........................................................................23

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ..................................................................................30

*Stern v. Marshall,*
    564 U.S. 462 (2011) ............................................................................28, 29

*Trump v. Deutsche Bank AG,*
    943 F.3d 627 (2d Cir. 2019), *vacated on other grounds by Trump v. Mazars*
    *USA, LLP,* 140 S. Ct. 2019 (2020) .........................................................15

*Trump v. Int'l Refugee Assistance Project,*
    137 S. Ct. 2080 (2017) ...........................................................................15

*United States v. Ward Baking Co.,*
    376 U.S. 327 (1964) ................................................................................25

*In re VeroBlue Farms USA, Inc.,*
    6 F.4th 880 (8th Cir. 2021) .....................................................................30

*In re W.R. Grace Co.,*
    --- F.4th ----, No. 20-2171, 2021 WL 4186678 (3d Cir. Sep. 15, 2021)..........................16, 17

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ................................................................................25

*In re Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015) ................................................................................28

*In re Western Real Estate Fund Inc.,*
    922 F.2d 592 (10th Cir. 1990) .................................................................17

*In re Zale Corp.,*
    62 F.3d 746 (5th Cir. 1995) .....................................................................17

**Statutes**

11 U.S.C. § 101(5) ........................................................................................20

11 U.S.C. § 101(10) ......................................................................................20

11 U.S.C. § 105(a) .............................................................................10, 12, 18

11 U.S.C. § 363(b) ................................................................................10, 12

11 U.S.C. § 523 ............................................................................................16

11 U.S.C. § 524(a) ........................................................................................16

11 U.S.C. § 524(e) ...............................................................................................16, 17

11 U.S.C. § 524(g) ..........................................................................................16, 17, 24

11 U.S.C. § 1126 ..........................................................................................................32

11 U.S.C. § 1129(a)(1) ................................................................................................17

11 U.S.C. § 1141(d) ............................................................................................16, 17

28 U.S.C. § 157(a) ......................................................................................................28

28 U.S.C. § 157(c)(1) ..................................................................................................28

28 U.S.C. § 158(d)(2) ..................................................................................................33

28 U.S.C. § 1334(b) ....................................................................................................28

## Other Authorities

Fed. R. Bankr. P. 8007..................................................................................1, 2, 10, 14

Fed. R. Bankr. P. 9019(a) .........................................................................................27

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .........................32

U.S. Const. Amndt. 5...................................................................................................26

U.S. Const. art. I, § 8, cl. 4..........................................................................................26

TO:    **THE HONORABLE ROBERT D. DRAIN,**
       **UNITED STATES BANKRUPTCY JUDGE:**

Pursuant to Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule") 8007 and 9013,

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"),

hereby respectfully submits this second amended memorandum of law in support of his

Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending

Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 (the "Stay Motion").  The Stay

Motion seeks a stay pending the United States Trustee's appeals of (1) the Court's September 17,

2021 Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint

Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors,[1] ECF Doc.

No. 3787 (the "Confirmation Order") and the Modified Bench Ruling on Request for

Confirmation of Eleventh Amended Joint Chapter 11 Plan (the "Modified Bench Ruling"), ECF

Doc. No. 3786, and (2) the related September 15, 2021 Order (I) Authorizing the Debtors to

Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco,

(II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

Other Related Relief, ECF Doc. No. 3773 (the "Advance Order").[2]  In support thereof, the

United States Trustee respectfully states:

## **PRELIMINARY STATEMENT**[3]

The Confirmation Order—approving the Twelfth Amended Joint Chapter 11 Plan of

Purdue Pharma L.P. and its Affiliated Debtors, along with supplements, schedules, and exhibits

to the Plan (including not limited to the Shareholder Settlement Agreement) (collectively, the

"Plan")—and the related Advance Order should be stayed pending the resolution of the appeals

filed by the United States Trustee.  The Court should grant the stay because the United States

Trustee has a substantial possibility of success on appeal and because the harm that would result

from denying a stay outweighs any potential harm from granting one.

The United States Trustee has a likelihood of success on appeal because the Confirmation

Order violates the Bankruptcy Code (the "Code") and the Constitution.  Particularly in light of

recent Supreme Court precedent, there is a substantial chance that the appellate court will reverse

the Confirmation Order's extinguishment of the rights of so many non-debtors against so many

other non-debtors without their knowing and informed consent, adequate notice, or an

opportunity to be heard.  As argued in the United States Trustee's objection to confirmation of

the Debtors' Sixth Amended Plan, the Bankruptcy Code prohibits what amounts to a world-wide

---

[2]  On September 15, 2021, after the Court entered the Advance Order, the United States Trustee filed his original Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007, ECF Doc. No. 3778, noting that the United States Trustee would amend the motion once the Confirmation Order is entered.  This amended Motion has been updated in light of the entry of the Confirmation Order and the Modified Bench Ruling.

[3]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, ECF No. 3526.  The United States Trustee has also objected to the subsequently filed amended plans.  *See* ECF Doc. Nos. 3636, 3710.

2

opioid-related discharge of hundreds, possibly thousands, of non-debtors who have not

themselves filed for bankruptcy.  And the Supreme Court has made clear that bankruptcy courts

cannot legislate by creating rights not specified in the Code by Congress, even in "rare" cases.

*Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 987 (2017); *Law v. Siegel*, 571 U.S. 415, 424,

427 (2014).  Moreover, while the United States Trustee does not agree that such non-debtor

releases are ever appropriate under the Code, the non-debtor releases here do not pass muster

even under the dicta of *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia

Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*").  Indeed, the Second Circuit

has never addressed the constitutional implications of non-consensual non-debtor releases like

those here.  Depriving countless victims of the opioid crisis of their direct causes of action

against the myriad Sackler Family members and other non-debtors—many of whom are

unidentified—cannot be reconciled with either the Due Process Clause or the Bankruptcy Clause

of the Constitution.  Nor does a non-Article III court have constitutional authority to render a

final judgment that would extinguish state-law causes of action between non-debtors.

This likelihood of success on appeal must be considered together with the significant and

irreparable harm that would result from denying a stay.  The Confirmation Order harms both the

public and countless individuals by extinguishing the rights that opioid victims hold against

possibly thousands of Sackler Family members and associated parties, all of whom will be

released without a full accounting of their role in and liability for the opioid disaster in a court of

law in which their victims are entitled to be heard.  Absent a stay, the non-debtor opioid victims

will be irreparably harmed by having their causes of action against the non-debtor Sackler

Family and others extinguished by the bankruptcy court in the Debtors' cases without the

victims' knowing and informed consent, without constitutionally adequate notice, and without

the releasees themselves filing for bankruptcy.  Moreover, if a stay is denied, appellees may

attempt to evade appellate review altogether by arguing that the appeal has become equitably

moot.  Although the United States Trustee does not believe the equitable-mootness doctrine

would apply, if meaningful appellate review of the Confirmation Order—which exceeds the

adjustment of the Debtors' relationship with their creditors and falls outside the Code—is

undermined by the denial of a stay pending appeal, public confidence in the bankruptcy system

may be irredeemably shaken.

There is no countervailing harm that would justify denying a stay.  Indeed, the Debtors

noted in their Disclosure Statement the possibility that a confirmation order could be stayed but

identified no harm that would result from such a stay.  ECF Doc. No. 2983 at 320.[4]  The Debtors

have acknowledged that the Plan cannot become effective immediately.  *See* ECF Doc. No. 3626

at 3.  And any potential delay in distributions can be minimized if any appeal is expedited.  *See*

ECF Doc. No. 3711 at 88 (Shareholder Settlement Agreement § 2.09[5]).

The Confirmation Order obliterates innocent parties' rights against parties other than the

Debtors.  For the reasons that follow, the Court should grant the relief requested, and stay the

Confirmation Order.

---

[4]  Cited page numbers refer to the ECF pagination at the top of the referenced document.

[5]  Although the Shareholder Settlement Agreement has not yet been executed, it evidences the parties' intended approach to an appeal.

## BACKGROUND

1.      Purdue Pharma L.P. and its affiliated debtors (collectively, the "Debtors")
commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019
(the "Petition Date").

2.      The Debtors are pharmaceutical companies that manufactured, sold, or
distributed, among other products, extended-release, long-acting opioid pain medications. *See*
First Day Brief, ECF Doc. No. 17 at 4.

3.      The Debtors are wholly owned by a non-debtor, Pharmaceutical Research
Associates LP ("PRA"). *Id*. at 19.  PRA is owned by two entities, each of which is ultimately
owned by various trusts for the benefit of Debtors' ultimate owners, members of the Raymond
Sackler family and Mortimer Sackler family (collectively, the "Sackler Family"). *Id*.

4.      No member of the Sackler Family is a debtor in these cases.

## I.      The Confirmation Proceedings.

5.      On March 15, 2021, the Debtors filed a Disclosure Statement for Chapter 11
Plan for Purdue Pharma L.P. and its Affiliated Debtors.  ECF Doc. No. 2488.

6.      On April 21, 2021, the United States Trustee filed his objection to the Disclosure
Statement, arguing that it failed to contain adequate information regarding the releases and
injunctions contemplated for the Sackler Family and other non-debtors, and questioning this
Court's authority and jurisdiction to issue those releases.  ECF Doc. No. 2686.

7.      Hearings on the adequacy of the Disclosure Statement were held on May 26,
2021, June 1, 2021, and June 2, 2021.

8.      On June 3, 2021, the Debtors filed a Disclosure Statement for Fifth Amended
Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the

5

"Disclosure Statement").  ECF Doc. No. 2983; *see also* ECF Doc. No. 2982 (Fifth Amended Plan).

9.      On the same day, this Court entered the Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto (the "Disclosure Statement Order").  *See* ECF Doc. No. 2988.[6]

10.     On July 14, 2021, the Debtors filed the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "Sixth Plan").  *See* ECF Doc. No. 3185.  Section 10.7(b) of the Sixth Plan included a broad release of causes of action (the "Non-Debtor releases") against all "Shareholder Released Parties," which it defined to include the "Sackler Family Members"—which in turn was defined to include Raymond and Mortimer Sackler, any of their descendants, any current and former spouses, and any of their estates—as well as six other broad categories that encompass potentially thousands of individuals and entities.  *Id*. at 40, 41-42, 132-34.  Under its terms, the Shareholder Released Parties include Sackler Family members still unborn.

11.     On July 19, 2021, the United States Trustee objected to confirmation of the Sixth Plan, arguing that the Non-Debtor releases were unconstitutional, unauthorized by the Bankruptcy Code, and inconsistent with Second Circuit law.  ECF Doc. No. 3526.

---

[6] The United States Trustee has also appealed the interlocutory order approving the disclosure statement, which merged into the final confirmation order.

12.     Although the Non-Debtor releases do not apply to the United States, *see* ECF

Doc. No. 3185 at 144-47 (Sixth Plan, § 10.20), the United States Attorney for the Southern

District of New York also filed a statement echoing the due process and other concerns

expressed by the United States Trustee concerning the extinguishments.  ECF Doc. No. 3268.

13.     Other parties in interest, including victims, state and local governments, insurers,

and industry participants, also objected or expressed similar concerns.  *See, e.g.*, objection of

Mary Butler-Fink (ECF Doc. No. 3235), objection of Dr. Michael Masiowski (ECF Doc. No.

3262), objection of the City of Seattle (ECF Doc. No. 3264), objection of the States of

Connecticut and Maryland, and the District of Columbia (ECF Doc. No. 3270), objection of

Stacey Bridges (ECF Doc. No. 3271); objection of Gulf Underwriters Insurance Co. and St.

Paul Fire and Marine Insurance Co. (ECF Doc. No. 3272), joinder of the State and People of

California (ECF Doc. No. 3274), objection of certain Canadian municipality and First Nation

creditors (ECF Doc. No. 3275), objection of Washington, Oregon and Other Objecting States

(ECF Doc. No. 3276), objection of the State of Maryland (ECF Doc. No. 3278), joinder of the

State of Vermont (ECF Doc. No. 3279), objection of the State of Delaware (ECF Doc. No.

3280), objection of Joyce Villanave (ECF Doc. No. 3292), objection of certain distributors,

manufacturers and pharmacies (ECF Doc. No. 3306); and objection of D. Thomas Page (ECF

Doc. No. 3368.

14.     Almost three weeks later, and on the morning the confirmation trial was

scheduled to begin, Debtors filed a Seventh Amended Joint Chapter 11 Plan of Reorganization

of Purdue Pharma L.P. and Its Affiliated Debtors (the "Seventh Plan").  ECF Doc. No. 3545.

The Seventh Plan altered the release language of the Sixth Plan in small ways, but the text

continues to release an admittedly unknown, and unidentifiable, number of non-debtors from liability without the knowing and informed consent of the releasing parties. *Id*. at 42 (definition of "Shareholder Released Parties"); *id*. at 133-34 (Plan § 10.7(b)).

15.     The Court held the confirmation hearing on August 12-13, 2021, August 16-19, 2021, August 23, 2021, August 25, 2021, and August 27, 2021.

16.     On August 23, 2021, after the close of evidence and fewer than 10 hours before closing arguments were to begin on plan confirmation, Debtors filed an Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (the "Eighth Plan"). ECF Doc. No. 3632. As with the Seventh Plan, the Eighth Plan again altered the language of the Non-Debtor releases in small ways, but continued to release an admittedly unknown, and unidentifiable, number of non-debtors from liability without the knowing and informed consent of the releasing parties. *Id*. at 42-43 (definition of "Shareholder Released Parties"); *id*. at 131-132 (Plan § 10.7(b)).

17.     On August 23, 2021, the United States Trustee filed a supplemental objection to the Plan, for the same reasons that he objected to the Sixth Plan and also because there was no opportunity to cross-examine witnesses about the amended plan.[7] ECF Doc. No. 3636.

18.     On August 25, 2021, after the close of evidence and in the midst of closing arguments on plan confirmation, Debtors filed a Ninth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (the "Ninth Plan"). ECF Doc. No. 3652. As with the Seventh and Eighth Plans, the Ninth Plan once again altered the

---

[7] The United States Trustee further objected to the post-confirmation gatekeeping function the Plan sought to impose on this Court in a manner that would exceed this Court's constitutional authority. ECF Doc. No. 3636 at 2; *see* Argument Section I(A)(2)(c) *infra*.

language of the Non-Debtor releases in small ways, but continued to release an admittedly

unknown, and unidentifiable, number of non-debtors from liability without the knowing and

informed consent of the releasing parties. *Id*. at 42-43 (definition of "Shareholder Released

Parties"); *id*. at 131-132 (Plan § 10.7(b)).

19.     On August 26, 2021, the Debtors filed a Tenth Amended Joint Chapter 11 Plan

of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (the "Tenth Plan").  ECF

Doc. No. 3682.  This version of the Plan excludes certain non-opioid related claims from the

release.  *Id*. at 132.  But the Tenth Plan continued to release an admittedly unknown, and

unidentifiable, number of non-debtors from liability without the knowing and informed consent

of the releasing parties.  *Id*. at 43 (definition of "Shareholder Released Parties"); *id*. at 132-33

(Plan § 10.7(b)).

20.     On August 31, 2021, the Debtors filed an Eleventh Amended Joint Chapter 11

Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (the "Eleventh Plan").

ECF Doc. No. 3706.  As with the prior Plans, the Eleventh Plan continued to release an

admittedly unknown, and unidentifiable, number of non-debtors from liability without the

knowing and informed consent of the releasing parties.  *Id*. at 43 (definition of "Shareholder

Released Parties"); *id*. at 132-33 (Plan § 10.7(b)).

21.     On August 31, 2021, the United States Trustee filed a supplemental objection to

the Eleventh Plan, for the same reasons that he objected to the prior Plans, including that

additional amendments were made after the close of evidence.  ECF Doc. No. 3710.

22.     On September 1, 2021, the Court rendered an oral ruling stating that it would

confirm the proposed plan provided that two changes were made relating to claims against the

9

Sackler Family and other non-debtors. 9/1/21 Tr. at 134-35, 154-55. The first change required

that the Non-Debtor releases apply to claims where the Debtors' conduct is a legal cause or

legally relevant factor to the cause of action against the non-debtors. *Id*. at 134-35. The second

change was to a provision requiring that parties must first receive permission from this Court

before they may bring certain non-opioid claims that are not released against the Sackler Family

or other non-debtors. *Id*. at 154-55. The Court stated that it expected to enter the confirmation

order the next day. *Id*. at 163.

23.     On September 2, 2021, the Debtors filed a Twelfth Amended Joint Chapter 11

Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors. ECF Doc. No. 3726.

The Plan includes these amendments, but remains objectionable for the reasons explained in the

United States Trustee's objections to the prior version of the plan.

24.     On September 15, 2021, the United States Trustee filed a notice of appeal of the

Court's September 1, 2021, oral ruling confirming the Plan. ECF Doc. No. 3776.

25.     On the same day, he also filed his Expedited Motion for a Stay of Confirmation

Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure

8007, ECF Doc. No. 3778, which noted that the United States Trustee would amend the Motion

once the Confirmation Order is entered, if appropriate.

26.     On September 17, 2021, the Court entered the Confirmation Order, ECF Doc.

No. 3787, and Modified Bench Ruling, ECF Doc. No. 3786.

## II.     The Advance Motion

27.     On August 6, 2021, before the confirmation hearing began, the Debtors filed the

Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an Order

(I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master

10

Disbursement Trust and TopCo, (II) Directing Prime Clerk LLC to Release Certain Protected

Information, and (III) Granting Other Related Relief (the "Advance Motion"). ECF Doc. No.

3484.

28.    In the Advance Motion, the Debtors sought authorization to advance $6,855,468

to seven Creditor Trusts, the Master Disbursement Trust, and TopCo prior to consummation of

the Plan—the "Proposed Advances"—"in order to enable such entities to undertake advance

set-up work prior to the Effective Date, thereby allowing distributions to be made to creditors as

soon as possible after the Effective Date." *Id*. at 2.

29.    The Proposed Advances would be used for things such as retaining professionals

to advise about selecting a trust company, building the technology to analyze and process

claims, providing accounting and legal services, and compensating the trustees of the various

Plan trusts and the TopCo managers. *Id*. at 7-16.

30.    The Advanced Motion also sought authorization to have PI Data—defined as the

information in the proofs of claim filed by Holders of PI Claims, including names and social

security numbers, *id*. at 6, 13-14—disclosed to the Proposed PI Trustee, certain of his retained

advisors, and "in the Proposed PI Trustee's sole discretion, to his partners, associates,

employees and agents, to third-party vendors that he engages for the work," and certain Third-

Party Payors. *Id*. at 18, 20-21.

31.    The Debtors represented in the Motion that "the Debtors only seek to have this

Motion heard if the Plan is confirmed to ensure that the Proposed Advances are not wasted."

*Id*. at 4.

11

32.     Despite this statement, the Debtors sought to set the hearing on the Advance

Motion on August 19, 2021—before the confirmation hearing was scheduled to begin.  *See* Ex

Parte Motion for Entry of an Order Shortening Notice With Respect to the Debtors' Motion

Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an Order (I) Authorizing the Debtors to

Fund Establishment of the Creditor Trusts, the Master Disbursement Trust, and Topco,

(II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting

Other Related Relief, ECF Doc. No. 3485 at 2 (the "Motion to Shorten").

33.     On August 9, 2021, the States of Maryland, Connecticut, Oregon, and

Washington (the "Objecting States") objected to the Motion to Shorten.  ECF Doc. No. 3493.

The Objecting States argued that "Debtors' motions are nothing more than a transparent and

inappropriate attempt to put cart before horse so that they may circumvent the jurisdiction of the

appellate courts by invoking the doctrine of equitable mootness."  *Id*. at 2.

34.     On August 13, 2021, the United States Trustee objected to the Advance Motion

and the Motion to Shorten.  ECF Doc. No. 3555.  The United States Trustee noted that "the

Debtors only seek to take actions that are contemplated by the Plan" and thus the Confirmation

Order itself will authorize the relief requested by the Advance Motion.  *Id*. at 4.  The United

States Trustee also argued that the Advance Motion should be denied for the same reasons that

the Plan should not be confirmed.  *Id*.

35.     After the Objecting States and the United States Trustee filed their objections, on

August 25, 2021, the Debtors adjourned the hearing on the Advance Motion to September 13,

2021.  ECF Doc. No. 3660.

12

36.     On September 9, 2021, the Debtors filed a Reply to the Objections of the

Objecting States, the United States Trustee, and the Canadian Municipality Creditors and

Canadian First Nations Creditors to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A) and

363(B) for Entry of an Order (I) Authorizing the Debtors to Fund Establishment of the Creditor

Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release

Certain Protected Information, and (III) Granting Other Related Relief (the "Reply").  ECF

Doc. No. 3743.

37.     In the Reply, the Debtors stated that they agreed to add the following language

to the proposed order:

> The funding of the Proposed Advances shall not prejudice any appeals of the
> confirmation of the Plan and the fact of such Proposed Advances having been paid
> prior to the Effective Date of the Plan shall not support any argument that any such
> appeals are equitably moot.

*Id*. at 4.

38.     On September 13, 2021, the Court held the hearing on the Advance Motion.

39.     On September 15, 2021, the Court entered the Advance Order.  ECF Doc. No.

3773.  The Advance Order states that the "the limited objections to the Motion are overruled, in

part because of the Debtors' waiver at the Hearing of their right to argue that the grant of this

Order and the implementation of the relief granted herein would render any appeal of the

Court's confirmation of the Debtors' amended chapter 11 plan equitably moot."  *Id*. at 2.

40.     The Advance Order also states: "The funding of the Proposed Advances shall

not prejudice any appeals of the confirmation of the Plan and the fact of such Proposed

Advances having been paid prior to the Effective Date of the Plan shall not support any

argument that any such appeals are equitably moot."  *Id*. at 5.

41.    The Advance Order provides that "[t]he terms and conditions of this Order shall be immediately effective and enforceable upon its entry," *id.* at 6, despite the fact that the Confirmation Order had not yet entered.[8]

42.    On September 15, 2021, the United States Trustee filed a notice of appeal of the Advance Order.  ECF Doc. No. 3777.

## **LEGAL STANDARD**

Bankruptcy Rule 8007 provides that a request for a stay of a bankruptcy judge's order pending the outcome of an appeal "must ordinarily be presented to the bankruptcy judge in the first instance."  *See* Fed. R. Bankr. P. 8007.  To determine whether to grant a stay pending appeal, a court must consider four factors:

- whether the movant will likely succeed on the merits on appeal;

- whether the movant will suffer irreparable injury if the stay is denied;

- whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

- where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009).  Where the government is a party, the injury and public interest factors merge.  *Cf. Nken*, 556 U.S. at 426 (holding factors of "assessing the harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party").  There is substantial overlap between these factors and those that govern preliminary injunctions.  *Id.* at 434.  Under Second Circuit law, "[f]or a preliminary injunction to issue, the movant must establish (1) either (a) a likelihood of success on the merits or

---

[8] The Court stated at the hearing that it would enter the Confirmation Order shortly.

(b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019) (internal quotation marks omitted); *accord Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *Mohamed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002); *ACC Bondholder Grp. v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*, 361 B.R. 337, 346-47 (S.D.N.Y. 2007).[9]

"Before issuing a stay, it is ultimately necessary to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal alteration and quotation marks omitted). The balance of equities favors granting a stay here.

## ARGUMENT

I. **The Court Should Stay the Confirmation Order.**

A. **The United States Trustee Has a Likelihood of Success on the Merits.**

The United States Trustee is likely to succeed in any appeal of the Confirmation Order. In an appeal of an order of a bankruptcy court, the appellate court applies a *de novo* standard of review to questions of law and a "clear error" standard of review to factual findings. *Giaimo v. DeTrano (In re DeTrano)*, 326 F.3d 319, 321 (2d Cir. 2003). Contrary to this Court's ruling, the extinguishment of these non-debtors' direct causes of action against other non-debtors are

---

[9]  The Second Circuit applies a more stringent likelihood-of-success standard when a party is seeking to enjoin government action. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

unauthorized under the Bankruptcy Code, the Constitution, and governing authority, for many

reasons, including those that follow.

### 1.    The Non-Debtor Releases Violate the Bankruptcy Code.

The Non-Debtor releases in section 10.7(b) of the Plan are effectively a court-ordered

discharge of a potentially limitless group of non-debtors for world-wide opioid-related liability.

Indeed, the Non-Debtor releases are so broad that they discharge liability—such as for fraud and

willful misconduct, *see* ECF Doc. No. 3726 at 10 & 132-33 (definitions of "Cause of Action," &

§ 10.7(b))—that the individual non-debtors would not be able to have discharged even if they

had filed for bankruptcy, as certain debts would not have been dischargeable, *see, e.g.*, 11 U.S.C.

§ 523 (exceptions to discharge), (a)(2) (fraud), (6) (willful or malicious injury) & (7) (fine,

penalty, or forfeiture to governmental unit).  The Bankruptcy Code, however, prohibits courts

from extinguishing involuntarily the causes of action of non-debtor third parties against other

non-debtors with only one exception that does not apply here.  The Code specifies that "[a]

discharge of a debt of the debtor does not affect the liability of any other entity on, or the

property of any other entity for, such debt."  11 U.S.C. § 524(e).  Rather, the Code discharges

only the debtor's liabilities upon plan confirmation.  11 U.S.C. §§ 524(a), 1141(d)(1)(A).

Congress authorized bankruptcy courts to impose non-debtor releases in one narrow

circumstance.  Section 524(g) is the *only* congressional authorization of third-party releases, and

it applies exclusively to asbestos-related cases, where the plan can enjoin claims against a

specified set of non-debtors.  11 U.S.C. § 524(g).[10]  Because Congress expressly authorized only

---

[10] Section 524(g) does not apply here.  But even if it did, the released parties do not satisfy the threshold statutory
requirements to be eligible for a channeling injunction:  (1) be identifiable from the terms of the injunction; (2) have
"derivative liability"; and (3) satisfy one of four "statutory relationship" tests.  *In re W.R. Grace Co.,* --- F.4th ---,

this one exception, courts may not create others. *Cf. Law*, 571 U.S. at 424 ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."); *accord Jevic,* 137 S. Ct. at 987.

The Fifth, Ninth, and Tenth Circuits thus have held that section 524 "prohibits the discharge of debts of nondebtors." *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) (holding "§ 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors");[11] *In re Western Real Estate Fund Inc.*, 922 F.2d 592, 600 (10th Cir. 1990) ("Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders."); *but see Metromedia*, 416 F.3d at 141-43 (suggesting in dicta that non-debtor releases may be permitted in certain "rare" circumstances).

Section 524(e)'s prohibition on discharging non-debtors renders the Plan unconfirmable because section 1129(a)(1) prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code. In addition, section 1141(d) specifies the scope

---

No. 20-2171, 2021 WL 4186678, *2 (3d Cir. Sep. 15, 2021) ("*Grace II*"). As the Third Circuit recently explained, the protections of a section 524(g) channeling injunction simply "do not extend to all claims brought against third parties." *Id.* Moreover, there are an abundance of other statutory protections required by section 524(g) not present here, such as super-majority voting requirements for current claimants and the appointment of a future claimants' representative. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), (g)(4)(B)(i).

The Second Circuit's decision in *In re Quigley Co.*, 676 F.3d 45, 56 (2d Cir. 2012)—an asbestos case governed by Code provisions with express authority for third-party channeling injunctions—in no way supports the sweeping non-debtor releases and injunctions ordered here. Even though it ruled the bankruptcy court had jurisdiction to enjoin the third-party claims, the court ultimately ruled it had no statutory authority to do so under the facts of the case. Consistent with *Grace II*, *Quigley* held that the plaintiffs' claims against the third party, non-debtor parent could not be enjoined because the non-debtor parent failed the requirement that one of four statutory relationships be a legal cause of the third-party's liability. *Id.* at 60-61.

[11] *But see Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084-85 (9th Cir. 2020) (holding 11 U.S.C. § 524(e) did not preclude approval of exculpation clause extending to non-debtor third parties).

17

of discharge upon confirmation, and it does not include non-debtors.  The residual equitable

powers of section 105(a) do not allow what the governing statutory structure and section 524

neither authorize nor permit—and, indeed, expressly prohibit.  *Law*, 571 U.S. at 421.  Because

the Confirmation Order effectively discharges the Sackler Family and other non-debtors for any

world-wide opioid-related liabilities that they bear, it violates the Bankruptcy Code.

> **2.    The Extinguishment of the Releasing Parties' Causes of Action Against the Sackler Family and Other Non-Debtors Is Unconstitutional for Several Independent Reasons.**

> **a.    The Non-Debtor releases violate the Due Process Clause.**

As explained below, the Plan and its Non-Debtor releases violate the Fifth Amendment's

guaranty of due process by extinguishing non-debtors' causes of action against other non-debtors

without adequate notice, an opportunity to be heard, knowing and informed consent, or adequate

compensation.

> **i.    The Plan provisions extinguishing, without compensation, non-debtors' causes of action against the Sackler Family and other non-debtors are expansive yet unintelligible.**

Section 10.7(b) of the Plan provides, in relevant part, that "the Shareholder Released

Parties . . . shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever

and permanently released . . . by the Releasing Parties from any and all Causes of Action" that

are "based on or relating to, or in any manner arising from, in whole or in part, . . . the Debtors"

and "as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause

or is otherwise a legally relevant factor."  ECF Doc. No. 3726 at 132 (Plan § 10.7(b)).  The Plan

does not define what it means for a Debtor's conduct, omission, or liability to be an "otherwise

legally relevant factor" to a Cause of Action when such conduct, omission, or liability is not the

18

"legal cause" of the Cause of Action.[12]  Certain non-opioid claims are excluded from the release.
*Id.* at 31, 132 (definition of "Non-Opioid Excluded Claim," § 10.7(b)).

Dr. Richard Sackler testified that although he tried to read the prior iteration of the Non-Debtor releases, they were so "extremely dense" and would take such "an enormous amount of time to fully understand" that he gave up.  8/18/21 Tr. at 133.  The form of the Non-Debtor releases approved in the Plan remains equally impenetrable.  Section 10.7(b) remains over a page long and continues to cross reference several other definitions, such as the extensive 24-line long definition of "Cause of Action."  And despite six iterations since the Sixth Plan as to which the witnesses testified, the definitions in the most recently filed Plan of who is releasing whom under the Non-Debtor releases remain ambiguous.  ECF Doc. No. 3726 at 10, 43, & 132-133 (Plan, definitions of "Cause of Action," "Shareholder Released Parties," & § 10.7(b)).

The Plan's definition of "Releasing Parties"—those being stripped of their direct causes of action against other non-debtors—remains indecipherable.  Like section 10.7, it, too, cross-references several other definitions, which in turn cross reference more definitions.  *See* ECF Doc. No. 3726 at 40 (definition of "Releasing Parties," which includes the defined terms "Holders," "Interests," "Debtors," "Future PI Channeled Claims," and others).

Notably, one of the categories of "Releasing Parties" includes all "Holders" of "Future PI Channeled Claims."  *Id.*  The definition of a "Future PI Channeled Claim" in turn references several other definitions.  It is defined to include "any alleged opioid-related personal injury or similar opioid-related *Cause of Action* against any Released Party or Shareholder Released

---

[12]  This provision—precluding claims against non-debtors where a debtor's conduct is *either* a "legal cause" *or* "an otherwise legally relevant factor" to a Cause of Action—is notably broader than the limited third-party injunction allowed in asbestos cases, which may only bar claims against third parties who have both "derivative liability" *and* one of the four "statutory relationships."  *See* n.10, *supra*.

Party," other than certain defined types of claims such as "PI Channeled Claims," which according to the Plan's definitions, must have arisen prior to the Petition Date. *Id*. at 17-18 (emphasis added); *see also id*. at 27, 31, 33 (definitions of "PI Channeled Claim," "NAS PI Channeled Claim," and "Non-NAS PI Channeled Claim"). A "Future PI Channeled Claim" thus includes post-petition opioid-related "Causes of Action" against non-debtor released parties. "Cause of Action," in turn, is defined to subsume, among many other things, "Claims," which the Plan defines as having the meaning set by 11 U.S.C. § 101(5). *Id.* at 10 (definitions of "Cause of Action" and "Claim").

That the Releasing Parties extend beyond creditors (as defined by 11 U.S.C. § 101(10)) who have Claims against the Debtors to a wider range of persons or entities establishes that the "Releasing Parties" are not limited to just creditors in the Debtors' Plan. *See* 11 U.S.C. § 101(10) (defining "creditors" to include parties that hold "claims" against the debtor). In addition, creditors of the Debtors, regardless of whether they filed claims against the Debtors, are nevertheless releasing their separate claims against the Sackler Family and other non-debtors.

And the Plan's definition of the "Shareholder Released Parties"—those non-debtors getting off the hook through the Debtors' Plan—is unintelligible, too. As with section 10.7 itself and the definition of "Releasing Parties," the definition of "Shareholder Released Parties" references other definitions. ECF Doc. No. 3726 at 43. But it goes one step further and also references the separately filed Shareholder Settlement Agreement. The term is so complex and imprecise that no one—not even the Debtors' Chief Financial Officer or Mortimer Sackler himself—can identify who is released. *See* 8/12/21 Tr. at 110-12; 8/19/21 Tr. at 135-36, 139. And, as the Debtors' Chief Financial Officer testified, given that even he cannot identify who is

being released, the average opioid victim would not be able to do so, either.[13]  8/12/21 Tr. at 110.

The filing of several amendments since the Disclosure Statement, which gave notice of the Sixth

Plan, does not remedy the issue because the definitions remain equally complex.

The Plan (like the Sixth Plan) lists seven capacious categories of releasees, releasing

hundreds, potentially thousands, of individuals, entities, and assets.  ECF Doc. No. 3185 at 41-42

(Sixth Plan's definition of "Shareholder Released Parties"); ECF Doc. No. 3726 at 43 (Plan's

definition of "Shareholder Released Parties").  Among these are the "Sackler Family Members,"

defined to include Raymond and Mortimer Sackler, any of their descendants (including those as-

yet unborn), any current and former spouses, and any of their estates.  ECF Doc. No. 3185 at 40;

ECF Doc. No. 3726 at 41 (definition of "Sackler Family Members").  The Plan's definition of

"Shareholder Released Parties" also includes "the Persons identified on Exhibit X to the

Shareholder Settlement Agreement."  ECF Doc. No. 3726 at 43.  Exhibit X to the Shareholder

Settlement Agreement filed with the Seventeenth Plan Supplement lists over one-thousand line

entries of persons and entities, ECF Doc. No. 3711 at 305-333 (Seventeenth Plan Supplement,

Exhibit AA)—similar to the Sixth Plan's definition's reference to Appendix H to the Disclosure

Statement, ECF Doc. No. 3185 at 41.  And that number excludes entries that list categories

without names, including: "spouses, children and grandchildren" of certain persons and "assets,

businesses and entities" owned by certain people or entities.  *See*, *e.g.*, ECF Doc. No. 3711 at

306, 309, 310, 314.

---

[13] "Q: And would it be possible for an average opioid victim based on publicly available information to identify all of these assets and individuals that are getting released?"

"A: I would presume if I'm not, they wouldn't be able to, no."

8/12/21 Tr. at 110 (testimony of Chief Financial Officer Lowne).

And the Plan denies the victims any compensation for their extinguished causes of action against the released non-debtors.  Under the Plan, newly created trusts will pay victims only on their bankruptcy claims against the Debtors and not on their causes of action against the released non-debtors.  *See* ECF Doc. No. 3726 at 115 (Plan § 6.21); ECF Doc. No. 3787 at 333 (Non-NAS PI TDP § 2(b)(ii)); *id*. at 392 (NAS PI TDP § 2(b)(ii)).[14]  The Plan documents expressly prohibit any value being paid for pre-petition direct causes of action against the Sackler Family or other non-debtors for opioid-related personal injury claims.  *See* ECF Doc. No. 3787 at 333 (Non-NAS PI TDP § 2(b)(ii)) ("Distributions hereunder are determined *only* with consideration to a Non-NAS PI Claim held against the Debtors, *and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); *id*. at 392 (NAS PI TDP § 2(b)(ii)) ("Distributions hereunder are determined *only* with consideration to an NAS PI Claim held against the Debtors, *and not to any associated NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added).  The same is true for any opioid-related causes of action arising post-petition.  *See* ECF Doc. No. 3787 at 433 (PI Futures TDP § 3) ("A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim formerly held or that would have been held against a non-Debtor party.").

> ii.    **The Plan violates the victims' rights under the Due Process Clause for several reasons.**

The extinguished causes of action are the victims' property protected by the Due Process Clause, which applies in bankruptcy cases like this.  *See Logan v. Zimmerman Brush Co.*, 455

---

[14] Even direct creditors of the Debtors fare poorly under the Plan.  Purdue claimants—even those with catastrophic injuries—will receive as little as $3,500 and—in installments, over as long as a ten-year period for some—no more than $48,000.  *See* ECF Doc. No. 2983 at 15 (Disclosure Statement); ECF Doc. No. 3787 at 360 (Non-NAS PI TDP, Exhibit B § 6).  These victims' actual compensation will be even less because attorney's fees and holdbacks must be paid first.  ECF Doc. No. 2983 at 15 (Disclosure Statement).

U.S. 422, 428 (1982); *Martinez v. State of Cal.*, 444 U.S. 277, 281–82 (1980); *Société Internationale v. Rogers*, 357 U.S. 197, 209 (1958); *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.2d 135, 161 (2d Cir. 2016); *In re Johns-Manville Corp.*, 551 B.R. 104, 113 (S.D.N.Y. 2016).  The United States Trustee is not aware of any appellate court that has held that the Due Process Clause permits a bankruptcy court to non-consensually extinguish non-debtors' direct causes of action against other non-debtors.

The Due Process Clause is violated here.  First, the Plan violates the victims' constitutional right to adequate notice.  Many Releasing Parties never received notice of the Non-Debtor releases, and if they had some notice, were (like Dr. Sackler and CFO Lowne) unable to understand them.  *See* 8/12/21 Tr. at 92-94.  As explained in the preceding subsection, any notice was illusory because it was impossible to identify who was released and what claims were extinguished.  And much of the advertising cited as providing notice mentioned only the Sackler Family "and certain other individuals and related entities," ECF Doc. No. 2988 at 287-299 (Disclosure Statement Order, Exhibits 15 & 16); *see also* Joint Exhibits 937 ¶ 3, 938, 939 ¶ 3, 940, 941, 942, without disclosing that the releases included layers of trusts, unborn descendants, lawyers, and an unidentified array of others.  *Id.*; ECF Doc. No. 3726 at 43 (definition of "Shareholder Released Parties").

The Plan does not even make it possible for the victims to know who they may and may not sue.  The lengthy list of "Shareholder Released Parties" includes, among others, their:

> predecessors, successors, permitted assigns, subsidiaries (other than the Debtors), controlled affiliates, spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, [and] (B) current and former officers

and directors, principals, members and employees, in each case, solely in their respective capacities as such.

ECF Doc. No. 3726 at 43.  The reader is consigned to wondering who they might be.  And that runs afoul of the Due Process Clause.[15]

In obtaining plan confirmation, the Debtors conflated the due process notice afforded Purdue's creditors for their claims against Purdue with the due process notice for those with causes of action against the non-debtor Sackler Family members or other non-debtors.  ECF Doc. No. 3461 at 95-96.  For example, Debtors misfocused on notice given of the bar date in these bankruptcy cases.  But that had no bearing on the question whether there was adequate notice to the victims about the Plan's extinguishment of their direct causes of action against the Sackler Family members and other non-debtors.  8/12/21 Tr. at 90-91 (acknowledging notice of bar date did not refer to causes of action against non-debtors); *see also* Joint Exhibits 932, 933, 934, 935, 936.

Even if notice had been constitutionally sufficient, the Non-Debtor releases would still fail to satisfy due process because the Plan deprived the non-debtor Releasing Parties of their opportunity to be heard.  The "deep-rooted historical tradition that everyone should have his own day in court" is a fundamental right guaranteed by the Due Process Clause.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).  The Releasing Parties, however, were deprived of their day in court and given no opportunity to voluntarily litigate or settle their direct causes of action against solvent parties.  As this Court explained to one of the many victims who lost a loved one to opioids, even for the 140,000

---

[15]  By contrast, one of the requirements for the limited third-party injunction authorized in asbestos cases by 11 U.S.C. § 524(g) is that the injunction only bars claims against third parties who are "identifiable from the terms of such injunction (by name or as part of an identifiable group)." 11 U.S.C. § 524(g)(4)(A)(ii).

claims filed against the Debtors in these cases—which would not include causes of action against

non-debtors—"[t]he merits . . . have not yet been determined" and would not be until after the

Plan is confirmed.  8/16/21 Tr. at 51-59.  But for those with causes of action against the Sackler

Family members and other non-debtors that are being extinguished by this Plan, the merits of

their causes of action will never be determined because those victims will never be heard by any

court.

The victims' right to due process was additionally denied because their causes of action

against the Sackler Family members and many others were extinguished even though they never

gave knowing and informed consent.[16]  The Debtors' Plan simply stripped them of their causes

of action against a host of non-debtors.[17]

But due process guaranteed them the right to decide whether to litigate or to settle their

own causes of action and the Debtors and the Sackler Family members have identified no

exception that would deprive victims of that right.  *See Ortiz,* 527 U.S. at 846 (when construing

due process right, "the burden of justification rests on the exception"); *cf. Wal-Mart Stores, Inc.

v. Dukes*, 564 U.S. 338, 363 (2011) ("In the context of a class action predominantly for money

damages we have held that absence of notice and opt out violates due process.").  This absence

---

[16]  It is thus incorrect to characterize the Non-Debtor releases as a settlement of the claims by the non-consenting
third parties.  As this Court noted in its Modified Bench Ruling, a settlement "takes an agreement."  ECF Doc. No.
3786 at 100.  Courts may not impose a settlement over a party's objections, *see United States v. Ward Baking Co.,*
376 U.S. 327, 334 (1964) (holding that a court could not enter a "consent" judgment for the government without the
government's actual consent), and "parties who choose to resolve litigation through settlement may not dispose of
the claims of a third party . . . without that party's agreement."  *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO
C.L.C. v. City of Cleveland,* 478 U.S. 501, 529 (1986).

[17]  Even those holding non-opioid claims excluded from the release are not free to sue.  Rather, before suing a
Sackler Family member or other non-debtor Shareholder Release Party for such a non-opioid claim, a person first
needs this Court's permission.  ECF Doc. No. 3726 at 148 (Plan § 11.1(e)).  As no such permission is required to
bring an opioid-related claim that is outside the scope of the release, the Plan makes it more difficult to sue the
Shareholder Released Parties for non-released non-opioid claims than for non-released opioid claims.

of knowing and informed consent creates a likelihood of success on appeal.  *See In re Adelphia Comm. Corp.*, 361 B.R. at 358 (finding substantial possibility of success on appeal where a confirmed plan's incorporation of a settlement that was not authorized by the necessary parties "could be a fundamental violation of Appellants' constitutional due process rights" and granting stay pending appeal).

Finally, the victims received nothing for the loss of their causes of action against the Shareholder Released Parties.  As explained in the preceding subsection, the Plan forbids that.  That, too, violated the victims' due process rights.

It is no answer to say that these victims of the opioid crisis can receive compensation through the Plan for their claims against the Debtors.  That ignores the fact that they have lost their separate property rights in their direct causes of action against the Sackler Family and the many other non-debtors who are released.  The Sacker Family Members alone among the released parties have a net worth estimated at $11 billion.  ECF Doc. No. 2983 at 172 (Disclosure Statement).  Their full-throated demand for involuntary releases (for them and hundreds, potentially thousands, of cohorts) makes all too clear the extinguishment of these causes of action has value.  That violates the Due Process Clause.

**b.    The releases are beyond the scope of the Bankruptcy Clause.**

Because the extinguishment of direct causes of action held by non-debtor victims against other non-debtors involves non-bankruptcy claims, it also falls outside the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4.  "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'"  *Railway Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quoting *Continental Ill. Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 673 (1935)).  Releasing claims

by non-debtors against other non-debtors does not fall within the scope of this power because it adjusts a non-debtor's obligations—not the obligations of a debtor who is within the bankruptcy court's in rem jurisdiction.  While the Supreme Court has recognized the Bankruptcy Clause authorizes courts to issue "ancillary" orders to enforce their "in rem" adjudications, *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006), as argued in the United States Trustee's objection, the requested involuntary Non-Debtor releases here do not do so, *see* ECF Doc. No. 3256 at 21-22.

The Bankruptcy Clause permits bankruptcy courts to approve settlements between debtors and those who have liability to them.  The Debtors' claims against the Sackler Family or other non-debtors thus can be reduced to judgments that the Sackler Family or other non-debtors must pay.  Or, with the Court's approval under Fed. R. Bankr. P. 9019(a), the Debtors may settle such claims resulting in the Sackler Family making payments to the estate.  That's the stuff of bankruptcy.

But these non-consensual extinguishments of non-debtors' legal causes of action against non-debtors venture far beyond what the Bankruptcy Clause authorizes.  Even if the Bankruptcy Clause might ever authorize a release in other circumstances, the substance, nature and breadth of these releases, the vast number of non-debtors released, and the many non-debtor victims suffering extinguishment of their non-debtor causes of action without their knowing and informed consent puts it far outside the Bankruptcy Clause and what a confirmation order may coerce.

27

    **c.**    **This Court lacks constitutional authority to involuntarily release non-debtors' state-law claims against other non-debtors.**

In addition, as non-Article III judges, bankruptcy judges lack constitutional authority to adjudicate the state law causes of action against the Sackler Family and other non-debtors that are extinguished by the Plan. Claims between non-debtors that arise under non-bankruptcy substantive law are at most "related to" the bankruptcy, 28 U.S.C. § 157(c)(1), and would not "necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding authority to adjudicate private state-law disputes must generally be vested in Article III judges). *See also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (although recognizing bankruptcy court's jurisdiction over proceedings "related to" bankruptcy case under 28 U.S.C. §§ 157(a) & 1334(b), such jurisdiction "cannot be limitless"); *id.* at 323 (questioning authority of bankruptcy court to "grant injunctions over cases that [it] may not decide" as "inconsistent" with limited jurisdiction over related proceedings under 28 U.S.C. § 157(c)(1)) (Stevens, J.) (dissenting). Thus, absent all parties' knowing and informed consent, bankruptcy judges lack statutory and constitutional authority to enter a final judgment to impose third-party releases against non-debtors that extinguish their state law causes of action against other non-debtors. *See In re Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) ("Article III is not violated when the parties knowingly and voluntarily consent to adjudication [of a *Stern* claim] by a bankruptcy judge.").

Indeed, while the Plan has been amended to exclude from the release "Non-Opioid Excluded Claims"—defined as "a Cause of Action by a Person" against "a Shareholder Released Party to the extent such Cause of Action" is not related to opioid use (and meets certain other

requirements in the definition)[18]—the Plan still precludes those Non-Opioid Excluded Claims

from being heard in the first instance by an Article III court.  ECF Doc. No. 3726 at 31.  The

Plan prohibits any "Person" from initiating or continuing a Non-Opioid Excluded Claim without

first obtaining leave of this Court.  *Id.* at 148.  The Plan further provides that this Court "may

grant such a request only upon a showing by the requesting Person, based on an appropriate

evidentiary record, that such Cause of Action is within the definition of Non-Opioid Excluded

Claim."  *Id.*  Because the definition of "Person" is not limited to those who are creditors of the

Debtors' estates, *id.* at 33, the Plan establishes a perpetual, post-confirmation gate-keeping role

for this Court before any persons—even those who may not be creditors of the Debtors—may

assert causes of action against released non-debtor parties based on a "Non-Opioid Excluded

Claim."  ECF Doc. No. 3726 at 148 (Plan § 11.1(e)).  Should this Court determine that such a

cause of action does not qualify to proceed in a different court, that determination would dispose

of the non-debtors' cause of action.  Consequently, the Plan further compounds the *Stern*

problems already posed by the Non-Debtor releases.

### 3. Second Circuit Precedent Does Not Authorize These Releases.

While there is a circuit split regarding the statutory authority for non-debtor releases—

notwithstanding the lack of explicit statutory authority for them—the Non-Debtor releases here

do not fit within the narrow circumstances that the Second Circuit has suggested may render

them permissible.  *See Metromedia*, 416 F.3d at 141-43.

---

[18]  The provisions regarding Non-Opioid Excluded Claims are circular.  A claim is within the definition of a "Non-Opioid Excluded Claim" if it meets all of four requirements—the last of which is that the Court allowed it under section 11.1(e).  ECF Doc. No. 3726 at 31.  But one only needs court approval under section 11.1(e) if the claim is a Non-Opioid Excluded Claim.  *Id.* at 148.

First and foremost, no party in *Metromedia* pressed the constitutional arguments raised above. Because the Second Circuit did not address those issues in *Metromedia*, that case does not control the disposition of those issues here. *See Metromedia*, 416 F.3d at 141-43.

Eliding that crucial fact, the crux of the Debtors' argument is that the "central holding of *Metromedia*" is that third-party releases "are appropriate so long as they are important to the Debtors' restructuring." ECF Doc. No. 3461 at 105. But that is not what the Second Circuit held in *Metromedia*. To the contrary, the Second Circuit's order dismissed the appeal under the equitable mootness doctrine (a doctrine inapplicable here and one that, in many of its applications, may run afoul of the Supreme Court's recent invalidation of similar prudential doctrines[19]), rendering its statements regarding non-debtor releases dicta.

Further, *Metromedia* preceded the Supreme Court's decision in *Jevic*, 137 S. Ct. at 986. In *Jevic*, the Court rejected the argument that a proposed deviation from the Code's priorities of payment was acceptable if limited to the "rare case" and the court finds "sufficient reasons," because that would still require a "departure from the protections Congress granted particular classes of creditors." *Jevic*, 137 S. Ct. at 986-87. The same is true here; allowing non-debtor

---

[19]  In 2005, the Second Circuit recognized that equitable mootness is a judge-created "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." *Metromedia*, 416 F.3d at 144. But as the Supreme Court has recently reaffirmed, courts have a "virtually unflagging" obligation to "hear and decide a case" and "to exercise the jurisdiction [they were] given." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). This applies as well to appeals of bankruptcy court orders confirming chapter 11 plans. *In re Continental Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (en banc) (Alito, J., dissenting) (noting equitable mootness is a "curious doctrine," which "permit[s] federal district courts and courts of appeals to refuse to entertain the merits of live bankruptcy appeals over which they indisputably possess statutory jurisdiction and in which they can plainly provide relief."); *see also In re VeroBlue Farms USA, Inc.*, 6 F.4th 880 (8th Cir. 2021) (requiring a "sufficiently rigorous test to determine when bankruptcy equities and pragmatics justify foregoing Article III judicial review of a bankruptcy court order confirming a Chapter 11 plan"); *see also In re City of Detroit, Michigan*, 838 F.3d 792, 805-06 (6th Cir. 2016) (Moore, J., dissenting); *In re One2One Communications, LLC*, 805 F.3d 428, 438-41 (3d Cir. 2015) (Krause, J., concurrence).

30

releases departs from Congress's direction that only debtors may obtain a discharge through a bankruptcy case with a narrow exception only for asbestos cases—a limitation that protects the property rights of third parties with causes of action against non-debtors.  *See* Argument Section I(A)(1) *supra*.  In addition, the Court explained in *Jevic* that the difficulty of giving "precise content to the concept 'sufficient reasons' . . . threatens to turn a 'rare case' exception into a more general rule."  *Id*. at 986.  That threat is acute in the context of non-debtor releases, which have become increasingly common.  *See, e.g., In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) (noting chapter 11 debtors "frequently seek third-party releases").

But even under the criteria suggested by *Metromedia,* 416 F.3d at 142, to consider when non-debtor releases may be tolerated—such as when the estate received "substantial consideration," when the released claims would impact the debtor's reorganization by way of indemnity or contribution, if the plan channels the claims rather than extinguishes them, or if the claims will otherwise be paid in full—the Plan fails to qualify.

As argued in the United States Trustee's Objection, ECF Doc. No. 3256 at 28-31, the circumstances of this case are unlike those in which non-debtor releases have been tolerated by courts within the circuit.  The Non-Debtor releases fall outside *Metromedia* because they extend to persons far beyond those making contributions to the reorganization plan; the releases do not uniformly affect the *res* of the estate[20]; and claimants will neither be paid in full nor as they agreed.  The Sackler Family's attempt to hold the Debtors' reorganization hostage unless the

---

[20]  The Non-Debtor releases are not limited to claims where the Shareholder Released Party would be entitled to indemnification or contribution from the Debtors—if that were the limit of the Non-Debtor releases they could easily have been drafted to say that, but they do not.

31

Non-Debtor releases are imposed does not justify taking third parties' property—their causes of action against non-debtors—without their consent, adequate notice, or any opportunity to be heard.

The Debtors made a half-hearted *Metromedia* argument by suggesting that "the domestic opioid litigation claims are not extinguished under the Plan but are instead channeled to the Creditor Trusts." ECF Doc. No. 3461 at 107. But that assertion is, at best, misleading given that no one is entitled to any distribution based on their causes of action against non-debtors. *See* ECF Doc. No. 3787 at 333 (Non-NAS PI TDP § 2(b)(ii)); *id.* at 392 (NAS PI TDP § 2(b)(ii)); *id.* at 433 (PI Futures TDP § 3).[21]

For all these reasons, there is a substantial likelihood of success justifying a stay pending appeal.

**B.    The Balance of Harms Weighs in Favor of a Stay.**

The final three factors—whether there is irreparable injury if the stay is denied, substantial injury to other parties if the stay is issued, or an impact on public interest—require the court to balance these respective harms. *Nken*, 556 U.S. at 426. Here, the balance of the harms weighs in favor of granting the stay.

As noted, when the government is a party, the injury and public interest factors merge. *Cf. Nken*, 556 U.S. at 426 (holding factors of "assessing the harm to the opposing party and

---

[21]  Debtors assert that there is overwhelming support for the Plan because, of those creditors with claims against the Debtors who voted on the Debtors' Plan, 95% voted to approve the Plan. Not only is that not a consideration under *Metromedia*, but it ignores the fact that fewer than 20% of those who filed a proof of claim in these cases voted for the Debtors' plan. *See* ECF Doc. No. 3372 ¶ 8 & Ex. A. Thus, the 95% number is only 95% of the less than 20% who voted. Debtors' calculation also disregards entirely anyone who did not file a proof of claim. While the 95% figure accurately reflects the percentage of creditors approving the Debtors' Plan for purposes of section 1126, it fails to demonstrate creditor support for the non-consensual third-party releases.

weighing the public interest" "merge when the Government is the opposing party"). That is

particularly true here, where the United States Trustee is acting as the congressionally designated

"bankruptcy watch-dog[]," H.R. Rep. No. 95-595 at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N.

5963, 6049, and fulfilling his "responsibility to represent and protect the public interest," *Adams

v. Zarnel (In re Zarnel)*, 691 F.3d 156, 162 (2d Cir. 2010). In ensuring compliance with the law,

the United States Trustee is advocating on behalf of the interests of small stakeholders, the

integrity of the bankruptcy system, and the public interest.

There is no dispute that this case implicates important public interests.[22] The importance

of the public interests impacted by these bankruptcy cases cannot be understated, given the sheer

number of victims and the nature of their plight.

Opioid abuse is "the worst manmade epidemic in history," with over 290,000 deaths

occurring in the United States since 2015. ECF Doc. No. 3276 at 1 (Objection of Washington,

Oregon and Other Objecting States, ¶ 1). Over 615,000 proofs of claim by those holding claims

against Purdue were filed in these cases. ECF Doc. No. 3372 at 5 (Declaration ¶ 8). And those

proofs of claim do not include the untold number of additional causes of action non-debtors hold

against the non-debtor Sackler Family members and other non-debtors, which the Debtors' Plan

extinguishes.

According to the Debtors, on the Petition Date, the various Sackler Family members were

defendants in approximately 400 civil actions nationwide. ECF Doc. No. 2983, at 171

(Disclosure Statement); *see also* ECF Doc. Nos. 3452 ¶¶ 7, 9, 3447 ¶¶ 13-15, 3449 ¶¶ 34-40,

---

[22] Indeed, in recognition of the impact of these cases on the public interest, one of the Plan documents includes an
agreement between the Debtors and the Sackler Family to support a direct appeal to the Second Circuit under 28
U.S.C. § 158(d)(2). ECF Doc. No. 3711 at 88.

3451 ¶¶ 18, 21; Adv. No. 18-08289, ECF Doc. Nos. 1 ¶¶ 17-21 & Ex. B; 43; 63 at 8; 82 at 4; 89,

105, 115, 126, 132, 139, 145, 168, 175, 185, 190, 194, 208, 214, 224, 241, 254, 264, 274, 286,

287, 291; Joint Exhibits 840, 841, 946, 947, 949, 1646, 1647, 1649, 2209, 2210, 2211, 2212,

2213, 2214.  And the Plan extinguishes not just these filed claims but also a broad array of

opioid-related causes of action.

It even extinguishes non-debtors' claims against the Sacklers based on "fraud" or "willful

misconduct," even if unknown, unforeseen, unsuspected, and unaccrued.  *See* ECF Doc. No.

3726 at 10, 132 (definitions of "Cause of Action" & section 10.7(b)).

Having lost, cared for, and/or financially-supported their loved ones, through their

appearances, claims and letters, individual stakeholders have clamored repeatedly to this Court

against releasing the Sackler Family.  *See, e.g.,* Letter from Mary Butler-Fink, ECF Doc. No.

3235, at 2 ("[P]leading with you to not let the Sacklers gain immunity from . . . any future

lawsuits against them."); *see also* ECF Doc. Nos. 442, 443, 2210, 2966, 3028, 3125, 3271, 3235,

3292, 3368, 3404, 3357, 3575, 3582, 3648, 3677, 3742, 3793; 9/13/21 Tr. at 149-53.  Should a

stay be denied, these parties will be irreparably harmed by having their causes of action

extinguished without their knowing and informed consent and in many cases without notice.

Those who have filed actions already presumably will face motions to dismiss based on the

releases.  And those that have not filed yet may not be able to do so—even after the releases are

reversed on appeal—if the statute of limitations applicable to their cause of action expires while

the appeal is pending.

Further, the United States Trustee's appeal raises an issue that is fundamental to

maintaining public confidence in the integrity of the bankruptcy system.  The system's integrity

34

depends on public confidence in its procedures and its transparency. The confirmed Plan erodes

the public's confidence in the bankruptcy system by giving the appearance that individuals and

their affiliates can use the bankruptcy case of another entity to evade responsibility for their

misconduct without filing bankruptcy themselves and submitting to the transparency required in

the bankruptcy process. *Cf. Bank of NY Trust Co., NA v. Official Unsecured Creditors Comm.*

*(In re The Pacific Lumber Co.)*, 584 F.3d 229, 251 (5th Cir. 2009) (explaining that appellate

review of non-debtor releases was "consequential to the integrity and transparency of the

Chapter 11 process") (internal quotation marks omitted). Imposition of a stay would serve the

public interest by ensuring that the rights of the non-debtor victims against the Sackler Family

members and the other non-debtors being released under the Debtors' Plan are protected while

the Confirmation Order is reviewed on appeal.

The Debtors have stated that their goal in these cases is to serve the public interest and

provide remedies for those harmed by the opioid crisis. ECF Doc. No. 2983 at 11. Granting a

stay pending any potential appeal and ensuring the preservation of the public's rights to a

meaningful review on appeal thus furthers not only the public interest, but the mission of these

cases. *In re Adelphia Comm'ns Corp.*, 361 B.R. at 349. Notably, the Disclosure Statement

warns that "absent a stay pending appeal . . . any appeal of the Confirmation Order may become

equitably moot." ECF Doc. No. 2983 at 320. While the United States Trustee disagrees that

equitable mootness would apply here, the Debtors may seek to evade appellate review based on

this doctrine in the absence of a stay. The "loss of appellate rights is a quintessential form of

prejudice" and satisfies the irreparable harm requirement. *In re Adelphia Comm'ns Corp.*, 361

B.R. at 348 (internal quotation marks omitted). The Debtors cannot be heard to argue that

35

denying a stay will not irreparably harm those whose rights are extinguished and also seek to

evade the appellate review that could restore those rights.

By contrast, a stay will not result in any harm that outweighs the harms from denying a

stay. The Disclosure Statement expressly acknowledges that the Confirmation Order may be

appealed, and an appealing party may seek to stay the order pending appeal. ECF Doc. No. 2983

at 320. The Disclosure Statement does not warn of any risks that would be posed by a stay;

instead, it notes that a stay would "maintain the status quo that has existed during the Chapter 11

Cases while an appeal remains pending." *Id.* Nor will a stay delay an otherwise imminent Plan

consummation. The Debtors have acknowledged that the Plan will not be consummated until at

least 82 days after confirmation. ECF Doc. No. 3626 at 3. Moreover, the Plan contemplates that

distributions will be made over the course of ten years. *See, e.g.,* ECF Doc. No. 2983 at 162-63;

ECF Doc. No. 3711 at 75. And while it is possible that a stay would delay some initial

distributions, the Shareholder Settlement Agreement included in the plan documents includes an

agreement to move that the appeal "be expedited on the fastest feasible schedule." ECF Doc.

No. 3711 at 88 (Shareholder Settlement Agreement § 2.09).

While there is no doubt about the importance of affording relief to victims of the opioid

crisis, that fact weighs in favor of a stay given the countless (and uncounted) victims who—

without their consent—will have their claims against non-debtors forever barred.

As the Second Circuit has explained, a debtor's "precarious situation and the need for

speed [does] not obviate basic constitutional principles. Due process applies even in a

company's moment of crisis." *Elliott*, 829 F.2d at 161.

36

**II.     The Court Should Also Stay the Advance Order.**

The Court should also stay the Advance Order for the same reasons that it should stay the

Confirmation Order because the only purpose of the Advance Order is to further the Plan.

The Advance Order thus only has merit to the extent the Confirmation Order itself is

likely to survive appeal.  But the United States Trustee is likely to succeed on appeal of the

Confirmation Order for the reasons discussed above, *supra* Argument Section I(A).  The parties

should not be moving ahead to implement a Plan when the Confirmation Order could, and likely

will, be reversed on appeal.

Indeed, given that the Confirmation Order states that its terms "provide adequate and

proper means for the implementation of the Plan," ECF Doc. No. 3787 at 13, it remains unclear

why a separate Advance Order was necessary.  The Debtors did not dispute that, as argued by the

United States Trustee, "the relief requested by the Advance Motion will be authorized by the

confirmation order."  ECF Doc. No. 3555 at 4.  Because the Confirmation Order subsumes the

Advance Order, there is no reason for the Advance Order to be treated differently than the

Confirmation Order of which it is a part for purposes of a stay pending appeal.

Moreover, while the United States Trustee agrees with the Debtors that any equitable

mootness argument based on the Advance Order would be frivolous, ECF Doc. No. 3743 at 4,

their waiver of this argument, ECF Doc. No. 3773 at 2, is not binding on other parties.  Nor is the

Advance Order's provision that it shall not support an equitable mootness argument, ECF Doc.

No. 3773 at 5, binding on the appellate court.  Failing to stay the Advance Order thus could

undermine a stay of the Confirmation Order.

## **CONCLUSION**

WHEREFORE, for these reasons, the United States Trustee respectfully moves for a stay

of the Confirmation Order and Advance Order pending resolution of the appeal of those orders.

Dated:  New York, New York
        September 21, 2021

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Linda A. Riffkin*
Linda A. Riffkin, Assistant United States Trustee

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax:  (202) 307-2397

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY  10014
(212) 510-0500
Fax:  (212) 668-2361

38