KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
Rachael Ringer
Jonathan Wagner
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
Jenna A. Hudson (admitted *pro hac vice*)
Emily P. Grim (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
Gerard Cicero
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
: 
In re:                             :   Chapter 11
: 
PURDUE PHARMA L.P., *et al.*,       :   Case No. 19-23649 (RDD)
: 
              Debtors.       :   (Jointly Administered)
: 
------------------------------------------------------------- X

## AD HOC COMMITTEE'S OBJECTION TO STAY MOTIONS

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

PRELIMINARY STATEMENT ................................................................................................ 1

OBJECTION .......................................................................................................................... 2

I.    The Movants Are Unlikely to Succeed on the Merits ............................................... 3

II.    The Parties Opposing the Stay Will Suffer Grave and Irreparable Harm ........................... 9

III.    The Movants Have Alleged No Cognizable Harm .......................................... 14

IV.    The Public Interest Strongly Disfavors a Stay ................................................ 16

V.    A Stay, If Granted, Should Be Conditioned on a Substantial Bond ................................ 16

    A.    The Movants Can Be Required to Post a Supersedeas Bond ................................... 16

    B.    The Movants Should Be Required to Post a Substantial Bond ................................. 18

The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**"), which consists of (i) ten States, (ii) the court-appointed Plaintiffs' Executive Committee in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio) (iii) six counties, cites, parishes, or municipalities, and (iv) one federally recognized American Indian Tribe, hereby submits this objection to the motions (the "**Stay Motions**") seeking stays of, among other things, the order confirming the chapter 11 plan (the "**Plan**") of the above-captioned debtors (the "**Debtors**"), and filed by (i) the United States Trustee (the "**UST Motion**") [Dkt. Nos. 3778, 3801, 3803, 3972], (ii) Washington and Connecticut (the "**Washington/Connecticut Motion**") [Dkt. No. 3789], (iii) Maryland (the "**Maryland Motion**") [Dkt. No. 3845], and (iv) certain Canadian municipal and First Nation appellants [Dkt. No. 3873].  In support of this Objection, the Ad Hoc Committee submits the declaration of John Guard, Chief Deputy Attorney General for the State of Florida (the "**Supplemental Guard Declaration**") (attached as **Exhibit A**) and references Mr. Guard's August 5, 2021 declaration submitted in connection with the confirmation hearing (the "**Guard Declaration**") [Dkt. No. 3446], and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      On September 17, 2021, almost two years to the day after the Debtors filed these chapter 11 cases, the Court confirmed the Plan, providing a clear pathway to the long-awaited resolution of this complex proceeding and the commitment of over $5 billion to address the harms caused by the opioid crisis.  The Plan enjoys overwhelming creditor support, and with good reason: the Plan (i) promises significant funds *now* to all States and Territories, thousands of local governments, hundreds of Tribes, and healthcare entities in dire need of abatement funding, as well as to the thousands of individual victims, (ii) avoids years of additional litigation and uncertainty, and (iii) serves the public interest through critical non-monetary provisions –

including the establishment of a public document repository, a comprehensive injunction which, among other things, bans any promotion of opioids, and a court-approved monitor – designed to hold the Debtors and the Sacklers accountable for their bad acts.  Moreover, as the Court found on the basis of uncontroverted evidence, the Plan is in the best interests of creditors.  "Under the most realistic scenarios…there would literally be <u>no</u> recovery by unsecured creditors…if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos."[1]

2.      The Stay Motions threaten this significant remedial relief, seeking on behalf of a handful of objectors an outcome destructive to the interests of the vast majority of the Debtors' constituents who support the Plan.  If the Court grants the Stay Motions and delays the Plan effective date, it is a certainty that distributions under the Plan will be delayed – at a daily cost to human life.  And with a stay, there is a real possibility that the Plan will unravel, plunging the parties back into prolonged and intractable litigation with ever-diminishing returns.

3.      The Court need not and should not order any such relief.  Of the four factors considered in granting a stay pending appeal, the movants have not satisfied a single one.  And even were they somehow able to do so, in light of the enormous and nearly incalculable harm to creditors that would be occasioned by a stay, a substantial bond would have to be posted before the Court could grant the extraordinary relief of delaying, indefinitely, the duly entered, thoroughly debated, deeply considered, and amply supported order of the Court.

## OBJECTION

4.      The burden on a movant seeking a stay is a "heavy" one.  *In re General Motors Corp.*, 409 B.R. 24 (Bankr. S.D.N.Y. 2009).  Before granting this "extraordinary" relief, *see Sabine*

---

[1] *See* Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan [Dkt. No. 3786] (the "**<u>Bench Ruling</u>**").

*Oil & Gas Corp. v. HPIP Gonzales Holdings, LLC (In re Sabine Oil & Gas Corp.)*, 551 B.R. 132, 142 (Bankr. S.D.N.Y. 2016), a court must consider four factors:  "(1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *New York v. Trump*, 490 F. Supp. 3d 736, 741 (S.D.N.Y. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (internal quotations omitted).  In addition, if granted a stay is typically conditioned on the posting of a bond. *See In re General Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) (referencing "ordinary full security requirement").

5.      These considerations weigh overwhelmingly against a stay.

## I.      The Movants Are Unlikely to Succeed on the Merits

6.      The movants have fallen far short of showing that they are likely to succeed on the merits of their appeals.

7.      The movants make four main claims of error:  (i) controlling Second Circuit precedent bearing on third-party releases was wrongly decided; (ii) the application of that law in any event was incorrect here; (iii) regardless of the general standards governing third-party releases, there should be an exception for so-called "police power" claims; and (iv) the Plan fails the best interests of creditors test of section 1129(a)(7) of the Bankruptcy Code.  There is no reason to believe that an appellate court would agree with any of these points.

8.      To begin with, the Court did far more than rubber-stamp an extensively negotiated and overwhelmingly-supported global resolution.  Rather, the Court's treatment of the release-related issues was extensive, covering 55 pages of the Bench Ruling.  *See* Bench Ruling at 103-159.  Equally significant, over the course of the confirmation hearing the Court repeatedly urged the Debtors to modify or pare back the third-party releases, and the releases in the Plan differ

3

materially from those originally proposed.  *See* Bench Ruling at 104 ("In light of colloquy during the confirmation hearing, the current form of the plan has substantially narrowed those releases."). The movants largely ignore these important changes.

9.      Turning to the movants' specific claims of error:

10.     *Metromedia* is the governing law of the Circuit.  There is little chance that the Court of Appeals or any other appellate court would reverse confirmation of the Plan on the supposed ground that nonconsensual third-party releases are never appropriate.  Third-party releases have been authorized in the Second Circuit for decades.  *See SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91 (2d Cir. 1988).  And the Court of Appeals has not shown any inclination to reverse or reconsider its governing *Metromedia* standard.  *See Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005); *see also Marshall v Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 93 n. 12 (2d Cir. 2014) (describing *Metromedia*'s holding).  Nor is the Second Circuit an outlier in this regard.  As noted in the Bench Decision, a "clear majority" of Circuits approve of third-party releases in appropriate circumstances.  Bench Ruling at 118.

11.     The movants no doubt pin their hopes on the United States Supreme Court granting certiorari and reversing *Metromedia*.  *See, e.g.*, Maryland Motion at 2 (citing S. Ct. R. 10).  That is unlikely.  The Supreme Court has repeatedly declined to accept certiorari in similar circumstances – denying as recently as 2020 a petition for review of a Third Circuit decision approving a non-consensual third-party release.  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020); *see also SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070 (11th

Cir. 2015), *cert. denied*, 577 U.S. 823 (2015).  Of note, the denial of certiorari in *Millennium Labs*

came *after* the Supreme Court's decision in *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973

(2017), upon which the United States Trustee places great reliance.  UST Motion at 3,17, 30.[2]

12.    The movants also repeat their arguments concerning the implications of section

524(g) and 524(e) on the bankruptcy courts' powers to grant third-party releases.  *See* UST Motion

at 16-17; Maryland Motion at 9.  Significantly, however, the movants make no real attempt to

address the Court's detailed explanation of the many reasons why those arguments are meritless.

*See* Bench Ruling at 119-124 (quoting extensively from legislative history to the contrary and

parsing the statutory language).  If movants do no more than repeat arguments already raised and

rejected, they have little chance of convincing an appellate court of their merits.

13.    The Court correctly applied *Metromedia*.  As for the movants' second main claim

of error – that the Court misapplied the governing *Metromedia* standard – that too does not provide

a basis for reversal on appeal.  Before granting a third-party release, *Metromedia* requires a court

to make factual findings that "truly unusual circumstances render the release terms important to

success of the plan."  *Metromedia*, 416 F.3d at 143.  The Court's findings in this regard were

extensive, addressing among other points the interrelated nature of the Plan settlements, the

overwhelming creditor support for the releases, the complexity and extent of the litigation, the

magnitude of the consideration provided, and the infeasibility and disastrous consequences of other

alternatives.  *See, e.g.*, Findings of Fact, Conclusions of Law, and Order Confirming Twelfth

Amended Jointed Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated

Debtors [Dkt. No. 3787] at 27-31.

---

[2] Unless otherwise indicated, cites to the "UST Motion" are to the latest of the United States
Trustee's several pleadings, filed at Docket Number 3972.

14.     The record evidence supporting the Court's conclusions is even more voluminous. Multiple witnesses testified at great length and with little meaningful cross-examination concerning the negotiation of the releases and their importance to the success of the Plan.  As one example, John Guard, the Ad Hoc Committee's witness and a principal negotiator of the Sackler settlement, testified that "[w]ithout the availability of the Sackler assets, compromise between the Non-Federal Public Claimants and the Private Claimants would have not been possible."  Guard Decl. ¶ 67.  He likewise noted that the "DOJ Settlement itself likely would not have been possible absent the Sackler contribution," *id*. ¶ 68, and that based on his considerable experience and extensive participation in the negotiations, the Sackler settlement "represents a reasonable resolution, in the current context of this case, of claims against the Sacklers," *id*. ¶71.  Notably, the movants chose not to cross Mr. Guard concerning this testimony.

15.     Constrained by the abundant evidence supporting the Court's approval of the releases, the movants fall back on unsubstantiated assertions of a case that they did not make despite ample opportunity.  Maryland contends that "[t]here is no question that Debtors would be able to successfully reorganize here without the Sackler contribution," Maryland Motion at 12, and Connecticut and Washington declare that "mere contribution of funds" cannot justify a release, Washington/Connecticut Motion ¶ 59.  These statements ignore the substantial trial record, and thus do not provide any reason to believe that an appellate court would reverse this Court's factual conclusions.

16.     The "police power" exception is a red herring.  Seeking to create ambiguity when none exists, certain movants assert that there is or should be a police power exception to *Metromedia*.  *See, e.g.*, Washington/Connecticut Motion ¶¶ 61-75.  The Bankruptcy Code provisions on which they rely (*e.g*., section 362(b)(4)) have nothing to do with third-party releases.

And it is far from clear that these inapposite provisions are representative of a broadly-applicable rule. *Cf. U.S. Bank Trust N.A. v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 106-07 (2d Cir. 2013) (existence of Code provisions specifically prohibiting enforcement of ipso facto clauses in certain circumstances was not indicative of a categorical rule against their enforceability).

17.     More fundamentally, the Plan's supposed failure to respect police power claims is a red herring. As explained by the Court, the Plan actually fosters many of the objectives of the objecting states' desired enforcement actions, for example injunctive relief and public accountability. And the absence of complete remuneration in the Plan is simply a consequence of the bankruptcy process:

> Given the limited scope of the plan's release of the shareholder released parties and those parties' agreement to no longer be involved with the Debtors or NewCo except to perform the settlement, as a practical matter the plan only limits the objecting states' remedies against the shareholder released parties to collect money on account of their past conduct. As to that limitation, moreover, all of the states, including the objecting states, have agreed to the public/private allocation and the NOAT allocation under the plan for abatement purposes. Indeed, during the confirmation hearing, counsel for the objecting State of Washington lauded the constructive nature of the NOAT allocation and the plan's proposed abatement procedure guidelines. Further, I have found that if the objecting governmental units were carved out of the release, the plan would fail, the Debtors would likely liquidate, and the objectors would collect materially less money from the Debtors and the shareholder released parties in the aggregate, as would the other states and governmental entities and non-public unsecured creditors who support the plan's confirmation.

Bench Ruling at 153-54.

18.     In view of the foregoing – and the ample evidence of the Plan's extensive benefits – there is no reason to expect that an appellate court would reverse the Court's "police power" holding.

19.     <u>The "best interests of creditors" argument fails on the facts and the law</u>. Finally, the movants' argument that the Plan does not meet the "best interests of creditors" test of section

1129(a)(7) of the Bankruptcy Code will almost certainly fail on appeal. Leaving aside intra-District disagreements regarding whether the best interests test even applies to the release of third-party claims – and this Court has properly held that it may not (*see* Bench Ruling at 144-45) – the movants cannot realistically hope to overturn the Court's factual findings in support of the satisfaction of the best interests test. *See, e.g.*, *In re Charter Commc'ns, Inc.*, 449 B.R. 14, 22 (S.D.N.Y. 2011) (factual findings are subject to a clearly erroneous standard of review).

20.    The Court received extensive written and oral testimony establishing that creditors are better off under the Plan than in a liquidation. That includes among other evidence: (i) the liquidation analysis prepared by the Debtors' financial advisor, Jesse DelConte[3]; (ii) the testimony of the Ad Hoc Committee's witness, Mr. Guard, concerning the interrelated nature of the Plan's many settlements, including the Sackler and DOJ settlements[4]; (iii) the testimony of the Ad Hoc Committee's witness, Jayne Conroy, concerning the "peace premium" achieved through the Sackler settlement[5]; (iv) the testimony of the Debtors' expert, Dr. Gautam Gowrisankaran, concerning the "multiplier effects" of abatement programs[6]; and (v) the testimony of an expert in the law of the Bailiwick of Jersey on matters of collectability.[7] On the basis of this and other evidence, the Court concluded:

> Under the most realistic scenarios described in [the Debtors' liquidation analysis], there would literally be <u>no</u> recovery by unsecured creditors from the estates in a Chapter 7 liquidation, which is, I believe, the most likely result if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos.

---

[3] *See* Declaration of Jesse DelConte [Dkt. No. 3411].

[4] *See* Guard Declaration ¶¶ 67, 68, 71, 75.

[5] *See* Aug. 16, 2021 Hr'g Tr. at 87:9-22.

[6] *See* Aug. 12, 2021 Hr'g Tr. at 240:15-241:1.

[7] *See* Expert Report of Michael Cushing [Dkt. No. 3442-1].

Bench Ruling at 90.

21.     The Court's factual findings in this regard were correct.  And they help explain why the members of the Ad Hoc Committee – and 38 of 48 States (eligible to vote), 97% of the non-federal domestic governmental claims voting on the Plan, and 96% of the Tribe claims voting on the Plan – support the Plan rather than the objecting States' position.  *See, e.g.*, Guard Declaration ¶ 71 (explaining that the Plan's settlement was the better of the potential outcomes).

## II.     The Parties Opposing the Stay Will Suffer Grave and Irreparable Harm

22.     The movants' arguments concerning injury are equally weak.  A stay would inflict substantial harm on Debtors' creditors, the States, municipalities and Tribes supporting the Plan, and the American public at large.  Simply put, for every day that the Plan's effective date is delayed, human lives are put at risk.  Equally important – because it would risk even more widespread and destructive consequences – if stayed the Plan itself could completely fall apart.

23.     The accompanying supplemental Declaration of John Guard describes some of these harms.  As part of his duties, Mr. Guard receives information and data concerning opioid overdose deaths in Florida.  According to Florida's Interim Drug Report:

- During the COVID-19 pandemic total drug deaths increased in Florida by 13 percent; and

- In the first half of 2020, 3,834 opioid-related deaths were reported – a 30.5 percent increase over the same six-month period in 2019 – and in 3,034 of the 3,834 deaths, opioids were the cause of death – a 51 percent increase.

Supplemental Guard Declaration ¶ 6.  Beyond that, available data suggests that drug overdoses are continuing to increase during COVID-19 in Florida and throughout the nation.  According to the federal government, there were 93,331 drug overdose deaths during 2020, a 30.4% increase over the prior year.  In that data set, 69,031 of the deaths involved opioids, with the CDC's data

indicating with an asterisk that the data is underreported. *See id.* In other words, far more people are dying today from opioid overdoses than when this case was filed.

24.    Extrapolating from the data in Mr. Guard's declaration, *more than 190 Americans die from opioid overdoses each day* (*i.e.*, 69,031/365). *See also* Maryland Motion at 16 (noting that the opioid crisis "takes on average almost seven Maryland lives a day"). Even the objecting States would agree that abatement saves lives. *See* Bench Ruling at 153-54 (noting that "counsel for the objecting State of Washington [had] lauded the constructive nature of the NOAT allocation and the plan's proposed abatement procedures guidelines"). By seeking to delay abatement, the movants are putting human lives at risk.

25.    Related to yet separate from these factors, a stay of the Plan's effective date would have more quantifiable effects as well. As described in the Supplemental Guard Declaration, the Ad Hoc Committee negotiated for provisions in the Shareholder Settlement Agreement that require the Sacklers to make substantial payments under the Plan notwithstanding appeals of the Confirmation Order. *See* Supplemental Guard Declaration ¶ 11. In particular, if the Confirmation Order is not stayed, then under the terms of the Shareholder Settlement Agreement the Sacklers will be required to pay:

- the first two installments of the Sackler Contribution – due on the Plan effective date ($300 million) and in June 2022 ($375 million); and

- the third installment of the Sackler Contribution, due in June 2023 ($375 million), provided that the Second Circuit has affirmed the Confirmation Order and the Supreme Court has not accepted certiorari.

Shareholder Settlement Agreement § 2.08(a). After accounting for payments due to the private creditor trusts and certain assumptions relating to insurance recoveries, over $250 million of these early Sackler payments should be available for distribution from the Master Disbursement Trust

to the non-federal governmental claimants through the end of 2023.  Supplemental Guard Declaration ¶ 10.

26.      In addition to these payments deriving from Sackler funds, the non-federal governmental claimants are expected to receive substantial distributions directly from the Debtors or NewCo on the effective date of the Plan and in the years that follow.  The Plan calls for effective date payments from the Debtors to both the National Opioid Abatement Trust ("**NOAT**") to benefit States, Territories, and local governments, and the Tribe Trust, estimated in the Plan at $220 million and $50 million, respectively.  *See* Plan at 13 (definition of "Initial Tribe Trust Distribution") and 102 (describing "Initial NOAT Distribution").  Based on estimated cash flows from NewCo's operations (and asset sales) following the Effective Date, NewCo is expected to have another approximately $900 million in aggregate excess cash available for distribution to NOAT and the Tribe Trust through the end of 2024.  Supplemental Guard Declaration ¶ 12.

27.      Thus, all told, on and after the effective date of the Plan, the non-federal governmental claimants are expected to receive over $250 million in distributions from the MDT through 2023 (principally on account of Sackler payments), and over $1.1 billion in cash distributions from the Debtors and excess cash available from NewCo's operations through 2024.

28.      Contrary to the movants' assertions, *see* Washington/Connecticut Motion ¶¶ 44-45, the provisions requiring Sackler payments notwithstanding the pendency of appeals are not intended to benefit the Sacklers or the Debtors.  In sharp contrast, these provisions are intended to benefit the *creditors*, who would otherwise be forced to wait until appeals were exhausted before receiving any funds under the Plan.  As Mr. Guard avers:  "The requirement that the Sacklers make their initial three payments even in the face of an appeal was extremely important to the Ad Hoc Committee, was heavily negotiated, and represents a critical component of the overall settlement

without which its economics would have materially differed. Put differently, the Ad Hoc Committee (and other parties) likely would not have agreed to the Sackler settlement had the Sacklers not been willing to fund these initial three payments even during an appeal." Supplemental Guard Declaration ¶ 11. Staying the effective date of the Plan while appeals are pending would directly undermine this important negotiated provision.

29.     In short, a stay would result in daily loss of life and the deferral of as much as $1.350 billion in payments for the benefit of non-federal governmental claimants under the Plan. And the ultimate consequences could be even worse. The Shareholder Settlement Agreement gives the Sacklers a termination right if "the Settlement Effective Date has not occurred by the earlier of (A) three months after the entry of the Confirmation Order…and (B) June 30, 2022." Shareholder Settlement Agreement, Exhibit I, subsection (a)(vii) [Dkt. No. 3711]. Since the Court entered the Confirmation Order on September 17, the Sacklers may terminate if the Shareholder Settlement Agreement does not go effective by December 17. Were the Sacklers to terminate – or if other unforeseen consequences of delay were to manifest – the Plan itself could unravel. As the Court has already found, unsecured creditors are likely to receive nothing in a liquidation, losing over $5 billion in value (not including insurance). *See* Findings of Fact at 41 (testimony showed that unsecured creditors "in the aggregate would recover zero in the low case and mid-case scenarios and would recover in the aggregate $699.1 million in the less likely high case scenario," while "[u]nder the Plan, an estimated at least $5.5 billion will be distributed on account of contingent liability claims.").

30.     Despite these potential consequences, Maryland claims that a stay will "prevent harm" to the creditors. Maryland Motion at 17. As Maryland also acknowledges that the opioid crisis "adds approximately 1,000 American lives each week to the more than 600,000 lives opioids

12

overdoses have already taken," *id.* at 2-3, this position is not serious. The movants appear to contend that the money to be distributed in the first few years of the Plan is, in context, comparatively small. *See* Maryland Motion at 18; Washington/Connecticut Motion ¶53. But as Mr. Guard explains, *see* Supplemental Guard Declaration ¶ 17, and as Maryland is constrained to acknowledge, "more money is clearly necessary." Maryland Motion at 18.

31.    For the same reason, other settlements, including the yet-to-be-implemented "National Opioid Settlement" referenced by Washington and Connecticut, are no substitute for the distribution of funds under the Purdue Plan. *See* Supplemental Guard Declaration ¶ 17 ("Each opioid settlement provides much-needed incremental funds for abatement and no settlement on its own (or even in combination) will provide enough funds to abate all the harms of the national opioid crisis.").[8]

32.    The movants' position at the end of the day appears to be that they are willing to accept some harm now, if that presents the possibility of an upside later. *See, e.g.*, Maryland Motion at 18 (speculating that "the appeal may provide an upside to all creditors, the expected value of which precludes any costs"). Both parts of this equation are wrong. The harm, particularly in terms of human life and health, is not an acceptable one. And the upside is not only speculative but has been found, on the basis of the evidentiary record at trial, to be unachievable.

33.    To sum up, and as Mr. Guard avers:

> Allowing Americans to needlessly die on some ephemeral hope that
> there may be some chance at more [money] under the circumstances
> is misguided and shortsighted. The abatement plan is designed to

---

[8] Washington is not even a party to the National Opioid Settlement, *see* Supplemental Guard Declaration ¶ 17, and does not explain how funds to be distributed under that settlement in the future could possibly substitute for funds to be distributed for the benefit of Washington's own citizens under the Purdue Plan.

save lives, and any delay is funding the abatement plan will thwart
that critical goal.

Supplemental Guard Declaration ¶ 16.

## III.    The Movants Have Alleged No Cognizable Harm

34.    In contrast to the enormous injury that would be suffered by the creditor opponents

of the stay – and the public at large – the movants have not credibly alleged any cognizable harm

to themselves.  Two main sources of harm from a stay are identified – the prospect of equitable

mootness (*see, e.g*., UST Motion at 35) and the alleged interference with the objecting States'

enforcement of their statutes (*see* Maryland Motion at 14).  Neither withstands scrutiny.[9]

35.    First, the mere possibility of mootness is insufficient.  As a three-judge panel of the

District Court recently observed, it is not enough for a movant to say that it "*may* suffer irreparable

injury without a stay."  The movant must plead that it "*will* be irreparably injured."  *New York v.

Trump*, 490 F. Supp. 3d 736, 741 (S.D.N.Y. 2020) (emphasis in original; internal quotations and

citations omitted).  The movants here have not contended that their appeals *will* be equitably moot,

but only that the appellees will *argue* that the appeals have become moot.  *See* UST Motion at 4,

35; Washington/Connecticut Motion ¶¶ 4, 49.  Indeed, the United States Trustee affirmatively

states that its appeal will not be moot.  *See* UST Motion at 4, 35.  Accordingly, the prospect of

equitable mootness does not establish the irreparable injury prong of the stay-pending-appeal

test.[10]

---

[9]  At times the movants also appear to address injury resulting from the confirmation or
effectiveness of the Debtors' Plan.  *See, e.g.*, Maryland Motion at 14 (noting that "the Plan will
imposes [sic] negative consequences for the States' protections of the public health").  But the
harm at issue here is not the alleged harm that the *Plan* will cause, but rather the alleged harm the
*failure to grant a stay* would cause.

[10] Moreover, the appellees have recently stipulated that they will not argue that the appeals "have
been rendered equitably moot by the actions undertaken in advance of the Effective Date in

36.    Second, to the extent Maryland claims harm resulting from its purported inability to enforce its "duly enacted statutes" (Maryland Motion at 14), that alleged harm results from the Plan itself, not from the failure to grant a stay.  This is, in other words, simply another way of articulating the potential harm that appellants claim may result from the prospect of equitable mootness.[11]

37.    Finally, and perhaps most importantly, the movants face no conceivable immediate harm.  The earliest the Plan can become effective is December 8.  The Debtors have repeatedly stated that they cannot, and committed that they will not, effectuate their Plan until after that date, and the District Court has now ordered the Debtors to provide parties with fourteen days' notice of the actual effective date of the Plan.  *See* Memorandum and Order Denying Without Prejudice the United States Trustee's Emergency Motion for a Stay Pending Appeal, *In re Purdue Pharma L.P., et al.*, No. 21-cv-7969 (S.D.N.Y. Oct. 13, 2021) [Dkt. No. 48] at 12.

38.    Meanwhile, the District Court has scheduled argument on the merits of the appeal for November 30.  The movants can therefore obtain their goal of a merits review before an Article III judge even without a stay.  And to the extent that the Movants seek a stay only through the end of November, that relief is unnecessary, as no material steps with respect to the Plan will occur between now and that date.

---

furtherance of carrying out the Plan pursuant to the Confirmation Order or the [Advance Funding Order]."  *See* Amended Stipulation, No. 7:21-cv-07532 [Dkt. No. 71] (Oct. 20, 2021).

[11] To the extent that Maryland complains of its inability to enforce its duly enacted statutes *during the pendency of the appeals*, that is likewise not a harm caused from the failure to grant a stay. Maryland, by virtue of the automatic stay and the existing preliminary injunction (not implicated in these appeals), would not be able to enforce its statutes during these appeals in any event.

## IV.    The Public Interest Strongly Disfavors a Stay

39.    The last prong – the public interest – is largely duplicative of factors addressed above.  The United States Trustee seems to recognize this very point, *see* UST Motion at 32, but draws the wrong conclusion.  In this case, where the harms are societal and the creditors consist of not only individual victims but also thousands of State, municipal, and Tribal governments across the country, the interests of the public and of the creditors are aligned.  And if it is the views of the "government" that matter, UST Motion at 32, then the views of the vast majority of the State, municipal, and Tribal governments across the nation are more significant and weighty than those of a small minority of states and of a non-economic government stakeholder charged only with the self-described role of "bankruptcy watch-dog."

40.    At the end of the day and as Mr. Guard avers, the balance of harms weighs so decidedly in favor of the stay objectors and against the stay proponents that the public interest would be severely disserved by a stay.

## V.    A Stay, If Granted, Should Be Conditioned on a Substantial Bond

41.    If despite the absence of any factor weighing in favors of movants, the Court were to entertain a stay, the Court should condition a stay on the posting of a substantial supersedeas bond.

### A.    The Movants Can Be Required to Post a Supersedeas Bond

42.    Movants, at least those who even address the issue, assert that for various reasons they cannot be required to post a bond.  Significantly, however, the harm that a stay would inflict on the creditors and the public has already been addressed at length above, and the movants' unwillingness to post a bond would accentuate that injury.  *See General Motors*, 409 B.R. at 34 (movants' statement that they would not post a bond "underscores the potential loss to the estate").

43.     Under Rule 8007 of the Federal Rules of Bankruptcy Procedure, movants can indeed be required to post a supersedeas bond.  Subsection (a) of that Rule describes certain "relief" that may be sought from the Court, including "the stay of a judgment, order, or decree of the bankruptcy court pending appeal."  The Rule then provides, as relevant here:

> (c) Filing a Bond or Other Security.  The district court, BAP, or court of appeals may condition relief on filing a bond or other security with the bankruptcy court.
>
> (d) Bond or Other Security for a Trustee or the United States.  The court may require a trustee to file a bond or other security *when the trustee appeals*.  A bond or other security is not required *when an appeal is taken by the United States*, its officer, or its agency or by direction of any department of the federal government.

Fed. R. Bankr. P. 8007(c), (d) (emphasis added).

44.     From this Rule, three points are apparent.  First, the Rule does not contain any mention of States nor any relevant exceptions applicable to States.  Thus, whatever may be the rule respecting the United States, Bankruptcy Rule 8007 does not excuse States from the bonding requirement.

45.     Second, the plain language of the Rule does not excuse the United States from the normal rules respecting a supersedeas bond – *i.e.*, a bond that is placed as a condition to a stay.  The Rule says that a bond is not required "when *an appeal* is taken by the United States" – it does not say that a bond is not required when *a stay* is sought by the United States.  The United States Trustee's contrary position is premised on the notion that subsection (d) of the Rule is an exception to subsection (c), but there is nothing in the plain language to suggest that this is so.  Subsection (c) of Rule 8007 sets forth the rule regarding "relief":  the court "may condition relief [e.g., a stay] on filing a bond or other security."  Subsection (d) addresses an entirely different subject:  the posting of a bond simply as a condition of an appeal.  For that sort of bond – for example, a bond

17

to cover costs[12] – the Rule makes clear that a "trustee" can be required to post one, but the United States is "not required" to do so.

46.    Finally, even if subsection (d) addressed supersedeas bonds, the provision does not prohibit the court from conditioning a stay on the United States' posting of a bond.  The United States can't be "required" to post one (under this reading), but the consequence may be that it does not obtain a stay.  The language of Bankruptcy Rule 8007(d) is notably different in this regard from the language of Federal Rule of Civil Procedure 62(e) – not applicable here – which says that "[t]he court *must not* require a bond . . . when granting a stay on appeal by the United States."  Fed. R. Civ. P. 62(e) (emphasis added).

### B.    The Movants Should Be Required to Post a Substantial Bond

47.    The purpose of a supersedeas bond, and the reason the bond is almost always required, is to "protect against diminution in the value of property pending appeal and to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 350 (S.D.N.Y. 2007) (internal quotations and citations omitted).  Therefore, "[i]f a stay pending appeal is likely to cause harm by diminishing the value of an estate…and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the nonmoving parties."  *Id*. at 351.

48.    Applied here, the Court should set a substantial bond, tied to the potential harm to nonmoving parties should the Plan unravel – or, at the very least, the amount of distributions to creditors that may potentially be delayed during the pendency of the appeal.

---

[12] *See generally, City of Providence v. Aerospostable, Inc.*, 2014 WL 6487393 (S.D.N.Y. Nov. 17, 2014) (explaining distinction between cost bond and supersedeas bond); *Oehring v. Fox Typewriter Co.*, 266 F. 682 (2d Cir. 1920) (same).

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests

that the Court deny a stay, or at the very least condition a stay on the posting of a substantial

supersedeas bond.

Dated:  October 22, 2021                            Respectfully submitted

                                                   /s/ *Kenneth H. Eckstein*
                                                   Kenneth H. Eckstein
                                                   Rachael Ringer
                                                   Jonathan Wagner
                                                   David E. Blabey Jr.
                                                   KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                                   1177 Avenue of the Americas
                                                   New York, NY 10036
                                                   Telephone: (212) 715-9100
                                                   Email: keckstein@kramerlevin.com
                                                           rringer@kramerlevin.com
                                                           jwagner@kramerlevin.com
                                                           dblabey@kramerlevin.com

                                                   David J. Molton
                                                   Steven D. Pohl
                                                   Gerard Cicero
                                                   BROWN RUDNICK LLP
                                                   7 Times Square
                                                   New York, NY 10036
                                                   Telephone: (212) 209-4800
                                                   Email: dmolton@brownrudnick.com
                                                           spohl@brownrudnick.com
                                                           gcicero@brownrudnick.com

                                                   Scott D. Gilbert (admitted *pro hac vice*)
                                                   Craig Litherland (admitted *pro hac vice*)
                                                   Kami E. Quinn (admitted *pro hac vice*)
                                                   Richard D. Shore (admitted *pro hac vice*)
                                                   Jenna A. Hudson (admitted *pro hac vice*)
                                                   Emily P. Grim (admitted *pro hac vice*)
                                                   GILBERT LLP
                                                   100 New York Ave, NW, Suite 700
                                                   Washington, D.C. 20005
                                                   Telephone: (202) 772-2200
                                                   Email: gilberts@gilbertlegal.com
                                                           litherlandc@gilbertlegal.com
                                                           quinnk@gilbertlegal.com

shorer@gilbertlegal.com
hudsonj@gilbertlegal.com
grime@gilbertlegal.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email:  mcyganowski@otterbourg.com
        jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
                                                  :
In re:                                            :    Chapter 11
                                                  :
PURDUE PHARMA L.P., *et al.*,                     :    Case No. 19-23649 (RDD)
                                                  :
                          Debtors.                :    (Jointly Administered)
                                                  :
---------------------------------------------------------------- X

### DECLARATION OF JOHN M. GUARD
### IN SUPPORT OF AD HOC COMMITTEE'S OPPOSITION
### TO MOTIONS FOR A STAY PENDING APPEAL

I, John M. Guard, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true
to the best of my knowledge, information, and belief:

1.       I am over eighteen years of age and am otherwise competent and capable of
making this declaration. This declaration is based on my personal knowledge.

2.       I submit this declaration on behalf of the Ad Hoc Committee of Governmental
and Other Contingent Litigation Claimants (the "Ad Hoc Committee") in opposition to the
motions filed by certain parties seeking a stay pending appeal of the Order (the "Confirmation
Order") [Dkt. No. 3787] confirming the chapter 11 plan (the "Plan") of the above-captioned
debtors and debtors-in-possession (the "Debtors" or "Purdue").

3.       As described further below, a stay of the Confirmation Order would cause
substantial harm to the State of Florida and the many other non-federal governmental claimants
that voted in favor of, and continue to support, the Plan. Indeed, it is my belief that entering a
stay will materially reduce the residual value of Purdue to the over ninety-six percent of creditors
and super-majority of states that voted in favor of the Plan. My belief is based upon the effect
that uncertainty and the bankruptcy process has had on the Debtors and the difficulties that a stay

1

will create in keeping and maintaining senior employees and directors for Purdue. For example, the United States obtained the approval of a plea agreement and settlement in the Bankruptcy. If that plea goes forward, there will be substantial effects on the Debtors' operations.

### BACKGROUND

4.      I am and have been a member of the Florida Bar for twenty years. I am a member of the bars of the United States District Courts of the Middle, Northern, and Southern Districts of Florida. I was admitted *pro hac vice* in this case by the Bankruptcy Court.

5.      Since January 2019, I have served as the Chief Deputy Attorney General for the State of Florida. I report directly to and serve at the pleasure of Attorney General Ashley Moody. In that role, I am ultimately responsible for, supervise and oversee all substantive legal divisions of the State of Florida, Department of Legal Affairs (the "Department"), including the Antitrust and Complex Litigation Division. Lawyers from the Antitrust and Complex Litigation Division are handling Florida's opioid litigation alongside a team of outside lawyers. Florida's opioid litigation is one of the largest, most important, and most complex litigation matters being handled by the Department. Accordingly, I have expended and continue to expend significant time and energy on that matter, both directly and through my oversight of its progress. My involvement includes participating on a multistate committee working on settlements with certain opioid defendants.

6.      The Attorney General of Florida is elected by the voters of the State of Florida. In addition to serving as the State of Florida's Chief Legal Officer. Florida's Constitution makes her part of the state cabinet. The Governor and cabinet serve as the agency head of the Florida Department of Law Enforcement ("FDLE"). Among other responsibilities, FDLE compiles and collects data on several subjects, including data related to drug related overdose deaths in

2

Florida. As part of my duties, I have received information and data related to opioid overdose

deaths. According to Florida's Interim Drug Report, total drug deaths increased in Florida during

the pandemic by thirteen percent. In the first half of 2020, 3,834 opioid-related deaths were

reported, which was a 30.5 percent increase (897 more deaths than during the same six months in

2019). In 3,034 of the 3,834 deaths, opioids were the cause of death, which was a 51 percent

increase (1,029 more). Deaths caused by oxycodone, the active ingredient in the Debtors

Oxycontin product, increased by ten percent. I have seen preliminary data and data from the

United States Centers for Disease Control and Prevention that would suggest that drug overdoses

are continuing to increase (not decrease) during COVID-19 in Florida and throughout the nation.

According to the United States government, there were 93,331 drug overdose deaths during 2020

(a 30.4% increase). https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm. From my

review of that data set 69,031 of the deaths involved opioids with the CDC's data indicating with

an asterisk that the data is underreported. In other words, more Americans are dying today from

opioid overdoses than when this case was filed.

7.      I have also served as Florida's representative on the Ad Hoc Committee in this

bankruptcy case since the petition date. Before the petition date, I was involved in settlement

negotiations and other activities relating to Purdue since sometime soon after January 2019. I

have been a key participant, among other things, in both pre- and post-petition negotiations

concerning the proposed settlement with the Sacklers that is incorporated in the Plan. I submitted

a declaration in support of confirmation of the Plan and testified at the confirmation hearing.

8.      Prior to and after confirmation, I have been involved in the selection of trustees

and directors related to post-effective date operations. Selection of candidates for these important

roles is almost concluded. It has been somewhat difficult to find conflict-free individuals willing

3

to serve in these roles because of the Debtors' history. If we cannot get the new board and

trustees in place, it is quite probable that we will lose the current set of directors and trustees and

have to start the months long process anew. Doing so will create uncertainty and would in all

probability result in a diminution in the value recovered by creditors, which would likely reduce

the monies available to abate the opioid crisis just as the opioid crisis has an increased number of

deaths.

### THE IMPORTANCE OF THE PLAN GOING EFFECTIVE

9.      The Plan represents an important step towards abating the effects of the opioid

crisis and ameliorating the significant harm caused by Purdue and the Sacklers. Under the terms

of the Plan, an estimated at least $5.5 billion will be distributed on account of contingent liability

claims.[1] The total distribution of value to public creditor trusts devoted to abatement is estimated

to exceed $4 billion.[2] Of this amount, in excess of $1 billion is projected to be distributed to the

public creditor trusts and dedicated to abatement by the end of 2023 if the Plan is not stayed.

10.     Of the payments the Sacklers are obligated to make, an initial payment of $300

million is due on the effective date of the Plan, another $375 million is due on June 30, 2022, and

$375 million is due on June 30, 2023.[3] Each of these three payments is due notwithstanding the

pendency of an appeal (though the third will be paid during an appeal only if the Second Circuit

has issued a ruling on the merits by June 30, 2023).[4] I understand from the Ad Hoc Committee's

financial advisors that after accounting for payments due to the private creditor trusts during each

of these years and certain other assumptions relating to insurance recoveries, over $250 million

---

[1] *See* Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [Dkt. No. 3787], at 41.

[2] *See* Declaration of Jesse DelConte [Dkt. No. 3456], ¶ 31.

[3] *See* Shareholder Settlement Agreement [Dkt. No. 3711], at 28 and 41.

[4] *See id.* § 2.08(a).

4

of the Sackler payments should be available for distribution from the Master Disbursement Trust to the non-federal governmental claimants through the end of 2023.

11.    The requirement that the Sacklers make their initial three payments even in the face of an appeal was extremely important to the Ad Hoc Committee, was heavily negotiated, and represents a critical component of the overall settlement without which its economics would have materially differed. Put differently, the Ad Hoc Committee (and other parties) likely would not have agreed to the Sackler settlement had the Sacklers not been willing to fund these initial three payments even during an appeal.

12.    In addition to the Sackler settlement payments, the non-federal governmental claimants are expected to receive substantial distributions directly from the Debtors or NewCo on the effective date of the Plan and in the years that follow. The Plan calls for effective date payments from the Debtors to both NOAT and the Tribe Trust, estimated in the Plan at $220 million and $50 million, respectively.[5] I understand from the Ad Hoc Committee's financial advisors that, based on estimated cash flows from NewCo's operations (and asset sales) following the Effective Date, NewCo is expected to have another approximately $900 million in aggregate excess cash available for distribution to NOAT and the Tribe Trust through the end of 2024.

13.    All told, on and after the effective date of the Plan, the non-federal governmental claimants are expected to receive over $250 million in distributions from the MDT through 2023 (principally on account of Sackler payments), and over $1.1 billion in cash distributions from the Debtors and excess cash available from NewCo's operations through 2024.[6]

---

[5] *See* Plan at 13 (definition of "Initial Tribe Trust Distribution") and 102 (describing "Initial NOAT Distribution").

[6] Assuming appeals are resolved successfully, additional Sackler payments will be made in 2024 and beyond. The reference to 2023 accounts for the fact that only the first three Sackler payments will be made during an appeal.

14.    The requests for a stay pending appeal threaten to delay the deployment of these

substantial initial funds, and all other subsequent distributions devoted to abatement under the

Plan, indefinitely. The stays, if granted, would also postpone the date by which the Sacklers must

exit the opioid business for good, and would delay the establishment of the Document

Repository contemplated by the Plan – both of which are non-economic provisions of the Plan

that are highly material to the creditors. Purdue's creditors, and in fact the country at large,

cannot afford additional delay. As detailed above, hundreds more Floridians are dying from

opioid overdoses than when this bankruptcy was filed. It is likely that thousands more Americans

are dying now than when this bankruptcy was filed. Given how the monies are to be utilized, it is

quite possible that additional Americans will die if a stay is granted versus if a stay is not

granted. It is unconscionable that the remote chance that some unknown creditor could recover

some money from the Sacklers on some distant day or that some known creditor could receive

additional money after years of litigation could justify the additional death of even a single

American.

15.    States, like Florida, have already been waiting a substantial amount of time for

these resources. States, tribes, and municipalities have been engaged in extensive litigation with

Purdue and the Sacklers for many years. Florida, for instance, served civil investigative demands

("CIDs") on Purdue starting in 2016 and conducted its own comprehensive investigation before

filing suit in 2018. Other non-federal governmental claimants have been engaged in litigation for

similar or even longer lengths of time. Santa Clara County and the City of Chicago filed suits

against Purdue in 2014. Mississippi sued Purdue (and other pharmaceutical manufacturers) in

2015. Tennessee and the District of Columbia formed a large, bipartisan multistate investigation

in 2016. Numerous states served CIDs or pre-litigation subpoenas on Purdue and related parties

thereafter. By the time Purdue filed for bankruptcy in September 2019, at least 50 Attorneys General had sued Purdue – and many had sued the Sacklers as well. In addition to their suits against Purdue and the Sacklers, certain states and members of the Plaintiffs' Executive Committee in *In re National Prescription Opiate Litigation*, No. 17-MD-02804, MDL No. 2804 (N.D. Ohio), had been actively negotiating with Purdue and the Sacklers for well over two years prior to Purdue's bankruptcy.

16.    In sum, in addition to the two years that Purdue's bankruptcy has been pending, non-federal governmental claimants have been awaiting recoveries on their claims against Purdue and the Sacklers for as long as an additional five years pre-petition. While parties are rightly focused on obtaining the highest possible recoveries on their claims, it is also important that monies that could be used for abatement now not be wasted on continuing litigation and that a single-minded focus on obtaining more should not indefinitely postpone abatement for the entire country. Allowing Americans to needlessly die on some ephemeral hope that there may be some chance at more under the circumstances is misguided and shortsighted. The abatement plan is designed to save lives, and any delay in funding the abatement plan will thwart that critical goal.

17.    Separate settlements with other opioid defendants – including the "National Opioid Settlement" referenced in one of the stay motions (i.e., the settlements with McKesson Corp., AmerisourceBergen Corp., Cardinal Health Inc. and Johnson & Johnson) – are no substitute for the deployment of resources under the Purdue Plan. Each opioid settlement provides much-needed incremental funds for abatement and no settlement on its own (or even in combination) will provide enough funds to abate all the harms of the national opioid crisis. Moreover, funds will not be available under the so-called "National Opioid Settlement" until

7

sometime next year. Even then, the settlement will not benefit *all* States and municipalities, but only those that have agreed to it. As of now, only 42 States have signed onto the deal – a group that does not include Washington – and the deadline for municipalities to opt in has not passed.

18.     Based on my twenty years of experience as a litigator, my extensive participation in the pre- and post-petition negotiations leading to the Plan, and my familiarity with the underlying litigation, I believe the Plan as confirmed represents a reasonable resolution, in the current context of this case, of claims against Purdue and the Sacklers, especially when a litigant considers the risks of collection and litigation, and the need for funds to go to programs and projects that will abate the opioid epidemic. The dispute that has existed among the states regarding this bankruptcy has been largely about trying to balance holding members of the Sackler family accountable while at the same time ensuring that needed resources are deployed to deal with the opioid epidemic as quickly as possible. The Plan reflects a reasonable resolution of those goals, yet its benefits can be fully realized only if the Plan goes effective and the work of abatement finally begins.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 22, 2021

JOHN M. GUARD,
Chief Deputy Attorney General
State of Florida