AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Z.W. Julius Chen
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
chenj@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of*
*Unsecured Creditors of Purdue Pharma L.P., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

## OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## TO MOTIONS FOR STAY PENDING APPEAL

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................2

ARGUMENT .........................................................................................................................5

I.     STAY APPELLANTS MEET NONE OF THE FACTORS FOR GRANTING A
STAY OF THE CONFIRMATION ORDER PENDING APPEAL....................................6

     A.    The Balance of Equities Tips Overwhelmingly Against a Stay Pending
Appeal .........................................................................................................6

          1.    Stay Appellants' Claims to Irreparable Harm Absent a Stay Are
Meritless............................................................................................7

               a)    The U.S. Trustee's Asserted Harms Are Illusory ............................7

               b)    Stay Appellants Cannot Rely on Equitable Mootness To
Demonstrate Harm ......................................................................13

          2.    A Stay Would Cause Incalculable Harm to Interested Parties and
the Public ........................................................................................15

          3.    Connecticut and Washington's Bond Arguments Are Unmoored
from Reality ....................................................................................27

     B.    Stay Appellants Fail To Demonstrate A Strong Likelihood Of Success On
The Merits ..................................................................................................29

          1.    Metromedia Stands in the Way of Stay Appellants' Merits
Arguments on Appeal ......................................................................29

          2.    The U.S. Trustee's Constitutional Challenges Border on Frivolous..........33

          3.    The Three Attorneys General's Novel Police Power and Other
Arguments Similarly Lack Support ..................................................35

     C.    At a Minimum, the Terms of the Plan Extending the Preliminary
Injunction Must Be Carved Out From Any Stay and Remain in Place ................39

II.    THE EFFORT TO STAY THE TRUST ADVANCES ORDER IS
INAPPROPRIATE...........................................................................................40

CONCLUSION....................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 461 7th Ave. Market, Inc.*,
  623 B.R. 681 (S.D.N.Y. 2020)................................................................29

*Ad Hoc Comm. of Equity Holders v. Republic Airways Holdings Inc.*
  *(In re Republic Airways Holdings Inc.)*,
  No. 16-cv-3315, 2016 WL 2621990 (S.D.N.Y. May 6, 2016) ................................32

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (2d Cir. 2007) ........................................................13, 27

*Agudath Israel of Am. v. Cuomo*,
  980 F.3d 222 (2d Cir. 2020)................................................................29

*In re Camp Arrowhead*,
  No. SA-10-CV-11-XR, 2010 WL 363773 (W.D. Tex. Jan. 22, 2010) ...................13

*Class Five Nev. Claimants v. Dow Corning Corp.*,
  537 U.S. 816 (2002)................................................................31

*Coronel v. Decker*,
  449 F. Supp. 3d 274 (S.D.N.Y. 2020)................................................................21

*In re Davis*,
  No. 2:20-cv-3492, 2020 WL 6566963 (C.D. Cal. Apr. 22, 2020)...........................28

*In re Dernick*,
  No. 18-32417, 2019 WL 236999 (Bankr. S.D. Tex. Jan. 16, 2019) ........................20

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.*
  *(In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005)........................................4, 29, 30, 31, 32, 33

*In re Fairmont Commc'ns Corp.*,
  No. 92 B 44861 (JLG), 1993 WL 428710 (Bankr. S.D.N.Y. Oct. 12, 1993) .........................20

*In re General Motors Corp.*,
  409 B.R. 24 (Bankr. S.D.N.Y. 2009)................................................................30

*Global Indus. Techs., Inc. v. Hartford Acc. & Indem. Co.*,
  565 U.S. 1014 (2011)................................................................31

*In re Grandview Ests. Assocs., Ltd.*,
  89 B.R. 42 (Bankr. W.D. Mo. 1988)................................................................21

*Hart Holding Co. v. Drexel Burnham Lambert Grp., Inc.*,
    506 U.S. 1088 (1993) ............................................................................................31

*Henrietta v. Giuliani*,
    119 F. Supp. 2d 181 (E.D.N.Y. 2000) ..................................................................21

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ................................................................................................5

*Hodges v. Shalala*,
    127 F. Supp. 2d 790 (D.S.C. 2001) ......................................................................33

*Int'l Schs. Servs., Inc. v. AAUG Ins. Co., Ltd.*,
    No. 10-cv-62115, 2011 WL 9357633 (S.D. Fla. Feb. 18, 2011) ..........................21

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007)............................................................................38, 39

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)..................................................................................37

*Ledesma v. Garland*,
    850 F. App'x 84 (2d Cir. 2021) ..............................................................................6

*Loparex, LLC v. MPI Release Techs., LLC*,
    No. 1:09-cv-01411, 2013 WL 704450 (S.D. Ind. Feb. 26, 2013)..........................28

*Lowenschuss v. Resorts Int'l, Inc.*,
    517 U.S. 1243 (1996)............................................................................................31

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.a.R.L.)*,
    592 B.R. 489 (S.D.N.Y. 2018)..............................................................................34

*MacArthur Co. v. Johns-Manville Corp.*,
    488 U.S. 868 (1988)..............................................................................................31

*In re Machne Menachem, Inc.*,
    No. 3:07-cv-57, 2007 WL 172486 (M.D. Pa. Jan. 18, 2007) ..................................8

*Martin v. Safety Elec. Constr. Co.*,
    151 B.R. 637 (D. Conn. 1993) ..............................................................................36

*Menard-Sanford v. A.H. Robins Co., Inc.*,
    493 U.S. 959 (1989)..............................................................................................31

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019)............................................................................31, 34

*Mohamed v. Reno*,
309 F.3d 95 (2d Cir. 2002).................................................................................30

*N.Y. Skyline, Inc. v. Empire State Bldg. Co. L.L.C. (In re N.Y. Skyline, Inc.)*,
No. 09-10181, 2013 WL 5487938 (Bankr. S.D.N.Y. Oct. 2, 2013) ...................32, 33

*Nat. Res. Defense Council, Inc. v. U.S. Food & Drug Admin.*,
884 F. Supp. 2d 108 (S.D.N.Y. 2012)....................................................................5

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
760 F.3d 344 (4th Cir. 2014) ...............................................................................32

*Natl Heritage Found., Inc. v. Highbourne Found.*,
574 U.S. 1076 (2015)............................................................................................31

*Nken v. Holder*,
556 U.S. 418 (2009)..........................................................................5, 6, 7, 14, 29

*In re Purdue Pharma., LP*,
619 B.R. 38 (S.D.N.Y. 2020)...........................................................................9, 37

*Rural & Migrant Ministry v. U.S. Env't Prot. Agency*,
510 F. Supp. 3d 138 (S.D.N.Y. 2020)...................................................................21

*In re Sabine Oil & Gas Corp.*,
548 B.R. 674 (Bankr. S.D.N.Y. 2016) ...................................................................13

*SEC v. Brennan*,
230 F.3d 65 (2d Cir. 2000)....................................................................................36

*Stern v. Marshall*,
564 U.S. 462 (2011)...............................................................................................34

*U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc.*
*(In re Windstream Holdings, Inc.)*,
No. 20-cv-4276 (VB), 2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020) .....................13

*Virginian R. Co. v. United States*,
272 U.S. 658 (1926)................................................................................................7

*Vision-Park Props., LLC v. Seaside Engineering & Surveying, LLC*,
577 U.S. 823 (2015)...............................................................................................31

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ....................................................................................13

*Welch v. Brown*,
935 F. Supp. 2d 875 (E.D. Mich. 2013).................................................................21

**Statutes**

11 U.S.C. § 362(b)(4) ...................................................................................................36

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 362.05 ..........................................................................36

Jan Hoffman, *Drug Distributors and J.&J. Reach $26 Billion Deal to End Opioid
Lawsuits*, N.Y. TIMES (July 21, 2021)...............................................................24, 25

Jan Hoffman, *Payout from a National Opioids Settlement Won't Be as Big as
Hoped*, N.Y. TIMES (Oct. 21, 2020) ........................................................................24

Press Release, *Drug Overdose Deaths in the U.S. Up 30% in 2020*, CDC: NAT'L
CTR. FOR HEALTH STATS. ........................................................................................17

*Provisional Drug Overdose Death Counts*, CDC: NAT'L CTR. FOR HEALTH STATS.....................16

Sara Randazzo, *States Announce $26 Billion Settlement to Resolve Opioid
Lawsuits*, WALL ST. J. (July 21, 2021) ....................................................................24

Michael Van Schoik, *Mo. Attorney General discusses advances on $500 million
opioid settlement, plus steps still needed to secure funding*, KY3 (Sept. 24,
2021) ........................................................................................................................17

The White House, *A Proclamation on Overdose Awareness Week, 2021* (Aug. 27,
2021) ...................................................................................................................10, 18

The Official Committee of Unsecured Creditors (the "Official Committee")[2] appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Purdue"), by and through its undersigned counsel, hereby submits this opposition (the "Opposition") to: (i) *Amended Memorandum of Law in Support of United States Trustee's Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* [ECF No. 3801] (the "U.S. Trustee Motion")[3]; (ii) *Motion of the States of Washington and Connecticut for a Stay Pending Appeal* [ECF No. 3789] (the "CT/WA Motion"); (iii) *State of Maryland's Motion for Stay of Confirmation Orders [3786, 3787] and Trust Advances Order [3773] Pending Appeal* [ECF No. 3845] (the "MD Motion**"** and, Maryland together with Washington and Connecticut, the "Three Attorneys General"); and (iv) the *Notice of Presentment of Joint Motion of Certain Canadian Municipality Creditors and Appellants and Certain Canadian First Nations Creditors and Appellants for the Granting by the Bankruptcy Court of a Stay Pending Appeals, Joinder to the Stay Motions of the Office of the United States Trustee and the State of Maryland, and Granting Related Relief* [ECF No. 3873] (the "CMFN Motion" and, collectively with the U.S. Trustee Motion, the CT/WA Motion, the MD Motion, and the CMFN Motion, the

---

[2] The Official Committee was appointed by the United States Trustee at the beginning of these Chapter 11 Cases to serve as a fiduciary for the interests of all unsecured creditors, and currently comprises the following eight members: (i) The Blue Cross and Blue Shield Association (chair); (ii) CVS Caremark Part D Services L.L.C. and CaremarkPCS Health L.L.C.; (iii) Cheryl Juaire, (iv) Kara Trainor; (v) LTS Lohmann Therapy Systems Corporation; (vi) Pension Benefit Guaranty Corporation; (vii) Walter Lee Salmons; and (viii) West Boca Medical Center, plus three *ex officio* members: (a) Cameron County, Texas, on behalf of the Multi-State Governmental Entities Group; (b) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors; and (c) Thornton Township High School District 205, on behalf of certain public school districts.

[3] Citations in this Opposition are to the U.S. Trustee's Motion at ECF No. 3801. The Official Committee also opposes the *Second Amended Memorandum of Law in Support of United States Trustee's Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* [ECF No. 3972].

"Stay Motions").[4]  By the Stay Motions, the U.S. Trustee, Three Attorneys General, and CMFN

(together, the "Stay Appellants")[5] seek to stay pending appeal:  (i) *Findings of Fact, Conclusions*

*of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of*

*Purdue Pharma L.P. and Its Affiliated Debtors* [No. 3787] (the "Confirmation Order"), which

approves the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.*

*and Its Affiliated Debtors* [ECF No. 3726] (the "Plan")[6]; and (ii) *Order (I) Authorizing the Debtors*

*to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II)*

*Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other*

*Related Relief* [ECF No. 3773] (the "Trust Advances Order").  In support of this Opposition, the

Official Committee respectfully states as follows.[7]

### PRELIMINARY STATEMENT

1.      The Official Committee vigorously opposes the Stay Appellants' request to stay the

orders of the Court confirming the Plan and providing for desperately needed distributions to

compensate victims of the opioid epidemic and fund abatement programs.  The opioid epidemic is

ravaging communities, spreading addiction and harm, and claiming the lives of more than 200

people *every single day*.  The Plan is designed to distribute much needed funds to individuals

harmed by the Debtors' marketing and sale of opioids, and to fund abatement programs that will

---

[4] The Official Committee also opposes the requests for a stay filed by Ronald S. Bass, Sr., which raises no argument in support of a stay, and by Ellen Isaacs, which adopts the arguments set forth by Washington and Connecticut.  *See Ronald Bass, Sr. Letter* [ECF No. 3860]; *Motion of Ellen Isaacs, Deceased Patrick Ryan Wroblewski & the American People for a Stay Pending Appeal* [ECF No. 3890].

[5] Several other parties also filed notices of appeal, but did *not move* for a stay pending appeal, namely, California, Rhode Island, Vermont, Delaware, Oregon, the District of Columbia and one personal injury plaintiff (collectively with the Stay Appellants, the "Appellants").  *See District of Columbia Notice of Appeal* [ECF No. 3725]; *California Notice of Appeal* [ECF No. 3813]; *State of Rhode Island and Providence Plantations Notice of Appeal* [ECF No. 3832]; *Vermont Notice of Appeal* [ECF No. 3849], *Delaware Notice of Appeal* [ECF No. 3851]; *Oregon Notice of Appeal* [ECF No. 3853]; *Maria Ecke Notice of Appeal* [ECF No. 3878].

[6] Capitalized terms used and not defined herein have the terms ascribed to them in the Plan.

[7] The Public School District Claimants have informed the Official Committee that they support the relief that the Official Committee is seeking in opposing the Stay Motions.

provide treatment, support and resources to those suffering from addiction, their families, and their communities. As set forth in declarations filed in support of this Opposition, the Official Committee's members include individuals with devastating, personal understanding about the horrors of the opioid epidemic, and knowledge about the ways that distributions provided under the Plan can help to alleviate some of that harm.[8] Every day that confirmation of the Plan is stayed is another day that victims are deprived of funds that are sorely needed and another day that defers funding programs to combat addiction, save people from overdoses, provide recovery support, and otherwise abate the opioid epidemic. As such, as the fiduciary body for all of the Debtors' creditors, the Official Committee strongly opposes the request by the U.S. Trustee and the Three Attorneys General to stop the Plan from going effective and distributing life-saving funds as soon as possible.

2.       The pressing need for distributions under the Plan to combat the daily harm of the opioid epidemic may explain why the Stay Appellants stand markedly alone in their attempt to stay implementation of the Plan. The overwhelming majority of creditors support the Plan, which received voting support from more than 95% of Purdue's creditors that voted, and every *ad hoc* group active in these Chapter 11 Cases. Even among the handful of Appellants who seek review of the Confirmation Order, the majority of states in number (and overwhelming majority by state population) have *not sought to stay* implementation of the Plan pending appeal, possibly because they recognize the tremendous harm that would result from such a stay.

3.       In contrast to the significant and irreparable injury that would result from a stay, the Stay Appellants fail to raise any concrete or cognizable injury that will result if the Stay Motions

---

[8] *See Declaration of Cheryl Juaire in Opposition to Motions to Stay Pending Appeal* ("Juaire Decl.") and *Declaration of Kara Trainor in Opposition to Motions to Stay Pending Appeal* ("Trainor Decl."), filed contemporaneously herewith.

are denied.  For instance, the U.S. Trustee and Attorneys General of Washington and Connecticut argue that they face the risk of equitable mootness, but the Debtors, the Official Committee, and other large creditor groups supporting the Plan in the appeals have made clear—indeed, stipulated as directed by the district court—that the Plan cannot go into effect before December 8, 2021 at the earliest and will not argue equitable mootness based upon the steps the Debtors are taking in preparation for the Effective Date pursuant to the Confirmation Order or the Trust Advances Order.[9]  Moreover, courts have routinely rejected similar arguments as a sufficient basis to stay an order approving a plan of reorganization.  The Stay Appellants' remaining purported harms are academic, illusory, and otherwise insufficient to justify a stay, especially in contrast to the undeniably massive harm that would result from delaying distributions under the Plan.  The arguments made by the Office of the U.S. Trustee on this score are particularly galling, given that the Office of the U.S. Trustee has made clear that it is not representing the interests of the United States in these appeals—indeed it does not represent the interests of any person or creditor in these Chapter 11 Cases.

4.    Consideration of the harms that would be caused by a stay is even more stark given the Stay Appellants' unlikely chances of success on appeal.  The Stay Appellants' success on an appeal would require overturning established Second Circuit precedent, *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) ("*Metromedia*"), and its progeny that authorize nonconsensual third-party releases that are the subject of the appeal.  In the face of controlling law that supports the Confirmation Order, the Stay Appellants' appeals are highly unlikely to prevail.

---

[9] *See Amended Stipulation*, *In re Purdue Pharma L.P.*, No. 21-cv-7532-CM (S.D.N.Y.) [ECF No. 71].

5.      The effort to stay the Trust Advances Order, which simply sets up the structures to allow for funds to be distributed on the Effective Date, is even more inappropriate.  There simply is no basis to stay the Trust Advances Order, particularly given the stipulation memorializing the agreement by all appellees not to cite actions taken under the order as a basis for equitable mootness.[10]

6.      Accordingly, the Stay Motions should be denied.

## ARGUMENT

7.      A stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review," *Nken v. Holder*, 556 U.S. 418, 427 (2009), and thus an "extraordinary remedy" evaluated under "stringent" standards, *Nat. Res. Defense Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012).  Four factors are relevant:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
>
> (2) whether the applicant will be irreparably injured absent a stay;
>
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
>
> (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of . . . discretion."  *Id.* at 433-34.

8.      Stay Appellants do not come close to demonstrating that any of the stay factors support a stay of the Confirmation Order or the Trust Advances Order pending appeal.  Notably, the majority of Appellants—including six of the nine appellant Attorneys General—do not even

---

[10] *See Amended Stipulation*, *In re Purdue Pharma L.P.*, No. 21-cv-7532-CM (S.D.N.Y.) [ECF No. 71].

request a stay pending appeal.  Of public claimants, only the Three Attorneys General, who are employed by states that represent approximately 5% of the U.S. population, join the U.S. Trustee in seeking a stay.[11]

9.      The fact that all but three Attorneys General, and the overwhelming majority of the Debtors' creditors, *do not seek a stay* that will block funds from flowing to support abatement programs and compensate victims as soon as possible, should come as no surprise.  With respect to the Confirmation Order, the balance of equities decidedly *dis*favors granting a stay—relief that is inappropriate for the additional reason that Stay Appellants fail to demonstrate a strong likelihood of prevailing on the merits.  Stay Appellants' bid to stay the Trust Advances Order— despite repeated assurances by the parties and ample support in case law that work performed in preparation for the Effective Date could not possibly result in equitable mootness—similarly is without merit.  Accordingly, the Stay Motions should be denied.

## I.   STAY APPELLANTS MEET NONE OF THE FACTORS FOR GRANTING A STAY OF THE CONFIRMATION ORDER PENDING APPEAL

### A.  The Balance of Equities Tips Overwhelmingly Against a Stay Pending Appeal

10.     Turning first to the Confirmation Order, a stay pending appeal may be denied outright if the balance of equities (factors two, three, and four) weigh against granting relief.  *See, e.g.*, *Ledesma v. Garland*, 850 F. App'x 84, 89-90 (2d Cir. 2021) ("[W]e need not resolve whether [movant] has actually met th[e] [merits] factor because, even if he has, his motion still fails on the other remaining *Nken* prongs.").  As the Supreme Court has emphasized, a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant."  *Nken*, 556 U.S. at 427

---

[11] The Attorneys General representing the other five appellant states and the District of Columbia who have chosen to appeal the Confirmation Order but not seek any stay pending appeal are employed by states that represent approximately 15% of the U.S. population.  The Attorneys General representing the remaining states, which represent approximately 80% of the U.S. population, all support the Plan.

(quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).  "[T]he traditional stay inquiry" also "calls for assessing the harm to the opposing party and weighing the public interest." *Id.* at 435.  And in the end, the decision to grant extraordinary stay relief is committed to judicial discretion. *Id.* at 434.

11.    Here, Stay Appellants fall well short of demonstrating that they will suffer irreparable harm in the absence of a stay pending appeal.  At the same time, their disingenuous attempts to explain away the obvious and grave harms that a stay would visit on interested parties and the American public at large simply reinforce the reality that the balance of equities tilts overwhelmingly *against* Stay Appellants, and illustrate the degree to which the Stay Appellants are willing to shut their eyes to the real world consequences of their actions (especially the U.S. Trustee).  The Court need not even reach the merits of the appeal to deny stay relief.

### 1. *Stay Appellants' Claims to Irreparable Harm Absent a Stay Are Meritless*

12.    Despite the fact that a showing of irreparable harm in the absence of a stay is one of the "most critical" facets of the stay inquiry, *Nken*, 556 U.S. at 434, Stay Appellants devote just a few pages each (or less) to the subject.  None of their thinly presented harms is sufficient to satisfy the second stay factor.

### a) *The U.S. Trustee's Asserted Harms Are Illusory*

13.    The U.S. Trustee, who can assert no harm that will befall itself, asserts that "the interests of small stakeholders" will be irreparably harmed if a stay is not granted.  U.S. Trustee Mot. at 32–33.  Setting aside for the moment (i) that the members of the Official Committee include individuals who have, themselves, "lost, cared for, and/or financially supported their loves ones" swept up by the opioid epidemic, *id.* at 33; (ii) the overwhelming support for the Plan expressed by tens of thousands of individual victims and the parents and guardians of children diagnosed at birth with Neonatal Abstinence Syndrome ("NAS") who voted in favor of the Plan; and (iii) the

support for the Plan expressed by the Ad Hoc Group of Individual Victims and by the NAS

Committee (both of which are entrusted with protecting the interests of their constituents), the U.S.

Trustee's declared "interests" are already fully protected by the appeals themselves.    In the

(unlikely) event that the Sackler Releases are deemed unlawful and the Confirmation Order is

vacated, it should go without saying that any released civil causes of action against the Sacklers

would revert to the holders of such claims.    To quote the U.S. Trustee, "the releases [would be]

reversed on appeal."    U.S. Trustee Mot. at 34.    A stay pending appeal is therefore completely

unnecessary to avoid the alleged harm.    *See, e.g.*, *In re Machne Menachem, Inc.*, No. 3:07-cv-57,

2007 WL 172486, at *2 (M.D. Pa. Jan. 18, 2007) (agreeing that appellant would not suffer

irreparable harm because "[i]f successful on appeal, the provision releasing [party] from any

liability he may owe to Debtor will be voided and any claims Debtor may have against [party] will

be restored").

14.    The U.S. Trustee attempts to create a semblance of irreparable injury by speculating

that "[t]hose who have filed actions already presumably will face motions to dismiss based on the

releases."    U.S. Trustee Mot. at 34.    But that argument not only presumes courts would act

unreasonably and order dismissal notwithstanding ongoing appeals over the Sackler Releases, but

also ignores applicable relation back, savings, and other such statutes and doctrines.    Moreover,

for both claimants with actions pending and claimants who have yet to file their causes of action,

statutes of limitations have been tolled by a separate order that remains in effect for a period even

if the Plan is vacated or reversed.[12]

15.    None of the Three Attorneys General joins in the U.S. Trustee's argument that

pending or to-be-filed claims somehow would be lost or otherwise prejudiced absent a stay.    The

---

[12] *See Stipulated Order Tolling Shareholder Released Claims* [ECF No. 3732].

Three Attorneys General's silence is particularly telling since they actually hold such causes of action, unlike the U.S. Trustee.[13]

16.      Regardless, it is disingenuous for the U.S. Trustee to paint "individual stakeholders" as a whole as "against releasing the Sackler family" and in favor of pursuing claims individually. U.S. Trustee Mot. at 33–34. The U.S. Trustee well knows that more than 95% of voting creditors overall—including 95.7% of non-NAS personal-injury claimants and 98% of NAS personal-injury claimants—supported the Plan along with the Official Committee, and each and every other one of the various *ad hoc* groups—the Ad Hoc Committee, the MSGE Group, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, the NAS Committee and the Public School District Claimants.[14] *See* Bench Ruling at 8-10[15]; Confirmation Order § S.[16]

17.      So whose interests exactly does the U.S. Trustee represent that will be irreparably harmed? When the U.S. Trustee was pressed by Judge McMahon in the district court hearing these appeals to identify whose interests it was protecting (or whose claims it was seeking to defend in the appeal), the U.S. Trustee was unable to answer that simple question.[17] And it is clear that the

---

[13] Maryland (alone) asserts injury to its sovereign interests in bringing civil enforcement actions. *See* MD Mot. at 14-16. But stay or not, prevailing on appeal will fully redress the release of Maryland's claims. As for Maryland's desire to engage in civil enforcement immediately, there is no reason to believe that a stay of the Confirmation Order would open the door to pursuing such actions during the pendency of the appeals. *See In re Purdue Pharma., LP*, 619 B.R. 38 (S.D.N.Y. 2020).

[14] *See* Plan § 1.1 (defining Supporting Claimants); Confirmation Order § II(f).

[15] *Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan* [ECF No. 3786] (the "Bench Ruling").

[16] *See also Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3372] ("Voting Declaration"), Ex. A.

[17] *See* Oct. 12, 2021 Hr'g Tr., No. 21-cv-7532-CM (S.D.N.Y.) at 33:13-36:4, attached as Exhibit A; *see also* Oct. 14, 2021 Hr'g Tr., No. 19-23649-RDD (Bankr. S.D.N.Y.) at 147:11–151:9. On October 21, 2021, the district court entered an order reiterating the question about what releases are at stake in the appeals. *See Order Consolidating Newly-Docketed Appeals and Addressing Other Matters*, No. 21-cv-7532-CM (S.D.N.Y.) [ECF No. 75].

U.S. Trustee does not represent the United States or the United States government. The United States has not filed a notice of appeal (and the Department of Justice settled its claims with both the Debtors and the Sacklers), yet the U.S. Trustee seems to have assumed the role as the mouthpiece for the federal government for this stage of these cases. Cloaking itself in the fiduciary garb of "the government" for purposes of the stay inquiry, the U.S. Trustee resorts to arguing that as a "bankruptcy watchdog" it is acting in the name of the integrity of the bankruptcy system and the public interest. U.S. Trustee Mot. at 32. But again, whether or not that statement is true, it has nothing to do with whether those interests will be irreparably harmed *absent a stay* of the Confirmation Order. The U.S. Trustee entirely elides that critical distinction. And for the same reason, the U.S. Trustee's argument that when the government is a party, the injury and public interest factors merge, *see* U.S. Trustee Mot. at 32, is inapposite. That may well be the cases where the government is seeking stay relief. But here, the U.S. Trustee has taken pains to clarify that it is not representing the interests of United States and thus cannot invoke case law that is predicated on representing the interests of the government.

18.    In truth, the fact that the U.S. Trustee continues to define the public interest so narrowly—pitting "principle" against "statements by the representatives of all of the people . . . that speak for the roughly 95 percent of the people that voted in favor of the plan," Aug. 23, 2021 Hr'g Tr. at 131—is just another example of the federal government failing to live up to a declared "commit[ment] to addressing addiction and the overdose epidemic" through "significant investments." The White House, *A Proclamation on Overdose Awareness Week, 2021* (Aug. 27, 2021).[18] Consider the following:

---

[18]https://www.whitehouse.gov/briefing-room/presidential-actions/2021/08/27/a-proclamation-on-overdose-awareness-week-2021/

- From 2008 to 2017, the federal government collected $4 billion in tax revenue from distributions that Purdue made to the Sacklers (not even counting another $634 million received directly from Purdue in 2007).

- As part of settling their civil claims against the Sacklers in late 2020, the federal government received another $225 million from the Sacklers, and will be receiving additional distributions after the Plan goes effective.

- The federal government has repeatedly refused requests to earmark those massive sums for opioid abatement or for victim compensation.[19]  In its refusal to earmark funds for abatement, the federal government stands alone among opioid claimants that actively participated in the Chapter 11 Cases and related mediation and will be receiving money under the Plan.

19.    Making matters worse, the federal government has actively *prevented* others from receiving funds from Purdue and the Sacklers.  When the Official Committee in early 2020 spearheaded an effort to create a $200 million Emergency Relief Fund ("ERF") to start the flow of funds to those most in need, it was the federal government (along with certain state Attorneys General) that undermined and ultimately defeated the proposal.  *See* Juaire Decl. ¶ 11; Trainor Decl. ¶ 11.  Likewise, following the conclusion of a hard-fought mediation over the allocation of distributions under the Plan, the federal government entered the negotiation (after refusing to be a mediation party) and insisted on *reducing* the amount of money that should be afforded to personal injury victims by $26 million.[20]  Given the federal government's positions taken throughout the

---

[19] *See Further Statement Regarding Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families under Settlement with the Department of Justice Is Not Prohibited by this Court* [ECF No. 1893] ¶¶ 3-6; *The Official Committee of Unsecured Creditors' Statement Regarding Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States and Request for Certain Modifications in the Proposed Form of Order Approving the Same* [ECF No. 1920] ¶¶ 16-17.

[20] The federal government has also failed to support affected individuals and the public interest in other ways.  For example, despite conducting a years-long investigation of the Sacklers that involved a massive document production, the U.S. Department of Justice simply took "no position" on the Official Committee's request to access those materials—resulting in the depletion of additional resources.

Chapter 11 Cases that reduced recoveries to victims, the U.S. Trustee's criticism of recoveries to victims under the Plan is particularly insincere.[21]

20.      As a result, not counting certain states—which themselves have collected significant tax revenue from Purdue and the Sacklers—the "public" (or in this case, the private claimants) has yet to receive a dime.

21.      The U.S. Trustee's latest claim that it would be in the public interest to stay the Confirmation Order—and thus delay distributions under the Plan that will fund abatement and victims' compensations programs—is so contrary to the existing record and common sense that one is left to wonder about its true motivations.  Notably, should the U.S. Trustee prevail on appeal and overturn the Plan, a potential outcome is that the federal government will receive a $2 billion superpriority claim—none of which it has agreed to devote to opioid abatement or victim compensation—and Purdue will not become a public benefit corporation (or other entity with a similar mission).[22]  Meanwhile, **all other claimants** would face the prospect of pursuing the Sacklers in court, with nowhere close to the recoveries that they would receive under the Plan. Confirmation Order §§ II(d)(iii), MM; Bench Ruling at 89-90.

22.      In short, the U.S. Trustee's fanciful claim that individuals will suffer harm in the *absence* of a stay turns reality on its head.  The U.S. Trustee's assertions of irreparable harm amount to nothing more than baseless fearmongering, and should be rejected out of hand.

---

[21] *Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3256] ¶ 16.

[22] *See Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3459] (the "UCC Confirmation Statement"), at 5 n.13.

### b) *Stay Appellants Cannot Rely on Equitable Mootness To Demonstrate Harm*

23.     Unable to claim any actual harm in the absence of a stay, the U.S. Trustee—joined

by Connecticut and Washington (but not Maryland)—fall back on a familiar refrain in appeals

following confirmation of chapter 11 plans:  that a stay pending appeal is necessary to avoid

equitable mootness.  The U.S. Trustee, Connecticut and Washington misapprehend the governing

law.  Even if mootness currently was a risk—and it is not, as discussed below—it would not be a

basis for establishing irreparable harm.

24.     Indeed, the very authority relied upon by the Stay Appellants recognizes that "[a]

majority of courts have held that a *risk* of mootness, standing alone, does not constitute irreparable

harm."  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (2d Cir. 2007) (emphasis added).  For

good reason:  the argument can be made in *any* post-confirmation appeal of a chapter 11 plan.  *See*

*U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.)*, No. 20-cv-

4276 (VB), 2020 WL 4481933, at *3 (S.D.N.Y. Aug. 3, 2020) ("[M]erely invoking equitable

mootness as the [appellants] have done here—a risk that is present in any post-confirmation appeal

of a chapter 11 plan—is not sufficient to demonstrate irreparable harm.").  As courts around the

country have explained, accepting Stay Appellants' argument "would mean that anytime an appeal

[may be] mooted, a stay would be required," effectively vitiating the irreparable harm requirement

altogether in most bankruptcy appeals.  *In re Camp Arrowhead*, No. SA-10-CV-11-XR, 2010 WL

363773, at *7 (W.D. Tex. Jan. 22, 2010); *see In re W.R. Grace & Co.*, 475 B.R. 34, 207 (D. Del.

2012) ("Indeed, if equitable mootness alone could serve as the basis of irreparable injury, a stay

would be issued in every case of this nature pending appeal.").  The U.S. Trustee, Connecticut, and

Washington cannot bypass the requirement of establishing irreparable harm absent a stay by

pointing to a risk of equitable mootness.

25. And that risk is greatly exaggerated in any case. In fact, the U.S. Trustee itself has expressed its "disagree[ment] that equitable mootness would apply here." U.S. Trustee Mot. at 34. Moreover, the future risk of mootness is neither actual nor imminent. "[S]imply showing some possibility of irreparable injury, fails to satisfy the second factor." *Nken*, 556 U.S. at 420 (citation and internal quotation marks omitted); *see In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) ("A showing of probable irreparable harm is the principal prerequisite for the issuance of a stay pursuant to Rule 8007, and such harm must be neither remote nor speculative, but actual and imminent." (internal quotation marks omitted)).

26. Moreover, while the Stay Motions were still pending and being briefed before this Court, the U.S. Trustee took the extraordinary step of filing a competing stay motion before Judge McMahon in the United States District Court for the Southern District of New York, where the appeals are pending.[23] The Debtors and other appellees made clear on the record that they would not argue that the pending appeals had been rendered equitably moot by the actions undertaken pursuant to the Confirmation Order and Trust Advances Order in advance of the Effective Date, and have entered signed stipulations to that effect on the district court docket,[24] consistent with Judge McMahon's order (as subsequently amended and corrected). The Debtors have also explained that the Plan cannot go into effect until December 8, 2021 at the absolute earliest.[25] As such, there is no conceivable risk of equitable mootness until early December under any scenario.

---

[23] *See Notice of Emergency Motion and Motion by Appellant William K. Harrington, United States Trustee, for a Stay Pending Appeal*, Case No. 7:21-cv-07969-CM (S.D.N.Y. filed Oct. 8, 2021) [ECF No. 18].

[24] *Stipulation*, Case No. 7:21-cv-07532-CM (S.D.N.Y.) [ECF No. 62]; *Amended Stipulation*, *In re Purdue Pharma L.P.*, Case No. 21-cv-7532-CM (S.D.N.Y.) [ECF No. 71]. *Memorandum and Order Denying without Prejudice the United States Trustee's Emergency Motion for a Stay Pending Appeal*, Case No. 7:21-cv-07969-CM (S.D.N.Y.) [ECF No. 48]; *Order Correcting Prior Decision*, Case No. 7:21-cv-07532-CM (S.D.N.Y.) [ECF No. 69].

[25] *See Memorandum and Order Denying without Prejudice the United States Trustee's Emergency Motion for a Stay Pending Appeal*, Case No. 7:21-cv-07969-CM (S.D.N.Y.) [ECF No. 48].

### 2. *A Stay Would Cause Incalculable Harm to Interested Parties and the Public*

27.     In any event, to the extent Stay Appellants can actually demonstrate any irreparable harm, the Court would need to balance any such harm against the injury a stay would cause to other parties.  Here, there is no contest:  the granting of a stay would plainly result in substantially more harm to interested parties and the public than the denial of a stay would cause to Stay Appellants.

28.     The Court need look no further than statements that feature prominently—at least as lip service—in the Stay Motions.  All tout the "dire circumstances of the *worsening* nationwide opioid crisis," rightly calling it "an *ongoing* public health emergency of horrific magnitude," MD Mot. at 3, 7, "*the* defining public health crisis facing Americans of the past generation," CT/WA Mot. at 2, and "the worst manmade epidemic in history," U.S. Trustee Mot. at 33.  All accept that a stay pending appeal "would delay some initial distributions," *id.* at 36, and in turn "delay the implementation of the remediation and abatement programs established under the Plan," CT/WA Mot. at 19; *see* MD Mot. at 18.  And most importantly, all express "no doubt about the importance of affording relief to victims of the opioid crisis"—"countless (and uncounted) victims," U.S. Trustee Mot. at 36—whose "crisis remains acute" even in the face of "desperately needed attention that has been paid to opioid abuse in recent years," CT/WA Mot. at 5.

29.     One would think that the dispositive factor in balancing the equities—particularly for parties wrapping themselves in the public interest and the cause of individual claimants— would be the fact that, "measured in terms of human loss and suffering, the costs [of the opioid epidemic] are incalculable."  CT/WA Mot. at 5.  One would also think that every effort should be made to bolster the "tens of billions of dollars annually" devoted to try and stem the tide of a crisis, when "[y]ear after year, tens of thousands of Americans have fallen victim to dependency,

addiction[,] and even death," *id.* at 4, and "[h]undreds of thousands have died with roughly another

thousand added every week."  MD Mot. at 19.

30.     Incredibly, however, it takes Stay Appellants all of a few paragraphs to weaponize

these facts *against* swift implementation of the Plan and to dismiss the harm a stay would visit on

interested parties and the public as insubstantial or lacking any support.  *See, e.g.*, CT/WA Mot. at

19 ("There is nothing in the record to establish that those initial payments are necessary to avoid

irreparable harm to *any* party or the public." (emphasis added)).  Their arguments belittle the

suffering and death visited on opioid victims every second of every minute of every day in this

country.  They also denigrate the hard-fought compromise that the Official Committee, the vast

majority of states, and numerous other creditor groups reached for the primary purpose of ensuring

that badly needed funds would reach opioid claimants as soon as possible, thereby avoiding the

morass of complex and uncertain piecemeal litigation against the Sacklers that could take years to

reach resolution.  Confirmation Order §§ N, II, KK, MM; Bench Ruling at 89-90.

31.     To be clear, as has been explained time and again throughout the confirmation

proceedings, the Official Committee supported the Plan, in part, because it was and remains the

best available alternative given the facts and circumstances of the Chapter 11 Cases, and the only

way to distribute funds quickly to those in need.  Specifically, the Plan provides mechanisms to

start distributing funds to Purdue's state and municipal creditors, which have pledged to use those

funds for abatement programs addressing the opioid epidemic, to compensate personal injury

victims who have suffered harm from the Debtors' products, to support hospitals that serve opioid

patients, to provide funds to programs that assist mothers and children born with NAS, and abate

the opioid crisis by providing funds to other creditors.  *See* Juaire Decl. ¶ 15; Trainor Decl. ¶ 12,

17–18.

32.     It is crucial that the Plan is consummated and the funds are distributed as soon as possible.  Each additional day of delay causes harm that is real and irreparable.  The Center for Disease Control estimates that more than 96,000 people died from overdoses in the 12-month period ending March 2021.[26]  That equates to more than one person dying every ten minutes, or approximately 263 persons dying per day.  *See* Juaire Decl. ¶ 20.  Of those daily deaths, approximately 204 are opioid overdoses.[27]  This shows a dramatic and tragic *escalation* in the opioid epidemic.  The Center for Disease Control previously estimated that more than 93,331 people died from overdoses in the 12-month period ending December 2020.[28]  In other words, ***we are losing the fight against the opioid epidemic.***  As one state Attorney General that supported the Plan put it, "[t]hat's like a plane going down every day of every week of every month of every year."  Michael Van Schoik, *Mo. Attorney General discusses advances on $500 million opioid settlement, plus steps still needed to secure funding*, KY3 (Sept. 24, 2021).[29]  Maryland itself underscores the "national public health crisis that continues to addict millions and adds approximately 1,000 American lives each week to the more than 600,000 lives opioids overdoses have already taken."  MD Mot. at 2.

33.     But even these horrifying statistics fail to capture the true scale of the daily harm from the opioid epidemic.  In addition to the devastating loss of life, the opioid epidemic also inflicts inestimable harm on the children, parents, partners, siblings, friends, etc., of those whose

---

[26] *Provisional Drug Overdose Death Counts*, CDC: NAT'L CTR. FOR HEALTH STATS., *available at* https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Oct. 20, 2021).

[27] *Id.* (noting that 74,724 deaths in the 12 months ending March 2021 are predicted opioid related).  74,724/365 = 204.

[28] Press Release, *Drug Overdose Deaths in the U.S. Up 30% in 2020*, CDC: NAT'L CTR. FOR HEALTH STATS., https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Oct. 21, 2021).

[29] https://www.ky3.com/2021/09/25/ky3-exclusive-mo-attorney-general-discusses-advances-500-million-opioid-settlement-plus-steps-still-needed-secure-funding/.

lives were cut short by an overdose and the more than more than 1.6 million Americans estimated

to be suffering from opioid use disorder ("OUD").  *See* Juaire Decl. ¶ 22.  As the President stated:

> The overdose epidemic has taken a toll on far too many Americans and their loved
> ones.  Addiction is a disease that touches families in every community, including
> my own.  The epidemic is national, but the impact is personal.  It is personal to the
> millions who confront substance use disorder every day, and to the families who
> have lost loved ones to an overdose.

*A Proclamation on Overdose Awareness Week, 2021*, *supra* note 18; *see also* MD Mot. at 3

(recognizing that proceedings "touch[] every community in the United States—and possibly in

some way nearly every individual").

34.    In their declarations submitted in opposition to the Stay Motions, Ms. Juaire and

Ms. Trainor—two members of the Official Committee appointed by the U.S. Trustee—give

concrete meaning to those statements.  Ms. Juaire describes the impact of the opioid epidemic in

painful and personal detail, based on her experience losing two sons to opioid overdoses, caring

for grandchildren that lost parents to the opioid epidemic, and working as a victim advocate.  As

the founder and president of a national non-profit organization called Team Sharing, Ms. Juaire

has met and talked with hundreds (if not thousands) of families struggling to help a loved one with

OUD, or mourning a loved one who died as a result of the opioid epidemic.  Juaire Decl. ¶¶ 3–7.

35.    As a survivor of the opioid epidemic, Ms. Trainor has personally experienced the

destructive force of drugs like OxyContin.  Beyond her own years-long struggle with addiction,

Ms. Trainor's declaration details how her son was born with NAS and still deals with the lingering

effects of NAS a decade later.  Trainor Decl. ¶¶ 5–6.  In dedicating her life to fighting the opioid

epidemic, *id.* ¶¶ 7–8, Ms. Trainor has seen firsthand how shorthanded and under resourced

grassroots community organizations really are in their battle against the ongoing crisis.  *Id.* ¶ 17.

36.    Unlike Ms. Juaire and Trainor, who are themselves victims of the opioid epidemic,

who work with victims of the opioid epidemic on a daily basis, and whose understanding of the

harm that will result from staying the Plan is grounded in their lived experience, the U.S. Trustee and the federal government's participation in the appeal is based on abstract principle. The U.S. Trustee's position, moreover, appears entirely removed from the realities of the opioid epidemic. The U.S. Trustee never asked to speak to members of the Official Committee with personal experience of the opioid epidemic, or, upon information and belief, to members of the victim community at large (at least until recent attempts to locate support for its Stay Motion). Nevertheless, the U.S. Trustee portends to speak on their behalf.

37.    Nobody disputes that the Plan will create mechanisms and disburse funds intended to abate and remedy some of this harm. These include additional counseling, peer recovery, education, various community organizations that serve those with OUD, medication-assisted treatment centers, clean syringe centers, organizations for children born with NAS, hospital programming, and public school special needs programs. *See* Juaire Decl. ¶¶ 15–16; Trainor Decl. ¶ 17. The Plan, moreover, will provide funds directly to victims of the opioid epidemic who can use those funds to obtain medicine, support, daily needs, or otherwise try to rebuild lives devastated by opioid addiction. Further still, the Plan will result in the creation of a document repository that will serve the public interest by making transparent the conduct of Purdue and the Sacklers, those who did business with them, and those who regulated them—hopefully serving as a forceful deterrent for generations to come. *See* Juaire Decl. ¶ 16; *see also* Bench Ruling at 155–56 (noting that "Ms. Conroy, who has been pursuing Purdue and the Sacklers for as long and as diligently as anyone, in fact testified that the document depository is perhaps the most important aspect of the settlement").

38.    The appeals of the Plan could take months, if not years, to reach a final resolution. Even assuming expedition throughout the process, all agree that a stay would delay

implementation of the Plan.  Each day that funds are held back, there will be real-world—and, unfortunately, life and death—consequences:  abatement programs will not be funded; overdose reversal medicine will not be distributed; community centers will not be constructed; organizations will lack necessary resources to provide sufficient transportation, housing, and counseling; children born with NAS will be left to suffer unnecessarily; those alive will be unable to pay for medical services; and victims will not be compensated.  *See* Juaire Decl. ¶¶ 22–28; Trainor Decl. ¶¶ 15–20.  Fundamentally, this means that lives that could have been bettered or saved, will be imperiled or lost.

39.    Contrary to Maryland's callous suggestion that "arguments raised concerning delay should be suspect," MD Mot. at 19, the harms just discussed are not mere hypothetical outcomes of a stay pending appeal.  As Ms. Trainor recounts, three organizations in her community of Kalamazoo, Michigan—established to provide services such as counseling, peer support, naloxone, and clean syringes—were forced to close or almost closed in the past few months alone. Trainor Decl. ¶ 15.  Ms. Juaire herself lost her (second) son to the opioid epidemic in 2021, and continues to meet families who recently suffered the same terrible loss.  Juaire Decl. ¶ 21.

40.    All of the foregoing is more than sufficient to establish—beyond any doubt—that a stay would cause immeasurable damage for the duration of the appeals that dwarfs any supposed countervailing interests.  It is "well settled precedent that the delay caused to creditors receiving their payments" in and of itself constitutes "significant harm in warranting denial of a stay." *In re Fairmont Commc'ns Corp.*, No. 92 B 44861 (JLG), 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) (internal quotation marks omitted); *see also In re Dernick*, No. 18-32417, 2019 WL 236999, at *4 (Bankr. S.D. Tex. Jan. 16, 2019) ("[C]ourts have generally found that a significant

delay in the administration of an estate, or a delay in the distribution to creditors under a plan generally satisfies the criterion of harm to other parties.").

41.    But even more importantly, the law also recognizes irreparable harm from a stay when human or public health is at risk. *See, e.g.*, *In re Grandview Ests. Assocs., Ltd.*, 89 B.R. 42, 43 (Bankr. W.D. Mo. 1988) (denying motion to stay pending appeal because related non-parties were at risk of asbestosis, which would cause great danger to the related non-parties); *cf. Rural & Migrant Ministry v. U.S. Env't Prot. Agency*, 510 F. Supp. 3d 138, 162–63 (S.D.N.Y. 2020) (determining, in temporary restraining order context that risk of serious danger to the health of the public created a threat of irreparable harm); *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (determining irreparable harm existed because petitioners "face[d] imminent risk to their health, safety, and lives" (quoting *Henrietta v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000))). Relatedly, courts find irreparable harm when individuals are unable to access health care or risk losing health insurance. *See Welch v. Brown*, 935 F. Supp. 2d 875, 888 (E.D. Mich. 2013) ("Plaintiffs are correct that, under certain circumstances, the loss or impairment of health insurance is sufficient to find irreparable harm."); *Int'l Schs. Servs., Inc. v. AAUG Ins. Co., Ltd.*, No. 10-cv-62115, 2011 WL 9357633, at *2 (S.D. Fla. Feb. 18, 2011) (finding policyholders would suffer irreparable harm because parties and "their families face imminent harm to their health and welfare should their pending medical claims continue to go unpaid, . . . [as] [t]he death of a child, the loss of a limb, or prolonged suffering due to lack of treatment cannot be undone by monetary means." (internal citations omitted)).

42.    None of Stay Appellants' excuses for turning a blind eye to these factual and legal realities has any merit. For example, they argue that a stay would not "delay an otherwise imminent Plan consummation" because the Plan cannot be consummated for at least 82 days, the

appeals may be expedited, and distributions will be made over the course of ten years. U.S.

Trustees Mot. at 35; *see* CT/WA Mot. at 19; MD Mot. at 18. But all of that misses the point. As

already noted, the U.S. Trustee and the Three Attorneys General readily concede "that a stay would

delay some initial distributions," U.S. Trustee Mot. at 36, and, more specifically, "implementation

of the remediation and abatement programs established under the Plan," CT/WA Mot. at 19. The

following chart shows anticipated distributions on the Effective Date[30]:

| Claimant Distributee | Estimated Effective Date Distribution[31] |
|---|---|
| PI Trust | $300 million |
| DOJ | $250 million |
| NOAT | $184 million |
| Tribe Trust | $50 million |
| Public Schools' Special Education Initiative | $25.5 million |
| Hospital Trust | $25 million |
| Truth Initiative Foundation | $6.5 million |
| TPP Trust | $5 million |
| PI Futures Trust | $5 million |
| NAS Monitoring Trust | $1 million |

43.    Indeed, the U.S. Trustee and the Three Attorneys General seek to ensure that result

by blocking the expenditure of funds for preparatory work, authorized under the Trust Advances

Order, that will allow the programs to "go live" on the Effective Date. *See* Part II, *infra*. For

individuals, families, and communities in the throes of the opioid epidemic, and those that will

soon become ensnared by it, every day and ever dollar make a difference.

---

[30] These estimated distributions are based on certain assumptions in the Debtors' Disclosure Statement, such as a September 30, 2021 emergence.

[31] The amounts distributed to the NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust are subject to payments of professional fees as set forth in section 5.8 of the Plan. The final amount of the initial NOAT distribution on the Effective Date is subject to adjustment for, among other things, year-to-date budget to actual adjustments for both operating and non-operating results, items outside of the Debtors' control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and potential cash collateral necessary to secure insurance coverage for NewCo and TopCo, and other adjustments. Additionally, it must be noted that the second largest amount of money being distributed on the Effective Date is to the DOJ, at their insistence. As a result, while all other claimants must wait years to receive their full recoveries, the DOJ receives its entire distribution on the very first day.

44.     Maryland nevertheless goes so far as to suggest that a stay would actually save creditors from being harmed by the Plan and "provide an upside to all creditors" by granting an "opportunity to pursue alternatives."  MD Mot. at 18.  That argument is absurd on its face.  An overwhelming number of creditors made the considered and hard-fought decision to vote in favor of and choose *this* Plan as the best available alternative.  Accordingly, it is Maryland that is "elevat[ing] [its] interests over those of the public and the victims themselves" in telling creditors what form "adequate compensation, retribution, and effective deterrence" should take.  *Id.* at 19. Indeed, this argument perhaps reveals one of the unfortunate drivers behind the Stay Appellants' willingness to toss away millions of dollars in guaranteed distributions for abatement programs and compensation to victims.  **In the event that the Appellants are successful and the cases return to all-out litigation, the Attorneys General may look to their state coffers to help them pursue more litigation and one or two states that win the race to the courthouse may hope for a larger recovery than their individual recovery under the Plan.  But the rest of the creditors, and especially the Debtors' numerous personal injury victims, in almost all likelihood will receive much, much less under this scenario, if anything at all**.  *E.g.*, Confirmation Order § MM; Bench Ruling at 89-90.  Perhaps the Three Attorneys General are willing to risk scuttling the guaranteed recoveries to private claimants under the Plan because they are unhappy with the deal they struck with the non-governmental claimants in mediation, or perhaps they believe the American public can be fooled into expecting that the outcomes for personal injury victims will be the same (or not much worse) if the Plan is not confirmed.

45.     Stay Appellants also paternalistically declare that disbursements under the Plan are not all that important, including because there are other mechanisms in place for dealing with the opioid epidemic.  *See, e.g.*, MD Mot. at 18 ("The federal, state, and local governments are already

23

spending roughly the same amount in a month as the Plan . . . ."); *see also* Aug. 23, 2021 Hr'g Tr. at 258 ("[I]t just seems really boneheaded to say that because \$4.325 billion won't pay off or resolve the opioid crisis, you shouldn't take it."). In particular, Connecticut and Washington invoke the National Opioid Settlement (the "<u>NOS</u>"), stating that the NOS provides claimants with sufficient monetary aid. *See* CT/WA Mot. at 20. But the Three Attorneys General mischaracterize the NOS and its import. Unlike the Plan, the NOS "settlement funds are not intended to compensate families of the victims of the two-decade-long opioid crisis." Jan Hoffman, *Drug Distributors and J.&J. Reach \$26 Billion Deal to End Opioid Lawsuits*, N.Y. TIMES (July 21, 2021)[32] (hereinafter Hoffman, *Drug Distributors*); *see* Sara Randazzo, *States Announce \$26 Billion Settlement to Resolve Opioid Lawsuits*, WALL ST. J. (July 21, 2021) ("***Individuals and families who have been affected by opioid abuse won't receive any money directly***." (emphasis added)).[33] The same is true for all private side claimants. Appellant Washington also fails to mention that it is one of six states that has opted out of the NOS, and thus the argument that Washington is receiving recoveries on opioid liability from that litigation is false.

46.    At any rate, it is hard to take those arguments seriously when Stay Appellants themselves simultaneously underscore how the opioid epidemic continues to rage and cause "incalculable" costs "in terms of human loss and suffering," CT/WA Mot. at 5, and thus there is "*no doubt* about the importance of affording relief to victims of the opioid crisis," U.S. Trustee Mot. at 36 (emphasis added). Whatever amounts the NOS provides, there can be no question that it is not enough. *See* Jan Hoffman, *Payout from a National Opioids Settlement Won't Be as Big as Hoped*, N.Y. TIMES (Oct. 21, 2020) ("Whatever the final amount [of the NOS settlement], it will

---

[32] https://www.nytimes.com/2021/07/21/health/opioids-distributors-settlement.html.

[33] https://www.wsj.com/articles/states-announce-26-billion-settlement-to-resolve-opioid-lawsuits-11626890613.

certainly fall well short of what public health experts say is needed to heal the long-term effects of the opioid crisis.").[34]  In Maryland's words, "more money is clearly necessary."  MD Mot. at 18.  Indeed, that is why Washington's Attorney General announced that "[t]he [NOS] settlement is, to be blunt, not nearly good enough for Washington":  "It stretches woefully insufficient funds into small payments over nearly 20 years."  Hoffman, *Drug Distributors*, *supra*.

47.      That statement directly contradicts the Washington Attorney General's statement in his own Stay Motion that the NOS "holds the promise of providing larger and faster funding for such programs," as compared to the Plan.  CT/WA Mot. at 20.  And it is the height of condescension for Stay Appellants—most of all, the U.S. Trustee purporting to speak for individual claimants— to decide that those suffering directly and indirectly from the opioid epidemic would "fare poorly" in receiving prompt distributions as a result of the Plan's implementation, U.S. Trustee Mot. at 22 n.14, and to accuse the Official Committee of "delaying relief to the public for more than two years," MD Mot. at 19, when it is the federal government and certain states that undermined the immediate disbursement of funds as part of the proposed ERF.  Such hypocrisy is all the more apparent given that Stay Appellants' alternative would be to have claimants sit on the sidelines while the appeals are pursued, and then if successful have those claimants spend additional time litigating against the Sacklers before seeing any recovery (likely none).

48.      The Stay Appellants' alternative would also result in an expensive and chaotic race to the courthouse, where every creditor would not only be litigating against the Sacklers, but also be rushing to try to be first in line with a judgment in order to have any hope of collecting any recoveries.  The Official Committee sought to avoid that outcome, which *may* benefit only a few creditors, but is guaranteed to leave the vast majority of creditors—and likely every single one of

---

[34] https://www.nytimes.com/2020/02/17/health/national-opioid-settlement.html.

the 140,000 personal injury victims who filed a proof of claim—without any recoveries whatsoever.[35]  Perhaps the Attorneys General want this alternative because they know that the state of Washington was "nearly trial ready" at the outset of these Chapter 11 Cases and expects to be able to proceed to judgment swiftly while other parties race to try to advance their claims.[36]  Certainly, the Three Attorneys General know that the personal injury and other private claimants, who tend to have fewer resources and less access to attorneys, will be especially disadvantaged under this scenario.  In any event, Stay Appellants have yet to explain why they embrace that outcome when they so readily trumpet the cause of opioid victims in other contexts.

\*        \*        \*

49.        At bottom, the balance-of-the-equities inquiry boils down to an exceedingly simple question:  should urgently needed funds reach those whose lives have been lost in, or turned upside down by, the opioid epidemic now, or years down the road and potentially not at all?  Although Appellees make the charged and baseless accusation that opposing a stay pending appeal is a "cynical appellate strategy" meant to "engineer equitable mootness" and "evade appellate review," CT/WA Mot. at 16, 19–20 (formatting altered); U.S. Trustee Mot. at 34, let there be no misunderstanding that the Official Committee's singular goal in opposing the stay is to start the flow of funds that were needed yesterday.  The vast, undeniable and human harm that will result if those funds are delayed by the stay Stay Appellants seek manifestly outweighs the so-called harm identified by the Stay Appellants absent a stay—a hypothetical possibility of equitable

---

[35] Claimants without resources to litigate, claimants with cases that were in the beginning stages pre-petition or not yet filed, and claimants in slower court systems, will all be harmed under this scenario, as any assets will be long depleted if and when such claimants ever obtain a judgment.

[36] *State of Washington's Memorandum of Law in Opposition to Purdue's Motion For A Preliminary Injunction*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y.) [ECF No. 38].

mootness that Stay Appellants themselves describe as low, and that could not constitute irreparable harm, by itself, under the law.

### 3. *Connecticut and Washington's Bond Arguments Are Unmoored from Reality*

50.     Even assuming that those harms are somehow outweighed by the (non-existent) harms that Stay Appellants say they will suffer in the absence of a stay—a finding that would be completely at odds with reality—the default rule is that appellants must "post a bond when appealing a lower court order absent 'exceptional circumstances.'" *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 350 (S.D.N.Y. 2007). There is no reason to deviate from that rule here for parties that otherwise are obligated to provide such security.  But undertaking that inquiry in the context of these cases simply proves the point that the balance of equities unequivocally favors non-movants:  delaying the flow of funds under the Plan will cause incalculable harm, including to human life, that no bond could begin to rectify.

51.     Connecticut and Washington nonetheless assert that they (apparently by proxy) should not be required to post a bond, pointing to the fact that the U.S. Trustee does not have to do so under Bankruptcy Rule 8007(d).  *See* CT/WA Mot. 38-39.  But those states (Maryland does not even address the issue) cite no authority for the proposition that they may piggyback on the U.S. Trustee, which is contrary to the basic principle that a bond is "necessary . . . to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal" and "guarantees the costs of delay incident to the appeal." *In re Adelphia Commc'ns*, 361 B.R. at 350-51.  The harm caused by a stay does not evaporate simply because the U.S. Trustee is not required to post a bond.

52.     Connecticut and Washington also presume too much.  The U.S. Trustee (i) has not been granted a stay, (ii) purports to represent a different set of interests than the Three Attorneys General, and (iii) intends to appeal on constitutional grounds that have no prospect of succeeding.

*See* Part I.B.2, *infra*. The U.S. Trustee's Stay Motion and the Three Attorneys General's Stay Motions—and the issue of whether a bond is necessary—do not rise and fall together for these additional reasons. *See Loparex, LLC v. MPI Release Techs., LLC*, No. 1:09-cv-01411, 2013 WL 704450, at *3-6, *12 (S.D. Ind. Feb. 26, 2013) (noting that stay movant "has not pointed the Court to any authority—and the Court is not aware of any—standing for the proposition that a party is absolved from the bond requirement because another party who is jointly and severally [liable] for part of the amount has posted a bond," raising concern that one appellant might prevail while another might not, and requiring movant to post bond in full amount); *cf. In re Davis*, No. 2:20-cv-3492, 2020 WL 6566963, at *2 (C.D. Cal. Apr. 22, 2020) (requiring posting of additional bond beyond that posted in four other appeals brought by appellant because "while [appellant] contends that several of the appeals contain common issues of law and fact that will likely be resolved as one under the doctrine of law of the case, that outcome is entirely speculative at this point, particularly in light of the variety and complexity of the decisions at issue").

53.    Finally, the argument that a sovereign should be accorded special solicitude to "pursue the best interests of their citizens" without posting a bond, CT/WA Mot. at 39, cannot be squared with the limited scope of the operative rule. Had the Supreme Court and Congress wished to relieve states of the obligation to post a bond to secure a stay pending appeal, it would have explicitly so provided in Bankruptcy Rule 8007(d), but did not. The Three Attorneys General's argument also is remarkably tone deaf given the general creditor approval for the Plan. The Court here should set a substantial bond reflecting the potential harm to the nonmoving parties should the Plan fall apart during any stay pending appeals, which should take into consideration, without limitation, the facts set forth in this brief regarding the number of people that die of an opioid overdose every few minutes in this country, victims' need for their compensation, and the lack of

funding for community organizations that could be helping victims every second of every minute of every day.

### B. Stay Appellants Fail To Demonstrate A Strong Likelihood Of Success On The Merits

#### 1. Metromedia *Stands in the Way of Stay Appellants' Merits Arguments on Appeal*

54.     Beyond the equities, Stay Appellants' inability to satisfy the "likelihood of success" stay factor provides an independent reason to deny relief. *See In re 461 7th Ave. Market, Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020) ("Here, aside from the fact that the other three factors militate against granting a stay, the [appellant] fails to make the required showing on [the merits]."). Although Stay Appellants liken a stay pending appeal to an injunction and otherwise seek to lower the bar for stay relief, *see* U.S. Trustee Mot. at 14–15; CT/WA Mot. at 16–17; MD Mot. at 8,[37] the Second Circuit has been clear that "[t]o obtain a stay of a . . . court's order pending appeal, more is required [than in the injunction context], including a strong showing that [the movant] is likely to succeed on the merits,'" *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020) (second alteration in original).  The Supreme Court has also used the same "strong showing" language in reiterating the traditional stay-pending-appeal standard (and distinguishing it from injunctions).  *Nken*, 556 U.S. at 428-29, 434.  Particularly given that the balance of equities disfavors a stay by a wide margin, Stay Appellants cannot prevail on their Stay Motions simply by showing that their appeals are non-frivolous.

55.     To the contrary, here the likelihood-of-success standard is *more* difficult to satisfy than usual given controlling Second Circuit precedent on the merits.  Try as they might to twist *Metromedia* and its progeny into support for their appeal or relegate it to dicta, in the end Stay

---

[37] For instance, Maryland argues that "[t]o obtain a stay, moving parties are required to show a 'substantial possibility of success,' but are not required to show a 'probability' of success or that success is more likely than not."  MD Mot. at 8.  Even under this standard, however, the Stay Appellants fail to meet their burden.

Appellants concede that *Metromedia* in fact *does* authorize nonconsensual third-party releases and that courts in this circuit have faithfully applied that precedent. *See, e.g.*, U.S. Trustee Mot. at 17, 29 (conceding that *Metromedia* permits non-debtor releases); CT/WA Mot. at 1 (admitting that courts of appeals, "including the Second Circuit," do "allow such releases"); MD Stay Mot. at 12-13 (stating that under *Metromedia* releases are permitted if "necessary to carry out a reorganization of a debtor").

56.     Consistent with that concession, the lead arguments in certain Stay Motions invite an appellate court to hold that "*Metromedia* was wrong." CT/WA Mot. at 22. Indeed, in asserting that the Bankruptcy Code prohibits non-debtor releases based on Fifth, Ninth, and Tenth Circuit precedent—heavily outweighed by contrary decisions in eight other circuits—the U.S. Trustee dismissively includes a "*but see*" citation to the one case that controls this appeal: *Metromedia*. U.S. Trustee Mot. 17. A likelihood of success on the merits is not satisfied where, as here, controlling precedent stands directly in the way of Stay Appellants' arguments. *See Mohamed v. Reno*, 309 F.3d 95, 102-03 (2d Cir. 2002) ("We conclude . . . that *Domond* remains binding authority in this Circuit and that Mohammed therefore does not have a substantial possibility of prevailing on his appeal."); *In re General Motors Corp.*, 409 B.R. 24, 31-32 (Bankr. S.D.N.Y. 2009) (finding that merits "factor isn't satisfied at all" despite "theoretical possibility" that "Circuit could reverse the decision of the panel upon *en banc* review or that appellants "could file a *certiorari* petition").

57.     Nor is the circuit conflict an "obvious sign[] indicating a likelihood of success on the merits." MD Mot. at 8-9. No doubt, the Supreme Court is more likely to grant review of a case involving a circuit conflict. But the unexceptional fact that a circuit conflict is essentially table stakes for Supreme Court review does not mean there is a strong likelihood—or for that

matter, any likelihood—that the Supreme Court will rule for Stay Appellants on the merits. In that

regard, if Maryland's supposition is that the Supreme Court is likely to do so because three courts

of appeals do not endorse nonconsensual third-party releases, it bears emphasis that "[t]he clear

majority (the First, Second, Third, Fourth, Sixth, Seventh, Eleventh, and D.C. Circuits) have

determined that such releases and injunctions under a plan are authorized." Bench Ruling at 118.

Furthermore, the courts of appeals in the minority adopted their decisions decades ago, and since

then the Supreme Court (unsurprisingly) has repeatedly declined to address the increasingly stale

and lopsided circuit split, including most recently in *In re Millennium Lab Holdings II, LLC*, 945

F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Trust v. Millennium Lab Holdings II, LLC*,

140 S. Ct. 2805 (2020). *See also Natl Heritage Found., Inc. v. Highbourne Found.*, 574 U.S. 1076

(2015) (denying certiorari to Fourth Circuit); *Vision-Park Props., LLC v. Seaside Engineering &

Surveying, LLC*, 577 U.S. 823 (2015) (denying certiorari to Eleventh Circuit); *Global Indus.

Techs., Inc. v. Hartford Acc. & Indem. Co.*, 565 U.S. 1014 (2011) (denying certiorari to Third

Circuit); *Class Five Nev. Claimants v. Dow Corning Corp.*, 537 U.S. 816 (2002) (denying certiorari

to Sixth Circuit); *Lowenschuss v. Resorts Int'l, Inc.*, 517 U.S. 1243 (1996) (denying certiorari to

Ninth Circuit); *Hart Holding Co. v. Drexel Burnham Lambert Grp., Inc.*, 506 U.S. 1088 (1993)

(denying certiorari to Second Circuit); *Menard-Sanford v. A.H. Robins Co., Inc.*, 493 U.S. 959

(1989) (denying certiorari to Fourth Circuit). *MacArthur Co. v. Johns-Manville Corp.*, 488 U.S.

868 (1988) (denying certiorari to Second Circuit). Thus, if anything, the circuit conflict and the

potential for Supreme Court review *undercut* Stay Appellants' likelihood of success.

58.     If that were not enough, Stay Appellants have spilled considerable ink—both in

their confirmation objections and in their Stay Motions—arguing that these cases do not present

the type of factual circumstances that support third-party releases under the *Metromedia*

framework.  *See, e.g.*, U.S. Trustee Mot. 29-32; CT/WA Mot. 22-23, 29-31; MD Mot. at 12-13.

That is simply untrue:  these cases can be described only as "truly unique" in light of their

unprecedented magnitude and scope.  There can be no colorable dispute (notwithstanding the Stay

Appellants' attempts to manufacture one) that substantial consideration ($4.325 billion) is being

offered for the release, the success or failure of the Plan is premised upon the consideration

provided for the release, and the release itself is an essential component of the Plan.  *See* UCC

Confirmation Statement at 24-35; Bench Ruling at 135-36; Confirmation Order §§ II, JJ, KK.

Maryland also argues that the Debtors will be able to reorganize without a contribution from the

Sacklers and without providing any releases to the Sackler family from their civil liability to the

states. MD Stay Mot. at 12.  This is wrong.  As the Court accurately held, the Sackler contribution

and releases are critical to the Plan.

59.      But for present purposes, the more fundamental point is that the *Metromedia*

inquiry involves fact-laden judgments reviewed deferentially on appeal.  *See Nat'l Heritage

Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 n.3 (4th Cir. 2014) (holding that whether

testimony was sufficient to support non-debtor releases "shall not be set aside unless clearly

erroneous").  This Court's underlying and overarching findings that these Chapter 11 Cases satisfy

the *Metromedia* inquiry could not possibly be clear error.  That further undermines the Stay

Appellants' likelihood of success of on appeal.  *See Ad Hoc Comm. of Equity Holders v. Republic

Airways Holdings Inc. (In re Republic Airways Holdings Inc.)*, No. 16-cv-3315, 2016 WL

2621990, at *6-7 (S.D.N.Y. May 6, 2016) (finding no likelihood of success where "Bankruptcy

Court's factual findings supporting its approval of the settlement were not clearly erroneous," and

emphasizing that "standards of review are highly relevant to this Court's consideration of whether

the Ad Hoc Committee has shown a likelihood of success on the merits of its appeal); *N.Y. Skyline,*

*Inc. v. Empire State Bldg. Co. L.L.C. (In re N.Y. Skyline, Inc.)*, No. 09-10181, 2013 WL 5487938, at *4 (Bankr. S.D.N.Y. Oct. 2, 2013) (finding "high hurdle in showing a strong likelihood of success" given clear error review).

60.     The fact that Stay Appellants attempt to avoid *Metromedia* by constructing supposedly novel claims hurts—not helps—their stay request.  When "a federal court would be required to take a long step into previously uncharted territory in order to support [the] holding" Stay Appellants favor, that means "the movant has not met its burden to present a sufficiently substantial legal question."  *Hodges v. Shalala*, 127 F. Supp. 2d 790, 793 (D.S.C. 2001).

61.     In any event, for reasons explained next, Stay Appellants cannot surmount even the minimal standard they have set for themselves on the merits.

### 2.  The U.S. Trustee's Constitutional Challenges Border on Frivolous

62.     The U.S. Trustee's constitutional arguments fail under well-settled principles and precedent.  Although the U.S. Trustee attempts to frame the issue as whether non-consensual third-party releases are permitted under various constitutional provisions, its arguments have little to do with the merits of such releases.

63.     For starters, due process is a *procedural* claim.  It does not bar releases absent consent or require compensation (which creditors *are* receiving under the Plan), much less in a particular amount.  *Contra* U.S. Trustee Mot. 25-26.  Rather, "[t]he issue of what process is due requires a court to ask whether the notice was reasonably calculated under the circumstances to apprise interested parties of the pendency of the plan's proposed release and afford them an opportunity to present their objections."  Bench Ruling at 114.  This Court has already catalogued the various ways in which widespread and unprecedented notice was afforded to holders of claims, and flatly rejected the assertion that the language of the releases is too "complicated" to pass muster under the Due Process Clause.  *Id.* at 113-14; Confirmation Order § RR.  In addition, "there were

33

multiple objections to the plan based upon its proposed third-party release," Bench Ruling at 114-15, the Court devoted significant time to addressing releases during the confirmation hearing, and the Court set aside time specifically to hear from *pro se* objectors, *see* Aug. 25, 2021 Hr'g Tr. at 204-05. So, contrary to the U.S. Trustee's insistence, parties both received notice and had an opportunity to be heard. To say that this Court's record-based findings have a strong likelihood of being overturned on appeal is simply not credible.

64.     The U.S. Trustee's challenges to this Court's constitutional authority are equally unavailing. The U.S. Trustee takes a narrow view of what the Bankruptcy Clause and *Stern v. Marshall*, 564 U.S. 462 (2011), permit. But the U.S. Trustee conspicuously makes no mention of ample authority—including as cited by this Court, *see* Bench Ruling at 116-17—recently and directly rebuffing such arguments in appeals. *See, e.g.*, *In re Millennium Lab Holdings*, 945 F.3d at 129 (framing issue as "whether the Bankruptcy Court, without running afoul of Article III of the Constitution, can confirm a Chapter 11 reorganization plan containing nonconsensual third-party releases and injunctions," and holding, under *Stern*, that "[o]n the specific, exceptional facts of this case, we hold that the Bankruptcy Court was permitted to confirm the plan because the existence of the releases and injunctions was 'integral to the restructuring of the debtor-creditor relationship'"); *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.a.R.L.)*, 592 B.R. 489, 504–06, 509–11 (S.D.N.Y. 2018) (holding that "[a] bankruptcy court acts pursuant to its core jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor in connection with the confirmation of a proposed plan of reorganization, which is a statutorily-defined core proceeding," and that the bankruptcy court "possessed the inherent constitutional adjudicatory authority to include the exculpation and injunction clauses in [the] confirmed reorganization plan"), *aff'd*, 792 F. App'x 99 (2d Cir. 2019). The U.S. Trustee's refusal to grapple with those on-

point precedents, and inability to produce any contrary authority, speaks volumes about its likelihood of success on the merits.[38]

### 3. The Three Attorneys General's Novel Police Power and Other Arguments Similarly Lack Support

65.      In contrast to the U.S. Trustee's narrower focus on constitutional issues, the Three Attorneys General intend to raise a wide range of confirmation-related arguments on appeal.

66.      The Three Attorneys General's main theory concerning nonconsensual third-party releases—that there should be a "police power exception"—lacks legal support.  Although the Three Attorneys General cite 28 U.S.C. § 1452(a) and Bankruptcy Code section 362(b)(4) as examples in which Congress has expressly dealt with state police powers, in the next breath they admit that "this case does not directly implicate either of these provisions."  CT/WA Mot. at 23-24; *see also* MD Mot. at 10-11.  Relatedly, the Three Attorneys General also concede that "the Bankruptcy Code does not expressly provide that nonconsensual third party releases may not be imposed on police power claims."  CT/WA Mot. at 24.

67.      The Three Attorneys General are thus left to argue that "[i]t stands to reason that police power claims should be accorded special consideration in the context of nonconsensual releases against non-debtors"—based on "policy justifications" derived from the two (inapposite) statutory provisions.  *Id.* at 24.  But that is an exceedingly thin reed upon which to base a likelihood of success argument.  After all, "where police and regulatory power or state sovereignty generally is not specifically recognized in the Bankruptcy Code, Congress' power under Art. I cl. 8 of the Constitution to enact uniform bankruptcy laws overrides it."  Bench Ruling at 152.

---

[38] Maryland echoes the U.S. Trustee's constitutional arguments, relying on Commerce Clause precedents, as well as the Tenth Amendment and other "federalism" statutes.  *See* MD Mot. 9-11 & n.2.  Those authorities are plainly inapposite.

68.     To be sure, Congress has provided an exception to the Bankruptcy Code's automatic stay provision.  But the fact that Congress chose to permit governmental units to continue regulating behavior during the course of a bankruptcy case hardly means that it also intended to grant unique treatment to certain *claims*, while leaving the treatment of any claims arising from such regulation to the ordinary bankruptcy process.  *See SEC v. Brennan,* 230 F.3d 65, 72 (2d Cir. 2000); *see also Martin v. Safety Elec. Constr. Co.,* 151 B.R. 637, 639 (D. Conn. 1993) ("The court notes that the individuals claiming unpaid wages will not receive any extra priority by virtue of this [unstayed Fair Labor Standards Act enforcement] action.  Actual collection of the back pay and liquidated damages claims must proceed according *to normal bankruptcy procedures*.") (emphasis added).  Indeed, the exception to the automatic stay explicitly does not apply to a governmental unit's "enforcement of . . . a money judgment," 11 U.S.C. § 362(b)(4), further demonstrating that a governmental unit enjoys no special treatment in respect of a claim arising from the enforcement of its police or regulatory authority.  *See also* 3 COLLIER ON BANKRUPTCY ¶ 362.05[5][b] (noting that police and regulatory exception is not intended to "give the governmental unit an unfair advantage over other creditors").  As such, the limited exception to the automatic stay provision does not entail different treatment for the Three Attorneys General's monetary claims in these Chapter 11 Cases.  To the contrary, their claims should (and do, under the Plan) receive the same treatment as all other unsecured creditors (including other states and governmental entities).

69.     The Three Attorneys General's hodgepodge of other appeal issues fares no better.  Apart from Maryland's misinterpretation of Second Circuit precedent that this Court has already rejected, *see* Maryland Mot. at 10-11; Bench Ruling at 107-11, the Three Attorneys General do not dispute that the Supreme Court and Second Circuit decisions have found treatment of third-party

claims to fall within Congress's jurisdictional grants, or that the "touchstone for bankruptcy jurisdiction"—"almost universally adopted by . . . sister circuits"—is whether the third-party claims will have a "conceivable effect on the bankruptcy estate." Bench Ruling at 110-11. In fact, Connecticut and Washington limit their argument to whether third-party claims here in fact would have a conceivable effect on the estate. But analogous arguments have already been rejected by an appellate court in this case. *See In re Purdue Pharms.*, 619 B.R. at 51-56 (discussing indemnification and contribution claims, and "low bar" for satisfying conceivable effect test).

70.     Connecticut and Washington further contend that the Debtors did not satisfy their burden to show that the Plan is in the best interests of the creditors under section 1129(a)(7) of the Bankruptcy Code—another question reviewed for clear error. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). In their view, the Debtors analyzed what the states would receive in a hypothetical liquidation scenario, but did not proffer evidence regarding the value of the claims against the Sacklers that the states would retain absent the Plan. *See* CT/WA Mot. at 34-36. As a threshold matter, it is not clear that such an analysis of claimant's rights against third parties is even required under the Bankruptcy Code, especially where the value of such claims is speculative or incapable of estimation. *See* Bench Ruling at 144–46. But in all events, this Court expressly addressed the issue of "the value of the third-party claims against the shareholder released parties," discussing in particular "evidence regarding the strengths and weaknesses of the claims, including the cost of pursuing them, the risks of collection, and the dilutive effect of all of the other litigation that would be pursued by all of the other creditors in these cases, including all of the other states and governmental entities who are otherwise agreeing to the plan that would have the same types of third-party claims." *Id.* at 146–49. Connecticut and Washington cannot present a strong

likelihood of prevailing on appeal by contesting the sufficiency of that evidence.  Indeed, they put up no evidence to the contrary at the confirmation hearing.

71.    Connecticut and Washington range even further afield in arguing that the Plan improperly classified states together with political subdivisions in a manner that purportedly ignored their different abilities to assert *parens patriae* claims.  CT/WA Mot. at 36–37.  They contend that their claims are much larger than those of the subdivisions, despite being assigned the same nominal $1 claim, and that the end result was to demonstrate to the states that they would be "hopelessly outvoted" and permit the Debtors to argue that the Plan received "'overwhelming' support." *Id.* at 37.  That argument is nonsensical.  The Plan received overwhelming support, whether the states were classified with, or without, political subdivisions.  In fact, the Debtors published results showing votes solely of the states, which showed that only ten states voted to reject the Plan, and 80% of the states that cast votes voted to accept the Plan.  *See* Voting Declaration, Ex. B.  Connecticut and Washington were not "hopelessly outvoted" because of any improper classification.  They were outvoted because the creditors, in all classes—*including the states themselves*—voted overwhelmingly in favor of the Plan.  *See* Bench Ruling at 8–10; Confirmation Order § S.

72.    Finally, Maryland maintains that the settlement with the Sacklers is inadequate under *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).  That complaint appears nowhere in Maryland's confirmation objection and it is not even listed among their appeal issues.  But even on its merits, all that Maryland can point to is this Court's personal remarks about the resolution.  MD Mot. at 13-14.  That ignores the actual findings this Court made as part of its 27-page *Iridium* analysis:  "[a] settlement is not evaluated in a vacuum, as a wish list"; "[i]t is simply not enough to say 'we need more,'" because "I'd rather see it all burned up before the Sacklers keep anything";

and, in the end, whatever misgivings anyone might have about the amount of the settlement, "the settlement is reasonable in the light of the standards laid out by the Supreme Court and the Second Circuit[,] [a]nd clearly both it and the process of arriving at it have not been in any shape or form a free ride for the Sacklers or enabled them to 'get away with it.'" Bench Ruling at 100–03. The fact that creditors supported the settlements "by an overwhelming margin . . . after being fully informed in making that decision," *id.* at 82–83, makes it highly unlikely Maryland could surmount the deferential standard for reviewing reasonableness findings (assuming it is even an appeal issue). *See In re Iridium*, 478 F.3d at 461 n.13 ("We review for abuse of discretion the reasonableness of that court's application of the Rule in approving the Settlement.").

### C. At a Minimum, the Terms of the Plan Extending the Preliminary Injunction Must Be Carved Out From Any Stay and Remain in Place

73.    At a minimum, any order providing for a stay of the Confirmation Order should contain a carve-out for the provisions of the Confirmation Order that continue the terms of the injunctions and stays arising under or entered during the Chapter 11 Cases until the Effective Date. *See* Confirmation Order ¶ 56(a). This Court entered a series of preliminary injunctions throughout these Chapter 11 Cases that, among other things, contained terms prohibiting the Sacklers from secreting any assets.[39] The last preliminary injunction entered by the Court has expired, and is continued now through the terms of the Confirmation Order. *See* Confirmation Order ¶ 56(a). Any stay that stays the continuation of the injunction, and arguably permits the Sacklers to secrete assets, will impose further harm on all creditors in these cases and jeopardize recoveries even if the appeals are successful.

---

[39] *See Twenty-Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. No, 19- 08289 (RDD) (Bankr. S.D.N.Y.) [ECF No. 291]; *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518] ¶ 13.

## II.  THE EFFORT TO STAY THE TRUST ADVANCES ORDER IS INAPPROPRIATE

74.     Not content to just stay the Confirmation Order, Stay Appellants also seek to stay the expenditure of funds under the Trust Advances Order.  No Appellant, however, identifies any irreparable harm that the Trust Advances Order will inflict on any party absent a stay.  On the contrary, the U.S. Trustee openly "agrees . . . that any equitable mootness argument based on the Advance Order would be frivolous."  U.S. Trustee Mot. at 37.  In addition, no Appellant provides any basis for challenging, much less overturning, the Trust Advances Order on its merits.

75.     On the other side of the ledger, once again there can be no question that interested parties and the public would be injured by staying the Trust Advances Order.  The entire point of the Trust Advances Order—which concerns the relatively small amount of $6.8 million—is to ensure that the mechanisms for distributing funds under the Plan are in place on the Effective Date, thereby avoiding needless delay that would jeopardize individual and public health and wellbeing.  Each day that work cannot be done to prepare for implementation of the Plan is a day that funds will not flow *even if the appeals ultimately fail*.  Inexplicably, Stay Appellants would prefer to risk such delay and invite such harm.  *See, e.g.*, Aug. 23, 2021 Hr'g Tr. at 269 ("You're apparently going to appeal this . . . and hold up the distributions to these people forever, and that's the United States' choice.").  That preference should tell the Court everything it needs to know about Stay Appellants' claim to be acting in the interest of individual claimants and the public interest.

## CONCLUSION

76.     For the reasons set forth herein, the Official Committee respectfully requests that the Court deny the Stay Motions.  If this Court were to grant a stay, it should take steps to ensure that the various protections afforded to creditors throughout these Chapter 11 Cases and prior to the entry of the Confirmation Order remain in force.

Dated:  New York, New York
      October 22, 2021

AKIN GUMP STRAUSS HAUER & FELD LLP

By: */s/ Arik Preis*           
Ira S. Dizengoff
Arik Preis
Mitchell P. Hurley
Z.W. Julius Chen
Sara L. Brauner
One Bryant Park
New York, New York 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
idizengoff@akingump.com
apreis@akingump.com
mhurley@akingump.com
chenj@akingump.com
sbrauner@akingump.com

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P., et al.*

# EXHIBIT A

LacWpurO

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In re                                21 Civ. 7532 (CM)
                                     et seq.
PURDUE PHARMA BANKRUPTCY APPEALS

                                     Oral Argument
------------------------------x
                                     New York, N.Y.
                                     October 12, 2021
                                     2:00 p.m.

Before:

                    HON. COLLEEN MCMAHON,

                                        District Judge

                       APPEARANCES

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
      Attorneys for Appellant States of Washington
      Connecticut, Delaware, Rhode Island and Vermont
BY:   MATTHEW J. GOLD
      -and-
PULLMAN & COMLEY, LLC
BY:   IRVE J. GOLDMAN

DAVIS POLK & WARDWELL LLP
      Attorneys for Appellees Purdue Pharma, et al.
BY:   BENJAMIN S. KAMINETZKY
      MARSHALL S. HUEBNER

BRIAN EDMUNDS
      Office of the Attorney General of the State of Maryland
      Attorney for Appellant State of Maryland

BERNARD A. ESKANDARI
      California Department of Justice
      Attorney for Appellant State of California
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWpurO

1    it talked about the cases that did allow such releases as being

2    rare cases that met certain conditions which are not met here.

3    Because these releases are so very broad, they extend far

4    beyond the persons who would have a claim for indemnity or

5    contribution, for example.

6         There's not a channeling of the claims.  I know the

7    debtors have talked about there being a channeling of the

8    claims, but the way the plan documents work is if you have a

9    claim against the Sacklers or some of these other nondebtors,

10   it's defined as a channeled claim, but then no compensation is

11   being paid on that claim, and we think that separates this very

12   distinctly from some of these cases where claims are channeled.

13        THE COURT:  I'm curious about something that needs to

14   be put on the record.  The kinds of claims that we're talking

15   about, the claims against the Sacklers, the nonderivative

16   claims, the state law claims, the nondischargable claims, what

17   are we talking about, and who has standing to assert them?

18        MS. LEVENE:  Your Honor, it's very broad, broadly

19   defined because the cause of action is very broadly defined.

20   It includes things like fraud, for example, that can't be

21   discharged.  It includes things like defenses and offsets,

22   which wouldn't be covered by a bankruptcy discharge.  And it's

23   defined in a way that is -- so to compare it, for example, to

24   524(g), which was at issue in the *Quigley* case and which

25   applies to asbestos cases --

LacWpurO

1        THE COURT:  It only applies to asbestos cases.

2        MS. LEVENE:  But just to compare it to that, there,

3   the liability must arise based on the conduct of the debtor.

4        Here, the release is raised more broadly, where the

5   debtor conduct should be either a legally relevant factor or a

6   legal cause, and so you've got what (inaudible) conjunctive of

7   524(g), where it has to be based on the conduct of the debtor

8   and the liability must arise by reason of the defendant's

9   statutory relationship to the debtor.  Here, that's all broken

10  apart.  So it doesn't have to be -- the liability doesn't have

11  to be because of the conduct.  We don't really know what

12  legally relevant factor means here.

13       THE COURT:  Your position is that 524(g) isn't

14  relevant anyway, so who cares?

15       MS. LEVENE:  To extent that we're talking about what

16  derivative liability is, it's a way of contrasting.

17       THE COURT:  But isn't your point --

18       (Indiscernible overlap)

19       MS. LEVENE:  Derivative liability.  It's not based

20  just on liability for the debtor's conduct.

21       THE COURT:  Right.  We're talking about, and I'll use

22  the phrase, "nonderivative claim."  That's your problem, the

23  release of nonderivative claims, the evil things that the

24  Sacklers allegedly did.  And I'm just curious whose claims are

25  those?  Who has such a claim?

LacWpurO

1          MS. LEVENE:  Your Honor, there are a number of

2     individuals who could have a claim.  There are suits.  There

3     are, I think, 400 suits against the Sacklers.

4          THE COURT:  But the Sacklers didn't say anything to

5     any of those people.  I'm just trying to figure out what the --

6     you're the ones who say, and I agree with you, that it's very

7     difficult to parse the scope of this release, and I'm trying to

8     figure out what is and what might not be covered.  And a fraud

9     claim requires a misrepresentation of some sort to someone.

10          This is not like *Metromedia*, where the claims that

11     were being discussed by Judge Jacobs in his disquisition before

12     he ruled on equitable mootness grounds were claims that the

13     Kluge family had against the corporation.  The Kluges owned

14     *Metromedia*.

15          This is not like *Drexel*, where we're talking about a

16     discrete number, like 850 securities fraud claims.  They were

17     all securities fraud claims.  Everyone knew what they were.

18     I'm trying to figure out what are these claims that people are

19     asserting against the Sacklers or that they would like to

20     assert against the Sacklers?

21          MS. LEVENE:  Yes, your Honor.

22          And you know, to some extent, we don't know because

23     people were not able to file claims in light of the preliminary

24     injunction.  We do know there have been objections filed to the

25     plan, and they're the ones that we cited in our brief where

LacWpurO

1   someone who objected had, I believe, a class action complaint.

2                THE COURT:  A class action complaint premised on what?

3                MS. LEVENE:  Your Honor, I'm afraid I'm not

4   sufficiently familiar with those details right now.

5                THE COURT:  OK.

6                MS. LEVENE:  But I believe they wanted, they want to

7   hold the Sacklers liable for their own actions and their own

8   conduct.

9                THE COURT:  Right.  As opposed to their conduct as

10  officers, directors, managers.

11               MS. LEVENE:  As opposed to saying Purdue did this, and

12  therefore, you're liable because you're a director, but for

13  their own individual conduct.

14               THE COURT:  Other than their conduct as officers,

15  directors, and managers.  OK.

16               OK.  Maybe somebody else in the room can enlighten me

17  a little bit, but you go ahead and argue your motion.

18               MS. LEVENE:  And your Honor, of course, we, in

19  addition to the statutory argument, do think there are

20  constitutional issues here, including the due process clause,

21  including the Court's authority to enter these releases under

22  the bankruptcy clause and as an Article I --

23               THE COURT:  You have a Thurgood Marshall argument that

24  only this Court could do this, but Judge Drain couldn't do

25  this.