**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF CHERYL JUAIRE**
**IN SUPPORT OF THE OPPOSITION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO MOTIONS FOR STAY PENDING APPEAL**

I, Cheryl Juaire, pursuant to 28 U.S.C. § 1764, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a member of the Official Committee of Unsecured Creditors (the "UCC") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively "Purdue" or the "Debtors") in the above-captioned chapter 11 cases ("Chapter 11 Cases"). I was appointed to the UCC by the Office of the United States Trustee when the UCC was formed on September 26, 2019, at the beginning of these Chapter 11 Cases.

2. I submit this declaration (the "Declaration") in support of the *Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal*.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Background and Experience**

3.  I am currently the founder and president of a national non-profit organization called Team Sharing. We are an organization of parents who have all lost a child or multiple children to Opioid Use Disorder ("OUD"). Team Sharing provides services and other assistance to family members who have lost loved ones to opioid and other drug-related overdoses, such as assisting with funeral expenses, sending Christmas gifts to children who have lost a parent, and so much more. Through my work with Team Sharing, I have met and talked with hundreds, if not thousands, of people who have lost family members to opioid-related overdoses and addictions. I am face-to-face with the results of the opioid epidemic every day.

4.  I created Team Sharing after I lost one of my sons, Corey, to an opioid overdose on February 24, 2011. Corey was only 23. He had started taking opioids at the age of 15, when they were prescribed by a doctor following hernia surgery. When Corey died, he had a four and a half month old child, Faith, who has grown up without knowing her father.

5.  On June 25, 2021, a little more than 10 years after Corey's death, I lost my second son, Sean, to an opioid overdose. Sean had a history of OUD but had turned his life around. He was actually working to help others with OUD when he relapsed and ultimately died alone. He, too, left a daughter, a son, and two grandchildren.

6.  Corey's daughter, and Sean's two children, my grandchildren, no longer have their biological fathers due to the opioid epidemic.

7.  As a result of these experiences, I have been active in the victim advocate community for a long time. For example, I was invited to be a member of Massachusetts Attorney General Maura Healy's opioid task force beginning on October 23, 2018, and I attended the 2020 State of the Union Address as the guest of honor of Congresswoman Lori Trahan due to my work

in advocacy. I petitioned to recognize August 31st as National Overdose Awareness Day across the country in memory of all of those lost. Approximately half of the states wrote proclamations honoring the day, and we also received recognition from the President of the United States. I participated in numerous rallies and even attempted on August 17, 2018 (with Ryan Hampton, a former UCC member) to deliver to Purdue's CEO, Craig Landau, a letter about Purdue and the Sacklers' role in the opioid epidemic. Through this advocacy and my work with Team Sharing, I have built relationships with many people around the country who, like me, are battling the opioid epidemic and/or have been personally affected by it.

**My Work on the UCC and the Plan**

8.  After joining the UCC, I was asked to refrain from public advocacy during the bankruptcy cases, which was a very difficult thing to do. Nevertheless, I took this instruction seriously and accepted and followed it. I understand that the UCC owes fiduciary duties to all of Purdue's unsecured creditors, including governmental and non-governmental claimants. I have attempted at all times to fulfill my fiduciary duties to all of Purdue's unsecured creditors.

9.  But serving as a UCC member in these Chapter 11 Cases has also allowed me to apply my experience and knowledge—both as a mother of two children claimed by the opioid epidemic and as a longtime victim advocate—in new ways. Throughout these cases, I have worked hard to provide a powerful voice to the many unsecured creditors represented by the UCC— including the United States, state governments, local political subdivisions, personal injury victims, children born with neonatal abstinence syndrome ("NAS"), hospitals, and others. But, in particular, I have always been aware that the voices of victims and the loved ones they leave behind must not be forgotten amid all the complicated legal issues in these Chapter 11 Cases, and most

importantly not be drowned out by those who would use the Chapter 11 Cases as a means to political gain.

10. The UCC has met approximately twice per week since it was formed almost two years ago. All together, the UCC has met approximately 200 times to date. In addition, UCC members receive email updates from the UCC's advisors on a nearly daily basis with information about developments in the ongoing Chapter 11 Cases and the work conducted by the UCC's professionals. In total, I have received approximately 700 of those updates.

11. I also attended meetings throughout these Chapter 11 Cases with many of the other major creditor groups on numerous key issues. Among other things, I worked hard with other members of the UCC in an attempt—undermined by the federal government and certain state attorneys general—to establish a $200 million Emergency Relief Fund ("ERF") more than 18 months ago, because I believed then (as I do now) that it was crucial to start trying to abate the opioid epidemic as soon as possible. I also actively participated in mediation. In addition, I watched almost every deposition taken in these Chapter 11 Cases and attended almost every court hearing.

12. Those proceedings, spanning countless hours, ultimately led to the confirmation of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "Plan"). As a member of the UCC, which supported confirmation of the Plan, I am generally familiar with the key aspects of the Plan, especially as they relate to the various ways in which the Plan devotes funds to combatting and addressing the opioid epidemic.

13. To be clear, the UCC's position on the Plan should not be misconstrued as satisfaction with the amount of money—$4.325 billion—that the Sacklers are contributing under the Plan. I can attest that the UCC wanted more from the Sacklers. I can also attest that there is

no dollar figure large enough to solve the opioid crisis, and of course there is no dollar figure that will ever bring back the tens of thousands of people who died in 2020 or the half-million people who have died since the opioid epidemic began.

14.     Nonetheless, the UCC has clearly and repeatedly communicated its position that, while the Plan is not perfect, it is the best alternative available at this point for a variety of reasons. Most importantly, the Plan provides a means to start contributing funds to help abate the opioid epidemic and compensate victims as soon as possible.  As noted above, if it had been up to the UCC alone, funds would have begun to flow to those in need long ago through the ERF, but that effort failed due to lack of support from public side creditors.  We cannot go back in time to implement the ERF, but at the very least allowing the Plan to go effective as soon as possible—without any more delays from a stay pending appeal—will finally allow at-risk communities to start receiving the money they so desperately need.

15.     I understand the Plan requires the overwhelming majority of distributed funds to be used for opioid abatement and victim compensation.

16.     Another valuable feature of the Plan is the creation of a document repository, which will make available for future study and analysis, a huge volume of documents from Purdue and the Sacklers.

**Stay of the Plan's Effectiveness Pending Appeal**

17.     I understand that there is overwhelming support for the Plan from the UCC and other creditor groups—including (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) the Public School District Claimants.  Additionally, I understand that more than 95% of creditors voted in support of the Plan.  I further understand, however, that the

U.S. Trustee, two Canadian groups, three individuals, and a handful of nine states (collectively, the "Appellants") seek to challenge the Plan on appeal. In essence, I understand that the Appellants want to continue pressing their objections to the settlement with the Sacklers, and to delay implementation of the confirmed Plan for as long as it takes for the appeals of these hold-out creditor groups to be resolved.

18. It is deeply frustrating and disappointing to see the Appellants choose this course of action. The Appellants' have made clear that their objective is to reclaim their individual ability to sue the Sacklers on civil opioid-related claims. Apparently they care more about their ability to pursue those claims, than the chance to use these Chapter 11 Cases collaboratively with other creditors to develop and fund programs to try to abate the opioid epidemic. Of course, the Appellants are still free, under the Plan, to pursue any criminal claims they may have.

19. As noted, at least some of the Appellants seek not only to challenge the Plan, but also to prevent the Plan from becoming effective by obtaining a stay pending their appeals. In support of their requests for such relief, those Appellants argue that delaying implementation of the Plan will not cause any harm. That is not true, as the Appellants well know.

20. Recently released data by the Center for Disease Control ("CDC") shows that deaths due to drug overdose reached a record high of more than 96,000 from March 2020 to March 2021. This represents a stark increase from the CDC's statistics for drug overdose deaths for the year 2020. I understand that this equates to about 263 people dying *each day*—in other words, more than one person every ten minutes. Of those daily deaths, I understand that approximately 204 are opioid related. These are not just anonymous numbers to me. One of these 263 daily deaths this year was my son, and I personally know several more families who have had loved ones pass away since June.

21.     I understand that (even on an expedited basis) the appeals could linger for months or even years before reaching their conclusion.  Delaying implementation of the plan for such a period of time would result in incalculable cost to human life.

22.     These horrifying statistics, however, do not even come close to communicating the true scale of the daily harm from the opioid epidemic.  Through my work with Team Sharing, attending funerals of victims of the opioid epidemic, and from own personal experience, I understand that the harm is exponentially greater.  In addition to this terrible loss of life, the daily harm includes the agony of people who are living with OUD and who are suffering and struggling with the physical pain of addiction and the mental and psychological effects of living a life that is often full of shame and embarrassment.  The devastation wrought by the opioid epidemic also spreads to the parents, brothers and sisters, spouses, children, relatives, friends, classmates, and co-workers of victims of the opioid epidemic.  Simply put, it devastates whole communities.  For each of the more than 96,000 people who died from an overdose in the year leading up to March 2021, and for each of the more than 1.6 million Americans estimated to be suffering from OUD, there are numerous other people who are suffering as well.

23.     There are societal harms, too.  The spouses of deceased loved ones must find financial assistance.  The children of deceased loved ones often need extra care, counseling, and psychological help.  The parents of deceased loved ones must come to grips with the disaster of outliving their children.  Co-workers must not only figure out a way to fill the void left by their co-worker, but also must struggle with the fact that they may have seen their co-worker every day and yet not known anything about the pain and suffering he or she was going through.  The friends of those who are deceased must go on living amid the pain of thinking that they failed to do

something to save their friend.  The same goes, not just for those who have passed away, but also for those who are living.  And the list goes on and on.

24.   Implementation of the Plan is intended to address these types of harms as well. Precisely how abatement funds will be used remains open.  However, there are many kinds of programs that might receive funding under the Plan and that would contribute to fighting the opioid crisis.  For instance, there is a great need to establish more counseling, peer recovery, and community organizations.  Through my advocacy work, I have also seen firsthand how grass-roots community organizations that already serve people with OUD are in desperate need of funding to maintain day-to-day operations, hire more people, pay for transportation to pick up victims, make beds available, provide food, and provide counseling, among other things.  In addition, with additional funding, medication-assisted treatment centers could provide much needed overdose reversal medication, clean syringe centers could be established and further funded, and more education could be provided.  With additional funding, organizations dedicated to helping mothers with children born with NAS could be built and funded, and programs could be set up for children born with NAS.  Hospitals could utilize additional funding now to pay for abatement programs. Public schools could use additional funding now to pay for special needs programs.

25.   Beyond abatement, the Plan provides compensation directly to victims and their families.  I know from firsthand experience that no amount of victim compensation could ever be sufficient, but these funds will make a difference in people's lives.  Those alive can use the money they receive under the Plan to pay for medical services and other life activities.  Parents of children born with NAS can utilize the money they receive under the Plan to take care of simple needs, like extra diapers, or fund long-term needs, like education. Families of victims often have lost hundreds of thousands of dollars while trying to keep their loved ones alive, only to have them die.  Then,

these families are forced to pay unexpected funeral expenses, and these families are also forced to scramble to replace the income of the person that has passed away. Compensation to these families would alleviate some of these expenses.

26.     In addition, the sooner the document repository is established, the sooner scholars, journalists, scientists, policy makers, and others, can review the documents from Purdue and the Sacklers and begin to analyze the root causes of the opioid epidemic, and how our nation can prevent something like this from happening again.

27.     In sum, the Plan must go into effect as soon as possible, so that funds can be distributed and made available to abatement programs and victims. The opioid epidemic is killing more than 204 people every day, and we cannot afford to spare one more minute. For the foregoing reasons, I believe that a stay pending appeal would cause incredible harm to countless numbers of individuals, families, and communities that would benefit from allowing the Plan to go effective as soon as possible.

[*Signature Page Follows*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October [21], 2021

_Cheryl Juaire_
Cheryl Juaire