UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF KARA TRAINOR
IN SUPPORT OF THE OPPOSITION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTIONS FOR STAY PENDING APPEAL**

I, Kara Trainor, pursuant to 28 U.S.C. § 1764, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a member of the Official Committee of Unsecured Creditors (the "UCC") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively "Purdue" or the "Debtors") in the above-captioned chapter 11 cases ("Chapter 11 Cases"). I was appointed to the UCC by the Office of the United States Trustee when the UCC was formed on September 26, 2019, at the beginning of these Chapter 11 Cases.

2. I submit this declaration (the "Declaration") in support of the *Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal*.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Background and Experience**

3. I am currently a peer recovery and outreach coach at Integrated Services of Kalamazoo, working with an opioid overdose response program. Integrated Services of Kalamazoo is an organization that provides support and assistance to individuals in need of help, including individuals who are suffering from Opioid Use Disorder ("OUD"). In my work, I have worked with countless people suffering from OUD and am constantly confronted with the reality of the opioid epidemic. On a daily basis, I see the damage that opioids inflict on people, the enormous problems people face while living with OUD or trying to overcome addiction, and the substantial lack of resources that are available to help people combat those problems.

4. I also serve on the board of a non-profit organization called Recovery Institute of Southwest Michigan. Recovery Institute of Southwest Michigan is an organization that provides peer-run and peer-delivered support to those with mental health or substance use concerns. In addition to my board member duties, I am active in a group that speaks about our recovery journey at colleges, high schools, hospitals, classes of nursing students, and treatment centers in the hopes of providing education and reducing the stigma around substance abuse disorder and mental illness.

5. I, myself, am a survivor. I was a nationally competitive baton twirler during my childhood, but suffered various injuries over time. After the birth of my oldest son, I started experiencing back pain related to a previous stress fracture. I went to my primary care physician, who promptly proscribed OxyContin. I became addicted to opioids very soon thereafter. I was only 21 years old. I, like many people, went down the path from OxyContin to other opioids/opiates and other illicit substances. Fortunately, I was able to utilize medication-assisted treatment ("MAT"), which for me was methadone, which saved my life. Finally, in 2018, after

fourteen years, I successfully transitioned off MAT. Today, I remain in recovery—opioid free. I feel lucky that I did not end up dead from an overdose. More than half a million people have not been as lucky.

6. When I got pregnant with my son, Riley, I was approaching two years of abstinence from all illicit drugs, and my recovery was stable. During my pregnancy, I was advised, by physicians, to continue MAT. On December 5, 2010, Riley was born. Riley was immediately transferred to the neonatal intensive care unit and was diagnosed with Neonatal Abstinence Syndrome ("NAS"). After his discharge, one of Riley's pediatricians decided to do a "slow taper" with methadone to curb his withdrawal symptoms. Riley was on methadone for most of the first year of his life. Riley is now ten years old and suffers the lingering effects of NAS. He still uses diapers, drinks from a sippy cup, and has been diagnosed with eye conditions. He has been diagnosed as autistic and will need 24/7 care for the rest of his life. Not every NAS child will have the same experience as Riley's, but many children will have emotional, psychological, physical, and financial needs, as do their mothers and the rest of their families. I know first-hand what their lives are like, and I want to do whatever I can to make the lives of others better.

7. As a result of my experiences as a survivor and a mother, I have dedicated my life to fighting the opioid epidemic. Many politicians say they care about the epidemic and wrap themselves in the plight of the victims, just like they wrap themselves in a flag, but few have been willing or able to make choices furthering the interests of victims, as opposed to their own agendas and ambitions.

8. I am similarly motivated by a desire to help all of those living with OUD to get access to the resources they need, such as peer counseling, MAT, clean syringes, recovery community organizations, transportation to treatment, and other resources that can help someone

struggling with OUD. Unfortunately, on a daily basis I see how many of these programs have to fight for funding, including those in my community in Kalamazoo, Michigan.

**My Work on the UCC and the Plan**

9.    I understand that the UCC owes fiduciary duties to all of Purdue's unsecured creditors, including governmental and non-governmental claimants. Even though I believe that I was appointed to the UCC in part to advocate for the interests of children born with NAS, their mothers, and their families, I have attempted at all times to fulfill my fiduciary duties to all of Purdue's unsecured creditors and to treat all of Purdue's unsecured creditors equally and fairly. That being said, I have been keenly focused on making sure that when the Chapter 11 Cases come to their conclusion, financial resources will be available for peer recovery, harm reduction, and grassroots organizations for opioid abatement, as well as for families who have children suffering from NAS.

10.   The UCC was formed at the outset of the Chapter 11 Cases more than two years ago. Since that time, the UCC has met approximately two times per week and the members of the UCC receive email updates from the UCC's advisors with information about developments in the ongoing Chapter 11 Cases and the work conducted by the UCC's professionals on an almost daily basis. To date, the UCC has met approximately 200 times and I have received approximately 700 email updates.

11.   I also attended meetings throughout these Chapter 11 Cases with some of the other major creditor groups on numerous key issues. Among other things, more than a year and a half ago, I worked with other members of the UCC to establish a $200 million Emergency Relief Fund ("ERF"). I worked hard to establish the ERF because I knew that direct funding to on-the-ground organizations would make a difference in saving lives. Unfortunately, our efforts to establish the

ERF were undermined by the federal government and certain state attorneys general. I often wonder how many lives would have been saved over the last 18 months if politics had not gotten in the way of what was such an important and life-saving program.

12. Despite my unhappiness with many developments in these Chapter 11 Cases, as a member of the UCC, I ultimately supported confirmation of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "Plan"). While I took advice from my counsel on many aspects of the Plan, I am generally familiar with how much money the Sackler family is contributing, and I am aware that the Plan envisions immediate funding for abatement of the opioid epidemic and that, at most, $750 million in compensation will be awarded to the approximately 140,000 claims filed by personal injury victims.

13. To be clear, the UCC is not satisfied that the Sacklers are contributing only $4.325 billion in cash over nine years in return for releases of civil liability. Of course the UCC and every other creditor wanted more from the Sacklers. However, while the Plan is not perfect, the UCC has clearly and repeatedly communicated its position that it is the best alternative available at this point given the facts and circumstances of these cases. Most importantly, the Plan provides a means to start contributing funds to help abate the opioid epidemic and compensate victims as soon as possible. As mentioned, I wanted funds to start flowing through the ERF long ago, but that effort failed due to lack of support from public side creditors. Although we cannot go back in time to implement the ERF, what we can do *now* is to allow the Plan to be implemented as soon as possible, so that at-risk communities, including the families of children born with NAS, will start receiving the money they so desperately need.

**Stay of the Plan's Effectiveness Pending Appeal**

14. I understand that there is overwhelming support for the Plan from the UCC and other creditor groups—including (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native

American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) the Public School District Claimants.  Additionally, I understand that more than 95% of creditors voted in support of the Plan.  I further understand, however, that the U.S. Trustee, two Canadian groups, three individuals, and a handful of nine states (collectively, the "Appellants") seek to challenge the Plan on appeal.  In addition, some (but not all) of the Appellants want to prevent the Plan from becoming effective by obtaining a stay pending their appeals.  In other words, I understand that the Appellants want to continue moving forward with their objections to the settlement with the Sacklers and to delay the distributions under the Plan for as long as it takes for the appeals of these hold-out creditor groups to be resolved.  I, personally, am sickened by this request.

15. In support of their requests to stay the Plan, the Appellants argue that delaying implementation of the Plan will not cause any harm.  That comment would be laughable if it were not so sad.  Perhaps if these Appellants had to tell people suffering from OUD that there simply is no transportation to get them to a treatment center because the Appellants want more time to bring their appeals (or fight over naming rights or documents), they would feel differently.  Or perhaps if they were the ones who watched two different community organizations in Kalamazoo, each of which was established to provide different necessary services, like counseling, close in the last 90 days, they would rethink their position.  Or perhaps if they were the ones who saw another organization, on top of the other two, be abruptly displaced and forced to establish a Go Fund Me in order to continue providing services, including harm reduction, peer support, naloxone, and clean syringes, they would feel differently.  Or perhaps if their children had NAS they would feel

differently. Lucky for them they do not face these issues. Lucky for them, they do not see what I see every day.

16. I understand that the appeals could go on for months or possibly years before reaching a resolution, even if the appeals are expedited. I am nauseated by this, as every American should be. Every passing day that goes by results in more harm, more death, more psychological and physical pain, more trauma, and more stress. And, to state the obvious—the effects of one person's OUD is not confined to that person alone; it spreads to their loved ones, their children, their relatives, their friends, their co-workers, and beyond. If this funding prevents even ***one*** mother from having to bury her child or ***one*** child from having to look into the stands at a sports event and not see his parent, then it would be worth allowing the settlement to go forth without delay.

17. Through my job—and through raising Riley—I have also seen firsthand how grass-roots community organizations that already serve people with OUD are in desperate need of funding. Specifically, these organizations need money to support basic day-to-day operations, to employ more people, to provide transportation to their clients, including transportation to treatment centers, to offer peer support and recovery coaching and groups for family members, and to furnish counseling, among other things. Also, additional funding could support MAT clinics and providers and help these programs provide overdose reversal medication. Funding could be used for maternal treatment centers, special programming for children born with NAS, and specific organizations for children with NAS. Funding could be used for Syringe Services Programs, Recovery Community Organizations, and re-entry programs for individuals previously incarcerated. Not to mention, funding could be used to implement and enhance wraparound services for people suffering from OUD. Funding could go to hospitals and public schools to pay

for abatement programs and special needs programs. Simply put, there is no shortage of ways more funding could be put to use.

18. In addition to abatement programs, the Plan provides compensation directly to victims and their families. From my own experience, I understand that no amount of victim compensation could ever make up for what has happened, but these funds will make a difference in people's lives. Parents of children born with NAS could use the money to pay for basic, urgent, everyday needs, like diapers and rent. They also could put these funds toward time sensitive services and opportunities like education and counseling, the value of which may be irretrievably lost (or at least greatly diminished) if payments are delayed by the stay sought by Appellants. Compensation to these families would help offset these families' financial burdens and allow them to plan for the future.

19. In sum, the Plan must go into effect as soon as possible, so that abatement programs and victims can start receiving the support they need. The opioid epidemic is killing hundreds of people every day, and we cannot afford to wait any longer. Programs need funding. People need compensation. Governments need to put resources to work.

20. For all of these reasons, I believe that a stay pending appeal would cause incredible harm that would impact countless numbers of individuals, families, and communities that would otherwise benefit from allowing the Plan to be implemented.

[*Signature Page Follows*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 21, 2021

*Kara Trainor*
Kara Trainor