DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DEBTORS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS FOR STAYS OF THE CONFIRMATION ORDER AND THE ADVANCE ORDER PENDING APPEAL**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..........................................................................................................................7

    I.    THE MOVANTS FAIL TO SATISFY THE HEAVY BURDEN TO PROVE
        THAT A STAY PENDING APPEAL OF THE CONFIRMATION ORDER IS
        JUSTIFIED ................................................................................................7

        A.    The Movants Fail to Establish Irreparable Harm Absent a Stay .......................9

        B.    The Debtors' Creditors and the American Public Would Suffer Significant
            Harm if the Confirmation Order is Stayed.......................................................16

        C.    The Movants Fail to Demonstrate a Substantial Possibility of Success on
            Their Appeal ...................................................................................................25

            1.    The Movants Fail to Demonstrate a Substantial Possibility of Success
                On Their Challenge to the Plan's Third-Party Releases...........................27

                (i)    There is No Police Power Exception to *Metromedia*....................29

                (ii)    The Non-Debtor Releases Do Not Violate the Due Process
                      Clause.............................................................................................38

                 (iii)    The Court Has Jurisdiction and Constitutional Power to Confirm
                      the Plan...........................................................................................40

            2.    The Plan Satisfies the Best Interests Test.................................................43

            3.    The Classification of States and Municipalities Together in Class 4 Is
                Proper .....................................................................................................46

         D.    The Public Interest Weighs Strongly Against the Issuance of a Stay..............47

    II.    THE CREDITORS' REQUESTS FOR BONDS ARE JUSTIFIED IN THE
        EVENT A STAY IS IMPOSED AND SUCH BOND SHOULD BE
        SUBSTANTIAL ........................................................................................53

    III.    A STAY OF THE ADVANCE ORDER SHOULD BE DENIED ..........................57

CONCLUSION.......................................................................................................................59

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*29 Brooklyn., LLC v. Chesley*,
  2015 WL 9255549 (E.D.N.Y. Dec. 16, 2015) ................................................................ 20, 25

*In re 203 N. LaSalle P'ship*,
  190 B.R. 595 (N.D. Ill. 1995) ............................................................................................... 14

*BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*,
  2009 WL 393948 (D. Del. Feb. 18, 2009) ........................................................................... 14

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007) ...................................................................................... *passim*

*In re Advanced Mining Sys. Inc.*,
  173 B.R. 467 (S.D.N.Y. 1994) ............................................................................................. 16

*In re Airadigm Commc'ns, Inc.*,
  519 F.3d 640 (7th Cir. 2008) .................................................................................. 28, 29, 37

*In re A.H. Robins Co., Inc.*,
  880 F.2d 694 (4th Cir. 1989) ............................................................................................... 28

*Credit One Bank, N.A. v. Anderson (In re Anderson)*,
  560 B.R. 84 (S.D.N.Y. 2016) ................................................................................................. 8

*In re Application of Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010) ................................................................................. 15

*In re Baker*,
  2005 WL 2105802 (E.D.N.Y. Aug. 31, 2005) .................................................................... 13

*In re Bd. of Dirs. Of Multicanal S.A.*,
  2005 Bankr. LEXIS 1865 (Bankr. S.D.N.Y. Jan. 6, 2005) .................................................. 13

*Bernard L. Madoff Inv. Sec. LLC v. Sec. Inv. Prot. Corp. (In re Bernard L. Madoff Inv. Sec.
  LLC)*,
    740 F.3d 81 (2d Cir. 2014) ................................................................................................27

*In re BGI, Inc.*,
  504 B.R. 754 (S.D.N.Y. 2014) ...................................................................................... 14, 15

ii

*Bijan–Sara Corp. v. Federal Deposit Ins. Corp. (In re Bijan-Sara Corp.)*,
   203 B.R. 358 (B.A.P. 2d Cir. 1997) ........................................................................ 8

*In re Brown*,
   2020 WL 3264057 (Bankr. S.D.N.Y. June 10, 2020) ............................................. 7

*Brown v. Am. Sur. Co.*,
   110 Okla. 253 (1925) ............................................................................................ 55

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*,
   2021 WL 3145612 (Bankr. D. Del. July 26, 2021) ............................................... 37

*In re Calpine Corp.*,
   2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ............................... 9, 14, 23, 55

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995) ............................................................................................. 41

*In re Chemtura Corp.*,
   2010 WL 4638898 (Bankr. S.D.N.Y. Nov. 8, 2010) ............................................ 50

*In re Commonwealth Cos., Inc.*,
   913 F.2d 518 (8th Cir. 1990) ................................................................................ 32

*Country Squire Assocs. of Carle Place L.P. v. Rochester Community Savings Bank (In re Country Squire Assocs. of Carle Place, L.P.)*,
   203 B.R. 182 (B.A.P. 2d Cir. 1996) ........................................................ 7, 8, 15, 16

*In re CPJFK, LLC*,
   496 B.R. 65 (Bankr. E.D.N.Y. 2011) ..................................................................... 8

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017) ...................................................................................... 32, 33

*In re Daebo Int'l Shipping Co., Ltd.*,
   2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016) .......................................... 14, 16

*In re DeGennaro*,
   2020 WL 6827936 (S.D.N.Y. Oct. 2, 2020) ......................................................... 16

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
   416 F.3d 136 (2d Cir. 2005) .......................................................................... *passim*

*Triple Net Invs. IX, LP v. DJK Resid. (In re DJK Resid., LLC)*,
   2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) ............................................... 13, 54, 56

*In re Dow Corning Corp.*,
    287 B.R. 396 (E.D. Mich. 2002) ........................................................................ 28

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) .................................................................... 28, 32

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............................................................. 46

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ............................................................................. 28

*In re Enron Corp.*,
    2006 WL 2400411 (Bankr. S.D.N.Y. May 10, 2006) ........................................ 14

*In re Fairmont Commc'ns Corp.*,
    1993 WL 428710 (Bankr. S.D.N.Y. Oct. 12, 1993) .......................................... 20

*Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*,
    388 B.R. 619 (Bankr. E.D. Pa. 2008) ............................................................. 14

*In re Glob. Indus. Techs. Inc.*,
    645 F.3d 201 (3d Cir. 2011) ............................................................................ 28

*In re Gen. Motors Corp.*,
    409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...................................................... *passim*

*Green Point Bank v. Treston*,
    188 B.R. 9 (S.D.N.Y. 1995) ............................................................................... 8

*Hirschfeld v. Bd. of Elections*,
    984 F.2d 35 (2d Cir. 1993) ................................................................................. 7

*In re Hologenix, LLC*,
    2020 WL 8457487 (C.D. Cal. Dec. 21, 2020) ............................................ 15, 16

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
    517 F.3d 52 (2d Cir. 2008) .............................................................................. 42

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ............................................................................ 47

*In re Karta Corp.*,
    342 B.R. 45 (S.D.N.Y. 2006) ........................................................................... 30

iv

*In re Kendall*,

    510 B.R. 356, 365 (D. Colo. 2014) ...................................................................... 9

*In re Kirwan Offices S.A.R.L v. Lapidem Ltd. & Mascini Holdings Ltd (In re Kirwan Offices S.A.R.L.)*,

    592 B.R. 489 (S.D.N.Y. 2018) .......................................................... 29, 30, 33, 43

*In re Lloyd E. Mitchell, Inc.*,

    373 B.R. 416 (Bankr. D. Md. 2007) ................................................................. 47

*MacArthur Co. v. Johns-Manville Corp.*,

    837 F.2d 89 (2d Cir. 1988) ........................................................................ 27, 28

*Maryland v. King*,

    567 U.S. 1301 (2012) ...................................................................................... 12

*ePlus, Inc. v. Katz (In re Metiom, Inc.)*,

    318 B.R. 263 (S.D.N.Y. 2004) ......................................................................... 50

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*,

    945 F.2d 150 (6th Cir. 1991) ........................................................................... 25

*In re Millennium Lab Holdings II, LLC*,

    945 F.3d 126 (3d Cir. 2019) ...................................................................... 28, 43

*Mohammed v. Reno*,

    309 F.3d 95 (2d Cir. 2002) .............................................................................. 25

*Monarch Life Ins. Co. v. Ropes & Gray*,

    65 F.3d 973 (1st Cir. 1995) ............................................................................. 28

*In re Moreau*,

    135 B.R. 209 (N.D.N.Y. 1992)......................................................................... 13

*In re Motors Liquidation Co.*,

    539 B.R. 676 (Bankr. S.D.N.Y. 2015) ................................................... 17, 53, 54

*In re MPM Silicones, LLC, et al.*,

    No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014) ................................................ 8

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,

    760 F.3d 344 (4th Cir. 2014) ........................................................................... 28

*Nken v. Holder*,

    556 U.S. 418 (2009) ....................................................................................... 25

*Our Wicked Lady LLC v. Cuomo*,
  2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) .......................................................................... 12

*Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.)*,
  2007 WL 781905 (Bankr. S.D.N.Y. Mar. 13, 2007) ............................................................ 14

*In re Pulp Finish 1 Co.*,
  2014 WL 201482 (Bankr. S.D.N.Y. Jan. 16, 2014) ............................................................. 20

*In re Quigley Co. Inc.*,
  377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................................................. 46

*In re Sabine Oil & Gas Corp.*,
  548 B.R. 674 (Bankr. S.D.N.Y. 2016) ........................................................................... *passim*

*In re Sabine Oil & Gas Corp.*,
  2016 WL 4203551 (S.D.N.Y. Aug. 9, 2016) ............................................................ 7, 13, 15

*In re Sabine Oil & Gas Corp.*,
  551 B.R. 132 (Bankr. S.D.N.Y. 2016) ................................................................................. 16

*SE Property Holdings, LLC. V. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying Inc.)*,
  780 F.3d 1070 (11th Cir. 2015) .......................................................................................... 28

*In re Smith*,
  2009 WL 366577 (E.D.N.Y. Feb. 12, 2009) ................................................................... 7, 14

*SPV OSUS Ltd. v. UBS AG*,
  882 F.3d 333 (2d Cir. 2018) ............................................................................................... 41

*State v. Approximately $2,000,000.00 in U.S. Currency*,
  822 S.W.2d 721 (Tex. App. 1991) ...................................................................................... 54

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019) ................................................................................. 33

*Thompson v. Dewine*,
  976 F.3d 610 (6th Cir. 2020) .............................................................................................. 12

*In re TK Holdings Inc.*,
  No. 17-11375 (Bankr. D. Del. Feb. 21, 2018) .................................................................... 28

*In re Tribune Co.*,
  477 B.R. 465 (Bankr. D. Del. 2012) .............................................................................. 23, 55

*Turner v. Citizens National Bank of Hammond (In re Turner)*,
   207 B.R. 373 (B.A.P. 2d Cir. 1997) ........................................................ 8

*In re Trans World Airlines, Inc.*,
   2001 WL 1820325 (Bankr. D. Del. Mar. 27, 2001) ............................. 14

*Valentine v. Collier*,
   956 F.3d 797 (5th Cir. 2020) ................................................................ 12

*In re Windstream Holdings, Inc.*,
   2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020) ........................................ 13

*W. Real Estate Fund v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund)*,
   922 F.2d 592 (10th Cir. 1990) .............................................................. 32


STATUTES & RULES

11 U.S.C. § 105(a) .................................................................................. 29, 32
11 U.S.C. § 1452(a) ................................................................................ 31, 32
28 U.S.C. § 157 ............................................................................................ 43
28 U.S.C. § 362(b)(4) ................................................................................... 31
28 U.S.C. § 502(c) ....................................................................................... 47
28 U.S.C. § 524(g) .................................................................................. 31, 32
28 U.S.C. § 1122 .......................................................................................... 46
28 U.S.C. § 1123(b)(6) ................................................................................ 29
28 U.S.C. § 1126 .......................................................................................... 46
28 U.S.C. § 1129(a)(7) ........................................................................... 43, 44
28 U.S.C. § 1141 .......................................................................................... 36
Fed. R. Bankr. P. 3018(a) .............................................................................47
Fed. R. Bankr. P. 7019 ................................................................................. 47
Fed. R. Bankr. P. 8007 ....................................................................... *passim*


OTHER AUTHORITIES

3 Collier on Bankruptcy ¶ 362.05[5](d) (16th ed. 2021) ............................32

7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021) ..............................46

10 Collier on Bankruptcy ¶ 8007.11 (16th ed. 2021) ...............................8, 9

10 Collier on Bankruptcy ¶ 8007.09 (16th ed. 2021) .............................55, 56

Christina M. Cutter, et al., "Social Network Theory—An Underutilized Opportunity to Align Innovative Methods with the Demands of the Opioid Epidemic," AM J. OF DRUG & ALCOHOL ABUSE 47 (3), 2001 .......................................................................................................19

*Governor Lamont and Congressional Delegation Announce $5.8 Million Federal Grant to Support Connecticut's Efforts against the Opioid Crisis*, Targeted News Service (March 21, 2019) .................................................................................................................................49

Press Release, Washington State Office of the Attorney General, *Attorney General Survey Shows Nearly Half of Child Dependency Cases Impacted by Opioid Abuse* (Oct. 10, 2018), https://www.atg.wa.gov/news/news-releases/attorney-general-survey-shows-nearly-half-child-dependency-cases-impacted-opioid...........................................................................49

U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* (Sept. 2018).........................................................................................19

Purdue Pharma L.P. ("**PPLP**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "**Debtors**"), respectfully submit this memorandum of law in opposition to the motions for stays pending appeal.[1] The Debtors respectfully state as follows:[2]

## PRELIMINARY STATEMENT

1.      A tiny subset of the estates' creditors (including just three U.S. states and the non-creditor U.S. Trustee) ask this Court for a stay pending exhaustion of their appeals of the Confirmation Order. The Movants seek such an indefinite stay notwithstanding that it would imperil and delay, for potentially years, the distribution of billions of dollars that would otherwise be put to use abating the opioid crisis and compensating individual claimants, and put the survival of the Debtors at risk. And the Movants seek such a stay despite their appeals to the

---

[1] The motions for stays pending appeal are: (i) the United States Trustee's *Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* (Dkt. No. 3801, *see also* Dkt. No. 3972 (*Second Amended Memorandum of Law in Support of United States Trustee's Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007*) ("**UST Br.**"), Dkt. No. 3778 (*Memorandum of Law in Support of United States Trustee's Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007*)); (ii) the *Motion of the States of Washington and Connecticut for a Stay Pending Appeal* (Dkt. No. 3789) ("**Wash. & Conn. Br.**"); (iii) the State of Maryland's *Motion for Stay of Confirmation Orders and Trust Advances Order Pending Appeal* (Dkt. No. 3845) ("**Md. Br.**"); (iv) the *Joint Motion of Certain Canadian Municipality Creditors and Appellants and Certain Canadian First Nations Creditors and Appellants for the Granting by the Bankruptcy Court of a Stay Pending Appeals, Joinder to the Stay Motions of the Office of the United States Trustee and the State of Maryland, and Granting Related Relief* (Dkt. No. 3873) ("**CMFN Br.**"); (v) the *Motion for an Order to Stay* filed by Ronald Bass, Sr. (Dkt. No. 3860); and (vi) the *Motion of Ellen Isaacs, Deceased Patrick Ryan Wroblewski & The American People for a Stay Pending Appeal* (Dkt. No. 3890) (the "**Motions**"). Docket numbers refer to Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), unless otherwise specified.

[2] All capitalized terms not defined herein shall have the meaning ascribed to such terms in the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (Dkt. No. 3726) (the "**Plan**"). (*See* Plan § 1.1.) Docket numbers refer to Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.) unless otherwise specified.

district court already being adequately protected by a stipulation entered in the district court. Pursuant to that stipulation, the Debtors and other appellees have agreed that they will not argue the Movants' appeals have been rendered equitably moot by actions undertaken in advance of the Effective Date in furtherance of carrying out the Plan pursuant to the Confirmation Order or Advance Order.[3] The Movants' appeals are further protected by the Appellees' subsequent offer conveyed to the U.S. Trustee, the states of Washington, Connecticut, and Maryland, and certain Canadian entities on October 22 not to seek to emerge from chapter 11 before December 15, 2021.[4] No stay is necessary or appropriate. Indeed, the Movants do not come close to satisfying any, let alone all, of the four relevant stay factors with respect to their request for an indefinite stay through multiple levels of appeal, a request that is procedurally improper. It should be denied.

2.      This Court is of course intimately familiar with the historic nature of the Plan, through which the Debtors will turn over 100% of their assets and the Sacklers will pay $4.325 billion—all for the benefit of the American public to combat the opioid crisis and to provide compensation to victims. The Plan is overwhelmingly supported by—and, indeed, was crafted by and with—the Debtors' creditors. Every single organized creditor group in these chapter 11 cases supported its confirmation, including (1) the Official Committee of Unsecured Creditors ("**UCC**"); (2) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**Ad Hoc Committee**"); (3) the Multi-State Governmental Entities Group

---

[3] The stipulation "does not address the criminal sentencing of Purdue Pharma L.P. or the effect or consequences of such sentencing on these or other appeals." (Amended Stipulation, *In re Purdue Pharma L.P., et al. Bankr. Appeals*, No. 21-cv-7532 (S.D.N.Y. Oct. 20, 2021), Dkt. No. 71.)

[4] As of this filing, Maryland summarily rejected the proposal without any counteroffer, and the Debtors have not received a substantive response from any other party.

("**MSGE**"); (4) the Native American Tribes; (5) the Ad Hoc Committee of NAS Children; (6)

the Ad Hoc Group of Hospitals; (7) the Ad Hoc Group of Individual Victims; (8) the Third-Party

Payor group; (9) the group of ratepayer mediation participants; and (10) the majority of States

that formerly constituted the Non-Consenting States Group.  All told, over 95% of the more than

120,000 creditors who voted on the Plan—which the Debtors believe to be the most votes cast in

any case in bankruptcy history—voted in favor of it.  This historic consensus that included

overwhelming support from every single class, including 97% of the thousands of voting non-

federal domestic governmental claimants and 96% of the tens of thousands of voting personal

injury claimants.

3.      The reason for this unprecedented degree of creditor support is simple.  As the

evidence at confirmation overwhelmingly established, the Plan maximizes the value to be put to

work to abate the opioid crisis and help those affected by it, and it avoids the destruction of

billions of dollars of value and years of risk, expense, and debt that would almost certainly result

were the Plan not to go forward.  Indeed, none of the Movants identifies a single alternative to

the Plan that is better for even a single party, let alone for the hundreds of thousands of parties

here—because there is none.  The only alternative to the Plan is the collapse of the numerous

intricate and interwoven intercreditor settlements embodied therein, the endless destruction of

value, years of delay in creditor recoveries, and the continuation of thousands of separate,

uncoordinated lawsuits against the Sacklers all over the country.  And in that scenario, there is no

guarantee that any recoveries (if and when they materialize) would be earmarked for abatement.

All of this was carefully weighed by each of the ten official and ad hoc committees (and the

substantial majority of states) who supported the Plan as far preferable to the endless chaos and

years of delay, cost, and risk that would otherwise result.  As the UCC noted in its letter to the

estates' creditors explaining its support of the Plan, the Plan "is the only path that will ensure value can begin to make its way to creditors, who desperately need it as soon as practicable." (JX-2869 at 3.)[5]

4.      There are four factors a party must establish to obtain a stay pending appeal, and the Movants fail to establish any of them.  First, the Movants fail to demonstrate that they would suffer irreparable harm in the absence of a stay and conjure "harms" that simply do not exist. One even argues that the urgency of the opioid crisis somehow counsels in favor of a stay that would halt the distribution of billions of dollars for abatement efforts while the Movants pursue their meritless appeals.  The evidence at confirmation demonstrated—and this Court correctly concluded—that the objectors will recover more under the Plan than they would in a liquidation scenario.  As to the Movants' principal contention that their appeals run the risk of being deemed equitably moot, the clear weight of authority in this Circuit (and elsewhere) is that the mere risk of equitable mootness alone is not cognizable as irreparable harm.  Were it otherwise, a stay pending appeal would not be "extraordinary" relief or confined to "limited circumstances"—it would be universal.  The lack of irreparable harm to the Movants is alone fatal to the Motions, especially where the Appellees, this Court, and the District Court have already given the Movants far more than their motions warrant—a full level of appeal with no material risk of mootness.

5.      Second, the 99.995% of non-movant creditors and the American public would, by contrast, suffer substantial irreparable harm if the Confirmation Order is stayed past mid-December and the Debtors are blocked from emerging.  At the core of the Plan are distributions

_____

[5] "JX" refers to the joint exhibits submitted to the Court in connection with the Confirmation Hearing.  The Debtors rely on that evidentiary record, along with the additional evidence set forth herein, in opposing the Motion.

that benefit not just creditors, but the American public through the Abatement Trusts and Personal Injury Trusts.  As the Movants concede, the opioid crisis continues to ravage individuals and communities across the country, and every day of delay in effectuating this Plan is a day where substantial funds sit idle rather than being put to use abating the crisis and saving lives.  An extended stay would also delay distributions to personal injury claimants, many of whom have waited years for a recovery on their claims; inject uncertainty and risk into the Shareholder Settlement and the Plan as a whole (including because the Sackler Families could have the right to terminate the Shareholder Settlement Agreement if the Plan is not substantially consummated within 90 days of entry of the Confirmation Order); and result in tens of millions of dollars of additional fee burn (directing dollars away from abatement and into the hands of bankers and lawyers).  Moreover, an extended stay will materially hamper the Debtors' ability to operate and maintain the value of their assets, further diminishing the value of the estates for the creditors.  Indeed, if the Debtors' business is unable to survive the costs and pressures attendant from an extended delay, the Plan will crumble and the Movants will have successfully used delay to achieve their objective of destroying the Plan, even though their appeals are without merit. The balance of harms here is not even close.

6.      Third, the Movants have not established a "substantial possibility" of success on appeal.  As they did at confirmation, the Movants primarily take issue with the third-party releases under the Plan.  But after thoroughly canvassing the extremely well-developed and thorough record, this Court correctly held—consistent with decades of established precedent in this Circuit and most others—that the releases under the Shareholder Settlement are lawful and entirely appropriate.  The undisputed evidence at the confirmation hearing established that the releases, which were substantially narrowed several times at the Court's direction, "play[] an

important part in the [Debtors'] reorganization." *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005).  The Movants do not offer any evidence to suggest that even a single one of this Court's many factual findings was clearly erroneous.  Nor have they advanced a single legal argument suggesting, much less establishing to the requisite level of probability, any errors of law that might be reversed on appeal.  Simply stated, third-party releases have been lawful in this and the majority of circuits <u>for decades</u>, and for good reason—third-party releases have played a foundational role in some of the most complex mass tort bankruptcies in history.  And having had the opportunity in other cases where the claims of states were subject to third-party releases, no court ever endorsed or even suggested the passive existence of a police power exemption that these few states seek.

7.      Finally, and overwhelmingly, the public interest militates against a stay.  Despite the Movants' efforts to cast themselves as champions of state governments and personal injury claimants, the reality is that they are one one-hundredth of one percent of the claimants in this case.  The claimants themselves—hundreds of thousands of adult and pediatric victims, states, cities, counties, tribes, territories, schools, hospitals, and others—emphatically reject the outcome that three states' attorney generals and the United States Trustee (who speaks for <u>no</u> creditor) are seeking to impose on them.  The benefits of respecting the will of this utterly overwhelming majority and dedicating the value of the estates to opioid abatement and compensating victims—and doing so as quickly as possible—radically outweigh the interest of these few Movants in minimizing their risk of equitable mootness in their second and potential third levels of appeal, which is not legally cognizable as irreparable harm in any event.  This tiny minority of Movants should not be permitted to risk what so very many have fought for and

achieved after years of effort and nearly half a billion dollars in cost.  Nor should they be

allowed to indefinitely halt the opioid abatement efforts that would be facilitated by the Plan in

an ill-fated effort to better their odds on second and third appeals.  The benefits that would inure

to creditors and the American public carry decisive weight.

8.    The Movants' motions for a stay should be denied outright because the harm to so

many from a stay would be truly irreparable.  But even if the Movants could surmount all of the

many formidable hurdles to obtaining such a stay (which they cannot), the Creditors' requests for

a bond are justified, because the harms flowing from a stay are substantial.

## ARGUMENT

### I.    THE MOVANTS FAIL TO SATISFY THE HEAVY BURDEN TO PROVE THAT A STAY PENDING APPEAL OF THE CONFIRMATION ORDER IS JUSTIFIED

9.    A stay pending appeal under Bankruptcy Rule 8007 is an extraordinary form of

relief that is "only granted in limited circumstances."  *In re Smith*, 2009 WL 366577, at *2

(E.D.N.Y. Feb. 12, 2009); *In re Brown*, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10,

2020) (same).  Courts consider four factors in evaluating whether a stay is warranted:

"(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will

suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated 'a

substantial possibility, although less than a likelihood, of success' on appeal, and (4) the public

interests that may be affected."  *Country Squire Assocs. of Carle Place L.P. v. Rochester

Community Savings Bank (In re Country Squire Assocs. of Carle Place, L.P.)*, 203 B.R. 182, 183

(B.A.P. 2d Cir. 1996) (quoting *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993));

*accord In re Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *1 (S.D.N.Y. Aug. 9, 2016).

10.    The Movants bear the burden of proof to demonstrate that a stay is justified.  That

burden is a "heavy" one, as "[they] must 'show satisfactory evidence on all four criteria.'"  *In re

*Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) (emphasis added) (quoting *Turner*

*v. Citizens National Bank of Hammond (In re Turner)*, 207 B.R. 373, 375 (B.A.P. 2d Cir. 1997));

*see also Bijan-Sara Corp. v. Federal Deposit Ins. Corp (In re Bajan-Sara Corp.)*, 203 B.R. 358,

360 (B.A.P. 2d Cir. 1996) (same); *Green Point Bank v. Treston*, 188 B.R. 9, 12 (S.D.N.Y. 1995)

(observing that a party's "failure to satisfy one prong of the standard for granting a stay pending

appeal dooms [its] motion"); *In re CPJFK, LLC*, 496 B.R. 65, 68 (Bankr. E.D.N.Y. 2011)

(same).  And the burden is especially heavy where, as here, the Movants seek to stay an order

confirming a plan of reorganization.  *In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr.

S.D.N.Y. Sept. 17, 2014) (Drain, J.), Dkt. No. 1036 at 169:6-9 ("The party seeking a stay has

what is described as a heavy burden, and that is particularly [] the case where it is seeking a stay

of a confirmation order . . . .").[6]

11.    Because the Movants utterly fail to satisfy <u>any</u> of the four criteria—let alone all

four, as they must—a stay pending appeal for any period on or after December 15 (i.e., a stay for

second and third appeals) should be denied (and a stay prior to that period is also unjustified and

unnecessary).[7]  Indeed, such a request for a stay through multiple levels of appeals is

procedurally improper and should be denied for that reason alone.  10 Collier on Bankruptcy ¶

---

[6] Some courts in the Second Circuit have adopted a balancing approach, under which a movant's
failure to meet its burden on one of the four factors is not necessarily dispositive.  *See, e.g.*,
*Credit One Bank, N.A. v. Anderson (In re Anderson)*, 560 B.R. 84, 88 n.5 (S.D.N.Y. 2016)
(noting the split in authority).  A stay should be denied even under that more generous standard
for reasons set forth herein.

[7] Movants request that the Court impose a stay that will endure for however long it will take to
complete "as many as <u>three levels of appeal</u>" before the Plan is consummated.  (Maryland Br. at
17 (emphasis added); *see also id.* at 3 (seeking stay "pending the conclusion of appellate review"
and "pending the exhaustion of the appellate process"); Wash & Conn. Br. ¶ 2 (asserting that
"the Second Circuit and ultimately the Supreme Court should have the opportunity to decide" the
issues on appeal); Exhibit A (Hr'g Tr. 31:3-4, *In re Purdue Pharma L.P.*, No. 21-cv-7532 (CM)
(S.D.N.Y. Oct. 12, 2021) (counsel for the U.S. Trustee confirming that the U.S. Trustee is
seeking "a stay pending exhaustion of all appeals").)

8007.11 (16th ed. 2021) ("The general rule is that a stay granted under Rule 8007 expires when the appeal has been decided by the bankruptcy appellate panel or the district court."); *see also In re Kendall*, 510 B.R. 356, 365 (D. Colo. 2014) (holding that the predecessor of Rule 8007 "should not be interpreted as transcending the boundaries of jurisdiction to allow a bankruptcy court to issue a stay pending appeal to the Tenth Circuit" and observing that interpreting the rule otherwise "would invite interference with the entire appellate process, and trample the authority vested in the district court and the BAP to enter a stay pending appeal of its orders to the court of appeals, and the authority of the Tenth Circuit to enter a stay pending resolution of a petition for certiorari").

### A.    The Movants Fail to Establish Irreparable Harm Absent a Stay

12.    "[T]he principal prerequisite for the issuance of a [Rule 8007] stay" is "[a] showing of probable irreparable harm" to the movant if a stay is not granted, which "must be neither remote nor speculative, but actual and imminent."  *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).  The Movants cannot do so—let alone with evidence, as is their legal burden.  In fact, they did not even try.

13.    As an initial matter, the Movants cannot demonstrate that they will suffer any actual, imminent, and irreparable harm prior to December 15 because the Movants' appellate rights are, until then, protected to a far greater degree than the law provides.  The Debtors cannot emerge until, at the earliest, seven days after the sentencing hearing in the District of New Jersey, which itself cannot take place until December 1, 2021, at the earliest, under the terms of the plea agreement.  The Debtors have also stipulated that they will never argue that work in furtherance of consummation of the Plan <u>before</u> emergence (other than the effects or consequences of criminal sentencing) equitably moots any appeal.  In accordance with the District Court's order, the Debtors must inform all parties 14 days <u>before</u> the intended date of

9

emergence; and the Debtors have also agreed to inform all parties of the scheduling of the sentencing hearing.[8]  In short, there is no imminent irreparable harm for at least the next seven weeks that could merit a stay.

14.    Even if Movants were <u>not</u> protected by the agreed realities of these cases and the District Court stipulation, they fall well short of demonstrating any cognizable form of irreparable harm under Second Circuit law, and their motions should be denied for that reason too.

15.    First, the Movants assert that the improper settlement of claims against the Sackler Families under the Plan amounts to irreparable harm.  (*See* UST Br. at 32-33; Md. Br. at 14-16.)  Under the circumstances of these chapter 11 cases, that "harm" simply does not exist. The evidence adduced at confirmation conclusively demonstrated—and this Court correctly held as a matter of fact, reversible only if clearly erroneous—that these very parties would not do better in a liquidation of the estates in which they retained their claims against the Sacklers.  (*See* Modified Bench Ruling (Dkt. No. 3786) ("**MBR**") at 99 ("I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effect on recoveries that would result from pursuing those claims and unraveling the plan's intricate settlements.").)[9]

---

[8] *See* Memorandum and Order Denying Without Prejudice the United States Trustee's Emergency Motion for a Stay Pending Appeal, *In re Purdue Pharma L.P., et al.*, No. 21-cv-7969 (S.D.N.Y. Oct. 13, 2021) (Dkt. No. 48) at 12 ("I am also prepared to condition the denial of a stay on the entry of an order by this court requiring the Debtors to provide all appellees and other interested parties with fourteen days' notice of the actual Effective Date."); Opposition of the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants, the Multi-State Governmental Entities Group, the Ad Hoc Group of Individual Victims, and the Ad Hoc Committee of NAS Children to the United States Trustee's Purported Motion for Clarification, *In re Purdue Pharma L.P., et al.*, No. 21-cv-7532 (S.D.N.Y.) (Dkt. No. 66) at 7 n.4 ("[T]he Debtors commit that once a sentencing date is set the Debtors will promptly file a notice of such date on the bankruptcy docket.").

[9] In light of the record evidence at confirmation and this Court's clear holdings, it is nothing short of remarkable that some of the Movants continue to claim that "[e]ven without the

Any argument that they would somehow do better than Under the Plan is contraindicated, speculative, and unsupported. Despite being afforded every opportunity, the Movants failed to adduce any evidence, whether at confirmation or otherwise, to the contrary.[10]

16.    Likewise, the U.S. Trustee's continued bald assertion that "many" third-party claims against the Sackler Families were released "without notice" under the Plan (UST Br. at 34) and that those claimants would therefore suffer irreparable harm absent a stay is just wrong—flatly contradicted by the voluminous and totally uncontroverted evidence adduced at the Confirmation Hearing and incorporated into the Court's findings of fact (again, reversible only if clearly erroneous) in its order confirming the Plan. (*See infra* ¶¶ 52-53, 70.) Moreover, the claim that <u>any</u> party's rights are being improperly vitiated by the Plan elides the reality that the dozens of settlements that make up the Plan were negotiated by creditors, for creditors. The U.S. Trustee also grossly mischaracterizes the tailored releases that are tied to claims against the Debtors. Under section 10.7(b) of the Plan, as described further below, it is crystal clear that the releases are limited and narrowly tailored: among other limitations, section 10.7(b) releases only those claims "relating to . . . the Debtors" **and** as to which "any conduct, omission or liability of

---

Sacklers' contribution, the essential purpose of Chapter 11 to enable the Debtors to reorganize can clearly be achieved" and that the Plan "diminishes the amount of recovery that states could ultimately receive from the Sacklers." (Md. Br. at 12, 14.) The Debtors request that <u>factual</u> claims like this be put where they belong—in sworn declarations under penalty of perjury—and look forward to cross-examining <u>any</u> rebuttal witness willing to swear to such claims, none of which was done at confirmation despite the best interest objections.

[10] Even if, as the U.S. Trustee contends, parties with pending claims against the Sackler Families that are released under the Plan are required to respond to motions to dismiss in the interim or to take affirmative steps to reassert their claims following a judgment on the Movants' appeals, any purported injury arising from the allegedly improper release of third-party claims does not amount to irreparable harm. As to the U.S. Trustee's argument that an applicable statute of limitations might run for some undefined set of potential claimants with respect to the Sackler Families, that is incorrect. *See* Stipulated Order Tolling Shareholder Released Claims (Dkt. No. 3732).

any Debtor or any Estate is the legal cause or . . . a legally relevant factor," and the third-party

releases are subject to a number of critical exceptions and carve-outs, including certain

"Excluded Claims" and "Non-Opioid Excluded Claims."  (Plan § 10.7(b).)

17.    Maryland's contention that a state always suffers irreparable harm whenever it is

"prevented from enforcing its duly enacted statutes" (Md. Br. at 14) is equally unavailing.

Maryland mischaracterizes every authority it cites, all of which involved challenges to the

lawfulness of state laws or regulations, including cases where an injunction blocking the

implementation of state law would demonstrably harm public safety.  *See Maryland v. King*, 567

U.S. 1301, 1303 (2012) (Md. Br. at 15) (injunction of Maryland law authorizing collection of

DNA samples from individuals charged with certain crimes denied because of "concrete harm to

Maryland's law enforcement and public safety interest"); *Our Wicked Lady LLC v. Cuomo*, 2021

WL 915033, at *1-2 (S.D.N.Y. March 9, 2021) (Md. Br. at 14) (injunction of indoor capacity

limits enacted to prevent the spread of COVID-19 denied on the same basis).  The release of <u>civil</u>

claims against the Sackler Families relating to <u>past</u> conduct is in no way akin to a facial

challenge to the validity of a then in-effect statute or regulation, and it gives rise to none of the

concerns that animate those decisions.[11]  In fact, the interest in public safety that underlies

Maryland's cited authorities cuts <u>against</u> a stay in this instance, as a stay would prevent the

funding of critically needed opioid abatement efforts.  Moreover, 97% of the thousands of other

governmental plaintiffs have taken the opposite position—that it serves as an appropriate

---

[11] In *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (Md. Br. at 15), the court stayed an "intrusive" injunction regulating the administration of the Texas prison system, which created an "administrative nightmare" for prison authorities.  In *Thompson v. DeWine*, 976 F.3d 610, 613-14 (6th Cir. 2020) (Md. Br. at 15), the court overturned an order preliminarily enjoining certain of Ohio's ballot access requirements where the state was likely to prevail in defending the constitutionality of the impugned laws.  Neither case is remotely analogous or relevant to the settlement of civil claims against private parties for past conduct by a state in its capacity as a plaintiff.

deterrent for the governments to effectively seize from the Sacklers their valuable company, turn

it into a public benefit structure, and extract what is believed to be the largest civil settlement

ever recovered from a private family and leave every Sackler party exposed to criminal

prosecution after paying more than $4 billion.  The Movants, if successful, would substitute the

judgment of just three attorneys general for that of dozens of other state attorneys general and

thousands of other governments (as well as their own citizens) who voted in favor of the Plan.

18.    At base, the Movants principally contend that the harm they risk is that their

appeals <u>might</u> be rendered equitably moot unless a stay is issued.  (*See, e.g.*, Wash. & Conn. Br.

¶¶ 48-50; Md. Br. at 16; CMFN Br. ¶ 40.)[12]  That argument, however, is squarely foreclosed by

the weight of authority in this Circuit (among others), as "a risk of mootness, standing alone,

does not constitute irreparable harm."  *In re Sabine*, 2016 WL 4203551, at *4 (internal

quotations and citations omitted); *see also In re Windstream Holdings, Inc.*, 2020 WL 4481933,

at *3 (S.D.N.Y. Aug. 3, 2020) (same); *In re Gen. Motors*, 409 B.R. at 31 (same); *Triple Net Invs.

IX, LP v. DJK Residential (In re DJK Residential, LLC)*, 2008 WL 650389, at *3 (S.D.N.Y. Mar.

7, 2008) ("[T]here is no reason why the majority view that the risk of mootness does not

constitute irreparable harm should not apply to [movant's] situation."); *In re Baker*, 2005 WL

2105802, at *9 (E.D.N.Y. Aug. 31, 2005) ("[T]he possibility that an appeal will be rendered

moot by a denial of stay does not, in and of itself, constitute irreparable harm."); *In re Bd. of

Dirs. Of Multicanal S.A.*, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005)

("There is substantial authority, however, that the risk of an appeal being rendered moot does not

---

[12] Washington and Connecticut baselessly assert that the Shareholder Settlement was
intentionally designed to manufacture equitable mootness by requiring the Debtors to oppose any
request for a stay pending appeal.  (*See* Wash. & Conn. Br. ¶ 45.)  Rather, that provision reflects
the fact that the creditors and the Special Committee negotiated an unusual and exceedingly
favorable settlement under which the Sacklers are obligated to pay hundreds of millions of
dollars prior to the Confirmation Order becoming a final order.

in and of itself constitute irreparable harm . . . ."); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y.

1992) ("It is clear that the danger of an appeal becoming moot is by itself never a sufficient

ground to justify [the] grant of a stay.").[13]

19.    Indeed, the risk of equitable mootness "is present in any post-confirmation appeal

of a chapter 11 plan."  *In re Calpine*, 2008 WL 207841, at *4 (rejecting movant's argument that

it would suffer irreparable harm because the occurrence of stock distributions under the plan

would moot the movant's appeal).  As noted above, if equitable mootness constituted irreparable

harm, a stay pending appeal would be commonplace, not "extraordinary" or confined to "limited

circumstances."  *In re Smith*, 2009 WL 366577, at *2.  A stay for the period after December 15,

2021 should be denied based on the Movants' failure to show irreparable harm alone, as the

Movants "<u>must</u> demonstrate that [irreparable] injury is likely before the other requirements will

be considered."  *Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.)*, 2007 WL 781905, at *1

(Bankr. S.D.N.Y. March 13, 2007) (emphasis added); *see also In re Enron Corp.*, 2006 WL

2400411, at *3 (Bankr. S.D.N.Y. May 10, 2006) ("A showing of irreparable harm is a necessary

threshold for a Rule [8007] motion.").[14]  A stay prior to December 15, 2021 should be denied for

---

[13] The weight of authority outside of the Second Circuit is also in accord.  *See, e.g.*, *BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 2009 WL 393948, at *1 (D. Del. Feb. 18, 2009) ("[E]quitable mootness of an appeal, without more, does not constitute irreparable harm."); *Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) ("[A] majority of courts find the potential of mootness insufficient to demonstrate irreparable harm."); *In Re Trans World Airlines, Inc.*, 2001 WL 1820325, at *10 (Bankr. D. Del. Mar. 27, 2001) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm." (quoting *In re 203 N LaSalle P'ship*, 190 B.R. 595, 598 (N.D. Ill. 2005))); *In re Adelphia*, 361 B.R. at 347 n.39 (collecting authorities).

[14] The Movants' authorities are not to the contrary.  Indeed, they largely <u>confirm</u> the majority view that a risk of equitable mootness does not suffice to establish irreparable injury, *see, e.g.*, *Adelphia*, 361 B.R. at 347 (Wash. & Conn. Br. at 17, UST Br. at 35) ("A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *In re BGI*, 504 B.R. at 763 (Bankr. S.D.N.Y. 2014) (Wash. & Conn. Br. at 17) (same); *In re Daebo Int'l Shipping Co., Ltd.*, 2016 WL 447655, at *3 (Bankr. S.D.N.Y. Feb. 4, 2016) (Wash & Conn. Br.

those reasons and the additional reason that the Appellees already have, on consent, offered

mootness protection for that period.

20.    In any event, "[e]ven courts that conclude that equitable mootness <u>might</u> be

enough to satisfy the irreparable harm requirement, recognize that it is still necessary to balance

the alleged injury against the possible injury to other parties." *In re Sabine*, 2016 WL 4203551,

at *4 (emphasis added); *see also In re Gen. Motors Corp.*, 409 B.R. at 31 ("I'll assume that the

threat of equitable mootness is enough to satisfy the requirement of showing <u>some</u> irreparable

injury . . . . How much that should be weighed, however—and especially how it should be

weighed against different kinds of irreparable injury that others would suffer—is a very different

question."). The "seriousness of [the] threat [of mootness] is [also] inextricably related to the

appellants' likelihood of success on the merits." *In re Application of Chevron Corp.*, 709 F.

Supp. 2d 283, 309 n.46 (S.D.N.Y. 2010) (holding that the movants had shown "little threat of

irreparable injury" arising from the risk of mootness "in light of . . . the improbability of success

on the merits") (internal quotations and citations omitted); *see also In re BGI, Inc.*, 504 B.R. 754

at 763 (same).

21.    Here, each of the remaining three prongs of the analysis weighs decisively against

a stay—including because the hundreds of thousands of non-movants would suffer significant

and irreparable harm if the Debtors are blocked from emerging for an indefinite period after

December 15. As a result, this case differs materially from other authorities on which the

---

at 16-17) (acknowledging that "courts have reached different conclusions as to whether [a risk of mootness] amounts to irreparable injury"), or otherwise disregard that authority entirely, *see, e.g.*, *In re Country Squire Assocs., L.P.*, 203 B.R. at 183-84 (one-sentence conclusion, without analysis or citations to authorities, that mootness is cognizable as a form of irreparable injury for purposes of a stay pending appeal); *In re Hologenix, LLC*, 2020 WL 8457487, at *2-3 (C.D. Cal. Dec. 21, 2020) (out-of-circuit and unpublished decision that cites to no authorities in accepting the movant's argument that the risk of equitable mootness sufficed to establish irreparable harm).

Movants rely in connection with their equitable mootness arguments, where the remaining

factors counseled <u>in favor</u> of a stay, often unmistakably.[15]

> ### B.    The Debtors' Creditors and the American Public Would Suffer Significant Harm if the Confirmation Order Is Stayed

22.    Under the second prong of the stay analysis, the Movants must "establish that the

non-moving party or other parties will not suffer substantial harm if the stay is granted." *In re*

*Adelphia*, 361 B.R. at 349; *accord In re Sabine*, 551 B.R. at 145.  The Movants do not and never

could make that showing as to the hundreds of thousands of non-Movants and other parties, and

their efforts to downplay or ignore the massive harms and risks that would inevitably result from

a stay past December 15 through the conclusion of all appeals are not remotely credible.  It is

indisputable that a months- or years-long stay of the effectiveness of the Plan would impose

significant and irreparable harm, risk, and material incremental cost on the estates' creditors and

---

[15] *See, e.g.*, *In re Country Squire Assocs.*, 203 B.R. at 183-84 (Wash. & Conn. Br. at 17) (staying a foreclosure sale where any harm to the non-movant was "pure speculation," the non-movant did not even request a supersedeas bond, the movant demonstrated "a substantial possibility of success on the merits," and "no adverse public interests [would] be implicated" by a stay); *In re Advanced Mining Sys., Inc.*, 173 B.R. 467, 468-70 (S.D.N.Y. 1994) (Wash. & Conn. Br. at 17) (staying an order expunging an administrative claim where the non-movants' "efforts to show prejudice to them if the stay is granted [did] not persuade," "[a]t the very least, there [was] a substantial question going to the merits," and "the public interest [was] not meaningfully implicated" by a stay); *In re DeGennaro*, 2020 WL 6827936, at *1 (S.D.N.Y. Oct. 2, 2020) (Wash. & Conn. Br. at 17) (staying a sanctions order where "it [was] hard to see what prejudice [the appellee] would suffer if the stay were granted," the stay would last 28 days at most, and the appellant "identified sufficiently serious question[s] going to the merits"); *In re Hologenix, LLC*, 2020 WL 8457487 (C.D. Cal. Dec. 21, 2020) (Wash. & Conn. Br. at 17) (movant made "some showing of likelihood of success on the merits," a stay would only "delay payments to bankruptcy professionals as well as some plan disbursements," and the appeal "implicate[d] issues of first impression").  *In re Daebo*, 2016 WL 447655 (Wash. & Conn. Br. at 17) is inapposite because the non-movant in that case did not even *allege* that it or its counterpart in the relevant transaction would be prejudiced by a stay.  Regardless, the stay of the order to vacate maritime attachments in *Daebo* is simply not analogous to the stay that the Movants seek here, which would significantly and irreparably harm numerous stakeholders and the public as a whole by delaying the distributions of billions of dollars in funds to abate the opioid crisis and to compensate personal injury claimants.  (*See infra*, Section I.B.)

the American public as a whole.[16]  Such a stay would greatly delay distribution of hundreds of

millions of dollars to various stakeholders—including funds that will be dedicated exclusively to

opioid abatement efforts (a guarantee that only the Plan provides).  (*See* J. DelConte. Decl. ¶¶

24-28.)  It would also impose material risks to the Debtors' ongoing business (required under the

Plan to be harnessed for the public good) (DelConte Decl. ¶¶ 32-35), force the estates to bear

costs associated with a prolonged stay in chapter 11 (DelConte Decl. ¶¶ 29-31), and gamble

billions of dollars of abatement and compensation value in the hopes that the Shareholder

Settlement (and the Plan, of which the Shareholder Settlement is an integral component) does not

unravel while the Plan is stayed.

23.    First, delaying abatement funding, and leaving abatement programs left un-or-

underfunded for many months or several years—and unable to generate the myriad related

benefits to public health and safety contemplated—imposes irreparable harm on all public and

private creditors and the public at large.  Uncontroverted evidence adduced at confirmation

demonstrates that the opioid crisis has caused "enormous harm," and that "absent effective

abatement, [it] would do so for many years to come."  (JX-3040 (Declaration of Gary A. Gotto)

¶ 9; *see also* JX-3269 (Declaration of Charles Cowan) ¶ 35 (same); MBR at 1 (noting the

"massive public health crisis in this country").)  This the Movants do not dispute.  (*See* Md. Br.

at 2 ("[The Plan] that the Court has now confirmed purports to address a national public health

crisis that continues to addict millions and adds approximately 1,000 American lives each week

---

[16] Although Judge McMahon has indicated an intent to rule expeditiously on the Movants'
appeals in the first instance (consistent with the Debtors' wishes), no party can guarantee how
quickly the Second Circuit or the Supreme Court will resolve the subsequent appeals or petitions
for *certiorari* that the Movants have all but committed to undertake (should they lose before the
District Court), even if they too are expedited.  *See General Motors Liquidation*, 539 B.R. at
687-88 (rejecting an argument that the court should assume a shorter stay period for purposes of
its stay analysis on the basis that a party had filed an unopposed motion for an expedited appeal
because "there can be no assurance that [the motion] will be granted").

to the more than 600,000 lives opioid overdose have already taken."); Wash. & Conn. Br. at 4-5

("[T]he costs of the opioid epidemic are staggering.  From a financial perspective, the toll has

been reckoned in the tens of billions of dollars annually.  Measured in terms of human loss and

suffering, the costs are incalculable.").)  Moreover, uncontroverted evidence showed that the

billions of dollars of value to abatement provided by the Plan will generate positive spillover

effects that will confer additional value to the American public as a whole, not only to the many

direct recipients of value under the Plan.  (*See, e.g.*, JX-0525 (Declaration of Gautam

Gowrisankaran) ¶¶ 47, 54; Confr. Hr'g Tr. 229:10-18, 240:14-:241:1 (Gowrisankaran) (Aug. 12,

2021, Dkt. No. 3564) (describing the "multiplier effect," through which abatement programs

funded by the Plan "would have benefits that would extend well beyond the recipients of

payouts"); MBR at 65 (noting the "unchallenged testimony" that "described the clear multiplier

effect" that enhances the value of the Plan).)  Those who could be helped by funds <u>now</u> will be

irreparably harmed by being forced to wait even longer.  Tragically, delay could mean that many

individuals will not receive the benefits at all.

24.     <u>Second</u>, the extended, open-ended stay the Movants seek does not merely delay

abatement funds.  It irretrievably reduces the value of abatement that the same amount of

abatement dollars would achieve (even if one disregards, for the moment, the erosion of the

amount and present value of those funds discussed below).  That is a simple consequence of an

uncontroverted fact adduced at confirmation: without additional spending on abatement, the

opioid crisis will only continue to get worse.  (*See, e.g.*, Confr. Hr'g Tr. 239:18-21 (Charles

Cowan) (Aug. 17, 2021, Dkt. No. 3599).)  Indeed, as this Court observed, "it is crystal clear from

the record of the trial, on the confirmation hearing, [] that time is no one's friend," as "people []

would benefit immeasurably from implementing what all of the states have agreed to." (Confr. Hr'g Tr. 45:25-46:22 (Aug. 27, 2021, Dkt. No. 3695).)

25.     As with any worsening problem, every dollar spent on abatement today will have a greater impact on addressing the opioid crisis than a dollar that is spent tomorrow because the magnitude of the crisis continues to grow over time.  The cost of delay is both significant and compounding.  For example, a delay in the use of funds to prevent Opioid Use Disorder ("**OUD**"), as contemplated by the Plan, will eliminate the opportunity to prevent individuals from developing OUD, increasing the future population with OUD that will require treatment when a hypothetical stay of the Confirmation Order expires.[17]  As the population with OUD grows, the money required to treat that population is correspondingly greater.  Moreover, to the extent that OUD is observed to grow at a compounding rate (because a higher prevalence of OUD increases the rate at which others develop OUD[18]), that harm compounds over time.  Thus, the lengthy delay the Movants seek—until all of their appeals are exhausted—risks permanently depriving public and private creditors of the opportunity to begin "bending the curve" of the opioid crisis today.  That harm is not only substantial; it is irreparable, as this is not a case where the full "monetary loss can be quantified . . . during the time that the effectiveness of [the] confirmation order [is] stayed" or where the harm to the non-movants can be adequately protected through a bond.  *In re Gen. Motors*, 409 B.R. at 34 (declining to grant a stay because a

---

[17] *See* U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* (Sept. 2018) at 15 ("Evidence-based prevention interventions, carried out before the need for treatment, are critical because they can prevent initiation of substance use, delay early use, and stop the progression from use to problematic use or to a substance use disorder. . . . [I]t is critical to prevent misuse form starting and to identify those who have already begun to misuse these substances and intervene early.").

[18] *See, e.g.*, Christina M. Cutter, et al., *Social Network Theory—An Underutilized Opportunity to Align Innovative Methods with the Demands of the Opioid Epidemic*, Am J. of Drug & Alcohol Abuse 47 (3), 2001.

stay would threaten irreparable injury to various stakeholders that could not be cured by a bond).

Significant delay in the funding of desperately needed abatement programs risks lives.

26.     <u>Third</u>, delaying the Effective Date of the Plan will reduce the present value of

distributions to creditors.  Mr. DelConte's analysis sets forth the total value of distributions that

would be delayed in the event of a delay of the Effective Date of varying lengths, as well as the

associated time value of those distributions, which quantifies the concrete dollar costs associated

with varying lengths of delay (DelConte Decl. ¶ 26):

| Hypothetical Stay Period | Amount of Distributions Delayed by Stay Period | Net Present Value Loss of Distributions Delayed by Stay Period |
|---|---|---|
| 3 Months | $1,221,200,000 | $15,700,000 |
| 6 Months | $1,221,200,000 | $37,100,000 |
| 9 Months | $1,221,200,000 | $58,100,000 |
| 12 Months | $1,634,700,000 | $86,700,000 |
| 18 Months | $2,044,900,000 | $147,100,000 |
| 24 Months | $2,518,000,000 | $205,600,000 |

27.     The quantifiable harm from the lost time value of money caused by a stay is

substantial and independently sufficient to deny the Motions.  *See, e.g.*, *In re Fairmont

Commc'ns Corp.*, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) (observing that it is

"well settled [] that the delay caused to creditors receiving their payments is [] a significant harm

in warranting denial of a stay" (internal quotations omitted)); *29 Brooklyn, LLC v. Chesley*, 2015

WL 9255549, at *2 (E.D.N.Y. Dec. 16, 2015) (same); *In re Pulp Finish 1 Co.*, 2014 WL 201482,

at *10 (Bankr. S.D.N.Y. Jan. 16, 2014) ("A stay of proceedings will also injure the creditors with

allowed claims by delaying their distributions . . . .").

28.     <u>Fourth</u>, as the evidence at confirmation established, the Plan (which includes

dozens of interconnected settlements) and the Shareholder Settlement are the product of years of

intense and tireless arm's-length negotiations, including months of mediation, at considerable

effort and expense.  (*See, e.g.*, JX-3037 (Declaration of John Dubel) ¶¶ 32-46.)  Although the

19-23649-shl    Doc 4014    Filed 10/22/21    Entered 10/22/21 23:17:37    Main Document
Pg 30 of 68

vast majority of constituencies support these many agreements, every one of these agreements is put at risk by a stay.  The Sackler Parties have the right to terminate the Shareholder Settlement Agreement in the event that a stay remains in effect 90 days after the Confirmation Order is entered.[19]  The termination of the Shareholder Settlement Agreement would unravel the Plan, because the Plan depends on the $4.375 billion Shareholder contribution.  The uncontroverted evidence proved that the Shareholder Settlement cannot be severed from the Plan, as "[w]ithout the $4.325 billion being paid by the Sacklers under the plan and the other elements of the Sackler settlements . . . [t]he private/public settlement would fall apart and the abatement settlements would likely fall apart for lack of funding," and "inevitable fighting [would occur] over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection."  (MBR at 73-74.)  Further, as this Court has already concluded, a chapter 7 liquidation and "ensuing litigation chaos" would have been "the most likely result" if the Shareholder Settlement was not approved.  (*Id.* at 90.)  The Movants' irresponsible and utterly false assertion that "[the] Debtors would be able to successfully reorganize here without the Sackler Contribution" (Md. Br. at 12) is as untruthful as it is unsupported, and it flies in the face of this Court's express findings to the contrary based on <u>uncontroverted evidence</u> by many witnesses.  (MBR at 72-74, 90-91.)

29.    The very real risk of that Hobbesian nightmare is a material harm, as an implosion of the Plan would destroy billions of dollars of value and plunge the Debtors and various other

---

[19] Specifically, the Shareholder Settlement Agreement provides that the Sackler Parties may terminate the agreement if the Settlement Effective Date has not occurred within three months of the entry of the Confirmation Order (except where such delay is caused by the need to obtain certain regulatory licenses, consents, or approvals).  A condition precedent to the Settlement Effective Date under the Shareholder Settlement Agreement is that the Confirmation Order must be "in full force and effect" and "shall not have been reversed, modified or stayed."  (Twelfth Plan Supplement, Ex. AA (Shareholder Settlement Agreement) § 10.01(a)(ii).)

case constituencies into years of protracted and value-destructive litigation, including among

governmental and private creditors and victims, that would consume enormous value with

professional fees and result in material value loss—the very result that the Debtors and other

constituencies have sought to avoid through the Plan and the Shareholder Settlement.[20]  *See, e.g.*,

*In re Sabine*, 548 B.R. 674, 683 (Bankr. S.D.N.Y. 2016) (denying a stay where it would "plac[e]

plan settlements in jeopardy").  Accordingly, this risk should be weighed heavily in assessing the

balance of harms, as an implosion of the Plan, the Shareholder Settlement, and dozens of other

interconnected settlements would cause material and irreparable harm to the American public as

a whole.

30.    <u>Fifth</u>, a stay would result in material incremental fees and expenses (and

concomitant reductions in the amount available for distribution) by prolonging the Debtors'

chapter 11 cases.  It is beyond question that these cases have already resulted in significant costs.

Between September 15, 2019 (the petition date) and September 30, 2021 alone, the Debtors have

incurred approximately $697 million in non-recurring professional fees, or approximately $28

million per month on average.  (DelConte Decl. ¶¶ 29, 31.)  As explained in Mr. DelConte's

accompanying declaration, additional professional fees incurred by the Debtors' estates in

connection with a prolonged stay in chapter 11—unrelated to the pending appeals themselves,

and related solely to the consequences of a stay—are likely to total tens of millions of dollars, as

---

[20] Although there is hopefully too much at stake now for the parties to walk away from the
Shareholder Settlement, the risk and uncertainty that would accompany a months-long or years-
long stay is real.  Given that these are among the most complex and contentious chapter 11 cases
in modern history and that they involve dozens of different constituencies with different (and
often conflicting) interests, the sheer impossibility of predicting potential developments during
the pendency of a stay that might threaten the Plan and the Shareholder Settlement should weigh
heavily in assessing the risks to the non-movants in this case.

set forth below.[21]  (DelConte Decl. ¶ 29.)  Critically, that is all money that would otherwise be

dedicated to opioid abatement efforts under the Plan (DelConte Decl. ¶ 31)—which is precisely

why the Debtors and other case constituencies worked tirelessly to seek confirmation of the Plan

as quickly as reasonably possible, and which further underscores the magnitude of the harm to

the non-movants if the Plan is stayed.  The Debtors are paying the fees of many parties in these

cases, including the UCC, the AHC, and the MSGE.

| Assumed Stay Period | Projected Incremental Professional Fees Incurred During Assumed Stay Period |
|---|---|
| 3 Months | $10,000,000 |
| 6 Months | $20,000,000 |
| 9 Months | $30,000,000 |
| 12 Months | $40,000,000 |
| 18 Months | $60,000,000 |
| 24 Months | $80,000,000 |

31.    Sixth, whereas the Plan provides that Purdue Pharma L.P. will be dissolved and

the Debtors' assets transferred to NewCo, a stay would require the Debtors to continue to operate

their businesses in a value-maximizing manner for the benefit of the estates' creditors—and to do

so for an undetermined and unpredictable length of time while the Movants' appeals are pending.

Continuing to operate in that context would present substantial operational risks to the Debtors'

---

[21] The fees and expenses incurred in connection with a prolonged stay in chapter 11 may include, among other things, costs associated with ongoing approvals of non-ordinary course transactions, reporting and monitoring costs, preparation of monthly operating reports, preparation of chapter 11 fee applications, and fees and costs associated with the fee examiner. Additional and unexpected costs are also all but certain to arise.  (DelConte Decl. ¶ 31); *see also, e.g.*, *In re Tribune Co.*, 477 B.R. 465, 480 (Bankr. D. Del. 2012) ("[T]his Court's experience with cases that are consigned for an extended period to that no-man's land—a time and place between the date of confirmation and the plan effective date—is that this period is rife with uncertainty, sometimes causing parties to seek court guidance and relief on matters that would otherwise be unnecessary.").  Indeed, as a point of comparison, in ruling on a stay motion, the bankruptcy court in *In re Calpine* estimated that the professional fees associated with remaining in chapter 11 "could cost the Debtors up to $17 million per month" during the period of any stay.  2008 WL 207841, at *5.

business (and therefore, by extension, to NewCo and the creditors). For example, remaining in bankruptcy increases the risk that counterparties will decline to do business with the Debtors as a result of reputational or other concerns. (DelConte Decl. ¶ 33-34.) Likewise, employee attrition—which, as this Court well knows from multiple hearings, has been a serious challenge during the Debtors' 24-plus months in chapter 11—will only continue, if not worsen, during the pendency of any stay. (DelConte Decl. ¶ 33); *see also, e.g.*, *In re Sabine*, 548 B.R. at 683 (recognizing "difficulty in recruiting and retaining talent" as one of the harms resulting from a stay pending appeal). A stay could also jeopardize NewCo's ability to bring its opioid overdose and rescue medicines to market or could delay for years the availability of these potentially life-saving medicines. (DelConte Decl. ¶ 35.) The Movants assert—again, totally unsupported and without providing any evidence, as is their burden—that the Debtors "should suffer little or no harm" because they have sufficient liquidity to operate. (Wash. & Conn. Br. ¶ 52.) But this ignores the many forms of value destruction that will occur regardless of whether the Debtors would require financing as a result of a stay, all of which would put at risk the future viability of NewCo. Likewise, Maryland's baseless assertions that the pending appeals would pose more business risks to NewCo than a stay would to the Debtors (Md. Br. at 17-18) are flatly wrong and should be afforded no weight because they are unsupported by any evidence whatsoever.

*        *        *

32.    Although, as set forth above, it is the <u>Movants'</u> burden to demonstrate the <u>absence</u> of substantial harm to the non-movants, the evidence conclusively shows just the opposite—that the Debtors and the beneficiaries of the Plan, including the American public as a whole, would suffer grievous risks and harms that are substantial and, in many respects, irreparable. These harms compel the denial of a stay.

24

C.    **The Movants Fail to Demonstrate a Substantial Possibility of Success on Their Appeal**

33.    Under the third prong of the stay analysis, the Movants must establish a "substantial possibility" of success on appeal.  They cannot.

34.    At the outset, it bears emphasis that the suggestion advanced by some of the Movants—that they somehow satisfy this prong merely by showing that their appeal is not "frivolous" (Wash. & Conn. Br. ¶¶ 56, 91)—grossly understates their burden as per the Supreme Court of the United States and the Second Circuit.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be better than negligible." (internal quotations omitted)).  As the Second Circuit has made clear, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay."  *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (citing *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)) (quotation and alteration omitted); *In re Sabine Oil & Gas Corp.*, 548 B.R. at 684 (same). "Simply stated, more of one excuses less of the other."  *Mohammed*, 309 F.3d at 101 (internal quotations omitted).  Here, as demonstrated above, the Movants have failed to demonstrate <u>any</u> irreparable injury (*see supra*, Section II.A), and since there is massive irreparable harm to hundreds of thousands of other creditors, they must "clearly establish a substantial possibility of success on appeal."  *29 Brooklyn, LLC*, 2015 WL 9255549, at *3.

35.    The Movants have not identified a single incorrect legal conclusion or clearly erroneous factual finding that would suggest, let alone establish, that they can prevail on appeal. The Movants' papers are remarkable for all that they do not contest.  No Movant, for example, seriously disputes that *Metromedia* is the governing law in the Second Circuit.  No Movant (with the exception of the U.S. Trustee) challenges this Court's conclusion that the *Metromedia* factors

support the releases on the facts of these cases (the U.S. Trustee, for its part, devotes only three

paragraphs to those findings in its over-40-page brief and yet again cites no evidence in support

of its assertions (*see* UST Br. at 31-32)).  No Movant contests this Court's finding that "as a

practical matter, the [P]lan only limits the objecting states' remedies against the shareholder

release parties to collect money on account of their past conduct," rather than to protect against

some risk of ongoing harm.  (MBR at 153.)  No Movant contests the overwhelming record

evidence cited by the Court that if the Movants were carved out of the third-party releases, the

Debtors' historic, abatement-centric Plan would collapse.  (*Id.* at 154.)  Nor do the Movants

challenge the fact that "[they] would collect materially less money from the Debtors and the

Shareholder released parties in the aggregate" in the absence of the Plan, as this Court found

(*id.*), let alone adduce any evidence to the contrary.  In fact, with the exception of a single

cursory paragraph in Maryland's brief (Md. Br. at 13-14),[22] no Movant even argues that the

Shareholder Settlement is not in the best interests of all creditors.

36.    Against the backdrop of this largely uncontested evidentiary and legal record,

which included over 4,000 pages of declarations and expert reports in support of Confirmation,

the Movants advance arguments that the Plan is somehow unconfirmable as a matter of law and

may be overturned on appeal—all of which the Court rejected in a thorough, six-and-a-half-hour

oral ruling (later reduced to a comprehensive modified bench ruling) after hearing six days of

evidence from 39 witnesses and more than two days of oral argument.  These arguments include:

(1) that the Plan's third-party releases are illegal; (2) that the Plan cannot satisfy the best interest

of creditors test; and (3) that the Plan improperly classifies states together with their political

---

[22] Although not entirely clear to the Debtors, Maryland appears to assert that the Shareholder
Settlement is "materially insufficient" (Md. Br. at 13-14), but it does not provide any factual
basis to conclude that the $4.325 billion in settlement payments is not fair and equitable in light
of the corresponding benefits and risks of proceeding with litigation.

subdivisions.  The Movants, however, offer <u>no</u> evidence to suggest that any of this Court's many detailed factual findings in support of its holdings are clearly erroneous (because they are not) nor any applicable legal authorities suggesting, much less establishing to the requisite level of probability, any errors of law that would be reversed on appeal.  Accordingly, the Movants fail to carry their burden on this prong.  *See In re Sabine*, 548 B.R. at 684 (denying stay pending appeal where movant failed to demonstrate "substantial possibility" of success on appeal by merely presenting a "pared-down reargument" of certain claims and arguing that other claims were "colorable").  Wishing decades of consistent governing law were different, the Movants cannot possibly satisfy this prong.

### 1. The Movants Fail to Demonstrate a Substantial Possibility of Success on Their Challenge to the Plan's Third-Party Releases

37.    Although the Movants, principally the U.S. Trustee, continue to assert that non-consensual third-party releases are improper and unconstitutional in <u>all</u> circumstances, the Movants all but concede—as they must—that *Metromedia* is the governing law in the Second Circuit.  (*E.g.*, UST Br. at 3.)[23]  As this Court correctly held, the "clear majority" of circuits, including the Second Circuit, long ago determined that non-consensual third-party "releases and injunctions under a plan are authorized in appropriate, narrow circumstances."  (MBR at 118 (citing, for example, *Metromedia*, 416 F.3d at 141, *MacArthur Co. v. Johns-Manville Corp.*, 837

---

[23] In their motion papers, the Movants suggest that *Metromedia*'s approval of third-party releases in appropriate circumstances is not a holding, but is merely "dicta" (*see* Wash. & Conn. Br. ¶ 31; UST. Br. at 3, 17, 30).  That argument, however, is frivolous.  The Second Circuit itself describes *Metromedia* as <u>holding</u> that nonconsensual third-party releases are authorized in appropriate circumstances.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 93 n. 12 (2d Cir. 2014) ("In *In re Metromedia Fiber Network, Inc.*, <u>we held</u> that a bankruptcy court could permit the nonconsensual release of creditors' claims against third parties upon a finding of "truly unusual circumstances" that "render the release terms important to [the] success of the [underlying bankruptcy reorganization plan]." (emphasis added)).  Bankruptcy and district courts have faithfully applied *Metromedia's* holding for years, and not one has ever suggested that it constitutes non-binding dicta.

F.2d 89, 93-94 (2d Cir. 1988), and *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293

(2d Cir. 1992).)  These also include the First, Third, Fourth, Sixth, Seventh, and Eleventh

Circuits.  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 137-40 (3d Cir. 2019), *cert.*

*denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020); *SE*

*Property Holdings, LLC. V. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying,*

*Inc.)*, 780 F.3d 1070, 1076-79 (11th Cir. 2015); *Nat'l Heritage Found., Inc. v. Highbourne*

*Found.*, 760 F.3d 344, 350 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 961 (2015); *In re Glob. Indus.*

*Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640,

655-58 (7th Cir. 2008); *In re Dow Corning Corp.*, 280 F.3d 648, 656-58 (6th Cir. 2002);

*Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 984-85 (1st Cir. 1995); *In re A.H. Robins*

*Co., Inc.*, 880 F.2d 694, 700-02 (4th Cir. 1989).  And they have played a foundational role in the

resolutions of many of the most complex mass tort bankruptcies in history.  *See Johns-Manville*

*Corp.*, 837 F.2d at 93-94 (use of third-party releases to resolve mass tort bankruptcy); *In re Dow*

*Corning Corp.*, 287 B.R. 396, 402-417 (E.D. Mich. 2002) (same); Confirmed Fifth Am. Plan of

Reorganization, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018), Dkt. No.

2120 (same).

      38.    The Movants claim that they have a "substantial possibility" of success on appeal

notwithstanding *Johns-Manville Corp.*, *Drexel*, *Metromedia*, *Madoff*, and *Quigley* because (a)

the Bankruptcy Court incorrectly concluded that the Plan could release so-called "police power

claims" of a very small minority of hold outs; (b) the Plan's third-party releases violate the Due

Process Clause of the U.S. Constitution; and (c) the Bankruptcy Court lacked the subject matter

jurisdiction and constitutional authority to confirm a plan containing third-party releases.  (*See*

Wash. & Conn. Br. ¶¶ 56-91; Md. Br. at 8-14; UST Br. at 15-36.)  This Court, however,

carefully considered and rejected each of these totally unsupported arguments—which the Movants largely ignore—and the Movants do not cite any authority or point to any evidence to the contrary. None of these arguments will succeed on appeal.

### (i)    There Is No Police Power Exception to *Metromedia*

39.    As an initial matter, Washington, Connecticut, and Maryland continue to claim that the Plan's release of their civil claims against the Sacklers for money damages for past conduct violates the Bankruptcy Code because it impugns their sovereignty and police powers. (*E.g.*, Wash. & Conn. Br at 23-29; Md. Br. 10-11.) Not so.

40.    As this Court correctly held—and as the three moving states all but concede— "there is no [police power] bar or exception under the Bankruptcy Code." (MBR at 149; *see also* Wash. & Conn. Br. ¶ 64 ("To be sure, the Bankruptcy Code does not expressly provide that nonconsensual third-party releases may not be imposed on police power claims.").) To the contrary, the federal statutory scheme expressly preserves the Bankruptcy Court's residual power to impose third-party releases as part of a plan of reorganization. The Bankruptcy Court's "equitable powers are traditionally broad." (MBR at 124 (quoting *In re Airadigm Commc'ns, Inc.*, 519 F.3d at 657).) Congress codified this understanding in section 105 of the Bankruptcy Code, which gives bankruptcy courts the authority to effect any "necessary or appropriate" order to carry out the provisions of the Bankruptcy Code. (MBR at 124 (citing *In re Airadigm Commc'ns, Inc.*, 519 F.3d at 657).) Moreover, section 1123(b)(6) of the Bankruptcy Code permits a plan of reorganization to "include any other appropriate provision not inconsistent with [the Code]." (*Id.*) As this Court correctly observed, the power to enter third-party releases, even of claims that nominally seek to exercise a state's police power, flow from these statutory provisions, as courts in this Circuit have long concluded. (*See* MBR at 125); *see also In re Kirwan Offices S.A.R.L v. Lapidem Ltd. & Mascini Holdings Ltd (In re Kirwan Offices S.A.R.L.)*,

592 B.R. 489, 511 (S.D.N.Y. 2018) ("This statutory scheme reflects Congress's exercise of its preemption powers, which permit the abolition of [rights] to attain a permissible legislative object." (internal quotations omitted)).  The Movants ignore these holdings entirely.  In their place, they would substitute a "unanimity of the creditors" test that is nowhere found in the statutes and contrary to the express aims of the Code, and which would give every governmental entity with a claim for money damages a veto power over any plan of reorganization, no matter how broad the support.  Moreover, this Court concluded that "to properly be subject to a third-party claims release under a plan . . . the third-party claim should be premised as a legal matter on a meaningful overlap with the debtors' conduct."  (MBR at 128-30 (citing *Quigley*; *In re Karta Corp.*, 342 B.R. at 55-57).)  The Movants, however, do not (and cannot) contest this Court's factual finding that their direct claims against the Sacklers "essentially dovetail with the facts of the claimants' third-party claims against the Debtors."[24]  (*Id.* at 131.)

41.    The Movants' principal response, at bottom, is that a plan cannot release their claims against the Sackler Families because "the drafters of the Bankruptcy Code considered police power actions to be a special category of claims that were to be accorded deferential treatment."  (Wash. & Conn. Br. ¶ 62; *see also* Md. Br. at 10-11.)  But the Code provisions and cases on which they rely—and which this Court methodically rejected—do not come close to supporting such a carve-out.  The Movants should be transparent that they intend to ask an appellate court to craft from whole cloth (as they asked this Court) an entirely new exception to a well-established rule of law.

---

[24] And as noted above, the releases are narrowly tailored to that end:  the Plan releases only those claims "relating to . . . the Debtors" and only by holders of claims against Debtors as to which "any conduct, omission or liability of any Debtor or any Estate is the legal cause or . . . a legally relevant factor."  (Plan § 10.7(b).)

42.     First, the three moving states assert that the authorization of non-debtor third-party releases in the asbestos context under Sections 524(g) and (h) of the Bankruptcy Code gives rise to a negative inference that such releases are prohibited in non-asbestos cases.  (Wash. & Conn. Br. at 63; Md. Br. at 9.)   But the Movants do not so much as even mention the dispositive legislative history of these provisions that this Court extensively canvassed, which establishes that "[section 524] is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan of reorganization."  (MBR at 123 (citing H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4, 1994)); *see also* An Act To Amend Title 11 of the United States Code, Pub. L. No. 103-394, sec. 111, 108 Stat. 4117 (1994) (codified as amended in scattered sections of 11 U.S.C.) ("Rule of Construction—Nothing in . . . 11 USC 524 . . . shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization.").)  In other words, precisely the opposite inference is warranted:  Section 524(g) was simply one Congressional effort to codify a subset of already well-established equitable powers, and no equitable powers were intended to be displaced by its enactment.

43.     Second, the Movants argue that a brand new carve-out for state police power claims from otherwise proper third-party releases should somehow be inferred from the "police and regulatory power" exception to the automatic stay under Section 362 and the limitations on removal under 28 U.S.C. 1452(a).  (*See* Wash. & Conn. Br. ¶ 62; Md. Br. at 10-11.)  Section 362(b)(4), as this Court correctly set out, provides only a "limited exception" to the automatic stay.  (MBR at 149.)  It does not, by its own terms, except governmental actions to enforce a monetary judgment from the automatic stay.  (*Id*.)  The automatic stay of section 362 therefore has no relevance to the inquiry.  Moreover, as this Court and many other courts have correctly

held for decades, it is black letter law that police and regulatory power actions may still be

enjoined under section 105(a)—a critical point ignored entirely by the Movants.[25]  The Movants'

claim that 11 U.S.C. § 1452(a), a statute governing removal of actions to federal court, somehow

alters this analysis (*see* Wash. & Conn. Br. ¶ 62) is similarly unavailing.  Indeed, these sorts of

quasi-textual arguments have been rejected by the Second Circuit and others for decades as a

basis to preclude non-consensual third-party releases in non-asbestos cases.  *See, e.g.*,

*Metromedia*, 416 F.3d at 142 (acknowledging section 524(g), for example, but affirming court's

power to enter non-consensual releases in a non-asbestos case); *Dow Corning*, 280 F.3d at 656

("The Bankruptcy Code does not explicitly prohibit . . . a bankruptcy court to enjoin a non-

consenting creditor's claims against a non-debtor to facilitate a reorganization plan.").

44.     Third, the Movants point to the Supreme Court's holding in *Czyzewsk v. Jevic*

*Holding Corp.*, 137 S. Ct. 973, 977 (2017), to suggest that the Bankruptcy Court may not enter

third-party releases because they contravene the Bankruptcy Code.  (Wash. & Conn. Br. ¶ 61.)

The U.S. Trustee goes further, suggesting that *Jevic* somehow abrogates *Metromedia*.  (*See* UST

Br. at 3, 30-31 (arguing that there is a "substantial chance that an appellate court will reverse the

Confirmation Order's [third-party releases]" in light of *Jevic*).)  *Jevic* does no such thing, as

---

[25] The Movants' attempt to distinguish the authority cited by the Court in support of the proposition that "actions excepted from the automatic stay, including under the police or regulatory power, may be subject to injunctive relief under section 105(a)" (MBR at 152) misreads the case law.  *See In re W. Real Estate Fund*, 922 F.2d 592, 599 (10th Cir. 1990) (observing that "section 105(a) has been widely utilized in attempts to enjoin court proceedings against nondebtor parties that allegedly will have an impact on the debtor's bankruptcy case") (emphasis added, quotation omitted); *W. Real Estate Fund v. First Nat'l Bank & Trust Co. (In re Commonwealth Cos., Inc.)*, 913 F.2d 518, 527 (8th Cir. 1990) (observing that Section 105(a) provides a bankruptcy court with "ample other powers . . . including the discretionary power under 11 U.S.C. § 105(a) to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title") (emphasis added, quotation omitted).  Similarly, nowhere in 3 Collier on Bankruptcy ¶ 362.05[5](d) does it suggest that the bankruptcy court's power under section 105(a) to "enjoin an action by a governmental unit when an injunction is necessary and appropriate" is limited to actions against a debtor.

subsequent cases have illustrated. *See, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. 781, 790

(Bankr. S.D.N.Y. 2019) (approving third party releases under *Metromedia*); *In re Kirwan*, 592

B.R. at 513 (*recognizing* Metromedia as governing Second Circuit law post-*Jevic*). In *Jevic*, the

Supreme Court held that bankruptcy courts may not approve structured dismissals that provide

for distributions that do not follow ordinary priority rules absent consent. 137 S. Ct. at 977, 985.

It therefore affirmed the otherwise unobjectionable proposition that the court's equitable powers

may not be used in a manner that violates a provision of the Bankruptcy Code. *Id.* Here, third-

party releases contravene no Bankruptcy Code provision. Moreover, the U.S. Trustee's citation

to *Jevic* for the proposition that an amorphous "rare case" exception is irreconcilable with the

Bankruptcy Code (UST Br. at 30-31), is also entirely irrelevant. Quite the opposite of an

unbounded carve-out, *Metromedia* provides structure and content to the circumstances where

third-party releases may be included in a plan of reorganization. *See* 416 F.3d at 141.

45.    Fourth, the Movants continue to falsely assert that the third-party releases of their

claims are an impermissible "super-discharge" that absolves the Sacklers of "all civil claims of

any kind held by all claimants, including the States, against the non-debtor Sacklers." (Wash. &

Conn. Br. ¶¶ 27, 58, 79.) Leaving aside the gross mischaracterization of the releases,

Washington and Connecticut go even further and yet again misleadingly intimate that the Plan's

releases cover Sackler liability related to criminal conduct. (*See* Wash. & Conn. Br. ¶ 76 ("The

Sackler liabilities that the Plan seeks to protect stem from among the most sordid crimes in

recent American history, a context not at all contemplated in *Metromedia*.").) The releases do no

such thing, and these reckless and false assertions of "immunity" and protection from "crimes"

grossly mischaracterize the nature of the releases and provide no support for the Movants'

appellate arguments.

46.     As an initial matter, as the Court has repeatedly emphasized, the Plan is "crystal clear" that the Shareholder Releases <u>unequivocally</u> exclude criminal claims against the Shareholder Released Parties.  (MBR at 55.)  As this Court held:

> At best, suggestions that the plan would relieve the Sacklers of potential criminal liability reflect a lack of understanding about these cases; at worst, such suggestions are irresponsible and, frankly, cruel to those whom they mislead. If anyone has engaged in criminal activity either before or during these cases, they are not relieved of the consequences of that liability under the plan.  If any prosecutor wants to pursue such a claim against the released parties, they can.

(*Id.* at 56.)

47.     Moreover, contrary to the Movants' repeated mischaracterizations regarding the scope of the Shareholder Releases, the plain language of the release is narrowly limited to <u>civil claims related to the Debtors' conduct</u>.  As the Court found, the Shareholders "are . . . being released of true third-party claims only if they are opioid-related and then only for such claims where Purdue's conduct is at least in material part a legal element of the third-party claim." (MBR at 104.)  For this reason, the U.S. Trustee's repeated untrue claims that the Shareholder Releases are "limitless" and release "world-wide opioid-related liability" (UST Br. at 16) are contrary to fact, as they well know.  After weeks of intense efforts by the parties to narrow the releases in the Debtors' Plan, the Court further instructed in its bench ruling that the "release of third-party claims against the shareholder released parties . . . be further modified to state that a Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party, for the third-party claim to be subject to the release."  (MBR at 131.)

48.     As this Court correctly concluded, this release falls at the core of the type of claim that is properly the subject of a third-party release as part of a plan of reorganization in appropriate circumstances.  (*Id.* at 131-36.)  Indeed, the scope of the releases was dramatically

narrowed between the first iteration of the Plan and the final version that was subsequently

confirmed.  For example, the definition of "Releasing Parties" was narrowed to remove "all other

Persons."  The definition of "Shareholder Released Parties" was narrowed to remove advisors

and to limit the capacity in which recipients of funds from the Sacklers would be released.  The

definition of "Excluded Claim" was <u>expanded</u> to cover all tax claims, Canadian claims <u>not</u>

<u>arising from the Debtors' conduct</u>, and claims arising from post-effective date conduct.  And the

Plan was revised to add yet another carve-out to the releases for so called "Non-Opioid Excluded

Claims"—that is, claims not arising from opioids that are the subject to the Plan's releases.[26]

The U.S. Trustee's repeated suggestion that the releases were modified only "in small ways"

(UST Br. at 7-9) is just another canard.

        49.        The Movants also contend that the Shareholders have "unclean hands" and

therefore are not entitled to be a "beneficiary of a court's equitable powers."  (Wash. & Conn.

Br. Obj. ¶¶ 76-77.)  This claim literally makes no sense.  The Sackler Families are <u>defendants</u>.

But for this settlement, they would be <u>sued</u> for <u>billions of dollars</u> by the estates and thousands or

tens of thousands of creditors.  Each of the major <u>plaintiff</u> constituencies in these chapter 11

cases—including the AHC, MSGE, the UCC, and the Debtors—negotiated, for months, opposite

the Sackler Families, the defendants.  Those efforts resulted in a historic agreement that extracted

billions of dollars—and many material concessions—from the Sackler Families (monies and

remedies that the Movants do not contest would be virtually impossible to secure in civil

litigation).  Each of these plaintiff constituencies was integral to drafting the abatement-centric

---

[26] *See* Notice of Filing of Blackline of Twelfth Amended Plan (Dkt. No. 3727); Notice of Filing of Blackline of Eleventh Amended Plan (Dkt. No. 3707); Notice of Filing of Blackline of Tenth Amended Plan (Dkt. No. 3683); Notice of Filing of Blackline of Ninth Amended Plan (Dkt. No. 3653); Notice of Filing of Blackline of Eighth Amended Plan (Dkt. No. 3633; Notice of Filing of Blackline of Seventh Amended Plan (Dkt. No. 3546); Notice of Filing of Blackline of Sixth Amended Plan (Dkt. No. 3186).

Plan.  And the Debtors' <u>creditors</u> voted overwhelmingly in favor of the Plan.  It is for <u>their</u>

benefit—not the Sacklers'—that the Court confirmed the Plan.  The Movants'

mischaracterization of the Plan avails them nothing.[27]   In any event, the Bankruptcy Court

thoroughly considered the Shareholders' alleged conduct in its analysis of the "fairness" of the

settlement to non-consenting third-party claimants whose claims would be released.  (*Compare*

MBR at 98-99 (reviewing testimony and recognizing availability of "strong arguments" that

"Sackler Board members . . . understood the highly addictive nature of Purdue's opioid

products") *with id.* at 138-43 (weighing the fact that "the objectors' aggregate net recovery on

their claims against the Debtors and the shareholder released parties would be materially less

than their recovery under the plan"); *and id.* at 143-44 (concluding that the Plan settlement is fair

and reasonable); *and id.* at 9, 83 (noting that "each voting class voted in favor of confirmation of

the plan overwhelmingly" with "over 95 percent aggregate vote in favor of the plan").)

50.     Finally, the Movants claim that these are cases of "first impression" and that they

are "unprecedented" (Wash. & Conn. Br. (¶¶ 5, 28, 56).  Like so many of their other legal and

factual claims and assertions in their pleadings, however, these are demonstrably false.  The

Bankruptcy Court canvassed the case law and cited a number of cases where "[p]lan injunctions

have previously been imposed over governmental units' police or regulatory power."  (MBR at

---

[27] This argument is also nothing more than a recast of the Movants' argument that the third-party releases of claims against the Sacklers are impermissible because such claims might not be dischargeable in bankruptcy.  But as the Debtors established at Confirmation, that is irrelevant. The discharge that section 1141 grants to a debtor upon confirmation applies to nearly every prepetition claim not subject to one of the narrowly tailored exceptions to discharge.  A wide gulf distinguishes the discharge of a debtor from the third-party releases.  The releases, unlike a discharge, are limited to claims relating to the Debtors (and not all prepetition liability), enable the estates to recover billions of dollars from domestic and foreign trusts that are not even chapter 11 eligible, and are imposed not automatically, but upon specific showing that they are necessary for the Debtors' reorganization, among many other factors.

152 (citing cases)[28].)  The Movants respond only that these cases are distinguishable and do not

support the relief granted under the Plan.  (*E.g.*, Wash. & Conn. Br. ¶¶ 65-75.)  But the common

denominator of their analysis is that those cases should be disregarded because the governmental

units there did not <u>argue</u> that the release of their claims was barred by some yet-to-be-discovered

police power exception.  (*See* Wash. & Conn. Br. ¶ 71 (distinguishing *Airadigm* because "the

FCC did not even argue that the Bankruptcy Code was improperly overriding its police or

regulatory power"); *id.* ¶ 72 (distinguishing *Exide* because "objecting creditor had not raised the

police power argument at all").)  The immutable fact remains: courts have repeatedly, in

appropriate circumstances, confirmed bankruptcy plans enjoining governmental units from

pursuing claims against third parties for money damages as part of a plan of reorganization—

including as recently as July of this year.  *See, e.g.*, *In re Exide Holdings*, 2021 WL 3145612, at

*8 (affirming order confirming plan of reorganization that embodied multi-state global resolution

and released monetary claims of state environmental agencies against debtor-polluter and third

parties over California's objection); *see also In re Airadigm Commc'ns*, 519 F.3d at 557 (holding

that third-party claims release of plan funder applied to FCC).  Against the backdrop of the

Bankruptcy Court's long-established, broad equitable powers to facilitate a fair and value-

maximizing reorganization, the Movants' inability to cite a <u>single</u> case or statute that would

<u>preclude</u> releasing supposed "police power" claims for money damages in a plan of

reorganization is both telling and fatal to their argument under this prong.

---

[28] *See, e.g.*, *Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings Inc.)*, 2021 WL 3145612, at *15 (Bankr. D. Del. July 6, 2021) (California Department of Toxic Substances Control enjoined from pursuing claims); *In re Airadigm Commc'ns*, 519 F.3d at 657 (third-party release of claims applied to the Federal Communications Commission).

### (ii)    The Non-Debtor Releases Do Not Violate the Due Process Clause

51.     Next, the U.S. Trustee contends again that the non-consensual third-party releases under the Plan are inconsistent with the Due Process Clause of the United States Constitution because (1) "[m]any Releasing Parties never received notice of the Non-Debtor releases, and if they had some notice . . . [they] were unable to understand them" (UST Br. at 23), and (2) releasing parties did not have a "meaningful opportunity to be heard" (*id.* at 24-26).

52.     The U.S. Trustee's first untrue assertion is <u>factual</u>—and yet again consists only of unsupported assertions in a brief by lawyers and not the evidence they must show.  In point of fact, the Court correctly concluded, on the basis of substantial record evidence, that the notice of the confirmation hearing and third-party releases provided by the Debtors was not only "sufficient," but "unprecedentedly broad."  (MBR at 8.)  In support, this Court held that the "most widespread" of the Debtors' notices "were simple" and stated "in plain English that the plan contemplated a broad release of the Sacklers and their related entities . . . including claims against them held by third parties."  (*Id.* at 7 (citing JX-3030 (Third Supp. Decl. of Jeanne Finegan Decl.) ¶¶ 19-22).)[29]  The Court also determined that this notice reached an estimated 87% of all U.S. adults with an average frequency of message exposure of five times and served over 3.6 billion impressions online around the world.  (MBR at 5.)  This was on top of the Debtors' publication of the General Bar Date publication, which reached an estimated 98% of all adults in the United States over the age of 18 with an average frequency of message exposure of

---

[29] The U.S. Trustee's claim that Shareholder Releases apply to a "potentially limitless group of non-debtors" (UST Br. at 16), is also wrong.  The Plan identifies named individuals of the Sackler Families and certain categories of their related parties as Shareholder Released Parties, including on Exhibit X to the Shareholder Settlement Agreement.  In any event, for all of the releases' supposed complexity, the notice makes crystal clear that any Sackler family member or other related entities will benefit from a release.

eight times, and an estimated 86% of all adults in Canada over the age of 18 with an average

frequency of message exposure of four times.  (*See* JX-3030 (Third Supp. Decl. of Jeanne

Finegan Decl.) ¶ 5.)  Indeed, there were "literally billions of hits on the internet and social

media" in addition to notice through other means, including TV, radio, print publications,

billboards, and outreach to victims' advocates and abatement-centered groups, reflecting the fact

that the noticing program was "carefully tailored to reach not only known creditors but also the

population at large." (MBR at 5-6.)

53.    The U.S. Trustee's unsupported and untrue <u>factual</u> assertion, for which it provides

no evidence whatsoever, that "many" parties never received notice of the releases—does not

come close to demonstrating that the Movants have a substantial possibility of success on appeal.

That is all the more so because the U.S. Trustee did not object to the form of notice or raise these

concerns at the proper time—the disclosure statement—and thus waived its meritless argument

in any event.  (*See* UST Obj.)[30]  The U.S. Trustee's after-the-fact objections ring hollow—if the

unprecedented notice in this case was insufficient, then when has notice ever been sufficient, and

what unwritten standard would they impose on all future bankruptcies?

54.    The U.S. Trustee's second due process argument—that non-consensual third-

party releases are a per se violation of the Due Process Clause because they do not provide for an

"opportunity to be heard"—likewise fails.  As the Debtors explained in their confirmation brief,

this claim is nothing more than a wholesale attack on governing Second Circuit law (and the law

of the First, Third, Fourth, Sixth, Seventh, and Eleventh Circuits).  The U.S. Trustee's

---

[30] The U.S. Trustee perplexingly claims that the Debtors "conflated" the notice for claims against
the Debtors and claims by non-debtors against the Sackler Families.  (UST Br. at 24.)  But this is
just an attempt to evade the Bankruptcy Court's findings with respect to confirmation hearing
notice noted above.  The Bankruptcy Court thoroughly analyzed the Debtors' Supplemental
Confirmation Hearing Notice program—which focused on the third-party releases—and
concluded it was more than adequate.  (MBR at 7-9.)

astonishingly audacious and in-credible claim is that for many decades, seven circuit courts and

dozens of district and bankruptcy courts all across the country have all been violating the

Constitution when confirming plans containing non-consensual releases and somehow no one

noticed (seemingly including the U.S. Trustee's offices in at least seven circuits) until late 2021.

If the holders of released claims must always have "the merits of their causes of action . . .

determined [and] . . . heard by [a] court" (UST Br. at 25), then bankruptcy courts have no power

to impose non-consensual releases of such claims in any circumstance against any party,

notwithstanding the unambiguous holdings of *Johns Manville*, *Drexel*, *Metromedia*, *Quigley*,

*Madoff*, and six other circuits to the contrary.  To the extent that the U.S. Trustee is claiming

(factually) that releasing parties did not have an opportunity to object and be heard before the

Bankruptcy Court, that too is belied by the notice provided here and the multi-day,

extraordinarily well-publicized trial and many objections filed before this Court during

confirmation, all of which this Court carefully considered and ultimately overruled.  There

simply is no basis in law to support such a Due Process challenge.  In the many cases in (and

outside of) this Circuit considering third-party releases, the Debtors are not aware of a single one

that has concluded that such releases violate due process, and of course the Movants cite none.

*See, e.g.*, *Metromedia*, 416 F.3d at 141-43.  Accordingly, this argument provides no basis to

conclude that the U.S. Trustee has any possibility of success on its Due Process argument.

### (iii)    The Court Has Jurisdiction and Constitutional Power to Confirm the Plan

55.    Finally, the Movants argue that the Bankruptcy Court lacked the jurisdiction or

power to enter a final order confirming the Plan and third-party releases.  But each of these

arguments was rejected by this Court based on ample precedent and provides no basis for a

credible claim of error on appeal.

56.    First, the Movants claim that the Bankruptcy Court lacked subject matter jurisdiction to confirm the Plan and the third-party releases because there is "no certainty" that the states' direct claims against the Sackler Families would affect the estates.  (Wash. & Conn. Br. ¶¶ 82-85; *see also* UST Br. at 26-29.)  Washington and Connecticut point only to Purdue's partnership agreement, which requires a showing of good faith to succeed on a contractual indemnification claim.  (Wash. & Conn. Br. ¶ 85).  In their view, the "Sacklers' bad acts would render them ineligible to assert claims against Purdue."  (*Id.*)  This, they say, therefore does not provide a basis to exercise jurisdiction to enjoin claims against the Sackler Families.  That is wrong for many reasons.  As the Bankruptcy Court correctly concluded, "related to" jurisdiction provides the bankruptcy court with authority to enjoin suits that "might have any conceivable effect on the bankruptcy estate."  (MBR at 106-07 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-340 (2d Cir. 2018).)  This standard sets a low bar.  An action has a "conceivable effect" on a bankruptcy estate "if the outcome could alter the debtors' rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankruptcy estate."  *SPV Osus Ltd.*, 882 F.3d at 339-340 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995)).  In other words, as is well established, the <u>mere possibility</u> of indemnification litigation that would affect the estate suffices to establish jurisdiction to enjoin third-party claims.  (MBR at 107.)  And on the facts of these cases, the Bankruptcy Court did in fact find that such a possibility exists.  (MBR at 111.)[31]  The Movants proffer no evidence to the

---

[31] In any event, the Bankruptcy Court found that claims against the non-debtor Released Parties would also have a direct impact on the <u>res</u> of the Estates by resulting in potential diminution on the Debtors' shared insurance and possible negative impacts on the Debtors' ability to pursue the Estates own "closely-related, indeed fundamentally overlapping" claims against the Sacklers. (MBR at 111.).  Accordingly, the fact that the Movants do not contest either of these separate and independent bases for jurisdiction is also fatal to their argument that they will succeed on appeal on subject matter jurisdiction grounds.

contrary.  Moreover, the Movants do not even bother to mention the additional independent—

and sufficient—bases that the Bankruptcy Court found also establish subject-matter jurisdiction

to confirm the Plan and releases.  These include the potential impact that released claims would

have on the value of the Debtors' shared insurance policies, a substantial asset of the Estates, or

the Debtors' ability to pursue the Estates' own closely related, overlapping claims against the

Shareholder Released Parties.  (MBR at 111.)  The record evidence at trial establishing these

facts was overwhelming, and none of it was contested either.  (*See, e.g.*, *See, e.g.*, JX-1161, JX-

1196, JX-1201, JX-1204 (proofs of claims); JX-0872, JX-1222, JX-1803, JX-2011

(indemnification agreements); JX-1623, JX-0562 – JX-0610, JX-0612 – JX-0616, JX-1254, JX-

1255 (insurance policies); *see also* JX-3040 (Fact Declaration of Jesse DelConte) ¶ 36-39, 41-

43.)

57.    Second, the U.S. Trustee contends that the Court's imposition of third-party

releases somehow exceeds the scope of the Bankruptcy Clause.  (*See* UST Br. at 26-27.)  This

argument likewise has no basis in law.  Despite labelling this as a constitutional argument, the

U.S. Trustee essentially just contests whether the released claims are sufficiently "related to"

these cases—a challenge to the Court's subject matter jurisdiction, which fails as demonstrated

---

Moreover, the Movants assert that *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 68 (2d Cir. 2008) stands for the proposition that bankruptcy courts "lack[] jurisdiction to enjoin the release of direct claims against the debtor's [related parties] based on the [related parties'] own alleged misconduct.  (Wash. & Conn. Br. ¶ 82).  But, as this Court correctly held, the Second Circuit's 2012 decision in *In re Quigley Co.* made crystal clear "*Manville III* did not work a change in [Second Circuit] jurisprudence," 676 F.3d at 56, that the "touchstone for bankruptcy jurisdiction remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate," *id.* at 57 (internal quotations omitted), and that, as this Court found here, "[a] suit against a third party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the res of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability," *id*.

above.   Indeed, the U.S. Trustee does not cite a single case that holds—or even contemplates—that a third-party release might contravene the Bankruptcy Clause.

58.    Finally, the U.S. Trustee claims that the Court lacks "constitutional power" to confirm a plan containing third-party releases under *Stern v. Marshall*.  (UST Br. at 28-29.)  As the Court correctly held, however, recent authority—including in this District by Judge McMahon, *see In re Kirwan*, 592 B.R. 489, 504-07 (S.D.N.Y. 2018), and in the Third Circuit—has affirmed that a proceeding to determine whether a chapter 11 plan containing third-party releases should be confirmed is not only a "core" matter under 28 U.S.C. § 157, but is also a "fundamentally central aspect of the chapter 11 case's adjustment of the debtor/creditor relationship, and, therefore, is 'constitutionally core' under *Stern*."  (MBR at 116-17 (citing, *e.g.*, *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 135).)  The U.S. Trustee does not address these authorities, much less provide a basis to conclude that it might succeed on appeal on this issue in the face of them.[32]

## 2.    The Plan Satisfies the Best Interests Test

59.    Two of the Movants—Washington and Connecticut—also argue that they have a "substantial possibility" of success on appeal because the Debtors failed to satisfy their burden of proof under section 1129(a)(7) of the Bankruptcy Code, the best interest of creditors test.  Given that at trial the Movants put on <u>no</u> evidence of any kind on this critical point, that the Plan proponents' evidence was compelling and overwhelming, and that the Court made both factual

---

[32] The Canadian Municipalities and First Nations argue that the Plan and third-party releases cannot not apply to Canadian Municipalities and First Nations because they are "protected" by the Foreign Sovereign Immunities Act.  (*See* CMFN Br. ¶¶ 23-28.)  But, as the Debtors established at confirmation, the Canadian Municipalities and First Nations have cited no authority suggesting that the FSIA has any application in this context whatsoever.  In any event, section 106 would abrogate any such immunity if it existed.  *See* 11 U.S.C. § 106 (abrogating sovereign immunity of "governmental units," which is defined to include foreign states).

findings and had two alternative legal rulings on this issue, the Movants cannot possibly succeed on this argument on appeal.

60.    Section 1129(a)(7) requires that the plan proponent show that dissenting creditors "will receive or retain under the Plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." In analyzing the Debtors' liquidation analysis, the Court found as a matter of fact (reviewed under a clearly erroneous standard) that (1) "[u]nder the most realistic scenarios described in that analysis, there would be literally no recovery by unsecured creditors from the estates in a Chapter 7 liquidation;" (2) a no-recovery scenario is "the most likely result if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos"; (3) given the DOJ's $2 billion superpriority claim, "the plan's abatement program would disappear" in a liquidation scenario; (4) the "midpoint valuation of the Debtors' businesses as going concerns [is] $1.8 billion; and (5) under the Plan, the Objectors "would recover at least as much as their recovery in a hypothetical Chapter 7 case, indeed materially more." (MBR at 90, 146.)

61.    The Movants do not meaningfully contest any of these many factual findings. Moreover, although asserting that it was error for the Debtors not to submit expert or other evidence of the value of the objecting states' highly speculative direct claims against the Sacklers (Wash. & Conn. Br. ¶ 87), the Movants make no attempt to contest the Court's finding that no such evidence was required to assess the value of direct claims "given the evidence regarding the strengths and weaknesses of the claims, including the cost of pursuing them, the risks of collection, and the dilutive effect of all of the other litigation that would be pursued by all of the

other creditors in these cases, including all of the other states and governmental entities who are

otherwise agreeing to the plan that would have the same types of third-party claims, as well as

the Chapter 7 trustee on behalf of the estate."  (MBR at 147.)

62.      Finally, the Movants misunderstand the nature of the Debtors' argument and the

Court's ruling.  The Debtors' argument was not that the <u>claims</u> of State X or State Y against the

Sacklers may not be meritorious.  (*See* Confr. Hr'g Tr. 39:8-23 (Aug 25, 2021, Dkt. No. 3684)

39:8-23 (Debtors' argument that the best interests of creditors test has "nothing to do—

nothing—with the merits and strength and validity of the claims of any individual entity against

the Sacklers").)  Rather, as the Debtors established in their papers and set out on the record at the

Confirmation Hearing, it was that the Movants could not possibly demonstrate—against the

uncontested factual backdrop of state recoveries against the Debtors going from billions in

chapter 7 to zero or virtually zero—that any one of them would recover <u>more</u> on those claims

than their recoveries under the Plan after years of inter-creditor warfare and disorderly races to

hundreds or thousands of courthouses.  (*See* Debtors' Conf. Br. ¶ 238 ("[*E*]*ven if* holders of

third-party claims prevailed entirely on their claims and recovered all of this wealth—*which is

far from assured*—they would recover more than $3 billion less than provided under the Plan.")

(emphasis added); Confr. Hr'g Tr. 38:25-39:7 (Aug 25, 2021, Dkt. No. 3684) (describing how

"no claimant could possibly credibly predict that the actual recovery on their claim against the

Sacklers . . . is knowable.").)  The Movants' improper attempts to evade the above uncontested

factual findings by characterizing the Bankruptcy Court's ruling in this regard as impermissible

burden shifting fails.  The Debtors proved with evidence that the Movants' recovery rights were

speculative and incalculable and that they would do worse absent the Plan.  In the ultimate tell,

no Movant has ever made the factual claim, by declaration, affidavit, or otherwise, that it

actually would do better in a liquidation as one of thousands of claimants suing the shareholders and likely one another.  Indeed, no such argument could credibly be made.

### 3. The Classification of States and Municipalities Together in Class 4 Is Proper

63.    Lastly, the Movants surprisingly reprise their argument that it was improper for the Plan to classify states with other non-federal governmental entities and have those claims vote at $1.  (Wash & Conn. Br. ¶ 90.)  But the Movants do not contest the Court's holding that the states' "claims have the same rights to the Debtors' assets as other general unsecured creditors, including the political subdivisions that are in their class."  (MBR at 41-42.)  Under well-established governing law, this is all that is required to classify similar claims together.  *See In re Quigley Co., Inc.*, 377 B.R. at 116 (quoting *In re Drexel Burnham Lambert Grp.*, 138 B.R. at 757) (holding that because those claims have "substantially similar rights to the [Debtors'] assets," they are "similar" for the purposes of section 1122 and are properly classified together); *see also* 7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the claim (e.g., senior or even secured or unsecured), and the relationship of the claim to property of the debtor").

64.    Additionally, although they fail to mention it in their stay papers, the three Movant states are not entitled to wish away the second independent ground for the Court's ruling, the uncontested mathematical reality that even if the states were classified separately from their political subdivisions "the percentage of states and territories accepting the plan would go to over 79 percent, still well above the 75 percent supermajority threshold" (MBR at 43), and far above the one half in number and two thirds in amount voting thresholds set forth in section 1126.  Finally, as the Court held, it was proper to assign the Movants' litigation claims a value of $1 for voting purposes, including because the Movants "made no attempt to seek to estimate

46

their claims or temporarily allow them for voting purposes in a different amount under section 502(c) of the Bankruptcy Code or Bankruptcy Rule 3018(a)." (MBR at 44.) "Under such circumstances, it is entirely appropriate to allow the claims for voting purposes in the sum of $1.00," and the Movants' arguments to the contrary lack a substantial possibility of success on appeal. (*Id.* (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 643, 647-48 (2d Cir. 1988); *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 428 (Bankr. D. Md. 2007)).)[33]

### D.    The Public Interest Weighs Strongly Against the Issuance of a Stay

65.    The Movants, less than 0.005% of the Debtors' creditors, less than 0.07% of governmental creditors, and less than 7% of U.S. states and territories, do not and cannot establish that a stay is in the public interest.[34]  The Movants contend that as "governmental units" it is in the public interest that they be able to pursue their civil claims for money damages for past conduct against the Sackler Families (notwithstanding the uncontested consequences of doing so). (*See, e.g.*, Wash. & Conn. Br. ¶¶ 92-96; Maryland Br. at 19-20.)  But the governmental and private creditors' overwhelming support of the Plan—and utter lack of support for these Motions—establishes otherwise.  In fact, Washington, Connecticut, and Maryland (the only states to seek a stay of the Confirmation Order) constitute only <u>three</u> non-federal domestic governmental claimants out of 4,924 that voted on the Plan.  (*See* JX-3028 (Declaration of Christina Pullo), Ex. A.)  Many states on the other hand are actively opposing the Movants'

---

[33] As to the stay motion filed by Mr. Bass (Dkt. No. 3860), the apparent relief sought in his appeal—joinder of non-Debtors and recovery against those non-Debtors for violating various state or federal laws—is improper, and therefore his appeal cannot succeed on the merits.  These chapter 11 cases are not the appropriate forum in which to litigate such claims and issues, and Bankruptcy Rule 7019 does not apply.  (*See* Order Denying Derivative and Fraudulent Conveyance Mot. (Dkt. No. 3958); *see also* Debtors' Omnibus Objection to Ronald Bass's Derivative and Fraudulent Conveyance Mot. And Supporting Letter (Dkt. No. 3910).)

[34] The U.S. Trustee is not a creditor and speaks for no one but itself, including because the United States as a creditor is not bound by the Shareholder Releases.

request (and, perhaps just as telling, most states appealing the Confirmation Order are not Movants).  The fact is that every voting class and every major creditor constituency, including the Creditors' Committee, the Ad Hoc Committee, the MSGE, the Native American Tribes Group, the Ad Hoc Committee of Individual Victims, the Third-Party Payor Group, the Ratepayer Mediation Participants, and the Ad Hoc Committee of NAS Children, supports the Plan and the Shareholder Settlement.  And the Plan garnered virtually unprecedented creditor support from what is believed to be the largest number of votes in U.S. bankruptcy history—a monumental feat given the complex and often contentious nature of these cases.  The public, the victims, the governments, and the states have resoundingly spoken about what is in their and the public's interest.

66.    The U.S. Trustee's only response that it is acting "on behalf of the interests of small stakeholders" (UST Br. at 33), and Washington and Connecticut say that they are acting "on behalf of their citizens" (Wash. & Conn. Br. ¶ 94).  But, against the backdrop of the above, this rings hollow, as over 95% of the 120,301 individuals or governments affected by and who voted on the Plan supported its confirmation.[35]  (*See* JX-3028 (Declaration of Christina Pullo), Ex. A.)  It is not in the public interest to allow the U.S. Trustee and the attorneys general of just three states to thwart distributions of significant value to every other U.S. state and thousands of other governments who supported the Plan (not to mention hundreds of thousands of other creditors, including personal injury claimants) for months (or even years).

---

[35] The U.S. Trustee again rehashes its argument that not every eligible creditor submitted a ballot in an effort to discredit the resounding show of support from the more than 100,000 creditors who voted in favor of the Plan.  (*See* UST Br. at 32 n.21.)  As this Court has previously admonished, that "is not how elections are conducted," and "where a vote is as extensive as occurred here, under any measure this plan has been overwhelmingly accepted."  (MBR at 10.)

67.    The overwhelming public support for the Plan is hardly surprising, as the

Shareholder Settlement and the plea were negotiated by the creditors as the best available

outcome—for creditors—in a difficult and complex situation.  The abatement-centric nature of

the Plan inures to the benefit of the American public as a whole by directing billions of dollars of

value to opioid abatement efforts nationwide, which will directly and immediately assist

communities that have been ravaged by the opioid crisis.  The need for those funds is real and

urgent; as the Movants themselves have observed, lives are literally at stake.[36]  But that value

cannot be unlocked—and those benefits cannot be realized—until the Plan goes effective.  The

public interest in working to turn the tide of the opioid crisis in this country is just more

important than the Movants' desire to strengthen the merits of their case on appeal by negating

the prospect of an equitable mootness argument—all of which would, at best, allow them and

tens of thousands of others to sue the Sackler Families (and one another) and do far worse than

under the Plan.  *Cf. In re Gen. Motors Corp.*, 409 B.R. at 33 (noting that it would be an

"intolerable result" to cause the "huge contrary public interests" of thousands of employees,

retirees, dealers, and suppliers "to be sacrificed for [the movants'] ability to avoid mootness

---

[36] *See, e.g.*, UST Br. at 33 (noting that more than 290,000 deaths have occurred in the United
States since 2015); *id.* at 36 ("[T]here is no doubt about the importance of affording relief to
victims of the opioid crisis . . . ."); Md. Br. at 14 (noting that the "ongoing public health crisis []
continues to kill more than 100 Americans per day); *id.* at 19 ("Hundreds of thousands have died
with roughly another thousand added every week."); Press Release, Washington State Office of
the Attorney General, *Attorney General Survey Shows Nearly Half of Child Dependency Cases
Impacted by Opioid Abuse* (Oct. 10, 2018), https://www.atg.wa.gov/news/news-
releases/attorney-general-survey-shows-nearly-half-child-dependency-cases-impacted-opioid
("Opioids have a devastating impact on Washington families, . . . [t]he state must do more to
combat this epidemic. Future generations of Washingtonians are at stake."); *Governor Lamont
and Congressional Delegation Announce $5.8 Million Federal Grant to Support Connecticut's
Efforts against the Opioid Crisis*, Targeted News Service (March 21, 2019) (quoting Connecticut
Governor Ned Lamont as noting that "our state's residents are still struggling with addiction, and
it is incumbent upon us to help," and that "[t]he only way to address the opioid epidemic is to
treat it as what it is: a true public health emergency").

arguments"). For this reason, too, the public interest weighs heavily against a stay, and it does so in a manner that is seldom the case in a typical chapter 11 proceeding.[37]

68.    Finally, the "public interest in the expeditious administration of bankruptcy cases" counsels against a stay. *ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 272 (S.D.N.Y. 2004); *see also In re Chemtura Corp.*, 2010 WL 4638898, at *8 (Bankr. S.D.N.Y. Nov. 8, 2010) ("The public interest favors the expeditious administration of bankruptcy cases, and also recognizes the desirability of implementing the legitimate expectations of creditors . . . to get paid."). The Plan and the Shareholder Settlement were the result of <u>years</u> of discovery, negotiation, and compromise by highly sophisticated parties advised by cadres of lawyers and other professionals. Numerous creditors, including tens of thousands of personal injury victims, have waited for years to get to where we are today. And it took years of mediation before Judge Polster, Judge Phillips (ret.), Judge Chapman, and Ken Feinberg for the <u>creditors'</u> deals with the Sacklers to reach their final form. The Plan has now been confirmed, and it is time to honor the overwhelming choice of governmental and private creditors to be paid and have 100% of Purdue's assets dedicated to the public good without any further delay.

69.    The U.S. Trustee's claim that the Plan should be stayed because it allegedly erodes public confidence in the bankruptcy system by "giving the appearance that individuals

---

[37] Maryland inexplicably invokes the urgency of the opioid crisis as a reason to <u>stay</u> the Plan because "the public has an interest in getting it right" and the public would be "confused" if the Plan is overturned on appeal. (Md. Br. at 18-19.) That argument is outlandish on its own terms, as it elides the fact that Maryland would have this Court put a halt to hundreds of millions of dollars of distributions that would otherwise be put to use to "address [the] national health crisis." (*Id.* at 2.) Moreover, it merely rehashes Maryland's contention that the Plan was wrongly confirmed, which it was not (*see supra*, Section I.C); and to the extent that avoiding "confusion" is a cognizable interest that should factor into the stay analysis (which it is not), Maryland's argument would effectively justify a stay pending appeal in every single chapter 11 case, as there is always a risk that an appellate court could overturn a confirmation order. These are simply not credible arguments.

and their affiliates can use the bankruptcy case of another entity to evade responsibility for their

misconduct" (UST Br. at 35) warrants special mention.  The notion that anyone is "evad[ing]

responsibility" (*id.*) or that this Court's order confirming the Plan has somehow undermined

confidence in the bankruptcy system is rooted in mistruths and mischaracterizations.  It is

perverse to invoke those supposed misperceptions (which the U.S. Trustee advances in an

unsupported conclusory fashion) as a basis for staying a Plan that is, in reality, entirely consistent

with the Bankruptcy Code and the governing law in this Circuit (*see supra* ¶¶ 12-21) and has

unprecedented and overwhelming creditor support, including 97% of the thousands of

governments that voted on the Plan.[38]  Indeed, it is the Movants who would undermine

confidence in the bankruptcy system by removing the tool that has been used to successfully

resolve myriad mass tort cases that would otherwise be unresolvable—cases such as breast

implants and airbags—where, like this one, the debtor itself does not have the resources to

provide sufficient compensation to a large universe of claimants, but a third party is able to make

a substantial contribution to fund a plan.

        70.    To the U.S. Trustee's contention that a stay is warranted because the bankruptcy

system's integrity depends on "public confidence in its procedures and its transparency," suffice

it to say that the Confirmation Hearing played out in full public view and in full compliance with

the law, and that it followed "the most extensive discovery process . . . [that] any court in

---

[38] By the same token, Washington and Connecticut's argument that the Court should stay the
Plan to "avoid . . . critical backlash" in the event of a possible equitable mootness finding on
appeal (Wash. & Conn. Br. ¶ 55) completely misunderstands the judicial function.  It should go
without saying that "confidence in [judicial] determinations" (*id.*) is fostered by applying the law
without fear or favor, not by catering to allegedly anticipated reactions to a ruling by a different
court on appeal.

bankruptcy has ever seen."[39]   (MBR at 78.)  In addition, the Debtors undertook one of the most

expensive and extensive noticing campaigns in U.S. history to provide notice of these chapter 11

cases and the Confirmation Hearing—a campaign that this Court has described as

"extraordinary."  (*See* June 3, 2020 Hr'g Tr. 89:4; *see also* MBR at 6.)  Indeed, for the bar date,

the Debtors deployed virtually every form of modern media—including print, TV, websites, and

social media—to provide publication notice to an estimated 98% of all adults in the United

States over the age of 18 with an average frequency of eight times.  (JX-3030 (Third Supp. Decl.

of Jeanne Finegan) ¶ 5.)  For the Confirmation Hearing, which provided notice regarding the

third-party releases in particular, the Debtors undertook a similarly extensive noticing campaign.

Collectively, both noticing programs resulted in over 5.2 billion impressions being served across

digital media, over 7,100 news mentions globally, and more than 890,000 users visiting the

Claims Website, generating more than 1.7 million page views.  (*Id.* ¶ 24.)

71.    Paradoxically, if anything has undermined public confidence in the bankruptcy

system, it is the irresponsible rhetoric and repeated misrepresentations and invented facts of a

tiny minority of parties who have substituted inflammatory assertions for evidence and cogent

legal argument.  Maryland's related unsupported, untrue contention that the Confirmation Order

---

[39] With respect to the value of transparency, it bears emphasis that the Plan itself provides for an
unprecedented degree of disclosure by creating a public document repository that will make
more than 100 million pages of material available for public review, including documents subject
to the attorney-client privilege that would never be produced in litigation.  (*See* Plan § 5.12.)
The evidence at confirmation established that the repository is "especially important given the
public interest raised by the objecting states;" and, indeed, for some claimants, it is "perhaps the
most important aspect of the settlement."  (MBR at 155-56; *see also* Conf. Hr'g Tr. 151:17-152:9
(Peter Weinberger) (Aug. 16, 2021, Dkt. No. 3602) (uncontroverted testimony that the document
repository, "which is available to the public and can be studied and written about, is extremely
important"); Confr. Hr'g Tr. 83:18-22 (Jayne Conroy) (Aug. 16, 2021, Dkt. No. 3581)
(uncontroverted testimony that "it could be that the document repository is actually the most
valuable piece of this settlement.").)  That, too, would be indefinitely put on hold if a stay is
entered, which is also contrary to the public interest.

was entered "prematurely" or that the Plan is "untested" (Md. Br. at 19-20) is belied by the

extensive record of discovery, the voluminous evidence that was adduced at the Confirmation

Hearing, and the support of numerous parties for the Plan—including estate fiduciaries and

individuals intimately familiar with the underlying claims—after years of investigations and

exhaustive analysis and consideration.  As only one data point, over 4,000 pages of declarations

and expert reports were filed by seven different parties in support of the Plan.  Many of those

experts were not even cross-examined because their written testimony was so strong, and those

that were questioned did not suffer a single dent in their conclusions.  That, too, confirms the

Movants cannot meet their burden to prove that a stay is in the public interest; the evidence

proves exactly the opposite.[40]

## II.     THE CREDITORS' REQUESTS FOR A BOND ARE JUSTIFIED IN THE EVENT A STAY IS IMPOSED AND SUCH BOND SHOULD BE SUBSTANTIAL

72.     For all the foregoing reasons, this Court should deny the Motions.  If, however,

the Court nevertheless agrees with the Movants that a stay is warranted, the creditor-appellees

have requested the imposition of a bond.  *See* Fed. R. Bankr. P. 8007(c).  Those requests are

justified under the circumstances in order to require the Movants to bear at least some of the

costs that they seek to force on the Debtors' stakeholders and are consistent with the presumption

of a bond requirement in this Circuit and elsewhere.

73.     The purpose of a bond "is to indemnify the party prevailing in the original action

against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court."

*In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015).  Where, as here, "the

movant seeks imposition of a stay without a bond, 'the applicant has the burden of demonstrating

---

[40] Ellen Isaacs's stay motion (*see* Dkt. No. 3890) merely attaches the Washington & Connecticut motion  and should be denied for the same reasons set forth above.

why the court should deviate from the ordinary full security requirement.'" *In re Sabine*, 548 B.R. at 681 (quoting *In re DJK Residential, LLC*, 2008 WL 650389, at *2); *accord In re Gen. Motors Liquidation Co.*, 539 B.R. at 686 (same); *In re Adelphia*, 361 B.R. at 350-51 (same).

74.    The Ad Hoc Committee has set forth reasons why the U.S. Trustee is not exempt from the bond requirement.  *See Ad Hoc Committee's Objection to Stay Motions* ¶¶ 45-46 (Dkt. No. 4002).  And Rule 8007 plainly does not in any way purport to exempt the moving states or foreign governmental entities from a bonding requirement.  The conclusory, one sentence assertion by Washington and Connecticut that no bond is required simply because the U.S. Trustee has also filed its own appeal of the Confirmation Order (Wash. & Conn. Br. ¶ 97) and has separately sought a stay pending appeal is baseless and contrary to the plain language of Bankruptcy Rule 8007.  Even if the U.S. Trustee is not subject to a bond requirement, the other Movants are not and should not be permitted to bootstrap onto such an appeal and foist onto the non-Movants the cost and risk associated with their own appeals (which raise different arguments and have different bases for appeal).  Such a result would be starkly at odds with the purpose of Bankruptcy Rule 8007.  Nor does "due consideration" of the "sovereign nature" of the moving states in any way militate against a bond.  Those parties' argument to the contrary rests entirely on two wholly inapposite authorities—a 30-year old decision from an intermediate appellate court in Texas applying Texas law, and a 96-year-old decision from an Oklahoma state court applying Oklahoma law—neither of which has anything to do with Bankruptcy Rule 8007(c) (or, for that matter, federal law), and neither of which involved billions of dollars for opioid abatement efforts that would be endangered by a stay.[41]  (*See* Wash. & Conn. Br. ¶ 99

---

[41] Notably, Washington and Connecticut do not (and cannot) even attempt to argue that their status as sovereigns prohibits the imposition of a bond; they simply suggest that their status as sovereigns should be granted "due consideration."

(citing *State v. Approximately $2,000,000.00 in U.S. Currency*, 822 S.W.2d 721, 725 n.1 (Tex.

App. 1991) and *Brown v. Am. Sur. Co. of New York*, 110 Okla. 253, 255 (1925).)  Moreover,

those governmental movants are acting against the public interest and wishes of over 4,500 other

governmental actors, as well as hundreds of thousands of private claimants.

   75.  The magnitude of the harm to the non-movants is far from "limited," as

Washington and Connecticut claim.  (Wash. & Conn. Br. ¶ 98).  As set forth above, the Movants

seek both to halt and risk the distribution of significant value for opioid abatement efforts and

personal injury victims for months, at bare minimum, and imperil the survival of the companies

while they pursue their meritless appeal.  That delay would result in significant irreparable (and

incalculable) injury to those parties, and the stay request should be denied outright on that basis

alone.  The direct, undisputable quantifiable harms associated with a stay are likewise

significant.  (*See supra* ¶¶ 26-27, 30-31.)  The vague assertion that the harms from a stay could

be "mitigated through good faith efforts of the parties" rings hollow, as the very essence of the

Motions is that the Plan should not be consummated—and as a consequence, the distributions

contemplated by the Plan should not be made—so long as the Movants' appeals remain pending.

In the relatively rare circumstances where a stay pending appeal is granted in complex chapter 11

cases, courts have found sizable bonds appropriate and necessary.  *See, e.g.*, *In re Gen. Motors*,

409 B.R. at 34 ($7.4 billion bond); *In re Tribune*, 477 B.R. at 483 ($1.5 billion bond); *In re

Adelphia*, 361 B.R. at 368 ($1.3 billion bond); *In re Calpine*, 2008 WL 207841, at *7 ($900

million bond).

   76.  "[C]ourt[s] should set a bond at or near the full amount of the potential harm to

the non-moving parties."  *In re Adelphia*, 361 B.R. at 368; *see also* 10 Collier on Bankr.

¶ 8007.09 (16th ed. 2021) (noting that a bond should be set "in a sum sufficient to protect the

rights of the party who prevailed in the bankruptcy court"); *In re DJK*, 2008 WL 650389, at \*5 (the bond should be "commensurate with the threatened loss to the non-moving parties").

77.     Under the Plan, creditors will receive approximately $5.5 billion in distributions over time.  (*See* JX-0882 (Disclosure Statement) at 2-3; JX-2761 (Am. DelConte Report) ¶¶ 9-10, 48.)  Staying the Confirmation Order and delaying emergence, however, risks a complete collapse of the Shareholder Agreement and Plan, the conversion of these chapter 11 cases to a liquidation, and the destruction of billions of dollars of distributable value.[42]   As this Court already found, creditors are likely to receive nothing or virtually nothing in a liquidation scenario.  (*See* MBR at 90 (finding that "[u]nder the most realistic scenarios . . . , there would literally be no recovery by unsecured creditors from the estates in a Chapter 7 liquidation, which is, I believe, the most likely result if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos"); JX-2761 (Am. DelConte Report) ¶¶ 9, 48.)  The resulting harm in such a scenario would be approximately $5.5 billion.

78.     Even if the risk that the Shareholder Settlement Agreement and Plan collapses during the pendency of an indefinite stay were to be discounted, the harms of a stay would still be substantial.  The harms that include, at minimum: (i) delays of hundreds of millions of dollars of distributions to Creditor Trusts, including distributions that will be dedicated to opioid abatement efforts and distributions to tens of thousands of qualified personal injury claimants, and the attendant harm to abatement efforts; (ii) the risk that a stay would undermine or even collapse the Shareholder Settlement and the Plan; (iii) the incremental fees and expenses

---

[42] Under the Shareholder Settlement Agreement, the Sackler Families would have a termination right in the event that "the Settlement Effective Date has not occurred by the earlier of (A) three months after the entry of the Confirmation Order . . . and (B) June 30, 2022."  Shareholder Settlement Agreement, Exhibit I, § (a)(vii) (Dkt. No. 3711).

associated with a prolonged stay in chapter 11; and (iv) the ongoing operational difficulties and challenges associated with the continued operation of the Debtors during a period of heightened uncertainty, in addition to harms identified and demonstrated by other parties in these cases. Indeed, even applying a 25% risk-weighted adjustment to the potential for a liquidation scenario and considering that alone, the harm would be no less than $1.375 billion.  And none of this, of course, accounts for the truly irreparable harm to public health that would result from a stay.

## III.    A STAY OF THE ADVANCE ORDER SHOULD BE DENIED

79.    In addition to seeking a stay of the Confirmation Order, the U.S. Trustee and the Non-Federal Public Movants also seek to stay the *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* (Dkt. No. 3773) ("**Advance Order**").  That stay should be denied as well, as the Court has already ruled that the Advance Order could not give rise to any possible mootness argument.

80.    Under the Advance Order, which was entered by the Bankruptcy Court on September 15, 2021 (and, unlike the Confirmation Order, not subject to any statutory stay), the Debtors were permitted to undertake certain work *before* emergence in order to facilitate speedy distributions *after* the Plan is consummated.  In total, the Advance Order permitted the Debtors to advance $6,855,468, or just 0.7% of the approximately $1 billion of the Debtors' unrestricted cash, and an even smaller fraction of the billions of dollars of value that will be distributed under the Plan.  Although immaterial in amount, the expenditures of those funds are critical to help ensure efficient and accurate claims processing after the Effective Date—for example, by enabling work to construct websites, claims databases, and platforms, and to fund activities of the proposed trustees and managers in preparation for post-Effective Date undertakings.

$6,666,500 has already been distributed in accordance with the terms of the Advance Order, consistent with the Debtors' authorization to do so more than five weeks ago.

81.     There is no credible argument whatsoever that the activities funded by the Advance Order could give rise to equitable mootness concerns, and that issue was thoroughly litigated and decided by this Court, both in approving the Advance Order and again in scheduling the hearing on the pending stay motions.  The payment of less than $6.9 million to creditor trusts in the context of a multi-billion dollar Plan—which can be undone—is categorically *not* the type of activity that could ever amount to a comprehensive change in circumstances warranting a denial of appellate review of the Plan, and neither the U.S. Trustee nor any other party has, at any point, offered a single authority to suggest otherwise.  Moreover, the Advance Order itself expressly provides that the payment of the advances prior to the Effective Date "shall not support any argument that any such appeals are equitably moot" (Advance Order ¶ 12), and the Debtors and other Plan supporters affirmatively represented that they will not make any such argument in connection with these appeals (*see* Debtor's Reply Brief in Support of Advance Motion at 4-5 (Sept. 9, 2021), Dkt. No. 3743).  Were that not enough, the proponents of the Plan have now also entered into a stipulation again providing that they will never argue before any Court that the pre-Effective Date activities undertaken pursuant to the Advance Order and the Confirmation Order (other than the sentencing) could render any appeal of the Confirmation Order equitably moot.  (*See* Amended Stipulation, *In re Purdue Pharma L.P., et al. Bankr. Appeals*, No. 21-cv-7532 (S.D.N.Y. Oct. 20, 2021), Dkt. No. 71.)  The fact that the Movants would seek to delay the expenditures of funds that would expedite distributions for opioid abatement and to personal injury claimants—when their risk of harm is immeasurably small—is both dispiriting and disquieting.

## **CONCLUSION**

82.    For the reasons set forth herein, the Motions should be denied in their entirety.


Dated:    October 22, 2021
         New York, New York


DAVIS POLK & WARDWELL LLP

By:    */s/ Marshall S. Huebner*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors*
*and Debtors in Possession*