**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## DECLARATION OF JESSE DELCONTE

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

I, Jesse DelConte, pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury:

1.      I am a Managing Director of AlixPartners, LLP ("**AlixPartners**"), which has a place of business at 909 Third Avenue, Floor 30, New York, New York 10022 and which serves as one of the principal advisors to Purdue Pharma L.P. ("**PPLP**") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, "**Purdue**" or the "**Debtors**").

2.      I submit this Declaration in support of the Debtors' opposition to the motions filed by the States of Washington and Connecticut [Dkt. No. 3789], the State of Maryland [Dkt. No. 3845], Certain Canadian Municipality Creditors and Canadian First Nation Creditors [Dkt. 3873], Ronald Bass Sr. [Dkt. No. 3860], Ellen Isaacs [Dkt. No. 3890], and the U.S. Trustee [Dkt. Nos. 3778, 3801, 3972] seeking a stay pending appeal of the Court's order confirming the Debtors' Twelfth Amended Plan of Reorganization (the "**Plan**" and the order confirming the Plan, the "**Confirmation Order**").[2]  My testimony is based on my personal knowledge of the facts set forth below.

3.      My testimony proceeds in four sections.  Section I describes the abatement and personal injury trusts established under the Plan, the timing and amount of payments that the Debtors' existing shareholders are obligated to make to the Estates under the Shareholder Settlement Agreement, and the amount and timing of distributions of that value to creditors contemplated under the Plan.  Section II identifies the distributions to creditors that might be delayed if an order staying the Confirmation Order is entered.  Section III identifies the increased

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

professional fees that would likely be incurred if an order staying the Confirmation Order is entered. Section IV describes operational risks that the Debtors' businesses (which inure to the benefit of creditors under the Plan) would likely face if an order staying the Confirmation Order is entered.

I.      **The Abatement and Personal Injury Trusts, the Shareholder Settlement Payments, and Distributions to Creditors Under the Plan**

4.      As I set forth in my Declaration in support of the Debtors' Fifth Amended Plan [Dkt. No. 3456] ("**Confirmation Declaration**"), the Plan will deploy Purdue's assets to help address and abate the opioid crisis. The majority of Purdue's value will be dedicated to trusts that, together, will fund abatement efforts and distribute funds to personal injury claimants. The value distributed under the Plan will include $4.325 billion in funds that will be paid over time by the Debtors' existing shareholders pursuant to the terms of a settlement agreement ("**Shareholder Settlement Agreement**") among the Debtors, certain shareholders of the Debtors (including members of the Mortimer Sackler family and Raymond Sackler family (together, the "**Sackler Families**") and trusts for the benefit of the Sackler Families. This value, in turn, will be transferred to the abatement and personal injury trusts as early as the Effective Date for distribution to creditors. The Debtors' business assets will also be transferred on the Effective Date to a new entity charged with the express purpose of addressing the opioid crisis and funding the trusts going forward.

A.      **The Plan Establishes Creditor Trusts to Administer Abatement and Distribution**

5.      The Plan establishes trusts to administer the distribution of value to fund opioid abatement efforts and compensate personal injury claimants. As set forth in detail in my Confirmation Declaration, these trusts include (1) the National Opioid Abatement Trust ("**NOAT**"); (2) the Tribe Trust (together with NOAT, "**Public Creditor Trusts**"); (3) the TPP

2

Trust; (4) the Hospital Trust; (5) the NAS Monitoring Trust; (6) the PI Trust; and (7) the PI

Futures Trust.  NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, and the NAS

Monitoring Trust are abatement trusts and may only make distributions for the purpose of opioid

abatement (or to pay attorneys' fees and costs) (such trusts, "**Abatement Trusts**").  (*See* Plan §

5.7(d).)  The PI Trust and PI Futures Trust will make distributions to qualifying personal injury

claimants.  (*See* Plan § 5.7(e).)  NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust, the

NAS Monitoring Trust, the PI Trust, and the PI Futures Trust are known as the "**Creditor**

**Trusts**."

6.      In addition to the Creditor Trusts, the Plan establishes the Master Disbursement

Trust ("**MDT**").  The Master Disbursement Trust, among other things, will have the right to

receive settlement payments under the Shareholder Settlement Agreement as set forth below in

Section I.B.  (Plan § 5.6(c).)  MDT also will make distributions to the Creditor Trusts as set forth

below in Section I.C.  (*See* Plan § 5.2.)

**B.      Under the Shareholder Settlement Agreement, the Estates Will Receive
$4.325 Billion in Cash Over Time**

7.      As noted above, the value distributed under the Plan will include $4.325 billion in

funds that will be paid over time by the Sackler Families to MDT (collectively, the

"**Shareholder Settlement Payments**").  The amount and timing of the Shareholder Settlement

Payments will proceed according to a set schedule as set forth in the Shareholder Settlement

Agreement.  The first settlement payment—totaling at least $300 million—is due to be paid on

the Effective Date of the Plan ("**Initial Shareholder Settlement Payment**").  The second

settlement payment—totaling at least $375 million—is due to be paid on June 30, 2022

("**Second Shareholder Settlement Payment**").  If the Effective Date is delayed past February

28, 2022, however, the Shareholder Settlement Agreement provides that the Second Shareholder

Settlement Payment will not be required to be paid until a date that is at least four calendar

months after the Effective Date.  Under the Shareholder Settlement Agreement, both the Initial

Shareholder Settlement Payment and the Second Shareholder Settlement Payment will be paid

directly to MDT.

8.      The third settlement payment is due on June 30, 2023 ("**Third Shareholder**

**Settlement Payment**").  The Third Shareholder Settlement Payment will total at least $375

million and be paid directly to MDT subject to certain conditions.  These conditions include, for

example, if an appeal of the Confirmation Order is taken and a final decision by the Court of

Appeals for the Second Circuit ("**Second Circuit**") has not been issued, (a) that the Second

Circuit has accepted a direct appeal, (b) the appeal has been expedited, and (c) a stay pending

appeal has been denied.  (Shareholder Settlement Agmt. at § 2.08(a)(iii)(A)-(C).)  I understand

that if the conditions as to the Third Shareholder Settlement Payment set forth in the Shareholder

Agreement are not satisfied at that time, the Third Shareholder Settlement Payment will be paid

into an escrow account ("**Appeals Account**"), and not to MDT, pending the final resolution of

any appeals of the Confirmation Order.   Moreover, if the Second Shareholder Settlement

Payment is not made until after January 2023, the Third Shareholder Settlement Payment will

not become due until at least five months after the Second Shareholder Settlement Payment is

made.

9.      The remaining shareholder settlement payments ("**Remaining Shareholder**

**Settlement Payments**") are due to be paid over the next seven (or eight) years according to a

schedule as set forth in the Shareholder Settlement Agreement.  The Remaining Shareholder

Settlement Payments are to be paid into the Appeals Account pending the final resolution of all

appeals of the Confirmation Order.  After a final resolution of all appeals, any payments that had

been paid into the Appeals Account will be released and paid to MDT.

### C.    The Creditor Trusts Will Make Distributions for Abatement Purposes and Distributions to Personal Injury Claimants

10.     As I set forth in my Confirmation Declaration, distributions to claimants will be

made not by MDT, but by the Creditor Trusts discussed above.  Each of the Creditor Trusts is

charged with holding, managing, and investing funds received from, among others, the Debtors

and the MDT, maintaining funds to pay its expenses, and administering, processing, resolving,

and liquidating claims that the Plan and Confirmation Order will channel to such Creditor Trust.

The five private creditor Trusts ("**Private Creditor Trusts**") are the Hospital Trust, the TPP

Trust, the NAS Monitoring Trust, the PI Trust, and the PI Futures Trust, while the two Public

Creditor Trusts are NOAT and the Tribe Trust.  (*See* Plan § 5.7.)  Each Creditor Trust has its

own trust distribution procedures ("**TDPs**").

11.     The purpose of the Hospital Trust is to make distributions to be used solely for

opioid abatement purposes on account of certain claims filed by hospitals and other providers of

health treatment or other social services.  Recipients of Hospital Abatement Distributions, in

turn, will be required to dedicate 100% of the net funds of each such distribution (i.e., the

amount of such distribution after deducting for legal fees and litigation expenses as set forth in

the Hospital TDPs) solely and exclusively for opioid use disorder abatement programs as

identified in the Hospital TDPs.  These permitted abatement purposes include, for example,

providing continuing professional education in addiction medicine, participating in community

efforts to provide opioid-use disorder treatment to others in the community (such as those in

jails, prisons, or other detention facilities), providing Naloxone kits and instruction to patients

upon discharge, and prospectively providing otherwise unreimbursed or under-reimbursed future

medical services for patients with opioid use disorder or other opioid related diagnoses.  (*See* Hospital Trust Distribution Procedures § 7(a).)

12.    The Plan contemplates that the Hospital Trust will receive a total of $250 million in distributions over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022; (ii) $45 million on July 31, 2023; (iii) $45 million on July 31, 2024; (iv) $50 million on July 31, 2025; and (v) $50 million on July 31, 2026.  (Plan § 5.2(d)(i)(A).)

13.    The purpose of the TPP Trust is to make distributions to be used solely for opioid abatement purposes on account of certain claims filed by TPPs.  Recipients of TPP Abatement Distributions, in turn, will be required under the Plan to dedicate 100% of the net funds of each such distribution (i.e., the amount of such distribution after deducting for legal fees and litigation expenses as set forth in the TPP TDPs) solely and exclusively for opioid use disorder abatement programs.  (Plan §§ 4.7(a), 5.7(d).)  These permitted abatement purposes include, for example, expanding telehealth networks and availability to increase access to treatment for opioid-use disorder and/or any substance use disorder or mental health conditions, including medication-assisted treatment, as well as counseling, psychiatric support, and other treatment and recovery support services.  (*See* TPP Trust Distribution Procedures Appendix D.)

14.    The Plan contemplates that the TPP Trust will receive a total of $365 million in distributions over time, with an initial payment of $5 million to the TPP Trust on the Effective Date and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $120 million on July 31, 2022; (ii) $120 million on July 31, 2023; and (iii) $120 million on July 31, 2024.  (Plan § 5.2(d)(i)(B).)

15.     The NAS Monitoring Trust will be established to address claims that (i) are filed on account of an NAS Child, (ii) are related to medical monitoring support, educational support, vocational support, familial support or similar related relief, and (iii) are not for an alleged personal injury suffered by an NAS Child.  (*See* Plan §§ 1.1, 4.9(a).)

16.     The Plan contemplates that the NAS Monitoring Trust will receive a total of $60 million in distributions over time, with an initial payment of $1 million to the NAS Monitoring Trust on the Effective Date and two subsequent payments to the NAS Monitoring Trust from the Master Disbursement Trust in the following amounts: (i) $24 million on the first scheduled Master Distribution Trust distribution date and (ii) $35 million on July 31, 2023. (Plan § 5.2(d)(i)(C).)

17.     Unlike the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust, the purpose of the PI Trust is to make distributions directly to qualified personal injury claimants, on account of (i) alleged opioid-related personal injury or similar claims and (ii) alleged opioid-related personal injury to an NAS Child or similar opioid-related claim asserted by or on behalf of an NAS Child.  The PI Trust will establish two funds: a PI Trust NAS Fund and a PI Trust Non-NAS Fund.  The PI Trust will make distributions to holders of NAS PI Channeled Claims from the PI Trust NAS Fund in accordance with the NAS PI Trust distribution procedures, and it will make distributions to holders of Non-NAS PI Channeled Claims from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI Trust distribution procedures.  (Plan § 4.10.)

18.     The Plan contemplates that the PI Trust will receive a total of between $700 to $750 million in distributions over time, with an initial payment of at least $300 million to the PI Trust on the Effective Date.  The PI Trust will receive additional payments of (i) $200 million on July 31, 2024, (ii) $100 million on July 31, 2025, and (iii) $100 million on July 31, 2026,

respectively.  In addition, the PI Trust will receive the value of proceeds received (in an amount not to exceed $450 million in the aggregate) from certain of the Debtors' insurance policies that cover opioid-related activities.  (Plan § 5.2(d)(i)(D).)

19.    The PI Futures Trust will be established to address claims filed on account of an alleged opioid-related personal injury or a similar opioid-related claim that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.  The PI Futures Trust will make distributions to holders of Future PI Channeled Claims according to the PI Futures Trust distribution procedures.  (Plan § 5.7(f).)

20.    The PI Futures Trust will receive $5 million in distributions on the Effective Date. For so long as the PI Futures Trust has assets available to make distributions, the PI Futures Trust will make such distributions on account of allowed Future PI Channeled Claims.  If, on the sixth anniversary of the Effective Date, there are amounts remaining in the PI Futures Trust after the resolution of all Future PI Channeled Claims asserted against the PI Futures Trust on or before the sixth anniversary of the Effective Date and the payment of all operating expenses of the PI Futures Trust, those amounts will be contributed to MDT.  (Plan §§ 5.2(d), 5.7(f).)

21.    NewCo's residual cash, after making the distributions to the Private Creditor Trusts described above and accounting for payments owed to the DOJ under the resolution approved by the Court on November 18, 2020 between PPLP and the DOJ ("**DOJ Resolution**") and for NewCo's operating cash requirements, will be transferred to the Public Creditor Trusts. The total distribution of value from the Debtors' estates to the Public Creditor Trusts is estimated to exceed $4 billion over time.

### D.    Under the Plan, Purdue's Businesses Will be Operated by New Entities for the Public Benefit

22.    Under the Plan, PPLP, PPLP's general partner Purdue Pharma Inc. ("**PPI**") and several of PPLP's subsidiaries[3] will cease to exist.  The Debtors' businesses will be transferred to and operated by a new entity, **NewCo**.  NewCo will be wholly owned by a new entity, **TopCo**.  TopCo, in turn, will be owned by the NOAT and the Tribe Trust.  As I set forth in my Confirmation Declaration, the Plan establishes a comprehensive system of safeguards designed to ensure that NewCo will operate the Debtors' businesses for the public benefit.  These include, among other things, an operating agreement that requires NewCo to operate in a responsible and sustainable manner (*See* NewCo Operating Agreement § 2.3(a)) and covenants set forth in the Confirmation Order designed to ensure that, among other things, NewCo pursues and implements certain public health initiatives to develop and distribute medicines to treat opioid addiction and reverse opioid overdoses ("**Public Health Initiatives**").[4]

23.    On the Effective Date, NewCo will receive substantially all of PPLP's non-cash assets and $200 million of unrestricted cash and cash equivalents.  In broad overview, the proceeds of NewCo's business will be used to fund the Public Health Initiatives and to make distributions to TopCo, which will, in turn, make distributions to NOAT and the Tribes Trust. (Plan §§ 1.1, 5.2(d)(iii); NewCo Operating Agreement §§ 6.2, 6.5.)

---

[3] Specifically, Rhodes Associates L.P., Rhodes Technologies, Paul Land Inc., UDF LP, SVC Pharma Inc., SVC Pharma LP, Button Land L.P., Quidnick Land L.P.

[4] The Debtors' Public Health Initiatives include three separate products (1) Buprenorphine / Naloxone Sublingual tablets, which are FDA approved and are used for addiction treatment, (2) over-the-counter intranasal Naloxone, which is an overdose rescue medication that is still in development and (3) Nalmafene vial, pre-filled syringe and autoinjector, which is also an overdose rescue medication that is still in development.

## II.    A Stay Would Delay Distributions to Creditors Under the Plan

24.    In the event that and while an order staying the Confirmation Order pending

appeal is entered, the Shareholder Settlement Payments under the Settlement Agreement will not

be made, and accordingly, distributions to MDT under the Plan will not commence.  In addition,

in this scenario, no funds from the Debtors will be distributed to TopCo.  The result of an order

staying the Confirmation Order, therefore, will be a delay in the distribution of funds to the

Creditor Trusts and ultimately to creditors.  The total amount of funds that may be delayed will

depend on the length of the stay order ("**Stay Period**").

25.    A stay of the Confirmation Order will have the effect of delaying the Effective

Date.  In total, it is estimated that approximately $600 million would be transferred to the

Creditor Trusts on the Effective Date, assuming an Effective Date of December 31, 2021.[5]  This

includes an estimated $290 million[6] that would be transferred to the Abatement Trusts (including

in particular an estimated $200 million that would be distributed specifically to NOAT)[7] for the

purpose of funding programs and efforts to abate the opioid crisis.  This also include $300

---

[5] For the purposes of this estimation and others contained in this Declaration, I have relied on the financial projections described at Appendix C to the Debtors *Fifth Amended Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 2983] ("**Disclosure Statement**").  As I described in my Confirmation Declaration, my team and I developed this financial model to reflect the Debtors' anticipated financial condition post-emergence if the Plan was confirmed.  In addition, the above estimate of distributions to Creditor Trusts on the Effective Date also includes the $6.5 million Truth Initiative Contribution as provided for in the Plan.

[6] This amount is subject to payments of professional fees as set forth in section 5.8 of the Plan.

[7] The final amount of the initial NOAT distribution on the Effective Date is subject to adjustment for, among other things, year-to-date budget to actual adjustments for both operating and non-operating results, items outside of the Debtors' control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and potential cash collateral necessary to secure insurance coverage for NewCo and TopCo, and other adjustments.

million that would be transferred to the PI Trust for distribution to individual personal injury claimants.[8]  In addition, $250 million (consisting of the $225 million DOJ Forfeiture Payment and a $25 million payment on account of the Federal Government Unsecured Claims) will be transferred to the United States on or around the Effective Date.[9]  Generally speaking, the longer any Stay Period lasts, the greater the amount of funds delayed that would have been transferred to the Creditor Trusts.  The consequence of this delay to creditors is that creditors will be delayed in utilizing the funds for abatement purposes as provided by the Plan or in receiving compensation for personal injuries.  This harm is further compounded when the future value of these payments is adjusted to present value to account for the time value of money.  In addition, a stay of the Confirmation Order could result in delaying the timeline on which the Debtors and NewCo can get their Public Health Initiatives to market at or below cost and ultimately to those in need.

26.    To illustrate the harm created by delaying the distribution of funds, my team and I prepared six illustrative delay scenarios based on a hypothetical Stay Period of 3 months, 6 months, 9 months, 12 months, 18 months, and 24 months, respectively, with each Stay Period beginning on the assumed effective date of December 31, 2021.  As a basis for this analysis, my team and I relied on the financial projections set forth in the Debtors' Disclosure Statement updated to reflect the terms of the final Shareholder Settlement Agreement, which increased the total shareholder contribution by $50 million to $4.325 billion and adjusted certain future

---

[8]  The $300 million amount excludes $5 million which would be transferred to the PI Futures Trust on the Effective Date.  This transfer, however, is included in the total estimated Effective Date distributions to Creditor Trusts described above.

[9]  Under the terms of the DOJ Resolution and the Plan, the DOJ Forfeiture Payment must be made within three business days following the entry of a judgment of conviction pursuant to Plea Agreement.

payment timing.  My team and I then calculated the total distributions to the United States and to

the Creditor Trusts that would otherwise have been made during the various Stay Periods, which

in each case exceeded $1 billion.  My team and I then calculated the present value loss of these

payments due to the delay caused by the various Stay Periods using a discount rate of 9%.  The

results of these calculations are summarized in the chart below ($ in millions):

| Hypothetical Stay Period | Amount of Distributions Delayed by Stay Period | Net Present Value Loss of Distributions Delayed by Stay Period (at 9.0% Discount Rate) |
|---|---|---|
| 3 Months | $1,221.2 | $15.7 |
| 6 Months | $1,221.2 | $37.1 |
| 9 Months | $1,221.2 | $58.1 |
| 12 Months | $1,634.7 | $86.7 |
| 18 Months | $2,044.9 | $147.1 |
| 24 Months | $2,518.0 | $205.6 |

27.     For example, during a three month hypothetical Stay Period, all distributions to

creditors and the federal government that would have otherwise been made on the Effective

Date—totaling approximately $852 million—would be delayed by three months.  In addition,

under a three month delay scenario, due to provisions in the Shareholder Settlement Agreement

and Plan that would delay the second distribution date in the event of a delay of the Effective

Date, it is estimated that approximately $369 million in additional distributions would be delayed

by one month.  Accordingly, a hypothetical three month stay would, in total, result in the delay

of approximately $1.221 billion in distributions to creditors.

28.     Moreover, the present value loss of the delayed payments under a three month

stay scenario would be $15.7 million (assuming a 9% discount rate).  Importantly, in calculating

the present value loss of delayed distributions during each Stay Period, I have assumed that MDT

or TopCo would not incur any forecasted expenses during the Stay Period.  This assumption

results in a future cost savings and thus has the effect of offsetting the projected present value

loss due to delayed payments.  In addition, the above present value calculations do not account for any delays in recoveries on causes of action that MDT and TopCo may pursue under the Plan, such as from potential recoveries against pre-petition insurance policies.  Delays in such recoveries would have the effect of increasing the present value loss associated with a stay of the Confirmation Order.  Therefore, the above present value loss estimates almost certainly underestimate the loss of present value that would result from delaying distribution payments during each of the hypothetical Stay Periods.  For the avoidance of doubt, such present value loss calculations do not include other costs and losses that could be associated with a delay of distributions to creditors, including, without limitation, the human costs of a delay, any multiple effects of abatement as discussed in the testimony of Dr. Gautam Gowrisankaran at the Confirmation Hearing, professional fees and costs (discussed more below), and risks to the Debtors' business and the future viability of NewCo and its Public Health Initiatives (also discussed more below), among potentially many others.

III.    **A Stay Would Increase the Incurrence of Professional Costs by the Estates**

29.    One element that will positively impact the Debtors' post-emergence financial picture is the significant decrease in assumed litigation expenses.  Between September 15, 2019, the date the bankruptcy petitions were filed, and September 30, 2021, the Debtors have incurred approximately $697 million in non-recurring professional fees based on the Debtors' monthly operating reports.  In the event the Confirmation Order is stayed, and the Debtors are unable to emerge from bankruptcy, the Estates will continue to incur professional fees in connection with the chapter 11 cases.  This will include fees and costs exclusive of fees that would be incurred regardless of whether a stay was imposed.  In other words, the Estates would continue to incur fees as a result of remaining in chapter 11 above and beyond fees incurred through, for example, litigation of creditor motions for a stay pending appeal, the appeals themselves or post-

emergence planning (such incremental chapter 11 costs, "**Incremental Professional Fees**"). The

total amount of Incremental Professional Fees incurred by the Estates as a result of a stay of the

Confirmation Order will depend on the length of the Stay Period.

30.    To estimate Incremental Professional Fees that the Estates might be expected to

incur during a stay of the Confirmation Order, my team and I assumed a monthly run rate for

each of the Debtors' legal advisors and financial advisors that is approximately 15% of the

average monthly run rate incurred by these professionals during the first six months of 2021.

This percentage represents a reasonable estimate of Incremental Professional Fees that might be

incurred on a monthly basis during a stay scenario.  My team and I then assumed each such

professional firm would incur these costs each month during a stay of the Confirmation Order.

The results of these projections are provided in the chart below ($ in millions).

| Assumed Stay Period | Projected Incremental Professional Fees Incurred During Assumed Stay Period |
|---|---|
| 3 Months | $10 |
| 6 Months | $20 |
| 9 Months | $30 |
| 12 Months | $40 |
| 18 Months | $60 |
| 24 Months | $80 |

31.    It bears emphasis, however, that the Estates incurred on average approximately

$28 million in professional fees and costs each month during the course of these chapter 11

cases, and it is possible that, due to uncertainties of remaining in chapter 11, that the above

Incremental Professional Fees projections could be significantly higher.  Under the Plan, with

exception of payments to the PI Trust and the DOJ and the NewCo Initial Cash Distribution (and

for certain other legal fees and costs), the value of the Debtors will be transferred for the purpose

of abating the opioid crisis.  Accordingly, any incremental value expended on professional fees

during any Stay Period is value that otherwise would be transferred for purposes of abatement in the absence of a stay of the Confirmation Order.

**IV.    A Stay Would Increase Operational and Other Risks to the Debtors' Businesses**

32.    As described above, the Plan provides that PPLP will be dissolved and the Debtors' assets, including their operational businesses, will be transferred to NewCo.  NewCo will then operate these businesses in a responsible manner for the benefit of creditors.  Among other things, NewCo's business will be used to fund the Public Health Initiatives and to make distributions to the Public Creditor Trusts.

33.    Continuing to remain in bankruptcy would also present an existential risk to the Debtors' business and, therefore, NewCo's future viability.  Throughout the pendency of the chapter 11 cases, the Debtors have continually promised their various stakeholders, such as their employees, customers and vendors, that although the timeline to emergence was long, there was a light at the end of the tunnel:  the Debtors would emerge from bankruptcy and transition to their new life as a public benefit company.  The uncertainty and delay introduced by a stay risks upsetting those expectations with potentially disastrous effects on the financial viability of the Company and the ability to make the level of cash distributions contemplated in the plan.  For example, remaining in bankruptcy could cause the Debtors' customers, such as the various pharmacy benefit managers that provide insurance coverage for the Debtors' products, to terminate their relationship with the Debtors given the increased perceived risk to the Debtors' future viability.  Vendors who have continued to work with the Debtors could decide to decline to do business with the Debtors as a result of ongoing reputational or other concerns that would have been abated by emerging from chapter 11.  And finally, continuing to remain in bankruptcy will have negative consequences for morale and the retention of employees.  As described more fully in Mr. Lowne's declaration filed in conjunction with the Debtors' 2021 KEIP and KERP

plans, the Debtors already have experienced higher than average employee attrition given that the Debtors have been in bankruptcy for over 24 months.  Confirmation of the Plan and the expectation that the Debtors' assets will soon be transferred to a new operating company that will operate in the public interest has provided important finality to this process.

34.     Moreover, operating a complicated pharmaceutical company in bankruptcy requires a significant amount of time and focus from numerous employees across the Debtors' businesses.  Emergence will help relieve the pressure on the Debtors and their employees and will enable the Debtors' employees to turn their full attention to NewCo and its public health mission.  Given that approximately $650 million in cash is projected to be distributed post-Effective Date through 2025 by NewCo to TopCo, MDT and ultimately the Public Creditor Trusts, putting the future viability of NewCo at risk by staying confirmation could potentially deprive the country of hundreds of millions of dollars in abatement funds.

35.     Finally, one central feature of NewCo, which will operate as a public benefit company, is not only that NewCo will provide cash for abatement, but also, as noted above, that it will continue to develop and bring to market three opioid overdose and rescue medications.  The Plan also calls for NewCo to develop and distribute these medicines at or below cost.  I understand that this is an essential characteristic of the Plan for many stakeholders. A stay of the Confirmation Order could jeopardize NewCo's ability to bring these medicines to market at all, or could delay for years the availability of these potentially life-saving medicines.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2021

/s/ Jesse DelConte
Jesse DelConte