Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq.
Lucas H. Self, Esq. (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005

*Counsel for the Multi-State Governmental Entities Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**OPPOSITION OF THE MULTI-STATE GOVERNMENTAL**
**ENTITIES GROUP TO THE MOTIONS FOR STAY PENDING APPEAL**

Dated:  October 22, 2021

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).   The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

Preliminary Statement .................................................................................................. 2

Background .................................................................................................................... 4

Argument ...................................................................................................................... 9

I.    Parties Seeking a Stay Pending Appeal Face a Heavy Burden ................................ 9

II.   Movants Fail to Meet the High Burden Necessary for a Stay Pending Appeal ..... 10

    A.   Movants Have Shown No Likelihood of Irreparable Injury Absent a Stay ...... 10

        1.   The Mere Possibility of Equitable Mootness Is Not Irreparable Harm ....... 11

        2.   The Possibility of Equitable Mootness Is Further Diminished by the Stipulation and Amended Stipulation ................................................................. 12

        3.   There Is No Threat of Irreparable Harm from the Advance Funding Order .............. 13

        4.   A State Enjoined from Enforcing Its Statutes Does Not Suffer Irreparable Harm When the Injunction Serves a Countervailing Federal Interest ................. 13

    B.   The Movants Are Unlikely to Succeed on the Merits ........................................ 16

        1.   This Court's Approval of the Plan Settlement, and the Releases Embodied Therein, Are Reviewable Only for Abuse of Discretion, a Deferential Standard ...... 16

        2.   Section 524(e) of the Bankruptcy Code Does Not Curb This Court's Authority to Approve Third-Party Releases in Non-Asbestos Cases ................................ 17

        3.   This Court Has Subject-Matter Jurisdiction and Constitutional Authority to Approve the Third-Party Releases in the Plan ............................................... 19

        4.   The Third-Party Releases Are Supported by Binding Circuit Precedent ................... 20

        5.   State "Police Power Claims" Are Not Entitled to Deference Under the Bankruptcy Code and Are Not Immune from the Court's Injunctive Powers ............ 21

        6.   The Plan and the Releases Contained Therein Received Overwhelming Creditor Support and Do Not Violate Due Process ................................................... 23

        7.   The Canadian Appellants Have Not Shown a Likelihood of Success on Appeal ....... 24

        8.   The Challenges to the Plan's Classification of Claims and Allowed Voting Amounts Are Unavailing and Not Likely to Succeed on Appeal .............................. 26

    C.   The Balance of Harms Militate Against a Stay ................................................. 27

D.  A Stay Is Not in the Public Interest ....................................................................32

III. Alternatively, if This Court Grants a Stay, It Should Require the Movant States And
Canadian Appellants to Post a Substantial Appeal Bond ........................................33

Conclusion .........................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007).............................................................11, 12, 27, 35

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019).................................................................21

*Am. Life League, Inc. v. Reno*,
  47 F.3d 642 (4th Cir. 1995) ...............................................................................18

*BDC Cap., Inc. v. Thoburn Ltd. P'ship*,
  508 B.R. 633 (E.D. Va. 2014)........................................................................11, 13

*Beeman v. BGI Creditors' Liquidating Tr.* (*In re BGI, Inc.*),
  504 B.R. 754 (S.D.N.Y. 2014).............................................................................11

*In re Bernard L. Madoff Investment Securities LLC*,
  740 F.3d 81 (2d Cir. 2014).............................................................................20, 21

*In re Best Prod. Co., Inc.*,
  177 B.R. 791 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ....................................11

*In re Bogdanovich*,
  No. 00CIV.2266(JGK), 2000 WL 1708163 (S.D.N.Y. Nov. 14, 2000) .................17

*Butner v. United States*,
  440 U.S. 48 (1979)..............................................................................................14

*In re Calpine Corp.*,
  No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008)............32

*Cent. Va. Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006)........................................................................................14, 15

*Curry v. Baker*,
  479 U.S. 1301 (1986) (Powell, J., in chambers) ...................................................10

*In re DAEBO Int'l Shipping Co., Ltd.*,
  No. 15-10616 (MEW), 2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016) ............11

*De la Fuente v. DCI Telecomms., Inc.*,
  269 F. Supp. 2d 237 (S.D.N.Y. 2003)..................................................................34

*Dhine v. Dist. Dir.*,
822 F. Supp. 1030 (S.D.N.Y. 1993) .................................................................... 17

*In re Diaz*,
No. 6:02-BK-05591-ABB, 2011 WL 285643 (Bankr. M.D. Fla. Jan. 25, 2011) ................... 33

*In re DJK Residential, LLC*,
No. 08-10375 (JMP), 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) ................... 10, 11, 12, 35

*In re Dow Corning Corp.*,
280 F.3d 648 (6th Cir. 2002) ............................................................................ 19

*In re Drexel Burnham Lambert Group, Inc.*,
960 F.2d 285 (2d Cir. 1992) ............................................................................. 20

*In re Exide Holdings, Inc.*,
No. 20-11157-CSS, 2021 U.S. Dist. LEXIS 138478 (D. Del. July 26, 2021) ................. 15, 21

*First Nat'l Bank of Md. v. Markoff*,
70 B.R. 264 (S.D.N.Y. 1987) ............................................................................. 32

*Five Flags Pipe Line Co. v. Dep't of Transp.*,
854 F.2d 1438 (D.C. Cir. 1988) ......................................................................... 18

*Gardner v. New Jersey*,
329 U.S. 565 (1947) ........................................................................................ 15

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) ..................................................................... 9

*Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
118 F. Supp. 3d 1338 (N.D. Ga. 2015) ................................................................. 14

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007) ......................................................................... 17, 23

*In re Kaiser Grp. Int'l, Inc.*,
302 B.R. 814 (D. Del. 2003) .............................................................................. 25

*Latta v. Otter*,
771 F.3d 496 (9th Cir. 2014) ............................................................................. 15

*In re Lloyd E. Mitchell, Inc.*,
373 B.R. 416 (Bankr. D. Md. 2007) ..................................................................... 27

*In re Machne Menachem, Inc.*,
No. 3:07CV00057, 2007 WL 172486 (M.D. Pa. Jan. 18, 2007) .................................. 17

*Martin v. Wilks,*
    490 U.S. 755 (1989)................................................................................24

*In re Metromedia Fiber Network, Inc.,*
    416 F.3d 136 (2d Cir. 2005)..........................................................19, 20, 21

*In re Millennium Lab Holdings II, LLC,*
    945 F.3d 126 (3d Cir. 2019)....................................................................20

*In re Moreau,*
    135 B.R. 209 (N.D.N.Y. 1992)..................................................................11

*In re Motors Liquidation Co.,*
    555 B.R. 355 (Bankr. S.D.N.Y. 2016).........................................................32

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
    187 F.R.D. 124 (S.D.N.Y. 1999).................................................................35

*Nat'l Heritage Found., Inc. v. Highbourne Found.,*
    760 F.3d 344 (4th Cir. 2014)..............................................................19, 23

*New Mexico Department of Game & Fish v. United States Department of the
    Interior,*
    854 F.3d 1236 (10th Cir. 2017)............................................................13, 14

*Nken v. Holder,*
    556 U.S. 418 (2009).......................................................................9, 10, 15, 16

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)................................................................................24

*Pao Tatneft v. Ukraine,*
    No. CV 17-582 (CKK), 2021 WL 2209460 (D.D.C. June 1, 2021).......................34

*In re Peabody Energy Corp.,*
    958 F.3d 717 (8th Cir. 2020)....................................................................21

*In re Quigley Co.,*
    676 F.3d 45 (2d Cir. 2012)..................................................................19, 20

*In re Richard Potasky Jeweler, Inc.,*
    222 B.R. 816 (S.D. Ohio 1998)..................................................................18

*In re Sabine Oil & Gas Corp.,*
    551 B.R. 132 (Bankr. S.D.N.Y. 2016).....................................................10, 26

*Shake v. Wilmington Tr., Nat'l Ass'n.,*
    No. 20-CV-6096 (LJL), 2020 WL 5261223 (S.D.N.Y. Sept. 3, 2020)..................32

*SR Constr. Inc. v. Hall Palm Springs, LLC*,
    No. 3:20-CV-3487-B, 2020 WL 7047173 (N.D. Tex. Dec. 1, 2020) ....................................11

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)....................................................................................21

*Tenn. Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004).................................................................................................................15

*In re Texas Equip. Co., Inc.*,
    283 B.R. 222 (Bankr. N.D. Tex. 2002)....................................................................................35

*In re Turner*,
    207 B.R. 373 (2d Cir. B.A.P. 1997).........................................................................................10

*Uniformed Fire Officers Ass'n v. de Blasio*,
    973 F.3d 41 (2d Cir. 2020).................................................................................................9, 10

*United States v. Vitek Supply Corp.*,
    151 F.3d 580 (7th Cir. 1988) ..................................................................................................18

*Universal Church v. Geltzer*,
    463 F.3d 218 (2d Cir. 2006).....................................................................................................18

*Virginian Ry. Co. v. United States*,
    272 U.S. 658 (1926).................................................................................................................10

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d
    332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd*, 729
    F.3d 311 (3d Cir. 2013).............................................................................................................11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).......................................................................................................32

*Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*,
    No. CIV.A. 14-0609, 2014 WL 1871889 (W.D. La. May 6, 2014) .........................................11

**Dockets**

*In re Purdue Pharma L.P., Bankruptcy Appeals*,
    No. 7:21-cv-07532-CM (S.D.N.Y.) ...............................................................................8, 9, 12

*In re Purdue Pharma L.P.*,
    No. 19-23649 (RDD) (Bankr. S.D.N.Y.) ...............................................................................25

*In re Purdue Pharma L.P.*,
    No. 7:21-cv-7966-CM (S.D.N.Y. Oct. 8, 2021) ...........................................................7, 8, 12

**Statutes**

11 U.S.C. § 101(27) ..................................................................................................25

11 U.S.C. § 105 ........................................................................................................25

11 U.S.C. § 105(a) .....................................................................................................6

11 U.S.C. § 106(a)(1) ...............................................................................................25

11 U.S.C. § 362(b)(4) ..........................................................................................21, 22

11 U.S.C. § 363 ........................................................................................................25

11 U.S.C. § 363(b) .....................................................................................................6

11 U.S.C. § 507 ........................................................................................................22

11 U.S.C. § 510(b) ...................................................................................................22

11 U.S.C. § 523(a) ....................................................................................................22

11 U.S.C. § 524 ........................................................................................................25

11 U.S.C. § 524(e) ....................................................................................................17

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) .......................................................................23

11 U.S.C. § 726(a)(4) ...............................................................................................22

11 U.S.C. § 1122(a) ..................................................................................................26

11 U.S.C. § 1141 ......................................................................................................25

28 U.S.C. § 1452 ......................................................................................................22

28 U.S.C. § 1452(a) ..................................................................................................21

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b) (Oct. 22, 1994) .......................18

**Other Authorities**

138 Cong. Rec. S8335-36 .........................................................................................18

10 *Collier on Bankruptcy* ¶ 8007.09 .......................................................................35

Fed. R. Bankr. P. 8007 ...........................................................................................9, 33

Fed. R. Bankr. P. 8007(d) .........................................................................................33

Fed. R. Civ. P. 62 ........................................................................................................................34

*Provisional Drug Overdose Death Counts*, CDC: Nat'l Ctr. for Health Stat.,
    https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed
    Oct. 21, 2021) ...............................................................................................................4, 28

The Multi-State Governmental Entities Group ("**MSGE Group**"),[2] by and through its undersigned counsel, hereby opposes the motions for a stay pending appeal (collectively, the "**Stay Motions**") filed by:

(1)  the United States Trustee for Region 2;[3]

(2)  the States of Washington and Connecticut;[4]

(3)  the State of Maryland[5] (with Washington and Connecticut, the "**Movant States**");

(4)  certain Canadian municipalities and First Nations ("**Canadian Appellants**");[6]

(5)  Ronald Bass, Sr.;[7] and

(6)  Ellen Isaacs[8] (together with all of the foregoing, "**Movants**").

By their Stay Motions, Movants seek an indefinite stay pending appeal of the Confirmation Order (defined below).  Additionally, the U.S. Trustee, the Movant States, and Ms. Isaacs seek a stay pending appeal of the Advance Funding Order (defined below).[9]

---

[2]  The governmental entities comprising the MSGE Group are set forth in the 2019 statement.  *See* Second Am. V.S. MSGE Group, Oct. 9, 2020 [ECF No. 1794].

[3]  *See* Am. Mem. Law Supp. U.S. Trustee's Expedited Mot. for a Stay of Conf. Ord. & Related Ords. Pending Appeal Purs. to Fed. R. Bankr. P. 8007, filed Sept. 21, 2021 [ECF No. 3801] ("**UST Motion**").

[4]  Mot. of the States of Wash. & Conn. for a Stay Pending Appeal, filed Sept. 19, 2021 [ECF No. 3789] ("**Wash. & Conn. Stay Motion**").

[5]  State of Md. Mot. for Stay of Conf. Ords. [ECF Nos. 3786, 3787] & Trust Advances Ord. [3773] Pending Appeal [ECF No. 3845] ("**Md. Stay Motion**").

[6]  J. Mot. of Certain Can. Mun. Creditors & Appellants & Certain Can. First Nations Creditors & Appellants for the Granting by the Bankr. Ct. of Stay Pending Appeals, Joinder to the Stay Mots. of the U.S. Trustee & the State of Md., & Granting Related Relief [ECF No. 3873] ("**Canadian Appellants' Stay Motion**").

[7]  Letter dated September 29, 2021 from Ronald Bass, Sr. to Hon. Robert D. Drain, requesting a stay pending appeal [ECF No. 3860].  In his letter-motion, Mr. Bass does not make any arguments for a stay and thus fails to carry his burden to justify the extraordinary remedy of a stay pending appeal.  His motion should be denied for this reason alone.

[8]  Mot. of Ellen Isaacs, Deceased Patrick Ryan Wroblewski & the Am. People for a Stay Pending Appeal, filed Oct. 5, 2021 [ECF No. 3890].  In support of her motion, Ms. Isaacs attaches to her cover motion and relies on the Wash. & Conn. Stay Motion.  Since Washington and Connecticut fail to carry their burden to justify the extraordinary remedy of a stay pending appeal, so too does Ms. Isaacs fail to carry her burden.

[9]  By joining in the other Stay Motions, the Canadian Appellants also appear to be requesting a stay of the Advance Funding Order, although they do not explain why such a stay is justified in their own motion.

For the reasons explained below, Movants have failed to carry their burden of demonstrating that the grounds for a stay are satisfied. Accordingly, their Stay Motions should be denied. Alternatively, if this Court decides to grant a stay, it should require the Movant States and Canadian Appellants to post a substantial bond to insure against, *inter alia*, the cost of delayed compensation and crucial abatement funding to harmed individuals and communities in need and putting this heavily negotiated and hard-won reorganization and the entire value of the Debtors in undue peril.

## PRELIMINARY STATEMENT

1.      Movants are asking this Court for extraordinary relief—namely, an indefinite stay pending appeal of the order confirming the Twelfth Amended Joint Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (ECF No. 3726) ("**Plan**") in these chapter 11 cases.[10] Movants carry the heavy burden of showing that they satisfy the four-part standard for a stay. For the reasons explained below, they fail to meet this standard.

2.      Movants assert that, absent a stay, they might suffer irreparable harm because their appeals could become equitably moot. But the mere possibility of equitable mootness is not sufficient to demonstrate a likelihood of irreparable injury absent a stay. If it were otherwise, stays pending appeal would be routine, not the extraordinary remedies that they are. Moreover, the Debtors, the MSGE Group, and other appellees presently before the District Court have recently stipulated that the work being done to prepare for the Plan's effective date will not be used to invoke equitable mootness. Additionally, the District Court has ordered the Debtors to provide at least 14 days' advance notice of the date on which the Debtors intend to have the Plan go effective. These further refute Movants' arguments of irreparable harm.

---

[10]   Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

3.      Maryland asserts that it will suffer irreparable harm absent a stay because the releases and injunctions in the Plan and confirmation order would preclude it from enforcing its laws.    Maryland's argument, however, relies on cases that did not involve chapter 11 reorganizations, the Bankruptcy Code, or any other comprehensive scheme enacted by Congress that establishes a countervailing federal interest.  Maryland's authorities are thus inapposite.

4.      Nor have Movants demonstrated a likelihood of success on the merits of their appeals.  Movants' arguments in large measure rehash what this Court carefully considered and rejected in its six-hour oral bench ruling, its 159-page modified bench ruling, and its 110-page confirmation order.  And, as this Court pointed out in its rulings, ample precedent supports the third-party releases that are the prime focus of Movants' challenges on appeal.

5.      If granted, an indefinite stay pending appeal would halt much needed efforts to abate the opioid crisis.  A prolonged delay in the abatement funding provided under the Plan will simply perpetuate the status quo with continuing strain on the localities comprising the MSGE Group and their residents, which will translate into more opioid overdoses and more lives lost. The sooner more abatement funding can be harnessed to help local governments, the more rapidly governmental creditors can deploy life-saving treatments and interventions and thus save lives. When this continuing harm to communities is weighed against the mere possibility of equitable mootness absent a stay, the balance of harms tips decisively against a stay pending appeal. Moreover, the public interest lies with upholding the hard-won arm's length settlements embodied in the Plan and with abating the public health crisis caused by the opioid epidemic.  It is imperative that needed abatement funding be released and distributed under the Plan sooner rather than later.

6.      For all the reasons set forth herein, the Stay Motions should be denied. Alternatively, if this Court decides to grant the Stay Motions, the Court should condition the

3

issuance of a stay on the Movant States' and Canadian Appellants' posting of a substantial supersedeas bond.

## **BACKGROUND**

7.        The MSGE Group was formed at the outset of these chapter 11 cases to represent the interests of the non-federal and non-state governmental creditors that make up the Group's membership: approximately 1,300 cities, counties, tribal nations, hospital districts, independent school districts, and other local governmental entities collectively representing a constituency of more than 60 million individuals across 37 States and territories of the United States.  Local governments comprising the MSGE Group have not been spared the crippling strain on municipal budgets and human capital wreaked by the opioid epidemic.[11]  As a result, local governments have taken a prominent role in pursuing claims against manufacturers, distributors, pharmacy dispensers, and prescribers of opioids to ensure that funds reach impacted local communities.

8.        From the outset of this bankruptcy, opioid "abatement [has been] the principal goal of the case."[12]  Abatement is necessary because "[t]he opioid crisis not only had caused enormous harm to government entities historically, but also was continuing to cause such harm, and absent effective abatement, would do so for many years to come."[13]  The tragic consequences of the opioid crisis are continuing.[14]  According to the Centers for Disease Control, in the latest twelve month period for which data is available, more than 96,000 drug overdose deaths were reported, equating to more than 260 deaths a day.[15]

---

[11]    *See* Decl. of Colin Jorgensen ¶¶ 15-18 ("**Jorgensen Decl.**"), annexed hereto as **Exhibit A**.

[12]    Decl. of Gary A. Gotto in Supp. of the Ad Hoc Comm.'s Reply to Plan Objs. & In Supp. of Plan Conf. ¶ 8 ("**Gotto Decl.**") [ECF No. 3443].

[13]    *Id.* ¶ 9.

[14]    Jorgensen Decl. ¶ 19.

[15]    *Provisional Drug Overdose Death Counts*, CDC: Nat'l Ctr. for Health Stat., https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed Oct. 21, 2021).

9.      Without the critical funds for abatement from this reorganization, cities, counties, tribal nations, hospital districts, independent school districts, and other municipalities will be deprived of the necessary tools and needed funding to curb this man-made public health disaster.[16]

10.     The Plan confirmed by this Court can deliver that needed funding.  It is expected that billions of dollars will be made available for distributions to creditors and parties in interest, primarily for abatement.  Critically, this amount includes the $4.325 billion to be contributed by the Sackler family and their entities under the Shareholder Settlement Agreement,[17] in exchange for the releases provided in the Plan and approved under the Confirmation Order.[18]  As this Court found in the Confirmation Order:

> The Third-Party Releases are an integral and necessary part of the Plan.  The Plan, and the global resolution embodied in the Plan and Plan Settlements, would not be possible without the Third-Party Releases.  The Shareholder Settlement would not be possible without the Shareholder Releases because the Sackler Families would not enter into the Shareholder Settlement, and cause the payments and other concessions contemplated therein, without the Shareholder Releases and Channeling Injunction.[19]

The Court further found that the "Plan Settlements" providing for the releases "are premised upon the consideration under the Shareholder Settlement Agreement, and the term sheets agreed to by the private claimants in Mediation were conditioned on the participation of the Sackler Families in this Plan."[20]  Moreover, absent the Plan Settlements, "the Debtors would not be able to take advantage of the DOJ Forfeiture Judgment Credit provided for in the DOJ Resolution."[21]  Thus,

---

[16]    Jorgensen Decl. ¶¶ 20-25.

[17]    Modified Bench Ruling on Req. Conf. Eleventh Am. J. Ch. 11 Plan at 57-58 [ECF No. 3786] ("**Modified Bench Ruling**"); Findings of Fact, Concls. of L., & Order Conf. Twelfth Am. J. Ch. 11 Plan of Reorg. of Purdue Pharma L.P. & Its Affiliated Debtors at 36 [ECF No. 3787] ("**Confirmation Order**").

[18]    Confirmation Order at 25, 37.

[19]    *Id.* ¶ II(d)(iii), at 29.

[20]    *Id.*

[21]    *Id.*

the releases and Shareholder Settlement are integral to the other settlements that are the bedrock of the Plan.

11.    The Disclosure Statement approved by this Court described the Plan releases,[22] and they were widely reported in the media.[23]   Even with these releases, the Plan received the overwhelming support of creditors, with over 95% of all impacted claimants voting in favor of the Plan.[24]

12.    Prior to the confirmation hearing, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and TopCo, and (II) Directing Prime Clerk LLC to Release Claim Protected Information, and (III) Granting Other Related Relief ("**Advance Funding Motion**").[25]   Through their Advance Funding Motion, the Debtors sought leave of this Court to disburse approximately $6.8 million to pay the start-up costs of the trusts to be formed under the Plan and otherwise prepare for the Plan's effective date, so that the trusts would be able to make distributions to creditors as soon as practicable after the effective date.[26]

13.    The confirmation hearing lasted a total of nine days.[27]   During that multiday hearing, the Debtors refined and narrowed the releases in their proposed chapter 11 plan.   On August 23, 2021, the Debtors filed an amended plan, which narrowed the scope of the releases.[28]

---

[22]   *Id.* at 26.

[23]   *See* Modified Bench Ruling at 113-14.

[24]   *Id.* at 82-83; *see also* Confirmation Order at 20.

[25]   ECF No. 3484.

[26]   Advance Funding Motion at 2.

[27]   The dates on which the Confirmation hearing was held were August 12-13, 16-19, 23, 25, and 27, 2021.

[28]   ECF No. 3632 at 42-43, 131-32.

On August 26, 2021, the Debtors again amended the proposed plan, this time excluding certain non-opioid claims from the releases.[29]

14.     On September 1, 2021, the Court stated that it would grant confirmation if, among other things, certain changes were made to the releases.[30]  The next day, the Debtors filed a conforming Plan.[31]

15.     Following objections[32] and a hearing, this Court granted the Advance Funding Motion by order of September 15, 2021 ("**Advance Funding Order**").[33]  This Court stated, *inter alia*, in the Advance Funding Order that "the fact of such Proposed Advances having been paid prior to the Effective Date of the Plan shall not support any argument that any such appeals are equitably moot."[34]

16.     On September 17, 2021, this Court issued its Modified Bench Ruling and entered the Confirmation Order.[35]  In both the Modified Bench Ruling and Confirmation Order, this Court found that the releases were integral to the heavily negotiated, arm's length settlements that formed the basis of the Plan.[36]

17.     On Sunday, October 10, 2021, in response to the U.S. Trustee's emergency motion for a stay pending appeal filed with the District Court on the previous Friday evening,[37] the District Court entered a temporary restraining order that provisionally granted that motion, pending a

---

[29]    ECF No. 3682 at 132.

[30]    Hr'g Tr. 134-35; 154-55, Sept. 1, 2021.

[31]    ECF No. 3726.

[32]    ECF No. 3493; 3555.

[33]    ECF No. 3773.

[34]    *Id.* at 5.

[35]    ECF Nos. 3786, 3787.

[36]    Modified Bench Ruling at 37; Confirmation Order at 20.

[37]    Notice of Emergency Mot. & Mot. by Appellant William K. Harrington, U.S. Trustee for a Stay Pending Appeal, *In re Purdue Pharma L.P.*, No. 7:21-cv-7966-CM (S.D.N.Y. Oct. 8, 2021) [ECF No. 19].

hearing before the District Court on October 10, 2021.[38]  After the District Court held the October

12th hearing, the Debtors, the MSGE Group, and other appellees filed a stipulation with the District

Court ("**Stipulation**"), which, in pertinent part, stated as follows:  "The Parties [signing the

Stipulation] shall not at any time argue before any court that the pending appeals in the above-

captioned actions of the [Confirmation Order] . . . have been rendered equitably moot by the

actions undertaken pursuant to the [Advance Funding Order]."[39]  With the filing of this Stipulation,

the TRO was dissolved, and the District Court denied the U.S. Trustee's stay motion without

prejudice.[40]  At the same time the District Court denied the stay motion, it also ordered that the

"Debtors shall give . . . in connection with these appeals no less that fourteen (14) days' written

notice of the date on which the Debtors intend that the Plan shall become effective."[41]

18.    After the U.S. Trustee filed yet another emergency motion on the evening of Friday,

October 15, 2021, this time requesting "clarification" of the District Court's denial of a stay,[42] the

District Court denied the U.S. Trustee's clarification motion but indicated that the scope of the

Stipulation should be broadened to cover pre-effective-actions taken under the Confirmation Order

(not just the Advance Funding Order).  On October 20, 2021, the Debtors, the MSGE Group, and

other appellees entered into an amended stipulation filed with the District Court ("**Amended**

**Stipulation**"), which stated, in pertinent part, as follows:  "The Parties [signing the Amended

---

[38]    TRO Pending Arg. on the U.S. Trustee's Mot. for a Stay, *In re Purdue Pharma L.P., Bankruptcy Appeals*, No. 7:21-cv-7532-CM (S.D.N.Y. Oct 10, 2021) [ECF No. 29].

[39]    Stipulation at 1, *In re Purdue Pharma L.P., Bankruptcy Appeals*, No. 7:21-cv-07532-CM (S.D.N.Y. Oct. 15, 2021) [ECF No. 62].

[40]    Mem. & Order Den. Without Prejudice the U.S. Trustee's Emergency Mot. for a Stay Pending Appeal, at 13, *In re Purdue Pharma L.P.*, No. 7:21-cv-7966-CM (S.D.N.Y. Oct. 13, 2021) [ECF No. 49].

[41]    *Id.*

[42]    U.S. Trustee's Mot. for Clarification of the Mem. & Order Den. Without Prejudice the U.S. Trustee's Emergency Mot. for a Stay Pending Appeal, *In re Purdue Pharma L.P., Bankruptcy Appeals*, No. 7:21-cv-07532-CM (S.D.N.Y. Oct. 15, 2021) [ECF No. 64].

Stipulation] shall not at any time argue before any court that the pending appeals in the above-captioned actions of the [Confirmation Order] . . . have been rendered equitably moot by the actions undertaken in advance of the Effective Date in furtherance of carrying out the Plan pursuant to the Confirmation Order or the [Advance Funding Order]."[43]

## ARGUMENT

## I.    PARTIES SEEKING A STAY PENDING APPEAL FACE A HEAVY BURDEN

19.    Federal Rule of Bankruptcy Procedure 8007 governs stays pending appeals in bankruptcy proceedings.  When seeking a stay pending appeal, "[t]he burden on the movant is a 'heavy' one" and "[t]he decision . . . lies within the sound discretion of the court."  *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009).

20.    In evaluating a request for a stay pending appeal, courts must examine:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citation and quotation marks omitted).  The first two factors are the "most critical."  *Id.*  A stay "is not a matter of right, even if irreparable injury might otherwise result"; it is "an exercise of judicial discretion."  *Id.* at 433 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672-73 (1926)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (quoting *Nken*, 556 U.S. at 433-34).

---

[43]    Am. Stipulation at 1-2, *In re Purdue Pharma L.P., Bankruptcy Appeals*, No. 7:21-cv-07532-CM (S.D.N.Y. Oct. 20, 2021) [ECF No. 71].

21.     To prevail on a stay request, a movant must "show satisfactory evidence on all four criteria." *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997); *see also Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., in chambers) ("It is no doubt true that, absent [a stay], the applicant here will suffer irreparable injury.  This fact alone is not sufficient to justify a stay."); *Virginian Ry. Co.*, 272 U.S. at 672 ("A stay is not a matter of right, even if irreparable injury might otherwise result."); *Uniformed Fire Officers Ass'n*, 973 F.3d at 49 ("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on the issuance of a stay pending appeal cannot possibly support a stay."); *In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008) ("Failure to satisfy one prong of this standard for granting a stay will doom the motion."  (internal quotation marks and citation omitted)).  As explained below, Movants fail to satisfy each of the four factors for a stay pending appeal.  Accordingly, their Stay Motions should be denied.

## II.     MOVANTS FAIL TO MEET THE HIGH BURDEN NECESSARY FOR A STAY PENDING APPEAL

### A.     Movants Have Shown No Likelihood of Irreparable Injury Absent a Stay

22.     Movants do not identify any irreparable harm sufficient to justify a stay pending appeal.  Courts have held that "irreparable harm is the 'principal prerequisite' for the issuance of a stay pursuant to Bankruptcy Rule 8007." *In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 143 (Bankr. S.D.N.Y. 2016).  This harm "must be neither remote nor speculative, but actual and imminent." *Id.* (citations omitted).  As the U.S. Supreme Court has explained, simply showing a "possibility of irreparable injury" fails to satisfy this factor, as "the 'possibility' standard is too lenient." *Nken*, 556 U.S. at 434-35 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

### 1.    *The Mere Possibility of Equitable Mootness Is Not Irreparable Harm*

23.    The majority of courts considering the issue have held that the possibility of equitable mootness does not constitute irreparable harm.  *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337 at 347 (S.D.N.Y. 2007) ("A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992) ("It is clear that the danger of an appeal becoming moot is by itself never a sufficient ground to justify grant of a stay."); *In re Best Prod. Co., Inc.*, 177 B.R. 791, 804 (S.D.N.Y.) (same), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *DJK Residential, LLC*, 2008 WL 650389, at *3 (stating "there is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply").[44]

24.    The U.S. Trustee, Washington, and Connecticut rely on *Adelphia Communications Corp.* to argue that a stay is warranted,[45] but their reliance is misplaced.  In *Adelphia*, the district court stayed the case pending appeal primarily because it was concerned that the bankruptcy court had violated its own order when it granted a noteholder committee standing to settle inter-company claims and then approved a settlement that a majority of the committee opposed.  *See id.* at 355-

---

[44]    The proposition has wide support in other circuits too.  *See, e.g.*, *SR Constr. Inc. v. Hall Palm Springs, LLC*, No. 3:20-CV-3487-B, 2020 WL 7047173, at *3 (N.D. Tex. Dec. 1, 2020) ("[T]he risk of mooting a bankruptcy appeal, standing alone, does not constitute irreparable harm warranting a stay."); *Yucaipa Corp. Initiatives Fund, ILP v. Piccadilly Rests., LLC*, No. CIV.A. 14-0609, 2014 WL 1871889, at *3 (W.D. La. May 6, 2014) ("Courts have consistently held the risk of equitable mootness alone does not establish the irreparable injury needed to obtain a stay pending appeal."); *BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 637-38 (E.D. Va. 2014) ("[T]he possibility that the appeal would become equitably moot does not constitute irreparable injury."); *In re W.R. Grace & Co.*, 475 B.R. 34, 207-08 (D. Del. 2012) ("[I]f equitable mootness alone could serve as the basis of irreparable injury, a stay would be issued in every case of this nature pending appeal."), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), *and aff'd*, 729 F.3d 311 (3d Cir. 2013).

[45]    Additionally, some of the other cases cited in the Stay Motions for the proposition that the risk of equitable mootness could cause irreparable injury ultimately denied a stay pending appeal, regardless of the dicta about irreparable injury.  *See In re DAEBO Int'l Shipping Co., Ltd.*, No. 15-10616 (MEW), 2016 WL 447655, at *3 (Bankr. S.D.N.Y. Feb. 4, 2016) (denying a stay pending appeal); *Beeman v. BGI Creditors' Liquidating Tr.* (*In re BGI, Inc.*), 504 B.R. 754, 768 (S.D.N.Y. 2014) (finding no irreparable harm and denying a stay pending appeal).

57.  No similar circumstances exist in this case.[46]  Here, the core issue raised by the U.S. Trustee

and the two Movant States is their disagreement with this Court's ruling on the merits.  In such a

case, the mere possibility of equitable mootness does not warrant a stay pending appeal.

> 2.    *The Possibility of Equitable Mootness Is Further Diminished by the Stipulation and Amended Stipulation*

25.    Two stipulations—*i.e.*, the Stipulation and Amended Stipulation—signed by the

Debtors, the MSGE Group, and other appellees have been filed with the District Court in response

to concerns raised before Judge McMahon that measures taken to prepare for the Plan's effective

date might equitably moot the appeals.  The most recent of these documents, the Amended

Stipulation, states in relevant part:  "The Parties [signing the Amended Stipulation] shall not at

any time argue before any court that the pending appeals in the above-captioned actions of the

[Confirmation Order] . . . have been rendered equitably moot by the actions undertaken in advance

of the Effective Date in furtherance of carrying out the Plan pursuant to the Confirmation Order or

the [Advance Funding Order]."[47]  In addition, Movants will have at least 14-days' written notice

in advance of the date on which the Debtors intend to have the Plan go effective, as required by

the District Court's order.[48]  As a result of the Stipulation, the Amended Stipulation, and the

District Court's order requiring 14-days' advance notice, the possibility of equitable mootness has

become even more remote, if not negated.

---

[46]    *Cf. DJK Residential, LLC*, 2008 WL 650389, at *3 (distinguishing *Adelphia* and ruling that risk of equitable mootness does not constitute irreparable harm).

[47]    Amended Stipulation at 1-2, *In re Purdue Pharma L.P., Bankruptcy Appeals*, No. 7:21-cv-07532-CM (S.D.N.Y. Oct. 20, 2021) [ECF No. 71].

[48]    Memorandum and Order Denying Without Prejudice the U.S. Trustee's Emergency Motion for a Stay Pending Appeal, at 13, *In re Purdue Pharma L.P.*, No. 7:21-cv-7966-CM (S.D.N.Y. Oct. 13, 2021) [ECF No. 49].

3.    *There Is No Threat of Irreparable Harm from the Advance Funding Order*

26.    The U.S. Trustee, the Movant States, and Ms. Isaacs are asking this Court to stay the Advance Funding Order.[49]  Yet, they fail to demonstrate how advances of funds made under the Advance Funding Order could trigger equitable mootness, particularly when the Advance Funding Order itself expressly provides that "the fact of such Proposed Advances having been paid prior to the Effective Date of the Plan shall not support any argument that any such appeals are equitably moot."[50]  Additionally, as noted above, the MSGE Group and other appellees have stipulated that they will not argue that pre-effective date actions taken under the Advance Funding Order will equitably moot the pending appeals.[51]  Movants fail to cite any case law holding that preparation work done before a plan's effective date can lead to equitable mootness.[52]  Accordingly, Movants fail to show any likelihood of equitable mootness as a result of pre-effective-date actions taken under the Advance Funding Order.

4.    *A State Enjoined from Enforcing Its Statutes Does Not Suffer Irreparable Harm When the Injunction Serves a Countervailing Federal Interest*

27.    Maryland argues that, any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.[53]  Yet, none of the cases that Maryland cites in support of its argument involved a chapter 11 reorganization, the Bankruptcy Code, or any other comprehensive scheme enacted by Congress that posed a countervailing federal interest.  That distinction is important.  In *New Mexico Department of Game & Fish v. United States Department of the Interior*, 854 F.3d 1236, 1239 (10th Cir. 2017), the

---

[49]    Trustee's Stay Motion at 37; Wash. & Conn. Stay Motion at 4.

[50]    *Id.* ¶ 12, at 5.

[51]    *See supra* notes 38-43 and accompanying text.

[52]    *Cf. BDC Cap., Inc.*, 508 B.R. at 637-38 (finding no likelihood of success on appeal where movant failed to cite case law supporting its position).

[53]    Md. Stay Motion at 14-16.

federal government sought to stay an injunction that prevented the Department of the Interior from releasing gray wolves into New Mexico without a permit from the State. Although the Tenth Circuit noted that the State necessarily suffers harm when it cannot enforce its own laws, the court also found that the Department of the Interior's action under the Endangered Species Act and federal regulations did not create irreparable harm. *Id.* at 1255; *see also Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015) (observing that state's interest in enforcing its election laws was diminished where it conflicted with the federal Voting Rights Act).

28.    Like the Endangered Species Act in *New Mexico Department of Game & Fish*, the Bankruptcy Code presents a comprehensive federal scheme that, at times, must prevail over the enforcement of state laws when there is an overriding federal interest. As the U.S. Supreme Court noted, state law governs in bankruptcy unless "some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 55 (1979). Here, there are overriding federal interests in successful chapter 11 reorganizations, in arm's length settlements among debtors and creditors, in maximizing the value of estate assets (*i.e.*, enhanced settlement dollars in exchange for releases and injunctive protection), and in the use of equitable remedies to ensure fair and equitable distributions to creditors.

29.    Notwithstanding the overblown rhetoric of the appealing States about the need to wield "police power claims" and pursue "police power litigation,"[54] the Movant States have not shown a proper basis by which their unsecured claims should be exempted from chapter 11 and confirmation of a plan. Indeed, caselaw undercuts their position. *See, e.g.*, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 373 (2006) ("The history of the Bankruptcy Clause . . . demonstrate[s] that

---

[54]    *E.g.*, Md. Stay Motion at 6.

14

it was intended . . . to authorize limited subordination of state sovereign immunity in the bankruptcy arena."); *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) ("Under our longstanding precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors."); *Gardner v. New Jersey*, 329 U.S. 565, 573-74 (1947) (holding that a State waives its sovereign immunity by filing a proof of claim); *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 U.S. Dist. LEXIS 138478, at *51 (D. Del. July 26, 2021) (enjoining California Department of Toxic Substances Control from pursuing released claims against plan funders). Any state interest in enforcing state laws must yield to this Court's authority to enter orders necessary or appropriate to effectuate the Plan in accordance with the Bankruptcy Code. *See Katz*, 546 U.S. at 373.

30.     Additionally, harm to citizens can overcome the interest of a State in enforcing its laws. In *Latta v. Otter*, 771 F.3d 496 (9th Cir. 2014), plaintiffs moved for dissolution of a stay pending appeal of the district court's order enjoining enforcement of Idaho's laws prohibiting same-sex marriage. The Ninth Circuit in *Latta* acknowledged that there was "some authority" indicating that a State suffers irreparable harm whenever its laws are enjoined. *Id.* at 500 (citing *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)). But the asserted harm to Idaho in *Latta* was outweighed by the "profound legal, financial, social and psychic harms" to same-sex couples that enforcement of the marriage ban would cause. *Id.* After considering the other *Nken* factors, the Ninth Circuit decided to dissolve the stay pending appeal. *See id.* at 501.

31.     Here, any harm that the Movant States may suffer from the release and injunction of their claims against Sacklers and their entities is outweighed by the harm that would likely befall more Americans if abatement funding under the Plan were held up for months or years. As explained further below, an indefinite delay of the Plan's abatement funding will simply perpetuate

the status quo with continuing strain on local governments that will translate into more overdoses and more lives lost.[55]   For these reasons, Maryland's assertions about alleged irreparable harm should be rejected.

### B.    The Movants Are Unlikely to Succeed on the Merits

32.    The next factor requires the stay applicant to make "a *strong showing* that he is *likely* to succeed on the merits."   *Nken*, 556 U.S. at 434 (emphasis added).   As the language suggests, it is "not enough that the chance of success on the merits be 'better than negligible.'"   *Id.* (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)).   This Court is familiar with the grounds supporting its decision to confirm the Plan.   Thus, in the interest of brevity, the MSGE Group will only address certain aspects of the Court's decision that are challenged on appeal to help underscore why Movants cannot make the requisite "strong showing" that they are "likely" to succeed on appeal.

> 1.    *This Court's Approval of the Plan Settlement, and the Releases Embodied Therein, Are Reviewable Only for Abuse of Discretion, a Deferential Standard*

33.    Certain Movants repeat the claim that the third-party releases under the Plan violate the Bankruptcy Code and are impermissible.   As a threshold matter, these Movants ignore the deferential standard of review that applies to settlements forming the basis of the confirmed Plan. This Court authorized and directed the Debtors to enter into the "Plan Settlement" in accordance with Bankruptcy Code § 1123 and Bankruptcy Rule 9019.[56]   The Second Circuit "review[s] for abuse of discretion the reasonableness of th[e] court's application of [Rule 9019] in approving the

---

55    *See infra* part II.C (balance of harms).

56    Confirmation Order ¶ 6(a), at 50-51; *see also* Modified Bench Ruling at 24.   This Court divided the settlements between (1) the settlement of the Debtors' Estates' clams and (2) third-party claims against the Sacklers related to those claims.   *Id.* at 72.   As this Court noted, the settlements at issue are "interrelated" to other settlements "that would not be achievable if either of the settlements with the Sacklers fell away." *Id.*

[s]ettlement." *In re Iridium Operating LLC*, 478 F.3d 452, 462 n.13 (2d Cir. 2007). This deferential standard of review makes success on appeal *unlikely*. *See Dhine v. Dist. Dir.*, 822 F. Supp. 1030, 1031 (S.D.N.Y. 1993) (stating that "the appeal appears to rest on the ground that the Court's findings constituted an abuse of discretion. As far as grounds for appeal go, this is one of the more difficult arguments to make successfully" even where the "case presents novel issues"); *In re Bogdanovich*, No. 00CIV.2266(JGK), 2000 WL 1708163, at *5 (S.D.N.Y. Nov. 14, 2000) ("It cannot be said that the bankruptcy court's decision was an abuse of discretion. Therefore, the debtors have not made a strong showing of a likelihood of success on appeal and are not entitled to a stay pending appeal."); *In re Machne Menachem, Inc.*, No. 3:07CV00057, 2007 WL 172486, at *1 (M.D. Pa. Jan. 18, 2007) (concluding that there was no likelihood of success, and denying the stay request, because bankruptcy judge did not abuse his discretion in granting the confirmation order). As a result, Movants cannot make a "strong showing" that they are likely to prevail on the merits in their appeals.

> ### 2.    Section 524(e) of the Bankruptcy Code Does Not Curb This Court's Authority to Approve Third-Party Releases in Non-Asbestos Cases

34.    Certain Movants argue that third-party releases are impermissible under § 524(e) of the Bankruptcy Code and that the only express exception to § 524(e) is § 524(g) of the Code, which authorizes permanent injunctions and releases of third-party claims only in asbestos mass-tort cases.[57] In making this assertion, certain Movants are inviting this Court to infer that, by authorizing permanent injunctions and third-party releases through § 524(g), Congress intended to proscribe such injunctions and releases in non-asbestos cases, per § 524(e).[58] Such an inference, however, is untenable. The enactment of § 524(g) did not foreclose the use of permanent

---

[57]   UST Motion at 16-18; Wash. & Conn. Stay Motion at 24.

[58]   *See, e.g.*, UST Motion at 16-17.

channeling injunctions or third-party releases in non-asbestos bankruptcies, as the saving clause

enacted with § 524(g) makes clear. When it added § 524(g) to the Code, Congress also enacted a

"Rule of Construction" or saving clause providing that § 524(g) was not to be read to abridge the

existing authority of the courts to grant permanent injunctions (or equivalent third-party releases)

in connection with plan confirmation:

> RULE OF CONSTRUCTION.—Nothing in subsection (a) [the provision enacting
> § 524(g)] or in the amendments made by subsection (a), shall be construed to
> modify, impair, or supersede any other authority the court has to issue injunctions
> in connection with an order confirming a plan of reorganization.

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b) (Oct. 22, 1994).

35.    The saving clause in section 111(b) "was intended by Congress to avoid any

conjecture that, absent cases involving asbestos, bankruptcy courts lacked the power to issue

permanent injunctions." *In re Richard Potasky Jeweler, Inc.*, 222 B.R. 816, 827 (S.D. Ohio 1998)

(citing 140 Cong. Rec. H10,766 (daily ed. Oct. 4, 1994) (remarks of Rep. Brooks); 140 Cong. Rec.

S14,461 (daily ed. Oct. 6, 1994) (remarks of Sen. Heflin)). The saving clause thus makes clear

that Congress did not intend for § 524(g) to alter or foreclose a bankruptcy court's existing

authority in non-asbestos bankruptcies to grant permanent injunctions or third-party releases,[59] as

Congress wanted to ensure that bankruptcy courts continue to "have the widest degree of latitude

in crafting responsible reorganizations that fit the specific needs of each case."[60]

---

[59]    Courts routinely give effect to rules of construction enacted by Congress, because they are guides to
Congress's intent, and make further resort to any other tools of statutory construction unnecessary. *See,
e.g.*, *Universal Church v. Geltzer*, 463 F.3d 218, 223 (2d Cir. 2006) (enforcing Bankruptcy Code's general
Rules of Construction); *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 646, 649, 654 (4th Cir. 1995) (enforcing
rules of construction in Religious Freedom Restoration Act and Access Act); *United States v. Vitek Supply
Corp.*, 151 F.3d 580, 585 (7th Cir. 1988) (finding that exclusive remedy language in Federal Debt
Collection Procedures Act did not apply because separate portion of statute preserved all procedures for
recovering a debt available under other federal law); *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d
1438, 1440 (D.C. Cir. 1988) (enforcing rule of construction applicable to entire United States Code and
Statutes at Large).

[60]    138 Cong. Rec. S8335-36 (remarks of Sen. Sanford).

36.     Consistent with this legislative history, a "clear majority" of circuits, including the Second Circuit, "have determined that such releases and injunctions under a plan are authorized in appropriate, narrow circumstances."[61]  *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014); *In re Dow Corning Corp.*, 280 F.3d 648, 656-58 (6th Cir. 2002).  Because Movants do little more than repeat arguments that are inconsistent with the saving clause and Second Circuit precedent, they have not shown a likelihood of success on the merits.

3.     *This Court Has Subject-Matter Jurisdiction and Constitutional Authority to Approve the Third-Party Releases in the Plan*

37.     Maryland argues that this Court is without subject-matter jurisdiction to approve third-party releases of direct claims, as opposed to derivative claims.[62]   This argument is unavailing, for the Second Circuit made clear in *In re Quigley Co.*[63] that, "while we have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy res, the touchstone for bankruptcy jurisdiction remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate."  *Id.* at 57 (internal quotation marks omitted).   Thus, explained the court of appeals, "[a] suit against a third party alleging liability not derivative of the debtor's conduct . . . may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability."  *Id.*   Based on *Quigley*, this Court correctly determined that "the third-party claims that are covered by the [Plan's] shareholder release," as further narrowed by the Court, "directly affect the *res* of the Debtors' estates, including insurance rights, the shareholder released

---

[61]   Modified Bench Ruling at 118 (citing cases).

[62]   Md. Stay Motion at 10. (citing *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009))

[63]   676 F.3d 45 (2d Cir. 2012).

parties' rights to indemnification and contribution, and the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims."[64]  On this basis, the Court held that it had "bankruptcy subject matter jurisdiction to impose a third-party claims release and injunction" under the Plan.[65]  On the strength of *Quigley* and this Court's findings, Maryland cannot make a "strong showing" that its jurisdictional challenges are likely to succeed on appeal.[66]

### 4. The Third-Party Releases Are Supported by Binding Circuit Precedent

38.    Contrary to Movants' assertions, the Second Circuit's precedents governing third-party releases are controlling and support this Court's confirmation of the Plan.  In *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992), the Second Circuit stated that "a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtors' reorganization plan."  *Id.* at 293.  Later, in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, the Second Circuit acknowledged that "[c]ourts have approved nondebtor releases when: the estate received substantial consideration, the enjoined claims were 'channeled' to a settlement fund rather than extinguished, the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution,' and the plan otherwise provided for the full payment of the enjoined claims."  *Id.* at 142 (citations omitted).

39.    The U.S. Trustee's attempt to characterize the Second Circuit's statement in *Metromedia* as mere *dicta* is unavailing,[67] because the decisional law, including that of the Second Circuit, views *Metromedia* as controlling precedent when it comes to third-party releases.  In *In re*

---

[64]    Modified Bench Ruling at 111.

[65]    *Id.*

[66]    In addition, this Court was properly acting within its constitutional authority to approve the third-party releases in the Plan.  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 137 (3d Cir. 2019) (holding that "the Bankruptcy Court possessed constitutional authority to confirm the plan containing the [third-party] release provisions").

[67]    UST Motion at 30.

*Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), the Second Circuit

stated that, in *Metromedia*, "we *held* that a bankruptcy court could permit the nonconsensual

release of creditors' claims against third parties upon a finding of 'truly unusual circumstances'

that 'render the release terms important to [the] success of the [reorganization plan].'" *Id.* at 93

n.12 (emphasis added).  The view of the lower courts in the Second Circuit is the same.  *See, e.g.*,

*In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019)

(referring to "the approach that *Metromedia* **commands** me to take" (emphasis added)); *In re*

*SunEdison, Inc.*, 576 B.R. 453, 457 (Bankr. S.D.N.Y. 2017) (finding that proposed release "did

not satisfy the ***requirements*** of *Metromedia*" (emphasis added)).  With the weight of Second

Circuit authority behind this Court's decision, Movants cannot make a "clear showing" that they

are likely to succeed on the merits.

     5.    *State "Police Power Claims" Are Not Entitled to Deference Under the Bankruptcy Code and Are Not Immune from the Court's Injunctive Powers*

40.    Relying on 11 U.S.C. § 362(b)(4) and 28 U.S.C. § 1452(a), Washington and

Connecticut assert that "the drafters of the Bankruptcy Code considered police power claims to be

a special category of claims that were to be accorded deferential treatment."[68]  There is no basis

for this remarkable, but fatally flawed, assertion.  This Court correctly noted that, apart from those

two narrow statutes, which do not apply here, the broad injunctive power under the Bankruptcy

Code makes no exception for police or regulatory powers.[69]  *See, e.g.*, *In re Peabody Energy Corp.*,

958 F.3d 717, 724-25 (8th Cir. 2020) (holding that chapter 11 plan discharges governmental units'

public nuisance claim); *Exide Holdings, Inc.*, 2021 U.S. Dist. LEXIS 138478, at *51 (enjoining

---

[68]   Wash. & Conn. Stay Motion at 23.

[69]   *See* Modified Bench Ruling at 149-52 (citing cases).

California Department of Toxic Substances Control from pursuing released claims against plan funders).

41.    Indeed, as the two statutes cited by Washington and Connecticut make clear, when Congress intends to carve out an exception for police and regulatory powers, it expressly does so in a statute. *See* 11 U.S.C. § 362(b)(4) (excepting from the automatic stay "an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power" but not the enforcement of "a money judgment[ ] obtained in an action or proceeding by a governmental unit to enforce . . . police or regulatory power"); 28 U.S.C. § 1452 (preventing bankruptcy removal of a "civil action by a governmental unit to enforce such governmental unit's police or regulatory power").  Unlike the two statutes quoted here, Congress has not expressly excepted "police power claims" from a bankruptcy discharge or from a bankruptcy court's injunctive powers.

42.    Similarly, when Congress intends to treat certain categories of unsecured claims differently from general unsecured claims, it expressly provides for such disparate treatment in the Bankruptcy Code.  *See* 11 U.S.C. § 507 (enumerating categories of claims entitled to priority or superpriority treatment); *id.* § 510(b) (subordinating, for purpose of distribution, "a claim arising from rescission of a purchase or sale of a security of the debtor"); *id.* § 523(a) (excepting from discharge certain categories of claims against an individual debtor); *id.* § 726(a)(4) (subordinating in a chapter 7 case "payment of any allowed claim . . . for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages arising [prepetition] . . . to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss . . . .").  Nothing in the Bankruptcy Code entitles "police power claims" to any kind of "deference," nor are "police power claims" expressly excepted by statute from a chapter 11 plan's settlement and release

provisions. Accordingly, the efforts of Washington and Connecticut to single out "police power claims" for "deferential" or exceptional treatment are not likely to succeed on appeal.

       6.    *The Plan and the Releases Contained Therein Received Overwhelming Creditor Support and Do Not Violate Due Process*

    43.    The U.S. Trustee challenges the releases based on the asserted absence of "knowing and informed consent, adequate notice, and an opportunity to be heard."[70] The U.S. Trustee's assertion, however, is unsupported by the facts of this case, where, among other things, an overwhelming majority of creditors voted in favor of the Plan containing the releases. As this Court noted, 96.87% of the non-federal governmental entities,[71] as well as over 95% of the aggregate creditor vote supported the Plan.[72] And these votes were cast *before* this Court narrowed the releases at issue.[73] The creditors' overwhelming support of the Plan bolsters the appropriateness of the releases and undercuts the U.S. Trustee's assertion that the third-party releases were wholly "nonconsensual."[74] *See Nat'l Heritage Found., Inc.*, 760 F.3d at 347 (noting a factor when approving a third-party release is that "the impacted class, or classes, has overwhelmingly voted to accept the plan" (quoting *In re Dow Corning*, 280 F.3d at 658)); *cf. In re Iridium Operating LLC*, 478 F.3d at 462 (noting as a factor for approving a settlement "the degree to which creditors either do not object to or affirmatively support the proposed settlement" (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S.

---

[70]  UST Stay Motion at 2.

[71]  Modified Bench Ruling at 40.

[72]  *Id.* at 82-83; *see also* Confirmation Order at 20.

[73]  Modified Bench Ruling at 104, 135.

[74]  The over 95% support is far in excess of the 75% required under § 524(g). *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); *accord*, Modified Bench Ruling at 10. Nevertheless, the U.S. Trustee insinuates that, because fewer than 20% of the creditors who filed proofs of claims voted on the Plan, the voting outcome fails to demonstrate support for the Plan. UST Motion at 32 n.21. The U.S. Trustee fails to supply any legitimate basis for inferring that non-voting creditors do not support the Plan.

414, 424 (1968))).  For these reasons, Movants' challenges to the releases are not likely to succeed on appeal.

44.    Quoting the U.S. Supreme Court's decision in *Ortiz v. Fibreboard Corp.*,[75] the U.S. Trustee makes a secondary due process argument, asserting that the releases run counter to the "deep-rooted historic tradition that everyone should have his own day in court."[76]  The U.S. Trustee cannot succeed simply by quoting maxim, especially when *Ortiz* itself involved a class action, not a chapter 11 bankruptcy.  Moreover, the U.S. Trustee overlooks the following material exception to the maxim:  "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example *in bankruptcy . . . , legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process*."  *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) (emphasis added and citations omitted), *quoted in Ortiz*, 527 U.S. at 846.

45.    Here, this Court found the Plan and the releases contained therein to be "consistent with due process" because of, among other things, the extensive and far-reaching noticing program undertaken by the Debtors.[77]   The evidentiary record from the confirmation hearing provides ample support for the Court's finding that interested parties received sufficient notice of the Plan and the releases contained therein.[78]   Accordingly, the U.S. Trustee has not made a "strong showing" that his due process challenges are likely to succeed on appeal.

7.    *The Canadian Appellants Have Not Shown a Likelihood of Success on Appeal*

46.    The Canadian Appellants assert that the "one issue" unique to them is that they are shielded from the effect of the Plan's third-party releases by dint of the Foreign Sovereign

---

[75]    527 U.S. 815 (1999).

[76]    UST Motion at 24 (quoting *Ortiz*, 527 U.S. at 846 (citation omitted)).

[77]    Modified Bench Ruling at 114.

[78]    *Id.* at 113-15.

Immunities Act.[79]  As a threshold matter, it is far from clear whether a Canadian *municipality* can claim the benefit of *sovereign* immunity.  But, even if Canadian municipalities could do so, § 106 of the Bankruptcy Code makes clear that the sovereign immunity of "a governmental unit" is abrogated with respect to numerous sections of the Bankruptcy Code, including §§ 105, 363, 524, and 1141, which form the statutory grounds for the Plan Settlement and the releases that are a necessary component thereof.  *See* 11 U.S.C. § 106(a)(1).  The Bankruptcy Code defines "governmental unit" to include a "foreign state," an "instrumentality" of a foreign state, and any "other foreign . . . government."  *Id.* § 101(27).  The definition thus sweeps in the entire class of Canadian Appellants and thus abrogates their sovereign immunity, to the extent they could even claim such immunity.

47.    In addition, the Canadian City of Grande Prairie and the Peter Ballantyne Cree Nation appear to have filed proofs of claims on behalf of themselves and all Canadian Appellants.[80] A foreign governmental unit that files a proof of claim waives its sovereign immunity.  *See In re Kaiser Grp. Int'l, Inc.*, 302 B.R. 814, 819 (D. Del. 2003) (stating that bankruptcy court correctly determined that international trade organization was a "governmental unit" that waived sovereign

---

[79]    Canadian Appellants' Stay Motion ¶ 23, at 6.

[80]    General Opioid Claimant Proof of Claim form for the City of Grand Prairie, as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Jul. 22, 2020) [Claim No. 145592]; General Opioid Claimant Proof of Claim form for Peter Ballantyne Cree Nation on Behalf of All Canadian First Nations and Metis People, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Jul. 28, 2020) [Claim No. 144535].  Attached to their proofs of claims is a civil complaint filed by Grande Prairie on behalf of all Canadian local governments. This Court noted in its bench ruling that the proofs of claims of the Canadian Appellants "rely on attached complaints against both non-Debtor Purdue Canada and other non-Debtors and against the Debtors that do not distinguish between the conduct of the Debtors and the non-Debtors[.]"  Modified Bench Ruling at 33 n.2.  As a result, this Court found it "far from clear that the claims really are against the Debtors."  *Id.* The Court further noted that the "claims that are based on the shareholder released parties' conduct related to non-Debtors [were not] released or enjoined under the plan."  *Id.*  This raises questions about the legal standing of the Canadian Appellants to press their appeal in the District Court, which, in turn, calls into question their ability to seek a stay pending appeal.

immunity by "filing its proof of claim and participating in the Debtor's bankruptcy"). Accordingly, the Canadian Appellants have waived whatever sovereign immunity they may have once had. For these reasons, the Canadian Appellants fail to make a "strong showing" that they are likely to succeed on appeal.

> 8. *The Challenges to the Plan's Classification of Claims and Allowed Voting Amounts Are Unavailing and Not Likely to Succeed on Appeal*

48.    Washington and Connecticut argue that their opioid-related claims were incorrectly classified with the opioid-related claims of local governments and that their claims were improperly set at $1.00 for voting purposes.[81]  These objections were litigated in connection with confirmation and overruled by this Court.[82]  The Bankruptcy Code only requires that claims be "substantially similar," not identical, in order to classify them together. 11 U.S.C. § 1122(a); *see also Sabine Oil & Gas Corp.*, 551 B.R. at 310 (noting that "the requirement of substantial similarity does not mean that claims or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan"). The opioid claims of the States are substantially similar to those of the local governments: both sets of opioid claims are unsecured, are based on or arise from the Debtors' conduct or role in the opioid epidemic, and are held by governmental units.[83]

49.    Additionally, this Court properly rejected the argument that the voting amount for each State's opioid claim was improperly fixed at $1.00.[84]  Washington and Connecticut, along with the other States and local governments, agreed to the NOAT distribution framework, which

---

[81]   Wash. & Conn. Stay Motion at 36-37.

[82]   Modified Bench Ruling at 42-44.

[83]   *Id.* at 42-43.

[84]   *Id.* at 43-44.

means that there was no reason to liquidate the claims through the claims allowance process.[85]

More fundamentally, Washington and Connecticut never filed a motion to estimate their claims,

which would have been a pointless and costly endeavor, given the distribution framework.[86]  In

circumstances where, as here, it would have been difficult, time-consuming, and costly to

determine a different voting amount for each and every claim, and no party is prejudiced, it was

appropriate for this Court to assign a voting amount of $1.00 to each opioid claim in the state and

local governmental entities' class.  *See In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 428 (Bankr. D.

Md. 2007) (setting the value of claims at $1.00 for voting purposes where it was merely

"speculative" that the allowance of claims at $1.00 would have any effect on the plan).

     50.     All in all, Movants ignore key reasons they are unlikely to succeed on appeal and

at best repeat arguments rejected by this Court.  Because Movants have failed to satisfy the second

essential factor for obtaining a stay, the Stay Motions should be denied.

### C.     The Balance of Harms Militate Against a Stay

     51.     Here, the balance of harms strongly favors denial of a stay pending appeal because

the distributions to be made under the Plan will in large part be dedicated to abating the public

health crisis caused by the opioid epidemic.[87]  If granted, an indefinite stay pending appeal would

hold up money that is critical to address the continuing opioid crisis in communities across the

United States.[88]

     52.     Courts have recognized the "weighty interest[ ]" of "the right of the majority of

creditors to receive their distributions."  *Adelphia Commc'ns Corp.*, 361 B.R. at 342.  Here, the

---

[85]  *Id.* at 43.

[86]  *Id.* at 44.

[87]  Weinberger Decl. ¶¶ 22-24.

[88]  Jorgensen Decl. ¶ 19; Gotto Decl. ¶ 9 (noting that the opioid crisis "was continuing to cause such harm, and absent effective abatement, would do so for many years to come").

distributions have even greater weight, as the vast majority of the distributions are earmarked to abate the public health crisis created by opioids.[89]   The scope of this public health crisis is enormous.[90]  More than 260 deaths occur each day from drug overdose.[91]  The impact of the opioid crisis is felt most intensely and severely at the local level—by first responders, communities, families, and addicts.[92]   If the Confirmation Order and Advance Funding Order were stayed, critical funds and abatement programs would not reach those first responders, communities, families, and addicts for months—if not years—while the appeals wend their way through the federal courts.

53.    The plight of Arkansas counties provides but one example.  Arkansas is one of the States most heavily impacted by the opioid crisis.[93]  Last year, Arkansas posted its highest-ever official death toll from drug overdose, 515,[94] and this official death toll likely represents a significant undercount.[95]  Arkansas counties and cities are strained in a variety of ways directly related to the opioid crisis, including law enforcement and court action concerning an increase in juvenile delinquencies, dependent-neglected juveniles, families in need of services, and a dramatic increase in the number of involuntary commitments.[96]

---

[89]    Weinberger Decl. ¶ 22 ("The chief remedy for public nuisance is abatement.  In other words, the most important and largest remedy that the government sought in their underlying opioid litigation against Purdue and the other defendants is money to be used to abate, fix, mend, and heal the human and societal health crisis that is the opioid epidemic.").

[90]    Weinberger Decl. ¶ 23 ("public entities estimate that the total cost to abate the opioid crisis nationwide exceeds two *trillion* dollars."); Gotto Decl. ¶ 8 ("abatement w[as] the principal goal of the case.").

[91]    *Provisional Drug Overdose Death Counts*, CDC: NAT'L CTR. FOR HEALTH STAT., https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed Oct. 21, 2021).

[92]    Jorgensen Decl. ¶ 16.

[93]    *Id.* ¶ 11.

[94]    *Id.* ¶ 12.

[95]    *Id.* ¶ 13.

[96]    *Id.* ¶ 18.

54.     As Mr. Colin Jorgensen, in-house litigation counsel at the Association of Arkansas Counties, explains in the accompanying declaration, "[t]he opioid crisis presents a catch-22 for the counties: forced to spend ever-increasing sums on required services because of the opioid crisis, counties are unable to dedicate funds to robust abatement programs that could, over the long-term, reduce the strain caused by opioids."[97]  Additionally, "[w]ithout adequate funding for abatement, the opioid crisis will continue to plague Arkansas counties and their residents for many years to come."[98]

55.     The Plan's funds are necessary for targeted abatement programs that would save lives, including the administration of naloxone, a drug that can rapidly reverse the effects of an overdose.[99]  Arkansas has a naloxone program administered in large part by county employees, including local law enforcement, fire and EMS organizations, school nurses, and treatment and recovery center personnel.[100]  The program saved nearly 400 lives in Arkansas in 2020[101] but relies on uncertain and inadequate funding, which reliable and ample funding could ameliorate.[102]  "If we had enough funding to equip all first responders in all corners of the state with naloxone," Mr. Jorgensen explains, "more lives would be saved."[103]

56.     Additionally, many of the "Core Strategies" identified in the NOAT trust distribution procedures ("**TDP**"), such as medically assisted treatment, treatment for neonatal abstinence syndrome, and prevention programs, are already widely utilized in Arkansas but are

---

[97]    Jorgensen Decl. ¶ 19.

[98]    *Id.*

[99]    *Id.* ¶¶ 20-25.

[100]   *Id.* ¶ 21.

[101]   *Id.*

[102]   *Id.* ¶ 22.

[103]   *Id.*

without adequate funding to bring the opioid crisis to an end.[104]  Other "Core Strategies," such as services for pregnant and postpartum women, treatment for incarcerated individuals, and syringe service programs, are needed but currently are sparsely implemented in Arkansas.[105]  Further, the "Approved Uses" described in the NOAT TDP would provide vital services that are not sufficiently available in Arkansas, such as additional facilities and capacity for treatment of opioid use disorder.[106]

57.    According to Mr. Jorgensen, "Arkansas counties and cities need funding as soon as possible to implement programs and strategies to abate the Arkansas opioid epidemic."[107]  As he explains, any "delay in the abatement funding provided under the Plan will simply perpetuate the status quo with continuing strain on Arkansas's local governments and their residents—translating into more overdoses and more lives lost."[108]  Thus, the "sooner more abatement funding can be harnessed to help local governments, the more rapidly local governments can deploy interventions and treatments that will save lives, restore families and communities, and create a post-opioid future in  Arkansas."[109]  "With so much at stake, delay comes at too high of a cost."[110]

58.    Movants cannot identify any asserted harms that would outweigh the human and financial costs that would result from an indefinite delay of needed abatement funding.  The U.S. Trustee, Washington, and Connecticut once again summon the specter of equitable mootness, asserting that loss of appellate rights are a quintessential form of harm and prejudice.[111]  But, as

---

[104]  *Id.* ¶ 25.

[105]  *Id.*

[106]  *Id.* ¶ 26.

[107]  *Id.* ¶ 27.

[108]  *Id.*

[109]  *Id.*

[110]  *Id.*

[111]  UST Motion at 35; Wash. & Conn. Stay Motion at 37-38.

noted above, the mere possibility of equitable mootness is not enough to establish a likelihood of irreparable injury.   And, the appellees' Stipulation and Amended Stipulation have further diminished that possibility, at least for the purpose of the pending District Court appeals, which are on a fast track.

59.    The U.S. Trustee argues that, if a stay were denied, creditors would "be irreparably harmed by having their causes of action extinguished without their knowing and informed consent and in many cases without notice."[112]  This is nonsense.  As noted above, this Court found that the Debtors' noticing program was extensive and far-reaching and that the requirements of due process were satisfied.   And the U.S. Trustee's generalized assertion of no "knowing and informed consent" is belied by the fact that over 95% of impacted voting creditors voted in favor of the Plan, and that was *before* this Court instructed the Debtors to narrow the third-party releases.   The exaggerations of the U.S. Trustee, which seem shaped only for rhetorical effect, are not enough to obtain a stay.

60.    Maryland's assessment of the harms is speculative, filled with equivocation and auxiliary verbs, such as "may be less likely," "may demand," and "may be difficult."[113]   For example, Maryland asserts that its "appeal *may provide* an upside to all creditors, the expected value of which precludes any costs,"[114] but fails to supply facts that would put that statement beyond the realm of wishful thinking.  Maryland also asserts that there are "other ways to resolve claims against non-debtors that would not lead to litigation abroad,"[115] but fails to substantiate and specify what those "other ways" might be.  Maryland further speculates, without supporting

---

[112]    UST Motion at 34.

[113]    Md. Stay Motion at 18.

[114]    *Id.* (emphasis added).

[115]    *Id.*

evidence, that implementing the Plan that has not been affirmed on appeal may create uncertainty to the detriment of stakeholders. For example, the Debtors "*may* face significant barriers to its operations," "potential creditors . . . *may* be less likely to contract with the reorganized business," and "[i]t *may* be difficult to maintain employees."[116] These statements "contain[] no more than speculation," and such "speculative harm" is an improper basis for granting a stay pending appeal. *Shake v. Wilmington Tr., Nat'l Ass'n.*, No. 20-CV-6096 (LJL), 2020 WL 5261223, at \*9 (S.D.N.Y. Sept. 3, 2020).

61.    For all the reasons explained above, the balance of harms tips decidedly against the Stay Motions. Accordingly, the Stay Motions should be denied.

### D.    A Stay Is Not in the Public Interest

62.    The public interest in settlements and finality weighs against granting a stay pending appeal. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) ("The compromise of complex litigation is encouraged by the courts and favored by public policy." (internal quotation marks omitted)); *In re Motors Liquidation Co.*, 555 B.R. 355, 364-65 (Bankr. S.D.N.Y. 2016) ("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.").

63.    Related to the policy that favors settlement is the "need for finality of decisions, especially in a bankruptcy proceeding." *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at \*7 (Bankr. S.D.N.Y. Jan. 24, 2008) (internal quotation marks omitted) (citing *In re Twenty-Six Realty Assocs., L.P.*, No. 95 CV 1262, 1995 WL 170124, at \*16 (E.D.N.Y. Apr. 4, 1995)); *see also First Nat'l Bank of Md. v. Markoff*, 70 B.R. 264, 265 (S.D.N.Y. 1987) (recognizing the "public interest in timeliness and finality of bankruptcy proceedings").

---

[116]  *Id.* at 17-18 (emphasis added).

64.     Most importantly, the public interest lies with abating the public health crisis caused by the opioid epidemic.  It is imperative that needed abatement funding be released and distributed under the Plan sooner rather than later.  A stay could delay this needed funding indefinitely, "translating into more overdoses and more lives lost."[117]  Thus, granting the Stay Motions is not in the public interest.[118]

## III.    ALTERNATIVELY, IF THIS COURT GRANTS A STAY, IT SHOULD REQUIRE THE MOVANT STATES AND CANADIAN APPELLANTS TO POST A SUBSTANTIAL APPEAL BOND

65.     In the alternative, if this Court grants a stay, it should require the Movant States and the Canadian Appellants to post a supersedeas bond, in accordance with Federal Rule of Bankruptcy Procedure 8007(d).  Under the plain language of Rule 8007, the Movant States and Canadian Appellants are not exempt from the bond requirement.  Rule 8007(d) "waives the requirement to post a bond when an appeal is taken by the United States or an officer or agency of the United States. *No such waiver exists for state governments or agencies of a state government.*" *In re Diaz*, No. 6:02-BK-05591-ABB, 2011 WL 285643, at *2 (Bankr. M.D. Fla. Jan. 25, 2011) (emphasis added).[119]  In *Diaz*, the court refused to waive the bond requirement for state government agencies, including the Florida Department of Revenue and the Virginia Department of Social Services. *Id.* at *1-2.  Similarly, the plain language of Bankruptcy Rule 8007(d) does not exempt the Canadian Appellants from posting an appeal bond.  Fed. R. Bankr. P. 8007(d); *cf.*

---

[117]  Jorgensen Decl. ¶ 27.

[118]  The U.S. Trustee raises "transparency" as a significant public interest that is allegedly undercut by the settlements.  UST Motion at 34.  However, this Court remarked on the "almost unfathomable record" developed in this case, which provided extensive transparency to all parties involved in the litigation. Modified Bench Ruling at 79-80.

[119]  The court in *Diaz* applied former Bankruptcy Rule 8005, of which current Rule 8007 "retain[s] the provisions of the former rule that permit the district court . . . to condition the granting of relief on the posting of a bond by the appellant, *except when that party is a federal government entity.*"  Fed. R. Bankr. P. 8007 advisory committee's note to 2014 amendment (emphasis added).

*Pao Tatneft v. Ukraine*, No. CV 17-582 (CKK), 2021 WL 2209460, at *3 (D.D.C. June 1, 2021) (stating that under Federal Rule of Civil Procedure 62, which includes a similar provision exempting the United States from posting an appeal bond, "with regard to foreign sovereigns, there is no hardline exception to the default rule requiring a bond to obtain a stay of execution").

66.    "[T]he party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond . . . ." *De la Fuente v. DCI Telecomms., Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003). Washington and Connecticut assert that, because "the United States Trustee has sought a stay, no bond is required,"[120] but they cite no authority to support this. As a result, they supply no proper basis for exemption from a bond. The Movant States and Canadian Appellants should not be permitted to piggyback on the federal government's exemption from the bond or security requirement.

67.    In addition, Washington and Connecticut argue that "due consideration" should be given to their "sovereign nature" and therefore "any doubts regarding a bond requirement" should be resolved in their favor.[121] In support of this argument, Washington and Connecticut cite a 1991 Texas case and a 1925 Oklahoma case that exempted Texas and Oklahoma, in their "sovereign" capacity, from a bond requirement.[122] Whatever these cases may say about a "sovereign" exemption from posting a bond in state-court proceedings, they have no applicability in this federal bankruptcy proceeding. Once again, Washington and Connecticut try to carve out a "sovereign" or "police power" exception from the normal rules applicable to all parties. But the thin reeds of

---

[120]    Wash. & Conn. Stay Motion ¶ 97.

[121]    *Id.* ¶ 99.

[122]    *Id.* (citing *State v. Approx. $2,000,000 in U.S. Currency*, 822 S.W.2d 721, 725 n.1 (Tex. App. 1991), and *Brown v. Am. Sur. Co. of N.Y.*, 110 Okla. 253, 255 (1925)).

their legal support cannot carry the weight of their extraordinary and unavailing assertions.  If Washington and Connecticut wish to test their "police power" and "sovereignty" theories on appeal, they should not do so while communities in need bear the burdens of the ongoing opioid crisis and the human and financial cost of delayed abatement dollars.  Since the Bankruptcy Rules do not exempt the Movant States and Canadian Appellants from a bond requirement, they should be required to post one if the Court grants a stay.

68.    With respect to the amount of the bond, "the court should set a bond at or near the full amount of the potential harm to the non-moving parties."  *See Adelphia Commc'ns Corp.*, 361 B.R. at 368; *see also* 10 *Collier on Bankruptcy* ¶ 8007.09 (noting that a bond should be set "in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court"); *DJK Residential, LLC*, 2008 WL 650389, at *5 (the bond should be "commensurate with the loss to the non-moving parties").  Here, the potential injury to the non-movants that must be insured by a bond include, at a minimum: (a) delays of hundreds of millions of dollars of distributions to the Creditor Trusts, including distributions that will be dedicated to opioid abatement efforts and distributions to many eligible personal injury claimants, and the attendant harm to abatement efforts;[123] (b) the risk that a stay would undermine or even collapse the Shareholder Settlement and the Plan; (c) the incremental fees and expenses associated with a prolonged stay in chapter 11; and (d) the ongoing operational difficulties and challenges associated with the continued operation of the Debtors during a period of heightened uncertainty, in addition to the harms identified and

---

[123]  *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 124, 129 (S.D.N.Y. 1999) (requiring an appeal bond to include "damages resulting from the delay and/or disruption of settlement administration caused by his appeal"); *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 230 (Bankr. N.D. Tex. 2002) (including in an appeal bond "the time value of the money that the property would sell for and that Washington Mutual could then use").

demonstrated by other parties in these cases.  As a result, a substantial bond should be required from the Movant States and Canadian Appellants as a condition of any stay.

## **CONCLUSION**

For all the reasons set forth above, the Stay Motions should be denied.  Alternatively, if this Court decides to grant the Stay Motions, the Court should condition the issuance of a stay on the Movant States' and Canadian Appellants' posting of a substantial supersedeas bond.  In all events, the MSGE Group requests that the Court grant such other and further relief as this Court deems just and appropriate.

Dated: October 22, 2021                    Respectfully submitted,


                                           */s/ Kevin C. Maclay*
                                           Kevin C. Maclay, Esq. (admitted *pro hac vice*)
                                           Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
                                           Todd E. Phillips, Esq.
                                           Lucas H. Self, Esq. (admitted *pro hac vice*)
                                           CAPLIN & DRYSDALE, CHARTERED
                                           One Thomas Circle, NW, Suite 1100
                                           Washington, DC 20005
                                           Tel: (202) 862-5000
                                           Fax: (202) 429-3301
                                           kmaclay@capdale.com
                                           jliesemer@capdale.com
                                           tphillips@capdale.com
                                           lself@capdale.com

                                           *Counsel for the Multi-State Governmental
                                           Entities Group*