## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF COLIN JORGENSEN

In accordance with 28 U.S.C. § 1746, Colin Jorgensen of the Association of Arkansas Counties declares as follows:

1.      My name is Colin Jorgensen, and I am employed as Litigation Counsel for the Association of Arkansas Counties ("**AAC**"), which has its principal place of business in Little Rock, Arkansas. I have held that position continuously since June 12, 2017. I submit this declaration, in lieu of direct testimony, as the AAC's designated representative in support of the *Opposition of the Multi-State Governmental Entities Group to the Motions for Stay Pending Appeal*. Because of the nature of the Arkansas opioid epidemic, and the nature of Arkansas governments, the following discussion necessarily involves issues related to cities and towns and their officials in Arkansas, and the State of Arkansas and some of its agencies and officials.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

2.      I am over 18 years of age and competent to make this declaration.  Except as otherwise indicated herein, all the facts set forth in this declaration are offered to the best of my knowledge, information, and belief based on my personal knowledge and professional experience, my review of various documents maintained by the AAC in the ordinary course of business, various public records and information maintained by other government agencies such as the CDC and the Arkansas Drug Director's Office, and information provided to me by the AAC's management or professionals working with me or under my supervision.  This declaration describes my recollection and analysis at this time based on the information currently available to me.  It does not attempt to capture every detail of every topic addressed.  I reserve the right to revise, amend, or supplement my testimony as appropriate in my judgment to address other matters or to the extent additional or updated information becomes available to me.

3.      I am authorized to submit this declaration on behalf of the AAC and am doing so to describe the continuing harms caused by the opioid crisis to local governments and the people they represent, as well as the harms to local governments and Arkansas residents that would likely arise from any delay in the distribution of opioid abatement funds under the plan of reorganization confirmed in the above-titled case ("**Plan**").

## I.    EDUCATION AND PROFESSIONAL BACKGROUND

4.      I hold a bachelor's degree in political science and philosophy from the University of Oklahoma and a juris doctorate degree from the University of Michigan.

5.      From 2004 to 2006, I worked as an associate at Wright, Lindsey & Jennings LLP in Little Rock.

6.      From 2007 to 2017, I served as an assistant attorney general and then senior assistant attorney general in the Civil Litigation Department of the Arkansas Attorney General's

Office.  During my decade-long service in the Attorney General's Office, I acted as lead defense counsel on behalf of the state in hundreds of civil cases filed against Arkansas, with a focus on constitutional challenges in the state and federal courts, and appeals before the Arkansas Supreme Court, the United States Court of Appeals for the Eighth Circuit, and the Supreme Court of the United States.  In January 2019, the Arkansas Supreme Court appointed me to a six-year term as Chair of the Arkansas Judges and Lawyers Assistance Program Committee.

7.      I joined the AAC as its Litigation Counsel in June 2017.  In my role with the AAC, I work directly with elected officials and employees of Arkansas counties, including county judges and their employees, county sheriffs and their employees, and other elected county officials and county employees.  I represent Arkansas counties and county officials in litigation in Arkansas state court and federal court, and appellate courts.  I participate in training of county officials.  I attend and provide presentations at conferences organized for county officials and the associations of elected county officials.  I work with the Arkansas Municipal League ("**AML**") regarding issues that are relevant to Arkansas counties and cities, and I work with state officials regarding issues that are relevant to Arkansas counties and the State of Arkansas.

8.      Additionally, I have been involved in litigation filed by the State of Arkansas, its counties, and its cities and towns against opioid manufacturers and distributors, such as Purdue Pharma L.P.  I have also participated in negotiations among the State of Arkansas and its counties and cities as to the apportionment and use of abatement funds received in that litigation.  As a result, I have a working knowledge of the harms done by opioids in communities across Arkansas as well as abatement allocations and guidelines.

## II.      THE ASSOCIATION OF ARKANSAS COUNTIES

9.      The AAC is a nonprofit corporation authorized and licensed by the State of Arkansas.[2] The AAC's mission is to support and promote the idea that all elected county officials must have the opportunity to act together to solve mutual problems as a unified group.  To accomplish this goal, the AAC provides a single source of cooperative support and information for all 75 Arkansas counties, and for county and district officials in Arkansas.  The AAC provides general research, education programs, legislative representation, training, on-site assistance, various publications, and conferences and seminars for county governments and officials.  The overall purpose of the AAC is to work for the improvement of county government in Arkansas.

10.      The AAC serves as a repository of information and best practices for the counties. Because it collects information from and distributes information to all 75 of Arkansas's counties, the AAC is uniquely situated to comment on the continuing challenges faced by local governments in responding to the opioid crisis and the urgent need for abatement funding.

## III.     THE OPIOID EPIDEMIC IN ARKANSAS

11.      Arkansas has been one of the states most heavily impacted by the opioid epidemic. In fact, Arkansas has had the second highest opioid prescription rate in the country across multiple years, with doctors writing 114.6 opioid prescriptions for every 100 Arkansans in 2016, while the national rate was 66.5 prescriptions per 100 persons.[3] In 2017, the national rate was 58.7 opioid prescriptions per 100 persons, while Arkansas maintained the second highest opioid prescription

---

[2]    *See* Ark. Code Ann.. § 14-20-107 (providing that the AAC is a nonprofit corporation under Arkansas law; that Arkansas counties may participate in the services provided by the AAC by appropriating county funds to the AAC; and that the AAC "is recognized as the official agency of the counties of this state"); *id.* § 19-8-303(1) & (2) (providing that "local government association" shall mean "the Association of Arkansas Counties," among others); *id.* § 24-4-101(14)(A) (AAC employees are "county employees" under Arkansas law).

[3]    Centers for Disease Control and Prevention, *U.S. State Prescribing Rates, 2016* (updated July 31, 2017), *available at* https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.

rate in the country at 105.4 prescriptions per 100 persons.[4]  In less than five years, Arkansas's

opioid prescription rates surged from eighth-most in the nation to second.[5]  Drug companies sold

235,934,613 opioid pills across the State in 2016, making opioids both the top-selling class of

prescription drug in Arkansas and more than twice as prevalent as the next highest-selling

prescription drug class.[6]  Drug companies have sold enough opioids in Arkansas for every man,

woman, and child to each take 80 pills per year.[7]

12.     According to the CDC, opioids "are currently the main driver of drug overdose

deaths" in the United States.[8]  In Arkansas, overdose deaths ballooned 262% from 5.1 per 100,000

citizens in the year 2000 to 13.4 per 100,000 in 2016.[9]  From 2013 to 2015, 1,067 people died from

drug overdose deaths in Arkansas, and at least half of those deaths were opioid-related.[10]  The

most recent three years have been worse.  In 2018 alone, Arkansas saw the number of drug

overdose deaths rise to 444.[11]  Although Arkansas' drug overdose deaths decreased slightly in

---

[4]    Centers for Disease Control and Prevention, *U.S. State Prescribing Rates, 2017, available at* https://www.cdc.gov/drugoverdose/maps/rxstate2017.html.

[5]    *Compare* Centers for Disease Control, *supra* note 14 *with* Centers for Disease Control and Prevention, *Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines, United States, 2012,* 63 Morbidity and Mortality Weekly Report 563 (July 4, 2014), *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6326a2.htm.

[6]    Arkansas Department of Health, *Prescription Monitoring Program Annual Report January-December 2016, available at* http://www.arkansaspmp.com/files/2017/2016_Annual_Report_FINAL.pdf.

[7]    Wesley Brown, *Arkansas at front line of U.S. opioid epidemic,* TALK BUSINESS & POLITICS (Sept. 13, 2017), *available at* https://talkbusiness.net/2017/09/arkansas-at-front-line-of-u-s-opioid-epidemic.

[8]    https://www.cdc.gov/drugoverdose/deaths/index.html.

[9]    Nate Smith, M.D., M.P.H., Arkansas Department of Health, *Opioid Prescribing in Arkansas* (July 10, 2017)                                              *available                                              at* http://www.arkleg.state.ar.us/assembly/2017/Meeting%20Attachments/430/I15851/Opioid%20Handout-Nate%20 Smith.pdf.

[10]    Wesley Brown, *Arkansas prescription drug crisis worsens, President Trump addresses national opioid epidemic*, TALK BUSINESS & POLITICS, *available at* https://talkbusiness.net/2017/08/arkansas-prescription-drug-crisis-worsens-president-trump-addresses-national-opioid-epidemic/.

[11]    Centers for Disease Control and Prevention, *2018 Drug Overdose Death Rates, available at* https://www.cdc.gov/drugoverdose/deaths/2018.html.

2019 to 388,[12] overdose deaths in 2020 reportedly rose 40% to their highest level ever, 515 deaths.[13] While drug overdoses killed a record number of Americans in 2020, drug overdoses also killed a record number of Arkansans in 2020—by a larger margin.

13.    It is widely understood that drug overdose deaths are underreported in Arkansas. Arkansas is approximately 1% of the U.S. population.[14] Multiplying Arkansas's deaths by 100, one would expect 51,500 overdose deaths nationwide in 2020. But the CDC estimated that U.S. drug overdose deaths in 2020 were 93,331, an increase of 30% over the previous year.[15] Significantly, Arkansas overdose deaths reportedly rose to 515, despite that number representing barely more than half of the 933 deaths that would be attributed to Arkansas if the U.S. estimate were distributed proportionally across all States. Since Arkansas is one of the states most affected by opioid over-prescription, there is reason to be skeptical that only 515 overdose deaths occurred in Arkansas in 2020.

14.    In the fall of 2017, shortly after I joined the AAC, the AAC organized and convened a task force regarding the opioid epidemic in Arkansas. After due deliberation on the Arkansas opioid epidemic and the issues and strategies involved in responding to it, the task force unanimously recommended that Arkansas governments pursue litigation against opioid

---

[12]    Centers for Disease Control and Prevention, *2019 Drug Overdose Death Rates, available at* https://www.cdc.gov/drugoverdose/deaths/2019.html.

[13]    Teresa Moss, *CDC: Overdose Deaths Rise in Arkansas*, ARKANSAS DEMOCRAT GAZETTE, (July 18, 2021) *available at* https://www.arkansasonline.com/news/2021/jul/18/cdc-overdose-deaths-rise-in-state/?news-arkansas#:~:text=Overdose%20deaths%20in%20Arkansas%20are%20estimated%20to%20have,during%202020%2C%20with%20363%20people%20dying%20in%202019.

[14]    Arkansas's population was approximately three million in 2020, compared to a U.S. population of approximately 331 million (or 0.9% of the U.S. population).

[15]    Centers for Disease Control and Prevention, *Drug Overdose Deaths in the U.S. up 30% in 2020*, *available* at https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20210714.htm.

pharmaceutical companies, including Purdue Pharma L.P., in order to obtain monetary recoveries to support abatement strategies and resources.

15.    The AAC worked with the AML to assemble a team of attorneys and law firms, including AAC in-house counsel (me), AML in-house counsel, and outside counsel, to offer representation of Arkansas counties and cities in opioid litigation.  We worked with county and city officials across several months to obtain authority to pursue litigation on behalf of Arkansas counties and cities.  By the time we filed the original complaint in the counties' litigation in Arkansas state court, the AAC represented 72 of the 75 Arkansas counties, and those 72 Arkansas counties joined together as co-plaintiffs along with the State of Arkansas and 16 of the highest-population cities in Arkansas, in a unified lawsuit against over 50 opioid manufacturers, distributors, and other defendants.  The original complaint was filed on March 15, 2018.  The case remains on file today as *Chrestman et al. v. Cephalon et al.*, Crittenden County Circuit Court No. 18CV-18-268.  All 75 Arkansas counties are plaintiffs in this single case.  The Purdue entities have been severed from the case due to their chapter 11 bankruptcy.

## IV.    STRAIN ON LOCAL GOVERNMENTS

16.    In Arkansas, the burden of responding to the opioid crisis falls disproportionately on local governments, including the counties represented by the AAC.  While pursuing litigation on behalf of Arkansas counties, I have also done what I can to assist county officials in Arkansas with their ongoing response to the opioid epidemic.  I have learned that the challenges of the epidemic across Arkansas are intense and severe, and the impact is felt most intensely and severely at the local level—by first responders, communities, families, and addicts.  In Arkansas, roughly 80% of law enforcement agencies and officers are local[16]—county sheriff departments and their

---

[16]    *See* July 2011 DOJ Bureau of Justice Statistics census of state and local law enforcement agencies conducted from 2004 to 2008.  According to the DOJ census, in 2008, Arkansas had 367 law-enforcement

deputies, and city police departments and their officers. The 911 system in Arkansas is operated by a network of county and city agencies and officials. EMS services are provided directly by local governments, or through contracts with local EMS organizations. Fire departments are local, and often volunteer, organizations. When an Arkansan calls 911, every responder—from dispatch to law enforcement to EMS and fire departments—is typically a person employed by and acting on behalf of a local government. These services continue to be strained by the opioid crisis.

17.    Additional local officials are often involved after first responders, from local medical facilities such as county health departments and crisis stabilization units, to county jails. For addicts who cycle through the criminal justice system repeatedly, interaction with the detention system typically occurs in county jails where arrestees are taken upon arrest for pre-trial detention, and where detainees serve misdemeanor sentences. The county jails have seen an increase in population that is, in large part, attributable to the opioid epidemic, and the increase strains resources. At the same time, the jails lack the resources to provide detainees suffering from opioid addiction with the type of long-term treatment necessary to curb their addiction.

18.    Additionally, Arkansas counties and cities are further strained in a variety of ways directly related to the opioid crisis, including, but not limited to, law enforcement and court action concerning increases in juvenile delinquencies, dependent-neglected juveniles, and families in need of services, and a dramatic increase in the number of involuntary commitments.

19.    The opioid crisis presents a catch-22 for the counties: forced to spend ever-increasing sums on required services because of the opioid crisis, counties are unable to dedicate

---

agencies with 11,165 full-time employees, including 6,779 sworn officers. City police in Arkansas had 252 agencies, 5,101 employees, and 3,924 sworn officers. County sheriff's departments had 75 agencies, 3,637 employees, and 1,577 sworn officers. Thus, counties and cities combined represented 89% of the law-enforcement agencies of Arkansas, 78% of full-time law enforcement employees in Arkansas, and 81% of all sworn law-enforcement officers in Arkansas—with state and federal law enforcement agencies and personnel filling the remainder.

funds to robust abatement programs that could, over the long-term, reduce the strain caused by opioids. Without adequate funding for abatement, the opioid crisis will continue to plague Arkansas counties and their residents for many years to come.

## V.    NEED FOR OPIOID ABATEMENT AT THE LOCAL LEVEL

20.    The more money that can be spent on abatement and the sooner that money is spent, the more lives the counties and cities can save. Funding from this Plan will help end the vicious cycle of counties and cities being forced to spend more money to respond to the opioid crisis, leaving little to no money available to abate the crisis.

21.    Arkansas counties, cities, and their first responders have helped implement abatement programs that have shown promise, including a statewide program where first responders carry naloxone, an opioid-antagonist drug that can rapidly reverse the effects of an overdose. Attached to this declaration as **Exhibit 1** is a document entitled Arkansas Naloxone Saves Program Report, a 35-slide presentation that Arkansas State Drug Director Kirk Lane prepared earlier this year. The Arkansas Naloxone Program distributes naloxone and provides overdose/naloxone training to first responders in Arkansas, including local law enforcement agencies, rural fire and EMS organizations, school nurses, and treatment and recovery center personnel. Ex. 1, at 2. The data underlying the documented "saves" of the Program shows an increasing number of saves in an increasing number of counties across Arkansas, from 48 saves in six Arkansas counties in 2017, to nearly 400 saves in 30 Arkansas counties in 2020. *Id*. at 3.

22.    The trends in the Arkansas Naloxone Program are an excellent example of what local law enforcement and local first responders can do to save lives with adequate resources. Unfortunately, the Program relies primarily on uncertain and inadequate grant funding, which reliable and ample funding could ameliorate. If we had enough funding to equip all first responders

in all corners of the state with naloxone, and give naloxone directly to addicts and those close to addicts, more lives would be saved.  If we had enough funding to provide syringe services and other recommended interventions, more lives would be saved.  If we had enough funding to pair immediate interventions with short-term diversion programs and long-term treatment programs, we could reduce the number of repeat overdoses.  And more lives would be saved.  And some of those saves would lead to stable recovery—not only lives saved, but lives reborn.

23.    Local government officials have repeated, day-to-day interactions with their residents that are key to successful abatement programs.  By and large, elected county officials and county employees have a firsthand understanding of how the opioid epidemic is affecting their communities, and this can lead to targeted, effective abatement.  The consequences of the epidemic have hit close to home for these individuals.  County and city officials are not only the first responders in this epidemic; they know and feel the effects of the epidemic.  They have lost loved ones and friends.  Their communities and families have experienced opioid addiction.  The local leaders of Arkansas are committed to working with their communities and ensuring the efficacy of the abatement programs that they fund.  They are ready to get to work on abatement in Arkansas.

24.    Indeed, local government officials have been ready to get to work on abatement for years.  On November 6, 2017, the County Judges' Association of Arkansas ("**CJAA**"), which is a sub-group within the AAC that was formed to serve the purposes of cooperation and exchange among counties, to solve county problems, and to promote efficiencies in county government and in the office of county judge, adopted CJAA Resolution No. 2017-05 concerning the opioids crisis (attached to this declaration as **Exhibit 2**).  In doing so, the CJAA "resolved to further advance our leadership role and affirmative effort to pursue all available ways and means to address this unprecedented crisis to address: the substantial and rising incidence of heroin and opioid addiction

in Arkansas; the unprecedented fatal overdoses in Arkansas; to address the extraordinary level of adverse impacts and costs to our families, society, local communities and to our counties; and to facilitate cooperation among counties in these public purposes, as provided for by Amendment 55 of the Arkansas Constitution, Ark. Code § 14-20-108 and the expressed missions of the CJAA and AAC." Ex. 2, at 2.

25.     This resolve to intervene in the Arkansas opioid crisis will be driven by local leaders in Arkansas who desire mightily to abate the epidemic.  Many of the Core Strategies for abatement of the opioid crisis embodied within the NOAT trust distribution procedures ("**TDP**") are already being utilized in Arkansas, but without adequate funding to bring the crisis to an end—they include: use of naloxone to reverse overdoses, medically-assisted treatment, treatment for neonatal abstinence syndrome, and prevention programs.  Other Core Strategies are certainly needed but are sparsely implemented in Arkansas, including: services for pregnant and postpartum women, treatment for incarcerated persons, syringe service programs, and evidence-based data collection and analysis of effective abatement strategies.

26.     Moreover, the Approved Uses of NOAT TDP funds will provide vital services that are not sufficiently available in Arkansas, such as additional facilities and capacity for treatment for opioid use disorder; additional support services for treatment and recovery; creation of crisis stabilization units, which have been highly effective in Arkansas but are needed in greater numbers; drug courts and law enforcement addiction intervention programs; opioid takebacks and other programs to prevent diversion and misuse; and expanded training for first responders.

27.     Arkansas counties and cities need funding as soon as possible to implement programs and strategies to abate the Arkansas opioid epidemic.  A delay in the abatement funding provided under the Plan will simply perpetuate the status quo with continuing strain on Arkansas's

local governments and their residents—translating into more overdoses and more lives lost. The sooner more abatement funding can be harnessed to help local governments, the more rapidly local governments can deploy interventions and treatments that will save lives, restore families and communities, and create a post-opioid future in Arkansas. With so much at stake, delay comes at too high of a cost.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

EXECUTED this 20th day of October, 2021

Colin Jorgensen

# **EXHIBIT 1**

# ARKANSAS NALOXONE SAVES PROGRAM REPORT

Office of State

Drug Director



- The Arkansas Naloxone Program was developed to train and equip first responders in communities with life-saving naloxone to stop an opioid overdose.  It is the result of  number of Federal, State and Corporate funding opportunities, along with a great partnership with the Criminal Justice Institute (CJI).  First responders consist of Law Enforcement, Fire, EMS, Treatment and Recovery Center personnel, and School Nurses, all of which have a high propensity to come into contact with those that may be experiencing an opioid overdose. The program also trains community members on health literacy regarding opioids and provides the NARCANSAS app to all Arkansans



# 2017 SAVES PER LOCATION



2017 - 48 lives saved from overdose

Top 5 Location  Breakdown:

Little Rock: 18 saved

North Little Rock: 8 saved

Batesville: 5 saved

Jacksonville: 3 saved

Maumelle: 3 saved



Pulaski County – 36 saves

Independence County – 7 saves

Montgomery County – 2 saves

Ouachita County – 1save

Saline County – 1 save

White County – 1 save

# 2017 SAVES BY COUNTY



2018 – 145 lives saved from overdose

Top 5 Location Breakdown:

Little Rock: 75 saved

North Little Rock: 8 saved

Jacksonville: 7 saved

Hot Springs: 7 saved

Jonesboro: 7 saved

# 2018 SAVES PER LOCATION



Pulaski – 92 saves

Craighead – 8 saves

Garland – 7 saves

Saline – 4 saves

Washington – 4 saves

Independence – 4 saves

Johnson – 3 saves

Crittenden – 3 saves

Crawford – 3 saves

Faulkner  – 3 saves

Lonoke – 3 saves

Baxter – 2 saves

Pope – 2 saves

Benton – 2 saves

Fulton – 1 save

Conway – 1 save

Izard – 1 save

Scott – 1 save

Miller – 1 save

# 2018 SAVES BY COUNTY



2019 - 185 lives saved from overdose

Top 5 Location Breakdown:

Little Rock: 58 saved

Jonesboro: 13 saved

Hot Springs: 14 saved

Conway: 9 saved

North Little Rock: 9 saved

# 2019 SAVES PER LOCATION



Pulaski – 71 saves

Garland – 13 saves

Craighead – 13 saves

Faulkner – 10 saves

Saline – 11 saves

Benton – 8 saves

Washington – 7 saves

Baxter – 6 saves

Crittenden – 5 saves

Lonoke – 8 saves

Franklin – 3 saves

Sebastian – 4 saves

Crawford – 3 saves

Greene – 3 saves

Independence – 2 saves

Marion – 1 save

Boone – 1 save

Poinsett – 2 save

Johnson – 1 save

Miller – 1 save

Jefferson – 1 save

# 2019 SAVES BY COUNTY



2020 - 369 lives saved from overdose

Top 5 Location Breakdown:

Little Rock: 96 saved

North Little Rock: 41 saved

Hot Springs: 30 saved

Jonesboro: 30 saved

Cabot: 22 saved

# 2020 SAVES PER LOCATION



# 2020 SAVES BY COUNTY

Pulaski – 149 saves

Craighead – 33 saves

Garland – 32 saves

Saline – 31 saves

Lonoke – 29 saves

Faulkner – 23 saves

Jefferson – 18 saves

Washington – 13 saves

Crittenden – 6 saves

Greene – 6 saves

Miller – 5 saves

Baxter – 4 saves

Independence – 4 saves

Pope – 4 saves

White – 4 saves

Benton – 3 saves

Poinsett – 3 saves

Sebastian – 5 saves

Crawford – 2 saves

Johnson – 2 saves

Sharp – 2 saves

Boone – 1 save

Clark – 1 save

Cleburne – 1 save

Drew – 1 save

Jackson – 1 save

Logan – 1 save

Mississippi – 1 save

Van Buren – 1 save

Yell – 1 save









# OVERALL BREAKDOWN BY MONTH











2017 Saves by Month
18
16
14
12
10
8
6
4
2
0
Saves
Jan Feb Mar Apr May June July Aug Sept Oct Nov Dec
2017 0 1 1 3 5 2 2 4 4 2 7 17
Month

2018 Saves by Month
18
16
14
12
10
8
6
4
2
0
Saves
Jan Feb Mar Apr May June July Aug Sept Oct Nov Dec
2018 9 10 10 10 16 13 13 10 15 14 16 8
Month

2019 Saves by Month
30
25
20
15
10
5
0
Saves
Jan Feb Mar Apr May June July Aug Sept Oct Nov Dec
Series1 13 11 20 15 10 12 12 18 19 24 16 15
Month

2020 Saves by Month
50
45
40
35
30
25
20
15
10
5
0
Saves
Jan Feb Mar Apr May June July Aug Sept Oct Nov Dec
Series1 23 22 21 36 39 46 44 40 30 27 34 29
Month

# SUICIDE ATTEMPT DATA:





# 2017 - 2020 MONTHLY COMPARISON: SUICIDE ATTEMPT OVERDOSES

# 2017 - 2020 WEEKDAY COMPARISON: SUICIDE ATTEMPT OVERDOSES



# GENDER DATA:



2017 Saves by Gender:

Total saves = 48
- Males saved: 33 (69%)
- Female saved: 15 (31%)



2018 Saves by Gender:

Total saves = 145

- Males saved: 96 (66%)

- Female saved: 49 (34%)



2019 Saves by Gender

Total saves = 185

- Males saved: 104 (56%)

- Females saved: 82 (44%)



2020 Saves by Gender

Total saves = 391

- Males saved: 254 (65%)

- Females saved: 131 (35%)



# AGE DATA:



# 2017 BREAKDOWN BY AGE



In 2017, 48 people were saved from an overdose death

1 was 19 or below

33 were 20 – 39

12 were 40 - 49

2 were 60 – 79

The youngest was 18, the oldest was 63.

# 2018 BREAKDOWN BY AGE



In 2018, 145 people were saved from an overdose death

12 were 19 or below

104 were 20 – 39

22 were 40 - 49

4 were 60 – 79

4 were undisclosed

The youngest was 12, the oldest was 63.

# 2019 BREAKDOWN BY AGE



In 2019, 185 people were saved from an overdose death

9 were 19 or below

125 were 20 – 39

40 were 40 - 49

11 were 60 – 79

0 were undisclosed

The youngest was 15, the oldest was 77.

# 2020 BREAKDOWN BY AGE



In 2020, 391 people were saved from an overdose death

15 were 19 or below

262 were 20 – 39

101 were 40 - 49

14 were 60 – 79

0 was undisclosed

The youngest was 13, the oldest was 80.

# RACE DATA:



Breakdown of Saves by Race:

- 666 were Caucasian

- 77 were African-American

- 23 were Hispanic

- 2 were Asian

- 1 was Undisclosed





# EMS NALOXONE DATA

Source: Arkansas Department of Health



# 2019 Total EMS Naloxone Administrations
## Arkansas State Total: 2,420





# Total EMS Naloxone Administrations by Year





# 2019 EMS Naloxone Rate per 100,000 Persons

## Arkansas State Rate: 80.2







# Kirk Lane

Arkansas Drug Director

Office: 501-618-8690

Email: kirk.lane@asp.arkansas.gov

# **<u>EXHIBIT 2</u>**

# CJAA RESOLUTION NO. 2017-05

BE IT RESOLVED BY THE COUNTY JUDGES' ASSOCIATION OF ARKANSAS:

***Whereas***, there's a national health emergency concerning overdoses of opioids; 64,000 Americans died from overdoses in 2016; and on average that's 175 deaths in the United States per day;

***Whereas***, according to the U.S Centers for Disease Control and Prevention in 2016 Arkansas ranked 2nd in the nation behind Alabama in the rate of opioids prescribed, 114.6 per 100 residents; the rate in Arkansas is substantially higher than the national rate of 66.5 per hundred;

***Whereas***, on October 10th, 2017, the Association of Arkansas Counties ("AAC") formed an Opioid Task Force to address the substantial and rising incidence of heroin and opioid addiction and fatal overdoses;

***Whereas***, the impact and costs are incredibly high to families, our society, local communities and counties;

***Whereas***, Arkansas Counties have incurred and will incur in the future substantial expenses and allocation of resources for: the jail, law enforcement, the courts and other county services and operations;

***Whereas***, on October 26, 2017, the President of the United States declared the opioid crisis to be a public health emergency;

***Whereas***, Amendment 55 of the Arkansas Constitution provides that counties may contract, cooperate or join with other counties for public purposes;

***Whereas***, the CJAA was formed to serve the purposes of cooperation and exchange among counties, to solve county problems, and to promote efficiencies in county government and in the office of county judge;

***Whereas***, the Association of Arkansas Counties ("AAC") was recognized by the General Assembly pursuant to Act 92 of 1968, Ark. Code § 14-20-108, and other subsequent acts of Arkansas, as the official agency of the counites of the State of Arkansas and vested with the continual mission to study ways and means to improve county government;

1

*Whereas*, the CJAA and AAC have recently taken an affirmative leadership role in calling for the creation, funding and partnership in the creation of crisis stabilization units in Arkansas for the mentally ill and low-level offenders;

*Whereas*, the CJAA recognizes the unprecedented magnitude of the opioid crisis nationally and in Arkansas; the unprecedented responsibility of the CJAA and our member counties to pursue all available ways and means to address the crisis, the substantial and rising incidence of heroin and opioid addiction, the fatal overdoses; and to address the substantial adverse impacts and costs to our families, society, local communities and to our counties.

*Whereas*, this crisis is of this unprecedented magnitude and should best be addressed by virtue of cooperation and collective action by the CJAA and our member counties.

*Now Therefore*, the COUNTY JUDGES ASSOCIATION OF ARKANSAS, are resolved to further advance our leadership role and affirmative effort to pursue all available ways and means to address this unprecedented crisis to address: the substantial and rising incidence of heroin and opioid addiction in Arkansas; the unprecedented fatal overdoses in Arkansas; to address the extraordinary level of adverse impacts and costs to our families, society, local communities and to our counties; and to facilitate cooperation among counties in these public purposes, as provided for by Amendment 55 of the Arkansas Constitution, Ark. Code § 14-20-108 and the expressed missions of the CJAA and AAC.

APPROVED:

HON. Frank Weaver
CJAA PRESIDENT

DATE: Nov. 6, 2017