UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                  :

In re                                  :        Chapter 11
                                  :

PURDUE PHARMA L.P., *et al.*,         :        Case No. 19-23649 (RDD)
                                  :

                      Debtors.    :        Jointly Administered
                                  :

------------------------------------------------------- x

### REPLY IN SUPPORT OF UNITED STATES TRUSTEE'S AMENDED EXPEDITED MOTION FOR A STAY OF CONFIRMATION ORDER AND RELATED ORDERS PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
MELANIE D. HENDRY
BETH A. LEVENE
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax:  (202) 307-2397

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY  10014
(212) 510-0500
Fax:  (212) 668-2361

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

ADDITIONAL BACKROUND ....................................................................................... 3

I.     The District Court Has Entered an Expedited Schedule and Recognized the
       Importance of the Issues on Appeal. ................................................................... 3

II.    The Debtors Have Refused to Stipulate Even to a Limited Stay, Despite this
       Court's Encouragement. ....................................................................................... 5

III.   The Debtors Have Made Clear They Plan to Argue Equitable Mootness Based Not
       Just on the Plan's Effective Date, But on the Pre-Effective Date Criminal
       Sentencing. ............................................................................................................ 7

ARGUMENT .................................................................................................................. 8

I.     Denying a Stay Will Cause Irreparable Harm and Harm to the Public Interest. ... 9

       A.     Denying a Stay Will Cause Irreparable Injury. ......................................... 9

       B.     The Public Interest Favors a Stay. .......................................................... 18

       C.     The Advance Order Still Raises Concerns. ............................................. 24

II.    The Irreparable Injury from Denying a Stay and Permanently Extinguishing Direct
       Claims Against Non-Debtors Outweighs Any Delay from Obtaining Appellate
       Review. ............................................................................................................... 25

III.   The United States Trustee Has a Likelihood of Success on Appeal. .................. 30

       A.     This Court Need Not Find that It Erred for Stay Movants to Meet the
              Likelihood-of-Success Prong. ................................................................. 30

       B.     The Plan Runs Afoul of the Constitution. ............................................... 31

              1.     The Non-Debtor Releases Violate the Due Process Clause. ........... 31

              2.     The Non-Debtor Releases Are Beyond the Scope of the Bankruptcy
                     Clause. ......................................................................................... 36

              3.     The Termination of Non-Debtor Claims Against Non-Debtors
                     Exceeds the Constitutional Authority of this Court. ..................... 38

       C.     The Bankruptcy Relief Accorded the Non-Debtors Is Not Permitted by the
              Bankruptcy Code or Second Circuit Precedent. ...................................... 39

IV.    No Bond May Be Required of the United States Trustee. .................................. 45

V.     This Court Has Authority to Enter a Stay Until All Appeals Are Resolved, But
       Should at a Minimum Grant a Stay Until the District Court Has Ruled .............. 46

CONCLUSION ............................................................................................................. 48

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007) .......................................................................... *passim*

*Adams v. Zarnel (In re Zarnel)*,
    619 F.3d 156 (2d Cir. 2010) ........................................................................................19

*In re Ahmed*,
    420 B.R. 518 (Bankr. C.D. Cal. 2010) ........................................................................45

*In re Baker*,
    No. 05-3487, 2005 WL 2105802 (E.D.N.Y 2005) ......................................................10

*Baraket v. Holder*,
    632 F.3d 56 (2d Cir. 2011) ..........................................................................................40

*In re Bd. of Dirs. of Multicanal S.A.*,
    2005 Bankr. LEXIS 1865 (Bankr. S.D.N.Y. Jan. 6, 2005) ........................................10

*Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau)*,
    135 B.R. 209 (N.D.N.Y. 1992) ...................................................................................10

*In re Bernard L. Madoff Inv. Secs. LLC*,
    740 F.3d 81 (2d Cir. 2014) ..........................................................................13, 42, 43

*In re Calpine Corp.*,
    No. 05-60200, 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ...........................10

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ....................................................................................................14

*Central Va. Cmty. Coll. v. Katz*,
    546 U.S. 356 (2006) ....................................................................................................37

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ..........................................................................................30

*In re Columbia Gas Sys., Inc.*,
    33 F.3d 294 (3d Cir. 1994) ..........................................................................................19

*Commonwealth v. Purdue Pharma, L.P.*,
    No. 1884CV01808, 2019 WL 6497887 (Mass. Super. Nov. 6, 2019) ........................14

*Corbett v. Manson*,
    903 A.2d 60 (Pa. Cmwlth. 2006) ........................................................................13

*Country Squire Assocs. of Carle Place, L.P. v. Rochester Cmty. Sav. Bank*,
    203 B.R. 182 (B.A.P. 2d Cir. 1996)......................................................................9

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)..................................................................................12, 20

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 717 (Bankr. S.D.N.Y. 1992)............................................................22, 42

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)...............................................................................31

*Francis v. City of New York*,
    235 F.3d 763 (2d Cir. 2000)..............................................................................41

*In re General Motors Corp.*,
    409 B.R. 24 (Bankr. S.D.N.Y. 2009) ..................................................................10

*In re Glo-Tex Intern.*,
    No. 07-06449, 2010 WL 4916574 (Bankr. D.S.C. Nov. 30, 2010) .........................15

*Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ..........................................................................18

*Hartman v. Sackler*,
    Case No. 21-02001 (E.D. Pa. filed Apr. 30, 2021) ...................................13, 17, 18

*Heden v. Johnson & Johnson*,
    No. 19-00586 (D.R.I. filed Nov. 12, 2019)..........................................................15

*Hickey v. Purdue Pharma, et al.*,
    Case No. 19-11806 (D. Mass. filed Aug. 22, 2019) ........................................13, 14

*In re Johns-Manville Corp.*,
    517 F.3d 52 (2d Cir. 2008), *rev'd and remanded on other grounds sub nom.*
    *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)......................................13, 42

*In re Johns-Manville Corp.*,
    600 F.3d 135 (2d Cir. 2010)......................................................................32, 37, 38

*In re Johns-Manville Corporation*,
    551 B.R. 104 (S.D.N.Y. 2016)...........................................................................32

*Kelly v. Honeywell Int'l, Inc.*,
 933 F.3d 173 (2d Cir. 2019)................................................................................30

*In re Kirwan Offs. S.a.r.l.*,
 592 B.R. 489 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan
 Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019).....................................36, 37, 38, 39

*In re Kobra Properties*,
 406 B.R. 396 (Bankr. E.D. Cal. 2009) .................................................................22

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
 478 U.S. 501 (1986)............................................................................................33

*Lutin v. United States Bankr. Court for the S.D.N.Y. (In re Advanced Mining Sys.,
 Inc.)*,
 173 B.R. 467 (S.D.N.Y. 1994)...........................................................................10

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
 837 F.2d 89 (2d Cir. 1988)..........................................................................40, 42

*Map to Health v. AmerisourceBergen Drug Corp.*,
 No. 21-45093 (N.D. Ohio filed July 15, 2021) .....................................................14

*Menges v. Knudsen*,
 No. CV 20-178, --- F. Supp. 3d --- .....................................................................21

*Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*,
 No. 18-46070 (N.D. Ohio filed Mar. 15, 2019) ....................................................14

*In re Metromedia Fiber Network, Inc.*,
 416 F.3d 136 (2d Cir. 2005)...................................................................... *passim*

*Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 136 (3d Cir. 2019), *cert. denied
 sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805
 (2020)................................................................................................................36

*Mohamed v. Reno*,
 309 F.3d 95 (2d Cir. 2002)...............................................................................9, 31

*Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*,
 898 F.2d 498 (6th Cir. 1990) ..............................................................................19

*Mountain Empire Oil Co., Inc. v. Callahan (In re Lambert Oil Co., Inc.)*,
 375 B.R. 197 (W.D. Va. 2007) .............................................................................47

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*,
 354 F.3d 249 (4th Cir. 2003) ..............................................................................21

*Nken v. Holder*,
   556 U.S. 418 (2009).............................................................................................30

*O&K Trojan, Inc. v. Municipal & Contractors Equip. Corp.*,
   751 F. Supp. 431 (S.D.N.Y. 1990) ......................................................................14

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)........................................................................................32, 42

*Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*,
   721 F.3d 54 (2d Cir. 2014)....................................................................................14

*In re Plaza de Diego Shopping Ctr., Inc.*,
   911 F.2d 820 (1st Cir. 1990)..................................................................................19

*In re Quigley Co.*,
   676 F.3d 45 (2d Cir. 2012)..............................................................................42, 43

*Railway Lab. Executives' Ass'n v. Gibbons*,
   455 U.S. 457 (1982)................................................................................................37

*Range v. 480-486 Broadway, LLC*,
   810 F.3d 108 (2d Cir. 2015)..................................................................................47

*Rhodes v. Rhodes Techs., Inc.*,
   No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019) ...............................................15

*In re RMAA Real Estate Holdings, LLC*,
   No. 10-16505, 2010 WL 3632706 (Bankr. E.D. Va. Sept. 10, 2010)....................46

*S.E.C. v. Mgmt. Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975)..................................................................................19

*S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition, Inc.)*,
   817 F.2d 1142 (5th Cir. 1987) ..............................................................................47

*In re Sabine Oil & Gas Corp.*,
   548 B.R. 674 (Bankr. S.D.N.Y. 2016) .............................................................10, 31

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
   960 F.2d 285 (2d Cir. 1992)..................................................................................42

*In re St. Johnsbury Trucking Co.*,
   185 B.R. 687 (S.D.N.Y. 1995)......................................................................10, 25, 26

*Stern v. Marshall*,
    564 U.S. 462 (2011)...................................................................................36, 37, 38

*The New York Times Co. v. Dept. of Health & Human Servs.*,
    No. 20-3063, 2021 WL 235138 (S.D.N.Y. Jan. 25, 2021)..................................9, 31

*Tilley v. Purdue Pharma L.P.*,
    No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019)......................................................15

*Triple Net Inv. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,
    No. 08-07375, 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008)....................................10

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017)................................................................................43, 44

*Trump v. Deutsche Bank AG*,
    943 F.3d 627 (2d Cir. 2019), *vacated on other grounds by Trump v. Mazars*
    *USA, LLP*, 140 S. Ct. 2019 (2020)........................................................................30

*U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc. (In re Windstream Holdings,*
    *Inc.)*,
    Nos. 20-4276, 20-5440, 20-5529, 2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020) ...................10

*United States Trustee v. Clark (In re Clark)*,
    927 F.2d 793 (4th Cir. 1991) .................................................................................19

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964)...............................................................................................33

*In re W.R. Grace Co.*,
    13 F.4th 279 (3d Cir.2021) ....................................................................................43

*In re World Trade Cntr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007)...................................................................................8

**Statutes**

11 U.S.C. § 524(g)............................................................................................39, 40, 43

11 U.S.C. § 524(g)(4)(A)(ii)..........................................................................................43

18 U.S.C. § 1961, *et seq*..............................................................................................14

28 U.S.C. § 157.............................................................................................................37

28 U.S.C. § 581.............................................................................................................45

28 U.S.C. § 1334(b).......................................................................................................37

28 U.S.C. § 2408 ................................................................................................45

Bankruptcy Reform Act of 1994, 108 Stat. 4117 (1994) ..................................40

Pennsylvania Unfair Trade Practices Act, 73 P.S. § 201-2(4) ..........................13

**Other Authorities**

Asbestos Injury Compensation, GAO Report No. 11-819 ..................................40

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
    § 2948.1 (3d ed. updated 2021) ...................................................................20

1 Collier on Bankruptcy ¶ 6.01 .........................................................................19

Fed. R. Bankr. P. 2019 ........................................................................................23

Fed. R. Bankr. P. 3020 .......................................................................................3, 4

Fed. R. Bankr. P. 8005 ........................................................................................46

Fed. R. Bankr. P. 8007 ............................................................................1, 45, 46

Fed. R. Bankr. P. 8007(a)(1) ..............................................................................46

Fed. R. Bankr. P. 8007(b)(1) ..............................................................................46

Fed. R. Bankr. P. 8007(c) ...................................................................................45

Fed. R. Bankr. P. 8007(d) ...................................................................................45

Fed. R. Bankr. P. 8017(a)(1) ..............................................................................46

Fed. R. Bankr. P. 8025 ...................................................................................46, 47

Fed. R. Bankr. P. 8025(a), (c) .............................................................................47

Fed. R. Bankr. P. 9019 ........................................................................................33

Fed. R. Civ. P. 23 ................................................................................................42

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...........20

TO:    **THE HONORABLE ROBERT D. DRAIN,**
       **UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States

Trustee"), hereby respectfully submits this reply in support of his Amended Expedited Motion

for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule

of Bankruptcy Procedure 8007 (the "Stay Motion").[1]

## <u>PRELIMINARY STATEMENT</u>

The United States Trustee's appeals raise important and recurring questions regarding the

appropriate scope of non-debtor releases in bankruptcy that should be heard on their merits,

including by the Second Circuit.  The United States Trustee acknowledges this Court's view that

the Confirmation Order accords with Second Circuit precedent.  But no Second Circuit case has

addressed non-debtor releases of such vast dimensions or the constitutional implications of such

broad releases.  Ensuring that the appeals can be heard on the merits is all the more imperative

because the Non-Debtor releases forever terminate, without consent, rights to sue the Sackler

Family and other non-debtors for the devastating harm they have caused through their own

conduct, rights that may be irretrievably lost in the absence of a stay.

The Debtors and others aligned with them (collectively, the "Stay Opponents")

nevertheless oppose any stay while making clear that they believe that both Purdue's criminal

sentencing and the occurrence of the Effective Date will equitably moot the appeals.[2]  *See, e.g.,*

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stay
Motion.

[2] And while the Debtors and other appellees have stipulated that they will not assert equitable mootness
based on any pre-Effective Date actions other than sentencing, at least four parties have filed oppositions
to the Stay Motion that have not signed that stipulation.  *See* ECF Doc. Nos. 4017 (the Ad Hoc Group of

ECF Doc. No. 4014 ¶ 1 & n.3.  The sentencing could occur as early as December 1, 2021, *id.*

¶ 13—the day after the district court is scheduled to hold argument in the appeals—and the

Effective Date will follow soon after, as early as December 8.  *Id.*; ECF Doc. No. 4002 ¶ 37;

ECF Doc. No. 4006 ¶ 3.  Thus, despite the lightning speed at which the district court appeals are

moving, the district court's ability to timely render a decision, much less any chance to proceed

to the Second Circuit, is threatened.  If the appeals were dismissed because of equitable

mootness, not only would it mean the loss of appellate review of these important issues, the

deprivation of non-debtors' rights to sue other non-debtors based on the non-consensually

released claims would become permanent.

Although a significant part of the Stay Opponents' briefs is devoted to improperly

arguing the potential harm that would ensue if the Confirmation Order is overturned on appeal,

their primary argument is based on harm from delay that a stay may cause.  Everyone agrees that

it is far past time that the Debtors and the Sackler Family provide funds for abatement of, and

compensation to those who have suffered from, the opioid epidemic that has ravaged the nation

because of their products.  Whether and how they will do so has been the subject of litigation

since before the Debtors filed for bankruptcy over two years ago.  Yet, further delaying that

relief, the Sackler Family insisted on a non-debtor release that they knew was objectionable and

would be appealed.  They knew this so well that over two pages of the Shareholder Settlement

Agreement are devoted to addressing what would happen during an appeal.  ECF Doc. No. 3711

at 86-88.[3]  Meanwhile, the United States Trustee and the other appellants are doing all they can

---

Hospitals), 4003 (the Native American Tribe Group), 4010 (the Private Insurance Ratepayers, 4011 (the
Blue Cross and Blue Shield Association).

[3] Cited page numbers refer to the ECF pagination at the top of the referenced document.

to minimize delay, rendering the Stay Opponents' claims that a delay may last years speculative at best, especially given the district court's expedited schedule.

The Constitution and the Bankruptcy Code limit what relief may be provided through bankruptcy—and who may benefit from that relief. The Sackler Family's insistence on withholding a portion of their vast fortune unless they get the releases they want does not alter those limits. Nor does the constitutionality and legality of the relief granted hinge on whether certain sophisticated parties in the case view the relief as a good deal. And despite some parties' misguided attempts to distort the United States Trustee's role, it is his congressionally mandated duty to prevent parties in bankruptcy cases from transgressing the limits of the law.

### ADDITIONAL BACKROUND

I.    **The District Court Has Entered an Expedited Schedule and Recognized the Importance of the Issues on Appeal.**

Since the United States Trustee filed the Stay Motion, the district court has set an expedited schedule, albeit on a slower schedule than proposed by the United States Trustee, under which briefing will be completed by November 22, 2021, and argument will be heard about a week later on November 30, 2021.

In addition, because the hearing in this Court on the Stay Motion was set for a date after the Rule 3020 automatic stay of the Confirmation Order expired, the United States Trustee sought stay relief from the district court. In addressing the stay request, the district court recognized the harm from the potential for a dismissal based on equitable mootness, as well as the fact that these appeals raise "critically important issues." Case No. 21-07966, Dkt. No. 33 (Oct. 12, 2021) ("I have no intention of allowing the critically important issues on appeal to be 'equitably mooted.'").

3

In assessing the stay request, the district court described the balance of the hardships question as "thorny." Case No. 21-0769, Dkt. 48 at 10. The court "accepted the representations of the Debtors and their allies that it is imperative to do whatever can be done now so that, if confirmation of the Plan is upheld on appeal, the Estate can begin dealing with claims and desperately needed remediation measures promptly." *Id*. It acknowledged that "[d]elay matters in this case." *Id*. But it concluded that "in the end, we are speaking only of delay—delay that [the district court] has done its best to minimize by putting the parties on a rocket docket for these appeals." *Id*. Balanced against this, the district court found that "Appellants for their part raise important questions under the Constitution, the Bankruptcy Code and Second Circuit law." *Id*. Further, the district court found: "The importance of having those issues considered and decided on appeal cannot be understated. For appellants and their allies to lose that right would indeed be irreparable—not to mention inequitable." *Id*. Accordingly, the district court stated that the stay movants "have tipped the balance of hardship decidedly in their favor." *Id*.

Nevertheless, based on the Debtors' representations regarding the ministerial nature of the actions being taken before the Effective Date, and the earliest date the Effective Date could occur, the district court found that the possibility that an appeal would be found to be equitably moot did not "yet" rise to the level of irreparable injury and likely would not before this Court's November 9, 2021, hearing on the Stay Motion. *Id*. at 10, 12. The district court thus denied a stay without prejudice, but conditioned that denial on the appellees and other interested parties providing fourteen days' notice of the actual Effective Date. *Id*. at 12. The district court further conditioned its order upon all appellees providing a written stipulation that "they would not ever argue to any court that the pending appeal had been rendered equitably moot by the actions

4

undertaken in advance of the Effective Date in furtherance of carrying out the Plan, whether

pursuant to the Advance Order or the Confirmation Order."  Case No. 21-07532, Dkt. 69 at 2.

The written stipulation that was filed was signed by counsel for the Debtors, the Official

Committee of Unsecured Creditors (the "UCC"), the Ad Hoc Committee of Governmental and

Other Contingent Litigation Claimants (the "AHC"), the Multi-State Governmental Entities

Group (the "MSGE"), the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.

(the "Ad Hoc Individual Group"), the Ad Hoc Committee of NAS Children, the Mortimer-side

Initial Covered Sackler Persons, and the Raymond Sackler Family.  Case No. 21-07532, Dkt. 71.

Notably, several groups that have filed oppositions to the Stay Motion in this Court did

not sign the stipulation:  the Ad Hoc Group of Hospitals, ECF Doc. No. 4017; the Native

American Tribe Group, ECF Doc. No. 4003; the Private Insurance Ratepayers, ECF Doc. No.

4010, and the Blue Cross and Blue Shield Association, ECF Doc. No. 4011.

## II.    The Debtors Have Refused to Stipulate Even to a Limited Stay, Despite this Court's Encouragement.

In the meantime, while professing to be concerned about the depletion of assets through

attorneys' fees,[4] *e.g.,* ECF Doc. No. 4014 ¶ 30, the Debtors have nonetheless consistently

refused to agree to even a temporary stay that would avoid the need to litigate the Stay Motion—

including avoiding pending discovery—despite this Court's encouragement to do so.

On September 30, 2021, this Court stated:

It would be my wish if that schedule [for the appeal] is a reasonable one that does
not run the risk of causing enormous harm to the creditors, to have a stay through
that period or at least to have a stay through the period that everyone thinks is
necessary with a potential second look at the appellate court as to whether any

---

[4] According to the Debtors' declarant, the average fee burn in the case has been $28 million per month.
ECF Doc. No. 4015 ¶ 31.

> further stay is necessary. I think that might obviate the need for a lot of litigation
> with the stay issue.

9/30/21 Tr. at 41; *see also id.* at 41-42 ("If you can hit the sweet spot or close to the sweet spot

where at least you can reasonably predict that there will be appellate review by date X, I think

you might well consider coming together on an order that just has a stay until day X with an

opportunity to, if the Court hasn't ruled by then, if the appellate court hasn't ruled by then, go to

the appellate court and say all right, you know, I want to extend that stay.").

Following the Court's suggestion, counsel for some of the appellee States proposed terms

for an agreed stay on October 6, 2021. The Debtors' counsel responded the next day regarding

other issues but did not address this proposal. Raising the stay proposal again, counsel for the

United States Trustee replied to the Debtors' email stating that he supported the States' proposal.

The Debtors' counsel still did not respond.

Again on October 14, 2021, this Court advised that "the parties seriously consider what

judges in these situations fairly often do where there is an expedited appeal, reaching an

agreement to have a stay in place for a brief period after a ruling by Judge McMahon on the

merits of the appeal . . . ." 10/14/21 Tr. at 224.

Over a week later, on October 22, 2021, the Debtors' counsel sent a counter to the States'

proposal that, instead of an agreed stay along the lines suggested by this Court, offered that

Debtors would "not seek to emerge from chapter 11 before December 15, 2021." ECF Doc. No.

4014 ¶ 1. Two business days later, the United States Trustee responded proposing an agreed stay

until 14 days after the district court rules on the appeals.

The day before the filing of this reply, the Debtors' and their allies responded to the United States Trustee's proposal, again refusing to agree to any stay and offering instead stipulations regarding the timing of the Effective Date and the criminal sentencing.

III.    **The Debtors Have Made Clear They Plan to Argue Equitable Mootness Based Not Just on the Plan's Effective Date, But on the Pre-Effective Date Criminal Sentencing.**

Although the Debtors and others have disclaimed any argument that most pre-Effective Date actions can support a dismissal based on equitable mootness, they have indicated they will argue that the appeals have been rendered equitably moot upon the happening of either (1) the Effective Date or (2) Purdue Pharma L.P.'s criminal sentencing.

The Effective Date could occur shortly after the November 30, 2021, argument in the district court, as early as December 8, 2021.  ECF Doc. No. 4014 ¶ 13; ECF Doc. No. 4002 ¶ 37; ECF Doc. No. ¶ 3, although the Debtors have suggested it may not be before December 15, 2021, ECF Doc. No. 4014 ¶ 1.

But before the Effective Date occurs, Purdue will be criminally sentenced—and that could occur as soon as December 1, 2021, a mere day after the November 30 district court argument.  Although the district court has opined that this could not form the basis for equitable mootness, *see* Case No. 21-07532, Dkt. 69 ("I do not understand how Purdue's being sentenced could be taxed to the Debtor as an action taken in furtherance of the Plan for equitable mootness purposes."), the Debtors plainly intend to argue equitable mootness if the sentencing occurs before a decision on appeal.  *See, e.g.*, Case No. 21-07532, Dkt. No. 66 at 7 n.3 ("[T]he Appellees are not willing to waive the right to argue that sentencing . . . will render an appeal equitably moot."); *see also* ECF Doc. No. 4014 ¶ 1 & n.3.

7

The Debtors' refusal to agree that Purdue Pharma L.P.'s criminal sentencing cannot support an equitable mootness argument is exacerbated by a refusal to provide any information that would allow parties to assess the likelihood that sentencing will go forward on December 1 or some later date.  There is currently no sentencing hearing scheduled, and the United States Trustee understands that no party to the Plea Agreement has yet made a such a request.

As explained by the Debtors, the DOJ Settlement Agreement's inclusion of a minimum time after confirmation before sentencing may happen "was put into the DOJ settlement *by the Debtors for the Debtors* because we need time to get ready to emerge and obviously didn't want to be sentenced until essentially the eve of emergence." 9/30/21 Tr. at 10. *Id*. (emphasis added). The Debtors have provided no insight into when they will request a sentencing date, including: what they need to accomplish before they make such a request, what steps they are taking to accomplish those things, or when those steps will be accomplished.  Although the Debtors have stated they will provide notice of the sentencing date once scheduled, it is unclear how far in advance of sentencing that will occur or whether a stay of the Confirmation Order at that point would be too late to postpone the sentencing on which the Debtors will rely for an equitable mootness argument.

## **ARGUMENT**

The Second Circuit has held that in determining whether to grant a stay, courts should balance four factors: likelihood of success, irreparable injury in the absence of a stay, whether a stay will substantially injure other parties, and the public interest.[5] *In re World Trade Cntr.*

---

[5] Although the Debtors argue that instead of a balancing test, all four stay factors must be met, they cite no Second Circuit cases for that proposition.  ECF Doc. No. 4014 ¶ 10.  As noted by the district court, "the Second Circuit has never articulated such a rigid rule of law." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 347 (S.D.N.Y. 2007).

8

*Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007); *Mohamed v. Reno*, 309 F.3d 95, 101 (2d

Cir. 2002); *The New York Times Co. v. Dept. of Health & Human Servs.*, No. 20-3063, 2021 WL

235138, at *1 (S.D.N.Y. Jan. 25, 2021).  As demonstrated in the United States Trustee's and

other movants' opening papers, and as reflected by the district court's stay order, the balance of

the stay factors weighs in favor of granting a stay.

**I.      Denying a Stay Will Cause Irreparable Harm and Harm to the Public Interest.**

**A.      Denying a Stay Will Cause Irreparable Injury.**

The United States Trustee established in his opening brief that the denial of a stay will

cause irreparable harm both because of the risk under Second Circuit law that—despite the

United States Trustee's position that the equitable-mootness doctrine does not apply—the appeal

nevertheless will be found to be equitably moot and because absent a stay the claims

extinguished by the Non-Debtor releases will be irretrievably lost.  The Stay Opponents'

attempts to minimize these harms fail.

The ability to appeal "is a substantial and important right" because it is "the guarantee of

accountability in our judicial system."  *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In

re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (S.D.N.Y. 2007).  The mooting of an appeal

thus is a "'quintessential form of prejudice.'"  *Country Squire Assocs. of Carle Place, L.P. v.

Rochester Cmty. Sav. Bank*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (quoting *Lutin v. United

States Bankr. Court for the S.D.N.Y. (In re Advanced Mining Sys., Inc.)*, 173 B.R. 467, 469

(S.D.N.Y. 1994)); *accord Adelphia Commc'ns Corp.*, 361 B.R. at 348.

The Stay Opponents argue that even if the appeals are equitably mooted, that would not

constitute irreparable injury warranting a stay.  But the cases they cite to dismiss the harm from

equitable mootness, ECF Doc. No. 4014 ¶ 18, say nothing more than that equitable mootness

9

*alone* does not support a stay, while generally acknowledging that the risk of equitable mootness can constitute an irreparable injury. *See Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau)*, 135 B.R. 209, 215 (N.D.N.Y. 1992); *Triple Net Inv. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*, No. 08-07375, 2008 WL 650389, at *3 (S.D.N.Y. Mar. 7, 2008); *In re Baker*, No. 05-3487, 2005 WL 2105802, at *9 (E.D.N.Y 2005); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 n.1 (S.D.N.Y. 1995); *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 682 (Bankr. S.D.N.Y. 2016); *In re General Motors Corp.*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009); *In re Calpine Corp.*, No. 05-60200, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008); *In re Bd. of Dirs. of Multicanal S.A.*, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005); *cf. U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.)*, Nos. 20-4276, 20-5440, 20-5529, 2020 WL 4481933, at *3 (S.D.N.Y. Aug. 3, 2020) (addressing motion to expedite appeal).

Courts have found that the irreparable injury from potential equitable mootness warrants a stay when, as here, the appeal involves important issues or when the loss of the ability to appeal is not the only harm from the appeal being mooted. *See Adelphia Commc'ns Corp.*, 361 B.R. at 346-47 (granting stay of confirmation order where equitable mootness threatened denial of review of settlement, incorporated into plan, that eliminated claims without consent); *Moreau*, 135 B.R. at 215 (holding $20,000 loss unreviewable on appeal because of mootness would be irreparable harm); *St. Johnsbury Trucking Co.*, 185 B.R. at 689-90 & n.1 (holding risk of equitable mootness of appeal challenging contested release that would cause government to lose claims against releasees constituted irreparable harm); *Advanced Mining Sys., Inc.*, 173 B.R. at 469 (granting stay where mooting of appeal would deny appellants any recovery).

10

The risk of equitable mootness warrants a stay here because of the important interests at stake and because the loss that would go unreviewed is not just a monetary loss but the loss of constitutionally protected rights.  As the district court stated, these appeals raise "critically important issues."  Case No. 21-07966, Dkt. No. 33 (Oct. 12, 2021).  "The importance of having those issues considered and decided on appeal cannot be understated.  For appellants and their allies to lose that right would indeed be irreparable—not to mention inequitable."  Case No. 21-0769, Dkt. 48 at 10.  And a dismissal based on equitable mootness would not just result in the denial of appellate review of those important issues.  It would also mean the permanent loss of rights to sue non-debtors based on the non-consensually released claims.

The Debtors argue that there is no harm from the permanent, non-consensual extinguishment of non-debtor claims against other non-debtors because holders of those claims could not recover more money if they retained them than they can recover under the Plan.  ECF Doc. No. 4014 ¶ 15.  They make this argument despite the fact that the Debtors never determined the value of the direct claims against the Sackler Family and other non-debtors being extinguished.  ECF Doc. No. 2983 at 175 ("[T]he valuation of third-party claims is uncertain and highly speculative."); 8/13 Tr. at 55-58 ("[W]e didn't feel it was possible to adequately or accurately estimate those claims" against the Debtors' shareholders); *see also* 8/13 Tr. at 55-59.  However, a Plan proponent submitted a declaration from a plaintiff's lawyer asserting that "the threat of liability for at least some members of the [Sackler] family was real and that, without the protections of bankruptcy, individual family members were at risk of *substantial judgments* against them."  ECF Doc. No. 3774 ¶ 15 (emphasis added).

11

Moreover, the argument that the released claims lack value is fundamentally inconsistent with the assertion that the Sackler Family's $4.3 billion contribution is being paid for the Non-Debtor Releases.  ECF Doc. No. 4006 ¶ 48.  The Supreme Court in *Jevic* rejected a similar argument—that a class passed over in a settlement was not harmed because it had no chance of recovery—where the settlement amount was much less, finding that a $3.7 million settlement "would make little sense if the action truly had no chance of success." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).  The Court thus found that the priority-skipping settlement harmed the skipped class because they either lost the chance to obtain a settlement respecting their priority or "the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million." *Id.*

But even if this prediction regarding the relative recoveries were true, the harm from denying a stay is not limited to monetary harm.  Rather, the harm is the deprivation of the ability to choose whether to settle the Non-Debtor claims or pursue them, a deprivation that violates due process.  That is a harm that cannot and will not be remedied on appeal if the appeal is not heard on the merits.  Moreover, as the Supreme Court has recognized, the possibility that those who wish to retain their rights to sue the released non-debtors may ultimately recover less money than they could under the Plan does not eliminate the injury from the Plan's deprivation of their rights to pursue those claims. *See id.* (rejecting bankruptcy court's finding that the unsecured creditors would receive nothing without settlement, holding that "the mere possibility of failure does not eliminate the value of the claim or petitioners' injury in being unable to bring it").

Some Stay Opponents also contend that there is no harm from a stay because there are no direct claims against the Sackler Family and other non-debtors subject to the Non-Debtor

releases.[6]  *See, e.g.,* ECF Doc. No. 4012 ¶ 16.  This argument is flawed for several reasons.

First, this heads-I-win, tails-you-lose argument ignores the fact that the preliminary injunction

*precluded* the filing of claims against the Sackler Family and other non-debtor releasees.

*Purdue*, Adv. Proc. No. 19-08289, Dkt. Nos. 82, 89, 105, 115, 126, 132, 139, 145, 168, 175, 185,

190, 194, 208, 214, 219, 241, 254, 264, 274, 286, and 287.

Second, the assertion that it is merely speculative whether anyone has direct claims

against the Sackler Family or other non-debtors reflects a willful ignorance of the existing

record, which includes long lists of such actions subject to the Court's twenty-two preliminary

injunction orders.  *Id*.  Those claims include, for example:

- *Hartman v. Sackler*, Case No. 21-02001, Dkt. 1 (E.D. Pa. filed Apr. 30, 2021), listed in
  the most recent injunction order, *Purdue*, Adv. No. 19-08289, Dkt. 291 at 123.  Mr.
  Hartman alleges a putative class action against members of the Sackler Family and other
  individuals, but not against the Debtors, including direct liability under the Pennsylvania
  Unfair Trade Practices Act, 73 P.S. § 201-2(4).[7]  Compl. ¶¶ 92-99.  One of the defendants
  already has asserted that the Plan's releases would apply to this case.  *See Hartman*, Dkt.
  6 (Aug. 30, 2021) (motion by defendant Mark Timney for an extension of time to answer
  "[i]n light of the releases in [the Debtors'] pending bankruptcy plan which encompass
  this action. . . .").  Mr. Hartman has objected to the Plan based on a lack of notice
  and based on "the extraordinarily broad nonconsensual third-party release of the Sackler
  Family and other non-debtors."  ECF Doc. No. 3793.

- *Hickey v. Purdue Pharma, et al.*, Case No. 19-11806, Dkt. 1 (D. Mass. filed Aug. 22,
  2019), listed in the most recent preliminary injunction order, *Purdue* Adv. No. 19-08289,
  Dkt. 291 at 120.  Mr. Hickey alleges, *inter alia*, unfair and deceptive acts in violation of

---

[6] A claim is direct if it is based on a party's own misconduct.  *In re Johns-Manville Corp.*, 517 F.3d 52,
68 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co.
v. Bailey*, 557 U.S. 137 (2009).  A claim is derivative if the creditor's "alleged injuries are inseparable
from, and predicated upon, a legal injury to the estate. . . ."  *In re Bernard L. Madoff Inv. Secs. LLC*, 740
F.3d 81, 92 (2d Cir. 2014) (holding creditor's claim against non-debtor for fraudulent withdrawals from
debtor was estate claim and not particularized to creditor).

[7] *See Corbett v. Manson*, 903 A.2d 60, 71, 75 (Pa. Cmwlth. 2006) (affirming liability of CEO under the
Act where "[the CEO] was a 'very hands-on owner,' was 'involved in certainly all of the important
decisions,' and, as time went on, 'really got involved much heavier and practically in every decision that
was made for the company,' 'almost micro managing the business right down to the smallest detail'").

the state consumer protection law because "[m]embers of the Sackler Family and other Purdue Executives purposefully downplayed the addictive properties of OxyContin and promoted sales tactics meant to encourage doctors to prescribe as much OxyContin, in the highest doses and longest duration as possible—despite the potential risk of abuse . . . ."[8]  *Hickey*, Dkt. 1 ¶ 3; *see also id.* at ¶¶ 6, 7.

- *Map to Health v. AmerisourceBergen Drug Corp.*, No. 21-45093, Dkt. 1 (N.D. Ohio filed July 15, 2021), is a putative class action by a treatment facility.[9]  The 317-page complaint against members of the Sackler Family and other former directors and officers of the Debtors includes detailed allegations of the "Sackler Defendants' micromanagement" and personal "active participat[ion]" in alleged wrongdoing, and asserts that because the defendants "directed and participated in" the Debtors' tortious conduct, they are individually liable for negligence, nuisance, fraud, and under state deceptive trade statutes.  *See, e.g.*, Dkt. 1 ¶¶ 72-80, 955, 973 995, 1027, 1079.  It further alleges violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), based on an alleged association-in-fact "Sackler Pharmaceutical Enterprise," which was "owned, directed and controlled at all times by the Sackler Defendants."  *Id.* ¶¶ 907-17, 948-956.[10]

These complaints are examples of the direct claims—not claims that belong to the

Debtors' bankruptcy estate that could have been brought by the estate—that are terminated by

---

[8] *See Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *2-*3 (Mass. Super. Nov. 6, 2019) (denying the Debtors' directors' motion to dismiss for failure to state a claim for violation of the state consumer protection law where complaint sufficiently alleged that the directors personally participated in the wrongdoing because they "repeatedly approved policies and tactics intended to aggressively promote opioid sales even though they knew that these policies and tactics were contributing to an epidemic of addiction, overdose and death").

[9] Although this complaint is not listed in the Court's most recent preliminary injunction order, *Purdue*, Adv. No. 19-08289, Dkt. 291, and does not appear to have been served, it was included in the Debtors' Notice of Filing of the Proposed Twenty-Second Amended Preliminary Injunction Order, *id.* Dkt. 290, Ex. D at 158; *see also Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*, No. 18-46070, Dkt. 27 (N.D. Ohio filed Mar. 15, 2019) (including similar allegations); *Purdue*, Adv. No. 19-08289, Dkt. 1, Ex. C at 125 (listing *Mercy House* among the actions to be enjoined).

[10] Individuals can be directly liable under RICO even if they were also owners or officers of a corporation acting within the scope of their authority.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  Moreover, "[a] defendant cannot obtain contribution for RICO liability."  *O&K Trojan, Inc. v. Municipal & Contractors Equip. Corp.*, 751 F. Supp. 431, 433 (S.D.N.Y. 1990).  *Cf. Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*, 721 F.3d 54, 65 (2d Cir. 2014) ("[I]t is settled in this Circuit that there is no claim for contribution unless the operative federal statute provides one.").

the Non-Debtor releases.[11] *See, e.g., In re Glo-Tex Intern.*, No. 07-06449, 2010 WL 4916574, at

*4-*5 (Bankr. D.S.C. Nov. 30, 2010) (allowing creditors' pursuit of claims against debtor's

former owners, despite former owners' settlement with trustee, where plaintiffs alleged that

former owners directly participated in state law torts, which were direct, not derivative, claims).

The assertion that no one is harmed by the non-consensual extinguishment of their claims

against the Sackler Family and other non-debtors is also directly contradicted by those who have

spoken out or voted against Plan.  These include:

- the victims who objected to the Plan and the termination of their claims, *see, e.g.,* ECF Doc. Nos. 443 (Letter from Kimberly Krawaczyk, "The Sackler Family needs to be held accountable for the destruction they have caused and the lives they have ruined. . . . Not only should we not settle, we should go after Purdue and the Sackler's [sic] to pay back the billions they have picked from the sales of Oxycontin!"); ECF Doc. No. 3793 (Objection by Paul Hartman, on Behalf of Himself and All Others Similarly Situated, objecting to "the extraordinarily broad nonconsensual third-party release of the Sackler Family and other non-debtors" because, among other reasons, "Mr. Hartman's lawsuit addresses individual conduct separate and apart from those which are pending in *In re Purdue Pharma L.P. et al.*"); *see also* ECF Doc. Nos. 442, 2210, 2966, 3028, 3099, 3125, 3271, 3235, 3292, 3368, 3404, 3357, 3575, 3582, 3648, 3677, 3742, and 3793; 9/13/21 Tr. at 149-53;

- state and local governments, insurers, and industry participants that also objected with similar concerns, *see* ECF Doc. Nos. 3264, 3270, 3272, 3274, 3275, 3276, 3278, 3279, 3280, 3292, and 3306;

- the 2,683 personal injury victims who voted against the Plan, ECF Doc. No. 3372 at 10; and

- the numerous other appellants, including eight states, the District of Columbia, Canadian municipalities, Canadian First Nations, and three pro se individuals that have appealed the Confirmation Order, *see* ECF Doc. Nos. 3724 (as amended by ECF Doc. No. 3812), 3725, 3774, 3775, 3780 (as amended by ECF Doc. No. 3839), 3784 (as amended by ECF Doc. No. 3818), 3810, 3813, 3832, 3849, 3851, 3853, 3877, and 3878.

---

[11] *See also Heden v. Johnson & Johnson*, No. 19-00586 (D.R.I. filed Nov. 12, 2019); *Rhodes v. Rhodes Techs., Inc.*, No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019); *Tilley v. Purdue Pharma L.P.*, No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019).

Lastly, the argument that the Non-Debtor releases do no harm because there are no direct claims within their scope cannot be reconciled with the Sackler Family's uncompromising insistence on the Non-Debtor releases, *see, e.g.,* 8/17/21 Tr. at 27 (testimony of David Sackler), or the assertion that the Plan will come apart at the seams without them, *see, e.g.,* ECF Doc. No. 4014 ¶ 6; ECF Doc. No. 4006 ¶ 58. If no such claims existed, there would be no need for a release. Likewise, there would be no need for the Non-Debtor releases, contained in section 10.7(b) of the Plan, if they truly were limited to derivative claims given the Plan's separate release in section 10.6(b) of the Debtors' owners, directors, officers, and other "Related Parties" to the extent a claim against them "(x) arises from [their] conduct or actions taken in such capacity [as a Related Party] . . . and not . . . from [their] conduct or actions independent of such capacity, and (y) to the extent [their] liability depends on or derives from the liability of such other Released Party, such claim would be released if asserted against such other Released Party." ECF No. 3726 at 39, 40, 129-30.[12]

To the extent the Stay Opponents now maintain there is no one with direct claims against the Shareholder Released Parties within the scope of the Non-Debtor releases, it was their burden to prove this. They made no attempt to do so before the Plan was confirmed. And this Court itself recognized that the Plan terminated direct causes of action. ECF Doc. No. 3786 at 127 ("If, in fact, [derivative] claims were the only claims to be released, we would not be talking about a

---

[12] Section 10.6(b) releases all "Released Parties," who are defined to include "each of the Debtors' Related Parties, solely in their capacities as such," which is defined to mean "solely to the extent a claim against such Person (x) arises from such Person's conduct or actions taken in such capacity, or from such Person's identified capacity in relation to another specified Released Party and not, in either case, from such Person's conduct or actions independent of such capacity, and (y) to the extent such Person's liability depends on or derives from the liability of such other Released Party, such claim would be released if asserted against such other Released Party." ECF No. 3726 at 39, 40, 129-30.

16

'third-party claims' release of the shareholder released parties."); *id*. at 128 (A "true third-party release[]," such as the one approved here, involves "claims that are independent of the debtor's estate's claims at least on a legal basis, if not as a factual basis.").

Even if the Confirmation Order is reversed, absent a stay, some opioid victims may still be permanently deprived of these claims. The UCC argues that if defendants choose to seek dismissal of complaints already filed based on the releases, courts will refuse to dismiss given the pending appeals. ECF Doc. No. 4006 ¶ 14. But that is entirely speculative, and little comfort to those who have lost control of their actions to defendants and courts who may choose to enforce the releases. *Cf. Hartman*, Dkt. 6 (Aug. 30, 2021) (motion by defendant Mark Timney for an extension of time to answer "[i]n light of the releases in [the Debtors'] pending bankruptcy plan which encompass this action. . . ."). And the Stay Opponents do not explain how claims can be revived if they are dismissed with prejudice based on the Non-Debtor releases.

As for as-yet unfiled claims, the Debtors and the UCC argue that the Stipulated Order Tolling Shareholder Released Claims (ECF Doc. No. 3732) obviates the possibility that the statute of limitations could run on them. ECF Doc. No. 4014 at 20 n.10; ECF Doc. No. 4006 ¶ 14. But the Stipulated Order only extends the limitations period for the "Shareholder Family Group" and "Designated Shareholder Released Parties," which the Shareholder Settlement Agreement defines as those listed in its Exhibits C and S. *See* ECF Doc. No. 3732 at 1-2; ECF Doc. No. 3711 at 56, 58, 143-51, 273; ECF Doc. No. 3726 at 13, 42. It thus does not apply to the broader list of releasees encompassed by Exhibit X to the Shareholder Settlement Agreement. ECF Doc. No. 3711 at 305-33. For example, claims are not tolled against several people named as defendants in lawsuits alleging liability related to the Debtors' opioids based on the

17

defendants' own wrongful conduct, such as John Stewart, Mark Timney, Craig Landau, and
Russell Gasdia. *See, e.g., Hartman*, Dkt. 1 (naming these defendants); *compare* ECF Doc. No.
3711 at 143-51, 273.

### B.    The Public Interest Favors a Stay.

As noted in the Stay Motion, when the government is the movant, the public interest and
irreparable injury factors merge. ECF Doc. No. 3972 at 38-39. The United States Trustee's
harm and the public interest "are one and the same, because the government's interest *is* the
public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C.
Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in the context of a
stay, assessing the harm to the opposing party and weighing the public interest "merge when the
Government is the opposing party")).

In response, the Stay Opponents resort to attacks on the United States Trustee's right to
object and appeal the Plan. *See, e.g.,* ECF Doc. No. 4006 ¶ 17; ECF Doc. No. 4012 ¶¶ 8-12.
The UCC, for example, incorrectly argues that "it is clear that the U.S. Trustee does not represent
the United States or the United States government" because the United States settled its claims
against the Sackler Family and the Debtors and did not appeal the Plan in its role as a creditor of
the Debtors' bankruptcy estate. ECF Doc. No. 4006 ¶ 17. From this, the UCC jumps to the
equally flawed conclusion that the United States Trustee "cannot invoke case law that is
predicated on representing the interests of the government." *Id*.

The government may have more than one interest represented in a bankruptcy case. *See*
1 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 6.01[4] (16th ed. 2021). In
specific cases in which the United States is a creditor, the government may have a pecuniary

interest in the case, represented by a separate division of the Department of Justice or the United States Attorney. *Id*.

United States Trustees, however, are officers of the Executive Branch that represent the United States' separate interest in ensuring that the bankruptcy laws are faithfully enforced in all cases and are not abused.[13] *See* 1 Collier on Bankruptcy ¶ 6.01. They do this by performing their statutorily mandated obligation to impartially administer cases and to address actions taken by stakeholders that are illegal or inconsistent with the Bankruptcy Code. *Id*. Congress acknowledged this dual interest when it proposed the United States Trustee system. *Id*. ¶ 6.01[4].

The United States Trustee appears in these proceedings as a statutory guardian charged with safeguarding the public interest in uniformly and faithfully enforcing the bankruptcy laws. *See Zarnel*, 619 F.3d at 162 (concluding that "the U.S. Trustee's responsibility to represent and protect the public interest affords it a substantial interest in, and therefore standing to proceed with, this appeal"). Thus, "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief." *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808–09 (2d Cir. 1975) (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944)).

---

[13] *See Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 162 (2d Cir. 2010) (discussing United States Trustee's responsibility to "represent and protect the public interest" in bankruptcy cases); *In re Columbia Gas Sys., Inc.*, 33 F.3d 294, 296 (3d Cir. 1994) (noting that Congress has stated that United States Trustees are responsible for protecting the public interest and ensuring that bankruptcy cases are conducted according to the law); *United States Trustee v. Clark (In re Clark)*, 927 F.2d 793, 795 (4th Cir. 1991) (referring to United States Trustee as a "watchdog" who must see that the bankruptcy laws are enforced); *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 824 (1st Cir. 1990) (noting United States Trustee's statutory responsibility to represent and protect the public); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (noting that United States Trustees protect the public interest just as a watchdog guards the interests of those for whom it watches).

As the congressionally created "watchdog[]" of the bankruptcy system designated to prevent abuse, H.R. Rep. No. 95-595 at 4, 99-100 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5966, 6061, the United States Trustee objected, is pressing his appeal, and seeks a stay, because the Sackler Family is abusing the system by using it to obtain releases that exceed the boundaries of the Constitution and the Bankruptcy Code.  The Constitution and Code set up guardrails restricting what can be done in bankruptcy.  It is the United States Trustee's job to ensure those guardrails stand firm, even against immense pressure—and even if the plan proponents have admirable motives.

The Supreme Court has emphasized that the Code's strictures must be enforced even in exigent circumstances.  For example, in *Jevic*, the Supreme Court reversed a structured dismissal that the bankruptcy court had approved "in light of the 'dire circumstances' facing the estate and its creditors" and the court's prediction that without the settlement and dismissal "there was 'no realistic prospect' of a meaningful distribution for anyone other than the secured creditors."  137 S. Ct. at 982.  Despite these circumstances, the Supreme Court held that courts cannot alter the balance struck by Congress, not even in rare cases.  *Id*. at 987.

Here, the Sackler Family is abusing the bankruptcy system because the Plan's non-consensual elimination of claims held by non-debtors against other non-debtors transgresses the Bankruptcy Code and the Constitution.  That abuse causes irreparable harm to victims who will be unconstitutionally deprived of their causes of action against the Sacker Family and other non-debtors.  *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. updated 2021) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further

showing of irreparable injury is necessary.") (internal footnotes omitted). And it harms the

public interest in the faithful and constitutional administration of the bankruptcy laws. *Cf.*

*Menges v. Knudsen*, No. CV 20-178, --- F. Supp. 3d ---, 32021 WL 1894154, at \*26 (D. Mont.

May 11, 2021) (stating that "public interest is served through the enjoinment of an

unconstitutional application of law"), *appeal filed* No. 21-35370 (9th Cir. May 12, 2021);

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (stating

that "upholding constitutional rights serves the public interest").

The public interest thus favors a stay because meaningful appellate review is necessary to

clarify when non-debtor releases can be compelled through a bankruptcy. As discussed further

below, *infra* Part III.C, no Second Circuit case has squarely addressed—much less upheld—the

constitutionality of a bankruptcy plan's imposition of non-consensual releases that are of direct

(versus derivative) claims against non-debtors, much less done so when faced with releases as

far-reaching as these.

The importance of further guidance from the Second Circuit is underscored by the Stay

Opponents' own arguments about the harm that will come if the Plan collapses because the Non-

Debtor releases are invalidated. Building a reorganization plan on a legally questionable

foundation is perilous. Clarifying the legal standards for when (if ever) non-debtor releases are

permissible will provide more certainty and predictability to avoid future plans from collapsing

because they were built on faulty premises.

The Stay Opponents also argue that the United States Trustee may not seek a stay on the

basis of harms that may befall other parties. ECF Doc. No. 4012 ¶ 11 (citing cases). But none of

the cited cases holds that harm to the public cannot be considered on a motion for stay by the United States Trustee.

Moreover, the fact that the UCC and the Ad Hoc Individual Group oppose a stay does not foreclose consideration of the interests of personal injury victims who did not support the Plan.

The UCC does not represent individual interests of unsecured creditors at all, much less those who voted against the Plan. "[T]he representation of a creditors' committee does not entail representation of any specific creditor . . . ." *In re Kobra Properties*, 406 B.R. 396, 403 (Bankr. E.D. Cal. 2009). *See also In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members") (citing *Matter of Levy,* 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985) (ruling that counsel for the committee does not represent any individual creditor's interest in a case because they were retained to represent the entire class, and thus, do not owe a duty to one creditor)).

Similarly, the Ad Hoc Individual Group does not claim to include all personal injury claimants. And although the Ad Hoc Individual Group states that it includes some who voted against the Plan, ECF Doc. No. 4012 ¶ 9, n.3, it does not explain how it can represent the views of individual claimants who opposed the Plan given the irreconcilable conflict of interest between those who supported the Plan and those who oppose it.[14] Moreover, despite the Ad Hoc Individual Group's representations about who it represents, there are substantial questions about

---

[14] Although ad hoc committees can represent individual interests of their committee members, "it is not the function of an ad hoc committee to bind the stakeholder constituencies that it derives from." *The Art of the Ad Hoc*, p. 44 (2d ed. 2020) Global Restructuring Review (editors Howard Morris, Sonya Van de Graaff, and James M. Peck). And ad hoc committees should be careful not "to give the appearance that informal committees speak for non-members." *Id*. at 70.

who the Ad Hoc Individual Group members are, whose interests the Group represents, and what,

if any, authority the Group has to bind dissenting personal injury claimants.[15]

The Debtors and other Stay Opponents also claim that the public interest favors denying a

stay because the Plan has wide support. *E.g.*, ECF Doc. No. 4014 ¶ 66. But when talking about

the public interest—not just the interests of those who voted on the Plan—one should not ignore

the fact that fewer than 20% of claimants voted on the plan, fewer than 50% of personal injury

claimants voted, and 2,683 of personal injury claimants voted against the Plan. ECF Doc. No.

3372 at 5, 10. And for all of their crowing about the high percentage of Plan-voters who voted in

favor of it, that fact does not show that denying a stay is in the public interest. To the contrary,

even when "the vast majority of creditors have approved" a reorganization plan, "there is a

significant public interest in vindicating the rights of the minority and preventing the will of the

majority to go unchecked by appellate review." *Adelphia Commc'ns Corp.*, 361 B.R. at 367

(internal quotation marks and alternations omitted).

The Debtors additionally argue that if appellants are successful in reversing the Non-

Debtor releases, that will "undermine confidence in the bankruptcy system by removing a tool"

---

[15] On July 21, 2020, the Ad Hoc Individual Group filed its Amended Verified Rule 2019 Statement representing that it had thirteen members and identifying the thirteen members by name, their counsel, and the amount and basis for each member's claim. ECF Doc. No. 1480. This representation remained unchanged for fifteen months, until October 13, 2021—six weeks after the Court rendered its bench ruling confirming the plan and four weeks after the United States Trustee filed his notice of appeal and moved for a stay pending appeal—when the Ad Hoc Individual Group filed a Second Amended Verified Rule 2019 Statement claiming *for the first time* that the Ad Hoc Individual Group had 60,671 members. ECF Doc. No. 3939. It did not identify a single individual member, claiming that information is protected by the Protective Order in this case, despite having previously identified the thirteen members without expressing a similar concern, and it attached no information regarding the Ad Hoc Individual Group's authority or governance. *Id.* Nor did the Ad Hoc Individual Group explain *when* any of the 60,658 new members joined it. *Id.* *Compare* Fed. R. Bankr. P. 2019 (requiring disclosure of "the pertinent facts and circumstances" concerning the group's formation, the name, address, and economic interest of the creditors represented by it, and "a copy of the instrument, if any, authorizing" the ad hoc group to act on behalf of creditors).

that has been used to resolve otherwise unresolvable mass tort cases.  ECF Doc. No. 4014 ¶ 69.

But the appeals are limited to the question of the permissibility of non-consensual releases for

direct claims against non-debtors.  Precluding such non-consensual releases through another

party's bankruptcy does not preclude resolution of mass torts outside of bankruptcy, such as

through a class action or multi-district litigation (where the Debtors' co-defendants, other than

the non-debtor releasees, continue to defend claims).  Nor would a holding that these non-

consensual Non-Debtor releases are impermissible preclude the solvent non-debtors from filing

their own bankruptcy case to address direct claims against them.  The Confirmation Order

unquestionably grants the Sackler Family and other non-debtors relief they could not otherwise

obtain outside bankruptcy, or even in bankruptcy as debtors, as the Non-Debtor releases include

claims excepted from an individual debtor's discharge.  The bankruptcy court's statutory and

constitutional authority to grant this relief is an important issue that should not evade appellate

review.

The MSGE group argues that the public interest in settlements and finality also counsels

against a stay.  ECF Doc. No. 4016 ¶ 63.  But the non-consensual Non-Debtor releases are not a

settlement, as discussed *infra* at 33-34, which requires informed and knowing consent, as there

was no ability to agree to or decline the Non-Debtor releases.  And the public interest in finality

should not subvert the normal appellate process.

### C.    The Advance Order Still Raises Concerns.

While the highest priority is obtaining a stay of the Confirmation Order, the United States

Trustee remains concerned about the actions being taken under the Advance Order.  The

stipulation that certain parties will not argue equitable mootness based on the actions taken

before the Effective Date does not bind the Second Circuit—nor other parties, such as the

additional parties that have filed oppositions to the Stay Motion but are not signatories to the

stipulation filed in the district court, ECF Doc. Nos. 4003, 4010, 4011, 4017. *See St. Johnsbury*

*Trucking Co.*, 185 B.R. at 690 ("The parties to a judicial proceeding therefore cannot determine,

even by agreement, whether a case is moot; that is for the court."). Moreover, the Debtors have

been clear that they will not forego the argument that the criminal sentencing would equitably

moot the appeal, and they have provided no clarity as to which pre-Effective Date activities clear

the way for the sentencing to go forward.

The Stay Opponents' arguments specific to staying the Advance Order are limited to the

delay that may result from being unable to take the actions it authorizes before the Effective

Date, which could be as early as December 8, 2021. But the Debtors have refused to report on

what they have already done in the weeks since the Advance Order was entered and what is left

to do—including whether there are any additional actions for which the Advance Order's

authorization is even necessary. To the extent there would be any delay from staying the

Advance Order so that the appeals can proceed, it is minimal.

## II. The Irreparable Injury from Denying a Stay and Permanently Extinguishing Direct Claims Against Non-Debtors Outweighs Any Delay from Obtaining Appellate Review.

The United States Trustee showed in his opening brief that the irreparable harm and

public interest outweigh any harm from granting a stay. And since he filed the Stay Motion, the

district court has found that the irreparable injury from the appeal potentially being mooted

outweighs the potential harm from delay that could be caused by a stay. In so doing, the district

court accepted "that it is imperative to do whatever can be done now so that, if confirmation of

the Plan is upheld on appeal, the Estate can begin dealing with claims and desperately needed

remediation measures promptly." Case No. 21-0769, Dkt. 48 at 10. But the court concluded that

"in the end, we are speaking only of delay—delay that [the district court] has done its best to minimize by putting the parties on a rocket docket for these appeals." *Id*.  Given the "important questions under the Constitution, the Bankruptcy Code and Second Circuit law" raised by the appeals, the district court held that "the balance of hardship decidedly" tips in favor of a stay. *Id*.

Despite the copious amounts of ink spilled in the filings opposing a stay in this Court, the Stay Opponents add little to the arguments they have already made orally to the district court—and nothing that should lead this Court to a different conclusion than the district court in balancing the harms.

As with all bankruptcy cases, the Plan attempts to resolve many competing claims. Because of the harms done by the Debtors and the Sackler Family in contributing to an epidemic of addiction, the competing claims are about more than just money.  The claimants' interests are pressing—and that fact is no less true for those who oppose the Plan than for those who support it.  Those opposing the plan, like those supporting it, include governmental entities seeking funding for abatement of the opioid crisis and those seeking compensation for tragic losses stemming from opioid addiction.  And a number of those opposing the Plan are plaintiffs in actions that already have been delayed for two years because of the preliminary injunction obtained by the Debtors.  *See* Adv. Case Proc. No. 19-08289, Dkt. Nos. 1, 82, 89, 105, 115, 126, 132, 139, 145, 168, 175, 185, 190, 194, 208, 214, 219, 241, 254, 264, 274, 286, and 287.  While relief under the Plan may be delayed by a stay, those who oppose the Non-Debtor releases will have their rights to pursue their claims against, and seek justice from, the Sackler Family and other non-debtors eliminated entirely by the Plan.

26

Moreover, claims that a stay would create a delay lasting years are inconsistent with the reality of the parties' efforts to minimize any delay by expediting the appellate process. The argument on the appeals is now scheduled to be heard in the district court on November 30, 2021.

The extent to which a stay pending appeal will actually, and not just hypothetically, delay the Effective Date also remains unclear. The fact that the Effective Date could occur *as early as* December 8, 2021, ECF Doc. No. 4014 ¶ 13; ECF Doc. No. 4002 ¶ 37; ECF Doc. No. ¶ 3, sheds no light on the expected *actual* Effective Date, which can only occur after certain conditions precedent have been met. *See* ECF Doc. No. 3726 at 123. One such condition precedent is that "the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan." *Id*. But the Debtors have been conspicuously silent regarding their progress in meeting the conditions precedent to the Effective Date—despite requests from the United States Trustee for status reports.[16] Without this information, there is no basis to draw any conclusion about when the Effective Date will occur, even without a stay, and thus no way to measure the extent of delay a stay would potentially cause.

Hedging its bets, the Ad Hoc Individual Group argues that "*[a]ny* delay in an estate's administration and distribution to creditors constitutes a substantial harm warranting denial of stay." ECF Doc. No. 4012 ¶ 24 (emphasis in original). But if this were true there could never be a stay of a confirmation order. Such a rule, combined with Second Circuit authority requiring

---

[16] The United States Trustee requested these by email on October 13, 2021, and at the scheduling conference before this Court the next day, 10/14/21 Tr. at 212-13. He also included the request in a motion filed with the district court, Case No. 21-07532 Dkt. No. 64 at 6, which denied that aspect of the motion.

27

appellants to seek a stay to protect against equitable mootness, would insulate virtually all confirmation orders from appellate review.

The remaining alleged harms from a stay are likewise speculative. For example, the Debtors argue that a stay will jeopardize the Plan (even if it is affirmed on appeal) because the Sackler Family "could have" the right to terminate the Shareholder Settlement Agreement if the Plan is not substantially consummated within three months of the Confirmation Order—i.e., December 17, 2021. ECF Doc. No. 4014 ¶ 5. As an initial matter, it would be inequitable to allow the Debtors and the Sackler Family to benefit from this provision—added on August 25, 2021, the last day of oral argument during the confirmation hearing, ECF Doc. No. 3655 at 505—which manufactures a ready-made argument to avoid any stay that would last mere days beyond the Plan's Effective Date.

Moreover, the Debtors conspicuously do not say that the Sackler Family *does* have the right to terminate. *Id*. The Shareholder Settlement Agreement states that the Sackler Family has the right to terminate it if the Effective Date does not occur by three months after the Confirmation Order is entered, *unless* a delay of the Effective Date is caused by "any delay in obtaining any state or federal regulatory licenses, consents, or approvals, or in transferring, assigning, or novating any state or federal government contracts necessary to implement and effectuate the Plan." ECF Doc. No. 3711 at 126-27, 173. The Debtors, however, remain silent regarding whether any such delays exist that would extend the Plan's Effective Date—along with the Sackler Family's termination right. And despite the Movants' requests, the Debtors have refused to provide information that would give any clarity on this issue or on what other pre-Effective Date actions are (or are not) occurring. *See, e.g.*, 10/14/21 Tr. 212-213.

28

Nor is there any evidence that the Sackler Family in fact would exercise this termination right.  The Shareholder Settlement Agreement does not require that the Sackler Family exercise this right.  ECF Doc. No. 3711 at 125, 129 (§§ 10.01(a) and 11.06(e)).  And the Sackler Family has already demonstrated a willingness to waive certain provisions of the Shareholder Settlement Agreement when it suits their interests, such as the waiver of the Agreement's requirement to seek certification of a direct appeal to the Second Circuit.  *See* ECF Doc. No. 3711 at 88 (§ 2.09(a)) ("[I]f any appeal is taken from the Confirmation Order that could result in vacatur, modification or reversal of the confirmation Order with respect to the Shareholder Releases . . . the MDT shall promptly request that all appellants and appellees with respect to the Appeal consent that the Appeal be certified for direct appeal to the Second Circuit . . . ."); 10/14/21 Tr. at 136 (representing that the Sackler Family had waived that requirement).  There is no obvious reason why the Sackler Family would terminate an agreement conferring on them these broad Non-Debtor releases that they fought so hard to obtain, and no evidence that they are likely to do so.

Other arguments against the stay are not only speculative—such as the prediction that the Debtors will not be able to survive as ongoing businesses for the duration of a stay, ECF Doc. No. ¶ 22, despite having done so for the past two years in bankruptcy—but are premised on the assumption that a stay would be "prolonged" for "months" or "even years."  *E.g.*, ECF Doc. No. 4014 ¶¶ 22, 23, 30; ECF Doc. No. 4006 ¶ 38.  As discussed above, that assumption is unwarranted.

The Stay Opponents bolster the speculation that a stay may cause the Plan to collapse with an argument that the Plan is the best option and there is no viable alternative to it.  *E.g.,*

ECF Doc. No. 4014 ¶ 3.  Even if that were true, it does not show that the Plan is permissible

under the Constitution, the Code, or Second Circuit precedent.  And while the Debtors declare

that an implosion of the Plan will result in a "Hobbesian nightmare," ECF Doc. No. 4014 ¶ 29,

these dire predictions only demonstrate the importance of appellate review to clarify the

standards for non-debtor releases so that future cases can move forward with greater certainty

regarding what is permissible.

Finally, the UCC raises a concern that, with the expiration of the preliminary injunction

order, only the Confirmation Order precludes the Sackler Family from secreting funds.  ECF

Doc. No. 4006 ¶ 73.  The United States Trustee would not oppose extending the preliminary

injunction during the pendency of a stay, or carving out from the stay the Confirmation Order's

continuation of the injunction against secreting assets, to avoid that result.

III.    **The United States Trustee Has a Likelihood of Success on Appeal.**

A.    **This Court Need Not Find that It Erred for Stay Movants to Meet the
Likelihood-of-Success Prong.**

The likelihood-of-success standard does not require this Court to conclude that it erred

and will be reversed.  Rather, under Second Circuit law, this prong requires only that stay

movants have raised "sufficiently serious questions going to the merits to make them a fair

ground for litigation."[17]  *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019)

(internal quotation marks omitted); *see also Citigroup Glob. Mkts., Inc. v. VCG Special

Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010) (explaining that while *Nken* uses

the "'likely to succeed on the merits' phrasing," in describing the standard for stay pending

---

[17] The Second Circuit applies a more stringent likelihood-of-success standard when a party is seeking to
enjoin government action.  *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated
on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

appeal, "it did not suggest that this factor requires a showing that the movant is 'more likely than

not' to succeed on the merits"); *accord Mohamed v. Reno*, 309 F.3d 95, 100-01 (2d Cir. 2002);

*The New York Times Co. v. Dept. of Health & Human Servs*., No. 20-3063, 2021 WL 235138, at

*1 (S.D.N.Y. Jan. 25, 2021); *Adelphia Commc'ns Corp.*, 361 B.R. at 346-47; *Sabine Oil & Gas

Corp.*, 548 B.R. at 683-84. The "'serious questions' standard is particularly appropriate" when a

court is asked to stay its own order because "the court has already determined that the applicant

failed to succeed on the merits." *New York Times Co.*, 2021 WL 235138, at *1.

    As established in the Stay Motion, the United States Trustee has made a strong showing

of a likelihood of success on appeal. At the least, the United States Trustee has raised

sufficiently serious questions, making them a fair ground for litigation, regarding whether the

Plan and its broad non-consensual, Non-Debtor releases comply with the Constitution, the

Bankruptcy Code, and Second Circuit precedent. These are questions of law subject to *de novo*

review. *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873

F.3d 85, 138 n.54 (2d Cir. 2017).

    The Stay Opponents have failed to rebut this showing. The Debtors, as the Plan

proponents, bore the burden to prove that it complied with the law, but they failed to do so.

     **B.**    **The Plan Runs Afoul of the Constitution.**

       **1.**    **The Non-Debtor Releases Violate the Due Process Clause.**

    For the reasons set forth in the United States Trustee's objection to confirmation and the

Stay Motion, the Non-Debtor releases violate the victims' due process rights by terminating their

independent rights against non-debtors without their consent, without compensation, and without

adequate notice. The Stay Opponents' contrary arguments lack merit.

The Stay Opponents fail to address the due process violations resulting from the termination of non-debtors' causes of actions against other non-debtors without the claimants' consent.  The UCC's argument that due process is simply a "procedural" claim that does not require consent to a release of one's claims, ECF Doc. No. 4006 ¶ 63, ignores the Supreme Court's holding that, outside of a "limited fund" class action, due process requires a choice of whether to settle one's monetary damages claims.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-48 (1999) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).[18]  And the MSGE misplaces its reliance on *Ortiz*'s citation of a "special remedial scheme" like bankruptcy as an exception to this due process protection.  ECF Doc. No. 4016 ¶ 44.  It is true that the bankruptcy system is a "special remedial scheme," but it is one that Congress designed to adjust the claims against, and interests in, a *debtor*—the party with the limited fund that justifies the special remedial scheme—and not to non-debtors that have declined to submit themselves to the bankruptcy system.[19]  *See Adelphia Commc'ns Corp.*, 361 B.R. at 358 ("Permitting the Plan to go effective as confirmed—thereby distributing the finite estate to the creditors and taking away forever the rights of Appellants to pursue [disputes] that a reviewing court might well find they had never agreed to compromise—could be a fundamental violation of Appellants' constitutional

---

[18] The Supreme Court was also clear that to be entitled to the limited fund "mandatory settlement," the fund cannot be limited by agreement of the parties, *Ortiz*, 527 U.S. at 821, as the Sackler Family and Debtors agreed here.  Simply put, in the class-action context, the Plan's mandatory release with no ability to opt out would violate claimants' due process rights.

[19] The Second Circuit expressly held that where a bankruptcy court asserts *in personam* jurisdiction over non-debtors' direct claims against third parties, rather than *in rem* jurisdiction over derivative claims against estate property, then bankruptcy's "special remedial scheme" exception to normal due process rules do not apply.  *In re Johns-Manville Corp.*, 600 F.3d 135, 154 (2d Cir. 2010) ("*Manville IV*").  Rather, the Second Circuit looked to toxic tort class action settlements for analogous due process principles.  *Id.*; *see also In re Johns-Manville Corporation*, 551 B.R. 104, 118-124 (S.D.N.Y. 2016) (explaining and applying due process analysis under *Manville IV*).

due process rights."). This Court may not extend that remedial scheme to discharge the debts of non-debtors.

The MSGE argues that there is no likelihood of success on the merits because the approval of settlement agreements under Bankruptcy Rule 9019 is reviewed only for an abuse of discretion. ECF Doc. No. 4016 ¶ 33. But the Non-Debtor releases' termination of claims between non-debtors is not a settlement by the Debtors or the estate governed by Rule 9019. In fact, as explained *infra*, they are not a "settlement" at all with the third-party releasees who did not consent or otherwise agree to them. *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party"); *United States v. Ward Baking Co*., 376 U.S. 327 (1964) (court cannot enter consent decree to which one party has not consented). The authority to impose such a non-consensual "settlement" is a question of law subject to *de novo* review. *Adelphia Commc'ns Corp.*, 361 B.R. at 357 ("The Bankruptcy Court's decision to approve the Settlement must be reviewed de novo if accepting the Settlement was erroneous as a matter of law.").

Contrary to the Stay Opponents' assertions, the due process concern is not alleviated by the fact that some people objected to the Plan. That fact fails to show that everyone who was required to receive adequate, understandable notice of the Non-Debtor releases did so. Further, the ability to object to a plan does not fix the due process problem that arises from the lack of consent to a "settlement" of direct claims against non-debtors. As the *Adelphia* court explained, a plan's incorporation of a disputed settlement "diluted the [objector's] ability to exercise its right to object to the Settlement and/or to assert that the Debtors lacked authority to settle those

33

disputes" because—despite having objected to the plan—the objector "faced an up-hill battle

based on the fact that the majority of creditors had accepted the Plan (which included the

purported Settlement)." *Adelphia Commc'ns Corp.*, 361 B.R. at 356.  And because no

alternative plan was offered without the settlement, the objector's litigation was "effectively

terminated without [its] consent." *Id.*

Also unavailing is the Ad Hoc Individual Group's quarrel with the United States

Trustee's observation that there is no compensation paid for the claims against the Sackler

Family and other non-debtors terminated under the Plan.  ECF Doc. No. 4012 ¶ 13 n.8.  The Ad

Hoc Individual Group disputes this fact based on the relevant trust distribution procedures'

provision that:

> Distributions hereunder are determined only with consideration to a Non-NAS PI
> Claim held against the Debtors, and not to any associated Non-NAS PI Channeled
> Claim against a non-Debtor party.  *However, any Distribution to a Non-NAS PI
> Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution
> in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI
> Claimant with respect to the injuries that are the subject of his/her Non-NAS PI
> Claim*.

*Id.* (quoting ECF Doc. No. 3787 at 333) (emphasis added by Ad Hoc Individual Group).  But the

fact that the claims against the Sackler Family and other non-debtors are "deemed" to be

satisfied, when the same procedures expressly state that *no value* is being paid for those claims,

does not change fact that no value is being paid for those claims.  The Plan provides payment

only based on the victims' claims against the Debtors.

The Stay Opponents also fail to rebut the showing that notice, while widespread, was

insufficient because the Non-Debtor releases are incomprehensible.  The Debtors' argument that

the United States Trustee failed to cite any evidence that people could not understand the notice

regarding the Non-Debtor releases flies in the face of trial testimony.  ECF Doc. No. 4014 ¶¶ 51-

52.  As acknowledged by both this Court and multiple witnesses testifying in support of the plan,

the average opioid victim would be unable to understand the 52 lines of section 10.7(b) with its

various cross-references of defined terms.  ECF Doc. No. 3786 at 7; 8/18/21 Tr. at 133; 8/12/21

Tr. at 110-12; 8/19/21 Tr. at 135-36, 139.  This Court recognized as "true" that the release

provisions were "lengthy and complex" and that one needed "legal training to parse those

provisions."  ECF Doc. No. 3786 at 7.  Dr. Richard Sackler testified that although he tried to

read the Non-Debtor releases, they were so "extremely dense" and would take such "an

enormous amount of time to fully understand" that he gave up.  8/18/21 Tr. at 133.  And neither

the Debtors' Chief Financial Officer nor Mortimer Sackler himself could identify who was

released under the provisions.  8/12/21 Tr. at 110-12; 8/19/21 Tr. at 135-36, 139.  As the Chief

Financial Officer testified, if he could not identify who is being released, the average opioid

victim would not be able to do so either.  8/12/21 Tr. at 110.

Nor did the "plain-language notice" cure this problem.  ECF Doc. No. 2988 at 296-99.

That notice failed to reveal the vast extent of the other non-debtors granted civil immunity by the

Plan, including the layers of trusts, unborn descendants, lawyers, and an unidentified array of

others.  ECF Doc. No. 2988 at 287-299; ECF Doc. No. 3726 at 43.  It also failed to explain what

universe of claims would be released under the Plan, ECF Doc. No. 2988 at 287-299, a scope

that continued to evolve through the Plan's multiple amendments, *see* ECF Doc. No. 3545, 3632,

3652, 3682, 3706, 3726, and, to some degree, is still not clear even after confirmation.  ECF

Doc. No. 3726 at 132.  Finally, that notice did not disclose that the Plan would make no payment

based on the extinguished claims against non-debtors.  ECF Doc. No. 2988 at 296-99.

The Debtors argue that the United States Trustee waived any objection to the form of notice because he did not raise the issue of adequate notice at time of the Disclosure Statement. ECF Doc. No. 4014 ¶ 53. This assertion is incorrect. The United States Trustee clearly raised a concern regarding inadequate notice in both his objection to the Disclosure Statement and at the May 26, 2021, hearing on the approval of the Disclosure Statement. In his objection to the Disclosure Statement, the United States Trustee argued that it lacked sufficient information on the releases to enable parties in interest to understand them and, therefore, to allow for adequate notice of them. ECF Doc. No. 2686. He continued to press his objection to the lack of adequate notice regarding the releases at the May 26, 2021, hearing on the approval of the Disclosure Statement. The United States Trustee raised the concern that, among other things, the Disclosure Statement failed to identify all the released parties as well as what those parties were contributing to receive a release. *See* 5/26/21 Tr. at 81. Without such information, parties in interest could not fully understand the releases and, therefore, would not receive adequate notice of them. And the United States Trustee reserved all rights regarding the notice of the releases on the record. *Id*. at 87.

## 2.    The Non-Debtor Releases Are Beyond the Scope of the Bankruptcy Clause.

None of the Stay Opponents actually addressed the United States Trustee's argument that the Non-Debtor releases exceeded what Congress could authorize under the Bankruptcy Clause. The UCC purports to address the Bankruptcy Clause but does not. Rather, the UCC responds to the United States Trustee's argument under *Stern v. Marshall*, 564 U.S. 462 (2011), by relying on *Millennium Lab Holdings II, LLC*., 945 F.3d 126, 136 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020), and *In re Kirwan*

36

*Offs. S.a.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan*

*Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). ECF Doc. No. 4006 ¶ 64. Neither *Millenium* nor

*Kirwan* ever reference the Bankruptcy Clause; they are inapposite to this issue.

At best, the Debtors assert that this argument is a proxy for whether this Court had

subject matter jurisdiction under 28 U.S.C. §§ 157 and 1334(b). ECF Doc. No. 4014 ¶ 57. This

is incorrect.[20] Second Circuit precedents analyzing whether bankruptcy courts have statutory

subject matter jurisdiction over particular disputes do not engage with the separate limits that the

Bankruptcy Clause imposes on Congress's authority in establishing a law on the subject of

bankruptcies—which "contemplate[s] an adjustment of a failing debtor's obligations." *Railway*

*Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (citation and quotation marks

omitted). And, as made clear under *Stern*, 564 U.S. at 475-82, Congress has in some instances

granted bankruptcy courts statutory authority that exceeds their constitutional authority.

While the Bankruptcy Clause permits bankruptcy courts to issue orders to enforce their *in*

*rem* jurisdiction, *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006), the Non-Debtor

releases exceed this Court's *in rem* jurisdiction. As the Second Circuit explained in *Manville IV*,

when a bankruptcy court enjoins non-debtors' direct claims against third parties, rather than

---

[20] The United States Trustee does not concede the existence of subject matter jurisdiction here. The Debtors cite the "potential diminution on the Debtors' shared insurance" and "possible negative impacts" on its ability to pursue its own "closely-related" claims against the Sackler Family as the Non-Debtor's releases' impact on estate property. ECF Doc. No. 4014 ¶ 56 n.31. But that simply means—at best—some claims against some non-debtor defendants might have potentially raised indemnification issues, that some of those claims might have affected shared insurance, and that some of those claims overlapped with the Debtors' own claims against the Sackler Family and others. ECF Doc. No. 3786 at 111. Yet, this Court never found that all potential claims affected by the releases satisfied one or more of these conditions. Nor could this Court plausibly have done so, given the sheer breadth of the release and its extension to unborn persons and others.

37

enjoining a derivative claim aimed at estate property, then the court is exerting *in personam*, and

not *in rem*, jurisdiction. *Manville IV*, 600 F.3d at 154.

> **3.    The Termination of Non-Debtor Claims Against Non-Debtors
> Exceeds the Constitutional Authority of this Court.**

As argued in the Stay Motion, under *Stern v. Marshall*, 564 U.S. 462 (2011), the

termination of the non-debtors' direct state law claims against non-debtors, which are not

required to be resolved in the claims-resolution process against the Debtors, is beyond this

Court's authority to order.  The Stay Opponents rely on *Millennium*, 945 F.3d at 136, and

*Kirwan*, 592 B.R. at 504, to argue otherwise.  But both authorities fail to recognize a central

holding of *Stern*.

The Supreme Court set out the test for determining when a bankruptcy court has

constitutional authority to enter final judgment on a claim in *Stern*: "Congress may not bypass

Article III simply because a proceeding may have some bearing on a bankruptcy case; the

question is whether the action at issue stems from the bankruptcy itself or would necessarily be

resolved in the claims allowance process."  564 U.S. at 499.

The Third Circuit's conclusion in *Millennium* is contrary to this plain language in Stern.

In arriving at its holding, the Third Circuit seized upon a statement in *Stern* explaining that "a

preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has

filed a claim, because then . . . the ensuing preference action by the trustee becomes integral to

the restructuring of the debtor-creditor relationship."  *Millennium*, 945 F.3d at 126 (*quoting*

*Stern*, 564 U.S at 497).  But the bankruptcy court's constitutional authority to resolve a

preference claim held by the debtor's estate in adjudicating the creditor's proof of claim against

the debtor's estate does not translate to authority for a non-Article III court to adjudicate private, state law claims *between non-debtors*.

Similarly, *Kirwan* focuses on whether the release of claims is "absolutely necessary to the operation of [the debtor's] reorganization plan" instead of the nature of the claims being released. 592 B.R. at 511. Further, *Kirwan's* ruling was not necessary to its holding because the district court held in the alternative that the debtor had consented to the bankruptcy court's exercise of adjudicatory authority. 592 B.R. at 512. On appeal, the Second Circuit affirmed only on that alternative ground and reserved the issue of whether bankruptcy courts may constitutionally enter final judgment on non-debtor releases. *Kirwan*, 792 F. App'x at 103. The United States Trustee respectfully submits that this Court lacks that authority.

### C. The Bankruptcy Relief Accorded the Non-Debtors Is Not Permitted by the Bankruptcy Code or Second Circuit Precedent.

As noted in the Stay Motion, Congress authorized bankruptcy courts to impose non-debtor releases in only one narrow circumstance—and that applies exclusively to asbestos cases. 11 U.S.C. § 524(g); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005). The Second Circuit has expressly recognized the *lack of* statutory authority to release non-debtors' direct claims against other non-debtors outside of the statutorily-bound asbestos context. *Id*. at 142 (recognizing that while some cases have allowed such releases, "the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g)").

The Debtors argue that if the United States Trustee's argument is correct, then bankruptcy courts have no power to impose non-consensual releases in any circumstances against any party. ECF Doc. No. 4014 ¶ 54. But that is not so. Congress has authorized such releases in 524(g) that are both limited to true derivative claims and accompanied by procedural

protections.  But that statutory authorization and those protections were both absent here, and the releases are not so limited.

The Stay Opponents incorrectly rely on the rule of construction under section 111(b) of the Bankruptcy Reform Act of 1994, which added section 524(g).  108 Stat. 4117 (1994).  This rule provides that "[n]othing in [the subsection adding 11 U.S.C. § 524(g) to the Bankruptcy Code] shall be construed to modify, impair or supercede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  *Id*.  The most reasonable interpretation of this rule is that Congress wanted to protect reliance interests and to provide certainty to the asbestos trusts established under the Manville model, *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988) ("*Manville I*") before the 1994 legislative amendment, and it is not an endorsement of channeling injunctions in other contexts.  *See* Asbestos Injury Compensation, GAO Report No. 11-819, p.8 ("Lingering concerns as to whether the injunction issued as part of [Manville's] plan could withstand all challenges underscored the 1994 amendment modeled after this approach.").

Nor are the Stay Opponents correct that the Non-Debtor releases are authorized by *Metromedia* or other Second Circuit law.

As an initial matter, to the extent *Metromedia* discussed non-debtor releases, it was dictum as the court dismissed the appeal as equitably moot.  *Metromedia*, 416 F.3d at 143-45.  The Second Circuit has explained that "it is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case."  *Baraket v. Holder*, 632 F.3d 56, 59 (2d Cir. 2011).  Appellees rely on another case's characterization of *Metromedia*'s statements regarding the

40

possibility of non-debtor releases as a "holding."  ECF Doc. No. 4014 ¶ 37 n.23.  But how

another case characterized *Metromedia's* statement is irrelevant to its nature for purposes of

precedent.  *Cf.*, *Francis v. City of New York*, 235 F.3d 763, 765 (2d Cir. 2000) (holding that

references in passing to administrative exhaustion requirements as "jurisdictional" did not make

them, as a matter of precedent, jurisdictional).

Contrary to the Stay Opponents' arguments, ECF Doc. No. 4014 ¶ 6; ECF Doc. No. 4016

¶ 39, no Second Circuit case holds that the *only* requirement for terminating non-debtors' direct

claims against other non-debtors is that such termination is important to the reorganization.

Rather, the Second Circuit stated that such importance was "*at minimum*" what was required.

*Metromedia*, 416 F.3d at 143 (emphasis added).  But stating that a non-debtor release must *at*

*least* be important to the plan is not the same as holding that such importance is alone *sufficient*

to make it permissible.

Moreover, the Second Circuit specifically disapproved of the non-debtor release at issue

in *Metromedia*.  416 F.3d at 143.  Among other things, it questioned whether the breadth of the

release—which covered numerous third parties in addition to the party contributing funds—was

necessary to the plan.  *Id*.  Similarly, here, the Non-Debtor releases extend to persons far beyond

those making contributions to the reorganization plan and who would have no claim for

indemnity or contribution against the Debtors.  It is not even clear whether individual Sackler

Family members are making any direct financial contributions to the estate or if all of the money

attributed to them comes from trusts.  *See* 8/19/21 Tr. at 116-117; 8/17/21 at 119-20; 8/18/21 at

119-20.

41

In addition, one of the factors considered by *Metromedia* is whether "the plan otherwise provided for the full payment of the enjoined claims." 416 F.3d at 142. No one contends that the personal injury victims are being paid in full. The Ad Hoc Individual Group has acknowledged this fact. *See* ECF Doc. No. 4012 ¶ 2 ("[T]he Plan does not (and no plan ever could) fully compensate Personal Injury Victims for their injuries.").

Nor do the other Second Circuit cases cited by the Stay Opponents support allowing the Non-Debtor releases here. *See* ECF Doc. No. 4002 ¶ 10; ECF Doc. No. 4014 ¶¶ 37-38; ECF Doc. No. ¶¶ 38-39 (collectively citing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285 (2d Cir. 1992); *Manville I*, 837 F.2d at 89; *Madoff*, 740 F.3d at 88; and *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012)).

*Drexel* did not involve a chapter 11 plan confirmation. Instead, it involved a settlement of a securities class action in which a class representative released claims on behalf of a certified class under Fed. R. Civ. P. 23. 960 F.2d at 288.[21]

*Manville I* involved the release of claims that were derivative of claims belonging to the debtor and that sought relief from insurance proceeds that were the debtor's property and part of its estate. 837 F.2d at 93 (approving injunction regarding disposition of debtor's insurance proceeds where plaintiffs' claims were "inseparable from Manville's own insurance coverage"). It does not support a bankruptcy court's authority to enjoin a creditor's direct claim against a non-debtor. That *Manville I* does not support a bankruptcy court's authority to enjoin a creditor's direct claim against a non-debtor is made amply clear by the holding of *Manville III*, 517 F.3d at 66.

---

[21] Moreover, it is not clear that *Drexel*'s ruling survived the Supreme Court's decision in *Ortiz*, prohibiting mandatory class certification when a limited fund is created by agreement. *See* n.18, *supra*.

*Madoff* similarly involved a release and injunction against claims that were derivative of the debtor's. 740 F.3d at 90-94. There, the trustee had settled with certain defendants for fraudulent transfers, and the bankruptcy court enjoined any claims that were "duplicative or derivative of the claims brought by the Trustee." *Id*. at 86. Third parties then sought to sue the same debtors for the same fraudulent conveyance settled by the trustee. *Id*. at 91. The court carefully looked for any allegations of "particularized" actions by the defendants, such as misrepresentations, and found none. *Id*. at 91-93. The court even noted that the plaintiffs may still amend the complaint to allege any "particularized conspiracy claim" that was not derivative of the debtor's. *Id*. at 94.

*In re Quigley Co*., 676 F.3d 45 (2d Cir. 2012), was an asbestos case that interpreted a statute, 11 U.S.C. § 524(g), that by its terms cannot apply to this case. Even if the statute did somehow apply to this non-asbestos case, its threshold requirements are not met here. Section 524(g) requires that: (1) the releasees are identifiable from the terms of the injunction; (2) they are "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor"; and (3) that liability must "arise by reason of" one of four statutory relationships. But here, the Plan precludes claims against *unidentified* non-debtors and is not limited to claims where liability is both based on the debtor's conduct *and* arises from one of the four statutory relationships to the debtor, 11 U.S.C. § 524(g)(4)(A)(ii), but extends to any claim for which a debtor's conduct is *either* a "legal cause" *or* "an otherwise legally relevant factor." 11 U.S.C. § 524(g)(4)(A)(ii); *In re W.R. Grace Co*., 13 F.4th 279 (3d Cir. 2021).

*In re Tronox Inc*., 855 F.3d 84 (2d Cir. 2017), likewise does not support the Non-Debtor releases. *Tronox* involved a final and unappealed release and injunction of claims that were

43

duplicative or derivative of those settled in the debtor's bankruptcy case. *Id*. at 92. There, third

parties later tried to sue the settling defendants based on indirect-liability claims—fraudulent

transfer actions and actions for alter-ego/successor liability—with no allegation that the settling

defendant had breached a duty directly to the plaintiffs. *Id*. at 105-06; *see also id*. at 88 (noting

plaintiffs did not "alter their state-court complaint to allege direct claims against [the defendant]

to hold it responsible for its own alleged wrongdoing"). The Second Circuit was thus only asked

in *Tronox* whether a particular claim fell within the unappealed release; it was not asked to

affirm the propriety of the release already issued.

Further, *Tronox* provided an extensive discussion of what constituted a "derivative"

claim. *Id*. at 99-107. The Second Circuit clarified that derivative claims would not include

claims asserting independent misconduct by the non-debtor third party. *Id*. at 104-05 (noting

plaintiffs could have, but did not, raise direct claims asserting that the successor-in-interest

"instructed its subsidiaries not to clean up the toxic site or were negligent in their supervision of

the cleanup" or otherwise alleged harms by acts of the successor-in-interest). Only in

*Metromedia* did the Second Circuit directly address the possibility of approving a release of

direct claims held by non-debtors against non-debtors, and even then the Second Circuit did not

approve the release at issue.

These cases do not stand for the proposition that a bankruptcy court may extinguish,

without consent, non-debtors' direct claims against other non-debtors that are independent of the

debtor's own claims and property. Whether this Court has correctly read these Second Circuit

decisions to permit this type of non-debtor release at least raises serious questions on the merits

making them a fair ground for litigation, especially given *Metromedia*'s express

44

acknowledgment that no provision of the Bankruptcy Code authorizes non-debtor releases outside of the asbestos context.

## IV.    No Bond May Be Required of the United States Trustee.

While other Stay Opponents recognize that no bond requirement may be imposed on the United States Trustee, *see*, *e.g.*, ECF Doc. No. 4016 ¶ 65, the AHC argues that the United States Trustee should be required to post a bond.  ECF Doc. No. 4002 ¶ 45.  That argument is baseless.

Under Rule 8007, which addresses stays pending appeal, "[t]he district court, BAP, or court of appeals may condition relief on filing a bond or other security with the bankruptcy court."  Fed. R. Bankr. P. 8007(c).  But "[a] bond or other security is not required when an appeal is taken by the United States, its officer, or its agency[.]"  Fed. R. Bankr. P. 8007(d).  As explained by the Advisory Committee Notes, the Rule permits the Court to "to condition the granting of relief on the posting of a bond by the appellant, *except when that party is a federal government entity*."  Fed. R. Bankr. P. 8007 (Advisory Committee Notes) (emphasis added).  *See also In re Ahmed*, 420 B.R. 518, 522 (Bankr. C.D. Cal. 2010) (citing former Rule 8005 and explaining that "[w]hile a supersedeas bond is usually required to obtain a stay [pending appeal] . . . the United States government . . . is excused from posting such a bond").

Rule 8007 is not the only obstacle to imposing a bond.  Rule 8007 implements a mandatory statutory prohibition on requiring bonds by the federal government: "Security for damages or costs shall not be required of the United States, any department or agency thereof or any party acting under the direction of any such department or agency on the issuance of process or the institution or prosecution of any proceeding."  28 U.S.C. § 2408.

Thus, because the United States Trustee is an officer of the United States, 28 U.S.C. § 581, no bond may be required of him as a condition of issuing a stay pending appeal.

45

**V.    This Court Has Authority to Enter a Stay Until All Appeals Are Resolved, But Should at a Minimum Grant a Stay Until the District Court Has Ruled.**

This Court can, and should, grant a stay for the full duration in which the United States Trustee's appeals are pending.  The United States Trustee has asked for a stay "pending appeal," and has not limited that request to the time when the appeal is pending in the district court.  *See* Fed. R. Bankr. P. 8007(a)(1).

Appellees argue that the request for a stay pending appeal through multiple levels of appeal is procedurally improper.  ECF Doc. No. 4014 ¶ 11.  The plain language of Rule 8017(a)(1), however, authorizes a stay "pending appeal."  Although the case law is not uniform as to the duration of a stay pending appeal under Rule 8007, nothing in the rule precludes the bankruptcy court from staying its order for the duration of the appellate process.  *See In re RMAA Real Estate Holdings, LLC*, No. 10-16505, 2010 WL 3632706, at *2 (Bankr. E.D. Va. Sept. 10, 2010) (staying bankruptcy court's order until appeal was fully disposed of without prejudice to the appellee seeking modification or termination of the stay in the event of an appeal to the Court of Appeals).[22]  Unlike Rule 8025, which provides a mechanism to stay the ruling of the district court "until final disposition by the court of appeals," Rule 8007 specifies no time at which a stay of the bankruptcy court's order must terminate.  Given the express limitation on the stay's duration in Rule 8025, the omission of a similar restriction in Rule 8007 should be understood to be deliberate.  If appellees believe that a stay is no longer warranted after the district court enters its judgment, they may ask that the district court vacate or modify the stay.  *See* Fed. R. Bankr. P. 8007(b)(1).

---

[22] *RMAA Real Estate* analyzed former Bankruptcy Rule 8005 from which Rule 8007 is derived.

46

This Court also has inherent authority to stay the Confirmation Order for the duration of the appeal process. Bankruptcy courts have "inherent power . . . under their general equity powers and in the efficient management of the[ir] dockets to grant a stay." *S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1146 n.3 (5th Cir. 1987) (quoting *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)); *cf. Range v. 480-486 Broadway, LLC*, 810 F.3d 108, 113 (2d Cir. 2015) ("[A] district court possesses inherent authority to control the disposition of the causes on its docket and has power to stay an action as an incident of that authority.") (internal quotation marks omitted); *Mountain Empire Oil Co., Inc. v. Callahan (In re Lambert Oil Co., Inc.)*, 375 B.R. 197, 199 (W.D. Va. 2007) (noting "the recognized inherent power of inferior courts to preserve the status quo pending appeals").

In the alternative, the United States Trustee requests a more limited stay pending resolution of the appeal in the district court.[23] Given the speed with which the district court appeal is proceeding, the Stay Opponents have failed to proffer a valid reason not to stay the Confirmation Order at least for this limited time. And while they claim that no stay is necessary given the district court's November 30, 2021, hearing date, they utterly disregard the fact that the district court might need some time to render its decision—and even at lightning speed, it may need more than the *one day* between the hearing date and the potential December 1, 2021, sentencing date.

---

[23] Under Bankruptcy Rule 8025, the district court's judgment will automatically be stayed for fourteen days, and that stay would also extend this Court's stay of the Confirmation Order. Fed. R. Bankr. P. 8025(a), (c).

47

## **CONCLUSION**

WHEREFORE, for these reasons, the United States Trustee respectfully moves for a stay

of the Confirmation Order and Advance Order pending resolution of the appeal of those orders.

Dated: New York, New York
       November 1, 2021

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Linda A. Riffkin*
Linda A. Riffkin, Assistant United States Trustee

| | |
|---|---|
| RAMONA D. ELLIOTT | WILLIAM K. HARRINGTON |
| Deputy Director/General Counsel | United States Trustee, Region 2 |
| P. MATTHEW SUTKO | LINDA A. RIFFKIN |
| Associate General Counsel | Assistant United States Trustee |
| WENDY COX | PAUL K. SCHWARTZBERG |
| MELANIE D. HENDRY | BENJAMIN J. HIGGINS |
| BETH A. LEVENE | Trial Attorneys |
| SUMI K. SAKATA | |
| Trial Attorneys | Department of Justice |
| | Office of the United States Trustee |
| Department of Justice | 201 Varick Street, Room 1006 |
| Executive Office for United States | New York, NY  10014 |
|  Trustees | (212) 510-0500 |
| 441 G Street, N.W., Suite 6150 | Fax:  (212) 668-2361 |
| Washington, DC  20530 | |
| (202) 307-1399 | |
| Fax:  (202) 307-2397 | |

48