**Hearing Date: November 9, 2021 at 10 am EST**

| | |
|---|---|
| KLEINBERG, KAPLAN, WOLFF & COHEN, P.C. | PULLMAN & COMLEY, LLC |
| Matthew J. Gold | Irve J. Goldman |
| Robert M. Tuchman | 850 Main Street |
| 500 Fifth Avenue | Bridgeport, Connecticut 06604 |
| New York, New York 10110 | Tel: (203) 330-2000 |
| Tel: (212) 986-6000 | |
| | |
| *Counsel to the State of Washington* | *Counsel to the State of Connecticut* |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| **In re:** | : | Chapter 11 |
| | : | |
| **PURDUE PHARMA L.P.,** *et al.*, | : | Case No. 19-23649 (RDD) |
| | : | (Jointly Administered) |
| **Debtors.** | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY IN FURTHER SUPPORT OF MOTION OF THE**
**STATES OF WASHINGTON AND CONNECTICUT**
**FOR A STAY PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT.......................................................................................................................4

    I.    The Confirmation Order Should be Stayed Pending Appeal....................................4

        A.    A Stay is Necessary to Prevent Irreparable Injury to the States. .................4

        B.    The States Have at Least a Substantial Possibility of Succeeding
            on Appeal. ....................................................................................................6

        C.    A Stay Is in the Public Interest, and Is Unlikely to Cause
            Substantial Harm.........................................................................................9

            a.    The Declarations Submitted by the Stay Opponents All
                Contain Inadmissible Evidence.......................................................10

            b.    The Stay Opponents' Arguments Fail............................................18

    II.    The Confirmation Order Should be Stayed Without any Requirement
        that a Bond be Posted...........................................................................................23

CONCLUSION...................................................................................................................26

12135601.7 - 11/01/21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
   361 B.R. 337 (S.D.N.Y. 2007) ................................................................................6

*Baity v. Kralik*,
   51 F. Supp. 3d 414 (S.D.N.Y. 2014) ...................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014) ....................................................................................7

*Bridgeway Corp. v. Citibank*,
   201 F.3d. 134 (2d Cir. 2000) ...............................................................................15

*Busler Enter., Inc. v. MG Refining and Mktg., Inc.*,
   No. 96-cv-3590, 1997 WL 672018 (S.D.N.Y. Oct. 29, 1997) .............................11

*Country Squire Assocs. of Carle Place, LP v. Rochester Comm. Sav. Bank (In re Country Squire Assocs. of Carle Place, LP)*,
   203 B.R. 182 (B.A.P. 2d Cir. 1996) .....................................................................4

*Credit One Bank, N.A. v. Anderson (In re Anderson)*,
   560 B.R. 84 (S.D.N.Y. 2016) ...............................................................................6

*In re Davis*,
   No. 20-cv-3492, 2020 BL 439410 (C.D. Cal., Apr. 22, 2020) .............................24

*In re Diaz*,
   No. 2-bk-5591, 2011 BL 28288 (Bankr. M.D. Fla. Jan. 25, 2011) ......................24

*DVL, Inc v. Niagara Mohawk Power Corp.*,
   490 Fed. App'x 378 (2d Cir. Aug. 2, 2012) .........................................................11

*Fenje v. Feld*,
   301 F. Supp. 2d 781 (N.D. Ill., 2003) .................................................................17

*Ferrar v. Federal Kemper Life Assurance Co.*,
   198 F. Supp. 2d 940 (S.D. Ohio, 2002) ..............................................................17

*Hollander v. American Cyanamid Co.*,
   172 F.3d 192, 198 (2d Cir. 1999) ...................................................................10, 14

12135601.7 - 11/01/21

*Larouche v. Webster*,
175 F.R.D. 452 (S.D.N.Y. 1996) ..........................................................................................11

*Loparex, LLC v. MPI Release Techs., LLC*,
No. 9-cv-1411, 2013 BL 51872 (S.D. Ind. Feb. 26, 2013) ....................................................24

*Luckert v. Dodge County*,
No. 7-cv-5010, 2011 WL 13128689 (D. Neb. Jan. 11, 2011) ................................................24

*In re Metromedia*,
416 F.3d 136 (2d Cir. 2005)................................................................................................6, 7

*Pao Tatneft v. Ukraine*,
No. 17-cv-582, 2021 BL 202234 (D.D.C. June 1, 2021).......................................................24

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020)..............................................................................................................11

*Saniteq, LLC v. GE Infrastructure Sensing, Inc.*,
No. 17-cv-771, 2018 WL 4522107 (E.D.N.Y. July 12, 2018)................................................11

*Sellers v. M.C. Floor Crafters, Inc.*,
842 F.2d 639 (2d Cir. 1988)............................................................................................12, 16

*Tripp v. Ariz. Bd. of Regents*,
No. C20144811, 2018 Ariz. Super. LEXIS 1107 (Super. Ct. June 4, 2018) ..........................24

*U.S. v. Awad*,
No. 06 CR 600, 2007 WL 1988382 (S.D.N.Y. July 3, 2007)................................................15

*U.S. v. Garcia*,
291 F.3d 127 (2d Cir. 2002)..................................................................................................13

*U.S. v. Garcia*,
413 F.3d 201 (2d Cir. 2005)..................................................................................................13

*United States v. Brown*,
938 F.2d 1482 (1st Cir. 1991) ...............................................................................................17

*United States v. Popejoy*,
578 F.2d 1346 (10th Cir. 1978) .............................................................................................17

*United States v. Subeh*,
No. 04-cr-6077T, 2006 WL 1875407 (W.D.N.Y. July 5, 2006) ............................................17

*Vanderbilt Minerals v. Sub-Technical, Inc.*,
No. 18-cv-105, 2019 WL 4864466 (N.D.N.Y. Oct. 8, 2019)................................................11

iii

*W.D. v. Rockland County*,
    521 F. Supp. 3d 358 (S.D.N.Y. Feb. 22, 2021)........................................................................14

*Wahad v. FBI*,
    179 F.R.D. 429 (S.D.N.Y. 1998) ...........................................................................................12

*Wyler v. U.S.*,
    725 F.2d 156, 160 (2d Cir. 1983)...........................................................................................10

**Statutes & Rules**

Fed. R. Bankr. P. 8007....................................................................................................3, 23, 24

Fed. R. Civ. P. 56.........................................................................................................................10

Fed. R. Evid. 602 ................................................................................................................ *passim*

Fed. R. Evid. 701 ............................................................................................................11, 12, 13

Fed. R. Evid. 702 ........................................................................................................................11

Fed. R. Evid. 803(8).....................................................................................................................15

iv

Hearing Date: **November 9, 2021 at 10 am EST**

## PRELIMINARY STATEMENT

1.      The States of Washington and Connecticut submit this reply to the objections of Purdue, the Official Committee of Unsecured Creditors (the "UCC"), the Ad Hoc Group of Individual Victims (the "Ad Hoc Group") and the Multi-State Governmental Entities Group (the "MSGE" and, collectively with the Purdue, the UCC and the Ad Hoc Group, the "Stay Opponents"), who now baldly insist that a delay of a small number of months—more than two years into the case—in order to allow for an expedited appeal of this Court's Order confirming the Plan is intolerable.

2.      By repetition, the Stay Opponents emphasize that the lynchpin of the confirmed Plan is the enforcement of the Sacklers' demanded condition of global peace and that to accomplish that goal, the Court is required to permanently extinguish sovereign police power claims against non-debtors. This calculated invasion of sovereignty is, without reasonable dispute, irreparable harm of the kind that justifies a stay. Purdue took two years to craft a Plan designed to insulate this calculated invasion of sovereignty from appellate review by holding hostage the public good that plan distributions could do. But the delay of some months necessary to determine whether such constitutional violence is permitted is both reasonable and in the public interest. The necessary time to get properly resolved a serious constitutional and statutory challenge to this Plan will not cause the kind of irreparable harm that justifies short-circuiting appellate review. The end does not justify illegal means.

3.      None of the redundant and overheated arguments offered up by the Stay Opponents warrants denial of a stay pending appeal. For the reasons set forth at length in the States' opening motion (Dkt. # 3789), such a stay is urgently necessary in order to avoid the risk that the States' appeal will be rendered equitably moot—a "quintessential form of prejudice." The Stay Opponents

now seek a free hand to avoid Circuit-level review of the States' appeal on the merits, notwithstanding that Circuit-level review is what is contemplated by statute and that review by the district court and the court of appeals is what the Stay Opponents were urging just a few weeks ago. To be clear, a stay through a Second Circuit appeal is what the States seek in this motion. The Stay Opponents' transparent bid to prevent a full appellate hearing should be denied.

4.      So too should be rejected the Stay Opponents' argument that a stay would not be in the public interest. By any reasonable measure, substantive appellate review of the Order, and of the States' ability to pursue their police power claims against the Sacklers, is in the public interest. While it cannot be doubted that Purdue's and the Sacklers' victims are facing real need, the Stay Opponents' cynical effort to portray the States as opposing desperately needed abatement efforts should be rejected as grossly myopic and misdirected. While any further delay in providing relief to the victims of Purdue and the Sacklers is regrettable, and indeed tragic, the fault lies with the Sacklers—who held out for <u>years</u> in order to extract their blanket release of civil liability from their company Purdue, and with the Stay Opponents, who persisted in pushing a plan that was constructed to contain illegal nonconsensual releases of State police power claims—and not with the States who have refused to dance to the Sacklers' tune. It is one more bitter irony of this case that Purdue and the Sacklers, who have inflicted so much harm on their victims, should now be using those victims cynically to preclude judicial review.

5.      Furthermore, it is manifestly against the public interest for the Plan's drafters and proponents to be permitted to construct a Plan that is designed to evade appellate review.

6.      This Court should not countenance the Stay Opponents' continued masquerade of engagement with the States and others seeking a stay. The States have made many proposals to Purdue and the Stay Opponents in order to find a way to permit appeals to go forward, on an

expedited basis, free of the threat of equitable mootness, but in a way that minimizes the effects upon the victims of Purdue and the Sacklers. The Stay Opponents have responded by either ignoring the proposals or, in some cases, responding with transparently inadequate counterproposals, proving yet again that their primary goal is not mitigation of harm but securing releases for the Sacklers free of appellate rights.

7.      The States, along with other stay movants, have sought to follow the Court's suggestion and to negotiate a meaningful consensual stay that would permit their appeals to proceed while avoiding stay litigation. However, Purdue and the Stay Opponents have refused to make a proposal that could seriously be expected to be acceptable to the movants. Most significantly they have included in every "proposal" a poison pill: that the movants agree that Purdue's sentencing hearing take place in December. The Stay Opponents' intention is to then argue that following sentencing Purdue will be compelled to begin the restructurings contemplated in the Plan, and that as a consequence the Plan will have been substantially consummated and the appeals equitably mooted. In this way the Stay Opponents hope to avoid exposing the Plan to the scrutiny of the Court of Appeals.

8.      For the reasons set forth at length in the States' objections to the Plan, in their opening brief and in their appellate brief filed in the District Court on October 25, 2021, the States have easily met their burden to show a "substantial possibility" of succeeding on appeal. While the Stay Opponents obviously have their own arguments in response, the issues implicated by the States' appeal are real ones—issues deserving of substantive appellate review.

9.      Finally, the Stay Opponents have offered no compelling reason for ignoring the plain language of Rule 8007 to impose a bond.

10. The Stay Opponents' arguments should be rejected, the States' stay motion granted, and implementation of this Court's Order stayed pending appeal.

## ARGUMENT

### I. THE CONFIRMATION ORDER SHOULD BE STAYED PENDING APPEAL.

#### A. A Stay is Necessary to Prevent Irreparable Injury to the States.

11. The Stay Opponents do not seriously contest that their intention is to seek to preclude appellate review of the Confirmation Order through equitable mootness, thereby cementing the involuntary injunction barring the States from asserting police power actions against the Sacklers. Depriving the States of their ability to protect their citizens as they see fit is undoubtedly an injury, and choking off direct appeal would make that injury irreparable. As stated in the States' motion, the loss of the States' appellate rights under these circumstances would be "the quintessential form of prejudice." *Country Squire Assocs. of Carle Place, LP v. Rochester Comm. Sav. Bank (In re Country Squire Assocs. of Carle Place, LP)*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (quotation marks and citation omitted). Judge McMahon agrees. (*See*, *e.g.*, Oct. 13, 2021 Order, at 12 ("I am on the record stating that I will not allow this appeal to be equitably mooted.").) Accordingly, the States have satisfied this prong regarding stay pending appeal.

12. Purdue's artful argument that there is no threat of equitable mootness is belied by its careful reservation of the argument that sentencing will not result in equitable mootness. (Purdue Opp., at ¶ 13; District Court Dkt. # 58, at ¶ 2.) This reservation gives away the game. While Purdue seeks to cloud the issue by stressing that payments under the Advance Order do not threaten equitable mootness, its intention is to create equitable mootness through sentencing. Accordingly, sentencing should be stayed and Purdue should be directed to seek a postponement of sentencing. There is no external reason for the sentencing to proceed 83 days after the

4

confirmation order entered; Purdue inserted that provision into the plan for its convenience to allow time to prepare for the transfer of assets to NewCo. The Federal Government acceded to Purdue's reasonable request. A similar request, premised on the resolution of weighty appellate issues, is equally as reasonable a request and can easily be pursued as a way of avoiding economic harm to Purdue's business. The only circumstance in which the duration of a stay should be affected by sentencing should be if the prosecutors or the sentencing court rejects Purdue's request and demands the sentencing proceed in December.

13.    Purdue's technical argument that the real threat of equitable mootness is insufficient for stay purposes makes little sense. The injury Purdue seeks to inflict upon the States is not "merely" equitable mootness, but rather the complete extinguishment of their police power claims against the non-Debtor Sacklers. Stifling the appellate rights of the elected leaders of States representing millions of citizens must constitute an injury cognizable by the courts.

14.    The parade of horribles trotted out by Purdue—that granting a stay in this case will somehow lead to the routine stay of confirmation orders in all cases—is overblown. All parties agree that this case is an exceptional one, consuming two years of lengthy and expensive negotiations to design a complex equitable abatement fund. The appellants are not bondholders or holders of trade claims, but sovereign States asserting police power claims. At issue on appeal is the momentous question whether the considered judgment of the lawful representatives of ten States—with a collective population exceeding 66 million—may be legally and constitutionally overridden in order to grant the non-Debtor Sacklers a blanket release from civil liability stemming from their role in the opioid crisis.[1]

---

[1]    Purdue continues to trot out the red herring that the States are mischaracterizing the scope of the release (Purdue Opp., at ¶ 45), when, as Purdue acknowledges in the immediately preceding sentence of its Opposition, the States have at all times accurately described the release as covering civil conduct only. That the liabilities relate to crimes—**federal felonies to which Purdue has pled guilty**—is true. And it is

15.     In this unusual case the stakes are not "merely" potential equitable mootness but rather an ongoing prohibition on the ability of the States to protect the health and wellbeing of their citizens. As discussed at length in Maryland Stay Motion (dkt. # 3845), such a prohibition itself is an injury to sovereign States. The States seek to do so not only within the four corners of this case but in the long run by ensuring that billionaire perpetrators of crimes cannot buy themselves out of civil liability, while preserving most of their ill-gotten gains, through the bankruptcy of their companies.[2] The interests at stake are powerfully real, and deserve a substantive hearing before the District Court and, if necessary, the Second Circuit.

**B.      The States Have at Least a Substantial Possibility of Succeeding on Appeal.**

16.     By now, the parties have set forth their respective positions on the merits of the issues on appeal at substantial length, including most recently by the States in their appellate brief filed on October 25, 2021 in the District Court. While of course this Court disagrees with the States' arguments (a circumstance common to all appeals), it should be clear to all that the States' arguments have at a minimum a "substantial possibility" of succeeding on appeal. *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 346 (S.D.N.Y. 2007). This is not a particularly high bar, *see Credit One Bank, N.A. v. Anderson (In re Anderson)*, 560 B.R. 84 (S.D.N.Y. 2016) (the "'substantial possibility of success' test … is intended to eliminate frivolous appeals") (quotation marks and citation omitted), and this Court

---

likewise true that the entire point of the settlement is to absolve the Sacklers of civil liability for those crimes. Moreover, the suggestion that the preservation of criminal liability justifies extinguishing civil liability is disingenuous. Criminal charges have different elements and different standards of proof. States statutes provide for both criminal and civil litigation against wrongdoers. States are entitled to pursue either remedy or both.

[2]     It cannot seriously be doubted that such future perpetrators will use Purdue as a roadmap. One need look no further than Purdue's efforts in this case to transform *Metromedia* into a checklist to confirmation of the Plan and its release of the non-Debtor Sacklers.

6

need do no more than review the arguments set forth in the States' appellate brief (and previewed in the States' opening brief on this motion) to find that the standard has been met—indeed, met easily.

17.    Of course the Stay Opponents have arguments in response, but they characteristically (especially in the case of Purdue) overstate the strength of their arguments and downplay—often glaringly so—that of the States'. While the Opponents insist that the States' arguments are "totally unsupported" (Purdue Opp., at ¶ 38), "directly" contradicted by "controlling precedent" (UCC Opp., at ¶ 56), and otherwise unlikely to succeed (MSGE Opp., at ¶ 36), the simple fact is that the Second Circuit has never approved of a non-debtor release, such as that of the Sacklers, in circumstances even remotely approaching those here (and such releases have been rejected categorically in three Circuits). In labeling non-debtor releases "foundational" (Purdue Opp., at ¶ 37), the Stay Opponents ignore the Second Circuit's admonition that such releases are "a device that lends itself to abuse" and can be used by a non-debtor to achieve a "bankruptcy discharge arranged without a filing and without the safeguards of the Code." *In re Metromedia*, 416 F.3d 136, 142 (2d Cir. 2005). The Stay Opponents likewise refuse to acknowledge that there is anything different about a State having its police powers non-consensually extinguished as compared to a discharge of the claims of a typical creditor.[3]

---

[3]    The States will not respond point-by-point here to the merits arguments of Purdue or any of the other Stay Opponents, as such issues are properly addressed in merits briefing in the District Court. In no way, of course, do the States concede anything about the merits arguments the Stay Opponents have asserted here, many of which are, as Purdue puts it, "frivolous". To take one example out of many, Purdue continues to insist that it is wrong to call *Metromedia*'s discussion of the third-party releases *dicta*. (Purdue Opp., at ¶ 37 n.23.) But the emperor has no clothes, and *dicta* is *dicta*. The *Metromedia* court resolved the case on other grounds—the portion of the opinion that concerns third-party releases is, by definition, *dicta*. Purdue's unironic citation to *dicta* in a footnote in *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 93 n. 12 (2d Cir. 2014), only underscores that Purdue does not understand or does not wish to acknowledge the definition of *dicta*.

18.    If the States' arguments are as weak as the Stay Opponents insist they are, one wonders why they have fought voraciously to engineer a condition of equitable mootness to preclude substantive appellate review—at least at the Circuit level.[4]

19.    In that regard it cannot be overlooked that this case could have been in the Second Circuit right now. The principal reason it is not is that the same parties now opposing a stay also strenuously opposed the States' certification motion. Not three weeks ago, Purdue—which just weeks before that had committed to *supporting* a direct appeal to the Second Circuit (Dkt. # 3655, Exhibit AA, at § 2.09)—abruptly changed course and railed against the States' supposed attempt "to short-circuit the normal appellate process, leapfrog the district court, and proceed directly to the Second Circuit." (Dkt. # 3933, at ¶ 1.)

20.    Now Purdue insists that the "normal appellate process" would take far too long for a stay of any kind to be appropriate—"[i]t is indisputable that a months- or years-long stay of the effectiveness of the Plan would impose significant and irreparable harm, risk, and material incremental cost on the estates' creditors and the American public as a whole." (Purdue Opp., at ¶ 22.) The Ad Hoc Group's prevarication is nearly as striking. (*Compare* Dkt. # 3936 (Ad Hoc Group's Opposition to Certification), *with* Ad Hoc Opp., at ¶ 25 & n.13 ("there is a very real possibility that the appeal will take longer than a year," and there is "simply no guarantee that it

---

[4]    Purdue's specific argument that the "evidence adduced at confirmation conclusively demonstrated … that [the States] would not do better in a liquidation of the estates in which they retained their claims against the Sacklers" (*id.*, at ¶ 15) is patently false. Although Purdue had the burden of proof on this issue, it adduced no evidence of any kind regarding the value of the States' direct claims, instead taking the position that the claims were too speculative to estimate. (*See* Aug. 13, 2021 Hr'g Tr. (testimony of DelConte), at 57, 61.). Moreover, the calculation of the magnitude of the injury to the States' sovereign authority to pursue corporate directors and other insiders engaged in wrongdoing is indisputably a political consideration fit to be resolved by the executive branch and voters in each state rather than being imposed by political calculations of other states or by a bankruptcy judge.

will" proceed more quickly).) The MSGE (Dkt. # 3932) and the UCC (Dkt. # 3935) opposed certification as well.

21.     The Opponents cannot have it both ways. Either there should be a "normal appellate process" with substantive review at the Circuit level, or the Second Circuit should have been given an opportunity to hear this case directly. The Stay Opponents chose the former path.[5]

22.     By avoiding both a direct appeal to the Second Circuit and a stay in the District Court, Purdue and the Stay Opponents have left the door wide open to avoiding substantive Second Circuit review—transparently their goal. For all of their puffery about the strength of their own arguments, their actions leave no doubt about how they truly feel about the States' arguments, particularly at the Circuit level. The Second Circuit should be given the opportunity to decide these matters for itself.

**C.     A Stay Is in the Public Interest, and Is Unlikely to Cause Substantial Harm.**

23.     The Stay Opponents should not be permitted to weaponize their own inefficiencies and mistakes to prevent appellate review. Their self-inflicted harms and threatened harms should not form the basis of the denial of a stay. Furthermore, the good that the Plan can accomplish does not outweigh the harm to the public caused first by the Sacklers' blatant purchase of civil

---

[5]     Perhaps even more egregiously, Purdue avoided a stay in the District Court—and thereby left the door open for equitable mootness to emerge (though they have partially pledged not to argue it) through their actions in the coming weeks—by affirmatively misrepresenting the relative size of payments authorized under the Advance Order. At the October 12, 2021 hearing before Judge McMahon, Purdue's counsel specifically represented that the forthcoming payments of $6.9 million under that Order constitute only "a thousandth of one percent of the estate's assets." (Oct. 12, 2021 Hr'g Tr., at 46:14-15.) Of course that is not true—one one-thousandth of one percent of the estate's assets would be only around $70,000. Judge McMahon relied upon this misrepresentation in denying the stay. In her Order of October 13 (Dkt. # 49 in 21-cv-7966), Judge McMahon specifically found that there was no "real threat that these appeals could be found to be equitably moot" because the expenditures contemplated by the Advance Order "are represented to be one one thousandth of one percent of the Bankruptcy Estate's assets, which [in] no way could qualify (equitably or otherwise) as substantial consummation." (Oct. 13, 2021 Order, at 11-12.)

immunity, and then by the Stay Opponents' desperate attempts to preclude full judicial scrutiny of the Plan. The end does not justify the means.

### a. The Declarations Submitted by the Stay Opponents All Contain Inadmissible Evidence.

24.     Each of the Stay Opponents submitted declarations that are rife with conclusory and conjectural statements of fact and opinion, as well as embedded hearsay. Substantial portions of these declarations must therefore be stricken or not considered by the Court in its deliberations on the Stay Motions, as more fully set forth below.

25.     As a fundamental matter, "portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements" should not be considered by the court. *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999).[6] In *Hollander*, the Second Circuit affirmed the lower court's disregard of an affidavit that was "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge, and more resembled an adversarial memorandum than a *bona fide* affidavit." *Id.* (emphasis original) (internal quotations omitted); *see also Wyler v. U.S.*, 725 F.2d 156, 160 (2d Cir. 1983) ("an affidavit … which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (affidavit containing "a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation" was disregarded).

---

[6]     Decisions that consider affidavits submitted in connection with a motion for summary judgment, such as *Hollander*, are directly relevant to the declarations at issue here, since they follow Rule 56's requirement that an affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify." Fed. R. Civ. P. 56(c)(4). The requirement that testimony must be based on personal knowledge is also contained in Fed. R. Evid. 602.

26.      An affidavit that contains "conjecture, legal argument and opinion testimony" must also be disregarded. *Saniteq, LLC v. GE Infrastructure Sensing, Inc.*, No. 17-cv-771, 2018 WL 4522107, at *7 (E.D.N.Y. July 12, 2018); *see also Busler Enter., Inc. v. MG Refining and Mktg., Inc.,* No. 96-cv-3590, 1997 WL 672018, at *7 (S.D.N.Y. Oct. 29, 1997) ("When opinions on ultimate facts and legal conclusions appear in an affidavit, courts will simply disregard the extraneous material"); *Larouche v. Webster*, 175 F.R.D. 452, 455 (S.D.N.Y. 1996) ("When ultimate facts and legal conclusions appear in an affidavit, such extraneous material should ... be disregarded by the court").

27.      Further, unless a witness is qualified as an expert in the area in which he or she is purporting to offer an opinion, a lay opinion offered on matters that require a degree of specialized knowledge is not admissible. F.R.E. 701 (if a witness is not testifying as an expert, testimony in form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) ***not based on scientific, technical or other specialized knowledge within the scope of Rule 702***") (emphasis added); *DVL, Inc v. Niagara Mohawk Power Corp.*, 490 Fed. App'x 378, 380-81 (2d Cir. Aug. 2, 2012) ("[t]he purpose of Rule 701(c) is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702") (quotation marks omitted); *Vanderbilt Minerals v. Sub-Technical, Inc.*, No. 18-cv-105, 2019 WL 4864466, at *10 (N.D.N.Y. Oct. 8, 2019) (affidavit that offered lay opinion on matter that "requires a degree of specialized knowledge" would not be considered). Matters of public health are unquestionably considered to require "special expertise" that is within the realm of "public health experts." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (recognizing "public health" as an area

involving "special expertise" in considering constitutionality of Executive Order limiting capacity

for religious gatherings due to pandemic).

> *Declaration of Jesse DelConte (Dkt. No. 4015) (Purdue Objection)*

28.    The Declaration of Jesse DelConte is replete with speculative and conclusory

assertions that are not supported by personal knowledge, as opposed to hearsay, by reason of which

the following portions are inadmissible:

- In ¶16, Mr. DelConte asserts that a stay "***could*** result in delaying the timeline on which the Debtor and NewCo can get their Public Initiatives to market" (emphasis added), without offering any facts to support this conclusory assertion (such as what, if any, initiatives will be delayed and to what extent) or a basis upon which to find he has personal knowledge about the subject.

- In ¶¶30 and 31, Mr. DelConte arbitrarily assigns an average monthly run rate to ongoing professional fees of 15% of the average rate incurred by professionals for the first six months of 2021, without any factual showing for assigning that percentage or assessment of what actual work would be required of all professionals during the period of any stay.

- The entirety of Part IV of Mr. DelConte's declaration should be disregarded for several reasons. First, it is clearly based on what Purdue has told him concerning what it "continually promised… employees, customers and vendors," which is hearsay, *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) (matters conveyed to affiant by client could not be considered); *Wahad v. FBI*, 179 F.R.D. 429, 437 n. 6 (S.D.N.Y. 1998) (same); and it is followed by the unsupported conclusory assertion that the expectations of customers, vendors and employees would be "upset" and lead to "potentially disastrous effects on the financial viability of the Company …" (¶33). Mr. DelConte cannot testify for employees, customers and vendors, and to the extent his testimony is based on what he was told by them or Purdue, it is infected with inadmissible hearsay and cannot be considered. Similarly, his conclusory statement that "[e]mergence will help relieve the pressure on the Debtors and their employees" is not supported by evidence of any personal knowledge, contrary to Fed. R. Evid. 602, is conclusory and, if anything, is purely a matter of opinion unsupported by evidence of any personal perceptions that would necessary to support such a lay opinion. Fed. R. Evid. 701(a) (lay opinion must be "rationally based on the witness's perception")[7]. Second, Mr. DelConte engages in pure speculation, without offering any basis in fact, for his

---

[7]    Mr. DelConte has not been proffered as a human resources expert and thus his opinion on the effect that non-emergence would have on Purdue's employees is at most, lay opinion. Lay opinion must be based on the personal perceptions of the witness, but irrespective of that, it will not be admissible if it covers a subject of specialized knowledge. *See infra.* n. 9.

conclusion that "[a] stay of the Confirmation Order could jeopardize NewCo's ability to bring these medications to market at all, or could delay for years the availability of these potentially life-saving medicines" (¶35)[8].

*Declaration of John M. Guard (Dkt. No. 4002) (AHC Objection)*

29.    The Declaration of John M. Guard, who has not been proffered as an expert in any identified area of expertise, contains many speculative and conclusory statements and opinions that are not properly considered as admissible evidence. They consist of the following:

- In ¶3, Mr. Guard remarks that it is his "belief" "that entering a stay will materially reduce the residual value of Purdue," which he bases on "the effect that uncertainty and the bankruptcy process has had on the Debtors and the difficulties that a stay will create in keeping and maintaining senior employees and directors for Purdue." Mr. Guard has not been offered as a valuation or human resource expert, such as might entitle him to proffer an expert opinion on Purdue's "residual value" or the human resource effect of a delay in Purdue's emergence. Nor are his conclusory beliefs supported by evidence of personal knowledge about that which he is asking the Court to accept as fact. Fed. R. Evid. 602 ("[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").[9] Indeed, it appears certain that much like Mr. DelConte's declaration, Mr. Guard is simply relaying what other persons may have told him.

- In ¶14, Mr. Guard makes the entirely conclusory statement, unsupported by evidence, that: "It is likely that thousands more Americans are dying now than when this bankruptcy was filed. Given how monies are to be utilized, it is quite possible that additional Americans will die if a stay is granted versus if a stay is not granted." Such grave predictions if a stay of limited duration is granted must be supported by evidence, not hyperbole. Mr. Guard has not been proffered as an expert on public health matters and his conclusory statement that deaths will occur as a direct result of delayed Plan distributions while the expedited appeals remain

---

[8]    For example, Mr. DelConte recites no facts, based on personal knowledge, of any steps, actions or funds NewCo was planning to deploy on public health initiatives in the short period during which the States are seeking a stay in order to allow the appellate process to be completed without the risk of equitable mootness.

[9]    To the extent these conclusory statements are claimed to be lay opinion, no facts were set forth as to what Mr. Guard may have personally perceived to support the opinion. *See U.S. v. Garcia*, 413 F.3d 201, 213 (2d Cir. 2005) (lay opinion must be based "only on personal perceptions" and not the collective perceptions of a group of which witness is a part); *U.S. v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) ("a witness offering a lay opinion must base his opinion on his own personal knowledge, which must be established to the court …"). In addition, Purdue's residual value and the effect of non-emergence on human resources require specialized knowledge, and thus, any lay opinion on those subjects would be inadmissible under Fed. R. Evid. 701(c).

pending simply lacks evidentiary support. For example, Mr. Guard does not even present evidence as to what plans Florida – let alone any other State – has to deploy abatement funds, in what amounts and for what purposes, during the short time appeals are expected to remain pending.

- In ¶16, Mr. Guard makes the same type of conclusory statement, resembling more of "an adversarial memorandum than a *bona fide affidavit*," *Hollander*, 172 F.3d at 198¸ that: "Allowing Americans to needlessly die on some ephemeral hope that there may be some chance at more under the circumstances is misguided and shortsighted. The abatement plan is designed to save lives, and any delay in funding the abatement plan will thwart that critical goal." This is plain argument, not admissible evidence. *Wylie*¸ 725 F.2d at 160 ("[a]n affidavit of the opposing party's attorney which does not contain specific facts or is not based on personal knowledge is not entitled to any weight"). The same can be said for ¶18 of Mr. Guard's declaration, which simply reads as a supplemental brief to the AHC's Objection.[10]

*Declaration of Colin Jorgensen (Dkt. No. 4016-1) (Association of Arkansas Counties' Objection ("AAC"))*

30.     The Declaration of Colin Jorgenson contains inadmissible evidence that should not

be considered in the following respects:

- In ¶¶12 and 13, Mr. Jorgensen relies on an Arkansas Democrat Gazette newspaper article reporting a rise in Arkansas overdose deaths in 2020, to extrapolate that such deaths in 2020 are underreported for Arkansas. It is well settled, however, that "a court may not consider newspaper articles as evidence of the truth of the facts asserted therein, as newspaper articles are hearsay and would not be admissible for their truth at trial." *W.D. v. Rockland County*, 521 F. Supp. 3d 358, 372 n. 5 (S.D.N.Y. Feb. 22, 2021).

- In ¶¶15-17, Mr. Jorgensen seeks to make the point that certain Arkansas local government services, such as first responders, courts and the jail system have seen a strain on resources due to the opioid epidemic. While there is no reason to doubt that is true, the declaration does not support the general statement with "specific facts" in terms of the particulars of this strain and how or to what degree these strains would be alleviated if Plan distributions that are slated to go to the AAC during the pendency of the appeals are not stayed; and no facts are set forth indicating that substantial harm would ensue from a short-term delay in receiving

---

[10]     Mr. Guard's belief as to the reasonableness of the Plan's resolution of claims against Purdue and the Sacklers, and that it strikes the correct balance between Sackler accountability and the need for abatement funds, is, of course, argument, not fact. It also ignores the acknowledgment by Ms. Conroy, touted by several objectors as a respected advocate for the Plan, that reasonable minds could differ as to whether the Sacklers were paying enough to justify the broad releases they are receiving (Aug. 16 Hr'g Tr., at 74:7-13).

Plan distributions while the appeal of what the States consider to be an illegal Plan
can be decided.

- In ¶21, Mr. Jorgensen attaches as Exhibit 1 a report prepared by the Arkansas State
  Drug Director, and in ¶22, he states that the program "relies primarily on uncertain
  and inadequate grant funding, which reliable and ample funding could ameliorate."
  For the admissibility of such a public report under Fed. R. Evid. 803(8)(iii), it must
  contain "factual findings from a legally authorized investigation." "Once a party
  has shown that a set of factual findings satisfies the minimum requirements of Rule
  803(8)(C), the admissibility of such factual findings is presumed." *Bridgeway
  Corp. v. Citibank*, 201 F.3d. 134, 143 (2d Cir. 2000). Under subsection (C), "[t]he
  'reporting agency must have firsthand knowledge of the investigation by which it
  accumulates the published factual findings that Rule 803(8)(C) contemplates, since
  it is the quality of the investigation that determines the caliber of the results'." *U.S.
  v. Awad*, No. 06 CR 600, 2007 WL 1988382, at *3 (S.D.N.Y. July 3, 2007).

- Mr. Jorgensen's declaration does not set forth the particulars of the investigation
  that was conducted, the identity of those involved and the source of the legal
  authority for it. It is therefore not presumptively admissible. The declaration also
  does not assert with specific facts the nature and extent of the uncertainty and
  inadequacy of grant funding, how, if at all, the Plan distributions that the AAC
  expects to receive during the requested stay would be expended and expected to
  ameliorate the inadequacy in funding, and how "more lives would be saved." There
  is a similar lack of factual underpinning for the conclusory and speculative assertion
  that delaying Plan distributions during the short period for which a stay is requested
  will translate "into more overdoses and more lives lost" (¶27).[11]

*Declaration of Kara Trainor (Dkt. No. 4008) (UCC Objection)*

31.    The following portions of the Declaration of Kara Trainor lack a proper foundation

for personal knowledge, are based on hearsay or otherwise inadmissible and should not be

considered:

- In ¶11, a proper foundation has not been established to find that Ms. Trainor has
  personal knowledge that the UCC's efforts to establish an Emergency Relief Fund
  ("ERF") "were undermined by the federal government and certain state attorneys
  general." See also ¶13 ("that effort failed due to lack of support from public side
  creditors"). Fed. R. Evid. 602 (there must be evidence "introduced sufficient to
  support a finding that the witness has personal knowledge of the matter"). Rather,
  it appears that her statement was based on what she was told at one of the UCC

---

[11]    It is anomalous that groups such as the AAC sought for almost two years to negotiate for their
constituents more of a recovery from the Sacklers, without accusing one another of costing lives while they
negotiated, but now seek to attribute such harm to the stay movants for contesting a Plan that in their view
does not provide sufficient funds to justify whitewashing all opioid-related claims against the Sacklers.

meetings about which she testified earlier in ¶11, and it is therefore based on inadmissible hearsay.[12] *M.C. Floor Crafters, Inc.*, 842 F.2d at 643 ("a hearsay affidavit is not a substitute for the personal knowledge of a party").

- In ¶15, Ms. Trainor recounts the closure of two local community organizations that provided treatment and other services, but she provides no evidence sufficient to support a finding of the reason for their closure. To the extent she implies it was due to a lack of funding, there is no evidence that she has personal knowledge that lack of funding was in fact the reason, Fed. R. Evid. 602, advisory committee notes to 1972 proposed rules (requirement of personal knowledge requires that witness "must have actually observed the fact"), and any information she might have in the regard would likely have come from hearsay.

- In ¶15, Ms. Trainor apparently cites these closures as a basis for her conclusion, or more accurately, opinion, that harm will come about in the future if the limited stay requested by the States is granted. Predicting such harm as a result of a short delay in Plan distributions might be within the province of public health experts, but Ms. Trainor's declaration on this point amounts to speculation and conjecture. First, Ms. Trainor's declaration does not set forth facts establishing that she has personal knowledge of the service organizations in any other communities outside of Southwestern Michigan. Second, no "specific facts" were introduced as to what funds would be made available to Southwestern Michigan local governments from Plan distributions, how they would be deployed during the period of the States' stay request, and how, if they were delayed during the period of a stay, it would result in harm.

- In that regard, ¶17 asserts that additional "funding could" be used for various abatement and treatment purposes, and simply assumes that some amount of Plan distributions that would make their way to those communities would be made available and deployed for those purposes during the period of any stay, and further, that a delay in receiving these unquantified funds will result in substantial harm. Such assumptions, however, cannot be substituted for evidence.

*Declaration of Cheryl Juaire (Dkt. No. 4007) (UCC Objection)*

32.    The following portions of the Declaration of Cheryl Juaire lack a proper foundation for personal knowledge, are based on hearsay or otherwise inadmissible and should not be considered:

- In ¶9, Ms. Juaire accuses certain unidentified persons or entities as using "the Chapter 11 Cases as a means to political gain." It is apparent that Ms. Juaire has no

---

[12]    Laying blame on the federal government and certain state attorneys general for the ERF's failing also contradicts Purdue's recounting of what occurred with respect to the ERF in the Disclosure Statement (Dkt. No. 2983, at 74-75).

personal knowledge that any creditor or party in interest in these Chapter 11 cases is using them for political gain, and she is otherwise not competent or qualified to opine on the state of mind or motivations of the parties to whom she is referring. Courts routinely reject unsupported lay opinion testimony regarding another party's state of mind. See *United States v. Subeh*, 04-cr-6077T, 2006 WL 1875407, \*5 (W.D.N.Y. July 5, 2006) (noting a witness is "not competent to testify as to what someone else's state of mind was"); *see also United States v. Brown*, 938 F.2d 1482, 1488 (1st Cir. 1991) ("Testimony regarding the inchoate state of mind of a defendant does not fall within the category of allowable opinion testimony by lay witnesses."); *United States v. Popejoy*, 578 F.2d 1346 (10th Cir. 1978) (witness not permitted to testify where question asked of witness would require him to "interpret the mind" of the defendant); *Fenje v. Feld*, 301 F. Supp. 2d 781 (N.D. Ill., 2003) (a witness is not competent to testify as to another person's state of mind); *Ferrar v. Federal Kemper Life Assurance Co.*, 198 F. Supp. 2d 940 (S.D. Ohio, 2002) (witness's testimony based on her own belief of her deceased husband's belief was inadmissible as incompetent). Her statement is simply *ad hominem* argument likely supplied by the UCC's attorneys and should be disregarded.

- She makes a similar accusation in ¶17: "Apparently [Appellants] care more about their ability to pursue those claims [against the Sacklers], than the chance to use these Chapter 11 Cases collaboratively with other creditors to develop and fund programs to try to abate the opioid epidemic." This suffers from the same evidentiary disability as her accusation in ¶11, as she is not competent or qualified to opine on what is essentially the state of mind of each of the Appellants in pursuing their appeals. As with the statement in ¶11, it is simply argument likely supplied by the UCC's attorneys and should be disregarded.

- As with the Declaration of Ms. Trainor, in ¶11, Ms. Juaire accuses "the federal government and certain state attorneys general" of undermining the ERF[13], which follows a statement in the same paragraph about her attendance throughout the Chapter 11 cases at creditor group meetings. It is therefore obvious that the accusation made by Ms. Juaire is based on what other people may have told her, which makes it inadmissible as grounded in hearsay. It also contradicts Purdue's explanation of what occurred with ERF. *See supra*. n. 12.

- In ¶21, Ms. Juaire asserts that: "I understand that (even on an expedited basis) the appeals could linger for months or even years before reaching their conclusion. Delaying implementation of the plan for such a period of time would result in incalculable cost to human life." As with Mr. Guard, Ms. Juaire has not been proffered as an expert on public health matters and her conclusory statement that deaths will occur as a direct result of delayed Plan distributions while the expedited appeals remain pending simply lacks evidentiary support and constitutes speculation.

---

[13]    She repeats the same accusation in ¶14 (ERF "failed due to lack of support from public side creditors").

17

- In ¶24, Ms. Juaire acknowledges that "[p]recisely how abatement funds will be used remains open," yet follows that acknowledgement with speculation as to how the funds provided under the Plan to various the parties "might" be used. The point that is elided in this declaration, as with the others that attempt to establish harm, is that no evidence has been presented by the Stay Opponents about the amount of the Plan distributions that would be delayed during the expedited appellate process for each of the groups, how and when they would be distributed to and used by the various constituents, how, specifically, the delay in the use of those funds would result in harm and what that harm would be. Anything less is speculation and argument.

- In ¶27, Ms. Juaire closes with the statement that "I believe that a stay pending appeal would cause incredible harm to countless numbers of individuals, families, and communities that would benefit from allowing the Plan to go effective as soon as possible." Ms. Juaire's belief, however, which is essentially lay opinion, cannot be regarding as admissible evidence. As she acknowledges, we do not know how *or when* abatement funds will be used by the various constituents and for what purposes during the short time it is expected the appeals will be pending. Her belief therefore lacks a sufficient factual basis, and in any event, is within the province of expert opinion.

### b. The Stay Opponents' Arguments Fail

33.    Just as it was error for the Sacklers to be allowed to leverage their victims' desperate need, through the winning negotiating hand their company Purdue dealt them, into a blanket release from opioid-related civil liability, so too would it be wrong for that need to cancel out the States' legitimate interest in a substantive (albeit highly expedited) Circuit-level appeal. This is so for several reasons, including the following:

34.    *First*, the Stay Opponents' argument that payments to Purdue's creditors simply cannot wait proves too much. The few short months of further delay that an orderly, expedited appeal through the Second Circuit will in all likelihood entail pales in comparison to the years leading up to the Plan, including the two years in which the Purdue bankruptcy has been pending in this Court while Purdue and the rest of the Stay Opponents engaged in protracted negotiations and motion practice. By the logic of the Stay Opponents they should have accepted the Sacklers' $3 billion offer from the beginning of the case rather spending years negotiating for more. By their

logic those years caused far more damage to the victims of Purdue and the Sacklers than the requested stay ever could. The ongoing harm to the victims of Purdue and the Sacklers did not suddenly change from being the unfortunate consequence of the legal process into an intolerable situation at the exact moment the Stay Opponents decided to accept the Sacklers' terms.

35.    Likewise, the plain fact is that Purdue and the Stay Opponents designed and included in the Plan a gap of at least 82 days between the entry of the Confirmation Order and the Plan effective date. This gap necessarily entailed a delay of several months between confirmation and the payment of funds, causing at least as much harm to the victims of Purdue and the Sacklers as the stay sought here. No one who sincerely believed the arguments proffered by the Stay Opponents would have constructed a plan with such a gap.

36.    *Second*, the reason it has taken so long to get to this point is not intransigence on the part of the States, as Mortimer Sackler Jr. insisted at the hearing: "I am aware of all of the continuing and continuing objections that are wasting time and wasting more resources and holding back the abatement [funds they conditioned on a blanket civil release] that should be going a year ago or three years ago to the people in the communities who need it." (Aug. 19 Hr'g Tr., at 202.) The States never consented to the Plan, and the Plan was not delayed in procuring such consent. The delay is first and foremost the fault of the Sacklers, who stubbornly held out for years to preserve the majority of their opioid wealth until finally wearing Purdue's desperate creditors. The delay is secondarily the fault of Purdue and the other Stay Opponents, who committed to the fatally flawed negotiation strategy of conceding upfront to the Sacklers that the negotiation term most dear to the Sacklers—a release crammed down on dissenting creditors—would be included in any settlement, while at the same time aiding the Sacklers by staying litigation against them. From that point forward the pressure was off the Sacklers and on their adversaries. It should have

19

been a surprise to no one that the result of this self-defeating strategy was, as this Court put it, a "bitter[ly]" small settlement. (Dkt. # 3786, at 99.) To hold the Sacklers' years-long delay against the States, through an argument that abatement can now no longer wait, in order to immunize the Sacklers' release from appellate scrutiny, is disingenuous in the extreme.

37.    *Third*, the American public is *disserved* through an ostrich-like ignorance of the long-term effect of allowing wrongdoers to purchase a blanket release from civil liability through the bankruptcy of their companies. The States' Attorneys General, as the constitutionally recognized and electorally responsive representatives of their citizens, have weighed the (short-term) benefits of the Plan against this (long-term, insidious) cost, and have found the Plan's benefits to come up short. The Stay Opponents refuse to so much as acknowledge the perverse lesson that future wrongdoers will learn from the Purdue bankruptcy.

38.    Furthermore, the American public is *disserved* through the cynical strategy of insulating a legally aggressive and unprecedented plan from appellate review. The American judicial system, and the federal courts in particular, are premised on the availability of judicial review of trial courts, which appellate oversight is provided by the circuit courts of appeal and to which appellants have recourse as a matter of right.

39.    Only with these principles in mind can the balance of harms and the public interest be properly assessed. Above all else, the American public will benefit most from substantive Circuit-level review of whether the Plan's release of the non-Debtor Sacklers accords with the Code, non-bankruptcy law, and the Constitution—the very appellate review that is a hallmark of our justice system and which Purdue seeks to curtail or even effectively extinguish at every turn. The States have already done all they can to minimize delay, filing their appellate brief less than two weeks after the preliminary, scheduling conference before Judge McMahon, and seeking a

20

direct appeal to the Second Circuit that would have obviated a full level of appellate review. Allowing the process to play out in the normal, expeditious course that Purdue previously requested is what the public needs and deserves.

40.    The Stay Opponents' remaining arguments involve self-inflicted harm. It is astonishing that Purdue and the Stay Opponents would have agreed to allow the Sacklers to terminate the Sackler Settlement Agreement (Purdue Opp., at ¶ 28), putting at risk all of the benefits Stay Opponents attribute to the settlement.[14] This provision was slipped into the Sackler Settlement Agreement, hidden in the fine print, well after the confirmation trial had begun. Purdue made no effort to notify parties in interest or the Court of the addition of the major concession to the agreement. If anything, it should be stricken from the agreement.

41.    To be sure, it is implausible that the Sacklers would actually exercise such a right, as it would throw away the vast benefits the Sacklers receive under the settlement. Indeed, given the testimony at trial that the Sacklers' greatest fear was the threat of massive litigation, Aug. 13 Hr'g Tr. at 208, it is highly unlikely that they would voluntarily trigger their own nightmare, especially given the Stay Opponents' vehement insistence that there is no chance that the appeals will actually succeed. And Purdue conceded that there is no realistic chance that such a right would be exercised, as the Disclosure Statement did not identify the exercise of this right as a material risk.

42.    There should no longer be any illusions about what is happening here. Just as the Stay Opponents granted the Sacklers a free negotiating hand to obtain a blanket release from civil liability by structuring the Plan to be dependent upon a Sackler financial contribution, they have

---

[14]    Tellingly, none of the Stay Opponents submitted declarations from any of the Sacklers indicating that they intend to invoke this termination right.

afforded the Sacklers a key to unlock a bar to substantive appellate review.[15] Allowing the Sacklers to bludgeon now the Court system, and not just their and Purdue's creditors, into giving them what they want—in this instance, an end to substantive appeals—is manifestly contrary to the public interest.

43.    Even more outrageous is the attempt to weaponize the massive legal fees incurred by Purdue and the Stay Opponents as a reason not to grant a stay.[16] If Purdue and the Stay Opponents truly believed that the legal fees they have been generating truly are causing suffering and death they should have taken drastic steps long ago to control the size of the legal fees.

44.    Purdue's arguments concerning the time value of money simply prove that this case has been going on for too long already. It has, but because of the Sacklers and the Stay Opponents, not the States. Purdue and the Stay Opponents should have pursued a plan structure that was truly consensual rather than adopting a steamroller approach that resulted in appeals that were anticipated and inevitable.

45.    Purdue's unsubstantiated argument that a "stay could jeopardize NewCo's ability to bring its opioid overdose and rescue medicines to market or could delay for years the availability of these potentially life-saving medicines" because of the potential for "forms of value destruction" like the potential need for "financing" (Purdue Opp., at ¶ 31), is just yet another effort to twist the

---

[15]    Purdue further depletes its credibility by insisting that the result of the right it agreed to give the Sacklers would be "litigation chaos"—a "Hobbesian nightmare." (Purdue Opp., at ¶¶ 28, 29.) Of course, such an overheated phrase could be used only by someone who has never read Hobbes. In any event, as Purdue's counsel forthrightly conceded before Judge McMahon, the actual alternative is "a different plan." (Oct. 12, 2021 Tr., at 58.)

[16]    The Stay Opponents approach self-parody by filing multiple lengthy and largely redundant objections to the stay motions—all at the expense of the Estate—when they could have easily submitted a single objection. In addition to Purdue's 59-page omnibus opposition brief prepared by David Polk, the Ad Hoc Group (18-page brief prepared by White & Case), the MSGE (36 pages, by Caplin & Drysdale) and UCC (40 pages; Akin Gump) collectively submitted nearly 100 pages of their own, covering very much the same ground.

egregious harms Purdue and the Sacklers wrought into an argument that scrutiny of the Sacklers should be ended.

46.     In short, the balance of harms, and the public interest, strongly favor a stay throughout the pendency of an expedited appeal to the District Court and the Second Circuit.

## II.    THE CONFIRMATION ORDER SHOULD BE STAYED WITHOUT ANY REQUIREMENT THAT A BOND BE POSTED.

47.     As the States explained in their opening brief, a bond of the States' appeal would be inappropriate for three principal reasons: (i) the United States Trustee has appealed this Court's Order, and the plain terms of Rule 8007(d) exempt the States' appeal from any bond requirement under these circumstances, (ii) the harms of a limited stay are limited and can be mitigated further through the good-faith efforts of the parties, and (iii) the States deserve consideration in light of the constitutional role they are fulfilling and their status as sovereigns. The Stay Opponents offer no cogent reason why a bond should be imposed.

48.     Most glaringly, none of the Stay Opponents grapples seriously with the plain language of Rule 8007(d), which provides that a "bond or other security is not required when an appeal is taken by the United States, its officer, or its agency or by direction of any department of the federal government." By its express terms, this Rule does not apply only to the federal government's appeal when there are multiple appellants, but applies across the board "when an appeal is taken by the United States" or its instrumentalities. The U.S. Trustee has appealed the Order, that appeal has been consolidated with those of the States, and Rule 8007(d) applies on its plain terms.

49.     Purdue has no real answer to this. While it argues that "Rule 8007 plainly does not in any way purport to exempt the moving states or foreign governmental entities from a bonding requirement," citing the putative "plain language of Bankruptcy Rule 8007" (Purdue Opp., at ¶ 74),

Purdue does not even recite the language it claims "plainly" supports its erroneous interpretation. Glossing over the language of the Rule, Purdue precipitously moves on to the alleged "purpose" of Rule 8007, but it do not explain what that ostensible purpose is and why it supposedly does not apply to the States' appeal. (*Id.*) None of the other Stay Opponents addresses the plain language of Rule 8007(d) other than to conclusorily state, like Purdue, that the language supports its position. (*See* MSGE Opp., at ¶ 65 ("Under the plain language of Rule 8007, the Movant States … are not exempt from the bond requirement."); UCC Opp., at ¶ 52; Ad Hoc Opp., at ¶ 12.)

50.    None of the (inapposite) authorities cited by the Stay Opponents remotely supports their position. *See Loparex, LLC v. MPI Release Techs., LLC*, No. 9-cv-1411, 2013 BL 51872 (S.D. Ind. Feb. 26, 2013), cited at UCC Opp. ¶ 52 (addressing whether one private appellant's posting of a bond relieves the other private appellant of the obligation to do so); *In re Davis*, No. 20-cv-3492, 2020 BL 439410 (C.D. Cal., Apr. 22, 2020), cited at UCC Opp. ¶ 52 (addressing whether a single appellant would be required to post bond in a fifth appeal in the same case); *Luckert v. Dodge County*, No. 7-cv-5010, 2011 WL 13128689 (D. Neb. Jan. 11, 2011), cited at Ad Hoc Opp. ¶ 29 (no bond required for county but requiring bond for private appellant); *Tripp v. Ariz. Bd. of Regents*, No. C20144811, 2018 Ariz. Super. LEXIS 1107 (Super. Ct. June 4, 2018), cited at Ad Hoc Opp. ¶ 29 (applying entirely inapplicable Arizona statute to appeal by private litigants); *In re Oil Spill by "Amoco Cadiz" off Coast*, 744 F. Supp. 848 (N.D. Ill. 1990), cited at Ad Hoc Opp. ¶ 29 (waiving bond requirement for non-U.S. sovereign while conditioning private appellant's appeal on a bond); *In re Diaz*, No. 2-bk-5591, 2011 BL 28288 (Bankr. M.D. Fla. Jan. 25, 2011), cited at MSGE Opp. ¶ 65 (involving an appeal by state agencies only); *Pao Tatneft v. Ukraine*, No. 17-cv-582, 2021 BL 202234 (D.D.C. June 1, 2021), cited at MSGE Opp. ¶ 65 (appeal

24

by foreign sovereign only). Not one of these cases involved an appeal by a bond-exempt U.S. Government entity, let alone such an entity together with a State.

51.     For the reasons set forth in their opening brief, the States' appeal merits exemption from any bond requirement on its own terms, in light of their sovereign status and the interests they are seeking to protect.

25

## **CONCLUSION**

52.    For the foregoing reasons, as well as those set forth in the States' opening brief, the

States' motion for a stay pending appeal should be granted without imposition of a bond.

Dated:  November 1, 2021
          New York, New York

Respectfully submitted,

KLEINBERG, KAPLAN, WOLFF &          ROBERT W. FERGUSON
COHEN, P.C.                                           Attorney General of the State of Washington

By:        */s/ Matthew J. Gold*                 By:        */s/ Tad Robinson O'Neill*
                Matthew J. Gold                                     Tad Robinson O'Neill
                Robert M. Tuchman

500 Fifth Avenue                                       Assistant Attorney General
New York, New York 10110                      800 Fifth Avenue, Suite 2000
Tel:  (212) 986-6000                               Seattle, Washington  98104
Fax:  (212) 986-8866                              Tel:  (206) 254-0570
E-mail:  mgold@kkwc.com                      E-mail: tad.oneill@atg.wa.gov
              rtuchman@kkwc.com

                                                                *Attorneys for the State of Washington*
*Attorneys for the State of Washington*


STATE OF CONNECTICUT
WILLIAM TONG, ATTORNEY GENERAL

By:        */s/ Irve J. Goldman*
                Irve J. Goldman (IG8058)

Pullman & Comley, LLC
850 Main Street, 8th Floor
P.O. Box 7006
Bridgeport, CT  06601-7006
Tel: 203 330 2213
E-mail : igoldman@pullcom.com


*Its Attorneys*

**Hearing Date: November 9, 2021 at 10 am EST**

## <u>CERTIFICATE OF SERVICE</u>

      I, Juliet Remi, hereby certify that, on November 1, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

                                          */s/ Juliet Remi*
                                            Juliet Remi