DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Timothy Graulich
Steven Z. Szanzer
Thomas S. Green

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **GRUPO AEROMÉXICO, S.A.B. de C.V.,** *et al.*, | **Case No. 20-11563 (SCC)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### CERTIFICATE OF NO OBJECTION REGARDING DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR AEROVÍAS DE MÉXICO, S.A. DE C.V. TO ENTER INTO NEW AIRCRAFT LEASE AGREEMENTS WITH SMBC AVIATION CAPITAL LIMITED

Pursuant to 28 U.S.C. § 1746, Rule 9075-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and in accordance with the United States Bankruptcy Court's case management procedures set forth in the *Order Establishing Certain Notice, Case Management, and Administrative Procedures*, entered on July 8, 2020 [ECF No. 79] (the "**Case Management Order**"), the undersigned hereby certifies as follows:

1.      On October 27, 2021, the above-captioned debtors and debtors in possession

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; and Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

(collectively, the "**Debtors**") filed the *Debtors' Motion for Entry of an Order Authorizing Debtor Aerovías de México, S.A. de C.V. To Enter into New Aircraft Lease Agreements with SMBC Aviation Capital Limited* [ECF No. 2000] (the "**Motion**").[2]  Objections and responsive pleadings to the Motion were due no later than November 7, 2021 at 12:00 p.m. (prevailing Eastern Time) (the "**Objection Deadline**").

2.      The Case Management Order and Local Rule 9075-2 provide that pleadings may be granted without a hearing if (a) no objections or other responsive pleadings have been filed on or before the applicable deadline and (b) the attorney for the entity that filed the pleading complies with the relevant procedural and notice requirements.

3.      As of the filing of this certificate, more than 48 hours have elapsed since the Objection Deadline and, to the best of my knowledge, no objection or responsive pleading to the Motion has been (a) filed with the Court on the docket of the above-captioned chapter 11 cases or (b) served on the Debtors or their counsel.

4.      Accordingly, the Debtors respectfully request that the Court enter the proposed order, a copy of which is attached hereto as **Exhibit A**, granting the Motion in accordance with the procedures set forth in the Case Management Order and Local Rule 9075-2.

*[Remainder of page intentionally left blank]*

---

[2] For the avoidance of doubt, "SMBC Aircraft," as such term is used in the Motion and the proposed order attached hereto as **Exhibit A**, refers to the aircraft bearing manufacturer's serial number 42837, 42839, 42841, 42842, and 63974.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    November 9, 2021
          New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Timothy Graulich*                    

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Timothy Graulich
Steven Z. Szanzer
Thomas S. Green

*Counsel to the Debtors*
*and Debtors in Possession*

## **Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **GRUPO AEROMÉXICO, S.A.B. de C.V.,** *et al.,* | Case No. 20-11563 (SCC) |
| Debtors.[1] | (Jointly Administered) |

### ORDER AUTHORIZING DEBTOR AEROVÍAS DE MÉXICO, S.A. DE C.V. TO ENTER INTO NEW AIRCRAFT LEASE AGREEMENTS WITH SMBC AVIATION CAPITAL LIMITED

Upon the motion (the "**Motion**")[2] of the Debtors for entry of an order (this "**Order**") authorizing, but not directing, Debtor Aerovías de México, S.A. de C.V. (the "**Debtor Lessee**") to enter into the SMBC Leases, on terms substantially consistent with those set forth in the Form Lease attached hereto as **Exhibit 1**, as set forth more fully in the Motion and the Landess Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue of the Chapter 11 Cases and related proceedings being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the notice parties identified in the Motion; such

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; and Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

notice having been adequate and appropriate under the circumstances, and it appearing that

no other or further notice need be provided; and the Court having reviewed the Motion and

considered the relief requested therein; and upon all of the proceedings had before the

Court; and after due deliberation the Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and the Court

having found that the relief granted herein is in the best interests of the Debtors, their

creditors, and all other parties in interest; and after due deliberation and sufficient cause

appearing therefor,

IT IS HEREBY ORDERED THAT:

1.       The Motion is granted to the extent set forth herein.

2.       The Debtors are authorized (but not directed), pursuant to section 363(b) of

the Bankruptcy Code, to enter into, and perform their obligations under, the SMBC Leases

on terms substantially consistent with those set forth in the Form Lease and the Summary.

3.       The Debtors are authorized (but not directed) to execute, deliver, provide,

implement, and fully perform any and all obligations, instruments, and papers provided for

or contemplated in connection with the SMBC Leases, and to take any and all actions to

implement the SMBC Leases.

4.       The Debtors are authorized (but not directed) to enter into, and perform their

obligations under, all exhibits, addenda, and other agreements contemplated by the SMBC

Leases without further approval of the Court.

5.       The Debtors' obligations under the SMBC Leases (including any other

transaction documents contemplated therein to which the Debtors are a party) shall

2

constitute administrative expenses of the Debtors' estates pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

6.    The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to implement the terms and conditions set forth in the SMBC Leases.  Upon the occurrence, and during the continuance, of any event of default under any SMBC Lease, SMBC may file with the Court, and deliver to the Debtors and the Committee, a written notice (a "**Termination Notice**") effective as of five business days after its filing and delivery (the "**Remedies Period**").  Upon the expiration of the Remedies Period, the automatic stay in the Chapter 11 Cases shall be deemed lifted and SMBC may undertake any remedies and enforcement actions provided for under such SMBC Lease without the need for any authorization from the Court or further notice (other than as expressly provided for under the applicable SMBC Lease).  During the Remedies Period, the Debtors or the Committee may seek an emergency hearing at which either may contest the fact that an event of default under the applicable SMBC Lease has occurred and is continuing.  The Remedies Period shall automatically extend to the conclusion of such a hearing and the issuance of a ruling on the matters contested thereat.

7.    Notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, their respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, SMBC and all other persons asserting interests in the SMBC Aircraft or the SMBC Leases.

8.      Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

9.      The Debtors are authorized to take, or refrain from taking, any action necessary or appropriate to implement and effectuate the terms of, and the relief granted in, this Order without seeking further order of the Court.

10.     While the above referenced Chapter 11 Cases are pending, this Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated:      _____, 2021
            New York, New York

_____
THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

4

## <u>Exhibit 1</u>

**Form of SMBC Lease**

Redactions: October 27, 2021

**DATED AS OF [_____], 2021**

**[____]**
**(NOT IN ITS INDIVIDUAL CAPACITY**
**BUT SOLELY AS OWNER TRUSTEE)**
**as Lessor**

**and**

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**
**as Lessee**

---

**AIRCRAFT LEASE AGREEMENT**
**RELATING TO THE LEASING OF ONE BOEING**
**737 MAX 8 MODEL AIRCRAFT**
**MSN [REDACTED]**
**EQUIPPED WITH TWO LEAP-1B[REDACTED]**
**ENGINES BEARING SERIAL NUMBERS**
**[REDACTED] AND [REDACTED]**

---

# CONTENTS

Clause                                                                                      Page

1.    Interpretation ....................................................................................................1
2.    Agreement to Lease ..........................................................................................1
3.    Delivery ............................................................................................................1
4.    Expiry Date and Renewal Option ......................................................................4
5.    Rent ..................................................................................................................7
6.    Commitment Payment ......................................................................................7
7.    Payments ........................................................................................................11
8.    Lessor Covenants ...........................................................................................14
9.    Lessee Covenants ...........................................................................................15
10.   Possession, Subleasing and Pooling ..............................................................28
11.   Technical Reporting, Aircraft Documents, Inspection, Maintenance and Repair ................35
12.   Replacement and Interchange of Engines and Parts ......................................38
13.   Manufacturer's Warranties .............................................................................44
14.   Indemnities .....................................................................................................45
15.   Insurance ........................................................................................................49
16.   Loss, Damage and Requisition ......................................................................52
17.   Disclaimers .....................................................................................................54
18.   Redelivery .......................................................................................................57
19.   Events of Default ............................................................................................60
20.   Taxation ..........................................................................................................68
21.   Assignment and Transfer ................................................................................76
22.   Miscellaneous Provisions ...............................................................................78
23.   Notices; Electronic Signatures ......................................................................84
24.   Governing Law Jurisdiction and Waiver of Jury Trial ...................................86
Schedule 1 Definitions and Construction ..............................................................92
Schedule 2 Representations and Warranties .........................................................111
Schedule 3 Conditions Precedent and Post-Closing Matters ...............................116
Schedule 4 Financial Terms Annex (Confidential) ..............................................123
Part A Base Lease Term Rent and Certain Definitions .........................................123
Part B Redelivery Maintenance Payments ............................................................125
Schedule 5 Insurance Requirements .....................................................................130

Schedule 6 Description of Aircraft ........................................................................135

Schedule 7 Aircraft Documents at Redelivery......................................................146

Schedule 8 Redelivery Conditions .......................................................................158

Schedule 9 Form of Acceptance Certificate .........................................................163

Schedule 10 Form of Renewal Notice and Final Renewal Notice ..............................178

Part A Form of Initial Renewal Notice ................................................................178

Part B Form of Final Renewal Notice ..................................................................180

Schedule 11 [REDACTED] .................................................................................182

Schedule 12 Forms of Technical Acceptance Certificate, AFAC Termination Letter and
    Redelivery Acceptance Certificate ................................................................183

Part A Form of Technical Acceptance Certificate ...................................................183

Part B Form of Redelivery Acceptance Certificate .................................................189

Part C Form of AFAC Termination Letter .............................................................195

Schedule 13 Form of Technical Status Report ......................................................197

Schedule 14 Form of Air Traffic Control Letter....................................................201

Schedule 15 Form of Owner Participant Letter .....................................................203

# AIRCRAFT LEASE AGREEMENT

**THIS AGREEMENT** is made as of [_____], 2021

**BETWEEN**:

[_____] (not in its individual capacity but solely as owner trustee), a [_____] incorporated under the laws of [_____] whose registered office is at [_____] ("**Lessor**"); and

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**, a company organized and existing under the Laws of the United Mexican States and having its principal office at Paseo de la Reforma, No. 243, Piso 25, Colonia Cuauhtémoc, Alcaldia Cuauhtémoc, Mexico City, DF 06500, Mexico ("**Lessee**").

It is agreed as follows:

1.    **INTERPRETATION**

1.1    **Definitions**

In this Agreement, unless the context otherwise requires, capitalized words and expressions shall have the respective meanings given to them in Clause 1 of Schedule 1 (*Definitions and Construction*).

1.2    **Construction**

The conventions on construction and usage set out in Clause 2 of Schedule 1 (*Definitions and Construction*) shall apply to this Agreement.

1.3    **Clauses and Schedules**

References in this Agreement to clauses or schedules are, unless otherwise specified, references to clauses of and schedules to this Agreement and together the clauses and schedules shall constitute this Agreement. Certain provisions including conditions precedent and representations and warranties have been placed in the schedules and shall take effect as part of this Agreement.

2.    **AGREEMENT TO LEASE**

Subject to and in accordance with the terms and conditions of this Agreement, Lessor agrees to lease the Aircraft to Lessee and Lessee agrees to take the Aircraft on lease from Lessor for the Term.

3.    **DELIVERY**

3.1    **Condition of the Aircraft; Inspection**

(a)    The Aircraft shall be delivered "ex-factory, as built" and newly ticketed by the FAA with an export certificate of airworthiness to EASA in accordance with the

Airframe Manufacturer's delivery procedures and standards for new aircraft of the same model and type, and in conformity with the Delivery Condition Specification (other than any non-material discrepancies agreed upon by the parties acting reasonably).

(b)     Prior to the Delivery Date, and subject to Lessee entering into a tri-partite agreement with the Airframe Manufacturer and the Lessor in the Airframe Manufacturer's required form, Lessee shall have the right to inspect the Aircraft, the Aircraft Documents and any uninstalled Parts at the Delivery Location, and participate in the Boeing Customer Flight. If Lessee's inspection reveals any discrepant condition or non-conformity with the Delivery Condition Specification, Lessee shall notify the Lessor, and the Lessor may correct or procure the correction of any such discrepancy at no cost to Lessee, and the Delivery Date shall be postponed to the date on which Lessor notifies Lessee that such discrepancy has been rectified; **provided**, **however that** the Delivery Date shall not be postponed beyond the Final Delivery Date. If Lessor elects not to correct any discrepancy, it shall so notify Lessee and either Lessor or Lessee will be entitled to terminate this Agreement by written notice to the other party, in which case the provisions of Clause 3.3 (*Termination Prior to Delivery*) will apply. If Lessor corrects or procures the correction of any such discrepancy, Lessor shall make the Aircraft available for re-inspection by Lessee. Upon completion of such inspection or re-inspection, and **provided that** the Aircraft is in conformity with the Delivery Condition Specification (other than any non-material discrepancies agreed upon by the parties acting reasonably), Lessee shall effect acceptance of the Aircraft in the manner and with the effect set forth in Clause 3.2 (*Delivery and Acceptance*).

## 3.2    Delivery and Acceptance

Lessor, subject to satisfaction of the conditions precedent set forth in Clause 1 of Schedule 3 (*Conditions Precedent and Post-Closing Matters*), will deliver the Aircraft to Lessee and, subject to satisfaction of the conditions precedent set forth in Clause 3 of Schedule 3 (*Conditions Precedent and Post-Closing Matters*), Lessee will accept the Aircraft at the Delivery Location or such other location as may be agreed by Lessor and Lessee in an "AS-IS, WHERE-IS" condition with all faults. Without prejudice to Clause 3.1 (*Condition of the Aircraft; Inspection*) and Clause 3 of Schedule 3 (*Conditions Precedent and Post-Closing Matters*), Lessee will effect acceptance of the Aircraft by execution and delivery to Lessor of the Acceptance Certificate. Lessee's acceptance of the Aircraft shall be regarded for all purposes as absolute, unconditional and irrevocable.

## 3.3    Termination Prior to Delivery

(a)     If a Total Loss of the Aircraft occurs prior to Delivery, this Agreement shall automatically terminate in accordance with Clause 16.1 (*Total Loss prior to Delivery).*

(b)     If Delivery does not occur by the Final Delivery Date for any reason, then either party may by written notice to the other terminate this Agreement.

(c)  Upon any termination pursuant to Clauses 3.1, 3.3(a) or 3.3(b) neither Lessor nor Lessee will have any further liability, rights or obligations under this Agreement other than:

    (i)  accrued rights and claims as of the date of termination;

    (ii)  pursuant to Clause 22.3 (*Expenses*) and Clause 22.10 (*Confidentiality*); and

    (iii)  unless a Material Default or Event of Default has occurred which is continuing, Lessor will, within seven (7) Business Days of such termination, pay to Lessee as an independent obligation an amount equal to the Commitment Payment and any prepaid Rent received by Lessor on or prior to the date of such termination, or, if applicable, return the Letter of Credit, and in the event that Lessor receives cash compensation from Airframe Manufacturer as a result of the delay in, or failure of, Delivery, then Lessor shall pay over to Lessee fifty percent (50%) of any such cash compensation on or prior to the date of such termination.

The provisions of this Clause 3.3(c) shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Agreement and/or the leasing of the Aircraft hereunder.

## 3.4    Delayed Delivery

If for any reason there is a delay in the delivery of the Aircraft or delivery of the Aircraft under this Agreement shall not occur, then:

(a)  Lessor will not be responsible for any Losses (including loss of profit) suffered or incurred by Lessee arising from or in connection with the delay or non-delivery of the Aircraft other than any Losses caused by a breach by Lessor of its obligations under the Operative Documents or the failure of the conditions precedent set forth in clauses 3.1(a), (b), (c) or (d) (but only in respect of Lessor's signature), 3.2(a) or (b) or (c)(a) of Schedule 3 to be satisfied; and

(b)  Lessee will not be entitled to terminate this Agreement or to reject the Aircraft when offered for delivery by Lessor because of any such delay **provided that** the Aircraft is tendered for Delivery in conformity with the Delivery Condition Specification on or prior to the Final Delivery Date (other than any non-material discrepancies agreed upon by the parties acting reasonably).

## 3.5    Risk

Throughout the Term, Lessee shall be responsible for all risks associated with or relating to the Aircraft, including for any loss of or damage to the Aircraft. In recognition of the foregoing, and notwithstanding Lessor's rights under this Agreement, Lessee acknowledges and agrees that, as between Lessor and Owner Participant, on the one hand, and Lessee, on the other hand, Lessee (a) is in sole operational control of the Aircraft during the Term and is in the business of operating commercial aircraft, (b) is solely responsible

for the condition, inspection, maintenance, repair, oversight, operation and security of the Aircraft and compliance with all requirements of applicable Regulations during the Term, and (c) has not relied upon, and shall not rely upon, any statement, act, or omission of Lessor or Owner Participant in connection with the use, operation, maintenance, repair, condition or security of the Aircraft, except as may be agreed by Lessor in writing or set forth in writing in the Acceptance Certificate.

## 4.    EXPIRY DATE AND RENEWAL OPTION

### 4.1    Expiry Date

The Expiry Date shall mean the Scheduled Expiry Date or if a Renewal Lease Term is then in effect, the Scheduled Renewal Term Expiry Date for that Renewal Lease Term, or if an Operational Extension is then in effect, the Operational Extension Expiry Date, subject to the following provisions:

(a)    if Lessor, acting in accordance with Clause 19.2 (*Lessor's Rights*), terminates or cancels the leasing of the Aircraft to Lessee under this Agreement, the date of such termination or cancellation shall be the Expiry Date and Clause 19.2 (*Lessor's Rights*) shall apply;

(b)    if Lessor or Lessee, acting in accordance with Clause 19.5 (*Illegality*), terminates the leasing of the Aircraft under this Agreement, the date of such termination shall be the Expiry Date and Clause 19.5 (*Illegality*) shall apply;

(c)    if the Aircraft or Airframe suffers a Total Loss, the Expiry Date shall be the date when Lessor receives the full amount of the Agreed Value;

(d)    if the period referred to in clause (d) of the definition of Total Loss extends beyond the Scheduled Expiry Date or the last day of the Renewal Lease Term, as applicable, the last day of such period shall be the Expiry Date; and

(e)    if the Term is extended pursuant to Clause 18.2 (*Non-Compliance*) and/or 18.5 (*Deregistration, Acceptance and Acknowledgement*), the Expiry Date shall be the date on which the Aircraft is redelivered to Lessor pursuant to such Clause.

In any event but subject to Clause 18.5, Rent shall continue to accrue and be payable until the Expiry Date, unless otherwise agreed herein.

### 4.2    Renewal Options

### 4.2.1    Renewal Notice

(a)    Following the Base Lease Term, Lessee shall have the right to extend the Term of this Agreement for an initial renewal term (the "**First Renewal Lease Term**") of [REDACTED].   If Lessee has extended the Term of this Agreement for a First Renewal Lease Term of [REDACTED], Lessee shall have the right to extend the Term of this Agreement for a second renewal term of [REDACTED], and if the

Lessee has extended the Term of this Agreement for a First Renewal Lease Term [REDACTED], Lessee shall have the right to extend the Term of this Agreement for a second renewal term of [REDACTED] (any such second Renewal Lease Term, a "**Second Renewal Lease Term**"). To exercise its right to extend the Term of this Agreement for a Renewal Lease Term, Lessee must deliver an Initial Renewal Notice and a Final Renewal Notice no later than [REDACTED] months and [REDACTED] months, respectively, prior to the Scheduled Expiry Date in the case of a First Renewal Lease Term and the Scheduled Renewal Lease Term Expiry Date in the case of a Second Renewal Lease Term. An Initial Renewal Notice delivered by Lessee in respect of a Renewal Lease Term shall not obligate Lessee to extend the leasing of the Aircraft hereunder for that Renewal Lease Term unless Lessee subsequently delivers a Final Renewal Notice to Lessor in respect of that Renewal Lease Term in accordance with this Clause.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Operative Document:

(i)    no Initial Renewal Notice or Final Renewal Notice shall be binding on Lessor or oblige Lessor to extend the leasing of the Aircraft hereunder for any Renewal Lease Term, and shall be considered not to have been given, if any Event of Default shall have occurred and be continuing on and as of the date of any such notice or on the date of the commencement of any Renewal Lease Term; and

(ii)    a Final Renewal Notice shall be irrevocable and shall constitute an unconditional obligation of Lessee to extend the leasing of the Aircraft hereunder for the Renewal Lease Term to which such Final Renewal Notice relates.

### 4.2.2    Renewal Rent and Documentation

(a)    Upon receipt of an Initial Renewal Notice, as provided in Clause 4.2.1 (*Renewal Notice*) above, Lessee and Lessor shall enter into good faith negotiations with respect to the amount to be paid by Lessee as Rent during the applicable Renewal Lease Term. Whether the amount of the Rent is agreed between Lessee and Lessor within twenty-five (25) days of the receipt of an Initial Renewal Notice or the amount of Rent is established pursuant to Clause 4.2.2(b), the amount of Rent shall be documented in an amendment to this Agreement within a further period of twenty-five (25) days, which shall be in form and substance acceptable to Lessee and Lessor. Thereupon, (i) Lessee and Lessor shall promptly execute and deliver such lease amendment, (ii) if a Lessor Guarantee is then required to be in place by the terms hereof, Lessor shall procure that Lessor Guarantor executes and delivers a confirmation of the Lessor Guarantee in respect of this Agreement as so amended in form and substance acceptable to Lessee acting reasonably, (iii) Lessee shall provide (x) written evidence of appropriate corporate action authorizing execution and delivery of such amendment, and (y) evidence of the issuance of each approval, license and consent which may be required in connection with such amendment

and (z) a capacity, authority, no registration and due execution opinion from Lessee's in-house counsel addressed to Lessor, Owner Participant and each Financing Party with respect to such amendment, including that all necessary filings and registrations with respect thereto have been or promptly will be made in the State of Registration and the State of Incorporation, which opinion shall be in form and substance satisfactory to Lessor and Owner Participant (acting reasonably); and (iv) Lessor shall provide (x) written evidence of appropriate corporate action by the Trust Company and Lessor authorizing the execution and delivery of such amendment and by Lessor Guarantor authorizing execution and delivery of such confirmation of the Lessor Guarantee, and (y) evidence of the issuance of each approval, license and consent which may be required in connection with such amendment and such confirmation.

(b)    [REDACTED].

(c)    All terms and conditions of this Agreement during the Base Lease Term shall remain in full force and effect during any Renewal Lease Term, unless Lessor and Lessee expressly agree otherwise.

### 4.2.3   Operational Extension

(a)    In addition to the extension options described in Clauses 4.2.1 and 4.2.2 above, and regardless of whether any such extension option is exercised, Lessee shall have the right to extend the Term of this Agreement by [REDACTED] (the "**Operational Extension**") by providing Lessor a written notice (an "**Operational Extension Notice**") signed by Lessee at least [REDACTED] prior to the scheduled Expiry Date (including, for the avoidance of doubt, if such Expiry Date has been extended pursuant to Clause 4.2.1(b) above). All terms and conditions of this Agreement during the then Base Lease Term (or Renewal Lease Term, as the case may be) shall remain in full force and effect during any Operational Extension, unless Lessor and Lessee expressly agree otherwise in writing. Prior to the commencement of an Operational Extension, Lessee shall provide evidence that all necessary filings and registrations with respect to such Operational Extension have been or promptly will be made in the State of Registration and the State of Incorporation.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Operative Document:

(i)    no Operational Extension Notice shall be binding on Lessor or oblige Lessor to extend the leasing of the Aircraft hereunder for any Operational Extension, and shall be considered not to have been given, if any Event of Default shall have occurred and be continuing on and as of the date of any such notice or on the date of the commencement of any Operational Extension; and

(ii)    an Operational Extension Notice shall be irrevocable and shall constitute an unconditional obligation of Lessee to extend the leasing of the Aircraft hereunder for the Operational Extension period.

## 5.    RENT

### 5.1    Rent Periods

(a)    The Term shall be divided into successive periods (each a "**Rent Period**") in respect of which Rent shall accrue and be payable.

(b)    The first Rent Period shall commence on the Delivery Date and each subsequent Rent Period shall commence on the date immediately following the last day of the previous Rent Period.

(c)    Each Rent Period shall be of one month's duration except that with respect to the final Rent Period, if it would not otherwise end on the Expiry Date, it shall end on the Expiry Date.

### 5.2    Rent Date

(a)    Lessee shall pay Rent to Lessor in [REDACTED] on each Rent Date.

(b)    Lessee shall initiate payment adequately in advance of each Rent Date to ensure that Lessor receives the payment for value on each such Rent Date.

### 5.3    Rent

(a)    Rent payable in respect of each Rent Period shall be as set forth in Clause 1 of Part A of the Financial Terms Annex.

(b)    If any Rent Period has a duration of less than a month, the Rent payable for that Rent Period shall be prorated by multiplying the amount of the Rent for that Rent Period by a fraction the numerator of which is the number of days in that Rent Period and the denominator of which is 30.

## 6.    COMMITMENT PAYMENT

### 6.1    Commitment Payment

Lessee shall pay to Lessor a Commitment Payment in the amount and at the time set forth in Clause 2 of Part A of the Financial Terms Annex.

### 6.2    Concerning the Commitment Payment

(a)    The Commitment Payment shall be the sole, absolute and unconditional property of Lessor, may be freely commingled by Lessor with its other funds and dealt with by Lessor in such manner as Lessor may see fit and Lessor will not hold any such funds as agent or on trust for Lessee or in any similar fiduciary capacity. If and to

the extent that, under applicable Law in any relevant jurisdiction, the Commitment Payment is considered to be the property of Lessee, the Commitment Payment shall be held by Lessor as security for the timely performance by Lessee of its obligations under the Operative Documents and Lessee hereby grants a Security Interest in and pledge of the Commitment Payment, and including all proceeds thereof and general intangibles (including payment intangibles) relating thereto, including any right to payment of an amount equal to the Commitment Payment by Lessor to Lessee hereunder, to Lessor as secured party for itself. Lessor shall be entitled to commingle the Commitment Payment with Lessor's general or other funds, and Lessor will not hold any such funds as agent or on trust for Lessee or in any similar fiduciary capacity. No interest shall be earned, paid or repaid in respect of the Commitment Payment.

(b)     Following the occurrence of an Event of Default which is continuing, in addition to all rights and remedies of Lessor elsewhere in this Agreement or under Law, Lessor may immediately or at any time thereafter, without notice to Lessee, use or apply an amount equal to all or part of the Commitment Payment in or towards the payment or discharge of any matured obligation owed by Lessee under this Agreement, in such order as Lessor sees fit, and/or exercise any of the rights of set-off described in Clause 22.4 (*Set-off*) with respect to an amount equal to the Commitment Payment and/or exercise any other right or remedy of a secured creditor upon a default provided in the UCC.

(c)     If Lessor exercises any of the rights described in Clause 6.2(b):

(i)     Lessee shall, upon a demand in writing from Lessor, immediately and in any event within [REDACTED] Business Days of such demand, pay in immediately available funds an amount sufficient to restore the Commitment Payment to the level at which it stood immediately prior to such exercise; and

(ii)    such use, application or retention shall not be deemed a cure of any Event of Default unless such use, application or retention was sufficient to cure such Event of Default (or Lessee has otherwise cured the same) and Lessee has restored the Commitment Payment to the level at which it stood immediately prior to such exercise.

(d)     It is hereby agreed that the Commitment Payment shall not constitute an agreed liquidated damages amount.

6.3    **Provision of Letter of Credit**

(a)     **Provided that** no Event of Default is continuing, Lessee may at any time following Delivery, by not less than [REDACTED] Business Days' prior written notice to Lessor elect to substitute the Commitment Fee for an irrevocable standby letter of credit in form and substance acceptable to Lessor, acting reasonably (including with respect to the designation of presentment location) (a "**Letter of Credit**").

(b)      Any Letter of Credit shall in any event:

      (i)      be denominated and payable in Dollars in an amount equal to the Commitment Fee required hereunder;

      (ii)     be issued by a bank which is and remains satisfactory to Lessor (acting reasonably) (the "**Issuing Bank**") or confirmed by a bank which is and remains satisfactory to Lessor (acting reasonably) (the "**Confirming Bank**") (each a "**Qualifying Bank**");

      (iii)    be a first demand, irrevocable and absolute documentary credit payment undertaking of the relevant Qualifying Bank, payable on demand without proof or evidence of entitlement or loss required;

      (iv)     be capable of being drawn if a replacement letter of credit is not provided in accordance with Clause 6.4 (*Letter of Credit*); and

      (v)      have a non-cancellable term of at least [REDACTED] days and/or be expressed to be renewed automatically annually on or prior to each anniversary of the date of issuance for a further term of [REDACTED] days. The final Letter of Credit shall not expire earlier than [REDACTED] days after the Expiry Date.

## 6.4    Letter of Credit

(a)      If Lessee has elected pursuant to Clause 6.3 (*Provision of Letter of Credit*) to provide Lessor with a Letter of Credit and does so provide a Letter of Credit which complies with the provisions of Clause 6.3 (*Provision of Letter of Credit*), then Lessor shall, so long as no Event of Default is then continuing, pay to Lessee an amount equal to the Commitment Payment (if any) paid by Lessee to Lessor under this Clause 6 (*Commitment Payment*) and not previously applied by Lessor under this Agreement, not later than [REDACTED] Business Days after receipt by Lessor of the Letter of Credit.

(b)      Lessee shall ensure that the Letter of Credit remains in place throughout the remaining Term and for a period of not less than [REDACTED] days following the Expiry Date. Lessee shall procure the renewal of or new issue of a Letter of Credit prior to the stated expiry date of a then current Letter of Credit (each an "**SDLC Renewal Date**").

(c)      If Lessee is not able to obtain a new Letter of Credit on or before the date which is [REDACTED] days prior to the SDLC Renewal Date (unless the same is renewed automatically and Lessor has not received notice from the Issuing Bank or from the Confirming Bank that such Letter of Credit will not be renewed on or prior to the SDLC Renewal Date), Lessee may provide a cash Commitment Payment (a "**Replacement Commitment Payment**"), **provided that** such Replacement Commitment Payment is received by Lessor on or before the date which is [REDACTED] days prior to the SDLC Renewal Date and within [REDACTED]

Business Days of such receipt (**provided that** no Event of Default is then continuing) Lessor shall return (or agree to the cancellation of) the Letter of Credit. If Lessor does not receive such Replacement Commitment Payment on or before the date which is [REDACTED] days prior to the SDLC Renewal Date, Lessor shall be entitled to drawdown on the existing Letter of Credit and any such amount drawn shall be held by Lessor as the Commitment Payment under this Agreement.

(d)     If, at any time during the Term, the Issuing Bank and/or the Confirming Bank (as applicable) ceases to be a Qualifying Bank, Lessee shall promptly and in any event within [REDACTED] days of notice of such cessation, at its option either (i) provide Lessor with a replacement Letter of Credit issued and/or confirmed by a bank which is a Qualifying Bank; or (ii) provide a Replacement Commitment Payment, and within [REDACTED] Business Days of receipt of such replacement Letter of Credit or Replacement Commitment Payment, Lessor shall return (or agree to the cancellation of the replaced Letter of Credit (**provided that**, in either case, no Event of Default is then continuing)).

(e)     Lessor shall be entitled to make any number of demands under the Letter of Credit at any time following any Event of Default which is continuing and at any other time as specified in this Clause 6 (*Commitment Payment*). Any amounts drawn under the Letter of Credit shall be held by Lessor as the Commitment Payment and as security and/or applied (and/or set-off) against any Losses arising under the Operative Documents or under Companion Agreement as a result of the occurrence of any Event of Default. Such holding as security, application and/or set off of any amount so drawn by Lessor shall not be deemed a cure by Lessee, or waiver by Lessor or any other person, of any Event of Default except to the extent Lessee replaces the Letter of Credit or provides an additional letter of credit (and which, in either case, satisfies the requirements of Clause 6.3 (*Provision of Letter of Credit*)) or by a cash deposit, in each case, in the amount so applied, held as security, and/or set-off by Lessor.

(f)     If Lessor applies any amount (the "**Paid Amount**") under the Letter of Credit in accordance with this Agreement, then Lessee shall within [REDACTED] Business Days of demand cause an additional letter of credit complying with the requirements specified in Clause 6.3 (*Provision of Letter of Credit*) with a face amount equal to the Paid Amount and expiring on the same date as the existing Letter of Credit to be issued, or shall within [REDACTED] Business Days of demand pay to Lessor (or its designee) in immediately available funds an amount equal to the Paid Amount to Lessor so that Lessor shall at all times have the benefit of one or more Letters of Credit which comply with this Clause 6.4 and/or a cash commitment fee which in aggregate has a value which is not less than the amount of the Commitment Payment.

(g)     At any time following the issuance of a Letter of Credit, Lessee may replace such Letter of Credit with a cash amount equal to the Commitment Payment and, within [REDACTED] days of such replacement (and subject to no Event of Default then continuing), Lessor shall return (or agree to the cancellation of) any such replaced

Letter of Credit, **provided that**, Lessee may elect to substitute the Commitment Payment with a Letter of Credit only twice during the Term.

6.5     **Unenforceability of Letter of Credit**

If at any time any Letter of Credit delivered to Lessor shall cease to constitute the legal, valid and binding obligations of the Issuing Bank or any applicable Confirming Bank thereof enforceable in accordance with its terms, or amounts payable under any Letter of Credit shall cease to be freely available for drawing, Lessee shall forthwith notify Lessor upon becoming aware of such circumstance(s) and as soon as practicable and in any event within [REDACTED] days after such circumstance occurs either (i) deliver to Lessor a replacement Letter of Credit complying with the requirements set out in Clause 6.3 (*Provision of Letter of Credit*) and Clause 6.4 (*Letter of Credit*) or (ii) deliver to Lessor (or its designee) a cash Commitment Payment of an amount equal to the face value of the Letter of Credit, to be held by Lessor (or its designee), whereupon Lessor shall redeliver to Lessee the first above mentioned Letter of Credit not later than [REDACTED] Business Days following receipt of such replacement Letter of Credit or, as the case may be, cash Commitment Payment.

7.     **PAYMENTS**

7.1     **Account for Lessee Payments**

All payments by Lessee to Lessor under the Operative Documents will be made for value on the due date in Dollars in immediately available funds by SWIFT or wire transfer to Lessor's account set out below or to such other account as Lessor may from time to time notify Lessee in writing [REDACTED] Business Days prior to a date for a payment hereunder; **provided that** the payment and/or indemnity obligations of Lessee shall not be increased as a result of the designation of such other account and further **provided that**, if such other account is not held by Lessor, Lessor shall provide Lessee with a tax residency certificate (or an equivalent document) of the party which holds such account, but only if such party's supervisory authority customarily issues such a document:

| | |
|---|---|
| **Bank:** | [REDACTED] |
| **Account No:** | [REDACTED] |
| **Account Name:** | [REDACTED] |
| **Sort Code:** | [REDACTED] |
| **IBAN BIC/Swift Code:** | [REDACTED] |
| | |
| **IBAN:** | [REDACTED] |
| **Correspondent Bank:** | [REDACTED] |
| **Swift Code:** | [REDACTED] |
| **ABA:** | [REDACTED] |
| **Reference:** | [REDACTED] |

7.2    **Default Interest**

If Lessee fails to pay any amount payable under this Agreement on the due date, Lessee shall pay to Lessor on demand from time to time interest at the Default Rate (both before and after judgment) on that amount, from the due date to the date of payment in full. All such interest will be compounded monthly and calculated on the basis of the actual number of days elapsed in the month and assuming a 30 day month and a 360 day year.

7.3    **Absolute Obligations**

(a)    This Agreement is a net lease. Lessee's obligations to pay Rent and to perform any of its other obligations pursuant to this Agreement are absolute and unconditional and shall be paid and performed in full when due without reduction, deduction, set-off, recoupment, claim or counter claim, and Lessor shall have all of the rights and benefits of a lessor under a lease to which Section 2A-407 of the UCC applies as provided therein. Lessee may not regard its obligations as cancelled, terminated, suspended, reduced or altered (and waives to the greatest extent permitted by applicable Laws any rights which it may have at any time to cancel, terminate, suspend, reduce or alter such obligations) by reason of any contingency or circumstance whatsoever, including (but not limited to):

(i)    any right of set-off, counterclaim, recoupment, reduction, reimbursement, claim, defense or other right which Lessee may have against Lessor, any Indemnitee, the Manufacturer, any other vendor, or against any other Person;

(ii)    any unavailability of the Aircraft for any reason or interruption of or interference with Lessee's use, operation or possession of the Aircraft;

(iii)    any defect in title, airworthiness, condition, design, operation of or use of the Aircraft, merchantability, fitness for any purpose, registration of the Aircraft or any damage to or (subject to the provisions of Clause 16.1 (*Total Loss*)) loss or destruction of the Aircraft or any Security Interest or Taxes;

(iv)    any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against Lessor or Lessee or any other Person;

(v)    any invalidity or unenforceability of or other defect in this Agreement; and,

(vi)    any other cause or circumstance which but for this provision would or might otherwise have the effect of terminating, canceling, suspending, abating, reducing, deferring or in any way affecting any obligation of Lessee under this Agreement, including to lease the Aircraft or pay Rent. Lessee acknowledges and agrees that it has used its own judgment in selecting the Aircraft, and has not relied on Lessor or on any information supplied by Lessor, and that Lessor is not a manufacturer of or dealer in aircraft.

(b)     Each payment of Rent made by Lessee shall be final.  Lessee will not seek to recover all or any part of any payment of Rent for any reason whatsoever except for manifest error.

(c)     The provisions of this Clause 7.3 (*Absolute Obligations*) shall not be construed to limit Lessee's right to institute separate legal proceedings for direct damages or otherwise pursue remedies for direct damages against Lessor in the event of Lessor's breach of the terms of this Agreement or to limit Lessee's rights and remedies against any other Person.

## 7.4     Breakage Costs Indemnity

Lessee shall indemnify and hold harmless Lessor, on written demand by Lessor on an after Tax basis, against any and all Breakage Costs as a result of or in connection with the termination of the leasing of the Aircraft under this Agreement prior to the Scheduled Expiry Date or if applicable, the Scheduled Renewal Term Expiry Date, for any reason other than the occurrence of a Total Loss (**provided** Lessee has complied with obligations under Clause 16.1 (*Total Loss*)) or an Illegality Event in accordance with Clause 19.5 (*Illegality*) where Lessor is the Relevant Party (provided Lessee has complied with its obligations under Clause 19.5(a) and (b)).

## 7.5     Currency Indemnity

(a)     If, under any applicable Law, whether as a result of a judgment or the liquidation of a party or for any other reason, any payment under or in connection with this Agreement is made or is recovered in a currency (the "**other currency**") other than the currency (the "**contractual currency**") in which it is payable pursuant to this Agreement then, to the extent that the payment (when converted into the contractual currency at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable Law) falls short of the amount unpaid under this Agreement, the payor shall as a separate and independent obligation, fully indemnify the party entitled to receive such payment against the amount of the shortfall.  For the purposes of this sub-clause "**rate of exchange**" means the rate at which the payor is able on the relevant date to purchase the contractual currency in New York with the other currency.

(b)     Lessee waives any right it may have in any jurisdiction to pay any amount under this Agreement in a currency other than that in which such amount is expressed to be payable.

## 7.6     Application of Payments by Lessor

If any sum paid to Lessor or recovered by Lessor in respect of the liabilities of Lessee under this Agreement is less than the amount then due, Lessor may apply that sum to amounts that are then due under this Agreement in such proportions and order and generally in such manner as Lessor may determine.

7.7    **Lessor's Determination of Amounts Due**

Any certificate or determination by Lessor as to any rate of interest or as to any other amount payable under this Agreement shall, in the absence of manifest error, be conclusive and binding on Lessee.

7.8    **Business Day Convention**

If any payment due under this Agreement (including any payment of Rent) would otherwise be due on a day which is not a Business Day, it shall be due on the immediately [REDACTED] Business Day, or, if that Business Day falls in the following month, in the following year, or after the Expiry Date, on the Business Day immediately before such date.

7.9    **Retention of Certain Payments**

Any amount referred to in any Operative Document which is payable to or retainable by Lessee shall not be paid to or retained by Lessee at any time when an Event of Default (other than an Event of Default under Clause 19.1(f) (*Cross-Default*)) shall have occurred and be continuing, but instead such amount shall be paid to or held by Lessor as security to be held and applied in accordance with the provisions of this Agreement. At such time as there shall not be continuing any Event of Default (without regard to any Event of Default under Clause 19.1(f) (*Cross-Default*)), such amount shall be paid to Lessee to the extent not applied in accordance with the preceding sentence. Where Lessor would, but for this Clause 7.9 (*Retention of Certain Payments*) or any similar provision, be obliged to make any payment to Lessee, Lessor may elect to make such payment but shall be entitled to deduct or withhold from such payment any amount then due and payable under this Agreement with prior electronic or written notice to Lessee.

7.10    **Invoices**

Lessor shall provide Lessee with an electronic or paper invoice and supporting documentation before any payment to be made by Lessee to Lessor hereunder is due (including with respect to the payment of Rent and the Commitment Payment), but failure by Lessor to issue an invoice or the non-receipt of any such invoice by Lessee shall not affect Lessee's obligation to make such payment.

8.    **LESSOR COVENANTS**

8.1    **Quiet Enjoyment**

Lessor agrees that, provided no Event of Default has occurred and is continuing and **provided that** this Agreement shall not have been otherwise terminated, none of Lessor, any other Lessor Party and any Person lawfully claiming by, through or under it or any other Lessor Party shall take or cause to be taken any action to interfere with Lessee's or any Permitted Sublessee's right to use, possession and quiet enjoyment of the Aircraft. The foregoing shall not, however, prevent Lessor, or its successors, assigns and transferees, from exercising any rights or remedies under this Agreement.

8.2     **Lessor Obligations following Expiry Date**

Subject to the payment, performance and discharge in full of all of Lessee's obligations under this Agreement, Lessor shall within five (5) Business Days of the Expiry Date

(a)     pay to Lessee a portion of any Rent paid to Lessor to the extent such portion is attributable to the period falling after, but excluding, the Expiry Date;

(b)     (i)     return the Letter of Credit to Lessee for cancellation, or;

         (ii)    pay to Lessee as an independent obligation an amount equal to the Commitment Payment (less the sum of amounts applied pursuant to Clause 6.2(b) and not replenished pursuant to Clause 6.2(c)); **provided that** in the event Lessee is required to pay any Redelivery Maintenance Payments, Lessor may elect to set-off such payment obligation against the amount of the Commitment Payment then held by Lessee, whichever is applicable.

If any Event of Default (other than an Event of Default under Clause 19.1(f) (*Cross-Default*)) has occurred and is continuing, Lessor may hold and apply any such amount in or toward the cure of such Event of Default, draw on the Letter of Credit as provided in Clause 6.4, and, at such time as no such Event of Default is in existence, shall pay the unapplied portion thereof (including the unapplied portion of any such drawing, as applicable), if any, to Lessee.

8.3     **Lessor Obligations regarding Tax Information**

Lessor shall, and shall cause the Owner Participant to, provide to Lessee the information described in Clause 20.7(c) hereof, as and when required pursuant to such Clause.

8.4     **Lessor Obligations Regarding AD Cost Sharing**

Subject to Clause 7.9 (*Retention of Certain Payments*), if Lessee performs an Airworthiness Directive on the Aircraft on a terminating action basis prior to the expiration of the Term, Lessor shall, promptly following receipt of an invoice and documentation supporting the cost of performing such Airworthiness Directives on the Aircraft, reimburse Lessee a portion of such cost determined in accordance with the formula set forth in Clause 5 of Part A of the Financial Terms Annex.

9.      **LESSEE COVENANTS**

9.1     **Performance**

(a)     Lessee shall perform and comply with its undertakings, covenants and other agreements in this Agreement at all times prior to Delivery (where applicable) and during the Term.   All such undertakings and covenants shall, except where expressly otherwise stated, be performed at the expense of Lessee.

(b) Lessee shall remain liable to Lessor for all of Lessee's obligations and liabilities under this Agreement notwithstanding any delegation by Lessee to another Person of any such obligations or liabilities or any reliance by Lessee on another Person to perform or discharge any such obligations or liabilities, whether or not such delegation or reliance is permitted or contemplated by this Agreement (including the Permitted Sublessee and the sublease under Clause 10.3 (*Subleasing*)) (**provided that** to the extent any such obligation or liability is actually performed or discharged by such other Person on Lessee's behalf, such performance or discharge shall constitute performance or discharge of the corresponding obligation or liability of Lessee).

(c) Lessee will take commercially reasonable steps to ensure that no Person (other than Lessor or any Financing Party) acts in any manner inconsistent with Lessee's obligations under this Agreement.

(d) Lessee will cause any Post-Delivery Authorizations and Filings to be made or obtained as provided in the definition of such term and by the deadlines provided in Clause 5 of Schedule 3 (*Conditions Precedent and Post-Closing Matters*).

## 9.2 Information – General and Financial

Lessee shall:

(a) furnish to Lessor:

 (i) save where such information is available on Lessee's website, upon Lessor's request, Lessee's consolidated management accounts of Lessee (comprising a balance sheet and profit and loss statement) prepared for the most recent previous financial quarter;

 (ii) by making the same available on its website or directly to Lessor if not posted on its website, no later than [REDACTED] days after the last day of each financial year of Lessee, its audited consolidated balance sheet and cash flow statement as of such day and its audited consolidated profit and loss statement for the year ending on such day; and

 (iii) to the extent that Lessee is permitted by applicable Law and is not bound by confidentiality undertakings to third parties, such other reasonable information concerning the business or financial affairs of Lessee as Lessor may from time to time reasonably request;

(b) promptly notify Lessor of the occurrence of any Total Loss or of any event which is likely to result in a claim under the Insurances (but in the case of hull claims only, for any claim in excess of the Damage Notification Threshold) and the status of any negotiations with the insurance brokers over any such claim;

(c) promptly notify Lessor of the occurrence of any Default or Event of Default;

(d)    provide Lessor, upon reasonable request, with confirmation satisfactory to Lessor and the Financing Parties Representative (if any) that all charges incurred by Lessee in connection with the Aircraft, its location and operation, including those invoiced by airports and air traffic control authorities have been paid in full within the periods permitted for payment of same; and

(e)    within thirty (30) days after receipt by Lessee of a request by Lessor (or such shorter period as may be set forth in any written request by any Government Entity for information or documents), Lessee shall furnish in writing to Lessor such information or documents within its possession or which are reasonably available to Lessee or obtainable by Lessee at no cost to it (or at Lessor's cost) (or copies thereof certified as correct by an authorized officer of Lessee) regarding the Aircraft as may reasonably be requested by Lessor or as may be required to enable Lessor, any Financing Party or any Affiliate thereof to file any report or document required to be filed by it with any Government Entity because of its ownership or other interest in the Aircraft, the Airframe or the Engines.

## 9.3    Operation of the Aircraft

Lessee shall:

(a)    operate the Aircraft solely for commercial purposes;

(b)    not use or operate the Aircraft in violation of or contrary to any applicable Regulation **provided that** the foregoing shall not prohibit Lessee from operating the Aircraft temporarily in an Excluded Country in emergency circumstances affecting the Aircraft and then only to the extent required and for the time necessary to avert such emergency and **provided further that** in such circumstances Lessee shall take all reasonable steps to move the Aircraft out of such Excluded Country without delay;

(c)    not knowingly permit any items (including any illegal substance or contraband) to be on or transported by the Aircraft if it is prohibited by any Regulation for such item to be on or transported by the Aircraft;

(d)    not use or operate the Aircraft for any purpose for which the Aircraft is not designed or for any purpose other than primarily in passenger service in passenger configuration;

(e)    not cause or permit the Aircraft to proceed to, or remain at, any location in an Excluded Country unless the same is permitted pursuant to applicable consents, exemptions or licences which have been obtained or apply in respect thereof or in emergency circumstances affecting the Aircraft and then only to the extent required and for the time necessary to avert such emergency and **provided further that** in such circumstances Lessee shall take all reasonable steps to move the Aircraft out of such Excluded Country without delay;

(f)     not use the Aircraft for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, and then only if the use of the Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same or similar type operated by Lessee at the time of such training;

(g)     not use or operate the Aircraft or suffer or permit the Aircraft to be used or operated in any manner when the Insurances are not in full force and effect, and not use, operate or locate the Aircraft or suffer or permit the Aircraft to be used, operated or located in any manner not covered by the Insurances or in any area excluded from coverage by the Insurances (and without limiting the foregoing Lessee will not use, operate or locate the Aircraft or permit it to be used, operated or located in any area of recognized or threatened hostilities when the war risk Insurances are not in full force and effect and applicable thereto); **provided, that** the foregoing shall not prohibit Lessee from operating the Aircraft temporarily in any such locations in emergency circumstances affecting the Aircraft and then only to the extent required and for the time necessary to avert such emergency and **provided further that** in such circumstances Lessee shall take all reasonable steps to move the Aircraft out of such location without delay; and

(h)     not operate, maintain, modify, insure or deal with the Aircraft or any Engine or Part in a manner which adversely discriminates against the Aircraft or such Engine or Part, when compared with the manner in which Lessee operates, maintains, modifies, insures or deals with similar aircraft, engines or parts in Lessee's fleet.

## 9.4    General Covenants, Compliance and Outgoings

Lessee shall:

(a)     at all times during the Term maintain (i) its business as a commercial scheduled air carrier; (ii) its corporate existence (except as permitted by Clause 9.7 below); and (iii) in full force and effect, all consents, licenses, authorizations, approvals, permits, rights and privileges that are material to its business or necessary for the performance of its obligations under this Agreement;

(b)     remain a Foreign Air Carrier or otherwise eligible to operate flights to and from the United States of America;

(c)     comply with all Regulations required for the making of payments, and the performance by Lessee of its other obligations under this Agreement;

(d)     ensure that the Habitual Base remains the habitual base of the Aircraft unless Lessor gives its prior written consent to a change thereof save in instances where the State of Registration of the Aircraft is changed in accordance with the terms of this Agreement;

(e)     promptly pay or cause to be paid when due (i) all license, registration, navigation and airport fees and charges assessed and demanded by any Government Entity

(including Nav Canada, ASA, AFAC, SENEAM, Eurocontrol and/or COCESNA) and/or any other air navigation authority in accordance with applicable Regulations relating to the Aircraft or other aircraft operated by Lessee and (ii) all costs, expenses, charges, fees (including, without limitation, license and registration fees), Taxes and other outgoings related to the operation, storage, maintenance, leasing or registration of the Aircraft, which in either case if not paid when due could result in a Security Interest which is not a Permitted Lien being imposed on the Aircraft; and

(f)      comply with all applicable Laws and implement appropriate procedures concerning security measures to protect the Aircraft and its passengers from theft, destruction, hijacking, bombing or other acts of terrorism in accordance with applicable Law and industry practices of similarly situated air carriers.

## 9.5     Registration and Protection

(a)      At Delivery, provided the Aircraft is compliant with its EASA type certificate and Lessee has made an article 83bis arrangement with the Irish Aviation Authority and AFAC that enables Lessee to operate the Aircraft temporarily or permanently without the embodiment of the FAA SBs (as defined below) and with the Aircraft being maintained in accordance with Lessee's existing Maintenance Program, Lessor will arrange for the Aircraft to be registered in its name on the aircraft register of the Irish Aviation Authority. The Aircraft will remain registered with the Irish Aviation Authority until such time as the State of Registration is changed to Mexico in accordance with Clause 9.5(b) (such period, the "**Initial Registration Period**"). During the Initial Registration Period:

(A)      Lessor shall:

(i)       subject to Lessee providing such cooperation and assistance as may be necessary on the part of Lessee as the operator of the Aircraft and requested by Lessor, preserve its eligibility and take all necessary administrative steps to keep the Aircraft registered in its name on the aircraft register of the Irish Aviation Authority;

(ii)      obtain the package of Airframe Manufacturer FAA type certificate compliance service bulletins and any associated kit of parts (the "**FAA SBs**") from the Airframe Manufacturer at Lessor's cost;

(iii)     use its reasonable efforts to procure the delivery of the FAA SBs to the Lessee promptly following Delivery and in any event no later than [REDACTED]; provided that Lessor shall provide the Lessee with an update regarding the timing of the delivery of the FAA SBs upon request from the Lessee;

(iv)    within [REDACTED] days after receipt of appropriate invoices, reimburse Lessee for [REDACTED] associated with embodying the FAA SBs;

(v)    provide the Lessee with the following [REDACTED]:

a.    *Downtime due to installation*: if the installation of the FAA SBs does not occur during a scheduled base maintenance event where the period needed for completion of such maintenance event provides sufficient time to perform the installation of the FAA SBs, [REDACTED] for the number of days the Aircraft was out of service for purposes of such installation; it being agreed by Lessee that it will use reasonable efforts to schedule the installation during such a maintenance event, where possible; and

b.    *Downtime due to deregistration and re-registration*: for any days that the Aircraft is out of service due to the deregistration in Ireland and re-registration in Mexico as described in Clause 9.5(b) below, [REDACTED];

provided that the aggregate amount of the [REDACTED] in a. and b. above shall not [REDACTED];

(vi)    pay directly to the IAA or reimburse Lessee for all costs of obtaining the initial IAA/EASA certificate of airworthiness for the Aircraft at Delivery (including the costs and expenses of the Irish airworthiness inspector);

(vii)    if the arrival of the FAA SBs is delayed beyond [REDACTED], and the Lessee does not have sufficient time to install them prior to any annual renewal of the IAA/EASA certificate of airworthiness (it being agreed that if the FAA SBs are received at least [REDACTED] days prior to the current annual renewal date then they have been received with sufficient time to install them), pay or reimburse Lessee for the additional cost of such IAA/EASA annual renewal (including the costs and expenses of the IAA airworthiness inspector) in excess of the costs that Lessee would have paid in respect of or relating to a certificate of airworthiness renewal from AFAC had the Aircraft been registered in Mexico; **provided that**, for the avoidance of doubt, once the Lessee has received the FAA SBs with sufficient time to install them prior to the current renewal of the IAA/EASA certificate of airworthiness, all costs associated with each subsequent renewal of the IAA/EASA certificate of

airworthiness and the registration of the Aircraft with the IAA shall be borne by the Lessee (and the Lessee will reimburse Lessor for any such costs to the extent required to be paid by Lessor); and

(viii)   if the Irish Aviation Authority or the EASA imposes any requirements or conditions (including, without limitation, any service bulletins) in order to maintain a valid IAA/EASA certificate of airworthiness in respect of the Aircraft (the "**IAA/EASA Requirements**"), the costs of complying with such IAA/EASA Requirements shall be allocated as follows:

a.   to the extent such IAA/EASA Requirements would have been applicable had the Aircraft been registered in Mexico, [REDACTED] shall bear the costs of such IAA/EASA Requirements;

b.   to the extent such IAA/EASA Requirements would not have been applicable had the Aircraft been registered in Mexico:

i.   if the FAA SBs are installed on the Aircraft within [REDACTED] months of their arrival to the Lessee, the [REDACTED] shall bear all costs of complying with the IAA/EASA Requirements prior to such installation;

ii.   if the FAA SBs are installed more than [REDACTED] months, but not more than [REDACTED] (or such longer period as may be agreed pursuant to sub-clause iii. below) after their arrival to the Lessee, and if such FAA SB installation activities take the Aircraft out of service for (x) no more than [REDACTED] days, the [REDACTED] shall bear the costs of complying with the IAA/EASA Requirements, or (y) more than [REDACTED] days, Lessor and Lessee shall split the costs of complying with such IAA/EASA Requirements as follows: (a) the [REDACTED] shall bear a portion of such costs equal to [REDACTED]; and (b) [REDACTED] shall bear the remainder of the costs of complying with such IAA/EASA Requirements;

        iii.  if the FAA SBs are installed on the Aircraft more than [REDACTED] days after the arrival of the FAA SBs to the Lessee, the [REDACTED] shall bear all costs of complying with such IAA/EASA Requirements; provided that if Lessee has not embodied the FAA SBs prior to the expiration of such [REDACTED]-day period, then the parties will discuss in good faith a reasonable extension of such period; and

        iv.  if the FAA SBs never arrive to the Lessee, the [REDACTED] shall bear any costs of complying with the IAA/EASA Requirements;

        **provided** that notwithstanding anything to the contrary in this Agreement, if any IAA/EASA Requirement does not require compliance prior to the Lessee's expected installation of the FAA SBs, the Lessee shall not be obligated to comply with such IAA/EASA Requirements;

(B)    notwithstanding anything herein to the contrary, if, prior to the installation of the FAA SBs on the Aircraft, the AFAC or the Irish Aviation Authority imposes any restriction or limitation preventing the Lessee from operating the Aircraft (other than for reasons of Lessee's non-compliance with any applicable regulation), Lessor shall provide the Lessee with [REDACTED] for the number of days elapsed between the date the Aircraft comes out of service as a result of such restriction or limitation until the earlier of (i) the date the FAA SBs are embodied on the Aircraft, (ii) the date falling [REDACTED] days after the FAA SBs are received by Lessee or the date falling [REDACTED] days after the date the Aircraft comes out of service if the FAA SBs have already been received by Lessee on such date, and (iii) the date Lessee is otherwise able to resume operations of the Aircraft.

(b)    Once the Aircraft has had the FAA SBs embodied, at Lessee's option and at [REDACTED]'s cost, Lessor and Lessee shall thereupon take all actions required to (i) deregister the Aircraft from the Irish Aviation Authority (including, if applicable, discharging any Lessor Liens), and (ii) register the Aircraft with the AFAC in accordance with Clause 9.5(c). Notwithstanding anything to the contrary in this Agreement, Lessee may return the Aircraft in an EASA configuration if Lessee elects to forego embodying the FAA SBs on the Aircraft and keep the Aircraft registered on the aircraft register of the Irish Aviation Authority until the end of the Term.

(c)     Save as set out in Clauses 9.5(a) and 9.5(b), Lessee shall to the greatest extent permitted by applicable Law:

(i)     so long as Lessor continues to be eligible for such registration and subject to Lessee's receipt from Lessor of any required documentation complying with any applicable execution formalities, keep the Aircraft registered with the Aviation Authority in the name of Lessor as owner thereof and not take or permit any action contrary to the continued registration of the Aircraft with the Aviation Authority in the name of Lessor other than (x) with Lessor's prior written approval which will not be unreasonably withheld or delayed or (y) in connection with a sublease of the Aircraft to a Permitted Sublessee in accordance with this Agreement;

(ii)    subject to clauses (iii) and (iv) below, cooperate with Lessor in relation to the registration and recordation with the Aviation Authority and any other relevant public record (or as required to comply with the Cape Town Convention or the Geneva Convention where applicable) of (x) the Aircraft, and this Agreement (or particulars thereof) and/or (y) the interest of Lessor as owner and lessor and, at Lessor's cost, the rights of any Financing Parties having a Security Interest in respect of the Aircraft or this Agreement (as the case may be) on such public record;

(iii)   make and cooperate with Lessor with the making of any changes to the registrations referred to at (i) or (ii) above as may be necessary or advisable (and are consistent with the provisions of this Agreement) to take account of any change permitted by this Agreement in ownership of the Aircraft any Engine or Part (including any permanent replacement of any Engine or Part) or any modification to the Aircraft (including Equipment Changes) or any change in the financing of the Aircraft (including this Agreement) or of any change in applicable Law or introduction of new Law; and

(iv)    Lessor shall pay all costs incurred in respect of a change in ownership and/or financing of the Aircraft pursuant to Clause 21.2 (*Lessor Transfer*) or in respect of any change in applicable Law relating to the financing of the Aircraft. Lessee will pay any other costs incurred in complying with this Clause except as specified above.

(d)     Lessee shall not without the prior written consent of Lessor change the State of Registration other than (i) as permitted pursuant to Clauses 9.5(a), 9.5(b) or 9.5(c), and (ii) following the termination of any sublease of the Aircraft during which the Aircraft is registered in a jurisdiction other than Mexico, Lessor and Lessee shall promptly cooperate to procure the deregistration of the Aircraft from such jurisdiction and re-register the Aircraft with the AFAC in the name of Lessor as owner.

(e)     At Lessee's cost (save as set out in this Agreement), Lessee shall from time to time do or cause to be done any and all acts and things which may be required or

desirable (in the discretion of Lessor acting reasonably, but in each case consistent with the provisions of the Agreement and the other Operative Documents) to ensure that Lessor and, at Lessor's cost, the Financing Parties (if any) have or obtain the fullest benefit(s) of the Cape Town Convention and/or the Protocol, as applicable and implemented, in connection with the Aircraft and any Engine, including (but not limited to):

(i)     any matters connected with registering, perfecting or preserving and/or enhancing any International Interest(s) or other registrable interests vested in the Lessor or the Financing Parties with respect to the Aircraft and/or any Engine and constituted by this Agreement;

(ii)    constituting any International Interest(s) or other registrable interests to be vested in the Lessor or the Financing Parties with respect to the Aircraft and/or any Engine in connection with this Agreement;

(iii)   entry into agreements (subordination or otherwise) to protect, perfect and/or enhance and/or improve the priority of any International Interest(s) or other registrable interests referred to in the foregoing Clause 9.5(e)(i) and/or (ii); and

(iv)    taking all relevant actions and cooperating as may be requested by Lessor in writing with respect to the issuance of an IDERA to the extent such instrument becomes recognized in Mexico after the date hereof and all necessary Regulations implementing such recognition and measures with respect to the filing and acknowledgement of an IDERA and any related required documents complying with any applicable execution formalities have been fully adopted and implemented in Mexico after the date hereof; **provided that** Lessee shall only be required to take any such action or provide any such cooperation subject to and in accordance with all applicable laws and regulations of Mexico. Lessor confirms that, following receipt of an IDERA from Lessee and without prejudice to Lessee's obligations hereunder (including pursuant to Clause 19.2(c)), Lessor shall not seek to enforce the Deregistration Power of Attorney unless the IDERA is not effective to procure the prompt de-registration of the Aircraft at any time following the occurrence of an Event of Default which is continuing.

(f)     Lessee and Lessor agree that for all purposes of the Cape Town Convention, (i) this Agreement upon the Delivery of the Aircraft will constitute a separate International Interest with respect to the Airframe and/or each Engine, (ii) the Airframe and each Engine constitute Aircraft Objects and (iii) this Agreement constitutes an agreement for the registration of the Airframe and Engines identified in the Acceptance Certificate.

(g)     For the avoidance of doubt, the costs and expenses in opening and maintaining the TUE accounts of the Lessor and any Financing Party shall not be at Lessee's cost.

9.6     **Title and other Property and Security Interests**

Lessee shall:

(a)     affix, and maintain in a prominent position, a fireproof plate (having dimensions of not less than 10 cm. x 7 cm.) on each Engine and in the cockpit or cabin of the Aircraft stating:

"THIS [AIRCRAFT/ENGINE] IS OWNED BY [_____], NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE AND IS LEASED TO AEROVÍAS DE MÉXICO, S.A. DE C.V. AND MAY NOT BE, OR REMAIN IN THE POSSESSION OF, OR BE OPERATED BY, ANY OTHER PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF [_____], NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE OR AS OTHERWISE PROVIDED IN THE LEASE AGREEMENT.";

**provided, that** the replacement of any such fireproof plates required due to changes of ownership or the incurrence of the lien of, or change of, any Financing Party Representative shall be arranged and paid for by Lessor.

(b)     not at any time (i) represent to others that Lessor, Owner Participant or the Financing Parties are in any way connected with or responsible for any operation of the Aircraft or the business of the Lessee or carriage (whether for hire or reward or gratuitously) which may be undertaken by Lessee; or (ii) pledge the credit of Lessor, Owner Participant or the Financing Parties;

(c)     on all occasions when the ownership of the Aircraft, any Engine or any Part is relevant, make clear to third parties that title is held by Lessor and inform any third party attempting to seize or arrest the Aircraft that it does not have any ownership interest in or title to the Aircraft;

(d)     not do or omit to do or knowingly permit to be done or omitted to be done any act or thing which might reasonably be expected to jeopardize the rights of Lessor as owner or lessor of the Aircraft or the Financing Parties under any Security Interest or assignment in respect of the Aircraft or this Agreement;

(e)     not abandon the Aircraft, any Engine or any Part;

(f)     not allow the Aircraft, any Engine or any Part, Lessor's or any Financing Party's interest in the same, or this Agreement or the Insurances, to become or remain subject to any Security Interest (other than Permitted Liens) and promptly at Lessee's expense take such action as may be necessary to discharge any such Security Interest other than Permitted Liens if the same shall exist at any time; or

(g)     not consent to any interests conflicting with (whether or not taking priority over) the interests of Lessor as lessor and owner or any Financing Party to be registered at the International Registry without the prior written consent of Lessor, or such Financing Party (as the case may be).

### 9.7   **Lessee Existence**

Lessee will preserve its corporate existence in Mexico, will not sell, lease, transfer or otherwise dispose of all or substantially all of its assets (in one or in any series of transactions) to any Person and will continue to be a regularly scheduled, commercial airline; **provided that** Lessee may sell, lease, transfer or otherwise dispose of all or substantially all of its assets to any Person or merge or consolidate with any Person in a transaction in which it is not the surviving Person if the following conditions are satisfied:

(a)   Lessee has provided Lessor with thirty (30) days prior written notice of such transaction;

(b)   the Person acquiring such assets or the Person surviving such merger or consolidation (in either case, the "**Surviving Entity**") assumes all of the rights and obligations of Lessee under the Operative Documents to which Lessee is a party;

(c)   the tangible net worth of the Surviving Entity is equal to or greater than the tangible net worth of Lessee immediately prior to such merger or consolidation;

(d)   the Surviving Entity is a regularly scheduled commercial airline duly organized and validly existing under the laws of Mexico;

(e)   the Surviving Entity shall execute and deliver to Lessor an agreement, in form and substance reasonably satisfactory to Lessor, by which the Surviving Entity assumes the due and punctual performance and observance of each covenant and condition of Lessee under this Agreement and agrees to be bound thereby (such assumption of obligations to be legal, valid, binding and enforceable, except as enforcement of such agreement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting the rights of creditors generally and general principles of equity);

(f)   Lessee shall have delivered to Lessor (and any Financing Parties) (i) a certificate of an officer stating that all conditions set forth in this Clause 9.7 in respect of such consolidation, merger, conveyance, transfer or lease have been satisfied and (ii) an opinion of external counsel selected by Lessor and reasonably acceptable to Lessee to the effect that the assumption agreement described in clause (e) above has been duly authorized, executed and delivered by the Surviving Entity, constitutes its legal, valid and binding obligation and is enforceable against such Surviving Entity in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and by principles of equity;

(g)   the Surviving Entity shall execute and deliver to Lessor and/or file such recordations and filings with any Government Entity (including the Aviation Authority) as Lessor shall reasonably deem to be necessary or advisable (including, without limitation, to preserve and protect the interests of Lessor and the Financing Parties) to evidence, or in connection with, such transfer of assets, merger or consolidation; and

(h)     prior to and immediately after giving effect to such transfer of assets, merger or consolidation, no Credit Default or Event of Default shall have occurred and be continuing.

Lessee shall pay all reasonable costs and expenses incurred by Lessor and, if applicable, any Financing Party (including all reasonable legal fees and expenses) in relation to any such transfer of assets, merger or consolidation following receipt of an invoice and supporting documentation in respect thereof reasonably acceptable to Lessee.

Upon any consolidation or merger, or any conveyance, transfer or lease of all or substantially all of the assets of Lessee as an entirety in accordance with this Clause 9.7, the Surviving Entity shall succeed to, be substituted for, and may exercise every right and power of, and shall assume every obligation and liability of, Lessee under the Operative Documents with the same effect as if the Surviving Entity had been named as Lessee herein; and thereafter, Lessee shall be released and discharged from all obligations and covenants under the Operative Documents.  This Clause 9.7 shall not be construed as permitting any sublease or other arrangement for the use, operation or possession of the Aircraft except as permitted under the applicable provision of this Agreement.

## 9.8    Recognition of Rights

Lessee shall procure that any Person to whom possession of the Aircraft, the Airframe or any Engine is given (other than maintenance providers as permitted hereunder) acknowledges in writing within a mortgage or lease or other agreement between Lessee and such Person, that it will respect the interests of the owner and lessor of the Aircraft, the Airframe or such Engine, as applicable and the interests of the Financing Parties in respect of such Aircraft, the Airframe or such Engine and will not seek to exercise any rights whatsoever in relation to such Aircraft, Airframe or Engine.  At Lessor's reasonable request, Lessee will provide an officer's certificate confirming that such acknowledgment is contained within each mortgage, lease or other agreement between Lessee and any such Person (other than such maintenance providers) which has possession of the Aircraft, the Airframe or any Engine.

Lessor hereby acknowledges, on behalf of itself and any Financing Parties, and for the benefit of any holder of an interest in an engine that may at any time be attached to the Airframe in accordance with this Agreement, that it will respect the interests of such holders of interests and will not seek to exercise any rights whatsoever in relation to such engine **provided that** each such holder of an interest has confirmed in writing within a mortgage or lease or other agreement between Lessee and such Person that it will respect the interests of the owner and lessor of the Aircraft and will not exercise any rights whatsoever in relation to the Aircraft.

Nothing in this Clause 9.8 shall limit or prejudice the exercise of Lessor's rights in respect of the Aircraft, including in accordance with this Agreement and applicable Law.

10.    **POSSESSION, SUBLEASING AND POOLING**

10.1    **Possession**

Lessee shall not, without the prior written consent of Lessor (not to be unreasonably withheld), sublease or part with possession of the Aircraft, the Engines or any Part, except that Lessee may part with possession without Lessor's consent:

(a)    with respect to the Aircraft, the Engines or any Part, to the Manufacturer or an Approved Maintenance Performer for service, testing, modification, maintenance, repair, overhaul or other work to the extent required or permitted by this Agreement;

(b)    on a wet lease which complies with Clause 10.2;

(c)    on a sublease to a certificated air carrier which complies with Clause 10.3; and

(d)    with respect to an Engine or Part as expressly permitted by this Agreement.

10.2    **Wet leasing**

Lessee shall be permitted to wet lease or charter the Aircraft to a third party **provided that** under the terms of such wet lease or charter:

(a)    the Aircraft shall be operated solely by regular employees of Lessee possessing all current certificates and licenses that are required by applicable Regulations;

(b)    the Aircraft shall remain subject to the insurance coverage required under Clause 15 or such other insurance coverage as is approved by Lessor;

(c)    the Aircraft shall be maintained by Approved Maintenance Performers in accordance with the Maintenance Program and Lessee's normal maintenance practices;

(d)    the Aircraft shall not be subject to any change in its State of Registration or Habitual Base;

(e)    such wet lease or charter is expressly subordinated to this Agreement and the rights of Lessor and the Financing Parties hereunder and to the Aircraft;

(f)    the duration of such wet lease (including all extensions and renewals) does not exceed twelve (12) months and does not extend beyond the Scheduled Expiry Date or if applicable, the Scheduled Renewal Term Expiry Date; and

(g)    no Credit Default or Event of Default has occurred and is continuing under this Agreement at the time Lessee enters into such wet lease or charter.

10.3    **Subleasing**

(a)     Lessee may, (x) [REDACTED] or (y) with the consent of Lessor (not to be unreasonably withheld or delayed), sublease the Aircraft to any certificated air carrier not described in clause (x), so long as in case of each of (x) and (y) the following conditions are satisfied:

(i)     Lessee shall have given not less than thirty (30) days' prior written notice to Lessor of its intention to enter into any sublease agreement or arrangement (which notice shall include a description of the proposed subleasing arrangements including the identity of the proposed sublessee, the term of the sublease and the proposed delivery date under the sublease) and Lessee shall have provided to Lessor at least ten (10) Business Days' prior to execution of the sublease agreement, a copy of the draft sublease agreement and the draft insurance certificate (it being acknowledged that in any event (x) Lessee may redact the amount of Rent and all other economic terms, (y) the below conditions are required to be satisfied prior to commencement of the relevant sublease and (z) the evidence and/or documentation specified below shall be required to be provided to Lessor prior to commencement of the relevant sublease so as to give Lessor a reasonable period of time to review the same);

(ii)    no Credit Default or Event of Default shall have occurred and be continuing at the time of commencement of such sublease and Lessee shall terminate the sublease at the written request of Lessor if an Event of Default has occurred and is continuing;

(iii)   the proposed State of Registration and Habitual Base of the Aircraft is not an Excluded Country;

(iv)    the proposed sublessee is not a Restricted Party or controlled by a Restricted Party;

(v)     the sublease shall be expressly stated to be subject to and subordinate to Lessor's rights under this Agreement and shall provide that it shall terminate automatically and immediately upon written notice from the Lessor following the occurrence of an Event of Default which is continuing or upon any termination of the leasing of the Aircraft under this Agreement;

(vi)    the sublease and all of Lessee's right, title and interest thereunder shall have been assigned to Lessor pursuant to a sublease assignment in form and substance acceptable to Lessor (acting reasonably), as collateral security for the performance of all obligations of Lessee and under this Agreement; **provided however that** if Lessor is satisfied (acting reasonably and based on advice from Lessor's counsel in the relevant jurisdiction) that under the laws of the relevant jurisdiction the subordination acknowledgement referred to in Clause 10.3(a)(vii) puts Lessor in a substantially similar

position (with regard to the protection and recognition of Lessor's rights to repossess the Aircraft from the sublessee upon the occurrence of an Event of Default which is continuing or upon the date upon which the leasing of the Aircraft hereunder terminates or expires, whichever is the earlier) to that which Lessor would have been had Lessee granted to Lessor a security assignment referred to in this Clause 10.3(a)(vi), no such security assignment shall be required;

(vii)    prior to delivery of the Aircraft under such sublease (and as a condition precedent thereof) the sublessee shall provide an acknowledgement to Lessor, in a form satisfactory to Lessor (acting reasonably), confirming such subordination and confirming that its rights to possession of the Aircraft under such sublease shall terminate immediately on written notice from Lessor stating that the leasing of the Aircraft under this Agreement has terminated following an Event of Default or an Illegality Event, that it will redeliver the Aircraft (together with all Engines, Parts and Aircraft Documents) to Lessor promptly following receipt of such notice and that it will perform all obligations under the sublease, including payment of rent, directly to, and deal exclusively with, Lessor following receipt of such notice;

(viii)    Lessee shall procure that Lessor is provided with an air traffic control letter issued by the sublessee in substantially the same form as Schedule 14, an IDERA (to the extent the State of Registration will be changed and the Cape Town Convention has been ratified by, and IDERAs are available in, such new State of Registration), deregistration power of attorney and/or such other documents for deregistering and exporting the Aircraft from such jurisdiction upon an early termination of the applicable sublease and removing evidence of such sublease from the applicable registries in such jurisdiction and the International Registry, if applicable; provided for each such document that it is customary to obtain such document from commercial airlines in the relevant State of Registration and **provided further that** where a sublessee has a policy of refusing to provide same, Lessor, acting reasonably, and taking into account, *inter alia*, its own experiences with such sublessee, may waive the requirement to procure such document;

(ix)    the sublease (v) requires the sublessee to operate the Aircraft on terms that would not cause Lessee to be in default under Clause 9.3 (*Operation of the Aircraft*), (w) maintain the Aircraft on terms that would not cause Lessee to be in default under Clause 11.4 (*Maintenance and Repair*), (x) (if the sublessee is to maintain Insurances rather than Lessee) insure the Aircraft on terms that would not cause Lessee to be in default under Clause 15 (*Insurance*), (y) shall contain terms that would not cause Lessee to be in default in relation to the restrictions on interchange and replacement of Engines and Parts contained in Clause 10.4 (*Pooling*) and Clause 12 (*Replacement and Interchange of Engines and Parts*) and (z) shall contain

covenants to pay all air navigation authority fees and charges relating to the Aircraft or other aircraft operated by such sublessee; **provided**, **however that**, the rights described in Clause 12.1(a) shall not be included in any sublease;

(x)    the sublease shall be on such terms as shall ensure that the sublessee shall not, in complying with such terms, cause Lessee to be in breach of or default under the provisions of this Agreement or any other Operative Document;

(xi)    the sublease shall not permit any further subleasing or wetleasing (except for any wetlease which complies with the provisions of Clause 10.2 (*Wet leasing*)) of the Aircraft;

(xii)    the sublease shall not have a term which extends or is capable of extending beyond the Term;

(xiii)    on or prior to the commencement of the sublease Lessee shall provide to Lessor evidence satisfactory to Lessor confirming (x) that the Aircraft will continue to be insured in accordance with this Agreement and (y) such additional insurance provisions as may be reasonably requested by Lessor and are applicable to aircraft registered in the relevant State of Registration shall have been complied with after giving effect to such change in registration;

(xiv)    the sublessee under the sublease shall not at the time of commencement of the relevant sublease be insolvent or otherwise be subject to any events of the type set out in Clause 19.1(a) (*Nonpayment*), 19.1(b)(ii) (*Insurance*), 19.1(h) (*Insolvency*), 19.1(i) (*Liquidation and Similar Proceedings*) or 19.1(j) (*Other Jurisdiction*), *mutatis mutandis*;

(xv)    the sublessee under the sublease shall hold all certificates, licenses, permits and authorizations required for its use and operation of the Aircraft;

(xvi)    the State of Registration shall not change without Lessor's prior written consent; **provided that** Lessor's consent to a change in the State of Registration shall not be required where the change is to the state of incorporation or organization of any Pre-Approved Sublessee (subject in each case to receipt by Lessor and any Financing Party of any documents necessary or desirable to protect their respective interests in the Aircraft, this Agreement and any other Operative Document in the proposed State of Registration); and **provided further that** Lessee shall not cause the Aircraft to be registered in a jurisdiction other than Mexico if (x) the civil aviation laws of such jurisdiction enacted, commenced or promulgated after the date of this Agreement impose unusual requirements, liabilities or risks on lessors of civil aircraft and (y) Lessor or any Financing Party, as the case may be, would be required to comply with such unusual requirements or would be subject to such liabilities or risks upon the registration of the

Aircraft in such jurisdiction, and compliance therewith by Lessor or the Financing Party, as the case may be, would result in a material burden on the business activities of Lessor or the Financing Party, as the case may be; and

(xvii) if the State of Registration changes in connection with the sublease, prior to the delivery of the Aircraft under such sublease, Lessor shall have received a legal opinion, in form and substance reasonably satisfactory to Lessor, from counsel reasonably satisfactory to Lessor in the jurisdiction in which the Aircraft is to be registered confirming, *inter alia*, (w) the legal, valid, binding and enforceable nature of the obligations of the sublessee under the sublease and the subordination acknowledgement delivered under clause (vii) above, (x) it is not necessary for Lessor or any Financing Party to qualify to do business in such jurisdiction or otherwise satisfy any other applicable law, rule or regulation existing at the date of such request as a result of the proposed re-registration, (y) subject to customary bankruptcy and insolvency exceptions, there exist no possessory rights in favor of the sublessee under the laws of the proposed State of Registration that would prevent the return of the Aircraft in accordance with and when permitted by the terms of this Agreement upon the exercise of remedies by Lessor of its remedies in accordance with the Lease in connection with an Event of Default that shall have occurred and be continuing, and (z) the proper compliance with registration and other formalities (including any registrations with the International Registry, if applicable) necessary or advisable in connection with the sublease.

(b) If the Aircraft is to be registered in a new State of Registration in connection with a sublease or the termination of a sublease, Lessee shall procure that all filings, recordings and registrations are promptly made to the extent necessary (i) to deregister the Aircraft from the registry maintained by the then existing State of Registration, (ii) to register the Aircraft in the new State of Registration in the name of Lessor as owner (and if that is not possible, in the name of Lessee or the sublessee with the interests of Lessor noted in the registry) in accordance with and to the extent permitted by applicable Law in the new State of Registration, and (iii) to register, record, protect and/or perfect the Security Interest of any Financing Parties Representative in the new State of Registration in accordance with and to the extent permitted by applicable Law in the new State of Registration. Lessor shall co-operate and shall use reasonable endeavors to procure that the Financing Parties co-operate with Lessee upon reasonable request by Lessee to assist Lessee and/or the sublessee, as the case may be, in promptly making any filings, recordings and registrations in the existing State of Registration and, if applicable, any new State of Registration which are necessary in connection with any subleasing or change in the State of Registration. No sublease shall be permitted unless and until such filings, recordings and registrations have been made or arrangements have been made to effect the same following the delivery of the Aircraft under the sublease.

(c)     Lessee shall indemnify, pay and reimburse Lessor and any Financing Party on demand for all reasonable and documented costs, expenses and liabilities incurred by Lessor and any Financing Party in determining that the conditions set forth in Clause 10.3(a) are satisfied and in connection with the filings, recordings and registrations contemplated by Clause 10.3(b).

(d)     Any change in the State of Registration referred to in clause (b) above will not result in the imposition by such country of any Taxes on Lessor or the Financing Parties for which Lessee is not required to indemnify Lessor or the Financing Parties, as the case may be, unless Lessee agrees to indemnify Lessor or the Financing Parties, as the case may be, for any Taxes imposed by such country in connection with or relating to the transactions contemplated by this Agreement that would not have been imposed but for such re-registration other than Taxes described in clauses (i), (ii) (other than Lessor Liens described in (a) in the definition thereof) or (iv) of Clause 20.3(b) hereof.

(e)     If a sublessee becomes subject to any of the events or circumstances described in 19.1(b)(ii) (*Insurance*), 19.1(h) (*Insolvency*), 19.1(i) (*Liquidation and Similar Proceedings*) or 19.1(j) (*Other Jurisdiction*), mutatis mutandis, Lessee shall to the extent permitted by law promptly terminate the sublease and shall take all steps to ensure the prompt return of the Aircraft to Lessee by the sublessee.

(f)     Lessee shall provide Lessor with a true and complete copy of the executed sublease and any amendments thereto within five (5) Business Days after the execution of such sublease or such amendments; such copy may be in electronic form, it being agreed that Lessee may redact the amount of rent and all other economic terms.

(g)     Subject to Clause 9.1(b), no subleasing of the Aircraft shall release Lessee from its obligations under this Agreement, and Lessee hereby confirms and agrees that it shall remain fully liable to perform all of its obligations under this Agreement notwithstanding any such subleasing and shall be primarily liable for any act or omission of any sublessee in connection with any such subleasing.

(h)     Lessor and Lessee shall review the list of Pre-Approved Sublessees upon reasonable request of the other party and following such review, may agree (acting reasonably and in good faith) to amend such list.

10.4    **Pooling**

(a)     Pooling of Engines

Lessee shall not permit any Engine to become subject to pooling or interchange arrangements or permit any Engine to go out of its possession pursuant to any such arrangement unless:

(i)     no Credit Default or Event of Default has occurred and is continuing;

(ii)    the installation of the Engine on a Pool Aircraft (as defined below) is in accordance with the provisions of an engine pooling arrangement with (x) the Engine Manufacturer, (y) an Approved Maintenance Performer or (z) other responsible, solvent certificated commercial air carriers, in each case whose terms the Lessor has previously approved in writing and which, among other things, contains the following requirements:

(A)    the Engine is installed on an aircraft (a "**Pool Aircraft**") with which it is compatible;

(B)    the arrangements under which the Pool Aircraft are owned or operated ensure that title to any Engine installed on that aircraft remains vested in Lessor following the installation of the Engine on that Pool Aircraft and shall not jeopardize Lessor's or any Financing Party's rights in that Engine;

(C)    the arrangements under which the Pool Aircraft is insured would permit the recovery by Lessor of an amount at least equal to the full replacement value of that Engine upon the Total Loss of that Pool Aircraft (including the Engine) when the Engine is installed thereon; and

(D)    the Engine is re-installed on the Airframe prior to the Expiry Date unless it is replaced by a Replacement Engine in accordance with Clause 12.6.

(b)    Pooling of Parts

Lessee shall not permit any Part to become subject to pooling or interchange arrangements, or allow any Part to go out of its possession pursuant to any such arrangement, except in respect of Parts (other than the APU and the Landing Gear) pursuant to an ordinary course arrangement with (x) the relevant Part Manufacturer, (y) an Approved Maintenance Performer or (z) other responsible, solvent certificated commercial air carriers and which contains the following requirements:

(i)    no Credit Default or Event of Default has occurred and is continuing;

(ii)    the Part is installed on a Pool Aircraft with which it is compatible;

(iii)    a record of the location of any Part will be kept and made available to Lessor at any time on request;

(iv)    title to the Part which has gone out of Lessee's possession pursuant to such arrangement shall remain with Lessor until returned to Lessee or replaced with a Replacement Part in accordance with Clause 12.6; and

(v)    the Part is re-installed on the Aircraft prior to the Expiry Date unless it is replaced by a Replacement Part in accordance with Clause 12.6.

11.    **TECHNICAL REPORTING, AIRCRAFT DOCUMENTS, INSPECTION, MAINTENANCE AND REPAIR**

11.1    **Technical Reporting**

Lessee shall:

(a)    during the Term, furnish to Lessor within 15 days of the end of each calendar quarter a Technical Status Report; and

(b)    within ten (10) Business Days of Lessor's request, provide to Lessor such other information and documentation as Lessor may reasonably request concerning the location, condition, use and operation of the Airframe, any Engine or Part, and any engine or part installed on the Airframe.

11.2    **Aircraft Documents**

Lessee shall:

(a)    keep accurate, complete and current records (which records shall form part of the Aircraft Documents and, notwithstanding that such records may be generated by Lessee, shall be deemed the property of Lessor and leased to Lessee hereunder) as listed in Schedule 7 or as may otherwise be required by the Aviation Authority, the Maintenance Program and all applicable Regulations;

(b)    maintain all Aircraft Documents current and up to date in English (through subscription to the relevant manufacturer's update service or otherwise) (except for the cockpit and cabin rectification log book which may be maintained in Spanish) in Lessee's format (which may be microfiche, microfilm or digital and/or electronic format or any other form); provided such format is readable by Lessor at no material additional cost to Lessor;

(c)    retain and store such Aircraft Documents, as required by the Aviation Authority, the Maintenance Program and all applicable Regulations and other materials at either (i) Lessee's or any Permitted Sublessee's principal place of business, (ii) the facility of an Approved Maintenance Performer or (iii) an Aviation Authority approved storage location under Lessee's or any Permitted Sublessee's control, and not permit any other Person (other than an Approved Maintenance Performer or a Permitted Sublessee) to have possession of or control over the same without Lessor's prior written consent, **provided that** Lessee shall be entitled to store the Aircraft Documents as provided in sub clause (ii) or (iii) above only if Lessee shall have first obtained an acknowledgment from the relevant Approved Maintenance Performer or the person providing the storage facility that Lessor shall have the right to access such Aircraft Documents during regular business hours and to remove the Aircraft Documents on the occurrence of an Event of Default which is continuing; and **provided further that** no such consent or acknowledgement shall be required from any Approved Maintenance Performer in respect of Aircraft

Documents in its possession in respect of any maintenance, repair, overhaul or other work being performed by that Approved Maintenance Performer; and

(d)     at Lessor's request, consent to Lessor having digital access to Aircraft Documents maintained by a Manufacturer and the Boeing Toolbox.

## 11.3    Inspection

(a)     Upon Lessor's request, Lessee shall arrange that at any reasonable time during the Term (but no more than once per calendar year for so long as no Credit Default or Event of Default has occurred and is continuing), Lessor or its authorized representatives may inspect the Aircraft and the Aircraft Documents (and make copies, at Lessor's expense, of the Aircraft Documents), as provided herein and Lessee shall provide all reasonable assistance and co-operation in connection with such inspection (including facilitating access to the Aircraft and the Aircraft Documents). Any such inspections shall not unreasonably disrupt Lessee's normal business operations. Lessee shall comply with the reasonable requests of Lessor during the course of an inspection including any reasonable request to open quick release panels or to take photographs of the Aircraft.

(b)     Each such inspecting Person shall be solely responsible for its cost of conducting an inspection (including all reasonable out-of-pocket expenses and employer insurance coverage) unless (A) a Credit Default or an Event of Default has occurred and is continuing or (B) an inspection reveals that Lessee has failed to comply in any material respect with its obligations under this Agreement, in which case any follow up inspection required to verify that remedial work has been completed will be at Lessee's cost.

(c)     Neither Lessor nor Owner Participant shall have any duty or obligation to inspect the Aircraft or arising out of such inspection and neither Lessor nor Owner Participant shall incur any liability as a result of non-exercise of any inspection rights in this Clause 11.2.

(d)     Any inspection of the Aircraft (including any Aircraft Documents) shall be solely for Lessor's information and failure to notify Lessee of any discrepancies thereafter shall not imply that Lessee is in compliance with this Agreement, its maintenance provisions or applicable Law.

## 11.4    Maintenance and Repair

Lessee shall or shall procure that an Approved Maintenance Performer shall, maintain, overhaul and repair the Aircraft so that at all times during the Term:

(a)     the Aircraft is kept airworthy in all respects and in good operating condition and repair except while the Aircraft is undergoing maintenance, modification or repair required or permitted by this Agreement;

(b)    Lessee has a current and valid certificate of airworthiness (in the appropriate category for the nature of the operations of the Aircraft) for the Aircraft issued by the Aviation Authority except where the Aircraft is undergoing maintenance, modification or repair required or permitted by this Agreement, and Lessee will from time to time provide to Lessor a copy thereof within ten (10) days of Lessor's request;

(c)    the Aircraft is maintained in accordance with the Maintenance Program through an Approved Maintenance Performer and in at least the same manner and with at least the same care as is the case with respect to similar aircraft owned, leased or otherwise operated by Lessee or, if the Aircraft is being subleased, the Permitted Sublessee (in each case taken as a whole), and as if Lessee were to retain and continue operating the Aircraft in its fleet after the Expiry Date, including maintenance scheduling, modification status and technical condition, and all maintenance to the Airframe, any Engine or any Part required to maintain all warranties or service life policies applicable to the Aircraft in full force and effect in accordance with their terms;

(d)    the Aircraft complies with all Regulations, Mandatory Orders and Airworthiness Directives having a compliance date during the Term, regardless of upon whom such requirements are imposed;

(e)    Lessee and the Aircraft are each in compliance with any other applicable Regulation which relates to the maintenance, condition, use or operation of the Aircraft or requires any modification or alteration to the Aircraft, any Engine or Part regardless of upon whom such requirements are imposed;

(f)    no maintenance is performed on or permanent modification made to the Aircraft that reduces the value, useful life or utility of the Aircraft, any Engine or any Part; **provided that** nothing herein shall prevent Lessee from maintaining the Aircraft in accordance with the Maintenance Program and to comply with the State of Registration and Aviation Authority requirements; and

(g)    any replacement of an Engine or Part in the course of maintenance is in accordance with Clause 12 (*Replacement and Interchange of Engines and Parts*).

## 11.5    Maintenance Program

(a)    Lessee shall at all times ensure that the Aircraft is subject to a maintenance program which is approved by the Aviation Authority and based on the Manufacturer's Maintenance Planning Document and including provisions in respect of scheduled maintenance (including block and/or equalized maintenance), condition monitored maintenance, and/or on condition maintenance of Airframe, Engine and Parts, including (but not limited to) servicing, testing, preventive maintenance, repairs, structural inspections, systems checks, overhauls, approved modifications, service bulletins, engineering orders, airworthiness directives, corrosion control, inspections and treatments (the "**Maintenance Program**").

(b)     Lessee shall provide prior written notice to Lessor of any change in the intervals of the Structural Checks set forth in the Maintenance Program. As soon as reasonably practicable after such notice, Lessor and Lessee shall cooperate in good faith to amend or supplement paragraph A of Part B of the Financial Terms Annex and Schedule 7 (*Aircraft Documents at Redelivery*) to the extent necessary to preserve the rights and benefits given to Lessor thereunder.

(c)     Upon Lessor's request, Lessee shall furnish to Lessor a copy of the then most current version of the preamble and matrix from the Maintenance Program.

## 12.     REPLACEMENT AND INTERCHANGE OF ENGINES AND PARTS

### 12.1     Replacement and Interchange of Engines and Parts

(a)     Lessee shall have the right at its option at any time provided no Credit Default or Event of Default has occurred and is continuing, on written notice to Lessor, to permanently replace any Engine with a Replacement Engine by complying with the terms of Clause 12.6 (*Permanent Replacement of Engines and Parts*).

(b)     Lessee shall promptly replace or procure the replacement of any Part which has become time, cycle or calendar-expired, lost, stolen, seized, confiscated, destroyed, damaged beyond economic repair, unserviceable or permanently rendered unfit for use, in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*).

(c)     Lessee shall be entitled to install and permit the installation of engines and parts on the Aircraft other than the Engines and Parts **provided that**:

(i)     a permanent replacement of an Engine or Part shall be in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*);

(ii)     a temporary replacement of an Engine shall be in accordance with Clause 12.3 (*Installation of other engines*); and

(iii)     a temporary replacement of a Part shall be in accordance with Clause 12.4 (*Installation of other parts*).

### 12.2     Removed Engines and Parts

Lessee shall be entitled to remove and permit the removal of an Engine or Part from the Aircraft **provided that**:

(a)     any Removed Engine or Removed Part (as the case may be) is promptly replaced in accordance with Clause 12.1 (*Replacement and Interchange of Engines and Parts*); and

(b)      such Removed Engine or Removed Part:

(i)      is (x) installed on another aircraft in accordance with Clause 12.5 (*Installation of Engines and Parts on Other Aircraft*), (y) properly and safely stored, or (z) in the possession of an Approved Maintenance Performer for repair, maintenance, modification and/or refurbishment in accordance with this Agreement;

(ii)     is kept free of Security Interests (other than Permitted Liens);

(iii)    continues to be covered by the Insurances; and

(iv)     remains the property of the Lessor unless and until there has been a permanent replacement in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*) and unless and until title to that Replacement Engine or Replacement Part, as applicable, has passed to the Lessor pursuant to and in accordance with this Agreement; and

(c)      Lessee complies with Clause 9.8 (*Recognition of Rights*) with respect to any Removed Engine.

Lessee shall ensure that any Removed Engine or Removed Part is reinstalled on the Aircraft or permanently replaced by a Replacement Engine or Replacement Part in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*) by no later than [REDACTED].

## 12.3   Installation of other engines

Lessee may only install and permit the installation of an engine on the Airframe that is not a permanent replacement in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*) if:

(a)      such engine is suitable for operation on the Airframe;

(b)      such engine is owned by or leased or conditionally sold to Lessee or a Permitted Sublessee or in Lessee's or a Permitted Sublessee's possession pursuant to a pooling arrangement; and

(c)      the Insurances for the Aircraft are not adversely affected.

No later than [REDACTED], Lessee shall remove any engine that is not an Engine and replace it with the relevant Removed Engine or a Replacement Engine in accordance with Clause 12.6 [REDACTED].

12.4    **Installation of other parts**

Lessee may only install and permit the installation of any part on the Aircraft that is not a permanent replacement pursuant to Clause 12.6 (*Permanent Replacement of Engines and Parts*) if:

(a)    as soon as reasonably practicable after a part is installed on the Aircraft, but before the earlier of (i) the date falling [REDACTED] after such temporary replacement and (ii) [REDACTED], Lessee removes that part and replaces it with the relevant Removed Part or a part that is a permanent replacement pursuant to Clause 12.6; and

(b)    the Insurances for the Aircraft are not adversely affected.

12.5    **Installation of Engines and Parts on Other Aircraft**

(a)    Lessee shall only be entitled to install or permit the installation of a Removed Engine or Removed Part on another aircraft (the "**Other Aircraft**") if such Other Aircraft is owned or leased and operated by Lessee or a Person that is a party to a pooling arrangement in accordance with Clause 10.4 and if:

(i)    no Credit Default or Event of Default has occurred and is continuing;

(ii)    subject to Clause 12.6 below, Lessor remains the owner of the Removed Engine or Removed Part until it is permanently replaced pursuant to Clause 12.6 (*Permanent Replacement of Engines and Parts*) and the Removed Engine or Removed Part does not thereby become subject to a Security Interest (other than a Permitted Lien) and remains subject to this Agreement;

(iii)    neither the provisions of applicable Law nor the terms of any lease, pooling arrangement or other agreement or Security Interest to which the Other Aircraft is subject, (x) prohibit such installation, or (y) require that the Removed Engine or Removed Part become the property of a Person other than Lessor and/or subject to any Security Interest, or (z) will have the effect at any time of divesting or impairing the title and interests of Lessor as owner and lessor of the Removed Engine or Removed Part (or the rights of the Financing Parties under any Security Interest or assignment in respect of the Removed Engine or Removed Part).

(b)    Lessee shall ensure that any Removed Engine or Removed Part is reinstalled on the Aircraft or permanently replaced by a Replacement Engine or Replacement Part in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*) by no later than [REDACTED].

### 12.6    Permanent Replacement of Engines and Parts

(a)    If Lessee provides Lessor with a notice under Clause 12.1(a) that it will permanently replace an Engine or if an Engine is subject to a Total Loss, Lessee shall procure that good and marketable title to a Replacement Engine free and clear of all Security Interests other than Permitted Liens is conveyed to Lessor and that such Replacement Engine is subject to this Agreement whereupon the Replacement Engine is an Engine hereunder and the replaced Engine shall cease to be an Engine.

(b)    Upon installation of a Replacement Part on the Airframe or any Engine, that Replacement Part shall without further act be deemed transferred to and owned by Lessor and subject to this Agreement.

(c)    In respect of any transfer of title of an Engine, APU or Landing Gear contemplated by this Clause 12.6, Lessee shall supply to Lessor all such title documents as Lessor may reasonably require to evidence and perfect such transfer of title in accordance with all applicable Laws (including the provision if requested by Lessor of bills of sale, any amendments or supplements to this Agreement, any financing documents required by a Financing Party and legal opinions, in each case at Lessee's cost), and where the Cape Town Convention applies, the parties shall procure the prompt registration of the transfers of title at the International Registry.

### 12.7    Equipment Changes

(a)    Lessee shall not make or permit any modification in or alteration and addition to the Aircraft (an "**Equipment Change**") except for Equipment Changes which Lessee considers desirable in the proper conduct of its business; **provided that** such Equipment Change (i) is approved by the Aviation Authority, and (ii) (w) is required by the Aviation Authority or the FAA, or (x) is a change to or modification of the [REDACTED] or (y) has been approved by Lessor in writing, or (z) does not and will not diminish or impair the value, utility, condition or airworthiness of the Aircraft.

(b)    Subject to the terms of this Clause 12.7(b), Lessee shall be entitled to request reimbursement from Lessor (or, as applicable require Lessor to pay directly to relevant suppliers and MROs (any such reimbursement or payment by Lessor, a "**Covered Payment**")) up to a maximum amount of US$[REDACTED] in aggregate (the "**Maximum Amount**") for certain Equipment Changes completed during the Lease Term (i) [REDACTED] ("**Covered Equipment Changes**"). Any request for a Covered Payment under this Clause 12.7(b) shall be subject to the following conditions:

(i)    Lessee shall use reasonable commercial efforts to complete the Covered Equipment Changes in a cost effective way.

(ii)    In the case of any Covered Payment, Lessee shall not be entitled to any rebate or credit note or future discount or other similar benefit received or offered by the applicable vendor that is directly attributable to (or arises as

a result of) such Covered Payment and if any such benefit is offered or given, its value shall be transferred to the lessor, and upon Lessor's request, Lessee shall provide Lessor with a certificate signed by the Lessee's chief financial officer certifying that the condition set forth in this Clause 12.7(b)(ii) has been satisfied, which certification shall constitute a representation and warranty by the Lessee for all purposes of this Agreement.

(iii)    Lessor shall not be required to make a Covered Payment (a) in respect of any Covered Equipment Change completed later than the date falling [REDACTED] months after the date on which the Aircraft enters revenue service, or such other date as the parties may agree in writing, or (b) that is requested by Lessee more than [REDACTED] months after the applicable Covered Equipment Change has been completed (it being agreed that a Covered Payment is not validly requested unless and until supported by the documentation and other evidence required by this Clause 12.7(b)).

(iv)    It is understood and agreed that (A) the Lessee will be undertaking similar reconfiguration exercises with respect to other aircraft in (and to be incorporated into) its fleet, (B) Lessee will use commercially reasonable efforts [REDACTED]; provided that Lessee has discretion to manage the timing of the reconfiguration in view of seasonality, maintenance schedule and availability and the requirements set forth in Clause 12.7(b)(iii).

(v)    Lessee shall consult with Lessor on the workscope and the cost of any Covered Equipment Change for which it intends to seek a Covered Payment, and shall obtain Lessor's approval (acting reasonably) of both the workscope and the costs before commencing work. For the avoidance of doubt all Covered Equipment Changes shall comply with the other provisions of this Clause 12.7.

(vi)    Under no circumstances will Lessor be required to make Covered Payments in excess of the Maximum Amount. If the cost of a Covered Equipment Change exceeds the Maximum Amount for any reason, the excess will be for the account of Lessee.

(vii)    Any amounts charged to Lessor by way of Covered Payments pursuant to this Clause 12.7(b) shall (a) in the case of amounts payable to third parties, be the actual amounts invoiced to Lessee by the relevant third parties for the relevant materials and services without any added profit or other mark-up by Lessee (and net of any rebate, discount, credit or other similar benefit required pursuant to Clause 12.7(b)(ii) to be transferred to the Lessor) and (b) in the case of Lessee's own labor costs, be charged in accordance with Lessee's standard rates charged to third parties for the relevant services. In the case of amounts payable to third parties, at Lessee's election, Lessor will (i) pay the relevant third parties directly or (ii) reimburse Lessee for such amounts payable. In the case of all amounts payable hereunder, Lessor will make the relevant payment within 30 days after receipt of appropriate

invoices (which may be sent directly from the relevant provider or supplier to Lessor in the case of third party invoices, subject to any applicable confidentiality restrictions) together with evidence satisfactory to Lessor (acting reasonably) of the completion of the corresponding work or delivery of the corresponding materials or products covered by the invoice, consistent with the workscope approved by Lessor for the relevant Covered Equipment Change. Lessor shall have the right to inspect the work to verify completion of any Covered Equipment Change.

(viii)    For the avoidance of doubt, all Covered Equipment Changes shall be Equipment Changes for all purposes of this Agreement.

(ix)    All Parts permanently removed from the Aircraft in connection with the completion of Covered Equipment Changes shall be [REDACTED] until collected by Lessor's shipping agent; **provided**, **however**, that Lessee shall notify Lessor in writing of the date when such Parts are expected to be ready for collection and Lessee shall not be obliged to store any such Parts for longer than [REDACTED] days after Lessee has notified Lessor that they have been made ready for such collection.

(c)    Title to any equipment (other than any leased IFE) installed on the Aircraft pursuant to an Equipment Change after the Delivery Date will on installation, without further act, vest in Lessor and shall be a Part subject to this Agreement free and clear of all Security Interests (other than Permitted Liens). Lessee will at its own expense take all such steps and execute, and procure the execution of, all such instruments as Lessor may reasonably require and which are necessary to ensure that title so passes to Lessor according to all applicable Laws.

(d)    So long as no Credit Default or Event of Default has occurred and is continuing, Lessee may remove and retain (for the avoidance of doubt, except as provided in Clause 12.7(b)(ix) above) any Equipment Change to the extent it is severable from the Aircraft and (i) such Equipment Change is not required by a Mandatory Order or an Airworthiness Directive, (ii) such severance will not adversely affect the value, utility, condition or airworthiness of the Aircraft in comparison to its value, utility, condition or airworthiness prior to the installation of such Equipment Change, and (iii) such Equipment Change did not constitute directly or by function a replacement of a Part or Parts installed on the Aircraft at Delivery unless the Part or Parts so replaced are reinstalled on the Aircraft; provided that Lessee shall not de-modify and return the Aircraft to its condition before the Covered Equipment Change.

## 12.8    Lessee Title

Following (i) transfer of title of a Replacement Engine or Replacement Part in accordance with Clause 12.6(a) and (b) respectively, or (ii) removal of an Equipment Change in accordance with Clause 12.7(d), title to the replaced Engine or Part or removed Equipment Change will, pass to Lessee on an "AS IS, WHERE IS" basis, without recourse,

representation or warranty, except that Lessor shall represent and warrant to Lessee that it has conveyed to Lessee such title to such replaced Engine or Part as was conveyed to it free and clear of all Lessor Liens, and (with respect to any such transfer of title of an Engine, APU or Landing Gear) Lessor will (at Lessee's request and cost) provide such documents as Lessee may reasonably require to evidence and perfect such transfer of title in accordance with all applicable Laws (including the provision, if required, to Lessee of bills of sale), and where the Cape Town Convention applies, cooperate with the prompt registration of the transfers of title at the International Registry.

## 13.    MANUFACTURER'S WARRANTIES

### 13.1    Use of Warranties

(a)    With effect from Delivery and for the duration of the Term, Lessor hereby makes available to Lessee, and authorizes Lessee to exercise, such rights as Lessor may have under any warranty with respect to the Aircraft, any Engine or any Part made by any manufacturer, vendor, sub-contractor or supplier (including compensation for loss of use of the Aircraft during the Term), to the extent that the same may be made available to Lessee and to the extent that the same have not otherwise been made available to Lessee pursuant to any other agreement.

(b)    Lessee shall give Lessor prompt written notice of any warranty claim in respect of the Aircraft which is settled with Lessee on the basis of a total or partial cash payment in excess of the Damage Notification Threshold. Any cash payments to Lessee in respect of warranty claims in excess of the Damage Notification Threshold which are not applied to, or not a reimbursement for costs incurred in connection with, repair or remedy of defects in the Aircraft and which are not in respect of compensation for loss of use of the Aircraft, an Engine or Part during the Term due to a defect covered by such warranty, shall be for Lessor's account and shall to the extent received by Lessee be promptly paid by Lessee to Lessor.

(c)    Lessee shall take all reasonable steps and execute all documents as are necessary at the end of the Term to ensure that the benefit of any warranties to which this Clause 13 (*Manufacturer's Warranties*) applies and which have not expired is vested in Lessor including all claims thereunder (whether or not perfected and not including any claims relating to Lessee's loss of use and operation of the Aircraft); **provided**, **that** in the event Lessee is required to pursue any such claims, Lessee will agree to do so only upon receipt of satisfactory indemnification for costs and expenses from Lessor.

### 13.2    Proceeds of Warranty Claims

(a)    If Lessee receives any cash payments in respect of warranty claims relating to the Aircraft, any Engine or any Part (other than to the extent that they (i) relate to compensation for loss of use of the Aircraft, any Engine or any Part, (ii) are a reimbursement for costs incurred in connection with repairing or remedying defects in the Aircraft, any Engine or any Part or (iii) are to be paid to Lessor in accordance

with Clause 13.1(b)), Lessee shall promptly apply any such payments to remedy the defect, if any, in the Aircraft, Engine or Part giving rise to such claim.

(b)   If an Event of Default has occurred and is continuing, Lessor may immediately:

(i)   cause any proceeds of any pending claims to be paid to Lessor, rather than to Lessee; and

(ii)   recover from Lessee the proceeds of any such claims previously paid to Lessee to the extent that such claims relate to any defect in the Aircraft, any Engine or any Part not rectified by Lessee in accordance with the requirements of this Agreement and applicable manufacturer's guidelines; and

Lessor shall hold such proceeds to secure Lessee's performance of its obligations hereunder and shall apply such proceeds in the same manner as it may apply the Commitment Payment.

## 14.   INDEMNITIES

### 14.1   General

Lessee agrees to assume liability for (as between itself and the Indemnitees), and to defend and indemnify and hold harmless each of the Indemnitees against and agrees to pay on demand and agrees not to make any claim against any Indemnitee for, any and all Losses (without duplication):

(a)   which may at any time be suffered or incurred by any Indemnitee directly or indirectly as a result of, arising from or connected with (i) the possession, delivery, purchase, sale, transfer, importation, transportation, pooling, interchange, leasing, subleasing, wet leasing, chartering, storage, registration, insurance, replacement, maintenance, modification, refurbishment, condition, service, repair, overhaul, control, management, ownership, use, operation, exportation or redelivery of the Aircraft, any Engine or Part (either in the air or on the ground), whether or not such Losses may be attributable to any defect in the Aircraft, any Engine or any Part or to its design, testing or use or otherwise, and regardless of whether it arises out of or is attributable to any act or omission, negligent or otherwise, of any Indemnitee, or (ii) any Security Interest (other than a Lessor Lien) in respect of the Aircraft, any Engine or Part;

(b)   in connection with any transfer of title of a Replacement Part or Replacement Engine;

(c)   which arise out of any act or omission which invalidates or renders voidable any of the Insurances;

(d)   which arise as a result of any non-compliance by Lessee with any term of this Agreement (other than an Event of Default where Clause 19.2 shall apply) the

prevention or attempt to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture of the Aircraft or in securing release of the Aircraft, unless the foregoing occurs as a result of a Lessor Lien; or

(e)    which may at any time be suffered or incurred as a consequence of any design, testing, use of any article or material in the Aircraft, any Engine or any Part, including any defect therein (regardless of whether it is discoverable) or its operation or use constituting an infringement of patent, copyright, trademark, design or other proprietary right,

but excluding any Loss in relation to a particular Indemnitee to the extent that such Loss:

(i)    arises solely as a result of the Gross Negligence or willful misconduct of such Indemnitee; or

(ii)    arises solely as a result of a Lessor Tax or a Lessor Lien attributable to such Indemnitee; or

(iii)    is a Tax (without prejudice to any Indemnitee's rights under any other provision of this Agreement, including Clause 20.3); or

(iv)    arises solely as a result of acts or events which occur before the Delivery or after the Aircraft has been redelivered to Lessor in compliance with Clause 18 (*Redelivery*) and is no longer subject to this Agreement, unless any such act or event is attributable to an act, omission, event or circumstance which occurred during the Term; or

(v)    in the case of Lessor, is attributable to the breach by any Indemnitee of the Trust Agreement, Lessor of this Agreement or any other Operative Document but excluding any such breach which is attributable to or arises out of a Default; or

(vi)    constitutes the ordinary and usual operating and overhead expenses of an Indemnitee (other than any such Loss which is suffered or incurred as a result of or following the occurrence of Default); or

(vii)    arises solely as a result of any voluntary sale, assignment, conveyance, transfer or other disposition by any Indemnitee of (x) the Aircraft, an Engine or (y) any interest in the Trust Agreement, this Agreement or any other Operative Document any interest therein that is not a replacement thereof under this Agreement (other than a sale, assignment, conveyance, transfer or other disposition (A) as a result of enforcement by Lessor or such other Indemnitee of its right following an Event of Default or (B) at Lessee's request);

(viii)    is in respect of any claim for currency indemnification, which shall instead be subject to Clause 7.4;

(ix)     arises as a result of a decline in the residual value of the Aircraft, to the extent such decline arises as a result of circumstances affecting the market value of aircraft of the same type as the Aircraft generally and does not result from any breach by Lessee of its obligations under this Agreement;

(x)      is a Loss for which Lessor or Owner Participant has expressly agreed to be responsible under any other provision of this Agreement or the Trust Agreement; or

(xi)     represents or arises solely out of a claim by the Trust Company or any Financing Party against any Lessor Party and is unrelated to the circumstances set forth in Clause 7.4.

## 14.2    **Notification and Contest**

Each Indemnitee intending to claim any amounts from Lessee pursuant to Clause 14.1 (*General*), shall as soon as reasonably practicable notify Lessee in writing of any matter of which such Indemnitee, through a responsible officer, has received written notice and for which Lessee is obligated to indemnify under this Clause 14 (each a "**Claim**"); **provided, however**, the delay or failure of such Indemnitee to give notice to Lessee in accordance with this Clause 14.2 will not discharge or release Lessee from any of its indemnity obligations under Clause 14.1 except, and only to the extent, that such delay or failure was unreasonable and materially prejudices Lessee's right to defend any such Claim or results in an increase in the amount which Lessee is required to indemnify (in such case to the extent of such increase). Lessor (and/or any other Indemnitee seeking indemnification, as the case may be) and the Lessee shall, if and for so long as no Event of Default is continuing, then consult with one another in good faith for a period not exceeding fifteen (15) Business Days in order to determine whether the Claim should be contested and what action (if any) may reasonably be taken to avoid or mitigate such Claim. Lessee shall pay Lessor's, or any other Indemnitee's, reasonable out of pocket expenses (including legal fees) in relation to any consultation. Following such consultation Lessor shall take reasonable actions (at the expense of Lessee), or shall (upon receipt of Lessor's prior written consent and in Lessor's sole discretion) permit Lessee to take reasonable actions on behalf, and, if necessary, in the name, of the Lessor and/or such other Indemnitee, in order to resist, defend or compromise (provided such compromise is accompanied by payment) any claims by third parties giving rise to such Claim, providing always that the following conditions are met or (as the case may be) complied with:

(i)      Lessee shall have acknowledged in writing to Lessor or the applicable Indemnitee it obligation to indemnify Lessor or such Indemnitee under this Clause 14;

(ii)     Lessor (and/or any other such Indemnitee), shall have received adequate provision satisfactory to it (acting reasonably) for any liability expense or Loss arising out of or related to such contest and if the Lessor or relevant Indemnitee is required by law to pay the Claim, the Lessee shall have complied with its obligation to indemnify the Lessor or such Indemnitee in respect thereof;

(iii)      no Event of Default occurs or has occurred which is continuing;

(iv)      such contest will not result in any material risk of the sale, forfeiture or loss of, or the creation of any lien (other than any Permitted Lien) on, the Aircraft;

(v)       such contest does not involve any risk of criminal liability or unindemnified civil penalties on the part of Lessor or relevant other Indemnitee;

(vi)      such contest does not involve, in the judgment of Lessor acting reasonably, any prejudice to the business, operations or commercial or financial standing of Lessor or any Indemnitee and does not, in the sole discretion of Lessor, trigger a significant possibility of impairing Lessor's or any Indemnitee's relationship with local regulators or the status of other open tax matters between Lessor or any Indemnitee and any local taxing authorities;

(vii)     such contest is permitted by applicable Laws;

(viii)    no Indemnitee shall be prevented by this Clause 14.2 from settling or paying any Claim immediately if such Indemnitee is required by applicable Law to do so;

(ix)      any compromise or settlement does not provide for or otherwise include an admission of fault or guilt for or on behalf of the Lessor or any Indemnitee;

(x)       if such contest shall be conducted in a manner requiring the payment of the Claim, Lessee shall have paid such Claim to the extent required;

(xi)      Lessor shall be entitled, upon consultation with and prior notice to Lessee, to terminate Lessee's participation in the defense of a Claim where an act or failure to act by Lessee indicates that the interest of the Indemnitees could reasonably be expected to materially adversely prejudiced by Lessee's continued defense of such Claim or where the interests of Lessee and the Indemnitees appear to be in conflict; and

(xii)     Lessor, acting reasonably, shall have cause to believe that good grounds exist for concluding that such contest will be successful.

14.3    **Refunds**

Any sums paid by the Lessee to the Lessor and/or any other Indemnitee in respect of any Claim pursuant to Clauses 14.1 (*General*) and 14.2 (*Notification and Contest*) shall be paid subject to the condition that, in the event that the Lessor or such Indemnitee (whichever received the payment) is subsequently reimbursed in respect of that Claim by any other Person, and so long as no Credit Default or Event of Default has occurred and is continuing, the Lessor or such Indemnitee (whichever received the payment) shall, to the extent that it can do so without prejudice to the retention of the amount of such reimbursement and without leaving Lessor or such Indemnitee in any worse position than that which it would have been in had such Claim not been required to be made, pay to the Lessee an amount equal to the sum paid to it by the Lessee, less any Tax payable by the Lessor or such

Indemnitee in respect of such reimbursement and less any costs and expenses incurred by Lessor or such Indemnitee in obtaining such reimbursement (to the extent that Lessor or such Indemnitee has not been reimbursed for such costs and expenses by the Lessee).

### 14.4    Subrogation

Upon the unconditional and irrevocable receipt by Lessor of payment in full of any indemnity pursuant to this Clause 14 by Lessee, Lessee will be subrogated to any right of the relevant Indemnitee in respect of the matter against which such indemnity has been made (save that Lessee shall have no right of subrogation with respect to such Indemnitee's insurance policies or its insurers); **provided that** Lessee may not exercise any such rights of subrogation while an Event of Default or Credit Default is continuing.

### 14.5    Duration

The indemnities and obligations contained in this Clause 14 will continue in full force after the expiration, cancellation or other termination of this Agreement notwithstanding any breach or repudiation of this Agreement by Lessor or Lessee or the termination of the leasing of the Aircraft under this Agreement.

## 15.    INSURANCE

### 15.1    Insurances

(a)    Lessee shall, at its own expense, obtain and maintain the Insurances in full force during the Term and thereafter and, in each case, as required by this Agreement which shall have such deductibles and be subject to such exclusions as may (in each case) be permitted by this Agreement or as otherwise approved by Lessor (acting reasonably) and with such insurers, brokers and underwriters complying with Clause 15.1(b).

(b)    The Insurances shall be effected either:

(i)    on a direct basis with insurers of recognized standing who normally participate in aviation insurances in the leading international insurance markets and led by reputable underwriter(s) and through brokers of recognized standing; or

(ii)    with a single insurer or group of insurers who do not fully retain the risk but effect substantial reinsurance with reinsurers who normally participate in aviation insurances in the leading international insurance markets and through brokers, each of recognized standing.

(c)    The insurers referred to in Clauses 15.1(b)(i) and (ii) above shall have [REDACTED]. Lessor may require Lessee to substitute an insurer which ceases to have [REDACTED], in which case Lessee shall provide evidence of the appointment of the new insurer to the Lessor within forty-five (45) calendar days after the date of such notice.

15.2    **Requirements**

Requirements as to the Insurances are as specified in this Clause 15 (*Insurance*) and in Schedule 5 (*Insurance Requirements*). In the event that there is a change in generally accepted industry-wide practice with respect to the insurance of aircraft of similar type to the Aircraft operating in similar circumstances and markets (whether relating to all, or any of, the types of insurance required to be effected under the other provisions of this Clause 15 and Schedule 5 (*Insurance Requirements*)), at Lessor's request, Lessor and Lessee and their respective independent insurance advisers shall consult concerning proposed amendments to the Insurances so that:

(a)    the scope and level of cover for the Insurances are maintained in line with the then applicable generally accepted industry-wide practices for such insurances; and

(b)    the interests of the Lessor, the Financing Parties and the Indemnitees continue to be protected on similar terms and scope as provided herein.

Lessee will agree within sixty (60) calendar days of such consultation to amendments to the Insurances to the extent that the changes to the Insurances are required for the Insurances to be in accordance with prudent industry practice of persons operating similar aircraft in similar circumstances and markets and such Insurances as so changed are reasonably commercially available to Lessee and are generally accepted by the other air operators operating the aircraft of similar type to the Aircraft in similar circumstances and markets.

15.3    **Insurance Covenants**

Lessee shall:

(a)    comply with the terms and conditions of each policy of the Insurances and any applicable Regulations and not do, consent or agree to any act or omission which:

    (i)    invalidates or could reasonably be expected to invalidate the Insurances; or

    (ii)    renders or could reasonably be expected to render void or voidable the whole or any part of any of the Insurances; or

    (iii)    brings any particular insured liability within the scope of an exclusion or exception to the Insurances;

(b)    not, without the prior written consent of Lessor (acting reasonably) take out any insurance or procure any reinsurance in respect of the Aircraft other than those required to be maintained by Lessee under this Agreement unless relating solely to liability insurance, hull total loss, business interruption, profit commission and deductible risk;

(c)    on request, provide to Lessor such documents and information as may be reasonably requested by Lessor (i) in respect of claims made under the insurances

or (ii) evidencing payment of Insurance premiums (including daily status updates of payment or non-payment of premiums after issuance of any notice of cancellation for failure to pay premiums until such time as the policy is reinstated);

(d)     if at any time insurance clause AVN 2000A or its successor is endorsed on the policies of Insurance, ensure that the insurance write back clauses AVN 2001A and AVN 2002A as applicable (or any equivalent clauses) are endorsed on the policies of Insurance required to be maintained under this Agreement and give and comply with all representations, warranties and undertakings required by the insurers or reinsurers in connection with such clauses; and

(e)     provide any other information and assistance in respect of the Insurances which Lessor may from time to time reasonably request.

**15.4    Renewal of Insurances**

Lessee shall commence renewal procedures at least thirty (30) days prior to the expiry of any Insurances, and provide to Lessor:

(a)     confirmation of completion of renewal prior to each insurance expiry date; and

(b)     certificates of insurance (and where appropriate certificates of reinsurance), and a brokers' and any reinsurance brokers' letter of undertaking in a form acceptable to Lessor in English, detailing the coverage and confirming the insurers' (and any reinsurers') agreement to the specified insurance requirements of this Agreement within seven (7) days after each renewal date.

**15.5    Failure to Insure**

If Lessee fails to maintain the Insurances in compliance with this Agreement, Lessor will be entitled but not bound (without prejudice to any other rights of Lessor under this Agreement):

(a)     to pay the premiums due or to effect and maintain insurances satisfactory to it or otherwise remedy Lessee's failure in such manner (including, without limitation to effect and maintain an owner's interest policy) as Lessor considers appropriate, and any sums so expended by Lessor will become immediately due and payable by Lessee to Lessor together with interest thereon at the Default Rate, from the date of expenditure by Lessor up to the date of reimbursement by Lessee; and

(b)     at any time while such failure is continuing to require the Aircraft to remain at any airport or to proceed to and remain at any airport designated by it (**provided that** Lessee is able to do so in accordance with applicable Laws and to the extent the Aircraft remains adequately insured for such flight) until the failure is remedied to its satisfaction.

15.6    **Continuing Insurance for Indemnity**

Except in case of a Total Loss, for a period ending on the earlier of the two year anniversary of the Expiry Date and the next due C Check after the Expiry Date, Lessee shall, at Lessee's cost, effect and maintain for the benefit of the Indemnitees ongoing product liability and completed operations insurance in respect of the risks and liabilities covered by the insurance required by paragraph 1(d) of Schedule 5 (*Insurance Requirements*). Such product liability insurances shall name the Indemnitees as additional insured. Additionally, if required to provide such insurance pursuant to a transfer in accordance with Clause 21.2 (*Lessor Transfer*) that provides for any transferring Indemnitee to be named as an additional insured, Lessee shall, at Lessee's cost, effect and maintain for the benefit of such Indemnitees ongoing product liability and completed operations insurance in respect of the risks and liabilities covered by the insurance required by paragraph 1(d) of Schedule 5 (*Insurance Requirements*) for a period ending on the earlier of the two year anniversary of such transfer and the next due C Check after such transfer.

15.7    **Application of Insurance Proceeds**

As between Lessor and Lessee all insurance proceeds shall be paid in accordance with Clause 6 of Schedule 5 (*Insurance Requirements*).

15.8    **AVN 67B**

Lessor confirms that notwithstanding the provisions of this Clause 15 and Schedule 5 (*Insurance Requirements*), Lessee shall be entitled to maintain insurance in respect of the Aircraft for the purposes of this Agreement which reflects the then current Lloyds' endorsement AVN 67B or any successor Lloyds' endorsement. In the event that any provision of the then current AVN 67B or any successor Lloyds' endorsement conflicts or is otherwise inconsistent with the requirements of this Clause 15 and Schedule 5 (*Insurance Requirements*), then (so long as it shall be general industry practice to insure aircraft financed or leased on the basis of any such endorsement) such conflicting or inconsistent provision of AVN 67B or any successor Lloyds' endorsement (as at the date hereof) shall prevail and such endorsement shall be deemed to satisfy the requirements of this Agreement.

16.    **LOSS, DAMAGE AND REQUISITION**

16.1    **Total Loss prior to Delivery**

If a Total Loss occurs prior to Delivery, this Agreement shall immediately terminate, and except as expressly stated in this Agreement neither party will have any further obligation or liability under this Agreement other than:

(a)    pursuant to Clauses 22.3 (*Expenses*) and 22.10 (*Confidentiality*); and

(b)    Lessor will pay to Lessee as an independent obligation an amount equal to the amount of Commitment Payment paid by Lessee prior to the date of such Total

Loss and not applied in accordance with Clause 6 (*Commitment Payment*), or return the Letter of Credit, as applicable.

## 16.2   Total Loss after Delivery

(a)   If a Total Loss of the Aircraft or Airframe occurs after Delivery, Lessee shall pay the Agreed Value to Lessor on or prior to the earlier of:

   (i)   [REDACTED] days after the Total Loss Date in respect of that Total Loss; and

   (ii)   [REDACTED] after the date of receipt of insurance proceeds in respect of that Total Loss.

   Lessor and Lessee will use their commercially reasonable efforts to agree and execute a release agreement in form and substance satisfactory to Lessor, Lessee and the relevant insurers and reinsurers, but, in any event, consistent with the requirements of this Agreement.

(b)   Subject to the rights of any insurers and reinsurers or other third parties, upon irrevocable payment in full to Lessor of the Agreed Value and all other amounts which may be or become payable to Lessor under this Agreement, Lessor shall transfer to Lessee all of Lessor's right, title and interest in and to the Aircraft including any Engines and Parts not installed when the Total Loss occurred, on an "AS IS, WHERE IS" basis and without recourse, representation or warranty (except a representation and warranty that Lessor is transferring such title to the Aircraft as the transferee from the Airframe Manufacturer received from the Airframe Manufacturer free from all Lessor Liens), and Lessor shall provide such documents as Lessee may reasonably require to evidence and perfect such transfer of title in accordance with all applicable Laws (including the provision, if required, to Lessee of bills of sale and removal of any International Interests created by this Agreement from the International Registry).

(c)   Upon a Total Loss of any Engine not involving a Total Loss of the Airframe, Lessee shall give Lessor prompt written notice thereof, and Lessee shall replace the Engine that suffered the Total Loss by procuring that title to a Replacement Engine is conveyed to Lessor in accordance with Clause 12.6 (*Permanent Replacement of Engines and Parts*) within [REDACTED] days of the Total Loss Date in respect of such Total Loss.

(d)   After a Total Loss of the Aircraft, Airframe or an Engine, Lessor shall, and shall procure that the Financing Parties shall, promptly complete any documents provided by the insurers or reinsurers necessary for such insurers or reinsurers to release the proceeds of the Insurances.

16.3    **Requisition**

(a)    During any requisition for use or hire of the Aircraft, any Engine or any Part which does not constitute a Total Loss:

(i)    the Rent and other amounts payable under this Agreement will not be suspended or abated either in whole or in part, and Lessee will not be released from any of its other obligations under the Agreement (other than operational obligations with which Lessee is unable to comply solely by virtue of the requisition);

(ii)    so long as no Credit Default or Event of Default has occurred and is continuing, Lessee shall be entitled to any rent or fees paid by the requisitioning authority in respect of the Term;

(iii)    Lessee shall, as soon as practicable after the end of any such requisition, cause the Aircraft to be put into the condition required by this Agreement; and

(iv)    Lessor shall be entitled to all compensation payable by the requisitioning authority in respect of any change in the structure, state or condition of the Aircraft arising during the period of requisition, and Lessor shall apply such compensation in reimbursing Lessee for the cost of complying with its obligations under this Agreement in respect of any such change, **provided that**, if any Credit Default or Event of Default has occurred and is continuing, Lessor may apply the compensation in or towards settlement of any amounts owing by Lessee under this Agreement.

17.    **DISCLAIMERS**

**LESSOR AND LESSEE AGREE THAT THE DISCLAIMERS, WAIVERS AND CONFIRMATIONS SET FORTH IN CLAUSES 17.1 (*EXCLUSION*) TO 17.5 (*CONFIRMATION*) SHALL APPLY AT ALL TIMES WITH EFFECT FROM LESSEE'S ACCEPTANCE OF THE AIRCRAFT IN ACCORDANCE WITH CLAUSE 3, WHICH ACCEPTANCE SHALL BE CONCLUSIVE EVIDENCE THAT LESSEE HAS FULLY INSPECTED THE AIRCRAFT AND EVERY PART THEREOF AND THAT THE AIRCRAFT, THE ENGINES, THE PARTS AND THE AIRCRAFT DOCUMENTS ARE TECHNICALLY ACCEPTABLE TO LESSEE, INDEPENDENT OF AND WITHOUT RELIANCE ON ANY STATEMENT OR REPRESENTATION MADE BY LESSOR, OWNER PARTICIPANT OR ANY AFFILIATE, AGENT, EMPLOYEE OR CONTRACTOR THEREOF, AND SATISFY THE DELIVERY CONDITION SPECIFICATION AND ARE IN SUITABLE CONDITION FOR DELIVERY TO AND ACCEPTANCE BY LESSEE EXCEPT AS MAY OTHERWISE BE EXPRESSLY SET FORTH IN THE ACCEPTANCE CERTIFICATE AND ACKNOWLEDGED IN WRITING BY LESSOR AND/OR OWNER PARTICIPANT:**

17.1   **Exclusion**

THE AIRCRAFT IS TO BE LEASED AND DELIVERED HEREUNDER "AS IS, WHERE IS", AND LESSEE AGREES AND ACKNOWLEDGES THAT:

(a)   LESSOR AND THE OTHER INDEMNITEES WILL HAVE NO LIABILITY IN RELATION TO, AND NEITHER LESSOR NOR ANY OTHER INDEMNITEE HAS MADE OR GIVEN NOR WILL BE DEEMED TO HAVE MADE OR GIVEN (WHETHER BY VIRTUE OF HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THIS AGREEMENT OR OTHERWISE), ANY WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO, THE AIRCRAFT OR ANY ENGINE OR PART UNDER THIS AGREEMENT INCLUDING THE TITLE, DESCRIPTION, AIRWORTHINESS, COMPLIANCE WITH SPECIFICATIONS, OPERATION, MERCHANTABILITY, QUALITY, FREEDOM FROM INFRINGEMENT OF PATENT OR OTHER PROPRIETARY RIGHTS, THE ACCURACY, VALIDITY, TRACEABILITY OR COMPLETENESS OF ANY AIRCRAFT DOCUMENTS, THE FITNESS FOR ANY PARTICULAR USE OR PURPOSE, VALUE, DURABILITY, CONDITION, OR DESIGN, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP, THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER MATTER WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OR TRADE) WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR ANY PART OR ANY SERVICES PROVIDED BY LESSOR OR OWNER PARTICIPANT UNDER THIS AGREEMENT; **PROVIDED THAT** THIS CLAUSE A SHALL NOT APPLY TO LESSOR'S REPRESENTATION AND WARRANTY SET FORTH IN CLAUSE 2(g) OF SCHEDULE 2; AND

(b)   NEITHER LESSOR NOR ANY OTHER INDEMNITEE SHALL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER TO LESSEE (WHETHER ARISING IN CONTRACT OR IN TORT, AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE OR STRICT LIABILITY OR OTHERWISE) FOR:

(i)   ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH;

(ii)   THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY RISKS RELATING THERETO;

     (iii)    ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS OR ANY OTHER DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE; OR

     (iv)    THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT, ANY ENGINE OR ANY PART.

## 17.2   Waiver

LESSEE HEREBY WAIVES, AS BETWEEN ITSELF AND LESSOR AND EACH OTHER INDEMNITEE, ALL ITS RIGHTS IN RESPECT OF ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, ON THE PART OF LESSOR OR ANY OTHER INDEMNITEE AND ALL CLAIMS AGAINST LESSOR AND ANY OTHER INDEMNITEE HOWSOEVER AND WHENEVER ARISING AT ANY TIME IN RESPECT OF OR OUT OF THE MATTERS EXPRESSLY WAIVED IN CLAUSE 17.1 (*EXCLUSION*).   LESSEE FURTHER AGREES THAT ITS ONLY RIGHT WITH RESPECT TO A DEFAULT BY LESSOR UNDER THIS AGREEMENT IS TO MAKE A CLAIM AGAINST LESSOR FOR ACTUAL DAMAGES RESULTING DIRECTLY THEREFROM.   LESSEE HEREBY WAIVES ANY AND ALL OTHER RIGHTS OR REMEDIES IT MAY HAVE UNDER ARTICLE 2A OF THE UCC (INCLUDING WITHOUT LIMITATION 2A-211, 2A-406 AND 2A-508 THROUGH 2A-522) AS IN EFFECT IN THE STATE OF NEW YORK, OR OTHERWISE.

## 17.3   Disclaimer of Consequential Damages

EACH PARTY HEREBY AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, IT SHALL NOT BE ENTITLED TO RECEIVE AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER LOST PROFITS, LOST REVENUE OR OTHER CONSEQUENTIAL, SPECIAL INCIDENTAL, INDIRECT OR PUNITIVE DAMAGES AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY ANY OTHER PARTY OR OWNER PARTICIPANT OF ANY OF THE AGREEMENTS CONTAINED IN THIS AGREEMENT OR THE OTHER OPERATIVE DOCUMENTS.

## 17.4   No Duties

LESSEE ACKNOWLEDGES AND AGREES THAT NEITHER LESSOR NOR OWNER PARTICIPANT HAS ANY FIDUCIARY OR OTHER DUTIES TO LESSEE WHATSOEVER, AND THAT LESSOR'S ONLY OBLIGATIONS TO LESSEE ARE THOSE OBLIGATIONS EXPRESSLY SET FORTH HEREIN.

## 17.5   Confirmation

LESSEE CONFIRMS THAT IT IS FULLY AWARE OF THE PROVISIONS OF THIS CLAUSE 17 (*DISCLAIMERS*) AND ACKNOWLEDGES THAT RENT AND OTHER AMOUNTS PAYABLE UNDER THIS AGREEMENT HAVE BEEN CALCULATED TAKING ITS PROVISIONS INTO ACCOUNT.

18.    **REDELIVERY**

18.1    **Redelivery**

(a)    On the Expiry Date (without regard to any extension thereof pursuant to Clause 18.2 or 18.5) or (if earlier) the date of required redelivery of the Aircraft pursuant to Clause 19.2, Lessee shall (unless a Total Loss has occurred) redeliver the Aircraft and Aircraft Documents (which shall include each of the documents referred to in Schedule 7 (*Aircraft Documents* at *Redelivery*)) to Lessor at Lessee's expense at the Redelivery Location in accordance with the procedures, and in compliance with the conditions set forth, in Schedule 8 (*Redelivery Conditions*).

(b)    At the time of such redelivery the Aircraft shall be free and clear of all Security Interests (other than Lessor Liens).

(c)    At redelivery and subject to receipt of the documents Lessor is required to deliver to Lessee pursuant to Clause 18.5(a), Lessee shall cause the Aircraft to be deregistered from the Aviation Authority.

(d)    On the Redelivery Date, Lessee shall pay to Lessor all Redelivery Maintenance Payments due and owing pursuant to and calculated in accordance with Part B of Schedule 4 (*Redelivery Maintenance Payments*). For the avoidance of doubt, no Redelivery Maintenance Payments are payable in the event of an Aircraft or Airframe Total Loss.

18.2    **Non-Compliance**

If on the Scheduled Expiry Date or the Scheduled Renewal Term Expiry Date, as applicable, the condition of the Aircraft does not comply with this Agreement (regardless of the circumstance), then:

(a)    Lessee shall rectify the non-compliance and or compensate Lessor as contemplated by Schedule 8 (*Redelivery Conditions*) and to the extent that the non-compliance (including failure to pay any sum in lieu of compliance as permitted by the terms of Schedule 8 (*Redelivery Conditions*)) extends beyond the Scheduled Expiry Date or if applicable, the Scheduled Renewal Term Expiry Date, the Term will be automatically extended solely for the purpose of enabling such non-compliance to be rectified and to allow for deregistration of the Aircraft and the obtaining of an export certificate of airworthiness, each as provided in Clause 18.5(c);

(b)    Lessee shall not use the Aircraft in flight operations except such operations directly related to the redelivery of the Aircraft to Lessor;

(c)    all Lessee's obligations and covenants under this Agreement will remain in full force until Lessee so redelivers the Aircraft; and

(d)    Lessee shall pay to Lessor Rent in respect of the period during which the Term is so extended (which Rent shall be calculated in accordance with the provisions of

Clause 5 (*Rent*)) until such time as the Aircraft is in the condition required by Schedule 8 (*Redelivery Conditions*) (other than in respect of the deregistration confirmation from the Aviation Authority, but in each case subject to Clause 18.5) and shall be payable to Lessor weekly in arrears and prorated to reflect the actual number of days during such intervals as Lessor may specify (or, in such period) at a rate per month equal to the amount of Rent payable immediately prior to the expiration of the Term plus [REDACTED] thereof, calculated on a per diem basis; **provided**, **however**, **that** if Lessee has removed the Aircraft from service sufficiently in advance of the Scheduled Expiry Date or the Scheduled Renewal Term Expiry Date, as applicable, to allow time for completion of all reasonably anticipated maintenance tasks required to place the Aircraft in the condition required at redelivery, then the aforementioned [REDACTED] increase in the applicable Rent rate shall not apply unless the extension period persists for more than [REDACTED], and shall then become applicable on the [REDACTED] day of such extension and thereafter until the Aircraft is returned in accordance with the terms of this Agreement (subject to Clause 18.5); and

(e)    any such extension shall not prejudice Lessor's right to treat such non-compliance as an Event of Default at any time and to enforce such rights and remedies as may be available to Lessor in respect thereof under the terms of this Agreement and applicable Law.

## 18.3    Redelivery after Non-Compliance

If on the Expiry Date the condition of the Aircraft does not comply with this Agreement (regardless of the circumstance), then Lessor may elect (either on first tender of the Aircraft for redelivery or at any time during a period of extension pursuant to Clause 18.2(a)) to accept redelivery of the Aircraft notwithstanding non-compliance with Clause 18.1 (*Redelivery*) or Schedule 8 (*Redelivery Conditions*), in which case Lessee shall indemnify Lessor in respect of the cost to Lessor of putting the Aircraft into the condition required by this Agreement. Any discrepancies between the condition of the Aircraft and Aircraft Documents and the Redelivery Conditions resolved by payment of compensation pursuant to the third paragraph of Schedule 8 (*Redelivery Conditions*) or Clause I of Schedule 8 (*Redelivery Conditions*) shall not constitute non-compliance for purposes of this clause.

## 18.4    Export Documents

Upon redelivery of the Aircraft, Lessee shall provide to Lessor, at Lessee's cost and expense all documents necessary to export the Aircraft from the Habitual Base or State of Registration, as applicable (including, without limitation, a valid and subsisting (*x*) export license, and (*y*) if provided by the State of Registration or Habitual Base, as applicable, an export certificate of airworthiness for the Aircraft) and, without prejudice to Clause 18.1(c) all documents required in relation to the deregistration of the Aircraft with the Aviation Authority or the re-registration of the Aircraft with another aviation authority.

18.5    **Deregistration, Acceptance and Acknowledgement**

(a)    When the Aircraft complies with the conditions set forth in Schedule 8 (*Redelivery Conditions*) (other than in respect of the deregistration confirmation from the Aviation Authority) to be complied with before redelivery, Lessor shall deliver to Lessee (i) the Technical Acceptance Certificate confirming that the Aircraft complies with the conditions set forth in Schedule 8 (*Redelivery Conditions*), (ii) the AFAC Termination Letter executed by the Lessor and notarized before a Mexican notary public or, if signed abroad, notarized and apostilled, with a Spanish translation certified by a court-approved translator and (iii) all other documents (if any) complying with all signing formalities and legalization requirements necessary for filing with the AFAC which must be provided by Lessor in connection with the deregistration of the Aircraft.  Upon receipt of such documents, Lessee shall within [REDACTED] Business Day of such receipt apply for the deregistration of the Aircraft with the Aviation Authority (the "**Deregistration Application Date**").

(b)    Upon receipt of confirmation of deregistration of the Aircraft from the Aviation Authority, Lessor shall deliver the Redelivery Acceptance Certificate to Lessee confirming the termination of the leasing of the Aircraft hereunder.

(c)    If confirmation of deregistration of the Aircraft from the Aviation Authority is not received prior to the Scheduled Expiry Date or, if applicable, the Scheduled Renewal Term Expiry Date, then the Term will be automatically extended until such time as the confirmation of deregistration is received, **provided that**:

(i)    Lessee shall not be responsible for (x) any change in condition of the Aircraft, correcting any discrepancies discovered after the delivery of the Technical Acceptance Certificate except to the extent that the same are attributable to Lessee's gross negligence, willful misconduct or breach of this Agreement and (y) any obligations under this Agreement in respect of the maintenance or insurance of the Aircraft other than as set forth below in clause (iii);

(ii)    Lessee shall have [REDACTED] Business Days after the Deregistration Application Date, in which case Lessee shall pay to Lessor Rent in respect of the period beginning [REDACTED] Business Days after the Deregistration Application Date until the deregistration confirmation is received (which Rent shall be calculated in accordance with the provisions of Clause 5 (*Rent*) without regard to any increase in the Rent pursuant to Clause 18.5) and shall be payable to the Lessor monthly [REDACTED] and prorated to reflect the actual number of days during such period at a rate per month equal to the amount of Rent payable immediately prior to the expiration of the Term; and

(iii)    Lessee shall ground and store the Aircraft at the Redelivery Location in accordance with the Maintenance Program and shall provide ground

insurance while it is in storage, such ground insurance to include hull insurance on an agreed value basis for an amount at least equal to the Agreed Value and liability insurance for a combined single limit of at least [REDACTED] and otherwise complying with Clause 15.

### 18.6    Cooperation with Remarketing

During the last six months of the Term, Lessee shall co-operate in all reasonable respects with the efforts of Lessor to lease or sell the Aircraft, including, without limitation, permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto **provided that** the same shall not interfere with Lessee's use or maintenance of the Aircraft or require Lessee to incur out-of-pocket expenses for which it is not reimbursed and Lessor shall use commercially reasonable efforts to minimize the number and frequency of such inspections.

## 19.    EVENTS OF DEFAULT

### 19.1    Events

Each of the following events will constitute an Event of Default, a "default" under the Cape Town Convention and a breach of this Agreement by Lessee:

(a)    **Non-payment**:  Lessee fails to make any payment of Rent under this Agreement within [REDACTED] Business Days after such payment is due, or Lessee fails to make any other payment when due hereunder and the failure to make such other payment continues for [REDACTED] Business Days after Lessee receives written notice of such failure; or

(b)    **Insurance**:

(i)    Lessee fails to maintain or cause to be maintained the Insurances as required by Clause 15 (*Insurance*) or Schedule 5 (*Insurance Requirements*); or

(ii)    A notice of cancellation is given in respect of any Insurances required by Clause 15 (*Insurance*) or Schedule 5 (*Insurance Requirements*) and such Insurances are not renewed or replaced in satisfaction of the requirements of Clause 15 (*Insurance*) or Schedule 5 (*Insurance Requirements*) at least [REDACTED] Business Days prior to the cancellation date specified in such cancellation notice, **provided that** it shall not constitute an Event of Default under this clause (b) if:

(A)    any failure by Lessee to comply with the terms of Clause 15 (*Insurance*) or Schedule 5 (*Insurance Requirements*) is for reasons other than any act or omission of Lessee (including but not limited to failure to pay any premium for, or to comply with any other condition of, such insurances);

(B)    the cancellation of the insurances is part of a wider program of cancellations by the insurer as a result of an event or series of events affecting the aviation insurance market generally;

(C)    the Aircraft is grounded in Mexico, the State of Registration or another jurisdiction acceptable to Lessor (acting reasonably) for the period for which such insurances are not in place;

(D)    the Aircraft continues to be covered by ground risk insurance (for at least the Agreed Value) approved by Lessor (acting reasonably);

(E)    Lessee continues to maintain legal liability insurances to the extent available with a minimum liability coverage of [REDACTED] or such lower amount as approved by Lessor (acting reasonably); and

(F)    as soon as such cover becomes generally available in the aviation insurance market, Lessee effects replacement insurances complying with the requirements of Clause 15 (*Insurance*) and Schedule 5 (*Insurance Requirements*).

(c)    **Breach**: Lessee fails to comply with any other provision of this Agreement or any other Operative Document and, if such failure is in the opinion of Lessor (acting reasonably) capable of remedy, such failure continues for [REDACTED] after written notice from Lessor to Lessee; **provided, that** if such failure cannot be remedied within such [REDACTED] period and Lessee is diligently seeking to rectify the breach, Lessee shall have an additional [REDACTED] to remedy such failure so long as Lessor's rights hereunder would not be prejudiced and so long as it appears that such breach is capable of remedy within such additional [REDACTED] period; or

(d)    **Representation**: any representation or warranty made by Lessee in or pursuant to this Agreement or any other Operative Document or in any document or certificate or statement is or proves to have been incorrect in any material respect when made or deemed made and the circumstances giving rise to the breach of such representation or warranty, if capable of being remedied, are not remedied to Lessor's satisfaction within [REDACTED]; or

(e)    **Rescission or Repudiation**: Lessee rescinds or purports to rescind or repudiates or purports to repudiate this Agreement or any Operative Document to which Lessee is a party; or

(f)    **Cross-Default**: any Companion Agreement Event of Default occurs and is continuing; or

(g)     **Authorizations**:

any consent, authorization, license, certificate or approval of or registration with or declaration to any Governmental Entity required in connection with the Agreement, including:

(i)     any authorization required by Lessee to authorize, or required in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of this Agreement or the performance by Lessee of its obligations under this Agreement; or

(ii)    the registration of the Aircraft or the Aircraft's certificate of airworthiness; or

(iii)   any airline license or air transport license required by Lessee;

is withheld, or is revoked, suspended, cancelled, withdrawn, terminated or not renewed, or otherwise ceases to be in full force and is not, as applicable, restored, replaced, returned, re-granted or renewed within [REDACTED] Business Days; or

(h)     **Insolvency**:

other than in respect of the Chapter 11 Cases:

(i)     Lessee is, or is deemed for the purposes of any relevant Law to be, unable to pay its debts as they fall due or to be insolvent, or announces it is unable, or admits in writing its inability to pay its debts generally as they fall due.

(ii)    Lessee suspends making payments on all or a material portion of its debt or announces an intention to do so, or a moratorium is declared in respect of any of its indebtedness.

(i)     **Liquidation and Similar Proceedings**:

(i)     other than in respect of the Chapter 11 Cases, Lessee passes a resolution or takes any material step (including filing of a petition or application to the court or affidavit, giving of notice, petition proposal or convening a meeting or giving notice) with a view to a composition, assignment or arrangement with its creditors of, or the rehabilitation, administration (whether out of court or otherwise), custodianship, reorganization, liquidation, protection from creditors or dissolution of, Lessee or any other insolvency or bankruptcy proceedings involving Lessee; or

(ii)    other than in respect of the Chapter 11 Cases, any order (including an order for relief) is made or resolution passed or petition filed for any such composition, assignment, arrangement, rehabilitation, administration (whether out of court or otherwise), custodianship, reorganization, *concurso mercantil, quiebra or reorganization*, liquidation, dissolution or insolvency

or bankruptcy proceedings, or Lessee becomes subject to or enters into any of the foregoing; **provided that** if a creditor of Lessee files an involuntary petition for Lessee's bankruptcy or liquidation, such petition shall remain undischarged, un-dismissed or un-stayed for a period of [REDACTED] days; or

(iii)    any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator, examiner or similar officer (in each case, whether out of court or otherwise) is appointed, or an assignment for the benefit of creditors is made, or, other than in respect of the Chapter 11 Cases, an order for relief under the bankruptcy laws of any jurisdiction is requested by Lessee and granted or entered, in respect of Lessee or any of its assets; or

(iv)    an administrative or other receiver or manager or other insolvency officer (in each case, whether out of court or otherwise) is appointed at the request of Lessee in respect of Lessee or any material part of its assets; or

(v)    an involuntary case or proceeding is commenced in a court of competent jurisdiction against Lessee seeking liquidation, reorganization, control, supervision or other relief with respect to Lessee or its debts under any insolvency law or seeking the appointment of a trustee, examiner, liquidator, administrator, receiver, custodian or similar official of Lessee or any material part of the business or assets of Lessee and, provided Lessee does not consent or acquiesce to or approve of such involuntary case or proceeding, such involuntary case or other proceeding shall remain undischarged, un-dismissed or un-stayed for a period of [REDACTED] days; or

(vi)    any other steps are taken to enforce any Security Interest over all or a material part of the assets of Lessee; or

(vii)    any attachment, sequestration, distress or execution affects all or a material part of the assets of Lessee and is not discharged or stayed within [REDACTED] days of such attachment, sequestration, distress or execution; or

(viii)    any one of the following occurs, in each case without the prior written consent of the Lessor: (A) Lessee files a Chapter 11 plan that contemplates the liquidation of all or a substantial portion of Lessee's assets; (B) the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code, or Lessee files or acquiesces in any motion or other pleading seeking such conversion; (C) a trustee or examiner is appointed in the Chapter 11 Cases, or Lessee files or acquiesces in any motion or other pleading seeking such appointment; or (D) Lessee files any motion or other pleading seeking to reverse, stay, modify or vacate the approval of this Agreement and the

transactions contemplated hereby or any other relief that is inconsistent with the terms of this Agreement.

(j)     **Other Jurisdiction**: other than with respect to any *Ley de Concursos Mercantiles* or any other recognition proceeding filed in a non-United States jurisdiction for the sole purpose of recognizing the Chapter 11 Cases or providing full force and effect to any orders entered therein, there occurs in relation to Lessee any event in any jurisdiction which corresponds with any of the events mentioned in Clause 19.1(i);

(k)     **Rights and Remedies**: Lessee or any other Person lawfully claiming by or through Lessee challenges the existence, validity, enforceability or priority of the rights of Lessor as owner or lessor of the Aircraft or the Financing Parties under any Security Interest or assignment in respect of the Aircraft or of this Agreement; or

(l)     **Suspension of Business**: Lessee suspends or ceases or announces its intention to suspend or cease to carry on all or substantially all of its business; or

(m)     **Disposal**: Lessee conveys, leases or otherwise transfers or disposes of all or substantially all of its property and assets to or consolidates or merges with or into any other Person (and Lessee is not the surviving Person) except as permitted under Clause 9.7 or unless Lessee has obtained Lessor's a prior written consent; or

(n)     **Delivery**: Lessee fails to comply with its obligation under Clause 3 (*Delivery*) to accept delivery of the Aircraft; or

(o)     **Redelivery**: Lessee fails to redeliver the Aircraft to Lessor on the Scheduled Expiry Date or the Scheduled Renewal Term Expiry Date, as applicable, in accordance with Clause 18 (*Redelivery*); **provided that** such failure by Lessee to redeliver the Aircraft shall not constitute an Event of Default for so long as Lessee is diligently seeking to rectify the non-compliance of the Aircraft with Clause 18 (*Redelivery*); or

(p)     **Certain Charges**: Any authority with jurisdiction over Lessee or the Aircraft notifies Lessor that there are navigation, landing, airport or similar charges due from Lessee, and such charges remain outstanding for a period of the longer of [REDACTED] days from the date of receipt by Lessee of written notice from Lessor that it has received such notice from such aviation authority; **provided that**: (i) no Event of Default shall arise under this Clause 19.1(p) for so long as such charges are being contested in good faith and by appropriate proceedings, an adequate bond has been provided or adequate reserves have been taken by Lessee for the payment of such charges and such proceedings do not involve any danger of the detention, interference with use or operation or sale, forfeiture or loss of the Aircraft; and (ii) such [REDACTED] day period shall not apply if there is any risk of detention, interference with use or operation or sale, forfeiture or loss of the Aircraft; or

(q)    **Letter of Credit**:  Any Letter of Credit is not renewed, issued, re-issued or replaced when required under Clauses 6.4 or 6.5 or any a cash payment is not made when required under Clauses 6.4 or 6.5.

(r)    **Conditions Subsequent**:  Lessee fails to comply with all requirements of this Agreement with respect to the Post-Delivery Authorizations and Filings within the time periods specified herein.

## 19.2    Lessor's Rights

(a)    **Lessor Rights and Remedies**:  If an Event of Default occurs and for so long as it continues, Lessor may at its option (and without prejudice to any of its other rights or remedies under this Agreement or available under applicable Law, including under the Cape Town Convention as adopted and implemented in the State of Registration, including, all rights and remedies under Chapter III of the Cape Town Convention and Chapter II of the Protocol), at any time thereafter while such Event of Default is continuing (and subject to compliance with any mandatory requirement of applicable Law then in effect):

(i)    by notice to Lessee and with immediate effect, terminate or cancel the leasing of the Aircraft or, if such leasing has not yet commenced, terminate or cancel Lessor's obligations under this Agreement (but, in each case, without prejudice to any continuing obligations of Lessee under this Agreement (including to provide Insurance, maintain and repair the Aircraft and/or redeliver the Aircraft at the location and in the condition required hereunder)), whereupon all rights of Lessee under this Agreement shall cease; and/or

(ii)    proceed by appropriate court action or actions to enforce performance of this Agreement and/or to recover damages for the breach of this Agreement; and/or

(iii)    either:

(x)    take possession of the Aircraft, for which purpose and to the extent permitted by Law, Lessor may enter any premises belonging to or in the occupation of or under the control of Lessee where the Aircraft may be located, or cause the Aircraft to be redelivered to Lessor at the Redelivery Location (or such other location as Lessor may require), and Lessor is hereby irrevocably by way of security for Lessee's obligations under this Agreement appointed attorney for Lessee in causing the redelivery or in directing the pilots of Lessee or other pilots to fly the Aircraft to that airport and will have all the powers and authorizations necessary for taking that action; or

(y)    require Lessee to redeliver the Aircraft to Lessor at the Redelivery Location [REDACTED];

**provided that**, irrespective of which remedy or remedies Lessor pursues, Lessee shall not be relieved of its obligations under Clause 18 (*Redelivery*).

[REDACTED]

(b) **Sale or Re-Lease of Aircraft**:  If an Event of Default occurs and the leasing of the Aircraft hereunder is terminated, Lessor may sell or re-lease or otherwise deal with the Aircraft at such time and in such manner as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee, as if this Agreement had never been entered into. Lessor shall have no obligation or duty to sell the Aircraft, and, subject to Clause 19.4, Lessor shall be obligated to re-lease the Aircraft only to the extent, if any, that it is required to do so under Article 2A of the UCC.

(c) **Deregistration/Removal of Lease from Registry**:  If an Event of Default occurs and for so long as it continues, Lessor may, to the extent permitted by applicable law and regulations, and Lessee shall at the request of Lessor promptly assist Lessor to, take all steps necessary to remove this Agreement from the registry of the Aviation Authority and to effect deregistration of the Aircraft and its export from the country where the Aircraft is for the time being situated and any other steps necessary to enable the Aircraft to be redelivered to and released or sold by Lessor.

(d) **Payments**:  If an Event of Default occurs, Lessor may require that Lessee pay to Lessor, and Lessee shall be liable for and immediately pay to Lessor, and Lessor may proceed by appropriate court action or actions to recover, any or all of the following amounts:

(i) [REDACTED];

(ii) [REDACTED];

(iii) [REDACTED];

(iv) [REDACTED];

(v) [REDACTED];

(vi) [REDACTED]

(vii) [REDACTED].

(e) **Interest**:  Require Lessee to pay, and Lessee shall pay to Lessor, interest on all unpaid amounts at the Default Rate, from the due date until the date of payment in full.

(f) **Commitment Payment**:  Apply (and/or draw under the Letter of Credit and apply) an amount equal to all or part of the Commitment Payment to any amounts owing or to be owing to Lessor under this Agreement.

(g)     **No Exclusive Remedy**: No remedy referred to in this Clause 19.2 (*Lessor's Rights*) is intended to be exclusive, but, to the extent permissible under this Agreement or under applicable Law and **provided that** there shall be no duplication, each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity or under the Cape Town Convention and in Lessor's sole and absolute discretion; and the exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies. No waiver by Lessor of any Default or Event of Default shall in any way be, or be construed to be, a waiver of any future subsequent Default or Event of Default.

## 19.3    Lessor's Right To Remedy

Following the occurrence of a Credit Default or an Event of Default, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to the ability of Lessor to treat such non-compliance as a Credit Default or an Event of Default, as applicable, effect compliance on behalf of Lessee, whereupon Lessee shall become liable to pay immediately any sums expended by Lessor or Owner Participant together with all costs and expenses (including legal costs) in connection with the non-compliance.

## 19.4    Mitigation

Lessor shall use commercially reasonable efforts to mitigate any of its losses, costs or expenses for which Lessee is liable under this Clause 19 (*Events of Default*), **provided that** Lessor shall not be obliged to take any step that, in its reasonable opinion, is likely to prejudice Lessor nor is Lessor obliged to achieve any particular result from taking any steps under this clause.

## 19.5    Illegality

(a)     If either party becomes aware that it is or will become unlawful in any relevant jurisdiction for either party (a "**Relevant Party**") to give effect to any of its obligations as contemplated by this Agreement or to continue this Agreement (an "**Illegality Event**"), such party shall give notice of such illegality to the other party as soon as practicable.

(b)     Lessor and Lessee shall, for a period of [REDACTED] days from the date of such notice, or such shorter period ending on the Business Day prior to the date on which such Illegality Event takes place, and subject to Clause 19.5(d), negotiate in good faith to mitigate the effects of such Illegality Event with a view to restructuring the transaction in a manner such that the leasing of the Aircraft to Lessee may continue on the same commercial terms as under the Operative Documents, including, without limitation, by way of amendment, novation or replacement to any Operative Document.

(c)     If Lessor and Lessee are unable to restructure the transaction as contemplated in Clause 19.5(b) within the time period set forth therein, either party may by notice in writing to the other party terminate the leasing of the Aircraft under this

Agreement, such termination to take effect on the latest date (the "**Effective Date**") on which the Relevant Party may continue to perform such obligations or be a party to such document without being in breach of applicable Laws or regulations. Upon the Effective Date:

    (i)     where [REDACTED]; and

    (ii)    where [REDACTED].

(d)    The cost of any negotiations or restructuring pursuant to this Clause 19.5 shall be for the account of Lessee except for any negotiations or restructuring relating to an Illegality Event described in Clause 19.5(c)(i), which shall be for the account of Lessor.

## 20.    TAXATION

### 20.1    Gross-up

(a)    All payments by Lessee under or in connection with this Agreement shall be made without set-off or counterclaim, free and clear of and without deduction for or on account of all Taxes unless Lessee is required by Law to make any such deduction or withholding.

(b)    All Taxes (other than Lessor Taxes) in respect of payments under this Agreement shall be for the account of Lessee and shall be paid by Lessee within the period for payment permitted by Law.

(c)    If any Taxes are required to be deducted or withheld from any amount payable hereunder, Lessee shall:

    (i)     if such Tax is not a Lessor Tax, pay to each Tax Indemnitee by way of additional rent such additional amounts, in the same currency as such payment as may be necessary in order that the amount of such payment received by such Tax Indemnitee on the date of such payment, after deduction or withholding for all such Taxes (including all deductions and withholdings on additional amounts payable under this Clause), will be equal to the amount that such Tax Indemnitee would have received if such Taxes had not been deducted or withheld;

    (ii)    pay to the relevant authority within the period for payment permitted by applicable Laws the full amount of the deduction or withholding; and

    (iii)   furnish to each Tax Indemnitee evidence of payment to the relevant authority of all amounts deducted or withheld as aforesaid.

(d)    If any payment is made by Lessee under Clause 20.1(c), and a Tax Indemnitee in good faith determines that it has actually received a credit against, or relief or remission for, or repayment of, any Tax paid or payable by such Tax Indemnitee in

respect of or calculated with reference to the deduction or withholding giving rise to such payment, such Tax Indemnitee shall, to the extent that it can do so without prejudice to the retention of the amount of such credit, relief, remission or repayment and without leaving such Tax Indemnitee in any worse position than that in which it would have been had such deduction or withholding not been required to be made, pay to Lessee such amount as such Tax Indemnitee shall in good faith have determined to be attributable to the relevant deduction or withholding.

Nothing in this Clause 20.1(d) shall:

(i)     interfere with the right of Lessor or Owner Participant to arrange its tax affairs in whatever manner it thinks fit and, in particular, but without limitation, neither Lessor nor Owner Participant shall be under any obligation to claim credit, relief, remission or repayment from or against its corporate profits or similar Tax liability in respect of the amount of any such deduction or withholding in priority to any other claims, reliefs, credits or deductions available to Lessor or Owner Participant; or

(ii)    oblige Lessor or Owner Participant to disclose any information relating to its Tax affairs or any computations in respect thereof.

## 20.2   Covenant to Pay Taxes

Lessee shall promptly pay when due:

(a)     all Taxes (other than Lessor Taxes) imposed by any Government Entity with respect to the Aircraft, including without limitation the ownership, presence, delivery, leasing, possession, use, operation, maintenance, storage, registration, redelivery, import, export, sale or other disposition of the Aircraft; and

(b)     all Taxes (other than Lessor Taxes) in respect of any premises where the Aircraft, any Engine or any Part thereof is located from time to time,

except to the extent that such payment is being contested in good faith by appropriate proceedings, in respect of which adequate resources have been provided by Lessee and non-payment of which does not give rise to any material risk of the Aircraft or any interest therein being sold, forfeited or otherwise lost or any risk of criminal liability on the part of Lessor, Owner Participant or any Financing Party.

## 20.3   Tax Indemnity

(a)     Lessee agrees to be liable for, and to indemnify and hold harmless each Tax Indemnitee against, and agrees to pay on demand, all Taxes (other than Lessor Taxes) payable by, levied or imposed against or upon any Tax Indemnitee or Lessee or the Aircraft and relating to or attributable to Lessee, this Agreement, or the Aircraft or directly or indirectly in connection with the possession, delivery, purchase, sale, transfer, location, existence, importation, transportation, pooling, interchange, leasing, subleasing, wet leasing, chartering, storage, registration,

insurance, replacement, maintenance, modification, refurbishment, condition, service, repair, overhaul, control, management, ownership, presence, use, operation, exportation or redelivery of the Aircraft, any Engine or any Part or any part thereof or any rent, receipts, insurance proceeds, income or other amounts arising therefrom, or the making of any Equipment Change or in connection with any transfer of title of a Replacement Part or a Replacement Engine.

(b)     The provisions of Clause 20.3(a) shall not apply to, and Lessee shall have no liability pursuant to such Clause to a Tax Indemnitee in respect of, any Tax to the extent that such Tax (a "**Lessor Tax**"):

(i)     arises solely as a result of the Gross Negligence or willful misconduct of such Tax Indemnitee; or

(ii)    is imposed as a result of a Lessor Lien; or

(iii)   is imposed with respect to any period commencing or event occurring before the Aircraft has been delivered to Lessee (unless arising in connection with the execution and delivery of the Operative Documents by Lessee or otherwise resulting from the action or inaction of Lessee, its employees, agents, Affiliates or independent contractors) or after the Aircraft has been redelivered to Lessor in compliance with Clause 18 (*Redelivery*) and is no longer subject to this Agreement unless such Tax is attributable to any act, omission, event or circumstance which occurred during the Term and would not have constituted a "Lessor Tax" had it arisen during the Term; or

(iv)    arises solely from the breach by such Tax Indemnitee of this Agreement but excluding any such breach which is attributable to or arises out of any Event of Default; or

(v)     is imposed as a direct result of any connection between that Tax Indemnitee and the jurisdiction imposing the Tax that is unrelated to the transactions contemplated by this Agreement or the use or operation of the Aircraft by Lessee or any Permitted Sublessee, or the location or registration of the Aircraft by Lessee or any Permitted Sublessee; or

(vi)    is imposed or levied on or measured by or with respect to the net income, profits or capital gains of that Tax Indemnitee by any Government Entity in Ireland or any jurisdiction where that Tax Indemnitee has a principal place of business; but excluding any Tax imposed by any government or taxing authority of any jurisdiction if and to the extent that such Tax results from the use, operation, presence, maintenance or registration of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax; or

(vii)   is imposed in connection with the sale, transfer, assignment (whether legal or equitable) or other disposition by that Tax Indemnitee of any or all of its rights, title and interest in or with respect to the Aircraft, the Airframe, any

Engine or any Part or this Agreement or any other Operative Document except a sale, transfer, assignment or other disposition permitted or required under this Agreement (other than pursuant to Clause 21.2 (*Lessor Transfer*)), or at Lessee's request or while an Event of Default is continuing;

(viii)    results solely from a voluntary change by any Tax Indemnitee of its tax residence; or

(ix)    is imposed on or payable by any Tax Indemnitee that would not have been imposed or payable but for the existence of any financing entered into by any Tax Indemnitee in respect of the Aircraft (it being understood that the provision of this Agreement and the other Operative Documents are not such a financing) except Taxes imposed as a result of (A) the gross negligence or willful misconduct of Lessee or any other user of the Aircraft, (B) a breach by Lessee of any of its representations or covenants under this Agreement or (C) the use, operation, presence, maintenance or registration of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax.

(c)    Lessee will provide each Tax Indemnitee such information as may reasonably be requested by such Tax Indemnitee to enable it to fulfill its Tax filing or other information reporting requirements with respect to the transactions contemplated by this Agreement.

(d)    If Lessee is required by any applicable Law, or by any Government Entity, to deliver any report or return in connection with any Taxes for which the Lessee is obligated to indemnify a Tax Indemnitee under this Agreement, Lessee will complete the same and, on request, supply a copy of the report or return to Lessor.

(e)    If any report, return or statement is required to be made by Lessor or any other Tax Indemnitee with respect to any Tax which is subject to indemnification under this Clause 20.3, Lessee will promptly notify Lessor of the requirement, and:

(i)    if permitted by applicable Law, subject to Lessor's or such relevant Tax Indemnitee's prior written consent, make and file in a timely manner such report, return or statement (except for any report, return or statement that Lessor has notified Lessee that Lessor or any other Tax Indemnitee intends to prepare and file), prepare such return in such manner as will indicate Lessor (or Owner Participant as beneficial owner if applicable) as owner and lessor of the Aircraft if required or appropriate, and provide Lessor upon request a copy of each such report, return or statement filed by Lessee, or

(ii)    if Lessee is not permitted by applicable Law to file any such report, return or statement, Lessee will prepare and deliver to Lessor a proposed form of such report, return or statement within a reasonable time prior to the time such report, return or statement is to be filed.

20.4    **Notice and Contest Rights.**

(a)    Each Tax Indemnitee shall notify Lessee in writing of any Taxes of which such Tax Indemnitee has through a responsible officer received written notice from a Tax authority as being payable and for which Lessee is obligated to indemnify or pay under this Clause 20; provided, however, the delay or failure of such Tax Indemnitee to give notice to Lessee in accordance with this Clause 20.4 will not discharge or release Lessee from any of its indemnity obligations under Clause 20 except, and only to the extent, that such delay or failure was unreasonable and results in material additional amounts payable by Lessee which amounts would not have been imposed in the absence of such delay.

(b)    Without in any way modifying Lessee's obligations under this Clause 20, if a Tax Indemnitee makes a claim pursuant to Clause 20, Lessee may request in writing, within ten (10) days after receipt of notice from such Tax Indemnitee of such claim, that Tax Indemnitee enter into consultation with Lessee for a period not exceeding 15 days with a view to agreeing whether or not the circumstances giving rise to such Tax should be contested. Lessee shall pay Lessor's or any other Tax Indemnitee's reasonable out of pocket costs and expenses (including legal fees) in relation to any such consultation. Following such consultation, and to the extent that there are means available by which to do so, such Tax Indemnitee shall, **provided that** no Event of Default shall have occurred and be continuing, take reasonable actions to contest the claim or, in such Tax Indemnitee's discretion if requested by Lessee, contest the claim in the name of Lessee (or permit Lessee, in such Tax Indemnitee's sole discretion if requested by Lessee, to contest in the name of Lessee); **provided that**:

(i)    prior to taking such action Lessee shall have agreed to indemnify, and shall indemnify on demand, such Tax Indemnitee in a manner satisfactory to such Tax Indemnitee for any costs and expenses on a net after Tax basis which such Tax Indemnitee may incur in connection with contesting such claim whether or not successful (including all legal and accountants' fees and disbursements and the amount of any interest, penalties or additions to tax which may be payable as a result of contesting such claim),

(ii)    such contest shall not result in any material risk of sale, forfeiture or loss of, or creation of any Lien on, the Aircraft,

(iii)    if such contest is to be initiated by the payment of, and the claiming of a refund for, such Taxes, Lessee shall have advanced to such Tax Indemnitee sufficient funds (on an interest-free basis and, if such Tax Indemnitee shall have determined in good faith that such advance results in taxable income to such Tax Indemnitee, on an after-tax basis) to make such payment,

(iv)    such Tax Indemnitee shall have received an opinion of independent tax counsel selected by such Tax Indemnitee and reasonably acceptable to Lessee, at Lessee's cost, reasonably satisfactory to such Tax Indemnitee (as

to counsel, substance and conclusion) that a reasonable basis exists for successfully contesting such claim,

(v)     Lessee shall have delivered to such Tax Indemnitee a written acknowledgement of Lessee's obligation to indemnify such Tax Indemnitee for the Tax being contested pursuant to this Clause 20,

(vi)    in the case of a contest conducted by a Tax Indemnitee and not the Lessee, the amount of the potential indemnity for which Lessee may be liable to pay such Tax Indemnitee under Clause 20.3(a) exceeds US$[REDACTED] or the equivalent thereof;

(vii)   the contest is not for a Tax, the imposition of which has been previously contested by Lessee or such Tax Indemnitee, and such contest (including all allowable appeals) was decided adversely to Lessee or such Tax Indemnitee;

(viii)  such contest is permitted by applicable laws;

(ix)    such contest does not involve any risk of criminal liability or unindemnified civil penalties on the part of Lessor or any Tax Indemnitee;

(x)     such contest does not involve, in the reasonable judgement of Lessor, any prejudice to the business, operations or commercial or financial standing of Lessor or any Tax Indemnitee and does not, in the reasonable judgement of Lessor, trigger a significant possibility of impairing Lessor's or any Tax Indemnitee's relationship with local regulators or the status of other open tax matters between Lessor or Tax Indemnitee and any local taxing authorities.

## 20.5    Sales Tax

Without limiting Clause 20.3 above, Lessee shall pay to Lessor or other applicable Tax Indemnitee (or, if permitted by applicable Law and if requested by Lessor or any other Tax Indemnitee, Lessee shall pay to the relevant tax authority for the account of Lessor and each Tax Indemnitee):

(a)     all sales, use, rental, value added, goods and services and similar Taxes ("**Sales Taxes**") required to be paid to the tax authority of each jurisdiction in which the Delivery Location is situated or in which the Aircraft, any Engine or any Part is from time to time located, including at the time of a transfer of any thereof permitted or required under this Agreement (other than under Clause 21.2 (*Lessor Transfer*)), in connection with a request of Lessee or while an Event of Default is in existence, to the jurisdiction of the Habitual Base or to the State of Incorporation or other jurisdiction where the Aircraft, any Engine or any Part is from time to time located, with respect to the lease of the Aircraft to Lessee pursuant to this Agreement or any such transfer unless Lessee delivers to Lessor on or prior to the Delivery Date or such other date upon which any such tax would otherwise become due, such exemption certificate or other document as may be required by applicable Law to

evidence Lessor's and each Tax Indemnitee's entitlement to exemption from all Sales Taxes imposed by each such jurisdiction with respect to the lease of the Aircraft pursuant to this Agreement or any such transfer; and

(b) All Sales Taxes required to be paid to the tax authority of any jurisdiction in which the Aircraft may be used, operated or otherwise located from time to time unless Lessee delivers to Lessor such exemption certificates or other documents as may be required by applicable Law to evidence Lessee's entitlement to exemption from all Sales Taxes imposed by each such jurisdiction with respect thereto.

20.6 **Value Added Tax**

(a) For the purposes of this Clause 20.6:

(i) "**VAT**" means value added tax and any goods and services, sales or turnover tax, imposition or levy of a like nature; and

(ii) "**supply**" includes anything on or in respect of which VAT is chargeable.

(b) Lessee shall pay to each Tax Indemnitee (without duplication) or the relevant taxing authority, as the case may be, the amount of any VAT chargeable in respect of any supply for VAT purposes under this Agreement.

(c) Each amount stated as payable by Lessee under this Agreement is exclusive of VAT (if any), and if VAT is payable in respect of any amount as aforesaid, Lessee shall pay all such VAT and shall indemnify each Tax Indemnitee against any claims for the same (and where appropriate Lessee shall increase the payments which would otherwise be required to be made under this Agreement so that such Tax Indemnitee is left in the same position as it would have been in had no VAT been payable); and Lessee shall provide evidence to such Tax Indemnitee, if available, in respect of payment of any such VAT.

20.7 **Information regarding Taxes**

(a) If Lessee is required by any applicable Laws, or by any third party, to deliver any report or return in connection with any Taxes, Lessee shall complete the same in accordance with such Laws (and where not provided by applicable Laws in a manner reasonably satisfactory to Lessor) and shall state therein (to the extent possible) that Lessee is exclusively responsible for the use and operation of the Aircraft and for any Taxes arising therefrom, and Lessee shall, on request supply a copy of the report or return to Lessor.

(b) Lessee shall within thirty days after Lessor's written request, furnish to Lessor evidence satisfactory to Lessor (acting reasonably) of payment of all Taxes arising in connection with or as a result of the transactions contemplated by this Agreement requiring payment within any Rent Period, including, without limitation, copies of receipts from the relevant tax authorities or other Government Entities for payments of withholding taxes, any Sales Taxes, any VAT and payment of customs duties.

(c)     As soon as practicable, but any case within the first 60 days of each calendar year during the Term, Lessor shall deliver to Lessee a tax residency certificate issued to the Owner Participant by the Irish Revenue Commissioners or the relevant supervisory tax authority of the country in which Owner Participant is a tax resident (to the extent that Irish Revenue Commissioners or such other supervisory tax authority issue tax residency certificates generally to aircraft owners and lessors). In the event that such certificate is provided later than 60 days from the start of the relevant calendar year, and such delay is due to a delay in issuance by the relevant tax authority, such delay shall not constitute a breach by Lessor of its obligations under this Agreement. Each Tax Indemnitee agrees to furnish from time to time to Lessee or to such other Person as Lessee may designate, at Lessee's request and expense, such duly executed and properly completed forms as such Tax Indemnitee may be permitted and legally able to deliver and as may be necessary or appropriate in order to claim any reduction of, or exemption from any Tax which Lessee may be required to indemnify against hereunder **provided that** Lessee shall have furnished Lessor with any information requested by Lessor necessary to complete such form, unless such Tax Indemnitee determines that furnishing such forms would or could reasonably be expected to have an adverse effect on the business or operations of such Tax Indemnitee.

## 20.8    Taxation of Indemnity Payments

(a)     If and to the extent that any sums payable to any Indemnitee or any Tax Indemnitee by Lessee under this Agreement by way of indemnity or otherwise under this Agreement are insufficient, by reason of any Taxes payable in respect of those sums, for such Indemnitee or such Tax Indemnitee to discharge the corresponding liability to the relevant third party (including any taxation authority), or to reimburse such Indemnitee or such Tax Indemnitee for the cost incurred by it to a third party (including any taxation authority), Lessee shall pay to such Indemnitee or such Tax Indemnitee such sum as will after the tax liability has been fully satisfied leave that Indemnitee or such Tax Indemnitee with the same after-tax amount as it would have been entitled to receive in the absence of that liability together with interest on the amount of the deficit at the Default Rate in respect of the period commencing on the date on which the payment of taxation is finally due until payment by Lessee (both before and after judgment).

(b)     If and to the extent that any sums constituting (directly or indirectly) an indemnity or other payment under this Agreement to an Indemnitee or a Tax Indemnitee but paid by Lessee to any Person other than such Indemnitee or such Tax Indemnitee are treated as taxable in the hands of such Indemnitee or such Tax Indemnitee, Lessee shall pay to such Indemnitee or such Tax Indemnitee such sum as will, after the tax liability has been fully satisfied at the applicable marginal rate in such jurisdiction, indemnify such Indemnitee or such Tax Indemnitee to the same extent as it would have been indemnified in the absence of such liability together with interest on the amount of the deficit at the Default Rate in respect of the period commencing on the date on which the payment of taxation is finally due until payment by Lessee (both before and after judgment).

20.9    **Verification**

At Lessee's written request within 30 days following the Lessee's receipt of any Tax Indemnitee's claim for an indemnity pursuant to this Clause 20, or of an amount otherwise payable on an after-Tax basis pursuant to this Agreement, if the amount of such claim is equal to or in excess of $[REDACTED], the amount of such claim shall be subject to confidential verification in writing by an internationally recognized firm of certified public accountants selected by such Tax Indemnitee.    The selected accounting firm shall be responsible only for verifying that the amount of the indemnity claimed is correct in amount and, if payable by such Tax Indemnitee, has been paid, and such accounting firm shall have no authority to, or responsibility for, determining whether such Tax was correctly assessed or legally imposed or is properly subject to indemnification pursuant to this Agreement.    The accounting firm shall be requested to complete its review within 30 days of Lessee's request for such verification.    The computations of such accounting firm shall (i) be delivered simultaneously to Lessee and such Tax Indemnitee and (ii) absent prima facie error, be final, binding and conclusive upon the Lessee and such Tax Indemnitee.    If Lessee pays any indemnity in whole or in part before completion of the verification procedure, appropriate adjustments will be made promptly after completion of the verification procedure to take into account any redetermination of the indemnity by the accounting firm.    Lessee and such Tax Indemnitee shall cooperate with such accounting firm and (subject to such accounting firm's execution of a confidentiality agreement reasonably satisfactory to Lessee and such Tax Indemnitee) shall supply such accounting firm with all information reasonably necessary to permit such review and determination.

20.10    **Duration**

The obligations and indemnities contained in this Clause 20 shall continue in full force after the expiration, cancellation or termination of this Agreement notwithstanding any breach or repudiation of this Agreement by Lessor or Lessee or the termination of the leasing of the Aircraft under this Agreement.

21.    **ASSIGNMENT AND TRANSFER**

21.1    **By Lessee**

Except as expressly permitted by Clause 9.7, Lessee will not assign, delegate or otherwise transfer (voluntarily, involuntarily, by operation of law or otherwise) any of its rights or obligations under this agreement or create or permit to exist any Security Interest over any of its rights under this Agreement, and any attempt to do so will be null and void.

21.2    **Lessor Transfer and Owner Participant Transfer**

(a)    Without any consent of Lessee other than as provided in Clause 21.2(d), Lessor and/or Owner Participant may at its own expense assign or grant a Security Interest over the Aircraft or any interest therein and/or Lessor and/or Owner Participant may assign or grant a Security Interest over all or any part of its rights under this Agreement, the Trust Agreement and any other Operative Document or any interest

therein, in either case, by way of security to any other Person (an "**Assignee**"); **provided that**:

    (i)       [REDACTED];

    (ii)     [REDACTED];

    (iii)    [REDACTED];

    (iv)    [REDACTED];

    (v)     [REDACTED];

    (vi)    [REDACTED]

    (vii)   [REDACTED].

(b)    Without any consent of Lessee other than as provided in Clause 21.2(d), after the Delivery Date, Lessor or Owner Participant may at its own expense upon reasonable prior notice to Lessee (delivered on or after the Delivery Date) transfer the Aircraft and its interest therein and/or transfer and/or assign all or any part of its rights and obligations under this Agreement and any other Operative Document to any Person (a "**Transferee**"); **provided that**:

    (i)       [REDACTED];

    (ii)     [REDACTED];

    (iii)    [REDACTED];

    (iv)    [REDACTED]

    (v)     [REDACTED].

(c)    Lessee shall upon request from Lessor and at the expense of Lessor cooperate in effecting any assignment or transfer referred to in subclause (a) or (b) above and will execute any agreements or other instruments reasonably requested by Lessor or Owner Participant and in form and substance reasonably satisfactory to Lessee acting reasonably (including, without limitation, any supplement or amendment to or novation of this Agreement) and if the transfer involves the assumption by the Transferee of any of Lessor's or Owner Participant's obligations under this Agreement or the other Operative Documents will release Lessor or Owner Participant, as the case may be, from the obligations so assumed and will execute such certificates and shall provide such corporate documents as shall be reasonably requested by Lessor or Owner Participant for the purposes of Lessor obtaining a legal opinion in respect of Lessee's due execution and due authorization of the transfer documents. Lessor shall pay, or reimburse Lessee on demand for out-of-pocket costs and expenses (including reasonable attorney's fees and expenses) and

any Taxes thereon, in connection with any assignment or transfer referred to in subclause (a) or (b).

(d)     For the purpose of Article 33(1) of the Cape Town Convention and Article XV of the Protocol, and without prejudice to the preceding provisions of this Clause 21.2 (*Lessor Transfer*) to the extent applicable, Lessee hereby consents in advance to the transfer of the associated rights and related international interests in respect of any assignment or sale by Lessor or the granting of any Security Interest by Lessor in accordance with this Agreement (and for the avoidance of doubt, no additional consent by Lessee will be required in connection with any such assignment of associated rights, the related international interests and the related right to discharge such international interest pursuant to the Cape Town Convention).

(e)     Except as permitted in this Clause 21.2, none of Trust Company, Lessor, and Owner Participant will assign or otherwise transfer (voluntarily, involuntarily, by operation of law or otherwise) any of its rights in and to the Aircraft or any of its rights and obligations under any Operative Document or permit to exist any Security Interest over any of the foregoing, and any attempt to do so will be null and void.

(f)     Upon the commencement of the First Renewal Lease Term, the tangible net worth requirements set forth in Clause 21.2(b)(iv) above shall be reduced by [REDACTED] for the remainder of the First Renewal Lease Term and any Second Renewal Lease Term.

## 22.     MISCELLANEOUS PROVISIONS

### 22.1     Rights Cumulative, Waivers

The rights of Lessor under this Agreement may be exercised as often as Lessor considers appropriate (except as otherwise expressly stated herein), are cumulative and are in addition to its rights under any Law. The rights of Lessor against Lessee or in relation to the Aircraft (whether arising under this Agreement or any Law) cannot be waived or varied other than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on Lessor's part or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

### 22.2     Delegation

Lessor may delegate to any Person or Persons all or any of its rights, powers or discretions vested in it by this Agreement, and any such delegation may be made upon such terms and conditions and subject to such regulations (including power to sub-delegate) as Lessor in its absolute discretion deems fit; **provided**, **however**, **that** notwithstanding any such delegation, Lessor shall at all times remain primarily liable for the obligations of "Lessor" hereunder.

22.3    **Expenses**

(a)    Each of Lessor and Lessee shall pay its own costs and expenses (including legal fees) in connection with the negotiation and completion of this Agreement and the other Operative Documents. On the Delivery Date, Lessee will issue, at no cost to Lessor, a customary in-house legal opinion as to Mexican law matters relating to Lessee. If Lessor requires an external Mexican legal opinion, Lessor shall be responsible for the cost of obtaining such legal opinion from Mexican counsel of its choosing. For the avoidance of doubt, the cost of registering the Aircraft (if not already registered) will be borne by Lessee.

(b)    Lessee shall, except as provided in Clause 22.3(a) above or where expressly stated otherwise in this Agreement, be responsible for all costs associated with (i) perfecting and registering Lessor's ownership of the Aircraft and this Agreement in the State of Registration and the Habitual Base including, but not limited to stamp duties, translations and registrations whether required by Lessor or Lessee and (ii) any Cape Town filings. Lessee shall pay to Lessor on demand all reasonable expenses (including legal, professional and out-of-pocket expenses) incurred or payable by Lessor in connection with any amendment to or extension of or other documentation in connection with, or the granting of any waiver or consent under this Agreement which is initiated or requested by Lessee; **provided that** each party shall bear its own costs and expenses in connection with any negotiation and amendment relating to a Renewal Lease Term. Lessee shall pay to Lessor on demand all expenses (including legal (which includes the fees of counsel for issuing any opinion required to be provided hereunder), professional, and out-of-pocket expenses incurred or payable by Lessor in connection with the enforcement or preservation of any of Lessor's and/or Owner Participant's (without duplication) rights or remedies under this Agreement in connection with and following any Event of Default.

22.4    **Set-off**

(a)    Lessor may set off any matured obligation owed by Lessee under this Agreement or any other Operative Document against any obligation (whether or not matured) owed by Lessor or Owner Participant to Lessee hereunder or thereunder, regardless of the place of payment or currency. If the obligations are in different currencies, Lessor may convert either obligation at the market rate of exchange available in London or (at Lessor's option) New York for the purpose of the set-off.

(b)    If an obligation is unascertained or unliquidated, Lessor may in good faith estimate that obligation and set off in respect of the estimated amount, in which case when the obligation is ascertained or liquidated Lessor or Lessee shall make a payment to the other (as appropriate) in respect of any amount by which the ascertained or liquidated amount differs from the estimated amount.

(c)    Notwithstanding any other provision of this Agreement, Lessor shall not be obliged to pay any amount to Lessee under this Agreement so long as any sums which are

then due from Lessee under this Agreement or any other Operative Document remain unpaid or if any Event of Default (other than an Event of Default under Clause 19.1(f)) has occurred and is continuing, and any such amount which would otherwise be due shall fall due only if and when Lessee has paid all such sums and cured all Events of Default, except to the extent that Lessor otherwise agrees in writing or sets off such amounts against such payment pursuant to Clause 22.4(a).

## 22.5    Time of Essence

The time stipulated in this Agreement for all payments by Lessee to Lessor and for the prompt performance of Lessee's other obligations under this Agreement are of the essence of this Agreement.

## 22.6    Entire Agreement

This Agreement and the other Operative Documents constitute the sole and entire agreement between Lessor and Lessee in relation to the leasing of the Aircraft and supersede all previous agreements in relation to that leasing. Any amendments to this Agreement must be in writing and signed on behalf of Lessor and Lessee.

## 22.7    Rights of Third Parties

(a)    All rights expressed to be granted to each Indemnitee or Tax Indemnitee (other than Lessor) under this Agreement are given to Lessor on behalf of that Indemnitee or Tax Indemnitee, and each Indemnitee or Tax Indemnitee is an express third party beneficiary hereof. Except for Lessor, Owner Participant, each Indemnitee and each Tax Indemnitee, no other Person shall be a third party beneficiary of this Agreement.

(b)    Any Tax Indemnitee or Indemnitee who is not a party to this Agreement may enforce the terms of this Agreement expressed to be for the benefit of or given by Lessee to or in favor of such Tax Indemnitee or Indemnitee; **provided that** any such enforcement shall be subject to the terms and conditions of this Agreement (including, but without limitation, Clauses 14 (*Indemnities*) and 20 (*Taxation*)) and any Tax Indemnitee and Indemnitee is obligated to comply with such Clauses as if the relevant Tax Indemnitee or Indemnitee were a party hereto.

(c)    All terms of this Agreement may be varied, amended or otherwise released by an agreement between Lessor and Lessee without reference to any Indemnitee or Tax Indemnitee.

## 22.8    Counterparts

This Agreement may be executed in two or more counterparts each of which will be deemed an original but all of which together will constitute one and the same agreement.

22.9    **Language**

All notices, requests, direction and other communications to be given under this Agreement will be in English.  Unless otherwise provided herein, all documents delivered to Lessee or Lessor pursuant to this Agreement will be in English or, if not in English, will be accompanied by a certified English translation.  If there is any inconsistency between the English version of this Agreement and any version in any other language, the English version will prevail.

22.10    **Confidentiality**

This Agreement, the other Operative Documents, the terms hereof and thereof and all non-public information obtained by a party about the other party are confidential and are among Lessor, Owner Participant and Lessee only.  Lessor, Owner Participant and Lessee shall not, and shall procure that their respective officers, employees and agents shall not, disclose the contents of this Agreement, the other Operative Documents or such nonpublic information to any third party (other than (a) to such party's or its Affiliates' auditors, legal advisors, regulators, financial advisors and rating agencies; (b) as required in connection with any filing of this Agreement in accordance with any applicable Regulation; (c) in connection with Lessor's or Owner Participant's potential sale, financing, refinancing of or related to the Aircraft and/or transfer or assignment of this Agreement as permitted under Clause 21.2 or in connection with a transaction permitted under Clause 9.7; **provided that** any recipient of any such confidential information in such case shall as a condition precedent to receipt of the information execute and deliver a confidentiality agreement containing equivalent terms to the terms of this Clause 22.10; (d) as required for enforcement by either party of its rights and remedies with respect to this Agreement; or (e) as required by applicable Regulation), without the prior written consent of the other party.  If any disclosure will result in the Agreement or the other Operative Documents becoming publicly available, Lessor, Owner Participant and Lessee will cooperate with one another to obtain confidential treatment or limit the scope of disclosure as to the commercial terms and other material provisions of this Agreement or the other Operative Documents.  Notwithstanding the foregoing, Lessee may disclose this Agreement (i) as may be required to obtain the Bankruptcy Court's approval of this Agreement; **provided that** Lessee shall use commercially reasonable efforts to obtain an order of the Bankruptcy Court sealing or redacting to the greatest extent possible the terms of this Agreement in connection with any such approval; (ii) subject to confidentiality restrictions equivalent to this Clause 22.10, to (x) the entities providing the debtor-in-possession financing to Lessee and its Affiliates in the Chapter 11 Cases and to (y) the professional advisors to the Ad Hoc Bondholders Group and the Unsecured Creditors Committee or the entities providing the debtor-in-possession financing to Lessee and its Affiliates in the Chapter 11 Cases; or (iii) the U.S. Trustee.

22.11    **Invalidity of any Provision**

If any provision of this Agreement becomes invalid, illegal or unenforceable in any respect under any Law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

### 22.12   Survival

All indemnities and other obligations of Lessee and Lessor under Clauses 14.2, 22.3 and 22.10 and all obligations of Lessor under Clause 8.2 shall survive remain in full force and effect, notwithstanding the expiration or other termination of this Agreement and/or the leasing of the Aircraft hereunder.

### 22.13   Further Assurance

(a)   Each of the parties agrees to perform (or procure the performance of) all further acts and things within its control, and execute and deliver (or procure the execution and delivery of) such further documents, as may be required by applicable Laws or as may be necessary or reasonably desirable to implement and/or give effect to this Agreement and the transactions contemplated by this Agreement.

(b)   The out-of-pocket costs and expenses of performing the acts contemplated by sub-clause (a) above shall be borne by Lessee, **provided however that** to the extent that such act is requested solely by Lessor in connection with an assignment or transfer pursuant to Clause 21.2, any request by a Financing Party or for other reasons unconnected with Lessee, the use or operation of the Aircraft or the transactions contemplated by the Operative Documents, the costs associated with such acts shall be borne by Lessor.

(c)   Except to the extent expressly provided herein, any terms of this Agreement which expressly incorporate any provisions of the Cape Town Convention shall prevail in the case of any conflict with any other provision contained herein. Each of the parties hereto acknowledges and agrees that for purposes of the Cape Town Convention (to the extent applicable hereto), separate rights may exist with respect to the Airframe and Engines.

### 22.14   No Brokers

Except for SkyWorks Capital, LLC (whose fees and expenses are the sole responsibility of Lessee), each of the parties represents and warrants to the other that it has not paid, agreed to pay, or caused to be paid directly or indirectly to any Person in any form, any commission percentage contingent fee, brokerage or other similar payments of any kind, in connection with the establishment or operation of this Agreement. Each party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, reasonable legal fees and expenses) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Agreement or the Aircraft, if such claim, suit, damage, cost or expense arises out of any breach by the indemnifying party, its employees or agents of this Clause 22.14 (*No Brokers*).

### 22.15   Chattel Paper

To the extent, if any, that this Agreement constitutes chattel paper (as such term is defined in the UCC as in effect in any applicable jurisdiction), no Security Interest in this

Agreement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart designated as the "chattel paper original" on the signature page of this Agreement by the Financing Parties Representative (if any) or Lessor, as the case may be.

## 22.16    True Lease

The parties intend and agree that this Agreement:

(a)     constitutes a "true lease", and not a "security interest" as defined in Section 1-201(37) of the UCC;

(b)     to the extent applicable, constitutes a "true lease" for United States federal income tax purposes; and

(c)     confers only a leasehold interest on Lessee in and to the Aircraft on and subject to the terms of this Agreement, and no ownership or other interest with respect to the Aircraft is provided to Lessee under this Agreement.

Lessee shall not file a tax return that is inconsistent with the provisions of this Clause.

## 22.17    Know Your Customer/OFAC Compliance

Each party agrees that it has and shall maintain in place for the term of the Agreement policies and procedures reasonably designed to promote compliance with its obligations in respect of Sanctions, Anti-Corruption Laws and applicable Laws relating to the prevention of money-laundering and the countering of terrorist financing.

## 22.18    USA Patriot Act Notice

Lessee agrees that pursuant to the requirements of the Patriot Act, Lessor and/or Owner Participant may obtain, verify, and record information from Lessee that identifies Lessee, which information may include the name and address of Lessee, and its officers, directors and shareholders, and other information that will allow Lessor and/or Owner Participant (without duplication) to identify Lessee in accordance and for purposes of compliance with the Patriot Act.

## 22.19    Statements of Trust Company

The parties hereto agree that all of the statements, representations, covenants and agreements made by Lessor contained in this Agreement and any agreement referred to herein, unless expressly otherwise stated, are made and intended only for the purpose of binding the Trust Estate and establishing the existence of rights and remedies which can be exercised and enforced against the Trust Estate. Therefore, anything contained in this Agreement or such other agreements to the contrary notwithstanding (except for any express provisions that the Trust Company is responsible for in its individual capacity (and the Trust Company shall be responsible in its individual capacity for all statements, representations, warranties, covenants and agreements made by the Trust Company)), no

recourse shall be had with respect to this Agreement or such other agreements against the Trust Company in its individual capacity or against any institution or Person which becomes a successor trustee or co-trustee or any officer, director, trustee, servant or direct or indirect parent or controlling Person or Persons of any of them; **provided**, **however**, **that** this Clause 22.19 (*Statements of Trust Company*) shall not be construed to prohibit any action or proceeding against any party hereto for its own willful misconduct or grossly negligent conduct for which it would otherwise be liable; and **provided further**, **that** nothing contained in this Clause 22.19 (*Statements of Trust Company*) shall be construed to limit the exercise and enforcement in accordance with the terms of this Agreement or such other agreements of rights and remedies against the Trust Estate. The foregoing provisions of this Clause 22.19 (*Statements of Trust Company*) shall survive the termination of this Agreement.

23.  **NOTICES; ELECTRONIC SIGNATURES**

23.1  Every notice, request, direction or other communication under this Agreement shall be in English and be in writing delivered personally or sent with an internationally recognized courier service or by electronic mail (including PDF) and shall be deemed to have been received:

(a)  in the case of a letter when delivered personally or where sent with an internationally recognized courier service, on the date shown as the delivery date (or, if delivery was refused, the date of such refusal) in the records of the Person who effected such delivery; or

(b)  in the case of an electronic mail, at the time of dispatch with confirmed receipt,

**provided always that** where delivery by hand or by electronic email occurs after 6:00 p.m. on a Business Day, or on a day which is not a Business Day, service shall be deemed to occur at 9:00 a.m. on the next Business Day.

23.2  Every notice, request, direction or other communication under this Agreement shall be sent:

To Lessor at:

Address:     [_____]
             [_____]
             [_____]
             [_____]

             Attention:     [_____]
             Facsimile:     [_____]
             Email:         [_____]

With a copy to Owner Participant:

SMBC Aviation Capital Limited
IFSC House
IFSC
Dublin 1
Ireland

Attention:        Contract Management & Managed Services
Facsimile:       + 353 1 8599230
Email:            ContractManagement@smbc.aero

**To Lessee at**:

Address:         Aerovías de México, S.A. de C.V.
                 Paseo de la Reforma, No. 243, Piso 25
                 Colonia Cuauhtemoc
                 Alcaldia Cuauhtémoc
                 Mexico City, DF 06500
                 Mexico

Attention:        Legal Department and Fleet Department
Facsimile:       52-55-9132-5079
Email:            malvarez@aeromexico.com
                 amnotificacionesjuridico@aeromexico.com

or any substitute address, email address or fax number or department or officer as the relevant party may notify to the other party by not less than five (5) Business Days' notice.

23.3    In connection with the performance of their respective duties hereunder, each party may give notices, consents, directions, approvals, instructions and requests to, and otherwise communicate with, each other using electronic means, including email transmission to such email addresses as each such party shall designate to the other parties, and, if necessary or if requested by the other party or parties, with an "electronic signature" or other "electronic record" (as such terms are defined in the New York State Electronic Signatures and Records Act).  Delivery of an executed counterpart of this Agreement or any other Operative Document by facsimile, email, "electronic signature" or other "electronic record" will be deemed as effective as delivery of an originally executed counterpart.  Any party delivering an executed counterpart of this Agreement or any other Operative Document by facsimile, email, "electronic signature" or other "electronic record" will also deliver an originally executed counterpart thereof, but the failure of any party to deliver an originally executed counterpart of this Agreement or any other Operative Document will not affect the validity or effectiveness of this Agreement or such other Operative Document.

24.    **GOVERNING LAW JURISDICTION AND WAIVER OF JURY TRIAL**

24.1    **Governing Law**

PURSUANT TO AND IN ACCORDANCE WITH SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, THE PARTIES HERETO AGREE THAT THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, AND ALL ISSUES CONCERNING THE RELATIONSHIP OF THE PARTIES HEREUNDER AND THE ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AS APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK (EXCLUSIVE OF SECTION 7-101 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH IS INAPPLICABLE TO THIS AGREEMENT) WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES. THE PARTIES AGREE THAT THIS AGREEMENT WAS DELIVERED IN THE STATE OF NEW YORK.

THE FOREGOING ELECTION OF THE LAWS OF THE STATE OF NEW YORK IS WITHOUT PREJUDICE TO THE RIGHT OF LESSOR TO APPLY THE LAWS OF THE FEDERAL DISTRICT OF MEXICO TO ANY REPOSSESSION OR OTHER ENFORCEMENT OF RIGHTS UNDER THIS AGREEMENT WHILE THE AIRCRAFT IS LOCATED IN MEXICO.

24.2    **Jurisdiction**

Pursuant to and in accordance with Section 5-1402 of the New York General Obligations Law, Lessee and Lessor each irrevocably agrees that (i) the United States District Court for the Southern District of New York sitting in The Borough of Manhattan and any New York state court sitting in the County of New York, New York, and all related appellate courts, and (ii) the courts of the jurisdictions in which the Aircraft at the relevant time is located in the case of enforcement proceedings in respect of remedies hereunder, have exclusive jurisdiction to settle any disputes arising out of or relating to this Agreement or any of the other Operative Documents and submits itself and its property to the jurisdiction of the foregoing courts with respect to such dispute, hereby waiving any other jurisdictions which may be available thereto by reason of domicile or otherwise.

24.3    **Process Agent**

(a)    Without prejudice to any other mode of service, Lessee:

(i)    appoints Cogency Global Inc., at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its agent for service of process relating to any proceedings before the New York courts described in Clause 24.2 (*Jurisdiction*) in connection with this Agreement and agrees to maintain the process agent in New York notified to Lessor;

(ii)     agrees that failure by a process agent to notify Lessee of the process shall not invalidate the proceedings concerned; and

(iii)    consents to the service of process relating to any such proceedings by prepaid mailing or by personal delivery of a copy of the process to Lessee's agent at the address identified in Clause 24.3(a)(i) above or by facsimile or prepaid mailing by air mail, certified or registered mail, or by personal delivery, of a copy of the process to Lessee at the address set forth in Clause 23.2.

(b)     Without prejudice to any other mode of service, Lessor:

(i)     appoints Lord Securities Corporation, at 48 Wall Street, 27th Floor, New York, NY 10005 as its agent for service of process relating to any proceedings before the New York courts described in Clause 24.2 (*Jurisdiction*) in connection with this Agreement and agrees to maintain the process agent in New York notified to Lessee;

(ii)    agrees that failure by a process agent to notify Lessor of the process shall not invalidate the proceedings concerned; and

(iii)   consents to the service of process relating to any such proceedings by prepaid mailing or by personal delivery of a copy of the process to Lessor's agent at the address identified in Clause 24.3(b)(i) above or by facsimile or prepaid mailing by air mail, certified or registered mail, or by personal delivery, of a copy of the process to Lessor at the address set forth in Clause 23.2.

## 24.4   Waiver of Objections

Each of Lessee and Lessor:

(a)     waives to the fullest extent permitted by Law any objection which it may now or hereafter have to the courts referred to in Clause 24.2 (*Jurisdiction*) on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Agreement;

(b)     waives to the fullest extent permitted by Law any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in the courts referred to in Clause 24.2 (*Jurisdiction*); and

(c)     to the extent permitted by applicable Law, agrees that a judgment or order of any court referred to in Clause 24.2 (*Jurisdiction*) in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction as if made by the highest court in that other jurisdiction and accordingly neither Lessee nor Lessor will seek to, nor be entitled to, contest and/or

delay and/or obstruct registration or enforcement of any such judgment and/or award and/or order on grounds of public policy or otherwise.

### 24.5    No Alternative Jurisdictions

This Clause 24.5 shall survive, continue to take full effect and not merge in any order or judgment and this Clause 24.5 prohibits either party to bring proceedings against the other in connection with this Agreement or any other Operative Document in any court other than as provided in Clause 24.2 (*Jurisdiction*) above.

### 24.6    Waiver of Sovereign Immunity and Other Defenses

Each of Lessee and Lessor irrevocably and unconditionally:

(a)     agrees that if the other brings legal proceedings against it or its assets in relation to this Agreement no sovereign or other immunity from such legal proceedings (which will be deemed to include suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment, other attachment, the obtaining of judgment, execution of a judgment or other enforcement or legal process or remedy) will be claimed by or on behalf of itself or with respect to its assets;

(b)     waives any such right of immunity which it or its assets now has or may in the future acquire and agrees that the foregoing waiver shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States of America and is intended to be irrevocable for the purposes of such Act; and

(c)     waives any requirement, of any kind whatsoever, for the other party to provide any form of security in respect of the payment of any damages, costs, expenses or any other financial obligation resulting from the commencement or prosecution of proceedings or the making of or service of any order and each party undertakes (x) not to challenge the validity of any proceedings or the making of any orders without any requirement for the provision of such security, (y) to advise any court upon the other party's request that it requires no such security, and (z) to provide security itself for any third party claims arising out of or in connection with such proceedings and/or orders.

### 24.7    Waiver of Jury Trial

EACH OF LESSEE AND LESSOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS TO A JURY TRIAL IN RESPECT OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THE LESSOR/LESSEE RELATIONSHIP BEING ESTABLISHED, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF LESSOR AND LESSEE REPRESENTS AND WARRANTS THAT EACH HAS REVIEWED AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING

CONSULTATION WITH ITS LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS CLAUSE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[Signature Page Follows]

**IN WITNESS WHEREOF** Lessor and Lessee have executed and delivered this Agreement in the State of New York, U.S.A., both as of the date shown at the beginning of this Agreement.

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**
*Lessee*

**[_____] (not in its individual capacity but solely as owner trustee)**
*Lessor*

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

By: _____

Name: _____

Title: _____

TO THE EXTENT IF ANY THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST IN THIS DOCUMENT MAY BE PERFECTED THROUGH THE POSSESSION OF ANY ORIGINAL OR COPY HEREOF OTHER THAN THAT MARKED "CHATTEL PAPER ORIGINAL".

## CHATTEL PAPER ORIGINAL

**IN WITNESS WHEREOF** Lessor and Lessee have executed and delivered this Agreement in the State of New York, U.S.A., both as of the date shown at the beginning of this Agreement.

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**
*Lessee*

**[_____] (not in its individual capacity but solely as owner trustee)**
*Lessor*

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

TO THE EXTENT IF ANY THAT THIS DOCUMENT CONSTITUTES CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE, NO SECURITY INTEREST IN THIS DOCUMENT MAY BE PERFECTED THROUGH THE POSSESSION OF ANY ORIGINAL OR COPY HEREOF OTHER THAN THAT MARKED "CHATTEL PAPER ORIGINAL".

**SCHEDULE 1**
**DEFINITIONS AND CONSTRUCTION**

1.    **Defined Terms**

The following words and expressions have the respective meanings set forth below:

"**Acceptance Certificate**" means a certificate of acceptance of the Aircraft to be executed and delivered by the parties at Delivery substantially in the form appearing in Schedule 9 (*Form of Acceptance Certificate*);

"**Ad Hoc Bondholders Group**" means the ad hoc group of holders of 7.000% Senior Notes Due 2025 issued pursuant to that certain Indenture, dated as of February 5, 2020, among Lessee, as issuer, Grupo Aeroméxico, S.A.B. de C.V., as guarantor, and The Bank of New York Mellon, as trustee;

"**AFAC**" means the *Agencia Federal de Aviación Civil* of the *Secretaría de Comunicaciones y Transportes de México* and each other Mexican governmental airworthiness authority having authority with respect to the Aircraft that is comparable to the authority of the FAA and any successor thereto;

"**AFAC Termination Letter**" means a AFAC termination letter substantially in the form appearing at Part C of Schedule 12 complying with all signing formalities and legalization requirements necessary for filing with the AFAC;

"**Affiliate**" means, in relation to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such first Person; and a Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, contract or otherwise;

"**Agreed Form**" means the form agreed between Lessor and Lessee;

"**Agreed Value**" has the meaning provided in Part A of the Financial Terms Annex;

"**Agreement**" means this Aircraft Lease Agreement together with its Schedules;

"**Aircraft**" means the aircraft described in Schedule 6 (*Description of Aircraft*), including all buyer furnished equipment and in-flight entertainment equipment (which term includes where the context admits a separate reference to all Engines, Parts and Aircraft Documents);

"**Aircraft Documents**" means the documents, data, aircraft manuals and technical records relating to the Aircraft at the time of Delivery and any other documents and records referred to in Clause 11.2 (*Aircraft Documents*) and Schedule 7 (*Aircraft Documents at Redelivery*) and all additions, renewals, revisions and replacements from time to time made thereto in accordance with this Agreement;

"**Aircraft Object**" has the meaning given to such term in the Consolidated Text;

"**Airframe**" means the Aircraft, excluding the Engines and the Aircraft Documents;

"**Airframe Manufacturer**" means The Boeing Company;

"**Airframe Warranty Assignment**" means the airframe warranty assignment entered into or to be entered into between Lessor and Lessee, and the related consent and agreement between Lessor, Lessee and the Airframe Manufacturer, in respect of the Aircraft in the Agreed Form;

"**Airworthiness Directive**" or "**AD**" means any and all State of Manufacture airworthiness directives and/or State of Registration airworthiness directives and/or airworthiness directives issued by the Aviation Authority;

"**AMM**" means, from time to time, the latest revision of the Airframe Manufacturer's approved maintenance manual for the Aircraft;

"**Anti-Corruption Laws**" means any of the following: (i) the Irish Criminal Justice (Corruption Offences) Act 2018; (ii) the United States Foreign Corrupt Practices Act 1977; and (iii) any other anti-bribery and/or anti-corruption related Laws applicable to any party to this Agreement;

"**Approved Maintenance Performer**" means (a) for all Major Checks, any shop visit for an Engine, the APU or any Landing Gear or the overhaul of any serialized components and all major modifications, any maintenance facility approved by (i) the Aviation Authority and (ii) either EASA or the FAA and (b) for all lower-level service, testing, modification, maintenance, repair, overhaul or other work, any maintenance facility approved by the Aviation Authority which, in either case, may be Lessee so long as Lessee has the requisite licenses and approvals;

"**APU**" means the auxiliary power unit installed on the Aircraft on the Delivery Date and any replacement auxiliary power unit installed in accordance with this Agreement title to which is vested in Lessor in accordance with this Agreement;

"**APU Cycle**" means one start-up and shut down of the APU;

"**APU Equivalency Charge**" shall mean the APU Equivalency Charge, if any, payable pursuant to Part B of the Financial Terms Annex (*Redelivery Maintenance Payments*);

"**APU Hour**" means each hour or part thereof (rounded to the nearest minute) elapsing from the moment the APU is started to the moment when the APU is shut down;

"**APU Manufacturer**" means Honeywell, Inc.;

"**APU Overhaul Shop Visit**" means, with respect to the APU, a level of work that includes, at a minimum, (i) complete power section disassembly and load compressor disassembly; (ii) inspection of rotating hardware in accordance with zero-time check criteria set forth in the APU Manufacturer's inspection and repair manual; (iii) inspection of static hardware inspections in accordance with the continuing time criteria set forth in the APU

Manufacturer's inspection and repair manuals; (iv) testing of the APU in accordance with the highest performance standard; and (v) APU being certified as overhauled;

"**Aviation Authority**" means (i) so long as the State of Registration is Ireland, the Irish Aviation Authority (ii) so long as the State of Registration is Mexico, the AFAC and the RAM, and (iii) if the Aircraft is registered in another State of Registration, the authorities, government departments, committees or agencies which under the laws of that State of Registration shall from time to time:

(a)      have control or supervision of civil aviation in that state; or

(b)      have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft;

"**Back to Birth Traceability**" means in respect of any Part or part, original documentary evidence specifying the part number and the unique serial number of such Part or part, and providing a detailed full operational history record acceptable to an FAA or EASA regulatory standard but in any event having the following: (i) (x) for a part delivered new as a spare part, the manufacturer's airworthiness document (FAA Form 8130–3 or EASA Form One (to the extent such EASA form is permitted by the FAA and the Maintenance Program)) showing the part number and serial number, and (y) for a part delivered new installed on an assembly, the manufacturer's assembly bill of material listing showing part number, serial number, assembly serial number and where relevant the as-delivered model and thrust rating; (ii) a removal/installation ('on/off') transaction history detailing an unbroken record of the Flight Hours and Cycles elapsed at each relevant thrust rating (for Engine Life Limited Parts) from new up to current signed or stamped by a person authorized by Lessee to do so; and (iii) an Incident and Accident Statement from each operator;

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Base Lease Term**" has the meaning given to such term in Part A of the Financial Terms Annex (*Base Lease Term Rent and Certain Definitions*);

"**Bill of Sale**" means the warranty bill of sale transferring title to the Aircraft from the Manufacturer to Lessor;

"**Breakage Costs**" means all costs, losses, premiums, penalties or expenses incurred or suffered by Lessor, any Affiliate of Lessor or any Financing Party in liquidating or employing funds raised on any interbank market in connection with the financing of Lessor's purchase or ownership of the Aircraft and the unwinding or terminating or maintaining any swap agreement, interest rate agreement or other financial instrument to the extent related to such financing and/or the leasing of the Aircraft hereunder;

"**Business Day**" means:

(a)        in the case of payments, any day (other than a Saturday or Sunday) on which banks are open for business in New York City and Mexico City;

(b)        in all other cases, any day (other than a Saturday or Sunday) on which banks are open for business in New York City, Mexico City and Dublin, Ireland;

"**C Check**" means a block **"C"** check in accordance with the Maintenance Program in effect on the date when such check is carried out;

"**Cape Town Convention**" means The Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (utilizing the English-language version thereof as in effect in Mexico on the Delivery Date), and references to the Cape Town Convention will include the Protocol as appropriate, and for so long as the Aircraft is registered in Mexico, references to the Cape Town Convention refer to the Cape Town Convention as adopted and implemented in Mexico;

"**Chapter 11 Cases**" means the Chapter 11 cases commenced by Lessee and its Affiliates on June 30, 2020 and pending in the Bankruptcy Court under the lead case no. 20-11563;

"**Claim**" has the meaning given to it in Clause 14.2 (*Notification and Contest*);

"**COCESNA**" means *Corporacion Centroamericana de Servicios de Navegacion Aérea*;

"**Commitment Payment**" means the amount provided in Part A of the Financial Terms Annex;

"**Companion Agreement**" means each aircraft lease agreement (or amended and restated lease agreement, as the case may be) between SMBC Aviation Capital Limited ("**SMBC AC**") or its Affiliate (including a trust of which SMBC AC or an Affiliate of SMBC AC is the beneficial owner) as lessor and Lessee as lessee with respect to the leasing of Companion Aircraft; **provided that** such aircraft lease agreement shall be a "Companion Agreement" for purposes hereof only so long as SMBC AC or an Affiliate of SMBC AC (including a trust of which SMBC AC or an Affiliate of SMBC AC is the beneficial owner) is the lessor under such aircraft lease agreement;

"**Companion Agreement Event of Default**" means, in respect of any Companion Agreement, an Event of Default as defined therein;

"**Companion Aircraft**" means the Boeing 737 aircraft bearing manufacturer's serial numbers [REDACTED] (other than the Aircraft);

"**Conditions Precedent**" means the conditions specified in Schedule 3 (*Conditions Precedent*);

"**Confirming Bank**" has the meaning given to such term in Clause 6.3(b)(ii);

"**Consolidated Text**" means the Consolidated Text of the Cape Town Convention and the Protocol attached to Resolution No. 1 of the Final Act of the Diplomatic Conference to adopt the Cape Town Convention and the Protocol held under the auspices of ICAO and UNIDROIT at Cape Town, South Africa from 29 October to 16 November 2001;

"**Credit Default**" means a Default of the type described in Clause 19.1(a) (*Nonpayment*), 19.1(b)(ii) (*Insurance*), 19.1(i) (*Liquidation and Similar Proceedings*) or 19.1(j) (*Other Jurisdiction*) of this Agreement or any Companion Agreement;

"**Cycle**" means one take-off and landing of the Aircraft or, in respect of any Engine or Part temporarily installed on another airframe, one take-off and landing of that other airframe;

"**Damage Notification Threshold**" has the meaning provided in Part A of the Financial Terms Annex;

"**Default**" means any condition, event or circumstance which, with the giving of notice and/or lapse of time and/or determination of materiality and/or fulfillment of any other condition, or any combination of any thereof, would, constitute an Event of Default under this Agreement or "Event of Default" under any Companion Agreement;

"**Default Interest**" means any interest paid or payable pursuant to Clause 7.2 (*Default Interest*);

"**Default Rate**" has the meaning given such term in Part A of the Financial Terms Annex;

"**Delivery**" means delivery of the Aircraft on lease by Lessor to Lessee under this Agreement;

"**Delivery Condition Specification**" means the condition detailed in Schedule 6 (*Description of Aircraft*) as the same may be amended by master changes, rapid revisions and production revisions records or other written agreement between Lessee, Lessor and the Airframe Manufacturer prior to Delivery, together with the specification set forth on Annex A of the Acceptance Certificate;

"**Delivery Date**" means the date on which Delivery occurs;

"**Delivery Location**" means the facilities of the Airframe Manufacturer in the State of Washington, or such other location as may be agreed by Lessor and Lessee;

"**Deregistration Power of Attorney**" means the irrevocable power of attorney from Lessee authorizing Lessor to do anything or act or to give any consent or approval which may be required to obtain deregistration of the Aircraft and export the Aircraft from Mexico upon termination of this Agreement as a result of an Event of Default;

"**Dollars**", "**$**" and "**US$**" means the lawful currency of the United States of America and, in relation to all payments in dollars to be made under or pursuant to this Agreement, in immediately available funds;

"**EASA**" means the European Aviation Safety Agency and any successor thereof;

"**Effective Date**" has the meaning given to it in Clause 19.5 (*Illegality*);

"**Engine**" means, whether or not for the time being installed on the Aircraft:

(a)     the engines specified in the Acceptance Certificate; or

(b)     any engine which has replaced that engine, title to which has, or should have, passed to Lessor in accordance with this Agreement, including, without limitation, any Replacement Engine,

and in each case includes all modules and Parts from time to time belonging to or installed in that engine but excludes any properly replaced engine title to which has, or should have, passed to Lessee pursuant to this Agreement;

"**Engine Equivalency Charge**" shall mean the Engine Equivalency Charge payable pursuant to Part B of the Financial Terms Annex (*Redelivery Maintenance Payments*);

"**Engine LLP Equivalency Charge**" shall mean the Engine LLP Equivalency Charge, if any, payable pursuant to Part B of the Financial Terms Annex (*Redelivery Maintenance Payments*);

"**Engine Major Module**" means, each of the following modules (i) Fan and Booster (ATA Chapters 72-21/22/23); (ii) HPC (ATA Chapters 72-31/32/33); (iii) HPT and Combustor (ATA Chapters 72-41/42/51/52/53); and (iv) LPT (ATA Chapters 72-54/55/56);

"**Engine Major Module Performance Restoration**" means, in respect of an Engine Major Module of an Engine, an off-wing engine shop visit including performance restoration or full overhaul of that Engine Major Module accomplished in accordance with the LMG, with all other modules having work performed as required per the LMG, and a scheduled Life Limited Part, State of Manufacture airworthiness directive and on-condition release of no less than the industry standard mean time between removals for a mature run on such Engine Major Module;

"**Engine Manufacturer**" means CFM International, Inc.;

"**Engine Performance Restoration**" means in respect of an Engine, the performance of off wing engine maintenance and repair accomplished [REDACTED];

"**Engine Thrust Rating**" means the "Engine Thrust Rating" of the Engines as set out in Schedule 6 (*Description of Aircraft*);

"**Engine Warranties Assignment**" means the engine warranty and/or product support assignment entered into or to be entered into between Lessor and Lessee, and the related consent and agreement between Lessor, Lessee and the Engine Manufacturer, in respect of the Engines in the Agreed Form;

"**Equipment Change**" means any modification in or alteration and addition to the Aircraft;

"**Event of Default**" has the meaning given to it in Clause 19.1 (*Events of Default*);

"**Excluded Country**" means a country or territory which is, or whose government is, at any time the subject or target of country-wide or territory-wide Sanctions;

"**Expiry Date**" means the date determined in accordance with Clause 4.1 (*Expiry Date*);

"**FAA**" means the Federal Aviation Administration of the United States of America and any successor thereof;

"**FAA SBs**" has the meaning given to it in Clause 9.5(a);

"**FAR**" means the Federal Aviation Regulations set forth in Title 14 of the United States Code of Federal Regulations;

"**Filing Bill of Sale**" means the Bill of Sale, notarised and apostilled, together with its Spanish translation certified by a court-approved translator for registration purposes before the RAM;

"**Final Renewal Notice**" means a notice substantially in the form of Schedule 10, Part B delivered, or to be delivered, by Lessee to Lessor pursuant to Clause 4.2.1;

"**Final Delivery Date**" means [REDACTED];

"**Financial Terms Annex**" means Schedule 4, which contains financial terms that shall be redacted (to the extent permitted by applicable Law) in the counterpart of this Agreement that is filed for recordation with any Aviation Authority or any other Government Entity;

"**Financing Parties**" means any Person or Persons from time to time notified by Lessor to Lessee as providing financing to Lessor in respect of Lessor's or Owner Participant's acquisition, ownership or leasing of the Aircraft, whether by way of loan, head lease or otherwise and shall include the Financing Parties Representative;

"**Financing Parties Representative**" means the Person or Persons that from time to time represent the Financing Parties as agent, trustee, secured party, security trustee, or in another similar capacity, the identity of which Lessor from time to time notifies Lessee as being a Financing Parties Representative;

"**First Renewal Lease Term**" has the meaning given to such term in Clause 4.2.1(a);

"**Flight Hour**" means each hour or part thereof (rounded to the nearest minute) elapsing from the moment at which the wheels of the Aircraft leave the ground on the take-off of the Aircraft until the wheels of the Aircraft touch the ground on the landing of the Aircraft following such take-off, or in the case of any Engine or Part installed on another aircraft means each hour or part thereof (rounded to the nearest minute) elapsing from the moment at which the wheels of that aircraft leave the ground on take-off of that aircraft until the

wheels of that aircraft touch the ground on the landing of that aircraft following such take-off;

"**Foreign Air Carrier**" means a Person, not a citizen of the United States (as defined in Section 40102 of Title 49 of the U.S.C.), undertaking by any means, directly or indirectly, to provide transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between a place in the United States and a place outside the United States when any part of the transportation is by aircraft and which holds a permit in good standing to conduct such operations pursuant to Section 41302 of Title 49 of U.S.C. by the Department of Transportation or any predecessor or successor agency thereto and is duly certificated to provide such foreign air transportation pursuant to Section 129 of Title 14 of U.S.C. and provides such transportation in accordance therewith;

"**Geneva Convention**" means the Convention on the International Recognition of Rights in Aircraft signed at Geneva, Switzerland on 19 June 1948, and amended from time to time;

"**Government Entity**" means:

(a)     any national government, political subdivision thereof, or local jurisdiction therein;

(b)     any instrumentality, board, commission, court, or agency of any thereof, however constituted;

(c)     any association, organization, or institution of which any of the above is a member or to whose jurisdiction any of the above is subject or in whose activities any of the above is a participant; and

(d)     to the extent that an airport, ground handling or air navigation service is not run or provided by an entity which falls within sub-paragraph (a) – (c) above, such relevant entity, body, corporate, organization or institution;

"**Gross Negligence**" means, in relation to an Indemnitee or Tax Indemnitee, gross negligence as determined under New York Law;

"**Habitual Base**" means Mexico or the state or incorporation of a Permitted Sublessee or the state in which the Aircraft is registered in accordance with a sublease to a Permitted Sublessee;

"**IDERA**" means an irrevocable deregistration and export request authorization pursuant to and for the purposes of the Cape Town Convention;

"**IFE**" means, collectively, the inflight entertainment system and the Wi-Fi system or connection.

"**Illegality Event**" has the meaning given to it in Clause 19.5 (*Illegality*);

"**Incident and Accident Statement**" means a statement signed by an authorized signatory for the Person from time to time having custody or possession of the Aircraft, an Engine or a Part certifying that, other than as set out in reasonable detail in such certificate, the Aircraft, such Engine or such Part, as applicable, has never been damaged in any 'accident' or 'incident' within the meaning of ICAO Annex 13 (or FAA 49 CFR 830.2 where applicable) and has never been exposed to excessive heat, shock or salt water and that no Part has ever been procured from a military source during the period such Person had custody or possession of the same;

"**Indemnitees**" means each of Lessor, Lease Manager, the Financing Parties and each of their respective shareholders, members, managers, partners, Affiliates, contractors, trustees, beneficiaries, directors, officers, servants, agents, representatives, employees, successors, assigns and transferees;

"**Initial Registration Period**" has the meaning given to it in Clause 9.5(a);

"**Initial Renewal Notice**" means a notice substantially in the form of Schedule 10, Part A delivered, or to be delivered, to Lessee pursuant to Clause 4.2.1;

"**Insurances**" means insurances and any reinsurances in respect of the Aircraft described in and complying with the requirements of Clause 15 (*Insurance*) and Schedule 5 (*Insurance Requirements*);

"**International Interest**" has the meaning given to such term in the Consolidated Text;

"**International Registry**" has the meaning given to such term in the Consolidated Text;

"**Irish Aviation Authority**" means the Irish Aviation Authority or any other authority, government department, committee or agency which under the laws of Ireland shall from time to time:

(a)    have control or supervision of civil aviation in Ireland; or

(b)    have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft in Ireland;

"**Issuing Bank**" has the meaning given to such term in Clause 6.3(b)(ii);

"**Landing Gear**" means the complete strut assembly, consisting of the inner and outer cylinders of each main landing gear and nose landing gear and all associated parts that comprise each landing gear assembly, as listed in the Aircraft Documents including side struts, braces, and uplock and downlock mechanisms but excluding, without limitation, rotable parts such as wheels, tires, brakes, transducers and switch assemblies, title to which is vested in the Lessor;

"**Landing Gear Equivalency Charge**" shall mean the Landing Gear Equivalency Charge, if any, payable pursuant to Part B of the Financial Terms Annex (*Redelivery Maintenance Payments*);

"**Landing Gear Overhaul**" means an overhaul of a Landing Gear assembly in accordance with the Landing Gear Manufacturer's repair manual that restores such Landing Gear to a "zero time since overhaul" condition in accordance with the Landing Gear Manufacturer's repair manual and is performed in accordance with the Landing Gear Manufacturer's overhaul specifications and operating criteria (excluding any rotable components such as wheels, tires, brakes and consumable items);

"**Law**" includes common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, request or requirement (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general practice of Persons to whom the directive, regulation, request or requirement is addressed);

"**Lease Manager**" means SMBC Aviation Capital Limited;

"**Lessee Conditions Precedent**" means the Conditions Precedent to be satisfied by Lessee, listed at Clause 1 of Schedule 3 (*Conditions Precedent*);

"**Lessor Conditions Precedent**" means the Conditions Precedent to be satisfied by Lessor, listed at Clause 3 of Schedule 3 (*Conditions Precedent*);

"**Lessor Guarantee**" means any guarantee of the obligations of Lessor under this Agreement and the other Operative Documents granted by Lessor Guarantor in favor of Lessee;

"**Lessor Guarantor**" means any Person guaranteeing the obligations of Lessor after a transfer in accordance with Clause 21.2(b)(iv);

"**Lessor Lien**" means:

(a)     any Security Interest in respect of the Aircraft from time to time created by, through or under any Lessor Party or any Affiliate of any Lessor Party in connection with the financing of the Aircraft;

(b)     any other Security Interest in respect of the Aircraft which results from acts of or claims against, or any indebtedness, liability or other obligation arising by, through or under, any Lessor Party, any Affiliate of any Lessor Party or any Financing Party, any Financing Party not related to the transactions contemplated by or permitted under this Agreement or the other Operative Documents; and

(c)     any Security Interest in respect of the Aircraft for Lessor Taxes;

"**Lessor Party**" means each of Lessor, any Lessor Guarantor, Trust Company, Owner Participant and Lease Manager;

"**Lessor Taxes**" means Taxes specified in Clause 20.3(b) (*Tax Indemnity*);

"**Letter of Credit**" has the meaning given to such term in Clause 6.3(a);

"**Life Limited Part**" or "**LLP**" means any Part that has a pre-determined life limit as mandated by Manufacturer, the Aviation Authority, the FAA or EASA which requires any such Part to be discarded upon reaching such life limit;

"**LMG**" means the Engine Manufacturer's LEAP Maintenance Guide or any replacement thereof provided by the Engine Manufacturer;

"**Loss**" means any loss, liability, action, claim, proceeding, judgment, penalty, fine, damages, fee, cost or expense (including legal fees and expenses, including legal fees and expenses incurred to enforce any applicable indemnity);

"**Maintenance Program**" has the meaning given to it in Clause 11.4(a) (*Maintenance Program*);

"**Major Checks**" means a C Check, a Structural Check, a shop visit of an Engine or the APU involving its removal from an airframe and a Landing Gear Overhaul;

"**Mandatory Orders**" means all and any Aviation Authority and FAA mandatory orders and Regulations applicable to the Aircraft, any Engine or any Part;

"**Manufacturer**" means, in relation to the Airframe, The Boeing Company or, in relation to the Engines, CFMI International, Inc. or in relation to any Part, the manufacturer of that Part;

"**Manufacturer's Maintenance Manual**" means the individual manuals or maintenance data sets published by the Aircraft, Engine and Parts Manufacturer (as the case may be);

"**Manufacturer's Maintenance Planning Document**" or "**MPD**" means the planning document relating to recommended maintenance of the Aircraft issued by Manufacturer, including the airworthiness limitation section, as the same may from time to time be amended, modified or supplemented;

"**Maximum Deductible Amount**" has the meaning provided in Part A of the Financial Terms Annex;

"**Mexico**" means the United Mexican States;

"**Minimum Liability Coverage**" has the meaning provided in Part A of the Financial Terms Annex;

"**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control;

"**Operational Extension**" has the meaning set forth in Clause 4.2.3;

"**Operational Extension Expiry Date**" means in respect of the Operational Extension, the scheduled last day thereof without regard to any early termination or extension thereof

pursuant to Clause 4.1 (*Expiry Date*) or Clause 19.2 (*Lessor's Rights*) as confirmed in the Operational Extension Notice;

"**Operational Extension Notice**" has the meaning set forth in Clause 4.2.3;

"**Operative Documents**" means (a) this Agreement, the Acceptance Certificate, any Renewal Notice, the Airframe Warranty Assignment, the Owner Participant Letter, the Engine Warranties Assignment, any IDERA issued pursuant to the terms hereof, the Deregistration Power of Attorney and the Lessor Guarantee (if any), together with (b) any schedules, documents, notices or certificates from time to time executed or issued by Lessee pursuant hereto or thereto and (c) any side letters, supplements, amendments or modifications to any of the foregoing from time to time executed or agreed to by Lessee which (other than in the case of amendments to Operative Documents, which shall automatically be Operative Documents), are agreed in writing by Lessor and Lessee to be Operative Documents for the purposes of this Agreement;

"**Owner Participant**" means SMBC Aviation Capital Limited, a company incorporated under the laws of Ireland, whose registered office is at IFSC House, IFSC, Dublin 1, Ireland;

"**Owner Participant Letter**" means a letter agreement executed by Owner Participant in the form attached hereto as Schedule 15;

"**Paid Amount**" has the meaning given to such term in Clause 6.4(f);

"**Part**" means, whether or not for the time being installed on the Aircraft:

(a)     any component, furnishing or equipment (other than a complete Engine) furnished with the Aircraft on the Delivery Date; and

(b)     any other component, furnishing or equipment (other than a complete Engine) title to which has, or should have, passed to Lessor pursuant to this Agreement;

but excludes any such items title to which has, or should have, passed to Lessee pursuant to this Agreement;

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56;

"**Permitted Lien**" means:

(a)     any lien for Taxes not assessed or, if assessed, not yet due and payable, or being contested in good faith by appropriate proceedings; or

(b)     any lien of a repairer, mechanic, carrier, hangarkeeper, airport, air navigation authority or other similar lien arising in the ordinary course of business by operation of law in respect of obligations which are not overdue or are being contested in good faith by appropriate proceedings; or

(c)      any Lessor Lien; or

(d)      any lien arising out of any judgment or award against Lessee provided such judgment or award is discharged, vacated or the execution thereof stayed pending appeal within thirty (30) days of the date of entry thereof and so long as during any such period such judgment or award does not involve any material risk of the sale, forfeiture or other loss of the Aircraft or any risk of criminal or material civil liability against Lessor or any other Indemnitees;

(e)      any lien arising from the Operative Documents; or

(f)      any rights of a Permitted Sublessee under a sublease or a Person participating in a pooling arrangement contemplated by Clause 10.4 (*Pooling*);

but only if (in the case of both (a) and (b)) (i) adequate reserves have been taken by Lessee for the payment of such Taxes or obligations; and (ii) such proceedings, or the continued existence of such lien, do not give rise to any material risk of the sale, forfeiture or other loss of the Aircraft or any interest therein or any risk of criminal liability or material civil liability against Lessor or any other Indemnitee;

"**Permitted Sublessee**" means a sublessee permitted pursuant to the terms of Clause 10.3 (*Subleasing*);

"**Person**" means any individual, firm, partnership, joint venture, trust, corporation, Government Entity, corporate or business association, committee, department, authority or any other entity, incorporated or unincorporated, whether having distinct legal personality or not, or any member of the same and Persons shall be construed accordingly;

"**Post-Delivery Authorizations and Filings**" means the authorizations, registrations, documents, filings and other items to be delivered or provided by Lessee after the Delivery Date pursuant to Clause 5 of Schedule 3 (*Conditions Precedent and Post-Closing Matters*);

"**Pre-Approved Sublessee**" means any air carrier from time to time listed on Schedule 11 which may be amended from time to time pursuant to Clause 10.3(f);

"**Pre-Delivery Authorizations and Filings**" means each of the following:

(a)      evidence that a Uniform Commercial Code filing has been made with respect to this Agreement and the Commitment Payment referenced herein and such other authorizations, filings, registrations and other like action to be made with or obtained from any Government Entity as Lessor may reasonably request; and

(b)      export documentation issued by the FAA with respect to the Aircraft, as may be required by applicable Law.

"**Protocol**" means the Protocol to the Convention on Matters Specific to Aircraft Equipment, signed in Cape Town, South Africa on 16 November 2001;

"**Qualifying Bank**" has the meaning given to such term in Clause 6.3(b)(ii);

"**RAM**" means the Mexican Aeronautical Registry (*Registro Aeronáutico Mexicano*) or any other Mexican Government Entity succeeding to its functions;

"**Redelivery Acceptance Certificate**" means a redelivery acceptance certificate substantially in the form appearing at Part C of Schedule 12;

"**Redelivery Check**" means Lessee's next due C Check inclusive of all lower level multiple maintenance checks ('A' checks and lesser checks) and inspections, without sampling, in accordance with the Maintenance Program and all systems/zonal and structures/corrosion checks and inspections or equivalent maintenance or inspections that fall due within Lessee's next due C Check period in force at that time, all performed by an Approved Maintenance Performer, but in any event not less than [REDACTED] Flight Hours, [REDACTED] Cycles and [REDACTED] calendar months of operation;

"**Redelivery Conditions**" means the condition set forth in Schedule 8 (*Redelivery Conditions*);

"**Redelivery Date**" means the date on which the Aircraft is redelivered by Lessee to Lessor in accordance with the terms of this Agreement;

"**Redelivery Location**" means a location within the contiguous United State, as Lessor and Lessee may agree;

"**Redelivery Maintenance Payments**" means any Structural Check Equivalency Charge, Engine Equivalency Charge, Engine LLP Equivalency Charge, APU Equivalency Charge and Landing Gear Equivalency Charge payable by Lessor to Lessee at redelivery pursuant to Clause 18.1(c) and Part B of the Financial Terms Annex;

"**Regulation**" means any Law or regulation (including any internal corporate regulation), official directive or recommendation, requirement or contractual undertaking which applies to Lessee or the Aircraft;

"**Relevant Party**" has the meaning given to it in Clause 19.5(a);

"**Removed Engine**" means any Engine not installed on the Airframe so long as title thereto remains vested in Lessor in accordance with the terms of this Agreement;

"**Removed Part**" means any Part not installed on the Aircraft so long as title thereto remains vested in Lessor in accordance with the terms of this Agreement;

"**Renewal Lease Term**" means a First Renewal Lease Term or a Second Renewal Lease Term;

"**Renewal Notice**" means the Initial Renewal Notice and the Final Renewal Notice;

"**Rent**" has the meaning given to it in Clause 1 of Part A of the Financial Terms Annex (*Base Lease Term Rent and Certain Definitions*);

"**Rent Date**" means the first day of each Rent Period as confirmed in the Acceptance Certificate;

"**Rent Period**" has the meaning given to it in Clause 5.1 (*Rent Periods*);

"**Replacement Commitment Payment**" has the meaning given to such term in Clause 6.4(c);

"**Replacement Engine**" means in respect of any Engine, an engine that (i) is of the same manufacturer and model (or at Lessee's option an improved model) as that Engine; (ii) has been [REDACTED]; (iii) taking into account [REDACTED]; (iv) is capable of being installed on the Airframe without impairing the value or utility of the Airframe; and (v) is delivered with the FAA Form 8130-3, EASA Form One or similar form identifying the serial number of such engine and an Incident and Accident Statement in respect of such engine, and in respect of which Lessee has relevant details of the source and maintenance records for all parts installed on such engine [REDACTED];

"**Replacement Part**" means a component furnishing or part that (i) is certified in accordance with FAR Part 145 or its equivalent successor for installation on the Aircraft; (ii) is [REDACTED]; (iii) has an Incident and Accident Statement showing that it has not been involved in any incident or accident during the period covered by such Incident and Accident Statement; (iv) has [REDACTED]; (v) has [REDACTED]and (vi) [REDACTED] and (vii) in respect of which title is capable of passing to Lessor free and clear of all Security Interests other than Permitted Liens and in respect of which Lessee has relevant details of the source and maintenance records [REDACTED];

"**Restricted Party**" means a Person or aircraft that is (a) listed on, or owned or controlled by a person listed on, a Sanctions List, or a person acting on behalf of such a person; (b) located in or organized under the laws of an Excluded Country, or is owned or controlled by, or acting on behalf of a person located in or organized under the laws of an Excluded Country; or (c) otherwise a subject of Sanctions;

"**Sales Taxes**" has the meaning given to it in Clause 20.5 (*Sales Tax*);

"**Sanctions**" means any trade, economic or financial sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by a Sanctions Authority;

"**Sanctions Authority**" means (a) the Security Council of the United Nations; (b) the United States of America; (c) the European Union; (d) Mexico; (e) Japan; and (f) the governments and official institutions or agencies of any of paragraphs (a) to (e) above, including OFAC and the U.S. Department of State;

"**Sanctions List**" means the Specially Designated Nationals and Blocked Persons, Sectoral Sanctions Identifications and Foreign Sanctions Evaders lists maintained by OFAC, the

Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by Her Majesty's Treasury, or any similar list maintained by, or public announcement of a Sanctions designation made by, a Sanctions Authority, each as amended, supplemented or substituted from time to time;

"**Scheduled Expiry Date**" means the last day of the Base Lease Term without regard to any early termination or extension thereof pursuant to Clause 4.1 (*Expiry Date*) or Clause 19.2 (*Lessor's Rights*) as confirmed in the Acceptance Certificate;

"**Scheduled Renewal Term Expiry Date**" means in respect of any Renewal Lease Term, the scheduled last day thereof without regard to any early termination or extension thereof pursuant to Clause 4.1 (*Expiry Date*) or Clause 19.2 (*Lessor's Rights*) as confirmed in the Final Renewal Notice for that Renewal Lease Term;

"**SDLC Renewal Date**" has the meaning given to such term in Clause 6.4(b);

"**Second Renewal Lease Term**" shall have the meaning given to such term in Clause 4.2.1(a);

"**Security Interest**" means any mortgage, charge, pledge, lien, encumbrance, assignment, lease, sublease, hypothecation, right of set-off or any other agreement or arrangement having the effect of conferring security or creating an encumbrance;

"**State of Incorporation**" means Mexico;

"**State of Manufacture**" means the United States of America;

"**State of Registration**" means (i) during the Initial Registration Period, Ireland, (ii) thereafter, Mexico, or (iii) any other country in which the Aircraft is from time to time registered in accordance with Clause 9.5 (*Registration and Protection*);

"**Structural Check Equivalency Charge**" shall mean the Structural Check Equivalency Charge, if any, payable pursuant to Part B of the Financial Terms Annex (*Redelivery Maintenance Payments*);

"**Structural Checks**" means, with respect to the Airframe, a Structural Check, and shall be construed to imply either the 9 Year SC or the 12 Year SC (or the equivalent Structural Check if such 9 Year SCs and 12 Year SCs are no longer applicable), where:

(a)    "**9 Year SC**" means a structural, zonal and systems inspection of the Aircraft (and resulting repairs, if any) which accomplishes all tasks having an interval of nine (9) years as per the current revision of the Maintenance Program and such additional major structural, zonal and systems tasks performed concurrently therewith as may then be due based upon the performance intervals set out in the then-current revision of the Maintenance Program or if the Maintenance Program has been revised in respect of such Structural Check, an inspection which Lessor agrees in writing is equivalent in scope and content to the foregoing in accordance with the then-current revision of the Maintenance Program; and

(b)      "**12 Year SC**" means a structural, zonal and systems inspection of the Aircraft (and resulting repairs, if any) which accomplishes all tasks having an interval of twelve (12) years as per the current revision of the Maintenance Program and such additional major structural, zonal and systems tasks performed concurrently therewith as may then be due based upon the performance intervals set out in the then-current revision of the Maintenance Program or if the Maintenance Program has been revised in respect of such Structural Check, an inspection which Lessor agrees in writing is equivalent in scope and content to the foregoing in accordance with the then-current revision of the Maintenance Program;

"**Tax Indemnitee**" means Lessor, the Financing Parties, the Owner Participant, the Trust Estate and the Affiliates of each;

"**Taxes**" means all present and future taxes, levies, imposts, duties or charges of any nature whatsoever, and wheresoever imposed, including (without limitation) value added tax or any similar tax and any franchise, transfer, sales, use, business, occupation, excise, personal property, real property, stamp, gross income, personal property, fuel, leasing, occupational, turnover, excess profits, excise, gross receipts, franchise, registration, license, corporation, capital gains, export/import, income, levies, imposts, withholdings or other taxes or duties of any nature whatsoever (or any other amount corresponding to any of the foregoing) now or hereafter imposed, levied, collected, withheld or assessed by any national or regional taxing or fiscal authority or agency, together with any penalties, additions to tax, fines or interest thereon, and Tax and Taxation shall be construed accordingly;

"**Technical Acceptance Certificate**" means a technical acceptance certificate substantially in the form of Part A of Schedule 12;

"**Technical Status Report**" means a quarterly report on the operation of the Aircraft in the form attached hereto as Schedule 13;

"**Term**" means the period commencing on the Delivery Date and ending on the Expiry Date;

"**Total Loss**" means, with respect to the Aircraft (including for the purposes of this definition the Airframe) or an Engine:

(a)      the actual, constructive, compromised, arranged or agreed total loss of the Aircraft or any Engine (including any damage to the Aircraft or any Engine or requisition for use or hire which results in an insurance settlement on the basis of a total loss); or

(b)      the Aircraft or any Engine being destroyed, damaged beyond economic repair or permanently rendered unfit for normal use for any reason whatsoever; or

(c)      the requisition of title, confiscation, forfeiture or other compulsory acquisition of title for any reason of the Aircraft or any Engine by the government of the State of Registration or any other authority (whether de jure or de facto); or

(d)    the hi-jacking, theft, disappearance, seizure or requisition for use or hire of the Aircraft or any Engine which deprives any Person permitted by this Agreement to have possession and/or use of the Aircraft of its possession and/or use for more than ninety (90) consecutive days or, in the case of requisition for use or hire by the government of the State of Registration, one hundred twenty consecutive (120) days whether or not extending beyond the Scheduled Expiry Date or any then applicable Scheduled Renewal Term Expiry Date;

"**Total Loss Date**" means with respect to the Aircraft (including for the purposes of this definition, the Airframe) or an Engine:

(a)    in the case of an actual total loss or destruction, a determination having been made by the insurer as to damage beyond economic repair of the Aircraft or any Engine, or the Aircraft or an Engine being rendered permanently unfit, the date on which such loss, destruction, determination or rendition occurs (or, if the date of loss or destruction is not known, the date on which the Aircraft or Engine was last heard of);

(b)    in the case of a constructive, compromised, arranged or agreed total loss of the Aircraft or any Engine, whichever shall be the earlier of (i) the date being seventy-five (75) days after the date on which notice claiming such total loss is issued to the insurers or brokers, and (ii) the date on which such loss is agreed or compromised by the insurers;

(c)    in the case of requisition for title, confiscation, forfeiture or other compulsory acquisition or similar event of the Aircraft or any Engine by the government of the State of Registration or any other authority, the date on which the same takes effect; or

(d)    in the case of hi-jacking, theft, disappearance, seizure or requisition for use or hire of the Aircraft or any Engine, the earlier of (i) the last day of the period referred to in clause (d) of the definition of Total Loss and (ii) the date on which the insurers make payment on the basis of a Total Loss;

"**Trust Agreement**" means the Trust Agreement, dated [_____], between Trust Company and Owner Participant in respect of the Aircraft;

"**Trust Company**" means [_____], a [_____], in its individual capacity;

"**Trust Estate**" has the meaning set out in the Trust Agreement;

"**UCC**" means the Uniform Commercial Code as enacted in the State of New York or, if the laws of another state of the United States so provide, as enacted in such state;

"**United States**" means the United States of America; and

"**VAT**" has the meaning given to it in Clause 20.6 (*Value Added Tax*).

2.      **Construction and Usage**

(a)      References in this Agreement to:

     (i)      any statutory or other legislative provision shall be construed as including any statutory or legislative modification or re-enactment thereof, or any provision enacted in substitution therefor;

     (ii)      "Lessor", "Lessor Guarantor", "Owner Participant" or "Lessee" includes any assignee or successor in title to Lessor, Lessor Guarantor, Owner Participant or Lessee respectively (subject to the provisions of Clause 21 (*Assignment and Transfer*));

     (iii)      any deed, agreement or instrument shall include any such deed, agreement or instrument as may from time to time be amended, supplemented or substituted;

     (iv)      an "agreement" also includes a concession, contract, deed, franchise, license, treaty or undertaking (in each case, whether oral or written);

     (v)      the "assets" of any Person shall be construed as a reference to the whole or any part of its business, undertaking, property, assets and revenues (including any right to receive revenues);

     (vi)      "month" is a reference to a period which starts on one day in a calendar month and ends on the day immediately preceding the numerically corresponding day in the next calendar month, except that if there is no numerically corresponding day in that next month it shall end on the last day of that next month (and references to "months" shall be construed accordingly); and

     (vii)      "includes," "including", "include" or similar terms shall not be construed as limiting and shall mean "including, without limitation".

(b)      Headings are for ease of reference only.

(c)      Where the context so admits, words importing the singular number only shall include the plural and vice versa, and words importing neuter gender shall include the masculine or feminine gender.

## SCHEDULE 2
## REPRESENTATIONS AND WARRANTIES

1. **Lessee's Representations and Warranties**

Lessee represents and warrants to Lessor on the date of execution of this Agreement and on the Delivery Date in each case by reference to the facts and circumstances existing on such date that:

(a)     **Status**: Lessee is a company duly incorporated and validly existing under the laws of the State of Incorporation;

(b)     **Power and Authority**:  subject to approval by the Bankruptcy Court of the transactions contemplated by this Agreement, (i) Lessee has the company power and authority to carry on its business as presently being conducted and to enter into and perform its obligations under this Agreement and each other Operative Document to which Lessee is a party, (ii) Lessee has taken all necessary company action to authorize the entry into, performance and delivery of, this Agreement and each other Operative Document to which Lessee is a party, and (iii) this Agreement and each other Operative Document to which Lessee is a party has been (or on or before the Delivery Date will be) duly executed and delivered by Lessee;

(c)     **Legal validity**:  subject to approval by the Bankruptcy Court of the transactions contemplated by this Agreement, this Agreement and each other Operative Document to which Lessee is a party constitutes (or when executed and delivered will constitute) legal, valid and binding obligations of Lessee, enforceable against Lessee in accordance with its terms, except insofar as enforceability may be limited by (i) applicable bankruptcy and/or similar laws affecting creditors' rights generally, or (ii) general principles of equity;

(d)     **Non-conflict**:  the entry into and performance by Lessee of, and the transactions contemplated by, this Agreement and each other Operative Document to which Lessee is a party do not: (i) conflict with any Laws or Regulations applicable to Lessee; or (ii) conflict with the organizational documents of Lessee; or (iii) conflict with or result in default under any document which is binding upon Lessee or any of its assets nor result in the creation of any Security Interest over any of its assets (other than as contemplated hereby and thereby);

(e)     **Licenses and permits**: Lessee holds all material licenses, certificates, permits and approvals necessary for the conduct of its business and the performance of its obligations under this Agreement and each other Operative Document to which Lessee is a party;

(f)     **Approvals and Consents**: subject to approval by the Bankruptcy Court of the transactions contemplated by this Agreement, all authorizations, approvals, consents and notifications required by Lessee in connection with the entry into, performance, validity and enforceability of, this Agreement and each other Operative Document to which Lessee is a party and the transactions contemplated

by this Agreement and each other Operative Document to which Lessee is a party, have been (or on or before the Delivery Date will be) obtained or effected (as appropriate) and are (or will on their being obtained or effected be) in full force and effect;

(g)    **Registrations and Filings**:   except for the Post-Delivery Authorizations and Filings, no filing or recording of any instrument or document is necessary under the laws of the State of Incorporation in order to ensure the validity, effectiveness and enforceability of this Agreement or to establish, perfect or protect the rights and interests of Lessor in the Aircraft and this Agreement against Lessee and all other Persons;

(h)    **Export**:  to the extent permitted under applicable Law, the Deregistration Power of Attorney is prima facie sufficient authority for Lessor to de-register the Aircraft from Mexico (if the Aircraft is registered in Mexico) and to export the Aircraft out of Mexico, and other than the approval of the AFAC for the de-registration of the Aircraft (if the Aircraft is registered in Mexico) (including the removal of the Aircraft from Lessee's air transportation license (*título de concesión*) and air operator certificate, an export permit from the Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*), a ferry flight permit granted by the AFAC and an export certificate of airworthiness from the AFAC, no authorizations are necessary to enable Lessor to export the Aircraft from its Habitual Base and to de-register the Aircraft from Mexico after Lessor has taken possession of the Aircraft in circumstances where an Event of Default shall have occurred and be continuing;

(i)    **Excluded Countries**:  Lessee does not hold a contract or other obligation to operate the Aircraft to or from any country which is an Excluded Country unless all applicable consents, exemptions or licenses applicable to Lessee, Lessor and the Aircraft have been obtained or apply in respect of such contracts, obligations or operations;

(j)    **Financial Statements**:  the financial statements delivered to Lessor pursuant to Clause 1.2(i) of Schedule 3 (*Conditions Precedent*) fairly present the financial condition of Lessee as at such date and the results of its operations for the period ended on such date, all in accordance with generally accepted accounting principles in the State of Incorporation applied on a consistent basis;

(k)    **No Litigation**:  other than the Chapter 11 Cases and proceedings related thereto, no litigation, arbitration or administrative proceedings are pending or, to Lessee's knowledge, threatened before any court or administrative agency against Lessee which, could reasonably be expected to have a material adverse effect upon Lessee's ability to perform its obligations under this Agreement or any other Operative Document;

(l)     **No Event of Default**:  no Default or Event of Default has occurred and is continuing or will result from the entry into or performance of this Agreement by Lessee;

(m)     **Full Disclosure**:  any factual information provided by Lessee in writing for the purposes of this Agreement or any other Operative Document was true and accurate in all material respects as at the date they were provided or as at the date (if any) at which they are stated (and, if not, were corrected before the date hereof);

(n)     **Pari Passu**: the obligations of Lessee under this Agreement or any other Operative Document (i) are direct, general and unconditional obligations and rank at least pari passu with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of Lessee, with the exception of such obligations as are mandatorily preferred by Law and not by virtue of any contract and (ii) subject to approval by the Bankruptcy Court of the transactions contemplated by this Agreement, shall constitute administrative expense obligations of the Lessee in the Chapter 11 Cases;

(o)     **No Immunity**:  Lessee a is subject to civil commercial law with respect to its obligations under this Agreement and each other Operative Document, neither Lessee nor any of its assets are entitled to any right of immunity and the entry into and performance of this Agreement or any other Operative Document by Lessee constitute private and commercial acts; and

(p)     **Sanctions**:

(i)     Neither Lessee nor any subsidiary nor to the Lessee's knowledge, any shareholder holding 25% or more of Lessee's shares, nor any director or officer of Lessee, is currently a Restricted Party;

(ii)     Neither Lessee nor any subsidiary nor to the Lessee's knowledge, any shareholder holding 25% or more of Lessee's shares, has violated or is violating any Sanctions

(iii)     The making or receipt of any payments by the Lessee pursuant to the Agreement does not contravene or circumvent any Sanctions;

(iv)     The Lessee is conducting its operations in material compliance with Anti-Corruption Laws and no action, suit or proceeding by or before any court or other Government Entity involving the Lessee with respect to any Anti-Corruption Law is pending or, to its knowledge, threatened.

2.     **Lessor's and Trust Company's Representations and Warranties**

Each of Lessor and the Trust Company (but, in respect of the Trust Company, only as provided in causes (a) – (f) below) represents and warrants to Lessee on the date of

execution of this Agreement and on the Delivery Date, in each case by reference to the facts and circumstances existing on such date that:

(a) **Status**: The Trust Company is a [●] duly incorporated and validly existing under the laws of [●];

(b) **Power and Authority**: (i) each of the Trust Company and Lessor has the power and authority to carry on its business as presently being conducted and to enter into and perform its obligations under the Trust Agreement, this Agreement and each of other Operative Document to which it is a party, (ii) the Trust Company has taken all necessary corporate action to authorize the entry into, the delivery of, and the performance by it and the Lessor of the Trust Agreement, this Agreement and each other Operative Document to which it of Lessor is a party, and (iii) the Trust Agreement, this Agreement and each other Operative Document to which the Trust Company or Lessor is a party has been (or will be on or before the Delivery Date) duly executed and delivered by the Trust Company in its individual capacity or as Lessor, as applicable;

(c) **Legal validity**: the Trust Agreement, this Agreement and each other Operative Document to which the Trust Company or Lessor is a party constitutes (or when executed and delivered will constitute) its valid, legal and binding obligation enforceable against it in accordance with its terms except insofar as enforceability may be limited by (i) applicable bankruptcy and similar laws afflicting creditors' rights generally or (ii) general principles of equity;

(d) **Non-conflict**: the entry into and performance by each of the Trust Company and Lessor of, and the transactions contemplated by, the Trust Agreement, this Agreement, each other Operative Document to which it is a party, does not and will not: (i) conflict with any Laws or Regulations applicable to the Trust Company or Lessor as of such date; or (ii) conflict with the constitutional documents of the Trust Company or Lessor; or (iii) conflict with or result in default under any document which is binding upon the Trust Company or Lessor or any of the Trust Company's or Lessor's assets nor result in the creation of any Security Interest over any of the Trust Company's or Lessor's assets other than Lessor Liens in favor of the Financing Parties Representative;

(e) **Approvals and Consents**: all authorizations, approvals, consents and notifications required by Lessor in connection with the entry into, performance, validity and enforceability of, the Trust Agreement, this Agreement and the other Operative Documents to which Lessor is a party and the transactions contemplated hereby and thereby, have been (or will on or before the Delivery Date have been) obtained or effected (as appropriate) and are (or will on their being obtained or effected be) in full force and effect;

(f) **No Litigation**: no litigation, arbitration or administration proceedings are pending or to Lessor's knowledge or in the case of the Trust Company, to Trust Company's knowledge, threatened before any court or administrative agency against Lessor or

the Trust Company which could reasonably be expected to have a material adverse effect upon the Trust Company's or Lessor's ability to perform its obligations the Trust Agreement, this Agreement or any other Operative Document;

(g) **Title**: Lessor will at the time of Delivery have such right, title and interest in the Aircraft as is conveyed to it under the Bill of Sale, free of all Security Interest arising by, through or under any Lessor Party other than Lessor Liens in favor of the Financing Parties Representative.

3.      **Survival**

The representations and warranties pursuant to Clauses 1 and 2 of this Schedule 2 (*Representations and Warranties*) shall survive the execution of this Agreement and the Delivery Date.

**SCHEDULE 3**
**CONDITIONS PRECEDENT AND POST-CLOSING MATTERS**

**Conditions Precedent to be satisfied by the Lessee**

1.     Lessor's obligations to deliver and lease the Aircraft to Lessee are subject to the satisfaction of the Conditions Precedent set out in Clause 1 of this Schedule 3. All documents delivered to Lessor pursuant to Clause 1 of this Schedule 3 will be at Lessee's cost and in English.

1.1    **Pre Execution Conditions Precedent**: At or before the execution and delivery of this Agreement by Lessor:

(a)    Lessee shall furnish the following to Lessor and Owner Participant in each case in form and substance satisfactory to Lessor and Owner Participant (acting reasonably):

(i)    **Signing Authority**:  written evidence of appropriate corporate action authorizing the execution, delivery and performance of this Agreement and each other Operative Document to which Lessee is a party and the leasing of the Aircraft hereunder and appointing a specified Person or Persons to execute this Agreement and each other Operative Document to which Lessee is a party on Lessee's behalf, and a specimen of the signature of each Person authorized to execute the Agreement on behalf of Lessee;

(ii)   **Know Your Customer**:  all such documentation and information from Lessee and each relevant Lessee Affiliate as requested by Lessor or Owner Participant in respect of its "Know Your Customer" checks, anti-money laundering checks and any other similar requirements and all such checks and requirements shall be satisfactory to Lessor and Owner Participant in their sole and absolute discretion;

(iii)  **Process Agent Letter**: a letter from the process agent appointed by Lessee accepting such appointment;

**Pre-Delivery Conditions Precedent**

1.2    On or before the Delivery Date, Lessee shall provide the following each in full force as of the Delivery Date and each in form and substance satisfactory to Lessor (acting reasonably):

(a)    **Corporate Documents**:  (to the extent not provided pursuant to Clause 1.1(a) or amended since the date provided pursuant to Clause 1.1(a) of this Schedule) a copy of the following items certified by an officer of Lessee (i) the organizational documents of Lessee, (ii) an abstract of the resolutions of the board of directors of Lessee or other written evidence of appropriate corporate action authorizing the execution, delivery and performance of this Agreement and each other Operative Document to which Lessee is a party and the leasing of the Aircraft hereunder and appointing a specified Person or Persons to execute this Agreement and each other Operative Document on its behalf and each other Operative Document to which

Lessee is a party and (iii) a specimen of the signature of each Person authorized to execute the Agreement and each other Operative Document to which Lessee is a party on behalf of Lessee;

(b)    **Opinions**: at Lessee's cost, (i) a legal opinion issued by in-house legal counsel substantially in the Agreed Form and (ii) a New York law legal opinion of White & Case LLP as counsel to Lessee;

(c)    **Approvals and Consents**: evidence of the issue of each authorization, approval, consent and notification other than the Post-Delivery Authorizations and Filings which may be required in relation to, or in connection with the performance by Lessee of any of its obligations hereunder or under the other Operative Documents to which it is a party or, if no such approvals are required, a statement to that effect included in the legal opinion described in Clause 1.2(b)(i) of this Schedule;

(d)    **Licenses**: copies of Lessee's air transport license, air operator's certificates, concession and all other licenses, certificates and permits required by Lessee in relation to, or in connection with, the operation of the Aircraft;

(e)    **Air Traffic Control Letter**: a letter in the form attached hereto as Schedule 14 from Lessee addressed to each relevant air traffic control authority (which authority has the right or ability to retain, seize or place liens on the Aircraft), pursuant to which, following the occurrence and continuance of an Event of Default, Lessee authorizes the addressee to issue to Lessor, upon Lessor's request from time to time, a statement of account of all sums due by Lessee to such authority in respect of the Aircraft;

(f)    **Know Your Customer**: all such documentation and information from Lessee as requested by Lessor or Owner Participant to update its "Know Your Customer" checks, anti-money laundering checks and any other similar requirements (i) completed under Clause 1.1(a) of Schedule 3 and (ii) all such checks and requirements shall be satisfactory to Lessor and Owner Participant in their sole and absolute discretion;

(g)    **Import**: evidence that any required import license, and all customs formalities relating to the import of the Aircraft into Mexico have been obtained or complied with (or if no such licenses or formalities are required, a statement to that effect included in the legal opinion described in Clause 1.2(b)(i) of this Schedule 3), and evidence that the import of the Aircraft into Mexico is exempt from Taxes, or that any such Taxes have been paid in full or will be paid in full when due;

(h)    **Insurance**: a certificate of insurance and, if applicable, reinsurance evidencing the due compliance by Lessee with the insurances required to be maintained pursuant to this Agreement together with a broker's letter of undertaking;

(i)    **Financial Statements**: the most recent available balance sheet of Lessee and its profit and loss account, cash flow statement and the notes to its financial statements in each case relating to the fiscal year then ended;

(j)     **Payments**: all sums due to Lessor under this Agreement on or before the Delivery Date including the first payment of Rent and the Commitment Payment;

(k)     **Maintenance Program**: a copy of the preamble and matrix from the Maintenance Program;

(l)     **Executed Documents**: originals (or copies if originals are not practically available) of the Operative Documents, duly executed by the parties thereto other than Lessor;

(m)     **Acceptance Certificate**: the Acceptance Certificate, dated and fully completed, and executed by Lessee;

(n)     **International Registry**: evidence in a "priority search certificate" from the International Registry that there are no International Interests, prospective International Interests or other interests registered in the International Registry in relation to the Airframe or any Engine, other than those arising under the transactions contemplated by the Operative Documents or in respect of Lessor Liens or prospective Lessor Liens;

(o)     **UCC**: UCC Form 1 precautionary financing statement with respect to this Agreement and the Aircraft in a form acceptable to Lessor and ready to be filed in Washington, D.C. immediately following Delivery;

(p)     **Deregistration Power of Attorney**: a Deregistration Power of Attorney in Spanish and English executed before a Mexican notary public by Lessee in favor of Lessor;

(q)     **Provisional Registration Mark**: Lessor shall have received the provisional registration mark in respect of the Aircraft issued by the Aviation Authority;

(r)     **83bis Arrangement**: Lessor shall have received evidence reasonably satisfactory to it that no unreasonably short time restrictions have been imposed on the period that the Lessee may operate the Aircraft pursuant to the article 83bis arrangement referred to in Clause 9.5(a); and

(s)     **General**: such other documents as Lessor may reasonably request as a result of a change in Law or industry practice; **provided that** Lessor provides Lessee with written notice of such request at least ten (10) Business Days prior to the Delivery Date.

**Delivery Conditions Precedent**

1.3     On the Delivery Date the following conditions shall be satisfied (and confirmed by a certificate of an authorized signatory of Lessee dated the Delivery Date in the case of clause (a) and (b)):

(a)     **Default**: no Default or Event of Default shall have occurred and be continuing or might result from the leasing of the Aircraft to Lessee under this Agreement;

(b)    **Representations and Warranties**:  Lessee shall repeat the representations and warranties in Clause 1 of Schedule 2 (*Representations and Warranties*); and

(c)    **Aircraft Delivery**:  (i) The Aircraft shall be "ex-factory, as built", and newly ticketed by the FAA with an export certificate of airworthiness to EASA in accordance with the Airframe Manufacturer's delivery procedures and standards for new aircraft of the same model and type, and in conformity with the Delivery Condition Specification (other than any non-material discrepancies agreed upon by the parties acting reasonably); and (ii) the warranties received by Lessee in respect of the Aircraft and the Engines shall be for new aircraft and engines of the same model and type for a warranty period that deems the manufacture date to be the Delivery Date; (iii) Lessor shall have received the Pre-Delivery Authorizations and Filings and a true and correct copy of the current valid air operator's certificate and airline operation license, or equivalent, of Lessee, permitting Lessee to operate aircraft of the same type as the Aircraft, issued by the Aviation Authority; (iv) the Manufacturer shall have transferred, either directly or indirectly, good and marketable title to the Aircraft to Lessor free and clear of all Security Interests, except this Agreement and any Lessor Liens; and (v) Lessor shall have received originals of the Manufacturer delivery documents, the Bill of Sale and buyer furnished equipment listings.

2.    **Waiver**:  Each of the Conditions Precedent set out in Clause 1 of this Schedule 3 is for the sole benefit of the Lessor and may be waived or deferred in whole or in part with or without conditions.  If any condition precedent set out in Clause 1.1 of this Schedule is not satisfied on the date of execution of this Agreement and/or any condition precedent set out in Clause 1.2 of this Schedule is not satisfied on the Delivery Date, and/or any condition precedent set out in Clause 1.3 to this Schedule 3 is not satisfied on the Delivery Date and the Lessor (in its absolute discretion) agrees to deliver the Aircraft to Lessee, Lessee shall ensure that such Conditions Precedent are fulfilled within fifteen (15) days after the Delivery Date and Lessor may treat the failure of Lessee to do so as an Event of Default.

3.    **Conditions Precedent to be Satisfied by Lessor**:  Lessee's obligations to accept the aircraft from Lessor on lease under this Agreement are subject to the satisfaction of the Conditions Precedent set out in Clause 3 to this Schedule 3. All documents delivered to Lessee pursuant to Clause 3 of this Schedule 3 will be at Lessor's cost and in English.

3.1    **Pre Execution Conditions Precedent**:  At or before the execution and delivery of this Agreement by Lessee, Lessor shall furnish the following to Lessee in each case in form and substance satisfactory to Lessee (acting reasonably):

(a)    **Constitutional Documents**:  a certified copy of the constitutional documents of Lessor;

(b)    **Signing Authority**:  a certified copy of (x) the constitutional documents of the Lessor, (y) the resolutions of a transaction committee of the board of directors of the Lessor or other written evidence of appropriate corporate action authorizing the execution, delivery and performance of this Agreement and each other Operative

Document to which Lessor is a party and the leasing of the Aircraft hereunder and appointing a specified Person or Persons to execute this Agreement and each other Operative Document to which Lessor is a party on its behalf and (z) specimen of the signatures of each such Person;

(c)     **Know Your Customer**: all such documentation and information from the Lessor as requested by Lessee in respect of its "Know Your Customer" checks, anti-money laundering checks and any other similar requirements and all such checks and requirements shall be satisfactory to Lessee in its sole and absolute discretion;

(d)     **Process Agent Letter**: a letter from the process agent appointed by Lessor accepting such appointment;

(e)     **Owner Participant Letter**; the Owner Participant Letter executed by the Owner Participant; and

(f)     **Provisional Registration Mark**: the provisional registration mark in respect of the Aircraft issued by the Aviation Authority.

3.2     **Pre-Delivery Conditions Precedent**. On or before the Delivery Date, Lessor shall provide the following each in full force as of the Delivery Date and each in form and substance satisfactory to Lessee (acting reasonably):

(a)     **Corporate Documents**: (to the extent not provided pursuant to Clause 3.1(a) of this Schedule or amended since the date provided pursuant to Clause 3.1(a) of this Schedule): a certified copy of (x) the constitutional documents of the Lessor, (y) the resolutions of the board of directors of the Lessor or other written evidence of appropriate corporate action authorizing the execution, delivery and performance of this Agreement and each other Operative Document to which Lessor is a party and the leasing of the Aircraft hereunder and appointing a specified Person or Persons to execute this Agreement and each other Operative Document to which Lessor is a party on its behalf and (z) specimen of the signatures of each such Person;

(b)     **Approvals and Consents**: evidence of the issue of each authorization, approval, consent and notification other than the Post-Delivery Authorizations and Filings which may be required in relation to, or in connection with the performance by Lessor of any of its obligations hereunder or under any Operative Document;

(c)     **83bis Arrangement**: Lessee shall have received reasonable assurances that an article 83bis arrangement between the Irish Aviation Authority and AFAC enables Lessee to operate the Aircraft temporarily or permanently without the embodiment of the FAA SBs and with the Aircraft being maintained in accordance with Lessee's existing Maintenance Program;

(d)     **Irish Registration**: evidence that the Lessor has taken all necessary administrative steps as to permit the Aircraft to be registered with the Irish Aviation Authority immediately following Delivery;

(e)     **Irish Certificate of Airworthiness**: Lessee shall have received reasonable assurances that the Irish Aviation Authority will issue a Certificate of Airworthiness in respect of the Aircraft immediately following Delivery;

(f)     **Irish Radio License**: the radio station license issued by the Irish Commission for Communications Regulation (COMREG); and

(g)     **FAA SBs**: evidence that the Lessor has ordered from the Airframe Manufacturer the FAA SBs and that the Airframe Manufacturer has confirmed the expected date for the delivery of the FAA SBs to the Lessee.

3.3     **Delivery Conditions Precedent**. On the Delivery Date the following conditions shall be satisfied:

(a)     **Representations and Warranties**: Each of Lessor and Owner Participant shall repeat its representations and warranties set forth in this Agreement and each other Operative Document to which it is a party; and

(b)     **Aircraft Delivery**: (i) The Aircraft shall have been tendered for delivery in accordance with Clause 3.1(a), (ii) Lessee shall have received originals of this Agreement and originals (or copies if originals are not practically available) of each of the other Operative Documents, in each case, duly executed by the parties thereto (other than Lessee); (iii) the Manufacturer shall have transferred, either directly or indirectly, good and marketable title to the Aircraft to Lessor free and clear of all Security Interests, except this Agreement and any Lessor Liens; and (iv) Lessee shall have received a copy of the Manufacturer delivery documents.

4.     **Waiver**: Each of the Conditions Precedent set out in Clause 3 of this Schedule 3 is for the sole benefit of the Lessee and may be waived or deferred in whole or in part with or without conditions. If any condition precedent set out in Clause 3.1 of this Schedule is not satisfied on the date of execution of this Agreement and/or any condition precedent set out in Clause 3.2 or (c) of this Schedule is not satisfied on the Delivery Date and the Lessee (in its absolute discretion) agrees to accept delivery of the Aircraft from Lessor, Lessor shall ensure that such Conditions Precedent are fulfilled within fifteen (15) days after the Delivery Date.

5.     [[**Post Delivery Matters**: (i) Lessee shall:

(a)     within [REDACTED] Business Days after the later of (x) the Delivery Date and (y) receipt by Lessee of necessary documents from Lessor, provide to Lessor (i) a ratified and apostilled copy of this Agreement (in addition to the original and ratified set to be filed), and (ii) evidence to Lessor of the filing of this Agreement with the AFAC;

(b)     within [REDACTED] Business Days of the Aircraft first being located within Mexico, provide to Lessor an import license or certificate with respect to the Aircraft, duly authorized and issued to Lessee by the appropriate Government Entity together with any other documents Lessee may need to import the Aircraft into Mexico;

(c)     within [REDACTED] Business Days after the Delivery Date, provide to Lessor the Deregistration Power of Attorney, granted before a Mexican notary public in favor of Lessor;

(d)     within [REDACTED] Business Days of delivery of the evidence of the filing of this Agreement with the AFAC in accordance with Clause 5(a) of this **Error! Reference source not found.**, provide to Lessor a copy of the official letter(s) approving the recordation of this Agreement with the RAM;

(e)     not later than [REDACTED] days after the Delivery Date, deliver to Lessor photographic evidence that fireproof plates described in Clause 9.6(a) of the Agreement have been affixed to the Airframe and each of the Engines;

(f)     as soon as reasonably practicable, deliver to Lessor an import license or certificate with respect to the Aircraft, duly authorized and issued to Lessee by the appropriate Government Entity together with any other documents the Lessee may need to import the Aircraft into Mexico; and

(ii) Lessor shall:

(g)     as soon as reasonably practicable, effect the registrations relating to the Aircraft with the International Registry in accordance with Clause 9.5 (*Registrations and Protections*) and provide to Lessee copies of the priority search certificates of the International Registry in respect of the Airframe and each Engine evidencing such registrations.]][1]

---

[1] Subject to review by SMBC's Mexican counsel.

**SCHEDULE 4**
**FINANCIAL TERMS ANNEX (CONFIDENTIAL)**

*(NOT FOR FILING WITH THE AVIATION AUTHORITY)*

**PART A**
**BASE LEASE TERM RENT AND CERTAIN DEFINITIONS**

1.  **Base Lease Term and Rent**

    "**Base Lease Term**" means the period commencing on the Delivery Date and ending on the date falling [REDACTED] months after the Delivery Date[; provided that if the Delivery occurs on or before [REDACTED], the Base Lease Term shall mean the period commencing on the Delivery Date and ending on the date falling [REDACTED] months after the earlier of (i) [REDACTED] and (ii) the date of [REDACTED]][2].

    "**Rent**" means for each Rent Period during the Base Lease Term, the amount of [REDACTED], subject to Clause 9.5 (*Registration and Protection*) of this Agreement[; provided that if the Delivery occurs on or before [REDACTED], Rent shall mean (i) for the first Rent Period during the Base Lease Term, an amount equal to [REDACTED] divided by 31 and multiplied by the number of days from (and including) [REDACTED] to (but excluding) the date corresponding to the Delivery Date in [REDACTED] and (ii) for each subsequent Rent Period during the Base Lease Term, the amount of [REDACTED]; **provided that** (x) if the Lessee puts the Aircraft into revenue service prior to [REDACTED], then it will notify Lessor and the Rent payable in respect of the second Rent Period shall be increased by an amount equal to [REDACTED] divided by 31 and multiplied by the number of days from (and including) date of entry into revenue service to (and including) [REDACTED]][3].

2.  **Commitment Payment**

    "**Commitment Payment**" means the sum of [REDACTED].

    [REDACTED] of the Commitment Payment shall be payable by Lessee to Lessor upon execution of this Agreement. The balance of Commitment Payment shall be payable by Lessee to Lessor not later than [REDACTED] Business Days before the Delivery Date.

3.  **Damage Notification Threshold**

    For the purposes of Clause 9.2(b) (*Information – General and Financial*) and Schedule 5 (*Insurance Requirements*) of this Agreement

    "**Damage Notification Threshold**" means [REDACTED].

---

[2] NTD: Insert bracketed proviso only for [REDACTED].

[3] NTD: Insert bracketed proviso only for [REDACTED].

4.      **Insurance and Default Matters**

For the purposes of Clause 15 (*Insurance*) and Schedule 5 (*Insurance Requirements*) of this Agreement:

"**Agreed Value**" means [REDACTED].

"**Minimum Liability Coverage**" means no less than [REDACTED], each occurrence, each aircraft [REDACTED];

"**Maximum Deductible Amount**" means no more than [REDACTED].

"**Default Rate**" means [REDACTED]% per annum.

5.      [REDACTED]

[REDACTED]

6.      [REDACTED]

[REDACTED].

## PART B
## REDELIVERY MAINTENANCE PAYMENTS

**A.    Structural Check Equivalency Charge**

(a)    If the Aircraft is redelivered to Lessor on the Redelivery Date other than fresh from a 9 Year SC, Lessee shall pay Lessor, on or prior to the Redelivery Date, a Structural Equivalency Charge for the 9 Year SC calculated pursuant to the following formula:

$$A = W \times (C/B)$$

Where:

**A** is the Structural Check Equivalency Charge for the 9 Year SC.

**W** is the labor and materials cost of the 9 Year SC based on (i) Lessee's costs for Boeing 737 MAX 8 aircraft 9 Year SCs over the previous [REDACTED] years, (ii) if not enough data is available or if Lessee and Lessor are in dispute on such cost, then the average of [REDACTED] invoices for such work from reputable maintenance providers who are FAA/EASA approved repair stations to accomplish such a Structural Check, [REDACTED] to be provided by Lessee, and [REDACTED] to be provided by Lessor, or (iii) if not enough recent invoices are available, then Lessee's costs for an equivalent Boeing 737-800 aircraft structural check. The value of each such invoice shall be increased at a rate of [REDACTED] per annum where it is more than [REDACTED] at the Redelivery Date.

**B** is the total interval of calendar months (or Cycles or Flight Hours, whichever is applicable and most limiting) between 9 Year SCs as provided in Lessee's then current Maintenance Program at redelivery.

**C** is the actual number of calendar months (or Cycles or Flight Hours, if applicable, accumulated by the Aircraft) since the Aircraft's last 9 Year SC (or if there has been no such 9 Year SC, since new).

(b)    If the Aircraft is redelivered to Lessor on the Redelivery Date other than fresh from a 12 Year SC, Lessee shall pay Lessor on or prior to the Redelivery Date a Structural Equivalency Charge for the 12 Year SC calculated pursuant to the following formula.

$$A = W \times (C/B)$$

Where:

**A** is the Structural Check Equivalency Charge for the 12 Year SC.

**W** is the labor and materials cost of the 12 Year SC based on (i) Lessee's costs for Boeing 737 MAX 8 aircraft 12 Year SCs over the previous [REDACTED] years, (ii) if not enough data is available or if Lessee and Lessor are in dispute on such cost, then the average of [REDACTED] recent invoices for such work from reputable maintenance providers who

are FAA/EASA approved repair stations to accomplish such a Structural Check, [REDACTED] to be provided by Lessee, and [REDACTED] to be provided by Lessor, or (iii) if not enough recent invoices are available, then Lessee's costs for an equivalent Boeing 737-800 aircraft structural check. The value of each such invoice shall be increased at a rate [REDACTED] per annum where it is more than [REDACTED] at the Redelivery Date.

**B** is the total interval of calendar months (or Cycles or Flight Hours, if applicable) between 12 Year SCs as provided in Lessee's then current Maintenance Program at redelivery.

**C** is the actual number of calendar months (or Cycles or Flight Hours, if applicable, accumulated by the Aircraft) since the Aircraft's last 12 Year SC, (or if there has been no such 12 Year SC, since new).

B.    **Landing Gear Equivalency Charge**

If a nose or main Landing Gear is not fresh from a Landing Gear Overhaul when the Aircraft is redelivered to Lessor, Lessee shall pay Lessor a Landing Gear Equivalency Charge in respect of that Landing Gear calculated pursuant to the following formula:

$$A = W \times (C/B)$$

Where:

**A** is the Landing Gear Equivalency Charge for that Landing Gear.

**W** is the cost of accomplishment of a Landing Gear Overhaul in respect of that Landing Gear based on (i) Lessee's costs for Landing Gear Overhauls of landing gear of the same type as such Landing Gear over the previous [REDACTED] years, (ii) if not enough data is available or if Lessee and Lessor are in dispute over such cost, then the rate shall be based on the average of [REDACTED] recent invoices for such work from reputable maintenance providers who are EASA/FAA approved repair stations to accomplish such work ([REDACTED] to be provided by Lessee and [REDACTED] to be provided by Lessor), or (iii) if not enough recent invoices are available, then the rate shall be based on Lessee's costs for an equivalent Boeing 737-800 aircraft landing gear overhaul for the corresponding landing gear. The value of each such invoice shall be increased at a rate of [REDACTED] per annum where it is more than [REDACTED] at the Redelivery Date.

**B** is the total interval of months, Cycles or Flight Hours, whichever is applicable and most limiting, between Landing Gear Overhauls for that Landing Gear as provided in Lessee's then current Maintenance Program at redelivery.

**C** is the actual number of months (or Cycles or Flight Hours, as applicable, accumulated by that Landing Gear) since that Landing Gear's last Landing Gear Overhaul (or if there has been no such Landing Gear Overhaul, since new).

C.    **Engine LLP Equivalency Charge**

If an Engine LLP does not have one hundred per cent of the Manufacturer's approved Cycle life remaining when the Aircraft is redelivered to Lessor, Lessee shall pay Lessor an Engine LLP Equivalency Charge in respect of that Engine LLP calculated pursuant to the following formula:

$$A = W \times (C/B)$$

Where:

**A** is the Engine LLP Equivalency Charge for that Engine LLP.

**W** is Engine Manufacturer's published list price for that Engine LLP at the time of redelivery.

**B** is the then current Cycle life limit for that Engine LLP as referenced in the Engine Manufacturer's Maintenance Manual Chapter 5; provided however, if Lessor has accepted an extended hard life Cycle limit pursuant to Clause E of Schedule 8 (*Redelivery Conditions*) for that Engine LLP, then such extended hard life Cycle limit shall be used instead.

**C** is the actual number of Cycles accumulated by that Engine LLP since new at redelivery.

D.    **Engine Equivalency Charge**

If an Engine Major Module on an Engine has operated since last Engine Major Module Performance Restoration or has never had an Engine Major Module Performance Restoration when the Aircraft is redelivered to Lessor, Lessee shall pay an Engine Equivalency Charge in respect of that Engine Major Module calculated pursuant to the following formula:

$$A = W \times P \times (C/B)$$

Where:

**A** is the Engine Equivalency Charge for that Engine Major Module.

**W** is the cost of accomplishment of an Engine Performance Restoration for that Engine (excluding Engine LLP costs) which shall be the average of [REDACTED] time and material invoices or quotations provided by FAA and EASA approved maintenance providers or the Engine Manufacturer ([REDACTED] to be provided by Lessor and [REDACTED] to be provided by Lessee) for completing Engine Performance Restoration of a mature engine of the same make and model as such Engine operating in an equivalent environment and at thrust level as, and at a similar Flight Hour to Cycle ratio to, such Engine. The cost of any such invoices which are dated on or before the last release of the parts catalogue from the Engine Manufacturer will be increased to the catalogue year at the

Redelivery Date by applying an escalation equal to [REDACTED] of the escalation applicable to the catalogue price of the gas path airfoils.

**P** is [REDACTED]. If either Lessee or Lessor request a re-evaluation of these percentages for each Engine Major Module more than six months before the Expiry Date, the parties will make good faith efforts to agreed revised percentages and if they are unable to agree, they will jointly request the Engine Manufacturer to provide the percentages for the Engine Major Modules and the percentages provided by the Engine Manufacturer shall be the percentages used in determining the Engine Equivalency Charge.

**B** is the Flight Hour mean-time between removals of such Engine for an Engine Major Module Performance Restoration of such Engine Major Modules LMG based on Lessee's experience in its fleet of a mature engine of the same make and model as such Engine operating in an equivalent environment and at thrust level as, and at a similar Flight Hour to Cycle ratio to, such Engine.

**C** is the actual number of Flight Hours accumulated by that Engine Major Module since its last Engine Major Module Performance Restoration (or if there has been no such performance restoration, since new).

E.    **APU Equivalency Charge**

If the APU has operated since the last APU Overhaul Shop Visit or has never had an APU Overhaul Shop Visit when the Aircraft is redelivered to Lessor, Lessee shall pay Lessor an APU Equivalency Charge calculated pursuant to the following formula:

$$A = W \times (C/B)$$

Where:

**A** is the APU Equivalency Charge.

**W** is the cost of accomplishment of an APU Overhaul Shop Visit based on (i) Lessee's average cost for APU Overhaul Shop Visits of auxiliary power units of the same type as the APU over the previous [REDACTED] years, or (ii) if not enough data is available or if Lessee and Lessor are in dispute over such cost, then the rate shall be based on the average of [REDACTED] recent time and material invoices for such work from reputable maintenance providers who are EASA/FAA approved repair stations to accomplish such work ([REDACTED] to be provided by Lessee and [REDACTED] to be provided by Lessor). The value of each such invoice shall be increased at a rate of [REDACTED] per annum where it is more than [REDACTED] at the Redelivery Date.

**B** is the by Lessee's average APU Hour interval between APU Overhaul Shop Visits for auxiliary power units of the same type as the APU over the last [REDACTED].

**C** is the actual number of APU Hours accumulated by the APU since its last APU Overhaul Shop Visit (or if there has been no such APU Overhaul Shop Visit, since new).

For each of the above Redelivery Maintenance Payment items, the invoices or quotations provided by Lessee or Lessor shall contain sufficient detail so as to evidence that such invoice or quotation reflects the relevant workscope in a manner to be consistent with the required performance restoration visit or check, as defined.

## SCHEDULE 5
## INSURANCE REQUIREMENTS

**Types of Insurance**

1.      The Insurances required to be maintained are as follows:

      (a)      Hull All Risks of loss or damage while flying and on the ground with respect to the Aircraft on an agreed value basis for the Agreed Value and with a deductible not exceeding the Maximum Deductible Amount each claim, or such other amount agreed by Lessee and Lessor from time to time, it being agreed that any deductible in excess of the Maximum Deductible Amount may be covered by a deductible buy-down insurance policy;

      (b)      Hull War and Allied Perils, being such risks excluded from the Hull All Risks Policy to the fullest extent available from the leading international insurance markets, including confiscation and requisition by the State of Registration, for the Agreed Value;

      (c)      All Risks (including War and Allied Risk except when on the ground or in transit other than by air) property insurance on all Engines and Parts when not installed on the Aircraft on an "agreed value" basis for their full replacement cost and including engine test and running risks;

      (d)      Aircraft Third Party, Property Damage, Passenger, Baggage, Cargo and Mail and Airline General Third Party (including Products) Legal Liability for a combined single limit (bodily injury/property damage) of an amount not less than the Minimum Liability Coverage for the time being for any one occurrence each aircraft (but in respect of products and personal injury liability, this limit shall be an aggregate limit for any and all losses occurring during the currency of the policy). War and Allied Risks are also to be covered under the policy to the fullest extent available from the leading international insurance markets (which coverage shall include but not be limited to an extended war risk coverage endorsement equivalent to the terms of AVN52E but for a combined single limit of an amount not less than the Minimum Liability Coverage).

**Terms of Hull and Spares Insurance**

2.      All required hull and spares insurance, so far as it relates to the Aircraft, will:

      (a)      **Additional Assureds**: name the Lessor, Owner Participant and any Financing Parties Representative for their respective rights and interests;

      (b)      **Settlement of Losses**: name Lessor (or, if Lessor so notifies Lessee, the Financing Parties Representative) as (sole) Loss Payee for the Agreed Value in respect of any Total Loss of the Aircraft or Airframe for an amount equal to the Agreed Value, and **provided that** any such Total Loss will be settled with Lessor (or, if applicable, the Financing Parties Representative) and will be payable in Dollars directly to

Lessor (or, if applicable, the Financing Parties Representative) as sole Loss Payee (or, if applicable, the Financing Parties Representative) may direct and further **provided that** where proceeds do not relate to a Total Loss of the Aircraft or the Airframe such proceeds will be applied in accordance with Clause 6(b) of this Schedule 5 and where the loss does not exceed the Damage Notification Threshold and Lessor has not notified the insurers to the contrary due to the continuance of an Event of Default, the loss will be settled with and paid to Lessee;

(c) **50/50 Provision**: if separate hull "all risks" and "war risks" insurances are arranged, include a 50/50 provision in accordance with market practice (AVS 103 is the current market language);

(d) **No option to Replace**: confirm that the insurers are not entitled to replace the Aircraft in the event of an insured Total Loss; and

(e) **Engines**: provide that the Agreed Value of the Aircraft shall be automatically increased to include the value of any engine attached to the Airframe which is not an Engine.

## Terms of Liability Insurance

3.    All required liability insurances will:

(a) **Additional Insureds**: name the Indemnitees and the Financing Parties Representative (if any) for their respective rights and interests;

(b) **Severability**: include a severability of interests clause which provides that the insurance, except for the limit of liability, will operate to give each insured the same protection as if there was a separate policy issued to each insured;

(c) **Primary Policy**: contain a provision confirming that the policy is primary without right of contribution, and the liability of the insurers will not be affected by any other insurance of which any Indemnitee or Lessee may have the benefit so as to reduce the amount payable to the additional insureds under such policies.

## Terms of All Insurances

4.    All Insurances will:

(a) **Prudent Industry Practice**: be in accordance with prudent industry practice of persons operating similar aircraft in similar circumstances;

(b) **Dollars**: provide cover denominated in dollars and any other currencies which Lessor may reasonably require in relation to liability insurance;

(c) **Worldwide**: operate on a worldwide basis subject to such limitations and exclusions as are customary in insurance coverages carried by major air carriers operating similar aircraft in similar circumstances;

(d)    **Acknowledgement**: acknowledge the insurer is aware of this Agreement and that the Aircraft is owned by Lessor and to the extent applicable mortgaged to the Financing Parties Representative (if any);

(e)    **Breach of Warranty**: provide that, in relation to the interests of each of the additional insureds, the Insurances will not be invalidated by any act or omission by Lessee, or any other Person other than the respective additional insureds seeking protection and shall insure the interests of each of the additional insureds regardless of any breach or violation by Lessee, or any other Person other than the respective additional insureds seeking protection of any warranty, declaration or condition, contained in such Insurances;

(f)    **Subrogation**: provide that the insurers will hold harmless and waive any rights of recourse against the additional assureds or to be subrogated to any rights of Lessor, the Financing Parties Representative (if any), or Lessee;

(g)    **Premiums**: provide that the additional insureds will have no obligation or responsibility for the payment of any premiums due (but reserve the right to pay the same should any of them elect so to do) and that the insurers will not exercise any right of set-off or counter-claim in respect of any premium due against the respective interests of the additional insureds other than outstanding premiums relating to the Aircraft, any Engine or Part the subject of the relevant claim;

(h)    **Cancellation/Change**: provide that the Insurances will continue unaltered for the benefit of the additional insureds for at least thirty days after written notice by registered mail or fax of any cancellation, change, event of non-payment of premium or installment thereof has been sent by insurer(s) to Lessor, Owner Participant, the Financing Parties Representative (if any), or where an insurance broker is appointed to the insurance broker who shall promptly send on such notice to Lessor, Owner Participant and the Financing Parties Representative (if any), except in the case of war risks for which seven days (or such lesser period as is or may be customarily available in respect of war risks or allied perils) will be given, or in the case of war between the five great powers or nuclear peril for which termination is automatic;

(i)    **Reinsurance**: reinsurance, as applicable, shall be placed with reinsurers and through brokers, in each case satisfying the requirements of Clause [15(b)(ii)] of the Agreement and such reinsurance will:

  (i)    be on the same terms as the original insurances and will include the provisions of this Schedule;

  (ii)    provide that notwithstanding any bankruptcy, insolvency, liquidation, dissolution or similar proceedings of or affecting the reinsured that the reinsurers' liability will be to make such payments as would have fallen due under the relevant policy of reinsurance if the reinsured had (immediately before such bankruptcy, insolvency, liquidation, dissolution or similar

proceedings) discharged its obligations in full under the original insurance policies in respect of which the then relevant policy of reinsurance has been effected; and

(iii)  contain a "cut-through" clause in the following form (or otherwise reasonably satisfactory to Lessor):

**"The Reinsurers hereby agree (at the request and with the agreement of the Reinsured) that in the event of any valid claim arising hereunder the Reinsurers shall in lieu of payment to the Reinsured, its successors in interest and assigns pay to the person named as loss payee in accordance with Loss Payable Clause under the original insurances effected by the Insured that portion of any loss due for which the Reinsurers would otherwise be liable to pay the Reinsured (subject to proof of loss), it being understood and agreed that any such payment by the Reinsurers shall fully discharge and release the Reinsurers from any and all further liability with such claim.**

**The Reinsurers reserve the right to set off against any claim payable hereunder in accordance with this clause any outstanding premiums due on the reinsurance in respect of the Aircraft.**

**Payment shall be made under this reinsurance notwithstanding any bankruptcy, insolvency, liquidation or dissolution of the Reinsured, and/or that the original Insurer has made no payment under the original insurance policies.**

**Subject any payment due under this clause shall not contravene any law or decree of the Government of Mexico or any other applicable jurisdiction;"**

(j)  **Initiating Claims**: contain a provision entitling Lessor or any insured party to initiate a claim under any policy in the event of the refusal or failure of Lessee to do so; and

(k)  **Indemnities**: accept and insure the indemnity provisions of this Agreement.

**Deductibles**

5.  Lessee shall be responsible for any and all deductibles under the Insurances.

**Application of Insurance Proceeds**

6.  The Insurances will be endorsed to provide for payment of proceeds as follows:

(a)  **Total Loss**: all insurance payments received as the result of a Total Loss occurring during the Term will be paid to or as directed by Lessor and Lessor will pay the balance of those amounts to Lessee after deduction of the Agreed Value and all

other amounts which may be or become payable by Lessee to Lessor under this Agreement;

(b)    **Other Loss/Damage**: all insurance proceeds of any property, damage or loss to the Aircraft, any Engine or any Part occurring during the Term not constituting a Total Loss will be applied in payment (or to reimburse Lessee) for repairs or replacement property upon Lessor being satisfied (acting reasonably) that the repairs or replacement have been effected in accordance with this Agreement;

(c)    **Liability Proceeds**: all insurance proceeds in respect of third party liability will be paid directly in satisfaction of the relevant liability or to Lessee in reimbursement of any payment so made; and

(d)    **Default**: notwithstanding the foregoing Clauses (a) and (b) above, if at the time of the payment of any such insurance proceeds under the insurances required under Clause 1(a), (b) or (c) of this Schedule 5, a Credit Default or an Event of Default has occurred and is continuing, all such proceeds will be paid to or retained by Lessor to be applied toward payment of any amounts which may be or become payable by Lessee pursuant to this Agreement in such order as Lessor may elect with any remainder after payment of all amounts payable hereunder or thereunder to be paid to Lessee.

To the extent that insurance proceeds are paid to Lessee, Lessee agrees to comply with the foregoing provisions and apply or pay over such proceeds as so required.

## SCHEDULE 6
## DESCRIPTION OF AIRCRAFT

In order for Lessor to be obligated to purchase the Aircraft and lease it to the Lessee on the Delivery Date and for the Lessee to lease the Aircraft from the Lessor hereunder on the Delivery, the Aircraft shall be "ex-factory, as-built" and newly ticketed by the FAA with an export certificate of airworthiness to EASA in accordance with the Airframe Manufacturer's delivery procedures and standards for new aircraft of the same model and type, and in conformity with the following specifications (other than any non-material discrepancies agreed upon by the parties acting reasonably) (which description shall not be deemed a covenant, representation, warranty or guaranty by any Lessor Party to Lessee or by Lessee to any Lessor Party with respect to the Aircraft, all of which are waived and disclaimed as provided in the Agreement), but otherwise "AS-IS, WHERE IS, WITH ALL FAULTS":

### GENERAL DESCRIPTION (MINIMUM REQUIREMENTS)

Information and values shown below are ex factory and prior to Equipment Changes pursuant to Clause 12.7(b)

| | |
|---|---|
| **Aircraft Type** | **B737 MAX 8** |
| **MTOW** | [REDACTED] **lbs** |
| **MLW** | [REDACTED] **lbs** |
| **MZFW** | [REDACTED] **lbs** |
| **Engines (2)** | **LEAP-1B**[REDACTED] |
| **Engine Thrust Rating** | [REDACTED] **lbs (Boeing Equivalent Thrust)** |
| **Configuration** | [REDACTED] **pax** |
| **Winglets** | [REDACTED] |
| **Boeing Sky Interior** | [REDACTED] |
| **ETOPS** | [REDACTED] |
| **Landing Category** | [REDACTED] |

## AIRCRAFT SPECIFICATION  (CSOS)

The  following  table  covers  14 aircraft,  of  which  [REDACTED]  aircraft  are  applicable  to  the
Lessee.   The  table  refers  to  aircraft  by  their  Boeing  Variable  number.   The  Variable  numbers
applicable  to the Lessee are as follows.

| VARIABLE NUMBER | MSN |
|-----------------|-----|
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |

[REDACTED]

**BFE**

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 01N65920 | EMERGENCY LOCATOR TRANSMITTER (ELT) | ELTA |
| 07N62351 | BRACKET, EMERGENCY LOCATOR TRANSMITTER (ELT) | ELTA |
| 110-337 | Antenna, Emergency Locator Transmitter | ACR ELECTRONICS INC |
| 1288L1000010 | MAIN CAMERA | LATECOERE |
| 1288L2000010 | SLAVE CAMERA | LATECOERE |
| 1288L4000010 | Control Panel | LATECOERE |
| 2246600-01 | AIRCRAFT LOCAL AREA NETWORK (AirLAN) | TELEDYNE CONTROLS INC |
| 2246690-01 | ANTENNA, WLAN | TELEDYNE CONTROLS INC |
| 3710CV99-31-011 | STD | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-021 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-031 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-041 | NO RECLINE, TABLE LATCH OPENS I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-051 | NARROW, NO RECLINE, SPECIAL EXIT CUSHION, NO ARMREST O/B, TABLE LATCH OPENS I/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-061 | NARROW, SPECIAL EXIT CUSHION, NO ARMREST O/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-071 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-081 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-091 | NARROW, NARROW BACKREST, LOWER LIT. POCKET I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-111 | NARROW, SPECIAL SEATLEG | RECARO AIRCRAFT SEATING DIVISION |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 3710CV99-31-211 | IAT NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-011 | STD | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-031 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-041 | NO RECLINE, TABLE LATCH OPENS I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-051 | NARROW, NO RECLINE, SPECIAL EXIT CUSHION, NO ARMREST O/B, TABLE LATCH OPENS I/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-061 | NARROW, SPECIAL EXIT CUSHION, NO ARMREST O/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-071 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-081 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-091 | NARROW, NARROW BACKREST, LOWER LIT. POCKET I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-211 | IAT NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 379-0620-010 | ATTENUATOR (4.8 dB) | ROCKWELL COLLINS |
| 379-0620-030 | EQUALIZER (4.8 dB) | ROCKWELL COLLINS |
| 38-10300-1-01 | PROVISIONS KIT - TELAIR SLIDING CARPET, 737-8 AFT CARGO | TELAIR |
| 38-10300-2-06 | TELAIR SYSTEM KIT | TELAIR |
| 441-2064-100 | System Interface Unit (SIU) | ROCKWELL COLLINS |
| 441-2067-100 | Cabin Wireless Access Point (CWAP) | ROCKWELL COLLINS |
| 442-2938-001 | HARNESS ASSEMBLY, B737, CWAP1 TO DISC | ROCKWELL COLLINS |
| 442-2939-001 | HARNESS ASSEMBLY, B737, CWAP2 TO DISC | ROCKWELL COLLINS |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 442-2940-001 | HARNESS ASSEMBLY, B737, CWAP3 TO DISC | ROCKWELL COLLINS |
| 442-2941-001 | HARNESS ASSEMBLY, B737, CWAP4 TO DISC | ROCKWELL COLLINS |
| 442-2943-001 | CABLE ASSEMBLY, MAIN PORT TO DISCONNECT | ROCKWELL COLLINS |
| 4491024-010 | PULSE 11 CU FT WITH FLOW INDICATOR | ROCKWELL COLLINS |
| 452-3052 | FRAME ASSEMBLY, TOP (406) | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 452-5050 | MOUNTING TRAY ASSEMBLY | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 452-5052 | 406 MOUNTING CAP ASSEMBLY | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 453-0161 | Emergency Locator, Control Panel | ACR ELECTRONICS INC |
| 453-5004 | EMERGENCY LOCATOR TRANSMITTER (B406-4) | ACR ELECTRONICS INC |
| 453-6501 | ELT/NAV INTERFACE UNIT | ACR ELECTRONICS INC |
| 476288 | FIRE EXTINGUISHER, 2-BTP | KIDDE GRAVINER LTD |
| 501510-5801A-3 | GALLEY 1 | DRIESSEN |
| 501520-6301A-60 | GALLEY 2 | DRIESSEN |
| 501540-7201A-3 | GALLEY 4B | DRIESSEN |
| 611-6013-04 | Emergency Locator, Antenna Cable | ACR ELECTRONICS INC |
| 611-6052 | Emergency Locator, Antenna Cable | ACR ELECTRONICS INC |
| 622-5129-802 | Weather Radar Control Panel, Single | ROCKWELL COLLINS |
| 622-5137-601 | WEATHER RADAR FLAT PLATE ANTENNA | ROCKWELL COLLINS INC |
| 622-5342-101 | AMPLIFIER, ARINC 715 | ROCKWELL COLLINS INC |
| 622-8973-001 | TRAFFIC ALERT AND COLLISION AVOIDANCE SYSTEM (TCAS) ANTENNA | ROCKWELL COLLINS INC |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 63600-101 | LIFE VEST,  ADULT/CHILD | AIR CRUISERS  CO |
| 63600-501 | LIFE VEST,  CREW | AIR CRUISERS  CO |
| 63600-501 | LIFE VEST,  CREW | AIR CRUISERS  CO |
| 64300-208 | headset-boommic telex | TELEX  CORP |
| 701-10300-00 | ICS-300  SATELLITE  DATA UNIT (SDU) | ROCKWELL  COLLINS  INC |
| 701-10600-00 | SDU CONFIGURATION  MODULE  (SCM) | ROCKWELL  COLLINS  INC |
| 7500 | GLOVES,  FIRE | TIGHITCO  INC |
| 8055515-4507 | Printer, Multi-Input, ARINC 740 | ASTRONOVA  INC |
| 810-0264-355 | 23 CMU SW - CORE,  V, A (DISK) | ROCKWELL  COLLINS  INC |
| 815-5679-505 | CMU CORE  SOFTWARE | ROCKWELL  COLLINS |
| 815-7568-108 | 23 CMU DATABASE  S/W - SITA ONLY  VDL VM CPCI | ROCKWELL  COLLINS |
| 815-7568-502 | VM DATABASE SW - SITA ONLY | ROCKWELL  COLLINS  INC |
| 8202-01-7000 | Oven Rack | SELL GMBH ZODIAC ELE INSERTS  EUROPE |
| 8202-01-8000 | OVEN  TRAY | SELL GMBH ZODIAC ELE INSERTS  EUROPE |
| 8203-02-7000 | Oven Rack | SELL GMBH ZODIAC ELE INSERTS  EUROPE |
| 8203-02-8000 | Oven Tray | SELL GMBH ZODIAC ELE INSERTS  EUROPE |
| 822-0299-001 | AUTOMATIC DIRECTION FINDER (ADF)  RECEIVER | ROCKWELL  COLLINS  INC |
| 822-0334-003 | LRRA  Transceiver | ROCKWELL  COLLINS  INC |
| 822-0987-004 | HF ANTENNA  COUPLER | ROCKWELL  COLLINS |
| 822-0990-004 | HF COMMUNICATION  TRANSCEIVER | ROCKWELL  COLLINS |
| 822-1239-151 | COMMUNICATIONS      MANAGEMENT  UNIT | *ROCKWELL  COLLINS  *ROCKWELL  COLLINS  INC |
| 822-1287-101 | VHF                  COMMUNICATIONS  TRANSCEIVER | ROCKWELL  COLLINS  INC |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 822-1338-205 | AIR TRAFFIC CONTROL (ATC) TRANSPONDER | ROCKWELL COLLINS INC |
| 822-1424-001 | AIRPLANE PERSONALITY MODULE (APM) | *ROCKWELL COLLINS<br>*ROCKWELL COLLINS INC |
| 822-2127-101 | WXR TRANSMITTER MODULE (RTM) | ROCKWELL COLLINS INC |
| 822-2130-001 | WXR ANTENNA DRIVE (DRV) | ROCKWELL COLLINS INC |
| 822-2325-001 | DISTANCE MEASURING EQUIPMENT (DME) INTERROGATOR | ROCKWELL COLLINS INC |
| 822-2532-100 | MULTI-MODE RECEIVER (MMR) - GLU-2100 | COLLINS AEROSPACE |
| 822-2911-002 | TRAFFIC ALERT AND COLLISION AVOIDANCE SYSTEM (TCAS) COMPUTER | ROCKWELL COLLINS INC |
| 822-3150-101 | WXR PROCESSOR (WRP) | ROCKWELL COLLINS INC |
| 822-5404-001 | AUTOMATIC DIRECTION FINDER (ADF) ANTENNA | ROCKWELL COLLINS INC |
| 8301-01-0000-01 | Oven | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 8303-01-0000-01 | Convection Oven | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 831-9135-001 | 23 CMU SW - CORE, V, A (DISK) | ROCKWELL COLLINS INC |
| 832-9548-012 | CMU CORE SOFTWARE | ROCKWELL COLLINS INC |
| 832-9929-104 | AOC SW, AOA CMU | ROCKWELL COLLINS INC |
| 832-9929-501 | CMU AOC SOFTWARE | ROCKWELL COLLINS |
| 892480 | FIRE EXTINGUISHER, WATER | WALTER KIDDE AEROSPACE INC |
| 90000380-1 | FUSELAGE MOUNTED ANTENNA (FMA) | HONEYWELL |
| 9002-01-4000-01 | Coffee Pot | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 903-1341 | Hand Microphone | ELECTRO VOICE INC |
| 903-1342 | Hand Microphone | ELECTRO VOICE INC |
| 90400012-0002 | MODEM MANAGER (MODMAN) | HONEYWELL |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 90401121 | AIRPLANE PERSONALITY (APM) | HONEYWELL |
| 90401203 | KA-BAND RADIO FREQUENCY UNIT (KRFU) | HONEYWELL |
| 90404302 | WAVE GUIDE KIT | HONEYWELL |
| 90404303 | SEMI RIGID COAX KIT | HONEYWELL |
| 90404304 | HYDRA CABLE | HONEYWELL |
| 90404307 | L BAND COAX CABLE - RX | HONEYWELL |
| 90404308 | L BAND COAX CABLE - TX | HONEYWELL |
| 90404518 | KA-Band Aircraft Networking Unit (KANDU) | HONEYWELL |
| 9201-01-0000-01 | BEVERAGE MAKER | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 9601-01-0000-01 | Water Boiler Rail | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 971-4193-001 | DFDR Accelerometer | HONEYWELL INCORPORATED |
| 980-4750-003 | SOLID STATE DIGITAL FLIGHT DATA RECORDER (1024 WPS) | HONEYWELL |
| 980-6032-003 | COCKPIT VOICE RECORDER (2 HR CAPACITY) | HONEYWELL |
| 980-6116-001 | Microphone/Monitor | ALLIEDSIGNAL AVIONICS INC |
| ACR/EM-1A | MEGAPHONE | ACR ELECTRONICS INC |
| BB001188 | Standard Container | DRIESSEN |
| COL41-0111-0404 | 44 AWCS CONFIGURATION DATABASE | ROCKWELL COLLINS INC |
| COL4C-0087-0003 | 34 MMR OPS | COLLINS AEROSPACE |
| D5Z4-291645A | DESSO, 100% NYLON; WOVEN; LOOP | DESSO CARPETS |
| DLH1443-015 | ICE DRAWER | DRIESSEN |
| DLH1950 | ICE CONTAINER | DRIESSEN |
| E28180-20-0006 | SMOKE HOOD PBE | B E AEROSPACE SYSTEMS GMBH |
| E28180-20-0006 | SMOKE HOOD PBE | B E AEROSPACE SYSTEMS GMBH |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| E28183-04 | BRACKET, SMOKE HOOD (PBE) | B E AEROSPACE SYSTEMS GMBH |
| G6990-51 | ATC/TCAS Control Panel | GABLES ENGINEERING INC |
| G7403-03 | ADF Control Panel, Dual | GABLES ENGINEERING INC |
| G7404-124 | RADIO TUNING PANEL | GABLES ENGINEERING |
| G7501-01 | 737NG MULTI-MODE (ILS, GLS, MLS, VOR, DME) NAVIGATION CONTROL PANEL | GABLES |
| HNI30-AL41-0G00 | 44 AWCS FMA SOFTWARE | ROCKWELL COLLINS INC |
| HNI34-AL61-0A00 | 44 AWCS KRFU SOFTWARE | ROCKWELL COLLINS INC |
| HNI35-AL11-0G00 | 44 AWCS KANDU SOFTWARE | ROCKWELL COLLINS INC |
| HNI3C-CD42-0B00 | 44 AWCS APM SOFTWARE | ROCKWELL COLLINS INC |
| HNI3D-AL51-0K00 | 44 AWCS MODMAN SOFTWARE | ROCKWELL COLLINS INC |
| MF20-004 | FULL FACE CREW OXYGEN MASK | AVOX SYSTEMS INC |
| MIP2B-9992-62A1 | 44 AWCS CWAP SOFTWARE | ROCKWELL COLLINS INC |
| NA138-714C | SELCAL DECODER | AVTECH |
| P2-07-0015-002 | LED FLASHLIGHT AND BRACKET | DME CORPORATION |
| P2-07-0015-002 | LED FLASHLIGHT AND BRACKET | DME CORPORATION |
| RD-AX7370-01 | WALL MOUNT PRAM | PANASONIC |
| S-10002-1300-999117 | LIFE VEST, INFANT | SWITLIK PARACHUTE CO |
| S6-01-0005-320 | FIRST AID KIT | DME CORPORATION |
| TH513001 | Half Size Waste Cart | DRIESSEN |
| TK500037 | Full Size Cart | DRIESSEN |
| TL500033 | Half Size Cart | DRIESSEN |
| XAR39-CCB3-0102 | 44 AWCS SIU SOFTWARE | ROCKWELL COLLINS INC |

## LOPA



189 Economy Class Seats at 30-Inch Pitch
189 Total Passenger Seats
HIC

## SCHEDULE 7
## AIRCRAFT DOCUMENTS AT REDELIVERY

The Aircraft Documents shall include those as of the Delivery Date, shall include those required during the Term to comply with FAR 91.417 and FAR 129 (or any successor provisions) and shall otherwise be as detailed below.

Paper records complying with Clause [11.1(c)] provided to Lessor during the Term and in addition all other documents shall be presented in a good, legible condition and, if applicable, sorted and/or bound together in a manner appropriate to the document type, loose page documents shall be grouped together in a secure manner and in the correct numerical or chronological order. Distinct groups, packages or boxes of documents shall be numbered and labeled according to their content and a master index of all packages or boxes shall be provided. Lessee may maintain all Aircraft Documents (or any subset thereof) in electronic format; **provided that** Lessee shall send to Lessor all documentation requiring necessary stamps, endorsements, certifications and signatures in hard copy format. For the avoidance of doubt, any electronic format that has been approved by the Aviation Authority will be acceptable instead of hard copies.

All records listed in this Schedule 7 shall be provided notwithstanding any policies of the Aviation Authority that may allow the disposal of such records.

1.    **Certificates**

    (a)    Certificate of Airworthiness;

    (b)    Certificate of Registration;

    (c)    Aircraft De-Registration Confirmation (if applicable);

    (d)    Export Certificate of Airworthiness issued by the last country of registry (if applicable);

    (e)    Noise Limitation Certificate (AFM page) (if applicable);

    (f)    Noise Certificate;

    (g)    Radio License Certificate;

    (h)    Type Certificate Data Sheet (TCDS);

    (i)    Material Flammability Certification;

    (j)    Latest Maintenance Release Certificate;

    (k)    Burn Certificates (Cabin Interiors);

    (l)    Original Export C of A and original for Engines if different;

    (m)    Copy of AOC;

(n)    Certificate of Sanitary Construction.

2.    Manuals (but only to the extent that the below was supplied by the Manufacturer on or prior to the Delivery Date)

(a)    Aircraft Flight Manual;

(b)    Weight and Balance Control and Cargo Loading Manual and Supplements;

(c)    Operations Manual (Manufacturer's generic);

(d)    Quick Reference Handbook (Manufacturer's generic);

(e)    Structural Repair Manual;

(f)    Aircraft Maintenance Manual;

(g)    Component Overhaul Manuals, (MM, IPC, SRM) for the following cabin BFE, only if such BFE is not factory installed and included in the Aircraft Documents:

(i)    Galleys;

(ii)    Coffee Makers, Ovens, Hot Jugs and other galley equipment;

(iii)    Lavatories;

(iv)    Toilet Assemblies;

(v)    Closets;

(vi)    Class Dividers;

(vii)    Passenger Seats;

(h)    Aircraft Illustrated Parts Catalog (I.P.C.) (operator customized);

(i)    Operator part number to manufacturer part number cross reference, if operator maintains its own part numbering system;

(j)    Aircraft Wiring Diagrams/Wiring Diagram Manual & Wiring Practices Manual;

(k)    Electrical Standard Practice Manual;

(l)    Troubleshooting Manual;

(m)    Engine shop manual;

(n)    APU shop manual;

(o)     Fault Isolation Manual;

(p)     Schematics Manual;

(q)     Summary of Lessee's Maintenance Program;

(r)     List of Certification Maintenance Requirements;

(s)     Master Minimum Equipment List;

(t)     Configuration Deviation List;

(u)     Fault Reporting Manual (if applicable);

(v)     Aircraft Fueling Manual;

(w)     Maintenance Task Cards

(x)     Power Plant Build-up Manual.

3.    **Airworthiness Directives Documentation**

(a)     The Aircraft shall have all records associated with AD compliance:

(i)     A complete and current applicable AD status list of the Airframe and each appliance, Engine and APU Airworthiness Directive applicable to the Aircraft. This list shall include, but not be limited to:

(A)     AD number and revision number;

(B)     AD title;

(C)     Aircraft serial number, Engine serial number, APU serial number, as applicable;

(D)     Engineering documentation reference;

(E)     Manufacturer's Service Bulletin reference and cross-references where appropriate;

(F)     Date of initial accomplishment;

(G)     Date of last maintenance accomplishment, if repetitive;

(H)     The means by which compliance was accomplished (either by means of repetitive inspections, modifications or terminating action); and

(I)    Details of any alternate means of compliance, including references, intervals, and applicability;

(b)    The list shall be typed, [REDACTED];

(c)    [REDACTED] the dirty fingerprint work card completion documents [REDACTED] and the operator's internal maintenance form used to document accomplishment of the A.D; and

(d)    Exemptions or deviations granted by the Aviation Authority (or other applicable civil aviation authority with jurisdiction over the Aircraft) on AD compliance, including copy of exemption request.

## 4.    Engineering Documentation

(a)    A current list of Engine and APU Service Bulletins, Engineering Orders, major repairs and Supplemental Type Certificates accomplished on each Engine and the APU. A current list of Airframe Engineering Orders, major repairs and Supplemental Type Certificates accomplished on the Airframe. For appliances, a current list of AD related Service Bulletins, major repairs, Supplemental Type Certificates and Engineering Orders are required;

(b)    Legible copies of the [REDACTED], to include the following:

(i)    SB number and revision number;

(ii)    SB title;

(iii)    Aircraft serial number, Engine serial number, APU serial number, appliance serial number as applicable;

(iv)    Engineering documentation reference;

(v)    Manufacturer's Service Bulletin reference and cross-references where appropriate;

(vi)    Date of accomplishment of each portion of such engineering document;

(vii)    Date of last maintenance accomplishment, if repetitive;

(viii)    Statement of the means by which compliance was accomplished (e.g., modified, repaired, inspected);

(c)    [REDACTED];

(d)    [REDACTED];

(e)    [REDACTED]:

       (i)      [REDACTED];

       (ii)     [REDACTED];

       (iii)    [REDACTED];

       (iv)    [REDACTED];

       (v)     [REDACTED];

       (vi)    [REDACTED];

(f)     [REDACTED];

(g)     [REDACTED]

(h)     List of Operator implemented Modifications Incorporated (Engineering Orders applied to Airframe, Engines and Appliances). Format/content as follows:

       (i)      Operator Modifications listed in numerical order.

       (ii)     Cross reference document between Operators modification number and original engineering source /vendor document provided.

       (iii)    Air Authority/FAA/JAA/State of Manufacture type certificate data approval for modification provided.

(i)     Structural Repair File with a detailed structural Map showing exact location of all external repairs and damages indicating their status in accordance with the Manufacturers structural repair manual showing general size and location of each external repair and basis for approval). Format/content as follows:

       (i)      Records of accomplishment or compliance of each indexed repair provided as follows:

           (A)    Original signed /certified "dirty finger print" records

           (B)    Presented in binder (or binders)

           (C)    Numbered and sorted by index number

       (ii)     Records for Major Repairs or repairs that do not conform to the Manufacturer's Structural Repair Manual accompanied by the appropriate Engineering Approval document issued by the State of Manufacture [Airbus RAS] [FAA Form 8110-3] [Transport Canada AE-100 Statement]

5.    **Aircraft Maintenance Status Summaries**

(a)     Certified current Time in Service (Flight Hours & Cycles);

(b)    Certified maintenance status of the Aircraft, including Aircraft serial number, hours, cycles and days since Major Checks and applicable time remaining to Major Checks;

(c)    Certified status of structural tasks, including SSI (including last accomplished and next due);

(d)    Certified status of CPCP (including last accomplished and next due), where the CPCP is not part of the Manufacturer's SSI program;

(e)    Certified current status for all Life Limited Parts and hard time components for the Airframe, Landing Gears, Engines and APU, including back-to-birth history for all Landing Gear and Engine Life Limited Parts and, to the extent any Engine Life Limited Parts ("Engine LLPs") have been used in higher rated engines, a summary of the Flight Hours and Cycles consumed on each such Engine LLP by use on such higher rated engines(s);

(f)    Certified listing of Aircraft, Landing Gear, Engine and APU hard time components & LLPs status by P/N – S/N – Description Position – TSO - TSN, CSO – CSN, Total time, Total Cycles, next Due Time;

(g)    Certified status of all non-SB and Major Modifications/STC's including acceptable State of Manufacture Certification and/or equivalent FAA or EASA approval;

(h)    List of out of Phase Checks, Service Bulletins requiring continuous surveillance and Special Requirements (if any); and

(i)    Declaration of Aircraft Accident/Incident Report, if applicable.

6.    **Aircraft Maintenance Records**

(a)    Aircraft & Pilot maintenance log from the past [REDACTED];

(b)    Cabin maintenance log (if maintained separately from the Aircraft maintenance log) from the past [REDACTED];

(c)    All "A" Checks, "C" Checks, all systems and Structural Checks (or equivalents). In the event that a check is performed in phases, all phases necessary to constitute a complete block check are required. In the event that check content varies by multiples of the check, all multiples necessary to constitute a complete cycle are required;

(d)    Complete work card packages, tally sheets, material data sheets and maintenance releases for all Structural Checks;

(e)    Documentation and records concerning the last Aircraft major structural inspection including CPCP Tasks and Structural Sampling Inspection;

(f)      Last Weight & Balance Report including Schedule;

(g)      Compass Swing Report (if applicable);

(h)      Last Test Flight Report (if applicable);

(i)      [REDACTED];

(j)      [REDACTED];

(k)      Weighing reports;

  (i)      Each Airframe will have a signed and certified cover page including engine or module total Flight Hours, total Cycles, part total Flight Hours, total Cycles and date for each removal and installation depicting the life of the part since new. Notwithstanding, any LLPs replaced during the term of the lease will have the most recent FAA Form 8130-3 tag or EASA Form One, as applicable, used to install such LLP into the applicable Engine or module;

  (ii)     Each Landing Gear will have a signed and certified cover page including engine or module total Flight Hours, total Cycles, part total Flight Hours, total Cycles and date for each removal and installation depicting the life of the part since new. Notwithstanding, any LLPs replaced during the term of the lease will have the most recent FAA Form 8130-3 tag or EASA Form One, as applicable, used to install such LLP into the applicable Engine or module;

(l)      List of Deferred Maintenance Items (if no Deferred Maintenance Items    are "open" at transfer, a signed statement to that effect is required).

(m)      List and Status of any Out-of-Phase Checks, Special Inspection Requirements, Time Limited Repairs, etc. (If none exist or if requirements are incorporated into aircraft status reports, then a signed statement to that effect is required).

(n)      Supplemental Structural Inspection (SSID) Status (if applicable) (showing last accomplishment and next due for each task), listing the Supplemental Structural Inspections in a numerical or chronological order as applicable.

(o)      Supplemental Structural Inspection (SSID) Status (if applicable) (showing last accomplishment and next due for each task), listing the Supplemental Structural Inspections in a numerical or chronological order as applicable.

(p)      Ageing Aircraft Inspection and Modification Programme Status (showing termination status as applicable, last accomplishment and next due for each item if open) if applicable and listing Ageing Aircraft Inspection and Modification Programme Tasks in a numerical order.

(q)    Airframe inspection, maintenance, modification and repair documents with maintenance and/or inspection signatures (as required) and description of work done.

7.    **Configuration Status**

(a)    FAA or EASA approved and certified LOPA;

(b)    [REDACTED];

(c)    Emergency, Safety and Loose Equipment Layout/Listing showing description, quantity, manufacturer, part number and location;

(d)    Inventory Listing of Avionics installed units;

(e)    List of applicable STC's;

(f)    Aircraft Inspection Record;

(g)    Buyer Furnished Equipment List (if applicable and including, but not limited to seats, galley, lavatories, entertainment, cargo handling, emergency equipment.); and

(h)    Electrical Load Analysis documents and data but only if supplied by the Manufacturer on or prior to the Delivery Date.

8.    **Engine Records**

(a)    Current Disk Sheet (LLP Sheet) [REDACTED];

(b)    Complete historical engine/ module shop visit reports and Engine Module Performance Restoration reports, for all Engine Module Performance Restorations;

(c)    [REDACTED];

(d)    On Wing Repair records;

(e)    Master Records of Installation/Removals;

(f)    Last Borescope Report, including video if available;

(g)    Test Cell Run Report (if applicable);

(h)    Certified Statement that Engines are not involved in an accident/incident;

(i)    Certified "On-Watch" statement;

(j)    List of "On-Watch Items" items requiring repetitive inspections;

(k)     [REDACTED];

(l)     Engine Trend Monitoring data for the last 12 months of operation (if applicable);

(m)     Last engine run and power assurance report;

(n)     [REDACTED];

(o)     Each LLP will have [REDACTED].  Notwithstanding, any LLPs replaced during the term of the lease will have the most recent FAA Form 8130-3 tag or EASA Form One, as applicable, used to install such LLP into the applicable Engine or module;

(p)     [REDACTED]:

        (i)     [REDACTED];

        (ii)     [REDACTED];

        (iii)     [REDACTED]

(q)     [REDACTED]:

        (i)     [REDACTED];

        (ii)     [REDACTED];

        (iii)     [REDACTED].

9.    **APU**

(a)     Certified Statement on Status of APU;

(b)     [REDACTED];

(c)     Approved Release to Service Certification for installed units;

(d)     APU Log Book/ Master Record of Installation/ Removals;

(e)     APU Shop Visit Reports & reason for removal, for all APU shop visits;

(f)     [REDACTED];

(g)     Statement of APU hours to Aircraft Flying hours (if applicable);

(h)     APU Borescope Report;

(i)     Last Test Run Report;

(j)      [REDACTED];

(k)      [REDACTED];

(l)      [REDACTED]:

      (i)      [REDACTED];

      (ii)     [REDACTED];

      (iii)    [REDACTED];

(m)     [REDACTED]:

      (i)      [REDACTED];

      (ii)     [REDACTED];

      (iii)    [REDACTED]

(n)      [REDACTED].

10.    **Components**

(a)      FAA Form 8130-3 or EASA Form One for Hard Time Components;

(b)      FAA Form 8130-3 or EASA Form One for on-condition and condition monitored components;

(c)      Quick Engine Change (QEC) rotable parts list and FAA Form 8130-3 or EASA Form-One for each QEC rotable part;

11.    **Landing Gear**

(a)      [REDACTED];

(b)      [REDACTED];

(c)      Last shop visit report; and

(d)      LLP status report.

12.    **Damage and Repairs**

(a)      [REDACTED];

(b)      All repairs will be in accordance with the Manufacturer's Maintenance Manual and Manufacturer's Structural Repair Manual, or will have Manufacturer's or FAA or EASA approved data.

(c)    [REDACTED]:

       (i)    [REDACTED]

       (ii)    [REDACTED].

(d)    Copies of applicable Engineering Orders (EOs);

(e)    Copies of applicable Supplemental Type Certificates (STCs);

(f)    Copies of applicable Alternative Means of Compliance (AMOC).

13.  **Software**

(a)    A certified listing of onboard loadable software and databases to include the following:

       (i)    ATA chapter;

       (ii)    nomenclature;

       (iii)    part number;

       (iv)    revision date;

       (v)    expiration date; and

(b)    Procedures for obtaining downloadable software from the internet, if applicable

14.  Aircraft Flight and Maintenance Log Sheets (minimum of operation back to previous highest level Airframe Structural Check). Format/Content as follows:

(a)    Corrosion Prevention and Control Programme compliance documents and inspection findings as applicable including records of accomplishment or compliance provided (the original signed /certified "dirty finger print" workcards).

(b)    X-Ray Inspection findings (pictures/film) as applicable.

15.  **Miscellaneous Technical Documents**

(a)    Reference material necessary for interpretation of status summaries, i.e. Operator part numbers Cross Reference to Manufacturer's part numbers.

(b)    Interior configuration drawings as follows.

       (i)    L.O.P.A.

       (ii)    Emergency Equipment Locations

          (iii)     Galley Drawings

          (iv)     Cargo Loading System layout

(c)     Aircraft Readiness Log (or parts configuration Status document).

(d)     Loose Equipment Inventory.

(e)     Seat, cushion and fabric cover Material Burn Test documents for [FAR 25.853] [JAR25.853].

(f)     Flight Data Recorder - Print / Copy of Last Read-Out with all exceedences (if any) identified and parameter accuracy confirmed.

## SCHEDULE 8
## REDELIVERY CONDITIONS

When Lessee has complied with the conditions specified below (other than deregistration of the Aircraft from the AFAC) and Lessee has procured the issuance of an export certificate of airworthiness or its equivalent from the AFAC ("**Technical Compliance**"), Lessor shall execute and deliver to Lessee the Technical Acceptance Certificate confirming that the Aircraft complies with such conditions.  On the date Lessee receives notice of deregistration of the Aircraft from the AFAC following Technical Compliance, Lessee shall redeliver the Aircraft to Lessor at the Redelivery Location.  For the avoidance of doubt, there will be no serviceability, cycle, condition or time requirements applicable to the Aircraft, any Engine or any Part at redelivery except those specified in this Schedule.

During the period commencing [REDACTED] months and ending no less than [REDACTED] months prior to the proposed redelivery date, Lessee and Lessor will agree to conduct a pre-redelivery meeting for the purpose of reviewing the workscope for the Redelivery Check and, if applicable, any Engine, APU, or Landing Gear shop visit.

With respect to any discrepancies between the condition of the Aircraft and Aircraft Documents and the Redelivery Conditions [REDACTED], Lessee and Lessor agree that Lessee will have the option of either correcting such discrepancy at its own expense or providing compensation in lieu of such correction in an amount to be mutually agreed upon by Lessee and Lessor.

### A.     Registration & Certification, Maintenance Program & Airworthiness Directives

Immediately before the redelivery of the Aircraft, the Aircraft shall be registered with the AFAC in the name of Lessor.  Following Lessee's receipt of the AFAC Termination Letter executed by Lessor (and notarized by a Mexican notary public and/or notarized and apostilled as required by the AFAC with a Spanish translation certified by a court-approved translator), Lessee shall promptly submit the AFAC Termination Letter to the AFAC (and in any event within one Business Day of receipt by Lessee of such letter from Lessor) in order to obtain a notice of de-registration for the Aircraft.  At the time of the Technical Compliance, the Aircraft shall be [REDACTED].  As a condition to redelivery, Lessee will provide an export certificate of airworthiness or its equivalent issued by the AFAC prior to Technical Compliance with respect to the Aircraft to the Lessor.

The Aircraft shall be in compliance with the Maintenance Program, and, if requested by Lessor at the pre-redelivery planning meeting, Lessee shall perform any tasks required to bridge to the most recent revision of the Manufacturer's Maintenance Planning Document as of the date that is six (6) months prior to the end of the Term and approved by the AFAC.

The Aircraft shall be in compliance with all outstanding State of Manufacture airworthiness directives ("ADs") and FAA mandatory orders ("**FAA Mandatory Orders**") which require compliance either by means of repetitive inspections, modifications or termination action, whichever is the highest level of requirement, prior to the date of Technical Compliance. Additionally, Lessee will comply with any ADs and FAA Mandatory Orders that are issued prior to the end of the Term without regard to any extensions thereof pursuant to

Clause 18.5 which require compliance within 90 days following the last day of the Term without regard to any extensions thereof pursuant to Clause 18.5, **provided that** the cost of performing each such AD and FAA Mandatory Order requiring compliance after the last day of the Term without regard to any extensions thereof pursuant to Clause 18.5 shall be for the account of Lessor and paid to Lessee upon execution of the Redelivery Acceptance Certificate. [REDACTED].

In the event that Lessee has received a modification kit specifically associated with the Aircraft, the Engines or serialized Part on the Aircraft from any Airframe Manufacturer, Engine Manufacturer, vendor or in relation to a Manufacturer's service bulletin modification, and to the extent that any such kit is appropriate for the Aircraft and has not been installed prior to the Redelivery Date (other than as a consequence of a Total Loss) title to such kit shall be deemed to have passed to Lessor on the Redelivery Date and such kit will be delivered as cargo to Lessor; provided Lessor shall reimburse Lessee for its actual out-of-pocket costs for such kit.

## B.    General Condition

The Aircraft (which shall include the Engines and Parts as the context requires) shall be (a) in good operating condition, (b) clean by international commercial airline standards, (c) in a passenger configuration, (d) with equipment, components and systems fully functional and operating within limits under the Maintenance Program, and (e) equipped with two Engines (which may be Replacement Engines) duly installed thereon. The Aircraft shall be in compliance with Lessee's corrosion prevention and control program.

The Aircraft shall conform to the FAA type design certification.

The Aircraft will meet the requirements of the International Civil Aviation Organization Annex 16, Chapter 4 noise requirements compliance (as stated in the Aviation Authority issued noise certificate) without waiver or restriction.

Wings shall be free of fuel leaks. Any temporary leak repairs will have been replaced by permanent repairs to the extent a permanent repair is available under the AMM.

The Aircraft will have all non-structural repairs, modifications and alterations, and all external and structural repairs, accomplished in accordance with FAA approved data. "In accordance with FAA approved data" means accomplished in accordance with the Airframe Manufacturer's structural repair manual or the Airframe Manufacturer's service bulletin or the Airframe Manufacturer's written approval (with a statement of conformity to type certificate data) or FAA Supplemental Type Certificate or 8100-9 approval (issued by the Airframe Manufacturer under delegation) or in the case of the Airframe only an FAA 8110-3 issued by an FAA DER, and for the avoidance of doubt, an FAA DER, and 8110-3 shall not be acceptable for the Engines.

Soft furnishings including cockpit and galley floor coverings, floor, dado and bulkhead carpets, curtains, seat covers and seat cushions, and other cabin items where applicable will meet FAR 25 fire resistance regulations.

Cargo nets will be present and in good condition with serviceable buckles and tie-downs (normal wear and tear excepted).

The Aircraft will have all required signs and decals secure and legible.

All required safety equipment shall be installed on the Aircraft and shall be serviceable. Associated equipment stowages and brackets shall be in place in accordance with approved data.

C.    **Redelivery Check**

The Aircraft shall have completed, within [REDACTED] days prior to the Redelivery Date, the Redelivery Check, and following such Redelivery Check the Aircraft shall not be used in commercial passenger operations.

D.    **Components**

Each Flight Hour and Cycle controlled Hart-Time Component and Life-Limited Component (excluding those on the Engines, Landing Gear and APU) shall have no less time remaining than the lesser of: (a) [REDACTED], whichever is most limiting and (b) [REDACTED] of hard-time life of such component, with such intervals to be based on the Maintenance Program and the then most current revision of the Manufacturer's MPD. All "on-condition" and "condition-monitored" components will be serviceable.

E.    **Landing Gear**

Each installed Landing Gear shall have no less than [REDACTED] (whichever is the most limiting factor) life remaining to the next scheduled Landing Gear Overhaul in accordance with the Maintenance Program (the "**Hard Time Landing Gear Minimum**").

The tires, wheels and brakes will have a minimum of [REDACTED]% life remaining.

F.    **Engine LLP**

No Engine LLP shall have fewer than [REDACTED] remaining to reaching the then manufacturer's published Chapter 5 life limit (the "**Engine LLP Hard Life Cycle Minimum**"). Notwithstanding the foregoing, Lessee may request of Lessor, and Lessor shall consider in its sole discretion, the allowance of an extended hard life Cycle limit that may be achieved via the incorporation of a service bulletin or other action that may only be incorporated on-wing post-redelivery.

G.    **Engine**

Each Engine shall be certified at -1B[REDACTED] thrust or higher and will have no fewer than [REDACTED] remaining to the next Engine Major Module Performance Restoration as measured by Lessee's expected time on wing to such next Engine Major Module Performance Restoration (the "**Engine Hard Time Performance Restoration Minimum**"), which shall be determined based on Lessee's mean time between sequential

performance restoration visits of engines of the same model and a thrust rating equal to the thrust rating of the Engines at redelivery in a similar operating environment and at a similar Flight Hour to Cycle ratio.

## H.   Auxiliary Power Unit

The APU [REDACTED] in accordance with the APU Manufacturer's Maintenance Manual and any defects discovered in such inspection which exceed the APU Manufacturer's in-service limits shall be corrected at Lessee's expense.

The APU will be in [REDACTED] and have not less than [REDACTED] remaining until the next expected removal based on Lessee's mean time between APU removals and each APU Life Limited Part shall have at least [REDACTED].

## I.   [REDACTED]

Lessee may request, and Lessor shall consider [REDACTED], Lessee and Lessor shall agree, acting reasonably, [REDACTED], which cost shall be for Lessee's account. For the avoidance of doubt, any [REDACTED] which cannot be deferred until the next C Check will be corrected or performed by Lessee at its expense prior to the Redelivery Date.

## J.   Special Markings

The exterior of the fuselage, vertical stabilizer and Engine cowlings shall be stripped or sanded (rubbed down and sanded in case of composite material) and painted white with any Lessee identification marks removed or painted over and all required markings applied in accordance with the Manufacturer's then-applicable painting standards and procedures. Lessee shall be responsible at redelivery for the permanent rectification of any scribe marks which are outside manufacturer's limits. All external placards, signs and markings will be properly attached, free from damage, clean and legible.

## K.   Aircraft Documents and Aircraft Documents Review

Aircraft Documents shall be in accordance with Schedule 7.

All Aircraft Documents will be made available for Lessor's review for the period beginning that is [REDACTED] days preceding the last day of the Term and ending on the date that is [REDACTED] days preceding the last day of the Term, subject to Lessee having provided the required Aircraft Documents to Lessor. Any review of the Aircraft Documents by Lessor shall be completed during this period and during normal business hours. All technical Aircraft Documents [REDACTED]

## L.   Borescope Inspections; Power Assurance Runs; Magnetic Chip Detection Inspection

An all module hot and cold section video borescope inspection of each Engine shall be accomplished in accordance with the then current version of the AMM after all flight tests and Engine ground runs have been completed by Lessee or its representative [REDACTED]. Each Engine shall also have a max power assurance run in accordance

with the AMM and an inspection of each magnetic chip detector which shall be performed at or immediately before the Redelivery Date by Lessee or its representative at Lessee's expense and in the presence of a representative of Lessor. Lessee will provide Lessor written confirmation of the Engine power assurance test conditions and results. Lessee will provide all documentation relating to the Engine borescope inspection, including reports and videos to Lessor. No Engine shall be "on watch" for any reason requiring any special or out of sequence or reduced interval inspection. Lessee will correct any discrepancies in accordance with the guidelines set out by the Engine Manufacturer which may be discovered during such inspection. In addition, Lessee will provide [REDACTED], Lessee will, prior to redelivery, cause to be corrected such conditions which are determined to have exceeded tolerances defined for such engines of the same model in the applicable Manufacturer's Maintenance Manual or are otherwise determined to be causing such performance deterioration.

**M.    Demonstration Flight**

At Lessor's request, Lessee will perform, at its expense, and in accordance with a mutually agreed acceptance flight procedure, a demonstration flight lasting no more than two hours (except where additional time has been determined to be required by the pilot in command to properly evaluate a discrepant condition that has been observed) for the purpose of demonstrating the satisfactory operation of the Aircraft with no more than [REDACTED] of Lessor on board during such flight, subject to the Aviation Authority's restrictions. Lessee will correct, at its expense, any discrepancies found during such demonstration flight which are determined not to have been in compliance with the Maintenance Program.

**N.    Fuel**

Lessee shall have no obligation to provide any fuel or oil with respect to the Aircraft at redelivery, **provided that** any fuel or oil remaining on board the Aircraft on the Redelivery Date shall be the property of Lessor without charge.

**O.    Inspection**

The Aircraft inspection shall occur during the Redelivery Check. During the Redelivery Check, Lessor and/or its representatives will have an opportunity to observe functional and operational system checks as they are performed, and to perform a visual inspection of the Aircraft only in those areas that are visible during the Redelivery Check and concurrently as the inspection tasks are being performed by Lessee.

Immediately prior to the Redelivery Date and after completion of the Redelivery Check, Lessor shall be permitted a final non-intrusive visual inspection ("**Final Inspection**") to verify that the Aircraft is in compliance with the conditions specified in this Appendix. The Final Inspection shall be conducted at the Redelivery Location by Lessor and/or Lessor's agent. The Final Inspection shall not include opening any bays or panels and shall not include any borescopes.

**SCHEDULE 9**
**FORM OF ACCEPTANCE CERTIFICATE**

**ACCEPTANCE CERTIFICATE**
*(MSN [_____])*

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**, ("**Lessee**") hereby acknowledges that on this _____ day of _____, 20___, [●] (not in its individual capacity but solely as owner trustee) ("**Lessor**") did deliver for inspection and acceptance to Lessee under the Aircraft Lease Agreement made between Lessor and Lessee dated as of _____, 20___ (the "**Lease**") the Aircraft, as described below, together with all Aircraft Documents applicable thereto, in accordance with the Lease. Capitalized terms used but not defined herein shall have the meanings given such terms in the Lease.

1. **Aircraft Details**

   (a)    **Airframe**

   **Aircraft Model:**              Boeing 737-MAX 8

   **Manufacturer's Serial**        [_____]
   **Number:**


   **Airframe Maintenance Status:**

      **Total Flight Hours:**  _____

      **Total Cycles:**  _____

   (b)    **Engines (Installed)**

   **Engine Type**              LEAP-1B[REDACTED]

   **Manufacturer's Serial**    _____ and
   **Numbers:**                 _____

   **Maximum Takeoff Thrust**   [REDACTED]  lbs.
   **Rating (expressed in Boeing**
   **Equivalent Thrust"BET"):**

   **Engines Maintenance Status:**

   Position 1

      **ESN:**  _____

**Total Flight Hours:** _____

**Total Cycles:** _____

Position 2

**ESN:** _____

**Total Flight Hours:** _____

**Total Cycles:** _____

(c)    **APU (Installed)**

**APU Type**                          [*]

**Manufacturer's Serial Number:**          _____

**APU Maintenance Status:**

**Total APU Hours:** _____

**Total APU Cycles:** _____

(d)    **Landing Gear (Installed)**

**Manufacturer's Serial Numbers:**    Left Main: _____
Right Main: _____
Nose: _____

**Landing Gear Maintenance Status:**

Left Main

**Total Flight Hours:** _____

**Total Cycles:** _____

Right Main

**Total Flight Hours:** _____

**Total Cycles:** _____

<u>Nose</u>

**Total Flight Hours:** _____

**Total Cycles:** _____

(e)     **Interior Configuration**

     **Seating**         _____

     **Lavatories**     _____

     **Galleys**       _____

     **Passenger Service Units**   _____

(f)     **Aircraft Documents; Aircraft Manuals; Hard Time Components; Avionics; Loose Equipment Inventory**

     As identified in Attachment 1 to this Acceptance Certificate.

2.     **Acceptance for Delivery**

(a)     Lessee hereby confirms to Lessor on _____, 20__ at _____ A.M./P.M., Pacific [Daylight][Standard] time at _____, _____ that the above described Aircraft is in accordance with the specifications, terms and conditions for Delivery set forth in the Lease, or is satisfactory in all respects and is in the condition required for Delivery under the Lease.

(b)     The Scheduled Expiry Date is _____ 20_____.

(c)     Lessee confirms that the Aircraft has been inspected by its duly appointed and authorized representatives and the same conforms to the information set forth above and in the Lease.

(d)     The Lease is in full force and effect, Lessor has fully, duly and timely performed all of its obligations of every kind and nature thereunder and Lessee has no claims, offsets, deductions, set-offs or defenses of any kind or nature in connection with the Lease.

(e)     The execution and delivery of this Acceptance Certificate by Lessee (i) signifies Lessee's absolute and irrevocable acceptance by Lessee of the Aircraft under the Lease, (ii) constitutes conclusive and irrebuttable proof that the Aircraft is delivered in accordance with the description set forth in the Lease and that the Lessee has independently confirmed the same without reliance on any descriptions or representations of Lessor or anyone acting for or on behalf of Lessor, (iii) Lessee hereby expressly waives any right it may have to revoke acceptance of the Aircraft

pursuant hereto for any reason, notwithstanding any nonconformity, whether discovered, difficult of discovery, or undiscovered, on the date hereof, and (iv) Lessee hereby unconditionally and irrevocably waives its right to revoke acceptance of Delivery of the Aircraft.

(f)     The parties acknowledge and agree that the manufacture date of the Aircraft is the date of this Acceptance Certificate.

3.     **Detail Specification**

A description of the Aircraft, including its detail specification, as of this date is set forth on Annex A.

4.     **Governing Law**

THIS ACCEPTANCE CERTIFICATE SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN THE PROVISIONS OF SECTION 5-1401.

IN WITNESS WHEREOF, this Acceptance Certificate has been executed and delivered this ____ day of _____, 20__.

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**


By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

[            ]
(not in its individual capacity but solely as owner trustee)


By:  _____

Name:  _____

Title:  _____

## ANNEX A
## AIRCRAFT DESCRIPTION

Information and values shown below are ex factory and should be as amended during the lease term by Equipment Changes pursuant to Clause 12.7(b) of the Lease.

| | |
|---|---|
| **Aircraft Type** | **B737 MAX 8** |
| **MTOW** | [REDACTED] lbs |
| **MLW** | [REDACTED] lbs |
| **MZFW** | [REDACTED] lbs |
| **Engines (2)** | **LEAP-1B**[REDACTED] |
| **Engine Thrust Rating** | [REDACTED] lbs (Boeing Equivalent Thrust) |
| **Configuration** | [REDACTED] pax |
| **Winglets** | [REDACTED] |
| **Boeing Sky Interior** | [REDACTED] |
| **ETOPS** | [REDACTED] |
| **Landing Category** | [REDACTED] |

## AIRCRAFT SPECIFICATION (CSOS)

The following table covers 14 aircraft, of which [REDACTED] aircraft are applicable to the Lessee. The table refers to aircraft by their Boeing Variable number. The Variable numbers applicable to the Lessee are as follows.

| VARIABLE NUMBER | MSN |
|---|---|
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |

| VARIABLE NUMBER | MSN |
|---|---|
| [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] |

[REDACTED]

**BFE**

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 01N65920 | EMERGENCY LOCATOR TRANSMITTER (ELT) | ELTA |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 07N62351 | BRACKET, EMERGENCY LOCATOR TRANSMITTER (ELT) | ELTA |
| 110-337 | Antenna, Emergency Locator Transmitter | ACR ELECTRONICS INC |
| 1288L1000010 | MAIN CAMERA | LATECOERE |
| 1288L2000010 | SLAVE CAMERA | LATECOERE |
| 1288L4000010 | Control Panel | LATECOERE |
| 2246600-01 | AIRCRAFT LOCAL AREA NETWORK (AirLAN) | TELEDYNE CONTROLS INC |
| 2246690-01 | ANTENNA, WLAN | TELEDYNE CONTROLS INC |
| 3710CV99-31-011 | STD | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-021 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-031 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-041 | NO RECLINE, TABLE LATCH OPENS I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-051 | NARROW, NO RECLINE, SPECIAL EXIT CUSHION, NO ARMREST O/B, TABLE LATCH OPENS I/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-061 | NARROW, SPECIAL EXIT CUSHION, NO ARMREST O/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-071 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-081 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-091 | NARROW, NARROW BACKREST, LOWER LIT. POCKET I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-111 | NARROW, SPECIAL SEATLEG | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-31-211 | IAT NARROW | RECARO AIRCRAFT SEATING DIVISION |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 3710CV99-32-011 | STD | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-031 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-041 | NO RECLINE, TABLE LATCH OPENS I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-051 | NARROW, NO RECLINE, SPECIAL EXIT CUSHION, NO ARMREST O/B, TABLE LATCH OPENS I/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-061 | NARROW, SPECIAL EXIT CUSHION, NO ARMREST O/B | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-071 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-081 | NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-091 | NARROW, NARROW BACKREST, LOWER LIT. POCKET I/B ONLY | RECARO AIRCRAFT SEATING DIVISION |
| 3710CV99-32-211 | IAT NARROW | RECARO AIRCRAFT SEATING DIVISION |
| 379-0620-010 | ATTENUATOR (4.8 dB) | ROCKWELL COLLINS |
| 379-0620-030 | EQUALIZER (4.8 dB) | ROCKWELL COLLINS |
| 38-10300-1-01 | PROVISIONS KIT - TELAIR SLIDING CARPET, 737-8 AFT CARGO | TELAIR |
| 38-10300-2-06 | TELAIR SYSTEM KIT | TELAIR |
| 441-2064-100 | System Interface Unit (SIU) | ROCKWELL COLLINS |
| 441-2067-100 | Cabin Wireless Access Point (CWAP) | ROCKWELL COLLINS |
| 442-2938-001 | HARNESS ASSEMBLY, B737, CWAP1 TO DISC | ROCKWELL COLLINS |
| 442-2939-001 | HARNESS ASSEMBLY, B737, CWAP2 TO DISC | ROCKWELL COLLINS |
| 442-2940-001 | HARNESS ASSEMBLY, B737, CWAP3 TO DISC | ROCKWELL COLLINS |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 442-2941-001 | HARNESS ASSEMBLY, B737, CWAP4 TO DISC | ROCKWELL COLLINS |
| 442-2943-001 | CABLE ASSEMBLY, MAIN PORT TO DISCONNECT | ROCKWELL COLLINS |
| 4491024-010 | PULSE 11 CU FT WITH FLOW INDICATOR | ROCKWELL COLLINS |
| 452-3052 | FRAME ASSEMBLY, TOP (406) | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 452-5050 | MOUNTING TRAY ASSEMBLY | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 452-5052 | 406 MOUNTING CAP ASSEMBLY | *ACR ELECTRONICS INC<br>*ARTEX AIRCRAFT SUPPLIES INC |
| 453-0161 | Emergency Locator, Control Panel | ACR ELECTRONICS INC |
| 453-5004 | EMERGENCY LOCATOR TRANSMITTER (B406-4) | ACR ELECTRONICS INC |
| 453-6501 | ELT/NAV INTERFACE UNIT | ACR ELECTRONICS INC |
| 476288 | FIRE EXTINGUISHER, 2-BTP | KIDDE GRAVINER LTD |
| 501510-5801A-3 | GALLEY 1 | DRIESSEN |
| 501520-6301A-60 | GALLEY 2 | DRIESSEN |
| 501540-7201A-3 | GALLEY 4B | DRIESSEN |
| 611-6013-04 | Emergency Locator, Antenna Cable | ACR ELECTRONICS INC |
| 611-6052 | Emergency Locator, Antenna Cable | ACR ELECTRONICS INC |
| 622-5129-802 | Weather Radar Control Panel, Single | ROCKWELL COLLINS |
| 622-5137-601 | WEATHER RADAR FLAT PLATE ANTENNA | ROCKWELL COLLINS INC |
| 622-5342-101 | AMPLIFIER, ARINC 715 | ROCKWELL COLLINS INC |
| 622-8973-001 | TRAFFIC ALERT AND COLLISION AVOIDANCE SYSTEM (TCAS) ANTENNA | ROCKWELL COLLINS INC |
| 63600-101 | LIFE VEST, ADULT/CHILD | AIR CRUISERS CO |
| 63600-501 | LIFE VEST, CREW | AIR CRUISERS CO |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 63600-501 | LIFE VEST, CREW | AIR CRUISERS CO |
| 64300-208 | headset-boommic telex | TELEX CORP |
| 701-10300-00 | ICS-300 SATELLITE DATA UNIT (SDU) | ROCKWELL COLLINS INC |
| 701-10600-00 | SDU CONFIGURATION MODULE (SCM) | ROCKWELL COLLINS INC |
| 7500 | GLOVES, FIRE | TIGHITCO INC |
| 8055515-4507 | Printer, Multi-Input, ARINC 740 | ASTRONOVA INC |
| 810-0264-355 | 23 CMU SW - CORE, V, A (DISK) | ROCKWELL COLLINS INC |
| 815-5679-505 | CMU CORE SOFTWARE | ROCKWELL COLLINS |
| 815-7568-108 | 23 CMU DATABASE S/W - SITA ONLY VDL VM CPCI | ROCKWELL COLLINS |
| 815-7568-502 | VM DATABASE SW - SITA ONLY | ROCKWELL COLLINS INC |
| 8202-01-7000 | Oven Rack | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 8202-01-8000 | OVEN TRAY | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 8203-02-7000 | Oven Rack | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 8203-02-8000 | Oven Tray | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 822-0299-001 | AUTOMATIC DIRECTION FINDER (ADF) RECEIVER | ROCKWELL COLLINS INC |
| 822-0334-003 | LRRA Transceiver | ROCKWELL COLLINS INC |
| 822-0987-004 | HF ANTENNA COUPLER | ROCKWELL COLLINS |
| 822-0990-004 | HF COMMUNICATION TRANSCEIVER | ROCKWELL COLLINS |
| 822-1239-151 | COMMUNICATIONS MANAGEMENT UNIT | *ROCKWELL COLLINS *ROCKWELL COLLINS INC |
| 822-1287-101 | VHF COMMUNICATIONS TRANSCEIVER | ROCKWELL COLLINS INC |
| 822-1338-205 | AIR TRAFFIC CONTROL (ATC) TRANSPONDER | ROCKWELL COLLINS INC |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 822-1424-001 | AIRPLANE PERSONALITY MODULE (APM) | *ROCKWELL COLLINS<br>*ROCKWELL COLLINS INC |
| 822-2127-101 | WXR TRANSMITTER MODULE (RTM) | ROCKWELL COLLINS INC |
| 822-2130-001 | WXR ANTENNA DRIVE (DRV) | ROCKWELL COLLINS INC |
| 822-2325-001 | DISTANCE MEASURING EQUIPMENT (DME) INTERROGATOR | ROCKWELL COLLINS INC |
| 822-2532-100 | MULTI-MODE RECEIVER (MMR) - GLU-2100 | COLLINS AEROSPACE |
| 822-2911-002 | TRAFFIC ALERT AND COLLISION AVOIDANCE SYSTEM (TCAS) COMPUTER | ROCKWELL COLLINS INC |
| 822-3150-101 | WXR PROCESSOR (WRP) | ROCKWELL COLLINS INC |
| 822-5404-001 | AUTOMATIC DIRECTION FINDER (ADF) ANTENNA | ROCKWELL COLLINS INC |
| 8301-01-0000-01 | Oven | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 8303-01-0000-01 | Convection Oven | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 831-9135-001 | 23 CMU SW - CORE, V, A (DISK) | ROCKWELL COLLINS INC |
| 832-9548-012 | CMU CORE SOFTWARE | ROCKWELL COLLINS INC |
| 832-9929-104 | AOC SW, AOA CMU | ROCKWELL COLLINS INC |
| 832-9929-501 | CMU AOC SOFTWARE | ROCKWELL COLLINS |
| 892480 | FIRE EXTINGUISHER, WATER | WALTER KIDDE AEROSPACE INC |
| 90000380-1 | FUSELAGE MOUNTED ANTENNA (FMA) | HONEYWELL |
| 9002-01-4000-01 | Coffee Pot | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 903-1341 | Hand Microphone | ELECTRO VOICE INC |
| 903-1342 | Hand Microphone | ELECTRO VOICE INC |
| 90400012-0002 | MODEM MANAGER (MODMAN) | HONEYWELL |
| 90401121 | AIRPLANE PERSONALITY (APM) | HONEYWELL |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| 90401203 | KA-BAND RADIO FREQUENCY UNIT (KRFU) | HONEYWELL |
| 90404302 | WAVE GUIDE KIT | HONEYWELL |
| 90404303 | SEMI RIGID COAX KIT | HONEYWELL |
| 90404304 | HYDRA CABLE | HONEYWELL |
| 90404307 | L BAND COAX CABLE - RX | HONEYWELL |
| 90404308 | L BAND COAX CABLE - TX | HONEYWELL |
| 90404518 | KA-Band Aircraft Networking Unit (KANDU) | HONEYWELL |
| 9201-01-0000-01 | BEVERAGE MAKER | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 9601-01-0000-01 | Water Boiler Rail | SELL GMBH ZODIAC ELE INSERTS EUROPE |
| 971-4193-001 | DFDR Accelerometer | HONEYWELL INCORPORATED |
| 980-4750-003 | SOLID STATE DIGITAL FLIGHT DATA RECORDER (1024 WPS) | HONEYWELL |
| 980-6032-003 | COCKPIT VOICE RECORDER (2 HR CAPACITY) | HONEYWELL |
| 980-6116-001 | Microphone/Monitor | ALLIEDSIGNAL AVIONICS INC |
| ACR/EM-1A | MEGAPHONE | ACR ELECTRONICS INC |
| BB001188 | Standard Container | DRIESSEN |
| COL41-0111-0404 | 44 AWCS CONFIGURATION DATABASE | ROCKWELL COLLINS INC |
| COL4C-0087-0003 | 34 MMR OPS | COLLINS AEROSPACE |
| D5Z4-291645A | DESSO, 100% NYLON; WOVEN; LOOP | DESSO CARPETS |
| DLH1443-015 | ICE DRAWER | DRIESSEN |
| DLH1950 | ICE CONTAINER | DRIESSEN |
| E28180-20-0006 | SMOKE HOOD PBE | B E AEROSPACE SYSTEMS GMBH |
| E28180-20-0006 | SMOKE HOOD PBE | B E AEROSPACE SYSTEMS GMBH |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| E28183-04 | BRACKET, SMOKE HOOD (PBE) | B E AEROSPACE SYSTEMS GMBH |
| G6990-51 | ATC/TCAS Control Panel | GABLES ENGINEERING INC |
| G7403-03 | ADF Control Panel, Dual | GABLES ENGINEERING INC |
| G7404-124 | RADIO TUNING PANEL | GABLES ENGINEERING |
| G7501-01 | 737NG MULTI-MODE (ILS, GLS, MLS, VOR, DME) NAVIGATION CONTROL PANEL | GABLES |
| HNI30-AL41-0G00 | 44 AWCS FMA SOFTWARE | ROCKWELL COLLINS INC |
| HNI34-AL61-0A00 | 44 AWCS KRFU SOFTWARE | ROCKWELL COLLINS INC |
| HNI35-AL11-0G00 | 44 AWCS KANDU SOFTWARE | ROCKWELL COLLINS INC |
| HNI3C-CD42-0B00 | 44 AWCS APM SOFTWARE | ROCKWELL COLLINS INC |
| HNI3D-AL51-0K00 | 44 AWCS MODMAN SOFTWARE | ROCKWELL COLLINS INC |
| MF20-004 | FULL FACE CREW OXYGEN MASK | AVOX SYSTEMS INC |
| MIP2B-9992-62A1 | 44 AWCS CWAP SOFTWARE | ROCKWELL COLLINS INC |
| NA138-714C | SELCAL DECODER | AVTECH |
| P2-07-0015-002 | LED FLASHLIGHT AND BRACKET | DME CORPORATION |
| P2-07-0015-002 | LED FLASHLIGHT AND BRACKET | DME CORPORATION |
| RD-AX7370-01 | WALL MOUNT PRAM | PANASONIC |
| S-10002-1300-999117 | LIFE VEST, INFANT | SWITLIK PARACHUTE CO |
| S6-01-0005-320 | FIRST AID KIT | DME CORPORATION |
| TH513001 | Half Size Waste Cart | DRIESSEN |
| TK500037 | Full Size Cart | DRIESSEN |
| TL500033 | Half Size Cart | DRIESSEN |

| Part Number | Part Name | Supplier Name |
|---|---|---|
| XAR39-CCB3-0102 | 44 AWCS SIU SOFTWARE | ROCKWELL  COLLINS  INC |

**SCHEDULE 10**
**FORM OF RENEWAL NOTICE AND FINAL RENEWAL NOTICE**

**PART A**
**FORM OF INITIAL RENEWAL NOTICE**

[Lessee Letterhead]

To:     [●] (not in its individual capacity but solely as owner trustee) ("**Lessor**")
        [Address]


Cc:     [●] ("**Owner Participant**")

        [Address]

_____, 20__

Re:     Renewal Notice in respect of One Boeing 737-MAX 8 Aircraft bearing manufacturer serial
        number [_____] (the "**Aircraft**")

Ladies and Gentlemen:

Reference is made to that certain Aircraft Lease Agreement dated [●], 2021 (as further amended,
modified or supplemented from time to time, the "**Lease**") between Lessor and Aerovías de
México, S.A. de C.V. ("**Lessee**") in respect of the Aircraft.  Capitalized terms not defined herein
shall have the meanings provided in the Lease.

In accordance with Clause 4.2.1 of the Lease, Lessee hereby provides notice that it may exercise
its right to extend the Term of the leasing of the Aircraft under the Lease for a Renewal Lease
Term [of [REDACTED] years] [until the Aircraft's next C Check] commencing on [●] and ending
[●].

This notice is a Renewal Notice.  It is irrevocable and is an Operative Document.

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

[●]
(not in its individual capacity but solely as owner trustee)
Lessor


By: _____

Name: _____

Title: _____

## PART B
## FORM OF FINAL RENEWAL NOTICE

[Lessee Letterhead]

To:    [●] (not in its individual capacity but solely as owner trustee) ("**Lessor**")
       [Address]

Cc:    [●] ("**Owner Participant**")

       [Address]

_____, 20__

Re:    Renewal Notice in respect of One Boeing 737-MAX 8 Aircraft bearing manufacturer serial number [REDACTED] (the "**Aircraft**")

Ladies and Gentlemen:

Reference is made to that certain Aircraft Lease Agreement dated [●], 2021 (as further amended, modified or supplemented from time to time, the "**Lease**") between lessor and Aerovías de México, S.A. de C.V. ("**Lessee**") in respect of the Aircraft. Capitalized terms not defined herein shall have the meanings provided in the Lease.

In accordance with Clause 4.2.1 of the Lease, Lessee hereby exercises its right to extend the Term of the leasing of the Aircraft under the Lease for a Renewal Lease Term [of [REDACTED] years][until the Aircraft's next C Check] commencing on [●] and ending [●], which shall be the Scheduled Renewal Lease Term Expiry Date for such Renewal Lease Term.

This notice is a Renewal Notice. It is irrevocable and is an Operative Document.

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**


By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____

Acknowledged and Agreed:

[●]
(not in its individual capacity but solely as owner trustee)
Lessor

By: _____

Name: _____

Title: _____

**SCHEDULE 11**
**[REDACTED]**

[REDACTED]

**SCHEDULE 12**
**FORMS OF TECHNICAL ACCEPTANCE CERTIFICATE, AFAC TERMINATION LETTER AND REDELIVERY ACCEPTANCE CERTIFICATE**

**PART A**
**FORM OF TECHNICAL ACCEPTANCE CERTIFICATE**

This Technical Acceptance Certificate (this "Certificate") is delivered at the time and on the date set forth below by [[●] (not in its individual capacity but solely as owner trustee)] (the "Lessor") to Aerovías De México, S.A. de C.V. (the "Lessee") pursuant to the Aircraft Lease Agreement dated _____ (as amended, modified or supplemented from time to time, the "Lease") in respect of one (1) Boeing 737 MAX 8 aircraft bearing manufacturer's serial number [REDACTED] together with two (2) Leap 1B[REDACTED] engines bearing manufacturer's serial numbers _____ and _____ (the "Aircraft"). The capitalized terms used in this Technical Acceptance Certificate shall have the respective meanings given to such terms in the Lease.

1.      **Details of Acceptance**

         Lessor hereby confirms to Lessee that at _____hours on this _____ day of _____, at _____ the following aircraft is in the Redelivery Condition:

         (a)      **Airframe**

| | | | |
|---|---|---|---|
| Manufacturer and model | | | |
| Serial number | | | |
| Aircraft registration | | | |
| Cabin configuration | | | |
| Fuel on board | | | |
| Livery/Paint scheme | | | |
| Aircraft MTOW/MLW/MZFW | | | |
| Airframe TSN & CSN & Date | | | |
| TSN & CSN & Date @ last C-Check | | | |
| TSN & CSN & Date @ Airframe 6 Year Structural Check | | | |
| TSN & CSN & Date @ Airframe 12 Year Structural Check | | | |

(b)    **Engines**

|  | Engine 1 | Engine 2 |
|---|---|---|
| Manufacturer  and model |  |  |
| Thrust  rating |  |  |
| Serial  number |  |  |
| Total Flight  Hours since  new |  |  |
| Total Cycles  since  new |  |  |
| TSN at last Engine  Module  Performance  Restoration |  |  |
| CSN at last Engine  Module  Performance  Restoration |  |  |
| Date of last Engine  Module  Performance  Restoration |  |  |
| TSN @ installation |  |  |
| CSN @ installation |  |  |
| Date of Installation |  |  |
| Lowest LLP limiter  (at Redelivery) |  |  |

(c)    **Landing  Gears**

|  | Nose Landing Gear | LH MLG | RH MLG |
|---|---|---|---|
| Manufacturer |  |  |  |
| Part number |  |  |  |
| Serial  number |  |  |  |
| TSN |  |  |  |
| CSN |  |  |  |
| TSN @ last LG Overhaul |  |  |  |
| CSN @ last LG Overhaul |  |  |  |

| | | | |
|---|---|---|---|
| Date of last LG Overhaul | | | |
| TSN @ installation | | | |
| CSN @ installation | | | |
| Date of Installation | | | |
| Months Since last LG Overhaul | | | |
| Date of Manufacture | | | |

(d)    **APU**

| | |
|---|---|
| Manufacturer and model | |
| Serial number | |
| Total APU Hours | |
| Total APU Cycles | |
| Total APU Hours at last APU Performance Restoration | |
| Total APU Cycles at last APU Performance Restoration | |
| Date of last APU Performance Restoration | |
| Date of Installation | |
| Cycles Remaining on LLP Limiter | |

(e)    **Loose Equipment List**: as per list signed by Lessor and Lessee and attached at Schedule 1 hereto;

(f)    **Engine LLP sheets** signed by Lessor and Lessee and attached at Schedule 2 hereto;

(g)    **Aircraft LOPA (Layout Passenger Accommodation)** signed by Lessor and Lessee and attached at Schedule 3 hereto;

(h)    **List of Aircraft Documents** signed by Lessor and Lessee and attached at Schedule 4 hereto.

2.      **Lessor Confirmation**

Lessor confirms that the Aircraft is the in the Redelivery Condition (other than in respect of the deregistration confirmation from the Aviation Authority and export certificate of airworthiness) and Lessee shall not be responsible for any change in condition of the Aircraft or correcting any discrepancies discovered after the date hereof except to the extent that the same are attributable to Lessee's gross negligence or breach of this Agreement in respect of the operation of the Aircraft.

This Technical Acceptance Certificate may be executed and delivered by the parties hereto in separate counterparts.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Certificate to be executed in their respective corporate names by their duly authorized representatives as of the day and year first above written.

[●]

By: _____

Name: _____

Title: _____


**AEROVÍAS DE MÉXICO, S.A. DE C.V.**


By: _____

Name: _____

Title: _____

<u>ANNEX I</u>

PAYMENT AND ADJUSTMENT AMOUNTS DUE AT REDELIVERY[4]

Upon redelivery, the following is due from the Lessee to the Lessor:

1.      Equivalency Charges under Part B of the Financial Terms Annex        $_____

2.      Discrepancy compensation under the third paragraph of Schedule 8        $_____

3.      Maintenance carry-over compensation under Clause I of Schedule 8        $_____


Payments [to Lessor] should be made to the following Account Details:

Beneficiary Name:
Beneficiary Bank:
Swift Code:
Sort Code:
Account No:
IBAN:

---

[4] NTD: Revise Annex for applicable payments.

## PART B
## FORM OF REDELIVERY ACCEPTANCE CERTIFICATE

This Redelivery Acceptance Certificate (this "Certificate") is delivered at the time and on the date set forth below by [[●]] (the "Lessor") to Aerovías de México, S.A. de C.V. (the "Lessee") pursuant to the Aircraft Lease Agreement dated _____ (as amended, modified or supplemented from time to time, the "Lease") in respect of one (1) Boeing 737 MAX 8 aircraft bearing manufacturer's serial number [_____] together with two (2) Leap 1B[REDACTED] engines bearing manufacturer's serial numbers _____ and _____ (the "Aircraft"). The capitalized terms used in this Redelivery Acceptance Certificate shall have the respective meanings given to such terms in the Lease.

1.    **Details of Acceptance**

Lessor hereby confirms to Lessee that Lessor has at _____hours on this _____ day of _____, at _____ accepted the redelivery of the following aircraft "AS IS WHERE IS" in accordance with the provisions of the Lease Agreement:

(a)    **Airframe**

| Manufacturer and model | | | |
|---|---|---|---|
| Serial number | | | |
| Aircraft registration | | | |
| Cabin configuration | | | |
| Fuel on board | | | |
| Livery/Paint scheme | | | |
| Aircraft MTOW/MLW/MZFW | | | |
| Airframe TSN & CSN & Date | | | |
| TSN & CSN & Date @ last C-Check | | | |
| TSN & CSN & Date @ Airframe 6 Year Structural Check | | | |
| TSN & CSN & Date @ Airframe 12 Year Structural Check | | | |

(b)    **Engines**

|  | Engine 1 | Engine 2 |
|---|---|---|
| Manufacturer and model |  |  |
| Thrust rating |  |  |
| Serial number |  |  |
| Total Flight Hours since new |  |  |
| Total Cycles since new |  |  |
| TSN at last Engine Module Performance Restoration |  |  |
| CSN at last Engine Module Performance Restoration |  |  |
| Date of last Engine Module Performance Restoration |  |  |
| TSN @ installation |  |  |
| CSN @ installation |  |  |
| Date of Installation |  |  |
| Lowest LLP limiter (at Redelivery) |  |  |

(c)    **Landing Gears**

|  | Nose Landing Gear | LH MLG | RH MLG |
|---|---|---|---|
| Manufacturer |  |  |  |
| Part number |  |  |  |
| Serial number |  |  |  |
| TSN |  |  |  |
| CSN |  |  |  |
| TSN @ last LG Overhaul |  |  |  |
| CSN @ last LG Overhaul |  |  |  |

| | | | |
|---|---|---|---|
| Date of last LG Overhaul | | | |
| TSN @ installation | | | |
| CSN @ installation | | | |
| Date of Installation | | | |
| Months Since last LG Overhaul | | | |
| Date of Manufacture | | | |

(d)    **APU**

| | |
|---|---|
| Manufacturer and model | |
| Serial number | |
| Total APU Hours | |
| Total APU Cycles | |
| Total APU Hours at last APU Performance Restoration | |
| Total APU Cycles at last APU Performance Restoration | |
| Date of last APU Performance Restoration | |
| Date of Installation | |
| Cycles Remaining on LLP Limiter | |

(e)    **Loose Equipment List**: as per list signed by Lessor and Lessee and attached at Schedule 1 hereto;

(f)    **Engine LLP sheets** signed by Lessor and Lessee and attached at Schedule 2 hereto;

(g)    **Aircraft LOPA (Layout Passenger Accommodation)** signed by Lessor and Lessee and attached at Schedule 3 hereto;

(h)    **List of Aircraft Documents** signed by Lessor and Lessee and attached at Schedule 4 hereto.

2.    **Lessor Confirmation**

Lessor confirms to Lessee as at the time indicated above, being the Redelivery Date, the irrevocable acceptance of the Aircraft for all purposes under the Lease Agreement.

3.    **Lessee Confirmation**

Lessee confirms that its obligations under the Lease Agreement accruing prior to the date hereof, and those required to be performed after the date hereof, shall remain in full force and effect until all such obligations have been completed.

This Redelivery Acceptance Certificate may be executed and delivered by the parties hereto in separate counterparts.

This Redelivery Acceptance Certificate is executed and delivered by the parties at _____ _____.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Certificate to be executed in their respective corporate names by their duly authorized representatives as of the day and year first above written.

[●]

By: _____

Name: _____

Title: _____

**AEROVÍAS DE MÉXICO, S.A. DE C.V.**

By: _____

Name: _____

Title: _____

## ANNEX I

### PAYMENT AND ADJUSTMENT AMOUNTS DUE AT REDELIVERY[5]

Upon redelivery, the following is due from the Lessee to the Lessor:

1.    Equivalency Charges under Part B of the Financial Terms Annex       $_____

2.    [REDACTED]       $_____

3.    [REDACTED]       $_____


Payments [to Lessor] should be made to the following Account Details:

Beneficiary Name:
Beneficiary Bank:
Swift Code:
Sort Code:
Account No:
IBAN:

---

[5]    Revise Annex for applicable payments.

**PART C**
**FORM OF AFAC TERMINATION LETTER**

**LEASE TERMINATION AGREEMENT (MSN [_____])**

This Lease Termination Agreement (the "Agreement") is being entered into as of this _____ day of _____, _____ by and between _____, as lessor ("Lessor") and Aerovías de México, S.A. de C.V., as lessee ("Lessee").

Reference is hereby made to that certain Aircraft Lease Agreement dated as of _____ (the "Lease"), pursuant to which Lessor leases to Lessee one Boeing 737 MAX 8 model aircraft bearing Manufacturer's Serial Number [_____] Mexican Registration Mark [__] (including the engines, appliances and parts installed thereon; herein, collectively, the "Aircraft"). Unless otherwise indicated, all capitalized terms used herein shall have the meanings set forth in the Lease.

Lessor and Lessee hereby agree that as of the date hereof, for purposes only of obtaining the deregistration of the Aircraft from the Agencia Federal de Aviación Civil of the Secretaría de Comunicaciones y Transportes de México ("AFAC"), the Lease is terminated with respect to the Aircraft. Such termination is without prejudice to the rights and obligations of the parties accrued thereunder.

Lessee undertakes forthwith to file this Lease Termination Agreement with the AFAC to immediately cause the Aircraft to be deregistered thereof and for the issuance of a deregistration confirmation by the AFAC to [the Federal Aviation Administration of the United States of America].

This Lease Termination Agreement shall be governed by and construed in accordance with the laws of the state of New York.

This Agreement may be executed by the parties hereto in separate counterparts; each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first written above.

[Spanish translation to be inserted]

**LESSOR:** _____
**By:**


By:    _____
Name:
Title:


**LESSEE:  AEROVÍAS DE MÉXICO, S.A. DE C.V**

By:    _____
Name:
Title:


By:    _____
Name:
Title:

**SCHEDULE 13**
**FORM OF TECHNICAL  STATUS REPORT**

**AIRCRAFT SUMMARY REPORT**

**Report Period from _____ to _____**

| Aircraft  Specification | |
|---|---|
| **Manufacturer** | |
| **Type** | |
| **Model** | |
| **Serial number** | |
| **Date of Manufacture** | |
| **Current  Registration** | |
| **Current  Operator** | |
| **Aircraft  Operating  Limitation** | |

| Airframe  Status | |
|---|---|
| **Total Airframe  Hours** | |
| **Total Airframe  Cycles** | |

| Main Engines (Currently  Installed) | | |
|---|---|---|
| **Manufacturer** | | |
| **Position** | | |
| **Part  number** | | |
| **Serial number** | | |
| **Time  Since New** | | |
| **Cycles Since New** | | |

| | | |
|---|---|---|
| **Time Since OH** | | |
| **Cycles Since OH** | | |
| **Last OH Date** | | |

| Main Engines (Delivered with A/C) | | |
|---|---|---|
| Manufacturer | | |
| Aircraft or Location | | |
| Position | | |
| Part number | | |
| Serial number | | |
| Time Since New | | |
| Cycles Since New | | |
| Time Since OH | | |
| Cycles Since OH | | |
| Last OH Date | | |

| APUs (Delivered with A/C) | |
|---|---|
| Manufacturer | |
| Aircraft or Location | |
| Position | |
| Part number | |
| Serial number | |
| Time Since New | |
| Cycles Since New | |
| Time Since OH | |
| Cycles Since OH | |
| Last OH Date | |

| Installed Auxiliary Power Unit (APU) | |
|---|---|
| Manufacturer | |
| Position | |
| Part number | |
| Serial number | |
| Flight Time Since New | |
| Flight Cycles Since New | |
| Time Since OH | |
| Cycles Since OH | |
| Last OH Date | |
| APU Hours Since New | |
| APU Cycles Since New | |

| Landing Gears | |
|---|---|
| Manufacturer | |
| Position | |
| Part number | |
| Serial number | |
| Time Since New | |
| Cycles Since New | |
| Time Since OH | |
| Cycles Since OH | |
| Last OH Date | |

**SCHEDULE 14**
**FORM OF AIR TRAFFIC CONTROL LETTER**

**Air Traffic Control, Emissions Trading, and Airport Authorities Letter**

Date:   [ ], 20[__]

To:     Whom It May Concern:


Re:     *Air Navigation / Airport Charges – _____ Aircraft with Manufacturer's Serial Number [_____] (the "**Aircraft**")*

Ladies and Gentlemen,

This letter is issued to provide the authorization set out below in respect of any and all flight charges, route navigation charges, navigation service charges, environmental charges and other fees, charges, ATC/Airport Authority charges, taxes or similar charges payable to any airport, airport authority, airport managing company, navigation or flight authority or other government entity for the use of any airport facilities or for services provided in connection with the operation (including baggage handling), landing, boarding, taking-off or navigation of the Aircraft (as defined below), except for charges payable to Servicios a la Navegación en el Espacio Mexicano, collectively defined as "**Air Navigation Charges/Airport Authorities Charges**".

We hereby confirm that Aerovías de México, S.A. de C.V. d/b/a Aeroméxico (the "**Lessee**") entered into an Aircraft Lease Agreement with _____ (the "**Lessor**") dated as of _____.

We wish to enable Lessor to monitor the value of air navigation, carbon emissions, and other Air Navigation Charges/Airport Authorities Charges incurred by Lessee in relation to the Aircraft.

We hereby irrevocably and unconditionally authorize you to release to Lessor (or its duly authorized representatives) upon its request from time to time, a statement of account of all sums due by Lessee to you, as at the date of each such request, in respect of the Aircraft, and to the extent the same might result in a lien upon the Aircraft, all other aircraft operated by Lessee.

This authorization may only be revoked or amended by a written instruction signed by us and Lessor.

Yours faithfully,

**AEROVÍAS DE MÉXICO S.A. DE C.V.
d/b/a AEROMÉXICO**


By: _____        By: _____
Name:                                      Name:
Title:                                     Title:

**SCHEDULE 15 FORM OF OWNER PARTICIPANT LETTER**

[Owner Participant Letterhead]

Aerovías de México, S.A. de C.V.
Paseo de la Reforma, 243, Piso 25
Colonia Cuauhtémoc
Mexico, DF 06500
Mexico

Re: Boeing [__] Aircraft bearing manufacturer's serial number [_____] (the "**Aircraft**")

Dear Sirs:

Reference is made to the Amended and Restated Aircraft Lease Agreement dated [_____], 20[_] (the "**Lease**") between [●], not in its individual capacity, except as otherwise provided therein, but solely as owner trustee under the Trust Agreement ("**Lessor**") and Aerovías de México, S.A. de C.V. ("**Lessee**"). Words and expressions defined in the Lease shall have the same meanings when used in this letter agreement (this "**Agreement**") (unless the context otherwise requires).

1.    **Owner Participant's Representations and Warranties**

Owner Participant represents and warrants to Lessee on the date of execution of this Agreement, in each case by reference to the facts and circumstances existing on such date that:

(a)    **Status**: Owner Participant is a limited liability company duly incorporated and validly existing under the laws of Ireland and as of such date is a tax resident of Ireland for purposes of the tax treaty between Ireland and Mexico;

(b)    **Power and Authority**: Owner Participant has the power and authority to carry on its business as presently being conducted and to enter into and perform its obligations under this Agreement, has taken all necessary corporate action to authorize the entry into, the delivery of, and the performance by it of this Agreement, and this Agreement has been duly executed and delivered by Owner Participant;

(c)    **Legal validity**: this Agreement constitutes its valid, legal and binding obligation enforceable against it in accordance with its terms except insofar as enforceability may be limited by (i) applicable bankruptcy and similar laws affecting creditors' rights generally or (ii) general principles of equity;

(d)    **Non conflict**: the entry into and performance by Owner Participant of, and the transactions contemplated by this Agreement, do not: (i) conflict with any Laws or Regulations applicable to Owner Participant as of such date; or (ii) conflict with the constitutional documents of Owner Participant; or (iii) conflict with or result in default under any document which is binding upon Owner Participant or any of its assets nor result in the creation of any Security Interest over any of the Owner Participant's assets other than Lessor Liens in favor of the Financing Parties Representative;

(e)    **Approvals and Consents**: all authorizations, approvals, consents and notifications required by Owner Participant in connection with the entry into, performance, validity and enforceability of, this Agreement and the transactions contemplated hereby, have been

obtained or effected (as appropriate) and are (or will on their being obtained or effected be) in full force and effect;

(f)    **No Litigation**: no litigation, arbitration or administrative proceedings are pending or, to Owner Participant's knowledge, threatened before any court or administrative agency against Owner Participant which could reasonably be expected to have a material adverse effect upon Owner Participant's ability to perform its obligations under this Agreement;

(g)    **Lease**: Owner Participant has received a copy of the Lease and the other Operative Documents;

(h)    **Net Worth**: Owner Participant has a tangible net worth of at least US$[●][6]; and

(i)    **Sanctions**: Neither Owner Participant nor to Owner Participant's knowledge, any shareholder holding 25% or more of Owner Participant's shares, nor any director or officer of Owner Participant, is currently a Restricted Party.

2.    **Owner Participant's Covenants**

Owner Participant hereby covenants to and with Lessee that:

(a)    provided no Event of Default has occurred and is continuing under the Lease and provided that the Lease shall not have been otherwise terminated, neither it nor any Person lawfully claiming by, through or under it shall take or cause to be taken any action to interfere with Lessee's or any Permitted Sublessee's right to use, possession and quiet enjoyment of the Aircraft during the Term;

(b)    it will undertake and perform the obligations specifically ascribed to the "Owner Participant" under the Lease (whether as an Indemnitee or otherwise) as if it were a party thereto;

(c)    it will not assign, transfer, novate or otherwise dispose of all or any portion of its right, title or interest in and to the Trust Agreement, any Operative Document or the Aircraft other than in accordance with Clause 21.2 of the Lease;

(d)    it has and shall maintain in place for the term of this Agreement policies and procedures reasonably designed to promote compliance with its obligations in respect of Sanctions, Anti-Corruption Laws and applicable Laws relating to the prevention of money-laundering and the countering of terrorist financing; and

(e)    it absolutely, unconditionally and irrevocably will hold itself jointly and severally liable for all due (whether at the stated maturity, by acceleration or otherwise) and punctual payment of, performance of and compliance with all payment obligations and other covenants, agreements, terms and conditions of the Lease and the Operative Documents required to be paid, performed or complied with by Lessor (all such payment obligations and other covenants, agreements, terms and conditions, being referred to herein as the "**Obligations**").

3.    **Waiver**

---

[6] NTD: Refer to the relevant net worth in Section 21.2.   US$[REDACTED]   shall be used for the initial Owner Participant Letter.

Owner Participant unconditionally waives, to the fullest extent permitted by law, (a) notices of the creation of any Obligation under the Lease and the Operative Documents or any notice of or proof of reliance by Lessee upon this Agreement or acceptance of this Agreement (the Obligations shall conclusively be deemed to have been created, contracted, incurred or renewed, extended, amended or waived in reliance upon this Agreement and all dealings between Lessor or Owner Participant and Lessee shall be conclusively presumed to have been had or consummated in reliance upon this Agreement), (b) all notices which may be required by statute, rule of law or otherwise, now or hereafter in effect, to preserve intact any rights of Lessee against Owner Participant, including, without limitation, any demand, presentment and protest, proof of notice of non-payment under the Lease or any Operative Document, and notice of default or any failure on the part of Lessor to perform and comply with any Obligation, (c) any right to the enforcement, assertion or exercise by Lessee of any right, power, privilege or remedy conferred herein or in any Operative Document or otherwise, (d) any requirement of promptness or diligence on the part of any of Lessee, (e) any requirement on the part of Lessee to mitigate the damages resulting from any default hereunder or under the Lease or any Operative Document, (f) any right to revoke this Agreement and Owner Participant acknowledges that this Agreement is continuing in nature and applies to all Obligations, whether existing now or in the future, (g) (i) any defense arising by reason of any claim or defense based upon an election of remedies by Lessee that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of Owner Participant or other rights of Owner Participant to proceed against Lessee, any other owner participant or any other Person or any collateral and (ii) except as otherwise agreed in the Lease, any defense based on any right of set-off or counterclaim against or in respect of the obligations of Owner Participant hereunder, (h) any duty on the part of Lessee to disclose to Owner Participant any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Lessor now or hereafter known by it or (i) any other circumstance whatsoever which might otherwise constitute a legal or equitable release, defense or discharge of the liabilities of an owner participant or surety, or which might otherwise limit recourse against Owner Participant.

No delay or omission in exercising any powers or privileges hereunder shall be construed as a waiver thereof. Any exercise of any part of the rights shall not preclude subsequent enforcement of any such rights which have not, or have not fully, been exercised.

4. **Release**

(a)     The Owner Participant shall be released from its obligations under this Agreement if the Owner Participant provides to the Lessee a replacement owner participant letter (the "**Replacement Owner Participant Letter**") on substantially the same terms as contained in this Agreement from any entity with a minimum net worth of not less than [●][7].

(b)     This Agreement will terminate upon the earlier to occur of:

(i)     the expiry of the Lease or termination of the leasing of the Aircraft under the Lease, in each case, with performance in full of all of the Lessor's obligations thereunder;

---

[7] NTD: Refer to the relevant net worth in Section 21.2.

(ii)     the completion of any assignment, novation or transfer by the Lessor of its rights and obligations under the Lease, or sale or other disposition by the Lessor of its interest in the Aircraft, in accordance with the Lease; or

(iii)    the replacement of this Agreement by a Replacement Owner Participant Letter in accordance with Clause 4(a) above.

Upon such termination, the Owner Participant will have no further obligations under this Agreement but without prejudice to its obligations hereunder accrued prior to such termination.

## 5.     Governing Law

PURSUANT TO AND IN ACCORDANCE WITH SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, THE PARTIES HERETO AGREE THAT THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT, AND ALL ISSUES CONCERNING THE RELATIONSHIP OF THE PARTIES HEREUNDER AND THE ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AS APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK (EXCLUSIVE OF SECTION 7-101 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH IS INAPPLICABLE TO THIS AGREEMENT) WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES. THE PARTIES AGREE THAT THIS AGREEMENT WAS DELIVERED IN THE STATE OF NEW YORK.

## 6.     Process Agent

Without prejudice to any other mode of service, Owner Participant:

(a)     appoints Cogency Global Inc. located at 122 East 42nd Street, 18th Floor, New York, NY 10168 as its agent for service of process relating to any proceedings before any New York State court or any United States Federal court in New York in connection with this Agreement or any Operative Document and agrees to maintain the process agent notified to Lessee;

(b)     agrees that failure by a process agent to notify Owner Participant of the process shall not invalidate the proceedings concerned; and

(c)     consents to the service of process relating to any such proceedings by prepaid mailing or by personal delivery of a copy of the process to Owner Participant's agent at the address identified in Clause 6(a) above or by facsimile or prepaid mailing by air mail, certified or registered mail, or by personal delivery, of a copy of the process to Owner Participant at the address set forth in Clause 6 below.

## 7.     Miscellaneous

The provisions of clauses 22.8, 22.9, 22.10, 22.11, 23, 24.2, 24.4, 24.5, 24.6 and 24.7 of the Lease are incorporated herein *mutatis mutandis* with references to "Lessor" and "this Agreement" being reference to Owner Participant and this Agreement, respectively, and Owner Participant's notice details shall be as follows:

Address:      [_____]

[_____]

[_____]

Attention:    [_____]

Facsimile:    [_____]

Email:        [_____]

Yours faithfully

[_____]

_____

Name:

Title:

Acknowledged and Agreed:

Aerovías de México, S.A. de C.V.

_____

Name:

Title: