# FRANK OZMENT

Attorney-at-Law
frankozmentlaw@gmail.com | (205) 413 2092

February 10, 2022

Honorable Shelley C. Chapman
One Bowling Green
Courtroom 623
New York, NY 10004-1408

Re: Purdue Pharmaceutical Mediation

    **Claimants:**    Creighton Bloyd
                        Stacey Bridges
                        Charles Fitch

Dear Judge Chapman:

I represent Creighton Bloyd, Stacey Bridges, and Charles Fitch in this matter. Mr. Bloyd and Ms. Bridges timely filed claims. Mr. Fitch did not timely file a claim but objected to confirmation based on the failure of adequate notice to prisoners (he is incarcerated). Judge Drain overruled his objection on the basis that he had filed a claim.

All three of these clients are in active recovery from opioid use disorder that originated with synthetic opioids manufactured by the debtor. This letter describes some practical issues and potential solutions that may arise with respect to the mediation. The practical issues involve the position of opioid use disorder (OUD) victims, particularly those in active recovery, relative to that of the United States.

In its agreement to allow Purdue to plead guilty in the United States District Court for New Jersey, the United States agreed to forego restitution under the Mandatory Victims Restitution Act. While the MVRA might not require Purdue to pay cash money to victims, it would require Purdue to subsidize their medical and vocational recoveries. The United States contended that MVRA restitution would unnecessarily prolong the proceedings. Given that MVRA restitution creates a judicial lien, recognizing the rights of OUD victims could also have given them a preferred

1

position to unsecured creditors. As it is, the decision to forego restitution left victims entitled to restitution under the MVRA with unsecured claims, while Purdue agreed to give the United States priority liens.

The refusal to subsidize medical recovery for OUD victims has great consequences for victims in active recovery. Successful recovery from OUD generally requires at least two elements. First, the victim often needs medicine assisted therapy, which has traditionally involved buprenorphine or methadone, but may also include Vivitrol and Sublocade (a form of time released buprenorphine that is injectable and less subject to diversion than buprenorphine) or other products. Second, the victim almost always needs counseling. Some victims also need medical detoxification if they have co-morbidities but I will not treat that subject here. If a victim is Medicaid eligible and resident in a State with expanded Medicaid, they may not have to pay for these treatments. However, many victims must pay for their treatments out of their own pockets, because they live in States without expanded Medicaid or they are not Medicaid eligible. Very, very few insurance plans cover these treatments.

The reorganization plan did not anticipate directly subsidizing medical recovery. Instead, the plan anticipated making disbursements to States who can use the money for "abatement." Given that almost all States have all but criminalized OUD, many OUD victims are understandably worried about that feature of the plan. While the plan has anticipated that Purdue will manufacture buprenorphine for sale at below currently prevailing market prices, the fact is that buprenorphine is strongly contraindicated for some victims who still need medication to assist with their recovery. Moreover, Purdue has no history of manufacturing and distributing buprenorphine for use in treating OUD (although the company did manufacture the drug for use as a pain medication).

From my conversations with persons who worked in preparing the plan, I believe some of them may have been unaware of how the plan could have accommodated the needs of personal injury victims who were entitled to restitution under the MVRA. In other words, at least some were unaware of the resources available to subsidize medical recovery for those claimants. As a practical matter, the subsidy can be accomplished in a fairly straight-forward fashion using existing technologies and market practices.

Pharmacy benefit managers routinely issue mechanisms (including, but not limited to, debit cards and smart phone apps) that allow an individual patient (but no one else) to buy a particular prescription medication (but nothing else) from a pharmacy (but no other class of merchant) within the patient's zip code (but not in any other

zip code). If a claimant in recovery (or desiring to be in recovery) timely filed a claim, it would be a fairly routine matter for the manager to issue a card for claimant's prescription. Of course, these claims would be subject to some verification. Moreover, the pharmacist processing the benefit would still be responsible for verifying the claimant had a prescription. Without a prescription, the payment mechanism would have no immediate value for the claimant holding it and, in any event, would not be transferrable to anyone else who could lawfully use it.

I have conferred at length with one pharmacy benefit manager with a network of 40,000 pharmacies across the United States, including many located in rural areas. They are eager to help and may be able to negotiate substantial discounts with manufacturers. I have also conferred with a large national bank whose commercial trust department is also eager to assist. Finally, I have had some conversations with substance abuse counselors and a leading addiction medicine specialist who has not "taken sides" in the opioid litigation. They are all eager to assist as trustees or advisors. Given the nature of disbursements to buy medicine of this kind, a separate, auditable trust may be preferred, and a retired bankruptcy judge said he would be willing to assist as a trustee, provided we could work out the details of his engagement. I have omitted the names of these parties because your office has advised that my letter should be filed on the docket, rather than sent to your chambers, but will be glad to supply the names if appropriate.

On behalf of OUD victims, I objected to the plan of confirmation in the Purdue case. One objection was based on the failure of the plan to respect the rights of victims under the MVRA. Judge Drain was not unfavorably disposed toward that objection, but indicated that it must first be raised in the United States District Court of New Jersey, which has the final say on whether to accept Purdue's plea. We anticipate raising the objection there in due course.

In remarks from the bench, Judge Drain also indicated that OUD victims may be entitled to subordinate the claims of the United States based on the fact that the government was obligated to respect the right of OUD victims under the MVRA, but instead advanced its own interests. We have filed a motion to subordinate.

I believe that many claimants would elect to receive the subsidies rather than the cash amounts allowed under the personal injury trust's distributions anticipated by the original plan of reorganization, which are heavily weighted toward compensating survivors of now deceased OUD victims. I believe that many claimants would make this election even if doing so meant expressly releasing third parties, such as the Sackler family, from further liability. Managing, much less overcoming, OUD

severely challenges the financial resources of many claimants, who literally live not paycheck to paycheck, but from prescription to prescription.

The challenges that incarcerated persons with OUD encounter are particularly harsh. In facilities where they are allowed to receive MAT, the government generally pays for the treatment. While inmates cannot receive MAT in most facilities, they could likely receive telemedicine counseling, provided they could pay for it themselves. When they are released, their challenges sharply increase. Assuming they have successfully managed their OUD while in custody (the U.S. Department of Justice estimates roughly 20% of inmates use opioids while in State custody), they face serious risk of relapse upon release.  Relapse correlates very strongly with recidivism.  If the rights of incarcerated persons with OUD under the MVRA had been respected, they would have sharply increased prospects of successfully reentering the free world and remaining there.

Funding a trust to subsidize the medical recovery of OUD victims could also relieve strain on the Purdue's finances, especially if victims elected the subsidy over all or part of cash payments made immediately.  Unlike cash payments, subsidies for medical recoveries can be funded over time.  To the extent funding came from additional contributions otherwise planned to be paid to the United States pursuant to the debtor's guilty plea, the relief could be considerable. In light of the reasons associated with the motion to subordinate the interests of the United States, these additional contributions are not unreasonable.

Of course, if there were an accommodation of the interests of OUD victims (particularly those who have filed claims or who will be allowed to file late claims), I would anticipate dismissing the motion to subordinate the interests of the United States and refraining from moving for relief in the New Jersey district court.

If you believe it would be helpful to have any further conversations on any of this, please advise. My clients would be delighted to participate in the mediation, if you believe that would be helpful.   Thank you very much for all your hard work in bringing this matter to an amicable resolution.

I remain

Sincerely yours,

*/s/ Frank Ozment*