**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |

## MEDIATOR'S FOURTH INTERIM REPORT

Pursuant to paragraph 1 of the *Order Appointing the Honorable Shelley C. Chapman as Mediator*, dated January 3, 2022 [ECF No. 4260] (the "Appointment Order"), the Court appointed the Honorable Shelley C. Chapman as mediator (the "Mediator") to conduct a mediation (the "Mediation") between the Nine,[1] on the one hand, and the representatives of the Covered Parties, on the other hand (the Nine and the Covered Parties being the "Mediation Parties"), with respect to modifications of the Plan (as defined below).  By order dated January 13, 2022 [ECF No. 4286], the Court extended the Mediation to February 1, 2022. On January 31, 2022, the Mediator filed her Interim Report [ECF No. 4316], requesting an extension of the Termination Date to February 7, 2022. By order dated February 1, 2022 [ECF No. 4319], the Court extended the Termination Date to February 7, 2022. On February 8, the Mediator filed her Second Interim Report [ECF No. 4338], requesting an extension of the Termination Date to February 16, 2022.  By order dated February 8, 2022 [ECF No. 4339], the Court extended the Termination Date to February 16, 2022. On February 18, 2022, the Mediator filed her Third Interim Report [ECF No. 4369], requesting an extension of the Termination Date to February 28, 2022.  By order dated February 18, 2022 [ECF No. 4370], the Court extended the Termination Date to February 28, 2022 (the "Third Extension

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the *Mediation Terms and Conditions Order* (defined below); the *Mediator's Report* [ECF No. 3119] filed on July 7, 2021; or the *Twelfth Amended Chapter 11 Plan*, dated September 2, 2022 [ECF No. 3726] (the "Plan"), as applicable.

Order"). On March 2, 2022, the Mediator filed her Notice of Extension of Mediation *Sine Die* [ECF No. 4403] (the "Mediation Extension Notice"), extending the Termination Date of the Mediation *sine die* pursuant to paragraph 2 of the *Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman*, dated January 3, 2022 [ECF No. 4261] (the "Mediation Terms and Conditions Order").

The Mediator respectfully submits this Fourth Interim Report in accordance with the terms of the Mediation Terms and Conditions Order.

### Statement of Mediator

1.      The Mediator's Interim Report, Second Interim Report, and Third Interim Report are each incorporated herein by reference. Certain portions of such reports are highlighted below.

2.      After the Court's extension of the Termination Date of the Mediation to February 16, 2022, the Mediator formally designated certain Additional Parties pursuant to the Mediation Terms and Conditions Order. Each of these Additional Parties confirmed in writing to the Mediator that it agreed to be bound by all of the confidentiality and protective order provisions of the Mediation Terms and Conditions Order.

3.      Between February 8, 2022, and February 16, 2022, the Mediator conducted dozens of telephonic and Zoom meetings between and among the Nine. The Mediator also participated in countless email exchanges and telephone calls with the Debtors, counsel to the Debtors, and the Covered Parties to keep them appropriately apprised of the status of the Mediation. In total, the Mediator devoted approximately 55 hours of time to Mediation sessions during this period.

4.      On February 9, 2022, the Mediator contacted the Court, copying all Mediation Parties, to seek clarification with respect to the Mediation Terms and Conditions Order. Specifically, the Mediator asked the following questions: (i) is the Mediator authorized to share the

position of a Mediation Party, with that Mediation Party's consent, with Additional Parties to the

Mediation who have agreed to abide by the Protective Order, and (ii) is the Mediator authorized to

disclose a Mediation Party's position (again with its consent) in interim or final mediation reports?

Copying all Mediation Parties, the Court provided a written response to the questions posed by the

Mediator. In the Third Interim Report, the Mediator requested that the clarifications provided by

the Court be specifically incorporated into the order further extending the Termination Date, if the

extension requested by the Mediator was granted. The Third Extension Order incorporates in its

entirety the Court's February 9, 2022 emailed answer to the Mediator's February 9, 2022

questions.

5.      Between February 17, 2022, and February 28, 2022, the Mediator conducted

dozens of telephonic and Zoom meetings and participated in countless email exchanges between

and among the Nine. The Mediator also participated in countless email exchanges and telephone

calls with the Debtors, counsel to the Debtors, the Covered Parties, and certain Additional Parties.

Specifically, the Mediator was involved in negotiations from 9:00 a.m. on February 27, 2022, until

3:00 a.m. on February 28, 2022, with negotiations resuming at 8:00 a.m. on February 28, 2022,

and continuing until 1:00 a.m. on March 1, 2022. Negotiations and discussions continued

thereafter until approximately 4:00 p.m. on March 2, 2022. In total, the Mediator devoted

approximately 155 hours of time to the Mediation during this period.

6.      On February 27, 2022, the Mediator formally designated the State of New

Hampshire as an Additional Party, and, on February 28, 2022, the Mediator formally designated

certain other Additional Parties. All such parties confirmed in writing to the Mediator that they

agreed to be bound by all of the confidentiality and protective order provisions of the Mediation

Terms and Conditions Order.

7.        As the Court is aware, this is not the first mediation conducted in these cases; indeed, it is the fourth. Accordingly, it is important to acknowledge the critical role played by (i) the mediators and the parties in interest, who, earlier in these cases, designed the architecture of a plan of reorganization that would facilitate billions of dollars being dedicated exclusively to opioid abatement and victim compensation and (ii) the fifteen States who spent months negotiating an improved settlement that enabled confirmation of the Plan. Without those efforts, we would not be here today. The settlement reflected in the Term Sheet being announced today further builds upon those prior extraordinary efforts, all for the benefit of the victims of the opioid crisis. Simply put, the final result—the dedication of at least $5.5 billion plus 100 percent of the Debtors' assets to opioid abatement and victims—is the product of the extraordinary efforts of each and every one of the fifty States, the District of Columbia, Puerto Rico, and the other inhabited United States Territories, as well as myriad other parties in interest in these cases.

8.        This Mediation has now spanned two months. The number and complexity of the challenges presented have been unlike any other the Mediator has encountered in over three decades of the practice of law and twelve years of judicial service. The stakes could not have been higher, with the goal of the Mediation being the delivery of substantial additional consideration from the Sackler Families (as defined below) to the victims of the opioid crisis. The Term Sheet (as defined below) accomplishes that goal. The success of the Mediation was made possible by the tireless efforts of the Mediation Parties, many of whom worked day after day and night after night to forge consensus. In particular, the Mediator would like to express gratitude to the State of Vermont for its leadership during the Mediation.

9.        Additional conclusions and disclosures permitted under or required by paragraph 14 of the Mediation Terms and Conditions Order may follow in one or more subsequent reports issued by the Mediator.

**Current Status of Mediation**

10.       As set forth in the Mediator's Third Interim Report, members of the Raymond

Sackler family and the Mortimer Sackler family (collectively, the "Sackler Families") previously

authorized the Mediator to disclose the following summary of the economic terms of a settlement

proposal made by them to the Nine (the "Sackler Settlement Proposal") that included $1.175 billion

in total committed cash and up to an additional $500 million of cash consideration contingent on the

net proceeds of IAC sales. This package is comprised of (i) $1 billion of incremental cash payable,

over 18 years, to the MDT (as defined in the Plan) and to a newly-established supplemental opioid

abatement fund to be administered by the Nine (the "SOAF") on a schedule set forth in the Sackler

Settlement Proposal, (ii) $175 million of incremental cash paid to the MDT at emergence in lieu of

any obligations under the Plan relating to certain Sackler family foundations, and (iii) 90% of the

amount by which Net Proceeds from IAC sales exceed $4.3 billion, up to a total of $500 million of

additional incremental cash to the MDT. All such funds would be used exclusively for abatement of

the opioid crisis, including support and services for survivors, victims, and their families. Upon

consummation of a Plan incorporating this Sackler Settlement Proposal, the Sackler Families would

be paying, in total, not less than $5.5 billion and up to $6 billion. The Sackler Settlement Proposal

also contains a number of significant non-economic terms. This proposal was conditioned on, *inter*

*alia*, acceptance by all of the Nine.

11.       On March 2, 2022, the Mediation Parties reached agreement on a term sheet (the

"Term Sheet"), attached hereto as **Exhibit A**, which provides for the same aggregate amount and

schedule of incremental cash payments as under the Sackler Settlement Proposal, with additional

provisions regarding how such payments shall be directed, additional important non-economic

concessions not previously disclosed, and other terms and conditions, including the following:

(a)       Of the $1 billion in incremental cash to be paid by the Sackler family members or
trusts, (i) $723,111,111.13 in incremental cash consideration will be paid to the

Master Disbursement Trust as additional consideration under the Shareholder Settlement Agreement and (ii) $276,888,888.87 will be paid to the SOAF, in each case on the terms and schedule set forth on Attachment A to the Term Sheet. Funds in the SOAF will be devoted exclusively to opioid-related abatement, including support and services for survivors, victims, and their families and each member of the Nine shall have the right to direct allocation of the SOAF funds for such purposes in the amounts and as set forth on Attachment D to the Term Sheet.

(b)     In addition, as set forth in and unchanged from the Sackler Settlement Proposal, $175 million of incremental cash will be payable to the MDT at emergence in lieu of any obligations under the Plan relating to certain Sackler family foundations, and 90% of the amount by which Net Proceeds from IAC sales exceed $4.3 billion, up to a total of $500 million, will also be payable to the MDT.

(c)     The Sackler Families have agreed to allow any institution or organization in the United States to remove the Sackler name from physical facilities and academic, medical, and cultural programs, scholarships, endowments, and the like, subject to certain conditions regarding the procedure for announcing such removal set forth in the Term Sheet.

(d)     The Term Sheet makes clear that the Nine may cite any unsealed or public trial testimony or public statements, including any expressions of regret, by members of the Sackler families, including when announcing the settlement, and provides that the statement annexed to the Term Sheet as Attachment B will be issued by a spokesperson for the Sackler Families within two days of filing of this Fourth Interim Report.

(e)     The Debtors have agreed to supplement the Public Document Repository with additional privileged materials, including additional material related to lobbying, public relations, compliance, and prior advice from certain parties related to marketing.

(f)     Each Member of the Nine agrees that, upon effectiveness of the agreements set forth in the Term Sheet, all issues raised in the Nine's appeals of the Bankruptcy Court's order confirming the Plan have been resolved by the settlement set forth in the Term Sheet and that each of them consents to and grants the releases to be provided under the terms of the Plan upon the effectiveness thereof, subject to certain provisions regarding the termination of the agreement set forth in the Term Sheet. New Hampshire has likewise agreed to grant the releases to be provided under the terms of the Plan upon the effectiveness thereof.

(g)     The Term Sheet reflects the acknowledgement and confirmation by the Nine that the members of the Sackler Families had no role in determining the allocation of settlement consideration between the SOAF and the Master Disbursement Trust or the allocation of the SOAF funds among the Nine or to any other State as set forth in the Term Sheet.

(h)   The effectiveness of the agreement set forth in the Term Sheet is conditioned on, among other things, entry of an order by the Bankruptcy Court that provides necessary approvals of the settlement, and the documents contemplated thereunder, as described in more detail in the Term Sheet.

12.   As set forth in the Term Sheet, with respect to the economics set forth therein, the negotiations with the Sackler Families involved solely the agreement to provide the aggregate funds proposed. The economic terms of the Sackler Families' proposal remain unchanged from the Sackler Settlement Proposal as described with consent in the Mediator's Third Interim Report on February 18, 2022. As the Term Sheet makes clear, and as the Nine acknowledge and confirm: "the Sackler family members had no role in determining the allocation of settlement consideration between the SOAF and the Master Disbursement Trust or the allocation of the SOAF funds among the Nine or to any other State as set forth in this Term Sheet." The Mediator understands that certain parties may have questions and concerns regarding the allocation of the incremental settlement consideration provided for in the Term Sheet. Given the exigencies of the circumstances and with the hope and expectation that such questions and concerns can be addressed appropriately prior to the hearing to consider such approval, the Mediator recommended that the Mediation Parties move forward with seeking approval of the Term Sheet. That recommendation was accepted. The Mediator will remain available and intends to continue to assist in all efforts to resolve these and other remaining issues.

13.   Paragraph 14 of the Mediation Terms and Conditions Order obligates the Mediator to report whether and to what extent the Mediation was successful. The Term Sheet has been accepted by each of the Nine and the Covered Parties, subject to applicable conditions as set forth in the Term Sheet.

14.   During the course of the Mediation, the Mediator has had the opportunity to hear, both directly and through numerous Attorneys General, from people whose lives (or the lives of loved ones) have been affected by opioid addiction.  The Mediator is aware that the Court has also

permitted victims of opioid addiction and their loved ones to share their experiences during prior

hearings before the Court.  At this critical juncture in these cases, the Mediator believes it would be

appropriate for the Court to provide a meaningful opportunity for victims to be heard at the

Approval Hearing[2] virtually by Zoom. To that end, the Mediator strongly recommends and requests

that (i) the Court set aside a substantial amount of time during the Approval Hearing to hear from

several personal injury victims (including those who have lost loved ones, as well as children born

with NAS and/or their parents/guardians), selected pursuant to such process as the Court finds

appropriate, as representatives of those affected by the opioid crisis, and (ii) at least one member

of the Side A and Side B branches of the Sackler Families also attend the full hearing by

Zoom.  The Mediator further recommends that no other participant in the Approval Hearing,

including the members of the Sackler Families in attendance, be expected or permitted to respond to

or comment on the statements made by such individuals.  The Mediator is of course aware that the

conduct of the Approval Hearing is entirely in the Court's discretion.  It is the Mediator's heartfelt

belief that providing this opportunity for the victims and the obligation of the Sackler Families to

participate in the Approval Hearing as the Mediator has described would not only be an important

part of the record of the proceedings held but would also, like the settlement reached in this

Mediation, serve the ends of justice.

---

[2] The term "Approval Hearing" shall refer to the hearing on the *Motion of the Debtors for Entry of an Order Authorizing and Approving Settlement Term Sheet*, dated March 3, 2022, which motion is being filed concurrently herewith.

15.     As set forth in the Mediation Extension Notice, the Termination Date of the

Mediation has been extended *sine die* by the Mediator. The Mediator remains available to assist the

Mediation Parties with the resolution of secondary issues and with drafting definitive

documentation.

Dated:   New York, New York
         March 3, 2022

                                              /s/ Shelley C. Chapman
                                              HONORABLE SHELLEY C. CHAPMAN

**EXHIBIT A**

**SETTLEMENT PROPOSAL**[1]

| | |
|---|---|
| **Incremental Economic Consideration and Accommodations** | 1) On the terms and schedule set forth on **Attachment A** hereto, $1 billion in incremental cash shall be paid by the Sackler family members or trusts as follows:<br><br>a) $112,236,111.11 is allocated to California, of which amount California elects that $21,222,222.22 shall be paid to the SOAF (defined below) and allocated to California, with the remainder to be paid to the Master Disbursement Trust as additional consideration under the Shareholder Settlement Agreement.<br><br>b) $785,652,777.78 is allocated collectively to Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and the District of Columbia, of which amount $148,555,555.54 will be paid to the SOAF ($21,222,222.22 allocated to each of Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and the District of Columbia) with the remainder to be paid to the Master Disbursement Trust as additional consideration under the Shareholder Settlement Agreement.<br><br>c) $93,111,111.11 is allocated to Washington, which elects to retain control of such full amount through the SOAF.<br><br>d) $14,000,000 is allocated and will be paid to New Hampshire (which is not a party hereto but has confirmed its support for this agreement) from the SOAF.<br><br>e) Cumulatively, (i) $723,111,111.13 in incremental cash consideration shall be paid to the Master Disbursement Trust as additional consideration under the Shareholder Settlement Agreement and (ii) $276,888,888.87 shall be paid by the Sackler family members or trusts directly to a fund established, structured, and administered by the Nine[2] (the "Supplemental Opioid Abatement Fund" or "SOAF") on the terms and schedule set forth on Attachment A hereto and otherwise on the same payment terms as under the Shareholder Settlement Agreement. Of the first $200,000,000 paid to the SOAF, 95.5% will be allocated equally among the Nine, and 4.5% will be allocated to New Hampshire. Funds in the SOAF shall be devoted exclusively to opioid-related abatement, including support and services for survivors, victims and their families and each member of the Nine shall have the right to direct allocation of the SOAF funds for such purposes in the amounts and as set forth on **Attachment D** hereto.<br><br>2) The Nine acknowledge and confirm that the Sackler family members and trusts had no role in determining the allocation of settlement consideration between the SOAF and the Master Disbursement Trust or the allocation of the SOAF funds among the Nine or to any other State as set forth in this Term Sheet.<br><br>3) In addition, (i) $175 million in incremental cash shall be paid by the Sackler family members or trusts under the Shareholder Settlement Agreement to the Master Disbursement Trust on the Effective Date in lieu of any obligations relating to the Foundations, including appointment of the Continuing Foundation Members as members of the Foundations and (ii) as further incremental cash consideration under the Shareholder Settlement Agreement, the Sackler family members or trusts shall pay to the Master Disbursement Trust, up to a maximum of $500 million, 90% of the amount by which aggregate Net Proceeds (without giving effect to the deduction of Unapplied Advanced Contributions) with respect to all IAC Payment Parties exceeds $4.3 billion.<br><br>4) All amounts paid to the Master Disbursement Trust will be further distributed in accordance with the terms of the Plan.<br><br>5) The Direct Settlement Agreement (hereinafter defined) shall benefit from, and be *pari passu* with, the same collateral applicable to the existing Shareholder Settlement Agreement. In the event that any of the payments under the Direct Settlement Agreement set forth on |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3726] (the "Plan") or the Shareholder Settlement Agreement attached as Exhibit AA to the *Notice of Filing of Seventeenth Plan Supplement Pursuant to the Eleventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 3711].

[2] The "Nine" means the eight states and the District of Columbia that appealed the Bankruptcy Court's order confirming the Plan.

|  |  |
|---|---|
|  | **Attachment A** hereto are not made when due, SOAF will have the same enforcement rights on account of such payments as would be available to the Master Disbursement Trust on account of missed payments under the existing Shareholder Settlement Agreement. |
|  | 6) There shall not be additional covenants or changes to the credit support arrangements related to the existing Shareholder Settlement Agreement as a result of the additional payments described above. |
|  | 7) The Sacklers shall procure all necessary corporate and judicial approvals to authorize the applicable Sackler payment parties to enter into the Direct Settlement Agreement and the modified Shareholder Settlement Agreement and all ancillary arrangements and shall execute and deliver these Agreements to the other Term Sheet Parties as soon as is reasonably practicable or as otherwise expressly provided herein. |
|  | 8) This Term Sheet summarizes the principal terms of the settlement among the parties. |
|  | 9) Notwithstanding anything herein to the contrary, no legally binding obligations will be created unless and until (i) the Direct Settlement Agreement shall be in agreed execution form and the Nine and the Sackler family shall be satisfied with the proposed procedures, mechanics and remedies for any signature pages not theretofor delivered, and (ii) court authorization (as set forth below) has been obtained, in each case on or before March 10, 2022. This term sheet and any documents implementing the agreements set forth in this term sheet shall be governed in all respects by the laws of New York, *provided* that matters internal to each member of the Nine shall be governed by the laws of such member's jurisdiction. |
|  | 10) Upon and after acceptance of this Settlement Proposal by all of the Term Sheet Parties, the Term Sheet Parties shall immediately commence and pursue the negotiation of the definitive agreements documenting and implementing the Direct Settlement Agreement (the "Definitive Documents") in good faith. |
|  | 11) As part of this settlement, and subject to it becoming effective and not terminated, the Nine will agree they will not seek incremental settlement consideration from the Sackler family members or trusts in excess of the foregoing amounts or to directly or indirectly support any party in seeking any such incremental consideration. |
| **Naming Rights** | 1) The Sackler family (including Sackler family foundations) will agree upon occurrence of the Effective Date of the Plan to allow any institution or organization in the United States to remove the Sackler name from (i) physical facilities and (ii) academic, medical, and cultural programs, scholarships, endowments, and the like, provided that:<br>a) The institution provides the Sackler family with 45 days' confidential notice of its intention to remove the Sackler name;<br>b) The removal of the Sackler name would be disclosed or announced by any such institution (if the institution in its discretion determines such an announcement is necessary) in a statement that indicates that the removal of the Sackler name is pursuant to an agreement reached in the Mediation in the Purdue bankruptcy case; and<br>c) Any statements issued by the institution in connection with or substantially concurrent with such renaming will not disparage the Sacklers, *provided* that such prohibition shall not restrict any academic or similar work at such institution or organization.<br>d) These name removal rights are in addition to, and do not limit, any rights that the institution or organization otherwise has. |
| **Additional Terms** | 1) The Debtors have agreed to supplement the Public Document Repository as described on **Attachment B** hereto.<br>2) The Debtors shall promptly file a motion seeking the entry of the Approval Order (as defined below). Among other things, the Approval Order shall authorize the payment of the reasonable and documented attorneys' fees of each of the Nine in the Purdue bankruptcy case (including any adversary proceedings, and any appeals thereunder), accrued to the date of the entry of the Approval Order and thereafter in furtherance of the agreements set forth herein, in each case subject to compliance with procedures applicable to the fees and expenses of the Ad Hoc Committee. |

| | |
|---|---|
| | |
| **Statement** | 1) Nothing in this Settlement Proposal shall restrict the ability of the Nine to cite any unsealed or public trial testimony or public statements, including any expressions of regret, by members of the Sackler families.<br><br>2) No later than two days after the filing with the Bankruptcy Court of a Mediator's Report that indicates the acceptance by the Nine of the terms of this Settlement Proposal, a statement in the form of **Attachment C** hereto will be issued by a spokesperson for the Sackler families. It is expressly understood that such statement is not an admission of any wrongdoing or liability and that the Sackler families reaffirm that they have always acted lawfully. |
| **Acceptance/ Effectiveness** | 1) By the deadline communicated by the Mediator, each of the Nine, Sackler Side A and Sackler Side B (collectively, the "Term Sheet Parties") and the Debtors shall write independently and directly only to the Mediator by email, c/o Jamie Eisen at Jamie_Eisen@nysb.uscourts.gov, indicating whether it accepts the Settlement Proposal.[3]<br><br>2) The effectiveness of the agreement is subject to the condition precedent of the entry of an order by the Bankruptcy Court (the "Approval Order") that provides necessary approvals of this settlement, and all documents contemplated hereunder, including a finding that the Direct Settlement Agreement does not contravene any provision of the Bankruptcy Code.<br><br>3) "Acceptance" by a member of the Nine, or by the Sacklers, as the case may be, shall constitute an agreement by such Term Sheet Party to promptly engage in good faith negotiations of the Definitive Documents.<br><br>4) Each of the Term Sheet Parties agrees to support the entry of the Approval Order and to defend it against any appeal therefrom.<br><br>5) The Debtors agree to seek the entry of the Approval Order, to support the settlement and related transactions contemplated hereunder, to participate in the negotiation of the Definitive Documents, and to seek the support of the other parties appealing the District Court's decision for the settlement and related transactions contemplated hereunder and to defend the Approval Order against any appeal therefrom.<br><br>6) Upon the effectiveness of this settlement and subject to the settlement not having been terminated, each Member of the Nine agrees: (i) that all issues raised in the Nine's appeals of the Bankruptcy Court's order confirming the Plan have been resolved by this settlement and that each of them consents to and grants the releases to be provided under the terms of the Plan upon the effectiveness thereof; (ii) that after the filing of a joint notice by the Nine and the Debtors advising the Court of Appeals for the Second Circuit that the Nine's non-opposition to the Appeal is contingent upon the terms of this settlement and subject to potential termination if the Approval Order is reversed by a final non-appealable order of a court of competent jurisdiction and that the parties will not argue in such circumstance that by failing to file briefs or present arguments that the Nine no longer have standing as appellees, it will not file any brief with or present any argument to the Second Circuit panel hearing the appeal of the District Court's Decision and Order issued on December 16, 2021 currently being prosecuted by the Debtors and the other supporters of the Plan (the "Appeal") or in any en banc proceeding or panel rehearing that may subsequently take place in the Second Circuit in the Appeal; (iii) that if the Appeal is decided in the Debtors' favor, it will not (a) file a party or amicus curiae brief at the petition stage in the Supreme Court of the United States, asking that court to grant certiorari with respect to the Appeal or (b) file a party brief at the merits stage in the Supreme Court should the Supreme Court grant certiorari with respect to the Appeal; (iv) that it will not object to the continuation of the Preliminary Injunction through a |

---

[3] Each party's acceptance of the Settlement Proposal shall be conditioned on (i) acceptance of the Settlement Proposal by all members of the Nine, Sackler Side A and Sackler Side B, (ii) the allocation of the funds in the SOAF set forth in Attachment D and (iii) that none of the Nine shall have received from the Sackler family or trusts or the Debtors actual or promised consideration not provided for hereunder or under the Plan.

ruling by the Court of Appeals for the Second Circuit on the Appeal and (v) to execute any other documentation and make any court filings reasonably necessary to implement any of the foregoing agreements.

7) The Nine shall be permitted to file a motion with the Court of Appeals for the Second Circuit to excuse the filing of appellate briefs by the current deadline of March 11, 2022 or thereafter and/or a statement (separate from the joint notice provided for herein) as has been agreed by the parties consistent with this Term Sheet explaining that the Nine are foregoing the filing of appellate briefs in connection with this settlement, which motion and/or statement shall not seek, suggest, or otherwise support any modification of the current Appeal schedule.

8) Subject to the Approval Order becoming final and non-appealable, each Member of the Nine will, upon the conclusion of the Appeal resulting in reversal or vacatur of the District Court's Decision and Order on Appeal issued on December 16, 2021, promptly file a notice and/or motion withdrawing and requesting dismissal of its appeal to the District Court of the Bankruptcy Court's order confirming the Plan.

9) If certiorari has been granted by the United States Supreme Court, members of the Nine may file amicus curiae briefs at the merits stage in the Supreme Court with respect to the Appeal, provided that such brief shall note that said member of the Nine withdrew its objections to the Plan in connection with this settlement and is not subject to a non-consensual release under the Plan.

10) For the avoidance of doubt, the agreement will not include the requirement to file any other pleadings or present argument in support or in favor of the Plan, and nothing in this agreement limits the ability of the Nine to write, to speak, or to participate fully in any judicial or other proceeding unrelated to Purdue or the Sacklers other than as expressly prohibited by this settlement.

11) If any payments or consideration or amounts allocated to any of the Nine under this Settlement Proposal cannot be effectuated because the Approval Order is reversed by a final order of a court of competent jurisdiction, the Sackler family members or trusts shall instead pay such consideration pursuant to one or more alternative mechanisms acceptable to each of the Nine in their sole discretion, that are permitted by or not inconsistent with such final order and also consistent with any subsequent governing court orders (which mechanism may include, without limitation, consent or stipulated judgments satisfactory to the Sackler family members or trusts and in favor of the Nine to be filed in the courts of their respective jurisdictions, with the form of such judgments to be attached to the Definitive Documents on or before the Effective Date of the Plan), provided that all such funds shall continue to be used for opioid-related abatement, including support and services for survivors, victims and their families, and provided further that such alternative mechanisms shall not be adverse to the Sackler family members or trusts as compared to the mechanisms set forth herein (it being agreed and understood that modest additional administrative or similar burdens, including the provision of consent or stipulated judgments satisfactory to the Sackler Family members or trusts as referenced above or a redirection of payments consistent with the allocation set forth herein, shall not be considered adverse). Each member of the Nine shall have the right to terminate the Agreement on and after a period of seven business days (or a shorter period if the full seven-day period would be unduly prejudicial) if the Nine after good faith consultation with one another do not identify and agree upon any such alternative mechanisms.

12) Each of the Nine and New Hampshire will voluntarily consent to grant the releases to be provided by it under the terms of the Plan as currently formulated in Section 10.7 thereof upon the effectiveness of the Plan as modified by this settlement and will therefore be voluntarily bound thereby. Each of the Nine and New Hampshire fully reserves its right to object to and litigate non-consensual third-party releases in all other bankruptcy cases.

13) Any Plan supporter that has agreed to support the transactions contemplated by this Term Sheet may note in its briefs in the Appeal that, subject to the conditions hereof, the Nine and New Hampshire do not object to, and will consensually be bound to, the releases contained in the Plan. However, any Plan supporter that notes in its briefs in the Appeal that the Nine and New Hampshire are not objecting to, or are being consensually bound to, the releases

| | |
|---|---|
| | contained in the Plan must note that such consent is not an indication that the Nine or New Hampshire agree with the legality of the Plan or of the non-consensual third party releases included in the Plan. |
| | 14) The Debtors will advise the Court of Appeals for the Second Circuit that: (a) all states have agreed to be consensually bound by the third party releases in the Plan; (b) that the appeal therefore no longer presents the question of whether claims brought by states against third parties can be non-consensually released in bankruptcy, either generally or under the facts of this case; and (c) and that therefore the following portions of the identified briefs are withdrawn as moot: Section III.B. of the Debtors' page proof brief at pgs. 79-84 and Section III.B. of the Mortimer-side Initial Covered Sackler Persons page proof brief at pgs. 63-67. |
| **Implementation** | 1) The Shareholder Settlement Agreement shall be amended to reflect the additional Master Disbursement Trust payments and non-economic terms herein, and a new settlement agreement (the "Direct Settlement Agreement") among the Term Sheet Parties shall be entered into to reflect the payments to the SOAF, together with customary intercreditor arrangements between the Master Disbursement Trust and SOAF that shall provide that SOAF is pari passu with the Master Disbursement Trust, in each case subject to receipt by the Mediator of acceptances by Sackler Side A, Sackler Side B, the Debtors, and all of the members of the Nine, with consummation of the Shareholder Settlement Agreement so modified and the Direct Settlement Agreement contingent upon entry of the Approval Order by the Bankruptcy Court[4] and consummation of the Plan. |
| | 2) Other than as provided in the provision beginning "If any payments" above, this agreement shall be void and have no effect on the rights of the parties if the settlement described herein or consummation of the Plan is barred by a final, non-appealable order of a court of competent jurisdiction, if a court of competent jurisdiction determines in a final, non-appealable order that any essential element of the settlement (including, without limitation, the Direct Settlement Agreement) or the Plan is invalid, or if the Plan otherwise becomes incapable of being consummated. |
| | 3) The parties acknowledge and agree that upon the Effective Date of the Plan all parties are bound by the terms thereof unless the confirmation order is subsequently vacated. |

---

[4] Any order or definitive documents effectuating the terms of this Settlement Proposal shall provide that the actions taken by members of the Sackler family or trust or their related parties in accordance with the terms of this Settlement Proposal are taken in connection with the Chapter 11 Cases for purposes of Section 10.7 of the Plan.

**Attachment A**

| Payment Date[56] | Payment Amount to Master Disbursement Trust | Direct Payment Amount to SOAF |
|---|---|---|
| Effective Date | $175 million | $25 million |
| Second Funding Deadline | $0.00 | $25 million |
| Third Funding Deadline | $0.00 | $25 million |
| Fourth Funding Deadline | $0.00 | $25 million |
| Fifth Funding Deadline | $0.00 | $0.00 |
| Sixth Funding Deadline | $0.00 | $0.00 |
| Seventh Funding Deadline | $0.00 | $0.00 |
| Eighth Funding Deadline | $0.00 | $0.00 |
| Ninth Funding Deadline | $0.00 | $0.00 |
| Tenth Funding Deadline | $0.00 | $0.00 |
| 6/30/2031 | $80 million | $20 million |
| 6/30/2032 | $80 million | $20 million |
| 6/30/2033 | $80 million | $20 million |
| 6/30/2034 | $80 million | $20 million |
| 6/30/2035 | $80 million | $20 million |
| 6/30/2036 | $80,777,777.78 | $19,222,222.22 |
| 6/30/2037 | $80,777,777.78 | $19,222,222.22 |
| 6/30/2038 | $80,777,777.78 | $19,222,222.22 |
| 6/30/2039 | $80,777,777.78 | $19,222,222.22 |

---

[5] The Funding Deadlines are set forth in Section 2.01(b)(i) of the Shareholder Settlement Agreement and are subject to adjustment pursuant to Section 2.01(b)(ii) thereof.

[6] The $175 million of incremental amounts paid in lieu of appointment of the Continuing Foundation Members as the sole members of the Foundations shall be funded $62.5 million by the Sackler family A-Side Payment Parties and $112.5 million by the Sackler family B-Side Payment Parties. The first $400 million chronologically of all other incremental amounts shall be funded 50% by the Sackler family A-Side Payment Parties and 50% by the Sackler family B-Side Payment Parties. Other incremental amounts above $575 million in the aggregate shall be funded exclusively by the Sackler family B-Side Payment Parties.

**Attachment B**

**Agreed Amendments to the Debtors' Privilege Waiver Section of Plan**

**(1)** <u>**Lobbying**</u>

Revised subsection (I) – Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to (i) any opioid product sold by Purdue, including OxyContin; and (ii) any public policies regarding the availability and accessibility of opioid products.

**(2)** <u>**Public Relations**</u>

New Subsection – Legal advice provided to Purdue's public relations department regarding the promotion, sales, or distribution of Purdue's opioid products, including but not limited to their safety, efficacy, addictive properties, or availability of opioid products.

**(3)** <u>**Compliance**</u>

Legal advice to the Compliance department regarding the organizational structure of the Compliance Department, including its processes for implementing order monitoring systems, suspicious order monitoring programs, and abuse deterrence and detection programs.

<u>**Subsection (ii)(B)**</u>

Documents created before February 2018 reflecting legal review and advice with respect to recommendations received from McKinsey & Company, Razorfish, and Publicis, related to the sale and marketing of opioids.

**Attachment C**

**Sackler Family Statement**

The Sackler families are pleased to have reached a settlement with additional states that will allow very substantial additional resources to reach people and communities in need. The families have consistently affirmed that settlement is by far the best way to help solve a serious and complex public health crisis.  While the families have acted lawfully in all respects, they sincerely regret that OxyContin, a prescription medicine that continues to help people suffering from chronic pain, unexpectedly became part of an opioid crisis that has brought grief and loss to far too many families and communities.

**Attachment D**

**Allocation of SOAF**

Attachment D

Allocation of SOAF

| Payment Date | Direct Payment Amount to SOAF | CA | CT | DE | MD | OR | RI | VT | WA | DC | NH | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Effective Date | $25,000,000.00 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $ 1,125,000.00 | $25,000,000 |
| Second Funding Deadline | $25,000,000.00 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $ 1,125,000.00 | $25,000,000 |
| Third Funding Deadline | $25,000,000.00 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $ 1,125,000.00 | $25,000,000 |
| Fourth Funding Deadline | $25,000,000.00 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $2,652,777.78 | $ 1,125,000.00 | $25,000,000 |
| Fifth Funding Deadline | $0.00 | | | | | | | | | | | |
| Sixth Funding Deadline | $0.00 | | | | | | | | | | | |
| Seventh Funding Deadline | $0.00 | | | | | | | | | | | |
| Eighth Funding Deadline | $0.00 | | | | | | | | | | | |
| Ninth Funding Deadline | $0.00 | | | | | | | | | | | |
| Tenth Funding Deadline | $0.00 | | | | | | | | | | | |
| 6/30/2031 | $20,000,000.00 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $ 900,000.00 | $20,000,000 |
| 6/30/2032 | $20,000,000.00 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $ 900,000.00 | $20,000,000 |
| 6/30/2033 | $20,000,000.00 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $ 900,000.00 | $20,000,000 |
| 6/30/2034 | $20,000,000.00 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $ 900,000.00 | $20,000,000 |
| 6/30/2035 | $20,000,000.00 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $2,122,222.22 | $ 900,000.00 | $20,000,000 |
| 6/30/2036 | $19,222,222.22 | | | | | | | | $17,972,222.22 | | $ 1,250,000.00 | $19,222,222 |
| 6/30/2037 | $19,222,222.22 | | | | | | | | $17,972,222.22 | | $ 1,250,000.00 | $19,222,222 |
| 6/30/2038 | $19,222,222.22 | | | | | | | | $17,972,222.22 | | $ 1,250,000.00 | $19,222,222 |
| 6/30/2039 | $19,222,222.22 | | | | | | | | $17,972,222.22 | | $ 1,250,000.00 | $19,222,222 |
| Total | | $21,222,222.22 | $21,222,222.22 | $21,222,222.22 | $21,222,222.22 | $21,222,222.22 | $21,222,222.22 | $21,222,222.22 | $93,111,111.10 | $21,222,222.22 | $14,000,000.00 | $276,888,889 |