AGENTIS PLLC
55 Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
T. 305.722.2002
F. 305.489.2698
Christopher B. Spuches

*Counsel for Creditor, the Attorney General, State of Florida*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649(RDD)** |
| Debtors. [1] | **(Jointly Administered)** |

**THE STATE OF FLORIDA'S OBJECTION TO MOTION OF DEBTORS
PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF AN ORDER
AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET**

The State of Florida ("Florida"), objects to the *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing and Approving Settlement Term Sheet* [ECF No. 4410], and states as follows in support of its objection:

**INTRODUCTION**

Far from the stunning success portrayed by the Debtors, the Debtors essentially jettisoned the creditor groups that worked so hard to get a plan confirmed in favor of the dissenting creditors in a New York minute when trouble in the District Court happened. So desperate for resolution, the Debtors orchestrated a settlement violative of the Bankruptcy Code itself. The settlement contains a "side deal," where affiliates of the Debtors are going to pay substantial monies to the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

eight dissenting states and the District of Columbia to essentially drop their appeals. There is no difference between the $276,888,888.87 side payment proposed to be paid to the eight states and the District of Columbia and the other over $4 billion paid by the Sacklers in this deal. It is all money paid by the Sacklers to obtain a release, and the monies paid by the Sacklers are the vast majority of monies likely to be distributed to the States. **To be clear, the State of Florida does not object to the Sacklers paying more money to abate the opioid crisis.** Florida objects to the eight states and the District of Columbia being paid additional money in violation of 11 U.S.C. §1123(a)(4). The State of Florida does not consent to such treatment.

As this Court well knows, the opioid epidemic is ravaging this entire country. There is not a corner of it untouched or unhurt. For the last almost six years, the State of Florida, on behalf of its citizens, pursued those that have caused this manmade crisis. It is not alone. On a bipartisan basis, state attorneys general from across the United States have mounted investigations and litigation against those responsible, including the Debtors and the Sacklers. On a bipartisan basis, they have worked collectively and recovered tens of billions of dollars that will hopefully curtail this epidemic.

In 2019, Florida participated in multiple extensive rounds of negotiations with the Debtors and the Sacklers that culminated in the original term sheet in this bankruptcy case. Under that term sheet, Purdue promised all of its assets and the Sacklers promised at least $3 billion (to almost $4.5 billion) for abatement of this epidemic. Neither the State of Florida, nor any of the other states involved in those negotiations sought a nearly thirty percent side payment like the eight states and the District of Columbia have now negotiated for their efforts. Indeed, making such a request was so repugnant to the State of Florida that the thought never crossed its or any other supporting state's

2

minds. As the bankruptcy case unfolded and the deal changed and eventually improved, no state again sought any side payment.

Florida's simple position has been and continues to be that whatever proceeds are achieved from this settlement should be distributed in accordance with the allocation the States agreed upon that this Court approved. The eight states and the District of Columbia (the "Nine") believe that they are entitled to extra money because they held out, not because they are classified incorrectly. But for, likely, a far more limited payment under Section 503 for substantial contribution, the Bankruptcy Code does not allow for such a side payment. Utilizing or characterizing payments from an affiliated third-party to circumvent Section 1123(a)(4), without obtaining creditor approval, invites abuse and, frankly, threatens the core of the bankruptcy system and the priority of payments of claims and interests under the Bankruptcy Code. Florida is also concerned that allowing for premiums or side payments in this deal will undermine the ability of attorneys general to resolve litigation against other opioid defendants. If approved, this deal could undermine states' abilities to receive future value in other cases well in excess of the amounts at issue here by disrupting allocations in other cases that may be payable now versus ten years or more from now, as provided in this settlement. For those reasons, Florida objects only to the manner of distribution of these additional monies.

## RELEVANT FACTS

1.    On September 15, 2019 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Shortly before the Petition Date, following months of hard-fought and arms'-length negotiations, the parties reached agreement on the framework for a comprehensive settlement – the so-called "Settlement Framework" – under which Purdue would file for bankruptcy and the Sacklers would relinquish their equity interests in Purdue, sell their

3

foreign pharmaceutical businesses, and make a multi-billion-dollar payment to the Debtors' estates.

2. The Ad Hoc Committee, of which Florida is a member, was formed to represent the interests of the supporting governmental creditors in the bankruptcy case and to serve as an organized group with whom other case parties, including those not yet supporting the settlement, could negotiate. The Ad Hoc Committee, along with the other governmental claimants including the Multi-State Governmental Entities Group and the Non-Consenting States, were given almost complete freedom to negotiate the creation of the procedures for distributing abatement funds and the programs and strategies for which those funds are to be deployed.

3. From the initial filing of these bankruptcy cases, there was broad consensus that abatement should be the primary focus of any chapter 11 plan, and that distributions to non-federal governmental claimants should be devoted to abatement. There was similar agreement that it was the governmental claimants themselves, and not the Debtors, that should be charged with responsibility for deploying funds for abatement. As the Court observed at an early hearing in the case: "I continue to believe that the states play a major role in that process . . . where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state." (Hearing Transcript of November 19, 2019 hearing, at 165:8-14),

## The Allocation of Abatement Funds

4. As to the split of abatement funds, negotiations began among the States in 2018 and continued for more than two years. The process involved the creation of a multistate committee, referred to as the "Remedies Committee," comprised of representatives from the Attorneys General offices of 14 States and the District of Columbia. The Remedies Committee solicited and received input from numerous sources and considered multiple allocation proposals advanced by

4

the different States and the Plaintiffs' Executive Committee (the "PEC").  In addition to written and telephonic discussions, the Attorneys General and senior staff convened in person at key conferences in Denver, Atlanta, and D.C. to discuss the interstate allocation. Not surprisingly, the States, with their diversity of characteristics, had a range of views of the appropriate metrics to be used in allocating funds amongst them. Eventually, however, after hundreds of hours of meetings and work, the Attorneys General held an open vote and overwhelmingly adopted an allocation plan.  That interstate allocation was incorporated into Purdue's Plan.  *See* Disclosure Statement [ECF No. 2983], pp. 97-99.

**Plan and Confirmation**

5.   On September 17, 2021, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Confirmation Order") [ECF No. 3787], confirming the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Plan") [ECF No. 3726].

6.   The Confirmation Order, among other things, approved the agreement (the "Sackler Settlement") reached by the Sackler Family and the Debtors' creditors which provided for the Sackler's payment of $4.325 billion to the Debtors' estate to be distributed pursuant to the terms of the Plan.  In exchange for the settlement payment, the Sacklers were to receive non-consensual releases of third-party claims against them.

7.   The Nine objecting States, among other parties, appealed the Confirmation Order. On December 16, 2021, the United States District Court for the Southern District of New York, entered its *Decision and Order on Appeal* (the "Appellate Order") [District Court ECF No 279], which vacated the Confirmation Order.  Specifically, the District Court held that the Bankruptcy

5

Code does not authorize the releases provided to the Sacklers in section 10.7 of the Plan, and therefore, the Plan as currently constituted cannot be confirmed.

8. The Appellate Order was subsequently appealed to the Second Circuit and various parties are in the process of preparing and filing briefs (the "Second Circuit Appeal").

### The Term Sheet

9. Following the entry of the Appellate Order, this Court ordered the Sacklers, the Debtors and the Nine to mediation. Following two months of secretive and confidential negotiations, which did not include the State of Florida or the major constituencies in this case, the Sacklers, the Debtors and the Nine agreed to the Term Sheet. The Term Sheet ignores the Plan and agreed upon allocation model, and instead provides for the payment of an extra $276,888,888.87 to the Nine. More specifically, it includes the following disproportionately favorable treatment for the Nine:

- $276,888,888.87 will be paid to the Nine (and New Hampshire), and not in accordance with the agreed upon allocation under the Plan, but instead, pursuant to a new fund titled the Supplemental Opioid Abatement Fund ("SOAF"); and

- Payment of an unspecified and unbudgeted amount of attorneys' fees of the Nine "in the bankruptcy case (including adversary proceedings, and any appeals thereunder), accrued to the date of the entry of the Approval Order and thereafter in furtherance of the agreements set forth herein …" *see* Term Sheet, p. 3

### OBJECTION

10. The Court should deny the Motion because the Court does not currently have jurisdiction to modify the Plan, making the Motion premature and not ripe for adjudication. The Motion also improperly attempts to circumvent Section 1123(a)(4) of the Bankruptcy Code

6

through a *sub rosa* plan. Finally, fees to the Nine should not be paid by the Debtor pursuant to Section 363(b) or Section 105, and the case law upon which the Debtor relies for this relief is inapposite.

I. **The Appeals have Divested the Bankruptcy Court of Jurisdiction to Grant the Relief Sought in the Motion.**

11. By the Motion, the Debtors seek approval of the Term Sheet and to substantively modify the Plan, including releases, payment of attorney's fees, the allocation model, and treatment of creditors in Class 4 of the Plan. The Bankruptcy Court currently lacks jurisdiction to grant such relief.

12. "It is well established that the filing of an appeal divests the lower court of its control over matters on appeal." *In re Sabine Oil & Gas Corp.*, 16-CV-2561 (JGK), 2016 WL 4203551, at *6 (S.D.N.Y. Aug. 9, 2016) (the filing of a bankruptcy appeal "confers jurisdiction on the [appellate court] and divests the [trial] court of control over those aspects of the case involved in the appeal") (citing *In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994) (noting that "[t]he same legal principle applies to appeals of bankruptcy court orders.")); *see also In re Emergency Beacon*, 58 B.R. 399, 402 (Bankr. S.D.N.Y. 1986) ("Once a notice of appeal is filed 'no lower court should be able to vacate or modify an order under appeal, not even a bankruptcy court attempting to eliminate the need for a particular appeal.'") (citation omitted). As such, a "lower court may take no action which interferes with the appeal process or with the jurisdiction of the appellate court." *Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *6; *In re Prudential Lines, Inc.*, 170 B.R. at 243; *see also In re Transtexas Gas Corp.*, 303 F.3d 571, 582 (5th Cir. 2002) ("[W]hen a notice of appeal has been filed in a bankruptcy case, the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are **not** the subject of the

7

appeal.") (emphasis added).  Although a bankruptcy court may retain jurisdiction to enforce an order subject to appeal, it cannot take any action to modify or expand upon such order. *See In re Prudential Lines, Inc.,* 170 B.R. at 244 ("Courts have accordingly recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or alter it; the former being permissible and the latter prohibited.").

13. This principle has been applied in rejecting a party's efforts to modify a chapter 11 plan in the bankruptcy court, where the order confirming such plan was on appeal. *See, e.g., In re Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *1, *6 (denying committee's motion for stay pending appeal of confirmation order where relief requested would modify plan pending appeal of confirmation order). In order to assure the integrity of the appeal process, it is imperative that the lower court take no action which might in any way interfere with the jurisdiction of the appeal court.  *In re Kendrick Equip. Corp.*, 60 B.R. 356, 358 (Bankr. W.D. Va. 1986)

14. Here, the issue currently on appeal to the Second Circuit is whether the Plan as currently constituted may be confirmed.  More specifically, whether the Bankruptcy Court had the authority to approve non-consensual third-party releases to non-Debtors.  The third-party releases were critical to the inter-creditor settlements, the original Sackler Settlement and the Term Sheet. Without this release, there is no Plan.

15. Nonetheless, the Motion seeks to significantly amend the Plan on appeal by revising the allocation models, revising the Sackler Settlement, altering the equality of distributions under the Plan, and incorporating the Term Sheet into the Plan.  The Bankruptcy Court lacks jurisdiction at this juncture to grant the relief sought by the Motion, as it was divested of jurisdiction to modify the Plan upon the filing of the appeal of the Confirmation Order.

8

## II.  The Motion Improperly Requests an Advisory Opinion

16. "The threshold issue in this, and every case, is whether a federal court has subject matter jurisdiction over the suit before it." *Concourse Rehabilitation & Nursing Ctr. Inc. v. DeBuono*, 179 F.3d 38, 43 (2d Cir. 1999); *see* U.S. Const. art. III, § 2 (establishing the extent of federal jurisdiction). "Federal lawsuits must satisfy Article III of the U.S. Constitution, which limits the federal judicial power to actual 'cases' or 'controversies.'" U.S. Const. art. III, § 2, cl. 1; *Endurance Am. Ins. Co. v. DiStefano*, 1:20-CV-0203 (LEK), 2021 WL 3089127, at *2 (N.D.N.Y. July 22, 2021). "A dispute is ripe for adjudication when there is 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir. 1996) (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)).

17. "The ripeness doctrine prevents the courts, 'through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49 (1967). "The applicability of the doctrine depends upon two factors: the fitness of the issues for adjudication and the hardship to the parties that would result from withholding review." *See Abbott Laboratories,* 387 U.S. at 149.

18. "Even though bankruptcy courts are not Article III courts, they are nevertheless courts of limited jurisdiction bound by Article III, section 2 of the United States Constitution." *In re Nunez*, No. 98-CV-7077, 2000 WL 655983, at *6 (E.D.N.Y. Mar. 17, 2000) (internal citations

9

omitted). Therefore, "bankruptcy courts cannot issue advisory opinions." *Id.* (internal citations omitted). A bankruptcy court "may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation, internal quotation marks, and alteration omitted).

19. Here, the Court lacks jurisdiction to approve the Term Sheet, as the issue is not ripe. The Appellate Order vacated the Confirmation Order and found that the non-consensual third-party releases, which were an integral part of the Plan, were not authorized by the Bankruptcy Code. Accordingly, at this moment, there is no filed Plan in these bankruptcy cases that can be confirmed. Nonetheless, the Motion seeks to amend the barred Plan through the Term Sheet. The Debtors readily admit that the Motion does not present an actual case of controversy, and state "none of this will be relevant unless the Court of Appeals for the Second Circuit or the District Court, as applicable, issue orders or rulings allowing the consummation of the Plan as materially enhanced by the Term Sheet." *See* Motion at ¶ 33.

### III. The Term Sheet Violates Section 1123(a)(4)

20. In an as-yet unfiled plan, the Debtors propose to disparately treat the 40 States[2] not parties to the Term Sheet, and instead pay $276,888,888.87 to the Nine and New Hampshire in addition to their proposed distributions under a plan. The result is that similarly situated creditors will be treated differently, contravening one of the basic tenants of bankruptcy law, a result which cannot be approved by this Court.

21. Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

---

[2] Although not a party to the term sheet, the State of New Hampshire is receiving an additional $14,000,000 under the proposed Term Sheet.

10

favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "Equality of treatment requires that all class members receive equal value and pay the same consideration in exchange for their distributions." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357–58 (Bankr. S.D.N.Y. 2018)

22. The Second Circuit has called equal treatment of similarly situated creditors "perhaps the predominant objective of a bankruptcy proceeding." *In re: PCH Assoc.*, 949 F.2d 585, 598 (2nd Cir. 1991); *see also In re Petition of Laitasalo*, 193 B.R. 187 (Bankr. S.D.N.Y. 1996); *City Bank v. Mutual Fire Marine & Inland*, 646 F.Supp. 1139, 1142 (S.D.N.Y. 1986) ("In sum, the broad policy of denying to one creditor preference over other similarly situated creditors is paramount.")

> The Supreme Court has recently had occasion to reaffirm the principle that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." *Howard Delivery Service, Inc. v. Zurich American Insurance Co.*, U.S., 126 S. Ct. 2105, 2109, 165 L. Ed. 2d 110 (2006) (citations omitted). 'The theme of the Bankruptcy Act is 'equality of distribution,' . . . and if one claimant is to be preferred over others, the purpose should be clear from the statute.' *Id.* at 2116 (citations omitted). With few exceptions 'preferential treatment of a class of creditors is in order only when clearly authorized by Congress.' *Id.* at 2109.

*In re Delta Air Lines*, 359 B.R. 454, 463-464 (Bankr. S.D.N.Y. 2006). The bankruptcy scheme concocted by the Debtors, the Sacklers and the Nine, utterly fails in this regard.

23. Here, the proposed $276,888,888.87 payment to the Nine violates section 1123(a)(4) of the Bankruptcy Code. Pursuant to the agreed upon allocation model in the Plan, the National Opioid Abatement Trust ("<u>NOAT</u>") was to be created to allocate funding among the states based on a formula that was heavily negotiated among the Attorneys General of various States. Under this allocation model, the States received equal treatment. The Term Sheet seeks to upend years of negotiation and pay $276,888,888.87 to the Nine to withdraw their objections to the Second Circuit Appeal. This additional $276,888,888.87 will not be paid pursuant to the

11

allocation model in the as yet unfiled plan and will result in the Nine receiving materially favorable treatment under such a plan than the other States and other members of Class 4 of the Plan. Florida does not consent to this treatment. Accordingly, the Term Sheet violates Section 1123(a)(4) of the Bankruptcy Code and cannot be approved by this Court.

### IV.     The Term Sheet Constitutes an Impermissible *Sub Rosa* Plan

24.     The Term Sheet is an impermissible *sub rosa*[3] plan that implements the terms of a future, unfiled plan of reorganization before the Court has had the opportunity to approve a disclosure statement and solicit votes on such plan in violation of the protections afforded to parties-in-interest by section 1125 of the Bankruptcy Code.

25.     In order to approve a settlement under § 363(b), the Court must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). The Court "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id.* "But such a sale is prohibited if it amounts to a *sub rosa* plan, which 'short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan.'" *In re Empire Generating Co, LLC*, 19-CV-5721 (CS), 2020 WL 1330285, at *8–9 (S.D.N.Y. Mar. 23, 2020) (quoting *Iridium Capital Corp. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks and alteration omitted); *In re Chrysler LLC*, 405 B.R. 84, 95 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *cert.*

---

[3] Latin for "under the rose." Since ancient times, the rose has often been associated with secrecy. In ancient mythology, Cupid gave a rose to Harpocrates, the god of silence, to keep him from telling about the indiscretions of Venus. *See Merriam-Webster*, See https://www.merriam-webster.com/dictionary/sub-rosa#:~:text=About%20sub%2Drosa-Sub%20Rosa%20and%20Secrecy,about%20the%20indiscretions%20of%20Venus.

*granted, judgment vacated sub nom. Indiana State Police Pension Tr. v. Chrysler LLC,* 558 U.S. 1087 (2009), *and vacated sub nom. In re Chrysler, LLC,* 592 F.3d 370 (2d Cir. 2010) ("A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.)

26. Courts have defined a *sub rosa* plan as a transaction that has the "practical effect of dictating some of the terms of any future reorganization plan." *See In re Braniff Airways*, Inc., 700 F.2d 935, 940 (5th Cir. 1983). Courts have also found that *sub rosa* plans cannot be approved outside of the well-established solicitation and confirmation requirements of the Bankruptcy Code. *See id.* ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets."); *see also In re Tower Auto. Inc.*, 241 F.R.D. 162, 168-69 (S.D.N.Y. 2006); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

27. The Term Sheet fits squarely within the definition of a *sub rosa* plan because the agreement materially alters the Plan to the detriment of the other States, who were not parties to the mediation, and improperly ignores the allocation and distribution scheme of the Plan prior to the approval of a disclosure statement and solicitation of votes on a plan. By modifying the distribution and allocation model of the Plan and favoring the Nine by providing only those states with an extra $276,888,888.87, the Debtors are seeking to "short circuit the requirements of Chapter 11." *See Braniff*, 700 F.2d at 940.

28. The Court should not allow the Debtors and the Nine to bypass the fundamental principles of bankruptcy law and the integrity of the confirmation process through a mediated settlement, at which the States were not parties. The Term Sheet not only dictates the terms of the

13

as yet unfiled plan, but it attempts to materially modify the Plan, to the detriment of the other States, and after the parties have already voted on the Plan.

## V. The Debtors Improperly Seek to Pay the Attorneys' Fees of the Nine

29. As part of the Motion, the Debtors improperly seek permission to pay or reimburse the attorneys' fees and expenses incurred by the Nine without any meaningful limits or parameters governing the scope or amount of such payments.[4] Such "Specified Payments" are in addition to any payments to which States or their professionals may be entitled under section 5.8 of the Plan and are blatantly unfair to the other States and creditors who have also undertaken tremendous efforts and made significant contributions to the Debtors' reorganization throughout the Cases. The Specified Payments represent yet another improper payment to the Nine and cannot be approved under sections 363(b) and 105(a) of the Bankruptcy Code.

30. First and foremost, "[s]ection 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor. If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b)." *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 02 CIV. 2854 (MBM), 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003). Nor can a debtor use section 363(b) to reimburse a creditor's fees or expenses that were incurred while attempting to collect on its pre-petition claims. *See id.* at *11 (recognizing that "where a creditor incurs expenses in attempting to collect on pre-petition claims and then seeks reimbursement from the estate," "[t]hat situation

---

[4] *See* Motion at ¶ 30 ("[T]he Debtors agree to pay or reimburse the reasonable and documented fees and expenses of outside counsel of the Nine in the Cases (including any adversary proceedings, and any appeals thereunder) (the 'Specified Payments'), in each case accrued through the date of entry of the Order and thereafter in furtherance of the agreements set forth in the Term Sheet."

14

is covered by § 503, and expenses will be paid only if the creditor's actions were helpful to the estate").

31. Here, the Debtors propose to pay the fees and expenses incurred by the Nine in formulating a deal that blatantly favors the Nine's self-interest above those of similarly situated States and creditors. Indeed, the Term Sheet contemplates that the Nine *alone* shall receive (i) an additional $276,888,888.87 and (ii) payment or reimbursement of their attorney's fees and expense in addition to those provided to all States under the Plan. The Debtor cannot use section 363(b) of the Bankruptcy Code to pay the Nine's fees and expenses when such fees and expenses were incurred by the Nine in constructing a self-interested deal that provides them with substantially more value than similarly situated creditors. Nor is such payment appropriate under section 363(b) where the Nine were representing themselves as creditors to enhance their collection on pre-petition claims.

32. Moreover, no sound business purpose exists to justify the Debtor's proposed Specified Payments. "The bankruptcy court may not authorize the use of funds under § 363(b) unless it finds 'a good business reason' for the expenditure." *Bethlehem Steel Corp., 2003 WL 21738964, at *10* (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)). The Debtors argue that a "sound business purpose" exists for the Specified Payments because "[t]he Nine have facilitated, and are making ongoing efforts to finalize and implement, the settlement reflected in the Term Sheet, which would bring significant additional value into the Debtors' estates." *See* Motion at ¶ 36. While the Term Sheet contemplates that additional value will be provided to the Debtors' estates, it also funnels a tremendous amount of value to the Nine *alone* through the nearly $276 million SOAF Payment and Specified Payments. Unlike *Bethlehem*, where the court found "that the reimbursement arrangement was 'in the best interest of the Debtors and all parties in

15

interest,'" *Bethlehem*, 2003 WL 21738964, at * 12 (emphasis added), the proposed Specified Payments will benefit a small group of non-consenting States for efforts that give that group an unjustifiable leg up on other similarly situated States. The Debtors cannot articulate any legitimate "business purpose" for such inequitable treatment, nor should such a result be achieved through section 105(a) of the Bankruptcy Code.

33. Approval of the Specified Payments is further inappropriate given that there is no indication whatsoever of the amount of fees and expenses that the Nine may incur in the future that would be subject to reimbursement by the Debtors and no clear parameters or caps for such reimbursements. None of the cases cited to by the Debtors permit what the Debtor and the Nine seek to accomplish through the Specified Payments—to compensate the Nine for their efforts to extract a settlement with the Debtors and Sacklers that will provide the Nine with significantly greater value than any other similarly situated creditor group, over the objection of creditors.[5] If

---

[5] The case law on which the Debtors rely to obtain approval of the Specified Payments is inapposite. In *Bethlehem*, the Debtor sought authority under sections 363(b) and 105(a) to pay the prospective professional fees and expenses of the United Steel Workers of America ("USWA") to undertake due diligence and analysis regarding the restructuring of the company, including re-negotiations of labor and benefits agreements with Debtor going forward. *Id.* at * 2. Unlike here, the USWA was "the largest constituency of unsecured creditors and the union representing most of Bethlehem's workers," the debtor's reimbursement proposal had the support of the committee and pre-petition lenders group, and the only party objecting to the proposed reimbursement was the U.S. Trustee. *Id.* at *2, *7, *11. Another important feature of the *Bethlehem* reimbursement proposal absent here is that it was subject to a specific cap on the amount to be reimbursed and circumscribed to a specific date range. *See id.* at *1-*2 ("The reimbursement would be . . . subject to an overall cap of $1.5 million for the period commencing October 15, 2001, and ending April 15, 2002, or upon payment of $1.5 million, whichever occurs later" which cap was later reduced by the court to $1.4 million).

*In re ASARCO LLC*, 441 B.R. 813, 815 (S.D. Tex. 2010), *aff'd sub nom. In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011), in which the court authorized the debtor under section 363(b) to reimburse qualified bidders that participated in an auction of a judgment held by the debtor, is also distinguishable for a variety of reasons. First, the rationale for the reimbursement of bidder expenses was "to provide an incentive for bidders to pursue the diligence and expend the resources necessary to bid on the SCC Judgment," which is in no way akin to the Nine's settlement negotiation efforts here. *Id.* at 820. Second, like *Bethlehem*, "[t]he proposed expense reimbursement process set a cap on the total allowed reimbursements." *Id.* at 821. Third, "[t]he Debtor had obtained either no objection with deference to the Debtor's business judgment or approval by the major creditor committees," and "[t]he only objection to the process came from the [debtor's parent] entity that might have to eventually pay the judgment or deal with an outside entity that might eventually own the judgment." *Id.* at 832. Lastly, the order in *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) [ECF No. 4652] cited by the Debtors is also distinguishable because it involved a debtor's request for authority under sections 363(b) and 105(a) to pay the fees and costs of an ad hoc group of creditors in connection with that group's due diligence, analyses, negotiation, preparation, and potential obtaining of equity and other financings to support the debtor's plan, in order to cover "the associated costs and risks the Group is undertaking"

16

the Nine wish to seek reimbursement of any fees and expenses incurred in these Cases, the sole available avenue to do so is under section 503 of the Bankruptcy Code, subject to the requirements thereunder.

## CONCLUSION

Florida supports additional funds going into the Debtors' estate and being distributed fairly to the States as already agreed upon in order to abate the opioid crisis. This case has been a study in collaboration between broad and disparate groups with a common aim – undoing the harm to the American people by opioids. There is nothing to justify handling additional funds differently now.

Dated: March 3, 2022.

Respectfully submitted:

AGENTIS PLLC
*Attorneys for the Attorney General, State of Florida*
55 Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
T. 305.722.2002
www.agentislaw.com

By: __/s/ *Christopher B. Spuches, Esq.*_____
　　　Christopher B. Spuches, Esq.
　　　New York Bar No: 2848653
　　　cbs@agentislaw.com

JOHN GUARD
Chief Deputy Attorney General
The Capital, PL-01
Tallahassee, Florida 32399-1050
T: (850) 414-3300
John.guard@myfloridalegal.com
www.MyFloridaLegal.com

---

in exploring such commitments. *See* [ECF No. 4217] ¶¶ 4, 6, 9. Unlike the Nine here, such ad hoc group represented a "substantial and diverse group of creditors of American," and such relief was supported by the creditors' committee. *Id.* at ¶ 7, 8.

ASHLEY MOODY
Florida Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
John Guard

*Attorneys for the State of Florida*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2021, a true and correct copy of *The State of Florida's Objection to Motion of Debtors Pursuant to 11 U.S.C. § 105(A) and 363(B) for Entry of an Order Authorizing and Approving Settlement Term Sheet* was filed electronically with the Clerk of the Court using the CM/ECF system which in turn sent notifications of such filing to all interested parties of record.

Dated: March 3, 2022.

                                          Respectfully submitted:

AGENTIS PLLC
*Attorneys for the Attorney General, State of Florida*
55 Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
T. 305.722.2002
www.agentislaw.com

By: __/s/ Christopher B. Spuches, Esq._____
       Christopher B. Spuches, Esq.
       New York Bar No: 2848653
       cbs@agentislaw.com

JOHN GUARD
Chief Deputy Attorney General
The Capital, PL-01
Tallahassee, Florida 32399-1050
T: (850) 414-3300
John.guard@myfloridalegal.com
www.MyFloridaLegal.com

ASHLEY MOODY
Florida Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
John Guard
Patricia A. Conners
Russell S. Kent

*Attorneys for the State of Florida*