Ellen Isaacs, Pro Se
ryansopc@gmail.com
561-860-0770

**UNITED STATES SOUTHERN DISTRICT BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P., et al** | Case No. 19-23649 (RDD) |
| Debtors | (Jointly Administered) |

_____

**ELLEN ISAACS' OBJECTION TO MOTION OF DEBTORS**

**PURSUANT TO THE 11 U.S.C. STATUTES 105(A) AND 363(B) FOR ENTRY OF AN <u>ORDER</u>**

**<u>AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET</u>**

Ellen Isaacs, Pro Se, objects to the *Motion of Debtors Pursuant to 11 U.S.C. Statutes 105 (a) and 363(b) for Entry of an Order Authorizing and Approving Settlement Term Sheet* [ECF No. 4410}, and states as follow in support of said objection:

**<u>INTRODUCTION</u>**

It is very apparent that the Debtor's and U.C.C. railroaded the non-consenting States with a payout to buy out the Attorney General's to gain leniency and traction from this matter before the Court as they saw how compelling the non-consenting State's arguments were upon appeal. The debtors were so desperate for resolution, the Debtor's orchestrated a settlement violative of the Bankruptcy Code itself. The settlement contains a "side deal", where affiliates of the Debtors are going to pay substantial monies to the eight dissenting states and the District of

Columbia to essentially drop their appeals. There is no difference between the $276,888,888.87 side payment proposed to be paid to the eight states and the District of Columbia ad the over $4.35B paid by the Sacklers in this deal. It is all money paid by the Sacklers to obtain a release, and the monies paid by the Sacklers are the vast majority of monies likely to be distributed to the States. **To be clear, Ellen Isaacs, Pro Se, does not object to the Sacklers paying more money to abate the Opioid Crisis.** Ellen Isaacs objects to the eight states and the District of Columbia being paid additional money in violation of 11 U.S.C. Statute 1123(a)(4). Ellen Isaacs does not consent to such treatment.

As this court well knows, the opioid pandemic is ravaging this entire country into a full blown mental health crisis. There is not a State, CIty, Municipality or tribunal full of citizens that are claimants or should have been and still should be eligible claimants in this bankruptcy scam. For over 20 years, Ellen Isaacs, her son Patrick Ryan Wroblewski and the entire extended family has had to partake in being abused by Federal, State & Local laws due to the manmade crisis. The States claim to have attempted to come to a bipartisan basis and failed the people over and over again.

Since the mid-2000's, the D.O.J. erroneously imposed fines to one of the wealthiest families in America. In 2019 through the initial settlement Agreement in September 2022 all of the consenting States sold out the American People for PROFITS over human life. On October 21, 2020 the D.O.J put out the following statement: "The abuse and diversion of prescription opioids has contributed to a national tragedy of addiction and deaths, in addition to those caused by illicit street opioids," said Deputy Attorney General Jeffrey A. Rosen. "With criminal guilty pleas, a federal settlement of more than $8 billion, and the dissolution of a company and repurposing its assets entirely for the public's benefit, the resolution in today's announcement re-affirms that the Department of Justice will not relent in its multi-pronged efforts to combat

the opioids crisis." Nearly a year and a half later and the Debtor's and U.C.C. continue to help the Sacklers put PROFITS over human life.

Ellen Isaacs' position has always been and continues to be that whatever proceeds are achieved from the settlement should be distributed in their entirety to the Victims. A far more limited payment under Section 503 for substantial contribution, the Bankruptcy Code does not allow for such a side payment. (Just like the Bankruptcy Code 9019.5 did not permit them to over reach their latitude to not permit the Pro Se Litigants to participate in mediation). Utilizing or characterizing payments from an affiliated third-party to circumvent Section 1123(a)(4), without obtaining creditor approval, invites abuse and, frankly, threatens the core of the bankruptcy system and the priority of payments of claims and interests under the Bankruptcy Code. Ellen Isaacs is also concerned that allowing the premiums or side payments in this deal will undermine victims to receive what they truly deserve. Which is the entire settlement. The States have no measure for their claims. Yet, the claimants have to jump through hoops, spend money to open probate, hite attorneys, burial expenses, long term mental health services for all of the family members in the grassroots of the communities, treatment services and so on. The States do not need the pittance of settlement money. It costs the government 1T annually to attempt to help society in the manmade Nationwide Public Health & Safety Emergency. The Victims and RCO's need the funds in the grassroots of the communities.

This Country saw how well the Asbestos and Tobacco Crisis mishandled the abatement funds and this Court would be shamefully amiss to arbitrarily do the exact same thing and worse with the widespread third-party non consensual releases. If approved, this deal could undermine the entire legal justice system. For those reasons, Ellen Isaacs' objects to the manner of distribution and the third party non-consensual releases.

## **RELEVENT FACTS**

1. On September 15, 2019 ("Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Shortly before the Petition Date, following months of hard-fought and arms'-length negotiations, the parties reached agreement on the framework for a comprehensive settlement - the so-called "Settlement Framework" -under which Purdue would file for bankruptcy and The Sacklers would relinquish their equity interests in Purdue, sell their foreign pharmaceutical businesses, and make a multi-billion dollar payment to the Debtors' estates.

2. The Ad Hoc Committee, of which Ellen Isaacs and The Estate of Patrick Ryan Wroblewski are claimants (creditors), was formed to represent the interests of the supporting the creditors in the bankruptcy case as an organized group. The Ad-Hoc Committee, along with the governmental claimants including the Multi-State Governmental Entities Group and the Non-Consenting States, were given complete freedom to negotiate the creation of the procedures for distributing abatement funds and the programs and strategies for which those funds are to be deployed. Further, this Court deliberately and calculatively prohibited Canada and the Pro Se litigants out of the negotiations and have violated the Bankruptcy Law.

3. From the initial filing of these bankruptcy cases, there was broad consensus that abatement should be the primary focus of any chapter 11 plan, and that distributions to non-federal governmental claimants should be devoted to abatement. There was similar agreement that it was the governmental claimants themselves, and not the Debtors, that should be charged with responsibility for deploying funds for abatement. As the Court observed at an early hearing in the case: "I continue to believe that the states play a major role in that process . . . where they act - in the best principles of federalism, for their state, the coordinator for the victims in their state." (Hearing Transcript of

November 19, 2019 hearing, at 165:8-14). Here again, the States have no measure of their claims.

## THE ALLOCATION OF ABATEMENT FUNDS

4.  As to the split of abatement funds, negotiations began among the States in 2018 and continued for more than two years. The process involved the creation of a multistate committee, referred to as the "Remedies Committee", comprised of representatives from the Attorneys General offices of 14 States and the District of Columbia. The Remedies Committee solicited and received input from numerous sources and considered multiple allocation proposals advanced by the different States and the Plaintiff's Executive Committee (the "PEC"). In addition to written and telephonic discussions, the Attorneys General and senior staff convened in person at key conferences in Denver, Atlanta and D.C. to discuss the interstate allocation. Not surprisingly, the States, with their diversity of characteristics, had a range of views of the appropriate metrics to be used in allocating funds amongst them. Wasting so much money by everyone that could have been put towards Nationwide Recovery. Eventually, however, after hundreds of hours of meetings and work, the Attorneys General held an open vote and overwhelmingly adopted an allocation plan. That interstate allocation was incorporated into Purdue's Plan. *See* Disclosure Statement [ECF No.2983], pp. 97-99.

## PLAN AND CONFIRMATION

5.  On September 17, 2021, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Twelth Amended Joint Chapter 11 Plan of Reorganization of*

*Purdue Pharma L.P. and its Affiliated Debtors* (the "Confirmation Order") [ECF No. 3787], confirming the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Plan") [ECF No. 3726].

6. The Confirmation Order, among other things, approved the agreement (the "<u>Sackler Settlement</u>") bamboozled by the The Sackler Family and the Debtors' creditors which provided for the Sackler's payment of $4.325B to the Debtors' estate to be distributed pursuant to the terms of the Plan. In exchange for the settlement payment, the Sacklers were to receive non-consensual releases of third-party claims against them.

7. The Nine objecting States, Canada, Ellen Isaacs, Maria Ecke and Ronald Bass, appealed the Confirmation Order. On December 16, 2021, the United States District Court for the Southern District of New York, entered its *Decision and Order on Appeal* (the "Appellate Order") [District Court ECF 279], which vacated the Confirmation Order. Specifically, the District Court held that the Bankruptcy Code does not authorize the releases provided to the Sacklers in section 10.7 of the Plan, and therefore, the Plan as currently construed cannot be confirmed.

8. The Appellate Order was subsequently appealed to the Second Circuit and various parties are in the process of preparing and filing briefs (the 'second Circuit Appeal").

## The Term Sheet

9. Following the entry of the Appellate Order, this COurt ordered the Sackler, the Debtors and the Nine into mediation. Despite being outside the scope of the Bankruptcy Law 9019.5 that requires all parties including Pro Se Litigants to participate in all mediation proceedings. Following two months of secretive and confidential negotiations, which did not include the Pro Se litigants or Canada, the Sacklers, the Debtors and the Nine agreed to the Term Sheet. THe Term Sheet ignores the Plan and agreed upon allocation model,

and instead provides for the payment of an extra 276,888,888,87 to the Nine. No further money is being allotted to the victims. More specifically, it includes the following disproportionately favorable treatment for The Nine:

- $276,888,888.87 will be paid to the Nine (and New Hampshire), and not in accordance with the agreed upon allocation under the Plan, but instead, pursuant to a new fund titles the Supplemental Opioid Abatement Fund ("SOAF"); and

- Payment of an "unspecified and unbudgeted" amount of attorney's fees of the Nine "in the bankruptcy case (including adversary proceedings, and any appeals thereunder), accrued to the date of the entry of the Approval Order and thereafter in furtherance of the agreements set forth herein… " *see* Term Sheet p. 3

## OBJECTION

10. The Court should deny the Motion because the Court does not currently have jurisdiction to modify the Plan, making the Motion premature and not ripe for adjudication. The Motion also improperly tries to circumvent section 1123(a)(4) of the Bankruptcy Code through a *sub rosa* plan. Finally, fees to the Nine should not be paid by the Debtor pursuant to Section 363(b) or Section 105, and the case law upon which the Debtor relies for this relief is inappropriate.

1. **The Appeals have Divested the Bankruptcy Court of Juridiction to Grant the Relief Sought in the Motion.**

11. By the Motion, the Debtors seek approval of the Term Sheet and to substantively modify the Plan, including releases, payment of attorney's fees, the allocation model, and treatment of creditors in Case 4 of the Plan, The Bankruptcy Court currently lacks jurisdiction to grant such relief.

12. "It is well established that the filing of an appeal divests the lower court of its control over matters on appeal." *In re Sabine Oil & Gas Corp.*, 16-CV-2561 (JGK), 216 WL 4203551, at *6 also S.D.N.Y. Aug 9, 2016) (the filing of a bankruptcy appeal "confers jurisdiction on the [appellate court] and divests the [trial] court of control over those aspects of the case involved in the appeal") (citing *In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (also S.D.N.Y. 1994) (noting that "[t]he same legal principle applies to appeals of bankruptcy court orders.")); *see also* In re *Emergency Beacon*, 58 B.R. 399, 402 (Bankr. Also S.D.N.Y. 1086) ("Once a notice of appeal is filed 'NO LOWER COURT SHOULD BE ABLE TO VACATE OR MODIFY AN ORDER UNDER APPEAL, NOT EVEN A BANKRUPTCY COURT ATTEMPTING TO ELIMINATE THE NEED FOR A PARTICULAR APPEAL.'" (citation omitted). As such, a "lower court may not take action which interferes with the appeal process or with the jurisdiction of the appellate court." *Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *6; In re *Prudential Lines, Inc.*, 170 B.R. at 243; *see also* In re *Transtexas Gas Corp,* 303 F. 3d 571, 582 (5th Cir. 2002) ("[W]hen a notice of appeal has been filed in a bankruptcy case, the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are **NOT** the subject of the appeal.") (EMPHASIS ADDED). Although a bankruptcy court may retain jurisdiction to enforce an order subject to appeal, it CANNOT take any action to modify or expand upon such order. *See In re Prudential Lines, Inc.,* 170 B.R. at 244 ("Courts have accordingly recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or after it; the former being permissible and the later being prohibited.").

13. The principle has been applied in rejecting a party's efforts to modify a Chapter 11 plan in the bankruptcy court, where the order confirming such plan was on appeal. *See, e.g., In re Sabine Oil & Gas Corp.*, 2016 W.L. 4203551, at *1, *6 (denying committee's motion for stay pending appeal of confirmation order where relief requested would modify plan

pending appeal of the confirmation order). In order to assure the integrity of the appeal process, it is imperative that the LOWER Court TAKE NO ACTION which might in any way interfere with the jurisdiction of the appeal court. *In re Kendrick Equip. Corp.*, 60 B.R. 356, 358 (Bankr. W.D. Va. 1986)

14. Here, the issue currently on appeal to the Second Circuit is whether the Plan as currently constituted may be confirmed. More specifically, whether the Bankruptcy Court had the authority to approve non-consensual third party releases to non-Debtors. The third party releases were critical to the inter-creditor settlements, the original Sackler Settlement and the Term Sheet. Without this release, there is NO Plan.

15. Nonetheless, the Motion seeks to significantly amend the Plan on appeal by revising the allocation models, revising the Sackler Settlement, altering the equality of distributions under the Plan, and incorporating the Term Sheet into the Plan. The Bankruptcy Court lacks jurisdiction at this juncture to grant the relief sought by the Motion, as it was divested of jurisdiction to modify the Plan upon the filing of the appeal of the Confirmation Order.

### II. The Motion Improperly Requests an Advisory Opinion

16. "The threshold issue in this, and every case, is whether a federal court has subject matter jurisdiction over the suit before it." *Concourse Rehabilitation & Nursing Ctr. Inc. v. DeBuono*, 179 F.3d 38, 43 (2nd Cir 1999); *see* U.S. Const. Art III Statute 2 (establishing the extent of federal jurisdiction). "Federal lawsuits must satisfy Article III of the U.S. Constitution, which limits the federal judicial power to actual 'cases' or 'controversies.'" U.S. Const. Art III Statute 2, cl. 1; *Endurance Am Ins. Co. DiStefano*, 1:20-CV-0203 (LEK), 2021 WL 3089127, at *2 (N.D.N.Y. July 22, 2021). "A dispute is ripe for

adjudication when there is a 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Motor Vehicle Mfrs, Ass'n of U.S., Inc. v. New York State Dept. of Envtl. Conservation*, 79 F. 3d 1298, 1305 (2nd Cir. 1996) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

17. "The ripeness doctrine prevents the courts, 'through avoidance premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protects] the agencies from judicial interference util an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties'" *Id*. (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 149 (1967). "The applicability of the doctrine depends upon two factors: the fitness of the issues for adjudication and the hardship to the parties that would result from withholding review." See Abbott Laboratories, 387 U.S. at 149.

18. "Even though bankruptcy courts are not Article III courts, they are nevertheless courts of limited jurisdiction bound by Article III, section 2 of the United States Constitution." *In re Nunez*, No 98-CV-7077, 2000 WL 655983, at *6 (E.D.N.Y. Mar. 17, 2000) (internal citations omitted). Therefore, "bankruptcy courts CANNOT issue advisory opinions." *Id* (internal citation omitted). A bankruptcy court "may NOT decide questions that cannot effect the rights of litigants to the case before them or give opinions what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation, internal quotation marks, and alteration omitted).

19. Here, the Court lacks jurisdiction to approve the Term Sheet, as the issue in NOT ripe. The Appellate Order vacated the Confirmation Order and found that the non-consensual third-party releases, which were an integral part of the Plan, were NOT authorized by the Bankruptcy Code. Accordingly, at this moment, there is no filed Plan in these bankruptcy cases that can be confirmed. Nonetheless, the Motion seeks to amend the barred Plan

through a term sheet. Another legal symantec. The Debtors readily admit the Motion does not present an actual case of controversy, and state "none of this will be relevant unless the Court of Appeals for the Second Circuit or the District Court, as applicable, issue orders or rulings allowing the consummation of the Plan materially enhanced by the Term Sheet." *See* Motion at 33.

### III. The Term Sheet Violates Section 1123(a)(4)

20. In an as-yet unfiled plan, the Debtors propose to disparately treet the 40 States, Canada and the Pro Se litigants to the Term Sheet, and instead pay $276,888,888.87 to the Nine and New Hampshire in addition to their proposed distributions under a plan. The result is that similarly situated creditors will be treated differently, contravening one of the basic tenets of bankruptcy law, a result which CANNOT be approved by this Court.

21. Section 1123(a)(4) requires that a plan "provide the same treatment for each claim of interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. Statute 1123(a)(4). "Equality of treatment requires that all class members receive equal value and pay the same consideration in exchange for their distributions." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357-58 (Bankr, also S.D.N.Y. 2018)

22. The Second Circuit has called equal treatment of similarly situated creditors "perhaps the predominant objective of a bankruptcy proceeding." *In re: PCH Assoc.*, 949 F.2d 585, 598 (2nd Cir. 1991); *see also In re Petition of Laitasalo*, 193 B.R. 187 (Bankr. also S.D.N.Y. 1996); *City Bank v. Mutual Fire Marine & Inland*, 646 F. Supp. 1139, 1142 (S.D.N.Y. 1986) ("In sum, the broad policy of denying to one creditor preference over other similarly situated creditors is paramount.")

The Supreme COurt has recently had occasion to reaffirm the principle that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." *Howard Delivery Service, Inc. v. Zurich American Insurance Co.*, U.S., 126 S. Ct  Bankruptcy Act is 'equality of distribution,'. ;  and if one claimant is to be preferred over others, the purpose should be clear from the statute.' *Id*. at 2116 (citations omitted). With dew exceptions 'preferential treatment of a class of creditors is in order only when clearly authorized by CONGRESS.' *Id*. at 2109.

*In re Delta Air Lines, 359 B.R. 454, 463-464* (Bankr also S.D.N.Y. 2006). The bankruptcy scheme concocted by the Debtors, the Sacklers and the Nine, utterly fails in this regard.

23. Here the proposed $276,888,888.87 payment to the Nine violates section 1123(a)(4) of the Bankruptcy Code. Pursuant to the agreed upon allocation model in the Plan, the National Opioid Abatement Trust ("NOAT") was to be created to allocate funding among the states based on a formula that was heavily negotiated among the Attorneys General of various States, Canada with avoidance and deterrent unto the pro se litigants. Under this allocation model, the States received equal treatment. The claimants and the pro se litigants were NOT  given equal treatment. The Term Sheet seeks to upend years of negotiation and pay $276,888,888.87 to the Nine to withdraw their objections to the Second Circuit Appeal. This additional $276,888,888.87 will not be paid pursuant to the allocation model in the as yet unfiled plan and will result in the Nine receiving materially favorable treatment under such a plan than the other States and other members of Class 4 of the Plan. Ellen Isaacs does not consent to any of the Debtor's Motion. The funds allocated belong to the claimants NOT the Nine or any of the States. Accordingly, the Term Sheet violates Section 1123(a)(4) of the Bankruptcy Code and CANNOT be approved by this Court.

### IV. The Term Sheet Constitutes an Impermissible *Sub Rosa* Plan

24. The Term Sheet is an IMPERMISSIBLE *sub rosa* plan that implements the terms of a future, unfiled plan of reorganization before the Court and has had the opportunity to approve a disclosure statement and solicit votes on such plan in violation of the protections afforded to parties-in-interest (Claimants) by section 1125 of the Bankruptcy Code.

25. In order to approve a settlement unter Stature 363(b), the Court must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Comm. of Equity Sec. Holders v. Lionel Corp* (*In re Lionel Corp.*), 722 F. 2d 1063, 1071 (2d Cir. 1983). The Court should consider all salient factors pertaining to the proceeding and, accordingly, act to further diverse interests of the debtor, creditors, claimants and equity holders, alike." *Id.* "But such a sale is prohibited if it amounts to a *sub rosa* plan, which short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan'" *In re Empire Generating Co, LLC,* 19-CV-5721 (CS), 2020 WL 1330285, at *8-9 (also S.D.N.Y. Mar. 23, 2020) (quoting *Iridium Capital Corp v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F. 3d 452, 466 (2d Cir. 2007) (internal quotation marks and alteration omitted); In re *Chrysler LLC,* 405 B.R. 84, 95 (Bankr. Also S.D.N.Y. 2009), aff'd, 576 F. 3d 108 (2d Cir 2009), *cert granted, judgment vacated sub mom. Indiana State Police Pension Tr. v Chrysler LLC,* 558 U.S. 1087 (2009), and vacated *sub mom. In re Chrysler, LLC,* 592 F. 3d 370 (2d Cir. 2010) ("A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.)

26. Courts have defined a *sub rosa* plan as a transaction that has the "practical effect of dictating some of the terms of any future reorganization plan. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). Courts have also found that *sub rosa* plans CANNOT be approved outside of the well-established solicitation and confirmation requirements of the Bankruptcy Code. *See id.* ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing ther terms of the plan *sub rosa* in connection with a sale of assets."); see also *In re Tower Auto, Inc.*, 241 F.R.D. 162, 168-69 (also S.D.N.Y. 2006); *In re Crowthers McCall Pattern Inc*, 114 B.R. 877, 885 (Bankr. Also S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan WILL NOT be permitted.").

27. The Term Sheet fits squarely within the definition of sub rosa plan because the agreement materially alters the Plan to the detriment of the other States, Canada, Pro Se Litigants and Claimants, who were not parties to the mediation, and improperly ignores the allocation and distribution scheme of the Plan prior to the approval of a disclosure statement and solicitation of votes on a plan. By modifying the distribution and allocation model of the Plan and favoring the Nine over the Claimants with an extra $276,888,888.87, the Debtors are seeking to "short circuit the requirements of Chapter 11." *See Braniff*, 700 F. 2d at 940.

28. The Could should not allow the Debtors and the Nine to bypass the fundamental principles of bankruptcy law and the integrity of the confirmation process through a mediated settlement, at which the States, Canada and Pro Se litigants were not parties. The Term Sheet not only dictates the terms of the as yet unfiled plan, but it attempts to materially modify the Plan, to the detriment of the claimants, and after the claimants partially voted on the plan. Not all claimants received their ballots from Prime Clerk to vote.

V. **The Debtors Improperly Seek to Pay the Attorneys' Fees of the Nine**

29. As part of the Motion, the Debtors improperly seek permission to pay or reimburse the attorney's fees and expenses incurred by the Nine without meaningful limits or parameters governing the scope or amount of such payments. Such "Specified Payments" are in addition to any payments to which States or their professionals may be entitled under Section 5.8 of the Plan and are blatantly unfair to the Pro Se Litigants who have also taken tremendous efforts and made significant contributions to the Debtors' reorganization throughout the Cases. The Specified Payments represent yet another improper payment to the Nine and CANNOT be approved under sections 363(b) and 105(a) of the Bankruptcy Code.

30. First and foremost, "[s]ection 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor. If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under Statute 363(b)." *U.S. Trustee v. Bethlehem Steel Corp (In re Bethlehem Steel Corp.).*, 02 CIV. 2854 (MBM), 2003 WL 21738964 at *10 (also S.D.N.Y. July 28, 2003). Nor can a debtor use section 262(b) to reimburse a creditor's fees or expenses that were incurred while attempting to collect on its pre-petition claims. *See id*. At *11 (recognizing that "where a creditor incurs expenses in attempting to collect on pre-petition claims and then seeks reimbursement from the estate." "[t}hat situation is covered by Statute 503, and expenses will be paid only if the creditor's actions were helpful to the estate").

31. Here, the Debtors propose to pay the fees and expenses incurred by the Nine in formulating a deal that blatantly favors the Nine's self interest above those of similarly situated States, Canada, Pro Se Litigants, Creditors and Claimants. Indeed, the Term

Sheet contemplates that the Nine *alone* shall receive (i) an additional $276,888,888.87 and (ii) payment or reimbursement of their attorney's fees and expense in addition to those provided to all States under the Plan. The Debtor cannot use section 363(b) of the Bankruptcy Code to pay the Nine's fees and expenses when such fees and expenses were incurred by the Nine in constructing a self-interested deal that provides them with substantially more value than similarly situated creditors and claimants. Nor is such payment appropriate under section 363(b) where the Nine were representing themselves as creditors to enhance their collection on pre-petition claims.

32. Moreover, no sound business purpose exists to justify the Debtor's proposed Specified Payments. "The bankruptcy court may not authorize the use of funds under Statute 363(b) unless it finds 'a good business reason' for the expenditure." Bethlehem Steel Corp., 2003 W L 21738964, at *10 (citing In re Lionel Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983)). The Debtors argue that a "sound business purpose" exists for the Specified Payments because '[t]he Nine have facilitated, and are making ongoing efforts to finalize and implement, the settlement reflected in the Term Sheet, which would bring significant additional value into the Debtors' estates." See Motion at 36. While the Term Sheet contemplates that additional value will be provided to the Debtors' estates, it also funnels a tremendous amount of value to the Nine *alone* through the nearly $276 million SOAF Payment and Specified Payments. Unlike *Bethlehem*, where the court found "that the reimbursement arrangement was 'in the best interest of the Debtors and <u>all</u> parties in interest,'" *Bethlehem*, 2003 WL 21738964, at *12 (emphasis added), the proposed Specified Payments will benefit a small group of non-consenting States for efforts that give that group an unjustifiable leg up on other similarly situated States, Canada, Pro Se litigants, Claimants and Creditors. The Debtors CANNOT articulate any legitimate "business purpose" for such inequitable treatment, not should such a result be achieved through section 105(a) of the Bankruptcy Code.

33. Approval of the Specified Payments is further inappropriate given that there is no indication whatsoever of the amount of fees and expenses that the Nine may incur in the future that would be subject to reimbursement by the Debtors and no clear parameters or caps for such reimbursements. None of the cases cited to by the Debtors permit what the Debtor and the Nine seek to accomplish through the Specified Payments – to compensate the Nine for their efforts to extract a settlement with the Debtors and Sacklers that will provide the Nine with significantly greater value than any similarly situated creditor group, over the objection of creditors and claimants. If the Nine wish to seek reimbursement of any fees and expenses incurred in these Cases, the sole available avenue under section 503 of the Bankruptcy Code, subject to the requirements thereunder.

## CONCLUSION

Ellen Isaacs supports additional funds going into the Debtors' estate and being distributed to the Claimants via a 501c3 in each State that the National Recovery Activists and Advocates abate to the claimants and their families for long term mental health services and for the approximately 23M afflicted that are in need of immediate services and their families due to the manmade genocide created by The Sackler's and continues to object to the third party non-consensual releases.

Dated: March 4, 2022.

                                          Respectfully submitted,

                                  By:    /s/ Ellen Isaacs
                                                  _____
                                                  Ellen Isaacs
                                                  ryansopc@gmail.com