TATE LAW GROUP, LLC
P.O. Box 9060
Savannah, Georgia 31412
(912) 234-3030
(912) 234-9700 (Fax)
Mark A. Tate

*Attorney for Creditor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649(RDD)** |
| Debtors[1] | **(Jointly Administered)** |

**CLAIMANTS' OBJECTION TO MOTION OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET**

Claimants[2] object to the *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b)*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Aboff's, Inc., Advanced C4 Solutions, Inc., AFL-CIO Local 475 Health & Welfare Fund, Allied Security Health and Benefit Fund, Alure Home Improvements, Inc., Amalgamated Union Local 450-A Welfare Fund, Austin & Williams, Inc., Bacon County Hospital, Georgia, Bacon County, Georgia, Barnes, Iaccarino & Shepherd, LLP, Bellmore Fire District, New York, Black Prince Distillery, Inc., Borough of Paramus, New Jersey, Brer-Four Transportation Corporation, Brighton Health Plan Solutions d/b/a MagnaCare Administrative Services, Brighton Health Plan Solutions d/b/a MagnaCare Administrative Services and MagnaCare, LLC, Brookhaven Ambulance, New York, Building Service Local 2 Welfare Fund, Cardoza Plumbing Corporation, Cedar International Services, LLC, Centereach Fire District, New York, Centerport Fire District, New York, Chatham County Hospital Authority, Georgia, Chatham County, Georgia, City of Alma, GA, City of Bayonne, New Jersey, City of Blackshear, Georgia, City of Brunswick, Georgia, City of Clifton, New Jersey, City of Demorest, Georgia, City of Elizabeth, New Jersey, City of Long Beach, New York, City of Pooler, Georgia, City of Richmond Hill, Georgia, Corbett Aggregates Companies, LLC, CWA Local 1181 Health Plan, CWA Local 1182 & 1183 Health & Welfare Funds, Dade County, Georgia, Drywall Tapers Insurance Fund, Flushing Hospital Medical Center, Friendship Engine and Hose Company, New York, Gordon L. Seaman, Inc., Habersham County Hospital, Georgia, Hauppauge Fire District, New York, Hicksville Water District, New York, Hudson Regional Hospital, IBEW Local 25 Health & Benefit Fund, IBEW Local 25 Health & Benefit Fund, International Brotherhood of Trade Unions Local 713 Health Plan, International Constructions, Inc., International Intimates, Inc., Iron Workers 361 Health Fund, Iron Workers Local 40 Health Fund, Iron Workers Local 417 Health Fund, Iron Workers Local 580 Health & Benefit Fund, Islip Terrace Fire District, New York, IUOE Local 138 Health Benefit Fund, Jamaica Hospital and Medical Center, John Martinez d/b/a John Martinez Trucking, Kaya Associates, Inc., Laborers Local 1298 of Nassau & Suffolk Counties, Laborers Local 235 Welfare Fund, Levittown Fire District, New York, LNO, Inc., Local 342 United Marine Division Insurance Trust, Local 381 Group Insurance Fund, Medford Volunteer Ambulance, New York, Melville Fire District, New York, Merrick Library, New York, Metal Polishers Local 8A-28A Welfare Fund, Metallic Lathers and Reinforcing Iron Workers Local 46 Health & Benefit Fund, Miller Place Fire District, New York, Mount Sinai Fire District, NY, Nesconset Fire District, New York, NOITU Insurance Trust Fund, North Merrick Fire, New York, North Patchogue Fire District, New York, Painting Industry Insurance Fund, Phillip Fyman and Alexander Weingarten, M.D. PC, Pierce County, Georgia, Plainview-

*for Entry of an Order Authorizing and Approving Settlement Term Sheet [ECF No. 4410],* and

states as follows in support of its objection:

## INTRODUCTION

This settlement contains a "side deal," where affiliates of the Debtors are going to pay

substantial monies to the eight dissenting states and the District of Columbia to essentially drop

their appeals. There is no difference between the $276,888,888.87 side payment proposed to be

paid to the eight states and the District of Columbia and the other over $4 billion paid by the

Sacklers in this deal. It is all money paid by the Sacklers to obtain a release, and the monies paid

by the Sacklers are the vast majority of monies likely to be distributed. **Claimants certainly do**

**not object to the Sacklers paying more money to abate the opioid crisis**. Claimants object to

the eight states and the District of Columbia being paid additional "hush money" in violation of

11 U.S.C. §1123(a)(4).

Whatever proceeds are obtained from this settlement should be distributed to compensate

these Claimants. The eight states and the District of Columbia (the "Nine") believe that

they are entitled to extra money because they held out, not because they are classified

---

Old Bethpage Library, New York, Port Washington Water District, New York, Redwood Contracting Corp., Ridge Fire District, New York, Rockville Centre Public Library, New York, Roofers Local 8 WBPA Fund, Roslyn Water District, New York, Shamrock Materials, LLC, Smithtown Fire District, New York, South Farmingdale Fire District, New York, St. James Fire District, New York, St. John's Riverside Hospital, Stony Brook Fire District, New York, Structural Steel Local 806 Health Plan, Teamsters Local 445 Welfare Fund, Teamsters Local 456 Welfare Fund, The Par Group, Thomas F. Corbett Associates, LLC, Town of Stony Point, New York, Town of Babylon, New York, Town of Brookhaven, New York, Town of Clarkstown, New York, Town of Clinton, New Jersey, Town of Haverstraw, New York, Town of Hempstead, New York, Town of Huntington, New York, Town of Islip, New York, Town of North Hempstead, New York, Town of Orangetown, New York, Town of Oyster Bay, New York, Town of Ramapo, New York, Town of Riverhead, New York, Town of Smithtown, New York, Town of Southampton, New York, Town of Southold, New York, Town of Wappinger, New York, Transitions Recovery Program, UFCW Local 1500 Welfare Fund, UFCW Local 342 Healthcare Fund, UFCW Local 342 Welfare Fund, Uniformed Fire Officers Association Benefits Fund, Uniondale Fire District, New York, United Crafts Benefit Fund, United Wire, Metal & Machine Local 820 Health, UOPW Local 175 Welfare Fund, Village of Amityville, New York, Village of Babylon, New York, Village of Bellport, New York, Village of East Hampton, New York, Village of East Rockaway, New York, Village of Farmingdale, New York, Village of Floral Park, New York, Village of Garden City, New York, Village of Great Neck, New York, Village of Greenport, New York, Village of Hempstead New York, Village of Island Park, New York, Village of Islandia, New York, Village of Lake Grove, New York, Village of Lawrence, New York, Village of Lindenhurst, New York, Village of Lloyd Harbor, New York, Village of Lynbrook, New York, Village of Massapequa Park, New York, Village of Mill Neck, New York, Village of Millertown, New York, Village of New Hyde Park, New York, Village of Northport, New York, Village of Old Westbury, New York, Village of Patchogue, New York, Village of Poquott, New York, Village of Port Washington North, New York, Village of Saltaire, New York, Village of Stewart Manor, New York, Village of Suffern, New York, Village of Valley Stream, New York, Village of Village of the Branch, New York, Village of Wappingers Falls, New York, Village of West Hampton Dunes, New York, Village of West Haverstraw, New York, Village of Westbury, New York, Villlage of Nissequogue, New York, West Hempstead Public Library, New York, and Westchester Heavy Construction Laborers Local 60 Health & Welfare Fund.

incorrectly. But for, likely, a far more limited payment under Section 503 for substantial

contribution, the Bankruptcy Code does not allow for such a side payment. Utilizing or

characterizing payments from an affiliated third-party to circumvent Section 1123(a)(4), without

obtaining creditor approval, invites abuse and, frankly, threatens the core of the bankruptcy

system and the priority of payments of claims and interests under the Bankruptcy Code.

Allowing for premiums or side payments in this deal undermines the ability of Plaintiffs to

resolve litigation against other opioid defendants. If approved, this deal could undermine the

ability to receive future value in other cases well in excess of the amounts at issue here by

disrupting allocations in other cases that may be payable now versus ten years or more from

now, as provided in this settlement. These claimants object only to the manner of distribution of

these additional monies.

## FACTS

1.      On September 15, 2019 ("Petition Date"), the Debtors filed voluntary petitions for

relief under Chapter 11 of the Bankruptcy Code. Shortly before the Petition Date, following

months of hard-fought and arms'-length negotiations, the parties reached agreement on the

framework for a comprehensive settlement – the so-called "Settlement Framework" – under

which Purdue would file for bankruptcy and the Sacklers would relinquish their equity interests

in Purdue, sell their foreign pharmaceutical businesses, and make a multi-billion-dollar payment

to the Debtors' estates.

2.      An Ad Hoc Committee was formed to represent the interests of the supporting

governmental creditors in the bankruptcy case and to serve as an organized group with whom

other case parties, including those not yet supporting the settlement, could negotiate. The Ad

Hoc Committee, along with the other governmental claimants including the Multi-State

Governmental Entities Group and the Non-Consenting States, were given almost complete

freedom to negotiate the creation of the procedures for distributing abatement funds and the

programs and strategies for which those funds are to be deployed.

3.        From the initial filing of these bankruptcy cases, there was broad consensus that

abatement should be the primary focus of any Chapter 11 plan, and that distributions to non-

federal governmental claimants should be devoted to abatement. There was similar agreement

that it was the governmental claimants themselves, and not the Debtors, that should be charged

with responsibility for deploying funds for abatement.

## **Plan and Confirmation**

4.        On September 17, 2021, this Court entered its *Findings of Fact, Conclusions of*

*Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of*

*Purdue Pharma L.P. and its Affiliated Debtors* (the "Confirmation Order") [ECF No. 3787],

confirming the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P.*

*and its Affiliated Debtors* (the "Plan") [ECF No. 3726].

5.        The Confirmation Order, among other things, approved the agreement (the

"Sackler Settlement") reached by the Sackler Family and the Debtors' creditors which provided

for the Sackler's payment of $4.325 billion to the Debtors' estate to be distributed pursuant to the

terms of the Plan. In exchange for the settlement payment, the Sacklers were to receive non-

consensual releases of third-party claims against them.

6.        The Nine objecting States, among other parties, appealed the Confirmation Order.

On December 16, 2021, the United States District Court for the Southern District of New York,

entered its *Decision and Order on Appeal* (the "Appellate Order") [ECF No. 279], which vacated

the Confirmation Order. Specifically, the District Court held that the Bankruptcy Code does not

authorize the releases provided to the Sacklers in section 10.7 of the Plan, and therefore, the Plan

4

as currently constituted cannot be confirmed.

7.      The Appellate Order was subsequently appealed to the Second Circuit and various

parties are in the process of preparing and filing briefs (the "Second Circuit Appeal").

**The Term Sheet**

8.      Following the entry of the Appellate Order, this Court ordered the Sacklers, the

Debtors and the Nine to mediation. Following two months of secretive and confidential

negotiations, which did not include the State of Florida or the major constituencies in this case,

the Sacklers, the Debtors and the Nine agreed to the Term Sheet. The Term Sheet ignores the

Plan and agreed upon allocation model, and instead provides for the payment of an extra

$276,888,888.87 to the Nine. More specifically, it includes the following disproportionately

favorable treatment for the Nine:

- $276,888,888.87 will be paid to the Nine (and New Hampshire), and not in
  accordance with the agreed upon allocation under the Plan, but instead, pursuant
  to a new fund titled the Supplemental Opioid Abatement Fund ("SOAF"); and

- Payment of an unspecified and unbudgeted amount of attorneys' fees of the Nine
  "in the bankruptcy case (including adversary proceedings, and any appeals
  thereunder), accrued to the date of the entry of the Approval Order and thereafter
  in furtherance of the agreements set forth herein …" *see* Term Sheet, p. 3.

**OBJECTION**

9.      The Court should deny the Motion because the Court does not currently have

jurisdiction to modify the Plan, making the Motion premature and not ripe for adjudication. The

Motion also improperly attempts to circumvent Section 1123(a)(4) of the Bankruptcy Code

through a sub rosa plan. Finally, fees to the Nine should not be paid by the Debtor pursuant to

Section 363(b) or Section 105, and the case law upon which the Debtor relies for this relief is

inapposite.

**I.**     **The Appeals have Divested the Bankruptcy Court of Jurisdiction to Grant the Relief Sought in the Motion.**

10.     By the Motion, the Debtors seek approval of the Term Sheet and to substantively

modify the Plan, including releases, payment of attorney's fees, the allocation model, and

treatment of creditors in Class 4 of the Plan. The Bankruptcy Court currently lacks jurisdiction to

grant such relief.

11.     "It is well established that the filing of an appeal divests the lower court of its

control over matters on appeal." *In re Sabine Oil & Gas Corp.*, 16-CV-2561 (JGK), 2016 WL

4203551, at *6 (S.D.N.Y. Aug. 9, 2016) (the filing of a bankruptcy appeal "confers jurisdiction

on the [appellate court] and divests the [trial] court of control over those aspects of the case

involved in the appeal") (citing *In re Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994)

(noting that "[t]he same legal principle applies to appeals of bankruptcy court orders.")); *see also*

*In re Emergency Beacon*, 58 B.R. 399, 402 (Bankr. S.D.N.Y. 1986) ("Once a notice of appeal is

filed 'no lower court should be able to vacate or modify an order under appeal, not even a

bankruptcy court attempting to eliminate the need for a particular appeal.'") (citation omitted).

As such, a "lower court may take no action which interferes with the appeal process or with the

jurisdiction of the appellate court." *Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *6; *In re*

*Prudential Lines, Inc.*, 170 B.R. at 243; *see also In re Transtexas Gas Corp.*, 303 F.3d 571, 582

(5th Cir. 2002) ("[W]hen a notice of appeal has been filed in a bankruptcy case, the bankruptcy

court retains jurisdiction to address elements of the bankruptcy proceeding that are ***not*** the

subject of the appeal.") (emphasis added). Although a bankruptcy court may retain jurisdiction to

enforce an order subject to appeal, it cannot take any action to modify or expand upon such

6

order. *See In re Prudential Lines, Inc.*, 170 B.R. at 244 ("Courts have accordingly recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or alter it; the former being permissible and the latter prohibited.").

12.     This principle has been applied in rejecting a party's efforts to modify a Chapter 11 plan in the bankruptcy court, where the order confirming such plan was on appeal. *See, e.g., In re Sabine Oil & Gas Corp.*, 2016 WL 4203551, at *1, *6 (denying committee's motion for stay pending appeal of confirmation order where relief requested would modify plan pending appeal of confirmation order). In order to assure the integrity of the appeal process, it is imperative that the lower court take no action which might in any way interfere with the jurisdiction of the appeal court. *In re Kendrick Equip. Corp.*, 60 B.R. 356, 358 (Bankr. W.D. Va. 1986).

13.     Here, the issue currently on appeal to the Second Circuit is whether the Plan as currently constituted may be confirmed. More specifically, whether the Bankruptcy Court had the authority to approve non-consensual third-party releases to non-Debtors. The third-party releases were critical to the inter-creditor settlements, the original Sackler Settlement and the Term Sheet. Without this release, there is no Plan.

14.     Nonetheless, the Motion seeks to significantly amend the Plan on appeal by revising the allocation models, revising the Sackler Settlement, altering the equality of distributions under the Plan, and incorporating the Term Sheet into the Plan. The Bankruptcy Court lacks jurisdiction at this juncture to grant the relief sought by the Motion, as it was divested of jurisdiction to modify the Plan upon the filing of the appeal of the Confirmation Order.

## II.    The Motion Improperly Requests an Advisory Opinion

15.    "The threshold issue in this, and every case, is whether a federal court has subject

matter jurisdiction over the suit before it." *Concourse Rehabilitation & Nursing Ctr. Inc. v.*

*DeBuono*, 179 F.3d 38, 43 (2d Cir. 1999); *see* U.S. Const. Art. III, § 2 (establishing the extent of

federal jurisdiction). "Federal lawsuits must satisfy Article III of the U.S. Constitution, which

limits the federal judicial power to actual 'cases' or 'controversies.'" U.S. Const. Art. III, § 2, cl.

1; *Endurance Am. Ins. Co. v. DiStefano*, 1:20-CV-0203 (LEK), 2021 WL 3089127, at *2

(N.D.N.Y. July 22, 2021). "A dispute is ripe for adjudication when there is 'a real, substantial

controversy between parties having adverse legal interests, a dispute definite and concrete, not

hypothetical or abstract.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dept. of*

*Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996) (quoting *Babbitt v. United Farm*

*Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

16.    "The ripeness doctrine prevents the courts, 'through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative policies,

and also [protects] the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967). "The applicability of the doctrine

depends upon two factors: the fitness of the issues for adjudication and the hardship to the parties

that would result from withholding review." *See Abbott Laboratories*, 387 U.S. at 149.

17.    "Even though bankruptcy courts are not Article III courts, they are nevertheless

courts of limited jurisdiction bound by Article III, section 2 of the United States Constitution." *In*

*re Nunez*, No. 98-CV-7077, 2000 WL 655983, at *6 (E.D.N.Y. Mar. 17, 2000) (internal citations

omitted). Therefore, "bankruptcy courts cannot issue advisory opinions." *Id*. (internal citations

omitted). A bankruptcy court "may not decide questions that cannot affect the rights of litigants

in the case before them or give opinions advising what the law would be upon a hypothetical

state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation, internal quotation marks,

and alteration omitted).

18.     Here, the Court lacks jurisdiction to approve the Term Sheet, as the issue is not

ripe. The Appellate Order vacated the Confirmation Order and found that the non-consensual

third- party releases, which were an integral part of the Plan, were not authorized by the

Bankruptcy Code. Accordingly, at this moment, there is no filed Plan in these bankruptcy cases

that can be confirmed. Nonetheless, the Motion seeks to amend the barred Plan through the Term

Sheet. The Debtors readily admit that the Motion does not present an actual case of controversy,

and state "none of this will be relevant unless the Court of Appeals for the Second Circuit or the

District Court, as applicable, issue orders or rulings allowing the consummation of the Plan as

materially enhanced by the Term Sheet." *See* Motion at ¶ 33.

### III.     The Term Sheet Violates Section 1123(a)(4)

19.     In an as-yet unfiled plan, the Debtors propose to disparately treat the 40 States not

parties to the Term Sheet, and instead pay $276,888,888.87 to the Nine and New Hampshire in

addition to their proposed distributions under a plan. The result is that similarly situated creditors

will be treated differently, contravening one of the basic tenants of bankruptcy law, a result

which cannot be approved by this Court.

20.     Section 1123(a)(4) requires that a plan "provide the same treatment for each claim

or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "Equality of

treatment requires that all class members receive equal value and pay the same consideration in

exchange for their distributions." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357–58

(Bankr. S.D.N.Y. 2018).

21.    The Second Circuit has called equal treatment of similarly situated creditors "perhaps the predominant objective of a bankruptcy proceeding." *In re: PCH Assoc.*, 949 F.2d 585, 598 (2nd Cir. 1991); see also *In re Petition of Laitasalo*, 193 B.R. 187 (Bankr. S.D.N.Y. 1996); *City Bank v. Mutual Fire Marine & Inland*, 646 F.Supp. 1139, 1142 (S.D.N.Y. 1986) ("In sum, the broad policy of denying to one creditor preference over other similarly situated creditors is paramount.").

> The Supreme Court has recently had occasion to reaffirm the principle that "the Bankruptcy Code aims, in the main, to secure equal distribution among creditors." *Howard Delivery Service, Inc. v. Zurich American Insurance Co.*, U.S., 126 S. Ct. 2105, 2109, 165 L. Ed. 2d 110 (2006) (citations omitted). "The theme of the Bankruptcy Act is 'equality of distribution,'" . . . and if one claimant is to be preferred over others, the purpose should be clear from the statute." *Id*. at 2116 (citations omitted). With few exceptions "preferential treatment of a class of creditors is in order only when clearly authorized by Congress." *Id*. at 2109.

*In re Delta Air Lines*, 359 B.R. 454, 463-464 (Bankr. S.D.N.Y. 2006). The bankruptcy scheme concocted by the Debtors, the Sacklers and the Nine, utterly fails in this regard.

22.    Here, the proposed $276,888,888.87 payment to the Nine violates section 1123(a)(4) of the Bankruptcy Code. Pursuant to the agreed upon allocation model in the Plan, the National Opioid Abatement Trust ("NOAT") was to be created to allocate funding among the states based on a formula that was heavily negotiated among the Attorneys General of various States. Under this allocation model, the States received equal treatment. The Term Sheet seeks to upend years of negotiation and pay $276,888,888.87 to the Nine to withdraw their objections to the Second Circuit Appeal. This additional $276,888,888.87 will not be paid pursuant to the allocation model in the as yet unfiled plan and will result in the Nine receiving materially favorable treatment under such a plan than the other States and other members of Class 4 of the Plan. Florida does not consent to this treatment. Accordingly, the Term Sheet violates Section

10

1123(a)(4) of the Bankruptcy Code and cannot be approved by this Court.

### IV.    The Term Sheet Constitutes an Impermissible *Sub Rosa* Plan

23.    The Term Sheet is an impermissible *sub rosa* plan that implements the terms of a future, unfiled plan of reorganization before the Court has had the opportunity to approve a disclosure statement and solicit votes on such plan in violation of the protections afforded to parties-in-interest by section 1125 of the Bankruptcy Code.

24.    In order to approve a settlement under § 363(b), the Court must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). The Court "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d at 1071. "But such a sale is prohibited if it amounts to a sub rosa plan, which 'short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan.'" *In re Empire Generating Co, LLC.*, 19-CV-5721 (CS), 2020 WL 1330285, at *8–9 (S.D.N.Y. Mar. 23, 2020) (quoting *Iridium Capital Corp. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks and alteration omitted); *In re Chrysler LLC*, 405 B.R. 84, 95 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *cert. granted, judgment vacated sub nom*; *Indiana State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009), and *vacated sub nom*; *In re Chrysler, LLC*, 592 F.3d 370 (2d Cir. 2010) (A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the Chapter 11 requirements for confirmation of a plan of reorganization).

25.    Courts have defined a *sub rosa* plan as a transaction that has the "practical effect

of dictating some of the terms of any future reorganization plan." *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). Courts have also found that *sub rosa* plans cannot be approved outside of the well-established solicitation and confirmation requirements of the Bankruptcy Code. *See Id.* ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets."); *see also In re Tower Auto. Inc.*, 241 F.R.D. 162, 168- 69 (S.D.N.Y. 2006); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

26.     The Term Sheet fits squarely within the definition of a sub rosa plan because the agreement materially alters the Plan to the detriment of the other States, who were not parties to the mediation, and improperly ignores the allocation and distribution scheme of the Plan prior to the approval of a disclosure statement and solicitation of votes on a plan. By modifying the distribution and allocation model of the Plan and favoring the Nine by providing only those states with an extra $276,888,888.87, the Debtors are seeking to "short circuit the requirements of Chapter 11." *See Braniff*, 700 F.2d at 940.

27.     The Court should not allow the Debtors and the Nine to bypass the fundamental principles of bankruptcy law and the integrity of the confirmation process through a mediated settlement, at which the States were not parties. The Term Sheet not only dictates the terms of the as yet unfiled plan, but it attempts to materially modify the Plan, to the detriment of the other States, and after the parties have already voted on the Plan.

**V.     The Debtors Improperly Seek to Pay the Attorneys' Fees of the Nine**

28.     As part of the Motion, the Debtors improperly seek permission to pay or

reimburse the attorneys' fees and expenses incurred by the Nine without any meaningful limits or parameters governing the scope or amount of such payments.[3] Such "Specified Payments" are in addition to any payments to which States or their professionals may be entitled under section 5.8 of the Plan and are blatantly unfair to the other States and creditors who have also undertaken tremendous efforts and made significant contributions to the Debtors' reorganization throughout the Cases. The Specified Payments represent yet another improper payment to the Nine and cannot be approved under sections 363(b) and 105(a) of the Bankruptcy Code.

29.     First and foremost, "[s]ection 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor. If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b)." *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 02 CIV. 2854 (MBM), 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003). Nor can a debtor use section 363(b) to reimburse a creditor's fees or expenses that were incurred while attempting to collect on its pre- petition claims. *See Id.* at *11 (recognizing that "where a creditor incurs expenses in attempting to collect on pre-petition claims and then seeks reimbursement from the estate, [t]hat situation is covered by § 503, and expenses will be paid only if the creditor's actions were helpful to the estate.").

30.     Here, the Debtors propose to pay the fees and expenses incurred by the Nine in formulating a deal that blatantly favors the Nine's self-interest above those of similarly situated States and creditors. Indeed, the Term Sheet contemplates that the Nine *alone* shall receive (i) an additional $276,888,888.87 and (ii) payment or reimbursement of their attorney's fees and expense in addition to those provided to all States under the Plan. The Debtor cannot use section

---

[3] See Motion at ¶ 30 ("[T]he Debtors agree to pay or reimburse the reasonable and documented fees and expenses of outside counsel of the Nine in the Cases (including any adversary proceedings, and any appeals thereunder) (the 'Specified Payments'), in each case accrued through the date of entry of the Order and thereafter in furtherance of the agreements set forth in the Term Sheet.").

363(b) of the Bankruptcy Code to pay the Nine's fees and expenses when such fees and expenses were incurred by the Nine in constructing a self-interested deal that provides them with substantially more value than similarly situated creditors. Nor is such payment appropriate under section 363(b) where the Nine were representing themselves as creditors to enhance their collection on pre- petition claims.

31.    Moreover, no sound business purpose exists to justify the Debtor's proposed Specified Payments. "The bankruptcy court may not authorize the use of funds under § 363(b) unless it finds 'a good business reason' for the expenditure." *Bethlehem Steel Corp.*, 2003 WL 21738964, at *10 (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)). The Debtors argue that a "sound business purpose" exists for the Specified Payments because "[t]he Nine have facilitated, and are making ongoing efforts to finalize and implement, the settlement reflected in the Term Sheet, which would bring significant additional value into the Debtors' estates." *See* Motion at ¶ 36. While the Term Sheet contemplates that additional value will be provided to the Debtors' estates, it also funnels a tremendous amount of value to the Nine *alone* through the nearly $276 million SOAF Payment and Specified Payments. Unlike *Bethlehem*, where the court found "that the reimbursement arrangement was 'in the best interest of the Debtors and all parties in interest,'" the proposed Specified Payments will benefit a small group of non-consenting States for efforts that give that group an unjustifiable leg up on other similarly situated States. *Bethlehem*, 2003 WL 21738964, at * 12 (emphasis added). The Debtors cannot articulate any legitimate "business purpose" for such inequitable treatment, nor should such a result be achieved through section 105(a) of the Bankruptcy Code.

32.    Approval of the Specified Payments is further inappropriate given that there is no indication whatsoever of the amount of fees and expenses that the Nine may incur in the future

that would be subject to reimbursement by the Debtors and no clear parameters or caps for such

reimbursements. None of the cases cited to by the Debtors permit what the Debtor and the Nine

seek to accomplish through the Specified Payments—to compensate the Nine for their efforts to

extract a settlement with the Debtors and Sacklers that will provide the Nine with significantly

greater value than any other similarly situated creditor group, over the objection of creditors.[4] If

the Nine wish to seek reimbursement of any fees and expenses incurred in these Cases, the sole

available avenue to do so is under section 503 of the Bankruptcy Code, subject to the

requirements thereunder.

## **CONCLUSION**

Claimants support additional funds going into the Debtors' estate and being distributed

fairly to the States as already agreed upon in order to abate the opioid crisis. This case has been a

study in collaboration between broad and disparate groups with a common aim – undoing the

harm to the American people by opioids. There is nothing to justify handling additional funds

differently now.

Dated: March 7, 2022.

---

[4] The case law on which the Debtors rely to obtain approval of the Specified Payments is inapposite. In *Bethlehem*, the Debtor sought authority under sections 363(b) and 105(a) to pay the prospective professional fees and expenses of the United Steel Workers of America ("USWA") to undertake due diligence and analysis regarding the restructuring of the company, including re-negotiations of labor and benefits agreements with Debtor going forward. *Id.* at * 2. Unlike here, the USWA was "the largest constituency of unsecured creditors and the union representing most of Bethlehem's workers," the debtor's reimbursement proposal had the support of the committee and pre-petition lenders group, and the only party objecting to the proposed reimbursement was the U.S. Trustee. *Id.* at *2, *7, *11. Another important feature of the *Bethlehem* reimbursement proposal absent here is that it was subject to a specific cap on the amount to be reimbursed and circumscribed to a specific date range. *See Id.* at *1-*2 ("The reimbursement would be . . . subject to an overall cap of $1.5 million for the period commencing October 15, 2001, and ending April 15, 2002, or upon payment of $1.5 million, whichever occurs later" which cap was later reduced by the court to $1.4 million).

In *re ASARCO LLC*, 441 B.R. 813, 815 (S.D. Tex. 2010), *aff'd sub nom. In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011), in which the court authorized the debtor under section 363(b) to reimburse qualified bidders that participated in an auction of a judgment held by the debtor, is also distinguishable for a variety of reasons. First, the rationale for the reimbursement of bidder expenses was "to provide an incentive for bidders to pursue the diligence and expend the resources necessary to bid on the SCC Judgment," which is in no way akin to the Nine's settlement negotiation efforts here. *Id.* at 820. Second, like *Bethlehem*, "[t]he proposed expense reimbursement process set a cap on the total allowed reimbursements." *Id.* at 821. Third, "[t]he Debtor had obtained either no objection with deference to the Debtor's business judgment or approval by the major creditor committees," and "[t]he only objection to the process came from the [debtor's parent] entity that might have to eventually pay the judgment or deal with an outside entity that might eventually own the judgment." *Id.* at 832. Lastly, the order in *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) [ECF No. 4652] cited by the Debtors is also distinguishable because it involved a debtor's request for authority under sections 363(b) and 105(a) to pay the fees and costs of an ad hoc group of creditors in connection with that group's due diligence, analyses, negotiation, preparation, and potential obtaining of equity and other financings to support the debtor's plan, in order to cover "the associated costs and risks the Group is undertaking" in exploring such commitments. *See* [ECF No. 4217] ¶¶ 4, 6, 9. Unlike the Nine here, such ad hoc group represented a "substantial and diverse group of creditors of American," and such relief was supported by the creditors' committee. *Id.* at ¶¶ 7, 8.

Respectfully submitted:

TATE LAW GROUP, LLC
*Attorney for Claimants*
P.O. Box 9060
Savannah, Georgia 31412
(912) 234-3030
(912) 234-9700 (Fax)
Mark A. Tate

By:       /s/ Mark A. Tate, Esq.

      Mark A. Tate
      Georgia Bar No. 698820

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 7, 2022, a true and correct copy of **Claimants'**

**Objection to Motion of Debtors Pursuant to 11 U.S.C. § 105(A) and 363(B) for Entry of an**

**Order Authorizing and Approving Settlement Term Sheet** was filed electronically with the

Clerk of the Court using the CM/ECF system which in turn sent notifications of such filing to all

interested parties of record.

Dated: March 7, 2022.

Respectfully submitted:

TATE LAW GROUP, LLC
*Attorney for Claimants*
P.O. Box 9060
Savannah, Georgia 31412
(912) 234-3030
(912) 234-9700 (Fax)
Mark A. Tate

By:    _____/s/ Mark A. Tate, Esq._____

Mark A. Tate
Georgia Bar No. 698820