KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
Gerard T. Cicero
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                                                :
In re:                                                          :    Chapter 11
                                                                :
PURDUE PHARMA L.P., *et al.*,                                   :    Case No. 19-23649 (RDD)
                                                                :
                        Debtors.                                :    (Jointly Administered)
                                                                :
------------------------------------------------------------------ X

**AD HOC COMMITTEE'S LIMITED OBJECTION TO DEBTORS'**
**MOTION TO APPROVE SETTLEMENT TERM SHEET**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ........................................................................................................................... 3

A.   The Negotiation of the Allocation and Abatement-Related Provisions of the Plan ........... 3

B.   The Mediation With the Nine ............................................................................................. 5

ARGUMENT ................................................................................................................................. 6

I.   There Are Serious Legal Impediments to Approval of the Side Settlement ...................... 7

    A.   The Side Settlement Violates Section 1123(a)(4) ....................................................... 7

    i.   The Side Settlement Will Modify the Plan ................................................................. 7

    ii.  The Plan as Modified Will Not Provide Equal Treatment........................................... 9

    B.   The Side Settlement Does Not Have Requisite Ad Hoc Committee Consent............. 9

II.  The Side Settlement Should Not Be Approved Absent Appropriate Changes ................. 10

    A.   The Settlement Must Be Modified to Remedy Its Disparate Treatment ................... 10

    B.   The Consideration Provided Under the Settlement Should Be Distributed in
        Accordance With the NOAT TDP ............................................................................ 11

    C.   The Pledge of Collateral to Secure the Sacklers' Obligations to the SOAF
        Must Not Diminish or Impair the MDT's Existing Collateral Rights ...................... 11

The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**"), which consists of (i) ten States, (ii) the court-appointed Plaintiffs' Executive Committee (the "**PEC**") in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio) (iii) six counties, cities, parishes, or municipalities, and (iv) one federally recognized American Indian Tribe, hereby submits this limited objection to the motion (the "**Motion**") of the above-captioned debtors (the "**Debtors**") for entry of an order (the "**Proposed Order**") approving a term sheet (the "**Term Sheet**") reflecting a settlement (the "**Side Settlement**") among the Debtors, the Sacklers, and the Eight States and the District of Columbia (collectively, the "**Nine**") that appealed the order (the "**Confirmation Order**") confirming the Debtors' plan (the "**Plan**").

## PRELIMINARY STATEMENT

1. A settlement with the Nine and the Sacklers would result in important and welcome improvements to the Plan, both monetary and non-monetary. The Ad Hoc Committee, like every creditor constituency in the case, is supportive of continuing efforts to ensure that the Sacklers are held to account for their wrongful conduct and is pleased to see that the additional amounts they have agreed to contribute – which must be spent on abating the opioid crisis – have been increased by over one billion dollars from the amounts in the confirmed Plan. What was already a valuable settlement has been improved even more.

2. There is work to be done, however. A fundamental premise of the Motion (and, indeed, the mediation) was to reach a resolution under which "the Plan will no longer be opposed by any state in the country and no release will be imposed on any state over its objection." Motion ¶ 6. Unfortunately, that goal has not been met. As objections to the Motion make clear, there are many non-federal governmental claimants that supported the Plan but are deeply troubled by the Side Settlement. Despite warnings from the Ad Hoc Committee, the Debtors have indeed traded

a Plan opposed by the Nine for a Plan opposed by many more non-federal governmental creditors. The reason is clear: the Side Settlement discriminates against all non-federal governmental creditors other than the Nine and New Hampshire, including creditors that have worked extensively with the Debtors throughout the bankruptcy and whose efforts led in major part to the substantial sums already being contributed by the Sacklers and to confirmation of the Plan.

3.  In this respect, the Side Settlement is regrettably unique. For the first time in these cases, despite prior opportunities, a group of creditors has chosen to enrich itself at the expense of others rather than adhere to the sacrosanct principle of equality of treatment. The original supporters of the Settlement Framework, including the members of the Ad Hoc Committee, did not seek preferential treatment despite the enormous work, both pre- and post-petition, that laid the foundation for the Plan; the group formerly known as the Non-Consenting States did not do this when they negotiated important improvements to the Plan in the summer of 2021; and the Multi-State Governmental Entities Group did not do this when they folded in to the deal. The result was a confirmed plan whose extensively-negotiated allocation provisions were the subject of near-unanimous agreement – a "truly remarkable" outcome. Modified Bench Ruling at 50.

4.  The self-interested approach of the Nine has resulted in a settlement with significant flaws. Beyond the overarching issue of unfair discrimination against the non-federal governmental creditors other than the Nine, two points stand out. First, there is no requirement in the Term Sheet that the funds devoted to the newly created supplemental opioid abatement fund ("**SOAF**") to be administered by the Nine be distributed and employed in accordance with the extensively negotiated and critically important trust distribution procedures in the Plan, which were agreed to among the States, the local governments, and the Tribes. Second, the Term Sheet adversely affects the collateral package that secures the Sacklers' payment obligations to the Master Disbursement

2

Trust ("**MDT**") under the Plan. The collateralization on a *pari passu* basis of an additional $277 million in contributions (from which no creditors other than the Nine and New Hampshire benefit) substantially alters the deal that was struck in the Plan and the Shareholder Settlement Agreement.

5. The foregoing problems are correctible, and they must be fixed. The Ad Hoc Committee has consent rights over any changes to the Shareholder Settlement Agreement (*see* Plan at 37-38), and it will not consent to such changes – nor to the Side Settlement as a whole – absent appropriate modifications to address the foregoing concerns.

6. The Ad Hoc Committee brought these concerns and others to the attention of the Debtors, the Nine, and the other mediation parties from the outset, and repeatedly warned that the proposal of a discriminatory settlement would be met with opposition. The settling parties were undeterred and ultimately presented the other case parties and the Court with a *fait accompli*, asking for approval on an expedited timeline. The Ad Hoc Committee is thus faced with an untenable choice: oppose a settlement that brings significant additional sums into the estate for abatement, or accept a settlement that discriminates unfairly against the very parties whose efforts were indispensable to the success of these cases. Under the circumstances, the Ad Hoc Committee has determined that it will not ask the Court to deny approval of the Side Settlement so long as the settlement is modified in the important respects discussed herein.

## BACKGROUND

7. "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). That fundamental tenet has been scrupulously adhered to in this case by all parties – until now.

**A.   The Negotiation of the Allocation and Abatement-Related Provisions of the Plan**

8. As the Court is well aware, having heard abundant testimony on the subject at confirmation, the abatement-related provisions of the Plan were the subject of extensive and broad-

3

based negotiations among the non-federal governmental creditors. The negotiations addressed two subjects: a split of abatement funds among the States, Territories, and Tribes and the procedures that would govern the use of funds within each. Those negotiations were described in detail by the Ad Hoc Committee's confirmation witnesses, and will not be repeated in full here.[1]

9. In short, the States – including members of the Nine – spent *years* negotiating a split of abatement funds among the States and Territories, eventually settling on an agreed formula that was intended to be used not just in the Purdue case but in other opioid cases as well. Members of the Ad Hoc Committee, the Non-Consenting States, and the Multi-State Governmental Entities Group thereafter engaged in extensive discussions concerning the intra-State allocation and use of abatement funds, settling on a detailed set of trust distribution procedures (the "**NOAT TDP**"). An analogous set of procedures was agreed to by the Tribes (the "**Tribe TDP**"). What emerged from these efforts was a Plan whose allocation and abatement provisions, from the perspective of the State and local governments and Tribes, were ultimately fully consensual.[2]

10. The Court's opinion confirming the Plan aptly summarized the significance of this outcome, both for the case and in the broader context of the Bankruptcy Code:

> The states' unanimous agreement to accept their recovery in the form of money solely devoted to opioid abatement, and their nearly unanimous agreement on the allocation of that distribution among them is *truly remarkable*, and, as noted during the confirmation hearing by the Attorney General of West Virginia, likely will serve as a model for the allocation of future settlement proceeds from other opioid manufacturers and distributors among the states. *Without that agreement, the goals of the Bankruptcy Code would have been jeopardized.* Such a failure would have resulted in extensive litigation over the various states' claims, a lengthy delay in making distributions to abate the opioid crisis, and arguably a fallback to

---

[1] *See generally* Declaration of Gary A. Gotto [Dkt. No. 3443]; Declaration of John M. Guard [Dkt. No. 3446]; Declaration of Peter H. Weinberger [Dkt. No. 3449].

[2] West Virginia initially objected to the interstate allocation, but its objection was resolved.

4

> distributing the value under the plan not for abatement purposes but, rather, for general use by states and other public creditors.

Modified Bench Ruling at 50 (emphasis added).

11. The allocation and abatement-related provisions of the Plan were not only central to the overall fairness of the Plan, they were central to its very existence. As the Debtors summarized in their confirmation brief (and as evidence showed):

> There is no reason to believe the Plan Settlements, and the crucial allocation agreements among creditors, could have been reached without the Third-Party Releases and the certainty they give to creditors that their allocation agreements will not be undermined by collateral litigation. As just one example, *there is no reason to believe the carefully-crafted interstate allocation in NOAT could hold if holdout states could recover both their allocation from NOAT and whatever proceeds they could receive, if any, from litigation against the Released Parties or Shareholder Released Parties.*

Debtors' Confirmation Brief at 132 [Dkt. No. 3461] (emphasis added).

12. Throughout the entire process of Plan negotiation, no group advocated for discriminatory treatment or preferential recoveries. As Florida notes in its objection, this idea would have been repugnant to the negotiators of the Plan. What is more, there is no reason to believe the Court would ever have approved such treatment. When the Court perceived unfairness in the Plan's interstate allocation vis-à-vis West Virginia because one State was not contributing the same 1% share as all other States to the so-called intensity fund, it was quick to encourage the parties to rectify that issue – which California promptly did. *See* Modified Bench Ruling at 54.

**B.    The Mediation With the Nine**

13. When the District Court reversed confirmation of the Plan, the Court sensibly ordered the parties to mediation, in an effort to resolve the Nine's objections to the Plan (objections that notably did *not* include complaints with the Plan's allocations). At the Debtors' request, the Court also extended the existing preliminary injunction to facilitate a resolution.

5

14. The Debtors justified the extension of the preliminary injunction by reference to the public interest, writing: "It is simply not in the public interest for a litigation free-for-all to ensue where the question of who gets paid what (if anything) is determined by a race to the courthouse, rather than merit and need – *and rather than the agreed-to allocations that have already been negotiated and settled by the parties in the case*." Memorandum of Law in Support of Motion to Extend the Preliminary Injunction at 9 [Adv. Dkt. No. 305] (emphasis added).

15. Having ostensibly acted to prevent any creditor from obtaining a leg up, however, the Debtors then participated in a mediation that results in just such an unfair advantage for the Nine and that jettisons the very allocation the Debtors had touted. Of the additional consideration agreed to by the Sacklers, approximately $277 million – or roughly a quarter – is diverted to the Nine and New Hampshire, and exempted from the agreed-upon allocation and abatement provisions of the Plan.

16. Ad Hoc Committee representatives repeatedly advised the Debtors and the Nine that a discriminatory settlement with the Nine would be met with strong opposition. They repeatedly stressed the importance of subjecting any additional funds to the same abatement waterfall the parties had spent so much time and energy negotiating. But without providing the Ad Hoc Committee (or other governmental creditors) any meaningful opportunity to participate in the negotiations, the Debtors, the Nine, and the Sacklers emerged from the mediation with the very type of discriminatory settlement they had been warned to avoid.

## ARGUMENT

17. There are serious legal impediments to approval of the Side Settlement with the Nine, including those articulated in the objections filed by other parties. Perhaps more importantly, the Side Settlement is simply and fundamentally unfair. The Ad Hoc Committee therefore cannot support the settlement in its current form. At the same time, the Ad Hoc Committee acknowledges

6

the significance and value of the additional financial and non-financial consideration the Sacklers have agreed to commit.  It is deeply unfortunate that the Debtors and the Nine have determined to condition the delivery of this additional consideration on its discriminatory distribution, and the Ad Hoc Committee fervently hopes they will reconsider.  If they do not, the Ad Hoc Committee – which holds consent rights over changes to the Shareholder Settlement Agreement – will not agree to the Side Settlement absent the changes and improvements discussed herein.

I.      **There Are Serious Legal Impediments to Approval of the Side Settlement**

      A.      **The Side Settlement Violates Section 1123(a)(4)**

18.     Section 1127(b) of the Bankruptcy Code permits the post-confirmation, pre-consummation modification of a chapter 11 plan, but only if the plan as modified "meet[s] the requirements of section[] . . . 1123 of this title." 11 U.S.C. § 1127(b).  Section 1123(a)(4), in turn, requires that a plan "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4).  Here, the Side Settlement will (1) effectuate a modification to the chapter 11 plan that (2) results in unequal treatment for claims in Class 4.

           i.      **The Side Settlement Will Modify the Plan**

19.     The Motion seems careful to avoid the outright admission that the Side Settlement will modify the Plan.  The Term Sheet is only slightly more forthcoming, referring just once to "the effectiveness of the Plan *as modified by this settlement*." Term Sheet at 4 (emphasis added). Despite the Debtors' coyness, however, it is clear that the Side Settlement will modify the Plan.

20.     *First*, the Debtors freely admit that "[i]n order to implement the agreement provided for in the Term Sheet . . . the Shareholder Settlement Agreement will be revised." Motion ¶29; *see* Proposed Order ¶3 (authorizing Debtors to "revise the Shareholder Settlement Agreement"). The Shareholder Settlement Agreement is expressly made part of the Plan.  *See* Plan § 12.6 (Shareholder Settlement Agreement "is integrated with and integral to . . . the Plan");

7

Confirmation Order ¶ 57 ("All materials included in the Plan Supplement [including the Shareholder Settlement Agreement] . . . are integral to, part of, and incorporated by reference into the Plan"). Thus, a change to the Shareholder Settlement Agreement *is* a change to the Plan.

21. *Second*, the release provisions of the Plan are altered by the Term Sheet, creating a contingent exception to the third-party release that is applicable only to the Nine. In particular:

> If any payments or consideration or amounts allocated to any of the Nine under this Settlement Proposal cannot be effectuated because the Approval Order is reversed by a final order of a court of competent jurisdiction, the Sackler family members or trusts shall instead pay such consideration pursuant to one or more alternative mechanisms acceptable to each of the Nine in their sole discretion . . . .

Term Sheet at 4. This provision gives rise to a possible scenario, for instance, in which the Plan goes effective, the order approving the Side Settlement is thereafter reversed, yet the Sacklers are still required to make a side payment to the Nine *notwithstanding the third-party releases in the Plan*. No other creditor benefits from such an exception to the releases.

22. *Third*, the treatment of Class 4 creditors is altered by the Term Sheet – in both form and substance. As to form, the Plan currently provides that "any and all liability of the Debtors and the other Protected Parties" – a term that includes the Sacklers – "for any and all Non-Federal Domestic Governmental Channeled Claims" – a term that includes claims against the Sacklers – is "channeled *exclusively to* and assumed by NOAT." Plan § 4.4(b) (emphasis added). Under the Side Settlement, the Nine and New Hampshire will have recourse to the SOAF, not just "exclusively" the NOAT. As to substance, upon consummation of the Side Settlement, the Nine and New Hampshire will surrender *less* consideration under the Plan to receive the *same* treatment. That is because the Nine and New Hampshire, rather than surrendering their claims against both Purdue and the Sacklers in exchange for their "Plan treatment," will instead surrender their claims

8

against Purdue and a *portion* of their claims against the Sacklers (the remaining portion having been satisfied by the side payments).[3]

### ii. The Plan as Modified Will Not Provide Equal Treatment

23. As the foregoing discussion makes clear, not only will the Side Settlement modify the Plan, it will do so in a way that results in unequal treatment of Class 4 claimants in violation of section 1123(a)(4). The Nine and New Hampshire, and those parties alone, will receive side payments from the Sacklers; the Nine and New Hampshire, and those parties alone, will benefit from a contingent exception to the third-party releases; and the Nine and New Hampshire, and those parties alone, will benefit from changes to the Shareholder Settlement Agreement (and related collateral documents) that will provide, among other things, that the SOAF will have competing access to collateral previously pledged to the MDT.

### B. The Side Settlement Does Not Have Requisite Ad Hoc Committee Consent

24. In addition, the Side Settlement does not have requisite consent from the Ad Hoc Committee. The Side Settlement, as noted, will be implemented by way of (among other things) changes to the Shareholder Settlement Agreement. *See* Motion ¶ 29; Proposed Order ¶ 3. But the Plan provides that the Shareholder Settlement Agreement must be consistent with the Plan, consistent with the Shareholder Settlement Term Sheet, and "otherwise acceptable to the Debtors, the Creditors' Committee ***and the Governmental Consent Parties***." Plan at 37-38 (definition of

---

[3] Though it seems too clear to be disputed, both law and logic show that a plan can be amended even if its language is left unaltered. The schedule of Sacklers payments, for instance, is not in the "plan" itself, but in the Shareholder Settlement Agreement – yet no one would doubt that the substance of the Plan would be changed if those payments were postponed by 50 years (or even 5). If a settlement is fundamentally inconsistent with a plan – or indeed overrides portions of the plan – the plan is changed even if its words remain the same. *See, e.g.*, *Ad Hoc Committee of CTA Bondholders v. Continental Airlines, Inc.*, 1994 WL 828457, at *5 (D. Del. 1994) (rejecting debtors' argument that settlement of a confirmation appeal that would divert money from one class of creditors to the objecting creditors was not a plan modification, notwithstanding debtors' argument that "no provision of the [settlement] would change even one word of the Plan").

9

"Shareholder Settlement Agreement") (emphasis added); *see also* Confirmation Order ¶ 7(a) (approving Shareholder Settlement Agreement in static form, i.e., "the form most recently filed by the Debtors with the Plan Supplement as of the date hereof," and expressly stating that "any amendments thereafter . . . are *not* approved") (emphasis added). The "Governmental Consent Parties" are defined to include the Ad Hoc Committee. *See* Plan at 12. The Ad Hoc Committee has not consented to revisions to the Shareholder Settlement Agreement or related documents and will not consent absent the changes to the Side Settlement discussed below.[4]

## II. The Side Settlement Should Not Be Approved Absent Appropriate Changes

25. The foregoing objections and those raised by other creditors raise serious concerns as to the legality and fairness of the Side Settlement. As a result, the Ad Hoc Committee cannot endorse the settlement in its current form. Nevertheless, the Ad Hoc Committee will not ask the Court to deny approval of the settlement as long as it is modified in three respects: (1) to remedy its disparate treatment; (2) to ensure that funds distributed to SOAF are subject to the same allocation and use provisions as those distributed to NOAT and the Tribe Trust; and (3) to protect MDT's previously negotiated collateral rights.

### A. The Settlement Must Be Modified to Remedy Its Disparate Treatment

26. The settlement, as discussed above, is inconsistent with the terms of section 1123(a)(4) of the Bankruptcy Code. To be approved, it must first be modified, by agreement of the parties or direction of the Court, in a manner that ensures its compliance with the Bankruptcy Code. The Ad Hoc Committee – and, indeed, presumably every non-federal governmental creditor other than the Nine – firmly believes that *all* of the more than $1 billion in new settlement consideration should be distributed equitably and in accordance with the Plan. The States,

---

[4] Any "amendment, modification or supplement" to the Plan itself must also "be reasonably acceptable to the Governmental Consent Parties." Plan § 12.3(a).

10

Territories, and municipalities should receive allocated distributions consistent with those contemplated in the NOAT TDP and the Tribes should receive the 3% allocation reflected in the Plan. If the Nine believe otherwise, they should not hold approval of the Side Settlement hostage to their demands, but should instead engage with the other non-federal governmental creditors (including the Tribes) constructively in an effort to reach agreement on an allocation that would be acceptable to all and that would comply with the Bankruptcy Code.

  **B.  The Consideration Provided Under the Settlement Should Be Distributed in Accordance With the NOAT TDP**

  27.  The Plan contains detailed provisions governing the distribution and use of abatement funds within each State, as reflected in the NOAT TDP. Of the new funds to be contributed under the Side Settlement, the majority will flow through the MDT and the mechanisms of the Plan, including the NOAT TDP – but the $277 million side payment to the Nine and New Hampshire will not. This must be corrected. Leaving aside the broader question of discriminatory allocation (addressed in point A, above), it is simply inexcusable for the Nine to refuse to be governed by the distribution procedures and abatement uses that they themselves helped negotiate. The Side Settlement should not be approved unless the Nine agree that SOAF funds (if any) will be subject to the same requirements as funds distributed to NOAT.

  **C.  The Pledge of Collateral to Secure the Sacklers' Obligations to the SOAF Must Not Diminish or Impair the MDT's Existing Collateral Rights**

  28.  As the Court knows, a persistent concern of the creditors in these cases was how to secure the Sacklers' obligations under the Plan. The creditors could not have agreed to a settlement contemplating payments over ten years without being assured of the Sacklers' ability to perform. As the Debtors' witness testified at confirmation, the "settlement terms relating to credit support, remedies, and releases . . . were of paramount importance to the Debtors and their creditors." Declaration of John Dubel ¶ 46 [Dkt. No. 3433].

29. The Side Settlement contemplates a fundamental change to the risk the creditors agreed to accept, proposing that the Sacklers' $277 million in additional obligations to the newly-created SOAF (into which the Nine's side payments will be distributed) be secured on a *pari passu* basis by the same collateral securing the Sacklers' obligations to the MDT. *See* Motion ¶ 29; Term Sheet at 1. The Ad Hoc Committee cannot consent to this riskier treatment. The settlement must be modified to make clear that enforcement of rights against the collateral (i) will be controlled by the MDT, and (ii) does not change the waterfall of payments to the MDT and SOAF in any given year. Absent the latter change, the largely later-year payments to the SOAF might inappropriately compete with the earlier payments to the MDT. The Ad Hoc Committee is working with the Debtors, the Sacklers, the Nine, and the Creditors' Committee to address this issue, and will not consent to changes to the Shareholder Settlement Agreement without a resolution. In the meantime, the Proposed Order should be amended to make clear that any changes to the Shareholder Settlement Agreement are conditioned on the Ad Hoc Committee's consent.

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests that the proposed relief be granted only if the modifications proposed herein are implemented.

Dated: March 8, 2022

Respectfully submitted,

/s/ *Kenneth H. Eckstein*
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Email: keckstein@kramerlevin.com
rringer@kramerlevin.com
dblabey@kramerlevin.com

David J. Molton
Steven D. Pohl
Gerard T. Cicero
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
       spohl@brownrudnick.com
       gcicero@brownrudnick.com

Scott D. Gilbert (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
GILBERT LLP
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200
Email: gilberts@gilberlegal.com
       quinnk@gilbertlegal.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
       jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*