Sander L. Esserman, Esq.
Peter C. D'Apice, Esq.
STUTZMAN, BROMBERG, ESSERMAN &
  PLIFKA, A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Tel:    214-969-4900
Fax:    214-969-4999
esserman@sbep-law.com
dapice@sbep-law.com
*Attorneys for the Tribal Leadership Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649(RDD) |
| Debtors. [1] | (Jointly Administered) |

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET**

The court-appointed Tribal Leadership Committee (the "TLC") in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, Case No. 17-md-02804 (N.D. Ohio) hereby objects to the *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and 363(b) for Entry of an Order Authorizing and Approving Settlement Term Sheet* [ECF No. 4410], and states as follows in support of its objection:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

171716-1

**PRELIMINARY STATEMENT**

Hundreds of Federally Recognized Indian Tribes suffering billions of dollars in aggregate losses and future abatement expenses caused by Purdue, the Sacklers, and other defendants in opioid litigation, voted overwhelmingly to approve a Plan designed to ensure a fair and equitable allocation to Tribes of the funds to be received by all non-federal governmental creditors collectively. The lynchpin of this guarantee is the creation of the Master Disbursement Trust (the "MDT") and the Tribal Abatement Fund Trust (the "TAFT"), the entities which serve as vehicles for the recoveries to the Tribes collectively, and then to Tribal governments individually, for approved abatement uses. These provisions of the Plan were heavily negotiated by the States and the Tribes, were agreed to by the States, and were voted on (and overwhelmingly approved) by the Tribes. Under these provisions, the Tribes receive an allocation of approximately 3% of *all* funds to be paid to the States.

As drafted, the Term Sheet deprives Tribes of the benefits of this bargain. Unless *all* new money is put through the MDT (as the current Plan requires), the Tribes do not receive their bargained-for allocation. By shunting approximately $277 million dollars to a select group of States through the Supplemental Opioid Abatement Fund ("SOAF") instead of through the MDT, these funds circumvent the MDT-TAFT waterfall and deprive the Tribes of their agreed-upon share of these funds. This structured evasion violates the bargain negotiated by the Tribes to receive an allocated share of all money going to the States, is therefore a materially adverse change to Tribes, and accordingly demands reformation of the Term Sheet to comply with the Plan.

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page 2**

171716-1

## BACKGROUND

1. On September 15, 2019 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Shortly before the Petition Date, following months of hard-fought and arms'-length negotiations among Purdue, the Sacklers, certain U.S. States' Attorneys General and the PEC, on behalf of its thousands of litigating local governments, cities, counties and Federally Recognized Indian Tribes, the parties reached agreement on the framework for a comprehensive settlement – the "Settlement Framework" – under which Purdue would file for bankruptcy and the Sacklers would relinquish their equity interests in Purdue, sell their foreign pharmaceutical businesses, and make a multi-billion-dollar payment to the Debtors' estates, in exchange for a global resolution of their civil liabilities related to Purdue's marketing, manufacture, and sale of opioids.

2. The Ad Hoc Committee, which is comprised of ten (10) States through their Attorneys General, six (6) local governments from across the nation, the Plaintiffs' Executive Committee from MDL-2804 (PEC) and one (1) Federally Recognized Indian Tribe, was formed to represent the interests of the supporting governmental creditors in the bankruptcy case and to serve as an organized group with whom other case parties, including those not yet supporting the settlement, could negotiate and document settlements, credit support documents, exit facilities and distribution procedures to ensure a value and abatement maximizing conclusion to the bankruptcy cases. The Ad Hoc Committee, along with the other governmental claimants including the Multi-State Governmental Entities Group (the "MSGE") and the Non-Consenting States, were given wide latitude to negotiate the creation of the procedures for distributing abatement funds and the programs and strategies for which those funds are to be deployed.

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  3**

171716-1

3.  From the initial filing of these bankruptcy cases, there was broad consensus that abatement should be the primary focus of any chapter 11 plan, and that distributions to non-federal governmental claimants should be devoted to abatement. There was similar agreement that it was the governmental claimants themselves, and not the Debtors, that should be charged with responsibility for deploying funds for abatement. All parties and the Court were keenly aware of public and academic criticisms of previous largescale state-led public health settlements. And the governments, here, charged themselves with developing settlements and procedures that rectify those issues by committing, among other things, that: (1) other than some de minimis exceptions, all settlements funds will be directed towards Court-approved abatement uses – and not for slush funds or for general treasury purposes; and (2) all settlement funds should be split equitably by agreement among the various governmental entities – including the Tribes -- based on public health data and modeling for use and delivery within their boundaries. The touch-stone of these agreements -- heavily-negotiated and agreed to by every state (including the Nine) -- was the establishment of the hub-and-spoke distribution scheme where the non-federal governments would receive recoveries from the Debtors' estates and from the Sacklers solely through the MDT and then distribute those funds from the MDT to the National Opioid Abatement Trust (NOAT) (for the States and their localities), and to the TAFT (for the Tribes) pursuant to agreed-upon waterfalls.

## THE ALLOCATION OF ABATEMENT FUNDS

4.  As the Court is well aware, there were a series of negotiations that resolved how funds would be allocated among all of the non-federal governments. One negotiation established the internal allocation of funds among the various States and territories. Another negotiation established the allocation of funds within each State between the State and its local governments. But there was a third, equally important negotiation, overseen by mediators Judge Layn Phillips

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  4**

171716-1

and Kenneth Feinberg, to resolve the allocation of non-federal governmental settlement funds between the States and local governments, on the one hand, and the Tribes, on the other. Over several months, representatives of the States and the PEC negotiated with the TLC (representing all of the Federally Recognized Tribes), to resolve on a final basis this allocation between sovereigns.

5. This negotiation in the summer of 2020 was grounded on the recognition that Tribal governments are separate sovereigns, not creations of State or local governments, with the obligation to provide health care and abatement services to their own citizens in Tribal communities. As a result of this negotiation, the parties agreed that of all funds going to State and local governments collectively, the Tribes would collectively receive an allocation of approximately 3%. This hard-fought negotiated agreement is memorialized in sec. 5.2(e)(iii) of the Plan, which provides for a split of funds coming out of the MDT, with approximately 3% going to the TAFT and the remaining 97% to the NOAT.[2] This agreement recognized the agency and sovereignty of Tribes to deploy funds for abatement consistent with their sovereign goals and the distinct cultural and epidemiological needs of Tribal communities. The Term Sheet, as drafted, obviates this agreement by routing funds to some States through the SOAF instead of through the MDT, thereby evading payment of the allocated share of those funds that should be received by the Tribes. This evasion is a material change to the Plan that obviates the basis on which Tribes voted on the Plan.

---

[2] The Tribes receive a share of Top Co. funds as well, pursuant to the same allocation formula. That portion of the allocation is not impacted by the Term Sheet.

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page 5**

## PLAN AND CONFIRMATION

6. On September 17, 2021, this Court entered its Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "Confirmation Order") [ECF No. 3787], confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "Plan") [ECF No. 3726].

7. The Confirmation Order, among other things, approved the agreement (the "Sackler Settlement") reached by the Sackler Family and the Debtors' creditors which provided for the Sackler's payment of $4.325 billion to the Debtors' estate to be distributed pursuant to the terms of the Plan. In exchange for the settlement payment, the Sacklers were to receive non-consensual releases of third-party claims against them.

8. The Nine objecting States, among other parties, appealed the Confirmation Order. On December 16, 2021, the United States District Court for the Southern District of New York, entered its *Decision and Order on Appeal* (the "Appellate Order") [District Court ECF No 279], which vacated the Confirmation Order. Specifically, the District Court held that the Bankruptcy Code does not authorize the releases provided to the Sacklers in section 10.7 of the Plan, and therefore, the Plan as currently constituted cannot be confirmed.

9. The Appellate Order was subsequently appealed to the Second Circuit and various parties are in the process of preparing and filing briefs (the "Second Circuit Appeal").

## THE TERM SHEET

10. Following the entry of the Appellate Order, this Court ordered the Sacklers, the Debtors and the Nine to mediation. Following two months of confidential negotiations, which did not include, in any meaningful way, the TLC, the AHC or the other major governmental

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
 OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  6**

171716-1

constituencies in this case, the Sacklers, the Debtors and the Nine agreed to the Term Sheet. The Term Sheet contravenes the Plan and the principles that fostered agreement among the State, local and Tribal governments in the first instance. Instead, it provides for a payment to the Nine (plus New Hampshire) of an extra $276,888,888.87, untethered to the Plan's agreed-to Tribal waterfall which allocates approximately 3% of all non-federal governmental funds for the Tribes.

11. That provision in the Term Sheet contravenes the agreement reached between the States and the Tribes by evading the Tribal waterfall agreement, and the Term Sheet cannot be approved unless amended to cure that defect and provide the Tribes with the share of State funds that the Tribes are entitled to receive under the terms of the agreement reached between the States and the Tribes, as embodied in the Plan.

## OBJECTION

### I. The Term Sheet Is A Material Change to the Plan and Must Be Amended to Align With the Treatment of the Tribes in the Plan.

12. Bankruptcy Code section 1127(b), in relevant part, provides the following: "(b) the proponent of a plan . . . may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title . . . (c) the proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified . . . (d) any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection." 11 U.S.C. § 1127.

13. Bankruptcy Rule 3019 also addresses how to view votes already cast on a pre-amended Plan when an amendment is proposed and provides: "[a]fter a plan has been accepted *and before its confirmation*, the proponent may file a modification of the plan. If the court finds

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  7**

171716-1

after hearing on notice to the trustee, any committee appointed under the Code and any other entity designated by the court that the ***proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification***, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan." Federal Rules of Bankruptcy Procedure Rule 3019 (emphasis added).

14.     Notably, Rule 3019's "adverse change" standard is not included in Section 1127(b)-(d), and Rule 3019 is facially unavailable to the Debtors or the nine (plus New Hampshire), because the proposed modification through the Term Sheet is being proposed months after the Plan's confirmation.[3]  Even assuming, *arguendo*, that Bankruptcy Rule 3019 did apply, modifications that adversely impact the interests of creditors must adequately disclosed and resolicited. *See In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1023 (Bankr. D.Col. 1988) ("This court does not agree with such an expansive reading of B.R. 3019.  The Court notes that subsection (f) of Section 1127, as proposed in the original Senate bill, provided that a proponent of a modification to a plan did not have to resolicit unless the court found the modification made a 'materially' adverse change in the treatment of the creditors . . . the language included in the Senate bill was not enacted.  Both the change in the legislative proposal and the express language of B.R. 3019 indicate that the Court should not disenfranchise creditors from having an opportunity to vote on plan modifications based on the degree of the hurt."). As described herein and below, the Term Sheet's plan amendment does adversely impact the interests of creditors.

---

[3]     Here, the Plan was confirmed, invalidated on appeal, but is subject to further appeal in the Second Circuit Appeal.  Therefore, this Court, if it has jurisdiction, and it may not, *see* State of Florida's Objection [ECF No. []], must view this modification under the lens of Bankruptcy Code section 1127, where a Plan has been confirmed, but not yet substantially consummated.

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
 OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  8**

15. The Term Sheet changes the core tenets of the Plan that Tribes relied on in casting their vote. The fundamental bargain offered in the Plan to Tribes is that they would receive approximately 3% of all non-federal governmental recoveries for use for abatement purposes in Tribal communities as deemed best by each Tribal government in accordance with the TAFT TDP. The Term Sheet ignores that fundamental agreement. It provides that hundreds of millions of dollars are diverted away from the MDT-to-TAFT waterfall, and instead delivered directly to the Nine objecting States (and New Hampshire), thus depriving Tribes of their hard-fought negotiated portion of all funds received by non-federal governments. Because funding of the SOAF does not flow through the MDT-TAFT waterfall, absent amendment, it denies the Tribes of their approximately 3% allocated share of this portion of the non-federal governmental funds. The adverse impact on Tribes is the undeniable result.

16. The Debtors will argue that the Term Sheet simply provides enhanced treatment to all creditors and that the objectors to the Term Sheet are crying crocodile tears. This argument is disingenuous – the adverse impact of the Term Sheet on the Tribes is apparent because the Term Sheet is a marked departure from the fundamental principle the Plan was negotiated and voted on with regard to treatment of the Tribes. It further sets a dangerous precedent as the States and Tribes move forward with the remainder of this litigation.

17. To cure this flaw in the Term Sheet, the Court should require that all new settlement funds be delivered through the Plan's existing and agreed-to waterfalls, so that the Tribes receive the benefit of their bargain of approximately 3% of all non-federal governmental recoveries. Requiring this amendment to the Term Sheet will align the Term Sheet with the Plan that garnered widespread support of the Tribes, and accordingly would not, in the view of the TLC require re-solicitation.

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
 OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page  9**

171716-1

# CONCLUSION

18. The TLC supports the additional funds from the Sacklers going to governments across the country. However, an 11th hour settlement cannot be allowed to unravel years of hard-work and consensus building that formed the basis of the Tribes' vote on the Plan. The Term Sheet must be amended to expressly include the protection included in the Plan for the benefit of the Tribes, *i.e.,* the right of the Tribes to receive a 3% allocation of *all* funds being paid to State and local governments.

Dated: March 8, 2022

Respectfully submitted

STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, A PROFESSIONAL CORPORATION

By: */s/ Sander L. Esserman*
Sander L. Esserman (admitted *pro hac vice*)
State Bar No. 06671500
Peter C. D'Apice
State Bar No. 05377783
2323 Bryan Street, Suite 2200
Dallas, Texas 75201-2689
(214) 969-4986
(214) 969-4999 (facsimile)
esserman@sbep-law.com
dapice@sbep-law.com

Steven J. Skikos
Jane E. Joseph
SKIKOS, CRAWFORD, SKIKOS & JOSEPH LLP
One Sansome Street, Suite 2830
San Francisco, CA 94104
Telephone: (415) 546-7300
sskikos@skikos.com
jjoseph@skikos.com

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page 10**

171716-1

T. Roe Frazer II
Frazer PLC
30 Burton Hills Blvd.
Suite 450
Nashville TN 37215
Telephone: (615) 647-6464
roe@frazer.law

Geoffrey D. Strommer
Caroline P. Mayhew
HOBBS, STRAUS, DEAN & WALKER LLP
215 SW Washington Street
Suite 200
Portland, OR 97204
Telephone: (503) 242-1745
gstrommer@hobbsstraus.com
cmayhew@hobbsstraus.com

Tara D. Sutton
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
TSutton@RobinsKaplan.com

Donald J. Simon
Lloyd B. Miller
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-0240
dsimon@sonosky.com
lloyd@sonosky.net

**ATTORNEYS FOR THE TRIBAL
LEADERSHIP COMMITTEE**

**TRIBAL LEADERSHIP COMMITTEE'S OBJECTION TO MOTION
OF DEBTORS PURSUANT TO 11 U.S.C. § 105(A) AND 363(B) FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING SETTLEMENT TERM SHEET – Page 11**

171716-1

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 8, 2022, he caused a true and correct copy of the foregoing *The Tribal Leadership Committee's Objection to Motion of Debtors Pursuant to 11 U.S.C. § 105(A) and 363(B) for Entry of an Order Authorizing and Approving Settlement Term Sheet* to be duly served upon (i) all counsel or parties of record by the Court's ECF notification system, (ii) by email upon the parties set forth in the Master Service List as of March 8, 2022, as maintained by Prime Clerk, and (iii) served by Federal Express, Priority Overnight on the following:

    Judge Robert D. Drain
    United States Bankruptcy Court
    Southern District of New York
    300 Quarropas Street
    White Plains, NY 10601-4140

    Paul Schwartzberg
    Office of the United States Trustee
    U.S. Federal Office Bldg.
    201 Varick Street, Suite 1006
    New York, NY 10014

    */s/ Peter D'Apice*
    Peter D'Apice

171716-1